**THE ROSEN LAW FIRM, P.A.**
Phillip Kim, Esq. (PK 9384)
Laurence M. Rosen, Esq. (LR 5733)
275 Madison Avenue, 34th Floor
New York, New York 10016
Telephone: (212) 686-1060
Fax: (212) 202-3827
Email: lrosen@rosenlegal.com
Email: pkim@rosenlegal.com

Counsel for Plaintiff

**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| TONY KHOURY, INDIVIDUALLY AND ON BEHALF OF ALL OTHERS SIMILARLY SITUATED,<br><br>Plaintiff,<br><br>v.<br><br>FXCM INC., DROR NIV, and ROBERT LANDE,<br><br>Defendants. | Case No.<br><br>**CLASS ACTION COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS**<br><br>**JURY TRIAL DEMANDED** |

Plaintiff Tony Khoury ("Plaintiff"), individually and on behalf of all other persons similarly situated, by Plaintiff's undersigned attorneys, for Plaintiff's complaint against Defendants (defined below), alleges the following based upon personal knowledge as to Plaintiff and Plaintiff's own acts, and upon information and belief as to all other matters based on the investigation conducted by and through Plaintiff's attorneys, which included, among other things, a review of Securities and Exchange Commission ("SEC") filings by FXCM Inc. ("FXCM or the "Company"), as well as media and analyst reports about the Company. Plaintiff believes that substantial evidentiary support will exist for the allegations set forth herein after a reasonable opportunity for discovery.

1

## NATURE OF THE ACTION

1. This is a federal securities class action on behalf of a class consisting of all persons and entities, other than Defendants and their affiliates, who purchased or otherwise acquired publicly traded FXCM securities between March 15, 2012 and February 6, 2017, both dates inclusive (the "Class Period"). Plaintiff seeks to recover compensable damages caused by Defendants' violations of federal securities laws and pursue remedies under the Securities Exchange Act of 1934 (the "Exchange Act") and Rule 10b-5 promulgated thereunder.

## JURISDICTION AND VENUE

2. The claims asserted herein arise under and pursuant to Sections 10(b) and 20(a) of the Exchange Act (15 U.S.C. §§ 78j(b) and 78t(a)) and Rule 10b-5 promulgated thereunder (17 C.F.R. § 240.10b-5).

3. This Court has jurisdiction over the subject matter of this action pursuant to Section 27 of the Exchange Act (15 U.S.C. § 78aa) and 28 U.S.C. § 1331.

4. Venue is proper in this judicial district pursuant to Section 27 of the Exchange Act (15 U.S.C. § 78aa) and 28 U.S.C. § 1391(b) as Defendants conduct business in this judicial district and the Company is headquartered in this judicial district.

5. In connection with the acts, conduct and other wrongs alleged herein, Defendants either directly or indirectly used the means and instrumentalities of interstate commerce, including but not limited to the United States mails, interstate telephone communications, and the facilities of the national securities exchange.

**PARTIES**

6. Plaintiff as set forth in the attached PSLRA Certification, acquired FXCM securities at artificially inflated prices during the Class Period and was damaged upon the revelation of the alleged corrective disclosures.

7. Defendant FXCM is a Delaware Corporation headquartered in New York, New York, which provides online foreign exchange (FX) trading and related services to retail and institutional customers worldwide through its subsidiaries. The Company's stock was traded on the New York Stock Exchange ("NYSE") from the beginning of the Class Period through September 23, 2016. Since September 26, 2016, the Company's securities trade on the NASDAQ under the symbol "FXCM."

8. Defendant Dror Niv ("Niv") has been the Company's Director and Chief Executive Officer at all relevant times.

9. Defendant Robert Lande ("Lande") has been the Company's Chief Financial Officer at all relevant times.

10. Collectively, Defendants Niv and Lande are referred to herein as "Individual Defendants."

11. Collectively, Defendant FXCM and Individual Defendants are herein referred to as "Defendants."

12. Each of the Individual Defendants:

   a. directly participated in the management of the Company;

   b. was directly involved in the day-to-day operations of the Company at the highest levels;

  c. was privy to confidential proprietary information concerning the Company and its business and operations;

  d. was directly or indirectly involved in drafting, producing, reviewing and/or disseminating the false and misleading statements and information alleged herein;

  e. was directly or indirectly involved in the oversight or implementation of the Company's internal controls;

  f. was aware of or recklessly disregarded the fact that the false and misleading statements were being issued concerning the Company; and/or

  g. approved or ratified these statements in violation of the federal securities laws.

13. FXCM is liable for the acts of the Individual Defendants and its employees under the doctrine of *respondeat superior* and common law principles of agency as all of the wrongful acts complained of herein were carried out within the scope of their employment with authorization.

14. The scienter of the Individual Defendants and other employees and agents of the Company is similarly imputed to FXCM under *respondeat superior* and agency principles.

## SUBSTANTIVE ALLEGATIONS

### Background

15. FXCM's sole asset is an equity interest in FXCM Holdings, LLC, of which FXCM is the sole managing member.

16. Forex Capital Markets LLC is the U.S. subsidiary of FXCM Holdings, LLC.

4

17.     FXCM's offered its retail clients No Dealing Desk (NDD) execution. Under this execution model, FXCM purportedly gave its retail clients access to buy and sell prices streamed directly from over a dozen liquidity providers anonymously so that its retail clients orders were invisible to these price providers. This supposedly resulted in an environment free of price manipulation.

**Defendants' False and Misleading Class Period Statements**

18.     On March 15, 2012, the Company filed an annual report on Form 10-K with the SEC announcing the Company's financial and operating results for the fiscal year ended December 31, 2011 (the "2011 10-K"). The 2011 10-K was signed by Defendants Niv and Lande. The 2011 10-K contained signed certifications pursuant to the Sarbanes-Oxley Act of 2002 ("SOX") by Defendants Niv and Lande attesting to the accuracy of financial reporting, the disclosure of any material changes to the Company's internal control over financial reporting and the disclosure of all fraud.

19.     The 2011 10-K touted the Company's agency model, which purportedly aligned its interests with those of its customers, stating in relevant part:

> ***Our agency model is fundamental to our core business philosophy because we believe that it aligns our interests with those of our customer****s, reduces our risks and provides distinct advantages over the principal model used by the majority of retail FX brokers. **In the principal model, the retail FX broker sets the price it presents to the customer and may maintain its trading position if it believes the price may move in its favor and against the customer. We believe this creates an inherent conflict between the interests of the customer and those of the principal model broker.*** Principal model brokers' revenues typically consist primarily of trading gains or losses and are more affected by market volatility than those of brokers utilizing the agency model.
>
> (Emphasis added).

20.     On March 18, 2013, the Company filed an annual report on Form 10-K with the SEC announcing the Company's financial and operating results for the fiscal year ended

5

December 31, 2012 (the "2012 10-K"). The 2012 10-K was signed by Defendants Niv and Lande. The 2012 10-K contained signed SOX certifications by Defendants Niv and Lande attesting to the accuracy of financial reporting, the disclosure of any material changes to the Company's internal control over financial reporting and the disclosure of all fraud.

21.     The 2012 10-K touted the Company's agency model, which purportedly aligned its interests with those of its customers, stating in relevant part:

> ***We primarily offer our customers what is referred to as an agency model to execute their trades. Our agency model is fundamental to our core business philosophy because we believe that it aligns our interests with those of our customers*** and reduces our risks. In the agency model, when our customer executes a trade on the best price quotation offered by our FX market makers, we act as a credit intermediary, or riskless principal, simultaneously entering into offsetting trades with both the customer and the FX market maker. We earn trading fees and commissions by adding a markup to the price provided by the FX market makers and generate our trading revenues based on the volume of transactions and the spread earned on transactions.

(Emphasis added).

22.     On March 17, 2014, the Company filed an annual report on Form 10-K with the SEC announcing the Company's financial and operating results for the fiscal year ended December 31, 2013 (the "2013 10-K"). The 2013 10-K was signed by Defendants Niv and Lande. The 2013 10-K contained signed SOX certifications by Defendants Niv and Lande attesting to the accuracy of financial reporting, the disclosure of any material changes to the Company's internal control over financial reporting and the disclosure of all fraud.

23.     The 2013 10-K touted the Company's agency model, which purportedly aligned its interests with those of its customers, stating in relevant part:

> ***We primarily offer our customers what is referred to as an agency model to execute their trades. Our agency model is fundamental to our core business philosophy because we believe that it aligns our interests with those of our customers*** and reduces our risks. In the agency model, when our customer executes a trade on the best price quotation offered by our FX market makers, we

act as a credit intermediary, or riskless principal, simultaneously entering into offsetting trades with both the customer and the FX market maker. We earn trading fees and commissions by adding a markup to the price provided by the FX market makers.

(Emphasis added).

24. On March 16, 2015, the Company filed an annual report on Form 10-K with the SEC announcing the Company's financial and operating results for the fiscal year ended December 31, 2012 (the "2014 10-K"). The 2014 10-K was signed by Defendants Niv and Lande. The 2014 10-K contained signed SOX certifications by Defendants Niv and Lande attesting to the accuracy of financial reporting, the disclosure of any material changes to the Company's internal control over financial reporting and the disclosure of all fraud.

25. The 2014 10-K touted the Company's agency model, which purportedly aligned its interests with those of its customers, stating in relevant part:

> ***We primarily offer our customers what is referred to as an agency model to execute their trades. Our agency model is fundamental to our core business philosophy because we believe that it aligns our interests with those of our customers*** and reduces our risks. In the agency model, when our customer executes a trade on the best price quotation offered by our FX market makers, we act as a credit intermediary, or riskless principal, simultaneously entering into offsetting trades with both the customer and the FX market maker. This agency model has the effect of automatically hedging our positions and eliminating market risk exposure. Generally, we earn trading fees through commissions or by adding a markup to the price provided by the FX market makers. In certain geographic locations, we provide our customers with the price provided by the FX market makers and display trading fees and commissions separately.

(Emphasis added).

26. On March 11, 2016, the Company filed an annual report on Form 10-K with the SEC announcing the Company's financial and operating results for the fiscal year ended December 31, 2015 (the "2015 10-K"). The 2015 10-K was signed by Defendants Niv and Lande. The 2015 10-K contained signed SOX certifications by Defendants Niv and Lande

7

attesting to the accuracy of financial reporting, the disclosure of any material changes to the Company's internal control over financial reporting and the disclosure of all fraud.

27. The 2015 10-K touted the Company's agency model, which purportedly aligned its interests with those of its customers, stating in relevant part:

> ***We primarily offer our customers what is referred to as an agency model to execute their trades. Our agency model is fundamental to our core business philosophy because we believe that it aligns our interests with those of our customers*** and reduces our risks. In the agency model, when our customer executes a trade on the best price quotation offered by our FX market makers, we act as a credit intermediary, or riskless principal, simultaneously entering into offsetting trades with both the customer and the FX market maker. This agency model has the effect of automatically hedging our positions and eliminating market risk exposure. Beginning in 2015, we began to offer a dealing desk, or principal, execution model to smaller retail clients. Under the dealing desk model, we maintain our trading position and do not offset the trade with another party on a one for one basis. CFDs are primarily a dealing desk offering. By combining smaller positions and trading them out on an aggregate basis, we are able to optimize revenues from accounts that are less actively traded. Generally, under both models, we earn trading fees through commissions or by adding a markup to the price provided by the FX market makers. In certain geographic locations, we provide our customers with the price provided by the FX market makers and display trading fees and commissions separately. Revenues earned under the dealing desk model also include our realized and unrealized foreign currency trading gains or losses on our positions with customers.

(Emphasis added).

28. The 2015 10-K also stated the following with regards to its No Dealing Desk execution:

Standard

> ***With an FXCM Standard account, a client has access to 24/7 support, No Dealing Desk execution, and free access to DailyFX plus***. The Standard account offers Electronic Communication Network ("ECN")-style low commission pricing similar to stocks. Standard accounts have a $2,000 minimum.

(Emphasis added).

8

29. The statements referenced in ¶¶ 18-28 above were materially false and/or misleading because they misinterpreted and failed to disclose the following adverse facts pertaining to the Company's business and operations which were known to Defendants or recklessly disregarded by them. Specifically, Defendants made false and/or misleading statements and/or failed to disclose that: (1) between September 4, 2009 through at least 2014, FXCM's U.S. subsidiary engaged in false and misleading solicitations of its retail foreign exchange customers by concealing its relationship with its most important market maker and by misrepresenting that its "No Dealing Desk" platform had no conflicts of interest with its customers; (2) FXCM's U.S. subsidiary made false statements to the National Futures Association about its relationship with the market maker; and (3) as a result, Defendants' statements about FXCM's business, operations and prospects were materially false and misleading and/or lacked a reasonable basis at all relevant times.

### The Truth Emerges

30. On February 6, 2017, the U.S. Commodity Futures Trading Commission announced that it banned the Company from operating in the U.S. after finding that FXCM was taking positions opposite its retail customers, stating in part:

RELEASE: pr7528-17

February 6, 2017

**CFTC Orders Forex Capital Markets, LLC (FXCM), Its Parent Company, FXCM Holdings, LLC and FXCM's Founding Partners, Dror Niv and William Ahdout, to Pay a $7 Million Penalty for FXCM's Defrauding of Retail Forex Customers**

**FXCM, Niv, and Ahdout are Prohibited from Registering with the CFTC, Acting in Exempt Capacities or Acting as Principals, Agents, Officers or Employees of Registrants**

**CFTC's Order also holds FXCM, Niv, and FXCM Holdings responsible for FXCM's False Statements to the National Futures Association**

Washington, DC – The U.S. Commodity Futures Trading Commission (CFTC) today issued an Order filing and settling charges against **Forex Capital Markets, LLC (FXCM)**, its parent company, **FXCM Holdings, LLC** (FXCM Holdings), and two founding partners, **Dror ("Drew") Niv**, and **William Ahdout**, who were, respectively, Chief Executive Officer of FXCM and Managing Director of FXCM, (collectively, Respondents). FXCM's principal place of business is New York, New York; Niv resides in Connecticut; and Ahdout resides in New York.

*The CFTC Order finds that, between September 4, 2009 though at least 2014 (the Relevant Period), FXCM engaged in false and misleading solicitations of FXCM's retail foreign exchange (forex) customers by concealing its relationship with its most important market maker and by misrepresenting that its "No Dealing Desk" platform had no conflicts of interest with its customers. The Order finds FXCM, FXCM Holdings, and Niv responsible for FXCM making false statements to the National Futures Association (NFA) about its relationship with the market maker.*

The Order requires Respondents jointly and severally to pay a $7 million civil monetary penalty and to cease and desist from further violations of the Commodity Exchange Act and CFTC Regulations, as charged. FXCM, Niv, and Ahdout agree to withdraw from CFTC registration; never to seek to register with the CFTC; and never to act in any capacity requiring registration or exemption from registration, or act as a principal, agent, officer, or employee of any person that is registered, required to be registered, or exempted from registration with the CFTC.

**"The CFTC Is Committed to Protecting Customers from Harm in the Markets It Regulates"**

"Full and truthful disclosure to customers and honest discourse with self-regulatory organizations such as NFA are vital to the integrity and oversight of our markets," said Gretchen L. Lowe, Principal Deputy Director and Chief Counsel of the CFTC's Division of Enforcement. "Today's action's demonstrates that the CFTC is committed to protecting customers from harm in the markets it regulates."

FXCM is registered with the CFTC as a Futures Commission Merchant and Retail Foreign Exchange Dealer. FXCM has been providing retail customers with access to over-the-counter forex markets through a proprietary technology platform and has acted as counterparty in transactions with its retail customers in which customers can buy one currency and simultaneously sell another. Both Niv and Ahdout were CFTC registrants during the relevant period.

FXCM, under Niv's and Ahdout's direction and control, misrepresented to its retail forex customers that when they traded forex on FXCM's No Dealing Desk platform, FXCM would have no conflict of interest, the Order finds. In addition, according to FXCM's marketing campaign, retail customers' profits or losses would have no impact on FXCM's bottom line, because FXCM's role in the customers' trades was merely that of a credit intermediary, the Order finds. FXCM further represented that the risk would be borne by banks and other independent "market makers" that provided liquidity to the platform, according to the Order.

**FXCM's Undisclosed Interest**

*Contrary to these representations, the Order finds, FXCM had an undisclosed interest in the market maker that consistently "won" the largest share of FXCM's trading volume – and thus was taking positions opposite FXCM's retail customers.* FXCM, the Order finds, formulated a plan in 2009 to create an algorithmic trading system, using an FXCM computer program that could make markets to FXCM's customers, and thereby either replace or compete with the independent market makers on FXCM's "No Dealing Desk" platform. Although FXCM eventually spun off the algorithmic trading system as a new company, in actuality the company remained closely aligned with FXCM, according to the Order. This market maker received special trading privileges, benefitted from a no-interest loan provided by FXCM, worked out of FXCM's offices, and used FXCM employees to conduct its business, the Order further finds.

The Order finds that FXCM and the market maker agreed that the market maker would rebate to FXCM approximately 70 percent of its revenue from trading on FXCM's retail forex platform. In total, through monthly payments from 2010 through 2014, the company rebated to FXCM approximately $77 million of the revenue it achieved. However, FXCM did not disclose to customers, among other things, that this company – FXCM's principal market maker – was a startup firm spun off from FXCM, the Order further finds.

**False Statements to the NFA**

*The Order also finds that FXCM willfully made false statements to NFA in order to conceal FXCM's role in the creation of its principal market maker as well as the fact that the market maker's owner had been an FXCM employee and managing director. The Order finds that during a meeting between NFA compliance staff and FXCM executives, Niv omitted to mention to NFA the details of FXCM's relationship with the market maker.*

*The Order holds Niv and Ahdout liable for FXCM's fraud violations as "controlling persons" who were responsible, directly or indirectly, for FXCM's violations. Niv is also held liable for FXCM's false statements to NFA as a controlling person who was responsible directly or indirectly for those*

11

*violations. FXCM Holdings is held liable for FXCM's fraud and false statement violations as principal of FXCM, the Order also finds.*

The CFTC thanks NFA for its assistance in this matter.

CFTC Division of Enforcement staff members responsible for this action are Christopher Giglio, Patrick Daly, David C. Newman, Xavier Romeu-Matta, K. Brent Tomer, Lenel Hickson, Jr., and Manal M. Sultan.

Media Contact
Dennis Holden
202-418-5088

(Emphasis added).

31. On this news, shares of the Company fell $3.40 per share or over 49% from its previously closing price to close at $3.45 per share on February 7, 2017, damaging investors.

32. As a result of Defendants' wrongful acts and omissions, and the precipitous decline in the market value of the Company's common shares, Plaintiff and other Class members have suffered significant losses and damages.

## PLAINTIFF'S CLASS ACTION ALLEGATIONS

33. Plaintiff brings this action as a class action pursuant to Federal Rule of Civil Procedure 23(a) and (b)(3) on behalf of all those who purchased or otherwise acquired FXCM securities publicly traded on the NYSE and/or NASDAQ between March 15, 2012 and February 6, 2017, both dates inclusive (the "Class") and were damaged upon the revelation of the alleged corrective disclosure. Excluded from the Class are Defendants herein, the officers and directors of the Company, at all relevant times, members of their immediate families and their legal representatives, heirs, successors or assigns and any entity in which Defendants have or had a controlling interest.

34. The members of the Class are so numerous that joinder of all members is impracticable. Throughout the Class Period, FXCM securities were actively traded on the NYSE

and/or NASDAQ. While the exact number of Class members is unknown to Plaintiff at this time and can be ascertained only through appropriate discovery, Plaintiff believes that there are hundreds or thousands of members in the proposed Class. Record owners and other members of the Class may be identified from records maintained by the Company or its transfer agent and may be notified of the pendency of this action by mail, using the form of notice similar to that customarily used in securities class actions.

35. Plaintiff's claims are typical of the claims of the members of the Class as all members of the Class are similarly affected by Defendants' wrongful conduct in violation of federal law that is complained of herein.

36. Plaintiff will fairly and adequately protect the interests of the members of the Class and has retained counsel competent and experienced in class and securities litigation. Plaintiff has no interests antagonistic to or in conflict with those of the Class.

37. Common questions of law and fact exist as to all members of the Class and predominate over any questions solely affecting individual members of the Class. Among the questions of law and fact common to the Class are:

    a. whether the federal securities laws were violated by Defendants' acts as alleged herein;

    b. whether statements made by Defendants to the investing public during the Class Period misrepresented material facts about the business, operations and management of the Company;

    c. whether the Individual Defendants caused the Company to issue false and misleading financial statements during the Class Period;

  d.  whether Defendants acted knowingly or recklessly in issuing false and misleading financial statements;

  e.  whether the prices of FXCM securities during the Class Period were artificially inflated because of the Defendants' conduct complained of herein; and

  f.  whether the members of the Class have sustained damages and, if so, what is the proper measure of damages.

38. A class action is superior to all other available methods for the fair and efficient adjudication of this controversy since joinder of all members is impracticable. Furthermore, as the damages suffered by individual Class members may be relatively small, the expense and burden of individual litigation make it impossible for members of the Class to redress individually the wrongs done to them. There will be no difficulty in the management of this action as a class action.

39. Plaintiff will rely, in part, upon the presumption of reliance established by the fraud-on-the-market doctrine in that:

  a.  Defendants made public misrepresentations or failed to disclose material facts during the Class Period;

  b.  the omissions and misrepresentations were material;

  c.  FXCM securities are traded in an efficient market;

  d.  FXCM securities were liquid and traded with moderate to heavy volume during the Class Period;

  e.  the misrepresentations and omissions alleged would tend to induce a reasonable investor to misjudge the value of FXCM securities; and

f.    Plaintiff and members of the Class purchased, acquired and/or sold FXCM securities between the time the Defendants failed to disclose or misrepresented material facts and the time the true facts were disclosed, without knowledge of the omitted or misrepresented facts.

40.    Based upon the foregoing, Plaintiff and the members of the Class are entitled to a presumption of reliance upon the integrity of the market.

41.    Alternatively, Plaintiff and the members of the Class are entitled to the presumption of reliance established by the Supreme Court in *Affiliated Ute Citizens of the State of Utah v. United States*, 406 U.S. 128, 92 S. Ct. 2430 (1972), as Defendants omitted material information in their Class Period statements in violation of a duty to disclose such information, as detailed above.

## COUNT I

### Violation of Section 10(b) of The Exchange Act Against and Rule 10b-5 Promulgated Thereunder Against All Defendants

42.    Plaintiff repeats and realleges each and every allegation contained above as if fully set forth herein.

43.    This Count is asserted against Defendants is based upon Section 10(b) of the Exchange Act, 15 U.S.C. § 78j(b), and Rule 10b-5 promulgated thereunder by the SEC.

44.    During the Class Period, Defendants, individually and in concert, directly or indirectly, disseminated or approved the false statements specified above, which they knew or deliberately disregarded were misleading in that they contained misrepresentations and failed to disclose material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading.

45.    Defendants violated §10(b) of the 1934 Act and Rule 10b-5 in that they:

15

- employed devices, schemes and artifices to defraud;

- made untrue statements of material facts or omitted to state material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading; or

- engaged in acts, practices and a course of business that operated as a fraud or deceit upon plaintiff and others similarly situated in connection with their purchases of FXCM securities during the Class Period.

46. Defendants acted with scienter in that they knew that the public documents and statements issued or disseminated in the name of FXCM were materially false and misleading; knew that such statements or documents would be issued or disseminated to the investing public; and knowingly and substantially participated, or acquiesced in the issuance or dissemination of such statements or documents as primary violations of the securities laws. These defendants by virtue of their receipt of information reflecting the true facts of FXCM, their control over, and/or receipt and/or modification of FXCM's allegedly materially misleading statements, and/or their associations with the Company which made them privy to confidential proprietary information concerning FXCM, participated in the fraudulent scheme alleged herein.

47. Individual Defendants, who are the senior officers and/or directors of the Company, had actual knowledge of the material omissions and/or the falsity of the material statements set forth above, and intended to deceive Plaintiff and the other members of the Class, or, in the alternative, acted with reckless disregard for the truth when they failed to ascertain and disclose the true facts in the statements made by them or other FXCM personnel to members of the investing public, including Plaintiff and the Class.

48. As a result of the foregoing, the market price of FXCM securities was artificially inflated during the Class Period. In ignorance of the falsity of Defendants' statements, Plaintiff and the other members of the Class relied on the statements described above and/or the integrity of the market price of FXCM securities during the Class Period in purchasing FXCM securities at prices that were artificially inflated as a result of Defendants' false and misleading statements.

49. Had Plaintiff and the other members of the Class been aware that the market price of FXCM securities had been artificially and falsely inflated by Defendants' misleading statements and by the material adverse information which Defendants did not disclose, they would not have purchased FXCM securities at the artificially inflated prices that they did, or at all.

50. As a result of the wrongful conduct alleged herein, Plaintiff and other members of the Class have suffered damages in an amount to be established at trial.

51. By reason of the foregoing, Defendants have violated Section 10(b) of the 1934 Act and Rule 10b-5 promulgated thereunder and are liable to the plaintiff and the other members of the Class for substantial damages which they suffered in connection with their purchase of FXCM securities during the Class Period.

## COUNT II

### Violation of Section 20(a) of The Exchange Act
### Against the Individual Defendants

52. Plaintiff repeats and realleges each and every allegation contained in the foregoing paragraphs as if fully set forth herein.

53. During the Class Period, the Individual Defendants participated in the operation and management of FXCM, and conducted and participated, directly and indirectly, in the conduct of FXCM's business affairs. Because of their senior positions, they knew the adverse

non-public information about FXCM's misstatement of revenue and profit and false financial statements.

54. As officers and/or directors of a publicly owned company, the Individual Defendants had a duty to disseminate accurate and truthful information with respect to FXCM's financial condition and results of operations, and to correct promptly any public statements issued by FXCM which had become materially false or misleading.

55. Because of their positions of control and authority as senior officers, the Individual Defendants were able to, and did, control the contents of the various reports, press releases and public filings which FXCM disseminated in the marketplace during the Class Period concerning FXCM's results of operations. Throughout the Class Period, the Individual Defendants exercised their power and authority to cause FXCM to engage in the wrongful acts complained of herein. The Individual Defendants therefore, were "controlling persons" of FXCM within the meaning of Section 20(a) of the Exchange Act. In this capacity, they participated in the unlawful conduct alleged which artificially inflated the market price of FXCM securities.

56. By reason of the above conduct, the Individual Defendants are liable pursuant to Section 20(a) of the Exchange Act for the violations committed by FXCM.

## PRAYER FOR RELIEF

**WHEREFORE**, Plaintiff prays for relief and judgment, as follows:

a. Determining that this action is a proper class action, designating Plaintiff as class representative under Rule 23 of the Federal Rules of Civil Procedure and Plaintiff's counsel as Class Counsel;

b. Awarding compensatory damages in favor of Plaintiff and the other Class

members against all defendants, jointly and severally, for all damages sustained as a result of Defendants' wrongdoing, in an amount to be proven at trial, including interest thereon;

 c. Awarding Plaintiff and the Class their reasonable costs and expenses incurred in this action, including counsel fees and expert fees; and

 d. Awarding such other and further relief as the Court may deem just and proper.

## JURY TRIAL DEMANDED

Plaintiff hereby demands a trial by jury.

Dated: February 7, 2017      Respectfully submitted,

             **THE ROSEN LAW FIRM, P.A.**

             By: /s/ Phillip Kim
             Laurence M. Rosen, Esq. (LR 5733)
             Phillip Kim, Esq. (PK 9384)
             275 Madison Ave, 34th Floor
             New York, NY  10016
             Phone: (212) 686-1060
             Fax: (212) 202-3827

             Counsel for Plaintiff