**THE ROSEN LAW FIRM, P.A.**
Phillip Kim, Esq. (PK 9384)
Laurence M. Rosen, Esq. (LR 5733)
Joshua Baker, Esq. (JB 8288)
275 Madison Avenue, 34th Floor
New York, New York 10016
Telephone: (212) 686-1060
Fax: (212) 202-3827
Email: pkim@rosenlegal.com
Email: lrosen@rosenlegal.com
Email: jbaker@rosenlegal.com

*Lead Counsel for Lead Plaintiffs*

### UNITED STATES DISTRICT COURT
### SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| In re Global Brokerage, Inc. f/k/a FXCM Inc. Securities Litigation | Master File No. 1: 17-cv-00916-RA<br><br>**CONSOLIDATED SECURITIES CLASS ACTION COMPLAINT**<br><br>CLASS ACTION |
| This Document Relates To: All Actions | JURY TRIAL DEMANDED |

Lead Plaintiffs 683 Capital Partners, LP and Shipco Transport Inc. and named plaintiffs Sergey Regukh and Brian Armstrong  ("Plaintiffs"), individually and on behalf of all other persons similarly situated, by Plaintiffs' undersigned attorneys, for Plaintiffs' consolidated complaint against Defendants (defined below), alleges the following based upon personal knowledge as to Plaintiffs and Plaintiffs' own acts, and upon information and belief as to all other matters based on the investigation conducted by and through Plaintiffs' attorneys, which included, among other things, a review of Securities and Exchange Commission ("SEC") filings by Global Brokerage, Inc., f/k/a FXCM Inc. ("FXCM" or the "Company")[1], the Commodity Futures Trading Commission ("CFTC")'s Order Instituting Proceedings Pursuant to Sections 6(c) and 6(d) of the Commodity Exchange Act, Making Findings, and Imposing Remedial Sanctions dated February 6, 2017 ("CFTC Order") which is attached hereto as Exhibit 1 and incorporated by reference herein, the National Futures Association ("NFA")'s complaint dated February 6, 2017 ("NFA Complaint") attached hereto as Exhibit 2 and incorporated by reference herein, as well as media and analyst reports about the Company. Plaintiffs believe that substantial evidentiary support will exist for the allegations set forth herein after a reasonable opportunity for discovery.

## <u>NATURE OF THE ACTION</u>

1.      This is a federal securities class action on behalf of a class consisting of all persons and entities who purchased or otherwise acquired publicly traded FXCM securities, including FXCM 2.25% Convertible Senior Notes due 2018 (the "FXCM Notes") and Class A common stock from March 15, 2012 to February 6, 2017, both dates inclusive (the "Class Period").[2]

---

[1] Included in these definitions are FXCM's subsidiaries.
[2]  Excluded from the Class are all (i) Defendants; (ii) current and former officers, employees, consultants and directors of FXCM and FXCM Holdings, LLC; (iii) siblings, parents, children, spouses, and household members of any person excluded under (i) and (ii); and (iv) any entities

Plaintiffs seek to recover compensable damages caused by Defendants' violations of federal securities laws and pursue remedies under the Securities Exchange Act of 1934 (the "Exchange Act").

2.      During the Class Period, FXCM knowingly misled investors in the Company's periodic reports filed with the SEC and other public statements by falsely claiming that its customers who transacted on FXCM's "No Dealing Desk" ("NDD") platform would be free from conflicts of interest because FXCM would not be on the other side of the trade or have any financial interest in the trade.

3.      According to FXCM, retail customers' profits or losses would have no effect on FXCM's interests, because FXCM's role was merely as an agent or credit intermediary.  FXCM explained that customer trades would be directed to banks and other independent "market makers" that provided liquidity to the platform.

4.      FXCM's purported lack of conflict of interest was extremely material and a centerpiece to their trading platform and marketing efforts.  Indeed throughout the Class Period, Defendants acknowledged that this conflicts-free business model was a "core" philosophy of the Company.

5.      Despite the Company's claims of having no conflicts of interest for its retail customers trading on the NDD platform, FXCM in fact had an undisclosed financial interest in the market maker that consistently "won" the largest share of FXCM's NDD trading volume, Effex Capital, LLC ("Effex").  Effex was essentially a front created by FXCM, allowing for FXCM to hold positions opposite its customers and financially benefit at its customers' expense—in direct

_____

affiliated with, controlled by, or more than 5% owned by, any person excluded under (i) through (iii); and (v) the legal representatives, heirs, successors or assigns of any person excluded under (i) through (iv).

contravention to the Company's representations to customers and investor of conflict free trading on the NDD.

6.      Effex was an FXCM-backed startup firm that was dreamed up, created, and financed by FXCM.

7.      Originally intending to have Effex operate as a subsidiary of FXCM, in 2009 FXCM hired John Dittami ("Dittami"), a high frequency trader, to create an algorithmic trading system to serve as the foundation of a new trading platform that could make markets to FXCM's customers and thereby either replace or compete with the independent market makers on FXCM's NDD platform.  Dittami completed the new algorithmic trading platform in early 2010.

8.      Because of red flags raised by its compliance department, FXCM created Effex as a separate stand-alone company to operate its new algorithmic trading system that Dittami built in order to conceal FXCM's economic interest in Effex from customers, regulators and investors.

9.      FXCM incorporated Effex and installed Dittami at its helm, but continued to own the trading system, finance the business, and maintain a 70% interest in all profits of Effex through thinly-veiled contractual arrangements.  Effex operated out of FXCM's offices rent-free for the first year of its existence, before renting its own offices, but continued to have two FXCM employees dedicated to working for Effex.

10.     Contrary to its public statements, FXCM manipulated its NDD platform by putting Effex in front of independent market makers in routing retail customer orders while also permitting Effex to win all "ties" with other market makers.  FXCM provided Effex with a real-time view of price quotations offered by other market makers, and added smaller markups to Effex prices than to prices provided by other market makers.  This way FXCM ensured that the bulk of its order flow would go to Effex and generate profits for FXCM.

11.     This arrangement was very lucrative for FXCM, as FXCM was provided 70% of Effex's profits and Effex kept the balance.  These kickbacks amounted to nearly $80 million between 2010 and 2014, and they continued through 2016.

12.     During the Class Period, FXCM's quarterly and annual reports misrepresented that FXCM had no interest in the trades executed on its NDD platform and therefore there were no conflicts of interest between FXCM and its customers who traded on the NDD platform.

13.     FXCM's financial statements violated SEC regulations and generally accepted accounting principles ("GAAP") for failing to disclose FXCM's economic interest in, contractual and related party relationship with, and control over, Effex during the Class Period.  Given that FXCM was entitled to 70% of Effex's profits, FXCM was required to (but did not) consolidate Effex's operations as a variable interest entity.  Alternatively, even if Effex were not required to be consolidated, it was still a related party to FXCM and therefore, FXCM was required to (but did not) disclose the related party nature of the business relationship and the amount of profits FXCM was earning from Effex.

14.     As a result of FXCM's failure to properly account for its arrangements with Effex, all of FXCM's financial statements issued during the Class Period were false and misleading.

15.     On February 6, 2017, the CFTC announced in a press release and accompanying Order that it had settled charges against FXCM and its two founders, Defendants Niv and Ahdout.  The CFTC found that FXCM engaged in false and misleading solicitations of its retail foreign exchange ("forex") customers by concealing FXCM's relationship with its most important market maker, by misrepresenting that its NDD platform had no conflicts of interest with its customers, and by, essentially, cheating customers through dishonest trade execution.  The Settlement imposed a civil penalty of $7 million and banned the Company from operating in the U.S.

16.     This announcement shocked the market and caused the price of FXCM's securities to lose more than half of their value, damaging FXCM investors.

## JURISDICTION AND VENUE

17.     The claims asserted herein arise under and pursuant to Sections 10(b) and 20(a) of the Exchange Act (15 U.S.C. §§ 78j(b) and 78t(a)) and Rule 10b-5 promulgated thereunder (17 C.F.R. § 240.10b-5).

18.     This Court has jurisdiction over the subject matter of this action pursuant to Section 27 of the Exchange Act (15 U.S.C. § 78aa) and 28 U.S.C. § 1331.

19.     Venue is proper in this judicial district pursuant to Section 27 of the Exchange Act (15 U.S.C. § 78aa) and 28 U.S.C. § 1391(b) as Defendants conduct business in this judicial district and the Company is headquartered in this judicial district.

20.     In connection with the acts, conduct and other wrongs alleged herein, Defendants either directly or indirectly used the means and instrumentalities of interstate commerce, including but not limited to the United States mails, interstate telephone communications, and the facilities of the national securities exchange.

## PARTIES

21.     Lead Plaintiffs 683 Capital Partners, LP and Shipco Transport Inc. purchased FXCM securities at artificially inflated prices during the Class Period and were damaged upon the revelation of the alleged corrective disclosures as set forth in their PSLRA certifications previously filed with the Court that are incorporated by reference herein.

22.     Named Plaintiffs Sergey Regukh and Brian Armstrong, purchased FXCM securities at artificially inflated prices during the Class Period and were damaged upon the revelation of the alleged corrective disclosures as set forth in their PSLRA certifications.  Regukh's

certification was previously filed with the Court and is incorporated by reference herein. Armstrong's certification is filed herewith and incorporated by reference.

23.     Defendant Global Brokerage, Inc., formerly known at all relevant times as FXCM, is a Delaware corporation headquartered in New York, New York, which provides online forex trading and related services to retail and institutional customers worldwide through its subsidiaries. FXCM is a holding company and its only material asset is a controlling interest in FXCM Holdings, LLC ("Holdings").

24.     FXCM's Class A common stock was traded on the New York Stock Exchange ("NYSE") under the ticker "FXCM" from the beginning of the Class Period through September 23, 2016.  Beginning September 26, 2016, the Company's securities traded on the NASDAQ under the symbol "FXCM" until February 27, 2017, when the Company changed its name to Global Brokerage, Inc. and adopted the ticker symbol "GLBR."

25.     Defendant Dror Niv ("Niv") was Chairman of the Board of Directors of FXCM since 2010, and served on the board of FXCM's predecessor, FXCM Holdings, since 1999. Mr. Niv was the Chief Executive Officer of FXCM since 1999 until his resignation after the Class Period and is one of the original founding partners of the firm.

26.     Defendant William Ahdout ("Ahdout") was a director of FXCM since 2010, and served on the board of Holdings since 1999. Mr. Ahdout was with FXCM since 1999, was its Chief Dealer and a Managing Director and was one of the original founding partners of the firm.

27.     Defendant David Sakhai ("Sakhai") was a founding partner of FXCM, a Director of the Company and the Company's Chief Operating Officer at all relevant times. He is Ahdout's cousin.

28.     Defendant Eduard Yusupov ("Yusupov") was Global Head of Dealing and a

Managing Director of FXCM since 1999 and is one of the original founding partners of the Company. Mr. Yusupov was a director of FXCM since 2010, and served on the board of FXCM's predecessor since 1999.  According to the Company's proxy statement, Mr. Yusupov has "deep knowledge of the Company as our Global Head of Dealing and experience in the retail foreign exchange industry as a Senior Dealer for MG Financial Group."

29.      FXCM went public in an initial public offering ("IPO") in December 2010.

30.      Prior to IPO, Niv, Ahdout, Sakhai and Yusupov owned FXCM's predecessor, Holdings.

31.      Through the IPO, Holdings became a subsidiary of FXCM. FXCM owned Holdings, which in turn owned all of FXCM's operating subsidiaries, including FXCM's U.S.A. subsidiary.

32.      Niv, Ahdout, Sakhai, and Yusupov are collectively referred to herein as the "Controlling Partners").

33.      Immediately following the IPO and thereafter, the Controlling Partners owned and controlled the equity of FXCM in the following proportions:

|  | # Shares as of 1/1/2011 | % of FXCM Shares as of 1/1/2011 | # Shares as of 4/15/2014 | % of FXCM Shares as of 4/15/2014 |
|---|---|---|---|---|
| Niv | 8,894,900 | 11.80% | 8,752,686 | 10.70% |
| Ahdout | 5,690,685 | 7.60% | 2,959,119 | 3.60% |
| Sakhai | 6,013,990 | 8.0% | 5,917,649 | 7.30% |
| Yusupov | 7,898,971 | 10.50% | 4,933,356 | 6.10% |
| Total | 28,498,546 | 37.9% | 22,562,810 | 27.7% |

34.      Following the IPO, the Controlling Partners continued to own stakes in Holdings

called "Holdings Units" which were convertible to Class A common shares on a one to one basis.[3] The Controlling Partners were also entitled to voting Class B shares of FXCM that allowed them voting rights on a one to one basis with Class A common shares based on the number of Holdings Units they owned. Thus, the Controlling Partners were able to exercise voting power at FXCM, the managing member of Holdings, at a level consistent with their overall equity ownership of FXCM.

35.     Defendant Janelle G. Lester ("Lester") was FXCM's Chief Compliance Officer from December 2012 until approximately July 20, 2016.   According to the National Futures Association, Ms. Lester sent a misleading e-mail to NFA on April 4, 2014 in which she attempted to downplay FXCM's involvement with Effex's Dittami in connection with a regulatory inquiry concerning the same.

36.     Defendant Robert Lande ("Lande") was the Company's Chief Financial Officer ("CFO") at all relevant times during the Class Period.   As CFO, Lande was aware that FXCM calculated its monthly preliminary P&L statement, in part, by taking Effex's monthly P&L and simply subtracting 30 percent.   In fact, for a period of time following its formation, Effex reported its P&L to FXCM on a weekly basis. As CFO, Lande was also aware that the invoices FXCM sent Effex seeking its 70% share of Effex's profits described the amounts billed as "P&L." In addition, Effex made the secret payments to Holdings, rather than FXCM's USA subsidiary. As CFO, Lande

---

[3]  FXCM claimed that the Controlling Founders held their FXCM equity interests in Holdings for tax reasons - because it was not taxable as a corporation for United States federal income tax purposes.

would was aware of the $77 million received by Holdings, even though the payments, if proper, would have been made to FXCM's USA subsidiary, thus raising a red flag.

37.     Defendant Ornit Niv was the Chief Executive Officer of Forex Capital Markets LLC, the U.S.A. subsidiary of FXCM, beginning in 2014.  Previously, Ornit Niv served as FXCM's Head of Sales and Customer Service for the Americas and Asia.  Ornit Niv is the sister of Defendant Dror Niv.[4]

38.     Defendant Nicola Santoro, Jr. ("Santoro") was the Company's Chief Accounting Officer between March 6, 2013 and September 18, 2015.  Santoro was responsible for directing financial reporting, accounting, tax and financial planning activities.  On September 18, 2015, Santoro relinquished his title and duties as principal accounting officer of the Company.

39.     Defendant Margaret Deverell ("Deverell") was the Company's Chief Accounting Officer at all relevant times since September 18, 2015. Deverell had been employed by the Company since August 2013 as global controller and continued to serve in that role after September 2015.

40.     Defendant David S. Sassoon ("Sassoon") was the General Counsel of FXCM since 2002 and the Secretary since November 2010. In his role as General Counsel, Mr. Sassoon was responsible for managing all of the legal and corporate affairs of FXCM and its various affiliates.

41.     Defendant Kenneth Grossman ("Grossman") was a founding partner of FXCM and a Director of the Company at all relevant times. According to the Company's proxy statement, Grossman has "deep knowledge of the Company based on his role as our Chief Financial Officer from 1999 to 2007 … and career experience in the retail foreign exchange industry as the Chief Financial Officer and in other senior management roles at Berisford Capital Markets."  Mr.

---

[4] References to "Niv" or "Defendant Niv" are to Defendant Dror Niv unless otherwise specified.

Grossman served on the board of the Company's predecessor from 1999 to 2010.  Grossman was a Managing Director of FXCM since 1999 and was one of the original founding partners of the firm. From 1999 to 2007, Grossman was also the CFO of FXCM.

42.     Defendant James Brown ("Brown") was a Director of the Company at all relevant times. Mr. Brown was the Presiding Independent Director and served on the Audit Committee, Compensation Committee, and Corporate governance and Nominating Committee.

43.     Defendant Ryan Silverman ("Silverman") was a Director of the Company at all relevant   times.   Mr.   Silverman   was   a   director   since   2010,   Independent Corporate Governance and Nominating Committee (Chair) and Compensation Committee (Chair). Silverman was appointed to the Board of Directors in connection with the Company's IPO.

44.     Defendant Arthur Gruen ("Gruen") was a Director of the Company at all relevant times. Gruen served as the chair of the Audit Committee and also on the Compensation Committee.

45.     Defendant Robin E. Davis ("Davis") was a Director of the Company at all relevant times.  Mr. Davis served on the Audit Committee.  According to the Company's proxy statement, Mr. Davis was appointed to the Board of Directors in connection with the IPO.

46.     Defendant Eric LeGoff ("LeGoff") was a Director of the Company at all relevant times." Mr. LeGoff was appointed to the Board of Directors in connection with the Company's IPO.

47.     Defendant Perry G. Fish ("Fish") was a Director of the Company at all relevant times until February 1, 2016.  Mr. Fish served as chair of the Compensation Committee and on the Corporate Governance and Nominating Committee.  Fish was appointed to the Board of Directors in connection with the IPO.

48.     Defendant Bryan Reyhani ("Reyhani") was a Director of the Company at all relevant times beginning on February 1, 2016.  Mr. Reyhani served as Chairman of the board since 2017 and Director since 2016.   He served on the Independent Corporate Governance and Nominating Committee.

49.     Defendants Niv, Lande, Lester, Ornit Niv, Santoro, Deverell, Ahdout, Sakhai, Sassoon, Grossman, Yusupov, Brown, Silverman, Gruen, Davis, LeGoff, Fish, and Reyhani are collectively referred to herein as "Individual Defendants."

50.     Collectively, Defendant FXCM and the Individual Defendants are herein referred to as "Defendants."

51.     Each of the Individual Defendants:

a.      directly participated in the management of the Company;

b.      was directly involved in the day-to-day operations of the Company at the highest levels;

c.      was privy to confidential proprietary information concerning the Company and its business and operations;

d.      was directly or indirectly involved in drafting, producing, reviewing and/or disseminating the false and misleading statements and information alleged herein;

e.      was directly or indirectly involved in the oversight or implementation of the Company's internal controls;

f.      was aware of or recklessly disregarded the fact that the false and misleading statements were being issued concerning the Company; and/or

g.      approved or ratified these statements in violation of the federal securities laws.

52.     FXCM is liable for the acts of the Individual Defendants and its employees under the doctrine of *respondeat superior* and common law principles of agency as all of the wrongful acts complained of herein were carried out within the scope of their employment with authorization.

53.     The scienter of the Individual Defendants and other employees and agents of the Company is similarly imputed to FXCM under *respondeat superior* and agency principles.

## SUBSTANTIVE ALLEGATIONS[5]

### Industry Background

54.     The forex market is the largest and most actively traded financial market in the world, with global forex trading averaging trillions of dollars per day.  Trading in the forex market is primarily done over-the-counter ("OTC") directly with a counterparty.

55.     Spot transactions are the exchange of one currency for another.  The forex market revolves around spot transactions because spot rates are the foundation for pricing all forex instruments.  In the forex market, these transactions occur OTC rather than through a central exchange. As a result, these transactions are reliant on a financial institution or "market maker," who provides liquidity to the market by acting as a dealer willing to continuously buy and sell currencies.

56.     Despite its size and importance, the forex market is one of the world's least regulated financial markets as most transactions occur OTC, away from regulation and scrutiny by

---

[5] The substantive allegations are drawn from, among other things, the Company's periodic reports filed with the SEC, its public statements, the CFTC Order, the NFA Complaint, and information available on the internet and witness identified herein.

the exchanges.  There is also no centralized exchange or institution that collects and posts real-time trade information for the OTC market.  Instead, these transactions occur on proprietary dealing platforms that match market makers with buyers, with real-time order flow and data often closely guarded. This substantially limits knowledge of traders' conduct inside these dealing platforms or information among the market makers themselves as to each other's doings.

**The Company**

57.     FXCM, founded in 1999, recently described itself in the Company's 2016 10-K (defined below) as "an online provider of foreign exchange ("FX") trading and related services," that offers its customers access to OTC forex markets and a "proprietary technology platform."  . As of December 31, 2016, FXCM had over 178,000 active retail customer accounts globally.  *Id.*

58.     Until approximately 2007, FXCM provided liquidity to its retail forex customers primarily through an internal "dealing desk" - a division of FXCM that determined the prices offered to customers and held positions opposite customers.

59.      In or around 2007, FXCM transitioned from using a dealing desk to what it termed an "agency" model for most of its retail forex customers, which it described to customers as providing NDD forex trading.

60.     Whereas a dealing desk broker acts as a market maker and may be trading against the customer's position, FXCM touted that its agency model eliminated that conflict of interest. In FXCM's agency model, price quotations were provided not by FXCM's internal dealing desk, but by banks and other third-party market makers.  FXCM was merely acting as a credit intermediary who simultaneously entered into offsetting trades with both the customer and the market maker.

61.     FXCM purportedly made money from its NDD platform through the bid/ask spread, adding a small markup to the bid/ask quotes received from its customers and liquidity providers and keeping that amount for itself as a fee for executing the offsetting transactions.

62.     Under this agency execution model, FXCM supposedly gave its retail clients access to buy and sell prices streamed directly from over a dozen liquidity providers anonymously, so that its retail clients' orders were invisible to these price providers.  The Company touted this model as a trading environment free of price manipulation and conflicts of interest, a highly appealing platform for OTC forex trading.

63.     This agency model was the centerpiece of FXCM's trading platform and marketing efforts.

**FXCM Creates Its Own, Secret Market Maker; Reaps Millions**

64.     In 2009, Defendants Niv, Ahdout and others at FXCM devised a plan to capitalize on FXCM's NDD clients through the use of a high frequency trading algorithm.  This algorithm would completely replace or supplant many of the independent market makers on the NDD platform and allow FXCM to cash in twice on its customers (first from its mark-ups, then from its kickback) while providing a purportedly conflict-free trading platform.

65.     To this end, FXCM hired a high-frequency trader, Dittami, for a Managing Director position at the Company in October 2009.  Dittami was hired to create a new algorithmic trading system. FXCM gave Dittami a contract promising him 30% of any profits generated by the new algorithmic trading system.  In early 2010, Dittami completed development of the algorithmic trading system sought by FXCM.

66.     Under Dittami's employment agreement, FXCM paid Dittami a base salary plus 30 percent of trading profits generated by Dittami's trading system.  That meant that FXCM would keep the remaining 70 percent of trading profits.

67.     In early 2010, when Dittami was finalizing his trading algorithm, FXCM's Compliance department voiced concerns that trading against FXCM's retail customers would contradict FXCM's marketing statements about its NDD model, which was supposedly free of precisely such conflicts of interest.

68.     In response, FXCM spun off Dittami's trading system as an "external" or "independent" market maker for FXCM, solely for the purpose of falsely creating the appearance that Effex was an independent entity that was not owned or controlled by FXCM.  On March 23, 2010, the new company, Effex was created under the direction of FXCM.

69.     To further create the false impression of separation, Dittami "resigned" from FXCM on April 14, 2010, but Dittami and FXCM agreed that his resignation would not change their economic relationship, including FXCM retaining 70% of Dittami's (now Effex's) algorithmic trading profits.  FXCM also continued to own the intellectual property rights to the algorithmic trading platform's software.

70.     Soon after Effex was created, it entered services agreements with FXCM by which Effex would make monthly payments to FXCM of $21 per million dollars of trading volume executed by Effex.  FXCM intended this amount to approximate 70 percent of Effex's profits from trading on FXCM's retail forex platform against FXCM's retail customers.

71.     In conjunction with Effex's formation, FXCM funded Effex with a $2 million interest-free loan and allowed Effex to use FXCM's prime broker through a "prime of prime" account. When Dittami "resigned" from FXCM and "moved" to Effex, he continued working from

16

FXCM's offices rent-free.  Effex operated from FXCM's offices in New York for a full year after Dittami's resignation from FXCM.

72.    Effex also used Dittami's trading algorithm – created for FXCM while Dittami was working for the Company and thus FXCM's intellectual property – to conduct its trading. For a period of time, Effex even used FXCM's servers and email systems.

73.    From 2010 to at least 2014, FXCM also gave bonuses, reimbursed by Effex, to two FXCM employees who assisted Effex on account of their work for the purportedly "independent" market maker.  From 2010 to 2014, one of the employees spent approximately 80 percent of the work week at Effex's offices. In short, Effex was no more than a hidden subsidiary of FXCM.

### FXCM's Control of and Material Interest in Effex

74.    Pursuant to the services agreement, FXCM sent Effex monthly invoices for "order flow," which were to be paid by Effex to FXCM Holdings, a holding company owned by FXCM which owned FXCM's U.S. subsidiary. Through August 2011, Effex paid $21 per million notional volume transacted by Effex on the FXCM retail forex platform.  These payments were adjusted to $16 per million from September 2011 through July 2014 due to tightening spreads in the forex market.  This reduction was intended to compensate for Effex's lower profitability and to maintain the agreed upon 70% / 30% division of profits between FXCM and Effex.

75.    From 2010 to 2014, no market maker besides Effex paid FXCM for order flow.  In truth, these payments were not order flow payments, but rather pre-negotiated kickbacks of FXCM's cut of profits generated by Effex from trading against FXCM's retail customers on the NDD platform.

76.     FXCM even viewed Effex's trading profits and losses ("P&L") as its own, less Effex's 30 percent share.  In fact, FXCM calculated its monthly preliminary P&L statement, in part, by taking Effex's monthly P&L and simply subtracting 30 percent.

77.     FXCM directed Effex to remit these payments to FXCM Holdings, which was not a member of the NFA, in an effort to avoid the NFA's scrutiny over these dealings.

78.     In exchange for these payments from Effex, FXCM agreed that it would favor Effex over other market makers in routing retail customer orders.  FXCM permitted Effex to win all "ties" with other market makers; provided Effex with a real-time view of price quotations offered by other market makers; and added smaller markups to Effex's prices than to prices provided by other market makers.  This gave Effex a significant leg up on the truly external and independent market makers trading on FXCM's platform.

79.     In addition to favoring Effex over other market makers, FXCM allowed Effex to use a hold timer that enabled Effex to execute a trade at the start or end of a hold timer period, whichever was better for Effex.  This asymmetrical price slippage practice deprived FXCM's customers of positive price improvements while giving customers negative price slippage, all to the benefit of Effex.

80.     Effex also used a "previous quote" practice whereby Effex submitted a quote to FXCM and FXCM would respond with an execution request based on the trading limits contained in a customer limit order, not the previous quote provided by FXCM.  This way Effex was using FXCM's inside knowledge of a customer's least favorable acceptable trade quote to ensure that it was getting the most favorable end of the bargain.

81.     On the same day Dittami resigned from FXCM, his trading algorithm was used in a "full-scale trading session" for the very first time. Based on the trading that day, FXCM

anticipated that Effex would capture approximately 25-30% of overall trade volume on FXCM's NDD Platform – well above the market share Effex would have expected to capture in any other forex market.

82.     Not surprisingly, Effex routinely captured over 50% of FXCM's daily order flow and, at one time, captured nearly 80%. All told, from 2010 through 2014 Effex rebated to FXCM nearly $80 million of Effex's trading revenue through its monthly payments to FXCM.

83.     The bulk of Effex's revenues were earned in transactions through FXCM. However, Effex was only able to profitably transact with other ECN's because of the pricing and order information that FXCM secretly provided to Effex.  Thus, Effex was wholly dependent on FXCM.

84.     Additionally, according to a former employee who worked in FXCM's headquarters in New York as a Client Relationship Manager from May 2014 to June 2015, and before that as Operations Associate from June 2009 to May 2014, "Niv, Ahdout, to a lesser extent, CFO Robert Lande had control over Effex Capital."

### Regulators Take Action, Bar FXCM and Founders from U.S., Levy Fines of $7 Million, and Accuse FXCM of Lying to NFA; FXCM Securities Prices Tank

85.     On February 6, 2017, the CFTC announced that it banned the Company from operating in the U.S. after finding that FXCM was taking undisclosed positions opposite its retail customers, stating in part:

RELEASE: pr7528-17

February 6, 2017

**CFTC Orders Forex Capital Markets, LLC (FXCM), Its Parent Company, FXCM Holdings, LLC and FXCM's Founding Partners, Dror Niv and William Ahdout, to Pay a $7 Million Penalty for FXCM's Defrauding of Retail Forex Customers**

**FXCM, Niv, and Ahdout are Prohibited from Registering with the CFTC, Acting in Exempt Capacities or Acting as Principals, Agents, Officers or Employees of Registrants**

**CFTC's Order also holds FXCM, Niv, and FXCM Holdings responsible for FXCM's False Statements to the National Futures Association**

Washington, DC – The U.S. Commodity Futures Trading Commission (CFTC) today issued an Order filing and settling charges against **Forex Capital Markets, LLC (FXCM)** , its parent company, **FXCM Holdings, LLC** (FXCM Holdings), and two founding partners, **Dror ("Drew") Niv**, and **William Ahdout**, who were, respectively, Chief Executive Officer of FXCM and Managing Director of FXCM, (collectively, Respondents). FXCM's principal place of business is New York, New York; Niv resides in Connecticut; and Ahdout resides in New York.

*The CFTC Order finds that, between September 4, 2009 though at least 2014 (the Relevant Period), FXCM engaged in false and misleading solicitations of FXCM's retail foreign exchange (forex) customers by concealing its relationship with its most important market maker and by misrepresenting that its "No Dealing Desk" platform had no conflicts of interest with its customers. The Order finds FXCM, FXCM Holdings, and Niv responsible for FXCM making false statements to the National Futures Association (NFA) about its relationship with the market maker.*

The Order requires Respondents jointly and severally to pay a $7 million civil monetary penalty and to cease and desist from further violations of the Commodity Exchange Act and CFTC Regulations, as charged. FXCM, Niv, and Ahdout agree to withdraw from CFTC registration; never to seek to register with the CFTC; and never to act in any capacity requiring registration or exemption from registration, or act as a principal, agent, officer, or employee of any person that is registered, required to be registered, or exempted from registration with the CFTC.

**"The CFTC Is Committed to Protecting Customers from Harm in the Markets It Regulates"**

"Full and truthful disclosure to customers and honest discourse with self-regulatory organizations such as NFA are vital to the integrity and oversight of our markets," said Gretchen L. Lowe, Principal Deputy Director and Chief Counsel of the CFTC's Division of Enforcement. "Today's action's demonstrates that the CFTC is committed to protecting customers from harm in the markets it regulates."

FXCM is registered with the CFTC as a Futures Commission Merchant and Retail Foreign Exchange Dealer. FXCM has been providing retail customers with access to over-the-counter forex markets through a proprietary technology platform and has acted as counterparty in transactions with its retail customers in which

customers can buy one currency and simultaneously sell another. Both Niv and Ahdout were CFTC registrants during the relevant period.

FXCM, under Niv's and Ahdout's direction and control, misrepresented to its retail forex customers that when they traded forex on FXCM's No Dealing Desk platform, FXCM would have no conflict of interest, the Order finds. In addition, according to FXCM's marketing campaign, retail customers' profits or losses would have no impact on FXCM's bottom line, because FXCM's role in the customers' trades was merely that of a credit intermediary, the Order finds. FXCM further represented that the risk would be borne by banks and other independent "market makers" that provided liquidity to the platform, according to the Order.

### FXCM's Undisclosed Interest

***Contrary to these representations, the Order finds, FXCM had an undisclosed interest in the market maker that consistently "won" the largest share of FXCM's trading volume – and thus was taking positions opposite FXCM's retail customers.*** FXCM, the Order finds, formulated a plan in 2009 to create an algorithmic trading system, using an FXCM computer program that could make markets to FXCM's customers, and thereby either replace or compete with the independent market makers on FXCM's "No Dealing Desk" platform. Although FXCM eventually spun off the algorithmic trading system as a new company, in actuality the company remained closely aligned with FXCM, according to the Order. This market maker received special trading privileges, benefitted from a no-interest loan provided by FXCM, worked out of FXCM's offices, and used FXCM employees to conduct its business, the Order further finds.

The Order finds that FXCM and the market maker agreed that the market maker would rebate to FXCM approximately 70 percent of its revenue from trading on FXCM's retail forex platform. In total, through monthly payments from 2010 through 2014, the company rebated to FXCM approximately $77 million of the revenue it achieved. However, FXCM did not disclose to customers, among other things, that this company – FXCM's principal market maker – was a startup firm spun off from FXCM, the Order further finds.

### False Statements to the NFA

***The Order also finds that FXCM willfully made false statements to NFA in order to conceal FXCM's role in the creation of its principal market maker as well as the fact that the market maker's owner had been an FXCM employee and managing director. The Order finds that during a meeting between NFA compliance staff and FXCM executives, Niv omitted to mention to NFA the details of FXCM's relationship with the market maker.***

***The Order holds Niv and Ahdout liable for FXCM's fraud violations as "controlling persons" who were responsible, directly or indirectly, for FXCM's***

*violations. Niv is also held liable for FXCM's false statements to NFA as a controlling person who was responsible directly or indirectly for those violations. FXCM Holdings is held liable for FXCM's fraud and false statement violations as principal of FXCM, the Order also finds.*

The CFTC thanks NFA for its assistance in this matter.

CFTC Division of Enforcement staff members responsible for this action are Christopher Giglio, Patrick Daly, David C. Newman, Xavier Romeu-Matta, K. Brent Tomer, Lenel Hickson, Jr., and Manal M. Sultan.

Media Contact
Dennis Holden
202-418-5088

(Emphasis added).

86.     On the same day, the NFA's Business Conduct Committee issued a complaint (Exhibit 2 hereto) and entered an order against FXCM, Defendants Niv, Ahdout, and Ornit Niv. The Business Conduct Committee made factual findings that the Defendants committed the violations alleged in the complaint, including that FXCM's NDD execution model was corrupted by the Company's control and relationship with Effex, and ordered that FXCM and the individual defendants be withdrawn from NFA membership and forever barred from reapplying.

87.     The Company also issued a press release on February 6, 2017, disclosing the settlements with the NFA and CFTC and announcing that the Company would withdraw from doing business in the U.S., pursuant to the CFTC's order, and sell its U.S. customer accounts to GAIN Capital Holdings, Inc. ("GAIN").

88.     On this news, shares of the Company fell $3.40 per share or over 49% from its previously closing price to close at $3.45 per share on February 7, 2017.

89.     Likewise the price of FXCM Notes fell 37% on February 7, 2017 from a previous closing price of $43.698 to close at $27.241 on February 7, 2017.

90.     FXCM entered into an Asset Purchase Agreement with GAIN for FXCM's U.S. accounts on February 7, 2017.  The asset sale was completed on February 24, 2017.

91.     On February 21, 2017, Defendant Niv resigned as CEO of the Company and resigned from the FXCM board of directors.  That same day, FXCM announced its name change to Global Brokerage Inc., effective February 27, 2017.

92.     As a result of Defendants' wrongful acts and omissions, and the precipitous decline in the market value of the Company's common shares, Plaintiffs and other Class members have suffered significant losses and damages.

### Defendants' False and Misleading Class Period Statements To Regulators

93.     As a part of FXCM's ongoing efforts to obscure and conceal its relationship with Effex, FXCM also misled regulators from the NFA.

94.     In connection with the NFA's 2013 examination of FXCM, NFA compliance staff met with FXCM executives on October 24, 2013. In response to the NFA's questions about FXCM's relationship with Effex, Defendant Niv neglected to mention any of the details described above concerning FXCM's relationship with Effex and Dittami. Defendant Niv misrepresented that he had a prior working relationship with Dittami from when Dittami was employed by other liquidity providers.

95.     Members of FXCM's compliance department also made a series of misstatements to the NFA. On October 22, 2013, an FXCM compliance officer told the NFA in an email: "FXCM LLC does not have any direct or indirect ownership, interest, or affiliation with entities that provide liquidity to retail clients...."

96.     After the NFA sought clarification of this statement, another FXCM compliance officer stated in a March 24, 2014 email: "To my knowledge, there are no present or past owners,

principals, APs, or employees of affiliates of FXCM LLC that have direct or indirect ownership, interest, or affiliation with entities that provide liquidity to retail clients on our No Dealing Desk Model."

97.     On April 4, 2014, in response to further attempts by the NFA to clarify the FXCM-Effex relationship, defendant Lester stated in an email that Dittami served as a consultant for FXCM from October 2009 through April 2010, working primarily on software coding—in an attempt to downplay Dittami in connection with NFA's inquiry into FXCM's relationship with Effex

98.     Defendant Niv participated in and approved of FXCM's false responses to the NFA's investigation.

**Defendants Failed to Consolidate, and Disclose the Nature of its Relationship with, Effex, or in the Alternative, Failed to Disclose Material Related Party Transactions**

99.     FXCM's periodic quarterly and annual reports filed with the SEC and accompanying Sarbanes-Oxley Act of 2002  ("SOX") certifications were materially false and misleading because FXCM either failed to consolidate Effex in its financial statements and to disclose the nature of its relationship with Effex, or failed to disclose the material related party transactions FXCM entered into with Effex.

100.     GAAP constitutes those standards recognized by the accounting profession as the conventions, rules, and procedures necessary to define accepted accounting practices at a particular time.

101.     GAAP are the common set of accounting principles, standards, and procedures that companies in the United States use to compile their financial statements.

102.     The SEC has the statutory authority for the promulgation of GAAP for public companies and has delegated that authority to the Financial Accounting Standards Board (the "FASB").

103.     SEC, NYSE, and NASDAQ rules and regulations require that publicly traded companies such as FXCM include financial statements that comply with GAAP in their annual and quarterly reports filed with the SEC. *See* Section 13 of the Exchange Act; SEC Rule 10-01(d) of Regulation S-X ("Reg. S-X").

104.     SEC Rule 4-01(a) of Reg. S-X states that "[f]inancial statements filed with the Commission which are not prepared in accordance with generally accepted accounting principles will be presumed to be misleading or inaccurate." 17 C.F.R. § 210.4-01(a)(1) (emphasis added).

105.     Management retains responsibility for preparing financial statements that conform with GAAP. The American Institute of Certified Public Accountants ("AICPA") Professional Standards provide:

> The financial statements are management's responsibility . . . Management is responsible for adopting sound accounting policies and for establishing and maintaining internal controls that will, among other things, record, process, summarize, and report transactions (as well as events and conditions) consistent with management's assertions embodied in the financial statements. The entity's transactions and the related assets, liabilities, and equity are within the direct knowledge and control of management. . . . Thus, the fair presentation of financial statements in conformity with generally accepted accounting principles is an implicit and integral part of management's responsibility.

AIPCA, Professional Standards, vol. 1, AU § 110.02 (1998).

106.     GAAP requires reporting entities to consolidate and make disclosures about certain entities that are determined to be Variable Interest Entities ("VIEs"). ASC 810, Consolidation. An entity is a VIE when one or more of several criteria are met, including, among others, (1) when the nominal owners of the entity are unable to make decisions about the entity's activities that have

a significant effect on the success of the entity, and (2) when the nominal owners do not fully participate in the entity's residual returns. ASC 810-10-15-14. A reporting entity is required to consolidate a VIE if that entity has a variable interest that will absorb the majority of the VIE's expected losses, receive the majority of the VIE's expected returns, or both. ASC 810-25-38. This entity is known as the primary beneficiary. Effex was a VIE and FXCM was the primary beneficiary with regard to Effex.

107.    Effex meets both of the criteria referred to in the preceding paragraph. Effex was dependent on FXCM for its business and subject to FXCM's determination as to whether its customers would be directed to book trades through Effex. Additionally, by agreement FXCM received the majority, 70%, of Effex's profits.

108.    Because FXCM received the majority of Effex's profits, it was the primary beneficiary of Effex's business and was required to consolidate Effex on FXCM's consolidated financial statements. FXCM was also therefore required to report a non-controlling interest related to Effex held by Dittami on its consolidated statements of condition, operations, and comprehensive income.

109.    As the primary beneficiary, FXCM also is required to make certain disclosures about the entity it has consolidated, including the nature, purpose, size and activities of the VIE. ASC 810-10-50-3.  FXCM would also be required to disclose the methodology for determining that Effex is a VIE and is being consolidated.  The nature of this information is material to FXCM's financial statements in particular because it is contrary to other disclosures made (or lack thereof) about its retail trading platform operating as an NDD free of conflicts of interest and the nature of the intermediary (Effex) to which FXCM directed certain of its customers.

110.    If FXCM was not required to consolidate Effex under the VIE accounting requirements, Effex would still be considered to be a related party of FXCM subject to disclosure requirements.

111.    GAAP and Reg. S-K required the Company to disclose all material related party transactions.

112.    ASC 850, Related Parties, provides that a public company's "[f]inancial statements shall include disclosures of material related party transactions." ASC 850-10-50-1.

113.    "Related party transactions" include those between "an enterprise and its principal owners, management, or members of their immediate families" and those between a company and its "affiliates." ASC 850-10-05-3. "Affiliate" includes any company that, directly or indirectly through one or more intermediaries, controls, is controlled by, or is under common control with an enterprise. ASC 850-10-20.

114.    Disclosures of related party transactions shall include: (a) the nature of the relationship involved, (b) a description of the transactions for each period for which income statements are presented and such other information necessary to an understanding of the effects of the transactions on the financial statements, (c) the dollar amount of transactions for each of the periods for which income statements are presented, and (d) amounts due from or to related parties as of the date of each balance sheet presented and, if not otherwise apparent, the terms and manner of settlement. ASC 850-10-50-1.

115.    Reg. S-K (together with the General Rules and Regulations under the Securities Act of 1933 and the Exchange Act and the forms under these Acts) states the requirements applicable to the content of the non-financial statement portions of the annual reports on form 10-K, quarterly reports on form 10-Q and proxy statements on form 14A. (See, Reg. S-K, §229.10).

116.    Reg. S-K at Section 229.404, Item 404, required, at all times during the Class Period, that the Company "[d]escribe any transaction, since the beginning of the registrant's last fiscal year, or any currently proposed transaction, in which the registrant was or is to be a participant and the amount involved exceeds $120,000, and in which any related person had or will have a direct or indirect material interest."

117.    Reg. S-K required the disclosure of detailed information concerning related party transactions exceeding $120,000, including the names of the "related person" or entity participating in the transaction, and the amounts of the transaction.

118.    A "related person" is defined by Reg. S-K as including any director or executive officer of the Company, any nominee for director, or any immediate family member of a director or executive officer of the registrant, or of any nominee for director or any 5% or greater shareholder.

119.    Effex was an affiliate of, and thus a related party to FXCM.  As noted herein: (a) Effex was founded for the purpose of creating the appearance of an independent company under the direction of FXCM; (b) Effex was funded by an interest-free loan by FXCM; (c) Effex was required to turn over 70% of its profits to FXCM; (d) Effex operated out of FXCM's offices rent-free; (e) certain FXCM employees worked the majority of their time for Effex; (f) all of Effex's business and revenue was either generated through FXCM or was dependent on FXCM to provide the pricing and transaction data to engage in its business; and (g)  FXCM paid bonuses to its employees who assisted Effex on account of their work for Effex. These facts demonstrate that Effex was controlled by FXCM.


**Defendants' False and Misleading Class Period Statements To Investors**

## 2011 10-K

120.    The Class Period Begins on March 15, 2012, when the Company filed an annual report on Form 10-K with the SEC announcing the Company's financial and operating results for the fiscal year ended December 31, 2011 (the "2011 10-K").  The 2011 10-K was signed by Defendants Niv, Sakhai, Ahdout, Grossman, Yusupov, Lande, Brown, Silverman, Gruen, Davis, Fish and LeGoff.

121.    The 2011 10-K touted the Company's agency model, which purportedly aligned its interests with those of its customers, stating in relevant part:

> ***Our agency model is fundamental to our core business philosophy because we believe that it aligns our interests with those of our customer***s, reduces our risks and provides distinct advantages over the principal model used by the majority of retail FX brokers. ***In the principal model, the retail FX broker sets the price it presents to the customer and may maintain its trading position if it believes the price may move in its favor and against the customer. We believe this creates an inherent conflict between the interests of the customer and those of the principal model broker.***

(Emphasis added).

122.    The 2011 10-K also noted the huge importance of FXCM's retail trading operations to the overall success of the Company, noting that the Company's "retail trading segment accounted for 87.5% of its total revenues in 2011."  The Company's NDD platform, supposedly using "agency execution," was similarly vital to FXCM's retail trading segment.  The Company stated in the 2011 10-K that "[a]gency execution represented approximately 86% of our retail trading volume in 2011."

123.    The 2011 10-K also stated that FXCM "utilize[s] what is referred to as agency execution or an agency model. … This service allows customers to obtain optimal prices offered by external banks."

124.    The Company also noted in its 2011 10-K that "[r]etail trading revenue is our largest source of revenue and is primarily driven by: (i) the number of active accounts and the mix of those accounts, such as low versus high volume accounts; … and (iv) the amount of additional retail revenues earned, including … payments we receive for order flow from FX market makers."

125.    Finally, recognizing the outsized importance of the Company's retail trading segment, FXCM stated that "[o]ur ability to attract and retain customers and employees may be adversely affected if our reputation is damaged. If we fail, or appear to fail, to deal with issues that may give rise to reputation risk, we could harm our business prospects."

126.    The above statements in the 2011 10-K were materially false and misleading because: (1) from September 4, 2009 through at least 2016, FXCM engaged in false and misleading solicitations of its retail foreign exchange customers by concealing its relationship with its most important market maker, Effex, and by misrepresenting that its NDD platform had no conflicts of interest with its customers; (2) FXCM was earning illicit profits on its NDD platform as it was on both sides of its customers' trades through its arrangement with Effex, in direct contravention to its stated "core" business; (3) FXCM and Defendant Niv made false statements to the NFA about the Company's relationship with Effex; and (4) as a result, Defendants' statements about FXCM's business, operations and prospects were materially false and misleading and/or lacked a reasonable basis at all relevant times.

127.    The 2011 10-K contained financial statements for FXCM that Defendants stated were prepared according to GAAP.  Because FXCM received 70% of Effex's profits, it was the primary beneficiary of Effex's business and GAAP required FXCM to consolidate Effex on its consolidated financial statements and to report a non-controlling interest related to Effex held by

Dittami.  Alternatively, GAAP required FXCM to disclose that Effex was a related party and the nature and amount of the income FXCM earned from Effex.

128.    FXCM's financial statements in the 2011 10-K were false and misleading and violated GAAP because FXCM failed to either consolidate Effex's business with its own or to disclose Effex as a related party.

129.    The 2011 10-K also included signed SOX certifications by Defendants Niv and Lande attesting to the accuracy of the 2011 10-K and certifying that Niv and Lande each disclosed "[a]ny fraud, whether or not material" to FXCM's auditor and audit committee.

130.    These SOX certifications were materially false and misleading because: (1) from September 4, 2009 through at least 2016, FXCM engaged in false and misleading solicitations of its retail foreign exchange customers by concealing its relationship with its most important market maker, Effex, and by misrepresenting that its NDD platform had no conflicts of interest with its customers; (2) FXCM was earning illicit profits on its NDD platform as it was on both sides of its customers' trades through its arrangement with Effex, in direct contravention to its stated "core" business; (3) FXCM and Defendant Niv made false statements to the NFA about the Company's relationship with Effex; (4) the accompanying financial statements were false as they failed to consolidate Effex and failed to disclose material related party transactions involving Effex; and (5) as a result, Defendants' statements about FXCM's business, operations and prospects were materially false and misleading and/or lacked a reasonable basis at all relevant times.

**12Q1 10-Q**

131.    On May 10, 2012, the Company filed a quarterly report on Form 10-Q with the SEC announcing the Company's financial and operating results for the quarter ended March 31, 2012 (the "12Q1 10-Q").  The 12Q1 10-Q was signed by Defendants Niv and Lande.

132.    The 12Q1 10-Q continued to champion FXCM's purported agency model, stating that the Company "utilizes what is referred to as an agency execution or agency model. … This service allows customers to obtain optimal prices offered by external banks. The counterparties to these trades are external financial institutions that hold customer account balances and settle the transactions."

133.    The Company further described its agency model and retail trading revenue in the 12Q1 10-Q, stating that "[t]he retail trading revenue is earned utilizing an agency model. Under the agency model, when a customer executes a trade on the best price quotation presented by the FX market maker, the Company acts as a credit intermediary, or a riskless principal, simultaneously entering into a trade with the customer and the FX market maker."

134.    The 12Q1 10-Q also stated that "[i]ncome earned on order flow represents payments received from certain FX market makers in exchange for routing trade orders to these firms for execution.  The Company's order routing software ensures that payments for order flow do not affect the routing of orders in a manner that is detrimental to its retail customers."

135.    The 12Q1 10-Q again noted that "[r]etail trading revenue is our largest source of revenue and is primarily driven by: (i) the number of active accounts and the mix of those accounts, such as low versus high volume accounts; … and (iv) the amount of additional retail revenues earned, including … payments we receive for order flow from FX market makers."

136.    The above statements in the 12Q1 10-Q were materially false and misleading because: (1) from September 4, 2009 through at least 2016, FXCM engaged in false and misleading solicitations of its retail foreign exchange customers by concealing its relationship with its most important market maker, Effex, and by misrepresenting that its NDD platform had no conflicts of interest with its customers; (2) FXCM was earning illicit profits on its NDD platform as it was on

both sides of its customers' trades through its arrangement with Effex, in direct contravention to its stated "core" business; (3) FXCM and Defendant Niv made false statements to the NFA about the Company's relationship with Effex; and (4) as a result, Defendants' statements about FXCM's business, operations and prospects were materially false and misleading and/or lacked a reasonable basis at all relevant times.

137.    The 12Q1 10-Q contained financial statements for FXCM that Defendants stated were prepared according to GAAP.  Because FXCM received 70% of Effex's profits, it was the primary beneficiary of Effex's business and GAAP required FXCM to consolidate Effex on its consolidated financial statements and to report a non-controlling interest related to Effex held by Dittami.  Alternatively, GAAP required FXCM to disclose that Effex was a related party and the nature and amount of the income FXCM earned from Effex.

138.    FXCM's financial statements in the 12Q1 10-Q were false and misleading and violated GAAP because FXCM failed to either consolidate Effex's business with its own or to disclose Effex as a related party.

139.    The 12Q1 10-Q also included signed SOX certifications by Defendants Niv and Lande attesting to the accuracy of the 12Q1 10-Q and certifying that Niv and Lande each disclosed "[a]ny fraud, whether or not material" to FXCM's auditor and audit committee.

140.    These SOX certifications were materially false and misleading because: (1) from September 4, 2009 through at least 2016, FXCM engaged in false and misleading solicitations of its retail foreign exchange customers by concealing its relationship with its most important market maker, Effex, and by misrepresenting that its NDD platform had no conflicts of interest with its customers; (2) FXCM was earning illicit profits on its NDD platform as it was on both sides of its customers' trades through its arrangement with Effex, in direct contravention to its stated "core"

business; (3) FXCM and Defendant Niv made false statements to the NFA about the Company's

relationship with Effex; (4) the accompanying financial statements were false as they failed to

consolidate Effex and failed to disclose material related party transactions involving Effex; and

(5) as a result, Defendants' statements about FXCM's business, operations and prospects were

materially false and misleading and/or lacked a reasonable basis at all relevant times.

## 12Q2 10-Q

141.   On August 9, 2012, the Company filed a quarterly report on Form 10-Q with the

SEC announcing the Company's financial and operating results for the quarter ended June 30,

2012 (the "12Q2 10-Q").  The 12Q2 10-Q was signed by Defendants Niv and Lande.

142.   In the 12Q2 10-Q, FXCM stated that "[t]he Company's primary offering to retail

customers is what is referred to as agency execution or an agency model. We earn trading fees and

commissions by adding a markup to the price provided by the FX market makers and generate our

trading revenues based on the volume of transactions, not trading profits or losses."

143.   The 12Q2 10-Q also described the agency model FXCM was purportedly using, as

well as payments for "order flow."

> Under the Company's retail agency FX offering, trading revenue is earned by
> adding a markup to the price provided by FX market makers generating trading
> revenue based on the volume of transactions and is recorded on trade date. Under
> the agency model, when a customer executes a trade on the best price quotation
> presented by the FX market maker, the Company acts as a credit intermediary, or a
> riskless principal, simultaneously entering into a trade with the customer and the
> FX market maker.
>
> * * *
>
> Income earned on order flow represents payments received from certain FX market
> makers in exchange for routing trade orders to these firms for execution. The
> Company's order routing software ensures that payments for order flow do not
> affect the routing of orders in a manner that is detrimental to its retail customers.

144.   In the 12Q2 10-Q, FXCM again stated that,

Retail trading revenue is our largest source of revenue and is primarily driven by: (i) the number of active accounts and the mix of those accounts, such as low versus high volume accounts; … and (iv) the amount of additional retail revenues earned, including revenues from contracts for difference (CFD) trading, fees earned through white label relationships and payments we receive for order flow from FX market makers.

145.    The Company explicitly recognized the risks inherent in operating a dealing desk or principal model, which it planned to launch as an option for some smaller retail clients. "We intend to launch an initiative to offer our smaller retail clients the option to trade with a dealing desk, or principal model … As a result, we may incur trading losses using principal model execution from changes in the prices of currencies where we are not hedged," and "as we have for a number of years conducted our retail operations on the basis of the agency model, we could suffer reputational damage and additional regulatory scrutiny by offering execution to retail clients that creates an inherent conflict between the interests of the customer and our interests."

146.    The above statements in the 12Q2 10-Q were materially false and misleading because: (1) from September 4, 2009 through at least 2016, FXCM engaged in false and misleading solicitations of its retail foreign exchange customers by concealing its relationship with its most important market maker, Effex, and by misrepresenting that its NDD platform had no conflicts of interest with its customers; (2) FXCM was earning illicit profits on its NDD platform as it was on both sides of its customers' trades through its arrangement with Effex, in direct contravention to its stated "core" business; (3) FXCM and Defendant Niv made false statements to the NFA about the Company's relationship with Effex; and (4) as a result, Defendants' statements about FXCM's business, operations and prospects were materially false and misleading and/or lacked a reasonable basis at all relevant times.

147.    The 12Q2 10-Q contained financial statements for FXCM that Defendants stated were prepared according to GAAP.  Because FXCM received 70% of Effex's profits, it was the

primary beneficiary of Effex's business and GAAP required FXCM to consolidate Effex on its consolidated financial statements and to report a non-controlling interest related to Effex held by Dittami.  Alternatively, GAAP required FXCM to disclose that Effex was a related party and the nature and amount of the income FXCM earned from Effex.

148.    FXCM's financial statements in the 12Q2 10-Q were false and misleading and violated GAAP because FXCM failed to either consolidate Effex's business with its own or to disclose Effex as a related party.

149.    The 12Q2 10-Q also included signed SOX by Defendants Niv and Lande attesting to the accuracy of the 12Q2 10-Q and certifying that Niv and Lande each disclosed "[a]ny fraud, whether or not material" to FXCM's auditor and audit committee.

150.    These SOX certifications were materially false and misleading because: (1) from September 4, 2009 through at least 2016, FXCM engaged in false and misleading solicitations of its retail foreign exchange customers by concealing its relationship with its most important market maker, Effex, and by misrepresenting that its NDD platform had no conflicts of interest with its customers; (2) FXCM was earning illicit profits on its NDD platform as it was on both sides of its customers' trades through its arrangement with Effex, in direct contravention to its stated "core" business; (3) FXCM and Defendant Niv made false statements to the NFA about the Company's relationship with Effex; (4) the accompanying financial statements were false as they failed to consolidate Effex and failed to disclose material related party transactions involving Effex; and (5) as a result, Defendants' statements about FXCM's business, operations and prospects were materially false and misleading and/or lacked a reasonable basis at all relevant times.

**12Q3 10-Q**

151.    On November 9, 2012, the Company filed a quarterly report on Form 10-Q with the SEC announcing the Company's financial and operating results for the quarter ended September 30, 2012 (the "12Q3 10-Q").  The 12Q3 10-Q was signed by Defendants Niv and Lande.

152.    The 12Q3 10-Q included similar statements to the other 2012 10-Qs concerning FXCM's purported agency model.

> The Company's primary offering to retail customers is what is referred to as agency execution or an agency model. We earn trading fees and commissions by adding a markup to the price provided by the FX market makers and generate our trading revenues based on the volume of transactions, not trading profits or losses.
>
> * * *
>
> Under the Company's retail agency FX offering, trading revenue is earned by adding a markup to the price provided by FX market makers generating trading revenue based on the volume of transactions and is recorded on trade date. Under the agency model, when a customer executes a trade on the best price quotation presented by the FX market maker, the Company acts as a credit intermediary, or a riskless principal, simultaneously entering into a trade with the customer and the FX market maker.
>
> * * *
>
> Income earned on order flow represents payments received from certain FX market makers in exchange for routing trade orders to these firms for execution. The Company's order routing software ensures that payments for order flow do not affect the routing of orders in a manner that is detrimental to its retail customers.
>
> * * *
>
> Retail trading revenue is our largest source of revenue and is primarily driven by: (i) the number of active accounts and the mix of those accounts, such as low versus high volume accounts; … and (iv) the amount of additional retail revenues earned, including revenues from CFD trading, fees earned through white label relationships and payments we receive for order flow from FX market makers.

153.    The above statements in the 12Q3 10-Q were materially false and misleading because: (1) from September 4, 2009 through at least 2016, FXCM engaged in false and misleading solicitations of its retail foreign exchange customers by concealing its relationship with its most important market maker, Effex, and by misrepresenting that its NDD platform had no conflicts of

interest with its customers; (2) FXCM was earning illicit profits on its NDD platform as it was on both sides of its customers' trades through its arrangement with Effex, in direct contravention to its stated "core" business; (3) FXCM and Defendant Niv made false statements to the NFA about the Company's relationship with Effex; and (4) as a result, Defendants' statements about FXCM's business, operations and prospects were materially false and misleading and/or lacked a reasonable basis at all relevant times.

154.    The 12Q3 10-Q contained financial statements for FXCM that Defendants stated were prepared according to GAAP.   Because FXCM received 70% of Effex's profits, it was the primary beneficiary of Effex's business and GAAP required FXCM to consolidate Effex on its consolidated financial statements and to report a non-controlling interest related to Effex held by Dittami.  Alternatively, GAAP required FXCM to disclose that Effex was a related party and the nature and amount of the income FXCM earned from Effex.

155.    FXCM's financial statements in the 12Q3 10-Q were false and misleading and violated GAAP because FXCM failed to either consolidate Effex's business with its own or to disclose Effex as a related party.

156.    The 12Q3 10-Q also included signed SOX certifications by Defendants Niv and Lande attesting to the accuracy of the 12Q3 10-Q and certifying that Niv and Lande each disclosed "[a]ny fraud, whether or not material" to FXCM's auditor and audit committee.

157.    These SOX certifications were materially false and misleading because: (1) from September 4, 2009 through at least 2016, FXCM engaged in false and misleading solicitations of its retail foreign exchange customers by concealing its relationship with its most important market maker, Effex, and by misrepresenting that its NDD platform had no conflicts of interest with its customers; (2) FXCM was earning illicit profits on its NDD platform as it was on both sides of its

customers' trades through its arrangement with Effex, in direct contravention to its stated "core" business; (3) FXCM and Defendant Niv made false statements to the NFA about the Company's relationship with Effex; (4) the accompanying financial statements were false as they failed to consolidate Effex and failed to disclose material related party transactions involving Effex; and (5) as a result, Defendants' statements about FXCM's business, operations and prospects were materially false and misleading and/or lacked a reasonable basis at all relevant times.

## 2012 10-K

158.    On March 18, 2013, the Company filed an annual report on Form 10-K with the SEC announcing the Company's financial and operating results for the fiscal year ended December 31, 2012 (the "2012 10-K"). The 2012 10-K was signed by Defendants Niv, Sakhai, Ahdout, Grossman, Yusupov, Lande, Brown, Silverman, Gruen, Davis, Fish, LeGoff, and Santoro.

159.    The 2012 10-K touted the Company's agency model, which purportedly aligned its interests with those of its customers, stating in relevant part:

> ***We primarily offer our customers what is referred to as an agency model to execute their trades. Our agency model is fundamental to our core business philosophy because we believe that it aligns our interests with those of our customers*** and reduces our risks. In the agency model, when our customer executes a trade on the best price quotation offered by our FX market makers, we act as a credit intermediary, or riskless principal, simultaneously entering into offsetting trades with both the customer and the FX market maker. We earn trading fees and commissions by adding a markup to the price provided by the FX market makers and generate our trading revenues based on the volume of transactions and the spread earned on transactions.

(Emphasis added).

160.    FXCM's retail trading revenues were clearly still supremely important to the Company. "Our retail trading segment accounted for 85.1% of our total revenues in 2012." FXCM also stated once more that "Retail trading revenue is our largest source of revenue and is primarily

driven by: (i) the number of active accounts and the mix of those accounts —high volume accounts

are charged a lower markup; … and (iv) retail revenues earned from CFD trading, fees earned

through white label relationships, payments we receive for order flow from FX market makers and

income from spread betting."

161.    The Company continued to emphasize its reliance on the purported agency model,

stating "our commitment to the agency model is one example of our core business philosophy to

reduce risks."

162.    In the 2012 10-K, FXCM again explained its agency model in detail.

Under our retail agency FX offering, trading revenue is earned by adding a markup
to the price provided by FX market makers generating trading revenue based on the
volume of transactions and is recorded on trade date. Under the agency model,
when a customer executes a trade on the best price quotation presented by the FX
market maker, we acts as a credit intermediary, or a riskless principal,
simultaneously entering into a trade with the customer and the FX market maker.

* * *

Income earned on order flow represents payments received from certain FX market
makers in exchange for routing trade orders to these firms for execution. Our order
routing software ensures that payments for order flow do not affect the routing of
orders in a manner that is detrimental to its retail customers.

* * *

The Company's primary offering to retail customers is what is referred to as agency
execution or an agency model. Under the agency model, when a customer executes
a trade on the price quotation presented by the FX market maker, the Company acts
as a credit intermediary, or a riskless principal, simultaneously entering into a trade
with the customer and the FX market maker. The Company earns trading revenue
by adding a markup to the price provided by the FX market makers, not trading
profit or losses.

163.    The above statements in the 2012 10-K were materially false and misleading

because: (1) from September 4, 2009 through at least 2016, FXCM engaged in false and misleading

solicitations of its retail foreign exchange customers by concealing its relationship with its most

important market maker, Effex, and by misrepresenting that its NDD platform had no conflicts of

interest with its customers; (2) FXCM was earning illicit profits on its NDD platform as it was on both sides of its customers' trades through its arrangement with Effex, in direct contravention to its stated "core" business; (3) FXCM and Defendant Niv made false statements to the NFA about the Company's relationship with Effex; and (4) as a result, Defendants' statements about FXCM's business, operations and prospects were materially false and misleading and/or lacked a reasonable basis at all relevant times.

164.    The 2012 10-K contained financial statements for FXCM that Defendants stated were prepared according to GAAP.   Because FXCM received 70% of Effex's profits, it was the primary beneficiary of Effex's business and GAAP required FXCM to consolidate Effex on its consolidated financial statements and to report a non-controlling interest related to Effex held by Dittami.  Alternatively, GAAP required FXCM to disclose that Effex was a related party and the nature and amount of the income FXCM earned from Effex.

165.    FXCM's financial statements in the 2012 10-K were false and misleading and violated GAAP because FXCM failed to either consolidate Effex's business with its own or to disclose Effex as a related party.

166.    The 2012 10-K also included signed SOX certifications  by Defendants Niv and Lande attesting to the accuracy of the 2012 10-K and certifying that Niv and Lande each disclosed "[a]ny fraud, whether or not material" to FXCM's auditor and audit committee.

167.    These SOX certifications were materially false and misleading because: (1) from September 4, 2009 through at least 2016, FXCM engaged in false and misleading solicitations of its retail foreign exchange customers by concealing its relationship with its most important market maker, Effex, and by misrepresenting that its NDD platform had no conflicts of interest with its customers; (2) FXCM was earning illicit profits on its NDD platform as it was on both sides of its

customers' trades through its arrangement with Effex, in direct contravention to its stated "core"

business; (3) FXCM and Defendant Niv made false statements to the NFA about the Company's

relationship with Effex; (4) the accompanying financial statements were false as they failed to

consolidate Effex and failed to disclose material related party transactions involving Effex; and

(5) as a result, Defendants' statements about FXCM's business, operations and prospects were

materially false and misleading and/or lacked a reasonable basis at all relevant times.

### 2013 10-Qs

168.   On May 10, 2013, the Company filed a quarterly report on Form 10-Q with the

SEC announcing the Company's financial and operating results for the quarter ended March 31,

2013 (the "13Q1 10-Q").  The 13Q1 10-Q was signed by Defendants Niv and Lande.

169.   In the 13Q1 10-Q, FXCM noted again that the importance of retail trading revenue

to the Company, and the continuing emphasis of the agency model.

> Retail trading revenue is our largest source of revenue and is primarily driven by:
> (i) the number of active accounts and the mix of those accounts — high volume
> accounts are charged a lower markup; … and (iv) retail revenues earned from
> contract for differences ("CFD") trading, fees earned through white label
> relationships, payments we receive for order flow from FX market makers and
> income from spread betting.
>
> * * *
>
> As we predominantly operate our retail business on an agency model with the
> exception of certain trades of our CFD customers we are not exposed to the market
> risk of a position moving up or down in value.

170.   On August 8, 2013, the Company filed a quarterly report on Form 10-Q with the

SEC announcing the Company's financial and operating results for the quarter ended June 30,

2013 (the "13Q2 10-Q").  The 13Q2 10-Q was signed by Defendants Niv and Lande.

171.   The 13Q2 10-Q contained substantially identical statements as those quoted above

from the 13Q1 10-Q, touting the importance of retail trading revenue and the agency model.

172.    On November 12, 2013, the Company filed a quarterly report on Form 10-Q with the SEC announcing the Company's financial and operating results for the quarter ended September 30, 2013 (the "13Q3 10-Q").   The 13Q3 10-Q was signed by Defendants Niv and Lande.

173.    The 13Q3 10-Q contained substantially identical statements as those quoted above from the 13Q1 and 13Q2 10-Qs (together with the 13Q3 10-Q, the "2013 10-Qs"), touting the importance of retail trading revenue and the agency model.

174.    The above statements in the 2013 10-Qs were materially false and misleading because: (1) from September 4, 2009 through at least 2016, FXCM engaged in false and misleading solicitations of its retail foreign exchange customers by concealing its relationship with its most important market maker, Effex, and by misrepresenting that its NDD platform had no conflicts of interest with its customers; (2) FXCM was earning illicit profits on its NDD platform as it was on both sides of its customers' trades through its arrangement with Effex, in direct contravention to its stated "core" business; (3) FXCM and Defendant Niv made false statements to the NFA about the Company's relationship with Effex; and (4) as a result, Defendants' statements about FXCM's business, operations and prospects were materially false and misleading and/or lacked a reasonable basis at all relevant times.

175.    The 10-Qs contained financial statements for FXCM that Defendants stated were prepared according to GAAP.   Because FXCM received 70% of Effex's profits, it was the primary beneficiary of Effex's business and GAAP required FXCM to consolidate Effex on its consolidated financial statements and to report a non-controlling interest related to Effex held by Dittami. Alternatively, GAAP required FXCM to disclose that Effex was a related party and the nature and amount of the income FXCM earned from Effex.

176.    FXCM's financial statements in the 2013 10-Qs were false and misleading and violated GAAP because FXCM failed to either consolidate Effex's business with its own or to disclose Effex as a related party

177.    The 2013 10-Qs also included signed SOX certifications by Defendants Niv and Lande attesting to the accuracy of the 2013 10-Qs and certifying that Niv and Lande each disclosed "[a]ny fraud, whether or not material" to FXCM's auditor and audit committee.

178.    These SOX certifications were materially false and misleading because: (1) from September 4, 2009 through at least 2016, FXCM engaged in false and misleading solicitations of its retail foreign exchange customers by concealing its relationship with its most important market maker, Effex, and by misrepresenting that its NDD platform had no conflicts of interest with its customers; (2) FXCM was earning illicit profits on its NDD platform as it was on both sides of its customers' trades through its arrangement with Effex, in direct contravention to its stated "core" business; (3) FXCM and Defendant Niv made false statements to the NFA about the Company's relationship with Effex; ; (4) the accompanying financial statements were false as they failed to consolidate Effex and failed to disclose material related party transactions involving Effex; and (5) as a result, Defendants' statements about FXCM's business, operations and prospects were materially false and misleading and/or lacked a reasonable basis at all relevant times.

**The FXCM Notes**

179.    On May 29, 2013, the Company issued a press release announcing the pricing of the FXCM Notes (the "May 29, 2013 Press Release"), stating in part:

### FXCM Inc. Announces Pricing of Private Offering of $150 Million of 2.25% Convertible Senior Notes due 2018

NEW YORK--(BUSINESS WIRE) -- FXCM Inc. (NYSE: FXCM) today announced the pricing of its private offering of $150.0 million aggregate principal amount of 2.25% Convertible Senior Notes due 2018, which was upsized from the

previously announced $125.0 million offering, to be sold only to qualified institutional buyers pursuant to Rule 144A under the Securities Act of 1933, as amended (the "Securities Act"). FXCM Inc. has also granted the initial purchasers of the notes a 30-day option to purchase up to an additional $22.5 million in aggregate principal amount of notes. The offering is expected to close on June 3, 2013, subject to customary closing conditions.

The notes will pay interest semi-annually in cash on June 15 and December 15 at a rate of 2.25% per year, commencing December 15, 2013. The notes will mature on June 15, 2018.

180.   On June 3, 2013, the Company filed a Form 8-K detailing the sale of the FXCM Notes (the "June 3, 2013 8-K"), stating in part:

**Item 1.01        Entry into a Material Definitive Agreement.**

Purchase Agreement

On May 28, 2013, FXCM, Inc. (the "Company") entered into a purchase agreement (the "Purchase Agreement") with Credit Suisse Securities (USA) LLC and Merrill Lynch, Pierce, Fenner & Smith Incorporated, as representatives of the several purchasers named in Schedule A thereto (the "Initial Purchasers"), pursuant to which the Company agreed to sell $150.0 million aggregate principal amount of 2.25% Convertible Senior Notes due 2018 (the "Firm Notes") and, at the option of the Initial Purchasers, up to an additional $22.5 million aggregate principal amount of 2.25% Convertible Senior Notes due 2018 (the "Option Notes" and, together with the Firm Notes, the "Notes").

On May 30, 2013, the Initial Purchasers exercised their option in full in respect of the Option Notes. On June 3, 2013, the Company issued and sold to the Initial Purchasers $172.5 million aggregate principal amount of the Notes upon payment pursuant to the Purchase Agreement.

181.   Attached as Exhibit 10.1 to the June 3, 2013 8-K was the Purchase Agreement (the "June 3, 2013 Purchase Agreement"), stating in part:

*(xx) Internal Controls and Compliance with the Sarbanes-Oxley Act*. Except as set forth in the General Disclosure Package, the Company, its subsidiaries and the Company's Board of Directors (the "Board") are in compliance with all applicable Exchange Rules and all provisions of Sarbanes-Oxley and all rules and regulations

45

promulgated thereunder or implementing the provisions thereof with which the Company is required to comply. The Company maintains a system of internal controls, including, but not limited to, disclosure controls and procedures, internal controls over accounting matters and financial reporting, an internal audit function, and legal and regulatory compliance controls (collectively, "Internal Controls") that are sufficient to provide reasonable assurances that (i) transactions are executed in accordance with management's general or specific authorizations, (ii) transactions are recorded as necessary to permit preparation of financial statements in conformity with U.S. Generally Accepted Accounting Principles ("GAAP") and to maintain accountability for assets, (iii) access to assets is permitted only in accordance with management's general or specific authorization, (iv) the recorded accountability for assets is compared with the existing assets at reasonable intervals and appropriate action is taken with respect to any differences, and (v) the interactive data in eXtensible Business Reporting Language included or incorporated by reference in the General Disclosure Package and the Final Offering Circular fairly presents the information called for in all material respects and is prepared in accordance with the Commission's rules and guidelines applicable thereto.

182.    The SOX certifications contained in the June 3, 2013 Purchase Agreement, attached as an exhibit to the June 3, 2013 8-K detailing the sale of the FXCM Notes, were signed by Defendants Niv and Lande and attested to the accuracy of financial reporting, the disclosure of any material changes to the Company's internal control over financial reporting and the disclosure of all fraud.

183.    These SOX certifications were materially false and misleading because: (1) from September 4, 2009 through at least 2016, FXCM engaged in false and misleading solicitations of its retail foreign exchange customers by concealing its relationship with its most important market maker, Effex, and by misrepresenting that its NDD platform had no conflicts of interest with its customers; (2) FXCM was earning illicit profits on its NDD platform as it was on both sides of its customers' trades through its arrangement with Effex, in direct contravention to its stated "core" business; (3) FXCM and Defendant Niv made false statements to the NFA about the Company's relationship with Effex; ; (4) the accompanying financial statements were false as they failed to consolidate Effex and failed to disclose material related party transactions involving Effex; and

(5) as a result, Defendants' statements about FXCM's business, operations and prospects were materially false and misleading and/or lacked a reasonable basis at all relevant times.

## 2013 10-K

184.     On March 17, 2014, the Company filed an annual report on Form 10-K with the SEC announcing the Company's financial and operating results for the fiscal year ended December 31, 2013 (the "2013 10-K"). The 2013 10-K was signed by Defendants Niv, Sakhai, Ahdout, Grossman, Yusupov, Lande, Brown, Silverman, Gruen, Davis, Fish, LeGoff, and Santoro.

185.     The 2013 10-K touted the Company's agency model, which purportedly aligned its interests with those of its customers, stating in relevant part:

> ***We primarily offer our customers what is referred to as an agency model to execute their trades. Our agency model is fundamental to our core business philosophy because we believe that it aligns our interests with those of our customers*** and reduces our risks. In the agency model, when our customer executes a trade on the best price quotation offered by our FX market makers, we act as a credit intermediary, or riskless principal, simultaneously entering into offsetting trades with both the customer and the FX market maker. We earn trading fees and commissions by adding a markup to the price provided by the FX market makers.

(Emphasis added).

186.     The Company once again noted the importance of retail trading revenues, stating that the "retail trading segment accounted for 77.4% of our total net revenues in 2013," and that "[r]etail trading revenue is our largest source of revenue and is primarily driven by: (i) the number of active accounts and the mix of those accounts — high volume accounts are charged a lower markup; …and (iv) retail revenues earned from contract for differences ("CFD") trading, fees earned through white label relationships, payments we receive for order flow from FX market makers and commission income earned from spread betting, equity and related brokerage activities."

187.    FXCM also recognized that "as we have for a number of years conducted our retail operations on the basis of the agency model, we could suffer reputational damage and additional regulatory scrutiny by offering execution to retail clients that creates an inherent conflict between the interests of the customer and our interests."

188.    The Company described the agency model and order flow revenues again in the 2013 10-K.

> Under our retail agency FX offering, trading revenue is earned by adding a markup to the price provided by FX market makers generating trading revenue based on the volume of transactions and is recorded on trade date. Under the agency model, when a customer executes a trade on the best price quotation presented by the FX market maker, we act as a credit intermediary, or a riskless principal, simultaneously entering into a trade with the customer and the FX market maker.
>
> \* \* \*
>
> Income earned on order flow represents payments received from certain FX market makers in exchange for routing trade orders to these firms for execution. Our order routing software ensures that payments for order flow do not affect the routing of orders in a manner that is detrimental to our retail customers.
>
> \* \* \*
>
> The Company's primary offering to retail customers is what is referred to as agency execution or an agency model. Under the agency model, when a customer executes a trade on the price quotation presented by the FX market maker, the Company acts as a credit intermediary, or a riskless principal, simultaneously entering into a trade with the customer and the FX market maker. The Company earns trading revenue by adding a markup to the price provided by the FX market makers, not trading profit or losses.

189.    The above statements in the 2013 10-K were materially false and misleading because: (1) from September 4, 2009 through at least 2016, FXCM engaged in false and misleading solicitations of its retail foreign exchange customers by concealing its relationship with its most important market maker, Effex, and by misrepresenting that its NDD platform had no conflicts of interest with its customers; (2) FXCM was earning illicit profits on its NDD platform as it was on both sides of its customers' trades through its arrangement with Effex, in direct contravention to

its stated "core" business; (3) FXCM and Defendant Niv made false statements to the NFA about the Company's relationship with Effex; and (4) as a result, Defendants' statements about FXCM's business, operations and prospects were materially false and misleading and/or lacked a reasonable basis at all relevant times.

190.    The 2013 10-K contained financial statements for FXCM that Defendants stated were prepared according to GAAP.  Because FXCM received 70% of Effex's profits, it was the primary beneficiary of Effex's business and GAAP required FXCM to consolidate Effex on its consolidated financial statements and to report a non-controlling interest related to Effex held by Dittami.  Alternatively, GAAP required FXCM to disclose that Effex was a related party and the nature and amount of the income FXCM earned from Effex.

191.    FXCM's financial statements in the 2013 10-K were false and misleading and violated GAAP because FXCM failed to either consolidate Effex's business with its own or to disclose Effex as a related party.

192.    The 2013 10-K also included signed SOX certifications by Defendants Niv and Lande attesting to the accuracy of the 2013 10-K and certifying that Niv and Lande each disclosed "[a]ny fraud, whether or not material" to FXCM's auditor and audit committee.

193.    These SOX certifications were materially false and misleading because: (1) from September 4, 2009 through at least 2016, FXCM engaged in false and misleading solicitations of its retail foreign exchange customers by concealing its relationship with its most important market maker, Effex, and by misrepresenting that its NDD platform had no conflicts of interest with its customers; (2) FXCM was earning illicit profits on its NDD platform as it was on both sides of its customers' trades through its arrangement with Effex, in direct contravention to its stated "core" business; (3) FXCM and Defendant Niv made false statements to the NFA about the Company's

relationship with Effex; (4) the accompanying financial statements were false as they failed to consolidate Effex and failed to disclose material related party transactions involving Effex; and (5) as a result, Defendants' statements about FXCM's business, operations and prospects were materially false and misleading and/or lacked a reasonable basis at all relevant times.

**2014 10-Qs**

194.    On May 12, 2014, the Company filed a quarterly report on Form 10-Q with the SEC announcing the Company's financial and operating results for the quarter ended March 31, 2014 (the "14Q1 10-Q").  The 14Q1 10-Q was signed by Defendants Niv and Lande.

195.    The 14Q1 10-Q echoed the 2013 10-Qs with substantially identical statements about the importance of retail trading revenues and the Company's use of the agency model.

196.    On August 8, 2014, the Company filed a quarterly report on Form 10-Q with the SEC announcing the Company's financial and operating results for the quarter ended June 30, 2014 (the "14Q2 10-Q").  The 14Q2 10-Q was signed by Defendants Niv and Lande.

197.    The 14Q2 10-Q echoed the 14Q1 and 2013 10-Qs with substantially identical statements about the importance of retail trading revenues and the Company's use of the agency model.

198.    On November 7, 2014, the Company filed a quarterly report on Form 10-Q with the SEC announcing the Company's financial and operating results for the quarter ended September 30, 2014 (the "14Q3 10-Q").  The 14Q3 10-Q was signed by Defendants Niv and Lande.

199.    The 14Q3 10-Q echoed the sentiments of the 14Q1 and 14Q2 10-Qs (together with the 14Q3 10-Q, the "2014 10-Qs") and the 2013 10-Qs with substantially similar statements about the importance of retail trading revenues and the Company's use of the agency model.  The 14Q3

10-Q also noted that as of August 1, 2014, the Company "no longer receive[d] payments for order flow."

200.   The above statements in the 2014 10-Qs were materially false and misleading because: (1) from September 4, 2009 through at least 2016, FXCM engaged in false and misleading solicitations of its retail foreign exchange customers by concealing its relationship with its most important market maker, Effex, and by misrepresenting that its NDD platform had no conflicts of interest with its customers; (2) FXCM was earning illicit profits on its NDD platform as it was on both sides of its customers' trades through its arrangement with Effex, in direct contravention to its stated "core" business; (3) FXCM and Defendant Niv made false statements to the NFA about the Company's relationship with Effex; and (4) as a result, Defendants' statements about FXCM's business, operations and prospects were materially false and misleading and/or lacked a reasonable basis at all relevant times.

201.   The 2014 10-Qs contained financial statements for FXCM that Defendants stated were prepared according to GAAP.  Because FXCM received 70% of Effex's profits, it was the primary beneficiary of Effex's business and GAAP required FXCM to consolidate Effex on its consolidated financial statements and to report a non-controlling interest related to Effex held by Dittami.  Alternatively, GAAP required FXCM to disclose that Effex was a related party and the nature and amount of the income FXCM earned from Effex.

202.   FXCM's financial statements in the 2014 10-Qs were false and misleading and violated GAAP because FXCM failed to either consolidate Effex's business with its own or to disclose Effex as a related party.

203.    The 2014 10-Qs also included signed SOX certifications by Defendants Niv and

Lande attesting to the accuracy of the 2014 10-Qs and certifying that Niv and Lande each disclosed

"[a]ny fraud, whether or not material" to FXCM's auditor and audit committee.

204.    These SOX certifications were materially false and misleading because: (1) from

September 4, 2009 through at least 2016, FXCM engaged in false and misleading solicitations of

its retail foreign exchange customers by concealing its relationship with its most important market

maker, Effex, and by misrepresenting that its NDD platform had no conflicts of interest with its

customers; (2) FXCM was earning illicit profits on its NDD platform as it was on both sides of its

customers' trades through its arrangement with Effex, in direct contravention to its stated "core"

business; (3) FXCM and Defendant Niv made false statements to the NFA about the Company's

relationship with Effex; (4) the accompanying financial statements were false as they failed to

consolidate Effex and failed to disclose material related party transactions involving Effex; and

(4) as a result, Defendants' statements about FXCM's business, operations and prospects were

materially false and misleading and/or lacked a reasonable basis at all relevant times.

## 2014 10-K

205.    On March 16, 2015, the Company filed an annual report on Form 10-K with the

SEC announcing the Company's financial and operating results for the fiscal year ended December

31, 2012 (the "2014 10-K"). The 2014 10-K was signed by Defendants Niv, Sakhai, Ahdout,

Grossman, Yusupov, Lande, Brown, Silverman, Gruen, Davis, Fish, LeGoff and Santoro.

206.    The 2014 10-K touted the Company's agency model, which purportedly aligned its

interests with those of its customers, stating in relevant part:

> ***We primarily offer our customers what is referred to as an agency model to
> execute their trades. Our agency model is fundamental to our core business
> philosophy because we believe that it aligns our interests with those of our
> customers*** and reduces our risks. In the agency model, when our customer executes

a trade on the best price quotation offered by our FX market makers, we act as a credit intermediary, or riskless principal, simultaneously entering into offsetting trades with both the customer and the FX market maker. This agency model has the effect of automatically hedging our positions and eliminating market risk exposure. Generally, we earn trading fees through commissions or by adding a markup to the price provided by the FX market makers. In certain geographic locations, we provide our customers with the price provided by the FX market makers and display trading fees and commissions separately.

(Emphasis added).

207.    In FXCM's 2014 10-K, the Company also stated that "[o]ur retail trading segment accounted for 76.6% of our total trading revenues in 2014."

208.    The 2014 10-K also contained similar quotes to the prior years' 10-K filings.

We primarily utilize what is commonly referred to as an agency model, which we have been offering to customers since July 2007. In our agency model, when a customer executes a trade with us, we act as a credit intermediary, or riskless principal, simultaneously entering into trades with the customer and the FX market maker. We have continued to invest in our agency platform, adding additional FX market makers, improving execution and adding features to enhance the trading experience of our customers, and believe that our commitment to the agency model reflects our core business philosophy to reduce risks.

* * *

…as we have for a number of years conducted our retail operations on the basis of the agency model, we could suffer reputational damage and additional regulatory scrutiny by offering execution to retail clients that creates an inherent conflict between the interests of the customer and our interests.

* * *

Under the agency model, when a customer executes a trade on the best price quotation presented by the FX market maker, we act as a credit intermediary, or a riskless principal, simultaneously entering into a trade with the customer and the FX market maker.

* * *

Income earned on order flow represents payments received from certain FX market makers in exchange for routing trade orders to these firms for execution. Our order routing software ensures that payments for order flow do not affect the routing of orders in a manner that is detrimental to our retail customers.

209.    The above statements in the 2014 10-K were materially false and misleading because: (1) from September 4, 2009 through at least 2016, FXCM engaged in false and misleading solicitations of its retail foreign exchange customers by concealing its relationship with its most important market maker, Effex, and by misrepresenting that its NDD platform had no conflicts of interest with its customers; (2) FXCM was earning illicit profits on its NDD platform as it was on both sides of its customers' trades through its arrangement with Effex, in direct contravention to its stated "core" business; (3) FXCM and Defendant Niv made false statements to the NFA about the Company's relationship with Effex; and (4) as a result, Defendants' statements about FXCM's business, operations and prospects were materially false and misleading and/or lacked a reasonable basis at all relevant times.

210.    The 2014 10-K contained financial statements for FXCM that Defendants stated were prepared according to GAAP.  Because FXCM received 70% of Effex's profits, it was the primary beneficiary of Effex's business and GAAP required FXCM to consolidate Effex on its consolidated financial statements and to report a non-controlling interest related to Effex held by Dittami.  Alternatively, GAAP required FXCM to disclose that Effex was a related party and the nature and amount of the income FXCM earned from Effex.

211.    FXCM's financial statements in the 2014 10-K were false and misleading and violated GAAP because FXCM failed to either consolidate Effex's business with its own or to disclose Effex as a related party.

212.    The 2014 10-K also included signed SOX certifications by Defendants Niv and Lande attesting to the accuracy of the 2014 10-K and certifying that Niv and Lande each disclosed "[a]ny fraud, whether or not material" to FXCM's auditor and audit committee.

213.     These SOX certifications were materially false and misleading because: (1) from September 4, 2009 through at least 2016, FXCM engaged in false and misleading solicitations of its retail foreign exchange customers by concealing its relationship with its most important market maker, Effex, and by misrepresenting that its NDD platform had no conflicts of interest with its customers; (2) FXCM was earning illicit profits on its NDD platform as it was on both sides of its customers' trades through its arrangement with Effex, in direct contravention to its stated "core" business; (3) FXCM and Defendant Niv made false statements to the NFA about the Company's relationship with Effex; (4) the accompanying financial statements were false as they failed to consolidate Effex and failed to disclose material related party transactions involving Effex; and (5) as a result, Defendants' statements about FXCM's business, operations and prospects were materially false and misleading and/or lacked a reasonable basis at all relevant times.

## 2015 10-Qs

214.     On May 11, 2015, the Company filed a quarterly report on Form 10-Q with the SEC announcing the Company's financial and operating results for the quarter ended March 31, 2015 (the "15Q1 10-Q").  The 15Q1 10-Q was signed by Defendants Niv and Lande.

215.     The 15Q1 10-Q repeated the 2013 and 2014 10-Qs with substantially identical statements about the importance of retail trading revenues and the Company's use of the agency model.

216.     On August 7, 2015, the Company filed a quarterly report on Form 10-Q with the SEC announcing the Company's financial and operating results for the quarter ended June 30, 2015 (the "15Q2 10-Q").  The 15Q2 10-Q was signed by Defendants Niv and Lande.

217.    The 15Q2 10-Q reiterated statements from the 15Q1 10-Q and the 2013 and 2014 10-Qs with substantially identical statements about the importance of retail trading revenues and the Company's predominant use of the agency model.

218.    On November 6, 2015, the Company filed a quarterly report on Form 10-Q with the SEC announcing the Company's financial and operating results for the quarter ended September 30, 2015 (the "15Q3 10-Q").  The 15Q3 10-Q was signed by Defendants Niv and Lande.

219.    The 15Q3 10-Q echoed the sentiments of the 15Q1 and 15Q2 10-Qs (together with the 15Q3 10-Q, the "2015 10-Qs") and the 2013 and 2014 10-Qs with substantially similar statements about the importance of retail trading revenues and the Company's predominant use of the agency model.

220.    The above statements in the 2015 10-Qs were materially false and misleading because: (1) from September 4, 2009 through at least 2016, FXCM engaged in false and misleading solicitations of its retail foreign exchange customers by concealing its relationship with its most important market maker, Effex, and by misrepresenting that its NDD platform had no conflicts of interest with its customers; (2) FXCM was earning illicit profits on its NDD platform as it was on both sides of its customers' trades through its arrangement with Effex, in direct contravention to its stated "core" business; (3) FXCM and Defendant Niv made false statements to the NFA about the Company's relationship with Effex; and (4) as a result, Defendants' statements about FXCM's business, operations and prospects were materially false and misleading and/or lacked a reasonable basis at all relevant times.

221.    The 2015 10-Qs contained financial statements for FXCM that Defendants stated were prepared according to GAAP.  Because FXCM received 70% of Effex's profits, it was the

primary beneficiary of Effex's business and GAAP required FXCM to consolidate Effex on its consolidated financial statements and to report a non-controlling interest related to Effex held by Dittami.  Alternatively, GAAP required FXCM to disclose that Effex was a related party and the nature and amount of the income FXCM earned from Effex.

222.    FXCM's financial statements in the 2015 10-Qs were false and misleading and violated GAAP because FXCM failed to either consolidate Effex's business with its own or to disclose Effex as a related party.


223.    The 2015 10-Qs also included signed SOX certifications by Defendants Niv and Lande attesting to the accuracy of the 2015 10-Qs and certifying that Niv and Lande each disclosed "[a]ny fraud, whether or not material" to FXCM's auditor and audit committee.

224.    These SOX certifications were materially false and misleading because: (1) from September 4, 2009 through at least 2016, FXCM engaged in false and misleading solicitations of its retail foreign exchange customers by concealing its relationship with its most important market maker, Effex, and by misrepresenting that its NDD platform had no conflicts of interest with its customers; (2) FXCM was earning illicit profits on its NDD platform as it was on both sides of its customers' trades through its arrangement with Effex, in direct contravention to its stated "core" business; (3) FXCM and Defendant Niv made false statements to the NFA about the Company's relationship with Effex; (4) the accompanying financial statements were false as they failed to consolidate Effex and failed to disclose material related party transactions involving Effex; and (5) as a result, Defendants' statements about FXCM's business, operations and prospects were materially false and misleading and/or lacked a reasonable basis at all relevant times.

**2015 10-K**

225.    On March 11, 2016, the Company filed an annual report on Form 10-K with the SEC announcing the Company's financial and operating results for the fiscal year ended December 31, 2015 (the "2015 10-K"). The 2015 10-K was signed by Defendants Niv, Sakhai, Ahdout, Grossman, Yusupov, Lande, Brown, Silverman, Gruen, Davis, Reyhani, LeGoff and Deverell.

226.    The 2015 10-K touted the Company's agency model, which purportedly aligned its interests with those of its customers, stating in relevant part:

> ***We primarily offer our customers what is referred to as an agency model to execute their trades. Our agency model is fundamental to our core business philosophy because we believe that it aligns our interests with those of our customers*** and reduces our risks. In the agency model, when our customer executes a trade on the best price quotation offered by our FX market makers, we act as a credit intermediary, or riskless principal, simultaneously entering into offsetting trades with both the customer and the FX market maker. This agency model has the effect of automatically hedging our positions and eliminating market risk exposure.

(Emphasis added).

227.    The 2015 10-K also stated that at that point in time, "[w]e operate our business in a single segment, retail trading."

228.    FXCM again made familiar statements concerning its purported agency model in the 2015 10-K.

> We primarily utilize what is commonly referred to as an agency model, which we have been offering to customers since July 2007. In our agency model, when a customer executes a trade with us, we act as a credit intermediary, or riskless principal, simultaneously entering into trades with the customer and the FX market maker.
>
> * * *
>
> The Company's primary offering to retail customers is what is referred to as agency execution or an agency model. Under the agency model, when a customer executes a trade on the price quotation presented by the FX market maker, the Company acts as a credit intermediary, or a riskless principal, simultaneously entering into a trade with the customer and the FX market maker.
>
> * * *

…as we have for a number of years conducted our retail operations on the basis of the agency model, we could suffer reputational damage and additional regulatory scrutiny by offering execution to retail clients that creates an inherent conflict between the interests of the customer and our interests.

229.    The above statements in the 2015 10-K were materially false and misleading because: (1) from September 4, 2009 through at least 2016, FXCM engaged in false and misleading solicitations of its retail foreign exchange customers by concealing its relationship with its most important market maker, Effex, and by misrepresenting that its NDD platform had no conflicts of interest with its customers; (2) FXCM was earning illicit profits on its NDD platform as it was on both sides of its customers' trades through its arrangement with Effex, in direct contravention to its stated "core" business; (3) FXCM and Defendant Niv made false statements to the NFA about the Company's relationship with Effex; and (4) as a result, Defendants' statements about FXCM's business, operations and prospects were materially false and misleading and/or lacked a reasonable basis at all relevant times.

230.    The 2015 10-K contained financial statements for FXCM that Defendants stated were prepared according to GAAP.  Because FXCM received 70% of Effex's profits, it was the primary beneficiary of Effex's business and GAAP required FXCM to consolidate Effex on its consolidated financial statements and to report a non-controlling interest related to Effex held by Dittami.  Alternatively, GAAP required FXCM to disclose that Effex was a related party and the nature and amount of the income FXCM earned from Effex.

231.    FXCM's financial statements in the 2015 10-K were false and misleading and violated GAAP because FXCM failed to either consolidate Effex's business with its own or to disclose Effex as a related party.

232.    The 2015 10-K also included signed SOX certifications by Defendants Niv and Lande attesting to the accuracy of the 2015 10-K and certifying that Niv and Lande each disclosed "[a]ny fraud, whether or not material" to FXCM's auditor and audit committee.

233.    These SOX certifications were materially false and misleading because: (1) from September 4, 2009 through at least 2016, FXCM engaged in false and misleading solicitations of its retail foreign exchange customers by concealing its relationship with its most important market maker, Effex, and by misrepresenting that its NDD platform had no conflicts of interest with its customers; (2) FXCM was earning illicit profits on its NDD platform as it was on both sides of its customers' trades through its arrangement with Effex, in direct contravention to its stated "core" business; (3) FXCM and Defendant Niv made false statements to the NFA about the Company's relationship with Effex; (4) the accompanying financial statements were false as they failed to consolidate Effex and failed to disclose material related party transactions involving Effex; and (5) as a result, Defendants' statements about FXCM's business, operations and prospects were materially false and misleading and/or lacked a reasonable basis at all relevant times.

### 2016 10-Qs

234.    On May 6, 2016, the Company filed a quarterly report on Form 10-Q with the SEC announcing the Company's financial and operating results for the quarter ended March 31, 2016 (the "16Q1 10-Q").  The 16Q1 10-Q was signed by Defendants Niv and Lande.

235.    The 16Q1 10-Q repeated the 2013, 2014 and 2015 10-Qs with substantially identical statements about the importance of retail trading revenues and the Company's use of the agency model.

236.    On August 5, 2016, the Company filed a quarterly report on Form 10-Q with the SEC announcing the Company's financial and operating results for the quarter ended June 30, 2016 (the "16Q2 10-Q").  The 16Q2 10-Q was signed by Defendants Niv and Lande.

237.    The 16Q2 10-Q reiterated statements from the 16Q1 10-Q and the 2013, 2014 and 2015 10-Qs with substantially identical statements about the importance of retail trading revenues and the Company's predominant use of the agency model.

238.    On November 8, 2016, the Company filed a quarterly report on Form 10-Q with the SEC announcing the Company's financial and operating results for the quarter ended September 30, 2016 (the "16Q3 10-Q").  The 16Q3 10-Q was signed by Defendants Niv and Lande.

239.    The 16Q3 10-Q echoed the sentiments of the 16Q1 and 16Q2 10-Qs and the 2013, 2014 and 2015 10-Qs with substantially similar statements about the importance of retail trading revenues and the Company's predominant use of the agency model.

240.    On November 18, 2016, the Company filed an amended quarterly report on Form 10-Q/A with the SEC amending the Company's financial and operating results for the quarter ended September 30, 2016 (the "16Q3 10-Q/A", and together with the 16Q1, 16Q2 and 16Q3 10-Qs, the "2016 10-Qs").  The 16Q3 10-Q/A was signed by Defendants Niv and Lande.

241.    The 16Q3 10-Q/A contained the same statements as the 16Q3 10-Q, as noted above, concerning the importance of retail trading revenues and the Company's predominant use of the agency model.

242.    The above statements in the 2016 10-Qs were materially false and misleading because: (1) from September 4, 2009 through at least 2016, FXCM engaged in false and misleading solicitations of its retail foreign exchange customers by concealing its relationship with its most

important market maker, Effex, and by misrepresenting that its NDD platform had no conflicts of interest with its customers; (2) FXCM was earning illicit profits on its NDD platform as it was on both sides of its customers' trades through its arrangement with Effex, in direct contravention to its stated "core" business; (3) FXCM and Defendant Niv made false statements to the NFA about the Company's relationship with Effex; and (4) as a result, Defendants' statements about FXCM's business, operations and prospects were materially false and misleading and/or lacked a reasonable basis at all relevant times.

243.    The 2016 10-Qs contained financial statements for FXCM that Defendants stated were prepared according to GAAP. Because FXCM received 70% of Effex's profits, it was the primary beneficiary of Effex's business and GAAP required FXCM to consolidate Effex on its consolidated financial statements and to report a non-controlling interest related to Effex held by Dittami.  Alternatively, GAAP required FXCM to disclose that Effex was a related party and the nature and amount of the income FXCM earned from Effex.

244.    FXCM's financial statements in the 2016 10-Qs were false and misleading and violated GAAP because FXCM failed to either consolidate Effex's business with its own or to disclose Effex as a related party.

245.    The 2016 10-Qs also included signed SOX certifications by Defendants Niv and Lande attesting to the accuracy of the 2016 10-Qs and certifying that Niv and Lande each disclosed "[a]ny fraud, whether or not material" to FXCM's auditor and audit committee.

246.    These SOX certifications were materially false and misleading because: (1) from September 4, 2009 through at least 2016, FXCM engaged in false and misleading solicitations of its retail foreign exchange customers by concealing its relationship with its most important market maker, Effex, and by misrepresenting that its NDD platform had no conflicts of interest with its

customers; (2) FXCM was earning illicit profits on its NDD platform as it was on both sides of its customers' trades through its arrangement with Effex, in direct contravention to its stated "core" business; (3) FXCM and Defendant Niv made false statements to the NFA about the Company's relationship with Effex; (4) the accompanying financial statements were false as they failed to consolidate Effex and failed to disclose material related party transactions involving Effex; and (5) as a result, Defendants' statements about FXCM's business, operations and prospects were materially false and misleading and/or lacked a reasonable basis at all relevant times.

247. Additionally, the following proxy statements FXCM filed with the SEC on Form DEF 14 A were materially false and misleading as they each had a section that purported to disclose material related party transactions, which failed to disclose FXCM's transactions involving Effex..

- DEF 14 A filed with SEC on April 30, 2012 and signed by Defendant Sassoon;

- DEF 14 A filed with SEC on April 30, 2013 and signed by Defendant Sassoon;

- DEF 14 A filed with SEC on April 30, 2014 and signed by Defendant Sassoon;

- DEF 14 A filed with SEC on May 1, 2015 and signed by Defendant Sassoon; and

- DEF 14 A filed with SEC on April 26, 2016 and signed by Defendant Sassoon

**Additional False Statements; Additional Allegations Demonstrating Materiality, Falsity, and Scienter**

248. FXCM's misrepresentations concerning its NDD execution or agency model extended beyond its public SEC filings, encompassing a broad strategy of deceiving potential clients and investors with public false and misleading claims on its website and advertising.

249. In January 2012, FXCM provided a downloadable trading guide on its website, including two videos claiming to show the difference between FXCM's NDD execution model

and a dealing desk model used by FXCM's competitors. *Available at https://web.archive.org/web/20120104211055/http://www.fxcm.com/fxcm-forex-execution.jsp.*

250.    One year later in January 2013, FXCM flaunted the "Major Benefits" for clients using its NDD execution model, including claims of "Fair and transparent order execution" and "No conflict of interest between broker and trader."

> Another advantage of the NDD model is that execution is transparent and fair. FXCM does not take a market position-eliminating a major conflict of interest. Dealing desk brokers, which act as market makers, may be actively trading against your positions. Because of this, they may manipulate your orders with re-quotes or in other ways. This cannot happen with our NDD forex execution. Your orders automatically fill from the NDD price feed, which is the best bid and best ask prices from all of our liquidity providers plus FXCM's small, fixed mark-up. Additionally, your orders are anonymous to the liquidity providers. They cannot see your stops, limits, or entry orders; they only see market orders coming from FXCM.

> *Available at https://web.archive.org/web/20130127222625/http://www.fxcm.com/advantages/forex-execution/no-dealing-desk*

251.    These misleading statements continued into January 2014, where FXCM continued to promote its NDD execution as a conflict-free platform.

> FXCM can see your waiting orders when you trade with No Dealing Desk execution. But this does not create a conflict of interest between you and FXCM because we aren't taking a market position. When you place an order with FXCM, we place an identical order to yours with our liquidity providers.

> Our liquidity providers only see market orders coming from FXCM. They do not see orders coming from you, and they cannot see your waiting orders (stops, limits, entry orders). So your trading is anonymous with our liquidity providers under the No Dealing Desk model.

> *Available at https://web.archive.org/web/20130205185432/http://www.fxcm.com/advantages/forex-execution/why-execution-matters-faq/*

252.    The following year, FXCM continued to feature its NDD execution platform on its homepage.  *Available at https://web.archive.org/web/20150102140639/http://www.fxcm.com/*

253.    In January 2016, FXCM was still promoting its NDD execution on its website, including claims of price improvements stemming from slippage in the customers' favor.

> With NDD, FXCM acts as a price aggregator. We take the best available bid and best ask prices from our liquidity providers—global banks, financial institutions and other market makers— and stream those prices to your platform. This large, diverse group of liquidity providers makes this model special: The more advantageous the prices, the more order flow the provider receives. Through competition, NDD ensures prices are market-driven and fair.

- Low spreads from liquidity providers[1]
- Anonymous order execution
- No re-quotes[2]; no dealer intervention
- No restrictions on the strategies (scalp, trade the news, use any EA)
- Potential Price Improvements on all order types

254.    In January 2017, FXCM disclosed the identities of its 17 various liquidity providers, including Effex, but neglected to divulge any details informing clients or investors of the Company's unique relationship with Effex.  *Available at*

*https://web.archive.org/web/20170120174036/https://www.fxcm.com/why-fxcm/liquidity-providers/*

255.    The selections above in this section were pulled from FXCM's website over various points in time, but most of these misleading claims were found on the Company's website at many or all times during the Class Period.  FXCM.com, the Company's public-facing platform for promoting the Company and its purported NDD execution, was replete with these and other misleading statements to clients and investors at all times during the Class Period.

## PLAINTIFFS' CLASS ACTION ALLEGATIONS

256.    Plaintiffs bring this action as a class action pursuant to Federal Rule of Civil Procedure 23(a) and (b)(3) on behalf of a class consisting of all persons and entities who purchased or otherwise acquired publicly traded FXCM securities, including FXCM Notes and Class A common stock during Class Period. Excluded from the Class are all (i) Defendants; (ii) current

and former officers, employees, consultants and directors of FXCM and Holdings; (iii) siblings, parents, children, spouses, and household members of any person excluded under (i) and (ii); and (iv) any entities affiliated with, controlled by, or more than 5% owned by, any person excluded under (i) through (iii); and (v) the legal representatives, heirs, successors or assigns of any person excluded under (i) through (iv).

257.    The members of the Class are so numerous that joinder of all members is impracticable. Throughout the Class Period, FXCM securities were actively traded on the NYSE and/or NASDAQ. While the exact number of Class members is unknown to Plaintiffs at this time and can be ascertained only through appropriate discovery, Plaintiffs believe that there are hundreds or thousands of members in the proposed Class. Record owners and other members of the Class may be identified from records maintained by the Company or its transfer agent and may be notified of the pendency of this action by mail, using the form of notice similar to that customarily used in securities class actions.

258.    Plaintiffs' claims are typical of the claims of the members of the Class as all members of the Class are similarly affected by Defendants' wrongful conduct in violation of federal law that is complained of herein.

259.    Plaintiffs will fairly and adequately protect the interests of the members of the Class and has retained counsel competent and experienced in class and securities litigation. Plaintiffs have no interests antagonistic to or in conflict with those of the Class.

260.    Common questions of law and fact exist as to all members of the Class and predominate over any questions solely affecting individual members of the Class. Among the questions of law and fact common to the Class are:

a.      whether the federal securities laws were violated by Defendants' acts as alleged herein;

b.      whether statements made by Defendants to the investing public during the Class Period misrepresented material facts about the business, operations and management of the Company;

c.      whether the Individual Defendants caused the Company to issue false and misleading financial statements during the Class Period;

d.      whether Defendants acted knowingly or recklessly in issuing false and misleading financial statements;

e.      whether the prices of FXCM securities during the Class Period were artificially inflated because of the Defendants' conduct complained of herein; and

f.      whether the members of the Class have sustained damages and, if so, what is the proper measure of damages.

261.    A class action is superior to all other available methods for the fair and efficient adjudication of this controversy since joinder of all members is impracticable. Furthermore, as the damages suffered by individual Class members may be relatively small, the expense and burden of individual litigation make it impossible for members of the Class to redress individually the wrongs done to them. There will be no difficulty in the management of this action as a class action.

262.    Plaintiffs will rely, in part, upon the presumption of reliance established by the fraud-on-the-market doctrine in that:

a.      Defendants made public misrepresentations or failed to disclose material facts during the Class Period;

b.      the omissions and misrepresentations were material;

      c.      FXCM securities are traded in an efficient market;

      d.      FXCM securities were liquid and traded with moderate to heavy volume during the Class Period;

      e.      FXCM was widely followed by professional market analysts that reported on the Company and made buy and sell recommendations;

      f.      the misrepresentations and omissions alleged would tend to induce a reasonable investor to misjudge the value of FXCM securities; and

      g.      Plaintiffs and members of the Class purchased, acquired and/or sold FXCM securities between the time the Defendants failed to disclose or misrepresented material facts and the time the true facts were disclosed, without knowledge of the omitted or misrepresented facts.

263.    Based upon the foregoing, Plaintiffs and the members of the Class are entitled to a presumption of reliance upon the integrity of the market.

264.    Alternatively, Plaintiffs and the members of the Class are entitled to the presumption of reliance established by the Supreme Court in *Affiliated Ute Citizens of the State of Utah v. United States*, 406 U.S. 128, 92 S. Ct. 2430 (1972), as Defendants omitted material information in their Class Period statements in violation of a duty to disclose such information, as detailed above.

265.    Additionally, the FXCM Notes should not have been introduced into the market because they were objectively unmarketable. Contrary to the information represented in FXCM's SEC filings, FXCM's U.S. subsidiary engaged in false and misleading solicitations of its retail forex customers and made false statements to the NFA about its relationship with its most important market maker. Where, as here, actors introduce an otherwise unmarketable security into

the market by means of fraud, they have effectively manipulated the market. Accordingly, Plaintiffs and the Class are entitled to a presumption of reliance because they relied on the integrity of the market rather than on individual fraudulent disclosures.

## COUNT I

### Violation of Section 10(b) of The Exchange Act and Rule 10b-5 Promulgated Thereunder Against FXCM, Niv, Ahdout, and Lande

266. Plaintiffs repeat and re-allege each and every allegation contained above as if fully set forth herein.

267. This Count, asserted against Defendants FXCM, Niv, Ahdout, and Lande, is based upon Section 10(b) of the Exchange Act, 15 U.S.C. § 78j(b), and Rule 10b-5 promulgated thereunder by the SEC.

268. During the Class Period, Niv, Ahdout, and Lande, individually and in concert, directly or indirectly, disseminated or approved the false statements specified above, which they knew or deliberately disregarded were misleading in that they contained misrepresentations and failed to disclose material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading.

269. Defendants violated §10(b) of the 1934 Act and Rule 10b-5 in that they:

- Employed devices, schemes and artifices to defraud;

- Made untrue statements of material facts or omitted to state material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading; or

- Engaged in acts, practices and a course of business that operated as a fraud or deceit upon Plaintiffs and others similarly situated in connection with their purchases of FXCM securities during the Class Period.

270.    Defendants acted with scienter in that they knew that the public documents and statements issued or disseminated in the name of FXCM were materially false and misleading; knew that such statements or documents would be issued or disseminated to the investing public; and knowingly and substantially participated, or acquiesced in the issuance or dissemination of such statements or documents as primary violations of the securities laws. These defendants by virtue of their receipt of information reflecting the true facts of FXCM, their control over, and/or receipt and/or modification of FXCM's allegedly materially misleading statements, and/or their associations with the Company which made them privy to confidential proprietary information concerning FXCM, participated in the fraudulent scheme alleged herein.

271.    These Defendants, who were senior officers and directors of the Company, had actual knowledge of the material omissions and/or the falsity of the material statements set forth above, and intended to deceive Plaintiffs and the other members of the Class, or, in the alternative, acted with reckless disregard for the truth when they failed to ascertain and disclose the true facts in the statements made by them or other FXCM personnel to members of the investing public, including Plaintiffs and the Class.

272.    As a result of the foregoing, the market price of FXCM securities was artificially inflated during the Class Period. In ignorance of the falsity of Defendants' statements, Plaintiffs and the other members of the Class directly or indirectly relied on the statements described above during the Class Period in purchasing FXCM securities at prices that were artificially inflated as a result of Defendants' false and misleading statements.

273.    As a result of the wrongful conduct alleged herein, Plaintiffs and other members of the Class have suffered damages in an amount to be established at trial.

274. By reason of the foregoing, Defendants have violated Section 10(b) of the 1934 Act and Rule 10b-5 promulgated thereunder and are liable to Plaintiffs and the other members of the Class for substantial damages which they suffered in connection with their purchase of FXCM securities during the Class Period.

## COUNT II

### Violation of Section 20(a) of The Exchange Act
### Against the Individual Defendants

275. Plaintiffs repeat and re-allege each and every allegation contained in the foregoing paragraphs as if fully set forth herein.

276. During the Class Period, the Individual Defendants participated in the operation and management of FXCM, and conducted and participated, directly and indirectly, in the conduct of FXCM's business affairs. Because of their senior positions, they knew the adverse non-public information about FXCM's misstatement of revenue and profit and false financial statements.

277. As officers and/or directors of a publicly owned company, the Individual Defendants had a duty to disseminate accurate and truthful information with respect to FXCM's financial condition and results of operations, and to correct promptly any public statements issued by FXCM which had become materially false or misleading.

278. Because of their positions of control and authority as senior officers, the Individual Defendants were able to, and did, control the contents of the various reports, press releases and public filings which FXCM disseminated in the marketplace during the Class Period concerning FXCM's results of operations. Throughout the Class Period, the Individual Defendants exercised their power and authority to cause FXCM to engage in the wrongful acts complained of herein. The Individual Defendants therefore, were "controlling persons" of FXCM within the meaning of

Section 20(a) of the Exchange Act. In this capacity, they participated in the unlawful conduct alleged which artificially inflated the market price of FXCM securities.

279.   By reason of the above conduct, the Individual Defendants are liable pursuant to Section 20(a) of the Exchange Act for the violations committed by FXCM.

## PRAYER FOR RELIEF

**WHEREFORE**, Plaintiffs pray for relief and judgment, as follows:

a.   Determining that this action is a proper class action, designating Plaintiffs as class representatives under Rule 23 of the Federal Rules of Civil Procedure and Plaintiffs' counsel as Class Counsel;

b.   Awarding compensatory damages in favor of Plaintiffs and the other Class members against all Defendants, jointly and severally, for all damages sustained as a result of Defendants' wrongdoing, in an amount to be proven at trial, including interest thereon;

c.   Awarding Plaintiffs and the Class their reasonable costs and expenses incurred in this action, including counsel fees and expert fees; and

d.   Awarding such other and further relief as the Court may deem just and proper.

## JURY TRIAL DEMANDED

Plaintiffs hereby demand a trial by jury.


Dated: June 19, 2017                    Respectfully submitted,

                                        **THE ROSEN LAW FIRM, P.A.**

                                        By: /s/ Phillip Kim
                                        Phillip Kim, Esq. (PK 9384)
                                        Laurence M. Rosen, Esq. (LR 5733)
                                        Joshua Baker, Esq. (JB 8288)
                                        275 Madison Ave, 34th Floor
                                        New York, NY  10016
                                        Phone: (212) 686-1060

Fax: (212) 202-3827

*Lead Counsel for Lead Plaintiffs*

**WOLF HALDENSTEIN ADLER FREEMAN & HERZ LLP**
Matthew M. Guiney, Esq. (MG 5858)
270 Madison Avenue
New York, NY 10016
270 Madison Ave.
New York, NY 10016
Tel:       (212) 545-4600
Email: Guiney@whafh.com

*Additional Counsel*

**<u>CERTIFICATE OF SERVICE</u>**

I hereby certify that on this 19th day of June 2017, a true and correct copy of the foregoing CONSOLIDATED SECURITIES CLASS ACTION COMPLAINT was served by CM/ECF to the parties registered to the Court's CM/ECF system.

/s/ Phillip Kim_____
Phillip Kim