Exhibit 2

**NATIONAL FUTURES ASSOCIATION**
**BEFORE THE**
**BUSINESS CONDUCT COMMITTEE**

In the Matter of: )
)
FOREX CAPITAL MARKETS, LLC )
(NFA ID #308179), )
)
WILLIAM AHDOUT )
(NFA ID #308182) )
)
DROR NIV )   NFA Case No. 17-BCC-001
(NFA ID #308183) )
)
        and )
)
ORNIT NIV )
(NFA ID #427646), )
)
)
        Respondents. )

FILED

FEB - 6 2017

NATIONAL FUTURES ASSOCIATION
LEGAL DOCKETING

## COMPLAINT

Having reviewed the investigative report submitted by the Compliance

Department of National Futures Association (NFA), and having found reason to believe

that NFA Requirements are being, have been or are about to be violated and that the

matter should be adjudicated, NFA's Business Conduct Committee (BCC or Committee)

issues this Complaint against Forex Capital Markets, LLC (FXCM), William Ahdout

(Ahdout), Dror Niv (Niv) and Ornit Niv.

## ALLEGATIONS

## JURISDICTION

1.      At all times relevant to this Complaint, FXCM was a Forex Dealer Member

        (FDM), futures commission merchant (FCM), retail foreign exchange dealer

        (RFED) and provisionally registered swap dealer (SD) Member of NFA.  As such,

FXCM was and is required to comply with NFA Requirements and is subject to
disciplinary proceedings for violations thereof.

2.   At all times relevant to this Complaint, Niv was a listed principal and associated
person (AP) of FXCM, and an NFA Associate.  As such, Niv was and is required
to comply with NFA Requirements and is subject to disciplinary proceedings for
violations thereof.  FXCM is liable for violations of NFA Requirements committed
by Niv in the course of his activities on behalf of the firm.

3.   Ahdout was an AP of FXCM and an NFA Associate from June 2011 to May 2016.
As such, Ahdout was required to comply with NFA Requirements and is subject
to disciplinary proceedings for violations thereof.  FXCM is liable for violations of
NFA Requirements committed by Ahdout in the course of his activities on behalf
of the firm.

4.   Ornit Niv has been a listed principal and AP of FXCM, and an NFA Associate
since March 2011.  As such, Ornit Niv was and is required to comply with NFA
Requirements and is subject to disciplinary proceedings for violations thereof.
FXCM is liable for violations of NFA Requirements committed by Ornit Niv in the
course of her activities on behalf of the firm.

## BACKGROUND

5.   FXCM is located in New York City and has been an FCM Member of NFA since
June 2001.  FXCM registered as an RFED and was approved as an FDM and
forex firm in October 2010.  In December 2012, the firm became provisionally
registered as an SD.

2

6.     Niv has been an NFA Associate and registered AP and principal of FXCM since
       June 2001. Niv was the chief executive officer (CEO) of FXCM until May 2014.

7.     In May 2014, Ornit Niv succeeded Niv, her brother, as FXCM's CEO, the position
       she currently holds.

8.     Ahdout has been a principal of FXCM since October 2001. He is a managing
       director of FXCM and the firm's chief dealer.

9.     Janelle G. Lester (Lester) was FXCM's chief compliance officer (CCO) from
       December 2012 until approximately July 20, 2016. Before Lester, James
       Sanders (Sanders) served as FXCM's CCO from approximately November 2005
       until December 2012.

Prior Disciplinary History

10.    This Committee has authorized four prior Complaints against FXCM. The most
       serious Complaint against FXCM was filed by this Committee in 2011 and
       charged FXCM with engaging in asymmetrical price slippage practices which
       detrimentally impacted customers while benefiting FXCM. That same year, the
       Commodity Futures Trading Commission (CFTC) filed a similar action against
       FXCM. FXCM settled NFA's and the CFTC's 2011 actions by paying civil
       monetary penalties and restitution totaling approximately $16 million.

FXCM's Order Execution Model

11.    There are two main types of order execution models in retail forex trading: 1) the
       Dealing Desk model; and 2) the straight-through processing model (hereinafter
       referred to as the "No Dealing Desk" model). In the Dealing Desk model, the
       forex broker acts as the liquidity provider to its customer by taking the other side

3

of the customer's trade.  In the No Dealing Desk model, the forex broker does not act as the liquidity provider and, instead, establishes a position with one of multiple, independent liquidity providers before entering into an offsetting position with its customer.

12.    From 2007 up until recently, FXCM represented that it predominantly utilized a No Dealing Desk order execution model.  To illustrate, a 2010 annual report available on FXCM's website stated that FXCM's "agency model" is fundamental to its core business philosophy because it aligns the firm's interests with customers, reduces risks, and provides "distinct advantages" over the principal model used by its competitors.

13.    Since at least 2010, FXCM's advertising repeatedly touted the superiority of its No Dealing Desk execution model over the Dealing Desk model used by its competitors.  FXCM claimed that the No Dealing Desk execution model eliminated the conflict of interest between FXCM and its customers and mitigated FXCM's risk exposure by filling a customer order only after the firm had established an offsetting position at a liquidity provider.

14.    FXCM's website also stated, "FXCM's No Dealing Desk aims to provide transparent and fair execution.  Every trade is executed back to back with one of the world's premier banks or financial institutions, which compete to provide FXCM with bid and ask prices…."

### FXCM's Relationship with Effex Capital, LLC

15.    Contrary to FXCM's advertising claims about using a No Dealing Desk execution model, FXCM routed customer trades to a Dealing Desk model by directing

4

trades to a liquidity provider, Effex Capital, LLC (Effex), that was purportedly independent but which FXCM actually supported and controlled. In exchange for the order flow that FXCM directed to Effex, Effex paid rebates to FXCM that amounted at times to as much as 70% of Effex's profits from FXCM's order flow and which FXCM referred to internally as "P&L".

16.   NFA commenced an investigation about Effex and its involvement with FXCM in 2013. However, NFA's investigation was hampered by the conduct of Niv and other FXCM employees who provided misleading information to NFA in an apparent effort to conceal FXCM's relationship with Effex and Effex's role in FXCM's order execution process.

17.   NFA's investigation not only uncovered the details of FXCM's relationship with Effex, but also found that FXCM allowed Effex to engage in abusive execution tactics, which denied FXCM's retail customers favorable price improvement and benefitted Effex and FXCM financially. Effex's denial of price improvement to FXCM's customers resembled the asymmetrical price slippage practices for which FXCM was sanctioned by both NFA and the CFTC in their 2011 cases.

### Exam and Other Deficiencies

18.   In addition to investigating FXCM and Effex's order execution practices, NFA's Compliance Department conducted an examination of FXCM in 2014, which identified continued shortcomings with FXCM's anti-money laundering (AML) program – as charged in a prior BCC case – as well as deficiencies with respect to the firm's margin and liquidation policies. In addition, NFA's Compliance Department identified continuing issues with the firm's price adjustment practices

5

and reporting of forex trade data to NFA – similar to charges in prior BCC cases against the firm – and found other deficiencies at the firm after FXCM suffered a capital shortfall on January 15, 2015.

## **APPLICABLE RULES**

19.     NFA Compliance Rule 2-2(f) provides that no Member or Associate shall willfully submit materially false or misleading information to NFA or its agents.

20.     NFA Compliance Rule 2-9(c) provides, in pertinent part, that each FCM Member shall develop and implement a written AML program approved in writing by senior management reasonably designed to achieve and monitor the Member's compliance with the applicable requirements of the Bank Secrecy Act and the implementing regulations promulgated thereunder by the Department of the Treasury and, as applicable, the CFTC.

21.     NFA Compliance Rule 2-36(b)(1) provides that no FDM or Associate of an FDM engaging in any forex transaction shall cheat, defraud or deceive, or attempt to cheat, defraud or deceive any other person.

22.     NFA Compliance Rule 2-36(b)(5) provides that no FDM or Associate of an FDM engaging in any forex transaction shall willfully submit materially false or misleading information to NFA or its agents with respect to forex transactions.

23.     NFA Compliance Rule 2-36(c) provides that FDMs and their Associates shall observe high standards of commercial honor and just and equitable principles of trade in the conduct of their forex business.

24.     NFA Compliance Rule 2-36(e) provides that each FDM shall diligently supervise its employees and agents in the conduct of their forex activities for or on behalf of

6

the FDM, and each Associate of an FDM who has supervisory duties shall diligently exercise such duties in the conduct of that Associate's forex activities for or on behalf of the FDM.

25.    NFA Compliance Rule 2-43(a)(1) provides, in pertinent part, that individual customer complaints are not required in order for an FDM to favorably adjust all customer orders that were adversely affected by technical problems with the trading platform or by similar factors beyond the customers' control and that are unrelated to market price movements and, when an FDM gives a price adjustment to a customer, in accordance with the Rule, the FDM Member must give a price adjustment to all similarly situated customers.

26.    NFA Compliance Rule 2-48(a) provides that an FDM must file a daily electronic report of trade data with NFA using the electronic filing method required by NFA.  The report must contain the data and be in the format prescribed by NFA.  Each FDM must prepare the report as of 5:00 p.m. Eastern time and file it with NFA by 11:59 p.m. Eastern time the same day.

27.    NFA Compliance Rule 2-49(a) provides, in pertinent part, that any SD that violates CFTC Regulation 3.3 or any requirement of Part 23 of the CFTC's Regulations, as applicable, shall be deemed to have violated an NFA Requirement.

28.    NFA Financial Requirements Section 11(a) provides, in pertinent part, that each FDM must maintain adjusted net capital equal to or in excess of the greatest of: (i) $20,000,000; or (ii) $20,000,000, plus 5% of all liabilities owed to customers exceeding $10,000,000.

29. NFA Financial Requirements Section 11(d) provides, in pertinent part, that an
    FDM, for which NFA is the designated self-regulatory organization (DSRO), that
    is required to give any notice to its DSRO under CFTC Regulations 5.6
    [Maintenance of minimum financial requirements by RFEDs] and 5.7 [Minimum
    financial requirements for RFEDs] shall also give such notice to NFA at its
    Chicago office no later than the date such notice is due to be filed with or given to
    the CFTC or the DSRO.

30. NFA Financial Requirements Section 12 provides, in pertinent part, that an FDM
    shall collect and maintain a minimum security deposit of 2% of the notional value
    of retail forex transactions in certain specified major currencies between the FDM
    and a person that is not an eligible contract participant as defined in Section
    1a(12) of the Commodity Exchange Act (Act).

31. NFA Financial Requirements Section 14 provides, in pertinent part, that each
    FDM shall calculate the amount owed to customers for forex transactions and
    hold assets equal to or in excess of that amount at one or more qualifying
    institutions in the United States or money center countries as defined under
    CFTC Regulation 1.49; and further provides that any assets held in a money
    center country, as defined under CFTC Regulation 1.49, are not eligible to meet
    the requirements under Section 14 unless the FDM and the qualifying institution
    have entered into an agreement authorizing the institution to provide NFA and
    the CFTC with information regarding the FDM's accounts and to provide that
    information directly to NFA or the CFTC upon their request.

8

## COUNT I

**VIOLATIONS OF NFA COMPLIANCE RULES 2-2(f); 2-36(b)(1) and (5); AND 2-36(c): ENGAGING IN FRAUDULENT EXECUTION AND SUBMITTING MISLEADING INFORMATION TO NFA CONCERNING FXCM'S RELATIONSHIP WITH EFFEX.**

32. The allegations contained in paragraphs 1 through 3, 5 through 6, 8 through 17, 19 and 21 through 23 are re-alleged as paragraph 32.

33. Effex's CEO, John Dittami (Dittami), was previously employed by FXCM starting in 2009 as head of one of FXCM's trading and market-making divisions.  In or around March 2010, Effex was formed as an apparently independent company organized and operated by Dittami.

34. However, Effex was actually the joint creation of both FXCM and Dittami, and FXCM supported and controlled Effex.  Specifically, FXCM furnished Effex with start-up capital in the form of a $2 million interest-free loan; FXCM sponsored an account for Effex at FXCM's prime broker; FXCM allowed Effex to operate out of FXCM's main office; FXCM furnished Effex with systems support and access to FXCM's corporate network through a virtual private network; FXCM provided Effex access to data from which Effex could derive customer order and position information; and FXCM assigned some of its employees to assist in operating Effex's trading systems and monitoring Effex's execution activities.

35. FXCM directed a significant percentage of its own order execution business to Effex by giving Effex preferential treatment over FXCM's other liquidity providers. For example, FXCM allowed Effex "read of book" (i.e., real-time access to the bids and offers of FXCM's other liquidity providers) since Effex used FXCM's other liquidity providers to create a price; FXCM awarded all ties to Effex when its

bids and offers were identical to those of FXCM's other liquidity providers; FXCM permitted Effex to review information about its other liquidity providers' rejection rates, quote numbers, spread characteristics, and overall order flow quality; and FXCM, at times, applied a lower mark-up to Effex's trades than it applied to its other liquidity providers' trades.

36. The lower markup that FXCM applied to Effex's trades, as well as the other advantages it extended to Effex – "read of book" and winning of ties – gave Effex a competitive edge over FXCM's other liquidity providers and allowed it to capture a large percentage of FXCM's execution business.

37. FXCM constantly monitored Effex's trading and percentage of volume captured. For a time, personnel at FXCM, including Niv and Ahdout, received regular updates on Effex's daily dealing activity.

38. Due to the preferential treatment it received, Effex routinely captured over 50% of FXCM's daily order flow and, at one time, captured nearly 80% of FXCM's daily order flow.  This, in turn, generated significant revenue for FXCM.

39. Unlike FXCM's other liquidity providers, most of Effex's profits were directed back to FXCM in the form of rebate payments.  Between 2010 and 2014, these rebates totaled approximately $77 million and amounted to approximately 70% of Effex's profits from FXCM's order flow.

40. FXCM appears to have attempted to conceal the rebate payments from NFA or others by directing Effex to pay most of the rebates to FXCM Holdings LLC, a former principal of FXCM and a non-NFA Member.

41.   FXCM's website made no mention of Effex until January 2016, when FXCM
      added a page to its website entitled, "FXCM Liquidity Providers", because of an
      NFA disclosure requirement.  Similarly, FXCM made no mention of Effex in any
      of the annual reports available on its website.  In fact, FXCM's 2010 annual
      report listed the names of seven global banks that acted as liquidity providers for
      FXCM but made no mention of Effex, even though Effex executed more orders
      for FXCM than any of the seven banks.

42.   NFA's investigation also found evidence that FXCM senior executives, Niv and
      Ahdout, approved Effex's use of execution practices that denied customers the
      benefit of positive price improvement and which practices were similar in nature
      to the asymmetrical price slippage practices alleged in NFA's 2011 disciplinary
      case against FXCM.

43.   In a press release announcing the resolution of NFA's 2011 disciplinary case,
      FXCM touted that the firm had "enhanced its execution system" in 2010 to pass
      along price improvements so that its customers benefited from "positive slippage"
      on all order types through its No Dealing Desk order execution model.

44.   This claim was false, at least as it related to trades executed by Effex, which
      engaged in execution practices that continued to deprive FXCM's customers of
      positive price improvement while giving customers negative price slippage.  This
      was the result of two execution tactics that Effex employed – known as "Hold
      Timer" and "Previous Quote" – which FXCM and its senior management,
      including Niv and Ahdout, approved of and permitted Effex to use in a manner
      that was detrimental to customers.

11

45.     Through an abusive use of the practice known as "last look", Effex imposed a
hold period between the receipt of a customer order and the acceptance or
rejection of the order, which process FXCM and Effex employees referred to as a
"Hold Timer." During this hold period – which was milliseconds in duration –
Effex would compare the price of the customer's order at the start of the hold
timer against the prevailing price at the end of the hold timer. In cases where the
price at the end of the hold timer had moved against Effex and in favor of the
customer, Effex would reject the trade. On the other hand, if the price had
moved in favor of Effex and against the customer, Effex would execute the trade
and give the customer negative price slippage.

46.     For a time, Effex used a particularly egregious version of Hold Timer where the
firm would hold market orders for a preset period and then execute the order at a
price beneficial to Effex, and to the detriment of FXCM's customers. Through this
practice, Effex's system would hold the order, review the prices that existed at
the beginning and end of the hold timer, and then fill the order at the price that
was more favorable to Effex.

47.     FXCM employees assigned to provide trade support to Effex set and adjusted
the hold timer on Effex's behalf. Further, to make using the hold timer easier,
Effex developed and utilized a configuration setting on its trading application to
turn the hold timer off and on and to adjust the hold timer's duration.

48.     The other abusive execution tactic that Effex used was known as "Previous
Quote." FXCM shared trade data with Effex, including the price that would
trigger the execution of a customer's order (the "Tagged Price"). Effex then used

this information to decide whether to execute the trade at its previously-quoted bid (or offer) or at the Tagged Price, choosing the price that was more favorable to Effex and which deprived the customer of favorable price improvement.

49.　NFA found evidence suggesting that Effex used the Previous Quote tactic numerous times during 2010 to deny customers the benefit of favorable price improvement.

50.　FXCM did not disclose the preferential treatment it gave to Effex (e.g., a lower mark-up, access to the bids and offers of FXCM's other liquidity providers, and winning ties), which ensured that Effex would end up executing the bulk of FXCM's customer orders.

51.　Not only did FXCM deceive its retail customers about the firm's execution model and its relationship with Effex, it did the same to NFA.  For example, former FXCM CCO Sanders notified NFA on July 2, 2010 that "FXCM was proceeding to implement system changes that would result in the execution of both client market and limit orders at the prevailing market rate."  However, Sanders' statement was highly misleading considering that, at the time it was made, FXCM knew that Effex was using Hold Timer and Previous Quote to deprive customers of favorable price improvement.

52.　FXCM's former CCO, Lester, sent a misleading e-mail to NFA on April 4, 2014 in which she attempted to downplay FXCM's involvement with Dittami by representing that Dittami was a "consultant" for FXCM from October 2009 through April 2010 when, in fact, he was a salaried employee of the firm and a managing director of one of its divisions.

13

53.  By reason of the foregoing acts and omissions, FXCM, Niv and Ahdout are
     charged with violations of NFA Compliance Rules 2-36(b)(1) and 2-36(c), and
     FXCM and Niv are charged with violations of NFA Compliance Rules 2-2(f) and
     2-36(b)(5).

## COUNT II

### VIOLATION OF NFA COMPLIANCE RULE 2-9(c):  FAILING TO IMPLEMENT THE FIRM'S ANTI-MONEY LAUNDERING PROGRAM.

54.  The allegations contained in paragraphs 1, 5, 18 and 20 are realleged as
     paragraph 54.

55.  During the 2014 exam, the person FXCM identified as its AML compliance officer
     reported to Niv until May 2014, after which time the AML compliance officer
     reported to Ornit Niv, as the firm's CEO.

56.  NFA reviewed FXCM's AML program, which included examples of suspicious
     account activity (e.g., unexplained or sudden extensive wire activity, especially in
     accounts that had little or no previous activity; and multiple accounts under the
     same name or multiple names, for no apparent reason) and discussed
     circumstances that warranted monitoring for suspicious activity.

57.  NFA reviewed a number of customer accounts that had frequent or unusual
     deposit/withdrawal activity or where the account holder resided in a high-risk
     country.  In analyzing this information, NFA found several instances where FXCM
     failed to monitor customer accounts in accordance with its AML program.

58.  NFA also found several instances where FXCM failed to identify potentially
     suspicious activity during the account opening process or failed to monitor the
     accounts after they were opened, in accordance with the firm's AML program.

59.    In addition, NFA found instances involving suspicious activity in FXCM's

customer accounts which FXCM failed to adequately monitor, e.g., requests to

wire a large amount of funds to a different bank than the one on record;

simultaneous deposits to two separate accounts quickly followed by a transfer of

funds to just one account and then a large withdrawal; repeated deposits that

exceed the deposit limit set by FXCM.

60.    By reason of the foregoing acts and omissions, FXCM is charged with violations

of NFA Compliance Rule 2-9(c).

## COUNT III

**VIOLATIONS OF NFA COMPLIANCE RULE 2-36(c) AND FINANCIAL
REQUIREMENTS SECTION 12:  FAILING TO IMPLEMENT AN EQUITABLE
MARGIN AND LIQUIDATION POLICY AND FAILING TO COLLECT REQUIRED
SECURITY DEPOSITS ON RETAIL FOREX TRANSACTIONS.**

61.    The allegations contained in paragraphs 1, 5, 18, 23 and 30 are realleged as

paragraph 61.

62.    NFA reviewed FXCM's margin policy and liquidation procedures during the 2014

exam and found several issues with the firm's margin and liquidation procedures.

63.    To illustrate, FXCM allowed customers on the Metatrader 4 (MT4) platform to

place trades using 100% of their equity.  As a result, customers could place

trades that might be liquidated immediately based solely on the differences in the

equity needed to place the trade and the equity needed to maintain the trade.  In

multiple instances during a two-month period in 2014, FXCM liquidated customer

trades immediately after the trades were placed.

64.    In addition, in several instances, FXCM failed to factor in the commissions and

spread charges when determining customers' margin requirements on its MT4

15

platform, which ultimately led to immediate liquidations for some customer trades when FXCM charged those fees.

65. Similarly, in other instances, customers' positions were liquidated immediately based on FXCM's handling of "entry stop" orders. As a result, FXCM allowed its customers to place trades with insufficient margin that could unintentionally close out other positions, thereby allowing the placement of at least one trade with no economic value to the customer.

66. FXCM also arranged with an NFA Member introducing broker (IB) whose MT4 platform connected to FXCM's backend system to purportedly adhere to NFA's security deposit (or forex margin) requirements. NFA found that FXCM violated NFA's security deposit requirement since an account introduced by the IB was able to place a trade with an effective margin rate of 1.55%. Although FXCM placed a backup secondary forex margin level of 1.5% to prevent clients from trading outside the requirements and to avoid duplicated liquidation orders if both systems were set at 2%, the "backup level" was lower than the 2% minimum security deposit required by NFA's Financial Requirements.

67. By reason of the foregoing acts and omissions, FXCM is charged with violations of NFA Compliance Rule 2-36(c) and NFA Financial Requirements Section 12.

### COUNT IV

**VIOLATION OF NFA COMPLIANCE RULES 2-43(a)(1) AND 2-48(a): FAILING TO TREAT ALL CUSTOMERS EQUALLY WHEN GIVING PRICE ADJUSTMENTS AND FAILURE TO SUBMIT TRADE DATA TO NFA THROUGH FORTRESS.**

68. The allegations contained in paragraphs 1, 5, 10, 18 and 25 through 26 are realleged as paragraph 68.

69.  As outlined in NFA's Interpretive Notice to Compliance Rule 2-36(e):  Supervision of the Use of Electronic Trading Systems (ETS), an FDM's supervisory responsibilities include ensuring the integrity of the trades placed on the trading system and involves, among other obligations, providing bids and offers that are reasonably related to current market prices and conditions.  The ETS Interpretive Notice further states that any slippage should be based on real market conditions.  NFA Compliance Rule 2-43 provides that a customer complaint is not required in order for an FDM to adjust an order adversely affected by technical problems with the firm's trading platform or similar factors beyond a customer's control.

70.  NFA's 2011 disciplinary case, discussed above, also charged FXCM with failing to treat all customers equally when giving price adjustments, contrary to NFA Compliance Rule 2-43.  However, NFA has identified several instances of FXCM's apparent continuing failure to treat all affected customers similarly when making price adjustments.

71.  While reviewing trade activity in June 2015, NFA found that customers trading the New Zealand Dollar (NZD) related currency pairs had orders executed at off-market prices, due to bad prices FXCM received from Effex.  During the June event, Effex filled almost 100 customer orders at approximately 245 pips off market.  Although FXCM initially provided partial adjustments to all affected customers – at a price the firm negotiated with Effex that was still 200 pips off-market – some customers complained to FXCM and received a further

adjustment to compensate them for their full losses, while other customers received only the initial, partial adjustment.

72.    System issues also required FXCM to provide customers with adjustments.  For example, a high volume of activity on a December 2015 trade date led to resting orders not being triggered for execution when the appropriate prices were met, which significantly delayed some orders before they were triggered for execution.

73.    When NFA asked initially about the delayed executions, FXCM explained that a "news event" created a fast-moving market and resulted in general order slippage.  However, after NFA questioned the firm further and asked about specific orders, FXCM explained the firm had discovered problems with its MT4 system, where a large queue of quotes had accumulated that exceeded the maximum quote amount per second the trading platform could handle.  In this situation, FXCM adjusted some – but not all – of the customers affected by the system problem.

74.    These findings prompted NFA to warn FXCM and CEO Ornit Niv that NFA would not accept FXCM's continuing violations of the 2011 Decision.  Yet despite NFA's warnings, FXCM's unfair adjustment practices continued.  In reviewing FXCM's May 31, 2016 Fortress submission, NFA noticed the firm had posted about 1,300 adjustments for $43,000.  Although the firm initially classified them as "good faith" adjustments, FXCM later informed NFA that the adjustments actually resulted from a system bug that caused the "Smart Margin" liquidation time to change to 6:00 p.m. GMT (rather than EST) and, in doing so, liquidated some

customers at a less favorable price.  FXCM again failed to provide adjustments to all customers negatively impacted by the glitch.

75.    Since June 2015, NFA identified more than 1,800 adjustments totaling over $110,000 that FXCM had failed to make until NFA brought the missing adjustments to the firm's attention.

76.    FXCM also reported in August 2016 that the firm had failed to activate a server for Fortress reporting, which caused the firm not to report complete data to NFA from February 22 through August 17, 2016, or 128 business days.  This missing data accounted for almost 2% of the firm's trading volume during this time.

77.    By reason of the foregoing acts and omissions, FXCM is charged with violations of NFA Compliance Rules 2-43(a)(1) and 2-48(a).

## COUNT V

**VIOLATIONS OF NFA COMPLIANCE RULE 2-49(a) AND NFA FINANCIAL REQUIREMENTS SECTIONS 11(a), 11(d) AND 14:  FAILING TO PROPERLY CALULATE AND MAINTAIN REQUIRED MINIMUM ANC, FILE REQUIRED NOTICE, COMPLY WITH CCO REQUIREMENTS, AND IMPLEMENT AN ADEQUATE RISK MANAGEMENT PROGRAM.**

78.    The allegations contained in paragraphs 1, 5, 18, 27 through 29 and 31 are realleged as paragraph 78.

79.    In the morning hours of January 15, 2015, the Swiss National Bank (SNB) unexpectedly abandoned its cap on the Swiss franc's exchange rate against the euro, which caused significant turmoil in the worldwide currency markets. Around 5:00 a.m. (EST), the markets had started to stabilize and, by 5:23 a.m. (EST), FXCM began executing trades again.  After learning of the SNB's action,

19

NFA staff started contacting Member firms, including FXCM, to determine the impact the SNB's decision had on each firm's financial condition.

80.    NFA staff exchanged e-mails with FXCM CCO Lester, starting at around 11:00 a.m. (EST), and finally spoke to her about an hour later. During NFA's phone call with Lester, NFA learned that FXCM had suffered significant losses, which caused the firm to have margin calls exceeding $200 million with its prime brokers and resulted in a capital shortfall. Prior to this phone call, no one at FXCM reported to NFA that the firm had fallen below its minimum net capital requirement.

81.    However, FXCM was in a position to estimate its capital position on the morning of January 15 and inform NFA of its capital shortfall well before NFA's phone conversation with Lester. Moreover, FXCM did not file written notice with NFA of its capital shortfall until January 22, 2015.

82.    Later on January 15, NFA learned that FXCM was below its minimum capital requirement by approximately $218 million, while its liabilities to customers were approximately $200 million and the firm only had $63 million in cash. FXCM's capital shortfall resulted from significant losses that caused margin calls in excess of $200 million at a global level.

83.    NFA informed FXCM personnel that unless the firm came into capital compliance by 12:00 p.m. on January 16, 2015, NFA would recommend the issuance of a Member Responsibility Action against the firm. The following day, FXCM secured a loan from an outside investor and came back into capital compliance under NFA Financial Requirements.

84.   Approximately $222 million of the losses experienced by FXCM resulted from losses suffered by its foreign affiliate, FXCM U.K., which acts as counterparty to non-U.S. retail customers and hedges its risk with FXCM. Most of FXCM's other foreign affiliates cover transactions with their non-U.S. retail customers through FXCM U.K, which FXCM U.K. also covers through FXCM. As a result, the risk attributed to all these positions ultimately held by non-U.S. customers rested with FXCM via its SD activities.

85.   At the time of the SNB event, FXCM was not required under either NFA's or the CFTC's forex requirements to collect and maintain security deposits from FXCM U.K. or to factor the customer liabilities owed to FXCM U.K. into its net capital calculation. In addition, the security deposits required of these non-U.S. retail customers were lower than the amounts required by NFA and the CFTC.

86.   Even though the January 2015 market event was significant, FXCM's risk management program at the time characterized its market risk as "very limited" since the firm processed the majority of its trades through its No Dealing Desk platform. However, this explanation fails to factor in other aspects of the firm's operations and its business model, as alleged above.

87.   By reason of the forgoing acts and omissions, FXCM is charged with violations of NFA Compliance Rule 2-49(a) and NFA Financial Requirements Sections 11(a), 11(d) and 14.

21

## COUNT VI

## VIOLATION OF NFA COMPLIANCE RULE 2-36(e):  FAILING TO SUPERVISE.

88.    The allegations contained in Counts I through VI and paragraph 24 above are
       realleged as paragraph 88.

89.    As alleged above, FXCM and its most senior staff failed to meet their obligations
       to adequately supervise the firm and its employees.  The allegations herein
       demonstrate significant supervisory failures on the part of FXCM, Niv and
       Ahdout, including their failure to disclose the full extent of FXCM's relationship
       with Effex and the abusive execution practices that FXCM and Effex engaged in
       to benefit themselves, to the detriment of FXCM's customers.  The 2014 exam
       findings, plus the firm's deficient price adjustment practices, Fortress reporting
       and risk management program, highlight further the supervisory shortcomings at
       FXCM, which occurred under the oversight of Niv, FXCM's former CEO, and
       Ornit Niv, the firm's current CEO.

90.    By reason of the forgoing acts and omissions, FXCM, Niv, Ahdout and Ornit Niv
       are charged with violations of NFA Compliance Rule 2-36(e).

## PROCEDURAL REQUIREMENTS

### ANSWER

            You must file a written Answer to the Complaint with NFA within thirty
days of the date of the Complaint.  The Answer shall respond to each allegation in the
Complaint by admitting, denying or averring that you lack sufficient knowledge or infor-

22

Case 1:17-cv-00916-RA-BCM   Document 48-3   Filed 06/19/17   Page 24 of 25

mation to admit or deny the allegation. An averment of insufficient knowledge or infor-

mation may only be made after a diligent effort has been made to ascertain the relevant

facts and shall be deemed to be a denial of the pertinent allegation.

The place for filing an Answer shall be:

> National Futures Association
> 300 South Riverside Plaza, Suite 1800
> Chicago, Illinois 60606
> Attn: Legal Department-Docketing
>
> E-Mail: Docketing@nfa.futures.org
>
> Facsimile: 312-781-1672

Failure to file an Answer as provided above shall be deemed an admission

of the facts and legal conclusions contained in the Complaint. Failure to respond to any

allegation shall be deemed an admission of that allegation. Failure to file an Answer as

provided above shall be deemed a waiver of hearing.

## POTENTIAL PENALTIES, DISQUALIFICATION AND INELIGIBILITY

At the conclusion of the proceedings conducted in connection with the

issuance of this Complaint, NFA may impose one or more of the following penalties:

(a) expulsion or suspension for a specified period from NFA membership;

(b) bar or suspension for a specified period from association with an NFA Member;

(c) censure or reprimand;

(d) a monetary fine not to exceed $250,000 for each violation found; and

(e) order to cease and desist or any other fitting penalty or remedial action not inconsistent with these penalties.

The allegations in this Complaint may constitute a statutory disqualification

from registration under Section 8a(3)(M) of the Act. Respondents in this matter who

23

apply for registration in any new capacity may be denied registration based on the pendency of this proceeding.

Pursuant to CFTC Regulation 1.63, penalties imposed in connection with this Complaint may temporarily or permanently render Respondents who are individuals ineligible to serve on disciplinary committees, arbitration panels and governing boards of a self-regulatory organization, as that term is defined in CFTC Regulation 1.63.

**NATIONAL FUTURES ASSOCIATION BUSINESS CONDUCT COMMITTEE**

Dated: 02 / 04 / 2017

By: _____

Chairperson

m/cxc/complaints/FXCM, et al Settled Complaint (1-30-2017)