# UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF NEW YORK

|  |  |
|---|---|
| In re Global Brokerage, Inc. f/k/a FXCM Inc. Securities Litigation | Master File No. 1:17-cv-00916-RA <br><br> <u>CLASS ACTION</u> <br><br> **ORAL ARGUMENT REQUESTED** |

## MEMORANDUM OF LAW IN SUPPORT OF DEFENDANTS' MOTION TO STRIKE AND DISMISS PLAINTIFFS' <u>CONSOLIDATED SECURITIES CLASS ACTION COMPLAINT</u>

Israel Dahan
Peter Isajiw
Chelsea Corey
Evan C. Ennis
KING & SPALDING LLP
1185 Avenue of the Americas
New York, NY 10036-2601
Tel: (212) 556.2100
Fax: (212) 556.2200

*Attorneys for Defendants Global Brokerage, Inc. f/k/a FXCM Inc., Dror Niv, William Ahdout, David Sakhai, Eduard Yusupov, Janelle G. Lester, Robert Lande, Ornit Niv, Nicola Santoro, Jr., Margaret Deverell, David S. Sassoon, Kenneth Grossman, James Brown, Ryan Silverman, Arthur Gruen, Robin E. Davis, Eric LeGoff, and Bryan Reyhani*

## TABLE OF CONTENTS

PRELIMINARY STATEMENT ................................................................................................ 1

STATEMENT OF FACTS ..................................................................................................... 4

    A.    The Parties ............................................................................................... 4

    B.    FXCM's No Dealing Desk Trading Model ................................................ 6

    C.    FXCM's Relationship With Effex ............................................................. 9

    D.    FXCM's Settlement With The CFTC And NFA ...................................... 10

    E.    The Alleged False And Misleading Statements ..................................... 11

ARGUMENT ....................................................................................................................... 14

I.    ALLEGATIONS THAT REFER TO OR RELY UPON THE
ALLEGATIONS IN THE CFTC ORDER AND THE NFA
COMPLAINT SHOULD BE STRICKEN FROM PLAINTIFFS' COMPLAINT ........... 14

    A.    Courts Routinely Use Rule 12(f) To Strike Allegations That Are Based
Upon An Unadjudicated Regulatory Complaint Or Consent Order ...................... 15

    B.    Plaintiffs' And Their Counsel's Sole Reliance On The Allegations In The
CFTC Order And The NFA Complaint Violates Rule 11(b)(3) ............................ 18

II.    PLAINTIFFS FAIL TO STATE A CLAIM UNDER
SECTION 10(b) AND RULE 10b-5 ...................................................................... 20

    A.    The Complaint Fails To Adequately Plead A Materially False Or
Misleading Statement By FXCM, Niv, Ahdout, Or Lande ................................. 23

        1.    Plaintiffs Do Not Even Attempt To Satisfy The Particularity
Requirement Under Rule 9(b) And The PSLRA ......................................... 23

        2.    The Challenged Statements Are Not False Or Misleading ......................... 25

        3.    FXCM's Public Filings After FXCM Terminated Its Pay-For-Flow
Agreement In August 2014 Cannot Contain Any Material
Misstatements Or Omissions ..................................................................... 34

    B.    The Complaint Also Fails To Adequately Plead Scienter ...................................... 35

        1.    Plaintiffs Have Not Adequately Alleged Scienter Against FXCM ............ 36

        2.    Plaintiffs Have Not Adequately Alleged Scienter As To Niv,
Ahdout, Or Lande ..................................................................................... 36

III.    PLAINTIFFS FAIL TO ADEQUATELY ALLEGE
CONTROL-PERSON LIABILITY UNDER SECTION 20(a) ................................... 40

    A.    Plaintiffs Fail To Plead That The Individual Defendants Are "Control
Persons" .......................................................................................................... 41

    B.    Plaintiffs Also Fail To Plead Culpable Participation .............................................. 43

CONCLUSION .................................................................................................................... 45

# TABLE OF AUTHORITIES

**Cases**                                                                                      **Page(s)**

*Anschutz Corp. v. Merrill Lynch & Co.*,
   690 F.3d 98 (2d Cir. 2012) ................................................................................. 22

*Ashcroft v. Iqbal*,
   556 U.S. 662 (2009) ........................................................................................... 21

*Athale v. SinoTech Energy Ltd.*,
   No. 11-cv-5831, 2015 WL 13145808 (S.D.N.Y. Jan. 23, 2015) ........................ 38

*ATSI Commc'ns, Inc. v. Shaar Fund, Ltd.*,
   493 F.3d 87 (2d Cir. 2007) ................................................................................. 4

*Bruce v. Suntech Power Holdings Co. Ltd.*,
   No. 12-cv-04061, 2013 WL 6843610 (N.D. Cal. Dec. 26, 2013) ....................... 43

*C.D.T.S. No. 1 v. UBS AG*,
   No. 12-cv-4924, 2013 WL 6576031 (S.D.N.Y. Dec. 13, 2013) ......................... 35

*Campo v. Sears Holdings Corp.*,
   371 F. App'x 212 (2d Cir. 2010) ....................................................................... 19

*City of Omaha, Neb. Civilian Employees' Ret. Sys. v. CBS Corp.*,
   679 F.3d 64 (2d Cir. 2012) ................................................................................. 26

*City of Pontiac Policemen's & Firemen's Ret. Sys. v. UBS AG*,
   752 F.3d 173 (2d Cir. 2014) ............................................................................... 31

*City of Sterling Heights Police & Fire Ret. Sys. v. Vodafone Grp. Pub. Ltd. Co.*,
   655 F. Supp. 2d 262 (S.D.N.Y. 2009) ............................................................... 32

*Dura Pharms., Inc. v. Broudo*,
   544 U.S. 336, 341 (2005) ............................................................................ 21, 22

*ECA, Local 134 IBEW Joint Pension Tr. of Chi. v. JP Morgan Chase Co.*,
   553 F.3d 187 (2d Cir. 2009) ................................................................... 21, 32, 36

*Footbridge Ltd. v. Countrywide Home Loans, Inc.*,
   No. 09-cv-4050, 2010 WL 3790810 (S.D.N.Y. Sept. 28, 2010) ........................ 16

*Garr v. U.S. Healthcare, Inc.*,
   22 F.3d 1274 (3d Cir. 1994) ............................................................................... 19

*Glaser v. The9, Ltd.*,
   772 F. Supp. 2d 573 (S.D.N.Y. 2011) .......................................................... 36, 39

*Harris v. AmTrust Fin. Servs., Inc.*,
   135 F. Supp. 3d 155 (S.D.N.Y. 2015) .......................................................... 32, 33

*HSH Nordbank AG v. RBS Holdings USA Inc.*,
   No. 13-cv-3303, 2015 WL 1307189 (S.D.N.Y. Mar. 23, 2015) ........................ 16

*In re Alstom SA Sec. Litig.*,
  406 F. Supp. 2d 433 (S.D.N.Y. 2005) ........................................................................ 41

*In re Bank of Am. AIG Disclosure Sec. Litig.*,
  980 F. Supp. 2d 564 (S.D.N.Y. 2013) ........................................................................ 29

*In re Bear Stearns Mortg. Pass-Through Certificates Litig.*,
  851 F. Supp. 2d 746 (S.D.N.Y. 2012) ........................................................................ 16

*In re Braskem S.A. Sec. Litig.*,
  2017 WL 1216592 (S.D.N.Y. Mar. 30, 2017) ......................................................... 42

*In re Carter-Wallace, Inc.*, Sec. Litig.,
  220 F.3d 36 (2d Cir. 2000) ........................................................................................ 37

*In re China Mobile Games & Ent. Grp. Sec. Litig.*,
  No. 14-cv-4471, 2016 WL 922711 (S.D.N.Y. Mar. 7, 2016) .................................. 38

*In re Citigroup Sec. Litig.*,
  753 F. Supp. 2d 206 (S.D.N.Y. 2010) ........................................................................ 39

*In re Connetics Corp. Sec. Litig.*,
  542 F. Supp. 2d 996 (N.D. Cal. 2008) ...................................................................... 19

*In re CRM Holdings, Ltd. Sec. Litig.*,
  No. 10-cv-00975, 2013 WL 787970 (S.D.N.Y. Mar. 4, 2013) ............................... 16

*In re CRM Holdings, Ltd. Sec. Litig.*,
  No. 10-cv-00975, 2012 WL 1646888, at *26-27 (S.D.N.Y. May 10, 2012) ............ 37

*In re DDAVP Direct Purchaser Antitrust Litig.*,
  585 F.3d 677 (2d Cir. 2009) ...................................................................................... 35

*In re Deutsche Bank Aktiengesellschaft Sec. Litig.*,
  No. 1:16-cv-03495 (S.D.N.Y. June 28, 2017) .................................................... 23, 24

*In re Fannie Mae 2008 Sec. Litig.*,
  742 F. Supp. 2d 382 (S.D.N.Y. 2010) ........................................................................ 33

*In re Int'l Rectifier Corp. Sec. Litig.*,
  No. 07-cv-02544, 2008 WL 4555794 (C.D. Cal. May 23, 2008) ........................... 41

*In re J.P. Jeanneret Assocs., Inc.*,
  769 F. Supp. 2d 340 (S.D.N.Y. 2011) ........................................................................ 44

*In re JP Morgan Chase Sec. Litig.*,
  363 F. Supp. 2d 595 (S.D.N.Y. 2005) ........................................................................ 25

*In re JP Morgan Chase Sec. Litig.*,
  No. 02-cv-1282, 2007 WL 950132 (S.D.N.Y. Mar. 29, 2007) ............................... 32

*In re Lihua Int'l, Inc. Sec. Litig.*,
  No. 14-cv-5037, 2016 WL 1312104 (S.D.N.Y. Mar. 31, 2016) ........................ 43, 44

*In re Lions Gate Entm't Corp. Sec. Litig.*,
  165 F. Supp. 3d 1 (S.D.N.Y. 2016) ........................................................................... 31

*In re Livent, Inc. Noteholders Sec. Litig.*,
   151 F. Supp. 2d 371 (S.D.N.Y. 2001) ..................................................................... 41

*In re Lululemon Sec. Litig.*,
   14 F. Supp. 3d 553 (S.D.N.Y. 2014) ....................................................................... 23

*In re Marsh & Mclennan Cos. Sec. Litig.*,
   501 F. Supp. 2d 452 (S.D.N.Y. 2006) ..................................................................... 32

*In re Merrill Lynch & Co. Research Reports Sec. Litig.*,
   218 F.R.D. 76 (S.D.N.Y. 2003) ......................................................................... 16, 21

*In re MRU Holdings Sec. Litig.*,
   769 F. Supp. 2d 500 (S.D.N.Y. 2011) ..................................................................... 19

*In re PetroChina Co. Ltd. Sec. Litig.*,
   120 F. Supp. 3d 340 (S.D.N.Y. 2015) ..................................................................... 23

*In re Philip Servs. Corp. Sec. Litig.*,
   383 F. Supp. 2d 463 (S.D.N.Y. 2004) ..................................................................... 41

*In re Platinum & Palladium Commodities Litig.*,
   828 F. Supp. 2d 588 (S.D.N.Y. 2011) ................................................................. 16, 17

*In re Refco, Inc. Sec. Litig.*,
   503 F. Supp. 2d 611 (S.D.N.Y. 2007) ..................................................................... 44

*In re Sanofi Securities Litigation*,
   155 F. Supp. 3d 386 (S.D.N.Y. 2016) ..................................................................... 26

*In re Sanofi-Aventis Sec. Litig.*,
   774 F. Supp. 2d 549 (S.D.N.Y. 2011) ..................................................................... 44

*In re Textron, Inc.*, 811 F. Supp. 2d 564 (D.R.I. 2011) ............................................. 41, 42

*In re Tower Grp. Int'l, Ltd. Sec. Litig.*,
   No. 13 CIV. 5852 AT, 2015 WL 5813393 (S.D.N.Y. Sept. 18, 2015) ..................... 35

*In re Turquoise Hill Res. Ltd. Sec. Litig.*,
   No. 13-cv-8846, 2014 WL 7176187 (S.D.N.Y. Dec. 16, 2014) ............................... 39

*In re UBS AG Sec. Litig.*,
   No. 07-cv-11225, 2012 WL 4471265 (S.D.N.Y. Sept. 28, 2012) ............................ 19

*In re Vivendi Universal, S.A., Sec. Litig.*,
   842 F. Supp. 2d 522 (S.D.N.Y 2012) ..................................................................... 40

*In re Weight Watchers International Inc. Sec. Litig.*,
   No. 14-cv-1997, 2016 WL 2757760 (S.D.N.Y. May 11, 2016) ............................... 26

*Kalnit v. Eichler*,
   264 F.3d 131 (2d Cir. 2001) ................................................................................... 37

*Kuriakose v. Fed. Home Loan Mortg. Corp.*,
   897 F. Supp. 2d 168 (S.D.N.Y. 2012) ..................................................................... 32

*Lanza v. Drexel & Co.*,
  479 F.2d 1277 (2d Cir. 1973)................................................................. 41

*Lipsky v. Commonwealth United Corp.*,
  551 F.2d 887 (2d Cir. 1976)............................................................ 15, 16

*Maine State Ret. Sys. v. Countrywide Fin. Corp.*,
  No. 2:10-cv-302, 2011 WL 4389689 (C.D. Cal. May 5, 2011)................. 19

*Maverick Fund, L.D.C. v. Comverse Tech., Inc.*,
  801 F. Supp. 2d 41 (E.D.N.Y. 2011) ...................................................... 43

*McIntire v. China MediaExpress Holdings, Inc.*,
  927 F. Supp. 2d 105 (S.D.N.Y. 2013)..................................................... 36

*Novak v. Kasaks*,
  216 F.3d 300 (2d Cir. 2000)....................................................... 32, 36, 38

*Omnicare, Inc. v. Laborers Dist. Council Constr. Indus. Pension Fund*,
  135 S. Ct. 1318 (2015)........................................................................... 26

*Pac. Inv. Mgmt. Co. v. Mayer Brown LLP*,
  603 F.3d 144 (2d Cir. 2010).................................................................. 21

*Pavelic & LeFlore v. Marvel Entm't Grp.*,
  493 U.S. 120 (1989)............................................................................... 19

*Pehlivanian v. China Gerui Advanced Materials Grp., Ltd.*,
  153 F. Supp. 3d 628 (S.D.N.Y. 2015)..................................................... 29

*Perrigo Company PLC v. Mylan N.V.*,
  No. 15-cv-7341, 2015 WL 9916726 (S.D.N.Y. Oct. 29, 2015)................. 26

*Plumbers & Pipefitters Local Union No. 719 Pension Trust Fund v. Conseco Inc.*,
  No. 09-cv-6966, 2011 WL 1198712 (S.D.N.Y. Mar. 30, 2011)................. 38

*Prime Mover Capital Partners L.P. v. Elixir Gaming Techs. Inc.*,
  793 F. Supp. 2d 651 (S.D.N.Y. 2011)..................................................... 37

*Richman v. Goldman Sachs Group, Inc.*,
  868 F. Supp. 2d 261 (S.D.N.Y. 2012)..................................................... 22

*RSM Prod. Corp. v. Fridman*,
  643 F. Supp. 2d 382 (S.D.N.Y. 2009)..................................................... 16

*S. Cherry St., LLC v. Hennessee Grp. LLC*,
  573 F.3d 98 (2d Cir. 2009).................................................................... 35

*S.E.C. v. Citigroup Global Mkts. Inc.*,
  827 F. Supp. 2d 328 (S.D.N.Y. 2011)..................................................... 17

*S.E.C. v. First Jersey Sec., Inc.*,
  101 F.3d 1450 (2d Cir. 1996)................................................................. 40

*Sgalambo v. McKenzie*,
  739 F. Supp. 2d 453 (S.D.N.Y. 2010)..................................................... 39

*Silsby v. Icahn,*
   17 F. Supp. 3d 348 (S.D.N.Y. 2014) ....................................................................... 4

*Smith v. Local 819 I.B.T. Pension Plan,*
   291 F.3d 236 (2d Cir. 2002) ................................................................................... 21

*Special Situations Fund III QP, L.P. v. Deloitte Touche Tohmatsu CPA, Ltd.,*
   33 F. Supp. 3d 401 (S.D.N.Y. 2014) ..................................................................... 43

*Tabor v. Bodisen Biotech, Inc.,*
   579 F. Supp. 2d 438 (S.D.N.Y. 2008) ................................................................... 23

*Vladimir v. Bioenvision Inc.,*
   606 F. Supp. 2d 473 (S.D.N.Y. 2009) ................................................................... 29

*VNB Realty, Inc. v. Bank of Am. Corp.,*
   No. 11-cv-6805, 2013 WL 5179197 (S.D.N.Y. Sept. 16, 2013) ........................... 16

*Younger v. Virtus Inv. Partners Inc.,*
   195 F. Supp. 3d 499 (S.D.N.Y. 2016) ................................................................... 41

## STATUTES

15 U.S.C. § 78j(b) ............................................................................................................ 20

15 U.S.C. § 78u-4(b) ........................................................................................... 21, 22, 35

17 C.F.R. § 240.10b-5 ..................................................................................................... 20

## RULES

ASC 810-10-15-14 ........................................................................................................... 34

ASC 850-10-20 ................................................................................................................ 34

FED. R. CIV. P. 9(b) .......................................................................................................... 21

## TREATISES

5 Thomas Lee Hazen, TREATISE ON THE LAW OF SECURITIES REGULATION § 14:127 (May 2017)
   ....................................................................................................................................... 28

Defendants Global Brokerage, Inc. f/k/a FXCM Inc. ("FXCM" or the "Company") and Dror Niv, William Ahdout, David Sakhai, Eduard Yusupov, Janelle G. Lester, Robert Lande, Ornit Niv, Nicola Santoro, Jr., Margaret Deverell, David S. Sassoon, Kenneth Grossman, James Brown, Ryan Silverman, Arthur Gruen, Robin E. Davis, Eric LeGoff, and Bryan Reyhani (collectively, the "Individual Defendants," and together with FXCM, the "Defendants") submit this memorandum of law in support of their motion to strike significant portions of Plaintiffs' Consolidated Securities Class Action Complaint (the "Complaint" or "Compl.") pursuant to Federal Rule of Civil Procedure 12(f) and 11(b)(3) and motion to dismiss the Complaint in its entirety pursuant to Federal Rule of Civil Procedure 12(b)(6).[1]

## PRELIMINARY STATEMENT

Plaintiffs seek to assert claims against Defendants for violations of the federal securities laws based solely on allegations contained in an unadjudicated regulatory complaint and related settlement consent order.  On February 6, 2017, FXCM, an online foreign exchange trading firm, entered into a settlement with the Commodity Futures Trading Commission ("CFTC") and the National Futures Association ("NFA") concerning the Company's alleged undisclosed "pay-for-flow" relationship with Effex Capital LLC ("Effex"), one of its many liquidity providers.  The CFTC and NFA alleged that FXCM failed to disclose that, between 2009 and 2014, it had an agreement with Effex under which the Company received payment in exchange for customer trading volume and, according to these regulators, such agreement created a conflict of interest between the Company and its retail trading customers.  In entering into this settlement, FXCM did not admit the CFTC and NFA allegations, and expressly preserved the right to contest such allegations, should they be asserted or relied upon in another matter by other litigants, as Plaintiffs seek to do here.

---

[1] All capitalized terms not defined herein adopt the meaning ascribed to them in the Complaint.

1

As discussed below in greater detail, FXCM did not hide the existence of its pay-for-flow relationship with liquidity providers.  To the contrary, FXCM repeatedly disclosed to its customers, investors, and the world at large that it had pay-for-flow agreements with liquidity providers, and that it received significant revenue from such agreements.  This information was repeatedly disclosed in FXCM's public filings, as even Plaintiffs acknowledge in their Complaint.  In fact, FXCM had no reason to hide the existence of its pay-for-flow agreements with liquidity providers as such agreements are legal and not prohibited by any CFTC or NFA rule.  While FXCM may not have disclosed the name of the liquidity providers who were party to the pay-for-flow agreements, FXCM had no legal duty or regulatory requirement to do so.

Moreover, FXCM's pay-for-flow agreement with Effex, *which was terminated prior to the time Plaintiffs even purchased their FXCM securities,* did not create a conflict of interest.  The pay-for-flow agreement was not tied in any way to the profit or loss of FXCM's retail customers or Effex.  It was simply a flat-fee based solely on customer trading volume.  And FXCM did not take any market position by virtue of having such a pay-for-flow agreement with Effex.  In reality, the pay-for-flow agreement did not harm FXCM retail customers or cause them to lose money on their trades; to the contrary, the agreement provided significant financial benefits to FXCM customers, including greater depth of liquidity and lower trade rejection rates.

Ignoring these facts and its pre-suit, independent investigation requirement, Plaintiffs instead have chosen to capitalize on the Company's settlement with the regulators by adopting, wholesale, the unadjudicated allegations asserted by the CFTC and NFA in crafting their claims against Defendants for violation of Sections 10(b) and 20(a) of the Securities Exchange Act of 1934 ("Exchange Act").  The seventy-two page Complaint is simply a "cut-and-paste" of the allegations contained in the unadjudicated CFTC Order and NFA Complaint and is devoid of any

admissible, well-pleaded facts supporting Plaintiffs' claims.  Plaintiffs cannot satisfy their heavy pleading burden for securities fraud claims by simply copying the allegations contained in an unadjudicated regulatory complaint and settlement consent order.  In fact, courts in this Circuit disapprove of such conduct and repeatedly have stricken complaints like the one filed in this case.

The Court has additional grounds to dismiss the Complaint because Plaintiffs have utterly failed to plead all the requisite elements of their securities fraud claims.  With respect to their Section 10(b) claim, as demonstrated below in great detail, Plaintiffs have not adequately alleged the existence of an actionable material misstatement of fact.  Instead, Plaintiffs inappropriately block quote statements from FXCM's public filings and follow them with the repetitious and formulaic allegation that they are materially false and misleading.  Plaintiffs also unsuccessfully attempt to manufacture accounting violations that neither the Company's well-respected outside auditors, nor FXCM's regulators, have found to exist.  Indeed, the Company has not had to restate any of its financial statements issued during the relevant period.  Moreover, Plaintiffs have wholly failed to satisfy their requirement to allege particularized facts showing that Defendants made an actionable material misstatement with scienter, *i.e.*, an intent to deceive investors.  To this end, Plaintiffs do not even claim that Defendants had a motive and opportunity to defraud investors, and they provide no facts supporting a strong inference of conscious wrongdoing by Defendants.

Likewise, the Court can, and should, dismiss the Section 20(a) claim asserted against the many named directors and officers of FXCM.  Section 20(a) was enacted to ensure that those individuals who operate behind the scenes to control a securities violator do not escape liability; it was not enacted to hold every director or senior officer of a company derivatively liable for

3

alleged securities fraud, as Plaintiffs seek to do here.  To effectively assert a Section 20(a) claim, one must show (1) a primary violation of the securities laws by a controlled person; (2) control of the primary violator by the targeted defendant; and (3) that the controlling person was in some meaningful sense a culpable participant in the fraud perpetrated by the controlled person.  As demonstrated below, Plaintiffs have not come close to establishing any, let alone all three, of these requirements.

Accordingly, the Court should grant Defendants' motion to strike and dismiss the Complaint.

## STATEMENT OF FACTS

The following facts are taken from the Complaint (ECF No. 48), and the Declaration of Israel Dahan ("Dahan Decl."), including the exhibits[2] attached thereto.[3]

### A.      The Parties

Lead Plaintiffs 683 Capital Partners, LP and Shipco Transport Inc., and Named Plaintiffs Sergey Regukh and Brian Armstrong (collectively, "Plaintiffs"), purportedly purchased FXCM securities during the Class Period.  *See* Compl. ¶¶ 21, 22.  Each of the Plaintiffs began purchasing their FXCM securities *after* FXCM publicly announced that it terminated its pay-for-flow agreement with Effex and *after* the Swiss National Bank ("SNB") Flash Crash on January

---

[2] Lettered exhibits are attached to the Dahan Declaration, while numbered exhibits are attached to the Complaint.

[3] When considering a motion to dismiss for failure to state a claim, courts may "consider any written instrument attached to the complaint, statements or documents incorporated into the complaint by reference, legally required public disclosure documents filed with the SEC, and documents possessed by or known to the plaintiff and upon which it relied in bringing the suit." *ATSI Commc'ns, Inc. v. Shaar Fund, Ltd.*, 493 F.3d 87, 98 (2d Cir. 2007); *see also Silsby v. Icahn*, 17 F. Supp. 3d 348, 354 (S.D.N.Y. 2014) ("The Court can take judicial notice of public disclosure documents that must be filed with the [SEC] and documents that both bear on the adequacy of SEC disclosures and are public disclosure documents required by law.") (internal quotations and citations omitted).

15, 2015, when FXCM's common stock price declined by over 90%.[4]  Specifically, 683 Capital Partners LP, a private investment fund specializing in the purchase of distressed debt, began purchasing FXCM convertible bonds on January 16, 2015, and Shipco Transport, Sergey Regukh, and Brian Armstrong began purchasing FXCM common stock on February 23, 2016, March 27, 2015, and December 29, 2015, respectively.  *See* ECF No. 27-3; ECF No. 13-2; ECF No. 48-1.

Plaintiffs assert a claim under Section 10(b) of the Exchange Act and Rule 10b-5 promulgated thereunder, against defendants FXCM, Dror Niv, William Ahdout, and Robert Lande.  During the Class Period, Niv served as the CEO of FXCM and the Chairman of FXCM's Board of Directors; Ahdout served as a director on the Board and as Managing Director; and Lande was FXCM's CFO.  *See* Compl. ¶¶ 25, 26, 36.

Plaintiffs also assert a claim under Section 20(a) of the Exchange Act against Niv, Ahdout, Lande, and David Sakhai (director on the Board and FXCM's COO), Eduard Yusupov (director on the Board, Global Head of Dealing, and Managing Director), Kenneth Grossman (director on the Board and Managing Director), James Brown, Ryan Silverman, Arthur Gruen,

---

[4] On January 15, 2015, the SNB shocked the world's financial markets by announcing that it would immediately end its three-year-old peg of 1.20 Swiss francs to one euro. The SNB made this announcement just days after assuring the markets that it had no intention of removing the currency peg.  This unforeseen policy reversal resulted in widespread market disruption, known as the "SNB Flash Crash," that entailed extreme price volatility and zero market liquidity.  When the dust settled, the value of the euro had plummeted versus the Swiss franc, and traders and brokers throughout the world with open long positions on the euro-Swiss franc currency pair had collectively lost billions of dollars.  FXCM customers with positions in this currency trading pair lost more than $275 million, and FXCM faced a brief regulatory-capital shortfall for the first and only time in its seventeen-year history.  *See* FXCM SEC Form 10-K 2015 Annual Report (attached as Ex. A to Dahan Decl.) at 13-14.

Robin Davis, Eric LeGoff, and Bryan Reyhani[5] (all outside directors on the Board), Janelle Lester (former FXCM Chief Compliance Officer), Ornit Niv (former CEO of Forex Capital Markets, LLC, a FXCM subsidiary),  Nicola Santoro, Jr. (former FXCM Chief Accounting Officer), Margaret Deverell (FXCM Chief Accounting Officer), and David Sassoon (FXCM General Counsel);  *See id.* ¶¶ 27-28, 35, 37-48.

**B.     FXCM's No Dealing Desk Trading Model**

FXCM was founded in 1999 and is one of the world's largest online foreign exchange ("FX") trading firms.  *See id.* at ¶¶ 23, 57.  FX trading was once the domain of large financial institutions and ultra-high-net-worth individuals, but the growth of online brokers like FXCM enabled the public to participate in this market.  *See* Bank for International Settlements, "Triennial Central Bank Survey, Foreign exchange turnover in April 2013: preliminary global results" (Sept. 2013) p. 7, *available at* http://www.bis.org/publ/rpfx13fx.pdf.  The FX market is the largest and most liquid market in the world, with an average daily trading volume of over $5.3 trillion.  *See id.* at 4.

FX trading firms generally operate under two types of trading models:  the agency-trading model, also known as the "No Dealing Desk" ("NDD") model, and the principal-trading model, also known as the "Dealing Desk" ("DD") model.  FXCM pioneered the NDD model in 2007, and operated both a NDD and a DD model during the Class Period.  *See* Compl. ¶ 59.

Under the NDD model, FXCM functioned as a credit intermediary between retail customers and over a dozen independent financial institutions (banks and specialist trading firms) that execute customer trades—known as market makers or "liquidity providers."  *See id.* ¶ 60.  Throughout the Class Period, FXCM counted numerous large banks among its liquidity

---

[5] Perry G. Fish died on February 21, 2017, and has been dismissed from the case.  *See* ECF No. 83.

providers for its NDD model.  These liquidity providers competed for retail customers' orders by submitting quotes (buy and sell prices for each currency pair) to FXCM.  *See id.* ¶ 62.

FXCM provided customers with an online electronic trading platform that gathered the available buy and sell pricing at any given time from liquidity providers.  FXCM then applied a markup to the prices provided by liquidity providers and generated a best bid/offer ("BBO") which was streamed to the customer via the trading platform.  *See id.* ¶¶ 61-62.  If the customer chose to execute a trade at the BBO, then FXCM would attempt to execute that customer's trade with the liquidity provider who provided the BBO.

Because FX prices often fluctuated from the time the BBO was provided to the time the customer placed the execution order, and because there was a limited amount of liquidity available at a given price, it was not unusual for a liquidity provider to refuse to execute a trade at the previously quoted BBO.  If the bid was rejected, the customer was notified that the trade could not be executed.  If the bid was accepted, FXCM entered into a trade with the liquidity provider and simultaneously entered into the offsetting trade with its customer (after FXCM charged the customer a small mark-up to the price or a per-trade commission as its brokerage fee).  The result of this transaction was that the customer's trade was executed, the liquidity provider's trade was executed, and FXCM had offsetting trades with the customer and the liquidity provider so that FXCM was flat or neutral. *See* Compl. Ex. 1, at 1.

Thus, under the NDD model, multiple liquidity providers acted as the market makers and accepted the market risk that the trade would either gain or lose money; FXCM was merely the broker-intermediary that facilitated the transaction.  *See id*.  FXCM did not take a trading

position opposite the customer and did not make money by betting *against* the customer.[6]
Instead, under the NDD model, FXCM made money by charging its customers a small markup
on quoted prices or a per-trade commission for facilitating the transaction between the retail
customer and the liquidity provider.  FXCM repeatedly disclosed both its process of gathering
quotes from liquidity providers and its charge of a markup or commission to customers.  *See,
e.g.*, Compl. ¶¶ 133, 143, 152, 159, 162, 185, 188, 208, 228.

Under the NDD model, FXCM also made money through arrangements with certain
liquidity providers, often termed "pay-for-flow" agreements.   Under these pay-for-flow
agreements, FXCM would receive a fixed fee based on the volume of the trades that were
executed by FXCM's customers with that liquidity provider.  FXCM repeatedly disclosed to the
public that its retail trading revenue included payments from pay-for-flow agreements.  *See id.*
¶¶ 124, 134, 135, 143, 144, 152, 160, 162, 169, 186, 188, 208; *see also, e.g.,* FXCM SEC Form
10-K 2014 Annual Report (attached as Ex. B to Dahan Decl.); *id.* at 42 (explaining that retail
trading revenue included "payments we receive for order flow from FX market makers"); *id.* at
51, 78-79 ("In 2013 and through August 2014, we earned revenue on order flow.  Income earned
on order flow represents payments received from certain FX market makers in exchange for
routing trade orders to these firms for execution.").  Critically, pay-for-flow agreements were not
unique to FXCM and such agreements did not violate any CFTC rule or regulation.

On August 1, 2014, FXCM discontinued its pay-for-flow agreements with liquidity
providers.  *See* Compl. ¶ 199; *see also* Ex. B at 42, 51, 79; FXCM SEC Form 10-Q for the third
quarter of 2014 (attached as Ex. C to Dahan Decl.) at 36, 40, 45, 51.  As Plaintiffs themselves

---

[6] The liquidity provider, on the other hand, made money by betting against the retail customer.
For example, when a customer places an order that is long euro on the euro/franc pair, the
liquidity provider that executes the trade essentially takes a short position on the euro.

acknowledge, FXCM publicly disclosed the discontinuation of such pay-for-flow agreements on November 7, 2014.  *See* Compl. ¶ 199; *see also* Ex. C at 40 ("Effective August 1, 2014, we no longer receive payments for order flow."); *id.* at 45 ("Beginning in August 2014 , we no longer receive payments for order flow.").

### C.     FXCM's Relationship With Effex

Effex is an independently owned limited liability company formed in 2010 that provides FX liquidity to institutional counterparties in the over-the-counter FX market.  Effex is not a subsidiary of FXCM.  Effex is managed and controlled by John Dittami, not FXCM or any employees of FXCM.  No Defendants ever had an ownership interest in Effex.  Even the CFTC, in its Consent Order, recognized that the only person or entity with an ownership interest in Effex was John Dittami.  *See* Compl. Ex. 1, at 7.

In the fall of 2009 through the spring of 2010, John Dittami developed computer source code and a trading algorithm that provided customers with a better FX trading experience, specifically by offering lower prices and lower rejection rates (*i.e.*, better trade execution).  *See* Compl. ¶ 65.  In May 2010, in order to gain the advantage of this algorithm, FXCM entered into a Services Agreement with Effex under which Effex would pay FXCM a $21 commission for every $1 million in trading volume that Effex was awarded from FXCM's customers.  The Services Agreement was a pay-for-flow agreement.  *See id.*  at ¶ 70.  Again, FXCM consistently disclosed the pay-for-flow revenue it received from the Services Agreement.  *See id.* ¶¶ 124, 134, 135, 143, 144, 152, 160, 162, 169, 186, 188, 208.

The Services Agreement between FXCM and Effex was not tied in any way to FXCM's customers' profit or loss or Effex's profit or loss.  The pay-for-flow fee that FXCM received was a flat fee, based solely on customer trading volume.  And contrary to Plaintiffs' unsupported contention, FXCM did not take any market positions opposite customers by virtue of having

such a Services Agreement with Effex.  Indeed, in relation to its NDD model, FXCM never took any market positions at all.  Moreover, the Services Agreement did not transform FXCM from a NDD model to a DD model.  Instead, the key tenets of a NDD model—(1) the presence of an intermediary liquidity provider and (2) the absence of market risk for FXCM—remained true for all of FXCM's NDD trades, including those executed with Effex as the liquidity provider.

As noted above, FXCM terminated its Services Agreement with Effex on August 1, 2014—a fact that was publicly disclosed.  *See id.* ¶ 199; *see also* Ex. C at 40, 45, 51; Ex. B at 42, 51, 79.  Effex continued to be one of FXCM's many liquidity providers until January 2017.

### D.      FXCM's Settlement With The CFTC And NFA

On February 6, 2017, FXCM (and Niv and Ahdout) settled with the CFTC and NFA alleged regulatory violations relating to the Company's pay-for-flow relationship with Effex.  *See* Compl. Exs. 1 & 2.

In the CFTC Order, the CFTC stated that it sought to file an administrative proceeding against FXCM, Niv, and Ahdout "*to determine whether* respondents engaged in the violations set forth herein, and *to determine whether* any order shall be issued imposing remedial sanctions." Compl. Ex. 1, at 1 (emphasis added).  Thus, by the CFTC's own admission, at the time of the settlement, there was no adjudication of the alleged regulatory violations by FXCM, Niv, and Ahdout.  And to date, such allegations have not been found to be true or adjudicated by any court of law.  Moreover, in entering into the CFTC Order, FXCM, Niv, and Ahdout made clear that they were not admitting to the allegations and claims set forth therein, and expressly preserved their rights to contest such allegations and claims in any other proceeding.  *See id.* at 11.  They also made clear that they were not consenting to the use of the CFTC Order in any other proceeding.  *See id.* at n.1.

10

Further, the CFTC defined the "Relevant Period" for the alleged violations as September 4, 2009 through 2014.  *See id.* at 2.  This definition of the relevant period recognized that the pay-for-flow agreement, memorialized as the Services Agreement, that FXCM had with Effex was terminated on August 1, 2014.  Thus, even though the CFTC Order was entered into on February 6, 2017, the CFTC did not claim (as Plaintiffs' erroneously assert in their Complaint) that FXCM, Niv, or Ahdout engaged in the alleged wrongdoing beyond the Relevant Period identified in the CFTC Order.

In the NFA Complaint, the NFA likewise acknowledged that it was only making allegations in the form of a "Complaint" and had only "*found reason to believe* that NFA Requirements are being, have been or are about to be violated[.]"  Compl. Ex. 2, at 1 (emphasis added).  To date, there has been no adjudication of the NFA's allegations and claims by any court of law.  Along with the Complaint, the NFA also issued a decision to settle the allegations contained in the NFA Complaint.  *See In the Matter of Forex Capital Markets, LLC, et al.*, NFA Case No. 17-BCC-001, Decision (Feb. 6, 2017) (attached as Ex. D to Dahan Decl.) (the "NFA Decision").  The NFA Decision accepted offers of settlement from FXCM, Niv, Ahdout, and Ornit Niv "in which they *neither admitted nor denied the allegations* of the Complaint and proposed to settle the charges against them[.]"  *Id.* at 3 (emphasis added).

Importantly, nowhere in the CFTC Order, NFA Complaint, or NFA Decision, do the CFTC or NFA contend that pay-for-flow agreements are illegal or improper.  Nor do they contend that FXCM's relationship with Effex caused FXCM customers to lose money on their FXCM trades, or that this relationship harmed FXCM's shareholders.

### E.      The Alleged False And Misleading Statements

In their Complaint Plaintiffs copy, nearly verbatim, the allegations contained in the unadjudicated CFTC Order and NFA Complaint and, based solely on such allegations, contend

that FXCM's annual and quarterly reports filed with the SEC during the Class Period contain

materially false and misleading statements.  The following are the challenged statements:[7]

- "We primarily offer our customers what is referred to as an agency model to execute their trades.  Our agency model is fundamental to our core business philosophy because we believe that it aligns our interests with those of our customers and reduces our risks.  In the agency model, when our customer executes a trade on the best price quotation offered by our FX market makers, we act as a credit intermediary, or riskless principal, simultaneously entering into offsetting trades with both the customer and the FX market maker.  We earn trading fees and commissions by adding a markup to the price provided by the FX market makers and generate our trading revenues based on the volume of transactions and the spread earned on transactions."  Compl. ¶¶ 159, 185, 206, 226.

- "Under the Company's retail agency FX offering, trading revenue is earned by adding a markup to the price provided by FX market makers generating trading revenue based on the volume of transactions and is recorded on trade date.  Under the agency model, when a customer executes a trade on the best price quotation presented by the FX market maker, the Company acts as a credit intermediary, or a riskless principal, simultaneously entering into a trade with the customer and the FX market maker."  *Id.* ¶¶ 133, 143, 152, 159, 162, 185, 188, 208, 228.

- "Income earned on order flow represents payments received from certain FX market makers in exchange for routing trade orders to these firms for execution.  The Company's order routing software ensures that payments for order flow do not affect the routing of orders in a manner that is detrimental to its retail customers."  *Id.* ¶¶ 134, 143, 152, 162, 188, 208.

- "The Company's primary offering to retail customers is what is referred to as agency execution or an agency model.  We earn trading fees and commissions by adding a markup to the price provided by the FX market makers and generate our trading revenues based on the volume of transactions, not trading profits or losses."  *Id.* ¶¶ 142, 152, 162, 188, 208.

- "Retail trading revenue is our largest source of revenue and is primarily driven by:  (i) the number of active accounts and the mix of those accounts, such as low versus high volume accounts; . . . and (iv) the amount of additional retail revenues earned, including revenues from contracts for difference (CFD) trading, fees earned through white label relationships and payments we receive for order flow from FX market makers."  *Id.* ¶¶ 135, 144, 152, 169.

---

[7] Although these statements in the public filings vary slightly from year to year, the message (if not the precise wording) remains the same.

Plaintiffs do not state what specific portions of the foregoing statements are materially false and misleading, or why that is the case.  Instead, Plaintiffs repeat the same boilerplate mantra after discussing each SEC filing:

> The above statements in the [relevant FXCM public filing] were materially false and misleading because:  (1) from September 4, 2009 through at least 2016, FXCM engaged in false and misleading solicitations of its retail foreign exchange customers by concealing its relationship with its most important market maker, Effex, and by misrepresenting that its NDD platform had no conflicts of interest with its customers; (2) FXCM was earning illicit profits on its NDD platform as it was on both sides of its customers' trades through its arrangement with Effex, in direct contravention to its stated "core" business; (3) FXCM and Defendant Niv made false statements to the NFA about the Company's relationship with Effex; and (4) as a result, Defendants' statements about FXCM's business, operations and prospects were materially false and misleading and/or lacked a reasonable basis at all relevant times.

*Id.* ¶¶ 126, 136, 146, 153, 163, 174, 189, 200, 209, 220, 229, 242.

> The [relevant FXCM public filing] contained financial statements for FXCM that Defendants stated were prepared according to GAAP.  Because FXCM received 70% of Effex's profits, it was the primary beneficiary of Effex's business and GAAP required FXCM to consolidate Effex on its consolidated financial statements and to report a non-controlling interest related to Effex held by Dittami.   Alternatively, GAAP required FXCM to disclose that Effex was a related party and the nature and amount of the income FXCM earned from Effex.  FXCM's financial statements in the [relevant FXCM public filing] were false and misleading and violated GAAP because FXCM failed to either consolidate Effex's business with its own or to disclose Effex as a related party.  The [relevant FXCM public filing] also included signed SOX certifications by Defendants Niv and Lande attesting to the accuracy of the [relevant FXCM public filing] and certifying that Niv and Lande each disclosed "[a]ny fraud, whether or not material" to FXCM's auditor and audit committee.  These SOX certifications were materially false and misleading because: (1) from September 4, 2009 through at least 2016, FXCM engaged in false and misleading solicitations of its retail foreign exchange customers by concealing its relationship with its most important market maker, Effex, and by misrepresenting that its NDD platform had no conflicts of interest with its customers; (2) FXCM was earning illicit profits on its NDD platform as it was on both sides of its customers' trades through its arrangement with Effex, in direct contravention to its stated "core" business; (3) FXCM and Defendant Niv made false statements to the NFA about the Company's relationship with Effex; (4) the accompanying financial statements were false as they failed to consolidate Effex and failed to disclose material related party transactions involving Effex; and (5) as a result, Defendants'

statements about FXCM's business, operations and prospects were materially false and misleading and/or lacked a reasonable basis at all relevant times.

*Id.* ¶¶ 127-130; 137-140; 147-150; 154-157; 164-167; 175-178; 183; 190-193; 201-204; 210-213; 221-224; 230-233; 243-246.

Related to this assertion, Plaintiffs also claim that FXCM's filings on Form DEF 14 A in the years 2012 through 2016 are materially false and misleading as "each had a section that purported to disclose material related party transactions, which failed to disclose FXCM's transactions involving Effex." *Id.* ¶ 247.

Not surprisingly, Plaintiffs ignore the fact that FXCM's outside auditors, Ernst & Young LLP ("EY"), opined that the FXCM's financial statements were not materially misstated during the Class Period.  In fact, even *after* FXCM's settlement with the CFTC and NFA, EY again opined that the financial statements contained in FXCM's 2016 annual report were not materially misstated and did not require that any earlier annual or quarterly FXCM filings be restated based on Effex's purported status as a variable interest entity ("VIE") or related party.  *See* FXCM SEC Form 10-K 2016 Annual Report (2016 10-K) (attached as Ex. E to Dahan Decl.) at F-2.

Lastly, Plaintiffs allege that FXCM made "misleading statements" on its website concerning its NDD model (*see id.* ¶¶ 249-254), but provide no explanation as to why these particular statements were allegedly misleading.

## ARGUMENT

## I.   ALLEGATIONS THAT REFER TO OR RELY UPON THE ALLEGATIONS IN THE CFTC ORDER AND THE NFA COMPLAINT SHOULD BE STRICKEN FROM PLAINTIFFS' COMPLAINT

Plaintiffs merely quote from and rely upon allegations contained in the unadjudicated CFTC Order and NFA Complaint, rather than provide *admissible facts* or additional information to support their claims.  Plaintiffs cannot satisfy their heavy pleading burden in such a manner.

Pursuant to Rules 12(f) and 11(b)(3), this Court can, and should, strike all allegations in the Complaint that refer to, or rely upon, the allegations contained in the unadjudicated CFTC Order and NFA Complaint.

> ### A.   Courts Routinely Use Rule 12(f) To Strike Allegations That Are Based Upon An Unadjudicated Regulatory Complaint Or Consent Order

Rule 12(f) permits a court to strike from a pleading "any redundant, immaterial, impertinent, or scandalous matter."  The Second Circuit has applied Rule 12(f) to strike as immaterial allegations in a complaint that are based upon a regulatory complaint or consent order, such as the CFTC Order and NFA Complaint.  *See Lipsky v. Commonwealth United Corp.*, 551 F.2d 887 (2d Cir. 1976).

*Lipsky* addressed whether a plaintiff can cite allegations contained in an SEC complaint and subsequent consent judgment.  The Second Circuit affirmed the district court's decision to strike such allegations under Rule 12(f), holding that "neither a complaint nor references to a complaint which results in a consent judgment may properly be cited in the pleadings."  *Id.* at 893.  In doing so, the Second Circuit observed that the SEC consent judgment was the result of "private bargaining" between the SEC and the plaintiff, and was not the result of any "hearing or ruling or any form of decision on the merits by the district court."  *Id.* at 893-94.  Accordingly, the consent judgment could not "be used as evidence in subsequent litigation between that corporation and another party."  *Id.* (citing FED. R. EVID. 410 and equating the SEC order to a *nolo contendere* plea).  The Second Circuit further held that "[s]ince it is clear that the SEC[] consent judgment, itself, can have no possible bearing on the [plaintiff's] action, the SEC complaint which preceded the consent judgment is also immaterial, for purposes of Rule 12(f)."  *Id.* at 894.

*Lipsky* has been adopted by many courts in the Southern District of New York to strike allegations in complaints, like the Complaint here, that are essentially lifted from other unadjudicated complaints or regulatory consent orders.  *See, e.g.*, *In re Merrill Lynch & Co. Research Reports Sec. Litig.*, 218 F.R.D. 76, 78-79 (S.D.N.Y. 2003) (striking all allegations in a complaint that "refer to or rely on" earlier unadjudicated regulatory complaints); *In re CRM Holdings, Ltd. Sec. Litig.*, No. 10-cv-00975, 2013 WL 787970, at *5 (S.D.N.Y. Mar. 4, 2013) (refusing to consider allegations derived from complaints filed by the New York State Workers' Compensation Board and the New York Attorney General); *Footbridge Ltd. v. Countrywide Home Loans, Inc.*, No. 09-cv-4050, 2010 WL 3790810, at *5 (S.D.N.Y. Sept. 28, 2010) (striking allegations that were based on pleadings and settlements from private actions and government investigations against the defendants); *RSM Prod. Corp. v. Fridman*, 643 F. Supp. 2d 382, 403 (S.D.N.Y. 2009) ("Second circuit case law is clear that paragraphs in a complaint that are either based on, or rely on, complaints in other actions that have been dismissed, settled, or otherwise not resolved, are, as a matter of law, immaterial within the meaning of [Rule 12(f)]."), *aff'd*, 387 F. App'x. 72 (2d Cir. 2010).[8]

The holding in *Lipsky* has in fact been applied to strike allegations in a complaint that "simply recast the CFTC's findings and are derived wholesale from the CFTC Order."  *In re Platinum & Palladium Commodities Litig.*, 828 F. Supp. 2d 588, 593-94 (S.D.N.Y. 2011).  As the *Platinum* court correctly reasoned, "[a]lthough the CFTC Order included certain factual

---

[8] While some courts in this District have declined to extend *Lipsky* to strike allegations from other unadjudicated complaints, those decisions are factually distinguishable and do not involve a situation where plaintiffs, as here, have failed to introduce *any* additional evidence supporting their claims.  *See, e.g.*, *HSH Nordbank AG v. RBS Holdings USA Inc.*, No. 13-cv-3303, 2015 WL 1307189, at *3-*4 (S.D.N.Y. Mar. 23, 2015); *VNB Realty, Inc. v. Bank of Am. Corp.*, No. 11-cv-6805, 2013 WL 5179197, at *2-*4 (S.D.N.Y. Sept. 16, 2013); *In re Bear Stearns Mortg. Pass-Through Certificates Litig.*, 851 F. Supp. 2d 746, 768 n.24 (S.D.N.Y. 2012).

findings, it nevertheless was the product of a settlement between the CFTC and the Respondents, not an adjudication of the underlying issues in the CFTC proceeding. *Plaintiffs are therefore prohibited from relying on the CFTC Order to plead the 'underlying facts of liability.'*" *Id.* at 594 (emphasis added); *see also S.E.C. v. Citigroup Global Mkts. Inc.*, 827 F. Supp. 2d 328, 333 (S.D.N.Y. 2011) ("As a matter of law, an allegation that is neither admitted nor denied is simply that, an allegation."), *vacated and remanded on other grounds*, 752 F.3d 285 (2d Cir. 2014).

As in *Platinum*, Plaintiffs here have adopted, wholesale, the allegations contained in the unadjudicated CFTC Order and NFA Complaint—which are either recast with slightly different wording or heavily quoted. *See* Compl. ¶¶ 85, 86; *see also* Chart Comparison of Allegations (attached as Ex. F to Dahan Decl.). Indeed, as is evident from Exhibit F to the Dahan Declaration, Plaintiffs' key allegations have been lifted directly from the CFTC Order and the NFA Complaint, which they attach as exhibits to the Complaint. And Plaintiffs do not just copy the allegations, they also mischaracterize or exaggerate several of them to suit their needs. As just one example, Plaintiffs assert that Effex was created at FXCM's direction, while the CFTC Order alleges that it was formed by Dittami, not FXCM. *Compare* Compl. ¶ 68 ("On March 23, 2010, the new company, *Effex was created under the direction of FXCM*.") with Compl. Ex. 1, at 4 ("On March 23, 2010, *HF Trader formed his new company*").[9]

Even more troubling, Plaintiffs totally ignore publicly available, contradictory allegations in other complaints, amplifying the Second Circuit's reliability concerns regarding unadjudicated complaints. Prior to the filing of this Complaint, Effex publicly disputed the key allegations in the CFTC Order and NFA Complaint and, in fact, filed a lawsuit against the NFA for defamation. *See Effex Capital, LLC v. Nat'l Futures Ass'n*, No. 1:17-cv-04245 (N.D. Il. June 6,

---

[9] *See* Dahan Decl., Ex. F for other instances where Plaintiffs have misstated the CFTC's or NFA's allegation to fit their purposes in this litigation.

2017) (attached as Ex. G to Dahan Decl.).  Not surprisingly, Plaintiffs totally ignore Effex's

filing as it contradicts the one-sided story they would like to tell.  *See* Ex. F (demonstrating that

Compl. ¶¶ 69, 71-72, 75, 80, and 82 are contravened by Ex. G ¶¶ 19, 20.j, 52.e, 53, and 63).  For

instance, while Plaintiffs allege that Effex was created and controlled by FXCM, Effex alleges in

its defamation complaint against the NFA that it "is an independently owned and closely held

proprietary foreign currency trading firm . . . managed and controlled by John Dittami since its

inception" and FXCM "never had any ownership interest in Effex . . . [and] never managed or

controlled Effex."  *See* Ex. G ¶¶ 16, 19.  The inability to reasonably assess conflicting narratives

such as this is precisely why unadjudicated allegations are routinely stricken from complaints.

     In short, Plaintiffs have inappropriately cribbed the entirety of their purported factual

allegations from the unadjudicated CFTC Order and NFA Complaint, which are not facts

sufficient to support Plaintiffs' claims.  *See* Ex. F.  The Court should apply *Lipsky* and its

progeny and, pursuant to Rule 12(f), strike all the allegations in the Complaint that mirror the

allegations in the CFTC Order and NFA Complaint (*e.g.*, Compl. ¶¶ 58-60, 64-82, 94-98), and

all the allegations in the Complaint that rely upon the CFTC Order and NFA Complaint (*e.g.*,

Compl. ¶¶ 2-12, 15, 61-63, 83, 85-87, 92-93, 99, 107-110, 119, 126-128, 130, 136-138, 140,

146-148, 150, 153-155, 157, 163-165, 167, 174-176, 178, 183, 189-191, 193, 200-202, 204, 209-

211, 213, 220-222, 224, 229-231, 233, 242-244, 246-248, 251, 254-255, 262-265, 268-274, 276-

279).

### B.    Plaintiffs' And Their Counsel's Sole Reliance On The Allegations In The CFTC Order And The NFA Complaint Violates Rule 11(b)(3)

     Rule 11(b)(3) imposes an affirmative duty on a plaintiff and its counsel to determine that

a pleading is factually and legally warranted.  This duty is nondelegable, and a plaintiff and its

counsel are not permitted to offload their Rule 11(b)(3) obligations onto third parties, including

government regulators. *See Pavelic & LeFlore v. Marvel Entm't Grp.*, 493 U.S. 120, 125 (1989). Courts have found that a violation of Rule 11(b)(3) provides an independent basis to strike allegations in a complaint that are essentially lifted from a regulatory complaint. *See In re Connetics Corp. Sec. Litig.*, 542 F. Supp. 2d 996, 1004-06 (N.D. Cal. 2008) (granting defendants' motion to strike paragraphs of complaint alleging Section 10(b) violations, reasoning that "lifting allegations from an SEC complaint does not constitute the reasonable investigation required by Federal Rule of Civil Procedure 11"); *Maine State Ret. Sys. v. Countrywide Fin. Corp.*, No. 2:10-cv-302, 2011 WL 4389689, at *20 (C.D. Cal. May 5, 2011) (same); *see also In re UBS AG Sec. Litig.*, No. 07-cv-11225, 2012 WL 4471265, at *17 n.17 (S.D.N.Y. Sept. 28, 2012) ("[T]he Court . . . need not consider parroted allegations for which counsel has not conducted independent investigation"); *Garr v. U.S. Healthcare, Inc.*, 22 F.3d 1274, 1280 (3d Cir. 1994) (emphasizing the necessity of personally conducting an independent investigation and imposing Rule 11 sanctions for failure to investigate).

Here, Plaintiffs and their counsel did not conduct any independent investigation with respect to the merits of the allegations they copied from the CFTC Order and NFA Complaint; instead, they improperly adopted them wholesale as true.[10] And while Plaintiffs reflexively assert that their allegations are "based upon personal knowledge" and "investigation conducted by and through Plaintiffs' attorneys," these phrases are not talismans that will allow a complaint

---

[10] Defendants acknowledge that Plaintiffs also rely (in passing) on a statement attributed to a confidential witness. *See* Compl. ¶ 84; p. 13 n.5. Plaintiffs provide no indicia of reliability or supporting facts with respect to that purported witness's solitary statement. As a general matter, allegations emanating from confidential witnesses are automatically suspect because of their anonymous nature, and may be discounted by the Court. *See In re MRU Holdings Sec. Litig.*, 769 F. Supp. 2d 500, 516 (S.D.N.Y. 2011); *accord Campo v. Sears Holdings Corp.*, 371 F. App'x 212, 216 n.4 (2d Cir. 2010). Moreover, Plaintiffs' passing use of an uncorroborated confidential-witness statement demonstrates how little diligence Plaintiffs actually exercised in drafting the Complaint. This "witness" is merely window dressing for Plaintiffs' improper attempt to entirely recast the allegations in the CFTC Order and the NFA Complaint as "facts."

to pass muster, especially when the Complaint displays neither personal knowledge nor independent investigation.

If Plaintiffs and their counsel truly performed an independent investigation, they would have discovered that there is no basis for their contention that the alleged disclosure fraud and GAAP violations continued through the end of 2016 because FXCM *terminated* its pay-for-flow agreement with Effex in *August 2014*.  Indeed, FXCM's termination of its pay-for-flow agreement with Effex was made known to all FXCM investors and customers when FXCM filed its 2014 3Q 10-Q on November 7, 2014.  *See* Compl. ¶ 199; Ex. C at 40, 45, 51.  Even the CFTC Order recognized this fact and limited its allegations and claims against FXCM, Niv, and Ahdout to a period extending from 2009 to 2014.  *See* Compl. Ex. 1, at 2.

Moreover, if Plaintiffs had independently investigated the merits of the allegations they lifted from the CFTC Order and NFA Complaint, they would have uncovered the Effex Complaint, which details Effex's strong denial of the allegations in the CFTC Order and NFA Complaint.  Yet, Effex's contradictory assertions are unaccounted for in the Complaint because Plaintiffs and their counsel abandoned their duties and only wished to tell a one-sided story parroted from regulators' allegations.

In light of Plaintiffs' and their counsel's failure to satisfy their duty to investigate under Rule 11(b)(3), the Court has a second, independent basis to strike all the allegations in the Complaint that are based upon the untested allegations contained in the unadjudicated CFTC Order and NFA Complaint.

## II.   PLAINTIFFS DO NOT STATE A CLAIM UNDER SECTION 10(b) AND RULE 10b-5

Plaintiffs claim that FXCM, Niv, Ahdout, and Lande violated Section 10(b) of the Exchange Act and Rule 10b-5.  *See* 15 U.S.C. § 78j(b); 17 C.F.R. § 240.10b-5.  To state such a

claim, Plaintiffs must adequately plead: (1) a material misrepresentation or omission of material fact; (2) scienter; (3) in connection with the purchase or sale of a security; (4) reliance; (5) economic loss; and (6) loss causation. *See Dura Pharms., Inc. v. Broudo*, 544 U.S. 336, 341 (2005); *Pac. Inv. Mgmt. Co. v. Mayer Brown LLP*, 603 F.3d 144, 151 (2d Cir. 2010) (quoting *Stoneridge Inv. Partners, LLC v. Scientific-Atlanta, Inc.*, 552 U.S. 148, 157 (2008)).

In accordance with Rule 12(b)(6), Plaintiffs' Complaint "must contain sufficient factual matter, accepted as true" that states a claim that is plausible on its face. *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009). A claim is plausible "when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id.* "[C]onclusory allegations or legal conclusions masquerading as factual conclusions will not suffice to prevent a motion to dismiss." *Smith v. Local 819 I.B.T. Pension Plan*, 291 F.3d 236, 240 (2d Cir. 2002). And as shown by Plaintiffs' seventy-two page Complaint, a complaint can be long and still not state a claim for relief. *See, e.g.*, *In re Merrill Lynch & Co. Research Reports Sec. Litig.*, 218 F.R.D. 76, 78 (S.D.N.Y. 2003) ("The Amended Complaint . . . spans 98 pages and 367 separate paragraphs. The prolix, discursive, redundant, argumentative, and disjointed assertions contained therein are improper.").

The Complaint must also allege facts sufficient to satisfy the heightened pleading requirements of Rule 9(b) and the Private Securities Litigation Reform Act of 1995 ("PSLRA"). *See ECA, Local 134 IBEW Joint Pension Tr. of Chi. v. JP Morgan Chase Co.*, 553 F.3d 187, 196 (2d Cir. 2009); 15 U.S.C. § 78u-4(b). Rule 9(b) requires that a plaintiff alleging fraud "must state *with particularity* the circumstances constituting" the fraud. FED. R. CIV. P. 9(b) (emphasis added). In particular, plaintiffs must "(1) specify the statements that the plaintiff contends were fraudulent, (2) identify the speaker, (3) state where and when the statements were made, and

(4) explain why the statements were fraudulent." *Anschutz Corp. v. Merrill Lynch & Co.*, 690 F.3d 98, 108 (2d Cir. 2012) (quoting *Rombach v. Chang*, 355 F.3d 164, 170 (2d Cir. 2004)); *see also* 15 U.S.C. § 78u-4(b)(1)(B).   Likewise, the PSLRA requires "that securities fraud complaints 'specify' each misleading statement; that they set forth the facts on which a belief that a statement is misleading was 'formed'; and that they '*state with particularity facts giving rise to a strong inference that the defendant acted with the required state of mind*.'"   *Id.* (emphasis added) (quoting *Dura*, 544 U.S. at 345); *see also* 15 U.S.C. § 78u-4(b)(2).

As demonstrated below, even if the Court permits Plaintiffs to rely upon the allegations contained in the unadjudicated CFTC Order and NFA Complaint, the Court has ample grounds to dismiss Plaintiffs' Section 10(b) claim against FXCM, Niv, Ahdout, and Lande because the Complaint fails to adequately plead (i) the existence of a materially false and misleading statement and (ii) scienter on the part of these Defendants.[11]

---

[11]   Although Defendants are not challenging the sufficiency of Plaintiffs' loss causation allegations in this motion, Plaintiffs will have extreme difficulty ultimately proving loss causation, *i.e.*, that "it was a defendant's fraud—rather than other salient factors—that proximately caused plaintiff's loss."   *Richman v. Goldman Sachs Group, Inc.*, 868 F. Supp. 2d 261, 282 (S.D.N.Y. 2012).   There are at least two intervening events that effected FXCM's share price during the Class Period.   First, the January 2015 SNB Flash Crash caused a 90% decline in FXCM's stock price.   Second, the February 2017 settlements with the regulators coincided with FXCM's announcement that it would leave the U.S. market and sell its U.S. operations to Gain Capital Holdings.   *See, e.g.*, NASDAQ, "Why FXCM Inc (FXCM) Stock Is Plunging Today," Feb. 7, 2017, *available at* http://www.nasdaq.com/article/why-fxcm-inc-fxcm-stock-is-plunging-today-cm744601 (chronicling FXCM's stock price drop after the announcement that it would leave the U.S. market and sell its U.S. business to Gain Capital).   Plaintiffs also will face serious challenges concerning its alleged damages given that each of them did not begin to purchase their FXCM securities until *after* the significant price drop from the SNB Flash Crash and *after* FXCM disclosed in August 2014 that it was terminating any further pay-for-flow agreements with liquidity providers.

### A. The Complaint Fails To Adequately Plead A Materially False Or Misleading Statement By FXCM, Niv, Ahdout, Or Lande

#### 1. Plaintiffs Do Not Even Attempt To Satisfy The Particularity Requirement Under Rule 9(b) And The PSLRA

"The Second Circuit has repeatedly stated that plaintiffs must do more than simply assert that a statement is false—'they must demonstrate with specificity why that is so.'" *In re Lululemon Sec. Litig.*, 14 F. Supp. 3d 553, 571 (S.D.N.Y. 2014) (quoting *Rombach*, 355 F.3d 164, 174 (2d Cir. 2004)).  Long block quotations from public filings, without explanation as to why those specific statements are false, are disfavored.  Indeed, "district courts should not have to 'search the long quotations in the complaint for particular false statements, and then determine on its own initiative how and why the statements were false and how other facts might show a strong inference of scienter.'" *In re PetroChina Co. Ltd. Sec. Litig.*, 120 F. Supp. 3d 340, 356 (S.D.N.Y. 2015) (quoting *Boca Raton Firefighters & Police Pension Fund v. Bahash*, 506 F. App'x 32, 38 (2d Cir. 2012)), *aff'd sub nom. Klein v. Petrochina Co.*, 644 F. App'x 13, 14 (2d Cir. 2016); *see also Tabor v. Bodisen Biotech, Inc.*, 579 F. Supp. 2d 438, 453 (S.D.N.Y. 2008) ("Plaintiffs use of large block quotes from SEC filings and press releases, followed by generalized explanations of how the statements were false or misleading are not sufficient to satisfy the heightened pleading requirements.") (citations omitted).

Recently, Judge Torres dismissed a complaint for failure to demonstrate that the alleged misstatements were materially false or misleading, reasoning that "[n]ot only is the complaint replete with such block quotations, but the complaint fails to demonstrate with specificity how any of the statements are allegedly false.  On the contrary, the complaint employs the same conclusory formula . . . four separate times in the complaint to cover *all* of the allegedly material misrepresentations." *In re Deutsche Bank Aktiengesellschaft Sec. Litig.*, No. 1:16-cv-03495 at

12 (S.D.N.Y. June 28, 2017).  Thus, Judge Torres concluded that "[o]n this basis alone, the complaint fails to meet the pleading requirements necessary to state a claim."  *Id.*

Here, too, Plaintiffs simply regurgitate the same block quotes from FXCM's SEC filings, followed by the same boilerplate objection to those quoted statements.  Plaintiffs do not identify which specific portions of the block quotes are false and misleading or demonstrate with particularized facts why that is so.  In fact, Plaintiffs' cut and pasted boilerplate objection becomes nonsensical when actually applied to the particular statements.  For example, Plaintiffs allege that FXCM's 2011 10-K, 2012 10-Qs, 2012 10-K, 2013 10-Qs for the first two quarters, and filings regarding the FXCM Notes, are false and misleading because, among other things: "FXCM and Defendant Niv made false statements to the NFA about the Company's relationship with Effex."  Compl. ¶¶ 126, 130, 136, 140, 146, 150, 153, 157, 163, 167, 174, 178, 183, 189.  Yet, even according to Plaintiffs' own allegations, and the CFTC Order and NFA Complaint from which they borrow, Niv did not make these allegedly false statements until *October 2013— well after* the 2011 10-K, 2012 10-Qs, 2012 10-K, 2013 10-Qs for the first two quarters, and the filings regarding the FXCM Notes were publicly filed.  *See id.* ¶¶ 85, 94-98; Ex. 1, at 7; Ex. 2, at ¶ 16.  It is impossible for an alleged statement made in the fall of 2013 to form the factual basis for a supposed misrepresentation in 2011, 2012, or earlier in 2013.  This is but one example of Plaintiffs' insufficient pleading.

Accordingly, as in *In re Deutsche Bank* and the precedent discussed above, "[o]n this basis alone," the Court can and should dismiss Plaintiffs' Section 10(b) claim.

2.      **The Challenged Statements Are Not False Or Misleading**[12]

a)      **The Statements Concerning The NDD Model Are True Statements Of Fact Or Inactionable Statements Of Opinion**

Plaintiffs contend that the following statements in FXCM's public filings are false and misleading:

- "We primarily offer our customers what is referred to as an agency model to execute their trades.  Our agency model is fundamental to our core business philosophy because we believe that it aligns our interests with those of our customers and reduces our risks.  In the agency model, when our customer executes a trade on the best price quotation offered by our FX market makers, we act as a credit intermediary, or riskless principal, simultaneously entering into offsetting trades with both the customer and the FX market maker.  We earn trading fees and commissions by adding a markup to the price provided by the FX market makers and generate our trading revenues based on the volume of transactions and the spread earned on transactions." Compl. ¶¶ 121, 159, 185, 206, 226.

- "Under the Company's retail agency FX offering, trading revenue is earned by adding a markup to the price provided by FX market makers generating trading revenue based on the volume of transactions and is recorded on trade date.  Under the agency model, when a customer executes a trade on the best price quotation presented by the FX market maker, the Company acts as a credit intermediary, or a riskless principal, simultaneously entering into a trade with the customer and the FX market maker." *Id.* ¶¶ 133, 143, 152, 159, 162, 185, 188, 208, 228.

Again, Plaintiffs do not state which specific statements in these two block quoted paragraphs are false and misleading.  Plaintiffs cannot seriously contend that FXCM did not primarily offer customers an agency model to execute trades; that FXCM did not enter into offsetting trades with both the customer and the FX market maker; and that FXCM did not charge a markup and earn trading fees and commissions.  To the extent Plaintiffs are focused on FXCM's statements that the "agency model is fundamental to our core business philosophy

---

[12]  While Defendants do not specifically attack the alleged materiality of the challenged statements in this Motion, it must be noted that Plaintiffs make conclusory and non-particularized allegations regarding these statements' materiality to *investors*, rather than to customers.  Plaintiffs simply do not adequately allege why these purported misstatements would have changed the total mix of information available to a reasonable investor.  *See In re JP Morgan Chase Sec. Litig.*, 363 F. Supp. 2d 595, 634 (S.D.N.Y. 2005) (reasoning that plaintiffs did not "properly allege how that [information] would have altered the total mix of information available to JPM Chase shareholders.").

because *we believe that it aligns our interests with those of our customer*," and "the Company acts as a credit intermediary" (*see* Compl. ¶¶ 121, 133, 143, 152, 162, 185, 188, 206, 226, 228 (emphasis added)), such statements are true and remained true even when FXCM had a pay-for-flow relationship with Effex.

As an initial matter, Plaintiffs are inappropriately seeking to impose Section 10(b) liability on a statement of *opinion*, not fact. The United States Supreme Court has made clear that, "a sincere statement of pure opinion is not an 'untrue statement of material fact,' regardless [of] whether an investor can ultimately prove the belief wrong," as plaintiffs lack "an invitation to Monday morning quarterback an issuer's opinions." *Omnicare, Inc. v. Laborers Dist. Council Constr. Indus. Pension Fund*, 135 S. Ct. 1318, 1327 (2015)).[13] *See also In re Weight Watchers International Inc. Sec. Litig.*, No. 14-cv-1997, 2016 WL 2757760, at \*5 & n.43 (S.D.N.Y. May 11, 2016) ("A statement of opinion is not misleading just because external facts show the opinion to be incorrect. . . . Where the speaker's opinion or belief is genuine, a bare allegation that her opinion or belief ultimately proved incorrect is not enough to survive a motion to dismiss after *Omnicare*."). Thus, to state a Section 10(b) claim based on this statement of opinion, a plaintiff must allege facts showing that the defendant did not genuinely hold its beliefs or opinions at the time the statement was made. *See City of Omaha, Neb. Civilian Employees' Ret. Sys. v. CBS Corp.*, 679 F.3d 64, 68 (2d Cir. 2012) ("Plaintiffs' second amended complaint is devoid even of conclusory allegations that defendants did not believe in their statements of opinion regarding CBS's goodwill at the time they made them."); *In re Sanofi Securities Litigation*, 155 F. Supp. 3d 386, 402 (S.D.N.Y. 2016) (dismissing securities-fraud claim where alleged misstatements

---

[13] "While the Supreme Court's decision in *Omnicare* dealt with claims under Section 11 of the Securities Act of 1933, its reasoning has been applied to claims brought under Section 10(b) of the Exchange Act[.]" *Perrigo Company PLC v. Mylan N.V.*, No. 15-cv-7341, 2015 WL 9916726, at \*9 n.5 (S.D.N.Y. Oct. 29, 2015).

were based on speaker's own belief and plaintiffs failed to allege any facts showing speaker did not believe what he said).

The Company's statement that "*we believe*" the NDD model "aligns our interests with those of our customer," is merely the Company expressing its opinion. Thus, Plaintiffs must allege facts showing that FXCM (or Niv, Ahdout, or Lande) did not believe that this opinion statement was true when it was made. Plaintiffs have not alleged any such facts. Accordingly, consistent with *Omnicare* and the other cases cited above, this Court should find this challenged statement to be an inactionable statement of opinion.

Moreover, the foregoing challenged statements are true. FXCM's interests remained aligned with NDD customers even during the period when the Company had a pay-for-flow agreement with Effex.[14] The Services Agreement between FXCM and Effex was not tied in any way to the profit or loss of Effex or FXCM customers. The pay-for-flow fee that FXCM received was a flat fee based solely on customer trading volume. FXCM also did not take any market positions opposite NDD customers by virtue of having such a Services Agreement with Effex. Indeed, in its NDD model, FXCM never took any market positions at all. Thus, contrary to Plaintiffs' unsupported contention, FXCM remained "a credit intermediary . . . simultaneously entering into a trade with the customer and the FX market maker" (Compl. ¶¶ 133, 143, 152, 159, 162, 185, 188, 208, 228) even while its pay-for-flow agreement with Effex was in effect.[15]

---

[14]  In reality, FXCM's pay-for-flow agreement with Effex made the alignment of interests between FXCM and its NDD customers even stronger as FXCM was able to provide its NDD customers with greater depth of liquidity at the BBO and significantly lower rejection rates.

[15]  To the extent Plaintiffs are contending, without any factual support, that the Effex relationship prevented NDD customers from "execut[ing] a trade on the best price quotation presented by the FX market maker," they are again mistaken. FXCM's trading platform is coded to route customer orders to the BBO, thus ensuring customers always received the best available price. It is also worth noting that Plaintiffs' conclusions regarding the use of a hold timer or "previous

Plaintiffs contend that the Company's relationship with Effex enabled the Company to earn "illicit profits on its NDD platform."  Compl. ¶¶ 126, 130, 136, 140, 146, 150, 153, 157, 163, 167, 174, 178, 183, 189, 193, 200, 204, 209, 213, 220, 224, 229, 233, 242, 246.  This contention is likewise unfounded—pay-for-flow agreements are not illegal and are widely used in the financial industry.  *See* 5 Thomas Lee Hazen, TREATISE ON THE LAW OF SECURITIES REGULATION § 14:127 (May 2017) (discussing payment for order flow agreements).  Indeed, neither the CFTC nor the NFA alleged that the Services Agreement between FXCM and Effex was illegal.  *See* Compl. Exs. 1 & 2.  Likewise, neither the SEC nor FXCM's outside auditors have taken such a position.  Thus, Plaintiffs' characterization of FXCM's profits from the pay-for-flow agreement with Effex as "illicit" is baseless.

In short, the foregoing public statements challenged by Plaintiffs are not actionable misstatements of fact under Section 10(b).

### b)      The Statements Concerning FXCM's Pay-For-Flow Agreements Are True And Sufficient Disclosures

Plaintiffs do not, and cannot, dispute that FXCM repeatedly disclosed to investors (and customers) that it had pay-for-flow agreements with liquidity providers, and that such agreements were a source of retail trading revenue for FXCM.  *See* Compl. ¶¶ 124, 134, 135, 143, 144, 152, 160, 162, 169, 186, 188, 199, 208.  Even the portions of the SEC filings that Plaintiffs block quote confirm that FXCM disclosed that "[i]ncome earned on order flow represents payments received from certain FX market makers in exchange for routing trade orders to these firms for execution," and that "payments we receive for order flow from FX

---

quote" inappropriately benefitted Effex are incorrect.  Not only are both of these practices commonplace in FX trading, there have been no facts (rather than conclusory allegations) asserted by either Plaintiffs or regulators that demonstrate Effex was abusing the hold timer or previous quote functionality on the trading platform, or receiving an improper benefit from these practices.

market makers" is one of the drivers of the Company's retail trading revenue.  *See* FXCM SEC

Form 10-K 2011 Annual Report (attached as Ex. H to Dahan Decl.) at 45, 65; FXCM SEC Form

10-K 2012 Annual Report (attached as Ex. I. to Dahan Decl.) at 46, 74; FXCM SEC Form 10-K

2013 Annual Report (attached as Ex. J to Dahan Decl.) at 40, 73; Ex. B at 42, 79; Ex. A at 74.

Nonetheless, Plaintiffs contend that FXCM's SEC filings were false and misleading because

FXCM "conceal[ed] its relationship with its most important market maker, Effex."  Compl.

¶¶ 126, 130, 136, 140, 146, 150, 153, 157, 163, 167, 174, 178, 183, 189, 193, 200, 204, 209, 213,

220, 224, 229, 233, 242, 246.  In other words, according to Plaintiffs, FXCM had an obligation

to disclose the identity of the liquidity provider with whom it had a pay-for-flow agreement and

failed to do so.  Plaintiffs are wrong as a matter of law and fact.

     "An omission is actionable under federal securities laws only when the defendant is

subject to a duty to disclose the omitted facts."  *In re Bank of Am. AIG Disclosure Sec. Litig.*,

980 F. Supp. 2d 564, 575 (S.D.N.Y. 2013) (alterations omitted) (quoting *In re Time Warner Inc.*

*Sec. Litig.*, 9 F.3d 259, 267 (2d Cir. 1993)); *see also Pehlivanian v. China Gerui Advanced*

*Materials Grp., Ltd.*, 153 F. Supp. 3d 628, 644 (S.D.N.Y. 2015); *Vladimir v. Bioenvision Inc.*,

606 F. Supp. 2d 473, 485 (S.D.N.Y. 2009), *aff'd sub nom. Thesling v. Bioenvision, Inc.*, 374 F.

App'x 141 (2d Cir. 2010).  FXCM did not have an affirmative duty to disclose its pay-for-flow

arrangement with Effex, beyond what was already repeatedly disclosed in its public filings.

Plaintiffs have not cited any rule or regulation that required FXCM to make such disclosure.  In

fact, prior to January 4, 2016, FXCM had no regulatory obligation to even disclose the identities

of the liquidity providers that it used, let alone those with whom it had a pay-for-flow

agreement.[16]   And when FXCM's obligation to disclose the identity of liquidity providers changed in 2016, it made such conforming disclosures, as even Plaintiffs acknowledge.  *See* Compl. ¶ 254.

Thus, FXCM's repeated disclosure to investors that it had pay-for-flow arrangements with liquidity providers, and that such arrangements were a source of retail trading revenue, were sufficient disclosures and true statements.

### c) The Company's Alleged False Statements To The NFA Are Irrelevant

Plaintiffs allege that FXCM's public filings were materially false or misleading because "FXCM and Defendant Niv made false statements to the NFA about the Company's relationship with Effex."  Compl. ¶¶ 126, 136, 146, 153, 163, 174, 189, 200, 209, 220, 229, 242.  As discussed above, Plaintiffs' contention is nonsensical with respect to FXCM's public filings *prior to* the time FXCM and Niv made any statements to the NFA about the Effex relationship. The NFA claims that the first alleged misstatement by FXCM or Niv took place in October 2013. *See* Compl. ¶¶ 95-98.  Putting aside the merits of the NFA's claim, logic dictates that the Company's public filings before October 2013, *i.e.*, before the third quarter of 2013, could not have been false or misleading as a result of any alleged misstatement by Niv to the NFA sometime after October 2013.  Thus, the Court can easily dispense with Plaintiffs' assertion that the Company's public filings *before* October 2013 were false and misleading due to FXCM's and Niv's alleged false statements to the NFA.

But the Court also can conclude that Plaintiffs' contention lacks merit even with respect to FXCM's public filings *after* October 2013.  Nowhere in the Complaint do Plaintiffs explain

---

[16] *See* NFA Rule 2-36(n)(iii); Proposed Amendments to NFA Compliance Rule 2-36, May 28, 2015, *available at* https://www.nfa.futures.org/news/PDF/CFTC/CR2-36_AdoptInterpNotc _FR_Sec_1112_May2015.pdf.

how or why FXCM's and Niv's alleged non-public statements to the NFA caused FXCM's public filings to be false or misleading.  To the extent Plaintiffs are claiming that FXCM should have disclosed to shareholders that the NFA was asking questions concerning FXCM's relationship with Effex, FXCM had no obligation to disclose such information.  The law is well-settled that a company does not have to disclose the existence of a government investigation. *See City of Pontiac Policemen's & Firemen's Ret. Sys. v. UBS AG*, 752 F.3d 173 (2d Cir. 2014) ("Indeed, absent an express prior disclosure, a corporation has no affirmative duty to speculate or disclose uncharged, unadjudicated wrongdoings or mismanagement, illegal internal policies, or violations of a company's internal codes of conduct and legal policies.") (internal quotation marks and citations omitted); *In re Lions Gate Entm't Corp. Sec. Litig.*, 165 F. Supp. 3d 1, 12-13 (S.D.N.Y. 2016) (holding that "a government investigation, without more, does not trigger a generalized duty to disclose").  Plaintiffs have submitted no facts showing that the Company even knew the NFA or CFTC was taking the position that the Company's or Niv's statements were false and misleading, or that regulators were going to file claims against FXCM and Niv for such wrongdoing prior to the negotiation of the settlements that were publicly disclosed in February 2017.  *See Lions Gate*, 165 F. Supp. 3d at 14-15 (finding that defendant met its obligations where, as here, it "disclosed the civil penalty amount as soon as it entered into the settlement and order with the SEC").

Accordingly, Plaintiffs have not adequately pleaded that any of FXCM's public filings during the Class Period were rendered false and misleading as a result of alleged misstatements FXCM or Niv purportedly made to the NFA concerning the Effex relationship.

### d)      FXCM Did Not Violate GAAP

Lastly, Plaintiffs allege that FXCM's public filings during the Class Period are false and misleading because, in violation of GAAP, the Company did not consolidate Effex into its

consolidated financial statements and did not treat the pay-for-flow agreement with Effex as a "related party transaction." *See* Compl. ¶¶ 106-110, 119, 127, 137, 147, 154, 164, 175, 190, 201, 210, 221, 230, 243.  Plaintiffs' unsupported and conclusory allegations of GAAP violations are insufficient to adequately allege a material misstatement.  *See City of Sterling Heights Police & Fire Ret. Sys. v. Vodafone Grp. Pub. Ltd. Co.*, 655 F. Supp. 2d 262, 270 (S.D.N.Y. 2009) (holding conclusory allegations of GAAP violations to be insufficient).

Under the law of this Circuit, allegations of "accounting irregularities, standing alone, are insufficient to state a securities fraud claim." *In re JP Morgan Chase Sec. Litig.*, No. 02-cv-1282, 2007 WL 950132, at *13 (S.D.N.Y. Mar. 29, 2007) *aff'd sub nom. ECA, Local 134 IBEW Joint Pension Trust of Chicago v. JP Morgan Chase Co.*, 553 F.3d 187, 195 (2d Cir. 2009) (quoting *Novak v. Kasaks*, 216 F.3d 300, 309 (2d Cir. 2000)).  This is especially the case where, as here, there has been no restatement by FXCM during the Class Period.  As the Second Circuit recently concluded:  "In the absence of a restatement or allegations pointing to objective facts that Defendants' accounting methods violated GAAP, carping about Defendants' application of GAAP amounts to no more than a naked assertion devoid of further factual enhancement; it does not permit the Court to infer that the Defendants committed accounting fraud." *Harris v. AmTrust Fin. Servs., Inc.*, 135 F. Supp. 3d 155, 172 (S.D.N.Y. 2015), *aff'd*, 649 F. App'x 7 (2d Cir. 2016) (internal quotation marks and citations omitted); *see also Kuriakose v. Fed. Home Loan Mortg. Corp.*, 897 F. Supp. 2d 168, 181 (S.D.N.Y. 2012), *aff'd sub nom. Cent. States, Se. & Sw. Areas Pension Fund v. Fed. Home Loan Mortg. Corp.*, 543 F. App'x 72 (2d Cir. 2013) ("Further negating any inference that Freddie Mac materially misstated its financials is the fact that the company never issued a restatement for its Class Period financials."); *In re Marsh & Mclennan Cos. Sec. Litig.*, 501 F. Supp. 2d 452, 477 (S.D.N.Y. 2006) (reasoning that the failure

to allege a restatement or other "hallmarks of accounting fraud" undercuts any attempt to plead the existence of such fraud).

There is no dispute that FXCM's public filings were audited by one of the leading accounting firms in the country:  EY.  In auditing these financial statements, EY reported on FXCM's variable interest entities, related party transactions, and retail trading revenue.  *See, e.g.*, Ex. H at F-11, F-15, F-16, F-28, F-29, F-41; Ex. I at F-12, F-16-F-18, F-34, F-35, F-48; Ex. J at F-12, F-16-F-18, F-35-F-37, F-53; Ex. B at F-10, F-13, F-17, F-18, F-36-F-38, F-44, F-57; Ex. A at F-11, F-20, F-40-F-42, F-55.  Since the announcement of the CFTC and NFA settlements, EY has not required FXCM to restate any of its previously issued financial statements.  Nor has any regulator made any such request.  Thus, the only party to contend that FXCM has violated GAAP is Plaintiffs.  That is not a sufficient basis for the Court to find the existence of a properly pleaded GAAP violation.  *See In re Fannie Mae 2008 Sec. Litig.*, 742 F. Supp. 2d 382, 408 (S.D.N.Y. 2010) (finding that the complaint failed to sufficiently allege a GAAP violation and noting that "only the Plaintiffs contend[ed] that [the defendant] committed these GAAP violations—federal regulators have never claimed any violation" or required a restatement); *see also Harris*, 135 F. Supp. 3d at 171 ("GAAP provisions are subject to interpretation and 'tolerate a range of 'reasonable' treatments, leaving the choice among alternatives to management.'") (quoting *Thor Power Tool Co. v. C.I.R.*, 439 U.S. 522, 544 (1979)).

But not only is Plaintiffs' lonely and conclusory position on alleged GAAP violations problematic as a matter of law, it is also undermined by the very CFTC and NFA allegations they seek to rely upon:

- Nowhere in the CFTC Consent Order or NFA Complaint do the CFTC or NFA claim that FXCM violated GAAP.

- The CFTC acknowledged that John Dittami of Effex, not FXCM, is the sole owner of Effex.  *See* Compl. Ex. 1, at 7 ("[Dittami], a former employee (and, indeed, an executive) of FXCM, was the principal and *100 percent owner of* [*Effex*]") (emphasis added).

- The CFTC acknowledged that under the Services Agreement FXCM was entitled to payment based upon trading volume, not based on percentage of Effex's profit.  *See* Compl. Ex. 1 at 5.  Even Plaintiffs acknowledge this fact.  *See* Compl. ¶ 74.[17]

- Nowhere in the CFTC Consent Order or NFA Complaint do the CFTC or NFA claim that FXCM had any voting power with Effex.

In the absence of either an ownership interest, voting rights, or a variable interest based upon Effex's profit and loss, it is incredible to assert that FXCM controlled Effex, and it would be incorrect to consider Effex a variable interest entity or a related party of FXCM based solely on revenues from the Services Agreement.  *See* ASC 810-10-15-14; ASC 850-10-20.

Accordingly, as a matter of law and fact, Plaintiffs have failed to adequately allege a material misstatement based upon their self-serving, unsupported contention of a GAAP violation by FXCM.

### 3.  FXCM's Public Filings After FXCM Terminated Its Pay-For-Flow Agreement In August 2014 Cannot Contain Any Material Misstatements Or Omissions

There can be no dispute that FXCM's pay-for-flow agreement with Effex was terminated on August 1, 2014.  For this reason, even the CFTC in its Consent Order identifies the relevant period of the alleged wrongdoing as between 2009 and 2014.  Accepting this, which is not subject to any credible dispute, FXCM's public filings after August 2014—*after FXCM terminated its pay-for-flow agreement with Effex*—cannot possibly be false and misleading due to the Effex-related reasons asserted by Plaintiffs.  Accordingly, at a minimum, the Court should

---

[17] Plaintiffs, without support, contradict themselves with respect to the nature of the Services Agreement.  *Compare* Compl. ¶ 119 (asserting that Effex was required to turn over 70% of its profits), with ¶ 74 ("Effex paid $21 per million notional volume transacted by Effex on the FXCM retail forex platform.").

dismiss from this case Plaintiffs' allegations and claims concerning the following FXCM public filings: 3Q 2014 10-Q, 2014 10-K, 1Q 2015 10-Q, 2Q 2015 10-Q, 3Q 2015 10-Q, 2015 10-K, 1Q 2016 10-Q, 2Q 2016 10-Q, and 3Q 2016 10-Q.  *See* Compl. ¶¶ 194-247.

### B.  The Complaint Also Fails To Adequately Plead Scienter

Even if Plaintiffs have managed to adequately allege a material misstatement or omission, the Complaint fails to "state with particularity facts giving rise to a strong inference that the defendant acted with the required state of mind [*i.e.*, scienter]." 15 U.S.C. § 78u–4(b)(2)(A).  "The Supreme Court has defined scienter as 'a mental state embracing intent to deceive, manipulate, or defraud.'"  *S. Cherry St., LLC v. Hennessee Grp. LLC*, 573 F.3d 98, 108 (2d Cir. 2009) (quoting *Tellabs, Inc. v. Makar Issues & Rights Ltd.*, 551 U.S. 308, 319 (2007)). In the Second Circuit, Plaintiffs can satisfy their scienter burden by alleging particularized facts showing that Defendants (1) had both motive and opportunity to commit the fraud, or (2) engaged in conduct constituting strong circumstantial evidence of conscious misbehavior or recklessness.  *See In re Tower Grp. Int'l, Ltd. Sec. Litig.*, No. 13 CIV. 5852 AT, 2015 WL 5813393, at *5 (S.D.N.Y. Sept. 18, 2015).  Importantly, the inference of scienter "must be more than merely plausible or reasonable—it must be cogent and at least as compelling as any opposing inference of nonfraudulent intent." *Id.* at *4.

Moreover, in a case involving multiple defendants, Plaintiffs "must plead circumstances providing a factual basis for scienter *for each defendant*; guilt by association is impermissible." *In re DDAVP Direct Purchaser Antitrust Litig.*, 585 F.3d 677, 695 (2d Cir. 2009) (emphasis added); *see also C.D.T.S. No. 1 v. UBS AG*, No. 12-cv-4924, 2013 WL 6576031, at *6 (S.D.N.Y. Dec. 13, 2013) ("Scienter must be separately pled and individually supportable as to each defendant; scienter is not amenable to group pleading."), *aff'd sub nom. Westchester Teamsters*

*Pension Fund v. UBS AG*, 604 F. App'x 5 (2d Cir. 2015).  Also, scienter must be pleaded "with regard to each alleged act or omission."  *Tower Grp.*, 2015 WL 5813393, at *4.

### 1.    Plaintiffs Have Not Adequately Alleged Scienter Against FXCM

To adequately plead scienter against FXCM, a corporate entity, "the pleaded facts must create a strong inference that someone whose intent could be imputed to [FXCM] acted with the requisite scienter."  *Teamsters Local 445 Freight Div. Pension Fund v. Dynex Capital Inc.*, 531 F.3d 190, 195 (2d Cir. 2008).  Plaintiffs have not adequately alleged scienter with respect to any of the three individual defendants—Niv, Ahdout, and Lande—and thus they also fail to allege scienter as to FXCM.

### 2.    Plaintiffs Have Not Adequately Alleged Scienter As To Niv, Ahdout, Or Lande

Plaintiffs cannot dispute that they make no allegations of motive and opportunity to commit fraud by Niv, Ahdout, or Lande.[18]  Thus, the only question is whether Plaintiffs adequately allege a strong inference of conscious misbehavior or recklessness by Niv, Ahdout, or Lande.  To do so, Plaintiffs must plead facts showing "a state of mind approximating *actual intent*, and not merely a heightened form of negligence."  *McIntire v. China MediaExpress Holdings, Inc.*, 927 F. Supp. 2d 105, 120 (S.D.N.Y. 2013) (emphasis added; citations and internal quotation marks omitted); *Glaser v. The9, Ltd.*, 772 F. Supp. 2d 573, 587 (S.D.N.Y. 2011) (plaintiffs "must show that the defendant[s'] conduct is at the least[ ] conduct which is

---

[18] To allege "motive and opportunity," the Plaintiffs' need to demonstrate that the Defendants "benefitted in some *concrete and personal* way from the purported fraud."  *Novak v. Kasaks*, 216 F.3d 300, 307-08 (2d Cir. 2000) (emphasis added); *see also ECA*, 553 F.3d at 198 ("Motives that are common to most corporate officers, such as the desire for the corporation to appear profitable and the desire to keep stock prices high to increase officer compensation, do not constitute 'motive' for purposes of [establishing scienter].").  The Complaint is devoid of allegations that Niv, Ahdout, or Lande received any individualized benefit, and absent such allegations Plaintiffs cannot allege scienter on this basis.  For example, there is no allegation of insider trading, which "in the ordinary case" is the general way of showing motive.  *Novak*, 216 F. 3d at 308.

*highly unreasonable* and which represents an *extreme departure* from the standards of ordinary care") (emphasis added). And in the absence of any motive and opportunity, "the strength of the circumstantial allegations must be correspondingly greater." *Kalnit v. Eichler*, 264 F.3d 131, 142 (2d Cir. 2001). Plaintiffs do not come close to alleging such conscious wrongdoing or recklessness by Niv, Ahdout, or Lande.

Plaintiffs attempt to establish Defendants' scienter through their conclusory and unsupported assertion that Defendants "knew or deliberately disregarded" purportedly false statements and "acted with scienter." Compl. ¶¶ 268, 270. Such bare allegations, however, are plainly insufficient. *See Prime Mover Capital Partners L.P. v. Elixir Gaming Techs. Inc.*, 793 F. Supp. 2d 651, 668 (S.D.N.Y. 2011) ("bald assertions that the defendants knew or should have known" are insufficient to establish scienter); *In re Carter-Wallace, Inc.*, Sec. Litig., 220 F.3d 36, 40 (2d Cir. 2000) ("[C]onlusory allegations do not satisfy the pleading requirements of Rule 9(b). The [plaintiffs] must provide at least a minimal factual basis for their allegations of scienter.") (internal quotation marks and citation omitted).

Plaintiffs also attempt to satisfy their heavy scienter burden by parroting the unadjudicated allegations in the CFTC Order and the NFA Complaint. These include allegations that Niv and Ahdout were dishonest with the NFA about FXCM's relationship with Effex. *See* Compl. ¶¶ 85-86, 93-98.[19] But again, unadjudicated allegations from other complaints "do not constitute factual allegations" with respect to scienter. *In re CRM Holdings, Ltd. Sec. Litig.*, No. 10-cv-975, 2012 WL 1646888, at *26-27 (S.D.N.Y. May 10, 2012) (finding that allegations in unadjudicated regulatory complaints could not be relied on to allege scienter).

---

[19] Neither the CFTC Order nor the NFA Complaint make any allegations that Lande attempted to mislead regulators in any way.

Plaintiffs further attempt to establish scienter by pointing to Defendants' executive positions at FXCM. *See, e.g.*, Compl. ¶¶ 51, 271. Yet courts in the Second Circuit have repeatedly rejected the proposition that scienter can be pleaded by pointing to a defendant's corporate position and asserting that they therefore "should" or "must" have known of the alleged fraud. *See, e.g.*, *In re China Mobile Games & Ent. Grp. Sec. Litig.*, No. 14-cv-4471, 2016 WL 922711, at *8 n.10 (S.D.N.Y. Mar. 7, 2016) ("Plaintiffs essentially claim that Defendants should have known about the alleged related-party transactions and bribery based on their corporate position, a contention courts in this circuit consistently reject.") (citing *In re Sotheby's Holdings*, 2000 WL 1234601, at *7 (S.D.N.Y. Aug. 31, 2000)).

To the extent Plaintiffs contend that Defendants were reckless in permitting the Company to file financial statements that violated GAAP, such argument fails for multiple reasons. First, as demonstrated above, the Company's financial statements did not violate GAAP. Second, "allegations of GAAP violations or accounting irregularities, standing alone, are insufficient to state a securities fraud claim . . . . Only where such allegations are coupled with evidence of 'corresponding fraudulent intent' might they be sufficient." *Novak*, 216 F.3d at 309; *see also Plumbers & Pipefitters Local Union No. 719 Pension Trust Fund v. Conseco Inc.*, No. 09-cv-6966, 2011 WL 1198712, at *22 (S.D.N.Y. Mar. 30, 2011) ("A failure to identify problems with the defendant-company's internal controls and accounting practices does not constitute reckless conduct sufficient for § 10(b) liability.") (internal quotation marks and citations omitted); *Athale v. SinoTech Energy Ltd.*, No. 11-cv-5831, 2015 WL 13145808, at *5 (S.D.N.Y. Jan. 23, 2015) (allegations of accounting violations without corresponding intent establish "at most negligence").

Here, Plaintiffs fail to provide any facts showing that Niv, Ahdout, or Lande knew that FXCM's accounting treatment with respect to the Effex relationship was improper and violative of GAAP.  To the contrary, these Defendants had every reason to believe that the accounting treatment was appropriate in light of the fact that EY provided unqualified opinions for each of the annual financial statements issued during the Class Period and has not required the Company to restate such financial statements.  *See In re Turquoise Hill Res. Ltd. Sec. Litig.*, No. 13-cv-8846, 2014 WL 7176187, at *6 (S.D.N.Y. Dec. 16, 2014) (finding no inference of scienter where complaint lacked allegations that the company's auditors disagreed with challenged accounting).

The flaws in Plaintiffs' scienter allegations are laid bare when compared to scienter allegations in complaints that survived the motion to dismiss stage by demonstrating scienter through "reports or other documents indicating defendants' recklessness as to their public statements' truth or falsity."  *Glaser*, 772 F. Supp. 2d at 588-89; *see also In re Citigroup Sec. Litig.*, 753 F. Supp. 2d 206, 237 (S.D.N.Y. 2010) (strong inference of scienter satisfied where the plaintiffs identified a specific "March 2007 report from Citigroup's quantitative credit strategy and analysis group" that described "the risks the subprime meltdown posed to the holders of CDO super senior tranches"); *Sgalambo v. McKenzie*, 739 F. Supp. 2d 453, 481-82 (S.D.N.Y. 2010) (finding scienter where the complaint "identifie[d] specific reports or documents that would have indicated that The Officers' public statements regarding the wells and Canadian Superior's inability to meet its financial obligations beginning late 2008 were inaccurate"). Unlike these cases, Plaintiffs here offer no reports, no documents, and no witnesses that provide any support whatsoever for their bald and conclusory scienter allegations.

In light of Plaintiffs' failure to put forth any particularized facts demonstrating a strong inference of scienter by Niv, Ahdout, or Lande, the Section 10(b) claim against these individuals

must be dismissed, and the Section 10(b) claim against FXCM must correspondingly be dismissed as well.

## III.    PLAINTIFFS FAIL TO ADEQUATELY ALLEGE CONTROL-PERSON LIABILITY UNDER SECTION 20(a)

In addition to defendants Niv, Ahdout, and Lande, Plaintiffs seek to impose Section 20(a) derivative liability on each member of FXCM's Board, including the outside, independent directors, FXCM's Chief Accounting Officers (Nicola Santoro and Margaret Deverell), Chief Compliance Officer (Janelle Lester), General Counsel (David Sassoon), and on the CEO of an FXCM trading subsidiary (Ornit Niv).  In order to establish a *prima facie* case of control-person liability against these individuals, Plaintiffs "must show a primary violation by the controlled person *and* control of the primary violator by the targeted defendant, *and* show that the controlling person was in some meaningful sense a culpable participant in the fraud perpetrated by the controlled person."  *S.E.C. v. First Jersey Sec., Inc.*, 101 F.3d 1450, 1472 (2d Cir. 1996) (internal quotation marks, alterations, and citation omitted) (emphases added).  Plaintiffs have not satisfied any, let alone all three, of these required elements.

Specifically, as demonstrated above, Plaintiffs have not adequately alleged a primary violation of Section 10(b); thus, their Section 20(a) claim against *all* the Individual Defendants fails outright and should be dismissed.  *See In re Vivendi Universal, S.A., Sec. Litig.*, 842 F. Supp. 2d 522, 527 (S.D.N.Y 2012) ("Where a plaintiff fails to allege properly a primary violation, the plaintiff cannot succeed on a Section 20(a) controlling-person-liability claim.").  Moreover, as shown below, Plaintiffs have not adequately alleged control *and* culpable participation by the Individual Defendants, especially the Non-10(b) Individual Defendants; thus their Section 20(a) claim fails yet again.  Indeed, Section 20(a) was enacted to ensure that those individuals who operate behind the scenes to control a securities violator do not escape liability;

it was not enacted to hold every director or senior officer of a company derivatively liable for securities fraud, as Plaintiffs inappropriately seek to do in this case. *See Lanza v. Drexel & Co.*, 479 F.2d 1277, 1299 (2d Cir. 1973).

### A. Plaintiffs Fail To Plead That The Individual Defendants Are "Control Persons"

In order to establish that the Individual Defendants are "control persons," Plaintiffs must show that they "possessed the power to direct or cause the direction of the management and policies" of the Company. *In re Philip Servs. Corp. Sec. Litig.*, 383 F. Supp. 2d 463, 485 (S.D.N.Y. 2004) (internal quotation marks omitted). "The mere exercise of influence . . . is not sufficient to establish control." *Younger v. Virtus Inv. Partners Inc.*, 195 F. Supp. 3d 499, 524 (S.D.N.Y. 2016).

Here, Plaintiffs seek to establish that the Individual Defendants were "control persons" with a conclusory assertion that because of their Board, committee, or officer positions, they "exercised their power and authority to cause FXCM to engage in the wrongful acts" described in the Complaint. *See* Compl. ¶¶ 276, 278. Such boilerplate allegations, however, are insufficient to establish actual control by a director or officer. *See In re Alstom SA Sec. Litig.*, 406 F. Supp. 2d 433, 495 (S.D.N.Y. 2005) ("[The] mere status as a board member is not enough to demonstrate actual control over the company and the transaction in question."); *In re Livent, Inc. Noteholders Sec. Litig.*, 151 F. Supp. 2d 371, 436 (S.D.N.Y. 2001) (holding that "membership on an audit committee by itself" is not enough to allege control); *In re Int'l Rectifier Corp. Sec. Litig.*, No. 07-cv-02544, 2008 WL 4555794, at *22 (C.D. Cal. May 23, 2008) (a title of "Executive Vice President, Global Sales and Marketing does not establish that he had control"). Nowhere in the Complaint do Plaintiffs allege specific facts showing, for example, that *each* of the Individual Defendants, particularly the Non-10(b) Individual

Defendants, exercised day-to-day operational control over the Company. *See In re Textron, Inc.*, 811 F. Supp. 2d 564, 575 (D.R.I. 2011) (dismissing § 20(a) claims against certain board members where there was no allegation they "had any role in managing [the company's] day-to-day affairs other than merely to point to their status as directors").

Moreover, while some of the Individual Defendants signed FXCM's 10-Ks at issue, they did not sign any of the 10-Qs, and the Complaint is entirely "silent with respect to [the Individual Defendants'] actual control of, or any role [they] played with respect to" such filings, and it does not provide "concrete allegations as to [the Individual Defendants'] activities in connection with, or responsibility for, such filings." *In re Braskem S.A. Sec. Litig.*, 2017 WL 1216592, at *28 (S.D.N.Y. Mar. 30, 2017); *see also Younger*, 195 F. Supp. 3d at 525 (finding that references to the defendants' job titles and a "single paragraph aggregating every individual defendant" and alleging that "by virtue of their status of officers and directors" the defendants "caused" the filing of registration statements was insufficient to allege control). Notably, some of the Individual Defendants did not sign a single SEC filing at issue (*e.g.*, Janelle Lester and Ornit Niv), and David Sassoon, the General Counsel of FXCM, only signed FXCM's proxy statements. Thus, the assertion that these particular Individual Defendants somehow controlled the Company and were active in the preparation and release of the Company's public filings is entirely unsupported.

Plaintiffs also fail to account for the fact that certain of the Individual Defendants held their positions at FXCM for only portions of the Class Period, which extends from March 15, 2012 to February 16, 2017. For example, Nicola Santoro left his position as FXCM's Chief Accounting Officer on September 18, 2015, and Janet Lester left her position as FXCM's Chief Compliance Officer on July 20, 2016. Moreover, Margaret Deverell did not become FXCM's

Chief Accounting Officer until September 18, 2015, and Brian Reyhani did not become a director of FXCM until February 1, 2016.  Therefore, any Section 20(a) allegations against them based on statements by FXCM before or after their employment must be dismissed.  *See Maverick Fund, L.D.C. v. Comverse Tech., Inc.*, 801 F. Supp. 2d 41, 61 (E.D.N.Y. 2011) (corporate officers "cannot be liable as control persons for the period after they left the Company"); *Bruce v. Suntech Power Holdings Co. Ltd.*, No. 12-cv-04061, 2013 WL 6843610, at *8 (N.D. Cal. Dec. 26, 2013) (holding CFO could not be liable under Section 20(a) for statements by the company before his employment).  Moreover, given that Deverell and Reyhani did not even become officers or directors of FXCM until well *after* FXCM's termination of the pay-for-flow agreement with Effex on August 1, 2014, Plaintiffs lack any credible basis to claim that these individuals "exercised their power and authority to cause FXCM to engage in the wrongful acts" described in the Complaint.

### B.    Plaintiffs Also Fail To Plead Culpable Participation

"[I]n this district . . . plaintiffs must [also] plead culpable participation in order to state a claim under § 20(a)."  *In re Lihua Int'l, Inc. Sec. Litig.*, No. 14-cv-5037, 2016 WL 1312104, at *18 (S.D.N.Y. Mar. 31, 2016).  Alleging culpable participation "requires 'particularized facts of the controlling person's conscious misbehavior or recklessness.'"  *Special Situations Fund III QP, L.P. v. Deloitte Touche Tohmatsu CPA, Ltd.*, 33 F. Supp. 3d 401, 438 (S.D.N.Y. 2014) (emphasis omitted) (quoting *Lapin v. Goldman Sachs Grp., Inc.*, 506 F. Supp. 2d 221, 246 (S.D.N.Y. 2006)).  And this Court has previously found that plaintiffs asserting Section 20(a) claims must "plead culpable participation with the same particularity they must [use to] plead scienter under the PSLRA."  *Lihua*, 2016 WL 1312104, at *18.

Because the Plaintiffs have failed to allege scienter under Section 10(b) with respect to Niv, Ahdout, and Lande, as described above, they also have failed to plead their culpable

participation for purposes of Section 20(a). *See id.* ("Plaintiffs do not plead [the defendant's] culpable participation for the same reasons they do not plead her scienter."). As to the Non-10(b) Individual Defendants, Plaintiffs' mere boilerplate allegations that lump them into an undifferentiated group are not the type of particularized allegations necessary to allege culpable participation. *See In re Sanofi-Aventis Sec. Litig.*, 774 F. Supp. 2d 549, 572 (S.D.N.Y. 2011) ("Merely generally alleging that these Individual Defendants were decision-making officials or had access to material information is inadequate circumstantial evidence that does not indicate involvement in perpetrating the fraud. Plaintiffs have thus failed to establish culpable participation as to any of those Individual Defendants. Therefore, Plaintiffs have failed to state a Section 20(a) claim against them.").[20]

The Complaint is devoid of any facts, let alone particularized facts, to support the proposition that each of the Non-10(b) Individual Defendants acted with the requisite recklessness and had "actual involvement in the making of the fraudulent statements" at issue. *In re Refco, Inc. Sec. Litig.*, 503 F. Supp. 2d 611, 663 (S.D.N.Y. 2007); *see also In re J.P. Jeanneret Assocs., Inc.*, 769 F. Supp. 2d 340, 367 (S.D.N.Y. 2011) (holding that plaintiffs had not "pleaded facts with sufficient specificity to establish [each defendant's] culpable participation in any fraudulent activity" to state a claim under Section 20(a)); *Lihua*, 2016 WL 1312104, at *18 (dismissing Section 20(a) claim against members of an audit committee where plaintiffs did not "allege particularized facts" demonstrating that their conduct rose "above possible negligence"). In the absence of factual allegations evidencing any of the Individual

---

[20] The Complaint alleges as to Janelle G. Lester that she "sent a misleading email to NFA on April 4, 2014 in which she attempted to downplay FXCM's involvement with Effex's Dittami in connection with a regulatory inquiry concerning the same." Compl. ¶ 35. Defendants will dispute the accuracy of this assertion at the appropriate time. However, even if taken at face value, Plaintiffs fail to allege how this lone non-public statement to the NFA demonstrates culpable participation in an effort to defraud investors.

Defendants' culpable participation in the alleged fraud, Plaintiffs' Section 20(a) claim should be dismissed.

<u>**CONCLUSION**</u>

For all the foregoing reasons, the Defendants respectfully request that the Court grant their motion to strike and dismiss Plaintiffs' Complaint in its entirety.

KING & SPALDING LLP

*/s/ Israel Dahan*
Israel Dahan
Peter Isajiw
Chelsea Corey
Evan C. Ennis
1185 Avenue of the Americas
New York, NY 10036
Tel: (212) 556-2100
Fax: (212) 556.2200
idahan@kslaw.com

*Attorneys for Defendants Global Brokerage, Inc. f/k/a FXCM Inc., Dror Niv, William Ahdout, David Sakhai, Eduard Yusupov, Janelle G. Lester, Robert Lande, Ornit Niv, Nicola Santoro, Jr., Margaret Deverell, David S. Sassoon, Kenneth Grossman, James Brown, Ryan Silverman, Arthur Gruen, Robin E. Davis, Eric LeGoff, and Bryan Reyhani*