# Exhibit A

**UNITED STATES**
**SECURITIES AND EXCHANGE COMMISSION**
Washington, D.C. 20549
_____
**FORM 10-K**
_____

☒ **ANNUAL REPORT PURSUANT TO SECTION 13 OR 15(d) OF THE SECURITIES EXCHANGE ACT OF 1934**
For the fiscal year ended December 31, 2015
or

☐ **TRANSITION REPORT PURSUANT TO SECTION 13 OR 15(d) OF THE SECURITIES EXCHANGE ACT OF 1934**

For the transition period from to .
Commission file number 001-34986
_____

# FXCM Inc.

(Exact name of registrant as specified in its charter)
_____

| **Delaware** | **27-3268672** |
|---|---|
| (State or other jurisdiction of incorporation or organization) | (I.R.S. Employer Identification No.) |

**55 Water Street, FL 50, New York, NY 10041**
(Address of principal executive offices) (Zip Code)
**(646) 432-2986**
(Registrant's telephone number, including area code)

Securities registered pursuant to Section 12(b) of the Act:

| **Title of each class** | **Name of each exchange on which registered** |
|---|---|
| Class A common stock, par value $0.01 per share | New York Stock Exchange |

Securities registered pursuant to Section 12(g) of the Act: **None**
_____

Indicate by check mark if the registrant is a well-known seasoned issuer, as defined in Rule 405 of the Securities Act. Yes ☐ No ☒

Indicate by check mark if the registrant is not required to file reports pursuant to Section 13 or Section 15(d) of the Act. Yes ☐ No ☒

Indicate by check mark whether the registrant (1) has filed all reports required to be filed by Section 13 or 15(d) of the Securities Exchange Act of 1934 during the preceding 12 months (or for such shorter period that the registrant was required to file such reports), and (2) has been subject to such filing requirements for the past 90 days. Yes ☒ No ☐

Indicate by check mark whether the registrant has submitted electronically and posted on its corporate Website, if any, every Interactive Data File required to be submitted and posted pursuant to Rule 405 of Regulation S-T during the preceding 12 months (or for such shorter period that the registrant was required to submit and post such files). Yes ☒ No ☐

Indicate by check mark if disclosure of delinquent filers pursuant to Item 405 of Regulation S-K (§229.405 of this chapter) is not contained herein, and will not be contained, to the best of the registrant's knowledge, in definitive proxy or information statements incorporated by reference in Part III of this Form 10-K or any amendment to this Form 10-K. ☒

Indicate by check mark whether the registrant is a large accelerated filer, an accelerated filer, a non-accelerated filer, or a smaller reporting company. See the definitions of "large accelerated filer," "accelerated filer" and "smaller reporting company" in Rule 12b-2 of the Exchange Act. (Check one):

| Large accelerated filer ☐ | Accelerated filer ☒ |
|---|---|
| Non-accelerated filer ☐ (Do not check if a smaller reporting company) | Smaller reporting company ☐ |

Indicate by check mark whether the registrant is a shell company (as defined in Rule 12b-2 of the Act.) Yes ☐ No ☒

As of June 30, 2015, the aggregate market value of the registrant's voting and non-voting common equity held by non-affiliates was $64,479,166.

As of March 9, 2016, there were 5,602,534 shares outstanding of the registrant's Class A Common Stock, par value $0.01 per share, and 25 shares outstanding of the registrant's Class B common stock, par value $0.01 per share.

**DOCUMENTS INCORPORATED BY REFERENCE**

Portions of the registrant's Definitive Proxy Statement relating to its 2016 Annual Meeting of Stockholders to be filed with the Securities and Exchange Commission pursuant to Regulation 14A not later than 120 days after the end of the fiscal year covered by this Form 10-K are incorporated by reference in Part III, Items 10 - 14 of this Form 10-K.

obtain and use our proprietary technology without authorization or otherwise infringe on our rights. We may also face claims of infringement that could interfere with our ability to use technology that is material to our business operations.

In the future, we may have to rely on litigation to enforce our intellectual property rights, protect our trade secrets, determine the validity and scope of the proprietary rights of others or defend against claims of infringement or invalidity. Any such litigation, whether successful or unsuccessful, could result in substantial costs and the diversion of resources and the attention of management, any of which could negatively affect our business.

***Our cost structure is largely fixed. If our revenues decline and we are unable to reduce our costs, our profitability will be adversely affected.***

Our cost structure is largely fixed. We base our cost structure on historical and expected levels of demand for our products and services, as well as our fixed operating infrastructure, such as computer hardware and software, hosting facilities and security and staffing levels. If demand for our products and services declines and, as a result, our revenues decline, we may not be able to adjust our cost structure on a timely basis and our profitability may be materially adversely affected.

***We have recently adopted a new pricing model and now require greater account minimums to trade with us. As a result, we may suffer declines in our revenue.***

We recently introduced a new retail FX pricing model in certain geographic markets intended to reduce client trading costs, provide more competitive pricing and increase transparency of commissions. In these markets, our platform will deliver to clients the direct price quote offered by our FX market makers, with a separate commission generally below what we previously charged as a mark-up to the price quote. While we believe the new retail FX pricing model will benefit FXCM in the long term, in these markets, we may suffer declines in our revenue. As a result, these initiatives may have a material adverse effect on our business, financial condition and results of operations and cash flows.

***Attrition of customer accounts and failure to attract new accounts could have a material adverse effect on our business, financial condition and results of operations and cash flows. Even if we do attract new customers, we may fail to attract the customers in a cost-effective manner, which could materially adversely affect our profitability and growth.***

Our customer base is primarily comprised of individual retail customers. Although we offer products and tailored services designed to educate, support and retain our customers, our efforts to attract new customers or reduce the attrition rate of our existing customers may not be successful. If we are unable to maintain or increase our customer retention rates or generate a substantial number of new customers in a cost-effective manner, our business, financial condition, results of operations and comprehensive income and cash flows would likely be adversely affected. For the year ended December 31, 2015, we incurred advertising and marketing expenses of $14.9 million from continuing operations. Although we have spent significant financial resources on advertising and marketing expenses, these efforts may not be a cost-effective way to attract new customers. We may be disadvantaged relative to our larger competitors in our ability to expand or maintain our advertising and marketing commitments, which may raise our customer acquisition costs. Additionally, our advertising and marketing methods are subject to regulation. The rules and regulations of various regulators impose specific limitations on our sales methods, advertising and marketing. If we do not achieve our advertising objectives, our profitability and growth may be materially adversely affected.

***We face risks related to the events of January 15, 2015.***

On January 15, 2015, our customers suffered significant losses and generated debit balances owed to us of approximately $275.1 million. This was due to the unprecedented and unexpected actions of the SNB, which caused extreme volatility in the EUR/CHF currency pair. As a result of customer debit balances following the historic movement of the Swiss Franc on January 15, 2015, certain of our regulators required those affected subsidiaries to supplement their respective net capital on an expedited basis. In order to achieve compliance with all regulatory capital requirements in all jurisdictions in which we operate, on January 16, 2015, we entered into a credit agreement with Leucadia that provided for a $300.0 million, two year term loan. Please see Note 20 "Leucadia Transaction" in the Notes to Consolidated Financial Statements in "Item 8. Financial Statements and Supplementary Data" for further detailed information regarding the transaction.

As a result of the events that took place on January 15, 2015, we may be subject to litigation by customers, stockholders, regulators or government agencies. While we are unable to predict the outcome of any existing or future litigation or future regulatory or governmental investigation, an unfavorable outcome in one or more of these matters could have a material adverse effect on our financial condition or ongoing operations.

Additionally, if our existing or potential future customers do not believe that we have satisfactorily addressed the issues related to the events of January 15, 2015, or if they have concerns about future issues, this could cause our existing or future customers to lose confidence in us which could adversely affect our reputation and ability to attract or maintain customers. In the event that we are not able to restore the confidence of our customers, we may experience reduced business activity and trading which could adversely impact the results of our operations.

***We operate in a heavily regulated environment that imposes significant compliance requirements and costs on us. Failure to comply with the rapidly evolving laws and regulations governing our FX and other businesses may result in regulatory agencies taking action against us and significant legal expenses in defending ourselves, which could adversely affect our revenues and the way we conduct our business.***

We are regulated by governmental bodies and/or self-regulatory organizations in a number of jurisdictions, including the U.S., the U.K. and Australia. We are also exposed to substantial risks of liability under federal and state securities laws, federal commodity futures laws, other federal and state laws and court decisions, as well as rules and regulations promulgated by the SEC, the Federal Reserve and state securities regulators.

Many of the regulations we are governed by are intended to protect the public, our customers and the integrity of the markets, and not necessarily our shareholders. Substantially all of our operations involving the execution and clearing of transactions in foreign currencies, CFDs, gold and silver are conducted through subsidiaries that are regulated by governmental bodies or self-regulatory organizations. In the U.S., we are principally regulated by the CFTC and the NFA. We are also regulated in all regions by applicable regulatory authorities and the various exchanges of which we are members. For example, we are regulated by the FCA and ASIC. In addition, certain of our branch offices in Europe, while subject to local regulators, are regulated by the FCA with respect to, among other things, FX, CFDs and net capital requirements. These regulators and self-regulatory organizations regulate the conduct of our business in many ways and conduct regular examinations of our business to monitor our compliance with these regulations. Among other things, we are subject to regulation with regard to:

- our sales practices, including our interaction with and solicitation of customers and our marketing activities;
- the custody, control and safeguarding of our customers' assets;
- account statements, record-keeping and retention;
- maintaining specified minimum amounts of capital and limiting withdrawals of funds from our regulated operating subsidiaries;
- making regular financial and other reports to regulators;
- anti-money laundering practices;
- licensing for our operating subsidiaries and our employees;
- the conduct of our directors, officers, employees and affiliates; and
- supervision of our business.

Compliance with these regulations is complicated, time consuming and expensive. Even minor, inadvertent irregularities can potentially give rise to claims that applicable laws and regulations have been violated. Failure to comply with all applicable laws and regulations could lead to fines and other penalties which could adversely affect our revenues and our ability to conduct our business as planned. In addition, we could incur significant legal expenses in defending ourselves against and resolving actions or investigations by such regulatory agencies.

***We accept customers from many jurisdictions in a manner which we believe does not require local registration, licensing or authorization. As a result, our growth may be limited by future restrictions in these jurisdictions, and we remain at risk that we may be exposed to civil or criminal penalties or be required to cease operations if we are found to be operating in jurisdictions without the proper license or authorization or if we become subject to regulation by local government bodies.***

Trading volume for 2015 with customers resident in jurisdictions in which we or our agents are not licensed or authorized by governmental bodies and/or self-regulatory organizations was, in the aggregate, approximately 51.6% of our total customer trading volume from continuing operations. We seek to deal with customers resident in foreign jurisdictions in a manner which does not breach any local laws or regulations where they are resident or require local registration, licensing or authorization from local governmental or regulatory bodies or self-regulatory organizations. We determine the nature and extent of services we can provide and the manner in which we conduct our business with customers resident in foreign jurisdictions based on a variety of factors.

Additionally, we earn income from trading in CFDs, rollovers and spread betting. Income or loss on CFDs represents the difference between the realized and unrealized trading gains or losses on our positions and the hedge gains or losses with the other financial institutions. Income or loss on CFDs is recorded on a trade date basis. Income or loss on rollovers is the interest differential customers earn or pay on overnight currency pair positions held and the markup that we receive on interest paid or received on currency pair positions held overnight. Income or loss on rollovers is recorded on a trade date basis. Spread betting is where a customer takes a position against the value of an underlying financial instrument moving either upward or downward in the market. Income on spread betting is recorded as earned on a trade date basis. In 2013 and through August 2014, we earned revenue on order flow. Income earned on order flow represented payments received from certain FX market makers in exchange for routing trade orders to these firms for execution. Our order routing software ensured that payments for order flow did not affect the routing of orders in a manner that was detrimental to our retail customers. We recognized payments for order flow as earned on a trade date basis.

Trading revenues from institutional customers include commission income generated by facilitating spot FX trades on behalf of institutional customers through the services provided by FXCM Pro and our Prime of Prime business, which allows these customers to obtain the best execution price from external banks and routes the trades to outside financial institutions that also hold customer account balances for settlement. We receive commission income on these trades without taking any market or credit risk. Revenue earned from institutional customers is recorded on a trade date basis.

We also earn income from market making and electronic trading in the institutional foreign exchange spot and futures markets through Lucid and market making and electronic trading into other asset classes through V3. Income on market making and electronic trading in foreign exchange spot and future currencies represents the spread between the bid and ask price for positions purchased and sold and the change in value of positions purchased and sold. Income on market making is recorded as trading gains, net of trading losses, on a trade date basis, and is included in Income (loss) from discontinued operations, net of tax in the consolidated statements of operations.

*Business Acquisitions*

We account for business acquisitions in accordance with ASC 805, *Business Combinations,* which requires us to estimate the fair value of assets acquired and liabilities assumed as of the acquisition date. We record any excess purchase price over the value assigned to net tangible and identifiable intangible assets of a business acquired as goodwill. Management makes significant estimates and judgments when determining the fair values of assets acquired and liabilities assumed, especially intangible assets and their respective useful lives. These estimates and judgments are inherently subjective and can have a material impact on our consolidated financial statements. The amounts and useful lives assigned to identified intangible assets impacts the amount and timing of future amortization expense.

*Goodwill*

We recorded goodwill from various acquisitions. Goodwill represents the excess purchase price over the value assigned to the net tangible and identifiable intangible assets of a business acquired. Beginning in the first quarter of 2015 we determined that we operate in a single operating segment, which also represents our reporting unit for purposes of the goodwill impairment test. We perform a two-step goodwill impairment review at the reporting unit level annually, or in interim periods if certain events occur indicating that the carrying value may be impaired. We test for impairment during the fourth quarter of our fiscal year using October 1 carrying values.

The first step of the two-step process involves a comparison of the estimated fair value of our reporting unit to its carrying amount, including goodwill. In performing the first step, we determine the fair value of the reporting unit using a discounted cash flow ("DCF") analysis. Determining fair value requires the exercise of significant judgment, including judgments about appropriate discount rates, perpetual growth rates and the amount and timing of expected future cash flows. The cash flows employed in the DCF analysis are based on our most recent budgets and business plans and, when applicable, various growth rates are assumed for years beyond the current business plan period. Discount rate assumptions are based on an assessment of the risk inherent in the future cash flows of the reporting unit. If the estimated fair value of the reporting unit exceeds its carrying amount, the goodwill of the reporting unit is not impaired and the second step of the impairment test is not necessary. If the carrying amount of the reporting unit exceeds its estimated fair value, then the second step of the goodwill impairment test must be performed. The second step of the goodwill impairment test compares the implied fair value of the reporting unit's goodwill with its carrying amount to measure the amount of impairment loss, if any. The implied fair value of goodwill is determined in the same manner as the amount of goodwill recognized in a business combination (i.e., the estimated fair value of the reporting unit is allocated to all of the assets and liabilities of that reporting unit including any unrecognized intangible assets as if the reporting unit had been acquired in a business combination and the fair value of the reporting unit was

TABLE OF CONTENTS

FXCM Inc.

**Notes to Consolidated Financial Statements**

**Note 1. Nature of Business and Organization - (continued)**

**Reverse Stock Split**

On September 29, 2015, the Company filed a Certificate of Amendment to its Amended and Restated Certificate of Incorporation to implement a one-for-ten reverse split of the Corporation's issued and outstanding Class A common stock (the "Reverse Stock Split"), as authorized at a special meeting of stockholders held on September 21, 2015. The Reverse Stock Split became effective at the opening of trading on the NYSE on October 1, 2015 (the "Effective Date"). As of the Effective Date, every ten shares of issued and outstanding Class A common stock were combined into one newly issued share of Class A common stock. No fractional shares were issued in connection with the Reverse Stock Split. Total cash payments made by the Company to stockholders in lieu of fractional shares was not material.

All references in this Annual Report to number of Class A common shares, number of Holdings Units, price per share and weighted average shares of Class A common stock have been adjusted to reflect the Reverse Stock Split on a retroactive basis for all prior periods presented, unless otherwise noted, including reclassifying an amount equal to the reduction in par value of Class A common stock to additional paid-in capital.

**Note 2. Significant Accounting Policies and Estimates**

**Basis of Presentation**

*Basis of Consolidation*

The accompanying consolidated financial statements are presented in accordance with accounting principles generally accepted in the United States of America ("U.S. GAAP"). The Company consolidates those entities in which it is the primary beneficiary of a variable-interest entity ("VIE") as required by Financial Accounting Standards Board ("FASB") Accounting Standards Codification Topic ("ASC") 810, *Consolidations* ("ASC 810"), or entities where it has a controlling interest. Intercompany accounts and transactions are eliminated in consolidation.

As indicated in Note 1, in January 2015, Holdings transferred its interest in its operating subsidiaries to Newco, a wholly-owned subsidiary of Holdings formed in connection with the Leucadia Transaction. The Leucadia Transaction provided the financing needed in order for the operating subsidiaries of Holdings and Newco to maintain compliance with regulatory capital requirements and continue operations. The Company determined that Newco is a VIE and concluded that Holdings is the primary beneficiary of Newco since Holdings has the ability to direct the activities of Newco that most significantly impact Newco's economic performance and the obligation to absorb losses of Newco or the right to receive benefits from Newco that could be significant to Newco. As a result, Holdings consolidates the financial results of Newco.

The Corporation records a non-controlling interest for the economic interest in Holdings not owned by the Corporation. The Corporation's and the non-controlling unit holders' economic interest in Holdings was 67.9% and 32.1%, respectively, as of December 31, 2015. The Corporation's and the non-controlling unit holders' economic interest in Holdings was 58.1% and 41.9%, respectively, as of December 31, 2014.

The Company's consolidated financial statements include the following significant subsidiaries of Holdings:

| | |
|---|---|
| FXCM Newco, LLC | ("Newco") |
| Forex Capital Markets LLC | ("US") |
| FXCM Asia Limited** | ("HK") |
| Forex Capital Markets Limited | ("UK LTD") |
| FXCM Australia Limited | ("Australia") |
| ODL Group Limited | ("ODL") |
| FXCM Securities Limited*** | ("FSL") |
| FXCM Japan Securities Co., Ltd.* | ("FXCMJ") |
| FXCM UK Merger Limited | ("Merger") |
| Lucid Markets Trading Limited | ("Lucid") |
| Lucid Markets LLP | ("Lucid LLP") |
| Faros Trading LLC* | ("Faros") |
| V3 Markets, LLC | ("V3") |

TABLE OF CONTENTS

**FXCM Inc.**

**Notes to Consolidated Financial Statements**

**Note 2. Significant Accounting Policies and Estimates - (continued)**

Company's realized and unrealized foreign currency trading gains or losses on its positions with customers. Trading revenue also includes fees earned from arrangements with other financial institutions to provide platform, back office and other trade execution services. This service is generally referred to as a white label arrangement. The Company earns a commission or a percentage of the markup charged by the financial institutions to their customers. Fees from this service are recorded when earned on a trade date basis.

Additionally, the Company earns income from trading in CFDs, rollovers and spread betting. Income or loss on CFDs represents the difference between the realized and unrealized trading gains or losses on the Company's positions and the hedge gains or losses with the other financial institutions. Income or loss on CFDs is recorded on a trade date basis. Income or loss on rollovers is the interest differential customers earn or pay on overnight currency pair positions held and the markup that the Company receives on interest paid or received on currency pair positions held overnight. Income or loss on rollovers is recorded on a trade date basis. Spread betting is where a customer takes a position against the value of an underlying financial instrument moving either upward or downward in the market. Income on spread betting is recorded as earned on a trade date basis. In 2013 and through August 2014, the Company earned revenue on order flow. Income earned on order flow represented payments received from certain FX market makers in exchange for routing trade orders to these firms for execution. The Company's order routing software ensured that payments for order flow did not affect the routing of orders in a manner that was detrimental to the Company's retail customers. Payments for order flow were recognized as earned on a trade date basis.

Trading revenues from institutional customers include commission income generated by facilitating spot FX trades on behalf of institutional customers through the services provided by FXCM Pro and FXCM Prime, which allow these customers to obtain the best execution price from external banks and routes the trades to outside financial institutions that also hold customer account balances for settlement. The Company receives commission income on these trades without taking any market or credit risk. Revenue earned from institutional customers is recorded on a trade date basis.

The Company also earns income from market making and electronic trading in the institutional foreign exchange spot and futures markets through Lucid and market making and electronic trading into other asset classes through V3. Income on market making and electronic trading in foreign exchange spot and future currencies represents the spread between the bid and ask price for positions purchased and sold and the change in value of positions purchased and sold. Income on market making is recorded as trading gains, net of trading losses, on a trade date basis, and is included in Income (loss) from discontinued operations, net of tax in the consolidated statements of operations.

*Interest Income*

Interest income consists of interest earned on cash and cash equivalents and cash and cash equivalents, held for customers and is recognized in the period earned. Interest income also includes interest on the Notes receivable.

*Other Income*

Other income primarily includes amounts earned from the sale of market data, account maintenance fees, ancillary fee income, adjustments due to the remeasurement of the tax receivable agreement liability and recovery of accounts receivable previously written off.

For the year ended December 31, 2015, Other income in the consolidated statements of operations primarily consists of $145.1 million attributable to the net reversal of the tax receivable agreement liability. During the first quarter of 2015, the contingent liability under the tax receivable agreement was reduced to zero based on the determination that it was more likely than not that the Corporation would not benefit from the tax deduction attributable to the tax basis step-up of which 85% of the benefit would be owed to members of Holdings under the tax receivable agreement. Other income for 2015 also consists of $2.6 million of service fees related to post-sale services provided to the buyers of FXCMJ, HK and FXCMS, $0.3 million of service fees from FastMatch and $3.2 million of account dormancy and ancilliary fees.

For the year ended December 31, 2014, Other income in the consolidated statements of operations primarily consists of $2.5 million of account dormancy and ancillary fees and a credit of $7.5 million attributable to the remeasurement of the tax receivable agreement liability to reflect a revised effective tax rate.

TABLE OF CONTENTS

**FXCM Inc.**

**Notes to Consolidated Financial Statements**

**Note 15. Related Party Transactions**

Amounts receivable from, and payable to, related parties are set forth below, with amounts in thousands:

|  | As of December 31, | |
|---|---|---|
|  | 2015 | 2014 |
| **Receivables** | | |
| Advances to Holdings non-controlling members | $ 112 | $ 196 |
| Accounts receivable - Lucid non-controlling members | 15 | 799 |
| Accounts receivable - equity method investment | - | 1,468 |
| Advances to employees | 201 | 563 |
| Notes receivable and interest - Lucid non-controlling members | 8,171 | 8,013 |
| Total receivables from related parties | $ 8,499 | $ 11,039 |
| | | |
| **Payables** | | |
| Guarantee agreement ("Monetary Guaranty") | $ - | $ 7,078 |
| Employees | 1,104 | 2,009 |
| Due to Lucid non-controlling members in connection with the allocation of income to Lucid non-controlling members for services provided | 6,500 | 8,876 |
| Tax receivable agreement | 145 | 150,576 |
| Total payables to related parties | $ 7,749 | $ 168,539 |

The Company has advanced funds for withholding taxes to several non-controlling members of Holdings. The outstanding balances as of December 31, 2015 and 2014, included in the table above, are included in Accounts receivable, net in the consolidated statements of financial condition.

Included in Current assets held for sale in the consolidated statements of financial condition are $0.8 million of advances to the Lucid non-controlling members as of December 31, 2014. Advances to the Lucid non-controlling members were not material as of December 31, 2015.

Prior to July 1, 2015, the Company received commission or mark-up income from institutional customers' trades executed on FastMatch's electronic trading platform, an entity in which the Company owns a 34.8% equity interest (see Note 7). The Company paid a per trade fee to FastMatch for use of the platform. Effective July 1, 2015, institutional customers trading via the FastMatch platform became direct customers of FastMatch. Fees collected from customers for trades executed on the FastMatch platform were $6.3 million, $13.8 million and $5.1 million for the years ended December 31, 2015, 2014 and 2013, respectively, and are included in Trading revenue in the consolidated statements of operations. Fees paid to FastMatch were $4.3 million, $7.4 million and $3.1 million for the years ended December 31, 2015, 2014 and 2013, respectively, and are reflected as a component of Communication and technology in the consolidated statements of operations. During the year ended December 31, 2015, the Company received $0.3 million from FastMatch for occupancy and operational costs, which is included in Other income in the consolidated statements of operations.

The Company has also advanced funds for expenses on behalf of FastMatch. As of December 31, 2015 and 2014, Accounts receivable, net in the consolidated statements of financial condition included a receivable from FastMatch of nil and $1.5 million, respectively, for net amounts due from FastMatch. In connection with the sale of FXCMJ, FXCMJ sold $0.5 million of office, communication and computer equipment to FastMatch during the year ended December 31, 2015.

The Company has advanced funds to several employees. The outstanding balances as of December 31, 2015 and 2014, included in the table above, are included in Accounts receivable, net in the consolidated statements of financial condition.

In January 2014, in connection with the formation of V3 by the Company and the non-controlling members of Lucid, the non-controlling members of Lucid borrowed approximately $7.9 million from the Company to assist with funding their

TABLE OF CONTENTS

**FXCM Inc.**

**Notes to Consolidated Financial Statements**

**Note 15. Related Party Transactions - (continued)**

portion of the capital contribution, which is included in Notes receivable in the consolidated statements of financial condition as of December 31, 2015 and 2014. The amount borrowed is due in 2017 and bears interest at the rate of 2% per annum. Interest income related to the notes receivable was $0.2 million, $0.1 million and nil for the years ended December 31, 2015, 2014 and 2013, respectively. During October 2015, Lucid acquired ownership interests and shares in CME Group Inc. from one of the non-controlling members of Lucid in a market-based transaction. The ownership interests and shares were recorded at a cost of $1.9 million and $1.8 million, respectively, and are included in assets held for sale as of December 31, 2015 (see Note 4).

UK LTD was party to an arrangement with Global Finance Company (Cayman) Limited ("Global Finance") and Master Capital Group, S.A.L. ("Master Capital"). A shareholder of the Company beneficially owns more than 90% of the equity of Global Finance and Master Capital. Pursuant to such arrangement, Global Finance and Master Capital were permitted to use the brand name "FXCM" and our technology platform to act as the Company's local presence in certain countries in the Middle East and North Africa ("MENA"). UK LTD collected and remitted to Global Finance and Master Capital fees and commissions charged by Global Finance and Master Capital to customers in MENA countries. These fees and commissions were $0.2 million, $1.3 million and $1.6 million for the years ended December 31, 2015, 2014 and 2013, respectively, and are included in Referring broker fees in the consolidated statements of operations. Effective May 4, 2015, UK LTD terminated the foregoing arrangement with Global Finance and Master Capital.

In March 2012, the Company entered into a settlement agreement with the former owners of ODL in connection with the acquisition of ODL by the Company in October 2010. The settlement agreement served to settle outstanding claims arising out of the acquisition of ODL related to certain warranties and indemnities pursuant to the share and purchase agreement. The settlement to the Company included cash of $1.2 million, return of capital, (i.e., equity interest of Holdings) of $4.0 million, and the forgiveness of the payment of a liability by the Company to the former owners in the amount of $1.4 million. In addition, the settlement required ODL to establish a collateral account for the benefit of the Company to pay certain outstanding third party claims up to an agreed upon amount. The Company recorded a loss of $0.2 million for the year ended December 31, 2013 related to this settlement, which is included in Other income in the consolidated statements of operations.

In August 2012, the Company entered into a master guaranty agreement (the "Method Guaranty") with Method Credit Fund ("Method"), a Cayman Island company, owned by certain directors and shareholders of the Company, including several of the Company's executive officers. Pursuant to the Method Guaranty, Method unconditionally guaranteed the obligations of certain counterparties that maintained a margin account with the Company. The Method Guaranty required Method to maintain a cash collateral account held by the Company equal to the aggregate amount of margin extended to all counterparties covered by the Method Guaranty. In exchange for this unconditional guaranty, the Company remitted a fee to Method determined on a counterparty by counterparty basis which was agreed upon by the Company, Method and the respective counterparty. The agreement was terminated in November 2013 and upon termination, the aggregate amount of margin extended under the Method Guaranty was reduced to zero. During the year ended December 31, 2013, no payments were made by Method to the Company to satisfy a guaranteed counterparty obligation. Fees collected from counterparties and subsequently remitted to Method by the Company were not material for the year ended December 31, 2013, and are included in Referring broker fees in the consolidated statements of operations.

In November 2013, the Company entered into a master guaranty agreement (the "Monetary Guaranty") with Monetary Credit Group LLC ("Monetary"), a Texas limited liability company, owned by certain directors and shareholders of the Company, including several of the Company's executive officers. Pursuant to the Monetary Guaranty, Monetary unconditionally guaranteed the obligations of certain counterparties that maintain a margin account with the Company. The Monetary Guaranty required Monetary to maintain a cash collateral account held by the Company equal to the aggregate amount of margin extended to all counterparties covered by the Monetary Guaranty. In exchange for this unconditional guaranty, the Company remitted a fee to Monetary determined on a counterparty by counterparty basis which was agreed upon by the Company, Monetary and the respective counterparty. The Company terminated the Monetary Guaranty with Monetary effective January 30, 2015. As of December 31, 2014, the aggregate amount of margin extended under the Monetary Guaranty was $13.2 million and the Company held cash collateral related to the Monetary Guaranty in the amount $7.1 million, which is included in Cash and cash equivalents, held for customers and Customer account liabilities in the consolidated statements of financial condition. During the years ended December 31, 2015, 2014 and 2013, no payments were made by Monetary to the Company to satisfy a guaranteed counterparty obligation. Fees collected from counterparties and subsequently remitted to Monetary by the Company under the Monetary Guaranty were not material, $1.1 million and $0.4 million for the years ended December 31, 2015, 2014 and 2013, respectively, and are included in Referring broker fees in the consolidated statements of operations.

**FXCM Inc.**

**Notes to Consolidated Financial Statements**

**Note 15. Related Party Transactions - (continued)**

Customer account liabilities in the consolidated statements of financial condition include balances for employees.

Amounts due related to the allocation of income to Lucid non-controlling members for services provided were $6.5 million and $8.9 million as of December 31, 2015 and 2014, respectively, and are included in Current liabilities held for sale on the consolidated statement of financial condition (see Note 4).

**Exchange Agreement**

The members of Holdings (other than the Corporation) entered into an exchange agreement under which they (or certain permitted transferees thereof) have the right (subject to the terms of the exchange agreement as described therein) to exchange their Holdings Units for shares of the Corporation's Class A common stock on a one-for-one basis at fair value, subject to customary conversion rate adjustments for stock splits, stock dividends and reclassifications. During the years ended December 31, 2015, 2014 and 2013, certain members of Holdings exchanged 0.8 million, 0.2 million and 1.0 million, respectively, of their Holdings Units, on a one-for-one basis, for shares of Class A common stock of the Corporation pursuant to the exchange agreement (after giving effect to the one-for-ten reverse stock split).

**Payments under Tax Receivable Agreement**

The Corporation entered into a tax receivable agreement with the members of Holdings (other than the Corporation) that will provide for the payment by the Corporation to Holdings' members (other than the Corporation) as defined therein. Assuming sufficient taxable income is generated such that the Corporation fully realizes the tax benefits of the amortization specified in the tax receivable agreement, the aggregate payments currently estimated that would be due are $146.8 million and $150.6 million as of December 31, 2015 and 2014, respectively. During the first quarter of 2015, the Corporation determined that it was not more likely than not that it would benefit from the tax deduction attributable to the tax basis step-up for which a portion of the benefit would be owed to the non-controlling members of Holdings under the tax receivable agreement and reduced the contingent liability under the tax receivable agreement to zero. As of December 31, 2015, the Corporation continues to believe it will not benefit from the tax deduction and the contingent liability remains zero. During the years ended December 31, 2015, 2014 and 2013, payments of $5.4 million, $3.7 million and $4.1 million, respectively, were made pursuant to the tax receivable agreement.

**Note 16. Stock-Based Compensation**

As a result of the one-for-ten reverse stock split of the Corporation's issued and outstanding Class A common stock on October 1, 2015, all references to the number and price per share of Class A common shares have been adjusted to reflect the one-for-ten reverse stock split on a retroactive basis for all prior periods presented, unless otherwise noted.

The Company's Amended and Restated 2010 Long-Term Incentive Plan (the "LTIP") permits the grant of various equity-based awards to employees, directors or other service providers of the Company and its subsidiaries. Under the LTIP, the Company has granted non-qualified stock options and other equity awards, including shares of the Corporation's Class A common stock ("Shares") and RSUs. The total number of Shares which may be issued under the LTIP is 1,529,500. The Shares issued may consist, in whole or in part, of unissued Shares or treasury Shares. The issuance of Shares shall reduce the total number of Shares available under the LTIP. As of December 31, 2015, 426,954 shares remained available for future issuance.

In arriving at stock-based compensation expense, the Company estimates the number of equity-based awards that will forfeit due to employee turnover. The Company's forfeiture assumption is based primarily on its turn-over historical experience. If the actual forfeiture rate is higher than the estimated forfeiture rate, then an adjustment will be made to increase the estimated forfeiture rate, which will result in a decrease to the expense recognized in the Company's financial statements. If the actual forfeiture rate is lower than the estimated forfeiture rate, then an adjustment will be made to lower the estimated forfeiture rate, which will result in an increase to expense recognized in the Company's financial statements. The expense the Company recognizes in future periods will be affected by changes in the estimated forfeiture rate and may differ significantly from amounts recognized in the current period.

**FXCM Inc.**

**Notes to Consolidated Financial Statements**

**Note 22. Commitments and Contingencies - (continued)**

*Guaranty*

In July 2015, the Company entered into a continuing guaranty with Citibank, N.A. (the "Guaranty") following the transition of certain institutional customers from the Company to FastMatch (see Note 15). Under the terms of the Guaranty, the Company agrees to indemnify Citibank, N.A. for any liabilities and other amounts that become due and payable by FastMatch for services provided by Citibank N.A. as the intermediating counterparty for trading transactions executed on the FastMatch platform. There is no limitation to the maximum potential future payments under the Guaranty. FastMatch has agreed to indemnify the Company for any losses suffered, however there is no assurance that the Company will be able to recover any or all of the losses under such indemnity. The Guaranty terminated on November 1, 2015. It was re-executed on the same terms and subsequently expired on March 1, 2016.

The Company cannot reasonably estimate the maximum potential amount of future payments under the Guaranty and the related provisions described above because it cannot predict when and under what circumstances these provisions may be triggered. There is no liability recorded for the Guaranty on the consolidated statements of financial condition as of December 31, 2015.

*Operating Lease Commitments*

The Company leases office space and equipment under operating leases. Some of the lease agreements contain renewal options ranging from 3 to 5 years at prevailing market rates. The leases for the office facilities are subject to escalation factors primarily related to property taxes and building operating expenses. As of December 31, 2015, future minimum lease payments under non-cancelable operating leases with terms in excess of one year, including leases that renewed in 2016, are as follows, with amounts in thousands:

| Year Ending December 31, | | |
|---|---|---|
| 2016 | $ | 6,704 |
| 2017 | | 5,868 |
| 2018 | | 3,943 |
| 2019 | | 3,670 |
| 2020 | | 3,376 |
| Thereafter | | 16,540 |
| | $ | 40,101 |

The aggregate operating lease expense from continuing operations, included in General and administrative expense in the consolidated statements of operations, for the years ended December 31, 2015, 2014 and 2013 was $6.2 million, $6.6 million and $6.2 million, respectively. As of December 31, 2015, there were no sublease commitments. The Company leases its corporate office location under an operating lease agreement expiring in May 2026.

*Other*

The Company holds an interest in an inactive entity that formerly provided online FX educational services ("Online Courses"). Online Courses meets the definition of a VIE under ASC 810 and the Company was considered the primary beneficiary. The members who owned the remaining interest in Online Courses had put options to sell their interest to the Company upon a change in control of Holdings. A change in control occurs when the number of Holdings Units held by unit holders as of the date of the Online Courses operating agreement, November 17, 2008, cease to make up at least 50% of the voting or vested economic interest securities of Holdings. The change in control occurred during the third quarter of 2013. Under U.S. GAAP, the value of the put options is recognized upon both the change in control and the exercise of the put options.

In 2014, the put options were exercised and Holdings remitted payments in the amount of $3.6 million. Based on the status (inactive and no assets) of Online Courses, the put option payments resulted in a charge to earnings for the year ended December 31, 2014 of $3.6 million, which is included in General and administrative expense in the consolidated statements of operations.