# Exhibit B

# UNITED STATES
# SECURITIES AND EXCHANGE COMMISSION
Washington, D.C. 20549

_____
## FORM 10-K
_____

☒ **ANNUAL REPORT PURSUANT TO SECTION 13 OR 15(d) OF THE SECURITIES EXCHANGE ACT OF 1934**
For the fiscal year ended December 31, 2014

or

☐ **TRANSITION REPORT PURSUANT TO SECTION 13 OR 15(d) OF THE SECURITIES EXCHANGE ACT OF 1934**

For the transition period from to .
Commission file number 001-34986
_____

# FXCM Inc.
(Exact name of registrant as specified in its charter)
_____

| **Delaware** | **27-3268672** |
|---|---|
| (State or other jurisdiction of incorporation or organization) | (I.R.S. Employer Identification No.) |

**55 Water Street, FL 50, New York, NY 10041**
(Address of principal executive offices) (Zip Code)
**(646) 432-2986**
(Registrant's telephone number, including area code)

Securities registered pursuant to Section 12(b) of the Act:

| Title of each class | Name of each exchange on which registered |
|---|---|
| Class A common stock, par value $0.01 per share | New York Stock Exchange |

Securities registered pursuant to Section 12(g) of the Act: **None**
_____

Indicate by check mark if the registrant is a well-known seasoned issuer, as defined in Rule 405 of the Securities Act. Yes ☐ No ☒

Indicate by check mark if the registrant is not required to file reports pursuant to Section 13 or Section 15(d) of the Act. Yes ☐ No ☒

Indicate by check mark whether the registrant (1) has filed all reports required to be filed by Section 13 or 15(d) of the Securities Exchange Act of 1934 during the preceding 12 months (or for such shorter period that the registrant was required to file such reports), and (2) has been subject to such filing requirements for the past 90 days. Yes ☒ No ☐

Indicate by check mark whether the registrant has submitted electronically and posted on its corporate Website, if any, every Interactive Data File required to be submitted and posted pursuant to Rule 405 of Regulation S-T during the preceding 12 months (or for such shorter period that the registrant was required to submit and post such files). Yes ☒ No ☐

Indicate by check mark if disclosure of delinquent filers pursuant to Item 405 of Regulation S-K (§229.405 of this chapter) is not contained herein, and will not be contained, to the best of the registrant's knowledge, in definitive proxy or information statements incorporated by reference in Part III of this Form 10-K or any amendment to this Form 10-K. ☐

Indicate by check mark whether the registrant is a large accelerated filer, an accelerated filer, a non-accelerated filer, or a smaller reporting company. See the definitions of "large accelerated filer," "accelerated filer" and "smaller reporting company" in Rule 12b-2 of the Exchange Act. (Check one):

| Large accelerated filer ☐ | Accelerated filer ☒ |
|---|---|
| Non-accelerated filer ☐ (Do not check if a smaller reporting company) | Smaller reporting company ☐ |

Indicate by check mark whether the registrant is a shell company (as defined in Rule 12b-2 of the Act.) Yes ☐ No ☒

As of June 30, 2014, the aggregate market value of the registrant's voting and non-voting common equity held by non-affiliates was $677,214,689.

As of March 12, 2015, there were 50,701,418 outstanding shares of the registrant's Class A Common Stock, par value $0.01 per share.

**DOCUMENTS INCORPORATED BY REFERENCE**

Portions of the registrant's Definitive Proxy Statement relating to its 2015 Annual Meeting of Stockholders to be filed with the Securities and Exchange Commission pursuant to Regulation 14A not later than 120 days after the end of the fiscal year covered by this Form 10-K are incorporated by reference in Part III, Items 10 - 14 of this Form 10-K.

*Competitive Environment* - The retail FX trading market is highly competitive. Our competitors in the retail market can be grouped into several broad categories based on size, business model, product offerings, target customers and geographic scope of operations. These include U.S. based retail FX brokers, international multi-product trading firms, other online trading firms, and international banks and other financial institutions with significant FX operations. We expect competition to remain strong for the foreseeable future.

*Regulatory Environment* - Our business and industry are highly regulated. Our operating subsidiaries are regulated in a number of jurisdictions, including the U.S., the U.K. (where regulatory passport rights have been exercised to operate in a number of European Economic Area jurisdictions), Hong Kong, Australia and Japan.

**Primary Sources of Revenues**

Most of our revenues are derived from fees charged as a markup or commission when our retail or institutional customers execute trades on our platform with our FX market makers. This revenue is primarily a function of the number of active accounts, the volume those accounts trade and the fees we earn on that volume.

*Retail Trading Revenue* - Retail trading revenue is our largest source of revenue and is primarily driven by: (i) the number of active accounts and the mix of those accounts - markup or commission accounts; (ii) the volume these accounts trade, which is driven by the amount of funds customers have on deposit, also referred to as customer equity, and the overall volatility of the FX market; (iii) the size of the markup or commission we receive, which is a function of the mix of currency pairs traded, the spread we add to the prices supplied by our FX market makers and the interest differential between major currencies and the markup we receive on interest paid and received on customer positions held overnight; and (iv) retail revenues earned from contract for differences ("CFD") trading, fees earned through white label relationships and payments we receive for order flow from FX market makers. Effective August 1, 2014, we no longer receive payments for order flow.

*Institutional Trading Revenue* - We generate revenue by executing spot FX trades on behalf of institutional customers through our institutional trading desks: FXCM Pro and Faros Trading LLC ("Faros"), a company in which we hold a 50.1% controlling interest (see *"Results of Operations, Acquisitions, Faros"*). We also earn revenues from market making and electronic trading in the institutional FX spot and futures markets through Lucid and market making and electronic trading in other asset classes through V3 (see *"Results of Operations, Acquisitions, V3"*). The counterparties to these trades are external financial institutions that hold customer account balances and settle these transactions. We receive commissions for these services without incurring market risk.

The income we earn on market making and electronic trading in FX spot and futures markets represents the spread between the bid and ask price for positions purchased and sold and the change in value of positions purchased and sold.

**Primary Expenses**

*Compensation and Benefits* - Compensation and benefits expense includes employee salaries, bonuses, stock compensation awards, benefits and employer taxes. Changes in this expense are driven by fluctuations in the number of employees, changes in the composition of our workforce, increases in wages as a result of inflation or labor market conditions, changes in rates for employer taxes and other cost increases affecting benefit plans. The expense associated with our bonus plans can also have a significant impact on this expense category and may vary from period to period. Compensation and benefits also includes the portion of the 49.9% of Lucid's earnings allocated among the non-controlling members of Lucid based on services provided. This allocation is reported as a component of compensation expense under *Allocation of income to Lucid members for services provided*.

At the time of our IPO and thereafter, we have periodically granted awards of stock options to purchase shares of FXCM Inc.'s Class A common stock pursuant to the Amended and Restated 2010 Long-Term Incentive Plan (the "LTIP") to certain employees and independent directors. Stock options granted to employees in connection with our IPO were our largest grant to date representing 75.0% of our stock options awards granted. For the years ended December 31, 2014, 2013 and 2012, we recorded stock compensation expense related to stock options granted of $9.9 million, $10.8 million and $10.2 million, respectively. Of these amounts, $7.9 million related to stock options granted at the time of our IPO for the year ended December 31, 2014 and $8.8 million for each of the years ended December 31, 2013 and 2012. The LTIP also provides for other stock based awards ("Other Equity Awards") that may be granted by our Executive Compensation Committee. In December 2014, the Company granted Restricted Stock Units ("RSUs") to employees. The expense for the RSU's for the year ended December 31, 2014 was not material. We did not incur any expense for Other Equity Awards for the year ended December 31, 2013. In June 2012, our Executive Compensation Committee granted 945,847 of FXCM Inc.'s Class A common stock as an Other Equity Award. The Other Equity Award had a fair value of $11.1 million and vested at the date of grant.

*Revenues*

|  | Years Ended December 31, | |
|---|---:|---:|
|  | 2014 | 2013 |
|  | (In thousands) | |
| **Revenues:** |  |  |
| Retail trading revenue | $ 338,035 | $ 365,285 |
| Institutional trading revenue | 103,199 | 103,994 |
| Trading revenue | 441,234 | 469,279 |
| Interest income | 2,525 | 2,614 |
| Brokerage interest expense | (714) | (258) |
| Net interest revenue | 1,811 | 2,356 |
| Other income | 20,712 | 17,953 |
| **Total net revenues** | $ 463,757 | $ 489,588 |

Retail trading revenue decreased by $27.3 million or 7.5% to $338.0 million for the year ended December 31, 2014 compared to the year ended December 31, 2013. Revenue from retail FX trading was down $31.3 million while CFD revenue was up $4.0 million. Revenue from retail FX trading for the year ended December 31, 2014 was negatively impacted by historically muted currency volatility and the discontinuation of payments for order flow effective August 1, 2014.

Institutional trading revenue decreased by $0.8 million or 0.8% to $103.2 million for the year ended December 31, 2014 compared to the year ended December 31, 2013. The net decrease of $0.8 million is primarily due to a decrease of $30.5 million in Lucid revenues, partially offset by revenue from V3 and Faros of $23.1 million and an increase in revenues from our other institutional business of $6.6 million, largely related to increased trading on the FastMatch platform. The decline in Lucid revenues is attributable to the decrease in currency volatility and less attractive order flow for the year ended December 31, 2014 versus the year ended December 31, 2013.

Net interest revenue decreased $0.5 million for the year ended December 31, 2014 compared to the year ended December 31, 2013 as low yields continue to impact this revenue stream.

Other income of $20.7 million for the year ended December 31, 2014 primarily consists of the $3.7 million reduction in the Faros Follow-on Payment (see "Results of Operations, Acquisitions, Faros"), $2.5 million of account dormancy and ancillary fees, $5.8 million related to FSL's brokerage activities, including spread betting, and a credit of $7.5 million attributable to the remeasurement of our tax receivable agreement liability to reflect a revised effective tax rate. Other income of $18.0 million for the year ended December 31, 2013 primarily consists of a $6.9 million benefit related to the reduction in the Faros Follow-on Payment recorded in December 2013 (see "Results of Operations, Acquisitions, Faros" for additional information), $7.2 million of FSL's brokerage activities, including spread betting, $3.1 million of account dormancy and ancillary fees and a bad debt recovery of $0.8 million, partially offset by a charge of $1.2 million attributable to the remeasurement of the tax receivable agreement liability to reflect a revised U.S. federal tax rate.

_____

The following table reconciles U.S. GAAP results as reported and Non-GAAP adjusted financial measures from the previous table to EBITDA and Adjusted EBITDA, respectively, for the years ended December 31, 2014, 2013 and 2012:

|  | For the Years Ended December 31, | | | | | |
|---|---|---|---|---|---|---|
|  | (In thousands) | | | | | |
|  | U.S. GAAP | | | Non-GAAP Measures | | |
|  | 2014 | 2013 | 2012 | 2014 | 2013 | 2012 |
| Net income attributable to FXCM Inc. | $ 17,151 | $ 14,832 | $ 8,958 | $ 28,238 | $ 57,800 | $ 42,587 |
| Net income attributable to non-controlling interest in FXCM Holdings, LLC | 8,960 | 24,850 | 23,131 | - | - | - |
| Net (loss) income attributable to other non-controlling interests | (6,464) | (4,846) | 6,389 | 3,232 | 16,444 | 6,389 |
| Income tax provision | 6,001 | 17,024 | 8,986 | 9,762 | 25,807 | 24,389 |
| Depreciation, amortization, and interest expense | 67,131 | 61,402 | 39,536 | 66,034 | 57,948 | 39,536 |
| **EBITDA / Adjusted EBITDA** | $ 92,779 | $ 113,262 | $ 87,000 | $ 107,266 | $ 157,999 | $ 112,901 |

## CRITICAL ACCOUNTING POLICIES AND ESTIMATES

The notes to our consolidated financial statements include disclosure of our significant accounting policies and estimates. In establishing these policies within the framework of U.S. GAAP, management must make certain assessments, estimates and choices that will result in the application of these principles in a manner that appropriately reflects our financial condition and results of operations. Critical accounting policies are those policies that we believe present the most complex or subjective measurements and have the most potential to affect our financial position and operating results. While all decisions regarding accounting policies are important, there are certain accounting policies and estimates that we consider to be critical. These critical policies, which are presented in detail in the notes to our consolidated financial statements, relate to revenue recognition, business acquisitions, goodwill, other intangible assets, litigation contingencies, due to related parties pursuant to tax receivable agreement, income taxes and stock-based compensation.

A summary of our critical accounting policies and estimates is as follows:

*Revenue Recognition*

We make foreign currency markets for customers trading in FX spot markets and through our subsidiary FSL, engage in equity and related brokerage activities. FX transactions are recorded on the trade date and positions are marked to market daily with related gains and losses, including gains and losses on open spot transactions, recognized currently in income. Commissions earned on brokerage activities are recorded on a trade date basis and are recognized currently in income.

*Retail Trading Revenue*

Under our retail agency FX offering, trading revenue is earned from charging a separate commission or by adding a markup to the price provided by FX market makers generating trading revenue based on the volume of transactions and is recorded on trade date. Under the agency model, when a customer executes a trade on the best price quotation presented by the FX market maker, we act as a credit intermediary, or a riskless principal, simultaneously entering into a trade with the customer and the FX market maker. This agency model has the effect of automatically hedging our positions and eliminating market risk exposure. Retail trading revenues from mark-up principally represent the difference of our realized and unrealized foreign currency trading gains or losses on our positions with customers and the systematic hedge gains and losses from the trades entered into with the FX market makers. Retail trading revenue also includes fees earned from arrangements with other financial institutions to provide platform, back office and other trade execution services. This service is generally referred to as a white label arrangement. We earn a percentage of the commission or markup charged by the financial institutions to their customers. Fees from this service are recorded when earned on a trade date basis.

Additionally, we earn income from trading in CFDs, rollovers, payments for order flow, and spread betting. Income or loss on CFDs represents the difference between the realized and unrealized trading gains or losses on our positions and the hedge gains or losses with the other financial institutions. Income or loss on CFDs is recorded on a trade date basis. Income or loss on rollovers is the interest differential customers earn or pay on overnight currency pair positions held and the markup that

we receive on interest paid or received on currency pair positions held overnight. Income or loss on rollovers is recorded on a trade date basis. In 2013 and through August 2014, we earned revenue on order flow. Income earned on order flow represents payments received from certain FX market makers in exchange for routing trade orders to these firms for execution. Our order routing software ensures that payments for order flow do not affect the routing of orders in a manner that is detrimental to our retail customers. We recognize payments for order flow as earned on a trade date basis. Spread betting is where a customer takes a position against the value of an underlying financial instrument moving either upward or downward in the market. Income on spread betting is recorded as earned on a trade date basis.

### *Institutional Trading Revenue*

Institutional trading revenue includes commission income generated by facilitating spot FX trades on behalf of institutional customers through the services provided by FXCM Pro and Faros. The counterparties to these trades are external financial institutions that also hold customer account balances and settle the transactions. We receive commission income on these trades without taking any market or credit risk. Institutional trading revenue is recorded on a trade date basis. We also earn income from market making and electronic trading in the institutional foreign exchange spot and futures markets through Lucid and market making and electronic trading into other asset classes through V3. Income on market making and electronic trading in foreign exchange spot and future currencies represents the spread between the bid and ask price for positions purchased and sold and the change in value of positions purchased and sold. Income on market making is recorded as trading gains, net of trading losses, on a trade date basis.

### *Business Acquisitions*

We account for business acquisitions in accordance with ASC 805 which requires us to estimate the fair value of assets acquired and liabilities assumed as of the acquisition date. We record any excess purchase price over the value assigned to net tangible and identifiable intangible assets of a business acquired as goodwill. Management makes significant estimates and judgments when determining the fair values of assets acquired and liabilities assumed, especially intangible assets and their respective useful lives. These estimates and judgments are inherently subjective and can have a material impact on our consolidated financial statements. The amounts and useful lives assigned to identified intangible assets impacts the amount and timing of future amortization expense.

### *Goodwill*

We recorded goodwill from various acquisitions. Goodwill represents the excess purchase price over the value assigned to the net tangible and identifiable intangible assets of a business acquired. Goodwill is allocated to our reporting units based on the assignment of the fair values of each reporting unit of the acquired company. For purposes of the goodwill impairment test, we have identified our Retail and Institutional trading segments as our reporting units. We perform a two-step goodwill impairment review at the reporting unit level annually, or in interim periods if certain events occur indicating that the carrying value may be impaired. We test for impairment during the fourth quarter of our fiscal year using October 1 carrying values.

The first step of the two-step process involves a comparison of the estimated fair value of a reporting unit to its carrying amount, including goodwill. In performing the first step, we determine the fair value of a reporting unit using a discounted cash flow ("DCF") analysis. Determining fair value requires the exercise of significant judgment, including judgments about appropriate discount rates, perpetual growth rates and the amount and timing of expected future cash flows. The cash flows employed in the DCF analysis are based on our most recent budgets and business plans and, when applicable, various growth rates are assumed for years beyond the current business plan period. Discount rate assumptions are based on an assessment of the risk inherent in the future cash flows of the respective reporting units. If the estimated fair value of a reporting unit exceeds its carrying amount, the goodwill of the reporting unit is not impaired and the second step of the impairment test is not necessary. If the carrying amount of a reporting unit exceeds its estimated fair value, then the second step of the goodwill impairment test must be performed. The second step of the goodwill impairment test compares the implied fair value of the reporting unit's goodwill with its carrying amount to measure the amount of impairment loss, if any. The implied fair value of goodwill is determined in the same manner as the amount of goodwill recognized in a business combination (i.e., the estimated fair value of the reporting unit is allocated to all of the assets and liabilities of that reporting unit including any unrecognized intangible assets as if the reporting unit had been acquired in a business combination and the fair value of the reporting unit was the purchase price paid). If the carrying amount of the reporting unit's goodwill exceeds the implied fair value of the reporting unit's goodwill, an impairment loss is recognized in an amount equal to that excess.

There was no impairment of goodwill for the year ended December 31, 2014. Although there is no impairment as of December 31, 2014, events such as economic weakness and unexpected significant declines in operating results of reporting

TABLE OF CONTENTS

FXCM Inc.

Notes to Consolidated Financial Statements

**Note 1. Nature of Business and Organization**

FXCM Inc. (the "Corporation"), a Delaware holding company incorporated on August 10, 2010, is an online provider of foreign exchange ("FX") trading and related services to retail and institutional customers worldwide. The Corporation operates through its managing membership interest in FXCM Holdings, LLC ("Holdings"), the Corporation's sole operating asset. Prior to the completion of the reorganization and the Corporation's initial public offering ("IPO"), the Corporation was a wholly-owned subsidiary of Holdings. As used in these notes, the term "Company" collectively refers to the Corporation, Holdings and subsidiaries of Holdings.

As an online provider of FX trading and related services, the Company offers its retail and institutional customers access to global over-the-counter FX markets. In a FX trade, a participant buys one currency and simultaneously sells another, a combination known as a "currency pair." The Company's proprietary trading platform presents its FX customers with the price quotations on several currency pairs from a number of global banks, financial institutions and market makers, or FX market makers. The Company's primary offering to retail customers is what is referred to as agency execution or an agency model. Under the agency model, when a customer executes a trade on the price quotation presented by the FX market maker, the Company acts as a credit intermediary, or a riskless principal, simultaneously entering into a trade with the customer and the FX market maker. This agency model has the effect of automatically hedging our positions and eliminating market risk exposure. The Company earns trading revenue from fees charged as a markup to the price provided by the FX market makers or commissions, not trading profit or losses. Additionally, the Company offers its customers the ability to trade contracts for difference ("CFDs"), spread betting, equities and equity options through its United Kingdom ("U.K.") subsidiaries. CFDs allow for the exchange of the difference in the value of a particular asset such as a stock index or oil or gold contracts, between the time at which a contract is opened and the time at which it is closed. Spread betting allows our customers to bet on the price fluctuations of various financial markets such as FX, indices, oil and metals.

Institutional trading revenue includes commission income generated by facilitating spot FX trades on behalf of institutional customers. The Company offers FX trading services to banks, hedge funds and other institutional customers, on an agency model basis, through its FXCM Pro division and Faros Trading LLC ("Faros") (see Note 4). These services allow customers to obtain optimal prices offered by external banks. The counterparties to these trades are external financial institutions that hold customer account balances and settle the transactions. The Company receives commissions for providing these services without taking any market or credit risk. The Company, through its 50.1% controlling interest in Lucid Markets Trading Limited ("Lucid") (see Note 4), is also an electronic market-maker and trader in the institutional FX market. In addition, with the creation of V3 Markets, LLC ("V3") (see Note 4), the Company expanded market making and electronic trading into other asset classes.

**Note 2. Significant Accounting Policies and Estimates**

*Basis of Presentation*

The accompanying consolidated financial statements are presented in accordance with accounting principles generally accepted in the United States of America ("U.S. GAAP"). The Company consolidates those entities in which it is the primary beneficiary of a variable-interest entity ("VIE") as required by ASC 810, *Consolidations* ("ASC 810"), or entities where it has a controlling interest. Intercompany accounts and transactions are eliminated in consolidation.

As indicated above, the Corporation operates and controls all of the businesses and affairs of Holdings and its subsidiaries. As such, the Corporation consolidates the financial results of Holdings and records a non-controlling interest for the economic interest in Holdings not owned by the Corporation. The Corporation's and the non-controlling unit holders' economic interest in Holdings was 58.1% and 41.9%, respectively, as of December 31, 2014. The Corporation's and the non-controlling unit holders' economic interest in Holdings was 54.8% and 45.2%, respectively, as of December 31, 2013.

Net income attributable to the non-controlling interest in Holdings in the consolidated statements of operations represents the portion of earnings or loss attributable to the economic interest in Holdings held by the non-controlling unit holders. Net income (loss) attributable to other non-controlling interests in the consolidated statements of operations represents the portion of net income or loss attributable to the non-controlling interests of Lucid, Faros, V3 and other consolidated entities. Net income (loss) attributable to the non-controlling interest in Lucid represents the portion of earnings or loss attributable to the 49.9% economic interest held by Lucid non-controlling members whose allocation among the non-controlling members is

FXCM Inc.

Notes to Consolidated Financial Statements

**Note 2. Significant Accounting Policies and Estimates - (continued)**

*Level III*: Unobservable inputs for assets or liabilities.

When Level I inputs are available, those inputs are selected for determination of fair value. To value financial assets and liabilities that are characterized as Level II and III, the Company uses observable inputs for similar assets and liabilities that are available from pricing services or broker quotes. These observable inputs may be supplemented with other methods, including internal models that result in the most representative prices for assets and liabilities with similar characteristics. Multiple inputs may be used to measure fair value, however, the level of fair value for each financial asset or liability is based on the highest priority level of input within this fair value hierarchy (see Note 25).

***Accounts Receivable, net***

As of December 31, 2014 and 2013, Accounts receivable, net, consisted primarily of amounts due from institutional customers relating to the Company's FX business, fees receivable from the Company's white label service to third parties and amounts due from customers related to the Company's FSL brokerage business. As of December 31, 2013, Accounts receivable, net, also includes receivables related to order flow revenue, described in "Retail Trading Revenue" below. Receivables are shown net of reserves for uncollectible accounts. The reserve for bad debts is maintained at a level that management believes to be sufficient to absorb estimated losses in the accounts receivable portfolio. The reserve is increased by the provision for bad debts which is charged against operating results and decreased by the amount of charge-offs, net of recoveries. The amount charged against operating results is based on several factors including, but not limited to, a continuous assessment of the collectability of each account, the length of time a receivable is past due and our historical experience with the particular customer. As of December 31, 2014 and 2013, the reserve netted against receivables in the consolidated statements of financial condition was not material.

As of December 31, 2014 and 2013, Accounts receivable, net, also includes advances to employees and non-controlling members of Holdings and, additionally, as of December 31, 2014, advances to Lucid non-controlling members and net amounts due from an equity method investee, as described in Note 16.

***Office, Communication and Computer Equipment, net***

Office, communication and computer equipment, net, consists of computer equipment, purchased technology hardware and software, internally-developed software, leasehold improvements, furniture and fixtures and other equipment, licenses and communication equipment. Office, communication and computer equipment are recorded at historical cost, net of accumulated depreciation. Additions and improvements that extend the lives of assets are capitalized, while expenditures for repairs and maintenance are expensed as incurred. Certain costs of software developed or obtained for internal use are capitalized. Depreciation is computed using the straight-line method. The Company depreciates these assets using the following useful lives:

| | |
|---|---|
| Computer equipment | 3 to 5 years |
| Software | 2 to 5 years |
| Leasehold improvements | Lesser of the estimated economic useful life or the term of the lease |
| Furniture and fixtures and other equipment | 3 to 5 years |
| Licenses | 2 to 3 years |
| Communication equipment | 3 to 5 years |

***Valuation of Other Long-Lived Assets***

The Company also assesses potential impairments of its other long-lived assets, including office, communication and computer equipment, when there is evidence that events or changes in circumstances indicate that the carrying amount of an asset may not be recovered. An impairment loss is recognized when the carrying amount of the long-lived asset exceeds its fair value and is not recoverable. The carrying amount of a long-lived asset is not recoverable if it exceeds the sum of the undiscounted cash flows expected to result from the use and eventual disposition of the asset. Any required impairment loss is

**FXCM Inc.**

**Notes to Consolidated Financial Statements**

**Note 2. Significant Accounting Policies and Estimates - (continued)**

convertible debt issuance and the amount measured as the liability component is recorded as the equity component. The Company recognizes the accretion of the resulting discount as part of interest expense in our consolidated statements of operations.

*Contingent Consideration*

The Company records a liability for contingent consideration resulting from a business combination at its fair value on the acquisition date included in Other liabilities in the consolidated statements of financial condition. Each reporting period thereafter, the Company revalues this liability and records increases or decreases in the fair value as an adjustment to Other income within the consolidated statements of operations. Changes in the fair value of the contingent consideration liability can result from adjustments in the probability targets of achieving profitability and adjustments to the discount rate.

*Foreign Currency*

Foreign denominated assets and liabilities are re-measured into the functional currency at exchange rates in effect at the statements of financial condition dates through the consolidated statements of operations. Gains or losses resulting from foreign currency transactions are re-measured using the rates on the dates on which those elements are recognized during the period, and are included in Retail and Institutional trading revenue in the consolidated statements of operations. The Company recorded gains of $3.6 million, $5.3 million and $0.8 million for the years ended December 31, 2014, 2013 and 2012, respectively.

Translation gains or losses resulting from translating the Company's subsidiaries' financial statements from the functional currency to the reporting currency, net of tax, are included in Foreign currency translation gain (loss) in the consolidated statements of comprehensive income. Assets and liabilities are translated at the statement of financial condition date while revenues and expenses are translated at an applicable average rate.

*Revenue Recognition*

The Company makes foreign currency markets for customers trading in FX spot markets and through its subsidiary FSL, engages in equity and related brokerage activities. FX transactions are recorded on the trade date and positions are marked to market daily with related gains and losses, including gains and losses on open spot transactions, recognized currently in income. Commissions earned on brokerage activities are recorded on a trade date basis and are recognized currently in income.

*Retail Trading Revenue*

Under the Company's retail agency FX offering, trading revenue is earned from charging a separate commission or by adding a markup to the price provided by FX market makers generating trading revenue based on the volume of transactions and is recorded on trade date. Under the agency model, when a customer executes a trade on the best price quotation presented by the FX market maker, the Company acts as a credit intermediary, or a riskless principal, simultaneously entering into a trade with the customer and the FX market maker. This agency model has the effect of automatically hedging the Company's positions and eliminating market risk exposure. Retail trading revenues from mark-up principally represent the difference of the Company's realized and unrealized foreign currency trading gains or losses on its positions with customers and the systematic hedge gains and losses from the trades entered into with the FX market makers. Retail trading revenue also includes fees earned from arrangements with other financial institutions to provide platform, back office and other trade execution services. This service is generally referred to as a white label arrangement. The Company earns a percentage of the commission or markup charged by the financial institutions to their customers. Fees from this service are recorded when earned on a trade date basis.

Additionally, the Company earns income from trading in CFDs, rollovers, payments for order flow, and spread betting. Income or loss on CFDs represents the difference between the Company's realized and unrealized trading gains or losses on its positions and the hedge gains or losses with the other financial institutions. Income or loss on CFDs is recorded on a trade date basis. Income or loss on rollovers is the interest differential customers earn or pay on overnight currency pair positions held and the markup that the Company receives on interest paid or received on currency pair positions held overnight. Income or loss on rollovers is recorded on a trade date basis. In 2013 and through August 2014, the Company earned revenue on order flow. Income earned on order flow represents payments received from certain FX market makers in exchange for routing trade orders to these firms for execution. The Company's order routing software ensures that payments for order flow do not affect the

**FXCM Inc.**

**Notes to Consolidated Financial Statements**

**Note 2. Significant Accounting Policies and Estimates - (continued)**

routing of orders in a manner that is detrimental to its retail customers. The Company recognizes payments for order flow as earned on a trade date basis. Spread betting is where a customer takes a position against the value of an underlying financial instrument moving either upward or downward in the market. Income on spread betting is recorded as earned on a trade date basis.

*Institutional Trading Revenue*

Institutional trading revenue includes commission income generated by facilitating spot FX trades on behalf of institutional customers through the services provided by FXCM Pro and Faros. The counterparties to these trades are external financial institutions that also hold customer account balances and settle the transactions. The Company receives commission income on these trades without taking any market or credit risk. Institutional trading revenue is recorded on a trade date basis. The Company also earns income from market making and electronic trading in the institutional foreign exchange spot and futures markets through Lucid and market making and electronic trading into other asset classes through V3. Income on market making and electronic trading represents the spread between the bid and ask price for positions purchased and sold and the change in value of positions purchased and sold. Income on market making is recorded as trading gains, net of trading losses, on a trade date basis.

*Interest Income*

Interest income consists of interest earned on cash and cash equivalents and cash and cash equivalents, held for customers and is recognized in the period earned. Interest income also includes interest on the Notes receivable.

*Other Income*

Other income primarily includes amounts earned from the sale of market data, equity and equity option brokerage activities, including spread betting on equities, account maintenance fees, ancillary fee income and recovery of accounts receivable previously written off.

For the year ended December 31, 2014, Other income in the consolidated statements of operations primarily includes $3.7 million of revenue related to the re-measurement of the contingent consideration recorded for the acquisition of Faros (See Note 4), $2.5 million of account dormancy and ancillary fees, $5.8 million related to FSL's brokerage activities and a credit of $7.5 million attributable to the re-measurement of the Due to related parties pursuant to tax receivable agreement liability to reflect a revised effective tax rate.

For the year ended December 31, 2013, Other income in the consolidated statements of operations primarily includes $6.9 million of revenue related to the re-measurement of the contingent consideration recorded for the acquisition of Faros, $7.2 million of FSL's brokerage activities, $3.1 million of account dormancy and ancillary fees, partially offset by a charge of $1.2 million attributable to the re-measurement of the Due to related parties pursuant to tax receivable agreement liability to reflect a revised U.S. federal tax rate. For the year ended December 31, 2012, Other income in the consolidated statements of operations includes a $1.4 million gain related to a settlement with the former owners of ODL.

*Communications and Technology*

Communications and technology expense consists primarily of costs for network connections to our electronic trading platforms, telecommunications costs, and fees paid for access to external market data. This expense is affected primarily by the growth of electronic trading, our network/ platform capacity requirements and by changes in the number of telecommunication hubs and connections which provide our customers with direct access to our electronic trading platforms.

*Trading Costs, Prime Brokerage and Clearing Fees*

Trading costs, prime brokerage and clearing fees primarily represent fees paid to third party clearing banks and prime brokers for clearing foreign exchange spot futures currency and contract transactions, transaction fees paid to exchanges, equity options brokerage activity fees, and fees paid to third party providers for use of their platform for the Company's market making trading business. Clearing fees primarily fluctuate based on changes in volume, rate of clearing fees charged by clearing banks and rate of fees paid to exchanges.

TABLE OF CONTENTS

FXCM Inc.

Notes to Consolidated Financial Statements

**Note 16. Related Party Transactions**

Amounts receivable from, and payable to, related parties are set forth below, with amounts in thousands:

|  | As of December 31, | |
|---|---:|---:|
|  | **2014** | **2013** |
| **Receivables** | | |
| Advances to Holdings non-controlling members | $ 196 | $ 940 |
| Accounts receivable - Lucid non-controlling members | 799 | - |
| Accounts receivable - equity method investment | 1,468 | - |
| Advances to employees | 563 | 826 |
| Notes receivable and interest - Lucid non-controlling members | 8,013 | - |
| Total receivables from related parties | $ 11,039 | $ 1,766 |
| **Payables** | | |
| Guarantee agreement ("Monetary Guaranty") | $ 7,078 | $ 8,363 |
| Employees | 2,009 | 708 |
| Shareholders with greater than 5% ownership in the Company | - | 200 |
| Due to Lucid non-controlling members in connection with the allocation of income to Lucid non-controlling members for services provided | 8,876 | 9,826 |
| Due to Lucid non-controlling members in connection with trade settlements | - | 169 |
| Notes payable to Lucid non-controlling members in connection with the Lucid Acquisition | - | 9,800 |
| Accounts payable - equity method investment | - | 378 |
| Faros Follow-on Payment | - | 3,672 |
| Tax receivable agreement | 150,576 | 150,258 |
| Total payables to related parties | $ 168,539 | $ 183,374 |

The Company has advanced funds for withholding taxes to several non-controlling members of Holdings. The outstanding balances as of December 31, 2014 and 2013, included in the table above, are included in Accounts receivable, net in the consolidated statements of financial condition.

Included in Accounts receivable, net in the consolidated statements of financial condition as of December 31, 2014 is $0.8 million of advances to the Lucid non-controlling members.

The Company receives commission or mark-up income from institutional customers' trades executed on FastMatch's electronic trading platform, an entity in which the Company owns a 35.3% equity interest (see Note 8). The Company pays a per trade fee to FastMatch for use of the platform. During the years ended December 31, 2014 and 2013, fees collected from customer for trades executed on the FastMatch platform were $13.8 million and $5.1 million, respectively, included in Institutional trading revenue in the consolidated statements of operations, and fees paid to FastMatch were $7.4 million and $3.1 million, respectively, which are reflected as a component of Communication and technology in the consolidated statements of operations. The Company has also advanced funds for expenses on behalf of FastMatch. At December 31, 2014, Accounts receivable, net in the consolidated statements of financial condition included a receivable from FastMatch of $1.5 million for net amounts due from FastMatch. Accounts payable and accrued expenses at December 31, 2013 included $0.4 million of net amounts due to FastMatch.

The Company has advanced funds to several employees. The outstanding balances as of December 31, 2014 and 2013, included in the table above, are included in Accounts receivable, net in the consolidated statements of financial condition.

As described in Note 4, V3 was formed by the Company and the non-controlling members of Lucid. The Company contributed capital of approximately $16.3 million and the non-controlling members of Lucid contributed capital of

TABLE OF CONTENTS

FXCM Inc.

Notes to Consolidated Financial Statements

**Note 16. Related Party Transactions - (continued)**

approximately $16.2 million. After giving effect to an adjustment of the purchase price subsequent to the acquisition date, the non-controlling members of Lucid borrowed approximately $7.9 million from the Company to assist with funding their portion of the capital contribution, which is included in Notes receivable in the consolidated statements of financial condition as of December 31, 2014. The amount borrowed is due in 2017 and bears interest at the rate of 2% per annum. Interest income related to the notes receivable was not material for the year ended December 31, 2014.

UK LTD is party to an arrangement with Global Finance Company (Cayman) Limited ("Global Finance") and Master Capital Group, S.A.L. ("Master Capital"). A shareholder of the Company beneficially owns more than 90% of the equity of Global Finance and Master Capital. Pursuant to such arrangement, Global Finance and Master Capital are permitted to use the brand name "FXCM" and our technology platform to act as the Company's local presence in certain countries in the Middle East and North Africa ("MENA"). UK LTD collects and remits to Global Finance and Master Capital fees and commissions charged by Global Finance and Master Capital to customers in MENA countries. For the years ended December 31, 2014, 2013 and 2012, these fees and commissions were approximately $1.3 million, $1.6 million and $2.5 million, respectively, and are included in the consolidated statements of operations in Referring broker fees. As of December 31, 2014, the shareholder described above beneficially owns less than 5% of the Corporation's Class A common stock.

In March 2012, the Company entered into a settlement agreement with the former owners of ODL in connection with the acquisition of ODL by the Company in October 2010. The settlement agreement serves to settle outstanding claims arising out of the acquisition of ODL related to certain warranties and indemnities pursuant to the share and purchase agreement. The settlement to the Company included cash of $1.2 million, return of capital, (i.e., equity interest of Holdings) of $4.0 million, and the forgiveness of the payment of a liability by the Company to the former owners in the amount of $1.4 million. The Company recorded a gain of $1.4 million for the year ended December 31, 2012, included in Other income in the consolidated statements of operations, in connection with this settlement. In addition, the settlement required ODL to establish a collateral account for the benefit of the Company to pay certain outstanding third party claims up to an agreed upon amount. For the year ended December 31, 2013, the Company recorded a net loss of $0.2 million, included in Other income in the consolidated statements of operations, related to this settlement.

In August 2012, the Company entered into a master guaranty agreement (the "Method Guaranty") with Method Credit Fund ("Method"), a Cayman Island company, owned by certain directors and shareholders of the Company, including several of the Company's executive officers. Pursuant to the Method Guaranty, Method unconditionally guaranteed the obligations of certain counterparties that maintained a margin account with the Company. The Method Guaranty required Method to maintain a cash collateral account held by the Company equal to the aggregate amount of margin extended to all counterparties covered by the Method Guaranty. In exchange for this unconditional guaranty, the Company remitted a fee to Method determined on a counterparty by counterparty basis which was agreed upon by the Company, Method and the respective counterparty. The agreement was terminated in November 2013 and upon termination, the aggregate amount of margin extended under the Method Guaranty was reduced to zero. During the year ended December 31, 2013, no payments were made by Method to the Company to satisfy a guaranteed counterparty obligation. For the years ended December 31, 2013 and 2012, fees collected from counterparties and subsequently remitted to Method by the Company were not material and are included in Referring broker fees in the consolidated statements of operations.

In November 2013, the Company entered into a master guaranty agreement (the "Monetary Guaranty") with Monetary Credit Group LLC ("Monetary"), a newly formed Texas limited liability company, owned by certain directors and shareholders of the Company, including several of the Company's executive officers. Pursuant to the Monetary Guaranty, Monetary unconditionally guarantees the obligations of certain counterparties that maintain a margin account with the Company. The Monetary Guaranty requires Monetary to maintain a cash collateral account held by the Company equal to the aggregate amount of margin extended to all counterparties covered by the Monetary Guaranty. In exchange for this unconditional guaranty, the Company remits a fee to Monetary determined on a counterparty by counterparty basis which is agreed upon by the Company, Monetary and the respective counterparty. The Monetary Guaranty may be terminated by either the Company or Monetary at any time provided that if Monetary elects to terminate there are no guaranteed obligations outstanding. As of December 31, 2014 and 2013, the aggregate amount of margin extended under the Monetary Guaranty was $13.2 million and $4.5 million, respectively. During the years ended December 31, 2014 and 2013, no payments were made by Monetary to the Company to satisfy a guaranteed counterparty obligation. For the years ended December 31, 2014 and 2013, fees collected from counterparties and subsequently remitted to Monetary by the Company under the Monetary Guaranty were $1.1 million and $0.4 million and are included in Referring broker fees in the consolidated statements of operations.

FXCM Inc.

Notes to Consolidated Financial Statements

Note 16. Related Party Transactions - (continued)

As of December 31, 2014 and 2013, the Company held cash collateral related to the Monetary Guaranty in the amount of $7.1 million and $8.4 million, respectively, which is included in Cash and cash equivalents, held for customers and Customer account liabilities in the consolidated statements of financial condition.

Effective January 30, 2015, the Company terminated the Monetary Guaranty with Monetary.

Customer account liabilities in the consolidated statements of financial condition include balances for employees and shareholders with greater than 5% ownership in the Company.

As of December 31, 2014 and 2013, Accounts payable and accrued expenses in the consolidated statements of financial condition include $8.9 million and $9.8 million, respectively, related to the *Allocation of income to Lucid members for services provided* (see Note 2). Accounts payable and accrued expenses also includes a balance of nil and $0.2 million of advances from certain Lucid non-controlling members as of December 31, 2014 and 2013, respectively.

Notes payable of nil and $9.8 million included in the consolidated statements of financial condition as of December 31, 2014 and 2013, respectively, represents the amount borrowed from the Lucid non-controlling members in connection with the Lucid acquisition. The Company repaid the unsecured promissory notes in December 2014 (see Note 23).

Other liabilities in the consolidated statements of financial condition include the Faros Follow-on Payment of nil and $3.7 million as of December 31, 2014 and 2013, respectively (see Note 4). The Company reassessed the Follow-on Payment liability and determined that no payment was required under the Faros Purchase Agreement as of December 31, 2014.

**Exchange Agreement**

The members of Holdings (other than the Corporation) entered into an exchange agreement under which they (or certain permitted transferees thereof) have the right (subject to the terms of the exchange agreement as described therein) to exchange their Holdings Units for shares of the Corporation's Class A common stock on a one-for-one basis at fair value, subject to customary conversion rate adjustments for stock splits, stock dividends and reclassifications. During the years ended December 31, 2014 and 2013, certain members of Holdings exchanged 2.4 million and 10.1 million, respectively, of their Holdings Units, on a one-for-one basis, for shares of Class A common stock of the Corporation pursuant to the exchange agreement.

**Payments under Tax Receivable Agreement**

The Corporation entered into a tax receivable agreement with the members of Holdings (other than the Corporation) that will provide for payments by the Corporation to Holdings' members (other than the Corporation) (see Note 2). The aggregate payments due under the tax receivable agreement were $150.6 million and $150.3 million as of December 31, 2014 and 2013, respectively. During the years ended December 31, 2014 and 2013, payments of $3.7 million and $4.1 million, respectively, were made pursuant to the tax receivable agreement.

Note 17. Stock-Based Compensation

The Company's Amended and Restated 2010 Long-Term Incentive Plan (the "LTIP") permits the grant of various equity-based awards to employees, directors or other service providers of the Company and its subsidiaries. Under the LTIP, the Company has granted non-qualified stock options and other equity awards, including shares of the Corporation's Class A common stock ("Shares") and, beginning in the fourth quarter of 2014, RSUs. The total number of Shares which may be issued under the LTIP is 15,295,000. The Shares issued may consist, in whole or in part, of unissued Shares or treasury Shares. The issuance of Shares shall reduce the total number of Shares available under the LTIP. As of December 31, 2014, 4.4 million shares remained available for future issuance.

In arriving at stock-based compensation expense, the Company estimates the number of equity-based awards that will forfeit due to employee turnover. The Company's forfeiture assumption is based primarily on its turn-over historical experience. If the actual forfeiture rate is higher than the estimated forfeiture rate, then an adjustment will be made to increase the estimated forfeiture rate, which will result in a decrease to the expense recognized in the Company's financial statements. If the actual forfeiture rate is lower than the estimated forfeiture rate, then an adjustment will be made to lower the estimated forfeiture rate,

**FXCM Inc.**

**Notes to Consolidated Financial Statements**

**Note 21. Commitments and Contingencies - (continued)**

The aggregate operating lease expense, included in General and administrative expense in the consolidated statements of operations for the years ended December 31, 2014, 2013 and 2012, was $10.2 million, $8.3 million and $7.9 million, respectively. For the years ended December 31, 2014 and 2013, there were no sublease commitments. The Company leases its corporate office location under an operating lease agreement expiring in May 2026.

*Capital Lease Commitments*

The Company leases office equipment under capital leases. Interest paid as part of our capital lease obligation was not material for the years ended December 31, 2014, 2013, and 2012, respectively. The capital leases expire in 2015. Future minimum lease payments for capital leases are not material for 2015.

*Other*

The Company holds an interest in an inactive entity that formerly provided online FX educational services ("Online Courses"). Online Courses meets the definition of a VIE under ASC 810 and the Company was considered the primary beneficiary. The members who owned the remaining interest in Online Courses had put options to sell their interest to the Company upon a change in control of Holdings. A change in control occurs when the number of Holdings Units held by unit holders as of the date of the Online Courses operating agreement, November 17, 2008, cease to make up at least 50% of the voting or vested economic interest securities of Holdings. The change in control occurred during the quarter ended September 30, 2013. Under U.S. GAAP, the value of the put options is recognized upon both the change in control and the exercise of the put options.

In 2014, the put options were exercised and Holdings remitted payments in the amount of $3.6 million. Based on the status (inactive and no assets) of Online Courses, the put option payments resulted in a charge to earnings, and General and administrative expense in the consolidated statements of operations for the year ended December 31, 2014 includes a charge of $3.6 million related to the put option payments.

**Note 22. Exchange Memberships**

The Company's exchange memberships, which represent ownership interests and shares owned in the Chicago Mercantile and the Intercontinental exchanges and provide the Company with the right to conduct business on the exchanges, are recorded at cost or, if an other-than-temporary impairment in value has occurred, at a value that reflects management's estimate of the impairment. There were no exchange membership impairments as of December 31, 2014. At December 31, 2014, ownership interests and shares owned with a cost of $2.7 million and $3.7 million, respectively, are included in Other assets in the consolidated statement of financial condition. There were no exchange memberships held at December 31, 2013.

**Note 23. Debt**

*Credit Agreement*

On December 19, 2011, Holdings entered into a credit agreement (the "Credit Agreement") with a syndicate of financial institutions. The Credit Agreement was guaranteed by certain subsidiaries of Holdings and was secured by a pledge of all of the equity interests in certain of Holdings' domestic subsidiaries and 65% of the voting equity interests in certain of its foreign subsidiaries.

As of December 31, 2014 and 2013, Holdings' outstanding balance under the Credit Agreement was $25.0 million and nil, respectively. In connection with the events described in Note 30 "Subsequent Events," the outstanding balance of $25.0 million and accrued interest and fees of $0.1 million were repaid in full and the Credit Agreement was terminated effective January 20, 2015.

Interest expense related to borrowings under the Credit Agreement, including the amortization of debt financing costs, included in Interest on borrowings in the consolidated statements of operations was $1.6 million, $1.4 million and $1.2 million for the years ended December 31, 2014, 2013 and 2012, respectively.

**FXCM Inc.**

**Notes to Consolidated Financial Statements**

**Note 27. Foreign Currencies and Concentration of Credit Risk - (continued)**

pursuant to limits set by the Company's prime brokers. The prime brokers incur the credit risk relating to the trading activities of these customers in accordance with the respective agreements between such brokers and the Company.

The Company is engaged in various trading activities with counterparties which include brokers and dealers, futures commission merchants, banks and other financial institutions. In the event counterparties do not fulfill their obligations, the Company may be exposed to risk. The risk of default depends on the creditworthiness of the counterparty or issuer of the financial instrument. It is the Company's policy to: (i) perform credit reviews and due diligence prior to conducting business with counterparties; (ii) set exposure limits and monitor exposure against such limits; and (iii) periodically review, as necessary, the credit standing of counterparties using multiple sources of information. The Company's Due from brokers balance included in the consolidated statements of financial condition was $37.3 million and $5.5 million as of December 31, 2014 and 2013, respectively. As of December 31, 2014, 97.1% of the Company's Due from brokers balance, included in the consolidated statements of financial condition, was from three large financial institutions. As of December 31, 2013, 96.2% of the Company's Due from brokers balance, included in the consolidated statements of financial condition, was from one large financial institution. Two banks held more than 10.0% each of the Company's total cash and cash equivalents and cash and cash equivalents, held for customers as of December 31, 2014 and 2013.

**Note 28. Segments**

ASC 280, *Segment Reporting,* establishes standards for reporting information about operating segments. Operating segments are defined as components of an enterprise about which separate financial information is available that is evaluated regularly by the chief operating decision maker, or decision making group, in deciding how to allocate resources and in assessing performance. The Company's operations relate to FX trading and related services and operate in two segments - retail and institutional, with different target markets and are covered by a separate sales force, customer support and trading platforms. The Company's segments are organized around three geographic areas. These geographic areas are the U.S., Asia and Europe and are based on the location of its customers' accounts.

*Retail Trading*

The Company operates its retail business whereby it acts as an agent between retail customers and a collection of large global banks and financial institutions by making foreign currency markets for customers trading in foreign exchange spot markets through its Retail Trading business segment. The Retail Trading business segment includes the Company's white label relationships, contracts for difference, payments for order flow (through August 1, 2014) and rollovers. In addition, the Retail Trading business segment includes offerings to some of the Company's smaller retail clients to trade with a dealing desk, or
principal model.

*Institutional Trading*

Institutional Trading facilitates spot foreign currency trades on behalf of institutional customers, market making and electronic trading in the institutional foreign exchange spot and futures markets. The facilitation of spot foreign currency trades allows customers to obtain the best execution price from external banks and financial institutions.

Our Institutional Trading segment also includes Lucid, an electronic market marker and trader in the institutional foreign exchange spot and futures markets, and activity from the acquisitions of Faros and V3. The V3 acquisition expanded the Lucid business model into a broader array of financial instruments and provides more robust connectivity to various financial exchanges.