# Exhibit F

**Chart of Plaintiffs' Complaint Allegations as Compared to
Allegations in the CFTC Order, NFA Complaint, and Effex Complaint**

| Allegations from Plaintiffs' Complaint | Allegations from the CFTC Order or the NFA Complaint |
|---|---|
| "Until approximately 2007, FXCM provided liquidity to its retail forex customers primarily through an internal 'dealing desk' - a division of FXCM that determined the prices offered to customers and held positions opposite customers."  Compl. ¶ 58. | "Until approximately 2007, FXCM provided liquidity to its retail forex customers primarily through an internal dealing desk - a division of FXCM that determined the prices offered to customers and held positions opposite customers."  Ex. 1, at 3. |
| "In or around 2007, FXCM transitioned from using a dealing desk to what it termed an 'agency' model for most of its retail forex customers, which it described to customers as providing NDD forex trading."  Compl. ¶ 59. | "In or around 2007, FXCM transitioned from utilizing a dealing desk to transact with customers to using what it termed an 'agency' model for the majority of its retail forex customers, which it described to customers as providing 'No Dealing Desk' forex trading."  Ex. 1, at 3. |
| "Whereas a dealing desk broker acts as a market maker and may be trading against the customer's position, FXCM touted that its agency model eliminated that conflict of interest.  In FXCM's agency model, price quotations were provided not by FXCM's internal dealing desk, but by banks and other third-party market makers. FXCM was merely acting as a credit intermediary who simultaneously entered into offsetting trades with both the customer and the market maker."  Compl. ¶ 60. | "Whereas a dealing desk broker 'acts as a market maker' and 'may be trading against your position,' FXCM claimed that its agency model 'eliminat[ed]' that 'major conflict of interest' between broker and retail customer. In FXCM's agency model, price quotations were provided not by FXCM's internal dealing desk but by banks and other third-party 'market makers' - sometimes also referred to as 'liquidity providers' or 'LPs.'"  Ex. 1, at 3. |
| "In 2009, Defendants Niv, Ahdout and others at FXCM devised a plan to capitalize on FXCM's NDD clients through the use of a high frequency trading algorithm.  This algorithm would **completely replace or supplant many of the independent market makers on the NDD platform and allow FXCM to cash in twice on its customers (first from its mark-ups, then from its kickback) while providing a purportedly conflict-free trading platform.**"[1]  Compl. ¶ 64. | "In 2009, Niv, Ahdout, and others at FXCM formulated a plan to create an algorithmic trading system - an FXCM computer program that could make markets to FXCM's customers and thereby **either replace or compete with the independent market makers on FXCM's No Dealing Desk platform.**"  Ex. 1, at 3. |

---

[1]  Red, bolded text is used to indicate where there is a notable, relevant, or misleading discrepancy between the Plaintiffs' allegation and the CFTC or NFA allegation.

**Chart of Plaintiffs' Complaint Allegations as Compared to
Allegations in the CFTC Order, NFA Complaint, and Effex Complaint**

| Allegations from Plaintiffs' Complaint | Allegations from the CFTC Order or the NFA Complaint |
|---|---|
| "To this end, FXCM hired a high-frequency trader, Dittami, for a Managing Director position at the Company in October 2009." Compl. ¶ 65. | "Niv and Ahdout hired a high-frequency trader (hereinafter, 'HF Trader') to a Managing Director position at FXCM." Ex. 1, at 4. |
| "Under Dittami's employment agreement, FXCM paid Dittami a base salary plus 30 percent of trading profits generated by Dittami's trading system. That meant that FXCM would keep the remaining 70 percent of trading profits." Compl. ¶ 66. | "FXCM would pay HF Trader a base salary plus a bonus of 30 percent of trading profits generated by HF Trader's algorithmic trading system, with FXCM keeping the remaining 70 percent." Ex. 1, at 4. |
| "In early 2010, when Dittami was finalizing his trading algorithm, FXCM's Compliance department voiced concerns that trading against FXCM's retail customers would contradict FXCM's marketing statements about its NDD model, which was supposedly free of precisely such conflicts of interest." Compl. ¶ 67. | "In early 2010, when HF Trader was finalizing his trading algorithm, FXCM's Compliance department raised concerns that trading against FXCM retail customers might contradict FXCM's marketing statements about its No Dealing Desk model." Ex. 1, at 4. |
| "On March 23, 2010, the new company, Effex was **created under the direction of FXCM**." Compl. ¶ 68. | "On March 23, 2010, **HF Trader formed his new company** (hereinafter, 'HFT Co')." Ex. 1, at 4. |
| "**To further create the false impression of separation**, Dittami **'resigned'** from FXCM on April 14, 2010, but Dittami and FXCM agreed that his resignation would not change their economic relationship, including FXCM retaining 70% of Dittami's (now Effex's) algorithmic trading profits.  FXCM also continued to own the intellectual property rights to the algorithmic trading platform's software." Compl. ¶ 69.[2] | "On April 14, 2010, HF Trader resigned from FXCM.  HF Trader and FXCM agreed that HF Trader's resignation would not change the economic relationship between FXCM and HF Trader, including, as stated in his employment contract, HF Trader's retention of 30 percent of his algorithmic trading profits, with FXCM capturing the residual 70 percent." Ex. 1, at 4. |

---

[2] This assertion is contravened by the Effex Complaint which states:  "Moreover, any payments from Effex to FXCM were based on volume not profits, the magnitude of which was substantially less than fifty percent of Effex's profits."  Effex Compl. at ¶ 63.

**Chart of Plaintiffs' Complaint Allegations as Compared to
Allegations in the CFTC Order, NFA Complaint, and Effex Complaint**

| Allegations from Plaintiffs' Complaint | Allegations from the CFTC Order or the NFA Complaint |
|---|---|
| "Soon after Effex was created, it entered services agreements with FXCM by which Effex would make monthly payments to FXCM of $21 per million dollars of trading volume executed by Effex.  FXCM intended this amount to approximate 70 percent of Effex's profits from trading on FXCM's retail forex platform **against FXCM's retail customers**." Compl. ¶ 70. | "To that end, a March 1, 2010 services agreement between HFT Co and FXCM, and a superseding May 1, 2010 services agreement between HFT Co and FXCM Holdings, provided that HFT Co would make monthly payments to FXCM in the amount of $21 per million dollars of trading volume executed by HFT Co.  HF Trader and FXCM believed that this amount approximated 70 percent of HFT Co's profits from trading on FXCM's retail forex platform." Ex. 1, at 4. |
| "In conjunction with Effex's formation, FXCM funded Effex with a $2 million interest-free loan and allowed Effex to use FXCM's prime broker through a 'prime of prime' account. When Dittami **'resigned'** from FXCM and 'moved' to Effex, he continued working from  FXCM's offices rent-free.  Effex operated from FXCM's offices in New York for a full year after Dittami's resignation from FXCM."  Compl. ¶ 71.[3] | "To help launch HFT Co's operations, FXCM gave HFT Co a $2 million interest-free loan, and allowed HFT Co to use FXCM's prime broker through a 'prime of prime' account. When HF Trader resigned from FXCM, he continued working from FXCM's offices, rent free.  HFT Co was located in FXCM's offices in New York City until approximately April 2011, when the company finally moved into its own office space, in Jersey City, New Jersey." Ex. 1, at 4. |
| "Effex also used Dittami's trading algorithm – created for FXCM while Dittami was working for the Company and thus FXCM's intellectual property – to conduct its trading. For a period of time, Effex even used FXCM's servers and email systems."  Compl. ¶ 72.[4] | "HFT Co also used HF Trader's trading algorithm, which was FXCM's intellectual property, to conduct its trading.  For a period of time, HFT Co used FXCM's servers and other technology, including FXCM's email systems." Ex. 1, at 4. |

---

[3] Effex disputes this assertion:  "From inception, Effex has always . . . leased its own office space[.]"  Effex Compl. ¶ 20.j.

[4] Effex likewise disputes this assertion:  "From inception, Effex has always . . . owned and/or leased all of its computers, services and other equipment[.]"  Effex Compl. ¶ 20.j.

**Chart of Plaintiffs' Complaint Allegations as Compared to
Allegations in the CFTC Order, NFA Complaint, and Effex Complaint**

| Allegations from Plaintiffs' Complaint | Allegations from the CFTC Order or the NFA Complaint |
|---|---|
| "From **2010 to at least 2014**, FXCM also gave bonuses, reimbursed by Effex, to two FXCM employees who assisted Effex on account of their work for the purportedly 'independent' market maker. From **2010 to 2014**, one of the employees spent approximately 80 percent of the work week at Effex's offices.  **In short, Effex was no more than a hidden subsidiary of FXCM**." Compl. ¶ 73. | "Two FXCM employees who assisted HFT Co received supplemental bonuses from FXCM, reimbursed by HFT Co, on account of their work. One of these employees spent approximately 80 percent of the work week at HFT Co's offices from **2011 until 2014**."  Ex. 1, at 4. |
| "Through August 2011, Effex paid $21 per million notional volume transacted by Effex on the FXCM retail forex platform. These payments were adjusted to $16 per million from September 2011 through July 2014 due to tightening spreads in the forex market. This reduction was intended to compensate for Effex's lower profitability and to maintain the agreed upon 70% / 30% division of profits between FXCM and Effex." Compl. ¶ 74. | "To that end, a March 1, 2010 services agreement between HFT Co and FXCM, and a superseding May 1, 2010 services agreement between HFT Co and FXCM Holdings, provided that HFT Co would make monthly payments to FXCM in the amount of $21 per million dollars of trading volume executed by HFT Co."  Ex. 1, at 4. |
| "From 2010 to 2014, no market maker besides Effex paid FXCM for order flow.  **In truth, these payments were not order flow payments, but rather pre-negotiated kickbacks of FXCM's cut of profits generated by Effex from trading against FXCM's retail customers on the NDD platform.**" Compl. ¶ 75.[5] | "From 2010 to 2014, no market maker besides HFT Co paid FXCM for order flow."  Ex. 1, at 5. |

---

[5] This allegation is contradicted by the Effex Complaint:  "Effex did not obtain order execution requests from FXCM in exchange for payments, but rather obtained execution requests in exchange for best execution and price.  Moreover, any payments from Effex to FXCM were based on volume not profits, the magnitude of which was substantially less than fifty percent of Effex's profits."  Effex Compl. ¶ 63.

**Chart of Plaintiffs' Complaint Allegations as Compared to
Allegations in the CFTC Order, NFA Complaint, and Effex Complaint**

| Allegations from Plaintiffs' Complaint | Allegations from the CFTC Order or the NFA Complaint |
|---|---|
| "FXCM even viewed Effex's trading profits and losses ('P&L') as its own, less Effex's 30 percent share.  In fact, FXCM calculated its monthly preliminary P&L statement, in part, by taking Effex's monthly P&L and simply subtracting 30 percent."  Compl. ¶ 76. | "FXCM viewed HFT Co's profits and losses ('P&L') from HFT Co's trading as essentially belonging to FXCM, less the 30 percent HFT Co was permitted to keep.  For instance, FXCM calculated its monthly preliminary P&L statement, in part, by taking HFT Co's monthly P&L and simply subtracting 30 percent."  Ex. 1, at 5. |
| "FXCM directed Effex to remit these payments to FXCM Holdings, which was not a member of the NFA, in an effort to avoid the NFA's scrutiny over these dealings."  Compl. ¶ 77. | "FXCM appears to have attempted to conceal the rebate payments from NFA or others by directing Effex to pay most of the rebates to FXCM Holdings LLC, a former principal of FXCM and a non-NFA Member."  Ex. 2, at ¶ 40. |
| "In exchange for these payments from Effex, FXCM agreed that it would favor Effex over other market makers in routing retail customer orders.  FXCM permitted Effex to win all  'ties' with other market makers; provided Effex with a real-time view of price quotations offered by other market makers; and added smaller markups to Effex's prices than to prices provided by other market makers."  Compl. ¶ 78. | "In exchange for these payments from HFT Co, FXCM agreed that it would favor HFT Co over other market makers in routing retail customer orders.  FXCM permitted HFT Co to win all 'ties' with other market makers; provided HFT Co with a real-time view of price quotations offered by other market makers; and added smaller markups to HFT Co prices than to prices provided by other market makers."  Ex. 1, at 5. |
| "In addition to favoring Effex over other market makers, FXCM allowed Effex to use a hold timer that enabled Effex to execute a trade at the start or end of a hold timer period, whichever was better for Effex."  Compl. ¶ 79. | "In addition to favoring HFT Co over other market makers, HFT Co made use of, and FXCM allowed HFT Co to use, a hold timer that enabled HFT Co to execute a trade at the start or end of a hold timer period, whichever was better for HFT Co."  Ex. 1, at 5. |

**Chart of Plaintiffs' Complaint Allegations as Compared to
Allegations in the CFTC Order, NFA Complaint, and Effex Complaint**

| Allegations from Plaintiffs' Complaint | Allegations from the CFTC Order or the NFA Complaint |
|---|---|
| "Effex also used a 'previous quote' practice whereby Effex submitted a quote to FXCM and FXCM would respond with an execution request based on the trading limits contained in a customer limit order, not the previous quote provided by FXCM. **This way Effex was using FXCM's inside knowledge of a customer's least favorable acceptable trade quote to ensure that it was getting the most favorable end of the bargain.**"  Compl. ¶ 80. | "HFT Co also made use of a 'previous quote' practice whereby HFT Co submitted a quote to FXCM and FXCM would respond with an execution request based on the trading limits contained in a customer limit order and not the previous quote provided by FXCM."  Ex. 1, at 5.[6] |
| "On the same day Dittami resigned from FXCM, his trading algorithm was used in a 'full-scale trading session' for the very first time. Based on the trading that day, FXCM anticipated that Effex would capture approximately 25-30% of overall trade volume on FXCM's NDD Platform – **well above the market share Effex would have expected to capture in any other forex market.**"  Compl. ¶ 81. | "On the day of HF Trader's resignation from FXCM, HF Trader's trading algorithm was used in a 'full-scale trading session' for the very first time. Based on the trading that day, FXCM anticipated that HFT Co would capture approximately 25-30% of overall trade volume on FXCM's No Dealing Desk Platform."  Ex. 1, at 5. |
| "Not surprisingly, Effex routinely captured over 50% of FXCM's daily order flow and, at one time, captured nearly 80%. All told, from 2010 through 2014 Effex rebated to FXCM nearly $80 million of Effex's trading revenue through its monthly payments to FXCM."  Compl. ¶ 82.[7] | Due to the preferential treatment it received, Effex routinely captured over 50% of FXCM's daily order flow and, at one time, captured nearly 80% of FXCM's daily order flow.  This, in turn, generated significant revenue for FXCM."  Ex. 2, at ¶ 38.<br><br>"In total, through HFT Co's monthly payments from 2010 through 2014, HFT Co rebated to FXCM approximately $77 million of the trading revenue HFT Co achieved."  Ex. 1, at 5. |

[6] Effex has alleged that statements such as these are defamatory asserting that the "Falsely portrayed Effex's use of 'hold timer' and 'prev quote' as abusive."  Effex Compl. ¶¶ 52.e, 53.

[7] Effex has also alleged this statement to be defamatory:  "The foregoing statements [regarding preferential treatment and the percentage of order flow Effex received] are false and defamatory."  Effex Compl. ¶ 53.

**Chart of Plaintiffs' Complaint Allegations as Compared to
Allegations in the CFTC Order, NFA Complaint, and Effex Complaint**

| Allegations from Plaintiffs' Complaint | Allegations from the CFTC Order or the NFA Complaint |
|---|---|
| "In connection with the NFA's 2013 examination of FXCM, NFA compliance staff met with FXCM executives on October 24, 2013. In response to the NFA's questions about FXCM's relationship with Effex, Defendant Niv neglected to mention any of the details described above concerning FXCM's relationship with Effex and Dittami. Defendant Niv misrepresented that he had a prior working relationship with Dittami from when Dittami was employed by other liquidity providers." Compl. ¶ 94. | "In connection with NFA's 2013 examination of FXCM, NFA compliance staff met with FXCM executives in Chicago on October 24, 2013.  In response to NFA's questions about FXCM's relationship with HFT Co, Niv omitted to mention any of the details described above concerning FXCM's relationship with HFT Co and its principal, HF Trader. Instead, Niv misrepresented that he had a prior working relationship with HF Trader from when HF Trader was a trader employed by other liquidity providers."  Ex. 1, at 7. |
| "Members of FXCM's compliance department also made a series of misstatements to the NFA. On October 22, 2013, an FXCM compliance officer told the NFA in an email: 'FXCM LLC does not have any direct or indirect ownership, interest, or affiliation with entities that provide liquidity to retail clients[.]'" Compl. ¶ 95. | "Members of FXCM's Compliance department also made a series of misstatements to NFA. On October 22, 2013, two days before FXCM's meeting with NFA, an FXCM compliance officer told NFA in an email: 'FXCM LLC does not have any direct or indirect ownership, interest, or affiliation with entities that provide liquidity to retail clients[.]'"  Ex. 1, at 7. |
| "After the NFA sought clarification of this statement, another FXCM compliance officer stated in a March 24, 2014 email: 'To my knowledge, there are no present or past owners, principals, APs, or employees of affiliates of FXCM LLC that have direct or indirect ownership,  interest, or affiliation with entities that provide liquidity to retail clients on our No Dealing Desk Model.'" Compl. ¶ 96. | "After NFA sought clarification of this statement, asking FXCM to 'provide representation as it relates to owners, principals, APs [associated persons], employees, and affiliates of FXCM,' another compliance officer compounded FXCM's previous misrepresentation in a March 24, 2014 email: 'To my knowledge, there are no present or past owners, principals, APs, or employees of affiliates of FXCM LLC that have direct or indirect ownership, interest, or affiliation with entities that provide liquidity to retail clients on our No Dealing Desk Model.'"  Ex. 1, at 7. |

**Chart of Plaintiffs' Complaint Allegations as Compared to
Allegations in the CFTC Order, NFA Complaint, and Effex Complaint**

| Allegations from Plaintiffs' Complaint | Allegations from the CFTC Order or the NFA Complaint |
|---|---|
| "On April 4, 2014, in response to further attempts by the NFA to clarify the FXCM-Effex relationship, defendant Lester stated in an email that Dittami served as a consultant for FXCM from October 2009 through April 2010, working primarily on software coding—in an attempt to downplay Dittami in connection with NFA's inquiry into FXCM's relationship with Effex[.]"  Compl. ¶ 97. | "On April 4, 2014, in response to further attempts by NFA to clarify the relationship between FXCM and HFT Co, an FXCM compliance officer stated in an email: '[HF Trader]  served as a consultant for FXCM from October 2009 through April 2010. [HF Trader] worked primarily on software coding.'"  Ex. 1, at 7. |
| "Defendant Niv participated in and approved of FXCM's false responses to the NFA's investigation."  Compl. ¶ 98. | "Niv generally participated in and approved of responses to [the] NFA."  Ex. 1, at 7. |
| "In **January 2017**, FXCM disclosed the identities of its 17 various liquidity providers, including Effex, but neglected to divulge any details informing clients or investors of the Company's unique relationship with Effex." Compl. ¶ 254. | "FXCM's website made no mention of Effex until **January 2016**, when FXCM added a page to its website entitled, 'FXCM Liquidity Providers', because of an NFA disclosure requirement."  Ex. 2, ¶ 41. |

8