# Exhibit G

# UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF ILLINOIS
### EASTERN DIVISION

EFFEX CAPITAL, LLC and JOHN
DITTAMI,

                    Plaintiffs,

v.

NATIONAL FUTURES ASSOCIATION,        **JURY TRIAL DEMANDED**
JOHN DOES 1-5, and JANE DOES 1-5,

                  Defendants.

## COMPLAINT

Plaintiffs Effex Capital, LLC and John Dittami (collectively, "Plaintiffs"), for their complaint against the defendants, National Futures Association ("NFA"), John Does 1-5 and Jane Does 1-5, allege as follows:

## PARTIES

1.       Plaintiff Effex Capital, LLC is a limited liability company. Its members are John Dittami, the Dittami Dynasty Trust, Darshan Garimella and James Bradley.

2.       Plaintiff John Dittami is a citizen of the United States and of the state of Florida and the managing member of Effex. The Dittami Dynasty Trust is deemed to be a citizen of Florida because Mr. Dittami is the settlor and trustee. Darshan Garimella is a citizen of the United States and of the state of New Jersey. James Bradley is a subject of the United Kingdom.

1

3.      Defendant NFA is a Delaware corporation with its principal place of business in Chicago. NFA is a self-regulatory organization established under the Commodities Exchange Act, 7 U.S.C. §21.

4.      The identities of defendants, various John Does and Jane Does are not presently known and this Complaint will be amended to include the names of such individuals when identified. Upon information and belief, defendants John Does and Jane Does participated in NFA's investigation of Forex Capital Markets in Chicago, Illinois as well as New York, New York and are not citizens of New Jersey, Florida, or a country other than the United States. Defendants are therefore subject to this Court's diversity jurisdiction.

## NATURE OF THIS ACTION

5.      Plaintiffs bring this action seeking injunctive relief and damages caused by the false, misleading and intentionally defamatory statements published by NFA which have severely damaged and threaten to destroy Effex's business and Effex and Dittami's reputations. NFA maliciously and mendaciously exceeded its regulatory powers by publishing false, defamatory and misleading statements against Effex and Dittami in connection with its investigation of Forex Capital Markets, LLC ("FXCM"). The tortious statements constitute a thinly disguised attempt to regulate parties not subject to NFA's jurisdiction and were designed to mar Plaintiffs' reputations and ruin their business. NFA's regulatory overreach occurred under the auspices of an authorized investigation of member firm FXCM, but in reality, amounted to a *de facto* investigation of non-NFA members, Effex and Dittami, without providing them with the opportunity to defend themselves or otherwise be heard. NFA's actions and public statements relating to Effex and Dittami exceeded its legal mandate, occurred outside of its jurisdiction, constituted acts beyond the scope of its

2

legal authority, and were unnecessary and irrelevant to advance its claims or secure its voluntary settlement with FXCM. NFA's malicious intent is underscored by virtue of its blatant and wholesale disregard of its jurisdictional authority which does not grant it power or authority to regulate, investigate or otherwise make findings, implied or actual, regarding non-NFA members such as Plaintiffs.

## JURISDICTION AND VENUE

6.      This Court has *in personam* jurisdiction over NFA because it has a place of business within the State of Illinois.

7.      This Court has *in personam* jurisdiction over John Does 1-5 and Jane Does 1-5 because: (a) they participated in bringing about the injury that was inflicted upon Plaintiffs through Defendants' actions in Illinois and thus NFA's Illinois contacts are attributed to them; (b) this case involves defendants' misrepresentation of information which NFA ascertained in an investigation which was conducted in Chicago and New York; and (c) the defamatory statements were published by defendants in Chicago.

8.      Federal subject matter jurisdiction exists under 28 U.S.C. §1331 since the Second and Third Claims herein involve federal questions concerning deprivation of due process under the Fifth Amendment to the Constitution of the United States. Federal subject matter jurisdiction also exists under 28 U.S.C §1332(a) because complete diversity of citizenship exists among adverse parties and the monetary relief sought and the value of the non-monetary relief sought exceeds $75,000.

9.      Venue is proper under 28 U.S.C. §1391(a)(1) in this District since NFA has a place of business in Chicago, Illinois, and because a substantial part of the events giving rise to the claims asserted herein occurred here.

**FACTS COMMON TO ALL CLAIMS**

10.      The Commodity Exchange Act ("CEA") was enacted in 1936 to regulate transactions on commodity futures exchanges, prevent manipulation of the market, and address the problems associated with short selling. The Commodity Futures Trading Commission Act of 1974 (the "1974 Act") amended the substantive federal law governing the industry, and created the Commodity Futures Trading Commission ("CFTC").

11.      The 1974 Act also provided for the establishment of a "two-tier" regulatory system, consisting of the CFTC and self-regulatory roles assigned to registered commodity and futures exchanges.

12.      In 1982 NFA became registered with the CFTC as a futures association, and became a self-regulatory body operating under the authority and supervision of the CFTC.

13.      Membership with the NFA is mandatory for entities that conduct business on U.S. futures exchanges, or solicit or undertake futures transactions involving U.S. exchanges or engage in off exchange retail forex transactions.

14.      Neither Effex nor Dittami are members of NFA. Effex, as an Eligible Contract Participant ("ECP"), is not required to register in any capacity with CFTC, or be a member of NFA. As non-members, neither Effex nor Dittami are subject to NFA's jurisdiction.

15.      Under CFTC oversight and pursuant to the CEA, NFA passes rules, processes CFTC registration applications, grants and denies registration, performs audits and

4

conducts examinations of members to ensure compliance with both its own rules and CFTC rules. In addition, NFA initiates disciplinary actions against firms and individuals who violate the rules, and provides a forum for arbitration and resolution of disciplinary, customer and member disputes. An NFA member, adversely affected by an NFA disciplinary action, may petition CFTC to review and overturn or modify the ruling.

## History of Effex Capital, LLC

16.     Effex is an independently owned and closely held proprietary foreign currency trading firm formed in 2010, and has been managed and controlled by John Dittami since its inception. Effex provides foreign currency liquidity to institutional counterparts and utilizes confidential and proprietary trading software ("Proprietary Software") to provide such liquidity.

17.     Effex, in its capacity as an ECP, is a provider in independent buy side foreign currency liquidity, an activity over which NFA has no authority to regulate. This new class of foreign currency trading competition has experienced significant growth and is in direct competition with many of NFA's member firms.

18.     Dittami and a trust which he created for the benefit of his children, at all times have owned a minimum of at least 93% of all membership interests in Effex.

19.     FXCM, William Adhout, Dror Niv and Ornit Niv have: (i) never been members; (ii) never had any ownership interest in Effex; and (iii) never managed or controlled Effex.

20.     From inception, Effex has always:

a.     determined in its sole discretion whether or not to accept a trade;
b.     hired, fired and paid numerous employees and consultants;

5

    c.      maintained its own bank accounts;

    d.     independently capitalized its prime broker relationship;

    e.      supplied all of its operating capital and risk capital;

    f.       provided FX retail pricing and execution services to over 30 counterparts in addition to FXCM, including FXCM's competitors;

    g.     owned and/or leased all of its computers, servers and other equipment;

    h.     utilized its own confidential, proprietary trading software to facilitate all of its over-the-counter ("OTC") foreign currency trades;

    i.       owned, managed, operated, maintained, updated and modified its own trading system;

    j.      leased its own office space;

    k.     had sole discretion to accept or reject trades;

    l.       assumed all risk of loss on its trades;

    m.    retained all of Effex's trading profits;

    n.     assumed liability for all trading and operating losses and potential losses;

    o.     filed its own tax returns; and

    p.     assumed all business risks, and other than Dittami, no person or entity ever guaranteed any of Effex's obligations.

21.      Effex engages in proprietary trading and provides foreign currency liquidity to institutional counterparts in the OTC foreign currency markets.

22.      Unlike the vast majority of institutional liquidity providers, Effex's business model involves the creation of customized liquidity solutions for each institutional counterpart, and Effex makes certain adaptations to its risk management methodology and analytics for each counterpart.

23.      Effex's Proprietary Software was developed at its own cost, and utilizes a unique trading strategy comprised of confidential computer source code and trading algorithms ("Algorithms") which were developed by Dittami.

24.      Effex's creation of customer-specific risk tolerance, choice of inputs, and pricing logic and structures of pricing and risk management which utilize the Algorithms constitute trade secrets ("Trade Secrets").

25.     Through the use of the Trade Secrets, Effex has always provided best in class execution and pricing benefits to its counterparts in the institutional OTC foreign currency market. This best in class institutional execution and pricing directly benefits Effex's counterparts and their underlying customers.

26.     At all relevant times, Effex protected the Trade Secrets and other proprietary information by: (i) requiring all of its employees and consultants to execute confidentiality agreements; (ii) only disclosing the Trade Secrets and any component thereof on a need to know basis; and (iii) protecting its trading and computer systems with passwords and other security measures.

27.     The Trade Secrets are kept under lock and key and are made available only to select individuals subject to their execution of confidentiality, non-compete and non-solicitation agreements.

**Effex Provided Private and Confidential Documents to the CFTC**

28.     In June 2015, the CFTC issued subpoenas to Effex, FXCM and Dittami.

29.     Effex and Dittami provided substantial amounts of documents in response to the subpoenas and in conjunction with their responses requested, pursuant to CFTC Regulation 145.9, that such documents be accorded confidential treatment.

30.     As part of its investigation, CFTC took a lengthy and detailed deposition of Dittami in April of 2016 ("JD Testimony"). In addition, CFTC took depositions of various officers and employees of FXCM. Effex also provided responses to CFTC's numerous informal document requests and numerous follow-up questions and requested that such submissions be accorded confidential treatment.

## The NFA Investigation of FXCM and Effex

31. In 2013, NFA commenced an investigation ("NFA Investigation") regarding Effex and FXCM, as well as William Ahdout ("Ahdout"), Dror Niv ("Dror") and Ornit Niv ("Ornit") (collectively referred to with Ahdout and Dror as "FXCM Management").

32. Neither Effex nor Dittami are NFA Members, associate members or parties to the NFA Investigation.

33. As such, neither Effex nor Dittami were subject to the jurisdiction of NFA.

34. Neither Effex nor Dittami had any right to appear or participate in the NFA Investigation.

35. NFA never contacted or provided any notice to Effex or Dittami in connection with the NFA Investigation.

36. During the NFA Investigation, NFA obtained numerous records from FXCM and its employees regarding Effex and Dittami.

37. During the NFA Investigation, NFA did not ask for or obtain any records from Dittami, Effex or its employees.

38. Upon information and belief, during the NFA Investigation, CFTC provided NFA with numerous documents ("CFTC Documents"), the JD Testimony and the testimony of FXCM Management.

39. The CFTC Documents, which were marked confidential by Effex and Dittami, included certain of Effex's Trade Secrets.

40. The JD Testimony explained Effex's proprietary and confidential trading strategy and techniques.

8

41.     Upon information and belief, as a result of the information provided by CFTC and/or FXCM to NFA, NFA gained knowledge of the Trade Secrets.

42.     On February 6, 2017, the same day CFTC issued its Order Instituting Proceedings Pursuant to Sections 6(c) and 6(d) of the Commodity Exchange Act, Making Findings, and Imposing Residual Sanctions, NFA simultaneously issued a complaint ("NFA Complaint") a decision ("Decision"), a narrative ("Narrative") and a release ("Release"). Plaintiffs will seek to file a copy of each of the foregoing under seal as **Exhibits A, B, C and D,** to the Supplemental Affidavit of John Dittami, Sworn to on May 1, 2017 ("Supp. Aff.").

43.     Neither Effex nor Dittami had any right to appear, intervene, or otherwise participate or appeal the NFA Investigation.

44.     Even assuming arguendo that Effex and Dittami had some due process right to appear or intervene to protect themselves in the NFA Investigation, due to the private nature of the investigation, the privately negotiated settlement between FXCM, its principals and NFA, and the simultaneous release of the NFA Complaint and Decision without any prior notice or warning, it was impossible for Effex and Dittami to exercise any such rights, notwithstanding the fact that the NFA Complaint specifically stated that Effex was being investigated.

45.     As non-members, neither Effex nor Dittami had any statutory right to defend the NFA Complaint or appeal the Decision nor were Effex or Dittami provided with prior notice.

46.     In fact, as non-members, Effex and Dittami had no rights whatsoever and were powerless to defend themselves or participate in any manner in the NFA Investigation.

9

47. Without authorization, the NFA Complaint disclosed certain of Effex's Trade Secrets ("Disclosed Trade Secrets") as set forth in paragraphs 35 and 36 of the NFA Complaint.

48. NFA knew or should have known that the Disclosed Trade Secrets should have been maintained under seal and not disclosed.

49. NFA failed to obtain Effex or Dittami's consent or to provide Plaintiffs with advance written notice of its intent to disclose the Disclosed Trade Secrets, a consent which NFA knew would not be granted.

50. NFA had no colorable reason to publish the Disclosed Trade Secrets other than to harm Plaintiffs.

51. In addition to the unauthorized publication of the Disclosed Trade Secrets, on February 6, 2017, NFA posted a Decision and Narrative (see Exhibits B and C to the Supp. Aff.) on its website, stating, among other things:

     a.    Effex and Dittami "engaged in abusive execution practices that denied FXCM's retail customers favorable price improvement and benefitted Effex and FXCM financially, and which resembled the asymmetrical price slippage practices for which FXCM was sanctioned by NFA in 2011";

     b.    Effex's relationship with FXCM "amounted to a dealing desk model;"

     c.    "Effex was controlled by FXCM"; and

     d.    "In exchange for the order flow directed to Effex, it paid rebates to FXCM that amounted at times to as much as 70% of Effex's profits."

52. On February 6, 2017, NFA posted the Complaint on its website, which in addition to the statements in paragraph 51(a), (b), (c) and (d) above, stated, among other things:

a. FXCM provided Effex access to data from which Effex could derive customer order and position information;

b. FXCM directed a significant percentage of its own order execution business to Effex by giving Effex preferential treatment over FXCM's other liquidity providers;

c. Due to the preferential treatment it received, Effex routinely captured over 50% of FXCM's daily order flow, and at one time, captured nearly 80% of FXCM's daily order flow;

d. NFA found that customers trading the New Zealand Dollar (NZD) related currency pairs had orders executed at off-market prices due to bad prices FXCM received from Effex; and

e. Falsely portrayed Effex's use of "hold timer" and "prev quote" as abusive.

53.     The foregoing statements in paragraph 51(a)-(d) and 52 (a)-(e) above are false and defamatory, and hereinafter are referred to as the "False and Defamatory Statements." NFA did not provide prior notice to Effex or Dittami regarding the Release or the Narrative. Nor did Effex or Dittami grant NFA authorization to publish the False and Defamatory Statements.

54.     NFA knew or should have known the False and Defamatory Statements were false and defamatory when NFA published the same.

55.     In fact, contrary to the False and Defamatory Statements in 51(a) above, Effex at all times provided best price and best execution in the delivery of its foreign currency liquidity services.  In this regard, Effex: (i) added in excess of 250 million dollars of value to FXCM and its customers; (ii) provided asymmetrical customer price improvements due to its unparalleled 4.5 to 1 ratio of trade execution requests whereby FXCM's customers benefitted via a favorable price improvement over trade execution requests whereby Effex benefitted; and (iii) Effex rejected less than one percent of all trade execution requests in contrast to the industrywide rejection rate of 13.5%.

11

56.     NFA knew or should have known that Effex: (i) provided superior execution to its counterparts thereby benefitting counterparts and their underlying customers; and (ii) did not engage in abusive execution practices.

57.     NFA willfully or recklessly ignored available data which would have confirmed Effex's superior pricing and execution services and instead ignored the substandard execution provided by FXCM's other liquidity providers. NFA falsely characterized Effex as providing abusive execution when, in fact, it provided best execution by objective metrics available during the entirety of NFA's investigation.

58.     NFA regularly audits and investigates NFA member firms engaged in foreign currency trading. As a result, NFA either understands or should understand the difference between the internal dealing desk execution model and the no dealing desk execution model.

59.     Contrary to the False and Defamatory Statement in 51(b) above and notwithstanding facts clearly demonstrating Effex's correct status, NFA nonetheless falsely characterized Effex as FXCM's dealing desk.

60.     NFA knew or should have known that Effex was not a dealing desk for FXCM, and that payment for order flow did not cause Effex to lose its status as an independent liquidity provider.

61.     Unlike a dealing desk, Effex: (i) took all risk in its trades and passed none of such risk to FXCM; (ii) independently set all prices without any involvement of FXCM; (iii) had no access to FXCM customer positions or resting orders; (iv) was only awarded execution requests from FXCM if Effex offered best price relative to all other liquidity

12

providers; and (v) there was no correlation between Effex's profits and losses and FXCM's profits and losses.

62.     Contrary to the False and Defamatory Statement in 51(c) above, NFA knew or should have known that Effex was not owned or controlled by FXCM, or any member of FXCM Management, yet NFA falsely referred to Effex as both supported and controlled by FXCM.

63.     Contrary to the False and Defamatory Statement in 51(d) above, Effex did not obtain order execution requests from FXCM in exchange for payments, but rather obtained execution requests in exchange for best execution and price. Moreover, any payments from Effex to FXCM were based on volume not profits, the magnitude of which was substantially less than fifty percent of Effex's profits.

64.     NFA, as set forth in paragraph 16 of the NFA Complaint, investigated Effex beginning in 2013 without naming or including Effex or seeking its participation or input in any part of the NFA investigatory process.

65.     The NFA Investigation, Decision, Narrative and Release were not part of a judicial proceeding involving Effex or Dittami.

66.     To the extent the Complaint, Decision, Narrative and Release *de facto* investigated and sanctioned Effex and Dittami, they were outside the scope of NFA's mandate under Section 17 of the CEA.

**Damages Caused by NFA**

67.     The False and Defamatory Statements, which also appear in the NFA Complaint, have caused certain of Effex's counterparts, prospective counterparts, vendors

13

and prospective vendors to cease completely or to decline to conduct business with Effex and Dittami.

68.     NFA's publication of the Disclosed Trade Secrets has caused prospective counterparts to decline to conduct business with Effex and Dittami.

69.     NFA's publication of the Disclosed Trade Secrets has caused institutional counterparts to advise Effex's counterparts that they will not trade with Effex's counterparts if such counterparts trade with Effex. Effex has been *de facto* blacklisted because of NFA's issuance of the False and Defamatory Statements.

70.     NFA's publication of the Disclosed Trade Secrets has damaged Effex's and Dittami's reputation and caused them substantial monetary harm.

71.     NFA's publication of the Disclosed Trade Secrets has caused firms to refuse to issue positive reviews of Effex or Dittami.

72.     NFA's publication and issuance of the False and Defamatory Statements contained in the Complaint, Decision and Narrative has resulted in a class action being filed in the United States District Court for the Southern District of New York against Effex and Dittami by Vantalie Nguyen on behalf of herself and all others similarly situated, Case No. 17-CV-02729.

73.     NFA's publication of and issuance of the False and Defamatory Statements contained in the Complaint, Decision and Narrative has resulted in commercial banks terminating their relationships with Effex, Dittami, the Trust and Dittami's wife's IRA.

14

## Count I
## Defamation Against all Defendants

74.     Plaintiffs repeat and reiterate paragraphs "1" through "73" above as if fully set forth at length herein.

75.     Defendants have defamed Plaintiffs by knowingly, willfully, or negligently publishing the False and Defamatory Statements regarding Plaintiffs, which they knew or should have known to be false at the time of publication.

76.     A statement is *per se* defamatory if it falsely imputes to another conduct, characteristics, or a condition incompatible with the proper exercise of its lawful business, trade, or profession, or in other words, if it tended to injure plaintiff in its trade or profession.

77.     NFA's False and Defamatory Statements constitute defamation *per se* because they falsely imputed conduct incompatible with the proper exercise of Plaintiffs' rendering of foreign exchange liquidity services.

78.     Defendants knew that their False and Defamatory Statements regarding Effex and Dittami would cause severe damage to the reputation, existing business relationships and business opportunities of Effex and Dittami.

79.     NFA intended that its publication of the False and Defamatory Statements would cause severe damage to the reputation, existing business relationships and business opportunities of Effex and Dittami.

80.     NFA was aware or should have been aware that Effex provided best execution and price.

81.     NFA could have accessed metrics and data from FXCM or Effex confirming Effex's superior and best in class execution services.

15

82.     NFA knew or should have known that its False and Defamatory Statements
would adversely impact the public perception of Effex's pricing and execution services and
benefits, and would cast Effex and Dittami in a false light.

83.     The publication of the False and Defamatory Statements caused substantial
injury to Effex. To wit:

<ol type="a">
<li>numerous liquidity counterparts refused to do business with Effex;</li>
<li>two critical large business partners directed Effex to remove any reference to such entities from Effex's website;</li>
<li>numerous industry publications published stories or statements which mimicked the Narrative and stated that Effex engaged in abusive trade practices and was controlled by FXCM;</li>
<li>various banks refused to trade with Effex due to NFA's revealing Effex had used actual trade data as a price reference;</li>
<li>various Electronic Communication Network vendors essential to Effex's operations have been taking steps to terminate their relationships with Effex;</li>
<li>Effex's ability to conduct business in jurisdictions outside of the United States has been negatively impacted due to prospective counterparts' concerns regarding their respective regulatory regimes' concerns related to doing business with Effex;</li>
<li>various liquidity providers advised FXCM that they would cease providing liquidity services to FXCM in non-U.S. jurisdictions if FXCM utilized Effex as a liquidity provider, thereby causing FXCM to refuse to transact forex business with Effex;</li>
<li>Plaintiffs' bank notified Effex, Dittami, the Trust and Dittami's wife that it was closing all of their accounts in thirty days; and</li>
<li>a class action was filed against Effex and Dittami in the United States District Court for the Southern District of New York which contained many of the same false allegations in the NFA Complaint.</li>
</ol>

84.     The publication of the False and Defamatory Statements has caused
substantial injury to Dittami. Specifically, the False and Defamatory Statements have:

<ol type="a">
<li>impeded Dittami's ability to obtain work from or with NFA Members;</li>
<li>impeded or impaired Dittami's ability to maintain or establish relationships with OTC foreign currency trading firms;</li>
<li>impeded Dittami's ability to obtain references from forex traders; and</li>
<li>damaged Dittami's reputation in the forex industry.</li>
</ol>

16

85.     NFA had no colorable public purpose to disclose the False and Defamatory Statements other than to harm Plaintiffs.

86.     NFA's conduct set forth above was reckless, willful, and grossly negligent.

87.     The actions of NFA were of such a character as to constitute willful, wanton and reckless misconduct and caused serious and substantial harm to the Plaintiffs, resulting in significant and ongoing damages arising from actions referenced in this Complaint.

88.     Furthermore, NFA has acted with such a conscious and flagrant disregard for the rights of Plaintiffs and have deliberately engaged in willful, wanton and reckless disregard for Plaintiffs' rights so as to entitle Plaintiffs to punitive and exemplary damages in an amount sufficient to deter such wrongful conduct from being repeated.

89.     As a result of NFA's publication of the False and Defamatory Statements, Plaintiffs have been damaged in an amount in excess of $10,000,000.00, with the precise amount to be determined at trial. Plaintiffs also seek punitive damages in an amount sufficient to deter similar actions in the future. In addition, Effex requests injunctive relief requiring NFA to: (i) remove the NFA Complaint, Decision, Narrative and Press Release from its website or, in the alternative, delete all references to Effex and Dittami in the Narrative, redact Count I from published versions of the NFA Complaint, redact in its entirety the third paragraph of the Decision; and (ii) issue a new release stating: (a) NFA did not make any findings against Effex or Dittami; (b) Effex was not a *de facto* dealing desk of FXCM; (c) Effex was not controlled by FXCM; and (d) FXCM was not ordered to make any customer restitution.

## Count II
### Injunctive Relief to Prevent Ongoing
### Violation of Due Process of Law Against NFA

90.     Plaintiffs repeat and reiterate paragraphs "1" through "89" above as if fully set forth at length herein.

91.     The Fifth Amendment to the United States Constitution provides: "[N]or shall any person . . . be deprived of life, liberty, or property, without due process of law[.]"

92.     Under the 1974 Act, the CFTC was granted authority to regulate the conduct of persons employed in the futures industry. The CFTC, in turn, has delegated a portion of that authority to NFA, including registration, supervision and discipline.

93.     NFA is subject to the due process requirements of the Fifth Amendment to the Unites States Constitution in connection with disciplining its members and associate members.

94.     When a self-regulatory organization ("SRO"), such as NFA, exercises the self-regulatory power conferred upon it by the 1974 Act, it is engaged in governmental action, federal in character, and is subject to the due process requirements of the Fifth Amendment to the United States Constitution.

95.     NFA acts in conjunction with and with the aid of CFTC in investigating and enforcing federal law, CFTC regulations, and NFA's own rules and standards of fair practice in establishing disciplinary procedures and imposing penalties for violations.

96.     NFA's conduct is subject to the constitutional limitations placed upon official government action when the conduct is intertwined with governmental activity or impregnated with a governmental character.

18

97.     NFA's website publication of the False and Defamatory Statements regarding Plaintiffs, without providing either notice or an opportunity to be heard, or a post-deprivation remedy, violates the due process clause of the Fifth Amendment. In addition to the damages set forth in paragraphs 83 and 84 above, including but not limited to, loss of business opportunities, business relationships and profits, Plaintiffs have been deprived of their constitutionally protected interest in avoiding stigmatization which has prevented Dittami from securing employment.

98.     NFA's regulatory role renders it a state actor liable for damages for violating due process of law.

99.     The imposition of liability on NFA will not cause the government to incur any cost or expense and will not impede or interfere with NFA's ability to regulate and supervise its members.

100.    In violation of the due process clause, NFA has failed to adopt notice and hearing provisions or procedures to intervene, and has failed to provide a post-deprivation remedy for non-members such as Effex and Dittami.

101.    NFA does not provide any due process protections to prevent or redress the type of injury Plaintiffs have suffered.

102.    Plaintiffs were denied due process because they did not receive any prior notice of the NFA Investigation, or an opportunity to be heard pre-deprivation.

103.    As set forth in paragraphs "100," "101" and "102" above, NFA does not provide sufficient safeguards to prevent unconstitutional conduct.

104.     NFA has failed to abide with its constitutional obligation to provide rules ensuring fair notice and hearings to persons aggrieved by the type of conduct which has injured Plaintiffs.

105.     Plaintiffs were denied due process because they did not receive an opportunity to be heard at a post-deprivation name clearing hearing or any other type of hearing or appeal post-deprivation.

106.     Plaintiffs will continue to suffer and incur injury to their business and property, damage to their business reputation and will be further stigmatized by the continued publication by NFA of the False and Defamatory Statements.

107.     Plaintiffs have no adequate remedy under state law.

108.     No prior request for this relief has been made.

109.     For the foregoing reasons, Effex and Dittami request injunctive relief requiring NFA to: (i) remove the NFA Complaint, Decision, Narrative and Press Release from its website or, in the alternative, to provide a name clearing hearing, or in the alternative, delete all references to Effex and Dittami in the Narrative, redact Count 1 from published versions of the NFA Complaint, redact in its entirety the third paragraph of the Decision; and (ii) issue a new release stating: (a) NFA did not make any findings against Effex or Dittami; (b) Effex was not a *de facto* dealing desk of FXCM; (c) Effex was not controlled by FXCM; and (d) FXCM was not ordered to make any customer restitution.

## Count III
## Money Damages to Redress Past Violations of Due Process of Law Under The
### Fifth Amendment of The United States Constitution Against All Defendants

110.    Paragraphs "1" through "109" are repeated and realleged as if set forth fully at length herein.

111.    Plaintiffs have suffered and incurred injuries to their business and property, and damage to their business reputation and have been stigmatized in connection with the loss of their business opportunities, as a result of the defamatory publications on NFA's website.

112.    Plaintiffs were denied due process because they did not receive any prior notice of the NFA Investigation, or an opportunity to be heard pre-deprivation.

113.    Plaintiffs were denied due process because they did not receive an opportunity to be heard at a post-deprivation name clearing hearing or any other type of hearing or appeal post-deprivation.

114.    Defendants' actions set forth above were reckless, willful, negligent and grossly negligent conduct.

115.    NFA's actions were of such a character as to constitute willful, wanton and reckless misconduct which caused serious and substantial harm to the Plaintiffs, resulting in significant and ongoing damages.

116.    Defendants have acted with such a conscious and flagrant disregard for the rights of Plaintiffs and have deliberately engaged in willful, wanton and reckless disregard for Plaintiffs' rights so as to entitle them to punitive and exemplary damages in an amount sufficient to deter such wrongful conduct from being repeated.

21

117.    Plaintiffs have no adequate remedy under applicable state law.

118.    For the foregoing reasons, Plaintiffs are entitled to money damages in an amount in excess of $10,000,000.00, as well as punitive damages with the precise amount to be determined at trial.

### Count IV
### Prima Facie Tort Against All Defendants

119.    Plaintiffs repeat and reiterate the allegations contained in paragraphs "1" through "118" above as if fully set forth at length herein.

120.    The publication of the False and Defamatory Statements was an unlawful act.

121.    The publication of the False and Defamatory Statements was done to harm Effex and Dittami.

122.    Defendants embarked upon an intentional and deliberate campaign to cause harm to Plaintiffs and damage their reputations by disparaging Plaintiffs with the specific intent to interfere with Plaintiffs' business relations with existing counterparts, prospective counterparts, existing vendors, and prospective vendors.

123.    There was no excuse or justification for the utterance of the False and Defamatory Statements.

124.    As a direct and proximate result of Defendants' wrongful conduct, Plaintiffs have and continue to suffer substantial injury and special damages, including the loss of existing counterparts and related income, vendors, and business opportunities with prospective counterparts and vendors.

125.    Defendants' actions set forth above were reckless, willful, negligent and grossly negligent conduct.

126.    The actions of Defendants were of such a character as to constitute willful, wanton and reckless misconduct and caused serious and substantial harm to the Plaintiffs, resulting in significant and ongoing damages arising from actions referenced in this Complaint.

127.    Furthermore, Defendants have acted with such a conscious and flagrant disregard for the rights of Plaintiffs and have deliberately engaged in willful, wanton and reckless disregard for Plaintiffs rights so as to entitle them to punitive and exemplary damages in an amount sufficient to deter such wrongful conduct from being repeated.

128.    As a result of the foregoing *prima facie* tort, Plaintiffs have sustained actual damages in an amount in excess of $10,000,000.00, with the precise amount to be determined at trial, as well as punitive damages in an amount to be determined at trial. In addition, Effex requests injunctive relief requiring NFA to: (i) remove the NFA Complaint, Decision, Narrative and Press Release from its website or, in the alternative, delete all references to Effex and Dittami in the Narrative, redact Count I from published versions of the NFA Complaint, redact in its entirety the third paragraph of the Decision, and (ii) issue a new release stating: (a) NFA did not make any findings against Effex or Dittami; (b) Effex was not a *de facto* dealing desk of FXCM; (c) Effex was not controlled by FXCX; and (d) FXCM was not ordered to make any customer restitution.

23

## Count V
### Abuse of Process Against All Defendants

129.     Plaintiffs repeat and reiterate the allegations contained in paragraphs "1" through "128" above as if fully set forth at length herein.

130.     NFA's issuance and publication of the NFA Complaint constituted process.

131.     NFA published the NFA Complaint to harm Effex and Dittami.

132.     NFA had no justification or excuse for specifically referencing Effex or Dittami in the NFA Complaint, or making the False and Defamatory Statements and characterizing and/or portraying Effex and Dittami in a false light.

133.     NFA mentioned Effex and Dittami in the NFA Complaint to achieve its collateral objective of harming Effex's and Dittami's business relationships and reputation.

134.     The actions of Defendants were of such a character as to constitute willful, wanton and reckless misconduct and caused serious and substantial harm to the Plaintiffs, resulting in significant and ongoing damages arising from actions referenced in this Complaint.

135.     Furthermore, Defendants have acted with such a conscious and flagrant disregard for the rights of Plaintiffs and have deliberately engaged in willful, wanton and reckless disregard for Plaintiffs rights so as to entitle them to punitive and exemplary damages in an amount sufficient to deter such wrongful conduct from being repeated.

136.     As a result of NFA's abuse of process, Plaintiffs seek damages against Defendants in an amount in excess of $10,000,000.00, plus punitive damages, with the precise amount to be determined at trial, and the issuance of a preliminary injunction directing NFA to: (i) remove the NFA Complaint, Decision, Narrative and Press Release

24

from its website or, in the alternative, delete all references to Effex and Dittami in the Narrative, redact Count I from published versions of the NFA Complaint, redact in its entirety the third paragraph of the Decision, and (ii) issue a new release stating: (a) NFA did not make any findings against Effex or Dittami; (b) Effex was not a *de facto* dealing desk of FXCM; (c) Effex was not controlled by FXCM; and (d) FXCM was not ordered to make any customer restitution.

### Count VI
### Interference with Business Relations Against All Defendants

137.    Plaintiffs repeat and reiterate the allegations contained in paragraphs "1" through "136" above as if fully set forth at length herein.

138.    Effex had contracts with various vendors and counterparts including FXCM.

139.    Defendants were aware that Effex had contracts with various vendors and counterparts including FXCM.

140.    Defendants intentionally interfered and induced Effex's vendors and counterparts, including FXCM to cease transacting or otherwise doing business with Effex.

141.    Effex has been damaged as a result of Defendants' interference with Effex's business relations.

142.    The actions of Defendants were of such a character as to constitute willful, wanton and reckless misconduct and caused serious and substantial harm to the Plaintiffs, resulting in significant and ongoing damages arising from actions referenced in this Complaint.

143.     Furthermore, Defendants have acted with such a conscious and flagrant disregard for the rights of Plaintiffs and have deliberately engaged in willful, wanton and reckless disregard for Plaintiffs rights so as to entitle them to punitive and exemplary damages in an amount sufficient to deter such wrongful conduct from being repeated.

144.     The actions of Defendants were of such a character as to constitute willful, wanton and reckless misconduct and caused serious and substantial harm to Plaintiffs, resulting in significant and ongoing damages arising from actions referenced in this Complaint.

145.     As a result of Defendants' interference with Effex's business relations, Effex seeks damages in an amount in excess of $10,000,000.00, plus punitive damages with the precise amount to be determined at trial and attorneys' fees. In addition, Effex requests injunctive relief requiring NFA to: (i) remove the NFA Complaint, Decision, Narrative and Press Release from its website or, in the alternative, delete all references to Effex and Dittami in the Narrative, redact Count I from published versions of the NFA Complaint, redact in its entirety the third paragraph of the Decision, and (ii) issue a new release stating: (a) NFA did not make any findings against Effex or Dittami; (b) Effex was not a *de facto* dealing desk of FXCM; (c) Effex was not controlled by FXCX; and (d) FXCM was not ordered to make any customer restitution.

### Count VII
### Interference with Economic Advantage Against All Defendants

146.     Plaintiff repeats and reiterate the allegations contained in paragraphs "1" through "145" above as if fully set forth at length herein.

147.    Effex had a reasonable expectation of deriving income from acting as a liquidity provider for FXCM and other counterparts throughout the world.

148.    Defendants were aware that Effex had a reasonable expectation deriving income from acting as a liquidity provider for FXCM and other counterparts throughout the world.

149.    Defendants intentionally referred to Effex in the Narrative and Decision in a false and defamatory manner to prevent or impede Effex from acting as a liquidity provider to other counterparts including FXCM.

150.    Defendants' actions have prevented Effex from acting as a liquidity provider to other counterparts including FXCM.

151.    Effex has been damaged as a result of Defendants' interference with Effex's business relations.

152.    The actions of Defendants were of such a character as to constitute willful, wanton and reckless misconduct and caused serious and substantial harm to Plaintiffs, resulting in significant and ongoing damages arising from actions referenced in this Complaint.

153.    Furthermore, Defendants have acted with such a conscious and flagrant disregard for the rights of Plaintiffs and have deliberately engaged in willful, wanton and reckless disregard for Plaintiffs' rights so as to entitle them to punitive and exemplary damages in an amount sufficient to deter such wrongful conduct from being repeated.

154.    As a result of Defendants' interference with Effex's economic advantage, Effex seeks damages in an amount in excess of $10,000,000.00, plus punitive damages with

the precise amount to be determined at trial and attorneys' fees. In addition, Effex requests injunctive relief requiring NFA to: (i) remove the NFA Complaint, Decision, Narrative and Press Release from its website or, in the alternative, delete all references to Effex and Dittami in the Narrative, redact Count I from published versions of the NFA Complaint, redact in its entirety the third paragraph of the Decision, and (ii) issue a new release stating: (a) NFA did not make any findings against Effex or Dittami; (b) Effex was not a *de facto* dealing desk of FXCM; (c) Effex was not controlled by FXCX; and (d) FXCM was not ordered to make any customer restitution.

## Count VIII
### Violation of Illinois Trade Secrets Act

155.    Plaintiff repeats and reiterates the allegations contained in paragraphs "1" through "154" above as if fully set forth at length herein.

156.    NFA acquired the Trade Secrets under circumstances giving rise to a duty to maintain their secrecy.

157.    NFA was aware, or should have been aware, that the Trade Secrets constituted trade secrets under Illinois law.

158.    NFA published the Trade Secrets in violation of *Illinois Trade Secrets Act*, 765 Ill. Comp. Stat. Ann. 1065\1-9(2010).

159.    As a result of NFA's violation of the Illinois Trade Secrets Act, Plaintiffs seek damages in an amount in excess of $10,000,000.00, plus punitive damages with the precise amount to be determined at trial and attorneys' fees. In addition, Effex requests injunctive relief requiring NFA to: (i) remove the NFA Complaint, Decision, Narrative and Press Release from its website or, in the alternative, delete all references to Effex and Dittami

28

in the Narrative, redact Count I from published versions of the NFA Complaint, redact in its entirety the third paragraph of the Decision, and issue a new narrative in a format compatible with NFA's numerous other releases; (ii) issue a new release stating: (a) NFA did not make any findings against Effex or Dittami; (b) Effex was not a *de facto* dealing desk of FXCM; (c) Effex was not controlled by FXCM; and (d) FXCM was not ordered to make any customer restitution.

## RELIEF SOUGHT

Wherefore, in light of the foregoing, Plaintiffs request judgment as follows:

1.     On the first count for defamation, an award of damages in favor of Plaintiffs for defamation against all Defendants, jointly and severally, in an amount in excess of $10,000,000.00, punitive damages in an amount to be determined at trial, and injunctive relief specifically requiring NFA to: (i) remove the NFA Complaint, Decision, Narrative and Press Release from its website or, in the alternative, delete all references to Effex and Dittami in the Narrative, redact Count I from published versions of the Complaint, redact in its entirety the third paragraph of the Decision; and (ii) issue a new release stating: (a) NFA did not make any findings against Effex or Dittami; (b) Effex was not a *de facto* dealing desk of FXCM; (c) Effex was not controlled by FXCM; and (d) FXCM was not ordered to make any customer restitution;

2.     On the second count for injunctive relief arising out of the failure to provide due process, and an order requiring NFA to: (i) remove the NFA Complaint, Decision, Narrative and Press Release from its website or, in the alternative, delete all references to Effex and Dittami in the Narrative, redact Count I from published versions of the Complaint, redact in its entirety the third paragraph of the Decision, or in the alternative provide Effex and Dittami with a name

29

clearing hearing; and (ii) issue a new release stating: (a) NFA did not make any findings against Effex or Dittami; (b) Effex was not a *de facto* dealing desk of FXCM; (c) Effex was not controlled by FXCM; and (d) FXCM was not ordered to make any customer restitution;

3.      On the third count arising out of violations of due process, an award of damages in favor of Plaintiffs and against NFA for violation of Plaintiffs' rights to due process under the Fifth Amendment and damages in an amount in excess of $10,000,000.00, and punitive damages, in an amount to be determined at trial;

4.      On the fourth count seeking relief under the doctrine of *prima facie* tort, an award in favor of Plaintiffs for defamation against all Defendants, jointly and severally, in an amount in excess of $10,000,000.00, and punitive damages in an amount to be determined at trial and injunctive relief requiring NFA to: (i) remove the NFA Complaint, Decision, Narrative and Press Release from its website or, in the alternative, delete all references to Effex and Dittami in the Narrative, redact Count I from published versions of the Complaint, redact in its entirety the third paragraph of the Decision; and (ii) issue a new release stating: (a) NFA did not make any findings against Effex or Dittami; (b) Effex was not a *de facto* dealing desk of FXCM; (c) Effex was not controlled by FXCM; and (d) FXCM was not ordered to make any customer restitution;

5.      On the fifth count for abuse of process an award in favor of Plaintiffs for defamation and against all Defendants, jointly and severally, in an amount in excess of $10,000,000.00, and punitive damages in an amount to be determined at trial and injunctive relief requiring NFA to: (i) remove the NFA Complaint, Decision, Narrative and Press Release from its website or, in the alternative, delete all references to Effex and Dittami in the Narrative, redact Count I from published versions of the Complaint, redact in its entirety the third paragraph of the Decision; and (ii) issue a new release stating: (a) NFA did not make any findings against Effex or Dittami; (b)

30

Effex was not a *de facto* dealing desk of FXCM; (c) Effex was not controlled by FXCM; and (d) FXCM was not ordered to make any customer restitution;

      6.     On the sixth count for interference with business relations, a judgment and award in favor of Effex and against all Defendants, jointly and severally, in an amount in excess of $10,000,000.00, plus punitive damages, with the precise amount to be determined at trial. In addition, Effex requests injunctive relief requiring NFA to: (i) remove the NFA Complaint, Decision, Narrative and Press Release from its website or, in the alternative, delete all references to Effex and Dittami in the Narrative, redact Count I from published versions of the Complaint, redact in its entirety the third paragraph of the Decision; and (ii) issue a new release stating: (a) NFA did not make any findings against Effex or Dittami; (b) Effex was not a *de facto* dealing desk of FXCM; (c) Effex was not controlled by FXCM; and (d) FXCM was not ordered to make any customer restitution;

      7.     On the seventh count for interference with prospective business advantage, an award in favor of Effex, and jointly and severally against all Defendants, in an amount in excess of $10,000,000.00, plus punitive damages, with the precise amount to be determined at trial. In addition, Effex requests injunctive relief requiring NFA to: (i) remove the NFA Complaint, Decision, Narrative and Press Release from its website or, in the alternative, delete all references to Effex and Dittami in the Narrative, redact Count I from published versions of the Complaint, redact in its entirety the third paragraph of the Decision; and (ii) issue a new release stating: (a) NFA did not make any findings against Effex or Dittami; (b) Effex was not a *de facto* dealing desk of FXCM; (c) Effex was not controlled by FXCM; and (d) FXCM was not ordered to make any customer restitution;

31

8.      On the eighth count for violation of Illinois Trade Secrets Act, an award in favor of Effex, and against NFA, in an amount in excess of $10,000,000.00, plus punitive damages, with the precise amount to be determined at trial. In addition, Effex requests injunctive relief requiring NFA to: (i) remove the NFA Complaint, Decision, Narrative and Press Release from its website or, in the alternative, delete all references to Effex and Dittami in the Narrative, redact Count I from published versions of the Complaint, redact in its entirety the third paragraph of the Decision; and (ii) issue a new release stating: (a) NFA did not make any findings against Effex or Dittami; (b) Effex was not a *de facto* dealing desk of FXCM; (c) Effex was not controlled by FXCM; and (d) FXCM was not ordered to make any customer restitution

9.      For such other further and different relief as this Court deems just and proper.


Dated: June 5, 2017                          Respectfully submitted,

                                             EFFEX CAPITAL, LLC and
                                             JOHN DITTAMI

                                             /s/ Adam Goodman
                                             *One of Their Counsel*

                                             Adam Goodman (6229333)
                                             Goodman Tovrov Hardy & Johnson LLC
                                             105 West Madison Street, 15th Floor
                                             Chicago, Illinois 60602
                                             (312) 238-9592
                                             (312) 264-2535 (fax)
                                             agoodman@goodtov.com

                                             Joseph Paykin (will seek admission)
                                             Paykin Krieg & Adams, LLP
                                             2500 Westchester Avenue, Suite 107
                                             Purchase, New York 10577
                                             (212) 725-4428
                                             jpaykin@pka-law.com

Eric W. Berry (2069524)
Berry Law PLLC
5 Columbus Circle, 8th Floor
New York, New York 10019
(212) 355-0777
(212) 750-1371 (fax)
berrylawpllc@gmail.com