**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| In re Global Brokerage, Inc. f/k/a FXCM Inc. Securities Litigation | Master File No. 1:17-cv-00916-RA |
| | CLASS ACTION |
| This Document Relates To: All Actions | |

**MEMORANDUM OF LAW IN OPPOSITION TO**
**DEFENDANTS' MOTION TO STRIKE AND DISMISS PLAINTIFFS'**
**CONSOLIDATED SECURITIES CLASS ACTION COMPLAINT**

## <u>TABLE OF CONTENTS</u>

**Page**

INTRODUCTION ................................................................................................................. 1

STATEMENT OF FACTS ................................................................................................... 4

ARGUMENT ........................................................................................................................ 10

    I.      THE MOTION TO STRIKE SHOULD BE DENIED ......................................... 10

          A.     Defendants' Rule 12(f) Motion Should Be Denied. ................................. 10

          B.     Defendants' Rule 11 Argument is Without Merit.................................... 13

    II.     THE COMPLAINT STATES A CLAIM UNDER SECTION 10(b)................... 16

          A.     The Complaint Sufficiently Pleads Materially False or Misleading
                Statements Made by Defendants......................................................... 17

               1.     Defendants' Statements Concerning FXCM's NDD
                        Platform Were False or Misleading. ............................... 17

               2.     Defendants' Statements Concerning Effex's Purported
                        Order Flow Payments to FXCM Were False or Misleading......... 20

               3.     Defendants' False Statements to the NFA Demonstrate
                        Falsity and Scienter...................................................... 22

               4.     Defendants' Financial Statements Were False and
                        Misleading and Violated GAAP. .................................... 22

               5.     Defendants' Statements After August 2014 Were False and
                        Misleading........................................................... 27

          B.     The Complaint Sufficiently Pleads Defendants' Scienter. ...................... 28

                1.     Plaintiffs Adequately Allege Scienter Against Niv, Ahdout
                        and Lande. ...................................................... 28

                2.     Plaintiffs Adequately Allege Scienter Against FXCM. ............... 31

    III.    THE COMPLAINT ADEQUATELY ALLEGES CONTROL-PERSON
          LIABILITY UNDER SECTION 20(a)................................................... 32

    IV.    THE COURT SHOULD NOT TAKE JUDICIAL NOTICE OF
          DEFENDANTS' EXHIBITS............................................................. 36

CONCLUSION.............................................................................................................. 38

i

## TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Acco Ltd. v. Rich Kids Jean Corp.*,
  15 Civ. 7425 (JSR), 2016 WL 3144053 (S.D.N.Y. Apr. 11, 2016)............................ 10, 11, 15

*Aldridge v. A.T. Cross Corp.*,
  284 F.3d 72 (1st Cir. 2002) ...................................................................................... 25

*ATSI Commc'ns, Inc. v. Shaar Fund, Ltd.*,
  493 F.3d 87 (2d Cir. 2007)........................................................................................ 38

*Barberan v. Nationpoint*,
  706 F. Supp. 2d 408 (S.D.N.Y. 2010)....................................................................... 36

*C.f. Fait v. Regions Fin. Corp.*,
  655 F.3d 105 (2d Cir. 2011)....................................................................................... 19

*Can., Inc. v. Aspen Tech., Inc.*,
  544 F. Supp. 2d 199 (S.D.N.Y. 2008)....................................................................... 33

*Chechele v. Scheetz*,
  466 Fed. Appx. 39 (2d Cir. 2012) ............................................................................. 37

*Chill v. General Elec. Co.*,
  101 F.3d 263 (2d Cir. 1996)................................................................................. 25, 28

*City of Westland Police and Fire Ret. Sys. v. MetLife, Inc.*,
  928 F. Supp. 2d 705 (S.D.N.Y. 2013)................................................................. 19, 33

*CompuDyne Corp. v. Shane*,
  453 F. Supp. 2d 807 (S.D.N.Y. 2006)....................................................................... 32

*De La Fuente v. DCI Telecomms., Inc.*,
  259 F. Supp. 2d 250 (S.D.N.Y. 2003).................................................................. 14, 15

*Degulis v. LXR Biotech., Inc.*,
  928 F. Supp. 1301 (S.D.N.Y. 1996).......................................................................... 32

*Difolco v. MSNBC Cable LLC*,
  66 F.3d 104 (2d Cir. 2010)........................................................................................ 38

*Dura Pharms., Inc. v. Broudo*,
  544 U.S. 336 (2005)................................................................................................... 16

*ECA & Local 134 IBEW Joint Pension Trust of Chi. v. JP Morgan Chase Co.*,
  553 F.3d 187 (2d Cir. 2009)...................................................................................... 28

*Emilio v. Sprint Spectrum, L.P.*,
  68 F. Supp. 3d 509 (S.D.N.Y. 2014)......................................................................... 10

*Faulkner v. Beer*,
  463 F.3d 130 (2d Cir. 2006)................................................................................. 36, 37

ii

*Fleischer v. A.A.P., Inc.*,
    180 F. Supp. 717 (S.D.N.Y. 1959) ........................................................................ 15

*Footbridge Ltd. Trust v. Countrywide Home Loans, Inc.*,
    2010 WL 3790810 (S.D.N.Y. Sept. 28, 2010) .................................................... 12

*Glaser v. The9, Ltd.*,
    772 F. Supp. 2d 573 (S.D.N.Y. 2011) .................................................................. 28

*Guevoura Fund v. Sillerman*,
    15 Civ. 7192 (CM), 2016 WL 4939372 (S.D.N.Y. Sept. 12, 2016) ...................... 32

*Harris v. AmTrust Fin. Servs., Inc.*,
    No. 14-CV-736 VEC, 2015 WL 5707235 (S.D.N.Y. Sept. 29, 2015) .................... 26

*Ho v. Duoyuan Glob. Water, Inc.*,
    887 F. Supp. 2d 547 (S.D.N.Y. 2012) .................................................................. 12

*In re Ambac Fin. Grp., Inc. Sec. Litig.*,
    693 F. Supp. 2d 241 (S.D.N.Y. 2010) ............................................................ 25, 27

*In re Atlas Air Worldwide Holdings, Inc. Sec. Litig.*,
    324 F. Supp. 2d 474 (S.D.N.Y. 2004) .................................................................. 30

*In re Bear Stearns Mortgage Pass-Through Certificates Litig.*,
    851 F. Supp. 2d 746 (S.D.N.Y. 2012) ...................................................... 11, 12, 15

*In re BioScrip, Inc. Sec. Litig.*,
    95 F. Supp. 3d 711 (S.D.N.Y. 2015) .................................................................... 35

*In re Burlington Coat Factory Sec. Litig.*,
    114 F.3d 1410 (3d Cir. 1997) .............................................................................. 27

*In re China Educ. Alliance, Inc. Sec. Litig.*,
    No. CV 10–9239, 2011 WL 4978483 (C.D. Cal. Oct. 11, 2011) .......................... 12

*In re Connetics Corp. Sec. Litig.*,
    542 F. Supp. 2d 996 (N.D. Cal. 2008) ................................................................ 14

*In re Connetics Corp. Sec. Litig.*,
    No. C 07-02940-SI, 2008 WL 3842938 (N.D. Cal. Aug. 14, 2008) ...................... 14

*In re CRM Holdings, Ltd. Sec. Litig.*,
    2013 WL 787970 (S.D.N.Y. Mar. 4, 2013) .......................................................... 12

*In re Dynex Capital Inc. Sec. Litig.*,
    2009 WL 3380621 (S.D.N.Y. Oct. 19, 2009) ...................................................... 31

*In re Fairway Grp. Holding Corp. Sec. Litig.*,
    No. 14 Civ. 0950(LAK)(AJP), 2015 WL 249508 (S.D.N.Y. Jan. 20, 2015) .......... 25

*In re Fannie Mae 2008 Sec. Litig.*,
    742 F. Supp. 2d 382 (S.D.N.Y. 2010) .................................................................. 26

*In re Flag Telecom Holdings, Ltd. Sec. Litig.*,
    352 F. Supp. 2d 429 (S.D.N.Y. 2005) .................................................................. 35

*In re Galena Biopharma, Inc. Sec. Litig.*,
   117 F. Supp. 3d 1145 (D. Or. 2015) ................................................................. 30

*In re Global Crossing, Ltd. Sec. Litig.*,
   322 F.Supp.2d 319 (S.D.N.Y. 2004)................................................................... 27

*In re Hi-Crush Ptrs. L.P. Sec. Litig.*,
   No. 12 Civ. 8557(CM), 2013 WL 6233561 (S.D.N.Y. Dec. 2, 2013)................... 31

*In re Inv. Tech. Grp., Inc. Sec. Litig.*,
   No. 15 Civ. 6369 (JFK), 2017 WL 1498055 (S.D.N.Y. Apr. 26, 2017)................. 33

*In re JPMorgan Chase Sec. Litig.*,
   363 F. Supp. 2d 595 (S.D.N.Y. 2005)................................................................. 30

*In re LDK Solar Sec. Litig.*,
   584 F. Supp. 2d 1230 (N.D. Cal. 2008) ............................................................. 25

*In re Marsh & Mclennan Cos. Sec. Litig.*,
   501 F. Supp. 2d 452 (S.D.N.Y. 2006)........................................................... 26, 32

*In re Merrill Lynch & Co. Research Reports Sec. Litig.*,
   218 F.R.D. 76 (S.D.N.Y. 2003) ........................................................................ 12

*In re Morgan Stanley Info. Fund Sec. Litig.*,
   592 F.3d 347 (2d Cir. 2010)............................................................................. 37

*In re Nature's Sunshine Prod. Sec. Litig.*,
   486 F. Supp. 2d 1301 (D. Utah 2007)................................................................ 30

*In re OSG Sec. Litig.*,
   12 F. Supp. 3d 619 (S.D.N.Y. 2014)...................................................... 11, 12, 14

*In re Pennie & Edmonds LLP*,
   323 F.3d 86 (2d Cir. 2003)............................................................................... 13

*In re Platinum & Palladium Commodities Litig.*,
   828 F. Supp. 2d 588 (S.D.N.Y. 2011)................................................................ 12

*In re Refco, Inc. Sec. Litig.*,
   503 F. Supp. 2d 611 (S.D.N.Y. 2007)................................................................ 29

*In re Reserve Fund Sec. & Derivative Litig.*,
   732 F.Supp.2d 310 (S.D.N.Y. 2010).................................................................. 31

*In re Rhodia S.A. Sec. Litig.*,
   531 F. Supp. 2d 527 (S.D.N.Y. 2007)................................................................ 33

*In re Silver Wheaton Corp. Sec. Litig.*,
   No. CV15-5146-CAS(JEMX), 2016 WL 3226004 (C.D. Cal. June 6, 2016) ....... 25

*In re Solucorp Indus. Sec. Litig.*,
   98 Civ. 3248 (LMM), 2000 WL 1708186 (S.D.N.Y. Nov. 15, 2000)................... 34

*In re Tronox, Inc. Sec. Litig.*,
   09 Civ. 6220 (SAS), 2010 WL 2835545 (S.D.N.Y. June 28, 2010)..................... 34

*In re Virtus Inv. Partners, Inc. Sec. Litig.*,
  195 F. Supp. 3d 528 (S.D.N.Y. 2016) .......................................................................... 33

*In re WorldCom*,
  294 F. Supp. 2d 392 (S.D.N.Y. 2003) .......................................................................... 36

*Kalnit v. Eichler*,
  264 F.3d 131 (2d Cir. 2001) ......................................................................................... 28

*Kuriakose v. Fed. Home Loan Mortg. Corp.*,
  897 F. Supp. 2d 168 (S.D.N.Y. 2012) .......................................................................... 26

*Lawrence v. Wilder Richman Sec. Corp.*,
  417 Fed. Appx. 11 (2d Cir. 2010) ................................................................................ 13

*Leonard F. v. Isr. Disc. Bank of N.Y.*,
  199 F.3d 99 (2d Cir. 1999) ........................................................................................... 36

*Lipsky v. Commonwealth United Corp.*,
  551 F.2d 887 (2d Cir. 1976) ............................................................................. 10, 11, 12

*Mangiafico v. Blumenthal*,
  471 F.3d 391 (2d Cir. 2006) ......................................................................................... 38

*McIntire v. China MediaExpress Holdings, Inc.*,
  927 F. Supp. 2d 105 (S.D.N.Y. 2013) .......................................................................... 12

*Menaldi v. Och-Ziff Capital Mgmt. Grp. LLC*,
  164 F. Supp. 3d 568 (S.D.N.Y. 2016) .................................................................... 34, 36

*Novak v. Kasaks*,
  216 F.3d 300 (2d Cir. 2000) .............................................................................. 16, 25, 28

*Operating Local 649 Annuity Trust Fund v. Smith Barney Fund Mgmt. LLC*,
  595 F.3d 86 (2d Cir. 2010) .................................................................................... 16, 17

*OTG Brands, LLC v. Walgreen Co.*,
  13- Civ. 9066 (ALC), 2015 WL 1499559 (S.D.N.Y. Mar. 31, 2015 ...................................... 10

*Prostic v. Xerox Corp.*,
  B-90-113 (EBB), 1991 WL 208441 (D. Conn. July 19, 1991) ............................................. 35

*Provenz v. Miller*,
  102 F.3d 1478 (9th Cir. 1996) ...................................................................................... 26

*Roth v. Jennings*,
  489 F.3d 499 (2d Cir. 2007) ......................................................................................... 37

*RSM Prod. Corp. v. Fridman*,
  643 F. Supp. 2d 382 (S.D.N.Y. 2009) .......................................................................... 12

*Russo v. Bruce*,
  777 F. Supp. 2d 505 (S.D.N.Y. 2011) .......................................................................... 22

*SEC v. Lee*,
  720 F. Supp. 2d 305 (S.D.N.Y. 2010) .................................................................... 11, 14

*Shields v. Citytrust Bancorp, Inc.*,
    25 F.3d 1124 (2d Cir. 1994) ........................................................................................ 19

*South Ferry LP v. Killinger*,
    542 F.3d 776 (9th Cir. 2008) ...................................................................................... 31

*Star Mark Mgmt., Inc. v. Koon Chun Hing Kee Soy & Sauce Factory, Ltd.*,
    682 F.3d 170 (2d Cir. 2012) ........................................................................................ 13

*Streit v. Bushnell*,
    424 F. Supp. 2d 633 (S.D.N.Y. 2006) ........................................................................ 27

*Suez Equity Investors, L.P. v. Toronto-Dominion Bank*,
    250 F.3d 87 (2d Cir. 2001) .......................................................................................... 31

*Szulik v. Tagliaferri*,
    966 F. Supp. 2d 339 (S.D.N.Y. 2013) ........................................................................ 30

*Teamsters Local 445 Freight Div. Pension Fund v. Dynex Capital, Inc.*,
    531 F.3d 190 (2d Cir. 2008) ........................................................................................ 32

*United States v. Gilbert*
    668 F.2d 94 (2d Cir. 1981) .......................................................................................... 11

*Va. Bankshares v. Sandberg*,
    501 U.S. 1083 (1991) .................................................................................................. 19

*Vanleeuwen v. Keyuan Petrochemicals Inc.*,
    13 Civ. 6057 (PAC), 2014 WL 3891351 (S.D.N.Y. Aug. 8, 2014) ............................ 14

*VNB Realty Inc. v. Bank of Am. Corp.*,
    11 Civ. 6805 (DLC), 2013 U.S. Dist. LEXIS 132250 (S.D.N.Y. Sept. 16, 2013) ................. 11

**Statutes**

15 U.S.C. § 78u-4(b)(1) .................................................................................................... 16

15 U.S.C. § 78u-4(b)(2) .................................................................................................... 16

**Rules**

Fed. R. Civ. P. 11 .............................................................................................................. 14

Fed. R. Civ. P. 11(b)(3) .............................................................................................. 13, 15

Fed. R. Civ. P. 11(c)(2) .................................................................................................... 13

Fed. R. Civ. P. 12(b)(6) ........................................................................................ 27, 36, 37

Fed. R. Civ. P. 12(f) .................................................................................................... 10, 12

**Regulations**

17 C.F.R. § 210.4-01(a)(1) ............................................................................................... 23

Lead Plaintiffs 683 Capital Partners, LP and Shipco Transport Inc., and named plaintiffs Sergey Regukh and Brian Armstrong ("Plaintiffs") respectfully submit this memorandum of law in opposition to Defendants' Motion to Strike and Dismiss Plaintiffs' Consolidated Securities Class Action Complaint ("Motion").  ECF No. 89.

## INTRODUCTION

This is a class action on behalf of investors in the public securities of FXCM Inc. (now known as Global Brokerage, Inc.).[1]  FXCM knowingly and repeatedly assured FXCM investors that the Company's "No Dealing Desk" ("NDD") platform would provide its customers with a foreign exchange ("forex") trading platform that was free of conflicts of interest.  While other forex trading platforms traditionally allowed companies to take positions opposite their own customers, FXCM assured its clients that it would have ***no financial interest*** in NDD trades.  Rather, FXCM would merely act as an agent, collect small markups, and route customers' trades to banks and other independent "market makers" that provided liquidity to the platform.

These representations were false.  Instead, the Company secretly developed a high-frequency trading algorithm to use on its platform to trade against unsuspecting customers.  As FXCM's secret trading algorithm neared completion, the Company's compliance department voiced serious concerns with the propriety of trading against FXCM's customers while explicitly promoting the NDD platform as "conflict-free."  To circumvent these concerns, Defendants spun off the trading system as a new, "independent" company, Effex Capital, LLC ("Effex").  However, this was nothing more than a workaround – a sham designed to hide the fact that the Company was actively taking positions opposite its customers.  In truth: (i) FXCM created Effex; (ii) the former FXCM Managing Director who created the trading algorithm was tabbed to

---

[1] The company was known as FXCM Inc. at all relevant times for the purposes of this case. Together with its subsidiaries, the company is referred to herein as "FXCM" or the Company.

helm Effex; and (iii) the financial arrangements between FXCM and Effex were devised to continue the profit-sharing agreement FXCM had with its former Managing Director.   The Company operated for years under this arrangement, taking approximately 70% of the profits Effex earned from trading against FXCM customers on the NDD platform, all while continuing to promote the NDD platform and its "agency model" as a conflict-free trading environment for retail forex trading customers.   The profit-sharing payments were disguised in FXCM's financial statements as "order flow" payments to disguise the arrangement from investors and regulators.

Eventually, regulators caught on to FXCM's ploy.   Both the U.S. Commodity Futures Trading Commission ("CFTC") and National Futures Association ("NFA") brought regulatory actions against FXCM and conducted in-depth investigations into the Company's undisclosed relationship with Effex.   The CFTC found that FXCM engaged in false and misleading solicitations of its customers by concealing FXCM's relationship with Effex and misrepresenting that its NDD platform had no conflicts of interest with its customers.   As a result of these investigations, the CFTC and NFA reached a settlement with FXCM and certain of its high-ranking executives.   Under the settlement agreements, the CFTC and NFA issued certain findings of fact and conclusions of law, and FXCM was fined $7 million and banned from operating in the U.S.   In light of the shocking allegations and penalties, the price of FXCM's stock dropped sharply, losing more than half of its value and damaging investors.

Defendants' motion to strike and dismiss Plaintiffs' Complaint is without merit.   Their motion to strike misapplies the relevant case law and requires the Court to ignore Plaintiffs' well-supported allegations.   Defendants' Rule 11 motion suffers from blatant procedural defects and similar substantive shortcomings – neither the law nor the substance of the Complaint merit dismissal, striking the pleading, or sanctions of any kind.

2

Likewise, Defendants' motion to dismiss falls short and must be denied.  Defendants concede each of the elements of Plaintiffs' securities fraud claim save for falsity and scienter, but the Complaint clearly alleges facts supporting each of these elements.  Defendants attempt to distract the Court with spurious arguments and seek to contest the truth of the matters asserted in Plaintiffs' Complaint, but a simple consideration of the facts alleged reveals Plaintiffs have more than satisfied their burden at the pleading stage.  Plaintiffs have alleged well-supported facts demonstrating years of repeated false and misleading statements by Defendants.  With respect to scienter, Defendants virtually concede that they had full knowledge of the facts constituting the misconduct alleged by Plaintiffs – they contend only that those facts do not amount to misconduct.  Defendants will have a full and fair opportunity to contest the interpretation and truth of the facts alleged at a later stage in this case, but such protestations are misplaced and inappropriate on a motion to dismiss.  Accepting Plaintiffs' allegations as true and granting Plaintiffs all due inferences, the Complaint clearly states each element of a securities fraud claim, including falsity and scienter.

Finally, Plaintiffs also adequately alleged control-person liability.  Plaintiffs' allegations establish a primary violation, control of the primary violator by the individual defendants, and that the controlling persons were culpable participants in the primary violation.  Accordingly, the Complaint alleges sufficient control and culpable conduct related to the alleged securities fraud.  Defendants' motion to dismiss the Section 20(a) claims against the Individual Defendants should be denied in its entirety.

## STATEMENT OF FACTS

This is a federal securities class action on behalf of a putative class consisting of all persons and entities who purchased or otherwise acquired publicly traded FXCM securities from March 15, 2012 to February 6, 2017, both dates inclusive (the "Class Period"). This action was commenced on February 7, 2017 against the Company and certain of its officers, and directors, for violations under the Securities Exchange Act of 1934 (the "Exchange Act"). After the Court consolidated this action with related actions and appointed 683 Capital Partners, LP and Shipco Transport Inc. as Lead Plaintiffs, ECF No. 47, Plaintiffs invested considerable time and resources into further investigating their claims against Defendants. Plaintiffs filed the Consolidated Securities Class Action Complaint (the "CAC" or "Complaint") on June 19, 2017. ECF No. 48.

FXCM provides online forex trading and related services to retail and institutional customers worldwide through its subsidiaries. The Complaint alleges that during the Class Period, FXCM knowingly misled investors by falsely claiming that its customers who transacted on FXCM's NDD platform would be free from conflicts of interest because FXCM would not have any financial interest in the trade. ¶2.[2] Whereas a dealing desk broker acts as a market maker and may be trading against the customer's position, FXCM touted that its "agency model" eliminated that conflict of interest. In FXCM's agency model, price quotations were provided by banks and other third-party market makers and FXCM served merely as a credit intermediary, entering into offsetting trades with both the customer and the market maker. ¶60. FXCM purportedly made money through the bid/ask spread, adding a small markup to the bid/ask

---

[2] All references to "¶__" are to the CAC, ECF No. 48. Capitalized terms, unless otherwise defined, shall have the same meaning as those used in the CAC. All emphases are added and all internal citations and quotations are omitted unless otherwise noted.

quotes received from its customers and liquidity providers.  ¶61.  Naturally, this model was highly appealing to OTC forex trading customers, quickly becoming the centerpiece of FXCM's trading platform and marketing efforts.  ¶¶62-63.  However, FXCM was not satisfied with its limited role and sought to take advantage of its NDD customers.

In 2009, Defendants devised a plan to capitalize on the Company's NDD clients through the use of a high frequency trading algorithm. This algorithm would completely replace or supplant many of the independent market makers on the NDD platform and allow FXCM to cash in twice on its customers – first from its publicly disclosed mark-ups, then from its own secret trading via the algorithm.  ¶64.  The Company hired a high-frequency trader, John Dittami, to a Managing Director position in October 2009, with the intent for Dittami to create a new algorithmic trading system for FXCM.  FXCM and Dittami entered into a contract promising Dittami 30% of profits generated by the trading system, with FXCM keeping the other 70%. ¶66.  In early 2010, Dittami completed development of the trading system.  ¶65.

As Dittami was finalizing his trading algorithm, concerns arose in FXCM's Compliance department that trading against the Company's retail customers would contradict its marketing statements about the purportedly conflict-free NDD platform.  ¶67.  In response to these valid concerns, on March 23, 2010, the Company spun off Dittami's trading system as Effex, a supposedly "external" or "independent" market maker for FXCM.  ¶68.  Dittami "resigned" from FXCM on April 14, 2010 to helm Effex, but he and the Company agreed that his resignation would not change their economic relationship, including FXCM retaining 70% of Dittami's (now Effex's) algorithmic trading profits.  FXCM also retained the intellectual property rights to the algorithmic trading platform's software.  ¶69.

To hide the true nature of their relationship, the two companies entered into services agreements by which Effex would make monthly payments to FXCM.  These payments were ostensibly based on trading volume, but in reality they were calculated to approximate 70% of Effex's profits from trading on FXCM's retail forex platform against FXCM's retail customers. ¶70.  To get Effex started, FXCM also: (1) gave Effex a $2 million interest-free loan; (2) allowed Effex to use FXCM's prime broker through a "prime of prime" account; (3) allowed Dittami and Effex to continue working from FXCM's offices rent-free for a full year; (4) allowed Effex to use Dittami's trading algorithm, which was FXCM's intellectual property; (5) allowed Effex to use FXCM's servers and email systems; and (6) gave bonuses, reimbursed by Effex, to two FXCM employees for their work assisting Effex, one of whom spent about 80% of his work week at Effex's offices.  ¶¶71-73.

Pursuant to their services agreement, FXCM sent Effex monthly invoices for "order flow," which were to be paid by Effex to FXCM Holdings, a holding company owned by FXCM which in turn owned FXCM's U.S. subsidiary.  ¶74.  The payments were made to FXCM Holdings, which was not a member of the NFA in an effort to avoid scrutiny from the NFA. ¶77.  Effex made consistent payments to FXCM via this arrangement.  In 2011, the payment rates were adjusted due to tightening spreads in the forex market.  This was a way to compensate for Effex's lower profitability and to maintain the 70-30 profit split between FXCM and Effex. ¶74.

These "order flow" payments were at all times a complete sham.  From 2010 to 2014, no market maker besides Effex paid FXCM for order flow.  In truth, these payments were merely kickbacks of FXCM's cut of profits generated by Effex from trading against FXCM's retail customers.  ¶75.  FXCM even viewed Effex's trading profits and losses ("P&L") as its own, less

Effex's 30 percent share.  FXCM calculated its monthly preliminary P&L statement, in part, by taking Effex's monthly P&L and simply subtracting 30 percent.  ¶76.

To ensure success of this charade, , FXCM granted a number of advantages to Effex compared to other market makers trading on FXCM's platform.  FXCM permitted Effex to win all "ties" with other market makers; provided Effex with a real-time view of price quotations offered by other market makers; and added smaller markups to Effex's prices than to prices provided by other market makers.  ¶78.  FXCM also allowed Effex to use a hold timer that enabled Effex to execute a trade at the start or end of a hold timer period, whichever was better for Effex (and worse for FXCM's customers on the opposite side of the trades).  ¶79.  Effex also used a "previous quote" practice, using FXCM's inside knowledge of a customer's least favorable acceptable trade quote to ensure that it was getting the most favorable end of the bargain.  ¶80.  Thanks in no small part to these home field advantages, Effex routinely captured over 50% of FXCM's daily order flow and, at one time, captured nearly 80%.  From 2010 through 2014, this added up to nearly $80 million in payments from Effex to FXCM.  ¶82.

While FXCM was secretly profiting from trading against its own customers through its arrangement with Effex, it was maintaining the public façade that its NDD model was free of those very same conflicts of interest.  Time and time again, through public filings with the U.S. Securities and Exchange Commission ("SEC") as well as FXCM's marketing efforts, Defendants touted FXCM's superior "agency model" and its NDD platform.  *See, e.g.,* ¶¶121, 133, 143, 152, 159, 162, 185, 206, 208, 226, 228, 248-255.  Defendants also repeatedly claimed to be receiving payments from market makers for "order flow."  ¶¶124, 134-35, 143-44, 152, 160, 162, 169, 186, 188, 199, 208.  In fact, the supposed "order flow" payments they received were merely disguised profit-sharing payments per FXCM's arrangement with Effex, and not a single market

maker other than Effex ever remitted such "order flow" payments to FXCM.  ¶¶70, 75.  Quite simply, Defendants lied to draw in customers and they lied to deceive investors.

On February 6, 2017, the CFTC announced that it banned the Company from operating in the U.S. after finding that FXCM was taking undisclosed positions opposite its retail customers. ¶85.  The CFTC's Order (attached to the CAC as Exhibit 1) required FXCM and Defendants Niv and Ahdout to pay a $7 million civil penalty, cease and desist from further violations of the Commodity Exchange Act and CFTC Regulations, and withdraw from CFTC registration – never to seek re-registration.  FXCM, Niv and Ahdout were also banned from acting in any capacity requiring registration or exemption from registration, or acting as a principal, agent, officer, or employee of any person that is registered, required to be registered, or exempted from registration with the CFTC.  *Id.*  The CFTC Order found that, from 2009 through *at least* 2014, FXCM engaged in false and misleading solicitations of its customers by concealing its relationship with Effex, and by misrepresenting that its NDD platform had no conflicts of interest with its customers.  The Order also found FXCM, FXCM Holdings, and Niv responsible for making false statements to the NFA about FXCM's relationship with Effex.  *Id.*

The CFTC Order made a number of explicit findings against Defendants.[3]  Specifically, the CFTC found that (1) FXCM had an undisclosed interest in Effex – and thus was taking positions opposite FXCM's retail customers; (2) FXCM formulated a plan in 2009 to create an algorithmic trading system to make markets for FXCM's customers, competing with the independent market makers on FXCM's NDD platform; (3) although FXCM eventually spun off the algorithmic trading system as Effex, Effex remained closely aligned with FXCM; and (4)

---

[3] Defendants reserved their right to object to the findings presented in the CFTC Order in other proceedings, such as this one, and neither admitted nor denied the findings therein.  However, the statements in the CFTC Order still constitute the official findings of the CFTC.

Effex received special trading privileges, benefitted from a no-interest loan provided by FXCM, worked out of FXCM's offices, and used FXCM employees to conduct its business. *Id.* The CFTC also found that Effex agreed to rebate FXCM 70% of its trading revenues earned on FXCM's retail forex platform, totaling approximately $77 million from 2010 through 2014. The CFTC also found that FXCM willfully made false statements to NFA in order to conceal FXCM's role in the creation of Effex, the fact that Effex's owner had been an FXCM employee and managing director, and other details of FXCM's relationship with Effex. *Id.*

On the same day the CFTC issued its press release and order, the NFA's Business Conduct Committee issued a complaint (the "NFA Complaint," attached to the CAC as Exhibit 2) and entered its own order against FXCM, Niv, Ahdout, and Ornit Niv. The NFA likewise made factual findings that Defendants committed the violations alleged in the complaint, including that FXCM's NDD execution model was corrupted by the Company's control and relationship with Effex, and ordered that FXCM and the individual defendants be withdrawn from NFA membership and forever barred from reapplying. ¶86.

On February 6, 2017, the Company issued a press release disclosing the settlements with the NFA and CFTC and announcing that FXCM would withdraw from doing business in the U.S. and sell its U.S. customer accounts to GAIN Capital Holdings, Inc. ("GAIN"). ¶87. On this news, prices of FXCM's publicly traded securities dropped precipitously, causing significant losses to investors. ¶¶88-89. On February 21, 2017, Niv resigned as CEO and from the FXCM board of directors, and FXCM changed its name to Global Brokerage Inc. ¶91.

## ARGUMENT

## I.   THE MOTION TO STRIKE SHOULD BE DENIED

### A.   Defendants' Rule 12(f) Motion Should Be Denied.

Defendants' motion to strike the Complaint's allegations referring to or relying on the CFTC Order and NFA Complaint should be denied because Defendants: (1) fail to satisfy the requirements of Rule 12(f); and (2) misread the relevant caselaw in support of the motion.

As a threshold matter, "motions to strike are viewed with disfavor and infrequently granted." *Acco Ltd. v. Rich Kids Jean Corp.*, 15 Civ. 7425 (JSR), 2016 WL 3144053, *1 (S.D.N.Y. Apr. 11, 2016) (quoting *Emilio v. Sprint Spectrum, L.P.*, 68 F. Supp. 3d 509, 514 (S.D.N.Y. 2014)).  In fact, a movant under Rule 12(f) bears the heavy burden of demonstrating that "(1) no evidence in support of the allegations would be admissible; (2) that the allegations have no bearing on the issues in the case; and (3) that to permit the allegations to stand would result in prejudice to the movant."  *OTG Brands, LLC v. Walgreen Co.*, 13- Civ. 9066 (ALC), 2015 WL 1499559, *5 (S.D.N.Y. Mar. 31, 2015).  Here, Defendants fail to even argue, much less satisfy, their heavy burden with respect any of the requirements set forth above. Consequently, the motion to strike should be denied for this reason alone.

Defendants also argue that in *Lipsky v. Commonwealth United Corp.*, 551 F.2d 887 (2d Cir. 1976) the Second Circuit adopted the broad rule that a complaint may never reference allegations from a separate proceeding that has not been decided on the merits.  Def. Mem. at 15.[4]  However, Defendants' argument was squarely rejected by former District Judge Scheindlin, who succinctly explained that "no Second Circuit precedent indicates such a broad rule."  *In re*

---

[4] References to "Def. Mem." are to Defendants' Memorandum of Law in Support of Defendants' Motion to Strike and Dismiss Plaintiffs' Consolidated Securities Class Action Complaint, ECF No. 89.

*OSG Sec. Litig.*, 12 F. Supp. 3d 619, 622 (S.D.N.Y. 2014).  While it is true that in 1976 the Second Circuit held that "neither a complaint nor references to a complaint which results in a consent judgment may properly be cited in the pleadings under the facts of this case" *Lipsky*, 551 F.2d at 893, Defendants ignore the fact that the *Lipsky* opinion emphasized the general rule that motions to strike pleadings as immaterial should be denied "unless it can be shown that no evidence in support of the allegation would be admissible." *Id.*  As Judge Scheindlin recently explained, "*Lipsky* did not hold that a complaint may never reference allegations from a separate proceeding under any circumstances. Instead, its holding was limited to complaints that ultimately resulted in a consent decree or *nolo contendere* plea protected by FRE 410." *OSG*, 12 F. Supp. 3d at 621.[5]

Indeed, in *United States v. Gilbert*, the Second Circuit clarified that while a civil consent decree may be barred as evidence to prove liability by the Federal Rules of Evidence, those same rules "specifically permit[] use of such evidence for other purposes."  668 F.2d 94, 97 (2d Cir. 1981) (citing *Lipsky*, 551 F.2d 887).  This approach makes intuitive sense as well: "It makes little sense to say that information . . . which [the complaint] could unquestionably rely on if it were mentioned in a news clipping . . . is immaterial simply because it is conveyed in an unadjudicated complaint." *Bear Stearns*, 851 F. Supp. 2d at 768.[6]  Consequently, the motion to

---

[5] Numerous other decisions are in accord.  *Acco*, 2016 WL 3144053 at n.3 ("no Second Circuit precedent indicates such a broad rule.") (quoting *OSG*, 12 F. Supp. 3d 619, 620 (S.D.N.Y. 2014)); *In re Bear Stearns Mortgage Pass-Through Certificates Litig.*, 851 F. Supp. 2d 746, n.24 (S.D.N.Y. 2012); *SEC v. Lee*, 720 F. Supp. 2d 305, 340 (S.D.N.Y. 2010) ("There is no absolute rule barring a private plaintiff from relying on government pleadings and proceedings in order to meet the Rule 9(b) and PSLRA thresholds."); *cf. VNB Realty Inc. v. Bank of Am. Corp.*, 11 Civ. 6805 (DLC), 2013 U.S. Dist. LEXIS 132250, at *9-10 (S.D.N.Y. Sept. 16, 2013) ("A close reading of *Lipsky* reveals that it does not mandate the elimination of material from a complaint simply because the material is copied from another complaint.").

[6] Courts in this District have also repeatedly held that it is appropriate to rely on short seller reports (which do not have the imprimatur of a regulatory body) in formulating a complaint, and

strike should be denied for the very same reasons Judge Scheindlin denied a nearly identical

motion in *OSG*:

> while settlements are inadmissible as evidence of liability, they are admissible for
> other purposes, including proof of knowledge. It follows that reference to the
> complaints or allegations in such actions would be permissible for the same
> reasons. Thus, it would make little sense to strike references to pleadings in
> ongoing actions, which do not trigger the protections or policy concerns of FRE
> 410 or FRE 408. In other words, while allegations from another lawsuit are not
> evidence and cannot be introduced in a later trial for collateral estoppel purposes,
> plaintiffs need not provide admissible proof at this stage. In fact, the Federal
> Rules of Civil Procedure permit discovery on relevant matters that appear
> reasonably calculated to lead to the discovery of admissible evidence.

12 F. Supp. 3d at 622.[7]

---

that the reliability of such a report is not a question for a motion to dismiss. *McIntire v. China MediaExpress Holdings, Inc.*, 927 F. Supp. 2d 105, 123 (S.D.N.Y. 2013); *Ho v. Duoyuan Glob. Water, Inc.*, 887 F. Supp. 2d 547, 563 (S.D.N.Y. 2012); *see also In re China Educ. Alliance, Inc. Sec. Litig.*, No. CV 10–9239, 2011 WL 4978483, *4 (C.D. Cal. Oct. 11, 2011).

[7] Defendants' other cited authority is without merit. Similar to *Lipsky*, where the underlying allegations were struck as pertaining to wholly unrelated SEC Filings, *In re Merrill Lynch & Co. Research Reports Sec. Litig.*, 218 F.R.D. 76 (S.D.N.Y. 2003), struck allegations that were "irrelevant to Plaintiffs' claim that the Focus Twenty Fund bought certain stocks in order to enhance Merrill Lynch's investment banking business. Conflicts of interest and litigation concerning stocks that the Fund *never held* have no place in a complaint that would be too long even without such tangents." *Id.* at 78. Following the *Merill Lynch* decision and its subsequent broad language concerning the ability to strike documents under *Lipsky*, the Courts in *In re CRM Holdings, Ltd. Sec. Litig.*, 2013 WL 787970 (S.D.N.Y. Mar. 4, 2013), *In re Platinum & Palladium Commodities Litig.*, 828 F. Supp. 2d 588 (S.D.N.Y. 2011), *Footbridge Ltd. Trust v. Countrywide Home Loans, Inc.*, 2010 WL 3790810 (S.D.N.Y. Sept. 28, 2010), and *RSM Prod. Corp. v. Fridman*, 643 F. Supp. 2d 382 (S.D.N.Y. 2009) all adopted the broad language and interpolated a very broad interpretation of *Lipsky*. However, those opinions have been criticized by courts in this District for stretching the holding of *Lipsky*. *See, e.g., Bear Stearns*, 851 F. Supp. 2d at n.24 ("Nonetheless, some courts in this district have stretched the holding in *Lipsky* to mean that any portion of a pleading that relies on unadjudicated allegations in another complaint is immaterial under Rule 12(f). Neither Circuit precedent nor logic supports such an absolute rule.") (citing *RSM Prod. Corp.*, 643 F. Supp. 2d at 403); *OSG*, 12 F. Supp. 3d at n.8 ("Many lower courts have interpreted this dicta [from *Lipsky*] to preclude any reference to an action or complaint that has not yet been decided on the merits. . . However, several district courts have recognized the limited holding of *Lipsky* and the illogic of a bright line rule against citing allegations from other proceedings.").

### B.      Defendants' Rule 11 Argument is Without Merit

As an initial matter, Defendants' Rule 11 motion is procedurally improper for two reasons.  First, a party moving for Rule 11 sanctions must do so in a filing "made separately from any other motion."  Fed. R. Civ. P. 11(c)(2).  "The safe-harbor provision is a strict procedural requirement."  *Star Mark Mgmt., Inc. v. Koon Chun Hing Kee Soy & Sauce Factory, Ltd.*, 682 F.3d 170 (2d Cir. 2012).  Defendants have plainly not filed their Rule 11 motion separately here. Second, Rule 11 "provides a 'safe harbor' in that the motion … must not be filed until the alleged violator is afforded twenty-one days to withdraw or correct the offending document." *Lawrence v. Wilder Richman Sec. Corp.*, 417 Fed. Appx. 11, 12 (2d Cir. 2010); *see also In re Pennie & Edmonds LLP*, 323 F.3d 86, 89 (2d Cir. 2003) (Rule 11's "safe harbor" provision "functions as a practical time limit, and motions have been disallowed as untimely when filed after a point in the litigation when the lawyer sought to be sanctioned lacked an opportunity to correct or withdraw the challenged submission").  Defendants have failed both strict procedural requirements of Rule 11 and thus their motion under that Rule must be summarily disregarded.

To the extent that the Court nevertheless considers Defendants' Rule 11 arguments, Defendants' motion is substantively lacking as well.  Defendants argue that "Plaintiffs and their counsel did not conduct any independent investigation with respect to the merits of the allegations," Def. Mem. at 19, but this completely baseless and utterly incorrect argument is belied by the face of the complaint itself.  Specifically, a pleading complies with Rule 11 when it specifies that the allegations "will likely have evidentiary support after a reasonable opportunity for further investigation or discovery."  Fed. R. Civ. P. 11(b)(3). Plaintiffs' complaint alleges precisely that well-founded allegation, and consequently complies with Rule 11.  *See, e.g.*, ¶2.

Furthermore, courts in this District have consistently rejected Defendants' argument that relying on regulatory complaints constitutes a failure to adequately investigate the underlying facts of a litigation.  *See, e.g., De La Fuente v. DCI Telecomms., Inc.*, 259 F. Supp. 2d 250, 260 (S.D.N.Y. 2003) ("The striking similarity between the SEC's allegations and plaintiff's allegations does not demonstrate that plaintiff lacked evidentiary support. Rather, the SEC allegations provided plaintiff with evidentiary support."); *SEC v. Lee*, 720 F. Supp. 2d at 341 ("[Plaintiff's] acknowledgement and reliance on the SEC and CFTC allegations does not demonstrate that it lacks evidentiary support, but rather provides it with the necessary evidentiary support."); *Vanleeuwen v. Keyuan Petrochemicals Inc.*, 13 Civ. 6057 (PAC), 2014 WL 3891351, *4 (S.D.N.Y. Aug. 8, 2014) ("Plaintiffs appropriately relied on the SEC complaint in pleading scienter and therefore state a claim under Section 10(b)"); *cf. OSG*, 12 F. Supp. 3d at 622 ("[P]laintiffs may plead facts contained in the [the document from another litigation] upon information and belief, and find admissible evidence to support those allegations at a later stage.") (citing Fed. R. Civ. P. 11).

Indeed, Defendants' own cited authority illustrates the futility of their argument here.  In *In re Connetics Corp. Sec. Litig.*, 542 F. Supp. 2d 996 (N.D. Cal. 2008), the court struck allegations based *exclusively* on an SEC complaint.  However, the court gave the plaintiffs leave to replead and subsequently explained that "the Court [previously] held that plaintiffs could not rely '*entirely* on another complaint as the *sole* basis for [their] allegations,' as plaintiffs had acknowledged doing." *In re Connetics Corp. Sec. Litig.*, No. C 07-02940-SI, 2008 WL 3842938, *4 (N.D. Cal. Aug. 14, 2008) (emphases in original). In denying the motion to strike the subsequent complaint premised on the same underlying SEC complaint, the *Connetics* court found relevant the inclusion of confidential witness information as well as the indication that the

"allegations in [the] complaint 'are based upon information and belief'' . . . such that additional evidentiary support may be forthcoming after further investigation and discovery." *Id.*, 2008 WL 3842938 at *4 (citing Fed. R. Civ. P. 11(b)(3)).  As Defendants concede in a footnote, Plaintiffs' Complaint in this case satisfies the relevant standard.  Def. Mem. at 19, n.10.

Moreover, striking the allegations related to the CFTC Order and the NFA Complaint pursuant to Defendants' arguments makes "little sense" as the Complaint "could unquestionably rely on [the information] if it were mentioned in a news clipping or public testimony."  *Bear Stearns*, 851 F. Supp. 2d at n.24.  As noted in *De La Fuente*, "The PSLRA does not require that a plaintiff re-invent the wheel before filing a complaint; and one could argue that a complaint predicated on the results of an SEC investigation has far more 'evidentiary support' than one based on rumor and innuendo gleaned from 'Heard on the Street.'" 259 F. Supp. 2d at 260.

Finally, in a self-contradictory argument, Defendants rely on a civil complaint filed by Effex against the NFA as a basis for striking allegations relating to the NFA Complaint from the Complaint.  However, "even assuming *arguendo* that [the allegation] was in some way factually inaccurate or incomplete, 'the grounds for a motion to strike  . . . do not include falsity of the matter alleged.'" *Acco*, 2016 WL 3144053, at *3 (quoting *Fleischer v. A.A.P., Inc.*, 180 F. Supp. 717, 721 (S.D.N.Y. 1959)) (emphasis in original).

Here, Plaintiffs have used the CFTC Order and the NFA Complaint to bolster the allegations in the Complaint obtained through public analyst and news reports as well as information provided by a confidential witness and the public filings of Defendant FXCM. Plaintiffs do not solely rely on a single source of evidence for the allegations, as the initial *Connetics* court found improper, nor do Plaintiffs solely rely on the work of regulators as Defendants contend.   Instead, Plaintiffs used all available information, including the CFTC

Order and the NFA Complaint, in order to adequately satisfy the pleading standards of Rule 9(b) and the PSLRA.  Moreover, Plaintiffs believe that substantial evidentiary support will exist after a reasonable opportunity to investigate during discovery.  ¶2.  Accordingly, Defendants' motion to strike should be denied in its entirety.

## II.    THE COMPLAINT STATES A CLAIM UNDER SECTION 10(b)

To state a claim under § 10(b) of the Exchange Act, plaintiffs must allege that the defendants, in connection with the purchase or sale of a security, made a materially false or misleading statement or omitted a material fact, with scienter, and that reliance on defendants' statements caused injury to the plaintiffs. *Operating Local 649 Annuity Trust Fund v. Smith Barney Fund Mgmt. LLC*, 595 F.3d 86, 92 (2d Cir. 2010).  The Private Securities Litigation Reform Act of 1995 ("PSLRA") further requires that a § 10(b) claim must "'specify'" each false statement, explain "'the reason or reasons why the statement [was] misleading,'" and "'state with particularity facts giving rise to a strong inference'" of scienter.  *Novak v. Kasaks*, 216 F.3d 300, 306-07 (2d Cir. 2000) (quoting 15 U.S.C. § 78u-4(b)(1) and (b)(2)); *Dura Pharms., Inc. v. Broudo*, 544 U.S. 336, 345 (2005).  Defendants lob a bevy of inaccurate and inapposite distractions at the Court in their Motion, but ultimately Plaintiffs' allegations of Defendants' clear, knowing fraud stand for themselves.  Plaintiffs' Complaint adequately pleads all the elements of a § 10(b) claim.[8]

---

[8] Defendants expressly concede that Plaintiffs have successfully pled the elements of materiality, loss causation, and damages, Def. Mem. at 22 n.11 and 25 n.12, and do not challenge any other required elements of a § 10(b) claim other than falsity and scienter.

## A. The Complaint Sufficiently Pleads Materially False or Misleading Statements Made by Defendants.

When evaluating the allegations of the CAC, the Court must accept all facts alleged therein as true and draw all reasonable inferences in favor of Plaintiffs. *See Operating Local 649 Annuity Trust Fund v. Smith Barney Fund Mgmt. LLC*, 595 F.3d 86, 91 (2d Cir. 2010). Plaintiffs' allegations, taken as true, clearly evince the false and misleading nature of Defendants' public statements.

At the heart of Plaintiffs' allegations lies the primary fraud in this case: FXCM knowingly or recklessly misled investors by falsely claiming that its customers who transacted on FXCM's "No Dealing Desk" ("NDD") platform would be free from conflicts of interest because FXCM would not be on the other side of the trade or have any financial interest in the trade. ¶2. In reality, FXCM had an undisclosed financial interest in the market maker that consistently "won" the largest share of FXCM's NDD trading volume, Effex Capital, LLC ("Effex"). Effex was essentially a front created by FXCM, allowing the Company to hold positions opposite its customers and financially benefit at its customers' expense. ¶5. Accordingly, FXCM's unfettered promotion of its purportedly conflict-free NDD platform, along with its statements concerning its relationship with Effex, were demonstrably false and misleading throughout the Class Period.

### 1. Defendants' Statements Concerning FXCM's NDD Platform Were False or Misleading.

The most rampant falsehood throughout Defendants' statements is FXCM's characterization of its NDD platform as conflict-free, touting it as an "agency model." Defendants fixate upon Plaintiffs' use of block quotes, Def. Mem. at 23-24, but Plaintiffs' use of lengthy selections is quite necessary as each is positively replete with false or misleading

17

statements concerning FXCM's purported agency model. For example, in many of these statements Defendants claim that: (1) the agency model "aligns our interests with those of our customers and reduces our risks;" (2) that FXCM acts "as a credit intermediary, or riskless principal," and (3) that its profits are generated "by adding a markup to the price provided by the FX market makers and … based on the volume of transactions and the spread earned on transactions." ¶¶121, 133, 143, 152, 159, 162, 185, 206, 208, 226, 228. Each of these oft-repeated statements was false or misleading because Defendants' claims were belied by FXCM's undisclosed relationship with Effex. Due to the Effex relationship, FXCM's interests were ***not*** aligned with those of its customers; its risks were ***higher*** than they would be without that relationship; FXCM was ***not*** acting as simply a credit intermediary or riskless principal; and it was earning trading profits passed on through its arrangement with Effex, who actively traded ***against*** FXCM's unwitting customers.

Defendants propound that "Plaintiffs cannot seriously contend that FXCM did not primarily offer customers an agency model to execute trades; that FXCM did not enter into offsetting trades with both the customer and the FX market maker; and that FXCM did not charge a markup and earn trading fees and commissions," Def. Mem. at 25, but that is ***precisely*** what Plaintiffs have alleged. FXCM did ***not*** primarily offer customers an agency model because its relationship with Effex placed its interests opposite from its customers. FXCM did enter offsetting trades and charged a markup and earned trading fees and commissions, but those statements were misleading because they imply that was the full extent of FXCM's role, while in truth FXCM *also* took positions adverse to its customers via Effex and earned profits from such trading. ¶5.

Defendants also attempt to hide behind the opinion/fact dichotomy with regard to Defendants' statements that "*we believe* that [the agency model] aligns our interests with those of our customers." This argument is meritless and does not preclude liability. To the extent that these statements were couched as opinions, such statements "can be actionable under the securities laws if the speaker knows the statement to be false." *C.f. Fait v. Regions Fin. Corp.*, 655 F.3d 105, 112 (2d Cir. 2011) (quoting *Shields v. Citytrust Bancorp, Inc.*, 25 F.3d 1124, 1131 (2d Cir. 1994) (in turn citing *Va. Bankshares v. Sandberg*, 501 U.S. 1083, 1094–96 (1991))). In this case, contrary to Defendants' assertions, Def. Mem. at 26-27, Plaintiffs have alleged facts showing that Defendants did not genuinely hold their professed opinions when the statements were made because Defendants knew those statements to be false. Defendants knew of FXCM's relationship with Effex at all relevant times, and it was that relationship that rendered their statements false. ¶5 ("Effex was essentially a front created by FXCM"), ¶6 ("Effex was an FXCM-backed startup firm that was dreamed up, created, and financed by FXCM"), ¶8 ("FXCM created Effex as a separate stand-alone company … in order to conceal FXCM's economic interest in Effex"), ¶9 ("FXCM incorporated Effex and installed Dittami at its helm, but continued to own the trading system, finance the business, and maintain a 70% interest in all profits of Effex"). Whether the statements are characterized as opinion or fact, Plaintiffs have alleged facts showing that Defendants knew them to be false or misleading at the time they were made and thus did not believe those statements to be true. *City of Westland Police and Fire Ret. Sys. v. MetLife, Inc.*, 928 F. Supp. 2d 705, 717 (S.D.N.Y. 2013) ("the company knew … or at least was aware that it had no reasonable basis for believing the estimates. … This is sufficient to plead that MetLife either did not believe the accuracy of its statements or actually knew that there was no reasonable basis for its estimates, which amounts to much the same thing.").

Defendants also contest the factual validity of Plaintiffs' allegations, *see e.g.,* Def. Mem. at 27, but such arguments are inappropriate at the pleading stage.   Defendants' unsupported assertions directly contradict Plaintiffs' allegations, which the Court must accept as true on a motion to dismiss.   Defendants claim FXCM's interests remained aligned with NDD customers, but the Complaint alleges that through its relationship with Effex, FXCM "was taking undisclosed positions opposite its retail customers."   ¶85.   Defendants claim that the Services Agreement between FXCM and Effex was unconnected to the profits or losses of FXCM customers, the order flow payments were based solely on trading volume, and FXCM did not take positions opposite its NDD customers via Effex.[9]   However, the Complaint explicitly alleges that Effex's payments to FXCM under the Services Agreement were intended "to approximate 70 percent of Effex's profits from trading on FXCM's retail forex platform against FXCM's retail customers," and that "these payments were not order flow payments, but rather pre-negotiated kickbacks of FXCM's cut of profits generated by Effex from trading against FXCM's retail customers on the NDD platform."   ¶¶70, 75.   That FXCM did not *directly* assume any market positions and did act as a credit intermediary does not neutralize the misleading implications of Defendants' statements that FXCM was an entirely disinterested facilitator.

### 2.   Defendants' Statements Concerning Effex's Purported Order Flow Payments to FXCM Were False or Misleading.

Another false refrain repeated throughout Defendants' statements was that "[i]ncome earned on order flow represents payments received from certain FX market makers in exchange for routing trade orders to these firms for execution," and that the Company's retail trading

---

[9] Defendants make this and other claims concerning the "Services Agreement," but have at no point filed this agreement publicly, nor have they attached this purported agreement to their motion papers.  If Defendants decline to supply the Court with the relevant document, it is entirely inappropriate for them to argue on a motion to dismiss that its contents contradict Plaintiffs' allegations.

revenue is driven in part by "payments we receive for order flow from FX market makers." ¶¶124, 134-35, 143-44, 152, 160, 162, 169, 186, 188, 199, 208.  Defendants' contention that order flow agreements in general are not illegal misses the point entirely.  Plaintiffs allege not that FXCM was receiving "illegal" order flow payments, but that the purported "order flow" payments were mere pretext for the Company's profit-sharing agreement with Effex.  As the Complaint alleges, these supposed order flow payments were intended to disguise payments approximating 70% of Effex's trading profits.[10]  ¶70.  In fact, these "order flow" payments were adjusted in September 2011 due to tightening spreads in the forex market, to compensate for Effex's lower profitability and maintain the agreed-upon division of Effex's trading profits.  ¶74.

Defendants are correct that "Plaintiffs do not, and cannot, dispute that FXCM repeatedly disclosed to investors (and customers) that it had pay-for-flow agreements with liquidity providers."  Def. Mem. at 28.  What Defendants conveniently neglect to mention is that Plaintiffs allege those disclosures were ***themselves*** false and misleading.  Specifically, the Complaint alleges that "From 2010 to 2014, no market maker besides Effex paid FXCM for order flow. In truth, these payments were not order flow payments, but rather pre-negotiated kickbacks of FXCM's cut of profits generated by Effex from trading against FXCM's retail customers on the NDD platform."  ¶75.  Thus, Defendants' statements concerning "order flow" payments from market makers were inherently false and misleading because the "order flow" payments were actually just profit-sharing with Effex and ***no*** other market maker (much less ***multiple*** "market makers") paid FXCM for order flow.  As Plaintiffs allege, FXCM's SEC filings were false and

---

[10] Defendants assert that Plaintiffs contradict themselves by alleging that "Effex paid $21 per million notional volume" rather than 70% of profits, Def. Mem. at 34, n.17, but Defendants simply misread the Complaint.  Plaintiffs explicitly spell out in the Complaint that "FXCM intended this [$21 per million] amount to approximate 70 percent of Effex's profits," and how the payments were reduced to $16 per million "to compensate for Effex's lower profitability and to maintain the agreed upon 70% / 30% division of profits between FXCM and Effex." ¶¶70, 74.

misleading because they concealed FXCM's relationship with Effex, including the true nature of the "order flow" payments as proxies for profit-sharing.  ¶¶126, 130, 136, 140, 146, 150, 153, 157, 163, 167, 174, 178, 183, 189, 193, 200, 204, 209, 213, 220, 224, 229, 233, 242, 246.

In short, Defendants categorically misconstrue Plaintiffs' allegations.  Plaintiffs do not allege that FXCM had a duty to disclose the identity of its liquidity provider or the source of its "order flow" payments.  Rather, Plaintiffs allege that the statements Defendants made concerning order flow payments from Effex were false or misleading for the reasons detailed above.

### 3.  Defendants' False Statements to the NFA Demonstrate Falsity and Scienter.

Plaintiffs' allegations that "FXCM and Defendant Niv made false statements to the NFA about the Company's relationship with Effex," speak to both the falsity and scienter inquiries. These allegations speak to falsity because they provide additional support for the allegations that Defendants' statements to customers and investors were false and misleading, as Defendants maintained the same false and misleading positions regarding FXCM's relationship with Effex in their statements to the NFA and to customers and investors.  The allegation that Defendants lied to the NFA also corroborates Plaintiffs' allegation that Defendants' statements, to the extent they expressed opinions rather than facts, were nevertheless subjectively false and misleading.  "The Court notes that in a case such as this one, which concerns [opinion] statements … the scienter inquiry tends to merge with the falsity inquiry."  *Russo v. Bruce*, 777 F. Supp. 2d 505, 521 n.3 (S.D.N.Y. 2011).  The allegations that Defendants lied to the NFA are also relevant to the scienter inquiry, discussed further in part II(B)(2), *infra*.

### 4.  Defendants' Financial Statements Were False and Misleading and Violated GAAP.

Plaintiffs' allegations of Defendants' GAAP violations go beyond mere accounting irregularities and, together with allegations of scienter, are sufficient to state a securities fraud

claim.   As the Complaint alleges, Defendants stated that FXCM's financial statements were prepared according to GAAP.   ¶¶127, 137, 147, 154, 164, 175, 190, 201, 210, 221, 230, and 243. SEC, NYSE, and NASDAQ rules and regulations require that publicly traded companies such as FXCM include financial statements that comply with GAAP in their annual and quarterly reports filed with the SEC. *See* Section 13 of the Exchange Act; SEC Rule 10-01(d) of Regulation S-X. SEC Rule 4-01(a) of Reg. S-X states that "[f]inancial statements filed with the Commission which are not prepared in accordance with generally accepted accounting principles will be presumed to be misleading or inaccurate." 17 C.F.R. § 210.4-01(a)(1).

GAAP requires reporting entities to consolidate and make disclosures about Variable Interest Entities ("VIEs"). Accounting Standards Codification ("ASC") 810, Consolidation.   An entity is a VIE when certain criteria are met, including when (1) the nominal owners of the entity are unable to make decisions about the entity's activities that have significant effect on the success of the entity, and (2) the nominal owners do not fully participate in the entity's residual returns.   ASC 810-10-15-14.   A reporting entity is required to consolidate a VIE if it will absorb or receive the majority of the VIE's expected losses or returns, or both.   ASC 810-25-38.   This reporting entity is known as the primary beneficiary.   Plaintiffs allege that Effex was a VIE, and FXCM was the primary beneficiary with regard to Effex, because FXCM was entitled to and did receive 70% of Effex's profits.   ¶¶69-70, 74, 106-108.   As the primary beneficiary, FXCM was also required to disclose the nature, purpose, size and activities of the VIE it should have consolidated.   ASC 810-10-50-3.   In this case, such disclosures would have revealed the true nature of FXCM's relationship with Effex.   Therefore, the financial reports Defendants filed that failed to consolidate and disclose Effex as a VIE were false and misleading.

Even if FXCM was not required to consolidate Effex as a VIE, Effex would still be a related party of FXCM subject to disclosure requirements.  GAAP and Regulation S-K require the Company to disclose all material related party transactions.  "Related party transactions" include those between "an enterprise and its principal owners, management, or members of their immediate families" and those between a company and its "affiliates." ASC 850-10-05-3. "Affiliate" includes any company that, directly or indirectly through one or more intermediaries, controls, is controlled by, or is under common control with an enterprise. ASC 850-10-20.

Effex was an affiliate of, and thus a related party to FXCM.  Required disclosures of related party transactions must include, among other things, the nature of the relationship involved and a description of the transactions for each period for which income statements are presented and such other information necessary to an understanding of the effects of the transactions on the financial statements.  ASC 850-10-50-1.  Plaintiffs allege that: (a) Effex was founded for the purpose of creating the appearance of an independent company under the direction of FXCM, ¶68; (b) Effex was funded by an interest-free loan by FXCM, ¶71; (c) Effex was required to turn over 70% of its profits to FXCM, ¶70; (d) Effex operated out of FXCM's offices rent free, ¶71; (e) certain FXCM employees worked the majority of their time for Effex, ¶73; (f) all of Effex's business and revenue was either generated through FXCM or was dependent on FXCM to provide the pricing and transaction data to engage in its business, ¶83; and (g) FXCM paid bonuses to its employees who assisted Effex on account of their work for Effex, ¶73.  These allegations demonstrate that FXCM controlled Effex, which was a related party for GAAP purposes, and therefore FXCM should have disclosed the true nature of the relationship between the two companies and a description of the transactions between the two.

Although "allegations of GAAP violations or accounting irregularities, *standing alone*, are insufficient to state a securities fraud claim," courts have found such allegations sufficient if "coupled with evidence of 'corresponding fraudulent intent.'" *Novak*, 216 F.3d at 309 (quoting *Chill v. General Elec. Co.*, 101 F.3d 263, 270 (2d Cir. 1996)); *In re Ambac Fin. Grp., Inc. Sec. Litig.*, 693 F. Supp. 2d 241, 273 (S.D.N.Y. 2010); *In re Fairway Grp. Holding Corp. Sec. Litig.*, No. 14 Civ. 0950(LAK)(AJP), 2015 WL 249508, at *15 (S.D.N.Y. Jan. 20, 2015). Indeed when the court finds "evidence of 'corresponding fraudulent intent,' GAAP violations may themselves give rise to a strong inference of scienter." *Ambac Fin. Grp.*, 693 F. Supp. 2d at 273 n.38. In this case, Plaintiffs have alleged ample facts supporting a strong inference of scienter. *See* part II(B), *infra*. Plaintiffs' allegations that Defendants violated GAAP by failing to consolidate Effex into FXCM's financial statements and failing to disclose its dealings with Effex as related party transactions plainly assert particularized false and misleading statements. These claims, coupled with Plaintiffs' scienter allegations, are sufficient to state a claim for securities fraud.

Defendants also claim that because FXCM did not restate its financial reports during the Class Period and its auditor signed off on its reports, the Court should not find that they made false statements with scienter. Def. Mem. at 32-34. In general, though, "the fact that the financial statements for the year in question were not restated does not end [plaintiff's] case when [plaintiff] has otherwise met the pleading requirements of the PSLRA." *Aldridge v. A.T. Cross Corp.*, 284 F.3d 72, 83 (1st Cir. 2002) (upholding complaint alleging securities fraud even in light of auditor's subsequent clean audit opinion on allegedly misstated financial results); *In re Silver Wheaton Corp. Sec. Litig.*, No. CV15-5146-CAS(JEMX), 2016 WL 3226004, at *11 (C.D. Cal. June 6, 2016) (considering and rejecting the argument that clean audit report absolved defendants); *In re LDK Solar Sec. Litig.*, 584 F. Supp. 2d 1230, 1246 (N.D. Cal. 2008) (same);

*see also Provenz v. Miller*, 102 F.3d 1478, 1490 (9th Cir. 1996) (reversing grant of summary judgment even though defendant had worked with auditor to ensure financial statements were accurate).

Defendants' cases on the subject are inapposite. In *Harris v. AmTrust Fin. Servs., Inc.*, No. 14-CV-736 VEC, 2015 WL 5707235, at *10 and n.29 (S.D.N.Y. Sept. 29, 2015), the plaintiffs pointed to neither objective facts suggesting that the defendants' accounting position was incorrect, nor to any government action calling the accounting position into question. Likewise in *Kuriakose v. Fed. Home Loan Mortg. Corp.*, 897 F. Supp. 2d 168, 181 (S.D.N.Y. 2012), the court found that "Plaintiffs have not alleged facts to support an inference that Freddie Mac was unreasonable in its [accounting] judgments." *See also In re Marsh & Mclennan Cos. Sec. Litig.*, 501 F. Supp. 2d 452, 477 (S.D.N.Y. 2006) ("Notably missing are specific examples of fraudulent accounting practices utilized by MMC, citations to GAAP provisions prohibiting MMC's accounting practices, or reference to any cases finding violations of GAAP on the basis of actions similar to those alleged by Plaintiffs."); *In re Fannie Mae 2008 Sec. Litig.*, 742 F. Supp. 2d 382, 408 (S.D.N.Y. 2010) ("Plaintiffs do not allege sufficient facts to establish that Fannie's financial statements were false at the time they were issued.").  Here, on the other hand, Plaintiffs point to specific facts showing Defendants knew their stated accounting position to be false at all relevant times, Plaintiffs cite specific GAAP provisions Defendants violated, and the CFTC Order and NFA Complaint both include findings of fact supporting Plaintiffs' allegations.

Defendants argue that there is an "absence of either an ownership interest, voting rights, or a variable interest based upon Effex's profit and loss," and thus FXCM did not control Effex and Effex was not a VIE or related party.  Def. Mem. at 34.  Defendants are off base for two reasons.  First, as detailed above, the Complaint clearly alleges those very facts which

Defendants claim to be absent.  Second, Defendants do not argue that Plaintiffs' allegations, taken as true, do not amount to actionable GAAP violations, they merely argue against Plaintiffs' factual allegations.  On a motion to dismiss, the Court considers Plaintiffs' allegations as true and must not pay heed to Defendants' counterfactual arguments at this stage.  *Streit v. Bushnell*, 424 F. Supp. 2d 633, 641 (S.D.N.Y. 2006) ("[Defendant's] argument ignores an elementary threshold governing Rule 12(b)(6) motions to dismiss: that, regardless of the defendant's denials and contrary versions of the underlying events, it is the plaintiff's account of the facts that the Court must accept as true").  To the extent Defendants attempt to challenge the truth of Plaintiffs' allegations, rather than their sufficiency if given their due deference, their motion must fail.  At the very least, the parties' disagreements over GAAP compliance raise issues of fact that cannot be resolved on a motion to dismiss. *Ambac Fin. Grp.*, 693 F. Supp. 2d at 273 (citing *In re Burlington Coat Factory Sec. Litig.*, 114 F.3d 1410, 1421 (3d Cir. 1997) (reversing 12(b)(6) dismissal because "it is a factual question whether [the company's] accounting practices were consistent with GAAP") and *In re Global Crossing, Ltd. Sec. Litig.*, 322 F.Supp.2d 319, 338–39 (S.D.N.Y. 2004) (finding sufficiency of allegations of GAAP violations "cannot be determined in advance of development of the record")).

### 5.  Defendants' Statements After August 2014 Were False and Misleading.

Defendants completely mischaracterize Plaintiffs' allegation that FXCM stated in its 14Q3 10-Q filing that, as of August 1, 2014, the Company "no longer receive[d] payments for order flow."  ¶199.  Rather than alleging this statement as a true fact, which in Defendants' eyes "is not subject to any credible dispute," Def. Mem. at 34, the *very next sentence* in the Complaint disavows that statement as false and misleading.  ¶200.  As explained in the Complaint and in part II(A)(2), *supra*, this statement was false and misleading because FXCM never really received payments for order flow in the first place – only pretextual payments approximating

Effex's profits from trading against FXCM customers. Plaintiffs allege that FXCM's public filings after August 2014 were still false and misleading because "from September 4, 2009 *through at least 2016*," FXCM concealed its relationship with Effex and misrepresented that its NDD platform had no conflicts of interest with its customers. The CFTC Order supports this allegation, stating that FXCM's misconduct continued "through *at least* 2014." ECF No. 28-2, at 2. Thus, Defendants' statement, which Plaintiffs allege is false and misleading, provides no basis for dismissing allegations of false statements made after August 2014.

## B.    The Complaint Sufficiently Pleads Defendants' Scienter.

A plaintiff properly alleges scienter "either (a) by alleging facts to show that defendants had both motive and opportunity to commit fraud, or (b) by alleging facts that constitute strong circumstantial evidence of conscious misbehavior or recklessness." *Kalnit v. Eichler*, 264 F.3d 131, 138-39 (2d Cir. 2001). The Second Circuit has held that scienter is established "where the complaint sufficiently alleges that the defendants (1) benefitted in a concrete and personal way from the fraud; (2) engaged in deliberately illegal behavior; (3) knew facts or had access to information suggesting that their public statements were not accurate; or (4) failed to check information they had a duty to monitor." *ECA & Local 134 IBEW Joint Pension Trust of Chi. v. JP Morgan Chase Co.*, 553 F.3d 187, 199 (2d Cir. 2009); *see also Glaser v. The9, Ltd.*, 772 F. Supp. 2d 573, 586-88 (S.D.N.Y. 2011). In other words, "[a]n egregious refusal to see the obvious, or to investigate the doubtful [can support] an inference of . . . recklessness." *Chill*, 101 F.3d at 269.

### 1.    Plaintiffs Adequately Allege Scienter Against Niv, Ahdout and Lande.

Scienter can be inferred when an executive has "access to information" that would reveal the fraud. *Novak*, 216 F.3d at 311; *In re Refco, Inc. Sec. Litig.*, 503 F. Supp. 2d 611, 652

(S.D.N.Y. 2007) (scienter be imputed to a CFO where an obviously fraudulent transaction "would have" appeared on the company's books and records).  Here, Niv, Ahdout, and Lande each had abundant access to information revealing the fraud in this case – the true nature of FXCM's relationship with Effex.  In fact, Defendants do not dispute that Niv, Ahdout, and Lande had access to information concerning FXCM's relationship with Effex, they merely protest that the revealing information did not render their statements false.  *See* Def. Mem. at 27.  On a motion to dismiss, when Plaintiffs' allegations are taken as true, Defendants' concession that they knew of the alleged underlying facts is sufficient to allege scienter.  That Defendants interpret those underlying facts differently is irrelevant to scienter analysis and inappropriate at the pleading stage.

Beyond asserting mere access to revealing information, Plaintiffs allege that Niv and Ahdout, together with others at FXCM "devised a plan to capitalize on FXCM's NDD clients" via the algorithmic trading system that would become Effex.  ¶64.  The Complaint also alleges specifically that, according to a former FXCM employee, "Niv, Ahdout [and], to a lesser extent, CFO Robert Lande had control over Effex Capital."  ¶84.  Further, the Complaint quotes the CFTC's press release, which states "FXCM, *under Niv's and Ahdout's direction and control*, misrepresented to its retail forex customers that when they traded forex on FXCM's No Dealing Desk platform, FXCM would have no conflict of interest, the [CFTC] Order finds."  ¶85.  These allegations go to show that not only did Niv, Ahdout, and Lande know of the fraud perpetrated by FXCM on its customers and investors, but they designed the scheme to surreptitiously trade against their customers in the first place.  The Complaint also alleges that as CFO of FXCM, "Lande was aware that FXCM calculated its monthly preliminary P&L [profit and loss]

statement, in part, by taking Effex's monthly P&L and simply subtracting 30 percent" – a key part of the fraudulent scheme.  ¶36.

Additionally, courts have found that attempts by a defendant to "cover up" fraud also constitute evidence of scienter.  *Szulik v. Tagliaferri*, 966 F. Supp. 2d 339, 365 (S.D.N.Y. 2013); *In re Galena Biopharma, Inc. Sec. Litig.*, 117 F. Supp. 3d 1145, 1166 (D. Or. 2015) (attempting to cover up wrongdoing is supportive of scienter); *In re Nature's Sunshine Prod. Sec. Litig.*, 486 F. Supp. 2d 1301, 1310 (D. Utah 2007) ("Evidence that a defendant has taken steps to cover-up [sic] a misdeed is strong proof of scienter").  Plaintiffs allege that Niv lied to NFA compliance staff when questioned about FXCM's relationship with Effex.  ¶94.  Plaintiffs also allege that Niv "participated and approved of FXCM's false responses to the NFA's investigation," ¶98, which Plaintiffs go on to allege in further detail.  ¶¶95-97.  The Complaint alleges that Lande, as CFO, "was aware of the $77 million received by Holdings [from Effex], even though the payments, if proper, would have been made to FXCM's USA subsidiary, thus raising a red flag." ¶36.  Lande was therefore complicit in attempting to shield Effex's ostensible "order flow" payments from NFA scrutiny which might, and eventually did, call into question the nature of those payments and the FXCM-Effex relationship.

Alternatively, under the "core operations" theory of scienter, "[w]hen information is at the core of a company's business, it may be properly ascribable to senior officers."  *In re JPMorgan Chase Sec. Litig.*, 363 F. Supp. 2d 595, 628 (S.D.N.Y. 2005); *In re Atlas Air Worldwide Holdings, Inc. Sec. Litig.*, 324 F. Supp. 2d 474, 489 (S.D.N.Y. 2004) (when a "high-level corporate officer" makes public statements about the "core operations" of a company an inference arises "that the speaker had intimate knowledge of those facts or should have known of

them.").[11]  "Core operations include matters critical to the long term viability of the company and events affecting a significant source of income."  *In re Hi-Crush Ptrs. L.P. Sec. Litig.*, No. 12 Civ. 8557(CM), 2013 WL 6233561, at *26 (S.D.N.Y. Dec. 2, 2013).

There is no dispute that the Company's retail trading operations, which include "payments we receive for order flow from FX market makers," ¶¶124, 135, 144, 152, 160, 169, 186, is a core operation of FXCM.  According to FXCM's 2011 10-K, the Company's "retail trading segment accounted for 87.5% of its total revenues in 2011."  ¶122.  In the following years those figures were 85.1% (2012), 77.4% (2013), and 76.6% (2014).  ¶¶160, 186, 207.  All told, the payments accounted for nearly $80 million of payments from Effex from 2010 through 2014.  ¶82.  Thus, beyond the Complaint's allegations that Niv, Ahdout, and Lande devised and executed the entire fraudulent scheme, the Court may also infer that Niv, Ahdout, and Lande knew that the purported "order flow" payments from Effex, which comprised a significant part of this all-important revenue segment, were actually profit-sharing kickbacks from their not-so-independent market maker.  This is especially true given Plaintiffs' allegations that FXCM did not receive *any* order flow payments from any other market makers, much less payments of this magnitude.  ¶75.

### 2.  Plaintiffs Adequately Allege Scienter Against FXCM.

"A corporation can only act through its employees and agents."  *Suez Equity Investors, L.P. v. Toronto-Dominion Bank*, 250 F.3d 87, 101 (2d Cir. 2001).  Therefore, in this Circuit, "courts have readily attributed the scienter of management-level employees to corporate

---

[11] This court has applied the core operations doctrine on multiple occasions after the passage of the PSLRA.  *See, e.g., In re Reserve Fund Sec. & Derivative Litig.*, 732 F.Supp.2d 310, 322–23 (S.D.N.Y. 2010); *In re Dynex Capital Inc. Sec. Litig.*, 2009 WL 3380621, at *15 (S.D.N.Y. Oct. 19, 2009).  *See also South Ferry LP v. Killinger*, 542 F.3d 776, 784 (9th Cir. 2008) ("Allegations that rely on the core-operations inference are among the allegations that may be considered in the complete PSLRA analysis.").

defendants." *Marsh & Mclennan*, 501 F. Supp. 2d at 481.  Here, the scienter of Niv, Ahdout, and Lande—as some of the highest-ranking employees of FXCM—can be attributed to FXCM. *See Teamsters Local 445 Freight Div. Pension Fund v. Dynex Capital, Inc.*, 531 F.3d 190, 195 (2d Cir. 2008) (holding that "it is possible to raise the required inference [of scienter] with regard to a corporate defendant without doing so with regard to a specific individual defendant" under the PSLRA).  As Plaintiff has adequately alleged scienter with respect to Niv, Ahdout, and Lande, their scienter is properly attributable to FXCM.

## III.   THE COMPLAINT ADEQUATELY ALLEGES CONTROL-PERSON LIABILITY UNDER SECTION 20(a)

Defendants' argument that plaintiffs fail to adequately allege control person liability under Section 20(a) should be denied.  As a threshold matter, an inquiry into whether certain defendants are "control persons" under Section 20(a) is "an inquiry that is … 'more appropriately decided on a motion for summary judgment than on a motion to dismiss.'" *Guevoura Fund v. Sillerman*, 15 Civ. 7192 (CM), 2016 WL 4939372, *11 (S.D.N.Y. Sept. 12, 2016) (quoting *Degulis v. LXR Biotech., Inc.*, 928 F. Supp. 1301, 1315 (S.D.N.Y. 1996)); *see also CompuDyne Corp. v. Shane*, 453 F. Supp. 2d 807, 829 (S.D.N.Y. 2006) ("Whether a person is a "controlling person" is a fact-intensive inquiry, and generally should not be resolved on a motion to dismiss.").

Moreover, "In the Second Circuit, the 'control person' provisions are broadly construed as they were meant to expand the scope of liability under the securities laws." *CompuDyne*, 453 F. Supp. 2d at 829. "In order to establish a *prima facie* case of liability under § 20(a), a plaintiff must show: (1) a primary violation by a controlled person; (2) control of the primary violator by the defendant; and (3) 'that the controlling person was in some meaningful sense a culpable

participant' in the primary violation." *In re Rhodia S.A. Sec. Litig.*, 531 F. Supp. 2d 527, 550 (S.D.N.Y. 2007).  The Complaint satisfies each of these requirements.

Defendants assert that plaintiffs cannot adequately alleged control-person liability because they have not adequately alleged a primary violation of the Exchange Act.  As demonstrated above, however, Plaintiffs adequately alleged a Section 10(b) claim.  *See* part II(A), *supra*.  Therefore, "the 'primary violation' element of section 20(a) is satisfied." *380544 Can., Inc. v. Aspen Tech., Inc.*, 544 F. Supp. 2d 199, 231 (S.D.N.Y. 2008).

The Complaint also satisfies the second requirement.  Indeed, the Complaint exhaustively details that the Individual Defendants and other senior management directly participated in the management of the Company and were privy to the Company's unique relationship with Effex, yet allowed for all of the Company's SEC filings  (¶¶120, 129, 131, 139, 141, 149, 151, 156, 158, 166, 168, 177, 182, 184, 192, 194, 196, 198, 203, 205, 212, 214, 216, 218, 223, 225, 232, 236, 245, 247) and advertising and website materials (¶¶248-255) to be disseminated to the public and investors alike during the Class Period.  This is the very definition of control under Section 20(a).  *See, e.g., In re Inv. Tech. Grp., Inc. Sec. Litig.*, No. 15 Civ. 6369 (JFK), 2017 WL 1498055, at *20 (S.D.N.Y. Apr. 26, 2017) ("courts have held that an officer's control as to financial statements, for example, is sufficiently pleaded if the officer has signed financial statements containing materially false or misleading statements.") (citing *In re Virtus Inv. Partners, Inc. Sec. Litig.*, 195 F. Supp. 3d 528, 542 (S.D.N.Y. 2016)); *City of Westland Police & Fire Ret. Sys.*, 928 F. Supp. 2d at 721 ("[When] a plaintiff alleges that the directors and officers participated in the alleged primary conduct, that is sufficient to state a claim for control person liability.").

The Complaint satisfies the third requirement by adequately alleging the requisite "culpable participation" in the fraudulent scheme.  Contrary to Defendants' assertions, "Courts in this District disagree about whether culpable participation must be pleaded with particularity, or instead, is an affirmative defense in which the burden to establish the absence of culpable conduct shifts to the defense."  *Menaldi v. Och-Ziff Capital Mgmt. Grp. LLC*, 164 F. Supp. 3d 568, 587 (S.D.N.Y. 2016).  Courts in this District have stated that "[a]llegations of control are not averments of fraud and therefore need not be pleaded with particularity." *In re Tronox, Inc. Sec. Litig.*, 09 Civ. 6220 (SAS), 2010 WL 2835545, at *5 (S.D.N.Y. June 28, 2010). "[A]lthough the meaning of 'culpable participation' is unclear, there is strong reason to believe that it is not the same as scienter, and thus is governed by Rule 8's pleading standard." *Id.*, 2010 WL 2835545 at *15.  In any event, Plaintiffs here have pled culpable participation with the same particularity as scienter.

As members of FXCM's senior management and as directors with access to information regarding FXCM's day-to-day business, the Individual Defendants were all senior level officers with the "power and influence" to cause FXCM to "engage in the alleged fraudulent conduct, which in turn supports an inference of culpability for the allegedly fraudulent statements." *In re Solucorp Indus. Sec. Litig.*, 98 Civ. 3248 (LMM), 2000 WL 1708186, at *7 (S.D.N.Y. Nov. 15, 2000).  For example, Defendants Niv, Ahdout, and Lande are alleged to have controlled Effex through their roles at FXCM, central to the fraudulent conduct alleged in this action. ¶64-84. Similarly, Defendants Niv and Lester, in response to regulatory inquiry, made misleading statements about Effex's relationship to the Company in attempts to downplay FXCM's involvement with Effex and Effex's Dittami. ¶¶35, 94-98.  While her conduct was not directed towards regulators, Defendant Ornit Niv (Defendant Niv's sister, who served as CEO of Forex

Capital Markets LLC, the domestic subsidiary of FXCM, as well as FXCM's Head of Sales and Customer Service for the Americas and Asia) was also intimately knowledgeable with respect to the marketing materials published by the Company and facilitated the misstatements set forth therein. ¶37. *See, e.g., Prostic v. Xerox Corp.*, B-90-113 (EBB), 1991 WL 208441, at *8 (D. Conn. July 19, 1991) (Finding exercise of "control over the contents and dissemination of [Company's] financial publications and public statements" as alleged in Complaint sufficient for claims under 20(a)); *cf. In re Flag Telecom Holdings, Ltd. Sec. Litig.*, 352 F. Supp. 2d 429, 468 (S.D.N.Y. 2005) (citing control of company press releases as support for 20(a) claim).

Moreover, far from relying solely upon the Individual Defendants' status as officers or directors as Defendants assert, the Complaint alleges that the Individual Defendants also signed materially false and misleading SEC filings and/or made other materially false and misleading statements. Defendant Niv, as Chairman of the Board of Directors of FXCM, CEO, and an original founding partner, and Defendant Lande, as FXCM's CFO, signed FXCM's SOX Certifications filed with the SEC during the Class Period. ¶¶139, 149, 156, 166, 177, 182, 192, 203, 212, 223, 232, 245. The Complaint also alleges that in addition to Defendants Niv and Lande, Defendants Sakhai, Ahdout, Grossman, Yusupov, Brown, Silverman, Gruen, Davis, Legoff, Santoro (in 2012, 2013, 2014), Reyhani (2015), and Deverell (2015) each signed various FXCM 10-K's filed with the SEC during the Class Period and are thus responsible for the misleading and omissive statements made in the filings they signed. ¶¶120, 158, 184, 205, 225. Similarly, the Complaint alleges Defendant Sassoon, as General Counsel, signed proxy statements filed with the SEC on Form DEF 14 A during the Class Period. ¶247. *See, e.g., In re BioScrip, Inc. Sec. Litig.*, 95 F. Supp. 3d 711, 741-42 (S.D.N.Y. 2015) (finding culpable participation because each individual defendant was responsible for reviewing SEC filings);

*Menaldi*, 164 F. Supp. 3d at 587 (holding plaintiffs "plausibly alleged culpable participation by Defendants Och and Frank" when they alleged "one or both of these Defendants signed all of the relevant SEC filings, and as a general matter, that both corporate officers were responsible for the content of those filings"); *cf. In re WorldCom*, 294 F. Supp. 2d 392, 420 (S.D.N.Y. 2003) ("The very fact that a director is required to sign these critical documents charges the director with power over the documents and represents to the corporation, its shareholders, and the public that the corporation's director has performed her role with sufficient diligence that she is willing and able to stand behind the information contained in those documents.").

Accordingly, Defendants' motion to dismiss the Section 20(a) claims against the Individual Defendants should be denied in its entirety, as the Complaint alleges sufficient control and culpable conduct related to the alleged fraudulent acts, statements, and omissions complained of in this action.

## IV. THE COURT SHOULD NOT TAKE JUDICIAL NOTICE OF DEFENDANTS' EXHIBITS

When considering a Rule 12(b)(6) motion, a district court must confine its consideration to "facts stated on the face of the complaint, in documents appended to the complaint or incorporated in the complaint by reference, and to matters of which judicial notice maybe taken." *Leonard F. v. Isr. Disc. Bank of N.Y.*, 199 F.3d 99, 107 (2d Cir. 1999). The Second Circuit has emphasized that "before materials outside the record may become the basis for a dismissal, several conditions must be met." *Barberan v. Nationpoint*, 706 F. Supp. 2d 408, 415 (S.D.N.Y. 2010) (quoting *Faulkner v. Beer*, 463 F.3d 130, 134 (2d Cir. 2006)). "For example, even if a document is 'integral' to the complaint, it must be clear on the record that no dispute exists regarding the authenticity or accuracy of the document." *Faulkner*, 463 F.3d at 134.

Here, Defendants do not even request that the Court take judicial notice of the documents attached to the Declaration of Israel Dahan ("Dahan Declaration").   ECF No. 90.    Instead, Defendants merely set forth the relevant standard without explaining why any of the documents should be considered.   Defendants fail to explain whether: (1) the documents fall within the permissible exceptions to consider materials outside of the four-corners of the Complaint; (2) the documents are underlying contracts for an action alleging breach; or (3) the documents were relied upon by plaintiff in drafting the complaint and thus integral to the complaint.   *Faulkner*, 463 F.3d at 134.   In short, Defendants fail to make *any* demonstration as to why the documents warrant judicial notice, and certainly do not show that there are "no material disputed issues of fact regarding the relevance of the document[s]."   *Id.*, 463 F.3d at 134.

Even if the Court considers the SEC documents appended to the Dahan Declaration (Exhibits A, B, C, E, H, and J), the Court should take judicial notice of the filings not for the *truth* of the matters asserted, but rather to establish the *existence* of the filings and the fact of their contents.   *See, e.g., Chechele v. Scheetz*, 466 Fed. Appx. 39, 40-41 (2d Cir. 2012) (finding that the district court did not err in declining to consider SEC filings, which were not incorporated into the complaint, for the truth of their assertions); *In re Morgan Stanley Info. Fund Sec. Litig.*, 592 F.3d 347, 355 n.5 (2d Cir. 2010) (taking judicial notice of SEC filings not "for their truth, but 'rather to establish the fact of such litigation and related filings'"); *Roth v. Jennings*, 489 F.3d 499, 509 (2d Cir. 2007) ("When a complaint alleges, for example, that a document filed with the SEC failed to disclose certain facts, it is appropriate for the court, in considering a Rule 12(b)(6) motion, to examine the document …. 'only to determine what the document[] stated,' and 'not to prove the truth of its contents.'").

37

Moreover, there is no circumstance whereby the Court should consider Exhibit F (attorney-made chart) or Exhibit G (complaint from an unrelated litigation).  These documents are not referenced in the Complaint nor has there been any showing that Plaintiffs relied upon the documents to craft the Complaint.  *See, e.g., Difolco v. MSNBC Cable LLC*, 66 F.3d 104, 111 (2d Cir. 2010) ("Where a document is not incorporated by reference, the court may nevertheless consider it where the complaint 'relies heavily upon its terms and effect,' thereby rendering the document 'integral' to the complaint.") (quoting *Mangiafico v. Blumenthal*, 471 F.3d 391, 398 (2d Cir. 2006)).

## CONCLUSION

For the foregoing reasons, Plaintiffs respectfully submit that Defendants' motion to dismiss should be denied.  If the CAC is dismissed, Plaintiffs respectfully submit that the dismissal should be without prejudice.[12]

Dated: September 18, 2017                    Respectfully submitted,

                                             **THE ROSEN LAW FIRM, P.A.**

                                             /s/ Phillip Kim
                                             Phillip Kim, Esq. (PK 9384)
                                             Laurence M. Rosen, Esq. (LR 5733)
                                             Joshua Baker, Esq. (JB 8288)
                                             275 Madison Avenue, 34th Floor
                                             New York, New York 10016
                                             Telephone: (212) 686-1060
                                             Fax: (212) 202-3827
                                             Email: pkim@rosenlegal.com
                                             Email: lrosen@rosenlegal.com
                                             Email: jbaker@rosenlegal.com

                                             *Lead Counsel for Lead Plaintiffs*

---

[12] *See ATSI Commc'ns, Inc. v. Shaar Fund, Ltd.*, 493 F.3d 87, 108 (2d Cir. 2007) ("District courts typically grant plaintiffs at least one opportunity to plead fraud with greater specificity when they dismiss under Rule 9(b).").

**WOLF HALDENSTEIN ADLER FREEMAN & HERZ LLP**
Matthew M. Guiney, Esq. (MG 5858)
270 Madison Avenue
New York, NY 10016
Tel: (212) 545-4600
Email: guiney@whafh.com

*Additional Counsel*

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on this 18th day of September 2017, a true and correct copy of the foregoing MEMORANDUM OF LAW IN OPPOSITION TO DEFENDANTS' MOTION TO STRIKE AND DISMISS PLAINTIFFS' CONSOLIDATED SECURITIES CLASS ACTION COMPLAINT was served by CM/ECF to the parties registered to the Court's CM/ECF system.


/s/ Phillip Kim
Phillip Kim