# UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| In re Global Brokerage, Inc. f/k/a FXCM, Inc. Securities Litigation | Master File No. 1:17-cv-00916-RA |
| | **MEMORANDUM OF LAW IN SUPPORT OF DEFENDANTS' MOTION TO DISMISS SECOND AMENDED CONSOLIDATED SECURITIES CLASS ACTION COMPLAINT** |
| | CLASS ACTION |
| | ORAL ARGUMENT REQUESTED |
| This Document Relates To:  All Actions | |

Paul R. Bessette
Israel Dahan
KING & SPALDING LLP
1185 Avenue of the Americas
New York, New York  10036-2601
Tel:  (212) 556.2100
Fax: (212) 556.2200

Rebecca Matsumura, *pro hac vice*
KING & SPALDING LLP
500 W. 2nd Street Suite 1800
Austin, Texas 78701
Tel: (512) 457.2000
Fax: (512) 457.2100

*Attorneys for Defendants Global Brokerage, Inc. f/k/a/ FXCM, Inc., Dror Niv, William Ahdout and Robert Lande*

## TABLE OF CONTENTS

PRELIMINARY STATEMENT ...................................................................... 1

STATEMENT OF FACTS ............................................................................. 2

    A.    FXCM's Agency-Trading Model ................................................ 2

    B.    Pay-For-Flow Agreements ...................................................... 4

    C.    The SNB Flash Crash ............................................................ 6

    D.    The Unadjudicated Regulatory Proceedings and Settlements ............... 8

    E.    Prior Ruling Dismissing Plaintiffs' Complaint ....................... 9

    F.    Plaintiffs' New Allegations ................................................. 11

LEGAL STANDARD .................................................................................. 12

ARGUMENT ............................................................................................ 14

I.    The SAC Does Not Plead Adequately A Materially False Or Misleading
    Statement. ..................................................................................... 14

    A.    FXCM's Public Filings After FXCM Terminated the Pay-For-
        Flow Agreement in August 2014 Cannot Contain Material
        Misstatements or Omissions. .................................................. 14

    B.    FXCM Did Not Violate GAAP. .............................................. 16

    C.    FXCM's Statements About the Agency-Trading Model Were
        Neither False Nor Misleading. ............................................... 19

    D.    FXCM Was Not Required To Disclose Ongoing Regulatory
        Investigations. ..................................................................... 21

    E.    SOX Certifications Are Not Independently Actionable. .......... 22

II.    The SAC Fails To Raise a Strong Inference of Scienter. .................... 22

    A.    Plaintiffs Have Not Alleged Any Facts Establishing Defendants'
        Motive or Opportunity. ......................................................... 22

    B.    Plaintiffs Have Not Alleged Any Particularized Circumstantial
        Evidence Raising a Strong Inference of Scienter by Any of the
        Individual Defendants. .......................................................... 23

i

(1)     Lande Was Not Involved With Effex. .......................................... 24

(2)     Plaintiffs Fail to Allege that Any of the Individual Defendants Disregarded Corporate Formalities Between FXCM and Effex. ........................................................... 26

(3)     Plaintiffs Have Failed To Allege That the Individual Defendants Intended to Defraud *Investors*................................. 28

C.     The Alleged GAAP Violations Do Not Suffice To Allege Scienter........ 30

D.     Plaintiffs Have Failed To Allege FXCM's Scienter.............................. 31

III.     The SAC Fails to Allege Loss Causation.......................................................... 32

IV.     The Second Amended Complaint Fails to Allege Adequately a Control-Person Claim Under Section 20(a) ................................................................. 34

CONCLUSION............................................................................................................ 35

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Acito v. IMCERA Grp., Inc.*,
  47 F.3d 47 (2d Cir. 1995) ........................................................................... 29

*Alaska Elec. Pension Fund v. Adecco S.A. (In re Adecoo S.A.)*,
  371 F. Supp. 2d 1203 (S.D. Cal. 2005) ...................................................... 28

*Allison v. Brooktree Corp.*,
  No. 97-CV-0852 TW(POR), 1998 WL 34074832, at *10 (S.D. Cal.
  Nov. 27, 1998) ............................................................................................. 29

*Alpha Capital Anstalt v. Schwell Wimpfheimer & Assocs. LLP*,
  No. 1:17-cv-1235-GHW, 2018 WL 1627266 (S.D.N.Y. Mar. 30, 2018) ................ 34

*Amorosa v. Ernst & Young LLP*,
  682 F. Supp. 2d 351 (S.D.N.Y. 2010) ....................................................... 33

*Anschutz Corp. v. Merrill Lynch & Co.*,
  690 F.3d 98 (2d Cir. 2012) .................................................................... 13, 14

*Ashcroft v. Iqbal*,
  556 U.S. 662 (2009) ................................................................................... 13

*ATSI Commc'ns Inc. v. Shaar Fund, Ltd.*,
  493 F.3d 87 (2d Cir. 2007) ..................................................................... 6, 34

*In re BISYS Sec. Litig.*,
  397 F. Supp. 2d 430 (S.D.N.Y. 2005) ....................................................... 23

*In re China Mobile Games & Entm't Grp. Sec. Litig.*,
  No. 14-cv-4471, 2016 WL 922711 (S.D.N.Y. Mar. 7, 2016) .................................. 25

*City of Roseville Employees' Ret. Sys. v. Sterling Fin. Corp.*,
  963 F. Supp. 2d 1092 (E.D. Wash. 2013) .................................................. 29

*City of Sterling Heights Police & Fire Ret. Sys. v. Vodafone Grp. Pub.
  Ltd. Co.*,
  655 F. Supp. 2d 262 (S.D.N.Y. 2009) ....................................................... 17

*City of Westland Police & Fire Ret. Sys. v. MetLife, Inc.*,
  928 F. Supp. 2d 705 (S.D.N.Y. 2013) ....................................................... 32

*Dura Pharms., Inc. v. Broudo,*
   544 U.S. 336 (2005) ..................................................................... 14

*ECA & Local 134 IBEW Joint Pension Tr. of Chi. v. JPMorgan Chase Co.,*
   553 F.3d 187 (2d Cir. 2009) ................................................ 13, 17, 23

*In re Fannie Mae 2008 Sec. Litig.,*
   742 F. Supp. 2d 382 (S.D.N.Y. 2010) ........................................... 18, 30

*Finn v. Barney,*
   471 F. App'x 30 (2d Cir. 2012) ........................................................ 8

*In the Matter of Forex Capital Markets, LLC, et al.,*
   NFA Case No. 17-BCC-001 ............................................................. 9

*Gebhardt v. Allspect, Inc.,*
   96 F. Supp. 2d 331 (S.D.N.Y. 2000) .............................................. 13

*Harris v. AmTrust Fin. Servs., Inc.,*
   135 F. Supp. 3d 155 (S.D.N.Y. 2015) ....................................... 17, 19

*In re Inv. Tech. Grp., Inc. Sec. Litig.,*
   No. 15 Civ. 6369(JFK), 2018 WL 1449206 (S.D.N.Y. Mar. 23, 2018) .................. 26

*In re JP Morgan Chase Sec. Litig.,*
   363 F. Spp. 2d 595, 621 (S.D.N.Y. 2005) ....................................... 27

*Kalnit v. Eichler,*
   264 F.3d 131 (2d Cir. 2001) ......................................................... 23

*Kalnit v. Eichler,*
   85 F. Supp. 2d 232 (S.D.N.Y. 1999) ............................................. 29

*Kuriakose v. Fed. Home Loan Mortg. Corp.,*
   897 F. Supp. 2d 168 (S.D.N.Y. 2012) ........................................... 17

*Lapin v. Goldman Sachs Grp., Inc.,*
   506 F. Supp. 2d 221 (S.D.N.Y. 2006) ........................................... 34

*Lattanzio v. Deloitte & Touche LLP,*
   476 F.3d 147 (2d Cir. 2007) ......................................................... 33

*Lawrence v. Alaska Elec. Pension Fund (In re Bank of Am. AIG Disclosure Sec. Litig.),*
   980 F. Supp. 2d 564 (S.D.N.Y. 2013) ........................................... 21

*Lentell v. Merrill Lynch & Co., Inc.*,
   396 F.3d 161 (2d Cir. 2005) ...................................................................... 32

*In re Lihua Int'l, Inc. Sec. Litig.*,
   No. 14-cv-5037, 2016 WL 1312104 (S.D.N.Y. Mar. 31, 2016) .............................. 35

*In re Lions Gate Ent. Corp. Sec. Litig.*,
   165 F. Supp. 3d 1 (S.D.N.Y. 2016) ............................................................ 22

*Loftin v. Bande (In re Flag Telecom Holdings, Ltd. Sec. Litig.)*,
   574 F.3d 29 (2d Cir. 2009) ...................................................................... 32

*In re Marsh & McLennan Cos., Inc. Sec. Litig.*,
   501 F. Supp. 2d 452 (S.D.N.Y. 2006) .................................................... 17, 27

*Menaldi v. Och-Ziff Cap. Mgmt. Grp. LLC*,
   277 F. Supp. 3d 500 (S.D.N.Y. 2017) ...................................................... 22

*Pac. Inv. Mgmt. Co. v. Mayer Brown LLP*,
   603 F.3d 144 (2d Cir. 2010) .................................................................... 12

*Plumbers & Pipefitters Local Union No. 630 Pension-Annuity Tr. Fund
   v. Arbitron Inc.*,
   741 F. Supp. 2d 474 (S.D.N.Y. 2010) ...................................................... 25

*Plumbers & Pipefitters Local Union No. 719 Pension Trust Fund v.
   Conseco Inc.*,
   No. 09-cv-6966, 2011 WL 1198712 (S.D.N.Y. Mar. 30, 2011) .............................. 30

*Plumbers & Pipefitters Nat'l Pension Fund v. Orthofix Int'l N.V.*,
   89 F. Supp. 3d 602 (S.D.N.Y. 2015) ........................................................ 24

*In re Polaroid Corp. Sec. Litig.*,
   134 F. Supp. 2d 176 (D. Mass. 2001) ...................................................... 34

*Rombach v. Chang*,
   355 F.3d 164 (2d Cir. 2004) .................................................................... 13

*Rothman v. Gregor*,
   220 F.3d 81 (2d Cir. 2000) ...................................................................... 6

*In re Sotheby's Holdings, Inc. Sec. Litig.*,
   No. 00 CIV. 1041 (DLC), 2000 WL 1234601 (S.D.N.Y. Aug. 31, 2000) ............... 25

*Special Situations Fund III QP, L.P. v. Deloitte Touche Tohmatsu CPA,
   Ltd.*,
   33 F. Supp. 3d 401 (S.D.N.Y. 2014) ........................................................ 34

*Stoneridge Inv. Partners, LLC v. Scientific-Atlanta, Inc.*,
    552 U.S. 148 (2008) ............................................................................. 13

*Stratte-McClure v. Morgan Stanley*,
    No. 09 Civ. 2017(DAB), 2013 WL 297954 (S.D.N.Y. Jan. 18, 2013).................... 33

*Teamsters Local 445 Freight Division Pension Fund v. Dynex Capital, Inc.*,
    531 F.3d 190 (2d Cir. 2008)................................................................... 31

*Tellabs, Inc. v. Makor Issues & Rights, Ltd.*,
    551 U.S. 308 (2007) ........................................................................ 24, 27

*Thomas v. Shiloh Indus., Inc.*,
    No. 15 CV 7449 (KMW), 2017 WL 2937620 (S.D.N.Y. July 7, 2017) .................. 31

*In re Tower Grp. Int'l, Ltd. Sec. Litig.*,
    No. 13 CIV. 5852 AT, 2015 WL 5813393 (S.D.N.Y. Sept. 18, 2015).............. 22, 24

*In re Turquoise Hill Res. Ltd. Sec. Litig.*,
    No. 13-cv-8846, 2014 WL 7176187 (S.D.N.Y. Dec. 16, 2014)............................... 30

*Vining v. Oppenheimer Holdings Inc.*,
    No. 08 Civ. 4435(LAP), 2010 WL 3825722 (S.D.N.Y. Sept. 29, 2010) ................. 31

*In re Vivendi Universal, S.A. Sec. Litig.*,
    842 F. Supp. 2d 522 (S.D.N.Y 2012) ...................................................... 34

*W.Va. Pipe Trades Health & Welfare Fund v. Medtronic, Inc.*,
    57 F. Supp. 3d 950 (D. Minn. 2014) ...................................................... 27

## Rules and Statutes

Exchange Act Section 10(b) ................................................................. 12, 35

FED. R. CIV. P. 9(b) .............................................................................. 13

FED R. CIV. P. 12(b)(6) ........................................................................ 13

Private Securities Litigation Reform Act ..................................... 13, 14, 35

Rule 10b-5 ........................................................................................ 12

Securities Exchange Act Section 20(a)....................................... 11, 34, 35

## PRELIMINARY STATEMENT

Plaintiffs' efforts to remedy the deficiencies that led the Court to dismiss their prior Complaint fall well short.  While Plaintiffs have addressed certain cosmetic problems by, for example, removing most block quotes, these changes have only served to highlight the many deficiencies in their theory of liability.  Plaintiffs' theory rests on the premise that a contract — between separate legal entities, providing for payments that are standard in the industry in both type and amount, and negotiated at arms-length — was actually a cover for a complicated profit-sharing scheme between the two companies.  The law sets a high bar for plaintiffs to allege adequately that a facially legitimate contract between two companies, who apparently observed corporate formalities, was secretly fraudulent.

Plaintiffs fail to plead the essential foundation of their theory — that FXCM[1] and Effex were not transacting at arms-length — and thus  fail to show that FXCM's statements about its agency-trading model were false or misleading.  For the same reason, Plaintiffs' attempt to manufacture an accounting violation based on financial statements that were audited by a nationally-known firm that never requested a restatement also fails.

Plaintiffs' attempt to plead a strong inference of scienter is likewise deficient.  Importantly, even assuming that Defendants misled the public regarding FXCM's relationship with Effex — which they did not — Plaintiffs fail to raise a strong

---

[1]  References in this brief to "FXCM" refer to FXCM, Inc., now known as Global Brokerage, Inc.

1

inference that Defendants intended to deceive *investors*, rather than customers.   A third, independent reason to dismiss this case is Plaintiffs' failure to plead loss causation in light of an industry-wide "flash crash" that pushed several competitors into bankruptcy.   Finally, because Plaintiffs fail to plead a primary violation, their control person claims also fail.

## STATEMENT OF FACTS

The following facts are taken from the Second Amended Complaint ("SAC"), ECF No. 111; the Declarations of Israel Dahan (collectively, the "Dahan Decl."), ECF Nos. 90, 95; the Declaration of Paul R. Bessette (the "Bessette Decl."); and the exhibits attached thereto.[2]

### A.    FXCM's Agency-Trading Model

FXCM was founded in 1999 and was one of the world's largest online foreign exchange ("FX") trading firms during the Class Period.  SAC ¶ 42.  The FX market relies on spot transactions in which a customer exchanges one currency for another.

---

[2] As the Court explained in its oral ruling,

> Even on a motion to dismiss, the court may consider any written instrument attached to the complaint, statements or documents incorporated into the complaint by reference, legally required public disclosure documents filed with the SEC, and documents possessed by or known to the plaintiff and upon which it relied in bringing this suit.

Hr'g Tr. (Mar. 1, 2018) at 11:20–25 ("Oral Op."), Bessette Decl. Ex. O.  The Court previously took judicial notice of Dahan Decl. Exs. A–C, E, H–J, and M.  *See* Oral Op. at 12:2–4.  Defendants request that the Court do so again in its consideration of this motion.  *See also infra* n.4 (requesting that the Court take judicial notice of Dahan Decl. Exs. K, L, & N).

*Id.* ¶ 40.   As explained below, FXCM facilitated spot transactions for retail customers.

FX trading firms generally operate under two types of trading models: the agency-trading model, also known as the "No Dealing Desk" model, and the principal-trading model, also known as the "Dealing Desk" model. *Id.* ¶¶ 43–45. FXCM pioneered the agency-trading model in 2007, and operated both agency-trading and principal-trading models during the Class Period. *Id.*

Under the agency-trading model, FXCM functioned as a credit intermediary between retail customers and over a dozen independent banks and specialist trading firms that execute customer trades. *Id.* ¶ 45.  These independent financial institutions are known as market markers or "liquidity providers." *Id.* ¶ 47. Throughout the Class Period, FXCM counted large banks and financial institutions among the liquidity providers for its agency-trading model. *Id.* ¶ 182.  These liquidity providers competed for retail customers' orders by submitting quotes (buy and sell prices for each currency pair) to FXCM. *Id.* ¶ 47.

FXCM provided customers with an online electronic trading platform that gathered the available buy and sell pricing at any given time from liquidity providers.   FXCM then applied a markup to those prices and generated a best bid/offer ("BBO"), which was then streamed to the customer via the trading platform. *Id.* ¶¶ 45, 146.  If the customer chose to execute a trade at the BBO, then FXCM would attempt to execute that customer's trade with that liquidity provider. *Id.*

Because FX prices often fluctuated from the time the BBO was provided to the time the customer placed the execution order, and because there was a limited amount of liquidity available at a given price, it was not unusual for a liquidity provider to refuse to execute a trade at the previously quoted BBO.  If the bid was rejected, then the customer was notified that the trade could not be executed.  If the bid was accepted, then FXCM entered into a trade with the liquidity provider and simultaneously entered into the offsetting trade with the customer.  As a result, FXCM's position after the two trades was flat or neutral.  *See id.* ¶ 45.

Under the agency-trading model, FXCM made money through brokerage fees earned on each transaction, markups on the liquidity provider's bid, and pay-for-flow agreements.  *Id.* ¶¶ 148, 152.  FXCM did not take a trading position opposite the customer and did not make money betting against the customer using its agency-trading model.[3]  FXCM repeatedly disclosed both its process of gathering quotes from liquidity providers and its markup or commission to customers.  *E.g., id.* ¶¶ 146, 152.

### B.    Pay-For-Flow Agreements

As noted above, FXCM also made money under the agency-trading model through "pay for flow" arrangements with certain liquidity providers.  Under these arrangements, FXCM received a fixed fee based on the volume of trades executed with that liquidity provider.  FXCM repeatedly disclosed that its retail trading

---

[3] The liquidity provider, on the other hand, made its money by betting against the retail customer.  For example, when a customer placed an order to exchange euros for francs, the customer was betting that euros were overvalued compared to francs; in agreeing to trade, the liquidity provider was betting that *francs* were overvalued.

revenue included payments from pay-for-flow arrangements.  *Id.* ¶¶ 148, 150; *see also*, *e.g.*, 2014 Form 10-K at 42, Dahan Decl. Ex. B (explaining that retail trading revenue included "payments we receive for order flow from FX market makers"); *id.* at 79 ("In 2013 and through August 2014, we earned revenue on order flow.  Income earned on order flow represents payments received from certain FX market makers in exchange for routing trade orders to these firms for execution.").  Pay-for-flow agreements were not unique to FXCM and such arrangements did not violate any Commodity Futures Trading Commission ("CFTC") rule or regulation.

FXCM had a pay-for-flow agreement with Effex, an independently owned limited liability company formed in 2010.  Effex is not, and has never been, a subsidiary of FXCM.  Effex is managed and controlled by John Dittami, not FXCM or any of its employees.  No Defendants ever had an ownership interest in Effex. *See* SAC ¶ 53.

In the fall of 2009 through the spring of 2010, Dittami developed a computer source code and a trading algorithm that provided customers with a better FX trading experience by offering lower prices and lower rejection rates.  *See id.* ¶ 50. In March 2010, to gain advantage of this algorithm, FXCM entered into a Services Agreement with Effex under which Effex would pay FXCM a $21 commission for every $1 million in trading volume that Effex was awarded from FXCM's customers. *Id.* ¶¶ 52–55; Services Agreement (Mar. 1, 2010) § 3.1, Dahan Decl. Ex. K.[4]  The

---

[4] In its prior ruling, the Court denied without prejudice Defendants' request to take judicial notice of the pay-for-flow agreements because they were not relevant to the Court's prior decision.  *See* Oral Op. at 12:5–9.  Defendants hereby renew their

Services Agreement was a pay-for-flow agreement; it was not tied in any way to FXCM's customers' profit or loss or Effex's profit or loss. Rather, the fee that FXCM received was a flat fee, based solely on customer trading volume. SAC ¶ 55 ("Effex would make monthly payment to FXCM of $21 per million dollars of trading volme executed by Effex").

On August 1, 2014, FXCM discontinued all pay-for-flow agreements, including the Services Agreement. SAC ¶ 73; *see also* Q3 2014 Form 10-Q at 36, 40, 45, 51, Dahan Decl. Ex. C; Letter (Aug. 25, 2014), Dahan Decl. Ex. N. Effex continued to be one of FXCM's many liquidity providers until January 2017, but without any pay-for-flow arrangement. SAC ¶ 73.

### C.   The SNB Flash Crash

On January 15, 2015, the Swiss National Bank ("SNB") shocked the world's financial markets by announcing that it would immediately end its three-year-old

---

request that the Court take judicial notice of Dahan Decl. Exs. K, L, and N. The Court can take judicial notice of these documents without converting Defendants' motion to one for summary judgment. The Court "may consider any . . . statements or documents incorporated into the complaint by reference . . . and documents possessed by or known by to the plaintiff and upon which it relied in bringing the suit." *ATSI Commc'ns Inc. v. Shaar Fund, Ltd.*, 493 F.3d 87, 98 (2d Cir. 2007) (citing *Rothman v. Gregor*, 220 F.3d 81, 88 (2d Cir. 2000)). As a preliminary matter, Defendants submitted these agreements in response to Plaintiffs' prior briefing, which specifically criticized Defendants for discussing these agreements without attaching a copy of them to their moving brief. ECF No. 92 at 20 n.9. Plaintiffs cannot now criticize Defendants for complying with their request. In any event, the *ATSI Commc'ns* requirements are met. First, these agreements are referenced throughout the body of the SAC and in Exhibit 1, the CFTC Order, on which Plaintiffs extensively rely to support their allegations. *See* SAC ¶¶ 55, 61, 97; *id.* Ex. 1 at 4–5. Second, these documents were publicly filed and served on Plaintiffs in these very proceedings. Plaintiffs undoubtedly possessed and relied upon these agreements in amending their complaint. Therefore, these agreements are properly before the Court on this motion to dismiss.

peg of 1.20 Swiss francs to one euro.  The SNB made this announcement just days after assuring the markets that it had no intention of removing the currency peg. This unforeseen policy reversal resulted in widespread market disruption, known as the "SNB Flash Crash," that entailed extreme price volatility and zero market liquidity.  When the dust settled, the value of the euro had plummeted versus the Swiss franc, and traders and brokers throughout the world with open long positions on the euro-Swiss franc currency pair had collectively lost billions of dollars.  FXCM customers with positions in this currency trading pair lost more than $275 million, and FXCM faced a brief regulatory-capital shortfall for the first and only time in its seventeen-year history.  *See* SAC Ex. 2 ¶¶ 79–85; 2015 Form 10-K at 13–14, Dahan Decl. Ex. A.

Other FX brokers were similarly affected.  The day after the SNB Flash Crash,

> Citigroup sustained more than $150 million in losses on its currency trading desks in the turmoil . . . .  Alpari UK, a foreign currency broker in Britain . . . entered insolvency . . . . In New Zealand, Global Brokers NZ, another online foreign exchange broker, said it was shutting down.

New York Times, "Swiss Move Prompts Fears of Sustained Market Tumult," Jan. 16, 2015, *available at* http://dealbook.nytimes.com/2015/01/16/currency-traders-rattled-in-wake-of-swiss-central-bank-move.[5]

---

[5] *See also* LeapRate.com, "How Forex Brokers Went Bankrupt Overnight amid EURCHF Flash Crash – Infographic," Jan. 20, 2017, *available at* http://www.leaprate.com/news/how-forex-brokers-went-bankrupt-overnight-amid-eurchf-flash-crash-infographic; Forbes, "Currency Brokers Fall Over Like Dominoes After SNB Decision on Swiss Franc," Jan. 16, 2015, *available at* http://www.forbes.com/sites/timworstall/2015/01/16/currency-brokers-fall-over-like-

### D.    The Unadjudicated Regulatory Proceedings and Settlements

On February 6, 2017, FXCM (and Niv and Ahdout) settled alleged regulatory violations relating to the Company's pay-for-flow relationship with Effex with the CFTC and the National Futures Association ("NFA").  *See generally* SAC Exs. 1 & 2.

In the CFTC Order, the CFTC stated that it sought to file an administrative proceeding against FXCM, Niv, and Ahdout "*to determine whether* Respondents engaged in the violations set forth herein, and *to determine whether* any order shall be issued imposing remedial sanctions."  SAC Ex. 1 at 1 (emphasis added).  At the time of the settlement, there was no adjudication of the alleged regulatory violations by FXCM, Niv, and Ahdout.  And to date, such allegations have not been found to be true or adjudicated by any court of law.  Moreover, in entering into the CFTC Order, FXCM, Niv, and Ahdout made clear that they were not admitting to the allegations and claims set forth therein, and expressly preserved their rights to contest such allegations and claims in any other proceeding.  *See id.* at 11.

Further, the CFTC defined the "Relevant Period" for the alleged violations as September 4, 2009 through 2014.  *See id.* at 2.  This definition of the relevant period recognized that the pay-for-flow agreement, memorialized as the Services Agreement between FXCM and Effex, was terminated on August 1, 2014.  Thus, even though the CFTC Order was entered into on February 6, 2017, the CFTC did not claim (as Plaintiffs' erroneously assert, *see* SAC ¶ 73) that FXCM, Niv, or

---

dominoes-after-snb-decison-on-swiss-franc. The Court may take judicial notice of publicly-available news articles on a motion to dismiss.  *Finn v. Barney*, 471 F. App'x 30, 32 (2d Cir. 2012).

Ahdout engaged in the alleged wrongdoing beyond the Relevant Period identified in the CFTC Order.

In the NFA Complaint, the NFA likewise acknowledged that it was only making allegations in the form of a "Complaint" and had only *found reason to believe* that NFA Requirements are being, have been or are about to be violated[.]" SAC Ex. 2 at 1 (emphasis added).  To date, there has been no adjudication of the NFA's claims by any court of law.  Along with the Complaint, the NFA also issued a decision to settle the allegations contained in the NFA Complaint.  *See In the Matter of Forex Capital Markets, LLC, et al.*, NFA Case No. 17-BCC-001, Decision (Feb. 6, 2017), Dahan Decl. Ex. D.  The NFA Decision accepted offers of settlement from FXCM, Niv, Ahdout, and Ornit Niv "in which they *neither admitted nor denied the allegations* of the Complaint and proposed to settle the charges against them[.]"  *Id.* at 3 (emphasis added).

Importantly, nowhere in the CFTC Order, NFA Complaint, or NFA Decision, do the CFTC or NFA contend that pay-for-flow agreements are illegal or improper.  Nor do they contend that FXCM's relationship with Effex caused FXCM customers to lose money on their FXCM trades, or that this relationship harmed FXCM's shareholders.  Finally, neither regulator alleged that FXCM violated Generally Accepted Accounting Principles ("GAAP").

### E.   Prior Ruling Dismissing Plaintiffs' Complaint

The operative complaint is Plaintiffs' second attempt to overcome a motion to dismiss.  *See* Consol. Securities Class Action Compl., ECF No. 48.  This Court

dismissed the prior Complaint finding it did not plead adequately that Defendants (1) made false statements or (2) acted with scienter.

With respect to falsity, the Court found that the Complaint failed to (1) "demonstrate with specificity why and how individual statements are false," Oral Op. at 13:2–4; (2) "plead the defendants did not actually" believe statements of opinion, *id.* at 15:22–25; (3) "allege a duty to disclose particular facts" alleged to be material omissions, *id.* at 16:20–22; (4) "allege facts allowing this Court to conclude that the statements were false at the time they were made," *id.* at 17:18–20; and (5) address other problems, *id.* at 16:8–10 ("There are other parts of the complaint that similarly failed to meet the heightened pleading standard, and I am not going to go through all of these problems now.").

With respect to scienter, the Court found that the Complaint did not allege "motive and opportunity." *Id.* at 18:13–14. Therefore, Plaintiffs were required to "do more than allege the individual defendants were aware of the order-flow arrangement with Effex;" they "must allege sufficient facts as to each defendant to make it cogent and at least as compelling as any opposing inference that defendants' statements . . . were made with fraudulent intent." *Id.* at 18:22–19:3. On this point, the Court instructed that, "[w]hen plaintiffs amend their complaint, they should clarify exactly what facts form their basis for believing each defendant was not acting on a good-faith basis and their attempts to preserve corporate formalities between Effex and FXCM were legally and financially [in]sufficient to avoid fraudulent statements." *Id.* at 19:6–11. The court further instructed that

"Plaintiff must also focus on why there was intent to defraud investors as opposed to customers." *Id.* at 19:11–13.

Finally, the Court also dismissed the Section 20(a) claims in the prior Complaint because Plaintiffs failed to "plead culpable participation by each of the individual defendants with particularity." *Id.* at 19:16–21. Specifically, the prior Complaint failed to "allege facts [supporting] a strong inference of scienter" that any misleading "statements were being issued concerning the company." *Id.* at 19:22–20:6.

### F.    Plaintiffs' New Allegations

As in their prior Complaint, Plaintiffs allege in the SAC that Defendants violated GAAP because they did not report Effex as either a variable interest entity or a related party. SAC ¶¶ 125–45. Plaintiffs continue to ignore that FXCM's outside auditors, Ernst & Young LLP ("EY"), opined that FXCM's financial statements were not materially misstated during the Class Period. In fact, even *after* FXCM's settlements with the CFTC and NFA, EY again opined that the financial statements contained in FXCM's 2016 annual report were not materially misstated and did not require that any earlier annual or quarterly FXCM filing be restated based on Effex's purported status as a variable interest entity or related party. *See* 2016 Form 10-K at F-2, Dahan Decl. Ex. E.

Plaintiffs further contend that various statements in FXCM's Class Period SEC filings were materially misleading. They first allege that certain statements were misleading because payments labeled "order flow" were actually profit-sharing payments, and FXCM therefore did not actually use an agency model. *See* SAC

11

¶¶ 147, 149, 151, 153, 155, 157, 159, 161, 163.  According to Plaintiffs, the alleged profit-sharing payments rendered false or misleading various statements (1) explaining FXCM's agency model, *see id.* ¶¶ 146, 154, 156, 158, 160; (2) defining "order flow" payments, *see id.* ¶ 150; and (3) describing FXCM's revenue sources, *see id.* ¶¶ 148, 152, 162.  Plaintiffs also allege that certain statements were false or misleading because "FXCM engaged in various practices designed to favor Effex over other market makers and give Effex advantages that were detrimental to FXCM's retail customers."  *Id.* ¶¶ 150–51.

In addition, Plaintiffs contend that various public filings were rendered misleading because Defendants did not disclose ongoing regulatory inquiries concerning Effex, *id.* ¶¶164–68, and that SOX certifications were misleading because of the foregoing misstatements, *id.* ¶¶ 169–76.  Plaintiffs also allege that FXCM made "misleading statements" on its website concerning its agency-trading model (*see id.* ¶¶ 178–83), but provide no explanation as to why these particular statements were allegedly misleading.

Finally, Plaintiffs allege that FXCM lied to regulators to cover up their scheme with Effex.  *Id.* ¶¶ 86–92.  None of the statements to regulators were made publicly or otherwise disclosed to investors.

## LEGAL STANDARD

To state a claim under Section 10(b) of the Exchange Act and Rule 10b-5, Plaintiffs must adequately plead: (1) a material misrepresentation or omission of material fact; (2) scienter; (3) in connection with the purchase or sale of a security; (4) reliance; (5) economic loss; and (6) loss causation.  *Pac. Inv. Mgmt. Co. v. Mayer*

*Brown LLP*, 603 F.3d 144, 151 (2d Cir. 2010) (quoting *Stoneridge Inv. Partners, LLC v. Scientific-Atlanta, Inc.*, 552 U.S. 148, 157 (2008)).

In accordance with Rule 12(b)(6), the SAC "must contain sufficient factual matter, accepted as true" that states a claim that is plausible on its face. *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009). A claim is plausible "when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id.* "[C]onclusory allegations or legal conclusions masquerading as factual conclusions will not suffice to prevent a motion to dismiss." *Gebhardt v. Allspect, Inc.*, 96 F. Supp. 2d 331, 333 (S.D.N.Y. 2000) (quoting 2 MOORE'S FED. PRACTICE § 12.34[1][b] (3d ed. 1997)).

The Complaint must also allege facts sufficient to satisfy the heightened pleading requirements of Rule 9(b) and the Private Securities Litigation Reform Act of 1995 ("PSLRA"). *See ECA & Local 134 IBEW Joint Pension Tr. of Chi. v. JPMorgan Chase Co.*, 553 F.3d 187, 196 (2d Cir. 2009) ("*IBEW*"). Rule 9(b) requires that a plaintiff alleging fraud "must state *with particularity* the circumstances constituting" the fraud. FED. R. CIV. P. 9(b) (emphasis added). In particular, plaintiffs must "(1) specify the statements that the plaintiff contends were fraudulent, (2) identify the speaker, (3) state where and when the statements were made, and (4) explain why the statements were fraudulent." *Anschutz Corp. v. Merrill Lynch & Co.*, 690 F.3d 98, 108 (2d Cir. 2012) (quoting *Rombach v. Chang*, 355 F.3d 164, 170 (2d Cir. 2004)). Likewise, the PSLRA requires "that securities fraud complaints 'specify' each misleading statement; that they set forth the facts

on which a belief that a statement is misleading was 'formed'; and that they '*state with particularity facts giving rise to a strong inference that the defendant acted with the required state of mind*.' "  *Anschutz*, 690 F.3d at 108 (emphasis added) (quoting *Dura Pharms., Inc. v. Broudo*, 544 U.S. 336, 345 (2005)).

As demonstrated below, the SAC fails to plead adequately (i) a materially false or misleading statement; (ii) scienter; (iii) loss causation; and (iv) control-person liability.

## ARGUMENT

**I.    The SAC Does Not Plead Adequately A Materially False Or Misleading Statement.**

**A.    FXCM's Public Filings After FXCM Terminated the Pay-For-Flow Agreement in August 2014 Cannot Contain Material Misstatements or Omissions.**

There can be no dispute that FXCM terminated its pay-for-flow agreement with Effex on August 1, 2014.  *See* SAC ¶ 73; Q3 2014 Form 10-Q at 36, 40, 45, 51, Dahan Decl. Ex. C; Letter (Aug. 25, 2014), Dahan Decl. Ex. N.  Therefore, order flow payments from Effex to FXCM could not render false or misleading any statement made after this date.  For this reason, the CFTC in its Consent Order identifies the relevant period of the alleged wrongdoing as between 2009 and 2014.  SAC, Ex. 1 at 2.  Accordingly, at a minimum, the Court should dismiss Plaintiffs' claims arising from the following FXCM public filings: Q3 2014 Form 10-Q; 2014 Form 10-K; Q1 2015 Form 10-Q; Q2 2015 Form 10-Q; Q3 2015 Form 10-Q; 2015 Form 10-K; Q1 2016 Form 10-Q; Q2 2016 Form 10-Q; and Q3 2016 Form 10-Q.

Indeed, the Court's prior order required Plaintiffs "to specifically allege the time period during which they say defendants had the allegedly improper relationship with Effex and to state the facts upon which they base those allegations." Oral Op. at 17:21–25.  Plaintiffs have failed to do this.  Instead, they add a single paragraph alleging "[u]pon information and belief" that "FXCM maintained its relationship with Effex into 2017" and listing the following "facts" to support this belief:

> (1) FXCM never received order flow payments from any market makers; (2) the payments from Effex were not order flow payments but rather disguised profit-sharing payments; and (3) FXCM listed Effex on its website as a liquidity provider as late as January 2017 – indicating that the relationship had been maintained beyond 2014 even if the sham "order flow" payments had ceased by that point.

SAC ¶ 73.  These allegations are insufficient for at least two reasons.

First, merely alleging that a "relationship" persisted into 2017 does not "specifically allege the time period during which . . . defendants had the *allegedly improper* relationship with Effex." Oral Op. at 17:21–25 (emphasis added).  As Paragraph 73 explains, the only relationship that persisted into 2017 was FXCM's use of Effex as a liquidity provider.  The order flow payments that allegedly gave FXCM a market position and created the "allegedly improper relationship with Effex," *id.*, "had ceased by that point."  SAC ¶ 73.[6]  Plaintiffs also fail to allege specifically the time period during which FXCM allegedly provided Effex any other

---

[6] Plaintiffs do not allege that *any* payments from Effex to FXCM continued after the termination of the pay-for-flow agreement in 2014.

advantage.  *Cf. id.* ¶ 151 (listing advantages FXCM allegedly gave Effex over other liquidity providers).

Second, Plaintiffs' new allegations contradict their theory of liability. Paragraph 73 states that the existence of payments from Effex to FXCM is not determinative of the profit-sharing relationship.  Yet elsewhere the SAC alleges that these payments are the mechanism by which FXCM shared Effex's profits. *See, e.g., id.* ¶ 55.  Plaintiffs cannot have it both ways.  Either the pay-for-flow payments from Effex to FXCM constituted improper profit sharing — and the cessation of these payments ended this relationship — or the payments did not constitute improper profit sharing and do not give rise to any claim.  In any event, this inconsistency renders implausible Plaintiffs' suggestion that statements postdating the termination of the pay-for-flow agreement could be actionable.  At a minimum, therefore, claims arising from statements made after August 1, 2014, should be dismissed.

### B.    FXCM Did Not Violate GAAP.

Plaintiffs allege that FXCM's public filings during the Class Period are false and misleading because, in violation of GAAP, the Company did not consolidate Effex into its consolidated financial statements and did not treat the pay-for-flow agreement with Effex as a "related party transaction." *See* SAC ¶¶ 125–45. Plaintiffs' unsupported and conclusory allegations of GAAP violations are insufficient to allege adequately a material misstatement.

16

The Second Circuit has explained that "naked assertions" of GAAP violations amount to conclusions that the Court need not credit when evaluating a motion to dismiss:

> In the absence of a restatement or allegations pointing to objective facts that Defendants' accounting methods violated GAAP, carping about Defendants' application of GAAP amounts to no more than a naked assertion devoid of further factual enhancement; it does not permit the Court to infer that the Defendants committed accounting fraud.

*Harris v. AmTrust Fin. Servs., Inc.*, 135 F. Supp. 3d 155, 172 (S.D.N.Y. 2015), *aff'd*, 649 F. App'x 7 (2d Cir. 2016) (internal quotation marks and citations omitted). "[A]llegations of GAAP violations or accounting irregularities, standing alone, are insufficient to state a securities fraud claim." *IBEW*, 553 F.3d at 200 (citation omitted); *see also See City of Sterling Heights Police & Fire Ret. Sys. v. Vodafone Grp. Pub. Ltd. Co.*, 655 F. Supp. 2d 262, 269–72 (S.D.N.Y. 2009) (finding conclusory allegations of GAAP violations to be insufficient to state a claim). This is especially the case where, as here, there has been no restatement by FXCM during the Class Period.[7]

There is no dispute that FXCM's public filings were audited by one of the leading accounting firms in the country: EY. In auditing these financial

---

[7] *See also Kuriakose v. Fed. Home Loan Mortg. Corp.*, 897 F. Supp. 168, 181 (S.D.N.Y. 2012) ("Further negating any inference that Freddie Mac materially misstated its financials is the fact that the company never issued a restatement for its Class Period financials."), *aff'd sub nom. Cent. States, Se. & Sw. Areas Pension Fund v. Fed. Home Loan Mortg. Corp.*, 543 F. App'x 72 (2d Cir. 2013); *In re Marsh & McLennan Cos., Inc. Sec. Litig.*, 501 F. Supp. 2d 452, 477 (S.D.N.Y. 2006) (reasoning that the failure to allege a restatement or other "hallmarks of accounting fraud" undercuts any attempt to plead the existence of such fraud).

statements, EY reported on FXCM's variable interest entities, related party transactions, and retail trading revenue.[8]   Since the announcement of the CFTC and NFA settlements, EY has not required FXCM to restate any of its previously issued financial statements.   Nor has any regulator alleged GAAP violations. Indeed, the only party to contend that FXCM has violated GAAP is Plaintiffs.   That is not a sufficient basis for the Court to find the existence of a properly pleaded GAAP violation.   *See In re Fannie Mae 2008 Sec. Litig.*, 742 F. Supp. 2d 382, 408 (S.D.N.Y. 2010) (finding that the complaint failed to sufficiently allege a GAAP violation and noting that "only the Plaintiffs contend that [the defendant] committed these GAAP violations — federal regulators have never claimed any violation" or required a restatement).

Further, the very CFTC and NFA allegations Plaintiffs rely upon demonstrate that the GAAP rules they describe were not violated:

- Nowhere in the CFTC Consent Order or NFA Complaint do the CFTC or NFA claim that FXCM violated GAAP.

- The CFTC acknowledged that John Dittami of Effex, not FXCM, is the sole owner of Effex.   *See* SAC Ex. 1 at 7 ("[Dittami], a former employee (and, indeed, an executive) of FXCM, was the principal and *100 percent owner of [Effex]*" (emphasis added)).

- The CFTC acknowledged that under the Services Agreement FXCM was entitled to payment based upon trading volume, not based on percentage of Effex's profit.   *See* SAC Ex. 1 at 5.  Even Plaintiffs acknowledge this fact. *See id.* ¶ 55.

---

[8] *See, e.g.*, 2011 Form 10-K at F-11, F-15–F-16, F-28, F-29, F-41, Dahan Decl. Ex. H; 2012 Form 10-K at F-12, F-16–F-18, F-34–F-35, F-48, Dahan Decl. Ex. I; 2013 Form 10-K at F-12, F-16–F-18, F-35–F-37, F-53, Dahan Decl. Ex. J; 2014 Form 10-K at F-10, F-13, F-17–F-18, F-36–F-38, F-44, F-57, Dahan Decl. Ex. B; 2015 Form 10-K at F-11, F-20, F-40–F-42, F-55, Dahan Decl. Ex. A.

- Nowhere in the CFTC Consent Order or NFA Complaint do the CFTC or NFA claim that FXCM had any voting power with Effex.

The pay-for-flow agreement further confirms that Effex was neither owned nor controlled by FXCM. Services Agreement (May 1, 2010) § 8.3, Dahan Decl. Ex. L ("[D]uring the term of this Agreement, John Dittami ('Owner') shall remain the sole owner actual and beneficial of 100% of the membership interest of Effex . . . ."); *id.* § 16 ("Nothing in this Agreement shall constitute or be deemed to establish a partnership, joint venture, association or employment relationship between the Parties hereto . . . .").

In the absence of an ownership interest, voting rights, or a variable interest based upon Effex's profit or loss, Plaintiffs' assertion that FXCM controlled Effex is implausible. Moreover, it is incorrect to consider Effex a variable interest entity or a related party of FXCM based solely on revenues from the Services Agreement. *See* ASC 810-10-15-14; ASC 850-10-20. At a minimum, the accounting treatment of Effex was a judgment call. The securities laws are not an invitation for the Court to substitute Plaintiffs' judgment for FXCM's or EY's. *See Harris*, 135 F. Supp. 3d at 161 n.9 ("The Court is not required to accept Lead Plaintiff's legal or accounting conclusion regarding the GAAP requirements . . . .").

### C.   FXCM's Statements About the Agency-Trading Model Were Neither False Nor Misleading.

As a preliminary matter, Plaintiffs fail to identify which sections of the block quotes from the FXCM website are allegedly actionable. *See* SAC ¶¶ 178–83. These allegations should be dismissed for the same reasons the prior Complaint was

dismissed.  *See* Oral Op. at 13:6–10 ("[T]his [C]ourt should not have to search the long quotations in the complaint for particular false statements and then determine on its own initiative how and why the statements were false . . . .").

Further, the facts alleged demonstrate that all of the challenged statements were true.  Most of the statements Plaintiffs identify as false or misleading are allegedly so because the payments labeled "order flow" were actually profit-sharing payments.  *See* SAC ¶¶ 147, 149, 151, 153, 155, 157, 159, 161, 163.  But Plaintiffs have not alleged adequately that "order flow" payments were anything other than as described in FXCM's public filings.  Plaintiffs do not dispute that the pay-for-flow fee that FXCM received was a flat fee based solely on customer trading volume.  *Id.* ¶ 55.  A profit sharing arrangement requires more than knowledge of the other entity's financials.  A profit sharing payment, by definition, is regularly and periodically adjusted based on profits.  But Plaintiffs do not allege that the fee paid actually varied on a quarterly, monthly, or annual basis based on Effex's profits.  Rather, Plaintiffs allege that Effex paid FXCM a flat fee, set long before Effex's profits or losses were known, that was at most adjusted one time.  *See id.* ¶ 61.

Plaintiffs further allege that certain statements were false or misleading because "FXCM engaged in various practices designed to favor Effex over other market makers and give Effex advantages that were detrimental to FXCM's retail customers."  *Id.* ¶ 151.[9]   However, Plaintiffs have failed to allege that these

---

[9]  Specifically, Plaintiffs allege that "FXCM (1) permitted Effex to win all 'ties' with other market makers; (2) provided Effex with a real-time view of price quotations offered by other market makers; (3) added smaller markups to Effex's prices than to

practices (1) are not standard in the industry (in fact, they were); (2) needed to be disclosed under SEC rules or other regulations (in fact, they did not); or (3) violated any regulatory requirements (in fact, they did not).  Further, these practices do not contradict or render misleading the statement that "[t]he Company's order routing software ensures that *payments for order flow* do not affect the routing of orders in a manner that is detrimental to its retail customers."  *Id.* ¶ 150 (emphasis added).  Even if *other* advantages affected routing of orders, the allegedly misleading statement only purports to address payments for order flow.  FXCM never said it treated all liquidity providers equally.  Crucially, while these other advantages could give Effex an edge over other liquidity providers, they could not create a market interest for FXCM or pit the interests of FXCM against its retail customers.  Therefore, Plaintiffs have failed to allege any false or misleading statement about the agency-trading model.

### D. FXCM Was Not Required To Disclose Ongoing Regulatory Investigations.

Plaintiffs contend that various public filings were rendered misleading because Defendants did not disclose ongoing regulatory inquiries concerning Effex. *Id.* ¶¶ 164–68.  However, as this Court ruled previously, "if plaintiffs seek to allege certain material omissions, they must allege a duty to disclose particular facts." Oral Op. 16:20–22; *see also Lawrence v. Alaska Elec. Pension Fund (In re Bank of Am. AIG Disclosure Sec. Litig.)*, 980 F. Supp. 2d 564, 575 (S.D.N.Y. 2013) (" 'A[n]

---

prices provided by other market makers; (4) allowed Effex to use a hold timer and a 'previous quote' practice; and (5) allowed Effex to access FXCM's internal servers." *Id.*

omission is actionable under federal securities laws only when the [defendant] is subject to a duty to disclose the omitted facts.' " (citation omitted), *aff'd* 566 F. App'x 93 (2d Cir. 2014)).   Plaintiffs have failed to allege any duty to disclose these investigations.   In fact, no such duty exists.   *See In re Lions Gate Entm't Corp. Sec. Litig.*, 165 F. Supp. 3d 1, 12 (S.D.N.Y. 2016) (no duty to disclose ongoing SEC investigation).   Therefore, Plaintiffs have failed to allege an actionable omission.

### E.   SOX Certifications Are Not Independently Actionable.

Plaintiffs allege that SOX certifications are actionable because of (i) alleged GAAP violations, *id.* ¶¶ 170, 175; or (ii) the previously-addressed alleged misstatements and underlying facts, *id.* ¶¶ 171–72, 176.   However, a SOX certification does not transform non-actionable statements into securities violations. *See, e.g.*, *Menaldi v. Och-Ziff Cap. Mgmt. Grp. LLC*, 277 F. Supp. 3d 500, 517 (S.D.N.Y. 2017) ("SOX certifications . . . do not constitute a standalone basis for liability.").   Therefore, the SOX certifications are not actionable for the same reasons explained above.

## II.   The SAC Fails To Raise a Strong Inference of Scienter.

### A.   Plaintiffs Have Not Alleged Any Facts Establishing Defendants' Motive or Opportunity.

In the Second Circuit, a strong inference of scienter may be raised by showing that Defendants either (1) had both motive and opportunity to commit the fraud, or (2) engaged in conduct constituting strong circumstantial evidence of conscious misbehavior or recklessness. *See In re Tower Grp. Int'l, Ltd. Sec. Litig.*, No. 13 CIV. 5852 AT, 2015 WL 5813393, at *5 (S.D.N.Y. Sept. 18, 2015).   As this Court

previously recognized, Plaintiffs failed in their prior Complaint to allege facts establishing any motive by Defendants to commit the alleged fraud.  Oral Op. at 18:12–17.  The SAC's new allegations likewise do not allege any plausible motive for Defendants to conceal FXCM's relationship with Effex from investors.

Plaintiffs have not alleged any of the customary facts that may establish motive.  For example, they have not pleaded that any Defendant sold stock, benefited from increased bonuses, or had a personal interest in Effex.  A general desire to increase the profitability of a company is not sufficient to constitute motive.  "The Second Circuit has made plain that these and other motives 'possessed by most corporate directors and officers' are too generic to support an allegation of fraud."  *In re BISYS Sec. Litig.*, 397 F. Supp. 2d 430, 444 (S.D.N.Y. 2005) (quoting *Kalnit v. Eichler*, 264 F.3d 131, 139 (2d Cir. 2001)).  Without allegations of motive and opportunity, Plaintiffs are left with no response to the simple fact that the Individual Defendants were among the largest shareholders of the Company, collectively owning 27.7% of the Company during the Class Period. SAC ¶ 31.  This ownership interest completely aligned the Individual Defendants' interests with those of investors; any fraud perpetrated to harm the shareholders would have equally harmed Defendants.

### B. Plaintiffs Have Not Alleged Any Particularized Circumstantial Evidence Raising a Strong Inference of Scienter by Any of the Individual Defendants.

Having failed to establish any motive for the alleged fraud, Plaintiffs instead rely on supposed circumstantial evidence of scienter.  In doing so, Plaintiffs must meet a considerably higher pleading standard.  *See IBEW*, 553 F.3d at 199.  When

relying on circumstantial evidence, plaintiffs are required to plead facts that are "more than merely plausible or reasonable — [the inference of scienter] must be cogent and at least as compelling as any opposing inference of nonfraudulent intent." *See Tower Grp.*, 2015 WL 5813393, at *4 (quoting *Tellabs, Inc. v. Makor Issues & Rights, Ltd.*, 551 U.S. 308, 314 (2007)).

In its prior dismissal of this action, this Court concluded that Plaintiffs had not met this high pleading requirement. Oral Op. at 19:5–6. The SAC attempts to remedy this defect by adding new allegations concerning Defendants' (1) purported involvement with Effex and (2) alleged attempts to cover-up the Effex relationship during the in NFA and CFTC investigations. As explained below, these allegations do not support a strong inference of scienter.

### (1)   Lande Was Not Involved With Effex.

Plaintiffs' primary new scienter allegation is that the Individual Defendants were directly involved in the allegedly improper relationship between FXCM and Effex. Relying on the CFTC's allegation that "FXCM personnel had full knowledge of . . . the facts about [Dittami] and [Effex]'s relationship with FXCM," Plaintiffs conclude that all three Individual Defendants had equal knowledge of this relationship. *See* SAC at ¶ 92. But Plaintiffs' factual allegations vary greatly between the three Individual Defendants. And "[i]n order to plead scienter adequately, the plaintiffs must allege facts supporting a strong inference with respect to *each defendant*." *Plumbers & Pipefitters Nat'l Pension Fund v. Orthofix Int'l N.V.*, 89 F. Supp. 3d 602, 614 (S.D.N.Y. 2015) (emphasis added) (citing

*Plumbers & Pipefitters Local Union No. 630 Pension-Annuity Tr. Fund v. Arbitron Inc.*, 741 F. Supp. 2d 474, 488 (S.D.N.Y. 2010)).

As discussed below, Plaintiffs allege that Niv and Ahdout were closely involved with the creation of Effex. *Id.* ¶ 93. But they do not allege that Lande had any role creating or directing Effex. Rather, Plaintiffs speculate that, as CFO, Lande must have been aware that Effex was reporting its profits and losses directly to FXCM for an unspecified period of time, that FXCM would then incorporate this information in its own profit and loss calculations, and that Effex made payments due under its order flow agreement to FXCM Holdings. *Id.* at ¶ 99. However, Plaintiffs do not provide any particularized *facts* showing how Lande would have been aware of these facts other than because of his job title.

"Plaintiffs essentially claim that [Lande] should have known about the alleged [fraud] based on [his] corporate position, a contention courts in this circuit consistently reject." *See, e.g., In re China Mobile Games & Entm't Grp. Sec. Litig.*, No. 14-cv-4471, 2016 WL 922711, at *8 n.10 (S.D.N.Y. Mar. 7, 2016) (citing *In re Sotheby's Holdings, Inc. Sec. Litig.*, No. 00 CIV. 1041 (DLC), 2000 WL 1234601, at *7 (S.D.N.Y. Aug. 31, 2000)). An executive's job title is not sufficient to raise an inference of scienter, even when the alleged facts were within the purview of that individual's job description. Instead, a plaintiff must allege specific facts that the individual was aware of, as well as how the individual was aware of those facts. *Sotheby's* 2000 WL 1234601, at *7. Plaintiffs have not alleged any such facts with respect to Lande and he should be dismissed from the case.

25

**(2)    Plaintiffs Fail to Allege that Any of the Individual Defendants Disregarded Corporate Formalities Between FXCM and Effex.**

In its prior dismissal of this action, the Court instructed Plaintiffs to "clarify exactly what facts form their basis for believing each defendant was not acting on a good-faith basis and their attempts to preserve corporate formalities between Effex and FXCM were legally and financially [in]sufficient to avoid fraudulent statements." Oral Op. at 19:6–11. The SAC does not remedy this deficiency; although Plaintiffs have incorporated some additional detail concerning Niv's involvement, their description of FXCM's relationship with Effex remains unchanged.

Plaintiffs allege no facts suggesting that Lande or Ahdout did not respect corporate formalities between Effex and FXCM. Regarding Lande, as described above, Plaintiffs do not allege that Lande had any role in, or knowledge of, the creation or direction of Effex. With regard to Ahdout, Plaintiffs allege that he was aware of a plan to create an algorithmic trading model and of Dittami's hiring, but they do not allege that he had knowledge of any fraudulent scheme and they provide no other particularized details concerning his involvement. SAC at ¶¶ 93–94. These allegations do not allege adequately Ahdout's scienter. *See In re Inv. Tech. Grp., Inc. Sec. Litig.*, No. 15 Civ. 6369(JFK), 2018 WL 1449206, at *6 (S.D.N.Y. Mar. 23, 2018). Therefore, Plaintiffs have failed to plead scienter for these two defendants, for the same reasons this Court previously found.

With respect to Niv, Plaintiffs allege that Niv (1) hired Dittami to develop a new algorithmic trading system, (2) provided Dittami with startup capital to create

26

Effex; (3) signed the Service Agreements with Effex to provide for order flow payments; and (4) provided Dittami with access to FXCM's brokerage relationship with Citi, as well as with offices, technology, and staff.  SAC at ¶ 93–98.

These allegations do not come close to alleging that corporate formalities between FXCM and Effex were not observed.  There is a more compelling, non-fraud explanation:  Dittami developed the trading algorithm while working for FXCM. FXCM realized that it could not profit directly from the trading algorithm because of its agency-trading model, but that FXCM, and its customers, would benefit from access to an efficient liquidity provider that would honor more of its bids than current liquidity provides.  FXCM therefore provided some limited support to allow Dittami to set up Effex.  Notably, as Plaintiffs admit, this support did not continue past Effex's start-up stage.  *See id.* ¶ 98.

Nor does the fact that Effex paid FXCM pursuant to the pay-for-flow agreement raise an inference of scienter.  "[A]llegations of payment for services rendered are generally inadequate."  *Marsh & McLennan,* 501 F. Supp. 2d at 489 (citing *In re JPMorgan Chase Sec. Litig.*, 363 F. Supp. 2d 595, 621 (S.D.N.Y. 2005)). "Plaintiffs do not allege facts supporting an inference of scienter that is 'at least as compelling as any opposing inference' of the 'plausible, nonculpable explanation[ ]' that these payments were for valid services, not for agreement to participate in a scheme to defraud."  *See W.Va. Pipe Trades Health & Welfare Fund v. Medtronic, Inc.*, 57 F. Supp. 3d 950, 979 (D. Minn. 2014) (quoting *Tellabs,* 551 U.S. at 324).

27

### (3)     Plaintiffs Have Failed To Allege That the Individual Defendants Intended to Defraud *Investors*.

In its prior opinion, this Court instructed Plaintiffs to "focus on why there was an intent to defraud *investors* as opposed to customers."  Oral Op. at 19:11–13 (emphasis added).   In an apparent attempt to comply with this instruction, Plaintiffs added a section to their SAC entitled "Defendants' Scheme Defrauded Investors As Well as Customers."  *See* SAC ¶¶ 186–90.  This section, however, is entirely devoid of allegations that Defendants stood to gain from misleading investors about the alleged scheme.

The core of Plaintiffs' theory is that FXCM's relationship with Effex allowed it to benefit from Effex's trades, which took positions opposing FXCM's customers. *See id.* ¶ 93.  Put another way, Plaintiffs allege that FXCM conspired with Effex to profit at the expense of FXCM's customers.  This is not true — but even if it were true, this lawsuit is not an action brought by FXCM's customers.[10]  A purported fraud to profit at the expense of customers is not a fraud against shareholders. FXCM's relationship with Effex could be improper, unlawful, or even deceptive without constituting securities fraud.  Notably, executives may conceal information without an intent to deceive investors.  For example, an executive may wish to keep information from competitors, or conceal facts in order to hide evidence of mismanagement.  *See, e.g.*, *Alaska Elec. Pension Fund v. Adecco S.A. (In re Adecoo*

---

[10] A separate class action filed by FXCM customers is pending in this district before Judge Crotty and has been stayed as to FXCM pending arbitration.  Stip. & Order to Stay Certain Proceedings Pending Arbitration, *Nguyen v. FXCM, Inc.*, Civil Action No. 1:17cv2729(HBP)(PAC), ECF No. 28.

*S.A.*), 371 F. Supp. 2d 1203, 1223 (S.D. Cal. 2005) ("A desire to conceal mismanagement is not sufficient to show motive and opportunity." (citing *Allison v. Brooktree Corp.*, No. 97-CV-0852 TW(POR), 1998 WL 34074832, at *10 (S.D. Cal. Nov. 27, 1998) and *Kalnit v. Eichler*, 85 F. Supp. 2d 232, 243 (S.D.N.Y. 1999))). The relevant question is whether Plaintiffs have alleged sufficiently that Defendants attempted to conceal information from *investors*. Plaintiffs have not.

At best, Plaintiffs allege that Defendants could not divulge their scheme to investors without customers learning of it. *See id.* ¶ 189. This allegation does not raise a strong inference of scienter. Even assuming Defendants did perpetrate a fraud against FXCM's consumers — which they did not — the more compelling inference is that it was done for the benefit of FXCM and its investors.

For the same reason, Plaintiffs' allegations that Niv[11] misled the NFA about the relationship between Effex and FXCM, *see* SAC ¶¶ 101–02, do not raise an inference of scienter. Even assuming Niv misled regulators — which he did not — Plaintiffs have not pleaded any facts suggesting that he was motivated to do so by a desire to mislead *investors*.[12] Indeed, Plaintiffs must admit that Niv's statements to the NFA were neither made publicly nor in any way communicated to investors.

---

[11] Plaintiffs do not allege that Ahdout or Lande misled regulators.

[12] Further, mere violations of government regulations do not constitute securities fraud. *See, e.g.*, *Acito v. IMCERA Grp., Inc.*, 47 F.3d 47, 52–53 (2d Cir. 1995) (finding no duty to disclose violations noted by FDA inspection); *City of Roseville Employees' Ret. Sys. v. Sterling Fin. Corp.*, 963 F. Supp. 2d 1092, 1139–40 (E.D. Wash. 2013) ("[E]ven assuming that Plaintiff had sufficiently alleged regulatory violations, these violations do not support an inference of scienter.").

### C.  The Alleged GAAP Violations Do Not Suffice To Allege Scienter.

As discussed in Section I(B), *supra*, Plaintiffs have failed to allege adequately that FXCM violated GAAP.  But even assuming that Plaintiffs adequately pleaded a GAAP violation, "[a]llegations of failure to comply with GAAP do not suffice to allege scienter."  *Plumbers & Pipefitters Local Union No. 719 Pension Trust Fund v. Conseco Inc.*, No. 09-cv-6966, 2011 WL 1198712, at *22 (S.D.N.Y. Mar. 30, 2011) (collecting cases); *see also Fannie Mae*, 742 F. Supp. 2d at 408 (no scienter where "the accounting rules governing the relevant practices are sufficiently flexible so as to encompass [the defendant's] interpretation of them during the Class Period.").

Plaintiffs also fail to allege any facts showing that Niv, Ahdout, or Lande knew that FXCM's accounting treatment of Effex violated GAAP.  To the contrary, these Defendants had every reason to believe that the accounting treatment was appropriate in light of the fact that EY provided unqualified opinions for each of the annual financial statements issued during the Class Period and has not required the Company to restate its financial statements. *See In re Turquoise Hill Res. Ltd. Sec. Litig.*, No. 13-cv-8846, 2014 WL 7176187, at *6 (S.D.N.Y. Dec. 16, 2014) (finding no inference of scienter where complaint lacked allegations that the company's auditors disagreed with challenged accounting).  Plaintiffs make no allegation that Defendants deceived the Company's auditors in any way or concealed the nature of FXCM's relationship with Effex from them.  Nor do they allege that the audits themselves were defective in any manner.  Accordingly, there

is a much stronger competing inference that Defendants believed — based on the work of its auditors — that FXCM was fully compliant with GAAP in all respects.

*     *     *

As none of Plaintiffs' scienter allegations individually contribute to a strong inference of scienter by the Individual Defendants, nor do their allegations collectively allege scienter.

### D.   Plaintiffs Have Failed To Allege FXCM's Scienter.

"Under the law of this Circuit, a plaintiff can show corporate scienter by pleading facts sufficient to create a strong inference either (1) that 'someone whose intent could be imputed to the corporation acted with the requisite scienter,' or (2) that 'a corporate statement is so important and dramatic that it "would have been approved by corporate officials sufficiently knowledgeable about the company to know that the announcement was false."'" *Thomas v. Shiloh Indus., Inc.*, No. 15 CV 7449 (KMW), 2017 WL 2937620, at *2 (S.D.N.Y. July 7, 2017) (quoting *Teamsters Local 445 Freight Division Pension Fund v. Dynex Capital, Inc.*, 531 F.3d 190, 195–96 (2d Cir. 2008) and *Vining v. Oppenheimer Holdings Inc.*, No. 08 Civ. 4435(LAP), 2010 WL 3825722, at *13 (S.D.N.Y. Sept. 29, 2010)).

The SAC fails to allege FXCM's scienter under either prong. First, for the reasons discussed above, Plaintiffs have failed to support a strong inference of scienter for any individual whose intent could be imputed to FXCM. Second, Plaintiffs have not alleged that any allegedly misleading statement was "important and dramatic."

31

### III.   The SAC Fails to Allege Loss Causation.

"To plead loss causation, the complaint[ ] must allege facts that support an inference that [efendants'] misstatements and omissions concealed the circumstances that bear upon that loss suffered such that plaintiffs would have been spared all or an ascertainable portion of that loss absent the fraud." *Lentell v. Merrill Lynch & Co., Inc.*, 396 F.3d 161, 175 (2d Cir. 2005). "While loss causation often is a fact specific question appropriate for trial, 'when the plaintiff's loss coincides with a marketwide phenomenon causing comparable losses to other investors, the prospect that the plaintiff's loss was caused by the fraud decreases, and a plaintiff's claim fails when it has not adequately ple[ ]d facts which, if proven, would show that its loss was caused by the alleged misstatements as opposed to intervening events.' " *City of Westland Police & Fire Ret. Sys. v. MetLife, Inc.*, 928 F. Supp. 2d 705, 715 (S.D.N.Y. 2013) (quoting *Lentell*, 396 F.3d at 174).

Here, a "marketwide phenomenon causing comparable losses to other investors" interrupts the alleged Class Period: The January 2015 SNB Flash Crash that caused a 90% decline in FXCM's stock price. *See* FXCM Stock Prices, Bessette Decl. Ex. P. FXCM's competitors suffered similar losses. For example, two online foreign exchange brokers entered bankruptcy the day after the SNB Flash Crash. *See supra*, at 6–7. "Given the precipitous drop in the market, . . . plaintiff was obliged to allege factual matter sufficient to 'disaggregate those losses caused by the [SNB Flash Crash] from disclosures of the truth behind the alleged misstatements.' " *Westland Police*, 928 F. Supp. 2d at 715 (quoting *Loftin v. Bande (In re Flag Telecom Holdings, Ltd. Sec. Litig.)*, 574 F.3d 29, 36 (2d Cir. 2009)); *see*

*also Lattanzio v. Deloitte & Touche LLP*, 476 F.3d 147, 158 (2d Cir. 2007) (holding that plaintiffs had not alleged loss causation where they did not "allege[ ] facts that would allow a factfinder to ascribe some rough proportion of the whole loss to Deloitte's misstatements."). Plaintiffs have made no attempt to do this. They have therefore failed to allege adequately loss causation.[13]

Further, Plaintiffs' only allegations of loss causation relate to the stock price drop on February 7, 2017, coinciding with publication of the regulatory settlements. *See* SAC ¶¶ 82–83. However, these settlements did not allege, or even discuss, any GAAP violations. In fact, Plaintiffs have not alleged, even conclusorily, that the alleged GAAP violations affected the stock price. Therefore, at a minimum, claims based on GAAP violations should be dismissed for failure to plead loss causation. *See, e.g.*, *Stratte-McClure v. Morgan Stanley*, No. 09 Civ. 2017(DAB), 2013 WL 297954, at *13 (S.D.N.Y. Jan. 18, 2013) (dismissing complaint for failure to allege loss causation where "Plaintiffs still fail to plead that *any* disclosure about Defendants' [alleged GAAP violation] occurred"), *aff'd* 776 F.3d 94 (2d Cir. 2015); *Amorosa v. Ernst & Young LLP*, 682 F. Supp. 2d 351, 363–65 (S.D.N.Y. 2010) (dismissing complaint for failure to allege loss causation where plaintiff failed to

---

[13] Plaintiffs also will have difficulty *proving* loss causation because an intervening event disrupted the chain of causation: The February 2017 settlements with the CFTC and NFA coincided with FXCM's announcement that it would leave the U.S. market and sell its U.S. operations to Gain Capital Holdings. *See, e.g.*, 2015 Form 10-K at 13–14, Dahan Decl. Ex. A; NASDAQ, "Why FXCM Inc (FXCM) Stock Is Plunging Today," Feb. 7, 2017, available at http://www.nasdaq.com/article/why-fxcm-inc-fxcm-stock-is-plunging-today-cm744601 (chronicling FXCM's stock price drop after the announcement that it would leave the U.S. market and sell its U.S. business to Gain Capital).

allege a corrective disclosure); *In re Polaroid Corp. Sec. Litig.*, 134 F. Supp. 2d 176, 189 (D. Mass. 2001) (dismissing complaint where "plaintiffs fail[ed] to allege that th[e] GAAP violation was a substantial factor in the decline of the stock price").

## IV.   The Second Amended Complaint Fails to Allege Adequately a Control-Person Claim Under Section 20(a).

Plaintiffs also seek to hold the Individual Defendants liable as control persons of the Company under Section 20(a) of the Securities Exchange Act.   SAC ¶¶ 210–18.   The Individual Defendants cannot be held liable under this section for two reasons.

First, before an individual may be held liable under Section 20(a), a plaintiff must successfully plead a primary violation of the securities laws.   *See In re Vivendi Universal, S.A. Sec. Litig.*, 842 F. Supp. 2d 522, 527 (S.D.N.Y 2012) (citing *ATSI Commc'ns*, 493 F.3d at 108)).   For all of the reasons discussed herein, Plaintiffs have failed to adequately allege any primary violation of the securities laws.

Second, to state a claim under Section 20(a), Plaintiffs must also allege culpable participation by each of the individual defendants, which they have not done.   *See* Oral Op. 19:16–21; *Alpha Capital Anstalt v. Schwell Wimpfheimer & Assocs. LLP*, No. 1:17-cv-1235-GHW, 2018 WL 1627266, at *21 (S.D.N.Y. Mar. 30, 2018).   Alleging culpable participation "requires 'particularized facts of the *controlling person's* conscious misbehavior or recklessness.' " *Special Situations Fund III QP, L.P. v. Deloitte Touche Tohmatsu CPA, Ltd.*, 33 F. Supp. 3d 401, 438 (S.D.N.Y. 2014) (quoting *Lapin v. Goldman Sachs Grp., Inc.*, 506 F. Supp. 2d 221, 246–47 (S.D.N.Y. 2006)).   And Plaintiffs asserting Section 20(a) claims must "plead

culpable participation with the same particularity they must [use to] plead scienter under the PSLRA." *In re Lihua Int'l, Inc. Sec. Litig.*, No. 14-cv-5037, 2016 WL 1312104, at *18 (S.D.N.Y. Mar. 31, 2016).

Because Plaintiffs have failed to allege scienter under Section 10(b) with respect to Niv, Ahdout, and Lande, as described above, they also have failed to plead their culpable participation for purposes of Section 20(a). *See id*. ("Plaintiffs do not plead [the defendant's] culpable participation for the same reasons they do not plead her scienter."). Having failed to allege either a primary violation of the securities laws by the Company or culpable participation by Defendants, Plaintiffs' claims under Section 20(a) must be dismissed.

## CONCLUSION

For these reasons, the Second Amended Complaint should be dismissed with prejudice.

Dated:  May 7, 2018

KING & SPALDING LLP

*/s/  Paul R. Bessette*
Paul R. Bessette
Israel Dahan
KING & SPALDING LLP
1185 Avenue of the Americas
New York, New York  10036-2601
Tel:  (212) 556.2100
Fax: (212) 556.2200

Rebecca Matsumura, *pro hac vice*
KING & SPALDING LLP
500 W. 2nd Street Suite 1800
Austin, Texas 78701
Tel: (512) 457.2000
Fax: (512) 457.2100

*Attorneys for Defendants Global Brokerage, Inc. f/k/a/ FXCM, Inc., Dror Niv, William Ahdout and Robert Lande*

## CERTIFICATE OF SERVICE

I hereby certify that, on May 7, 2018, the foregoing Motion to Dismiss Plaintiff's Second Amended Complaint was electronically delivered to all counsel of record via the Southern District of New York's CM/ECF system.

*/s/  Paul R. Bessette*
Paul R. Bessette

36