**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| In re Global Brokerage, Inc. f/k/a FXCM Inc. Securities Litigation | Master File No. 1:17-cv-00916-RA |
| | <u>CLASS ACTION</u> |
| This Document Relates To: All Actions | |

**MEMORANDUM OF LAW IN OPPOSITION TO**
**DEFENDANTS' MOTION TO DISMISS PLAINTIFFS' SECOND AMENDED**
<u>**CONSOLIDATED SECURITIES CLASS ACTION COMPLAINT**</u>

## <u>TABLE OF CONTENTS</u>

**Page**

INTRODUCTION ............................................................................................................... 1

STATEMENT OF FACTS ................................................................................................. 4

ARGUMENT ................................................................................................................... 10

    I.      PLAINTIFFS ADEQUATELY ALLEGE FALSE OR MISLEADING STATEMENTS OF MATERIAL FACT .............................................. 11

          A.    Defendants' Statements Concerning FXCM's NDD Platform And "Agency Model" Were False And Misleading ......................... 12

          B.    Defendants' Statements Concerning Purported Order Flow Payments Were False And Misleading ....................................... 13

          C.    Defendants' Financial Statements Were False and Misleading and Violated GAAP .................................................................. 15

          D.    Defendants' Statements and Omissions Concerning Regulatory Investigations Were False and Misleading .............................. 20

          E.    Defendants' SOX Certifications Were False and Misleading ................. 22

          F.    Defendants' Statements and Omissions Post-Dating August 2014 Are Actionable ................................................................... 22

    II.     THE SAC ADEQUATELY ALLEGES SCIENTER ......................................... 23

          A.    Plaintiffs Adequately Allege Scienter Against Niv, Ahdout and Lande.................................................................................... 25

          B.    Plaintiffs Adequately Allege Scienter Against FXCM ........................... 30

          C.    Plaintiffs Allege Scienter Under The Core Operations Theory ............... 31

    III.    PLAINTIFFS ADEQUATELY ALLEGE LOSS CAUSATION ......................... 32

    IV.    PLAINTIFFS ADEQUATELY ALLEGE CONTROL PERSON LIABILITY UNDER SECTION 20(a)................................................ 34

CONCLUSION ............................................................................................................... 35

# TABLE OF AUTHORITIES

**Page(s)**

<u>**Cases**</u>

*380544 Canada, Inc. v. Aspen Tech., Inc.,*
    544 F. Supp. 2d 199 (S.D.N.Y. 2008) ................................................................ 34

*Acito v. IMCERA Grp., Inc.,*
    47 F.3d 47 (2d Cir. 1995) ................................................................................... 23

*Aldridge v. A.T. Cross Corp.,*
    284 F.3d 72 (1st Cir. 2002) ................................................................................ 17

*Amorosa v. Ernst & Young LLP,*
    682 F. Supp. 2d 351 (S.D.N.Y. 2010) ................................................................ 34

*ATSI Commc'ns, Inc. v. Shaar Fund, Ltd.,*
    493 F.3d 87 (2d Cir. 2007) ................................................................................. 35

*Baena v. Woori Bank,*
    515 F. Supp. 2d 414 (S.D.N.Y. 2007) ........................................................... 26, 27

*Bd. of Trustees of City of Ft. Lauderdale Gen. Employees' Ret. Sys. v. Mechel OAO,*
    811 F. Supp. 2d 853 (S.D.N.Y. 2011) ................................................................ 31

*Chill v. Gen. Elec. Co.,*
    101 F.3d 263 (2d Cir. 1996) ..................................................................... 17, 23, 24

*City of Pontiac Gen. Employees' Ret. Sys. v. Lockheed Martin Corp.,*
    875 F. Supp. 2d 359 (S.D.N.Y. 2012) ................................................................ 24

*City of Westland Police & Fire Ret. Sys. v. MetLife, Inc.,*
    928 F. Supp. 2d 705 (S.D.N.Y. 2013) ................................................................ 32

*CompuDyne Corp. v. Shane,*
    453 F. Supp. 2d 807 (S.D.N.Y. 2006) ................................................................ 34

*Cortina v. Anavex Life Scis. Corp.,*
    No. 15-CV-10162 (JMF), 2016 WL 7480415 (S.D.N.Y. Dec. 29, 2016) .............. 31

*Cosmas v. Hassett,*
    886 F.2d 8 (2d Cir. 1989) ................................................................................... 31

*Crossing, Ltd. Sec. Litig.,*
    322 F. Supp. 2d 319 (S.D.N.Y. 2004) ........................................................... 19, 20

*Dura Pharm., Inc. v. Broudo,*
  544 U.S. 336 (2005) .................................................................................................. 11, 31

*ECA, Local 134 IBEW Joint Pension Tr. of Chicago v. JP Morgan Chase Co.,*
  553 F.3d 187 (2d Cir. 2009) ............................................................................................ 21

*Fin. Guar. Ins. Co. v. Putnam Advisory Co., LLC,*
  783 F.3d 395 (2d Cir. 2015) ............................................................................................ 31

*Freudenberg v. E*Trade Fin. Corp.,*
  712 F. Supp. 2d 171 (S.D.N.Y. 2010) ............................................................................. 33

*Gross v. GFI Grp., Inc.,*
  No. 14CV9438, 2018 WL 1918620 (S.D.N.Y. Apr. 20, 2018) ........................................ 23

*Hall v. The Children's Place Retail Stores, Inc.,*
  580 F. Supp. 2d 212 (S.D.N.Y. 2008) ............................................................................. 22

*Harris v. AmTrust Fin. Servs., Inc.,*
  135 F. Supp. 3d 155 (S.D.N.Y. 2015) ............................................................................. 17

*In re Ambac Fin. Grp., Inc. Sec. Litig.,*
  693 F. Supp. 2d 241 (S.D.N.Y. 2010) ........................................................................ 17, 19

*In re Atlas Air Worldwide Holdings, Inc. Sec. Litig.,*
  324 F. Supp. 2d 474 (S.D.N.Y. 2004) ............................................................................. 31

*In re BioScrip, Inc. Sec. Litig.,*
  95 F. Supp. 3d 711 (S.D.N.Y. 2015) ............................................................................... 21

*In re Bristol Myers Squibb Co. Sec. Litig.,*
  586 F. Supp. 2d 148 (S.D.N.Y. 2008) ........................................................................ 26, 29

*In re Burlington Coat Factory Sec. Litig.,*
  114 F.3d 1410 (3d Cir. 1997) .......................................................................................... 19

*In re Cannavest Corp. Sec. Litig.,*
  No. 14 CIV. 2900 (PGG), 2018 WL 1633847 (S.D.N.Y. Mar. 31, 2018) ....................... 24

*In re Carter-Wallace, Inc., Sec. Litig.,*
  220 F.3d 36 (2d Cir. 2000) .............................................................................................. 24

*In re CitiGroup Inc. Bond Litig.,*
  723 F. Supp. 2d 568 (S.D.N.Y. 2010) ............................................................................. 15

*In re Fairway Grp. Holding Corp. Sec. Litig.,*
  No. 14 CIV. 0950 LAK, 2015 WL 249508 (S.D.N.Y. Jan. 20, 2015) ............................. 17

*In re Fannie Mae 2008 Sec. Litig.,*
   742 F. Supp. 2d 382 (S.D.N.Y. 2010) ......................................................... 18

*In re Galena Biopharma, Inc. Sec. Litig.,*
   117 F. Supp. 3d 1145 (D. Or. 2015) ........................................................... 26

*In re Initial Pub. Offering Sec. Litig.,*
   544 F. Supp. 2d 277 (S.D.N.Y. 2008) ....................................................... 33

*In re LDK Solar Sec. Litig.,*
   584 F. Supp. 2d 1230 (N.D. Cal. 2008) ..................................................... 17

*In re Lehman Bros. Sec. & Erisa Litig.,*
   799 F. Supp. 2d 258 (S.D.N.Y. 2011) ....................................................... 27

*In re Lions Gate Entm't Corp. Sec. Litig.,*
   165 F. Supp. 3d 1 (S.D.N.Y. 2016) ........................................................... 21

*In re Marsh & Mclennan Companies, Inc. Sec. Litig.,*
   501 F. Supp. 2d 452 (S.D.N.Y. 2006) ................................................. 18, 30

*In re McKesson HBOC, Inc. Sec. Litig.,*
   126 F. Supp. 2d 1248 (N.D. Cal. 2000) ..................................................... 28

*In re Nature's Sunshine Prod. Sec. Litig.,*
   486 F. Supp. 2d 1301 (D. Utah 2007) ....................................................... 26

*In re Polaroid Corp. Sec. Litig.,*
   134 F. Supp. 2d 176 (D. Mass. 2001) ................................................. 33, 34

*In re Refco, Inc. Sec. Litig.,*
   503 F. Supp. 2d 611 (S.D.N.Y. 2007) ................................................. 16, 35

*In re Rhodia S.A. Sec. Litig.,*
   531 F. Supp. 2d 527 (S.D.N.Y. 2007) ....................................................... 34

*In re Rockwell Med., Inc. Sec. Litig.,*
   No. 16 CIV. 1691 (RJS), 2018 WL 1725553 (S.D.N.Y. Mar. 30, 2018)................................ 31

*In re Silver Wheaton Corp. Sec. Litig.,*
   No. CV15-5146-CAS(JEMX), 2016 WL 3226004 (C.D. Cal. June 6, 2016) ......................... 17

*In re Stellent, Inc. Sec. Litig.,*
   326 F. Supp. 2d 970 (D. Minn. 2004) ....................................................... 19

*In re Winstar Commc'ns,*
   No. 01 CV 11522, 2006 WL 473885 (S.D.N.Y. Feb. 27, 2006)................................ 33

*Iowa Pub. Employee's Ret. Sys. v. Deloitte & Touche LLP,*
  919 F. Supp. 2d 321 (S.D.N.Y. 2013) ............................................................. 27

*Kalnit v. Eichler,*
  264 F.3d 131 (2d Cir. 2001) .................................................................. 24, 28

*Kuriakose v. Fed. Home Loan Mortg. Corp.,*
  897 F. Supp. 2d 168 (S.D.N.Y. 2012) ............................................................. 18

*Lentell v. Merrill Lynch & Co.,*
  396 F.3d 161 (2d Cir. 2005) ......................................................................... 32

*Loreley Fin. (Jersey) No. 3 Ltd. v. Wells Fargo Sec., LLC,*
  797 F.3d 160 (2d Cir. 2015) ......................................................................... 32

*Matrixx Initiatives, Inc. v. Siracusano,*
  563 U.S. 27 (2011) ...................................................................................... 11

*Menaldi v. Och-Ziff Capital Mgmt. Grp. LLC,*
  164 F. Supp. 3d 568 (S.D.N.Y. 2016) ............................................................. 21

*Meyer v. Jinkosolar Holdings Co.,*
  761 F.3d 245 (2d Cir. 2014) ......................................................................... 20

*Mineworkers' Pension Scheme v. First Solar Inc.,*
  881 F.3d 750 (9th Cir. 2018) ........................................................................ 33

*Nathel v. Siegal,*
  592 F. Supp. 2d 452 (S.D.N.Y. 2008) ............................................................. 24

*Novak v. Kasaks,*
  216 F.3d 300 (2d Cir. 2000) ................................................................. passim

*Operating Local 649 Annuity Tr. Fund v. Smith Barney Fund Mgmt. LLC,*
  595 F.3d 86 (2d Cir. 2010) .............................................................. 10, 11, 20

*Patel v. L-3 Commc'ns Holdings Inc.,*
  2016 WL 1629325 (S.D.N.Y. Apr. 21, 2016) .................................................. 23

*Provenz v. Miller,*
  102 F.3d 1478 (9th Cir. 1996) ...................................................................... 17

*S.E.C. v. Gabelli,*
  653 F.3d 49 (2d Cir. 2011) ........................................................................... 11

*S.E.C. v. StratoComm Corp.,*
  652 Fed. App'x 35 (2d Cir. 2016) ............................................................ 11, 13

*Shemian v. Research In Motion Ltd.,*
    No. 11 CIV. 4068 RJS, 2013 WL 1285779 (S.D.N.Y. Mar. 29, 2013) ................................... 31

*Stratte-McClure v. Morgan Stanley,*
    No. 09 CIV. 2017 DAB, 2013 WL 297954 (S.D.N.Y. Jan. 18, 2013) .................................... 33

*Streit v. Bushnell,*
    424 F. Supp. 2d 633 (S.D.N.Y. 2006) .................................................................................. 18

*Suez Equity Inv'rs, L.P. v. Toronto-Dominion Bank,*
    250 F.3d 87 (2d Cir. 2001) ................................................................................................... 30

*Szulik v. Tagliaferri,*
    966 F. Supp. 2d 339 (S.D.N.Y. 2013) .................................................................................. 26

*Teamsters Local 445 Freight Div. Pension Fund v. Dynex Capital Inc.,*
    531 F.3d 190 (2d Cir. 2008) ................................................................................................. 30

*Tellabs, Inc. v. Makor Issues & Rights, Ltd.,*
    551 U.S. 308 (2007) ....................................................................................................... 23, 24

*Vanleeuwen v. Keyuan Petrochemicals, Inc.,*
    No. 13 CIV. 6057 PAC, 2014 WL 3891351 (S.D.N.Y. Aug. 8, 2014)............................. 16, 18

**Statutes**

15 U.S.C. § 78u-4(b)(1) and (2) ..................................................................................................... 11

**Rules**

Fed. R. Civ. P. 11(b)(3) ................................................................................................................... 11

Fed. R. Civ. P. 12(b)(6) ................................................................................................................... 11

Fed. R. Civ. P. 12(f) ........................................................................................................................ 11

**Regulations**

17 C.F.R. § 210.4-01(a)(1) .............................................................................................................. 15

17 C.F.R. § 240.10b-5(b) ................................................................................................................ 11

Lead Plaintiffs 683 Capital Partners, LP and Shipco Transport Inc., and named plaintiffs Sergey Regukh and Brian Armstrong ("Plaintiffs") respectfully submit this memorandum of law in opposition to Defendants' Motion to Dismiss Plaintiffs' Second Amended Consolidated Securities Class Action Complaint. ECF No. 117.

## INTRODUCTION

Plaintiffs' Second Amended Consolidated Class Action Complaint ("SAC") alleges a clear case of securities fraud against FXCM Inc. (now known as Global Brokerage, Inc.) and the Individual Defendants.[1] For years, FXCM knowingly and repeatedly assured FXCM investors that the Company's "No Dealing Desk" ("NDD") platform provided its customers with foreign exchange ("forex") trading that was free of conflicts of interest. FXCM assured its clients and investors alike that, unlike other forex trading platforms, it had ***no financial interest*** in NDD trades. FXCM acted merely as an agent, collecting small markups and routing customers' trades to independent "market makers" that provided liquidity to the platform. These assurances turned out to be complete fabrications.

Beginning in 2009, FXCM secretly developed a high frequency trading algorithm to trade against unsuspecting customers on its NDD platform. As FXCM prepared to go public in 2010, the Company's compliance department voiced serious concerns with the propriety of trading against FXCM's customers while explicitly promoting the NDD platform as "conflict-free." Rather than give up the chance to profit twice off its unsuspecting customers, Defendants spun off the trading operations as a purportedly "independent" company, Effex Capital, LLC

---

[1] The company was known as FXCM Inc. at all relevant times. Together with its subsidiaries, the company is referred to herein as "FXCM" or the "Company." The "Individual Defendants" are Dror Niv, William Ahdout, and Robert Lande. "Defendants" refers to FXCM and the Individual Defendants, collectively.

("Effex"). This scheme was unambiguously designed to hide the fact that the Company was actively profiting from taking positions opposite its customers.

In truth, FXCM created Effex as a functional subsidiary. FXCM installed its own former Managing Director, John Dittami, who had overseen the trading algorithm development, to head Effex. FXCM continued to own the trading system and, most importantly, it retained 70% of Effex's trading profits. FXCM funded Effex with a $2 million interest-free loan as start-up capital. Effex even operated out of FXCM's offices rent-free for the first year of its existence, moving at one point to a windowless office at FXCM to duck suspicious regulators, and had two FXCM employees dedicated to working for Effex. The Company operated for years under this arrangement, all while continuing to promote the NDD platform and its "agency model" as a conflict-free trading environment. The profit-sharing payments were invoiced as "P&L" (profits and losses), but were disguised in FXCM's public financial statements as "order flow" payments, made pursuant to illusory services agreements designed to hide the profit-sharing arrangement.

Not content with secretly profiting off its customers twice, FXCM also provided Effex with a leg up on competing market makers and gave Effex trading advantages that ensured Effex would squeeze every last drop of profits from trading against FXCM's customers. Through 2014, Effex rebated to FXCM nearly $80 million of Effex's trading revenue. FXCM had no similar arrangements with, and received no payments from, any other market maker.

Defendants went to great lengths to conceal their scheme from customers, investors, and regulators. When regulators were tipped off as to the scheme and began investigating FXCM, Defendants lied to the regulators and covered their tracks. Well after it became clear that FXCM and its improper relationship with Effex were the subject of two serious regulatory investigations, Defendants still refused to disclose the investigations to investors.

Eventually, both the U.S. Commodity Futures Trading Commission ("CFTC") and National Futures Association ("NFA") brought regulatory actions against FXCM based on the Company's undisclosed relationship with Effex. The CFTC found that FXCM concealed FXCM's relationship with Effex and misrepresented that its NDD platform had no conflicts of interest with its customers. The CFTC and NFA reached settlements with FXCM and certain of its high-ranking executives which, among other things, banned FXCM from operating in the U.S. In light of the shocking allegations and penalties, the price of FXCM's stock dropped sharply, losing more than half of its value and damaging investors.

Defendants' motion to dismiss the SAC mischaracterizes Plaintiffs' allegations, and must be denied. Defendants claim that the sham "order flow" payments were purely contractual, routine payments, yet they offer no explanation for Plaintiffs' allegations that: (1) no other market maker ever made any such payments; (2) no other market maker was afforded the advantages FXCM granted to Effex; (3) the payments were constructed to approximate a percentage of Effex's trading profits based off of FXCM's prior internal employment agreement with Dittami; and (4) the payments were billed as profits and losses. Additionally, Defendants' contentions are misplaced in that the law does not require a restatement as a prerequisite for liability based on accounting violations. Further, contrary to Defendants' claims, the SAC alleges that the Individual Defendants had knowledge of facts flatly contradicting their false statements to the investing public, demonstrating their intent to deceive investors along with their customers. Finally, Defendants' argument that an unrelated event occurring *two years before* the corrective disclosure somehow disrupts the loss causation element finds no basis in law or logic. The SAC adequately alleges each element of a securities fraud claim, and thus the Court must deny Defendants' motion to dismiss.

3

## STATEMENT OF FACTS

**Industry and Company Background**

The forex market is the largest financial market in the world, averaging trillions of dollars per day in global trading. ¶39.[2] Forex trading is primarily done over-the-counter ("OTC") directly with a counterparty and relies on financial institutions or "market makers" to provide liquidity to the market. ¶¶39-40. Despite its size, the forex market is one of the world's least regulated financial markets. ¶41. There is no centralized exchange or institution that collects and posts real-time trade information. *Id.* Instead, these transactions occur on proprietary trading platforms that match market makers with buyers. *Id.*

FXCM provides online forex trading and related services to retail and institutional customers worldwide through its subsidiaries. Until approximately 2007, FXCM provided liquidity to its retail forex customers primarily through an internal "dealing desk." ¶43. Whereas a dealing desk broker acts as a market maker and may be trading against the customer's position, FXCM touted that its No Dealing Desk platform used an "agency model," eliminating that conflict of interest. ¶45.

In FXCM's agency model, price quotations were provided by third-party market makers and FXCM served merely as a credit intermediary, entering into offsetting trades with both the customer and the market maker. *Id.* FXCM purportedly made money through the bid/ask spread, adding a small markup to the bid/ask quotes received from its customers and liquidity providers. ¶46. Naturally, this model was highly appealing to OTC forex trading customers, quickly

---

[2] All references to "¶_" are to the SAC, ECF No. 111. All emphases are added and all internal citations and quotations are omitted unless otherwise noted.

becoming the centerpiece of FXCM's trading platform and marketing efforts. ¶¶47-48. However, FXCM was not satisfied with its limited role and set out to take advantage of its NDD customers.

**Defendants Create Effex**

In 2009, Defendants devised a plan to capitalize on the Company's NDD clients through the use of a high frequency trading algorithm. This algorithm would completely replace or supplant many of the independent market makers on the NDD platform and allow FXCM to cash in twice on its customers – first from its publicly disclosed mark-ups, then from its own secret trading via the algorithm. ¶49. Defendants Niv and Ahdout hired a high frequency trader, John Dittami, to a Managing Director position with FXCM in October 2009, with the intent for Dittami to develop an algorithmic trading system for FXCM. ¶50. The Company provided Dittami with $2-3 million in startup capital and entered into an employment agreement promising Dittami 30% of the profits generated by the trading system, with FXCM keeping the rest. *Id.* In early 2010, Dittami completed development of the trading system. *Id.*

As the Company geared up for its initial public offering, FXCM's compliance department raised concerns that trading against the Company's retail customers would contradict its public statements about the purportedly conflict-free NDD platform. ¶52. In response to these valid concerns, Niv decided to restructure FXCM's relationship with Dittami to create the false appearance of an independent entity that was not owned or controlled by FXCM. ¶53. On March 23, 2010, under Niv's direction, the Company spun off Dittami's trading system as Effex, a supposedly external market maker for FXCM. *Id.*

Dittami "resigned" from FXCM on April 14, 2010 to helm Effex, but the Company agreed that his resignation would not change their economic relationship. ¶54. FXCM retained its stake in 70% of Dittami's (now Effex's) algorithmic trading profits and its intellectual

property rights in the algorithmic trading platform's software. *Id*. To hide the true nature of their relationship, Effex and FXCM entered into undisclosed so-called services agreements by which Effex would make monthly payments to FXCM. ¶55. These payments were ostensibly based on trading volume, but they were intended to approximate 70% of Effex's profits from trading against FXCM's retail customers on the NDD platform, maintaining the profit-sharing arrangement between Dittami and FXCM. *Id*. FXCM had no such agreements with its independent market makers, and received no such payments from any of them. *Id.*

To get Effex started, under Niv's direction FXCM gave Effex a $2 million interest-free loan and allowed Effex to use FXCM's prime broker through a "prime of prime" account. ¶56. FXCM allowed Dittami and Effex to continue working from FXCM's offices rent-free for a full year. ¶57. When regulatory scrutiny surrounding the NDD platform increased, Effex moved into a discrete, windowless location within FXCM's offices, before eventually moving its operations off-site. *Id.* The Company also allowed Effex to use FXCM's trading algorithm, which was FXCM's intellectual property, and allowed Effex to use FXCM's servers and email systems. Effex maintained access to FXCM's server and on-site computers, giving Effex access to real time trading information including which market makers or investors were trading on FXCM's platform and at what price and quantities. ¶58. FXCM considered Effex part of the Company's internal trading operations, and indeed FXCM gave bonuses, reimbursed by Effex, to two FXCM employees for their work assisting Effex. ¶59. One of these employees spent about 80% of his work week at Effex's offices. *Id*. None of FXCM's truly independent market makers received any similar favorable treatment. ¶60.  Nor did they pay 70% of their profits to FXCM.

**Effex's Sham "Order Flow" Payments**

To maintain the false impression that Effex was an independent entity, FXCM sent Effex monthly invoices for "order flow," pursuant to the supposed services agreements. In an effort to avoid NFA scrutiny, Effex made these payments to FXCM Holdings, a holding company owned by FXCM and most notably, not a member of the NFA. ¶¶61, 64. In 2011, the payment rates were adjusted due to tightening spreads in the forex market that reduced Effex's profits, maintaining the agreed-upon 70-30 profit split between FXCM and Effex. *Id.*

These "order flow" payments were at all times a complete sham. From 2010 to 2014, no market maker besides Effex paid FXCM for order flow. ¶62. In truth, these payments were merely pre-arranged kickbacks of FXCM's cut of Effex's profits from trading against FXCM's retail customers on the NDD platform. *Id.* FXCM even viewed Effex's trading profits and losses as its own, less Effex's 30 percent share, unchanged from its original relationship with Dittami. ¶63. FXCM calculated its monthly preliminary P&L statement, in part, by taking Effex's monthly P&L and simply subtracting 30 percent. *Id.*

**FXCM Gives Effex A Leg Up**

To ensure the success of this charade, FXCM granted a number of advantages to Effex over other market makers. FXCM permitted Effex to win all "ties" with other market makers, provided Effex with a real-time view of price quotations offered by other market makers, and added smaller markups to Effex's prices than to prices provided by other market makers. ¶65. FXCM also allowed Effex to use a hold timer that enabled Effex to execute a trade at the start or end of a hold timer period, whichever was better for Effex (and worse for FXCM's customers on the opposite side of the trades). ¶66. Effex also used a "previous quote" practice, using FXCM's

inside knowledge of a customer's least favorable acceptable trade quote to ensure that it was getting the most favorable end of the bargain. ¶67.

Thanks in no small part to these home field advantages, Effex routinely captured over 50% of FXCM's daily order flow and at one time captured nearly 80%. ¶70. This far exceeded the market share Effex would have expected to capture in any other forex market. ¶69. In fact, Effex was so successful using these advantages that FXCM management, including Niv, feared it would shatter the illusion of a legitimate market and directed Effex to limit itself to only 45-50% of the trading volume on FXCM's platform. ¶70. Through 2014, this added up to nearly $80 million in profit-sharing payments from Effex to FXCM. *Id*.

While FXCM was secretly profiting from trading against its own NDD platform customers through its arrangement with Effex, it was consistently representing to its investors that its NDD platform was free of those very same conflicts of interest. Through public filings with the U.S. Securities and Exchange Commission ("SEC"), Defendants repeatedly touted FXCM's superior "agency model" and its purportedly conflict-free NDD platform, as well as the sham "order flow" payments it was receiving from "market makers." *See* ¶¶146-163. Defendants also failed to disclose the ongoing CFTC and NFA investigations in its contemporaneous SEC filings. *See* ¶¶164-168. In short, Defendants consistently deceived investors about the agency model that was "fundamental to our core business philosophy." ¶189.

**<u>Regulators Investigate the FXCM-Effex Relationship and Take Action</u>**

The CFTC and NFA began investigating FXCM and its secret relationship with Effex by 2013, at the latest. In connection with the NFA's examination of FXCM, NFA compliance staff met with FXCM executives in October 2013. ¶87. During that meeting, the NFA asked about FXCM's relationship with Effex, but Niv failed to disclose any of the above details showing the

true nature of the relationship. *Id*. Members of FXCM's compliance department also lied to the NFA in an effort to cover up the Company's profit-sharing relationship with Effex. ¶¶88-90.

The CFTC and NFA investigations ramped up in 2014. The CFTC sent FXCM a Request for Production of Documents in October 2014. ¶74. The NFA and CFTC each sent FXCM document preservation notices in February and July 2015, respectively. ¶¶75-76. The CFTC issued a subpoena to Niv in August 2015, and in September 2015, FXCM executed a tolling agreement with the CFTC. ¶¶77-78.

On February 6, 2017, the CFTC announced that it banned the Company from operating in the U.S. after finding that FXCM was taking undisclosed positions opposite its retail customers. ¶79. The CFTC's Order required FXCM, Niv and Ahdout to pay a $7 million civil penalty, cease and desist from further violations of the Commodity Exchange Act and CFTC Regulations, and permanently withdraw from CFTC registration. SAC Ex. 1 (CFTC Order). The CFTC Order found that, from 2009 through *at least* 2014, FXCM engaged in false and misleading solicitations of its customers by concealing its relationship with Effex, and by misrepresenting that its NDD platform had no conflicts of interest with its customers.[3] *Id.* The Order also found FXCM, FXCM Holdings, and Niv responsible for making false statements to the NFA about FXCM's relationship with Effex. *Id.*

The CFTC Order made a number of explicit findings against Defendants. Specifically, the CFTC found that: (1) FXCM had an undisclosed interest in Effex – and thus was taking positions opposite FXCM's retail customers; (2) FXCM formulated a plan in 2009 to create an algorithmic trading system to make markets for FXCM's customers, competing with the

---

[3] Defendants reserved their right to object to the findings presented in the CFTC Order in other proceedings, such as this one, and neither admitted nor denied the findings therein. However, the CFTC Order still constitutes the official findings of the CFTC.

independent market makers on FXCM's NDD platform; (3) although FXCM eventually spun off the algorithmic trading system as Effex, Effex remained closely aligned with FXCM; and (4) Effex received special trading privileges, benefitted from a no-interest loan provided by FXCM, worked out of FXCM's offices, and used FXCM employees to conduct its business. *Id.* The CFTC found that Effex agreed to rebate FXCM 70% of its trading revenues earned on FXCM's retail forex platform, totaling approximately $77 million from 2010 through 2014. The CFTC also found that FXCM willfully made false statements to NFA in order to obfuscate the true nature of FXCM's relationship with Effex. *Id.*

On the same day, the NFA issued a complaint (the "NFA Complaint," attached to the SAC as Exhibit 2) and entered an order against FXCM, Niv, Ahdout, and Niv's sister, Ornit Niv. ¶80. The NFA found that FXCM's NDD platform was corrupted by the Company's relationship with Effex, and ordered that FXCM and the individual defendants be withdrawn from NFA membership and forever barred from reapplying. *Id.*

On this news, prices of FXCM's publicly traded securities dropped precipitously, causing significant losses to investors. ¶¶82-83. On February 21, 2017, Niv resigned as CEO and from the FXCM board of directors, and FXCM changed its name to Global Brokerage Inc. ¶91.

## ARGUMENT

When evaluating the allegations of the SAC, the Court must accept all facts alleged therein as true and draw all reasonable inferences in favor of Plaintiffs. *See Operating Local 649 Annuity Tr. Fund v. Smith Barney Fund Mgmt. LLC*, 595 F.3d 86, 91 (2d Cir. 2010). To state a claim under § 10(b) of the Exchange Act, plaintiffs must allege that the defendants, in connection with the purchase or sale of a security, made a materially false or misleading statement or omitted a material fact, with scienter, and that reliance on defendants' statements

caused injury to the plaintiffs. *Id.* at 92. The Private Securities Litigation Reform Act of 1995 ("PSLRA") further requires that a § 10(b) claim must specify each false statement, explain why the statement was misleading, and state with particularity facts giving rise to a strong inference of scienter. *Novak v. Kasaks*, 216 F.3d 300, 306–07 (2d Cir. 2000) (quoting 15 U.S.C. § 78u-4(b)(1) and (2)); *Dura Pharm., Inc. v. Broudo*, 544 U.S. 336, 345 (2005). Plaintiffs' allegations, taken as true, clearly state claims under §§ 10(b) and 20(a) of the Exchange Act.[4]

## I. PLAINTIFFS ADEQUATELY ALLEGE FALSE OR MISLEADING STATEMENTS OF MATERIAL FACT

Statements of material fact are actionable in the securities fraud context if they are either false or misleading. *See Matrixx Initiatives, Inc. v. Siracusano*, 563 U.S. 27, 36 (2011). "The law is well settled ... that so-called half-truths—literally true statements that create a materially misleading impression—will support claims for securities fraud." *S.E.C. v. Gabelli*, 653 F.3d 49, 57 (2d Cir. 2011), *rev'd on other grounds*, *Gabelli v. S.E.C.*, 568 U.S. 442 (2013). *See also S.E.C. v. StratoComm Corp.*, 652 Fed. App'x 35, 37 (2d Cir. 2016) ("untrue assertions, ambiguous statements, and half-truths can render a statement misleading"). An omission is actionable when disclosure is "necessary ... to make the statements made, in light of the circumstances under which they were made, not misleading." 17 C.F.R. § 240.10b-5(b).

The primary fraud in this case is clear: FXCM knowingly or recklessly misled investors by falsely claiming that its customers who transacted on FXCM's "No Dealing Desk" platform would be free from conflicts of interest because FXCM would not have a financial interest in the

---

[4] Defendants challenge only the § 10(b) elements of falsity, scienter, and loss causation, and § 20(a) control person liability. While Defendants' Notice of Motion, ECF No. 117, references Fed. R. Civ. P. 12(f) and 11(b)(3), Defendants' memorandum of law addresses only arguments concerning Fed. R. Civ. P. 12(b)(6). ECF No. 118 ("Def. Br."). Defendants have supplied no basis for relief under Rules 12(f) and 11(b)(3), and the Court should not grant any such relief.

opposing side of the trades. ¶2. Accordingly, FXCM's unfettered promotion of its purportedly conflict-free NDD platform and "agency model," along with statements and omissions concerning its relationship with Effex, were demonstrably false and misleading throughout the Class Period. The SAC makes clear why each of these statements or omissions was false and misleading.

### A. Defendants' Statements Concerning FXCM's NDD Platform And "Agency Model" Were False And Misleading

The foremost falsehood in Defendants' public filings is the characterization of FXCM's NDD platform as a conflict-free "agency model." For example, Defendants repeatedly claimed that "[w]e primarily offer our customers what is referred to as an agency model." ¶¶146, 154, 156, 158, 160. These statements were false and misleading because FXCM did not primarily offer its customers an agency model. ¶¶147, 155, 157, 159, 161. Instead, customers trading on FXCM's supposed agency model on the NDD platform were unwittingly trading on a "principal model" or dealing desk platform due to FXCM's secret profit-sharing relationship with Effex.[5]

Defendants' public filings also included statements that the agency model "aligns our interests with those of our customers," ¶146, and "reduces our risks," ¶¶146, 158. These statements were false and misleading because FXCM's interests were not *aligned* with those of its customers, but *opposite*, through FXCM's hidden profit-sharing agreement with Effex, who traded against FXCM's customers on the NDD platform. ¶147. FXCM also granted Effex certain trading advantages including a hold timer and "previous quote" practice, which resulted in asymmetrical price slippage that would maximize the benefit to Effex (and thus to FXCM) at the

---

[5] The SAC quotes selections from FXCM's website at various times through the Class Period simply to demonstrate the importance of the purported agency model to FXCM's operations, and Defendants' cross-platform strategy of deceiving both potential clients and investors. ¶¶177-185.

expense of FXCM's retail customers. ¶¶66-67. These practices further entrenched FXCM's interests opposite those of its customers. As a result, because FXCM was not truly using an agency model, the Company exposed itself to additional risks through its stake in Effex's trading profits. ¶159.

Similarly, Defendants made false and misleading statements in their public filings that FXCM acted merely as a "credit intermediary, or riskless principal," ¶146, and implied that by virtue of the agency model, FXCM was not exposed to "trading losses," "market risk," or "reputational damage and additional regulatory scrutiny." ¶¶154, 156, 160. These statements were false and misleading because again, FXCM did not operate a true agency model because of its profit-sharing relationship with Effex. ¶¶147, 155, 157, 161. Contrary to the statements in FXCM's public filings, the Company was already exposed to trading losses and market risk through reduced profits flowing through Effex to FXCM. ¶¶155, 161. FXCM was already risking reputational damage and regulatory scrutiny due to its secret relationship with Effex, which created "an inherent conflict between the interests of the customer and our interests." ¶157.

Finally, FXCM's public filings contained false and misleading statements that the Company's trading revenues were generated "based on the volume of transactions, not trading profits or losses." ¶¶146, 152. These statements were false and misleading because they failed to disclose that FXCM was earning kickback payments from Effex that were tied directly to Effex's trading profits and losses. ¶¶147, 153. Omitting these kickback payments misled investors as to the source of FXCM's revenues. *Id.*

### B.  Defendants' Statements Concerning Purported Order Flow Payments Were False And Misleading

Defendants also made repeated false and misleading statements concerning the sham "order flow" payments FXCM was receiving. Numerous FXCM public filings contained

statements that "[i]ncome earned on order flow represents payments received from certain FX market makers in exchange for routing trade orders to these firms for execution," and that the Company's retail trading revenue was driven in part by "payments we receive for order flow from FX market makers." ¶¶148, 150. These statements were false and misleading because FXCM did not receive payments for order flow from any market makers, much less multiple market makers. To the extent it received "order flow" payments from Effex, those payments were actually an approximation of 70% of Effex's profits from trading on the NDD platform. ¶¶149, 151. Contrary to Defendants' assertions, Def. Br. at 20, Plaintiffs allege that FXCM monitored Effex's profits and losses statement on a weekly or monthly basis, sent Effex invoices billed as "P&L" for amounts approximating 70% of Effex's profits, and adjusted the payment amounts downward when Effex's profits were reduced. ¶¶61, 63. Furthermore, the fact that the payments were otherwise relatively static is consistent with Plaintiffs' allegation that FXCM directed Effex to limit itself to only 45-50% of the trading volume. ¶70.

The Company also claimed that "payments for order flow do not affect the routing of orders in a manner that is detrimental to its retail customers." ¶150. This statement was false and misleading because the sham "order flow" payments—a mere façade to hide the profit-based kickbacks from Effex to FXCM—were part and parcel of FXCM's scheme to drive customer orders to Effex in order to maximize FXCM's profits. Because FXCM was receiving the lion's share of Effex's trading profits, it gave Effex unprecedented advantages over other market makers. ¶¶65-67, 151. These advantages paved the way for Effex to capture up to nearly 80% of FXCM's daily order flow, a level so outrageously out of line with the market share Effex would have expected to capture in another forex market that FXCM management had to direct Effex to limit itself. ¶¶69-70. The result was reduced liquidity on FXCM's trading platform, asymmetrical

14

price slippage, and unfair trading practices which directly harmed FXCM's retail customers. ¶¶66-68.

Finally, in late 2014 the Company's public filings contained the statement that as of August 2014, the Company "no longer receive[d] payments for order flow." ¶162. These statements were false and misleading because FXCM had never received payments for order flow in the first place. ¶163. To the extent the Company had received "order flow" payments from Effex, those payments were in fact disguised profit-sharing payments.

### C. Defendants' Financial Statements Were False and Misleading and Violated GAAP

Plaintiffs' allegations of Defendants' GAAP violations go beyond mere accounting irregularities. As the SAC alleges, Defendants consistently stated that FXCM's financial statements were prepared according to GAAP. ¶¶135, 144. SEC Rule 4-01(a) of Reg. S-X states that if the financial statements filed with the SEC are not prepared in accordance with GAAP, they will be "presumed to be misleading or inaccurate." 17 C.F.R. § 210.4-01(a)(1).

GAAP requires reporting entities to consolidate and make disclosures about Variable Interest Entities ("VIEs"). Accounting Standards Codification ("ASC") 810, Consolidation. Plaintiffs allege that Effex was a VIE, and FXCM was the primary beneficiary with regard to Effex, because FXCM was entitled to and did receive 70% of Effex's profits. ¶¶131-133. As the primary beneficiary, FXCM was required to disclose the nature, purpose, size and activities of Effex, ASC 810-10-50-3, and consolidate Effex's financial results with its own. ¶136. FXCM failed to do so, rendering the financial reports it filed false and misleading. *See In re CitiGroup Inc. Bond Litig.*, 723 F. Supp. 2d 568, 594–95 (S.D.N.Y. 2010) (finding that allegations of a failure to properly consolidate and make disclosures about a VIE adequately supported claims

for GAAP violations and "that defendants' non-compliance with GAAP rendered materially untrue its representation to the contrary in each of its relevant financial statements").

Even if FXCM was not required to consolidate Effex as a VIE, Effex would still be a related party of FXCM, and FXCM was required to disclose all material related party transactions. ¶¶138-139. "Related party transactions" include those between a company and its "affiliates." ASC 850-10-05-3. Effex was an affiliate of FXCM, and thus a related party. ASC 850-10-20; ¶140. The SAC alleges that: (a) Effex was founded under the direction of FXCM to create the false appearance of an independent company; (b) FXCM funded Effex with an interest-free loan; (c) FXCM took 70% of Effex's profits; (d) Effex operated out of FXCM's offices rent free for a full year; (e) certain FXCM employees worked the majority of their time for Effex and received bonuses from FXCM for that work; (f) all of Effex's business and revenue was either generated through FXCM or was dependent on FXCM to provide the pricing and transaction data to engage in its business. ¶142. These allegations demonstrate that FXCM controlled Effex or that Effex was an affiliate of FXCM, making Effex a related party for GAAP purposes. FXCM failed to disclose the true nature of the relationship between the two companies and an accurate description of the transactions between the two, violating GAAP and rendering its financial statements false and misleading. *See In re Refco, Inc. Sec. Litig.*, 503 F. Supp. 2d 611, 656 (S.D.N.Y. 2007) ("As to the failure of Refco's financial statements to conform with GAAP, plaintiffs allege that the statements failed to disclose significant related-party transactions … and that the statements violated general principles of GAAP requiring that financial statements contain a thorough and complete report of relevant information"); *Vanleeuwen v. Keyuan Petrochemicals, Inc.*, No. 13 CIV. 6057 PAC, 2014 WL 3891351, at *3

(S.D.N.Y. Aug. 8, 2014) (finding section 10(b) liability based on failure to disclose material related-party transactions).

Although "allegations of GAAP violations or accounting irregularities, *standing alone*, are insufficient to state a securities fraud claim," courts have found such allegations sufficient if "coupled with evidence of 'corresponding fraudulent intent.'" *Novak*, 216 F.3d at 309 (quoting *Chill v. Gen. Elec. Co.*, 101 F.3d 263, 270 (2d Cir. 1996)); *see also In re Ambac Fin. Grp., Inc. Sec. Litig.*, 693 F. Supp. 2d 241, 273 (S.D.N.Y. 2010); *In re Fairway Grp. Holding Corp. Sec. Litig.*, No. 14 CIV. 0950 LAK, 2015 WL 249508, at *15 (S.D.N.Y. Jan. 20, 2015). The SAC alleges ample facts supporting a strong inference of scienter, as detailed in part II below. Plaintiffs' allegations that Defendants violated GAAP by failing to consolidate Effex into FXCM's financial statements and failing to disclose its dealings with Effex as related party transactions plainly assert particularized false and misleading statements. These claims, coupled with Plaintiffs' scienter allegations, are sufficient to state a claim for securities fraud.

Defendants claim that because FXCM did not restate its financial reports during the Class Period and its auditor signed off on its reports, the Court should not find that they made false statements with scienter. Def. Br. at 17-18. To the contrary, courts have found that "the fact that the financial statements for the year in question were not restated does not end [plaintiff's] case." *Aldridge v. A.T. Cross Corp.*, 284 F.3d 72, 83 (1st Cir. 2002) (upholding complaint alleging securities fraud even in light of an auditor's subsequent clean audit opinion on allegedly misstated financial results); *In re Silver Wheaton Corp. Sec. Litig.*, No. CV15-5146-CAS(JEMX), 2016 WL 3226004, at *11 (C.D. Cal. June 6, 2016) (rejecting the argument that a clean audit report absolved defendants); *In re LDK Solar Sec. Litig.*, 584 F. Supp. 2d 1230, 1246 (N.D. Cal. 2008) (same); *see also* Provenz v. Miller, 102 F.3d 1478, 1490 (9th Cir. 1996)

(reversing grant of summary judgment even though defendant had worked with auditor to ensure financial statements were accurate).

Defendants' cases on the subject are inapposite. In *Harris v. AmTrust Fin. Servs., Inc.*, 135 F. Supp. 3d 155, 172 (S.D.N.Y. 2015), the plaintiffs pointed to neither objective facts suggesting that the defendants' accounting position was incorrect, nor to any government action calling the accounting position into question, both of which are alleged in the SAC here. *See also Kuriakose v. Fed. Home Loan Mortg. Corp.*, 897 F. Supp. 2d 168, 181 (S.D.N.Y. 2012), ("Plaintiffs have not alleged facts to support an inference that Freddie Mac was unreasonable in its [accounting] judgments"); *In re Marsh & Mclennan Companies, Inc. Sec. Litig.*, 501 F. Supp. 2d 452, 477 (S.D.N.Y. 2006) ("Notably missing are specific examples of fraudulent accounting practices utilized by MMC, citations to GAAP provisions prohibiting MMC's accounting practices, or reference to any cases finding violations of GAAP on the basis of actions similar to those alleged by Plaintiffs."); *In re Fannie Mae 2008 Sec. Litig.*, 742 F. Supp. 2d 382, 408 (S.D.N.Y. 2010) ("Plaintiffs do not allege sufficient facts to establish that Fannie's financial statements were false at the time they were issued."). In contrast to Defendants' cases, the SAC here alleges specific facts showing Defendants knew their stated accounting position to be false at all relevant times and specific GAAP provisions that Defendants violated. ¶¶131-145; *Keyuan*, 2014 WL 3891351, at *3 (finding liability where the plaintiffs alleged "facts indicating that Li was aware of the third-party transactions and failed to disclose them"). Even if the CFTC Order and NFA Complaint (SAC, Exs. 1 and 2) did not expressly include allegations of GAAP violations, both include findings of fact that support Plaintiffs' allegations.

Defendants mischaracterize the SAC's allegations to argue that Effex was neither controlled nor owned by FXCM, but the Court must reject Defendants' counterfactual arguments

at this stage. *Streit v. Bushnell*, 424 F. Supp. 2d 633, 641 (S.D.N.Y. 2006) ("regardless of the defendant's denials and contrary versions of the underlying events, it is the plaintiff's account of the facts that the Court must accept as true"). The CFTC Order's statement that Dittami was the "100 percent owner of [Effex]," Def. Br. at 18, is merely a description of the pretextual arrangement by which FXCM spun off Effex as a purportedly separate entity. Defendants ignore the CFTC's allegations demonstrating FXCM's *de facto* ownership of Effex, including "[Effex] and FXCM's agreement to share profits" based on the 70-30 split that Effex "was permitted to keep," and that "FXCM viewed [Effex's] profits and losses … as essentially belonging to FXCM." SAC Ex. 1 at 5.

Likewise, Defendants are flatly wrong in that neither the CFTC nor Plaintiffs "acknowledge" that Effex's payments to FXCM were not based upon percentage of Effex's profit. Def. Br. at 18. Rather, the CFTC Order and SAC each specifically allege that "[n]otwithstanding the formal documentation … in reality the payments represented [Effex] and FXCM's agreement to share profits." SAC, Ex. 1 at 5; ¶¶55, 61-63. "GAAP also requires that transactions 'be accounted for in accordance with their substance rather than their form.'" *In re Stellent, Inc. Sec. Litig.*, 326 F. Supp. 2d 970, 981 (D. Minn. 2004) (citing SEC Accounting and Auditing Enforcement Release No. 817 and FASB Statement of Concepts No. 2, ¶ 160 ("The quality of reliability and, in particular, representational faithfulness leaves no room for accounting representations that subordinate substance to form.")).

At the very least, the parties' disagreements over GAAP compliance raise issues of fact that cannot be resolved on a motion to dismiss. *In re Ambac Financial Group, Inc. Securities Litigation*, 693 F. Supp. 2d at 273 (citing *In re Burlington Coat Factory Sec. Litig.*, 114 F.3d 1410, 1421 (3d Cir. 1997) (reversing 12(b)(6) dismissal because "it is a factual question whether

[the company's] accounting practices were consistent with GAAP") and *In re Glob. Crossing, Ltd. Sec. Litig.*, 322 F. Supp. 2d 319, 338–39 (S.D.N.Y. 2004) (finding that the sufficiency of allegations of GAAP violations "cannot be determined in advance of development of the record")).

### D.  Defendants' Statements and Omissions Concerning Regulatory Investigations Were False and Misleading

FXCM was subject to regulatory inquiries and investigations by at least October 2013, yet consistently failed to disclose that regulators were actively scrutinizing the Company's relationship with Effex. ¶164. FXCM repeatedly stated that "our business is also subject to extensive regulation, which ***may*** result in administrative claims, investigations and regulatory proceedings against us." *Id.* These statement were false and misleading because Defendants created the false and misleading impression that the Company was not ***currently*** under regulatory investigations that portended, and ultimately resulted in, a material impact on FXCM's business. Contrary to their vague public statements, Defendants knew of the NFA investigation by at least October 2013, when NFA compliance staff pointedly asked FXCM executives about the Company's relationship with Effex. ¶¶87-88, 101, 166. Terminating the pretextual "services agreement" with Effex in August 2014 evinces Defendants' awareness that the regulatory investigations into FXCM's relationship with Effex were ramping up and presented a material risk to the Company. At the latest, by September 2015 the CFTC had explicitly notified FXCM that it was conducting an investigation into potential legal and regulatory violations concerning the Company's relationship with Effex. ¶¶78, 166. Even when FXCM finally disclosed the ongoing regulatory investigations, it soft-played them as benign examinations, rather than acknowledging the high likelihood of imminent legal action demonstrated by the tolling agreement. ¶¶167-168.

FXCM had a duty to ensure that its public filings were "both accurate and complete." *Meyer v. Jinkosolar Holdings Co.*, 761 F.3d 245, 250 (2d Cir. 2014). "Even where there is no existing independent duty to disclose information, once a company speaks on an issue or topic, there is a duty to tell the whole truth." *Id.* at 250; *see also Smith Barney*, 595 F.3d at 92 ("The veracity of a statement or omission is measured not by its literal truth, but by its ability to accurately inform rather than mislead prospective buyers"). The SAC alleges a similar case to *Menaldi v. Och-Ziff Capital Mgmt. Grp. LLC*, 164 F. Supp. 3d 568, 583 (S.D.N.Y. 2016), where the plaintiffs alleged that defendants' statements downplayed an ongoing regulatory investigation that presented a "material risk." The court found that these statements were actionable under § 10(b), because "Plaintiffs have plausibly alleged that Och-Ziff misled investors by suggesting that the company was not facing an investigation that could have a material impact on its business, when, in fact, it was facing such an investigation." *Id.* at 584. FXCM had a duty to disclose the CFTC and NFA investigations because it chose to make statements about regulatory investigations, but "did not speak in an accurate and complete manner." *In re BioScrip, Inc. Sec. Litig.*, 95 F. Supp. 3d 711, 727 (S.D.N.Y. 2015).

This case does not resemble *In re Lions Gate Entm't Corp. Sec. Litig.*, 165 F. Supp. 3d 1, 13 (S.D.N.Y. 2016) because in *Lions Gate*, the plaintiffs alleged "no statements during the Class Period about the Transactions that were the subject of the SEC investigation or about the SEC investigation itself." The court specifically distinguished that case from those cited by the plaintiff, holding that "when a company speaks on a subject, it cannot omit material facts about that subject." *Id.* That is precisely what Plaintiffs have alleged here.

Whether the statements are actionable "depends on whether those statements contained material misrepresentations or omitted material information about pending regulatory

proceedings." *Och-Ziff*, 164 F. Supp. 3d at 585. Dismissal is inappropriate at this stage because this is a question of materiality on which "reasonable minds" could disagree. *Id.* (citing *ECA, Local 134 IBEW Joint Pension Tr. of Chicago v. JP Morgan Chase Co.*, 553 F.3d 187, 197 (2d Cir. 2009)).

### E.  Defendants' SOX Certifications Were False and Misleading

The SAC alleges that, in connection with various Class Period filings, Defendants Niv and Lande signed Sarbanes-Oxley Act of 2002 ("SOX") certifications attesting to the accuracy of the respective filings, certifying that "this report does not contain any untrue [or misleading] statement of a material fact," and certifying that Niv and Lande each disclosed "[a]ny fraud, whether or not material." ¶¶169-172, 174-176. The SOX certifications were false and misleading because (1) the accompany financial statements were not accurate due to the GAAP violations detailed above; (2) each of the reports contained other false and misleading statements of material fact, as outlined above; and (3) Niv and Lande did not disclose all fraud, including Defendants' scheme to conceal the Company's improper relationship with Effex. ¶¶170-172, 175-176. The SOX certifications are actionable because Niv and Lande had knowledge that the certifications were false. *See Hall v. The Children's Place Retail Stores, Inc.*, 580 F. Supp. 2d 212, 231–32 (S.D.N.Y. 2008) ("for these [SOX] certifications to be materially false … defendants must also have had knowledge of that falsity").

### F.  Defendants' Statements and Omissions Post-Dating August 2014 Are Actionable

Defendants wrongly claim that because the sham services agreement between FXCM and Effex ended on August 1, 2014, payments for "order flow" could not render Defendants' statements made after this date false and misleading. As Plaintiffs explain in the SAC, this date is irrelevant because the CFTC Order indicated that the improper relationship between FXCM and Effex lasted "through *at least* 2014," and FXCM listed Effex on its website as a liquidity

provider as late as January 2017, demonstrating the continuation of the relationship. ¶73. The sham "order flow" payments were merely a mechanism by which Effex remitted FXCM's share of trading profits. Just because one profit-sharing payment mechanism *may* have ceased (at least according to Defendants' filings) does not mean the Company must have abandoned its improper profit-sharing relationship with Effex at that time.

Moreover, even if the August 2014 termination were to neutralize subsequent statements based on the sham "order flow" payments, Defendants made actionable false statements about its 2014 operations and finances in SEC reports filed beyond August 2014. FXCM's 14Q3 10-Q and 2014 10-K each covered financial reporting periods that included dates prior to August 1, 2014, and thus contained false statements and GAAP violations as alleged in the SAC and detailed above. ¶¶135, 144, 148, 160. The 14Q3 10-Q and 2014 10-K also contained the false statement that the Company "no longer receive[d] payments for order flow," which is false and actionable for the reasons stated above. The SAC also alleges additional false and misleading statements concerning the NFA and CFTC investigations, which were contained in FXCM's SEC filings through November 18, 2016. ¶¶164-168. Defendants provide no basis for the Court to dismiss claims based on Defendants' false and misleading statements post-dating August 1, 2014.

## II.    THE SAC ADEQUATELY ALLEGES SCIENTER

To allege scienter, a plaintiff must "allege facts that give rise to a strong inference of fraudulent intent." *Acito v. IMCERA Grp., Inc.*, 47 F.3d 47, 52 (2d Cir. 1995). This can be done "by alleging facts that constitute strong circumstantial evidence of conscious misbehavior or recklessness." *Chill*, 101 F.3d at 267; *Gross v. GFI Grp., Inc.*, No. 14CV9438, 2018 WL 1918620, at *6 (S.D.N.Y. Apr. 20, 2018). In other words, "[a]n egregious refusal to see the

obvious, or to investigate the doubtful [can support] an inference of ... recklessness." *Chill*, 101 F.3d at 269.

The Court must consider whether the SAC and other proper sources of facts "give rise to a strong inference of scienter" when "taken collectively." *Tellabs, Inc. v. Makor Issues & Rights, Ltd.*, 551 U.S. 308, 322–23 (2007). A strong inference of scienter must only be "*at least as compelling* as any opposing inference." *Id.* at 324; *Patel v. L-3 Commc'ns Holdings Inc.*, 2016 WL 1629325, at *15 (S.D.N.Y. Apr. 21, 2016) (citing *City of Pontiac Gen. Employees' Ret. Sys. v. Lockheed Martin Corp.*, 875 F. Supp. 2d 359, 372 (S.D.N.Y. 2012) ("[A]t the motion to dismiss stage, a tie on scienter goes to the plaintiff.")). The inference of scienter "need not be irrefutable, *i.e.*, of the 'smoking-gun' genre, or even the 'most plausible of competing inferences.'" *Tellabs, Inc.*, 551 U.S. at 324.

Allegations of conscious misbehavior or recklessness can support a finding of scienter. "Intentional misconduct is easily identified since it encompasses deliberate illegal behavior." *Novak*, 216 F.3d at 308. Recklessness requires demonstrating "strong circumstantial evidence of that recklessness ... such that it gives rise to a strong inference of fraudulent intent." *Chill*, 101 F.3d at 269. Plaintiffs pursuing a "conscious misbehavior or recklessness" theory must allege conduct that is, "at the least ... highly unreasonable and which represents an extreme departure from the standards of ordinary care to the extent that the danger was either known to the defendant or so obvious that the defendant must have been aware of it." *In re Carter-Wallace, Inc., Sec. Litig.*, 220 F.3d 36, 39 (2d Cir. 2000)). Such claims typically survive motions to dismiss when based on specific allegations demonstrating "defendants' knowledge of facts or access to information contradicting their public statements." *Id.* at 40 (quoting *Novak*, 216 F.3d at 308).

A failure "to check information [defendants] had a duty to monitor" may also give rise to a strong inference of scienter. *Novak*, 216 F.3d at 311; *Nathel v. Siegal*, 592 F. Supp. 2d 452, 464 (S.D.N.Y. 2008). In such circumstances, "defendants knew or, more importantly, should have known that they were misrepresenting material facts related to the corporation." *Kalnit v. Eichler*, 264 F.3d 131, 142 (2d Cir. 2001) (quoting *Novak*, 216 F.3d at 308). *See also In re Cannavest Corp. Sec. Litig.*, No. 14 CIV. 2900 (PGG), 2018 WL 1633847, at *13 (S.D.N.Y. Mar. 31, 2018).

### A. Plaintiffs Adequately Allege Scienter Against Niv, Ahdout and Lande

The SAC alleges that the Individual Defendants: (i) had knowledge of facts that directly contradicted their repeated core misrepresentations; (ii) attempted to cover up FXCM's secret relationship with Effex conflict when questioned by regulators, and (iii) violated GAAP in several respects when reporting financial results associated with Effex.[6] Consequently, the facts alleged in the SAC strongly support an inference of scienter as to the Individual Defendants.

***First***, the SAC alleges in detail that the Individual Defendants had knowledge of facts or access to information contradicting their public statements. *Novak*, 216 F.3d at 308. The SAC alleges specifically that Defendants Niv and Ahdout created, funded, housed, and helped operate Effex to take advantage of FXCM customers. Specifically, the SAC alleges that Defendants Niv and Ahdout: (i) devised the plan to develop the high frequency trading algorithm to secretly trade against FXCM's retail clients, ¶49; (ii) hired Dittami to a Managing Director position at the

---

[6] Defendants argue that "Plaintiffs have failed to allege that the Individual Defendants intended to defraud *investors*." Def. Br. at 28-29 (emphasis in original). But this argument simply ignores the allegations in the SAC, which detail FXCM's false and misleading statements in its public reports filed for the benefit of investors. The fact that FXCM may ***also*** face liability from its customers does not insulate the Company from liability to its investors, who rely on the Company's public filings.

Company, ¶50; (iii) provided Dittami with startup capital, *Id.* (iv) were made aware of compliance department concerns associated with trading against FXCM's retail customers, ¶52; (v) restructured FXCM's relationship with Dittami by spinning off Dittami's trading system as an "independent" market maker to superficially address those concerns, ¶53; (vi) crafted so-called services agreements by which Effex would make monthly payments to FXCM calculated to approximate the same 70-30 split from Dittami's FXCM employment agreement, ¶55: (vii) provided logistical support to Effex by allowing it to use FXCM's prime brokerage relationship with Citi (which Effex could not attain on its own), operate from FXCM's offices, and use FXCM's servers and email systems, ¶¶56, 58; (viii) permitted Effex to use a hold timer to enable Effex to execute preferential trades and a previous quote system whereby Effex could select the most advantageous quote when executing trades, ¶¶66-67; and (ix) agreed that FXCM would favor Effex to win all ties with other market makers, provide Effex with real time price quotes from other market makers, and add smaller markups to Effex prices than to other market providers, ¶65.

As the CFTC noted, "FXCM personnel had full knowledge of the representations that the firm was making to its customers about the No Dealing Desk model, as well as the facts about [Dittami] and [Effex]'s relationship with FXCM." ¶92. The Individual Defendants' knowledge of the above facts **directly contradicted** their public statements, thus demonstrating scienter. *Novak*, 216 F.3d at 308. Allegations of hidden side arrangements like the agreement between FXCM and Effex also give rise to a strong inference of scienter. *In re Bristol Myers Squibb Co. Sec. Litig.*, 586 F. Supp. 2d 148, 152–54 (S.D.N.Y. 2008) (holding that plaintiffs adequately alleged scienter where the defendants organized secret side agreements on behalf of the Company in order to protect its most profitable drug).

**Second**, attempts by a defendant to "cover up" fraud also constitute evidence of scienter. *Szulik v. Tagliaferri*, 966 F. Supp. 2d 339, 365 (S.D.N.Y. 2013); *In re Galena Biopharma, Inc. Sec. Litig.*, 117 F. Supp. 3d 1145, 1166 (D. Or. 2015) (attempting to cover up wrongdoing is supportive of scienter); *In re Nature's Sunshine Prod. Sec. Litig.*, 486 F. Supp. 2d 1301, 1310 (D. Utah 2007) ("Evidence that a defendant has taken steps to cover-up [sic] a misdeed is strong proof of scienter"); *Baena v. Woori Bank*, 515 F. Supp. 2d 414, 421 (S.D.N.Y. 2007) ("The significance of the subsequent alleged lies is that they speak to whether defendants acted with scienter — and intent to deceive at an earlier point in time. The subsequent lies — the cover up — [are] strong circumstantial evidence of [...] 'conscious behavior' which raises an inference of an intent to defraud.").

Here, the SAC alleges that Niv lied to NFA compliance staff when questioned about FXCM's relationship with Effex. For example, Niv failed to disclose any of the details concerning FXCM's relationship with Effex and Dittami. ¶87. Niv also misrepresented that he had a prior working relationship with Dittami arising from when Dittami was employed by other liquidity providers. *Id.* Defendants, including Niv, also knew that the Company was under investigation by the CFTC and NFA as early as October 2013 yet failed to fully disclose these highly material investigations during the Class Period. ¶¶164-168. Niv's failure to disclose the true nature of FXCM's relationship with Effex and Dittami and his approval of FXCM's false responses to the NFA's investigation demonstrated his aim to conceal FXCM's undisclosed interest in Effex, muddy the NFA's attempts to clarify the FXCM-Effex relationship, and downplay Dittami's role with FXCM and Effex. ¶91. Consequently, these allegations also support an inference of scienter.

*Third*, accounting improprieties in general and GAAP violations in particular also give rise to a strong inference of scienter. Where improper accounting is alleged, establishing conscious misbehavior or recklessness at the pleading stage entails conduct that is "highly unreasonable[,] ... represent[ing] an extreme departure from the standards of ordinary care to the extent that the danger was either known to the defendant or so obvious that the defendant must have been aware of it." *Iowa Pub. Employee's Ret. Sys. v. Deloitte & Touche LLP*, 919 F. Supp. 2d 321, 333–34 (S.D.N.Y. 2013) (alterations in original). *See also In re Lehman Bros. Sec. & Erisa Litig.*, 799 F. Supp. 2d 258 (S.D.N.Y. 2011) (holding that allegations that certain transactions were used to affect a financial metric that was material to investors, credit rating agencies, and analysts supported a strong inference of scienter).[7]

Here, the SAC alleges two separate accounting issues. First, the SAC alleges that FXCM structured its payments from Effex to avoid the NFA's scrutiny. ¶64. As CFO, Lande knew that FXCM directed Effex to remit these payments to FXCM Holdings rather than FXCM's U.S. subsidiary, because FXCM Holdings was not a member of the NFA. *Id.* These unusual payments, totaling approximately $77 million, was a red flag for Lande as CFO.

Additionally, for a period of time Effex reported its P&L directly to FXCM. Part of FXCM's monthly preliminary P&L statement would take Effex's monthly P&L and simply subtract 30 percent. ¶63. As CFO, Lande was well aware that FXCM viewed Effex's P&L as its own, less Effex's 30 percent share—just as it did when FXCM employed Dittami and split his trading profits 70-30. *Id.* Indeed, for a period of time following its formation, Effex reported its

---

[7] Defendants argue that "allegations of failure to comply with GAAP do not suffice to allege scienter." Def. Br. at 30. But even if GAAP violations alone do not suffice, "it does not mean that detailed allegations of GAAP violations cannot support a strong inference of scienter." *In re McKesson HBOC, Inc. Sec. Litig.*, 126 F. Supp. 2d 1248, 1273 (N.D. Cal. 2000).

P&L to FXCM on a weekly basis. *Id.* Lande was also aware that the invoices FXCM sent Effex seeking its 70% share of Effex's profits expressly described the amounts billed as "P&L." *Id.* The SAC alleges facts showing that Lande either had information directly contradicting Defendants' false and misleading statements or failed "to check information [he] had a duty to monitor," *Novak*, 216 F.3d at 311. Plaintiffs have alleged that Lande "knew or, more importantly, should have known that [he was] misrepresenting material facts related to the corporation." *Kalnit*, 264 F.3d at 142 (quoting *Novak*, 216 F.3d at 308).

The SAC also alleges that FXCM's financial statements during the Class Period violated GAAP for failing to disclose FXCM's economic interest in, or related party transactions with, Effex. Given that FXCM was entitled to 70% of Effex's profits, FXCM was required to (but did not) consolidate Effex's operations as a variable interest entity. ¶¶131-136. Alternatively, even if Effex were not required to be consolidated, it was still a related party to FXCM and therefore, FXCM was required to (but did not) disclose the related party nature of the business relationship and the amount of profits FXCM was earning from Effex. ¶¶137-145.

These allegations, when considered holistically, give rise to a strong inference of scienter. Indeed, the CFTC Order concluded that "FXCM acted with scienter" because "FXCM personnel had full knowledge of the representations that the firm was making to its customers about the No Dealing Desk model, as well as the facts about" Effex's relationship with FXCM. SAC Ex. 1 at 9. "Accordingly, FXCM knowingly or recklessly misrepresented and failed to disclose" the true nature of its relationship with Effex. *Id.*

On a motion to dismiss on scienter grounds, "the critical inquiry is whether a reasonable person would deem the inference of scienter at least as strong as any opposing inference." *Bristol Myers Squibb*, 586 F. Supp. 2d at 168. Here, Defendants concede that the "compelling, non-fraud

explanation" is that "FXCM realized that it could not profit directly from the trading algorithm because of its agency-trading model" but nevertheless "provided some limited support to allow Dittami to set up Effex" to enable FXCM to benefit from the trading algorithm. Def. Br. at 27.[8] The inference of scienter is at least as strong as any opposing inference; thus the SAC adequately alleges scienter.

### B.  Plaintiffs Adequately Allege Scienter Against FXCM

"A corporation can only act through its employees and agents." *Suez Equity Inv'rs, L.P. v. Toronto-Dominion Bank*, 250 F.3d 87, 101 (2d Cir. 2001). In this Circuit, "courts have readily attributed the scienter of management-level employees to corporate defendants." *Marsh & McLennan*, 501 F. Supp. 2d at 481. To adequately plead scienter against FXCM, a corporate entity, "the pleaded facts must create a strong inference that someone whose intent could be imputed to [FXCM] acted with the requisite scienter." *Teamsters Local 445 Freight Div. Pension Fund v. Dynex Capital Inc.*, 531 F.3d 190, 195 (2d Cir. 2008). Here, the scienter of Niv, Ahdout, and Lande—some of the highest-ranking employees of FXCM—can be attributed to FXCM. Indeed, according to a former FXCM employee, "Niv, Ahdout, to a lesser extent, CFO Robert Lande had control over Effex Capital." ¶72. As Plaintiff has adequately alleged scienter with respect to Niv, Ahdout, and Lande, their scienter is properly attributable to FXCM. Even if the Court does not find scienter adequately pleaded as to the individual Defendants, the SAC sufficiently alleges scienter as to FXCM. *See Teamsters*, 531 F.3d at 195 ("it is possible to raise

---

[8] Defendants argue that "the fact that Effex paid FXCM pursuant to the pay-for-flow agreement" does not "raise an inference of scienter." Def. Br. at 27. This argument mischaracterizes the SAC, which alleges that the sham "order flow" payments were merely the façade hiding Defendants' scheme to take advantage of its customers by sharing in Effex's trading profits.

the required inference [of scienter] with regard to a corporate defendant without doing so with regard to a specific individual defendant" under the PSLRA).

### C. Plaintiffs Allege Scienter Under The Core Operations Theory

Allegations concerning a company's core operations may also give rise to a strong inference of scienter. Under the core operations theory, "if a plaintiff can plead that a defendant made false or misleading statements when contradictory facts of critical importance to the company either were apparent, or should have been apparent, an inference arises that high-level officers and directors had knowledge of those facts by virtue of their positions with the company." *In re Atlas Air Worldwide Holdings, Inc. Sec. Litig.*, 324 F. Supp. 2d 474, 489 (S.D.N.Y. 2004) (citing *Cosmas v. Hassett*, 886 F.2d 8, 13 (2d Cir. 1989)).[9]

There is no dispute that the Company's retail trading segment is a core operation of FXCM. For example, according to FXCM's 2011 10-K, the Company's "retail trading segment accounted for 87.5% of its total revenues in 2011." ¶187. Throughout the Class Period, Defendants represented that the NDD platform and agency model were "fundamental to our core business philosophy." ¶189. Effex routinely captured over 50% of FXCM's daily order flow and at one time captured nearly 80%, and all told, from 2010 through 2014 Effex rebated to FXCM nearly $80 million of Effex's trading revenue through its monthly payments to FXCM. ¶70. Thus, the SAC alleges facts supporting a strong inference of scienter under the core operations theory.

---

[9] The core operations inference "may be considered 'as part of [a court's] holistic assessment of the scienter allegations.'" *Shemian v. Research In Motion Ltd.*, No. 11 CIV. 4068 RJS, 2013 WL 1285779, at *18 (S.D.N.Y. Mar. 29, 2013) (quoting *Bd. of Trustees of City of Ft. Lauderdale Gen. Employees' Ret. Sys. v. Mechel OAO*, 811 F. Supp. 2d 853, 872 (S.D.N.Y. 2011)); *accord Cortina v. Anavex Life Scis. Corp.*, No. 15-CV-10162 (JMF), 2016 WL 7480415, at *7 (S.D.N.Y. Dec. 29, 2016). *In re Rockwell Med., Inc. Sec. Litig.*, No. 16 CIV. 1691 (RJS), 2018 WL 1725553, at *15 (S.D.N.Y. Mar. 30, 2018).

## III.    PLAINTIFFS ADEQUATELY ALLEGE LOSS CAUSATION

"The purpose of the loss causation element is to require a plaintiff 'to provide a defendant with some indication of the loss and the causal connection that the plaintiff has in mind,' not to make a conclusive proof of that causal link." *Fin. Guar. Ins. Co. v. Putnam Advisory Co., LLC*, 783 F.3d 395, 404 (2d Cir. 2015) (quoting *Dura Pharmaceuticals, Inc.*, 544 U.S. at 347)). The SAC unquestionably alleges Plaintiffs' loss and the causal connection to Defendants' misconduct.

Defendants curiously challenge loss causation as to the SAC, when they explicitly declined to challenge the same allegations in the FAC. ECF No. 89 at 22 n.11 ("Defendants are not challenging the sufficiency of Plaintiffs' loss causation allegations"). Defendants point to the "January 2015 SNB Flash Crash that caused a 90% decline in FXCM's stock price" *in 2015*— two years before the February 7, 2017 stock drop alleged in the SAC (¶¶82-83)—to argue that Plaintiffs' loss "coincides with a marketwide phenomenon." Def. Br. at 32 (quoting *City of Westland Police & Fire Ret. Sys. v. MetLife, Inc.*, 928 F. Supp. 2d 705, 715 (S.D.N.Y. 2013)). Defendants do not and cannot explain how stock drops two years apart "coincide," because this case does not remotely resemble *Westland Police*. In *Westland Police*, the alleged corrective disclosure occurred on August 5, 2011, the *same day* that Standard and Poor's downgraded the credit rating of the United States for the first time in history, causing the entire market to drop precipitously the following trading day. 928 F. Supp. 2d at 714. Here the disclosure causing Plaintiffs' losses occurred two years after the SNB Flash Crash.

The Second Circuit has provided apt guidance on this point. "While Plaintiffs did not plead that the alleged fraud caused their losses independently of the larger financial events of 2007 and 2008, they were not required to do so under our precedents. The requirement, if any, to plead a causal link does not place on Plaintiffs a further pleading obligation to rule out other

contributing factors or alternative causal explanations." *Loreley Fin. (Jersey) No. 3 Ltd. v. Wells Fargo Sec., LLC*, 797 F.3d 160, 188–89 (2d Cir. 2015). "Plaintiffs must only allege enough facts regarding their loss to support the inference that they 'would have been spared all ***or an ascertainable portion of that loss*** absent the fraud.'" *Id.*, 797 F.3d at 189 (quoting *Lentell v. Merrill Lynch & Co.*, 396 F.3d 161, 175 (2d Cir. 2005)). That is precisely what the SAC alleges here.[10]

Defendants also challenge loss causation as to the GAAP violations alleged in the SAC, because the CFTC and NFA "settlements did not allege, or even discuss, any GAAP violations." Def. Br. at 33. This is simply not the standard that applies to pleading loss causation. *See Freudenberg v. E\*Trade Fin. Corp.*, 712 F. Supp. 2d 171, 202 (S.D.N.Y. 2010) (noting that no court requires "a corrective disclosure be a 'mirror image' tantamount to a confession of fraud"); *In re Initial Pub. Offering Sec. Litig.*, 544 F. Supp. 2d 277, 289 (S.D.N.Y. 2008) ("[T]here is no requirement that the disclosure take a particular form").

The SAC alleges that FXCM's SEC filings contained false and misleading statements and violated GAAP because they failed to disclose Effex as a VIE or Effex's payments to FXCM as related party transactions. ¶¶131-145. The CFTC and NFA settlements revealed that Effex was indeed either a VIE or related party, showing Defendants' statements were false and misleading and violated GAAP. This presents a similar case to *In re Winstar Commc'ns*, No. 01 CV 11522, 2006 WL 473885, at \*16 (S.D.N.Y. Feb. 27, 2006) ("Plaintiffs allege that once the truth regarding the questionable accounting practices underlying the Audit Report leaked into the

---

[10] Defendants also argue that "an intervening event disrupted the chain of causation," pointing to FXCM's announcement that it would leave the U.S. market and sell its U.S. operations. Def. Br. at 33 n.13. This is nonsensical. Of course news of FXCM leaving the U.S. coincided with the CFTC settlement: it was a critical term ***of the settlement***. ¶79; SAC Ex. 1 at 13-14.

public forum, the price of Winstar stock immediately declined. Such allegations are sufficient to adequately plead loss causation"). As the Ninth Circuit recently explained, "it is the underlying facts concealed by fraud that affect the stock price. … Fraud simply causes a delay in the revelation of those facts." *Mineworkers' Pension Scheme v. First Solar Inc.*, 881 F.3d 750, 754 (9th Cir. 2018).

Defendants' cases regarding GAAP violations and loss causation are inapposite. In *Stratte-McClure v. Morgan Stanley*, No. 09 CIV. 2017 DAB, 2013 WL 297954, at *13 (S.D.N.Y. Jan. 18, 2013), the court found that "none of the alleged [corrective] disclosures make any indication that Defendants improperly made third quarter write-downs," which was the plaintiffs' central theory of falsity. In *In re Polaroid Corp. Sec. Litig.*, 134 F. Supp. 2d 176, 189 (D. Mass. 2001), the plaintiffs alleged that Polaroid had not received a certain payment when it announced its earnings, but the payment was nonetheless received during the class period prior to the alleged revelation of truth. Thus the court found that "no such inference [of loss causation] is appropriate because this latent problem dissipated as soon as the income was received." *Id.* at 189. In *Amorosa v. Ernst & Young LLP*, 682 F. Supp. 2d 351, 364 (S.D.N.Y. 2010), the plaintiff "fail[ed] to allege that the truth of the June 1999 Opinion was 'called into question' at any time during the purported stock decline." Here, the SAC clearly alleges that the CFTC and NFA settlements revealed the falsity of FXCM's financial statements and violations of GAAP.

## IV. PLAINTIFFS ADEQUATELY ALLEGE CONTROL PERSON LIABILITY UNDER SECTION 20(a)

"In the Second Circuit, the 'control person' provisions are broadly construed as they were meant to expand the scope of liability under the securities laws." *CompuDyne Corp. v. Shane*, 453 F. Supp. 2d 807, 829 (S.D.N.Y. 2006). "In order to establish a *prima facie* case of liability under § 20(a), a plaintiff must show: (1) a primary violation by a controlled person; (2) control of

the primary violator by the defendant; and (3) 'that the controlling person was in some meaningful sense a culpable participant' in the primary violation." *In re Rhodia S.A. Sec. Litig.*, 531 F. Supp. 2d 527, 550 (S.D.N.Y. 2007). The SAC satisfies each of these requirements.

Defendants assert that Plaintiffs have not adequately alleged control person liability because they have not adequately alleged a primary violation of the Exchange Act. As demonstrated above, however, Plaintiffs adequately alleged a Section 10(b) claim. Therefore, "the 'primary violation' element of section 20(a) is satisfied." *380544 Canada, Inc. v. Aspen Tech., Inc.*, 544 F. Supp. 2d 199, 231 (S.D.N.Y. 2008). Defendants do not assert that the SAC fails to allege control, thus conceding the second requirement for control person liability.

The SAC satisfies the third requirement by adequately alleging the requisite "culpable participation" in the fraudulent scheme with the same particularity as scienter. Indeed "the conclusion above that plaintiffs have sufficiently plead scienter as to [certain individual defendants] … **requires** the conclusion that plaintiffs have shown culpable participation as to those defendants." *Refco*, 503 F. Supp. 2d at 661-62. For the same reasons that Plaintiffs have adequately alleged scienter as to Niv, Ahdout, and Lande, they have "necessarily  raise[d] a strong inference that the defendant[s'] participation as a control person was culpable." *Id.* at 662.

## CONCLUSION

For the foregoing reasons, the Court should deny Defendants' motion to dismiss in its entirety. If the SAC is dismissed, Plaintiffs respectfully submit that the dismissal should be without prejudice because the order granting Defendants' motion to dismiss Plaintiffs' first amended complaint did not address the substance of Plaintiffs' allegations.[11]

---

[11] *See ATSI Commc'ns, Inc. v. Shaar Fund, Ltd.*, 493 F.3d 87, 108 (2d Cir. 2007) ("District courts typically grant plaintiffs *at least* one opportunity to plead fraud with greater specificity when they dismiss under Rule 9(b)").

Dated: June 6, 2018                    Respectfully submitted,

                                                     **THE ROSEN LAW FIRM, P.A.**

                                                     /s/ Phillip Kim
                                                     Phillip Kim, Esq. (PK 9384)
                                                     Laurence M. Rosen, Esq. (LR 5733)
                                                     Joshua Baker, Esq. (JB 8288)
  275 Madison Avenue, 34th Floor
  New York, New York 10016
  Telephone: (212) 686-1060
  Fax: (212) 202-3827
  Email: pkim@rosenlegal.com
  Email: lrosen@rosenlegal.com
  Email: jbaker@rosenlegal.com

  *Lead Counsel for Lead Plaintiffs*

  **WOLF HALDENSTEIN ADLER FREEMAN & HERZ LLP**
  Matthew M. Guiney, Esq. (MG 5858)
  270 Madison Avenue
  New York, NY 10016
  Tel: (212) 545-4600
  Email: guiney@whafh.com

  *Additional Counsel*

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on this 6th day of June 2018, a true and correct copy of the foregoing MEMORANDUM OF LAW IN OPPOSITION TO DEFENDANTS' MOTION TO DISMISS PLAINTIFFS' SECOND AMENDED CONSOLIDATED SECURITIES CLASS ACTION COMPLAINT was served by CM/ECF to the parties registered to the Court's CM/ECF system.


<u>/s/ Phillip Kim                          </u>
Phillip Kim