J36VGLOO

```
1    UNITED STATES DISTRICT COURT
     SOUTHERN DISTRICT OF NEW YORK
2    ------------------------------x
3    IN RE GLOBAL BROKERAGE, INC.
     f/k/a FXCM INC. SECURITIES
4    LITIGATION                            17 CV 916 (RA)
5    ------------------------------x
                                           ARGUMENT
6
7                                          New York, N.Y.
                                           March 6, 2019
8                                          11:10 a.m.
9    Before:
10                    HON. RONNIE ABRAMS,
11                                         District Judge
12                        APPEARANCES
13   THE ROSEN LAW FIRM
          Attorneys for Plaintiffs
14   BY:  PHILLIP C. KIM
          JOSH BAKER
15
     KING & SPALDING
16        Attorneys for Defendants
     BY:  PAUL R. BESSETTE
17        REBECCA MATSUMURA
          ISRAEL DAHAN
18
19
20
21
22
23
24
25
```

J36VGLOO

1             (Case called)

2             MR. KIM:  Good morning, your Honor.

3             Phillip Kim and my associate Josh Baker from The Rosen

4    Law Firm, for plaintiffs.

5             THE COURT:  Good morning.

6             MR. BESSETTE:  Good morning, your Honor.

7             Paul Bessette of King & Spalding, on behalf of the

8    defendants.

9             And my colleagues will introduce themselves.

10            MS. MATSUMURA:  Rebecca Matsumura.

11            THE COURT:  Good morning.

12            MR. DAHAN:  Israel Dahan.

13            THE COURT:  Good morning to you.

14            So we have defendant's motion.

15            Who would like to be heard?

16            MR. BESSETTE:  Your Honor, since it's our motion, we'd

17   be happy to be heard first.

18            THE COURT:  Yes.  Thank you.

19            MR. BESSETTE:  May it please the Court, Paul Bessette,

20   on behalf of the defendants.

21            This Court gave specific guidance to the plaintiffs

22   the first time around to plead facts rather than conclusions to

23   state a viable claim for securities fraud.

24            To get to the heart of the matter, this case is about

25   an arm's-length contract during the class period in which FX

J36VGLOO

was supposed to make order flow payments to FXCM and, according
to plaintiffs, that, in reality, was a pretext for a secret
profit-sharing agreement.  The viability of the second amended
complaint rises or falls on this allegation and, we submit,
your Honor, that it falls.

First, preliminarily, courts are rightly skeptical of
fraud claims based like this on pretextual secret
relationships.  We cited several cases about that.  One of the
common things in those cases, your Honor, both *SkyPeople Fruit
Juice* in this Court of 2012, and *Verizon Communications* in
2001, both in the reply brief at footnote 2, there's a common
theme, which is that this pretext conclusion in those cases and
others was unsupported by particular and sufficient facts.  And
that is the same thing that's true here.

They plead no facts to support the secret
profit-sharing relationship critically during the class period.
Their facts and conclusions are prior to the class period and
they are really cut-and-pasted from the unadjudicated
complaints and no admit/no deny settlements from the CFTC and
the NFA.

But the fact that regulators made these conclusory
allegations doesn't mean that plaintiffs have met the PSLRA
pleading burden by just lifting those and putting them in.  We
understand that wasn't sufficient to strike them under Rule
12(f), but we submit it's not sufficient under their pleading

J36VGLOO

1   burden to survive a 12(b)(6) motion.  Why?  Because companies

2   settle civil cases like this all the time without regard to the

3   strength of the allegations.  There are a lot of reasons they

4   settle.

5           So you ask yourself what is required then?  And one of

6   plaintiffs' cases answered that point well in the *Bristol-Myers*

7   *Squibb* case, again in this Court of 2008.  The Court found that

8   a secret side agreement was adequately pleaded where plaintiffs

9   relied on the company's guilty plea of fraud for that very

10  reason.  That is a far cry from an unadjudicated allegation in

11  a civil lawsuit brought by regulators who don't even enforce

12  the securities laws.

13          THE COURT:  But are they just relying on the civil

14  allegations?  Don't they do a better job this time around of

15  specifically identifying the statements at issue, among other

16  things?

17          MR. BESSETTE:  Well, your Honor, I do admit that this

18  second amended complaint is certainly a better cleaned-up

19  version than the first amended.  The statements are identified,

20  they are not block quoted and all of that.

21          But when you look at what the statements are, they are

22  not sufficient.  And here's why.  So that was some background

23  on what the case law says.

24          What we have here, when you strip the conclusions

25  away, right, so the conclusions are a secret side agreement.

1    Where are the facts?

2            The class period started in March of 2012.

3    Plaintiffs' own allegation at paragraph 61 of the second

4    amended complaint, FX paid on order flow and volume $21 per

5    million dollars of notional order flow.  And in September of

6    2011, again, before the class period, that was dropped to $16

7    per million of order flow.  It's not based on profit, it's

8    order flow.  And then at the class period in March, that number

9    was never adjusted for profits or losses or anything.

10           In fact, plaintiffs allege that from that period

11   forward, since FXCM had spun out FX, no controlling interest,

12   it was its own stand-alone company, they provided support for a

13   year.  But at the beginning of the class period, it stood on

14   its own; its expenses went up.  That $16 never changed.  It was

15   based on an order flow.  There was a services agreement which

16   plaintiffs allege.  That's the basis for the payment.

17           So the fact that FXCM may have, quote/unquote, birthed

18   and spun out FX, and maybe the $21 original order flow payment

19   might have been based on some notion of where the profit was,

20   at the time the class period started, it's a stand-alone

21   company with a contract to pay based on order flow.  And that's

22   what the facts are.

23           So everything else is a conclusion that they are

24   trying to draw, conclusions that the CFTC put in their

25   complaint, again, unadjudicated, no admit, no deny.  There are

1    no facts, when you strip the conclusions away from the

2    allegations, to show that these payments were anything but

3    order flow and based on order flow.

4            In fact, your Honor, at paragraph 70, plaintiffs even

5    admit that FXCM directed FX to limit its share of the trading

6    volume.  So if they were still having a secret profit-sharing

7    relationship, you certainly wouldn't expect FXCM to say, FX,

8    lower your volume, lower the profitability.  It just doesn't

9    make sense.  That's why I'm saying if you look at the

10   statements, your Honor, and you make sure you have the time

11   period, the class period, which starts in March of 2012, there

12   are no facts from that point forward to show that these

13   payments were anything other than what was contracted for,

14   which is order flow and volume.  And that is why, your Honor,

15   we submit that the false and misleading statements, they fall,

16   because there is no profit-sharing arrangement.

17           So for example --

18           THE COURT:  Just let me ask you, didn't the order flow

19   match the original agreement with Dittami?

20           MR. BESSETTE:  The allegations in the second amended

21   complaint and, frankly, in the underlying regulatory agency

22   complaints, are that the $21 was sort of a proxy for a certain

23   profit level.  We don't submit that that's -- that's what's

24   pleaded.  But my point is that was prior to the class period.

25   That one was when the person was still either -- Dittami or

J36VGLOO

whatever his name is, part of FXCM or just after they were spun

out.  But they were spun out before the company went public at

the end of 2010.

    The class period starts in March of 2012.  At that

point in time, there are service agreements, there are

disclosures by FXCM that we have these arrangements for order

flow.  And all the payments at that point were based on $16 per

million dollars of order flow.  And they weren't changed

throughout the class period until it ended in 2014, halfway

through the class period.  There's no adjustment, up or down,

for profits or losses; it's $16 per million based on an

agreement.

    So what you really have here, your Honor, if you look

at this, is, yeah, they might have started this company, spun

it out, approximated profits.  But then it's a stand-alone

company on its own, there's a contract, they adjust the price.

And at the time the class period starts, which is the critical

point here, in March of 2012, there is no adjustments for

profit or loss.  There is nothing but $16 per million of

notional volume.  That's what it is.  There's no facts in the

complaint to show otherwise.  All their facts are prior to the

class period starting.

    Frankly, your Honor, if you step back and look at

this, it's like you could bring a securities fraud claim

against any company who may have had some arrangement, an

J36VGLOO

1    affiliate, but then spun him out.  And the period that the

2    class period starts, plaintiffs can just say, Oh, no, you just

3    papered that up.  No, this is not real.  This is a secret side

4    agreement.  You just carried it through.

5          Any company could be liable for that.  They have to

6    have facts.  And all their facts are pre IPO -- I'm sorry, pre

7    class period, class period, which is when we have to look at

8    the false and misleading statements.  There is nothing to show

9    a profit-sharing relationship.  And that is why -- well, a

10   couple of things.

11         First, the company admitted on August 1st of 2014 that

12   these order flow payment arrangements stopped.  So by

13   definition there can be no false and misleading statement after

14   that date, because that's the very basis for the allegation

15   that all of the statements are false, because there was a

16   profit sharing relationship.  We submit there wasn't one, but

17   there was an order flow arrangement and that, by itself,

18   terminated in August of 2014.

19         THE COURT:  I'm going to confirm that plaintiffs don't

20   disagree with that.  Do you mind if I just break in, Mr. Rosen?

21         Is there any dispute about that, about the timing with

22   respect to 2014?

23         MR. KIM:  Well, paragraph 61 of the complaint, with

24   respect to whether these order flow payments were changed, talk

25   about how they were changed.  And I believe they were adjusted

J36VGLOO

1    to $16 per million during the class period.  The class period

2    starts in 2012, but the conduct here, if you look at the

3    regulatory complaints, span from 2010 to 2014.  So the notion

4    that none of this happened during the class period is just

5    wrong.

6              THE COURT:  I was just focusing on the 2014 date as

7    being the end period.

8              MR. KIM:  August 1st, 2014 is when the defendants say

9    the services agreement was terminated.

10             THE COURT:  All right.  Thanks.

11             I didn't mean to interrupt, Mr. Bessette.

12             MR. BESSETTE:  That's fine, your Honor.

13             And I just want to point out the drop from $21 to $16

14   was pre class period; it was September of 2011.  The class

15   period starts March of 2012.

16             And again, plaintiffs fail to point any facts to

17   support their belief that an improper relationship between the

18   two companies outlasted the cessation of the order flow

19   payments in August of 2014.  In fact, their opposition does

20   nothing except put the burden on us.  In fact, he says, Just

21   because one profit-sharing payment mechanism may have been

22   ceased does not mean that the company must have abandoned its

23   improper profit-sharing relationship.

24             That's really what they are saying is, Well, it may

25   have continued past '14, we don't really know.  Just because of

1    this -- that's not meeting their pleading burden.  They have no

2    facts pled to show beyond August of 2014 at a minimum.  We

3    think there's no facts pled at the beginning of the class

4    period to show a profit-sharing relationship.

5           Some other statements, again, because the whole second

6    amended complaint rises or falls on the basis of a

7    profit-sharing relationship, when there is none, because none

8    has been adequately pled from the beginning of the class

9    period, then you see that all the other things fall away.

10          For example, they make a big deal about how the

11   company violated GAAP.  And the basis for that, the very

12   foundation of that is, Well, there was an improper

13   profit-sharing relationship, so there must have been an

14   affiliate relationship, there must have been a variable --

15          THE COURT:  Wasn't there still a relationship with FX

16   that they didn't disclose?

17          MR. BESSETTE:  I would submit no, your Honor.  They

18   disclosed that FX was one of the many liquidity providers and

19   that they had order flow payments.  That's all true.

20          The only thing -- plaintiffs saying, Well, you didn't

21   disclose that you had a secret profit-sharing relationship.

22   Well, we didn't.  There are no facts pled.  The facts pled are

23   pre class period, when the company -- when FXCM spun out and

24   supported FX well before the class period started, and then had

25   service agreements, a set $16.  And you know during the class

J36VGLOO

1    period FX's expenses went up because FXCM wasn't supporting

2    them.  Well, where is the profit-sharing then?  When is the

3    adjustments?  None of that is pled because it didn't happen.

4         You really have to look at the allegations and keep

5    the class period in mind, because this is a classic example of

6    a company birthing another company, an affiliate, having a good

7    idea and then saying, You know what?  You're right, compliance

8    department, we can't keep -- let's spin them out.  We'll help

9    them out a little bit; they'll become one of our service

10   providers; we're going to get order flow volume.  And they may

11   have targeted 30 percent pre class period, but they never

12   adjusted that.  It never changed.  It was paper, they are

13   severed companies, no ownership interest, and order flow

14   payments only, from the beginning to halfway through the class

15   period when all of that ended in August of 2014.

16        And because there's no profit-sharing relationship,

17   there's no GAAP violation.  Why would E&Y, one of the top

18   auditors in the world, either before or after all this became

19   public, require a restatement?  There's no profit-sharing.

20   There are no facts to show that.  There was no GAAP violations,

21   no restatement.  The Second Circuit requires objective facts

22   under the case law to show a GAAP violation.  There's nothing

23   here.  That's because there's no profit-sharing relationship

24   sufficiently alleged.

25        Let me turn briefly to *scienter*, because that's,

J36VGLOO

again, another place that the SAC just falls short.  Because if
you don't have the foundation, if you don't have the predicate
of a profit-sharing relationship, then you don't really have an
intent to deceive or defraud.  And you can see that.

          What you have, the facts that are pled, actually show
that FXCM was trying to comply.  The inference is the opposite
of an intent to deceive or defraud.  It is, Okay, plaintiffs
admit that FXCM spun off FX in response to concerns from its
compliance department.  Again, pre class period.

          That Dittami resigned from FXCM and was no longer
employed after the spin-off, and that they admit FXCM further
separated FX over time, again, all up to even before the class
period started.  And the fact that FXCM let FX use its offices,
email servers in the immediate time after the spin-off, they
don't allege that that lasted beyond a year.  And again, that
is right before the class period.

          So, yes, the obvious inference is FXCM was trying to
do this right, listen to its compliance department.  It
couldn't have a profit-sharing relationship.  It set up the
company on its own to help them a little bit.  But at the
beginning of the class period, it's a stand-alone company, FXCM
has no ownership interest, and all the payments are based on
order flow.  That was fully disclosed.

          So you can't take, Oh, we think what you did over here
before the class period somehow permeated into the class

J36VGLOO

period.  We don't have any facts; we just got conclusions.  And
the facts we do plead actually show it was based on order flow
and survive a motion.

          Certainly in PSLRA pleading burdens and *scienter*, when
you have to have a cogent, strong inference of *scienter*, what
we have here is actually the inference that cuts the other way,
that the company was trying to do it right.  Maybe they got it
right, maybe they got it wrong.  E&Y never came after them for
violating GAAP or anything else.  The regulators never alleged
any of that.

          Just to wrap up, your Honor, one of the things that
you tasked plaintiffs with the first time around was to show
even if what you allege, how is that an intent to defraud
investors versus the regulators who don't have any jurisdiction
over the securities laws or investors?

          THE COURT:  Or versus the customers.

          MR. BESSETTE:  Or versus the customers, right.

          If you step back, you say, Even if what plaintiffs
allege is true, okay, you had this relationship, it may be so
volume was being sent to FX because you were getting a cut of
that.  We dispute all of that.  But at the end of the day, what
does that do?  It benefits FXCM and, therefore, its
shareholders.  It's not a fraud on shareholders.  It may have
been hiding the ball of the consumers or the people who were
doing the trading.

J36VGLOO

1          THE COURT:  But why isn't it a fraud on investors who,

2    assuming the truth of the allegations, didn't know that there

3    was this system that was harming customers in this way and that

4    they would not have invested had they known that there was this

5    secret agreement?

6          MR. BESSETTE:  But it's not a harm to the investors,

7    your Honor.  I would say maybe they might have been

8    distasteful, maybe they wouldn't have invested, but is there

9    harm to the shareholders, assuming the truth of the

10   allegations?  No, I would submit that it actually benefited

11   shareholders; that the company would have more profit because

12   it was directing the order flow to FX.  There's no harm to the

13   investors.

14         THE COURT:  So you think in a situation where there's

15   a fraud on customers, if the investors are making money in the

16   short-term, even though they are investing in a company that's

17   dependent on fraud, that's not a fraud on the investors?

18   Assuming material misstatements, *scienter*, etc.

19         MR. BESSETTE:  I would say that's right, your Honor.

20   I would say that's exactly right.

21         And it's certainly not an intent to deceive or defraud

22   the shareholders.  It may have, at most, been an intent to hide

23   the ball to consumers or people who are in the market and/or

24   regulators; but, again, those regulators have no jurisdiction

25   over the securities laws, so you can't take the inferential

J36VGLOO

| | |
|---|---|
| 1 | leap to say because you -- and they try to do this in the SAC, |
| 2 | is because they hid the ball with the regulators, maybe weren't |
| 3 | fully truthful in the interviews or what have you, that |
| 4 | demonstrates an intent to deceive or defraud.  No. |
| 5 | If that had happened to the SEC, which had |
| 6 | jurisdiction over the securities laws, then yes.  And there's |
| 7 | case law to show that.  There is no case law anywhere -- and |
| 8 | they haven't cited any -- that says that statements which |
| 9 | allegedly misled an agency not charged with protecting |
| 10 | investors is sufficient to plead *scienter*.  There's just no |
| 11 | case to say that because it doesn't make common sense. |
| 12 | Before I finish, I should say there is nothing -- to |
| 13 | get to defendant Lande, there is nothing in the complaint that |
| 14 | he had any involvement with FX.  At a minimum, he should be |
| 15 | dismissed from this case. |
| 16 | With that, your Honor, unless you have any questions, |
| 17 | I'll reserve my time. |
| 18 | THE COURT:  All right.  Not for now.  Thank you. |
| 19 | MR. BESSETTE:  Thank you. |
| 20 | MR. KIM:  Good morning, your Honor. |
| 21 | Phillip Kim, Rosen Law Firm, for the plaintiffs. |
| 22 | THE COURT:  Mr. Kim, can you start by kind of |
| 23 | answering the premise of defendants' argument, which is that |
| 24 | there aren't facts alleged during the class period regarding |
| 25 | this illicit profit-sharing agreement. |

1          MR. KIM:  Well, that's just incorrect, your Honor.

2          THE COURT:  Just walk me through the complaint.  Just

3     take me to the pages.  I have the second amended complaint

4     right here.

5          MR. KIM:  Well, your Honor, of course we acknowledge

6     that prior to the class period the FXCM entity was spun out.

7     And according to the regulatory actions and the penalties, the

8     profit-sharing or the illicit payments and the hiding of this

9     agreement and arrangement continued through 2014.  We do allege

10    that in the complaint.  It's throughout the complaint where we

11    allege the background of the formation of the entity and also

12    continuing through the class period.

13          Now, we do acknowledge in the complaint that our

14    assertion with respect to statements regarding whether the

15    company has a no dealing desk, right, there are three

16    categories of misstatements we have in the case.  So the first

17    category are the statements that the platform is free of

18    conflicts, it's a no-dealing desk, it was sort of the primary

19    aspect of their business, right.  Because previously to this,

20    they had a dealing desk where they were on both sides of the

21    trade and they made some money off the trade.  Then they

22    switched to this agency model that they were telling investors

23    and also consumers, because these statements, as we allege,

24    were made in 10-Ks and 10-Qs, and those are directed to

25    investors.  And those were the statements that we focused on,

J36VGLOO

paragraph 146 and continued thereon.  Those were the statements

regarding the conflict-free agency model.  And that model is is

that they take a commission on the bid and ask, and that's it.

They don't have an interest on how the trade plays out.  But

that wasn't the case.  And that continued from 2010 to 2014.

          Now, after August 1st of 2014, we acknowledge the only

fact we allege with respect to these profits being paid back

are the fact that in the CFTC complaint that said the conduct

continued through at least 2014 and on FX's website, they

indicated that they were still a provider for FXCM.  So we

acknowledge that with respect to beyond August 1st of 2014,

those are the only facts we have.  But before that period, we

have a slew of facts that demonstrate the payments.

          This idea that the services agreement --

          THE COURT:  -- class period.

          MR. KIM:  Pardon?

          THE COURT:  Including within the class period.

          MR. KIM:  Within the class period, because the class

period starts in 2012.

          This idea that the case is about this services

agreement, it's about the false statements with respect to the

company's conflict-free platform.  It was the centerpiece of

their business.  They say in their 10-K that that's the core of

their retail trading operation.  So it's extremely material to

investors.

J36VGLOO

1          And at the hearing when we were here last time, the

2     Court said it's not enough -- and I think this is relevant to

3     falsity and *scienter*, because a lot of the arguments from

4     Mr. Bessette are inferences based upon the services agreement.

5          And the Court said something like, It's not enough for

6     plaintiff to just say that the defendants were aware of the

7     services agreement.  We need to allege facts, whether direct

8     facts or circumstantial, under *Tellabs*, to demonstrate that

9     these people acted in bad faith to defraud investors.

10         So if we look at the facts, these aren't conclusions,

11    they are facts in the complaint.  They may disagree with those

12    facts and dispute them, but in the complaint we have a number

13    of facts, taken holistically, demonstrating that the defendants

14    acted with an intent to defraud investors.

15         First of all, the services agreement was never made

16    available public in an SEC filing.  The first time that the

17    public has seen eyes on that was with respect to the prior

18    motion to dismiss when they filed it as an exhibit to a motion

19    to dismiss.  During the class period, the company never

20    disclosed in an SEC filing that FX was a liquidity provider.

21    They never disclosed it.

22         THE COURT:  Was a what?

23         MR. KIM:  Was a liquidity provider; that they had an

24    agreement with FX.  That was unknown to investors.  And in

25    their SEC filings, they made it seem like it was normal for the

J36VGLOO

1    company to have paid for flow agreements.  But it wasn't.  In

2    the SEC filings, they say, We have these agreements with market

3    makers, plural, to suggest that perhaps this is a standard

4    thing.

5            The only such agreement they had was with FX.  There

6    was no other market maker that was provided early peaks, the

7    whole timer, the information about the client trades ahead of

8    the trade, no other market maker had that.  And all of those

9    trades, which we allege happened between 2010 and 2014, at

10   least, favored FX.  So no one had that.

11           So then we look at other facts.

12           They say, Well, there's some stuff before -- they

13   attack the statements, the facts we have in the complaint where

14   we say that they were untruthful to the regulators, and that

15   was during the class period.  There was an inspection in 2013

16   and it continued on.  And we say that Mr. Niv, in response to

17   inquiries by the NFA about the relationship with FX, did not

18   mention any of this information.  And he told the NFA that his

19   relationship with Dittami was with respect to another company,

20   not with respect to FXCM.  And we've alleged those facts in the

21   complaint, paragraph 87 and continuing on therefrom.

22           So what that indicates is, okay, so they first spun

23   this company off because their own compliance department says

24   this is problematic with what we are telling the customers,

25   right.  It's a conflict of interest.

J36VGLOO

1          Then, during the class period, while they are engaged

2     in this conduct, starting in 2013, they are not being truthful

3     to the regulators.  And this is against the backdrop of they

4     are telling investors that there are multiple market makers.

5          So it seems like at every turn they are misleading the

6     public, right.  This isn't an instance where it's just an

7     innocent mistake and they have this alleged arm's-length

8     agreement.  If you look at the history and consider the

9     totality of the circumstances, it indicates fraud.  It doesn't

10    indicate an innocent mistake; it doesn't indicate negligence.

11         THE COURT:  Do you want to respond to the argument

12    that maybe this hurt customers -- I mean they are not conceding

13    that, but maybe this hurt customers but it didn't hurt

14    investors.  This is the suit brought by investors; there's

15    another suit, I think, before Judge Crotty with respect to the

16    customers.  How did this actually affect the investors?

17         MR. KIM:  Well, it affected the investors from the

18    standpoint my clients lost a couple million dollars when the

19    truth of this was announced, right, when ultimately the NFA and

20    the CFTC put the hammer down, so to speak.  There were extreme

21    penalties.  The company, Mr. Niv and Mr. Ahdout, were banned

22    from the CFTC and NFA.  The company had to sell its business

23    because it could no longer operate in the United States.

24         So unlike the cases that are cited about regulatory

25    actions or no-fault settlements and things like that, none of

J36VGLOO

1   those cases have such harsh penalties.  And I think when the

2   Court is assessing facts with respect to the regulatory

3   actions, you also have to look at the penalties.  These were

4   harsh penalties.  That's what these defendants agreed as part

5   of a settlement.  These people are self-interested; they want

6   to agree to the best deal possible, and that wasn't a good

7   deal.

8        And the idea that this only affected potential

9   customers, this company's business is dealing with customers.

10  So as we allege in the complaint, in the FX market credibility

11  is very important because there's no centralized exchange.

12  People rely on the platform to be trustworthy, to be

13  transparent.  And that's why they marketed themselves as this

14  agency model.  They were saying, You know what?  You can trade

15  on our platform; we're not going to trade against you; we're

16  just here collecting commissions on the bid and ask.

17       Meanwhile, they have this agreement with FX; they are

18  driving 50 percent of their trades there.  And profits are

19  being kicked back up to FXCM 70/30, consistent with the

20  original agreement with Mr. Dittami.

21       And the other fact is -- here's another fact -- those

22  profits were not only treated as profit and loss by FXCM

23  itself, that's how they did it, they received weekly reports,

24  instead of funneling those payments back to the holding -- the

25  operating subsidiary, right, the services agreement is between

1   FX and the operating entity, they funneled that money back up

2   to the holding company.  And that's because we allege to add

3   another layer of -- to hide that from the regulators because

4   the holding company itself wasn't registered with the NFA.

5           So with every little step when they were dealing with

6   FX, they hit it, they misled regulators.  In describing it to

7   investors they never even mentioned FX; they said there were

8   multiple market makers, and that they were receiving order flow

9   payments from multiple market makers, when there was just one.

10          So when the Court takes the totality of those

11  circumstances, they all point in one direction, is that there's

12  something amiss here; that there's fraud.

13          And the inferences that Mr. Bessette says that, Well,

14  this is just a contract.  And if that's all we had, then that's

15  a good argument.  But we have all these other facts that the

16  Court must consider.

17          And even if the Court were to say -- were to only

18  uphold the statements about conflict of interest and the

19  services agreement was terminated on August 1st of 2014, as we

20  say in our papers, the company continued to talk about order

21  flow payments and the like throughout 2015.

22          So the company's --

23          THE COURT:  You think misstatements were made after

24  the August 2014 date?

25          MR. KIM:  That's correct.

 1          For example, the company's 10-K for 2014, which covers

 2    August of 2014, was filed on March 16, 2015.

 3          I'm sorry.

 4          The company's annual report for fiscal year 2014 was

 5    filed on March 16th, 2015.  So if the Court were to assume

 6    conflict-type misstatements ended on August 1st, it would be

 7    included in the March 16th, 2015 10-K, which covered that

 8    period.

 9          THE COURT:  Did it an improper relationship with FX

10    continue past the August 2014 date, or is your position no, but

11    misstatements about the prior relationship --

12          MR. KIM:  We believe that it -- we allege that we

13    believe that it may.  But I understand with respect to

14    pleading, as I said earlier, we only have two facts to support

15    that, which, frankly, are pretty thin, which is the CFTC says

16    that the relationship continued at least through 2014; and the

17    fact that FX's website recently, when we had filed the

18    complaint, around that time had also indicated they were still

19    working with FXCM.  So we acknowledge that those are the only

20    facts we have with respect to that.

21          So if the Court were to only say, Plaintiffs have only

22    stated a claim with respect to the conflict statements, we

23    would say that the class period would extend through March 16

24    of 2015, because that's when the company filed the 10-K for

25    2014, which covered the period up to August 1st.

```
1              But we do allege other misstatements here with respect

2     to the company's failure to disclose the ongoing investigations

3     that it had with the NFA and CFTC. And I think the case that's

4     very similar to the case here is the Och-Ziff case that we

5     cited. And in this instance, the company disclosed at the

6     beginning of the class period that -- paragraph 164. It says

7     that their business is subject to extensive regulation which

8     may result in administrative claims.

9              And we allege that based upon the history of the

10    investigation with the CFTC and the NFA, that the company had a

11    duty to disclose that they were being investigated.

12             THE COURT: Where did FXCM actually misrepresent that

13    it was under regulatory investigation?

14             MR. KIM: We allege that it was in the company's SEC

15    filings. In their SEC filings they have a statement, paragraph

16    164 is an example, where it says that their business is subject

17    to extensive regulation, which may result in administrative

18    claims and investigations.

19             And our contention is is that it wasn't "may," it was

20    actually happening; and it was happening to a core part of

21    their business.

22             If you just look at the CFTC, we know on August -- and

23    it's paragraph 166 in the complaint. On August 15th, 2014, the

24    CFTC made a request for production for quote -- and it's also

25    set forth in paragraph 71 -- FX's business and/or financial
```

J36VGLOO

1   reporting relationship with FXCM, including, but not limited

2   to, FX relationship as a liquidity provider to FXCM.

3          So they knew on October 15th of 2014 the CFTC was

4   requesting information regarding relationship.

5          Then, on July 2nd of 2015, the company received a

6   preservation notice.  That's paragraph 77 of the complaint.

7   And on August 13th of 2015, they also received a notice

8   regarding, quote, relating to FX, the creation of FX, FX's

9   operation and/or financial relationship with FXCM, and FX's

10  role as a liquidity provider and/or market maker to FXCM.

11         So the CFTC, starting in 2014 and continuing out to

12  2015, was asking questions about FX's relationship.  And at the

13  time there's no dispute that FX was doing anywhere between 50

14  to 80 percent of the volume.  So clearly it was material.  It

15  affected their retail.

16         And if you look at NFA -- this is all happening at the

17  same time -- the NFA, on October 24th of 2013, it's during the

18  class period, met with FXCM executives about and asked

19  questions about their relationship with Mr. Dittami and FX.

20         THE COURT:  So right now you're referring to the 2016

21  Q3 10-K, the statement that the CFTC and the NFA are currently

22  examining the relationship with U.S., meaning FXCM's U.S.

23  subsidiary and one of its liquidity providers, are you focusing

24  on that statement?

25         MR. KIM:  No, no.  What we are saying is ultimately

J36VGLOO

1  they did disclose something, we are saying.

2          In the beginning of this class period when this

3  happening, they never disclosed anything.  It wasn't until

4  November 18th of 2016, which I believe is paragraph 168 you may

5  be looking at, is when they finally disclosed something where

6  they say the CFTC and NFA are currently examining the

7  relationship with us and one of its liquidity providers.

8          So the second set of misstatements, what we are saying

9  is is that when the CFTC and the NFA were looking at this, were

10  investigating this starting in 2013, that they should have

11  disclosed that the CFTC and NFA were investigating this,

12  because it was material and the duty arose --

13          THE COURT:  There's no independent duty for a company

14  to disclose that it's being investigated, right?  If they talk,

15  they have to be honest about it.

16          MR. KIM:  That's correct.

17          THE COURT:  There's no independent duty to disclose.

18          MR. KIM:  That's correct.

19          We're saying that the independent duty arose when the

20  company, for example, in paragraph 164, had said that their

21  business is subject to extensive regulation which may result in

22  administrative claims and investigations and regulatory

23  proceedings against us.

24          THE COURT:  Is that true?

25          MR. KIM:  Pardon?

1              THE COURT:  Is that not a true statement?

2              MR. KIM:  It is.  But it's misleading because it says

3      it may.  And at the time we say that they were.  And that's

4      exactly what the holding in *Och-Ziff* was.  In *Och-Ziff*,

5      Och-Ziff was a financial company, a private financial company

6      that was publicly listed.

7              And what happened was the company had a similar

8      disclosure, saying that, We may be subject to regulatory

9      oversight, government regulation, very general risk statement.

10     But at the time they made the statement, they were, in fact --

11     they received a subpoena from a regulator.

12             And here it's very similar.

13             Here, they say we may be subject to regulation.

14     That's accurate, but it's misleading.  And that's when the duty

15     to disclose arises, when an affirmative statement is rendered

16     misleading by the omission of the information.  And that's what

17     *Och-Ziff* says.  And what we are claiming here is that's what

18     happened.

19             The company is saying that we may be subject to these

20     inspections and reviews, but at the time they were; it was

21     actually happening.  And it was material.  This wasn't -- they

22     weren't just looking into some immaterial -- some rogue broker.

23     This was their retail operation.  This was involving FX, who

24     was clearing 50 percent of their trades.  So if you look at

25     that, that would also keep the class period going forward until

J36VGLOO

about November 18th of 2016.

          And what's interesting here, your Honor, which
occurred to me, the company canceled its agreement, its paper
agreement, right, on August 1st of 2014.  And the CFTC and
NFA -- the NFA started asking questions in 2013.  And the CFTC
had made formal requests in October.  So that begs the
question, well, perhaps the reason why they, quote, canceled
this agreement was because they felt the heat was coming down
and they knew that they were in trouble.  And certainly if they
were aware of that, the inference is that they should have
disclosed that these investigations -- especially in light of
the fact that they say that they may be subject to
investigation.

          And it makes sense because they made $80 million from
this arrangement, and all of a sudden they are like, You know
what? we're going to cancel this.  It doesn't seem to make
business sense.  There's nothing in the public documents that
indicate why they did that.  It just says that they canceled
this arrangement.  And perhaps they canceled it because the
regulators were closing in.

          THE COURT:  May I ask you a question about GAAP?

          MR. KIM:  Yes.

          THE COURT:  Is your view that defendants knowingly
violated the GAAP provisions at issue, that is, that they had
specific intent to violate the provisions, or is it that they

J36VGLOO

1    misrepresented their relationship with FXCM and violated GAAP

2    even though they didn't have the specific intent?

3         MR. KIM:  Well, I think what we're saying is is that

4    they, the defendants, intentionally engaged in the underlying

5    conduct.  We don't have an allegation that says specifically

6    Mr. Niv intentionally --

7         THE COURT:  Violated GAAP.

8         MR. KIM:  -- used the wrong -- violated GAAP.

9         We're saying as a consequence of that, as a

10   consequence of hiding this information, that they violated GAAP

11   and, as such, had a false statement.

12        But I think these GAAP provisions, related party

13   transactions, are simple GAAP assertions.  There's case law out

14   there dealing with related party transactions.  I've had a

15   number of them where the idea that was it an innocent mistake

16   that they failed to disclose the related party transactions?

17        I would say that the inferences here, given the fact

18   that they were lying to regulators, that they had the extensive

19   penalties, that even in their own filings when they are

20   describing this agreement, they are suggesting that other

21   people are involved, to suggest that it's something normal, I

22   would say that the inferences there would suggest that the GAAP

23   violations here were done in a reckless manner.

24        I understand they say that, you know, Look, there is

25   an overstatement.  E&Y looked at our papers.  I acknowledge

1       that if we had a restatement, it would be a better fact for us,

2       but it's just not there.

3              THE COURT:  This is a totally separate question:  What

4       in your view is the fundamental difference between order flows

5       and profit-sharing agreements?

6              MR. KIM:  I think in this case, if they had disclosed

7       that all they were receiving was order flow payments, and these

8       other facts were withheld, these other facts didn't exist, it

9       wasn't giving FX an edge, it wasn't giving FX an opportunity to

10      put their interests ahead of the customers, and all they had

11      was an order flow payment and they were honest that it's only

12      with this liquidity provider, then I don't think there's a

13      case.

14             But we are here because they did kickback the profits;

15      that these people were banned; they paid a $7 million fine;

16      they were not truthful to their customers; they were not

17      truthful to their investors.  And ultimately the company had to

18      file for bankruptcy.  So this isn't a situation where all of

19      this was something else.

20             And touching briefly on it, with respect to loss

21      causation, I think we've alleged it.  I think the argument they

22      bring up has to do with more of a summary judgment issue,

23      whether or not the stock price declined was attributed to

24      something else.

25             We allege that when the information -- the penalties

J36VGLOO

1    were announced, the price of the stock dropped and lost over 50

2    percent of its value, that's sufficient to plead a case.  But

3    as to ultimately what part of the drop during the class period

4    is attributable to other factors, that's a fact question for

5    summary judgment or trial.

6              Unless the Court has any other questions, I'll sit

7    down.

8              THE COURT:  All right.  Thank you, Mr. Kim.

9              Do you want to respond, Mr. Bessette?

10             MR. BESSETTE:  Thank you, your Honor.

11             THE COURT:  Just on GAAP, can I hear you out with

12   respect to if there needs a specific intent to violate the law

13   there?  If I just were to find that plaintiffs have

14   sufficiently alleged false and misleading statements with

15   respect to the agency trading model and the order flow

16   agreements, should I be looking at GAAP differently?

17             MR. BESSETTE:  Well, your Honor, I think there are two

18   questions there.

19             Plaintiffs allege a GAAP violation, which is a false

20   or misleading statement, that we presented our financials

21   wrong.  And the Second Circuit is very clear.  You have to have

22   an objective event or standard, a restatement or something to

23   show -- and some of the cases even talk about an expert witness

24   who says, Yeah, they did this wrong; or a confidential witness

25   who happened to be in the accounting department who alleged

J36VGLOO

1   this.  There's nothing here.  It's all thin air.  It's like

2   clouds.  There's nothing to show a GAAP violation.  No

3   restatement, no indication by E&Y, who did the auditing for the

4   company, either before or after the regulatory violations were

5   public, they didn't go back and say, Yes, we agree, you have to

6   restate and you have to treat FX as a related party or

7   whatever.  There is absolutely nothing other than the predicate

8   conclusion that there was a profit-sharing arrangement.  So we

9   submit they haven't alleged a false statement.

10          And then GAAP is sometimes used to show an inference

11  of *scienter*.  And we know the case law there is a GAAP

12  violation alone does not show a strong inference of *scienter*.

13  We don't have a GAAP violation and we don't have *scienter*

14  related to GAAP.

15          Have I answered your question?

16          THE COURT:  I don't think it really answered my

17  question, but you made your point.

18          MR. BESSETTE:  I want to answer your question.  I'm

19  sorry.

20          THE COURT:  No, no, it's okay.

21          My question was if I were hypothetically to find that

22  plaintiffs had sufficiently alleged false statements with

23  respect to the agency trading model and the order flow

24  agreements, is there some other defense that you have with

25  respect to the GAAP violations?

1    As I heard your answer, your answer was, Well, they

2    didn't do any of this, so you can't find a GAAP violation.

3    For example, is specific intent required?  Do you need

4    to know that you're specifically violating GAAP?  Is there some

5    other -- I'm just asking if there's some other defense that you

6    have with respect to GAAP.

7    MR. BESSETTE:  I think there has to be -- for a

8    financial statement to be false or to be in violation of GAAP,

9    there has to be red flags or some indication that you are doing

10   something intentionally, right, or severely recklessly.  Just a

11   mere GAAP violation in and of itself is not *scienter* and it's

12   not a false -- it may be incorrect, but it's not necessarily a

13   false statement.

14   So I would say it doesn't show a false statement, it

15   doesn't show *scienter*.  We don't even have a GAAP violation

16   here, according to anyone other than the plaintiffs in the

17   complaint.  There's no indication.  Under the Second Circuit

18   law it is clear that there's no adequate allegation of a GAAP

19   violation in the first place.

20   And then I would say on top of that, if we're talking

21   about GAAP, there's clearly no corrective disclosure about

22   GAAP.  There was no indication that there was any problem with

23   the financial statements.  So without a corrective disclosure,

24   there clearly is no loss causation for any of the stock drop

25   related to a GAAP violation.  So GAAP's got problems with the

J36VGLOO

 1   material statement, *scienter*, and loss causation.

 2          THE COURT:  And how do you respond to plaintiffs'

 3   answer with respect to how the investors were harmed here?  I

 4   asked you earlier the difference between let's say there's an

 5   intent here, let's say I think that there has been adequate

 6   allegations with respect to an intent to deceive customers.

 7   How does that affect investors?

 8          You heard Mr. Kim's answer.  Do you want to respond to

 9   that?

10          MR. BESSETTE:  Well, yes, your Honor.

11          I didn't hear much of an answer other than, Well, the

12   statements were made in SEC filings which go to investors.

13          But the underlying premise --

14          THE COURT:  He also said that there were ultimately a

15   whole host of fines and stock drop; correct, Mr. Kim?

16          MR. KIM:  That's right, your Honor.

17          MR. BESSETTE:  Okay.

18          I'd like to unpack that, if I could.

19          THE COURT:  Please.  Go ahead.

20          MR. BESSETTE:  It's important to make the point.

21          Your first question to plaintiffs' counsel was, Please

22   walk me through the second amended complaint; let me see the

23   facts alleged during the class period to show false and

24   misleading statements.  That never happened.  He didn't do it.

25   And I submit to you there are none.

1          And I would ask the Court to go through and look at

2     the facts that are pled.  They are pre class period, not during

3     the class period.  The only facts pled during the class period

4     show an order flow payment as the basis for FX making payments

5     to FXCM, pursuant to a services agreement.  And FX, by the way,

6     was disclosed on the company's website as a liquidity provider.

7     That is according to plaintiffs' own complaint and opposition.

8          Second, the company disclosed that it got paid for

9     order flow.  Whether from liquidity providers or a provider, it

10    got paid and it disclosed that it got paid for order flow.  So

11    there's no misleading omission or statement there.

12         But importantly, this idea of misleading -- well, the

13    agency trading model, okay -- so I would like to have the Court

14    look to paragraph 146, because that's what plaintiffs pointed

15    to.  And there's a fundamental problem here, a disconnect.

16    Because the plaintiffs say that the foremost falsehood in our

17    public filings is the characterization that its agency trading

18    model would be free from conflicts of interest because FXCM

19    would not have a financial interest in the opposing side of the

20    trades.  That's in their opposition.  That's the centerpiece of

21    their false and misleading statement about the agency trading

22    model.

23         The problem is the company never said that.  If you

24    look at paragraph 146, the company said -- second or so

25    paragraph down -- that it believes -- it's an opinion

J36VGLOO

1    statement.  It believes that the agency trading model aligns

2    our interests with those of our customers and reduces our risk.

3              As an opinion statement, we know --

4              THE COURT:  Did they know that not to be true?

5              MR. BESSETTE:  Where are the allegations though in the

6    complaint, your Honor?  There are none.  They have to meet the

7    *Omnicare* standard to show that the speaker didn't hold the

8    belief, or the supporting facts supplied were untrue, or the

9    speaker omits information that makes the opinion statement

10   misleading to a reasonable investor.

11             There is no factual support.  There's no documentary

12   evidence, there's no conflicting statements by Niv, Ahdout, or

13   Lande, that they didn't believe that the agency trading model

14   aligned their interests with those of their customers.  Or that

15   there was no reasonable basis.  And that goes to your question

16   about was this misleading to investors when the company says,

17   This model aligns our interests with those of our customers.

18             If there's no profit-sharing relationship between FXCM

19   and FX, how is that a false opinion statement?  They have to

20   have the facts to show that.  They have to show that Niv didn't

21   believe that or Lande or Ahdout.

22             Where is the evidence pled?

23             They do have a pleading burden, your Honor.

24             And this is telling.  Because instead of walking you

25   through statements, like you asked, it is all about the

J36VGLOO

atmospherics.  Well, there were fines, and there were, you
know, this and that, and so that must be enough, there must be
fraud here.

     If you dissect the second amended complaint and hold
the pleading burden -- hold plaintiffs to the pleading burden,
both for false and misleading statements and *scienter*, we say
it's just not there.  It is not there.

     And another example, failure to disclose the
investigations.  I'd like to look at that.

     Plaintiffs were hanging their hat on the statements to
regulators as showing *scienter*.  And they talk about the
*Och-Ziff* case, which is, again, in this Court in 2017.

     This case -- that case is very different in that --
hold on.  I'm sorry.  I got sidetracked here.

     Right.  So in that case the Court found that the
statements were actionable under 10b, as plaintiffs allege
here, because they plausibly allege that Och-Ziff misled
investors by suggesting that the company was not -- this is the
regulatory investigations.  That the company there said it was
not facing an investigation that would have a material impact
on its business.

     And the plaintiffs say, This case is a lot like that.
They said, We are under investigations and it may have an
impact, and so we should look to this case.

     But that case is very different because there the

1    company said, We are not currently subject to any pending

2    regulatory, administrative, or arbitration proceedings that we

3    expect to have a material impact on the results of our

4    operations or financial conditions.  FXCM never made an

5    absolute statement like that.  It said it was constantly under

6    investigation and examination by these regulatory agencies.

7    And I think your Honor asked, isn't that a true statement, and

8    it is.

9          So they pivot in their opposition that, Well, it's

10   misleading because you didn't disclose this.  There's no duty

11   to disclose an ongoing investigation.

12         The company never made an absolute statement like the

13   *Och-Ziff* case, that they weren't under investigation.  And

14   that's the material difference there.  So the idea that there's

15   a false or misleading statement or evidence of *scienter* because

16   of the disclosures around regulatory investigations, the law

17   does not support their case and their very case makes that

18   point.

19         I would also submit that when you take away the

20   conclusions, when you take away the fact that statements to

21   regulators who don't have a purview of the securities laws

22   under their charge, there's no law that says that is evidence

23   of *scienter*.

24         The agency trading model statements were true.  They

25   are opinion statements and they haven't met their burden under

J36VGLOO

1   *Omnicare* to show falsity or *scienter*.  GAAP violations, in our

2   view, fall away.  There's absolutely nothing.  Second Circuit

3   law is clear that there's no objective statement or standard

4   there to show a GAAP violation.  So either falsity, *scienter*,

5   or loss causation, because it was never a corrective

6   disclosure.

7          And I was amazed to hear, Well, there must be

8   something wrong here, your Honor, because the company

9   terminated the agreement in August of 2014.  Maybe it was

10  because the regulators were getting close to -- this is all

11  like writing a novel.

12         This is a PSLRA pleading case with very clear pleading

13  standards for falsity, *scienter*, and loss causation.  And we've

14  laid out in our briefs, when you strip away the atmospherics,

15  they haven't met their pleading burden; they haven't met the

16  standard.  You asked them to the first time around, which is to

17  plead facts, not conclusions; and certainly facts within the

18  class period, not prior that they just string along as, well,

19  this has to be how it was.  The Second Circuit says those kinds

20  of pretext secret relationship cases have to be supported by

21  sufficient facts.  If you look at those cases which we cited,

22  your Honor, they don't have the facts here.

23         With that, unless the Court has questions.

24         THE COURT:  Thank you.

25         MR. BESSETTE:  Thank you.

1             MR. KIM:  Brief rebuttal, your Honor.

2             THE COURT:  Sure.

3             MR. KIM:  I'm just going to be brief here, your Honor.

4             With respect to the false statement, the *Omnicare*

5      argument, if you look at paragraph 146 of the complaint, in

6      *Omnicare*, the standard is either the speaker did not hold the

7      belief to supporting facts were untrue, or omits information

8      that makes the opinion misleading.

9             This is just one paragraph from the 10-Ks, the various

10     10-Ks.  And it talks about the agency model.  And it says:  We

11     believe that it aligns our interests with those of our

12     customers and reduces our risk.

13            Then it goes on to talk about how the agency model

14     functions, that it executes the trade on the price quotation

15     offered by FX market makers, acts as a credit intermediary,

16     riskless principal, and so on.  So the subsequent sentences and

17     the sentences before that are factual statements, they are not

18     opinion statements.  And they all go toward the idea that in

19     this agency model that they are getting the best execution.

20            In reality, when you look at paragraph 147, and also

21     if you cross-reference paragraphs 64 to 66, which talk about

22     the advantages that FXCM gave, because that's the specificity

23     and 147 is the summation of it, that wasn't happening, at least

24     to 50 percent of the trades and, at some point, 80 percent.

25     Because FX was getting the whole timer; they were getting the

J36VGLOO

```
 1   edge.  So that when a customer put in a limit order, FX would

 2   be able to have that information and get prices that were

 3   disfavorable to the client.

 4         So this idea that this one opinion that we believe,

 5   the whole set of statements here are misleading because the

 6   supporting facts are not accurate and --

 7         THE COURT:  But put aside the opinion argument for a

 8   minute.  I think part of what defendants are arguing is that

 9   there is nothing to show that there was this improper

10   relationship during the class period.

11         MR. KIM:  We've alleged it in the complaint.  It

12   starts from the introduction of the complaint of the genesis of

13   FX, of why it was started.  It was started because there was a

14   compliance issue.  And then Mr. Niv and Mr. Ahdout had come

15   with the idea that they would spin it out and they would still

16   maintain a 70/30 split.  That the company would give it an

17   interest-free loan.  These are sweetheart-type terms that you

18   would give to, as we allege, a hidden subsidiary, right.  They

19   let them use their offices; they let them use their employees.

20         THE COURT:  -- was focused on the class period.

21         MR. KIM:  That goes in.  That was before the class

22   period.  But then during the class period they were continuing

23   with this arrangement, right.  I think the history of it is

24   important because it shows the bad faith.  It shows the intent

25   to defraud.  From the beginning this thing was designed to
```

J36VGLOO

1   skirt issues.  And then when they were asked about it, they

2   weren't truthful.

3         So I think this notion that we don't allege facts, we

4   do allege facts.  These are facts that the regulators asked

5   them a question, they gave them a response which was untrue,

6   right.  They received document requests; they received

7   subpoenas from the regulators.  Those are facts, they are not

8   conclusions.  They had to pay a $7 million fine.  They were

9   banned from the industry.  Those are facts.  That happened

10  during the class period.

11        So this idea that it's conclusory --

12        THE COURT:  To what extent do you think I can rely on

13  their being banned from the industry and the agreement reached?

14        MR. KIM:  I think you can for the purposes of alleging

15  a claim.  We cited those cases.  I know this wasn't an issue

16  necessarily in this case, but we briefed it previously.  I

17  think it was the *Lipsky* case that we talked about, which is a

18  Second Circuit case that talks about this.  I think Judge Cote

19  had a decision interpreting *Lipsky* in the broader sense, not

20  the narrow sense -- or reading *Lipsky* narrowly, rather than

21  broadly, to exclude.

22        So I would say your Honor has already ruled on that

23  issue; it's law of the case; that the Court could rely on it.

24        THE COURT:  Is there anything else you want to say in

25  response to the argument that even if this arguably harmed

J36VGLOO

1   customers, it didn't harm the investors?  I think you spoke to

2   it already, frankly.

3           MR. KIM:  To me it doesn't make any sense, because

4   this is a company that deals with retail customers.  And in any

5   business your reputation with customers is paramount, right.

6   If you have a bad reputation, particularly when you're dealing

7   with people's monies in a virtual type business where you don't

8   see a building, you don't see a big building with columns, you

9   just see a company and they are professing to be independent,

10  of course it hurt investors.  That was their business.  They

11  just got caught.  And, of course, the stock went down, the

12  company filed for bankruptcy, and those facts are asserted.

13          I think it's sort of like a materiality argument, the

14  way I see it, saying, Well, since it didn't hurt investors,

15  maybe it wasn't that material.  But it wasn't a 10-K.  That

16  goes to investors; that's what people read about.  When you

17  look at a 10-K, you look to see what the company does, what

18  their niche is, what their pitch is, and that was their pitch.

19          So I sort of view it as a materiality argument; that's

20  more of a factual type issue of how material it was.  I don't

21  view it as whether it was actionable because it was directed to

22  consumers or investors.

23          THE COURT:  Is there anything else you'd like to say?

24          MR. KIM:  Nothing, your Honor.  Thank you.

25          THE COURT:  Thanks, all.

J36VGLOO

1           I'm going to reserve judgment.

2           MR. BESSETTE:  May I have one minute, your Honor?

3           THE COURT:  Yes.  Sure.

4           MR. BESSETTE:  If I might?  Just one minute.

5           Counsel said that history is important, right.  Again,

6    what I've been saying, prior to the class period and to the

7    class period -- and that's exactly what this Court in the

8    *SkyPeople Fruit Juice* said was a problem.

9           The Court said:  Plaintiffs do not explain why events

10   surrounding the founding of BOLI in 2005 have any relevance to

11   its ownership in 2008 or 2009.  That's why I'm focusing on

12   class period statements.

13          THE COURT:  But here isn't the background to this

14   alleged agreement important?

15          MR. BESSETTE:  It is, your Honor, to understand maybe

16   how it came about.  But to allege that it was a secret

17   profit-sharing relationship and not as, on its face, with

18   agreements and contracts, an order flow arrangement, you have

19   to have the facts.  And the fact that it started as one thing

20   and a company spun this company out, helped it to grow, yes,

21   used its offices, had a short-term loan, but at the start of

22   the class period, there is a contract, there is a relationship

23   based on order flow.  There is not a profit-sharing because you

24   don't see payments being made on profits.  You don't see that.

25          So the history, sure, it's important to understand.

J36VGLOO

```
 1    But as the district court said here, what is the relevance of
 2    that to what you're alleging in this class period?  And where
 3    are the facts?  If they had the facts, they should allege them.
 4    And I'm saying, your Honor, they don't.
 5           And the last thing I would say is nowhere -- and their
 6    whole case is based on the CFTC order, the NFA complaint, and
 7    the NFA decision.  Nowhere in any of those documents do the
 8    CFTC or the NFA contend that paper flow agreements were illegal
 9    or improper; nor do they contend that FXCM's relationship with
10    FX caused FXCM's customers to lose money on their FXCM trades;
11    nor do they allege that this relationship harmed FXCM
12    shareholders.  There is none of that.  Plaintiffs are saying
13    that in the complaint without adequate and sufficient facts.
14           That's our argument.
15           Thank you, your Honor.
16           THE COURT:  Thanks, all.
17           I'm going to reserve judgment.
18                            *    *    *
19
20
21
22
23
24
25
```