**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| IN RE GLOBAL BROKERAGE, INC. f/k/a FXCM INC. SECURITIES LITIGATION | Master File No. 1:17-cv-00916(RA)(BCM) |
| | CLASS ACTION |
| This Document Relates To: All Actions | |

**MEMORANDUM OF LAW IN SUPPORT OF**
**MOTION FOR CLASS CERTIFICATION AND APPOINTMENT OF**
**CLASS REPRESENTATIVES AND CLASS COUNSEL**

## TABLE OF CONTENTS

PRELIMINARY STATEMENT ................................................................................................. 1

BACKGROUND AND PROCEDURAL HISTORY .................................................................. 3

ARGUMENT ............................................................................................................................... 5

I.   The Applicable Standards Favor Class Certification in This Securities Action ................ 5

II.  The Proposed Class Satisfies Each of the Requirements of Rule 23(a) ........................... 6

      A.   The Proposed Class Satisfies the Numerosity Requirement ...................... 6

      B.   The Proposed Class Satisfies the Commonality Requirement ................... 7

      C.   The Proposed Class Satisfies the Typicality Requirement ........................ 8

      D.   The Proposed Class Satisfies the Adequacy Requirement ........................ 9

III. The Proposed Class Satisfies the Predominance and Superiority Requirements of Rule

     23(b)(3) .......................................................................................................................... 10

      A.   Common Questions of Law and Fact Predominate ................................. 10

            1.   The Affiliated Ute Presumption of Reliance Applies ................... 11

            2.   Plaintiffs are Entitled to a Presumption of Reliance Under Basic  12

                  (a)   The Cammer Factors Show Market Efficiency ................ 13

                  (b)   The Unger/Krogman Factors Further Support a Finding of

                        Market Efficiency ........................................................... 20

            3.   Potential Individual Questions of Damages Do Not Predominate 22

      B.   A Class Action is Superior to Other Methods of Adjudication ................ 23

IV.  The Class is Ascertainable ............................................................................................. 25

CONCLUSION .......................................................................................................................... 25

# TABLE OF AUTHORITIES

**Cases**

*Affiliated Ute Citizens of Utah v. United States*,
  406 U.S. 128 (1972) ................................................................................. 2, 10, 11

*Amchem Prod., Inc. v. Windsor*,
  521 U.S. 591 (1997) ............................................................................ 1, 5, 10, 23

*Amgen Inc. v. Connecticut Ret. Plans & Tr. Funds*,
  568 U.S. 455 (2013) .................................................................................. 1, 5, 10

*Baffa v. Donaldson, Lufkin & Jenrette Sec. Corp.*,
  222 F.3d 52 (2d Cir. 2000) .................................................................................. 9

*Basic v. Levinson*
  485 U.S. 224 (1988) ................................................................................... 3, 10, 12

*Billhofer v. Flamel Techs., S.A.*,
  281 F.R.D. 150 (S.D.N.Y. 2012) ...................................................................... 21

*Brown v. Kelly*,
  609 F.3d 467 (2d Cir. 2010) ............................................................................. 10

*Cammer v. Bloom*,
  711 F. Supp. 1264 (D.N.J. 1989) .............................................................. passim

*Carpenters Pension Tr. Fund of St. Louis v. Barclays PLC*,
  310 F.R.D. 69 (S.D.N.Y. 2015) ....................................................................... 13

*Cheney v. Cyberguard Corp.*,
  213 F.R.D. 484 (S.D. Fla. 2003) ..................................................................... 21

*Comcast Corp. v. Behrend*,
  569 U.S. 27 (2013) ........................................................................................... 22

*Consol. Rail Corp. v. Town of Hyde Park*,
  47 F.3d 473 (2d Cir. 1995) ................................................................................. 6

*Dodona I, LLC v. Goldman, Sachs & Co.*,
  296 F.R.D. 261 (S.D.N.Y. 2014) ....................................................................... 6

*Erica P. John Fund, Inc. v. Halliburton Co.*,
  563 U.S. 804 (2011) ..................................................................................... 5, 10

*Fogarazzao v. Lehman Bros.*,
  232 F.R.D. 176 (S.D.N.Y. 2005) ....................................................................... 7

*Fogarazzo v. Lehman Bros.*,
  263 F.R.D. 90 (S.D.N.Y. 2009) ................................................................................ 24

*Green v. Wolf Corp.*,
  406 F.2d 291 (2d Cir. 1968) .................................................................................... 6

*Halliburton Co. v. Erica P. John Fund, Inc.*,
  573 U.S. 258 (2014) ................................................................................................ 12

*In re Alstom SA Sec. Litig.*,
  253 F.R.D. 266 (S.D.N.Y. 2008) ...................................................................... 16, 19

*In re Am. Int'l Grp., Inc. Sec. Litig.*,
  689 F.3d 229 (2d Cir. 2012) .................................................................................... 2

*In re Barrick Gold Sec. Litig.*,
  314 F.R.D. 91 (S.D.N.Y. 2016) ....................................................................... 11, 22

*In re Blech Sec. Litig.*,
  187 F.R.D. 97 (S.D.N.Y. 1999) ............................................................................. 24

*In re Dynex Capital, Inc. Sec. Litig.*,
  No. 05 CIV. 1897 HB, 2011 WL 781215 (S.D.N.Y. Mar. 7, 2011) ........................... 11, 13, 17

*In re Facebook, Inc., IPO Sec. & Derivative Litig.*,
  986 F. Supp. 2d 428 (S.D.N.Y. 2013) .................................................................... 11

*In re Goldman Sachs Grp., Inc. Sec. Litig.*,
  No. 10 CIV. 3461 PAC, 2015 WL 5613150 (S.D.N.Y. Sept. 24, 2015) .................. 22

*In re Indep. Energy Holdings PLC Sec. Litig.*,
  210 F.R.D. 476 (S.D.N.Y. 2002) ............................................................................ 6

*In re Initial Pub. Offering Sec. Litig.*,
  260 F.R.D. 81 (S.D.N.Y. 2009) ............................................................................. 16

*In re Merck & Co., Inc. Sec., Derivative & ERISA Litig.*,
  No. CIV.A. 05-1151 SRC, 2013 WL 396117 (D.N.J. Jan. 30, 2013) ..................... 23

*In re Methyl Tertiary Butyl Ether (MTBE) Prod. Liab. Litig.*,
  241 F.R.D. 435 (S.D.N.Y. 2007) ........................................................................... 23

*In re NTL, Inc. Sec. Litig.*,
  No. 02 CIV.3013 LAK AJP, 2006 WL 330113 (S.D.N.Y. Feb. 14, 2006) ............... 7

*In re NYSE Specialists Sec. Litig.*,
  260 F.R.D. 55 (S.D.N.Y. 2009) .......................................................................... 6, 7

*In re Petrobras Sec. Litig.*
      312 F.R.D. 354 (S.D.N.Y. 2016) ................................................................................. 19, 24

*In re Petrobras, Sec.Litig,*
      862 F.3d 250 (2d Cir. 2017) ........................................................................... passim

*In re Pfizer Inc. Sec. Litig.,*
      282 F.R.D. 38 (S.D.N.Y. 2012) ............................................................................... 10

*In re Smith Barney Transfer Agent Litig.,*
      290 F.R.D. 42 (S.D.N.Y. 2013) ............................................................................. 6, 11

*In re Virtus Inv. Partners, Inc. Sec. Litig.,*
      No. 15CV1249, 2017 WL 2062985 (S.D.N.Y. May 15, 2017) ................................................. 6

*In re Visa Check/MasterMoney Antitrust Litig.,*
      280 F.3d 124 (2d Cir. 2001) ............................................................................... 24

*In re Winstar Commc'ns Sec. Litig.,*
      290 F.R.D. 437 (S.D.N.Y. 2013) ........................................................................... passim

*In re Xcelera.com Sec. Litig.,*
      430 F.3d 503 (1st Cir. 2005) ............................................................................... 15

*Krogman v. Sterritt,*
      202 F.R.D. 467 (N.D. Tex. 2001) .................................................................... 19, 20, 21

*Litton Indus., Inc. v. Lehman Bros. Kuhn Loeb Inc.,*
      967 F.2d 742 (2d Cir. 1992) ............................................................................... 11

*McIntire v. China MediaExpress Holdings, Inc.,*
      38 F. Supp. 3d 415 (S.D.N.Y. 2014) ........................................................................ passim

*Phillips Petroleum Co. v. Shutts,*
      472 U.S. 797 (1985) ........................................................................................ 23

*Pub. Employees' Ret. Sys. of Mississippi v. Merrill Lynch & Co.,*
      277 F.R.D. 97 (S.D.N.Y. 2011) ............................................................................. 7

*Robidoux v. Celani,*
      987 F.2d 931 (2d Cir. 1993) ............................................................................... 8

*Spagnola v. Chubb Corp.,*
      264 F.R.D. 76 (S.D.N.Y. 2010) ............................................................................ 23

*Strougo v. Barclays PLC,*
      312 F.R.D. 307 (S.D.N.Y. 2016) ........................................................................... 10

*Teachers' Ret. Sys. of Louisiana v. ACLN Ltd.*,
   No. 01 CIV. 11814 (LAP), 2004 WL 2997957 (S.D.N.Y. Dec. 27, 2004)............................ 6, 8

*Teamsters Local 445 Freight Div. Pension Fund v. Bombardier Inc.*,
   546 F.3d 196 (2d Cir. 2008) ...................................................................................................... 13

*Todd v. STAAR Surgical Co.*,
   No. CV-14-05263-MWF-RZ, 2017 WL 821662 (C.D. Cal. Jan. 5, 2017) .............................. 15

*Trinidad v. Breakaway Courier Sys., Inc.*,
   No. 05 CIV. 4116 RWS, 2007 WL 103073 (S.D.N.Y. Jan. 12, 2007) ...................................... 8

*Tsereteli v. Residential Asset Securitization Tr. 2006-A8*,
   283 F.R.D. 199 (S.D.N.Y. 2012) ............................................................................................... 6

*Unger v. Amedisys Inc.*,
   401 F.3d 316 (5th Cir. 2005) ..................................................................................................... 19

*Waggoner v. Barclays PLC*,
   875 F.3d 79 (2d Cir. 2017) ................................................................................................ passim

*Wallace v. IntraLinks*,
   302 F.R.D. 310 (S.D.N.Y. 2014) ......................................................................................... 8, 22

**Rules**

Fed. R. Civ. P. 23 ....................................................................................................... 1, 2, 5, 24

Fed. R. Civ. P. 23(a) ...................................................................................................... 6, 9, 25

Fed. R. Civ. P. 23(a)(1)......................................................................................................... 2, 6

Fed. R. Civ. P. 23(a)(2).............................................................................................................. 7

Fed. R. Civ. P. 23(a)(2)-(4)....................................................................................................... 2

Fed. R. Civ. P. 23(a)(3).............................................................................................................. 8

Fed. R. Civ. P. 23(a)(4)......................................................................................................... 2, 9

Fed. R. Civ. P. 23(b) .................................................................................................................. 6

Fed. R. Civ. P. 23(b)(3)............................................................................................ 2, 10, 23, 25

Fed. R. Civ. P. 23(g) ...................................................................................................... 2, 24, 25

Fed. R. Civ. P. 23(g)(1)(A) ..................................................................................................... 24

Lead Plaintiffs 683 Capital Partners, LP ("683 Capital") and Shipco Transport Inc. ("Shipco") (together, "Lead Plaintiffs"), and additional named plaintiff Sergey Regukh (together with Lead Plaintiffs, "Plaintiffs" or the proposed "Class Representatives") respectfully submit this memorandum of law in support of their motion for class certification pursuant to Rule 23 of the Federal Rules of Civil Procedure, seeking (i) certification of the Class as defined herein; (ii) the appointment of Plaintiffs as Class Representatives; and (iii) the appointment of The Rosen Law Firm, P.A. ("Rosen Firm" or "Lead Counsel") as Class Counsel.

## PRELIMINARY STATEMENT

Plaintiffs are pursuing claims on behalf of a class of Global Brokerage, Inc., f/k/a FXCM Inc. ("FXCM" or "Company") investors under §§ 10(b) and 20(a) of the Securities Exchange Act of 1934 ("Exchange Act") against Defendants FXCM; Dror Niv, FXCM's co-founder, CEO, and Chairman of the Board; and William Ahdout, FXCM's co-founder, Chief Dealer, Managing Director, and director (collectively, "Defendants"). The proposed Class is defined as:

> All persons and/or entities that purchased or otherwise acquired publicly traded Global Brokerage, Inc., f/k/a FXCM Inc. ("FXCM") securities, including FXCM 2.25% Convertible Senior Notes due 2018 and Class A common stock, during the period March 15, 2012 through February 6, 2017, both dates inclusive.

> Excluded from the Class are: (i) Defendants; (ii) current and former officers, employees, consultants and directors of FXCM and FXCM Holdings, LLC; (iii) siblings, parents, children, spouses, and household members of any person excluded under (i) and (ii); (iv) any entities affiliated with, controlled by, or more than 5% owned by, any person excluded under (i) through (iii); and (v) the legal representatives, heirs, successors or assigns of any person excluded under (i) through (iv).

Both the United States Supreme Court and the Second Circuit have long held that securities cases are especially well-suited to class-wide adjudication, and that the class action mechanism is an important tool to enforcing securities laws. *See, e.g.*, *Amchem Prod., Inc. v. Windsor*, 521 U.S. 591, 624 (1997); *Amgen Inc. v. Connecticut Ret. Plans & Tr. Funds*, 568 U.S. 455, 478 (2013); *In*

*re Am. Int'l Grp., Inc. Sec. Litig.*, 689 F.3d 229, 240 (2d Cir. 2012) (noting that the predominance test of Rule 23 is "readily met" in cases alleging securities fraud).

Consistent with this precedent, certification is appropriate here as the proposed Class satisfies all of the requirements of certification under Rule 23 of the Federal Rules of Civil Procedure. FXCM common stock traded on the NYSE and NASDAQ and the FXCM 2.25% Convertible Senior Notes due 2018 ("FXCM Notes") were widely held and traded during the Class Period, such that the proposed Class numbers in the many thousands, satisfying Rule 23(a)(1)'s numerosity requirement. The nature of the proposed Class Representatives' injuries, which resulted from Defendants' common course of conduct, is identical to that of the proposed Class members such that no Class Representative suffers from a conflict of interest that would impede the vigorous prosecution of this action, satisfying the commonality, typicality, and adequacy requirements of Rule 23(a)(2)-(4). Moreover, the Rosen Firm possesses the requisite experience and resources to successfully prosecute this matter as a class action, further supporting adequacy under Rule 23(a)(4), and supporting appointment of the Rosen Firm as Class Counsel under Rule 23(g).

This action also satisfies Rule 23(b)(3)'s requirements of predominance and superiority. Each of the elements of Plaintiffs' § 10(b) and § 20(a) claims are susceptible to Class-wide proof based upon common facts. Specifically, the Class is entitled to a presumption of reliance pursuant to the Supreme Court's ruling in *Affiliated Ute Citizens of Utah v. United States*, 406 U.S. 128 (1972) as this is primarily an omissions case. Namely, Defendants failed to disclose the secret profit-sharing relationship it maintained with Effex, which created a conflict of interests between FXCM and its customers. Separately, the predominance requirement is independently satisfied because the Class is entitled to a presumption of reliance based on the *Basic v. Levinson* "fraud-

on-the-market" doctrine, as FXCM's common stock and the FXCM Notes each traded in an efficient market. 485 U.S. 224 (1988); *In re Petrobras Sec.*, 862 F.3d 250, 276–78 (2d Cir. 2017) ("the Supreme Court has suggested that the burden required to establish market efficiency 'is not an onerous one.'"); *Waggoner v. Barclays PLC*, 875 F.3d 79, 97 (2d Cir. 2017) (same).[1] *See also* Opening Report on Market Efficiency, Dr. Adam Werner ("Werner Report") ¶¶ 8-9, 23-155. Thus, any potential individual questions of reliance do not predominate over common issues in this case. Moreover, the Werner Report explains how the calculation of damages is susceptible to a Class-wide methodology. *Id.* ¶¶ 156-161. Finally, a class action is a superior means of litigating Class members' claims because it is easily manageable, provides redress to investors who would otherwise be unable to pursue individual claims, and least taxes judicial resources.

## BACKGROUND AND PROCEDURAL HISTORY

For years, FXCM claimed that the Company's "No Dealing Desk" ("NDD") platform provided its customers with retail foreign exchange ("forex") trading that was free of conflicts of interest. SAC ¶ 2.[2] Unlike other forex trading platforms, FXCM claimed that it had no financial interest in NDD trades. SAC ¶¶ 2-3. Instead of trading against its customers, FXCM purported to act merely as an agent, collecting small markups and routing customers' trades to independent "market makers" that provided liquidity to the platform. SAC ¶ 3. These assurances were false.

In 2009, FXCM began to develop a high frequency trading algorithm to trade against unsuspecting customers on its NDD platform. SAC ¶ 7. As FXCM prepared to go public in 2010,

---

[1] The Werner Report is attached as Exhibit 1 to the Declaration of Joshua Baker ("Baker Decl."), filed concurrently herewith.

[2] References to "SAC" are to Plaintiffs' Second Amended Consolidated Securities Class Action Complaint. Dkt. No. 111.

the Company's compliance department voiced serious concerns over trading against FXCM's customers while explicitly promoting the NDD platform as "conflict-free." SAC ¶ 8. To avoid scrutiny, Defendants spun off the trading operations as a purportedly "independent" company, Effex Capital, LLC ("Effex"). *Id.*

In truth, FXCM created Effex as a functional subsidiary. SAC ¶ 9. FXCM installed John Dittami, who had overseen development of the trading algorithm, to head Effex. FXCM entered into a sham "services agreement" by which it would retain 70% of Effex's trading profits, disguised as "order flow" payments. *Id.* FXCM also provided Effex with millions in start-up capital, allowed Effex to operate out of FXCM's offices rent-free, and designated two FXCM employees to work for Effex. *Id.* The Company operated for years under this arrangement, all while continuing to promote the NDD platform conflict-free. SAC ¶ 11. FXCM also gave Effex distinct trading advantages over other market makers. SAC ¶ 10. Through 2014, Effex had sent nearly $80 million of its trading revenue to FXCM. SAC ¶ 11. At the same time, FXCM had no similar arrangements with, and received no payments from, any other market maker. *Id.*

Eventually, both the U.S. Commodity Futures Trading Commission ("CFTC") and National Futures Association ("NFA") brought regulatory actions against FXCM based on the Company's undisclosed relationship with Effex. SAC ¶ 15-16. On February 6, 2017, the CFTC announced that it had banned the Company from operating in the U.S. after finding that FXCM was taking undisclosed positions opposite its retail customers. SAC ¶ 16. The CFTC issued an Order which required FXCM, Niv and Ahdout to pay a $7 million civil penalty, cease and desist from further violations of the Commodity Exchange Act and CFTC Regulations, and permanently withdraw from CFTC registration. *Id.* The same day, the NFA also issued an order against FXCM, Niv, Ahdout, and Niv's sister, Ornit Niv. SAC ¶ 80. The NFA found that FXCM's NDD platform

was corrupted by the Company's relationship with Effex, and issued an order terminating the NFA membership of FXCM and the individual defendants, forever barring them from reapplying. *Id.* In response to the CFTC and NFA orders, the price of FXCM's stock and the FXCM Notes dropped sharply, damaging investors. SAC ¶¶ 82-83.

Tony Khoury filed the first of four related shareholder actions against FXCM on February 7, 2017. Dkt. No. 1. By Order dated May 3, 2017, the Court consolidated the related actions, appointed 683 Capital and Shipco as Lead Plaintiffs, and appointed the Rosen Firm as Lead Counsel. Dkt. No. 47. Plaintiffs filed their Consolidated Securities Class Action Complaint on June 19, 2017. Dkt. No. 48 ("FAC"). Defendants moved to dismiss the FAC on August 3, 2017. Dkt. No. 88. After briefing, the Court granted the motion to dismiss without prejudice on March 1, 2017. Dkt. No. 108. Plaintiffs then filed the SAC on April 6, 2018. Dkt. No. 111. Defendants moved to dismiss the SAC on May 7, 2018. Dkt. No. 117. After briefing, the Court issued an Order on March 28, 2019 denying in part Defendants' motion to dismiss as to Defendants FXCM, Niv, and Ahdout. Dkt. No. 135.

## ARGUMENT

## I.     The Applicable Standards Favor Class Certification in This Securities Action

The Supreme Court has long recognized that securities fraud claims are particularly well-suited for class treatment. *Amchem*, 521 U.S. at 625 (noting that predominance of common issues "is a test readily met in certain cases alleging … securities fraud").[3] Accordingly, the Supreme Court continues to favor class certification in securities fraud cases. *See Erica P. John Fund, Inc.*

---

[3] Internal quotations and citations are omitted and emphasis is added unless otherwise noted.

*v. Halliburton Co.*, 563 U.S. 804, 812–13 (2011) (vacating appellate court's denial of class certification); *Amgen*, 568 U.S. at 464-67 (affirming class certification).

"The Second Circuit has directed courts to adopt a liberal interpretation of Rule 23 in order to maximize the benefits to private parties and, in cases such as this that involve alleged manipulation of public markets, to maximize the benefits to the public provided by class actions." *Dodona I, LLC v. Goldman, Sachs & Co.*, 296 F.R.D. 261, 266 (S.D.N.Y. 2014); *Green v. Wolf Corp.*, 406 F.2d 291, 298 (2d Cir. 1968) ("[I]f there is to be an error made, let it be in favor and not against the maintenance of the class action").[4]

To be certified, a proposed class must satisfy the four prerequisites of Rule 23(a)—numerosity, commonality, typicality, and adequacy—as well as one of the three provisions in Rule 23(b). *Waggoner*, 875 F.3d at 93. Each of these requirements are satisfied here, and therefore the Class should be certified.

## II.     The Proposed Class Satisfies Each of the Requirements of Rule 23(a)

### A.     The Proposed Class Satisfies the Numerosity Requirement

Rule 23(a)(1) is satisfied when a class is "so numerous that joinder of all members is impracticable." Fed. R. Civ. P. 23(a)(1). In the Second Circuit, "[n]umerosity is presumed when a class consists of forty members or more." *In re NYSE Specialists Sec. Litig.*, 260 F.R.D. 55, 70

---

[4] *See also In re Smith Barney Transfer Agent Litig.*, 290 F.R.D. 42, 45 (S.D.N.Y. 2013) (noting that claims brought under § 10(b) of the Exchange Act are "especially amenable to class certification"); *In re Virtus Inv. Partners, Inc. Sec. Litig.*, No. 15CV1249, 2017 WL 2062985, at *2 (S.D.N.Y. May 15, 2017) (same); *Tsereteli v. Residential Asset Securitization Tr. 2006-A8*, 283 F.R.D. 199, 206 (S.D.N.Y. 2012) ("violations of securities laws … are 'especially amenable' to class action certification and resolution."); *In re Indep. Energy Holdings PLC Sec. Litig.*, 210 F.R.D. 476, 479 (S.D.N.Y. 2002) (class action treatment is "particularly appropriate" for securities fraud claims).

(S.D.N.Y. 2009) (citing *Consol. Rail Corp. v. Town of Hyde Park*, 47 F.3d 473, 483 (2d Cir. 1995)). "In securities fraud class actions relating to publicly owned and nationally listed corporations, the numerosity requirement may be satisfied by a showing that a large number of shares were outstanding and traded during the relevant period." *Teachers' Ret. Sys. of Louisiana v. ACLN Ltd.*, No. 01 CIV. 11814 (LAP), 2004 WL 2997957, at *3 (S.D.N.Y. Dec. 27, 2004).

During the Class Period, FXCM common stock was actively traded on the NYSE and NASDAQ, with an average weekly trading volume of over 660,000 shares. Werner Report ¶ 25 n.46. FXCM issued the FXCM Notes on June 3, 2013 under Rule 144A, and the FXCM Notes began trading on June 24, 2014. *Id.* ¶¶ 18-19. The FXCM Notes saw an average weekly trading volume of over $5 million in aggregate par value during the part of the Class Period in which the FXCM Notes traded: June 24, 2014 through February 7, 2017 ("Notes Period"). *Id.* ¶ 125 n.144. Numerosity is easily satisfied here.

### B. The Proposed Class Satisfies the Commonality Requirement

Rule 23(a)(2) is satisfied when "there are questions of law or fact common to the class." Fed. R. Civ. P. 23(a)(2). This requirement "has been characterized as a 'low hurdle.'" *In re NTL, Inc. Sec. Litig.*, No. 02 CIV.3013 LAK AJP, 2006 WL 330113, at *6 (S.D.N.Y. Feb. 14, 2006). "Even a single common legal or factual question will suffice." *NYSE Specialists*, 260 F.R.D. at 70. "In general, where putative class members have been injured by similar material misrepresentations and omissions, the commonality requirement is satisfied." *Fogarazzao v. Lehman Bros.*, 232 F.R.D. 176, 180 (S.D.N.Y. 2005).[5] Here, Defendants made uniform omissions of material fact to the Class, such that common questions in this litigation include:

--------------------

[5] *Accord In re Winstar Commc'ns Sec. Litig.*, 290 F.R.D. 437, 443 (S.D.N.Y. 2013) (same); *see also Pub. Employees' Ret. Sys. of Mississippi v. Merrill Lynch & Co.*, 277 F.R.D. 97, 105 (S.D.N.Y.

- whether the omissions concerning the undisclosed profit-sharing relationship between FXCM and Effex rendered FXCM's public statements materially false or misleading;

- whether and to what extent the market prices of FXCM common stock and FXCM Notes were artificially inflated during the Class Period due to Defendants' misrepresentations and omissions;

- whether Defendants acted with scienter;

- whether the members of the Class have sustained damages as a result of the alleged misconduct, and, if so, the proper measure thereof; and

- whether the Individual Defendants "controlled" FXCM for purposes of Section 20(a) liability.

Given the numerous common questions of fact and law present in this case, the commonality requirement is established.

### C.     The Proposed Class Satisfies the Typicality Requirement

Rule 23(a)(3) is satisfied when the claims of the Class Representatives are "typical" of those of the Class. Fed. R. Civ. P. 23(a)(3). As with commonality, the test for typicality "is not demanding." *Wallace v. IntraLinks*, 302 F.R.D. 310, 315 (S.D.N.Y. 2014). "When it is alleged that the same unlawful conduct was directed at or affected both the named plaintiff and the class sought to be represented, the typicality requirement is usually met irrespective of minor variations in the fact patterns underlying individual claims." *Robidoux v. Celani*, 987 F.2d 931, 936–37 (2d Cir. 1993). Thus, typicality "should be determined with reference to the company's actions, not with respect to particularized defenses it might have against certain class members." *Trinidad v. Breakaway Courier Sys., Inc.*, No. 05 CIV. 4116 RWS, 2007 WL 103073, at *6 (S.D.N.Y. Jan.

---

2011) ("courts in this Circuit have held that the … commonality requirement is plainly satisfied where the alleged misrepresentations … relate to all the investors, as the existence and materiality of such misrepresentations obviously present important common issues.").

12, 2007).[6] Here, Plaintiffs' claims and legal theories are typical of the Class.  Each purchased FXCM common stock or FXCM Notes during the Class Period and suffered losses when the truth materialized and was disclosed at the end of the Class Period. As with other Class members, Plaintiffs' claims are based on Defendants' material omissions concerning the profit-sharing relationship between FXCM and Effex. As such, typicality is satisfied.

> **D.   The Proposed Class Satisfies the Adequacy Requirement**

The final requirement of Rule 23(a) is that "the class representatives … fairly and adequately protect the interests of the class." Fed. R. Civ. P. 23(a)(4). To meet this requirement, the lead plaintiffs' counsel must be "qualified, experienced, and able to conduct the litigation," and the class representatives must not have interests conflicting with the class. *Baffa v. Donaldson, Lufkin & Jenrette Sec. Corp.*, 222 F.3d 52, 60 (2d Cir. 2000).

The interests of the proposed Class Representatives are aligned with those of the Class. The proposed Class Representatives' claims are predicated on the same wrongful conduct that gives rise to the claims of the Class. The proposed Class Representatives have suffered sizable financial losses,[7] and all have demonstrated a commitment to prosecute this action on behalf of absent Class members. *See* Baker Decl. Ex. 2 (Declaration of Joseph Patt, on behalf of 683 Capital), Ex. 3 (Declaration of Frank Cozzarelli, on behalf of Shipco), and Ex. 4 (Declaration of Sergey Regukh). Each of the proposed Class Representatives has participated in the action by communicating by phone and by email with Lead Counsel, by monitoring the progress and status

---

[6] *See also ACLN*, 2004 WL 2997957, at *4 ("When inquiring into the typicality requirement under Rule 23(a)(3), the focus must be on the defendants' behavior and not that of the plaintiffs.").

[7] *See* Plaintiffs' PSLRA certifications previously filed with the Court. Dkt. Nos. 27-2 (683 Capital and Shipco) and 13-2 (Regukh).

of the Action; reviewing pleadings, briefs, and other documents in this Action; and by following news about FXCM.[8] In addition, each proposed Class Representative has attested to their understanding of the duty to act in the interests of all other members of the Class.[9]

Moreover, Plaintiffs retained counsel who are qualified, experienced, and able to conduct this litigation. The Rosen Firm has vigorously pursued the Class's interests and advanced the Class's claims before this Court since the Court appointed the Rosen Firm as Lead Counsel. *See also* Baker Decl., Ex. 5 (firm résumé of the Rosen Firm). In short, the adequacy requirement has been met because Plaintiffs' interests are not antagonistic of the Class and Plaintiffs' counsel are well-qualified and have demonstrated their competence prosecuting this case.

## III.   The Proposed Class Satisfies the Predominance and Superiority Requirements of Rule 23(b)(3)

### A.   Common Questions of Law and Fact Predominate

"[T]he predominance requirement is met if the plaintiff can establish that the issues in the class action that are subject to generalized proof, and thus applicable to the class as a whole, … predominate over those issues that are subject only to individualized proof." *Brown v. Kelly*, 609 F.3d 467, 483 (2d Cir. 2010). "Predominance is a test readily met in certain cases alleging securities fraud." *Amchem*, 521 U.S. at 625. In cases under § 10(b) of the Exchange Act, the elements of falsity, materiality, scienter, and loss causation are subject to class-wide proof.[10] Thus,

---

[8] Baker Decl., Ex. 2 ¶¶ 14-19; Ex. 3 ¶¶ 14-19; and Ex. 4 ¶ 13-18.

[9] Baker Decl., Ex. 2 ¶¶ 12, 15-16; Ex. 3 ¶¶ 12, 15-16; and Ex. 4 ¶¶ 11, 14-15.

[10] *See Amgen Inc.*, 568 U.S. at 459 (materiality "is question common to all members of the class"); *In re Pfizer Inc. Sec. Litig.*, 282 F.R.D. 38, 52 (S.D.N.Y. 2012) (all elements of a Section 10(b) claim, "*other than reliance in cases that are not premised on fraud-on-the-market*, are subject to class wide proof in securities litigation").

"[w]hether common questions of law or fact predominate in a securities fraud action often turns on the element of reliance." *Halliburton I*, 563 U.S. at 810.

Here, the class satisfies the predominance requirement in two separate ways because reliance may be presumed on a class-wide basis pursuant to both (1) the presumption of reliance applicable to omission claims under *Affiliated Ute*, 406 U.S. at 154, and (2) the fraud-on-the-market presumption under *Basic*, 485 U.S. at 224.[11] Each presumption is independently sufficient for class certification, and both apply here.

### 1.    The *Affiliated Ute* Presumption of Reliance Applies

The Supreme Court has instructed that in cases "involving primarily a failure to disclose, positive proof of reliance is not a prerequisite to recovery." *Affiliated Ute*, 406 U.S. at 153.  Instead, "[a]ll that is necessary is that the facts withheld be material in the sense that a reasonable investor might have considered them important in the making of [its] decision." *Affiliated Ute*, 406 U.S. at 154. The Second Circuit has thus consistently held that reliance is presumed under *Affiliated Ute*, without a showing of market efficiency, where "a plaintiff's claim is based on a defendant's failure to disclose material information." *Litton Indus., Inc. v. Lehman Bros. Kuhn Loeb Inc.*, 967 F.2d 742, 748 (2d Cir. 1992) (citing *Affiliated Ute*, 406 U.S. at 154); *Waggoner*, 875 F.3d at 95–96 (reiterating that *Affiliated Ute* presumption of reliance applies in cases "*primarily*" alleging a material omission) (emphasis in original).[12]

---

[11] *See generally Strougo v. Barclays PLC*, 312 F.R.D. 307 (S.D.N.Y. 2016) ("The predominance requirement is typically met in securities fraud class actions by plaintiffs' invocation of one of two presumptions developed by the Supreme Court … the '*Basic* presumption' of reliance in fraudulent misrepresentation cases, and the '*Affiliated Ute* presumption' of reliance in fraudulent omission cases."); *In re Barrick Gold Sec. Litig.*, 314 F.R.D. 91, 101 (S.D.N.Y. 2016) (similar).

[12] The *Affiliated Ute* presumption is rooted in the reality that "as a practical matter [reliance on an omission] is impossible to prove." *In re Facebook, Inc., IPO Sec. & Derivative Litig.*, 986 F. Supp.

Reliance here may be presumed because Plaintiffs' claims are primarily based on Defendants' omission of material facts relating to the secret profit-sharing relationship between FXCM and Effex. Plaintiffs are thus entitled the *Affiliated Ute* presumption of reliance. *See In re Dynex Capital, Inc. Sec. Litig.*, No. 05 CIV. 1897 HB, 2011 WL 781215, at *7 (S.D.N.Y. Mar. 7, 2011) (applying *Affiliated Ute* presumption since "the heart of the alleged deception is rooted not in statements, but in the fact that specific information … was withheld, and that information would have been important to a reasonable investor.").

### 2.    Plaintiffs are Entitled to a Presumption of Reliance Under *Basic*

Plaintiffs are also entitled to a presumption of reliance under the "fraud-on-the-market" theory espoused in *Basic*, 485 U.S. at 224. Pursuant to the *Basic* fraud-on-the-market doctrine, Plaintiffs may show reliance "by invoking a presumption that a public, material misrepresentation will distort the price of stock traded in an efficient market, and that anyone who purchases the stock at the market price may be considered to have done so in reliance on the misrepresentation." *Halliburton Co. v. Erica P. John Fund, Inc. ("Halliburton II")*, 573 U.S. 258, 283-84 (2014).

To invoke this presumption, Plaintiffs must show, based on a holistic analysis of the totality of evidence presented, that FXCM's securities traded in an efficient market. *Petrobras*, 862 F.3d at 276-78 (affirming class certification where plaintiffs provided direct and indirect evidence of market efficiency, including an event study similar to that provided by Dr. Werner here (*see* Sec. III.A.2(a), *infra*), and noting that the Supreme Court's opinions "consistently suggest that the

---

2d 428, 469 (S.D.N.Y. 2013). This is because "[w]hen a defendant's fraud consists primarily of omissions, requiring a plaintiff to show a speculative set of facts, *i.e.*, how he would have behaved if omitted material information had been disclosed, places an unrealistic evidentiary burden on the 10(b) plaintiff." *In re Smith Barney*, 290 F.R.D. at 47.

burden [of showing market efficiency] is not an onerous one"); *Waggoner*, 875 F.3d at 89, 97 (holding that "that a plaintiff seeking to demonstrate market efficiency need not always present direct evidence of price impact through event studies" and affirming class certification where plaintiffs provided "'indirect' indicia of an efficient market"). As set forth below, Plaintiffs have shown, based on the totality of the evidence presented, that FXCM's common stock and the FXCM Notes each traded in efficient markets during the proposed Class Period, and Plaintiffs are therefore entitled to a presumption of reliance under *Basic*.

(a)      The *Cammer* Factors Show Market Efficiency

Neither the Supreme Court nor the Second Circuit has adopted a formal test for market efficiency. *Petrobras*, 862 F.3d at 276. Courts in the Second Circuit and elsewhere, however, routinely consider the non-exhaustive factors derived from *Cammer v. Bloom*, 711 F. Supp. 1264 (D.N.J. 1989), in determining whether a security trades in an efficient market. *Petrobras*, 862 F.3d at 276-79. Those factors include:

> (1) a large weekly trading volume; (2) the existence of a significant number of analyst reports; (3) the existence of market makers and arbitrageurs in the security; (4) the eligibility of the company to file an S–3 registration statement; and (5) a history of immediate movement of the stock price caused by unexpected corporate events or financial releases.

*McIntire v. China MediaExpress Holdings, Inc.*, 38 F. Supp. 3d 415, 431 (S.D.N.Y. 2014) (citing *Cammer*, 711 F. Supp. at 1285–87). The *Cammer* factors, however, are neither exclusive nor strictly required, and instead "are meant to be an analytical tool to assist in the evaluation of market efficiency, not a rigid checklist." *McIntire*, 38 F. Supp. 3d at 432; *see also Carpenters Pension Tr. Fund of St. Louis v. Barclays PLC*, 310 F.R.D. 69, 83 (S.D.N.Y. 2015) ("While the Second Circuit endorsed the use of the *Cammer* factors in *Bombardier*, it has not required their use or held that any one of them is dispositive."). Courts apply the *Cammer* factors in assessing the efficiency of both stock and bond markets, adjusting as necessary for the unique characteristics of bond

13

markets.[13] An analysis of each of the *Cammer* factors, evaluated both individually and collectively, shows that both FXCM's common stock and the FXCM Notes traded in efficient markets during the Class Period.

**Factor One – FXCM's High Weekly Trading Volume:**

The average weekly trading volume of both FXCM common stock and the FXCM Notes exceeded the threshold set in *Cammer* of 2% of the outstanding securities. This factor supports a strong presumption that the FXCM common stock and FXCM Notes traded in efficient markets.

Stock: During the Class Period, FXCM's common stock had an average weekly trading volume of 14.86% of the outstanding shares. Werner Report ¶ 25. That turnover rate far exceeds the 2% threshold set by *Cammer* as giving rise to a "strong presumption" of market efficiency. *See Cammer*, 711 F. Supp at 1286.[14]

Notes:  As Dr. Werner explains, bonds typically trade less frequently than stocks due to the "inherently different nature of how bonds are transacted." *See* Werner Report ¶¶ 119-124. Nonetheless, the FXCM Notes had an average weekly trading volume of 2.92% of the par value of outstanding FXCM Notes during the Notes Period. *Id.* ¶ 125. *See Winstar*, 290 F.R.D. at 447

---

[13] *Teamsters Local 445 Freight Div. Pension Fund v. Bombardier Inc.*, 546 F.3d 196, 204 n.11 (2d Cir. 2008) ("The *Cammer* factors have been routinely applied by district courts considering the efficiency of equity markets."); *Petrobras*, 862 F.3d at 276 (affirming finding of market efficiency pursuant to *Cammer* factors). *See also Winstar*, 290 F.R.D. at 446 (applying *Cammer* factors to analysis of bond market efficiency, and recognizing that "courts adjust them for the realities of the over the counter bond market"); *Dynex*, 2011 WL 781215, at *4-6 (same).

[14] Furthermore, FXCM's common stock traded on the NYSE and NASDAQ during the Class Period. *See* Werner Report ¶ 16. The Second Circuit has held that a stock's listing on the NYSE or NASDAQ is strong evidence of market efficiency. *Waggoner*, 875 F.3d at 98–99 (noting that market efficiency was shown and a presumption of reliance was warranted in part because Barclay's stock traded on the NYSE).

(bond market's average weekly trading volume exceeded the *Cammer* 2% threshold, justifying a strong presumption of efficiency).

### Factor Two – Substantial Coverage by Financial Analysts:

The presence of substantial analyst coverage on a security "supports a finding of market efficiency because it permits an inference that financial statements relating to a security are closely watched by investment professionals, who in turn inject their views on the company and the security into the market." *Winstar*, 290 F.R.D. at 446. This factor is measured alternatively by the number of analysts covering the company or security, or by the number of analyst reports published about the company or security, during the relevant period.[15] Courts also consider the extent of analyst coverage in connection with related factors, including the amount of news coverage on a company and the degree of institutional ownership.[16]

Stock:  Here, at least 15 analysts or analyst firms covered FXCM during the Class Period, issuing at least 265 reports on the Company during the Class Period. Werner Report ¶¶ 27-29 & Exhibit-4 thereto. By comparison, the *Cammer* court found efficiency where the security at issue was the subject of "[a]t least 15 research reports" during the entire one-year class period. 711 F. Supp. at 1283 n.30, 1287.

---

[15] *Compare, e.g.*, *id.* ("the number of securities analysts") *with McIntire*, 38 F. Supp. 3d at 431 ("the existence of a significant number of analyst reports").

[16] *E.g.*, *In re Xcelera.com Sec. Litig.*, 430 F.3d 503, 514–15 (1st Cir. 2005) (affirming district court's finding of market efficiency, where only one analyst followed the company's stock and issued only one report during a 16-month class period, but information about the company was widely distributed through other sources, including news articles, press releases, and SEC filings, and institutional investors invested in the stock); *Todd v. STAAR Surgical Co.*, No. CV-14-05263-MWF-RZ, 2017 WL 821662, at *7 (C.D. Cal. Jan. 5, 2017) (ownership of company's stock by major institutions bolstered determination that efficiency was indicated by second *Cammer* factor).

Notes: During the Notes Period, at least 12 analysts or analyst firms covered FXCM, collectively issuing at least 89 reports on the Company. Werner Report ¶¶ 126-128 & Exhibit-4 thereto. *See also Winstar*, 290 F.R.D. at 446 (analyst coverage weighed in favor of efficiency of bond market where three analysts reported on company's bonds and additional analysts followed company's stock). As Dr. Werner notes, "the same analysts that analyze, disseminate, and disclose information relevant to common stock investors offer the same value for bond investors in promoting an efficient market." Werner Report ¶ 123. *See also id.* ¶ 126.

Furthermore, over 1,608 news stories, press releases and SEC filings featuring FXCM were published in financial publications and newswires during the Class Period, of which 938 were published during the Notes Period. Werner Report ¶¶ 31, 129 & Exhibit-2 thereto. These news articles similarly facilitated the flow of information about the Company to both stock and bond investors, promoting the efficiency of the markets for FXCM common stock and the FXCM Notes. *Id.* ¶¶ 30, 129; *Winstar*, 290 F.R.D. at 446 (press releases and news coverage about the Company bolstered finding of market efficiency).

### **Factor Three – Market Makers, Institutional Investors, and Arbitrageurs:**

The third *Cammer* factor concerns whether there are a sufficient number of market makers and/or arbitrageurs to facilitate the efficiency of the market. *See McIntire*, 38 F. Supp. 3d at 431–32. Courts have found the fact that a security trades on the NYSE, as FXCM's common stock did, sufficient to satisfy this factor.[17] As Dr. Werner explains, "[a] stock with a large number of market makers would indicate that many market participants are trading in that stock, thereby increasing

---

[17] *See In re Initial Pub. Offering Sec. Litig.*, 260 F.R.D. 81, 100 (S.D.N.Y. 2009) (trading on the NYSE "provides the necessary evidence to satisfy this factor"); *In re Alstom SA Sec. Litig.*, 253 F.R.D. 266, 280 (S.D.N.Y. 2008) (similar).

liquidity and decreasing trading costs. It follows that a large number of market makers indicates efficiency of the market for a particular stock." Werner Report ¶ 34.

Stock:  There were at least 205 market makers for FXCM common stock during the Class Period. *Id.* Comparatively, in *Cammer* the court found that just "[t]en market makers for a security would justify a substantial presumption that the market for the security is an efficient one." 711 F. Supp. At 1293. Additionally, the presence of institutional investors in the market indicated market efficiency, as economists presume them "to be better informed about the securities they hold and better able to interpret new information than individual investors." Werner Report ¶ 36. At least 382 unique institutional investors owned FXCM common stock during the Class Period. *Id.* ¶ 37.

Notes:  Under Rule 144A, only qualified institutional buyers may hold or trade the FXCM Notes, thus the entire issue of FXCM Notes was owned by institutional investors. *Id.* ¶ 130. Moreover, the FXCM Notes were placed into the financial marketplace by prominent underwriters. *Id.* ¶ 131. During the Notes Period, 35-40% of the trades reported in FXCM Notes were dealer transactions, which results from a large number of dealers facilitating transactions similarly to how market makers increase the efficiency of the equity market. *Id.* ¶ 134. Therefore, the third *Cammer* factor supports a finding of market efficiency for both FXCM common stock and the FXCM Notes.

**Factor Four – FXCM Filed Two Form S-3 Registrations During the Class Period:**

Eligibility for S-3 registration with the SEC is an indicator of market efficiency because it is associated with characteristics that correlate with efficiency, including size, transparency, and the availability of relevant financial information. *See Cammer*, 711 F. Supp. at 1284–85; Werner Report ¶¶ 39-41. These characteristics foster the efficiency of the market for the FXCM Notes just as they do for the common stock. Werner Report ¶ 136; *see also Winstar*, 290 F.R.D. at 447, *Dynex*, 2011 WL 781215, at *5.

To be eligible to file an S-3 registration, a company must have filed Exchange Act reports with the SEC for 12 months, and it must meet a minimum threshold of $75 million for its public float. *Id.* FXCM easily met both requirements and it filed Form S-3 Registration Statements twice during the Class Period: first on October 4, 2012 and again on July 12, 2016. *Id.* ¶ 42.

**<u>Factor Five – The Prices of FXCM Shares and FXCM Notes Reacted to News:</u>**

The fifth *Cammer* factor examines whether empirical evidence demonstrates "a cause and effect relationship between unexpected corporate events or financial releases and an immediate response in the stock price." *Cammer*, 711 F. Supp. at 1287. To make this showing, Plaintiffs submit the expert report of Dr. Adam Werner, which sets forth empirical tests of the efficiency of the markets for FXCM common stock and for FXCM Notes during the Class Period.

First, Dr. Werner conducted event studies in which he examined whether the markets for FXCM common stock and for the FXCM Notes were efficient specifically with regard to (1) the alleged corrective disclosure in this litigation, on February 6, 2017, (2) the significant acquisition announcement by FXCM during the Class Period, on June 14, 2012, and (3) the announcement of FXCM's breach of regulatory capital requirements during the Class Period, on January 15, 2015. Werner Report ¶¶ 50-94, 137-150.[18] Dr. Werner selected these three events because they would reasonably be expected to have a significant impact on the Company's stock (or bond) valuation. *Id.* ¶¶ 57-69, 137. He then used a market model to isolate the price impact of the company-specific information, as opposed to market or peer factors. *Id.* ¶¶ 70, 141. Finally, for each event, Dr.

---

[18] As Dr. Werner explained, not all of the event study events selected for FXCM common stock were suitable candidates for a bond market efficiency event study, as only two of the three events occurred after the issuance of the FXCM notes, and only one of those two events (January 15, 2015) had trading data in the following trading days. Werner Report ¶ 138.

Werner conducted a t-test to determine whether the price impact from the selected events was statistically significant. *Id.* ¶¶ 79, 145. The t-tests demonstrated that FXCM's stock price and bond price reactions to each of the events tested was statistically significant, indicating market efficiency. *Id.* ¶¶ 81-94, 147-150.

Second, Dr. Werner examined whether FXCM's share price, and the price of FXCM Notes, increased or decreased a statistically significant amount on "news" days relative to "non-news" days during the Class Period. Werner Report ¶¶ 95-105. Dr. Werner found that they did, *i.e.*, the price of FXCM's common stock and the price of FXCM Notes reacted to news, such that FXCM's securities both traded in an efficient market during the Class Period. *Id.*

More specifically, Dr. Werner's event study analysis showed a statistically significant positive difference between the percentage of "news" days with statistically significant changes in the price of FXCM common stock and the percentage of "non-news" days with statistically significant price changes during the Class Period. *Id.* ¶¶ 95-105. Dr. Werner performed this event study analysis using an objective definition of news days: days on which the Company filed a Current Report with the SEC on Form 8-K. *Id.* ¶¶ 97-99. Dr. Werner found that out of the 106 trading days during the Class Period in which the Company issued a Form 8-K, 27 days had statistically significant residual returns, or 25.5%. *Id.* ¶ 104. Of the 1,125 "non-news" trading days during the Class Period, only 53 days had statistically significant residual returns, or 4.7%. *Id.* These data points demonstrate that FXCM common stock reacted to new information during the Class Period, indicating market efficiency. *Id.* ¶ 105. *See McIntire*, 38 F. Supp. 3d at 433 ("because CCME's stock price was six to eight times more likely to change on News Days than on Non–News Days, Plaintiffs have satisfied the fifth *Cammer* factor"); *Alstrom*, 253 F.R.D. at 280 (finding

fifth *Cammer* factor satisfied where "Alstom was over 6 times more likely to have a statistically significant stock return on a day with news than on a day with no news")).

Based on these tests, Dr. Werner concluded that there was "a cause and effect relationship between the release of new information and reactions in FXCM's common stock price," as well as "in the price of the FXCM Notes." Werner Report ¶¶ 106, 151.[19]  Accordingly, the fifth *Cammer* factor weighs in favor of a finding of market efficiency.

> **(b)     The *Unger/Krogman* Factors Further Support a Finding of Market Efficiency**

Courts also consider three other factors identified in *Unger v. Amedisys Inc.*, 401 F.3d 316, 323 (5th Cir. 2005) and *Krogman v. Sterritt*, 202 F.R.D. 467, 478 (N.D. Tex. 2001): (1) market capitalization; (2) float; and (3) the bid-ask spread. *See Petrobras*, 862 F.3d at 276 (acknowledging these "three additional" factors comprised part of the efficiency analysis).

**Market Capitalization:**     The larger a Company's market capitalization, the more likely the Company's stock is to attract analyst and news media coverage, and gain the attention of more investors, including large institutional investors. All of these characteristics promote market efficiency. Werner Report ¶ 108. The same holds true as to the FXCM Notes. *Id.* ¶ 153.

<u>Stock</u>: During the Class Period, the average market value of FXCM's common stock was over $340 million, meaning that FXCM was larger than at least 50% of all other publicly-traded

---

[19] These tests are directly analogous to the non-directional event studies conducted by Prof. Steven Feinstein in *Petrobras*, which the district court and the Second Circuit found to sufficiently show market efficiency, even without an alternative event study assessing whether the stock's price moved in the "correct" direction in response to events. *See  In re Petrobras Sec. Litig. ("Petrobras I")*, 312 F.R.D. 354, 370 (S.D.N.Y. 2016) ("Whether the market, upon receiving new information, moved in the precise way analysts or experts would expect it to move is not the key to unlocking *Basic*'s presumption of reliance."); *Petrobras*, 862 F.3d at 279 (rejecting argument that courts must "rely on directional event studies and directional event studies alone").

companies in the United States. Werner Report ¶ 110, n.132 & Exhibit-7 thereto. *See McIntire*, 38 F. Supp. 3d at 433 (finding that a market capitalization ranging from $292 million to $585 million during the class period weighed in favor of finding an efficient market).

Notes: The total par value of FXCM Notes was $173 million, and was larger than the market capitalizations of at least 40% of all public companies listed on the NYSE, AMEX, NASDAQ, and ARCA during the Notes Period. Werner Report ¶ 154 and n.153.

**Float:** A stock's float is the number of shares outstanding, less shares held by insiders and affiliated corporate entities, which is generally the number of shares available for trading by outside investors in the open market. *See* Werner Report ¶ 112. Under *Krogman*, a large public float supports a finding of an efficient market. 202 F.R.D. at 478.

Stock: During the Class Period, the market value of FXCM's common stock float averaged $336 million, which was still larger than the total market capitalization of at least 50% of all other publicly-traded companies in the United States. Werner Report ¶ 112.

Notes: The float of the FXCM Notes equaled the outstanding par value, and thus the substantial outstanding par value and float are indicative of the efficiency of the market for the FXCM Notes during the Notes Period. Werner Report ¶ 155.

**Bid-Ask Spread:**     The final *Unger/Krogman* factor is the bid-ask spread, which is the difference between the price at which market makers are offering to buy/sell the security, and is often associated with market efficiency. Werner Report ¶ 115. The bid-ask spread will tend to be narrow for actively traded securities where information is readily available. Conversely, a large bid-ask spread is indicative of inefficiency. *Krogman*, 202 F.R.D. at 478. Moreover, a narrow bid-ask spread makes trading in the security less costly for investors, which can attract greater interest, coverage, and volume. Werner Report ¶ 115.

Stock:  Here, the average bid-ask spread for FXCM common stock during the Class Period was only 0.28%. *Id.* ¶ 117. FXCM's average bid-ask spread during the Class Period was approximately eight times narrower than the threshold bid-ask spread of 2.44% found in *Cheney v. Cyberguard Corp.*, 213 F.R.D. 484, 501 (S.D. Fla. 2003) to weigh in favor of market efficiency. Werner Report ¶ 117; *McIntire*, 38 F. Supp. 3d at 433 (a bid-ask spread of 0.27% supported market efficiency).

Notes:  Bid-ask data are not reported for bond transactions, so Dr. Werner did not assess this factor for the FXCM Notes. Werner Report ¶ 152.

In sum, the three *Unger/Krogman* factors strongly weigh in favor of finding that both FXCM's common stock and the FXCM Notes traded in efficient markets. *See, e.g.*, *Billhofer v. Flamel Techs., S.A.*, 281 F.R.D. 150, 160 (S.D.N.Y. 2012) ("[S]ubstantial market capitalization with a narrow bid-ask spread, and a large public float … strongly indicate … an efficient market.").

### 3.      Potential Individual Questions of Damages Do Not Predominate

Following the Supreme Court's decision in *Comcast Corp. v. Behrend*, 569 U.S. 27 (2013), the Second Circuit has held that damages in securities cases present common questions because they can be calculated by measuring the price impact of company-specific information alleged to be a corrective disclosure on a class-wide basis. *See Waggoner*, 875 F.3d at 106 (holding that plaintiffs' damages model, which "examin[ed] the drop in price that occurred" when the "ongoing problems related to Barclay's management" were revealed, was "'directly linked with their underlying theory of classwide liability … and [was ] therefore in accord with the Supreme Court's … decision in *Comcast*.'").[20]

_____

[20] *See also Barrick Gold*, 314 F.R.D. at 106 ("as required by *Comcast*, plaintiffs' actual theory of damages (out-of-pocket damages) is entirely consistent with their theory of Section 10(b) liability

Here, damages for both the FXCM common stock and FXCM Notes can be readily calculated on a class-wide basis in this action using the same kind of generally accepted event study methodology. Werner Report ¶¶ 156-61. Using such an event study, the artificial inflation caused by false statements and omissions can be measured on a class-wide basis by analyzing the change in the stock or bond prices caused by a corrective disclosure. *Id.* ¶ 159. Once the daily levels of price inflation have been calculated for each day during the Class Period, a Class member's actual trading activity in the security can be used to calculate damages on an individual basis for each Class member in the claims administration process. *Id.* Because this methodology is consistent with the class-wide theory of liability and allows for measurement of damages on a class-wide basis, common issues predominate.[21]

### B.    A Class Action is Superior to Other Methods of Adjudication

Under Rule 23(b)(3), "[s]uperiority is established when 'a class action would achieve economies of time, effort, and expense, and promote uniformity of decision as to persons similarly situated, without sacrificing procedural fairness or bringing about other undesirable results.'" *In re Methyl Tertiary Butyl Ether (MTBE) Prod. Liab. Litig.*, 241 F.R.D. 435, 449 (S.D.N.Y. 2007)

and would be  measurable on a class-wide basis[,]" and noting that the calculation of damages called for the "application of a damages model across the entire class"); *In re Goldman Sachs Grp., Inc. Sec. Litig.*, No. 10 CIV. 3461 PAC, 2015 WL 5613150, at *8 (S.D.N.Y. Sept. 24, 2015) ("[A]t the class certification stage, Plaintiffs must only show that their damages model 'actually measure[s] damages that result from the Class's asserted *theory* of injury.'"); *Wallace*, 302 F.R.D. at 318 ("Plaintiff's proposed determination of damages by event study appears to be a workable methodology of determining damages on a class-wide basis that conforms to its theory of liability, thus meeting the requirements of *Comcast*[.]").

[21] Plaintiffs' showing above that the § 10(b) claim meets the reliance presumption likewise shows that Plaintiffs' claim under § 20(a) is also satisfied. *In re Merck & Co., Inc. Sec., Derivative & ERISA Litig.*, No. CIV.A. 05-1151 SRC, 2013 WL 396117, at *13 (D.N.J. Jan. 30, 2013) (finding that the same predominance analysis applies to § 20(a) claims as for Rule 10b-5 violations).

(quoting *Amchem*, 521 U.S. at 615). Superiority is typically found in cases in which each individual class member's interest in the litigation is less than the anticipated cost of litigating individually. *See Spagnola v. Chubb Corp.*, 264 F.R.D. 76, 99 (S.D.N.Y. 2010).[22]   The following factors are relevant to the superiority assessment:

> A) the class members' interests in individually controlling the prosecution . . . of separate actions; B) the extent and nature of any litigation concerning the controversy already begun by … class members; C) the desirability … of concentrating the litigation of the claims in the particular forum; and D) the likely difficulties to be encountered in managing a class action.

Fed. R. Civ. P. 23(b)(3). These factors all weigh in favor of class certification in this case.

Given the complexity of the allegations, and temporal scope of the Class Period, it would be prohibitively difficult and expensive to prosecute this case on an individual basis. The fraud here, like "[m]ost violations of the federal securities laws[,] … inflict[ed] economic injury on large numbers of geographically dispersed persons such that the cost of pursuing individual litigation to seek recovery is often not feasible." *In re Blech Sec. Litig.*, 187 F.R.D. 97, 107 (S.D.N.Y. 1999). Finally, securities class actions like this one generally raise no unusual manageability issues. *See, e.g.*, *Petrobras I*, 312 F.R.D. at 363 (citing *In re Visa Check/MasterMoney Antitrust Litig.*, 280 F.3d 124, 140 (2d Cir. 2001)). Thus, a class action is the superior method for the efficient adjudication of the Class's claims.

---

[22] The Supreme Court has recognized that "[c]lass actions … permit the plaintiffs to pool claims which would be uneconomical to litigate individually. … [M]ost of the plaintiffs would have no realistic day in court if a class action were not available." *Phillips Petroleum Co. v. Shutts*, 472 U.S. 797, 809 (1985).

**IV.**   **The Class is Ascertainable**

Finally, the Second Circuit recognizes that "Rule 23 contains an implicit threshold requirement that the members of a proposed class be readily identifiable." *Petrobras*, 862 F.3d at 264. This "ascertainability requirement, as defined in this Circuit, asks district courts to consider whether a proposed class is defined using objective criteria that establish a membership with definite boundaries." *Id.* at 269. The proposed Class is ascertainable because the identity of its members can be determined from the books and records maintained by FXCM and its transfer agents. *See Fogarazzo v. Lehman Bros.*, 263 F.R.D. 90, 101 (S.D.N.Y. 2009); *Petrobras*, 862 F.3d at 269 (finding proposed classes were ascertainable where "[t]he Classes include persons who acquired specific securities during a specific time period," since "[t]hese criteria—securities purchases identified by subject matter, timing, and location—are clearly objective.").

**V.**   **The Rosen Firm Should be Appointed Class Counsel Under Rule 23(g)**

Rule 23(g)(1)(A) sets forth the factors to consider in appointing Class Counsel, including: (i) the work counsel has done in identifying or investigating claims in the action; (ii) counsel's experience in handling class actions, other complex litigation, and the types of claims asserted in the action; (iii) counsel's knowledge of the applicable law; and (iv) the resources counsel will commit to the case. Under these criteria, the Rosen Firm is eminently qualified. The Rosen Firm specializes in litigating securities fraud class actions under federal and state laws. *See* Baker Decl. Ex. 5. In sum, Plaintiffs respectfully submit that the requirements of Rule 23(g) are met, and thus request that the Court approve the Rosen Firm as Class Counsel.

## CONCLUSION

For the foregoing reason, the Court should certify the proposed Class, appoint Plaintiffs as Class Representatives, and appoint the Rosen Firm as Class Counsel.

Dated: January 6, 2020

**THE ROSEN LAW FIRM P.A.**

By: _/s/ Phillip Kim_
Laurence M. Rosen
Phillip Kim
Joshua Baker
275 Madison Avenue, 40th Floor
New York, New York 10016
Telephone: (212) 686-1060
Fascimile:  (212) 202-3827
Email:  lrosen@rosenlegal.com
          pkim@rosenlegal.com
          jbaker@rosenlegal.com

_Lead Counsel for Plaintiffs and the Proposed Class_

**WOLF HALDENSTEIN ADLER FREEMAN & HERZ LLP**
Matthew M. Guiney
270 Madison Ave.
New York, NY 10016
Tel: (212) 545-4600
Email:  guiney@whafh.com

_Additional Counsel_

26

**<u>CERTIFICATE OF SERVICE</u>**

I, the undersigned say:

I am not a party to the above case, and am over eighteen years old. On January 6, 2020, I served true and correct copies of the foregoing MEMORANDUM OF LAW IN SUPPORT OF MOTION FOR CLASS CERTIFICATION AND APPOINTMENT OF CLASS REPRESENTATIVES AND CLASS COUNSEL, by posting the document electronically to the ECF website of the United States District Court for the Southern District of New York, for receipt electronically by the parties listed on the Court's Service List.

I affirm under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

Executed on January 6, 2020, at New York, New York.

*/s/ Joshua Baker* _____
Joshua Baker