**THE ROSEN LAW FIRM, P.A.**
Phillip Kim, Esq. (PK 9384)
Laurence M. Rosen, Esq. (LR 5733)
Joshua Baker, Esq. (JB 8288)
275 Madison Avenue, 40th Floor
New York, New York 10016
Telephone: (212) 686-1060
Fax: (212) 202-3827
Email: pkim@rosenlegal.com
Email: lrosen@rosenlegal.com
Email: jbaker@rosenlegal.com

*Lead Counsel for Lead Plaintiffs*

## UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| In re Global Brokerage, Inc. f/k/a FXCM Inc. Securities Litigation | Master File No. 1: 17-cv-00916-RA-BCM<br><br>**THIRD AMENDED CONSOLIDATED SECURITIES CLASS ACTION COMPLAINT**<br><br>CLASS ACTION |
| This Document Relates To: All Actions | JURY TRIAL DEMANDED |

Lead Plaintiffs 683 Capital Partners, LP and Shipco Transport Inc., and named plaintiffs Sergey Regukh, E-Global Trade and Finance Group, Inc., and Brian Armstrong ("Plaintiffs"), individually and on behalf of all other persons similarly situated, by Plaintiffs' undersigned attorneys, for Plaintiffs' third amended consolidated complaint against Defendants (defined below), alleges the following based upon personal knowledge as to Plaintiffs and Plaintiffs' own acts, and upon information and belief as to all other matters based on the investigation conducted by and through Plaintiffs' attorneys, which included, among other things, a review of Securities and Exchange Commission ("SEC") filings by Global Brokerage, Inc., f/k/a FXCM Inc. ("FXCM" or the "Company")[1], the Commodity Futures Trading Commission ("CFTC")'s Order Instituting Proceedings Pursuant to Sections 6(c) and 6(d) of the Commodity Exchange Act, Making Findings, and Imposing Remedial Sanctions dated February 6, 2017 ("CFTC Order") which is attached hereto as Exhibit 1 and incorporated by reference herein, the National Futures Association ("NFA")'s complaint dated February 6, 2017 ("NFA Complaint") attached hereto as Exhibit 2 and incorporated by reference herein, documents received in response to a Freedom of Information Act request to the CFTC, as well as media and analyst reports about the Company. Plaintiffs believe that substantial evidentiary support will exist for the allegations set forth herein after a reasonable opportunity for discovery.

## NATURE OF THE ACTION

1.      This is a federal securities class action on behalf of a class consisting of all persons and entities who purchased or otherwise acquired publicly traded FXCM securities, including FXCM 2.25% Convertible Senior Notes due 2018 (the "FXCM Notes") and Class A common stock from March 15, 2012 to February 6, 2017, both dates inclusive (the "Class

---

[1]  Included in these definitions are FXCM's subsidiaries.

Period")[2] Plaintiffs seek to recover compensable damages caused by Defendants' violations of federal securities laws and pursue remedies under the Securities Exchange Act of 1934 (the "Exchange Act").

2.      During the Class Period, FXCM knowingly misled investors in the Company's periodic reports filed with the SEC and other public statements by falsely claiming that its customers who transacted on FXCM's "No Dealing Desk" ("NDD") platform would be free from conflicts of interest because FXCM would not be on the other side of the trade or have any financial interest in the trade.

3.      According to FXCM, retail customers' profits or losses would have no effect on FXCM's interests, because FXCM's role was merely as an agent or credit intermediary.  FXCM explained that customer trades would be directed to banks and other independent "market makers" that provided liquidity to the platform.

4.      FXCM's purported lack of conflict of interest was extremely material and a centerpiece to their trading platform and marketing efforts.  Indeed throughout the Class Period, Defendants acknowledged that this conflicts-free business model was a "core" philosophy of the Company.

5.      Despite the Company's claims of having no conflicts of interest for its retail customers trading on the NDD platform, FXCM in fact had an undisclosed financial interest in the market maker that consistently "won" the largest share of FXCM's NDD trading volume,

---

[2]   Excluded from the Class are all (i) Defendants; (ii) current and former officers, employees, consultants and directors of FXCM and FXCM Holdings, LLC; (iii) siblings, parents, children, spouses, and household members of any person excluded under (i) and (ii); and (iv) any entities affiliated with, controlled by, or more than 5% owned by, any person excluded under (i) through (iii); and (v) the legal representatives, heirs, successors or assigns of any person excluded under (i) through (iv).

Effex Capital, LLC ("Effex").  Effex was essentially a front created by FXCM, allowing for FXCM to hold positions opposite its customers and financially benefit at its customers' expense—in direct contravention to the Company's representations to investors and its own customers of conflict free trading on the NDD.

6.      Effex was an FXCM-backed startup firm that was dreamed up, created, and financed by FXCM.

7.      In 2009, FXCM hired John Dittami ("Dittami"), a high frequency trader, to develop a trading algorithm to replace or supplant many of the independent market makers on FXCM's NDD platform, secretly trading against FXCM's customers.  Part of Dittami's compensation was 30% of his trading profits using this algorithm on FXCM's platform. Dittami completed the new algorithmic trading system in early 2010.

8.      Leading up to FXCM's initial public offering in 2010, FXCM's compliance department recognized that this trading algorithm directly contravened FXCM's "conflict-free" agency model. In light of these concerns, FXCM was forced to restructure its relationship with Dittami. Together with Dittami, FXCM created Effex as a separate stand-alone company to operate the new algorithmic trading system in order to conceal FXCM's economic interest in Effex from customers, regulators and investors.

9.      FXCM incorporated and funded Effex and installed Dittami at the helm, but continued to own the trading system, finance the business, and most importantly, maintain its 70% interest in Effex's trading profits through thinly-veiled contractual arrangements.  Effex even operated out of FXCM's offices rent-free for the first year of its existence and had two FXCM employees dedicated to working for Effex.

10.     Contrary to its public statements, FXCM manipulated its NDD platform by putting Effex in front of independent market makers in routing retail customer orders while also permitting Effex to win all "ties" with other market makers.  FXCM provided Effex with a real-time view of price quotations offered by other market makers, and added smaller markups to Effex prices than to prices provided by other market makers.  This way FXCM ensured that the bulk of its order flow would go to Effex and generate profits for FXCM.

11.     This undisclosed arrangement was very lucrative for FXCM, as FXCM earned 70% of Effex's trading profits.  Effex's payments to FXCM were disguised as "order flow" payments, which no other market maker was making to FXCM.  These kickbacks amounted to nearly $80 million between 2010 and 2014.

12.     During the Class Period, FXCM's quarterly and annual reports misrepresented that FXCM had no interest in the trades executed on its NDD platform and therefore there were no conflicts of interest between FXCM and its customers who traded on the NDD platform.

13.     FXCM's financial statements violated SEC regulations and Generally Accepted Accounting Principles ("GAAP") for failing to disclose FXCM's economic interest in, contractual and related party relationship with, and control over, Effex during the Class Period. Given that FXCM was entitled to 70% of Effex's profits, FXCM was required to (but did not) consolidate Effex's operations as a variable interest entity.  Alternatively, even if Effex were not required to be consolidated, it was still a related party to FXCM and therefore, FXCM was required to (but did not) disclose the related party nature of the business relationship and the amount of profits FXCM was earning from Effex.

14.     As a result of FXCM's failure to properly account for its arrangements with Effex, all of FXCM's financial statements issued during the Class Period were false and misleading.

15.     FXCM knew it was under investigation by the CFTC and NFA as early as October 2014, when the CFTC sent FXCM a Request for Production seeking documents concerning Effex's relationship with FXCM. In 2015 FXCM received preservation notices from the CFTC and the NFA as to documents relating to Effex and Dittami, and their relationship with FXCM, noting the agencies' "ongoing" review. Later that year the CFTC issued a subpoena to Niv to testify and produce documents on the same subject, and FXCM executed a tolling agreement with the CFTC. FXCM failed to fully disclose these highly material investigations at any point during the Class Period, rendering certain of its SEC filings materially false and misleading.

16.     On February 6, 2017, the CFTC announced in a press release and accompanying Order that it had settled charges against FXCM and its two founders, Defendants Niv and Ahdout.  The CFTC found that FXCM engaged in false and misleading solicitations of its retail foreign exchange ("forex") customers by concealing FXCM's relationship with its most important market maker, by misrepresenting that its NDD platform had no conflicts of interest with its customers, and by, essentially, cheating customers through dishonest trade execution. The Settlement imposed a civil penalty of $7 million and banned the Company from operating in the U.S.

17.     This announcement shocked the market and caused the price of FXCM's securities to lose more than half of their value, damaging FXCM investors.

## JURISDICTION AND VENUE

18.     The claims asserted herein arise under and pursuant to Sections 10(b) and 20(a) of the Exchange Act (15 U.S.C. §§ 78j(b) and 78t(a)) and Rule 10b-5 promulgated thereunder (17 C.F.R. § 240.10b-5).

19.     This Court has jurisdiction over the subject matter of this action pursuant to Section 27 of the Exchange Act (15 U.S.C. § 78aa) and 28 U.S.C. § 1331.

20.     Venue is proper in this judicial district pursuant to Section 27 of the Exchange Act (15 U.S.C. § 78aa) and 28 U.S.C. § 1391(b) as Defendants conduct business in this judicial district and the Company is headquartered in this judicial district.

21.     In connection with the acts, conduct and other wrongs alleged herein, Defendants either directly or indirectly used the means and instrumentalities of interstate commerce, including but not limited to the United States mails, interstate telephone communications, and the facilities of the national securities exchange.

## PARTIES

22.     Lead Plaintiffs 683 Capital Partners, LP and Shipco Transport Inc. purchased FXCM securities at artificially inflated prices during the Class Period and were damaged upon the revelation of the alleged corrective disclosures as set forth in their PSLRA certifications previously filed with the Court that are incorporated by reference herein.

23.     Named Plaintiffs E-Global Trade and Finance Group, Inc., Sergey Regukh, and Brian Armstrong, purchased FXCM securities at artificially inflated prices during the Class Period and were damaged upon the revelation of the alleged corrective disclosures as set forth in their PSLRA certifications previously filed with the Court and incorporated by reference herein.

24.     Defendant Global Brokerage, Inc., formerly known at all relevant times as

FXCM, is a Delaware corporation headquartered in New York, New York, which provides online forex trading and related services to retail and institutional customers worldwide through its subsidiaries. FXCM is a holding company and its only material asset is a controlling interest in FXCM Holdings, LLC ("Holdings").

25.     FXCM's Class A common stock was traded on the New York Stock Exchange ("NYSE") under the ticker "FXCM" from the beginning of the Class Period through September 23, 2016.  Beginning September 26, 2016, the Company's securities traded on the NASDAQ under the symbol "FXCM" until February 27, 2017, when the Company changed its name to Global Brokerage, Inc. and adopted the ticker symbol "GLBR." On December 11, 2017, FXCM filed a Chapter 11 voluntary petition for bankruptcy and prepackaged plan of reorganization in the United States Bankruptcy Court, Southern District of New York. *Global Brokerage, Inc.*, No. 1:17-bk-13532 (Bankr. S.D.N.Y. Dec. 11, 2017). On January 22, 2018, the prepacked Chapter 11 plan was approved by the bankruptcy court with an effective date of February 8, 2018.

26.     Defendant Dror Niv was Chairman of the Board of Directors of FXCM since 2010, and served on the board of FXCM's predecessor, FXCM Holdings, since 1999. Mr. Niv was the Chief Executive Officer of FXCM since 1999 until his resignation after the Class Period and is one of the original founding partners of the firm.

27.     Defendant William Ahdout was a director of FXCM since 2010, and served on the board of Holdings since 1999. Mr. Ahdout was with FXCM since 1999, was its Chief Dealer and a Managing Director and was one of the original founding partners of the firm.

28.     FXCM went public in an initial public offering ("IPO") in December 2010.

29.     Prior to the IPO, Niv, Ahdout, David Sakhai and Eduard Yusupov ("Controlling Partners") owned FXCM's predecessor, Holdings.

30.    Through the IPO, Holdings became a subsidiary of FXCM. FXCM owned Holdings, which in turn owned all of FXCM's operating subsidiaries, including FXCM's U.S. subsidiary.

31.    Immediately following the IPO and thereafter, the Controlling Partners owned and controlled the equity of FXCM in the following proportions:

|  | # Shares as of 1/1/2011 | % of FXCM Shares as of 1/1/2011 | # Shares as of 4/15/2014 | % of FXCM Shares as of 4/15/2014 |
|---|---|---|---|---|
| Niv | 8,894,900 | 11.80% | 8,752,686 | 10.70% |
| Ahdout | 5,690,685 | 7.60% | 2,959,119 | 3.60% |
| Sakhai | 6,013,990 | 8.0% | 5,917,649 | 7.30% |
| Yusupov | 7,898,971 | 10.50% | 4,933,356 | 6.10% |
| Total | 28,498,546 | 37.9% | 22,562,810 | 27.7% |

32.    Following the IPO, the Controlling Partners continued to own stakes in Holdings called "Holdings Units" which were convertible to Class A common shares on a one to one basis.[3] The Controlling Partners were also entitled to voting Class B shares of FXCM that allowed them voting rights on a one to one basis with Class A common shares based on the number of Holdings Units they owned. Thus, the Controlling Partners were able to exercise voting power at FXCM, the managing member of Holdings, at a level consistent with their overall equity ownership of FXCM.

33.    Defendant Robert Lande ("Lande") was the Company's Chief Financial Officer ("CFO") at all relevant times during the Class Period.

34.    Defendants Niv, Lande, and Ahdout are collectively referred to herein as the "Individual Defendants."

---

[3]   FXCM claimed that the Controlling Founders held their FXCM equity interests in Holdings for tax reasons - because it was not taxable as a corporation for United States federal income tax purposes.

35.     Collectively, Defendant FXCM and the Individual Defendants are herein referred to as "Defendants."

36.     Each of the Individual Defendants:

a.      directly participated in the management of the Company;

b.      was directly involved in the day-to-day operations of the Company at the highest levels;

c.      was privy to confidential proprietary information concerning the Company and its business and operations;

d.      was directly or indirectly involved in drafting, producing, reviewing and/or disseminating the false and misleading statements and information alleged herein;

e.      was directly or indirectly involved in the oversight or implementation of the Company's internal controls;

f.      was aware of or recklessly disregarded the fact that the false and misleading statements were being issued concerning the Company; and/or

g.      approved or ratified these statements in violation of the federal securities laws.

37.     FXCM is liable for the acts of the Individual Defendants and its employees under the doctrine of *respondeat superior* and common law principles of agency as all of the wrongful acts complained of herein were carried out within the scope of their employment with authorization.

38.     The scienter of the Individual Defendants and other employees and agents of the Company is similarly imputed to FXCM under *respondeat superior* and agency principles.

## SUBSTANTIVE ALLEGATIONS[4]

### Industry Background

39.     The forex market is the largest and most actively traded financial market in the world, with global forex trading averaging trillions of dollars per day.  Trading in the forex market is primarily done over-the-counter ("OTC") directly with a counterparty.

40.     Spot transactions are the exchange of one currency for another.  The forex market revolves around spot transactions because spot rates are the foundation for pricing all forex instruments.  In the forex market, these transactions occur OTC rather than through a central exchange. As a result, these transactions are reliant on a financial institution or "market maker," who provides liquidity to the market by acting as a dealer willing to continuously buy and sell currencies.

41.     Despite its size and importance, the forex market is one of the world's least regulated financial markets as most transactions occur OTC, away from regulation and scrutiny by the exchanges.  Thus the reputation of the market participants is extremely material to investors.  There is also no centralized exchange or institution that collects and posts real-time trade information for the OTC market.  Instead, these transactions occur on proprietary dealing platforms that match market makers with buyers, with real-time order flow and data often closely guarded. This substantially limits knowledge of traders' conduct inside these dealing platforms or information among the market makers themselves as to each other's doings.

---

[4] The substantive allegations are drawn from, among other things, the Company's periodic reports filed with the SEC, its public statements, the CFTC Order, the NFA Complaint, documents received in response to a Freedom of Information Act request to the CFTC, information available on the internet and witness identified herein.

**The Company**

42.     FXCM, founded in 1999, recently described itself in the Company's 2016 10-K (defined below) as "an online provider of foreign exchange ("FX") trading and related services," that offers its customers access to OTC forex markets and a "proprietary technology platform." . As of December 31, 2016, FXCM had over 178,000 active retail customer accounts globally. *Id.*

43.     Until approximately 2007, FXCM provided liquidity to its retail forex customers primarily through an internal "dealing desk" - a division of FXCM that determined the prices offered to customers and held positions opposite customers.

44.      In or around 2007, FXCM transitioned from using a dealing desk to what it termed an "agency" model for most of its retail forex customers, which it described to customers as providing NDD forex trading.

45.     Whereas a dealing desk broker acts as a market maker and may be trading against the customer's position, FXCM touted that its agency model eliminated that conflict of interest. In FXCM's agency model, price quotations were provided not by FXCM's internal dealing desk, but by banks and other third-party market makers.  FXCM was merely acting as a credit intermediary who simultaneously entered into offsetting trades with both the customer and the market maker.

46.     FXCM purportedly made money from its NDD platform through the bid/ask spread, adding a small markup to the bid/ask quotes received from its customers and liquidity providers and keeping that amount for itself as a fee for executing the offsetting transactions.

47.     Under this agency execution model, FXCM supposedly gave its retail clients access to buy and sell prices streamed directly from over a dozen liquidity providers anonymously, so that its retail clients' orders were invisible to these price providers.  The

Company touted this model as a trading environment free of price manipulation and conflicts of interest, a highly appealing platform for OTC forex trading.

48.     This agency model was the centerpiece of FXCM's trading platform and marketing efforts.

## FXCM Creates Its Own, Secret Market Maker; Reaps Millions

49.     In 2009, Defendants Niv, Ahdout and others at FXCM devised a plan to take advantage of FXCM's NDD clients through the use of a high frequency trading algorithm.  This algorithm would completely replace or supplant many of the independent market makers on the NDD platform and allow FXCM to cash in twice on its customers (first from its mark-ups, then from its kickback) while providing a purportedly conflict-free trading platform.

50.     To this end, Niv and Ahdout hired a high-frequency trader, Dittami, for a Managing Director position at the Company in October 2009.  Dittami was hired to create a new algorithmic trading system. FXCM gave Dittami an employment contract promising him 30% of any profits generated by the new algorithmic trading system.  In early 2010, Dittami used the startup capital provided by FXCM (approximately $2-3 million) to hire a company called First Derivatives to construct the trading algorithm.

51.     Under Dittami's employment agreement, FXCM paid Dittami a base salary plus 30 percent of trading profits generated by the trading algorithm.  FXCM would keep the remaining 70 percent of trading profits.

52.     In early 2010, Dittami was finalizing the trading algorithm as the Company was gearing up for its initial public offering.  FXCM's compliance department voiced concerns that trading against FXCM's retail customers would contradict FXCM's marketing statements about its NDD model, which was supposedly free of precisely such conflicts of interest.

53.     In response, FXCM restructured its relationship with Dittami to disguise this glaring conflict of interest. It spun off Dittami's trading system as an "external" or "independent" market maker for FXCM, solely for the purpose of falsely creating the appearance of an independent entity that was not owned or controlled by FXCM.  On March 23, 2010 the new company, Effex, was created under the direction of Niv and FXCM.

54.     To further create the false impression of separation, Dittami "resigned" from FXCM on April 14, 2010, but Dittami and FXCM agreed that his resignation would not change their economic relationship, including FXCM retaining 70% of Dittami's (now Effex's) algorithmic trading profits.  FXCM also continued to own the intellectual property rights to the algorithmic trading platform's software.

55.     As part of the scheme, Effex entered so-called services agreements with FXCM by which Effex would make monthly payments to FXCM of $21 per million dollars of trading volume executed by Effex.  Dittami and FXCM management estimated that Effex could make about $30 per $1 million notional traded on the FXCM platform. $21 per million dollars of trading volume roughly corresponded to the 70-30 split in the initial pre-IPO agreement between FXCM and Dittami. Thus FXCM intended this amount to approximate 70 percent of Effex's profits from trading on FXCM's retail forex platform against FXCM's retail customers.  No such agreements were entered into with FXCM and any of it independent market makers.

### FXCM's Control of and Material Interest in Effex

56.     In conjunction with Effex's formation, FXCM funded Effex with a $2 million interest-free loan and allowed Effex to use FXCM's prime brokerage relationship with Citi. Effex lacked the capital to post the necessary collateral with Citi for its own prime brokerage account, and this arrangement remained in place until Effex made enough capital to establish its

own prime brokerage account.  Thus, without FXCM's funding and permission to use FXCM's prime brokerage, Effex could not operate.

57.     When Dittami "resigned" from FXCM and "moved" to Effex, he continued working from FXCM's offices rent-free.  In fact, Effex operated from FXCM's offices in New York for a full year after Dittami's resignation from FXCM. As scrutiny surrounding FXCM's NDD trading platform increased, Effex moved into a windowless office at FXCM, out of way of traffic from the trading floor and strategically located to hide Effex's operations from regulators. Eventually, Effex moved off-site to hide the fact that its operations were jointly run with FXCM.

58.     Effex used FXCM's trading algorithm – created for FXCM by Dittami when he worked for the Company – to conduct its trading. For a period of time Effex even used FXCM's servers and email systems. Effex maintained access to the same server as FXCM, so all trading information that passed through FXCM also passed through Effex. This meant Effex could see in real time which market makers or retail investors were bidding or offering on FXCM's platform, at what price and amounts. Effex personnel were even given access to FXCM on-site computers through a virtual private network.

59.     Internally at FXCM, Effex was considered part of the trading operation. From 2010 to at least 2014, FXCM gave bonuses, reimbursed by Effex, to two FXCM employees who assisted Effex on account of their work for the purportedly "independent" market maker.  From 2010 to 2014, one of the employees spent approximately 80 percent of the work week at Effex's offices. In short, Effex was no more than a hidden subsidiary of FXCM.

60.     None of FXCM's market makers were provided such funding, employees, office space, access and favorable treatment set forth in ¶¶ 56-59, above.

61.     To further create the false impression of an independent entity, FXCM and Effex entered into a services agreement, whereby FXCM sent Effex monthly invoices for "order flow," which were to be paid by Effex to FXCM Holdings, a holding company owned by FXCM which in turn owned FXCM's U.S. subsidiary. Through August 2011, Effex paid $21 per million notional volume transacted by Effex on the FXCM retail forex platform.  These payments were adjusted to $16 per million from September 2011 through July 2014 due to tightening spreads in the forex market that reduced Effex's profits.  This reduction was intended to compensate for Effex's lower profitability and to maintain the agreed upon 70% / 30% division of profits between FXCM and Effex.

62.     From 2010 through the end of the Class Period, no market maker besides Effex paid FXCM for "order flow."  In truth, these payments were not order flow payments, but rather pre-negotiated kickbacks of FXCM's cut of profits generated by Effex from trading against FXCM's retail customers on the NDD platform.

63.     FXCM even viewed Effex's trading profits and losses ("P&L") as its own, less Effex's 30 percent share—just as it did when FXCM employed Dittami and split his trading profits 70/30. Indeed, FXCM calculated its monthly preliminary P&L statement, in part, by taking Effex's monthly P&L and simply subtracting 30 percent.  For a period of time following its formation, Effex reported its P&L to FXCM on a weekly basis.  As CFO, Lande was well aware of this method of calculation.  Lande was also aware that the invoices FXCM sent Effex seeking its 70% share of Effex's profits described the amounts billed as "P&L."

64.     FXCM directed Effex to remit these payments to FXCM Holdings rather than FXCM's U.S. subsidiary. FXCM Holdings was not a member of the NFA, so these payments were an effort by FXCM to avoid the NFA's scrutiny over these dealings.  These unusual

payments to FXCM Holdings, totaling approximately $77 million, would have raised a red flag for Lande as CFO.

65.     In exchange for these payments from Effex, FXCM agreed that it would favor Effex over other market makers in routing retail customer orders.  FXCM permitted Effex to win all "ties" with other market makers; provided Effex with a real-time view of price quotations offered by other market makers; and added smaller markups to Effex's prices than to prices provided by other market makers.  This gave Effex a significant leg up on the truly external and independent market makers trading on FXCM's platform.

66.     In addition to favoring Effex over other market makers, FXCM allowed Effex to use a hold timer that enabled Effex to execute a trade at the start or end of a hold timer period, whichever was better for Effex.  This asymmetrical price slippage practice deprived FXCM's customers of positive price improvements while giving customers negative price slippage, all to the benefit of Effex.

67.     Effex also used a "previous quote" practice whereby Effex submitted a quote to FXCM and FXCM would respond with an execution request based on the trading limits contained in a customer limit order, not the previous quote provided by FXCM.  This way Effex was using FXCM's inside knowledge of a customer's least favorable acceptable trade quote to ensure that it was getting the most favorable end of the bargain.

68.     As a consequence of this special, secret relationship between FXCM and Effex, the profitability of other market makers is reduced through unfair competition and liquidity is reduced on the FXCM platform. This harms retail customers directly, and the concentration of revenue from one market maker was not disclosed to shareholders or investors.

69.     On the same day Dittami "resigned" from FXCM, his trading algorithm was used in a "full-scale trading session" for the very first time. Based on the trading that day, FXCM anticipated that Effex would capture approximately 25-30% of overall trade volume on FXCM's NDD Platform – well above the market share Effex would have expected to capture in any other forex market.

70.     Not surprisingly, Effex routinely captured over 50% of FXCM's daily order flow and, at one time, captured nearly 80%. FXCM management considered this number too high to provide the illusion of a legitimate market, so FXCM directed Effex to limit itself to only 45-50% of the trading volume on FXCM's platform. All told, from 2010 through 2014 Effex rebated to FXCM nearly $80 million of Effex's trading revenue through its monthly payments to FXCM.

71.     The bulk of Effex's revenues were earned in transactions through FXCM. However, Effex was only able to profitably transact with other ECN's because of the pricing and order information that FXCM secretly provided to Effex.  Thus, Effex was wholly dependent on FXCM.

72.     Additionally, according to a former employee who worked in FXCM's headquarters in New York as a Client Relationship Manager from May 2014 to June 2015, and before that as Operations Associate from June 2009 to May 2014, "Niv, Ahdout, to a lesser extent, CFO Robert Lande had control over Effex Capital."

73.     Upon information and belief, FXCM maintained its relationship with Effex into 2017. The CFTC Order indicates that the secret relationship lasted "through at least 2014." FXCM stated that it stopped receiving payments for order flow as of August 1, 2014, but that date is irrelevant because (1) FXCM never received order flow payments from any market

makers; (2) the payments from Effex were not order flow payments but rather disguised profit-sharing payments; and (3) FXCM listed Effex on its website as a liquidity provider as late as January 2017 – indicating that the relationship had been maintained beyond 2014 even if the sham "order flow" payments had ceased by that point. In light of these facts, Plaintiffs believe that evidence showing the extent of FXCM's relationship with Effex after 2014 exists but is uniquely within Defendants possession.

### Regulators Investigate and Take Action; FXCM Securities Prices Tank

74.     On or about October 15, 2014, the CFTC sent FXCM a Request for Production of Documents seeking documents and information concerning "Effex's business and/or financial relationship with FXCM, including, but not limited to, Effex's relationship as a liquidity provider to FXCM."

75.     On or about February 19, 2015, the NFA send a letter to FXCM ("NFA Preservation Notice") instructing the Company to preserve all documents concerning Effex, Dittami or related entities. The letter noted, "[a]s you know, NFA has been conducting a review of FXCM's relationship with Effex and John Dittami" and that "the review is ongoing."

76.     On or about July 2, 2015, the CFTC sent a letter to FXCM ("CFTC Preservation Notice") instructing the Company to preserve documents "relating to Effex, the creation of Effex, Effex's operation, and/or financial relationship with FXCM, and Effex's role as a liquidity provider and/or market maker to FXCM."

77.     On or about August 13, 2015, the CFTC issued a subpoena to Niv to testify and produce documents in the matter of "Retail Forex Fraud." The subpoena sought, among other things, documents concerning FXCM's business and/or financial relationship with Effex, including, but not limited to, Effex's relationship as a liquidity provider to FXCM."

78.     On or about September 18, 2015, FXCM executed a tolling agreement with the CFTC Division of Enforcement ("CFTC Tolling Agreement"). The agreement stated that "the Division has notified FXCM, through its counsel that the Division is conducting an investigation to determine whether there have been violations of certain provisions of the Commodity Exchange Act and/or Commodity Futures Trading Commission Regulations."

79.     On February 6, 2017, the CFTC announced that it banned the Company from operating in the U.S. after finding that FXCM was taking undisclosed positions opposite its retail customers, stating in part:

RELEASE: pr7528-17

February 6, 2017

**CFTC Orders Forex Capital Markets, LLC (FXCM), Its Parent Company, FXCM Holdings, LLC and FXCM's Founding Partners, Dror Niv and William Ahdout, to Pay a $7 Million Penalty for FXCM's Defrauding of Retail Forex Customers**

**FXCM, Niv, and Ahdout are Prohibited from Registering with the CFTC, Acting in Exempt Capacities or Acting as Principals, Agents, Officers or Employees of Registrants**

**CFTC's Order also holds FXCM, Niv, and FXCM Holdings responsible for FXCM's False Statements to the National Futures Association**

Washington, DC – The U.S. Commodity Futures Trading Commission (CFTC) today issued an Order filing and settling charges against **Forex Capital Markets, LLC (FXCM)** , its parent company, **FXCM Holdings, LLC** (FXCM Holdings), and two founding partners, **Dror ("Drew") Niv**, and **William Ahdout**, who were, respectively, Chief Executive Officer of FXCM and Managing Director of FXCM, (collectively, Respondents). FXCM's principal place of business is New York, New York; Niv resides in Connecticut; and Ahdout resides in New York.

*The CFTC Order finds that, between September 4, 2009 though at least 2014 (the Relevant Period), FXCM engaged in false and misleading solicitations of FXCM's retail foreign exchange (forex) customers by concealing its relationship with its most important market maker and by misrepresenting that its "No Dealing Desk" platform had no conflicts of interest with its customers. The Order finds FXCM, FXCM Holdings, and Niv responsible for FXCM*

*making false statements to the National Futures Association (NFA) about its relationship with the market maker.*

The Order requires Respondents jointly and severally to pay a $7 million civil monetary penalty and to cease and desist from further violations of the Commodity Exchange Act and CFTC Regulations, as charged. FXCM, Niv, and Ahdout agree to withdraw from CFTC registration; never to seek to register with the CFTC; and never to act in any capacity requiring registration or exemption from registration, or act as a principal, agent, officer, or employee of any person that is registered, required to be registered, or exempted from registration with the CFTC.

**"The CFTC Is Committed to Protecting Customers from Harm in the Markets It Regulates"**

"Full and truthful disclosure to customers and honest discourse with self-regulatory organizations such as NFA are vital to the integrity and oversight of our markets," said Gretchen L. Lowe, Principal Deputy Director and Chief Counsel of the CFTC's Division of Enforcement. "Today's action's demonstrates that the CFTC is committed to protecting customers from harm in the markets it regulates."

FXCM is registered with the CFTC as a Futures Commission Merchant and Retail Foreign Exchange Dealer. FXCM has been providing retail customers with access to over-the-counter forex markets through a proprietary technology platform and has acted as counterparty in transactions with its retail customers in which customers can buy one currency and simultaneously sell another. Both Niv and Ahdout were CFTC registrants during the relevant period.

FXCM, under Niv's and Ahdout's direction and control, misrepresented to its retail forex customers that when they traded forex on FXCM's No Dealing Desk platform, FXCM would have no conflict of interest, the Order finds. In addition, according to FXCM's marketing campaign, retail customers' profits or losses would have no impact on FXCM's bottom line, because FXCM's role in the customers' trades was merely that of a credit intermediary, the Order finds. FXCM further represented that the risk would be borne by banks and other independent "market makers" that provided liquidity to the platform, according to the Order.

**FXCM's Undisclosed Interest**

*Contrary to these representations, the Order finds, FXCM had an undisclosed interest in the market maker that consistently "won" the largest share of FXCM's trading volume – and thus was taking positions opposite FXCM's retail customers.* FXCM, the Order finds, formulated a plan in 2009 to create an algorithmic trading system, using an FXCM computer program that could make

markets to FXCM's customers, and thereby either replace or compete with the independent market makers on FXCM's "No Dealing Desk" platform. Although FXCM eventually spun off the algorithmic trading system as a new company, in actuality the company remained closely aligned with FXCM, according to the Order. This market maker received special trading privileges, benefitted from a no-interest loan provided by FXCM, worked out of FXCM's offices, and used FXCM employees to conduct its business, the Order further finds.

The Order finds that FXCM and the market maker agreed that the market maker would rebate to FXCM approximately 70 percent of its revenue from trading on FXCM's retail forex platform. In total, through monthly payments from 2010 through 2014, the company rebated to FXCM approximately $77 million of the revenue it achieved. However, FXCM did not disclose to customers, among other things, that this company – FXCM's principal market maker – was a startup firm spun off from FXCM, the Order further finds.

**False Statements to the NFA**

***The Order also finds that FXCM willfully made false statements to NFA in order to conceal FXCM's role in the creation of its principal market maker as well as the fact that the market maker's owner had been an FXCM employee and managing director. The Order finds that during a meeting between NFA compliance staff and FXCM executives, Niv omitted to mention to NFA the details of FXCM's relationship with the market maker.***

***The Order holds Niv and Ahdout liable for FXCM's fraud violations as "controlling persons" who were responsible, directly or indirectly, for FXCM's violations. Niv is also held liable for FXCM's false statements to NFA as a controlling person who was responsible directly or indirectly for those violations. FXCM Holdings is held liable for FXCM's fraud and false statement violations as principal of FXCM, the Order also finds.***

The CFTC thanks NFA for its assistance in this matter.

CFTC Division of Enforcement staff members responsible for this action are Christopher Giglio, Patrick Daly, David C. Newman, Xavier Romeu-Matta, K. Brent Tomer, Lenel Hickson, Jr., and Manal M. Sultan.

Media Contact
Dennis Holden
202-418-5088

(Emphasis added).

21

80.     On the same day, the NFA's Business Conduct Committee issued a complaint (Exhibit 2) and entered an order against FXCM, Niv, Ahdout, and Niv's sister, Ornit Niv.  The Business Conduct Committee made factual findings that the Defendants committed the violations alleged in the complaint, including that FXCM's NDD execution model was corrupted by the Company's control and relationship with Effex, and ordered that FXCM and the individual defendants be withdrawn from NFA membership and forever barred from reapplying.

81.     The Company also issued a press release on February 6, 2017, disclosing the settlements with the NFA and CFTC and announcing that the Company would withdraw from doing business in the U.S., pursuant to the CFTC's order, and sell its U.S. customer accounts to GAIN Capital Holdings, Inc. ("GAIN").

82.     On this news, shares of the Company fell $3.40 per share or over 49% from its previously closing price to close at $3.45 per share on February 7, 2017.

83.     Likewise the price of FXCM Notes fell 37% on February 7, 2017 from a previous closing price of $43.698 to close at $27.241 on February 7, 2017.

84.     FXCM entered into an Asset Purchase Agreement with GAIN for FXCM's U.S. accounts on February 7, 2017.  The asset sale was completed on February 24, 2017.

85.     On February 21, 2017, Defendant Niv resigned as CEO and from the FXCM board of directors.  That same day, FXCM announced its name change to Global Brokerage Inc., effective February 27, 2017.

**Defendants Lie to Regulators to Cover Up Their Scheme With Effex**

86.     As a part of FXCM's ongoing efforts to obscure and conceal its relationship with Effex, FXCM misled regulators from the NFA. Efforts to cover up wrongdoing are strong evidence of scienter.

87.     In connection with the NFA's 2013 examination of FXCM, NFA compliance staff met with FXCM executives on October 24, 2013. In response to the NFA's questions about FXCM's relationship with Effex, Niv failed to disclose any of the details described above concerning FXCM's relationship with Effex and Dittami. Niv also misrepresented that he had a prior working relationship with Dittami arising from when Dittami was employed by other liquidity providers.

88.     Members of FXCM's compliance department also made a series of misstatements to the NFA. On October 22, 2013, an FXCM compliance officer told the NFA in an email: "FXCM LLC does not have any direct or indirect ownership, interest, or affiliation with entities that provide liquidity to retail clients...." This statement was false because FXCM had an undisclosed interest in Effex, one of its market makers, receiving, among other things, approximately 70% of Effex's profits.

89.     After the NFA sought clarification of this statement, another FXCM compliance officer stated in a March 24, 2014 email: "To my knowledge, there are no present or past owners, principals, APs, or employees of affiliates of FXCM LLC that have direct or indirect ownership, interest, or affiliation with entities that provide liquidity to retail clients on our No Dealing Desk Model." This statement was false because, again, FXCM had an undisclosed interest in Effex, who was one of its market makers for clients on FXCM's NDD platform.

90.     On April 4, 2014, in response to further attempts by the NFA to clarify the FXCM-Effex relationship, Janelle Lester, FXCM's Chief Compliance Officer, stated in an email that Dittami served as a consultant for FXCM from October 2009 through April 2010, working primarily on software coding—in an attempt to downplay Dittami in connection with NFA's

inquiry into FXCM's relationship with Effex.  In truth, Dittami was employed by FXCM and maintained his financial relationship with FXCM through the sham agreement with Effex.

91.     Niv also participated in and approved of FXCM's false responses to the NFA's investigation.

92.     As the CFTC noted, "FXCM personnel had full knowledge of the representations that the firm was making to its customers about the No Dealing Desk model, as well as the facts about [Dittami] and [Effex]'s relationship with FXCM."

### The Individual Defendants Knew of, and Directed, the Fraudulent Scheme

93.     In 2009, Niv and Ahdout, along with others at FXCM, devised the plan to develop a high-frequency trading algorithm to secretly trade against FXCM's retail customers on FXCM's purportedly conflict-free platform.

94.     In furtherance of their plan, Niv and Ahdout hired Dittami to a Managing Director position at the Company in October 2009.  Niv and Ahdout tasked Dittami with developing the new algorithmic trading system, promising Dittami 30% of any profits generated by the trading system he would create for FXCM (on top of a base salary).  The Company also provided Dittami with $2-3 million in startup capital, which Dittami used to outsource construction of the trading algorithm.

95.     In early 2010, as the Company prepared for its initial public offering, FXCM's compliance department voiced concerns over trading against FXCM's retail customers, as this conflict would contravene FXCM's NDD model.

96.     In response, Niv restructured FXCM's relationship with Dittami by spinning off Dittami's trading system as an "independent" market maker. On March 23, 2010, Niv helped oversee the creation of the new company, Effex.

97.     Dittami "resigned" from FXCM on April 14, 2010, but Niv and Dittami crafted so-called services agreements by which Effex would make monthly payments to FXCM calculated to approximate the same 70-30 split from Dittami's FXCM employment agreement. Under these services agreements Effex would remit payments to FXCM disguised as "order flow." These payments were a complete sham as they were intended merely to approximate Effex's profits and losses from trading against FXCM customers on FXCM's platform, and no other market makers ever paid FXCM for order flow.

98.     Under Niv's direction, FXCM allowed Effex to use FXCM's prime brokerage relationship with Citi, which Effex could not attain on its own. After being spun off as a "separate" entity, Effex still operated from FXCM's offices in New York for a full year after Dittami's resignation from FXCM. For a period of time Effex even used FXCM's servers and email systems, and two FXCM employees spent significant portions of their time assisting Effex. All of these benefits were unique to Effex among FXCM's market makers.

99.     For a period of time, Effex reported its P&L directly to FXCM.  Part of FXCM's monthly preliminary P&L statement would take Effex's monthly P&L and simply subtract 30 percent.  As CFO, Lande was well aware of this method of calculation, and that the invoices FXCM sent Effex described the amounts billed as "P&L." Furthermore, on FXCM's direction, Effex made these payments to FXCM Holdings (who was not regulated by the NFA) rather than FXCM's U.S. subsidiary in order to avoid the NFA's scrutiny.  These highly unusual payments would have raised a red flag for Lande as CFO.

100.    Given all the unique advantages FXCM afforded Effex, Effex dominated FXCM's daily order flow to the point that it captured nearly 80% of it. FXCM's management, including Niv, knew that number was too high to maintain the intended illusion that Effex was a

legitimate market maker, so they directed Effex to limit itself to only half of the order flow to avoid raising suspicions.

101.    Defendants' knowledge and involvement with the fraudulent scheme is also evidenced by their efforts to cover it up. In October 2013, the NFA met with FXCM executives in connection with the NFA's 2013 examination of FXCM's relationship with Effex. Answering questions at this meeting, Niv entirely failed to disclose the true nature of FXCM's relationship with Effex and Dittami.

102.    Niv also participated in and approved of FXCM's false responses to the NFA's investigation, including a series of misstatements FXCM employees told to the NFA. These false statements concealed FXCM's undisclosed interest in Effex, muddied the NFA's attempts to clarify the FXCM-Effex relationship, and downplayed Dittami's role with FXCM and Effex.

### DEFENDANTS' MATERIALLY FALSE AND MISLEADING STATEMENTS MADE TO INVESTORS DURING THE CLASS PERIOD

#### Defendants' False and Misleading Class Period SEC Filings

103.    The following periodic reports filed with the SEC by FXCM during the Class Period contained materially false and misleading statements. The reasons why each of these statements were false and misleading are explained in the subsequent sections.

104.    The Class Period Begins on March 15, 2012, when the Company filed an annual report on Form 10-K with the SEC announcing the Company's financial and operating results for the fiscal year ended December 31, 2011 (the "2011 10-K").  Defendants Niv, Ahdout, and Lande signed the 2011 10-K.

105.    On May 10, 2012, the Company filed a quarterly report on Form 10-Q with the SEC announcing the Company's financial and operating results for the quarter ended March 31, 2012 (the "12Q1 10-Q").  Defendants Niv and Lande signed the 12Q1 10-Q.

106.     On August 9, 2012, the Company filed a quarterly report on Form 10-Q with the SEC announcing the Company's financial and operating results for the quarter ended June 30, 2012 (the "12Q2 10-Q").  Defendants Niv and Lande signed the 12Q2 10-Q.

107.     On November 9, 2012, the Company filed a quarterly report on Form 10-Q with the SEC announcing the Company's financial and operating results for the quarter ended September 30, 2012 (the "12Q3 10-Q").  Defendants Niv and Lande signed the 12Q3 10-Q.

108.     On March 18, 2013, the Company filed an annual report on Form 10-K with the SEC announcing the Company's financial and operating results for the fiscal year ended December 31, 2012 (the "2012 10-K"). Defendants Niv, Ahdout, and Lande signed the 2012 10-K.

109.     On May 10, 2013, the Company filed a quarterly report on Form 10-Q with the SEC announcing the Company's financial and operating results for the quarter ended March 31, 2013 (the "13Q1 10-Q").  Defendants Niv and Lande signed the 13Q1 10-Q.

110.     On August 8, 2013, the Company filed a quarterly report on Form 10-Q with the SEC announcing the Company's financial and operating results for the quarter ended June 30, 2013 (the "13Q2 10-Q").  Defendants Niv and Lande signed the 13Q2 10-Q.

111.     On November 12, 2013, the Company filed a quarterly report on Form 10-Q with the SEC announcing the Company's financial and operating results for the quarter ended September 30, 2013 (the "13Q3 10-Q").  Defendants Niv and Lande signed the 13Q3 10-Q.

112.     On March 17, 2014, the Company filed an annual report on Form 10-K with the SEC announcing the Company's financial and operating results for the fiscal year ended December 31, 2013 (the "2013 10-K"). Defendants Niv, Ahdout, and Lande signed the 2013 10-K.

113.    On May 12, 2014, the Company filed a quarterly report on Form 10-Q with the SEC announcing the Company's financial and operating results for the quarter ended March 31, 2014 (the "14Q1 10-Q").  Defendants Niv and Lande signed the 14Q1 10-Q.

114.    On August 8, 2014, the Company filed a quarterly report on Form 10-Q with the SEC announcing the Company's financial and operating results for the quarter ended June 30, 2014 (the "14Q2 10-Q").  Defendants Niv and Lande signed the 14Q2 10-Q.

115.    On November 7, 2014, the Company filed a quarterly report on Form 10-Q with the SEC announcing the Company's financial and operating results for the quarter ended September 30, 2014 (the "14Q3 10-Q").  Defendants Niv and Lande signed the 14Q3 10-Q.

116.    On March 16, 2015, the Company filed an annual report on Form 10-K with the SEC announcing the Company's financial and operating results for the fiscal year ended December 31, 2012 (the "2014 10-K"). Defendants Niv, Ahdout, and Lande signed the 2014 10-K.

117.    On May 11, 2015, the Company filed a quarterly report on Form 10-Q with the SEC announcing the Company's financial and operating results for the quarter ended March 31,2015 (the "15Q1 10-Q"). Defendants Niv and Lande signed the 15Q1 10-Q.

118.    On August 7, 2015, the Company filed a quarterly report on Form 10-Q with the SEC announcing the Company's financial and operating results for the quarter ended June 30, 2015 (the "15Q2 10-Q"). Defendants Niv and Lande signed the 15Q2 10-Q.

119.    On November 6, 2015, the Company filed a quarterly report on Form 10-Q with the SEC announcing the Company's financial and operating results for the quarter ended September 30, 2015 (the "15Q3 10-Q"). Defendants Niv and Lande signed the 15Q3 10-Q.

120.    On March 11, 2016, the Company filed an annual report on Form 10-K with the SEC announcing the Company's financial and operating results for the fiscal year ended December 31, 2015 (the "2015 10-K"). Defendants Niv, Ahdout, and Lande signed the 2015 10-K.

121.    On May 6, 2016, the Company filed a quarterly report on Form 10-Q with the SEC announcing the Company's financial and operating results for the quarter ended March 31, 2016 (the "16Q1 10-Q").  Defendants Niv and Lande signed the 16Q1 10-Q.

122.    On August 5, 2016, the Company filed a quarterly report on Form 10-Q with the SEC announcing the Company's financial and operating results for the quarter ended June 30, 2016 (the "16Q2 10-Q").  Defendants Niv and Lande signed the 16Q2 10-Q.

123.    On November 8, 2016, the Company filed a quarterly report on Form 10-Q with the SEC announcing the Company's financial and operating results for the quarter ended September 30, 2016 (the "16Q3 10-Q").  Defendants Niv and Lande signed the 16Q3 10-Q.

124.    On November 18, 2016, the Company filed an amended quarterly report on Form 10-Q/A with the SEC amending the Company's financial and operating results for the quarter ended September 30, 2016.  Defendants Niv and Lande signed the 16Q3 10-Q/A.

**Defendants Made False and Misleading Statements and Violated GAAP by Failing to Consolidate and Disclose the Nature of its Relationship with Effex, or Failing to Disclose Material Related Party Transactions**

125.    GAAP constitute those standards recognized by the accounting profession as the conventions, rules, and procedures necessary to define accepted accounting practices at a particular time.

126.    GAAP are the common set of accounting principles, standards, and procedures that companies in the United States use to compile their financial statements.

127.    The SEC has the statutory authority for the promulgation of GAAP for public companies and has delegated that authority to the Financial Accounting Standards Board (the "FASB").

128.    SEC, NYSE, and NASDAQ rules and regulations require that publicly traded companies such as FXCM include financial statements that comply with GAAP in their annual and quarterly reports filed with the SEC. *See* Section 13 of the Exchange Act; SEC Rule 10-01(d) of Regulation S-X ("Reg. S-X").

129.    SEC Rule 4-01(a) of Reg. S-X states that "[f]inancial statements filed with the Commission which are not prepared in accordance with generally accepted accounting principles will be presumed to be misleading or inaccurate." 17 C.F.R. § 210.4-01(a)(1) (emphasis added).

130.    Management retains responsibility for preparing financial statements that conform with GAAP. The American Institute of Certified Public Accountants ("AICPA") Professional Standards provide:

> The financial statements are management's responsibility . . . Management is responsible for adopting sound accounting policies and for establishing and maintaining internal controls that will, among other things, record, process, summarize, and report transactions (as well as events and conditions) consistent with management's assertions embodied in the financial statements. The entity's transactions and the related assets, liabilities, and equity are within the direct knowledge and control of management. . . . Thus, the fair presentation of financial statements in conformity with generally accepted accounting principles is an implicit and integral part of management's responsibility.

AIPCA, Professional Standards, vol. 1, AU § 110.02 (1998).

### Defendants Made False and Misleading Statements and Violated GAAP Because FXCM Failed to Disclose Effex as a VIE

131.    GAAP requires reporting entities to consolidate and make disclosures about certain entities that are determined to be Variable Interest Entities ("VIEs"). ASC 810, Consolidation. An entity is a VIE when one or more of several criteria are met, including, among

others, (1) when the nominal owners of the entity are unable to make decisions about the entity's activities that have a significant effect on the success of the entity, and (2) when the nominal owners do not fully participate in the entity's residual returns. ASC 810-10-15-14. A reporting entity is required to consolidate a VIE if that entity has a variable interest that will absorb the majority of the VIE's expected losses, receive the majority of the VIE's expected returns, or both. ASC 810-25-38. This entity is known as the primary beneficiary. Due to their profit-sharing relationship, Effex was a VIE and FXCM was the primary beneficiary with regard to Effex.

132.    Effex meets both of the criteria referred to in the preceding paragraph. Effex was dependent on FXCM for its business and subject to FXCM's determination as to whether its customers would be directed to book trades through Effex. Additionally, by agreement, FXCM received 70% of Effex's profits.

133.    Because FXCM received the majority of Effex's profits, it was the primary beneficiary of Effex's business and was required to consolidate Effex on FXCM's consolidated financial statements. FXCM was also therefore required to report a non-controlling interest related to Effex held by Dittami on its consolidated statements of condition, operations, and comprehensive income. FXCM did neither.

134.    As the primary beneficiary, FXCM was required to make certain disclosures about the consolidated entity, including the nature, purpose, size and activities of the VIE. ASC 810-10-50-3.  FXCM was also required to disclose the methodology for determining that Effex is a VIE and is being consolidated.

135.    FXCM failed to consolidate Effex on FXCM's financial statements and failed to make disclosures about Effex, as a VIE, that were required by GAAP. Each of FXCM's 2011 10-

K, 12Q1 10-Q, 12Q2 10-Q, 12Q3 10-Q, 2012 10-K, 13Q1 10-Q, 13Q2 10-Q, 13Q3 10-Q, 2013

10-K, 14Q1 10-Q, 14Q2 10-Q, 14Q3 10-Q, 2014 10-K, 15Q1 10-Q, 15Q2 10-Q, 15Q3 10-Q,

2015 10-K, 16Q1 10-Q, 16Q2 10-Q, 16Q3 10-Q and 16Q3 10-Q/A contained financial

statements for FXCM that Defendants stated were prepared according to GAAP.

136.    The preceding periodic reports filed with the SEC during the Class Period were

materially false misleading because: (a) Effex was a Variable Interest Entity ("VIE") and FXCM

was required to, but did not, disclose Effex and details about its relationship with FXCM

including the nature, purpose, size and activities of Effex and the methodology for determining

that Effex was a VIE; (b) FXCM was required to consolidate Effex's financial results with

FXCM's but failed to do so; and (c) as a result FXCM's financial statements did not comply with

GAAP and were false when made.

**In the Alternative, Defendants Made False and Misleading Statements and Violated GAAP
Because Effex was a Related Party and FXCM Failed to Disclose Its Related Party
Transactions With Effex**

137.    Even if FXCM were not required to consolidate Effex's financial results with its

own as a VIE, Effex would still be considered a related party to FXCM, requiring FXCM to

disclose the material transactions between FXCM and Effex in FXCM's financial statements and

proxy statements.

138.    GAAP required the Company to disclose all material related party transactions.

139.    ASC 850, Related Parties, provides that a public company's "[f]inancial

statements shall include disclosures of material related party transactions." ASC 850-10-50-1.

140.    "Related party transactions" include those between "an enterprise and its principal

owners, management, or members of their immediate families" and those between a company

and its "affiliates." ASC 850-10-05-3. "Affiliate" includes any company that, directly or

indirectly through one or more intermediaries, controls, is controlled by, or is under common control with an enterprise. ASC 850-10-20.

141.   Disclosures of related party transactions shall include: (a) the nature of the relationship involved, (b) a description of the transactions for each period for which income statements are presented and such other information necessary to an understanding of the effects of the transactions on the financial statements, (c) the dollar amount of transactions for each of the periods for which income statements are presented, and (d) amounts due from or to related parties as of the date of each balance sheet presented and, if not otherwise apparent, the terms and manner of settlement. ASC 850-10-50-1.

142.   Effex was an affiliate of, and thus a related party to, FXCM.  As noted herein: (a) Effex was founded for the purpose of creating the appearance of an independent company under the direction of FXCM; (b) Effex was funded by an interest-free loan by FXCM; (c) Effex was required to turn over 70% of its profits to FXCM; (d) Effex operated out of FXCM's offices rent-free; (e) certain FXCM employees worked the majority of their time for Effex; (f) all of Effex's business and revenue was either generated through FXCM or was dependent on FXCM to provide the pricing and transaction data to engage in its business; and (g)  FXCM paid bonuses to its employees who assisted Effex on account of their work for Effex. These facts demonstrate that Effex was controlled by FXCM, and therefore was an affiliate of, and related party to, FXCM.

143.   Additionally, the related party transactions were material, as Effex paid FXCM nearly $80 million between 2010 and 2014 alone.

144.   Each of FXCM's 2011 10-K, 12Q1 10-Q, 12Q2 10-Q, 12Q3 10-Q, 2012 10-K, 13Q1 10-Q, 13Q2 10-Q, 13Q3 10-Q, 2013 10-K, 14Q1 10-Q, 14Q2 10-Q, 14Q3 10-Q, 2014 10-

K, 15Q1 10-Q, 15Q2 10-Q, 15Q3 10-Q, 2015 10-K, 16Q1 10-Q, 16Q2 10-Q, 16Q3 10-Q and

16Q3 10-Q/A contained financial statements for FXCM that Defendants stated were prepared

according to GAAP.

145.    The preceding periodic reports filed with the SEC during the Class Period were

materially false misleading because Effex was a related party and FXCM was required to, but did

not, disclose its material transactions with Effex including: (a) a description of the transactions

for each period for which income statements are presented and such other information necessary

to an understanding of the effects of the transactions on the financial statements, (b) the dollar

amount of transactions for each of the periods for which income statements are presented, and (c)

amounts due from or to Effex as of the date of each balance sheet presented and, if not otherwise

apparent, the terms and manner of settlement. *See* ASC 850-10-50-1.

### Defendants Falsely Claim that Their Agency Model is Conflict-Free in Class Period SEC Filings

146.    The following statement, or one substantially similar to it[5], was contained in

FXCM's 2011 10-K, 2012 10-K, 2013 10-K, 2014 10-K and 2015 10-K:

> We primarily offer our customers what is referred to as an agency model to
> execute their trades. Our agency model is fundamental to our core business
> philosophy because we believe that it aligns our interests with those of our
> customers and reduces our risks. In the agency model, when our customer
> executes a trade on the best price quotation offered by our FX market makers, we
> act as a credit intermediary, or riskless principal, simultaneously entering into
> offsetting trades with both the customer and the FX market maker. We earn
> trading fees and commissions by adding a markup to the price provided by the FX
> market makers and generate our trading revenues based on the volume of
> transactions and the spread earned on transactions.

147.    These statements are false and misleading. The first sentence is false and

misleading because FXCM did not primarily offer its customers an agency model due to its

---

[5] A table setting forth the exact quotes from each filing is attached hereto as Exhibit 3.

relationship with Effex. The second sentence is false and misleading because the agency model did not, and Defendants did not believe it to, align FXCM's interests with its customers' interests nor reduce FXCM's risks. By way of FXCM's relationship with Effex, Defendants knew that FXCM's interests were actually opposed to its customers' interests and FXCM was exposed to the risks of having a stake in the transactions between customers and Effex. They knew this because Niv and Ahdout, along with others at FXCM, devised the plan to develop a trading algorithm to secretly trade against FXCM's retail customers on the NDD platform, hired Dittami for that purpose, then ostensibly spun off Effex while secretly maintaining their financial relationship with Dittami and providing Effex with unique trading advantages. In exchange, FXCM received payments meant to approximate 70% of Effex's profits from trading against FXCM's customers on NDD's "agency model" platform. The third and fourth sentences are false and misleading because, due to its relationship with Effex, FXCM was not using an agency model and was not acting solely as a credit intermediary or riskless principal. Similarly, the statements omit that on top of trading fees and commissions, FXCM was earning kickback payments from Effex that were tied directly to Effex's trading profits and losses.

148.    The following statement, or one substantially similar to it[6], was contained in FXCM's 2011 10-K, 12Q1 10-Q, 12Q2 10-Q, 12Q3 10-Q, 2012 10-K, 13Q1 10-Q, 13Q2 10-Q, 13Q3 10-Q, 2013 10-K, 14Q1 10-Q, 14Q2 10-Q, 14Q3 10-Q and 2014 10-K: "Retail trading revenue is our largest source of revenue and is primarily driven by: ... (iv) the amount of additional retail revenues earned, including … payments we receive for order flow from FX market makers."

---

[6] *See* Exhibit 3.

149.    These statements are false and misleading because FXCM did not receive payments for order flow from any market makers, much less multiple market makers. To the extent it received "order flow" payments from Effex, those payments were not for order flow but rather an approximation of 70% of Effex's profits and losses from its trades on the FXCM platform.

150.    The following statement, or one substantially similar to it[7], was contained in FXCM's 12Q1 10-Q, 12Q2 10-Q, 12Q3 10-Q, 2012 10-K, 2013 10-K and 2014 10-K:

> Income earned on order flow represents payments received from certain FX market makers in exchange for routing trade orders to these firms for execution. The Company's order routing software ensures that payments for order flow do not affect the routing of orders in a manner that is detrimental to its retail customers.

151.    The first statement is false and misleading because FXCM did not receive payments for order flow from any market makers. To the extent it received "order flow" payments from Effex, those payments were not for order flow but rather an approximation of 70% of Effex's profits and losses from its trades on the FXCM platform. The second statement is misleading because FXCM engaged in various practices designed to favor Effex over other market makers and give Effex advantages that were detrimental to FXCM's retail customers. Namely, FXCM (1) permitted Effex to win all "ties" with other market makers; (2) provided Effex with a real-time view of price quotations offered by other market makers; (3) added smaller markups to Effex's prices than to prices provided by other market makers; (4) allowed Effex to use a hold timer and a "previous quote" practice; and (5) allowed Effex access to FXCM's internal servers.

---

[7] *See* Exhibit 3.

152.   The following statement, or one substantially similar to it[8], was contained in FXCM's 2011 10-K, 12Q2 10-Q and 12Q3 10-Q: "We earn trading fees and commissions by adding a markup to the price provided by the FX market makers and generate our trading revenues based on the volume of transactions, not trading profits or losses."

153.   The first statement is false and misleading because FXCM did not primarily offer its customers agency execution due to its relationship with Effex. The second statement is false and misleading because the statements fail to disclose that on top of trading fees and commissions, FXCM was earning kickback payments from Effex that were tied directly to Effex's trading profits and losses. Omitting these kickback payments misled investors as to the source of FXCM's revenues.

154.   The following statements were contained in FXCM's 12Q2 10-Q:

We intend to launch an initiative to offer our smaller retail clients the option to trade with a dealing desk, or principal model … As a result, we may incur trading losses using principal model execution from changes in the prices of currencies where we are not hedged.

155.   These statements were false and misleading because FXCM was already offering a principal model to its unsuspecting retail clients due to its relationship with Effex. Thus it was already facing the risk of trading losses.

156.   The following statements were contained in FXCM's 12Q2 10-Q, 2013 10-K, 2014 10-K and 2015 10-K:

[A]s we have for a number of years conducted our retail operations on the basis of the agency model, we could suffer reputational damage and additional regulatory scrutiny by offering execution to retail clients that creates an inherent conflict between the interests of the customer and our interests.

---

[8] *See* Exhibit 3.

157.    These statements were false because FXCM had not been conducting its retail operations on the agency model since it launched the trading algorithm in 2009 that was later spun off into Effex. FXCM was already risking reputational damage and regulatory scrutiny through its relationship with Effex, which in FXCM's own words "creates an inherent conflict between the interests of the customer and our interests."

158.    The following statement was contained in FXCM's 2012 10-K: "our commitment to the agency model is one example of our core business philosophy to reduce risks."

159.    This statement was false and misleading because FXCM was not committed to the agency model or reducing associated risks due to its relationship with Effex.

160.    The following statement was contained in FXCM's 13Q1 10-Q, 13Q2 10-Q, 13Q3 10-Q, 14Q1 10-Q, 14Q2 10-Q, and 14Q3 10-Q: "As we predominantly operate our retail business on an agency model with the exception of certain trades of our CFD customers we are not exposed to the market risk of a position moving up or down in value."

161.    This statement was false and misleading because FXCM did not predominantly operate its retail business on an agency model due to its relationship with Effex. Accordingly, FXCM was in fact exposed to the market risks it described.

162.    The following statement was contained in FXCM's 14Q3 10-Q and 2014 10-K: the Company "no longer receive[d] payments for order flow."

163.    This statement was false and misleading because FXCM had not been receiving payments for order flow. To the extent it had received "order flow" payments from Effex, those payments were not for order flow but rather an approximation of 70% of Effex's profits and losses from its trades on the FXCM platform.

**Defendants Fail to Disclose Ongoing Regulatory Inquiries Concerning Effex,
Rendering Their Class Period SEC Filings Materially False and Misleading**

164.    The following statement, or one substantially similar to it[9], was contained in FXCM's 13Q3 10-Q, 2013 10-K, 14Q1 10-Q, 14Q2 10-Q, 14Q3 10-Q, 2014 10-K, 15Q1 10-Q, 15Q2 10-Q, 15Q3 10-Q, 2015 10-K, 16Q1 10-Q, and 16Q2 10-Q: "our business is also subject to extensive regulation, which may result in administrative claims, investigations and regulatory proceedings against us."

165.    These statements were false and misleading because at the time these statements were made, Defendants knew, but failed to disclose, that FXCM was *currently* under investigation by the CFTC and NFA for its relationship with Effex. By saying that the Company's operations *may* result in investigations and regulatory proceedings, Defendants created the false and misleading impression that the Company was not *currently* under regulatory investigations – investigations which portended, and ultimately resulted in, a material impact on FXCM's business.

166.    Defendants were on notice of the CFTC investigation by at least October 15, 2014, upon receipt of the CFTC's Request for Production of Documents, or alternatively by July 2, 2015, upon receipt of the CFTC Preservation Notice. Defendants were on notice of the NFA investigation by at least October 24, 2013, when NFA compliance staff met with FXCM executives and asked questions about FXCM's relationship with Effex, or by February 19, 2015, upon receipt of the NFA Preservation Notice. At the very latest, Defendants knew of the CFTC's investigation by at least September 18, 2015, when counsel for FXCM signed the Tolling Agreement.

---

[9] *See* Exhibit 3.

167.    Defendants failed to disclose the CFTC and NFA investigations in any manner until FXCM filed its 16Q3 10-Q. The 16Q3 10-Q and 16Q3 10-Q/A contained the following statement: "The CFTC and the NFA are currently examining the relationship with US [FXCM's United States subsidiary] and one of its liquidity providers."

168.    These statements were misleading because they significantly underplayed the extent of the CFTC and NFA's investigations into FXCM's relationship with Effex, which threatened and resulted in a material impact on FXCM's business. FXCM had already signed the Tolling Agreement by this point, so it knew that it was facing a high likelihood of imminent legal action from the regulators, far beyond a mere "examin[ation.]"

### Niv and Lande Sign Materially False and Misleading S-OX Certifications

169.    Each of FXCM's 2011 10-K, 12Q1 10-Q, 12Q2 10-Q, 12Q3 10-Q, 2012 10-K, 13Q1 10-Q, 13Q2 10-Q, 13Q3 10-Q, 2013 10-K, 14Q1 10-Q, 14Q2 10-Q, 14Q3 10-Q, 2014 10-K, 15Q1 10-Q, 15Q2 10-Q, 15Q3 10-Q, 2015 10-K, 16Q1 10-Q, 16Q2 10-Q, 16Q3 10-Q and 16Q3 10-Q/A also included Sarbanes-Oxley Act of 2002 ("SOX") certifications signed by Defendants Niv and Lande attesting to the accuracy of the respective filings, certifying that "this report does not contain any untrue [or misleading] statement of a material fact," and certifying that Niv and Lande each disclosed "[a]ny fraud, whether or not material" to FXCM's auditor and audit committee.

170.    These S-OX certifications were materially false and misleading because the accompanying financial statements were not accurate. The accompanying financial statements were not accurate because they each failed to either (1) disclose Effex as a VIE, consolidate Effex's financial statements with FXCM's and disclose details about Effex's relationship with

FXCM; or (2) disclose Effex as a related party and disclose FXCM's material transactions with Effex.

171.    These S-OX certifications were also materially false and misleading because each of the reports contained other false and misleading statements of material fact, as detailed in paragraphs 146-168.

172.    These S-OX certifications were also materially false and misleading because Niv and Lande did not disclose all fraud. Niv and Lande did not disclose all fraud because they failed to disclose that: (1) from September 4, 2009 through at least 2014, FXCM engaged in false and misleading solicitations of its retail foreign exchange customers by concealing its relationship with its most important market maker, Effex, and misrepresented that its NDD platform had no conflicts of interest with its customers; (2) FXCM was secretly profiting from taking positions opposite its customers on its NDD platform through its arrangement with Effex; (3) the accompanying financial statements were false as they failed to consolidate Effex or failed to disclose material related party transactions involving Effex; and (4) as a result, Defendants' statements about FXCM's business, operations and prospects were materially false and misleading and/or lacked a reasonable basis at all relevant times.

## The FXCM Notes

173.    On May 29, 2013, the Company issued a press release announcing the pricing of the FXCM Notes, and on June 3, 2013, the Company filed a Form 8-K detailing the sale of the FXCM Notes (the "June 3, 2013 8-K"), stating in part:

**Item 1.01        Entry into a Material Definitive Agreement.**

Purchase Agreement

On May 28, 2013, FXCM, Inc. (the "Company") entered into a purchase agreement (the "Purchase Agreement") with Credit Suisse Securities (USA) LLC

and Merrill Lynch, Pierce, Fenner & Smith Incorporated, as representatives of the several purchasers named in Schedule A thereto (the "Initial Purchasers"), pursuant to which the Company agreed to sell $150.0 million aggregate principal amount of 2.25% Convertible Senior Notes due 2018 (the "Firm Notes") and, at the option of the Initial Purchasers, up to an additional $22.5 million aggregate principal amount of 2.25% Convertible Senior Notes due 2018 (the "Option Notes" and, together with the Firm Notes, the "Notes").

On May 30, 2013, the Initial Purchasers exercised their option in full in respect of the Option Notes. On June 3, 2013, the Company issued and sold to the Initial Purchasers $172.5 million aggregate principal amount of the Notes upon payment pursuant to the Purchase Agreement.

174.    Attached as Exhibit 10.1 to the June 3, 2013 8-K was the Purchase Agreement, which details the sale of the FXCM Notes. The S-OX certifications contained in the June 3, 2013 Purchase Agreement were signed by Defendants Niv and Lande and attested to the accuracy of financial reporting, the disclosure of any material changes to the Company's internal control over financial reporting and the disclosure of all fraud.

175.    These S-OX certifications were materially false and misleading because the accompanying financial statements were not accurate. The accompanying financial statements were not accurate because they each failed to either (1) disclose Effex as a VIE, consolidate Effex's financial statements with FXCM's and disclose details about Effex's relationship with FXCM; or (2) disclose Effex as a related party and disclose FXCM's material transactions with Effex.

176.    These S-OX certifications were also materially false and misleading because Niv and Lande did not disclose all fraud. Niv and Lande did not disclose all fraud because they failed to disclose that: (1) from September 4, 2009 through at least 2014, FXCM engaged in false and misleading solicitations of its retail foreign exchange customers by concealing its relationship with its most important market maker, Effex, and misrepresented that its NDD platform had no conflicts of interest with its customers; (2) FXCM was secretly profiting from taking positions

opposite its customers on its NDD platform through its arrangement with Effex; (3) the accompanying financial statements were false as they failed to consolidate Effex or failed to disclose material related party transactions involving Effex; and (4) as a result, Defendants' statements about FXCM's business, operations and prospects were materially false and misleading and/or lacked a reasonable basis at all relevant times.

### Defendants' False Statements About FXCM's Agency Model Across Different Platforms Further Demonstrates its Importance to FXCM's Operations

177.    FXCM's misrepresentations concerning its NDD execution or agency model extended beyond its public SEC filings, encompassing a broad strategy of deceiving both potential clients and investors with public false and misleading claims on its website and advertising.

178.    In January 2012, FXCM provided a downloadable trading guide on its website, including two videos claiming to show the difference between FXCM's NDD execution model and a dealing desk model used by FXCM's competitors. *Available at https://web.archive.org/web/20120104211055/http://www.fxcm.com/fxcm-forex-execution.jsp.*

179.    One year later in January 2013, FXCM flaunted the "Major Benefits" for clients using its NDD execution model, including claims of "Fair and transparent order execution" and "No conflict of interest between broker and trader."

> Another advantage of the NDD model is that execution is transparent and fair. ***FXCM does not take a market position-eliminating a major conflict of interest***. Dealing desk brokers, which act as market makers, may be actively trading against your positions. Because of this, they may manipulate your orders with re-quotes or in other ways. This cannot happen with our NDD forex execution. Your orders automatically fill from the NDD price feed, which is the best bid and best ask prices from all of our liquidity providers plus FXCM's small, fixed mark-up. Additionally, your orders are anonymous to the liquidity providers. They cannot see your stops, limits, or entry orders; they only see market orders coming from FXCM.

*Available at https://web.archive.org/web/20130127222625/http://www.fxcm.com/ advantages/forex-execution/no-dealing-desk*

180.   These misleading statements continued into January 2014, where FXCM continued to promote its NDD execution as a conflict-free platform.

> FXCM can see your waiting orders when you trade with No Dealing Desk execution. ***But this does not create a conflict of interest between you and FXCM because we aren't taking a market position***. When you place an order with FXCM, we place an identical order to yours with our liquidity providers.
>
> Our liquidity providers only see market orders coming from FXCM. They do not see orders coming from you, and they cannot see your waiting orders (stops, limits, entry orders). So your trading is anonymous with our liquidity providers under the No Dealing Desk model.

*Available at https://web.archive.org/web/20130205185432/http://www.fxcm.com/*

*advantages/forex-execution/why-execution-matters-faq/*

181.   The following year, FXCM continued to feature its NDD execution platform on its homepage. *Available at https://web.archive.org/web/20150102140639/http://www.fxcm.com/*

182.   In January 2016, FXCM was still promoting its NDD execution on its website, including claims of price improvements stemming from slippage in the customers' favor.

> With NDD, FXCM acts as a price aggregator. We take the best available bid and best ask prices from our liquidity providers—global banks, financial institutions and other market makers— and stream those prices to your platform. This large, diverse group of liquidity providers makes this model special: The more advantageous the prices, the more order flow the provider receives. Through competition, NDD ensures prices are market-driven and fair.
>
> - Low spreads from liquidity providers[1]
> - Anonymous order execution
> - No re-quotes[2]; no dealer intervention
> - No restrictions on the strategies (scalp, trade the news, use any EA)
> - Potential Price Improvements on all order types

183.   In January 2017, FXCM disclosed the identities of its 17 various liquidity providers, including Effex, but neglected to divulge any details informing clients or investors of the Company's unique relationship with Effex.  *Available at*

*https://web.archive.org/web/20170120174036/https://www.fxcm.com/why-fxcm/liquidity-providers/*

184.   The selections above in this section were pulled from FXCM's website over various points in time, and most of these misleading claims were found on the Company's website at many or all times during the Class Period.  FXCM.com, the Company's public-facing platform for promoting the Company and its purported NDD execution, was replete with these and other misleading statements to clients and investors at all times during the Class Period.

185.   These statements were false and misleading because, due to FXCM's relationship with Effex, (1) FXCM was not truly offering NDD execution or an agency model; (2) FXCM did have a conflict of interest with its retail customers, effectively taking positions against them through Effex; and (3) customers were not receiving the best prices from market makers due to FXCM and Effex's market distortions.

**Defendants' Scheme Defrauded Investors As Well As Customers**

186.   Although the primary aim of Defendants' fraudulent scheme was to take advantage of its retail customers by secretly trading against them via Effex, it had the additional effect and purpose of significantly misleading investors as well.

187.   Defendants' false and misleading statements about the purported agency model deceived investors as to a material part of the Company's operations and revenues. For example, the 2011 10-K noted the huge importance of FXCM's retail trading operations to the overall success of the Company, in that the Company's "retail trading segment accounted for 87.5% of

its total revenues in 2011." The Company's NDD platform, supposedly using "agency execution," was similarly vital to FXCM's retail trading segment. The Company stated in the 2011 10-K that "[a]gency execution represented approximately 86% of our retail trading volume in 2011."

188.   Defendants' statements about the sham "order flow" payments likewise deceived investors as the duplicitous payments from Effex totaled nearly $80 million in misattributed revenue from 2010 to 2014.

189.   Defendants' GAAP violations deceived investors because disclosure of FXCM's hidden relationship with Effex would have enraged and alienated the Company's customer base. The agency model (or the appearance thereof) was "fundamental to our core business philosophy," and Defendants knew that FXCM would "suffer reputational damage and additional regulatory scrutiny" if customers discovered the Company's "inherent conflict between the interests of the customer and our interests."

190.   Finally, Defendants' false statements about regulatory investigations deceived investors because the undisclosed CFTC and NFA investigations threatened the very core of FXCM's agency model. When Defendants agreed to give up their U.S. business in order to settle the regulatory claims against FXCM – this was the materialization of a serious risk that had been hidden from investors.

## PLAINTIFFS' CLASS ACTION ALLEGATIONS

191.   Plaintiffs bring this action as a class action pursuant to Federal Rule of Civil Procedure 23(a) and (b)(3) on behalf of a class consisting of all persons and entities who purchased or otherwise acquired publicly traded FXCM securities, including FXCM Notes and Class A common stock during Class Period. Excluded from the Class are all (i) Defendants; (ii)

current and former officers, employees, consultants and directors of FXCM and Holdings; (iii) siblings, parents, children, spouses, and household members of any person excluded under (i) and (ii); and (iv) any entities affiliated with, controlled by, or more than 5% owned by, any person excluded under (i) through (iii); and (v) the legal representatives, heirs, successors or assigns of any person excluded under (i) through (iv).

192.     The members of the Class are so numerous that joinder of all members is impracticable. Throughout the Class Period, FXCM securities were actively traded on the NYSE and/or NASDAQ. While the exact number of Class members is unknown to Plaintiffs at this time and can be ascertained only through appropriate discovery, Plaintiffs believe that there are hundreds or thousands of members in the proposed Class. Record owners and other members of the Class may be identified from records maintained by the Company or its transfer agent and may be notified of the pendency of this action by mail, using the form of notice similar to that customarily used in securities class actions.

193.     Plaintiffs' claims are typical of the claims of the members of the Class as all members of the Class are similarly affected by Defendants' wrongful conduct in violation of federal law that is complained of herein.

194.     Plaintiffs will fairly and adequately protect the interests of the members of the Class and has retained counsel competent and experienced in class and securities litigation. Plaintiffs have no interests antagonistic to or in conflict with those of the Class.

195.     Common questions of law and fact exist as to all members of the Class and predominate over any questions solely affecting individual members of the Class. Among the questions of law and fact common to the Class are:

a.      whether the federal securities laws were violated by Defendants' acts as alleged herein;

b.      whether statements made by Defendants to the investing public during the Class Period misrepresented material facts about the business, operations and management of the Company;

c.      whether the Individual Defendants caused the Company to issue false and misleading financial statements during the Class Period;

d.      whether Defendants acted knowingly or recklessly in issuing false and misleading financial statements;

e.      whether the prices of FXCM securities during the Class Period were artificially inflated because of the Defendants' conduct complained of herein; and

f.      whether the members of the Class have sustained damages and, if so, what is the proper measure of damages.

196.    A class action is superior to all other available methods for the fair and efficient adjudication of this controversy since joinder of all members is impracticable. Furthermore, as the damages suffered by individual Class members may be relatively small, the expense and burden of individual litigation make it impossible for members of the Class to redress individually the wrongs done to them. There will be no difficulty in the management of this action as a class action.

197.    Plaintiffs will rely, in part, upon the presumption of reliance established by the fraud-on-the-market doctrine in that:

a.      Defendants made public misrepresentations or failed to disclose material facts during the Class Period;

b.      the omissions and misrepresentations were material;

c.      FXCM securities are traded in an efficient market;

d.      FXCM securities were liquid and traded with moderate to heavy volume during the Class Period;

e.      FXCM was widely followed by professional market analysts that reported on the Company and made buy and sell recommendations;

f.      the misrepresentations and omissions alleged would tend to induce a reasonable investor to misjudge the value of FXCM securities; and

g.      Plaintiffs and members of the Class purchased, acquired and/or sold FXCM securities between the time the Defendants failed to disclose or misrepresented material facts and the time the true facts were disclosed, without knowledge of the omitted or misrepresented facts.

198.    Based upon the foregoing, Plaintiffs and the members of the Class are entitled to a presumption of reliance upon the integrity of the market.

199.    Alternatively, Plaintiffs and the members of the Class are entitled to the presumption of reliance established by the Supreme Court in *Affiliated Ute Citizens of the State of Utah v. United States*, 406 U.S. 128, 92 S. Ct. 2430 (1972), as Defendants omitted material information in their Class Period statements in violation of a duty to disclose such information, as detailed above.

200.    Additionally, the FXCM Notes should not have been introduced into the market because they were objectively unmarketable.  Contrary to the information represented in FXCM's SEC filings, FXCM's U.S. subsidiary engaged in false and misleading solicitations of its retail forex customers and made false statements to the NFA about its relationship with its

most important market maker. Where, as here, actors introduce an otherwise unmarketable security into the market by means of fraud, they have effectively manipulated the market. Accordingly, Plaintiffs and the Class are entitled to a presumption of reliance because they relied on the integrity of the market rather than on individual fraudulent disclosures.

## COUNT I

### Violation of Section 10(b) of The Exchange Act and Rule 10b-5
### Promulgated Thereunder Against FXCM, Niv and Ahdout

201.     Plaintiffs repeat and re-allege each and every allegation contained above as if fully set forth herein.

202.     This Count, asserted against Defendants FXCM, Niv and Ahdout, is based upon Section 10(b) of the Exchange Act, 15 U.S.C. § 78j(b), and Rule 10b-5 promulgated thereunder by the SEC.

203.      During the Class Period, Niv and Ahdout, individually and in concert, directly or indirectly, disseminated or approved the false statements specified above, which they knew or deliberately disregarded were misleading in that they contained misrepresentations and failed to disclose material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading.

204.     Defendants violated §10(b) of the 1934 Act and Rule 10b-5 in that they:

- Employed devices, schemes and artifices to defraud;

- Made untrue statements of material facts or omitted to state material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading; or

- Engaged in acts, practices and a course of business that operated as a fraud or deceit upon Plaintiffs and others similarly situated in connection with their purchases of FXCM securities during the Class Period.

205.    Defendants acted with scienter in that they knew that the public documents and statements issued or disseminated in the name of FXCM were materially false and misleading; knew that such statements or documents would be issued or disseminated to the investing public; and knowingly and substantially participated, or acquiesced in the issuance or dissemination of such statements or documents as primary violations of the securities laws. These defendants by virtue of their receipt of information reflecting the true facts of FXCM, their control over, and/or receipt and/or modification of FXCM's allegedly materially misleading statements, and/or their associations with the Company which made them privy to confidential proprietary information concerning FXCM, participated in the fraudulent scheme alleged herein.

206.    These Defendants, who were senior officers and directors of the Company, had actual knowledge of the material omissions and/or the falsity of the material statements set forth above, and intended to deceive Plaintiffs and the other members of the Class, or, in the alternative, acted with reckless disregard for the truth when they failed to ascertain and disclose the true facts in the statements made by them or other FXCM personnel to members of the investing public, including Plaintiffs and the Class.

207.    As a result of the foregoing, the market price of FXCM securities was artificially inflated during the Class Period. In ignorance of the falsity of Defendants' statements, Plaintiffs and the other members of the Class directly or indirectly relied on the statements described above during the Class Period in purchasing FXCM securities at prices that were artificially inflated as a result of Defendants' false and misleading statements.

208.    As a result of the wrongful conduct alleged herein, Plaintiffs and other members of the Class have suffered damages in an amount to be established at trial.

209.    By reason of the foregoing, Defendants have violated Section 10(b) of the 1934 Act and Rule 10b-5 promulgated thereunder and are liable to Plaintiffs and the other members of the Class for substantial damages which they suffered in connection with their purchase of FXCM securities during the Class Period.

### COUNT II

**Violation of Section 20(a) of The Exchange Act**
**Against the Individual Defendants**

210.    Plaintiffs repeat and re-allege each and every allegation contained in the foregoing paragraphs as if fully set forth herein.

211.    During the Class Period, the Individual Defendants participated in the operation and management of FXCM, and conducted and participated, directly and indirectly, in the conduct of FXCM's business affairs. Because of their senior positions, they knew the adverse non-public information about FXCM's misstatement of revenue and profit and false financial statements.

212.    As officers and/or directors of a publicly owned company, the Individual Defendants had a duty to disseminate accurate and truthful information with respect to FXCM's financial condition and results of operations, and to correct promptly any public statements issued by FXCM which had become materially false or misleading.

213.    Because of their positions of control and authority as senior officers, the Individual Defendants were able to, and did, control the contents of the various reports, press releases and public filings which FXCM disseminated in the marketplace during the Class Period concerning FXCM's results of operations. Throughout the Class Period, the Individual

Defendants exercised their power and authority to cause FXCM to engage in the wrongful acts complained of herein. The Individual Defendants therefore, were "controlling persons" of FXCM within the meaning of Section 20(a) of the Exchange Act. In this capacity, they participated in the unlawful conduct alleged which artificially inflated the market price of FXCM securities.

214.    The Individual Defendants also culpably participated in the fraudulent scheme.

215.    As members of FXCM's senior management (Niv and Lande) and as directors with access to information regarding FXCM's day-to-day business (Niv and Ahdout), the Individual Defendants each had the power and influence to cause FXCM to make the fraudulent statements detailed herein.

216.    Niv and Ahdout originated and implemented the fraudulent scheme to secretly trade against FXCM's customers on the Company's "conflict-free" trading platform. They hired Dittami for that purpose and helped establish Effex, while secretly maintaining FXCM's profit-sharing relationship with Dittami and providing Effex with unique trading advantages. They arranged for FXCM to receive payments disguised as "order flow" meant to approximate 70% of Effex's profits from trading against FXCM's customers on NDD's "agency model" platform. Niv also oversaw and participated in FXCM's untruthful responses to the NFA's investigation in an effort to cover up his fraudulent scheme. Additionally, Niv knew about the CFTC's request for documents, the CFTC's and NFA's preservation notices, the CFTC's subpoena of Niv, and the tolling agreement between FXCM and the CFTC, yet failed to disclose the ongoing CFTC and NFA investigations into FXCM's clandestine relationship with Effex.

217.    Each of the Individual Defendants also personally signed materially false and misleading SEC filings during the Class Period, including each of the 10-Ks (Niv, Ahdout and

Lande) and 10-Qs (Niv and Lande). Niv and Lande, in their respective roles as CEO and CFO, both personally signed materially false and misleading S-OX certifications during the Class Period. The Individual Defendants are responsible for the false and misleading statements made in the filings they signed.

218.    By reason of the above conduct, the Individual Defendants are liable pursuant to Section 20(a) of the Exchange Act for the violations committed by FXCM.

## PRAYER FOR RELIEF

**WHEREFORE**, Plaintiffs pray for relief and judgment, as follows:

a.    Determining that this action is a proper class action, designating Plaintiffs as class representatives under Rule 23 of the Federal Rules of Civil Procedure and Plaintiffs' counsel as Class Counsel;

b.    Awarding compensatory damages in favor of Plaintiffs and the other Class members against all Defendants, jointly and severally, for all damages sustained as a result of Defendants' wrongdoing, in an amount to be proven at trial, including interest thereon;

c.    Awarding Plaintiffs and the Class their reasonable costs and expenses incurred in this action, including counsel fees and expert fees; and

d.    Awarding such other and further relief as the Court may deem just and proper.

## JURY TRIAL DEMANDED

Plaintiffs hereby demand a trial by jury.


Dated:  April 17, 2020                         Respectfully submitted,

                                   **THE ROSEN LAW FIRM, P.A.**

                                   By: /s/ Phillip Kim
                                   Phillip Kim, Esq. (PK 9384)
                                   Laurence M. Rosen, Esq. (LR 5733)

Joshua Baker, Esq. (JB 8288)
275 Madison Ave, 40th Floor
New York, NY  10016
Phone: (212) 686-1060
Fax: (212) 202-3827

*Lead Counsel for Lead Plaintiffs*

**WOLF HALDENSTEIN ADLER FREEMAN &
HERZ LLP**
Matthew M. Guiney, Esq. (MG 5858)
270 Madison Avenue
New York, NY 10016
270 Madison Ave.
New York, NY 10016
Tel:       (212) 545-4600
Email: Guiney@whafh.com

*Additional Counsel*

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on April 17, 2020, a true and correct copy of the foregoing THIRD AMENDED CONSOLIDATED SECURITIES CLASS ACTION COMPLAINT was served by CM/ECF to the parties registered to the Court's CM/ECF system.

/s/ Joshua Baker
Joshua Baker