# UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| In re Global Brokerage, Inc. f/k/a FXCM Inc. Securities Litigation | Master File No. 1:17-cv-00916-RA<br><br>CLASS ACTION<br><br>ORAL ARGUMENT REQUESTED |

## MEMORANDUM OF LAW IN OPPOSITION TO
## PLAINTIFFS' AMENDED MOTION FOR CLASS CERTIFICATION
## AND APPOINTMENT OF CLASS REPRESENTATIVES AND CLASS COUNSEL

Paul R. Bessette
Israel Dahan
Peter Isajiw
Evan C. Ennis
KING & SPALDING LLP
1185 Avenue of the Americas
New York, New York  10036-2601
Tel:  (212) 556.2100
Fax: (212) 556.2200

Rebecca Matsumura, *pro hac vice*
KING & SPALDING LLP
500 W. 2nd Street Suite 1800
Austin, Texas 78701
Tel: (512) 457.2000
Fax: (512) 457.2100

*Attorneys for Defendants Global Brokerage, Inc. f/k/a/*
*FXCM, Inc., Dror Niv, and William Ahdout*

## <u>TABLE OF CONTENTS</u>

<u>Page</u>

PRELIMINARY STATEMENT ...................................................................................................1

FACTUAL AND PROCEDURAL BACKGROUND...................................................................4

    A.  FXCM And Its Trading Relationship With Effex.......................................................4

    B.  The FXCM Securities Subject To Plaintiffs' Claims ....................................................5

    C.  The January 2015 SNB Flash Crash Dramatically Affected The Value Of
        FXCM And Its Notes ..................................................................................................7

    D.  FXCM Enters Into "No-Admit" Settlements With The CFTC And NFA
        Relating To Its Effex Relationship ...........................................................................8

    E.  Procedural History And Plaintiffs' Motion For Class Certification ...........................8

LEGAL STANDARD....................................................................................................................9

ARGUMENT ...............................................................................................................................10

  I.  Plaintiffs Have Not Established By A Preponderance Of The Evidence All Four
     Requirements Of Rule 23(a) .............................................................................................10

    A.  The Proposed Notes Class Is Not Sufficiently Numerous ..........................................10

    B.  Plaintiffs Are All Atypical Investors Subject To Unique Defenses ...........................12

    C.  Plaintiffs Are All Inadequate Class Representatives Due To Their Repeated
        Failure To Cooperate in Discovery............................................................................13

  II.  Plaintiffs Have Not Established By A Preponderance Of The Evidence Rule
      23(b)(3)'s Predominance And Superiority Requirements With Respect To The
      Notes ................................................................................................................................15

    A.  The *Affiliated Ute* Presumption Does Not Apply ......................................................15

    B.  *Basic's* "Fraud On The Market" Presumption Does Not Apply.................................17

        1.  The *Cammer* Factors Weigh Against A Finding That The Notes Traded In
           An Efficient Market ...........................................................................................18

          a.  The Notes Had A Low Average Weekly Trading Volume During The
             Notes Period.................................................................................................18

b. The Notes Received No Meaningful Coverage By Analysts During The Notes Period................................................................20

c. Plaintiffs Present No Evidence Of Makers Or Arbitrageurs For The Notes During The Notes Period......................................22

d. Dr. Werner Fails To Demonstrate A Cause And Effect Reaction Between News And Price Changes In The Notes..........................23

2. The *Krogman* Factors Also Do Not Support A Finding That The Notes Traded In An Efficient Market ..............................................26

3. Plaintiffs' Testimony Undermines Any Presumption Of Efficiency ....................27

III. Plaintiffs' Proposed Damages Model Does Not Measure Damages Arising From Defendants' Alleged Wrongdoing. ........................................29

CONCLUSION..............................................................30

## <u>TABLE OF AUTHORITIES</u>

**Page(s)**

**Cases**

*Affiliated Ute Citizens of Utah v. United States*,
  406 U.S. 128 (1972)..................................................................................................16

*Amgen Inc. v. Connecticut Retirement Plans and Trust Funds*,
  568 U.S. 455 (2013)..................................................................................................17

*Argent Classic Convertible Arbitrage Fund L.P. v. Countrywide Fin. Corp.*,
  No. CV 07-07097, 2009 WL 10673338 (C.D. Cal. Dec. 9, 2009) ...........................11

*Baffa v. Donaldson, Lufkin & Jenrette Sec. Corp.*,
  222 F.3d 52 (2d Cir. 2000)........................................................................................12

*Basic v. Levinson*,
  485 U.S. 224 (1988)..................................................................................................17

*Cammer v. Bloom*,
  711 F. Supp. 1264 (D.N.J. 1989) ....................................................................... *passim*

*Comcast Corp. v. Behrend*,
  569 U.S. 27 (2013)....................................................................................................29

*In re Critical Path, Inc. Sec. Litig.*,
  156 F. Supp. 2d 1102 (N.D. Cal. 2001) ...................................................................13

*In re Flag Telecom Holdings, Ltd. Sec. Litig.*,
  574 F.3d 29 (2d Cir. 2009).......................................................................................10

*In re Fresh Del Monte Pineapples Antitrust Litig.*,
  No. 1:04-md-1628, 2008 WL 5661873 (S.D.N.Y. Feb. 20, 2008) ...........................1

*George v. China Auto. Sys., Inc.*,
  No. 11 Civ. 7533 (KBF), 2013 WL 3357170 (S.D.N.Y. July 3, 2013) ...................25

*George* v. *China Auto. Sys., Inc.*,
  No. 11-cv-7533 (KBF), 2013 WL 3357120 (S.D.N.Y. May 7, 2013)......................1

*Gordon v. Sonar Capital Mgmt. LLC*,
  92 F. Supp. 3d 193 (S.D.N.Y. 2015)........................................................................12

*Hamilton Partners, Ltd. v. Sunbeam Corp.*,
  No. 99-CV-8275, 2001 WL 34556527 (S.D. Fla. July 3, 2001)...............................29

*In re IMAX Sec. Litig.*,
   272 F.R.D. 138 (S.D.N.Y. 2010) ......................................................................12

*In re Initial Public Offerings Sec. Litig.*,
   471 F.3d 24 (2d Cir. 2006).......................................................................10, 11

*Koss v. Wackenhut Corp.*,
   No. 03-CV-7679 (SCR), 2009 WL 928087 (S.D.N.Y. Mar. 30, 2009)..................................14

*Krogman v. Sterritt*,
   202 F.R.D. 467 (N.D. Tex. 2001) ...............................................................26, 27

*Leber v. Citigroup 401(k) Plan Inv. Comm.*,
   323 F.R.D. 145 (S.D.N.Y. 2017) ......................................................................13

*Levitt v. J.P. Morgan Sec., Inc.*,
   710 F.3d 454 (2d Cir. 2013)..........................................................................10

*In re Livent, Inc. Noteholders Sec. Litig.*,
   211 F.R.D. 219 (S.D.N.Y. 2002) ................................................................10, 29

*In re Northfields Labs., Inc. Sec. Litig.*,
   267 F.R.D. 536 ......................................................................................19

*In re Petrobras Sec.*,
   862 F.3d 250 (2d Cir. 2017)................................................................... *passim*

*In re Winstar Comm'ns Sec. Litig.*,
   290 F.R.D. 437 (S.D.N.Y. 2013) ................................................................10, 26

*Rocco v. Nam Tai Elecs., Inc.*,
   245 F.R.D. 131 (S.D.N.Y. 2007) ............................................................12, 13, 14

*In re Safety-Kleen Corp. Bondholders Litig.*,
   No. 3:00-1145-17, 2004 WL 3115870 (D.S.C. Nov. 1, 2004) ....................................21, 23, 29

*Schleicher v. Wendt*,
   2009 WL 761157 (S.D. Ind. Mar. 20, 2009).........................................................18

*SRM Glob. Master Fund Ltd. P'ship v. Bear Stearns Companies L.L.C.*,
   829 F.3d 173 (2d Cir. 2016).........................................................................13

*Stanaford v. Genovese*,
   No. 13-cv-80923, 2016 WL 4198146 (S.D. Fla. March 14, 2016).........................................27

*Sykes v. Mel S. Harris & Assocs. LLC*,
   780 F.3d 70 (2d Cir. 2015)...........................................................................29

*Teamsters Local 445 Freight Div. Pension Fund v. Bombardier Inc.*,
    546 F.3d 196 (2d Cir. 2008)...................................................................................10, 21, 23

*Teamsters Local 445 Freight Div. Pension Fund v. Bombardier, Inc.*,
    No. 05 Civ. 1898(SAS), 2006 WL 2161887 (S.D.N.Y. Aug. 1, 2006) .......................... *passim*

*Waggoner v. Barclays PLC*,
    875 F.3d 79 (2d Cir. 2017)...................................................................................................16

*Wal–Mart Stores, Inc. v. Dukes*,
    564 U.S. 338 (2011)..............................................................................................................9

*Weikel v. Tower Semiconductor Ltd.*,
    183 F.R.D. 377 (D.N.J. 1998)............................................................................................13

**Statutes**

17 C.F.R. § 230.144A ...................................................................................................................2, 6

28 U.S.C.A. § 1658....................................................................................................................13

**Rules**

Fed. R. Civ. P. 23 ................................................................................................................. *passim*

Defendants Global Brokerage, Inc. f/k/a FXCM Inc. ("FXCM" or the "Company"), Dror Niv and William Ahdout (together with FXCM, the "Defendants") respectfully submit this memorandum of law in opposition to Plaintiffs' Amended Motion for Class Certification and Appointment of Class Representatives and Class Counsel.  Along with this memorandum of law, Defendants also submit the report of Terrence Hendershott, Ph.D. (the "Hendershott Report") and the Declarations of Israel Dahan and Kenneth A. Grossman.[1]

## PRELIMINARY STATEMENT

Plaintiffs' class certification motion (the "Motion" or "Br.") asks this Court to certify under Federal Rule of Civil Procedure 23 a class consisting of (i) purchasers of FXCM's Class A common stock during the period March 15, 2012 through February 6, 2017, both dates inclusive (the "Stock Class"), *and* (ii)  purchasers of FXCM's 2.25% Convertible Senior Notes due 2018 (the "Notes") during the same time period (the "Notes Class").  Plaintiffs propose Shipco Transport Inc. ("Shipco") and E-Global Trade and Finance Group, Inc. ("E-Global"), purchasers of the common stock, and 683 Capital Partners, LP ("683 Capital"),[2] a Notes purchaser, as class representatives.

Under well-settled Second Circuit, precedent Plaintiffs bear the burden of establishing that the requirements of Rule 23 have been met for the proposed class.  Plaintiffs must show, by a preponderance of the evidence, that they have satisfied all four requirements of Rule 23(a)—

---

[1] Defendants reserve their right to seek an evidentiary hearing with respect to the Motion.  *See In re Fresh Del Monte Pineapples Antitrust Litig.*, No. 1:04-md-1628, 2008 WL 5661873, at *3 (S.D.N.Y. Feb. 20, 2008) (evidentiary hearing may be "particularly useful" at class certification); *George* v. *China Auto. Sys., Inc.*, No. 11-cv-7533 (KBF), 2013 WL 3357120, at *9 (S.D.N.Y. May 7, 2013) (court ordered the parties to produce their market efficiency experts for cross examination at a class certification hearing in securities fraud case).

[2] In addition to purchasing the Notes, 683 Capital also traded FXCM options and engaged in short sales of the common stock.  ECF No. 168.

numerosity, commonality, typicality, and adequacy of representation—and at least one of the requirements of Rule 23(b), in this case, Rule 23(b)(3)'s requirement that common questions of law and fact predominate for the proposed class and that a class action is superior to other available litigation avenues.  A district court must conduct a *rigorous* analysis of Rule 23's requirements before certifying a class.  This Court must look beyond the pleadings, weigh the evidence, and find, not merely assume, that the facts support class certification even if this analysis overlaps with the merits of Plaintiffs' securities claims.  For multiple reasons, Plaintiffs cannot—and did not— demonstrate that they have satisfied *all* the requisite elements of Rule 23, especially with respect to the putative Notes Class.  Accordingly, their Motion should be denied.

*First*, Plaintiffs fail to demonstrate that the proposed Stock or Notes Class meets all four elements of Rule 23(a).  With respect to the Notes Class, the number of noteholders is not sufficiently numerous.  The Notes were issued under Rule 144A and, therefore, were purchased by large institutional investors.[3]  Additionally, Notes purchasers in the initial offering and before the Notes began trading on June 24, 2014 cannot be included in the putative Notes Class.  More significantly, the holders of the vast majority of the Notes have waived and released any securities claims they might have against Defendants under a forbearance agreement they entered into with the Company in 2019.  With respect to both the proposed Stock and Notes Class, the proposed class representatives are all atypical as they are subject to unique defenses.  To this end, *all* of the Plaintiffs began purchasing FXCM securities *after* their value fell precipitously because of a liquidity crisis caused by the Swiss National Bank's decision in January 2015 (two years before the end of the proposed class period) to remove the euro/swiss franc peg and six months *after*

---

[3] Rule 144A allows companies to sell securities that are not registered with the Securities Exchange Commission.  *See* 17 C.F.R. § 230.144A.  According to Dr. Werner, securities sold under Rule 144A may only be sold to "qualified institutional buyers."  Werner Rpt. ¶¶ 21, 130.

FXCM announced that it was no longer engaged in pay-for-flow arrangements with liquidity providers.[4]  Plaintiffs also have disclaimed any reliance on the integrity of the market for FXCM securities.   Furthermore, *all* of the Plaintiffs are not adequate class representatives, having abdicated their duty to participate meaningfully in discovery.

*Second*, Plaintiffs have failed to satisfy Rule 23(b)(3)'s predominance and superiority requirements at least with respect to the putative Notes Class.  Contrary to Plaintiffs' contention, this is not primarily an omissions case and, therefore, the presumption of reliance set forth in *Affilated Ute* is inapplicable.  As is evident on the face of Plaintiffs' Third Amended Complaint and the Court's ruling on Defendants' motion to dismiss, Plaintiffs' securities fraud claims principally turn on whether FXCM misrepresented the nature of its trading model and its relationship with one of its liquidity providers.  And since Plaintiffs have pled their claims as misstatements, and the Court allowed them to proceed on that basis, they cannot now recharacterize their claims as omissions claims.

Plaintiffs also cannot rely on the fraud-on-the-market presumption set forth in *Basic* given that the Notes did not trade in an efficient market.  In their Motion, Plaintiffs proffer the report of Dr. Adam Werner to support their contention of market efficiency for the Notes.  However, as detailed in the report of Defendants' rebuttal expert, Professor Terrence Hendershott, Dr. Werner's report and analysis of the market for the Notes is fundamentally flawed and unreliable.  Specifically, Dr. Werner glosses over the fact that the Notes were thinly traded and poorly covered by analysts, and he provides no evidence of market makers or arbitrageurs trading in the securities.  Moreover, unlike the multi-year analysis performed by Dr. Werner for the common stock, his

---

[4] As the Court noted in its March 28, 2019 Opinion & Order, FXCM's relationship with Effex "came to a halt" in August 2014.  ECF No. 135 at 21.

event study analysis for the Notes is premised on price reactions on only *two* dates across a more than two-and-a-half-year period. As Professor Hendershott explains, this type of analysis is unscientific, and when the same type of multi-year analysis Dr. Werner employed for the common stock is applied to the Notes, the results weigh *against* a finding of market efficiency for the Notes.

*Finally*, Plaintiffs do not offer a damages methodology that ties to their theory of liability. The alleged corrective disclosure included other information that substantially altered FXCM's financial prospects. Yet, Plaintiffs fail to show that they could isolate the impact of these collateral consequences from losses arising from the alleged fraud. Plaintiffs further fail to show that they could calculate the price drop had the alleged "truth" been revealed by FXCM earlier (*i.e.*, any price inflation attributable to the alleged misstatements).

In sum, the class Plaintiffs' seek to certify does not fully satisfy Rule 23 and, therefore, the Motion must be denied.

## FACTUAL AND PROCEDURAL BACKGROUND

### A.   FXCM And Its Trading Relationship With Effex

FXCM was founded in 1999 and was one of the world's largest online foreign exchange ("FX") trading firms. Third Amended Consolidated Securities Class Action Complaint ("TAC") ¶ 42. FX trading firms generally operate under two types of trading models: the agency-trading model, also known as the "No Dealing Desk" model, and the principal-trading model, also known as the "Dealing Desk" model. *Id.* ¶¶ 43–45. FXCM pioneered the agency-trading model in 2007 and operated both agency-trading and principal-trading models during the Class Period. *See id.*

Under its agency-trading model, FXCM functioned as a credit intermediary between retail customers and over a dozen independent banks and specialist trading firms that execute customer trades, known as market makers or "liquidity providers." *Id.* ¶¶ 45–47. FXCM's liquidity providers competed for retail customers' orders by submitting quotes (buy and sell prices for each

currency pair) to FXCM. *Id.* ¶¶ 46-47. FXCM made money through brokerage fees earned on each transaction, markups on the liquidity provider's bid, and pay-for-flow agreements with certain liquidity providers. *Id.* ¶¶ 46, 148, 152. Under pay-for-flow arrangements, FXCM received a fixed fee based on the volume of trades executed with that liquidity provider. *See id.* ¶¶ 148, 150. FXCM did not take a trading position opposite the customer and did not make money betting against the customer using its agency-trading model.[5]

Effex Capital LLC ("Effex") was one of FXCM's liquidity providers. *See id.* ¶ 89. In March 2010, FXCM entered into a Services Agreement with Effex under which Effex would pay FXCM a $21 commission for every $1 million in trading volume that Effex was awarded from FXCM's customers. *Id.* ¶¶ 52–55; Services Agreement (Mar. 1, 2010) § 3.1, June 12, 2020 Declaration of Israel Dahan ("Dahan Decl.") Ex. 2. The Services Agreement was a pay-for-flow agreement; it was not tied in any way to FXCM's customers' profit or loss or Effex's profit or loss. Rather, FXCM received a flat fee, based solely on customer trading volume. TAC ¶ 55. On August 1, 2014, FXCM discontinued all pay-for-flow agreements, including the Services Agreement—a development that was publicly disclosed at that time and years before the end of the proposed class period. *Id.* ¶ 73. Effex continued to be one of FXCM's many liquidity providers until January 2017, but without any pay-for-flow arrangement. *Id.*

### B.   The FXCM Securities Subject To Plaintiffs' Claims

On December 2, 2010, FXCM completed an initial public offering of 15,060,000 shares of Class A common stock, which began trading on the New York Stock Exchange ("NYSE") under the symbol "FXCM." TAC ¶ 28; *see also* FXCM Dec. 1, 2010 Form S-1, Dahan Decl. Ex. 3. On

---

[5] The liquidity provider, on the other hand, made money by betting against the retail customer, *i.e.*, when a customer placed an order to exchange euros for francs, the customer was betting that euros were overvalued compared to francs; in agreeing to trade, the liquidity provider was betting that *francs* were overvalued.

October 1, 2015, FXCM's shares underwent a one-for-ten reverse stock split.  Werner Rpt. ¶ 16.

FXCM's common stock continued to trade on the NYSE until September 23, 2016, when FXCM

voluntarily de-listed.  *Id.*  Beginning on September 26, 2016, FXCM's common stock traded on

NASDAQ under the symbol "FXCM".  *Id.*  On February 24, 2017, FXCM's name was changed

to Global Brokerage, Inc., and the shares subsequently traded under the symbol GLBR.  *Id.*

On June 3, 2013, FXCM issued $172.5 million in senior unsecured convertible fixed

coupon notes due June 15, 2018 (the "Notes").  TAC ¶ 173.  The Notes were issued under Rule

144A, and therefore were not registered with the Securities and Exchange Commission.  Werner

Rpt. ¶ 18; *see also* 17 C.F.R. § 230.144A.  Nor were they listed on any exchange.  Hendershott

Rpt. ¶ 31.  As Dr. Werner explains, since the Notes were sold pursuant to Rule 144A they could

only be traded by Qualified Institutional Buyers ("QIBs") (Werner Rpt. ¶ 21), which are entities

"that in the aggregate own[ ] and invest[ ] on a discretionary basis at least $100 million in securities

of issuers that are not affiliated with the entity."  17 C.F.R. § 230.144A(a)(1)(i).  In addition, initial

purchasers of securities issued under Rule 144A are restricted from reselling those securities for a

certain period after the date of issuance.  Werner Rpt. ¶ 19.  Here, the offering circular for the

Notes set the end of the resale restriction to one year after closing,[6] and the Notes did not begin

trading until June 24, 2014.  *Id.*

Like most corporate debt, the FXCM Notes traded on over the counter ("OTC") dealer

markets.  Hendershott Rpt. ¶ 25.  In OTC markets, a security's price is not readily observable and

may vary depending on factors specific to the particular trade under consideration by the relevant

counterparties.  *Id.*  Trading on OTC markets can be infrequent, and securities traded on these

markets are generally less liquid than securities traded on centralized exchanges.  *Id.* ¶¶ 27–30.

---

[6] FXCM June 3, 2013 Form 8-K at 16, Dahan Decl. Ex. 4.

Furthermore, "[t]he market for 144A bonds has long been an even more opaque and illiquid market than the regular public bond market." *Id.* ¶ 31.

### C. The January 2015 SNB Flash Crash Dramatically Affected The Value Of FXCM And Its Notes

Beginning in early 2015, *two years before the end of the proposed class period*, FXCM experienced dramatic changes in its business and financial condition that dramatically affected the value of its securities. Specifically, on January 15, 2015, the Swiss National Bank ("SNB") shocked the world's financial markets by announcing that it would immediately end its three-year-old peg of 1.20 Swiss francs to one euro. Werner Rpt. ¶ 13. The SNB made this announcement just days after assuring the markets that it had no intention of removing the currency peg. This unforeseen policy reversal resulted in a widespread market disruption, known as the "SNB Flash Crash," that entailed extreme price volatility and severely impaired market liquidity. *Id.*; Hendershott Rpt. ¶ 81. The value of the euro plummeted versus the Swiss franc, and traders and brokers throughout the world with open long positions on the euro-Swiss franc currency pair collectively lost billions of dollars. FXCM customers with positions in this currency trading pair lost more than $275 million. *See* TAC ¶ 13.

As a result, the Company faced a possible breach of its regulatory capital requirements. *Id.* In order to avoid liquidation, FXCM secured an emergency $300 million loan from Leucadia National Corp. *Id.*; Hendershott Rpt. ¶ 42. Within days of the SNB Flash Crash and the subsequent bailout financing from Leucadia, the price of FXCM's common stock declined by nearly 90%[7] and the Notes traded substantially below par. Hendershott Rpt. ¶ 42. Over time, FXCM also lost

---

[7] Mike Stone, "FX Broker FXCM Gets Rescue From Jefferies Parent Leucadia", Reuters (Jan. 16, 2015), *available at*: https://www.reuters.com/article/us-swiss-snb-fxcm/fx-broker-fxcm-gets-rescue-from-jefferies-parent-leucadia-idUSKBN0KP1MY20150117.

most of its security analyst coverage and trading in the Notes became sparse.  *Id.*  Significantly, *all* of the Plaintiffs in this action began purchasing FXCM securities *after* the SNB Flash Crash and *after* FXCM's public announcement that it had terminated its pay-for-flow agreements.

**D.     FXCM Enters Into "No-Admit" Settlements With The CFTC And NFA Relating To Its Effex Relationship**

On February 6, 2017, FXCM announced that the Company, Dror Niv, and William Ahdout had entered into a settlement with the Commodity Futures Trading Commission ("CFTC") and the National Futures Association ("NFA") concerning the Company's "pay-for-flow" relationship with Effex.  TAC ¶ 16.  The CFTC and NFA alleged that FXCM had failed to properly disclose that, between 2009 and 2014, the Company received pay-for-flow from Effex and that this agreement created a conflict of interest between FXCM and its retail trading customers.  In entering into this settlement, FXCM did not admit to the CFTC and NFA allegations, and expressly preserved the right to contest such allegations, should they be asserted or relied upon in another matter by other litigants.  ECF No. 90-4 at 3; ECF No. 181-1 at 11.  Furthermore, FXCM's pay for flow relationship with Effex was not illegal or improper under CFTC or NFA rules, and neither the CFTC nor NFA alleged otherwise.[8]

Pursuant to these no-admit settlements, FXCM subsequently sold its U.S. business.  Form 8-K (Feb. 7, 2017), Ex. 99.1, Dahan Decl. Ex. 5.  Plaintiffs allege that FXCM's securities lost significant value following the February 7, 2017 announcement of (1) these regulatory settlements and (2) the pending divestment of FXCM's U.S. business.  TAC ¶¶ 82-83.

**E.     Procedural History And Plaintiffs' Motion For Class Certification**

On June 19, 2017, the Plaintiffs filed their Consolidated Securities Class Action Complaint

---

[8] The CFTC has dismissed on motion reparation actions by FXCM customers who have sought to use this no admit settlement as a basis to establish unlawful conduct by FXCM.  *See, e.g.*, Dahan Decl. Ex. 5.

("CSAC").  ECF No. 48.  The CSAC was dismissed without prejudice on March 3, 2018.  ECF

No. 108.  Plaintiffs filed their Second Amended Consolidated Securities Class Action Complaint

("SAC") on April 6, 2018.  ECF No. 111.  The SAC alleged that the Defendants were responsible

for false or misleading public statements with respect to FXCM's agency-trading model and the

Company's order flow relationship with Effex.  SAC ¶¶ 2, 5.  On March 28, 2019, the Court denied

in part Defendants' Motion to Dismiss but limited the time period of Plaintiffs' allegations of

misstatements to reflect FXCM's publicly announced termination of its order flow arrangement

with Effex as of August 2014.  ECF No. 135 at 21.

On January 6, 2020, Plaintiffs' filed their original Motion for Class Certification and

Appointment of Class Representatives and Class Counsel.  This motion was denied as moot on

April 13, 2020, after Plaintiffs filed a notice of Amended Motion for Class Certification and

Appointment of Class Representatives and Class Counsel, seeking to substitute E-Global Trade

and Finance Group, Inc. ("E-Global") for Sergey Regukh.  ECF No. 177.

Plaintiffs filed their Third Amended Consolidated Securities Class Action Complaint on

April 17, 2020.  In their Motion, Plaintiffs ask this Court to certify a class consisting of:

> All persons and/or entities that purchased or otherwise acquired publicly traded
> Global Brokerage, Inc., f/k/a FXCM Inc. ("FXCM") securities, including FXCM
> 2.25% Convertible Senior Notes due 2018 and Class A common stock, during the
> period March 15, 2012 through February 6, 2017, both dates inclusive.

Br. at 1. As explained below, Plaintiffs have failed to establish the requisite elements for class

certification under Rule 23 for either the foregoing purchasers of FXCM common stock or Notes.

## LEGAL STANDARD

"The class action is an exception to the usual rule that litigation is conducted by and on

behalf of the individual named parties only." *Wal–Mart Stores, Inc. v. Dukes*, 564 U.S. 338, 348

(2011) (internal quotes and citation omitted).  In order to maintain a class action, each element of

Rule 23(a) (numerosity, typicality, commonality and adequacy of representation), and at least one element of Rule 23(b), in this case Rule 23(b)(3) (class-wide questions predominate and class-wide adjudication is superior to individual actions), must be satisfied. *See In re Livent, Inc. Noteholders Sec. Litig.*, 211 F.R.D. 219, 220 (S.D.N.Y. 2002); *In re Initial Public Offerings Sec. Litig.*, 471 F.3d 24, 40 (2d Cir. 2006) ("[A] district court may not grant class certification without making a determination that all of the Rule 23 requirements are met.")  Significantly, the trial court must "conduct a rigorous analysis" of the Rule 23 elements before certifying a class. *In re Livent*, 211 F.R.D. at 221-22.  "[T]he obligation to make such determinations is not lessened by overlap between a Rule 23 requirement and a merits issue." *In re Initial Public Offerings*, 471 F.3d at 41.

"The burden of proving compliance with all of the requirements of Rule 23 rests with the party moving for certification." *Levitt v. J.P. Morgan Sec., Inc.*, 710 F.3d 454, 465 (2d Cir. 2013).  And they must do so by a preponderance of the evidence. *Teamsters Local 445 Freight Div. Pension Fund v. Bombardier Inc.*, 546 F.3d 196, 202 (2d Cir. 2008).  If the plaintiff does not meet its burden with respect to *any* element, class certification must be denied. *See In re Flag Telecom Holdings, Ltd. Sec. Litig.*, 574 F.3d 29, 34-35 (2d Cir. 2009).  Plaintiffs have not met their burden.

## <u>ARGUMENT</u>

I. **Plaintiffs Have Not Established By A Preponderance Of The Evidence All Four Requirements Of Rule 23(a)**

### A.   **The Proposed Notes Class Is Not Sufficiently Numerous**

In this Circuit, "[n]umerosity is presumed when a class consists of forty or more plaintiffs." *In re Winstar Comm'ns Sec. Litig.*, 290 F.R.D. 437, 442 (S.D.N.Y. 2013).  Plaintiffs' assert that they have met their burden because the Notes "saw an average weekly trading volume of over $5 million in aggregate par value" between June 24, 2014 and February 7, 2017.  Br. at 7.  But Plaintiffs offer no specifics as to the number or identities of the parties who held the Notes during

that period, and there is every reason to believe the Notes were not widely held and that any potential class of noteholders with claims against Defendants will not be numerous enough for class certification to be appropriate.

According to Dr. Werner, the market for the Notes was inherently restricted since they were issued under Rule 144A and could only be purchased by QIBs.  Werner Rpt. ¶¶ 21, 130.  Therefore, there were only a limited number of institutional investors who were eligible to purchase the Notes.  And any noteholders who purchased Notes in the initial offering on June 3, 2013, and before the Rule 144A restriction expired and the Notes began trading on June 24, 2014, must be excluded from any class to the extent Plaintiffs rely on the fraud-on-the market presumption.  *See, e.g.*, *Initial Public Offerings*, 471 F.3d at *42 ("[A] primary market for newly issued [securities] is not efficient or developed under any definition of these terms.") (internal citation omitted).  In fact, Plaintiffs do not contend that the market for Notes was efficient before that point.  Werner Rpt. ¶ 1.[9]  Moreover, because the noteholders in this matter are likely large, sophisticated entities as opposed to a group of small investors, it would not be difficult for them to file their own lawsuit.  *See, e.g.*, *Argent Classic Convertible Arbitrage Fund L.P. v. Countrywide Fin. Corp.*, No. CV 07-07097, 2009 WL 10673338, at *5 (C.D. Cal. Dec. 9, 2009) ("Where the putative class is small in number, relatively sophisticated, and has potential claims, the class members may be presumed to have incentives to file their own actions.").

Furthermore, the holders of the vast majority of the notional value of the Notes as of May 29, 2019, waived and released any claims against Defendants for violations of the securities laws relating to their purchase or sale of FXCM's securities.  On May 29, 2019, FXCM entered into a

---

[9] Indeed, Dr. Werner testified that he was not "asked to look at" whether the market for the Notes was efficient before June 24, 2014.  Werner Tr. 201:5-18.

forbearance agreement with a number of parties, including Note holders. Grossman Aff. ¶ 4. In connection with that agreement, FXCM obtained a release of claims from Note holders representing over 80% of the notional value of the outstanding Notes at the time, including claims for violations of the federal securities laws relating to the purchase or sale of FXCM's securities. *Id.* ¶¶ 4-6.

### B.     Plaintiffs Are All Atypical Investors Subject To Unique Defenses

A plaintiff seeking to be named as a class representative must show by a preponderance of the evidence that its claims are typical of the class and that it is not subject to "unique defenses which threaten to become the focus of the litigation." *In re IMAX Sec. Litig.*, 272 F.R.D. 138, 147 (S.D.N.Y. 2010) (internal quotes and citation omitted).   A defendant "need not show at the certification stage that the unique defense will prevail, only that it is meritorious enough to require the plaintiff to devote considerable time to rebut the unique defense." *Gordon v. Sonar Capital Mgmt. LLC*, 92 F. Supp. 3d 193, 201 (S.D.N.Y. 2015) (internal quotes and citation omitted).   A plaintiff "who is subject to an arguable defense of non-reliance on the market has been held subject to a unique defense, and therefore, atypical of the class under Rule 23(a)(3)." *Rocco v. Nam Tai Elecs., Inc.*, 245 F.R.D. 131, 136 (S.D.N.Y. 2007) (internal quotes and citation omitted).

Here, each of the Plaintiffs are subject to unique defenses given the timing of their purchases of FXCM's common stock or Notes, disqualifying them as representatives for a class related to either the common stock or Notes.   Specifically, each of the Plaintiffs began investing in FXCM securities *after* the SNB Flash Crash in January 2015—approximately *three years after* the beginning of the proposed class period and *after* the value of FXCM's securities significantly declined.   ECF Nos. 168, 176-2, 182; *see also Baffa v. Donaldson, Lufkin & Jenrette Sec. Corp.*, 222 F.3d 52, 59 (2d Cir. 2000) (finding class representative was inadequate based in part on her stock purchase "after the value had drastically declined amidst reports of financial difficulty").

Moreover, each of the Plaintiffs purchased their FXCM securities *after* FXCM disclosed that it ceased its pay-for-flow arrangement with Effex, the very arrangement that is at the heart of this action.  ECF No. 135 at 21; ECF Nos. 168, 176-2 & 182.

Moreover, during their depositions, each Plaintiff *disclaimed* reliance on the integrity of the market, putting them at odds with the fraud-on-the-market theory of reliance and subjecting them to unique defenses.  Specifically, 683 Capital, the only Notes purchaser, admitted that it purchased the Notes because it believed the market undervalued them by "a lot," (Patt Tr. 129:14-17 (Dahan Decl. Ex. 7)) and that the Notes appeared "well covered" to "recover a hundred cents on the dollar," despite the fact that they were "trading in the 40s," *id.* at 77:13-78:7; *see also Rocco*, 245 F.R.D. at 136 (finding proposed class representative inadequate based in part on evidence that "he was relying not on the market, but on his own assessment of the value of the stock").[10] Plaintiffs Shipco and E-Global likewise testified that they purchased FXCM common stock because they believed that it was undervalued.  *See* Regukh Tr. 170:9-18; Cozzarelli Tr. 110:24-113:4 (Dahan Decls. Ex. 8 &11).[11]

### C.  Plaintiffs Are All Inadequate Class Representatives Due To Their Repeated

---

[10] 683 Capital also employed a unique and sophisticated trading strategy that included significant short sales of FXCM common stock, as well as both numerous call and put options.  *See* ECF No. 168.  *See Weikel v. Tower Semiconductor Ltd.*, 183 F.R.D. 377, 392 (D.N.J. 1998) (finding short seller unsuitable as class representative because he would be unlikely to be able to benefit from the fraud on the market theory); *see also In re Critical Path, Inc. Sec. Litig.*, 156 F. Supp. 2d 1102, 1110 (N.D. Cal. 2001) ("Short sales raise the question of whether the seller was actually relying on the market price.").

[11] E-Global is also an atypical because some of its claims are barred by the five-year statute of repose, which runs from the date of the alleged misrepresentation.  28 U.S.C.A. § 1658; *see also SRM Glob. Master Fund Ltd. P'ship v. Bear Stearns Cos. L.L.C.*, 829 F.3d 173, 177 (2d Cir. 2016).  Plaintiffs filed their Motion to Add Named Plaintiff E-Global on March 16, 2020, more than six months after the expiration of the statute of repose for the vast majority of Plaintiffs' allegations which relate to alleged misstatements on or before August 2014.  *See Leber v. Citigroup 401(k) Plan Inv. Comm.*, 323 F.R.D. 145, 153-54 (S.D.N.Y. 2017) (striking named plaintiff where she was "time-barred from raising any individual claims at the time of her entry into this case" but noting that it did not preclude her from remaining a member of any class).  Nor is this failure excusable as E-Global's representative testified that it was aware in early 2017 that it could have brought claims in its own right.  E-Global Tr. 35:17-22 (Dahan Decl. Ex. 10).

### Failure To Cooperate in Discovery

Class representatives must also satisfy Rule 23(a)'s adequacy requirement and demonstrate that they can "serv[e] as [] fiduciar[ies] to advance and protect the interests of those whom [they] purport[] to represent." *Rocco*, 245 F.R.D. at 136 (internal quotation and citation omitted). As fiduciaries, class representatives have "a responsibility to comply with discovery requests." *Koss v. Wackenhut Corp.*, No. 03-CV-7679 (SCR), 2009 WL 928087, at *7 (S.D.N.Y. Mar. 30, 2009). And refusal to cooperate in the discovery process can render a plaintiff inadequate as a class representative. *See, e.g., Rocco*, 245 F.R.D at 136-37 (finding named plaintiff inadequate where he refused to produce documents until compelled by a court order).

Plaintiffs have abdicated their duty to participate meaningfully in the discovery process, again disqualifying them as representatives of a class for either security. Each initially produced a miniscule number of documents and represented to Defendants and the Court that their productions were complete. Yet, each testified at their depositions that they failed to search for or produce relevant documents. 683 Capital's representative testified that he believed that he had corresponded via email about its investments in FXCM (Patt Tr. 200:22-201:14), but no such documents were produced prior to his deposition. Shipco admitted during its deposition that it had "just" started collecting potentially relevant emails. Cozzarelli Tr. 149:16-152:19. And E-Global provided a single bank statement and performed no other searches. Regukh Tr. 262:18-22; 263:10-14. Additionally, representatives of all three were also woefully unprepared for their 30(b)(6) depositions, having spent only a few hours preparing with counsel and having had little or no substantive conversations with colleagues regarding subjects as to which they did not have

personal knowledge. Patt Tr. 16:13-17:16; Regukh Tr. 187:44-188:5; Cozzarelli Tr. 19:12-21:24.[12]

## II. Plaintiffs Have Not Established By A Preponderance Of The Evidence Rule 23(b)(3)'s Predominance And Superiority Requirements With Respect To The Notes

To obtain class certification, Plaintiffs must also establish one of the requirements of Rule 23(b). Plaintiffs contend that the proposed class satisfies the requirements of Rule 23(b)(3), which requires the court to find "that the questions of law or fact common to class members predominate over any questions affecting only individual members, and that a class action is superior to other available methods for fairly and efficiently adjudicating the controversy." Fed.R.Civ.P. 23(b)(3). Whether individual or common questions will predominate boils down, in this case, to the method by which the Plaintiffs will prove the reliance element of their Section 10(b) claim. *See In re Petrobras Sec.*, 862 F.3d 250, 275 (2d Cir. 2017) (unless reliance is presumed, "the reliance element would appear to preclude class certification on predominance grounds").

As demonstrated below, the issue of reliance will not be common among the Note purchasers. Therefore, Notes purchasers cannot avail themselves of the presumption of reliance under *Affiliated Ute* or the fraud-on-the-market presumption under *Basic*.

### A. The *Affiliated Ute* Presumption Does Not Apply

Plaintiffs assert in conclusory fashion that they are "entitled the [sic] *Affiliated Ute* presumption of reliance." Br. at 12. In *Affiliated Ute Citizens of Utah v. United States*, the

---

[12] 683 Capital and Shipco also provided inadequate and misleading PSLRA certifications. 683 Capital listed several internal transfers as "purchases" of Notes, overstating their purchases, and completely failed to list their short sales of the common stock and numerous options transactions. *See* ECF Nos. 27-2; Patt Tr. 81:22-83:6. This deficiency was not remedied until shortly before its 30(b)(6) deposition when it filed an amended certification attaching a series of highly redacted account statements that their own representative struggled to decipher. Similarly, Shipco's certification concealed that many of its purchases were actually the product of an internal assignment and did not include two stock sales. ECF Nos. 27-2 & 27-3. Its certification was not amended until the day before its deposition (ECF No. 168) and needed to be amended again after further deficiencies were revealed during questioning. (ECF No. 184). These errors could have been identified by even a superficial review of their trading records.

Supreme Court ruled that plaintiffs in securities fraud cases were not required to present proof of reliance in cases "involving *primarily* a failure to disclose."  406 U.S. 128, 153 (1972) (emphasis added).  According to Plaintiffs, they are entitled to invoke *Affiliated Ute* because their "claims are primarily based on Defendants' omission of material facts relating to the secret profit-sharing relationship between FXCM and Effex."  Br. at 12.  This is simply not true.

Plaintiffs' claims are primarily based on alleged misstatements by Defendants and any alleged omissions are secondary thereto.  Even a *cursory* review of the TAC reveals that Plaintiffs allege numerous affirmative misstatements by Defendants.  *See, e.g.*, TAC ¶ 2 (alleging FXCM "knowingly misled investors" in the Company's SEC filings and other public statements "by *falsely claiming*" that customers who transacted on its No Dealing Desk platform would be free from conflicts of interest) (emphasis added); ¶ 12 (alleging that "FXCM's quarterly and annual reports *misrepresented* that FXCM had no interest in the trades executed on its NDD platform and [that] there were no conflicts of interest between FXCM and its customers") (emphasis added); ¶¶ 103-124 (identifying Defendants' "false and misleading statements" in SEC filings during the class period); ¶¶ 146-163 (identifying Defendants' false statements regarding FXCM's agency model as being conflict free in light of its order flow relationship with Effex).[13]  Indeed, the Court allowed Plaintiffs to proceed with this action based on allegedly false "statements" relating to FXCM's agency-trading model and its order flow relationship with Effex.  ECF No. 135 at 38.  Accordingly, because Plaintiffs' claim is premised primarily on these affirmative statements, *Affiliated Ute* does not apply, and reliance may not be presumed.  *See Waggoner*, 875 F.3d at 96 (holding *Affiliated*

---

[13] At most, Plaintiffs allege that FXCM's affirmative statements were half-truths made misleading by not including explicit disclosures regarding FXCM's relationship with Effex.  But, "[t]he *Affiliated Ute* presumption does not apply to earlier misrepresentations made more misleading by subsequent omissions, or to what has been described as 'half–truths.'"  *Waggoner v. Barclays PLC*, 875 F.3d 79, 96 (2d Cir. 2017).

*Ute* presumption did not apply where omissions "directly related" to earlier statements plaintiffs claimed were false); *Teamsters Local 445 Freight Div. Pension Fund v. Bombardier, Inc.*, No. 05 Civ. 1898(SAS), 2006 WL 2161887, at *9 (S.D.N.Y. Aug. 1, 2006) (*Affiliated Ute* presumption did not apply where "positive statements, not omissions, are central to the alleged fraud").

 **B.** ***Basic's* "Fraud On The Market" Presumption Does Not Apply**

 In *Basic v. Levinson*, the U.S. Supreme Court held that plaintiffs may establish a rebuttable presumption of reliance by showing that the relevant security traded in an open and developed (*i.e.*, efficient) market.  485 U.S. 224 (1988).  This is commonly referred to as the fraud-on-the-market presumption.  The fraud-on-the-market presumption "rests on the premise that certain well developed markets are efficient processors of public information."  *Amgen Inc. v. Connecticut Retirement Plans and Trust Funds*, 568 U.S. 455, 461 (2013); *see also Teamsters*, 2006 WL 2161887, at *5 ("The fraud on the market presumption applies only if the market for the security is open and developed enough so that it quickly incorporates material information into the price of the security, *i.e.*, the market must be *efficient.*").

 Plaintiffs concede that it is their burden to show market efficiency where they seek to "invoke" the fraud-on-the-market presumption articulated in *Basic*.  *See* Br. at 12.  And they must make such showing by a preponderance of the evidence.  Plaintiffs attempt to meet their heavy burden of demonstrating market efficiency with respect to the FXCM securities at issue (common stock and Notes) through the report of Dr. Adam Werner (the "Werner Report" or "Werner Rpt.").  The Werner Report, however, utterly fails to show that the Notes traded in an efficient market, and is fundamentally flawed in many respects.   Accordingly, Notes purchasers cannot invoke the

presumption of class-wide reliance under *Basic* and should not be certified as a class.[14]

**1.   The *Cammer* Factors Weigh Against A Finding That The Notes Traded In An Efficient Market**

As Plaintiffs acknowledge, courts in this Circuit look to the factors set forth in *Cammer v. Bloom*, 711 F. Supp. 1264 (D.N.J. 1989), when assessing market efficiency for a given security. Br. at 13.   The first four *Cammer* factors (average weekly trading volume, analyst coverage, existence of market makers and arbitrageurs, and S-3 eligibility) "examine indirect indicia of market efficiency for a particular security."   *In re Petrobras*, 862 F.3d at 276.   "The fifth *Cammer* factor [causation] . . . invites plaintiffs to submit direct evidence, consisting of empirical facts showing a cause and effect relationship between unexpected corporate events or financial releases and immediate response in the stock price."   *Id.* (internal quotes and citations omitted).   The *Cammer* factors have been applied to equity markets, and "in modified form, to bond markets with a recognition of the differences between the manner in which debt bonds and equity securities trade."   *Id.* (internal quotes and citation omitted).   Here, the *Cammer* factors weigh *against* a finding of market efficiency with respect to the Notes.[15]

**a.   The Notes Had A Low Average Weekly Trading Volume During The Notes Period**

The first *Cammer* factor looks at a security's average weekly trading volume.   *Cammer*, 711 F. Supp. at 1286 (average weekly trading volume of 2% or more establishes a strong presumption of an efficient market for the security).   "A high average trading volume suggests

---

[14] Defendants are not disputing the market efficiency of FXCM's common stock; however, the fact that the market for the common stock was efficient is not proof that the Notes traded in an efficient market.   *See Schleicher v. Wendt*, 2009 WL 761157, at *6 (S.D. Ind. Mar. 20, 2009) (rejecting notion "that evidence of an efficient market for common stock allows a court to infer that the markets for all other publicly traded securities from the same issuer are also efficient").

[15] The only *Cammer* factor that weighs in favor of efficiency is S-3 eligibility.

market efficiency, because it implies that there is 'significant investor interest in the company' and 'a likelihood that many investors are executing trades on the basis of newly available or disseminated corporate information.'" *Teamsters*, 2006 WL 2161887, at *6 (citation omitted). In his report, Dr. Werner opines that the average weekly trading volume for the Notes was 2.92% (Werner Rpt. ¶ 125) and, therefore, according to Plaintiffs, there exists a "strong presumption" of market efficiency for the Notes. Br. at 14-15.

But as Professor Hendershott explains, Dr. Werner's calculation of average weekly trading volume across a nearly two-and-a-half-year period is skewed by isolated outlier events. Hendershott Rpt. ¶ 46. For most weeks, the Notes' average trading volume was usually well below 2%, or even 1%, and the Notes did not trade at all for many weeks during the proposed five-year Notes class period. *Id.* ¶¶ 46, 49-50. *See, e.g.*, *In re Northfields Labs., Inc. Sec. Litig.*, 267 F.R.D. 536, 547 (trading volume did not support a finding of efficiency and expert's calculation of trading volume was "suspect" where the expert "made one calculation of average trading volume over the entire five-year class period," which disguised several years of low average daily trading volume and a significant increase towards the end of the class period). Dr. Werner's 2.92% number is also skewed by the abnormal spikes in trading activity that followed the SNB Flash Crash. Hendershott Rpt. ¶ 48. In fact, as Professor Hendershott details in his report, the median trading volume—which is more instructive from a statistical perspective given the anomalies caused by the SNB Flash Crash—was only 0.49% during the Notes class period. *Id.* ¶¶ 48-49.[16]

Professor Hendershott provides a more granular analysis of the Notes' trading volume which shows that the Notes actually were thinly traded during the class period. To this end, during

---

[16] This period runs from when the Notes began trading on June 24, 2014 to February 6, 2017. Werner Rpt. ¶ 1.

the putative Notes class period of 138 weeks, there were only 35 weeks which had a weekly trading volume greater than 2% (approximately 25% of all weeks) compared to 103 weeks which had a weekly trading volume less than 2% (approximately 75% of all weeks).  Hendershott Rpt. ¶ 49. And 90 of the 138 weeks had a weekly trading volume less than 1% (approximately 65% of all weeks).  *Id.*  Furthermore, 44 out of the 138 weeks (approximately 31% of all weeks) had no trading *at all* during the entire week.  *Id.*  The number of trades for the Notes also declined over time, especially during the second half of the Notes class period.  From October 27, 2015 until February 6, 2017, a period of 69 weeks, average weekly trading volume was only 0.98%, and the median weekly trading volume was merely 0.01%.  *Id.* ¶ 50.  Additionally, for 31 of the 69 weeks, *i.e.*, 44%, the Notes did not trade *at all*.  *Id.*  This level of illiquidity weighs against a presumption of market efficiency, even for a bond.  *See, e.g.*, *Teamsters*, 2006 WL 2161887, at *10, 12 (trading volume did not support a finding of efficiency, even where average weekly trading volume was 8.5% where there were "infrequent trades" and no certificates traded at all on 82.3% of the days in the class period).  Therefore, *Cammer* factor No. 1 weighs *against* a finding of market efficiency.

### b.   The Notes Received No Meaningful Coverage By Analysts During The Notes Period

The second *Cammer* factor focuses on analyst coverage.  "If a large number of financial analysts report on the [security], one can infer that financial statements are closely reviewed by investment professionals, who would in turn make buy/sell recommendations to client investors." *Teamsters*, 2006 WL 2161887, at *6 (internal citation omitted).  Dr. Werner opines that this factor weighs in favor of efficiency because "[d]uring the Notes Period, at least nine firms/analysts following FXCM issued recommendations and/or research reports," "three additional firms also followed FXCM" but did not issue reports, and there were "938 news articles about FXCM that were published during the Notes Period."  Werner Rpt. ¶¶ 126-27, 129.  And Dr. Werner argues

that the Notes being "held and traded solely by QIBs" weighs in favor of efficiency because "[i]nstitutional investors employ financial analysts and portfolio managers who conduct their own research on securities and make investment decisions based on that research." *Id.* ¶ 130.

Again, Dr. Werner's analysis is flawed and misleading. Dr. Werner uses the same set of analyst reports when assessing coverage for FXCM's common stock and the Notes—ignoring the inherent differences between debt and equity securities. Hendershott Rpt. ¶¶ 53-54. And he does not address whether *any* analysts specifically covered the Notes, rather than the common stock or FXCM as a whole. *Id.* ¶ 53. Dr. Werner also fails to address the fact that none of the ratings agencies (*i.e.*, Moodys, S&P or Fitch) covered the Notes during the Notes class period. *Id.* ¶ 54. Moreover, his focus on the total number of analysts during the Notes class period also disguises the fact that coverage drastically decreased during the period, falling precipitously after the SNB Flash Crash in January 2015. *Id.* ¶ 55. Only five reports were released during 2016 and 2017, the last dated November 10, 2016—nearly three months before the alleged corrective disclosure. *Id.*

This scant level of analyst and ratings agency coverage is insufficient to support a presumption of market efficiency. *See, e.g.*, *Teamsters*, 2006 WL 2161887, at *10 (*Cammer* factor No. 2 did not support market efficiency even though 44 analysts covered the company because the plaintiff "presented no evidence that analysts specifically followed the Certificates" and plaintiff's argument that analysts who followed the company necessarily followed the certificates as well was "not persuasive"), *aff'd* 546 F.3d at 2016; *In re Safety-Kleen Corp. Bondholders Litig.*, No. 3:00-1145-17, 2004 WL 3115870, at *7 (D.S.C. Nov. 1, 2004) (that 19 analysts covered the company's securities did not weigh in favor of market efficiency where "only two or three provided any credit research on the bonds"). Nor does the fact that the Notes were owned by institutional investors who had their own analysts and/or portfolio managers weigh in favor of efficiency. *See id.* at *6

(plaintiffs' argument that "QIBs employ professional securities analysts whose job it is to monitor news about the companies and securities they are covering and who stay informed" suggested inefficiency because "[i]n an efficient market, there is no need for individual investors to hire analysts to determine what the price of the bonds should be through the information that the analysts are able to glean by their efforts; the price already reflects the information publicly available").  Therefore, *Cammer* factor No. 2 also weighs *against* a finding of market efficiency.

### c.   Plaintiffs Present No Evidence Of Market Makers Or Arbitrageurs For The Notes During The Notes Period

The third *Cammer* factor examines the number of market-makers and arbitrageurs who traded in a security.  *See Teamsters*, 2006 WL 2161887, at *5.  "Market makers and arbitrageurs contribute to market efficiency by reacting swiftly to company news and reported financial results by buying or selling stock and driving it to a changed price level." [17]  *Id.* at *7 (internal citation omitted).  Dr. Werner opines that this factor is satisfied because the Notes "were placed into the financial marketplace by prominent underwriters" and were purchased by large investment banks, and that certain banks stated that they made markets in "FXCM securities."  Werner Rpt. ¶¶ 131, 134.  According to Dr. Werner, that "there were numerous market participants that provided liquidity for the FXCM notes [] is compelling evidence in favor of market efficiency."  *Id.* ¶ 135.

However, Dr. Werner presents no *actual* evidence that *any* market makers traded in the Notes during the class period, and he fails to address the existence of arbitrageurs at all.  Though Dr. Werner points to the existence of underwriters for FXCM's Notes offering, he presents no

---

[17] "A market-maker is one who helps establish a market for securities by reporting bid-and-asked quotations (the price a buyer will pay for a security and the price a seller will sell a security), and who stands ready to buy or sell at these publicly quoted prices.  Arbitrageurs are professional investors who exploit price differences in different markets by buying and selling identical securities in those markets." *Teamsters*, 2006 WL 2161887, at *7 (internal quotes and citation omitted).

evidence which, if any, of them actually made a market in the Notes or how frequently they traded the Notes. *See, e.g.*, *Teamsters*, 2006 WL 2161887, at \*10-11 (argument that lead underwriter of a notes offering essentially acts as a market maker was unavailing because plaintiff failed to show there were actually "firms who would furnish bids and quotes on request and who would effect transactions for each Certificate"), *aff'd* 546 F.3d at 207. And though Dr. Werner points to data on dealer transactions, he admitted that it does not identify the dealers (*see* Werner Tr. 240:6-17), so it cannot be used to ascertain if they actually made a market in the Notes. Hendershott Rpt. ¶ 58. Nor did any of the three banks Dr. Werner references specifically state that they made a market in the Notes, and one actually stated that it was a market maker for the common stock. *Id.* This is insufficient to support a finding that these entities acted as market makers for the Notes. *See, e.g.*, *In re Safety-Kleen*, 2004 WL 3115870, at \*7 (plaintiff's allegation that there were nine market makers insufficient where "[t]he uncontradicted evidence by defendants is that the firms . . . appear to have had too few trades in Safety Kleen bonds during the class period to meet the definition of market makers"). Therefore, *Cammer* factor No. 3 weighs *against* market efficiency.

### d. Dr. Werner Fails To Demonstrate A Cause And Effect Reaction Between News And Price Changes In The Notes

The fifth *Cammer* factor, the most important one, examines "the cause-and-effect relationship between company disclosures and an immediate response in the price of the [security]." *Teamsters*, 2006 WL 2161887, at \*7 (internal quotes and citation omitted). "[I]n an efficient market, a security's price remains stable in the absence of news, and changes rapidly as the market receives new and unexpected information." *Id.* Plaintiffs point to Dr. Werner's report and argue that they have satisfied this factor. Br. at 18. They contend that Dr. Werner conducted an event study and a "news no-news" test for the Notes (Br. at 18-19), and that based on these tests Dr. Werner was able to conclude that there was a "cause and effect relationship" between the

release of new information and price reactions in the Notes (Br. at 20).  None of this is true.  As an initial matter, Dr. Werner did *not* conduct a "news no-news" test for the Notes.  And as Professor Hendershott explains in his report, Dr. Werner's assessment of *Cammer* factor No. 5 is deeply flawed and unreliable, and his analysis is biased, unscientific, and internally inconsistent. Hendershott Rpt. ¶ 13. Accordingly, *Cammer* factor No. 5 also weighs *against* market efficiency.

The only empirical analysis Dr. Werner purportedly conducted with respect to the Notes was an event study where he examined price reactions on only *two trading days* (January 16, 2015 and February 7, 2017), the latter of which is outside the class period.  As Professor Hendershott explains, observing price reaction on only two trading days cannot reliably demonstrate market efficiency over two-and-a-half-years, especially given the Notes' pattern of inconsistent and declining liquidity and analyst coverage.  Hendershott Rpt. ¶ 67.  Even Dr. Werner conceded at his deposition that looking at only "two snap shots in time" may "not be sufficient . . . to opine upon market efficiency."[18]

Notably, when assessing the common stock, Dr. Werner relied not just on an event study, but also what he termed a "news no-news" test.  Werner Rpt. ¶ 49.  According to Dr. Werner, this test allows him to determine whether the proportion of days with statistically significant price returns among the "news" days during the Class Period is higher than the proportion among the "non-news" days.[19]  Werner Tr. 123:17-23.  Dr. Werner designated days on which FXCM released

---

[18] Werner Tr. 68:9-19 ("Q. Okay. And if you tested the efficiency of a security in 2010 and today, would that tell you whether the market for that security would be efficient throughout 2015? A. So I looked at two snapshots in time. That – is it possible? It's possible. My guess is it would not be sufficient to determine – to opine upon market efficiency. Q. And is that true for both stocks and notes? A. Yes.")

[19] Defendants do not concede that this type of "news no-news" test is sufficient to demonstrate market efficiency.  As Professor Hendershott explains, this is a threshold test at best and is not sufficient to determine market efficiency.  Hendershott Rpt. ¶ 81.  However, if there is no difference in volatility between "news" and "no-news" days, this test could indicate inefficiency.  *Id.*

8-Ks as "news" days because they were more likely to reveal value-relevant information. However, although Dr. Werner testified that his "news no-news" test was critical to making him comfortable with conclusions based on the small number of trading days analyzed for the stock, and he admitted it was possible to perform a "news no-news" test for the Notes, he did not conduct such a test.  Werner Tr. 263:4-9.  And the reason he did not is most likely because, as Professor Hendershott demonstrates, a "news no-news" test for the Notes actually undercuts a conclusion of market efficiency.  Hendershott Rpt. ¶ 70.  Professor Hendershott found that there was not a statistically significant difference between the frequency of abnormal price reactions on news days versus no-news days for the Notes.  *Id.* ¶ 85.  The Notes did not even trade on 42 of the 64 "news" days identified by Dr. Werner, including six days on which Dr. Werner found significant abnormal returns for the common stock.  *Id.* ¶ 86.  If the Notes were trading in an efficient market, and new, value-relevant information was released, then one would expect to see Notes trading on those "news" days.  *Id.*; *see also George v. China Auto. Sys., Inc.*, No. 11 Civ. 7533 (KBF), 2013 WL 3357170, at *12 (S.D.N.Y. July 3, 2013) (denying motion for class certification where plaintiffs' event study showed that "only seven out of sixteen [news] days resulted in a market reaction," finding that to be "an insufficient foundation upon which to pronounce market efficiency").[20]

The flaws in Dr. Werner's event study for the Notes are compounded by his numerous methodological errors.  Hendershott Rpt. ¶ 92.  Specifically, Dr. Werner makes a statistical error

---

[20] Plaintiffs' citation to the Second Circuit's decision in *Petrobras* is misplaced.  Br. at 20 n.19.  Though the Second Circuit refused to hold that directional empirical evidence of market efficiency was necessary, *i.e.*, evidence that showed the security moved in the "correct" direction, Dr. Hendershott's analysis demonstrated that on a number of Dr. Werner's "news" days the Notes did not trade at all.  Furthermore, the Second Circuit also emphasized the importance of indirect evidence where "direct evidence [did] not entirely resolve the question" of market efficiency.  *In re Petrobras*, 862 F.3d at 278.  Here, both the direct and indirect evidence weigh against market efficiency.  Furthermore, unlike FXCM, Petrobras was one of the largest and most-analyzed firms in the world.  *Id.* at 276.

that causes him to overestimate the statistical significance of the return on February 7, 2017. *Id.*

¶ 93. He also deviates from accepted academic practice by including a total of 10 dummy variables

out of the 66 days included in his event study. *Id.* ¶ 94. The use of these dummy variables would

cause him to underestimate the Notes' normal volatility and artificially increases the likelihood

that the Notes' price return for a certain event is statistically significant. *Id.* Finally, when

calculating residual returns, Dr. Werner uses the same variables to control for market and industry

movements that he used in his event study for the common stock and fails to account for factors

typically controlled for in bond event studies. *Id.*

### 2. The *Krogman* Factors Also Do Not Support A Finding That The Notes Traded In An Efficient Market

As part of the "efficient market" analysis, courts in this Circuit also have looked to the

three factors articulated in *Krogman v. Sterritt*, 202 F.R.D. 467, 478 (N.D. Tex. 2001), which are:

(i) market capitalization; (ii) float; and (iii) bid-ask spread. *See, e.g.*, *Teamsters*, 2006 WL

2161887, at *5 & n.66; *In re Petrobras Sec.*, 862 F.3d at 276 (describing *Krogman* factors as "three

additional factors that are commonly included in *Cammer* analyses"). Again, Plaintiffs point to

Dr. Werner's report and argue that his findings indicate that the *Krogman* factors "strongly weigh

in favor of finding that . . . the FXCM Notes traded in [an] efficient market[]." Br. at 22. But Dr.

Werner's conclusions are unreliable and misleading.

Dr. Werner opines that the first two *Krogman* factors—market capitalization and float—

support efficiency because the aggregate par value of the Notes was $173 million. Werner Rpt.

¶¶ 153-55. But $173 million is not a large issue size for a bond and does not support efficiency.

*See, e.g.*, *In re Winstar Comm'n Sec. Litig.*, 290 F.R.D. at 449 (finding a total par value of $1.8

billion was likely to be efficient but noting that courts "that have examined bond market efficiency

tend to find that smaller issues of bonds did not trade in efficient markets"). Furthermore, market

capitalization and float are based on *market value* or *market prices*.  *See* Werner Rpt. ¶¶ 108, 153.  Yet, instead of looking at the market value of the Notes, Dr. Werner inexplicably focuses on their *par value—i.e.*, the face value, or the total amount FXCM was required to pay back at maturity.  As Professor Hendershott explains, par value can be very different from market value, especially for a distressed company like FXCM.  Hendershott Rpt. ¶ 61.  Here, the Notes' market value and float were much lower than their par value for much of the Notes Period.  *Id.* ¶ 62.  Indeed, their market value declined dramatically after the SNB Flash Crash, at times were as low as approximately $60 million.  *Id.*

Additionally, Dr. Werner does not even attempt to examine the third *Krogman* factor— bid-ask spreads.  According to Plaintiffs, this is because bid-ask data is not available for notes' transactions.  Br. at 22.  But the anecdotal evidence provided by Plaintiff 683 Capital demonstrates wide bid-ask spreads on the Notes, including that "the spread could be, you know, point a wide, half a point wide, four points [wide], ten points wide in really bad markets."  Patt Tr. 109:16-19.  A point corresponds to 1% of par, indicating that bid-ask spreads for the Notes at times were higher than 10%.  Hendershott Rpt. ¶ 60.  *See Krogman*, 202 F.R.D. at 478 (bid-ask spread of 5.6% suggested market inefficiency); *Stanaford v. Genovese*, No. 13-cv-80923, 2016 WL 4198146 at *8 (S.D. Fla. March 14, 2016) (bid-ask spread of 7.1% weighed against market efficiency).

### 3.    Plaintiffs' Testimony Undermines Any Presumption Of Efficiency

The lack of an efficient market for the Notes is underscored by the sworn testimony of 683 Capital, the only Plaintiff that purports to have purchased the Notes.  683 Capital's corporate representative, Mr. Joseph Patt, testified that when investing it looks for situations where securities are not trading efficiently,[21] and 683 Capital started investing in FXCM after the SNB Flash Crash

---

[21] Patt Tr. at 24:2-8 (A. But the other thing that we do is that we, generally, try and be nimble and quick in

because it believed that the market had overreacted to the news and FXCM was undervalued.[22] As Professor Hendershott explains market overreaction is an example of *inefficiency*. *See* Hendershott Rpt. ¶ 111. Mr. Patt also admitted that the Notes were not "super liquid" securities, were less liquid than other bonds, and could not be purchased on an exchange, instead requiring a call or emails with a broker.[23] Mr. Patt also admitted that the Notes did not trade frequently and that 683 Capital could not always buy or sell them in the quantities it desired.[24] 683 Capital was not always able to execute trades at desirable prices, and the prices it paid for the FXCM Notes were determined based on their negotiations with brokers rather than a fixed or consistent price.[25]

Mr. Patt's testimony confirms that the Notes market was inefficient. For example, in *In re*

---

places where there's – how do I say this – dislocation or distress, where people are, you know, acting emotionally for whatever reasons and we can try and take the other side of that. We try and look for situations like that.").

[22] *Id.* at 74:3-18 (Q. And is the – was the SNB Flash Crash an example of one of the 'dislocations' you were discussing earlier? A. Yes. Q. Okay. And can you just explain to me just so I better understand what you mean when you say 'disclocations'? A. So a moment when investors in some asset sort of wake up or because FX decided it isn't actually what they were invested in and so they're selling for emotional or panic reasons as opposed to analytical reasons. People who are used to investing in something, a bond at par, you know, don't like when it trades at 50 or, I mean, nobody does. But it doesn't fit their business model often.")

[23] *Id.* at 108:19-109:7 ("Q. Okay. So, for the FXCM bonds at issue here, they were the type of transactions that would require a call with a broker to discuss the purchase or sale because they're not a super liquid security like other bonds may have been? A. Correct. I would say mostly a call but also times an instant message or an instant Bloomberg is what they would call it, but direct communication not like something that happens over – like when you trade stock personally in Fidelity or something or when we trade stock, our fund.")

[24] *Id.* at 109:8-14 ("Q. [Did] the FXCM notes trade frequently in your experience? A. No. Q. Were you in a position that you could always buy or sell the quantity you wanted to buy or sell immediately? A. No.")

[25] *Id.* at 107:23 – 108:18 ("Q. Okay. And so, when you say you're looking at a Bloomberg terminal, you're seeing which brokers are offering the purchase or sale of these securities at what price? A. And they were advertising they're involved, they're interested. It depends on the security, the liquidity of the security, the facts around the security, whatever day it is. Like, on a super liquid, like, bond, it might just all be like electronic or a stock. But on this, like, you know, they'd be, like, oh, on bid 30 and offered at 40, 1 million up, call to discuss. I don't know. I'm making up, you know. It would be really wide. It would involve a conversation – they all involved conversations. . . .")

*Safety-Kleen*, 2004 WL 3115870, at *6, a court de-certified a class action of bond purchasers where "the description of the market by plaintiffs [was] one in which traders must make numerous calls to determine the prices available and in which the buyers negotiate the price with sellers [was] further evidence of an inefficient market."  Similarly, in *In re Livent*, 211 F.R.D. at 222, the district court refused to certify a class of noteholders because the "[n]otes were not traded on any public exchange" and instead "were bought and sold through an informal net of contacts among institutional investors and brokers who would exchange bids and negotiate prices privately . . . meaning there was no fixed or consistent price for the [n]otes at any given time," which was "inconsistent with" the "'fraud on the market' theory."  *See also Hamilton Partners, Ltd. v. Sunbeam Corp.*, No. 99-CV-8275, 2001 WL 34556527, at *10 (S.D. Fla. July 3, 2001) (finding debenture market was not efficient where "the only way to obtain pricing information . . . was by 'calling around,' rather than relying on a market where bids, asks, and transactions are quoted publicly and accurate transaction data and information is available").

## III.    Plaintiffs' Proposed Damages Model Does Not Measure Damages Arising From Defendants' Alleged Wrongdoing.

Supreme Court and Second Circuit precedent requires plaintiffs to show, even at the class certification stage, "that their damages stemmed from the defendant's actions that created the legal liability."  *Sykes v. Mel S. Harris & Assocs. LLC*, 780 F.3d 70, 82 (2d Cir. 2015) (internal quotes and citation omitted); *see also Comcast Corp. v. Behrend*, 569 U.S. 27, 35 (2013) ("[A] model purporting to serve as evidence of damages in [a] class action must measure only those damages attributable to [plaintiffs'] theory [of liability].").

Plaintiffs have not presented a model capable of segregating damages arising from the alleged fraud from other events that affected the price of FXCM's securities.  As a preliminary matter, an event study as employed by Dr. Werner cannot, without more analysis, disentangle the

impact of multiple pieces of information identified simultaneously (*see* Hendershott Rpt. ¶ 100-03), and Dr. Werner does not identify any methodology that might be used to do so.  And this isn't just an academic concern—in this case, the very government settlements that allegedly revealed the alleged fraud also included terms that substantially altered FXCM's financial prospects, including the requirement to shut down (and hence an immediate sale of) its US-based business. *Id.* ¶ 102.  Yet, Dr. Werner has not put forth any methodology that can isolate the impact of these collateral consequences from the losses arising from the alleged fraud.  *Id.* ¶ 103.  Indeed, as Professor Hendershott explains, there is good reason to believe that the collateral consequences alone caused any losses felt by putative class members, and that the purported revelation of an alleged fraud that occurred and concluded years before did not impact the price of FXCM's securities.  *Id.* ¶¶ 100-108.  Simply put, information is value relevant if it has an impact on the present value of a company's expected future cash flows.  *Id.* ¶ 105.  Logically, it's hard to see why disclosure of a discontinued, past practice *(i.e.*, the order flow contract with Effex) would affect the expected future cash flows.  *Id.* ¶ 106.  Dr. Werner fails to acknowledge, much less explain, this fundamental problem in damages modeling.  As a result, Plaintiffs have failed to meet their burden at class certification to propose a damages model related to their theory of liability. Similarly, Plaintiffs further fail to show that they could calculate the common stock or Notes price drop had the alleged "truth" been revealed by FXCM earlier *(i.e.*, any price inflation attributable to the alleged misstatements).

## **CONCLUSION**

For the reasons above, the Court can and should conclude that Plaintiffs have not met their burden under Rule 23 and deny their Motion for certification of a class of either FXCM common stock or Notes purchasers during the proposed class period.

Dated:  June 12, 2020

KING & SPALDING LLP

*/s/  Israel Dahan*
Paul R. Bessette
Israel Dahan
Peter Isajiw
Evan C. Ennis
KING & SPALDING LLP
1185 Avenue of the Americas
New York, New York  10036-2601
Tel:  (212) 556.2100
Fax: (212) 556.2200

Rebecca Matsumura, *pro hac vice*
KING & SPALDING LLP
500 W. 2nd Street Suite 1800
Austin, Texas 78701
Tel: (512) 457.2000
Fax: (512) 457.2100

*Attorneys for Defendants Global Brokerage,*
*Inc. f/k/a/ FXCM, Inc., Dror Niv, and William*
*Ahdout*