# EXHIBIT 4

# UNITED STATES
# SECURITIES AND EXCHANGE COMMISSION
**Washington, D.C. 20549**

# FORM 8- K

### CURRENT REPORT
**Pursuant to Section 13 or 15(d)**
**of the Securities Exchange Act of 1934**
**Date of Report (Date of earliest event reported): June 3, 2013 (May 28, 2013)**

# FXCM INC.
**(Exact name of registrant as specified in its charter)**

| Delaware | 001- 34986 | 27- 3268672 |
|---|---|---|
| **(State or other jurisdiction of incorporation)** | **(Commission File Number)** | **(I.R.S. Employer Identification No.)** |

**55 Water Street, FL 50 New York, NY, 10041**
**(Address of Principal Executive Offices) (Zip Code)**
**Registrant's telephone number, including area code: (646) 432- 2986**
**Not Applicable**
**(Former name or former address, if changed since last report)**

Check the appropriate box below if the Form 8- K filing is intended to simultaneously satisfy the filing obligation of the registrant under any of the following provisions:

❑ Written communications pursuant to Rule 425 under the Securities Act (17 CFR 230.425)

❑ Soliciting material pursuant to Rule 14a- 12 under the Exchange Act (17 CFR 240.14a- 12)

❑ Pre- commencement communications pursuant to Rule 14d- 2(b) under the Exchange Act (17 CFR 240.14d- 2(b))

❑ Pre- commencement communications pursuant to Rule 13e- 4(c) under the Exchange Act (17 CFR 240.13e- 4(c))

---

**Item 1.01        Entry into a Material Definitive Agreement.**
Purchase Agreement
On May 28, 2013, FXCM, Inc. (the "Company") entered into a purchase agreement (the "Purchase Agreement") with Credit Suisse Securities (USA) LLC and Merrill Lynch, Pierce, Fenner & Smith Incorporated, as representatives of the several purchasers named in Schedule A thereto (the "Initial

Purchasers"), pursuant to which the Company agreed to sell $150.0 million aggregate principal amount of 2.25% Convertible Senior Notes due 2018 (the "Firm Notes") and, at the option of the Initial Purchasers, up to an additional $22.5 million aggregate principal amount of 2.25% Convertible Senior Notes due 2018 (the "Option Notes" and, together with the Firm Notes, the "Notes"). The Notes were sold to the Initial Purchasers in a private placement, in reliance on the exemption from registration provided by Section 4(2) of the Securities Act of 1933, as amended (the "Securities Act") and resold by the Initial Purchasers to "qualified institutional buyers" pursuant to the exemption from registration set forth in Rule 144A under the Securities Act. The Company is relying on these exemptions from registration based in part on representations made by the Initial Purchasers in the Purchase Agreement.

On May 30, 2013, the Initial Purchasers exercised their option in full in respect of the Option Notes. On June 3, 2013, the Company issued and sold to the Initial Purchasers $172.5 million aggregate principal amount of the Notes upon payment pursuant to the Purchase Agreement.

The Purchase Agreement includes customary representations, warranties and covenants. Under the terms of the Purchase Agreement, the Company has agreed to indemnify the Initial Purchasers against certain liabilities, and contribute to payments which the Initial Purchasers may be required to make in respect of any such liabilities.

The Company estimates that the net proceeds from the offering of the Notes will be approximately $167.3 million, after deducting the Initial Purchasers' discounts and commissions. On June 3, 2013, the Company used approximately $10.5 million of the net proceeds from the Offering to fund the cost of the Convertible Bond Hedge Transactions described below (after such cost was partially offset by the proceeds to the Company from the Warrant Transactions described below), and provided the remainder of the net proceeds to FXCM Holdings, LLC ("Holdings") pursuant to agreements with Holdings pursuant to which Holdings will agree to provide the Company with the cash necessary to make any payments required under the Notes. The Company expects Holdings to use such net proceeds, after paying offering expenses, to repay approximately $80.0 million of outstanding borrowings under Holdings' revolving credit facility and the remainder for general corporate purposes, including potential future acquisitions.

The foregoing description of the Purchase Agreement is qualified in its entirety by the copy thereof which is attached as Exhibit 10.1 and incorporated herein by reference.

Indenture and Notes

The Notes are governed by the Indenture, dated as of June 3, 2013 (the "Indenture") between the Company and The Bank of New York Mellon, as trustee (the "Trustee").

The Notes pay interest semi- annually on June 15 and December 15, commencing on December 15, 2013, at a rate of 2.25% per year, and mature on June 15, 2018, unless earlier converted or purchased by the Company. The Notes are the Company's general unsecured obligations that rank senior in right of payment to any of the Company's future indebtedness that is expressly subordinated in right of payment to the Notes, rank equally in right of payment with the

Company's future unsecured indebtedness that is not so subordinated, effectively junior to any of the Company's future secured indebtedness to the extent of the value of the assets securing such indebtedness, and structurally subordinated to all existing and future indebtedness and other liabilities (including borrowings under Holdings' revolving credit facility trade payables) of the Company's subsidiaries.

At any time prior to 5:00 p.m., New York City time, on the business day immediately preceding March 15, 2018, the Notes will be convertible at the option of the holder only upon the specified events and during the specified periods set forth in the following paragraph. Thereafter, the Notes will be convertible at the option of the holder at any time until 5:00 p.m., New York City time, on the second scheduled trading day immediately preceding the maturity date. The Notes will initially be convertible at a conversion rate of 53.2992 shares of the Class A common stock per $1,000 principal amount of Notes, which is equivalent to an initial conversion price of approximately $18.76. The conversion rate is subject to adjustment upon certain events. Upon conversion, the Company's conversion obligation will be satisfied in cash and, if applicable, shares of Class A common stock (subject to the Company's right to deliver cash in lieu of all or a portion of such shares, based upon a Daily Conversion Value (as defined in the Indenture) calculated for each VWAP Trading Day (as defined in the Indenture) in the applicable 40 VWAP Trading Day Observation Period (as defined in the Indenture).

Prior to 5:00 p.m., New York City time, on the business day immediately preceding March 15, 2018, the Notes will be convertible at the option of the holder only under the following circumstances:

(i) during any fiscal quarter commencing after the fiscal quarter ending on September 30, 2013 (and only during such fiscal quarter), if the last reported sale price of our Class A common stock for at least 20 trading days (whether or not consecutive) during the period of 30 consecutive trading days ending on the last trading day of the immediately preceding fiscal quarter is greater than or equal to 130% of the applicable conversion price on each applicable trading day;

(ii) during the five business day period immediately after any five consecutive trading day period (the "measurement period") in which the "trading price" (as defined in the Indenture) per $1,000 principal amount of Notes for each trading day of such measurement period was less than 98% of the product of the last reported sale price of our Class A common stock and the applicable conversion rate on such trading day; or

Upon a Fundamental Change (as defined in the Indenture), holders may require the Company to purchase the Notes in whole or in part for cash at a price equal to 100% of the principal amount of the Notes to be purchased, plus any accrued and unpaid interest to, but not including, the fundamental change purchase date. In addition, upon a Make- Whole Fundamental Change (as defined in the Indenture), the Company will, under certain circumstances, increase the applicable conversion rate for a holder that elects to convert its Notes in connection with such Make- Whole Fundamental Change.

The Indenture provides that an Event of Default (as defined in the Indenture) will occur if: (a) the Company defaults for 30 days in the payment when due of interest on the Notes; (b) the Company defaults in the payment of the principal of any Note when due and payable at maturity, upon required purchase, upon declaration of acceleration or otherwise; (c) the Company fails to comply with its obligation to convert the Notes in accordance with the Indenture upon the exercise of a holder's conversion right, and such failure continues for 5 business days following the scheduled settlement date for such conversion; (d) the Company fails to provide notice of a Fundamental Change, specified corporate event or Make- Whole Fundamental Change, in each case when due; (e) the Company fails to comply with its obligations regarding consolidation, merger, sale, conveyance and lease pursuant to Article 11 of the Indenture; (f) the

3

Company fails to comply with any of its other agreements contained in the Notes or the Indenture for 60 days after the Company has received written notice of such default from the Trustee or the holders of at least 25% in principal amount of the then outstanding Notes; (g) the Company or any of its Significant Subsidiaries (as defined in the Indenture) defaults with respect to any mortgage, agreement or other instrument under which there may be outstanding, or by which there may be secured or evidenced, any indebtedness for money borrowed in excess of $30.0 million in the aggregate of the Company and/or any Significant Subsidiary, whether such indebtedness now exists or shall hereafter be created, resulting in such indebtedness becoming or being declared due and payable or constituting a failure to pay the principal or interest of any such indebtedness when due and payable at its stated maturity, upon required purchase, upon declaration or otherwise; (h) the Company or any of its Significant Subsidiaries fails to pay final judgments entered by a court or courts of competent jurisdiction in excess of $30.0 million, which judgments are not paid, discharged or stayed, for a period of 60 days; and (i) certain events of bankruptcy or insolvency described in the Indenture with respect to the Company or any of its Significant Subsidiaries (as defined in the Indenture).

If certain bankruptcy and insolvency- related Events of Defaults with respect to the Company occur, the principal of, and accrued and unpaid interest on, all of the then outstanding Notes shall automatically become due and payable. If an Event of Default other than certain bankruptcy and insolvency-related Events of Defaults with respect to the Company occurs and is continuing, the Trustee by notice to the Company or the holders of the Notes of at least 25% in principal amount of the outstanding Notes by notice to the Company and the Trustee, may declare the principal of, and accrued and unpaid interest on, all of the then outstanding Notes to be due and payable. Notwithstanding the foregoing, the Indenture provides that, to the extent the Company elects, the sole remedy for an Event of Default relating to certain failures by the Company to comply with reporting covenants in the Indenture consists exclusively of the right to receive additional interest on the Notes.

The Indenture provides that the Company may not consolidate with or merge with or into, or sell, convey, transfer or lease all or substantially all of the consolidated assets of the Company and its subsidiaries, taken as a whole, to, another person, unless: (a) the resulting, surviving or transferee person (if not the Company) is a corporation, organized and existing under the laws of the United States, any state thereof or the District of Columbia, and such corporation (if not the Company) expressly assumes by a supplemental indenture all of the Company's obligations under the Notes and the Indenture; (b) immediately after giving effect to the transaction described above, no Default or Event of Default, has occurred and is continuing; and (c) the Company has delivered to the Trustee an officers' certificate and opinion of counsel in accordance with the Indenture.

The foregoing description of the Indenture is qualified in its entirety by the copies thereof which is attached as Exhibit 4.1 (which includes the form of 2.25% Convertible Senior Notes due 2018 filed as Exhibit 4.2) and incorporated herein by reference.

<u>Convertible Bond Hedge Transactions and Warrant Transactions</u>

On May 28, 2013, the Company entered into privately negotiated convertible bond hedge transactions (together, the "Convertible Bond Hedge Transactions") with each of Credit Suisse International (represented by Credit Suisse AG, New York Branch, as its agent) and Bank of America, N.A. (the "Hedge Counterparties"). The Convertible Bond Hedge Transactions cover, subject to customary anti- dilution adjustments, the number of shares of Class A Common Stock that initially underlie the Notes, and are expected to reduce the potential dilution with respect to the Class A Common Stock upon conversion of the Notes and/or reduce the Company's exposure to potential cash payments that may be required to be made by the Company upon conversion of the Notes.

4

The Company also entered into privately negotiated warrant transactions (together, the "Warrant Transactions") generally relating to the same number of shares of Class A Common Stock with each of the Hedge Counterparties. Under certain circumstances, the Company may be required under the terms of the Warrant Transactions to issue up to 16,241,640 shares of Class A Common Stock (subject to adjustments). The Warrant Transactions could have a dilutive effect with respect to the common equity or, if the Company so elects, obligate the Company to make cash payments to the extent that the market price per share of Class A common stock exceeds the applicable strike price of the Warrant Transactions on any expiration date of the warrants. The strike price for the Warrant Transactions will initially be $21.2400 per share of Class A Common Stock.

The notional size of each of the Convertible Bond Hedge Transactions and Warrant Transactions was increased on May 30, 2013 upon the Initial Purchasers' exercise of their option to purchase additional Notes to correspond in the aggregate to the number of shares underlying all Notes, including the additional Notes.

The Company used approximately $10.5 million of the net proceeds from the offering of the Notes to pay the cost of the Convertible Bond Hedge Transactions (after such cost was partially offset by the proceeds to the Company from the Warrant Transactions).

The Convertible Bond Hedge Transactions and the Warrant Transactions are separate transactions, each entered into by the Company with the Hedge Counterparties, are not part of the terms of the Notes and will not change any holders' rights under the Notes. Holders of the Notes will not have any rights with respect to the Convertible Bond Hedge Transactions or Warrant Transactions.

The foregoing description of the Convertible Bond Hedge Transactions and Warrant Transactions is qualified in its entirety by reference to the confirmations relating to the Convertible Bond Hedge Transactions and Warrant Transactions and the amendments to such confirmations, forms of which are attached hereto as Exhibits 10.2, 10.3, 10.4 and 10.5 and are incorporated herein by reference.

**Item 2.03 Creation of a Direct Financial Obligation or an Obligation under an Off Balance Sheet Arrangement of a Registrant.**

The information set forth in Item 1.01 in connection with the Notes and Indenture is incorporated by reference into this Item 2.03.

**Item 3.02 Unregistered Sales of Equity Securities.**

The information set forth in Item 1.01 in connection with the Notes and Indenture and Warrant Transactions is incorporated by reference into this Item 3.02.

**Item 8.01 Other Information.**

On May 30, 2013, the Company issued a press release announcing the exercise in full of the over- allotment option granted to the Initial Purchasers. A copy of the press release is attached hereto as Exhibit 99.1 and incorporated by reference herein.

5

**Item 9.01 Financial Statements and Exhibits.**

(d) Exhibits

| | |
|---|---|
| 4.1 | Indenture, dated June 3, 2013, between the Company and The Bank of New York Mellon, as trustee. |
| 4.2 | Form of 2.25% Convertible Senior Note due 2018 (included as Exhibit A in Exhibit 4.1). |
| 10.1 | Purchase Agreement, dated May 28, 2013, between the Company and Credit Suisse Securities (USA) LLC and Merrill Lynch, Pierce, Fenner & Smith Incorporated, as representatives of the several purchasers named therein. |
| 10.2 | Form of Convertible Bond Hedge Transaction Confirmation, dated May 28, 2013, between the Company and dealer. |
| 10.3 | Form of Amendment to Convertible Bond Hedge Transaction Confirmation, dated May 30, 2013, between the Company and dealer. |
| 10.4 | Form of Issuer Warrant Transaction Confirmation, dated May 28, 2013, between the Company and dealer. |
| 10.5 | Form of Amendment to Issuer Warrant Transaction Confirmation, dated May 30, 2013, between the Company and dealer. |
| 99.1 | Press release, dated May 30, 2013, announcing the exercise in full of the Initial Purchasers' over- allotment option. |

**Signature**

Pursuant to the requirements of the Securities Exchange Act of 1934, the Registrant has duly caused this report to be signed on its behalf by the undersigned hereunto duly authorized.

**FXCM INC.**

Date: June 3, 2013                    By:                         /s/ David S. Sassoon
                                                               Name:                  David S. Sassoon
                                                               Title:                   General Counsel

7

## Exhibit Index

| | |
|---|---|
| 4.1 | Indenture, dated June 3, 2013, between the Company and The Bank of New York Mellon, as trustee. |
| 4.2 | Form of 2.25% Convertible Senior Note due 2018 (included as Exhibit A in Exhibit 4.1). |
| 10.1 | Purchase Agreement, dated May 28, 2013, between the Company and Credit Suisse Securities (USA) LLC and Merrill Lynch, Pierce, Fenner & Smith Incorporated, as representatives of the several purchasers named therein. |
| 10.2 | Form of Convertible Bond Hedge Transaction Confirmation, dated May 28, 2013, between the Company and dealer. |
| 10.3 | Form of Amendment to Convertible Bond Hedge Transaction Confirmation, dated May 30, 2013, between the Company and dealer. |
| 10.4 | Form of Issuer Warrant Transaction Confirmation, dated May 28, 2013, between the Company and dealer. |
| 10.5 | Form of Amendment to Issuer Warrant Transaction Confirmation, dated May 30, 2013, between the Company and dealer. |
| 99.1 | Press release, dated May 30, 2013, announcing the exercise in full of the Initial Purchasers' over- allotment option. |

8

**Exhibit 4.1**

FXCM INC.
AND
The Bank of New York Mellon,
as Trustee
INDENTURE
Dated as of June 3, 2013
2.25% Convertible Senior Notes due 2018

**TABLE OF CONTENTS**

| | | PAGE |
|---|---|---|
| **ARTICLE 1** | | |
| DEFINITIONS | | |
| Section 1.01. | *Definitions* | 1 |
| Section 1.02. | *References to Interest* | 11 |
| **ARTICLE 2** | | |
| ISSUE, DESCRIPTION, EXECUTION, REGISTRATION AND EXCHANGE OF NOTES | | |
| Section 2.01. | *Designation and Amount* | 11 |
| Section 2.02. | *Form of Notes* | 11 |
| Section 2.03. | *Date and Denomination of Notes; Payments of Interest and Defaulted Amounts* | 12 |
| Section 2.04. | *Execution, Authentication and Delivery of Notes* | 13 |
| Section 2.05. | *Exchange and Registration of Transfer of Notes; Restrictions on Transfer; Depositary* | 14 |
| Section 2.06. | *Mutilated, Destroyed, Lost or Stolen Notes* | 20 |
| Section 2.07. | *Temporary Notes* | 21 |
| Section 2.08. | *Cancellation of Notes Paid, Converted, Etc.* | 21 |
| Section 2.09. | *CUSIP Numbers* | 21 |
| Section 2.10. | *Additional Notes; Purchases* | 22 |
| **ARTICLE 3** | | |
| SATISFACTION AND DISCHARGE | | |
| SECTION 3.01. | *Satisfaction and Discharge* | 22 |
| **ARTICLE 4** | | |
| PARTICULAR COVENANTS OF THE COMPANY | | |
| Section 4.01. | *Payment of Principal and Interest* | 23 |
| Section 4.02. | *Maintenance of Office or Agency* | 23 |
| Section 4.03. | *Appointments to Fill Vacancies in Trustee's Office* | 23 |
| Section 4.04. | *Provisions as to Paying Agent* | 23 |
| Section 4.05. | *Existence* | 24 |
| Section 4.06. | *Rule 144A Information Requirement and Annual Report and Additional Interest* | 25 |
| Section 4.07. | *Stay, Extension and Usury Laws* | 26 |
| Section 4.08. | *Compliance Certificate; Statements as to Defaults* | 26 |
| Section 4.09. | *Further Instruments and Acts* | 27 |

i

ARTICLE 5
[RESERVED]

ARTICLE 6
DEFAULTS AND REMEDIES

| | | |
|---|---|---|
| Section 6.01. | *Events of Default* | 27 |
| Section 6.02. | *Acceleration; Rescission and Annulment* | 28 |
| Section 6.03. | *Additional Interest* | 29 |
| Section 6.04. | *Payments of Notes on Default; Suit Therefor* | 30 |
| Section 6.05. | *Application of Monies Collected by Trustee* | 31 |
| Section 6.06. | *Proceedings by Holders* | 32 |
| Section 6.07. | *Proceedings by Trustee* | 33 |
| Section 6.08. | *Remedies Cumulative and Continuing* | 33 |
| Section 6.09. | *Direction of Proceedings and Waiver of Defaults by Majority of Holders* | 33 |
| Section 6.10. | *Notice of Defaults* | 34 |
| Section 6.11. | *Undertaking to Pay Costs* | 34 |

ARTICLE 7
CONCERNING THE TRUSTEE

| | | |
|---|---|---|
| Section 7.01. | *Duties and Responsibilities of Trustee* | 35 |
| Section 7.02. | *Certain Rights of the Trustee* | 36 |
| Section 7.03. | *No Responsibility for Recitals, Etc.* | 38 |
| Section 7.04. | *Trustee, Paying Agents, Conversion Agents, Bid Solicitation Agent or Note Registrar May Own Notes* | 38 |
| Section 7.05. | *Monies and Shares of Class A Common Stock to Be Held in Trust* | 38 |
| Section 7.06. | *Compensation and Expenses of Trustee* | 38 |
| Section 7.07. | *Officer's Certificate as Evidence* | 39 |
| Section 7.08. | *Eligibility of Trustee* | 39 |
| Section 7.09. | *Resignation or Removal of Trustee* | 39 |
| Section 7.10. | *Acceptance by Successor Trustee* | 40 |
| Section 7.11. | *Succession by Merger, Etc.* | 41 |
| Section 7.12. | *Trustee's Application for Instructions from the Company* | 41 |
| Section 7.13. | *Conflicting Interests of Trustee* | 42 |

ARTICLE 8
CONCERNING THE HOLDERS

| | | |
|---|---|---|
| Section 8.01. | *Action by Holders* | 42 |
| Section 8.02. | *Proof of Execution by Holders* | 42 |
| Section 8.03. | *Who Are Deemed Absolute Owners* | 42 |
| Section 8.04. | *Company- Owned Notes Disregarded* | 43 |
| Section 8.05. | *Revocation of Consents; Future Holders Bound* | 43 |

ii

ARTICLE 9
ACTS OF HOLDERS

Section 9.01. ................................................................ *Acts of Holders* ................................ 44

ARTICLE 10
SUPPLEMENTAL INDENTURES

Section 10.01. .............................................................. *Supplemental Indentures*
*Without Consent of Holders* ........ 45
Section 10.02. .............................................................. *Supplemental Indentures*
*with Consent of Holders* ............. 45
Section 10.03. .............................................................. *Effect of Supplemental*
*Indentures* ................................... 46
Section 10.04. .............................................................. *Notation on Notes* ....................... 47
Section 10.05. .............................................................. *Evidence of Compliance of*
*Supplemental Indenture to Be*
*Furnished Trustee* ........................ 47

ARTICLE 11
CONSOLIDATION, MERGER, SALE, CONVEYANCE AND LEASE

Section 11.01. .............................................................. *Company May Consolidate,*
*Etc. on Certain Terms* .................. 47
Section 11.02. .............................................................. *Successor Corporation to Be*
*Substituted* ................................... 48
Section 11.03. .............................................................. *Opinion of Counsel to Be*
*Given to Trustee* ........................... 48

ARTICLE 12
IMMUNITY OF INCORPORATORS, STOCKHOLDERS, OFFICERS AND DIRECTORS

Section 12.01. .............................................................. *Indenture and Notes Solely*
*Corporate Obligations* .................. 48

ARTICLE 13
INTENTIONALLY OMITTED

ARTICLE 14
CONVERSION OF NOTES

Section 14.01. .............................................................. *Conversion Privilege* ................... 49
Section 14.02. .............................................................. *Conversion Procedure;*
*Settlement Upon Conversion* ........ 51
Section 14.03. .............................................................. *Increased Conversion Rate*
*Applicable to Certain Notes*
*Surrendered in Connection*
*with Make- Whole*
*Fundamental Changes* .................. 54
Section 14.04. .............................................................. *Adjustment of Conversion*
*Rate* .............................................. 56
Section 14.05. .............................................................. *Adjustments of Prices* ................. 65
Section 14.06. .............................................................. *Shares to Be Fully Reserved* ....... 66
Section 14.07. .............................................................. *Effect of Recapitalizations,*
*Reclassifications and*
*Changes of the Class A*
*Common Stock* ............................. 66
Section 14.08. .............................................................. *Certain Covenants* ...................... 68
Section 14.09. .............................................................. *Responsibility of Trustee* ............ 68
Section 14.10. .............................................................. *Notice to Holders Prior to*
*Certain Actions* ............................ 69
Section 14.11. .............................................................. *Stockholder Rights Plans* ........... 69

iii

ARTICLE 15

PURCHASE OF NOTES AT OPTION OF HOLDERS

| | | |
|---|---|---|
| Section 15.01. | *Intentionally Omitted* | 70 |
| Section 15.02. | *Purchase at Option of Holders Upon a Fundamental Change* | 70 |
| Section 15.03. | *Withdrawal of Fundamental Change Purchase Notice* | 72 |
| Section 15.04. | *Deposit of Fundamental Change Purchase Price* | 73 |
| Section 15.05. | *Covenant to Comply with Applicable Laws Upon Purchase of Notes* | 73 |

ARTICLE 16

NO OPTIONAL REDEMPTION

| | | |
|---|---|---|
| Section 16.01. | *No Optional Redemption* | 74 |

ARTICLE 17

MISCELLANEOUS PROVISIONS

| | | |
|---|---|---|
| Section 17.01. | *Provisions Binding on Company's Successors* | 74 |
| Section 17.02. | *Official Acts by Successor Corporation* | 74 |
| Section 17.03. | *Addresses for Notices, Etc.* | 74 |
| Section 17.04. | *Governing Law* | 75 |
| Section 17.05. | *Intentionally Omitted* | 75 |
| Section 17.06. | *Evidence of Compliance with Conditions Precedent; Certificates and Opinions of Counsel to Trustee* | 75 |
| Section 17.07. | *Legal Holidays* | 76 |
| Section 17.08. | *No Security Interest Created* | 76 |
| Section 17.09. | *Benefits of Indenture* | 76 |
| Section 17.10. | *Table of Contents, Headings, Etc.* | 76 |
| Section 17.11. | *Authenticating Agent* | 76 |
| Section 17.12. | *Execution in Counterparts* | 77 |
| Section 17.13. | *Severability* | 77 |
| Section 17.14. | *Waiver of Jury Trial; Submission of Jurisdiction* | 77 |
| Section 17.15. | *Force Majeure* | 78 |
| Section 17.16. | *Calculations* | 78 |
| Section 17.17. | *U.S.A. Patriot Act* | 78 |

**EXHIBIT**

| | | |
|---|---|---|
| Exhibit A | Form of Note | A- 1 |

INDENTURE dated as of June 3, 2013 between FXCM Inc., a Delaware corporation, as issuer (the "**Company**", as more fully set forth in Section 1.01) and The Bank of New York Mellon, as trustee (the "**Trustee**", as more fully set forth in Section 1.01).

W I T N E S S E T H:

WHEREAS, for its lawful corporate purposes, the Company has duly authorized the issuance of its 2.25% Convertible Senior Notes due 2018 (the "**Notes**"), initially in an aggregate principal amount not to exceed $172,500,000, and in order to provide the terms and conditions upon which the Notes are to be authenticated, issued and delivered, the Company has duly authorized the execution and delivery of this Indenture; and

WHEREAS, the Form of Note, the certificate of authentication to be borne by each Note, the Form of Notice of Conversion, the Form of Fundamental Change Purchase Notice and the Form of Assignment and Transfer to be borne by the Notes are to be substantially in the forms hereinafter provided; and

WHEREAS, all acts and things necessary to make the Notes, when executed by the Company and authenticated and delivered by the Trustee or a duly authorized authenticating agent, as in this Indenture provided, the valid, binding and legal obligations of the Company, and this Indenture a valid agreement according to its terms, have been done and performed, and the execution of this Indenture and the issuance hereunder of the Notes have in all respects been duly authorized.

NOW, THEREFORE, THIS INDENTURE WITNESSETH:

That in order to declare the terms and conditions upon which the Notes are, and are to be, authenticated, issued and delivered, and in consideration of the premises and of the purchase and acceptance of the Notes by the Holders thereof, the Company covenants and agrees with the Trustee for the equal and proportionate benefit of the respective Holders from time to time of the Notes (except as otherwise provided below), as follows:

ARTICLE 1

DEFINITIONS

Section 1.01. *Definitions.* The terms defined in this Section 1.01 (except as herein otherwise expressly provided or unless the context otherwise requires) for all purposes of this Indenture and of any indenture supplemental hereto shall have the respective meanings specified in this Section 1.01. The words "herein," "hereof," "hereunder," and words of similar import refer to this Indenture as a whole and not to any particular Article, Section or other subdivision. The terms defined in this Article include the plural as well as the singular.

"**Additional Interest**" means all amounts, if any, payable pursuant to Section 4.06(d), Section 4.06(e) and Section 6.03, as applicable.

"**Additional Shares**" shall have the meaning specified in Section 14.03(a).

"**Affiliate**" of any specified Person means any other Person directly or indirectly controlling or controlled by or under direct or indirect common control with such specified Person. For the purposes of this definition, "control," when used with respect to any specified Person means the power to direct or cause the direction of the management and policies of such Person, directly or indirectly, whether through the ownership of voting securities, by contract or otherwise; and the terms "controlling" and "controlled" have meanings correlative to the foregoing.

"**Bid Solicitation Agent**" means the Person appointed by the Company to solicit bids for the Trading Price of the Notes in accordance with Section 14.01(b)(i). The Company shall initially act as the Bid Solicitation Agent.

"**Board of Directors**" means the board of directors of the Company or a committee of such board duly authorized to act for it hereunder.

"**Board Resolution**" means a copy of a resolution certified by the Secretary or an Assistant Secretary of the Company to have been duly adopted by the Board of Directors, and to be in full force and effect on the date of such certification, and delivered to the Trustee.

"**Business Day**" means any day other than a Saturday, a Sunday or a day on which the Federal Reserve Bank of New York is authorized or required by law or executive order to close or be closed.

"**Capital Stock**" means, for any entity, any and all shares, interests, rights to purchase, warrants, options, participations or other equivalents of or interests in (however designated) stock issued by that entity.

"**Cash Percentage**" means the percentage of the Daily Share Amounts for each VWAP Trading Day in the Observation Period for the relevant Conversion Date to be settled in cash, as specified in the related Cash Percentage Notice.

"**Cash Percentage Notice**" shall have the meaning specified in Section 14.02(k).

"**Class A Common Stock**" means the Class A common stock of the Company, par value $0.01 per share, subject to Section 14.07.

"**Clause A Distribution**" shall have the meaning specified in Section 14.04(c).

"**Clause B Distribution**" shall have the meaning specified in Section 14.04(c).

"**Clause C Distribution**" shall have the meaning specified in Section 14.04(c).

"**close of business**" means 5:00 p.m. (New York City time).

"**Code**" means the Internal Revenue Code of 1986, as amended.

"**Commission**" means the U.S. Securities and Exchange Commission.

2

"**Common Equity**" of any Person means Capital Stock of such Person that is generally entitled (a) to vote in the election of directors of such Person or (b) if such Person is not a corporation, to vote or otherwise participate in the selection of the governing body, partners, managers or others that will control the management or policies of such Person.

"**Company**" shall have the meaning specified in the first paragraph of this Indenture, and subject to the provisions of Article 11, shall include its successors and assigns.

"**Company Order**" " means a written order of the Company, signed by an Officer of the Company.

"**Conversion Agent**" shall have the meaning specified in Section 4.02.

"**Conversion Date**" shall have the meaning specified in Section 14.02(c).

"**Conversion Obligation**" shall have the meaning specified in Section 14.01(a).

"**Conversion Price**" means as of any date, $1,000, *divided by* the Conversion Rate as of such date.

"**Conversion Rate**" shall have the meaning specified in Section 14.01(a).

"**Corporate Trust Office**" means the principal office of the Trustee at which at any time its corporate trust business shall be administered, which office at the date hereof is located at 101 Barclay Street, Floor 4W, New York, New York, 10286, Attn: Corporate Trust Administration, or such other address as the Trustee may designate from time to time by notice to the Holders and the Company, or the principal corporate trust office of any successor trustee (or such other address as such successor trustee may designate from time to time by notice to the Holders and the Company).

"**Custodian**" means the Trustee, as custodian for The Depository Trust Company, with respect to the Global Notes, or any successor entity thereto.

"**Daily Conversion Value**" means, for each of the 40 consecutive VWAP Trading Days during the Observation Period, 1/40th of the product of (i) the Conversion Rate on such VWAP Trading Day; and (ii) the Daily VWAP on such VWAP Trading Day.

"**Daily Net Cash Portion**" means, if the Company timely specifies a Cash Percentage for a Conversion Date, the amount of cash that the Company shall deliver in lieu of all or the applicable portion of the shares of Class A Common Stock comprising the Daily Share Amount for any VWAP Trading Day in the applicable Observation Period, which shall equal the product of (i) the Cash Percentage; (ii) the Daily Share Amount for such VWAP Trading Day; and (iii) the Daily VWAP for such VWAP Trading Day.

3

"**Daily Settlement Amount,**" for each of the 40 consecutive VWAP Trading Days during the Observation Period, shall consist of:

(a) cash in an amount equal to the lesser of (i) $25 and (ii) the Daily Conversion Value for such VWAP Trading Day; and

(b) if the Daily Conversion Value on such VWAP Trading Day exceeds $25, a number of shares of Class A Common Stock equal to the Daily Share Amount; *provided, however,* that the Company has the right to deliver cash in lieu of all or a portion of the Daily Share Amount as provided in Section 14.02(k).

"**Daily Share Amount**" means for each of the 40 consecutive VWAP Trading Days during the Observation Period, a number of shares equal to (i) the difference between the Daily Conversion Value and $25, divided by (ii) the Daily VWAP for such VWAP Trading Day.

"**Daily VWAP**" means, for each of the 40 consecutive VWAP Trading Days during the applicable Observation Period, the per share volume- weighted average price as displayed under the heading "Bloomberg VWAP" on Bloomberg page "FXCM<equity> AQR" (or its equivalent successor if such page is not available) in respect of the period from the scheduled open of trading until the scheduled close of trading of the primary trading session on such VWAP Trading Day (or if such volume- weighted average price is unavailable, the market value of one share of Class A Common Stock on such VWAP Trading Day determined, using a volume- weighted average method, by a nationally recognized independent investment banking firm retained for this purpose by the Company). The "**Daily VWAP**" shall be determined without regard to after hours trading or any other trading outside of the regular trading session trading hours.

"**Default**" means any event that is, or after notice or passage of time, or both, would be, an Event of Default.

"**Defaulted Amounts**" means any amounts on any Note (including, without limitation, the Fundamental Change Purchase Price, principal and interest) that are payable but are not punctually paid or duly provided for.

"**Depositary**" means, with respect to each Global Note, the Person specified in Section 2.05(b) as the Depositary with respect to such Notes, until a successor shall have been appointed and become such pursuant to the applicable provisions of this Indenture, and thereafter, "**Depositary**" shall mean or include such successor.

"**Distributed Property**" shall have the meaning specified in Section 14.04(c).

"**effective date**" means, for purposes of Section 14.04, the first date on which the shares of the Class A Common Stock trade on the applicable exchange or in the applicable market, regular way, reflecting the relevant transaction.

"**Effective Date**" shall have the meaning specified in Section 14.03(c).

"**Event of Default**" shall have the meaning specified in Section 6.01.

"**Ex- Dividend Date**" means the first date on which shares of Class A Common Stock trade on the applicable exchange or in the applicable market, regular way, without the right to

4

receive the issuance, dividend or distribution in question, from the Company or, if applicable, from the seller of Class A Common Stock on such exchange or market (in the form of due bills or otherwise) as determined by such exchange or market.

"**Exchange Act**" means the Securities Exchange Act of 1934, as amended, and the rules and regulations promulgated thereunder.

"**Expiration Date**" shall have the meaning specified in Section 14.04(e).

"**Expiration Time**" shall have the meaning specified in Section 14.04(e).

"**Form of Assignment and Transfer**" shall mean the "Form of Assignment and Transfer" attached as Attachment 3 to the Form of Note attached hereto as Exhibit A.

"**Form of Fundamental Change Purchase Notice**" shall mean the "Form of Fundamental Change Purchase Notice" attached as Attachment 2 to the Form of Note attached hereto as Exhibit A.

"**Form of Notice of Conversion**" shall mean the "Form of Notice of Conversion" attached as Attachment 1 to the Form of Note attached hereto as Exhibit A.

"**Fundamental Change**" shall be deemed to have occurred at such time after the Notes are originally issued that any of the following occurs:

(a) a "person" or "group" within the meaning of Section 13(d) of the Exchange Act, other than the Company, its Subsidiaries and the employee benefit plans of the Company and its Subsidiaries, has become the direct or indirect "beneficial owner," as defined in Rule 13d- 3 under the Exchange Act, of the Company's Common Equity representing more than 50% of the voting power of the Company's Common Equity;

(b) the consummation of (A) any recapitalization, reclassification or change of the Class A Common Stock (other than changes resulting from a subdivision or combination) as a result of which the Class A Common Stock would be converted into, or exchanged for, stock, other securities, or other property or assets; (B) any share exchange, consolidation or merger of the Company pursuant to which the Class A Common Stock will be converted into cash, securities or other assets; or (C) any sale, lease or other transfer in one transaction or a series of transactions of all or substantially all of the consolidated assets of the Company and its Subsidiaries, taken as a whole, to any Person other than one of the Company's Subsidiaries; *provided, however*, that neither (i) a transaction described in clause (B) in which the holders of all classes of the Company's Common Equity immediately prior to such transaction own, directly or indirectly, more than 50% of all classes of Common Equity of the continuing or surviving corporation or transferee or the parent thereof immediately after such transaction in substantially the same proportions as such ownership immediately prior to such transaction nor (ii) any merger primarily for the purpose of changing the Company's jurisdiction of incorporation and resulting in a reclassification, conversion or exchange of outstanding shares of the Class A Common Stock solely into shares of common stock of the surviving entity shall be a Fundamental Change pursuant to this clause (b);

5

(c) the stockholders of the Company approve any plan or proposal for the liquidation or dissolution of the Company; or

(d) the Class A Common Stock (or other common stock underlying the Notes) ceases to be listed or quoted on any of The New York Stock Exchange, The NASDAQ Global Select Market or The NASDAQ Global Market (or any of their respective successors);

*provided*, *however*, that a transaction or transactions described in clauses (a) or (b) above shall not constitute a Fundamental Change, if at least 90% of the consideration received or to be received by the holders of the Company's Class A Common Stock, excluding cash payments for fractional shares, in connection with such transaction or transactions consists of shares of common stock that are listed or quoted on any of The New York Stock Exchange, The NASDAQ Global Select Market or The NASDAQ Global Market (or any of their respective successors) or will be so listed or quoted when issued or exchanged in connection with such transaction or transactions (such securities, "**Publicly Traded Securities**") and as a result of such transaction or transactions the Notes become convertible into such Publicly Traded Securities (subject to the provisions of Section 14.02).

"**Fundamental Change Company Notice**" shall have the meaning specified in Section 15.02(c).

"**Fundamental Change Purchase Date**" shall have the meaning specified in Section 15.02(a).

"**Fundamental Change Purchase Notice**" shall have the meaning specified in Section 15.02(b)(i).

"**Fundamental Change Purchase Price**" shall have the meaning specified in Section 15.02(a).

"**Global Note**" shall have the meaning specified in Section 2.05(a).

"**Holder**," as applied to any Note, or other similar terms (but excluding the term "beneficial holder"), shall mean any person in whose name at the time a particular Note is registered on the Note Register.

"**Indenture**" means this instrument as originally executed or, if amended or supplemented as herein provided, as so amended or supplemented.

"**Interest Payment Date**" means June 15 and December 15 of each year, beginning on December 15, 2013.

"**Last Reported Sale Price**" of the Class A Common Stock on any date means the closing sale price per share (or if no closing sale price is reported, the average of the bid and ask

6

prices or, if more than one in either case, the average of the average bid and the average ask prices) on that date as reported in composite transactions for the Relevant Stock Exchange. If the Class A Common Stock is not listed, quoted or traded on any U.S. national or regional securities exchange on the relevant date, the "**Last Reported Sale Price**" shall be the last quoted bid price per share for the Class A Common Stock in the over- the- counter market on the relevant date as reported by OTC Markets Group Inc. or a similar organization. If the Class A Common Stock is not so quoted, the "**Last Reported Sale Price**" shall be the average of the mid- point of the last bid and ask prices per share for the Class A Common Stock on the relevant date from each of at least three nationally recognized independent investment banking firms selected by the Company for this purpose.

"**Make- Whole Fundamental Change**" means any transaction or event that constitutes a Fundamental Change (determined after giving effect to any exceptions to or exclusions from the definition thereof, but without regard to subclause (i) of the *proviso* in clause (b) of the definition thereof).

"**Make- Whole Fundamental Change Company Notice**" shall have the meaning specified in Section 14.03(b).

"**Market Disruption Event**" means (a) a failure by the Relevant Stock Exchange to open for trading during its regular trading session or (b) the occurrence or existence prior to 1:00 p.m., New York City time, on any Scheduled Trading Day for the Class A Common Stock for more than one half-hour period in the aggregate during regular trading hours of any suspension or limitation imposed on trading (by reason of movements in price exceeding limits permitted by the Relevant Stock Exchange or otherwise) in the Class A Common Stock or in any option contracts or futures contracts relating to the Class A Common Stock.

"**Maturity Date**" means June 15, 2018.

"**Measurement Period**" shall have the meaning specified in Section 14.01(b)(i).

"**Note**" or "**Notes**" shall have the meaning specified in the first paragraph of the recitals of this Indenture.

"**Note Register**" shall have the meaning specified in Section 2.05.

"**Note Registrar**" shall have the meaning specified in Section 2.05.

"**Notice of Conversion**" shall have the meaning specified in Section 14.02(b).

"**Observation Period**" with respect to any Note surrendered for conversion means: (i) if the relevant Conversion Date occurs prior to March 15, 2018, the 40 consecutive VWAP Trading Day period beginning on, and including, the third VWAP Trading Day after such Conversion Date; and (ii) if the relevant Conversion Date occurs on or after March 15, 2018, the 40 consecutive VWAP Trading Day Period beginning on, and including, the 42nd Scheduled Trading Day immediately preceding the Maturity Date.

"**Offering Circular**" means the preliminary offering circular dated May 28, 2013, as supplemented by the pricing term sheet dated May 28, 2013, relating to the offering and sale of the Notes.

"**Officer**" means, with respect to the Company, the President, the Chief Executive Officer, the Chief Operating Officer, the Chief Financial Officer, the Chief Accounting Officer, the Chief Legal Officer, the General Counsel, the Treasurer, any assistant Treasurer, the Secretary, any Executive or Senior Vice President or any Vice President (whether or not designated by a number or numbers or word or words added before or after the title "Vice President").

"**Officer's Certificate**," when used with respect to the Company, means a certificate that is delivered to the Trustee and that is signed by one Officer of the Company. Each such certificate shall include the statements provided for in Section 17.06 if and to the extent required by the provisions of such Section. The Officer giving an Officer's Certificate pursuant to Section 4.08 shall be the principal executive, financial or accounting officer of the Company.

"**open of business**" means 9:00 a.m. (New York City time).

"**Opinion of Counsel**" means an opinion in writing, acceptable to the Trustee, signed by legal counsel, who may be an employee of or counsel to the Company, that is delivered to the Trustee. Each such opinion shall include the statements provided for in Section 17.06 if and to the extent required by the provisions of such Section 17.06.

"**outstanding**," when used with reference to Notes, shall, subject to the provisions of Section 8.04, mean, as of any particular time, all Notes authenticated and delivered by the Trustee under this Indenture, except:

(a) Notes theretofore canceled by the Trustee or accepted by the Trustee for cancellation;

(b) Notes, or portions thereof, that have become due and payable and in respect of which monies in the necessary amount shall have been deposited in trust with the Trustee or with any Paying Agent (other than the Company) or shall have been set aside and segregated in trust by the Company (if the Company shall act as its own Paying Agent);

(c) Notes that have been paid pursuant to Section 2.06 or Notes in lieu of which, or in substitution for which, other Notes shall have been authenticated and delivered pursuant to the terms of Section 2.06 unless proof satisfactory to the Trustee is presented that any such Notes are held by protected purchasers in due course;

(d) Notes converted pursuant to Article 14 and required to be cancelled pursuant to Section 2.08; and

(e) Notes purchased by the Company pursuant to the penultimate sentence of Section 2.10.

8

"**Paying Agent**" shall have the meaning specified in Section 4.02.

"**Person**" means an individual, a corporation, a limited liability company, an association, a partnership, a joint venture, a joint stock company, a trust, an unincorporated organization or a government or an agency or a political subdivision thereof.

"**Physical Notes**" means permanent certificated Notes in registered form issued in denominations of $1,000 principal amount and multiples thereof.

"**Predecessor Note**" of any particular Note means every previous Note evidencing all or a portion of the same debt as that evidenced by such particular Note; and, for the purposes of this definition, any Note authenticated and delivered under Section 2.06 in lieu of or in exchange for a mutilated, lost, destroyed or stolen Note shall be deemed to evidence the same debt as the mutilated, lost, destroyed or stolen Note that it replaces.

"**Publicly Traded Securities**" shall have the meaning specified in the definition of "Fundamental Change."

"**Reference Property**" shall have the meaning specified in Section 14.07(a).

"**Regular Record Date**," with respect to any Interest Payment Date, shall mean the June 1 or December 1 (whether or not such day is a Business Day) immediately preceding the applicable June 15 or December 15 Interest Payment Date, respectively.

"**Relevant Stock Exchange**" means The New York Stock Exchange or, if the Class A Common Stock (or other security for which a Last Reported Sale Price must be determined) is not then listed on The New York Stock Exchange, on the principal other U.S. national or regional securities exchange on which the Class A Common Stock (or such other security) is then listed.

"**Resale Restriction Termination Date**" shall have the meaning specified in Section 2.05(b).

"**Responsible Officer**" means, when used with respect to the Trustee, any officer within the corporate trust department of the Trustee, including any vice president, assistant secretary, senior associate, associate, trust officer or any other officer of the Trustee who customarily performs functions similar to those performed by the Persons who at the time shall be such officers, respectively, or to whom any corporate trust matter is referred because of such person's knowledge of and familiarity with the particular subject and who shall have direct responsibility for the administration of this Indenture.

"**Restricted Securities**" shall have the meaning specified in Section 2.05(b).

"**Rule 144A**" means Rule 144A as promulgated under the Securities Act.

"**Scheduled Trading Day**" means a day that is scheduled to be a Trading Day on the Relevant Stock Exchange. If the Class A Common Stock is not so listed or admitted for trading, "**Scheduled Trading Day**" means a Business Day.

9

"**Securities Act**" means the Securities Act of 1933, as amended, and the rules and regulations promulgated thereunder.

"**Settlement Amount**" has the meaning specified in Section 14.02(a).

"**Share Exchange Event**" shall have the meaning specified in Section 14.07(a).

"**Significant Subsidiary**" means a Subsidiary of the Company that meets the definition of "significant subsidiary" in Article 1, Rule 1- 02(w) of Regulation S- X under the Exchange Act.

"**Spin- Off**" shall have the meaning specified in Section 14.04(c).

"**Stock Price**" shall have the meaning specified in Section 14.03(c).

"**Subsidiary**" means, with respect to any Person, any corporation, association, partnership or other business entity of which more than 50% of the total voting power of shares of Capital Stock or other interests (including partnership interests) entitled (without regard to the occurrence of any contingency) to vote in the election of directors, managers, general partners or trustees thereof is at the time owned or controlled, directly or indirectly, by (i) such Person; (ii) such Person and one or more Subsidiaries of such Person; or (iii) one or more Subsidiaries of such Person.

"**Successor Company**" shall have the meaning specified in Section 11.01(a).

"**Trading Day**" means a day on which (i) trading in the Class A Common Stock (or other security for which a Last Reported Sale Price must be determined) generally occurs on the Relevant Stock Exchange; and (ii) a Last Reported Sale Price for the Class A Common Stock (or such other security) is available on the Relevant Stock Exchange; provided that if the Class A Common Stock (or such other security) is not listed, quoted or traded on any U.S. securities exchange or any other market, "Trading Day" means a "Business Day."

"**Trading Price**" of the Notes on any date of determination means the average of the secondary market bid quotations obtained by the Bid Solicitation Agent for $5,000,000 principal amount of Notes at approximately 3:30 p.m. (New York City time) on such determination date from three independent nationally recognized securities dealers the Company selects for this purpose; *provided* that if three such bids cannot reasonably be obtained by the Bid Solicitation Agent but two such bids are obtained, then the average of such two bids shall be used, and if only one such bid can reasonably be obtained by the Bid Solicitation Agent, that one bid shall be used. If the Bid Solicitation Agent cannot reasonably obtain at least one bid for $5,000,000 principal amount of Notes from a nationally recognized securities dealer on any determination date, then the Trading Price per $1,000 principal amount of Notes on such determination date shall be deemed to be less than 98% of the product of the Last Reported Sale Price of the Class A Common Stock and the applicable Conversion Rate.

"**transfer**" shall have the meaning specified in Section 2.05(b).

"**Trigger Event**" shall have the meaning specified in Section 14.04(c).

10

"**Trust Indenture Act**" means the Trust Indenture Act of 1939, as amended, as it was in force at the date of execution of this Indenture.

"**Trustee**" means the Person named as the "**Trustee**" in the first paragraph of this Indenture until a successor trustee shall have become such pursuant to the applicable provisions of this Indenture, and thereafter "**Trustee**" shall mean or include each Person who is then a Trustee hereunder.

"**Unit of Reference Property**" shall have the meaning specified in Section 14.07(a).

"**Valuation Period**" shall have the meaning specified in Section 14.04(c).

"**VWAP Trading Day**" means a day on which (i) there is no Market Disruption Event; and (ii) trading in the Class A Common Stock generally occurs on the Relevant Stock Exchange. If the Class A Common Stock is not so listed or admitted for trading, "VWAP Trading Day" means a Business Day.

Section 1.02. *References to Interest*. Unless the context otherwise requires, any reference to interest on, or in respect of, any Note in this Indenture shall be deemed to include Additional Interest if, in such context, Additional Interest is, was or would be payable pursuant to any of Section 4.06(d), Section 4.06(e) and Section 6.03. Unless the context otherwise requires, any express mention of Additional Interest in any provision hereof shall not be construed as excluding Additional Interest in those provisions hereof where such express mention is not made.

ARTICLE 2

Issue, Description, Execution, Registration and Exchange of Notes

Section 2.01. *Designation and Amount*. The Notes shall be designated as the "2.25% Convertible Senior Notes due 2018." The aggregate principal amount of Notes that may be authenticated and delivered under this Indenture is initially limited to $172,500,000, subject to Section 2.10 and except for Notes authenticated and delivered upon registration or transfer of, or in exchange for, or in lieu of other Notes pursuant to Section 2.05, Section 2.06, Section 2.07, Section 10.04, Section 14.02 and Section 15.04.

Section 2.02. *Form of Notes*. The Notes and the Trustee's certificate of authentication to be borne by such Notes shall be substantially in the respective forms set forth in Exhibit A, the terms and provisions of which shall constitute, and are hereby expressly incorporated in and made a part of this Indenture. To the extent applicable, the Company and the Trustee, by their execution and delivery of this Indenture, expressly agree to such terms and provisions and to be bound thereby.

Any Global Note may be endorsed with or have incorporated in the text thereof such legends or recitals or changes not inconsistent with the provisions of this Indenture as may be required by the Custodian or the Depositary, or as may be required to comply with any applicable law or any regulation thereunder or with the rules and regulations of any securities exchange or automated quotation system upon which the Notes may be listed or traded or designated for issuance or to conform with any usage with respect thereto, or to indicate any special limitations or restrictions to which any particular Notes are subject.

11

Any of the Notes may have such letters, numbers or other marks of identification and such notations, legends or endorsements as the Officers executing the same may approve (execution thereof to be conclusive evidence of such approval) and as are not inconsistent with the provisions of this Indenture, or as may be required to comply with any law or with any rule or regulation made pursuant thereto or with any rule or regulation of any securities exchange or automated quotation system on which the Notes may be listed or designated for issuance, or to conform to usage or to indicate any special limitations or restrictions to which any particular Notes are subject.

Each Global Note shall represent such principal amount of the outstanding Notes as shall be specified therein and shall provide that it shall represent the aggregate principal amount of outstanding Notes from time to time endorsed thereon and that the aggregate principal amount of outstanding Notes represented thereby may from time to time be increased or reduced to reflect purchases, cancellations, conversions, transfers or exchanges permitted hereby. Any endorsement of the Global Note to reflect the amount of any increase or decrease in the amount of outstanding Notes represented thereby shall be made by the Trustee or the Custodian, at the direction of the Trustee, in such manner and upon instructions given by the Holder of such Notes in accordance with this Indenture. Payment of principal (including the Fundamental Change Purchase Price, if applicable) of, and accrued and unpaid interest on, the Global Note shall be made to the Holder of such Note on the date of payment, unless a record date or other means of determining Holders eligible to receive payment is provided for herein.

Section 2.03. *Date and Denomination of Notes; Payments of Interest and Defaulted Amounts*. (a) The Notes shall be issuable in registered form without coupons in denominations of $1,000 principal amount and multiples of $1,000 in excess thereof. Each Note shall be dated the date of its authentication and shall bear interest from the date specified on the face of the form of Note attached as Exhibit A hereto. Accrued interest on the Notes shall be computed on the basis of a 360- day year composed of twelve 30- day months.

(b) The Person in whose name any Note (or its Predecessor Note) is registered on the Note Register at the close of business on any Regular Record Date with respect to any Interest Payment Date shall be entitled to receive the interest payable on such Interest Payment Date. Interest shall be payable at the office or agency of the Company maintained by the Company for such purposes in the Borough of Manhattan, The City of New York, which shall initially be the Corporate Trust Office. The Company shall pay interest (i) on any Physical Notes (A) to Holders holding Physical Notes having an aggregate principal amount of $5,000,000 or less, by check mailed to the Holders of these Notes at their address as it appears in the Note Register and (B) to Holders holding Physical Notes having an aggregate principal amount of more than $5,000,000, either by check mailed to such Holders or, upon application by such Holder to the Note Registrar not later than the relevant Regular Record Date, by wire transfer in immediately available funds to that Holder's account within the United States, which application shall remain in effect until the Holder notifies, in writing, the Note Registrar to the contrary or (ii) on any Global Note by wire transfer of immediately available funds to the account of the Depositary or its nominee.

(c) Any Defaulted Amounts shall forthwith cease to be payable to the Holder on the relevant payment date but shall accrue interest per annum at the rate borne by the Notes from, and including, such relevant payment date, and such Defaulted Amounts together with such interest thereon shall be paid by the Company, at its election in each case, as provided in clause (i) or (ii) below:

(i) The Company may elect to make payment of any Defaulted Amounts to the Persons in whose names the Notes (or their respective Predecessor Notes) are registered at the close of business on a special record date for the payment of such Defaulted Amounts, which shall be fixed in the following manner. The Company shall notify the Trustee in writing of the amount of the Defaulted Amounts proposed to be paid on each Note and the date of the proposed payment (which shall be not less than 25 days after the receipt by the Trustee of such notice, unless the Trustee shall consent to an earlier date), and at the same time the Company shall deposit with the Trustee an amount of money equal to the aggregate amount to be paid in respect of such Defaulted Amounts or shall make arrangements satisfactory to the Trustee for such deposit on or prior to the date of the proposed payment, such money when deposited to be held in trust for the benefit of the Persons entitled to such Defaulted Amounts as in this clause provided. Thereupon the Company shall fix a special record date for the payment of such Defaulted Amounts which shall be not more than 15 days and not less than 10 days prior to the date of the proposed payment, and not less than 10 days after the receipt by the Trustee of the notice of the proposed payment. The Company shall promptly notify the Trustee of such special record date and the Trustee, in the name and at the expense of the Company, shall cause notice of the proposed payment of such Defaulted Amounts and the special record date therefor to be mailed, first- class postage prepaid, to each Holder at its address as it appears in the Note Register, not less than 10 days prior to such special record date. Notice of the proposed payment of such Defaulted Amounts and the special record date therefor having been so mailed, such Defaulted Amounts shall be paid to the Persons in whose names the Notes (or their respective Predecessor Notes) are registered at the close of business on such special record date and shall no longer be payable pursuant to the following clause (ii) of this Section 2.03(c).

(ii) The Company may make payment of any Defaulted Amounts in any other lawful manner not inconsistent with the requirements of any securities exchange or automated quotation system on which the Notes may be listed or designated for issuance, and upon such notice as may be required by such exchange or automated quotation system, if, after notice given by the Company to the Trustee of the proposed payment pursuant to this clause, such manner of payment shall be deemed satisfactory to the Trustee.

Section 2.04. *Execution, Authentication and Delivery of Notes.* The Notes shall be signed in the name and on behalf of the Company by the manual or facsimile signature of its Officers.

At any time and from time to time after the execution and delivery of this Indenture, the Company may deliver Notes executed by the Company to the Trustee for authentication, together with a Company Order for the authentication and delivery of such Notes, and the Trustee in accordance with such Company Order shall authenticate and deliver such Notes, without any further action by the Company hereunder.

13

Only such Notes as shall bear thereon a certificate of authentication substantially in the form set forth on the form of Note attached as Exhibit A hereto, executed manually by an authorized signatory of the Trustee (or an authenticating agent appointed by the Trustee as provided by Section 17.11), shall be entitled to the benefits of this Indenture or be valid or obligatory for any purpose. Such certificate by the Trustee (or such an authenticating agent) upon any Note executed by the Company shall be conclusive evidence that the Note so authenticated has been duly authenticated and delivered hereunder and that the Holder is entitled to the benefits of this Indenture.

In case any Officer of the Company who shall have signed any of the Notes shall cease to be such Officer before the Notes so signed shall have been authenticated and delivered by the Trustee, or disposed of by the Company, such Notes nevertheless may be authenticated and delivered or disposed of as though the Person who signed such Notes had not ceased to be such Officer of the Company; and any Note may be signed on behalf of the Company by such persons as, at the actual date of the execution of such Note, shall be the Officers of the Company, although at the date of the execution of this Indenture any such Person was not such an Officer.

Section 2.05. *Exchange and Registration of Transfer of Notes; Restrictions on Transfer; Depositary.* The Company shall cause to be kept at the Corporate Trust Office a register (the register maintained in such office or in any other office or agency of the Company designated pursuant to Section 4.02, the "**Note Register**") in which, subject to such reasonable regulations or procedures as it may prescribe, the Company shall provide for the registration of Notes and transfers of Notes. Such register shall be in written form or in any form capable of being converted into written form within a reasonable period of time. The Trustee is hereby initially appointed the "**Note Registrar**" for the purpose of registering Notes and transfers of Notes as herein provided. The Company may appoint one or more co- Note Registrars in accordance with Section 4.02.

Upon surrender for registration of transfer of any Note to the Note Registrar or any co- registrar, and satisfaction of the requirements for such transfer set forth in this Section 2.05, the Company shall execute, and the Trustee shall authenticate and deliver, in the name of the designated transferee or transferees, one or more new Notes of any authorized denominations and of a like aggregate principal amount and bearing such restrictive legends as may be required by this Indenture.

Notes may be exchanged for other Notes of any authorized denominations and of a like aggregate principal amount, upon surrender of the Notes to be exchanged at any such office or agency maintained by the Company pursuant to Section 4.02. Whenever any Notes are so surrendered for exchange, the Company shall execute, and the Trustee shall authenticate and deliver, the Notes that the Holder making the exchange is entitled to receive, bearing registration numbers not contemporaneously outstanding.

All Notes presented or surrendered for registration of transfer or for exchange, repurchase or conversion shall (if so required by the Company, the Trustee, the Note Registrar or any co- Note Registrar) be duly endorsed, or be accompanied by a written instrument or instruments of transfer in form satisfactory to the Company and duly executed, by the Holder thereof or its attorney- in- fact duly authorized in writing.

14

No service charge shall be imposed by the Company, the Trustee, the Note Registrar or any co- Note Registrar for any exchange or registration of transfer of Notes, but the Company or the Trustee may require a Holder to pay a sum sufficient to cover any documentary, stamp or similar issue or transfer tax required by law or permitted pursuant to Section 14.02(d) or Section 14.02(e).

None of the Company, the Trustee, the Note Registrar or any co- Note Registrar shall be required to exchange or register a transfer of (i) any Notes surrendered for conversion or, if a portion of any Note is surrendered for conversion, such portion thereof surrendered for conversion or (ii) any Notes, or a portion of any Note, surrendered for purchase (and not withdrawn) in accordance with Article 15.

All Notes issued upon any registration of transfer or exchange of Notes in accordance with this Indenture shall be the valid obligations of the Company, evidencing the same debt, and entitled to the same benefits under this Indenture as the Notes surrendered upon such registration of transfer or exchange.

(a) So long as the Notes are eligible for book- entry settlement with the Depositary, unless otherwise required by law, subject to the fourth paragraph from the end of Section 2.05(b) all Notes shall be represented by one or more Notes in global form (each, a "**Global Note**") registered in the name of the Depositary or the nominee of the Depositary. The transfer and exchange of beneficial interests in a Global Note that does not involve the issuance of a Physical Note, shall be effected through the Depositary (but not the Trustee or the Custodian) in accordance with this Indenture (including the restrictions on transfer set forth herein) and the procedures of the Depositary therefor.

(b) Every Note that bears or is required under this Section 2.05(b) to bear the legend set forth in this Section 2.05(b) (together with any Class A Common Stock issued upon conversion of the Notes and required to bear the legend set forth in Section 2.05(c), collectively, the "**Restricted Securities**") shall be subject to the restrictions on transfer set forth in this Section 2.05(b) (including the legend set forth below), unless such restrictions on transfer shall be eliminated or otherwise waived by written consent of the Company, and the Holder of each such Restricted Security, by such Holder's acceptance thereof, agrees to be bound by all such restrictions on transfer. As used in this Section 2.05(b) and Section 2.05(c), the term "**transfer**" encompasses any sale, pledge, transfer or other disposition whatsoever of any Restricted Security.

15

Until the date (the "**Resale Restriction Termination Date**") that is the later of (1) the date that is one year after the date of original issuance of the Notes, or such shorter period of time as permitted by Rule 144 under the Securities Act or any successor provision thereto, and (2) such later date, if any, as may be required by applicable law, any certificate evidencing such Note (and all securities issued in exchange therefor or substitution thereof, other than Class A Common Stock, if any, issued upon conversion thereof which shall bear the legend set forth in Section 2.05(c), if applicable) shall bear a legend in substantially the following form (unless such Notes have been transferred pursuant to a registration statement that has become or been declared effective under the Securities Act and that continues to be effective at the time of such transfer, or sold pursuant to the exemption from registration provided by Rule 144 or any similar provision then in force under the Securities Act, or unless otherwise agreed by the Company in writing, with notice thereof to the Trustee):

THIS SECURITY AND THE CLASS A COMMON STOCK, IF ANY, ISSUABLE UPON CONVERSION OF THIS SECURITY HAVE NOT BEEN REGISTERED UNDER THE SECURITIES ACT OF 1933, AS AMENDED (THE "**SECURITIES ACT**"), AND MAY NOT BE OFFERED, SOLD, PLEDGED OR OTHERWISE TRANSFERRED EXCEPT IN ACCORDANCE WITH THE FOLLOWING SENTENCE. BY ITS ACQUISITION HEREOF OR OF A BENEFICIAL INTEREST HEREIN, THE ACQUIRER:

(1) REPRESENTS THAT IT AND ANY ACCOUNT FOR WHICH IT IS ACTING IS A "QUALIFIED INSTITUTIONAL BUYER" (WITHIN THE MEANING OF RULE 144A UNDER THE SECURITIES ACT) AND THAT IT EXERCISES SOLE INVESTMENT DISCRETION WITH RESPECT TO EACH SUCH ACCOUNT, AND

(2) AGREES FOR THE BENEFIT OF FXCM INC. (THE "**COMPANY**") THAT IT WILL NOT OFFER, SELL, PLEDGE OR OTHERWISE TRANSFER THIS SECURITY OR ANY BENEFICIAL INTEREST HEREIN PRIOR TO THE DATE THAT IS THE LATER OF (X) ONE YEAR AFTER THE ORIGINAL ISSUE DATE HEREOF OR SUCH SHORTER PERIOD OF TIME AS PERMITTED BY RULE 144 UNDER THE SECURITIES ACT OR ANY SUCCESSOR PROVISION THERETO, AND (Y) SUCH LATER DATE, IF ANY, AS MAY BE REQUIRED BY APPLICABLE LAW, EXCEPT:

(A) TO THE COMPANY OR ANY SUBSIDIARY THEREOF, OR

(B) PURSUANT TO A REGISTRATION STATEMENT WHICH HAS BECOME EFFECTIVE UNDER THE SECURITIES ACT, OR

(C) TO A QUALIFIED INSTITUTIONAL BUYER IN COMPLIANCE WITH RULE 144A UNDER THE SECURITIES ACT, OR

(D) PURSUANT TO AN EXEMPTION FROM REGISTRATION PROVIDED BY RULE 144 UNDER THE SECURITIES ACT OR ANY OTHER AVAILABLE EXEMPTION FROM THE REGISTRATION REQUIREMENTS OF THE SECURITIES ACT.

PRIOR TO THE REGISTRATION OF ANY TRANSFER IN ACCORDANCE WITH (2)(D) ABOVE, THE COMPANY AND THE TRUSTEE RESERVE THE RIGHT TO REQUIRE THE DELIVERY OF SUCH LEGAL OPINIONS, CERTIFICATIONS OR OTHER EVIDENCE AS MAY REASONABLY BE REQUIRED IN ORDER TO DETERMINE THAT THE PROPOSED TRANSFER IS BEING MADE IN COMPLIANCE WITH THE SECURITIES ACT AND APPLICABLE STATE SECURITIES LAWS. NO REPRESENTATION IS MADE AS TO THE AVAILABILITY OF ANY EXEMPTION FROM THE REGISTRATION REQUIREMENTS OF THE SECURITIES ACT.

16

No transfer of any Note prior to the Resale Restriction Termination Date will be registered by the Note Registrar unless the applicable box on the Form of Assignment and Transfer has been checked.

Any Note (or security issued in exchange or substitution therefor) as to which such restrictions on transfer shall have expired in accordance with their terms may, upon surrender of such Note for exchange to the Note Registrar in accordance with the provisions of this Section 2.05, be exchanged for a new Note or Notes, of like tenor and aggregate principal amount, which shall not bear the restrictive legend required by this Section 2.05(b) and shall not be assigned a restricted CUSIP number. The Company shall be entitled to instruct the Custodian in writing to so surrender any Global Note as to which such restrictions on transfer shall have expired in accordance with their terms for exchange, and, upon such instruction, the Custodian shall so surrender such Global Note for exchange; and any new Global Note so exchanged therefor shall not bear the restrictive legend specified in this Section 2.05(b) and shall not be assigned a restricted CUSIP number. The Company shall promptly notify the Trustee upon the occurrence of the Resale Restriction Termination Date and promptly after a registration statement, if any, with respect to the Notes or any Class A Common Stock issued upon conversion of the Notes has been declared effective under the Securities Act.

Notwithstanding any other provisions of this Indenture (other than the provisions set forth in this Section 2.05(b)), a Global Note may not be transferred as a whole or in part except (i) by the Depositary to a nominee of the Depositary or by a nominee of the Depositary to the Depositary or another nominee of the Depositary or by the Depositary or any such nominee to a successor Depositary or a nominee of such successor Depositary and (ii) for transfers of portions of a Global Note in certificated form made upon request of a member of, or a participant in, the Depositary (for itself or on behalf of a beneficial owner) by written notice given to the Trustee by or on behalf of the Depositary in accordance with customary procedures of the Depositary and in compliance with this Section 2.05(b).

The Depositary shall be a clearing agency registered under the Exchange Act. The Company initially appoints The Depository Trust Company to act as the "**Depositary**" with respect to each Global Note. Initially, each Global Note shall be issued to the Depositary, registered in the name of Cede & Co., as the nominee of the Depositary, and deposited with the Trustee as custodian for Cede & Co.

If (i) the Depositary notifies the Company at any time that the Depositary is unwilling or unable to continue as depositary for the Global Notes and a successor depositary is not appointed within 90 days, (ii) the Depositary ceases to be registered as a clearing agency under the Exchange Act and a successor depositary is not appointed within 90 days or (iii) an Event of Default with respect to the Notes has occurred and is continuing and a beneficial owner of any Note requests that its beneficial interest therein be issued as a Physical Note, the Company shall execute, and the Trustee, upon receipt of an Officer's Certificate, Opinion of Counsel and a Company Order for the authentication and delivery of Notes, shall authenticate and deliver (x) in the case of clause (iii), a Physical Note to such beneficial owner in a principal amount equal to the principal amount of such Note corresponding such beneficial owner's beneficial interest and (y) in the case of clause (i) or (ii), Physical Notes to each beneficial owner of the related Global Notes (or a portion thereof) in an aggregate principal amount equal to the aggregate principal amount of such Global Notes in exchange for such Global Notes, and upon delivery of the Global Notes to the Trustee such Global Notes shall be canceled.

17

Physical Notes issued in exchange for all or a part of the Global Note pursuant to this Section 2.05(b) shall be registered in such names and in such authorized denominations as the Depositary, pursuant to instructions from its direct or indirect participants or otherwise, shall instruct the Trustee. Upon execution and authentication, the Trustee shall deliver such Physical Notes to the Persons in whose names such Physical Notes are so registered.

At such time as all interests in a Global Note have been converted, canceled, purchased or transferred, such Global Note shall be, upon receipt thereof, canceled by the Trustee in accordance with standing procedures and existing instructions between the Depositary and the Custodian. At any time prior to such cancellation, if any interest in a Global Note is exchanged for Physical Notes, converted, canceled, purchased or transferred to a transferee who receives Physical Notes therefor or any Physical Note is exchanged or transferred for part of such Global Note, the principal amount of such Global Note shall, in accordance with the standing procedures and instructions existing between the Depositary and the Custodian, be appropriately reduced or increased, as the case may be, and an endorsement shall be made on such Global Note, by the Trustee or the Custodian, at the direction of the Trustee, to reflect such reduction or increase.

Neither the Company, the Trustee nor any agent of the Company or the Trustee shall have any responsibility or liability for any aspect of the records relating to or payments made on account of beneficial ownership interests of a Global Note or maintaining, supervising or reviewing any records relating to such beneficial ownership interests.

(c) Until the Resale Restriction Termination Date, any stock certificate representing Class A Common Stock issued upon conversion of a Note shall bear a legend in substantially the following form (unless the Note or such Class A Common Stock has been transferred pursuant to a registration statement that has become or been declared effective under the Securities Act and that continues to be effective at the time of such transfer, or pursuant to the exemption from registration provided by Rule 144 or any similar provision then in force under the Securities Act, or such Class A Common Stock has been issued upon conversion of Notes that have been transferred pursuant to a registration statement that has become or been declared effective under the Securities Act and that continues to be effective at the time of such transfer, or pursuant to the exemption from registration provided by Rule 144 or any similar provision then in force under the Securities Act, or unless otherwise agreed by the Company with written notice thereof to the Trustee and any transfer agent for the Class A Common Stock):

THIS SECURITY HAS NOT BEEN REGISTERED UNDER THE SECURITIES ACT OF 1933, AS AMENDED (THE "**SECURITIES ACT**"), AND MAY NOT BE OFFERED, SOLD, PLEDGED OR OTHERWISE TRANSFERRED EXCEPT IN ACCORDANCE WITH THE FOLLOWING SENTENCE. BY ITS ACQUISITION HEREOF OR OF A BENEFICIAL INTEREST HEREIN, THE ACQUIRER:

(1) REPRESENTS THAT IT AND ANY ACCOUNT FOR WHICH IT IS ACTING IS A "QUALIFIED INSTITUTIONAL BUYER" (WITHIN THE MEANING OF RULE 144A UNDER THE SECURITIES ACT) AND THAT IT EXERCISES SOLE INVESTMENT DISCRETION WITH RESPECT TO EACH SUCH ACCOUNT, AND

(2) AGREES FOR THE BENEFIT OF FXCM INC. (THE "**COMPANY**") THAT IT WILL NOT OFFER, SELL, PLEDGE OR OTHERWISE TRANSFER THIS SECURITY OR ANY BENEFICIAL INTEREST HEREIN PRIOR TO THE DATE THAT IS THE LATER OF (X) ONE YEAR AFTER THE ORIGINAL ISSUE DATE OF THE NOTES UPON THE CONVERSION OF WHICH THIS SECURITY WAS ISSUED OR SUCH SHORTER PERIOD OF TIME AS PERMITTED BY RULE 144 UNDER THE SECURITIES ACT OR ANY SUCCESSOR PROVISION THERETO AND (Y) SUCH LATER DATE, IF ANY, AS MAY BE REQUIRED BY APPLICABLE LAW, EXCEPT:

(A) TO THE COMPANY OR ANY SUBSIDIARY THEREOF, OR

(B) PURSUANT TO A REGISTRATION STATEMENT WHICH HAS BECOME EFFECTIVE UNDER THE SECURITIES ACT, OR

(C) TO A QUALIFIED INSTITUTIONAL BUYER IN COMPLIANCE WITH RULE 144A UNDER THE SECURITIES ACT, OR

(D) PURSUANT TO AN EXEMPTION FROM REGISTRATION PROVIDED BY RULE 144 UNDER THE SECURITIES ACT OR ANY OTHER AVAILABLE EXEMPTION FROM THE REGISTRATION REQUIREMENTS OF THE SECURITIES ACT.

PRIOR TO THE REGISTRATION OF ANY TRANSFER IN ACCORDANCE WITH (2)(D) ABOVE, THE COMPANY AND THE TRANSFER AGENT RESERVE THE RIGHT TO REQUIRE THE DELIVERY OF SUCH LEGAL OPINIONS, CERTIFICATIONS OR OTHER EVIDENCE AS MAY REASONABLY BE REQUIRED IN ORDER TO DETERMINE THAT THE PROPOSED TRANSFER IS BEING MADE IN COMPLIANCE WITH THE SECURITIES ACT AND APPLICABLE STATE SECURITIES LAWS. NO REPRESENTATION IS MADE AS TO THE AVAILABILITY OF ANY EXEMPTION FROM THE REGISTRATION REQUIREMENTS OF THE SECURITIES ACT.

(d) Any such Class A Common Stock as to which such restrictions on transfer shall have expired in accordance with their terms may, upon surrender of the certificates representing such shares of Class A Common Stock for exchange in accordance with the procedures of the transfer agent for the Class A Common Stock, be exchanged for a new certificate or certificates for a like aggregate number of shares of Class A Common Stock, which shall not bear the restrictive legend required by Section 2.05(c).

(e) Any Note or Class A Common Stock issued upon the conversion of a Note that is purchased or owned by any Affiliate of the Company may not be resold by such Affiliate unless registered under the Securities Act or resold pursuant to an exemption from the registration requirements of the Securities Act in a transaction that results in such Note or Class A Common Stock, as the case may be, no longer being "restricted securities" (as defined under Rule 144 under the Securities Act). The Trustee shall have no obligation or duty to monitor,

19

determine or inquire as to compliance with any restrictions on transfer imposed under this Indenture or under applicable law with respect to any transfer of any interest in any Note (including any transfers between or among members of, or participants in, the Depositary or beneficial owners of interests in any Global Note) other than to require delivery of such certificates and other documentation or evidence as are expressly required by, and to do so if and when expressly required by the terms of, this Indenture, and to examine the same to determine substantial compliance as to form with the express requirements hereof.

(f) Neither the Trustee nor any agent of the Trustee shall have any responsibility for any actions taken or not taken by the Depositary.

Section 2.06. *Mutilated, Destroyed, Lost or Stolen Notes.* In case any Note shall become mutilated or be destroyed, lost or stolen, the Company in its discretion may execute, and upon its written request the Trustee or an authenticating agent appointed by the Trustee shall authenticate and deliver, a new Note, bearing a registration number not contemporaneously outstanding, in exchange and substitution for the mutilated Note, or in lieu of and in substitution for the Note so destroyed, lost or stolen. In every case the applicant for a substituted Note shall furnish to the Company, to the Trustee and, if applicable, to such authenticating agent such security or indemnity as may be required by them to save each of them harmless from any loss, liability, cost or expense caused by or connected with such substitution, and, in every case of destruction, loss or theft, the applicant shall also furnish to the Company, to the Trustee and, if applicable, to such authenticating agent evidence to their satisfaction of the destruction, loss or theft of such Note and of the ownership thereof.

The Trustee or such authenticating agent may authenticate any such substituted Note and deliver the same upon the receipt of such security or indemnity as the Trustee, the Company and, if applicable, such authenticating agent may require. Upon the issuance of any substitute Note, the Company or the Trustee may require the payment by the Holder of a sum sufficient to cover any tax, assessment or other governmental charge that may be imposed in relation thereto and any other expenses connected therewith. In case any Note that has matured or is about to mature or has been surrendered for required purchase or is about to be converted in accordance with Article 14 shall become mutilated or be destroyed, lost or stolen, the Company may, in its sole discretion, instead of issuing a substitute Note, pay or authorize the payment of or convert or authorize the conversion of the same (without surrender thereof except in the case of a mutilated Note), as the case may be, if the applicant for such payment or conversion shall furnish to the Company, to the Trustee and, if applicable, to such authenticating agent such security or indemnity as may be required by them to save each of them harmless for any loss, liability, cost or expense caused by or connected with such substitution, and, in every case of destruction, loss or theft, evidence satisfactory to the Company, the Trustee and, if applicable, any Paying Agent or Conversion Agent evidence of their satisfaction of the destruction, loss or theft of such Note and of the ownership thereof.

Every substitute Note issued pursuant to the provisions of this Section 2.06 by virtue of the fact that any Note is destroyed, lost or stolen shall constitute an additional contractual obligation of the Company, whether or not the destroyed, lost or stolen Note shall be found at any time, and shall be entitled to all the benefits of (but shall be subject to all the limitations set forth in) this Indenture equally and proportionately with any and all other Notes duly issued

20

hereunder. To the extent permitted by law, all Notes shall be held and owned upon the express condition that the foregoing provisions are exclusive with respect to the replacement or payment or conversion or repurchase of mutilated, destroyed, lost or stolen Notes and shall preclude any and all other rights or remedies notwithstanding any law or statute existing or hereafter enacted to the contrary with respect to the replacement or payment or conversion of negotiable instruments or other securities without their surrender.

Section 2.07. *Temporary Notes.* Pending the preparation of Physical Notes, the Company may execute and the Trustee or an authenticating agent appointed by the Trustee shall, upon written request of the Company, authenticate and deliver temporary Notes (printed or lithographed). Temporary Notes shall be issuable in any authorized denomination, and substantially in the form of the Physical Notes but with such omissions, insertions and variations as may be appropriate for temporary Notes, all as may be determined by the Company. Every such temporary Note shall be executed by the Company and authenticated by the Trustee or such authenticating agent upon the same conditions and in substantially the same manner, and with the same effect, as the Physical Notes. Without unreasonable delay, the Company shall execute and deliver to the Trustee or such authenticating agent Physical Notes (other than any Global Note) and thereupon any or all temporary Notes (other than any Global Note) may be surrendered in exchange therefor, at each office or agency maintained by the Company pursuant to Section 4.02 and the Trustee or such authenticating agent shall authenticate and deliver in exchange for such temporary Notes an equal aggregate principal amount of Physical Notes. Such exchange shall be made by the Company at its own expense and without any charge therefor. Until so exchanged, the temporary Notes shall in all respects be entitled to the same benefits and subject to the same limitations under this Indenture as Physical Notes authenticated and delivered hereunder.

Section 2.08. *Cancellation of Notes Paid, Converted, Etc.* The Company shall cause all Notes surrendered for the purpose of payment, purchase (not including Notes purchased pursuant to cash- settled swaps or other derivatives), registration of transfer or exchange or conversion, if surrendered to any Person other than the Trustee (including any of the Company's Agents, Subsidiaries or Affiliates), to be surrendered to the Trustee for cancellation. All Notes delivered to the Trustee shall be canceled promptly by it, and no Notes shall be authenticated in exchange thereof except as expressly permitted by any of the provisions of this Indenture. The Trustee shall dispose of canceled Notes in accordance with its customary procedures and, after such disposition, shall deliver a certificate of such disposition to the Company, at the Company's written request in a Company Order. If the Company or any of its Subsidiaries shall acquire any of the Notes, such acquisition shall not operate as a purchase or satisfaction of the indebtedness represented by such Notes unless and until the same are delivered to the Trustee for cancellation.

Section 2.09. *CUSIP Numbers.* The Company in issuing the Notes may use "CUSIP" numbers (if then generally in use), and, if so, the Trustee shall use "CUSIP" numbers in all notices issued to Holders as a convenience to such Holders; *provided* that any such notice may state that no representation is made as to the correctness of such numbers either as printed on the Notes or on such notice and that reliance may be placed only on the other identification numbers printed on the Notes. The Company shall promptly notify the Trustee in writing of any change in the "CUSIP" numbers.

21

Section 2.10. *Additional Notes; Purchases.* (a) The Company may, from time to time, without notice to or consent of the Holders, reopen this Indenture and issue additional Notes hereunder with the same terms and with the same CUSIP number as the Notes initially issued hereunder in an unlimited aggregate principal amount; *provided* that if any such additional Notes are not fungible with the Notes initially issued hereunder for U.S. federal income tax or securities law purposes, such additional Notes shall have one or more separate CUSIP numbers. Such additional Notes and the Notes initially issued hereunder shall rank equally and ratably and shall be treated as a single series for all purposes under this Indenture. Prior to the issuance of any such additional Notes, the Company shall deliver to the Trustee a Company Order, an Officer's Certificate and an Opinion of Counsel, such Officer's Certificate and Opinion of Counsel to cover such matters, in addition to those required by Section 17.06, as the Trustee shall reasonably request.

(b) The Company may, to the extent permitted by law, and directly or indirectly (regardless of whether such Notes are surrendered to the Company), purchase Notes in the open market or otherwise, whether by the Company or its Subsidiaries or through a private or public tender or exchange offer or through counterparties to private agreements, including by cash- settled swaps or other derivatives. The Company shall cause any Notes so purchased (other than Notes purchased pursuant to cash- settled swaps or other derivatives) to be surrendered to the Trustee for cancellation in accordance with Section 2.08, and they will no longer be considered outstanding under this Indenture upon their purchase.

ARTICLE 3

SATISFACTION AND DISCHARGE

Section 3.01. *Satisfaction and Discharge.* This Indenture shall upon request of the Company contained in an Officer's Certificate cease to be of further effect, and the Trustee, at the expense of the Company, shall execute proper instruments acknowledging satisfaction and discharge of this Indenture, when (a) (i) all Notes theretofore authenticated and delivered (other than (x) Notes which have been destroyed, lost or stolen and which have been replaced or paid as provided in Section 2.06 and (y) Notes for whose payment money has theretofore been deposited in trust or segregated and held in trust by the Company and thereafter repaid to the Company or discharged from such trust, as provided in Section 4.04(d)) have been delivered to the Trustee for cancellation; or (ii) the Company has deposited with the Trustee or delivered to Holders, as applicable, after all the Notes have become due and payable, whether at the Maturity Date or any Fundamental Change Purchase Date, and/or have been converted (and the related Settlement Amounts have been determined), cash or cash and shares of Class A Common Stock, if any (solely to satisfy the Company's Conversion Obligation, if applicable), as applicable, sufficient to pay all of the outstanding Notes and/or satisfy all conversions, as the case may be, and pay all other sums due and payable under this Indenture by the Company; and (b) the Company has delivered to the Trustee an Officer's Certificate and an Opinion of Counsel, each stating that all conditions precedent herein provided for relating to the satisfaction and discharge of this Indenture have been complied with. Notwithstanding the satisfaction and discharge of this Indenture, the obligations of the Company to the Trustee under Section 7.06 shall survive.

22

## ARTICLE 4
### PARTICULAR COVENANTS OF THE COMPANY

Section 4.01. *Payment of Principal and Interest.* The Company covenants and agrees that it will cause to be paid the principal (including the Fundamental Change Purchase Price, if applicable) of, and accrued and unpaid interest on, each of the Notes at the places, at the respective times and in the manner provided herein and in the Notes.

Section 4.02. *Maintenance of Office or Agency.* The Company will maintain in the Borough of Manhattan, The City of New York, an office or agency where the Notes may be surrendered for registration of transfer or exchange or for presentation for payment or repurchase ("**Paying Agent**") or for conversion ("**Conversion Agent**") and where notices and demands to or upon the Company in respect of the Notes and this Indenture may be served. The Company will give prompt written notice to the Trustee of the location, and any change in the location, of such office or agency. If at any time the Company shall fail to maintain any such required office or agency or shall fail to furnish the Trustee with the address thereof, such presentations, surrenders, notices and demands may be made or served at the Corporate Trust Office or the office or agency of the Trustee in the Borough of Manhattan, The City of New York.

The Company may also from time to time designate as co- Note Registrars one or more other offices or agencies where the Notes may be presented or surrendered for any or all such purposes and may from time to time rescind such designations; *provided* that no such designation or rescission shall in any manner relieve the Company of its obligation to maintain an office or agency in the Borough of Manhattan, The City of New York, for such purposes. The Company will give prompt written notice to the Trustee of any such designation or rescission and of any change in the location of any such other office or agency. The terms "**Paying Agent**" and "**Conversion Agent**" include any such additional or other offices or agencies, as applicable. The Company hereby initially designates the Trustee as the Paying Agent, Note Registrar, Custodian and Conversion Agent and the Corporate Trust Office and the office or agency of the Trustee in the Borough of Manhattan, The City of New York, each shall be considered as one such office or agency of the Company for each of the aforesaid purposes.

Section 4.03. *Appointments to Fill Vacancies in Trustee's Office.* The Company, whenever necessary to avoid or fill a vacancy in the office of Trustee, will appoint, in the manner provided in Section 7.09, a Trustee, so that there shall at all times be a Trustee hereunder.

Section 4.04. *Provisions as to Paying Agent.* If the Company shall appoint a Paying Agent other than the Trustee, the Company will cause such Paying Agent to execute and deliver to the Trustee an instrument in which such agent shall agree with the Trustee, subject to the provisions of this Section 4.04:

(i) that it will hold all sums held by it as such agent for the payment of the principal (including the Fundamental Change Purchase Price, if applicable) of, and accrued and unpaid interest on, the Notes in trust for the benefit of the Holders of the Notes;

(ii) that it will give the Trustee prompt notice of any failure by the Company to make any payment of the principal (including the Fundamental Change Purchase Price, if applicable) of, and accrued and unpaid interest on, the Notes when the same shall be due and payable; and

(iii) that at any time during the continuance of an Event of Default, upon request of the Trustee, it will forthwith pay to the Trustee all sums so held in trust.

23

The Company shall, by 11:00 A.M. (New York City time) on each due date of the principal (including the Fundamental Change Purchase Price, if applicable) of, or accrued and unpaid interest on, the Notes, deposit with the Paying Agent a sum sufficient to pay such principal (including the Fundamental Change Purchase Price, if applicable) or accrued and unpaid interest, and (unless such Paying Agent is the Trustee) the Company will promptly notify the Trustee of any failure to take such action.

(b) If the Company shall act as its own Paying Agent, it will, on or before each due date of the principal (including the Fundamental Change Purchase Price, if applicable) of, and accrued and unpaid interest on, the Notes, set aside, segregate and hold in trust for the benefit of the Holders of the Notes a sum sufficient to pay such principal (including the Fundamental Change Purchase Price, if applicable) and accrued and unpaid interest so becoming due and will promptly notify the Trustee in writing of any failure to take such action and of any failure by the Company to make any payment of the principal (including the Fundamental Change Purchase Price, if applicable) of, or accrued and unpaid interest on, the Notes when the same shall become due and payable.

(c) Anything in this Section 4.04 to the contrary notwithstanding, the Company may, at any time, for the purpose of obtaining a satisfaction and discharge of this Indenture, or for any other reason, pay, cause to be paid or deliver to the Trustee all sums or amounts held in trust by the Company or any Paying Agent hereunder as required by this Section 4.04, such sums or amounts to be held by the Trustee upon the trusts herein contained and upon such payment or delivery by the Company or any Paying Agent to the Trustee, the Company or such Paying Agent shall be released from all further liability but only with respect to such sums or amounts.

(d) Any money and shares of Class A Common Stock deposited with the Trustee or any Paying Agent, or then held by the Company, in trust for the payment of the principal (including the Fundamental Change Purchase Price, if applicable) of, and accrued and unpaid interest on, any Note and remaining unclaimed for two years after such principal (including the Fundamental Change Purchase Price, if applicable) or interest has become due and payable shall be paid to the Company on request of the Company contained in an Officer's Certificate, or (if then held by the Company) shall be discharged from such trust; and the Holder of such Note shall thereafter, as an unsecured general creditor, look only to the Company for payment thereof, and all liability of the Trustee or such Paying Agent with respect to such trust money and shares of Class A Common Stock, and all liability of the Company as trustee thereof, shall thereupon cease.

Section 4.05. *Existence.* [Reserved].

24

Section 4.06. *Rule 144A Information Requirement and Annual Report and Additional Interest.* (a) For as long as any Notes are outstanding hereunder, at any time the Company is not subject to Sections 13 or 15(d) of the Exchange Act, the Company shall, so long as any of the Notes or any shares of Class A Common Stock issued upon conversion thereof shall, at such time, constitute "restricted securities" within the meaning of Rule 144(a)(3) under the Securities Act, promptly provide to the Trustee and shall, upon written request, provide to any Holder, beneficial owner or prospective purchaser of such Notes or any shares of Class A Common Stock issued upon conversion of such Notes, the information required to be delivered pursuant to Rule 144A(d)(4) under the Securities Act to facilitate the resale of such Notes or shares of Class A Common Stock pursuant to Rule 144A under the Securities Act. For as long as any Notes are outstanding hereunder, the Company shall take such further action as any Holder or beneficial owner of such Notes or such Class A Common Stock may reasonably request to the extent from time to time required to enable such Holder or beneficial owner to sell such Notes or shares of Class A Common Stock in accordance with Rule 144A under the Securities Act, as such rule may be amended from time to time.

(b) The Company shall file with the Trustee within 15 days after the same are required to be filed with the Commission, copies of any documents or reports that the Company is required to file with the Commission pursuant to Section 13 or 15(d) of the Exchange Act (giving effect to any grace period provided by Rule 12b- 25 under the Exchange Act). Any such document or report that the Company files with the Commission via the Commission's EDGAR system shall be deemed to be filed with the Trustee for purposes of this Section 4.06(b) as of the time such documents are filed via the EDGAR system; provided that the Trustee shall have no responsibility to determine whether such filing has occurred.

(c) Delivery of the reports and documents described in Section 4.06(b) to the Trustee is for informational purposes only, and the Trustee's receipt of such shall not constitute constructive notice of any information contained therein or determinable from information contained therein, including the Company's compliance with any of its covenants hereunder (as to which the Trustee is entitled to conclusively rely on an Officer's Certificate).

(d) If, at any time during the six- month period beginning on, and including, the date that is six months after the last date of original issuance of the Notes, the Company fails to timely file any document or report that it is required to file with the Commission pursuant to Section 13 or 15(d) of the Exchange Act, as applicable (other than reports on Form 8- K), the Company shall pay Additional Interest on the Notes. Such Additional Interest shall accrue on the Notes at a rate equal to 0.50% per annum of the principal amount of the Notes outstanding for each day during such period, for which the Company's failure to file has occurred and is continuing. As used in this Section 4.06(d), documents or reports that the Company is required to "file" with the Commission pursuant to Section 13 or 15(d) of the Exchange Act does not include documents or reports that the Company furnishes to the Commission pursuant to Section 13 or 15(d) of the Exchange Act.

(e) If, and for so long as, the restrictive legend on the Notes specified in Section 2.05(b) has not been removed, the Notes are assigned a restricted CUSIP or the Notes are not otherwise freely tradable by Holders other than the Company's Affiliates (without restrictions pursuant to U.S. securities law or the terms of this Indenture or the Notes) as of the 365th day

25

after the last date of original issuance of the Notes, the Company shall pay Additional Interest on the Notes at a rate equal to (i) 0.50% per annum of the principal amount of Notes outstanding until the restrictive legend on the Notes shall have been so removed or the Notes are otherwise freely tradable by such Holders.

(f) Additional Interest will be payable in arrears on each Interest Payment Date following accrual in the same manner as regular interest on the Notes.

(g) If Additional Interest is accruing and payable under Section 4.06(d) or Section 4.06(e) and the Company has elected pursuant to Section 6.03 to have the accrual of Additional Interest be the sole remedy for any such Event of Default, no Additional Interest shall be payable pursuant to Section 6.03 for so long as Additional Interest is accruing and payable under Section 4.06(d) or Section 4.06(e).

(h) If Additional Interest is payable by the Company pursuant to Section 4.06(d) or Section 4.06(e), the Company shall deliver to the Trustee an Officer's Certificate to that effect stating (i) the amount of such Additional Interest that is payable and (ii) the date on which such Additional Interest is payable. Unless and until a Responsible Officer of the Trustee receives at the Corporate Trust Office such a certificate, the Trustee may assume without inquiry that no such Additional Interest is payable. If the Company has paid Additional Interest directly to the Persons entitled to it, the Company shall deliver to the Trustee an Officer's Certificate setting forth the particulars of such payment.

Section 4.07. *Stay, Extension and Usury Laws.* The Company covenants (to the extent that it may lawfully do so) that it shall not at any time insist upon, plead, or in any manner whatsoever claim or take the benefit or advantage of, any stay, extension or usury law or other law that would prohibit or forgive the Company from paying all or any portion of the principal of or interest on the Notes as contemplated herein, wherever enacted, now or at any time hereafter in force, or that may affect the covenants or the performance of this Indenture; and the Company (to the extent it may lawfully do so) hereby expressly waives all benefit or advantage of any such law, and covenants that it will not, by resort to any such law, hinder, delay or impede the execution of any power herein granted to the Trustee, but will suffer and permit the execution of every such power as though no such law had been enacted.

Section 4.08. *Compliance Certificate; Statements as to Defaults.* The Company shall deliver to the Trustee within 120 days after the end of each fiscal year of the Company (beginning with the fiscal year ending on December 31, 2013) an Officer's Certificate stating whether or not the signers thereof have knowledge of any Default and, if so, specifying each such Default and the nature thereof.

In addition, the Company shall deliver to the Trustee, within 30 days after the Company becomes aware of the occurrence of any Event of Default or Default, an Officer's Certificate setting forth the details of such Event of Default or Default, its status and the action that the Company is taking or proposes to take with respect thereto; provided that no notice shall be required to the extent that the event that would constitute a Default has been cured or waived.

26

Section 4.09. *Further Instruments and Acts.* Upon request of the Trustee, the Company will execute and deliver such further instruments and do such further acts as may be reasonably necessary or proper to carry out more effectively the purposes of this Indenture.

ARTICLE 5

[Reserved]

ARTICLE 6

Defaults and Remedies

Section 6.01. *Events of Default.* The following events shall be "**Events of Default**" with respect to the Notes:

(a) default in any payment of interest on any Note when due and payable, and the default continues for a period of 30 days;

(b) default in the payment of principal of any Note when due and payable on the Maturity Date, upon any required purchase, upon declaration of acceleration or otherwise;

(c) failure by the Company to comply with its obligation to convert the Notes in accordance with this Indenture upon exercise of a Holder's conversion right and such failure continues for a period of five Business Days following the scheduled settlement date;

(d) failure by the Company to issue a Fundamental Change Company Notice in accordance with Section 15.02(c) or notice of a specified corporate event in accordance with Section 14.01(b)(ii) or (iii) or a Make- Whole Fundamental Change Company Notice in accordance with Section 14.03(b), in each case when due;

(e) failure by the Company to comply with its obligations under Article 11;

(f) failure by the Company for 60 days after written notice from the Trustee or the Holders of at least 25% in principal amount of the Notes then outstanding (a copy of which notice, if given by Holders, is also to be given to the Trustee) has been received by the Company to comply with any of its other agreements contained in the Notes or this Indenture;

(g) default by the Company or any Significant Subsidiary of the Company with respect to any mortgage, agreement or other instrument under which there may be outstanding, or by which there may be secured or evidenced, any indebtedness for money borrowed having a principal amount in excess of $30,000,000 (or its foreign currency equivalent) in the aggregate of the Company and/or any Significant Subsidiary, whether such indebtedness exists on the date hereof or shall hereafter be created (i) resulting in such indebtedness becoming or being declared due and payable or (ii) constituting a failure to pay the principal or interest of any such indebtedness when due and payable at its stated maturity, upon required purchase, upon declaration of acceleration or otherwise; *provided* that any such Event of Default shall be deemed cured and not continuing upon payment of such indebtedness or rescission or annulment of such declaration of acceleration;

27

(h) a final judgment for the payment of $30,000,000 (or its foreign currency equivalent) or more (excluding any amounts covered by insurance) rendered against the Company or any Significant Subsidiary of the Company, which judgment is not discharged or stayed within 60 days after (i) the date on which the right to appeal thereof has expired if no such appeal has commenced, or (ii) the date on which all rights to appeal have been extinguished;

(i) the Company or any Significant Subsidiary shall commence a voluntary case or other proceeding seeking liquidation, reorganization or other relief with respect to the Company or any such Significant Subsidiary or its debts under any bankruptcy, insolvency or other similar law now or hereafter in effect or seeking the appointment of a trustee, receiver, liquidator, custodian or other similar official of the Company or any such Significant Subsidiary or any substantial part of its property, or shall consent to any such relief or to the appointment of or taking possession by any such official in an involuntary case or other proceeding commenced against it, or shall make a general assignment for the benefit of creditors, or shall fail generally to pay its debts as they become due; or

(j) an involuntary case or other proceeding shall be commenced against the Company or any Significant Subsidiary seeking liquidation, reorganization or other relief with respect to the Company or such Significant Subsidiary or its debts under any bankruptcy, insolvency or other similar law now or hereafter in effect or seeking the appointment of a trustee, receiver, liquidator, custodian or other similar official of the Company or such Significant Subsidiary or any substantial part of its property, and such involuntary case or other proceeding shall remain undismissed and unstayed for a period of 60 consecutive days.

Section 6.02. *Acceleration; Rescission and Annulment*. In case one or more Events of Default shall have occurred and be continuing (whatever the reason for such Event of Default and whether it shall be voluntary or involuntary or be effected by operation of law or pursuant to any judgment, decree or order of any court or any order, rule or regulation of any administrative or governmental body), then, and in each and every such case (other than an Event of Default specified in Section 6.01(i) or Section 6.01(j) with respect to the Company (and not with respect to a Significant Subsidiary) and subject to Section 6.03), unless the principal of all of the Notes shall have already become due and payable, either the Trustee or the Holders of at least 25% in aggregate principal amount of the Notes then outstanding determined in accordance with Section 8.04, by notice in writing to the Company (and to the Trustee if given by Holders), may, and the Trustee, at the request of such Holders shall, declare 100% of the principal of, and accrued and unpaid interest, if any, on, all the Notes to be due and payable immediately, and upon any such declaration the same shall become and shall be immediately due and payable, anything in this Indenture or in the Notes contained to the contrary notwithstanding. If an Event of Default specified in Section 6.01(i) or Section 6.01(j) with respect to the Company (and not with respect to a Significant Subsidiary) occurs and is continuing, 100% of the principal of, and accrued and unpaid interest, if any, on, all Notes shall become and shall automatically be immediately due and payable.

28

The immediately preceding paragraph, however, is subject to the conditions that if, at any time after the principal of the Notes shall have been so declared due and payable, and before any judgment or decree for the payment of the monies due shall have been obtained or entered as hereinafter provided, the Company shall pay or shall deposit with the Trustee a sum sufficient to pay installments of accrued and unpaid interest upon all Notes and the principal of any and all Notes that shall have become due otherwise than by acceleration (with interest on overdue installments of accrued and unpaid interest, and on such principal at the rate borne by the Notes) and amounts due to the Trustee pursuant to Section 7.06, and if (1) rescission would not conflict with any judgment or decree of a court of competent jurisdiction and (2) any and all existing Events of Default under this Indenture, other than the nonpayment of the principal of and accrued and unpaid interest, if any, on Notes that shall have become due solely by such acceleration, shall have been cured or waived or otherwise remedied pursuant to Section 6.09, then and in every such case (except as provided in the immediately succeeding sentence) the Holders of a majority in aggregate principal amount of the Notes then outstanding, by written notice to the Company and to the Trustee, may waive all Defaults or Events of Default with respect to the Notes and rescind and annul such declaration and its consequences and such Default shall cease to exist, and any Event of Default arising therefrom shall be deemed to have been cured for every purpose of this Indenture; but no such waiver or rescission and annulment shall extend to or shall affect any subsequent Default or Event of Default, or shall impair any right consequent thereon. Notwithstanding anything to the contrary herein, no such waiver or rescission and annulment shall extend to or shall affect any Default or Event of Default resulting from (i) the nonpayment of the principal of, or accrued and unpaid interest on, any Notes, (ii) a failure to repurchase any Notes when required or (iii) a failure to pay or deliver, as the case may be, the consideration due upon conversion of the Notes.

Section 6.03. *Additional Interest*. Notwithstanding anything in this Indenture or in the Notes to the contrary, to the extent the Company elects, the sole remedy for an Event of Default relating to the Company's failure to comply with its obligations as set forth in Section 4.06(b) shall, for the first 180 days after the occurrence of such an Event of Default, consist exclusively of the right to receive Additional Interest on the Notes at a rate equal to 0.25% per annum of the principal amount of the Notes outstanding for each day during the first 90 days after the occurrence of such Event of Default and 0.50% per annum of the principal amount of the Notes outstanding for each day from the 91st day until the 180th day following the occurrence of such an Event of Default during which such Event of Default is continuing beginning on, and including, the date on which such an Event of Default first occurs. If Additional Interest is accruing and payable under Section 4.06(d) or Section 4.06(e) and the Company has been elected pursuant to this Section 6.03 to have the accrual of Additional Interest be the sole remedy for any such Event of Default, no Additional Interest shall be payable pursuant to this Section 6.03 for so long as Additional Interest is accruing and payable under Section 4.06(d) or Section 4.06(e). If the Company so elects, such Additional Interest shall be payable in the same manner and on the same dates as regular interest on the Notes. On the 181st day after such Event of Default (if the Event of Default relating to the Company's failure to comply with its obligations as set forth in Section 4.06(b) is not cured or waived prior to such 181st day), the Notes will be subject to acceleration as provided in Section 6.02. No Additional Interest shall accrue after such 180th day, regardless of whether such failure has occurred or is continuing. In the event the Company does not elect to pay Additional Interest following an Event of Default in accordance with this Section 6.03, or the Company elects to make such payment but does not pay the Additional Interest when due, the Notes shall immediately be subject to acceleration as provided in Section 6.02.

29

In order to elect to pay Additional Interest as the sole remedy during the first 180 days after the occurrence of any Event of Default relating to the Company's failure to comply with its obligations as set forth in Section 4.06(b), the Company must notify all Holders of the Notes, the Trustee and the Paying Agent of such election on or prior to the beginning of such 180- day period. Upon the Company's failure to timely give such notice, the Notes shall be immediately subject to acceleration as provided in Section 6.02.

Section 6.04. *Payments of Notes on Default; Suit Therefor.* If an Event of Default described in clause (a) or (b) of Section 6.01 shall have occurred, the Company shall, upon demand of the Trustee, pay to the Trustee, for the benefit of the Holders of the Notes, the whole amount then due and payable on the Notes for principal and interest, if any, with interest on any overdue principal and interest, if any, at the rate borne by the Notes at such time, and, in addition thereto, such further amount as shall be sufficient to cover any amounts due to the Trustee under Section 7.06. If the Company shall fail to pay such amounts forthwith upon such demand, the Trustee, in its own name and as trustee of an express trust, may institute a judicial proceeding for the collection of the sums so due and unpaid, may prosecute such proceeding to judgment or final decree and may enforce the same against the Company or any other obligor upon the Notes and collect the monies adjudged or decreed to be payable in the manner provided by law out of the property of the Company or any other obligor upon the Notes, wherever situated.

In the event there shall be pending proceedings for the bankruptcy or for the reorganization of the Company or any other obligor on the Notes under title 11 of the United States Code, or any other applicable law, or in case a receiver, assignee or trustee in bankruptcy or reorganization, liquidator, sequestrator or similar official shall have been appointed for or taken possession of the Company or such other obligor, the property of the Company or such other obligor, or in the event of any other judicial proceedings relative to the Company or such other obligor upon the Notes, or to the creditors or property of the Company or such other obligor, the Trustee, irrespective of whether the principal of the Notes shall then be due and payable as therein expressed or by declaration or otherwise and irrespective of whether the Trustee shall have made any demand pursuant to the provisions of this Section 6.04, shall be entitled and empowered, by intervention in such proceedings or otherwise, to file and prove a claim or claims for the whole amount of principal and accrued and unpaid interest, if any, in respect of the Notes, and, in case of any judicial proceedings, to file such proofs of claim and other papers or documents and to take such other actions as it may deem necessary or advisable in order to have the claims of the Trustee (including any claim for the reasonable compensation, expenses, disbursements and advances of the Trustee, its agents and counsel) and of the Holders allowed in such judicial proceedings relative to the Company or any other obligor on the Notes, its or their creditors, or its or their property, and to collect and receive any monies or other property payable or deliverable on any such claims, and to distribute the same after the deduction of any amounts due to the Trustee under Section 7.06; and any receiver, assignee or trustee in bankruptcy or reorganization, liquidator, custodian or similar official is hereby authorized by each of the Holders to make such payments to the Trustee, as administrative expenses, and, in the event that the Trustee shall consent to the making of such payments directly to the Holders, to pay to the Trustee any amount due it for reasonable compensation, expenses, advances and

30

disbursements, including agents and counsel fees, and including any other amounts due to the Trustee under Section 7.06, incurred by it up to the date of such distribution. To the extent that such payment of reasonable compensation, expenses, advances and disbursements out of the estate in any such proceedings shall be denied for any reason, payment of the same shall be secured by a lien on, and shall be paid out of, any and all distributions, dividends, monies, securities and other property that the Holders of the Notes may be entitled to receive in such proceedings, whether in liquidation or under any plan of reorganization or arrangement or otherwise.

Nothing herein contained shall be deemed to authorize the Trustee to authorize or consent to or accept or adopt on behalf of any Holder any plan of reorganization, arrangement, adjustment or composition affecting such Holder or the rights of any Holder thereof, or to authorize the Trustee to vote in respect of the claim of any Holder in any such proceeding.

All rights of action and of asserting claims under this Indenture, or under any of the Notes, may be enforced by the Trustee without the possession of any of the Notes, or the production thereof at any trial or other proceeding relative thereto, and any such suit or proceeding instituted by the Trustee shall be brought in its own name as trustee of an express trust, and any recovery of judgment shall, after provision for the payment of the reasonable compensation, expenses, disbursements and advances of the Trustee, its agents and counsel, be for the ratable benefit of the Holders of the Notes.

In any proceedings brought by the Trustee (and in any proceedings involving the interpretation of any provision of this Indenture to which the Trustee shall be a party) the Trustee shall be held to represent all the Holders of the Notes, and it shall not be necessary to make any Holders of the Notes parties to any such proceedings.

In case the Trustee shall have proceeded to enforce any right under this Indenture and such proceedings shall have been discontinued or abandoned because of any waiver pursuant to Section 6.09 or any rescission and annulment pursuant to Section 6.02 or for any other reason or shall have been determined adversely to the Trustee, then and in every such case the Company, the Holders, and the Trustee shall, subject to any determination in such proceeding, be restored respectively to their several positions and rights hereunder, and all rights, remedies and powers of the Company, the Holders, and the Trustee shall continue as though no such proceeding had been instituted.

Section 6.05. *Application of Monies Collected by Trustee*. Any monies collected by the Trustee pursuant to this Article 6 with respect to the Notes shall be applied in the following order, at the date or dates fixed by the Trustee for the distribution of such monies, upon presentation of the several Notes, and stamping thereon the payment, if only partially paid, and upon surrender thereof, if fully paid:

First, to the payment of all amounts due the Trustee under Section 7.06;

Second, in case the principal of the outstanding Notes shall not have become due and be unpaid, to the payment of interest on, and any cash due upon conversion of, the Notes in default in the order of the date due of the payments of such interest and cash due upon conversion, as the

31

case may be, with interest (to the extent that such interest has been collected by the Trustee) upon such overdue payments at the rate borne by the Notes at such time, such payments to be made ratably to the Persons entitled thereto;

Third, in case the principal of the outstanding Notes shall have become due, by declaration or otherwise, and be unpaid to the payment of the whole amount (including, if applicable, the payment of the Fundamental Change Purchase Price and any cash due upon conversion) then owing and unpaid upon the Notes for principal and interest, if any, with interest on the overdue principal and, to the extent that such interest has been collected by the Trustee, upon overdue installments of interest at the rate borne by the Notes at such time, and in case such monies shall be insufficient to pay in full the whole amounts so due and unpaid upon the Notes, then to the payment of such principal (including, if applicable, the Fundamental Change Purchase Price and the cash due upon conversion) and interest without preference or priority of principal over interest, or of interest over principal or of any installment of interest over any other installment of interest, or of any Note over any other Note, ratably to the aggregate of such principal (including, if applicable, the Fundamental Change Purchase Price and any cash due upon conversion) and accrued and unpaid interest; and

Fourth, to the payment of the remainder, if any, to the Company.

Section 6.06. *Proceedings by Holders*. Except to enforce the right to receive payment of principal (including, if applicable, the Fundamental Change Purchase Price) or interest when due, or the right to receive payment and/or delivery of the consideration due upon conversion, no Holder of any Note shall have any right by virtue of or by availing of any provision of this Indenture to institute any suit, action or proceeding in equity or at law upon or under or with respect to this Indenture, or for the appointment of a receiver, trustee, liquidator, custodian or other similar official, or for any other remedy hereunder, unless:

(a) such Holder previously shall have given to the Trustee written notice of an Event of Default and of the continuance thereof, as herein provided;

(b) Holders of at least 25% in aggregate principal amount of the Notes then outstanding shall have made written request upon the Trustee to institute such action, suit or proceeding in its own name as Trustee hereunder;

(c) such Holders shall have offered to the Trustee such security or indemnity reasonably satisfactory to it against any loss, liability or expense to be incurred therein or thereby;

(d) the Trustee for 60 days after its receipt of such request and offer of security and/or indemnity, shall have neglected or refused to institute any such action, suit or proceeding; and

(e) no direction that, in the opinion of the Trustee, is inconsistent with such written request shall have been given to the Trustee by the Holders of a majority of the aggregate principal amount of the Notes then outstanding within such 60- day period pursuant to Section 6.09,

32

it being understood and intended, and being expressly covenanted by the taker and Holder of every Note with every other taker and Holder and the Trustee that no one or more Holders shall have any right in any manner whatever by virtue of or by availing of any provision of this Indenture to affect, disturb or prejudice the rights of any other Holder, or to obtain or seek to obtain priority over or preference to any other such Holder, or to enforce any right under this Indenture, except in the manner herein provided and for the equal, ratable and common benefit of all Holders, except as otherwise provided herein (it being understood that the Trustee does not have an affirmative duty to ascertain whether or not such actions or forbearances are unduly prejudicial to such Holders). For the protection and enforcement of this Section 6.06, each and every Holder and the Trustee shall be entitled to such relief as can be given either at law or in equity.

Notwithstanding any other provision of this Indenture and any provision of any Note, the right of any Holder to receive payment or delivery, as the case may be, of (x) the principal (including the Fundamental Change Purchase Price, if applicable) of, (y) accrued and unpaid interest, if any, on, and (z) the consideration due upon conversion of, such Note, on or after the respective due dates expressed or provided for in such Note or in this Indenture, or to institute suit for the enforcement of any such payment or delivery, as the case may be, and such right to receive such payment or delivery, as the case may be, on or after such respective dates against the Company shall not be impaired or affected without the consent of such Holder.

Section 6.07. *Proceedings by Trustee*. In case of an Event of Default the Trustee may in its discretion proceed to protect and enforce the rights vested in it by this Indenture by such appropriate judicial proceedings as are necessary to protect and enforce any of such rights, either by suit in equity or by action at law or by proceeding in bankruptcy or otherwise, whether for the specific enforcement of any covenant or agreement contained in this Indenture or in aid of the exercise of any power granted in this Indenture, or to enforce any other legal or equitable right vested in the Trustee by this Indenture or by law.

Section 6.08. *Remedies Cumulative and Continuing*. Except as provided in the last paragraph of Section 2.06, all powers and remedies given by this Article 6 to the Trustee or to the Holders shall, to the extent permitted by law, be deemed cumulative and not exclusive of any thereof or of any other powers and remedies available to the Trustee or the Holders of the Notes, by judicial proceedings or otherwise, to enforce the performance or observance of the covenants and agreements contained in this Indenture, and no delay or omission of the Trustee or of any Holder of any of the Notes to exercise any right or power accruing upon any Default or Event of Default shall impair any such right or power, or shall be construed to be a waiver of any such Default or Event of Default or any acquiescence therein; and, subject to the provisions of Section 6.06, every power and remedy given by this Article 6 or by law to the Trustee or to the Holders may be exercised from time to time, and as often as shall be deemed expedient, by the Trustee or by the Holders.

Section 6.09. *Direction of Proceedings and Waiver of Defaults by Majority of Holders*. The Holders of a majority of the aggregate principal amount of the Notes at the time outstanding determined in accordance with Section 8.04 shall have the right to direct the time, method and place of conducting any proceeding for any remedy available to the Trustee or exercising any trust or power conferred on the Trustee with respect to Notes; *provided*, *however*, that i) such

33

direction shall not be in conflict with any rule of law or with this Indenture, and ii) the Trustee may take any other action deemed proper by the Trustee that is not inconsistent with such direction. The Trustee may refuse to follow any direction that it determines is unduly prejudicial to the rights of any other Holder or that would involve the Trustee in personal liability. The Holders of a majority in aggregate principal amount of the Notes at the time outstanding determined in accordance with Section 8.04 may on behalf of the Holders of all of the Notes waive any past Default or Event of Default hereunder and its consequences except (1) a default in the payment of accrued and unpaid interest, if any, on, or the principal (including any Fundamental Change Purchase Price) of, the Notes, (2) a failure by the Company to deliver the consideration due upon conversion of the Notes or (3) a default in respect of a covenant or provision hereof which under Article 10 cannot be modified or amended without the consent of each Holder of an outstanding Note affected. Upon any such waiver the Company, the Trustee and the Holders of the Notes shall be restored to their former positions and rights hereunder; but no such waiver shall extend to any subsequent or other Default or Event of Default or impair any right consequent thereon. Whenever any Default or Event of Default hereunder shall have been waived as permitted by this Section 6.09, said Default or Event of Default shall for all purposes of the Notes and this Indenture be deemed to have been cured and to be not continuing; but no such waiver shall extend to any subsequent or other Default or Event of Default or impair any right consequent thereon.

Section 6.10. *Notice of Defaults*. The Trustee shall, within 90 days after the occurrence and continuance of a Default of which a Responsible Officer has actual knowledge, mail to all Holders as the names and addresses of such Holders appear upon the Note Register, notice of all Defaults known to a Responsible Officer, unless such Defaults shall have been cured or waived before the giving of such notice; *provided* that, except in the case of a Default in the payment of the principal of (including the Fundamental Change Purchase Price, if applicable), or accrued and unpaid interest on, any of the Notes or a Default in the payment or delivery of the consideration due upon conversion, the Trustee shall be protected in withholding such notice if and so long as the Trustee in good faith determines that the withholding of such notice is in the interests of the Holders.

Section 6.11. *Undertaking to Pay Costs*. All parties to this Indenture agree, and each Holder of any Note by its acceptance thereof shall be deemed to have agreed, that any court may, in its discretion, require, in any suit for the enforcement of any right or remedy under this Indenture, or in any suit against the Trustee for any action taken or omitted by it as Trustee, the filing by any party litigant in such suit of an undertaking to pay the costs of such suit and that such court may in its discretion assess reasonable costs, including reasonable attorneys' fees and expenses, against any party litigant in such suit, having due regard to the merits and good faith of the claims or defenses made by such party litigant; *provided* that the provisions of this Section 6.11 (to the extent permitted by law) shall not apply to any suit instituted by the Trustee, to any suit instituted by any Holder, or group of Holders, holding in the aggregate more than 10% in principal amount of the Notes at the time outstanding determined in accordance with Section 8.04, or to any suit instituted by any Holder for the enforcement of the payment of the principal of (including, but not limited to, the Fundamental Change Purchase Price with respect to the Notes being purchased as provided in this Indenture) or accrued and unpaid interest, if any, on any Note on or after the due date expressed or provided for in such Note or to any suit for the enforcement of the right to convert any Note in accordance with the provisions of Article 14.

34

## ARTICLE 7
### CONCERNING THE TRUSTEE

Section 7.01. *Duties and Responsibilities of Trustee.*

(a) Prior to the occurrence of an Event of Default and after the curing or waiving of all Events of Default that may have occurred:

(i) the duties and obligations of the Trustee shall be determined solely by the express provisions of this Indenture, and the Trustee shall not be liable except for the performance of such duties and obligations as are specifically set forth in this Indenture and no implied covenants or obligations shall be read into this Indenture against the Trustee; and

(ii) in the absence of bad faith or willful misconduct on the part of the Trustee, unless a Responsible Officer has actual knowledge to the contrary, the Trustee may conclusively rely, as to the truth of the statements and the correctness of the opinions expressed therein, upon any certificates or opinions furnished to the Trustee and conforming to the requirements of this Indenture; but, in the case of any such certificates or opinions that by any provisions hereof are specifically required to be furnished to the Trustee, the Trustee shall be under a duty to examine the same to determine whether or not they conform to the requirements of this Indenture (but need not confirm or investigate the accuracy of any mathematical calculations);

(b) In case an Event of Default has occurred that has not been cured or waived the Trustee shall exercise such of the rights and powers vested in it by this Indenture, and use the same degree of care and skill in their exercise, as a prudent person would exercise or use under the circumstances in the conduct of such person's own affairs.

(c) No provision of this Indenture shall be construed to relieve the Trustee from liability for its own negligent action, its own negligent failure to act or its own willful misconduct, except that:

(i) this Subsection shall not be construed to limit the effect of Subsection (a) of this Section;

(ii) the Trustee shall not be liable for any error of judgment made in good faith by a Responsible Officer or Officers of the Trustee, unless it shall be proved that the Trustee was negligent in ascertaining the pertinent facts;

(iii) the Trustee shall not be liable with respect to any action taken or omitted to be taken by it in good faith in accordance with the written direction of the Holders of not less than a majority of the aggregate principal amount of the Notes at the time outstanding determined as provided in Section 8.04 relating to the time, method and place of conducting any proceeding for any remedy available to the Trustee, or exercising any trust or power conferred upon the Trustee, under this Indenture; and

(iv) no provision of this Indenture shall require the Trustee to expend or risk its own funds or otherwise incur any financial liability in the performance of any of its duties hereunder, or in the exercise of any of its rights or powers, if it shall have reasonable grounds for believing that repayment of such funds or adequate indemnity against such risk or liability is not reasonably assured to it.

35

(d) Whether or not therein provided, every provision of this Indenture relating to the conduct or affecting the liability of, or affording protection to, the Trustee shall be subject to the provisions of this Section 7.01.

Section 7.02. *Certain Rights of the Trustee.*

(a) the Trustee may conclusively rely and shall be fully protected in acting upon any resolution, certificate, statement, instrument, opinion, report, notice, request, consent, order, bond, note, coupon or other paper or document believed by it in good faith to be genuine and to have been signed or presented by the proper party or parties;

(b) any request, direction, order or demand of the Company mentioned herein shall be sufficiently evidenced by an Officer's Certificate (unless other evidence in respect thereof be herein specifically prescribed); and any Board Resolution may be evidenced to the Trustee by a copy thereof certified by the Secretary or an Assistant Secretary of the Company;

(c) the Trustee may consult with counsel of its selection and require an Opinion of Counsel and any advice of such counsel or Opinion of Counsel shall be full and complete authorization and protection in respect of any action taken or omitted by it hereunder in good faith and in accordance with such advice or Opinion of Counsel;

(d) the Trustee shall not be bound to make any investigation into the facts or matters stated in any resolution, certificate, statement, instrument, opinion, report, notice, request, direction, consent, order, bond, debenture or other paper or document, but the Trustee, in its discretion, may make such further inquiry or investigation into such facts or matters as it may see fit, and, if the Trustee shall determine to make such further inquiry or investigation, it shall be entitled, at a reasonable time on any Business Day, to examine the books, records and premises of the Company, personally or by agent or attorney at the expense of the Company and shall incur no liability of any kind by reason of such inquiry or investigation;

(e) the Trustee may execute any of the trusts or powers hereunder or perform any duties hereunder either directly or by or through duly authorized agents, custodians, nominees or attorneys and the Trustee shall not be responsible for any misconduct or negligence on the part of any agent, custodian, nominee or attorney appointed by it with due care hereunder;

(f) the permissive rights of the Trustee enumerated herein shall not be construed as duties;

(g) the Trustee shall not be required to give any bond or surety in respect of the performance of its powers and duties hereunder;

36

(h) the Trustee may request that the Company deliver a certificate setting forth the names of individuals and/or titles of Officers authorized at such time to take specified actions pursuant to this Indenture;

(i) in no event shall the Trustee be liable for any special, indirect, punitive or consequential loss or damage of any kind whatsoever (including but not limited to lost profits), even if the Trustee has been advised of the likelihood of such loss or damage and regardless of the form of action;

(j) the Trustee shall not be charged with knowledge of any Default or Event of Default with respect to the Notes, unless either (1) a Responsible Officer shall have actual knowledge of such Default or Event of Default or (2) written notice of such Default or Event of Default shall have been given to a Responsible Officer of the Trustee by the Company or by any Holder of the Notes at the Corporate Trust Office of the Trustee;

(k) the Trustee shall not be liable in respect of any payment (as to the correctness of amount, entitlement to receive or any other matters relating to payment) or notice effected by the Company or any Paying Agent or any records maintained by any co- Note Registrar with respect to the Notes;

(l) if any party fails to deliver a notice relating to an event the fact of which, pursuant to this Indenture, requires notice to be sent to the Trustee, the Trustee may conclusively rely on its failure to receive such notice as reason to act as if no such event occurred, unless such Responsible Officer of the Trustee had actual knowledge of such event;

(m) in the absence of written investment direction from the Company, all cash received by the Trustee shall be placed in a non- interest bearing trust account, and in no event shall the Trustee be liable for the selection of investments or for investment losses, fees, taxes or other charges incurred thereon or for losses incurred as a result of the liquidation of any such investment prior to its maturity date or the failure of the party directing such investments prior to its maturity date or the failure of the party directing such investment to provide timely written investment direction, and the Trustee shall have no obligation to invest or reinvest any amounts held hereunder in the absence of such written investment direction from the Company;

(n) the rights and protections afforded to the Trustee pursuant to this Article 7 shall also be afforded to the Trustee in each of its capacities hereunder, and each agent, custodian and other Person employed to act hereunder;

(o) the Trustee shall be under no obligation to exercise any of the rights or powers vested in it by this Indenture at the request or direction of any of the Holders pursuant to this Indenture, unless such Holders shall have offered to the Trustee security or indemnity satisfactory to the Trustee against the costs, expenses and liabilities which might be incurred by it in compliance with such request or direction; and

(p) the Trustee shall not be liable for any action taken, suffered, or omitted to be taken by it in good faith and reasonably believed by it to be authorized or within the discretion or rights or powers conferred upon it by this Indenture.

37

Section 7.03. *No Responsibility for Recitals, Etc.* The recitals contained herein and in the Notes (except in the Trustee's certificate of authentication) shall be taken as the statements of the Company, and the Trustee assumes no responsibility for the correctness of the same. The Trustee makes no representations as to the validity or sufficiency of this Indenture or of the Notes. The Trustee shall not be accountable for the use or application by the Company of any Notes or the proceeds of any Notes authenticated and delivered by the Trustee in conformity with the provisions of this Indenture.

Section 7.04. *Trustee, Paying Agents, Conversion Agents, Bid Solicitation Agent or Note Registrar May Own Notes.* The Trustee, any Paying Agent, any Conversion Agent, the Custodian, Bid Solicitation Agent or Note Registrar, in its individual or any other capacity, may become the owner or pledgee of Notes with the same rights it would have if it were not the Trustee, Paying Agent, Conversion Agent, the Custodian, Bid Solicitation Agent or Note Registrar.

Section 7.05. *Monies and Shares of Class A Common Stock to Be Held in Trust.* All monies and shares of Class A Common Stock received by the Trustee shall, until used or applied as herein provided, be held in trust for the purposes for which they were received. Money and shares of Class A Common Stock held by the Trustee in trust hereunder need not be segregated from other funds except to the extent required by law. The Trustee shall be under no liability for interest on any money or shares of Class A Common Stock received by it hereunder except as may be agreed from time to time by the Company and the Trustee.

Section 7.06. *Compensation and Expenses of Trustee.* The Company covenants and agrees to pay to the Trustee from time to time, and the Trustee shall be entitled to, such compensation for all services rendered by it hereunder in any capacity (which shall not be limited by any provision of law in regard to the compensation of a trustee of an express trust) as mutually agreed to in writing between the Trustee and the Company, and the Company will pay or reimburse the Trustee upon its request for all reasonable expenses, disbursements and advances reasonably incurred or made by the Trustee in accordance with any of the provisions of this Indenture in any capacity hereunder (including the reasonable compensation and the expenses and disbursements of its agents and counsel and of all Persons not regularly in its employ) except any such expense, disbursement or advance as shall have been caused by its negligence or willful misconduct. The Company also covenants to indemnify the Trustee (which for purposes of this Section 7.06 shall include its officers, directors, employees and agents) in any capacity under this Indenture and any other document or transaction entered into in connection herewith and its agents and any authenticating agent for, and to hold them harmless against, any loss, claim, damage, liability or expense incurred without negligence or willful misconduct on the part of the Trustee, its officers, directors, agents or employees, or such agent or authenticating agent, as the case may be, and arising out of or in connection with the acceptance or administration of this Indenture or in any other capacity hereunder, including the costs and expenses of defending themselves against any claim (whether asserted by the Company, a Holder or any other Person) of liability in the premises. The obligations of the Company under this Section 7.06 to compensate or indemnify the Trustee and to pay or reimburse the Trustee for expenses, disbursements and advances shall be secured by a senior claim to which the Notes are hereby made subordinate on all money or property held or collected by the Trustee, except, subject to the effect of Section 6.05, funds held in trust herewith for the benefit of the Holders of particular Notes. The Trustee's right to receive

38

payment of any amounts due under this Section 7.06 shall not be subordinate to any other liability or indebtedness of the Company. The obligation of the Company under this Section 7.06 shall survive the satisfaction and discharge of this Indenture, final payment of the Notes and the earlier resignation or removal of the Trustee. The Company need not pay for any settlement made without its consent, which consent shall not be unreasonably withheld. The indemnification provided in this Section 7.06 shall extend to the officers, directors, agents and employees of the Trustee.

Without prejudice to any other rights available to the Trustee under applicable law, when the Trustee and its agents and any authenticating agent incur expenses or render services after an Event of Default specified in Section 6.01(i) or Section 6.01(j) occurs, the expenses and the compensation for the services are intended to constitute expenses of administration under any bankruptcy, insolvency or similar laws.

Section 7.07. *Officer's Certificate as Evidence.* Except as otherwise provided in Section 7.01, whenever in the administration of the provisions of this Indenture the Trustee shall deem it necessary or desirable that a matter be proved or established prior to taking or omitting any action hereunder, such matter (unless other evidence in respect thereof be herein specifically prescribed) may, in the absence of negligence, willful misconduct, recklessness and bad faith on the part of the Trustee, be deemed to be conclusively proved and established by an Officer's Certificate delivered to the Trustee, and such Officer's Certificate, in the absence of negligence, willful misconduct, recklessness and bad faith on the part of the Trustee, shall be full warrant to the Trustee for any action taken or omitted by it under the provisions of this Indenture upon the faith thereof.

Section 7.08. *Eligibility of Trustee.* There shall at all times be a Trustee hereunder which shall be a Person that is eligible pursuant to the Trust Indenture Act to act as such and has a combined capital and surplus of at least $50,000,000. If such Person publishes reports of condition at least annually, pursuant to law or to the requirements of any supervising or examining authority, then for the purposes of this Section 7.08, the combined capital and surplus of such Person shall be deemed to be its combined capital and surplus as set forth in its most recent report of condition so published. If at any time the Trustee shall cease to be eligible in accordance with the provisions of this Section, it shall resign immediately in the manner and with the effect hereinafter specified in this Article 7.

Section 7.09. *Resignation or Removal of Trustee.* The Trustee may at any time resign by giving written notice of such resignation to the Company and by mailing notice thereof to the Holders at their addresses as they shall appear on the Note Register. Upon receiving such notice of resignation, the Company shall promptly appoint a successor trustee by written instrument, in duplicate, executed by order of the Board of Directors, one copy of which instrument shall be delivered to the resigning Trustee and one copy to the successor trustee. If no successor trustee shall have been so appointed and have accepted appointment within 30 days after the mailing of such notice of resignation to the Holders, the resigning Trustee may, at the expense of the Company, upon ten Business Days' notice to the Company and the Holders, petition any court of competent jurisdiction for the appointment of a successor trustee, or any Holder who has been a bona fide holder of a Note or Notes for at least six months may, subject to the provisions of Section 6.11, on behalf of himself and all others similarly situated, petition any such court for the appointment of a successor trustee. Such court may thereupon, after such notice, if any, as it may deem proper and prescribe, appoint a successor trustee.

(a) In case at any time any of the following shall occur:

(i) the Trustee shall fail to comply with Section 7.13 within a reasonable time after written request therefor by the Company or by any Holder who has been a bona fide Holder of a Note or Notes for at least six (6) months;

(ii) the Trustee shall cease to be eligible in accordance with the provisions of Section 7.08 and shall fail to resign after written request therefor by the Company or by any such Holder, or

(iii) the Trustee shall become incapable of acting, or shall be adjudged a bankrupt or insolvent, or a receiver of the Trustee or of its property shall be appointed, or any public officer shall take charge or control of the Trustee or of its property or affairs for the purpose of rehabilitation, conservation or liquidation,

then, in any such case, the Company may by a Board Resolution remove the Trustee and appoint a successor trustee by written instrument, in duplicate, executed by order of the Board of Directors, one copy of which instrument shall be delivered to the Trustee so removed and one copy to the successor trustee, or, subject to the provisions of Section 6.11, any Holder who has been a bona fide holder of a Note or Notes for at least six months may, on behalf of himself and all others similarly situated, petition any court of competent jurisdiction for the removal of the Trustee and the appointment of a successor trustee. Such court may thereupon, after such notice, if any, as it may deem proper and prescribe, remove the Trustee and appoint a successor trustee.

(b) The Holders of a majority in aggregate principal amount of the Notes at the time outstanding, as determined in accordance with Section 8.04, may at any time remove the Trustee and nominate a successor trustee that shall be deemed appointed as successor trustee unless within ten days after notice to the Company of such nomination the Company objects thereto. If no successor trustee shall have been so appointed and have accepted appointment within 30 days after removal of the Trustee by the Holders, the Trustee may, at the expense of the Company, upon ten Business Days' notice to the Company and the Holders, petition any court of competent jurisdiction for the appointment of a successor trustee.

(c) Any resignation or removal of the Trustee and appointment of a successor trustee pursuant to any of the provisions of this Section 7.09 shall become effective upon acceptance of appointment by the successor trustee as provided in Section 7.10.

Section 7.10. *Acceptance by Successor Trustee*. Any successor trustee appointed as provided in Section 7.09 shall execute, acknowledge and deliver to the Company and to its predecessor trustee an instrument accepting such appointment hereunder, and thereupon the resignation or removal of the predecessor trustee shall become effective and such successor trustee, without any further act, deed or conveyance, shall become vested with all the rights, powers, duties and obligations of its predecessor hereunder, with like effect as if originally named as Trustee herein; but, nevertheless, on the written request of the Company or of the successor trustee, the predecessor trustee shall, upon payment of any amounts then due it pursuant to the provisions of

40

Section 7.06, execute and deliver an instrument transferring to such successor trustee all the rights and powers of the trustee so ceasing to act. Upon request of any such successor trustee, the Company shall execute any and all instruments in writing for more fully and certainly vesting in and confirming to such successor trustee all such rights and powers. Any trustee ceasing to act shall, nevertheless, retain a senior claim to which the Notes are hereby made subordinate on all money or property held or collected by such trustee as such, except for funds held in trust for the benefit of Holders of particular Notes, to secure any amounts then due it pursuant to the provisions of Section 7.06.

No successor trustee shall accept appointment as provided in this Section 7.10 unless at the time of such acceptance such successor trustee shall be eligible under the provisions of Section 7.08.

Upon acceptance of appointment by a successor trustee as provided in this Section 7.10, each of the Company and the successor trustee, at the written direction and at the expense of the Company shall mail or cause to be mailed notice of the succession of such trustee hereunder to the Holders at their addresses as they shall appear on the Note Register. If the Company fails to mail such notice within ten days after acceptance of appointment by the successor trustee, the successor trustee shall cause such notice to be mailed at the expense of the Company.

Section 7.11. *Succession by Merger, Etc.* Any corporation or other entity into which the Trustee may be merged or converted or with which it may be consolidated, or any corporation or other entity resulting from any merger, conversion or consolidation to which the Trustee shall be a party, or any corporation or other entity succeeding to all or substantially all of the corporate trust business of the Trustee (including the administration of this Indenture), shall be the successor to the Trustee hereunder without the execution or filing of any paper or any further act on the part of any of the parties hereto; *provided* that in the case of any corporation or other entity succeeding to all or substantially all of the corporate trust business of the Trustee such corporation or other entity shall be eligible under the provisions of Section 7.08.

In case at the time such successor to the Trustee shall succeed to the trusts created by this Indenture, any of the Notes shall have been authenticated but not delivered, any such successor to the Trustee may adopt the certificate of authentication of any predecessor trustee or authenticating agent appointed by such predecessor trustee, and deliver such Notes so authenticated; and in case at that time any of the Notes shall not have been authenticated, any successor to the Trustee or an authenticating agent appointed by such successor trustee may authenticate such Notes either in the name of any predecessor trustee hereunder or in the name of the successor trustee; and in all such cases such certificates of authentication shall have the full force which it is anywhere in the Notes or in this Indenture provided that the certificate of authentication of the Trustee shall have; *provided*, *however*, that the right to adopt the certificate of authentication of any predecessor trustee or to authenticate Notes in the name of any predecessor trustee shall apply only to its successor or successors by merger, conversion or consolidation.

Section 7.12. *Trustee's Application for Instructions from the Company*. Any application by the Trustee for written instructions from the Company (other than with regard to any action proposed to be taken or omitted to be taken by the Trustee that affects the rights of the Holders of the

41

Notes under this Indenture) may, at the option of the Trustee, set forth in writing any action proposed to be taken or omitted by the Trustee under this Indenture and the date on and/or after which such action shall be taken or such omission shall be effective. The Trustee shall not be liable for any action taken by, or omission of, the Trustee in accordance with a proposal included in such application on or after the date specified in such application (which date shall not be less than three Business Days after the date any Officer actually receives such application, unless any such Officer shall have consented in writing to any earlier date), unless, prior to taking any such action (or the effective date in the case of any omission), the Trustee shall have received written instructions in accordance with this Indenture in response to such application specifying the action to be taken or omitted.

Section 7.13. *Conflicting Interests of Trustee*. If the Trustee has or shall acquire a conflicting interest within the meaning of the Trust Indenture Act, the Trustee shall either eliminate such interest or resign, to the extent and in the manner provided by, and subject to the provisions of this Indenture.

ARTICLE 8

CONCERNING THE HOLDERS

Section 8.01. *Action by Holders*. Whenever in this Indenture it is provided that the Holders of a specified percentage of the aggregate principal amount of the Notes may take any action (including the making of any demand or request, the giving of any notice, consent or waiver or the taking of any other action), the fact that at the time of taking any such action, the Holders of such specified percentage have joined therein may be evidenced (i) by any instrument or any number of instruments of similar tenor executed by Holders in person or by agent or proxy appointed in writing, or (ii) by the record of the Holders voting in favor thereof at any meeting of Holders duly called and held, or (iii) by a combination of such instrument or instruments and any such record of such a meeting of Holders. Whenever the Company or the Trustee solicits the taking of any action by the Holders of the Notes, the Company or the Trustee may, but shall not be required to, fix in advance of such solicitation, a date as the record date for determining Holders entitled to take such action. The record date if one is selected shall be not more than fifteen days prior to the date of commencement of solicitation of such action. The Trustee may act at the direction of the requisite Holders without liability.

Section 8.02. *Proof of Execution by Holders*. Subject to the provisions of Section 7.01 and Section 7.02, proof of the execution of any instrument by a Holder or its agent or proxy shall be sufficient if made in accordance with such reasonable rules and regulations as may be prescribed by the Trustee or in such manner as shall be satisfactory to the Trustee. The holding of Notes shall be proved by the Note Register or by a certificate of the Note Registrar.

Section 8.03. *Who Are Deemed Absolute Owners*. The Company, the Trustee, any authenticating agent, any Paying Agent, any Conversion Agent and any Note Registrar may deem the Person in whose name a Note shall be registered upon the Note Register to be, and may treat it as, the absolute owner of such Note (whether or not such Note shall be overdue and notwithstanding any notation of ownership or other writing thereon made by any Person other than the Company or any Note Registrar) for the purpose of receiving payment of or on account

42

of the principal of and (subject to Section 2.03) accrued and unpaid interest on such Note, for conversion of such Note and for all other purposes; and neither the Company nor the Trustee nor any Paying Agent nor any Conversion Agent nor any Note Registrar shall be affected by any notice to the contrary. All such payments or deliveries so made to any Holder for the time being, or upon its order, shall be valid, and, to the extent of the sums or shares of Class A Common Stock so paid or delivered, effectual to satisfy and discharge the liability for monies payable or shares deliverable upon any such Note. Notwithstanding anything to the contrary in this Indenture or the Notes following an Event of Default, any Holder of a beneficial interest in a Global Note may directly enforce against the Company, without the consent, solicitation, proxy, authorization or any other action of the Depositary or any other Person, such Holder's right to exchange such beneficial interest for a Note in certificated form in accordance with the provisions of this Indenture.

Section 8.04. *Company- Owned Notes Disregarded*. In determining whether the Holders of the requisite aggregate principal amount of Notes have concurred in any direction, consent, waiver or other action under this Indenture, Notes that are owned by the Company or by any Affiliate of the Company shall be disregarded (from both the numerator and the denominator) and deemed not to be outstanding for the purpose of any such determination; *provided* that for the purposes of determining whether the Trustee shall be protected in relying on any such direction, consent, waiver or other action only Notes that a Responsible Officer actually knows are so owned shall be so disregarded. Notes so owned that have been pledged in good faith may be regarded as outstanding for the purposes of this Section 8.04 if the pledgee shall establish to the satisfaction of the Trustee the pledgee's right to so act with respect to such Notes and that the pledgee is not the Company or any Affiliate of the Company. In the case of a dispute as to such right, any decision by the Trustee taken upon the advice of counsel shall be full protection to the Trustee. Upon request of the Trustee, the Company shall furnish to the Trustee promptly an Officer's Certificate listing and identifying all Notes, if any, known by the Company to be owned or held by or for the account of any of the above described Persons; and, subject to Section 7.01, the Trustee shall be entitled to accept such Officer's Certificate as conclusive evidence of the facts therein set forth and of the fact that all Notes not listed therein are outstanding for the purpose of any such determination.

Section 8.05. *Revocation of Consents; Future Holders Bound*. At any time prior to (but not after) the evidencing to the Trustee, as provided in Section 8.01, of the taking of any action by the Holders of the percentage of the aggregate principal amount of the Notes specified in this Indenture in connection with such action, any Holder of a Note that is shown by the evidence to be included in the Notes the Holders of which have consented to such action may, by filing written notice with the Trustee at its Corporate Trust Office and upon proof of holding as provided in Section 8.02, revoke such action so far as concerns such Note. Except as aforesaid, any such action taken by the Holder of any Note shall be conclusive and binding upon such Holder and upon all future Holders and owners of such Note and of any Notes issued in exchange or substitution therefor or upon registration of transfer thereof, irrespective of whether any notation in regard thereto is made upon such Note or any Note issued in exchange or substitution therefor or upon registration of transfer thereof.

43

# ARTICLE 9
## Acts Of Holders

Section 9.01. *Acts of Holders*.

(a) Any request, demand, authorization, direction, notice, consent, waiver or other action provided by this Indenture to be given or taken by Holders may be embodied in and evidenced by one or more instruments of substantially similar tenor signed by such Holders in person or by agent duly appointed in writing; and, except as herein otherwise expressly provided, such action shall become effective when such instrument or instruments are delivered to the Trustee and, where it is hereby expressly required, to the Company. Such instrument or instruments (and the action embodied therein and evidenced thereby) are herein sometimes referred to as the "Act" of Holders signing such instrument or instruments. Proof of execution of any such instrument or of a writing appointing any such agent shall be sufficient for any purpose of this Indenture and conclusive in favor of the Trustee and the Company, if made in the manner provided in this Section.

(b) The fact and date of the execution by any Person of any such instrument or writing may be proved by the affidavit of a witness of such execution or by a certificate of a notary public or other officer authorized by law to take acknowledgments of deeds, certifying that the individual signing such instrument or writing acknowledged to such officer the execution thereof. Where such execution is by a signer acting in a capacity other than such signer's individual capacity, such certificate or affidavit shall also constitute sufficient proof of such signer's authority. The fact and date of the execution of any such instrument or writing, or the authority of the Person executing the same, may also be proved in any other manner which the Trustee deems sufficient;

(c) The ownership of Notes shall be proved by the Note Register.

(d) Any request, demand, authorization, direction, notice, consent, waiver or other Act of the Holder of any Note shall bind every future Holder of the same Note and the holder of every Note issued upon the registration of transfer thereof or in exchange therefor or in lieu thereof in respect of anything done, omitted or suffered to be done by the Trustee or the Company in reliance thereon, whether or not notation of such action is made upon such Note.

(e) If the Company shall solicit from the Holders any request, demand, authorization, direction, notice, consent, waiver or other Act, the Company may, at its option, by or pursuant to a Board Resolution, fix in advance a record date for the determination of Holders entitled to give such request, demand, authorization, direction, notice, consent, waiver or other Act, but the Company shall have no obligation to do so. If such a record date is fixed, such request, demand, authorization, direction, notice, consent, waiver or other Act may be given before or after such record date, but only the Holders of record at the close of business on such record date shall be deemed to be Holders for the purposes of determining whether Holders of the requisite proportion of outstanding Notes have authorized or agreed or consented to such request, demand, authorization, direction, notice, consent, waiver or other Act, and for that purpose the outstanding Notes shall be computed as of such record date; provided that no such authorization, agreement or consent by the Holders on such record date shall be deemed effective unless it shall become effective pursuant to the provisions of this Indenture not later than six months after the record date.

44

## ARTICLE 10
### SUPPLEMENTAL INDENTURES

Section 10.01. *Supplemental Indentures Without Consent of Holders*. The Company, when authorized by the resolutions of the Board of Directors, and the Trustee, at the Company's expense, may from time to time and at any time enter into an indenture or indentures supplemental hereto for one or more of the following purposes:

(a) to cure any ambiguity, omission, defect or inconsistency that does not adversely affect Holders of the Notes;

(b) to provide for the assumption by a Successor Company of the obligations of the Company under this Indenture pursuant to Article 11;

(c) to make provisions with respects to conversion rights of the Holders pursuant to and in accordance with Section 14.07;

(d) to appoint a successor trustee;

(f) to secure the Notes;

(g) to add to the covenants or Events of Default for the benefit of the Holders or surrender any right or power conferred upon the Company;

(h) to make any other change that does not adversely affect the rights of any Holder; or

(i) to conform the provisions of this Indenture or the Notes to the "Description of Notes" section of the Offering Circular.

Upon the written request of the Company, the Trustee is hereby authorized to join with the Company in the execution of any such supplemental indenture, to make any further appropriate agreements and stipulations that may be therein contained, but the Trustee shall not be obligated to, but may in its discretion, enter into any supplemental indenture that affects the Trustee's own rights, duties or immunities under this Indenture or otherwise. Any supplemental indenture authorized by the provisions of this Section 10.01 may be executed by the Company and the Trustee without the consent of the Holders of any of the Notes at the time outstanding, notwithstanding any of the provisions of Section 10.02.

Section 10.02. *Supplemental Indentures with Consent of Holders*. With the consent (evidenced as provided in Article 8) of the Holders of at least a majority of the aggregate principal amount

45

of the Notes then outstanding (determined in accordance with Article 8 and including, without limitation, consents obtained in connection with a purchase of, or tender or exchange offer for, Notes), the Company, when authorized by the resolutions of the Board of Directors, and the Trustee, at the Company's expense, may from time to time and at any time enter into an indenture or indentures supplemental hereto for the purpose of adding any provisions to or changing in any manner or eliminating any of the provisions of this Indenture or any supplemental indenture or of modifying in any manner the rights of the Holders; *provided*, *however*, that, without the consent of each Holder of an outstanding Note affected, no such supplemental indenture shall:

(a) reduce the amount of Notes whose Holders must consent to an amendment;

(b) reduce the rate of or extend the stated time for payment of interest on any Note;

(c) reduce the principal of or extend the Maturity Date of any Note;

(d) make any change that adversely affects the conversion rights of any Notes;

(e) reduce the Fundamental Change Purchase Price of any Note or amend or modify in any manner adverse to the Holders the Company's obligation to make such payments;

(f) make any Note payable in a currency other than that stated in the Note;

(g) change the ranking of the Notes in any manner adverse to Holders;

(h) impair the right of any Holder to receive payment of principal of and interest, on such Holder's Notes on or after the due dates therefor or to institute suit for the enforcement of any payment on or with respect to such Holder's Notes; or

(i) make any change in this Article 10 that requires each Holder's consent or in the waiver provisions in Section 6.02 or Section 6.09.

Upon the written request of the Company, and upon the filing with the Trustee of evidence of the consent of Holders as aforesaid and subject to Section 10.05, the Trustee shall join with the Company in the execution of such supplemental indenture unless such supplemental indenture affects the Trustee's own rights, duties or immunities under this Indenture or otherwise, in which case the Trustee may in its discretion, but shall not be obligated to, enter into such supplemental indenture.

Holders do not need under this Section 10.02 to approve the particular form of any proposed supplemental indenture. It shall be sufficient if such Holders approve the substance thereof. After any such supplemental indenture becomes effective, the Company shall mail to the Holders a notice briefly describing such supplemental indenture. However, the failure to give such notice to all the Holders, or any defect in the notice, will not impair or affect the validity of the supplemental indenture.

Section 10.03. *Effect of Supplemental Indentures.* Upon the execution of any supplemental indenture pursuant to the provisions of this Article 10, this Indenture shall be and be deemed to

46

be modified and amended in accordance therewith and the respective rights, limitation of rights, obligations, duties and immunities under this Indenture of the Trustee, the Company and the Holders shall thereafter be determined, exercised and enforced hereunder subject in all respects to such modifications and amendments and all the terms and conditions of any such supplemental indenture shall be and be deemed to be part of the terms and conditions of this Indenture for any and all purposes.

Section 10.04. *Notation on Notes.* Notes authenticated and delivered after the execution of any supplemental indenture pursuant to the provisions of this Article 10 may, at the Company's expense, bear a notation in form approved by the Trustee as to any matter provided for in such supplemental indenture. If the Company or the Trustee shall so determine, new Notes so modified as to conform, in the opinion of the Trustee and the Board of Directors, to any modification of this Indenture contained in any such supplemental indenture may, at the Company's expense, be prepared and executed by the Company, authenticated by the Trustee (or an authenticating agent duly appointed by the Trustee pursuant to Section 17.11) and delivered in exchange for the Notes then outstanding, upon surrender of such Notes then outstanding.

Section 10.05. *Evidence of Compliance of Supplemental Indenture to Be Furnished Trustee.* In addition to the documents required by Section 17.06, the Trustee shall receive an Officer's Certificate and an Opinion of Counsel as conclusive evidence that any supplemental indenture executed pursuant hereto complies with the requirements of this Article 10 and is permitted or authorized by this Indenture and it is the legal, valid and binding obligation of the Company, enforceable in accordance with its terms.

## ARTICLE 11
### Consolidation, Merger, Sale, Conveyance and Lease

Section 11.01. *Company May Consolidate, Etc. on Certain Terms.* Subject to the provisions of Section 11.02, the Company shall not consolidate with, merge with or into, or sell, convey, transfer or lease all or substantially all of its properties and assets to another Person, unless:

(a) the resulting, surviving or transferee Person (the "**Successor Company**"), if not the Company, shall be a corporation organized and existing under the laws of the United States of America, any State thereof or the District of Columbia, and the Successor Company (if not the Company) shall expressly assume, by supplemental indenture all of the obligations of the Company under the Notes and this Indenture; and

(b) immediately after giving effect to such transaction, no Default or Event of Default shall have occurred and be continuing under this Indenture.

For purposes of this Section 11.01, the sale, conveyance, transfer or lease of all or substantially all of the properties and assets of one or more Subsidiaries of the Company to another Person, which properties and assets, if held by the Company instead of such Subsidiaries, would constitute all or substantially all of the properties and assets of the Company on a consolidated basis, shall be deemed to be the sale, conveyance, transfer or lease of all or substantially all of the properties and assets of the Company to another Person.

47

Section 11.02. *Successor Corporation to Be Substituted.* In case of any such consolidation, merger, sale, conveyance, transfer or lease and upon the assumption by the Successor Company, by supplemental indenture, executed and delivered to the Trustee and satisfactory in form to the Trustee, of the due and punctual payment of the principal of and accrued and unpaid interest on all of the Notes, the due and punctual delivery and/or payment, as the case may be, of any consideration due upon conversion of the Notes and the due and punctual performance of all of the covenants and conditions of this Indenture to be performed by the Company, such Successor Company (if not the Company) shall succeed to, and may exercise every right and power of and be substituted for, the Company, with the same effect as if it had been named herein as the party of the first part, except in the case of a lease of all or substantially all of the Company's properties and assets. Such Successor Company thereupon may cause to be signed, and may issue either in its own name or in the name of the Company any or all of the Notes issuable hereunder which theretofore shall not have been signed by the Company and delivered to the Trustee; and, upon the order of such Successor Company instead of the Company and subject to all the terms, conditions and limitations in this Indenture prescribed, the Trustee shall authenticate and shall deliver, or cause to be authenticated and delivered, any Notes that previously shall have been signed and delivered by the Officers of the Company to the Trustee for authentication, and any Notes that such Successor Company thereafter shall cause to be signed and delivered to the Trustee for that purpose. All the Notes so issued shall in all respects have the same legal rank and benefit under this Indenture as the Notes theretofore or thereafter issued in accordance with the terms of this Indenture as though all of such Notes had been issued at the date of the execution hereof. In the event of any such consolidation, merger, sale, conveyance or transfer (but not in the case of a lease), upon compliance with this Article 11, the Person named as the "Company" in the first paragraph of this Indenture shall be released from its liabilities as obligor and maker of the Notes and from its obligations under this Indenture and the Notes.

In case of any such consolidation, merger, sale, conveyance, transfer or lease, such changes in phraseology and form (but not in substance) may be made in the Notes thereafter to be issued as may be appropriate.

Section 11.03. *Opinion of Counsel to Be Given to Trustee.* No consolidation, merger, sale, conveyance, transfer or lease shall be effective unless the Trustee shall receive an Officer's Certificate and an Opinion of Counsel as conclusive evidence that any such consolidation, merger, sale, conveyance, transfer or lease and any such assumption complies with the provisions of this Article 11 and, if a supplemental indenture is required in connection with such transaction, such supplemental indenture, complies with the provisions of this Article 11 and Article 10.

## ARTICLE 12

### Immunity of Incorporators, Stockholders, Officers and Directors

Section 12.01. *Indenture and Notes Solely Corporate Obligations.* No recourse for the payment of the principal of or accrued and unpaid interest on any Note, nor for any claim based thereon or otherwise in respect thereof, and no recourse under or upon any obligation, covenant or agreement of the Company in this Indenture or in any supplemental indenture or in any Note, nor

48

because of the creation of any indebtedness represented thereby, shall be had against any incorporator, stockholder, employee, agent, Officer or director or Subsidiary, as such, past, present or future, of the Company or of any successor corporation, either directly or through the Company or any successor corporation, whether by virtue of any constitution, statute or rule of law, or by the enforcement of any assessment or penalty or otherwise; it being expressly understood that all such liability is hereby expressly waived and released as a condition of, and as a consideration for, the execution of this Indenture and the issue of the Notes.

ARTICLE 13

Intentionally Omitted

ARTICLE 14

Conversion of Notes

Section 14.01. *Conversion Privilege.* (a) Subject to and upon compliance with the provisions of this Article 14, each Holder of a Note shall have the right, at such Holder's option, to convert all or any portion (if the portion to be converted is $1,000 principal amount or an integral multiple in excess thereof) of such Note (i) subject to satisfaction of the conditions described in Section 14.01(b), at any time prior to the close of business on the Business Day immediately preceding March 15, 2018 under the circumstances and during the periods set forth in Section 14.01(b), and (ii) on or after March 15, 2018, at any time prior to the close of business on the second Scheduled Trading Day immediately preceding the Maturity Date, in each case, at an initial conversion rate of 53.2992 shares of Class A Common Stock (subject to adjustment as provided in Section 14.04, the "**Conversion Rate**") per $1,000 principal amount of Notes (subject to the settlement provisions of Section 14.02, the "**Conversion Obligation**").

(i) Prior to the close of business on the Business Day immediately preceding March 15, 2018, the Notes may be surrendered for conversion during the five Business Day period immediately after any five consecutive Trading Day period (the "Measurement Period") in which the Trading Price per $1,000 principal amount of Notes, as determined following a request by a Holder of Notes in accordance with this subsection (b)(i), for each Trading Day of the Measurement Period was less than 98% of the product of the Last Reported Sale Price of the Class A Common Stock and the Conversion Rate on each such Trading Day. The Trading Prices shall be determined by the Bid Solicitation Agent at the request of the Company pursuant to this subsection (b)(i) and the definition of Trading Price set forth in this Indenture. The Company shall provide written notice to the Bid Solicitation Agent (if other than the Company) of the three independent nationally recognized securities dealers selected by the Company pursuant to the definition of Trading Price, along with appropriate contact information for each. The Bid Solicitation Agent (if other than the Company) shall have no obligation to determine the Trading Price per $1,000 principal amount of Notes unless the Company has requested such determination, and the Company shall have no obligation to make such request (or, if the Company is acting as the Bid Solicitation Agent, the Company shall have no obligation to determine the

49

Trading Price) unless a Holder provides the Company with reasonable evidence that the Trading Price per $1,000 principal amount of Notes would be less than 98% of the product of the Last Reported Sale Price of the Class A Common Stock and the Conversion Rate, at which time the Company shall instruct the Bid Solicitation Agent to (or, if the Company is acting as the Bid Solicitation Agent, the Company shall) determine the Trading Price per $1,000 principal amount of Notes beginning on the next Trading Day and on each successive Trading Day until the Trading Price per $1,000 principal amount of Notes is greater than or equal to 98% of the product of the Last Reported Sale Price of the Class A Common Stock and the Conversion Rate. If the Company does not instruct the Bid Solicitation Agent to determine the Trading Price per $1,000 principal amount of Notes when obligated as provided in the preceding sentence, or if the Company instructs the Bid Solicitation Agent to obtain bids and the Bid Solicitation Agent fails to make such determination (or, if the Company is acting as the Bid Solicitation Agent, the Company fails to obtain bids) then, in either case, the Trading Price per $1,000 principal amount of Notes shall be deemed to be less than 98% of the product of the Last Reported Sale Price of the Class A Common Stock and the Conversion Rate on each Trading Day of such failure. If the Trading Price condition set forth above has been met, the Company shall so notify the Holders, the Trustee and the Conversion Agent (if other than the Trustee). If, at any time after the Trading Price condition set forth above has been met, the Trading Price per $1,000 principal amount of Notes is greater than or equal to 98% of the product of the Last Reported Sale Price of the Class A Common Stock and the applicable Conversion Rate, the Company shall so notify the Holders of the Notes, the Trustee and the Conversion Agent (if other than the Trustee).

(ii) If, prior to the close of business on the Business Day immediately preceding March 15, 2018, the Company elects to:

(A) issue or distribute to all or substantially all holders of its Class A Common Stock any rights, options or warrants entitling them, for a period of not more than 45 calendar days after the public announcement date for such issuance or distribution, to subscribe or purchase shares of its Class A Common Stock, at a price per share that is less than the average of the Last Reported Sale Prices of the Class A Common Stock for the 10 consecutive Trading Day period ending on, and including, the Trading Day immediately preceding the date of public announcement of such issuance or distribution; or

(B) distribute to all or substantially all holders of its Class A Common Stock the Company's assets, debt securities or rights to purchase securities of the Company, which distribution has a per share value, as reasonably determined by the Board of Directors, exceeding 10% of the Last Reported Sale Price of the Class A Common Stock on the Trading Day immediately preceding the date of public announcement for such distribution,

then, in either case, the Company shall notify all Holders of the Notes, the Trustee and the Conversion Agent (if other than the Trustee) at least 45 Scheduled Trading Days prior to the Ex- Dividend Date for such issuance or distribution. Once the Company has given such notice, the Holders may surrender all or a portion of their Notes for conversion at any time until the earlier

50

of (1) the close of business on the Business Day immediately preceding the Ex- Dividend Date for such issuance or distribution and (2) the Company's announcement that such issuance or distribution will not take place.

Holders may not exercise a conversion right pursuant to this Section 14.01(b)(ii) if they will participate (as a result of holding Notes and at the same time and on the same terms as holders of Class A Common Stock participate) in any of the transactions described in this Section 14.01(b)(ii) as if such Holders held a number of shares of Class A Common Stock equal to the Conversion Rate, multiplied by the principal amount of Notes held by such Holders divided by $1,000, without having to convert their Notes.

(iii) If, prior to the close of business on the Business Day immediately preceding March 15, 2018, a Fundamental Change or a Make- Whole Fundamental Change occurs or the Company is a party to a consolidation, merger, binding share exchange, or sale, lease or other transfer of all or substantially all of its assets, pursuant to which the Class A Common Stock would be converted into cash, securities or other assets (including any combination thereof), the Notes may be surrendered for conversion at any time from or after the date that is 45 Scheduled Trading Days prior to the anticipated effective date of the transaction (or, if later, the Business Day after the Company gives notice of such transaction) until the close of business on the 35th Trading Day after the actual effective date of such transaction or, if such transaction also constitutes a Fundamental Change, the related Fundamental Change Purchase Date. The Company shall notify Holders, the Trustee and the Conversion Agent (if other than the Trustee) has promptly as practicable following the date the Company publicly announces such transaction; provided that the Company shall deliver such notice in no event later than the actual effective date of such transaction.

If a Holder has delivered a Fundamental Change Purchase Notice with respect to a Note, such Holder may not surrender such Note for conversion until such Holder has validly withdrawn such Fundamental Change Purchase Notice in accordance with the terms of Section 15.03.

(iv) Prior to the close of business on the Business Day immediately preceding March 15, 2018, the Notes may be surrendered for conversion during any fiscal quarter commencing after the fiscal quarter ending on September 30, 2013 (and only during such fiscal quarter), if the Last Reported Sale Price of the Class A Common Stock for at least 20 Trading Days (whether or not consecutive) during the period of 30 consecutive Trading Days ending on the last Trading Day of the immediately preceding fiscal quarter is greater than or equal to 130% of the Conversion Price on each applicable Trading Day. Section 14.02. *Conversion Procedure; Settlement Upon Conversion.* (a) Except as provided in Section 14.03(b) and Section 14.07(a), upon conversion of any Note, on the third Business Day immediately following the last Trading Day of the relevant Observation Period, the Company shall pay or deliver, as the case may be, to the converting Holder, in respect of each $1,000 principal amount of Notes being converted, a "**Settlement Amount**" equal to the sum of the Daily Settlement Amounts for each of the 40 consecutive VWAP Trading Days during the applicable Observation Period for such Note. The Daily Settlement Amounts and the Daily Conversion Values shall be determined by the Company promptly following the last VWAP

51

Trading Day of the Observation Period. Promptly after such determination, the Company shall notify the Trustee and the Conversion Agent (if other than the Trustee) of such amount. The Trustee and the Conversion Agent (if other than the Trustee) shall have no responsibility for such determination.

(b) In order to be entitled to convert a Note as set forth above, a Holder shall (i) in the case of a Global Note, comply with the procedures of the Depositary in effect at that time and, if required, pay funds equal to interest payable on the next Interest Payment Date to which such Holder is not entitled as set forth in Section 14.02(h) and pay any tax owed pursuant to Section 14.02(e) and (ii) in the case of a Physical Note (1) complete, manually sign and deliver an irrevocable notice to the Conversion Agent as set forth in the Form of Notice of Conversion (or a facsimile thereof) (a "**Notice of Conversion**") at the office of the Conversion Agent and state in writing therein the principal amount of Notes to be converted and the name or names (with addresses) in which such Holder wishes the certificate or certificates for any shares of Class A Common Stock to be delivered upon settlement of the Conversion Obligation to be registered, (2) surrender such Notes, duly endorsed to the Company or in blank (and accompanied by appropriate endorsement and transfer documents), at the office of the Conversion Agent, (3) if required, furnish appropriate endorsements and transfer documents and (4) if required, pay funds equal to interest payable on the next Interest Payment Date to which such Holder is not entitled as set forth in Section 14.02(h) and pay any tax owed pursuant to Section 14.02(e). The Conversion Agent shall notify the Company of any conversion pursuant to this Article 14 on the Conversion Date for such conversion. No Notice of Conversion with respect to any Notes may be surrendered by a Holder thereof if such Holder has also delivered a Fundamental Change Purchase Notice to the Company in respect of such Notes and not validly withdrawn such Fundamental Change Purchase Notice in accordance with Section 15.03.

If more than one Note shall be surrendered for conversion at one time by the same Holder, the Conversion Obligation with respect to such Notes shall be computed on the basis of the aggregate principal amount of the Notes (or specified portions thereof to the extent permitted thereby) so surrendered.

(c) A Note shall be deemed to have been converted immediately prior to the close of business on the date (the "**Conversion Date**") that the Holder has complied with the requirements set forth in Section 14.02(b). If any shares of Class A Common Stock are due (and converting Holders, the Company shall issue or cause to be issued, and deliver to the Conversion Agent or to such Holder, or such Holder's nominee or nominees, certificates or a book- entry transfer through the Depositary for the full number of shares of Class A Common Stock to which such Holder shall be entitled in satisfaction of the Company's Conversion Obligation, subject to the Company's right to pay cash in lieu of all or a portion of such shares as pursuant to Section 14.02(k).

(d) In case any Note shall be surrendered for partial conversion, the Company shall execute and the Trustee shall authenticate and deliver to or upon the written order of the Holder of the Note so surrendered a new Note or Notes in authorized denominations in an aggregate principal amount equal to the unconverted portion of the surrendered Note, without payment of any service charge by the converting Holder but, if required by the Company or Trustee, with payment of a sum sufficient to cover any transfer tax or similar governmental charge required

52

by law or that may be imposed in connection therewith as a result of the name of the Holder of the new Notes issued upon such conversion being different from the name of the Holder of the old Notes surrendered for such conversion.

(e) If a Holder submits a Note for conversion, the Company shall pay any documentary, stamp or similar issue or transfer tax due on the issue of any shares of Class A Common Stock upon conversion, unless the tax is due because the Holder requests such shares to be issued in a name other than the Holder's name, in which case the Holder shall pay that tax. The Conversion Agent may refuse to deliver the certificates representing the shares of Class A Common Stock being issued in a name other than the Holder's name until the Trustee receives a sum sufficient to pay any tax that is due by such Holder in accordance with the immediately preceding sentence.

(f) Except as provided in Section 14.04, no adjustment shall be made for dividends on any shares issued upon the conversion of any Note as provided in this Article 14.

(g) Upon the conversion of an interest in a Global Note, the Trustee and Depositary shall reflect the reduction in the principal amount represented thereby on their books and records. The Company shall notify the Trustee in writing of any conversion of Notes effected through any Conversion Agent other than the Trustee.

(h) Upon conversion, a Holder shall not receive any separate cash payment for accrued and unpaid interest, if any, except as set forth below. The Company's delivery of the Settlement Amount shall be deemed to satisfy in full its obligation to pay the principal amount of the Note and accrued and unpaid interest, if any, to, but not including, the Conversion Date. As a result, accrued and unpaid interest, if any, to, but not including, the Conversion Date shall be deemed to be paid in full rather than cancelled, extinguished or forfeited. Upon a conversion of Notes, accrued and unpaid interest shall be deemed to be paid first out of the cash paid upon such conversion. Notwithstanding the foregoing, if Notes are converted after the close of business on a Regular Record Date and prior to the open of business on the immediately following Interest Payment Date, Holders of such Notes as of the close of business on such Regular Record Date shall receive the full amount of interest payable on such Notes on the corresponding Interest Payment Date notwithstanding the conversion. Notes surrendered for conversion during the period from the close of business on any Regular Record Date to the open of business on the immediately following Interest Payment Date must be accompanied by funds equal to the amount of interest payable on such Interest Payment Date on the Notes so converted (regardless of whether the converting Holder was the Holder of record on the corresponding Regular Record Date); *provided* that no such payment shall be required (1) for conversions following the Regular Record Date immediately preceding the Maturity Date; (2) if the Company has specified a Fundamental Change Purchase Date that is after a Regular Record Date and on or prior to the Business Day immediately following the corresponding Interest Payment Date; or (3) to the extent of any overdue interest, if any overdue interest exists at the time of conversion with respect to such Note. For the avoidance of doubt, all Holders on the Regular Record Date immediately preceding the Maturity Date shall receive and retain the full interest payment due on the Maturity Date regardless of whether their Notes are converted following such Regular Record Date.

53

(i) The Person in whose name the certificate for any shares of Class A Common Stock delivered upon conversion is registered (or with respect to which book- entry transfer through the Depositary shall be effected) shall be treated as a stockholder of record as of the close of business on the last VWAP Trading Day of the relevant Observation Period. Upon a conversion of Notes, such Person shall no longer be a Holder of such Notes surrendered for conversion.

(j) The Company shall not issue any fractional share of Class A Common Stock upon conversion of the Notes and shall instead pay cash in lieu of any fractional shares of Class A Common Stock issuable upon conversion based on the Daily VWAP on the Last VWAP Trading Day of the applicable Observation Period. For each Note surrendered for conversion, the full number of shares that shall be issued upon conversion thereof (subject to the Company's right to pay cash in lieu of all or a portion of such shares pursuant to subsection (k) of this Section 14.02) shall be computed on the basis of the aggregate Daily Settlement Amounts for the applicable Observation Period and any fractional shares remaining after such computation shall be paid in cash.

(k) The Company may elect to settle all or a portion of the Daily Share Amount in cash. To make such election with respect to a Conversion Date, the Company must deliver to each converting Holder, the Trustee and the Conversion Agent (if other than the Trustee), a written notice specifying the Cash Percentage (such notice, the "**Cash Percentage Notice**"). The Company shall deliver the Cash Percentage Notice no later than the close of business on the Business Day immediately following such Conversion Date; *provided, however*, that the Company shall deliver the Cash Percentage Notice no later than the close of business on the Business Day immediately preceding March 15, 2018 to all Holders, the Trustee and the Conversion Agent (if other than the Trustee) with respect to all conversions occurring on or after March 15, 2018. If the Company timely specifies a Cash Percentage for a Conversion Date, the Company shall deliver to each converting Holder the Daily Net Cash Portion and a number of shares of Class A Common Stock, if any, equal to a percentage of the Daily Share Amount equal to 100% minus the Cash Percentage. If the Company fails to timely specify a Cash Percentage for a Conversion Date, the Company shall no longer have the right to specify a Cash Percentage with respect to the applicable conversion and shall settle the Daily Share Amount for each VWAP Trading Day in the applicable Observation Period in shares of Class A Common Stock, if any.

Section 14.03. *Increased Conversion Rate Applicable to Certain Notes Surrendered in Connection with Make- Whole Fundamental Changes.* (a) If the Effective Date of a Make- Whole Fundamental Change occurs prior to the Maturity Date and a Holder elects to convert its Notes in connection with such Make- Whole Fundamental Change, the Company shall, under the circumstances described below, increase the Conversion Rate for the Notes so surrendered for conversion by a number of additional shares of Class A Common Stock (the "**Additional Shares**"), as described below. A conversion of Notes shall be deemed for these purposes to be "in connection with" such Make- Whole Fundamental Change if the relevant Notice of Conversion (or, in the case of a Global Note, the relevant notice of conversion in accordance with the Depositary's applicable procedures) is received by the Conversion Agent from, and including, the Effective Date of the Make- Whole Fundamental Change up to, and including, the close of business on the Business Day immediately preceding the related Fundamental Change

54

Purchase Date (or, in the case of a Make- Whole Fundamental Change that would have been a Fundamental Change but for subclause (i) of the *proviso* in clause (b) of the definition thereof, the 35th Trading Day immediately following the Effective Date of such Make- Whole Fundamental Change).

(b) The Company shall notify Holders and the Trustee of the Effective Date of any Make- Whole Fundamental Change and issue a press release announcing such Effective Date no later than 5 Business Days after such Effective Date (the "**Make- Whole Fundamental Change Company Notice**"). Upon surrender of Notes for conversion in connection with a Make- Whole Fundamental Change, the Company shall satisfy the related Conversion Obligation in accordance with Section 14.02 based on the Conversion Rate as increased to reflect the Additional Shares pursuant to the table below; *provided*, *however*, that if, in the case of a Make- Whole Fundamental Change described in clause (b) of the definition of Fundamental Change, the Reference Property is composed entirely of cash, for any conversion of Notes following the Effective Date of such Make- Whole Fundamental Change, the Conversion Obligation shall be calculated based solely on the Stock Price for the transaction and shall be deemed to be an amount of cash per $1,000 principal amount of converted Notes equal to the Conversion Rate (including any adjustment for Additional Shares), *multiplied by* such Stock Price. In such event, the Conversion Obligation shall be paid to Holders in cash on the third Business Day following the Conversion Date.

(c) The number of Additional Shares, if any, by which the Conversion Rate shall be increased shall be determined by reference to the table below, based on the date on which the Make- Whole Fundamental Change occurs or becomes effective (the "**Effective Date**") and the price (the "**Stock Price**") paid (or deemed to be paid) per share of the Class A Common Stock in the Make- Whole Fundamental Change. If the holders of the Class A Common Stock receive only cash in a Make- Whole Fundamental Change described in clause (b) of the definition of Fundamental Change, the Stock Price shall be the cash amount paid per share. Otherwise, the Stock Price shall be the average of the Last Reported Sale Prices of the Class A Common Stock over the five Trading Day period ending on, and including, the Trading Day immediately preceding the Effective Date of the Make- Whole Fundamental Change. The Board of Directors shall make appropriate adjustments to the Stock Price, in its good faith determination, to account for any adjustment to the Conversion Rate that becomes effective, or any event requiring an adjustment to the Conversion Rate where the Ex- Dividend Date of the event occurs, during such five Trading Day period.

(d) The Stock Prices set forth in the column headings of the table below shall be adjusted as of any date on which the Conversion Rate is otherwise adjusted. The adjusted Stock Prices shall equal the Stock Prices applicable immediately prior to such adjustment, *multiplied by* a fraction, the numerator of which is the Conversion Rate immediately prior to such adjustment giving rise to the Stock Price adjustment and the denominator of which is the Conversion Rate as so adjusted. The number of Additional Shares set forth in the table below shall be adjusted in the same manner and at the same time as the Conversion Rate as set forth in Section 14.04.

55

(e) The following table sets forth the number of Additional Shares by which the Conversion Rate per $1,000 principal amount of Notes shall be increased pursuant to this Section 14.03 for each Stock Price and Effective Date set forth below:

| Effective Date | Stock Price | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|
| | $14.16 | $16.00 | $18.00 | $20.00 | $23.00 | $26.00 | $30.00 | $35.00 | $40.00 | $50.00 |
| June 3, 2013 | 17.3222 | 12.9468 | 9.5877 | 7.1871 | 4.7400 | 3.1613 | 1.8472 | 0.9173 | 0.4124 | 0.0000 |
| June 15, 2014 | 17.3222 | 13.3058 | 9.7115 | 7.1707 | 4.6216 | 3.0134 | 1.7110 | 0.8239 | 0.3642 | 0.0221 |
| June 15, 2015 | 17.3222 | 13.2152 | 9.3995 | 6.7481 | 4.1556 | 2.5793 | 1.3617 | 0.5858 | 0.2168 | 0.0002 |
| June 15, 2016 | 17.3222 | 12.6065 | 8.5636 | 5.8369 | 3.2955 | 1.8557 | 0.8425 | 0.2782 | 0.0577 | 0.0000 |
| June 15, 2017 | 17.3222 | 11.2715 | 6.8934 | 4.1306 | 1.8453 | 0.7817 | 0.2114 | 0.0121 | 0.0000 | 0.0000 |
| June 15, 2018 | 17.3222 | 9.2008 | 2.2564 | 0.0000 | 0.0000 | 0.0000 | 0.0000 | 0.0000 | 0.0000 | 0.0000 |

The exact Stock Prices and Effective Dates may not be set forth in the table above, in which case:

(i) if the Stock Price is between two Stock Prices in the table or the Effective Date is between two Effective Dates in the table, the number of Additional Shares shall be determined by a straight- line interpolation between the number of Additional Shares set forth for the higher and lower Stock Prices and the earlier and later Effective Dates, as applicable, based on a 365- day year;

(ii) if the Stock Price is greater than $50.00 per share (subject to adjustment in the same manner as the Stock Prices set forth in the column headings of the table above pursuant to Section 14.03(d), no Additional Shares shall be added to the Conversion Rate; and

(iii) if the Stock Price is less than $14.16 per share (subject to adjustment in the same manner as the Stock Prices set forth in the column headings of the table above pursuant to Section 14.03(d), no Additional Shares shall be added to the Conversion Rate.

Notwithstanding the foregoing, in no event shall the Conversion Rate per $1,000 principal amount of Notes exceed 70.6214 shares of Class A Common Stock, subject to adjustment in the same manner as the Conversion Rate pursuant to Section 14.04.

(f) Nothing in this Section 14.03 shall prevent an adjustment to the Conversion Rate pursuant to Section 14.04 in respect of a Make- Whole Fundamental Change.

Section 14.04. *Adjustment of Conversion Rate.* The Conversion Rate shall be adjusted from time to time by the Company if any of the following events occurs, except that the Company shall not make any adjustments to the Conversion Rate if Holders of the Notes participate (other than in the case of a share split or share combination), at the same time and upon the same terms as holders of the Class A Common Stock and solely as a result of holding the Notes, in any of the transactions described in this Section 14.04, without having to convert their Notes, as if they held a number of shares of Class A Common Stock equal to the Conversion Rate, *multiplied by* the principal amount of Notes held by such Holder, divided by $1,000.

56

(a) If the Company exclusively issues shares of Class A Common Stock as a dividend or distribution on shares of its Class A Common Stock, or if the Company effects a share split or share combination, the Conversion Rate shall be adjusted based on the following formula:

$$CR_1 = CR_0 \times \frac{OS_1}{OS_0}$$

where,

| | | |
|---|---|---|
| $CR_0$ | = | the Conversion Rate in effect immediately prior to the open of business on the Ex-Dividend Date of such dividend or distribution, or immediately prior to the open of business on the effective date of such share split or share combination, as applicable; |
| $CR_1$ | = | the Conversion Rate in effect immediately after the open of business on such Ex-Dividend Date or effective date, as applicable; |
| $OS_0$ | = | the number of shares of Class A Common Stock outstanding immediately prior to the open of business on such Ex- Dividend Date or effective date, as applicable; and |
| $OS_1$ | = | the number of shares of Class A Common Stock outstanding immediately after giving effect to such dividend, distribution, share split or share combination. |

Any adjustment made under this Section 14.04(a) shall become effective immediately after the open of business on the Ex- Dividend Date for such dividend or distribution, or immediately after the open of business on the effective date for such share split or share combination, as applicable. If any dividend or distribution of the type described in this Section 14.04(a) is declared that results in an adjustment under this Section 14.04(a) but is not so paid or made, or the outstanding shares of Class A Common Stock are not split or combined, as the case may be, the Conversion Rate shall be immediately readjusted, effective as of the date the Board of Directors determines not to pay such dividend or distribution or to effect such split or combination, to the Conversion Rate that would then be in effect if such dividend or distribution or share split or share combination had not been declared or announced.

(b) If the Company issues or distributes to all or substantially all holders of its Class A Common Stock any rights, options or warrants entitling them, for a period of not more than 45 calendar days after the date of public announcement of such issuance or distribution, to subscribe for or purchase shares of Class A Common Stock at a price per share that is less than the average of the Last Reported Sale Prices of the Class A Common Stock for the 10 consecutive Trading Day period ending on, and including, the Trading Day immediately preceding the date of public announcement of such issuance or distribution, the Conversion Rate shall be increased based on the following formula:

$$CR_1 = CR_0 \times \frac{(OS_0 + X)}{(OS_0 + Y)}$$

where,

| | | |
|---|---|---|
| $CR_0$ | = | the Conversion Rate in effect immediately prior to the open of business on the Ex- Dividend Date for such issuance; |
| $CR_1$ | = | the Conversion Rate in effect immediately after the open of business on such Ex- Dividend Date; |
| $OS_0$ | = | the number of shares of Class A Common Stock outstanding immediately prior to the open of business on such Ex- Dividend Date; |
| X | = | the total number of shares of Class A Common Stock issuable pursuant to such rights, options or warrants; and |
| Y | = | the number of shares of Class A Common Stock equal to the aggregate price payable to exercise such rights, options or warrants, *divided by* the average of the Last Reported Sale Prices of the Class A Common Stock over the 10 consecutive Trading Day period ending on, and including, the Trading Day immediately preceding the date of public announcement of the issuance of such rights, options or warrants. |

Any increase made under this Section 14.04(b) shall be made successively whenever any such rights, options or warrants are issued and shall become effective immediately after the open of business on the Ex- Dividend Date for such issuance. To the extent that such rights, options or warrants are not exercised prior to their expiration or shares of Class A Common Stock are not delivered after the expiration of such rights, options or warrants, the Conversion Rate shall be decreased to the Conversion Rate that would then be in effect had the increase with respect to the issuance of such rights, options or warrants been made on the basis of delivery of only the number of shares of Class A Common Stock actually delivered. If such rights, options or warrants are not so issued, the Conversion Rate shall be decreased to the Conversion Rate that would then be in effect if such Ex- Dividend Date for such issuance had not occurred.

For purposes of this Section 14.04(b) and Section 14.01(b)(ii)(A), in determining whether any rights, options or warrants entitle the holders to subscribe for or purchase shares of the Class A Common Stock at less than such average of the Last Reported Sale Prices of the Class A Common Stock over the 10 consecutive Trading Day period ending on, and including, the Trading Day immediately preceding the date of public announcement of such issuance, and in determining the aggregate offering price of such shares of Class A Common Stock, there shall be taken into account any consideration received by the Company for such rights, options or warrants and any amount payable on exercise or conversion thereof, the value of such consideration, if other than cash, to be determined by the Board of Directors.

(c) If the Company distributes shares of its Capital Stock, evidences of its indebtedness, other assets or property of the Company or rights, options or warrants to acquire its Capital Stock or other securities, to all or substantially all holders of the Class A Common Stock, excluding (i) dividends, distributions or issuances as to which an adjustment was effected pursuant to Section 14.04(a) or Section 14.04(b), (ii) dividends or distributions paid exclusively in cash as to which an adjustment was effected pursuant to Section 14.04(d) and (iii) Spin- Offs as to which the provisions set forth below in this Section 14.04(c) shall apply (any of

58

such shares of Capital Stock, evidences of indebtedness, other assets or property or rights, options or warrants to acquire Capital Stock or other securities of the Company, the "**Distributed Property**"), then the Conversion Rate shall be increased based on the following formula:

$$CR_1 = CR_0 \times \frac{SP_0}{(SP_0 - FMV)}$$

where,

| | | |
|---|---|---|
| $CR_0$ | = | the Conversion Rate in effect immediately prior to the open of business on the Ex-Dividend Date for such distribution; |
| $CR_1$ | = | the Conversion Rate in effect immediately after the open of business on such Ex-Dividend Date; |
| $SP_0$ | = | the average of the Last Reported Sale Prices of the Class A Common Stock over the 10 consecutive Trading Day period ending on, and including, the Trading Day immediately preceding the Ex-Dividend Date for such distribution; and |
| FMV | = | the fair market value (as determined by the Board of Directors) of the Distributed Property with respect to each outstanding share of the Class A Common Stock as of the Ex-Dividend Date for such distribution. |

Any increase made under the portion of this Section 14.04(c) above shall become effective immediately after the open of business on the Ex-Dividend Date for such distribution. If such distribution is not so paid or made, the Conversion Rate shall be decreased to the Conversion Rate that would then be in effect if such dividend or distribution had not been declared.

Notwithstanding the foregoing, if "FMV" (as defined above) is equal to or greater than "$SP_0$" (as defined above), in lieu of the foregoing increase, each Holder of a Note shall receive, in respect of each $1,000 principal amount thereof, at the same time and upon the same terms as holders of the Class A Common Stock receive the Distributed Property, the amount and kind of Distributed Property such Holder would have received if such Holder owned a number of shares of Class A Common Stock equal to the Conversion Rate in effect on the Ex-Dividend Date for the distribution. If the Board of Directors determines the "FMV" (as defined above) of any distribution for purposes of this Section 14.04(c) by reference to the actual or when-issued trading market for any securities, it shall in doing so consider the prices in such market over the same period used in computing the Last Reported Sale Prices of the Class A Common Stock over the 10 consecutive Trading Day period ending on, and including, the Trading Day immediately preceding the Ex-Dividend Date for such distribution.

With respect to an adjustment pursuant to this Section 14.04(c) where there has been a payment of a dividend or other distribution on the Class A Common Stock of shares of Capital Stock of any class or series, or similar equity interest, of or relating to a Subsidiary or other business unit of the Company, that are, or, when issued, will be, listed or admitted for trading on a U.S. national securities exchange (a "**Spin- Off**"), the Conversion Rate shall be increased based on the following formula:

$$CR_1 = CR_0 \times \frac{(FMV_0 + MP_0)}{MP_0}$$

where,

$CR_0$      =    the Conversion Rate in effect immediately prior to the end of the Valuation Period;

$CR_1$      =    the Conversion Rate in effect immediately after the end of the Valuation Period;

$FMV_0$    =    the average of the Last Reported Sale Prices of the Capital Stock or similar equity interest distributed to holders of the Class A Common Stock applicable to one share of the Class A Common Stock (determined by reference to the definition of Last Reported Sale Price as set forth in Section 1.01 as if references therein to Class A Common Stock were to such Capital Stock or similar equity interest) over the first 10 consecutive Trading Day period after, and including, the effective date of the Spin- Off (the "**Valuation Period**"); and

$MP_0$     =    the average of the Last Reported Sale Prices of the Class A Common Stock over the Valuation Period.

The adjustment to the Conversion Rate under the preceding paragraph shall occur after the close of business on the last Trading Day of the Valuation Period; *provided* that in respect of any conversion during the Valuation Period, references in the portion of this Section 14.04(c) related to Spin- Offs to 10 Trading Days shall be deemed to be replaced with such lesser number of Trading Days as have elapsed between the effective date of such Spin- Off and the Conversion Date in determining the Conversion Rate.

For purposes of this Section 14.04(c) (and subject in all respect to Section 14.11), rights, options or warrants distributed by the Company to all holders of its Class A Common Stock entitling them to subscribe for or purchase shares of the Company's Capital Stock, including Class A Common Stock (either initially or under certain circumstances), which rights, options or warrants, until the occurrence of a specified event or events ("**Trigger Event**"): (i) are deemed to be transferred with such shares of the Class A Common Stock; (ii) are not exercisable; and (iii) are also issued in respect of future issuances of the Class A Common Stock, shall be deemed not to have been distributed for purposes of this Section 14.04(c) (and no adjustment to the Conversion Rate under this Section 14.04(c) will be required) until the occurrence of the earliest Trigger Event, whereupon such rights, options or warrants shall be deemed to have been distributed and an appropriate adjustment (if any is required) to the Conversion Rate shall be made under this Section 14.04(c). If any such right, option or warrant, including any such existing rights, options or warrants distributed prior to the date of this Indenture, are subject to events, upon the occurrence of which such rights, options or warrants become exercisable to purchase different securities, evidences of indebtedness or other assets, then the date of the occurrence of any and each such event shall be deemed to be the date of distribution and Ex- Dividend Date with respect to new rights, options or warrants with such rights (in which case the

60

existing rights, options or warrants shall be deemed to terminate and expire on such date without exercise by any of the holders thereof). In addition, in the event of any distribution (or deemed distribution) of rights, options or warrants, or any Trigger Event or other event (of the type described in the immediately preceding sentence) with respect thereto that was counted for purposes of calculating a distribution amount for which an adjustment to the Conversion Rate under this Section 14.04(c) was made, (1) in the case of any such rights, options or warrants that shall all have been redeemed or purchased without exercise by any holders thereof, upon such final redemption or purchase (x) the Conversion Rate shall be readjusted as if such rights, options or warrants had not been issued and (y) the Conversion Rate shall then again be readjusted to give effect to such distribution, deemed distribution or Trigger Event, as the case may be, as though it were a cash distribution, equal to the per share redemption or purchase price received by a holder or holders of Class A Common Stock with respect to such rights, options or warrants (assuming such holder had retained such rights, options or warrants), made to all holders of Class A Common Stock as of the date of such redemption or purchase, and (2) in the case of such rights, options or warrants that shall have expired or been terminated without exercise by any holders thereof, the Conversion Rate shall be readjusted as if such rights, options and warrants had not been issued.

For purposes of Section 14.04(a), Section 14.04(b) and this Section 14.04(c), any dividend or distribution to which this Section 14.04(c) is applicable that also includes one or both of:

(A) a dividend or distribution of shares of Class A Common Stock to which Section 14.04(a) is applicable (the "**Clause A Distribution**"); or

(B) a dividend or distribution of rights, options or warrants to which Section 14.04(b) is applicable (the "**Clause B Distribution**"),

then (1) such dividend or distribution, other than the Clause A Distribution and the Clause B Distribution, shall be deemed to be a dividend or distribution to which this Section 14.04(c) is applicable (the "**Clause C Distribution**") and any Conversion Rate adjustment required by this Section 14.04(c) with respect to such Clause C Distribution shall then be made, and (2) the Clause A Distribution and Clause B Distribution shall be deemed to immediately follow the Clause C Distribution and any Conversion Rate adjustment required by Section 14.04(a) and Section 14.04(b) with respect thereto shall then be made, except that, if determined by the Company (I) the "Ex- Dividend Date" of the Clause A Distribution and the Clause B Distribution shall be deemed to be the Ex- Dividend Date of the Clause C Distribution and (II) any shares of Class A Common Stock included in the Clause A Distribution or Clause B Distribution shall be deemed not to be "outstanding immediately prior to the open of business on such Ex- Dividend Date or effective date" within the meaning of Section 14.04(a) or "outstanding immediately prior to the open of business on such Ex- Dividend Date" within the meaning of Section 14.04(b).

(d) If any cash dividend or distribution is made to all or substantially all holders of the Class A Common Stock other than a regular quarterly cash dividend that does not exceed $0.06 per share (the "**Initial Dividend Threshold**") (subject to adjustment as provided below), the Conversion Rate shall be increased based on the following formula:

$$CR_1 = CR_0 \times \frac{(SP_0 - T)}{(SP_0 - C)}$$

61

where,

$CR_0$    =    the Conversion Rate in effect immediately prior to the open of business on the Ex- Dividend Date for such dividend or distribution;

$CR_1$    =    the Conversion Rate in effect immediately after the open of business on the Ex- Dividend Date for such dividend or distribution;

$SP_0$    =    the average of the Last Reported Sale Prices of the Class A Common Stock over the 10 consecutive Trading Day period ending on and including, the Trading Day immediately preceding the the Ex- Dividend Date for such dividend or distribution (or, if the Company declares such dividend or distribution less than 11 Trading Days prior to such Ex- Dividend Date, 10 shall be replaced with a smaller number of Trading Days that will have occurred after, and not including, such declaration date and prior to, but not including, such Ex- Dividend Date);

T    =    the Initial Dividend Threshold; *provided* that if the dividend or distribution in question is not a regular, quarterly cash dividend, the Initial Dividend Threshold will be deemed to be zero; and

C    =    the amount in cash per share the Company distributes to holders of its Class A Common Stock.

The Initial Dividend Threshold is subject to concurrent adjustment in a manner inversely proportional to adjustments to the Conversion Rate, *provided* that no adjustment will be made to the Initial Dividend Threshold for any adjustment to the Conversion Rate pursuant to this Section 14.04(d).

Any increase pursuant to this Section 14.04(d) shall become effective immediately after the open of business on the Ex- Dividend Date for such dividend or distribution. If such dividend or distribution is not so paid, the Conversion Rate shall be decreased, effective as of the date the Board of Directors determines not to make or pay such dividend or distribution, to the Conversion Rate that would then be in effect if such dividend or distribution had not been declared.

Notwithstanding the foregoing, if "C" (as defined above) is equal to or greater than "$SP_0$" (as defined above), in lieu of the foregoing increase, each Holder of a Note shall receive, for each \$1,000 principal amount of Notes, at the same time and upon the same terms as holders of shares of the Class A Common Stock, the amount of cash that such Holder would have received if such Holder owned a number of shares of Class A Common Stock equal to the Conversion Rate on the Ex- Dividend Date for such cash dividend or distribution.

(e) If the Company or any of its Subsidiaries make a payment in respect of a tender or exchange offer for the Class A Common Stock, to the extent that the cash and value of any

62

other consideration included in the payment per share of the Class A Common Stock exceeds the average of the Last Reported Sale Prices of the Class A Common Stock over the 10 consecutive Trading Day period commencing on, and including, the Trading Day next succeeding the last date on which tenders or exchanges may be made pursuant to such tender or exchange offer (such date, the "**Expiration Date**"), the Conversion Rate shall be increased based on the following formula:

$$CR_1 = CR_0 \times \frac{(AC + (SP_1 \times OS_1))}{(OS_0 \times SP_1)}$$

where,

$CR_0$ = the Conversion Rate in effect immediately prior to the open of business on the Trading Day next succeeding the Expiration Date;

$CR_1$ = the Conversion Rate in effect immediately after the open of business on the Trading Day next succeeding the Expiration Date;

AC = the aggregate value of all cash and any other consideration (as determined by the Board of Directors) paid or payable for shares of Class A Common Stock purchased in such tender or exchange offer;

$OS_0$ = the number of shares of Class A Common Stock outstanding immediately prior to the time (the "**Expiration Time**") such tender or exchange offer expires (prior to giving effect to the purchase of all shares of Class A Common Stock accepted for purchase or exchange in such tender or exchange offer);

$OS_1$ = the number of shares of Class A Common Stock outstanding immediately after the Expiration Time (after giving effect to the purchase of all shares of Class A Common Stock accepted for purchase or exchange in such tender or exchange offer); and

$SP_1$ = the average of the Last Reported Sale Prices of the Class A Common Stock over the 10 consecutive Trading Day period commencing on, and including, the Trading Day next succeeding the Expiration Date.

The adjustment to the Conversion Rate under this Section 14.04(e) shall occur at the close of business on the 10th consecutive Trading Day immediately following, and including, the Trading Day next succeeding the Expiration Date; *provided* that in respect of any conversion within the 10 Trading Days immediately following, and including, the Expiration Date of any tender or exchange offer, references in this Section 14.04(e) with respect to 10 Trading Days shall be deemed replaced with such lesser number of Trading Days as have elapsed between such Expiration Date and the Conversion Date in determining the Conversion Rate.

If the Company is obligated to purchase shares pursuant to any such tender or exchange offer, but the Company is permanently prevented by applicable law from effecting all or any such purchases or all or any portion of such purchases are rescinded, the Conversion Rate shall be decreased to the Conversion Rate that would then be in effect if such tender or exchange offer had been made only in respect of the purchases actually effected.

(f) If the application of the formulas in clauses (a), (b), (c), (d) and (e) of this Section 14.04 would result in a decrease in the Conversion Rate, no adjustment to the Conversion Rate will be made (other than as a result of a reverse share split or share combination). In no event will the Company adjust the Conversion Rate to the extent that the adjustment would reduce the Conversion Price below the par value per share of the Class A Common Stock. In no event shall the Conversion Rate per $1,000 principal amount of the Notes exceed 70.6214 shares of Class A Common Stock, subject to adjustment in the same manner as the Conversion Rate as set forth in this Section 14.04.

(g) All calculations and other determinations under this Article 14 shall be made by the Company and shall be made to the nearest one- ten thousandth (1/10,000) of a share.

(h) In addition to those adjustments required by clauses (a), (b), (c), (d) and (e) of this Section 14.04, and to the extent permitted by applicable law and subject to the applicable rules of The New York Stock Exchange, the Company from time to time may increase the Conversion Rate by any amount for a period of at least 20 Business Days if the Board of Directors determines that such increase would be in the Company's best interest. In addition, the Company may (but is not required to) increase the Conversion Rate to avoid or diminish any income tax to holders of Class A Common Stock or rights to purchase shares of Class A Common Stock in connection with a dividend or distribution of shares of Class A Common Stock (or rights to acquire shares of Class A Common Stock) or similar event. Whenever the Conversion Rate is increased pursuant to either of the preceding two sentences, the Company shall mail to the Holder of each Note at its last address appearing on the Note Register a notice of the increase at least 15 days prior to the date the increased Conversion Rate takes effect, and such notice shall state the increased Conversion Rate and the period during which it will be in effect.

(i) Except as stated herein, the Company shall not adjust the Conversion Rate for the issuance of shares of its Class A Common Stock or any securities convertible into or exchangeable for shares of its Class A Common Stock or the right to purchase shares of its Class A Common Stock or such convertible or exchangeable securities. In addition, notwithstanding anything to the contrary in this Article 14, the Conversion Rate shall not be adjusted:

(i) upon the issuance of any shares of Class A Common Stock pursuant to any present or future plan providing for the reinvestment of dividends or interest payable on the Company's securities and the investment of additional optional amounts in shares of Class A Common Stock under any plan;

(ii) for stock repurchases that are not tender or exchange offers referred to in Section 14.04(e), including structured or derivative transactions

64

(iii) upon the issuance of any shares of Class A Common Stock or options or rights to purchase those shares pursuant to any present or future employee, director or consultant benefit plan or program of or assumed by the Company or any of the Company's Subsidiaries;

(iv) upon the issuance of any shares of the Class A Common Stock pursuant to any option, warrant, right or exercisable, exchangeable or convertible security not described in clause (iii) of this subsection and outstanding as of the date the Notes were first issued;

(v) solely for a change in the par value of the Class A Common Stock;

(vi) upon any exchange of units of FXCM Holdings, LLC for shares of Class A Common Stock; or

(j) [Reserved].

(k) Whenever the Conversion Rate is adjusted as herein provided, the Company shall promptly file with the Trustee (and the Conversion Agent if not the Trustee) an Officer's Certificate setting forth the Conversion Rate after such adjustment and setting forth a brief statement of the facts requiring such adjustment. Unless and until a Responsible Officer of the Trustee shall have received such Officer's Certificate, the Trustee shall not be deemed to have knowledge of any adjustment of the Conversion Rate and may assume without inquiry that the last Conversion Rate of which it has knowledge is still in effect. Promptly after delivery of such certificate, the Company shall prepare a notice of such adjustment of the Conversion Rate setting forth the adjusted Conversion Rate and the date on which each adjustment becomes effective and shall mail such notice of such adjustment of the Conversion Rate to each Holder at its last address appearing on the Note Register of this Indenture. Failure to deliver such notice shall not affect the legality or validity of any such adjustment.

(l) For purposes of this Section 14.04, the number of shares of Class A Common Stock at any time outstanding shall not include shares held in the treasury of the Company so long as the Company does not pay any dividend or make any distribution on shares of Class A Common Stock held in the treasury of the Company, but shall include shares issuable in respect of scrip certificates issued in lieu of fractions of shares of Class A Common Stock.

(m) If the Conversion Rate is adjusted pursuant to this Indenture, to the extent such adjustment results in a constructive distribution to beneficial owners of Notes under Section 305 of the Code with respect to which the Company is obligated to deduct and withhold a tax under the Code, the Company may, to the extent of the withholding tax obligations required by United States law, recoup or set- off such liability against any payments (whether in cash or Class A Common Stock) subsequently made with respect to the Notes (or any Class A Common Stock received upon conversion thereof) to such beneficial owners.

Section 14.05. *Adjustments of Prices.* Whenever any provision of this Indenture requires the Company to calculate the Last Reported Sale Prices, the Daily VWAPs, the Daily Conversion

65

Values or the Daily Settlement Amounts over a span of multiple days (including an Observation Period and the period for determining the Stock Price for purposes of a Make- Whole Fundamental Change), the Board of Directors shall make appropriate adjustments to each to account for any adjustment to the Conversion Rate that becomes effective, or any event requiring an adjustment to the Conversion Rate where the Ex- Dividend Date of the event occurs, at any time during the period when the Last Reported Sale Prices, the Daily VWAPs, the Daily Conversion Values or the Daily Settlement Amounts are to be calculated.

Section 14.06. *Shares to Be Fully Reserved.* The Company shall reserve, out of its authorized but unissued shares or shares held in treasury, sufficient shares of Class A Common Stock to provide for conversion of the Notes from time to time as such Notes are presented for conversion (assuming that at the time of computation of such number of shares, all such Notes would be converted by a single Holder).

Section 14.07. *Effect of Recapitalizations, Reclassifications and Changes of the Class A Common Stock.* (a) In the case of:

(i) any recapitalization, reclassification or change of the Class A Common Stock (other than changes resulting from a subdivision or combination);

(ii) any consolidation, merger or combination involving the Company, or any statutory share exchange; or

(iii) any sale, lease or other transfer to a third party of all or substantially all of the consolidated assets of the Company and the Company's Subsidiaries, in each case, as a result of which the Class A Common Stock would be converted into, or exchanged for cash, securities or other assets (including any combination thereof) (any such event, a "**Share Exchange Event**" and any such cash, securities or other assets (including any combination thereof, "**Reference Property**" and the amount of Reference Property that a holder of one share of the Class A Common Stock immediately prior to such transaction would have been entitled to receive upon the occurrence of such transaction, a "**Unit of Reference Property**"), then the Company, or the successor or purchasing company, as the case may be, will execute with the Trustee, without the consent of the Holders, a supplemental indenture providing that, at and after the effective time of the transaction, the right to convert each $1,000 principal amount of Notes into cash and, if applicable, shares of the Class A Common Stock will be changed into a right to convert such principal amount of Notes into cash and, if applicable, Units of Reference Property; *provided*, *however*, that at and after the effective time of the Share Exchange Event, the Conversion Obligation shall be calculated and settled in accordance with Section 14.02 such that (A) the amount payable in cash upon conversion of the Notes as set forth under Section 14.02 shall continue to be payable in cash, (B) the number of shares of Class A Common Stock otherwise deliverable upon conversion of the Notes in accordance with Section 14.02 shall instead be deliverable in the amount and type of Reference Property, if any (subject to the obligor's right to pay cash in lieu of all or a portion of such units of Reference Property), that a holder of that number of shares of Class A Common Stock would have been entitled to receive in such Share Exchange Event and (C) the Daily VWAP shall be calculated based on the value of a unit of Reference Property; *provided further, however*, that if the Holders receive only

66

cash in such transaction, then for all conversions that occur after the effective date of such transaction (i) the consideration due upon conversion of each $1,000 principal amount of Notes shall be solely cash in an amount equal to the Conversion Rate in effect on the Conversion Date (subject to adjustment as described in this Section 14.03), multiplied by the price paid per share of Class A Common Stock in such transaction and (ii) settlement shall occur on the third Business Day immediately following the Conversion Date.

If the Share Exchange Event causes the Class A Common Stock to be converted into, or exchanged for, the right to receive more than a single type of consideration (determined based in part upon any form of stockholder election), then the Reference Property used to calculate the Daily VWAP shall be deemed to be the weighted average of the types and amounts of consideration received by the holders of Class A Common Stock that affirmatively make such an election. The Company shall notify Holders, the Trustee and the Conversion Agent (if other than the Trustee) of such weighted average as soon as practicable after such determination is made.

Such supplemental indenture described in the second immediately preceding paragraph shall provide for adjustments that shall be as nearly equivalent as is possible to the adjustments provided for in this Article 14. The Initial Dividend Threshold shall be adjusted based on the number of shares of common stock, if any, comprising the Reference Property and, if applicable, the value of any non- stock consideration comprising the Reference Property. If the Reference Property is comprised solely of non- stock consideration, the Initial Dividend Threshold shall be zero.

If, in the case of any Share Exchange Event, the Reference Property includes securities or other assets (including any combination thereof) of a Person other than the successor or purchasing corporation, as the case may be, in such Share Exchange Event, then such supplemental indenture shall also be executed by such other Person and shall contain such additional provisions to protect the interests of the Holders of the Notes as the Board of Directors shall reasonably consider necessary by reason of the foregoing, including to the extent required by the Board of Directors and practicable the provisions providing for the purchase rights set forth in Article 15.

(b) In the event the Company shall execute a supplemental indenture pursuant to Section 14.07(a), the Company shall promptly file with the Trustee an Officer's Certificate briefly stating the reasons therefor, the kind or amount of cash, securities or other assets (including any combination thereof) that will comprise the Reference Property after any such Share Exchange Event, any adjustment to be made with respect thereto and that all conditions precedent have been complied with, and shall promptly mail notice thereof to all Holders. The Company shall cause notice of the execution of such supplemental indenture to be mailed to each Holder, at its address appearing on the Note Register provided for in this Indenture, within 20 days after execution thereof. Failure to deliver such notice shall not affect the legality or validity of such supplemental indenture.

(c) The Company shall not become a party to any Share Exchange Event unless its terms are consistent with this Section 14.07. None of the foregoing provisions shall affect the right of a holder of Notes to convert its Notes into cash and shares of Class A Common Stock, if any, (subject to the Company's right to deliver cash in lieu of all or a portion of such shares) as set forth in Section 14.01 and Section 14.02 prior to the effective date of such Share Exchange Event.

(d) The above provisions of this Section shall similarly apply to successive Share Exchange Events.

67

Section 14.08. *Certain Covenants.*

(a) The Company covenants that all shares of Class A Common Stock issued upon conversion of Notes will be fully paid and non- assessable by the Company and free from all preemptive rights and taxes, liens and charges with respect to the issue thereof.

(b) The Company covenants that, if any shares of Class A Common Stock to be provided for the purpose of conversion of Notes hereunder require registration with or approval of any governmental authority under any federal or state law before such shares may be validly issued upon conversion, the Company shall, to the extent then permitted by the rules and interpretations of the Commission, secure such registration or approval, as the case may be.

(c) The Company further covenants that if at any time the Class A Common Stock shall be listed on any national securities exchange or automated quotation system the Company will list and keep listed, so long as the Class A Common Stock shall be so listed on such exchange or automated quotation system, any Class A Common Stock issuable upon conversion of the Notes.

Section 14.09. *Responsibility of Trustee.* The Trustee and any other Conversion Agent shall not at any time be under any duty or responsibility to any Holder to determine the Conversion Rate (or any adjustment thereto) or whether any facts exist that may require any adjustment (including any increase) of the Conversion Rate, or with respect to the nature or extent or calculation of any such adjustment when made, or with respect to the method employed, or herein or in any supplemental indenture provided to be employed, in making the same. The Trustee and any other Conversion Agent shall not be accountable with respect to the validity or value (or the kind or amount) of any shares of Class A Common Stock, or of any securities, property or cash that may at any time be issued or delivered upon the conversion of any Note; and the Trustee and any other Conversion Agent make no representations with respect thereto. Neither the Trustee nor any Conversion Agent shall be responsible for any failure of the Company to issue, transfer or deliver any shares of Class A Common Stock or stock certificates or other securities or property or cash upon the surrender of any Note for the purpose of conversion or to comply with any of the duties, responsibilities or covenants of the Company contained in this Article. Without limiting the generality of the foregoing, neither the Trustee nor any Conversion Agent shall be under any responsibility to determine the correctness of any provisions contained in any supplemental indenture entered into pursuant to Section 14.07 relating either to the kind or amount of shares of stock or securities or property (including cash) receivable by Holders upon the conversion of their Notes after any event referred to in such Section 14.07 or to any adjustment to be made with respect thereto, but, subject to the provisions of Section 7.01, may accept (without any independent investigation) as conclusive evidence of the correctness of any such provisions, and shall be protected in relying upon, the Officer's Certificate (which the Company shall be obligated to file with the Trustee prior to the execution of any such

68

supplemental indenture) with respect thereto. Neither the Trustee nor the Conversion Agent shall be responsible for determining whether any event contemplated by Section 14.01(b) has occurred that makes the Notes eligible for conversion or no longer eligible therefor until the Company has delivered to the Trustee and the Conversion Agent the notices referred to in Section 14.01(b) with respect to the commencement or termination of such conversion rights, on which notices the Trustee and the Conversion Agent may conclusively rely, and the Company agrees to deliver such notices to the Trustee and the Conversion Agent immediately after the occurrence of any such event or at such other times as shall be provided for in Section 14.01(b).

Section 14.10. *Notice to Holders Prior to Certain Actions*. In case of any:

(a) action by the Company or one of its Subsidiaries that would require an adjustment in the Conversion Rate pursuant to Section 14.04 or Section 14.11;

(b) Share Exchange Event; or

(c) voluntary or involuntary dissolution, liquidation or winding- up of the Company or any of its Subsidiaries;

then, in each case (unless notice of such event is otherwise required pursuant to another provision of this Indenture), the Company shall cause to be filed with the Trustee and the Conversion Agent (if other than the Trustee) and to be mailed to each Holder at its address appearing on the Note Register, as promptly as possible but in any event at least 20 days prior to the applicable date hereinafter specified, a notice stating (i) the date on which a record is to be taken for the purpose of such action by the Company or one of its Subsidiaries or, if a record is not to be taken, the date as of which the holders of Class A Common Stock of record are to be determined for the purposes of such action by the Company or one of its Subsidiaries, or (ii) the date on which such Share Exchange Event, dissolution, liquidation or winding- up is expected to become effective or occur, and the date as of which it is expected that holders of Class A Common Stock of record shall be entitled to exchange their Class A Common Stock for securities or other property deliverable upon such Share Exchange Event, dissolution, liquidation or winding- up. Failure to give such notice, or any defect therein, shall not affect the legality or validity of such action by the Company or one of its Subsidiaries, Share Exchange Event, dissolution, liquidation or winding- up.

Section 14.11. *Stockholder Rights Plans.* To the extent that the Company has a rights plan in effect upon conversion of the Notes, each share of Class A Common Stock, if any, issued upon such conversion shall be entitled to receive the appropriate number of rights, if any, and the certificates representing the Class A Common Stock issued upon such conversion shall bear such legends, if any, in each case as may be provided by the terms of any such stockholder rights plan, as the same may be amended from time to time. If at the time of conversion, however, the rights have separated from the shares of Class A Common Stock in accordance with the provisions of the applicable stockholder rights plan so that the Holders would not be entitled to receive any rights in respect of Class A Common Stock, if any, issuable upon conversion of the Notes, the Conversion Rate shall be adjusted at the time of separation as if the Company distributed to all or substantially all holders of Class A Common Stock Distributed Property as provided in Section 14.04(c), subject to readjustment in the event of the expiration, termination or redemption of such rights.

ARTICLE 15

PURCHASE OF NOTES AT OPTION OF HOLDERS

Section 15.01. *Intentionally Omitted.*

Section 15.02. *Purchase at Option of Holders Upon a Fundamental Change.* (a) If a Fundamental Change occurs at any time prior to the Maturity Date, each Holder shall have the right, at such Holder's option, to require the Company to purchase for cash all of such Holder's Notes, or any portion thereof that is equal to $1,000 or an integral multiple of $1,000 in excess thereof, on the date (the "**Fundamental Change Purchase Date**") specified by the Company that is not less than 20 calendar days or more than 35 calendar days following the date of the Fundamental Change Company Notice at a purchase price equal to 100% of the principal amount thereof, *plus* accrued and unpaid interest thereon to, but not including, the Fundamental Change Purchase Date (the "**Fundamental Change Purchase Price**"), unless the Fundamental Change Purchase Date falls after a Regular Record Date but on or prior to the Interest Payment Date to which such Regular Record Date relates, in which case the Company shall instead pay the full amount of accrued and unpaid interest to Holders of record as of such Regular Record Date, and the Fundamental Change Purchase Price shall be equal to 100% of the principal amount of Notes to be purchased pursuant to this Article 15.

(b) Purchases of Notes under this Section 15.02 shall be made, at the option of the Holder thereof, upon:

(i) delivery to the Paying Agent by a Holder of a duly completed notice (the "**Fundamental Change Purchase Notice**") in the form set forth in Attachment 2 to the Form of Note attached hereto as Exhibit A, if the Notes are Physical Notes, or in compliance with the Depositary's procedures for surrendering interests in Global Notes, if the Notes are Global Notes, in each case on or before the close of business on the Business Day immediately preceding the Fundamental Change Purchase Date; and

(ii) delivery of the Notes, if the Notes are Physical Notes, to the Paying Agent on or before the close of business on the Business Day immediately preceding the Fundamental Change Purchase Date (together with all necessary endorsements for transfer) at the Corporate Trust Office of the Paying Agent, or book- entry transfer of the Notes, if the Notes are Global Notes, in compliance with the procedures of the Depositary, in each case such delivery being a condition to receipt by the Holder of the Fundamental Change Purchase Price therefor.

The Fundamental Change Purchase Notice in respect of any Notes to be repurchased shall state:

A. in the case of Physical Notes, the certificate numbers of the Notes to be delivered for purchase;

70

B. the portion of the principal amount of Notes to be purchased, which must be $1,000 or a multiple thereof; and

C. that the Notes are to be purchased by the Company pursuant to the applicable provisions of the Notes and this Indenture;

*provided*, *however*, that if the Notes are Global Notes, the Fundamental Change Purchase Notice must comply with appropriate procedures of the Depositary.

Notwithstanding anything herein to the contrary, any Holder delivering to the Paying Agent the Fundamental Change Purchase Notice contemplated by this Section 15.02 shall have the right to withdraw, in whole or in part, such Fundamental Change Purchase Notice at any time prior to the close of business on the Business Day immediately preceding the Fundamental Change Purchase Date by delivery of a written notice of withdrawal to the Paying Agent in accordance with Section 15.03.

If a Holder has delivered a Fundamental Change Purchase Notice with respect to a Note, such Holder may not surrender such Note for conversion until such Holder has validly withdrawn such Fundamental Change Purchase Notice in accordance with Section 15.03.

The Paying Agent shall promptly notify the Company of the receipt by it of any Fundamental Change Purchase Notice or written notice of withdrawal thereof.

(c) On or before the 20th calendar day after the occurrence of the effective date of a Fundamental Change, the Company shall provide to all Holders of Notes and the Trustee and the Paying Agent (in the case of a Paying Agent other than the Trustee) a notice (the "**Fundamental Change Company Notice**") of the occurrence of the Fundamental Change and of the purchase right at the option of the Holders arising as a result thereof. Such notice shall be by first class mail or, in the case of Global Notes, in accordance with the applicable procedures of the Depositary. Simultaneously with providing such notice, the Company shall publish a notice containing the information set forth in the Fundamental Change Company Notice or on the Company's website or through a press release or such other public medium as the Company may use at that time. Each Fundamental Change Company Notice shall specify:

(i) the events causing the Fundamental Change;

(ii) the date of the Fundamental Change;

(iii) the last date on which a Holder may exercise the purchase right pursuant to this Article 15;

(iv) the Fundamental Change Purchase Price;

(v) the Fundamental Change Purchase Date;

(vi) the name and address of the Paying Agent and the Conversion Agent;

(vii) the Conversion Rate and any adjustments to the Conversion Rate;

(viii) if applicable, that the Notes with respect to which a Fundamental Change Purchase Notice has been delivered by a Holder may be converted only if the Holder withdraws the Fundamental Change Purchase Notice in accordance with the terms of this Indenture; and

(ix) the procedures that Holders must follow to require the Company to purchase their Notes.

No failure of the Company to give the foregoing notices and no defect therein shall limit the Holders' purchase rights or affect the validity of the proceedings for the purchase of the Notes pursuant to this Section 15.02.

At the Company's written request, the Trustee shall give such notice in the Company's name and at the Company's expense; *provided*, *however*, that, in all cases, the text of such Fundamental Change Company Notice shall be prepared by the Company.

(d) Notwithstanding the foregoing, no Notes may be purchased by the Company on any date at the option of the Holders upon a Fundamental Change if the principal amount of the Notes has been accelerated, and such acceleration has not been rescinded, on or prior to such date (except in the case of an acceleration resulting from a Default by the Company in the payment of the Fundamental Change Purchase Price with respect to such Notes). The Paying Agent will promptly return to the respective Holders thereof any Physical Notes held by it during the acceleration of the Notes (except in the case of an acceleration resulting from a Default by the Company in the payment of the Fundamental Change Purchase Price with respect to such Notes), or any instructions for book- entry transfer of the Notes in compliance with the procedures of the Depositary shall be deemed to have been cancelled, and, upon such return or cancellation, as the case may be, the Fundamental Change Purchase Notice with respect thereto shall be deemed to have been withdrawn.

(e) Notwithstanding the foregoing, the Company will not be required to make an offer to purchase Notes upon a Fundamental Change if a third party makes such an offer in the manner and at the times required and otherwise in compliance with the requirements for an offer made by the Company pursuant to this Article 15 and such third party purchases all Notes validly tendered and not validly withdrawn under its offer.

Section 15.03. *Withdrawal of Fundamental Change Purchase Notice.* A Fundamental Change Purchase Notice may be withdrawn (in whole or in part) by means of a written notice of withdrawal delivered to the Paying Agent in accordance with this Section 15.03 at any time prior to the close of business on the Business Day immediately preceding the Fundamental Change Purchase Date, specifying:

(a) the principal amount of the Notes with respect to which such notice of withdrawal is being submitted,

(b) if Physical Notes have been issued, the certificate number of the Note in respect of which such notice of withdrawal is being submitted, and

(c) the principal amount, if any, of such Note that remains subject to the original Fundamental Change Purchase Notice, which portion must be in principal amounts of $1,000 or an integral multiple of $1,000 in excess thereof;

*provided*, *however*, that if the Notes are Global Notes, the withdrawal notice must comply with appropriate procedures of the Depositary.

Section 15.04. *Deposit of Fundamental Change Purchase Price*. (a) The Company will deposit with the Trustee (or other Paying Agent appointed by the Company, or if the Company is acting as its own Paying Agent, set aside, segregate and hold in trust as provided in Section 4.04) on or prior to 11:00 a.m., New York City time, on the Fundamental Change Purchase Date an amount of money sufficient to purchase all of the Notes to be purchased at the appropriate Fundamental Change Purchase Price. Subject to receipt of funds by the Trustee (or other Paying Agent appointed by the Company), payment for Notes surrendered for purchase (and not validly withdrawn prior to the close of business on the Business Day immediately preceding the Fundamental Change Purchase Date) will be made on the later of (i) the Fundamental Change Purchase Date with respect to such Note (*provided* the Holder has satisfied the conditions in Section 15.02) and (ii) the time of book- entry transfer or the delivery of such Note to the Trustee (or other Paying Agent appointed by the Company) by the Holder thereof in the manner required by Section 15.02, by mailing checks for the amount payable to the Holders of such Notes entitled thereto as they shall appear in the Note Register; *provided*, *however*, that payments to the Depositary shall be made by wire transfer of immediately available funds to the account of the Depositary or its nominee. The Trustee shall, promptly after such payment and upon written demand by the Company, return to the Company any funds in excess of the Fundamental Change Purchase Price

(b) If by 11:00 a.m. New York City time, on the Fundamental Change Purchase Date, the Trustee (or other Paying Agent appointed by the Company) holds money sufficient to make payment on all the Notes or portions thereof that are to be purchased on such Fundamental Change Purchase Date, then, with respect to Notes that have been properly tendered and not validly withdrawn, (i) such Notes shall cease to be outstanding, (ii) interest shall cease to accrue on such Notes (whether or not book- entry transfer of the Notes has been made or the Notes have been delivered to the Trustee or Paying Agent) and (iii) all other rights of the Holders of such Notes will terminate (other than (x) the right to receive the Fundamental Change Purchase Price) or (y) if the Fundamental Change Purchase Date falls after a Regular Record Date but on or prior to the related Interest Payment Date, the right of the Holder on such Regular Record Date to receive the related interest payment).

(c) Upon surrender of a Note that is to be purchased in part pursuant to Section 15.02, the Company shall execute and the Trustee shall authenticate and deliver to the Holder a new Note in an authorized denomination equal in principal amount to the unpurchased portion of the Note surrendered.

Section 15.05. *Covenant to Comply with Applicable Laws Upon Purchase of Notes*. In connection with any purchase offer, the Company will, if required:

(a) comply with the provisions of the tender offer rules under the Exchange Act that may then be applicable;

73

(b) file a Schedule TO or any successor or similar schedule required under the Exchange Act; and

(c) otherwise comply with all applicable federal and state securities laws in connection with any offer by the Company to purchase the Notes;

in each case, so as to permit the rights and obligations under this Article 15 to be exercised in the time and in the manner specified in this Article 15.

## ARTICLE 16
### No Optional Redemption

Section 16.01. *No Optional Redemption.* The Notes shall not be redeemable by the Company prior to the Maturity Date, and no sinking fund is provided for the Notes.

## ARTICLE 17
### Miscellaneous Provisions

Section 17.01. *Provisions Binding on Company's Successors.* All the covenants, stipulations, promises and agreements of the Company contained in this Indenture shall bind its successors and assigns whether so expressed or not.

Section 17.02. *Official Acts by Successor Corporation.* Any act or proceeding by any provision of this Indenture authorized or required to be done or performed by any board, committee or Officer of the Company shall and may be done and performed with like force and effect by the like board, committee or officer of any corporation or other entity that shall at the time be the lawful sole successor of the Company.

Section 17.03. *Addresses for Notices, Etc.* Any notice or demand that by any provision of this Indenture is required or permitted to be given or served by the Trustee or by the Holders on the Company shall be in writing (including facsimile and electronic mail in PDF format) and shall be deemed to have been sufficiently given or made, for all purposes if given or served by being deposited postage prepaid by registered or certified mail in a post office letter box addressed (until another address is filed by the Company with the Trustee) to FXCM Inc., 55 Water Street, FL 50, New York, New York 10041, Attention: General Counsel. Any notice, direction, request or demand hereunder to or upon the Trustee shall be in writing (including facsimile and electronic mail in PDF format) and shall be deemed to have been sufficiently given or made, for all purposes, if given or served by being deposited postage prepaid by registered or certified mail in a post office letter box addressed to the Corporate Trust Office.

The Trustee, by notice to the Company, may designate additional or different addresses for subsequent notices or communications.

74

Any notice or communication mailed to a Holder shall be mailed to it by first class mail, postage prepaid, at its address as it appears on the Note Register and shall be sufficiently given to it if so mailed within the time prescribed.

Failure to mail a notice or communication to a Holder or any defect in it shall not affect its sufficiency with respect to other Holders. If a notice or communication is mailed in the manner provided above, it is duly given, whether or not the addressee receives it.

In case by reason of the suspension of regular mail service or by reason of any other cause it shall be impracticable to give such notice to Holders by mail, then such notification as shall be made with the approval of the Trustee shall constitute a sufficient notification for every purpose hereunder.

In addition to the foregoing, the Trustee agrees to accept and act upon notice, instructions or directions pursuant to this Indenture sent by unsecured e-mail, facsimile transmission or other similar unsecured electronic methods. If the party elects to give the Trustee e- mail or facsimile instructions (or instructions by a similar electronic method) and the Trustee in its discretion elects to act upon such instructions, the Trustee's understanding of such instructions shall be deemed controlling. The Trustee shall not be liable for any losses, costs or expenses arising directly or indirectly from the Trustee's reliance upon and compliance with such instructions notwithstanding such instructions conflict or are inconsistent with a subsequent written instruction. The party providing electronic instructions agrees to assume all risks arising out of the use of such electronic methods to submit instructions and directions to the Trustee, including without limitation the risk of the Trustee acting on unauthorized instructions, and the risk or interception and misuse by third parties.

Section 17.04. *Governing Law.* THIS INDENTURE AND EACH NOTE, AND ANY CLAIM, CONTROVERSY OR DISPUTE ARISING UNDER OR RELATED TO THIS INDENTURE AND EACH NOTE, SHALL BE GOVERNED BY, AND CONSTRUED IN ACCORDANCE WITH, THE LAWS OF THE STATE OF NEW YORK.

Section 17.05. *Intentionally Omitted.*

Section 17.06. *Evidence of Compliance with Conditions Precedent; Certificates and Opinions of Counsel to Trustee.* Upon any application or demand by the Company to the Trustee to take any action under any of the provisions of this Indenture, the Company shall furnish to the Trustee an Officer's Certificate and Opinion of Counsel stating that in the opinion of the signors, all conditions precedent and covenants, if any, provided for in this Indenture relating to the proposed action have been satisfied.

Each Officer's Certificate and Opinion of Counsel provided for, by or on behalf of the Company in this Indenture and delivered to the Trustee with respect to compliance with this Indenture (other than the Officer's Certificates provided for in Section 4.08) shall include (i) a statement that the Person making such certificate has read such covenant or condition; (ii) a brief statement as to the nature and scope of the examination or investigation upon which the statement contained in such certificate is based; (iii) a statement that, in the judgment of such person, he or she has made such examination or investigation as is necessary to enable him or her

75

to express an informed judgment as to whether or not such covenant or condition has been complied with; and (iv) a statement as to whether or not, in the judgment of such Person, such covenant or condition has been complied with.

Notwithstanding anything to the contrary in this Section 17.06, if any provision in this Indenture specifically provides that the Trustee shall or may receive an Opinion of Counsel in connection with any action to be taken by the Trustee or the Company hereunder, the Trustee shall be entitled to such Opinion of Counsel.

Section 17.07. *Legal Holidays.* In any case where any Interest Payment Date, Fundamental Change Purchase Date, Conversion Date or Maturity Date is not a Business Day, then any action to be taken on such date need not be taken on such date, but may be taken on the next succeeding Business Day with the same force and effect as if taken on such date, and no interest shall accrue in respect of the delay.

Section 17.08. *No Security Interest Created.* Nothing in this Indenture or in the Notes, expressed or implied, shall be construed to constitute a security interest under the Uniform Commercial Code or similar legislation, as now or hereafter enacted and in effect, in any jurisdiction.

Section 17.09. *Benefits of Indenture.* Nothing in this Indenture or in the Notes, expressed or implied, shall give to any Person, other than the parties hereto, any Paying Agent, any Custodian, any Bid Solicitation Agent, any Conversion Agent, any authenticating agent, any Note Registrar and their successors hereunder or the Holders, any benefit or any legal or equitable right, remedy or claim under this Indenture.

Section 17.10. *Table of Contents, Headings, Etc.* The table of contents and the titles and headings of the articles and sections of this Indenture have been inserted for convenience of reference only, are not to be considered a part hereof, and shall in no way modify or restrict any of the terms or provisions hereof.

Section 17.11. *Authenticating Agent.* The Trustee may appoint an authenticating agent that shall be authorized to act on its behalf and subject to its direction in the authentication and delivery of Notes in connection with the original issuance thereof and transfers and exchanges of Notes hereunder, including under Section 2.04, Section 2.05, Section 2.06, Section 2.07, Section 10.04 and Section 15.04 as fully to all intents and purposes as though the authenticating agent had been expressly authorized by this Indenture and those Sections to authenticate and deliver Notes. For all purposes of this Indenture, the authentication and delivery of Notes by the authenticating agent shall be deemed to be authentication and delivery of such Notes "by the Trustee" and a certificate of authentication executed on behalf of the Trustee by an authenticating agent shall be deemed to satisfy any requirement hereunder or in the Notes for the Trustee's certificate of authentication. Such authenticating agent shall at all times be a Person eligible to serve as trustee hereunder pursuant to Section 7.08.

Any corporation or other entity into which any authenticating agent may be merged or converted or with which it may be consolidated, or any corporation or other entity resulting from any merger, consolidation or conversion to which any authenticating agent shall be a party, or

76

any corporation or other entity succeeding to all or substantially all the corporate trust business of any authenticating agent, shall be the successor of the authenticating agent hereunder, if such successor corporation or other entity is otherwise eligible under this Section 17.11, without the execution or filing of any paper or any further act on the part of the parties hereto or the authenticating agent or such successor corporation or other entity.

Any authenticating agent may at any time resign by giving written notice of resignation to the Trustee and to the Company. The Trustee may at any time terminate the agency of any authenticating agent by giving written notice of termination to such authenticating agent and to the Company. Upon receiving such a notice of resignation or upon such a termination, or in case at any time any authenticating agent shall cease to be eligible under this Section, the Trustee may appoint a successor authenticating agent (which may be the Trustee), shall give written notice of such appointment to the Company and shall mail notice of such appointment to all Holders as the names and addresses of such Holders appear on the Note Register.

The Company agrees to pay to the authenticating agent from time to time reasonable compensation for its services although the Company may terminate the authenticating agent, if it determines such agent's fees to be unreasonable.

The provisions of Section 7.02, Section 7.03, Section 7.04, Section 7.06, Section 8.03 and this Section 17.11 shall be applicable to any authenticating agent.

If an authenticating agent is appointed pursuant to this Section 17.11, the Notes may have endorsed thereon, in addition to the Trustee's certificate of authentication, an alternative certificate of authentication in the following form:

,

as Authenticating Agent, certifies that this is one of the Notes described
in the within- named Indenture.

By:
Authorized Officer

Section 17.12. *Execution in Counterparts.* This Indenture may be executed in any number of counterparts, each of which shall be an original, but such counterparts shall together constitute but one and the same instrument. The exchange of copies of this Indenture and of signature pages by facsimile or PDF transmission shall constitute effective execution and delivery of this Indenture as to the parties hereto and may be used in lieu of the original Indenture for all purposes. Signatures of the parties hereto transmitted by facsimile or PDF shall be deemed to be their original signatures for all purposes.

Section 17.13. *Severability.* In the event any provision of this Indenture or in the Notes shall be invalid, illegal or unenforceable, then (to the extent permitted by law) the validity, legality or enforceability of the remaining provisions shall not in any way be affected or impaired.

Section 17.14. *Waiver of Jury Trial; Submission of Jurisdiction.* EACH OF THE COMPANY AND THE TRUSTEE HEREBY IRREVOCABLY WAIVES, TO THE FULLEST EXTENT PERMITTED BY APPLICABLE LAW, ANY AND ALL RIGHT TO TRIAL BY JURY IN

77

ANY LEGAL PROCEEDING ARISING OUT OF OR RELATING TO THIS INDENTURE, THE NOTES OR THE TRANSACTIONS CONTEMPLATED HEREBY. THE COMPANY HEREBY IRREVOCABLY SUBMITS TO THE JURISDICTION OF ANY NEW YORK STATE COURT SITTING IN THE BOROUGH OF MANHATTAN IN THE CITY OF NEW YORK OR ANY FEDERAL COURT SITTING IN THE BOROUGH OF MANHATTAN IN THE CITY OF NEW YORK IN RESPECT OF ANY SUIT, ACTION OR PROCEEDING ARISING OUT OF OR RELATING TO THIS INDENTURE AND THE NOTES, AND IRREVOCABLY ACCEPTS FOR ITSELF AND IN RESPECT OF ITS PROPERTY, GENERALLY AND UNCONDITIONALLY, JURISDICTION OF THE AFORESAID COURTS.

Section 17.15. *Force Majeure.* In no event shall the Trustee be responsible or liable for any failure or delay in the performance of its obligations hereunder arising out of or caused by, directly or indirectly, forces beyond its control, including, without limitation, strikes, work stoppages, accidents, acts of war or terrorism, civil or military disturbances, nuclear or natural catastrophes or acts of God, and interruptions, loss or malfunctions of utilities, communications or computer (software and hardware) services; it being understood that the Trustee shall use reasonable efforts that are consistent with accepted practices in the banking industry to resume performance as soon as practicable under the circumstances.

Section 17.16. *Calculations*. Except as otherwise provided herein, the Company or its agents shall be responsible for making all calculations called for under the Notes or this Indenture. These calculations include, but are not limited to, determinations of the Last Reported Sale Prices of the Class A Common Stock, Daily Conversion Values, Daily Settlement Amounts, Daily VWAP, accrued interest payable on the Notes and the Conversion Rate of the Notes. The Company or its agents shall make all these calculations in good faith and, absent manifest error, the Company's calculations shall be final and binding on Holders of Notes. The Company or its agents shall provide a schedule of its calculations to each of the Trustee and the Conversion Agent, and each of the Trustee and Conversion Agent is entitled to rely conclusively upon the accuracy of the Company's calculations without independent verification. The Trustee will forward the Company's calculations to any Holder of Notes upon the written request of that Holder at the sole cost and expense of the Company. In no event shall the Trustee or the Conversion Agent be charged with knowledge of or have any duty to monitor Stock Price or Measurement Period.

Section 17.17. *U.S.A. Patriot Act.* The parties hereto acknowledge that in accordance with Section 326 of the U.S.A. Patriot Act, the Trustee, like all financial institutions and in order to help fight the funding of terrorism and money laundering, is required to obtain, verify, and record information that identifies each person or legal entity that establishes a relationship or opens an account with the Trustee. The parties to this Indenture agree that they will provide the Trustee with such information as is required to satisfy the requirements of the U.S.A. Patriot Act.

IN WITNESS WHEREOF, the parties hereto have caused this Indenture to be duly executed as of the date first written above.

FXCM INC.

By:          /s/ David S. Sassoon
              Name:        David S. Sassoon
              Title:         General Counsel

The Bank of New York Mellon, as Trustee

By:          /s/ Francine Kincaid
              Name:        Francine Kincaid
              Title:         Vice President

[*Signature Page to Indenture*]

**EXHIBIT A**

[FORM OF FACE OF NOTE]

[INCLUDE FOLLOWING LEGEND IF A GLOBAL NOTE]

[UNLESS THIS CERTIFICATE IS PRESENTED BY AN AUTHORIZED REPRESENTATIVE OF THE DEPOSITORY TRUST COMPANY, A NEW YORK CORPORATION ("DTC"), TO THE COMPANY OR ITS AGENT FOR REGISTRATION OF TRANSFER, EXCHANGE, OR PAYMENT, AND ANY CERTIFICATE ISSUED IS REGISTERED IN THE NAME OF CEDE & CO. OR IN SUCH OTHER NAME AS IS REQUESTED BY AN AUTHORIZED REPRESENTATIVE OF DTC (AND ANY PAYMENT IS MADE TO CEDE & CO. OR TO SUCH OTHER ENTITY AS IS REQUESTED BY AN AUTHORIZED REPRESENTATIVE OF DTC), ANY TRANSFER, PLEDGE, OR OTHER USE HEREOF FOR VALUE OR OTHERWISE BY OR TO ANY PERSON IS WRONGFUL INASMUCH AS THE REGISTERED OWNER HEREOF, CEDE & CO., HAS AN INTEREST HEREIN.]

[INCLUDE FOLLOWING LEGEND IF A RESTRICTED SECURITY]

[THIS SECURITY AND THE CLASS A COMMON STOCK, IF ANY, ISSUABLE UPON CONVERSION OF THIS SECURITY HAVE NOT BEEN REGISTERED UNDER THE SECURITIES ACT OF 1933, AS AMENDED (THE "SECURITIES ACT"), AND MAY NOT BE OFFERED, SOLD, PLEDGED OR OTHERWISE TRANSFERRED EXCEPT IN ACCORDANCE WITH THE FOLLOWING SENTENCE. BY ITS ACQUISITION HEREOF OR OF A BENEFICIAL INTEREST HEREIN, THE ACQUIRER:

(1) REPRESENTS THAT IT AND ANY ACCOUNT FOR WHICH IT IS ACTING IS A "QUALIFIED INSTITUTIONAL BUYER" (WITHIN THE MEANING OF RULE 144A UNDER THE SECURITIES ACT) AND THAT IT EXERCISES SOLE INVESTMENT DISCRETION WITH RESPECT TO EACH SUCH ACCOUNT, AND

(2) AGREES FOR THE BENEFIT OF FXCM INC. (THE "COMPANY") THAT IT WILL NOT OFFER, SELL, PLEDGE OR OTHERWISE TRANSFER THIS SECURITY OR ANY BENEFICIAL INTEREST HEREIN PRIOR TO THE DATE THAT IS THE LATER OF (X) ONE YEAR AFTER THE LAST ORIGINAL ISSUE DATE HEREOF OR SUCH OTHER PERIOD OF TIME AS PERMITTED BY RULE 144 UNDER THE SECURITIES ACT OR ANY SUCCESSOR PROVISION THERETO, AND (Y) SUCH LATER DATE, IF ANY, AS MAY BE REQUIRED BY APPLICABLE LAW, EXCEPT:

(A) TO THE COMPANY OR ANY SUBSIDIARY THEREOF, OR

(B) PURSUANT TO AN EFFECTIVE REGISTRATION STATEMENT OF THE COMPANY THAT COVERS THE RESALE OF THIS SECURITY OR SUCH CLASS A COMMON STOCK, OR

1

(C) TO A QUALIFIED INSTITUTIONAL BUYER IN COMPLIANCE WITH RULE 144A UNDER THE SECURITIES ACT, OR
(D) PURSUANT TO AN EXEMPTION FROM REGISTRATION PROVIDED BY RULE 144 UNDER THE SECURITIES ACT OR ANY OTHER AVAILABLE EXEMPTION FROM THE REGISTRATION REQUIREMENTS OF THE SECURITIES ACT.
PRIOR TO THE REGISTRATION OF ANY TRANSFER IN ACCORDANCE WITH (2)(D) ABOVE, THE COMPANY AND THE TRUSTEE RESERVE THE RIGHT TO REQUIRE THE DELIVERY OF SUCH LEGAL OPINIONS, CERTIFICATIONS OR OTHER EVIDENCE AS MAY REASONABLY BE REQUIRED IN ORDER TO DETERMINE THAT THE PROPOSED TRANSFER IS BEING MADE IN COMPLIANCE WITH THE SECURITIES ACT AND APPLICABLE STATE SECURITIES LAWS. NO REPRESENTATION IS MADE AS TO THE AVAILABILITY OF ANY EXEMPTION FROM THE REGISTRATION REQUIREMENTS OF THE SECURITIES ACT.]

2

FXCM Inc.
2.25% Convertible Senior Note due 2018

No. R- [    ]                                                                                           Initially $[    ]

CUSIP No. 302693 AA4

FXCM Inc., a corporation duly organized and validly existing under the laws of the State of Delaware (the "**Company**," which term includes any successor corporation or other entity under the Indenture referred to on the reverse hereof), for value received hereby promises to pay to CEDE & CO., or registered assigns, the principal amount of $[    ] or such other amount as reflected on the books and records of the Trustee and the Depositary, on June 15, 2018 and interest thereon as set forth below.

This Note shall bear interest at the rate of 2.25% per year from June 3, 2013 or from the most recent date to which interest had been paid or provided for to, but excluding, the next scheduled Interest Payment Date until June 15, 2018, unless earlier converted or purchased. Accrued interest on this Note shall be computed on the basis of a 360- day year composed of twelve 30- day months. Interest is payable semi- annually in arrears on each June 15 and December 15, commencing on December 15, 2013, to Holders of record at the close of business on the preceding June 1 and December 1 (whether or not such day is a Business Day), respectively. Additional Interest will be payable as set forth in Section 4.06(d), Section 4.06(e) and Section 6.03 of the within- mentioned Indenture, and any reference to interest on, or in respect of, any Note therein shall be deemed to include Additional Interest if, in such context, Additional Interest is, was or would be payable pursuant to any of such Section 4.06(d), Section 4.06(e) or Section 6.03 and any express mention of the payment of Additional Interest in any provision therein shall not be construed as excluding Additional Interest in those provisions thereof where such express mention is not made.

Any Defaulted Amounts shall accrue interest per annum at the rate borne by the Notes from, and including, the relevant payment date to, but excluding, the date on which such Defaulted Amounts shall have been paid by the Company, at its election, in accordance with Section 2.03(c) of the Indenture.

The Company shall pay the principal of and interest on this Note, so long as such Note is a Global Note, in immediately available funds to the Depositary or its nominee, as the case may be, as the registered Holder of such Note. As provided in and subject to the provisions of the Indenture, the Company shall pay the principal of any Notes (other than Notes that are Global Notes) at the office or agency designated by the Company for that purpose. The Company has initially designated the Trustee as its Paying Agent and Note Registrar in respect of the Notes and its agency in New York, New York as a place where Notes may be presented for payment or for registration of transfer.

Reference is made to the further provisions of this Note set forth on the reverse hereof, including, without limitation, provisions giving the Holder of this Note the right to convert this

3

Note into cash and shares of Class A Common Stock, if any (subject to the Company's right to deliver cash in lieu of all or a portion of such shares), on the terms and subject to the limitations set forth in the Indenture. Such further provisions shall for all purposes have the same effect as though fully set forth at this place.

**This Note, and any claim, controversy or dispute arising under or related to this Note, shall be construed in accordance with and governed by the laws of the State of New York.**

In the case of any conflict between this Note and the Indenture, the provisions of the Indenture shall control and govern.

This Note shall not be valid or become obligatory for any purpose until the certificate of authentication hereon shall have been manually signed by the Trustee or a duly authorized authenticating agent under the Indenture.

[Remainder of page intentionally left blank]

4

IN WITNESS WHEREOF, the Company has caused this Note to be duly executed.

FXCM Inc.

By:

Name:
Title:

Dated:

TRUSTEE'S CERTIFICATE OF AUTHENTICATION
The Bank of New York Mellon,
as Trustee, certifies that this is one of the Notes described
in the within- named Indenture.

By:

Authorized Signatory

5

[FORM OF REVERSE OF NOTE]
FXCM Inc.
2.25% Convertible Senior Note due 2018

This Note is one of a duly authorized issue of Notes of the Company, designated as its 2.25% Convertible Senior Notes due 2018 (the "**Notes**"), limited to the aggregate principal amount of $172,500,000 all issued under and pursuant to an Indenture dated as of June 3, 2013 (the "**Indenture**"), between the Company and The Bank of New York Mellon (the "**Trustee**"), to which Indenture and all indentures supplemental thereto reference is hereby made for a description of the rights, limitations of rights, obligations, duties and immunities thereunder of the Trustee, the Conversion Agent, the Company and the Holders of the Notes. Additional Notes may be issued in an unlimited aggregate principal amount, subject to certain conditions specified in the Indenture.

In case an Event of Default, as defined in the Indenture, shall have occurred and be continuing, the principal of, and interest on, all Notes may be declared, by either the Trustee or Holders of at least 25% in aggregate principal amount of Notes then outstanding, and upon said declaration shall become, due and payable, in the manner, with the effect and subject to the conditions and certain exceptions set forth in the Indenture.

Subject to the terms and conditions of the Indenture, the Company will make all payments and deliveries in respect of the Fundamental Change Purchase Price and the principal amount on the Maturity Date, as the case may be, to the Holder who surrenders a Note to a Paying Agent to collect such payments in respect of the Note. The Company will pay cash amounts in money of the United States that at the time of payment is legal tender for payment of public and private debts.

The Indenture contains provisions permitting the Company and the Trustee in certain circumstances, without the consent of the Holders of the Notes, and in certain other circumstances, with the consent of the Holders of not less than a majority in aggregate principal amount of the Notes at the time outstanding, evidenced as in the Indenture provided, to execute supplemental indentures modifying the terms of the Indenture and the Notes as described therein. It is also provided in the Indenture that, subject to certain exceptions, the Holders of a majority in aggregate principal amount of the Notes at the time outstanding may on behalf of the Holders of all of the Notes waive any past Default or Event of Default under the Indenture and its consequences.

No reference herein to the Indenture and no provision of this Note or of the Indenture shall alter or impair the obligation of the Company, which is absolute and unconditional, to pay the principal (including the Fundamental Change Purchase Price, if applicable) of or the consideration due upon conversion of, as the case may be, and accrued and unpaid interest on this Note at the place, at the respective times, at the rate and in the lawful money herein prescribed.

6

The Notes are issuable in registered form without coupons in denominations of $1,000 principal amount and integral multiples thereof. At the office or agency of the Company referred to on the face hereof, and in the manner and subject to the limitations provided in the Indenture, Notes may be exchanged for a like aggregate principal amount of Notes of other authorized denominations, without payment of any service charge but, if required by the Company or Trustee, with payment of a sum sufficient to cover any transfer or similar tax that may be imposed in connection therewith as a result of the name of the Holder of the new Notes issued upon such exchange of Notes being different from the name of the Holder of the old Notes surrendered for such exchange.

The Notes are not subject to redemption through the operation of any sinking fund or otherwise.

Upon the occurrence of a Fundamental Change, the Holder has the right, at such Holder's option, to require the Company to purchase for cash all of such Holder's Notes or any portion thereof (in principal amounts of $1,000 or integral multiples in excess thereof) on the Fundamental Change Purchase Date at a price equal to the Fundamental Change Purchase Price.

Subject to the provisions of the Indenture, the Holder hereof has the right, at its option, during certain periods and upon the occurrence of certain conditions specified in the Indenture, prior to the close of business on the second Scheduled Trading Day immediately preceding the Maturity Date, to convert any Notes or portion thereof that is $1,000 or an integral multiple in excess thereof, into cash and shares of Class A Common Stock, if any (subject to the Company's right to deliver cash in lieu of all or a portion of such shares), at the Conversion Rate specified in the Indenture, as adjusted from time to time as provided in the Indenture.

Terms used in this Note and defined in the Indenture are used herein as therein defined.

7

ABBREVIATIONS

The following abbreviations, when used in the inscription of the face of this Note, shall be construed as though they were written out in full according to applicable laws or regulations:

TEN COM = as tenants in common
UNIF GIFT MIN ACT = Uniform Gifts to Minors Act
CUST = Custodian
TEN ENT = as tenants by the entireties
JT TEN = joint tenants with right of survivorship and not as tenants in common
Additional abbreviations may also be used though not in the above list.

**ATTACHMENT 1**

[FORM OF NOTICE OF CONVERSION]

To: FXCM Inc.

The undersigned registered owner of this Note hereby exercises the option to convert this Note, or the portion hereof (that is $1,000 principal amount or an integral multiple in excess thereof) below designated, into cash and shares of Class A Common Stock, if any (subject to the Company's right to deliver cash in lieu of all or a portion of such shares), in accordance with the terms of the Indenture referred to in this Note, and directs that any cash payable and any shares of Class A Common Stock issuable and deliverable upon such conversion, together with any cash for any fractional share, and any Notes representing any unconverted principal amount hereof, be issued and delivered to the registered Holder hereof unless a different name has been indicated below. If any shares of Class A Common Stock or any portion of this Note not converted are to be issued in the name of a Person other than the undersigned, the undersigned will pay all documentary, stamp or similar issue or transfer taxes, if any in accordance with Section 14.02(d) and Section 14.02(e) of the Indenture. Any amount required to be paid to the undersigned on account of interest accompanies this Note.

Dated:

Signature(s)

8

Signature Guarantee

Signature(s) must be guaranteed by an eligible Guarantor Institution (banks, stock brokers, savings and loan associations and credit unions) with membership in an approved signature guarantee medallion program pursuant to Securities and Exchange Commission Rule 17Ad- 15 if shares of Class A Common Stock are to be issued, or Notes are to be delivered, other than to and in the name of the registered holder.

Fill in for registration of shares if to be issued, and Notes if to be delivered, other than to and in the name of the registered holder:

(Name)

(Street Address)

(City, State and Zip Code)
Please print name and address

Principal amount to be converted (if less than all): $        ,000

NOTICE: The above signature(s) of the Holder(s) hereof must correspond with the name as written upon the face of the Note in every particular without alteration or enlargement or any change whatever.

Social Security or Other Taxpayer
Identification Number

9

**ATTACHMENT 2**

[FORM OF FUNDAMENTAL CHANGE REPURCHASE NOTICE]

To: FXCM Inc.

The undersigned registered owner of this Note hereby acknowledges receipt of a notice from FXCM Inc. (the "**Company**") as to the occurrence of a Fundamental Change with respect to the Company and specifying the Fundamental Change Purchase Date and requests and instructs the Company to pay to the registered holder hereof in accordance with Section 15.02 of the Indenture referred to in this Note (1) the entire principal amount of this Note, or the portion thereof (that is $1,000 principal amount or an integral multiple in excess thereof) below designated, and (2) if such Fundamental Change Purchase Date does not fall during the period after a Regular Record Date and on or prior to the corresponding Interest Payment Date, accrued and unpaid interest, if any, thereon to, but excluding, such Fundamental Change Purchase Date.

In the case of Physical Notes, the certificate numbers of the Notes to be repurchased are as set forth below:

Dated:

Signature(s)

Social Security or Other Taxpayer
Identification Number

Principal amount to be repaid (if less than all): $          ,000

NOTICE: The above signature(s) of the Holder(s) hereof must correspond with the name as written upon the face of the Note in every particular without alteration or enlargement or any change whatever.

1

**ATTACHMENT 3**

[FORM OF ASSIGNMENT AND TRANSFER]

For value received        hereby sell(s), assign(s) and transfer(s) unto      (Please insert social security or Taxpayer Identification Number of assignee) the within Note, and hereby irrevocably constitutes and appoints     attorney to transfer the said Note on the books of the Company, with full power of substitution in the premises.

In connection with any transfer of the within Note occurring prior to the Resale Restriction Termination Date, as defined in the Indenture governing such Note, the undersigned confirms that such Note is being transferred:

❑ To FXCM Inc. or a subsidiary thereof; or

❑ Pursuant to a registration statement that has become or been declared effective under the Securities Act of 1933, as amended; or

❑ Pursuant to and in compliance with Rule 144A under the Securities Act of 1933, as amended; or

❑ Pursuant to and in compliance with Rule 144 under the Securities Act of 1933, as amended, or any other available exemption from the registration requirements of the Securities Act of 1933, as amended.

1

Dated:


Signature(s)

Signature Guarantee

Signature(s) must be guaranteed by an eligible Guarantor
Institution (banks, stockbrokers, savings and loan
associations and credit unions) with membership in an
approved signature guarantee medallion program pursuant to
Securities and Exchange Commission Rule 17Ad- 15 if
Notes are to be delivered, other than to and in the name of
the registered holder.
NOTICE: The signature on the assignment must correspond with the name as written upon the face of the Note in every particular without alteration or
enlargement or any change whatever.

2

**Exhibit 10.1**
EXECUTION VERSION

$150,000,000
**FXCM INC.**
**2.25% Convertible Senior Notes due June 15, 2018**
**PURCHASE AGREEMENT**

May 28, 2013

CREDIT SUISSE SECURITIES (USA) LLC
MERRILL LYNCH, PIERCE, FENNER & SMITH
    INCORPORATED
As Representatives of the Several Purchasers ("**Representatives**"),
c/o Credit Suisse Securities (USA) LLC,
    Eleven Madison Avenue
     New York, N.Y. 10010- 3629

Dear Sirs:

1. *Introductory.* FXCM Inc., a Delaware corporation (the "**Company**"), agrees with the several initial purchasers named in Schedule A hereto (the "**Purchasers**" and each, a "**Purchaser**"), subject to the terms and conditions stated herein, to issue and sell to the several Purchasers $150,000,000 principal amount of its 2.25% Convertible Senior Notes due June 15, 2018 (the "**Firm Securities**") and also agrees to sell to the Purchasers, at the option of the Purchasers, an aggregate of up to an additional $22,500,000 principal amount ("**Optional Securities**") of its 2.25% Convertible Senior Notes due June 15, 2018, each to be issued under an indenture, dated as of June 3, 2013 (the "**Indenture**"), between the Company and The Bank of New York Mellon, as trustee (the "**Trustee**"). The Firm Securities and the Optional Securities which the Purchasers may elect to purchase pursuant to Section 3 hereof are herein collectively called the "**Offered Securities**".

2. *Representations and Warranties of the Company.* The Company represents and warrants to, and agrees with, the several Purchasers that:

(i) *Offering Documents; Certain Defined Terms.* The Company has prepared or will prepare a Preliminary Offering Circular and a Final Offering Circular.

For purposes of this Agreement:

"**Applicable Time**" means 5:30 p.m. (Eastern time) on the date of this Agreement.

"**Closing Date**" has the meaning defined in Section 3 hereof.

"**Commission**" means the Securities and Exchange Commission.

"**Exchange Act**" means the United States Securities Exchange Act of 1934, as amended.

"**Final Offering Circular**" means the final offering circular and the documents, if any, incorporated by reference therein, relating to the Offered Securities be offered by the Purchasers that discloses the offering price and other final terms of the Offered Securities and is dated as of the date of this Agreement (even if finalized and issued subsequent to the date of this Agreement).

"**Free Writing Communication**" means a written communication (as such term is defined in Rule 405) that constitutes an offer to sell or a solicitation of an offer to buy the Offered Securities and is made by means other than the Preliminary Offering Circular or the Final Offering Circular.

"**General Disclosure Package**" means the Preliminary Offering Circular together with any Issuer Free Writing Communication existing at the Applicable Time and the information in which is intended for general distribution to prospective investors, as evidenced by its being specified in Schedule B to this Agreement.

"**Issuer Free Writing Communication**" means a Free Writing Communication prepared by or on behalf of the Company, used or referred to by the Company or containing a description of the final terms of the Offered Securities or of their offering, in the form retained in the Company's records.

"**Preliminary Offering Circular**" means the preliminary offering circular and the documents, if any, incorporated by reference therein, relating to the Offered Securities to be offered by the Purchasers, dated May 28, 2013.

"**Rules and Regulations**" means the rules and regulations of the Commission.

"**Securities Act**" means the United States Securities Act of 1933, as amended.

"**Securities Laws**" means, collectively, the Sarbanes- Oxley Act of 2002 ("**Sarbanes- Oxley**"), the Securities Act, the Exchange Act, the Rules and Regulations, the auditing principles, rules, standards and practices applicable to auditors of "issuers" (as defined in Sarbanes- Oxley) promulgated or approved by the Public Company Accounting Oversight Board and, as applicable, the rules of The New York Stock Exchange and the NASDAQ Stock Market ("**Exchange Rules**").

"**Supplemental Marketing Material**" means any Issuer Free Writing Communication other than any Issuer Free Writing Communication specified in Schedule B hereto. Supplemental Marketing Materials include, but are not limited to, any Issuer Free Writing Communication listed on Schedule C to this Agreement.

"**Underlying Shares**" means the shares of Class A common stock of the Company, par value $0.01 per share ("**Class A Common Stock**"), if any, into which the Offered Securities are convertible.

Unless otherwise specified, a reference to a "rule" is to the indicated rule under the Securities Act.

(ii) *Disclosure*. As of the date of this Agreement, the Final Offering Circular does not, and as of each Closing Date, the Final Offering Circular will not include any untrue statement of a material fact or omit to state any material fact necessary to make the statements therein, in light of the circumstances in which they were made, not misleading. The preceding sentence does not apply to statements in or omissions from any such document based upon written information furnished to the Company by any Purchaser through the Representatives specifically for use therein, it being understood and agreed that the only such information is that described as such in Section 8(b) hereof. At the Applicable Time neither (i) the General Disclosure Package, nor (ii) any individual Supplemental Marketing Material, when considered together with the General Disclosure Package, included any untrue statement of a material fact or omitted to state any material fact necessary in order to make the statements therein, in the light of the circumstances under which they were made, not misleading. The preceding sentence does not apply to statements in or omissions from the Preliminary Offering Circular or Final Offering Circular, the General Disclosure Package or any Supplemental Marketing Material based upon written information furnished to the Company by any Purchaser through the Representatives specifically for use therein, it being understood and agreed that the only such information furnished by a Purchaser consists of the information described as such in Section 8(a) hereof. Except as disclosed in the General Disclosure Package, on the date of this Agreement, the Company's Annual Report on Form 10- K most recently filed with the Commission and all subsequent reports (collectively, the "**Exchange Act Reports**") incorporated by reference in the General Disclosure Package or the Final Offering Memorandum do not include any untrue statement of a material fact or omit to state a material fact necessary in order to make the statements therein, in the light of the circumstances under which they were made, not misleading. Such documents, when they were filed with the Commission, conformed in all material respects to the requirements of the Exchange Act and the Rules and Regulations.

(iii) *Good Standing of the Company*. The Company has been duly incorporated and is validly existing as a corporation in good standing under the laws of the State of Delaware, with power and authority (corporate and other) to own its properties and conduct its business as described in the General Disclosure Package; and the Company is duly qualified to do business as a foreign corporation in good standing (to the extent such concept exists) in all other jurisdictions in which its ownership or lease of property or the conduct of its business requires such qualification in each case except as would not reasonably be expected to have a material adverse effect on the condition (financial or otherwise), results of operations, business, properties or prospects of the Company and its subsidiaries taken as a whole ("**Material Adverse Effect**").

(iv) *Subsidiaries*. Each subsidiary of the Company has been duly incorporated or formed and is validly existing as a corporation or other entity in good standing (to the extent such concept exists) under the laws of the jurisdiction of its incorporation or formation, in each case except as would not reasonably be expected to have a Material Adverse Effect. Each subsidiary of the Company has full corporate or limited liability

3

company or other entity power and authority to own its properties and conduct its business as currently being carried on and described in the General Disclosure Package except as would not reasonably be expected to have a Material Adverse Effect. Each subsidiary of the Company is duly qualified to do business as a foreign corporation or other entity in good standing (to the extent such concept exists) in each jurisdiction in which its ownership or lease of property or the conduct of its business requires such qualification and in which the failure to so qualify would have a Material Adverse Effect.

(v) *Indenture*. The Indenture has been duly authorized; the Offered Securities have been duly authorized; and when the Offered Securities are delivered and paid for pursuant to this Agreement on the Closing Date, the Indenture will have been duly executed and delivered, such Offered Securities will have been duly executed, authenticated, issued and delivered and will conform to the description of such Offered Securities contained in the General Disclosure Package, the Final Offering Circular and the Indenture and such Offered Securities will constitute valid and legally binding obligations of the Company, enforceable in accordance with their terms, subject to bankruptcy, insolvency, fraudulent transfer, reorganization, moratorium and similar laws of general applicability relating to or affecting creditors' rights and to general equity principles and entitled to the benefits provided by the Indenture.

(vi) *Offered Securities*. The Offered Securities have been duly and validly authorized by the Company; and when Offered Securities are delivered by the Company and paid for by the Purchasers in accordance with the terms of this Agreement on the relevant Closing Date for such Offered Securities, such Offered Securities will have been duly executed, authenticated, issued and delivered by the Company and, assuming authentication of such Offered Securities by the Trustee in accordance with the Indenture, will constitute valid and legally binding obligations of the Company, enforceable in accordance with their terms, subject to bankruptcy, insolvency, fraudulent transfer, reorganization, moratorium and similar laws of general applicability relating to or affecting creditors' rights and to general equitable principles, and will be convertible in accordance with the terms of the Indenture; and the Offered Securities will conform in all material respects to the description thereof contained in the General Disclosure Package and the Final Offering Circular.

(vii) *Underlying Shares*. The maximum number of Underlying Shares initially issuable upon conversion of the Offered Securities (including the maximum number of shares of Class A Common Stock that may be issued upon conversion of the Offered Securities in connection with a make- whole fundamental change, assuming the Company elects to issue and deliver solely shares of Class A Common Stock in respect of all such conversions) (the "**Maximum Number of Underlying Shares**") have been duly authorized and reserved for issuance upon such conversion and, when issued upon conversion of the Offered Securities in accordance with the terms of the Indenture, will be validly issued, fully paid and nonassessable; the Underlying Shares conform in all material respects to the description thereof contained in the General Disclosure Package and in the Final Offering Circular; the outstanding shares of Class A Common Stock have been duly authorized and validly issued, are fully paid and nonassessable, will conform in all material respects to the description thereof contained in the General Disclosure Package and the Final Offering Circular; and the stockholders of the Company have no preemptive rights with respect to the Offered Securities or the Underlying Shares.

4

(viii) *Capitalization*. The authorized equity capitalization of the Company is as set forth in the General Disclosure Package; all outstanding shares of capital stock of the Company are validly issued, fully paid and nonassessable; and none of the outstanding shares of capital stock of the Company have been issued in violation of any preemptive or similar rights of any security holder.

(ix) *No Finder's Fee*. Except as disclosed in the General Disclosure Package, there are no contracts, agreements or understandings between the Company and any person that would give rise to a valid claim against the Company or any Purchaser for a brokerage commission, finder's fee or other like payment in connection with this offering.

(x) *Absence of Further Requirements*. No consent, approval, authorization, or order of, or filing or registration with, any governmental agency or body or any court is required to be obtained or made by the Company for the consummation of the transactions contemplated by this Agreement, or the Indenture in connection with the offering, issuance and sale of the Offered Securities, except such as have been obtained, or made and such as may be required under the Securities Act, the Exchange Act, the rules of the Financial Industry Regulatory Authority, Inc. ("**FINRA**") and state securities laws.

(xi) *Absence of Defaults and Conflicts Resulting from Transaction*. The execution, delivery and performance of the Indenture, and this Agreement, and the issuance and sale of the Offered Securities and the Underlying Shares issuable upon conversion thereof, and compliance with the terms and provisions thereof will not result in a breach or violation of any of the terms and provisions of, or constitute a default or a Debt Repayment Triggering Event (as defined below) under, or result in the imposition of any lien, charge or encumbrance upon any property or assets of the Company or any of its subsidiaries pursuant to, (i) the charter, by- laws or similar organizational document of the Company, (ii) the charter, by- laws or similar organizational document of any subsidiary of the Company, (iii) any statute, rule, regulation or order of any governmental agency or body or any court, domestic or foreign, having jurisdiction over the Company or any of its subsidiaries or any of their properties, or (iv) any agreement or instrument to which the Company or any of its subsidiaries is a party or by which the Company or any of its subsidiaries is bound or to which any of the properties of the Company or any of its subsidiaries is subject, except for, in the case of foregoing clauses (iii) and (iv), any such breach, violation, default or imposition that would not, individually or in the aggregate, result in a Material Adverse Effect or adversely affect the ability of the Company to perform its obligations under this Agreement or consummate the transactions contemplated hereby; a "**Debt Repayment Triggering Event**" means any event or condition that gives, or with the giving of notice or lapse of time would give, the holder of any note, debenture, or other evidence of indebtedness (or any person acting on such holder's behalf) the right to require the repurchase, redemption or repayment of all or a portion of such indebtedness by the Company or any of its subsidiaries.

5

(xii) *Absence of Existing Defaults and Conflicts*. The Company and its subsidiaries are not in violation of its respective charter or by- laws or in default (or with the giving of notice or lapse of time would be in default) under any existing obligation, agreement, covenant or condition contained in any indenture, loan agreement, mortgage, lease or other agreement or instrument to which any of them is a party or by which any of them is bound or to which any of the properties of any of them is subject, except such defaults that would not, individually or in the aggregate, result in a Material Adverse Effect.

(xiii) *Authorization of Agreement*. This Agreement has been duly authorized, executed and delivered by the Company.

(xiv) *Possession of Licenses and Permits*. Except as would not reasonably be expected to have a Material Adverse Effect, the Company and each of its subsidiaries possess, and are in compliance with the terms of, all consents, certificates, authorizations, franchises, licenses, exemptions and permits, orders of and from federal, state, local, and foreign government and/or regulatory authorities, all self- regulatory organizations, and all courts or tribunals ("**Licenses**") necessary to the conduct of the business now conducted or proposed in the General Disclosure Package to be conducted by them and, except as would not reasonably be expected to have a Material Adverse Effect, have not received any notice of investigation, inquiry or proceedings relating to the revocation or modification of any Licenses.

(xv) *Absence of Labor Dispute*. No labor dispute with the employees of the Company or any of its subsidiaries exists or, to the knowledge of the Company, is imminent that could have a Material Adverse Effect.

(xvi) *Intellectual Property*. The Company and its subsidiaries own, possess or can acquire on reasonable terms sufficient trademarks, trade names, patent rights, copyrights, domain names, licenses, approvals, trade secrets, inventions, technology, know- how and other intellectual property and similar rights, including registrations and applications for registration thereof (collectively, "**Intellectual Property Rights**") necessary to the conduct of the business now conducted or proposed in the General Disclosure Package to be conducted by them, except to the extent the failure of such ownership, possession or acquisition (and/or the expected expiration) of any such Intellectual Property Rights would not, individually or in the aggregate, have a Material Adverse Effect. Except as disclosed in the General Disclosure Package (i) there are no rights of third parties to any of the Intellectual Property Rights owned by the Company or its subsidiaries; (ii) there is no infringement, misappropriation, breach, default or other violation by the Company or its subsidiaries of any of the Intellectual Property Rights of any other persons; (iii) there is no pending or threatened action, suit, proceeding or claim by others challenging the Company's or any subsidiary's rights in or to any of their Intellectual Property Rights, and the Company is unaware of any facts which would form a reasonable basis for any such claim; (iv) there is no pending or threatened action, suit, proceeding or claim by others challenging the validity, enforceability or scope of any such Intellectual Property Rights, and the Company is unaware of any facts which would form a reasonable basis for any such claim; (v) there is no pending or threatened action,

6

suit, proceeding or claim by others that the Company or any subsidiary infringes, misappropriates or otherwise violates or conflicts with any Intellectual Property Rights or other proprietary rights of others and the Company is unaware of any other fact which would form a reasonable basis for any such claim; and (vi) none of the Intellectual Property Rights used by the Company or its subsidiaries in their businesses has been obtained or is being used by the Company or its subsidiaries in violation of any contractual obligation binding on the Company or any of its subsidiaries or in violation of the rights of any persons, except in each case covered by clauses (i)(vi) such as would not, if determined adversely to the Company or any of its subsidiaries, individually or in the aggregate, have a Material Adverse Effect.

(xvii) *Accurate Disclosure*. The statements in the General Disclosure Package and the Final Offering Circular under the headings "Material United States Federal Income and Estate Tax Consequences to Non- U.S. Holders," "Description of Capital Stock" and "Description of Notes," insofar as such statements summarize legal matters, agreements, documents or proceedings discussed therein, are accurate and fair summaries of such legal matters, agreements, documents or proceedings.

(xviii) *Absence of Manipulation.* The Company has not taken, directly or indirectly, any action that is designed to or that has constituted or that would reasonably be expected to cause or result in the unlawful stabilization or manipulation of the price of any security of the Company to facilitate the sale or resale of the Offered Securities.

(xix) *Statistical and Market- Related Data*. Any third- party statistical and market- related data included in the General Disclosure Package or the Final Offering Circular are based on or derived from sources that the Company believes to be reliable and accurate in all material respects.

(xx) *Internal Controls and Compliance with the Sarbanes- Oxley Act*. Except as set forth in the General Disclosure Package, the Company, its subsidiaries and the Company's Board of Directors (the "**Board**") are in compliance with all applicable Exchange Rules and all provisions of Sarbanes- Oxley and all rules and regulations promulgated thereunder or implementing the provisions thereof with which the Company is required to comply. The Company maintains a system of internal controls, including, but not limited to, disclosure controls and procedures, internal controls over accounting matters and financial reporting, an internal audit function, and legal and regulatory compliance controls (collectively, "**Internal Controls**") that are sufficient to provide reasonable assurances that (i) transactions are executed in accordance with management's general or specific authorizations, (ii) transactions are recorded as necessary to permit preparation of financial statements in conformity with U.S. Generally Accepted Accounting Principles ("**GAAP**") and to maintain accountability for assets, (iii) access to assets is permitted only in accordance with management's general or specific authorization, (iv) the recorded accountability for assets is compared with the existing assets at reasonable intervals and appropriate action is taken with respect to any differences, and (v) the interactive data in eXtensible Business Reporting Language included or incorporated by reference in the General Disclosure Package and the Final Offering Circular fairly presents the information called for in all material respects and is prepared in accordance with the Commission's rules and guidelines applicable thereto.

7

(xxi) *Litigation*. Except as disclosed in the General Disclosure Package, there are no pending actions, suits or proceedings (including any inquiries or investigations by any court or governmental agency or body, domestic or foreign) against or affecting the Company, any of its subsidiaries or any of their respective properties that would individually or in the aggregate be reasonably expected to have a Material Adverse Effect, or would materially and adversely affect the ability of the Company to perform its obligations under the Indenture, or this Agreement, or which are otherwise material in the context of the sale of the Offered Securities; and no such actions, suits or proceedings (including any inquiries or investigations by any court or governmental agency or body, domestic or foreign) are, to the Company's knowledge, threatened or contemplated.

(xxii) *Financial Statements*. The statement of financial condition of the Company included in the General Disclosure Package and the Final Offering Circular presents fairly, in all material respects, the financial position of the Company as of the date indicated, in conformity with GAAP. The statement of financial condition of Lucid Markets Trading Limited and Lucid Markets LLP (together, "**Lucid Markets**") included in the General Disclosure Package and the Final Offering Circular presents fairly, in all material respects, the financial position of Lucid Markets as of the dates indicated, in conformity with United Kingdom Accounting Standards and the assumptions used in preparing the pro forma financial statements included in the General Disclosure Package and the Final Offering Circular have been prepared in accordance with the Commission's rules and guidelines applicable thereto. Ernst & Young LLP which has expressed their opinion related to the Company with respect to certain financial statements included in the General Disclosure Package and the Final Offering Circular is (x) an independent public accounting firm within the meaning of the Securities Act and the Rules and Regulations, (y) a registered public accounting firm (as defined in Section 2(a)(12) of the Sarbanes- Oxley Act) and (z) not in violation of the auditor independence requirements of the Sarbanes- Oxley Act. The interactive data in eXtensible Business Reporting Language included or incorporated by reference in the General Disclosure Package and the Final Offering Circular fairly presents the information called for in all material respects and has been prepared in accordance with the Commission's rules and guidelines applicable thereto.

(xxiii) *No Material Adverse Change in Business*. Except as disclosed in the General Disclosure Package, since the end of the period covered by the latest audited financial statements included in the General Disclosure Package (i) there has been no change, nor any development or event involving a prospective change, in the condition (financial or otherwise), results of operations, business, properties or prospects of the Company and its subsidiaries, taken as a whole, that is material and adverse, (ii) except as disclosed in or contemplated by the General Disclosure Package, there has been no dividend or distribution of any kind declared, paid or made by the Company on any class of its capital stock and (iii) except as disclosed in or contemplated by the General Disclosure Package, there has been no material adverse change in the capital stock of the Company or the consolidated short- term indebtedness, long- term indebtedness, net current assets or net assets of the Company and its subsidiaries.

8

(xxiv) *Investment Company Act.* The Company is not and, after giving effect to the offering and sale of the Offered Securities and the application of the proceeds thereof as described in the General Disclosure Package, will not be an "investment company" as defined in the Investment Company Act of 1940, as amended (the "**Investment Company Act**").

(xxv) *Anti- bribery.* Neither the Company nor any of its subsidiaries, nor any director, officer or employee, nor, to the Company's knowledge, any agent or representative of the Company or of any of its subsidiaries, has taken or will take any unlawful action in furtherance of an offer, payment, promise to pay, or authorization or approval of the payment or giving of money, property, gifts or anything else of value, directly or indirectly, to any "government official" (including any officer or employee of a government or government- owned or controlled entity or of a public international organization, or any person acting in an official capacity for or on behalf of any of the foregoing, or any political party or party official or candidate for political office) to influence official action or secure an improper advantage; and the Company and its subsidiaries have conducted their businesses in material compliance with applicable anti- corruption laws and have instituted and maintain and will continue to maintain policies and procedures designed to promote and achieve compliance with such laws and with the representation and warranty contained herein.

(xxvi) *Anti- money Laundering.* The operations of the Company and its subsidiaries are and, except as described in the General Disclosure Package have been conducted at all times in material compliance with the Bank Secrecy Act, as amended by Title III of the Uniting and Strengthening America by Providing Appropriate Tools Required to Intercept and Obstruct Terrorism Act of 2001 (USA PATRIOT ACT), to the extent applicable, and the applicable anti- money laundering statutes of jurisdictions where the Company and its subsidiaries conduct business, and the rules and regulations thereunder (collectively, the "**Anti- Money Laundering Laws**"), and no action, suit or proceeding by or before any court or governmental agency, authority or body or any arbitrator involving the Company or any of its subsidiaries with respect to the Anti- Money Laundering Laws is pending or, to the best knowledge of the Company, threatened.

(xxvii) *OFAC.* None of the Company, any of its subsidiaries or, to the knowledge of the Company, any director, officer, agent, employee, affiliate or other person, in each case acting on behalf of the Company (each, a, "**Person**") has in the past knowingly engaged in or is now knowingly engaged in any dealings or transactions with any person, or in any country or territory, that at the time of the dealing or transaction was or is: (a) the target of sanctions administered by the U.S. Department of Treasury's Office of Foreign Assets Control, (b) the target of restrictions set forth in applicable non- U.S. government sanctions lists, including, but not limited to, the sanctions lists maintained by the United Nations, by the United Kingdom's HM Treasury, by Canada's Office of the Superintendent of Financial Institutions, and as set forth in Canada's Cumulative

9

Warning List (collectively, with subsection (a), "**Sanctions**"), or (c) named on the list of Specially Designated Nationals and Blocked Persons, or subject to a list issued pursuant to Section 326 of the USA PATRIOT ACT, as such time as the applicable person was engaged in business with the Company or an applicable subsidiary or affiliate, nor is the Company located, organized or resident in a country or territory that is the subject of Sanctions; and the Company will not directly or indirectly use the proceeds of the sale of the Securities, or lend, contribute or otherwise make available such proceeds to any subsidiaries, joint venture partners or other Person, to fund any activities of or business with any Person, or in any country or territory, that, at the time of such funding, is the subject of Sanctions or in any other manner that will result in a violation by any Person (including any Person participating in the transaction, whether as purchaser, advisor, investor or otherwise) of Sanctions.

(xxviii) *Taxes.* The Company and its subsidiaries have filed all federal, state, local and non- U.S. tax returns that are required to be filed or have requested extensions thereof (except in any case in which the failure so to file would not have a Material Adverse Effect); and, except as set forth (including, for the avoidance of doubt, through the establishment of appropriate reserves) in the General Disclosure Package, the Company and its subsidiaries have paid all taxes (including any assessments, fines or penalties) required to be paid by them, except for any such taxes, assessments, fines or penalties currently being contested in good faith or as would not, individually or in the aggregate, have a Material Adverse Effect.

(xxix) *Insurance.* The Company and its subsidiaries are insured by insurers with appropriately rated claims paying abilities against such losses and risks as the Company believes to be adequate for the conduct of its business and as is customary for companies engaged in similar businesses in similar industries.

(xxx) *Ratings.* The Company does not have any debt securities rated by a "nationally recognized statistical rating organization" as such term is defined for purposes of Rule 436(g)(2) or preferred stock outstanding.

(xxxi) *Rule 144A Eligibility.* The Offered Securities are eligible for resale pursuant to Rule 144A and will not be, at the Closing Date, of the same class as securities listed on a national securities exchange registered under Section 6 of the Exchange Act or quoted in a U.S. automated interdealer quotation system.

(xxxii) *No Registration.* The offer and sale of the Offered Securities in the manner contemplated by this Agreement will be exempt from the registration requirements of the Securities Act by reason of Section 4(2) thereof; and it is not necessary to qualify the Indenture in respect of the Offered Securities under the United States Trust Indenture Act of 1939, as amended (the "**Trust Indenture Act**").

(xxxiii) *Similar Offerings.* Neither the Company nor any of its affiliates, as such term is defined in Rule 501(b) of Regulation D under the Securities Act (each, an "**Affiliate**"), has, directly or indirectly, solicited any offer to buy, sold or offered to sell or otherwise negotiated in respect of, or will solicit any offer to buy, sell or offer to sell or

10

otherwise negotiate in respect of, in the United States or to any United States citizen or resident, any security which is or would be integrated with the sale of the Offered Securities in a manner that would require the Offered Securities to be registered under the Securities Act.

(xxxiv) *Reporting Status*. The Company is subject to Section 13 or 15(d) of the Exchange Act and has filed all reports required under the Exchange Act in the last twelve month period.

3. *Purchase, Sale and Delivery of Offered Securities.* On the basis of the representations, warranties and agreements and subject to the terms and conditions set forth herein, the Company agrees to sell to each Purchaser and each Purchaser agrees, severally and not jointly, to purchase from the Company, at a purchase price of 97.00% of the principal amount thereof plus accrued interest, if any, from June 3, 2013 to the First Closing Date (as hereinafter defined), the respective principal amounts of Firm Securities set forth opposite the name of such Purchaser in Schedule A hereto.

The Company will deliver the Firm Securities to or as instructed by Credit Suisse for the accounts of the several Purchasers in a form reasonably acceptable to Credit Suisse against payment of the purchase price in Federal (same day) funds by official bank check or checks or wire transfer to an account at a bank acceptable to Credit Suisse drawn to the order of FXCM Inc., at the office of Shearman & Sterling LLP, at 10:00 A.M., New York time, on June 3, 2013, or at such other time not later than seven full business days thereafter as Credit Suisse and the Company determine, such time being herein referred to as the "**First Closing Date**". For purposes of Rule 15c6- 1 under the Exchange Act, the First Closing Date (if later than the otherwise applicable settlement date) shall be the settlement date for payment of funds and delivery of securities for all the Offered Securities sold pursuant to the offering. The Company shall deliver the Firm Securities through the facilities of The Depository Trust Company ("**DTC**") unless Credit Suisse shall otherwise instruct.

In addition, upon written notice from Credit Suisse given to the Company from time to time not more than 30 days subsequent to the date of the Final Offering Circular, the Purchasers may purchase all or less than all of the Optional Securities at the purchase price per Security to be paid for the Firm Securities. The Company agrees to sell to the Purchasers the principal amount of Optional Securities specified in such notice and the Purchasers agree, severally and not jointly, to purchase such Optional Securities. Such Optional Securities shall be purchased from the Company for the account of each Purchaser in the same proportion as the principal amount of Firm Securities set forth opposite such Purchaser's name in Schedule A hereto bears to the principal amount of Firm Securities (subject to adjustment by Credit Suisse to eliminate fractions) and may be purchased by the Purchasers only for the purpose of covering over- allotments made in connection with the sale of the Firm Securities. No Optional Securities shall be sold or delivered unless the Firm Securities previously have been, or simultaneously are, sold and delivered. The right to purchase the Optional Securities or any portion thereof may be exercised from time to time and to the extent not previously exercised may be surrendered and terminated at any time upon notice by Credit Suisse to the Company.

11

Each time for the delivery of and payment for the Optional Securities, being herein referred to as an "**Optional Closing Date**", which may be the First Closing Date (the First Closing Date and each Optional Closing Date, if any, being sometimes referred to as a "**Closing Date**"), shall be determined by Credit Suisse but shall be not later than five full business days after written notice of election to purchase Optional Securities is given. The Company will deliver the Optional Securities being purchased on each Optional Closing Date to or as instructed by Credit Suisse for the accounts of the several Purchasers in a form reasonably acceptable to Credit Suisse, against payment of the purchase price therefor in Federal (same day) funds by official bank check or checks or wire transfer to an account at a bank acceptable to Credit Suisse drawn to the order of FXCM Inc., at the above office of Shearman & Sterling LLP. The Company shall deliver the Optional Securities through the facilities of DTC, unless Credit Suisse shall otherwise instruct.

4. *Representations by Purchasers; Resale by Purchasers.*

(a) Each Purchaser severally represents and warrants to the Company that it is an "accredited investor" within the meaning of Regulation D under the Securities Act.

(b) Each Purchaser severally agrees that it and each of its affiliates has not entered and will not enter into any contractual arrangement with respect to the distribution of the Offered Securities except for any such arrangements with the other Purchasers or affiliates of the other Purchasers or with the prior written consent of the Company.

(c) Each Purchaser severally agrees that it and each of its affiliates will not offer or sell the Offered Securities in the United States by means of any form of general solicitation or general advertising within the meaning of Rule 502(c), including, but not limited to (i) any advertisement, article, notice or other communication published in any newspaper, magazine or similar media or broadcast over television or radio, or (ii) any seminar or meeting whose attendees have been invited by any general solicitation or general advertising. Each Purchaser severally agrees, with respect to resales made in reliance on Rule 144A of any of the Offered Securities, to deliver either with the confirmation of such resale or otherwise prior to settlement of such resale a notice to the effect that the resale of such Offered Securities has been made in reliance upon the exemption from the registration requirements of the Securities Act provided by Rule 144A.

5. *Certain Agreements of the Company.* The Company agrees with the several Purchasers that:

(a) *Amendments and Supplements to Offering Circular*. The Company will promptly advise the Representatives of any proposal to amend or supplement the Preliminary or Final Offering Circular and will not effect such amendment or supplementation in a form reasonably objected to by the Representatives. If, at any time prior to the completion of the resale of the Offered Securities by the Purchasers, there occurs an event or development as a result of which the Preliminary or Final Offering Circular, the General Disclosure Package or any Supplemental Marketing Material, if republished immediately following such event or development, included or would include an untrue statement of a material fact or omit to state any material fact necessary

12

to make the statements therein, in the light of the circumstances under which they were made, not misleading, the Company will promptly notify the Representatives of such event and will promptly prepare and furnish, at its own expense, or at any time nine months or more after the date hereof, at the expense of the Purchasers, to the Purchasers and the dealers and any other dealers upon request of the Representatives, an amendment or supplement which will correct such statement or omission. Neither the absence of the Representatives' objection to, nor the Purchasers' delivery of, any such amendment or supplement shall constitute a waiver of any of the conditions set forth in Section 7 hereof.

(b) *Furnishing of Offering Circulars*. The Company will furnish at its own expense or, at any time nine months or more after the date hereof, at the expense of the Purchasers, to the Representatives copies of the Preliminary Offering Circular, each other document comprising a part of the General Disclosure Package, the Final Offering Circular, all amendments and supplements to such documents and each item of Supplemental Marketing Material, in each case as soon as available and in such quantities as the Representatives reasonably request. At any time when the Offered Securities remain outstanding and are "restricted securities" within the meaning of Rule 144(a)(3) under the Securities Act and the Company is not subject to Section 13 or 15(d) of the Exchange Act, the Company will promptly furnish or cause to be furnished to the Representatives (and, upon request, to each of the other Purchasers) and, upon request of holders and prospective purchasers of the Offered Securities, to such holders and purchasers, copies of the information required to be delivered to holders and prospective purchasers of the Offered Securities pursuant to Rule 144A(d)(4) (or any successor provision thereto) in order to permit compliance with Rule 144A in connection with resales by such holders of the Offered Securities. Except as described above, the Company will pay the expenses of printing and distributing to the Purchasers all such documents.

(c) *Blue Sky Qualifications*. The Company will arrange for the qualification of the Offered Securities for sale under the laws of such states and other jurisdictions as Credit Suisse designates and will continue such qualifications in effect so long as required for the resale of the Offered Securities by the Purchasers, provided that the Company shall not be obligated to qualify as a foreign corporation in any jurisdiction in which it is not so qualified or file a general consent to service of process in any such jurisdiction or take any action that would subject it to taxation in any such jurisdiction where it is not then so subject.

(d) *Reporting Requirements*. For so long as the Offered Securities remain outstanding, the Company will furnish to the Representatives and, upon request, to each of the other Purchasers, as soon as practicable after the end of each fiscal year, a copy of its annual report to shareholders for such year; and the Company will furnish to the Representatives and, upon request, to each of the other Purchasers (i) as soon as available, a copy of each report and any definitive proxy statement of the Company filed with the Commission under the Exchange Act or mailed to shareholders, and (ii) from time to time, such other information concerning the Company as the Representatives may reasonably request. However, so long as the Company is subject to the reporting requirements of either Section 13 or Section 15(d) of the Exchange Act and is timely

13

filing reports with the Commission on its Electronic Data Gathering, Analysis and Retrieval system ("**EDGAR**"), it is not required to furnish such reports or statements to the Purchasers.

(e) *Transfer Restrictions*. During the period of one year after the later of the First Closing Date and the last Optional Closing Date, the Company will, upon request, furnish to the Representatives, each of the other Purchasers and any holder of Offered Securities a copy of the restrictions on transfer applicable to the Offered Securities.

(f) *No Resales by Affiliates*. During the period of two years after the later of the First Closing Date and the last Optional Closing Date, the Company will not, and will not permit any of its affiliates (as defined in Rule 144) to, resell any of the Offered Securities that have been reacquired by any of them.

(g) *Payment of Expenses*. The Company agrees with the several Purchasers that the Company will pay all expenses incident to the performance of the obligations of the Company under this Agreement and the Indenture, including but not limited to (i) the fees and expenses of the Trustee and its professional advisers, (ii) fees and expenses incident to listing the Underlying Shares on The New York Stock Exchange and other national and foreign exchanges, (iii) all expenses in connection with the execution, issue, authentication, packaging and initial delivery of the Offered Securities, the preparation and printing of this Agreement, the Offered Securities, the Indenture, the Preliminary Offering Circular, any other documents comprising any part of the General Disclosure Package, the Final Offering Circular, all amendments and supplements thereto, each item of Supplemental Marketing Material and any other document relating to the issuance, offer, sale and delivery of the Offered Securities, (iv) any expenses (including reasonable fees and disbursements of counsel to the Purchasers) incurred in connection with qualification of the Offered Securities for sale under the laws of such jurisdictions as Credit Suisse designates and the preparation and printing of memoranda relating thereto, costs and expenses related to the review by FINRA of the Offered Securities (including filing fees and the reasonable fees and expenses of counsel for the Purchasers relating to such review) (v) expenses incurred in distributing the Preliminary Offering Circular, any other documents comprising any part of the General Disclosure Package, the Final Offering Circular (including any amendments and supplements thereto) and any Supplemental Marketing Material to the Purchasers and (vi) costs and expenses relating to investor presentations or any "road show" in connection with the offering and sale of the Offered Securities including, without limitation, any travel expenses of the Company's officers and employees and any other expenses of the Company. Except as provided in this Section 5(g), the Company shall not be responsible for any other expenses.

(h) *Use of Proceeds*. The Company will use the net proceeds received in connection with this offering in the manner described in the "Use of Proceeds" section of the General Disclosure Package.

(i) *Absence of Manipulation*. The Company will not take, directly or indirectly, any action designed to or that would constitute or that might reasonably be expected to cause or result in, unlawful stabilization or manipulation of the price of any securities of the Company to facilitate the sale or resale of the Offered Securities.

14

(j) *Restriction on Sale of Securities by Company.* For the period specified below (the "**Lock- Up Period**"), the Company will not, directly or indirectly, take any of the following actions with respect to its Class A Common Stock or any securities convertible into or exchangeable or exercisable for any of its Class A Common Stock ("**Lock- Up Securities**"): (i) offer, sell, issue, contract to sell, pledge or otherwise dispose of Lock- Up Securities, (ii) offer, sell, issue, contract to sell, contract to purchase or grant any option, right or warrant to purchase Lock- Up Securities, (iii) enter into any swap, hedge or any other agreement that transfers, in whole or in part, the economic consequences of ownership of Lock- Up Securities, (iv) establish or increase a put equivalent position or liquidate or decrease a call equivalent position in Lock- Up Securities within the meaning of Section 16 of the Exchange Act or (v) file with the Commission a registration statement under the Securities Act relating to Lock- Up Securities, or publicly disclose the intention to take any such action, without the prior written consent of the Representatives; provided that the foregoing restrictions shall not apply to (i) the Offered Securities to be sold by the Company hereunder or any transaction involving, including any repurchase, redemption or conversion of, the Offered Securities, including but not limited to the issuance of any Underlying Shares upon the conversion of the Offered Securities, (ii) shares or other securities issuable pursuant to employee benefit plans, qualified stock option plans or other employee compensation plans or outstanding convertible or exchangeable securities existing on the date hereof or as described or contemplated in the General Disclosure Package, the Final Offering Circular or the proxy statement on Schedule 14A for the Company's 2013 annual meeting of stockholders, filed April 30, 2013, (iii) the sale, purchase or issuance by the Company of Class A Common Stock or other securities pursuant to any convertible note hedge transactions or warrant transactions entered into by the Company with one or more of the Purchasers (or affiliate(s) thereof) in connection with the offering of the Offered Securities and (iv) the issuance of securities in connection with the acquisition of, or a joint venture with, another company if both (A) each recipient of such securities shall have executed and delivered to the Representatives an agreement substantially in the form of Exhibit A hereto and (B) the aggregate number of securities issued in such transactions, taken together, does not exceed 10% of the aggregate number of shares of Class A Common Stock outstanding immediately following the offering contemplated hereby (assuming all limited liability company units of FXCM Holdings, LLC then outstanding are redeemed or exchanged for newly issued shares of Class A Common Stock on a one- for- one basis). The initial Lock- Up Period will commence on the date hereof and continue for 90 days after the date hereof or such earlier date that the Representatives consent to in writing; provided, however, that if (1) during the last 17 days of the initial Lock- Up Period, the Company releases earnings results or material news or a material event relating to the Company occurs or (2) prior to the expiration of the initial Lock- Up Period, the Company announces that it will release earnings results during the 16- day period beginning on the last day of the initial Lock- Up Period, then in each case the Lock- Up Period will be extended until the expiration of the 18- day period beginning on the date of release of the earnings results or the occurrence of the material news or material event, as applicable, unless the Representatives waive, in writing, such

15

extension. The Company will provide the Representatives with notice of any announcement described in clause (2) of the preceding sentence that gives rise to an extension of the Lock- Up Period.

(k) *Underlying Shares*. The Company will reserve and keep available at all times, free of pre- emptive rights, shares of Class A Common Stock for the purpose of enabling the Company to satisfy all obligations to issue Underlying Shares upon conversion of the Offered Securities. The Company will use all reasonable best efforts to cause the Maximum Number of Underlying Shares to be listed on The New York Stock Exchange and to maintain such listing for so long as any Offered Securities are outstanding.

(l) *Integration*. The Company agrees that it will not and will cause its affiliates not to, directly or indirectly, solicit any offer to buy, sell or make any offer or sale of, or otherwise negotiate in respect of, securities of the Company of any class if, as a result of the doctrine of "integration" referred to in Rule 502 under the Regulations promulgated under the Securities Act, such offer or sale would render invalid (for the purpose of (i) the sale of the offered Securities by the Company to the Purchasers, (ii) the resale of the offered Securities by the Purchasers to subsequent purchasers or (iii) the resale of the offered Securities by such subsequent purchasers to others) the exemption from the registration requirements of the Securities Act provided by Section 4(2) thereof or by Rule 144A thereunder or otherwise.

(m) *Rule 144A Information*. The Company agrees that, in order to render the offered Securities eligible for resale pursuant to Rule 144A, while any of the offered Securities remain outstanding, it will make available, upon request, to any holder of offered Securities or prospective purchasers of Securities the information specified in Rule 144A(d)(4), unless the Company furnishes information to the Commission pursuant to Section 13 or 15(d) of the Exchange Act.

(n) *Restriction on Repurchases*. Until the expiration of one year after the original issuance of the offered Securities, the Company will not, and will cause its affiliates not to, resell any offered Securities which are "restricted securities" (as such term is defined under Rule 144(a)(3)), whether as beneficial owner or otherwise (except as agent acting as a securities broker on behalf of and for the account of customers in the ordinary course of business in unsolicited broker's transactions).

6. *Free Writing Communications.*

(a) *Issuer Free Writing Communications*. The Company represents and agrees that, unless it obtains the prior consent of the Representatives, and each Purchaser represents and agrees that, unless it obtains the prior consent of the Company and the Representatives, it has not made and will not make any offer relating to the Offered Securities that would constitute an Issuer Free Writing Communication.

(b) *Term Sheets*. The Company consents to the use by any Purchaser of a Free Writing Communication that contains only (A) information describing the preliminary

16

terms of the Offered Securities or their offering or (B) information that describes the final terms of the Offered Securities or their offering and that is included in or is subsequently included in the Final Offering Circular or (ii) does not contain "issuer information" (as defined in Rule 433(h)(2) under the Securities Act), including, for the avoidance of doubt, customary Bloomberg communication by the Purchasers to potential purchasers in connection with the preliminary pricing of the offering (or such other Bloomberg communications by the Purchasers as may be approved in advance by the Company).

7. *Conditions of the Obligations of the Purchasers.* The obligations of the several Purchasers to purchase and pay for the Firm Securities on the First Closing Date and the Optional Securities to be purchased on each Optional Closing Date will be subject (i) to the accuracy of the representations and warranties of the Company herein (as though made on such Closing Date), (ii) to the accuracy of the statements of Company officers made pursuant to the provisions hereof, (iii) to the performance in all material respects by the Company of its obligations hereunder and (iv) to the following additional conditions precedent:

(a) *Accountants' Comfort Letter.* The Representatives shall have received letters, dated, respectively, the date hereof and each Closing Date, of Ernst & Young LLP confirming that they are a registered public accounting firm and independent public accountants within the meaning of the Securities Laws and substantially in form and substance acceptable to the Representatives.

(b) *Accountants' Comfort Letter.* The Representatives shall have received letters, dated, respectively, the date hereof and each Closing Date, of PricewaterhouseCoopers confirming that they are independent accountants within the meaning of the Securities Laws and substantially in form and substance acceptable to the Representatives.

(c) *No Material Adverse Change.* Subsequent to the execution and delivery of this Agreement, there shall not have occurred (i) any change, or any development or event involving a prospective change, in the condition (financial or otherwise), results of operations, business, properties or prospects of the Company and its subsidiaries taken as a whole which, in the judgment of the Representatives, is material and adverse and makes it impractical or inadvisable to market the Offered Securities; (ii) any change in U.S. or international financial, political or economic conditions or currency exchange rates or exchange controls the effect of which is such as to make it, in the judgment of the Representatives, impractical to market or to enforce contracts for the sale of the Offered Securities, whether in the primary market or in respect of dealings in the secondary market; (iii) any suspension or material limitation of trading in securities generally on The New York Stock Exchange or the NASDAQ Stock Market, or any setting of minimum or maximum prices for trading on such exchange; (iv) any suspension of trading of any securities of the Company on any exchange or in the over- the- counter market; (v) any banking moratorium declared by any U.S. federal or New York authorities; (vi) any major disruption of settlements of securities, payment or clearance services in the United States or any other country where such securities are listed or (vii) any attack on, outbreak or escalation of hostilities or act of terrorism involving the United States, any declaration of war by Congress or any other national or international calamity

17

or emergency if, in the judgment of the Representatives, the effect of any such attack, outbreak, escalation, act, declaration, calamity or emergency is such as to make it impractical or inadvisable to market the Offered Securities or to enforce contracts for the sale of the Offered Securities.

(d) *Opinion of Counsel for the Company.* The Representatives shall have received (i) an opinion and 10b- 5 letter, each dated such Closing Date, of Simpson Thacher & Bartlett LLP, counsel for the Company, substantially in the form previously submitted to Shearman & Sterling LLP, counsel for the Purchasers and (ii) an opinion, dated the Closing Date, of David Sassoon, General Counsel to the Company, substantially in the form previously submitted to Shearman & Sterling LLP, counsel for the Purchasers.

(e) *Opinion of Counsel for Purchasers*. The Representatives shall have received from Shearman & Sterling LLP, counsel for the Purchasers, such opinion or opinions, dated such Closing Date, with respect to such matters as the Representatives may require, and the Company shall have furnished to such counsel such documents as they request for the purpose of enabling them to pass upon such matters.

(f) *Officers' Certificate*. The Representatives shall have received a certificate, dated such Closing Date, of an executive officer of the Company and a principal financial or accounting officer of the Company in which such officers shall state that: the representations and warranties of the Company in this Agreement are true and correct; the Company has complied with all agreements and satisfied all conditions on its part to be performed or satisfied hereunder at or prior to such Closing Date in all material respects; and subsequent to the respective dates of the most recent financial statements in the General Disclosure Package, there has been no material adverse change, nor any development or event involving a prospective material adverse change, in the condition (financial or otherwise), results of operations, business, properties or prospects of the Company and its subsidiaries taken as a whole except as set forth in the General Disclosure Package or as described in such certificate.

(g) *CFO Certificate*. The Representatives shall have received a certificate of the Chief Financial Officer of the Company, dated, respectively, the date hereof and each Closing Date, respectively, in form and substance satisfactory to counsel for the Underwriters, confirming certain financial information relating to Company and Lucid Markets Trading Limited included or incorporated by reference in the General Disclosure Package and the Final Offering Circular.

(h) *Lock- Up Agreements.* On or prior to the date hereof, the Representatives shall have received lockup letters, in the form set forth on Exhibit A hereto, from each person listed on Schedule C hereto.

(i) *Listing of Additional Shares*. An application for the listing of the Maximum Number of Underlying Shares shall have been submitted to the New York Stock Exchange.

18

The Company will furnish the Representatives with such conformed copies of such opinions, certificates, letters and documents as the Representatives reasonably request. The Representatives may in their sole discretion waive on behalf of the Purchasers compliance with any conditions to the obligations of the Purchasers hereunder, whether in respect of an Optional Closing Date or otherwise.

8. *Indemnification and Contribution*.

(a) *Indemnification of Purchasers by Company*. The Company will indemnify and hold harmless each Purchaser, its partners, members, directors, officers, employees, agents, affiliates and each person, if any, who controls such Purchaser within the meaning of Section 15 of the Securities Act or Section 20 of the Exchange Act (each an "**Indemnified Party**"), against any and all losses, claims, damages or liabilities, joint or several, to which such Indemnified Party may become subject, under the Securities Act, the Exchange Act, other Federal or state statutory law or regulation or otherwise, insofar as such losses, claims, damages or liabilities (or actions in respect thereof) arise out of or are based upon any untrue statement or alleged untrue statement of any material fact contained in the Preliminary Offering Circular or the Final Offering Circular, in each case as amended or supplemented, or any Supplemental Marketing Material/Issuer Free Writing Communication or the Exchange Act Reports, or arise out of or are based upon the omission or alleged omission of a material fact required to be stated therein or necessary to make the statements therein not misleading, and will reimburse each Indemnified Party for any legal or other expenses reasonably incurred by such Indemnified Party in connection with investigating or defending against any loss, claim, damage, liability, action, litigation, investigation or proceeding whatsoever (whether or not such Indemnified Party is a party thereto) whether threatened or commenced and in connection with the enforcement of this provision with respect to any of the above as such expenses are incurred; provided, however, that the Company will not be liable in any such case to the extent that any such loss, claim, damage or liability arises out of or is based upon an untrue statement or alleged untrue statement in or omission or alleged omission from any of such documents in reliance upon and in conformity with written information furnished to the Company by any Purchaser through the Representatives specifically for use therein, it being understood and agreed that the only such information furnished by any Purchaser consists of the information described as such in subsection (b) below.

(b) *Indemnification of Company*. Each Purchaser will severally and not jointly indemnify and hold harmless the Company, each of its directors and officers and each person, if any, who controls the Company within the meaning of Section 15 of the Securities Act or Section 20 of the Exchange Act (each, a "**Purchaser Indemnified Party**"), against any losses, claims, damages or liabilities to which such Purchaser Indemnified Party may become subject, under the Securities Act, the Exchange Act or other Federal or state statutory law or regulation or otherwise, insofar as such losses, claims, damages or liabilities (or actions in respect thereof) arise out of or are based upon any untrue statement or alleged untrue statement of any material fact contained in the Preliminary Offering Circular or the Final Offering Circular, in each case as amended or supplemented, or any Supplemental Marketing Material/Issuer Free Writing Communication or arise out of or are based upon the omission or the alleged omission of a material fact necessary to make the statements therein not misleading, in each case to the extent, but only to the extent, that such untrue statement or alleged untrue statement or omission

19

or alleged omission was made in reliance upon and in conformity with written information furnished to the Company by such Purchaser through the Representatives specifically for use therein, and will reimburse any legal or other expenses reasonably incurred by such Purchaser Indemnified Party in connection with investigating or defending against any such loss, claim, damage, liability, action, litigation, investigation or proceeding whatsoever (whether or not such Purchaser Indemnified Party is a party thereto) whether threatened or commenced based upon any such untrue statement or omission, or any such alleged untrue statement or omission as such expenses are incurred, it being understood and agreed that the only such information furnished by any Purchaser consists of the following information in the Final Offering Circular furnished on behalf of each Purchaser: the first paragraph under the caption "Plan of Distribution - Stabilization and Short Positions"; provided, however, that the Purchasers shall not be liable for any losses, claims, damages or liabilities arising out of or based upon the Company's failure to perform its obligations under Section 5(a) of this Agreement.

(c) *Actions against Parties; Notification*. Promptly after receipt by an indemnified party under this Section of notice of the commencement of any action, such indemnified party will, if a claim in respect thereof is to be made against an indemnifying party under subsection (a) or (b) above, notify the indemnifying party of the commencement thereof; but the failure to notify the indemnifying party shall not relieve it from any liability that it may have under subsection (a) or (b) above except to the extent that it has been materially prejudiced (through the forfeiture of substantive rights or defenses) by such failure; and provided further that the failure to notify the indemnifying party shall not relieve it from any liability that it may have to an indemnified party otherwise than under subsection (a) or (b) above. In case any such action is brought against any indemnified party and it notifies an indemnifying party of the commencement thereof, the indemnifying party will be entitled to participate therein and, to the extent that it may wish, jointly with any other indemnifying party similarly notified, to assume the defense thereof, with counsel satisfactory to such indemnified party (who shall not, except with the consent of the indemnified party, be counsel to the indemnifying party), and after notice from the indemnifying party to such indemnified party of its election so to assume the defense thereof, the indemnifying party will not be liable to such indemnified party under this Section for any legal or other expenses subsequently incurred by such indemnified party in connection with the defense thereof other than reasonable costs of investigation. No indemnifying party shall, without the prior written consent of the indemnified party, effect any settlement of any pending or threatened action in respect of which any indemnified party is or could have been a party and indemnity could have been sought hereunder by such indemnified party unless such settlement (i) includes an unconditional release of such indemnified party from all liability on any claims that are the subject matter of such action and (ii) does not include a statement as to or an admission of fault, culpability or failure to act by or on behalf of an indemnified party.

(d) *Contribution*. If the indemnification provided for in this Section is unavailable or insufficient to hold harmless an indemnified party under subsection (a) or (b) above, then each indemnifying party shall contribute to the amount paid or payable by such indemnified party as a result of the losses, claims, damages or liabilities referred to in subsection (a) or (b) above (i) in such proportion as is appropriate to reflect the relative benefits received by the Company on the one hand and the Purchasers on the other from the offering of the Offered Securities and the application of the proceeds therefor or (ii) if the allocation provided by clause (i) above is not permitted by applicable law, in such proportion as is

20

appropriate to reflect not only the relative benefits referred to in clause (i) above but also the relative fault of the Company on the one hand and the Purchasers on the other in connection with the statements or omissions which resulted in such losses, claims, damages or liabilities as well as any other relevant equitable considerations. The relative benefits received by the Company on the one hand and the Purchasers on the other shall be deemed to be in the same proportion as the total net proceeds from the offering (before deducting expenses) received by the Company bear to the total discounts and commissions received by the Purchasers. The relative fault shall be determined by reference to, among other things, whether the untrue or alleged untrue statement of a material fact or the omission or alleged omission to state a material fact relates to information supplied by the Company or the Purchasers and the parties' relative intent, knowledge, access to information and opportunity to correct or prevent such untrue statement or omission. The amount paid by an indemnified party as a result of the losses, claims, damages or liabilities referred to in the first sentence of this subsection (d) shall be deemed to include any legal or other expenses reasonably incurred by such indemnified party in connection with investigating or defending any action or claim which is the subject of this subsection (d). Notwithstanding the provisions of this subsection (d), no Purchaser shall be required to contribute any amount in excess of the amount by which the total price at which the Offered Securities purchased by it were resold exceeds the amount of any damages which such Purchaser has otherwise been required to pay by reason of such untrue or alleged untrue statement or omission or alleged omission. No person guilty of fraudulent misrepresentation (within the meaning of Section 11(f) of the Securities Act) shall be entitled to contribution from any person who was not guilty of such fraudulent misrepresentation. The Purchasers' obligations in this subsection (d) to contribute are several in proportion to their respective purchase obligations and not joint. The Company and the Purchasers agree that it would not be just and equitable if contribution pursuant to this Section 8(d) were determined by pro rata allocation (even if the Purchasers were treated as one entity for such purpose) or by any other method of allocation which does not take account of the equitable considerations referred to in this Section 8(d).

9. *Default of Purchasers.* If any Purchaser or Purchasers default in their obligations to purchase Offered Securities hereunder on either the First or any Optional Closing Date and the aggregate principal amount of Offered Securities that such defaulting Purchaser or Purchasers agreed but failed to purchase does not exceed 10% of the total principal amount of Offered Securities that the Purchasers are obligated to purchase on such Closing Date, the Representatives may make arrangements satisfactory to the Company for the purchase of such Offered Securities by other persons, including any of the Purchasers, but if no such arrangements are made by such Closing Date, the non- defaulting Purchasers shall be obligated severally, in proportion to their respective commitments hereunder, to purchase the Offered Securities that such defaulting Purchasers agreed but failed to purchase on such Closing Date. If any Purchaser or Purchasers so default and the aggregate principal amount of Offered Securities with respect to which such default or defaults occur exceeds 10% of the total principal amount of Offered Securities that the Purchasers are obligated to purchase on such Closing Date and arrangements satisfactory to the Representatives and the Company for the purchase of such Offered Securities by other persons are not made within 36 hours after such default, this Agreement will terminate without liability on the part of any non- defaulting Purchaser or the Company, except as provided in Section 10 (provided that, if such default occurs with respect to Optional Securities after the First Closing Date, this Agreement will not terminate as to the Firm Securities or any Optional Securities purchased prior to such termination). As used in this Agreement, the term "Purchaser" includes any person substituted for a Purchaser under this Section. Nothing herein will relieve a defaulting Purchaser from liability for its default.

10. *Survival of Certain Representations and Obligations.* The respective indemnities, agreements, representations, warranties and other statements of the Company or its officers and of the several Purchasers set forth in or made pursuant to this Agreement will remain in full force and effect, regardless of any investigation, or statement as to the results thereof, made by or on behalf of any Purchaser, the Company or any of their respective representatives, officers or directors or any controlling person, and will survive delivery of and payment for the Offered Securities. If the purchase of the Offered Securities by the Purchasers is not consummated for any reason other than solely because of the termination of this Agreement pursuant to Section 9 hereof, the Company will reimburse the Purchasers for all out- of- pocket expenses (including fees and disbursements of counsel) reasonably incurred by them in connection with the offering of the Offered Securities, and the respective obligations of the Company and the Purchasers pursuant to Section 8 hereof shall remain in effect shall remain in effect. In addition, if any Offered Securities have been purchased hereunder, the representations and warranties in Section 2 and all obligations under Section 5 shall also remain in effect. Notwithstanding the foregoing, if this Agreement is terminated pursuant to (a) Section 9 by reason of the default of one or more Purchasers, the Company shall not be obligated to reimburse any defaulting Purchaser for its expenses pursuant to Section 5(g) or (b) clauses (ii), (iii), (v), (vi) or (vii) of Section 7(c), the Company shall not be obligated to reimburse any Purchaser for its expenses pursuant to Section 5(g).

11. *Notices.* All communications hereunder will be in writing and, if sent to the Purchasers will be mailed, delivered or telegraphed and confirmed to the Representatives at Credit Suisse Securities (USA) LLC, Eleven Madison Avenue, New York, N.Y. 10010- 3629, Attention: LCD- IBD, Attention: General Counsel, Merrill Lynch, Pierce, Fenner & Smith Incorporated, One Bryant Park, New York, N.Y. 10036, Attention: ECM Syndicate Department, Attention: ECM legal, with a copy to Shearman & Sterling LLP, 599 Lexington Avenue, New York, N.Y. 10022, Attention: Robert Evans III, Esq., or, if sent to the Company, will be mailed, delivered or telegraphed and confirmed to it at FXCM Inc., 55 Water Street, 50th Floor, New York, New York 10041, Attention: Chief Financial Officer; provided, however, that any notice to a Purchaser pursuant to Section 8 will be mailed, delivered or telegraphed and confirmed to such Purchaser.

12. *Successors.* This Agreement will inure to the benefit of and be binding upon the parties hereto and their respective successors and the officers and directors and controlling persons referred to in Section 8, and no other person will have any right or obligation hereunder.

13. *Representation.* The Representatives will act for the several Purchasers in connection with the transactions contemplated by this Agreement, and any action under this Agreement taken by the Representatives jointly will be binding upon all the Purchasers.

14. *Counterparts.* This Agreement may be executed in any number of counterparts, each of which shall be deemed to be an original, but all such counterparts shall together constitute one and the same Agreement.

22

15. *Absence of Fiduciary Relationship.* The Company acknowledges and agrees that:

(a) *No Other Relationship.* The Representatives have been retained solely to act as initial purchasers in connection with the initial purchase, offering and resale of the Offered Securities and that no fiduciary, advisory or agency relationship between the Company, on the one hand, and the Representatives, on the other, has been created in respect of any of the transactions contemplated by this Agreement or the Final Offering Circular, irrespective of whether the Representatives have advised or are advising the Company on other matters;

(b) *Arm's Length Negotiations.* The purchase price of the Offered Securities set forth in this Agreement was established by the Company following discussions and arms- length negotiations with the Representatives and the Company is capable of evaluating and understanding and understands and accepts the terms, risks and conditions of the transactions contemplated by this Agreement;

(c) *Absence of Obligation to Disclose.* The Company has been advised that the Representatives and their affiliates are engaged in a broad range of transactions which may involve interests that differ from those of the Company and that the Representatives have no obligation to disclose such interests and transactions to the Company by virtue of any fiduciary, advisory or agency relationship; and

(d) *Waiver.* The Company waives, to the fullest extent permitted by law, any claims it may have against the Representatives for breach of fiduciary duty or alleged breach of fiduciary duty and agrees that the Representatives shall have no liability (whether direct or indirect) to the Company in respect of such a fiduciary duty claim or to any person asserting a fiduciary duty claim on behalf of or in right of the Company, including stockholders, employees or creditors of the Company.

16. *Patriot Act Notice.* In accordance with the requirements of the USA Patriot Act (Title III of Pub. L. 107- 56 (signed into law October 26, 2001)), the Purchasers are required to obtain, verify and record information that identifies their respective clients, including the Company, which information may include the name and address of their respective clients, as well as other information that will allow the Purchasers to properly identify their respective clients.

**17. *Applicable Law.* This Agreement shall be governed by, and construed in accordance with, the laws of the State of New York.**

The Company hereby submits to the non- exclusive jurisdiction of the Federal and state courts in the Borough of Manhattan in The City of New York in any suit or proceeding arising out of or relating to this Agreement or the transactions contemplated hereby. The Company irrevocably and unconditionally waives any objection to the laying of venue of any suit or proceeding arising out of or relating to this Agreement or the transactions contemplated hereby in Federal and state courts in the Borough of Manhattan in the City of New York and irrevocably and unconditionally waives and agrees not to plead or claim in any such court that any such suit or proceeding in any such court has been brought in an inconvenient forum.

23

If the foregoing is in accordance with the Representatives' understanding of our agreement, kindly sign and return to the Company one of the counterparts hereof, whereupon it will become a binding agreement among the Company and the several Purchasers in accordance with its terms.

Very truly yours,

FXCM Inc.

By                                        /s/ David Sakhai

[*Signature Page to FXCM Purchase Agreement*]

The foregoing Purchase Agreement
is hereby confirmed and accepted
as of the date first above written.

CREDIT SUISSE SECURITIES (USA) LLC

      By:    /s/ Vik Hebatpuria
           Name:        Vik Hebatpuria
           Title:         Director

MERRILL LYNCH, PIERCE, FENNER & SMITH
      INCORPORATED

      By:    /s/ Prasanth B. Rao- Kathi
                    Prasanth B.
           Name:        Rao- Kathi
                    Managing
           Title:        Director
Acting on behalf of themselves and as the
  Representatives of the several Purchasers.

[*Signature Page to FXCM Purchase Agreement*]

**SCHEDULE A**

| Manager | Principal Amount of Firm Securities | |
|---|---|---|
| Credit Suisse Securities (USA) LLC | $ | 55,875,000 |
| Merrill Lynch, Pierce, Fenner & Smith Incorporated | | 55,875,000 |
| Morgan Stanley & Co. LLC | | 18,750,000 |
| Barclays Capital Inc. | | 7,500,000 |
| CJS Securities, Inc. | | 12,000,000 |
| | | |
| Total | $ | 150,000,000 |

Sch. A- 1

**SCHEDULE B**

1.    **Issuer Free Writing Communications (included in the General Disclosure Package)**

      1.    Final term sheet, dated May 28, 2013.

2.    **Other Information Included in the General Disclosure Package**
The following information is also included in the General Disclosure Package:
None.

**SCHEDULE C**

William Ahdout
James Brown
Robin Davis
Perry Fish
Kenneth Grossman
Arthur Gruen
Eric LeGoff
Dror (Drew) Niv
Andreas Putz
David Sakhi
Ryan Silverman
Matthew Wilhelm
Eduard Yusupov

Sch. C- 1

**EXHIBIT A**

May 28, 2013

FXCM Inc.
55 Water Street
50ᵗʰ Floor
New York, N.Y. 10041
Credit Suisse Securities (USA) LLC
Merrill Lynch, Pierce, Fenner & Smith
          Incorporated
As Representatives of the Several Purchasers,
c/o Credit Suisse Securities (USA) LLC,
          Eleven Madison Avenue,
            New York, N.Y. 10010- 3629

Dear Sirs:

As an inducement to the Purchasers to execute the Purchase Agreement, pursuant to which an offering of FXCM Inc.'s (the "**Company**") 2.25% Convertible Senior Notes due June 15, 2018 will be made, the undersigned hereby agrees that during the period specified in the following paragraph (the "**Lock- Up Period**"), the undersigned will not offer, sell, contract to sell, pledge or otherwise dispose of, directly or indirectly, any shares of Class A Common Stock of the Company or securities convertible into or exchangeable or exercisable for any shares of Class A Common Stock enter into a transaction which would have the same effect, or enter into any swap, hedge or other arrangement that transfers, in whole or in part, any of the economic consequences of ownership of the Class A Common Stock, whether any such aforementioned transaction is to be settled by delivery of the Class A Common Stock or such other securities, in cash or otherwise, or publicly disclose the intention to make any such offer, sale, pledge or disposition, or to enter into any such transaction, swap, hedge or other arrangement, without, in each case, the prior written consent of Credit Suisse Securities (USA) LLC ("**Credit Suisse**") and Merrill Lynch, Pierce, Fenner & Smith Incorporated (collectively, the "**Representatives**"). In addition, the undersigned agrees that, without the prior written consent of the Representatives, it will not, during the Lock- Up Period, make any demand for or exercise any right with respect to, the registration of any Class A Common Stock or any security convertible into or exercisable or exchangeable for the Class A Common Stock.

The initial Lock- Up Period will commence on the date of this Lock- Up Agreement and continue and include the date 90 days after the offering date set forth on the final offering circular used to sell the Securities (the "**Offering Date**") pursuant to the Purchase Agreement, to which you are or expect to become parties, or such earlier date that the Representatives consent to in writing; provided, however, that if (1) during the last 17 days of the initial Lock- Up Period, the Company releases earnings results or material news or a material event relating to the Company occurs or (2) prior to the expiration of the initial Lock- Up Period,

Ex. A- 1

the Company announces that it will release earnings results during the 16- day period beginning on the last day of the initial Lock- Up Period, then in each case the Lock- Up Period will be extended until the expiration of the 18- day period beginning on the date of release of the earnings results or the occurrence of the material news or material event, as applicable, unless the Representatives waive, in writing, such extension.

The undersigned hereby acknowledges and agrees that written notice of any extension of the Lock- Up Period pursuant to the previous paragraph will be delivered by each of the Representatives to the Company (in accordance with Section 5(j) of the Purchase Agreement) and that any such notice properly delivered will be deemed to have been given to, and received by, the undersigned. The undersigned further agrees that, prior to engaging in any transaction or taking any other action that is subject to the terms of this Lock- Up Agreement during the period from the date of this Lock- Up Agreement to and including the 34th day following the expiration of the initial Lock- Up Period, it will give notice thereof to the Company and will not consummate such transaction or take any such action unless it has received written confirmation from the Company that the Lock- Up Period (as may have been extended pursuant to the previous paragraph) has expired.

Notwithstanding the foregoing, the restrictions set forth herein shall not apply to (i) transactions contemplated by the Purchase Agreement, (ii) any Securities acquired by the undersigned in the open market, (iii) the exercise of stock options or other similar awards granted pursuant to the Company's equity incentive plans; provided that such restriction shall apply to any of the undersigned's Securities issued upon such exercise, (iv) the establishment of any contract, instruction or plan (a "**Plan**") that satisfies all of the requirements of Rule 10b5- 1(c)(1)(i)(B) under the Securities Exchange Act of 1934 (the "**Exchange Act**"), provided that no sales of the undersigned's Securities shall be made pursuant to such a Plan prior to the expiration of the Lock- Up Period (as such may have been extended pursuant to the provisions hereof), (v) transfers as a bona fide gift or gifts or by will or intestacy, (vi) distributions to members, limited partners or stockholders of the undersigned, (vii) transfers to a member or members of the undersigned's immediate family or to a trust, the beneficiaries or which are the undersigned and/or a member or members of his or her immediate family, (viii) transfers to any corporation, partnership, limited liability company or other entity that is wholly- owned by the undersigned and/or by a member or members of his or her immediate family or (ix) the sale, purchase or issuance by the Company of Class A Common Stock or other securities pursuant to a convertible note hedge confirmation and a warrant confirmation related to convertible note hedge transactions and warrant transactions made in connection with the transactions contemplated in the Purchase Agreement; provided that in the case of any transfer or distribution pursuant to clause (v), (vi), (vii) or (viii), each transferee or distributee shall execute and deliver to the Representatives a lock- up letter in the form of this letter. For the purposes of this Agreement, "immediate family" shall mean any relationship by blood, marriage or adoption, no more remote than first cousin.

In furtherance of the foregoing, the Company and its transfer agent and registrar are hereby authorized to decline to make any transfer of shares of Securities if such transfer would constitute a violation or breach of this Agreement.

Ex. A- 2

This Agreement shall be binding on the undersigned and the successors, heirs, personal representatives and assigns of the undersigned. This Agreement shall lapse and become null and void if the Offering Date shall not have occurred on or before June 30, 2013. **This Agreement shall be governed by, and construed in accordance with, the laws of the State of New York.**

Very truly yours,

[*Name of stockholder*]

Ex. A- 3

**Exhibit 10.2**
Opening Transaction

| To: | FXCM Inc. |
|---|---|
| A/C: | **[Insert Account Number]** |
| From: | [✍ ] |
| Re: | Convertible Bond Hedge Transaction |
| Ref. No: | **[Insert Reference Number]** |
| Date: | May 28, 2013 |

Dear Sir(s):

The purpose of this communication (this "**Confirmation**") is to set forth the terms and conditions of the above- referenced transaction entered into on the Trade Date specified below (the "**Transaction**") between [ ✍ ] ("**Dealer**") and FXCM Inc. ("**Counterparty**"). This communication constitutes a "Confirmation" as referred to in the Agreement specified below.

1. This Confirmation is subject to, and incorporates, the definitions and provisions of the 2000 ISDA Definitions (including the Annex thereto) (the "**2000 Definitions**") and the definitions and provisions of the 2002 ISDA Equity Derivatives Definitions (the "**Equity Definitions**", and together with the 2000 Definitions, the "**Definitions**"), in each case as published by the International Swaps and Derivatives Association, Inc. ("**ISDA**"). In the event of any inconsistency between the 2000 Definitions and the Equity Definitions, the Equity Definitions will govern. Certain defined terms used herein have the meanings assigned to them in the Indenture to be dated as of June 3, 2013 between Counterparty and The Bank of New York Mellon, as trustee (the "**Indenture**") relating to the USD150,000,000 principal amount of 2.25% convertible senior notes due June 15, 2018 (the "**Convertible Notes**"). In the event of any inconsistency between the terms defined in the Indenture and this Confirmation, this Confirmation shall govern. References herein to sections of the Indenture are based on the draft of the Indenture most recently reviewed by the parties at the time of execution of this Confirmation. If any relevant sections of the Indenture are changed, added or renumbered between the execution of this Confirmation and the execution of the Indenture, the parties will amend this Confirmation in good faith to preserve the economic intent of the parties based on the draft of the Indenture so reviewed. The parties further acknowledge that references to the Indenture herein are references to the Indenture as in effect on the date of its execution and if the Indenture is amended following its execution, any such amendment will be disregarded for purposes of this Confirmation unless the parties agree otherwise in writing. The Transaction is subject to early unwind if the closing of the Convertible Notes is not consummated for any reason, as set forth below in Section 8(j).

Each party is hereby advised, and each such party acknowledges, that the other party has engaged in, or refrained from engaging in, substantial financial transactions and has taken other material actions in reliance upon the parties' entry into the Transaction to which this Confirmation relates on the terms and conditions set forth below.

This Confirmation evidences a complete and binding agreement between Dealer and Counterparty as to the terms of the Transaction to which this Confirmation relates. This Confirmation shall be subject to an agreement (the "**Agreement**") in the form of the 2002 ISDA Master Agreement, as published by ISDA,

as if Dealer and Counterparty had executed an agreement in such form on the date hereof (but without any Schedule except for the election of US Dollars ("**USD**") as the Termination Currency). The Transaction shall be the only Transaction under the Agreement.

All provisions contained in, or incorporated by reference to, the Agreement will govern this Confirmation except as expressly modified herein. In the event of any inconsistency between this Confirmation and either the Definitions or the Agreement, this Confirmation shall govern.

2. The Transaction constitutes a Share Option Transaction for purposes of the Equity Definitions. The terms of the particular Transaction to which this Confirmation relates are as follows:

General Terms:

| Trade Date: | May 28, 2013 |
|---|---|
| Effective Date: | June 3, 2013 |
| Option Style: | Modified American, as described under "Procedures for Exercise" below. |
| Option Type: | Call |
| Seller: | Dealer |
| Buyer: | Counterparty |
| Shares: | The Class A Common Stock of Counterparty, par value USD0.01 per share (Ticker Symbol: "FXCM"). |
| Number of Options: | 150,000, equal to the number of Convertible Notes in denominations of USD1,000 principal amount issued by Counterparty on the closing date for the initial issuance of the Convertible Notes. |
| Applicable Percentage: | [✍ ]% |
| Option Entitlement: | As of any date, a number of Shares per Option equal to the (x) Applicable Percentage multiplied by (y) the Conversion Rate (as defined in, and determined pursuant to, the |

Indenture, but without regard to any adjustments to the Conversion Rate determined pursuant to Section 14.03 or 14.04(h) of the Indenture) as of such date.

Strike Price:  As of any date, an amount in USD, rounded to the nearest cent (with 0.5 cents being rounded upwards), equal to USD1,000 *divided by* clause (y) of the definition of Option Entitlement as of such date.

Number of Shares:  The product of the Number of Options and the Option Entitlement.

Premium:  [✍️ ]

Premium Payment Date:  The Effective Date

Exchange:  The New York Stock Exchange

Related Exchange:  All Exchanges

Procedures for Exercise:

Exercise Date:  Each Conversion Date.

2

| | |
|---|---|
| Conversion Date: | Each "Conversion Date" (as defined in, and determined pursuant to, the Indenture) occurring during the Exercise Period for Convertible Notes (such Convertible Notes, each in denominations of USD1,000 principal amount, the "**Relevant Convertible Notes**" for such Conversion Date). |
| Exercise Period: | The period from and excluding the Trade Date to and including the Expiration Date. |
| Expiration Date: | The earlier of (i) the last day on which any Convertible Notes remain outstanding and (ii) the second "Scheduled Trading Day" (as defined in the Indenture) immediately preceding the "Maturity Date" (as defined in, and determined pursuant to, the Indenture). |
| Automatic Exercise on Conversion Dates: | On each Conversion Date, a number of Options equal to the number of Relevant Convertible Notes for such Conversion Date in denominations of USD1,000 principal amount shall be automatically exercised, subject to "Notice of Exercise" below. |
| Notice Deadline: | In respect of any exercise of Options hereunder, the Scheduled Trading Day immediately preceding the first Scheduled Trading Day of the relevant "Observation Period" (as defined in the Indenture), subject to "Notice of Exercise" below; *provided* that in the case of any exercise of Options hereunder in connection with the conversion of any Relevant Convertible Notes for any Conversion Date occurring during the period starting on March 15, 2018 (the "**Final Conversion Period**"), the Notice Deadline shall be the Business Day immediately following such Conversion Date. |
| Notice of Exercise: | Notwithstanding anything to the contrary in the Equity Definitions, Dealer shall have no obligation to make any payment or delivery in respect of any exercise of Options hereunder unless Counterparty notifies Dealer in writing prior to 5:00 PM, New York City time, on the Notice Deadline in respect of such exercise of (i) the number of Options being exercised on such Exercise Date, (ii) the scheduled settlement date under the Indenture for the Relevant Convertible Notes for the related Conversion Date, (iii) the first Scheduled Trading Day of the Observation Period for such Relevant Convertible Notes and (iv) the "Cash Percentage" (as defined in, and determined pursuant to, the Indenture), if any, for such Relevant Convertible Notes; *provided* that in the case of any exercise of Options hereunder in connection with the conversion of any Relevant Convertible Notes for any Conversion Date occurring during the Final Conversion Period, the content of such notice shall be as set forth in clause (i) and (iv) |

3

above. For the avoidance of doubt, if Counterparty fails to give such notice when due in respect of any exercise of Options hereunder, Dealer's obligation to make any payment or delivery in respect of such exercise shall be permanently extinguished, and late notice shall not cure such failure; *provided* that, notwithstanding the foregoing, such notice shall be effective if given after the deadline specified above but prior to 5:00 P.M., New York City time, on the fifth Scheduled Trading Day after such date, in which case the Calculation Agent shall have the right to adjust the Delivery Obligation to capture the economic effect on the Dealer's commercially reasonable hedging activities, including the unwinding thereof, in relation to the Transaction as a result of its not having received such notice prior to the notice deadline.

and Telex and/or Facsimile Number and Contact Details for purpose of Giving Notice:

To: [✎ ]

Settlement Terms:

Settlement Date:

For any Exercise Date, the settlement date for the Shares to be delivered in respect of the Relevant Convertible Notes for the Conversion Date occurring on such Exercise Date under the terms of the Indenture; *provided* that the Settlement Date shall not be prior to the latest of (i) the date one Settlement Cycle following the final day of the relevant Observation Period, (ii) the Exchange Business Day immediately following the date on which Counterparty gives notice to Dealer of such Settlement Date prior to 5:00 PM, New York City time, and (iii) the Exchange Business Day immediately following the date Counterparty provides the Notice of Delivery Obligation prior to 5:00 PM, New York City time.

Delivery Obligation:

In lieu of the obligations set forth in Sections 8.1 and 9.1 of the Equity Definitions, and subject to "Notice of Exercise" above, in respect of any Exercise Date, Dealer will deliver to Counterparty on the related Settlement Date (i) a number of Shares equal to the Applicable Percentage multiplied by the aggregate "Daily Share Amount" that Counterparty is obligated to deliver to the holder(s) of the Relevant Convertible Notes for such Conversion Date determined pursuant to Section 14.02 of the Indenture (except that such aggregate Daily Share Amount shall be determined without taking into consideration any rounding pursuant to Section 14.02 of the Indenture and shall be rounded down to the nearest whole number) and cash in lieu of fractional shares, if any, resulting from such rounding and (ii) an amount in cash equal to the

4

Applicable Percentage multiplied by the sum of the "Daily Net Cash Portions" (as defined in, and determined pursuant to, the Indenture) that Counterparty is obligated to deliver to the holder(s) of the Relevant Convertible Notes for such Conversion Date determined pursuant to Section 14.02 of the Indenture, in the case of (i) and (ii), based on the applicable Cash Percentage under the Indenture (such Shares and/or cash, the "**Convertible Obligation**"); *provided* that the Convertible Obligation shall be determined excluding any Shares and/or cash that Counterparty is obligated to deliver to holder(s) of the Relevant Convertible Notes as a direct or indirect result of any adjustments to the Conversion Rate pursuant to Sections 14.03 or 14.04(h) of the Indenture and any interest payment that Counterparty is (or would have been) obligated to deliver to holder(s) of the Relevant Convertible Notes for such Conversion Date; and *provided further* that if such exercise relates to the conversion of Relevant Convertible Notes in connection with which holders thereof are entitled to receive additional Shares and/or cash determined pursuant to the adjustments to the Conversion Rate set forth in Section 14.03 of the Indenture, then, notwithstanding the foregoing, the Delivery Obligation shall include such additional Shares and/or cash, except that the Delivery Obligation shall be capped so that the value of the Delivery Obligation for the Options exercised on such Exercise Date (with the value of any Shares included in the Delivery Obligation determined by the Calculation Agent using the "Daily VWAP" (as defined in the Indenture on the last day of the relevant Observation Period) does not exceed the amount (the "**Fair Value Cap**") as determined by the Calculation Agent that would be payable by Dealer pursuant to Section 6 of the Agreement if such Conversion Date were an Early Termination Date resulting from an Additional Termination Event with respect to which the Transaction (except that, for purposes of determining such amount, (x) the Number of Options shall be deemed to be equal to the number of Options exercised on such Exercise Date and (y) such amount payable will be determined as if Section 14.03 of the Indenture were deleted and, for the avoidance of doubt, such amount will be determined taking into account the Applicable Percentage) was the sole Affected Transaction and Counterparty was the sole Affected Party (determined without regard to Section 8(a) of this Confirmation). For the avoidance of doubt, if the "Daily Conversion Value" (as defined in, and determined pursuant to, the Indenture) for each of the VWAP Trading Days (as defined in the Indenture) occurring in the relevant Observation Period is less than or equal to USD25.00, Dealer will have no delivery obligation hereunder in respect of the related Exercise Date.

5

| | |
|---|---|
| Notice of Delivery Obligation: | No later than the Exchange Business Day immediately following the last day of the relevant Observation Period), Counterparty shall give Dealer notice of the final number of Shares and/or cash comprising the relevant Convertible Obligation; *provided* that, with respect to any Exercise Date occurring during the Final Conversion Period, Counterparty may provide Dealer with a single notice of the aggregate number of Shares and/or cash comprising the Convertible Obligations for all Exercise Dates occurring during such period (it being understood, for the avoidance of doubt, that the requirement of Counterparty to deliver such notice shall not limit Counterparty's obligations with respect to Notice of Exercise or Dealer's obligations with respect to Delivery Obligation, each as set forth above, in any way). In addition, for the avoidance of doubt, such final number of Shares in such notice shall not be the basis for determining the Delivery Obligation. With respect to any conversion of Relevant Convertible Notes to which the second proviso to "Delivery Obligation" above applies, the Calculation Agent shall notify Counterparty of the Fair Value Cap as promptly as practicable and in no event later than the Exchange Business Day immediately following the day on which Dealer receives the Notice of Delivery Obligation from Counterparty. |
| Other Applicable Provisions: | To the extent Dealer is obligated to deliver Shares hereunder, the provisions of Sections 9.1(c), 9.8, 9.9, 9.10, 9.11 and 9.12 of the Equity Definitions will be applicable as if "Physical Settlement" applied to the Transaction; *provided* that the Representation and Agreement contained in Section 9.11 of the Equity Definitions shall be modified by excluding any representations therein relating to restrictions, obligations, limitations or requirements under applicable securities laws that exist solely as a result of the fact that Buyer is the issuer of the Shares. |
| Restricted Certificated Shares: | Notwithstanding anything to the contrary in the Equity Definitions, Dealer may, in whole or in part, deliver Shares in certificated form representing the Number of Shares to be Delivered to Counterparty in lieu of delivery through the Clearance System. |
| Adjustments: | |
| Method of Adjustment: | Notwithstanding Section 11.2 of the Equity Definitions, upon the occurrence of any event or condition set forth in Sections 14.04(a)- (e) of the Indenture (an "**Adjustment Event**"), the Calculation Agent shall make the corresponding adjustment in respect of any one or more of the Number of Options, |

6

the Option Entitlement and any other variable relevant to the exercise, settlement or payment of the Transaction, to the extent an analogous adjustment is made under the Indenture; *provided* that, notwithstanding the foregoing, if the Calculation Agent in good faith disagrees with any adjustment under the Indenture that involves an exercise of discretion by Counterparty or its board of directors (including, without limitation, pursuant to Section 14.04(c) of the Indenture or in connection with any proportional adjustment or the determination of the fair value of any securities, property, rights or other assets), then in each such case, the Calculation Agent will determine the adjustment to be made to any one or more of the Strike Price, Number of Options, Option Entitlement and any other variable relevant to the exercise, settlement or payment for the Transaction in a commercially reasonable manner. Promptly upon the occurrence of any Adjustment Event, Counterparty shall notify the Calculation Agent of such Adjustment Event; and once the adjustments to be made to the terms of the Indenture and the Relevant Convertible Notes in respect of such Adjustment Event have been determined, Counterparty shall, promptly notify the Calculation Agent in writing of the details of such adjustments.

| | |
|---|---|
| Extraordinary Events: | |
| Merger Events: | Notwithstanding Section 12.1(b) of the Equity Definitions, a "Merger Event" means the occurrence of any event or condition set forth in Section 14.07 of the Indenture. |
| Consequences of Merger Events: | Notwithstanding Section 12.2 of the Equity Definitions, upon the occurrence of a Merger Event, the Calculation Agent shall make the corresponding adjustment in respect of any adjustment under, and made pursuant to the terms of, the Indenture to any one or more of the nature of the Shares, the Number of Options, the Option Entitlement and any other variable relevant to the exercise, settlement or payment for the Transaction, to the extent an analogous adjustment is made under, and pursuant to the terms of, the Indenture in respect of such Merger Event; *provided* that such adjustment shall be made without regard to any adjustment to the Conversion Rate for the issuance of additional Shares as set forth in Section 14.03 or 14.04(h) of the Indenture; provided further that if (i) the consideration for the Shares includes (or, at the option of a holder of the Shares, may include) shares of an entity or person that is not a corporation or is not organized under the laws of the United States, any State thereof or the District of Columbia or (ii) the counterparty to the Transaction following such Merger Event will not be |

7

a corporation or will not be the Issuer following such Merger Event, then Cancellation and Payment (Calculation Agent Determination) may apply at Dealer's sole election.

| | |
|---|---|
| Notice of Merger Consideration: | Upon the occurrence of a Merger Event that causes the Shares to be converted into the right to receive more than a single type of consideration (determined based in part upon any form of stockholder election), Counterparty shall reasonably promptly (but in any event prior to the relevant effective date of such Merger Event determined pursuant to Section 14.07 of the Indenture) of the Merger Event) notify the Calculation Agent of (i) the weighted average of the types and amounts of consideration received by the holders of Shares entitled to receive cash, securities or other property or assets with respect to or in exchange for such Shares in any Merger Event who affirmatively make such an election and (ii) the details of the adjustment made under the Indenture in respect of such Merger Event. |
| Nationalization, Insolvency or Delisting: | Cancellation and Payment (Calculation Agent Determination); *provided* that in addition to the provisions of Section 12.6(a)(iii) of the Equity Definitions, it will also constitute a Delisting if the Exchange is located in the United States and the Shares are not immediately re- listed, re- traded or re- quoted on any of the New York Stock Exchange, the NASDAQ Global Select Market or the NASDAQ Global Market (or their respective successors); if the Shares are immediately re- listed, re- traded or re- quoted on any such exchange or quotation system, such exchange or quotation system shall thereafter be deemed to be the Exchange. |

For the avoidance of doubt, whenever the Dealer, Calculation Agent or Determining Party is called upon to determine an amount or make an adjustment pursuant to the terms of this Confirmation or the Equity Definitions to take into account the effect of an event, the Dealer, Calculation Agent, or Determining Party shall make such adjustment or determination by reference to the effect of such event, assuming that the Dealer maintains a commercially reasonable hedge position.

Additional Disruption Events:

| | |
|---|---|
| (a) Change in Law: | Applicable; *provided* that Section 12.9(a)(ii) of the Equity Definitions is hereby amended by (i) replacing the phrase "the interpretation" in the third line thereof with the phrase "or public announcement or statement of the formal or informal interpretation", (ii) immediately following the word "Transaction" in clause (X) thereof, adding the phrase "in the manner contemplated by Hedging Party on the Trade Date", (iii) adding the words "(including, for the avoidance of doubt and without limitation, adoption or |

8

promulgation of new regulations authorized or mandated by existing statute)" after the word "regulation" in the second line thereof and (iv) adding the words "or any Hedge Positions" after the word "Shares" in the clause (X) thereof.

| | |
|---|---|
| (b) Failure to Deliver: | Applicable |
| (c) Insolvency Filing: | Applicable |
| (d) Hedging Disruption: | Applicable; *provided* that: |

Section 12.9(a)(v) of the Equity Definitions is hereby modified by inserting the following two phrases at the end of such Section:

"For the avoidance of doubt, the term "equity price risk" shall be deemed to include, but shall not be limited to, stock price and volatility risk. And, for the further avoidance of doubt, any such transactions or assets referred to in phrases (A) or (B) above must be available on commercially reasonable pricing terms."

| | |
|---|---|
| Hedging Party: | Dealer |
| Determining Party: | Dealer |
| Non- Reliance: | Applicable |
| Agreements and Acknowledgments Regarding Hedging Activities: | Applicable |
| Additional Acknowledgments: | Applicable |
| 3. <u>Calculation Agent</u>: | Dealer. The Calculation Agent shall, upon reasonable written request by either party, provide a written explanation of any calculation or adjustment made by it, including, where applicable, a description of the methodology and data applied, it being understood that the Calculation Agent shall not be obligated to disclose any proprietary models used by it for such calculation. |

4. <u>Account Details</u>:

Dealer Payment Instructions:

[✍ ]

Counterparty Payment Instructions:

To be provided by Counterparty.

5. <u>Offices</u>:

The Office of Dealer for the Transaction is:

[✍ ]

The Office of Counterparty for the Transaction is:

55 Water Street, 50th Floor
New York, New York 10041

9

6. Notices: For purposes of this Confirmation:

    (a)    Address for notices or communications to Counterparty:

David S. Sassoon
General Counsel & Secretary
55 Water Street, 50th Floor
New York, New York 10041
(646) 512- 4284 Fax
(646) 432- 2997 phone
dsassoon@fxcm.com

    (b)    Address for notices or communications to Dealer:

[✍ ]

7. Representations, Warranties and Agreements:

(a) In addition to the representations and warranties in the Agreement and those contained elsewhere herein, Counterparty represents and warrants to and for the benefit of, and agrees with, Dealer as follows:

(i) On the Trade Date, (A) none of Counterparty and its officers and directors is aware of any material nonpublic information regarding Counterparty or the Shares and (B) all reports and other documents filed by Counterparty with the Securities and Exchange Commission pursuant to the Securities Exchange Act of 1934, as amended (the "**Exchange Act**") when considered as a whole (with the more recent such reports and documents deemed to amend inconsistent statements contained in any earlier such reports and documents), do not contain any untrue statement of a material fact or any omission of a material fact required to be stated therein or necessary to make the statements therein, in the light of the circumstances in which they were made, not misleading.

(ii) On the Trade Date, neither Counterparty nor any "affiliate" or "affiliated purchaser" (each as defined in Rule 10b- 18 of the Exchange Act ("**Rule 10b- 18**")) shall directly or indirectly (including, without limitation, by means of any cash- settled or other derivative instrument other than the Transaction) purchase, offer to purchase, place any bid or limit order that would effect a purchase of, or commence any tender offer relating to, any Shares (or an equivalent interest, including a unit of beneficial interest in a trust or limited partnership or a depository share) or any security convertible into or exchangeable or exercisable for Shares, provided that this clause will not apply to Share Option transactions entered into with Dealer or [✍ ] in connection with, or substantially concurrently with, the Convertible Notes.

(iii) Without limiting the generality of Section 13.1 of the Equity Definitions, Counterparty acknowledges that Dealer is not making any representations or warranties with respect to the treatment of the Transaction under any accounting standards including ASC Topic 260, *Earnings Per Share*, ASC Topic 815, *Derivatives and Hedging*, ASC Topic 480, *Distinguishing Liabilities from Equity and ASC 815- 40, Derivatives and Hedging  Contracts in Entity's Own Equity*.

(iv) Prior to the Trade Date, Counterparty shall deliver to Dealer a resolution of Counterparty's board of directors authorizing the Transaction.

(v) Counterparty is not entering into this Confirmation to create actual or apparent trading activity in the Shares (or any security convertible into or exchangeable for Shares) or to raise or depress or otherwise manipulate the price of the Shares (or any security convertible into or exchangeable for Shares) or to otherwise violate the Exchange Act.

(vi) Counterparty is not, and after giving effect to the transactions contemplated hereby will not be, required to register as, an "investment company" as such term is defined in the Investment Company Act of 1940, as amended.

(vii) On each of the Trade Date and the Premium Payment Date, Counterparty is not "insolvent" (as such term is defined under Section 101(32) of the U.S. Bankruptcy Code (Title 11 of the United States Code) (the "**Bankruptcy Code**")) and Counterparty would be able to purchase the Shares hereunder in compliance with the laws of the jurisdiction of Counterparty's incorporation.

(viii) The representations and warranties of Counterparty set forth in Section 3 of the Agreement and Section 2 of the Purchase Agreement between Issuer and Credit Suisse Securities (USA) LLC and Merrill Lynch, Pierce, Fenner & Smith Incorporated, as representatives of the initial purchasers party thereto, are true and correct as of the Trade Date and the Effective Date and are hereby deemed to be repeated to Dealer as if set forth herein.

(b) Each of Dealer and Counterparty represents to the other party that it is an "eligible contract participant" as defined in Section 1a(18) of the U.S. Commodity Exchange Act, as amended.

(c) Each of Dealer and Counterparty acknowledges that the offer and sale of the Transaction to it is intended to be exempt from registration under the Securities Act of 1933, as amended (the "**Securities Act**"), by virtue of Section 4(2) thereof. Accordingly, Counterparty represents and warrants to Dealer that (i) it has the financial ability to bear the economic risk of its investment in the Transaction and is able to bear a total loss of its investment and its investments in and liabilities in respect of the Transaction, which it understands are not readily marketable, are not disproportionate to its net worth, and it is able to bear any loss in connection with the Transaction, including the loss of its entire investment in the Transaction, (ii) it is an "accredited investor" as that term is defined in Regulation D as promulgated under the Securities Act, (iii) it is entering into the Transaction for its own account and without a view to the distribution or resale thereof, (iv) the assignment, transfer or other disposition of the Transaction has not been and will not be registered under the Securities Act and is restricted under this Confirmation, the Securities Act and state securities laws, and (v) its financial condition is such that it has no need for liquidity with respect to its investment in the Transaction and no need to dispose of any portion thereof to satisfy any existing or contemplated undertaking or indebtedness and is capable of assessing the merits of and understanding (on its own behalf or through independent professional advice), and understands and accepts, the terms, conditions and risks of the Transaction.

(d) Each of Dealer and Counterparty agrees and acknowledges that Dealer is a "financial institution," "swap participant" and "financial participant" within the meaning of Sections 101(22), 101(53C) and 101(22A) of Title 11 of the United States Code (the "**Bankruptcy Code**"). The parties hereto further agree and acknowledge (A) that this Confirmation is (i) a "securities contract," as such term is defined in Section 741(7) of the Bankruptcy Code, with respect to which each payment and delivery hereunder is a "settlement payment," as such term is defined in Section 741(8) of the Bankruptcy Code, and (ii) a "swap agreement," as such term is defined in Section 101(53B) of the Bankruptcy Code, with respect to which each payment and delivery hereunder is a "transfer," as such term is defined in Section 101(54) of the Bankruptcy Code, and (B) that Dealer is entitled to the protections afforded by, among other sections, Sections 362(b)(6), 362(b)(17), 546(e), 546(g), 555 and 560 of the Bankruptcy Code.

(e) Counterparty shall deliver to Dealer an opinion of counsel, dated as of the Effective Date (containing customary exceptions and qualifications) and reasonably acceptable to Dealer in form and substance, with respect to the matters set forth in Section 3(a) of the Agreement.

11

8. <u>Other Provisions</u>:

(a) *Alternative Calculations and Payment on Early Termination and on Certain Extraordinary Events*. If Dealer shall owe Counterparty any amount pursuant to "Consequences of Merger Events" above or Sections 12.6, 12.7 or 12.9 of the Equity Definitions or pursuant to Section 6(d)(ii) of the Agreement (a "**Payment Obligation**"), Counterparty shall have the right, in its sole discretion, to require Dealer to satisfy any such Payment Obligation by the Share Termination Alternative (as defined below) by giving irrevocable telephonic notice to Dealer, confirmed in writing within one Scheduled Trading Day, between the hours of 9:00 A.M. and 4:00 P.M. New York City time on the relevant merger date, announcement date, Early Termination Date or date of cancellation or termination in respect of an Additional Disruption Event ("**Notice of Share Termination**"); *provided* that if Counterparty does not elect to require Dealer to satisfy its Payment Obligation by the Share Termination Alternative, Dealer shall have the right, in its sole discretion, to elect to satisfy its Payment Obligation by the Share Termination Alternative, notwithstanding Counterparty's failure to elect; and *provided further* that Counterparty shall not have the right to so elect (but, for the avoidance of doubt, Dealer shall have the right to so elect) in the event of (i) an Insolvency, a Nationalization or a Merger Event, in each case, in which the consideration or proceeds to be paid to holders of Shares consists solely of cash or (ii) an Event of Default in which Counterparty is the Defaulting Party or a Termination Event in which Counterparty is the Affected Party, which Event of Default or Termination Event resulted from an event or events within Counterparty's control. Upon such Notice of Share Termination, the following provisions shall apply on the Scheduled Trading Day immediately following the relevant merger date, announcement date, Early Termination Date or date of cancellation or termination in respect of an Additional Disruption Event, as applicable:

| | |
|---|---|
| Share Termination Alternative: | Applicable and means that Dealer shall deliver to Counterparty the Share Termination Delivery Property on the date on which the Payment Obligation would otherwise be due pursuant to "Consequences of Merger Events" above, Section 12.7 or 12.9 of the Equity Definitions or Section 6(d)(ii) of the Agreement, as applicable (the "**Share Termination Payment Date**"), in satisfaction of the Payment Obligation. |
| Share Termination Delivery Property: | A number of Share Termination Delivery Units, as calculated by the Calculation Agent, equal to the Payment Obligation divided by the Share Termination Unit Price. The Calculation Agent shall adjust the Share Termination Delivery Property by replacing any fractional portion of the aggregate amount of a security therein with an amount of cash equal to the value of such fractional security based on the values used to calculate the Share Termination Unit Price. |
| Share Termination Unit Price: | The value of property contained in one Share Termination Delivery Unit on the date such Share Termination Delivery Units are to be delivered as Share Termination Delivery Property, as determined by the Calculation Agent in its discretion by commercially reasonable means and notified by the Calculation Agent to Dealer at the time of notification of the Payment Obligation. |
| Share Termination Delivery Unit: | In the case of a Termination Event, Event of Default, Delisting or Additional Disruption Event, one Share or, in the case of an Insolvency, Nationalization or Merger Event, one Share or a unit consisting of the number or amount of each type of property received by a holder of one Share (without consideration of any requirement to pay cash or other consideration in lieu of fractional amounts of any securities) in such Insolvency, Nationalization or Merger Event. If such Insolvency, Nationalization or Merger Event involves a choice of consideration to be received by holders, such holder shall be deemed to have elected to receive the maximum possible amount of cash. |
| Other applicable provisions: | If Share Termination Alternative is applicable, the provisions of Sections 9.8, 9.9, 9.11 and 9.12 of the Equity Definitions will be |

12

applicable as if "Physical Settlement" applied to the Transaction, except that all references to "Shares" shall be read as references to "Share Termination Delivery Units"; *provided* that the Representation and Agreement contained in Section 9.11 of the Equity Definitions shall be modified by excluding any representations therein relating to restrictions, obligations, limitations or requirements under applicable securities laws as a result of the fact that Buyer is the issuer of any Share Termination Delivery Units (or any part thereof).

In the event that (i) an Early Termination Date occurs or is designated with respect to the Transaction as a result of a Termination Event or an Event of Default (other than an Event of Default arising under Section 5(a)(ii) or 5(a)(iv) of the Agreement) and, as a result, Counterparty owes to Dealer an amount calculated under Section 6(e) of the Agreement, or (ii) Counterparty owes to Dealer, pursuant to Section 12.7 or Section 12.9 of the Equity Definitions, an amount calculated under Section 12.8 of the Equity Definitions, such amount shall be deemed to be zero.

(b) *Disposition of Hedge Shares*. Counterparty hereby agrees that if, in the good faith reasonable judgment of Dealer based on the advice of counsel, the Shares (the "**Hedge Shares**") acquired by Dealer for the purpose of hedging its obligations pursuant to the Transaction cannot be sold in the U.S. public market by Dealer without registration under the Securities Act, Counterparty shall, at its election: (i) in order to allow Dealer to sell the Hedge Shares in a registered offering, make available to Dealer an effective registration statement under the Securities Act to cover the resale of such Hedge Shares and (A) enter into an agreement, in form and substance reasonably satisfactory to Dealer and Counterparty, substantially in the form of a customary underwriting agreement for a registered secondary offering of similar size, (B) provide accountant's "comfort" letters in customary form for registered offerings of equity securities of similar size, (C) provide customary disclosure opinions of nationally recognized outside counsel to Counterparty in a form customarily addressed to underwriters in registered underwritten offerings, containing customary assumptions and qualifications of such outside counsel, each as reasonably acceptable to Dealer, (D) provide other customary opinions, certificates and closing documents customary in form as those customarily provided to underwriters of registered offerings of equity securities of similar size and (E) afford Dealer a reasonable opportunity to conduct a "due diligence" investigation with respect to Counterparty customary in scope for underwriters of underwritten offerings of equity securities of similar size; *provided, however*, that if Dealer, in its sole reasonable discretion, is not satisfied with access to due diligence materials, the results of its due diligence investigation, or the procedures and documentation for the registered offering referred to above, then clause (ii) or clause (iii) of this Section 8(b) shall apply at the election of Counterparty; (ii) in order to allow Dealer to sell the Hedge Shares in a private placement, to enter into a private placement agreement substantially similar to private placement purchase agreements customary for private placements of equity securities of similar size, in form and substance reasonably satisfactory to Dealer and Counterparty, including customary representations, covenants, blue sky and other governmental filings and/or registrations, indemnities to Dealer, due diligence rights (for Dealer or any designated buyer of the Hedge Shares from Dealer), opinions and certificates and such other documentation as is customary for private placements agreements for private placements of equity securities of similar size, all reasonably acceptable to Dealer (in which case, the Calculation Agent shall make any adjustments in a commercially reasonable manner to the terms of the Transaction that are necessary, in its reasonable judgment, to compensate Dealer for any discount from the public market price of the Shares incurred on the sale of Hedge Shares in a private placement); or (iii) purchase the Hedge Shares from Dealer at the VWAP Price on such Exchange Business Days, and in the amounts, requested by Dealer. "**VWAP Price**" means, on any Exchange Business Day, the per Share volume-weighted average price as displayed under the heading "Bloomberg VWAP" on Bloomberg page FXCM <equity> VAP (or any successor thereto) in respect of the period from 9:30 a.m. to 4:00 p.m. (New York City time) on such Exchange Business Day (or if such volume-weighted average price is unavailable, the market value of one Share on such Exchange Business Day, as determined by the Calculation Agent using a volume-weighted method). For the avoidance of doubt, under no circumstances shall Counterparty be obligated to make the election described in clause (iii) of this Section 8(b).

13

(c) *Repurchase Notices*. Counterparty shall, on any day on which Counterparty effects any repurchase of Shares, promptly give Dealer a written notice of such repurchase (a "**Repurchase Notice**") on such day if, following such repurchase, the Notice Percentage as determined on such day is (i) greater than 12% and (ii) greater by 0.5% than the Notice Percentage included in the immediately preceding Repurchase Notice (or, in the case of the first such Repurchase Notice, greater than the Notice Percentage as of the date hereof). The "**Notice Percentage**" as of any day is the fraction, expressed as a percentage, the numerator of which is the Number of Shares and the denominator of which is the number of Shares outstanding on such day. In the event that Counterparty fails to provide Dealer with a Repurchase Notice on the day and in the manner specified in this Section 8(c) then Counterparty agrees to indemnify and hold harmless Dealer, its affiliates and their respective directors, officers, employees, agents and controlling persons (Dealer and each such person being an "**Indemnified Party**") from and against any and all losses, claims, damages and liabilities (or actions in respect thereof), joint or several, to which such Indemnified Party may become subject under applicable securities laws, including without limitation, Section 16 of the Exchange Act, relating to or arising out of such failure. If for any reason the foregoing indemnification is unavailable to any Indemnified Party or insufficient to hold harmless any Indemnified Party, then Counterparty shall contribute, to the maximum extent permitted by law, to the amount paid or payable by the Indemnified Party as a result of such loss, claim, damage or liability. In addition, Counterparty will reimburse any Indemnified Party for all reasonable expenses (including reasonable counsel fees and expenses) as they are incurred (after notice to Counterparty) in connection with the investigation of, preparation for or defense or settlement of any pending or threatened claim or any action, suit or proceeding arising therefrom, whether or not such Indemnified Party is a party thereto and whether or not such claim, action, suit or proceeding is initiated or brought by or on behalf of Counterparty. Counterparty shall be relieved from liability to the extent that an Indemnified Person fails to notify Counterparty as soon as reasonably practicable of any action commenced against it in respect of which indemnity may be sought hereunder. Counterparty shall not be liable for any settlement of any proceeding effective without its written consent. This indemnity shall survive the completion of the Transaction contemplated by this Confirmation and any assignment and delegation of the Transaction made pursuant to this Confirmation or the Agreement shall inure to the benefit of any permitted assignee of Dealer.

(d) *Additional Termination Events*.

(i) The occurrence of (A) an event of default with respect to Counterparty under the terms of the Convertible Notes as set forth in, and determined for the purposes of the Transaction pursuant to, Section 6.01 of the Indenture that results in an acceleration of the Convertible Notes or (B) an Amendment Event shall be an Additional Termination Event with respect to which the Transaction is the sole Affected Transaction and Counterparty is the sole Affected Party, and Dealer shall be the party entitled to designate an Early Termination Date pursuant to Section 6(b) of the Agreement; *provided* that in the case of an Amendment Event, such right to designate an Early Termination Date shall be automatically extinguished after 30 days following Dealer's obtaining knowledge of the occurrence of such Amendment Event.

"**Amendment Event**" means that Counterparty amends, modifies, supplements or obtains a waiver in respect of any term of the Indenture or the Convertible Notes governing the principal amount, coupon, maturity, repurchase obligation of Counterparty, redemption right of Counterparty, any term relating to conversion of the Convertible Notes (including changes to the conversion price, conversion settlement dates or conversion conditions), or any term that would require consent of the holders of not less than 100% of the principal amount of the Convertible Notes to amend, in each case without the prior consent of Dealer, such consent not be unreasonably withheld.

(ii) If any Note Repurchase Event occurs, (A) Counterparty shall notify Dealer as promptly as reasonably practicable of such event, (B) such an event shall be an Additional Termination Event, (C) an Early Termination Date shall be deemed to occur automatically on the date of such notice with respect to a portion of the Transaction relating to a number of Units equal to the number of Convertible Notes in denominations of USD1,000 principal amount so repurchased, exchanged or repaid in connection with such Note Repurchase Event (the "**Affected Portion**"), but payment of the Close- out Amount in respect of such Early Termination Date shall not be due until one Settlement Cycle following the last Exchange Business Day of the time period described in clause (E) below, (D) Counterparty shall be deemed the sole Affected Party

14

and the Affected Portion shall be deemed the sole Affected Transaction, and (E) the Calculation Agent may reasonably determine the Close- out Amount in connection with such Additional Termination Event using a volume- weighted average price determined over a time period reasonably determined by Dealer in a commercially reasonable manner based on the period of time necessary to unwind a commercially reasonable hedge position of the Transaction.

"**Note Repurchase Event**" means the occurrence of any of the following:

(1)    any Convertible Notes are repurchased (whether in connection with or as a result of a fundamental change, howsoever defined, or for any other reason) by Counterparty or any of its subsidiaries;

(2)    any Convertible Notes are delivered to Counterparty in exchange for delivery of any property or assets of Counterparty or any of its subsidiaries (howsoever described);

(3)    any principal of any of the Convertible Notes is repaid prior to the final maturity date of the Convertible Notes (whether following acceleration of the Convertible Notes or otherwise); or

(4)    any Convertible Notes are exchanged by or for the benefit of the holders thereof for any other securities of Counterparty or any of its affiliates (or any other property, or any combination thereof) pursuant to any exchange offer or similar transaction.

For the avoidance of doubt, in the case of each of clauses (1) through (4), conversions of the Convertible Notes pursuant to the terms of the Indenture shall not constitute a Note Repurchase Event.

(e) *Right to Extend*. Dealer may postpone any Settlement Date or any other date of valuation or delivery by Dealer, with respect to some or all of the relevant Options (in which event the Calculation Agent shall make appropriate adjustments to the Delivery Obligation), if Dealer determines, in its reasonable discretion based on the advice of counsel, that such extension is reasonably necessary or appropriate to preserve Dealer's commercially reasonable hedging or hedge unwind activity hereunder in light of existing liquidity conditions in the cash market or the stock borrow market or other relevant market or to effect purchases of Shares in connection with its commercially reasonable hedging, hedge unwind or settlement activity hereunder in a manner that would, if Dealer were Counterparty or an affiliated purchaser of Counterparty, be in compliance with applicable legal, regulatory or self- regulatory requirements, or with related policies and procedures applicable to Dealer.

(f) *Staggered Settlement*. Dealer may, by notice to Counterparty prior to any Settlement Date (a "**Nominal Settlement Date**"), elect to deliver the Shares on one or more dates (each, a "**Staggered Settlement Date**") or at two or more times on the Nominal Settlement Date as follows:

(i) in such notice, Dealer will specify to Counterparty the related Staggered Settlement Dates (each of which will be on or prior to the date that follows such Nominal Settlement Date, but not prior to the relevant Conversion Date) or delivery times and how it will allocate the Shares it is required to deliver under "Delivery Obligation" (above) among the Staggered Settlement Dates or delivery times; and

(ii) the aggregate number of Shares that Dealer will deliver to Counterparty hereunder on all such Staggered Settlement Dates and delivery times will equal the number of Shares that Dealer would otherwise be required to deliver on such Nominal Settlement Date.

(g) *Transfer and Assignment*. Either party may transfer any of its rights or obligations under the Transaction with the prior written consent of the non-transferring party, such consent not to beunreasonably withheld; *provided* that Dealer may transfer or assign without any consent of Counterparty its rights and obligations hereunder, in whole or in part, to (i) any of its affiliates of credit quality no weaker than that of Dealer; *provided further* that at any time at which (1) the Equity Percentage exceeds 9% or (2) Dealer, Dealer Group (as defined below) or any person whose ownership position would be aggregated with that of Dealer or Dealer Group (Dealer, Dealer Group or any such person, a "**Dealer Person**") under Section 203 of the Delaware General Corporation Law (the "**DGCL Takeover Statute**") or any state or federal bank holding company or banking laws, or other federal, state or local regulations or regulatory

15

orders applicable to ownership of Shares ("**Applicable Laws**"), owns, beneficially owns, constructively owns, controls, holds the power to vote or otherwise meets a relevant definition of ownership in excess of a number of Shares equal to (x) the number of Shares that would give rise to reporting or registration obligations or other requirements (including obtaining prior approval by a state or federal regulator) of a Dealer Person under Applicable Laws (including, without limitation, "interested stockholder" or "acquiring person" status under the DGCL Takeover Statute) and with respect to which such requirements have not been met or the relevant approval has not been received *minus* (y) 1% of the number of Shares outstanding on the date of determination (either such condition described in clause (1) or (2), an "**Excess Ownership Position**"), if Dealer, in its reasonable discretion, is unable to effect a transfer or assignment to a third party in accordance with the requirements set forth above after using its commercially reasonable efforts on pricing terms reasonably acceptable to Dealer such that an Excess Ownership Position no longer exists, Dealer may designate any Scheduled Trading Day as an Early Termination Date with respect to a portion (the "**Terminated Portion**") of the Transaction, such that such Excess Ownership Position no longer exists. In the event that Dealer so designates an Early Termination Date with respect to a portion of the Transaction, a payment or delivery shall be made pursuant to Section 6 of the Agreement and Section 8(a) of this Confirmation as if (i) an Early Termination Date had been designated in respect of a Transaction having terms identical to the Terminated Portion of the Transaction, (ii) Counterparty shall be the sole Affected Party with respect to such partial termination and (iii) such portion of the Transaction shall be the only Terminated Transaction. The "**Equity Percentage**" as of any day is the fraction, expressed as a percentage, (A) the numerator of which is the number of Shares that Dealer and any of its affiliates subject to aggregation with Dealer for purposes of the "beneficial ownership" test under Section 13 of the Exchange Act and all persons who may form a "group" (within the meaning of Rule 13d- 5(b)(1) under the Exchange Act) with Dealer (collectively, "**Dealer Group**") "beneficially own" (within the meaning of Section 13 of the Exchange Act) without duplication on such day and (B) the denominator of which is the number of Shares outstanding on such day.

(h) *Equity Rights*. Dealer acknowledges and agrees that this Confirmation is not intended to convey to it rights with respect to the Transaction that are senior to the claims of common stockholders in the event of Counterparty's bankruptcy. For the avoidance of doubt, the parties agree that the preceding sentence shall not apply at any time other than during Counterparty's bankruptcy to any claim arising as a result of a breach by Counterparty of any of its obligations under this Confirmation or the Agreement. For the avoidance of doubt, the parties acknowledge that this Confirmation is not secured by any collateral that would otherwise secure the obligations of Counterparty herein under or pursuant to any other agreement.

(i) *No Netting and Set- off*. The provisions of Section 2(c) of the Agreement shall not apply to the Transaction. Each party waives any and all rights it may have to set off delivery or payment obligations it owes to the other party under the Transaction against any delivery or payment obligations owed to it by the other party, whether arising under the Agreement, under any other agreement between the parties hereto, by operation of law or otherwise.

16

(j) *Early Unwind*. In the event the sale by Counterparty of the Convertible Notes is not consummated with the initial purchasers for any reason by the close of business in New York on June 3, 2013 (or such later date as agreed upon by the parties, which in no event shall be later than June 10, 2013) (June 3, 2013 or such later date being the "**Early Unwind Date**"), the Transaction shall automatically terminate (the "**Early Unwind**"), on the Early Unwind Date and (i) the Transaction and all of the respective rights and obligations of Dealer and Counterparty thereunder shall be cancelled and terminated and (ii) Counterparty shall reimburse Dealer for any reasonable costs or expenses (including market losses) relating to the unwinding of Dealer's commercially reasonable hedging activities in connection with the Transaction (including any reasonable loss or cost incurred as a result of its terminating, liquidating, obtaining or reestablishing any commercially reasonable hedge or related trading position), which shall be paid in cash or Shares at the option of the Counterparty (and if paid in Shares, (i) with the market valuation of such Shares being determined in a commercially reasonable manner by the Calculation Agent including any liquidity discount if the Shares are not subject to an effective registration statement, (ii) the provisions of Section 8(b) of this Confirmation will be applicable as if the shares delivered were Hedge Shares and (iii) the Counterparty will not be obligated to deliver more than [✍ ] shares pursuant to this provision (which number shall be subject to adjustment hereunder as a result of a Potential Adjustment Event, but only to the extent such adjustments are within the Company's control)). The amount of any such reimbursement shall be determined by Dealer in its sole good faith discretion. Following such termination, cancellation and payment, each party shall be released and discharged by the other party from and agrees not to make any claim against the other party with respect to any obligations or liabilities of the other party arising out of and to be performed in connection with the Transaction either prior to or after the Early Unwind Date.

(k) *Designation by Dealer*. Notwithstanding any other provision in this Confirmation to the contrary requiring or allowing Dealer to purchase, sell, receive or deliver any Shares or other securities to or from Counterparty, Dealer may designate any of its affiliates to purchase, sell, receive or deliver such Shares or other securities and otherwise to perform Dealer's obligations in respect of the Transaction and any such designee may perform such obligations to the extent it does not result in any additional costs, taxes, fees, or losses to Counterparty. Dealer shall be discharged of its obligations to Counterparty to the extent of any such performance.

(l) *Disclosure*. Effective from the date of commencement of discussions concerning the Transaction, Counterparty and each of its employees, representatives, or other agents may disclose to any and all persons, without limitation of any kind, the tax treatment and tax structure of the Transaction and all materials of any kind (including opinions or other tax analyses) that are provided to Counterparty relating to such tax treatment and tax structure.

(m) *Counterparts*. This Confirmation may be executed in several counterparts, each of which shall be deemed an original but all of which together shall constitute one and the same instrument.

(n) *Waiver of Trial by Jury*. EACH OF COUNTERPARTY AND DEALER HEREBY IRREVOCABLY WAIVES (ON ITS OWN BEHALF AND, TO THE EXTENT PERMITTED BY APPLICABLE LAW, ON BEHALF OF ITS STOCKHOLDERS) ALL RIGHT TO TRIAL BY JURY IN ANY ACTION, PROCEEDING OR COUNTERCLAIM (WHETHER BASED ON CONTRACT, TORT OR OTHERWISE) ARISING OUT OF OR RELATING TO THE TRANSACTION OR THE ACTIONS OF COUNTERPARTY OF ITS AFFILIATES OR DEALER OR ITS AFFILIATES IN THE NEGOTIATION, PERFORMANCE OR ENFORCEMENT HEREOF.

(o) *Submission to Jurisdiction*. Each party hereby irrevocably and unconditionally submits for itself and its property in any legal action or proceeding by the other party against it relating to the Transaction to which it is a party, or for recognition and enforcement of any judgment in respect thereof, to the exclusive jurisdiction of the Supreme Court of the State of New York, sitting in New York County, the courts of the United States of America for the Southern District of New York, and appellate courts from any thereof.

(p) *Governing Law*. THIS CONFIRMATION SHALL BE GOVERNED BY THE LAWS OF THE STATE OF NEW YORK (WITHOUT REFERENCE TO ITS CHOICE OF LAW DOCTRINE).

17

Counterparty hereby agrees (a) to check this Confirmation carefully and immediately upon receipt so that errors or discrepancies can be promptly identified and rectified and (b) to confirm that the foregoing (in the exact form provided by Dealer) correctly sets forth the terms of the agreement between Dealer and Counterparty with respect to the Transaction, by manually signing this Confirmation or this page hereof as evidence of agreement to such terms and providing the other information requested herein and immediately returning an executed copy to [ ✍ ].

Yours faithfully,

[ ✍ ]

By:

Name:
Title:

Agreed and Accepted By:

**FXCM INC.**

By:

Name:
Title:

18

**Exhibit 10.3**

**AMENDMENT AGREEMENT**

**AMENDMENT AGREEMENT** (this "**Amendment**") dated as of May 30, 2013 between [✍ ] ("**Dealer**") and FXCM Inc. ("**Counterparty**").

**WITNESSETH**

WHEREAS, Dealer and Counterparty have entered into a Convertible Bond Hedge Transaction, dated as of May 28, 2013, with Reference Number [✍ ] (the "**Confirmation**"); and

WHEREAS, Dealer and Counterparty wish to amend the Confirmation on the terms and conditions set forth herein;

NOW, THEREFORE, in consideration of the mutual agreements herein contained, Dealer and Counterparty hereby acknowledge and agree as follows:

1. <u>Certain Definitions</u>. Unless otherwise defined herein, capitalized terms used herein have the meanings specified in the Confirmation.

2. <u>Amendments to the Confirmation.</u>

    (a)    The number "150,000,000" in the eighth line of Section 1 of the Confirmation shall be deleted and replaced with the number "172,500,000";

    (b)    Number of Options: The number "150,000" referenced to the right of the term "Number of Options" in Section 2 of the Confirmation shall be deleted and replaced with the number "172,500";

    (c)    Premium: The number "[✍ ]" referenced to the right of the term "Premium" in Section 2 of the Confirmation shall be deleted and replaced with the number "[✍ ]"; and

    (d)    Early Unwind: The number "[✍ ]" in the fifteenth line of Section 8(j) of the Confirmation shall be deleted and replaced with the number "[✍ ]".

3. Except as specifically amended hereby, all of the terms and conditions of the Confirmation shall continue in full force and effect and shall be binding upon the parties in accordance with their respective terms.

4. Each of the parties hereby represents and warrants that:

    (a)    the representations and warranties made by it in the Confirmation are true and correct as of the date hereof as if made by the party on and as of such date; and

    (b)    the execution, delivery and performance of this Amendment are within the party's corporate power and have been duly authorized by all necessary corporate action, and this Amendment constitutes the legal, valid and binding obligation of the party in accordance with its terms, except as the same may be limited by applicable bankruptcy, insolvency, reorganization, moratorium or similar laws affecting the enforcement of creditors' rights generally and general equitable principles regardless of whether such enforceability is considered in a proceeding at law or in equity.

5. This Amendment may be executed in several counterparts, each of which shall be deemed an original but all of which together shall constitute one and the same instrument.

6. This Amendment shall be subject to the waiver of trial by jury, submission to jurisdiction and governing law provisions of Sections 8(n), (o) and (p) of the Confirmation as if set forth herein.

[THE REMAINDER OF THE PAGE HAS INTENTIONALLY BEEN LEFT BLANK]

IN WITNESS WHEREOF, the parties have caused this Amendment to be executed by their respective officers or authorized representatives as of the date hereof.

Yours faithfully,

[✍
]

By:
  Name:
  Title:

Agreed and Accepted By:

**FXCM INC.**

By:
  Name:
  Title:

**Exhibit 10.4**
Opening Transaction

| | |
|---|---|
| To: | FXCM Inc. |
| A/C: | **[Insert Account Number]** |
| From: | [✍ ] |
| Re: | Issuer Warrant Transaction |
| Ref. No: | **[Insert Reference Number]** |
| Date: | May 28, 2013 |

Dear Sir(s):

The purpose of this communication (this "**Confirmation**") is to set forth the terms and conditions of the above- referenced transaction entered into on the Trade Date specified below (the "**Transaction**") between [ ✍ ] ("**Dealer**") and FXCM Inc. ("**Issuer**"). This communication constitutes a "Confirmation" as referred to in the Agreement specified below.

1. This Confirmation is subject to, and incorporates, the definitions and provisions of the 2000 ISDA Definitions (including the Annex thereto) (the "**2000 Definitions**") and the definitions and provisions of the 2002 ISDA Equity Derivatives Definitions (the "**Equity Definitions**", and together with the 2000 Definitions, the "**Definitions**"), in each case as published by the International Swaps and Derivatives Association, Inc. ("**ISDA**"). In the event of any inconsistency between the 2000 Definitions and the Equity Definitions, the Equity Definitions will govern. For purposes of the Equity Definitions, each reference herein to a Warrant shall be deemed to be a reference to a Call Option or an Option, as context requires.

Each party is hereby advised, and each such party acknowledges, that the other party has engaged in, or refrained from engaging in, substantial financial transactions and has taken other material actions in reliance upon the parties' entry into the Transaction to which this Confirmation relates on the terms and conditions set forth below.

This Confirmation evidences a complete and binding agreement between Dealer and Issuer as to the terms of the Transaction to which this Confirmation relates. This Confirmation shall be subject to an agreement (the "**Agreement**") in the form of the 2002 ISDA Master Agreement (Multicurrency- Cross Border), as published by ISDA, as if Dealer and Issuer had executed an agreement in such form on the date hereof (but without any Schedule except for the election of (i) US Dollars ("**USD**") as the Termination Currency) and (ii) that the "Cross Default" provisions of Section 5(a)(vi) shall apply to Issuer with a "Threshold Amount" of USD30 million). The Transaction shall be the only Transaction under the Agreement.

All provisions contained in, or incorporated by reference to, the Agreement will govern this Confirmation except as expressly modified herein. In the event of any inconsistency between this Confirmation and either the Definitions or the Agreement, this Confirmation shall govern.

1

2. The Transaction is a Warrant Transaction, which shall be considered a Share Option Transaction for purposes of the Equity Definitions. The terms of the particular Transaction to which this Confirmation relates are as follows:

General Terms:

| | |
|---|---|
| Trade Date: | May 28, 2013 |
| Effective Date: | June 3, 2013, or such other date as agreed between the parties, subject to Section 8(l) below |
| Components: | The Transaction will be divided into individual Components, each with the terms set forth in this Confirmation, and, in particular, with the Number of Warrants and Expiration Date set forth in this Confirmation. The payments and deliveries to be made upon settlement of the Transaction will be determined separately for each Component as if each Component were a separate Transaction under the Agreement. |
| Warrant Style: | European |
| Warrant Type: | Call |
| Seller: | Issuer |
| Buyer: | Dealer |
| Shares: | The Class A Common Stock of Issuer, par value USD0.01 per share (Ticker Symbol: "FXCM"). |
| Number of Warrants: | For each Component, as provided in Annex A to this Confirmation. |
| Warrant Entitlement: | One Share per Warrant |
| Strike Price: | [✍ ] |
| Premium: | [✍ ] |

Premium Payment Date:                               The Effective Date

Exchange:                                           The New York Stock Exchange

Related Exchange:                                   All Exchanges

Procedures for Exercise:

*In respect of any Component:*

Expiration Time:                                    Valuation Time

Expiration Date:                                    As provided in <u>Annex A</u> to this Confirmation (or, if such date is not a Scheduled Trading Day, the next following Scheduled Trading Day that is not already an Expiration Date for another Component); *provided* that if that date is a Disrupted Day, the Expiration Date for such Component shall be the first succeeding Scheduled Trading Day that is not a Disrupted Day and is not or is not deemed to be an Expiration Date in respect of any other Component of the Transaction hereunder; and *provided further* that if the Expiration Date has not occurred pursuant to

2

the preceding proviso as of the Final Disruption Date, the Calculation Agent may elect in its discretion that the Final Disruption Date shall be the Expiration Date (irrespective of whether such date is an Expiration Date in respect of any other Component for the Transaction). "**Final Disruption Date**" means [✎]. Notwithstanding the foregoing and anything to the contrary in the Equity Definitions, if a Market Disruption Event occurs on any Expiration Date, the Calculation Agent may determine that such Expiration Date is a Disrupted Day only in part, in which case (i) the Calculation Agent shall make adjustments to the Number of Warrants for the relevant Component for which such day shall be the Expiration Date and shall designate the Scheduled Trading Day determined in the manner described in the immediately preceding sentence as the Expiration Date for the remaining Warrants for such Component and (ii) the VWAP Price and the weighting thereof for such Disrupted Day shall be determined by the Calculation Agent based on transactions in the Shares on such Disrupted Day effected before the relevant Market Disruption Event occurred and/or after the relevant Market Disruption Event ended. Any day on which the Exchange is scheduled to close prior to its normal closing time shall be considered a Disrupted Day in whole. If a Market Disruption Event occurs on the Expiration Date for any Component, the Calculation Agent, in its good faith and commercially reasonable discretion, may determine the VWAP Price for such Expiration Date using its good faith estimate of the value of the Shares on such Expiration Date based on the volume, historical trading patterns and price of the Shares and such other factors as it deems appropriate. Section 6.6 of the Equity Definitions shall not apply to any Valuation Date occurring on an Expiration Date.

Market Disruption Events:

The first sentence of Section 6.3(a) of the Equity Definitions is hereby amended (A) by deleting the words "during the one hour period that ends at the relevant Valuation Time, Latest Exercise Time, Knock- in Valuation Time or Knock- out Valuation Time, as the case may be" in the third, fourth and fifth lines thereof, and (B) by replacing the words "or (iii) an Early Closure." by "(iii) an Early Closure, or (iv) a Regulatory Disruption."

Section 6.3(d) of the Equity Definitions is hereby amended by deleting the remainder of the provision following the term "Scheduled Closing Time" in the fourth line thereof.

Regulatory Disruption:

Any event that Dealer, in its good faith and reasonable discretion, determines based on the advice of counsel that it would be appropriate with regard to any legal, regulatory or self- regulatory requirements

3

| | |
|---|---|
| | or related policies and procedures (whether or not such requirements, policies or procedures are imposed by law or have been voluntarily adopted by Dealer, and including without limitation Rule 10b- 18, Rule 10b- 5, Regulation 13D- G and Regulation 14E under the Securities Exchange Act of 1934, as amended (the "**Exchange Act**"), and Regulation M), for Dealer to refrain from or decrease any market activity in connection with the Transaction. Dealer shall notify Issuer as soon as reasonably practicable that a Regulatory Disruption has occurred and the Expiration Dates affected by it. |
| Automatic Exercise: | Applicable; and means that the Number of Warrants for the corresponding Expiration Date will be deemed to be automatically exercised at the Expiration Time on such Expiration Date unless Buyer notifies Seller (by telephone or in writing) prior to the Expiration Time on such Expiration Date that it does not wish Automatic Exercise to occur, in which case Automatic Exercise will not apply to such Expiration Date. |
| Issuer's Telephone Number and Telex and/or Facsimile Number and Contact Details for purpose of | |
| Giving Notice: | David S. Sassoon<br>General Counsel & Secretary<br>55 Water Street, 50th Floor<br>New York, New York 10041<br>(646) 512- 4284 Fax<br>(646) 432- 2997 phone<br>dsassoon@fxcm.com |
| Settlement Terms: | |
| *In respect of any Component:* | |
| Settlement Currency: | USD |
| Settlement Method Election: | Applicable with respect to Cash Settlement or Net Share Settlement only; provided that either such Settlement Method shall apply to all Components. |
| Electing Party: | Counterparty. |
| Settlement Method Election Date: | 10 Business Days prior to the first Expiration Date. |
| Default Settlement Method: | Net Share Settlement. |
| Cash Settlement: | Applicable; provided that it shall be a condition of Counterparty's right to elect Cash Settlement that on the date of the Cash Settlement election Counterparty makes the representations and warranties in Sections 7(a)(i), (vi), (x), (xi) and (xii) of this Confirmation. |
| Settlement Price: | With respect to Cash Settlement only, for each Valuation Date, the VWAP Price. |

4

| | |
|---|---|
| Cash Settlement Payment Date: | With respect to each Valuation Date, three Currency Business Days after such Valuation Date. |
| Net Share Settlement: | If Net Share Settlement is applicable, then on each Settlement Date, Issuer shall deliver to Dealer a number of Shares equal to the Number of Shares to be Delivered for such Settlement Date to the account specified by Dealer and cash in lieu of any fractional Shares valued at the Relevant Price on the Valuation Date corresponding to such Settlement Date. If, in the good faith and reasonable judgment of Dealer based on the advice of counsel, for any reason, the Shares deliverable upon Net Share Settlement would not be immediately freely transferable by Dealer under Rule 144 under the Securities Act of 1933, as amended (the "**Securities Act**"), then Dealer may elect to either (x) accept delivery of such Shares notwithstanding any restriction on transfer or (y) have the provisions set forth in Section 8(b) below apply. |
| | The Number of Shares to be Delivered shall be delivered by Issuer to Dealer no later than 12:00 noon (local time in New York City) on the relevant Settlement Date. |
| Number of Shares to be Delivered: | In respect of any Exercise Date, subject to the last sentence of Section 9.5 of the Equity Definitions, the product of (i) the Number of Warrants exercised or deemed exercised on such Exercise Date, (ii) the Warrant Entitlement and (iii) (A) the excess of the VWAP Price on the Valuation Date occurring on such Exercise Date over the Strike Price (or, if no such excess, zero) *divided by* (B) such VWAP Price. |
| VWAP Price: | For any Valuation Date, the Rule 10b-18 dollar volume weighted average price per Share for such Exchange Business Day based on transactions executed during such Exchange Business Day, as reported on Bloomberg Page "FXCM"<Equity>AQR SEC" (or any successor thereto) or, in the event such price is not so reported on such Exchange Business Day for any reason or is, in the reasonable determination of the Calculation Agent, erroneous, as reasonably determined by the Calculation Agent. |
| Other Applicable Provisions: | The provisions of Sections 9.1(c), 9.8, 9.9, 9.10, 9.11 (except that the Representation and Agreement contained in Section 9.11 of the Equity Definitions shall be modified by excluding any representations therein relating to restrictions, obligations, limitations or requirements under applicable securities laws as a result of the fact that Seller is the issuer of the Shares) and Section 9.12 of the Equity Definitions will be applicable, as if "Physical Settlement" applied to the Transaction. |

5

Adjustments:

*In respect of any Component:*

| | |
|---|---|
| Method of Adjustment: | Calculation Agent Adjustment |

Extraordinary Events:

Consequences of Merger Events:

| | |
|---|---|
| (a) Share- for- Share: | Modified Calculation Agent Adjustment. |
| (b) Share- for- Other: | Cancellation and Payment (Calculation Agent Determination). |
| (c) Share- for- Combined: | Component Adjustment. |
| Tender Offer: | Applicable; *provided* that the definition of "Tender Offer" in Section 12.1(d) of the Equity Definitions shall be amended by replacing "10%" in the third line thereof with "20%". |

Consequences of Tender Offers:

| | |
|---|---|
| (a) Share- for- Share: | Modified Calculation Agent Adjustment. |
| (b) Share- for- Other: | Modified Calculation Agent Adjustment. |
| (c) Share- for- Combined: | Modified Calculation Agent Adjustment. |
| Announcement Event: | If an Announcement Event has occurred, the Calculation Agent shall have the right to determine the economic effect of the Announcement Event on the theoretical value of the Transaction (including without limitation any change in volatility, stock loan rate or liquidity relevant to the Shares or to the Transaction) (i) at a time that it deems appropriate, from the Announcement Date to the date of such determination (a "**Determination Date**"), and (ii) on the earlier to occur of (x) the relevant Merger Date or Tender Offer Date, as the case may be, and (y) a date on which a payment amount is determined pursuant to Sections 12.7 or 12.8 of the Equity Definitions (such earlier date, a "**Final Determination Date**"), from the Announcement Date or the Determination Date, as applicable, to such Final Determination Date. If any such economic effect is deemed to be material by the Calculation Agent, the Calculation Agent may adjust the terms of the Transaction to reflect such economic effect. "**Announcement Event**" shall mean the occurrence of an Announcement Date (as defined below). |
| Announcement Date: | The definition of "Announcement Date" in Section 12.1(l) of the Equity Definitions shall be amended by (i) replacing the word "leads to the" in the third and the fifth lines thereof with the words ", if completed, would lead to a", (ii) replacing the words "voting shares" in the fifth line thereof with the word "Shares", (iii) inserting the words "by an entity with direct knowledge" after the word "announcement" in the second and the fourth lines thereof, (iv) inserting |

6

| | |
|---|---|
| | the words "or to explore the possibility of engaging in" after the words "engage in" in the second line thereto, (v) inserting the words "or to explore the possibility of purchasing or otherwise obtaining" after the word "obtain" in the fourth line thereto, (vi) deleting the parenthetical in the third and the fifth line thereof, (vii) adding immediately after the words "Merger Event" in the third line thereof ", and any publicly announced change or amendment to such an announcement (including the announcement of an abandonment of such intention)" and (viii) adding immediately after the words "Tender Offer" in the fifth line thereof ", and any publicly announced change or amendment to such an announcement (including the announcement of an abandonment of such intention)." |
| New Shares: | In the definition of New Shares in Section 12.1(i) of the Equity Definitions, the text in clause (i) shall be deleted in its entirety and replaced with "publicly quoted, traded or listed on any of the New York Stock Exchange, the NASDAQ Global Select Market or the NASDAQ Global Market (or their respective successors)". |
| Modified Calculation Agent Adjustment: | With respect to any Merger Event to which Modified Calculation Agent Adjustment applies, as a condition precedent to the adjustments contemplated in Section 12.2(e)(i) of the Equity Definitions, Dealer, the Issuer of the Affected Shares and the entity that will be the Issuer of the New Shares shall, prior to the Merger Date, have entered into such documentation containing representations, warranties and agreements relating to securities law and other issues as Dealer has determined, in its reasonable discretion, to be reasonably necessary or appropriate to allow Dealer to continue as a party to the Transaction, as adjusted under Section 12.2(e)(i) of the Equity Definitions, and to preserve its commercially reasonable hedging or hedge unwind activities in connection with the Transaction in a manner compliant with applicable legal, regulatory or self-regulatory requirements, or with related policies and procedures applicable to Dealer, and if such conditions are not met or if the Calculation Agent determines that no adjustment that it could make under Section 12.2(e)(i) of the Equity Definitions will produce a commercially reasonable result, then the consequences set forth in Section 12.2(e)(ii) of the Equity Definitions shall apply. |
| Nationalization, Insolvency or Delisting: | Cancellation and Payment (Calculation Agent Determination); *provided* that in addition to the provisions of Section 12.6(a)(iii) of the Equity |

7

Definitions, it shall also constitute a Delisting if the Exchange is located in the United States and the Shares are not immediately re-listed, re- traded or re- quoted on any of the New York Stock Exchange, The NASDAQ Global Select Market or The NASDAQ Global Market (or their respective successors); if the Shares are immediately re- listed, re- traded or re- quoted on any such exchange or quotation system, such exchange or quotation system shall thereafter be deemed to be the Exchange.

For the avoidance of doubt, whenever Dealer, the Calculation Agent or the Determining Party is called upon to determine an amount or make an adjustment pursuant to the terms of this Confirmation or the Equity Definitions to take into account the effect of an event, Dealer, Calculation Agent or Determining Party shall make such adjustment or determination by reference to the effect of such event, assuming that Dealer maintains a commercially reasonable hedge position.

Additional Disruption Events:

(a) Change in Law:

Applicable; *provided* that Section 12.9(a)(ii) of the Equity Definitions is hereby amended by (i) replacing the phrase "the interpretation" in the third line thereof with the phrase ", or public announcement of, the formal or informal interpretation", (ii) by replacing the word "Shares" where it appears in clause (X) thereof with the words "Hedge Position" and (iii) by immediately following the word "Transaction" in clause (X) thereof, adding the phrase "in the manner contemplated by Dealer on the Trade Date"; *provided further* that (i) any determination as to whether (A) the adoption of or any change in any applicable law or regulation (including, for the avoidance of doubt and without limitation, (x) any tax law or (y) adoption or promulgation of new regulations authorized or mandated by existing statute) or (B) the promulgation of or any change in the interpretation by any court, tribunal or regulatory authority with competent jurisdiction of any applicable law or regulation (including any action taken by a taxing authority), in each case, constitutes a "Change in Law" shall be made without regard to Section 739 of the Dodd- Frank Wall Street Reform and Consumer Protection Act of 2010 or any similar legal certainty provision in any legislation enacted, or rule or regulation promulgated, on or after the Trade Date, and (ii) Section 12.9(a)(ii) of the Equity Definitions is hereby amended by replacing the parenthetical beginning after the word "regulation" in the second line thereof the words "(including, for the avoidance of doubt and without limitation, (x) any tax law or (y) adoption or promulgation of new regulations authorized or mandated by existing statute)".

(b) Insolvency Filing:

Applicable

(c) Hedging Disruption:

Applicable; *provided* that Section 12.9(a)(v) of the Equity Definitions is hereby amended by (a) inserting

8

the following words at the end of clause (A) thereof: "in the manner contemplated by the Hedging Party on the Trade Date" and (b) inserting the following two phrases at the end of such Section:

"For the avoidance of doubt, the term "equity price risk" shall be deemed to include, but shall not be limited to, stock price and volatility risk. And, for the further avoidance of doubt, any such transactions or assets referred to in phrases (A) or (B) above must be available on commercially reasonable pricing terms.".

| | |
|---|---|
| (d) Increased Cost of Hedging: | Applicable |
| (e) Loss of Stock Borrow: | Applicable |
| Maximum Stock Loan Rate: | [✍ ] |
| (f) Increased Cost of Stock Borrow: | Applicable |
| Initial Stock Loan Rate: | [✍ ] |
| Hedging Party: | Dealer |
| Determining Party: | Dealer for all applicable Additional Disruption Events |
| Non- Reliance: | Applicable |
| Agreements and Acknowledgments Regarding Hedging Activities: | Applicable |
| Additional Acknowledgments: | Applicable |
| 3. <u>Calculation Agent</u>: | Dealer. The Calculation Agent shall, upon reasonable written request by either party, provide a written explanation of any calculation or adjustment made by it including, where applicable, a description of the methodology and data applied, it being understood that the Calculation Agent shall not be obligated to disclose any proprietary models used by it for such calculation. |

4. <u>Account Details</u>:

Dealer Payment Instructions:

[✍ ]

Issuer Payment Instructions:                                    To be provided by Issuer.

5. <u>Offices</u>:

The Office of Dealer for the Transaction is:

[✍ ]

The Office of Issuer for the Transaction is:

55 Water Street, 50th Floor
New York, New York 10041

9

6. <u>Notices</u>: For purposes of this Confirmation:

      (a)     Address for notices or communications to Issuer:

David S. Sassoon
General Counsel & Secretary
55 Water Street, 50th Floor
New York, New York 10041
(646) 512- 4284 Fax
(646) 432- 2997 phone
dsassoon@fxcm.com

      (b)     Address for notices or communications to Dealer:

[✍ ]

7. <u>Representations, Warranties and Agreements</u>:

(a) In addition to the representations and warranties in the Agreement and those contained elsewhere herein, Issuer represents and warrants to and for the benefit of, and agrees with, Dealer as follows:

(i) (A) none of Issuer and its officers and directors is aware of any material nonpublic information regarding Issuer or the Shares and (B) all reports and other documents filed by Issuer with the Securities and Exchange Commission pursuant to the Exchange Act when considered as a whole (with the more recent such reports and documents deemed to amend inconsistent statements contained in any earlier such reports and documents), do not contain any untrue statement of a material fact or any omission of a material fact required to be stated therein or necessary to make the statements therein, in the light of the circumstances in which they were made, not misleading.

(ii) Without limiting the generality of Section 13.1 of the Equity Definitions, Issuer acknowledges that Dealer is not making any representations or warranties with respect to the treatment of the Transaction under ASC Topic 260, *Earnings Per Share*, ASC Topic 815, *Derivatives and Hedging*, ASC Topic 480, *Distinguishing Liabilities from Equity* and ASC 815- 40, *Derivatives and Hedging  Contracts in Entity's Own Equity*.

(iii) The Shares of Issuer initially issuable upon exercise of the Warrant (the "**Warrant Shares**") have been reserved for issuance by all required corporate action of Issuer. The Warrant Shares have been duly authorized and, when delivered against payment therefor (which may include Net Share Settlement in lieu of cash) and otherwise as contemplated by the terms of the Warrant following the exercise of the Warrant in accordance with the terms and conditions of the Warrant, will be validly issued, fully- paid and non- assessable, and the issuance of the Warrant Shares will not be subject to any preemptive or similar rights.

(iv) Issuer is not entering into this Confirmation to create actual or apparent trading activity in the Shares (or any security convertible into or exchangeable for Shares) or to raise or depress or otherwise manipulate the price of the Shares (or any security convertible into or exchangeable for Shares) or otherwise in violation of the Exchange Act.

(v) Issuer is not, and after giving effect to the transactions contemplated hereby will not be, required to register as an "investment company" as such term is defined in the Investment Company Act of 1940, as amended.

(vi) On the Trade Date and the Premium Payment Date (A) the assets of Issuer at their fair valuation exceed the liabilities of Issuer, including contingent liabilities, (B) the capital of Issuer is adequate to conduct the business of Issuer and (C) Issuer has the ability to pay its debts and obligations as such debts mature and does not intend to, or does not believe that it will, incur debt beyond its ability to pay as such debts mature.

10

(vii) Issuer shall not take any action to decrease the number of Available Shares below the Capped Number (each as defined below).

(viii) The representations and warranties of Issuer set forth in Section 3 of the Agreement and Section 2 of the Purchase Agreement dated as of the Trade Date between Issuer and Credit Suisse Securities (USA) LLC and Merrill Lynch, Pierce, Fenner & Smith Incorporated, as representatives of the initial purchasers party thereto are true and correct as of the Trade Date and the Effective Date and are hereby deemed to be repeated to Dealer as if set forth herein.

(ix) Issuer understands no obligations of Dealer to it hereunder will be entitled to the benefit of deposit insurance and that such obligations will not be guaranteed by any affiliate of Dealer or any governmental agency.

(x) (A) During the period starting on the first Expiration Date and ending on the last Expiration Date (the "**Settlement Period**"), the Shares or securities that are convertible into, or exchangeable or exercisable for Shares, are not, and shall not be, subject to a "restricted period," as such term is defined in Regulation M under the Exchange Act ("**Regulation M**") and (B) Issuer shall not engage in any "distribution," as such term is defined in Regulation M, other than a distribution meeting the requirements of the exceptions set forth in sections 101(b)(10) and 102(b)(7) of Regulation M, until the second Exchange Business Day immediately following the Settlement Period.

(xi) During the Settlement Period, neither Issuer nor any "affiliate" or "affiliated purchaser" (each as defined in Rule 10b- 18 of the Exchange Act ("**Rule 10b- 18**")) shall directly or indirectly (including, without limitation, by means of any cash- settled or other derivative instrument) purchase, offer to purchase, place any bid or limit order that would effect a purchase of, or commence any tender offer relating to, any Shares (or an equivalent interest, including a unit of beneficial interest in a trust or limited partnership or a depository share) or any security convertible into or exchangeable or exercisable for Shares, except through Dealer, provided that this clause will not apply to Share Option transactions entered into with Dealer or [✍] on the Trade Date.

(xii) Issuer agrees that it (A) will not during the Settlement Period make, or permit to be made (to the extent it is in Issuer's reasonable control), any public announcement (as defined in Rule 165(f) under the Securities Act) of any Merger Transaction or potential Merger Transaction unless such public announcement is made prior to the opening or after the close of the regular trading session on the Exchange for the Shares; (B) shall promptly (but in any event prior to the next opening of the regular trading session on the Exchange) notify Dealer following any such announcement that such announcement has been made; and (C) shall promptly (but in any event prior to the next opening of the regular trading session on the Exchange) provide Dealer with written notice specifying (i) Issuer's average daily Rule 10b- 18 Purchases (as defined in Rule 10b- 18) during the three full calendar months immediately preceding the announcement date that were not effected through Dealer or its affiliates and (ii) the number of Shares purchased pursuant to the proviso in Rule 10b- 18(b)(4) under the Exchange Act for the three full calendar months preceding the announcement date. Such written notice shall be deemed to be a certification by Issuer to Dealer that such information is true and correct. In addition, Issuer shall promptly notify Dealer of the earlier to occur of the completion of such transaction and the completion of the vote by target shareholders. "**Merger Transaction**" means any merger, acquisition or similar transaction involving a recapitalization as contemplated by Rule 10b- 18(a)(13)(iv) under the Exchange Act.

(xiii) Neither the execution and delivery of this Confirmation nor the incurrence or performance of obligations of Issuer hereunder will (i) conflict with or result in a breach of any agreement or instrument to which Issuer or any of its subsidiaries is a party or by which Issuer or any of its subsidiaries is bound or to which Issuer or any of its subsidiaries is subject (including, but not limited to, any agreements and contracts of Issuer or any of its subsidiaries filed as exhibits to Issuer's Annual Report on Form 10- K for the year ended 2013), except for any such conflict that would not, individually or in the aggregate, have a material adverse effect on the business, properties, management, financial position, results of operations or prospects of Issuer and its

11

subsidiaries taken as a whole or on the performance by Issuer of its obligations under the Transaction ("**Material Adverse Effect**") or (ii) constitute a default under, or result in the creation of any lien under, any such agreement or instrument, except for any such default or lien that would not, individually or in the aggregate, have a Material Adverse Effect.

(b) Each of Dealer and Issuer represents to the other party that it is an "eligible contract participant" as defined in Section 1a(18) of the U.S. Commodity Exchange Act, as amended.

(c) Each of Dealer and Issuer acknowledges that the offer and sale of the Transaction to it is intended to be exempt from registration under the Securities Act of 1933, as amended (the "**Securities Act**"), by virtue of Section 4(2) thereof. Accordingly, Dealer represents and warrants to Issuer that (i) it has the financial ability to bear the economic risk of its investment in the Transaction and is able to bear a total loss of its investment and its investments in and liabilities in respect of the Transaction, which it understands are not readily marketable, are not disproportionate to its net worth, and it is able to bear any loss in connection with the Transaction, including the loss of its entire investment in the Transaction, (ii) it is an "accredited investor" as that term is defined in Regulation D as promulgated under the Securities Act, (iii) it is entering into the Transaction for its own account without a view to the distribution or resale thereof, (iv) the assignment, transfer or other disposition of the Transaction has not been and will not be registered under the Securities Act and is restricted under this Confirmation, the Securities Act and state securities laws, (v) its financial condition is such that it has no need for liquidity with respect to its investment in the Transaction and no need to dispose of any portion thereof to satisfy existing or contemplated undertaking or indebtedness and is capable of assessing the merits of and understanding (on its own behalf or through independent professional advice), and understands and accepts, the terms, conditions and risks of the Transaction.

(d) Each of Dealer and Issuer agrees and acknowledges that Dealer is a "financial institution," "swap participant" and "financial participant" within the meaning of Sections 101(22), 101(53C) and 101(22A) of Title 11 of the United States Code (the "**Bankruptcy Code**"). The parties hereto further agree and acknowledge (A) that this Confirmation is (i) a "securities contract," as such term is defined in Section 741(7) of the Bankruptcy Code, with respect to which each payment and delivery hereunder is a "settlement payment," as such term is defined in Section 741(8) of the Bankruptcy Code, and (ii) a "swap agreement," as such term is defined in Section 101(53B) of the Bankruptcy Code, with respect to which each payment and delivery hereunder is a "transfer," as such term is defined in Section 101(54) of the Bankruptcy Code, and (B) that Dealer is entitled to the protections afforded by, among other sections, Sections 362(b)(6), 362(b)(17), 546(e), 546(g), 555 and 560 of the Bankruptcy Code.

(e) Each party acknowledges and agrees to be bound by the Conduct Rules of the Financial Industry Regulatory Authority, Inc. applicable to transactions in options, and further agrees not to violate the position and exercise limits set forth therein.

(f) Prior to the Trade Date, Issuer shall deliver to Dealer a resolution of Issuer's board of directors authorizing the Transaction.

(g) Issuer shall deliver to Dealer an opinion of counsel, dated as of the Effective Date (containing customary exceptions and qualifications) and reasonably acceptable to Dealer in form and substance, with respect to the matters set forth in Section 3(a) of the Agreement.

8. <u>Other Provisions</u>:

(a) *Alternative Calculations and Payment on Early Termination and on Certain Extraordinary Events*. If Issuer shall owe Buyer any amount pursuant to Sections 12.2, 12.3, 12.6, 12.7 or 12.9 of the Equity Definitions or pursuant to Section 6(d)(ii) of the Agreement (a "**Payment Obligation**"), Issuer shall have the right, in its sole discretion, to satisfy any such Payment Obligation by the Share Termination Alternative (as defined below) by giving irrevocable telephonic notice to Buyer, confirmed in writing within one Scheduled Trading Day, between the hours of 9:00 A.M. and 4:00 P.M. New York City time on the Merger Date, Tender Offer Date, Announcement Date, Early Termination Date or date of cancellation or termination in respect of an Additional Disruption Event, as applicable ("**Notice of Share Termination**"); *provided* that if Issuer does not elect to satisfy its Payment Obligation by the Share Termination Alternative, Buyer shall have the right, in its sole discretion, to elect to require Issuer to satisfy

12

its Payment Obligation by the Share Termination Alternative, notwithstanding Issuer's failure to elect or election to the contrary; and *provided further* that Issuer shall not have the right to so elect (but, for the avoidance of doubt, Buyer shall have the right to so elect) in the event of (i) an Insolvency, a Nationalization, a Tender Offer or a Merger Event, in each case, in which the consideration or proceeds to be paid to holders of Shares consists solely of cash or (ii) an Event of Default in which Issuer is the Defaulting Party or a Termination Event in which Issuer is the Affected Party, which Event of Default or Termination Event resulted from an event or events within Issuer's control. Upon such Notice of Share Termination, the following provisions shall apply on the Scheduled Trading Day immediately following the Merger Date, the Tender Offer Date, Announcement Date, Early Termination Date or date of cancellation or termination in respect of an Additional Disruption Event, as applicable:

| | |
|---|---|
| Share Termination Alternative: | Applicable and means that Issuer shall deliver to Dealer the Share Termination Delivery Property on the date on which the Payment Obligation would otherwise be due pursuant to Section 12.7 or 12.9 of the Equity Definitions or Section 6(d)(ii) of the Agreement, as applicable (the "**Share Termination Payment Date**"), in satisfaction of the Payment Obligation. |
| Share Termination Delivery Property: | A number of Share Termination Delivery Units, as calculated by the Calculation Agent, equal to the Payment Obligation divided by the Share Termination Unit Price. The Calculation Agent shall adjust the Share Termination Delivery Property by replacing any fractional portion of the aggregate amount of a security therein with an amount of cash equal to the value of such fractional security based on the values used to calculate the Share Termination Unit Price. |
| Share Termination Unit Price: | The value of property contained in one Share Termination Delivery Unit on the date such Share Termination Delivery Units are to be delivered as Share Termination Delivery Property, as determined by the Calculation Agent in its discretion by commercially reasonable means and notified by the Calculation Agent to Issuer at the time of notification of the Payment Obligation. |
| Share Termination Delivery Unit: | In the case of a Termination Event, Event of Default, Delisting or Additional Disruption Event, one Share or, in the case of an Insolvency, Nationalization, Merger Event or Tender Offer, a unit consisting of the number or amount of each type of property received by a holder of one Share (without consideration of any requirement to pay cash or other consideration in lieu of fractional amounts of any securities) in such Insolvency, Nationalization, Merger Event or Tender Offer. If such Insolvency, Nationalization, Merger Event or Tender Offer involves a choice of consideration to be received by holders, such holder shall be deemed to have elected to receive the maximum possible amount of cash. |
| Failure to Deliver: | Applicable |
| Other applicable provisions: | If Share Termination Alternative is applicable, the provisions of Sections 9.8, 9.9, 9.10, 9.11 (except that the Representation and Agreement contained in Section 9.11 of the Equity Definitions shall be modified by excluding any representations therein relating to restrictions, obligations, limitations or requirements under applicable securities laws as a result of the fact that Seller is the Issuer of the Shares) and 9.12 of the Equity Definitions will be applicable as if "Physical Settlement" applied to the Transaction, except that all references to "Shares" shall be read as references to "Share Termination Delivery Units". If, in the reasonable judgment of Dealer, for any reason, any securities comprising the Share Termination |

13

Delivery Units deliverable pursuant to this Section 8(a) would not be immediately freely transferable by Dealer under Rule 144 under the Securities Act, then Dealer may elect to either (x) accept delivery of such securities notwithstanding any restriction on transfer or (y) have the provisions set forth in Section 8(b) below apply.

In the event that an (i) an Early Termination Date occurs or is designated with respect to the Transaction as a result of a Termination Event or an Event of Default (other than an Event of Default arising under Section 5(a)(ii) or 5(a)(iv) of the Agreement) and, as a result, Dealer owes to Issuer an amount calculated under Section 6(e) of the Agreement, or (ii) Dealer owes to Issuer, pursuant to Section 12.7 or Section 12.9 of the Equity Definitions, an amount calculated under Section 12.8 of the Equity Definitions, such amount shall be deemed to be zero.

(b) *Registration/Private Placement Procedures*. (i) With respect to the Transaction, the following provisions shall apply to the extent provided for above opposite the caption "Net Share Settlement" in Section 2 or in paragraph (a) of this Section 8. If so applicable, then, at the election of Issuer by notice to Buyer within one Exchange Business Day after the relevant delivery obligation arises, but in any event at least one Exchange Business Day prior to the date on which such delivery obligation is due, either (A) all Shares or Share Termination Delivery Units, as the case may be, delivered by Issuer to Buyer shall be, at the time of such delivery, covered by an effective registration statement of Issuer for immediate resale by Buyer (such registration statement and the corresponding prospectus (the "**Prospectus**") (including, without limitation, any sections describing the plan of distribution) in form and content commercially reasonably satisfactory to Buyer) or (B) Issuer shall deliver additional Shares or Share Termination Delivery Units, as the case may be, so that the value of such Shares or Share Termination Delivery Units, as determined by the Calculation Agent to reflect an appropriate liquidity discount (with such discount not duplicating any adjustment made by the Calculation Agent as part of determining the value of a Share Termination Unit), equals the value as of such determination date of the number of Shares or Share Termination Delivery Units that would otherwise be deliverable if such Shares or Share Termination Delivery Units were freely tradeable (without prospectus delivery) upon receipt by Buyer (such value, the "**Freely Tradeable Value**"); *provided* that, if requested by Dealer, Issuer shall make the election described in this clause (B) with respect to Shares delivered on all Settlement Dates no later than one Exchange Business Day prior to the first Expiration Date, and the applicable procedures described below shall apply to all Shares delivered on the Settlement Dates on an aggregate basis. (For the avoidance of doubt, as used in this paragraph (b) only, the term "Issuer" shall mean the issuer of the relevant securities, as the context shall require.)

(ii) If Issuer makes the election described in clause (b)(i)(A) above:

(A) Buyer (or an affiliate of Buyer designated by Buyer) shall be afforded a reasonable opportunity to conduct a due diligence investigation with respect to Issuer that is customary in scope for underwritten offerings of similar size of equity securities and that yields results that are commercially reasonably satisfactory to Buyer or such affiliate, as the case may be, in its discretion; and

(B) Buyer (or an affiliate of Buyer designated by Buyer) and Issuer shall enter into an agreement (a "**Registration Agreement**") on commercially reasonable terms in connection with the public resale of such Shares or Share Termination Delivery Units, as the case may be, by Buyer or such affiliate substantially similar to underwriting agreements customary for underwritten offerings of similar size of equity securities, in form and substance commercially reasonably satisfactory to Buyer or such affiliate and Issuer, which Registration Agreement shall include, without limitation, provisions substantially similar to those contained in such underwriting agreements relating to the indemnification of, and contribution in connection with the liability of, Buyer and its affiliates and Issuer, shall provide for the payment by Issuer of all commercially reasonable expenses in connection with such resale, including all commercially reasonable registration costs and all reasonable fees and expenses of counsel for Buyer, and shall provide for the delivery of customary accountants' "comfort letters" to Buyer or such affiliate with respect to the financial statements and certain financial information contained in or incorporated by reference into the Prospectus.

14

(iii) If Issuer makes the election described in clause (b)(i)(B) above:

(A) Buyer (or an affiliate of Buyer designated by Buyer) and any potential institutional purchaser of any such Shares or Share Termination Delivery Units, as the case may be, from Buyer or such affiliate identified by Buyer shall be afforded a commercially reasonable opportunity to conduct a due diligence investigation in compliance with applicable law with respect to Issuer customary in scope for private placements of similar size of equity securities (including, without limitation, the right to have made available to them for inspection all financial and other records, pertinent corporate documents and other information reasonably requested by them), subject to execution by such recipients of customary confidentiality agreements reasonably acceptable to Issuer;

(B) Buyer (or an affiliate of Buyer designated by Buyer) and Issuer shall enter into an agreement (a "**Private Placement Agreement**") on commercially reasonable terms in connection with the private placement of such Shares or Share Termination Delivery Units, as the case may be, by Issuer to Buyer or such affiliate and the private resale of such shares by Buyer or such affiliate, substantially similar to private placement purchase agreements customary for private placements of similar size of equity securities, in form and substance commercially reasonably satisfactory to Buyer and Issuer, which Private Placement Agreement shall include, without limitation, provisions substantially similar to those contained in such private placement purchase agreements relating to the indemnification of, and contribution in connection with the liability of, Buyer and its affiliates and Issuer, shall provide for the payment by Issuer of all commercially reasonable expenses in connection with such resale, including all commercially reasonable fees and expenses of counsel for Buyer, shall contain representations, warranties and agreements of Issuer reasonably necessary or advisable to establish and maintain the availability of an exemption from the registration requirements of the Securities Act for such resales, and shall use commercially reasonable efforts to provide for the delivery of customary accountants' "comfort letters" to Buyer or such affiliate with respect to the financial statements and certain financial information contained in or incorporated by reference into the offering memorandum prepared for the resale of such Shares; and

(C) Issuer agrees that any Shares or Share Termination Delivery Units so delivered to Dealer, (i) may be transferred by and among Dealer and its affiliates, and Issuer shall effect such transfer without any further action by Dealer and (ii) after the minimum "holding period" within the meaning of Rule 144(d) under the Securities Act has elapsed with respect to such Shares or any securities issued by Issuer comprising such Share Termination Delivery Units, Issuer shall promptly remove, or cause the transfer agent for such Shares or securities to remove, any legends referring to any such restrictions or requirements from such Shares or securities upon delivery by Dealer (or such affiliate of Dealer) to Issuer or such transfer agent of seller's and broker's representation letters customarily delivered by Dealer in connection with resales of restricted securities pursuant to Rule 144 under the Securities Act, without any further requirement for the delivery of any certificate, consent, agreement, opinion of counsel, notice or any other document, any transfer tax stamps or payment of any other amount or any other action by Dealer (or such affiliate of Dealer).

(D) Issuer shall not take, or cause to be taken, any action that would make unavailable either the exemption pursuant to Section 4(2) of the Securities Act for the sale by Issuer to Dealer (or any affiliate designated by Dealer) of the Shares or Share Termination Delivery Units, as the case may be, or the exemption pursuant to Section 4(1) or Section 4(3) of the Securities Act for resales of the Shares or Share Termination Delivery Units, as the case may be, by Dealer (or any such affiliate of Dealer).

(c) *Make-whole Shares*. If Issuer makes the election described in clause (i)(B) of paragraph (b) of this Section 8, then Dealer or its affiliate may sell (which sale shall be made in a commercially reasonable manner) such Shares or Share Termination Delivery Units, as the case may be, during a period (the "**Resale Period**") commencing on the Exchange Business Day following delivery of such Shares or Share Termination Delivery Units, as the case may be, and ending on the Exchange Business Day on which Dealer completes the sale of all such Shares or Share Termination Delivery Units, as the case may be, or a

15

sufficient number of Shares or Share Termination Delivery Units, as the case may be, so that the realized net proceeds of such sales exceed the Freely Tradeable Value. If any of such delivered Shares or Share Termination Delivery Units remain after such realized net proceeds exceed the Freely Tradeable Value, Dealer shall return such remaining Shares or Share Termination Delivery Units to Issuer. If the Freely Tradeable Value exceeds the realized net proceeds from such resale, Issuer shall transfer to Dealer by the open of the regular trading session on the Exchange on the Exchange Trading Day immediately following the last day of the Resale Period the amount of such excess (the "**Additional Amount**") in cash or in a number of additional Shares ("**Make- whole Shares**") in an amount that, based on the Relevant Price on the last day of the Resale Period (as if such day was the "Valuation Date" for purposes of computing such Relevant Price), has a dollar value equal to the Additional Amount. The Resale Period shall continue to enable the sale of the Make- whole Shares in the manner contemplated by this Section 8(c). This provision shall be applied successively until the Additional Amount is equal to zero, subject to Section 8(e).

(d) *Beneficial Ownership*. Notwithstanding anything to the contrary in the Agreement or this Confirmation, in no event shall Buyer be entitled to receive, or shall be deemed to receive, any Shares if, immediately upon giving effect to such receipt of such Shares, (i) the "beneficial ownership" (within the meaning of Section 13 of the Exchange Act and the rules promulgated thereunder) of Shares by Buyer or any affiliate of Buyer subject to aggregation with Buyer under such Section 13 and rules or any "group", as such term is used in such Section 13 and rules, of which Buyer or any such affiliate of Buyer is a member or may be deemed to be a member (collectively, "**Buyer Group**") would be equal to or greater than 9% or more of the outstanding Shares or (ii) Buyer, Buyer Group or any person whose ownership position would be aggregated with that of Buyer or Buyer Group (Buyer, Buyer Group or any such person, a "**Buyer Person**") under Section 203 of the Delaware General Corporation Law (the "**DGCL Takeover Statute**") or any state or federal bank holding company or banking laws, or other federal, state or local regulations or regulatory orders applicable to ownership of Shares ("**Applicable Laws**"), owns, beneficially owns, constructively owns, controls, holds the power to vote or otherwise meets a relevant definition of ownership in excess of a number of Shares equal to (x) the number of Shares that would give rise to reporting or registration obligations or other requirements (including obtaining prior approval by a state or federal regulator) of a Buyer Person under Applicable Laws (including, without limitation, "interested stockholder" or "acquiring person" status under the DGCL Takeover Statute) and with respect to which such requirements have not been met or the relevant approval has not been received *minus* (y) 1% of the number of Shares outstanding on the date of determination (either such condition described in clause (i) or (ii), an "**Excess Ownership Position**"). If any delivery owed to Buyer hereunder is not made, in whole or in part, as a result of this provision, Issuer's obligation to make such delivery shall not be extinguished and Issuer shall make such delivery as promptly as practicable after, but in no event later than one Exchange Business Day after, Buyer gives notice to Issuer that such delivery would not result in the existence of an Excess Ownership Position.

(e) *Limitations on Settlement by Issuer*. Notwithstanding anything herein or in the Agreement to the contrary, in no event shall Issuer be required to deliver Shares in connection with the Transaction in excess of [✍ ] (as such number may be adjusted from time to time in accordance with the provisions hereof but, for the avoidance of doubt, solely in relation to events that are within the control of Issuer) (the "**Capped Number**"). Issuer represents and warrants to Dealer (which representation and warranty shall be deemed to be repeated on each day that the Transaction is outstanding) that the Capped Number is equal to or less than the number of authorized but unissued Shares of the Issuer that are not reserved for future issuance in connection with transactions in the Shares (other than the Transaction) on the date of the determination of the Capped Number (such Shares, the "**Available Shares**"). In the event Issuer shall not have delivered the full number of Shares otherwise deliverable as a result of this Section 8(e) (the resulting deficit, the "**Deficit Shares**"), Issuer shall be continually obligated to deliver, from time to time until the full number of Deficit Shares have been delivered pursuant to this paragraph, Shares when, and to the extent, that (i) Shares are repurchased, acquired or otherwise received by Issuer or any of its subsidiaries after the Trade Date (whether or not in exchange for cash, fair value or any other consideration), (ii) authorized and unissued Shares reserved for issuance in respect of other transactions prior to such date which prior to the relevant date become no longer so reserved and (iii) Issuer additionally authorizes any unissued Shares that are not reserved for other transactions. Issuer shall promptly notify Dealer of the occurrence of any of the foregoing events (including the number of Shares subject to clause (i), (ii) or (iii) and the corresponding number of Shares to be delivered) and promptly deliver such Shares

16

thereafter. For the avoidance of doubt, under no circumstances would Issuer be obligated to pay cash in the event Issuer shall not have delivered the full number of Shares otherwise deliverable as a result of this Section 8(e).

(f) *Amendments to Equity Definitions*. The following amendments shall be made to the Equity Definitions:

(i) Section 11.2(c) of the Equity Definitions is hereby amended by (x) replacing the words "a diluting or concentrative" with "a material", (y) adding the phrase "or Warrants" after the words "the relevant Shares" in the same sentence and (z) deleting the phrase "(provided that no adjustments will be made to account solely for changes in volatility, expected dividends, stock loan rate or liquidity relative to the relevant Shares)" and replacing it with the phrase "(and, for the avoidance of doubt, adjustments may be made to account solely for changes in volatility, expected dividends, stock loan rate or liquidity relative to the relevant Shares);

(ii) Each of Section 11.2(a) and Section 11.2(e)(vii) of the Equity Definitions is hereby amended by deleting the words "diluting or concentrative" and replacing them with the words "a material", and adding the phrase "or Warrants" at the end of the sentence;

(iii) Section 12.9(b)(iv) of the Equity Definitions is hereby amended by (x) deleting (1) subsection (A) in its entirety, (2) the phrase "or (B)" following subsection (A) and (3) the phrase "in each case" in subsection (B); and (y) deleting the phrase "neither the Non- Hedging Party nor the Lending Party lends Shares in the amount of the Hedging Shares or" in the penultimate sentence; and

(iv) Section 12.9(b)(v) of the Equity Definitions is hereby amended by (x) adding the word "or" immediately before subsection "(B)" and deleting the comma at the end of subsection (A); and (y) (1) deleting subsection (C) in its entirety, (2) deleting the word "or" immediately preceding subsection (C) and (3) deleting the penultimate sentence in its entirety and replacing it with the sentence "The Hedging Party will determine the Cancellation Amount payable by one party to the other".

(g) *Additional Termination Events*. The occurrence of any of the following shall constitute an Additional Termination Event with respect to which the Transaction shall be the sole Affected Transaction and Issuer shall be the sole Affected Party; *provided* that with respect to any Additional Termination Event, Dealer may choose to treat part of the Transaction as the sole Affected Transaction, and, upon the termination of the Affected Transaction, a Transaction with terms identical to those set forth herein except with a Number of Warrants equal to the unaffected number of Warrants shall be treated for all purposes as the Transaction, which shall remain in full force and effect:

(i) Dealer, despite using commercially reasonable efforts, is unable or reasonably determines, based on advice of counsel, that it is impractical or illegal, to effect a commercially reasonable hedge of its obligations pursuant to the Transaction in the public market without registration under the Securities Act or as a result of any legal, regulatory or self- regulatory requirements or related policies and procedures (whether or not such requirements, policies or procedures are imposed by law or have been voluntarily adopted by Buyer in light of legal, regulatory, or self- regulatory concerns);

(ii) a "person" or "group" within the meaning of Section 13(d) of the Exchange Act, other than the Issuer, its Subsidiaries and the employee benefit plans of the Issuer and its subsidiaries, has become the direct or indirect "beneficial owner," as defined in Rule 13d- 3 under the Exchange Act, of the Issuer's common equity representing more than 50% of the voting power of the Issuer's common equity;

(iii) the consummation of (A) any recapitalization, reclassification or change of the Class A Common Stock of the Issuer (other than changes resulting from a subdivision or combination) as a result of which the Class A Common Stock of the Issuer would be converted into, or exchanged for, stock, other securities, other property or assets; (B) any share exchange, consolidation or merger of the Issuer pursuant to which the Class A Common Stock of the Issuer

17

will be converted into cash, securities or other assets; or (C) any sale, lease or other transfer in one transaction or a series of transactions of all or substantially all of the consolidated assets of the Issuer and its subsidiaries, taken as a whole, to any person other than one of the Issuer's subsidiaries; provided, however, that neither (i) a transaction described in clause (B) in which the holders of all classes of the Issuer's common equity immediately prior to such transaction own, directly or indirectly, more than 50% of all classes of common equity of the continuing or surviving corporation or transferee or the parent thereof immediately after such transaction in substantially the same proportions as such ownership immediately prior to such transaction nor (ii) any merger primarily for the purpose of changing the Issuer's jurisdiction of incorporation and resulting in a reclassification, conversion or exchange of outstanding shares of the Class A Common Stock of the Issuer solely into shares of common stock of the surviving entity shall be an Additional Termination Event pursuant to this clause (iii);

(iv) the stockholders of the Issuer approve any plan or proposal for the liquidation or dissolution of the Issuer; or

(v) the Class A Common Stock of the Issuer ceases to be listed or quoted on any of The New York Stock Exchange, The NASDAQ Global Select Market or The NASDAQ Global Market (or any of their respective successors);

Notwithstanding the foregoing, a transaction set forth in clause (ii) or (iii) above will not constitute an Additional Termination Event if at least 90% of the consideration received or to be received by the holders of the Class A Common Stock of the Issuer, excluding cash payments for fractional shares, in connection with such transaction or transactions consists of shares of common stock that are listed or quoted on any of The New York Stock Exchange, The NASDAQ Global Select Market or The NASDAQ Global Market (or any of their respective successors) or will be so listed or quoted when issued or exchanged in connection with such transaction or transactions.

(h) *Extension of Settlement*. Dealer may (x) divide any Component into additional Components and designate the Expiration Date and the Number of Warrants for each such Component, or (y) extend any Expiration Date or any other date of valuation or delivery of Shares, if Dealer determines, in its reasonable discretion based on the advice of counsel, that such further division or extension is necessary or advisable to preserve Dealer's commercially reasonable hedging activity hereunder in light of existing liquidity conditions in the cash market or stock loan market or to enable Dealer to effect purchases of Shares in connection with its commercially reasonable hedging, hedge unwind or settlement unwind activity hereunder in a manner that would, if Dealer were Issuer or an affiliated purchaser of Issuer, be in compliance with applicable legal and regulatory requirements.

(i) *Transfer and Assignment*. Dealer may transfer or assign its rights and obligations hereunder and under the Agreement, in whole or in part, at any time without the consent of Issuer; *provided* that at any time at which an Excess Ownership Position exists, if Dealer, in its discretion, is unable to effect a transfer or assignment to a third party after using its commercially reasonable efforts on pricing terms reasonably acceptable to Dealer such that an Excess Ownership Position no longer exists, Dealer may designate any Scheduled Trading Day as an Early Termination Date with respect to a portion (the "**Terminated Portion**") of the Transaction, such that such Excess Ownership Position no longer exists. In the event that Dealer so designates an Early Termination Date with respect to a portion of the Transaction, a payment or delivery shall be made pursuant to Section 6 of the Agreement and Section 8(a) of this Confirmation as if (i) an Early Termination Date had been designated in respect of a Transaction having terms identical to the Terminated Portion of the Transaction, (ii) Issuer shall be the sole Affected Party with respect to such partial termination and (iii) such portion of the Transaction shall be the only Terminated Transaction.

(j) *Equity Rights*. Dealer acknowledges and agrees that this Confirmation is not intended to convey to it rights with respect to the Transaction that are senior to the claims of common stockholders in the event of Issuer's bankruptcy. For the avoidance of doubt, the parties agree that the preceding sentence shall not apply at any time other than during Issuer's bankruptcy to any claim arising as a result of a breach by Issuer of any of its obligations under this Confirmation or the Agreement. For the avoidance of doubt, the parties acknowledge that this Confirmation is not secured by any collateral that would otherwise secure the obligations of Issuer herein under or pursuant to any other agreement.

18

(k) *No Netting and Set- off*. The provisions of Section 2(c) of the Agreement shall not apply to the Transaction. Each party waives any and all rights it may have to set- off delivery or payment obligations it owes to the other party under Transaction against any delivery or payment obligations owed to it by the other party whether arising under the Agreement, under any other agreement between parties thereto, by operation of law or otherwise.

(l) *Effectiveness*. If, prior to the Effective Date, Dealer reasonably determines that it is advisable to cancel the Transaction because of concerns that Dealer's related commercially reasonable hedging activities could be viewed as not complying with applicable securities laws, rules or regulations, the Transaction shall be cancelled and shall not become effective, and neither party shall have any obligation to the other party in respect of the Transaction.

(m) *Designation by Dealer*. Notwithstanding any other provision in this Confirmation to the contrary requiring or allowing Dealer to purchase, sell, receive or deliver any Shares or other securities to or from Issuer, Dealer may designate any of its affiliates to purchase, sell, receive or deliver such Shares or other securities and otherwise to perform Dealer's obligations in respect of the Transaction and any such designee may perform such obligations; *provided* that Issuer will not, as a result of such designation, incur additional taxes, fees, costs or losses. Dealer shall be discharged of its obligations to Issuer to the extent of any such performance.

(n) *Disclosure*. Effective from the date of commencement of discussions concerning the Transaction, Issuer and each of its employees, representatives, or other agents may disclose to any and all persons, without limitation of any kind, the tax treatment and tax structure of the Transaction and all materials of any kind (including opinions or other tax analyses) that are provided to Issuer relating to such tax treatment and tax structure.

(o) *Tax Representations and Forms*. Issuer (x) represents that for the purpose of Section 3(f) of the Agreement, it is a "U.S. Person" (as that term is used in Section 7701(a)(30) of the Internal Revenue Code of 1986, as amended), and (y) for purposes of Sections 4(a)(i) and 4(a)(iii) of the Agreement, agrees to deliver U.S. Internal Revenue Service Form W- 9 (A) prior to execution of the Agreement, promptly upon reasonable demand by Dealer and promptly upon learning that any form or other document previously provided by Issuer has become obsolete or incorrect. For the purpose of Section 3(e) of the Agreement, Dealer represents that [✍ ] and it will provide [✍ ] prior to execution of the Agreement, promptly upon reasonable demand by Issuer and promptly upon learning that any form or other document previously provided by Dealer has become obsolete or incorrect.

(p) *Counterparts*. This Confirmation may be executed in several counterparts, each of which shall be deemed an original but all of which together shall constitute one and the same instrument.

(q) *Waiver of Trial by Jury*. EACH OF ISSUER AND DEALER HEREBY IRREVOCABLY WAIVES (ON ITS OWN BEHALF AND, TO THE EXTENT PERMITTED BY APPLICABLE LAW, ON BEHALF OF ITS STOCKHOLDERS) ALL RIGHT TO TRIAL BY JURY IN ANY ACTION, PROCEEDING OR COUNTERCLAIM (WHETHER BASED ON CONTRACT, TORT OR OTHERWISE) ARISING OUT OF OR RELATING TO THE TRANSACTION OR THE ACTIONS OF ISSUER OF ITS AFFILIATES OR DEALER OR ITS AFFILIATES IN THE NEGOTIATION, PERFORMANCE OR ENFORCEMENT HEREOF.

(u) *Submission to Jurisdiction and Governing Law*. Each party hereby irrevocably and unconditionally submits for itself and its property in any legal action or proceeding by the other party against it relating to the Transaction to which it is a party, or for recognition or enforcement of any judgment in respect thereof, to the exclusive jurisdiction of the Supreme Court of the State of New York, sitting in New York County, the courts of the United States of America for the Southern District of New York, and appellate courts from any thereof. THIS CONFIRMATION SHALL BE GOVERNED BY THE LAWS OF THE STATE OF NEW YORK (WITHOUT REFERENCE TO ITS CHOICE OF LAW DOCTRINE).

19

(v) *Illegality*. The parties agree that for the avoidance of doubt, for purposes of Section 5(b)(i) of the Agreement, "any applicable law" shall include the Dodd- Frank Wall Street Reform and Consumer Protection Act of 2010, any rules and regulations promulgated thereunder and any similar law or regulation, without regard to Section 739 of the Dodd- Frank Wall Street Reform and Consumer Protection Act of 2010 or any similar legal certainty provision in any legislation enacted, or rule or regulation promulgated, on or after any Trade Date, and the consequences specified in the Agreement, including without limitation, the consequences specified in Section 6 of the Agreement, shall apply to any Illegality arising from any such act, rule or regulation.

(w) *Foreign Account Tax Compliance Act*. "Indemnifiable Tax" as defined in Section 14 of the Master Agreement shall not include any U.S. federal withholding tax imposed or collected pursuant to Sections 1471 through 1474 of the Code, any current or future regulations or official interpretations thereof, any agreements entered into pursuant to Section 1471(b) of the Code, or any fiscal or regulatory legislation, rules or practices adopted pursuant to any intergovernmental agreement entered into in connection with the implementation of such section of the Code (a **"FATCA Withholding Tax"**). For the avoidance of doubt, a FATCA Withholding Tax is a Tax the deduction or withholding of which is required by applicable law for purposes of Section 2(d) of the Master Agreement.

20

Issuer hereby agrees (a) to check this Confirmation carefully and immediately upon receipt so that errors or discrepancies can be promptly identified and rectified and (b) to confirm that the foregoing (in the exact form provided by Dealer) correctly sets forth the terms of the agreement between Dealer and Issuer with respect to the Transaction, by manually signing this Confirmation or this page hereof as evidence of agreement to such terms and providing the other information requested herein and immediately returning an executed copy to [ ✍ ], Facsimile No. [✍ ].

[✍ ]

By:

Name:
Title:

Agreed and Accepted By:

**FXCM INC.**

By:

Name:
Title:

**Annex A**

For each Component of the Transaction, the Number of Warrants and Expiration Date is set forth below.

| Component Number | Expiration Date | Number of Warrants |
|---|---|---|
| [✍ ] | [✍ ] | [✍ ] |

**Exhibit 10.5**

### AMENDMENT AGREEMENT

**AMENDMENT AGREEMENT** (this "**Amendment**") dated as of May 30, 2013 between [✍ ] ("**Dealer**") and FXCM Inc. ("**Counterparty**")

### WITNESSETH

WHEREAS, Dealer and Counterparty have entered into an Issuer Warrant Transaction, dated as of May 28, 2013, with Reference Number [✍ ] (the "**Confirmation**"); and

WHEREAS, Dealer and Counterparty wish to amend the Confirmation on the terms and conditions set forth herein;

NOW, THEREFORE, in consideration of the mutual agreements herein contained, Dealer and Counterparty hereby acknowledge and agree as follows:

1. Certain Definitions. Unless otherwise defined herein, capitalized terms used herein have the meanings specified in or determined pursuant to the Confirmation.

2. Amendments to the Confirmation.

(a) Components: Annex A to the Confirmation shall be deleted in its entirety and replaced with Annex A hereto;

(b) Premium: The number "[✍ ]" referenced to the right of the term "Premium" in Section 2 of the Confirmation shall be deleted and replaced with the number "[✍ ]";

(c) Adjustments: The following provisions shall be inserted below "Method of Adjustment" and above "Extraordinary Events" in Section 2 of the Confirmation:

| | |
|---|---|
| "Extraordinary Dividend: | Any Dividend (i) that has an ex- dividend date occurring on or after the Trade Date and on or prior to the date on which Issuer satisfies all of its delivery obligations hereunder and (ii) the amount or value of which is greater than the Ordinary Dividend Amount for such Dividend, as determined by the Calculation Agent. |
| Dividend: | Any dividend or distribution on the Shares (other than any dividend or distribution of the type described in Sections 11.2(e)(i), 11.2(e)(ii)(A) or 11.2(e)(ii)(B) of the Equity Definitions). |
| Ordinary Dividend Amount: | USD 0.06 per regular quarterly dividend period of the Issuer."; and |

(d) Limitations on Settlement by Issuer: The number "[✍ ]" in the third line of Section 8(e) of the Confirmation shall be deleted and replaced with the number "[✍ ]".

3. Except as specifically amended hereby, all of the terms and conditions of the Confirmation shall continue in full force and effect and shall be binding upon the parties in accordance with their respective terms.

4. Each of the parties hereby represents and warrants that:

(a)  the representations and warranties made by it in the Confirmation are true and correct as of the date hereof as if made by the party on and as of such date; and

(b)  the execution, delivery and performance of this Amendment are within the party's corporate power and have been duly authorized by all necessary corporate action, and this Amendment constitutes the legal, valid and binding obligation of the party in accordance with its terms, except as the same may be limited by applicable bankruptcy, insolvency, reorganization, moratorium or similar laws affecting the enforcement of creditors' rights generally and general equitable principles regardless of whether such enforceability is considered in a proceeding at law or in equity.

5. This Amendment may be executed in several counterparts, each of which shall be deemed an original but all of which together shall constitute one and the same instrument.

6. This Amendment shall be subject to the waiver of trial by jury and submission to jurisdiction and governing law provisions of Section 8(q) and (u) of the Confirmation as if such provisions were set forth herein.

[THE REMAINDER OF THE PAGE HAS INTENTIONALLY BEEN LEFT BLANK]

IN WITNESS WHEREOF, the parties have caused this Amendment to be executed by their respective officers or authorized representatives as of the date hereof.

Yours faithfully,

[✍
]

By:
     Name:
     Title:

Agreed and Accepted By:

**FXCM INC.**

By:
     Name:
     Title:

**Annex A**

For each Component of the Transaction, the Number of Warrants and Expiration Date is set forth below.

| Component Number | Expiration Date | Number of Warrants |
|---|---|---|
| [✍ ] | [✍ ] | [✍ ] |

**Exhibit 99.1**

**May 30, 2013**

**FXCM Inc. Announces Exercise of Option to Purchase Additional 2.25% Convertible Senior Notes due 2018**

NEW YORK - FXCM Inc. (NYSE: FXCM) today announced that, in connection with FXCM Inc.'s private offering of 2.25% Convertible Senior Notes due 2018, the initial purchasers have exercised in full their option to purchase an additional $22.5 million in aggregate principal amount of notes. The full exercise of the option to purchase additional notes brings the total aggregate principal amount of notes sold in the offering to $172.5 million. The offering is expected to close on June 3, 2013, subject to customary closing conditions.

FXCM Inc. estimates that the net proceeds from the offering of notes, including the notes sold pursuant to the initial purchasers' option to purchase additional notes, will be approximately $166.3 million, after deducting the initial purchasers' discount and the estimated offering expenses payable by FXCM Inc.

In connection with the exercise of the option to purchase additional notes, FXCM Inc. is entering into additional privately negotiated convertible note hedge transactions with affiliates of certain initial purchasers (the "hedge counterparties"). FXCM Inc. is also entering into additional privately negotiated warrant transactions with the hedge counterparties.

The notes and any shares of FXCM Inc.'s Class A common stock issuable upon conversion of the notes will not be and have not been registered under the Securities Act of 1933, as amended (the "Securities Act"), or any state securities law, and may not be offered or sold in the United States or to any U.S. persons absent registration under the Securities Act, or pursuant to an applicable exemption from, or in a transaction not subject to, the registration requirements of the Securities Act and applicable state securities laws.

This press release does not constitute an offer to sell or a solicitation of an offer to buy the notes or any shares of FXCM Inc.'s Class A common stock issuable upon conversion of the notes, nor shall there be any offer, solicitation or sale of any notes or any shares of FXCM Inc.'s Class A common stock issuable upon conversion of the notes in any jurisdiction in which such offer, solicitation or sale would be unlawful.

**Disclosure Regarding Forward- Looking Statements**

This release contains forward- looking statements within the meaning of Section 27A of the Securities Act of 1933 and Section 21E of the Securities Exchange Act of 1934, which reflect FXCM Inc.'s current views with respect to, among other things, its operations and financial performance for the future. You can identify these forward- looking statements by the use of words such as "outlook," "believes," "expects," "potential," "continues," "may," "will," "should," "seeks," "approximately," "predicts," "intends," "plans," "estimates," "anticipates" or the negative version of these words or other comparable words. Such forward- looking statements are subject to various risks and uncertainties. Accordingly, there are or will be important factors that could cause actual outcomes or results to differ materially from those indicated in these statements. FXCM Inc. believes these factors include but are not limited to evolving legal and regulatory requirements of the FX industry, the limited operating history of the FX industry,

risks related to the protection of its proprietary technology, risks related to its dependence on FX market makers, market conditions and those other risks described under "Risk Factors" in FXCM Inc.'s Annual Report on Form 10- K and other SEC filings, which are accessible on the SEC website at sec.gov.

These factors should not be construed as exhaustive and should be read in conjunction with the other cautionary statements that are included in this presentation and in our SEC filings. FXCM Inc. undertakes no obligation to publicly update or review any forward- looking statement, whether as a result of new information, future developments or otherwise, except as required by law.

FXCM Inc.

Jaclyn Klein, 646- 432- 2463

Vice- President, Corporate Communications

jklein@fxcm.com or investorrelations@fxcm.com