# EXHIBIT 9
## REDACTED

Page 1

1

2            UNITED STATES DISTRICT COURT

             SOUTHERN DISTRICT OF NEW YORK

3

      In re:                    :

4                               :  Master File No.

      Global Brokerage, Inc.   :  1:17-cv-00916-RA

5     F/k/a FXCM, Inc.          :

      Securities Litigation    :

6     ----------------------    :

7

8

9          ** C O N F I D E N T I A L **

10     REMOTE VIDEO DEPOSITION OF:  JOSEPH S. PATT

11            THURSDAY, APRIL 23, 2020

12

13

14

15

16

17

18

19

20

21

22

23

24      REPORTED BY:

25      SILVIA P. WAGE, CCR, CRR, RPR

```
                                            Page 14
 1              JOSEPH PATT - CONFIDENTIAL
 2      this deposition.
 3                  (Deposition Exhibit 1, Amended Notice
 4      of 30(b)(6) Deposition of Lead Plaintiff 683
 5      Capital Partners, LP, was marked for
 6      identification.)
 7          Q.  And it's the Amended Notice of
 8      30(b)(6) Deposition for Lead Plaintiff 683
 9      Capital Partners.
10                  Can you access that?
11          A.  Yes.  I'm trying to use it -- yeah,
12      it looks like it's easier to do it in the website
13      itself.  So I'll try that first.
14                  Okay.  Or maybe I should download it
15      to the -- yeah, you know, it's better in Adobe.
16      Okay, got it.
17          Q.  Alright.  And have you reviewed this
18      document before?
19                  (The witness reads to himself out
20      loud.)
21          A.  Notice of Deposition.
22          Q.  Yeah.  And if you turn to Page 4, it
23      gives a list of the matters upon which deposition
24      is requested for the 30(b)(6) witness.
25          A.  I don't recall this.  I knew I was
```

```
                                              Page 15
 1                JOSEPH PATT - CONFIDENTIAL
 2        being deposed because of communications with
 3        attorneys.  But I don't recall this specific
 4        document.
 5              Q.  Okay.  Have you reviewed the
 6        categories that are listed on Page 4 and
 7        following to Page 8?
 8              A.  Yes.
 9              Q.  Okay.  And are you the person -- I'm
10        sorry.
11              A.  Just scanning through it.  Just
12        trying to get all of the way through it quickly,
13        through Page 4 and 8.
14                  I believe, yeah, I believe so, yeah.
15              Q.  Okay.  And you're the person at 683
16        Capital who is most knowledgeable about these
17        categories of information; is that correct?
18              A.  Yes.
19              Q.  And as we discussed before, you're
20        authorized to speak on behalf of 683 Capital with
21        respect to these categories of information,
22        correct?
23              A.  Yes.
24              Q.  Okay.  When did you first learn that
25        you had to give a deposition in this case?
```

```
                                          Page 16
 1              JOSEPH PATT - CONFIDENTIAL
 2         A.   Within the last, you know, several
 3    months.
 4         Q.   Okay.  And who told you?
 5         A.   Our attorneys.
 6         Q.   Okay.  And did you do anything to
 7    prep for this deposition?
 8         A.   Yes.
 9         Q.   And what did you do?
10         A.   Had meetings and conversations with
11    our attorneys and looked over some of the other
12    documents.
13         Q.   Approximately -- when you said you
14    had meetings with your attorneys, which
15    attorneys?
16         A.   The Rosen Law Firm, Phil and Josh.
17         Q.   And how many times did you meet?
18         A.   Specifically, about the deposition?
19         Q.   Yes.
20         A.   Once.
21         Q.   And when was that?
22         A.   Yesterday.
23         Q.   And how long was it?
24         A.   Two hours, maybe three -- two hours,
25    two hours.
```

```
                                                   Page 17
 1                 JOSEPH PATT - CONFIDENTIAL
 2            Q.   And did you talk to anybody else in
 3       connection with the preparation for this
 4       deposition?
 5            A.   In preparation for the deposition,
 6       no.
 7            Q.   Okay.  Did you talk to anybody else
 8       about your deposition today just generally
 9       speaking, not as part of your prep?
10            A.   Yeah, I mean, I told my family that I
11       would be doing a deposition and I told my
12       colleagues I wouldn't be reachable because I'm
13       doing a deposition.
14            Q.   Okay.  Any substantive conversations
15       about the categories with your colleagues?
16            A.   No.
17            Q.   And did you review any documents in
18       preparation for your deposition?
19            A.   Yes.
20            Q.   Which ones?
21            A.   The complaints that were filed, the
22       certification, the -- some of the trading
23       history.
24            Q.   Anything else?
25            A.   That's -- that's what I recall.
```

```
 1                JOSEPH PATT - CONFIDENTIAL
 2            Q.   Okay.  And did reviewing the
 3       documents refresh your memory about any of the
 4       aspects of the lawsuit today?
 5            A.   Some, yes.
 6            Q.   Which ones?
 7            A.   More about the timeline, just trying
 8       to remember all the events.  There were a lot of
 9       events involved in this investment.
10            Q.   Okay.  Any particular document that
11       helped you with the timeline?
12            A.   The complaints and the trading
13       histories.
14            Q.   Switching gears for a second, can we
15       just talk about your general background.
16                 Can you walk us through your
17       education from college on?
18            A.   Sure.  I graduated from Yale in 1995
19       with an undergraduate in chemistry and a Master's
20       in chemistry.  I took a year off.  I then went to
21       Harvard Law School graduated with -- in 1999.
22                 You just want education or is there
23       anything else?
24            Q.   For now, we can do education.
25            A.   Those are my degrees.
```

1        JOSEPH PATT - CONFIDENTIAL

2            But the other thing that we do is

3    that we, generally, try and be nimble and quick

4    in places where there's -- how do I say this --

5    dislocation or distress, where people are, you

6    know, acting emotionally for whatever reasons and

7    we can try and take the other side of that.  We

8    try and look for situations like that.

9            Q.  Okay.  And how many clients do you

10   manage money for at 683 Capital?

11

18            Q.  Okay.  So is that invested in any --

19   just generally in the company or in particular

20   investment funds in the company?

21            A.  We have only one investment fund --

22            (Stenographer clarification.)

23            (There is a discussion off the

24   record.)

25            Q.  So, I think, the next question I

```
 1                    JOSEPH PATT - CONFIDENTIAL
 2        expressed in the marketing materials that you
 3        would send to clients?
 4              A.  Yeah, or in the LP agreement.
 5              Q.  And who at 683 Capital would have
 6        access to the marketing materials and LP
 7        agreements?
 8              A.  I mean, Mimi does, but we all do have
 9        access to it.
10              MR. ISAJIW:  Okay.  I don't think
11        we've seen either of the marketing materials or
12        LP agreements.  [REQUEST] So, Phil, if we can
13        talk about that later, but we would like to
14        request those.
15              MR KIM:  Yeah, we'll take the request
16        under advisement and then if we can talk about
17        it, you know, post-depo.
18                    (INAUDIBLE COMMENT MADE BY WITNESS.)
19              Q.  And the decision make strategy for
20        683 investment -- 683 Capital's investment, in
21        terms of risk tolerance or the types of
22        investments you're looking at, is that documented
23        anywhere?
24              A.  We have very vague and wide
25        flexibility.  Our investors know that we move
```

1          JOSEPH PATT - CONFIDENTIAL

2      around a lot.

3          Q.  In connection with the FXCM

4      investments, can you walk me through the

5      decision-making process between you and

6      Mr. Zweiman in connection with the deciding to

7      invest initially in a company?

8          A.  So, as I believe we described

9      earlier, like we saw the Swiss franc crash.  We

10     both saw news stories about it.  We read it.  We

11     talked about what it meant.  We looked into the

12     filings.  We looked into the documents and the

13     indentures and together we concluded that it

14     seemed like this was a good risk reward to own

15     the bonds.

16         Q.  So when -- would you view this as

17     investing in a distressed company at the time you

18     made the investment?

19         A.  Yes.

20         Q.  And is that something that 683,

21     typically, does?

22         A.  Often does.

23         Q.  Do you have a rough sense of

24     percentage of investments that are in distress

25     companies at 683 right now?

```
 1              JOSEPH PATT - CONFIDENTIAL
 2     ███  ███████████████████████
 3         Q.  And is the -- was the SNB Flash Crash
 4     an example of one of the "dislocations" you were
 5     discussing earlier?
 6         A.  Yes.
 7         Q.  Okay.  And can you just explain to me
 8     just so I better understand what you mean when
 9     you say "dislocations"?
10         A.  So a moment when investors in some
11     asset sort of wake up or because FX decided it
12     isn't actually what they were invested in and so
13     they're selling for emotional or panic reasons as
14     opposed to analytical reasons.
15              People who are used to investing in
16     something, a bond at par, you know, don't like
17     when it trades at 50 or, I mean, nobody does.
18     But it doesn't fit their business model often.
19         Q.  So you're looking to capitalize on
20     those situations?
21         A.  Yes.
22         Q.  And how do you monitor individual
23     investments for performance once you've invested?
24         A.  I mean, lots of different ways.  We
25     follow the public filings.  We -- as we discussed
```

JOSEPH PATT - CONFIDENTIAL

```
 1                    JOSEPH PATT - CONFIDENTIAL
 2         before, sometimes we talk to management.
 3         Sometimes we talk to research analysts who watch
 4         the stock prices or the bond prices, I mean.
 5              Q.  You said you talk to research
 6         analysts and not just look at their research but
 7         you actually can pick up the phone --
 8              A.  Sometimes both, I mean -- yes, both.
 9              Q.  Does 683 Capital use investment
10         managers at all?
11              A.  No.  You mean outside managers to
12         manage --
13              Q.  Yes.
14              A.  Puts the capital with other people,
15         no.
16              Q.  Yes.
17              A.  No.  I mean, one could argue say
18         anytime you invest in say Coke-a-Cola, the
19         management team of Coke-a-Cola is your investment
20         manager for that business but...
21              Q.  I guess that is theoretically an
22         argument one can make.  But I was referring to
23         contractually putting capital with investment
24         managers outside of the firm.
25              A.  No.
```

1                 JOSEPH PATT - CONFIDENTIAL

2          Q.   And is any portion of 683 Capital

3      portfolio passively managed?

4          A.   No, not by the definition of

5      "passive," no.

6          Q.   So we referred to the "SNB Flash

7      Crash" a couple of times.

8               What is your understanding of that

9      event?

10         A.   Yeah, up until then the -- up until

11     that day, everybody thought that the Swiss franc

12     would be pegged to a certain level of the Euro.

13              And I said, you know, nah, and then

14     let it re-peg at a different price.  And it

15     seemed that way --

16         Q.   Okay.  And what was -- what was the

17     effect on --

18         A.   -- 40 percent movement today.

19              What?

20         Q.   I'm sorry, I think you were just

21     answering.

22         A.   Yeah, I think there was a 40 percent

23     move today in that moment.  I mean, it happened

24     over night.

25         Q.   What was your -- and what was your

JOSEPH PATT - CONFIDENTIAL

1

2          understanding of that event's effect on FXCM?

3                   A.  So my recollection was and based on

4          what they said was, you know, they had clients

5          that were say short the Swiss franc on a very

6          levered basis.  The Swiss franc moved, you know,

7          in an unprecedented fashion.  It moved through

8          all their clients' equity, well-passed whatever

9          their clients could pay back and they were --

10         they had counterparties and they suffered a loss

11         as a result because it became their loss, once it

12         moved enough through their client's equity.

13                  Q.  And so why would that make -- why

14         would you be interested in investing in FXCM at

15         that time?

16                  A.  Because at that moment then -- they

17         announced how much their losses were or they said

18         their losses were.  You could look at their

19         balance sheet based on the public filings.  You

20         could see that they were getting, you know, a

21         rescue financing from Leucadia.  So they weren't

22         going to have to, like, liquidate immediately.

23                  And there was information based on

24         the money that was coming in and statements

25         around that that you could value their assets

```
 1              JOSEPH PATT - CONFIDENTIAL
 2       based on what they said and for what their
 3       business had been worth based, again, on what
 4       they said and it looked like you were well
 5       covered, that the bottoms were easily going to
 6       recover a hundred cents on the dollar and they
 7       were trading in the 40s, I believe.
 8            Q.   Okay.  So what FXCM securities did
 9       683 Capital purchase at that point?
10            A.   The convertible bonds, convertible
11       notes.
12            Q.   The Rule 144A notes?
13            A.   I thought they were registered.
14       That's my recollection.  Am I incorrect?
15                 I think the 144A, when they were
16       issued and then became -- I may be wrong about
17       this.  So it's a long time since -- a long time
18       since we did this.
19                 But I thought they were issued maybe
20       144A and then had become registered, because they
21       were convertible.  So they had stock underlying
22       them.  So the typical pattern on a convertible
23       bond is -- like that it is gets issued as a 144A
24       and then it's quickly -- registered in the next
25       six months or it becomes registered just by the
```

```
 1                  JOSEPH PATT - CONFIDENTIAL
 2          waiting period, so -- and they were over
 3          six-months old those bonds so...
 4                  Maybe I'm wrong.  I just -- that's my
 5          recollection.
 6                  Q.  Okay.  Any other securities?
 7                  A.  That we bought in the company, no.
 8                  MR. ISAJIW:  Okay.  I'm going to
 9          introduce -- I think, we're at Exhibit 8 -- the
10          Memorandum of Law in support of 683 Capital
11          Partners and Shipco's motions to consolidate the
12          related actions and appoint Co-Lead Plaintiffs.
13                  Ashley, can you help me with that?
14                  (Deposition Exhibit 8, Memorandum of
15          Law in Support of Motion of 683 Capital Partners,
16          LP and Shipco Transport Inc. To: (1) Consolidate
17          Related Actions; (2) Appoint Co-Lead Plaintiffs;
18          and (3) Approve Co-Lead Plaintiffs' Selection of
19          Counsel, was marked for identification.)
20                  MS. DePALMA:  It should now be
21          introduced.
22                  A.  This is -- I'm downloading it now.
23          Hold on.
24                  Okay.  This is Exhibit 8, yeah, okay.
25                  Q.  And so you'll see at the top, there's
```

1              JOSEPH PATT - CONFIDENTIAL

2        a Page No. 1 of 10 and it also --

3              A.   Yeah.

4              Q.   -- says that this was filed April 10,

5        2017.

6              A.   Yeah.

7              Q.   If you flip to page -- I want to

8        point you to Exhibit 2 of this document --

9              A.   Uh-huh.   Yep.

10             Q.   -- which could be your certification.

11             A.   Yes.

12             Q.   Okay.   So we mentioned -- I was

13       asking before about other types of securities in

14       FXCM that you purchased?

15                  And before we dive into this

16       document, other than the bonds, did 683 Capital

17       trade in any other FXCM securities, as far as you

18       know?

19             A.   We traded in the stocks and, I think,

20       we might have traded some options.   I can't

21       remember I have a hazy recollection that we did,

22       but I don't remember exactly.

23             Q.   So, if you look at the document that

24       we just marked as Exhibit 8, Paragraph 4 of your

25       certification indicates that, "The following is a

```
                                          Page 81
 1              JOSEPH PATT - CONFIDENTIAL
 2       list of purchases and sales I have made in FXCM
 3       notes during the class period as set forth in the
 4       complaint.  I have made no transactions during
 5       the class period in the debt or equities
 6       securities that are subject of this lawsuit
 7       except for those set forth below."
 8                 And then attached it says, "See
 9       attached."  And attached on the next page is
10       "Schedule A of 683 Capital Partners Transactions
11       in Global Brokerage Inc., 2.25 percent," dated
12       6/15/18 CVT.
13                 Do you see that?
14            A.   Uh-huh.
15            Q.   Did you prepare this document?
16            A.   No.
17            Q.   Who prepared it?
18            A.   I believe our attorneys.
19            Q.   Did you review the document before it
20       was submitted?
21            A.   Yes.
22            Q.   Okay.  And did you do anything to
23       verify that the information there is correct?
24            A.   I just looked at my memory, which
25       turned out to be incorrect because there's some
```

```
                                              Page 82

 1                 JOSEPH PATT - CONFIDENTIAL
 2         things here that were not trades but were
 3         actually transfers between our PBs.
 4               Q.  Okay.  And that's one of the things I
 5         wanted to ask you so I understand it.
 6               If you look at Schedule A, there is
 7         -- one, two, three -- four transactions in
 8         August 27, 2015.
 9               A.  Uh-huh.
10               Q.  One, two -- three transactions in
11         December 15, 2015.
12               Can you explain to me whether or not
13         those are purchases?
14               A.  I can't -- I can't without looking at
15         the schedule of our confirms.  But I know that we
16         were transferring back and forth between PBs just
17         the balance assets at some point.
18               So I don't believe -- I just don't
19         remember which were actual purchases, other than
20         the stuff at the beginning, which were clearly
21         purchases.  And the sales were -- clearly looked
22         like they were clearly the sales.  But I just
23         don't remember which were transfers and which
24         were purchases.
25               Q.  So, at least, some of these were
```

```
                                           Page 83
 1                 JOSEPH PATT - CONFIDENTIAL
 2        transfers as opposed to purchases?
 3                 A.  Yeah.  And my belief is that we
 4        corrected all that, like, our -- we -- 683 worked
 5        with the attorneys to make sure we got it right
 6        when we corrected it.
 7                 Q.  And we'll take a look at the other
 8        documents too.  I'm just trying to understand.
 9                 When you say there were "transfers,"
10        what does that mean?
11                 A.  Sure.  So we -- at the time in 2015,
12        we had two brokers, basically, main brokers,
13        prime brokers for us.  I say "prime," but we had
14        two of them, Goldman Sachs at the time and Credit
15        Suisse at the time.
16                 And so we moved some bonds from one
17        to the other.  I just don't remember which, to
18        equalize assets, to optimize our margin, just our
19        normal portfolio balancing, if you will.
20                 Q.  So they weren't new purchases of the
21        bonds, they were just storing the bonds at
22        different prime brokerage accounts?
23                 A.  Yeah, there was no market transaction
24        of any sort, no economic effect for investors.
25                 Q.  Okay.  And you've used the acronym
```

```
 1                  JOSEPH PATT - CONFIDENTIAL
 2        point, then how much we would have ultimately
 3        lost.
 4              Q.  Okay.  But it's not -- that is math
 5        you can do from this sheet, but it's not
 6        summarized in this sheet?
 7              A.  I don't see it in this sheet, but you
 8        can, certainly, do it from this sheet.
 9              Q.  Okay.  And if you look at -- again,
10        still focusing on the bond portion of this sheet,
11        in October of 2015, there are additional buys of
12        the 2.25 percent --
13              A.  Correct.
14              Q.  What was the rationale for purchasing
15        at that point?
16              A.  Price again.
17              Q.  Can you explain that in more detail?
18              A.  Yeah, price had come down quite a
19        bit.  Time had passed a bit, so the yield was a
20        lot higher.  We had been following the company
21        and they had been, you know, achieving some of
22        their sales and milestones.  Money had been going
23        back to Leucadia.  So the money was senior to us
24        was coming back.  We were more optimistic in the
25        value of the business and the value of our
```

```
 1              JOSEPH PATT - CONFIDENTIAL
 2      securities.
 3              Q.  So, other than price, any other
 4      decision -- sorry, let me ask that slightly
 5      better.
 6                  Any other information -- did you
 7      analyze any other information in connection with
 8      your decision to buy bonds in October of 2015
 9      other than the price?
10              A.  Well, the continuing public filings,
11      which, as I mentioned, there had been
12      announcements.
13                  I don't remember the details anymore.
14      It was a long time ago.  And it was a really
15      complicated situation.
16                  But there had been continuing filings
17      about what businesses FXCM had been able to sell,
18      what assets they had been able to realize, how
19      much they had been able to pay down the Leucadia
20      rescue loan and what that meant for the -- what
21      we thought that meant for the ultimate value of
22      our bonds; all of which had been done in
23      ignorance of, you know, what they had actually
24      been doing with their business.
25              Q.  And then if you look at the end of
```

```
 1                    JOSEPH PATT - CONFIDENTIAL
 2        this sheet, we have a cell of bonds in February
 3        of 2017.
 4             A.  Yes.
 5             Q.  So what was the rationale for selling
 6        in February of 2017?
 7             A.  I mean, that was after they announced
 8        they had been banned in the US, which radically
 9        changed our value -- the value proposition of
10        this business and this security and, frankly, you
11        know, angered us.
12                  But that's not why we sold it.  We
13        sold because it changed our value analysis.
14             Q.  So it was, again, a price-based
15        decision?
16             A.  An information based -- I mean, the
17        price was terrible, information relative to
18        price.  Information was these guys had been lying
19        about their core business.  They just admitted it
20        in a regulatory filing and they were banned from
21        doing business in the US and paid a fine.  This
22        business was worth a lot less.
23             Q.  And did you sell all of your holdings
24        in FXCM at that point?
25             A.  No.
```

```
 1              JOSEPH PATT - CONFIDENTIAL
 2         Q.  What portion of your holdings did you
 3    sell?
 4         A.  According to this, 2 million, which
 5    comports with my recollection.
 6         Q.  And, roughly speaking, what
 7    percentage is that?
 8         A.  2 out of the 17.  So 2 out 16 would
 9    be one-eighth, which is 12 and a half.  So two of
10    17 is like I don't know --
11              (Stenographer clarification.)
12         A.  Well, the sum total here is 15
13    million, right.  We sold two, which means we had
14    17 million before that.  So we sold two out of
15    17.  Two -- I can tell you the 2 out of the 16 is
16    12 and a half percent.  So 2 out of 17 is
17    slightly less than that.  Again, that's in
18    nonrational numbers that I can also tell you.
19         Q.  Okay.  And can you walk me through
20    some of the logistics of selling these bonds and
21    purchasing these bonds?
22              Does 683 Capital call a dealer
23    directly?
24              Do you e-mail your prime broker?
25              How do these transactions actually
```

1               JOSEPH PATT - CONFIDENTIAL

2       work?

3               A.   The prime broker -- the prime broker

4       is just where we custody.  They're not involved

5       in the pretrade or trade execution, just in the

6       after market -- after effect, if you will.

7               We would -- so various brokers

8       sometimes call us, sometimes we call them.  They

9       are often running -- they send runs.  So, like, I

10      have a Bloomberg terminal at work and I have one,

11      you know, a virtual one here and, you know, when

12      we're working remote.

13              And on that Bloomberg terminal, we

14      get messages that, basically, literally one --

15      dozens a minute, frankly, from all sorts of

16      dealers about all sorts of securities and you

17      sort of do a scan; hey, oh, who is making markets

18      or showing indications on Global Brokerage or

19      FXCM.

20              And, you know, we saw the news and

21      we're like, let's see where they're trading, see

22      if we can get rid of some and at what price.

23              Q.   Okay.  And so, when you say you're

24      looking at a Bloomberg terminal, you're seeing

25      which brokers are offering the purchase or sale

1                   JOSEPH PATT - CONFIDENTIAL

2          of these securities at what price?

3                   A.  And they were advertising they're

4          involved, they're interested.  It depends on the

5          security, the liquidity of the security, the

6          facts around the security, whatever day it is.

7                        Like, on a super liquid, like, bond,

8          it might just all be like electronic or a stock.

9          But on this, like, you know, they'd be, like, oh,

10         on bid 30 and offered at 40, 1 million up, call

11         to discuss.

12                       I don't know.  I'm making up, you

13         know.  It would be really wide.  It would involve

14         a conversation.  It wouldn't be -- almost all

15         these involved conversation -- they all involved

16         conversations.  But they, you know, would be

17         triggered by, effectively, a Bloomberg e-mail, if

18         you will, a Bloomberg mail.

19                  Q.   Okay.  So, for the FXCM bonds at

20         issue here, they were the type of transactions

21         that would require a call with a broker to

22         discuss the purchase or sale because they're not

23         a super liquid security like other bonds may have

24         been?

25                  A.   Correct.  I would say mostly a call

1            JOSEPH PATT - CONFIDENTIAL

2       but also times an instant message or an instant

3       Bloomberg is what they would call it, but direct

4       communication not like something that happens

5       over -- like when you trade stock personally in

6       Fidelity or something or when we trade stock, our

7       fund.

8            Q.  Does the FXCM notes trade frequently

9       in your experience?

10           A.  No.

11           Q.  Were you in a position that you could

12      always buy or sell the quantity you wanted to buy

13      or sell immediately?

14           A.  No.

15           Q.  What were the limitations on that?

16           A.  You had to make a conversation and

17      the spread could be, you know, point a wide, half

18      a point wide, four points white, ten points wide

19      in really bad markets.

20           Q.  And you're having conversations with

21      individual brokers.

22               How many brokers did you discuss FXCM

23      notes trades with?

24           A.  Probably three or four over the

25      years.

1          JOSEPH PATT - CONFIDENTIAL
2          Q.  And who were they?
3          A.  I can look on the this list and I can
4      see we traded with Credit Suisse, J.P. Morgan,
5      GMP, CRT, Goldman.  That's everybody.
6          Q.  And that's under the "Broker" column
7      of this spreadsheet that we're looking at
8      Exhibit 12, correct?
9          A.  Yep.
10          Q.  Was there any kind of centralized --
11      I'm sorry?
12          A.  I'm certain we traded with Jefferies
13      too.  So I don't know why that's not there.
14      There may be some -- so...
15          Q.  Do you know, roughly, the dates that
16      you would be trading with Jefferies?
17          A.  Actually, I'm not -- yeah, in the
18      first couple of trades.  I have a feeling -- I
19      don't know why it was says Credit Suisse there.
20      I think those are all Jefferies trades to be
21      perfect -- from my recollection.
22          Q.  Where would you -- if we wanted to
23      confirm one way or the other whether it was
24      Credit Suisse as a broker or Jefferies as a
25      broker, what information would we look at?

1              JOSEPH PATT - CONFIDENTIAL

2          A.  The actual confirms or -- and the

3      account statements from back then.

4          Q.  And where are the confirms or account

5      statements from back then stored at 683?

6          A.  Our CFO knows where they are.  He has

7      them.

8          Q.  And so the confirms will just list

9      who the executing broker is and we can confirm

10     one way or the other.

11         A.  Yeah.

12         Q.  But you think Jefferies is missing

13     from this list?

14         A.  I think the original trades at say

15     Credit Suisse not the later ones.  But I think my

16     recollection is that they're Jefferies.

17         Q.  So you think it these trades with a

18     different broker, as opposed to trades that are

19     not listed here?

20         A.  Oh, yeah.

21         Q.  Okay.

22         A.  Yeah.  I -- there shouldn't be a

23     mistake in the trades, just the broker.

24         Q.  Okay.

25         A.  And I may be wrong.  I'm just -- my

1          JOSEPH PATT - CONFIDENTIAL
2          Q.  To me it would be helpful if you
3     could just explain to me when you buy an option,
4     what type of financial contract are you making?
5          A.  When you buy a call option, you're
6     betting -- you say paying a small amount now for
7     the right to buy the stock at some price at
8     anytime between now and the expiry and that stock
9     price is the strike price.
10         Q.  Yeah, a predetermined strike price?
11         A.  Yes, a predetermined strike price.
12         Q.  So, in that situation, you have the
13    right but not the obligation to purchase the
14    security, if the price does hit the strike price?
15         A.  Correct.
16              Can I --
17         Q.  So how does -- I'm sorry?
18         A.  -- have 30 seconds to approve our
19    firm's, you know, payments today just to go -- I
20    just got a text.
21         Q.  Sure.
22         A.  Is that okay?  I'll be really quick.
23              MR. ISAJIW:  [REQUEST] And, Phil,
24    while he's doing that, I don't think we've seen
25    any of the confirms and we would be interested in

                                                        Page 128

1                    JOSEPH PATT - CONFIDENTIAL
2           getting a production of these trades that would
3           include the options, if possible.  So, again,
4           just wanted to make a request and we can talk
5           about it after the deposition.
6                    MR KIM:  Yeah, we can talk about it
7           afterwards.  I mean, I think, those transactions
8           are reflected in the account statement.  So I
9           don't know why you would need another piece of
10          paper, but we can discuss it later.
11                   A.  I'm back.  Thank you.  I just need
12          to...
13                   Q.  Understood.
14                   So, I guess, what I'm trying to
15          understand is in the overall trading strategy of
16          683 Capital in connection with the FXCM
17          Securities, 683 is purchasing notes.  It is
18          shorting securities -- I'm sorry.  It is shorting
19          common stock.  It is --
20                   A.  Sometimes.
21                   Q.  -- purchasing -- "sometimes."  It is
22          buying call options and other options.
23                   First of all, any other transactions
24          related to FXCM securities that were missing?
25                   A.  Not that were -- not that I recall.

```
                                        Page 129
 1              JOSEPH PATT - CONFIDENTIAL
 2      I mean, I think you've got them all in the
 3      statements but...
 4              Q.  Okay.  So how do all those different
 5      types of securities transactions fit into an
 6      overall strategy?  That's what I'm trying to
 7      understand.
 8              A.  Sure.  We thought that the bonds were
 9      really really cheap and we wanted to own as much
10      of them as we can risk tolerate.  And at various
11      points we changed our mind as to whether or not
12      the stock was cheap relative to the bonds, cheap
13      on its own or expensive.
14              Q.  Okay.  So you thought the bonds were
15      worth more than their current market price, the
16      stock --
17              A.  By a lot.
18              Q.  By a lot?
19              A.  Based on the filings that had been,
20      you know, that we read.
21              Q.  Okay.  You thought that the stock at
22      some points was worth less than its current
23      market price and at other points potentially
24      worth more than its current market price?
25              A.  And at other points we thought, well,
```

```
 1              JOSEPH PATT - CONFIDENTIAL
 2      we weren't sure but we thought it was worth less
 3      on a relative basis than the bonds.  So that
 4      altogether long bonds and shorted tiny bit of
 5      stock was a better trade than just long bonds,
 6      probably less bonds, if you will.
 7            Q.  Okay.  And so the options contracts,
 8      how do they fit into that strategy?
 9              I understand the short position and
10      the long bonds.
11              How does the options --
12            A.  We thought it was a good bet that the
13      -- that the likelihood the chance that the stock
14      might be go up multiple 10, 20, 30 times was
15      large enough because there were lots of ways we
16      could imagine based on the filings that it did
17      that we wanted to own the potential -- we wanted
18      to make on the potential that it would go up by
19      multiples.
20            Q.  Okay.  Overall against the whole
21      portfolio that 683 had with FXCM securities,
22      would it generally -- would 683 Capital's
23      position generally do better if the stock price
24      decreased or increased?
25            A.  Always do better if it increased.
```

```
                                             Page 131
 1                 JOSEPH PATT - CONFIDENTIAL
 2            Q.   Okay.   Not withstanding the short
 3       sales?
 4            A.   Correct.
 5            Q.   And why is that?
 6            A.   Because it meant the business was
 7       worth more.   The bonds would have gone up by so
 8       much it wouldn't have -- it just wouldn't have
 9       mattered for anything that we might have lost on
10       the stock.
11            Q.   So do you believe that the bond price
12       and the stock price are correlated?
13            A.   To some extent.   So, certainly, as a
14       corporate finance matter, they are "correlated,"
15       right, the ultimate value of an enterprise.
16                 But, technically, these bonds had
17       convertible features to them, right.   They turned
18       into stock at a high enough price, right.   So
19       these, in particular, had a correlation.   And
20       then --
21            Q.   Was that -- was that part of 683's
22       investment strategy is the fact that these bonds
23       could be converted?
24            A.   Eventually, yeah.   If the stock went
25       way up, business got really back to what it had
```

```
 1              JOSEPH PATT - CONFIDENTIAL
 2         Q.  And what is your understanding of how
 3    your lawyers will get paid in connection with
 4    this case?
 5         A.  On a sliding scale contingency fee.
 6         Q.  I think we touched on this before,
 7    but I just wanted to make sure we wrapped it all
 8    up.
 9              How did 683 choose its attorneys in
10    connection with this case?
11         A.  So we saw that they had filed and
12    then I did research on the firm based on its
13    website, saw which cases they had been involved
14    in, looked at the CVs of the principals at the
15    firm and thought, you know what, these looks like
16    competent, quality, frankly, plaintiffs-like
17    securities lawyers and they're to the party --
18    they're first to the party and they've done
19    similar cases and we -- and I wanted to make sure
20    that the note holders who had big losses
21    including ourselves were included.
22         Q.  Did you interview any other firms
23    before selecting your current attorneys?
24         A.  I don't recall that I did.  I mean,
25    it was very quick process, so that may not be
```

```
                                        Page 190
```

1                   JOSEPH PATT - CONFIDENTIAL

2       correct.  I just don't recall doing it.

3            Q.  Did you solicit any competitive bids

4       from other attorneys?

5            A.  No.  But I did have some sense as to

6       what -- and we did negotiate a little bit on the

7       sliding fee.  And I did chat with another friend

8       of mine from law school who is a plaintiff's

9       attorney as to what fair fees would be and he

10      thought these were fair.

11           Q.  Do you know what the hourly billing

12      rate of your attorneys is?

13           A.  Again, it's a contingency.  So I

14      don't see it as an hourly rate.  So, if it turns

15      out -- it will be very dependent as to what the

16      ultimate outcome is.  If we realize zero, their

17      fee will be quite low.  If we get, you know, a

18      little bit low, their fee will also be quite low

19      per hour.  And if we get a great outcome, well,

20      their -- I think their fee will be justifiably

21      quite high.

22           Q.  Other than preparation for your

23      deposition, how many times have you physically

24      met with your attorneys in relation to this case

25      to date?

```
 1              JOSEPH PATT - CONFIDENTIAL
 2         A.   Two or three.
 3         Q.   And how often do you speak with your
 4    attorneys about the status of this lawsuit?
 5         A.   I think we communicate like once
 6    every month or two months or so and, certainly,
 7    as there's filings or announcements, rulings.
 8         Q.   As you're aware, because we've gone
 9    through some of the documents that you guys
10    produced, we've made discovery requests upon 683
11    Capital.
12              Who at 683 discusses the responses to
13    those requests with your attorneys; is that you
14    or somebody else?
15         A.   I refer them to Alan Leibel and
16    people who refer to him and they have been
17    putting them together, to the best of my
18    knowledge.
19              And they've asked me questions like,
20    should we -- you know, does this include it?
21              And I'm, like, tell them, you, know
22    make it as expansive as possible and our
23    attorneys will look at it and see if it's
24    responsive.
25         Q.   And who makes the strategy calls in
```

```
                                            Page 192
 1                JOSEPH PATT - CONFIDENTIAL
 2      connection with this litigation at 683?
 3            A.  I do.
 4            Q.  Do you discuss it with anybody else?
 5            A.  No.
 6            Q.  You don't discuss that with Ari?
 7            A.  No, he's fine for me to deal with it.
 8      He doesn't like confrontation.
 9            Q.  Has anybody from 683 Capital
10      discussed the strengths and weaknesses of your
11      case with your attorneys?
12            A.  You mean other than me?
13            Q.  Yeah.
14            A.  No.
15            Q.  Have you?
16            A.  Yes.
17            Q.  Okay.
18                MR KIM:  There are no "weaknesses."
19      What are you talking about?
20            A.  That's what I think but we'll see.
21            Q.  Have you discussed the prospects of
22      settlement with your attorneys?
23            A.  Only in very general terms.
24            Q.  Has your attorneys advanced any cost
25      to 683 Capital?
```

1           JOSEPH PATT - CONFIDENTIAL

2           A.   No.

3           Q.   Like travel or meals or anything like

4      that?

5           A.   No.

6           Q.   Do you understand if your agreement

7      to reimburse your attorneys for all costs would

8      be regardless of the outcome of this case?

9           A.   No, that's --

10          MR KIM:   Objection to form, also,

11     assumes facts.

12          But you can answer the question.

13          A.   Yeah, I think they're fronting the --

14     they're paying the costs.

15          Q.   Do you have any idea about the

16     magnitude of the costs, are they in thousands,

17     tens of thousands?

18          A.   I don't recall if there was a cap or

19     a limitation, but I don't -- I -- I remember

20     believing like if there was -- I remember looking

21     at this and feeling like this was satisfactory

22     that if we got a -- the amount of what I believe

23     was both -- what I hoped/believed was available

24     and merited based on our claims, that we would be

25     better off hiring them than, you know, going

```
 1              JOSEPH PATT - CONFIDENTIAL
 2      other bankruptcies that I'm involved in right
 3      now.  I don't think so.  There may be some that
 4      happened.
 5              Oh, there is another one.  We're
 6      involved in McDermott a little bit.  But, again,
 7      we own securities.  We don't even have lawyers
 8      there so...
 9          Q.  So is that, roughly, five?
10          A.  Let's call it five including this
11      one.
12          Q.  In your view, is 683 Capital's claims
13      typical of the class of plaintiffs you want to
14      represent?
15          A.  Yes.
16          Q.  And why is that?
17          A.  Because we all owned and believed and
18      bought securities in this company believing it
19      was one thing that it wasn't.
20          Q.  Any other reason?
21          A.  Well, we all lost money.
22          Q.  Anything else?
23          A.  We were all probably pretty mad when
24      we saw the press release.  I don't know if
25      there's anything else.
```

1                     JOSEPH PATT - CONFIDENTIAL

2                     MR. ISAJIW:  Okay.  I'm going to

3           mark, I think, we are up to 18; is that correct?

4                     (Deposition Exhibit 18, Defendants'

5           First Requests for Production to Plaintiffs, was

6           marked for identification.)

7                     MR. ISAJIW:  Ashley, this is 33.

8           A.  Downloading.  This is another filing

9           in the court?  Okay.

10          Q.  It's a court -- it's a

11          litigation-related document, but it's not

12          necessarily --

13          A.  It's a request, document production

14          request.

15          Q.  Just for the record, it's a document

16          titled, "Defendant's First Request for Production

17          to Plaintiffs."

18          A.  Okay.

19          Q.  Have you seen this document before?

20          A.  I don't recall.

21          Q.  Did you assist in preparing the

22          response to this document?

23          A.  To the extent we provided any

24          responses, there were -- you know, we would have

25          gotten the request from our attorneys and then I

1                   JOSEPH PATT - CONFIDENTIAL

2          passed it onto my colleagues and said, you know,

3          provide everything to them and they'll figure out

4          what's responsive.

5                   Q.  And those "colleagues," again, were

6          Mr. Leibel -- Leibel?

7                   A.  Yeah, he oversees that team

8          basically, yeah.

9                   Q.  Did you -- in preparation for your

10         deposition, did you talk to Mr. Leibel at all

11         about what 683 Capital did in response to these

12         requests?

13                  A.  No.

14                  Q.  Do you know what custodians were

15         searched for responsive information in connection

16         with these requests?

17                  A.  What do you mean by "custodian"?

18         When I think of "custodian," I think of prime

19         brokerage.

20                  You mean something else, I think.

21                  Q.  I mean, custodians of documents or

22         information that could be potentially relevant.

23                  So human beings at 683 Capital who

24         would have e-mail communications or account

25         statements or other documents called for by these

1              JOSEPH PATT - CONFIDENTIAL

2        --

3            A.  I would -- I believe Alan searched

4        all of our, like, you know, e-mail files and

5        folders and our hard drives, our communal hard

6        drives and personal hard drives.

7            Q.  Do you believe that or do you know

8        that because you spoke to Alan and he explained

9        it to you?

10           A.  I know -- I told him to do that and I

11       think he said, yeah, I did that.  But, like, I

12       didn't actually see him do it.  That's why I'm

13       saying belief.

14           Q.  I'm just trying to figure out the

15       parameters of the search.

16              So, for instance, were e-mails

17       included in the search for potentially responsive

18       documents?

19           A.  It should be and I told him to and he

20       would have.  You know, it's not the first time

21       we've looked for documents for something.

22           Q.  Okay.  Would you have e-mails related

23       to your FXCM investments with anybody else at 683

24       Capital?

25           A.  Sure.  I assume I do, yeah.  Like,

1               JOSEPH PATT - CONFIDENTIAL

2       hey, we should buy this or, you know, or not buy

3       this or, hey, did you see this report or...

4               Q.  And who would those e-mails be with,

5       most likely?

6               A.  Most likely, Ari.

7               Q.  Anybody else?

8               A.  Could be Ed as well, could be

9       everybody.  And to the extent when we were in

10      bankruptcy, I would have sent out a -- and we

11      were restricted, I would have sent out a note to

12      the entire firm, we're restricted, and then when

13      we came out and we weren't restricted, I would

14      have sent it.

15              Q.  Okay.  Would you use instant

16      messaging at all in connection with your work at

17      683 Capital?

18              A.  We -- so we use very little of it.

19      It's possible we did some texting back then.  At

20      some point -- I think, it was either early '18 we

21      moved to Slack because it has better instant

22      messaging retention.  We, certainly, would have

23      used some instant Bloombergs to do trades, as I

24      explained earlier.

25                      The vast majority of what we do is

```
 1              JOSEPH PATT - CONFIDENTIAL
 2        always on e-mail or verbally.
 3              Q.  Do you use text messages in
 4        connection with work?
 5              A.  Again, we used to do it more.  We do
 6        it very little now because Slack has better
 7        retention policy -- has better retention
 8        capabilities, I should say.
 9              Q.  What's App?
10              A.  Slack.
11              Q.  No, okay, sorry.  I understand Slack
12        is what you use for electronic communications
13        now.
14              I was asking if you used the
15        application What's App.
16              A.  So, as a general matter, for sanity
17        and ethics reasons, I try and use nothing
18        associated with Facebook at any point in my life.
19              Q.  Okay.
20              A.  I will concede some of my friends
21        like What's App, some of my relatives too.  So I
22        use What's App when they insist on using it
23        including my kindergartener's, like, you know,
24        parent's group but...
25              Q.  So, in connection with your work at
```

```
1              JOSEPH PATT - CONFIDENTIAL
2       683 Capital, would you have used What's App to
3       communicate about FXCM investments?
4              A.  No.
5              Q.  Do you keep a hardcopy file on FXCM
6       at all?
7              A.  No.
8              Q.  You don't have any printed out papers
9       in connection with your analysis of trading
10      decisions?
11             A.  Not that I know of, no.
12             Q.  Do you --
13             A.  I mean, I might have -- like, way
14      back when if there were any analyst reports, I
15      probably printed them out and read them and then
16      recycled them, but that's to be hyper correct on
17      hardcopies but...
18             Q.  Do you know if Ari, for instance,
19      would keep a hardcopy file on FXCM?
20             A.  I don't believe so, no.
21             Q.  What did 683 Capital do to preserve
22      relevant documents in connection with this
23      litigation?
24             A.  I mean, we preserved -- generally, we
25      preserve all our documents.
```