# EXHIBIT 11

Page 1

1

2                    UNITED STATES DISTRICT COURT

              FOR THE SOUTHERN DISTRICT OF NEW YORK

3

        In re:                          :

4                                       :   Master File No.

        Global Brokerage, Inc.    :   1:17-cv-00916-RA

5       F/k/a FXCM, Inc.                :

        Securities Litigation     :

6       ----------------------    :

7

8

9                ** C O N F I D E N T I A L **

10              REMOTE VIDEO DEPOSITION OF:

11                  FRANK J. COZZARELLI

12                FRIDAY, MAY 22, 2020

13

14

15

16

17

18

19

20

21

22

23

24       REPORTED BY:

25       SILVIA P. WAGE, CCR, CRR, RPR

1                FRANK COZZARELLI - CONFIDENTIAL

2        these matters.

3                    So, you know, we're not going to sit

4        here and have gotcha moment saying, hey, you just

5        said you're going to testify to all these

6        matters, but you already know what we testified

7        to.  Let's just move along.

8                    MS. DePALMA:  Okay.  I think you know

9        --

10                   MR. KIM:  [INSTRUCTION] I'm directing

11       -- I'm directing him not to answer the question.

12           Q.  Okay.  So, Mr. Cozzarelli, are you

13       following your Counsel's advice and refusing the

14       to answer the question as to whether you are

15       prepared to testify regarding these topics?

16           A.  Well, I'm following my Counsel's

17       instructions.  I know that we've objected to

18       certain things and I'll answer within the scope

19       of the matters that are -- my Counsel previously

20       advised you I would testify to.

21           Q.  Okay.  Thank you for that

22       clarification.

23                   And are you authorized to testify on

24       behalf Shipco with respect to the categories of

25       information as discussed with your Counsel?

```
                                                        Page 18
 1              FRANK COZZARELLI - CONFIDENTIAL
 2              A.  Well, as my Counsel told you, the
 3      scope that he's agreed with you would be subject
 4      matter of this deposition and I would testify to.
 5      I am authorized to testify to those matters by
 6      the company.
 7              Q.  Okay.  Thank you.
 8                  And are you the person at Shipco who
 9      is most knowledgeable about the topics on which
10      you will be testifying?
11              A.  I would say so.
12              Q.  Okay.
13              A.  To the best of my knowledge.
14              Q.  Okay.  Now, in this deposition
15      notice, there are certain topics relating to Scan
16      Group's trading in FXCM securities, for example,
17      Topic No. 3.
18                  Do you see that?
19              A.  Yes.
20              Q.  Are you authorized to provide
21      testimony on topics relating to Scan Group, as
22      modified by your attorney's response to us in the
23      meet and confer process?
24              A.  Yes, ma'am.
25              Q.  Okay, thank you.
```

```
 1              FRANK COZZARELLI - CONFIDENTIAL
 2                   Now, when did you first learn that
 3         you would have to give a deposition in this
 4         litigation?
 5              A.   Friday.
 6              Q.   And who told you?
 7              A.   Klaus Jepsen was originally going to
 8         be the witness, but due to the way this is being
 9         conducted, he would not be able to participate
10         either in person or via conference link because
11         of where he is.
12              Q.   Okay.  Did you meet with anyone to
13         prepare for this deposition?
14              A.   My lawyers.  I mean, Shipco's
15         lawyers.
16              Q.   And how many times did you meet with
17         them?
18              A.   For prep -- I met with the lawyers
19         several times having to do with this litigation.
20         I don't think that's what you're asking me.
21                   If you're asking me when did I meet
22         with them to prepare for the deposition, as I
23         said earlier, I think it was Monday.  Not "I
24         think," I know it was Monday.
25              Q.   And did you meet with Mr. Kim and
```

```
                                          Page 20

 1              FRANK COZZARELLI - CONFIDENTIAL

 2        Mr. Baker?

 3              A.  I met with Mr. Kim at first,

 4        Mr. Baker then joined in.

 5              Q.  And was anyone else at the meeting?

 6              A.  No, ma'am; my Schnauzers.

 7              Q.  Okay.  And how long did that meeting

 8        -- how long was that meeting?

 9              A.  About two hours.

10              Q.  And how did you meet, by video

11        conference or phone, for example?

12              A.  We did a video conference.

13              Q.  Okay.  And I think you already

14        probably answered this.

15                  But was this deposition preparation

16        the first time you met with your attorneys?

17              A.  No, I met with Mr. Rosen.  I've met

18        -- I've talked to Mr. Kim several times.  I've

19        talked to Mr. Rosen several times.  I've met with

20        Mr. Rosen personally.  I don't think Mr. Kim and

21        I met personally, to the best of my recollection,

22        other than the video, and then we met virtually.

23              Q.  Okay.  And, aside from your

24        attorneys, have you communicated with anyone else

25        in preparation for your deposition today?
```

```
                                                 Page 21
 1                FRANK COZZARELLI - CONFIDENTIAL
 2               A.   I did communicate with one of my
 3       colleagues in Denmark to confirm a question that
 4       I had in my mind with regard to the stock
 5       position.
 6               Q.   And what was the name of your
 7       colleague?
 8               A.   Lars Stroyer.
 9               Q.   It might be helpful if you could just
10       spell that for the record, if you don't mind.
11               A.   I'm not going --
12               Q.   If you can.
13               A.   -- to give you the -- there's some
14       odd letters.  But it's S-T-R-O-Y-E-R is his last
15       name.  His first name is Lars, L-A-R-S.
16               Q.   Thank you for that.
17                    And when did you speak with
18       Mr. Stroyer?
19               A.   I -- I checked with -- I sent him an
20       e-mail Tuesday or Wednesday and he responded
21       immediately.  I didn't speak to him.
22               Q.   So you conversed via e-mail; is that
23       correct?
24               A.   That's right.
25               Q.   Okay.  And did you review any
```

```
 1              FRANK COZZARELLI - CONFIDENTIAL
 2      the Second Amended Consolidated Securities Class
 3      Action Complaint.
 4              I reviewed a document called Opinion
 5      and Order by Judge Ronnie Abrams that was dated
 6      -- date filed was 3/28 of '19.
 7              I reviewed my declaration, which
 8      looks to be from January of 2020.  I think I
 9      signed it in December, on December 27th.  That
10      was the file date I gave you.
11              I reviewed the notice of deposition
12      of Lead Plaintiff Shipco Transport.
13              I reviewed the Plaintiff's Responses
14      and Objections to Defendant's First Request for
15      Production.
16              I reviewed the trades, the slips, the
17      trade slips.
18              I reviewed the Lead Plaintiff's
19      Amended Responses and Objections to Defendant's
20      First Set of Interrogatories.
21              I reviewed Lead Plaintiff's Amended
22      Responses and Objections to Defendant's Notice of
23      30(b)(6) Deposition.
24              And I reviewed a summary of the
25      trades that -- the purchases and, I think, we --
```

```
 1              FRANK COZZARELLI - CONFIDENTIAL
 2        I picked up or we picked up that there were,
 3        actually, 3400 shares that were sold at some
 4        point in time.  The exact date escapes me.  But
 5        those are the things that I reviewed.
 6              Q.  Okay.  Thank you for that very
 7        complete list.
 8                   And, for the record, it looks like
 9        you were leafing through some documents.
10                   What were you looking at?
11              A.  Those documents that I reviewed.  I
12        just looked at the title pages.
13              Q.  Okay.  So you were looking at copies
14        of those documents printed out?
15              A.  Yes, ma'am.
16              Q.  Okay.  So, as we talked about
17        earlier, there are certain topics relating to
18        Scan Group's trading in FXCM securities.
19                   How did you prepare to provide
20        testimony relating to Scan Group?
21              A.  I went and I looked at the trades
22        that occurred and I have recollection of events
23        pertaining to Scan Group's acquisition of shares
24        and I don't think that were many documents to
25        look at other than the trades purchase.  I guess,
```

```
 1              FRANK COZZARELLI - CONFIDENTIAL
 2        you call them purchases.
 3              Q.  Okay.  And did you communicate with
 4        anyone at Scan Group in preparation for the
 5        deposition?
 6              A.  I -- well, Lars Stroyer is the only
 7        person I talked to to confirm something.
 8              Q.  And, just for the record, on how many
 9        occasions did you communicate with Lars?  I'm
10        sorry, Mr. Stroyer.
11              A.  Preparation for the deposition, the
12        one time.
13              Q.  Okay.
14              A.  I communicate with Lars routinely
15        about various matters.
16              Q.  And aside from the records pertaining
17        to Scan Group's investments in FXCM, did you
18        review any other documents from Scan Group in
19        preparation for the deposition today?
20              A.  No.
21              Q.  Okay.  So I'd like to turn to a
22        different topic and get some general background
23        information for you.
24                   So could you just walk me through
25        your educational history starting with college?
```

```
                                            Page 26
 1              FRANK COZZARELLI - CONFIDENTIAL
 2              A.  I went to Rutgers Law -- Rutgers
 3         undergraduate, got a degree in economics; went to
 4         Seton Hall Law School and that's it.
 5              Q.  And when did you graduate from
 6         Rutgers?
 7              A.  1974.
 8              Q.  And when did you graduate from Seton
 9         Hall Law School?
10              A.  '77.
11              Q.  Okay.  And are you currently licensed
12         to practice law?
13              A.  No.
14              Q.  Were you ever licensed to practice
15         law?
16              A.  At one time.
17              Q.  And in what state?
18              A.  New Jersey.
19              Q.  And for what years?
20              A.  I don't remember.  I think it was
21         probably '77 up until 2016.
22              Q.  And your law license is no longer
23         active; is that correct?
24              A.  Correct.
25              Q.  And what was the reason for your law
```

```
 1              FRANK COZZARELLI - CONFIDENTIAL
 2        license expiring, retirement or...
 3              A.  It was a combination of different
 4        things.  But I was -- I was the subject of an
 5        ethics complaint at one point when I was in
 6        private practice going back some decades ago and
 7        I had enough.
 8              Q.  Okay.  And you said you had been the
 9        "subject of an ethics complaint"; is that
10        correct?
11              A.  Yes, that's correct.
12              Q.  And what was the nature of the
13        complaint?
14              A.  I -- it had to do with -- the nature
15        of the complaint?  You want a very high level.
16              The very high level is they wanted to
17        conduct random audits of my accounts and that
18        became a whole big involved process and it just
19        got to be way too much to deal with.
20              Q.  Okay.  Was the complaint held -- I'm
21        sorry.
22              Was the complaint heard in -- strike
23        that.
24              In what court or what courts was the
25        ethics complaint heard?
```

```
 1              FRANK COZZARELLI - CONFIDENTIAL
 2              A.  I have to look at -- I got to -- I'm
 3        going to look at a paper exhibit, which is the
 4        chart.  I'm going to take the chart so I can, at
 5        least, look at it.
 6              Q.  Okay.  So are you looking at your
 7        Amended PSLRA Certification, just so we're clear
 8        on the record?
 9              A.  Yes.  It just -- I have to switch
10        back and forth.  It would be really difficult to
11        do it.
12              Q.  Yes.
13              A.  I would have to open up another tab.
14        So just let me just look; 2/29.
15              Q.  And just, you know, Mr. Cozzarelli,
16        you're free to look at the exhibit as much as you
17        need to.  I wasn't intending to ask you to
18        compare every trade to your certification.
19              A.  Oh, well, yeah, it's 15 -- it's
20        15,700 shares on February 29th.  That's it.
21              Q.  Right.  And so -- yes, so that's
22        fine.
23              But so if you turn to -- in
24        Exhibit 10 page ending in 135, you'll see a Wells
25        Fargo confirmation.
```

```
 1              FRANK COZZARELLI - CONFIDENTIAL
 2                   Do you see that?
 3              A.   135, Exhibit -- the page is marked
 4         PLA-000135 and that's a confirmation.  Yes,
 5         that's the purchase of 1251.
 6              Q.   Okay, great.  So we're on the same
 7         page now.
 8                   You'll see at the top -- top right
 9         corner there is a statement that says, "your
10         financial advisor Thomas Cannizzo."
11                   Do you see that?
12              A.   Yeah.
13              Q.   So who is Thomas Cannizzo?
14              A.   He's the -- he was the Bank Officer
15         who opened the account and managed our account.
16         I met with him personally a couple of times.
17              Q.   Okay.  When you say he managed your
18         account, you know, what did his management
19         responsibilities entail?
20              A.   He executed the trades that we told
21         him to execute.
22              Q.   Okay.  Did he provide you any advice
23         on what trades to execute?
24              A.   Not with regard to -- no.  The answer
25         is, no.
```

1          FRANK COZZARELLI - CONFIDENTIAL

2          Q.  Okay.  And, you know, aside from

3     asking Mr. Cannizzo to execute the trades, did

4     Shipco discuss its investments in FXCM with

5     Mr. Cannizzo?

6          A.  No.  You mean discuss the -- discuss

7     rationales, reasons, things like that?

8          Q.  Yeah, that's right.

9          A.  No.

10         Q.  Okay.  And was it February 29th, 2016

11    the first time that Shipco invested in FXCM

12    securities?

13         A.  I'm assuming that's -- if that's the

14    earliest date, then the answer is, yes.  Well,

15    hey, it's on that chart.

16         Q.  Just for the record, you're looking

17    at your Amended PSLRA Certification, right?

18         A.  Yes, yeah.  Well, I'm sorry, I'm

19    looking at the certification.

20              Where is the Amended?

21              I thought I organized this.  Oh, here

22    it is.  Okay.  Sorry.  At 2/29 of '16 looks like

23    the first date.

24         Q.  Okay.  At that time was Shipco aware

25    of what has been referred to as the "Swiss

```
                                            Page 111
```

1           FRANK COZZARELLI - CONFIDENTIAL

2        National Bank Flash Crash," "the SNB Flash

3        Crash"?

4              A.   No.

5              Q.   Okay.  So Shipco had no understanding

6        at that time what the "SNB Flash Crash" had on

7        FXCM?

8              A.   Let me take that back.

9                   What it -- say it -- try and define

10       -- I don't know what that means, "flash crash."

11                  Is that some event?  Is that when

12       they lost their -- was it Leuda pulled their

13       financing; is that the "flash crash"?

14             Q.   So, when I say, "SNB Flash Crash,"

15       I'm referring to the abandonment by the Swiss

16       National Bank of the Euros Swiss peg that

17       resulted in a liquidity event.

18                  Are you familiar with that event?

19             A.   I think that's part of -- part and

20       parcel of when they lost their line of credit.

21       If that's the "flash crash," then, you know, we

22       were -- we knew that there was a drop from the

23       high, which was anywhere from one -- you know,

24       180 was the high.  There was a range of 150, 180,

25       160, whatever it was, and we knew there was a

1                  FRANK COZZARELLI - CONFIDENTIAL

2          drop due to that liquidity issue and that was

3          their line of credit, which gave them the ability

4          to buy and sell currency.  That allowed them to

5          be a market maker, as I understood.  And they

6          were doing a refinancing from what they told --

7          from what they published.

8                  Q.  Do you have any -- you know, you may

9          have already said this.  But -- actually, strike

10         that.

11                 Was Shipco aware at the time it made

12         its first time that FXCM had to take out

13         $300 million loan from Leucadia to keep the

14         company operating?

15                 A.  Yes.

16                 Q.  And did that factor affect Shipco's

17         decision to start buying FXCM securities?

18                 A.  As I said before, it was that -- it

19         was the lack of liquidity.  They, basically, had

20         a debt they needed to refinance and when they

21         refinanced the debt, it would be in a much better

22         position.

23                 And, presumably -- our rationale was

24         that, presumably, the stock would rise in value

25         due to getting more favorable terms on that

```
                                          Page 113
 1            FRANK COZZARELLI - CONFIDENTIAL
 2       $300 million.  Because as I recall, they were
 3       fairly onerous terms for the $300 million.  At
 4       least, that's what the press report said.
 5            Q.  Okay.  So Shipco -- you know, I
 6       guess, if you turn to Exhibit 9, which is the
 7       Amended PSLRA Certification.
 8            Shipco continued --
 9            A.  Nine?
10            Q.  Yes.
11            A.  I'm sorry, nine?
12            Q.  Yes.  Sorry, Exhibit 9.
13            A.  Yeah.
14            Q.  This is a copy of the Amended PSLRA
15       Certification --
16            A.  Yes.
17            Q.  -- that, I believe, you've been
18       looking at in hardcopy.
19            A.  I'm looking at it.  It's soft copy
20       now.  Go ahead.
21            Q.  Alright.  So Shipco continued to
22       purchase FXCM stock through March 10th, 2016.
23            Do you see that?
24            A.  Yes.
25            Q.  And why did Shipco continue to
```

         1              FRANK COZZARELLI - CONFIDENTIAL
         2       with somebody else.  That somebody else might
         3       gather some information and supply it back to me.
         4              I might look at it and say, they're
         5       not going to see this or understand it in this
         6       format, and I'll summarize and send it to them.
         7       So we'll have internal work product.
         8              And, you know, that's why I say an
         9       hour.  You know, you contact Mr. Stroyer as an
        10       example, did we sell any of position?  That might
        11       have taken him a total of 15 minutes to answer
        12       that question.  Or he might have answered it in
        13       two minutes.  So I gave you a best guess.
        14              If you actually want numbers, I
        15       suppose with spending a lot of time we can come
        16       back and give you accurate numbers and then we'd
        17       ask for that as compensable time to find out what
        18       the numbers are.
        19       Q.   Okay.  So, you know, to kind of
        20       summarize, you mean both more
        21       decision-making-type management that would be
        22       done by sounds like Mr. Jepsen, for example, and
        23       there's also more administrative tasks that would
        24       be done by --
        25       A.   Others.

1           FRANK COZZARELLI - CONFIDENTIAL
2                Q.   -- a secretary or something of that
3      sort?
4                A.   Well, we don't have many of those.
5      What, generally, happens is we have
6      administrative staff.  We have people that are
7      manager roles that might gather up information
8      and then we as executives might review the
9      information.  So it would be Jepsen and I would
10     sit down and go over something.  So those would
11     be the roles.
12                    But he is -- you know, if I had to
13     guess, he's about an hour and a month on this and
14     that might include conferring with the colleagues
15     over in Denmark and things like that.
16                Q.   Do you think Shipco's claims are
17     typical of the class of representatives that you
18     purport to represent?
19                    MR. KIM:  Objection to form.  I think
20     this asked and answered and, also, it calls for a
21     legal conclusion.
22                A.   I would think so.
23                Q.   And why?
24                A.   There's -- because if you read the
25     complaint, there's allegations that are fairly

1                    FRANK COZZARELLI - CONFIDENTIAL

2            specific about misrepresentations that have

3            occurred along the way by the people at FXCM.

4            Maybe it wasn't all of the misrepresentations,

5            maybe it was some of the misrepresentations, but

6            overall the effect to the damaged parties is the

7            same.  So, you know, you could have a cascade of

8            different -- "cascade" is the wrong word.

9                        You could have a panoply of different

10           reasons why we're all in the same boat and it

11           could be varying degrees of the misrepresented

12           facts that have caused damage to the injured

13           parties here.

14                       So, yes, I think we're typical of the

15           shareholder -- the shareholder claims.

16                  Q.  Alright.  Do you have an

17           understanding that Defendants have served

18           requests for a production of documents from

19           Shipco?

20                  A.  I believe that we received that, yes.

21                  Q.  Did you assist with preparing a

22           response to that document?

23                  A.  Yes.

24                  Q.  And who was responsible for finding

25           documents responsive to those requests?

```
 1              FRANK COZZARELLI - CONFIDENTIAL
 2              A.  Well, I was -- I was involved at --
 3         this is kind of the point of contact for the
 4         lawyers.  They would -- and then I would deal
 5         with anybody else that was involved so that they
 6         didn't have to manage four or five different
 7         points of contact.  It just made for a more
 8         efficient way to exchange information.
 9                   So, you know, they told us what --
10         you know, we looked at the document production
11         and I understand it's -- you write it in a very
12         broad expansive way and if I -- if we spent all
13         of our time responding to every single nuance of
14         the document production, it would be
15         counterproductive to all parties concerned,
16         including you because you'd get a document on it.
17                   So what we tried to do was be
18         intelligent about how we responded to it with the
19         assistance of our lawyers, gathered up the
20         relevant information and supplied it to you.  If
21         it exists, you got it.  If it doesn't exist, then
22         we said it didn't exist.
23                   There may be certain things that we
24         have to go back and look for again.  This is the
25         normal process, as I understand it.
```

```
 1                FRANK COZZARELLI - CONFIDENTIAL
 2           Q.   I just want to get a better
 3      understanding of what kind of search you
 4      undertook for documents.
 5                Did you check for e-mails?
 6           A.   The answer is, I just asked for
 7      e-mails from Mr. Jepsen.
 8                I haven't done an e-mail search for
 9      myself yet, which I will do.
10                It kind of came up in the context of
11      preparing for this deposition and it may very
12      well be that we have to supply you with some
13      information that's additional responses.  There
14      may be some non-privileged communications that
15      are -- that you're entitled to.
16                I just don't -- we haven't gone
17      through them all, as I'm sure there are e-mails.
18      Everybody uses e-mail.
19                You know what -- they call the "E" in
20      e-mail stands for evidence.  So I assume that
21      you're going get it.  And it's not a matter of
22      keeping it from you.  It's a matter of
23      understanding whether there's privilege in it or
24      non-privilege in it and that we have to go
25      through with The Rosen Law Firm.
```

```
                                         Page 152
```

1          FRANK COZZARELLI - CONFIDENTIAL

2                    And, obviously, that is one of the

3          things that's going to take a lot of time for us

4          to go through with them because -- and you asked

5          how much time is spent, that could be one of

6          those instances.

7               Q.  In your memory, did Mr. Jepsen have

8          any e-mails that you turned over to your Counsel

9          as potentially responsive to that request?

10              A.  No.  I haven't turned over any

11         e-mails and I thought I was clear on that.  I

12         have not turned over any e-mails.  I just started

13         looking for them in the request.

14              Q.  I see, okay.

15                   In connection with that, did you also

16         request e-mail searches with any employees of

17         Scan?

18              A.  I just sent the request over to Scan

19         as well.

20              Q.  Okay.  Did you check for any share

21         drive files?  And by "share drive," I mean, an

22         electronic file that would be accessible to

23         multiple users on a centralized repository.

24              A.  The answer is these documents would

25         not be on any form of share drive, since this is

```
                                           Page 153
 1              FRANK COZZARELLI - CONFIDENTIAL
 2       -- these are highly confidential within our
 3       organization.  They are confined.  I know exactly
 4       where they would be.
 5                    And, in terms of electronically
 6       stored information, they would not be on a cloud
 7       system, server or anything like that.  We did
 8       away with servers.  We moved over to more
 9       distributed storage and these wouldn't be on
10       that.
11            Q.  Okay.  And, just following up on one
12       point with the e-mails, you said that the search
13       is in progress.
14                    Whose e-mails are being searched
15       currently?
16            A.  Well, mine -- mine, Mr. Jepsen,
17       Mr. Dyrholm's, Mr. Stroyer's, Mr. Jaepelt's.
18       They may lead to others, but that would be the
19       search.  That would be the top level search at
20       this point.
21            Q.  Okay.  Do you know if you are using a
22       date range for the e-mail search?
23            A.  Well, it would be -- to be safe, we
24       probably go six months before our first trade and
25       then take it to date.
```

```
                                                    Page 154

 1               FRANK COZZARELLI - CONFIDENTIAL
 2          Q.   Okay.  Did you --
 3          A.   I think that -- I think that's a
 4     reasonable range, because I don't think there was
 5     any discussion having to do with FXCM before six
 6     months.  I mean, if something turns up, then,
 7     obviously, we'll say we didn't send it.
 8          Q.   Okay.  Did you check for any hardcopy
 9     files?
10          A.   Yes.
11          Q.   Physical copies?
12          A.   Yes.
13          Q.   And did you identify any?
14          A.   Yes.
15          Q.   What --
16          A.   I mean, they're -- bank statements
17     that you have are physical copies.  They're not
18     electronic copies.  That's an example.  There
19     might be account agreements.  Those are the kinds
20     of things that would be physical.
21               The printout -- the printouts of --
22     there was one other one.  The printouts of those
23     news articles, those were kept physically, not
24     electronically.  That's because I'm old school,
25     you know.
```

```
 1              FRANK COZZARELLI - CONFIDENTIAL
 2         if you're talking back and forth communications
 3         with our lawyers, getting documents together,
 4         that kind of thing?
 5              Q.   Yes.
 6              A.   Talking to internal staff, talking to
 7         our internal management?  I couldn't tell you.  I
 8         mean, the days go by.  I don't even know what day
 9         it is in this environment.
10                   This has gone on for several years.
11         Reasonable estimate is based on maybe ten hours a
12         month at most over the course of the litigation.
13         That's on the high side.
14              Q.   Alright.  And what about others at
15         Shipco?
16              A.   I would say their roles are limited
17         to internal communications.  They're probably in
18         the range of an hour a month, if that.
19              Q.   So what percentage of your overall
20         time as an employee of Shipco would you estimate
21         that you devote to managing the FXCM class action
22         litigation?
23              A.   Well, let's see.  Out of an 80-hour
24         work week -- let me just...
25                   I figure you're talking about -- let
```

```
 1              FRANK COZZARELLI - CONFIDENTIAL
 2       me see.
 3                 Did I say ten hours a month?  So ten
 4       hours a month times -- 360 -- about 1/16th --
 5            Q.  Again, I'm not trying to make you do
 6       math like that.  Would you say it's about ten --
 7            A.  It's like 1/16th of my time.
 8            Q.  Okay.  Just going back to one thing
 9       you said a minute or two ago.  You mentioned that
10       others at Shipco have more limited roles with
11       respect to managing litigation and they would
12       spend maybe an hour or so a month.
13                 Who were you referring to when you
14       were talking about the others?
15            A.  Well, I'm trying to -- it's more
16       administrative time than anything.
17                 When you say, manage litigation, were
18       you using that in terms in the context of
19       administering -- an administrative function
20       interacting with lawyers.  You know, "managing
21       litigation" in as far as running it, I don't
22       think is the case.
23                 What we're doing is, lawyer calls up
24       and says, I need this.  So I'm the point of
25       contact.  I then have a followup, as an example,
```

```
                                           Page 147
 1              FRANK COZZARELLI - CONFIDENTIAL
 2       with somebody else.  That somebody else might
 3       gather some information and supply it back to me.
 4                  I might look at it and say, they're
 5       not going to see this or understand it in this
 6       format, and I'll summarize and send it to them.
 7       So we'll have internal work product.
 8                  And, you know, that's why I say an
 9       hour.  You know, you contact Mr. Stroyer as an
10       example, did we sell any of position?  That might
11       have taken him a total of 15 minutes to answer
12       that question.  Or he might have answered it in
13       two minutes.  So I gave you a best guess.
14                  If you actually want numbers, I
15       suppose with spending a lot of time we can come
16       back and give you accurate numbers and then we'd
17       ask for that as compensable time to find out what
18       the numbers are.
19              Q.   Okay.  So, you know, to kind of
20       summarize, you mean both more
21       decision-making-type management that would be
22       done by sounds like Mr. Jepsen, for example, and
23       there's also more administrative tasks that would
24       be done by --
25              A.   Others.
```

1

2          Q.   -- a secretary or something of that

3      sort?

4          A.   Well, we don't have many of those.

5      What, generally, happens is we have

6      administrative staff.  We have people that are

7      manager roles that might gather up information

8      and then we as executives might review the

9      information.  So it would be Jepsen and I would

10     sit down and go over something.  So those would

11     be the roles.

12              But he is -- you know, if I had to

13     guess, he's about an hour and a month on this and

14     that might include conferring with the colleagues

15     over in Denmark and things like that.

16         Q.   Do you think Shipco's claims are

17     typical of the class of representatives that you

18     purport to represent?

19              MR. KIM:  Objection to form.  I think

20     this asked and answered and, also, it calls for a

21     legal conclusion.

22         A.   I would think so.

23         Q.   And why?

24         A.   There's -- because if you read the

25     complaint, there's allegations that are fairly

```
                                          Page 149
 1              FRANK COZZARELLI - CONFIDENTIAL
 2       specific about misrepresentations that have
 3       occurred along the way by the people at FXCM.
 4       Maybe it wasn't all of the misrepresentations,
 5       maybe it was some of the misrepresentations, but
 6       overall the effect to the damaged parties is the
 7       same.  So, you know, you could have a cascade of
 8       different -- "cascade" is the wrong word.
 9              You could have a panoply of different
10       reasons why we're all in the same boat and it
11       could be varying degrees of the misrepresented
12       facts that have caused damage to the injured
13       parties here.
14              So, yes, I think we're typical of the
15       shareholder -- the shareholder claims.
16           Q.  Alright.  Do you have an
17       understanding that Defendants have served
18       requests for a production of documents from
19       Shipco?
20           A.  I believe that we received that, yes.
21           Q.  Did you assist with preparing a
22       response to that document?
23           A.  Yes.
24           Q.  And who was responsible for finding
25       documents responsive to those requests?
```