**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| IN RE GLOBAL BROKERAGE, INC. f/k/a FXCM INC. SECURITIES LITIGATION | Master File No. 1:17-cv-00916(RA)(BCM) |
| | CLASS ACTION |
| This Document Relates To: All Actions | |

**REPLY MEMORANDUM OF LAW IN FURTHER SUPPORT OF**
**AMENDED MOTION FOR CLASS CERTIFICATION AND APPOINTMENT OF**
**CLASS REPRESENTATIVES AND CLASS COUNSEL**

## TABLE OF CONTENTS

ARGUMENT ........................................................................................................................ 1

I.     The Proposed Class Satisfies Each of the Requirements of Rule 23(a) ................................. 1

       A.     The FXCM Notes Sub-Class Satisfies the Numerosity Requirement ................... 1

       B.     The Proposed Class Representatives Satisfy the Typicality Requirement ............ 2

       C.     The Proposed Class Representatives Satisfy the Adequacy Requirement............. 5

II.    The Proposed Class Satisfies the Predominance and Superiority Requirements ................... 7

       A.     Common Questions of Reliance Predominate as to the FXCM Notes Sub-Class .. 7

              1.     The *Affiliated Ute* Presumption of Reliance Applies................................. 7

              2.     The FXCM Notes Traded on an Efficient Market ...................................... 8

                     (a)     *Cammer* Factor One Supports Market Efficiency ......................... 9

                     (b)     *Cammer* Factor Two Supports Market Efficiency ....................... 10

                     (c)     *Cammer* Factor Three Supports Market Efficiency..................... 12

                     (d)     *Cammer* Factor Five Supports Market Efficiency ...................... 12

                     (e)     The *Unger*/*Krogman* Factors Further Support a Finding of Market

                             Efficiency for the FXCM Notes.................................................. 14

       B.     Plaintiffs' Proposed Damages Model Matches Plaintiffs' Theory of Liability and

              is Capable of Measuring Damages on a Class-Wide Basis ................................ 14

CONCLUSION................................................................................................................... 15

## TABLE OF AUTHORITIES

**Cases**

*Affiliated Ute Citizens of Utah v. United States*,
   406 U.S. 128 (1972) ........................................................................................ 8

*Anwar v. Fairfield Greenwich Ltd.*,
   306 F.R.D. 134 (S.D.N.Y. 2015) ..................................................................... 7

*Baffa v. Donaldson, Lufkin & Jenrette Sec. Corp.*,
   185 F.R.D. 172 (S.D.N.Y. 1999) ..................................................................... 3

*Baffa v. Donaldson, Lufkin & Jenrette Sec. Corp.*,
   222 F.3d 52 (2d Cir. 2000) .............................................................................. 3

*Bennett v. Sprint Nextel Corp.*,
   298 F.R.D. 498 (D. Kan. 2014) ............................................................... 10, 13

*Cammer v. Bloom*,
   711 F. Supp. 1264 (D.N.J. 1989) ........................................................ 9, 10, 12

*Carpenters Pension Tr. Fund of St. Louis v. Barclays PLC*,
   310 F.R.D. 69 (S.D.N.Y. 2015) ................................................................ 14, 15

*Crossen v. CV Therapeutics*,
   No. C 03-03709 SI, 2005 WL 1910928 (N.D. Cal. Aug. 10, 2005) ............... 4

*Darvin v. Int'l Harvester Co.*,
   610 F. Supp. 255 (S.D.N.Y. 1985) .................................................................. 5

*DiRienzo v. Philip Servs. Corp.*,
   294 F.3d 21 (2d Cir. 2002) .............................................................................. 9

*Fields v. Biomatrix, Inc.*,
   198 F.R.D. 451 (D.N.J. 2000) ......................................................................... 4

*Fogarazzao v. Lehman Bros.*,
   232 F.R.D. 176 (S.D.N.Y. 2005) .................................................................. 7, 8

*George v. China Auto. Sys., Inc.*,
   No. 11 CIV. 7533 KBF, 2013 WL 3357170 (S.D.N.Y. July 3, 2013) ........... 13

*Gruber v. Gilbertson*,
   No. 16CV9727, 2019 WL 4439415 (S.D.N.Y. Sept. 17, 2019) ...................... 8

*Halliburton Co. v. Erica P. John Fund, Inc.*,
573 U.S. 258 (2014) ............................................................................................... 2, 3

*Howard v. Liquidity Servs. Inc.*,
322 F.R.D. 103 (D.D.C. 2017) ..................................................................................... 3

*In re AM Int'l, Inc. Sec. Litig.*,
108 F.R.D. 190 (S.D.N.Y. 1985) ............................................................................... 5, 6

*In re Barrick Gold Sec. Litig.*,
314 F.R.D. 91 (S.D.N.Y. 2016) .................................................................................. 15

*In re Countrywide Fin. Corp. Sec. Litig.*,
273 F.R.D. 586 (C.D. Cal. 2009) ........................................................................... 1, 12

*In re Critical Path, Inc. Sec. Litig.*,
156 F. Supp. 2d 1102 (N.D. Cal. 2001) ....................................................................... 4

*In re DVI Inc. Sec. Litig.*,
249 F.R.D. 196 (E.D. Pa. 2008) ........................................................................... 11, 12

*In re Dynex Capital, Inc. Sec. Litig.*,
No. 05 CIV. 1897 HB, 2011 WL 781215 (S.D.N.Y. Mar. 7, 2011) ................................. 1, 9, 12

*In re Enron Corp.*,
*Sec.*, 529 F. Supp. 2d 644 (S.D. Tex. 2006) .......................................................... 8, 12

*In re Groupo Televisa Sec. Litig.*,
No. 18 CIV. 1979 (LLS), 2020 WL 3050550 (S.D.N.Y. June 8, 2020) ............................ 4

*In re HealthSouth Corp. Sec. Litig.*,
261 F.R.D. 616 (N.D. Ala. 2009) ...................................................................... 8, 9, 11, 14

*In re Imax Sec. Litig.*,
No. 06 CIV. 6128 NRB, 2011 WL 1487090 (S.D.N.Y. Apr. 15, 2011) ............................ 4

*In re Initial Pub. Offering Sec. Litig.*,
671 F. Supp. 2d 467 (S.D.N.Y. 2009) ......................................................................... 2

*In re Initial Pub. Offering Sec. Litig..*,
227 F.R.D. 65 (S.D.N.Y. 2004) ................................................................................... 4

*In re NII Holdings, Inc. Sec. Litig.*,
311 F.R.D. 401 (E.D. Va. 2015) ................................................................................ 10

*In re Northfield Labs., Inc. Sec. Litig.*,
267 F.R.D. 536 (N.D. Ill. 2010) ................................................................................ 10

*In re Oxford Health Plans, Inc. Sec. Litig.*,
   199 F.R.D. 119 (S.D.N.Y. 2001) ................................................................ 4

*In re Pfizer Inc. Sec. Litig.*,
   282 F.R.D. 38 (S.D.N.Y. 2012)................................................................... 5

*In re Sadia, S.A. Sec. Litig.*,
   269 F.R.D. 298 (S.D.N.Y. 2010) ................................................................ 6

*In re Turkcell Iletisim Hizmetler, A.S. Sec. Litig.*,
   209 F.R.D. 353 (S.D.N.Y. 2002) ................................................................ 6

*In re UBS Auction Rate Sec. Litig.*,
   No. 08 CIV. 2967 (LMM), 2010 WL 2541166 (S.D.N.Y. June 10, 2010)................................ 7

*In re Vivendi Universal, S.A. Sec. Litig.*,
   605 F. Supp. 2d 570 (S.D.N.Y. 2009)........................................................ 7

*In re Winstar Commc'ns Sec. Litig.*,
   290 F.R.D. 437 (S.D.N.Y. 2013) ....................................................... 9, 11, 13

*In re Xcelera.com Sec. Litig.*,
   430 F.3d 503 (1st Cir. 2005) .................................................................. 12

*In re: Petrobras Sec. Litig.*,
   312 F.R.D. 354 (S.D.N.Y. 2016) .......................................................... 9, 14

*Koss v. Wackenhut Corp.*,
   No. 03 CIV. 7679 (SCR), 2009 WL 928087 (S.D.N.Y. Mar. 30, 2009) ................................... 5

*Leber v. Citigroup 401(k) Plan Inv. Comm.*,
   323 F.R.D. 145 (S.D.N.Y. 2017) ................................................................ 4

*Plumbers & Pipefitters Nat. Pension Fund v. Burns*,
   967 F. Supp. 2d 1143 (N.D. Ohio 2013) ................................................... passim

*Rao v. Quorum Health Corp.*,
   221 F. Supp. 3d 987 (M.D. Tenn. 2016) ........................................................ 7

*Robidoux v. Celani*,
   987 F.2d 931 (2d Cir. 1993)................................................................. 1, 2

*Rocco v. Nam Tai Elecs., Inc.*,
   245 F.R.D. 131 (S.D.N.Y. 2007) ............................................................. 3, 5

*Saddle Rock Partners v. Hiatt*,
   No. 96CIV.9474(SHS), 2000 WL 1182793 (S.D.N.Y. Aug. 21, 2000) ................................... 3

*Teamsters Local 445 Freight Div. Pension Fund v. Bombardier, Inc.*,
   No. 05 CIV. 1898 (SAS), 2006 WL 2161887 (S.D.N.Y. Aug. 1, 2006) ........................ 9, 10, 11

*Villella v. Chem. & Mining Co. of Chile Inc.*,
   333 F.R.D. 39 (S.D.N.Y. 2019) ................................................................................................ 3

*Weikel v. Tower Semiconductor Ltd.*,
   183 F.R.D. 377 (D.N.J. 1998) ................................................................................................ 4

*Werner v. Satterlee, Stephens, Burke & Burke*,
   797 F. Supp. 1196 (S.D.N.Y. 1992) ........................................................................................ 2

## Statutes

15 U.S.C. § 78u-4(a)(2)(A)(iv) ..................................................................................................... 6

28 U.S.C. § 1658(b)(2) ................................................................................................................... 2

## Other Authorities

*Fraud on the Market: Analysis of the Efficiency of the Corporate Bond Market*,
   2011 COLUM. BUS. L.REV. 654 (2011) ................................................................................ 11

Plaintiffs submit this reply memorandum of law in further support of their amended motion for class certification.[1]

## ARGUMENT

### I.    The Proposed Class Satisfies Each of the Requirements of Rule 23(a)

With respect to Rule 23(a), Defendants challenge only the elements of numerosity (as to the FXCM Notes), and the typicality and adequacy of Plaintiffs as class representatives.

#### A.    The FXCM Notes Sub-Class Satisfies the Numerosity Requirement

Defendants do not contest that the large trading volume of FXCM Notes during the Notes Period supports a finding of numerosity. Mot. at 7. The same trading data Dr. Werner analyzed in his opening report also show nearly 1,000 trades of the FXCM Notes during the Notes Period, "a significant amount for bond trading," which further supports numerosity. *See In re Dynex Capital, Inc. Sec. Litig.*, No. 05 CIV. 1897 HB, 2011 WL 781215, at *1 (S.D.N.Y. Mar. 7, 2011) (certifying class of bondholders).[2] Plaintiffs need not set forth an exact class size or the identity of class members to establish numerosity. *Robidoux v. Celani*, 987 F.2d 931, 935 (2d Cir. 1993).

There is no reason that investors who purchased FXCM Notes in the Notes' initial offering must be categorically excluded from the class. Opp. at 11. These same investors could also have purchased FXCM Notes during the Notes Period. They are also not excluded from the class to the

---

[1] Capitalized terms not defined herein assume the meaning ascribed to them in Plaintiffs' opening brief. Dkt. No. 175. References to "Mot." are to Plaintiffs' opening brief. *Id.* References to "Opp." are to Defendants' brief in opposition to Plaintiffs' amended motion. Dkt. No. 187. References to "Baker Decl." are to the Declaration of Joshua Baker, filed herewith. References to "Werner Rebuttal" are to Dr. Werner's Rebuttal Report on Market Efficiency. Baker Decl., Ex. 7. Emphasis is added and internal citations and quotations are omitted unless otherwise indicated.

[2] *See also In re Countrywide Fin. Corp. Sec. Litig.*, 273 F.R.D. 586, 596 (C.D. Cal. 2009) (certifying bond sub-class and finding numerosity satisfied despite "relatively fewer buyers and sellers" compared to company's equity securities).

extent the Court finds that the *Affiliated Ute* presumption of reliance applies.[3] Defendants are wrong that potential class members could easily file their own lawsuits. None have done so, nor could they if certification were denied because the five-year period of repose has expired.[4] Thus, the *inability* of potential class members to bring individual suits, as well as judicial economy and the geographic dispersion of class members, supports certification. *See Robidoux*, 987 F.2d at 936.

Finally, Defendants' argument regarding a forbearance agreement purportedly signed by an unspecified number of holders of a different security more than two years after the Notes Period ended demonstrates nothing with respect to the numerosity of the Notes sub-class. Opp. at 11-12.

**B.     The Proposed Class Representatives Satisfy the Typicality Requirement**

Defendants' argument that Plaintiffs did not rely on the market price and thus are at odds with *Basic* has been explicitly rejected by the Supreme Court. In *Halliburton Co. v. Erica P. John Fund, Inc.*, 573 U.S. 258, 273 (2014) ("*Halliburton II*"), the Court rejected the argument that a "value investor, who believes that certain stocks are undervalued," was not typical because they did not rely on the integrity of the market price.

> Such an investor implicitly relies on the fact that a stock's market price will eventually reflect material information…. But to indirectly rely on a misstatement in the sense relevant for the *Basic* presumption, he need only trade stock based on the belief that the market price will incorporate public information within a reasonable period. The value investor also presumably tries to estimate how undervalued or overvalued a particular stock is, and such estimates can be skewed by a market price tainted by fraud.

[3] *Werner v. Satterlee, Stephens, Burke & Burke*, 797 F. Supp. 1196, 1215 (S.D.N.Y. 1992) (purchasers in IPO were entitled to *Affiliated Ute* presumption); *In re Initial Pub. Offering Sec. Litig.*, 671 F. Supp. 2d 467, 496 (S.D.N.Y. 2009) (purchasers in market not found efficient were still entitled to *Affiliated Ute* presumption).

[4] The last actionable statement to survive Defendants' motion to dismiss was made in March 2015. Dkt. No. 135 (order on motion to dismiss); 28 U.S.C. § 1658(b)(2).

*Id.* at 273–74. Numerous courts have applied *Halliburton II* to reject the same argument Defendants make here. *E.g., Villella v. Chem. & Mining Co. of Chile Inc.*, 333 F.R.D. 39, 57–58 (S.D.N.Y. 2019) (applying *Halliburton II* and rejecting similar "value investor" argument).[5]

*Rocco v. Nam Tai Elecs., Inc.*, 245 F.R.D. 131, 136 (S.D.N.Y. 2007), which predates *Halliburton II*, is inapposite because the *Rocco* plaintiff made numerous post-class period purchases after the revelation of the fraud, unlike Plaintiffs here. *Id.* at 136 ("The primary issue is the fact that he made numerous post-class purchases").[6] *Baffa v. Donaldson, Lufkin & Jenrette Sec. Corp.*, 222 F.3d 52, 59 (2d Cir. 2000) does not support Defendants' contention that purchases made during the Class Period, but after the stock price declined due to an event wholly unrelated to the misconduct alleged, render Plaintiffs atypical. As the district court's opinion reveals, unlike here, the *Baffa* plaintiff purchased stock after the company had declared bankruptcy. *Baffa v. Donaldson, Lufkin & Jenrette Sec. Corp.*, 185 F.R.D. 172, 177 (S.D.N.Y. 1999) (finding plaintiff atypical because she "had access to more information about [the company's] financial condition … [which] may have affected her knowledge about the alleged omissions." *Id.*

Equally unpersuasive is Defendants' unsupported contention that Plaintiffs are atypical because they purchased after FXCM ceased its order flow arrangement. Plaintiffs' theory is that Defendants' misrepresentations introduced or maintained artificial inflation in the price of FXCM's securities. Then Plaintiffs purchased FXCM securities at artificially inflated prices. The

---

[5] *See also Howard v. Liquidity Servs. Inc.*, 322 F.R.D. 103, 124–125 (D.D.C. 2017) (same); *Saddle Rock Partners v. Hiatt*, No. 96CIV.9474(SHS), 2000 WL 1182793, at *4 (S.D.N.Y. Aug. 21, 2000) ("sophisticated stockbroker" who purchased "stock based upon its trading history which he thought revealed short term market inefficiencies" was nonetheless typical). Defendants' argument as to market "overreaction" fails for the same reasons. Opp. at 28.

[6] *See also Villella*, 333 F.R.D at 58 (rejecting "value investor" argument and distinguishing a case where, as in *Rocco*, the plaintiff bought additional shares after the fraud was revealed).

artificial inflation did not dissipate until the CFTC revealed Defendants' fraud in February 2017. Plaintiffs need not show that they specifically relied on any particular misrepresentations, only that they are entitled to an applicable presumption of reliance, as discussed below in part II.A.

Courts have consistently rejected Defendants' argument that 683 Capital is atypical due to its "unique and sophisticated trading strategy." Opp. at 13 n.10. *In re Imax Sec. Litig.*, No. 06 CIV. 6128 NRB, 2011 WL 1487090, at *7 (S.D.N.Y. Apr. 15, 2011) (collecting cases). The same is true as to Defendants' argument that 683 Capital's "tiny" short sales of FXCM stock (but not of FXCM Notes) render it atypical.[7] *In re Initial Pub. Offering Sec. Litig..*, 227 F.R.D. 65, 109 (S.D.N.Y. 2004) (that "institutional investors, short-sellers, arbitragers, etc. … have divergent motivations in purchasing shares should not defeat the fraud-on-the-market presumption.").[8] That 683 Capital traded options in FXCM stock also does not render it atypical. *In re Oxford Health Plans, Inc. Sec. Litig.*, 199 F.R.D. 119, 123–24 (S.D.N.Y. 2001) (finding options traders were typical).[9]

---

[7] 683 Capital, a hedge fund, took "tiny" short positions in FXCM stock as a hedge to "mak[e] our position less risky allowing ourselves to buy more bonds." Baker Decl., Ex. 8 (Patt Tr. 117:18-118:23). Its relatively immaterial short positions in a different security were not "premised on the belief the stock would fall," unlike *In re Critical Path, Inc. Sec. Litig.*, 156 F. Supp. 2d 1102, 1110 (N.D. Cal. 2001). *C.f. In re Groupo Televisa Sec. Litig.*, No. 18 CIV. 1979 (LLS), 2020 WL 3050550, at *7–8 (S.D.N.Y. June 8, 2020) (plaintiff was atypical because it made $11 million from short positions, "roughly three times what [it] had lost in its own long position"). 683 Capital's options trades in FXCM stock "weren't very big." Baker Decl., Ex. 8 (Patt Tr. 124:17-18).

[8] *See also Fields v. Biomatrix, Inc.*, 198 F.R.D. 451, 458–61 (D.N.J. 2000) (finding short sales did not render plaintiff atypical, collecting cases, and distinguishing *Weikel v. Tower Semiconductor Ltd.*, 183 F.R.D. 377, 392 (D.N.J. 1998) as based on outdated law); *Crossen v. CV Therapeutics*, No. C 03-03709 SI, 2005 WL 1910928, at *5 (N.D. Cal. Aug. 10, 2005) (plaintiff's trading strategy, which included short sales and options trading did not render him atypical).

[9] Unlike *Leber v. Citigroup 401(k) Plan Inv. Comm.*, 323 F.R.D. 145, 153–54 (S.D.N.Y. 2017), where the court struck the plaintiff "as an improperly added named plaintiff" because *all* of her claims were time-barred, Defendants argue that E-Global is atypical because *some* of E-Global's claims are purportedly barred by the statute of repose. Opp. at 13 n.11. Plaintiffs do not concede that any of E-Global's claims are barred by the statute of repose.

### C.     The Proposed Class Representatives Satisfy the Adequacy Requirement

"Courts rarely deny class certification on the basis of the inadequacy of class representatives, doing so only in flagrant cases, where the putative class representatives display an alarming unfamiliarity with the suit, display an unwillingness to learn about the facts underlying their claims, or are so lacking in credibility that they are likely to harm their case." *In re Pfizer Inc. Sec. Litig.*, 282 F.R.D. 38, 51 (S.D.N.Y. 2012). This is no such "flagrant case."

Plaintiffs have in no way "abdicated their duty to participate meaningfully in the discovery process." Opp. at 14. Plaintiffs timely produced all relevant documents as they represented. Upon Defendants' insistence, Plaintiffs produced additional documents that were largely duplicative and not relevant to Plaintiffs' motion for class certification or the claims or defenses in this Action; mostly email confirmations of the same transactions documented in Plaintiffs' prior productions.[10] Baker Decl. ¶ 5. Plaintiffs produced the additional documents two weeks before Defendants' opposition to the amended class certification motion was due. *Id.* Plaintiffs also offered to discuss reopening their depositions to allow Defendants to question them on these documents. Tellingly, Defendants declined and have not claimed that the additional productions were deficient. *Id.* ¶ 6.

Defendants' discovery quibbles do not amount to "glaring violations of the discovery rules," *In re AM Int'l, Inc. Sec. Litig.*, 108 F.R.D. 190, 197 (S.D.N.Y. 1985), that have led to the disqualification of class representatives in other cases.[11] Courts in this District have found that

---

[10] Defendants misrepresent Mr. Regukh's testimony (Opp. at 14); in fact he testified that he *had* performed searches for relevant documents. *E.g.,* Baker Decl., Ex. 9 (Regukh Tr. 254:5-255:12) ("Q. For this case, in response to these document requests, did you check your e-mails for documents -- A. Yeah, yeah. Q. -- regarding -- you checked them? A. Yes, I checked them.").

[11] *See, e.g., Darvin v. Int'l Harvester Co.*, 610 F. Supp. 255 (S.D.N.Y. 1985) (refusal to answer deposition questions); *Rocco*, 245 F.R.D. at 136-37 (refusal to produce documents); *Koss v. Wackenhut Corp.*, No. 03 CIV. 7679 (SCR), 2009 WL 928087 (S.D.N.Y. Mar. 30, 2009) (failing to attend depositions and failing to respond to numerous discovery requests).

producing additional documents after a deposition "clearly does not render the plaintiff an inadequate representative," *AM Int'l*, 108 F.R.D. at 197, and have refused to find a plaintiff inadequate where the plaintiff had still not produced additional relevant documents even after the defendants' class certification opposition was due. *In re Turkcell Iletisim Hizmetler, A.S. Sec. Litig.*, 209 F.R.D. 353, 357 (S.D.N.Y. 2002).

Plaintiffs' 30(b)(6) witnesses were adequately prepared for their depositions. Opp. at 14-15.[12] Defendants do not identify any shortcomings in Plaintiffs' knowledge of the case and cite no authority for the proposition that their level of preparation alone renders Plaintiffs inadequate. *Id. See In re Sadia, S.A. Sec. Litig.*, 269 F.R.D. 298 (S.D.N.Y. 2010) (plaintiffs were adequate despite "laundry list" of deposition questions the plaintiffs could not answer, because "each has the requisite basic awareness of the facts of the case and a willingness to satisfy his obligations").

Defendants cite no authority for their argument that amending PSRLA certifications renders 683 Capital and Shipco inadequate. Opp. at 15 n.12. Defendants do not allege that the original certifications impacted the lead plaintiff process or any other facet of this litigation.[13] That 683 Capital and Shipco amended their certifications promptly upon recognizing minor inadvertent

---

[12] Defendants' citation to "Regukh Tr. 187:44-188:5" includes a line number (44) that does not exist, refers to Mr. Regukh's *individual* deposition, and the excerpt in no way supports Defendants' proposition regarding Mr. Regukh's preparation for *E-Global's* deposition.

[13] 683 Capital's original certification did not list its stock transactions because it first brought suit—later consolidated into this action (Dkt. No. 47)—only on behalf of FXCM Notes holders. *See 683 Capital Partners, LP v. Global Brokerage, Inc. f/k/a FXCM, Inc., et al.*, 1:17-cv-02506-RA (S.D.N.Y.), Dkt. No. 1-1 (listing purchases and sales "in FXCM notes"); 15 U.S.C. § 78u-4(a)(2)(A)(iv) (requiring plaintiff to list in certification "all of the transactions of the plaintiff in the security that is the subject of the complaint during the class period specified in the complaint."). 683 Capital later amended its certification to correct certain FXCM Notes transactions and to add stock transactions after filing the consolidated complaint that covered both stock and notes.

errors demonstrates their commitment to litigating this action, not their inadequacy.[14] Defendants do not identify any inaccuracies in the amended certifications. That Shipco's initial certification did not include a valid assignment from its parent company, which assignment Shipco timely produced in discovery, does not render Shipco inadequate.[15]

## II.   The Proposed Class Satisfies the Predominance and Superiority Requirements

With respect to Rule 23(b), Defendants challenge only whether common questions of reliance predominate with respect to the FXCM Notes sub-class, and whether the damages methodology proposed by Plaintiffs' expert is adequate.

### A.   Common Questions of Reliance Predominate as to the FXCM Notes Sub-Class

#### 1.   The *Affiliated Ute* Presumption of Reliance Applies

Determining whether the *Affiliated Ute* presumption applies requires a "flexible and practical approach" that considers whether a case "primarily involv[es] omissions where reliance would be difficult to prove because Plaintiffs' claim is based on a negative." *Anwar v. Fairfield Greenwich Ltd.*, 306 F.R.D. 134, 145–46 (S.D.N.Y. 2015) (quoting *In re UBS Auction Rate Sec. Litig.*, No. 08 CIV. 2967 (LMM), 2010 WL 2541166, at *26 (S.D.N.Y. June 10, 2010)). Importantly, "the *Affiliated Ute* presumption … is not undermined simply because a defendant makes misstatements at the same time it omits material information." *Id.* at 146; *Fogarazzao v. Lehman Bros.*, 232 F.R.D. 176, 186 (S.D.N.Y. 2005) (courts apply the *Affiliated Ute* presumption "where plaintiffs' claims are based on a combination of omissions and misstatements").

---

[14] *See Rao v. Quorum Health Corp.*, 221 F. Supp. 3d 987, 989 (M.D. Tenn. 2016) (collecting cases, "many courts have allowed lead plaintiff movants to amend their certifications if issues arose").

[15] *See In re Vivendi Universal, S.A. Sec. Litig.*, 605 F. Supp. 2d 570, 586 (S.D.N.Y. 2009) (permitting plaintiff to amend and allege an assignment not initially disclosed in certification).

The theory behind *Affiliated Ute* is that "when material information is concealed, plaintiffs should only have to prove that 'a reasonable investor might have considered the omitted facts important in the making of [her] investment decision.'" *Fogarazzao*, 232 F.R.D. at 186 (*Affiliated Ute* presumption applied to claims based on omission of improper business relationship creating a conflict of interest) (quoting *Affiliated Ute Citizens of Utah v. United States*, 406 U.S. 128, 153–54 (1972)); *see also Gruber v. Gilbertson*, No. 16CV9727, 2019 WL 4439415, at *7 (S.D.N.Y. Sept. 17, 2019) (*Affiliated Ute* presumption applied to claims based on omission of undisclosed ownership interests). Here, Plaintiffs' allegations center on Defendants' omission of the profit-sharing relationship between FXCM and Effex. The falsity of Defendants' affirmative misrepresentations derive from this central omission.

Moreover, Plaintiffs' GAAP claims are unmistakably omission-based: Plaintiffs allege that Defendants failed to disclose Effex as a variable interest entity or related party, in violation of Defendants' duty under GAAP to disclose those material facts. Dkt. No. 135 ("Plaintiffs have adequately alleged that the Company omitted material statements with respect to GAAP").

### 2.    The FXCM Notes Traded on an Efficient Market

Courts have long recognized that "significant differences exist between stocks and bonds, the way each is priced, and the way each is traded," *In re HealthSouth Corp. Sec. Litig.*, 261 F.R.D. 616, 633 (N.D. Ala. 2009) (certifying bond class), and accordingly, "a comparison between equity and bond markets is a comparison between the proverbial apple and orange." *In re Enron Corp. Sec.*, 529 F. Supp. 2d 644, 755 (S.D. Tex. 2006) (certifying bond class).[16]

---

[16] *Enron* also found that over-the-counter bond markets can be efficient because qualified institutional buyers ("QIBs") "participate in negotiating a buy based on real-time up-to-the-minute prices by calling the secondary market participants." *Id.* at 772. Thus, Mr. Patt's testimony as to his personal experience trading FXCM Notes, Opp. at 28, does not weigh against a finding of market efficiency. Defendants' arguments, *id.*, would render nearly all corporate bond markets *de*

### (a)   *Cammer* **Factor One Supports Market Efficiency**

Defendants do not contest Dr. Werner's calculation that the FXCM Notes had an average weekly trading volume of 2.92%, which exceeds the 2% threshold set out in *Cammer* for a "strong presumption" of efficiency, as well as the 1% threshold for a "substantial presumption." *Cammer v. Bloom*, 711 F. Supp. 1264, 1286 (D.N.J. 1989); *In re Winstar Commc'ns Sec. Litig.*, 290 F.R.D. 437, 447 (S.D.N.Y. 2013) (certifying bond class where average weekly trading volume for bonds exceeded the *Cammer* 2% threshold, justifying a strong presumption of efficiency). Moreover, the 2% benchmark applies to stocks, which trade much more frequently than bonds. Werner Rebuttal ¶ 27. The fact that the trading volume for FXCM Notes nonetheless exceeds the more stringent threshold for stock further strengthens the finding that the FXCM Notes traded in an efficient market. *Id.* ¶¶ 23-24; *see In re: Petrobras Sec. Litig.*, 312 F.R.D. 354, 366 (S.D.N.Y. 2016) (certifying bond class where bonds exceeded *Cammer* threshold for trading volume "even though the *Cammer* thresholds are designed for common stock, which trades more frequently than bonds"), *aff'd in part, vacated in part*, 862 F.3d 250 (2d Cir. 2017).[17]

Defendants cite no cases in which a court applied the "more granular analysis" of trading volume used by Dr. Hendershott to disregard a finding that bond trading volume surpassed the 2% threshold. Opp. at 19.[18] The *Cammer* court applied the thresholds to the entire class period, not

---

*jure* inefficient, as most corporate bonds trade via the same over-the-counter mechanisms. As the court recognized in *HealthSouth*, "to exclude over-the-counter transactions from the fraud-on-the-market presumption of reliance would severely limit the public policy behind the securities laws." 261 F.R.D. at 639 (citing *DiRienzo v. Philip Servs. Corp.*, 294 F.3d 21, 33 (2d Cir. 2002)).

[17] The court in *Dynex*, 2011 WL 781215, at *4, recognized that even if the *Cammer* threshold were not met, an expert's showing that trading in the bonds was active during the 4-year class period still supports a finding of efficiency due to differences between stock and bond markets.

[18] Defendants misrepresent the court's findings in *Teamsters Local 445 Freight Div. Pension Fund v. Bombardier, Inc.*, No. 05 CIV. 1898 (SAS), 2006 WL 2161887, at *10 (S.D.N.Y. Aug. 1, 2006).

subdivisions of the class period. 711 F. Supp. at 1286 (assessing "average weekly trading volume during the class period").[19] Defendants identify no court that has used the median, as opposed to mean, to calculate average weekly trading volume for purposes of the *Cammer* threshold. Opp. at 19. Even if the Court were to adopt Defendants' unsupported and novel standard of "granular" analysis, courts have found that bonds trading on 20-21% of trading days support a finding of active trading and an efficient market. *Plumbers & Pipefitters Nat. Pension Fund v. Burns*, 967 F. Supp. 2d 1143, 1161 (N.D. Ohio 2013) (certifying bond class); *see* Dkt. No. 188-1 (Hendershott Report) ¶ 47 ("the FXCM Notes traded on only about 26% of trading days"). Dr. Hendershott concedes that "the median corporate bond does not trade on a majority of trading days." *Id.* ¶ 30.

### (b)   *Cammer* Factor Two Supports Market Efficiency

Defendants do not contest that at least 12 securities analysts covered FXCM securities during the Notes Period, issuing 89 reports; that 938 news stories, press releases and SEC filings were published during the Notes Period; or that QIBs exclusively traded and held the FXCM Notes. Mot. at 15-16. Instead, Defendants argue that the analysts did not explicitly cover the FXCM Notes, as opposed to the stock, so their analysis does not support market efficiency. Opp. at 21. Defendants' approach ignores the fact that equity analyst reports, including those covering FXCM during the Notes Period, divulge a wide swath of financial information that is also relevant to

---

*Compare id.* ("the turnover is 0.085, or 8.5%, ***which nonetheless supports a finding that the Certificates traded in an efficient market***"), *with* Opp. at 20 (claiming the opposite). In *Teamsters*, the court also noted that "some classes of Certificates went months and even years without trading," which Defendants do not claim is true of the FXCM Notes. 2006 WL 2161887, at *10. In *In re Northfield Labs., Inc. Sec. Litig.*, 267 F.R.D. 536, 547 (N.D. Ill. 2010), the 2% threshold was not met and the securities at issue were common stock, not bonds.

[19] *See also In re NII Holdings, Inc. Sec. Litig.*, 311 F.R.D. 401, 410 (E.D. Va. 2015) (certifying bond class where 2.94% turnover over 4-year class period supported strong presumption of efficiency); *Bennett v. Sprint Nextel Corp.*, 298 F.R.D. 498, 508 (D. Kan. 2014) (certifying bond class with a 2.76% turnover rate over 1.5-year class period).

investors in bonds issued by the same company, particularly convertible bonds such as the FXCM Notes.[20] Werner Rebuttal ¶¶ 29-30; *Winstar*, 290 F.R.D. at 446 (finding the number of analysts covering the company's stock "instructive" to analysis of the bond market because stock analysts "reported on the health of Winstar as a whole, giving both stock and fixed income investors recommendations on securities and opinions regarding the company's outlook.").[21]

That analyst coverage decreased during the Notes Period does not vitiate the fact that the Notes were covered by at least two analysts, and often more, throughout the Notes Period. Werner Rebuttal ¶ 32. That at least some analyst coverage persisted throughout the Notes Period weighs in favor of market efficiency. *Id.* Finally, the fact that the FXCM Notes were traded exclusively by QIBs who employ their own analysts also weighs in favor of efficiency. As the court explained in *HealthSouth*, 261 F.R.D. at 639, with respect to a similar bond market:

> Bond traders at large institutions who make transactions of six figures or more simply do not trade on insufficient information, or information perceived to be unreliable, or on less than all publicly available information. To argue that the investors in HealthSouth bonds did not have sufficient publicly available information in making their decisions about buying and/or selling HealthSouth bonds, and what would be a reasonable price for those bonds, defies logic and ignores the realities of the bond market in which billions of dollars trade hands.

---

[20] *Teamsters* is again inapposite here because the analyst reports in that case covered the stock of *a different company* than the one that issued the bonds. 2006 WL 2161887, at *10

[21] *See also id.* (citing Michael Hartzmark, Cindy A. Schipani, & H. Nejat Seyhun, *Fraud on the Market: Analysis of the Efficiency of the Corporate Bond Market*, 2011 COLUM. BUS. L.REV. 654, 397 (2011) ("both equity and credit reports provide important and useful information" to bondholders)); *Plumbers*, 967 F. Supp. 2d at 1150 (analyst reports covering stock "helped investors evaluate the riskiness of Dana's debt securities.") (citing *In re DVI Inc. Sec. Litig.*, 249 F.R.D. 196, 215 (E.D. Pa. 2008) (certifying bond class and finding that a lack of analyst coverage for bonds is mitigated by numerous reports from analysts covering DVI's common stock)).

### (c)  *Cammer* Factor Three Supports Market Efficiency

Defendants do not contest Dr. Werner's finding that 35-40% of the trades in FXCM Notes were dealer transactions. This evidences a large number of dealers facilitating transactions, in the same way that market makers serve to promote the efficiency of the market. Dkt. No. 176-1 (Werner Report) ¶ 134. Numerous courts have found that these dealers serve the same function as market makers because they "ensure completion of the market mechanism; [they] react swiftly to company news and reported financial results by buying or selling stock and driving it to a changed price level." *Cammer*, 711 F. Supp. at 1286–87; *Dynex*, 2011 WL 781215, at *5 ("even if the financial institutions referred to in the Ferri Report do not constitute proper market makers, *some market makers existed to satisfy the third factor*").[22] Dr. Werner's finding of a large number of dealers for FXCM Notes is also sufficient to establish that the FXCM Notes traded in the presence of arbitrageurs, which indicates market efficiency. Werner Rebuttal ¶ 37.

### (d)  *Cammer* Factor Five Supports Market Efficiency

Defendants' criticisms of Dr. Werner's event study for the FXCM Notes are based on a fundamental misunderstanding of the differences between equity and debt markets. Bond prices are insulated from all but the most extreme news and bonds are typically the least sensitive security to company-specific news, due to their seniority in a company's capital structure. Werner Report

---

[22] *See also Plumbers*, 967 F. Supp 2d at 1162 ("notwithstanding any difference between the SEC's definition of a market maker and those entities Nettesheim identified as market makers, the market participants Nettesheim identified facilitated trading in the Dana bonds—a process that contributes to an open, developed, and efficient market"); *Countrywide*, 273 F.R.D. at 614 ("the presence of large institutional investors may be similar to the presence of market-makers and arbitrageurs") (citing *In re Xcelera.com Sec. Litig.*, 430 F.3d 503, 515 (1st Cir. 2005)); *DVI*, 249 F.R.D. at 215 (similar); *Enron*, 529 F. Supp. at 772 (similar).

¶ 137.[23] Thus, Dr. Werner did not conduct a news-no news test for the FXCM Notes because it would be inappropriate and unhelpful to analyze the bonds' price reactions to 8-K filings, which would not generally be expected to materially impact bond prices. Werner Rebuttal ¶¶ 61-64.

For his FXCM Notes event study, Dr. Werner examined two of the same three events that he selected for his common stock event study—which Defendants do not claim was inadequate— as one event occurred outside the Notes Period. Werner Report ¶¶ 138-140. Defendants do not provide any legal or academic support for their assertion that an event study using only two trading days for the Notes Period cannot reliably demonstrate market efficiency.[24] Courts regularly accept this type of analysis as supportive evidence of the efficiency of bond markets. *E.g., Winstar*, 290 F.R.D. at 448 (that bond prices reacted to bond-relevant news on two dates supported efficiency); *Bennett*, 298 F.R.D. at 510 (same); *Plumbers*, 967 F. Supp. 2d at 1157 ("reject[ing] defendants' arguments that Nettesheim's study is unreliable because she studied only two events").[25]

Defendants do not claim that any of the purported errors they identified in Dr. Werner's methodology changed the result of his study. Opp. at 26. Nor do they offer any statistical evidence

---

[23] *See also Bennett*, 298 F.R.D. at 512 (that "the bonds did not exhibit similar statistically significant price movement as the Sprint stocks on the same dates does not undermine Plaintiff's evidence of market efficiency"); *Plumbers*, 967 F. Supp. 2d at 1157 (collecting cases and explaining that "bond prices do not react to the same types of information that drive stock prices").

[24] Dr. Werner's testimony does not contradict this, as he merely speculated on an incomplete hypothetical that using one event date in 2010 and one in 2020 may not be sufficient to opine on the efficiency of a security in 2015, but that nonetheless it was "possible." Opp. at 24 n.18. *George v. China Auto. Sys., Inc.*, No. 11 CIV. 7533 KBF, 2013 WL 3357170, at *12 (S.D.N.Y. July 3, 2013) is inapposite because it involved analysis of stock, not bonds, and found that less than half of the event days tested resulted in a market reaction, which Defendants do not claim is true here.

[25] In *Plumbers*, as here, the defendants challenged the selection of only two events but "failed to identify a specific event, involving the release of new, unexpected information relevant to the bondholders, that Nettesheim should have included in her event study." 967 F. Supp. 2d at 1157.

contradicting Dr. Werner's finding. *Id.*; Werner Rebuttal ¶ 66. In any event, each of Defendants' criticisms are inaccurate and inconsequential. Werner Rebuttal ¶¶65-75.

> **(e)**    **The *Unger/Krogman* Factors Further Support a Finding of Market Efficiency for the FXCM Notes**

The relevance of market capitalization or float to market efficiency is grounded in the prominence of the Company with investors. Werner Rebuttal ¶ 40. Since the Company's market capitalization and float were relatively high, the Company's prominence facilitates efficiency for the FXCM Notes as well as the common stock. *Id.*; Mot. at 21. *See Petrobras*, 312 F.R.D. at 366 (comparing par value of bonds to market capitalization of publicly traded companies to find *Krogman* factors supported market efficiency). Academic literature supports the view that a wide bid-ask spread, which there is no evidence of here, does not indicate an inefficient market for debt securities.[26] Werner Rebuttal ¶ 43. The lack of available information on bid-ask spreads for bond markets "is not determinative of the efficiency of the market for [] bonds when other factors support a finding of efficiency." *HealthSouth*, 261 F.R.D. at 637.

**B.**    **Plaintiffs' Proposed Damages Model Matches Plaintiffs' Theory of Liability and is Capable of Measuring Damages on a Class-Wide Basis**

Plaintiffs' damages model "survives the minimal scrutiny required under *Comcast* and Rule 23(b)(3)" which require only that Plaintiffs' theory of liability matches their theory of damages and that individualized damages issues will not predominate. *Carpenters Pension Tr. Fund of St. Louis v. Barclays PLC*, 310 F.R.D. 69, 99 (S.D.N.Y. 2015). Defendants' argument that Plaintiffs' damages model "cannot, ***without more analysis***, disentangle the impact of multiple

---

[26] Mr. Patt's deposition testimony does not demonstrate "wide bid-ask spreads ***on the Notes***" in particular, Opp. at 27, but rather Mr. Patt's general recollection of circumstances that "could" be present "in really bad markets" for bonds. *Id.* In any event, Mr. Patt's general recollection was not based on actual data and is not determinative of the market's characteristics as a whole.

piece of information identified simultaneously," Opp. at 29, perverts the burden required at the class certification stage. Defendants' concerns are with an ill-conceived, hypothetical application of the proposed model, not with the capabilities of the model. Plaintiffs need not propound a full analysis of loss causation and damages at the class certification stage. *Carpenters*, 310 F.R.D. at 99; *In re Barrick Gold Sec. Litig.*, 314 F.R.D. 91, 105 (S.D.N.Y. 2016) (same).

Defendants do not contest that event study results and valuation tools can be used to construct an inflation ribbon, or that an inflation ribbon can serve as the basis of a damages methodology, as Dr. Werner proposes. Rather, their concern is that Dr. Werner has not detailed how he would address each potential valuation complexity that may arise during the process of constructing an actual inflation ribbon based on a fully developed factual record. Werner Rebuttal ¶ 80. These are case-specific issues that are routinely addressed in the *application* of the common damages model during loss causation and damages analysis, but which are premature and inapplicable at this stage. *Id.* ¶¶ 79-83.[27] Plaintiffs' damages model matches their theory of liability and shows that individualized damages issues will not predominate. No more is required.[28]

### CONCLUSION

For the foregoing reasons, the Court should certify the proposed Class, appoint Plaintiffs as Class Representatives, and appoint the Rosen Firm as Class Counsel.

---

[27] Accordingly, the Court should disregard as premature and inapplicable Defendants' absurd contentions that, among other things, the material consequences and terms of the CFTC consent order are "collateral" to the corrective disclosure. Opp. at 30. These are red herrings that have nothing to do with the capability of Plaintiffs' damages model; they are strictly loss causation arguments inappropriate for consideration on a class certification motion.

[28] Defendants' argument that Plaintiffs purportedly fail to show that their proposed damages model could calculate the price impact of a hypothetical earlier corrective disclosure, Opp. at 30, ignores Plaintiffs' proposed use of an inflation ribbon, which does precisely that. Werner Report ¶ 159(ii).

Dated: July 27, 2020                    **THE ROSEN LAW FIRM P.A.**

By: */s/ Phillip Kim*
Laurence M. Rosen
Phillip Kim
Joshua Baker
275 Madison Avenue, 40th Floor
New York, New York 10016
Telephone: (212) 686-1060
Fascimile:  (212) 202-3827
Email: lrosen@rosenlegal.com
        pkim@rosenlegal.com
        jbaker@rosenlegal.com

*Lead Counsel for Plaintiffs and the Proposed Class*

**WOLF HALDENSTEIN ADLER FREEMAN & HERZ LLP**
Matthew M. Guiney
270 Madison Ave.
New York, NY 10016
Tel: (212) 545-4600
Email: guiney@whafh.com

*Additional Counsel*

**<u>CERTIFICATE OF SERVICE</u>**

I, the undersigned say:

I am not a party to the above case, and am over eighteen years old. On July 27, 2020, I served true and correct copies of the foregoing REPLY MEMORANDUM OF LAW IN FURTHER SUPPORT OF AMENDED MOTION FOR CLASS CERTIFICATION AND APPOINTMENT OF CLASS REPRESENTATIVES AND CLASS COUNSEL, by posting the document electronically to the ECF website of the United States District Court for the Southern District of New York, for receipt electronically by the parties listed on the Court's Service List.

I affirm under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

Executed on July 27, 2020, at Jenkintown, Pennsylvania.

*/s/ Joshua Baker*
Joshua Baker