USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #:
DATE FILED: 3/18/21

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| IN RE GLOBAL BROKERAGE, INC. f/k/a FXCM INC. SECURITIES LITIGATION | 17-CV-916 (RA) (BCM)<br><br>**REPORT AND RECOMMENDATION TO THE HONORABLE RONNIE ABRAMS** |

**BARBARA MOSES, United States Magistrate Judge.**

Lead plaintiffs 683 Capital Partners, LP (683 Capital) and Shipco Transport, Inc. (Shipco), together with named plaintiff E-Global Trade and Finance Group, Inc. (E-Global), suing on behalf of themselves and all others similarly situated, allege that defendants Global Brokerage, Inc. f/k/a FXCM Inc. (FXCM), Robert Lande, Dror Niv, and William Ahdout (collectively the Individual Defendants) violated the federal securities laws by knowingly misleading investors as to the nature of FXCM's No Dealing Desk (NDD) platform and FXCM's relationship with the largest market maker for its NDD platform. Now before me for report and recommendation is their amended motion for class certification pursuant to Fed. R. Civ. P. 23(a) and (b)(3) (Mot.) (Dkt. No. 174), which asks the Court to certify a class (the Class) defined as follows:

> All persons and/or entities that purchased or otherwise acquired publicly traded Global Brokerage, Inc., f/k/a FXCM Inc. ("FXCM") securities, including FXCM 2.25% Convertible Senior Notes due 2018 and Class A common stock, during the period March 15, 2012 through February 6, 2017, both dates inclusive. Excluded from the Class are: (i) Defendants; (ii) current and former officers, employees, consultants and directors of FXCM and FXCM Holdings, LLC; (iii) siblings, parents, children, spouses, and household members of any person excluded under (i) and (ii); (iv) any entities affiliated with, controlled by, or more than 5% owned by, any person excluded under (i) through (iii); and (v) the legal representatives, heirs, successors or assigns of any person excluded under (i) through (iv).

Mot. at 1.

For the reasons that follow, I respectfully recommend that the motion be GRANTED as to FXCM's Class A common stock (FXCM Stock) and DENIED as to its 2.25% Convertible Senior Notes due 2018 (FXCM Notes).

# I.    FACTUAL BACKGROUND

## A.    Parties

During the Class Period, which plaintiffs define as March 15, 2012 through February 6, 2017, inclusive, FXCM was a New York City-based "online provider of foreign exchange [] trading and related services," which "offer[ed] its customers access to OTC [over-the-counter] forex [foreign exchange] markets and a 'proprietary technology platform.'" Third Amend. Compl. (TAC) (Dkt. No. 181) ¶¶ 1, 24, 42; *see also* FXCM Annual Report (Form 10-K) (Mar. 17, 2014), *available at* https://www.sec.gov/Archives/edgar/data/1499912/000144530514001063/fxcm-20131231x10k.htm. Following the company's initial public offering on December 2, 2010, FXCM's Class A common stock traded on the New York Stock Exchange (NYSE) through September 23, 2016, and on NASDAQ thereafter. TAC ¶ 25; Corrected Opening Report on Market Efficiency by Dr. Adam Werner (Werner Rpt.) (Dkt. No. 176-1) ¶ 16. On July 3, 2013, FXCM issued $172.5 million in senior unsecured convertible fixed coupon notes due June 15, 2018 pursuant to Securities and Exchange Commission (SEC) Rule 144A, 17 C.F.R. § 230.144. Werner Rpt. ¶ 18.[1] The FXCM Notes were issued on June 3, 2013, more than a year after the start of the Class Period, and began trading a year after that, on June 24, 2014. *Id.* ¶¶ 18-19.[2]

Defendant Niv, one of the firm's "original founding partners," was FXCM's Chief Executive Officer, as well as Chairman of its Board of Directors, throughout the Class Period.

---

[1] "Notes that are not registered with the SEC and are exempt from the typical registration requirements are commonly referred to as Rule 144A issues." Werner Rpt. ¶ 21. These notes can be traded only by a qualified institutional buyer (QIB), which is an entity "acting for its own account or the accounts of other qualified institutional buyers, that in the aggregate owns and invests on a discretionary basis at least $100 million in securities of issuers that are not affiliated with the entity." Werner Rpt. ¶ 21 (quoting "Rule 144A-Private Resales of Securities to Institutions," *Securities Lawyer's Deskbook*, The University of Cincinnati College of Law).

[2] On February 27, 2017, shortly after the close of the Class Period, FXCM changed its name to Global Brokerage, Inc. TAC ¶ 25.

TAC ¶ 26. Defendant Ahdout, another founding partner, was the company's Chief Dealer, a Managing Director, and a member of the Board of Directors. *Id.* ¶ 27. Defendant Lande served as FXCM's Chief Financial Officer (CFO) throughout the Class Period. *Id.* ¶ 33.

Plaintiffs allege that they "purchased FXCM securities at artificially inflated prices during the Class Period and were damaged upon the revelation of . . . corrective disclosures" at the end of the Class Period. TAC ¶¶ 22-23. 683 Capital, Shipco, and E-Global ask this Court to certify the Class defined in the Motion, appoint them as Class Representatives, and appoint their counsel, The Rosen Law Firm, P.A. (Rosen Law) as Class Counsel. Mot. at 1; Pl. Mem. (Dkt. No. 175) at 1. According to their PSLRA Certifications, both Shipco (Dkt. No. 184) and E-Global (Dkt. No. 176-2) purchased FXCM Stock during the Class Period. 683 Capital purchased FXCM Notes. (Dkt. No. 168.)[3]

### B.    FXCM's Relationship with Effex

Although FXCM had previously run a division "that determined the prices offered to customers and held positions opposite customers" (an internal "dealing desk"), it transitioned, in or around 2007, to an "agency" (or NDD) model. TAC ¶¶ 42-44. FXCM advertised to its customers that its agency model eliminated the conflict of interest inherent in a dealing desk model, where the "dealing desk broker acts as a market maker and may be trading against the customer's position." *Id.* ¶ 45. Rather, under its agency/NDD model, banks and other third-party market makers (*not* FXCM's own internal dealing desk) offered price quotations, allowing FXCM to act merely "as a credit intermediary [that] simultaneously entered into offsetting trades with both the customer and the market maker." *Id.*

---

[3] 683 Capital's certification shows that the firm "also traded FXCM options and engaged in short sales of the common stock." Def. Mem. (Dkt. No. 187) at 1 n.2.

In 2009, defendants Niv and Ahdout hired a high-frequency trader, John Dittami, "to create a new algorithmic trading system" for FXCM. TAC ¶ 50. As Dittami was finalizing the algorithm in early 2010, FXCM's compliance department "voiced concerns that trading against FXCM's retail customers would contradict FXCM's marketing statements about its NDD model." *Id.* ¶ 52. Consequently, FXCM "spun off Dittami's trading system as an 'external' or 'independent' market maker for FXCM," and on March 23, 2010, the new market maker called "Effex" was formed – under the direction of both Niv and FXCM. *Id.* ¶ 53. The purpose of this transaction was to "falsely creat[e] the appearance of an independent entity that was not owned or controlled by FXCM." *Id*. As part of the scheme, Dittami then "resigned" from FXCM, though he and FXCM "agreed that his resignation would not change their economic relationship, including FXCM retaining 70% of Dittami's (now Effex's) algorithmic trading profits." TAC ¶ 54. Moreover, FXCM "continued to own the intellectual property rights" to the Effex software. *Id.*

The new company, Effex, entered into a series of service agreements with FXCM for "order flow" pursuant to which Effex would pay FXCM "$21 per million dollars of trading volume executed by Effex." TAC ¶¶ 55, 61. FXCM and Dittami agreed that this amount would "approximate 70 percent of Effex's profits" from trading against FXCM's customers. *Id*. ¶ 55. FXCM did not enter into any such agreements with any of its truly independent market makers. *Id.* ¶¶ 55, 61-62. According to plaintiffs, these payments were not for "order flow," as FXCM claimed, "but rather pre-negotiated kickbacks of FXCM's cut of profits generated by Effex from trading against FXCM's retail customers on the NDD platform." *Id.* ¶ 62. In exchange for these payments, "FXCM agreed that it would favor Effex over other market makers in routing retail customer orders," for example, by adding "smaller markups to Effex's prices than to prices provided by other market makers." *Id.* ¶ 65.

In addition to these financial arrangements, FXCM provided Effex with "funding, employees, office space, access, and favorable treatment," which it did not offer to any other market makers. TAC ¶ 60. For example, FXCM provided a "$2 million interest-free loan" to Effex and also permitted Effex "to use FXCM's prime brokerage relationship with Citi." *Id.* ¶ 56. Further, even after Dittami resigned from FXCM and began working for Effex, he "continued working from FXCM's offices rent-free." *Id.* ¶ 57. In fact, Effex's offices remained at FXCM for a full year after Dittami's resignation. *Id.* Effex also used FXCM's servers and email systems for a period of time, and Effex employees were "given access to FXCM on-site computers through a virtual private network." *Id.* ¶ 58. Plaintiffs allege, upon information and belief, that "FXCM maintained its relationship with Effex into 2017." *Id.* ¶ 73.

C.     **Regulatory Investigations**

On or about October 15, 2014, the U.S. Commodity Futures Trading Commission (CFTC) sent FXCM a request for documents and information concerning "Effex's business and/or financial relationship with FXCM, including, but not limited to, Effex's relationship as a liquidity provider to FXCM." TAC ¶ 74. On or about July 2, 2015, the CFTC followed up with a preservation notice, and a month later, issued a subpoena to Niv to testify and produce documents in the matter of "Retail Forex Fraud." *Id.* ¶¶ 76-77. On or about September 18, 2015, FXCM executed a tolling agreement with the CFTC's Division of Enforcement, which acknowledged that the CFTC "notified FXCM, through its counsel that the Division is conducting an investigation to determine whether there have been violations of certain provisions of the Commodity Exchange Act and/or Commodity Futures Trading Commission Regulations." *Id.* ¶ 78. On February 6, 2017 (the last day of the Class Period), following its investigation, the CFTC announced that it had banned FXCM from operating in the United States "after finding that FXCM was taking undisclosed positions opposite its retail customers." *Id.* ¶¶ 78-79 & Ex. 1.

The National Futures Association (NFA) also investigated FXCM. On or about February 19, 2015, the NFA sent FXCM a preservation notice for all documents concerning Effex, Dittami or related entities. TAC ¶ 75. On February 6, 2017 – the same day the CFTC issued its ban – the NFA's Business Conduct Committee issued a complaint and entered an order making factual findings that FXCM, Niv, his sister Ornit Niv, and Ahdout "committed the violations alleged in the complaint, including that FXCM's NDD execution model was corrupted by the Company's control and relationship with Effex, and ordered that FXCM and the individual defendants be withdrawn from NFA membership and forever barred from reapplying." *Id.* ¶ 80.

That same day, FXCM issued a press release disclosing its settlements with the NFA and CFTC, confirming that it would withdraw from doing business in the United States, and announcing that it would sell its U.S. customer accounts to another firm. TAC ¶ 81. The price of FXCM Stock fell 49% on February 7, 2017. *Id.* ¶ 82. The price of FXCM Notes fell 37% that same day. *Id.* ¶ 83.[4]

### D.    Defendants' Allegedly False and Misleading Statements

Plaintiffs allege that FXCM made numerous false and misleading statements in, and omitted material information from, many of its public filings with the SEC during the Class Period, particularly regarding its agency/NDD model, its relationship with Effex, and the NFA and CFTC investigations. For example, plaintiffs contend that defendants materially misstated that FXCM's agency/NDD model was "conflict-free" in SEC filings throughout the Class Period. Specifically,

---

[4] FXCM's market capitalization, which reached a peak of $806 million during the Class Period, fell to $19.3 million by close of trading on February 7, 2017. Werner Rpt. ¶ 17. On December 11, 2017, FXCM "filed for Chapter 11 bankruptcy" in this District, and on January 22, 2018, the bankruptcy court confirmed its plan of reorganization, pursuant to which the FXCM Notes were "discharged and cancelled," and new notes were issued in exchange. Declaration of Kenneth A. Grossman (Grossman Decl.) (Dkt. No. 189) ¶ 3.

the following statement (or one much like it) appeared in FXCM's annual reports on Form 10-K

from 2011 through 2015:

> We primarily offer our customers what is referred to as an agency model to execute
> their trades. Our agency model is fundamental to our core business philosophy
> because we believe that it aligns our interests with those of our customers and
> reduces our risks. In the agency model, when our customer executes a trade on the
> best price quotation offered by our FX market makers, we act as a credit
> intermediary, or riskless principal, simultaneously entering into offsetting trades
> with both the customer and the FX market maker. We earn trading fees and
> commissions by adding a markup to the price provided by the FX market makers
> and generate our trading revenues based on the volume of transactions and the
> spread earned on transactions.

TAC ¶ 146. Plaintiffs assert that these statements were false and misleading for several reasons:

(1) "FXCM did not primarily offer its customers an agency model due to its relationship with

Effex"; (2) "the agency model did not, and Defendants did not believe it to, align FXCM's interests

with its customers' interests nor reduce FXCM's risks"; and (3) FXCM "was not acting solely as a

credit intermediary or riskless principal." *Id.* ¶ 147. FXCM's public statements also omitted,

plaintiffs allege, that "on top of trading fees and commissions, FXCM was earning kickback

payments from Effex that were tied directly to Effex's trading profits and losses," which if known,

would undermine FXCM's supposed position as a mere intermediary. *Id.*

As an additional example, plaintiffs allege that the following statement, or one substantially

similar to it, appeared in many annual and quarterly reports from 2011 through 2014: "Retail

trading revenue is our largest source of revenue and is primarily driven by: . . . (iv) the amount of

additional retail revenues earned, including . . . payments we receive for order flow from FX

market makers." TAC ¶ 148. These statements were false and misleading because "FXCM did not

receive payments for order flow from any market makers" and "[t]o the extent it received 'order

flow' payments from Effex, those payments were not for order flow but rather an approximation

of 70% of Effex's profits and losses from its trades on the FXCM platform." *Id.* ¶ 149.

According to plaintiffs, other statements appearing in FXCM's SEC filings were false and misleading because they did not disclose the ongoing regulatory inquiries concerning Effex. For example, FXCM included in many filings the statement that its "business is also subject to extensive regulation, which may result in administrative claims, investigations and regulatory proceedings against us." TAC ¶ 164. Because FXCM failed to disclose that it was "*currently* under investigation by the CFTC and NFA for its relationship with Effex," *id.* ¶ 165 (emphasis in original), plaintiffs allege these disclosures were misleading. *Id*. In fact, plaintiffs allege, defendants did not disclose either investigation to the public until FXCM filed its quarterly report on Form 10-Q for the third quarter of 2016, which included the following statement: "The CFTC and the NFA are currently examining the relationship with [FXCM's United States subsidiary] and one of its liquidity providers." *Id.* ¶ 167. This statement was still misleading, plaintiffs say, because it "significantly underplayed" the extent of both investigations. *Id.* ¶ 168.

Plaintiffs further allege that FXCM's financial disclosures, included in its SEC filings, violated Generally Accepted Accounting Principles (GAAP) and were for that reason false and misleading. For example, plaintiffs contend that FXCM failed to disclose Effex as a Variable Interest Entity (VIE), as required by GAAP, and also failed to offer important details about Effex's relationship with FXCM ("including the nature, purpose, size and activities of Effex"). TAC ¶¶ 131, 136.[5] FXCM likewise failed to consolidate Effex's financial results with its own, allegedly

---

[5] An entity is considered a VIE when it meets one of a number of possible characteristics, including (1) the nominal owners of the entity lack the "power, through voting rights or similar rights, to direct the activities of a legal entity that most significantly impact the entity's economic performance," and (2) the nominal owners do not have the "right to receive the expected residual returns of the legal entity." CODIFICATION OF ACCOUNTING STANDARDS AND PROCEDURES § 810-10-15-14. Plaintiffs allege that because Effex was "dependent on FXCM for its business and subject to FXCM's determination as to whether its customers could be directed to book trades through Effex," and because "FXCM received 70% of Effex's profits," Effex was a VIE that should have been disclosed. TAC ¶¶ 131-33.

in violation of GAAP. *Id.* ¶ 136. Plaintiffs further assert that "[e]ven if FXCM were not required to consolidate Effex's financial results with its own as a VIE, Effex would still be considered a related party to FXCM, requiring FXCM to disclose the material transactions between FXCM and Effex in FXCM's financial statements and proxy statements." *Id.* ¶ 137.

As a result of these and other false and misleading statements described in their pleading, plaintiffs allege that defendants misled investors "as to a material part of the Company's operations and revenues," TAC ¶ 187, deceived them as to the "duplicitous payments from Effex," *id.* ¶ 188, concealed the company's "inherent conflict between the interests of the customer and [its own] interests," *id.* ¶ 189, and hid information concerning regulatory investigations that "threatened the very core of FXCM's agency model," *id.* ¶ 190, thereby violating § 10(b) of the Securities Exchange Act of 1934 (Exchange Act), 15 U.S.C. § 78j(b), and SEC Rule 10b-5 promulgated thereunder, 17 C.F.R. § 240.10b-5, as well as § 20(a) of the Exchange Act, 15 U.S.C. § 78t. *Id.* ¶¶ 201-218.

## II.    PROCEDURAL BACKGROUND

Plaintiffs commenced this action on February 7, 2017. (Dkt. No. 1.) Thereafter, the Hon. Ronnie Abrams, United States District Judge, consolidated several related actions, naming this action (No. 17-CV-916) as the master file/docket. (Dkt. No. 47.) She also appointed 683 Capital and Shipco as Co-Lead Plaintiffs and appointed Rosen Law as Lead Counsel. (*Id.*) Plaintiffs then filed a consolidated complaint (Dkt. No. 48), which defendants moved to dismiss on August 3, 2017. (Dkt. No. 88.) Judge Abrams granted that motion from the bench, with leave to amend, on March 1, 2018. (Dkt. No. 108.)

Plaintiffs filed their Second Amended Complaint (SAC) (Dkt. No. 111) on April 6, 2018. On May 7, 2018, defendants again moved to dismiss, arguing, *inter alia*, that the SAC failed

adequately to plead any materially false or misleading statement, failed to raise a strong inference of scienter, and failed to allege loss causation. (Dkt. Nos. 117, 118.) In an Opinion and Order dated March 28, 2019 (Dkt. No. 135), Judge Abrams granted defendants' motion as to one of the individual defendants but denied it as to defendants FXCM, Niv, and Ahdout, concluding that the SAC "adequately alleges that the remaining Defendants have committed securities fraud with respect to statements or omissions concerning FXCM's supposed agency-trading model, the Company's purported 'order flow' payments with Effex, and [GAAP]." *Id.* at 2, 38. Judge Abrams then referred the case to me for general pretrial management. (Dkt. No. 146.)

Plaintiffs first moved for class certification on January 6, 2020. (Dkt. No. 149.) On April 7, 2020, Judge Abrams expanded my reference (Dkt. No. 171) to include hearing, report, and recommendation on the motion for class certification. Upon consent of defendants, plaintiffs filed their amended motion for class certification on April 9, 2020,[6] accompanied by a memorandum of law and a declaration from counsel Joshua Baker (Baker Decl.) (Dkt. No. 176) attaching, among other things, the Werner Report.

On June 12, 2020, defendants filed their brief in opposition to the amended class certification motion, accompanied by the Grossman Declaration and a declaration from counsel Israel Dahan (Dahan Decl.) (Dkt. No. 188) attaching, among other things, the Expert Report of Terrence Hendershott, Ph.D. (Hendershott Rpt.) (Dkt. No. 188-1). On July 27, 2020, plaintiffs filed a reply brief (Pl. Reply) (Dkt. No. 195), along with another declaration from attorney Baker

---

[6] The purpose of the amendment was to substitute E-Global for Sergey Regukh as a proposed class representative because E-Global "is the real party in interest." Mot. at 1. Accordingly, on April 13, 2020, Judge Abrams denied the original class certification motion as moot. (Dkt. No. 177.) Plaintiffs filed their TAC on April 17, 2020, in order to add E-Global as a plaintiff, and defendants answered the TAC on May 21, 2020. (Dkt. No. 183.)

(Baker Reply Decl.) (Dkt. No. 196) attaching the "Rebuttal Report on Market Efficiency by Dr. Adam Werner" (Werner Rebuttal Rpt.) (Dkt. No. 196-1).[7]

On October 15, 2020, at defendants' request (*see* Dkt. No. 197), I conducted a limited evidentiary hearing via videoconference, including testimony from Dr. Werner and Prof. Hendershott. The hearing – like the experts' previously-filed written reports – focused largely on whether the FXCM Notes traded in an efficient market during the Class Period. *See* Tr. of Oct. 15, 2020 Hr'g (Oct. 15 Tr.) (Dkt. No. 213) at 4:21-25. Additionally, after a discussion about numerosity, the Court gave the parties leave to submit additional evidence concerning the number of potential Class members who purchased FXCM Notes. *Id.* at 106:21-107:21.

After the hearing, plaintiffs filed a supplemental letter (Pl. Supp. Ltr.) (Dkt. No. 215) which attached screenshots taken from Bloomberg Terminal and argued that there were at least 35 noteholders eligible for Class membership. Pl. Supp. Ltr. at 1. On October 28, 2020, defendants responded (Def. Supp. Opp.) (Dkt. No. 216) with evidence that at least 15 of those 35 had signed a Forbearance Agreement, waiving their securities claims against the company and affiliates, and therefore could not be Class members.[8] With the Court's permission, plaintiffs then filed a reply

---

[7] Plaintiffs' expert, Adam Werner, Ph.D., is a Lecturer in economics at the Orfalea College of Business at Cal Poly San Luis Obispo and is an affiliated expert at Crowninshield Financial Research, Inc. Werner Rpt. ¶ 4. He is frequently consulted on "matters pertaining to market efficiency, materiality and loss causation, damages, investment banking, financial valuation, security issuance, bankruptcy, and option backdating." *Id.* Defendants' expert, Terrence Hendershott, Ph.D., is a Professor and the Willis H. Booth Chair in Banking and Finance at the Haas School of Business at the University of California, Berkeley. Hendershott Rpt. ¶ 1. His expertise and research focus on "market microstructure, which includes how information is incorporated into security prices and the interaction between trading and prices of various securities and financial instruments." *Id.* ¶ 2.

[8] As explained in the Grossman Declaration, the Forbearance Agreement is a May 29, 2019 agreement in which numerous holders of the new notes issued by FXCM pursuant to its plan of reorganization released FXCM, including its directors, officers, and other agents, from "any and all claims, obligations, rights, suits, damages, causes of action, remedies, and liabilities whatsoever, including any derivative claims . . . whether known or unknown, foreseen or

letter on November 2, 2020 (Pl. Supp. Reply) (Dkt. No. 220), and defendants filed a sur-reply on November 6, 2020 (Def. Supp. Sur-Reply) (Dkt. No. 222).

## III.   ANALYSIS

### A.   Legal Standard

Class certification is governed by Fed. R. Civ. P. 23. Under section (a), any party seeking certification must establish that: "(1) the class is so numerous that joinder of all members is impracticable; (2) there are questions of law or fact common to the class; (3) the claims or defenses of the representative parties are typical of the claims or defenses of the class; and (4) the representative parties will fairly and adequately protect the interests of the class." Fed. R. Civ. P. 23(a). Beyond that, "the movant must show that the action is one of three types described in section (b)." *Ciaramella v. Zucker*, 2019 WL 4805553, at *12 (S.D.N.Y. Sept. 30, 2019) (quoting *Jackson v. Bloomberg, L.P.*, 298 F.R.D. 152, 159 (S.D.N.Y. 2014)). Plaintiffs here assert that their proposed class satisfies subsection (b)(3), Mot. at 1, which provides that a class action may be maintained if "the court finds that the questions of law or fact common to class members predominate over any questions affecting only individual members, and that a class action is superior to other available methods for fairly and efficiently adjudicating the controversy." Fed. R. Civ. P. 23(b)(3).

Rule 23 is more than a "mere pleading standard." *Wal-Mart Stores, Inc. v. Dukes*, 564 U.S. 338, 350 (2011). The movant must establish each of Rule 23's requirements by a "preponderance

---

unforeseen, liquidated or unliquidated, contingent or fixed, existing or hereafter arising, in law, at equity or otherwise, whether for tort, contract, violations of federal or state securities laws or otherwise" that were "based on or relating to, or in any manner arising from, in whole or in part: . . . the conduct of [FXCM's] business . . . [or] the purchase or sale, or rescission of the purchase or sale, of any security [of FXCM]." Grossman Decl. ¶¶ 4-5. The unredacted version of the Forbearance Agreement was filed under seal on October 28, 2020. (Dkt. No. 218.)

of the evidence." *Teamsters Local 445 Freight Div. Pension Fund v. Bombardier Inc.*, 546 F.3d 196, 202 (2d Cir. 2008).[9]

### B.     Overview of Arguments and Conclusions

In their opposition papers, defendants do not challenge numerosity as to the Stock Class, and do not challenge commonality as to either the Stock Class or the Notes Class.[10] However, they argue vigorously that the Notes Class cannot be certified because its members are insufficiently numerous. Def. Mem. at 10-12. This issue is further developed in the parties' post-hearing letter-briefs, which, as discussed in more detail below, persuade me that defendants are correct. There are no more than 20 potential members of the Notes Class.  Moreover, the purchasers of the FXCM Notes are all QIBs, and thus were more than capable of suing individually, as did 683 Capital. Certification of the Notes Class is precluded for this reason alone.

Defendants also argue that the proposed Class Representatives are atypical, because they purchased late in the Class Period and "disclaimed reliance on the integrity of the market" by using a "value" investing strategy. Def. Mem. at 12-13. However, both E-Global and Shipco purchased well within the Class Period – that is, before "the CFTC revealed Defendants' fraud in February

---

[9] In addition to the express requirements of Rule 23, courts in the Second Circuit imply a "requirement of ascertainability" into the rule. *Brecher v. Republic of Argentina*, 806 F.3d 22, 24 (2d Cir. 2015). "A class is ascertainable when defined by objective criteria that are administratively feasible and when identifying its members would not require a mini-hearing on the merits of each case." *Id*. at 24-25 (quoting *Charron v. Pinnacle Grp. N.Y. LLC*, 269 F.R.D. 221, 229 (S.D.N.Y. 2010)). In this case, as in most securities fraud cases, ascertainability does not impede certification, because members of the proposed Class, which includes purchasers of FXCM Stock and FXCM Notes within a specified time period, can be easily identified. *See Fogarazzo v. Lehman Bros., Inc.*, 263 F.R.D. 90, 101 (S.D.N.Y. 2009) (finding plaintiffs demonstrated ascertainability under similar circumstances).

[10] Although the Motion seeks certification of a single Class consisting of purchasers of both (i) the FXCM Stock and (ii) the FXCM Notes, defendants refer to these two components as the Stock Class and the Notes Class, respectively, *see* Def. Mem. at 1, and as to certain certification criteria analyze them separately. In their expert report and reply papers, when discussing challenges specific to the FXCM Notes, plaintiffs use the term Notes Sub-Class. *See*, *e.g.*, Pl. Reply at 1, 7.

2017," Pl. Reply at 4 – when the price of the FXCM Stock was still inflated. Moreover, the Supreme Court has expressly rejected the notion that a "value investor" does not rely on the integrity of the market. *Halliburton Co. v. Erica P. John Fund, Inc*. (*Halliburton II*), 573 U.S. 258, 273-74 (2014). Consequently, neither E-Global nor Shipco is uncertifiable. Defendants fare no better when they argue that the proposed Class Representatives are inadequate because they failed to produce certain documents in discovery until after their depositions, for which they underprepared.  Def. Mem. at 13-15. The alleged discovery misconduct was minor and does not come close to the level required to bar a class representative who is in turn represented by well-qualified counsel, as the moving plaintiffs are here.

The remaining areas of dispute between the parties arise under Rule 23(b)(3), which requires plaintiffs to demonstrate both that (1) "questions of law or fact common to class members predominate over any questions affecting only individual members," and that (2) "a class action is superior to other available methods for fairly and efficiently adjudicating the controversy." *In re Vale S.A. Sec. Litig.*, 2019 WL 11032303, at *10 (S.D.N.Y. Sept. 27, 2019) (quoting Fed. R. Civ. P. 23(b)(3)). Defendants do not contest predominance as to the Stock Class but argue vigorously that the Notes Class cannot be certified because the FXCM Notes did not trade in an efficient market, meaning that purchasers of those securities could not rely on the fraud-on-the-market hypothesis  described in *Basic Inc. v. Levinson*, 485 U.S. 224, 247 (1988), and *Halliburton II*, 573 U.S. at 277-78, and would instead be required to establish, on an individual basis, that each of them actually relied on defendants' misleading statements. Def. Mem. at 17-27. I agree. Therefore, even if the Notes Class were sufficiently numerous, I would not recommend certifying it.

Finally, defendants argue that plaintiffs have failed to propose a damages model capable of disentangling the effect of defendants' alleged misstatements from the effect of "other events

that affected the price of FXCM's securities," such as the CFTC and NFA settlements, and in particular have failed to show that they will be able to calculate the degree of price inflation attributable to defendants' misstatements. Def. Mem. at 29-30. As to damages, however, plaintiffs' burden at the class certification stage is minimal, and in my judgment has been satisfied, at least with respect to the Stock Class.

I discuss each requirement in more detail below.

### C.   Rule 23(a)

#### 1.   Numerosity

The first subsection of Rule 23(a) requires that the class be "so numerous that joinder of all members is impracticable." Fed. R. Civ. P. 23(a)(1). In the Second Circuit, "the numerosity requirement is presumed once plaintiffs number 40." *Taylor v. Zucker*, 2015 WL 4560739, at *7 (S.D.N.Y. July 27, 2015); *see also In re NYSE Specialists Sec. Litig.*, 260 F.R.D. 55, 70 (S.D.N.Y. 2009) (citing *Consol. Rail Corp. v. Town of Hyde Park*, 47 F.3d 473, 483 (2d Cir. 1995)). "In securities fraud class actions relating to publicly owned and nationally listed corporations, 'the numerosity requirement may be satisfied by a showing that a large number of shares were outstanding and traded during the relevant period.'" *Teachers' Ret. Sys. of Louisiana v. ACLN Ltd.*, 2004 WL 2997957, at *3 (S.D.N.Y. Dec. 27, 2004) (quoting *Garfinkel v. Memory Metals, Inc.*, 695 F. Supp. 1397, 1401 (D. Conn. 1988)).

The FXCM Stock was "actively traded on the NYSE and NASDAQ, with an average weekly trading volume of over 660,000 shares." Pl. Mem. at 7 (citing Werner Rpt. ¶ 25 n.46). On this basis, plaintiffs contend – and defendants do not dispute – that the Stock Class is sufficiently numerous. *See* Pl. Mem. at 7. I agree.

As noted above, however, the question of numerosity is hotly contested as to the Notes Class. Prior to the October 15, 2020 hearing, plaintiffs offered "no specifics as to the number or

identities of the parties who held the Notes" during the Class Period. Def. Mem. at 10-11. Thereafter, plaintiffs supplemented the record by offering "the identities and holdings of FXCM Notes holders at the end of each quarter through the Notes Period," as determined through their review of data from Bloomberg Terminal. Pl. Supp. Ltr. at 1; Supp. Baker Decl. (Dkt. No. 215-1) ¶ 2 & Ex. 10.[11] The data showed 83 unique noteholders during that period, though plaintiffs admitted that 43 were "in and out" purchasers who would not have been damaged by the alleged fraud and thus would not be members of the Notes Class. Pl. Supp. Ltr. at 1. Plaintiffs also admitted that, of the remaining 40 noteholders, five signed the Forbearance Agreement, leaving 35 potential members of the Notes Class. *Id.*; Baker Supp. Decl. ¶ 3.

In fact, as defendants demonstrated in their own post-hearing supplement, 20 of the noteholders identified by plaintiffs signed the Forbearance Agreement, Def. Supp. Opp. at 1-2 & Ex. A, leaving only 20 potential members of the Notes Class. This is not enough, particularly where, as here, those 20 are "large, sophisticated entities," Def. Mem. at 11, with $100 million or more under management (as required by Rule 144), fully capable of filing their own claims. *See* Supp. Baker Decl. Ex. 10 (listing noteholders by name).[12] As to the FXCM Notes, therefore, certification should be denied on this basis alone.

---

[11] In their motion papers, plaintiffs refer to the Notes Period as running from June 2014, when the FXCM Notes began trading, through the end of the Class Period on February 6, 2017. *See*, *e.g.*, Pl. Supp. Ltr. at 1 n.1.

[12] Upon realizing that there were only 20 potential members of the Notes Class, plaintiffs advanced several last-ditch arguments in their final letter-brief, none of them persuasive. First, plaintiffs note that defendants produced the unredacted version of the Forbearance Agreement for the first time on October 27, 2020, and argue that had the noteholders known earlier that there were only 20 of them with viable claims (jeopardizing certification), "they may have sought to join this action during the repose period," which expired in March 2020. Pl. Supp. Reply at 1-2. This is sheer speculation. Moreover, plaintiffs can hardly fault defendants for the "late" production of the unredacted document where plaintiffs – who bear the burden of proof – failed to identify any potential members of the Notes Class until October 21, 2020. Second, plaintiffs abandon the notion of a Notes Sub-Class, arguing instead that the Court should certify a single, combined Class (which

### 2.    Commonality

A party seeking class certification must also show that there are "questions of law or fact common to the class." Fed. R. Civ. P. 23(a)(2). Members of the class must have claims that "depend upon a common contention" that "is capable of classwide resolution," meaning that "determination of its truth or falsity will resolve an issue that is central to the validity of each one of the claims in one stroke." *Dukes*, 564 U.S. at 350. In most cases, the test for commonality "'is not demanding' and is met so long as there is at least one issue common to the class." *Brooklyn Ctr. for Independence of the Disabled v. Bloomberg*, 290 F.R.D. 409, 418 (S.D.N.Y. 2012) (quoting *Raymond v. Rowland,* 220 F.R.D. 173, 179 (2004)); *see also Lewis Tree Serv., Inc. v. Lucent Techs. Inc.,* 211 F.R.D. 228, 231 (S.D.N.Y. 2002) (The commonality element of Rule 23(a)(2) is considered a "minimal burden for a party to shoulder.").

Here, plaintiffs contend – and defendants do not disagree – that there are questions of law or fact common to the Class, including "whether and to what extent the market prices of FXCM common stock and FXCM Notes were artificially inflated during the Class Period due to Defendants' misrepresentations and omissions," "whether Defendants acted with scienter," and "whether the Individual Defendants 'controlled' FXCM for purposes of Section 20(a) liability." Pl. Mem. at 7-8. I agree, and therefore find that Rule 23(a)(2) is satisfied as to both the FXCM Stock and the FXCM Notes.

---

would be sufficiently numerous), because the stockholders and the noteholders are not adverse, have "litigated the entirety of this case together save for market efficiency arguments," and are "represented by the same counsel." Pl. Supp. Reply at 2. Not only is this inconsistent with how plaintiffs framed this issue in their reply brief (which included a section entitled "The FXCM Notes Sub-Class Satisfies the Numerosity Requirement"); it ignores the significance of the "market efficiency arguments," which create a second, insurmountable barrier to class certification for the holders of the FXCM Notes, because in the absence of an efficient market for the notes, they are not entitled to any presumption of reliance. *See* Part III.D.2 of this Report, *infra*.

### 3.   Typicality

Rule 23(a)(3) requires that the class representatives have claims typical of the claims of the class. This requirement is satisfied "when each class member's claim arises from the same course of events and each class member makes similar legal arguments to prove the defendant's liability . . . irrespective of minor variations in the fact patterns underlying the individual claims." *Reynolds v. Giuliani*, 118 F. Supp. 2d 352, 389 (S.D.N.Y. 2000) (quoting *Robidoux v. Celani*, 987 F.2d 931, 936-37 (2d Cir. 1993)). Thus, the typicality requirement tends to "merge" with the commonality requirement, "and similar considerations guide both analyses." *Mayhew v. KAS Direct, LLC*, 2018 WL 3122059, at *5 (S.D.N.Y. June 26, 2018).

Plaintiffs argue that each member of the proposed Class has "purchased FXCM common stock or FXCM Notes during the Class Period and suffered losses when the truth materialized and was disclosed at the end of the Class Period." Pl. Mem. at 9. Defendants contend, however, that each moving plaintiff is *atypical* because each is subject to unique defenses, including that: (1) each started investing in FXCM securities *after* the so-called SNB Flash Crash,[13] which took place in January 2015, "approximately *three years after* the beginning of the proposed class period and *after* the value of FXCM's securities significantly declined"; (2) the moving plaintiffs' purchases occurred "*after* FXCM disclosed that it ceased its pay-for-flow arrangement with Effex"; and (3) the moving plaintiffs "*disclaimed* reliance on the integrity of the market" by testifying that they

---

[13] On January 15, 2015, the Swiss National Bank (SNB) announced "that it would immediately end its three-year-old peg of 1.20 Swiss francs to one euro," Def. Mem. at 7 (citing Werner Rpt. ¶ 13), despite having only days earlier announced that it had no intention of removing the currency peg. Widespread market disruption ensued, with "unprecedented volatility in the EUR/CHF currency pair." Werner Rpt. ¶ 13; *accord* Hendershott Rpt. ¶ 81. As a result of this event, known as the SNB Flash Crash, FXCM customers holding positions in this currency lost more than $275 million. TAC ¶ 13. To avoid liquidation, "FXCM took a $300 million term loan from Leucadia National Corporation on January 16, 2015." Werner Rpt. ¶ 13; *accord* Hendershott Rpt. ¶ 42. Within days, "the price of FXCM's common stock declined by nearly 90% and the Notes traded substantially below par." Hendershott Rpt. ¶ 42.

believed the securities were "undervalued," which puts them "at odds with the fraud-on-the-market theory of reliance." Def. Mem. at 12-13 (emphases in original).

The Court is unpersuaded that the timing of the proposed Class Representatives' purchases renders them atypical. Plaintiffs contend that defendants' false and misleading statements and omissions caused FXCM's securities to be artificially inflated – throughout the Class Period – and allege that the artificial inflation did not dissipate "until the CFTC revealed Defendants' fraud in February 2017," Pl. Reply at 3-4, at which point the stock price dropped 49%. TAC ¶¶ 22-23, 82, 207. Since the proposed Class Representatives made their purchases before that event, it is of no moment that they purchased later rather than earlier in the Class Period. *See In re Arakis Energy Corp. Sec. Litig.*, 1999 WL 1021819, at *6 (E.D.N.Y. Apr. 27, 1999) (rejecting typicality challenge to proposed class representative who purchased options "in the last two days of the Class Period, after Arakis had disseminated to the public certain curative disclosures," because his claim "arises from the same factual background as the other class members and there is no reason to believe that a defense predicated on his purchase of options late in the class period will divert the trial from the main issues"); *Dura-Bilt Corp. v. Chase Manhattan Corp.*, 89 F.R.D. 87, 100 (S.D.N.Y. 1981) ("That later events may be more important to later purchasers does not outweigh the overriding importance of the common course of conduct and the alleged failure to disclose material information.").

I am similarly unpersuaded that the proposed Class Representatives are insufficiently typical because they were "value investors." The Supreme Court has expressly rejected the argument that an investor who looks for undervalued securities has waived reliance on the integrity of the market. To the contrary: an investor who purchases in the belief that a security is temporarily undervalued "implicitly relies on the fact that a stock's market price will eventually reflect material

information – how else could the market correction on which his profit depends occur?" *Halliburton II*, 573 U.S. at 273–74. Thus, the value investor is entitled to the *Basic* presumption of reliance, as discussed in Part III.D.2 of this Report, *infra*, because he "trade[s] stock based on the belief that the market price will incorporate public information within a reasonable period." *Villella v. Chem. & Mining Co. of Chile Inc.*, 333 F.R.D. 39, 56 (S.D.N.Y. 2019) (quoting *Halliburton II*, 573 U.S. at 273-74).

I therefore conclude that the typicality requirement is satisfied.

### 4. Adequacy

The final Rule 23(a) requirement is that the class representatives must show that they "will fairly and adequately protect the interests of the class." Fed. R. Civ. P. 23(a)(4). The adequacy prong of the rule focuses on the lawyers who propose to represent the Class and is satisfied where counsel are "qualified, experienced, and generally able to conduct the litigation," and where the plaintiffs' personal interests are not "antagonistic to those of the remainder of the class." *Teachers' Ret. Sys. of Louisiana*, 2004 WL 2997957, at *4 (quoting *In re Prudential Sec. Inc. Ltd. P'ships Litig.*, 163 F.R.D. 200, 208 (S.D.N.Y. 1995)).

Defendants do not dispute that Rosen Law is sufficiently qualified; they do, however, contend that plaintiffs themselves are inadequate class representatives, "due to their repeated failure to cooperate in discovery." Def. Mem. at 13-14. In particular, defendants point to the fact that plaintiffs initially represented that their document productions were complete, only to testify at their depositions that they "failed to search for or produce relevant documents." *Id.* at 14 (citing Tr. of Joseph S. Patt Dep. (Patt Tr.) (Dkt. No. 188-9) at 200:22-201:14; Tr. of Frank J. Cozzarelli Dep. (Dkt. No. 188-11) at 149:16-152:19; Tr. of Sergey Regukh Dep. (Dkt. No. 188-10) at 262:18-22, 263:10-14). Defendants also assert that the representatives were "woefully unprepared for their

[Rule] 30(b)(6) depositions," Def. Mem. at 14, because they spent "only a few hours preparing with counsel." *Id.*

Class certification may be denied on the basis of the proposed representatives' failure to comply with discovery requests where they "have so little knowledge of and involvement in the class action that they would be unable or unwilling to protect the interests of the class." *Koss v. Wackenhut Corp.*, 2009 WL 928087, at *7 (S.D.N.Y. Mar. 30, 2009) (quoting *Maywalt v. Parker & Parsley Petroleum Co.*, 67 F.3d 1072, 1077-78 (2d Cir. 1995)). However, denial is appropriate "only in flagrant cases, where the putative class representatives display an alarming unfamiliarity with the suit, display an unwillingness to learn about the facts underlying their claims, or are so lacking in credibility that they are likely to harm their case." *Id.* (quoting *In re Frontier Ins. Grp., Inc. Sec. Litig.*, 172 F.R.D. 31, 47 (E.D.N.Y. 1997)). For example, courts in this Circuit have disqualified class representatives after they have failed to appear at their own depositions *and* ignored various discovery requests. *Id.* at *8 (collecting cases).

This not a "flagrant" or "alarming" case. Plaintiffs appeared at their depositions and responded to questions under oath. Further, while certain documents may have been produced only after those depositions, defendants make no showing that the late-produced documents were significant, declined the opportunity to reopen plaintiffs' depositions after receiving them, *see* Pl. Reply at 5, and never brought the discovery misconduct of which they now complain to the attention of the assigned magistrate judge. (*See, e.g.*, Dkt. Nos. 153, 155.) As Judge Rakoff explained in response to a similar argument in *In re Petrobras Securities Litig.*, "[i]f defendants felt that plaintiffs and their counsel were behaving so badly, they should have notified the Court sooner than their opposition to plaintiffs' motion for class certification. The argument thus smacks more of strategy than substance." 312 F.R.D. 354, 362 (S.D.N.Y. 2016), *aff'd in part and vacated*

*in part, on other grounds, sub nom. In re Petrobras Securities*, 862 F.3d 250 (2d Cir. 2017). I therefore conclude that plaintiffs have satisfied the adequacy requirement.

      **D.**      **Rule 23(b)(3)**

In addition to satisfying Rule 23(a), a proposed class "must satisfy through evidentiary proof at least one of" the provisions of Rule 23(b). *Comcast Corp. v. Behrend*, 569 U.S. 27, 33 (2013). Here, plaintiffs seek certification pursuant to Rule 23(b)(3), which requires them to demonstrate both that (1) "questions of law or fact common to class members predominate over any questions affecting only individual members," and that (2) "a class action is superior to other available methods for fairly and efficiently adjudicating the controversy." *Vale,* 2019 WL 11032303, at *10 (quoting Fed. R. Civ. P. 23(b)(3)).

Defendants do not challenge the proposed Stock Class under the "predominance" prong of Rule 23(b)(3). As to the Notes Class, however, defendants argue that plaintiffs cannot satisfy the predominance requirement because each note purchaser would need to prove, individually, that it relied on defendants' allegedly false or misleading statements in making its purchases, which is one of the elements required to recover under § 10(b) of the Exchange Act and Rule 10b-5. *See Dura Pharms., Inc. v. Broudo*, 544 U.S. 336, 341-42 (2005). That is, each plaintiff would need to show "that [it] was aware of [the] company's statement and engaged in a relevant transaction . . . based on that specific misrepresentation." *Waggoner v. Barclays PLC*, 875 F.3d 79, 93 (2d Cir. 2017) (quoting *Erica P. John Fund, Inc. v. Halliburton Co.* (*Halliburton I*), 563 U.S. 804, 810 (2011)).

The Supreme Court has dispensed with that requirement in two instances. First, in cases "involving primarily a failure to disclose, positive proof of reliance is not a prerequisite to recovery. All that is necessary is that the facts withheld be material in the sense that a reasonable investor might have considered them important in the making of this decision." *Affiliated Ute*

*Citizens of Utah v. United States*, 406 U.S. 128, 153-54 (1972). Second, if plaintiffs can demonstrate that defendants committed a "fraud on the market" by disseminating materially misleading statements into an "impersonal, well-developed market for securities," the "reliance of individual plaintiffs on the integrity of the market price may be presumed." *Basic*, 485 U.S. at 247. According to defendants, plaintiffs are not entitled to either presumption with respect to the FXCM Notes, and therefore must prove reliance on an individual basis, which in turn would cause questions affecting only individual members to predominate over common questions, barring certification. Def. Mem at 15-29.

I agree. For the reasons that follow, I conclude that even if the Notes Class were sufficiently numerous to satisfy Rule 23(a)(1), it would fail the predominance test of Rule 23(b)(3) and thus could not be certified.

### 1.   *Affiliated Ute*

Plaintiffs first contend that reliance may be presumed for all members of the proposed Class, including purchasers of the FXCM Notes, because plaintiffs' claims are "primarily based on Defendants' omission of material facts relating to the secret profit-sharing relationship between FXCM and Effex," entitling them to the *Affiliated Ute* presumption. Pl. Mem. at 12. It is true, of course, that *some* of their claims are based on omissions. *See*, *e.g.*, TAC ¶ 147 (alleging that defendants omitted that "FXCM was earning kickback payments from Effex that were tied directly to Effex's trading profits and losses"). But defendants are correct that plaintiffs' claims are "*primarily* based on alleged misstatements . . . and any alleged omissions are secondary thereto." Def. Mem. at 16 (emphasis added); *see*, *e.g.*, TAC ¶¶ 2 ("FXCM knowingly misled investors . . . by falsely claiming that its customers who transacted on FXCM's 'No Dealing Desk' ('NDD') platform would be free from conflicts of interest"), 12 (same), 103-124 (identifying the "false and misleading statements" in FXCM's periodic reports), 146-63 (same). Because "positive statements,

not omissions, are central to the alleged fraud," *Bombardier*, 2006 WL 2161887, at *9, the *Affiliated Ute* presumption does not apply.

### 2. *Basic*

The fraud-on-the-market theory is "based on the hypothesis that, in an open and developed securities market, the price of a company's stock is determined by the available material information regarding the company and its business." *Basic*, 485 U.S. at 241; *see also Halliburton II*, 573 U.S. at 283-84 (elaborating on the *Basic* "presumption that a public, material misrepresentation will distort the price of stock traded in an efficient market, and that anyone who purchases the stock at the market price may be considered to have done so in reliance on the misrepresentation"). Thus, in order to invoke the *Basic* presumption, a plaintiff must show that the security in question "traded in an efficient market." *Halliburton II*, 573 U.S. at 277-78.

When evaluating whether a security trades in an efficient market, courts in this Circuit routinely assess the non-exhaustive factors derived from *Cammer v. Bloom*, 711 F. Supp. 1264 (D.N.J. 1989). *See In re Petrobras Securities*, 862 F.3d 250, 276 (2d Cir. 2017); *Bombardier*, 546 F.3d at 204 n.11. These factors are:

> (1) a large weekly trading volume; (2) the existence of a significant number of analyst reports; (3) the existence of market makers and arbitrageurs in the security; (4) the eligibility of the company to file an S-3 registration statement; and (5) a history of immediate movement of the stock price caused by unexpected corporate events or financial releases.

*McIntire v. China MediaExpress Holdings, Inc.*, 38 F. Supp. 3d 415, 431 (S.D.N.Y. 2014). However, the Second Circuit has "not required their use or held that any one of them is dispositive." *Carpenters Pension Tr. Fund of St. Louis v. Barclays PLC*, 310 F.R.D. 69, 83 (S.D.N.Y. 2015).

For bonds (like the FXCM Notes), the *Cammer* factors are frequently applied "in modified form . . . [in] recognition of the differences between the manner in which debt bonds and equity securities trade." *Petrobras,* 862 F.3d at 276 (quoting *Bombardier*, 546 F.3d at 204 n.11); *see also*

*In re Winstar Comms. Sec. Litig.*, 290 F.R.D. 437, 446 (S.D.N.Y. 2013) ("Because the *Cammer* factors were created in the context of the stock markets, courts adjust them for the realities of the over the counter bond market"); *In re Enron Corp. Sec.*, 529 F. Supp. 2d 644, 747-49 (S.D. Tex. 2006) (applying the *Cammer* factors in modified form to debt securities). Additionally, courts within our Circuit commonly look at three additional factors, discussed in *Krogman v. Sterritt*, 202 F.R.D. 467, 478 (N.D. Tex. 2001): (1) market capitalization; (2) float; and (3) the bid/ask spread. *See Petrobras*, 862 F.3d at 276; *McIntire*, 38 F. Supp. 3d at 431.

While these factors all weigh in favor of efficiency as to the market for FXCM Stock (which, as noted above, is not disputed here), the same is not true for the FXCM Notes. I discuss each factor in turn.

### a)   Cammer Factor 1: Average Weekly Trading Volume

The first *Cammer* factor "considers the average weekly trading volume during the Class Period." *Petrobras*, 312 F.R.D. at 365 (S.D.N.Y. 2016); *McIntire*, 38 F. Supp. 3d at 431. A large weekly volume of trades suggests an efficient market "because it implies significant investor interest in the company," which implies, in turn, "that many investors are executing trades on the basis of newly available or disseminated corporate information." *Cammer*, 711 F. Supp. at 1286. According to the *Cammer* court (which was considering the market for common shares traded over the counter), an average weekly trading volume of 2% or more of the outstanding shares permits a "strong presumption" of efficiency, whereas an average weekly trading volume of 1% justifies a "substantial presumption." *Id.* at 1293 (citing Bromberg & Lowenfels, 4 *Securities Fraud and Commodities Fraud*, § 8.6 (Aug. 1988)).

When *Cammer* Factor 1 is modified for the bond market, courts consider "trading volume and frequency," *Petrobras*, 312 F.R.D. at 366-67, both of which tend to be lower for bonds than for common shares. *Id.* at 366; *accord In re DVI Inc. Sec. Litig.*, 249 F.R.D. 196, 215 (E.D. Pa.

2008). Thus, even where "trading volume would not likely support a finding of an efficient market for equities," it may be "sufficient to support such a finding for corporate bonds." *DVI*, 249 F.R.D. at 215 (finding that an average weekly trading volume of 1.25% for senior notes implied efficiency, even though the notes "were left untraded for 48% of the trading days" during the Class Period).

Dr. Werner calculates that the FXCM Notes had an average weekly trading volume of 2.92% of the par value outstanding, Werner Rpt. ¶ 125, which according to plaintiffs "justif[ies] a strong presumption of efficiency." Pl. Mem. at 14-15. Defendants note, however, that Dr. Werner's calculation is "skewed by isolated outlier events," including "abnormal spikes in trading activity that followed the SNB Flash Crash" in 2015. Def. Mem. at 19 (citing Hendershott Rpt. ¶ 48). According to defendants, the average trading volume of the FXCM Notes was "usually" well below 2%. Def. Mem. at 19 (citing Hendershott Rpt. ¶¶ 46, 49-50). Dr. Hendershott's more granular analysis shows that there were only "35 weeks which had a weekly trading volume greater than 2% (approximately 25% of all weeks)." Hendershott Rpt. ¶ 49. By comparison, there were 103 weeks (approximately 75% of all weeks) which had a weekly trading volume less than 2%; 90 weeks (approximately 65% of all weeks), which had a weekly trading volume less than 1%; and 44 weeks (approximately 31% of all weeks) which had "*no trading at all* during the week." *Id*. (emphasis in original). Overall, the FXCM Notes "traded on only about 26% of trading days." *Id.* ¶ 47. Moreover, defendants note, the "number of trades for the Notes also declined over time," Def. Mem. at 20, such that from 2016 through the end of the Class Period, the Notes "traded on only about 13% of trading days." Hendershott Rpt. ¶ 47. For the last 16 months of the Class Period, between October 17, 2015 and February 6, 2017, the average weekly trading volume of the FXCM Notes was only 0.98%, *id.* ¶ 50, and the median weekly trading volume (a figure Dr. Hendershott

focuses on rather than the average, which was "skewed" by the "outliers") was "merely 0.01%." *Id.* ¶¶ 48-50.

In order to take advantage of the *Basic* presumption, plaintiffs must show that the market for the FXCM Notes was efficient throughout the entire Notes Period, not just for the first half of it. Here, the evidence shows that for the last 16 months of the Notes Period, the average weekly trading volume of the FXCM Notes fell below 1%, the median fell even further, and the frequency of trades declined as well. *Cammer* Factor 1 thus militates against a finding that the market for the notes was efficient.

b)      *Cammer Factor 2: Analyst Coverage*

The second *Cammer* factor considers analyst and news coverage. *See Petrobras*, 312 F.R.D. at 365 (noting that 50 analysts was "inarguably a significant number" when considering whether the company's exchange-traded equity securities traded in an efficient market). Where a debt security is at issue, courts modify this factor to include both "analyst and credit rating agency coverage of the debt securities." *Id.* at 366. Generally speaking, "[t]he existence of a number of analysts who report on a security supports a finding of market efficiency because it permits an inference that financial statements relating to a security are closely watched by investment professionals, who in turn inject their views on the company and the security into the market." *Winstar*, 290 F.R.D. at 446 (citing *Bombardier*, 546 F.3d at 205).

Dr. Werner notes that at least 12 analysts or analyst firms covered FXCM and collectively issued at least 89 reports. Werner Rpt. ¶¶ 126-28 & Ex. 4. There were also more than 1,608 news stories, press releases, and SEC filings during the Class Period. Werner Rpt. ¶¶ 31, 129 & Ex. 2. Dr. Werner does not address whether any analysts specifically covered the Notes, because – he explains – "[t]he same analysts that analyze, disseminate, and disclose information relevant to

27

common stock investors offer the same value for bond investors in promoting an efficient market." Werner Rpt. ¶ 123; *see also* Werner Rebuttal Rpt. ¶¶ 29-30. "[A]t the very least," Dr. Werner asserts, "analyst reports provide debt investors with relevant information for assessing a company's ability to pay off its debt and its likelihood of bankruptcy." Werner Rebuttal Rpt. ¶ 29. In their reply brief, plaintiffs add that the fact that the Notes were traded exclusively by QIBs – who employ their own analysts – also weighs in favor of efficiency. Pl. Reply at 11 (citing *In re HealthSouth Corp. Sec. Litig.*, 261 F.R.D. 616, 639 (N.D. Ala. 2009)).

For purposes of *Cammer* Factor 2, "courts tend to look at the number of analysts following a given security (as opposed to the company as a whole)." *Winstar*, 290 F.R.D. at 446. It is true that "both equity and credit reports provide important and useful information" to bondholders. Michael Hartzmark, Cindy A. Schipani, & H. Nejat Seyhun, *Fraud on the Market: Analysis of the Efficiency of the Corporate Bond Market,* 2011 COLUM. BUS. L. REV. 654, 397 (2011). Thus, the number of analysts following the company as a whole can be "instructive" as to the efficiency of the market for its bonds. *Winstar*, 290 F.R.D. at 446 (finding that *Cammer* Factor 2 "militates towards a finding of market efficiency" where "numerous analysts" followed Winstar's stock and at least three analysts "reported directly on the merits of Winstar's bonds during the class period"). That said, if there are *no* analysts specifically following a given debt security, *Cammer* Factor 2 "provides little support" for market efficiency. *In re Am. Int'l Grp., Inc. Sec. Litig.*, 265 F.R.D. 157, 177 (S.D.N.Y. 2010), *vacated and remanded on other grounds*, 689 F.3d 229 (2d Cir. 2012) (*Cammer* Factor 2 offered little support for market efficiency where "none of the industry analysts who examined AIG's debt securities discussed either the 0.5% or the Zero Coupon bonds specifically, but rather analyzed AIG's bond ratings and financial performance generally").

Here, insofar as it can be determined from Dr. Werner's report, there were no analysts specifically covering the FXCM Notes. Moreover, as Dr. Werner acknowledged during the October 15, 2020 hearing, analyst coverage of the company as a whole "dropped considerably after the first quarter of 2015." Oct. 15 Tr. at 43:7-18.

Dr. Werner also confirmed that (as Prof. Hendershott reported, *see* Hendershott Rpt. ¶ 54) "the FXCM notes were not covered by any ratings agencies during the note period." Oct. 15 Tr. at 43:22-24. The fact that a bond is rated by one or more of the major credit rating agencies is not, in and of itself, a strong indicator of market efficiency. *Winstar*, 290 F.R.D. at 446 n.10 (noting that ratings agency coverage may mean only that the company "desire[s] investor interest"). However, the fact that a debt security is *not* rated by any of the three major agencies (Moody's, S&P, and/or Fitch), may "militate against market efficiency." *Id*.

I conclude that *Cammer* Factor 2 weighs against efficiency with respect to the FXCM Notes. The company, and its common stock, received relatively robust analyst coverage at the start of the Class Period. However, no analysts covered the bonds specifically, which is unhelpful to plaintiffs on this issue, and no credit rating agencies rated them, which is also unhelpful. Moreover, analyst coverage of any sort became quite sparse after the SNB Flash Crash, which is when plaintiff 683 Capital made its FXCM purchases. As noted above, plaintiffs must establish that the market for FXCM Notes was efficient throughout the entire Notes Period. *Cammer* Factor 2 does not assist them in doing so.

c)     *Cammer Factor 3: Market Makers*

The third *Cammer* factor considers whether (and how many) market makers existed for the securities at issue. *Petrobras*, 312 F.R.D. at 365. Where a debt security is at issue, courts modify

this factor to consider market makers and underwriters for the bonds. *Id*. at 366. Some courts also consider institutional ownership. *Id.* at 366.

A market maker, as defined by the SEC, is one who either "(1) regularly publishes bid and offer quotations, (2) furnishes these quotations upon request, and (3) is ready, willing and able to transact in reasonable quantities at quoted prices." *Winstar*, 290 F.R.D. at 446-47 (citing 17 C.F.R. § 240.15c3-1(c)(8)). "Market makers promote efficiency by reacting quickly to new information by buying or selling securities in order to drive their price to the market-clearing level." *Id.* at 447 (citing *Cammer*, 711 F. Supp. at 1287).

There were at least 205 market makers for the FXCM Stock, as well as 382 unique institutional investors. Werner Rpt. ¶¶ 34-37; *see Cammer*, 711 F. Supp. at 1293 (finding just 10 market makers to justify a presumption of sufficiency); *Winstar*, 290 F.R.D. at 447 (explaining that there need only be "some market makers"). With respect to the FXCM Notes, however, Dr. Werner does not identify any market makers. Moreover, as plaintiffs acknowledged at the hearing, there were "no arbitrageurs" for the notes. Oct. 15 Tr. at 6:6-8.

According to Dr. Werner, the lack of identifiable market makers and arbitrageurs is balanced by the fact that the FXCM Notes, which were governed by Rule 144, were entirely owned by institutional investors, which "employ financial analysis and portfolio managers who conduct their own research on securities," Werner Rpt. ¶ 130, and were placed into the financial marketplace by prominent underwriters. *Id*. ¶ 131. Dr. Werner further explains that "[i]nvestment banks that underwrite notes typically then serve as market makers for the notes." *Id.* ¶¶ 131-32. During the Notes Period, "between 35% and 40% of the trades reported" to FINRA's Trade Reporting and Compliance Engine (TRACE) "were dealer transactions which results from a large number [of] dealers facilitating transactions similarly to how Market Makers increase the

efficiency of the equity market." *Id.* ¶ 134. It is Dr. Werner's contention that these dealers are "the equivalent of . . . market makers in equity markets." Oct. 15 Tr. at 56:5-13.

Prof. Hendershott disagrees, pointing out, among other things, that the market for Rule 144 bonds is generally "even more opaque and illiquid" than the market for registered corporate bonds, in part because trading is limited to QIBs. Hendershott Rpt. ¶ 31. *See also In re Safety-Kleen Bondholders Litig.,* 2004 WL 3115870 at *6 (D.S.C. Nov. 1, 2004) (the fact that the bonds were "bought and sold only among QIBs . . . suggests that the market was inefficient" because "[i]n an efficient market, there is no need for individual investors to hire analysts to determine what the price of the bonds should be through the information that the analysts are able to glean by their efforts; the price already reflects the information publicly available").

I conclude that Prof. Hendershott has the better end of the argument as to *Cammer* Factor 3. In the absence of any identifiable market makers, I cannot simply assume that the underwriters who "typically [] serve as market makers for the notes" did so here, Werner Rpt. ¶ 132, or that the dealers who facilitated trades in the FXCM Notes were doing more than facilitating trades. Further, the fact that the notes were unregistered, and that trading was limited to QIBs, weighs against efficiency. Consequently, I do not find that the facts marshaled by Dr. Werner provide "compelling evidence in favor of market efficiency." Werner Rpt. ¶ 135.

### d)    *Cammer Factor 4: S-3 Eligibility*

The fourth *Cammer* factor considers whether an issuer was eligible to file a registration statement on Form S-3. *Petrobras*, 312 F.R.D. at 365. Factor 4 applies to equity and bond markets alike. *Id.* at 366. Although the FXCM Notes themselves were unregistered, FXCM filed Form S-3 Registration Statements on October 4, 2012 and July 12, 2016. Werner Rpt. ¶ 42. This factor therefore weighs, albeit slightly, in favor of efficiency.

e)        *Cammer Factor 5: Cause and Effect Relationship*

The fifth *Cammer* factor looks to "empirical facts showing a cause and effect relationship between unexpected corporate events or financial releases and an immediate response" in the price of the security at issue. *Petrobras*, 312 F.R.D. at 365 (quoting *Cammer*, 711 F. Supp. at 1287). This factor needs no modification for the bond market. *Id.* at 367. "Courts have considered this 'the most important *Cammer* factor' because without finding this causal relationship, it is 'difficult to presume that the market will integrate the release of material information about a security into its price.'" *Winstar*, 290 F.R.D. at 448 (quoting *Bombardier*, 546 F.3d at 207). As Prof. Hendershott explains, "only *Cammer* Factor No. 5, which assesses whether there is a cause and effect relationship between the release of new, value relevant information and a security's price response, directly tests market efficiency." Hendershott Rpt. ¶ 64.

For the FXCM Stock, plaintiffs' expert Dr. Werner determined that *Cammer* Factor 5 was satisfied after completing both an event study and an extensive "news no-news" test. *See* Werner Rpt. ¶¶ 45-106. For the FXCM Notes, Dr. Werner completed an event study, but no "news no news" test. This is because "bond prices do not react to the same types of information that drive stock prices." *Plumbers & Pipefitters, Nat'l Pension Fund v. Burns*, 967 F. Supp. 2d 1143, 1156-57 (N.D. Ohio 2013); *see also Enron,* 529 F. Supp. 2d at 747 ("There seems to be little, if any, dispute that the nature of news that would affect the markets for stock can be quite different [from] what would affect the market for bonds."). Unlike equity, which typically responds to a wide range of news concerning a company's performance, debt reacts to "the risk of a change in interest rates" and to "default risk, which is the risk that the issuer will not pay as agreed." *In re Countrywide Fin. Corp. Sec. Litig.,* 273 F.R.D. 586, 615 (C.D. Cal. 2009);  *see also HealthSouth,* 261 F.R.D. at

631–632 ("information that affects the price of stocks, such as the announcement of a dividend or earnings statement, would not be expected to affect the price of bonds").

For the FXCM Notes event study, Dr. Werner selected January 16, 2015 (the day of the SNB Flash Crash) and February 7, 2017 (the day after the last day of the Class Period) as the two test dates. Werner Rpt. ¶ 138. On January 16, 2015, the price of the FXCM Notes fell 58.58%, with an abnormal return of -58.47%, which Dr. Werner deemed statistically significant and indicative of market efficiency. *Id.* ¶¶ 147-48. On February 7, 2017, the FXCM Notes fell 42.18%, with an abnormal return of -42.35%, which Dr. Werner again deemed statistically significant and indicative of market efficiency. *Id.* ¶¶ 149-50.

Dr. Hendershott criticizes Dr. Werner's study on three grounds: (1) Dr. Werner examines only two trading days, one of which falls outside the Class Period; (2) he selects these two dates in an "unscientific and biased way"; and (3) he "does not test if the FXCM Notes traded efficiently with respect to the specific type of information alleged to have been misrepresented." Hendershott Rpt. ¶ 66. These points are well taken. It is unsurprising that the Notes would react to extraordinary events presenting imminent and tangible default risk: the SNB Flash Crash, which resulted in FXCM's near liquidation, and the February 6, 2017 disclosures, which not only corrected prior allegedly misleading statements about the NDD platform and Effex but also informed the market that the company was withdrawing from engaging in any business in the United States, TAC ¶ 81, thus presaging its bankruptcy filing later that year.

That the price of the notes dropped after these events "reflects the assimilation of market information at its grossest level" and cannot, "standing alone," provide adequate evidence that the bonds traded in an efficient market throughout the Notes Period. *See Safety-Kleen*, 2004 WL 3115870, at *6-7 (quoting *Gariety v. Grant Thornton LLP*, 368 F.3d 356, 368 (4th Cir. 2004))

(finding "the bond price dropping after disclosure of accounting irregularities was too isolated an event to indicate the market was efficient during the three time periods at issue"). Thus, "the evidence presented is insufficient to demonstrate, for class certification purposes, market efficiency during the relevant time periods in which plaintiffs purchased the bonds." *Safety-Kleen*, 2004 WL 3115870, at *6-7.

f)    *Krogman Factor 1: Market Capitalization*

The first *Krogman* factor considers market capitalization. *Petrobras*, 312 F.R.D. at 365 (noting that the average aggregate market value was $16.9 billion for Petrobras common stock and $15.9 billion for its preferred stock, in both cases larger than 90% of publicly traded U.S. companies). Where a debt security is at issue, courts modify this factor to consider par value. *Id.* at 366 (noting that "the aggregate par value of Petrobras Notes totaled $41.4 billion and was larger than 90% of all market capitalizations on the NYSE, Amex, and NASDAQ during the Class Period").

The total par value of the FXCM Notes, according to Dr. Werner, was $173 million, which was "larger than the market capitalizations of at least 40% of all public companies listed on the NYSE, AMEX, NASDAQ, and ARCA during the Class Period." Werner Report ¶ 154, n.153. Defendants are not impressed, asserting that $173 million "is not a large issue size for a bond and does not support efficiency." Def. Mem. at 26. Moreover, as Dr. Hendershott explains, comparing the par value of the FXCM Notes to the market capitalization of other U.S. companies (rather than to the par value of debt issued by other U.S. companies) is "an apples-to-oranges comparison." Hendershott Rpt. ¶ 63. Dr. Hendershott also mentions that the notes were trading well below par after the SNB Flash Crash ("at times to roughly $60 million, far lower than the $173 million par value"). *Id.* ¶ 62.

Neither side provides any comparative information that might allow this Court to determine whether an issue of corporate debt with a par value of $173 million is large enough to imply an efficient market. Nor do plaintiffs point to any cases supporting the proposition that *Krogman* Factor 1 could be satisfied by a $173 million issue.[14] Since plaintiffs bear the burden of proof on this issue, I find that *Krogman* Factor 1 does not assist plaintiffs in demonstrating that the FXCM Notes traded in an efficient market.

g)   *Krogman Factor 2: Bid-Ask Spread*

This factor, derived from *Krogman*, considers the bid-ask spread for the security at issue (that is, the difference between the price at which market makers are offering to buy and sell the security). *Petrobras*, 312 F.R.D. at 366 (noting that the average bid-ask spread was 0.09% for the company's common stock and 0.08% for preferred stock, whereas the average bid-ask spread for all stocks in the Center for Research in Security Prices database was 0.59%). A large bid-ask spread may suggest inefficiency. *Krogman*, 202 F.R.D. at 478; *cf.* Werner Rpt. ¶ 115.

There is no dispute that FXCM's common stock had a relatively narrow bid-ask spread of 0.28%, consistent with efficiency. Werner Rpt. ¶ 117; *see Cheney v. Cyberguard Corp.*, 213 F.R.D. 484, 501 (S.D. Fla. 2003) (finding a bid-ask spread of 2.44% to weigh in favor of efficiency); *McIntire*, 38 F. Supp. 3d at 433 (finding a bid-ask spread of 0.27% to weigh in favor of efficiency).

Dr. Werner could not assess this factor in connection with the FXCM Notes because, as he explained, "[b]id-ask data are not reported by TRACE for bond transactions." Werner Rpt. ¶ 152.

---

[14] In *Petrobras*, the aggregate par value of the notes totaled $41.4 billion. 312 F.R.D. at 366. In *Winstar*, the court held that $1.88 billion in par value was "sufficiently large" to be "consistent with a more liquid and efficient market." 290 F.R.D. at 449; *see also Enron*, 529 F. Supp. 2d at 756-57 ($3.3 billion in par value indicated efficiency); *HealthSouth*, 261 F.R.D. at 637 ($3.5 billion was enough to indicate efficiency). *Cf. Safety-Kleen*, 2004 WL 3115870 at *1, 5 (concluding that an issue of debt securities with a par value of $550 million did not trade in an efficient market).

Defendants, for their part, point to "anecdotal evidence" of wide bid-ask spreads on the Notes provided by 683 Capital at its Rule 30(b)(6) deposition. *See* Patt Tr. 109:16-19 ("the spread could be, you know, a point wide, half a point wide, four points [wide], ten points wide in really bad markets"). This testimony, defendants argue, may weigh against a finding of efficiency. Def. Mem. at 27.

I assess this factor as neutral, as do other courts attempting to determine the efficiency of the market for debt securities. *See HealthSouth*, 261 F.R.D. at 637 (because bid-ask spreads are typically unknown or unreported with regard to corporate bond markets, the lack of such data "is not determinative of the efficiency of the market"). The offhand recollection of one witness, with no corroboration and even less "sound analysis," Werner Rebuttal Rpt. ¶ 43, is insufficient to tip the scale in either direction.

h)      *Krogman Factor 3: Float*

The final factor considers the issuer's float – that is, the number of shares (or, in the case of debt securities, par value) available for trading by outside investors in the open market. *Petrobras*, 312 F.R.D. at 366. Here, FXCM's common stock float averaged $336 million during the Class Period. Werner Rpt. ¶ 112. The par value of its outstanding debt, as noted above, was $173 million, and according to Dr. Werner, FXCM's public filings "did not indicate that any substantial portion of its outstanding Notes were held by insiders." Werner Rpt. ¶ 155. On this basis, Dr. Werner concludes that the float on the FXCM Notes "equaled the amount outstanding," which was "large" and therefore "indicative of the efficiency of the market" for those notes during the Class Period. *Id*. Once again, however, the record contains no comparative information or relevant case law supporting plaintiffs' position that a $173 million float is large enough to imply an efficient market. I therefore conclude that *Krogman* Factor 3 does not assist plaintiffs.

I further find that, balancing all of the *Cammer* and *Krogman* factors, plaintiffs have not met their burden of demonstrating that the FXCM Notes traded in an efficient market throughout the Notes Period. The issue size was relatively small – smaller than in any of the cases relied on by plaintiffs in their papers – and the notes were unregistered, initially restricted, and thereafter traded only among a fairly small number of QIBs. No analysts followed the FXCM Notes (as opposed to the FXCM Stock), and none of the ratings agencies rated them. Moreover, the volume and the frequency of the trading decreased over the course of the Notes Period, with the volume dipping below the *Cammer* benchmarks after October 2015. The only direct evidence of market efficiency in the record, offered to show a cause and effect relationship between the release of "company-specific news" and changes to the price of the FXCM Notes, is Dr. Werner's event study, which is of limited utility due to the nature (and timing) of the two events chosen.

Because plaintiffs have not established that the FXCM Notes traded in an efficient market, they cannot rely on the *Basic* presumption of reliance as to the notes, meaning that each note purchaser would be required to prove, individually, that it relied on defendants' allegedly false or misleading statements in making its purchases. This in turn means that plaintiffs cannot satisfy the predominance requirement of Rule 23(b)(3) with respect to the FXCM Notes.[15]

---

[15] In their final letter-brief, plaintiffs suggest that even absent the *Basic* presumption, "resolving the issue of reliance" for the approximately 20 investors otherwise eligible for inclusion in the Class "would be relatively manageable and would not predominate over issues common to the entire class." Pl. Supp. Reply at 3. The cases that plaintiffs cite, however, do not support their position. In *In re Vivendi Universal, S.A. Sec. Litig.*, 284 F.R.D. 144, 153-55 (S.D.N.Y. 2012), the court did indeed "outlin[e] a procedure for resolving individual issues of reliance," Pl. Supp. Reply at 3, but only after a presumption of reliance, based on the fraud-on-the-market theory, had been established on a class-wide basis. In *In re WorldCom, Inc. Sec. Litig.*, 219 F.R.D. 267, 294 (S.D.N.Y. 2003), the court certified a class after holding that the presumption of reliance applied to plaintiffs' § 11 claims just as it did to their § 10(b) claims, and therefore that "it is unlikely that proof of individual reliance will be required." *Id*. at 294. In *Sumitomo Copper Litig. v. Credit Lyonnais Rouse, Ltd.*, 262 F.3d 134, 142-43 (2d Cir. 2001), the issue was whether the district court's class certification order – which among other things applied the presumption of reliance to

### 3.    Proposed Damages Model

A plaintiff seeking class certification under Rule 23(b)(3) must also show "that a class action is superior to other available methods for fairly and efficiently adjudicating the controversy." Defendants argue that plaintiffs cannot satisfy this requirement – as to either the FXCM Stock or the FXCM Notes – because their proposed damages model will be incapable of "segregating damages arising from the alleged fraud from other events that affected the price of FXCM's securities." Def. Mem. at 29. I disagree.

In his reports, Dr. Werner describes (but does not actually conduct) a damages methodology that "can be applied to compute damages for all investors who purchased FXCM securities during the Class Period." Werner Rebuttal Rpt. ¶ 76; *see also* Werner Rpt. ¶¶ 156-58. In his rebuttal report, Dr. Werner summarized his proposed methodology as follows:

> [T]he first step to calculate damages would be to determine whether the disclosure(s) caused the prices of the FXCM securities to fall significantly. Event study results and valuation tools would be applied to determine the magnitude of the price decline attributable to the corrective disclosures. . . . [I]nflation ribbons would be constructed, using generally accepted empirical analyses and valuation tools, to indicate how much artificial inflation caused by the alleged misrepresentations and omissions was in the prices of the FXCM securities on each day during the Class Period.

Werner Rebuttal Rpt. ¶ 77.

---

plaintiffs' common-law securities claims – presented a "compelling question of law." The Second Circuit declined to review the issue on an interlocutory basis because it could be "fully reviewed on appeal from the final judgment," *id*. at 142, and because, even if defendants prevailed, "it would not alter the district court's grant of certification with respect to the plaintiffs' RICO and CEA claims," which did not require proof of reliance. *Id*. at 143. In a final and somewhat casual *dictum*, supported by a single state court case, the *Sumitomo* court remarked that an adverse resolution of the issue "arguably" would not alter the district court's grant of certification with respect to the common-law fraud claim. *Id*. None of these cases militates in support of certifying a class in which 20 members – most of them hedge funds, insurance companies, and other financial institutions that have thus far shown no interest in pursuing the claims pleaded by plaintiffs herein – would be subjected to discovery and then required to prove, at trial, that each of them actually relied on defendants' allegedly misleading statements when purchasing their FXCM Notes.

Defendants and their expert complain that plaintiffs' model will be incapable of "segregating damages arising from the alleged fraud from other events that affected the price of FXCM's securities." Def. Mem. at 29; *see also* Hendershott Rpt. ¶ 95; *id.* §§ V.A.1, V.A.2, V.B, and V.C. As a result, they contend, plaintiffs have failed to demonstrate that "their damages stemmed from the defendant's actions that created the legal liability," as required by *Sykes v. Mel S. Harris & Assocs. LLC*, 780 F.3d 70, 82 (2d Cir. 2015). Def. Mem. at 29.

This argument is premature. As plaintiffs correctly point out, the burden on them at the class certification stage, with regard to damages, is minimal. Pursuant to *Comcast Corp. v. Behrend*, 569 U.S. 27 (2013), plaintiffs need only show that (1) "their theory of liability matches their theory of damages," and (2) "individualized damages issues will not predominate." *Carpenters Pension Tr. Fund of St. Louis*, 310 F.R.D. at 99-100. In fact, it is rare that "issues and facts surrounding damages" pose an obstacle to certification in § 10(b) cases. *Id.* at 74. Plaintiffs "are not required to demonstrate either loss causation or damages for purposes of class certification," as these questions "go to the merits." *Id.* at 99-100. Thus, any issues pertaining to the "construction of an inflation ribbon" or the "subsequent adjustments necessary for case-specific valuation complexities" can be addressed when plaintiffs address loss causation, which need not happen at the class certification stage. *See In re Barrick Gold Sec. Litig.*, 314 F.R.D. 91, 106 (S.D.N.Y. 2016) ("Although plaintiffs may face substantial hurdles in actually proving loss causation and out-of-pocket damages, they are not required to make these showings until the merits stage.").

## IV.   CONCLUSION

For the reasons set forth above, I recommend, respectfully, that plaintiffs' class certification motion be GRANTED IN PART, as to the FXCM Stock, and DENIED IN PART, as to the FXCM Notes. The following class should be certified pursuant to Fed. R. Civ. P. 23(a) and (b)(3):

All persons and/or entities that purchased or otherwise acquired publicly traded Global Brokerage, Inc., f/k/a FXCM Inc. ("FXCM") Class A common stock, during the period March 15, 2012 through February 6, 2017, both dates inclusive. Excluded from the Class are: (i) Defendants; (ii) current and former officers, employees, consultants and directors of FXCM and FXCM Holdings, LLC; (iii) siblings, parents, children, spouses, and household members of any person excluded under (i) and (ii); (iv) any entities affiliated with, controlled by, or more than 5% owned by, any person excluded under (i) through (iii); and (v) the legal representatives, heirs, successors or assigns of any person excluded under (i) through (iv).

I further recommend that Shipco and E-Global be appointed as Class Representatives, and that Rosen Law be appointed as Class Counsel.

Dated: New York, New York
       March 18, 2021

                              **SO ORDERED**.

                              _____

                              **BARBARA MOSES**
                              **United States Magistrate Judge**

### NOTICE OF PROCEDURE FOR FILING OF OBJECTIONS
### TO THIS REPORT AND RECOMMENDATION

The parties shall have fourteen days from this date to file written objections to this Report and Recommendation pursuant to 28 U.S.C. § 636(b)(1) and Fed. R. Civ. P. 72(b). *See also* Fed. R. Civ. P. 6(a) and (d). Any such objections shall be filed with the Clerk of the Court. Any request for an extension of time to file objections must be directed to the Hon. Ronnie Abrams. Failure to file timely objections will preclude appellate review. *See Thomas v. Arn*, 474 U.S. 140 (1985); *Wagner & Wagner, LLP v. Atkinson, Haskins, Nellis, Brittingham, Gladd & Carwile, P.C.*, 596 F.3d 84, 92 (2d Cir. 2010).