10-K 1 fxcm-20131231x10k.htm 10-K

**UNITED STATES**
**SECURITIES AND EXCHANGE COMMISSION**
Washington, D.C. 20549

_____

**FORM 10-K**
_____

☒    **ANNUAL REPORT PURSUANT TO SECTION 13 OR 15(d) OF THE SECURITIES EXCHANGE ACT OF 1934**
For the fiscal year ended December 31, 2013
**or**

☐    **TRANSITION REPORT PURSUANT TO SECTION 13 OR 15(d) OF THE SECURITIES EXCHANGE ACT OF 1934**

For the transition period from          to          .
Commission file number 001-34986

_____

# FXCM Inc.
(Exact name of registrant as specified in its charter)

_____

| | |
|---|---|
| **Delaware** | **27-3268672** |
| (State or other jurisdiction of incorporation or organization) | (I.R.S. Employer Identification No.) |

**55 Water Street, FL 50, New York, NY 10041**
(Address of principal executive offices) (Zip Code)

**(646) 432-2986**
(Registrant's telephone number, including area code)

Securities registered pursuant to Section 12(b) of the Act:

| Title of each class | Name of each exchange on which registered |
|---|---|
| Class A common stock, par value $0.01 per share | New York Stock Exchange |

Securities registered pursuant to Section 12(g) of the Act: **None**

Indicate by check mark if the registrant is a well-known seasoned issuer, as defined in Rule 405 of the Securities Act. Yes ☐ No ☒

Indicate by check mark if the registrant is not required to file reports pursuant to Section 13 or Section 15(d) of the Act. Yes ☐ No ☒

Indicate by check mark whether the registrant (1) has filed all reports required to be filed by Section 13 or 15(d) of the Securities Exchange Act of 1934 during the preceding 12 months (or for such shorter period that the registrant was required to file such reports), and (2) has been subject to such filing requirements for the past 90 days. Yes ☒ No ☐

Indicate by check mark whether the registrant has submitted electronically and posted on its corporate Web site, if any, every Interactive Data File required to be submitted and posted pursuant to Rule 405 of Regulation S-T during the preceding 12 months (or for such shorter period that the registrant was required to submit and post such files). Yes ☒ No ☐

Indicate by check mark if disclosure of delinquent filers pursuant to Item 405 of Regulation S-K (§229.405 of this chapter) is not contained herein, and will not be contained, to the best of the registrant's knowledge, in definitive proxy or information statements incorporated by reference in Part III of this Form 10-K or any amendment to this Form 10-K. ☐

Indicate by check mark whether the registrant is a large accelerated filer, an accelerated filer, a non-accelerated filer, or a smaller reporting company. See the definitions of "large accelerated filer," "accelerated filer" and "smaller reporting company" in Rule 12b-2 of the Exchange Act. (Check one):

| | | |
|---|---|---|
| Large accelerated filer ☐ | | Accelerated filer ☒ |
| Non-accelerated filer ☐ (Do not check if a smaller reporting company) | | Smaller reporting company ☐ |

Indicate by check mark whether the registrant is a shell company (as defined in Rule 12b-2 of the Act.) Yes ☐ No ☒

As of June 28, 2013, the aggregate market value of the registrant's voting and non-voting common equity held by non-affiliates was $623,789,933

As of March 12, 2014, there were 45,752,292 outstanding shares of the registrant's Class A Common Stock, par value $0.01 per share.

**DOCUMENTS INCORPORATED BY REFERENCE**

Portions of the registrant's Definitive Proxy Statement relating to its 2014 Annual Meeting of Stockholders to be filed with the Securities and Exchange Commission pursuant to Regulation 14A not later than 120 days after the end of the fiscal year covered by this Form 10-K are incorporated by reference in Part III, Items 10 – 14 of this Form 10-K.

TABLE OF CONTENTS

## Table of Contents

| Item Number | | Page |
|---|---|---|
| **PART I** | | |
| 1 | Business | 1 |
| 1A | Risk Factors | 10 |
| 1B | Unresolved Staff Comments | 34 |
| 2 | Properties | 34 |
| 3 | Legal Proceedings | 34 |
| 4 | Mine Safety Disclosures | 35 |
| **PART II** | | |
| 5 | Market for Registrant's Common Equity, Related Stockholder Matters and Issuer Purchases of Equity Securities | 36 |
| 6 | Selected Financial Data | 37 |
| 7 | Management's Discussion and Analysis of Financial Condition and Results of Operations | 37 |
| 7A | Quantitative and Qualitative Disclosures About Market Risk | 78 |
| 8 | Financial Statements and Supplementary Data | F-1 |
| 9 | Changes in and Disagreements With Accountants on Accounting and Financial Disclosure | 81 |
| 9A | Controls and Procedures | 81 |
| 9B | Other information | 83 |
| **PART III** | | |
| 10 | Directors, Executive Officers and Corporate Governance | 84 |
| 11 | Executive Compensation | 84 |
| 12 | Security Ownership of Certain Beneficial Owners and Management and Related Stockholder Matters | 84 |
| 13 | Certain Relationships and Related Transactions, and Director Independence | 85 |
| 14 | Principal Accounting Fees and Services | 85 |
| **PART IV** | | |
| 15 | Exhibits, Financial Statement Schedules | 86 |
| | Signatures | 87 |

Cited in In re Global Brokerage
17Cv916 Decided 3/18/21
Archived on 3/23/21
This document is protected by copyright.
Further reproduction is prohibited without permission.

TABLE OF CONTENTS

**Forward-Looking Statements**

This Annual Report on Form 10-K contains forward-looking statements within the meaning of Section 27A of the Securities Act of 1933 and Section 21E of the Securities Exchange Act of 1934, which reflect our current views with respect to, among other things, our operations and financial performance. You can identify these forward-looking statements by the use of words such as "outlook," "believes," "expects," "potential," "continues," "may," "will," "should," "seeks," "approximately," "predicts," "intends," "plans," "estimates," "anticipates" or the negative version of these words or other comparable words. Such forward-looking statements are subject to various risks and uncertainties. Accordingly, there are or will be important factors that could cause actual outcomes or results to differ materially from those indicated in these statements. We believe these factors include but are not limited to those described under the section "Risk Factors" in Item 1A of this Report. Additional risk factors may be described from time to time in our future filings with the Securities and Exchange Commission ("SEC"). We undertake no obligation to publicly update or review any forward-looking statement, whether as a result of new information, future developments or otherwise, except as required by law.

FXCM Inc. is a holding company that was incorporated as a Delaware corporation on August 10, 2010 and its sole asset is an equity interest in FXCM Holdings, LLC, of which FXCM, Inc. is the sole managing member. Unless the context suggests otherwise, specifically, where "Holdings" refers to FXCM Holdings, LLC and the "Corporation" refers to FXCM Inc., references in this report to "FXCM," the "Company," "we," "us" and "our" refer FXCM Inc. and its consolidated subsidiaries.

Cited in In re Global Brokerage
17CV916 Decided 3/18/21
Archived on 3/23/21
This document is protected by copyright.
Further reproduction is prohibited without permission.

TABLE OF CONTENTS

PART I

**Item 1. Business**

**Overview**

We are an online provider of foreign exchange ("FX") trading and related services to approximately 183,679 active retail customers globally. We offer our customers access to over-the-counter ("OTC") FX markets through our proprietary technology platform. In an FX trade, a participant buys one currency and simultaneously sells another, a combination known as a "currency pair". Our platform seeks to present our FX customers with the best price quotations on up to 59 currency pairs from up to 35 global banks, financial institutions and market makers, or FX market makers, which we believe provides our customers with an efficient and cost-effective way to trade FX.

We primarily offer our customers what is referred to as an agency model to execute their trades. Our agency model is fundamental to our core business philosophy because we believe that it aligns our interests with those of our customers and reduces our risks. In the agency model, when our customer executes a trade on the best price quotation offered by our FX market makers, we act as a credit intermediary, or riskless principal, simultaneously entering into offsetting trades with both the customer and the FX market maker. We earn trading fees and commissions by adding a markup to the price provided by the FX market makers.

In 2012, in order to accommodate our expanding customer base, we began to offer our smaller retail clients the option to trade through a principal model. In the principal model, we set the price and act as the counterparty for our customer's transactions, earning revenue on our trading gains or losses. We do not simultaneously offset each trade with another party.

We also earn other forms of revenue such as fees earned from: referring broker fees and white label arrangements with other financial institutions to provide platform, back office and trade execution services, trading in contract-for-differences ("CFDs"), trading in equities and equity options, payments for order flow, FX market prices and other various ancillary FX related services and joint ventures.

We operate our business through two segments: retail trading and institutional trading. Our retail trading segment accounted for 77.4% of our total net revenues in 2013. Our institutional trading segment, FXCM Pro, offers FX trading services to banks, hedge funds and other institutional customers on an agency model basis. In addition, we own a 50.1% controlling interest in Lucid Markets Trading Limited ("Lucid"), an electronic market-maker and trader in the institutional foreign exchange spot and futures market. Our institutional trading segment accounted for 22.6% of our total revenues in 2013. For financial information regarding our segments, see Note 26 to our consolidated financial statements in "Item 8. Financial Statements and Supplementary Data".

Our operating subsidiaries are regulated in a number of jurisdictions, including, but not limited to, the United States ("U.S."), the United Kingdom ("U.K."), where regulatory passport rights have been exercised to operate in a number of European Economic Area jurisdictions, Hong Kong, Australia and Japan. We maintain offices in these jurisdictions, among others. We offer our trading software in 17 languages, produce FX research and content in 17 languages and provide customer support in 19 languages. For the year ended December 31, 2013, approximately 87.3% of our retail customer trading volume was derived from customers residing outside the United States. We believe our global footprint provides us with access to emerging markets, diversifies our risk from regional economic conditions and allows us to draw our employees from a broad pool of talent.

**Our Products and Services**

We offer three types of accounts, each designed for a particular type of retail FX trader. Our Basic accounts is designed for those new to FX trading and it enables traders to open accounts between $50 and $4,999. These accounts offer trading in small increments, providing 24/7 support and access to DailyFX resources. Our Premium accounts are available to clients depositing between $5,000 and $24,999. These accounts offer the same benefits as our Basic accounts, but also allow corporate entity accounts, include additional customer support options and allow customization of account type and setup. Our Basic and Premium level accounts are available utilizing the agency or principal models. Our principal model account may offer traders a lower transaction cost, however, the large majority of our clients choose the agency model. We also offer Active Trader accounts that are designed for experienced, high volume traders and generally require an opening deposit of $25,000 or trading volume of at least $10 million per month.

1

Cited in In re Global Brokerage
17CV916 Decision dated 3/23/21
Archived on 3/23/2021
This document is protected by copyright.
Further reproduction is prohibited without permission.

TABLE OF CONTENTS

We also offer trading in a growing number of other financial instruments. While some customers may choose a retail FX broker based on the breadth of products they offer, we limit the products we offer to those that meet our risk, regulatory and technology criteria.

### Spot FX Pairs

We offer spot FX trading in over 59 currency pairs. Of these pairs, our most popular seven currency pairs represent over 69.1% of all trading volume, with the EUR/USD currency pair being the most popular, representing over 21.7% of our trading volume in 2013. We add new currencies to our list provided they meet our risk and regulatory standards. We do not allow trading in currencies from nations that have prohibitions on the trading of their own currency.

### Contract-for-Difference

We offer our non-U.S. customers the ability to trade CFDs, which are agreements to exchange the difference in value of a particular asset such as a stock index or oil or gold contract, between the time at which a contract is opened and the time at which it is closed. Our CFD offerings currently include contracts for metals, fixed income, energy and stock indices, and for the year ended December 31, 2013, CFD trading constituted approximately 17.4% of total trading volume. We will continue to introduce new products as permitted by applicable laws and regulations. Due to U.S. regulatory requirements, we do not offer CFDs in the United States. CFD trading is offered through our Trading Station II and Meta Trader 4 ("MT4") products similar to our currency pairs. As our FX market makers cannot process agency model trades for CFDs, these products are not offered on an agency basis. We stream the best bid and offer to customers, but we do not offset each trade automatically. However, we use futures contracts to hedge CFD positions on a net basis.

### Spread Betting

We offer spread betting trading to our U.K. customers, which is where customers take a position against the value of an underlying financial instrument moving either upwards or downwards in the market. Customers can make spread betting trades on FX pairs, stock indices, gold, silver and oil. For the year ended December 31, 2013 spread betting constituted approximately 1.9% of total trading volume.

### Equities and Equity Options

We offer our customers equity and equity option trading through FXCM Securities Limited ("FSL"). FSL offers customers outside of the United States the ability to trade equities and options on U.K., continental Europe and U.S. markets. They are offered using an FSL platform which integrates proprietary as well as third party software that connects to third party data providers, clearing firms and other market participants.

Equities and equity options offered and sold through FSL, as a regulated broker dealer in the U.K., will, if traded in the primary market, be offered and sold pursuant to Regulation S. Trading in equities and equity options for and with customers in the secondary market will be carried out by FSL in compliance with applicable rules and regulations of the Financial Conduct Authority ("FCA") and other applicable law. These products do not currently represent a material source of revenue for us.

**Our Trading Systems**

We offer a number of trading systems, all of which are supported by our sophisticated, proprietary technology infrastructure. Our technology tracks the balances, positions, profits and losses and margin levels for all account holders in real time. The back office system's real time margin-watcher feature automatically closes out open positions if a customer's account is at risk of going into a negative balance as a result of a trading position losing value and reaching the minimum margin threshold.

_Trading Station_ is our proprietary flagship technology platform. Trading Station combines power and functionality and is accessible through a user-friendly interface. Trading Station is designed to serve the needs of our retail FX customers, but also offers advanced functionalities often used by professional money managers and our institutional customers. Trading Station is a Windows-based platform with a wide variety of customization options for users to choose from including a choice of 17 languages. The platform provides an advanced chart offering called Marketscope which offers a wide array of customization features, technical analysis indicators, signal and alert functionality, as well as the ability to place trades directly from the chart. We grant many of our white labels a limited, non-exclusive, nontransferable, cost-free license to use Trading Station to facilitate trading volume and increase trading fees and commissions.

2

TABLE OF CONTENTS

*Active Trader Platform*, also a proprietary technology platform, was built and designed for our higher volume customers. The platform is web-based, making it easily and quickly accessible by users without requiring a download. The platform features most of the same capabilities as the Trading Station platform but also adds the ability to display up to 10 tiers of market depth information. While Trading Station streams the best bid and best offer from our FX market makers to the customer, our Active Trader Platform displays not only the best bid and best offer but also the next nine bids and offers. Our customers can use this information to determine where market liquidity is heavier and therefore which direction the more immediate moves may likely be. This market depth information is similar to Level II information displayed on the more professionally geared equity trading systems, but is not common for retail FX. At present, we do not license rights or have any white label arrangements which include licenses to use our Active Trader Platform.

*Meta Trader 4* is a third-party platform built and maintained by MetaQuotes Software Corp, and we have licensed the rights to offer it to our customer base. MT4 has a loyal and global user group and the platform caters towards customers with automated trading systems that they have either developed themselves or have purchased from other developers. Our MT4 platform utilizes all the features of our back office system and order execution logic that are provided to users of our proprietary technology platforms. We have integrated MT4 into the same pricing engine as Trading Station, enabling its users to get the same pricing and execution.

*FXCM Pro* is our institutional level FX offering that permits banks, hedge funds, professional money managers and similar entities to trade anonymously on our Electronic Communication Network (ECN). FXCM Pro adds value by connecting institutional customers to our top tier FX market makers to gain access to preferred pricing. Customers using FXCM Pro can both take and make prices on the platform. We earn revenue through markups on those prices and/or commissions charged to the customer. We are currently using the FXCM Pro ECN, which is our in-house platform as well as the licensed FastMatch FX Technology. These Platforms are designed to allow banks, hedge funds, professional money managers and similar entities to trade through FXCM Pro rather than third party platforms.

*FastMatch* is a third party ECN for spot foreign exchange trading that offers customers access to large pools of diversified liquidity with the speed and transparency of equities trading and with a customer target of retail brokers, institutions, banks, hedge funds and proprietary trading firms. FastMatch allows clients to trade across an array of unique liquidity sub-pools each governed by its own distinct rules of trading. FastMatch will also enable institutional clients to easily transact large sizes with minimum market impact.

#### Other Platforms

Our *Trading Station Web* is similar to Trading Station but is web-based. The browser based platform allows customers to access their account from any computer without installing any additional programs. Trading Station Web is also easy to use and has most of the customization options of Trading Station.

*Mirror Trader Platform*, is a third party platform that we license, which allows customers to scan and review dozens of pre-programmed and pre-filtered trading systems and 39 automated strategies. Customers can then select the systems that match their trading and risk preferences and apply them to their trading account. Mirror Trader Platform is an ideal option for customers that follow general market trends but may not prefer to execute trades themselves. We offer the Mirror Trader Platform to FXCM's entire client base.

*Ninja Trader Platform* ("Ninja Trader") is an award-winning and leading trading software provider that is known for its high performance analytic and trade execution tools that maximize a trader's efficiency in fast-moving markets. Ninja Trader also offers free, daily trading webinars, an interactive product training video library, and an active online forum. Ninja Trader also offers multiple simulation options.

We also offer mobile platforms for multiple mobile devices, including Blackberry® and the iPhone®/iPad®. These platforms include a majority of the functionality found on the Trading Station and allow customers to log in and trade anywhere in the world.

#### White Label and Referring Broker Opportunities

We offer financial institutions the ability to offer retail FX trading services to its customers using our technology, our sales and support staff and/or our access to liquidity through white label partnerships. We also have a wide network of referring brokers, which are third parties that advertise and sell our services in exchange for performance-based compensation. These partnerships allow us to expand into new markets around the world.

Cited in In re General Brokerage
17CV916 Decitica 3/18/21
Archived on 3/23/21
This document is protected by copyright.
Further reproduction is prohibited without permission.

TABLE OF CONTENTS

We believe we have a well-established presence in Asia and in Europe through our white label partnerships. While referring brokers are not permitted to use our name in their advertising, certain white label partnerships are fully disclosed, including our partnership with E*Trade FFX, LLC. We also have a white label partnership with Bourse Direct, a leading independent French online financial broker, DIF Broker and GVC Gaesco.

Through our white label partners and referring brokers, we generated 43.6% of our retail trading volume for the year ended December 31, 2013. We intend to continue to build upon the success of our existing white label partnerships and referring broker networks and create new partnership opportunities around the world.

### Sales and Marketing

Our sales and marketing strategy focuses on diverse customer acquisition channels to expand our customer base.

#### *Direct Marketing Channel*

Our direct marketing channel, through which we seek to attract new customers is our most important marketing channel. In executing our direct marketing strategy, we use a mix of online, television and radio advertising, search engine marketing, email marketing, event marketing including educational seminars and expos and strategic public and media relations, all of which are aimed at driving prospective customers to our web properties, DailyFX.com and FXCM.com. In those jurisdictions in which we are not regulated by governmental bodies and/or self-regulatory organizations, however, we are generally restricted from utilizing our direct marketing channel. See "Business — Regulation."

While our platform is available in 17 languages (English, French, Spanish, German, Russian, Korean, Turkish, Italian, Hebrew, Greek, Portuguese, Polish, Hungarian, Chinese (Traditional), Chinese (Simplified), Japanese, Arabic) and we have websites available in 17 languages (English, French, Spanish, German, Russian, Italian, Hebrew, Greek, Chinese (Traditional), Chinese (Simplified), Indonesian, Japanese, Tagalog, Malay, Thai, Vietnamese, Arabic), the majority of our direct marketing efforts have historically been focused on North America, our home market, and Asia, due to its high rate of growth. In the last two years, we have focused on expanding our global footprint by opening new international offices in Europe as well as the Middle East and supporting this expansion with marketing campaigns. An international office provides us many benefits, including the ability to hold in-person seminars, a location for customers to visit, the ability to accept deposits at a regional bank and provide sales and support by native speakers. Currently, we maintain offices in the United States, the United Kingdom, France, Germany, Italy, Greece, Chile, Lebanon, Israel, Hong Kong, Japan and Australia.

The primary objective of our marketing is to encourage prospective customers to register for free practice trading accounts or tradable accounts. Free registered practice trading accounts or "demo" accounts are our principal lead generation tool. We believe the demo account serves as an educational tool, providing prospective customers with the opportunity to try trading in a risk-free environment, without committing any capital. Additionally, it allows prospective customers to evaluate our technology platforms, tools and services. The demo account is identical to the platform used by our active trading customers, including the availability of live real-time streaming quotes. However, trades are not actually executed with our market makers.

During the trial period for the demo account, we provide customers with information about our firm's advantages, educational resources and trading tools. To complement these efforts, a team of Series 3 licensed sales representatives contact prospective customers by telephone to provide individualized assistance.

#### *Indirect Marketing Channels*

Our indirect channels utilize a network of referring brokers and white label partners.

Referring brokers are third parties that advertise and sell our services in exchange for performance-based compensation. Many referring brokers offer services that are complementary to our brokerage offering, such as trading education and automated trading software. While referring brokers are not permitted to use our name in their advertising, accounts originating from referring brokers are legally opened with a FXCM-owned entity. In most cases, the sales function is performed by the referring broker and customer service is provided by our staff.

Our white label channel enables financial institutions to offer retail trading services to its customers using one or more of the following services: (1) our technology; (2) our sales and support staff or (3) our access to liquidity. White labels can add value to our core offering through increased positive name recognition on a regional or global scale and access to a large existing customer base.

4

Cited in the Gain Brokerage
17Cv916 docket on 11/18/21

Archived on 4/23/20

This document is protected copyright.
Further reproduction is prohibited without permission.

TABLE OF CONTENTS

*Institutional sales and marketing*

FXCM Pro is targeted at institutional customers, principally banks, hedge funds, corporate treasury departments and commodity trading advisors. These customers trade using a variety of tools. Some trade directly on the FXCM Pro system, using its graphic user interface. Most, however, trade using automated systems that receive price streams from FXCM Pro, as well as other institutional price providers such as banks and ECNs. The sales process involves identifying a customer, receiving credit approval from one of our prime brokers, signing them to a contract and then connecting them to our network. Our revenues are principally determined by the number of trades executed by the institutional customer.

We service this customer base with a dedicated experienced institutional sales force primarily located in our New York, London and Hong Kong offices. As the customer base is much smaller compared to that in our retail marketplace, we are able to provide customized service and attention to each account. The institutional sales force is primarily compensated on a commission basis.

With the acquisition of Faros Trading LLC ("Faros") in September 2013, which provides FX intelligence, market coverage and execution services to the institutional FX market, we are able to provide institutional customers with targeted and value added research and expand into new segments of the institutional FX market.

*Marketing expertise*

We believe that our in-house marketing organization provides us with a competitive advantage. We seldom rely on outside marketing agencies to provide services because our marketing team acts as an in-house agency. Our marketing team handles functions such as creative, media buying, price-per-click advertising, website development, email and database marketing, and corporate communications. Many of these staff members have been with us for multiple years and have developed an internal knowledge base at our Company that would probably not otherwise be available. This expertise has enabled us to assemble a tightly integrated digital marketing platform which encompasses our CRM (salesforce.com), Trading Back Office, Ad Serving, and Website Analytics. As a result, we can calculate the value of any media purchase with a high level of precision on a cost per lead and cost per account basis. We believe this analysis enables us to make intelligent media buying decisions allowing us to maximize our lead and account conversion.

**Customer Service**

We provide customer service 24 hours a day, seven days a week in English, handling customer inquiries via telephone, email and online chat. To provide efficient service to our growing customer base, we have segmented our customer demographic into three main categories.

- *New to FX*: We cater to new customers seeking to open accounts by providing low barrier account minimums and in-depth educational resources on the FX market. We believe that education is an important factor for new customers, and we have a team dedicated to educate our customers about the fundamentals of FX trading, application of technical analysis to FX and the use of risk management, specifically focusing on our Traits of a Successful Trader guide. We offer online videos for educating new customers on the FX market. In addition, we have a dedicated staff of instructors who conduct live webinars and answer questions posted by customers in forums.

- *Experienced Customers*: We offer our experienced customers value-added resources and trading functionality. DailyFX Plus is a proprietary secure portal that provides trading signals and high touch education. As many experienced customers are technical traders, we also provide them with the ability to trade directly from the charts.

- *High Volume/Algorithmic Trading*: Our Active Trader sales group caters to active customers. Active trader customers can receive price incentives for trading higher volumes. High volume, automated trading has increased in popularity in the FX market. We have a dedicated programming services team that can code automated trading strategies on behalf of customers. Additionally, we offer multiple automated programming interfaces that allow customers with automated trading systems to connect to our execution system.

Our retail sales and customer service teams are not compensated on a commission basis. All customers receive the same level of service, regardless of the FXCM representative. We believe this is a key differentiator for us compared to other retail FX firms that employ commission based sales forces who may not be motivated to provide support to smaller customers.

Cited in In re Global Brokerage, Inc.
17CV916 Decided 8/18/21
Archived on 3/23/21
This document is protected by copyright.
Further reproduction is prohibited without permission.

TABLE OF CONTENTS

**Technology and Infrastructure**

*Proprietary technology platform*

Our FX technology platform has been designed using proprietary technologies to deliver high standards in performance, flexibility and reliability. Our platform can be divided into three main groups: (1) front-end technology platforms and trading decision support tools, (2) agency model technology platform and (3) back office applications for account management, operations, reporting and reconciliation processes.

We believe that our technology and infrastructure platform provides us with a competitive advantage and enables us to provide innovative solutions to our customers and partners. As examples, we introduced the concept of real-time rebate calculation for referring brokers and automation of basic operations and account management routines to reduce processing time.

*Scalability*

Our agency model system has been designed to meet the demands of our growing customer base with a focus on speed, accuracy and reliability. Within our network, we currently process orders in under 2 milliseconds during peak load periods, and have processed over 1,700 orders per second during volatile market conditions, 340 times our average volume over the last two years. We believe our current platform has the capacity of scale to meet our growth expectations for the foreseeable future.

*Reliability and Availability*

Our trading infrastructure is primarily hosted at collocation facilities run by Equinix and Xand. The two trading venues are located in New Jersey and Tokyo, with a disaster recovery location in Pennsylvania. The New Jersey and Pennsylvania datacenters are over 90 miles apart, on separate power grids and separate fiber connectivity. Each facility has N+1 (or greater) uninterruptible power supply systems, generator systems, public utility power feeds, cooling systems, internet providers and private network providers. Locations on the eastern coast of the United States were chosen to achieve both optimal networking latency to price providers and required geographic distance separation.

Applications, servers, network, storage devices, power and temperature are monitored 24 hours a day, seven days a week by support personnel through a combination of industry standard monitoring and alerting tools, including Nagios, Cacti, SmokePing and NfSen. Custom written applets and scripts are used to report key resource usage in near real-time.

Personnel are distributed across five major office locations with key operations, such as dealing, customer support and technology support, staffed at multiple locations. Each office location utilizes redundant network connections to access datacenter resources.

*Security*

Data security is of critical importance to us. We use industry standard products and practices throughout our facilities. We have strict policies and procedures with a minimal set of employees retaining access to customer data. Physical security at our datacenters is handled by security staff present 24 hours a day, seven days a week. In addition, we use biometric and card access systems, video surveillance, and "man traps" which refers to a small space having two sets of interlocking doors such that the first set of doors must close before the second set opens and also requires identification for each door. Physical access at our corporate headquarters is also handled by a security staff that is present 24 hours a day, seven days a week, as well as turnstiles and card access systems.

Our systems and policies are tested annually for Payment Card Industry ("PCI") compliance. Additionally, we engage a public accounting firm to perform an annual audit of our internal controls and issue a SSAE (Statements on Standards for Attestation Engagements) 16 audit report.

*Business Continuity/Disaster Recovery*

We have established a business continuity management team to prepare and maintain business continuity plans and procedures designed to ensure a prompt recovery following the loss or partial loss of any of our infrastructure, systems or locations. Our recovery plans are tested on a regular basis in order to verify their effectiveness. Plans are maintained and updated based upon results of the tests and as business needs change.

6

Cited in Global Brokerage
17Cv916 decided 3/18/21
Archived on 3/23/21
This document is protected copyright.
Further reproduction is prohibited without permission.

TABLE OF CONTENTS

**Risk management**

We primarily utilize what is commonly referred to as an agency model, which we have been offering to customers since July 2007. We have continued to invest in our agency platform, adding additional FX market makers, improving execution and adding features to enhance the trading experience of our customers and believe that our commitment to the agency model is one example of our core business philosophy to reduce risks. In our agency model, when a customer executes a trade with us, we act as a credit intermediary, or riskless principal, simultaneously entering into trades with the customer and the FX market maker.

Our FX trading operations require a commitment of our capital and involve risk of loss due to the potential failure of our customers to perform their obligations under these transactions. In order to minimize the incidence of a customer's losses exceeding the amount of cash in their account, which we refer to as negative equity, we require that each trade must be collateralized in accordance with our collateral risk management policies. Each customer is required to have minimum funds in their account for opening positions, referred to as the initial margin, and for maintaining positions, referred to as maintenance margin, depending on the currency pair being traded. Margin requirements are expressed as a percentage of the customer's total position in that currency, and the customer's total margin requirement is based on the aggregated margin requirement across all of the positions that a customer holds at any time. Each net position in a particular currency pair is margined separately. Because we do not net across different currency pairs, we believe we produce a fairly conservative margin policy. Our systems automatically monitor each customer's margin requirements in real-time and we confirm that each of our customers has sufficient cash collateral in their account before we execute their trades. If at any point in time a customer's trading position does not comply with the applicable margin requirement because our predetermined liquidation thresholds have been exceeded, the position will be automatically liquidated in accordance with our margin policies and procedures documented in our customer agreement. We believe this policy protects both us and the customer. We believe that as a result of implementing real-time margining and liquidation processing, the incidence of customer negative equity has been insignificant.

We are also exposed to potential credit risk arising from our exposure to counterparties with which we hedge and financial institutions with whom we deposit cash. By transacting with several of the largest global financial institutions, we have limited our exposure to any one institution. In the event that our access to one or more financial institutions becomes limited, our ability to hedge may be impaired.

**Relationships with wholesale FX market makers and prime brokers**

Our global network of FX market makers includes global banks, financial institutions and market makers and these relationships have been established through prime broker relationships and direct relationships with FX market makers.

We have entered into prime brokerage agreements with Citibank ("Citi"), Morgan Stanley, Deutsche Bank, BNP Paribas and Barclays Bank for our retail trading, and Citi, BNP Paribas and Royal Bank of Scotland for our FXCM Pro institutional business, which we believe allow us to maximize our credit relationships and activities while improving efficiency. As our prime brokers, these firms operate as central hubs through which we transact with our FX market makers. Our prime brokers allow us to source liquidity from a variety of executing dealers, even though we maintain a credit relationship, place collateral, and settle with a single entity, the prime broker. We depend on the services of these prime brokers to assist in providing us access to liquidity through our wholesale FX market makers. In return for paying a modest prime brokerage fee, we are able to aggregate our trading exposures, thereby reducing our transaction costs and increasing the efficiency of the capital we are required to post as collateral. Our prime brokerage agreements may be terminated at any time by either us or the prime broker upon complying with certain notice requirements. We are also obligated to indemnify our prime brokers for certain losses they may incur.

We typically also enter into Master Trading Agreements (such as International Swaps and Derivatives Association or "ISDA" agreements, Futures Master Agreements, or Prime Broker Agreements) with each financial institution that we have a liquidity relationship with. These standardized agreements are widely used in the interbank market for establishing credit relationships and are typically customized to meet the unique needs of each liquidity relationship. These Master Trading Agreements outline the products supported as well as margin requirements for each product. We have had a number of key liquidity relationships in place for over five years and as such we believe we have developed a strong track record of meeting and exceeding the requirements associated with each relationship. However, our FX market makers have no obligation to provide liquidity to us and may terminate our standing arrangements with them at any time, and we currently have a number of effective ISDA agreements and other applicable agreements with other institutions should the need arise.

Cited in In re Global Brokerage
17Cv916 Decided on 3/23/2
Archived on 3/23/2
This document is protected by copy
Further reproduction is prohibited without per

TABLE OF CONTENTS

**Intellectual Property**

We rely on a combination of trademark and copyright laws in the United States and other jurisdictions to protect our intellectual property rights and our brand. We also enter into confidentiality and invention assignment agreements with our employees and consultants and confidentiality agreements with other third parties and rigorously control access to proprietary technology. Currently, we do not have any pending or issued patents.

We use the following service marks that have been registered or for which we have applied for registration with the U.S. Patent and Trademark Office: Forex Capital Markets (registered service mark), FXCMPRO (registered service mark) and FXCM (registered service mark).

**Competition**

The retail FX trading market is fragmented and highly competitive. Our competitors in the retail market can be grouped into several broad categories based on size, business model, product offerings, target customers and geographic scope of operations. Competition in the institutional market can be grouped by type, technology and provider.

_U.S. based retail FX brokers_:  In the U.S. market, our primary competitors are Gain Capital Holdings Inc. and OANDA Corporation. They are well capitalized, have their own technology platforms and are recognizable brands. These firms operate using the principal model. We also compete with smaller retail FX brokers such as FXDirectDealer, LLC, InterbankFX, LLC, MB Trading and FX Solutions. These firms, to date, have not been our core competitors due to their smaller size, technology and marketing limitations. With the exception of InterbankFX, all of these firms operate using the principal model.

_International multi-product trading firms_:  Outside the United States we compete with firms such as Saxo Bank, CMC Group, IG Group Holdings plc and City Index Limited. Other than Saxo Bank, the international firms tend to focus on CFDs and spread betting.

_Other online trading firms_:  To a lesser degree, we compete with traditional online equity brokers, OptionsXpress Holdings, Inc.,TD Ameritrade, TradeStation and Interactive Brokers. These firms generally tend to focus on listed products and may already, or will in the future, provide retail FX principally as a complementary offering. With the exception of Interactive Brokers, the firms in this category that have entered the FX market have generally done so through a relationship with a retail FX broker who specializes in FX.

_International banks and other financial institutions with significant FX operations_:  We also compete with international banks that have announced or launched retail FX operations. Financial institutions generally choose to enter into a joint venture with an independent retail currency firm in lieu of building a retail operation.

_Competition in institutional market_:  In the institutional market that our FXCM Pro segment competes, we face competition from three principal sources. We compete with other multi-bank ECNs such as State Street Banks' Currenex, Knight Capital's Hotspot FX and ICAP's EBS. We also compete with single bank platforms such as Deutsche Bank's Autobahn, Barclays' Barx and Citi's Velocity. The third source of competition are desktop aggregators, including Progress Software's Apama, Flextrade and Integral. Additionally, with the acquisition of Lucid, we now face competition from major FX banks, such as Deutsche Bank, Citi, Barclays and Goldman Sachs, and other non-bank electronic market making trading firms such as GSA Capital Partners LLP.

We attribute our competitive success to the quality of the service we offer our customers and their confidence in our agency business model and strong financial condition. We believe that our expertise in product innovation, trading technology and international scale will allow us to continue to compete globally as we expand our presence in existing markets and enter new ones.

**Regulation**

_Overview_

Our business and industry are highly regulated. Our operating subsidiaries are regulated in a number of jurisdictions, including the U.S., the U.K., Hong Kong, Australia and Japan.

In the United States, we are primarily regulated by the Securities and Exchange Commission ("SEC"), the New York Stock Exchange ("NYSE"), the Commodities Futures Trading Commission, ("CFTC"), and the National Futures Association,

8

TABLE OF CONTENTS

("NFA"). These regulatory bodies are charged with safeguarding the integrity of the markets. The CFTC and the NFA specifically target the FX and futures markets and protect the interests of customers participating in those markets.

Outside the United States, we are regulated by, among others; the FCA in the U. K.; the Securities and Futures Commission in Hong Kong ("SFC"); the Australian Securities and Investment Commission in Australia ("ASIC"); the Kanto Local Finance Bureau ("KLFB") the Financial Services Agency in Japan ("JFSA") and the Financial Futures Association of Japan ("FFAJ"). In addition, certain of our branch offices in Europe, while subject to local regulators (such as Commissione Nazionale per le Societa'e la Borsa (Consob); Autorite des Marches Financiers ("AMF"), and Hellenic Capital Markets Commission ("CMC")), are regulated by the FCA with respect to, among other things, FX, CFDs and net capital requirements. In any foreign jurisdiction in which we operate, there is a possibility that a regulatory authority could assert jurisdiction over our activities and seek to subject us to the laws, rules and regulations of that jurisdiction. The laws, rules and regulations of each foreign jurisdiction differ. In the jurisdictions where we have the most foreign customers, we may be either licensed or registered or believe we are exempt from licensing or registration due to our limited conduct, lack of solicitation in those jurisdictions, and/or other factors. In any jurisdiction where we are relying on an exemption from registration, there remains the risk that we could be required to register, and therefore, be subject to regulation and enforcement action or, in the alternative, to reduce or terminate our activities in these jurisdictions.

*Patriot Act/EU Money Laundering Directive*

As required by the Uniting and Strengthening America by Providing Appropriate Tools Required to Intercept and Obstruct Terrorism Act of 2001, or the Patriot Act, and the EU Money Laundering Directive, we have established comprehensive anti-money laundering and customer identification procedures, designated an anti-money laundering compliance officer, trained our employees and retained an independent audit of our program. There are significant criminal and civil penalties that can be imposed for violations of the Patriot Act and the EU Money Laundering Directive.

*Net Capital Requirements*

Certain of our subsidiaries are subject to jurisdictional specific minimum net capital requirements, designed to maintain the general financial integrity and liquidity of a regulated entity. In general, net capital requirements require that at least a minimum specified amount of a regulated entity's assets are kept in relatively liquid form, usually cash or cash equivalents. Net capital is generally defined as net worth, assets minus liabilities, plus qualifying subordinated borrowings and discretionary liabilities, and less mandatory deductions that result from excluding assets that are not readily convertible into cash and from valuing conservatively other assets.

If a firm fails to maintain the minimum required net capital, its regulator and the self-regulatory organization may suspend or revoke its registration and ultimately could require its liquidation. The net capital requirements may prohibit payment of dividends, redemption of stock, prepayment of subordinated indebtedness and issuance of any unsecured advance or loan to a stockholder, employee or affiliate, if the payment would reduce the firm's net capital below minimum required levels.

Global regulatory bodies continue to evaluate and modify regulatory capital requirements in response to market events in an effort to improve the stability of the international financial system. As of December 31, 2013, on a separate company basis, we were required to maintain approximately $82.5 million of minimum capital in the aggregate across all jurisdictions and approximately $27.1 million of minimum capital in the aggregate for our U.S. entity. As such, as of December 31, 2013, we had approximately $219 million of excess adjusted net capital over this required regulated capital in all jurisdictions and $37.1 million in our U.S. entity.

For further information regarding the risks associated with the regulation of our business and industry, please see "Item 1A. Risk Factors", beginning on page 10 of this Annual Report.

**Employees**

As of December 31, 2013, we had a total of 874 full-time employees and 60 full-time contractors, 480 of which were based in the United States and 394 of which were based outside the United States. We have assembled what we believe is a highly talented group of employees many of whom have been with the firm since our founding. We believe our culture promotes a strong sense of loyalty, customer focus and high ethical standards. None of our domestic employees are covered by collective bargaining agreements. We believe that our relations with our employees are good.

9

TABLE OF CONTENTS

**Available Information**

Our website address is *http://www.fxcm.com*. The content on our website is available for information purposes only. It should not be relied upon for investment purposes, nor is it incorporated by reference into this Annual Report, unless expressly noted. We file reports with the SEC, which we make available on the Investor Relations section of our website free of charge. These reports include our Annual Report on Form 10-K, Quarterly Reports on Form 10-Q and Current Reports on Form 8-K, each of which is provided on our website as soon as reasonably practicable after we electronically file such materials with or furnish them to the SEC. We also make, or will make, available through our website other reports filed with or furnished to the SEC under the Exchange Act, including our Proxy Statements and reports filed by officers and directors under Section 16(a) of that Act.

**Item 1A. Risk Factors**

An investment in our securities involves risk and uncertainties. The risks and uncertainties set forth below are those that we currently believe may materially and adversely affect us, our future business or results of operations, or investments in our securities. Additional risks and uncertainties that we are unaware of or that we currently deem immaterial may also materially and adversely affect us, our future business or results of operations, or investments in our securities.

**Risks Related to Our Business**

***The FX market has only recently become accessible to retail investors and, accordingly, we have a limited operating history upon which to evaluate our performance.***

The FX market has only recently become accessible to retail investors. Prior to 1996, retail investors generally did not directly trade in the FX market, and we believe most current retail FX traders only recently viewed currency trading as a practical alternative investment class. Our FX trading operations were launched in 1999, at which time we began offering FX trading services domestically and internationally. Accordingly, we have a limited operating history in a relatively new international retail FX trading market upon which you can evaluate our prospects and future performance. Our prospects may be materially adversely affected by the risks, expenses and difficulties frequently encountered in the operation of a new business in a rapidly evolving industry characterized by intense competition and evolving regulatory oversight and rules.

***Our revenue and profitability are influenced by trading volume and currency volatility, which are directly impacted by domestic and international market and economic conditions that are beyond our control.***

Our revenue is influenced by the general level of trading activity in the FX market. It is difficult to predict volatility and its effects in the FX markets. Our revenue and operating results may vary significantly from period to period due primarily to movements and trends in the world's currency markets and to fluctuations in trading levels. We have generally experienced greater trading volume and higher revenue in periods of volatile currency markets. Significant swings in the market volatility can also result in increased customer trading losses, higher turnover and reduced trading volume. In the event we experience lower levels of currency volatility, our revenue and profitability may be negatively affected.

Like other financial services firms, our business and profitability are directly affected by factors that are beyond our control, such as economic and political conditions, broad trends in business and finance, changes in the volume of foreign currency transactions, changes in supply and demand for currencies, movements in currency exchange rates, changes in the financial strength of market participants, legislative and regulatory changes, changes in the markets in which such transactions occur, changes in how such transactions are processed and disruptions due to terrorism, war or extreme weather events. Any one or more of these factors, or other factors, may adversely affect our business and results of operations and cash flows. A weakness in equity markets, could result in reduced trading activity in the FX market and therefore could have a material adverse effect on our business, financial condition and results of operations and cash flows. As a result, period to period comparisons of our operating results may not be meaningful and our future operating results may be subject to significant fluctuations or declines.

***Our risk management policies and procedures may not be effective and may leave us exposed to unidentified or unexpected risks.***

We are dependent on our risk management policies and the adherence to such policies by our trading staff. Our policies, procedures and practices are used to identify, monitor and control a variety of risks, including risks related to market exposure, human error, customer defaults, market movements, fraud and money-laundering. Some of our methods for managing risk are discretionary by nature and are based on internally developed controls and observed historical market behavior, and also

10

TABLE OF CONTENTS

involve reliance on standard industry practices. These methods may not adequately prevent losses, particularly as they relate to extreme market movements, which may be significantly greater than historical changes in market prices. Our risk management methods also may not adequately prevent losses due to technical errors if our testing and quality control practices are not effective in preventing software or hardware failures. In addition, we may elect to adjust our risk management policies to allow for an increase in risk tolerance, which could expose us to the risk of greater losses. Our risk management methods rely on a combination of technical and human controls and supervision that are subject to error and failure. These methods may not protect us against all risks or may protect us less than anticipated, in which case our business, financial condition and results of operations and cash flows may be materially adversely affected.

***We depend on our proprietary technology. Any disruption or corruption of our proprietary technology or our inability to maintain technological superiority in our industry could have a material adverse effect on our business, financial condition and results of operations and cash flows. We may experience failures while developing our proprietary technology.***

We rely on our proprietary technology to receive and properly process internal and external data. Any disruption for any reason in the proper functioning, or any corruption, of our software or erroneous or corrupted data may cause us to make erroneous trades, accept customers from jurisdictions where we do not possess the proper licenses, authorizations or permits, or require us to suspend our services and could have a material adverse effect on our business, financial condition and results of operations and cash flows. For example, our technology platform includes a real time margin-watcher feature to ensure that open positions are automatically closed out if a customer becomes at risk of going into a negative balance on his or her account. Any disruption or corruption of this feature would subject us to the risk that amounts owed to us by such customer exceed the collateral in such customer's account, and our policy is generally not to pursue claims for negative equity against our customers.

In order to remain competitive, we need to continuously develop and redesign our proprietary technology. In doing so, there is an ongoing risk that failures may occur and result in service interruptions or other negative consequences, such as slower quote aggregation, slower trade execution, erroneous trades, or mistaken risk management information.

Our success in the past has largely been attributable to our proprietary technology that has taken us many years to develop. We believe our proprietary technology has provided us with a competitive advantage relative to many FX market participants. If our competitors develop more advanced technologies, we may be required to devote substantial resources to the development of more advanced technology to remain competitive. The FX market is characterized by rapidly changing technology, evolving industry standards and changing trading systems, practices and techniques. We may not be able to keep up with these rapid changes in the future, develop new technology, realize a return on amounts invested in developing new technologies, and as such, may not remain competitive in the future.

***System failures could cause interruptions in our services or decreases in the responsiveness of our services which could harm our business.***

If our systems fail to perform, we could experience disruptions in operations, slower response times or decreased customer service and customer satisfaction. Our ability to facilitate transactions successfully and provide high quality customer service depends on the efficient and uninterrupted operation of our computer and communications hardware and software systems. Our systems also are vulnerable to damage or interruption from human error, natural disasters, power loss, telecommunication failures, break-ins, sabotage, computer viruses, intentional acts of vandalism and similar events. We do not have fully redundant capabilities. While we currently maintain a disaster recovery plan ("DRP"), which is intended to minimize service interruptions and secure data integrity, our DRP may not work effectively during an emergency. Any system failure that causes an interruption in our services, decreases the responsiveness of our services or affects access to our services could impair our reputation, damage our brand name and materially adversely affect our business, financial condition and results of operations and cash flows.

***We may not be able to protect our intellectual property rights or may be prevented from using intellectual property necessary for our business.***

We rely on a combination of trademark, copyright, trade secret and fair business practice laws in the United States and other jurisdictions to protect our proprietary technology, intellectual property rights and our brand. We also enter into confidentiality and invention assignment agreements with our employees and consultants, and confidentiality agreements with other third parties. We also rigorously control access to our proprietary technology. It is possible that third parties may copy or otherwise obtain and use our proprietary technology without authorization or otherwise infringe on our rights. We may also face claims of infringement that could interfere with our ability to use technology that is material to our business operations.

11

TABLE OF CONTENTS

In the future, we may have to rely on litigation to enforce our intellectual property rights, protect our trade secrets, determine the validity and scope of the proprietary rights of others or defend against claims of infringement or invalidity. Any such litigation, whether successful or unsuccessful, could result in substantial costs and the diversion of resources and the attention of management, any of which could negatively affect our business.

***Our cost structure is largely fixed. If our revenues decline and we are unable to reduce our costs, our profitability will be adversely affected.***

Our cost structure is largely fixed. We base our cost structure on historical and expected levels of demand for our products and services, as well as our fixed operating infrastructure, such as computer hardware and software, hosting facilities and security and staffing levels. If demand for our products and services declines and, as a result, our revenues decline, we may not be able to adjust our cost structure on a timely basis and our profitability may be materially adversely affected.

***We operate in a heavily regulated environment that imposes significant compliance requirements and costs on us. Failure to comply with the rapidly evolving laws and regulations governing our FX and other businesses may result in regulatory agencies taking action against us and significant legal expenses in defending ourselves, which could adversely affect our revenues and the way we conduct our business.***

We are regulated by governmental bodies and/or self-regulatory organizations in a number of jurisdictions, including the U.S., the U.K., Hong Kong, Australia and Japan. We are also exposed to substantial risks of liability under federal and state securities laws, federal commodity futures laws, other federal and state laws and court decisions, as well as rules and regulations promulgated by the SEC, the Federal Reserve and state securities regulators.

Many of the regulations we are governed by are intended to protect the public, our customers and the integrity of the markets, and not necessarily our shareholders. Substantially all of our operations involving the execution and clearing of transactions in foreign currencies, CFDs, gold and silver and securities are conducted through subsidiaries that are regulated by governmental bodies or self-regulatory organizations. In the U.S., we are principally regulated by the CFTC and the NFA. We are also regulated in all regions by applicable regulatory authorities and the various exchanges of which we are members. For example, we are regulated by the FCA, the SFC, the ASIC, the KLFB, the JFSA and the FFAJ. In addition, certain of our branch offices in Europe, while subject to local regulators, are regulated by the FCA with respect to, among other things, FX, CFDs and net capital requirements. These regulators and self-regulatory organizations regulate the conduct of our business in many ways and conduct regular examinations of our business to monitor our compliance with these regulations. Among other things, we are subject to regulation with regard to:

•   our sales practices, including our interaction with and solicitation of customers and our marketing activities;

•   the custody, control and safeguarding of our customers' assets;

•   account statements, record-keeping and retention;

•   maintaining specified minimum amounts of capital and limiting withdrawals of funds from our regulated operating subsidiaries;

•   making regular financial and other reports to regulators;

•   anti-money laundering practices;

•   licensing for our operating subsidiaries and our employees;

•   the conduct of our directors, officers, employees and affiliates; and

•   supervision of our business.

Compliance with these regulations is complicated, time consuming and expensive. Even minor, inadvertent irregularities can potentially give rise to claims that applicable laws and regulations have been violated. Failure to comply with all potentially applicable laws and regulations could lead to fines and other penalties which could adversely affect our revenues and our ability to conduct our business as planned. In addition, we could incur significant legal expenses in defending ourselves against and resolving actions or investigations by such regulatory agencies.

***We accept customers from many jurisdictions in a manner which we believe does not require local registration, licensing or authorization. As a result, our growth may be limited by future restrictions in these jurisdictions and we remain at risk that we may be exposed to civil or criminal penalties or be required to cease operations if we are found to be operating in jurisdictions without the proper license or authorization or if we become subject to regulation by local government bodies.***

12

TABLE OF CONTENTS

Trading volume for 2013 with customers resident in jurisdictions in which we or our agents are not licensed or authorized by governmental bodies and/or self-regulatory organizations was, in the aggregate, approximately 45.4% of our total customer trading volume. We seek to deal with customers resident in foreign jurisdictions in a manner which does not breach any local laws or regulations where they are resident or require local registration, licensing or authorization from local governmental or regulatory bodies or self-regulatory organizations. We determine the nature and extent of services we can provide and the manner in which we conduct our business with customers resident in foreign jurisdictions based on a variety of factors.

In jurisdictions where we are not licensed or authorized, we are generally restricted from direct marketing to retail investors including the operation of a website specifically targeted to investors in a particular foreign jurisdiction. This restriction may limit our ability to grow our business in such jurisdictions or may result in increased overhead costs or lower service quality to customers in such jurisdictions. Accordingly, we currently have only a limited presence in a number of significant markets and may not be able to gain a significant presence there unless and until legal and regulatory barriers to international firms in certain of those markets are modified. Existing and future legal and regulatory requirements and restrictions may adversely impact our international expansion on an ongoing basis and we may not be able to successfully develop our business in a number of markets, including emerging markets, as we currently plan.

We generally consult with local counsel in jurisdictions where our total retail trading volume per jurisdiction is greater than 1%. In the aggregate, these jurisdictions represent approximately 81.7% of our total retail customer trading volume. We consult with local counsel in these jurisdictions for advice regarding whether we are operating in compliance with local laws and regulations (including whether we are required to be licensed or authorized) or, in some cases where licensing or authorization requirements could be read to be applicable to foreign dealers without a local presence, whether such requirements are generally not enforced. We generally do not consult with local counsel in jurisdictions where the total retail trading volume per jurisdiction is less than 1%. These jurisdictions represent approximately 18.3% of our total trading volume in the aggregate. In these jurisdictions that each have less than 1% of our total trading volume, we are accordingly exposed to the risk that we may be found to be operating in jurisdictions without required licenses or authorizations or without being in compliance with local legal or regulatory requirements. Furthermore, where we have taken legal advice we are exposed to the risk that our legal and regulatory analysis is subsequently determined by a local regulatory agency or other authority to be incorrect and that we have not been in compliance with local laws or regulations (including local licensing or authorization requirements) and to the risk that the regulatory environment in a jurisdiction may change, including a circumstance where laws or regulations or licensing or authorization requirements that previously were not enforced become subject to enforcement. In any of these circumstances, we may be subject to sanctions, fines and restrictions on our business or other civil or criminal penalties and our contracts with customers may be void or unenforceable, which could lead to losses relating to restitution of client funds or principal risk on open positions. Any such action in one jurisdiction could also trigger similar actions in other jurisdictions. We may also be required to cease the conduct of our business with customers in any such jurisdiction and/or we may determine that compliance with the laws or licensing, authorization or other regulatory requirements for continuance of the business are too onerous to justify making the necessary changes to continue that business. In addition, any such event could impact our relationship with the regulators or self-regulatory organizations in the jurisdictions where we are subject to regulation, including our regulatory compliance or authorizations. If sanctions, fines, restrictions on our business or other penalties are imposed on us for failure to comply with applicable legal requirements, guidelines or regulations, our financial condition and results of operations, and our reputation and ability to engage in business, may be materially adversely affected.

We periodically evaluate our activities in relation to jurisdictions in which we are not currently regulated by governmental bodies and/or self-regulatory organizations on an ongoing basis. This evaluation may involve speaking with regulators, local counsel and referring brokers or white labels (firms that offer our trading services to their clients under their own brand name in exchange for a revenue sharing arrangement with us) operating in any such jurisdiction and reviewing published regulatory guidance and examining the licenses that any competing firms may have. As a result of these evaluations we may determine to alter our business practices in order to comply with legal or regulatory developments in such jurisdictions and, at any given time, are generally in various stages of updating our business practices in relation to various jurisdictions. For example, in 2010, we received a request from the JFSA, the regulatory authority responsible for the regulation of FX trading in Japan, that we submit a plan for coming into compliance with JFSA requirements with respect to transacting business with Japanese retail customers who register to trade with foreign entities not regulated by the JFSA. Accordingly, we submitted a plan to the JFSA to transfer our Japanese retail customers registered with any of our subsidiaries to our subsidiary, FXCM Japan Securities Co. Limited ("FXCMJ"), which is also regulated with the KLFB in Japan. As of December 31, 2013, no Japanese clients are trading directly with an FXCM entity other than FXCMJ. In Canada, the securities and derivatives industry is governed locally by provincial or territorial legislation, and there is no national regulator. The regulation of FX products differs from province to province and territory to territory. For example, the provincial laws of British Columbia would require us to register as an investment dealer to offer our trading services directly. We previously conducted our business in British Columbia through an affiliate that was a registered exchange contract dealer with the British Columbia Securities Commission. We currently conduct

13

Cited in In re Global...
17Cv916 Decided...
Archived on 3/23/21
This document is protected by copyright
Further reproduction is prohibited without permission

TABLE OF CONTENTS

our business in British Columbia through an arrangement with a registered investment dealer in Canada. In other provinces and territories in Canada, where we conduct the bulk of our Canadian business, we have historically provided our services directly from our U.S. facilities, without registering as a dealer in Canada. We are aware that local regulators in certain Canadian provinces and territories have begun to determine that FX trading services must be carried out through a registered investment dealer. Accordingly, we have entered an agreement with a registered investment dealer to address these regulatory developments.

As a result of these, among other potential future changes in our business practices in certain jurisdictions, customers may decide to transact their business with a different FX broker, which may adversely affect our revenue and profitability. We may also be subject to enforcement actions and penalties by the regulatory authorities of those jurisdictions or be subject to customer claims.

***We conduct our business within a heavily regulated environment and may be exposed to increased compliance costs or may be restricted from entering new markets as a result of extensive regulatory requirements.***

The cost of compliance with international regulations may adversely increase our costs, affect our revenue and impede our ability to expand internationally. Since we operate our business internationally, we are subject to regulations in many different countries in which we operate. If we are required to comply with new regulations or new or different interpretations of existing regulations, or if we are unable to comply with these regulations or interpretations, our business could be adversely affected, or the cost of compliance may make it difficult to expand into new international markets, or we may be liable for additional costs, which may be substantial.

***Servicing customers via the internet may require us to comply with the laws and regulations of each country in which we are deemed to conduct business. Failure to comply with such laws may negatively impact our financial results.***

Since our services are available over the internet in foreign countries and we have customers residing in foreign countries, foreign jurisdictions may require us to qualify to do business in their country. We believe that the number of our customers residing outside of the United States will increase over time. We are required to comply with the laws and regulations of each country in which we conduct business, including laws and regulations currently in place or which may be enacted related to internet services available to their citizens from service providers located elsewhere. Any failure to develop effective compliance and reporting systems could result in regulatory penalties in the applicable jurisdiction, which could have a material adverse effect on our business, financial condition and results of operations and cash flows.

***Our failure to comply with regulatory requirements could subject us to sanctions and could have a material adverse effect on our business, financial condition and results of operations and cash flows.***

Many of the laws and regulations by which we are governed grant regulators broad powers to investigate and enforce compliance with their rules and regulations and to impose penalties and other sanctions for non-compliance. Our ability to comply with all applicable laws and regulations is dependent in large part on our internal compliance function as well as our ability to attract and retain qualified compliance personnel, which we may not be able to do. If a regulator finds that we have failed to comply with applicable rules and regulations, we may be subject to censure, fines, cease-and-desist orders, suspension of our business, removal of personnel, civil litigation or other sanctions, including, in some cases, increased reporting requirements or other undertakings, revocation of our operating licenses or criminal conviction. Any disciplinary action taken against us could result in negative publicity, potential litigation, remediation costs and loss of customers which could have a material adverse effect on our business, financial condition and results of operations and cash flows.

In August 2011, Forex Capital Markets, L.L.C. ("US") entered into a settlement with the NFA. The settlement terms principally pertain to FXCM's practice concerning the execution of price improvements or "positive slippage" in its trading execution system prior to August 2010. Under the terms of the settlement, US agreed, without admitting or denying any of the allegations to pay a fine of $2.0 million to the NFA and to provide restitution to the affected clients.

In October 2011, US entered into a settlement with the CFTC. The settlement principally addressed allegations regarding US's failure to monitor and maintain its trading systems prior to August 2010. US had previously settled with the NFA for allegations regarding mainly the same underlying issues. Under the terms of the settlement, US agreed, without admitting or denying any of the allegations, to pay a fine of $6.0 million to the CFTC and to provide restitution to the affected clients.

In September 2012, the FCA initiated investigations relating to the past trade execution practices of Forex Capital Markets Limited ("UK") and FSL. Following a prolonged period of responding to information requests, in January 2014 UK and FSL entered into a settlement with the FCA. The settlement pertains principally to FXCM's practice concerning the execution of

14

Cited in Oral Decision 3/16/21
17Cv916 Gual Brokerage
Archived 3/23/21
This document is protected by copyright.
Further reproduction is prohibited without permission.

TABLE OF CONTENTS

price improvements or 'positive slippage' in its execution systems prior to August 2010. Under the terms of the settlement UK and FSL agreed to pay a fine of £4 million to the FCA and to provide restitution to the affected clients.

Following discussions with the JFSA, in July 2012, FXCMJ paid a price adjustment to certain clients who executed trades between June 30, 2008 through to December 17, 2010. We settled this matter for $2.3 million, which included an administrative penalty, during the first quarter of 2013.

***The regulatory environment in which we operate is subject to continual change. Changes in the regulatory environment could have a material adverse effect on our business, financial condition and results of operations and cash flows.***

The legislative and regulatory environment in which we operate has undergone significant changes in the recent past and there may be future regulatory changes in our industry. The financial services industry in general has been subject to increasing regulatory oversight in recent years. The governmental bodies and self-regulatory organizations that regulate our business have proposed and may consider additional legislative and regulatory initiatives and may adopt new or revised laws and regulations. As a result, in the future, we may become subject to new regulations that may affect the way in which we conduct our business and may make our business less profitable. For example, a regulatory body may reduce the levels of leverage we are allowed to offer to our customers, which may adversely impact our business, financial condition and results of operations and cash flows. Changes in the interpretation or enforcement of existing laws and regulations by those entities may also adversely affect our business.

For example, in August 2010, the CFTC released final rules relating to retail FX regarding, among other things, registration, disclosure, recordkeeping, financial reporting, minimum capital and other operational standards. Most significantly the regulations:

- impose an initial minimum security deposit amount of 2% of the notional value for major currency pairs as designated by NFA from time to time and 5% of the notional value for all other retail FX transactions.

- provide that referring brokers must either meet the minimum net capital requirements applicable to futures and commodity options or enter into a guarantee agreement with a CFTC-regulated FX dealer member, along with a requirement that such referring broker may be a party to only one guarantee agreement at a time;

- prohibit the making of guarantees against loss to retail FX customers by futures commission merchant ("FCMs"), retail foreign exchange dealer ("RFEDs") and referring brokers and require that FCMs, RFEDs and referring brokers provide retail FX customers with enhanced written disclosure statements that, among other things, inform customers of the risk of loss.

- require that the risk disclosure statement provided to every retail FX customer include disclosure of the number of non-discretionary accounts maintained by the FCM, or RFED, that were profitable and those that were not during the four most recent calendar quarters;

- require us to ensure that our customers resident in the United States have accounts with our NFA-registered operating entity;

- require that FCMs and RFEDs are obligated when re-quoting prices to do so in a symmetrical fashion so that the re-quoted prices do not represent an increase in the spread from the initially quoted prices, regardless of the direction the market moves.

In addition, the Dodd-Frank Wall Street Reform and Consumer Protection Act, ("Dodd-Frank Act"), enacted in July 2010 has had broad effects on the derivatives markets generally. In response to the rulemakings by the CFTC and SEC under the Dodd-Frank Act that defined the term "swap", FXCM conducted an in-depth review of the products offered by the firm. FXCM applied for registration as a "Swap Dealer" on December 31, 2012 and has been granted provisional status. FXCM will continue to monitor the applicability of the rules to the firm's existing business practices. This law and related regulatory requirements may affect the ability of FX market makers to do business or affect the prices and terms on which such market makers will do business with us. The Dodd-Frank Act may also affect the structure, size, depth and liquidity of the FX markets generally. These effects may adversely impact our ability to provide FX transactions to our customers and could have a material adverse effect on our business and profitability.

The European Markets Infrastructure Regulation ("EMIR") is the new European regulations on OTC derivatives, central counterparties and trade repositories. The EMIR has completed the European legislative process and is being implemented across the EU member states. The EMIR imposes three new requirements on our European operations: (a) report derivatives to a trade repository (b) clear OTC derivatives that have been declared subject to the clearing obligation through a central

15

Cited in In re
17CV916 December 31
Archived on 3/1/21
This document is protected by copyright.
Further reproduction is prohibited without permission.

TABLE OF CONTENTS

counterparty and (c) put in place certain risk management procedures for OTC derivative transactions that are not cleared. Current attention is being focused on the reporting requirements which take effect in February 2014.

In addition, the ASIC is considering new regulations which would limit any inappropriate advertising by the FX industry, provide disclosure benchmarks for over-the-counter CFD providers, and devise a policy on customer suitability.

Additionally, the JFSA announced in August 2010 that maximum leverage for Japanese customers would be reduced from 100-to-1 to 50-to-1, and then announced a further reduction from 50-to-1 to 25-to-1, effective August 2011. In Korea, the Financial Services Commission and the Financial Supervisory Services announced that, as of March 2012, FX traders would be limited to 10-to-1 leverage, down from 20-to-1, and down from 50-to-1 in September 2009.The continued impact of these regulations may diminish trading volume of our customers which can affect our revenue and profitability.

The Foreign Account Tax Compliance Act ("FATCA"), enacted in 2010 as part of the Hiring Incentives to Restore Employment Act, imposes a new system of information reporting and a new 30% withholding tax on "withholdable" payments made by U.S. persons and others to foreign financial institutions ("FFI"s) and certain non-financial foreign entities ("NFFE"s) that do not meet the information reporting requirements of FATCA. In certain circumstances, certain of our non-U.S. entities through which payments are made may be required to withhold U.S. tax at a rate of 30% on all, or a portion of, payments made after June 30, 2014. Under FATCA, non-U.S. financial institutions generally will be required to enter into agreements with the U.S. Internal Revenue Service to identify financial accounts held by U.S. persons or entities with substantial U.S. ownership, as well as accounts of other financial institutions that are not themselves participating in, or otherwise exempt from, the FATCA reporting regime. FATCA is complex and its application to FXCM is uncertain at this time. Compliance with FATCA could have a material adverse effect on our business, financial condition and cash flow.

These and other future regulatory changes could have a material adverse effect on our business and profitability and the FX industry as a whole.

In addition, the regulatory enforcement environment has created uncertainty with respect to certain practices or types of transactions that, in the past, were considered permissible and appropriate among financial services firms, but that later have been called into question or with respect to which additional regulatory requirements have been imposed. Legal or regulatory uncertainty and additional regulatory requirements could adversely affect our business.

***We are required to maintain high levels of regulatory capital, which could constrain our growth and subject us to regulatory sanctions.***

The CFTC, NFA and other U.S. and non-U.S. regulators have stringent rules requiring that we maintain specific minimum levels of regulatory capital in our operating subsidiaries that conduct our spot foreign exchange, CFDs, including contracts for gold, silver, oil and stock indices and securities business. As of December 31, 2013, on a separate company basis, we were required to maintain approximately $82.5 million of minimum net capital in the aggregate across all jurisdictions. Regulators continue to evaluate and modify minimum capital requirements from time to time in response to market events and to improve the stability of the international financial system.

More recently, the EU has announced that it is in the process of implementing amendments to its Capital Requirements Directive ("CRD IV"), which seeks to strengthen its capital requirements and liquidity rules as well as expand certain reporting obligations. CRD IV legislation was entered into on January 1, 2014 and will gradually be implemented over a period until January 2019. The direct effect of the legislation on us is not known at this time, but we will continue to monitor the potential impact on our U.S. subsidiaries.

Even if regulators do not change existing regulations or adopt new ones, our minimum capital requirements will generally increase in proportion to the size of our business conducted by our regulated subsidiaries. As a result, we will need to increase our regulatory capital in order to expand our operations and increase our revenue, and our inability to increase our capital on a cost-efficient basis could constrain our growth. In addition, in many cases, we are not permitted to withdraw regulatory capital maintained by our subsidiaries without prior regulatory approval or notice, which could constrain our ability to allocate our capital resources most efficiently throughout our global operations. In particular, these restrictions could limit our ability to pay dividends or make other distributions on our shares and, in some cases, could adversely affect our ability to withdraw funds needed to satisfy our ongoing operating expenses, debt service and other cash needs.

Regulators monitor our levels of capital closely. We are required to report the amount of regulatory capital we maintain to our regulators on a periodic basis, and to report any deficiencies or material declines promptly. While we expect that our

16

Cited in In re Global Brokerage, Inc.
17CV916 Defendants' Exhibit
Archived on 3/2/21
This document is protected by copyright
Further reproduction is prohibited without permission

TABLE OF CONTENTS

current amount of regulatory capital will be sufficient to meet anticipated short-term increases in requirements, any failure to maintain the required levels of regulatory capital, or to report any capital deficiencies or material declines in capital could result in severe sanctions, including fines, censure, restrictions on our ability to conduct business and revocation of our registrations. The imposition of one or more of these sanctions could ultimately lead to our liquidation, or the liquidation of one or more of our subsidiaries.

***Procedures and requirements of the Patriot Act and similar laws may expose us to significant costs or penalties.***

As a financial services firm, we and our subsidiaries are subject to laws and regulations, including the Patriot Act, that require that we know our customers and monitor transactions for suspicious financial activities. The cost of complying with the Patriot Act and related laws and regulations is significant. We face the risk that our policies, procedures, technology and personnel directed toward complying with the Patriot Act and similar laws and regulations are insufficient and that we could be subject to significant criminal and civil penalties or reputational damage due to noncompliance. Such penalties and subsequent remediation costs could have a material adverse effect on our business, financial condition and results of operations and cash flows.

***Due to the evolving nature of financial regulations in certain jurisdictions of the world, our operations may be disrupted if a regulatory authority deems them inappropriate and requires us to comply with additional regulatory requirements.***

The legislative and regulatory environment in which we operate has undergone, and is undergoing, significant changes in the recent past and there may be future regulatory changes affecting our industry. The financial services industry in general has been subject to increasing regulatory oversight in various jurisdictions throughout the world, including the jurisdictions in which we operate. We have benefited from recent regulatory liberalization in several emerging markets in developing regions enabling us to increase our presence in those markets. Our ability to continue to expand our presence in these regions, however, will depend to a large extent upon continued evolution of the regulatory environment in these several markets, and there is no assurance that favorable regulatory trends will continue. Moreover, we currently have only a limited presence in a number of significant markets and may not be able to gain a significant presence there unless and until regulatory barriers to international firms in certain of those markets are modified. Consequently, our recent success in various regions may not continue or we may not be able to develop our business in emerging markets as we currently plan. To the extent current activities are deemed inappropriate, we may incur a disruption in services offered to current customers as we are forced to comply with additional regulations.

***Attrition of customer accounts and failure to attract new accounts could have a material adverse effect on our business, financial condition and results of operations and cash flows. Even if we do attract new customers, we may fail to attract the customers in a cost-effective manner, which could materially adversely affect our profitability and growth.***

Our customer base is primarily comprised of individual retail customers. Although we offer products and tailored services designed to educate, support and retain our customers, our efforts to attract new customers or reduce the attrition rate of our existing customers may not be successful. If we are unable to maintain or increase our customer retention rates or generate a substantial number of new customers in a cost-effective manner, our business, financial condition, results of operations and comprehensive income and cash flows would likely be adversely affected. For the year ended December 31, 2013, we incurred advertising and marketing expenses of $27.1 million. Although we have spent significant financial resources on advertising and marketing expenses, these efforts may not be a cost-effective way to attract new customers. We may be disadvantaged relative to our larger competitors in our ability to expand or maintain our advertising and marketing commitments, which may raise our customer acquisition costs. Additionally, our advertising and marketing methods are subject to regulation. The rules and regulations of various regulators impose specific limitations on our sales methods, advertising and marketing. If we do not achieve our advertising objectives, our profitability and growth may be materially adversely affected.

***We are subject to litigation risk which could adversely affect our reputation, business, financial condition and results of operations and cash flows.***

Many aspects of our business involve risks that expose us to liability under U.S. federal and state laws, as well as the rules and enforcement efforts of our regulators and self-regulatory organizations worldwide. These risks include, among others, disputes over trade terms with customers and other market participants, customer losses resulting from system delay or failure and customer claims that we or our employees executed unauthorized transactions, made materially false or misleading statements or lost or diverted customer assets in our custody. We may also be subject to regulatory investigation and enforcement actions seeking to impose significant fines or other sanctions, which in turn could trigger civil litigation for our previous operations that may be deemed to have violated applicable rules and regulations in various jurisdictions.

17

Cited in In re Global Brokerage
17CV916 Decided on 3/23/21
Archived on 3/23/21
This document is protected by copyright.
Further reproduction is prohibited without permission.

TABLE OF CONTENTS

The volume of claims and the amount of damages and fines claimed in litigation and regulatory proceedings against financial services firms have been increasing, particularly in the current environment of heightened scrutiny of financial institutions. The amounts involved in the trades we execute, together with rapid price movements in our currency pairs, can result in potentially large damage claims in any litigation resulting from such trades. Dissatisfied customers may make claims against us regarding the quality of trade execution, improperly settled trades, mismanagement or even fraud, and these claims may increase as our business expands.

Litigation may also arise from disputes over the exercise of our rights with respect to customer accounts. Although our customer agreements generally provide that we may exercise such rights with respect to customer accounts as we deem reasonably necessary for our protection, our exercise of these rights may lead to claims by customers that we did so improperly.

Even if we prevail in any litigation or enforcement proceedings against us, we could incur significant legal expenses defending against the claims, even those without merit. Moreover, because even claims without merit can damage our reputation or raise concerns among our customers, we may feel compelled to settle claims at significant cost. The initiation of any claim, proceeding or investigation against us, or an adverse resolution of any such matter could have a material adverse effect on our reputation, business, financial condition and results of operations and cash flows.

Please see "Item 3. Legal Proceedings" beginning on page 34 of this Annual Report for a description of pending material legal proceedings we are currently involved in.

***We may be subject to customer litigation, financial losses, regulatory sanctions and harm to our reputation as a result of employee misconduct or errors that are difficult to detect and deter.***

There have been a number of highly publicized cases involving fraud or other misconduct by employees of financial services firms in recent years. Our employees could execute unauthorized transactions for our customers, use customer assets improperly or without authorization, carry out improper activities on behalf of customers or use confidential customer or company information for personal or other improper purposes, as well as misrecord or otherwise try to hide improper activities from us.

In addition, employee errors, including mistakes in executing, recording or reporting transactions for customers, may cause us to enter into transactions that customers disavow and refuse to settle. Employee errors expose us to the risk of material losses until the errors are detected and the transactions are reversed. The risk of employee error or miscommunication may be greater for products that are new or have non-standardized terms. Further, such errors may be more likely to occur in the aftermath of any acquisitions during the integration of or migration from technological systems.

Misconduct by our employees or former employees could subject us to financial losses or regulatory sanctions and seriously harm our reputation. It may not be possible to deter or detect employee misconduct and the precautions we take to prevent and detect this activity may not be effective in all cases. Our employees may also commit good faith errors that could subject us to financial claims for negligence or otherwise, as well as regulatory actions.

Misconduct by employees of our customers can also expose us to claims for financial losses or regulatory proceedings when it is alleged we or our employees knew or should have known that an employee of our customer was not authorized to undertake certain transactions. Dissatisfied customers can make claims against us, including claims for negligence, fraud, unauthorized trading, failure to supervise, breach of fiduciary duty, employee errors, intentional misconduct, unauthorized transactions by associated persons and failures in the processing of transactions.

***Any restriction in the availability of credit cards as a payment option for our customers could adversely affect our business, financial condition and results of operations and cash flows.***

We currently allow our customers to use credit cards to fund their accounts with us. There is a risk that in the future, new regulations or credit card issuing institutions may restrict the use of credit and debit cards as a means to fund accounts used to trade in investment products. In 2013, the NFA published a request for comments on a rule proposal to prohibit the use of credit cards to fund customer trading accounts. Deposits from credit cards, globally, represented 28.5% of total cash deposits in 2013 whereas deposits from credit cards of U.S. customers represented 3.0% of total cash deposits in 2012. The elimination or a reduction in the availability of credit cards as a means to fund customer accounts, particularly for our customers residing outside the United States, could have a material adverse effect on our business, financial condition and results of operations and cash flows.

18

Cited in In re Global Brokerage
17CV916 Decided 3/23/21
Archived on 3/23/21
This document is protected by copyright.
Further reproduction is prohibited without permission.

TABLE OF CONTENTS

*Our customer accounts may be vulnerable to identity theft and credit card fraud.*

Credit card issuers have adopted credit card security guidelines as part of their ongoing efforts to prevent identity theft and credit card fraud. We continue to work with credit card issuers to ensure that our services, including customer account maintenance, comply with these rules. There can be no assurances, however, that our services are fully protected from unauthorized access or hacking. If there is unauthorized access to credit card data that results in financial loss, we may experience reputational damage and parties could seek damages from us.

*In the current environment facing financial services firms, a firm's reputation is critically important. If our reputation is harmed, or the reputation of the online financial services industry as a whole or retail FX industry is harmed, our business, financial condition and results of operations and cash flows may be materially adversely affected.*

Our ability to attract and retain customers and employees may be adversely affected if our reputation is damaged. If we fail, or appear to fail, to deal with issues that may give rise to reputation risk, we could harm our business prospects. These issues include, but are not limited to, appropriately dealing with potential conflicts of interest, legal and regulatory requirements, ethical issues, money-laundering, privacy, customer data protection, record-keeping, sales and trading practices, and the proper identification of the legal, credit, liquidity, operational and market risks inherent in our business. Failure to appropriately address these issues could also give rise to additional legal risk to us, which could, in turn, increase the size and number of claims and damages asserted against us or subject us to regulatory enforcement actions, fines and penalties. Any such sanction would materially adversely affect our reputation, thereby reducing our ability to attract and retain customers and employees.

In addition, our ability to attract and retain customers may be adversely affected if the reputation of the online financial services industry as a whole or retail FX industry is damaged. In recent years, a number of financial services firms have suffered significant damage to their reputations from highly publicized incidents that in turn resulted in significant and in some cases irreparable harm to their business. The perception of instability within the online financial services industry could materially adversely affect our ability to attract and retain customers.

*The loss of members of our senior management could compromise our ability to effectively manage our business and pursue our growth strategy.*

We rely on members of our senior management to execute our existing business plans and to identify and pursue new opportunities. Our chief executive officer, Drew Niv, has been our chief executive officer since our founding and was one of our founders. Certain others on our management team have been with us for most of our history and have significant experience in the FX industry. Our continued success is dependent upon the retention of these and other key executive officers and employees, as well as the services provided by our trading staff, technology and programming specialists and a number of other key managerial, marketing, planning, financial, technical and operations personnel. The loss of such key personnel could have a material adverse effect on our business. In addition, our ability to grow our business is dependent, to a large degree, on our ability to retain such employees.

*Our acquisitions may adversely affect our business, and new acquisitions or joint ventures that we may pursue could present unforeseen integration obstacles.*

We have completed several significant acquisitions since our inception. The process of integrating the operations of these entities with ours may require a disproportionate amount of resources and management attention as the acquisitions will increase the geographic footprint of our operations, especially in Asia, Europe and the Middle East. Any substantial diversion of management attention or difficulties in operating any of the combined business could affect our ability to achieve operational, financial and strategic objectives. The unsuccessful integration of any of the operations of these entities with ours may also have adverse short-term effects on reported operating results and may lead to the loss of key personnel. In addition, customers from these entities may react unfavorably to the combination of our businesses or we may be exposed to additional liabilities of the combined business, both of which could materially adversely affect our revenue and results of operations.

We may also pursue new acquisitions or joint ventures that could present integration obstacles or costs. We may not realize any of the benefits we anticipated from the strategy and we may be exposed to additional liabilities of any acquired business, any of which could materially adversely affect our revenue and results of operations. In addition, future acquisitions or joint ventures may involve the issuance of additional limited liability company interests in FXCM Holdings, LLC ("Holdings"), or Holdings Units, or shares of our Class A common stock, which would dilute ownership.

19

Cited in In re Global Brokerage 17Cv916 Decided 3/12/21

Archived on 3/23/21

This document is protected by copyright. Further reproduction is prohibited without permission.

TABLE OF CONTENTS

*New lines of business or new products and services may subject us to additional risks.*

From time to time, we may implement new lines of business or offer new products and services within existing lines of business. There are substantial risks and uncertainties associated with these efforts, particularly in instances where the markets are not fully developed. In developing and marketing new lines of business and/or new products or services, we may invest significant time and resources. Initial timetables for the introduction and development of new lines of business and/or new products or services may not be achieved and price and profitability targets may not prove feasible. External factors, such as compliance with regulations, competitive alternatives and shifting market preferences, may also impact the successful implementation of a new line of business or a new product or service. Furthermore, any new line of business and/or new product or service could have a significant impact on the effectiveness of our system of internal controls. Failure to successfully manage these risks in the development and implementation of new lines of business or new products or services could have a material adverse effect on our business, results of operations and financial condition.

For example, we introduced trading in CFDs. Through our acquisition of ODL Group Limited ("ODL"), we increased the size of our CFD business and added spread betting and equity options. We face the same risks with these products that we face in our FX trading business, including market risk, counterparty risk, liquidity risk, technology risk, third party risk and risk of human error. Furthermore, the volatility of the CFD and spread betting markets may have an adverse impact on our ability to maintain profit margins similar to the profit margins we have realized with respect to FX trading. The introduction of these and other potential financial products also poses a risk that our risk management policies, procedures and practices, and the technology that supports such activities, will be unable to effectively manage these new risks to our business. In addition, these offerings may be subject to regulation under applicable securities or other consumer protection laws. Our non-U.S. subsidiaries, FSL and UK (which are licensed with the FCA in the U.K.), FXCM Australia Limited ("Australia") (which is licensed with the ASIC) and FXCMJ (which is licensed with the JFSA and a member of the FFAJ) offer and sell CFDs outside the United States in compliance with applicable local regulatory requirements. CFDs are not and may not be offered in the United States by us and are not eligible for resale to U.S. persons. They are not registered with the SEC or any U.S. regulator. CFDs may not be enforceable in the United States. In the event that an offer or sale of CFDs by our non-U.S. subsidiaries was to constitute an offer or sale of securities subject to the U.S. federal securities laws or swaps, futures, forwards or other instruments over which the CFTC has, or under the Dodd-Frank Act, will have jurisdiction, we would be required to comply with such U.S. laws with respect to such offering. In that event, we may determine that it would be too onerous or otherwise not feasible for us to continue such offers or sales of CFDs. We currently derive approximately 20.3% of our revenues from our CFD business.

*Lucid and our newly created entity V3 Markets, LLC, subject us to a variety of new risks*

In June 2012, we acquired a 50.1% controlling interest in Lucid. Recently, we created a new entity with the principals of Lucid, V3 Markets, LLC ("V3"), where we will also maintain a 50.1% controlling interest. V3 will contain the assets purchased from Infinium Capital Holdings LLC ("Infinium Capital") and certain of Infinium Capital's affiliates.

Lucid and V3 may expose us to a variety of new risks, including:

- Significant fluctuations in our revenues and profitability from period to period;
- Risk of trading losses;
- System failures and delays;
- Expansion into new products;
- Competition from new competitors; and
- Our failure to implement and apply new risk management controls and procedures.

Lucid's and V3's revenues and operating results vary significantly from period to period, whether due to movements and trends in the underlying markets, to competitors who are willing to trade more aggressively by decreasing their bid/offer spreads and thereby assuming more risk in order to acquire market share, to fluctuations in trading levels or otherwise. As a result, our revenues and profitability may be subject to significant fluctuations or declines.

As a market maker, Lucid provides liquidity by buying from sellers and selling to buyers. Lucid may accumulate significant positions preceding unfavorable price movements in currencies, creating the potential for trading losses. Should these events occur or increase in frequency or magnitude, we could experience material trading losses.

20

TABLE OF CONTENTS

The business activities of Lucid and V3 are heavily dependent on the integrity and performance of the computer and communications systems supporting them and the services of certain third parties. Our systems and operations are vulnerable to damage or interruption from human error, technological or operational failures, natural disasters, power loss, computer viruses, intentional acts of vandalism, terrorism and other similar events. The nature of Lucid's and V3's businesses involves a high volume of transactions made in rapid fashion which could result in certain errors being repeated or compounded before they are discovered and successfully rectified. Extraordinary trading volumes or other events could cause Lucid's or V3's computer systems to operate at an unacceptably slow speed or even fail. Lucid's and V3's necessary dependence upon automated systems to record and process transactions and large transaction volume may further increase the risk that technical flaws or employee tampering or manipulation of those systems will result in losses that are difficult to detect.

Lucid and V3 have expanded our market making and trading activities into options on selected exchange traded futures and over-the-counter FX. V3 may be exposed to additional risk due to incorrect recording and valuation of inventory as well as market events which impact large and/or illiquid positions. All of the risks that pertain to our FX business also apply to these new products, and despite the measures taken to strengthen the risk oversight of V3, we have less experience in these markets and despite a slow and thoughtful expansion, unforeseen events may have an adverse effect on our business, financial condition and results of operation.

As a result of the business of Lucid and V3, we have new competitors. Our competitors include sophisticated institutions which have larger customer bases, more established name recognition and substantially greater financial, marketing, technological and personnel resources than we do. These competitors, including commercial and investment banking firms, may have access to capital in greater amounts and at lower costs than we do, and therefore, may be better able to respond and to compete for market share generally. We may not be able to compete effectively against these firms, particularly those with greater financial resources, and our failure to do so could materially affect our business, financial condition and results of operations and cash flows.

Lucid and V3 are dependent on risk management policies and the adherence to such policies by trading staff. Policies, procedures and practices are used to identify, monitor and control a variety of risks, including market risk and risks related to human error, customer defaults, market movements, fraud and money-laundering. Some of our methods for managing risk are discretionary by nature and are based on internally developed controls and observed historical market behavior, and also involve reliance on standard industry practices. The trading activities of Lucid and V3 as principals subject us to this risk and we may need to continually implement and apply new risk management controls and procedures. We may not successfully implement and apply risk management policies and procedures that will identify, monitor and control the risks associated with principal trading.

***We offer our smaller retail clients trading through a principal model in addition to agency model, which will expose us to additional risks, including the risk of material trading losses.***

We offer our smaller retail clients the option to trade through a principal model. In our agency model, when a customer executes a trade with us, we act as a credit intermediary, or riskless principal, simultaneously entering into trades with the customer and the FX market maker. In the principal model, however, we may maintain our trading position if we believe the price may move in our favor and against the customer and not offset the trade with another party As a result, we may incur trading losses using principal model execution for a variety of reasons, including:

• Price changes in currencies;

• Lack of liquidity in currencies in which we have positions; and

• Inaccuracies in our proprietary pricing mechanism, or rate engine, which evaluates, monitors and assimilates market data and reevaluates our outstanding currency quotes and is designed to publish prices reflective of prevailing market conditions throughout the trading day.

These risks may affect the prices at which we are able to sell or buy currencies, or may limit or restrict our ability to either resell currencies that we have purchased or repurchase currencies that we have sold. In addition, competitive forces may require us to match the breadth of quotes our competitors display and to hold varying amounts and types of currencies at any given time. By having to maintain positions in certain currencies, we may be subject to a high degree of market risk.

We may not be able to successfully implement and apply risk management policies and procedures that address the risks associated with principal model execution and may otherwise fail to manage such risks successfully. Accordingly, we could

21

Cited in In re Global Brokerage
17CV916 Decided 3/30/21
Archived on 3/23/21
This document is protected by copyright.
Further reproduction is prohibited without permission.

TABLE OF CONTENTS

experience significant losses from such activities, which could have a material adverse effect on our business, financial condition and results of operations and cash flows.

In addition, the revenues we expect to record from our principal model broker activities consists primarily of trading gains and losses, and are more affected by market volatility.

Finally, as we have for a number of years conducted our retail operations on the basis of the agency model, we could suffer reputational damage and additional regulatory scrutiny by offering execution to retail clients that creates an inherent conflict between the interests of the customer and our interests.

***We may be unable to effectively manage our rapid growth and retain our customers.***

The rapid growth of our business during our short history has placed significant demands on our management and other resources. If our business continues to grow at a rate consistent with our historical growth, we may need to expand and upgrade the reliability and scalability of our transaction processing systems, network infrastructure and other aspects of our proprietary technology. We may not be able to expand and upgrade our technology systems and infrastructure to accommodate such increases in our business activity in a timely manner, which could lead to operational breakdowns and delays, loss of customers, a reduction in the growth of our customer base, increased operating expenses, financial losses, increased litigation or customer claims, regulatory sanctions or increased regulatory scrutiny.

In addition, due to our rapid growth, we will need to continue to attract, hire and retain highly skilled and motivated officers and employees. We may not be able to attract or retain the officers and employees necessary to manage this growth effectively.

***We may be unable to respond to customers' demands for new services and products and our business, financial condition and results of operations and cash flows may be materially adversely affected.***

Our business is subject to rapid change and evolving industry standards. New services and products provided by our competitors may render our existing services and products less competitive. Our future success will depend, in part, on our ability to respond to customers' demands for new services and products on a timely and cost-effective basis and to adapt to address the increasingly sophisticated requirements and varied needs of our customers and prospective customers. We may not be successful in developing, introducing or marketing new services and products. In addition, our new service and product enhancements may not achieve market acceptance. Any failure on our part to anticipate or respond adequately to customer requirements or changing industry practices, or any significant delays in the development, introduction or availability of new services, products or service or product enhancements could have a material adverse effect on our business, financial condition and results of operations and cash flows.

***Our revolving credit facility is guaranteed by certain subsidiaries of the Company and is secured by a pledge of certain equity interests of the Company's domestic and foreign subsidiaries. The credit facility also contains financial covenants and other restrictions on our actions, and it could therefore limit our operational flexibility or otherwise adversely affect our financial condition.***

We have, from time to time, financed our liquidity needs in part from borrowings made under a revolving credit facility. The credit agreement for our revolving credit facility contains a number of restrictive covenants including, among others, covenants relating to consolidated leverage ratio, excess net capital requirements, and net unhedged exposure. The credit agreement also contains financial covenants relating to limitations on liens, investments, payments, fundamental changes, dispositions, the incurrence of indebtedness, and transactions with affiliates. The credit agreement contains customary events of default, including, among others, non-payments of principal and interest; breach of representations and warranties; failure to maintain compliance with the financial and other covenants contained in the credit agreement; the existence of bankruptcy or insolvency proceedings; insolvency; and a change of control.

Failure to comply with these restrictive or financial covenants could result from, among other things, changes in our results of operations or general economic conditions. These covenants may restrict our ability to engage in transactions that would otherwise be in our best interests. Failure to comply with any of the covenants under the credit agreement could result in a default. An event of default would permit our lenders to declare all amounts borrowed from them to be due and payable, together with accrued and unpaid interest. If the lenders accelerate the repayment of borrowings, we may not have sufficient assets to repay our debt or it would have a material adverse effect on our business, operations, financial condition and liquidity. See Note 21 to our consolidated financial statements in "Item 8. Financial Statements and Supplementary Data" for further information on our credit facility.

22

TABLE OF CONTENTS

***We face significant competition. Many of our competitors and potential competitors have larger customer bases, more established brand recognition and greater financial, marketing, technological and personnel resources than we do which could put us at a competitive disadvantage. Additionally, some of our competitors and many potential competitors are better capitalized than we are and able to obtain capital more easily which could put us at a competitive disadvantage.***

We compete in the FX market based on our ability to execute our customers' trades at competitive prices, to retain our existing customers and to attract new customers. Certain of our competitors have larger customer bases, more established name recognition, a greater market share in certain markets, such as Europe, and greater financial, marketing, technological and personnel resources than we do. These advantages may enable them, among other things, to:

- develop products and services that are similar to ours, or that are more attractive to customers than ours, in one or more of our markets;

- provide products and services we do not offer;

- provide execution and clearing services that are more rapid, reliable or efficient, or less expensive than ours;

- offer products and services at prices below ours to gain market share and to promote other businesses, such as FX options listed securities, CFDs, including contracts for precious metals, energy and stock indices, and OTC derivatives;

- adapt at a faster rate to market conditions, new technologies and customer demands;

- offer better, faster and more reliable technology;

- outbid us for desirable acquisition targets;

- more efficiently engage in and expand existing relationships with strategic alliances;

- market, promote and sell their products and services more effectively; and

- develop stronger relationships with customers.

These larger and better capitalized competitors, including commercial and investment banking firms, may have access to capital in greater amounts and at lower costs than we do and thus, may be better able to respond to changes in the FX industry, to compete for skilled professionals, to finance acquisitions, to fund internal growth and to compete for market share generally. Access to capital is critical to our business to satisfy regulatory obligations and liquidity requirements. Among other things, access to capital determines our creditworthiness, which if perceived negatively in the market could materially impair our ability to provide clearing services and attract customer assets, both of which are important sources of revenue. Access to capital also determines the degree to which we can expand our operations. Thus, if we are unable to maintain or increase our capital on competitive terms, we could be at a significant competitive disadvantage, and our ability to maintain or increase our revenue and earnings could be materially impaired. Also, new or existing competitors in our markets could make it difficult for us to maintain our current market share or increase it in desirable markets. In addition, our competitors could offer their services at lower prices, and we may be required to reduce our fees significantly to remain competitive. A fee reduction without a commensurate reduction in expenses would decrease our profitability. We may not be able to compete effectively against these firms, particularly those with greater financial resources, and our failure to do so could materially and adversely affect our business, financial condition and results of operations and cash flows. We may in the future face increased competition, resulting in narrowing bid/offer spreads which could materially and adversely affect our business, financial condition and results of operations and cash flows.

***If we are unable to effectively compete in emerging international markets, either directly or through joint ventures with local firms, the future growth of our business may be adversely affected.***

We regard emerging international markets as an important area of our future growth. Due to cultural, regulatory and other factors relevant to these markets, however, we may be at a competitive disadvantage in those regions relative to local firms or to international firms that have a well-established local presence. In some regions, we may need to enter into joint ventures with local firms in order to establish a presence in the local market, and we may face intense competition from other international firms over relatively scarce opportunities for market entry. Given the intense competition from other international firms that are also seeking to enter these fast-growing markets, we may have difficulty finding suitable local firms willing to enter into the types of relationships with us that we may need to gain access to these markets. This competition could make it difficult for us to expand our business internationally as planned. For the year ended December 31, 2013, we generated approximately 87.3% of our customer trading volume from customers outside the United States. Expanding our business in emerging markets is an

33

Cited in FXCM v. BLH Brokerage, 17Cv916 Declaration of Niv Even. This document is protected by copyright law. Further reproduction is prohibited without permission.

TABLE OF CONTENTS

important part of our growth strategy. We face significant risks in doing business in international markets, particularly in developing regions. These businesses, legal and tax risks include:

- less developed or mature local technological infrastructure and higher costs, which could make our products and services less attractive or accessible in emerging markets;

- difficulty in complying with the diverse regulatory requirements of multiple jurisdictions, which may be more burdensome, not clearly defined, and subject to unexpected changes, potentially exposing us to significant compliance costs and regulatory penalties;

- less developed and established local financial and banking infrastructure, which could make our products and services less accessible in emerging markets;

- reduced protection of intellectual property rights;

- inability to enforce contracts in some jurisdictions;

- difficulties and costs associated with staffing and managing foreign operations, including reliance on newly hired local personnel;

- tariffs and other trade barriers;

- currency and tax laws that may prevent or restrict the transfer of capital and profits among our various operations around the world; and

- time zone, language and cultural differences among personnel in different areas of the world.

In addition, in order to be competitive in these local markets, or in some cases because of restrictions on the ability of foreign firms to conduct business locally, we may seek to operate through joint ventures with local firms as we have done, for example, in South Korea. Doing business through joint ventures may limit our ability to control the conduct of the business and could expose us to reputational and greater operational risks.

**Our business could be adversely affected if global economic conditions continue to negatively impact our customer base.**

Our customer base is primarily comprised of individual retail customers who view foreign currency trading as an alternative investment class. If global economic conditions continue to negatively impact the FX market or adverse developments in global economic conditions continue to limit the disposable income of our customers, our business could be materially adversely affected as our customers may choose to curtail their trading in the FX market which could result in reduced customer trading volume and trading revenue.

**A systemic market event that impacts the various market participants with whom we interact could have a material adverse effect on our business, financial condition and results of operations and cash flows.**

We interact with various third parties through our relationships with our prime brokers, white labels and referring brokers. Some of these market participants could be overleveraged. In the event of sudden, large market price movements, such market participants may not be able to meet their obligations to brokers who, in turn, may not be able to meet their obligations to their counterparties. As a result, if a systemic collapse in the financial system were to occur, defaults by one or more counterparties could have a material adverse effect on our business, financial condition and results of operations and cash flows.

**The decline in short-term interest rates has had an adverse effect on our interest income and revenues.**

A portion of our revenue is derived from interest income. We earn interest on customer balances held in customer accounts and on our cash held in deposit accounts at various financial institutions. As a result of the recent decline in short-term interest rates, our interest income has declined significantly. Short-term interest rates are highly sensitive to factors that are beyond our control, including general economic conditions and the policies of various governmental and regulatory authorities. Our interest income was approximately $2.6 million and $3.6 million for the years ended December 31, 2013 and 2012. Interest income may not return to the amount we reported in prior years, and any further deterioration in short-term interest rates could further adversely affect our interest income and revenue.

In addition, this decline in interest rates has narrowed cross-border interest rate differentials, which has adversely affected the "carry trade", a once popular investing strategy which involves buying a currency that offers a higher interest rate while selling a currency that offers a lower interest rate. We believe the decline in the carry trade has resulted in a decrease in retail FX volume. Accordingly, our growth could be impeded if cross-border interest rate differentials remain compressed.

24

TABLE OF CONTENTS

*Our operations in certain developing regions may be subject to the risks associated with politically unstable and less economically developed regions of the world. Trading in the currencies of these developing regions may expose our customers and the third parties with whom we interact to sudden and significant financial loss as a result of exceptionally volatile and unpredictable price movements and could negatively impact our business.*

Our operations in some emerging markets may be subject to the political, legal and economic risks associated with politically unstable and less economically developed regions of the world, including the risks of war, insurgency, terrorism and government appropriation. For example, we do business in countries whose currencies may be less stable than those in our primary markets. Currency instability or government imposition of currency restrictions in these countries could impede our operations in the FX markets in these countries. In addition, emerging markets may be subject to exceptionally volatile and unpredictable price movements that can expose customers and brokers to sudden and significant financial loss. Trading in these markets may be less liquid, market participants may be less well capitalized and market oversight may be less extensive, all of which could increase trading risk, particularly in markets for derivatives, commodities and currencies. Substantial trading losses by customers or customer or counterparty defaults, or the prospect of them, in turn, could drive down trading volume in these markets.

*We are dependent on FX market makers to continually provide us with FX market liquidity. In the event we lose access to current prices and liquidity levels, we may be unable to provide competitive FX trading services, which will materially adversely affect our business, financial condition and results of operations and cash flows.*

We rely on third party financial institutions to provide us with FX market liquidity. These FX market makers, although under contract with us, have no obligation to provide us with liquidity and may terminate our arrangements at any time. We also rely upon these FX market makers to provide us with competitive FX pricing which we can pass on to our customers. In the event we lose access to the competitive FX pricing and/or liquidity levels that we currently have, we may be unable to provide competitive FX trading services, which will materially adversely affect our business, financial condition and results of operations and cash flows. When we act as a riskless principal between our customers and our FX market makers, we provide our customers with the best bid and offer price for each currency pair from our FX market makers plus a fixed markup. When a customer places a trade and opens a position, we act as the counterparty to that trade and our system immediately opens a trade between us and the FX market maker who provided the price that the customer selected. In the event that an offsetting trade fails, we could incur losses resulting from our trade with our customer.

In addition, whether as a result of exceptional volatility or situations affecting the market, the absence of competitive pricing from FX market makers and/or the suspension of liquidity would expose us to the risk of a default by the customer and consequently, trading losses. Although our margining practices are designed to mitigate this risk, we may be unable to close out customer positions at a level where margin posted by the customer is sufficient to cover the customer's losses. As a result, a customer may suffer losses greater than any margin or other funds or assets posted by that customer or held by us on behalf of that customer. Our policy is generally not to pursue claims for negative equity against our customers.

*We are subject to risk of default by financial institutions that hold our funds and our customers' funds.*

We have significant deposits with banks and other financial institutions. As of December 31, 2013, 44 financial institutions held our funds and our customer funds of $1.6 billion, of which Bank of America held approximately 18.8% and Nomura held approximately 19.1%. Pursuant to current guidelines set forth by the NFA and the CFTC for our U.S.-regulated subsidiaries, we are not required to segregate customer funds from our own funds. As such, we aggregate our customers' funds and our funds and hold them in collateral and deposit accounts at various financial institutions. In the event of insolvency of one or more of the financial institutions with whom we have deposited these funds, both we and our customers may not be able to recover our funds. Moreover, in aggregate, Bank of America and Nomura hold approximately 37.9% of our entire customer and our funds, if any of such financial institutions becomes insolvent, a significant portion of our funds and our customer funds may not be recovered. In such an event, our business and cash flow would be materially adversely impacted. Because our customers' funds are aggregated with our own, they are not insured by the Federal Deposit Insurance Corporation or any other similar insurer domestically or abroad, except to the extent of the maximum insured amount per deposit, which is unlikely to provide significant benefits to our customers. In any such insolvency, we and our customers would rank as unsecured creditors in respect of claims to funds deposited with any such financial institution. As a result, we may be subject to claims by customers due to the loss of customer funds and our business would be harmed by the loss of our own funds.

Cited in In re Global
17CV916 Decided on 3/23/21
Archived on 3/23/21
This document is protected by copyright.
Further reproduction is prohibited without permission.

25

***We are subject to counterparty risk whereby defaults by parties with whom we do business can have an adverse effect on our business, financial condition and results of operations and cash flows.***

Our FX trading operations require a commitment of capital and involve risk of losses due to the potential failure of our customers to perform their obligations under these transactions. All retail customers are required to deposit cash collateral in order to trade on our retail platforms.

Certain institutional customers that use our retail trading platforms are not required to deposit cash collateral in order to trade on our retail platforms. In rare circumstances, we provide short term credit directly to certain institutional customers when initial collateral does not cover risk exposure.

Most of the institutional customers that use our institutional trading platforms trade via credits and limits set by the customers' prime brokers and by our prime brokers. As part of our arrangement with our prime brokers, they incur the credit risk regarding the trading of our institutional customers. We also, in certain situations, act in the capacity of a prime broker to a select number of institutional customers that use our institutional trading platform

As of December 31, 2013, we have extended a minimal amount of credit to institutional customers that use our trading platforms. We have had no significant losses due to failure to repay amounts credited to those certain institutional customers.

We are also subject to counterparty risk with respect to clearing and prime brokers as well as banks with respect to our own deposits and deposits of customer funds. We are exposed to credit risk in the event that such counterparties fail to fulfill their obligations. Although we seek to manage the credit risk arising from institutional counterparties by setting exposure limits and monitoring exposure against such limits, carrying out periodic credit reviews, and spreading credit risk across a number of different institutions to diversify risk, if our credit and counterparty risk management processes are inadequate we could face significant liabilities which could have a material adverse effect upon our business, financial conditions, results of operations and cash flows.

***We depend on the services of prime brokers to assist in providing us access to liquidity through our FX market makers. The loss of one or more of our prime brokerage relationships could lead to increased transaction costs and capital posting requirements, as well as having a negative impact on our ability to verify our open positions, collateral balances and trade confirmations.***

We depend on the services of prime brokers to assist in providing us access to liquidity through our FX market makers. We currently have established three prime brokerage relationships which act as central hubs through which we are able to deal with our FX market makers. In return for paying a transaction-based prime brokerage fee, we are able to aggregate our trading exposures, thereby reducing our transaction costs. Since we trade with our FX market makers through our prime brokers, they also serve as a third party check on our open positions, collateral balances and trade confirmations. If we were to lose one or more of our prime brokerage relationships, we could lose this source of third party verification of our trading activity, which could lead to an increased number of record-keeping or documentation errors. Although we have relationships with FX market makers who could provide clearing services as a back-up for our prime brokerage services, if we were to experience a disruption in prime brokerage services due to a financial, technical, regulatory or other development adversely affecting any of our current prime brokers, our business could be materially adversely affected to the extent that we are unable to transfer positions and margin balances to another financial institution in a timely fashion. In the event of the insolvency of a prime broker, we might not be able to fully recover the assets we have deposited (and have deposited on behalf of our customers) with the prime broker or our unrealized profits since we will be among the prime broker's unsecured creditors.

***Failure of third-party systems or third-party service and software providers upon which we rely could adversely affect our business.***

We rely on certain third party computer systems or third party service and software providers, including technology platforms, back-office systems, internet service providers and communications facilities. Any interruption in these third party services, or deterioration in their performance or quality, could adversely affect our business. If our arrangement with any third party is terminated, we may not be able to find an alternative systems or services provider on a timely basis or on commercially reasonable terms. This could have a material adverse effect on our business, financial condition and results of operations and cash flows.

26

Cited in In re Global Brokerage
17Cv916 Decided 3/23/21
Archived on 3/23/21
This document is protected by copyright.
Further reproduction is prohibited without permission.

TABLE OF CONTENTS

***Our computer infrastructure may be vulnerable to security breaches. Any such problems could jeopardize confidential information transmitted over the internet, cause interruptions in our operations or give rise to liabilities to third parties.***

Our computer infrastructure is potentially vulnerable to physical or electronic computer break-ins, viruses and similar disruptive problems and security breaches. Any such problems or security breaches could give rise to liabilities to one or more third parties, including our customers, and disrupt our operations. A party able to circumvent our security measures could misappropriate proprietary information or customer information, jeopardize the confidential nature of information we transmit over the internet or cause interruptions in our operations. Concerns over the security of internet transactions and the safeguarding of confidential personal information could also inhibit the use of our systems to conduct FX transactions over the internet. To the extent that our activities involve the storage and transmission of proprietary information and personal financial information, security breaches could expose us to a risk of financial loss, litigation and other liabilities. Our current insurance policies may not protect us against all of such losses and liabilities. Any of these events, particularly if they result in a loss of confidence in our services, could have a material adverse effect on our business, financial condition and results of operations and cash flows.

***We have relationships with referring brokers who direct new customers to us. Failure to maintain these relationships could have a material adverse effect on our business, financial condition and results of operations and cash flows.***

We have relationships with NFA registered referring brokers who direct new customers to us and provide marketing and other services for these customers. Many of our relationships with referring brokers are non-exclusive or may be terminated by the brokers on short notice. In addition, under our agreements with referring brokers, they have no obligation to provide us with new customers or minimum levels of transaction volume. Our failure to maintain our relationships with these referring brokers, the failure of the referring brokers to provide us with customers or our failure to create new relationships with referring brokers would result in a loss of revenue, which could have a material adverse effect on our business, financial condition and results of operations and cash flows. To the extent any of our competitors offer more attractive compensation terms to one of our referring brokers, we could lose the broker's services or be required to increase the compensation we pay to retain the broker. In addition, we may agree to set the compensation for one or more referring brokers at a level where, based on the transaction volume generated by customers directed to us by such brokers, it would have been more economically attractive to seek to acquire the customers directly rather than through the referring broker. To the extent we do not enter into economically attractive relationships with referring brokers, our referring brokers terminate their relationship with us or our referring brokers fail to provide us with customers, our business, financial condition and results of operations and cash flows could be materially adversely affected.

***Our relationships with our referring brokers may also expose us to significant reputational and legal risks as we could be harmed by referring broker misconduct or errors that are difficult to detect and deter.***

Our reputation may be harmed by, or we may be liable for, improper conduct by our referring brokers, even though we do not control their activities. Referring brokers maintain customer relationships and delegate to us the responsibilities associated with FX and back-office operations. Furthermore, many of our referring brokers operate websites, which they use to advertise our services or direct customers to us. It is difficult for us to closely monitor the contents of their websites to ensure that the statements they make in relation to our services are accurate and comply with applicable rules and regulations. Under the current NFA rules, we are responsible for the activities of any party that solicits or introduces a customer to us unless such party is a member or associate of the NFA. Although all of our referring brokers are members or associates of the NFA, any disciplinary action taken against our referring brokers in the United States and abroad, could have a material adverse effect on our reputation, damage our brand name and materially adversely affect our business, financial condition and results of operations and cash flows, and, in any event, we may be subject to claims by customers and others concerning the conduct of referring brokers. In August 2010, the CFTC adopted regulations which require that referring brokers either meet the minimum net capital requirements applicable to futures and commodity options referring brokers or enter into a guarantee agreement with a CFTC-regulated FX broker, along with a requirement that such referring broker may be a party to only one guarantee agreement at a time. If the referring brokers with whom we currently do business choose to enter into a guarantee agreement, we cannot assure you that such referring brokers will choose to enter into such a guarantee agreement with us, rather than one of our competitors. We would be liable for the solicitation activity and performance of our referring brokers we guarantee. At this time, we have not entered into a guarantee agreement with any of our referring brokers.

Cited in In re Global Brokerage 17CV916 Decided 3/18/21
Archived on 3/23/21
This document is protected by copyright. Further reproduction is prohibited without permission.

TABLE OF CONTENTS

***We have relationships with white labels who direct customer trading volume to us. Failure to maintain these relationships or develop new white label relationships could have a material adverse effect on our business, financial condition and results of operations and cash flows.***

We have relationships with white labels which provide FX trading to their customers by using our technology platform and other services and therefore provide us with an additional source of revenue. In certain jurisdictions, we are only able to provide our services through white label relationships. Many of our relationships with white labels are non-exclusive or may be terminated by them on short notice. In addition, our white labels have no obligation to provide us with minimum levels of transaction volume. Our failure to maintain our relationships with these white labels, the failure of these white labels to continue to offer online FX trading services to their customers using our technology platform, the loss of requisite licenses by our white labels or our inability to enter into new relationships with white labels would result in a loss of revenue, which could have a material adverse effect on our business, financial condition and results of operations and cash flows. To the extent any of our competitors offer more attractive compensation terms to one or more of our white labels, we could lose the white label relationship or be required to increase the compensation we pay to retain the white label.

White labels with whom we have relationships accept customers from many jurisdictions and are therefore subject to regulations in a number of jurisdictions. If such regulations, or changes in such regulations, increase the white labels' overhead costs, including compliance costs and legal fees and expenses, limit their ability to engage or grow their business and increase their market share or result in sanctions and fines, their business, financial condition and results of operations may be adversely affected. This could reduce the volume of customer trading that such white labels direct to us, which would, in turn, adversely affect our business and results of operations. Our relationships with our white labels also may expose us to significant regulatory, reputational and other risks as we could be harmed by white label misconduct or errors that are difficult to detect and deter. If any of our white labels provided unsatisfactory service to their customers or are deemed to have failed to comply with applicable laws or regulations, our reputation may be harmed or we may be subject to claims as a result of our association with such white label. Any such harm to our reputation or liability would have a material adverse effect on our business, financial condition and results of operations and cash flows.

***Reduced spreads in foreign currencies, levels of trading activity, trading through alternative trading systems and price competition from principal model firms could harm our business.***

Computer-generated buy and sell programs and other technological advances and regulatory changes in the FX market may continue to tighten spreads on foreign currency transactions. Tighter spreads and increased competition could make the execution of trades and market-making activities less profitable. In addition, new and enhanced alternative trading systems have emerged as an option for individual and institutional investors to avoid directing their trades through retail FX brokers, which could result in reduced revenue derived from our FX brokerage business. We may also face price competition from our competitors. Many competing firms using a principal model can set their own prices as they generate income from trading with their customers. In contrast, the prices we provide to our customers are set by our FX market makers which vary based on market conditions.

**Risks Relating to Our Convertible Senior Notes and Related Hedge Transactions**

***We incurred significant indebtedness through the sale of our 2.25% convertible senior notes due 2018.***

We incurred $172.5 million of senior indebtedness in June 2013 when we sold $172.5 million aggregate principal amount of 2.25% convertible senior notes due 2018 (the "Convertible Notes").

We cannot assure shareholders that we will continue to maintain sufficient cash reserves or that our business will continue to generate cash flow from operations at levels sufficient to permit us to make required payments related to the Convertible Notes. Our ability to meet our obligations under the Convertible Notes depends in large part on the earnings of our subsidiaries and the payment of those earnings to us, in the form of distributions, loans or advances and through repayment of loans or advances from us. If we are unable to generate cash flow, we may be required to adopt one or more alternatives, such as selling assets, restructuring debt or obtaining additional equity capital on terms that may be onerous or highly dilutive.

***We may not have the ability to raise the funds necessary to settle conversions of the Convertible Notes or to purchase the Convertible Notes upon a fundamental change, and our future debt may contain limitations on our ability to pay cash upon conversion or to purchase the Convertible Notes.***

Upon the occurrence of a fundamental change, subject to certain conditions, holders of the Convertible Notes will have the right to require us to purchase their Convertible Notes for cash at 100% of their principal amount plus accrued and unpaid interest, if any. In addition, upon conversion of the Convertible Notes, we will be required to make cash payments of up to

28

TABLE OF CONTENTS

$1,000 for each $1,000 in principal amount of Convertible Notes converted. However, we may not have enough available cash or be able to obtain financing at the time we are required to make purchases of Convertible Notes surrendered for purchase upon a fundamental change or to make cash payments in respect of Convertible Notes that are being converted. In addition, our ability to purchase the Convertible Notes or to pay cash upon conversions of the Convertible Notes may be limited by law, by regulatory authority or by agreements governing our future indebtedness. Our failure to purchase Convertible Notes at a time when the purchase is required by the indenture or to pay any cash payable on conversions of the Convertible Notes as required by the indenture would constitute a default under the indenture. A default under the indenture or the fundamental change itself could also lead to a default under agreements governing our existing and future indebtedness. If the repayment of the related indebtedness were to be accelerated after any applicable notice or grace periods, we may not have sufficient funds to repay the indebtedness and purchase the Convertible Notes or make cash payments upon conversions thereof.

***Despite current indebtedness levels associated with our revolving credit facility, we may still be able to incur substantially more debt.***

We may be able to incur substantial additional indebtedness in the future, some of which may be secured. Under certain circumstances, our revolving credit facility may be increased during the term of the credit agreement up to $250.0 million. We will not be restricted under the terms of the indenture governing the Convertible Notes from incurring additional debt, securing future debt, recapitalizing our debt or taking a number of other actions that could have the effect of diminishing our ability to make payments on the Convertible Notes when due.

***Future issuances of our Class A common stock may adversely affect our stock price.***

Sales of a substantial number of shares of our Class A common stock from the Convertible Notes, or the perception by the market that those sales could occur, could cause the trading price of the notes and the market price of our Class A common stock to decline or could make it more difficult for us to raise funds through the sale of equity in the future. In addition, a substantial number of shares of our Class A common stock is reserved for issuance upon conversion of the Convertible Notes, for equity grants pursuant to our equity compensation plans and for potential exchanges of Holdings Units for shares of Class A common stock. The issuance and sale of these shares of our Class A common stock, or the perception that such issuances and sales may occur, could adversely affect the trading price of the Convertible Notes and the market price of our Class A common stock and impair our ability to raise capital through the sale of additional equity securities.

We cannot be sure that we will not need to raise additional capital in the future, as a result of economic conditions or otherwise. If we do need to raise additional capital, there can be no assurance that we will be able to do so on favorable terms or at all. In addition, any such financing could be significantly dilutive to our existing shareholders and result in the issuance of securities that have rights, preferences and privileges that are senior to those of our Class A common stock.

***Provisions of the notes could discourage an acquisition of us by a third party.***

Certain provisions of the notes could make it more difficult or more expensive for a third party to acquire us. Upon the occurrence of certain transactions constituting a fundamental change, holders of the Convertible Notes have the right, at their option, to require us to repurchase all of their notes or any portion of the principal amount of such notes in integral multiples of $1,000. We may also be required to increase the conversion rate upon conversion in connection with certain fundamental change transactions. These provisions could deter unsolicited takeovers, including transactions in which stockholders might otherwise receive a premium for their shares over the then current market price or could limit the price that some investors might be willing to pay in the future for shares of our Class A common stock.

***The conditional conversion features of the notes, if triggered, may adversely affect our financial condition and operating results.***

In the event the conditional conversion features of the notes are triggered, holders of notes will be entitled to convert the Convertible Notes at any time during specified periods at their option. If one or more holders elect to convert their notes, we would be required to settle up to the principal amount of notes being converted through the payment of cash, which could adversely affect our liquidity. In addition, even if holders do not elect to convert their notes, we could be required under applicable accounting rules to classify all or a portion of the outstanding principal of the notes as a current liability rather than long-term liability, which would result in a material reduction of our net working capital.

Cited in In re Global Brokerage
17CV916 Decided 3/23/21
Archived on 3/23/21
This document is protected by copyright.
Further reproduction is prohibited without permission.

TABLE OF CONTENTS

*The convertible note hedge and warrant transactions we entered into in connection with our Convertible Notes issuance may affect the trading price of our Class A common stock.*

In connection with our offering of the Convertible Notes, we entered into privately negotiated convertible note hedge transactions with several financial institutions, or the hedge counterparties. We entered into these convertible note hedge transactions with the expectation that they will reduce the potential dilution to our Class A common stock and/or offset potential cash payments in excess of the principal amount of the Convertible Notes, as the case may be, upon conversion of the Convertible Notes. In the event that the hedge counterparties fail to deliver shares to us or potential cash payments, as the case may be, as required under the convertible note hedge documents, we would not receive the benefit of such transactions. Separately, we also entered into warrant transactions with the hedge counterparties. The warrant transactions could separately have a dilutive effect from the issuance of Class A common stock pursuant to the warrants.

In connection with hedging these transactions, the hedge counterparties and/or their affiliates may enter into various derivative transactions with respect to our Class A Common Stock, and may enter into, or may unwind, various derivative transactions and/or purchase or sell our Class A Common Stock or other securities of ours in secondary market transactions prior to maturity of the Convertible Notes (and are likely to do so during any conversion period related to any conversion of the Convertible Notes). These activities could have the effect of increasing or preventing a decline in, or could have a negative effect on, the value of our Class A Common Stock and could have the effect of increasing or preventing a decline in the value of our Class A Common Stock during any cash settlement averaging period related to a conversion of the Convertible Notes.

We do not make any representation or prediction as to the direction or magnitude of any potential effect that the transactions described above may have on the price of the Convertible Notes or the shares of our Class A common stock. In addition, we do not make any representation that the hedge counterparties will engage in these transactions or that these transactions, once commenced, will not be discontinued without notice.

*We are subject to counterparty risk with respect to the convertible note hedge transactions.*

The hedge counterparties are financial institutions or the affiliates of financial institutions, and we will be subject to the risk that the hedge counterparties may default under the convertible note hedge transactions. Our exposure to the credit risk of the hedge counterparties will not be secured by any collateral. Recent global economic conditions have resulted in the actual or perceived failure or financial difficulties of many financial institutions. If any of the hedge counterparties become subject to insolvency proceedings, we will become an unsecured creditor in those proceedings with a claim equal to our exposure at that time under the convertible note hedge transactions. Our exposure will depend on many factors, but, generally, the increase in our exposure may be correlated to the increase in our Class A common stock market price and in volatility of our Class A common stock. In addition, upon a default by a hedge counterparty, we may suffer adverse tax consequences and dilution with respect to our Class A common stock. We can provide no assurance as to the financial stability or viability of the hedge counterparties.

*The accounting method for the Convertible Notes may have an adverse effect on our reported financial results and is subject to uncertainty.*

Under Accounting Standards Codification Topic 470-20 ("ASC 470-20"), an entity must separately account for the liability and equity components of the convertible debt instruments (such as the Convertible Notes) that may be settled entirely or partially in cash upon conversion in a manner that reflects the issuer's economic interest cost. The effect of ASC 470-20 on the accounting for the Convertible Notes is that the equity component is included in the additional paid-in capital section of stockholders' equity on our consolidated balance sheet and the value of the equity component is treated as original issue discount for purposes of accounting for the debt component of the Convertible Notes. As a result we are required to record a greater amount of non-cash interest expense in current periods presented as a result of the amortization of the discounted carrying value of the Convertible Notes to their face amount over the term of the Convertible Notes. We report lower net income in our financial results because ASC 470-20 requires interest to include both the current period's amortization of the debt discount and the instrument's coupon interest, which could adversely affect our reported or future financial results, the trading price of our Class A common stock and the trading price of the Convertible Notes.

In addition, the equity component of the Convertible Notes are accounted for utilizing the treasury stock method, the effect of which is that the shares of Class A common stock issuable upon conversion of the Convertible Notes are not included in the calculation of diluted earnings per share except to the extent that the conversion value of the securities exceeds their principal amount. Under the treasury stock method, for diluted earnings per share purposes, the transaction is accounted for as if the number of shares of Class A common stock that is necessary to settle such excess, if we elected to settle such excess in shares, are issued. We cannot be sure that accounting standards in the future will continue to permit the use of the treasury stock

30

TABLE OF CONTENTS

method. If we are unable to use the treasury stock method in accounting for the shares issuable upon conversion of the Convertible Notes, then our diluted earnings per share would be adversely affected. In addition, if we are permitted to utilize the treasury stock method, to the extent that the market price of our Class A common stock exceeds the strike price of the warrants we intend to sell to the hedge counterparties, the warrant transactions will be accounted for as if the number of shares of our Class A common stock that is necessary to settle such excess are issued. However, any shares we are entitled to receive from the hedge counterparties under the convertible note hedge transactions upon conversion of the notes, in the event that the market price of our Class A common stock exceeds the strike price of the convertible note hedge transactions, will not be reflected in our diluted earnings per share.

**Risks Related to Our Organizational Structure**

***FXCM Inc.'s only material asset is its interest in Holdings, and it is accordingly dependent upon distributions from Holdings to pay taxes, make payments under the tax receivable agreement or pay dividends.***

FXCM Inc. is a holding company and has no material assets other than its ownership of Holdings Units. FXCM Inc. has no independent means of generating revenue. FXCM Inc. intends to cause Holdings to make distributions to its unitholders in an amount sufficient to cover all applicable taxes at assumed tax rates, payments under the tax receivable agreement and dividends, if any, declared by it. Deterioration in the financial condition, earnings or cash flow of Holdings and its subsidiaries for any reason could limit or impair their ability to pay such distributions. Additionally, to the extent that FXCM Inc. needs funds, and Holdings is restricted from making such distributions under applicable law or regulation or under the terms of our financing arrangements, or is otherwise unable to provide such funds, it could materially adversely affect our liquidity and financial condition.

Payments of dividends, if any, will be at the discretion of our board of directors after taking into account various factors, including our business, operating results and financial condition, current and anticipated cash needs, plans for expansion and any legal or contractual limitations on our ability to pay dividends. Any financing arrangement that we enter into in the future may include restrictive covenants that limit our ability to pay dividends. In addition, Holdings is generally prohibited under Delaware law from making a distribution to a member to the extent that, at the time of the distribution, after giving effect to the distribution, liabilities of Holdings (with certain exceptions) exceed the fair value of its assets. Subsidiaries of Holdings are generally subject to similar legal limitations on their ability to make distributions to Holdings. In addition, our regulated subsidiaries are subject to regulatory capital requirements that limit the distributions that may be made by those subsidiaries.

***Members of Holdings control a significant portion of the voting power in FXCM Inc., which may give rise to conflicts of interests.***

As of December 31, 2013, members of Holdings collectively held approximately 45.2% of the combined voting power of our Class A and Class B common stock. As a result, the members of Holdings have the ability to exercise significant influence over the election of the members of our board of directors and, therefore, significant influence over our management and affairs as well as matters requiring shareholder approval, including mergers and other material transactions. This concentration of ownership could deprive our shareholders of an opportunity to receive a premium for their Class A common stock as part of a sale of our company and might ultimately affect the market price of our Class A common stock.

In addition, as of December 31, 2013, the members of Holdings owned 45.2% of the Holdings Units. Because they hold their ownership interest in our business through Holdings, rather than through the public company, these owners may have conflicting interests with holders of shares of our Class A common stock. For example, if Holdings makes distributions to FXCM Inc., these owners will also be entitled to receive distributions pro rata in accordance with the percentages of their respective limited liability company interests in Holdings and their preferences as to the timing and amount of any such distributions may differ from those of our public shareholders. The members of Holdings may also have different tax positions from us which could influence their decisions regarding whether and when to dispose of assets, especially in light of the existence of the tax receivable agreement that we entered into in connection with our initial public offering ("IPO"), whether and when to incur new or refinance existing indebtedness, and whether and when FXCM Inc. should terminate the tax receivable agreement and accelerate its obligations thereunder. In addition, the structuring of future transactions may take into consideration these owners' tax or other considerations even where no similar benefit would accrue to us. See "Item 13. Certain Relationships and Related Person Transactions, and Director Independence".

31

Cited in In re Global Brokerage
17CV916 Decided 3/16/18
Archived on 3/23/21
This document is protected by copyright.
Further reproduction is prohibited without permission.

TABLE OF CONTENTS

***FXCM Inc. will be required to pay the counterparties to the tax receivable agreement for certain tax benefits it may claim arising in connection with our IPO and related transactions, and the amounts it may pay could be significant.***

In connection with our IPO, we purchased Holdings Units from our pre-IPO owners, including members of our senior management. Subsequently, we have had additional unit conversions. At the IPO, we also entered into a tax receivable agreement with our pre-IPO owners that provides for the payment by FXCM Inc. to these parties of 85% of the benefits, if any, that FXCM Inc. is deemed to realize as a result of the increases in tax basis resulting from our purchases or exchanges of Holdings Units and certain other tax benefits related to our entering into the tax receivable agreement, including tax benefits attributable to payments under the tax receivable agreement. See "Item 13. Certain Relationships and Related Transactions, and Director Independence".

We expect that the payments that FXCM Inc. may make under the tax receivable agreement will be substantial. Assuming no material changes in the relevant tax law, and that we earn sufficient taxable income to realize all tax benefits that are subject to the tax receivable agreement, we expect future payments under the tax receivable agreement relating to the purchase by FXCM Inc. of Holdings Units as part of the IPO to aggregate $68.8 million and to range over the next 15 years from approximately $3.6 million to $7.6 million per year and decline thereafter. Future payments to our pre-IPO owners in respect of 2012 and 2013 exchanges are in addition to these amounts and aggregate to $77.9 million, the amounts per year ranging from approximately $2.6 million to $6.7 million over the next 15 years. The foregoing numbers are merely estimates, and the actual payments could differ materially. It is possible that future transactions or events could increase or decrease the actual tax benefits realized and the corresponding tax receivable agreement payments. There may be a material negative effect on our liquidity if, as a result of timing discrepancies or otherwise, the payments under the tax receivable agreement exceed the actual benefits we realize in respect of the tax attributes subject to the tax receivable agreement and/or distributions to FXCM Inc. by Holdings are not sufficient to permit FXCM Inc. to make payments under the tax receivable agreement after it has paid taxes. The payments under the tax receivable agreement are not conditioned upon our pre-IPO owners' continued ownership of us.

***In certain cases, payments under the tax receivable agreement may be accelerated and/or significantly exceed the actual benefits FXCM Inc. realizes in respect of the tax attributes subject to the tax receivable agreement.***

The tax receivable agreement provides that upon certain mergers, asset sales, other forms of business combinations or other changes of control, or if, at any time, FXCM Inc. elects an early termination of the tax receivable agreement, FXCM Inc.'s (or its successor's) obligations with respect to exchanged or acquired Holdings Units (whether exchanged or acquired before or after such transaction) would be based on certain assumptions, including that FXCM Inc. would have sufficient taxable income to fully utilize the deductions arising from the increased tax deductions and tax basis and other benefits related to entering into the tax receivable agreement. As a result, (1) FXCM Inc. could be required to make payments under the tax receivable agreement that are greater than or less than the specified percentage of the actual benefits FXCM Inc. realizes in respect of the tax attributes subject to the tax receivable agreement and (2) if FXCM Inc. elects to terminate the tax receivable agreement early, FXCM Inc. would be required to make an immediate payment equal to the present value of the anticipated future tax benefits, which upfront payment may be made years in advance of the actual realization of such future benefits. Upon a subsequent actual exchange, any additional increase in tax deductions, tax basis and other benefits in excess of the amounts assumed at the change in control will also result in payments under the tax receivable agreement. In these situations, our obligations under the tax receivable agreement could have a substantial negative impact on our liquidity. There can be no assurance that we will be able to finance our obligations under the tax receivable agreement. In addition, the present value of such anticipated future payments are discounted at a rate equal to LIBOR plus 100 basis points.

Payments under the tax receivable agreement will be based on the tax reporting positions that we determine. Although we are not aware of any issue that would cause the IRS to challenge a tax basis increase, FXCM Inc. will not be reimbursed for any payments previously made under the tax receivable agreement. As a result, in certain circumstances, payments could be made under the tax receivable agreement in excess of the benefits that FXCM Inc. actually realizes in respect of the increases in tax basis resulting from our purchases or exchanges of Holdings Units and certain other tax benefits related to our entering into the tax receivable agreement, including tax benefits attributable to payments under the tax receivable agreement.

***Anti-takeover provisions in our charter documents and Delaware law might discourage or delay acquisition attempts for us that you might consider favorable.***

Our certificate of incorporation and bylaws contain provisions that may make the acquisition of our company more difficult without the approval of our board of directors. Among other things, these provisions:

32

TABLE OF CONTENTS

- authorize the issuance of undesignated preferred stock, the terms of which may be established and the shares of which may be issued without stockholder approval, and which may include super voting, special approval, dividend, or other rights or preferences superior to the rights of the holders of Class A common stock;

- prohibit stockholder action by written consent, which requires all stockholder actions to be taken at a meeting of our stockholders;

- provide that the board of directors is expressly authorized to make, alter, or repeal our bylaws and that our stockholders may only amend our bylaws with the approval of 80% or more of all of the outstanding shares of our capital stock entitled to vote; and

- establish advance notice requirements for nominations for elections to our board or for proposing matters that can be acted upon by stockholders at stockholder meetings.

These anti-takeover provisions and other provisions under Delaware law could discourage, delay or prevent a transaction involving a change in control of our company, including actions that our stockholders may deem advantageous, or negatively affect the trading price of our Class A common stock. These provisions could also discourage proxy contests and make it more difficult for you and other stockholders to elect directors of your choosing and to cause us to take other corporate actions you desire.

**Risks Related to our Class A Common Stock**

*The market price of shares of our Class A common stock may decline due to the large number of shares of Class A common stock eligible for exchange and future sale.*

The market price of shares of our Class A common stock could decline as a result of sales of a large number of shares of Class A common stock in the market or the perception that such sales could occur. These sales, or the possibility that these sales may occur, also might make it more difficult for us to sell shares of Class A common stock in the future at a time and at a price that we deem appropriate.

In addition, we and our pre-IPO owners entered into an exchange agreement under which they (or certain permitted transferees thereof) have the right, from and after the first anniversary of the date of the closing of the IPO (subject to the terms of the exchange agreement), to exchange their Holdings Units for shares of our Class A common stock on a one-for-one basis, subject to customary conversion rate adjustments. The market price of shares of our Class A common stock could decline as a result of the exchange or the perception that an exchange could occur. These exchanges, or the possibility that these exchanges may occur, also might make it more difficult for holders of our Class A common stock to sell such stock in the future at a time and at a price that they deem appropriate.

*If securities or industry analysts stop publishing research or reports about our business, or if they downgrade their recommendations regarding our Class A common stock, our stock price and trading volume could decline.*

The trading market for our Class A common stock is influenced by the research and reports that industry or securities analysts publish about us or our business. If any of the analysts who covers us downgrades our Class A common stock or publishes inaccurate or unfavorable research about our business, our Class A common stock price may decline. If analysts cease coverage of us or fail to regularly publish reports on us, we could lose visibility in the financial markets, which in turn could cause our Class A common stock price or trading volume to decline and our Class A common stock to be less liquid.

*The market price of shares of our Class A common stock may be volatile, which could cause the value of your investment to decline.*

The market price of our Class A common stock may be highly volatile and could be subject to wide fluctuations. Securities markets worldwide experience significant price and volume fluctuations. This market volatility, as well as general economic, market or political conditions, could reduce the market price of shares of our Class A common stock in spite of our operating performance. In addition, our operating results could be below the expectations of public market analysts and investors due to a number of potential factors, including variations in our quarterly operating results or dividends, if any, to stockholders, additions or departures of key management personnel, failure to meet analysts' earnings estimates, publication of research reports about our industry, litigation and government investigations, changes or proposed changes in laws or regulations or differing interpretations or enforcement thereof affecting our business, adverse market reaction to any indebtedness we may incur or securities we may issue in the future, changes in market valuations of similar companies or speculation in the press or investment community, announcements by our competitors of significant contracts, acquisitions, dispositions, strategic

38

TABLE OF CONTENTS

partnerships, joint ventures or capital commitments, adverse publicity about the industries we participate in or individual scandals, and in response the market price of shares of our Class A common stock could decrease significantly. You may be unable to resell your shares of Class A common stock at or above the price you originally paid.

In the past few years, stock markets have experienced extreme price and volume fluctuations. In the past, following periods of volatility in the overall market and the market price of a company's securities, securities class action litigation has often been instituted against public companies. This litigation, if instituted against us, could result in substantial costs and a diversion of our management's attention and resources.

**You may be diluted by the future issuance of additional Class A common stock in connection with our incentive plans, acquisitions or otherwise.**

As of December 31, 2013, we had an aggregate of more than 2.96 billion shares of Class A common stock authorized but unissued, including approximately 36.84 million shares of Class A common stock issuable upon exchange of Holdings Units. Our certificate of incorporation authorizes us to issue these shares of Class A common stock and options, rights, warrants and appreciation rights relating to Class A common stock for the consideration and on the terms and conditions established by our board of directors in its sole discretion, whether in connection with acquisitions or otherwise. We have reserved 15,295,000 shares for issuance under our 2010 Long Term Incentive Plan, including, as of December 31, 2013, 7,485,369 shares issuable upon the exercise of stock options that we have granted to our officers, employees, independent contractors and outside directors. See "Item 11. Executive Compensation". Any Class A common stock that we issue, including under our 2010 Long Term Incentive Plan or other equity incentive plans that we may adopt in the future, would dilute the percentage ownership held by the investors.

### Item 1B. Unresolved Staff Comments

None.

### Item 2. Properties

Our company headquarters are located at 55 Water Street, 50th Floor, New York, NY 10041, with other U.S. offices in Plano, TX and San Francisco, CA. Outside the United States, we have offices in London, Paris, Berlin, Milan, Athens, Hong Kong, Sydney, and Tokyo. We lease each of these facilities and do not own any real property. We believe we have adequate office space or will be able to find additional space on reasonable commercial terms to meet our projected growth rates.

### Item 3. Legal Proceedings

In the ordinary course of business, we may from time to time be involved in litigation and claims incidental to the conduct of our business, including intellectual property claims. In addition, our business is also subject to extensive regulation, which may result in regulatory proceedings against us. We have been named in various arbitration and civil litigation cases brought by customers seeking damages for trading losses. Management has investigated these matters and believes that such cases are without merit and is defending them vigorously. However, the arbitrations and litigations are presently in various stages of the judicial process and no judgment can be made regarding the ultimate outcome of the arbitrators' and/or court's decisions.

In October, 2011, the Trustee in bankruptcy, representing three debtors, Certified, Inc., Global Bullion Trading Group, Inc., and WJS Funding, Inc., filed an adversary complaint in the United States Bankruptcy Court for the Southern District of Florida against US, ODL Securities, Inc. and ODL Securities, Ltd. (the "Defendants"). Before the Defendants filed any response, the Trustee amended the Complaint to add ODL, FXCM Securities, LLC, FSL, FXCM, Inc., and Holdings as Defendants. The Amended Complaint asserts claims under the Federal Bankruptcy Code to recover allegedly preferential and fraudulent transfers to the Defendants, under the Racketeer Influenced and Corrupt Organizations Act ("RICO"), 18 U.S.C §1961 et seq., as well as the common law. The Amended Complaint seeks an unspecified amount of compensatory and punitive damages, interests, and costs. The Defendants have filed motions to dismiss the Amended Complaint in its entirety. Thereafter, the parties engaged in non-binding mediation. Ultimately a settlement was reached in the amount of $0.7 million which was approved by the Bankruptcy Court on June 20, 2012.

In 2012, FXCMJ accrued $2.6 million as an estimate to settle certain trading system matters with the JFSA. We settled this matter for $2.3 million, which included an administrative penalty, during the first quarter of 2013.

34

TABLE OF CONTENTS

In January 2014, the equity Receiver for a former client of US, Revelation Forex Fund ("Revelation"), its principal, Kevin G. White ("White"), and related entities RFF GP, LLC ("RFF"), KGM Capital Management, LLC ("KGM")(collectively "Fund"), filed suit against US, and certain unrelated defendants, in Texas state court. The suit alleges that US is liable under the Texas Securities Act, and the common law: (i) as a "control person;" and, (ii) as an aider and abettor of fraud and a breach of fiduciary obligations; and, (iii) for its negligence. The Receiver seeks joint and several liability for damages in excess of $3.8 million, plus exemplary damages under Texas law, interest, and attorneys' fees. On February 7, 2014, US filed the equivalent of a motion to dismiss and to compel arbitration based on the mandatory forum selection clause and arbitration agreement in its Client Agreement with the Fund. It also filed an Answer with multiple affirmative defenses. The motions are currently pending.

In February 2014, UK and FSL entered into a settlement with the FCA following an investigation into trade execution practices of UK and FSL in the period from 2006 to 2010, as well as a breach of notification obligations to the FCA. UK and FSL agreed to pay (a) restitution to affected clients up to $9.9 million; and (b) a financial penalty of GBP 4.0 million, together with any unclaimed restitution.

For the outstanding matters referenced above for which a loss is more than remote but less than likely, whether in excess of an accrued liability or where there is no accrued liability, we have estimated a range of possible loss. We believe the estimate of the aggregate range of possible loss in excess of accrued liabilities for such matters is between nil and $3.8 million as of December 31, 2013.

In view of the inherent difficulty of predicting the outcome of litigation and claims, we cannot predict what the eventual outcome of the pending matters will be, what the timing of the ultimate resolution of these matters will be, or what the eventual loss related to each pending matter may be. Furthermore, the above-referenced matters represented in the estimated aggregate range of possible loss will change from time to time and actual results may vary significantly from the current estimate. An adverse outcome in one or more of these matters could be material to our results of operations or cash flows for any particular reporting period.

**Item 4. Mine Safety Disclosure**

Not applicable.

Cited in In re Global Brokerage
17CV916 Decided 3/18/21
Archived on 3/23/21
This document is protected by copyright.
Further reproduction is prohibited without permission.

TABLE OF CONTENTS

PART II

**Item 5. Market for Registrant's Common Equity, Related Stockholder Matters and Issuer Purchases of Equity Securities**

**Market Information**

    Our Class A common stock currently trades on New York Stock Exchange under the symbol "FXCM". The following table sets forth, for the previous two fiscal years, the high and low sales prices per share of our Class A common stock as reported by the New York Stock Exchange.

| Fiscal 2013 | | Low | | High |
|---|---|---|---|---|
| First Quarter | $ | 10.11 | $ | 14.30 |
| Second Quarter | $ | 12.75 | $ | 16.81 |
| Third Quarter | $ | 15.75 | $ | 19.97 |
| Fourth Quarter | $ | 14.64 | $ | 19.78 |

| Fiscal 2012 | | Low | | High |
|---|---|---|---|---|
| First Quarter | $ | 9.46 | $ | 13.50 |
| Second Quarter | $ | 9.58 | $ | 13.42 |
| Third Quarter | $ | 8.60 | $ | 12.00 |
| Fourth Quarter | $ | 8.96 | $ | 10.39 |

    Our Class B common stock is not publicly traded.

**Holders of Record**

    On March 12, 2014, there was 1 holder of record of our Class A common stock and 41 holders of our Class B common stock. The number of record holders does not include persons who held our Class A common stock in nominee or "street name" accounts through brokers.

**Dividends**

    We declared a quarterly dividend of $0.06 per share on our outstanding Class A common stock during 2013. Following is a summary of dividends declared per share of Class A common stock during fiscal year 2013 (in thousands, except per share amounts):

| Date of Declaration | | Dividend per share | Record Date | Payment Date | | Total Amount |
|---|---|---|---|---|---|---|
| March 6, 2013 | $ | 0.06 | March 19, 2013 | April 1, 2013 | $ | 2,158 |
| May 5, 2013 | $ | 0.06 | June 6, 2013 | July 1, 2013 | $ | 2,278 |
| August 6, 2013 | $ | 0.06 | September 6, 2013 | September 30, 2013 | $ | 2,487 |
| November 6, 2013 | $ | 0.06 | December 19, 2013 | December 30, 2013 | $ | 2,680 |

    The declaration, amount and payment of any future dividends on shares of Class A common stock will be at the sole discretion of our board of directors and we may reduce or discontinue entirely the payment of such dividends at any time. Our board of directors may take into account general and economic conditions, our financial condition and operating results, our available cash and current and anticipated cash needs, capital requirements, contractual, legal, tax and regulatory restrictions and implications on the payment of dividends by us to our stockholders or by our subsidiaries to us, and such other factors as our board of directors may deem relevant.

36

This document is used in In re Global Brokerage, No. 1:17-cv-916, redacted 3/8/21. Authenticity is disputed. Further reproduction is prohibited by copyright. Further reproduction is prohibited without permission.

TABLE OF CONTENTS

FXCM Inc. is a holding company and has no material assets other than its ownership of Holding Units in Holdings. We intend to cause Holdings to make distributions to us in an amount sufficient to cover cash dividends, if any, declared by us. If Holdings makes such distributions to FXCM Inc., the other holders of Holding Units will also be entitled to receive distributions pro rata in accordance with the percentages of their respective limited liability company interests.

Any financing arrangements that we enter into in the future may include restrictive covenants that limit our ability to pay dividends. In addition, Holdings is generally prohibited under Delaware law from making a distribution to a member to the extent that, at the time of the distribution, after giving effect to the distribution, liabilities of Holdings (with certain exceptions) exceed the fair value of its assets. Subsidiaries of Holdings are generally subject to similar legal limitations on their ability to make distributions to Holdings. In addition, our regulated subsidiaries are subject to regulatory capital requirements that limit the distributions that may be made by those subsidiaries.

Holdings made distributions to the holders of Holding Units of Holdings in the amount of $14.1 million and $14.9 million during 2013 and 2012, respectively. We anticipate that future distributions by Holdings to FXCM Inc. and the other members of Holdings generally will not significantly exceed the amounts distributed to members pursuant to the tax distribution provisions of the amended and restated limited liability company agreement of Holdings, although future distributions may from time to time exceed such amounts.

## Purchases of Equity Securities by the Issuer

Shares of Class A common stock repurchased by us during the quarter ended December 31, 2013, were as follows:

### Issuer Repurchases of Equity Securities

| Period | Total Number of Shares Purchased* | Average Price Paid per Share** | Total Number of Shares Purchased as Part of Publicly Announced Plans or Programs | Approximate Dollar Value of Shares that May Yet Be Purchased Under the Plans or Programs |
|---|---|---|---|---|
| Month 10: October 1, 2013 to October 31, 2013 | 237,000 | 16.68 | 4,497,934 | 25,903,206.82 |
| Month 11: November 1, 2013 to November 30, 2013 | 487,600 | 16.03 | 4,985,534 | 18,087,341.57 |
| Month 12: December 1, 2013 to December 31, 2013 | — | — | 4,985,534 | 18,087,341.57 |
| Total | 724,600 | $ 16.24 | 4,985,534 | $ 18,087,341.57 |

\*       As of Settlement Date

\*\*      Average Price including Commission

On May 17, 2011, our board of directors approved the repurchase of up to $30.0 million of our Class A common stock. On October 17, 2011, we announced that the board of directors authorized a $20.0 million increase in the size of the share repurchase plan and on November 8, 2012 we announced that the board of directors increased the share repurchase program an additional $30.0 million, bringing the total authorization to $80.0 million. As of December 31, 2013 we had repurchased a total of 4,985,534 shares of our Class A common stock. We are not obligated to purchase any shares under the Repurchase Program which does not have an expiration date. All of the above repurchases were part of this program.

## Item 6. Selected Financial Data

The selected financial data set forth under Item 7. "Management's Discussion and Analysis of Financial Condition and Results of Operations" included in this Annual Report on Form 10-K is incorporated herein by reference.

## Item 7. Management's Discussion and Analysis of Financial Condition and Results of Operations

The following discussion should be read in conjunction with our audited consolidated financial statements and the related notes included in Item 8. Financial Statements and Supplementary Data. This discussion contains forward-looking statements

37

*that are subject to known and unknown risks and uncertainties. Actual results and the timing of events may differ significantly from such forward looking statements due to a number of factors, including those set forth in Item 1A. Risk Factors.*

The following table sets forth Selected Historical Consolidated Statement of Financial Data:

| | Year Ended December 31, | | | | |
|---|---|---|---|---|---|
| | 2013 | 2012 | 2011 | 2010 | 2009 |
| | (In thousands except per share data) | | | | |
| **Consolidated Statements of Operations Data** | | | | | |
| **Revenues** | | | | | |
| Retail trading revenue | $ 365,285 | $ 339,685 | $ 363,774 | $ 318,472 | $ 291,668 |
| Institutional trading revenue | 103,994 | 62,033 | 28,908 | 27,833 | 21,107 |
| Trading revenue | 469,279 | 401,718 | 392,682 | 346,305 | 312,775 |
| Interest income | 2,614 | 3,571 | 3,644 | 2,373 | 1,289 |
| Interest expense | (258) | (277) | (329) | (116) | (125) |
| Net interest revenue | 2,356 | 3,294 | 3,315 | 2,257 | 1,164 |
| Other income | 17,953 | 12,303 | 19,581 | 11,599 | 8,666 |
| **Total revenues** | 489,588 | 417,315 | 415,578 | 360,161 | 322,605 |
| **Operating Expenses** | | | | | |
| Compensation and benefits | 105,470 | 105,779 | 95,086 | 76,195 | 62,588 |
| Allocation of Income to Lucid members for services provided | 21,290 | — | — | — | — |
| Total compensation and benefits | 126,760 | 105,779 | 95,086 | 76,195 | 62,588 |
| Referring broker fees | 84,231 | 76,585 | 92,832 | 81,365 | 76,628 |
| Advertising and marketing | 27,091 | 30,860 | 34,897 | 23,788 | 29,355 |
| Communication and technology | 38,441 | 37,113 | 31,869 | 27,120 | 24,026 |
| Trading costs, prime brokerage and clearing fees | 30,821 | 16,935 | 8,167 | 6,597 | 4,542 |
| General and administrative | 68,230 | 63,043 | 63,077 | 31,480 | 21,911 |
| Depreciation and amortization | 53,729 | 36,773 | 20,053 | 9,306 | 6,542 |
| Total operating expenses | 429,303 | 367,088 | 345,981 | 255,851 | 225,592 |
| **Total operating income** | 60,285 | 50,227 | 69,597 | 104,310 | 97,013 |
| **Other Expense** | | | | | |
| Loss on equity method investments, net | 752 | — | — | — | — |
| Interest on borrowings | 7,673 | 2,763 | — | — | — |
| **Income before income taxes** | 51,860 | 47,464 | 69,597 | 104,310 | 97,013 |
| Income tax provision | 17,024 | 8,986 | 10,816 | 4,149 | 10,053 |
| **Net income** | 34,836 | 38,478 | 58,781 | 100,161 | 86,960 |
| Net income attributable to non-controlling interest in FXCM Holdings, LLC | 24,850 | 23,131 | 46,045 | 100,015 | 86,960 |
| Net income attributable to other non-controlling interests | (4,846) | 6,389 | — | — | — |
| Net income attributable to FXCM Inc. | 14,832 | 8,958 | 12,736 | 146 | — |
| Weighted average shares of Class A common stock outstanding | | | | | |
| Basic | 32,789 | 24,086 | 16,567 | 17,319 | — |
| Diluted | 33,957 | 24,086 | 16,567 | 17,319 | — |
| Net income per share attributable to stockholders of Class A common stock of FXCM Inc. | | | | | |
| Basic | $ 0.45 | $ 0.37 | $ 0.77 | $ — | $ — |

38

Cited in In re Global Brokerage
17CV916 Declaration 3/18/21
Archived on 3/23/21
This document is protected by copyright.
Further reproduction is prohibited without permission.

TABLE OF CONTENTS

| | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|
| Diluted | $ | 0.44 | $ | 0.37 | $ | 0.77 | $ | — | $ | — |
| **Consolidated Statements of Financial Condition Data** | | | | | | | | | | |
| Cash and cash equivalents | $ | 365,245 | $ | 272,332 | $ | 184,721 | $ | 193,330 | $ | 139,858 |
| Cash and cash equivalents, held for customers | | 1,190,880 | | 1,190,762 | | 1,046,983 | | 641,152 | | 353,825 |
| Total assets | | 2,223,947 | | 2,065,170 | | 1,487,133 | | 1,047,793 | | 517,936 |
| Customer account liabilities | | 1,190,880 | | 1,190,762 | | 1,046,984 | | 641,152 | | 353,825 |
| Total equity | | 635,381 | | 574,915 | | 293,432 | | 268,007 | | 130,788 |

## OVERVIEW

### Industry Environment

*Economic Environment* — Currency volatility remained at historically low levels in 2013. The daily JPMorgan Global FX Volatility Index was down 2% on average in 2013 compared with 2012. This reduced volatility suppressed trading volumes in both retail and institutional markets.

Volatility in the currency markets significantly impacts customer trading volumes which in turn impact our financial performance. In general, in periods of elevated volatility customer trading volumes tend to increase, however, significant swings in market volatility can also result in increased customer trading losses, higher turnover and reduced trading volume. It is difficult to predict volatility and its effects in the FX market.

*Competitive Environment* — The retail FX trading market is highly competitive. Our competitors in the retail market can be grouped into several broad categories based on size, business model, product offerings, target customers and geographic scope of operations. These include U.S. based retail FX brokers, international multi-product trading firms, other online trading firms, and international banks and other financial institutions with significant FX operations. We expect competition to remain strong for the foreseeable future.

*Regulatory Environment* — Our business and industry are highly regulated. Our operating subsidiaries are regulated in a number of jurisdictions, including the U.S., the U.K. (where regulatory passport rights have been exercised to operate in a number of European Economic Area jurisdictions), Hong Kong, Australia and Japan.

### Business Strategy

Since our inception, we have pursued a strategy to grow the business to reap the benefits of scale and the protection of diversified sources of revenue.

• Increase our Scale Goal: Operating efficiency, sustainable results, resilience across good/bad markets
  ◦ Organic growth supplemented by selective acquisitions
  ◦ Take advantage of market turbulence to increase share
  ◦ Expand distribution through white labels and similar relationships

• Build a Diversified Revenue Base Goal: Exploit global opportunities, protection against downturns in a geography or segment
  ◦ Establish/expand presence in best markets globally
  ◦ Offset declines in one jurisdiction with growth from others
  ◦ Increase institutional presence to balance our strength in retail

### Executive Summary

Despite muted currency volatility in 2013, we are pleased with our 2013 results with retail trading volumes increasing 13% in 2013 compared to 2012 and our institutional trading volumes increasing substantially in 2013 to $2.0 trillion compared to $1.2 trillion for 2012. We are confident in our view that we will be able to continue to grow our revenues and profits in what are still moderately volatile market conditions as compared to the past few years, because of the expansion of our scale.

39

Accused in In re Global Brokerage
17-cv-00916 Decided on 3/23/21
Admitted on 3/18/21
This document is protected by copyright.
Further reproduction is prohibited without permission.

TABLE OF CONTENTS

geographic reach and diverse sources of revenue. As our near-record results in the first half of 2013 demonstrated, small improvements in trading conditions can lead to significant increases in client volumes.

Looking forward, we are optimistic that market conditions will improve in 2014. In particular, rising interest rates will increase our interest income and bring the return of the carry trade. In 2014, we will continue to pursue our strategy of increasing our scale and building a diversified revenue base by pursuing additional white label opportunities, expanding our institutional platform and increasing our presence in emerging markets. Our balance sheet strength and strong cash flow puts us in a position to pursue this strategy through organic growth and selective acquisitions. We will continue to monitor the regulatory landscape. Regulatory changes have been a constant in our market and we expect this will continue. While they can present challenges in different geographies or segments, we continue to believe they present us with more opportunities than obstacles. There are a number of regulations some already enacted, some proposed and some potential, which will impact other asset classes making spot FX more attractive, or impacting other FX brokers, presenting opportunities.

*Primary Sources of Revenues*

Most of our revenues are derived from fees charged as a markup or commission when our retail or institutional customers execute trades on our platform with our FX market makers. This revenue is primarily a function of the number of active accounts, the volume those accounts trade and the fees we earn on that volume.

*Retail Trading Revenue* — Retail trading revenue is our largest source of revenue and is primarily driven by: (i) the number of active accounts and the mix of those accounts — high volume accounts are charged a lower markup; (ii) the volume these accounts trade, which is driven by the amount of funds customers have on deposit, also referred to as customer equity, and the overall volatility of the FX market; (iii) the size of the markup we receive, which is a function of the mix of currency pairs traded, the spread we add to the prices supplied by our FX market makers and the interest differential between major currencies and the markup we receive on interest paid and received on customer positions held overnight; and (iv) retail revenues earned from contract for differences ("CFD") trading, fees earned through white label relationships, payments we receive for order flow from FX market makers and commission income earned from spread betting, equity and related brokerage activities. For the years ended December 31, 2013 and 2012, 31% and 27%, respectively, of our retail trading revenues were derived from the activities noted in item (iv).

*Institutional Trading Revenue* — We generate revenue by executing spot FX trades on behalf of institutional customers through our institutional trading desks: FXCM Pro and Faros Trading LLC ("Faros"), a company in which we recently acquired 50.1% controlling interest. See "*Acquisitions, Faros*" under "*Results of Operations*". The counterparties to these trades are external financial institutions that hold customer account balances and settle these transactions. We receive commissions for these services without incurring market risk. We also earn revenues from market making and electronic trading in the institutional FX spot and futures markets through Lucid. The income we earn on market making and electronic trading in FX spot and futures markets represents the spread between the bid and ask price for positions purchased and sold and the change in value of positions purchased and sold.

*Primary Expenses*

*Compensation and Benefits* — Compensation and benefits expense includes employee salaries, bonuses, stock compensation awards, benefits and employer taxes. Changes in this expense are driven by fluctuations in the number of employees, changes in the composition of our workforce, increases in wages as a result of inflation or labor market conditions, changes in rates for employer taxes and other cost increases affecting benefit plans. The expense associated with our bonus plans can also have a significant impact on this expense category and may vary from period to period. Compensation and benefits also includes the portion of the 49.9% of Lucid's earnings allocated among the non-controlling members of Lucid based on services provided. This allocation is reported as a component of compensation expense under "Allocation of net income to Lucid members for services provided."

At the time of our IPO and thereafter, we have periodically granted awards of stock options to purchase shares of FXCM Inc.'s Class A common stock pursuant to the Long-Term Incentive Plan ("LTIP") to certain employees and independent directors. Stock options granted to employees in connection with our IPO were our largest grant to date representing 79.8% of our stock options awards granted. For the years ended December 31, 2013, 2012 and 2011, we recorded stock compensation expense related to stock options granted of $10.0 million, $10.2 million and $9.5 million, respectively. Of these amounts, $8.8 million related to stock options granted at the time of our IPO for each of the years ended December 31, 2013 and 2012 and $9.2 million for the year ended December 31, 2011, respectively. The LTIP also provides for other stock based awards ("Other Equity Awards") that may be granted by our Executive Compensation Committee. We did not incur any expense for Other Equity Awards for the year ended December 31, 2013. In June 2012, our Executive Compensation Committee granted 943,847

40

Cited in in relation to case.
17CV916 December 4, 2020.
Archived on 3/23/2021.
This document is protected by copyright.
Further reproduction is prohibited without permission.

TABLE OF CONTENTS

of FXCM Inc.'s Class A common stock as an Other Equity Award. The Other Equity Award had a fair value of $11.1 million and vested at the date of grant. Accordingly, Compensation and benefits for the year ended December 31, 2012 includes $11.1 million of expense for this Other Equity Award.

The Lucid acquisition resulted in $9.4 million of deferred compensation of which $3.1 million and $1.7 million was recognized as expense for the years ended December 31, 2013 and 2012, respectively. See "Results of Operations, Acquisitions, Lucid" for additional details.

*Referring Broker Fees* — Referring broker fees consist primarily of compensation paid to our brokers and white labels. We generally provide white labels access to our platform systems and back-office services necessary for them to offer trading services to their customers. We also establish relationships with referring brokers that identify and direct potential trading customers to our platform. Referring brokers and white labels generally incur advertising, marketing and other expenses associated with attracting the customers they direct to our platform. Accordingly, we do not incur any incremental sales or marketing expense in connection with trading revenue generated by customers provided through our referring brokers and/or white labels. We do, however, pay a portion of the trading revenue generated by the customers of our referring brokers and/or white labels and record this expense as Referring broker fees.

*Advertising and Marketing* — Advertising and marketing expense consists primarily of electronic media, print and other advertising costs, as well as costs associated with our brand campaign and product promotion.

*Communications and Technology* — Communications and technology expense consists primarily of costs for network connections to our electronic trading platforms, telecommunications costs, and fees paid for access to external market data. This expense is affected primarily by the growth of electronic trading, our network/platform capacity requirements and by changes in the number of telecommunication hubs and connections which provide our customers with direct access to our electronic trading platforms.

*Trading Costs, Prime Brokerage and Clearing Fees* — Trading costs, prime brokerage and clearing fees primarily represent fees paid to third party clearing banks and prime brokers for clearing foreign exchange spot futures currency and contract transactions, transaction fees paid to exchanges, equity options brokerage activity fees, and fees paid to third party providers for use of their platform for our market making business. Clearing fees primarily fluctuate based on changes in volume, rate of clearing fees charged by clearing banks and rate of fees paid to exchanges.

    *General and Administrative* — We incur general and administrative costs to support our operations, including:

- *Professional fees and outside services expenses* — consisting primarily of legal, accounting and outsourcing fees;

- *Bank processing fees* — consisting of service fees charged by banks primarily related to our customer deposits and withdrawals;

- *Regulatory fees* — consisting primarily of fees from regulators overseeing our businesses which are largely tied to our overall trading revenues. Regulatory fees also includes fines and restitution imposed by regulators from time to time; and

- *Occupancy and building operations expense* — consisting primarily of costs related to leased property including rent, maintenance, real estate taxes, utilities and other related costs.

*Depreciation and Amortization* — Depreciation and amortization expense results primarily from the depreciation of long-lived assets purchased and internally developed software that has been capitalized.

Amortization of purchased intangibles primarily includes amortization of intangible assets obtained through our various acquisitions.

*Income Taxes* — FXCM Holdings, LLC ("Holdings") operates in the U.S. as a limited liability company that is treated as a partnership for U.S. federal, state and local income tax purposes. As a result, Holdings' income from its U.S. operations is not subject to U.S. federal income tax because the income is attributable to its members. Accordingly, our U.S. tax provision is solely based on the portion of Holdings' income attributable to FXCM Inc. and excludes the income attributable to other members of Holdings whose income is included in Net income attributable to non-controlling interest in FXCM Holdings, LLC in our consolidated statements of operations.

In addition to U.S. federal and state income taxes, Holdings is subject to New York City Unincorporated Business Tax which is attributable to Holdings' operations apportioned to New York City. Our foreign subsidiaries are also subject to local

41

Cited in In re Global Brokerage...
17Cv916 Decider archived 8/14
Archived on 3/23/2...
This document is protected by copyright.
Further reproduction is prohibited without permission.

TABLE OF CONTENTS

taxes. In addition, Lucid Markets LLP is a limited liability partnership treated as a partnership for income tax purposes. As a result, Lucid Markets LLP's income is not subject to U.K. corporate income tax because the income is attributable to its members. Therefore, Lucid's tax provision (a component of the Company's tax provision) is solely based on the portion of its income attributable to its managing member, Lucid Markets Trading Limited, a U.K. limited liability company subject to U.K. corporate income tax and excludes the income attributable to other members of Lucid Markets LLP whose income is included in *Allocation of net income to Lucid members for services provided* reported in our consolidated statements of operations as a component of compensation and benefits expense.

*Other*

Net income attributable to non-controlling interest in FXCM Holdings, LLC — FXCM Inc. is a holding company, and its sole material asset is a controlling membership interest in Holdings. As the sole managing member of Holdings, FXCM Inc. operates and controls all of the business and affairs of Holdings and, through Holdings and its subsidiaries, conducts our business. FXCM Inc. consolidates the financial results of Holdings and its subsidiaries, and the ownership interest of the other members of Holdings is reflected as a non-controlling interest in our consolidated financial statements.

Net income (loss) attributable to other non-controlling interests and Allocation of net income to Lucid members for services provided — We consolidate the financial results of Lucid in which we have a 50.1% controlling interest. The 49.9% ownership interest of the non-controlling Lucid members is reflected as follows:

• The portion of the 49.9% of earnings allocated among the non-controlling members of Lucid based on services provided to Lucid is reported as a component of compensation and benefits expense in our consolidated statements of operations.
• The portion of the 49.9% of earnings allocated among the non-controlling members not allocated based on services provided is reported as a component of Net income (loss) attributable to other non-controlling interests in our consolidated statements of operations.

We also consolidate the financial results of other entities in which we have a controlling interest. The ownership interests of the non-controlling members is reported in net income (loss) attributable to other non-controlling interests in the consolidated statements of operations.

Adjusted Pro Forma Results - We utilize and report results presented on an Adjusted Pro Forma basis that excludes certain income and expenses not in the ordinary course of business [1], certain items relating to the IPO of FXCM Inc. and also reflect the exchange of all units of FXCM Holdings, LLC for shares of Class A common stock of FXCM Inc. We manage our business using these measures and believe that these Adjusted Pro Forma measures, when presented in conjunction with comparable generally accepted accounting principles in the United States of America ("U.S. GAAP") measures, are useful to investors to compare our results across different periods and facilitate an understanding of our operating results. Income and expense items not in the ordinary course of our business are noted throughout our management discussion and analysis. Further, the differences between Adjusted Pro Forma and U.S. GAAP results and reconciliations of our Adjusted Pro Forma results with our results presented in accordance with U.S. GAAP are detailed in the Non-GAAP Financial Measures section of our Management's Discussion and Analysis.

[1] 2013 items primarily include a $16.6 million regulatory settlement with the FCA, a $7.0 million benefit related to acquisition contingent consideration, a $3.5 million asset impairment charge and compensation costs of $3.8 million in connection with the renegotiation of a certain employment contract. 2012 items primarily include compensation costs of $13.8 million related to the renegotiation of an employee contract and a $4.4 million regulatory settlement with the Japan FSA. Please refer to Non-GAAP Financial Measures for additional information.

*Segment Information*

Accounting Standards Codification ("ASC") 280, *Segment Reporting* — The Financial Accounting Standards Board ("FASB") establishes standards for reporting information about operating segments. Operating segments are defined as components of an enterprise about which separate financial information is available that is evaluated regularly by the chief operating decision maker, or decision making group, in deciding how to allocate resources and in assessing performance. Our operations relate to FX trading and related services and operate in two segments — retail and institutional, with different target markets with separate sales forces, customer support and trading platforms. For financial information regarding our segments, see Note 26 to our consolidated financial statements.

42

TABLE OF CONTENTS

*Common Stock Repurchase Program*

On May 17, 2011 and October 17, 2011, our board of directors approved the repurchase of $30.0 million and $20.0 million of our Class A common stock (the "Stock Repurchase Program"), respectively. On November 7, 2012, the board of directors approved a $30.0 million increase in the Stock Repurchase Program for an aggregate of $80.0 million. As of December 31, 2013, we had repurchased 5.0 million shares for $61.9 million under these authorizations.

Pursuant to an agreement between FXCM Inc. and Holdings, anytime FXCM Inc. repurchases shares of its Class A common stock, Holdings enters into an equivalent Holding Units transaction with FXCM Inc. Therefore, as of December 31, 2013, Holdings has repurchased 5.0 million of Holding Units from FXCM Inc. related to FXCM Inc. Class A common stock repurchases noted above.

*Credit Agreement*

In December 2011, we entered into a three year credit agreement (the "Credit Agreement") with a syndicate of financial institutions. The Credit Agreement provided for a revolving credit line of up to $75.0 million. The credit facility is guaranteed by certain subsidiaries of ours and is secured by a pledge of all of the equity interests in certain of our domestic subsidiaries and 65% of the voting equity interests in certain of our foreign subsidiaries.

On November 8, 2012, we entered into an amendment to the Credit Agreement (the "Amendment"). The Amendment provided us with the ability to increase the credit facility during the term of the Credit Agreement up to a maximum of $175.0 million. Additionally, the Amendment modified certain terms of the Credit Agreement, among other things, to provide additional flexibility regarding financing and investment initiatives. Simultaneously, on November 8, 2012, we received additional commitments from a group of financial institutions, both new and existing lenders, and increased the credit facility to $155.0 million

On November 15, 2013, we entered into an amendment to the Credit Agreement (the "2013 Amendment"). The 2013 amendment extended the final maturity date of the credit facility to December 2016 and provided us with the ability to increase the credit facility during the term of the Credit Agreement up to a maximum of $250.0 million. Additionally, the 2013 Amendment modified certain terms of the Credit Agreement, among other things, to provide additional flexibility regarding financing and investment initiatives. Simultaneously, on November 15, 2013, we received additional commitments from existing lenders and increased the credit facility to $205.0 million.

See "Liquidity and Capital Resources" for more information.

*Convertible Senior Notes due 2018*

In June 2013, FXCM Inc. issued $172.5 million principal amount of Convertible Notes and received net proceeds of $166.5 million, after deducting the initial purchasers' discount and offering expenses. The Convertible Notes pay interest semi-annually on June 15 and December 15 at a rate of 2.25% per year, commencing December 15, 2013. The Convertible Notes will mature on June 15, 2018. We used $10.5 million of the net proceeds of the offering to fund the net cost of the convertible note hedge and warrant transactions entered into concurrently with the issuance of the Convertible Notes, repaid $80.0 million of outstanding borrowings under our revolving credit agreement and repaid $22.9 million of outstanding promissory notes issued in connection with the Lucid acquisition. We intend to use the remaining net proceeds from the offering for general corporate purposes, including potential future acquisitions. See "Liquidity and Capital Resources" for more information.

**RESULTS OF OPERATIONS**

*Acquisitions*

*Faros* - On September 20, 2013 (the "Faros Acquisition Date"), we acquired a 50.1% controlling interest in Faros. Faros provides foreign exchange intelligence, market coverage, and execution services to the institutional foreign exchange market. The acquisition further expands our presence and capabilities in the institutional marketplace. As consideration, we provided an initial cash payment of $5.0 million (the "Initial Payment") and a follow-on payment (the "Follow-on Payment") to be made in 2015 in an amount to be determined, based on the sale purchase agreement (the "Faros Purchase Agreement") estimated at $10.6 million on the Faros Acquisition Date for a total estimated purchase price of $15.6 million. Pursuant to the terms of the Faros Purchase Agreement, the Follow-on Payment is payable partly in shares of FXCM Inc.'s Class A common stock to one of the Faros sellers if certain criteria are met. Under the terms of the Faros Purchase Agreement, any of the FXCM Inc.'s Class A

43

Cited in Professional Brokerage
17CV916 - 3/18/21
Archived with copyright.
This document is protected by copyright.
Further reproduction is prohibited without permission.

TABLE OF CONTENTS

common stock issued to the Faros seller will be restricted for sale until September 2021 if the Faros seller ceases to be employed by Faros as of either December 31, 2015 or December 31, 2016 for reasons other than death, disability or the sale of the majority of the Corporation's combined voting power. As of December 31, 2013, the fair value of the Follow-on Payment was estimated at $3.7 million. The $7.0 million decrease in the estimated fair value of the Follow-on Payment was recorded in Other income in the statements of operations. The decline in the estimated fair value of the Follow-on Payment is due to lowering our Faros EBITDA estimate.

The assets acquired, liabilities assumed and non-controlling interest were recorded at their estimated fair values at the Faros Acquisition Date. This resulted in the recording of intangible assets of $8.0 million primarily related to customer relationships, which will be amortized over 4 years. Goodwill of $23.0 million was recorded as the excess over the estimated fair value of the assets acquired. In addition, the estimated fair value of a liquidity restriction related to the Follow-on Payment was $0.4 million which is accounted for as deferred compensation and recognized over a 3.25 year term in Compensation and benefits in the statements of operations.

*Lucid* - On June 18, 2012 (the " Lucid Acquisition Date"), we acquired a 50.1% controlling interest in Lucid to expand our presence and capabilities in the institutional marketplace. Lucid's sole material asset is a controlling membership interest in Lucid Markets LLP, an electronic market maker and trader in the institutional foreign exchange spot and futures markets headquartered in the U.K. As consideration for our interest, we issued 3.5% unsecured promissory notes totaling $71.4 million, and 9.0 million shares of FXCM Inc.'s Class A common stock to the Lucid sellers as well as $15.8 million in 3.5% unsecured promissory notes for all controlling untiliquid assets for a total estimated purchase price of $177.5 million. Any of the FXCM Inc.'s common shares issuable to a Lucid seller on an anniversary from the Acquisition Date is restricted (the "Lucid Liquidity Restriction") for sale until the eighth anniversary of the Acquisition Date if the recipient ceases to be employed by us.

The assets acquired, liabilities assumed and non-controlling interest were recorded at their estimated fair values at the Lucid Acquisition Date. This resulted in the recording of intangible assets of $84.9 million primarily related to proprietary technology, which will be amortized over a weighted average life of 4.1 years. Goodwill of $236.5 million was recorded as the excess over the estimated fair value of the net assets acquired. In addition, the estimated fair value assigned to the Lucid Liquidity Restriction was $9.4 million, which is accounted for as deferred compensation and recognized over a 3 year term in Compensation and benefits in the statements of operations. In the second quarter of 2013, the purchase price was increased by $15.3 million due to the final determination of tax balances at the Lucid Acquisition Date adjusted during the measurement period. We issued 2.25% unsecured promissory notes to the Lucid sellers for this purchase price increase. In connection with this adjustment, the goodwill initially recorded was reduced by $1.2 million to $235.3 million.

*Foreland and FXCMJ* - On October 7, 2011 and March 31, 2011, we acquired a 100% interest in Foreland and FXCMJ, respectively, two Japan based foreign exchange providers. The acquisitions were designed to increase our profile in the Japanese market and accelerate its growth in Asia, utilizing Foreland and FXCMJ's relationships and sales force. As consideration, we provided $37.7 million and $15.7 million in cash, respectively.

The acquisitions noted above have resulted in a significant increase in amortization of intangible assets in our consolidated statements of operations and comprehensive income as these intangible assets are amortized over their estimated useful lives. In addition, the acquisitions of these entities contributed to year over year revenue and operating expense fluctuations highlighted in our discussion of year over year results since we begin reporting their respective revenues and operating expenses as of the acquisition date. Therefore, a full year of their associated revenues and operating expenses are not reflected in the year in which the respective entity was acquired.

44

Cited in In re Global Brokerage
17CV916 Decided 3/18/21
Archived on 3/23/21
This document is protected by copyright.
Further reproduction is prohibited without permission.

TABLE OF CONTENTS

*Year Ended December 31, 2013 and 2012*

The following table sets forth our consolidated statements of operations for the years ended December 31, 2013 and 2012:

| | For the Year Ended December 31, | |
|---|---|---|
| | 2013 | 2012 |
| | (Amounts in thousands) | |
| **Revenues** | | |
| Retail trading revenue | $ 365,285 | $ 339,685 |
| Institutional trading revenue | 103,994 | 62,033 |
| Trading revenue | 469,279 | 401,718 |
| Interest income | 2,614 | 3,571 |
| Brokerage interest expense | (258) | (277) |
| Net interest revenue | 2,356 | 3,294 |
| Other income | 17,953 | 12,303 |
| **Total net revenues** | 489,588 | 417,315 |
| **Operating Expenses** | | |
| Compensation and benefits | 105,470 | 105,779 |
| Allocation of income to Lucid members for services provided | 21,290 | — |
| Total compensation and benefits | 126,760 | 105,779 |
| Referring broker fees | 84,231 | 76,585 |
| Advertising and marketing | 27,091 | 30,860 |
| Communication and technology | 38,441 | 37,113 |
| Trading costs, prime brokerage and clearing fees | 30,821 | 16,935 |
| General and administrative | 68,230 | 63,043 |
| Depreciation and amortization | 53,729 | 36,773 |
| Total operating expenses | 429,303 | 367,088 |
| **Total operating income** | 60,285 | 50,227 |
| **Other Expense** | | |
| Loss on equity method investments, net | 752 | |
| Interest on borrowings | 7,673 | 2,763 |
| Income before income taxes | 51,860 | 47,464 |
| Income tax provision | 17,024 | 8,986 |
| Net income | 34,836 | 38,478 |
| Net income attributable to non-controlling interest in FXCM Holdings, LLC | 24,850 | 23,131 |
| Net income attributable to other non-controlling interests | (4,846) | 6,389 |
| Net income attributable to FXCM Inc. | $ 14,832 | $ 8,958 |

45

Cited In re Global Brokerage ... 7C ... 16 Decided 3/18/ ...
Archived on 3/22/ ...
This document is protected by copyright.
Further reproduction is prohibited without permission.

TABLE OF CONTENTS

*Other Selected Operating Financial Metrics*

| | For the Year Ended December 31, | | |
|---|---|---|---|
| | **2013** | **2012** | **2011** |
| Customer equity (in millions) | $ 1,191 | $ 1,191 | $ 1,047 |
| Tradable accounts | 188,130 | 190,217 | 194,606 |
| Active accounts | 183,679 | 170,930 | 163,094 |
| Daily average trades - retail customers | 437,947 | 364,417 | 381,030 |
| Total retail trading volume [1] (billions) | 4,068 | 3,601 | 3,774 |
| Retail trading revenue per million traded [1] | 90 | 94 | 96 |
| Average retail customer trading volume per day [1] (billions) | 15.8 | 13.9 | 14.5 |
| Daily average trades - institutional customers | 33,387 | 14,136 | 14,097 |
| Institutional trading volumes [1] (billions) | 2,022 | 1,178 | 1,171 |
| Average institutional customer trading volume per day [1] (billions) | 7.8 | 4.6 | 4.5 |
| Trading days | 258 | 259 | 260 |

[1] Volume that an FXCM customer traded in period translated into US dollars.

*Highlights*

In 2013 and 2012, we took the following actions to support our strategy to increase our scale and build a diversified revenue base:

- We improved our liquidity by issuing 2.25% Convertible Notes with an aggregate principal amount of $172.5 million in June 2013. In addition, in both 2013 and 2012, we amended our credit agreement to increase the total commitments provided under the facility. Our amendment in November 2013 increased the total commitments to $205.0 million, provides us with the ability to expand the facility to $250.0 million and extended the final maturity date to December 2016. The credit facility was also amended to provide for continued flexibility regarding financing and investment initiatives. By improving our liquidity, we are now in a better position to pursue organic and external growth opportunities.
- On June 18, 2012, we purchased a 50.1% interest in Lucid, an electronic market maker and trader in the institutional foreign exchange spot and futures markets headquartered in the U.K. in order to expand our presence and capabilities in the institutional market place.
- In the second quarter of 2012, we invested in FastMatch, a newly formed third party ECN for spot foreign exchange trading that offers customers access to large pools of diversified liquidity with the speed and transparency of equities trading and with a customer target of retail brokers, institutions, banks, hedge funds and proprietary trading firms.
- In September 2013, we purchased a 50.1% interest in Faros, a provider of foreign exchange intelligence, market coverage, and execution services to the institutional foreign exchange market.

Despite historically low currency volatility, our customer metrics and financial results improved in 2013 when compared to 2012:

- Retail trading volume increased 13% to $4,068 billion.
- Institutional trading volume increased 72% to $2,022 billion.
- Reported net income of $34.8 million, decreased 9.5% or $3.6 million from 2012.
- Adjusted Pro Forma net income of $74.2 million, an increase of $25.3 million and 51.6% respectively versus 2012.

46

Created in live exchange 3/17/19 from
17/916 Record Exhibit
Archived on 12/23/20
This document is protected is protected
Further reproduction is prohibited without permission

TABLE OF CONTENTS

*Revenues*

|  | December 31, 2013 | | December 31, 2012 |
|---|---|---|---|
|  | (In thousands) | | |
| **Revenues:** | | | |
| Retail trading revenue | $ 365,285 | $ | 339,685 |
| Institutional trading revenue | 103,994 | | 62,033 |
| Trading revenue | 469,279 | | 401,718 |
| Interest income | 2,614 | | 3,571 |
| Brokerage interest expense | (258) | | (277) |
| Net interest revenue | 2,356 | | 3,294 |
| Other income | 17,953 | | 12,303 |
| **Total net revenues** | $ 489,588 | $ | 417,315 |

Retail trading revenue increased by $25.6 million or 7.5% for the year ended December 31, 2013 compared to the year ended December 31, 2012. While revenue per million decreased 4.3%, revenue overall increased, primarily due to an increase in revenues earned from CFD trading offset by lower revenue from retail FX trading. The decline in revenue from retail FX trading, despite the volume increase of 13%, is driven by a higher proportion of volume coming from Yen-based currency pairs in 2013, where we earn a lower mark-up on these trades.

Institutional trading revenue increased by $42.0 million or 67.6% to $104.0 million for the year ended December 31, 2013 compared to the year ended December 31, 2012. The increase is due primarily to $39.7 million of increased revenue from Lucid resulting from the inclusion of revenues for the full year in 2013 versus six and a half months in 2012. Revenues from our other institutional business also increased $2.3 million or 11.6% due primarily to increased volume in spite of a lower mark-up. In 2012, we undertook several initiatives aimed at improving our institutional volume and increasing our institutional market share. Specifically, starting in the first quarter of 2012, we began migrating clients from a third party platform to an in-house platform and we passed the savings that resulted from the migration to our customers by lowering the customer mark-up. In addition, in the second quarter of 2012, we entered into a relationship with FastMatch, a third party ECN for spot foreign exchange trading that offers customers access to large pools of diversified liquidity with the speed and transparency of equities trading and with a customer target of retail brokers, institutions, banks, hedge funds and proprietary trading firms. These two initiatives now make up the majority of our institutional volume.

Net interest revenue decreased $0.9 million for the year ended December 31, 2013 compared to the year ended December 31, 2012. The decrease is attributable to cash held in lower yielding bank accounts somewhat offset by higher cash balances held.

Other income of $18.0 million for the year ended December 31, 2013 primarily consists of a $7.0 million benefit related to an adjustment recorded in December 2013 to reduce the initial contingent consideration recorded for the Faros acquisition (see Acquisitions - Faros for additional information), $3.1 million of account dormancy and ancillary fees, $7.2 million of FSL's brokerage activities and a bad debt recovery of $0.8 million, offset by a charge of $1.2 million attributable to the remeasurement of the tax receivable agreement liability to reflect a revised U.S. federal tax rate. Other income of $12.3 million for the year ended December 31, 2012 primarily consists of $3.0 million of account dormancy and ancillary fees, $5.9 million of FSL's brokerage activities and $1.4 million from a settlement with the former owners of ODL. The increase in FSL's brokerage revenue relates to our London Metals Exchange ("LME") desk which commenced trading in the second quarter of 2012.

47

Cited in In re Global . . .
17Cv916 Decided . . .

Archived on 3/23/21

This document is protected by copyright.
Further reproduction is prohibited without permission.

TABLE OF CONTENTS

*Expenses*

| | December 31, 2013 | | December 31, 2012 |
|---|---|---|---|
| | (In thousands) | | |
| **Expenses:** | | | |
| Compensation and benefits | $ 105,470 | | 105,779 |
| Allocation of income to Lucid members for services provided | 21,290 | | — |
| Total compensation and benefits | 126,760 | | 105,779 |
| Referring broker fees | 84,231 | $ | 76,585 |
| Advertising and marketing | 27,091 | | 30,860 |
| Communication and technology | 38,441 | | 37,113 |
| Trading costs, prime brokerage and clearing fees | 30,821 | | 16,935 |
| General and administrative | 68,230 | | 63,043 |
| Depreciation and amortization | 53,729 | | 36,773 |
| Total expenses | 429,303 | | 367,088 |

Compensation and benefits expense increased $21.0 million or 19.8% to $126.8 million for the year ended December 31, 2013 compared to the year ended December 31, 2012. Compensation expense in 2013 includes Allocation of income to Lucid members for services provided of $21.3 million, representing the portion of the 49.9% of Lucid's earnings allocated among the non-controlling members of Lucid based on services provided. In addition, compensation expense in 2013 and 2012 includes charges of $3.5 million and $11.1 million, respectively, in connection with the renegotiation of an employee contract. Excluding these items, compensation and benefits increased $7.3 million for the year ended December 31, 2013 compared to the year ended December 31, 2012. The increase is primarily attributable to higher headcount, an increase in variable compensation, a higher rate of amortization of deferred compensation expense for Lucid and an increase in stock compensation expense.

Referring broker fees increased $7.6 million or 10.0% to $84.2 million for the year ended December 31, 2013 compared to the year ended December 31, 2012. The increase is related to an increase in indirect retail trading volumes of 7.8% and higher CFD referring broker fees.

Advertising and marketing expense decreased $3.8 million or 12.2% to $27.1 million for the year ended December 31, 2013 compared to the year ended December 31, 2012. The decrease is partly due to ending our sponsorship of a FX television show and trading contest on the CNBC television network in February 2013. Advertising and marketing costs have decreased in line with our strategy to reduce costs through targeted advertising and marketing initiatives.

Communication and technology expense increased $1.3 million or 3.6% to $38.4 million for the year ended December 31, 2013 compared to the year ended December 31, 2012. The $1.3 million increase is primarily attributable to (i) 1.2 million due to the inclusion of Lucid expenses for the full year in 2013 versus six and a half months in 2012; (ii) $0.9 million of market data listing fees related to the CFD business; (iii) $0.8 million of FastMatch expenses; (iv) $0.5 increased expenses for FXCM Pro, partially offset by (v) $1.4 million lower equipment maintenance cost and (vi) $0.9 million lower equipment leasing costs and technology provider costs for FSL.

Trading costs, prime brokerage and clearing fees increased $13.9 million or 82.0% to $30.8 million for the year ended December 31, 2013 compared to the year ended December 31, 2012. The $13.9 million increase is primarily attributable to (i) $10.5 million due to the inclusion of Lucid expenses for the full year in 2013 versus six and a half months in 2012; (ii) $0.6 million attributable to FSL for our LME Desk which commenced trading in the second quarter of 2012 and (iii) $2.3 million related to higher prime broker fees.

General and administrative expense increased $5.2 million or 8.2% to $68.2 million for the year ended December 31, 2013 compared to the year ended December 31, 2012. General and administrative expense for the year ended December 31, 2013 includes an expense of $16.6 million pertaining to a settlement with the FCA regarding pre August 2010 trade execution practices, and general and administrative expense for the year ended December 31, 2012 includes a $4.2 million accrual established to settle certain trading system matters with the JFSA. Excluding these settlements, general and administrative expense decreased $7.2 million. The $7.2 million decrease is primarily attributable to (i) $1.0 million of one-time costs incurred

48

Cited in Complaint Brous 11/18/21
17Cv916RABCM 2021-12-15 doc 1
Archived 2022-03-23
This document is protected by copyright.
Further reproduction is prohibited without permission.

TABLE OF CONTENTS

in the first quarter of 2012 related to the relocation of FXCMJ's operations and system redundancy; (ii) lower bank charges of $1.7 million due to the termination of a vendor relationship in Japan; (iii) $1.2 million decrease in FCA extraordinary levy (iv) $1.6 million of acquisition costs incurred in the second quarter of 2012; (v) $1.1 million lower professional fees for FSL, primarily audit costs, and (vii) $0.5 million lower U.K. consumption taxes.

Depreciation and amortization expense increased $17.0 million or 46.1% to $53.7 million for the year ended December 31, 2013 compared to the year ended December 31, 2012. The $17.0 million increase is primarily attributable to (i) $10.0 million due to the inclusion of Lucid expense for intangible amortization for the full year in 2013 versus six and a half months in 2012; (ii) a $3.5 million impairment charge to write down the value of an electronic FX option trading platform and (iii) $4.0 million due to higher depreciation related to capitalized software.

***Non-Operating Expenses***

| | December 31, 2013 | | December 31, 2012 |
|---|---|---|---|
| | (In thousands) | | |
| ***Contractual interest expense*** | | | |
| Credit Agreement | $ 869 | $ | 913 |
| Lucid Promissory Notes | 405 | | 1,546 |
| Convertible Notes[1] | 2,232 | | — |
| ***Amortization of Debt Discount*** | | | |
| Convertible Notes[1] | 2,904 | | — |
| ***Amortization of Debt Issuance Costs*** | | | |
| Credit Agreement | 564 | | 304 |
| Convertible Notes[1] | 699 | | — |
| Total interest expense | $ 7,673 | $ | 2,763 |

[1] Convertible Notes were issued June 3, 2013. See "Liquidity and Capital Resources" for more information.

The following table presents the weighted average borrowings under the Credit Agreement, the Lucid Promissory Notes and the Convertible Notes:

| | December 31, 2013 | | December 31, 2012 |
|---|---|---|---|
| | (in millions) | | |
| Credit agreement | $ 34.9 | $ | 41.2 |
| Lucid Promissory Notes | 18.1 | | 44.2 |
| Convertible Notes | 83.7 | | — |

Cited in In re Global Brokerage
17CV916 Decided 3/18/21
Archived on 3/23/21
This document is protected by copyright.
Further reproduction is prohibited without permission.

TABLE OF CONTENTS

*Income Taxes*

| | December 31, 2013 | | December 31, 2012 |
|---|---|---|---|
| | (In thousands, except percentages) | | |
| Income before income taxes | $ 51,860 | $ | 47,464 |
| Income tax provision | 17,024 | $ | 8,986 |
| Effective tax rate | 32.8% | | 18.9% |

Our operating subsidiary, Holdings, is as a limited liability company that is treated as a partnership for U.S. federal and state income tax purposes. As a result, Holdings income is not subject to U.S. federal income tax because the income is attributable to its members. Accordingly, our U.S. tax provision is solely based on the portion of Holdings' income attributable to FXCM Inc. and excludes the income attributable to other members of Holdings whose income is included in Net income attributable to non-controlling interests in FXCM Holdings, LLC in our consolidated statements of operations.

Accordingly, our effective tax rates reflect the proportion of income recognized by FXCM Inc. taxed at the U.S. marginal corporate income tax rate of 34% and the proportion of income recognized by each of our international subsidiaries subject to tax at their respective local jurisdiction tax rates unless subject to U.S. tax by election or as a U.S. controlled foreign corporation.

Our income tax provision increased $8.0 million for the year ended December 31, 2013 compared to the year ended December 31, 2012. Our effective tax rate increased to 32.8% for the year ended December 31, 2013 from 18.9% for the year ended December 31, 2012. The increase in the effective tax rate for the year ended December 31, 2013 compared to the year ended December 31, 2012 was primarily due to an increase in our ownership in Holdings, a valuation allowance established on foreign tax credits and the non-deductible FCA penalty accrued. The increase in our ownership in Holdings is due to members of Holdings exchanging their membership units for our Class A common stock. Our effective tax rate increases as additional exchanges occur because the portion of Holdings' income attributable to FXCM Inc., and therefore taxable, increases. The effect of Holdings members' unit exchanges is partially offset by our Class A common stock repurchases. Anytime we repurchase shares of our Class A common stock, Holdings enters into an equivalent Holdings membership unit transaction with us. The effect of these repurchases decreases our ownership in Holdings and, accordingly, decreases the portion of Holdings' income attributable to FXCM Inc. In addition, our effective tax rate increased due to earning a higher portion of our income from subsidiaries (primarily Lucid) taxed locally as corporations in their respective foreign jurisdictions in 2013. This increase in tax on foreign sourced income is somewhat offset by a lower statutory tax rate in effect in the U.K.

Cited in In re Global Brokerage
17Cv916 Decided 3/18/21
Archived on 3/23/21
This document is protected by copyright.
Further reproduction is prohibited without permission.

TABLE OF CONTENTS

*Year Ended December 31, 2012 and 2011*

The following table sets forth our consolidated statement of operations for the years ended December 31, 2012 and 2011:

|  | For the Year Ended December 31, | |
|  | 2012 | 2011 |
|  | (Amounts in thousands) | |
| **Revenues** | | |
| Retail trading revenue | $ 339,685 | $ 363,774 |
| Institutional trading revenue | 62,033 | 28,908 |
| Trading revenue | 401,718 | 392,682 |
| Interest income | 3,571 | 3,644 |
| Brokerage interest expense | 277 | 329 |
| Net interest revenue | 3,294 | 3,315 |
| Other income | 12,303 | 19,581 |
| **Total net revenues** | 417,315 | 415,578 |
| **Operating Expenses** | | |
| Referring broker fees | 76,585 | 92,832 |
| Compensation and benefits | 105,779 | 95,086 |
| Advertising and marketing | 30,860 | 34,897 |
| Communication and technology | 37,113 | 31,869 |
| Trading costs, prime brokerage and clearing fees | 16,935 | 8,167 |
| General and administrative | 63,043 | 63,077 |
| Depreciation and amortization | 36,773 | 20,053 |
| Total operating expenses | 367,088 | 345,981 |
| **Total operating income** | 50,227 | 69,597 |
| **Other Expense** | | |
| Interest on borrowings | 2,763 | — |
| **Income before income taxes** | 47,464 | 69,597 |
| Income tax provision | 8,986 | 10,816 |
| **Net income** | 38,478 | 58,781 |
| Net income attributable to non-controlling interest in FXCM Holdings, LLC | 23,131 | 46,045 |
| Net income attributable to non-controlling interest in Lucid | 6,389 | — |
| Net income attributable to FXCM Inc. | $ 8,958 | $ 12,736 |

*Highlights*

- On June 18, 2012, we consummated the acquisition of Lucid, an electronic market maker and trader in the institutional foreign exchange spot and futures markets headquartered in the U.K. Our acquisition of Lucid is intended to expand our presence and capabilities in the institutional marketplace.

- In 2012, we experienced significant growth in institutional trading with a 114.6% increase in institutional trading revenue to $62.0 million primarily as a result of the acquisition of Lucid. Revenues from Lucid were 10.1% or $42.2 million of our total net revenues since its acquisition.

- Total net revenues increased $1.7 million or 0.4% to $417.3 million for the year ended December 31, 2012 compared to the year ended December 31, 2011 as institutional trading revenues increased with the Lucid acquisition, offset by 6.6% and 37.2% decline in retail trading revenues and other income, respectively. Retail trading revenues declined as a result of lower volatility, decreased trading volume of 4.6% and a 2.1% decrease in markup to $94 per million traded. Other income decreased due to the recognition of $6.0 million in deferred revenue in 2011 resulting from the termination of an agreement to provide trade execution services to FXCMJ and the inclusion of non-recurring income

Exhibit 705 In re Global Brokerage
2016 Decided 3/18/21
This document is protected by copyright.
Further reproduction is prohibited without permission.
on 3/23/21

TABLE OF CONTENTS

of $3.3 million attributable to the remeasurement of a liability pursuant to the tax receivable agreement to reflect our revised U.S. federal tax rate in 2011.

- Net income decreased 34.5% or $20.3 million to $38.5 million for the year ended December 31, 2012 versus the year ended December 31, 2011 as a result of the acquisitions of Lucid, Foreland, and FXCMJ in June 2012, October 2011 and March 2011, respectively, including higher amortization of intangibles relating to these acquisitions. Net income also decreased due to the inclusion of compensation costs of $13.8 million in connection with the renegotiation of certain employment contracts and the Lucid acquisition, offset by lower referring broker, advertising and marketing and general and administrative costs during the year ended December 31, 2012 compared to the year ended December 31, 2011.

*Revenues*

| | December 31, 2012 | | December 31, 2011 |
|---|---|---|---|
| | (In thousands) | | |
| **Revenues:** | | | |
| Retail trading revenue | $ 339,685 | $ | 363,774 |
| Institutional trading revenue | 62,033 | | 28,908 |
| Trading revenue | 401,718 | | 392,682 |
| Interest income | 3,571 | | 3,644 |
| Brokerage interest expense | 277 | | 329 |
| Net interest revenue | 3,294 | | 3,315 |
| Other income | 12,303 | | 19,581 |
| **Total net revenues** | $ 417,315 | $ | 415,578 |

Retail trading revenue decreased by $24.1 million or 6.6% to $339.7 million for the year ended December 31, 2012 compared to the year ended December 31, 2011 primarily due to the decline in retail trading volume of 4.6% resulting from lower volatility in the currency markets and the effect of that on customer volumes and a 2.1 % decrease in markup to $94 per million resulting from a higher proportion of volume coming from higher volume retail clients trading on lower average markups. The impact of lower volatility in the currency markets was dampened by growth in customer equity. In 2012, we grew customer equity by 14% to $1.2 billion.

Institutional trading revenue increased by $33.1 million or 114.5% to $62.0 million for the year ended December 31, 2012 compared to the year ended December 31, 2011. The net increase of $33.1 million was due to the inclusion of $42.2 million of Lucid's revenue in the year ended December 31, 2012 offset by a decline of $9.1 million or 31.4% in revenue earned by our other institutional business. The decline of $9.1 million in our other institutional business is attributable to a 32.0% lower markup. In 2012, despite the low volatility in currencies and a de-risking by a number of market participants, resulting in lower volumes generally in the institutional FX market, our institutional trading volume increased 1% when compared to last year. We believe this performance was due to the migration of clients from a third party platform to an in-house platform in which we passed the savings that resulted from migration to customers by lowering the customer mark-up. We believe that over time volume increases will make up for the lower markup.

Net interest revenue remained consistent for the year ended December 31, 2012 compared to the year ended December 31, 2011.

Other income decreased by $7.3 million or 37.2% to $12.3 million. Other income in 2011 included the recognition of $6.0 million in previously deferred revenue recognized upon the termination of an agreement to provide trade execution services to FXCMJ prior to our acquisition and the inclusion of non-recurring income of $3.3 million attributable to the remeasurement of a liability pursuant to the tax receivable agreement to reflect our revised U.S. federal tax rate. When excluding these items, other income increased $2.0 million or 19.2%. The $2.0 million increase is attributable to $2.4 million of account maintenance fees (these fees were $2.5 million for the year ended December 31, 2012 and were included in Retail trading revenue) and a $1.4 million gain from a settlement with the former owners of ODL. This was partially offset by a $1.0 million decline in ODL's brokerage activities business and a decrease in service licensing fees of $0.7 million.

52

Cited in a legal Brokers copyright.
17CV916 on 1/13/21
Archived on 1/13/21
This document is protected.
Further reproduction is prohibited without permission.

TABLE OF CONTENTS

*Expenses*

| | December 31, 2012 | December 31, 2011 |
|---|---|---|
| | (In thousands) | |
| **Expenses:** | | |
| Referring broker fees | $ 76,585 | $ 92,832 |
| Compensation and benefits | 105,779 | 95,086 |
| Advertising and marketing | 30,860 | 34,897 |
| Communication and technology | 37,113 | 31,869 |
| Trading costs, prime brokerage and clearing fees | 16,935 | 8,167 |
| General and administrative | 63,043 | 63,077 |
| Depreciation and amortization | 36,773 | 20,053 |
| **Total expenses** | $ 367,088 | $ 345,981 |

Referring broker fees decreased $16.2 million or 17.5% to $76.6 million for the year ended December 31, 2012 compared to the year ended December 31, 2011. The decrease in referring broker fees is correlated to the decrease in indirect volume of 17.9% during the year ended December 31, 2012 compared to the year ended December 31, 2011.

Compensation and benefits expense increased $10.7 million or 11.3% for the year ended December 31, 2012 compared to the year ended December 31, 2011. The $10.7 million net increase in compensation and benefits is primarily due to: (i) $12.1 million of expense related to equity based compensation issued in connection with the renegotiation of certain employment contracts; (ii) $1.7 million associated with the amortization of the deferred compensation in relation to the Lucid acquisition and (iii) $1.9 million due to a full year of expense in 2012 for Foreland and FXCMJ. This was partially offset by $4.2 million of lower employee bonus expense and $1.5 million of additional compensation that was capitalized.

Advertising and marketing expense decreased $4.0 million or 11.6% to $30.9 million for the year ended December 31, 2012 compared to the year ended December 31, 2011. The decrease is partly due to the decline in advertising costs associated with the sponsorship of a FX television show and a trading contest on the CNBC television network in 2011. Advertising and marketing costs have also decreased in line with our cost reduction strategies.

Communication and technology expense increased $5.2 million or 16.5% to $37.1 million for the year ended December 31, 2012 compared to the year ended December 31, 2011. The $5.2 million net increase is primarily attributable to (i) $1.3 million due to a full year of expense in 2012 for Foreland and FXCMJ; (ii) $0.6 million due to the inclusion of Lucid's expenses and (iii) $3.0 million of additional expense relating to database infrastructure upgrade and support services.

Trading costs, prime brokerage and clearing fees increased $8.8 million or 107.4% to $16.9 million for the year ended December 31, 2012 compared to the year ended December 31, 2011. The inclusion of Lucid in the results for the year ended December 31, 2012 amounted to $11.1 million which was offset by renegotiated lower prime brokerage fees and the migration of transactions to lower cost providers. In connection with the Lucid acquisition, we began reporting Trading costs, prime brokerage and clearing fees separately since these costs are a significant component of Lucid's costs base. In prior periods, Trading costs, prime brokerage and clearing fees were not material and were reported as a component of General and administrative expense. The decrease in General and administrative expense was 0.1% to $63.0 million during the year ended December 31, 2012 compared to the year ended December 31, 2011.

General and administrative expense in 2011 included a $16.3 million expense relating to our settlement with the CFTC and the NFA regarding trade execution activities. In addition, general and administrative expenses in 2011 included $4.4 million of costs relating to the relocation of our corporate headquarters. When excluding these charges, general and administrative expense increased $12.4 million or 24.4%. The $12.4 million increase is primarily attributable to (i) $2.8 million due to a full year of expense in 2012 for Foreland and FXCMJ; (ii) $1.4 million of one-time costs incurred in 2012 related to the relocation of FXCMJ's operations and system redundancy; (iii) $2.4 million expense resulting from a system error while integrating FXCMJ's platform; (iv) $2.6 million of expense related to a reserve established to settle certain trading system matters with the JFSA regarding trade execution activities (v) $1.2 million expense related to an extraordinary levy by the U.K. FSA on all of its members; and (vi) $3.0 million in increased professional fees relating to our acquisition of Lucid and higher accounting and auditing fees.

Cited on January 5, 2017 (V).
17Cv916 (R.A.) - Exhibit.
Archived January 5, 2017.
This document is protected by copyright. All rights reserved.
Further reproduction is prohibited.

53

TABLE OF CONTENTS

Depreciation and amortization expense increased $16.7 million or 83.4% to $36.8 million for the year ended December 31, 2012 compared to the year ended December 31, 2011. The $16.7 increase is primarily attributable to $11.4 million of expense due to the amortization of intangibles related to the Lucid acquisition, $1.6 million of the increase due to a full year of expense for FXCMJ's and Foreland's and $3.6 million due to higher capitalized software amortization.

*Non-Operating Expenses*

|  | December 31, 2012 | December 31, 2011 |
|---|---|---|
|  | (In thousands) | |
| Interest on borrowings | $ 2,763 | $ — |

Interest on borrowings of $2.8 million for the year ended December 31, 2012 consists of $1.2 million related to the Credit Agreement and $1.6 million related to the notes issued in connection with Lucid Acquisition. We did not incur interest expense in 2011 because we had no outstanding borrowings.

*Income Taxes*

|  | December 31, 2012 | December 31, 2011 |
|---|---|---|
|  | (In thousands, except percentages) | |
| Income before income taxes | $ 47,464 | $ 69,597 |
| Income tax provision | $ 8,986 | $ 10,816 |
| Effective tax rate | 18.9% | 15.5% |

Our income tax provision decreased $1.8 million or 16.9% to $9.0 million for the year ended December 31, 2012 compared to the same period in 2011. Our effective rate increased to 18.9% for the year ended December 31, 2012 from 15.5% for the year ended December 31, 2011.

Our effective tax rate is lower than the U.S. federal statutory rate because it includes a rate benefit attributable to the fact that our operating subsidiary, Holdings is as a limited liability company that is treated as a partnership for U.S. federal and state income tax purposes. As result, Holdings income from its U.S. operations is not subject to U.S. federal and state income tax because the income is attributable to its members. Accordingly, our U.S. tax provision is solely based on the portion of Holdings' income attributable to us and excludes the income attributable to other members of Holdings whose income is included in Net income attributable to non-controlling interest.

The increase in the effective tax rate for the year ended December 31, 2012 compared to the year ended December 31, 2011 was primarily due to an increase in our ownership in Holdings. The increase in our ownership in Holdings is due to members of Holdings exchanging their membership units for our Class A common stock. Our effective tax rate will continue to increase as additional exchanges occur. The effect of Holdings member unit exchanges is partially offset by our Class A Common Stock repurchases. Anytime we repurchase shares of our Class A common stock, Holdings enters into an equivalent Holdings membership unit transaction with us. The effect of these repurchases decreases our ownership in Holdings. Please refer to Note 4 to our consolidated audited financial statements in "Item 8. Financial Statements and Supplementary Data" for further information. Our effective tax rate also increased because we earned a higher portion of income from our subsidiaries (primarily Lucid) taxed locally as corporations in their respective foreign jurisdictions somewhat offset by a lower statutory rate in effect in the U.K. in 2012 when compared to 2011. In addition, our effective rate for the year ended December 31, 2011 reflects the release of valuation allowance relating to FXCMJ tax loss carryforwards.

54

TABLE OF CONTENTS

*Segment Results*

*Years Ended December 31, 2013, 2012, 2011*

*Retail Trading*

Retail Trading is our largest segment and consists of providing FX trading and related services to approximately 183,679 active retail customers globally as of December 31, 2013.

Revenues, operating expenses and income before income taxes of the Retail Trading segment for the years ended December 31, 2013 and 2012 are as follows:

|  | December 31, 2013 | December 31, 2012 |
|---|---|---|
|  | (In thousands) | |
| Revenues | $ 379,840 | $ 355,282 |
| Operating and other expenses | 219,016 | 218,018 |
| **Income before income taxes** | $ 160,824 | $ 137,264 |

Revenues from our Retail Trading segment increased $24.6 million or 6.9% to $379.8 million for the year ended December 31, 2013 compared to the year ended December 31, 2012. While revenue per million decreased 4.3%, retail trading revenue overall increased, primarily due to an increase in revenues earned from CFD trading offset by lower revenue from retail FX trading. The decline in revenue from retail FX trading, despite the volume increase of 13%, is driven by a higher proportion of volume coming from Yen-based currency pairs in 2013, where we earn a lower mark-up on these trades. Net interest revenue decreased $0.9 million for the year ended December 31, 2013 compared to the year ended December 31, 2012, attributable to cash held in lower yielding bank accounts somewhat offset by higher cash balances held. Other income decreased $0.1 million, primarily due to a $1.4 million gain and a $0.2 million loss from a settlement with the former owners of ODL recorded in 2012 and 2013, respectively, largely offset by increased revenues of $1.3 million related to FSL's brokerage activities for the LME desk which commenced trading in the second quarter of 2012 and a bad debt recovery of $0.8 million.

Operating and other expenses increased $1.0 million or 0.5% to $219.0 million for the year ended December 31, 2013 compared to the year ended December 31, 2012. Operating and other expenses increased as a result of (i) referring broker fees increased $8.9 million due to an increase in indirect retail trading volume and higher CFD fees; (ii) trading cost, prime brokerage and clearing fees increased $1.9 million due to higher prime broker fees and $0.6 million attributable to FSL's brokerage activities and (iii) depreciation and amortization expense increased $2.8 million due primarily to $4.0 million of higher amortization expense on capitalized software, partly offset by lower amortization of intangibles related to fully amortized assets. Operating and other expenses decreased due to (i) employment and benefits decreased $8.4 million due primarily to charges in 2013 and 2012 of $3.5 million and $11.1 million, respectively, in connection with the renegotiation of an employee contract; (ii) advertising and marketing decreased $3.8 million due partly to ending our sponsorship of a FX television show and trading contest and also due to our strategy to reduce costs through targeted advertising and marketing initiatives and (iii) general and administrative expense decreased $0.7 million, primarily due to lower bank charges of $2.4 million for FXCMJ, largely due to $1.7 million for the termination of a vendor relationship in Japan, partly offset by higher bank and regulatory fees for U.S. of $0.5 million and FSL of $0.8 million.

Revenues, operating and other expenses and income before income taxes of the Retail Trading segment for the years ended December 31, 2012 and 2011 are as follows:

|  | December 31, 2012 | December 31, 2011 |
|---|---|---|
|  | (In thousands) | |
| Revenues | $ 355,282 | $ 383,356 |
| Operating and other expenses | 218,018 | 218,534 |
| **Income before income taxes** | $ 137,264 | $ 164,822 |

Revenues from Retail Trading segment decreased $28.1 million or 7.3% to $355.3 million for the year ended December 31, 2012 compared to the year ended December 31, 2011. Retail trading revenue decreased by $24.1 million or 6.6% to $339.7

Cited in In re Global Brokerage,
17-CV-916 Decided 3/18/21
Archived on 3/23/21
This document is protected by copyright.
Further reproduction is prohibited without permission.

55

TABLE OF CONTENTS

million for the year ended December 31, 2012 compared to the year ended December 31, 2011 primarily due to the decline in retail trading volume of 4.6% resulting from lower volatility in the currency markets and the effect of that on customer volumes and a 2.1% decrease in markup to $94 per million resulting from a higher proportion of volume coming from retail clients trading with lower average markups. The impact of lower volatility in the currency markets was dampened by growth in customer equity. In 2012, we grew customer equity by 14% to $1.2 billion.

Operating and other expenses decreased $0.5 million or 0.2% to $218.0 million for the year ended December 31, 2012 compared to the year ended December 31, 2011. Operating expense decreased as a result of (i) lower referring broker fees of $16.0 million or 17.6% in 2012 compared to 2011 which correlates to the decrease in indirect volume of 18.4%; (ii) higher compensation costs of $10.0 million primarily due to $12.7 million of expense associated with equity based compensation issued in connection with the renegotiation of certain employment contracts and $1.9 million resulting from the inclusion of a full year of compensation and benefits expenses in 2012 for Foreland and FXCMJ compared to partial year expenses recorded during 2011 following their acquisitions in October 2011 and March 2011, respectively, partially offset by lower bonus expense in 2012; (iii) lower advertising and marketing costs of $4.0 million due in part to the decline in advertising costs associated with the sponsorship of a FX television show and a trading contest on the CNBC television network in 2011 and decreased costs in line with the Company's cost reduction strategies; (iv) higher general and administrative expense of $5.0 million primarily due to a loss resulting from a system integration error in Tokyo and a reserve established to settle certain trading system matters with the JFSA regarding trading execution activities; and (v) $4.1 million of higher depreciation and amortization expenses primarily due to increased expense resulting from higher capitalized software.

### Institutional Trading

Revenues, operating and other expenses and income before income taxes of the Institutional Trading segment for the years ended December 31, 2013 and 2012 are as follows:

| | December 31, 2013 | December 31, 2012 |
|---|---|---|
| | (In thousands) | |
| Revenues | $ 110,957 | $ 62,033 |
| Operating and other expenses | 99,536 | 45,164 |
| **Income before income taxes** | $ 11,421 | $ 16,869 |

Revenues for our Institutional Trading segment increased $48.9 million or 78.9% to $111.0 million for the year ended December 31, 2013 compared to the year ended December 31, 2012. Institutional trading revenue increased by $42.0 million due primarily to $39.7 million of increased revenue from Lucid resulting from the inclusion of revenues for the full year in 2013 versus six and a half months in 2012. Revenues from our other institutional business also increased $2.3 million or 11.6% primarily to increased volume in spite of a lower mark-up. The remainder of the increase is due to a benefit of $7.0 million related to an adjustment recorded in December 2013 to reduce the initial contingent consideration recorded for the Faros acquisition included in Other income.

Operating and other expenses increased $54.4 million or 120.4% to $99.5 million for the year ended December 31, 2013, compared to the year ended December 31, 2012, attributable to (i) compensation and benefits increased $26.6 million as a result of the inclusion of Allocation of net income to Lucid members for services provided of $21.3 million for the portion of the 49.9% of Lucid's earnings allocated among the non-controlling members of Lucid based on services provided to Lucid. Compensation and benefits also increased due to higher salaries and bonus for the FXCM Pro business and a full year of amortization of deferred compensation expense for Lucid; (ii) communication and technology costs increased $2.8 million primarily due to $1.2 million related to Lucid expenses for the full year in 2013 versus six and a half months in 2012, $0.8 million for FastMatch expenses and $0.5 million increased expenses for FXCM Pro; (iii) trading costs, prime brokerage and clearing fees increased $12.0 million primarily attributable to $10.5 million due to the inclusion of Lucid expenses for the full year in 2013 versus six and a half months in 2012 and higher prime broker fees for FXCM Pro and FastMatch; (iv) depreciation and amortization increased $14.1 million due primarily to $10.0 of Lucid expense for intangible amortization for the full year in 2013 versus six and a half months in 2012 and a $3.5 million impairment charge to write down the value of an electronic FX option trading platform. These increases were partly offset by $1.2 million of lower referring broker fees for FXCM Pro and $1.1 million of lower interest expense on the Lucid Promissory Notes issued in conjunction with the acquisition.

56

TABLE OF CONTENTS

Revenues, operating and other expenses and income before income taxes of the Institutional Trading segment for the years ended December 31, 2012 and 2011 are as follows:

|  | December 31, 2012 | December 31, 2011 |
|---|---|---|
|  | (In thousands) | |
| Revenues | $ 62,033 | $ 28,908 |
| Operating and other expenses | 45,164 | 20,784 |
| **Income before income taxes** | $ 16,869 | $ 8,124 |

Revenues for our Institutional Trading segment increased $33.1 million or 114.6% to $62.0 million for the year ended December 31, 2012 compared to the year ended December 31, 2011. The net increase of $32.1 million was due to the inclusion of $42.2 million of Lucid's revenue in the year ended December 31, 2012 offset by a decline of $9.0 million or 31.4% in revenue earned by the our other institutional business. The decline of $9.0 million in our other institutional business is attributable to a 32.0% lower markup. In 2012, despite the low volatility in currencies and a de-risking by a number of market participants, resulting in lower volumes generally in the institutional FX market, our institutional trading volume was increased 1% when compared to last year. We believes this performance was due to our migration of clients from a third party to an in-house platform in which we passed the savings that resulted from migration to customers by lowering the customer mark-up. We believe that over time volume increases will make up for the lower markup.

Operating and other expenses decreased $24.4 million or 117.3% to $45.2 million for the year ended December 31, 2012, compared to the year ended December 31, 2011. The change is due primarily to (i) the acquisition of Lucid which added $12.5 million in operating expenses and $11.3 million in amortization of intangibles in 2012; (ii) additional compensation of $2.0 million due to the addition of a voice broker division; (iii) $1.1 million in higher depreciation from a new options trading platform placed in service in December 2011; and (iv) acquisition related interest expense of $1.5 million. These increases were offset by $2.0 million of lower communication and technology expense due to the migration of new clients to in-house trading platform and lower trading costs of $2.0 million due to more favorably negotiated prime brokerage expenses.

*Corporate*

Loss before income taxes of the Corporate segment for the years ended December 31, 2013 and 2012 are as follows:

|  | December 31, 2013 | December 31, 2012 |
|---|---|---|
|  | (In thousands) | |
| Revenues | $ (1,209) | — |
| Operating and other expenses | 119,176 | 106,669 |
| **Loss before income taxes** | $ (120,385) | $ (106,669) |

Loss before income taxes increased $13.7 million or 12.9% to $120.4 million for the year ended December 31, 2013 compared to the year ended December 31, 2012, primarily attributable to $5.8 million of interest expense on the Convertible Notes and a $5.4 million increase in general and administrative expense, primarily due to an expense of $10.9 million pertaining to a settlement with the FCA regarding pre August 2010 trade execution practices and general and administrative expense for the year ended December 31, 2012 includes a $4.2 million accrual established to settle certain trading system matters with the Financial Services Agency of Japan. Excluding these settlements, general and administrative expense decreased $7.0 million. The $7.0 million decrease is primarily attributable to (i) $1.0 million of one-time costs incurred in the first quarter of 2012 related to the relocation of FXCM's operations and system redundancy; (ii) $1.2 million decrease in U.K. extraordinary levy (iii) $1.6 million of acquisition costs incurred in the second quarter of 2012; (iv) $1.1 million lower professional fees for FSL, primarily audit costs, and (v) $0.5 million lower U.K. consumption taxes. The remainder of the increase is primarily due to an increase in compensation and benefits of $2.7 million due to higher headcount, variable compensation and stock compensation expense, partly offset by lower communication costs of $1.5 million. Revenues includes a charge of $1.2 million attributable to the remeasurement of the tax receivable agreement liability to reflect a revised U.S. federal tax rate.

Cited in In [...] Damages
17Cv916 Deakins [...]

Archived on [...]

This document is protected by [...]
Further reproduction is prohibited without [...]

57

TABLE OF CONTENTS

Loss before income taxes of the Corporate segment for the years ended December 31, 2012 and 2011 are as follows:

|  | December 31, 2012 | December 31, 2011 |
|---|---|---|
|  | (In thousands) | |
| Revenues | $ — | $ 3,314 |
| Operating expenses | 106,669 | 106,663 |
| **Loss before income taxes** | $ (106,669) | $ (103,349) |

    Loss before income taxes increased $3.3 million or 3.2% to $106.7 million for the year ended December 31, 2012 compared to the year ended December 31, 2011. The increase is attributable to the inclusion of $3.3 million of non-recurring income in 2011 related to a tax receivable liability to reflect our revised U.S. federal tax rate. Operating expenses primarily consists of general and administrative, communication and technology, rent and compensation and benefits expenses. For the year ended December 31, 2012, general and administrative expenses decreased $5.5 million, rent expense decreased $1.0 million and salary expense decreased $1.2 million compared to the year ended December 31, 2011. These decreases were offset by communication and technology costs increases of $6.7 million primarily as a result additional expense relating to database infrastructure upgrade and support services for the year ended December 31, 2012 compared to the year ended December 31, 2011.

    As noted above, general and administrative expense component of operating expense decreased $5.5 million to $44.4 million during the year ended December 31, 2012 compared to the year ended December 31, 2011. General and administrative expense in 2011 included a $16.3 million expense relating to our settlement with the CFTC and the NFA regarding trade execution activities. In addition, operating expense in 2011 included $4.4 million of costs relating to the relocation of our corporate headquarters. When excluding these charges, operating expense increased $15.2 million. The $15.2 million increase is primarily attributable to (i) $2.8 million due to a full year of expense in 2012 for Foreland and FXCMJ; (ii) $1.4 million of one-time costs incurred in 2012 related to the relocation of FXCMJ's operations and system redundancy; (iii) $2.4 million expense resulting from a system error while integrating FXCMJ's platform;(iv) $2.6 million of expense relating to the settlement with the JFSA regarding trade executive activities; (v) $1.2 million expense related to an extraordinary levy by the FCA on all of its members; and (vi) $3.0 million in increased professional fees relating to our acquisition of Lucid and higher accounting and auditing fees.

Cited in In re Global Brokerage
17CV916 Decided 3/18/21

Archived on 3/23/21

This document is protected by copyright.
Further reproduction is prohibited without permission.

TABLE OF CONTENTS

**Quarterly Financial Data (Unaudited)**

| | For the Year Ended December 31, 2013 | | | |
| | (In thousands, except per share data) | | | |
| | Fourth Quarter | Third Quarter | Second Quarter | First Quarter |
|---|---|---|---|---|
| **Revenues** | | | | |
| Retail trading revenues | $ 82,989 | $ 86,974 | $ 104,068 | $ 91,254 |
| Institutional trading revenues | 21,790 | 22,856 | 31,792 | 27,556 |
| Trading revenue | 104,779 | 109,830 | 135,860 | 118,810 |
| Interest income | 728 | 537 | 670 | 679 |
| Brokerage interest expense | (71) | (63) | (69) | (55) |
| Net interest income | 657 | 474 | 601 | 624 |
| Other income | 7,907 | 2,944 | 3,672 | 3,430 |
| Total net revenues | 113,343 | 113,248 | 140,133 | 122,864 |
| **Operating Expenses** | | | | |
| Compensation and benefits | 26,541 | 28,809 | 26,587 | 23,533 |
| Allocation of Income to Lucid members | 3,290 | 2,996 | 15,004 | — |
| Total compensation and benefits | 29,831 | 31,805 | 41,591 | 23,533 |
| Referring broker fees | 19,750 | 20,709 | 22,422 | 21,350 |
| Advertising and marketing | 7,278 | 6,305 | 6,157 | 7,351 |
| Communication and technology | 10,210 | 10,111 | 9,765 | 8,355 |
| Trading costs, prime brokerage and clearing fees | 7,113 | 6,809 | 8,961 | 7,938 |
| General and administrative | 14,387 | 27,949 | 13,423 | 12,471 |
| Depreciation and amortization | 16,425 | 12,849 | 12,481 | 11,974 |
| Total operating expenses | 104,994 | 116,537 | 114,800 | 92,972 |
| **Total operating income** | 8,349 | (3,289) | 25,333 | 29,892 |
| **Other Expenses** | | | | |
| Equity Investments, gain (loss) | (24) | (183) | (397) | (148) |
| Interest on borrowing | 2,697 | 2,869 | 1,290 | 817 |
| **Income (loss) before income taxes** | 5,628 | (6,341) | 23,646 | 28,927 |
| Income tax provision | 231 | 2,444 | 6,390 | 7,959 |
| Net income (loss) | 5,397 | (8,785) | 17,256 | 20,968 |
| Net income (loss) attributable to non-controlling interest in FXCM Holdings, LLC | 3,660 | (3,133) | 14,093 | 10,230 |
| Net income (loss) attributable to other non-controlling interests | (1,233) | (530) | (6,961) | 3,878 |
| Net income (loss) attributable to FXCM Inc. | $ 2,970 | $ (5,122) | $ 10,124 | $ 6,860 |

| | For the Year Ended December 31, 2013 | | | |
| | Fourth Quarter | Third Quarter | Second Quarter | First Quarter |
|---|---|---|---|---|
| Net Income (In thousands) | $ 2,970 | $ (5,122) | $ 10,124 | $ 6,860 |
| Net income per Class A Share: | | | | |
| Basic | $ 0.08 | $ (0.15) | $ 0.33 | $ 0.24 |
| Diluted | $ 0.08 | $ (0.15) | $ 0.32 | $ 0.23 |

59

Cited in Lucid Global Brokerage
FXCV-16 Decided on 3/24/21
Archived on 3/24/21
This document is protected by copyright.
Further reproduction is prohibited without permission.

TABLE OF CONTENTS

| | For the Year Ended December 31, 2012 | | | |
| | (In thousands, except per share data) | | | |
| | Fourth Quarter | Third Quarter | Second Quarter | First Quarter |
|---|---|---|---|---|
| **Revenues** | | | | |
| Retail trading revenues | $ 83,852 | $ 85,237 | $ 77,870 | $ 92,726 |
| Institutional trading revenues | 19,125 | 25,868 | 11,220 | 5,820 |
| Trading revenue | 102,977 | 111,105 | 89,090 | 98,546 |
| Interest income | 661 | 990 | 1,059 | 860 |
| Brokerage interest expense | (42) | (66) | (78) | (91) |
| Net interest income | 619 | 924 | 981 | 769 |
| Other income | 4,498 | 2,919 | 1,612 | 3,274 |
| Total net revenues | 108,094 | 114,948 | 91,683 | 102,589 |
| **Operating Expenses** | | | | |
| Compensation and benefits | 24,604 | 24,156 | 33,802 | 23,217 |
| Referring broker fees | 17,720 | 18,708 | 19,968 | 20,189 |
| Advertising and marketing | 7,594 | 7,509 | 7,487 | 8,270 |
| Communication and technology | 10,522 | 9,600 | 8,611 | 8,380 |
| Trading costs, prime brokerage and clearing fees | 6,748 | 6,981 | 1,893 | 1,313 |
| General and administrative | 14,152 | 13,681 | 16,813 | 18,397 |
| Depreciation and amortization | 12,012 | 11,717 | 6,863 | 6,181 |
| Total operating expenses | 93,352 | 92,352 | 95,437 | 85,947 |
| **Total operating income** | 14,742 | 22,596 | (3,754) | 16,642 |
| **Other Expenses** | | | | |
| Interest on borrowing | 1,065 | 1,158 | 271 | 269 |
| **Income before income taxes** | 13,677 | 21,438 | (4,025) | 16,373 |
| Income tax provision | 4,130 | 3,598 | (1,109) | 2,367 |
| Net income | 9,547 | 17,840 | (2,916) | 14,006 |
| Net income attributable to non-controlling interest | 6,549 | 13,327 | (1,475) | 11,118 |
| Net income attributable to FXCM Inc. | $ 2,998 | $ 4,513 | $ (1,441) | $ 2,888 |

| | For the Year Ended December 31, 2012 | | | |
| | Fourth Quarter | Third Quarter | Second Quarter | First Quarter |
|---|---|---|---|---|
| Net Income (In thousands) | $ 2,998 | $ 4,513 | $ (1,441) | $ 2,888 |
| Net income per Class A Share: | | | | |
| Basic and Diluted | $ 0.11 | $ 0.17 | $ (0.06) | $ 0.16 |

60

Cited in In re Global Brokerage.
17Cv916 Decided 3/15/21
Archived on 05/23/21
This document is protected by copyright.
Further reproduction is prohibited without permission.

TABLE OF CONTENTS

|  | For the Year Ended December 31, 2011 | | | |
|  | (In thousands, except per share data) | | | |
|  | Fourth Quarter | Third Quarter | Second Quarter | First Quarter |
|---|---|---|---|---|
| **Revenues** | | | | |
| Retail trading revenues | $ 95,540 | $ 97,017 | $ 93,482 | $ 77,735 |
| Institutional trading revenues | 7,088 | 7,720 | 6,721 | 7,379 |
| Trading revenue | 102,628 | 104,737 | 100,203 | 85,114 |
| Interest income | 807 | 963 | 933 | 941 |
| Brokerage interest expense | (103) | (93) | (60) | (73) |
| Net interest income | 704 | 870 | 873 | 868 |
| Other income | 5,353 | 3,368 | 2,263 | 8,597 |
| Total net revenues | 108,685 | 108,975 | 103,339 | 94,579 |
| **Operating Expenses** | | | | |
| Compensation and benefits | 26,424 | 22,955 | 23,121 | 22,586 |
| Referring broker fees | 20,579 | 25,720 | 24,932 | 21,601 |
| Advertising and marketing | 10,522 | 9,870 | 7,487 | 7,018 |
| Communication and technology | 8,310 | 8,190 | 8,010 | 4,719 |
| Trading costs, prime brokerage and clearing fees | 1,682 | 2,095 | 2,190 | 2,199 |
| General and administrative | 14,205 | 11,102 | 27,054 | 10,716 |
| Depreciation and amortization | 5,852 | 5,367 | 4,740 | 4,094 |
| Total operating expenses | 87,574 | 85,299 | 97,534 | 75,573 |
| **Total operating income** | 21,111 | 23,676 | 5,805 | 19,006 |
| **Other Expenses** | | | | |
| Interest on borrowing | — | — | — | — |
| **Income before income taxes** | 21,111 | 23,676 | 5,805 | 19,006 |
| Income tax provision | 60 | 8,136 | 2,070 | 549 |
| Net income | 21,051 | 15,540 | 3,735 | 18,457 |
| Net income attributable to non-controlling interest | 17,823 | 12,142 | 420 | 15,661 |
| Net income attributable to FXCM Inc. | $ 3,228 | $ 3,398 | $ 3,315 | $ 2,796 |

|  | For the Year Ended December 31, 2011 | | | |
|  | Fourth Quarter | Third Quarter | Second Quarter | First Quarter |
|---|---|---|---|---|
| Net Income (In thousands) | $ 3,227 | $ 3,398 | $ 3,315 | $ 2,796 |
| Net income per Class A Share: | | | | |
| Basic and Diluted | $ 0.20 | $ 0.21 | $ 0.19 | $ 0.16 |

**LIQUIDITY AND CAPITAL RESOURCES**

We finance, and plan to continue to finance, our operating liquidity, capital needs and new business transactions with funds generated from our operations, the net proceeds received from the Convertible Notes and borrowings under our Credit Agreement.

As of December 31, 2013, we had cash and cash equivalents of $365.2 million and available borrowing capacity under the Credit Agreement of $205.0 million. We primarily invest our cash and cash equivalents in short-term demand deposits at various financial institutions. In general, we believe all our deposits are with institutions of high credit quality and we have sufficient liquidity to conduct the operations of our businesses.

61

TABLE OF CONTENTS

As a holding company, almost all of the funds generated from our operations are earned by our operating subsidiaries. We access these funds through receipt of dividends from our subsidiaries. Some of our subsidiaries are subject to requirements of various regulatory bodies relating to liquidity and capital standards, which may limit the funds available for the payment of dividends to us. In addition, while we currently intend to permanently reinvest the earnings of certain foreign subsidiaries, a change in this decision in the future could increase our effective tax rate. At December 31, 2013, approximately 28.8% of our cash and cash equivalents was held in these respective foreign subsidiaries.

| | | As of December 31, 2013 | | |
| | Regulatory Jurisdiction | Minimum Regulatory Capital Requirements | Capital Levels Maintained | Excess Net Capital |
|---|---|---|---|---|
| | | (In millions) | | |
| Forex Capital Markets, LLC | USA | $ 27.1 | $ 64.2 | $ 37.1 |
| Forex Capital Markets, Ltd. | U.K. | 24.7 | 86.0 | 61.3 |
| FXCM Asia, Ltd. | Hong Kong | 12.3 | 33.6 | 21.3 |
| FXCM Australia, Ltd. | Australia | 0.4 | 4.7 | 4.3 |
| ODL Group, Ltd. | U.K. | 6.9 | 18.4 | 11.5 |
| FXCM Securities, Ltd. | U.K. | 8.2 | 34.8 | 26.6 |
| FXCM Japan Securities Co., Ltd. | Japan | 5.6 | 36.3 | 30.7 |
| Lucid Markets LLP | U.K. | 4.2 | 41.8 | 37.6 |
| Faros Trading LLC | USA | — | 0.1 | 0.1 |

We filed a shelf registration statement on Form S-3 with the SEC on October 4, 2012. The shelf registration statement provides us with the ability to offer, from time to time and subject to market conditions, debt securities, preferred stock, common stock, depositary shares, purchase contracts warrants or units for proceeds in the aggregate amount of up to $125.0 million. The shelf registration statement is intended to give us greater flexibility to efficiently raise capital and put us in a position to take advantage of favorable market conditions as they arise.

***Cash Flows and Capital Expenditures***

*Years Ended December 31, 2013 and 2012*

The following table sets forth a summary of our cash flows for the years ended December 31, 2013 and December 31, 2012:

| | December 31, 2013 | December 31, 2012 |
|---|---|---|
| | (In thousands) | |
| Cash provided by operating activities | 123,572 | $ 102,134 |
| Cash used in investing activities | (70,720) | (67,952) |
| Cash provided by financing activities | 47,243 | 56,364 |
| Effect of foreign currency exchange rate changes on cash and cash equivalents | (7,182) | (2,935) |
| **Net increase in cash and cash equivalents** | 92,913 | 87,611 |
| **Cash and cash equivalents – end of year** | $ 365,245 | $ 272,332 |

Cited in In re Global Brokerage 17CV916 Decided 3/18/21

Archived on 3/23/21

This document is protected by copyright. Further reproduction is prohibited without permission.

62

TABLE OF CONTENTS

*Operating Activities*

Details of cash provided by operating activities are as follows, with amounts in thousands:

|  | Years Ended December 31, | |
|---|---|---|
|  | 2013 | 2012 |
| EBITDA[(1)] | $　113,262 | $　87,000 |
| Non-cash equity-based compensation | 13,959 | 22,979 |
| Net interest payments | (3,449) | (2,334) |
| Net income tax payments | (6,936) | (12,617) |
| All other, net, including net current assets and liabilities | 6,736 | 7,106 |
| Net cash provided by operating activities | $　123,572 | $　102,134 |

_____

[(1)] See Non-GAAP Financial Measures

Cash provided by operating activities increased $21.4 million to $123.6 million in 2013 when compared to 2012. The increase was primarily attributable to an increase in EBITDA, which includes $39.6 million of additional cash flow generated by Lucid. Tax payments decreased $5.7 million due to lower taxes paid in foreign jurisdictions somewhat offset by a payment of $4.1 million related to the tax receivable agreement.

*Investing Activities*

Details of cash used in investing activities are as follows, with amounts in thousands:

|  | Years Ended December 31, | |
|---|---|---|
|  | 2013 | 2012 |
| Capital expenditures | $　(23,416) | $　(27,263) |
| Acquisitions, net of cash acquired | (32,312) | (36,555) |
| Payment for equity investment | (3,000) | (4,000) |
| Purchase of notes | (11,942) | — |
| Other | (50) | (134) |
| Net cash used in investing activities | $　(70,720) | $　(67,952) |

Cash used in investing activities of $70.7 million consisted of $23.4 million of capital expenditures, payments of $28.4 million of unsecured promissory notes issued in connection with the Lucid acquisition, $3.9 million related to our Faros acquisition, $11.9 million for the acquisition of notes receivable issued by Infinium Capital and a $3.0 million payment related to our investment in FastMatch. The $22.9 million of unsecured promissory notes issued in connection with the Lucid acquisition were repaid on June 6, 2013 with a portion of the proceeds received from the Convertible Notes. In the second quarter of 2013, the Company issued unsecured promissory notes to the Lucid sellers for $15.3 million for an increase in the Lucid purchase price due to the final determination of tax balances at the Lucid Acquisition Date adjusted during the measurement period. These notes matured in December 2013 and the Company paid $5.5 million and issued $9.8 million in unsecured promissory notes maturing in June 2014. In September 2013, we purchased a 50.1% controlling interest in Faros and the $3.9 million represents our initial cash outlay of $5.0 million less the net cash acquired of $1.1 million. In December 2012, we committed to a $7.0 million investment in FastMatch of which $4.0 million was paid in December 2012 and $3.0 million was paid in March 2013. Capital expenditures for the year included $15.1 million of capitalized software, software licenses of $2.4 million and $5.4 million of computer equipment.

63

Cited by Cygnus Brokerage 5/18/21
Archived Version.
This document is protected.
Further reproduction is prohibited.

TABLE OF CONTENTS

Details of cash provided by financing activities are as follows, with amounts in thousands:

| | Years Ended December 31, | |
| | 2013 | 2012 |
| --- | --- | --- |
| Distributions to members | $ (14,147) | $ (14,926) |
| Contributions from members | 5,650 | 578 |
| Dividends paid | (9,602) | (6,813) |
| Proceeds from exercise of stock options | 22,499 | — |
| Common stock repurchased | (28,080) | (7,475) |
| Proceeds from issuance of Convertible Notes, net of debt issuance costs | 166,453 | — |
| Purchase of note hedge relating to Convertible Notes issuance | (29,101) | — |
| Proceeds from issuance of warrants relating to the Convertible Notes issuance | 18,571 | — |
| Net (payments) borrowings under the Credit Agreement | (85,000) | 85,000 |
| Net cash provided by financing activities | $ 47,243 | $ 56,364 |

Cash provided by financing activities in 2013 decreased by $9.1 million compared to $56.4 million provided in 2012. In June 2013 we received net proceeds of $166.5 million from the Convertible Notes. We used $10.5 million of the net proceeds to fund the net cost of the convertible note hedge and warrant transactions entered into concurrently with the issuance of the Convertible Notes and repaid $80.0 million of outstanding borrowings under our revolving credit agreement. Distributions to non-controlling members were approximately $14.1 million in 2013 compared to $14.9 million in 2012. The decrease in distributions is primarily attributable to the decrease in the non-controlling ownership of Holdings. As of December 31, 2013, non-controlling members owned approximately 45.2% of Holdings compared to 57.5% as of December 31, 2012. Dividends paid to our Class A common stockholders were $9.6 million in 2013 compared to $6.8 million in 2012. The increase in dividends paid is due to the increase in our outstanding Class A common stock. In 2013, our weighted average Class A common stock shares outstanding were 34.0 million compared to 24.1 million in 2012. In 2013, we used approximately $28.1 million for repurchases of our Class A common stock compared to $7.5 million in 2012. As previously mentioned, our board of directors has approved a Stock Repurchase Program aggregating $80.0 million and through December 31, 2013, we have repurchased 5.0 million shares for $61.9 million under this Stock Repurchase Program. The size and timing of these purchases are based on a number of factors, including price, business and market conditions. In 2012, we borrowed $85.0 million under the Credit Agreement. The funds were primarily used to paydown the $64.0 million of notes that were issued in connection with the acquisition of Lucid.

*Years Ended December 31, 2012 and 2011*

The following table sets forth a summary of our cash flows for the years ended December 31, 2012 and December 31, 2011:

| | December 31, 2012 | December 31, 2011 |
| --- | --- | --- |
| | (In thousands) | |
| Cash provided by operating activities | $ 102,134 | $ 83,949 |
| Cash used in investing activities | (67,952) | (45,603) |
| Cash provided by (used in) financing activities | 56,364 | (44,052) |
| Effect of foreign currency exchange rate changes on cash and cash equivalents | (2,935) | (2,903) |
| **Net increase (decrease) in cash and cash equivalents** | 87,611 | (8,609) |
| **Cash and cash equivalents – end of year** | $ 272,332 | $ 184,721 |

64

Cited in In re Global Brokerage
17CV916 Decided 3/18/21
Archived on 3/23/21
This document is protected by copyright.
Further reproduction is prohibited without permission.

TABLE OF CONTENTS

*Operating Activities*

Details of cash provided by operating activities are as follows, with amounts in thousands:

|  | Years Ended December 31, | |
|  | 2012 | 2011 |
|---|---|---|
| EBITDA[1] | $ 87,000 | $ 89,650 |
| Non-cash equity-based compensation | 22,979 | 9,535 |
| Net interest payments | (2,334) | — |
| Net income tax payments | (12,617) | (4,117) |
| All other, net, including net current assets and liabilities | 7,106 | (11,119) |
|  | $ 102,134 | $ 83,949 |

(1)   (See Non-GAAP Financial Measures)

Despite the decline in net income, cash provided by operating activities increased $18.2 million to $102.1 million in 2012 when compared to 2011. The increase was primarily related to positive cash flow from current year operations and the cash receipts of $8.5 million related to prior year account receivables. The increase in positive cash flow from current year operations is primarily attributable to the cash flow generated by Lucid and the timing of payments related to accounts payable and accrued expenses somewhat offset by increased income tax payments of $8.5 million and interest payments of $2.3 million.

*Investing Activities*

Details of cash used in investing activities are as follows, with amounts in thousands:

|  | Years Ended December 31, | |
|  | 2012 | 2011 |
|---|---|---|
| Capital expenditures | $ (27,263) | $ (30,041) |
| Acquisition, net of cash received | (36,555) | (12,787) |
| Payment for equity investments | (4,000) | (1,319) |
| Other | (134) | (1,456) |
|  | $ (67,952) | $ (45,603) |

Cash used in investing activities increased by $22.3 million to $68.0 million in 2012 principally due to the cash used in the acquisition of Lucid and our $4.0 million investment in FastMatch, partially offset by a decrease in capital expenditures. Capital expenditures in 2012 included $14.0 million of capitalized software, $7.4 million of leasehold improvements in connection with our relocation of our corporate headquarter and $5.9 million of computer equipment.

Details of cash provided by (used in) financing activities are as follows, with amounts in thousands:

|  | Years Ended December 31, | |
|  | 2012 | 2011 |
|---|---|---|
| Distributions to members | $ (14,926) | $ (29,911) |
| Contributions from members | 578 | 16,263 |
| Dividends paid | (6,813) | (3,905) |
| Common stock repurchased | (7,475) | (26,357) |
| Net borrowings under the Credit Agreement | 85,000 | — |
| Other | — | (142) |
|  | $ 56,364 | $ (44,052) |

65

Cited in In re Global Brokerage 17Cv916 Dividend 18/21 Archived on 3/23/21 This document is protected by copyright. Further reproduction is prohibited without permission.

TABLE OF CONTENTS

Cash provided by financing activities in 2012 increased by $100.4 million compared to $44.1 million used in 2011. Distributions to non-controlling members were approximately $14.9 million in 2012 compared to $29.9 million in 2011. The decrease in distributions is attributable to the decrease in the non-controlling ownership of Holdings as well as the decline in our net income. As of December 31, 2012, non-controlling members owned approximately 57.5% of Holdings compared to 79.6% as of December 31, 2011. Dividends paid to our Class A common stockholders were $6.8 million in 2012 compared to $3.9 million in 2011. The increase in dividend paid to our Class A common stockholders is due to the increase in our outstanding Class A common stock. In 2012, our weighted average Class A common stock shares outstanding were 24.1 million compared to 16.6 million in 2011. In 2012, we used approximately $7.5 million for repurchases of our Class A common stock compared to $26.4 million in 2011. As previously mentioned, our board of directors has approved a Stock Repurchase Program aggregating $80.0 million and through December 31, 2012, we have repurchased 3.2 million shares or $33.8 million under this Stock Repurchase Program. The size and timing of these purchases are based on a number of factors, including price, business and market conditions. In 2012, we borrowed $85.0 million under the Credit Agreement. The funds were primarily used to paydown the $64.0 million of notes that were issued in connection with the Lucid acquisition.

*Credit Agreement*

On December 19, 2011, Holdings entered into a three year Credit Agreement with a syndicate of financial institutions. The Credit Agreement provided for a revolving credit facility of up to $75.0 million. The credit facility is guaranteed by certain subsidiaries of Holdings and is secured by a pledge of all of the equity interests in certain of Holdings' domestic subsidiaries and 65% of the voting equity interests in certain of its foreign subsidiaries.

On November 8, 2012, Holdings entered into an amendment to the Credit Agreement (the "Amendment"). The Amendment provided Holdings with the ability to increase the credit facility during the term of the Credit Agreement up to a maximum of $175.0 million. Additionally, the Amendment modified certain terms of the Credit Agreement, among other things, to provide additional flexibility regarding financing and investment initiatives. Simultaneously, on November 8, 2012, Holdings received additional commitments from a group of financial institutions, both new and existing lenders, and increased the credit facility to $155.0 million.

On November 15, 2013, Holdings entered into an amendment to the Credit Agreement (the "2013 Amendment"). The 2013 amendment extended the final maturity date of the credit facility to December 2016 and provided Holdings with the ability to increase the credit facility during the term of the Credit Agreement up to a maximum of $250.0 million. Additionally, the 2013 Amendment modified certain terms of the Credit Agreement, among other things, to provide additional flexibility regarding financing and investment initiatives. Simultaneously, on November 15, 2013, Holdings received additional commitments from existing lenders and increased the credit facility to $205.0 million.

As of December 31, 2013 and 2012, Holdings' outstanding balance under the Credit Agreement was nil and $85.0 million, respectively.

Under the terms of the Credit Agreement, loans will bear interest at either a Eurodollar Rate or a Base rate (as defined below), at Holdings' election, plus an applicable margin, based on Holdings' leverage ratio. In addition, Holdings must pay an annual commitment fee based on Holdings' leverage ratio on the undrawn commitments under the Credit Agreement. The applicable margin and commitment fees are set forth in the table below:

| Consolidated Leverage Ratio | Commitment Fee | Applicable Margin for Eurodollar Loans | Applicable Margin for Base Rate Loans |
| --- | --- | --- | --- |
| Less than .50 to 1.00 | 0.25% | 1.75% | 0.75% |
| Greater than or equal to 0.50 to 1.00 but less than 1.00 to 1.00 | 0.30% | 2.00% | 1.00% |
| Greater than or equal to 1.00 to 1.00 but less than 1.50 to 1.00 | 0.35% | 2.25% | 1.25% |
| Greater than or equal to 1.50 to 1.00, but less than 2.00 to 1.00 | 0.40% | 2.50% | 1.50% |
| Greater than or equal to 2.00 to 1.00 | 0.45% | 2.75% | 1.75% |

The Base Rate means for any day a fluctuating rate per annum equal to the highest of (a) the Federal Funds Rate, as defined in the Credit Agreement, plus 0.5%, (b) the rate of interest in effect for such day as publicly announced from time to time by the administrative agent, Bank of America, N.A., as its prime rate, and (c) the Eurodollar Rate plus 1.00%. The

66

Cited in the Tao Global Brokerage
17Cv916 decided 3/18/21
Archived on 3/23/21
This document is protected by copyright.
Further reproduction is prohibited without permission.

TABLE OF CONTENTS

Eurodollar Rate means the rate per annum equal to (i) the British Bankers Association LIBOR Rate, or (ii) if such rate is not available, the rate per annum determined by the administrative agent.

Interest expense related to borrowings under the Credit Agreement, including the amortization of debt financing costs was $1.4 million, $1.2 million and nil for the years ended December 31, 2013, 2012 and 2011, respectively.

Pursuant to covenants in the Credit Agreement, Holdings' is required to maintain: excess net capital amount of 125% of adjusted net capital required to be maintained as of the last day of any fiscal quarter for US and UK, Consolidated Interest Coverage Ratio and Consolidated Leverage Ratio, as defined in the Credit Agreement, of 4.00 to 1.00 and 2.50 to 1.00, respectively, as of the last day of any fiscal quarter, Net Unhedged Exposure, as defined in the Credit Agreement, of less than 20% of total assets of Holdings and its subsidiaries, and Net Unhedged Non-FX Exposure, as defined in the Credit Agreement, of less than 10% of total assets of Holdings and its subsidiaries. In addition, the Credit Agreement contains certain customary covenants as well as certain customary events of default.

During the years ended December 31, 2013 and 2012, the weighted average dollar amount of borrowings related to the Credit Agreement was $34.9 million and $41.2 million, respectively. During the years ended December 31, 2013 and 2012, the weighted average interest rate related to the Credit Agreement was 2.4% and 2.1% , respectively.

*Senior Convertible Notes due 2018*

In June 2013, we issued $172.5 million principal amount of Convertible Notes and received net proceeds of $166.5 million, after deducting the initial purchasers' discount and offering expenses. The Convertible Notes pay interest semi-annually on June 15 and December 15 at a rate of 2.25% per year, commencing December 15, 2013. The Convertible Notes will mature on June 15, 2018. We used $10.5 million of the net proceeds of the offering to fund the net cost of the convertible note hedge and warrant transactions described below, repaid $80.0 million of outstanding borrowings under our revolving credit agreement and repaid $22.9 million of outstanding promissory notes issued in connection with the Lucid acquisition. We intend to use the remaining net proceeds from the offering for general corporate purposes, including potential future acquisitions.

Prior to March 15, 2018, the Convertible Notes will be convertible only upon the occurrence of certain events and during certain periods, and thereafter, at any time until the second scheduled trading day immediately preceding the maturity date of the Convertible Notes. The Convertible Notes will be convertible at an initial conversion rate of 53.2992 shares of FXCM Inc. Class A common stock per $1,000 principal amount of the Convertible Notes, which is equivalent to an initial conversion price of approximately $18.76, which represents an approximately 32.5% conversion premium to the last reported sale price of $14.16 per share of FXCM Inc. Class A common stock on the New York Stock Exchange on May 28, 2013. In addition, following certain corporate transactions that occur prior to the maturity date, FXCM Inc. will, in certain circumstances, increase the conversion rate for a holder that elects to convert its Convertible Notes in connection with such corporate transaction. Upon conversion, FXCM Inc. will deliver cash up to the principal amount. With respect to any conversion value in excess of the principal amount, FXCM Inc. will deliver shares of FXCM Inc. Class A common stock (unless it elects to deliver cash in lieu of all or a portion of such shares).

In connection with the offering of the Convertible Notes, we entered into privately negotiated convertible note hedge transactions. The convertible note hedge transactions will cover, subject to customary anti-dilution adjustments, the number of shares of FXCM Inc. Class A common stock that will initially underlie the Convertible Notes. The convertible note hedge transactions are intended to reduce the potential dilution and/or offset potential cash payments FXCM Inc. is required to make upon conversion of the Convertible Notes. We also entered into privately negotiated warrant transactions with the hedge counterparties relating to the same number of shares of FXCM Inc. Class A common stock as the convertible note hedge transactions. The strike price of the warrant transaction will initially be $21.24 per share, which represents an approximately 50.0% premium to the last reported sale price of FXCM Inc. common stock on the New York Stock Exchange on May 28, 2013. The warrant transactions will have a dilutive effect to the extent that the market price per share of FXCM Inc.'s Class A common stock exceeds the applicable strike price of the warrants on the applicable expiration dates of the warrants. The net cost of the convertible note hedge transactions after such cost was partially offset by the warrant transactions proceeds was $10.5 million.

FXCM Inc. entered into several agreements with Holdings pursuant to which, among other things, FXCM Inc. provided Holdings with the net proceeds of the offering less approximately $10.5 million, which was the net cost to FXCM Inc. of the convertible note hedge transactions discussed above, and Holdings agreed to provide FXCM Inc. with the cash necessary to make any payments required under the Convertible Notes.

67

Cited in In re Global Brokerage, Inc.
17Cv916 Decided on 3/24/21
Archived on 3/23/21
This document is protected by copyright.
Further reproduction is prohibited without permission.

TABLE OF CONTENTS

*Lucid Notes Payable*

In connection with the Acquisition, we issued to the Lucid sellers 3.5% unsecured promissory notes in the amounts of $71.4 million and $15.8 million which matured on December 21, 2012. On December 21, 2012, in satisfaction of the matured notes we repaid $64.0 million in cash and issued a series of 2.25%, $22.9 million unsecured promissory notes for the balance with a maturity date of December 21, 2013. The notes were repaid on June 6, 2013 with a portion of the proceeds received from the Convertible Notes issued on June 3, 2013. In the second quarter of 2013, the purchase price was increased by $15.3 million due to the final determination of tax balances at the Lucid Acquisition Date adjusted during the measurement period and we issued six-month 2.25% unsecured promissory notes to the Lucid sellers for this purchase price increase. The notes matured on December 21, 2013. In satisfaction of the matured notes, the Company repaid $5.5 million and issued a series of 2.25% unsecured promissory notes to the Lucid sellers for the balance of $9.8 million with a maturity date of June 6, 2014.

## NON-GAAP FINANCIAL MEASURES

Adjusted Pro Forma basis is a non-generally accepted accounting principles ("non-GAAP") measure. Adjusted Pro Forma results begin with information prepared in accordance with U.S. GAAP, adjusted to exclude certain items and reflects the conversion of all units of Holdings for shares of Class A common stock of FXCM Inc. Management believes that the disclosed Adjusted Pro Forma measures and any adjustments thereto, when presented in conjunction with comparable U.S. GAAP measures, are useful to investors to compare FXCM's results across several periods and facilitate an understanding of FXCM's operating results. We use these measures to evaluate our operating performance, as well as the performance of individual employees. These measures should not be considered a substitute for, or superior to, measures of financial performance prepared in accordance with U.S. GAAP. The differences between Adjusted Pro Forma and U.S. GAAP results are as follows:

1.  *Assumed Exchange of Units of Holdings for FXCM Inc. Class A Shares.*  As a result of the exchange of Holdings units, the non-controlling interest related to these units is converted to controlling interest. The Company's management believes that it is useful to provide the per-share effect associated with the assumed exchange of all Holdings units.

2.  *Compensation Expense.*  Adjustments have been made to the Adjusted Pro Forma Earnings to eliminate expense relating to stock based compensation relating to the Company's IPO as well as costs associated with the renegotiation or termination of certain employment contracts that held profit sharing interests in the performance of the Company's business units. Given the nature of these expenses, they are not viewed by management as expenses incurred in the ordinary course of business and management believes it is useful to provide the effects of eliminating these expenses.

3.  *Lucid Minority Interest/Compensation Expense.*  Our reported U.S. GAAP results reflect the portion of the 49.9% of Lucid earnings allocated among the non-controlling members of Lucid based on services provided as a component of compensation expense under "Allocation of net income to Lucid members for services provided." Adjustments have been made to the Adjusted Pro Forma Earnings to reclassify this allocation of Lucid's earnings attributable to non-controlling members to "Net income attributable to other non-controlling interests." The Company's management believes that this reclassification provides a more meaningful view of the Company's operating expenses and the Company's economic arrangement with Lucid's non-controlling members. This adjustment has no impact on net income as reported by the Company.

4.  *Acquisition Costs/Income.*  Adjustments have been made to the Adjusted Pro Forma Earnings to eliminate certain acquisition related costs/income. Given the nature of these items, they are not viewed by management as expenses/income incurred in the ordinary course of business and management believes it is useful to provide the effects of eliminating these items.

5.  *Regulatory Costs.*  Adjustments have been made to the Adjusted Pro Forma Earnings to eliminate certain costs (including client reimbursements) associated with ongoing discussions and settling certain historical trade execution matters with the Company's regulators. Given the nature of these expenses, they are not viewed by management as expenses incurred in the ordinary course of business and management believes it is useful to provide the effects of eliminating these expenses.

6.  *Depreciation.*  Adjustments have been made to the Adjusted Pro Forma Earnings to eliminate certain impairment charges recorded as a component of depreciation. Given the nature of these charges they are not viewed by management as expenses incurred in the ordinary course of business and management believes it is useful to provide the effects of eliminating these charges.

68

Cited in In re Global Brokerage
17CV916 Decided 8/2/21
Archived on 3/23/21
This document is protected by copyright.
Further reproduction is prohibited without permission.

TABLE OF CONTENTS

7.   *Income Taxes.*   Prior to the IPO FXCM was organized as a series of limited liability companies and foreign corporations, and even following the IPO not all of the Company's income is subject to corporate-level taxes. As a result, adjustments (including tax receivable agreement adjustments recorded to Other income) have been made to the Adjusted Pro Forma earnings to assume that the Company has adopted a conventional corporate tax structure and is taxed as a C corporation in the U.S. at the prevailing corporate rates. This assumption is consistent with the assumption that all of Holdings units are exchanged for shares of FXCM Inc. Class A common stock, as discussed in Item 1 above, as the assumed exchange would change the tax structure of the Company. In addition, Adjusted Pro Forma income tax provision reflects the tax effect of any adjusted pro forma adjustments.

69

Cited in In re Global Brokerage
17CV916 Decided 3/18/21

Archived on 3/23/21

This document is protected by copyright.
Further reproduction is prohibited without permission.

TABLE OF CONTENTS

The following table reconciles our Adjusted Pro Forma results with our results presented in accordance with U.S. GAAP for the years ended December 31, 2013, 2012 and 2011.

| | For the Years Ended December 31 | | | | | | | | |
| | 2013 | | | 2012 | | | 2011 | | |
| | (In thousands, except per share data) | | | | | | | | |
| | As Reported | Adjustments | Adjusted Pro Forma | As Reported | Adjustments | Adjusted Pro Forma | As Reported | Adjustments | Adjusted Pro Forma |
|---|---|---|---|---|---|---|---|---|---|
| Revenues | $ 489,588 | $ (5,750) (9) | $ 483,838 | $ 417,315 | $ — | $ 417,315 | $ 415,578 | $ (3,314) (10) | $ 412,264 |
| Expenses | | | | | | | | | |
| Compensation and benefits | 105,470 | (12,289) (1) | 93,181 | 105,779 | (21,475) (5) | 84,304 | 95,086 | (9,269) (8) | 85,817 |
| Allocation of income to Lucid members for services provided | 21,290 | (21,290) (2) | — | — | — | — | — | — | — |
| Total compensation and benefits | 126,760 | (33,579) | 93,181 | 105,779 | (21,475) | 84,304 | 95,086 | (9,269) | 85,817 |
| Referring broker fees | 84,231 | — | 84,231 | 76,585 | — | 76,585 | 92,832 | — | 92,832 |
| Depreciation, amortization and interest expense | 61,402 | (3,454) (13) | 57,948 | 39,536 | — | 39,536 | 20,053 | — | 20,053 |
| Other expense | 165,335 | (16,908) (6) | 148,427 | 147,951 | (4,426) (11) | 143,525 | 138,010 | (16,262) (12) | 121,748 |
| Total expenses | 437,728 | (53,941) | 383,787 | 369,851 | (25,901) | 343,950 | 345,981 | (25,531) | 320,450 |
| Income before income taxes | 51,860 | 48,191 | 100,051 | 47,464 | 25,901 | 73,365 | 69,597 | 22,217 | 91,814 |
| Income tax provision | 17,024 | 8,783 (3) | 25,807 | 8,986 | 15,403 (3) | 24,389 | 10,816 | 13,844 (3) | 24,660 |
| Net income | 34,836 | 39,408 | 74,244 | 38,478 | 10,498 | 48,976 | 58,781 | 8,373 | 67,154 |
| Net income attributable to non-controlling interest in FXCM Holdings, LLC | 24,850 | (24,850) (4) | — | 23,131 | (23,131) (4) | — | 46,045 | (46,045) (4) | — |
| Net income attributable to other non-controlling interests | (4,846) | 21,290 (2) | 16,444 | 6,389 | — | 6,389 | — | — | — |
| Net income attributable to FXCM Inc. | 14,832 | 42,968 | 57,800 | 8,958 | 33,629 | 42,587 | 12,736 | 54,418 | 67,154 |
| Diluted weighted average shares outstanding as reported and pro forma fully exchanged, fully diluted weighted average shares outstanding | 33,957 | — | 76,361 (7) | 24,086 | | 73,896 (7) | 16,567 | | 74,548 (7) |
| Diluted net income per share as reported and adjusted pro forma net income per fully exchanged, fully diluted weighted average shares outstanding | $ 0.44 | $ — | $ 0.76 | $ 0.37 | $ — | $ 0.58 | $ 0.77 | $ — | $ 0.90 |

70

Cited in In re Global Brokerage
17CV916 Decided 3/18/21

Archived on 3/23/21

This document is protected by copyright.
Further reproduction is prohibited without permission.

TABLE OF CONTENTS

_____

(1)  Represents the elimination of equity-based compensation associated with the IPO and a charge incurred in connection with the termination of an employment contract in the Company's retail business.

(2)  Represents the reclassification of the portion of the 49.9% of Lucid's earnings attributed to non-controlling interests recorded as compensation for U.S. GAAP purposes to Net income attributable to other non-controlling interests.

(3)  Represents an adjustment to reflect an effective corporate tax rate of approximately 25.8%, 33.2% and 26.9% for the years ended December 31, 2013, 2012 and 2011, respectively assuming a full exchange of existing unitholders Holdings Units for shares of Class A common stock of the Company and the tax effect of any pro forma adjustments.

(4)  Represents the elimination of the non-controlling interest associated with the ownership by existing unitholders of Holdings (excluding FXCM Inc.), as if the unitholders had fully exchanged their Holdings Units for shares of Class A common stock of the Company.

(5)  Represents the elimination of equity-based compensation associated with the IPO, severance and stock-based compensation in connection with the termination or renegotiation of certain employment contracts in the Company's institutional and retail businesses.

(6)  Represents an adjustment to eliminate a reserve established relating to a settlement with FCA regarding pre August 2010 trade execution practices.

(7)  Fully diluted shares assuming all unitholders had fully exchanged their Holdings Units for shares of Class A common stock of the Company.

(8)  Represents the elimination of equity-based compensation associated with the IPO.

(9)  Represents the elimination of a $7.0 million benefit recorded to reduce the the initial contingent consideration recorded for the Faros acquisition and the elimination of a $1.2 million expense attributable to the remeasurement of Due to related parties pursuant to the tax receivable agreement relating to the change in our U.S. federal tax rate.

(10) Represents the elimination of an amount related to the remeasurement of our tax receivable liability pursuant to a tax receivable agreement. This non-recurring expense is attributable to the change in our U.S. federal income tax rate.

(11) Represents the elimination of certain acquisition-related costs and the elimination of costs (including client reimbursements) associated with settling historical trade execution issues with the Financial Services Agency of Japan.

(12) Represents an adjustment to eliminate an expense relating to a settlement with the National Futures Association and the Commodity Futures Trading Commission regarding trade execution activities. Pursuant to an agreement with a subsidiary of Holdings, certain founding members of Holdings reimbursed the cost of these matters, up to $16.0 million plus additional amounts as approved by such founding members. Consequently, there was no impact to FXCM Inc.'s net income for the year ended December 31, 2011 as the entire expense was allocated to such funding members. Accordingly $16.3 million of additional capital was provided by the respective founding members.

(13) Represents the elimination of an amount related to an impairment adjustment to the carrying value of an electronic foreign exchange options trading platform in the Company's institutional business.

The following table reconciles EBITDA and adjusted EBITDA to U.S. GAAP Net Income and Adjusted Pro forma Net Income, as presented and reconciled in the prior table for the years ended December 31, 2013, 2012 and 2011:

71

Cited in In re Global Brokerage
17CV916 Decided 3/18/21
Archived on 3/23/21
This document is protected by copyright.
Further reproduction is prohibited without permission.

TABLE OF CONTENTS

| | For the Years Ended December 31, | | | | | |
| | (In thousands) | | | | | |
| | U.S. GAAP | | | Adjusted Pro Forma | | |
| | 2013 | 2012 | 2011 | 2013 | 2012 | 2011 |
|---|---|---|---|---|---|---|
| Net income attributable to FXCM Inc. | $ 14,832 | $ 8,958 | $ 12,736 | $ 57,800 | $ 42,587 | $ 67,154 |
| Net income attributable to non-controlling interest in FXCM Holdings, LLC | 24,850 | 23,131 | 46,045 | — | — | — |
| Net income attributable to other non-controlling interests | (4,846) | 6,389 | — | 16,444 | 6,389 | — |
| Provision for income taxes | 17,024 | 8,986 | 10,816 | 25,807 | 24,389 | 24,660 |
| Depreciation, amortization, and interest expense | 61,402 | 39,536 | 20,053 | 57,948 | 39,536 | 20,053 |
| EBITDA | $ 113,262 | $ 87,000 | $ 89,650 | $ 157,999 | $ 112,901 | $ 111,867 |

*Contractual Obligations and Commercial Commitments*

The following tables reflect a summary of our contractual cash obligations and other commercial commitments at March 14, 2014:

| | As of December 31, 2013 | | | | |
| | Total | Less Than 1 Year | 1 – 3 Years | 4 – 5 Years | More Than 5 Years |
| | (In thousands) | | | | |
|---|---|---|---|---|---|
| **Lease obligations** | $ 46,672 | $ 5,915 | $ 13,904 | $ 6,959 | $ 19,894 |
| **Credit Agreement** [1] | 55,222 | 1,731 | 53,491 | — | — |
| **Lucid Note Payable** [2] | 9,910 | 9,910 | — | — | — |
| **Contingent put options** [3] | 3,443 | 3,443 | — | — | — |
| **Convertible Notes** | 189,966 | 3,881 | 11,644 | 174,441 | — |
| **Vendor obligations** | 1,704 | 1,271 | 434 | — | — |
| **Total** | $ 306,918 | $ 26,151 | $ 79,473 | $ 181,399 | $ 19,894 |

[1] Assumes there will be no other increases to the amount borrowed as of March 14, 2014 and the outstanding balance will be paid upon expiration of the facility. Includes commitment fees using the rates in effect as of December 31, 2013.

[2] Principal plus interest at the stated rate of 2.25%.

[3] See Note 20 to our consolidated financial statements. Assumes exercise of put option in the first quarter of 2014.

*Off-Balance Sheet Arrangements*

As of December 31, 2013, we did not have any significant off-balance sheet arrangements as defined by the regulations of the SEC.

**CRITICAL ACCOUNTING POLICIES AND ESTIMATES**

The notes to our consolidated financial statements include disclosure of our significant accounting policies and estimates. In establishing these policies within the framework of U.S. GAAP, management must make certain assessments, estimates and choices that will result in the application of these principles in a manner that appropriately reflects our financial condition and results of operations. Critical accounting policies are those policies that we believe present the most complex or subjective measurements and have the most potential to affect our financial position and operating results. While all decisions regarding accounting policies are important, there are certain accounting policies and estimates that we consider to be critical. These critical policies, which are presented in detail in the notes to our consolidated financial statements, relate to revenue recognition, cash and cash equivalents, held for customers, fair value measurements, office, communication and computer equipment, business combinations, goodwill, other intangibles, derivatives and income taxes.

A summary of our critical accounting policies and estimates follows:

72

FXCM Global Brokerage

Decided 3/18/2

This document is protected by copyright.
Further reproduction is prohibited without permission.

TABLE OF CONTENTS

*Revenue Recognition*

We make foreign currency markets for customers trading in FX spot markets and through our subsidiary FSL, engage in equity and related brokerage activities. FX transactions are recorded on the trade date and positions are marked to market daily with related gains and losses, including gains and losses on open spot transactions, recognized currently in income. Commissions earned on brokerage activities are recorded on a trade date basis and are recognized currently in income.

*Retail Trading Revenue*

Under our retail agency FX offering, trading revenue is earned by adding a markup to the price provided by FX market makers generating trading revenue based on the volume of transactions and is recorded on trade date. Under the agency model, when a customer executes a trade on the best price quotation presented by the FX market maker, we act as a credit intermediary, or a riskless principal, simultaneously entering into a trade with the customer and the FX market maker. This agency model has the effect of automatically hedging our positions and eliminating market risk exposure. Retail trading revenues principally represent the difference of our realized and unrealized foreign currency trading gains or losses on our positions with customers and the systematic hedge gains and losses from the trades entered into with the FX market makers. Retail trading revenue also includes fees earned from arrangements with other financial institutions to provide platform, back office and other trade execution services. This service is generally referred to as a white label arrangement. We earn a percentage of the markup charged by the financial institutions to their customers. Fees from this service are recorded when earned on a trade date basis. Additionally, we earn income from trading in CFDs, rollovers, payments for order flow, and spread betting. Income on CFDs represents the difference between the realized and unrealized trading gains or losses on our positions and the hedge gains or losses with the other financial institutions. Income or loss on CFDs is recorded on a trade date basis. Income or loss on rollovers is the interest differential customers earn or pay on overnight currency pair positions held and the markup that we receive on interest paid or received on currency pair positions held overnight. Income or loss on rollovers is recorded on a trade date basis. Income earned on order flow represents payments received from certain FX market makers in exchange for routing trade orders to these firms for execution. Our order routing software ensures that payments for order flow do not affect the routing of orders in a manner that is detrimental to our retail customers. We recognize payments for order flow as earned on a trade date basis. Spread betting is where a customer takes a position against the value of an underlying financial instrument moving either upward or downward in the market. Income on spread betting is recorded as earned on a trade date basis.

*Institutional Trading Revenue*

Institutional trading revenue relates to commission income generated by facilitating spot FX trades on behalf of institutional customers through the services provided by the FXCM Pro division and Faros. The counterparties to these trades are external financial institutions that also hold customer account balances. We receive commission income on these trades without taking any market or credit risk. Institutional trading revenue is recorded on a trade date basis. We also earn income from market making and electronic trading in the institutional foreign exchange spot and futures markets through our subsidiary, Lucid. Income on market making and electronic trading in foreign exchange spot and future currencies represents the spread between the bid and ask price for positions purchased and sold and the change in value of positions purchased and sold. Income on market making is recorded as trading gains, net of trading losses, on a trade date basis.

*Cash and Cash Equivalents, held for customers*

Cash and cash equivalents, held for customers represents cash held to fund customer liabilities. At times, balances held in U.S. bank accounts may exceed federally insured limits. This potentially subjects us to concentration risk. We have not experienced losses in such accounts.

The balance arises primarily from cash deposited by customers and net realized gains from customer trading activity. We record a corresponding liability in connection with this amount that is included in customer account liabilities in the consolidated statements of financial condition. A portion of the balance is not available for general use due to legal restrictions in accordance with certain jurisdictional regulatory requirements.

*Derivatives*

Derivative financial instruments are accounted for in accordance with ASC 815, *Derivatives and Hedging* ("ASC 815"), and are included in due from/to brokers in our consolidated statements of financial condition. We recognize all derivative financial instruments in the consolidated statements of financial condition as either assets or liabilities at fair value. We enter

73

Cited in FXCM Global Brokerage
17Cv916 Decided 3/11/21
Archived on 4/23/21
This document is protected by copyright.
Further reproduction is prohibited without permission.

TABLE OF CONTENTS

into future contracts to (i) economically hedge the open customer contracts on our CFD business and (ii) hedge trading in our electronic market making and institutional foreign exchange spot and futures markets. Future contracts are exchanged traded contracts to either purchase or sell a specific asset at a specified future date for a specified price. Gains or losses on future contracts related to our CFD business are included in Retail trading revenue and gains or losses on hedge trading in our electronic market making and institutional foreign exchange spot and futures markets are included in Institutional trading revenue in the consolidated statements of operations.

### Fair Value Measurements

Fair value is defined as the price that would be received to sell an asset or paid to transfer a liability in an orderly transaction between market participants at the measurement date. Fair value measurement establishes a fair value hierarchy that prioritizes the inputs of valuation techniques used to measure fair value. The hierarchy gives the highest priority to unadjusted quoted prices in active markets for identical assets or liabilities and the lowest priority to unobservable inputs. These three levels of fair value hierarchy are defined as follows:

_Level I_:  Quoted prices in active markets for identical assets or liabilities, accessible by the Company at the measurement date.

_Level II_:  Quoted prices for similar assets or liabilities in active markets, or quoted prices for identical or similar assets or liabilities in markets that are not active, or other observable inputs other than quoted prices.

_Level III_:  Unobservable inputs for assets or liabilities.

When Level I inputs are available, those inputs are selected for determination of fair value. To value derivatives that are characterized as Level II and III, the Company uses observable inputs for similar assets and liabilities that are available from pricing services or broker quotes. These observable inputs may be supplemented with other methods, including internal models that result in the most representative prices for assets and liabilities with similar characteristics. Multiple inputs may be used to measure fair value, however, the level of fair value for each derivative and financial asset or liability is based on the highest priority level of input within this fair value hierarchy.

### Office, Communication and Computer Equipment, net

Office, communication and computer equipment, net, consist of computer equipment, purchased technology hardware and software, internally developed software, leasehold improvements, furniture and fixtures and other equipment, licenses and communication equipment. Office, communication and computer equipment are recorded at historical cost, net of accumulated depreciation. Additions and improvements that extend the lives of assets are capitalized, while expenditures for repairs and maintenance are expensed as incurred. Certain costs of software developed or obtained for internal use are capitalized. Depreciation is computed using the straight-line method. We depreciate these assets using the following useful lives:

| | |
|---|---|
| Computer equipment | 3 to 5 years |
| Software | 2 to 5 years |
| Leasehold improvements | Lesser of the estimated economic useful life or the term of the lease |
| Furniture and fixtures and other equipment | 3 to 5 years |
| Licenses | 2 to 3 years |
| Communication equipment | 3 to 5 years |

### Business Combination

We account for business acquisitions in accordance with ASC 805 and records assets acquired and liabilities assumed at their fair values as of the acquisition date. We records any excess purchase price over the value assigned to net tangible and identifiable intangible assets of a business acquired as goodwill. Acquisition related costs are expensed as incurred.

74

Cited in the Global Brokerage
17Cv916 decided 3/18/21
Archived on 10/23/21
This document is protected by copyright.
Further reproduction is prohibited without permission.

TABLE OF CONTENTS

*Goodwill*

We recorded goodwill from various acquisitions. Goodwill represents the excess purchase price over the value assigned to the net tangible and identifiable intangible assets of a business acquired. Goodwill is allocated to our reporting units based on the assignment of the fair values of each reporting unit of the acquired company. For purposes of the goodwill impairment test, we have identified our Retail and Institutional trading segments as our reporting units. We perform a two-step goodwill impairment review at the reporting unit level annually, or in interim periods if certain events occur indicating that the carrying value may be impaired. We test for impairment during the fourth quarter of our fiscal year using October 1 carrying values.

The first step of the two-step process involves a comparison of the estimated fair value of a reporting unit to its carrying amount, including goodwill. In performing the first step, we determine the fair value of a reporting unit using a discounted cash flow ("DCF") analysis. Determining fair value requires the exercise of significant judgment, including judgments about appropriate discount rates, perpetual growth rates, the amount and timing of expected future cash flows. The cash flows employed in the DCF analysis are based on our most recent budgets and business plans and, when applicable, various growth rates are assumed for years beyond the current business plan period. Discount rate assumptions are based on an assessment of the risk inherent in the future cash flows of the respective reporting units. If the estimated fair value of a reporting unit exceeds its carrying amount, the goodwill of the reporting unit is not impaired and the second step of the impairment test is not necessary. If the carrying amount of a reporting unit exceeds its estimated fair value, then the second step of the goodwill impairment test must be performed. The second step of the goodwill impairment test compares the implied fair value of the reporting unit's goodwill with its carrying amount to measure the amount of impairment loss, if any. The implied fair value of goodwill is determined in the same manner as the amount of goodwill recognized in a business combination (i.e., the estimated fair value of the reporting unit is allocated to all of the assets and liabilities of that reporting unit including any unrecognized intangible assets as if the reporting unit had been acquired in a business combination and the fair value of the reporting unit was the purchase price paid). If the carrying amount of the reporting unit's goodwill exceeds the implied fair value of the reporting unit's goodwill, an impairment loss is recognized in an amount equal to that excess.

There was no impairment of goodwill for the year ended December 31, 2013. Although there is no impairment as of December 31, 2013, events such as economic weakness and unexpected significant declines in operating results of reporting units may result in our having to perform a goodwill impairment test for some or all of our reporting units prior to the required annual assessment. These types of events and the resulting analysis could result in goodwill impairment charges in the future.

*Other Intangible Assets, net*

Other intangible assets, net, primarily include customer relationships, proprietary technology, non-compete agreements and trade names recorded from various acquisitions.

The customer relationships, non-compete agreements and trade name are finite-lived intangibles and are amortized on a straight-line basis over their estimated average useful life of 4 to 9 years, 3 to 9 and 3 years, respectively. Proprietary technology is also finite-lived intangibles and is amortized on a straight-line basis over their estimated average useful life of 4 to 7 years, respectively. The useful life of these intangibles is based on the period they are expected to contribute to future cash flows as determined by the Company's historical experience. For these finite-lived intangible assets subject to amortization, impairment is considered upon certain "triggering events" and is recognized if the carrying amount is not recoverable and the carrying amount exceeds the fair value of the intangible asset. There was no impairment of finite-lived intangible assets for the years ended December 31, 2013, 2012 and 2011.

Indefinite-lived assets are not amortized but tested for impairment. Our policy is to test for impairment at least annually or in interim periods if certain events occur indicating that the fair value of the asset may be less than its carrying amount. An impairment test on indefinite-lived assets is performed during the fourth quarter of our fiscal year using the October 1st carrying value. Impairment exists if the carrying value of the indefinite-lived intangible asset exceeds its fair value. There was no impairment of indefinite-lived intangible assets for the years ended December 31, 2013, 2012 and 2011.

*Income Taxes*

Holdings operates in the U.S. as a limited liability company that is treated as a partnership for U.S. federal and state income tax purposes. Accordingly, Holdings' income from its U.S. operations is not subject to U.S. federal income tax because the income is attributable to its members. Accordingly, our U.S. tax provision is solely based on the portion of Holdings' income attributable to the Corporation and excludes the income attributable to other members of Holdings whose income is included in Net income attributable to non-controlling interest in FXCM Holdings, LLC in the consolidated statements of operations.

76

TABLE OF CONTENTS

Income taxes are accounted for in accordance with ASC 740, *Income Taxes* ("ASC 740"), which requires that deferred tax assets and liabilities are recognized, using enacted tax rates, for the effect of temporary differences between the book and tax basis of recorded assets and liabilities. Deferred tax assets, including net operating losses and income tax credits, are reduced by a valuation allowance if it is "more likely than not" that some portion or all of the deferred tax assets will not be realized.

In addition to U.S. federal and state income taxes, we are subject to Unincorporated Business Tax which is attributable to Holdings' operations apportioned to New York City. Our foreign subsidiaries are also subject to local taxes.

In accordance with ASC 740, we evaluate a tax position to determine whether it is more likely than not that the tax position will be sustained upon examination, based on the technical merits of the position. If the position does not meet a more likely than not threshold, a tax reserve is established and no income tax benefit is recognized. We are audited by U.S. federal and state, as well as foreign, tax authorities. In some cases, many years may elapse before a tax return containing tax positions for which an ASC 740 reserve has been established is examined and an audit is completed. As audit settlements are reached, we adjust the corresponding reserves, if required, in the period in which the final determination is made. While it is difficult to predict the final outcome or timing of a particular tax matter, we believe that our reserves for uncertain tax positions are recorded pursuant to the provisions of ASC 740.

### Accounting Pronouncements Adopted in 2012

### Fair Value Measurements and Related Disclosures

In May 2011, the FASB issued authoritative guidance that provides a uniform framework for fair value measurements and related disclosures between U.S GAAP and International Financial Reporting Standards. Additional disclosure requirements under this guidance include: (1) for Level III fair value measurements, quantitative information about unobservable inputs used, a description of the valuation processes used by the entity, and a qualitative discussion about the sensitivity of the measurements to changes in the unobservable inputs; (2) for an entity's use of nonfinancial asset that is different from the asset's highest and best use, the reason for the difference; (3) for financial instruments not measured at fair value but for which disclosure of fair value is required, the fair value hierarchy level in which the fair value measurements were determined; and (4)the disclosure of all transfers between Level I and Level II of the fair value hierarchy. This guidance became effective for the Company on January 1, 2012 and did not have a material impact on its consolidated financial statements.

### Presentation of Comprehensive Income

In June 2011, the FASB issued authoritative guidance that eliminates the option to present components of other comprehensive income as part of the statement of changes in stockholders' equity, among other updates to the presentation of comprehensive income. Under this guidance, an entity has the option to present the total of comprehensive income, the components of net income and the components of other comprehensive income either in a single continuous statement of comprehensive income or in two separate but consecutive statements. In addition, an entity is required to present on the face of the financial statements reclassification adjustments for items that are reclassified from other comprehensive income to net income in the statement(s) where the components of net income and the components of other comprehensive income are presented. This guidance became effective for the Company on January 1, 2012 and did not have a material impact on its consolidated financial statements.

### Accounting Pronouncements Adopted in 2013

### Balance Sheet Offsetting

In December 2011, the FASB issued Accounting Standards Update ("ASU") No. 2011-11 which requires disclosures of both gross and net information about instrument and transactions eligible for offset as well as transactions subject to an agreement similar to a master netting agreement. In February 2013, the FASB issued ASU No. 2013-01 which limited the scope of the offsetting disclosures to recognized derivative instruments accounted for in accordance with ASC 815. ASU No. 2013-01 is effective for annual periods beginning on or after January 1, 2013 and interim periods within those annual periods and must be applied retrospectively. This guidance became effective for the Company on January 1, 2013 and did not have a material impact the presentation of the Company's consolidated financial statements.

### Testing Goodwill for Impairment

In July 2012, the FASB issued amended guidance relating to FASB ASC Topic 350, "Intangibles — Goodwill and Other," which permits an entity to first assess qualitative factors to determine whether it is more likely than not that an indefinite-lived

Cited In re documentaire
17Cv-0916 Decatur Brokerage
Archives on 3/23/21
This document is protected by copyright provision.
Further reproduction is prohibited without permission.

76

TABLE OF CONTENTS

intangible asset is impaired as a basis for determining whether it is necessary to perform the quantitative impairment test in accordance with ASC Topic 350. The more-likely-than-not threshold is defined as having a likelihood of more than 50 percent. If, after assessing the totality of events and circumstances, an entity concludes that it is not more likely than not that the indefinite-lived intangible asset is impaired, then no further action is required. This guidance became effective for the Company on January 1, 2013. Since this guidance only changes the manner in which the Company assesses indefinite-lived intangible assets for impairment, adoption of this guidance did not have a material effect on the Company's consolidated financial condition or results of operations.

### Reclassification Out of Accumulated Other Comprehensive Income

In February 2013, the FASB issued ASU No. 2013-02, Reporting of Amounts Reclassified Out of Accumulated Other Comprehensive Income. This guidance requires an entity to present information about significant items reclassified out of Accumulated Other Comprehensive Income (AOCI) by component and for items reclassified out of AOCI and into net income, an entity must disclose the effect of such items on the affected net income line item. ASU No. 2013-02 is effective for annual periods beginning on or after January 1, 2013 and interim periods within those annual periods and must be applied retrospectively. This guidance became effective for the Company on January 1, 2013 and did not have a material impact on the presentation of the Company's consolidated financial statements.

### Recently Issued Accounting Pronouncement

### Certain Obligations Resulting from Joint and Several Liability Arrangements

In February 2013, the FASB issued ASU No. 2013-20, Obligations Resulting from Joint and Several Liability Arrangements for Which the Total Amount of the Obligation is Fixed at the Reporting Date. This standard requires an entity to measure obligations resulting from joint and several liability arrangements for which the total amount of the obligation is fixed at the reporting date as the sum of (i) the amount the entity agreed to pay on the basis of its arrangement among its co-obligors and (ii) any additional amount it expect to pay on behalf of its co-obligors.

ASU No. 2013-20 is effective for fiscal years and interim periods beginning after December 15, 2013, but earlier adoption is permitted. Upon adoption, the standard should be applied retrospectively to all prior periods presented. The Company plans to adopt the standard on its required effective date of January 1, 2014 and does not expect the adoption of this standard to have a material effect on our consolidated financial condition, results of operations or cash flows.

### Parent's Accounting for the Cumulative Translation Adjustment upon Derecognition of an Investment within a Foreign Entity or of an Investment in a Foreign Entity

In March 2013, the FASB issued ASU No. 2013-05, Parent's Accounting for the Cumulative Translation Adjustment upon Derecognition of Certain Subsidiaries or Groups of Assets within a Foreign Entity or of an Investment in Foreign Entity. This standard addresses whether consolidation guidance or foreign currency guidance applies to the release of the cumulative translation adjustment into net income when a parent sells all or a part of its investment in a foreign entity or no longer holds a controlling financial interest in a subsidiary or net assets that are a business (other than a sale of in-substance real estate) within a foreign entity. The standard also resolves the diversity in practice for the cumulative translation adjustment treatment in business combinations achieved in stages involving foreign entities.

Under this standard, the entire amount of the cumulative translation adjustment associated with the foreign entity should be released into earnings when there has been: (i) a sale of a subsidiary or group of net assets within a foreign entity and the sale represents a complete or substantially complete liquidation of the foreign entity in which the subsidiary or the net assets had resided; (ii) a loss of a controlling financial interest in an investment in a foreign entity; or (iii) a change in accounting method from applying the equity method to an investment in a foreign entity to consolidating the foreign entity.

ASU No. 2013-05 is effective for fiscal years and interim periods beginning after December 15, 2013, and will be applied prospectively. The Company plans to adopt the standard on its required effective date of January 1, 2014 and does not expect the adoption of the standard to have a material effect on our consolidated financial condition, results of operations or cash flows.

### Presentation of Unrecognized Tax Benefits

In July 2013, the FASB issued ASU No. 2013-11, Presentation of Unrecognized Tax Benefits When a Net Operating Loss Carryforward, a Similar Tax Loss, or a Tax Credit Carryforward Exists. This standard requires a liability related to unrecognized tax benefits to be presented as a reduction to the related deferred tax asset for a net operating loss carryforward or a tax credit carryforward. When the carryforwards are not available at the reporting date under the tax law of the applicable jurisdiction or the tax law of the applicable jurisdiction does not require, and the entity does not intend to use, the deferred tax

Cited in In re Global Brokerage
17Cv916 Denial Bull-283
Archived on 3/23/2021
This document is protected by copyright.
Further reproduction is prohibited without permission.

TABLE OF CONTENTS

asset for such purpose, the unrecognized tax benefit will be presented in the financial statements as a liability and will not be combined with the related deferred tax asset.

ASU No. 2013-11 is effective for fiscal years and interim periods beginning after December 15, 2013, but earlier adoption is permitted. Upon adoption, the standard should be applied prospectively to unrecognized tax benefits that existed at the effective date. Retrospective application is permitted. The Company plans to adopt the standard prospectively on its required effective date of January 1, 2014 and does not expect the adoption of the standard to have a material effect on its consolidated financial condition, results of operations or cash flows.

**Item 7A. Quantitative and Qualitative Disclosures about Market Risk**

*Currency risk*

Currency risk arises from the possibility that fluctuations in foreign exchange rates will impact the value of our assets denominated in foreign currencies as well as our earnings due to the translation of our statement of financial condition and statement of operations from local currencies to U.S. dollars. We currently have limited exposure to currency risk from customer open positions as we utilize an agency model, simultaneously entering offsetting trades with both our customers and FX market makers. However, we do incur currency mismatch risk arising from customer accounts denominated in one currency being secured by cash deposits in a different currency. As exchange rates change, we could suffer a loss.

As of December 31, 2013, (2.7)% of our net assets (assets less liabilities) were in British pounds, 0.9% in Euros, 13.2% in Japanese yen, and 1.7% in Hong Kong dollars, and 3.0% in all other currencies other than the U.S. dollar. For illustrative purposes, if each of these currencies were to adversely change by 10% with no intervening hedging activity by ourselves, this would result in a pre-tax gain (loss) of $(1.7) million in the case of British pounds, $0.5 million for Euros, $8.4 million for Japanese yen and $1.1 million for Hong Kong Dollars.

*Interest rate risk*

Interest rate risk arises from the possibility that changes in interest rates will impact our financial statements.

Our cash and customer cash (on which we do not pay interest) is held primarily in short-term demand deposits at banks and at our FX market makers. Interest rates earned on these deposits and investments affects our interest revenue. We currently derive a minimal amount of interest income on our cash balances as interest rates are near-zero. Based on cash and customer cash held, we estimate that a 50 basis point increase in interest rates would increase our annual pretax income by approximately $7.8 million. We also have a credit facility with a floating interest rate. As of December 31, 2013, no amounts were outstanding under the facility.

We also earn a spread on overnight position financing (rollovers) and the interest differential our customers earn or pay depends on whether they are long a higher or lower yielding currency relative to the currency they borrowed. Currently interest rate differentials globally are at low levels and we earn a minimal amount of income from our spread on rollover.

*Credit risk*

Credit risk is the risk that a borrower or counterparty will fail to meet their obligations. We are exposed to credit risk from our retail and institutional customers as well as institutional counterparties.

All retail customers are required to deposit cash collateral in order to trade on our platforms. Our policy is that retail customers are not advanced credit in excess of the cash collateral in their account and our systems are designed so that each customer's positions are revalued on a real-time basis to calculate the customer's useable margin. Useable margin is the cash the customer holds in the account after adding or deducting real-time gains or losses, less the margin requirement. The retail customer's positions are automatically closed once his or her useable margin falls to zero. Exposure to credit risk from customers is therefore minimal. While it is possible for a retail customer account to go negative in rare circumstances, for example, due to system failure, a final stop loss on the account is automatically triggered which will execute the closing of all positions. For the years ended December 31, 2013 and 2012, we incurred $1.3 million and $0.3 million, respectively, in losses from customer accounts that had gone negative.

Institutional customers are permitted credit pursuant to limits set by the prime brokers that we use. As part of our arrangement with our prime brokers, they incur the credit risk regarding the trading of our institutional customers.

78

TABLE OF CONTENTS

In addition, we are exposed to the following institutional counterparties: clearing and prime brokers as well as banks with respect to our own deposits and deposits of customer funds. We are exposed to credit risk in the event that such counterparties fail to fulfill their obligations. We manage the credit risk arising from institutional counterparties by setting exposure limits and monitoring exposure against such limits, carrying out periodic credit reviews, and spreading credit risk across a number of different institutions to diversify risk. As of December 31, 2013, our exposure to our largest institutional counterparties, all major global banking institutions, was 33.0% of total assets and the single largest within the group was 13.4% of total assets.

In 2013 we acquired notes receivable from Infinium Capital. The notes expose us to the risk that Infinium Capital will fail to meet their obligation. The notes are secured by liens on capital stock, equity interest held and certain other subsidiaries and other assets of Infinium Capital.

*Market risk*

Market risk is the risk of losses in on- and off-balance sheet positions arising from movements in market prices. In our retail business, we operate predominantly on an agency execution model and are not exposed to the market risk of a position moving up or down in value with the exception of certain trades of our CFD customers. As of December 31, 2013, our net unhedged exposure to CFD customer positions was 3.14% of total assets. A hypothetical 10% change in the value of our unhedged CFD positions as of December 31, 2013 would result in an $7.0 million decrease in pre-tax income.

We offer our smaller retail clients the option to trade with a dealing desk, or principal model. In our agency execution model, when a customer executes a trade with us, we act as a credit intermediary, simultaneously entering into trades with the customer and the FX market maker. In the principal model, we may maintain our trading position if we believe the price may move in our favor and against the customer and not offset the trade with another party. As a result, we may incur trading losses using principal model execution from changes in the prices of currencies where we are not hedged. We have established risk limits, policies and procedures to monitor risk on a continuous basis and they have been reviewed and approved by our Board of Directors. As of December 31, 2013, our net unhedged exposure to FX customer positions was 1.21% of total assets. A hypothetical 10% change in the value of our unhedged FX positions as of December 31, 2013 would result in an $2.7 million decrease in pre-tax income.

We acquired a 50.1% interest in Lucid, an electronic market maker and trader in the institutional foreign exchange spot and futures market. Lucid has risk limits by currency, trading strategy and overall exposure which are monitored continuously. In addition, Lucid seeks to close all open positions by the end of each foreign exchange trading day in New York. The average intra-day gross notional position in the year ended December 31, 2013 was $17.4 million and the maximum intra-day gross position was $84.3 million. A 10% fully correlated decrease in value at the maximum intra-day position would result in a $8.43 million decrease in consolidated pre-tax income.

*Liquidity risk*

In normal conditions, our business of providing online FX trading and related services is self-financing as we generate sufficient cash flows to pay our expenses as they become due. As a result, we generally do not face the risk that we will be unable to raise cash quickly enough to meet our payment obligations as they arise. Our cash flows, however, are influenced by customer trading volume and the income we derive on that volume. These factors are directly impacted by domestic and international market and economic conditions that are beyond our control. In an effort to manage this risk, we maintain a substantial pool of liquidity. As of December 31, 2013, cash and cash equivalents, excluding cash and cash equivalents held for customers, were 16.4% of total assets.

*Operational risk*

Our operations are subject to various risks resulting from technological interruptions, failures, or capacity constraints in addition to risks involving human error or misconduct. Regarding technological risks, we are heavily dependent on the capacity and reliability of computer and communications systems supporting our operations. We have established a program to monitor our computer systems, platforms and related technologies and to promptly address issues that arise. We have also established disaster recovery facilities in strategic locations to ensure that we can continue to operate with limited interruptions in the event that our primary systems are damaged. As with our technological systems, we have established policies and procedures designed to monitor and prevent both human errors, such as clerical mistakes and incorrectly placed trades, as well as human misconduct, such as unauthorized trading, fraud, and negligence. In addition, we seek to mitigate the impact of any operational issues by maintaining insurance coverage for various contingencies.

78

TABLE OF CONTENTS

### Regulatory capital risk

Various domestic and foreign government bodies and self-regulatory organizations responsible for overseeing our business activities require that we maintain specified minimum levels of regulatory capital in our operating subsidiaries. If not properly monitored or adjusted, our regulatory capital levels could fall below the required minimum amounts set by our regulators, which could expose us to various sanctions ranging from fines and censure to the imposition of partial or complete restrictions on our ability to conduct business. To mitigate this risk, we continuously evaluate the levels of regulatory capital at each of our operating subsidiaries and adjust the amounts of regulatory capital in each operating subsidiary as necessary to ensure compliance with all regulatory capital requirements. These may increase or decrease as required by regulatory authorities from time to time. We also maintain excess regulatory capital to provide liquidity during periods of unusual or unforeseen market volatility, and we intend to continue to follow this policy. In addition, we monitor regulatory developments regarding capital requirements to be prepared for increases in the required minimum levels of regulatory capital that may occur from time to time in the future. As of December 31, 2013, we had $82.5 million in regulatory capital requirements in the aggregate at our regulated subsidiaries and $301.5 million of capital on a consolidated basis.

### Regulatory risk

We operate in a highly regulated industry and are subject to the risk of sanctions from U.S., federal and state, and international authorities if we fail to comply adequately with regulatory requirements. Failure to comply with applicable regulations could result in financial and operational penalties. In addition, efforts to comply with applicable regulations may increase our costs and/or limit our ability to pursue certain business opportunities. Federal and state regulations significantly limit the types of activities in which we may engage. U.S. and international legislative and regulatory authorities change these regulations from time to time. See "Item 1A. Risk Factors."

80

Cited in In re Global Brokerage
17CV916 Decided 3/18/21
Archived on 3/23/21
This document is protected by copyright.
Further reproduction is prohibited without permission.

**Item 8. Financial Statements and Supplementary Data**

<div align="center">

**INDEX TO FINANCIAL STATEMENTS**

</div>

**FXCM Inc.**

| | |
|---|---|
| Report of Independent Registered Public Accounting Firm | F-2 |
| FXCM Inc. Consolidated Statements of Financial Condition as of December 31, 2013 and 2012 | F-3 |
| FXCM Inc. Consolidated Statements of Operations for the Years Ended December 31, 2013, 2012 and 2011 | F-4 |
| FXCM Inc. Consolidated Statements of Comprehensive Income for the Years Ended December 31, 2013, 2012 and 2011 | F-5 |
| FXCM Inc. Consolidated Statements of Stockholders' Equity for the Years Ended December 31, 2013, 2012 and 2011 | F-6 |
| FXCM Inc. Consolidated Statements of Cash Flows for the Years Ended December 31, 2013, 2012 and 2011 | F-8 |
| FXCM Inc. Notes to Consolidated Financial Statements | F-10 |

<div align="center">

F-1

</div>

Cited in In re Global Brokerage 17CV916 Decided 3/18/21

Archived on 3/23/21

This document is protected by copyright. Further reproduction is prohibited without permission.

TABLE OF CONTENTS

**Report of Independent Registered Public Accounting Firm**

The Board of Directors and Shareholders of FXCM Inc.

We have audited the accompanying consolidated statements of financial condition of FXCM Inc. as of December 31, 2013 and 2012, and the related consolidated statements of operations, comprehensive income, stockholders' equity, and cash flows for each of the three years in the period ended December 31, 2013. These financial statements are the responsibility of the Company's management. Our responsibility is to express an opinion on these financial statements based on our audits.

We conducted our audits in accordance with the standards of the Public Company Accounting Oversight Board (United States). Those standards require that we plan and perform the audit to obtain reasonable assurance about whether the financial statements are free of material misstatement. An audit includes examining, on a test basis, evidence supporting the amounts and disclosures in the financial statements. An audit also includes assessing the accounting principles used and significant estimates made by management, as well as evaluating the overall financial statement presentation. We believe that our audits provide a reasonable basis for our opinion.

In our opinion, the financial statements referred to above present fairly, in all material respects, the consolidated financial position of FXCM Inc. at December 31, 2013 and 2012, and the consolidated results of its operations and its cash flows for each of the three years in the period ended December 31, 2013, in conformity with U.S. generally accepted accounting principles.

We have also audited, in accordance with the standards of Public Company Accounting Oversight Board (United States), FXCM Inc.'s internal control over financial reporting as of December 31, 2013, based on criteria established in Internal Control - Integrated Framework issued by the Committee of Sponsoring Organizations of the Treadway Commission (1992 framework) and our reported dated March 14, 2014 expressed an unqualified opinion thereon.

/ / Ernst & Young LLP

New York, NY

March 14, 2014

<div align="center">F-2</div>

Cited in In re Global Brokerage
17CV916 Decided 3/18/21
Archived on 3/23/21
This document is protected by copyright.
Further reproduction is prohibited without permission.

TABLE OF CONTENTS

FXCM Inc.

**Consolidated Statements of Financial Condition**

| | December 31, 2013 | December 31, 2012 |
|---|---|---|
| | (In thousands, except share data) | |
| **Assets** | | |
| Current assets | | |
| Cash and cash equivalents | $ 365,245 | $ 272,332 |
| Cash and cash equivalents, held for customers | 1,190,880 | 1,190,762 |
| Due from brokers | 5,450 | 8,040 |
| Accounts receivable, net | 9,953 | 6,336 |
| Deferred tax asset | 11,910 | 10,598 |
| Notes receivable | 5,992 | — |
| Tax receivable | 3,861 | 6,003 |
| Total current assets | 1,593,291 | 1,494,071 |
| Deferred tax asset | 166,576 | 117,221 |
| Office, communication and computer equipment, net | 49,165 | 50,316 |
| Goodwill | 307,936 | 285,654 |
| Other intangible assets, net | 76,713 | 97,792 |
| Notes receivable | 5,950 | — |
| Other assets | 24,316 | 20,116 |
| **Total assets** | $ 2,223,947 | $ 2,065,170 |
| **Liabilities and Equity** | | |
| Current liabilities | | |
| Customer account liabilities | $ 1,190,880 | $ 1,190,762 |
| Accounts payable and accrued expenses | 69,697 | 52,635 |
| Credit agreement | — | 85,000 |
| Notes payable | 9,800 | 22,867 |
| Due to brokers | 8,652 | 14,494 |
| Deferred tax liability | — | 7,100 |
| Due to related parties pursuant to tax receivable agreement | 18,588 | 13,569 |
| Total current liabilities | 1,297,617 | 1,386,427 |
| Deferred tax liability | 3,687 | 12,351 |
| Due to related parties pursuant to tax receivable agreement | 131,670 | 87,271 |
| Senior convertible notes | 146,303 | — |
| Other liabilities | 9,289 | 4,206 |
| **Total liabilities** | 1,588,566 | 1,490,255 |
| **Commitments and Contingencies** | | |
| **Stockholders' Equity** | | |
| Class A common stock, par value $0.01 per share; 3,000,000,000 shares authorized, 44,664,884 and 34,683,599 shares issued and outstanding as of December 31, 2013 and 2012, respectively | 447 | 347 |
| Class B common stock, par value $0.01 per share; 1,000,000 shares authorized, 41 and 43 shares issued and outstanding as of December 31, 2013 and 2012, respectively | 1 | 1 |
| Additional paid-in-capital | 245,426 | 171,390 |
| Retained earnings | 16,352 | 11,122 |
| Accumulated other comprehensive income | (5,344) | (1,301) |
| Total stockholders' equity, FXCM Inc. | 256,882 | 181,559 |
| Non-controlling interests | 378,499 | 393,356 |
| **Total stockholders' equity** | 635,381 | 574,915 |
| **Total liabilities and stockholders' equity** | $ 2,223,947 | $ 2,065,170 |

Cited in In re Global Brokerage 17CV916 Decided 3/18/21

Archived on 3/23/21

This document is protected by copyright. Further reproduction is prohibited without permission.

See accompanying notes to the consolidated financial statements.

F-3

TABLE OF CONTENTS

**FXCM Inc.**

**Consolidated Statements of Operations**

|  | For the Years Ended December 31, | | |
|---|---|---|---|
|  | 2013 | 2012 | 2011 |
|  | (Amounts in thousands, except per share data) | | |
| **Revenues** | | | |
| Retail trading revenue | $ 365,285 | $ 339,685 | $ 363,774 |
| Institutional trading revenue | 103,994 | 62,033 | 28,908 |
| Trading revenue | 469,279 | 401,718 | 392,682 |
| Interest income | 2,614 | 3,571 | 3,644 |
| Brokerage interest expense | (258) | (277) | (329) |
| Net interest revenue | 2,356 | 3,294 | 3,315 |
| Other income | 17,953 | 12,303 | 19,581 |
| **Total net revenues** | 489,588 | 417,315 | 415,578 |
| **Operating Expenses** | | | |
| Compensation and benefits | 105,470 | 105,779 | 95,086 |
| Allocation of income to Lucid members for services provided | 21,290 | — | — |
| Total compensation and benefits | 126,760 | 105,779 | 95,086 |
| Referring broker fees | 84,231 | 76,585 | 92,832 |
| Advertising and marketing | 27,091 | 30,860 | 34,897 |
| Communication and technology | 38,441 | 37,113 | 31,869 |
| Trading costs, prime brokerage and clearing fees | 30,821 | 16,935 | 8,167 |
| General and administrative | 68,230 | 63,043 | 63,077 |
| Depreciation and amortization | 53,729 | 36,773 | 20,053 |
| Total operating expenses | 429,303 | 367,088 | 345,981 |
| **Total operating income** | 60,285 | 50,227 | 69,597 |
| **Other Expense** | | | |
| Loss on equity method investments, net | 752 | — | — |
| Interest on borrowings | 7,673 | 2,763 | — |
| **Income before income taxes** | 51,860 | 47,464 | 69,597 |
| Income tax provision | 17,024 | 8,986 | 10,816 |
| **Net income** | 34,836 | 38,478 | 58,781 |
| Net income attributable to non-controlling interest in FXCM Holdings, LLC | 24,850 | 23,131 | 46,045 |
| Net income (loss) attributable to other non-controlling interests | (4,846) | 6,389 | — |
| Net income attributable to FXCM Inc. | $ 14,832 | $ 8,958 | $ 12,736 |
| | | | |
| Weighted average shares of Class A common stock outstanding | | | |
| Basic | 32,789 | 24,086 | 16,567 |
| Diluted | 33,957 | 24,086 | 16,567 |
| Net income per share attributable to stockholders of Class A common stock of FXCM Inc.: | | | |
| Basic | $ 0.45 | $ 0.37 | $ 0.77 |
| Diluted | $ 0.44 | $ 0.37 | $ 0.77 |
| Dividends declared per common share | $ 0.24 | $ 0.24 | $ 0.24 |

See accompanying notes to the consolidated financial statements.

F-4

Cited in In re Global Brokerage 17Cv916 Decided 3/18/21 Archived on 3/23/21 This document is protected by copyright. Further reproduction is prohibited without permission.

TABLE OF CONTENTS

**FXCM Inc.**

**Consolidated Statements of Comprehensive Income**

| | For the Years Ended December 31, | | |
|---|---|---|---|
| | 2013 | 2012 | 2011 |
| **Net income** | $ 34,836 | $ 38,478 | $ 58,781 |
| Other comprehensive income | | | |
|   Foreign currency translation gain (loss) | (9,678) | (3,414) | 57 |
|   Income tax expense (benefit) | (108) | 12 | (3) |
| Other comprehensive income (loss), net of tax | (9,570) | (3,426) | 60 |
|   **Comprehensive income** | 25,266 | 35,052 | 58,841 |
|   Comprehensive income attributable to non-controlling interest in FXCM Holdings, LLC | 19,323 | 21,148 | 46,015 |
|   Comprehensive income (loss) attributable to other non-controlling interests | (4,846) | 6,389 | — |
| Comprehensive income attributable to FXCM Inc. | $ 10,789 | $ 7,515 | $ 12,826 |

See accompanying notes to the consolidated financial statements.

F-5

Cited in In re Global Brokerage
17CV916 Decided 3/18/21
Archived on 3/23/21
This document is protected by copyright.
Further reproduction is prohibited without permission.

TABLE OF CONTENTS

**FXCM Inc.**

**Consolidated Statements of Stockholders' Equity**
**(In thousands, except share amounts)**

| | Non-controlling Interest | Retained Earnings | Accumulated Other Comprehensive Income | Additional Paid-in Capital | Common Stock - Class B Shares | Dollars | Common Stock - Class A Shares | Dollars | Total Stockholders Equity |
|---|---|---|---|---|---|---|---|---|---|
| Balance as of January 1, 2011 | $ 165,787 | $ 146 | $ 52 | 101,848 | 100 | $ 1 | 17,319,000 | $ 173 | $ 268,007 |
| Net income | 46,045 | 12,736 | — | — | — | — | — | — | 58,781 |
| Other comprehensive income (loss), net of tax | (30) | — | 90 | — | — | — | — | — | 60 |
| Comprehensive income | 46,015 | 12,736 | 90 | — | — | — | — | — | 58,841 |
| Class A common stock | | | | | | | | | |
| Repurchase of class A common stock | — | — | — | (26,333) | — | — | (2,419,609) | (24) | (26,357) |
| Equity based compensation | — | — | — | 10,637 | — | — | — | — | 10,637 |
| Dividends on class A common stock | — | (3,905) | — | — | — | — | — | — | (3,905) |
| Other Initial Public Offering costs | (142) | — | — | — | — | — | — | — | (142) |
| Contributions | 16,263 | — | — | — | — | — | — | — | 16,263 |
| Distributions | (29,911) | — | — | — | — | — | — | — | (29,911) |
| Balance as of December 31, 2011 | 198,012 | 8,977 | 142 | 86,152 | 100 | 1 | 14,899,391 | 149 | 293,433 |
| Net income | 29,520 | 8,958 | — | — | — | — | — | — | 38,478 |
| Other comprehensive loss, net of tax | (1,983) | — | (1,443) | — | — | — | — | — | (3,426) |
| Comprehensive income (loss) | 27,537 | 8,958 | (1,443) | — | — | — | — | — | 35,052 |
| Class A common stock | | | | | | | | | |
| Repurchase of class A common stock | (2,618) | — | — | (4,849) | — | — | (750,125) | (8) | (7,475) |
| Equity based compensation | 12,918 | — | — | 11,428 | — | — | 782,015 | 8 | 24,354 |
| Dividends on Class A common stock | — | (6,813) | — | — | — | — | — | — | (6,813) |
| Exchange of Holdings Units to Class A common stock (see Note 15) | (17,759) | — | — | 17,667 | (57) | — | 10,752,318 | 108 | — |
| Effects of Tax Receivable Agreement | — | — | — | 5,120 | — | — | — | — | 5,120 |
| Settlement of receivable balance with related party (see Note 15) | (3,205) | — | — | (774) | — | — | — | — | (3,979) |
| Stock issuances, Lucid acquisition (see Note 5) | 7,851 | — | — | 13,622 | — | — | 800,000 | 18 | 21,491 |

See accompanying notes to the consolidated financial statements.

F-6

TABLE OF CONTENTS

| | Non-controlling Interest | Retained Earnings | Accumulated Other Comprehensive Income | Additional Paid-in Capital | Common Stock - Class B | | Common Stock - Class A | | Total Stockholders Equity |
|---|---|---|---|---|---|---|---|---|---|
| | | | | | Shares | Dollars | Shares | Dollars | |
| Contingently issuable shares, Lucid acquisition (see Note 5) | 24,803 | — | — | 43,040 | — | — | 7,200,000 | — | 67,915 |
| Contributions | 578 | — | — | — | — | — | — | — | 578 |
| Distributions | (14,926) | — | — | — | — | — | — | — | (14,926) |
| Non-controlling interest- Lucid (see Note 5) | 160,165 | — | — | — | — | — | — | — | 160,165 |
| Balance as of December 31, 2012 | 393,356 | 11,122 | (1,301) | 171,390 | 43 | 1 | 34,683,599 | 347 | 574,915 |
| Net income | 20,004 | 14,832 | — | — | — | — | — | — | 34,836 |
| Other comprehensive loss, net of tax | (5,527) | — | (4,043) | — | — | — | — | — | (9,570) |
| Comprehensive income (loss) | 14,477 | 14,832 | (4,043) | — | — | — | — | — | 25,266 |
| Class A common stock | | | | | | | | | |
| Repurchase of class A common stock | (9,270) | — | — | (18,792) | — | — | (1,815,800) | (18) | (28,080) |
| Equity based compensation | 8,668 | — | — | 6,631 | — | — | — | — | 15,299 |
| Dividends on Class A common stock | — | (9,602) | — | — | — | — | — | — | (9,602) |
| Exchange of Holdings Units to Class A common stock (see note 15) | (53,500) | — | — | 53,399 | (4) | — | 10,094,371 | 101 | — |
| Assignment of permitted transferees | — | — | — | — | 2 | — | — | — | — |
| Stock options exercised | 7,777 | — | — | 14,705 | — | — | 1,702,714 | 17 | 22,499 |
| Effects of Tax Receivable Agreement | — | — | — | 9,441 | — | — | — | — | 9,441 |
| Equity component of Convertible Note issuance | 15,512 | — | — | 13,589 | — | — | — | — | 29,101 |
| Sale of warrants | 9,899 | — | — | 8,672 | — | — | — | — | 18,571 |
| Purchase of Convertible Note hedges | (15,512) | — | — | (13,589) | — | — | — | — | (29,101) |
| Distributions | (14,147) | — | — | — | — | — | — | — | (14,147) |
| Contributions | 5,650 | — | — | — | — | — | — | — | 5,650 |
| Non-controlling interest- Other Adj | 20 | — | — | (20) | — | — | — | — | — |
| Non-controlling interest Faros Trading LLC | 15,569 | — | — | — | — | — | — | — | 15,569 |
| **Balance as of December 31, 2013** | **$ 378,499** | **$ 16,352** | **$ (5,344)** | **$ 245,426** | **41** | **$ 1** | **44,664,884** | **$ 447** | **$ 635,381** |

See accompanying notes to the consolidated financial statements.

F-7

Cited in In re Global Brokerage
17CV916 Decided 10/04

Archived on 3/23/21

This document is protected by copyright.
Further reproduction is prohibited without permission.

TABLE OF CONTENTS

**FXCM Inc.**

**Consolidated Statements of Cash Flows**

| | For the Years Ended December 31, | | |
|---|---|---|---|
| | 2013 | 2012 | 2011 |
| | (Amounts in thousands) | | |
| **Cash Flows From Operating Activities** | | | |
| Net income | $ 34,836 | $ 38,478 | $ 58,781 |
| **Adjustments to reconcile net income to net cash provided by operating activities** | | | |
| Depreciation and amortization | 53,729 | 36,773 | 20,053 |
| Equity-based compensation | 13,959 | 22,979 | 9,535 |
| Deferred tax expense (benefit) | 11,442 | 7,170 | (74) |
| Deferred revenue | — | — | (6,000) |
| Adjustment to follow-on payment for business acquisition | (6,959) | — | — |
| Loss on disposal of fixed assets | 126 | 773 | 320 |
| Amortization of deferred bond discount | 2,904 | — | — |
| Amortization of deferred financing cost | 1,263 | 304 | — |
| Loss on equity method investments, net | 752 | — | — |
| Gain on settlement of receivables from related parties | — | (1,436) | — |
| Bad debt | — | — | 1,250 |
| Due to related parties pursuant to tax receivable agreement | 1,209 | — | (3,314) |
| Changes in operating assets and liabilities | | | |
| Cash and cash equivalents, held for customers | 1,390 | (142,463) | (116,276) |
| Due from brokers | 2,590 | (6,427) | 2,739 |
| Accounts receivable, net | (3,577) | 13,178 | 765 |
| Tax receivable, net | 2,142 | (3,987) | 177 |
| Other assets | 1,521 | 5,172 | (3,256) |
| Customer account liabilities | 118 | 143,779 | 118,981 |
| Accounts payable and accrued expenses | 15,997 | (11,341) | 4,572 |
| Other liabilities | 1,410 | — | — |
| Payments for tax receivable agreement | (8,079) | — | — |
| Due to brokers | (5,892) | 999 | (4,304) |
| Foreign currency remeasurement loss | (1,359) | (1,817) | — |
| Net cash provided by operating activities | 123,572 | 102,134 | 83,949 |
| **Cash Flows From Investing Activities** | | | |
| Acquisition of business, net of cash acquired | (32,312) | (36,555) | (12,787) |
| Payment for equity investment | (3,000) | (4,000) | (1,319) |
| Purchases of intangible assets | (50) | (134) | (1,456) |
| Purchase of notes receivable | (11,942) | — | — |
| Purchase of office, communication and computer equipment, net | (23,416) | (27,263) | (30,041) |
| Net cash used in investing activities | (70,720) | (67,952) | (45,603) |
| **Cash Flows From Financing Activities** | | | |
| Payment for IPO | — | — | (142) |
| Members' distributions | (14,147) | (14,926) | (29,911) |
| Members' contributions | 5,650 | 578 | 16,263 |
| Dividends paid | (9,602) | (6,813) | (3,905) |
| Proceeds from exercise of stock options | 22,499 | — | — |
| Common stock repurchases | (28,080) | (7,475) | (26,357) |
| Proceeds from issuance of senior convertibles notes, net | 166,453 | — | — |
| Purchase of convertible note hedges | (29,101) | — | — |
| Proceeds from sale of warrants | 18,571 | — | — |
| Borrowings under the credit agreement | 10,000 | 130,000 | — |
| Payments on borrowings under the credit agreement | (95,000) | (45,000) | — |
| Net cash provided by (used in) financing activities | 47,243 | 56,364 | (44,052) |

See accompanying notes to the consolidated financial statements.

F-8

TABLE OF CONTENTS

| | For the Years Ended December 31, | | |
| --- | --- | --- | --- |
| | 2013 | 2012 | 2011 |
| | (Amounts in thousands) | | |
| Effect of foreign currency exchange rate changes on cash and cash equivalents | (7,182) | (2,935) | (2,903) |
| **Net increase (decrease) in cash and cash equivalents** | 92,913 | 87,611 | (8,609) |
| Cash and cash equivalents | | | |
| Beginning of year | 272,332 | 184,721 | 193,330 |
| End of year | $ 365,245 | $ 272,332 | $ 184,721 |
| **Supplemental disclosures of cash flow activities** | | | |
| Net cash paid for taxes | $ 6,936 | $ 12,617 | $ 4,117 |
| Net cash paid for interest | $ 3,449 | $ 2,334 | $ — |
| **Supplemental disclosure of non-cash investing activities** | | | |
| Exchange of Holding Units for shares of Class A common stock | $ 53,500 | $ 17,759 | $ — |
| Settlement of receivable from related party | $ — | $ (3,979) | $ — |
| Value of equity interest paid for business acquisition | $ — | $ 89,406 | $ — |
| Note issued for business acquisition | $ 15,300 | $ 22,867 | |
| Non-controlling interest – Lucid | $ — | $ 160,165 | $ — |
| Non-controlling interest - Faros Trading LLC | $ 15,569 | $ — | $ — |
| Follow-on Payment for business acquisition (not yet paid) | $ 10,631 | $ — | $ — |

See accompanying notes to the consolidated financial statements.

F-9

Cited in In re Global Brokerage
17CV916 Decided 3/18/21
Archived on 3/23/21
This document is protected by copyright.
Further reproduction is prohibited without permission.

TABLE OF CONTENTS

FXCM Inc.

**Notes to Consolidated Financial Statements**

**Note 1. Nature of Business and Organization**

FXCM Inc. (the "Corporation"), a Delaware holding company incorporated on August 10, 2010, is a global online provider of foreign exchange ("FX") trading and related services to retail and institutional customers worldwide. The Corporation operates through its managing membership interest in FXCM Holding, LLC ("Holdings"), the Corporation's sole operating asset. Prior to the completion of the reorganization and the Corporation's initial public offering ("IPO") described in Note 2, the Corporation was a wholly-owned subsidiary of Holdings. As used in these notes, the term "Company" collectively refers to the Corporation, Holdings and subsidiaries of Holdings.

As an online provider of FX trading and related services, the Company offers its retail and institutional customers access to global over-the-counter FX markets. In a FX trade, a participant buys one currency and simultaneously sells another, a combination known as a "currency pair." The Company's proprietary trading platform presents its FX customers with the price quotations on several currency pairs from a number of global banks, financial institutions and market makers, or FX market makers. The Company's primary offering to retail customers is what is referred to as agency execution or an agency model. Under the agency model, when a customer executes a trade on the price quotation presented by the FX market maker, the Company acts as a credit intermediary, or a riskless principal, simultaneously entering into a trade with the customer and the FX market maker. The Company earns trading revenue by adding a markup to the price provided by the FX market makers, not trading profit or losses. Additionally, the Company offers its customers the ability to trade contract for differences ("CFDs"), spread betting, equities and equity options through its United Kingdom subsidiaries. CFDs allow for the exchange of the difference in the value of a particular asset such as a stock index or oil or gold contracts, between the time at which a contract is opened and the time at which it is closed. Spread betting allows our customers to bet on the price fluctuations of various financial markets such as FX, indices, oil and metals.

Institutional trading revenue relates to commission income generated by facilitating spot FX trades on behalf of institutional customers through the services provided by FXCM Pro and Faros Trading LLC ("Faros") (see Note 5). The counterparties to these trades are external financial institutions that also hold customer account balances. The Company receives commission income on these trades without taking any market or credit risk. The Company also offers FX trading services to banks, hedge funds and other institutional customers, on an agency model basis, through its FXCM Pro division and Faros. These services allow customers to obtain optimal prices offered by external banks. The counterparties to these trades are external financial institutions that hold customer account balances and settle the transactions. The Company receives commissions for providing these services. In addition, the Company, through its 50.1% controlling interest in Lucid Markets Trading Limited ("Lucid") (see Note 5), is an electronic market-maker and trader in the institutional FX market.

**Note 2. Reorganization and IPO**

*Reorganization*

Prior to the completion of the Corporation's IPO, the limited liability company agreement of Holdings (the "LLC Agreement") was restated among other things, to modify its capital structure by reclassifying the interests held by its existing owners (i.e., the owners of Holdings prior to the IPO) (the "Existing Unit Holders") into a single new class of units ("Holding Units"). The Existing Unit Holders also entered into an exchange agreement (the "Exchange Agreement") under which they (or certain permitted transferees thereof) have the right, from and after the first anniversary of the date of the closing of the IPO, subject to the terms of the Exchange Agreement as described therein, to exchange their Holding Units for shares of the Corporation's Class A common stock on a one-for-one basis, subject to customary conversion rate adjustments for stock splits, stock dividends and reclassifications. Following the IPO, each of the Existing Unit Holders held one share of Class B common stock. The shares of Class B common stock have no economic rights but entitle the holder, without regard to the number of shares of Class B common stock held, to a number of votes on matters presented to stockholders of the Corporation that is equal to the aggregate number of Holding Units held by such holder, subject to customary adjustment for stock splits, stock dividends and reclassifications.

At the time of the IPO, the Corporation purchased newly-issued Holding Units from Holdings and outstanding Holding Units from the Existing Unit Holders, including members of its senior management, at a purchase price per unit equal to the $14.00 price per share of Class A common stock in the offering net of underwriting discounts. Since the Existing Unit Holders continued to have control of over 50% of the voting shares (through their interests in the Corporation) upon completion of the exchange, the exchange of cash by the Corporation for Holding Units was accounted for as a transaction between entities under

F-10

TABLE OF CONTENTS

FXCM Inc.

Notes to Consolidated Financial Statements

**Note 2. Reorganization and IPO - (continued)**

common control in accordance with the guidance in Financial Accounting Standards Board ("FASB") Accounting Standards Codification ("ASC") 805, *Business Combinations* ("ASC 805"). The date of the exchange was December 7, 2010 (i.e., the effective date of the IPO). As described in more detail in Note 3, subsequent to the IPO and the reorganization described above, the Corporation consolidates the financial results of Holdings and its subsidiaries and reflects the ownership interest of the other members of Holdings as a non-controlling interest in the Corporation's consolidated financial statements.

*Tax Receivable Agreement*

In connection with the Reorganization, Holdings made an election under Section 754 of the Internal Revenue Code effective for each taxable year in which an exchange of Holding Units shares of Class A common stock as described above occurs, which may result in an adjustment to a portion of the tax basis of the assets of Holdings at the time of an exchange of Holding Units. As a result of both the initial purchase of Holding Units from the Existing Unit Holders in connection with the IPO and these subsequent exchanges, the Corporation is entitled to a proportionate share of the existing tax basis of the assets of Holdings. In addition, the purchase of Holding Units and subsequent exchanges, in conjunction with the election under Section 754 described above, are expected to result in increases in the tax basis of the assets of Holdings that otherwise would not have been available. Both this proportionate share and these increases in tax basis may reduce the amount of tax that the Corporation would otherwise be required to pay in the future. These increases in tax basis may also decrease gains (or increase losses) on future dispositions of certain capital assets to the extent tax basis is allocated to those capital assets.

The Corporation entered into a tax receivable agreement with Holdings members that will provide for the payment by the Corporation to Holdings members of an amount equal to 85% of the amount of the benefits, if any, that the Corporation is deemed to realize as a result of (i) the existing tax basis in the intangible assets of Holdings on the date of the IPO, (ii) any increases in tax basis resulting from Section 754 election and (iii) certain other tax benefits related to our entering into the tax receivable agreement, including tax benefits attributable to payments under the tax receivable agreement. These payment obligations are obligations of the Corporation and not of Holdings. For purposes of the tax receivable agreement, the benefit deemed realized by the Corporation is computed by comparing the actual income tax liability of the Corporation to the amount of such taxes that the Corporation would have been required to pay had there been no increase to the tax basis of the assets of Holdings as a result of the purchase or exchanges, had there been no tax benefit from the tax basis in the intangible assets of Holdings on the date of the IPO and had the Corporation not entered into the tax receivable agreement. The term of the tax receivable agreement will continue until all such tax benefits have been utilized or expired, unless the Corporation exercises its right to terminate the tax receivable agreement for an amount based on the agreed payments remaining to be made under the agreement or the Corporation breaches any of its material obligations under the tax receivable agreement in which case all obligations will generally be accelerated and due as if the Corporation had exercised its right to terminate the agreement.

F-11

Cited in In re Global Brokerage
17CV916 Decided 3/18/21
Archived on 3/23/21
This document is protected by copyright.
Further reproduction is prohibited without permission.

TABLE OF CONTENTS

FXCM Inc.

**Notes to Consolidated Financial Statements**

**Note 3. Significant Accounting Policies and Estimates**

*Basis of Presentation*

The accompanying consolidated financial statements are presented in accordance with accounting principles generally accepted in the United States of America ("U.S. GAAP"). The Company consolidates those entities in which it is the primary beneficiary of a variable-interest entity (VIE) as required by ASC 810, *Consolidations* ("ASC 810"), or entities where it has a controlling interest. Intercompany accounts and transactions are eliminated in consolidation.

As indicated above, the Corporation operates and controls all of the businesses and affairs of Holdings and its subsidiaries. As such, the Corporation consolidates the financial results of Holdings and records a non-controlling interest for the economic interest in Holdings not owned by the Corporation. The Corporation's and the non-controlling unit holders' economic interest in Holdings was 54.8% and 45.2%, respectively, as of December 31, 2013. The Corporation's and the non-controlling unit holders' economic interest in Holdings was 42.5% and 57.5%, respectively, as of December 31, 2012.

Net income attributable to the non-controlling interest in Holdings in the consolidated statements of operations represents the portion of earnings or loss attributable to the economic interest in Holdings held by the non-controlling unit holders. Net income attributable to other non-controlling interests in the consolidated statements of operations represents the portion of net income attributable to the non-controlling interests of Lucid, Faros and other consolidated subsidiaries or VIE's. Net income attributable to the non-controlling interest in Lucid represents the portion of earnings or loss attributable to the 49.9% economic interest held by Lucid non-controlling members whose allocation among the non-controlling members is not contingent upon services being provided. The portion of the 49.9% of Lucid earnings allocated among the non-controlling members of Lucid contingent on services provided is reported as a component of compensation expense under "Allocation of net income to Lucid members for services provided" in the consolidated statements of operations. Net income or loss attributable to the non-controlling interest in Faros (see Note 5) represents the portion of earnings or loss attributable to the 49.9% economic interest held by Faros non-controlling members. Net income or loss attributable to the non-controlling interests in other consolidated subsidiaries or VIE's represents the portion of earnings or loss attributable to the economic interests held by the non-controlling members.

Non-controlling interests in the consolidated statements of financial condition represents the portion of equity attributable to the non-controlling interests of Holdings, Lucid, Faros and other consolidated subsidiaries or VIE's. The allocation of equity to the non-controlling interests is based on the percentage owned by the non-controlling interest in the respective entity.

The Company's consolidated financial statements include the following significant subsidiaries of Holdings:

| | |
|---|---|
| Forex Capital Markets LLC | ("US") |
| FXCM Asia Limited | ("HK") |
| Forex Capital Markets Limited | ("UK") |
| FXCM Australia Limited | ("Australia") |
| ODL Group Limited | ("ODL") |
| FXCM Securities Limited | ("FSL") |
| FXCM Japan Securities Co., Ltd. | ("FXCMJ") |
| FXCM UK Merger Limited | ("Merger") |
| Lucid Markets Trading Limited | ("Lucid") |
| Lucid Markets LLP | ("Lucid LLP") |
| Faros Trading LLC | ("Faros") |

Investments where the Company is deemed to exercise significant influence (generally defined as owning a voting interest of 20% to 50% ), but no control, are accounted for using the equity method of accounting. The Company records its pro-rata share of earnings or losses each period and records any dividends as a reduction in the investment balance. The carrying value of these investments are included in Other assets in the consolidated statements of financial condition and earnings or losses are included in Loss on equity method investments, net in the consolidated statements of operations.

F-12

TABLE OF CONTENTS

FXCM Inc.

Notes to Consolidated Financial Statements

**Note 3. Significant Accounting Policies and Estimates - (continued)**

FXCMJ, a wholly owned subsidiary of Holdings, has a fiscal year end of March 31 while the Company has a fiscal year end of December 31. FXCMJ is a Japanese based foreign exchange provider and is required under Japanese law to have a fiscal year end of March 31. The difference between the Company's reporting year end and FXCMJ does not result in a material impact on the Company's financial position or results of operations.

Certain reclassifications have been made to previously reported amounts to conform to the current presentation.

*Use of Estimates*

The preparation of consolidated financial statements in conformity with U.S. GAAP requires management to make estimates and assumptions that affect the reported amounts of assets and liabilities and disclosure of contingent assets and liabilities as at the date of the consolidated financial statements as well as the reported amount of revenue and expenses during the year. Actual results could differ from those estimates and could have a material impact on the consolidated financial statements.

*Cash and Cash Equivalents*

Cash and cash equivalents include cash at banks and highly liquid instruments with original maturities of less than 90 days at the time of purchase and cash collateral held by FX and CFD market makers related to hedging activities. At times, balances held in U.S. bank accounts may exceed federally insured limits. This potentially subjects the Company to concentration risk. The Company has not experienced losses in such accounts.

*Cash and Cash Equivalents, held for customers*

Cash and cash equivalents, held for customers represents cash held to fund customer liabilities. At times, balances held in U.S. bank accounts may exceed federally insured limits. This potentially subjects the Company to concentration risk. The Company has not experienced losses in such accounts.

The balance arises primarily from cash deposited by customers and net realized gains from customer trading activity. The Company records a corresponding liability in connection with this amount that is included in customer account liabilities in the consolidated statements of financial condition (see Note 12). A portion of the balance is not available for general use due to regulatory restrictions in certain jurisdictions. These restricted balances were $1.0 billion as of December 31, 2013 and 2012.

*Due from/to Brokers*

Due from/to brokers represents the amount of the unsettled spot currency trades that the Company has open with its financial institutions. Also included in due from/to brokers is the fair value of derivative financial instruments discussed below. The Company has master netting agreements with its respective counterparties under which its due from/to brokers are presented on a net-by-counterparty basis in accordance with ASC 815 *Derivatives and Hedging* ("ASC 815") and ASC Topic 210 *Balance Sheet* ("ASC 210").

*Derivatives*

Derivative financial instruments are accounted for in accordance with ASC 815 and are included in Due from/to brokers in the consolidated statements of financial condition. The Company recognizes all derivative financial instruments in the consolidated statements of financial condition as either assets or liabilities at fair value. The Company enters into futures contracts to (i) economically hedge the open customer contracts on its CFD business and (ii) hedge trading in its electronic market making and institutional foreign exchange spot and futures markets. Futures contracts are exchanged traded contracts to either purchase or sell a specific asset at a specified future date for a specified price. Gains or losses on futures contracts related to the Company's CFD business are included in Retail trading revenue and gains or losses on hedge trading in its electronic market making and institutional foreign exchange spot and futures markets are included in Institutional trading revenue in the consolidated statements of operations (see Note 22).

F-13

TABLE OF CONTENTS

FXCM Inc.

**Notes to Consolidated Financial Statements**

**Note 3. Significant Accounting Policies and Estimates - (continued)**

*Fair Value Measurements*

Fair value is defined as the price that would be received to sell an asset or paid to transfer a liability in an orderly transaction between market participants at the measurement date. Fair value measurement establishes a fair value hierarchy that prioritizes the inputs of valuation techniques used to measure fair value. The hierarchy gives the highest priority to unadjusted quoted prices in active markets for identical assets or liabilities and the lowest priority to unobservable inputs. These three levels of fair value hierarchy are defined as follows:

*Level I*:  Quoted prices in active markets for identical assets or liabilities, accessible by the Company at the measurement date.

*Level II*:  Quoted prices for similar assets or liabilities in active markets, or quoted prices for identical or similar assets or liabilities in markets that are not active, or other observable inputs other than quoted prices.

*Level III*:  Unobservable inputs for assets or liabilities.

When Level I inputs are available, those inputs are selected for determination of fair value. To value derivatives that are characterized as Level II and III, the Company uses observable inputs for similar assets and liabilities that are available from pricing services or broker quotes. These observable inputs may be supplemented with other methods, including internal models that result in the most representative prices for assets and liabilities with similar characteristics. Multiple inputs may be used to measure fair value, however, the level of fair value for each derivative and financial asset or liability is based on the highest priority level of input within this fair value hierarchy.

*Office, Communication and Computer Equipment, net*

Office, communication and computer equipment, net, consist of computer equipment, purchased technology hardware and software, internally developed software, leasehold improvements, furniture and fixtures and other equipment, licenses and communication equipment. Office, communication and computer equipment are recorded at historical cost, net of accumulated depreciation. Additions and improvements that extend the lives of assets are capitalized, while expenditures for repairs and maintenance are expensed as incurred. Certain costs of software developed or obtained for internal use are capitalized. Depreciation is computed using the straight-line method. The Company depreciates these assets using the following useful lives:

| | |
|---|---|
| Computer equipment | 3 to 5 years |
| Software | 2 to 5 years |
| Leasehold improvements | Lesser of the estimated economic useful life or the term of the lease |
| Furniture and fixtures and other equipment | 3 to 5 years |
| Licenses | 2 to 3 years |
| Communication equipment | 3 to 5 years |

*Valuation of Other Long-Lived Assets*

The Company also assesses potential impairments of its other long-lived assets, including office, communication and computer equipment, when there is evidence that events or changes in circumstances indicate that the carrying amount of an asset may not be recovered. An impairment loss is recognized when the carrying amount of the long-lived asset exceeds its fair value and is not recoverable. The carrying amount of a long-lived asset is not recoverable if it exceeds the sum of the undiscounted cash flows expected to result from the use and eventual disposition of the asset. Any required impairment loss is measured as the amount by which the carrying amount of a long-lived asset exceeds its fair value and is recorded as a reduction in the carrying value of the related asset and a charge to operating results.

F-14

Cited in Brixdale Global Brokerage
17Cv-00916 decided 3/18/21
Archived 3/23/21
This document is protected by copyright.
Further reproduction is prohibited without permission.

TABLE OF CONTENTS

FXCM Inc.

**Notes to Consolidated Financial Statements**

Note 3. Significant Accounting Policies and Estimates - (continued)

*Business Combinations*

The Company accounts for business acquisitions in accordance with ASC 805 and records assets acquired and liabilities assumed at their fair values as of the acquisition date. The Company records any excess purchase price over the value assigned to net tangible and identifiable intangible assets of a business acquired as goodwill. Acquisition related costs are expensed as incurred (see Note 5).

*Goodwill*

The Company recorded goodwill from various acquisitions. Goodwill represents the excess purchase price over the value assigned to the net tangible and identifiable intangible assets of a business acquired. Goodwill is allocated to the Company's reporting units based on the assignment of the fair values of each reporting unit of the acquired company. For purposes of the goodwill impairment test, the Company has identified its Retail and Institutional trading segments as its reporting units. The Company performs a two-step goodwill impairment review at the reporting unit level annually, or in interim periods if certain events occur indicating that the carrying value may be impaired. The Company tests for impairment during the fourth quarter of our fiscal year using October 1 carrying values.

The first step of the two-step process involves a comparison of the estimated fair value of a reporting unit to its carrying amount, including goodwill. In performing the first step, the Company determines the fair value of a reporting unit using a DCF analysis. Determining fair value requires the exercise of significant judgment, including judgments about appropriate discount rates, perpetual growth rates, the amount and timing of expected future cash flows. The cash flows employed in the DCF analyses are based on the Company's most recent budgets and business plans and, when applicable, various growth rates are assumed for years beyond the current business plan period. Discount rate assumptions are based on an assessment of the risk inherent in the future cash flows of the respective reporting units. If the estimated fair value of a reporting unit exceeds its carrying amount, the goodwill of the reporting unit is not impaired and the second step of the impairment test is not necessary. If the carrying amount of a reporting unit exceeds its estimated fair value, then the second step of the goodwill impairment test must be performed. The second step of the goodwill impairment test compares the implied fair value of the reporting unit's goodwill with its carrying amount to measure the amount of impairment loss, if any. The implied fair value of goodwill is determined in the same manner as the amount of goodwill recognized in a business combination (i.e., the estimated fair value of the reporting unit is allocated to all of the assets and liabilities of that reporting unit including any unrecognized intangible assets as if the reporting unit had been acquired in a business combination and the fair value of the reporting unit was the purchase price paid). If the carrying amount of the reporting unit's goodwill exceeds the implied fair value of the reporting unit's goodwill, an impairment loss is recognized in an amount equal to that excess.

There was no impairment of goodwill for the year ended December 31, 2013. Although there is no impairment as of December 31, 2013, events such as economic weakness and unexpected significant declines in operating results of reporting units may result in our having to perform a goodwill impairment test for some or all of our reporting units prior to the required annual assessment. These types of events and the resulting analysis could result in goodwill impairment charges in the future (see Note 8).

*Other Intangible Assets, net*

Other intangible assets, net, primarily include customer relationships, proprietary technology, non-compete agreements and trade names recorded from various acquisitions.

The customer relationships, non-compete agreements and trade names are finite-lived intangibles and are amortized on a straight-line basis over their estimated average useful life of 4 to 9 years, 3 to 9 years, and 3 years, respectively. Proprietary technology is also finite-lived intangibles and is amortized on a straight-line basis over their estimated average useful life of 4 to 7 years, respectively. The useful life of these intangibles is based on the period they are expected to contribute to future cash flows as determined by the Company's historical experience. For these finite-lived intangible assets subject to amortization, impairment is considered upon certain "triggering events" and is recognized if the carrying amount is not recoverable and the carrying amount exceeds the fair value of the intangible asset. There was no impairment of finite-lived intangible assets for the years ended December 31, 2013, 2012 and 2011.

F-15

Cited in In re Cantor Brokerage
17CV916 December 8, 2021

Archived on 3/23/2021

This document is protected by copyright.
Further reproduction is prohibited without permission.

TABLE OF CONTENTS

FXCM Inc.

**Notes to Consolidated Financial Statements**

**Note 3. Significant Accounting Policies and Estimates - (continued)**

The FX trading license is an indefinite-lived asset that is not amortized but tested for impairment. The Company's policy is to test for impairment at least annually or in interim periods if certain events occur indicating that the fair value of the asset may be less than its carrying amount. An impairment test on this indefinite-lived asset is performed during the fourth quarter of the Company's fiscal year using the October 1 carrying value. Impairment exists if the carrying value of the indefinite-lived intangible asset exceeds its fair value. There was no impairment of indefinite-lived intangible assets for the years ended December 31, 2013, 2012 and 2011 (see Note 9).

*Equity Method Investments*

Investments where the Company is deemed to exercise significant influence (generally defined as owning a voting interest of 20% to 50%), but no control, are accounted for using the equity method of accounting. The Company records its pro-rata share of earnings or losses each period and records any dividends as a reduction in the investment balance. Additionally, the carrying value of investments accounted for using the equity method of accounting is adjusted downward to reflect any impairment in value. For investments accounted for using the cost or equity method of accounting, the Company evaluates information (e.g., budgets, business plans, financial statements, etc.) in addition to quoted market prices, if any, in determining whether an other-than-temporary decline in value exists. Factors indicative of an impairment in value include recurring operating losses, credit defaults and subsequent rounds of financing at an amount below the cost basis of the Company's investment.

All of the Company's equity method investments are accounted for at cost. These investments are included in Other assets in the consolidated statements of financial condition and earnings or losses are included in Loss on equity method investments, net in the consolidated statements of operations. Equity method investments are included in institutional and corporate for purposes of segment reporting.

*Accounts Receivable, net*

As of December 31, 2013 and 2012, accounts receivable, net, consisted primarily of amounts due from institutional customers relating to the Company's FX business, and fees receivable from the Company's white label service to third parties and payments for order flow, described in "Retail Trading Revenue" below. Receivables are shown net of reserves for uncollectible accounts. The reserve for bad debts is maintained at a level that management believes to be sufficient to absorb estimated losses in the accounts receivable portfolio. The reserve is increased by the provision for bad debts which is charged against operating results and decreased by the amount of charge-offs, net of recoveries. The amount charged against operating results is based on several factors including, but not limited to, a continuous assessment of the collectability of each account, the length of time a receivable is past due and our historical experience with the particular customer. As of December 31, 2013 and 2012, the reserve netted against receivables in the consolidated statements of financial condition was not material.

*Notes Receivable*

Notes receivable represent receivable for notes acquired for cash plus accrued interest. Notes receivable are initially recorded at the amount of cash exchanged plus accrued interest. Interest income on the notes is recorded on an accrual basis and included in Interest income in the consolidated statements of operations. The Company individually assesses its notes receivables for impairment using internally generated cash flow projections to determine if the notes will be repaid under the expected terms of the note agreements. If the Company concludes that the counterparty will not repay a note in accordance with its terms, the Company considers the note impaired and begins recognizing interest income on a cash basis, if any. To measure impairment, the Company calculates the estimated fair value of the collateral. If the estimated fair value of the collateral is less than the carrying value of the note receivable, the Company establishes an impairment reserve for the difference. If it is likely that a note will not be collected based on financial or other business indicators, the Company's policy is to charge off the note in the period which it deems it uncollectible (see Note 10).

*Other Assets*

Other assets include prepaid expenses, equity method investments, deposits for rent security and deferred debt costs (see Note 11).

F-16

Cited in In re Global …
17CV916 Decided …
Archived on 3/23/21
This document is protected by copyright
Further reproduction is prohibited without per…

TABLE OF CONTENTS

FXCM Inc.

**Notes to Consolidated Financial Statements**

Note 3. Significant Accounting Policies and Estimates - (continued)

*Accounts Payable and Accrued Expenses*

Accounts payable and accrued expenses include operating expenses payable, amounts due to the Lucid non-controlling members in connection with trade settlements, commissions payable which represents balances owed to referring brokers for trades transacted by customers that were introduced to the Company by such brokers, bonuses payable, income taxes payable, a payable for a portion of the cash consideration relating to the business acquisitions (see Notes 5 and 13) and interest due on borrowings.

*Convertible Debt Transactions*

The Company separately accounts for the liability and equity components of convertible debt instruments that may be settled entirely or partially in cash upon conversion by allocating the proceeds from issuance between the liability component and the embedded conversion option, or equity component, in accordance with ASC 470, *Debt*. The value of the equity component is calculated by first measuring the fair value of the liability component, using the interest rate of a similar liability that does not have a conversion feature, as of the issuance date. The difference between the proceeds from the convertible debt issuance and the amount measured as the liability component is recorded as the equity component. The Company recognizes the accretion of the resulting discount as part of interest expense in our consolidated statements of operations.

*Contingent Consideration*

The Company records a liability for contingent consideration resulting from a business combination at its fair value on the acquisition date included in Other liabilities in the consolidated statements of financial condition. Each reporting period thereafter, the Company revalues this liability and records increases or decreases in the fair value as an adjustment to Other income within the consolidated statements of operations. Changes in the fair value of the contingent consideration liability can result from adjustments in the probability targets of achieving profitability and adjustments to the discount rate.

*Foreign Currency*

Foreign denominated assets and liabilities are re-measured into the functional currency at exchange rates in effect at the statements of financial condition dates through the consolidated statements of operations. Gains or losses resulting from foreign currency transactions are re-measured using the rates on the dates on which those elements are recognized during the period, and are included in Retail and Institutional trading revenue in the consolidated statements of operations. The Company recorded gains of $5.3 million, $0.8 million and $3.1 million for the years ended December 31, 2013, 2012 and 2011, respectively.

Translation gains or losses resulting from translating the Company's subsidiaries' financial statements from the functional currency to the reporting currency, net of tax, are included in Foreign currency translation gain (loss) in the consolidated statements of comprehensive income. Assets and liabilities are translated at the statement of financial condition date while revenues and expenses are translated at an applicable average rate.

*Revenue Recognition*

The Company makes foreign currency markets for customers trading in FX spot markets and through its subsidiary FSL, engages in equity and related brokerage activities. FX transactions are recorded on the trade date and positions are marked to market daily with related gains and losses, including gains and losses on open spot transactions, recognized currently in income. Commissions earned on brokerage activities are recorded on a trade date basis and are recognized currently in income.

*Retail Trading Revenue*

Under the Company's retail agency FX offering, trading revenue is earned by adding a markup to the price provided by FX market makers generating trading revenue based on the volume of transactions and is recorded on trade date. Under the agency model, when a customer executes a trade on the best price quotation presented by the FX market maker, the Company acts as a credit intermediary, or a riskless principal, simultaneously entering into a trade with the customer and the FX market maker. This agency model has the effect of automatically hedging the Company's positions and eliminating market risk exposure. Retail trading revenues principally represent the difference of the Company's realized and unrealized foreign currency trading gains or losses on its positions with customers and the systematic hedge gains and losses from the trades entered into with the

F-17

This document is ... in re ... Brokers ... 6 December ... 3/18/21 ... on 3/23/... protected by copyright. Further reproduction is prohibited without permission.

TABLE OF CONTENTS

FXCM Inc.

**Notes to Consolidated Financial Statements**

**Note 3. Significant Accounting Policies and Estimates - (continued)**

FX market makers. Retail trading revenue also includes fees earned from arrangements with other financial institutions to provide platform, back office and other trade execution services. This service is generally referred to as a white label arrangement. The Company earns a percentage of the markup charged by the financial institutions to their customers. Fees from this service are recorded when earned on a trade date basis. Additionally, the Company earns income from trading in CFDs, rollovers, payments for order flow, and spread betting. Income or loss on CFDs represents the difference between the Company's realized and unrealized trading gains or losses on its positions and the hedge gains or losses with the other financial institutions. Income or loss on CFDs is recorded on a trade date basis. Income or loss on rollovers is the interest differential customers earn or pay on overnight currency pair positions held and the markup that the Company receives on interest paid or received on currency pair positions held overnight. Income or loss on rollovers is recorded on a trade date basis. Income earned on order flow represents payments received from certain FX market makers in exchange for routing trade orders to these firms for execution. The Company's order routing software ensures that payments for order flow do not affect the routing of orders in a manner that is detrimental to its retail customers. The Company recognizes payments for order flow as earned on a trade date basis. Spread betting is where a customer takes a position against the value of an underlying financial instrument moving either upward or downward in the market. Income on spread betting is recorded as earned on a trade date basis.

*Institutional Trading Revenue*

Institutional trading revenue relates to commission income generated by facilitating spot FX trades on behalf of institutional customers through the services provided by FXCM Pro and Faros (see Note 5). The counterparties to these trades are external financial institutions that also hold customer account balances. The Company receives commission income on these trades without taking any market or credit risk. Institutional trading revenue is recorded on a trade date basis. The Company also earns income from market making and electronic trading in the institutional foreign exchange spot and futures markets through Lucid. Income on market making and electronic trading in foreign exchange spot and future currencies represents the spread between the bid and ask price for positions purchased and sold and the change in value of positions purchased and sold. Income on market making is recorded as trading gains, net of trading losses, on a trade date basis.

*Interest Income*

Interest income consists of interest earned on cash and cash equivalents and cash and cash equivalents, held for customers and is recognized in the period earned. Interest income also includes interest on the Notes receivable.

*Other Income*

Other income primarily includes amounts earned from the sale of market data, equity and equity option brokerage activities, account maintenance fees, ancillary fee income and recovery of accounts receivable previously written off.

For the year ended December 31, 2013, Other income in the consolidated statements of operations includes $7.0 million of revenue related to the re-measurement of the contingent consideration recorded for the acquisition of Faros (see Note 5), partly offset by a charge of $1.2 million attributable to the re-measurement of the Due to related parties pursuant tax receivable agreement to reflect a revised U.S. federal tax rate. For the year ended December 31, 2012, Other income in the consolidated statements of operations includes a $1.4 million gain related to a settlement with the former owners of ODL.

For the year ended December 31, 2011, Other income in the consolidated statements of operations includes $4.5 million of revenue related to the termination of a trade execution services contract that resulted in the recognition of previously deferred income and $3.3 million attributable to the re-measurement of the Due to related parties pursuant to tax receivable agreement to reflect the Company's revised U.S. Federal income tax rate.

*Communications and Technology*

Communications and technology expense consists primarily of costs for network connections to our electronic trading platforms, telecommunications costs, and fees paid for access to external market data. This expense is affected primarily by the growth of electronic trading, our network/ platform capacity requirements and by changes in the number of telecommunication hubs and connections which provide our customers with direct access to our electronic trading platforms.

F-18

TABLE OF CONTENTS

**FXCM Inc.**

**Notes to Consolidated Financial Statements**

**Note 3. Significant Accounting Policies and Estimates - (continued)**

### *Trading Costs, Prime Brokerage and Clearing Fees*

Trading costs, prime brokerage and clearing fees primarily represent fees paid to third party clearing banks and prime brokers for clearing foreign exchange spot futures currency and contract transactions, transaction fees paid to exchanges, equity options brokerage activity fees, and fees paid to third party providers for use of their platform for the Company's market making trading business. Clearing fees primarily fluctuate based on changes in volume, rate of clearing fees charged by clearing banks and rate of fees paid to exchanges.

### *Referring Broker Fees*

Referring broker fees represent commissions paid to brokers for introducing trading customers to the Company. Commissions are determined based on the number and size of transactions executed by the customers and are recorded on a trade date basis.

### *Compensation and Benefits*

Compensation and benefits expense represents employee and member salaries and benefit expense, including stock based compensation expense.

The Company accounts for stock-based compensation in accordance with ASC 718, *Compensation-Stock Compensation* ("ASC 718"). The fair value of the Company's stock-based compensation is estimated using the Black-Scholes option pricing model or the fair value of the Corporation's Class A common stock. The Company recognizes compensation expense for equity awards on a straight-line basis over the requisite service period of the award. Compensation expense is adjusted for an estimate of equity awards that do not vest in the future because service or performance conditions are not satisfied (forfeitures) and have been included in Compensation and benefits in the consolidated statements of operations (see Note 16.)

Compensation and benefits also includes the Allocation of net income to Lucid members for services provided. This expense represents the 49.9% of Lucid's earnings allocated among the non-controlling members of Lucid based on services provided to Lucid.

### *Advertising and Marketing*

Advertising and marketing costs are charged to operations when incurred.

### *General and Administrative Expenses*

General and administrative expenses include bank processing and regulatory fees, professional and consulting fees, occupancy and equipment expense and other administrative costs. Bank processing fees are costs associated with the processing of credit card transactions. Regulatory fees are volume-based costs and annual fees charged by certain regulatory authorities. General and administrative expense for the year ended December 31, 2013 includes a charge of $16.6 million related to a liability established pertaining to a settlement with the FCA regarding our pre August 2010 trade execution practices (see Note 27).

### *Income Taxes*

Holdings operates in the United States ("U.S.") as a limited liability company that is treated as a partnership for U.S. Federal, state and local income tax purposes. As a result, Holdings' income from its U.S. operations is not subject to U.S. federal income tax because the income is attributable to its members. Accordingly, the Company's U.S. tax provision is solely based on the portion of Holdings' income attributable to the Corporation and excludes the income attributable to other members of Holdings whose income is included in Net Income attributable to non-controlling interest in FXCM Holdings, LLC in the consolidated statements of operations.

Income taxes are accounted for in accordance with ASC 740, *Income Taxes* ("ASC 740"), which requires that deferred tax assets and liabilities are recognized, using enacted tax rates, for the effect of temporary differences between the book and tax basis of recorded assets and liabilities. Deferred tax assets, including net operating losses and income tax credits, are reduced by

F-19

TABLE OF CONTENTS

FXCM Inc.

Notes to Consolidated Financial Statements

**Note 3. Significant Accounting Policies and Estimates - (continued)**

a valuation allowance if it is "more likely than not" that some portion or all of the deferred tax assets will not be realized (see Note 24).

In addition to U.S. federal and state income taxes, Holdings is subject to Unincorporated Business Tax which is attributable to Holdings' operations apportioned to New York City. The Company's foreign subsidiaries are also subject to local taxes.

In accordance with ASC 740, we evaluate a tax position to determine whether it is more likely than not that the tax position will be sustained upon examination, based on the technical merits of the position. If the position does not meet a more likely than not threshold, a tax reserve is established and no income tax benefit is recognized. We are audited by U.S. federal and state, as well as foreign, tax authorities. In some cases, many years may elapse before a tax return containing tax positions for which an ASC 740 reserve has been established is examined and an audit is completed. As audit settlements are reached, we adjust the corresponding reserves, if required, in the period in which the final determination is made. While it is difficult to predict the final outcome or timing of a particular tax matter, we believe that our reserves for uncertain tax positions are recorded pursuant to the provisions of ASC 740.

*Accounting Pronouncements Adopted in 2012*

*Fair Value Measurements and Related Disclosures*

In May 2011, the FASB issued authoritative guidance that provides a uniform framework for fair value measurements and related disclosures between U.S GAAP and International Financial Reporting Standards. Additional disclosure requirements under this guidance include: (1) for Level III fair value measurements, quantitative information about unobservable inputs used, a description of the valuation processes used by the entity, and a qualitative discussion about the sensitivity of the measurements to changes in the unobservable inputs; (2) for an entity's use of nonfinancial asset that is different from the asset's highest and best use, the reason for the difference; (3) for financial instruments not measured at fair value but for which disclosure of fair value is required, the fair value hierarchy level in which the fair value measurements were determined; and (4)the disclosure of all transfers between Level I and Level II of the fair value hierarchy. This guidance became effective for the Company on January 1, 2012 and did not have a material impact on its consolidated financial statements.

*Presentation of Comprehensive Income*

In June 2011, the FASB issued authoritative guidance that eliminates the option to present components of other comprehensive income as part of the statement of changes in stockholders' equity, among other updates to the presentation of comprehensive income. Under this guidance, an entity has the option to present the total of comprehensive income, the components of net income and the components of other comprehensive income either in a single continuous statement of comprehensive income or in two separate but consecutive statements. In addition, an entity is required to present on the face of the financial statements reclassification adjustments for items that are reclassified from other comprehensive income to net income in the statement(s) where the components of net income and the components of other comprehensive income are presented. This guidance became effective for the Company on January 1, 2012 and did not have a material impact on its consolidated financial statements.

*Accounting Pronouncements Adopted in 2013*

*Balance Sheet Offsetting*

In December 2011, the FASB issued Accounting Standards Update ("ASU") No. 2011-11 which requires disclosure of both gross and net information about instrument and transactions eligible for offset as well as transactions subject to an agreement similar to a master netting agreement. In February 2013, the FASB issued ASU No. 2013-01 which limited the scope of the offsetting disclosures to recognized derivative instruments accounted for in accordance with ASC 815. ASU No. 2013-01 is effective for annual periods beginning on or after January 1, 2013 and interim periods within those annual periods and must be applied retrospectively. This guidance became effective for the Company on January 1, 2013 and did not have a material impact on the presentation of the Company's unaudited condensed consolidated financial statements.

F-20

Cited in FXCM Global Brokerage
17CV916
Archived on 3/18/21
This document is protected with copyright.
Further reproduction is prohibited without permission.

FXCM Inc.

**Notes to Consolidated Financial Statements**

Note 3. Significant Accounting Policies and Estimates - (continued)

*Testing Goodwill for Impairment*

In July 2012, the FASB issued amended guidance relating to FASB ASC Topic 350, *Intangibles — Goodwill and Other*, which permits an entity to first assess qualitative factors to determine whether it is more likely than not that an indefinite-lived intangible asset is impaired as a basis for determining whether it is necessary to perform the quantitative impairment test in accordance with ASC Topic 350. The more-likely-than-not threshold is defined as having a likelihood of more than 50 percent. If, after assessing the totality of events and circumstances, an entity concludes that it is not more likely than not that the indefinite-lived intangible asset is impaired, then no further action is required. This guidance became effective for the Company on January 1, 2013. Since this guidance only changes the manner in which the Company assesses indefinite-lived intangible assets for impairment, adoption of this guidance did not have a material effect on the Company's financial position or results of operations.

*Reclassification Out of Accumulated Other Comprehensive Income*

In February 2013, the FASB issued ASU No. 2013-02, *Reporting of Amounts Reclassified Out of Accumulated Other Comprehensive Income*. This guidance requires an entity to present information about significant items reclassified out of Accumulated Other Comprehensive Income (AOCI) by component and for items reclassified out of AOCI and into net income, an entity must disclose the effect of such items on the affected net income line item. ASU No. 2013-02 is effective for annual periods beginning on or after January 1, 2013 and interim periods within those annual periods and must be applied retrospectively. This guidance became effective for the Company on January 1, 2013 and did not have a material impact the presentation of the Company's unaudited condensed consolidated financial statements.

*Recently Issued Accounting Pronouncement*

*Certain Obligations Resulting from Joint and Several Liability Arrangements*

In February 2013, the FASB issued ASU No. 2013-20, *Obligations Resulting from Joint and Several Liability Arrangements for Which the Total Amount of the Obligation is Fixed at the Reporting Date*. This standard requires an entity to measure obligations resulting from joint and several liability arrangements for which the total amount of the obligation is fixed at the reporting date as the sum of (i) the amount the entity agreed to pay on the basis of its arrangement among its co-obligors and (ii) any additional amount it expect to pay on behalf of its co-obligors.

ASU No. 2013-20 is effective for fiscal years and interim periods beginning after December 15, 2013, but earlier adoption is permitted. Upon adoption, the standard should be applied retrospectively to all prior periods presented. The Company plans to adopt the standard on its required effective date of January 1, 2014 and does not expect the adoption of this standard to have a material effect on our consolidated financial condition, results of operations or cash flows.

*Parent's Accounting for the Cumulative Translation Adjustment upon Derecognition of an Investment within a Foreign Entity or of an Investment in a Foreign Entity*

In March 2013, the FASB issued ASU No. 2013-05, *Parent's Accounting for the Cumulative Translation Adjustment upon Derecognition of Certain Subsidiaries or Groups of Assets within a Foreign Entity or of an Investment in Foreign Entity*. This standard addresses whether consolidation guidance or foreign currency guidance applies to the release of the cumulative translation adjustment into net income when a parent sells all or a part of its investment in a foreign entity or no longer holds a controlling financial interest in a subsidiary or net assets that are a business (other than a sale of in-substance real estate) within a foreign entity. The standard also resolves the diversity in practice for the cumulative translation adjustment treatment in business combinations achieved in stages involving foreign entities.

Under this standard, the entire amount of the cumulative translation adjustment associated with the foreign entity should be released into earnings when there has been: (i) a sale of a subsidiary or group of net assets within a foreign entity and the sale represents a complete or substantially complete liquidation of the foreign entity in which the subsidiary or the net assets had resided; (ii) a loss of a controlling financial interest in an investment in a foreign entity; or (iii) a change in accounting method from applying the equity method to an investment in a foreign entity to consolidating the foreign entity.

ASU No. 2013-05 is effective for fiscal years and interim periods beginning after December 15, 2013, and will be applied prospectively. The Company plans to adopt the standard on its required effective date of January 1, 2014 and does not expect the adoption of the standard to have a material effect on our consolidated financial condition, results of operations or cash flows.

F-21

TABLE OF CONTENTS

FXCM Inc.

**Notes to Consolidated Financial Statements**

**Note 3. Significant Accounting Policies and Estimates - (continued)**

*Presentation of Unrecognized Tax Benefits*

In July 2013, the FASB issued ASU No. 2013-11, *Presentation of Unrecognized Tax Benefits When a Net Operating Loss Carryforward, a Similar Tax Loss, or a Tax Credit Carryforward Exists*. This standard requires a liability related to unrecognized tax benefits to be presented as a reduction to the related deferred tax asset for a net operating loss carryforward or a tax credit carryforward. When the carryforwards are not available at the reporting date under the tax law of the applicable jurisdiction or the tax law of the applicable jurisdiction does not require, and the entity does not intend to use, the deferred tax asset for such purpose, the unrecognized tax benefit will be presented in the financial statements as a liability and will not be combined with the related deferred tax asset.

ASU No. 2013-11 is effective for fiscal years and interim periods beginning after December 15, 2013, but earlier adoption is permitted. Upon adoption, the standard should be applied prospectively to unrecognized tax benefits that existed at the effective date. Retrospective application is permitted. The Company plans to adopt the standard prospectively on its required effective date of January 1, 2014 and does not expect the adoption of the standard to have a material effect on its consolidated financial condition, results of operations or cash flows.

**Note 4. Non-Controlling Interests**

*Holdings*

The Corporation consolidates the financial results of Holdings whereby it records a non-controlling interest for the economic interest in Holdings not owned by the Corporation. Pursuant to an agreement between the Corporation and Holdings, anytime the Corporation cancels, issues or repurchases shares of its Class A common stock, Holdings enters into an equivalent Holding Unit transaction with the Corporation. In addition, anytime Existing Unit Holders exchange their Holding Units for shares of the Corporation's Class A common stock, Holdings is required to transfer an equal amount of Holding Units to the Corporation.

Changes in the non-controlling and the Corporation's interests in Holdings for the year ended December 31, 2013 are presented in the following table:

|  | Controlling Units | Non-Controlling Units | Total Units | FXCM Inc. | Non-Controlling | Total |
|---|---|---|---|---|---|---|
| Balance as of January 1, 2013 | 34,683,599 | 46,930,192 | 81,613,791 | 42.5 % | 57.5 % | 100.0% |
| Holding Units repurchased related to Class A common stock repurchased | (1,815,800) | — | (1,815,800) | (0.8)% | 0.8 % | —% |
| Holding Units acquired by FXCM Inc. related to exchanges of Holding Units for shares of Class A common stock | 10,094,371 | (10,094,371) | — | 12.3 % | (12.3)% | —% |
| Exercise of stock options | 1,702,714 | — | 1,702,714 | 0.8 % | (0.8)% | —% |
| Balance as of December 31, 2013 | 44,664,884 | 36,835,821 | 81,500,705 | 54.8 % | 45.2 % | 100.0% |

*Lucid, Faros and Other Non-Controlling Interests*

The Company owns a controlling interest in Lucid, Faros and other entities and consolidates the financial results of these entities whereby it records a non-controlling interest for the economic interests not owned by the Company.

F-22

Cited in In re: Global Brokerage
17Cv916 Decided 3/8/21
Archived on 3/8/21
This document is protected by copyright.
Further reproduction is prohibited without permission.

TABLE OF CONTENTS

FXCM Inc.

**Notes to Consolidated Financial Statements**

**Note 5. Business Acquisition**

Faros

On September 20, 2013 (the "Faros Acquisition Date"), the Company acquired a 50.1% controlling interest in Faros. Faros provides foreign exchange intelligence, market coverage, and execution services to the institutional foreign exchange market. The acquisition further expands the Company's presence and capabilities in the institutional marketplace. As consideration, the Company provided an initial cash payment of $5.0 million (the "Initial Payment") and a follow-on payment (the " Follow-on Payment") to be made in 2015 in an amount to be determined, based on the purchase agreement (the "Faros Purchase Agreement") estimated at $10.6 million on the Faros Acquisition Date for a total estimated purchase price of $15.6 million. Pursuant to the terms of the Faros Purchase Agreement, the Follow-on Payment is a multiple of Faros' 2014 EBITDA and is payable partly in shares of the Corporation's Class A common stock to one of the Faros sellers if certain criteria are met. Under the terms of the Faros Purchase Agreement, any of the Corporation's Class A common stock issued to the Faros seller will be restricted for sale until September 2021 if the Faros seller ceases to be employed by Faros as of either December 31, 2015 or December 31, 2016 for reasons other than death, disability or the sale of the majority of the Corporation's combined voting power. This restriction ("the Faros Liquidity Restriction") has an estimated fair value of $0.4 million at the Faros Acquisition Date and is accounted for as deferred compensation and recognized over the term of the restriction.

The Company has the option to buy out the remaining interest of the Faros sellers subject to the terms of the Faros Purchase Agreement. In the event the buyout is not exercised by the Company by December 31, 2017, the sellers have the right, subject to the terms of the Faros Purchase Agreement, to market Faros for sale of all the membership interests of Faros.

The fair value of the Follow-on Payment is included in Other liabilities in the consolidated statements of financial condition. Changes in the fair value of the Follow-on Payment subsequent to the Faros Acquisition Date are recognized in earnings in the period in which the change is recorded. The Company estimated the fair value of the Follow-on Payment using both a discounted cash flow model and guideline public company model. The discount rate considered in the assessment of the $10.6 million Follow-on Payment at the Faros Acquisition Date was 25.0%. As of December 31, 2013, the fair value of the Follow-on Payment was estimated at $3.7 million. The $7.0 million decrease in the estimated fair value was recorded in Other income in the consolidated statement of operations (see Note 23). The decline in the estimated fair value of the Follow-on Payment is due to lowering our Faros EBITDA estimate.

The acquisition was accounted for in accordance with ASC 805. The assets acquired, liabilities assumed and non-controlling interest were recorded at their estimated fair values in accordance with ASC 820 at the Faros Acquisition Date as summarized in the table below. Full goodwill of $23.0 million was calculated as the fair value of estimated consideration over the estimated fair value of the net assets acquired. The estimated fair value of the non-controlling interest was $15.6 million, and was determined by valuing Faros using a discounted cash flow model and guideline public company model, less the Initial Payment and the Follow-on Payment. The estimate of the fair value of the non-controlling interest is based on an assumed discount rate of 25.0%, long term annual earnings growth rate of 3.0% and assumed adjustments due to the lack of control that market participants would consider when estimating the fair value of the non-controlling interest in Faros. Goodwill was allocated at the reporting unit level in the Institutional segment based on an analysis of the fair value of assets acquired and expected future benefits of synergies created from combining the Faros business with the Company's foreign exchange trading expertise. Faros is included in the Institutional segment for purposes of segment reporting (see Note 26).

F-23

TABLE OF CONTENTS

FXCM Inc.

**Notes to Consolidated Financial Statements**

**Note 5. Business Acquisition - (continued)**

### Faros Purchase Price Allocation

| (Amounts in thousands) | | | | |
|---|---|---|---|---|
| Purchase price | | | $ | 15,631 |
| Non-controlling interest | | | | 15,569 |
| Total fair value at Acquisition Date | | | | 31,200 |
| Net assets acquired | $ | 137 | | |
| Adjustments to reflect acquired assets and liabilities at fair value | | | | |
| Customer relationships [1] | | 6,000 | | |
| Non-compete agreement [2] | | 1,900 | | |
| Trade name [3] | | 130 | | |
| Fair value of net assets acquired | | | | 8,167 |
| Goodwill resulting from the Faros acquisition | | | $ | 23,033 |

[1] Consists of institutional and bank customers, with an amortization life of 4 years.

[2] Amortization life is 9 years.

[3] Amortization life is 3 years.

The amounts included in the Faros Purchase Price Allocation table represent the preliminary allocation of the purchase price and are subject to revision during the remainder of the measurement period, a period not to exceed 12 months from the Faros Acquisition Date. Adjustments, if any, to the provisional values during the measurement period will be pushed back to the date of acquisition. Comparative information for periods after acquisition but before the period in which the adjustments are identified will be adjusted to reflect the effects of the adjustments as if they were taken into account as of the acquisition date. Changes to the amounts recorded as assets and liabilities may result in a corresponding adjustment to goodwill. As a result of changes identified to the net assets acquired, the initial goodwill was increased by $0.8 million to $23.0 million at December 31, 2013.

The following condensed statement of net assets acquired reflects the amounts of Faros net assets recognized as of the Faros Acquisition Date, with amounts in thousands:

**Condensed Statement of Net Assets Acquired**

| | | As of September 20, 2013 |
|---|---|---|
| Assets | | |
| Cash and cash equivalents | $ | 1,055 |
| Accounts receivable, net | | 40 |
| Office, communication and computer equipment, net | | 31 |
| Intangible assets | | 8,030 |
| Other assets | | 76 |
| Total assets | $ | 9,232 |
| Liabilities | | |
| Accounts payable and accrued expenses | | 1,065 |
| Total liabilities | | 1,065 |
| Fair value of net assets acquired | $ | 8,167 |

F-24

Cited in In re Global Brokerage
17C-916 Decided 3/18/21
Archived on 3/23/21
This document is protected by copyright.
Further reproduction is prohibited without permission.

TABLE OF CONTENTS

FXCM Inc.

**Notes to Consolidated Financial Statements**

**Note 5. Business Acquisition - (continued)**

**Contingencies and Accounts Receivable**

There were no contingent liabilities recorded in the fair value of net assets acquired as of the Faros Acquisition Date and the fair value of net assets acquired includes accounts receivables with book value that approximates fair value. There was no reserve netted against receivables as of the Faros Acquisition Date since based on current information and events, it is probable that the Company will collect all amounts due according to the contractual terms of the receivable.

**Condensed Combined Financial Information:**

The following condensed financial information presents the resulting operations of Faros from the Faros Acquisition Date to December 31, 2013, with amounts in thousands:

|  | For the period September 20, 2013 to December 31, 2013 |
|---|---|
| Total revenue | $ 526 |
| Net loss | $ (301) |

**Lucid**

On June 18, 2012 (the "Acquisition Date"), the Company acquired a 50.1% controlling interest in Lucid, an electronic market maker and trader in the institutional foreign exchange spot and futures markets headquartered in the U.K., to expand the Company's presence and capabilities in the institutional marketplace. Lucid's sole material asset is a controlling membership interest in Lucid LLP, an electronic market maker and trader in the institutional foreign exchange spot and futures markets headquartered in the U.K. As consideration, the Company issued $71.4 million, 3.5% unsecured promissory notes, and 9.0 million unregistered shares of the Corporation's Class A common stock to Lucid sellers as well as a $15.8 million, 3.5% unsecured promissory note for all liquid assets for a total estimated purchase price of $177.5 million. The Lucid sellers were entitled to 1.8 million shares of the 9.0 million shares at closing, with the remaining 7.2 million shares held in escrow (the "Remaining Shares"), subject to the achievement of certain fixed profit-based targets (the "Profit Targets"). If the Profit Targets are achieved, the Lucid sellers are entitled to receive the Remaining Shares on the first, second and third anniversary following the Acquisition Date or over a three year term (the "Term") pursuant to the sale purchase agreement (the "Purchase Agreement") (see Note 14). Pursuant to the terms of the Acquisition, any of the Corporation's common shares issuable to a Lucid seller on an anniversary from closing will be restricted (the "Lucid Liquidity Restriction") for sale until the eighth anniversary of the closing of the Acquisition if the recipient ceases to be employed by Lucid or any entity controlled by the Corporation for reasons other than death or incapacity on such anniversary. The Purchase Agreement includes a contingent arrangement which provides for a claw back of the Remaining Shares in the event that the Profit Targets are not achieved. Additionally, the Company has the option to buy-out the remaining interest of the Lucid sellers subject to terms of the Purchase Agreement. In the event the buy-out is not exercised by the Company within four years from the Acquisition Date, the Lucid sellers have the ability to buy-back the Company's ownership interests within 30 days of the fourth anniversary date.

The estimated fair value of the 9.0 million shares was $89.4 million and is accounted for as equity. This fair value consisted of 1.8 million shares with a fair value of $21.5 million based on the Corporation's closing stock price as of the Acquisition Date and the Remaining Shares with an estimated fair value of $67.9 million, adjusted for the Lucid Liquidity Restriction. The estimated fair value of the Lucid Liquidity Restriction was $9.4 million, and is accounted for as deferred compensation and recognized over the Term.

The Acquisition was accounted for in accordance with ASC 805. The assets acquired, liabilities assumed and non-controlling interest were recorded at their estimated fair values in accordance with ASC 820 at the Acquisition Date as summarized in the table below. Full goodwill of $236.5 million was calculated as the fair value over the estimated fair value of the net assets acquired. The estimated fair value of the non-controlling interest was $160.2 million, and was determined by valuing Lucid using a discounted cash flow method, less the considerations transferred. The estimate of the fair value of the non-controlling interest is based on an assumed discount rate between 10.0% and 11.0%, annual earnings growth rate of 4.0% and assumed adjustments due to the lack of control that market participants would consider when estimating the fair value of the non-controlling interest in Lucid. Goodwill was allocated at the reporting unit level in the Institutional segment based on an

F-25

Cited in rebuttal dec. of
17Cv916 ... dated ...
Archived ... for ...
This document is protected under copyright.
Further reproduction is prohibited without permission.

TABLE OF CONTENTS

FXCM Inc.

Notes to Consolidated Financial Statements

Note 5. Business Acquisition - (continued)

analysis of the fair value of assets acquired and expected future benefits of synergies created from combining the Lucid market making business with the Company's foreign exchange trading expertise. The goodwill is deductible for U.K. income tax purposes.

During the year ended December 31, 2013, the purchase price was increased by $15.3 million due to the final determination of tax balances at the Acquisition Date adjusted during the measurement period. The Company issued six-month 2.25% unsecured promissory notes to the Lucid sellers for the purchase price increase (see Note 21). In connection with this purchase price adjustment, the initial goodwill recorded was reduced by $1.2 million to $235.3 million.

**Lucid Purchase Price Allocation ([1])**

| (Amounts in thousands) | | | | |
|---|---|---|---|---|
| Purchase price | | | $ | 192,784 |
| Non-Controlling interest | | | | 160,165 |
| Total fair value at Acquisition Date | | | | 352,949 |
| Net assets acquired | $ | 32,732 | | |
| Adjustments to reflect acquired assets and liabilities at fair value | | | | |
| Proprietary technology ([2]) | | 83,900 | | |
| Non-compete agreements ([3]) | | 1,000 | | |
| Fair value of net assets acquired | | | | 117,632 |
| Goodwill resulting from the Lucid acquisition | | | $ | 235,317 |

_____

([1]) The amounts included in the Lucid Purchase Price Allocation table represent the allocation of the purchase price and includes revisions made during the 12 months remeasurement period from the Acquisition Date.

([2]) Consists of internally developed software platforms through which the Company: (i) executes its specific trading strategies, with an amortization life of 4 years and (ii) clears and efficiently settle trades, with an amortization life of 7 years.

([3]) Consists of two non-compete agreements with amortization lives of 3 years.

The amounts included in the Lucid Purchase Price Allocation table represent the preliminary allocation of the purchase price and were subject to revision during the measurement period, a period not to exceed 12 months from the acquisition date. Adjustments to the provisional values during the measurement period were pushed back to the date of acquisition. Comparative information for periods after acquisition but before the period in which the adjustments were identified were adjusted to reflect the effects of the adjustments as if they were taken into account as of the acquisition date. Changes to the amounts recorded as assets and liabilities resulted in a corresponding adjustment to goodwill.

F-26

Cited in In re Glo... 17CV916 Decided on 3/23/21 Archived on 3/23/21 This document is protected by copyright. Further reproduction is prohibited without permission.

FXCM Inc.

Notes to Consolidated Financial Statements

**Note 5. Business Acquisition - (continued)**

**Condensed Statement of Net Assets Acquired**

The following condensed statement of net assets acquired reflects the amounts of Lucid net assets recognized as of the Acquisition Date, with amounts in thousands:

|  | As of June 18, 2012 |
|---|---|
| Assets |  |
| Cash and cash equivalents | $ 28,656 |
| Accounts receivable, net | 5,100 |
| Due from brokers | 302 |
| Deferred tax asset | 11,311 |
| Office, communication and computer equipment, net | 499 |
| Intangible assets | 84,900 |
| Other assets | 226 |
| Total assets | $ 130,994 |
| Liabilities |  |
| Accounts payable and accrued expenses | 13,362 |
| Total liabilities | 13,362 |
| Fair value of net assets acquired | $ 117,632 |

**Contingencies and Accounts Receivable**

There were no contingent liabilities recorded in the fair value of net assets acquired as of the Acquisition Date. The Company has collected all material accounts receivable amounts as of December 31, 2013.

**Condensed Combined Financial Information:**

The following condensed financial information presents the resulting operations of Lucid from the Acquisition Date to December 31, 2012:

|  | For the period June 18, 2012 to December 31, 2012 |
|---|---|
| Total revenue | $ 42,198 |
| Net income | $ 21,446 |

*Foreland*

On October 7, 2011, the Company acquired a 100% interest in Foreland (the "Foreland Acquisition"), a Japan based foreign exchange provider. The Foreland Acquisition was designed to increase the Company's profile in the Japanese market and accelerate its growth in Asia, utilizing Foreland's relationships and sales force. The Company's purchase price was $37.7 million provided in cash. The Foreland Acquisition was accounted for in accordance with ASC 805. The assets acquired and the liabilities assumed were recorded at their fair values in accordance with ASC 820.

The $37.7 million purchase price was allocated to Foreland assets acquired and liabilities assumed based on their estimated fair values at the acquisition date as summarized in the following table. Goodwill of $10.0 million was calculated as the purchase premium after adjusting for the fair value of net assets acquired. Goodwill was allocated to the Retail Trading segment based on an analysis of the fair value of assets acquired and expected future benefits of synergies created from combining Foreland's FX business with the Company's foreign exchange trading expertise, the economies of scale expected from

F-27

This document is protected by copyright. Further reproduction is prohibited without permission. Admitted in In re Global Brokerage Inc. 17cv916 Decided on 3/18/21

TABLE OF CONTENTS

FXCM Inc.

Notes to Consolidated Financial Statements

**Note 5. Business Acquisition - (continued)**

combining the operations of the two companies and the retail relationships brought by the Foreland's management. No goodwill is expected to be deductible for federal income tax purposes.

**Foreland Purchase Price Allocation**

| (Amounts in thousands) | | |
|---|---|---|
| Purchase price | | $ 37,654 |
| Net assets acquired | $ 21,460 | |
| Adjustments to reflect acquired assets and liabilities at fair value | | |
| Customer relationships[1] | 9,925 | |
| Deferred tax liability | (3,726) | |
| Fair value of net assets acquired | | 27,659 |
| Goodwill resulting from the Foreland acquisition | | $ 9,995 |

_____

[1]   Consists of retail customers. The amortization life is 6 years.

**Condensed Statement of Net Assets Acquired**

The following condensed statement of net assets acquired reflects the amounts of Foreland net assets recognized as of October 7, 2011, with amounts in thousands:

| | As of October 7, 2011 |
|---|---|
| Assets | |
| Cash and cash equivalents | $ 29,853 |
| Cash and cash equivalents, held for customers | 172,826 |
| Accounts receivable, net | 501 |
| Office, communication and computer equipment, net | 847 |
| Intangible assets | 9,934 |
| Other assets | 1,199 |
| Total assets | $ 215,160 |
| Liabilities | |
| Customer account liabilities | $ 172,826 |
| Accounts payable and accrued expenses | 6,502 |
| Due to brokers | 4,447 |
| Deferred tax liability | 3,726 |
| Total liabilities | 187,501 |
| Fair value of net assets acquired | $ 27,659 |

**Accounts Receivable**

The Company has collected all material accounts receivable amounts as of December 31, 2013.

**FXCMJ**

On March 31, 2011, the Company acquired a 100% interest in FXCMJ (the "FXCMJ Acquisition"), a Japan based foreign exchange provider that had previously contracted to use the FXCM Japan trademark. The FXCMJ Acquisition was designed to increase the Company's profile in the Japanese market and accelerate its growth in Asia, utilizing FXCMJ's relationships and sales force. The Company's purchase price was $15.7 million provided in cash. The FXCMJ Acquisition was accounted for in

F-28

https://www.sec.gov/Archives/edgar/data/1499912/000144530514001063/fxcm-20131231x10k.htm

FXCM Inc.

Notes to Consolidated Financial Statements

**Note 5. Business Acquisition - (continued)**

accordance with ASC 805. The assets acquired and the liabilities assumed were recorded at their fair values in accordance with ASC 820.

The $15.7 million purchase price was allocated to FXCMJ assets acquired and liabilities assumed based on their estimated fair values at the acquisition date as summarized in the following table. Goodwill of $0.8 million was calculated as the purchase premium after adjusting for the fair value of net assets acquired. Goodwill was allocated to the Retail Trading segments based on an analysis of the fair value of assets acquired and expected future benefits of synergies created from combining FXCMJ's foreign exchange with the Company's foreign exchange trading expertise, the economies of scale expected from combining the operations of the two companies and the retail relationships brought by the FXCMJ's management. No goodwill is expected to be deductible for federal income tax purposes.

**FXCM Japan Inc. Purchase Price Allocation**

| (Amounts in thousands) | | |
|---|---:|---:|
| Purchase price | | $ 15,725 |
| Net assets acquired | $ 14,301 | |
| Adjustments to reflect acquired assets and liabilities at fair value | | |
| Customer relationships [1] | 1,055 | |
| Deferred tax liability | (397) | |
| Fair value of net assets acquired | | 14,959 |
| Goodwill resulting from the FXCMJ acquisition | | $ 766 |

———————

[1]   Consists of retail customers. The amortization life is 6 years.

**Condensed Statement of Net Assets Acquired**

The following condensed statement of net assets acquired reflects the amounts of FXCMJ net assets recognized as of March 31, 2011, with amounts in thousands:

| | As of March 31, 2011 |
|---|---:|
| Assets | |
| Cash and cash equivalents | $ 9,827 |
| Cash and cash equivalents, held for customers | 114,024 |
| Due from broker | 3,885 |
| Accounts receivable, net | 194 |
| Tax receivable | 478 |
| Office, communication and computer equipment, net | 2,279 |
| Intangible assets | 1,064 |
| Other assets | 1,189 |
| Total assets | $ 132,940 |
| Liabilities | |
| Customer account liabilities | $ 114,023 |
| Accounts payable and accrued expenses | 3,561 |
| Deferred tax liability | 397 |
| Total liabilities | 117,981 |
| Fair value of net assets acquired | $ 14,959 |

F-29

TABLE OF CONTENTS

FXCM Inc.

**Notes to Consolidated Financial Statements**

**Note 5. Business Acquisition - (continued)**

**Accounts Receivable**

The Company has collected all material accounts receivable amounts as of December 31, 2013.

**Pro Forma Condensed Combined Financial Information**

Pro forma condensed combined financial information for the acquisitions completed in 2013 (i.e., Faros), 2012 (i.e., Lucid) and 2011 (i.e., Foreland and FXCMJ) are presented as they may have appeared if all acquisitions had been completed on January 1, 2013, 2012 and 2011, with amounts in thousands:

| | For the Years Ended | | |
| --- | --- | --- | --- |
| | December 31, 2013 | December 31, 2012 | December 31, 2011 |
| Total revenues | $ 491,217 | $ 463,767 | $ 588,028 |
| Net income before non-controlling interest | $ 32,463 | $ 49,224 | $ 115,884 |

These pro forma results for the years ended December 31, 2013, 2012 and 2011 primarily include the related tax impact and the elimination of certain revenues and expenses resulting from transactions conducted with Lucid, Foreland, and FXCMJ prior to these acquisitions as well as the adjustments for the intangible assets acquired in the Faros acquisition and the related tax impact.

**Acquisition-related Costs**

For the year ended December 31, 2013, acquisition-related transaction costs for the Faros acquisition were not significant. For the year ended December 31, 2012, acquisition-related costs for Lucid were $0.9 million. For the year ended December 31, 2011, acquisition-related transaction costs for the acquisitions were $0.2 million for the acquisition of Foreland and $0.3 million for the acquisition of FXCMJ. Acquisition-related transaction costs are included in General and administrative expense in the consolidated statements of operations.

**Note 6. Equity Method Investment**

On December 4, 2012, the Company completed the acquisition of a non-controlling equity interest in an electronic communication network for foreign exchange trading. As the Company holds a 38% equity interest and exerts significant influence, the investment is accounted for using the equity method and is included in institutional for purposes of segment reporting (see Note 26). The Company also has 26.3% equity interest in a developer of FX trading software which is accounted for using the equity method and is included in corporate for purposes of segment reporting.

As of December 31, 2013 and 2012, the Company's carrying values of equity method investments were $9.8 million and $12.0 million, respectively, and are included as a component of Other assets in the consolidated statements of financial condition.

Loss on equity method investments was $0.8 million for the year ended December 31, 2013 and is included in Loss on equity method investments, net in the consolidated statements of operations. Income or loss recognized from equity method investments was not material for the years ended December 31, 2012 and 2011.

Dividend distributions received from the Company's equity method investments during the year ended December 31, 2013 were not significant. There were no dividend distributions received from the Company's equity method investments during the years ended December 31, 2012 and 2011.

F-30

Cited in Initial Brief 3/1/21
17CV916 Actual Brief
Archived on 1/25/21
This document is protected by copyright.
Further reproduction is prohibited without permission.

TABLE OF CONTENTS

**FXCM Inc.**

**Notes to Consolidated Financial Statements**

**Note 7. Office, Communication and Computer Equipment, net**

Office, communication and computer equipment, net, including capitalized software development costs, leasehold improvements, capital leases, furniture and fixtures and other equipment, licenses and communication equipment, consisted of the following as of December 31, 2013 and 2012, with amounts in thousands:

|  | December 31, 2013 | December 31, 2012 |
|---|---|---|
| Computer equipment | $ 28,047 | $ 34,541 |
| Software | 47,138 | 31,476 |
| Leasehold improvements | 9,687 | 9,478 |
| Furniture and fixtures and other equipment | 3,427 | 3,185 |
| Licenses | 10,101 | 20,222 |
| Communication equipment | 1,664 | 1,522 |
|  | 100,064 | 100,424 |
| Less: Accumulated depreciation | (50,899) | (50,108) |
| Office, communication and computer equipment, net | $ 49,165 | $ 50,316 |

Depreciation is computed on a straight-line basis (see Note 3). Depreciation expense, including impairments, included in the consolidated statements of operations was $25.8 million, $17.7 million, and $13.1 million for the years ended December 31, 2013, 2012 and 2011, respectively. Also included in depreciation expense was amortization expense of capitalized software development cost in the amount of $10.6 million, $6.5 million, and $3.0 million for the years ended December 31, 2013, 2012 and 2011, respectively. Unamortized capitalized software development costs were $26.0 million and $20.3 million as of December 31, 2013 and 2012, respectively. Assets disposed of during the year ended December 31, 2013 were $19.2 million. The Company disposed of $2.9 million of fully depreciated assets during the year ended December 31, 2012. For the year ended December 31, 2013, the Company recorded an impairment of $3.5 million to write down the value of an electronic FX option trading platform. The net realizable value of the asset was determined based on DCFs over the remaining useful life. The impairment charge is included in Depreciation and amortization in the consolidated statements of operations. The impairment charge is included in retail trading for purposes of segment reporting.

**Note 8. Goodwill**

The following table presents the changes in goodwill by segment during the year ended December 31, 2013, with amounts in thousands:

|  | Retail Trading | Institutional Trading | Total |
|---|---|---|---|
| Balance at January 1, 2013 | $ 37,851 | $ 247,803 | $ 285,654 |
| Goodwill acquired |  | 23,033 | 23,033 |
| Goodwill adjustment/remeasurement | 1,387 | (1,196) | 191 |
| Foreign currency translation adjustment | (1,159) | 217 | (942) |
| Balance at December 31, 2013 | $ 38,079 | $ 269,857 | $ 307,936 |

F-31

TABLE OF CONTENTS

FXCM Inc.

Notes to Consolidated Financial Statements

### Note 9. Other Intangible Assets, net

The Company's acquired intangible assets consisted of the following as of December 31, 2013 and 2012, with amounts in thousands:

| | December 31, 2013 | | | December 31, 2012 | | |
|---|---|---|---|---|---|---|
| | Gross Carrying Amount | Accumulated Amortization | Net Carrying Amount | Gross Carrying Amount | Accumulated Amortization | Net Carrying Amount |
| **Finite-lived intangible assets** | | | | | | |
| Customer relationships | $ 37,746 | $ (14,529) | $ 23,217 | $ 32,269 | $ (9,815) | $ 22,454 |
| Non-compete agreements | 10,507 | (8,177) | 2,330 | 8,214 | (5,841) | 2,373 |
| Proprietary technology | 83,900 | (31,849) | 52,051 | 83,900 | (11,081) | 72,819 |
| Trade name | 177 | (13) | 164 | — | — | — |
| Foreign currency translation adjustment | (1,831) | 172 | (1,659) | (220) | (244) | (464) |
| Total finite-lived intangible assets | $ 130,499 | $ (54,396) | $ 76,103 | $ 124,163 | $ (26,981) | $ 97,182 |
| **Indefinite-lived intangible assets** | | | | | | |
| License | 610 | — | 610 | 610 | — | 610 |
| Total indefinite-lived intangible assets | $ 610 | $ — | $ 610 | $ 610 | $ — | $ 610 |

Customer relationships, non-compete agreements, proprietary technology and trade name are amortized on a straight-line basis over 4 to 9 years, 3 to 9 years, 4 years and 7 years, and 3 years, respectively, which approximates the weighted average useful lives. Indefinite-lived assets are not amortized (see Note 3). Amortization expense included in the consolidated statements of operations was $27.9 million, $19.0 million and $6.9 million for the years ended December 31, 2013, 2012 and 2011 respectively. Estimated future amortization expense for acquired intangible assets outstanding as of December 31, 2013 is as follows, with amounts in thousands:

| Year Ending December 31, | Estimated Amortization Expense |
|---|---|
| 2014 | $ 27,655 |
| 2015 | 27,431 |
| 2016 | 15,562 |
| 2017 | 3,068 |
| 2018 | 1,022 |
| Thereafter | 1,365 |
| | $ 76,103 |

### Note 10. Notes Receivable

On October 2, 2013, the Company acquired 4.0% notes receivable aggregating $1.9 million (the "Notes") from Infinium Capital Holdings ("Infinium Capital"). The principal of the Notes is payable in two lump sums with 50% due on August 1, 2014 and the remaining 50% due on August 1, 2015. The Notes are secured by liens on capital stock, equity interest held and certain other subsidiaries and other assets of Infinium Capital. As of December 31, 2013 there was no reserve against the Notes receivable.

F-32

Cited in 17Cv916 Global Brokerage Archived, decided 3/18/21 17Cv916, decided 3/23/21
This document is protected copyright.
Further reproduction is prohibited without permission.

TABLE OF CONTENTS

FXCM Inc.

**Notes to Consolidated Financial Statements**

**Note 11. Other Assets**

Other assets were comprised of the following as of December 31, 2013 and 2012, with amounts in thousands:

|  | December 31, 2013 | December 31, 2012 |
|---|---|---|
| Prepaid expenses | $ 5,738 | $ 5,439 |
| Equity method investments | 9,793 | 12,000 |
| Deferred debt issuance costs | 7,131 | 1,109 |
| Deposits | 1,492 | 1,555 |
| Other | 162 | 13 |
|  | $ 24,316 | $ 20,116 |

**Note 12. Customer Account Liabilities**

Customer account liabilities represent amounts due to customers related to cash and margin transactions. This includes cash deposits and gains and losses on settled FX, CFDs and spread betting trades as well as unrealized gains and losses on open FX commitments, CFDs and spread betting. Customer account liabilities were $1.2 billion as of December 31, 2013 and 2012.

**Note 13. Accounts Payable and Accrued Expenses**

Accounts payable and accrued expenses were comprised of the following as of December 31, 2013 and 2012, with amounts in thousands:

|  | December 31, 2013 | December 31, 2012 |
|---|---|---|
| Operating expenses payable | $ 41,528 | $ 28,793 |
| Due to Lucid non-controlling members | 9,995 | 9,611 |
| Commissions payable | 9,485 | 8,126 |
| Bonus payable | 7,455 | 3,945 |
| Income tax payable | 1,046 | 1,231 |
| Acquisition cash consideration payable | — | 808 |
| Interest due on borrowings | 177 | 121 |
| Other | 11 | — |
|  | $ 69,697 | $ 52,635 |

**Note 14. Earnings per Share**

Basic earnings per share ("EPS") measures the performance of an entity over the reporting period. Diluted EPS measures the performance of an entity over the reporting period while giving effect to all potentially dilutive common shares that were outstanding during the period. The Company uses the treasury stock method in accordance with ASC Topic 260 — *Earnings per Share* ("ASC 260"), to determine the diluted EPS.

In accordance with ASC 260, all outstanding unvested share-based payments that contain rights to non-forfeitable dividends participate in the undistributed earnings with the common stockholders and are therefore participating securities. The shares of Class B common stock do not share in the earnings of the Company and are therefore not participating securities. Accordingly, basic and diluted net earnings per share of Class B common stock have not been presented.

During the year ended December 31, 2013, the Company granted 105,636 and 426,000 stock options to purchase shares of the Corporation's Class A common stock to its independent directors and employees, respectively. For the year ended December 31, 2012, the Company granted 109,488 and 725,000 stock options to purchase shares of the Corporation's Class A common

F-33

Produced in Global Brokerage

This document is protected by copyright.
Further reproduction is prohibited without permission.

Archived on 10/23/21
Link 191 decided 3/18/21

TABLE OF CONTENTS

**FXCM Inc.**

**Notes to Consolidated Financial Statements**

**Note 14. Earnings per Share - (continued)**

stock to its independent directors and employees, respectively. For the years ended December 31, 2013 and 2012, stock options granted to certain employees, non-employees and independent directors in the aggregate of 426,000 and 9,178,128, respectively, were not included in the computation of earnings per common share because they were antidilutive under the treasury method.

As discussed in Note 5, the Company issued 7.2 million shares of the Corporation's Class A common stock in connection with the Lucid acquisition subject to the achievement of certain Profit Targets. If the Profit Targets are achieved, the Lucid sellers are entitled to receive 1.2 million shares on the first anniversary, 3.0 million shares on the second anniversary and 3.0 million shares on the third anniversary of the Acquisition Date. In accordance with ASC 260, the anniversary shares are considered contingently issuable shares. Accordingly, they are considered outstanding common shares and included in basic EPS as of the date that all necessary conditions have been satisfied (that is, when issuance of the shares is no longer contingent) and there is no circumstance under which those shares would not be issued. In accordance with ASC 260, shares whose issuance is contingent upon the satisfaction of certain conditions shall be considered outstanding and included in the computation of diluted EPS if all necessary conditions have been satisfied by the end of the period. During the year ended December 31, 2013, the Profit Targets for the 1.2 million first anniversary shares were achieved and these shares are included in the computation of basic and diluted EPS for the year ended December 31, 2013. In accordance with ASC 260, the first anniversary shares were not included in the computation of basic or diluted EPS for the year ended December 31, 2012 and the second and third anniversary shares were not included in the computation of basic or diluted EPS for the year ended December 31, 2013 and 2012.

As described in Note 21, in June 2013 FXCM Inc. issued $172.5 million principal amount of 2.25% Senior Convertible Notes maturing on June 15, 2018 (the "Convertible Notes"). The Convertible Notes will be convertible at an initial conversion rate of 53.2992 shares of the Corporation's Class A common stock per $1,000 principal amount of the Convertible Notes, which is equivalent to an initial conversion price of approximately $18.76. In accordance with ASC 260, the shares of the Corporation's Class A common stock issuable upon conversion of the Convertible Notes is included in the calculation of diluted EPS to the extent that the conversion value of the securities exceeds the principal amount. For diluted EPS purposes, the number of shares of the Corporation's Class A common stock that is necessary to settle such excess is considered issued. For the year ended December 31, 2013, the conversion value did not exceed the principal amount and therefore the conversion effect was not included in the computation of diluted EPS because it was antidilutive under the treasury method.

As described in Note 21, the Company also entered into a warrant transaction whereby the Company sold to the counterparties warrants to purchase shares of the Corporation's Class A common stock. For the year ended December 31, 2013, the warrants were not included in the computation of diluted EPS because they were antidilutive under the treasury method.

Additionally, as discussed in Note 2, the Existing Unit Holders also entered into an Exchange Agreement under which they (or certain permitted transferees thereof) have the right, from and after the first anniversary of the date of the closing of the IPO, (subject to the terms of the Exchange Agreement as described therein) to exchange their Holding Units for shares of the Corporation's Class A common stock on a one-for-one basis at fair value, subject to customary conversion rate adjustments for stock splits, stock dividends and reclassifications. These shares were also excluded from the computation of dilutive EPS because they were anti-dilutive under the treasury method. During the years ended December 31, 2013 and 2012, certain members of Holdings exchanged 10.1 million and 10.8 million of their Holding Units, on a one-for-one basis, for shares of Class A common stock of the Corporation under the Exchange Agreement (see Note 15).

F-34

TABLE OF CONTENTS

FXCM Inc.

Notes to Consolidated Financial Statements

**Note 14. Earnings per Share - (continued)**

The following is a reconciliation of the numerator and denominator used in the basic and diluted EPS calculations, with amounts in thousands except per share data:

| | Year Ended December 31, 2013 | Year Ended December 31, 2012 | Year Ended December 31, 2011 |
|---|---|---|---|
| **Basic and diluted net income per share:** | | | |
| **Numerator** | | | |
| Net income available to holders of Class A common stock | $ 14,832 | $ 8,958 | $ 12,736 |
| Earnings allocated to participating securities | — | — | — |
| Earnings available for common stockholders | $ 14,832 | $ 8,958 | $ 12,736 |
| **Denominator for basic net income per share of Class A common stock** | | | |
| Weighted average shares of Class A common stock | 32,789 | 24,086 | 16,567 |
| Add dilutive effect of the following: | | | |
| Stock options | 616 | — | — |
| Lucid contingently issuable shares | 552 | — | — |
| Convertible note hedges | — | — | — |
| Warrants | — | — | — |
| Assumed conversion of Holding Units for Class A common stock | — | — | — |
| Dilutive weighted average shares of Class A common stock | 33,957 | 24,086 | 16,567 |
| **Basic income per share of Class A common stock** | $ 0.45 | $ 0.37 | $ 0.77 |
| **Diluted income per share of Class A common stock** | $ 0.44 | $ 0.37 | $ 0.77 |

**Note 15. Related Party Transactions**

Amounts receivable from, and payable to, related parties are set forth below, with amounts in millions:

| | December 31, 2013 | December 31, 2012 |
|---|---|---|
| **Receivables** | | |
| Advances to partners | $ 0.9 | $ — |
| Advances to employees | 0.8 | 0.9 |
| | $ 1.7 | $ 0.9 |
| **Payables** | | |
| Guaranty agreements | $ 8.4 | $ 9.0 |
| Employees | 0.7 | 0.3 |
| Shareholders with greater than 5% ownership in the Company | 0.2 | 0.7 |
| Due to Lucid non-controlling members in connection with the allocation of net income to Lucid non-controlling members for services provided | 9.8 | — |
| Due to Lucid non-controlling members in connection with trade settlements | 0.2 | 9.6 |
| Notes payable to Lucid non-controlling members in connection with the Acquisition | 9.8 | 22.9 |
| Tax receivable agreement | 150.3 | 100.8 |
| Follow-on Payment | 3.7 | |
| | $ 183.1 | $ 143.3 |

The Company has advanced funds for withholding taxes for several partners. The outstanding balance as of December 31, 2013, included in the table above, is included in Accounts receivable, net in the consolidated statements of financial condition.

F-35

Cited in In re Global Brokerage 17CV916 Decided 3/18/21

Archived on 3/23/21

This document is protected by copyright. Further reproduction is prohibited without permission.

TABLE OF CONTENTS

FXCM Inc.

**Notes to Consolidated Financial Statements**

**Note 15. Related Party Transactions - (continued)**

The Company has advanced funds to several employees. The outstanding balances as of December 31, 2013 and 2012, included in the table above, are included in Accounts receivable, net in the consolidated statements of financial condition.

Customer account liabilities included in the consolidated statements of financial condition include balances for employees and shareholders with greater than 5% ownership in the Company.

UK is party to an arrangement with Global Finance Company (Cayman) Limited, ("Global Finance"), and Master Capital Group, S.A.L. ("Master Capital"). A shareholder of the Company beneficially owns more than 90% of the equity of Global Finance and Master Capital. Pursuant to such arrangement, Global Finance and Master Capital are permitted to use the brand name "FXCM" and our technology platform to act as the Company's local presence in certain countries in the Middle East and North Africa ("MENA"). UK collects and remits to Global Finance and Master Capital fees and commissions charged by Global Finance and Master Capital to customers in MENA countries. For the years ended December 31, 2013, 2012 and 2011, these fees and commissions were approximately $1.6 million, $2.5 million and $3.5 million, respectively, and are included in the consolidated statements of operations.

In March 2012, the Company entered into a settlement agreement with the former owners of ODL in connection with the acquisition of ODL by the Company in October 2010. The settlement agreement serves to settle outstanding claims arising out of the acquisition of ODL related to certain warranties and indemnities pursuant to the share and purchase agreement. The settlement to the Company included cash of $1.2 million, return of capital, (i.e., equity interest of Holdings) of $4.0 million, and the forgiveness of the payment of a liability by the Company to the former owners in the amount of $1.4 million. The Company recorded a gain of $1.4 million for the year ended December 31, 2012, included in Other income in the consolidated statements of operations, in connection with this settlement. In addition, the settlement required ODL to establish a collateral account for the benefit of the Company to pay certain outstanding third party claims up to an agreed upon amount. For the year ended December 31, 2013, the Company recorded a net loss of $0.2 million, included in Other income in the consolidated statements of operations, related to this settlement.

In August 2012, the Company entered into a master guaranty agreement (the "Method Guaranty") with Method Credit Fund ("Method"), a Cayman Island company, owned by certain directors and shareholders of the Company, including several of the Company's executive officers. Pursuant to the Method Guaranty, Method unconditionally guaranteed the obligations of certain counterparties that maintained a margin account with the Company. The Method Guaranty required Method to maintain a cash collateral account held by the Company equal to the aggregate amount of margin extended to all counterparties covered by the Method Guaranty. In exchange for this unconditional guaranty, the Company remitted a fee to Method determined on a counterparty by counterparty basis which was agreed upon by the Company, Method and the respective counterparty. The agreement was terminated in November 2013 and upon termination, the aggregate amount of margin extended under the Method Guaranty was reduced to zero. As of December 31, 2012, the aggregate amount of margin extended under the Method Guaranty was $1.1 million. During the years ended December 31, 2013 and 2012, no payments were made by Method to the Company to satisfy a guaranteed counterparty obligation. For the years ended December 31, 2013 and 2012, fees collected from counterparties and subsequently remitted to Method by the Company under the Method Guaranty were not material and are included in Referring broker fees in the consolidated statement of operations. As of December 31, 2012, the Company held cash collateral in the amount of $9.0 million which is included Cash and cash equivalents, held for customers and Customer account liabilities in the consolidated statements of financial condition.

In November 2013, the Company entered into a master guaranty agreement (the "Monetary Guaranty") with Monetary Credit Group LLC ("Monetary"), a newly formed Texas limited liability company, owned by certain directors and shareholders of the Company, including several of the Company's executive officers. Pursuant to the Monetary Guaranty, Monetary unconditionally guarantees the obligations of certain counterparties that maintain a margin account with the Company. The Monetary Guaranty requires Monetary to maintain a cash collateral account held by the Company equal to the aggregate amount of margin extended to all counterparties covered by the Monetary Guaranty. In exchange for this unconditional guaranty, the Company remits a fee to Monetary determined on a counterparty by counterparty basis which is agreed upon by the Company, Monetary and the respective counterparty. The Monetary Guaranty may be terminated by either the Company or Monetary at any time provided that if Monetary elects to terminate there are no guaranteed obligations outstanding. As of December 31, 2013, the aggregate amount of margin extended under the Monetary Guaranty was $4.5 million. During the year ended December 31, 2013, no payments were made by Monetary to the Company to satisfy a guaranteed counterparty obligation. For the year ended December 31, 2013, fees collected from counterparties and subsequently remitted to Monetary

F-36

TABLE OF CONTENTS

FXCM Inc.

**Notes to Consolidated Financial Statements**

**Note 15. Related Party Transactions - (continued)**

by the Company under the Monetary Guaranty were not material and are included in Referring broker fees in the consolidated statements of operations.

As of December 31, 2013, the Company held cash collateral in the amount of $8.4 million which is included in Cash and cash equivalents, held for customers and Customer account liabilities in the consolidated statements of financial condition. In January 2014, $2.4 million of the cash collateral was returned to one of the former members of Method and the balance was reduced to $6.0 million.

Accounts payable and accrued expenses in the consolidated statements of financial condition include a balance of $0.2 million and $9.6 million of advances from certain Lucid non-controlling members in connection with trade settlements as of December 31, 2013 and December 31, 2012, respectively. Accounts payable and accrued expenses also include a balance of $9.8 million and nil related to the Allocation of net income to Lucid members for services provided as of December 31, 2013 and December 31, 2012, respectively (see Note 3).

Notes payable of $9.8 million and $22.9 million included in the consolidated statements of financial condition as of December 31, 2013 and December 31, 2012, respectively, represent the amount borrowed from the Lucid non-controlling members in connection with the Acquisition (see Notes 5 and 21).

Other liabilities in the consolidated statements of financial condition include the Follow-on Payment of $3.7 million and nil as of December 31, 2013 and December 31, 2012, respectively, related to the Faros acquisition (see Note 5).

**Exchange Agreement**

As discussed in Note 2, Existing Unit Holders entered into an Exchange Agreement under which they (or certain permitted transferees thereof) have the right, from and after the first anniversary of the date of the closing of the IPO (subject to the terms of the exchange agreement as described therein), to exchange their Holding Units for shares of the Corporation's Class A Common Stock on a one-for-one basis at fair value, subject to customary conversion rate adjustments for stock splits, stock dividends and reclassifications. During the years ended December 31, 2013 and 2012, certain members of Holdings exchanged 10.1 million and 10.8 million, respectively of their Holding Units, on a one-for-one basis, for shares of Class A common stock of the Corporation under the Exchange Agreement.

**Payments under Tax Receivable Agreement**

As discussed in Note 2, the Corporation entered into a tax receivable agreement with the Existing Unit Holders. The aggregate amounts due under the tax receivable agreement were $150.3 million and $100.8 million as of December 31, 2013 and 2012, respectively. Amounts due under the tax receivable agreement become payable upon the realization of the tax benefit by the Corporation. During the years ended December 31, 2013 and 2012, the Corporation made payments of $3.8 million and nil, respectively, to Existing Unit Holder related to the tax receivable agreement.

**Note 16. Stock-Based Compensation**

The Company has a long term incentive plan (the "LTIP") that provides for the grant of stock options to purchase shares of the Corporation's Class A common stock to its employees ("Employee Stock Options") and the independent members of the board of directors ("Independent Directors Options") (collectively, the "Stock Options"). The Employee Stock Options have a contractual term of seven years and a four-year graded vesting schedule. The Independent Directors Options also have a seven-year contractual term but cliff vest on the first anniversary after the grant date. Under the terms of the LTIP, the Company may issue new shares or treasury shares upon share option exercise.

During the year ended December 31, 2013, the Company granted 105,636 Independent Director Options and 425,000 Employee Stock Options to purchase shares of the Corporation's Class A common stock to employees. During the year ended December 31, 2012, the Company granted 109,488 Independent Director Options and 725,000 Employee Stock Options to purchase shares of the Corporation's Class A common stock to employees.

F-37

Cited in In re balance coverage
17Cv916 Denied on 3/2/21
Archived on 3/2/21
This document is protected by copyright.
Further reproduction is prohibited without permission.

TABLE OF CONTENTS

FXCM Inc.

**Notes to Consolidated Financial Statements**

**Note 16. Stock-Based Computation - (continued)**

The following table summarizes the Company's stock options activity as of December 31, 2013 and changes for the year then ended:

| Options | Shares | | Weighted-Average Exercise Price | Weighted-Average Remaining Contractual Term |
|---|---|---|---|---|
| Outstanding at January 1, 2013 | 9,178,128 | $ | 13.37 | 2.1 |
| Granted | 531,636 | $ | 14.87 | |
| Exercised | (1,702,714) | $ | 13.21 | |
| Forfeited or expired | (399,250) | $ | 13.78 | |
| Outstanding as of December 31, 2013 | 7,607,800 | $ | 13.48 | 4.3 |
| Vested or expected to vest at December 31, 2013 | 7,485,369 | $ | 13.49 | 4.3 |
| Exercisable as of December 31, 2013 | 4,445,164 | $ | 13.77 | 4.0 |

The weighted-average grant date fair value of options granted during the years 2013, 2012, and 2011 was $5.67, $3.55 and $4.26, respectively. As of December 31, 2013, the weighted average period over which compensation cost on non-vested Stock Options is expected to be recognized is 1.6 years and the unrecognized expense is $12.9 million. The Company had 6,308,628 and 2,046,250 vested stock options under the LTIP during the years ended December 31, 2013 and 2012, respectively. The fair value of the options vested under the LTIP was $32.4 million and $21.3 million during the years ended December 31, 2013 and 2012, respectively.

Stock-based compensation before income taxes included in Compensation and benefits in the consolidated statements of operations was $10.4 million, $9.8 million and $9.1 million for the years ended December 31, 2013, 2012 and 2011, respectively, for the Employee Stock Options. Stock-based compensation before income taxes included in Compensation and benefits in the consolidated statements of operations was $0.4 million for each year ended December 31, 2013, 2012 and 2011, respectively, for the Independent Directors. The total compensation cost capitalized and included in Office, communication and computer equipment, net, in the consolidated statements of financial condition was $1.4 million for the years ended December 31, 2013 and 2012. The total compensation cost capitalized and included in Office, communication and computer equipment, net in the consolidated statements of financial condition was $1.1 million for the year ended December 31, 2011.

In arriving at stock-based compensation expense, the Company estimates the number of stock-based awards that will be forfeited due to employee turnover. The Company's forfeiture assumption is based primarily on its turn-over historical experience. If the actual forfeiture rate is higher than the estimated forfeiture rate, then an adjustment will be made to increase the estimated forfeiture rate, which will result in a decrease to the expense recognized in the Company's financial statements. If the actual forfeiture rate is lower than the estimated forfeiture rate, then an adjustment will be made to lower the estimated forfeiture rate, which will result in an increase to expense recognized in the Company's financial statements. The expense the Company recognizes in future periods will be affected by changes in the estimated forfeiture rate and may differ significantly from amounts recognized in the current period.

Cash proceeds received from the exercise of Stock Options and the income tax benefits realized from the exercise of Stock Options were $22.5 million and $1.5 million, respectively, for the year ended December 31, 2013. The Company did not have any cash proceeds or income tax benefits realized from the exercise of Stock Options for the years ended December 31, 2012 and 2011.

**Valuation Assumptions**

F-38

Cited in In re Global Brokerage,
17CV916 Decided 3/16/2021

Archived on 3/23/21

This document is protected by copyright.
Further reproduction is prohibited without permission.

TABLE OF CONTENTS

FXCM Inc.

**Notes to Consolidated Financial Statements**

**Note 16. Stock-Based Computation - (continued)**

Calculating the fair value of Employee Stock Options requires estimates and significant judgment. The Company uses the Black-Scholes option pricing model to estimate the fair value of its employee stock options, consistent with the provisions of ASC 718. The fair value of the Stock Options grant is estimated on the date of the grant using the Black-Scholes option pricing model, and is not remeasured as a result of subsequent stock price fluctuations. Options granted to the Company's independent directors are considered options granted to employees under ASC 718 as defined therein.

Assumptions used in the Black Scholes valuation model were as follows:

| | Employee Stock Options | | | Independent Directors Options | | |
| | For the Years Ended | | | For the Years Ended | | |
| | 2013 | 2012 | 2011 | 2013 | 2012 | 2011 |
|---|---|---|---|---|---|---|
| Expected term in years | 4.75 | 4.75 | 4.75 | 4.00 | 4.00 | N/A |
| Risk-free interest rate | 1.06% | 0.71% | 0.96% | 0.63% | 0.60% | N/A |
| Expected volatility | 51.00% | 52.00% | 56.00% | 54.00% | 63.00% | N/A |
| Dividend yield | 1.55% | 2.48% | 2.24% | 2.05% | 2.40% | N/A |
| Estimated fair value at grant date | $ 6.02 | $ 3.47 | $ 4.26 | $ 4.26 | $ 4.11 | N/A |

Expected term for the Employee Stock Options and Independent Directors Options is based on the simplified method outlined in ASC 718. In accordance with ASC 718, options are considered to be exercised halfway between the average vesting date and the contractual term of each option grant. The simplified method is applicable for "plain vanilla" stock options, as defined in ASC 718, only if the Company does not have sufficient historical data upon which to estimate an expected term. Given that the Corporation's Class A common stock has been publicly traded for approximately three years, the Company believes that the simplified method is an applicable methodology to estimate the expected term of the options as of the grant date.

The risk free interest rates for the Employee Stock Options and Independent Directors Options are based on U.S. Treasury instruments whose terms are consistent with the expected lives of the Stock Options.

Expected volatility is based on a weighing of the historical and implied volatilities of the Company and for a set of public guideline companies deemed comparable to it. The guideline companies selected operate in a similar industry, pursue similar market opportunities, and are subject to similar risks of the Company. Changes in the subjective assumptions required in the valuation models may significantly affect the estimated value of the Company's Stock Options, the related stock-based compensation expense and, consequently, its results of operations and comprehensive income.

The dividend yield is determined based on the Company's expected dividend payouts.

The LTIP also provides for other stock based awards ("Other Equity Awards") which may be granted by the Company's Executive Compensation Committee (the "Committee"). Pursuant to the terms of the LTIP, the Committee may grant Other Equity Awards that are valued in whole or in part by reference to or that are otherwise based on the fair market value of the Corporation's Class A common stock. The Company did not grant any Other Equity Awards during the year ended December 31, 2013. During the year ended December 31, 2012, the Company granted 945,847 of the Corporation's Class A common stock with a per share fair market value of $11.76 as Other Equity Awards. The Other Equity Awards were fully vested at the date of the grant. Other equity awards compensation expense included in Compensation and benefits in the consolidated statements of operations was nil and $11.1 million for the years ended December 31, 2013 and 2012, respectively.

**Note 17. Stockholders' Equity**

Refer to the description of the Reorganization and IPO as described in Note 2 for further information regarding the current capital structure of the Company.

The Corporation's authorized capital stock consists of 3,000,000,000 shares of Class A common stock, par value $.01 per share, 1,000,000 shares of Class B common stock, par value $.01 per share, and 300,000,000 shares of preferred stock, par value $.01 per share.

F-39

Cited in re Global Brokerage...
17cv916 Decision 3/23/21
Archived on 3/23/2021
This document is protected by copyright.
Further reproduction is prohibited without permission.

TABLE OF CONTENTS

**FXCM Inc.**

**Notes to Consolidated Financial Statements**

**Note 17. Stockholders' Equity - (continued)**

*Class A Common Stock Repurchase Program*

On May 17, 2011 and October 17, 2011, the Company's Board of Directors approved the repurchase of $30.0 million and $20.0 million of its Class A common stock (the "Stock Repurchase Program"), respectively. On November 7, 2012, the Board of Directors approved a $30.0 million increase in the Stock Repurchase Program for an aggregate of $80.0 million. Purchases under the Stock Repurchase Program may be made from time to time in the open market and in privately negotiated transactions. Under the Stock Repurchase Program, there is no expiration date or other restrictions limiting the period over which the Company can make its share repurchase. The Stock Repurchase Program will expire only when and if the Company has repurchased $80.0 million of its shares under this program. Under the Stock Repurchase Program, repurchased shares are retired and returned to unissued stock. The size and timing of these purchases are based on a number of factors, including price, business and market conditions.

During the year ended December 31, 2013, the Company repurchased and retired 1,815,800 shares of its Class A common stock, at an average price of $15.46 per share, for approximately $28.1 million pursuant to the trading program under Rule 10b5-1 of the Securities Exchange Act of 1934, as amended. The following table presents the changes in the Company's Class A common stock shares outstanding during the year ended December 31, 2013, with amounts in thousands:

| Class A Common Stock | As of December 31, 2013 |
| --- | --- |
| Balance at January 1, 2013 | 34,684 |
| Issued | — |
| Repurchased | (1,816) |
| Exchange of Holdings units into Class A common stock | 10,094 |
| Stock options exercised | 1,703 |
| Balance at December 31, 2013 | 44,665 |

As of December 31, 2013 and 2012, there were 41 and 43 shares of Class B common stock issued and held by the members of Holdings, respectively.

Holders of shares of our Class A common stock and Class B common stock vote together as a single class on all matters presented to our stockholders for their vote or approval, except as otherwise required by applicable law.

*Class A Common Stock*

Holders of shares of the Corporation's Class A common stock are entitled to one vote for each share held of record on all matters submitted to a vote of stockholders. Holders of shares of Class A common stock are entitled to receive dividends when and if declared by the Corporation's board of directors out of funds legally available therefore, subject to any statutory or contractual restrictions on the payment of dividends and to any restrictions on the payment of dividends imposed by the terms of any outstanding preferred stock. Upon dissolution or liquidation or the sale of all or substantially all of the Corporation's assets, after payment in full of all amounts required to be paid to creditors and to the holders of preferred stock having liquidation preferences, if any, the holders of shares of Class A common stock will be entitled to receive pro rata the Corporation's remaining assets available for distribution. Holders of shares of Class A common stock do not have preemptive, subscription, redemption or conversion rights.

*Class B Common Stock*

Each holder of the Corporation's Class B common stock is entitled, without regard to the number of shares of Class B common stock held by such holder, to one vote for each Holding Unit in Holdings held by such holder. The unit holders of Holdings collectively have a number of votes in the Corporation that is equal to the aggregate number of Holding Units that they hold. Holders of our Class B common stock do not have any right to receive dividends or to receive a distribution upon a liquidation or dissolution of the Corporation.

F-39

TABLE OF CONTENTS

FXCM Inc.

**Notes to Consolidated Financial Statements**

**Note 18. Employee Benefit Plan**

The Company maintains a defined contribution employee profit-sharing and savings 401(k) plan for all eligible full time employees. The Company was not required to and made no contributions to the plan for the years ended December 31, 2013, 2012 and 2011.

**Note 19. Net Capital Requirements**

Our regulated entities are subject to minimum capital requirements in their respective jurisdictions. The minimum capital requirements of the entities below may effectively restrict the payment of cash distributions by the subsidiaries. The tables below present the capital, as defined by the respective regulatory authority, the minimum capital requirement and the excess capital for US, HK, UK, Australia, ODL, FSL, FXCMJ, Lucid LLP and Faros as of December 31, 2013 and 2012, with amounts in millions:

| | December 31, 2013 | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|
| | US | HK | UK | Australia | ODL | FSL | FXCMJ | Lucid LLP | Faros |
| Capital | $ 64.2 | $ 33.6 | $ 86.0 | $ 4.7 | $ 18.4 | $ 34.8 | $ 36.3 | $ 41.8 | $ 0.1 |
| Minimum capital requirement | 27.1 | 12.3 | 24.7 | 0.4 | 6.9 | 8.2 | 5.6 | 4.2 | — |
| Excess capital | $ 37.1 | $ 21.3 | $ 61.3 | $ 4.3 | $ 11.5 | $ 26.6 | $ 30.7 | $ 37.6 | $ 0.1 |

| | December 31, 2012 | | | | | | |
|---|---|---|---|---|---|---|---|
| | US | HK | UK | Australia | ODL | FSL | FXCMJ |
| Capital | $ 53.5 | $ 22.7 | $ 73.1 | $ 4.2 | $ 14.1 | $ 30.7 | $ 33.5 |
| Minimum capital requirement | 26.1 | 8.1 | 17.4 | 1.2 | 4.4 | 4.4 | 5.6 |
| Excess capital | $ 27.4 | $ 14.6 | $ 55.7 | $ 3.0 | $ 9.7 | $ 26.3 | $ 27.9 |

**Note 20. Commitments and Contingencies**

*Operating Lease Commitments*

The Company leases office space and equipment under operating leases. Some of the lease agreements contain renewal options ranging from 3 to 5 years at prevailing market rates. The leases for the office facilities are subject to escalation factors primarily related to property taxes and building operating expenses. Future minimum lease payments under non-cancelable operating leases with terms in excess of one year are as follows as of December 31, 2013, with amounts in thousands:

| Year Ending December 31, | As of December 31, 2013 |
|---|---|
| 2014 | $ 7,186 |
| 2015 | 5,847 |
| 2016 | 4,685 |
| 2017 | 3,807 |
| 2018 | 3,612 |
| Thereafter | 23,240 |
| | $ 48,377 |

F-41

Cited in In re Global Brokerage
17CV916 Decided 3/23/21
Archived on 3/23/21
This document is protected by copyright.
Further reproduction is prohibited without permission.

TABLE OF CONTENTS

**FXCM Inc.**

**Notes to Consolidated Financial Statements**

**Note 20. Commitments and Contingencies - (continued)**

The aggregate operating lease expense, net of sublease income, included in General and administrative expense in the consolidated statements of operations, for the years ended December 31, 2013, 2012 and 2011, was $8.3 million, $7.9 million and $8.9 million, respectively. There was no sublease income for the years ended December 31, 2013 and 2012 and sublease income was not material for the year ended Decembers 31, 2011. For the years ended December 31, 2013 and 2012, there were no sublease commitments. The Company leases its corporate office location under an operating lease agreement expiring in May 2026.

*Capital Lease Commitments*

The Company leases office equipment under capital leases. Interest paid as part of our capital lease obligation was not material for the years ended December 31, 2013, 2012, and 2011, respectively. The capital leases expire in 2015. Future minimum lease payments for capital leases are not material for the years 2014 and 2015.

*Other*

The Company holds an interest in an inactive entity that formerly provided online FX educational services ("Online Courses"). Online Courses meets the definition of a VIE under ASC 810 and the Company is considered the primary beneficiary. The members who own the remaining interest in Online Courses have a put option to sell their interest to the Company upon a change in control of Holdings. A change in control occurs when the number of Holdings units held by unit holders as of the date of the Online Courses operating agreement, November 17, 2008, ceases to make up at least 50% of the voting or vested economic interest securities of Holdings. Under U.S. GAAP, the value of the put option is recognized upon the change in control and the exercise of the put option.

Assuming both a change in control and the exercise of the put option at December 31, 2013, the Company would have been obligated to purchase the remaining interest for approximately $3.3 million. Pursuant to the terms of the Online Courses operating agreement, the put option payment accretes interest at a rate of 15% per annum. Based on the status (inactive and no assets) of Online Courses, a put option payment would most likely result in a charge to earnings.

**Note 21. Debt**

*Credit Agreement*

On December 19, 2011, Holdings entered into a three year credit agreement (the "Credit Agreement") with a syndicate of financial institutions. The Credit Agreement provided for a revolving credit facility of up to $75.0 million. The credit facility is guaranteed by certain subsidiaries of Holdings and is secured by a pledge of all of the equity interests in certain of Holdings' domestic subsidiaries and 65% of the voting equity interests in certain of its foreign subsidiaries.

On November 8, 2012, Holdings entered into an amendment to the Credit Agreement (the "2012 Amendment"). The 2012 Amendment provided Holdings with the ability to increase the credit facility during the term of the Credit Agreement up to a maximum of $175.0 million. Additionally, the 2012 Amendment modified certain terms of the Credit Agreement, among other things, to provide additional flexibility regarding financing and investment initiatives. Simultaneously, on November 8, 2012, Holdings received additional commitments from a group of financial institutions, both new and existing lenders, and increased the credit facility to $155.0 million.

On November 15, 2013, Holdings entered into an amendment to the Credit Agreement (the "2013 Amendment"). The 2013 amendment extended the final maturity date of the credit facility to December 2016 and provided Holdings with the ability to increase the credit facility during the term of the Credit Agreement up to a maximum of $250.0 million. Additionally, the 2013 Amendment modified certain terms of the Credit Agreement, among other things, to provide additional flexibility regarding financing and investment initiatives. Simultaneously, on November 15, 2013, Holdings received additional commitments from existing lenders and increased the credit facility to $205.0 million.

As of December 31, 2013 and 2012, Holdings' outstanding balance under the Credit Agreement was nil and $85.0 million, respectively.

F-42

Cited in rebuttal to average
17CV916 DTB 3.14.17
Archived on 3/17/2021
This document is protected by copyright.
Further reproduction is prohibited without permission.

TABLE OF CONTENTS

FXCM Inc.

**Notes to Consolidated Financial Statements**

**Note 21. Debt - (continued)**

Under the terms of the Credit Agreement, loans will bear interest at either a Eurodollar Rate or a Base rate (as defined below), at Holdings' election, plus an applicable margin, based on Holdings' leverage ratio. In addition, Holdings must pay an annual commitment fee based on Holdings' leverage ratio on the undrawn commitments under the Credit Agreement. The applicable margin and commitment fees are set forth in the table below:

| Consolidated Leverage Ratio | Commitment Fee | Applicable Margin for Eurodollar Loans | Applicable Margin for Base Rate Loans |
|---|---|---|---|
| Less than .50 to 1.00 | 0.25% | 1.75% | 0.75% |
| Greater than or equal to 0.50 to 1.00 but less than 1.00 to 1.00 | 0.30% | 2.00% | 1.00% |
| Greater than or equal to 1.00 to 1.00 but less than 1.50 to 1.00 | 0.35% | 2.25% | 1.25% |
| Greater than or equal to 1.50 to 1.00, but less than 2.00 to 1.00 | 0.40% | 2.50% | 1.50% |
| Greater than or equal to 2.00 to 1.00 | 0.45% | 2.75% | 1.75% |

The Base Rate means for any day a fluctuating rate per annum equal to the highest of (a) the Federal Funds Rate, as defined in the Credit Agreement, plus 0.5%, (b) the rate of interest in effect for such day as publicly announced from time to time by the administrative agent, Bank of America, N.A., as its prime rate, and (c) the Eurodollar Rate means the rate per annum equal to (i) the British Bankers Association LIBOR Rate, or (ii) if such rate is not available, the rate per annum determined by the administrative agent.

Interest expense related to borrowings under the Credit Agreement, including the amortization of debt financing costs, included in Interest on borrowings in the consolidated statements of operations was $1.4 million, $1.2 million and nil for the years ended December 31, 2013, 2012 and 2011, respectively.

Pursuant to covenants in the Credit Agreement, Holdings' is required to maintain: excess net capital amount of 125% of adjusted net capital required to be maintained as of the last day of any fiscal quarter for US and UK (see Note 19), Consolidated Interest Coverage Ratio and Consolidated Leverage Ratio, as defined in the Credit Agreement, of 4.00 to 1.00 and 2.50 to 1.00, respectively, as of the last day of any fiscal quarter, Net Unhedged Exposure, as defined in the Credit Agreement, of less than 20% of total assets of Holdings and its subsidiaries, and Net Unhedged Non-FX Exposure, as defined in the Credit Agreement, of less than 10% of total assets of Holdings and its subsidiaries. In addition, the Credit Agreement contains certain customary covenants as well as certain customary events of default. As of December 31, 2013, Holdings was in compliance with all material covenants.

During the year ended December 31, 2013, the weighted average dollar amount of borrowings related to the Credit Agreement was $34.9 million and the weighted average interest rate was 2.4%. During the year ended December 31, 2012, the weighted average dollar amount of borrowings related to the Credit Agreement was $41.2 million and the weighted average interest rate was 2.1%. For the year ended December 31, 2011 there were no amounts outstanding under the Credit Agreement.

*Senior Convertible Notes due 2018*

In June 2013, the Corporation issued $172.5 million principal amount of 2.25% Convertible Notes maturing on June 15, 2018 and received net proceeds of $166.5 million, after deducting the initial purchasers' discount and offering expenses. The Convertible Notes pay interest semi-annually on June 15 and December 15 at a rate of 2.25% per year, commencing December 15, 2013. The indenture governing the Convertible Notes does not prohibit the Company from incurring additional senior debt or secured debt, nor does it prohibit any of its subsidiaries from incurring additional liabilities.

The Convertible Notes will be convertible at an initial conversion rate of 53.2992 shares of the Corporation's Class A common stock per $1,000 principal amount of the Convertible Notes, which is equivalent to an initial conversion price of approximately $18.76. In addition, following certain corporate transactions that occur prior to the maturity date, the Corporation will, in certain circumstances, increase the conversion rate for a holder that elects to convert its Convertible Notes in connection with such corporate transaction. Upon conversion, the Corporation will deliver cash up to the principal amount.

F-43

TABLE OF CONTENTS

FXCM Inc.

**Notes to Consolidated Financial Statements**

**Note 21. Debt - (continued)**

With respect to any conversion value in excess of the principal amount, the Corporation will deliver shares of its Class A common stock (unless it elects to deliver cash in lieu of all or a portion of such shares).

Holders may convert their notes at their option prior to the close of business on the business day immediately preceding March 15, 2018, only under the following circumstances:

- during any fiscal quarter commencing after the fiscal quarter ending on September 30, 2013 (and only during such fiscal quarter), if the last reported sale price of the Corporation's Class A common stock for at least 20 trading days (whether or not consecutive) during the period of 30 consecutive trading days ending on the last trading day of the immediately preceding fiscal quarter is greater than or equal to 130% of the applicable conversion price on each applicable trading day;
- during the five business day period immediately after any five consecutive trading day period (the "measurement period") in which the "trading price" (as defined in the offering circular) per $1,000 principal amount of notes for each trading day of such measurement period was less than 98% of the product of the last reported sale price of the Corporation's Class A common stock and the applicable conversion rate on such trading day;
- upon the occurrence of specified corporate events; or
- on or after March 15, 2018 until the close of business on the second scheduled trading day immediately preceding the maturity date, holders may convert their notes at any time.

In addition, if the Company undergoes a fundamental change (as defined in the offering circular), holders may, subject to certain conditions, require the Corporation to repurchase their notes for cash at a price equal to 100% of the principal amount of the notes to be purchased, plus accrued and unpaid interest.

*Convertible Note Hedges*

In connection with the offering of the Convertible Notes, the Company entered into privately negotiated convertible note hedge transactions with certain counterparties (the "Convertible Note Hedge Transaction"). The Convertible Note Hedge Transactions will cover, subject to customary anti-dilution adjustments, the number of shares of the Corporation's Class A common stock that will initially underlie the Convertible Notes. Concurrently with entering into the Convertible Note Hedge Transaction, the Company also entered into a separate, privately negotiated warrant transaction (the "Warrant Transaction") with the same counterparties, whereby the Company sold to the counterparties warrants to purchase, subject to customary anti-dilution adjustments, up to the same number of shares of the Corporation's Class A common stock as in the Convertible Note Hedge Transaction. The strike price of the Warrant Transaction will initially be $21.24 per share of the Corporation's Class A common stock. Subject to certain conditions, the Company may settle the warrants in cash or on a net-share basis.

The Convertible Note Hedge Transaction and the Warrant Transaction have the effect of increasing the effective conversion price of the Convertible Notes to $21.24 per share. The cost of the Convertible Note Hedge Transaction and the proceeds from the Warrant Transaction was $29.1 million and $10.6 million, respectively. In accordance with ASC 815, the Company recorded the cost of the Convertible Note Hedge Transaction and the proceeds from the Warrant Transaction to additional-paid-in-capital in stockholders' equity in the consolidated statements of financial condition and the recorded values will not be adjusted for subsequent changes in their respective fair values.

The Convertible Note Hedge Transaction and the Warrant Transaction are separate transactions, in each case, entered into by the Company with certain counterparties, and are not part of the terms of the Convertible Notes and will not affect any holder's right under the Convertible Notes. Holders of the Convertible Notes will not have any rights with respect to the Convertible Hedge Transaction or the Warrant Transaction.

Under ASC 470 *Debt* ("ASC 470"), an entity must separately account for the liability and equity components of the convertible debt instruments (such as the Convertible Notes) that may be settled entirely or partially in cash upon conversion in a manner that reflects the issuer's economic interest cost. The effect of ASC 470 on the accounting for the Convertible Notes is that the fair value of the equity component is included in the additional paid-in capital section of stockholders' equity in the Company's consolidated statements of financial condition and the principal amount of the Convertible Notes is reduced by original issue discount to reflect the Convertible Notes' fair value at issuance. At issuance, the equity component of the

F-44

TABLE OF CONTENTS

FXCM Inc.

**Notes to Consolidated Financial Statements**

**Note 21. Debt - (continued)**

Convertible Notes was valued at $29.1 million and the Convertible Notes were valued at $144.1 million consisting of $172.5 million of principal net of original issuance discount of $29.1 million. The original issue discount will be amortized over the life of the Convertible Notes using the effective interest rate of 6.2%.

The balances of the liability and equity components as of December 31, 2013, were as follows, with amounts in thousands:

|  |  | December 31, 2013 |
|---|---|---|
| Liability component - principal | $ | 172,500 |
| Deferred bond discount |  | (26,197) |
| Liability component - net carrying value | $ | 146,303 |
| Equity component | $ | 29,101 |

Interest expense related to the Convertible Notes, included in Interest on borrowings in the consolidated statements of operations was as follows, with amounts in thousands:

|  |  | Year Ended December 31, 2013 |
|---|---|---|
| Interest expense - stated coupon rate | $ | 2,232 |
| Interest expense - amortization of deferred bond discount |  | 2,904 |
| Interest expense - amortization of debt issuance cost |  | 699 |
| Total interest expense - Convertible Notes | $ | 5,835 |

The Company incurred $6.0 million of Convertible Notes issuance cost. Amortization of Convertible Notes issuance costs included in Interest on borrowings in the consolidated statements of operations was $0.7 million for the year ended December 31, 2013. Unamortized Convertible Notes issuance cost was $5.3 million at December 31, 2013 and is included in Other assets in the consolidated statements of financial condition.

*Notes Payable*

As discussed in Note 5, in connection with the acquisition of Lucid, the Company issued to the Lucid sellers 3.5% unsecured promissory notes in the amounts of $71.4 million and $15.8 million maturing on December 21, 2012. On December 21, 2012, the Company repaid $64.0 million of these notes and issued a series of 2.25%, $22.9 million unsecured promissory notes for the balance. The notes were pre-paid on June 6, 2013 with a portion of the proceeds received from the Convertible Notes issued on June 3, 2013. In the second quarter of 2013, the Lucid purchase price was increased by $15.3 million due to the final determination of tax balances at the Acquisition Date adjusted during the measurement period. The Company issued six-month 2.25% unsecured promissory notes to the Lucid sellers for the purchase price increase which matured on December 21, 2013. In satisfaction of the matured notes, the Company repaid $5.5 million and issued a series of 2.25% unsecured promissory notes to the Lucid sellers for the balance of $9.8 million with a maturity date of June 6, 2014.

**Note 22. Derivative Financial Instruments**

Derivative financial instruments are accounted for in accordance with ASC 815 and are included in Due from/to brokers in the consolidated statements of financial condition. The Company recognizes all derivative financial instruments in the consolidated statements of financial condition as either assets or liabilities at fair value. The Company has master netting agreements with its respective counterparties under which derivative financial instruments are presented on a net-by-counterparty basis in accordance with ASC 210 and ASC 815. The Company enters into futures contracts to (i) economically hedge the open customer contracts on its CFD business and (ii) hedge trading in its electronic market making and institutional foreign exchange spot and futures markets. Futures contracts are exchanged traded contracts to either purchase or sell a specific asset at a specified future date for a specified price. Gains or losses on futures contracts related to the Company's CFD business are included in Retail trading revenue and gains or losses on hedge trading in its electronic market making and institutional foreign exchange spot and futures markets are included in Institutional trading revenue in the consolidated statements of operations.

F-45

Global Archive
Archived 3/23/21
This document is copyright.
Further reproduction is prohibited without permission

TABLE OF CONTENTS

FXCM Inc.

**Notes to Consolidated Financial Statements**

**Note 22. Derivative Financial Instruments - (continued)**

The following tables present the gross and net fair values of the Company's derivative transactions and the related offsetting amounts permitted under ASC 210 and ASC 815, as of December 31, 2013 and December 31, 2012. Under ASC 210, gross positive fair values are offset against gross negative fair values by counterparty pursuant to enforceable master netting agreements, with amounts in thousands:

| | Derivatives Classified in Due from/to brokers | | |
|---|---|---|---|
| | December 31, 2013 | | |
| | Assets | Liabilities | Net |
| Gross fair values | $ 84 | $ (2,404) | $ (2,320) |
| Netting agreements | (84) | 84 | — |
| Net fair values | $ — | $ (2,320) | $ (2,320) |

| | Derivatives Classified in Due from/to brokers | | |
|---|---|---|---|
| | December 31, 2012 | | |
| | Assets | Liabilities | Net |
| Gross fair values | $ 520 | $ (265) | $ 255 |
| Netting agreements | (265) | 265 | — |
| Net fair values | $ 255 | $ — | $ 255 |

For the years ended December 31, 2013, 2012 and 2011, total revenues of $489.6 million, $417.3 million, and $415.6 million in the consolidated statements of operations included net losses of $74.3 million, $46.3 million and $8.8 million respectively, related to derivative financial instrument transactions. The net notional value of the derivative financial instruments was $159.9 million and $119.5 million as of December 31, 2013 and 2012 respectively.

F-46

Cited in In re Global Brokerage 17CV916 Decided 3/18/21

Archived on 3/23/21

This document is protected by copyright.
Further reproduction is prohibited without permission.

TABLE OF CONTENTS

FXCM Inc.

**Notes to Consolidated Financial Statements**

**Note 23. Fair Value Measurements**

The following table presents the Company's assets and liabilities that are measured at fair value on a recurring basis and the related hierarchy levels, with amounts in thousands:

| | Fair Value Measurements on a Recurring Basis | | | |
| | As of December 31, 2013 | | | |
| | Quoted Prices in Active Markets for Identical Assets (Level I) | Significant Observable Inputs (Level II) | Significant Unobservable Inputs (Level III) | Total |
|---|---|---|---|---|
| **Financial Assets:** | | | | |
| Cash and cash equivalents | $ 365,245 | $ — | $ — | $ 365,245 |
| Cash and cash equivalents, held for customers | 1,190,880 | | — | 1,190,880 |
| Total assets | $ 1,556,125 | $ — | $ — | $ 1,556,125 |
| | | | | |
| **Financial Liabilities:** | | | | |
| Customer account liabilities | $ 1,190,880 | $ — | $ — | 1,190,880 |
| Due to brokers- open futures contracts | 2,320 | | — | 2,320 |
| Follow-on Payment | — | — | 3,672 | 3,672 |
| Total liabilities | $ 1,193,200 | $ — | $ 3,672 | $ 1,196,872 |

| | Fair Value Measurements on a Recurring Basis | | | |
| | As of December 31, 2012 | | | |
| | Quoted Prices in Active Markets for Identical Assets (Level I) | Significant Observable Inputs (Level II) | Significant Unobservable Inputs (Level III) | Total |
|---|---|---|---|---|
| **Financial Assets:** | | | | |
| Cash and cash equivalents | $ 272,332 | $ — | $ — | $ 272,332 |
| Cash and cash equivalents, held for customers | 1,190,762 | | — | 1,190,762 |
| Due from brokers- open futures contracts | 255 | | | 255 |
| Total assets | $ 1,463,349 | $ — | $ — | $ 1,463,349 |
| | | | | |
| **Financial Liabilities:** | | | | |
| Customer account liabilities | $ 1,190,762 | $ — | $ — | 1,190,762 |
| Total liabilities | $ 1,190,762 | $ — | $ — | 1,190,762 |

Cash and cash equivalents and cash and cash equivalents, held for customers are deemed to be Level I financial assets. Open futures contracts included in Due from brokers and Due to brokers, are classified as Level I financial assets and liabilities, respectively, as they are actively traded and valued at their quoted market prices.

F-47

Cited in In re Global Brokerage 17CV916 Dec. of 3/18/21

This document is protected by copyright. Further reproduction is prohibited without permission.

TABLE OF CONTENTS

FXCM Inc.

**Notes to Consolidated Financial Statements**

**Note 23. Fair Value Measurements - (continued)**

The following table presents the carrying value, fair value and fair value hierarchy category of certain financial instruments that are not measured at fair value in the consolidated statements of financial condition, with amounts in thousands:

| | As of December 31, 2013 | | Fair Value Measurements using: | | |
| | Carrying Value | Fair Value | Quoted Prices in Active Markets for Identical Assets (Level I) | Significant Observable Inputs (Level II) | Significant Unobservable Inputs (Level III) |
|---|---|---|---|---|---|
| **Financial Assets:** | | | | | |
| Due from brokers- unsettled spot FX | $ 5,450 | $ 5,450 | $ 5,450 | $ — | $ — |
| Equity method investments | 9,793 | 13,504 | — | — | 13,504 |
| Notes receivable | 11,942 | 11,942 | — | — | 11,942 |
| Total assets | $ 27,185 | $ 30,896 | $ 5,450 | $ — | $ 25,446 |
| | | | | | |
| **Financial Liabilities:** | | | | | |
| Due to brokers- unsettled spot FX | $ 6,332 | $ 6,332 | $ 6,332 | $ — | $ — |
| Notes payable | 9,800 | 9,800 | — | — | 9,800 |
| Senior convertible notes | 146,303 | 149,418 | — | 149,418 | — |
| Total liabilities | $ 162,435 | $ 165,550 | $ 6,332 | $ 149,418 | $ 9,800 |

Other assets, excluding equity method investments and notes receivable, are carried at contracted amounts, which approximate fair value. Equity method investments are carried at cost. Fair value is based on a DCF analysis. Notes receivables are carried at contracted amounts which approximate fair value, as the fair value is based on an assessment of the underlying collateral. Notes payable are carried at contracted amounts, which approximate fair value based on the relatively short amount of time until maturity. Senior convertible notes are carried at contractual amounts. The fair value of the Senior convertible notes are based on similar recently executed transactions and market price quotations (where observable) obtained from independent brokers.

The following table reconciles the ending balances of liabilities classified as Level III and identifies the total gains (losses) the Company recognized during the year ended December 31, 2013 on such liabilities that were included in the consolidated statements of financial condition as of December 31, 2013, respectively with amounts in thousands:

| | Beginning Balance | Additions | Net Unrealized/Realized (Gains) Losses | Total |
|---|---|---|---|---|
| Follow-on Payment | $ — | $ 10,631 | $ (6,959) | $ 3,672 |
| Total Level III liabilities | $ — | $ 10,631 | $ (6,959) | $ 3,672 |

As of December 31, 2013, the Follow-on Payment was valued using significant unobservable inputs based on a multiple of Faros' 2014 EBITDA. A hypothetical 10% change (increase or decrease) in either the multiple or EBITDA used in the calculation would result in approximately a 24% increase or decrease in the fair value of the Follow-on Payment. The net unrealized/realized gains (losses) are included in Other income in the consolidated statements of operations.

The Company did not have any transfers in or out of Level I, II and III during the year ended December 31, 2013.

Cited in re Global Brokerage, Inc.
Archived: 3/18/21
This document is protected by copyright.
Further reproduction is prohibited without permission.

F-48

TABLE OF CONTENTS

FXCM Inc.

**Notes to Consolidated Financial Statements**

**Note 24. Income Taxes**

Holdings operates in the U.S. as a limited liability company that is treated as a partnership for U.S. federal, state, and local income tax purposes. As a result, Holdings' income from its U.S. operations is not subject to U.S. federal income tax because the income is attributable to its members. Accordingly, the Company's U.S. tax provision is solely based on the portion of Holdings' income attributable to the Corporation and excludes the income attributable to other members of Holdings whose income is included in Net income attributable to non-controlling interest in FXCM Holdings, LLC in the consolidated statements of operations.

In addition to U.S. federal and state income taxes, the Company is subject to Unincorporated Business Tax which is attributable to Holdings' operations apportioned to New York City. The Company's foreign subsidiaries are also subject to local taxes.

Income before income taxes, as shown in the consolidated statements of operations, includes the following income components, with amounts in thousands:

| | | Years Ended December 31, | | | | |
|---|---|---|---|---|---|---|
| | | 2013 | | 2012 | | 2011 |
| Domestic | $ | 10,390 | $ | 19,794 | $ | 29,035 |
| Foreign | | 41,470 | | 27,670 | | 40,562 |
| | $ | 51,860 | $ | 47,464 | $ | 69,597 |

The provision for income taxes consists of the following, with amounts in thousands:

| | | Year Ended December 31, | | | | |
|---|---|---|---|---|---|---|
| | | 2013 | | 2012 | | 2011 |
| **Current** | | | | | | |
| Federal income tax (benefit) | $ | (185) | $ | 478 | $ | 238 |
| State and local income tax | | 682 | | 574 | | 1,384 |
| Foreign income tax | | 5,085 | | 764 | | 9,268 |
| Subtotal | $ | 5,582 | $ | 1,816 | $ | 10,890 |
| **Deferred** | | | | | | |
| Federal income tax | $ | 3,996 | $ | 2,837 | $ | 7,578 |
| State and local income tax (benefit) | | (235) | | (171) | | (1,802) |
| Foreign income tax (benefit) | | 7,211 | | 4,504 | | (5,850) |
| Subtotal | $ | 11,442 | $ | 7,170 | $ | (74) |
| Total provision for taxes | $ | 17,024 | $ | 8,986 | $ | 10,816 |

F-49

Cited in In re Global Brokerage
17Cv916 Decided 3/18/21
Archived on 3/23/21
This document is protected by copyright.
Further reproduction is prohibited without permission.

TABLE OF CONTENTS

FXCM Inc.

Notes to Consolidated Financial Statements

**Note 24. Income Taxes - (continued)**

The following table reconciles the provision for income taxes to the U.S. federal statutory tax rate:

| | Year Ended December 31, | | |
| --- | --- | --- | --- |
| | 2013 | 2012 | 2011 |
| Statutory U.S. federal income tax rate | 34.0 % | 34.0 % | 34.0 % |
| Income passed through to non-controlling members | (5.4) | (15.5) | (13.0) |
| State and local income tax | 0.9 | 1.0 | 2.1 |
| Foreign income tax | (1.4) | (3.1) | (0.2) |
| Release of valuation allowance | — | — | (11.8) |
| Non- deductible FCA fine | 2.0 | — | — |
| Foreign tax credit valuation allowance | 3.5 | 2.5 | 0.8 |
| Impact of rate change on deferred tax assets | (0.9) | — | 4.0 |
| Other | 0.1 | — | (0.4) |
| Effective tax rate | 32.8 % | 18.9 % | 15.5 % |

The increase in the effective tax rate for the year ended December 31, 2013 compared to the year ended December 31, 2012 was primarily due to an increase in the Corporation's ownership in Holdings, a valuation allowance established on the Company's foreign tax credits and the non-deductible FCA penalty the Company accrued. The increase in the Corporation's ownership in Holdings is due to Holdings' members exchanging their membership units for the Corporation's Class A common stock. The Company's effective tax rate increases as additional exchanges occur because the portion of Holdings' income attributable to the Corporation, and therefore taxable, increases. The effect of Holdings member unit exchanges is partially offset by the Corporation's Class A common stock repurchases. Anytime the Corporation repurchases shares of its Class A common stock, Holdings enters into an equivalent Holdings membership unit transaction with the Corporation. The effect of these repurchases decreases the Corporation's ownership in Holdings and, accordingly, decreases the portion of Holdings' income attributable to the Corporation (see Note 4). In addition, the Company's effective tax rate increased due to the Company earning a higher portion of its income from subsidiaries (primarily Lucid) taxed locally as corporations in their respective foreign jurisdictions in 2013. This increase in tax on foreign sourced income is somewhat offset by a lower statutory tax rate in effect in the U.K. for the years ended December 31, 2013 and 2012. The Company's effective tax rate for the year ended December 31, 2011 reflects the release of a valuation allowance relating to FXCMJ's tax loss carryforwards.

F-50

Cited in In re Global Brokerage
17CV916 Decided 3/18/21
Archived on 3/23/21
This document is protected by copyright.
Further reproduction is prohibited without permission.

Case 1:17-cv-00916-RA-BCM   Document 233-15   Filed 03/29/21   Page 134 of 150

TABLE OF CONTENTS

FXCM Inc.

**Notes to Consolidated Financial Statements**

**Note 24. Income Taxes - (continued)**

Deferred tax assets and liabilities are determined based on the differences between the financial statements and tax basis of assets and liabilities using enacted tax rates in effect for the year in which the differences are expected to reverse. A summary of the tax effects of the temporary differences is as follows, with amounts in thousands:

|  | Years Ended December 31, | |
|  | 2013 | 2012 |
|---|---|---|
| **Deferred tax assets** | | |
| Equity based compensation | $ 1,059 | $ 1,259 |
| Investment in partnership | 178,941 | 118,327 |
| Fixed assets | 2,279 | 4,009 |
| Tax loss carryforwards | 25,631 | 7,761 |
| Tax credit carryforward/foreign sub income | 4,265 | 2,083 |
| Japan software | 1,516 | 3,083 |
| Other | 577 | 140 |
| **Gross deferred tax assets** | $ 214,268 | $ 136,662 |
| **Less: valuation allowance** | (25,288) | (8,843) |
| **Net deferred tax asset** | $ 188,980 | $ 127,819 |
| **Deferred tax liabilities** | | |
| Fixed assets | $ 4 | $ 65 |
| Intangible assets | 3,965 | 6,292 |
| Goodwill | 8,742 | 12,563 |
| Software development cost | 238 | 193 |
| Other | 1,232 | 338 |
| **Gross deferred tax liabilities** | $ 14,181 | $ 19,451 |
| Net deferred tax asset | $ 174,799 | $ 108,368 |

The increase in deferred tax assets was primarily driven by the increase in the Corporation's ownership in Holdings as a result of members of Holdings exchanging their membership units for the Corporation's Class A common stock. As Existing Unit Holders exchange their membership units, the Company records a deferred tax benefit related to Holdings election under Section 754 of the Internal Revenue Code (see Note 2). The increase in net operating loss carryforwards also contributed to the increase.

The Company assesses available positive and negative evidence to estimate if it is more-likely-than-not to use certain jurisdiction based deferred tax assets including certain tax credits and net operating loss carryovers. On the basis of this assessment, a valuation allowance of $25.3 million was recorded as of December 31, 2013.

As of December 31, 2013, the Company has $129.8 million of foreign net operating loss carryforwards. The net operating loss carryforwards have various expiration dates through 2033 with the net operating losses generated by certain of our U.K. subsidiaries having indefinite carryforward periods.

F-51

TABLE OF CONTENTS

FXCM Inc.

**Notes to Consolidated Financial Statements**

**Note 24. Income Taxes - (continued)**

The tax credit carryforward includes foreign tax credits of $3.6 million that may be carried forward for a period of 10 years and begin to expire in 2021 and unincorporated business tax credits of $0.4 million that may be carried forward for 7 years.

The Company does not provide for deferred taxes on the excess of the financial reporting over the tax basis in its investments in foreign subsidiaries that are essentially permanent in duration. That excess totaled $28.1 million as of December 31, 2013.

Income tax payable as of December 31, 2013 and 2012 was $1.0 million and $1.2 million, respectively, and is included in accounts payable and accrued expenses in the consolidated statements of financial condition (see Note 13). Tax receivable as of December 31, 2013 and 2012 was $3.9 million and $6.0 million respectively.

The following is a tabular reconciliation of the total amounts of unrecognized tax benefits, with amounts in thousands:

| | 2013 | 2012 | 2011 |
|---|---|---|---|
| Unrecognized tax benefits – January 1 | $ 3,691 | $ 223 | $ — |
| Gross increases – tax positions in prior period | — | 1 | 44 |
| Gross decreases – tax positions in prior period | (3,445) | (16) | — |
| Gross increases – tax positions in current period | 51 | 3,483 | 179 |
| Settlement | (114) | — | — |
| Lapse of statute of limitations | — | — | — |
| Unrecognized tax benefits – December 31 | $ 183 | $ 3,691 | $ 223 |

The Company recognizes interest and penalties related to unrecognized tax benefits within the income tax expense line in the accompanying consolidated statements of operations. Accrued interest and penalties are included within the related tax liability line in the consolidated statements of financial condition. Related to the unrecognized tax benefits noted above, the Company accrued penalties and interest of immaterial amounts during 2013 and 2012.

The Company does not believe that it will have a material increase in its unrecognized tax benefits during the coming year.

The Company is subject to taxation in the U.S. and various states and foreign jurisdictions. As of December 31, 2013, the Company's tax years for 2010, 2011, and 2012 are subject to examination by the tax authorities. Currently, the Company's 2011 U.S. Federal tax return is under examination. With a few exceptions, as of December 31, 2013, the Company is no longer subject to U.S. federal, state, local, or foreign examinations by tax authorities for years before 2010.

**Note 25. Foreign Currencies and Concentrations of Credit Risk**

Under the agency model, the Company accepts and clears FX spot contracts for the accounts of its customers (see Notes 1 and 3). These activities may expose the Company to off- balance-sheet risk in the event that the customer or other broker is unable to fulfill its contracted obligations and the Company has to purchase or sell the financial instrument underlying the contract at a loss.

In connection with these activities, the Company executes and clears customers' transactions involving the sale of foreign currency not yet purchased, substantially all of which are transacted on a margin basis subject to internal policies. Such transactions may expose the Company to off-balance-sheet risk in the event margin deposits are not sufficient to fully cover losses that customers may incur. In the event that a customer fails to satisfy its obligations, the Company may be required to purchase or sell financial instruments at prevailing market prices to fulfill the customer's obligation.

The Company controls such risks associated with its customer activities by requiring customers to maintain margin collateral, in the form of cash, in compliance with various internal guidelines. The Company's trading software technology monitors margin levels on a real time basis and, pursuant to such guidelines, requires customers to deposit additional cash collateral, or to reduce positions, if necessary. The system is designed to ensure that any breach in a customer's margin requirement as a result of losses on the trading account will automatically trigger a final liquidation, which will execute the closing of all positions. Exposure to credit risk is therefore minimal. Institutional customers are permitted credit pursuant to limits set by the Company's prime brokers. The prime brokers incur the credit risk relating to the trading activities of these customers in accordance with the respective agreements between such brokers and the Company.

The Company is engaged in various trading activities with counterparties which include brokers and dealers, futures commission merchants, banks, and other financial institutions. In the event counterparties do not fulfill their obligations, the Company may be exposed to risk. The risk of default depends on the creditworthiness of the counterparty or issuer of the

F-52

TABLE OF CONTENTS

FXCM Inc.

Notes to Consolidated Financial Statements

**Note 25. Foreign Currencies and Concentration of Credit Risk - (continued)**

financial instrument. It is the Company's policy to: (i) perform credit reviews and due diligence prior to conducting business with counterparties; (ii) set exposure limits and monitor exposure against such limits; and (iii) periodically review, as necessary, the credit standing of counterparties using multiple sources of information. The Company's Due from brokers balance included in the consolidated statements of financial condition was $5.5 million and $8.0 million as of December 31, 2013 and 2012, respectively. As of December 31, 2013, 96.2% of the Company's Due from brokers balance, included in the consolidated statements of financial condition, was from one large financial institution. As of December 31, 2012, 91.5% of the Company's Due from brokers balance, included in the consolidated statements of financial condition, was from one large financial institution. Two banks held more than 10.0% each of the Company's total cash and cash equivalents and cash and cash equivalents, held for customers as of December 31, 2013. Three banks held more than 10.0% each of the Company's total cash and cash equivalents and cash and cash equivalents, held for customers as of December 31, 2012.

**Note 26. Segments**

ASC 280, *Segment Reporting,* establishes standards for reporting information about operating segments. Operating segments are defined as components of an enterprise about which separate financial information is available that is evaluated regularly by the chief operating decision maker, or decision making group, in deciding how to allocate resources and in assessing performance. The Company's operations relate to FX trading and related services and operate in two segments — retail and institutional, with different target markets and are covered by a separate sales force, customer support and trading platforms. The Company's segments are organized around three geographic areas. These geographic areas are the United States, Asia and Europe and are based on the location of its customers' accounts.

*Retail Trading*

The Company operates its retail business whereby it acts as an agent between retail customers and a collection of large global banks and financial institutions by making foreign currency markets for customers trading in foreign exchange spot markets through its Retail Trading business segment. The Retail Trading business segment also includes the Company's white label relationships, CFDs, payments for order flow and rollovers. In addition, the Retail Trading business segment includes offerings to some of the Company's smaller retail clients to trade with a dealing desk, or principal model.

*Institutional Trading*

Institutional Trading facilitates spot foreign currency trades on behalf of institutional customers, market making and electronic trading in the institutional foreign exchange spot and futures markets. The facilitation of spot foreign currency trades allows customers to obtain the best execution price from external banks and financial institutions.

Information concerning the Company's operations by reportable segment is as follows, with amounts in thousands:

|  | Retail Trading | Institutional Trading | Corporate | Total |
|---|---|---|---|---|
|  | As of and For the Year Ended December 31, 2013 | | | |
| Total net revenues | $ 379,840 | $ 110,957 | $ (1,209) | $ 489,588 |
| Operating and other expenses | 219,016 | 99,536 | 119,176 | 437,728 |
| Income (loss) before income taxes | $ 160,824 | $ 11,421 | $ (120,385) | $ 51,860 |
| Assets | $ 1,622,829 | $ 417,492 | $ 183,626 | $ 2,223,947 |

F-53

Cited in In re Global Brokerage
17Cv916 Decided 3/18/21

Archived on November 23, 2023.
This document is protected by copyright.
Further reproduction is prohibited without permission.

TABLE OF CONTENTS

**FXCM Inc.**

**Notes to Consolidated Financial Statements**

**Note 26. Segments - (continued)**

|  | As of and For the Year Ended December 31, 2012 | | | |
|  | Retail Trading | Institutional Trading | Corporate | Total |
|---|---|---|---|---|
| Total net revenues | $ 355,282 | $ 62,033 | $ — | $ 417,315 |
| Operating and other expenses | 218,018 | 45,164 | 106,669 | 369,851 |
| Income (loss) before income taxes | $ 137,264 | $ 16,869 | $ (106,669) | $ 47,464 |
| Assets | $ 1,556,680 | $ 381,368 | $ 127,122 | $ 2,065,170 |

|  | As of and For the Year Ended December 31, 2011 | | | |
|  | Retail Trading | Institutional Trading | Corporate | Total |
|---|---|---|---|---|
| Total net revenues | $ 383,356 | $ 28,908 | $ 3,314 | $ 415,578 |
| Operating and other expenses | 218,534 | 20,784 | 106,663 | 345,981 |
| Income (loss) before income taxes | $ 164,822 | $ 8,124 | $ (103,349) | $ 69,597 |
| Assets | $ 1,361,577 | $ 9,534 | $ 116,022 | $ 1,487,133 |

| Total Net Revenues | Years Ended December 31, | | |
|  | 2013 | 2012 | 2011 |
|---|---|---|---|
| United States | $ 301,005 | $ 284,511 | $ 329,366 |
| Asia | 57,557 | 51,486 | 27,960 |
| Europe, Middle East and North Africa | 286,771 | 191,314 | 165,073 |
| Other | 4,811 | 4,183 | 5,098 |
| Eliminations | (160,556) | (114,179) | (111,919) |
| Total | $ 489,588 | $ 417,315 | $ 415,578 |

| Operating and Other Expenses | Years Ended December 31, | | |
|  | 2013 | 2012 | 2011 |
|---|---|---|---|
| United States | $ 290,549 | $ 264,706 | $ 299,841 |
| Asia | 39,410 | 41,228 | 24,173 |
| Europe, Middle East and North Africa | 265,218 | 173,467 | 130,254 |
| Other | 3,107 | 3,214 | 3,632 |
| Eliminations | (160,556) | (112,764) | (111,919) |
| Total | $ 437,728 | $ 369,851 | $ 345,981 |

F-59

Cited in In re Global Brokerage 17Cv916 Decided 3/18/21

Archived on 3/23/21

This document is protected by copyright. Further reproduction is prohibited without permission.

TABLE OF CONTENTS

**FXCM Inc.**

**Notes to Consolidated Financial Statements**

**Note 26. Segments - (continued)**

| | Years Ended December 31, | | |
|---|---|---|---|
| | **2013** | **2012** | **2011** |
| **Income Before Income Taxes** | | | |
| United States | $    10,456 | $    19,805 | $    29,525 |
| Asia | 18,147 | 10,258 | 3,787 |
| Europe, Middle East and North Africa | 21,553 | 17,847 | 34,819 |
| Other | 1,704 | 969 | 1,466 |
| Eliminations | — | (1,415) | — |
| Total | $    51,860 | $    47,464 | $    69,597 |

F-55

TABLE OF CONTENTS

FXCM Inc.

**Notes to Consolidated Financial Statements**

**Note 27. Litigation**

In the ordinary course of business, we may from time to time be involved in litigation and claims incidental to the conduct of our business, including intellectual property claims. In addition, our business is also subject to extensive regulation, which may result in regulatory proceedings against us. We have been named in various arbitration and civil litigation cases brought by customers seeking damages for trading losses. Management has investigated these matters and believes that such cases are without merit and is defending them vigorously. However, the arbitrations and litigations are presently in various stages of the judicial process and no judgment can be made regarding the ultimate outcome of the arbitrators' and/or court's decisions.

In October, 2011, the Trustee in bankruptcy, representing three debtors, Certified, Inc., Global Bullion Trading Group, Inc., and WJS Funding, Inc., filed an adversary complaint in the United States Bankruptcy Court for the Southern District of Florida against US, ODL Securities, Inc. and ODL Securities, Ltd. (the "Defendants"). Before the Defendants filed any response, the Trustee amended the Complaint to add ODL, FXCM Securities, LLC, FSL, FXCM, Inc., and Holdings as Defendants. The Amended Complaint asserts claims under the Federal Bankruptcy Code to recover allegedly preferential and fraudulent transfers to the Defendants, under the Racketeer Influenced and Corrupt Organizations Act ("RICO"), 18 U.S.C §1961 et seq., as well as the common law. The Amended Complaint seeks an unspecified amount of compensatory and punitive damages, interests, and costs. The Defendants have filed motions to dismiss the Amended Complaint in its entirety. Thereafter, the parties engaged in non-binding mediation. Ultimately a settlement was reached in the amount of $0.7 million which was approved by the Bankruptcy Court on June 20, 2012.

In 2012, FXCMJ accrued $2.6 million as an estimate to settle certain trading system matters with the JFSA. The Company settled this matter for $2.3 million, which included an administrative penalty, during the first quarter of 2013.

In January 2014, the equity Receiver for a former client of US, Revelation Forex Fund ("Revelation"), its principal, Kevin G. White ("White"), and related entities RFF GP, LLC ("RFF"), KGM Capital Management, LLC ("KGM")(collectively "Fund"), filed suit against US, and certain unrelated defendants, in Texas state court. The suit alleges that US is liable under the Texas Securities Act, and the common law: (i) as a "control person;" and, (ii) as an aider and abettor of fraud and a breach of fiduciary obligations; and, (iii) for its negligence. The Receiver seeks joint and several liability for damages in excess of $3.8 million, plus exemplary damages under Texas law, interest, and attorneys' fees. On February 7, 2014, US filed the equivalent of a motion to dismiss and to compel arbitration based on the mandatory forum selection clause and arbitration agreement in its Client Agreement with the Fund. It also filed an Answer with multiple affirmative defenses. The motions are currently pending.

In February 2014, UK and FSL entered into a settlement with the FCA following an investigation into trade execution practices of UK and FSL in the period from 2006 to 2010, as well as a breach of notification obligations to the FCA. UK and FSL agreed to pay (a) restitution to affected clients up to $9.9 million; and (b) a financial penalty of GBP 4.0 million, together with any unclaimed restitution.

For the outstanding matters referenced above for which a loss is more than remote but less than likely, whether in excess of an accrued liability or where there is no accrued liability, we have estimated a range of possible loss. We believe the estimate of the aggregate range of possible loss in excess of accrued liabilities for such matters is between nil and $3.8 million as of December 31, 2013.

In view of the inherent difficulty of predicting the outcome of litigation and claims, we cannot predict what the eventual outcome of the pending matters will be, what the timing of the ultimate resolution of these matters will be, or what the eventual loss related to each pending matter may be. Furthermore, the above-referenced matters represented in the estimated aggregate range of possible loss will change from time to time and actual results may vary significantly from the current estimate. An adverse outcome in one or more of these matters could be material to our results of operations or cash flows for any particular reporting period.

F-56

Cited in In re Global Brokerage
17Cv916 Decided 3/18/21

Archived on 3/23/21

This document is protected by copyright.
Further reproduction is prohibited without permission.

TABLE OF CONTENTS

FXCM Inc.

Notes to Consolidated Financial Statements

**Note 28. Subsequent Events**

The Company has evaluated subsequent events after the date of the consolidated financial statements to consider whether or not the impact of such events needed to be reflected or disclosed in the consolidated financial statements. Such evaluation was performed through the report date of the consolidated financial statements.

On February 28, 2014, the Company, through a new entity, V3 Markets, LLC, created with the non-controlling members of Lucid, completed the acquisition of certain assets and liabilities of Infinium Capital and certain of its affiliates.   Assets acquired included exchange memberships, trading network infrastructure and intellectual property. The acquisition is intended to expand the Company into a broader array of financial instruments and provide more robust connectivity to various financial exchanges. The consideration for the transaction was approximately $30.0 million consisting of cash, assumed liabilities and a credit of $11.9 million for the Infinium Capital senior secured notes held and exchanged by a consolidated subsidiary of the Company (see Note 10). The Company will hold a 50.1% interest in the new entity.

As of March 14, 2014, the Company had an outstanding balance of $50 million under the Credit Agreement.

The Company declared a quarterly dividend of $0.06 per share on its outstanding Class A common stock. The dividend is payable on April 1, 2014 to Class A stockholders of record at the close of business on March 21, 2014.

F-57

Cited in In re Global Brokerage
17CV916 Decided 3/18/21
Archived on 3/23/21
This document is protected by copyright.
Further reproduction is prohibited without permission.

**Item 9. Changes in and Disagreements with Accountants on Accounting and Financial Disclosure**

    None.

**Item 9A. Controls and Procedures**

**Evaluation of Disclosure Controls and Procedures**

    We maintain disclosure controls and procedures (as that term is defined in Rules 13a-15(e) and 15d-15(e) under the Exchange Act) that are designed to ensure that information required to be disclosed in our reports under the Exchange Act is recorded, processed, summarized and reported within the time periods specified in the SEC's rules and forms, and that such information is accumulated and communicated to our management, including our Chief Executive Officer and Chief Financial Officer, as appropriate, to allow timely decisions regarding required disclosures. Any controls and procedures, no matter how well designed and operated, can provide only reasonable assurance of achieving the desired control objectives. Our management, with the participation of our Chief Executive Officer and Chief Financial Officer, has evaluated the effectiveness of the design and operation of our disclosure controls and procedures as of December 31, 2013. Based upon that evaluation and subject to the foregoing, our Chief Executive Officer and Chief Financial Officer concluded that, as of December 31, 2013, the design and operation of our disclosure controls and procedures were effective to accomplish their objectives at the reasonable assurance level.

**Management's Report on Internal Control over Financial Reporting**

    Our management is responsible for establishing and maintaining adequate controls over financial reporting (as that term is defined in Rules 13a-15(f) and 15d-15(f) under the Exchange Act). Internal control over financial reporting is a process to provide reasonable assurance regarding the reliability of our financial reporting for external purposes in accordance with accounting principles generally accepted in the United States of America. Internal control over financial reporting includes maintaining records that, in reasonable detail, accurately and fairly reflect our transactions, providing reasonable assurance that transactions are recorded as necessary for the preparation of our financial statements, providing reasonable assurance that receipts and expenditures of assets are made in accordance with management authorization and providing reasonable assurance that unauthorized acquisition, use or disposition of assets that could have a material effect on our financial statements would be prevented or detected on a timely basis. Because of its inherent limitations, internal control over financial reporting is not intended to provide absolute assurance that a misstatement of our financial statements would be prevented or detected.

    Management conducted an evaluation of the effectiveness of our internal control over financial reporting based on the framework in *Internal Control — Integrated Framework* issued by the Committee of Sponsoring Organizations of the Treadway Commission (1992 framework). Based on this evaluation, management concluded that our internal control over financial reporting was effective as of December 31, 2013.

    The effectiveness of our internal control over financial reporting has been audited by the our independent auditor, Ernst & Young LLP, a registered public accounting firm, as stated in their report herein.

<div align="center">81</div>

Cited in In re Global Brokerage
17CV916 Decided 3/18/21
Archived on 3/23/21
This document is protected by copyright.
Further reproduction is prohibited without permission.

TABLE OF CONTENTS

**Attestation Report of Independent Registered Public Accounting Firm**

<div align="center">

**Report of Independent Registered Public Accounting Firm**

</div>

The Board of Directors and Shareholders of FXCM Inc.

We have audited FXCM Inc.'s internal control over financial reporting as of December 31, 2013, based on criteria established in Internal Control - Integrated Framework issued by the Committee of Sponsoring Organizations of the Treadway Commission (1992 framework) (the COSO criteria). FXCM Inc.'s management is responsible for maintaining effective internal control over financial reporting, and for its assessment of the effectiveness of internal control over financial reporting included in the accompanying Management's Report on Internal Control over Financial Reporting. Our responsibility is to express an opinion on the company's internal control over financial reporting based on our audit.

We conducted our audit in accordance with the standards of the Public Company Accounting Oversight Board (United States). Those standards require that we plan and perform the audit to obtain reasonable assurance about whether effective internal control over financial reporting was maintained in all material respects. Our audit included obtaining an understanding of internal control over financial reporting, assessing the risk that a material weakness exists, testing and evaluating the design and operating effectiveness of internal control based on the assessed risk, and performing such other procedures as we considered necessary in the circumstances. We believe that our audit provides a reasonable basis for our opinion.

A company's internal control over financial reporting is a process designed to provide reasonable assurance regarding the reliability of financial reporting and the preparation of financial statements for external purposes in accordance with generally accepted accounting principles. A company's internal control over financial reporting includes those policies and procedures that (1) pertain to the maintenance of records that, in reasonable detail, accurately and fairly reflect the transactions and dispositions of the assets of the company; (2) provide reasonable assurance that transactions are recorded as necessary to permit preparation of financial statements in accordance with generally accepted accounting principles, and that receipts and expenditures of the company are being made only in accordance with authorizations of management and directors of the company; and (3) provide reasonable assurance regarding prevention or timely detection of unauthorized acquisition, use or disposition of the company's assets that could have a material effect on the financial statements.

Because of its inherent limitations, internal control over financial reporting may not prevent or detect misstatements. Also, projections of any evaluation of effectiveness to future periods are subject to the risk that controls may become inadequate because of changes in conditions, or that the degree of compliance with the policies or procedures may deteriorate.

In our opinion, FXCM Inc. maintained, in all material respects, effective internal control over financial reporting as of December 31, 2013, based on the COSO criteria.

We also have audited, in accordance with the standards of the Public Company Accounting Oversight Board (United States), the consolidated statements of financial condition of FXCM Inc. as of December 31, 2013 and 2012 and the related consolidated statements of operations, comprehensive income, stockholders' equity, and cash flows of FXCM Inc. for each of the three years in the period ended December 31, 2013 and our report dated March 14, 2014 expressed an unqualified opinion thereon.

// Ernst & Young LLP
New York, NY
March 14, 2014

<div align="center">

82

</div>

Cited in In re Global Brokerage
17CV916 Decided 3/18/21

Archived on 3/23/21

This document is protected by copyright.
Further reproduction is prohibited without permission.

TABLE OF CONTENTS

**Changes in Internal Control over Financial Reporting**

There have not been any changes in the Company's internal control over financial reporting during the quarter ended December 31, 2013 that have materially affected, or are reasonably likely to materially affect, its internal control over financial reporting.

**Item 9B. Other Information**

None.

Cited in In re Global Brokerage
17CV916 Decided 3/18/21
Archived on 3/23/21
This document is protected by copyright.
Further reproduction is prohibited without permission.

TABLE OF CONTENTS

**PART III**

The information required by Part III is incorporated by reference to the information to be set forth in our definitive Proxy Statement for the 2013 Annual Meeting of Stockholders (the "Proxy Statement"). The Proxy Statement is to be filed with the SEC pursuant to Regulation 14A of the Exchange Act, no later than 120 days after the end of the fiscal year covered by this Annual Report.

**PART III**

**Item 10. Directors, Executive Officers and Corporate Governance**

The information regarding our directors and executive officers set forth under the captions "Proposal No. 1 — Election of Directors" and "The Board of Directors and Certain Governance Matters — Executive Officers of the Company" in the Proxy Statement is incorporated herein by reference.

The information regarding compliance with Section 16(a) of the Exchange Act set forth under the caption "Section 16(a) Beneficial Ownership Reporting Compliance" in the Proxy Statement is incorporated herein by reference.

The information regarding our Code of Ethics, our audit committee and our audit committee financial expert under the captions "The Board of Directors and Certain Governance Matters — Code of Ethics for Financial Professionals," "The Board of Directors and Certain Governance Matters — Board Committees and Meetings" and "The Board of Directors and Certain Governance Matters — Committee Membership — Audit Committee" in the Proxy Statement is incorporated herein by reference.

**Code of Ethics**

The Company has adopted a Code of Ethics for Financial Professionals, which is applicable to our Chief Executive Officer, Chief Financial Officer, our principal accounting officer or controller and to other professionals of the Company serving in a finance, accounting, corporate treasury or tax role. The Code of Ethics for Financial Professionals may be found on our website at *www.fxcm.com* under Company Profile: Investor Relations: Corporate Governance: Code of Ethics for Financial Professionals. If the Company ever were to amend or waive any provision of its Code of Ethics for Financial Professionals, the Company intends to satisfy its disclosure obligations with respect to any such waiver or amendment by posting such information on its website set forth above rather than by filing a Form 8-K.

**Item 11. Executive Compensation**

The information contained in the sections captioned "Executive Compensation" and "Director Compensation" of the Proxy Statement is incorporated herein by reference.

**Item 12. Security Ownership of Certain Beneficial Owners and Management and Related Stockholder Matters**

The information contained in the section captioned "Ownership of Securities" of the Proxy Statement is incorporated herein by reference.

**Securities Authorized for Issuance Under Equity Compensation Plans**

The following table provides information about the securities authorized for issuance under our equity compensation plans as of December 31, 2013:

**Equity Compensation Plan Information**

84

TABLE OF CONTENTS

| Plan category | (A) Number of securities to be issued upon exercise of outstanding options, warrants and rights | | (B) Weighted-average exercise price of outstanding options, warrants and rights | (C) Number of securities remaining available for future issuance under equity compensation plans (excluding securities reflected in column (A)) |
|---|---|---|---|---|
| Equity compensation plans approved by security holders | 4,445,164 | 1 | $　13.77 | 4,165,139 |
| Equity compensation plans not approved by security holders | — | | — | — |

---

1　　　　Includes 253,416 of stock options granted to our independent directors.

Equity compensation plans approved by security holders consist of our 2010 Long-Term Incentive Plan.

**Item 13. Certain Relationships and Related Transactions, and Director Independence**

The information contained in the sections captioned "Certain Relationships and Related Person Transactions" and "The Board of Directors and Certain Governance Matters — Director Independence and Independence Determinations" in the Proxy Statement is incorporated herein by reference.

**Item 14. Principal Accountant Fees and Services**

The information regarding our independent registered public accounting firm fees and services in the section captioned "Proposal No. 2 — Ratification of Independent Registered Public Accounting Firm — Audit and Non-Audit Fees" of the Proxy Statement is incorporated herein by reference.

85

Cited in In re Global Brokerage
17CV916 Decided 3/18/21
Archived on 3/23/21
This document is protected by copyright.
Further reproduction is prohibited without permission.

TABLE OF CONTENTS

**PART IV**

**Item 15. Exhibits and Financial Statement Schedules**

(a) (1) Financial Statements

See Item 8 of Part II of this Annual Report on Form 10-K.

(a) (2) Financial Statement Schedules

(a) (3) Exhibits

See Exhibit Index

86

Cited in In re Global Brokerage
17CV916 Decided 3/18/21

Archived on 3/23/21

This document is protected by copyright.
Further reproduction is prohibited without permission.

TABLE OF CONTENTS

## SIGNATURES

Pursuant to the requirements of Section 13 or 15(d) of the Securities Exchange Act of 1934, the registrant has duly caused this Annual Report to be signed on its behalf by the undersigned, thereunto duly authorized, in the City of New York, New York.

**FXCM INC.**

| | |
|---|---|
| Date: March 14, 2014 | By: /s/ Dror (Drew) Niv |
| | Name: Dror (Drew) Niv |
| | Title: Chief Executive Officer |

## POWER OF ATTORNEY

Each of the officers and directors of FXCM Inc., whose signature appears below, in so signing, also makes, constitutes and appoints each of Dror (Drew) Niv, Robert Lande, and David S. Sassoon, and each of them, his true and lawful attorneys-in-fact, with full power and substitution, for him in any and all capacities, to execute and cause to be filed with the SEC any and all amendments to this Annual Report on Form 10-K, with exhibits thereto and other documents connected therewith and to perform any acts necessary to be done in order to file such documents, and hereby ratifies and confirms all that said attorneys-in-fact or their substitute or substitutes may do or cause to be done by virtue hereof.

Pursuant to the requirements of the Securities Exchange Act of 1934, this report has been signed below by the following persons on behalf of the registrant and in the capacities and on the dates indicated.

Cited in In re Global Brokerage 17CV916 Decided 3/18/21

Archived on 3/23/21

This document is protected by copyright. Further reproduction is prohibited without permission.

TABLE OF CONTENTS

| Signature | Title | Date |
|---|---|---|
| Drow (Drew) Niv<br>/s/ Drow (Drew) Niv | Director and Chief Executive Officer<br>(principal executive officer) | March 14, 2014 |
| Dror (Drew) Niv<br>/s/ David Sakhai | Director and Chief Operating Officer | March 14, 2014 |
| David Sakhai<br>/s/ William Adhout | Director | March 14, 2014 |
| William Ahdout<br>/s/ Kenneth Grossman | Director | March 14, 2014 |
| Kenneth Grossman<br>/s/ Eduard Yusupov | Director | March 14, 2014 |
| Eduard Yusupov<br>/s/ Robert Lande | Chief Financial Officer<br>(principal financial officer) | March 14, 2014 |
| Robert Lande<br>/s/ James Brown | Director | March 14, 2014 |
| James Brown<br>/s/ Ryan Silverman | Director | March 14, 2014 |
| Ryan Silverman<br>/s/ Arthur Gruen | Director | March 14, 2014 |
| Arthur Gruen<br>/s/ Robin E. Davis | Director | March 14, 2014 |
| Robin E. Davis<br>/s/ Perry G. Fish | Director | March 14, 2014 |
| Robin E. Davis<br>Eric LeGoff<br>/s/ Eric LeGoff | Director | March 14, 2014 |
| Nicola Santoro, Jr.<br>/s/ Nicola Santoro, Jr. | Chief Accounting Officer<br>(principal accounting officer) | March 14, 2014 |

Cited in In re Global Brokerage
17CV916 Decided 3/18/21
Archived on 3/23/21
This document is protected by copyright.
Further reproduction is prohibited without permission.

TABLE OF CONTENTS

## EXHIBIT INDEX

The agreements and other documents filed as exhibits to this report are not intended to provide factual information or other disclosure other than with respect to the terms of the agreements or other documents themselves, and should not be relied upon for that purpose. In particular, any representations and warranties made by the Company in these agreements or other documents were made solely within the specific context of the relevant agreement or document and may not describe the actual state of affairs as of the date they were made or at any other time.

| | |
|---|---|
| 2.1 | Agreement Relating to the Sale and Purchase of the Whole of the Issued Share Capital of Lucid Markets Trading Limited, dated June 21, 2012, among Mr. Reuter, Matthew Wilhelm, FXCM UK Merger Limited, FXCM Holdings LLC and the Issuer (incorporated by reference to Exhibit 2.1 to Current Report on Form 8-K filed by FXCM Inc. on June 25, 2012 (File No. 001-34986)). |
| 3.1 | Amended and Restated Certificate of Incorporation of FXCM Inc. (incorporated by reference to Exhibit 3.1 to the Registration Statement on Form S-1 filed by FXCM Inc. on September 3, 2010 (File No. 333-169234)). |
| 3.2 | Amended and Restated Bylaws of FXCM Inc. (incorporated by reference to Exhibit 3.2 to Amendment No. 1 to the Registration Statement on Form S-1 filed by FXCM Inc. on October 12, 2010 (File No. 333-169234)). |
| 4.1 | Indenture, dated June 3, 2013, between the Company and The Bank of New York Mellon, as trustee (incorporated by reference to Exhibit 4.1 to Current Report on Form 8-K filed by FXCM Inc. on June 3, 2013 (File No. 001-34986)). |
| 4.2 | Form of 2.25% Convertible Senior Note due 2018 (included as Exhibit A and incorporated by reference to Exhibit 4.1 to Current Report on Form 8-K filed by FXCM Inc. on June 3, 2013 (File No. 001-34986)). |
| 10.1 | Third Amended and Restated Limited Liability Company Agreement of FXCM Holdings, LLC, dated as of December 1, 2010 (incorporated by reference to Exhibit 10.1 to Current Report on Form 8-K filed by FXCM Inc. on December 7, 2010 (File No. 001-34986)). |
| 10.2 | Amendment No. 1 to the Third Amended and Restated Limited Liability Company Agreement of FXCM Holdings, LLC (incorporated by reference to Exhibit 10.7 to Quarterly Report on Form 10-Q filed by FXCM Inc. on August 8, 2013 (File No. 001-34986)). |
| 10.3 | Exchange Agreement, dated as of December 1, 2010, among FXCM Inc., FXCM Holdings, LLC and the holders of Holdings Units from time to time party thereto (incorporated by reference to Exhibit 10.2 to Current Report on Form 8-K filed by FXCM Inc. on December 7, 2010 (File No. 001-34986)). |
| 10.4 | Tax Receivable Agreement, dated as of December 1, 2010, by and among FXCM Inc., FXCM Holdings, LLC and the TRA Parties from time to time party thereto (incorporated by reference to Exhibit 10.3 to Current Report on Form 8-K filed by FXCM Inc. on December 7, 2010 (File No. 001-34986)). |
| 10.5 | FXCM Inc. Amended and Restated 2010 Long-Term Incentive Plan (incorporated by reference to Exhibit A to the Schedule 14A filed by FXCM Inc. on June 30, 2013 (File No. 001-34986)).† |
| 10.6 | Form of Annual Incentive Plan (incorporated by reference to Exhibit 10.6 to Amendment No. 1 to the Registration Statement on Form S-1 filed by FXCM Inc. on October 12, 2010 (File No. 333-169234)).† |
| 10.7 | Offer Letter of Robert Lande (incorporated by reference to Exhibit 10.7 to Amendment No. 1 to the Registration Statement on Form S-1 filed by FXCM Inc. on October 12, 2010 (File No. 333-169234)).† |
| 10.8 | Form of Option Award Agreement (incorporated by reference to Exhibit 10.9 to Amendment No. 2 to the Registration Statement on Form S-1 filed by FXCM Inc. on November 2, 2010 (File No. 333-169234)).† |
| 10.9 | Severance Protection Agreement between Dror (Drew) Niv and FXCM Holdings, LLC, dated as of December 1, 2010 (incorporated by reference to Exhibit 10.8 to Current Report on Form 8-K filed by FXCM Inc. on December 7, 2010 (File No. 001-34986)).† |
| 10.10 | Severance Protection Agreement between David Sakhai and FXCM Holdings, LLC, dated as of December 1, 2010 (incorporated by reference to Exhibit 10.9 to Current Report on Form 8-K filed by FXCM Inc. on December 7, 2010 (File No. 001-34986)).† |
| 10.11 | Form of Option Award Agreement for Non-Employee Directors (incorporated by reference to Exhibit 10.12 to Amendment No. 3 to the Registration Statement on Form S-1 filed by FXCM Inc. on November 15, 2010 (File No. 333-169234)).† |
| 10.12 | Fifth Amendment to Credit Agreement and Amendment to Guaranty, dated November 15, 2013 by and among FXCM Holdings LLC, Bank of America, N.A., as Administrative Agent and lenders who are parties thereto (incorporated by reference to Exhibit 10.1 to Current Report on Form 8-K filed by FXCM Inc. on November 18, 2013 (File No. 001-34986)). |
| 10.13 | Sixth Amendment to Credit Agreement, dated March 12, 2014 by and among FXCM Holdings LLC, Bank of America, N.A., as Administrative Agent and lenders who are parties thereto. * |

Archived on 3/31/2021
Cited in The Vault by Coltera. Ltd.
This document is protected by copyright.
Further reproduction is prohibited without permission.

TABLE OF CONTENTS

| 10.14 | Amended and Restated Deed of Shareholders Agreement relating to Lucid Markets Trading Limited, by and among Dierk Reuter, Matthew Wilhelm, FXCM UK Merger Limited, FXCM Holdings, LLC and Lucid Markets Trading Limited (incorporated by reference to Exhibit 10.1 to Quarterly Report on Form 10-Q filed by FXCM Inc. on August 8, 2013 (File No. 001-34986)). |
| 10.15 | Purchase Agreement, dated May 28, 2013, between the Company and Credit Suisse Securities (USA) LLC and Merrill Lynch, Pierce, Fenner & Smith Incorporated, as representatives of the several purchasers named therein (incorporated by reference to Exhibit 10.1 to Current Report on Form 8-K filed by FXCM Inc. on June 3, 2013 (File No. 001-34986)). |
| 10.16 | Form of Convertible Bond Hedge Transaction Confirmation, dated May 28, 2013, between the Company and dealer (incorporated by reference to Exhibit 10.2 to Current Report on Form 8-K filed by FXCM Inc. on June 3, 2013 (File No. 001-34986)). |
| 10.17 | Form of Amendment to Convertible Bond Hedge Transaction Confirmation, dated May 30, 2013, between the Company and dealer (incorporated by reference to Exhibit 10.3 to Current Report on Form 8-K filed by FXCM Inc. on June 3, 2013 (File No. 001-34986)). |
| 10.18 | Form of Issuer Warrant Transaction Confirmation, dated May 28, 2013, between the Company and dealer (incorporated by reference to Exhibit 10.4 to Current Report on Form 8-K filed by FXCM Inc. on June 3, 2013 (File No. 001-34986)). |
| 10.19 | Form of Amendment to Issuer Warrant Transaction Confirmation, dated May 30, 2013, between the Company and dealer (incorporated by reference to Exhibit 10.5 to Current Report on Form 8-K filed by FXCM Inc. on June 3, 2013 (File No. 001-34986)). |
| 21.1 | Subsidiaries of the Registrant* |
| 23.1 | Consent of Ernst & Young LLP as to FXCM Inc.* |
| 24.1 | Power of Attorney (included on signature page to this Report on Form 10-K)* |
| 31.1 | Certification of the Principal Executive Officer pursuant to Rule 13a-14(a)/15d-14(a) as adopted pursuant to Section 302 of the Sarbanes-Oxley Act of 2002* |
| 31.2 | Certification of the Principal Financial Officer pursuant to Rule 13a-14(a)/15d-14(a) as adopted pursuant to Section 302 of the Sarbanes-Oxley Act of 2002* |
| 32.1 | Certification of the Principal Executive Officer pursuant to 18 U.S.C. Section 1350, as adopted pursuant to Section 906 of the Sarbanes-Oxley Act of 2002.**[1] |
| 32.2 | Certification of the Principal Financial Officer pursuant to 18 U.S.C. Section 1350, as adopted pursuant to Section 906 of the Sarbanes-Oxley Act of 2002.**[1] |
| 101.INS | XBRL Instance Document |
| 101.SCH | XBRL Taxonomy Extension Schema Document |
| 101.CAL | XBRL Taxonomy Extension Calculation Document |
| 101.LAB | XBRL Taxonomy Extension Labels Document |
| 101.PRE | XBRL Taxonomy Extension Presentation Document |
| 101.DEF | XBRL Taxonomy Extension Definition Document |

---

\*    Filed herewith

\*\*    Furnished herewith

*(1) This exhibit should not be deemed to "filed" for purposes of Section 18 of the Exchange Act.*

†    Indicates a management contract or compensatory plan or arrangement in which directors or executive officers are eligible to participate.

Cited in In re Global Brokerage
17Cv916 Decided 3/18/21
Archived on 3/23/21
This document is protected by copyright.
Further reproduction is prohibited without permission.