# Exhibit 11

UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | |
|---|---|
| EFFEX CAPITAL, LLC and JOHN DITTAMI, <br><br> Plaintiffs, <br><br> v. <br><br> NATIONAL FUTURES ASSOCIATION, JOHN DOES 1-5, and JANE DOES 1-5, <br><br> Defendants. | Case No. 17 Civ. |

## REPLY AFFIDAVIT OF JOHN DITTAMI

State of Florida    )
                    ) ss:
County of Palm Beach)

John Dittami, being duly sworn, deposes and says as follows:

1. I am the individual plaintiff in this action, managing member of plaintiff Effex Capital, LLC ("Effex") and am submitting this affidavit in further support of Plaintiffs' Application for a Preliminary Injunction directing defendant National Futures Association ("NFA") to: (i) remove the NFA Complaint, Settlement, Narrative and Release from its website, or, in the alternative, direct a name clearing hearing; and (ii) issue a new release stating that the Settlement contained no judicial findings about either Effex or me.

2. From the outset, my objective and intent was to improve pricing and liquidity in the retail foreign exchange market by outcompeting all other liquidity providers by utilizing execution and risk standards which were traditionally ignored by other liquidity providers. I marketed my concept to FXCM and we agreed that we would form a division of FXCM that would provide liquidity services through an "Agency Model", not as a "Retail Dealing Desk". The goals

1



Exhibit 0016 Barron

and objectives of such venture remained constant as shown by the annexed excerpt from a PowerPoint document which I presented to FXCM's board of directors in February 2010 (a copy of which is annexed hereto as Exhibit 1).

3. A few months prior to the launch of the division which contemplated the provision of liquidity services, FXCM and I decided to terminate our venture, and I formed Effex as an independent forex liquidity provider to compete with the other liquidity providers. At all times Effex and FXCM maintained separate books and records and never co-mingled funds.

4. Effex has a unique business niche. Unlike a bank it does not trade swaps, forwards or futures but exclusively participates in rolling cash forward contracts ("Spot Contracts") that settle within two days. Effex, which is an eligible contract participant ("ECP") solely engages in transactions with other ECP's, utilizing its own funds for its own account. Effex does not transact any business with retail customers. Given the narrow scope of its business niche, Effex is either the only US firm, or one of a handful of US firms, that provide institutional forex liquidity without being required to register with the Commodities Futures Trading Commission ("CFTC") or become an NFA member firm.

5. Effex was one of the first, if not the first, buy side forex liquidity provider which held its own inventory and competed with the "too big to fail banks" (now classified as "Swap Dealers").

6. NFA has historically dramatized its concerns about retail participants in off-exchange forex trading in an effort to convince Congress to delegate NFA with jurisdiction to oversee all such business, including the transaction of business exclusively between ECP's -- in other words, force all forex trading to be done on exchange. Indeed, in 2009, Dan Roth, who was NFA's general counsel, testified before Congress that the case *Commodity Futures Trading*

2

*Commission v. Zelener*, 373 F.3d 861, 862 (7th Cir. 2004) had dealt a "crippling blow" to NFA's power to protect unsophisticated customers (a copy of such testimony is annexed hereto as Exhibit 2). More specifically, the Court in *Zelener* declined to extend CFTC's jurisdiction to include cash forward contracts because those contracts contemplated immediate delivery of the commodity, and therefore were not futures, even if the delivery could be deferred and rolled over to a new settlement date. Id.

7. NFA took public issue, via Tom Sexton (defendant) and Dan Roth with the 7th Circuit Court of Appeals' holding that rolling spot Forex transactions were not futures, and thus exempt from NFA's jurisdiction. NFA then lobbied for greater oversight of retail Forex participants. Such lobbying efforts are summarized in a publication titled "Making Numerous Calls to Force Retail Forex On Exchange" (a copy of which is annexed hereto as Exhibit 3). In the publication, Dan Roth noted:

   i. "Retail FX is the only retail trading done off exchange and whether it's something Congress wants to look at, they will let us know",

   ii. "If Congress asked us "What do you Think".. I don't think we would shake our basic proposition that retail trading should be done on exchange ... That has been our testimony for a long period of time."

   iii. "The NFA has long stated that retail trading is best done on exchange. Congress has chosen to allow this exemption, and may well continue to allow this exemption."

8. Congress revisited the issue of off-exchange Forex trading, but it merely extended CFTC's and NFA's jurisdiction to off-exchange rolling spot contracts where one of the participants was a retail customer. Despite not being successful in obtaining complete jurisdiction and authority

3

for entities, such as Effex, NFA took a series of actions to significantly reduce the number of forex dealer members from over 50 to 2 (see, youtube video of Tom Sexton at https://www.youtube.com/watch?v=Ec5VrRpPwpM) as part of its effort to force all retail forex on exchange where NFA generates transactional fees.[1] This was acknowledged by the CFTC in background materials submitted along with a proposed rule in 2010 which stated:

> The Commission's authority, however, does not extend to securities, or contracts that result in actual delivery within two days or that create an enforceable obligation to deliver between buyer and seller that have the ability to deliver or accept delivery in connection with their line of business. *Proposed Rule: Regulation of Off-Exchange Retail Foreign Exchange Transactions and Intermediaries*, 5 Fed Reg. 3282, 3285.

9. Thus, despite NFA's continuous efforts, it was unable to obtain jurisdiction over Effex and this explains why NFA utilized its settlement with FXCM as a pretext for circumventing such restrictions and harming Effex.

10. NFA's claim that on exchange forex trading provides better pricing and execution than over the counter forex trading is simply incorrect. Indeed, in February 2016, FXCM published a statistical analysis which showed that over the counter retail forex trading resulted in superior execution versus on exchange forex futures trading ninety one percent of the time and savings to customers of 36.4 million dollars. NFA reacted to such publication by requesting that FXCM remove it from its website. Instead, FXCM published an updated study which showed that off exchange retail forex trading continued to provide savings to its customers. The superior execution statistics were largely due to Effex inclusion in the FXCM agency model, and therefore are indicative of the tremendous pricing execution benefit provided by Effex. This data contradicted NFA's longstanding position that all retail forex trading should be on exchange, and

---

[1] NFA generates no transactional fees on over the counter retail forex trading.

4

simultaneously confirmed that off exchange pricing could actually be more advantageous for retail customers.

11. In late 2015, Effex provided trade statistics to FXCM which showed that Effex provided best execution out of all of FXCM's liquidity providers. FXCM provided such statistics to NFA, which were apparently disregarded due to NFA's preconceived prejudices against over the counter forex trading its bias and prejudices against non-regulated ECP's and its self interest in having all forex trading conducted on exchange. Indeed, NFA's self-interest is exposed by its admitted focus on regulating off exchange retail forex (enforcement cases involving forex related activities continue to require a disproportionate amount of NFA's resources, see 2011 NFA Annual Report at https://www.nfa.futures.org/about/annual-reviews-files/2011 annualreport.pdf) at the expense of investigating the more serious issues which it is tasked with overseeing. To wit: the over 1-Billion-dollar MF Global fraud, the over 200 million dollar Peregrine Financial Group fraud, and the fraud by the board member, and technology firm, AlphaMetrix, touted as a friend of NFA's board and as the technology vetted solution to preventing future fraud.

12. In order to harm Effex, NFA utilized its settlement with FXCM as a vehicle to distribute numerous false and defamatory statements about Effex via publication of both the Settlement and the Narrative. Departing from ordinary course procedure involving the mere reporting its investigations, NFA instead inserted numerous conclusions into the Settlement and Narrative which were not supported by the actual facts and not the result of a judicial proceeding as there was no testimony, cross-examination or decisions made by a trier of fact. The conclusions in the Settlement were not even agreed to by the respondents, who neither admitted nor denied the truth of the allegations therein. NFA's insistence on including the numerous specious statements regarding Effex and me were spearheaded by Thomas Sexton (former General Counsel of NFA

5

and incoming President and CEO of NFA) who, in negotiations with FXCM, refused to modify the statements in the documents to eliminate the defamatory statements.

13. Notably, neither the CFTC nor NFA required FXCM to provide customer restitution, because no customers of FXCM were damaged by the actions referenced by NFA or CFTC, and in fact, it is mathematically and statistically undeniable that FXCM's retail customers benefited from Effex's superior execution.

14. In arguing that Effex committed abusive execution, NFA cites to a NZDUSD transaction as an example of egregious execution. However, if properly analyzed, NFA would have concluded that at that time no market existed for such pairing on exchange futures, and Effex's price and execution was far superior to that which could have been obtained on exchange.

15. NFA's conclusions were also contrary to those of the CFTC. In broad brush strokes the CFTC concluded FXCM failed to disclose its relationship with Effex while on the other hand, NFA stated FXCM controlled Effex and due to Effex's abusive trading (ie. Use of hold timer, prev quote and last look), FXCM profited at the expense of its retail clients. In other words, NFA stated that Effex and FXCM committed a fraud on FXCM's retail clients. In order to reach this conclusion, NFA relied on many "facts" (which were false), which were simply not relevant or even admissible due to the applicable five year statute of limitations[2]: (i) Effex did not share space with FXCM since early 2011; (ii) Effex did not use FXCM's prime of prime relationship since the summer of 2010; (iii) Effex paid back all prime of prime margin funding to FXCM by the summer of 2010; (iv) Effex did not use Prev Quote in the referenced manner since 2010 (NFA settled such charge with FXCM in 2011); (v) Effex reimbursed FXCM for every dime it expended in developing the trading system by the summer of 2010; and (vi) Effex's payments to FXCM were

---

[2] The Complaint was filed on or about February 6, 2017 and any acts which occurred more than five years prior should have been time barred. 28 U.S.C. §2462.

6

based on per million dollars of order flow per contract which were paid regardless of whether Effex made a profit. Moreover, as CFTC stated, such payments ceased in 2014, and were always calculated as payments per million dollars of volume and never calculated as a percent of Effex's profits. However, if such payments were analyzed as a percentage of Effex's profits, the payments never equaled 70 percent of Effex's profits and collectively were dramatically less during the relevant period than thirty percent of Effex's profits.

16. NFA's description of Effex's use of hold timer is incorrect after the fall of 2010. NFA ignored that in 2011, Effex instituted price tolerance and liquidity tolerance which netted FXCM's customers positive price improvement. NFA's claim that Effex's use of Hold Timer, Last Look and Prev Quote was abusive is unsupported by any objective measure as these techniques are utilized industry wide, including NFA's member firms which have representation on the SWAP Dealer segment of its board of directors. In stating that Effex's use of hold timer was egregious due to lack of asymmetrical tolerance configurations, NFA ignored that in 2010, Effex only used Hold Timer 7 days, rarely utilized it thereafter, infrequently used it with tolerance configurations that ensured asymmetrical price improvements to FXCM's customers benefit and Effex's detriment (the exact opposite of NFA's statements). In fact, Effex's profit and loss is not and was never correlated to any customers' profit and loss, including but not limited to, FXCM's. In addition, Effex: (i) did not have access to FXCM's customers resting stop limits or positions; and (ii) was only routed trades when it offered best price.

17. FXCM provided Goldman Sachs, Citibank and Commerz Bank pricing advantages (.3 to .6 pips on ten pairs) through May 2010.

18. NFA ignored that any of FXCM's liquidity providers had the option to collocate in NY7, and to receive similar data from FXCM. No other liquidity provider did because apparently,

7

they failed to recognize the value, and instead attempted to paint Effex's contractual relationship with FXCM as a fraudulent relationship.

19. It is clear that NFA intentionally misrepresented the business relationship between FXCM and Effex in a manner to suggest that: (i) they were alter egos when in fact they were arm's length business partners; and (ii) they were conspiring to defraud FXCM's retail customers when in fact Effex added more value to FXCM's retail customers than any of FXCM's other liquidity providers, who were NFA members. In furtherance of this effort to harm Effex, the Settlement and Narrative were drafted in a manner which was unique to NFA and clearly designed to harm Effex. More specifically, a review of NFA's settlements and narratives over the last two years demonstrates that, in contrast to the specificity contained in the Settlement and Narrative, generally NFA merely stated: (i) which rules were violated; (ii) the amount of penalty assessed; and (iii) whether or not the respondent admitted or denied or findings were made. In this instance, NFA included tremendous detail about the underlying acts of Effex, which format was an absolute enigma to NFA (see summary comparing NFA's various settlements and narratives over the last two years, a copy of which is annexed hereto as Exhibit 4). Also in unusual fashion, NFA left out the fact that FXCM did not admit the allegations.

20. Annexed hereto as Exhibit 5 is an article describing NFA's failure to regulate MF Global and Peregrine.

21. Annexed hereto as Exhibit 6 is a copy of the CFTC's Office of Inspector General's audit report of its oversight of NFA.

22. I am further aware that FXCM settled with NFA because it did not want to incur the tremendous expense of defending the investigation by NFA. Moreover, only twenty percent of FXCM's business was in the U.S. Market and as a result FXCM's agreeing to abandon the U.S.

8

Market cost it little volume and actually increased its profits as it was losing ten million dollars per annum in the United States (see copy of FXCM's 8k's filed with SEC annexed hereto as Exhibit 7). In addition, exiting the U.S. Market allowed FXCM to sell its client list for about 17.5 million dollars and freed up fifty two million dollars, which allowed FXCM to easily satisfy the penalty of seven million dollars (which did not include customer restitution as there was none because FXCM's customers were not damaged) and pay down its loan to Leucadia which carried interest at twenty and one half percent per annum (see Exhibit 7). In reality, FXCM's decision to settle was purely a business decision.

23. In addition to the irreparable harm set forth in my Affidavit sworn to on June 6, 2017, Effex and I have experienced, as detailed below in items a-j, and will continue to experience irreparable harm stemming from the false and defamatory statements contained in the Narrative and Release because the public assumes a high level of legitimacy in the NFA Investigation, the NFA Complaint, the Settlement, Narrative and the Release.

    a. On June 4, 2017, a second-class action was filed against various parties, which included baseless claims against Effex and me in the United States District Court for the Southern District of New York captioned, <u>Arthur P. Cardi, et al. v. FXCM, Inc., et al., Civil Action No. 17 civ 4699 (PAC).</u> The complaint clones the same false allegations against Effex and me contained in the NFA Complaint, Decision, Narrative and Release. This further harms plaintiffs' reputations and ability to conduct business;

    b. Despite diligent efforts, Effex has been unable to establish a prime broker relationship (a critical relationship for the continuation of forex trading) and in fact

9

has been denied such relationship directly by Royal Bank of Scotland, Jeffries Securities and Societe Generale via a third party alternative credit attempt;

c. Meetings with MXT Global and Blackwell Global were abruptly canceled and representatives of such entities stated that if they conducted business with Effex they were concerned that NFA or another regulator might target them in a disciplinary proceeding;

d. Currenex and Fastmatch which provide necessary liquidity to institutional liquidity providers and Forex traders terminated Effex's right to trade on their exchanges immediately following the publication of the Narrative. This limits Effex's ability to hedge or trade out of its own risk;

e. Citadel, which was a member of NFA's board of directors until December 31, 2016, has actively solicited former agents, employees and contractors of Effex and has recently requested access to the information necessary to implement a trading strategy similar to that deployed by Effex;

f. As a result of the negative publicity and stress caused by such publicity, a top Effex executive resigned, and if injunctive relief is not granted, it is likely that additional key employees will resign;

g. As previously stated, Effex's largest counterpart (FXCM UK) will not utilize Effex as a liquidity provider because several of the largest fee paying NFA firms (with representation on NFA's board of directors – Citadel, UBS, Deutsche Bank and Goldman Sachs) advised FXCM UK that if it utilized Effex as a liquidity provider they would cease to provide liquidity for FXCM because they do not want to compete with Effex because of NFA's disclosure of Effex's pricing strategy;

10

    h. With respect to counterparts that trade with Effex (whether or not the relationship commenced pre or post the NFA's publication of the Settlement and Narrative) they are routinely refusing to provide Effex with access to key inputs necessary to properly operate Effex's intellectual property;

    i. Multiple counterparts that agreed to do business with Effex prior to NFA's publication of the Settlement and Narrative refused to transact business with Effex because their respective compliance departments refused to proceed due to concerns that transacting business with Effex would paint a regulatory target on their own company's back; and

    j. In attempting to set up a new business venture, I was advised that the proposed counter-party would entertain such venture with my employees but not if I was actively involved.

    24. In the event the Court directs NFA to provide a written release stating it made no findings regarding Effex, it is possible that Effex will be able to: (i) establish a prime broker relationship and recommence trading with Currenex and Fastmatch; and (ii) transact business with both new and former counterparts. Additionally, Effex may be able to reinstate trading with FXCM in other global jurisdictions. Without such relief, Effex will undoubtedly be forced to cease operations and forfeit all remaining good will. Unless rectified, it is clear I will be not able to obtain employment, as all overtures which I have made to forex firms have been soundly rejected.

    25. FOREX brokers that operate through the "Dealing Desk" model route trades through their own "Dealing Desk" and make money by trading against their clients. A "Dealing Desk" forex broker is considered a market maker by making the market for traders: so when traders want to sell, the "Dealing Desk" forex broker buys from them, when traders want to buy, the

"Dealing Desk" forex broker sells to them. Thus, the "Dealing Desk" forex broker always takes the opposite side of the trade and in this way creates the market. In this model, a trader will not see prevailing market rates, which allows the "Dealing Desk" forex brokers to manipulate their quotes to their advantage. The implication of being a "Dealing Desk" is that the forex broker operating the "Dealing Desk" only makes money when its customers lose money. Because Effex does not know customers' positions, does not take all the flow from customers and only obtains execution requests if it generates the best prevailing market price in competition with all other liquidity providers, Effex's profits and losses have no correlation with customers' profits and losses.

26. The elimination of Effex as a liquidity provider for FXCM has reduced the quality of execution and harmed retail forex traders.

As a result of the foregoing, I respectfully request that this Court grant Effex's and my application for a preliminary injunction directing NFA to: (i) remove the NFA Complaint, Settlement, Narrative and Release from its website or in the alternative, order a name clearing

hearing; and (ii) issue a new release stating no adjudicatory findings were made regarding Effex or me; and (iii) for such further and additional relief as this Court deems just and proper.

John Dittami

Sworn to before me this 21st
day of August, 2017

Notary Public

JOHN MICHAEL SAYNE
MY COMMISSION #FF187727
EXPIRES February 3, 2019
(407) 398-0153    FloridaNotaryService.com

13

NY 246544698v1