UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| In re Global Brokerage, Inc. f/k/a FXCM, Inc. Securities Litigation | Master File No. 1:17-cv-00916-RA |
| | CLASS ACTION |
| | ORAL ARGUMENT REQUESTED |
| This Document Relates To:  All Actions | |

**DEFENDANTS' MEMORANDUM OF LAW IN SUPPORT OF THEIR MOTION TO EXCLUDE THE REPORTS, TESTIMONY, AND OPINIONS OF DR. ADAM WERNER**

Israel Dahan
Peter Isajiw
Evan C. Ennis
Ryan Gabay
KING & SPALDING LLP
1185 Avenue of the Americas
New York, New York 10036-2601
Tel:  (212) 556-2100
Fax: (212) 556-2200

Chelsea Corey
KING & SPALDING LLP
300 S. Tryon Street, Suite 1700
Charlotte, North Carolina 28202
Tel: (704) 503-2575
Fax: (704) 503-2622

*Attorneys for Defendants Global Brokerage, Inc. f/k/a/ FXCM, Inc., Dror Niv, and William Ahdout*

38984633.v13

**TABLE OF CONTENTS**

PRELIMINARY STATEMENT ...................................................................................1

BACKGROUND ......................................................................................................4

    A.    Werner's Prior Reports And Opinions Regarding Market Efficiency....................5

    B.    Werner's Current Opinions On Loss Causation And Damages..............................7

LEGAL STANDARD...............................................................................................7

ARGUMENT .........................................................................................................8

I.    Werner's Analysis Of The Corrective Disclosure And Its Value Impact Is Flawed And Unreliable.......................................................................................................9

    A.    Werner Fails To Disentangle The Impact Of Allegedly Corrective Information From Other Collateral Consequences .................................................10

    B.    Werner Fails To Show That The Allegedly Corrective Information Would Have Been Value Relevant To Investors ..........................................................14

II.    Werner's ████████████████ To Estimating Inflation Fails To Reliably Measure Damages.................................................................................................16

III.    Werner's Opinions Regarding Loss Causation And Damages Stemming From The Alleged GAAP Violations Are Unsupported And Inadmissible ......................................20

IV.    Werner's Opinions Regarding Loss Causation And Damages With Respect To The FXCM Notes Are Not Admissible.....................................................................................21

CONCLUSION...................................................................................................24

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Amorgianos v. National R.R. Passenger Corp.*,
   303 F.3d 256 (2d Cir. 2002)...........................................................7, 8, 9

*Atlantica Holdings, Inc. v. Sovereign Wealth Fund Samruk-Kazyna JSC*,
   477 F. Supp. 3d 88 (S.D.N.Y. 2020)...............................................9, 16

*In re BP p.l.c. Sec. Litig.*,
   No. 4:10-MD-2185, 2016 WL 3090779 (S.D. Tex. May 31, 2016)........................12

*Comcast Corp. v. Behrend*,
   569 U.S. 27 (2013)...........................................................................10

*Daubert v. Merrell Dow Pharmaceuticals, Inc.*,
   507 U.S. 579 (1993)..................................................................... *passim*

*Nimely v. City of New York*,
   414 F.3d 381 (2d Cir. 2005).................................................................8

*Ruggiero v. Warner-Lambert Co.*,
   424 F.3d 249 (2d Cir. 2005).................................................................8

*Teamsters Local 445 Freight Div. Pension Fund v. Bombardier*,
   546 F.3d 196 (2d Cir. 2008)................................................................11

*U.S. v. Williams*,
   506 F.3d 151 (2d Cir. 2007).................................................................8

*In re Williams Sec. Litig.*,
   496 F. Supp. 2d 1195 (N.D. Okl. 2007)...................................................19

*In re Wireless Telephone Servs. Antitrust Litig.*,
   385 F. Supp. 2d 403 (S.D.N.Y. 2005).....................................................17

**Other Authorities**

Fed. R. Evid. 702 .................................................................................8

Federal Judicial Center, Reference Manual on Scientific Evidence (3d ed. 2011) ........................8

Defendants Global Brokerage Inc. f/k/a FXCM Inc. ("FXCM" or the "Company"), Dror Niv and William Ahdout (collectively, "Defendants") respectfully submit this memorandum of law in support of their Motion to Exclude the Reports, Testimony, and Opinions of Dr. Adam Werner (the "Motion").

## PRELIMINARY STATEMENT

Plaintiffs proffer Dr. Adam Werner ("Werner") as a loss causation and damages expert and seek to rely on his two reports and deposition testimony to support their allegations that (1) Defendants' allegedly false and misleading statements regarding FXCM's relationship with Effex Capital, LLC ("Effex") caused the prices of FXCM's common stock and the FXCM 2.25% Convertible Senior Notes due 2018 (the "FXCM Notes" and collectively, the "FXCM Securities") to be inflated during the Class Period;[1] (2) that the alleged corrective disclosures on February 6, 2017 dissipated that inflation; and (3) Plaintiffs and the other class members were damaged thereby.  Werner also uses ███████████████████████████████████████ ████████████████████████████████████████  As explained below, Werner's reports and testimony should be excluded because the opinions he provides therein are not the product of reliable principles and methods and, thus, do not meet the standard required of an expert under *Daubert*.

Under Second Circuit precedent an expert's methodology must be reliable at every step, *i.e.*, there must be a sufficiently rigorous connection between the expert's methodology and their conclusions.  Though event studies are routinely used to assess loss causation and damages in securities fraud cases, they are not admissible where they are methodologically unsound.  Here, Werner's loss causation and damages analysis is unsound because he fundamentally fails to

---

[1] The Class Period, as defined in Plaintiffs' Third Amended Complaint ("TAC"), is March 15, 2012 to February 6, 2017.  ECF No. 181 at ¶ 1.

disaggregate losses caused by the alleged misstatements from losses caused by other factors as required under the securities laws.  To this end, Werner's analysis is premised on the ███████

████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████

█████████████████████████████████████████████████ He makes this assumption despite knowing that the ███████████████████████████████████████████████████

████████████████████████████████████████████████████████

Werner also assumes that FXCM's settlements related to the CFTC and NFA's allegations regarding FXCM's pay-for-flow agreement with Effex during the 2010 to 2014 period and all the related collateral consequences[2] of those events, including the Company's payment of a $7 million civil monetary penalty, its withdrawal from the U.S. market, and plan to lay off approximately 18% of its workforce (among others), ██████████████████████████████████████

████████████████████████████████████████████████████████

██████████████████████████ Thus, Werner ████████████████████████████

█████████████████████████████████████████████████ Yet, Werner offers no analysis or evidence to support his assumptions, which are contrary to the record, this

---

[2] As Professor Terrence Hendershott, Defendants' damages expert, explains, █████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

███████ Ex. 4, Hendershott Report ¶ 43; *see also* Ex. 14, Cornell & Rutten, *Collateral Damage and Securities Litigation*, 717 Utah L. Rev. 3, at 721 (2009) (describing ████████████████████

████████████████████████ as "collateral damage" and noting that the term refers to "the valuation impact of a corrective disclosure that does not correspond to the original inflation").

Court's prior ruling regarding FXCM's disclosure obligations under the securities laws,[3] and common sense.

Werner's methodology also contains other significant errors that render his opinions unreliable.  Rather than analyze varying levels of alleged inflation throughout the nearly five-year Class Period, ████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████ Werner fails to take into account, or even consider, that ████████████████████████████████████████████████████████████████████████████████████████████████████████████████

Werner's analysis is further flawed because he ████████████████████████████████████████████████████████████████████████████████████████████ As this Court previously ruled in denying certification of a class for the FXCM Notes, Plaintiffs and Werner have failed to establish that the FXCM Notes traded in an efficient market during the Notes Period.[4]  Werner also fails to conduct *any* substantive loss causation or damages analysis whatsoever concerning the alleged misstatements regarding FXCM's compliance with Generally Accepted Accounting Principles ("GAAP").  As such, Plaintiffs put forth no expert testimony supporting any damages for the GAAP-related allegations.

---

[3] In its March 28, 2019 Opinion & Order on the Motion to Dismiss the Second Amended Complaint ("SAC"), the Court held that the SAC's actionable allegations of securites fraud were time limited from the begining of the Class Period through the end of Effex's Order flow arrangment in August 2014.  *See* ECF No. 135 at 38.  Werner's analyis does *not* account for these date limitations.

[4] Werner defines the "Notes Period" as June 24, 2014, when the FXCM Notes first started trading, through February 6, 2017.  ECF No. 152-1 at 4.

Therefore, as explained in greater detail below, the Court should grant Defendants' motion and exclude Werner's reports, testimony, and opinions.

## **BACKGROUND**

Plaintiffs claim that during the Class Period FXCM's public filings contained materially false and misleading statements in violation of Sections 10(b) and 20(a) of the Exchange Act and Rule 10b-5 promulgated thereunder. Specifically, Plaintiffs allege that FXCM misled investors by falsely representing that its No Dealing Desk ("NDD") platform was free of conflicts of interest when FXCM actually had an undisclosed financial interest in Effex, a market maker that consistently "won" the largest share of FXCM's NDD trading volume. *See* ECF No. 181 at ¶¶ 2-5. Plaintiffs also allege that as a result of FXCM's relationship with Effex, the Company's financial statements did not comply with GAAP. *Id.* ¶ 13. According to Plaintiffs, the "truth" was revealed on February 6, 2017, when news that FXCM had entered into settlements with the CFTC and NFA concerning alleged regulatory violations relating to the Company's pay-for-flow agreement with Effex became public. *Id.* ¶¶ 79-80. According to Plaintiffs, this disclosure led to a drop in the price of the FXCM Securities on February 7, 2017. *Id.* ¶¶ 82-83.

Plaintiffs have retained Werner as their expert witness in two capacities. First, as an expert on market efficiency in connection with Class Certification. Second, as an expert regarding loss causation and damages. On April 21, 2021, Werner submitted an expert report on loss causation and damages (the "Werner Report"). *See* Ex. 1.[5] Werner was deposed on June 4, 2021 (Ex. 2, Werner June 4, 2021 Tr.), and on July 12, 2021, he submitted a rebuttal report (the "Rebuttal Report") (Ex. 3) in response to the report on loss causation and damages submitted by Professor

---

[5] Citations to "Ex. __" are to the exhibits attached to the September 9, 2021 Declaration of Israel Dahan in Support of Defendants' Motion to Exclude the Reports, Testimony, and Opinions of Dr. Adam Werner.

Terrence Hendershott (the "Hendershott Report") (Ex. 4). Werner's loss causation and damages opinions, reports, and testimony are the subject of the present motion.

### A.      Werner's Prior Reports And Opinions Regarding Market Efficiency

Werner previously submitted testimony as an expert on market efficiency at the class certification stage, and he submitted a report in support of Plaintiffs' motion for class certification (the "Market Efficiency Report"). In his Market Efficiency Report, Werner opined that FXCM's common stock traded in an efficient market throughout the Class Period and that the FXCM Notes traded in an efficient market throughout the Notes Period. ECF No. 152-1 at 3-5. Werner also opined that if Plaintiffs' proposed classes of stock and noteholders were certified it would be possible to design a common methodology that would allow a finder of fact to compute any damages on a class-wide basis and described at a high-level how he would go about doing so. *Id.* at 5, ¶¶ 159-61.

On June 12, 2020, Defendants filed their opposition to Plaintiffs' motion for class certification. ECF No. 187. Included, was a report from Professor Terrence Hendershott. ECF No. 188-1. Hendershott disputed Werner's conclusion that the FXCM Notes traded in an efficient market. *Id.* ¶¶ 11-13. Hendershott also opined that Werner had not proposed a viable class-wide damages methodology, in that Werner had failed to: (i) explain how his damages model could disentangle the securities' price reaction related to the allegedly corrective information from the reaction due to the collateral consequences associated with the alleged corrective disclosures on February 6, 2017; (ii) demonstrate that the residual price movement on February 7, 2017 identified by his flawed event study could provide a reliable measure of the value impact of the allegedly corrective information revealed the prior day; and (iii) account for the potential that the level of price inflation for the securities based on the alleged misrepresentations would likely change if the corrective disclosures were made at different times across the putative Class Period. *Id.* ¶¶ 14-15.

On July 27, 2020, Werner filed a rebuttal report (the "Market Efficiency Rebuttal Report"), in which he argued that Hendershott's criticisms of his proposed damages methodology were premature because he had not yet conducted a loss causation or damages analysis. ECF No. 196-1 ¶ 79. Werner vouched that when he eventually did so, he would "take special care to ensure that an inflation ribbon is constructed such that it properly controls for potential valuation complexities," such as those Hendershott noted. *Id.* ¶ 82. Werner also assured the Court that he had at his disposal "a variety of valuation tools designed to accommodate the potential valuation complexities identified by Dr. Hendershott," including: valuation multiple models, such as those based on earnings, EBITDA, revenue, book value, and cash flow; discounted cash flow models (DCF); and return attribution analysis. *Id.* ¶ 85.

On October 15, 2020, the Court held an evidentiary hearing on Plaintiffs' class certification motion at which both Werner and Hendershott testified. The Court subsequently found that "plaintiffs ha[d] not met their burden of demonstrating that the FXCM Notes traded in an efficient market throughout the Notes Period." ECF No. 229 at 37.[6] The Court noted that "[t]he only direct evidence of market efficiency in the record . . . [was] Dr. Werner's event study, which [was] of limited utility due to the nature (and timing) of the two events chosen." *Id.* Therefore, the Court denied Plaintiffs' motion to certify a class of FXCM Noteholders. *Id.* at 40.

As part of its class certification ruling, the Court found that Defendants' criticisms of Werner's proposed damages methodology were premature. *Id.* at 39. The Court noted that Plaintiffs' burden regarding damages was minimal at the class certification stage, and that "any issues pertaining to the construction of an inflation ribbon or the subsequent adjustments necessary

---

[6] The March 18, 2021 Report and Order (ECF No. 229) was adopted by the Court on March 23, 2021 (ECF No. 232).

for case-specific valuation complexities [could] be addressed when plaintiffs address loss causation . . . ." *Id.* (internal quotation and citation omitted).

**B.    Werner's Current Opinions On Loss Causation And Damages**



Werner's Report opines that ███████████████████████████████

███████████████████████████████████████████████████████

████   Ex. 1, Werner Report ¶ 7.   According to Werner, FXCM's actions ███████████

███████████████████████████████████████████████████████

█████████████████████████████████████████   *Id.*  Werner concludes that

███████████████████████████████████████████████████████

███████████████████████   *Id.*

Werner's opinions on loss causation and damages rely on the ███████████

███████████████████████████████████████████████████████

████   He did not employ any of the "variety of valuation tools" described in his Market Efficiency Rebuttal Report.   Based on his event study, Werner concludes ███████████

███████████████████████████████████████████████████████   *Id.*

¶ 9.   He also concludes that ███████████████████████████████

███████████████████████████████████████████████████████

███████████████████████████████████████████████████████   *Id.*

¶ 12.   According to Werner, ███████████████████████████████████

█████████████████████████████   *Id.*

## LEGAL STANDARD

The Federal Rules of Evidence assign district courts a "gatekeeping function," charging them "with 'the task of ensuring that an expert's testimony both rests on a reliable foundation and is relevant to the task at hand.'"   *Amorgianos v. National R.R. Passenger Corp.*, 303 F.3d 256, 265

(2d Cir. 2002) (quoting *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 507 U.S. 579, 597 (1993)). In conducting this inquiry, "a district court should consider the indicia of reliability identified in Rule 702, namely, (1) that the testimony is grounded on sufficient facts or data; (2) that the testimony 'is the product of reliable principles and methods'; and (3) that 'the witness has applied the principles and methods reliably to the facts of the case.'" *Amorgianos*, 303 F.3d at 265 (quoting Fed. R. Evid. 702).

The proponent of the expert testimony has the burden of establishing by a preponderance of the evidence that it satisfies those standards. Fed. R. Evid. 702 Advisory Committee Note (2000); *see also U.S. v. Williams*, 506 F.3d 151, 160 (2d Cir. 2007). And "when an expert opinion is based on data, a methodology, or studies that are simply inadequate to support the conclusions reached, *Daubert* and Rule 702 mandate the exclusion of that unreliable opinion testimony." *Amorgianos*, 303 F.3d at 266; *see also Ruggiero v. Warner-Lambert Co.*, 424 F.3d 249, 255 (2d Cir. 2005) (same).

## ARGUMENT

"To warrant admissibility . . . it is critical that an expert's analysis be reliable at every step." *Amorgianos*, 303 F.3d at 267. "[R]eliability within the meaning of Rule 702 requires a sufficiently rigorous analytical connection between that methodology and the expert's conclusion." *Nimely v. City of New York*, 414 F.3d 381, 396 (2d Cir. 2005); *see also Amorgianos*, 303 F.3d at 267 ("In deciding whether a step in an expert's analysis is unreliable, the district court should undertake a rigorous examination of the facts on which the expert relies, the method by which the expert draws an opinion from those facts, and how the expert applies the facts and methods to the case at hand."). While "[a] minor flaw in an expert's reasoning or a slight modification of an otherwise reliable method will not render an expert's opinion *per se* inadmissible," an expert should be excluded

where "the flaw is large enough that the expert lacks 'good grounds' for his or her conclusions." *Amorgianos*, 303 F.3d at 267 (citation and quotation omitted).

As demonstrated below, Werner's loss causation and damages analysis is seriously flawed and unreliable; thus, it should be inadmissible.

## I.   Werner's Analysis Of The Corrective Disclosure And Its Value Impact Is Flawed And Unreliable

"In order to prove loss causation, [a] [p]laintiff[] must show that the concealed information later reached the market and caused their loss." *Atlantica Holdings, Inc. v. Sovereign Wealth Fund Samruk-Kazyna JSC*, 477 F. Supp. 3d 88, 110 (S.D.N.Y. 2020).   One method is the "corrective disclosure theory," under which "a plaintiff must show that the market reacted negatively to a 'corrective disclosure,' which revealed an alleged misstatement's falsity or disclosed that allegedly material information had been omitted." *Id.* (citation and quotation omitted).   However, a plaintiff must "'disaggregate' losses caused by 'disclosures of the truth behind the alleged misstatements from losses caused by other factors, including changed economic circumstances, changed investor expectations, new industry-specific or firm-specific facts, conditions, [and] other events.'" *Id.* (quoting *In re Flag Telecom Holdings, Ltd. Sec. Litig.*, 574 F.3d 29, 36 (2d Cir. 2009)).

As explained below, Werner's loss causation analysis is simply not reliable.   Not only does Werner fail to disaggregate the impact of the allegedly corrective information concerning FXCM's relationship with Effex from collateral consequences, he also fails to demonstrate that the allegedly corrective information would even have been value relevant to investors.   Accordingly, his analysis does not reliably demonstrate the dollar value of any alleged price inflation for the FXCM Securities resulting from the alleged misstatements or omissions concerning FXCM's relationship with Effex, let alone demonstrate that the totality of the price decrease at the end of the Class

Period was attributable to dissipation of the inflation resulting from any alleged corrective disclosure related to this relationship.

> **A.**    **Werner Fails To Disentangle The Impact Of Allegedly Corrective Information From Other Collateral Consequences**

In a properly constructed analysis, "[t]he first step . . . is the translation of the legal theory of the harmful event into an analysis of the economic impact of that event." *Comcast Corp. v. Behrend*, 569 U.S. 27, 38 (2013) (quoting Federal Judicial Center, Reference Manual on Scientific Evidence 432 (3d ed. 2011)).  Accordingly, a damages expert should begin with "a description of the defendant's proper actions in place of its unlawful actions and a statement about the economic situation absent the wrongdoing, with the defendant's proper actions replacing the unlawful ones (the but-for scenario)."  Federal Judicial Center, Reference Manual on Scientific Evidence at 432 (3d ed. 2011).  In simpler terms—and as Hendershott explains in his report—the expert needs to identify the "but-for disclosure," *i.e.*, "what the company could and should have disclosed to correct the alleged fraud at an earlier point in time."  Ex. 4, Hendershott Report ¶ 31.

Werner does not identify—or even analyze—the substance of the relevant "but-for disclosure" in this case.  The parties agree that multiple pieces of information about FXCM were released to the market on February 6, 2017—not only the CFTC and NFA's allegations regarding FXCM's pay-for-flow relationship with Effex during the 2010 to 2014 period, but also that FXCM would pay a civil monetary penalty of $7 million, withdraw from its U.S. business, and planned to lay off approximately 18% of its workforce.  *See, e,g.*, Ex. 1, Werner Report ¶¶42-44.  Werner makes no effort to disaggregate the price impact of these separate pieces of information.  Instead, Werner assumes that the ███████████████████████████████████████████████████████████████████ ███████████████        *See, e.g.*, Ex. 1, Werner Report ¶¶ 8, 46, 54, 84; *see also* Ex. 2, Werner Tr. at 368:9-

372:16.  And relying on his assumption that the ███████████████████████████

███████████████████████████████████████████████████████████████

███████████████████████████████████████████████████████████████

███████████████████████████████████████████████████████████████

████████████████████  Ex. 1, Werner Report ¶ 83.  While Defendants do not dispute that event

studies are commonly used in loss causation and damages analyses, "[a]n event study may be

rejected . . . if it is methodologically unsound or unreliable."  *Teamsters Local 445 Freight Div.*

*Pension Fund v. Bombardier*, 546 F.3d 196, n. 15 (2d Cir. 2008).

Here, Werner's analysis and event study is based on a single flawed premise:  ███████

███████████████████████████████████████████████████████████████

███████████████████████████████████████████████████████████████

████████████████████████████  Ex. 2, Werner Tr. at 443:2-22.  Put simply, Werner

contends that the ███████████████████████████████████████████████

███████████████████████████████████████████████████████████████

██████████████████████████████████████████████████  Ex. 1, Werner

Report ¶¶ 8, 46, 84.  This premise is what allows him to ██████████████████████

██████████████████████████████████████████████  Werner admits

that he made this assumption because he ██████████████████████████████████

███████████████████████████████████████████████████████████████

███████████████████████████████████████████████████████████████

Ex. 2, Werner Tr. at 443:2-22.  Yet, Werner conducts no substantive analysis to determine whether

his assumption of ████████████████  makes economic (or practical) sense.

During his deposition Werner agreed that as a █████████████████████████

████████████████████████████████████████████████████████████████████

█████████████████████████ *See* Ex. 2, Werner Tr. at 417:20-25.  Yet, Werner attempts to

defend his ███████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████████

███████████████████ *Id.* at 464:21-465:16.  According to Werner, ███████████████

████████████████████████████████████████████████████████████████████

██████████████████████████████ Ex. 3, Rebuttal Report ¶ 18.  In fact, Werner

assumes that the ██████████████████████████████████████████████████████

████████████████████████████████████████████████████ In other words, Werner

contends that regardless of whether the ████████████████████████████████

████████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████████

█████████████████████████████████████████████████████████ But Werner

cites no evidence to prove that this was the case, nor could he.  *See In re BP p.l.c. Sec. Litig.*, No.

4:10-MD-2185, 2016 WL 3090779, at *33 (S.D. Tex. May 31, 2016) (finding plaintiffs failed to

demonstrate damages where the materialization of a risk was "highly likely" but less than 100%

and plaintiffs were "consequently not permitted to claim 100% of the stock decline as damages

upon the materialization of that understated risk").

In fact, Werner's ██████████████ premise is undermined by the factual record.  As Werner

admits, FXCM only became ████████████████████████████████████████████

█████████████████████████████████████████ Ex. 1, Werner Report ¶ 36. ████

████████████████████████████████████████████████████████████████████

████████████████████████████████████████ Werner also

conceded at his deposition that ███████████████████████████

████████████████ Ex. 2, Werner Tr. at 456:7-11.  Yet, as Hendershott points out,

Werner ignores the reality that settlement outcomes may be driven by negotiation and factors

unrelated to the allegations, including a company's level of cooperation and other business

considerations.[7]  Ex. 4, Hendershott Report ¶ 51.  Thus, unlike ████████████████████

██████, here no statute provides pre-defined penalties for the alleged CFTC violations, rendering

the exact consequences of an alleged violation unknowable.  Not surprisingly, Werner is unable to

point to any preexisting CFTC decisions or settlements regarding similar conduct that would serve

as precedent to support his foreseeability assumption.  As such, Werner simply fails to support his

primary analytical premise.

Werner's assertion that the ██████████████████████ is also contrary to

this Court's prior rulings.  Plaintiffs alleged in the TAC that after the CFTC investigation began in

---

[7] Indeed, multiple events that were unrelated to the CFTC and NFA allegations occurred during
the Class Period that FXCM could not have foreseen, and which influenced the settlement
negotiations.  On January 15, 2015—during the pendency of the CFTC's and NFA's
investigations—the Swiss National Banc announced that it would immediately end it's three-year-
old peg of 1.20 Swiss francs to one euro, just days after it had assured the market it had no intention
of removing the currency peg.  Ex. 8, Reuters, "Swiss franc jumps 30 percent after Swiss National
Bank dumps euro ceiling" (January 15, 2015).  This announcement resulted in widespread market
disruption, causing a drop of nearly 30% in the value of the euro relative to the Swiss Franc (the
"SNB Flash Crash").  *Id.*  FXCM customers with positions in this currency pair lost more than
$275 million and FXCM faced a regulatory capital shortfall.  Ex. 9, FXCM 2015 Form 10-K at
13-14.  As a result, FXCM was forced to take a $300 million emergency loan from Leucadia
National Corporation ("Leucadia").  Ex. 10, FXCM Jan 19, 2015 8-K; Ex. 4, Hendershott Report
¶ 110.  FXCM and Leucadia subsequently entered into an additional agreement, pursuant to which
Leucadia appointed three FXCM directors.  Ex. 11, FXCM Mar. 10, 2016 Form 8-K. ████████
████████████████████████████████████ Ex. 12, D. Niv Feb. 11, 2021 Tr. 272:13-273:8.
Furthermore, the proceeds FXCM realized from the sale of its U.S. customer accounts to GAIN
Capital Holdings, Inc. in connection from its withdrawal from the U.S. market following its
settlements with the CFTC and NFA, as well as the $52 million in savings generated thereby, were
allocated to service the Leucadia debt.  Ex. 13, FXCM Feb. 6, 2017 Form 8-K.

2014, FXCM's SEC filings were materially misstated because the Company failed to disclose that the CFTC was investigating its relationship with Effex.  ECF No. 181 ¶ 165.  Plaintiffs also alleged that FXCM's statement in its 2016 Q3 filing that the CFTC was "currently examining the relationship with US [FXCM's United States subsidiary] and one of its liquidity providers" was misleading because the Company had entered into a tolling agreement with the CFTC, therefore the Company was aware "that it was facing a high likelihood of imminent legal action from the regulators, far beyond a mere 'examin[ation.]'"  *Id.* ¶¶ 167-68.  The Court dismissed these claims, holding that "there is no independent duty for a company to disclose that it is being investigated by a regulatory agency," and that "companies do not have an affirmative duty 'to speculate or disclose uncharged, unadjudicated wrongdoings or mismanagement."  ECF No. 135 at 27-28 (quoting *In re UBS AG Sec. Litig.*, No. 07 Civ. 11225 (RJS), 2012 WL 4471265, at *31 (S.D.N.Y. Sept. 28, 2012).  For the same reasons, Werner's assertion that Defendants, ▬▬▬▬▬

▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬

▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬

▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬

▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬

### B.     Werner Fails To Show That The Allegedly Corrective Information Would Have Been Value Relevant To Investors

In addition to his failure to disentangle the impact of the alleged corrective information from other collateral consequences on February 7, 2017, Werner also fails to provide any evidence or analysis to support the proposition that FXCM's historical pay-for-flow agreement with Effex was even value relevant to investors as of February 6, 2017, let alone that the same corrective disclosure would have had a similar or greater price impact earlier in the Class Period.

As Hendershott explains, ███████████████████████████████████

███████████████████████████████████████████████████████████ Ex.

4, Hendershott Report ¶ 58.   FXCM's order flow relationship with Effex ended in August 2014,

and FXCM disclosed in November 2014 that as of August 1, 2014, it no longer received payments

for order flow.   ECF No. 135 at 21.   Indeed, the Court dismissed Plaintiffs' claims regarding

FXCM's disclosures related to the period after August 1, 2014.  *Id.* at 21.[8]  By February 7, 2017,

FXCM had not received payments for order flow from Effex for more than two years.  And Werner

points to no evidence demonstrating that the terminated historical relationship was relevant to

FXCM's future cash flows.   Nor does Werner support his conclusory assertion that ████████

████████████████████████████████████████████████ *See, e.g.*,

Ex. 1, Werner Report ¶¶ 8, 46, 91.  In fact, as Hendershott points out, FXCM had been operating

for more than two years during the Class Period (*i.e.*, August 2014 to February 2017) without

receiving a single order flow payment from Effex, ███████████████████████

███████████████████████████████████████████████ Ex. 4,

Hendershott Report ¶ 61.   And though FXCM agreed to withdraw from the U.S. market in

connection with the settlements, it continues to operate as an online foreign exchange broker in

foreign markets to this day (over four years later).

In his Rebuttal Report, Werner attempts to salvage his conclusions by arguing that

█████████████████████████████████████████████████████████████

---

[8] *See* ECF No. 135 at 21 ("The Court agrees with Defendants, however, that plaintiffs have failed
to plead that the Company's allegedly problematic relationship with Effex persisted past August
2014, when their order flow arrangement came to a halt. . . . Accordingly, the second amended
complaint plausibly alleges FXCM misled investors in its public filings with respect to its
purported agency-trading model, but only from the beginning of the Class Period until the end of
its order flow arrangement with Effex in August 2014.")



Ex. 3, Rebuttal Report ¶ 17.  But this simplistic assertion is insufficient to render Werner's analysis reliable.   It is Plaintiffs' responsibility under the securities laws to disaggregate losses caused by disclosure of the alleged misstatements from losses caused by other factors.  *See Atlantica Holdings*, 477 F. Supp. 3d at 110.  And Werner's discussion of ███████████████████████████████████████████ is simply not helpful for a fact finder seeking to determine the price impact, if any, attributable to the specific alleged corrective disclosures here.

**II.   Werner's ████████████████████ To Estimating Inflation Fails To Reliably Measure Damages**

To calculate the level of alleged inflation in the FXCM Securities, Werner constructs an ████████████████████████████████████████████████ Ex. 1, Werner Report ¶¶ 86, 88.  More specifically, Werner estimates ███████████████ ████████ *Id.* ¶¶ 92, 94-96.  Werner calculates ██████████████ ███████████████████████████████████████████████ *Id.* ¶¶ 90, 92, 96. This constant-dollar approach is inherently unreliable.

Werner's ████████████████ fails to control for the fact that the nature of the alleged disclosure, as well as FXCM's financial situation and the likely value relevance of that disclosure to investors, varied over the course of the nearly five-year Class Period, rendering it unreliable. *See In re Wireless Telephone Servs. Antitrust Litig.*, 385 F. Supp. 2d 403, 427 (S.D.N.Y. 2005)



("Where an expert conducts a regression analysis and fails to incorporate major independent variables, such analysis may be excluded as irrelevant."). As Hendershott explains, [redacted] Ex. 4, Hendershott Report ¶ 98.

For example, even according to Werner, FXCM [redacted] Ex. 1, Werner Report ¶ 36. Thus, as Hendershott points out, [redacted] Ex. 4, Hendershott Report ¶ 102. Similarly, FXCM's pay-for-flow agreement with Effex ended in August 2014. Therefore, [redacted] *Id.* Because Werner's entire approach assumes that the [redacted], he fails to analyze these factual developments and does not consider how they might have changed the price impact, if any, of the alleged corrective disclosures over time, despite acknowledging [redacted].[9]

Werner's simplistic [redacted] also ignores the fact that the price effect of the corrective disclosures would necessarily have changed throughout the Class Period. As Hendershott explains, even if one could accept the proposition that the but-for disclosure could have remained the same throughout the Class Period, constant dollar inflation is not an appropriate approach if the value implications of that disclosure changed over time. Ex. 4, Hendershott Report

[9] *See* Ex. 2, Werner Tr. at 417:20-24 [redacted]

¶ 103.  For example, if FXCM made a corrective disclosure about its relationship with Effex at the beginning of the Class Period, more than two years before the CFTC investigation even started, the market's expectation regarding regulatory consequences could have been different than its expectations at the end of the Class Period.  *Id.* ¶ 105.  Werner fails to consider this reality.  Nor does Werner analyze factors that could have altered the settlement outcome or how the market would have valued that type of uncertainty if the corrective information was revealed at different points in time.  *Id.*  Furthermore, Werner fails to consider the fact that FXCM's business changed drastically during the Class Period and was dramatically affected by the SNB Flash Crash that occurred two years before the end of the Class Period.  *Id.* ¶¶ 107, 110.  And though Werner asserts that FXCM's ███████████████████████████████████████████████████████ ██████, he makes no effort to deal with the possibility that the value implications of a withdrawal from the U.S. market would likely have been different at different points in the Class Period because FXCM investors' perception of the value of the US business would have fluctuated with its performance changes over time.

The deficiencies of Werner's ██████████████████████ are particularly stark with respect to the FXCM Notes.  According to Werner, because FXCM had a ████████████ ███████████████████████████████████████████████████████████ ███████████████████████████████████████████████████████████ ██████ Ex. 3, Rebuttal Report ¶ 29.  Werner offers no support for this conclusion.  Furthermore, according to Werner, ██████████████████████████████████████████████ ███████████████████████████████████████████████████████████ ████████████████████ ECF No. 152-1 ¶ 137.  However, ██████████████████████████ ███████████████████████████████████████████████████████ Ex. 4, Hendershott

Report ¶ 110.  For example, FXCM's capital and ownership structure changed drastically after the SNB Flash Crash and the resulting emergency loan from Leucadia.  *Id.*  On June 24, 2014, when the FXCM Notes started trading, FXCM's equity market capitalization was approximately $645 million and the Notes were trading at approximately par.  *Id.*  At the end of the Class Period on February 6, 2017, FXCM's equity market capitalization was approximately $38 million and the FXCM Notes were trading below $50, *i.e.*, substantially below par.  *Id.*  Werner simply fails to consider that given the equity cushion, the FXCM Notes might have been less, rather than more, reactive to new information earlier in the Class Period, and his unsupported assertion that ███████

████████████████████████████████████   Simply put, these issues demonstrate that Werner's simplistic ████████████████████ is not the product of reliable principles and methods.

Werner's attempt to justify the use of a ████████████████████████████ ██████████████████ is an unsupported strawman argument.  Werner argues that his model is ████████████████████████████████████████████████████████████████ ████████████████████████████████████████ Ex. 1, Werner Report ¶¶ 94-95.  However, Courts have found that constant percentage models are inappropriate because they can artificially inflate damages.  *See, e.g.*, *In re Williams Sec. Litig.*, 496 F. Supp. 2d 1195, 1270 (N.D. Okl. 2007) (finding expert's constant percentage inflation approach did not satisfy Rule 702 and *Daubert* because it would allow plaintiffs to recover damages for stock drops unrelated to the corrective disclosure).  Werner cannot justify the deficiencies in his own model by pointing to another, even more unreliable methodology.

Nor can Werner justify his failure to analyze how the alleged corrective disclosures would have had differing price impacts at different times during the Class Period. Werner argues that

██████████████████████████████████████████████████████

██████████████████████████████████████████████████████

██████████     Ex. 3, Rebuttal Report ¶ 29 (emphasis removed).  This overly simplistic summary of Plaintiff's claims misses the point.  Werner purports to have analyzed—as an expert—how the market would have priced the value impact of the alleged corrective disclosure throughout the Class Period.  Ex. 1, Werner Report ¶¶ 88-94.  Simply pointing to Plaintiffs' allegations about the period prior to the Class Period demonstrates nothing about how the market would have priced the alleged corrective disclosure if it was revealed at various points during the Class Period.  Accordingly, it cannot justify Werner's failure to conduct such an analysis.  And though Werner acknowledges that ████████████████████████████████████████████

██████████████████████████████████████████████████████

██████████████████████████████████████████████████████

██████████████████████████████████████████████████████

██████████     Ex. 3, Werner Rebuttal Report ¶ 31.  Werner does not perform any analysis to support this conclusion.  Instead, rather than taking "special care" to construct a valuation ribbon that "properly controls for potential valuation complexities" as he vouched to the Court that he would do (ECF No. 196-1 ¶ 82), Werner  relies solely on his *ipse dixit*, an approach that simply cannot survive the rigorous examination required of a district court under *Daubert*.

## III.   Werner's Opinions Regarding Loss Causation And Damages Stemming From The Alleged GAAP Violations Are Unsupported And Inadmissible

In his Report, Werner acknowledges Plaintiffs' allegation that "FXCM's financial statements violated SEC regulations and [GAAP] for failing to disclose FXCM's economic interest in, contractual and related party relationship with, and control over, Effex during the Class Period." Ex. 1, Werner Report ¶ 26(f).  Yet, he provides *zero* analysis regarding loss causation and damages

related to the alleged GAAP violations.  Aside from quoting Plaintiffs' allegation, Werner's Reports fail to discuss GAAP issues at all.  At his deposition, Werner testified that the ███ ████████████████████████████████████████████████████████████████████████ ███████ Ex. 2, Werner Tr. at 487:19-488:15.  However, Werner provides no specific analysis regarding the alleged price impact of Plaintiffs' GAAP allegations, and despite Hendershott's criticisms of Werner's lack of analysis (Ex. 4, Hendershott Report ¶¶ 67-71), Werner entirely fails to address the issue in his Rebuttal Report.  Furthermore, Plaintiffs have not identified any disclosure that "corrected" the alleged GAAP violations.  *Id.* ⁋ 68.  FXCM has not issued any restatements to its financial statements for fiscal years 2011 through 2014, and the CFTC and NFA did not address any issues with FXCM's accounting.  *Id.*;  *see also* Ex. 5, NFA Decision; Ex. 6, NFA Complaint, Ex. 7, CFTC Order.  Werner's Reports set forth no GAAP related disclosures. Indeed, at his deposition Werner did not even ██████████████████████████████████ ██████████████ Ex. 2, Werner Tr. at 488:16-489:3.  Absent any corrective disclosure tied to the alleged GAAP violations, Werner cannot rely on any price drop associated with the alleged corrective disclosures on February 6, 2017 to assess loss causation or damages associated with Plaintiffs' GAAP-related allegations.  Accordingly, any opinion Werner might offer on loss causation and damages related to GAAP issues is simply not the product of reliable principles and methods and should be excluded.

## IV.    Werner's Opinions Regarding Loss Causation And Damages With Respect To The FXCM Notes Are Not Admissible

As discussed above, the Court refused to certify a class of FXCM Noteholders because Plaintiffs failed to "establish[] that the FXCM Notes traded in an efficient market."  ECF No. 229 at 37.  The Court also noted that Werner's event study regarding market efficiency was of "limited utility due to the nature (and timing) of the events chosen."  *Id.*  Yet, rather than employ any of the

valuation tools he described at the class certification stage, Werner simply relies ███████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████   Ex. 2, Werner Tr. at 411:17-23.  These deficiencies render

Werner's Notes opinions inadmissible because an event study is not an appropriate tool to study

price impact unless the market for a security is efficient.

As Hendershott explains, ████████████████████████████

████████████████████████████████████████████████████

███████████████   Ex. 4, Hendershott Report ¶ 86 (quoting Craig A. MacKinlay, "Event Studies in

Economics and Finance," Journal of Economic Literature 35(1): 13-19 at 13 (1997)).  Therefore,

████████████████████████████████████████████████████

████████████████████████████████████████████████████

█████████████   *Id.* ¶ 86.  And ███████████████████████████

████████████████████████████████████████████████████

████████████████████████████████   *Id.* ¶ 87.  This is because ███████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████   *Id.*   ██████████████████████████████████████

████████████████████████████████████████████████████

██████████████████████████████████████   *Id.*

Here, there is every reason to believe that the price decline on February 7, 2017 is not a

reliable measure of value impact on the day of the disclosure, let alone throughout the nearly five-year Class Period.  As Hendershott points out, Werner's ███████████████████████████████████

███████████████████████████████████████████████████████████████████

████████  Ex. 4, Hendershott Report ¶ 91.  Towards the end of the Class Period the volume and frequency of Notes trading had decreased significantly, and on the alleged corrective disclosure day Werner was forced to ████████████████████████████████████████████

███████████████████████████████████████████████████████████████████

██████  *Id.*  Furthermore, by the end of the Class Period the markers of inefficiency, such as low volume and lack of analyst coverage, were particularly acute (*id.* ¶ 88), and FXCM's financial situation and the equity cushion underlying the Notes had deteriorated significantly (*id.* ¶ 110).  Accordingly, there is every reason to believe that the Notes market's efficiency and the Notes' sensitivity to new information might be substantially different at the end of the Class Period than earlier in the Class Period.  *See id.* ¶¶ 107-11.  Werner makes no analytical adjustments for these factors.  Indeed, despite these factors, he simply relies on an event study and fails to avail himself of any of the additional valuation tools he assured the Court were available to him when defending his proposed methodology at the class certification stage.

In his Rebuttal Report, Werner proffers no substantive defense of his methodology in response to these concerns about the Notes market's efficiency.  Instead, he simply argues that because the ████████████████████████████████████████████████

███████████████████████████████████████████████████████████████████

███████████████████████████████████████████████████████████████████

███████████████████████████████████████████████████████████████████

Ex. 3, Rebuttal Report ¶ 33.  According to Werner his ████████████████████████████

███████████████████████████████████████████████

███████████████████████████████████████████████

██████████████████████████████████ Rather, it is Plaintiffs' burden to

demonstrate that Werner's opinions are the result of a reliable methodology.

Given the undeniable flaws that permeate every step of Werner's analysis of loss causation

and damages with respect to the FXCM Notes, Plaintiffs simply cannot demonstrate that Werner's

opinions are the product of reliable principles and methods.  Indeed, Werner's testimony and

opinions will only serve to confuse the issues and should, therefore, be excluded.

## CONCLUSION

For all the foregoing reasons, Defendants respectfully request that the Court exclude the

reports, testimony and opinions of Dr. Adam Werner.

Dated: New York, New York
September 9, 2021

Respectfully submitted,

KING & SPALDING LLP

By: */s/ Israel Dahan*
Israel Dahan
Peter Isajiw
Evan Ennis
Ryan Gabay
KING & SPALDING LLP
1185 Avenue of the Americas
New York, NY 10036
Telephone No.:  (212) 556-2114
idahan@kslaw.com
eennis@kslaw.com
rgabay@kslaw.com

Chelsea J. Corey
KING & SPALDING LLP
300 South Tryon Street
Suite 1700
Charlotte, NC 28202
Telephone No.:  (704) 503-2575
ccorey@kslaw.com

*Counsel for Defendants*