# Exhibit 14

# COLLATERAL DAMAGE AND SECURITIES LITIGATION

## Bradford Cornell and James C. Rutten[*]

*Damages arise in securities cases when misstatements or omissions inflate the price of a security above its true value. Investors who buy the securities at these inflated prices are damaged when subsequent revelation of the misstatements or omissions causes the price of the securities to return to their fair value. But what if the subsequent revelation causes the price to fall much more than the original inflation? For example, with respect to stock option backdating, economic research indicates that failure to account properly for employee options does little to inflate security prices, but in numerous instances the subsequent revelation of option backdating led to significant stock price declines. The term coined for the decline in excess of the original inflation is "collateral damage." Here we examine collateral damage from both an economic and legal perspective. We conclude that while collateral damage can have a material impact on securities prices, declines associated with collateral damage are not, and should not be, recoverable under section 10(b) of the Securities Exchange Act of 1934.*

### TABLE OF CONTENTS

I. INTRODUCTION ................................................. 717
II. OVER-DISCLOSURE AND COLLATERAL DAMAGE ........................................... 719
III. VALUE CREATION AND COLLATERAL DAMAGE ............................................ 722
IV. DOES SECTION 10(B) PERMIT RECOVERY FOR COLLATERAL DAMAGE? ...... 727
   A. *The Supreme Court's Analytical Framework for Construing the Scope of the Implied Right of Action Under Section 10(b)* ........................................ 730
   B. *The Elements of the Section 10(b) Cause of Action* .................................. 738
      1. *The Existence of a Duty to Disclose* ...................................................... 738
      2. *Materiality* ................................................................................. 741
      3. *Transaction Causation* ............................................................... 743
      4. *Loss Causation* ............................................................................ 743
      5. *The "In Connection With" Requirement* ................................................. 745
V. CONCLUSION ............................................... 746

## I. INTRODUCTION

Despite recent rulings, including the groundbreaking decision in *Dura Pharmaceuticals, Inc. v. Broudo*,[1] the concept of inflation remains the linchpin of

---

[*] © 2009 Bradford Cornell & James C. Rutten. The authors are grateful to Mathew Dark and Miriam Steele of Allens Arthur Robinson, and John Haut of Charles River Associates for helpful comments.

damages analysis in securities litigation. If a misrepresentation or omission fails to inflate the price of a company's securities, then damages are zero regardless of any other considerations, and there is no reason for plaintiffs to proceed. Nonetheless, the problem of measuring inflation has received less attention in recent years as focus has shifted to other issues, such as causation. This has led to conceptual gaps in the legal and financial analysis of inflation. This Article takes a step in redressing that deficiency.

The best way to highlight the contribution of this Article is to first explain what it does *not* address. This is not an article on the economic and legal issues associated with event studies. It is assumed that the standard event study approach accurately measures the impact of a company's disclosures on its stock price. More specifically, it is assumed that a model can be developed that produces residual returns accurately reflecting the valuation impact of information disclosures.[2] This is, of course, a highly controversial assumption. In most securities cases, there is active debate regarding which model should be used to net out market and industry effects. Once a model is selected, there remains the problem of confounding information that arises when more than one disclosure occurs on a given day. In addition, the authors demonstrate[3] that by using hindsight in combination with the market inefficiency proven to exist by Grossman and Stiglitz,[4] plaintiffs can select those unique days on which the residual return markedly overstates the fundamental value of the information disclosed. These and other issues related to event studies are all important, but they all have been analyzed extensively. Because this article focuses on conceptual issues unrelated to the application of event study techniques, it is assumed that all of these problems can be surmounted. It is important to stress that in making this assumption it also is implicitly assumed that the market is efficient. If such were not the case, then the residual return would not necessarily reflect the fundamental value of an information disclosure.

---

[1] 544 U.S. 336 (2005).

[2] For a description of how finance study is applied in litigation, see Bradford Cornell & R. Gregory Morgan, *Using Finance Theory to Measure Damages in Fraud on the Market Cases*, 37 UCLA L. REV. 883 (1990). A more recent discussion is contained in Allen Ferrell & Atanu Saha, *The Loss Causation Requirement for Rule 10b-5 Causes of Action: The Implications of Dura Pharmaceuticals v. Broudo*, 63 BUS. LAW. 163 (2007). A detailed technical overview of event study analysis can be found in S.P. KOTHARI & JEROLD B. WARNER, *The Econometrics of Event Studies*, *in* 1 HANDBOOK OF CORPORATE FINANCE: EMPIRICAL CORPORATE FINANCE (B. Espen Eckbo ed., 2007).

[3] *See* Bradford Cornell & James C. Rutten, *Market Efficiency, Crashes and Securities Litigation*, 81 TUL. L. REV. 443, 443 (2006) ("In light of theoretical and empirical research in finance, we show that the failure to understand the differing implications of the efficient market hypothesis for proving reliance and assessing damages introduces a significant plaintiff's bias in securities class action litigation.").

[4] *See* Sanford J. Grossman & Joseph E. Stiglitz, *On the Impossibility of Informationally Efficient Markets*, 70 AM. ECON. REV. 393, 405 (1980) ("We have argued that because information is costly, prices cannot perfectly reflect the information which is available, since if it did, those who spent resources to obtain it would receive no compensation.").

Given these assumptions, estimating inflation is straightforward in the case of a company making an unexpected and false statement. An example would be a company's announcement that new oil reserves had been discovered on the company's property when, in fact, no such discovery had occurred. Under these circumstances, the residual return on the day of announcement would measure the inflating impact of the misrepresentation. The problem is that such cases are rare. More commonly, misstatements involve expected announcements, half-truths, and omissions. A common example is a situation in which a company artificially inflates stated earnings to meet the estimates of Wall Street analysts. In that situation, the stock price of the company should be unchanged by the earnings announcement because expectations are met. Inflation occurs because the stock price should have fallen to its "true value" had the correct financial information been disclosed. In this situation, inflation cannot be measured simply by looking at the residual return on the day of misrepresentation because there is no residual return.

The standard solution to this problem has been to go forward in time to the date on which the misinformation is corrected and the stock price falls. The event study approach is used to estimate the residual return on that date.[5] It is assumed that this residual return—i.e., the valuation impact of the corrective disclosure—is equal to the amount of the original inflation. We argue in this Article that this final critical assumption is typically faulty. The reaction to a corrective disclosure will commonly exceed—often by a large amount—the inflation caused by the original misstatement. This occurs not because the event study approach fails to measure properly the impact of the corrective disclosure—we assume that it does—but because the residual return associated with the disclosure is a poor estimate of the original inflation. The remainder of the Article explains why and discusses the legal implications of this assertion.

## II. OVER-DISCLOSURE AND COLLATERAL DAMAGE

There are two major reasons why the valuation impact of a disclosure that corrects a misstatement can exceed the amount of the inflation caused by the original misstatement: over-disclosure and collateral damage. Of the two, over-disclosure has been analyzed more extensively, beginning with Cornell and Morgan.[6] For that reason, our analysis focuses on collateral damage. Nonetheless, before turning to a discussion of collateral damage, it is helpful to review briefly what is meant by over-disclosure. *Basic, Inc. v. Levinson*[7] provides a good example despite the fact that the misstatement at issue was associated with deflation rather

---

[5] It is possible that the corrective disclosure occurs over several days. While this complicates the computations, it does not change the nature of the conceptual issues analyzed here. Therefore, to avoid unnecessary complication, it is assumed that the corrective disclosure occurs in one day.

[6] *See* Cornell & Morgan, *supra* note 2, at 889–97.

[7] 485 U.S. 224 (1988).

than inflation. Except for the direction of the price movement caused by the misstatement, the issues related to the analysis of inflation are identical.

In *Basic*, representatives of Basic met with and called representatives of Combustion Engineering in September 1976 regarding a possible merger.[8] During 1977 and 1978, however, Basic made public statements denying any potential merger.[9] Then, on December 18, 1978, Basic abruptly asked the New York Stock Exchange to suspend trading in its shares pending a news announcement.[10] The following day, Basic's board of directors endorsed Combustion Engineering's $46 per share offer for its common stock. On December 20, the agreed-upon merger was publicly announced.[11]

If the merger announcement is taken as the corrective disclosure, it clearly "over-discloses" previous misstatements.[12] While Basic was denying any potential merger in 1977 and early 1978, it knew that its statements were false, but only to the extent that merger discussions were in fact occurring. Basic did not know the merger negotiations would be successful. Consequently, the corrective disclosure that announced the merger agreement did more than correct the original misstatements; it represented an over-disclosure that arguably had a greater impact on the stock price than a disclosure of ongoing merger discussions would have had.

The solution to the over-disclosure problem is to estimate what Cornell and Morgan call "the equivalent disclosure."[13] The equivalent disclosure is the price at which a security would have traded if the omitted and misrepresented information—and only that information—had been accurately disclosed in the first place.[14] Though easy to state in theory, estimating the equivalent disclosure price is difficult in practice. Courts and scholars have struggled with this issue since *Elkind v. Liggett & Myers, Inc.*[15] It remains a vexing problem, but not one we address here. This Article's focus is collateral damage.

To our knowledge, the term "collateral damage" was coined by Ferrell and Saha,[16] but their application of the term is confusing because they use it in two different ways. On the one hand, they discuss collateral damage in the context of an accounting fraud and note that the disclosure of an accounting restatement can have collateral damage effects, including reassessment of the quality of a firm's management and/or internal controls, as well as possible disruptive legal action.[17] On the other hand, they argue at another juncture that misstatements can be divided

---

[8] *Id.* at 227.

[9] *Id.*

[10] *Id.* at 227–28.

[11] *Id.* at 228.

[12] Cornell & Morgan, *supra* note 2, at 889–90.

[13] *Id.* at 894–97.

[14] *Id.* at 894.

[15] 472 F. Supp. 123, 129 (S.D.N.Y. 1978) (explaining an expert's analysis of how disclosure would have affected a defendant corporation's stock price), *aff'd in part and rev'd in part*, 635 F.2d 156 (2d Cir. 1980).

[16] *See* Ferrell & Saha, *supra* note 2, at 179–85.

[17] *Id.*

into two categories.[18] In the first category are misstatements with direct implications for future cash flows. In the second category are misstatements that "do not have any bearing on the future cash flows of the firm or the discount rate that should apply to those cash flows . . . ."[19] Collateral damage is placed in the second category.

This second description of collateral damage does not square with the statement that reassessments of management credibility or a company's internal controls are examples of collateral damage. As discussed in detail below, management credibility or a company's internal controls will have an impact—in some cases a large impact—on future cash flows. If they did not, reassessments of management credibility or internal controls would not affect the stock price.

To avoid this confusion, there is a more direct and useful way to define collateral damage: the valuation impact of a corrective disclosure that does not correspond to the original inflation. This definition is best illustrated by an example, and the one presented by Ferrell and Saha is instructive. They posit: "[A] misstatement might be an accounting statement by a firm that falsely states that the firm has $100 more in cash than it really does while falsely understating, in the same statement, the firm's corporate holdings of U.S. treasury bonds by an equivalent amount, $100."[20] From a financial point of view, such a misstatement—at the time it occurred—would have no impact on value. Treasury bonds are sufficiently liquid that a company can move from bonds to cash or vice versa almost instantaneously at a negligible transaction cost. However, Ferrell and Saha go on to assume that the firm fails promptly to report the error. It is not until a later date that the firm issues a corrective disclosure regarding its holdings of cash and Treasury bonds. At that time, the stock price falls. Because the original misstatement could not have inflated the stock price in an efficient market, the decline following the corrective disclosure must be due to collateral damage.[21]

The example raises at least two questions related to collateral damage. First, from an economic perspective, what is the source of the collateral damage? Second, from a legal perspective, should collateral damage be recoverable? That is, should it be taken into account when assessing materiality, reliance, causation, and the other elements of liability? Or should it be considered as independent of the alleged misstatements? Part IV addresses these legal questions, but first the Article focuses on the economic issues.

Before turning to the analysis, it is helpful to graphically summarize the concept of collateral damage. The impact of collateral damage in a hypothetical case is depicted in Figure 1.

---

[18] *Id.*

[19] *Id.* at 180.

[20] *Id.*

[21] *Id.* Of course, this example is a bit unrealistic from an economic standpoint. Presumably, companies engage in securities fraud only when management perceives that perpetrating a fraud will create some benefit. With respect to misstating holdings of cash and Treasury bonds, there is no apparent benefit to be gained.

**Figure 1: Inflation and Collateral Damage**



As shown in the figure, price and value are equal until the company receives negative information (for instance, that its earnings will be less than expected). At that juncture, rather than accurately disclosing the information, the company misstates its financials so that earnings appear to meet market expectations. As a result, the market price of the stock does not fall as indicated by the dotted line, but its true value does as indicated by the solid line. The figure shows that if the correct information had been disclosed, the price would have fallen by $5 per share. Consequently, the stock price is now inflated because true value has fallen but the price remains constant. The inflation equals the difference between the solid line and the dotted line. At a later date, the company corrects the omission by providing accurate historical financial information, and the stock price falls by $15 per share. As shown, the drop exceeds the original inflation by $10 per share. As a result, the ultimate stock price is now $10 per share below what it would have been in the but-for world in which there was no misstatement. The added drop represents the collateral damage. The economic question is, what is the source of this additional decline?

## III. VALUE CREATION AND COLLATERAL DAMAGE

Value creation does not occur in a vacuum. It is affected by the relationships between the various classes of stakeholders, including managers, employees, customers, distributors, and investors, who are party to the nexus of both legal contracts and informal agreements that define the corporation. Both the contractual and informal relationships among stakeholders depend upon the flow of

information among counterparties.[22] Disclosure of negative information can damage these working relationships and thereby affect the ability of the firm to generate cash flow. We argue that the primary source of collateral damage comes from the impact that corrective disclosures have on stakeholder relationships. In this context, collateral damage is not a secondary consideration from a valuation standpoint. In many situations, collateral damage can have a larger impact on a company's stock price than the original misstatement or omission with which it is associated. Nonetheless, as we argue below, this does not mean it results in recoverable damage.

The stakeholder approach builds off the large literature in economics regarding reputational capital.[23] The idea is that relationships between various corporate stakeholders, including managers, investors, customers, and employees, are multifaceted and complex. While some aspects of those relationships can be reduced to legal contracts, many cannot. In this context, managers and companies create what can be called reputational value by properly managing the intangible aspects of those relationships.[24] One widely studied example in this regard is the development of brand-name capital.[25] Consumers pay higher prices for brand-name products because the brand name provides information about product quality at the time of purchase. Companies with brand names, in turn, take extra care to assure consumers that they continue to produce high-quality products so as to maintain the reputation associated with the brand and, thereby, continue to charge premium prices.[26]

As shown by Klein and Leffler,[27] Cornell and Shapiro,[28] and several subsequent authors, such reputational capital often constitutes a significant fraction of a company's market value. In addition to brands, reputational value can be associated with perceptions regarding the honesty, integrity, and skill of management, the internal controls of the company, and the company's quality control, among other things.[29]

---

[22] *See* Bradford Cornell & Alan C. Shapiro, *Corporate Stakeholders and Corporate Finance*, 16 FIN. MGMT. 5, 10 (1987).

[23] *See, e.g.*, W. Bentley MacLeod, *Reputations, Relationships, and Contract Enforcement*, 45 J. ECON. LITERATURE 595, 595–96 (2007) (exploring "the relationship between the concern for one's reputation and the effect of reputation on the efficiency and form of contracts that are enforced informally").

[24] *Id.* at 597 ("If one can assign a value to one's reputation, one can reformulate the problem in which each party trades off the benefit of breaching against the cost of losing one's reputation.").

[25] *Id.* at 611–16.

[26] *Id.*

[27] *See* Benjamin Klein & Keith B. Leffler, *The Role of Market Forces in Assuring Contractual Performance*, 89 J. POLITICAL ECON. 615, 615–16 (1981) ("[E]conomists also have long considered 'reputations' and brand names to be private devices which provide incentives that assure contract performance in the absence of any third-party enforcer.").

[28] *See* Cornell & Shapiro, *supra* note 22, at 8–9 (describing the effect that failure to deliver on an implicit claim could have had on IBM's company name).

[29] *Id.* (detailing IBM's reaction to setbacks with a product).

Because reputational value depends on the perceptions of investors and other stakeholders, it is highly sensitive to negative information regarding the company, its management, or its products. A variety of empirical studies demonstrates the impact of disclosures on the value of reputational capital. One source of evidence is the market response to corporate litigation. The Texaco-Pennzoil case provides a particularly dramatic example.[30] On November 19, 1985, a Houston jury found that Getty Oil breached its contract with Pennzoil for Pennzoil to buy Getty, and because Texaco had indemnified Getty for any resulting litigation, the jury directed Texaco to pay Pennzoil $10.53 billion in damages plus interest.[31] In the six trading days following the verdict, the market value of Texaco dropped by approximately $1.8 billion, while the market value of Pennzoil rose by only about $800 million.[32] After the judge upheld the award, Pennzoil stock rose further, and Texaco fell. Overall, Texaco lost about $2.58 billion in market value, whereas Pennzoil's market value rose by about $935 million.[33] One explanation for the $1.64 billion differential between Texaco's loss and Pennzoil's gain is the impact of the trial on reputational capital. Given the financial distress caused by the award, customers, suppliers, and business partners were no longer willing to do business with Texaco on the same terms.[34] For instance, Atlantic Richfield sent a letter to its staff in early December urging them to use "prudence" in doing business with Texaco.[35] This loss of confidence increased the cost of doing business for Texaco, thereby reducing the value of the company.[36] On the other hand, receiving a windfall would have been unlikely to significantly affect Pennzoil's reputational capital. If stakeholders were already satisfied with their relationship with Pennzoil, changes associated with the windfall would have been small. Though it is a dramatic illustration, the Texaco-Pennzoil example is not unique. Large corporate awards are typically associated with asymmetric valuation changes. Cornell and Engelman[37] study five cases in detail and report results similar to those for Texaco and Pennzoil.

The reputational effect also explains the response of stock prices to recalls by drug and automobile manufacturers. In a classic study, Jarrell and Peltzman report that the drop in shareholder wealth accompanying recalls is twelve times the size of the direct costs of the recalls on average.[38] These findings are consistent with the

---

[30] The material on the Texaco-Pennzoil case is taken from David M. Cutler & Lawrence Summers, *The Costs of Conflict Resolution and Financial Distress: Evidence from the Texaco-Pennzoil Litigation*, 19 RAND J. ECON. 157, 157–170 (1988).

[31] *Id.* at 158.

[32] *Id.* at 161.

[33] *Id.*

[34] *Id.* at 167–68.

[35] Bradford Cornell & Kathleen Engelman, *Measuring the Cost of Corporate Litigation: Five Case Studies*, 17 J. LEGAL STUD. 377, 381 (1988).

[36] *Id.*

[37] *See id.* at 398.

[38] Greg Jarrell & Sam Peltzman, *The Impact of Product Recalls on the Wealth of Sellers*, 93 J. POL. ECON. 512, 521 (1985).

view that the reputational capital associated with product quality control is an important component of the value of a drug company.

The impact of defective Firestone tires on Ford Explorer sport-utility vehicles in 2000 provides another example. Bridgestone's stock price dropped by more than $9 billion over the four months after Bridgestone (Firestone's Japan-based parent company) announced the recall of the defective tires.[39] Overall, the drop reached nearly 55 percent of Bridgestone's stock market value.[40] Ford's stock price did not drop initially, but it eventually fell about 18 percent relative to the S&P 500 index over the same period, as information was revealed that Ford knew tire failure was possible.[41] These stock market declines amounted to losses of about $7 billion in Bridgestone's market value and nearly $10 billion in Ford's market value.[42] These costs were substantially greater than the direct costs associated with the recall and the related litigation, as estimated by the companies.[43]

Finally, a comprehensive study by Karpoff, Lee, and Martin[44] examines the impact of collateral damage in securities-related matters directly. The authors analyze 384 firms investigated by the Securities and Exchange Commission ("SEC") for accounting-related issues from 1978 through 2002, for which Compustat financial data is available. The authors divide the total losses in value at the sample firms into four categories: (1) fines and sanctions imposed by regulators, (2) amounts paid to settle related securities class actions, (3) the valuation impact of financial restatements, and (4) remaining reputational costs.[45] The authors find that the fourth component, reputational costs, accounted for more than 66 percent of the decline in value.[46] Furthermore, if reputational costs are compared with component (3) alone—the component associated with the original inflation—they are more than two-and-a-half times as large on average.[47]

The underlying point is that collateral damage is not a secondary consideration from a valuation standpoint. Loss in reputational value associated with the company and its management often greatly exceeds the amount of the original inflation. As a result, great care must be taken to differentiate between the extent to which a disclosure corrects an original misstatement and thereby removes inflation, and the collateral damage caused by the disclosure.

With this background, we return to the example of the company that hides an earnings miss by accounting manipulation and thereby inflates its stock price by $5 per share. When the accounting misstatement is disclosed, the stock price drops by

---

[39] Alan B. Krueger & Alexander Mas, *Strikes, Scabs, and the Separations: Labor Strife and the Defective Bridgestone/Firestone Tires*, 112 J. POL. ECON. 253, 287 (2004).

[40] *Id.*

[41] *Id.*

[42] *Id.*

[43] *Id.*

[44] Jonathan M. Karpoff, D. Scott Lee & Gerald S. Martin, *The Cost to Firms of Cooking the Books*, 43 J. FIN. & QUANTITATIVE ANALYSIS 581 (2008).

[45] *Id.* at 582–83.

[46] *Id.* at 582.

[47] *Id.* at 583.

$15 per share—$5 per share to correct for the accounting misstatement and an additional $10 per share associated with reputational collateral damage. In this example, the reputational effects are most likely associated with the honesty, integrity, and competence of management, as well as the reliability of the company's internal controls. When the corrective disclosure occurs, the market acquires two—and only two—pieces of information it did not possess beforehand: (1) the substantive information it would have had if accurate information had been conveyed originally, and (2) the knowledge that the company made a false statement. Disclosure of the first category corrects the inflation.[48] Disclosure of the second leads to collateral damage by causing the market to reevaluate the reputation of the company's management and its internal controls.[49]

In summary, a misrepresentation can cause investors to suffer real financial harm—at least in a "but for" sense—in the form of collateral damage as a result of altered assessments of the reputational capital of the company and its management. Furthermore, the changes in value caused by these reputational effects often significantly exceed the inflation caused by the initial misstatement or omission. However, the size of the reputational effect does not answer the critical *legal* question: to what extent is recovery for collateral damage permitted by section 10(b) of the Securities Exchange Act of 1934 (the "Exchange Act")[50] and SEC Rule 10b-5?[51]

---

[48] Removing the inflation may itself involve the devaluation of reputational capital as the market considers whether an earnings shortfall bears on the quality of the company's management, but only reputational capital that would have been devalued anyway if accurate information had been disclosed. The devaluation of this reputational capital does not represent collateral damage.

[49] The market price also can decline in an amount greater than the original inflation if the market expects that the company will face securities fraud lawsuits or regulatory sanctions as a result of its misstatement. Richard Booth demonstrates how this anticipation of a lawsuit theoretically can cause the stock price to drop by a multiple of the percentage decline attributable to the news itself. *See* Richard A. Booth, *Who Should Recover What in a Securities Fraud Class Action?* 4, 7 (U. of Maryland Sch. Law Faculty Publications, Working Paper No. 11, 2005), *available at* http://digitalcommons.law.umaryland.edu/fac_pubs/11/. While Booth is theoretically correct, the exacerbation of the decline is likely limited by the fact that not all misstatements associated with stock price declines lead to litigation or regulatory sanctions. Also, many lawsuits are dismissed, and among those that proceed, settlements typically are only small fractions of claimed damages. For example, recovery rates in securities class actions were only 2.7 percent of investor losses in 2002 and 2.8 percent of investor losses in 2003. Elaine Buckberg et al., *Recent Trends in Securities Class Action Litigation: 2003 Update*, 5 CLASS ACTION LITIG. REP. 304, 307 (2004). Because investors are presumptively aware of these facts, the amount by which the initial stock price decline is exacerbated should not be a multiple as Booth suggests, although it is not a factor that can be ignored. Along with the economic issues discussed above, it will widen the potential wedge between the inflation caused by the misstatement and the amount by which the value of a company declines upon a corrective disclosure.

[50] 15 U.S.C. § 78j(b) (2006).

[51] 17 C.F.R. § 240.10b-5 (2008).

## IV.  DOES SECTION 10(B) PERMIT RECOVERY FOR COLLATERAL DAMAGE?

There is good reason to tread cautiously in permitting recovery for collateral damage. Collateral damage is inherently nebulous and therefore difficult to identify and to measure. What may appear at first blush to be collateral damage may be attributable, in whole or in part, to market inefficiencies and random crashes in security prices bearing no relation to changes in the value of a company's reputational capital.

An example illustrates the point. On September 21, 2000, Intel Corp. issued a brief and seemingly unexceptional press release.[52] It projected that revenue for the third quarter would be 3 to 5 percent higher than the second quarter's revenue of $8.3 billion—results that fell short of the company's previous forecast of 7 to 9 percent growth.[53] Intel attributed the lower growth to a temporary decline in European sales associated with currency exchange rate fluctuations. An Intel officer later expressed his view that the press release was relatively insignificant in that it reflected only short-run developments in Europe (the decline of the Euro) and did not reflect "any change in Intel's long-run strategy, product mix, competitive position, or even . . . the long-run demand for Intel's products."[54] Intel's stock price could have been expected to decline slightly on this news, but instead it plummeted. Its stock fell nearly 30 percent over the next two trading days, and $122 billion in shareholder wealth—more than twice the market capitalization of Enron Corp. at its peak—evaporated.[55]

Bradford Cornell, a co-author of this Article, has compared the $122 billion drop in market value with estimates of the change in the company's fundamental value associated with the announcement.[56] Cornell used analysts' forecasts of financial performance to compute the discounted present value of future cash flows for Intel before and after the September 21, 2000 announcement.[57] He found that, depending on the assumptions used, the drop in the discounted cash flow value of the company accounted for between 1 percent and 4.5 percent of the market drop. The remaining $116.5 billion to $120.8 billion in lost market capitalization must have been attributable to something else.[58]

Plaintiffs often see a bonanza in facts like these. They invariably invoke efficient market theory in presenting their damages models, following a devastatingly simple chain of reasoning to the ultimate conclusion that the entire stock price drop (net of the market and the industry) is attributable to the fraud. Plaintiffs argue that if "[t]he market is acting as the unpaid agent of the investor,

---

[52] *See* Bradford Cornell, *Is the Response of Analysts to Information Consistent with Fundamental Valuation? The Case of Intel*, 30 FIN. MGMT. 113, 113 (2001).

[53] *Id.*

[54] *Id.*

[55] *See id.*

[56] *See id.* at 119–28.

[57] *See id.* at 123, 127.

[58] *See id.* at 126.

informing him that given all the information available to it, the value of the stock is worth the market price,"[59] then the entire stock price drop after the corrective disclosure *must* be attributable to the fraud. It has been observed that the stock price drop in many cases is disproportionate to the fundamental value of the information conveyed by the corrective disclosure, and, therefore, the entire drop cannot represent the amount the shareholder overpaid for the stock—i.e., it cannot represent out-of-pocket damages. Plaintiffs have developed a convenient response to this observation. They portray the delta as collateral damage arising from changed perceptions regarding the value of the reputational capital associated with the company and its management. They argue that this is a foreseeable consequence of securities fraud that is therefore recoverable not as out-of-pocket damages, but as consequential damages.[60] After all, they argue, if the market is efficient, what other explanation can there be?

As we demonstrated in a previous article,[61] however, there can be many explanations for a stock price drop that is out of all proportion to the fundamental value of the information conveyed by a corrective disclosure. As we show in that article, even the most efficient of markets contains inefficiencies that can cause unwarranted crashes in stock prices irrespective of changed perceptions regarding the value of reputational capital. Certainly in the case of Intel, it is difficult to imagine how a disclosure relating to short-term fluctuations in currency exchange rates could change perceptions of management to the tune of $120 billion—yet determining whether *any* portion of the stock price drop is attributable to such changed perceptions is a hazardous enterprise at best. Estimating *how much* of the drop might represent collateral damage is wholly speculative.

The problem is compounded by ex post selection bias on the part of plaintiffs. Even the largest and most sophisticated plaintiffs' firms have finite resources and must pick and choose their cases based not only on the strengths and weaknesses of a case, but also on its potential for recovery. A plaintiff's lawyer naturally will prefer to take on cases with large drops in market capitalization, all else being equal. It is difficult to differentiate the portion of a stock price drop caused by collateral damage from a portion attributable to other factors, such as market inefficiencies. Thus, permitting plaintiffs to recover for collateral damage threatens to permit recovery completely unrepresentative of collateral damage—recovery that normally would not be permitted under *any* legal theory.

---

[59] Basic, Inc. v. Levinson, 485 U.S. 224, 244 (1988) (quoting *In re* LTV Sec. Litig., 88 F.R.D. 134, 143 (N.D. Tex. 1980)).

[60] *See, e.g.*, Programs v. Leighton, 90 F.3d 1442, 1449 (9th Cir. 1996) ("Rule 10b-5 plaintiffs may recover consequential damages which can be proven with reasonable certainty to have resulted from the fraud.") (internal quotation marks, emphasis and citation omitted); Garnatz v. Stifel, Nicolaus & Co., 559 F.2d 1357, 1360 (8th Cir. 1977) ("As applied to a fraudulently induced purchase of securities, [the out-of-pocket] rule provides for the recovery of the difference between the actual value of the securities and their purchase price. . . . Recovery is also allowed for any consequential damages proximately resulting from the fraud.").

[61] Cornell & Rutten, *supra* note 3, at 464.

The federal securities laws are carefully structured to avoid such results. The securities laws are designed to strike a balance between deterring and remedying wrongdoing, and imposing liabilities so draconian that they effectively deter capital formation.[62] The securities laws therefore carefully circumscribe recoverable damages, often more sharply than the common law would. Section 28 of the Exchange Act, for example, precludes punitive or exemplary damages by providing that "no person permitted to maintain a suit for damages under the provisions of this Act shall recover . . . a total amount in excess of his actual damages on account of the act complained of."[63] Additionally, section 21D of the Exchange Act,[64] enacted as part of the Private Securities Litigation Reform Act of 1995, imposes a "look back" requirement because Congress was concerned that "[t]he current method of calculating damages in 1934 Act securities fraud cases" was too "uncertain" and resulted in "windfall damages."[65]

This is not to suggest that collateral damage, where it exists, does not stem from securities fraud—at least in a "but for" sense, as discussed below—or that it does not constitute actual financial harm to shareholders. Nor is it meant to suggest that difficulties in identifying and measuring collateral damage are sufficient reasons to preclude recovery, although prohibitions on recovering damages that cannot reasonably be estimated might well be dispositive in most, if not all, cases.[66] The point is that the *in terrorem* effects of permitting recovery for

---

[62] *See, e.g.*, H.R. REP. NO. 104-369, at 31 (1995) (Conf. Rep.) ("The overriding purpose of our Nation's securities laws is to protect investors and to maintain confidence in the securities markets, so that our national savings, capital formation and investment may grow for the benefit of all Americans."); Stoneridge Inv. Partners, LLC v. Scientific-Atlanta, Inc., 552 U.S. 148, 128 S. Ct. 761, 772 (2008) (declining to adopt an expansive interpretation of section 10(b) in part because companies "might find it necessary to protect against these threats, raising the costs of doing business," and "[o]verseas firms with no other exposure to our securities laws could be deterred from doing business here," which, "in turn, may raise the cost of being a publicly traded company under our law and shift securities offerings away from domestic capital markets"); United Hous. Found., Inc. v. Forman, 421 U.S. 837, 849 (1975) ("The primary purpose of the Acts of 1933 and 1934 was to eliminate serious abuses in a largely unregulated securities market. The focus of the Acts is on the capital market of the enterprise system: the sale of securities to raise capital for profit-making purposes, the exchanges on which securities are traded, and the need for regulation to prevent fraud and to protect the interest of investors.").

[63] 15 U.S.C. § 78bb (2006).

[64] *Id.* § 78u-4(e).

[65] H.R. REP. NO. 104-369, at 42 (1995).

[66] *See, e.g.*, Ambassador Hotel Co. v. We-Chuan Inv., 189 F.3d 1017, 1030 (9th Cir. 1999) ("Consequential damages may also be awarded [under section 10(b)] if proved with sufficient certainty.") (citation omitted); Pelletier v. Stuart-James Co., 863 F.2d 1550, 1557–58 (11th Cir. 1989) ("The measure of damages in a Rule 10b-5 case is limited to actual pecuniary loss suffered by the defrauded party, and does not include any speculative loss of profits."); Hershock v. Fiascki, No. 90-0497, 1992 WL 164739, at *7 (E.D. Pa. July 2, 1992) ("The important element in allowing a recovery for other than out-of-pocket damages is whether the asserted damage is actual and nonspeculative.").

collateral damage cannot be ignored in evaluating whether section 10(b) should be construed to permit such recovery.

Below, we apply the United States Supreme Court's governing analytical framework for construing the scope of implied rights of action in the securities laws to show that recovery for collateral damage is not permitted by section 10(b), precisely because of its *in terrorem* effects. We also show that permitting recovery for collateral damage would be contrary to nearly every element of the section 10(b) cause of action.

### A. *The Supreme Court's Analytical Framework for Construing the Scope of the Implied Right of Action Under Section 10(b)*

Section 10(b)'s language is the starting point in construing the scope of its right of action.[67] Section 10(b) does not expressly address the damages a private plaintiff may recover, which is unsurprising because the statute does not expressly create a private right of action at all—that right is judicially implied.[68] The statute nevertheless contains language relevant to whether collateral damage is recoverable.

Section 10(b) prohibits fraud only "in connection with the purchase or sale of any security."[69] The statute's "purchase or sale" requirement generally is regarded as a standing requirement,[70] but is also relevant to the damages question because it indicates that Congress was focused on the purchase transaction.[71] The statutory language indicates that Congress was focused on the out-of-pocket harm befalling investors who purchase at an inflated price, only to later suffer losses when the value of their holdings declines in a corresponding amount upon a corrective disclosure[72]—i.e., their out-of-pocket damages. There is no indication that

---

[67] *See, e.g.*, Cent. Bank of Denver, N.A. v. First Interstate Bank of Denver, N.A., 511 U.S. 164, 173 (1994) ("With respect [to] . . . the scope of conduct prohibited by § 10(b), the text of the statute controls our decision. . . . [A] private plaintiff may not bring a 10b-5 suit against a defendant for acts not prohibited by the text of § 10(b). To the contrary, our cases considering the scope of conduct prohibited by § 10(b) in private suits have emphasized adherence to the statutory language . . . .").

[68] *See id.* ("[Determining] the elements of the 10b-5 private liability scheme[] has posed difficulty because Congress did not create a private § 10(b) cause of action and had no occasion to provide guidance about the elements of a private liability scheme."); Superintendent of Ins. v. Bankers Life & Cas. Co., 404 U.S. 6, 13 n.9 (1971) (endorsing the consensus of the lower courts and commentators that there is an implied right of action under section 10(b) and Rule 10b-5).

[69] 15 U.S.C. § 78j(b) (2006).

[70] *See* Blue Chip Stamps v. Manor Drug Stores, 421 U.S. 723, 731–33 (1975) (holding that persons who neither purchased nor sold securities lack standing to sue under section 10(b)).

[71] For simplicity, we discuss the issues in terms of defrauded purchasers, not defrauded sellers.

[72] As *Dura* explains, even if an investor pays an inflated price for stock, the investor suffers no harm unless and until the market price subsequently declines as a result of a

Congress was concerned with losses investors suffer from additional declines in value due to changes in reputational capital not corresponding with an amount by which the investors overpaid.[73]

The legislative history of section 10(b) is consistent with its language. It suggests that section 10(b) was designed to ensure that the *prices* investors *pay* reflect only the legitimate forces of supply and demand.[74]

Although section 10(b)'s text and legislative history suggest that the statute does not permit recovery for collateral damage, they are anything but definitive. Determining whether section 10(b) permits such recovery thus requires additional analysis.

The Supreme Court repeatedly has held that when the scope of the section 10(b) right of action cannot be gleaned from the statutory language, courts should refrain from determining its scope based on policy considerations or the like, as courts frequently do with common law causes of action. Rather, the Court has held that because the cause of action is statutory, courts should attempt to infer how the 1934 Congress would have defined the parameters of the section 10(b) cause of action had it enacted it expressly—looking for guidance in the causes of action Congress actually did enact expressly.

In *Musick, Peeler & Garrett v. Employers Insurance of Wausau*,[75] for example, the Court considered "whether a right to contribution is within the contours of the 10b-5 action."[76] The Court criticized the parties for "devot[ing] considerable portions of their briefs to debating whether a rule of contribution or of

---

corrective disclosure—because at "the moment the transaction takes place, . . . the inflated purchase payment is offset by ownership of a share that *at that instant* possesses equivalent value." Dura Pharm., Inc. v. Broudo, 544 U.S. 336, 342, (2005). *Dura* teaches that there must be a corrective disclosure before there can be a loss and that a plaintiff's out-of-pocket damages cannot exceed the amount by which the stock price subsequently declines.

[73] *Cf.* Strougo *ex rel*. Brazil Fund, Inc. v. Scudder, Stevens & Clark, Inc., 964 F. Supp. 783, 803 (S.D.N.Y. 1997) ("*Blue Chip Stamps* and the other cases cited by the defendants in support of an out-of-pocket rule involved securities fraud claims . . . . The defendants cite no authority imposing a similar 'purchaser-seller' requirement in cases arising under [another statute]. Moreover, *Blue Chip Stamps* was decided under Section 10(b) and Rule 10b-5, which expressly require that the plaintiff be injured 'in connection with the purchase or sale of any security.'").

[74] For example, one of the Senate reports states: "Certain devices employed for the purpose of artificially raising or depressing security *prices* are specifically prohibited by the act. Others have not been forbidden outright but have been placed under the control of the Securities and Exchange Commission." S. REP. No.1455, at 54 (1934) (emphasis added). The reference to "other[]" provisions appears to be a reference to section 10(b), which prohibits fraud in connection with the purchase or sale of securities "in contravention of such rules and regulations as the Commission may prescribe." 15 U.S.C. § 78j(b) (2006).

[75] 508 U.S. 286 (1993).

[76] *Id.* at 294.

no contribution is more efficient or more equitable," and "declined to rule on such matters."[77] The Court explained:

> Our task is not to assess the relative merits of the competing rules, but rather to attempt to infer how the 1934 Congress would have addressed the issue had the 10b-5 action been included as an express provision in the 1934 Act. We do this not as an exercise in historical reconstruction for its own sake, but to ensure that the rules established to govern the 10b-5 action are symmetrical and consistent with the overall structure of the 1934 Act and, in particular, with those portions of the 1934 Act most analogous to the private 10b-5 right of action that is of judicial creation. . . . [O]ur goals in establishing limits for the 10b-5 action [are] . . . to ensure the action does not conflict with Congress' own express rights of action, to promote clarity, consistency, and coherence for those who rely upon, or are subject to, 10b-5 liability, and to effect Congress' objectives in enacting the securities laws.[78]

Similarly, in *Central Bank of Denver, N.A. v. First Interstate Bank of Denver, N.A.*,[79] the Court considered whether defendants can be liable for aiding and abetting violations of section 10(b). The Court applied the same approach:

> When the text of § 10(b) does not resolve a particular issue, we attempt to infer how the 1934 Congress would have addressed the issue had the 10b-5 action been included as an express provision in the 1934 Act. For that inquiry, we use the express causes of action in the securities Acts as the primary model for the § 10(b) action.[80]

The Court explained: "The reason is evident: Had the 73d Congress enacted a private § 10(b) right of action, it likely would have designed it in a manner similar to the other private rights of action in the securities Acts."[81]

The Court repeatedly has applied this approach in numerous cases presenting questions about the scope of section 10(b), such as whether only purchasers or sellers of securities have standing to sue,[82] whether there is a scienter

---

[77] *Id.*

[78] *Id.* at 294–95 (citations omitted).

[79] 511 U.S. 164 (1994).

[80] *Id.* at 178 (internal quotation marks and citation omitted).

[81] *Id.*

[82] *See* Blue Chip Stamps v. Manor Drug Stores, 421 U.S. 723, 735–36 (1975) ("The principal express nonderivative private civil remedies, created by Congress contemporaneously with the passage of § 10(b), for violations of various provisions of the 1933 and 1934 Acts are by their terms expressly limited to purchasers or sellers of securities. . . . It would . . . be anomalous to impute to Congress an intention to expand the plaintiff class for a judicially implied cause of action beyond the bounds it delineated for comparable express causes of action.").

requirement,[83] whether there is a reliance requirement,[84] the appropriate statute of limitations,[85] and where to draw the line between primary and secondary liability.[86]

   The most relevant express causes of action to consult in construing the scope of section 10(b) are contained in sections 9[87] and 18[88] of the Exchange Act, because they are "close in structure, purpose, and intent to the 10b-5 action."[89] They "both target the precise dangers that are the focus of section 10(b), and the intent motivating all three sections is the same—to deter fraud and manipulative practices in the securities markets, and to ensure full disclosure of information material to investment decisions."[90] Section 9, like Rule 10b-5(a) and (c), generally prohibits manipulative securities transactions, such as wash sales and the like. Section 18, similar to Rule 10b-5(b), prohibits "false or misleading" statements, albeit limited to the context of documents filed with the SEC.[91]

   Both statutes expressly discuss the damages a private plaintiff may recover. Section 9 provides that "[a]ny person who willfully participates in any act or transaction in violation of [the statute] shall be liable to any person who shall purchase or sell any security *at a price which was affected* by such act or transaction, and the person *so injured* may sue . . . to recover the damages sustained as a result of any such act or transaction."[92] Similarly, section 18

---

   [83] *See* Ernst & Ernst v. Hochfelder, 425 U.S. 185, 200 (1976) ("It is . . . evident that Congress fashioned standards of fault in the express civil remedies in the 1933 and 1934 Acts on a particularized basis. Ascertainment of congressional intent with respect to the standard of liability created by a particular section of the Acts must therefore rest primarily on the language of that section.").

   [84] *See* Basic Inc. v. Levinson, 485 U.S. 224, 244 (1988) (noting that the "analogous express right of action," i.e., section 18 of the Exchange Act, "includes a reliance requirement"); *see also* Central Bank of Denver, N.A. v. First Interstate Bank of Denver, N.A., 511 U.S. 164, 178 (1994) (interpreting *Basic* as turning on the fact that section 18 imposes a reliance requirement).

   [85] *See* Lampf v. Gilbertson, 501 U.S. 350, 359 (1991) ("[W]e are faced with the awkward task of discerning the limitations period that Congress intended courts to apply to a cause of action it really never knew existed. . . . We can imagine no clearer indication of how Congress would have balanced the policy considerations implicit in any limitations provision than the balance struck by the same Congress in limiting similar and related protections. When the statute of origin contains comparable express remedial provisions, the inquiry usually should be at an end.") (citations omitted). The Supreme Court decided *Lampf* before Congress amended 28 U.S.C. § 1658 to provide an express statute of limitations for securities fraud claims.

   [86] *See* Stoneridge Inv. Partners LLC v. Scientific-Atlanta, Inc., 552 U.S. 148, 128 S. Ct. 761, 768 (2008) ("The Court doubted the implied § 10(b) action should extend to aiders and abettors when none of the express causes of action in the securities Acts included that liability.").

   [87] 15 U.S.C. § 78i (2006).

   [88] *Id.* § 78r.

   [89] Musick v. Employers Ins. of Wausau, 508 U.S. 286, 295 (1993).

   [90] *Id.* (internal quotation marks and citations omitted).

   [91] 15 U.S.C. § 78r(a) (2006).

   [92] *Id.* § 78i(e) (emphasis added).

provides that "[a]ny person [who makes a false statement in violation of the statute] shall be liable to any person . . . who, in reliance upon such statement, shall have purchased or sold a security *at a price which was affected* by such statement, for damages caused by such reliance."[93]

Sections 9 and 18 are similar to section 10(b) in that they both contain a "purchase or sale" requirement. Moreover, sections 9 and 18 explicitly reference "a price which was affected by" the fraud,[94] thereby strongly suggesting that Congress was focused on the harm that can befall investors when they purchase shares at an inflated price and later suffer losses from a corresponding decline in value—i.e., their out-of-pocket damages. Section 9, by providing that only an investor "so injured" may sue, further underscores that Congress was focused on investors' out-of-pocket harm. The legislative history of sections 9 and 18 is in accord.[95] Not surprisingly, the statutes have been construed, like section 10(b), to permit recovery of out-of-pocket damages.[96]

The other express causes of action in the Exchange Act, though less relevant because they are less analogous to section 10(b),[97] underscore that Congress was

---

[93] *Id.* § 78r(a) (emphasis added).

[94] *Id.* §§ 78i(e), 78r(a).

[95] S. REP. NO. 792, at 7 (1934) ("Several devices are employed for the purpose of artificially raising or depressing security *prices*.") (emphasis added); *id.* at 8 (stating that the anti-manipulation provisions of the bill were designed to prohibit "transactions specifically designed to manipulate the *price* of a security") (emphasis added); *id.* at 12–13 ("[T]he bill provides that any person who unlawfully manipulates the *price* of a security . . . shall be liable in damages to those who have *bought or sold* the security at *prices* affected by such violation or statement.") (emphasis added); *id.* at 17 ("To manipulate the *price* of a security . . . is prohibited by [section 9].") (emphasis added); *id.* at 21 (section 18 creates liability in any person "who in reliance on the statement . . . has purchased the security to which it relates at a *price affected by it*") (emphasis added); S. REP. NO. 1455, at 30 (1934) ("The true function of an exchange is to maintain an open market for securities, where supply and demand may freely meet at *prices* uninfluenced by manipulation."); *id.* at 54 ("Certain devices employed for the purpose of artificially raising or depressing security prices are specifically prohibited by the act."); H.R. REP. NO. 1383, at 10 (1934) ("The bill seeks to give to investors markets where *prices* may be established by the free and honest balancing of investment demand with investment supply.") (emphasis added); *id.* ("False and misleading statements designed *to induce investors to buy* when they should sell and sell when they should buy are . . . outlawed and penalized.") (emphasis added).

[96] *See, e.g.*, 26 MICHAEL J. KAUFMAN, SECURITIES LITIGATION: DAMAGES § 8.5 (2005) ("[A plaintiff can] recover[] damages [under section 9] if it . . . paid an inflated price for stock subjected to manipulative acts. Damages presumably [are] the difference between what [the plaintiff] paid . . . and what it would have paid, but for the manipulation."); Marc M. Seltzer & George A. Shohet, *Measures of Damages in Private Actions for Violations of the Federal Securities Laws*, 417 PLI/LIT 761, 817 (1991) ("Damages under §18 include out-of-pocket losses . . . .").

[97] *See* Musick v. Employers Ins. of Wausau, 508 U.S. 286, 296 (1993) (declining to analyze "[t]he Acts' six other express liability provisions [because they] stand in marked contrast to the implied § 10(b) remedy"). *But see* Cent. Bank of Denver, N.A. v. First

careful in defining recoverable damages so as to avoid creating liability that is unduly open-ended and unpredictable. Section 16 relates to short swing trading and permits recovery of only the "profit realized by [the trader]."[98] Section 20(a)[99] imposes secondary liability on "controlling persons" only "to the same extent [that a] controlled person" is liable under one of the substantive sections of the Exchange Act.[100] Section 20A[101] relates to insider trading, and although it is arguably irrelevant here because it was enacted in 1988 instead of by the 1934 Congress,[102] it too is careful to cap recoverable damages at a definite and certain amount; it provides that "[t]he total amount of damages [recoverable by persons who traded in the market at the same time as the insider] shall not exceed the profit gained or loss avoided in the transaction or transactions."[103]

The Securities Act of 1933 (the "Securities Act") has a somewhat different focus but does not lead to a different conclusion. The Securities Act contains two express causes of action (other than a cause of action against "controlling persons" that is identical insofar as relevant here to section 20(a) of the Exchange Act).[104] Section 11[105] of the Securities Act relates to false and misleading registration statements and prescribes a damages measure of "the difference between the amount paid for the security (not exceeding the price at which the security was offered to the public)" and the market price at certain subsequent points in time, subject to a "negative causation" defense that "any portion or all of such damages represents other than the depreciation in value of such security resulting from [the] registration statement . . . not being true."[106] Section 12[107] of the Securities Act relates to sales of unregistered securities or pursuant to false or misleading prospectuses or oral communications, and it provides for rescission of the transaction or a rescissory measure of damages,[108] again subject to a negative

---

Interstate Bank of Denver, N.A., 511 U.S. 164, 165 (1994) (analyzing the other express causes of action).

[98] 15 U.S.C. § 78p(b) (2006).

[99] *Id.* § 78t(a).

[100] *Id.*

[101] *Id.* § 78t-1.

[102] *See* Musick v. Employers Ins. of Wausau, 508 U.S. 286, 296 (1993) (declining to consider section 20A for this reason).

[103] 15 U.S.C. § 78t-1(b)(1) (2006).

[104] *Id.* § 77o.

[105] *Id.* § 77k.

[106] *Id.* § 77k(e).

[107] *Id.* § 77*l*.

[108] *See id.* § 77*l*(a) ("Any person who [violates the statute] shall be liable . . . to the person purchasing such security from him, who may sue . . . to recover the consideration paid for such security with interest thereon, less the amount of any income received thereon, upon the tender of such security, or for damages if he no longer owns the security."); Randall v. Loftsgaarden, 478 U.S. 647, 649 (1986) (stating that investors are "entitled under § 12(2) . . . to rescind the fraudulent transaction or obtain rescissory damages"); Farley v. Henson, 11 F.3d 827, 837 (8th Cir. 1993) (addressing rescissory damages under section 12).

causation defense.[109] Sections 11 and 12, rather than referencing the amount the plaintiff overpaid, explicitly look to the amount by which the plaintiff's investment declined—an amount that could include collateral damage—while taking care to ensure that the plaintiff cannot recover for damages not proximately caused by the misstatement.

Sections 11 and 12, however, are vastly different from section 10(b). Section 11 relates to sales pursuant to false or misleading registration statements, a context in which the sale price is set by the issuer, not the open market—and in the case of initial public offerings, before there is any secondary market for the securities at all. Accordingly, section 11—unlike section 10(b)—by definition cannot look to market-price inflation in calculating the plaintiff's damages. Although section 11 does permit recovery in connection with open-market purchases, it requires an open-market purchaser plaintiff to "trace" its shares to the challenged registration statement,[110] which, in light of the way modern-day securities trades are cleared,[111] is usually impossible if the same class of securities has been offered pursuant to more than one registration statement.[112] Further, section 11 provides that even

---

[109] 15 U.S.C. § 77*l*(b) (2006).

[110] *See, e.g.*, Lee v. Ernst & Young LLP, 294 F.3d 969, 977 (8th Cir. 2002) (ruling that "§ 11 is broad enough to encompass some aftermarket purchases, subject, of course, to the long-recognized requirement" that the security was indeed issued under *that* registration statement and not another); Krim v. pcOrder.com, Inc., 210 F.R.D. 581, 586 (W.D. Tex. 2002) (noting that even where 91 percent of the stock in the market came from the challenged registration statement, the plaintiffs could not prevail under section 11 because "[p]laintiffs must demonstrate all stock for which they claim damages was actually issued pursuant to a defective statement, not just that it might have been, probably was, or most likely was, issued pursuant to a defective statement") (emphasis removed); *In re* Quarterdeck Office Sys., Inc. Sec. Litig., No. CV 92-3970-DWW(GHKx), 1993 WL 623310, at *2–3 (C.D. Cal. Sep. 30, 1993) (holding that plaintiff lacked section 11 standing even though fully 97 percent of the shares outstanding were issued pursuant to the allegedly defective registration statement); Lorber v. Beebe, 407 F. Supp. 279, 287 (S.D.N.Y. 1975) ("[I]t is insufficient that stock 'might' have been issued pursuant to a defective registration statement. A plaintiff must show that it actually was so issued.").

[111] Most broker-dealers clear trades through the Depository Trust Company ("DTC")

[which] will hold all certificates of a particular company, both old and new, in its nominee name as pooled shares in a fungible mass for the benefit of all its members. . . . Assuming that some of the shares held by the [DTC] were issued in the offering, all of them would be held in a common pool. The fungible nature of the shares held by the [DTC] makes it virtually impossible for a purchaser to ascertain the exact origin of his stock even if the stock certificate he receives is new. A person who acquires securities in the open market following a registered offering is no better off . . . .

17 J. WILLIAM HICKS, CIVIL LIABILITIES: ENFORCEMENT AND LITIGATION UNDER THE 1933 ACT § 4.14 (2002).

[112] *See* Abbey v. Computer Memories, Inc., 634 F. Supp. 870, 872–73 (N.D. Cal. 1986) (holding that because the plaintiff's shares "were purchased in the open market," and

when a plaintiff can trace (e.g., where there is only one registration statement), the plaintiff's purchase price shall be deemed to be not more than "the price at which the security was offered to the public."[113] Section 11 is therefore narrowly focused on registration statements, provides far more limited remedies, and, unlike section 10(b), provides no remedy for purchase-price inflation as such. Section 11 provides little support for construing section 10(b) to permit recovery for subsequent declines in the price of a security that do not correspond with inflation in the market price at the time of purchase.

Section 12 is similar. Section 12 creates liability only on the part of persons who "offer[] or sell[]" securities in certain prohibited circumstances, and provides a remedy only to "the person purchasing such security from him."[114] Section 12 thus imposes what is effectively a privity requirement, authorizing suit against only the seller (and as construed by the case law, certain persons acting on behalf of or in conjunction with the seller).[115] Section 12 therefore tends to be limited to direct seller-purchaser transactions at prices the parties specifically negotiate or that one side dictates (e.g., face-to-face transactions, direct purchases from the issuer in a public offering), rather than open-market transactions at prices set by the market. Section 12 is therefore much more limited than section 10(b) and provides little support for construing section 10(b) to permit recovery for subsequent declines in the price of a security that do not correspond with inflation in the market price at the time of purchase.

In sum, section 10(b) and its analogous provisions, sections 9 and 18, suggest that Congress focused on the out-of-pocket harm that can befall investors when they overpay for stock and later suffer a loss due to a decline in the value of their holdings upon a corrective disclosure. This harm contrasts with losses investors suffer from further declines due to changed perceptions of the reputational value associated with a company and its management that do not correspond to purchase-price inflation. The other express causes of action further demonstrate that Congress was careful to craft remedies that were not utterly open-ended and unpredictable, as section 10(b) would threaten to be if recovery for collateral damage were permitted. The language of section 10(b) and the express causes of action all are consistent with the overall balance struck by the securities laws: protecting investors by deterring and remedying wrongdoing, while not imposing liabilities so burdensome that they deter capital formation. This balance counsels against permitting recovery for collateral damage under section 10(b).

---

at one time were "part of the common pool of . . . shares held in DTC's vault," the plaintiff could not trace his shares to the relevant registration statement); Kirkwood v. Taylor, 590 F. Supp. 1375, 1379 (D. Minn. 1984) (concluding that the way the DTC operates precludes tracing where there is more than one extant registration statement).

[113] 15 U.S.C. § 77k(e) (2006).

[114] *Id.* § 77*l*.

[115] *See* Pinter v. Dahl, 486 U.S. 622, 643 n.21 (1988).

### B.  The Elements of the Section 10(b) Cause of Action

A misleading statement or omission that causes collateral damage can be viewed as having two components: a substantive statement or omission (e.g., "We had third-quarter revenues of $100 million," when actually they were $90 million); and an omission to disclose that management was dishonest, reckless, or incompetent in making the statement or omission, or that the information management relied on was the product of deficient internal controls. Permitting recovery for losses caused by the former is what section 10(b) entails if the other elements of liability are satisfied. As shown below, permitting recovery for losses caused by the latter would be contrary to nearly every element of the section 10(b) cause of action, including the existence of a duty to disclose, materiality, transaction causation, loss causation, and that the defendant's statement or omission be made in connection with the purchase or sale of a security.

### 1.  The Existence of a Duty to Disclose

Courts have made clear that section 10(b) prohibits only dishonest statements and conduct in connection with the purchase or sale of a security, not dishonest character, managerial incompetence, or deficient corporate controls. Courts consistently reject section 10(b) claims that allege nothing more than factors such as these, and they reject attempts by plaintiffs to bootstrap such issues into section 10(b) claims by alleging that defendants failed to disclose dishonesty, incompetence, or mismanagement.

*Santa Fe Industries, Inc. v. Green*,[116] is the seminal case in this area. In *Santa Fe*, a 95 percent shareholder of a company tried to effect a short-form merger by cashing out the minority shareholders at a price of $150 per share—a $25 per share premium above the value set forth in an appraisal that the majority shareholder had commissioned and provided to the minority shareholders when it made the offer. The minority shareholders concluded that the value of their shares was significantly higher, but rather than availing themselves of their appraisal rights in state court, they sued under section 10(b). The minority shareholders alleged that the majority shareholder had commissioned a "fraudulent appraisal" and that providing the appraisal to them was an attempt to "lull [them] into erroneously believing that [the majority shareholder] was generous" when in fact it was trying to "freeze [them] out . . . at a wholly inadequate price."[117]

The Supreme Court held that section 10(b) did not extend to the challenged conduct, because the majority shareholder had fully disclosed the bases of the $150 offer, including the appraisal itself, and the plaintiffs' remedy was to pursue their appraisal rights in state court—even though the plaintiffs clearly alleged that the majority shareholder harbored a dishonest motive in making the offer and

---

[116] 430 U.S. 462 (1977).
[117] *Id.* at 467.

transmitting the appraisal. The Court concluded that the complaint essentially alleged a breach of fiduciary duty, and the Court rejected the notion that "the term 'fraud' in Rule 10b-5 . . . bring[s] within the ambit of the Rule all breaches of fiduciary duty in connection with a securities transaction."[118] The Court explained:

> [T]he claim of fraud and fiduciary breach in this complaint states a cause of action under any part of Rule 10b-5 only if the *conduct* alleged can be fairly viewed as "manipulative or deceptive" within the meaning of the statute. . . . [T]here was no "omission" or "misstatement" in the information statement accompanying the [$150 per share] offer. . . . [T]he cases do not support the proposition . . . that a breach of fiduciary duty by majority stockholders, without any deception, misrepresentation, or nondisclosure, violates the statute and the Rule. . . . [W]e do not think [Congress] . . . meant to bring within the scope of § 10(b) instances of *corporate mismanagement* such as this, in which the essence of the complaint is that shareholders were treated unfairly by a fiduciary. . . . We thus adhere to the position that Congress by § 10(b) did not seek to regulate transactions which constitute no more than internal corporate mismanagement.[119]

The courts have consistently interpreted *Santa Fe* as standing for the proposition "[the] securities laws do not require corporate management to direct conclusory accusations at itself or to characterize its behavior in a pejorative manner,"[120] much less "to confess one's corporate wrongdoing."[121] For example, in *In re Citigroup, Inc. Securities Litigation*,[122] the plaintiff alleged that Citigroup "structur[ed] commodities and other financial transactions with Enron and other entities that permitted those entities to disguise debt on their books, with Citigroup carrying the transactions on its own books as equity investments rather than extensions of credit."[123] The plaintiff contended that such "activity supports a section 10(b) claim because the risks inherent in participating in allegedly illegal and deceptive conduct with Enron and other companies, as well as the effect disclosure of the transactions as loans would have had on Citigroup's balance sheet, rendered misleading Citigroup's public disclosures regarding its risk management policies."[124] The court, relying heavily on *Santa Fe*, held that a failure to disclose corporate mismanagement or malfunctioning internal controls could not give rise to liability under section 10(b):

---

[118] *Id.* at 472.

[119] *Id.* at 473–79.

[120] *In re* Donna Karan Int'l, No. 97-CV-2011 (CBA), 1998 WL 637547, at *10 n.9 (E.D.N.Y. Aug. 14, 1998).

[121] Merritt v. Colonial Foods, Inc., 499 F. Supp. 910, 914 (D. Del. 1980).

[122] 330 F. Supp. 2d 367 (S.D.N.Y. 2004).

[123] *Id.* at 375.

[124] *Id.*

Even taking as true Plaintiff's claims that Citigroup and its defendant officers knowingly participated in the structuring of transactions designed to mislead investors in Enron and other companies as to the true financial status of those companies, and that Citigroup improperly carried the transactions on its own books as equity investments rather than loans, Plaintiff's section 10(b) claim here—that participation in such transactions was inconsistent with Citigroup's stated risk management policies and historical business practices—amounts to nothing more than a charge that Citigroup's business was mismanaged. Such allegations of mismanagement, even where a plaintiff claims that it would not have invested in an entity had it known of the management issues, are insufficient to support a securities fraud claim under section 10(b).[125]

The court found "likewise unavailing" the plaintiff's allegation that "Citigroup's failure to disclose that its revenues were derived from 'unsustainable and illegitimate sources' violated section 10(b)."[126] The court held: "[T]he federal securities laws do not require a company to accuse itself of wrongdoing."[127]

Similarly, in *Iron Workers Local Pension 16 Fund v. Hilb, Rogal & Hobbs Co.*,[128] the plaintiff alleged that the defendant insurance broker "hid [the broker's] significant reliance on non-standard commissions in reporting its revenue and earnings" and that the broker "should have disclosed that its practices were illicit and improper."[129] The court, citing *Santa Fe*, rejected this argument and held that the "[f]ederal securities laws do not require a company to accuse itself of wrongdoing."[130] The court explained:

Rule 10b-5 was not intended to provide shareholders with an avenue for relief against executives for alleged illegal practices or corporate mismanagement. . . . Thus, even if [the defendant's] commission practices were improper, Plaintiff has no claim for securities fraud on that basis alone. Moreover, securities laws do not require that [the company] had a duty to disclose illegal and illicit activities.[131]

These cases and many others like them[132] teach that section 10(b) requires statements to be *substantively* accurate with respect to their subject matter, and

---

[125] *Id.* (emphasis removed).

[126] *Id.* at 377.

[127] *Id.*

[128] 432 F. Supp. 2d 571 (E.D. Va. 2006).

[129] *Id.* at 575, 586.

[130] *Id.*

[131] *Id.* at 586–87 (internal quotation marks and citations omitted).

[132] *See, e.g.*, Biesenbach v. Guenther, 588 F.2d 400, 409 (3d Cir. 1978) ("In effect, appellants are stating that the failure to disclose the breach of fiduciary duty is a misrepresentation sufficient to constitute a violation of the Act. We refuse to adopt this

does not require disclosures that management has acted dishonestly or incompetently, that management is inherently dishonest or incompetent, or that internal controls are weak. These cases explain why recovery is permitted for the losses caused by substantively misleading statements, and refute the notion that recovery is permitted for collateral damage: if recovery were permitted for collateral damage, recovery would be available for a failure to confess wrongdoing, dishonesty, or mismanagement—precisely what the case law holds there is no duty to disclose.[133]

### 2. Materiality

Section 10(b) liability requires the defendant's misstatement or omission to have been material, i.e., to have been of such a character that "disclosure of the omitted fact would have been viewed by the reasonable investor as having significantly altered the 'total mix' of information made available."[134] Section 10(b)'s materiality requirement would appear at first blush to be satisfied whenever a company fails to disclose that its management is dishonest or incompetent in making a statement to investors, or that its statements are unreliable because they are the product of weak internal controls. After all, what reasonable investor would *not* view such a disclosure as affecting the "total mix" of information to consider in making an investment decision?

That observation proves too much, however, for it would write the materiality requirement out of the law. Suppose, for example, that a plaintiff shows that management knowingly lied to investors by telling them that the corporate offices had just been painted blue, when in fact they had been painted green. The plaintiff would have satisfied two elements of section 10(b) liability—falsity and scienter.

---

approach which would clearly circumvent the Supreme Court's holding in *Santa Fe*."); *In re* Am. Express Co. S'holder Litig., 840 F. Supp. 260, 269–70 (S.D.N.Y. 1993) (stating a company is not required to "accuse itself of antisocial or illegal policies") (quoting GAF Corp. v. Heyman, 724 F.2d 727, 740 (2d Cir. 1983)); Ciresi v. Citicorp, 782 F. Supp. 819, 823 (S.D.N.Y. 1991) ("[T]he law does not impose a duty to disclose uncharged, unadjudicated wrongdoing or mismanagement."); Merritt v. Colonial Foods, Inc., 499 F. Supp. 910, 914 (D. Del. 1980) ("[T]he gravamen of plaintiff's federal claim . . . reduces inescapably to a claimed failure to confess one's corporate wrongdoing. . . . [T]he Supreme Court's holding in *Santa Fe* is not to be easily circumvented.").

[133] This is not to say that failures to disclose facts about management's honesty or competence can never give rise to liability. Where, for example, a company misrepresents management's education or experience, section 10(b) liability might well arise. *See, e.g.*, Suez Equity Investors LP v. Toronto-Dominion Bank, 250 F.3d 87, 92 (2d Cir. 2001). The issue we address is different; the issue is whether a false or misleading statement on a subject that does not particularly relate to management's honesty or competence (quarterly revenues, for example) can give rise to liability for collateral damage when the fact of the misrepresentation is revealed and the market reassesses management's honesty or competence.

[134] Basic, Inc. v. Levinson, 485 U.S. 224, 232 (1988) (adopting materiality standard of *TSC Industries, Inc. v. Northway, Inc.*, 426 U.S. 438 (1976)).

But, absent facts that are hard to imagine, the plaintiff would not be able to establish materiality because reasonable investors do not care what color the corporate offices are painted. The plaintiff's section 10(b) claim would fail even though management made a false statement, even though it did so knowingly, and even though reasonable investors care very much if management is going around lying to investors. If the plaintiff could show materiality on the theory that a knowingly false statement is ipso facto material—or put another way, that management failed to disclose that the statement was knowingly false—then there would be no separate materiality requirement; it would be subsumed within the falsity and scienter elements. A plaintiff, therefore, must show that a statement is *substantively* material, i.e., material as to its subject matter.

The courts have held as much for decades. In *Britt v. Cyril Bath Co.*,[135] for example, the court explained:

> [A] nondisclosure is neither material nor immaterial; it is the fact itself which is known to the corporate insider but not disclosed when there is a duty to do so, which is either material or immaterial to the market price of the stock. The difference between the two approaches is not a mere question of semantics because the proper focus of inquiry should be on the materiality of the undisclosed facts themselves. The materiality of the undisclosed facts is the prime issue in determining whether a nondisclosure is a violation of Rule 10b-5.[136]

Similarly, in *United States v. Reyes*,[137] the defendant was convicted of engaging in securities fraud in connection with stock option backdating, and he argued in his motion for a new trial that the prosecutor improperly had invited the jury to infer materiality from the mere fact that a misstatement had been made. The *Reyes* court, in discussing this issue, stated: "[I]nvestors must care about the information misrepresented, not merely *that* it was misrepresented. If a misrepresentation is deemed material simply because it is a misrepresentation, then the law's materiality requirement is altogether meaningless."[138]

The foregoing case law makes clear that a failure to confess managerial dishonesty or incompetence is immaterial as a matter of law as far as the securities laws are concerned. Permitting recovery for collateral damage would permit recovery not just for the portion of the defendant's misstatement that is substantively false or misleading, but for the portion that consists of not disclosing dishonesty or mismanagement in making the statement—precisely what the foregoing case law teaches cannot give rise to liability.

---

[135] 417 F.2d 433 (6th Cir. 1969).

[136] *Id.* at 437.

[137] No. C 06-00556-1 CRB, 2007 WL 2462147 (N.D. Cal. Aug. 29, 2007), *rev'd*, Nos. 08-10047, 08-10140, 2009 WL 2501920 (9th Cir. Aug. 18, 2009) (overturning defendant's conviction because of prosecutorial misconduct).

[138] *Id.* at *9.

### 3. *Transaction Causation*

The foregoing case law regarding materiality also bears on the element of transaction causation, or "but for" causation.[139] Case law makes clear that transaction causation generally requires a showing that the plaintiff actually or constructively relied on the defendant's statement or omission.[140] The cases hold, however, that reasonable investors, as a matter of law, do not rely on statements or omissions that are immaterial.[141] The cases holding failures to disclose managerial dishonesty, incompetence, or weak internal controls immaterial as a matter of law thus also lead to the conclusion that, as a matter of law, there can be no transaction causation with respect to such failures to disclose.

### 4. *Loss Causation*

Loss causation is the securities law equivalent of proximate causation,[142] and requires a showing "that the act or omission of the defendant . . . caused the loss

---

[139] *See, e.g.*, Berckeley Inv. Group, Ltd. v. Colkitt, 455 F.3d 195, 222 (3d Cir. 2006) ("In the securities realm, but for causation is referred to as . . . transaction causation . . . . In order to establish . . . transaction causation, a Section 10(b) plaintiff must prove that but for the fraudulent misrepresentation, the investor would not have purchased or sold the security."); Binder v. Gillespie, 184 F.3d 1059, 1065 (9th Cir. 1999) ("The requirement of transaction causation is equivalent . . . in tort liability terms[] [to] but-for causation."); Harris v. Union Elec. Co., 787 F.2d 355, 366 (8th Cir. 1986) ("Transaction causation is established when the plaintiff shows that the defendant's fraudulent conduct caused the plaintiff to engage in the transaction in question. This is nothing more than 'but for' causation . . . .") (citation omitted).

[140] *See* Stoneridge Inv. Partners LLC v. Scientific-Atlanta, Inc., 128 S. Ct. 761, 768 (2008) ("In a typical § 10(b) private action a plaintiff must prove . . . reliance upon the misrepresentation or omission . . . ."); Basic, Inc. v. Levinson, 485 U.S. 224, 241–49 (1988) (transaction causation can be satisfied by the presumption of reliance afforded by the fraud-on-the-market doctrine). Some courts have held that transaction causation can be satisfied in other ways in unusual cases, such as where the plaintiff alleges that but for the reliance of a third party (such as a government regulator), the plaintiff would not have purchased the security. *See* Arthur Young & Co. v. United States Dist. Court, 549 F.2d 686, 695 (9th Cir. 1977); *In re* Am. Cont'l. Corp. / Lincoln Sav. & Loan Sec. Litig., 140 F.R.D. 425, 433–35 (D. Ariz. 1992); Mishkin v. Peat, Marwick, Mitchell & Co., 658 F. Supp. 271, 273–74 (S.D.N.Y. 1987).

[141] *See, e.g.*, *In re* Amdocs Ltd. Sec. Litig., 390 F.3d 542, 548 (8th Cir. 2004) ("Alleged misrepresentations can be immaterial as a matter of law if . . . no reasonable investor would rely upon them . . . ."); Amalgamated Bank v. Coca-Cola Co., No. 1:05-CV-1226, 2006 WL 2818793, at *3 (N.D. Ga. Sep. 29, 2006) ("[E]ven where a statement is intentionally misleading as to the speaker's true opinion or prediction, it may be held immaterial as a matter of law [if] no reasonable investor would rely upon it.").

[142] *See* Dura Pharm., Inc. v. Broudo, 544 U.S. 336, 344 (2005) (noting "the common-law roots of the securities fraud action (and the common-law requirement that a plaintiff show actual damages)" and holding that the defendant's statement must "proximately cause the relevant economic loss"); *Berckeley*, 455 F.3d at 222 ("Causation in the securities

for which the plaintiff seeks to recover damages."[143] The loss causation element ensures that the securities laws "protect [investors] against [only] those economic losses that misrepresentations actually cause."[144]

A misrepresentation can "actually cause" collateral damage, at least in some sense. When a misrepresentation is revealed, the market may reassess the reputation of management and the company and accordingly adjust the price of the stock downward. Absent the misrepresentation, such an adjustment would not have taken place (holding all other factors constant), and the misrepresentation thus would have "led to [the] loss."[145] Further, that a misrepresentation can have this effect is entirely foreseeable because it is reasonable that revelation of a false statement may cause the market to reassess management's honesty or competence or the quality of the company's controls—and foreseeability long has been the touchstone of proximate causation.[146]

Loss causation nevertheless would appear to be lacking as a matter of law when it comes to collateral damage. "[T]o establish loss causation, a plaintiff must [show] . . . that the *subject* of the fraudulent statement or omission was the cause of the actual loss suffered."[147]

What is the "subject of the fraudulent statement or omission" in this context?[148] Again, a false statement or omission can be viewed as having two components: a substantive statement or omission; and an omission to disclose that management was dishonest, reckless, or incompetent in making the statement or omission, or that the statement or omission was the product of weak internal controls. The first component might well cause harm when the truth is revealed and might well result in the recovery of out-of-pocket damages, but it does not cause collateral damage. Only the second component causes collateral damage,

---

context is strikingly similar to the familiar standard in the torts context, but with different labels. In the securities realm, . . . 'proximate cause' is known as 'loss causation.'").

[143] 15 U.S.C. § 78u-4(b)(4) (2006); *see also Dura*, 544 U.S. at 342 (requiring "a causal connection between the material misrepresentation and the loss").

[144] *Dura*, 544 U.S. at 345.

[145] *Id.* at 342.

[146] *See generally* Palsgraf v. Long Island Rail Co., 162 N.E. 99 (N.Y. 1928) (seminal case on proximate causation and the closely related tort law concept of duty); *see also* McCabe v. Ernst & Young LLP, 494 F.3d 418, 430 (3d Cir. 2007) ("The loss causation inquiry typically examines how directly the subject of the fraudulent statement caused the loss, and whether the resulting loss was a foreseeable outcome of the fraudulent statement."); Lattanzio v. Deloitte & Touche LLP, 476 F.3d 147, 156 (2d Cir. 2007) ("Loss causation . . . is intended to fix a legal limit on a person's responsibility even for wrongful acts, and . . . it requires that the plaintiff's loss be foreseeable.") (internal quotation marks and citations omitted).

[147] Lentell v. Merrill Lynch & Co., 396 F.3d 161, 175 (2d Cir. 2005) (emphasis added); *see also* Emergent Capital Inv. Mgmt. LLC v. Stonepath Group, Inc., 343 F.3d 189, 199 (2d Cir. 2003) (holding that loss causation requires a plaintiff to "demonstrate a causal connection between the *content* of the alleged misstatements or omissions and the harm actually suffered") (emphasis added).

[148] *Lentell*, 396 F.3d at 175.

but, as shown above, that is the component with which the securities laws do not concern themselves. Accordingly, when it comes to the *relevant* "subject of the fraudulent statement or omission,"[149] loss causation is lacking.

Moreover, loss causation, like common law proximate causation, is not just analytically driven—it is policy driven as well. "[L]oss causation focuses on whether the defendant should be held responsible as a matter of public policy for the losses suffered by the plaintiff."[150] There may be strong equitable arguments for holding defendants liable for collateral damage, as discussed below. There are also strong arguments for disallowing recovery for collateral damage, however, even if permitting the same would be analytically sound. These include the inherent difficulty, if not impossibility, of estimating the amount of the stock price decline attributable to collateral damage, and the *in terrorem* effects of allowing open-ended and unpredictable liability, among others.[151] Such policy considerations counsel in favor of treading cautiously in this area.

### 5. The "In Connection With" Requirement

The "in connection with" requirement of section 10(b) is liberally construed and easily satisfied in many cases.[152] Although the "in connection with" requirement in the abstract neither supports nor undercuts the notion of permitting recovery for collateral damage, it is relevant here because it tends to rebut, at least to some degree, what would otherwise be a strong policy argument in favor of permitting such recovery.

The argument is one of culpability and foreseeability. When a defendant violates section 10(b) by making a false statement to investors with scienter, the defendant in many cases should be able to foresee that when the falsity is revealed, collateral damage may result. As between the culpable defendant—who could foresee that investors would suffer the collateral damage—and the innocent investors, it would seem entirely appropriate to require the defendant to be the one to bear that loss.

This policy argument, however, though certainly equitable, proves too much because it runs headlong into the "in connection with" requirement. This argument counsels in favor of permitting recovery for collateral damages not only for

---

[149] *Id.*

[150] *McCabe*, 494 F.3d at 430; *accord* Berckeley Inv. Group, Ltd. v. Colkitt, 455 F.3d 195, 222 (3d Cir. 2006); Suez Equity Investors LP v. Toronto-Dominion Bank, 250 F.3d 87, 96 (2d Cir. 2001) ("In the end, whether loss causation has been demonstrated presents a public policy question, the resolution of which is predicated upon notions of equity because it establishes who, if anyone, along the causal chain should be liable for the plaintiffs' losses.").

[151] *See supra* Part IV.

[152] *See* Merrill Lynch, Pierce, Fenner & Smith Inc. v. Dabit, 547 U.S. 71, 85 (2006) ("When this Court has sought to give meaning to the phrase in the context of § 10(b) and Rule 10b-5, it has espoused a broad interpretation."); *see also generally* SEC v. Zandford, 535 U.S. 813, 819–20 (2002).

defrauded purchasers, but also for existing stockholders who did not purchase during the relevant period.

For example, suppose that a defendant fraudulently states on July 22 that second-quarter revenues were $100 million when in fact they were $90 million, and that this false information inflates the stock price by $5 per share. Suppose further that the defendant's fraud is revealed a month later on August 22 and that, as in our example above, the stock price declines $15 per share—$5 per share to correct the inflation once the market impounds the truth about the revenues, and $10 per share in collateral damage. The defendant would be liable under section 10(b) to everyone who purchased between July 22 and August 22 (the class period). If the defendant is to be liable to the class not only for the $5 loss per share it suffered when the market corrected the inflation but, on a theory of equity, also for the additional $10 loss per share in the form of collateral damage, why stop there? Why not also hold the defendant liable to everyone who purchased *before* the class period and held the shares through the subsequent decline? After all, the defendant equally could foresee that those investors also would suffer collateral damage when the price of their shares declined. Yet the defendant cannot be liable to such "holders" under section 10(b) because they did not purchase their shares "in connection with" the fraud.[153] Arguing that the defendant should be liable for collateral damage based on equitable considerations therefore tends to prove too much.

## V. CONCLUSION

*Dura* teaches that an investor does not suffer a loss—even if the investor overpaid for the stock—unless and until the stock price declines upon a corrective disclosure.[154] *Dura* explains that focusing on whether the stock price declines is the proper way to assess *causation* of damages. *Dura*'s approach, however, all too often is used to estimate the *amount* of those damages—with the plaintiffs, and sometimes the defendants, assuming that the entire amount of the stock price decline upon the corrective disclosure represents the amount of the inflation for which recovery should be allowed.

---

[153] *See Dabit*, 547 U.S. at 80 (noting that only persons who purchased or sold in connection with the fraud have standing to sue under section 10(b)); Blue Chip Stamps v. Manor Drug Stores, 421 U.S. 723 (1975). Holders can avail themselves of statutory or common law claims under the laws of numerous states. *See, e.g.*, Small v. Fritz Cos., 65 P.3d 1255 (Cal. 2003). However, the Securities Litigation Uniform Standards Act of 1998, 112 Stat. 3227 ("SLUSA"), precludes such causes of action from being brought on a class basis. *See* 15 U.S.C. § 78p(b) (2006) ("No covered class action based upon the statutory or common law of any State . . . may be maintained in any State or Federal court by any private party alleging . . . an untrue statement or omission of material fact in connection with the purchase or sale of a covered security . . . ."); *Dabit*, 547 U.S. at 71 (holding that SLUSA precludes holders' claims brought on a class basis).

[154] *See supra* note 72 and accompanying text.

Causation and damages, however, are two distinct inquiries, and the issues should not be conflated. Causation focuses on the stock price decline; damages focus on inflation before the decline. Once causation is established, the analysis shifts, and the parties and their experts must set about estimating the amount of the inflation so as to avoid permitting recovery for collateral damage—which as shown above, is not recoverable under section 10(b).