UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| In re Global Brokerage, Inc. f/k/a FXCM, Inc. Securities Litigation | Master File No. 1:17-cv-00916-RA<br><br>CLASS ACTION<br><br>ORAL ARGUMENT REQUESTED |
| This Document Relates To:  All Actions | |

**DEFENDANTS' MEMORANDUM OF LAW IN SUPPORT OF THEIR
MOTION FOR SUMMARY JUDGMENT**

Israel Dahan
Peter Isajiw
Evan C. Ennis
Ryan Gabay
KING & SPALDING LLP
1185 Avenue of the Americas
New York, New York 10036-2601
Tel: (212) 556.2100
Fax: (212) 556.2200

Chelsea Corey
KING & SPALDING LLP
300 S. Tryon Street, Suite 1700
Charlotte, North Carolina 28202
Tel: (704) 503.2575
Fax: (704) 503.2622

*Attorneys for Defendants Global Brokerage, Inc. f/k/a/
FXCM, Inc., Dror Niv, and William Ahdout*

# TABLE OF CONTENTS

PRELIMINARY STATEMENT ............................................................................................. 1

PROCEDURAL BACKGROUND ......................................................................................... 2

PLAINTIFFS' ALLEGATIONS ............................................................................................ 4

   I.     Defendants' Alleged Misstatements Concerning FXCM's Agency Model ................. 5

   II.    Defendants' Alleged Misstatements Regarding
        Effex's Order Flow Payments to FXCM ..................................................................... 7

   III.   Defendants' Alleged GAAP Violations ....................................................................... 8

RELEVANT FACTUAL BACKGROUND ........................................................................... 9

LEGAL STANDARD ......................................................................................................... 12

ARGUMENT ...................................................................................................................... 13

   I.     Plaintiffs Cannot Prove Their Section 10(b) Claim .................................................. 13

       A.    Plaintiffs Cannot Demonstrate A Genuine Issue of Material Fact
           Regarding Any Misrepresentations Or Omissions ............................................... 14

       B.    Plaintiffs Cannot Demonstrate A Genuine Issue Of Material Fact
           Regarding Scienter ............................................................................................... 22

       C.    Plaintiffs Cannot Demonstrate A Genuine Issue of Material Fact
           Regarding Loss Causation ................................................................................... 29

       D.    Plaintiffs Cannot Demonstrate A Genuine Issue Of Material Fact
           Regarding Economic Loss .................................................................................. 36

   II.    Individual Plaintiff 683 Capital Cannot Prove Its Section 10(b) Claim ................... 39

       A.    683 Capital Cannot Raise A Genuine Issue Of Material Fact
           Regarding Reliance .............................................................................................. 39

       B.    683 Capital Cannot Raise Genuine Issues Of Material Fact
           Regarding Loss Causation And Economic Loss ................................................. 43

   III.   Plaintiffs Cannot Demonstrate A Genuine Issue Of Material Fact Regarding Their
       Section 20(a) Claim ................................................................................................... 44

       A.    Plaintiffs Cannot Prove A Primary Violation ...................................................... 45

       B.    Plaintiffs Cannot Prove "Culpable Participation" By Niv And Ahdout ............... 45

   CONCLUSION ................................................................................................................. 46

## TABLE OF AUTHORITIES

**Cases**                                                                 **Page(s)**

*Action AG v. China North East Petroleum Holdings Ltd.*,
    692 F.3d 34 (2d Cir. 2012)..................................................................................36

*Affiliated Ute Citizens v. United States*,
    406 U.S. 128 (1972)...............................................................................4, 37, 39

*Atlantica Holdings, Inc. v. Sovereign Wealth Fund Samruk-Kazyna JSC*,
    477 F. Supp. 3d 88 (S.D.N.Y. 2020).............................................. *passim*

*ATSI Commc'ns, Inc. v. Shaar Fund, Ltd.*,
    493 F.3d 87 (2d Cir. 2007)..................................................................................44

*Basic Inc. v. Levinson*,
    485 U.S. 224 (1988)..................................................................................4, 39

*Beleson v. Schwartz*,
    419 Fed. Appx. 38 (2d Cir. 2010)......................................................................45

*In re BP p.l.c. Sec. Litig.*,
    No. 10 MD 2185, 2016 WL 3090779 (S.D. Tex. May 31, 2016)....................37, 38

*Bricklayers and Trowel Trades Intern. Pension Fund v.
    Credit Suisse Sec. (USA) LLC*,
    752 F.3d 82 (1st Cir. 2014)................................................................................32

*Brown v. Eli Lilly & Co.*,
    654 F.3d 347 (2d Cir. 2011)..............................................................................13

*Carpenters Pension Trust Fund of St. Louis v. Barclays PLC*,
    750 F.3d 227 (2d Cir. 2014)..............................................................................29

*Celotex Corp. v. Catrett*,
    477 U.S. 317 (1986)..........................................................................................13

*Charney v. Wilkov*,
    734 Fed. App'x 6 (2d Cir. 2018)........................................................................40

*In re Cirrus Logic Sec. Litig.*,
    946 F. Supp. 1446 (N.D. Cal. 1996) ............................................................27, 28

*Crown Cork & Seal Co., Inc. Master Retirement Trust v.
    Credit Suisse First Boston Corp.*,
    No. 12 Civ. 05803, 2013 WL 978980 (S.D.N.Y. Mar. 12, 2013) ..........................37

*In re Digi Int'l, Inc. Sec. Litig.*,
    14 F. App'x 714 (8th Cir. 2001) ...........................................................................28

*Dodona I, LLC v. Goldman Sachs & Co.*,
    132 F. Supp. 3d 505 (S.D.N.Y. 2015)...................................................................45

*ECD Inv'r Grp. v. Credit Suisse Int'l*,
    No. 14-CV-8486, 2017 WL 3841872 (S.D.N.Y. Sept. 1, 2017)............................26

*Erica P. John Fund, Inc. v. Halliburton Co.*,
    563 U.S. 804 (2011).......................................................................................39, 40

*Gabriel Capital, LP v. NatWest Fin., Inc.*,
    177 F. Supp. 2d 169 (S.D.N.Y. 2001)..................................................................41

*Gallup v. Clarion Sintered Metals, Inc.*,
    489 Fed. App'x 553 (3d Cir. 2012).......................................................................41

*In re GlaxoSmithKline PLC Sec. Litig.*,
    No. 05 Civ. 3751 (LAP), 2006 WL 2871968 (S.D.N.Y. Oct. 6, 2006) ................14

*Gruber v. Price Waterhouse*,
    776 F. Supp. 1044 (S.D.N.Y. 1991).....................................................................42

*Haitian Ctrs. Council, Inc. v. Sale*,
    823 F. Supp. 1028 (E.D.N.Y. 1993) ......................................................................6

*Hicks v. Baines*,
    593 F.3d 159 (2d Cir. 2010)..................................................................................13

*In re Int'l Bus. Machines Corp. Sec. Litig.*,
    163 F.3d 102 (2d Cir. 1998)..................................................................................14

*Lentell v. Merrill Lynch & Co.*,
    396 F.3d 161 (2d Cir. 2005)............................................................................29, 32

*In re Marsh & McLennan Co., Inc. Sec. Litig.*,
    501 F. Supp. 2d 452 (S.D.N.Y. 2006)...................................................................28

*Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*,
    475 U.S. 574 (1986)..............................................................................................13

*Mikhlin v. Oasmia Pharm. AB*,
    No. 19 Civ. 4349, 2021 WL 1259559 (E.D.N.Y. Jan. 6, 2021)............................22

*In re N. Telecom Ltd. Sec. Litig.*,
    116 F. Supp. 2d 446 (S.D.N.Y. 2000)..............................................................14, 23

*Novak v. Kasaks*,
     216 F.3d 300 (2d Cir. 2000)...........................................................................................23

*In re Omnicom Grp., Inc. Sec. Litig.*,
     597 F.3d 501 (2d Cir. 2010).....................................................................................32, 44

*In re Pall Corp.*,
     No. 07 Civ. 3359, 2013 WL 1702227 (E.D.N.Y. Apr. 8, 2013)................................22

*Pension Comm. of the Univ. of Montreal Pension Plan v. Banc of Am. Sec., LLC*,
     592 F. Supp. 2d 608 (S.D.N.Y. 2009)......................................................................41

*People for the Ethical Treatment of Animals v. Doughney*,
     263 F.3d 359 (4th Cir. 2001) ......................................................................................6

*Pivot Point Capital Master LP v. Deutsche Bank AG*,
     No. 08 Civ. 2788, 2010 WL 9452230 (S.D.N.Y. Dec. 9, 2010)...............................23

*In re Refco, Inc. Sec. Litig.*,
     503 F. Supp. 2d 611 (S.D.N.Y. 2007).......................................................................45

*Reiss v. Pan Am. World Airways, Inc.*,
     711 F.2d 11 (2d Cir. 1983).........................................................................................23

*In re REMEC Inc. Sec. Litig.*,
     702 F. Supp. 2d 1202 (S.D. Cal. 2010).........................................................27, 28, 32

*In re Retek Sec. Litig.*,
     621 F. Supp. 2d 690 (D. Minn. 2009)........................................................................36

*Richter v. Achs*,
     962 F. Supp. 31 (S.D.N.Y. 1997)...............................................................................40

*Rothman v. Gregor*,
     220 F.3d 81 (2d Cir. 2000).........................................................................................24

*S. Cherry St., LLC v. Hennessee Grp. LLC*,
     573 F.3d 98 (2d Cir. 2009).........................................................................................23

*In re Scientific Atlanta, Inc. Sec. Litig.*,
     754 F. Supp. 2d 1339 (N.D. Ga. 2010).........................................................35, 36, 39

*SEC v. Boock*,
     No. 09 Civ. 8261, 2011 WL 3792819 (S.D.N.Y. Aug. 25, 2011) ...........................13

*SEC v. Yorkville Advisors, LLC*,
     305 F. Supp. 3d 486 (S.D.N.Y. 2018)........................................................................45

*Shenk v. Karmazin*,
   868 F. Supp. 2d 299 (S.D.N.Y. 2012)...............................................................14, 22

*Special Situations Fund III QP, L.P. v. Deloitte Touche Tohmatsu CPA, Ltd.*,
   33 F. Supp. 3d 401 (S.D.N.Y. 2014)................................................................45, 46

*Steed Fin. LDC v. Nomura Sec. Int'l, Inc.*,
   148 F. App'x 66 (2d Cir. 2005) .............................................................................22

*Strougo v. Barclays PLC*,
   334 F. Supp. 3d 591 (S.D.N.Y. 2018)....................................................................45

*Teamsters Local 445 Freight Div. Pension Fund v. Dynex Capital Inc.*,
   531 F.3d 190 (2d Cir. 2008)...................................................................................29

*In re Williams Sec. Litig.*,
   496 F. Supp. 2d 1195 (N.D. Okl. 2007)..................................................................32

**Statutes**

15 U.S.C. § 78t(a) ........................................................................................................44

Exchange Act Sections 10(b) and 20(a)...................................................................1, 45

**Other Authorities**

Federal Rule Civil Procedure 56(a) ..............................................................................12

Federal Rule of Civil Procedure 23 ................................................................................4

Federal Rule of Evidence 702.......................................................................................30

Rule 10(b) .....................................................................................................................38

Rule 10b-5......................................................................................................1, 13, 39, 40

Defendants Global Brokerage Inc. f/k/a FXCM Inc. ("FXCM" or the "Company"), Dror Niv and William Ahdout (collectively "Defendants") respectfully submit this memorandum of law in support of their Motion for Summary Judgment on all claims asserted by Plaintiffs, whether individually or as a class.

## PRELIMINARY STATEMENT

After more than two years of discovery in which Defendants produced tens of thousands of documents and the parties deposed 18 witnesses, Plaintiffs find themselves no closer to having evidentiary support for their claims that Defendants violated Sections 10(b) and 20(a) of the Exchange Act and Rule 10b-5 promulgated thereunder. What started as a copycat action, parroting the CFTC's and NFA's allegations of regulatory violations, has reached a dead end. As demonstrated herein, the discovery record is devoid of evidence demonstrating that Defendants made any alleged material misstatements, that Defendants did so with the requisite scienter, or that the alleged material misstatements caused damage to Plaintiffs.

At its core, Plaintiffs' action is based on the following premise: that Effex's agreement to pay FXCM a fixed-dollar amount for order flow was really a profit-sharing agreement and that FXCM and Effex were virtually one and the same. This is simply incorrect. The vast discovery record demonstrates that ███████████████████████████████████████████ ████████████████████████████████████████████████████████████████████ ████████████████████████████ The discovery record also confirms that Effex and FXCM operated independently throughout the Class Period (as defined *infra*). Indeed, John Dittami, the founder and Chief Executive Officer of Effex, has repeatedly stated under oath that, during the Class Period, Effex: (1) managed its own business, maintained its own payroll, opened its own offices, and maintained its own bank accounts; (2) had trading relationships with dozens of counterparties besides FXCM and Effex never paid FXCM for any business Effex transacted with

1

non-FXCM counterparties; and (3) had the obligation to absorb its own losses and the right to its own profits. Importantly, it is undisputed that the Services Agreement was terminated in August 2014—halfway through the Class Period—at which point Effex no longer made payments for order flow to FXCM. This termination was publicly disclosed in August 2014.

More than two years later, when Defendants' settlements with the CFTC and NFA were announced in February 2017, Plaintiffs jumped on the opportunity to leverage a no-admit, no-deny settlement (composed of mere allegations of no evidentiary value) into a class action pay day. But discovery has robbed Plaintiffs of any leverage they once had. Now, Defendants are entitled to judgment as a matter of law because the undisputed facts demonstrate Plaintiffs cannot show that there is a genuine issue as to any material fact relating to any of their claims.

## PROCEDURAL BACKGROUND

The first complaint in this action was filed on February 7, 2017. ECF No. 1. On April 10, 2017, various putative class members filed motions requesting consolidation and seeking appointment as lead plaintiff. ECF Nos. 11-31. On May 3, 2017, the Court entered an order consolidating the related cases, appointing 683 Capital Partners, LP ("683 Capital") and Shipco Transport Inc. ("Shipco") as co-lead plaintiffs, and appointing the Rosen Law Firm as Lead Counsel. ECF No. 47.

On June 19, 2017, Plaintiffs filed their Consolidated Securities Class Action Complaint ("CSAC"). ECF No. 48. The CSAC also included Sergey Regukh and Brian Armstrong as named plaintiffs. The CSAC was dismissed without prejudice on March 3, 2018. ECF No. 108. Plaintiffs filed their Second Amended Consolidated Securities Class Action Complaint ("SAC") on April 6, 2018. ECF No. 111. The SAC alleged that the Defendants were responsible for false or misleading public statements with respect to FXCM's agency trading model and the Company's order flow relationship with one of its market makers, Effex Capital LLC ("Effex"). SAC ¶¶ 2, 5. The SAC

2

also alleged that FXCM's financial statements were false and misleading because the Company had not consolidated Effex as a variable interest entity ("VIE"), or, in the alternative, disclosed Effex as a related entity. *Id.* ¶ 13. The SAC also alleged that FXCM had failed to properly disclose investigations by the CFTC and NFA regarding the Company's relationship with Effex. *Id.* ¶ 15.

On March 28, 2019, the Court granted Defendants' Motion to Dismiss in part, dismissing Plaintiffs' claims against Defendant Robert Lande, FXCM's former CFO. The Court also denied in part Defendants' Motion to dismiss but limited the time period for all of the misstatements alleged by Plaintiffs to reflect FXCM's publicly announced termination of its order flow arrangement with Effex as of August 2014. ECF No. 135 at 38.[1]

On January 6, 2020, Plaintiffs' filed their first Motion for Class Certification and Appointment of Class Representatives and Class Counsel. ECF No. 149. On April 13, 2020, Plaintiffs filed a notice of Amended Motion for Class Certification and Appointment of Class Representatives and Class Counsel (the "Class Certification Motion"), which was substantively identical but substituted E-Global Trade and Finance Group, Inc. ("E-Global") for named Plaintiff Sergey Regukh. ECF Nos. 174-75. Defendants did not object to Plaintiffs' motion, and Plaintiffs also subsequently filed their Third Amended Consolidated Securities Class Action Complaint ("TAC") on April 17, 2020. ECF No. 181. In their Class Certification Motion, Plaintiffs asked the Court to certify a class consisting of:

> All persons and/or entities that purchased or otherwise acquired publicly traded Global Brokerage, Inc., f/k/a FXCM Inc. ("FXCM") securities, including

---

[1] Specifically, the Court allowed Plaintiffs to proceed on their claims of alleged misstatements as follows: "the agency-model statements identified by Plaintiffs from the beginning of the Class Period through the end of FXCM and Effex's order flow arrangement; (2) the order flow statements identified by Plaintiffs from the beginning of the Class Period through the Company's 2014 10-K; and (3) [FXCM's] failure the disclose Effex as a VIE from the beginning of the Class Period through the end of FXCM and Effex's order flow arrangement." ECF No. 135 at 38.

FXCM 2.25% Convertible Senior Notes due 2018 [the "FXCM Notes"] and Class A common stock, during the period March 15, 2012 through February 6, 2017, both dates inclusive.  ECF No. 175 at 1.

The Class Certification Motion was assigned to Magistrate Judge Barbara Moses for a report and recommendation (ECF No. 171), which Magistrate Moses issued on March 18, 2021, after holding an evidentiary hearing (ECF No. 229).  On March 23, 2021, the Court fully adopted Magistrate Judge Moses' report and recommendation.  ECF No. 232.  The Court therefore granted Plaintiffs' request in their Class Certification Motion to certify a class of common stockholders but denied class certification as to the FXCM Notes.  ECF Nos. 232, 229.  Specifically, Magistrate Judge Moses found that Plaintiffs, through their market efficiency expert Dr. Adam Werner, did not establish that the FXCM Notes traded in an efficient market.  Thus, FXCM Noteholders were not entitled to the presumption of reliance under *Basic Inc. v. Levinson*, 485 U.S. 224 (1988).  ECF No. 229 at 14.  Nor were FXCM Noteholders entitled to a presumption of reliance under *Affiliated Ute Citizens v. United States*, 406 U.S. 128 (1972).  *Id.* at 23-24.  Accordingly, the Court found that common questions of fact and law did not predominate.  *Id.* at 23.  In addition, the Court found that the proposed FXCM Noteholder class was not sufficiently numerous to satisfy Federal Rule of Civil Procedure 23.  *Id.* at 15-16.

Fact and expert discovery have concluded, and Defendants now move for summary judgment as to all remaining claims asserted in the TAC.

## PLAINTIFFS' ALLEGATIONS

Plaintiffs' surviving allegations regarding Defendants' misstatements and omissions fall into three general categories:  (1) misstatements concerning FXCM's agency model; (2) misstatements regarding Effex's order flow payments to FXCM; and (3) misstatements and omissions concerning GAAP violations.  Importantly, for each of these alleged misstatements, the

Court has already limited the applicable time period to reflect FXCM's termination of its order

flow relationship with Effex in August 2014.

## I.   Defendants' Alleged Misstatements Concerning FXCM's Agency Model

Plaintiffs have alleged that certain statements in FXCM's public filings and on its website

are false and misleading because FXCM did not in fact operate using an agency model.   Those

statements are:

1. From FXCM's 2011 10-K, 2012 10-K, and 2013 10-K:  "We primarily offer our customers what is referred to as an agency model to execute their trades. Our agency model is fundamental to our core business philosophy because we believe that it aligns our interests with those of our customers and reduces our risks. In the agency model, when our customer executes a trade on the best price quotation offered by our FX market makers, we act as a credit intermediary, or riskless principal, simultaneously entering into offsetting trades with both the customer and the FX market maker. We earn trading fees and commissions by adding a markup to the price provided by the FX market makers and generate our trading revenues based on the volume of transactions and the spread earned on transactions."  ECF No. 181 ¶ 146.

2. From FXCM's 12Q2 10-Q and 2013 10-K: "[A]s we have for a number of years conducted our retail operations on the basis of the agency model, we could suffer reputational damage and additional regulatory scrutiny by offering execution to retail clients that creates an inherent conflict between the interests of the customer and our interests." *Id.* ¶ 156.

3. From FXCM's 2012 10-K:  "Our commitment to the agency model is one example of our core business philosophy to reduce risks."  *Id.* ¶ 158.

4. From FXCM's 13Q1 10-Q, 13Q2 10-Q, 13Q3 10-Q, 14Q1 10-Q, 14Q2 10-Q, and 14Q3 10-Q:  "As we predominantly operate our retail business on an agency model with the exception of certain trades of our CFD customers we are not exposed to the market risk of a position moving up or down in value." *Id.* ¶ 160.

5. From FXCM's website on January 27, 2013:  "FXCM does not take a market position-eliminating a major conflict of interest."[2]

_____

[2] The alleged misstatements from FXCM's website were not identified specifically in the TAC but were identified by Plaintiffs in their Second Amended Responses and Objections to Defendants'

6.   From FXCM's website on February 5, 2013: "FXCM can see your waiting orders when you trade with No Dealing Desk execution.  But this does not create a conflict of interest between you and FXCM because we aren't taking a market position."[3]

According to Plaintiffs these statements are false "because FXCM had not been conducting its retail operations on the agency model since it launched the trading algorithm in 2009 that was later spun off into Effex. . . ." *Id.* ¶ 157.  Further, "FXCM was not committed to the agency model or reducing associated risks due to its relationship with Effex" (*id.* ¶ 159) and "FXCM did not predominantly operate its business on an agency model due to its relationship with Effex" and "was in fact exposed to the market risks it described."  *Id.* ¶¶ 161, 147.

Plaintiffs also allege that the following statement, contained in FXCM's 12Q 10-Q, was false and misleading:

We intend to launch an initiative to offer our smaller retail clients the option to trade with a dealing desk, or principal model . . . As a result, we may incur trading losses using principal model execution from changes in prices of currencies where we are not hedged.

According to Plaintiffs, this statement is false because "FXCM was already offering a principal model to its unsuspecting clients due to its relationship with Effex" and "[t]hus it was already facing the risk of trading losses."  *Id.* ¶ 155.

---

Interrogatories Nos. 1-6.  Dahan Decl. Ex. 80 at 17.  Plaintiffs cannot introduce new legal theories at will throughout the case.  Courts have interpreted a party's introduction of new legal theories through interrogatories or similar means, as the Plaintiffs have purported to effect here, as an untimely, *de facto* motion for leave to amend.  *See Haitian Ctrs. Council, Inc. v. Sale*, 823 F. Supp. 1028, 1033–34 (E.D.N.Y. 1993) (discussing unpleaded claims raised in the first instance in interrogatories); *see also, e.g.*, *People for the Ethical Treatment of Animals v. Doughney*, 263 F.3d 359, 367–68 (4th Cir. 2001) (discussing unpleaded claims raised in the first instance on summary judgment).  Defendants object to Plaintiffs efforts to do just that through their interrogatory responses and do not consent to the trial of unpleaded alleged misstatements.
[3] *See supra* note 3.

## II.   Defendants' Alleged Misstatements Regarding Effex's Order Flow Payments to FXCM

Plaintiffs have alleged that certain statements in FXCM's public filings are false and misleading because, according to Plaintiffs, Effex's order flow payments to FXCM amounted to an undisclosed profit-sharing agreement.  Those statements are:

1.   From the 2011 10-K, 12Q1 10-Q, 12Q2 10-Q, 12Q-3 10-Q, 2012 10-K, 13Q1 10-Q, 13Q2 10-Q, 13Q3 10-Q, 2013 10-K, 14Q1 10-Q, 14Q2 10-Q, 14Q3 10-Q and 2014 10-K:  "Retail trading revenue is our largest source of revenue and is primarily driven by:  . . . (iv) the amount of additional retail revenues earned, including . . . payments we receive for order flow from FX market makers."  ECF No. 181 ¶ 148.

2.   From FXCM's 12Q1 10-Q, 12Q2 10-Q, 12Q3 10-Q, 2012 10-K, 2013 10-K, and 2014 10-K:  "Income earned on order flow represents payments received from certain FX market makers in exchange for routing trade orders to these firms for execution.  The Company's order routing software ensures that payments for order flow do not affect the routing of orders in a manner that is detrimental to its retail customers."  *Id.* ¶ 150.

3.   From FXCM's 2011 10-K, 12Q2 10-Q and 12Q3 10-Q:  "We earn trading fees and commissions by adding a markup to the price provided by the FX market makers and generate our trading revenues based on the volume of transactions, not trading profits or losses."  *Id.* ¶ 152.

4.   From FXCM's 14Q3 10-Q and 2014 10-K:  The Company "no longer receive[d] payments for order flow."  *Id.* ¶ 162.

According to Plaintiffs these statements are false and misleading because  "FXCM did not receive payments for order flow from any market makers, much less multiple market makers" and "[t]o the extent it received 'order flow' payments from Effex, those payments were not for order flow but rather an approximation of 70% of Effex's profits and losses from its trades on the FXCM platform."  *Id.* ¶¶ 149, 151, 162, 163.  Plaintiffs further allege that "the statements fail to disclose that on top of trading fees and commissions, FXCM was earning kickback payments from Effex that were tied directly to Effex's trading profits and losses.  Omitting these kickback payments misled investors as to the source of FXCM's revenues."  *Id.* ¶ 153.

7

### III.     Defendants' Alleged GAAP Violations

Regarding Defendants' alleged failure to make disclosures about Effex as a variable interest entity ("VIE"), Plaintiffs allege that each of FXCM's 2011 10-10, 12Q1 10-Q, 12Q2 10-Q, 12Q3 10-Q, 2012 10-K, 13Q1 10-Q, 13Q2 10-Q, 13Q3 10-Q, 2013 10-K, 14Q1 10-Q, 14Q2 10-Q, 14Q3 10-Q, and 2014 10-K were "materially false [and] misleading because: (a) Effex was a Variable Interest Entity ('VIE') and FXCM was required to, but did not, disclose Effex and details about its relationship with FXCM including the nature, purpose, size and activities of Effex and the methodology for determining that Effex was a VIE; (b) FXCM was required to consolidate Effex's financial results with FXCM's but failed to do so; and (c) as a result FXCM's financial statements did not comply with GAAP and were false when made."  ECF No. 181 ¶¶ 135, 136.

Regarding Defendants' failure to make related party disclosures, Plaintiffs allege that each of FXCM's 2011 10-K, 12Q1 10-Q, 12Q2 10-Q, 12Q3 10-Q, 2012 10-K, 13Q1 10-Q, 13Q2 10-Q, 13Q3 10-Q, 2013 10-K, 14Q1 10-Q, 14Q2 10-Q, 14Q3 10-Q, and 2014 10-K "were materially and false misleading because Effex was a related party and FXCM was required to, but did not, disclose its material transactions with Effex including: (a) a description of the transactions for each period for which income statements are presented and such other information necessary to an understanding of the effects of the transactions on the financial statements, (b) the dollar amount of transactions for each of the periods for which income statements are presented, and (c) amounts due from or to Effex as of the date of each balance sheet presented and, if not otherwise apparent, the terms and manner of the settlement."  *Id.* ¶¶ 144, 145.

As demonstrated below in Argument Section I.A, Plaintiffs cannot establish that any of the foregoing alleged misstatements were untrue.

## RELEVANT FACTUAL BACKGROUND[4]

FXCM was founded in 1999 as an online provider of foreign exchange ("FX") trading and related services.  ¶ 1[5].  FXCM offered its customers access to over-the-counter FX markets through its proprietary technology platform.  ¶ 2.  On December 7, 2010, FXCM completed its initial public offering.  ¶ 84.

There are primarily two trading models employed by FX service providers like FXCM:  an agency model, or "No Dealing Desk," and a principal model, or "Dealing Desk."  ¶ 3.  In an agency trading model, the customer places an order with a broker, a commission is charged, and that order is passed on to be executed with a liquidity provider.  ¶ 4.  As a result, in an agency model, the broker is not exposed to market risk and primarily makes money by charging a commission or markup.  ¶ 5.  In contrast to the agency model, in a principal model the broker is the direct counterparty that executes the customer's trade.  ¶ 6.  Thus, in a principal model, the broker is exposed to market risk and primarily makes money when the market moves in the broker's favor (in a direction adverse to the customer placing the trade).  ¶ 7.  Contrary to Plaintiffs' unsupported contention, during the Class Period, FXCM primarily employed an agency model.  ¶ 11.  During the Class Period, FXCM repeatedly disclosed that its trading revenue included revenue from both commissions and payments for order flow.  ¶¶ 14, 15.  Of note, in years where payment for order flow was earned, FXCM's trading revenue from commissions never fell below 94% of its total revenue.  ¶ 16.

---

[4] A more fulsome explanation of the relevant, undisputed facts at issue are set forth in Defendants' Rule 56.1 Statement of Undisputed Material Facts, filed along with this memorandum pursuant to Fed. R. Civ. P. 56.1.

[5] Citations to "¶ __" refer to Defendants' Rule 56.1 Statement of Undisputed Material Facts, filed along this motion.

In September 2009, FXCM hired John Dittami to manage algorithmic trading projects at FXCM.  ¶ 17.  ██████████████████████████████████████████████████████
██████████████████████████████████████  ¶¶ 19-20.  In the fall of 2009 through the spring of 2010, Dittami developed a trading algorithm to provide customers with a better FX trading experience.  ¶ 22.  ████████████████████████████████████
████████████████████████████████████████  ¶ 23.  On April 14, 2010, Dittami resigned from FXCM ████████████████████████████████████
████████████████████████████████████████  ¶ 25.

On March 23, 2010, Dittami formed Effex to act as a liquidity provider to FXCM and other FX counterparties.  ¶ 28.  Shortly after its formation, Effex began operating as a FX liquidity provider utilizing the trading system and algorithms developed by Dittami.  ¶ 29.  Dittami paid FXCM for ownership of the trading system and algorithm.  ¶ 33.  Since the date of its formation, Dittami and the Dittami Dynasty Trust have owned at least 93% of the issued and outstanding units of Effex.  ¶ 30.  No FXCM entity, employee, officer, board member, or affiliate has ever held any equity interest in Effex.  ¶ 31.  Additionally, since its inception, Dittami has been the managing member of Effex and has made all major decisions concerning Effex, including hiring members, establishing banking relationships, determining employee compensation, selecting office locations, client onboarding (including competitors of FXCM), vendor selection, and prime broker selection.  *See* ¶¶ 30, 40.  While Effex is a liquidity provider, it does not employ a principal model of trading because it:  (1) does not have knowledge of customer positions, stops, limits, or resting orders and (2) does not earn profits or suffer losses that are correlated to FXCM customers' profits and losses.  ¶¶ 42, 43.



¶ 58.

¶ 59.

¶¶ 59, 61.

¶¶ 59, 61.

¶¶ 67-69.

¶ 70.

¶¶ 63, 66.

¶ 63.

. ¶ 72.  And those amounts payable to FXCM were due and owing regardless of whether Effex made or lost money.  ¶ 64.

Payments for order flow are common and legal in the United States and abroad.  For example, in the U.S. equities market, large brokers such as Charles Schwab and Interactive Brokers received payments for order flow during the Class Period.  ¶ 78.

¶ 79.

FXCM itself paid for order flow received from introducing brokers.  ¶ 80.  Indeed, FXCM paid

$76.6 million to introducing brokers globally in 2012.  ¶ 80.  

¶ 47.

¶ 66.

FXCM terminated the Services Agreement with Effex effective August 1, 2014.  ¶ 74.

FXCM disclosed this termination publicly in its public filings from 2014.  ¶ 76.  FXCM did not

receive payments for order flow from Effex after the termination of the Services Agreement.  ¶ 76.

On January 15, 2015, the Swiss National Bank announced that it would immediately end

its three-year-old peg of 1.20 Swiss francs to one euro, just days after it had assured the market it

had no intention of removing the currency peg.  ¶ 118.  This announcement resulted in widespread

market disruption, causing a drop of nearly 30% in the value of the euro relative to the Swiss franc

(the "SNB Flash Crash").  ¶ 118.  FXCM customers with positions in this currency pair lost more

than $275 million and FXCM faced a regulatory capital shortfall.  ¶ 119.  As a result of the SNB

Flash Crash, FXCM's share price decreased from $167.00 per share on January 15, 2015 to $16.00

per share on January 20, 2015.  ¶ 120.  The prices of the FXCM Notes also decreased and they

traded below the par thereafter.  ¶ 121.

On February 6, 2017, FXCM announced simultaneous regulatory settlements with the NFA

and the CFTC against Defendants concerning FXCM's business relationship with Effex and

alleged regulatory violations.  ¶ 126.  Pursuant to the NFA Decision and CFTC Order, FXCM

withdrew from the U.S. market.  ¶ 129.

## **LEGAL STANDARD**

Summary judgment is appropriate where "there is no genuine dispute as to any material

fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a).  "In moving

for summary judgment against a party who will bear the ultimate burden of proof at trial, the movant's burden will be satisfied if he can point to an absence of evidence to support an essential element of the nonmoving party's claim." *Atlantica Holdings, Inc. v. Sovereign Wealth Fund Samruk-Kazyna JSC*, 477 F. Supp. 3d 88, 99 (S.D.N.Y. 2020) (quoting *Goenaga v. March of Dimes Birth Defects Found.*, 51 F.3d 14, 18 (2d Cir. 1995)).  The non-movant must provide "specific evidence demonstrating the existence of a genuine dispute of material fact." *Brown v. Eli Lilly & Co.*, 654 F.3d 347, 358 (2d Cir. 2011).  And the non-movant "may not rely on mere speculation or conjecture as to the true nature of the facts to overcome a motion for summary judgment." *Hicks v. Baines*, 593 F.3d 159, 166 (2d Cir. 2010).

Moreover, "only admissible evidence need be considered by the trial court in ruling on a motion for summary judgment." *SEC v. Boock*, No. 09 Civ. 8261, 2011 WL 3792819, at *9 (S.D.N.Y. Aug. 25, 2011) (quoting *Presbyterian Church of Sudan v. Talisman Energy, Inc.*, 582 F.3d 244, 264 (2d Cir. 2009)); *see also Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986).  "Where the record taken as a whole could not lead a rational trier of fact to find for the non-moving party, there is no 'genuine issue for trial.'" *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986).

## **ARGUMENT**

### I.    **Plaintiffs Cannot Prove Their Section 10(b) Claim**

The elements of a private securities fraud claim for violation of Section 10(b) and Rule 10b-5 are "1) a material misrepresentation or omission; 2) scienter or 'wrongful state of mind;' 3) a connection with the purchase or sale of a security; 4) reliance; 5) economic loss; and 6) loss

causation." *In re GlaxoSmithKline PLC Sec. Litig.*, No. 05 Civ. 3751 (LAP), 2006 WL 2871968, at *5 (S.D.N.Y. Oct. 6, 2006) (citing *Dura Pharms., Inc. v. Broudo*, 544 U.S. 336, 341-42 (2005)).

Although Plaintiffs' failure to prove even one of these elements is sufficient for Defendants to prevail at summary judgment, Plaintiffs fail to put forth sufficient evidence to demonstrate that a material issue of fact exists as to *four* of these elements—namely, misrepresentation or omission, scienter, loss causation, or economic loss.   Accordingly, the Court should grant Defendants' motion for summary judgment as to Plaintiffs' Section 10(b) claim.

     **A.**    **Plaintiffs Cannot Demonstrate A Genuine Issue of Material Fact Regarding Any Misrepresentations Or Omissions**

To prevail on their Section 10(b) claim, Plaintiffs must prove that Defendants made "false statement[s] or omission[s] of material fact." *In re Int'l Bus. Machines Corp. Sec. Litig.*, 163 F.3d 102, 106 (2d Cir. 1998) (granting summary judgment after finding that the statements at issue were not false or misleading).  If no false statement or omission of material fact can be proven because the relevant statements are true, summary judgment is proper.  *See Atlantica Holdings,* 477 F. Supp. 3d at 100 (granting summary judgment because "no reasonable factfinder could conclude that any" of the alleged misstatements were material misstatements or omissions); *Shenk v. Karmazin*, 868 F. Supp. 2d 299, 306 (S.D.N.Y. 2012) (granting summary judgment where discovery showed that challenged statements were true statements of fact); *In re N. Telecom Ltd. Sec. Litig.*, 116 F. Supp. 2d 446, 466 (S.D.N.Y. 2000) (granting summary judgment and finding that all of the statements at issue "are either immaterial, cautionary, or have a reasonable basis in

fact"). Defendants are entitled to summary judgment because Plaintiffs cannot demonstrate that Defendants made any misrepresentation or omission.

> ### 1. FXCM Operated An Agency Model Even When It Had An Order Flow Agreement With Effex

An agency model, alternately called a "no dealing desk" model, is an FX trading model in which the customer places an order with a broker, a commission is charged, and then that order is passed on to be executed with a liquidity provider—all of which happens in milliseconds. ¶ 4. In an agency model, the broker is not exposed to market risk, instead, that risk is passed on to liquidity providers which execute the trades. ¶ 5. In an agency model the broker makes money by charging a commission. ¶ 4. In contrast to the agency model, in a principal model (or "dealing desk" model) the broker (principal) is the direct counterparty that executes the customer's trade. ¶ 6. In a principal model, the broker is exposed to market risk. ¶ 6. Further, in a principal model the broker makes money when the market price moves in its favor and loses money if the market price moves in an adverse direction. ¶ 7. In addition, an agency model allows retail customers access to the best price from a wide range of FX liquidity providers, while in a principal model the retail customer is only provided access to the price from the principal, which acts as the trade counterparty. ¶ 8.

At all times during the Class Period, including when FXCM had a payment for order flow agreement with Effex, the No Dealing Desk trading platform that FXCM provided to its customers retained all the foregoing characteristics of an agency model. Thus, FXCM's representations regarding its use of the agency model were truthful.[6] To begin with, it is undisputed that on

---

[6] Defendants have put forth an expert on the FX industry, Mr. Simon Wilson-Taylor, to further explain these two trading models. Mr. Wilson-Taylor has opined █████████████████

FXCM's No Dealing Desk trading platform, FXCM passed on every trade it received from a customer to a liquidity provider. ¶ 12. Plaintiffs do not contend otherwise. The presence of Effex as one of the many liquidity providers which executed FXCM's customers' trades does not alter this fact. It is also undisputed that FXCM's customers had access to the best price quote from a number of available liquidity providers, as is consistent with an agency model and ultimately received the best available price on their trades, including those filled by Effex. *See* ¶ 12.

Likewise, it is undisputed that FXCM primarily made money from its retail customers by charging them a commission on trades. ¶ 14. In fact, even in the years where payment for order flow was earned, between 94.03% and 98.03% of FXCM's annual revenue was earned from trading commissions—not payments for order flow. ¶ 16.

Despite the mental gymnastics Plaintiffs employ to argue otherwise, FXCM was not exposed to market risk and did not earn profits that were causally linked to customers' profits and losses. ¶ 65. Plaintiffs' assertion that the order flow payments Effex made to FXCM were based on Effex's profits and losses has been disproven in many ways: (1) ████████████████████████

████████████████████████████████████████████████████ (¶¶ 59-64);

(2) ████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████ (¶¶ 61-64); and (3) ████████████████████████████

_____

████████████████████████████████████████ Dahan Decl. Ex. 2 (Wilson-Taylor Report) ¶ 11.e.
Mr. Wilson-Taylor further opines that ████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

*Id.* ¶ 11.f. Plaintiffs have offered no expert opinions that the business relationship between FXCM and Effex transformed FXCM into a dealing desk.



Because FXCM's retail trading desk retained all the aspects of an agency model, its public disclosures during the Class Period concerning its agency model were truthful.

### 2.   FXCM Did Not Have A Profit-Sharing Agreement With Effex

Despite Plaintiffs' characterizations to the contrary, the payments FXCM received from Effex were for order flow and were not the fruits of a profit-sharing agreement.  This is confirmed





¶¶ 63-64.

¶ 72.

¶ 61.

¶¶ 63, 66.

Dittami's employment agreement was terminated in April 2010, and

¶¶ 46, 66.

Plaintiffs have similarly relied on a

As a matter of logic, even if an option agreement existed, an unexercised option to purchase a company is not evidence of active profit sharing.

¶¶ 50-54.

(¶ 55)—

18



¶ 56.

¶ 56.

### 3. FXCM Complied With GAAP

Plaintiffs also have failed to provide any evidence that FXCM's financial statements did not comply with GAAP during the Class Period.  Neither the CFTC nor the NFA identified any evidence that would suggest that FXCM violated GAAP (¶¶ 130, 131), and FXCM's financial statement auditor, EY, never suggested a restatement of FXCM's financials was necessary (¶ 114).  Indeed, FXCM has never restated its financial statements.  ¶ 114.

#### a. FXCM Was Not Required To Consolidate Effex As A VIE During The Class Period

There is simply no genuine issue of fact regarding whether FXCM was required to consolidate Effex as a VIE.  ASC 810 provides the controlling methodology for determining whether such consolidation is appropriate and it prescribes a three-step test:  (1) whether the entity considered for consolidation is a VIE; (2) whether the reporting entity has a variable interest in the VIE; and (3) whether the reporting entity the primary beneficiary of the VIE.  ¶ 107.

Whether an entity is considered a VIE is determined by examining (1) whether there is sufficient equity at risk and (2) whether the equity holders in the entity have the power to direct

the significant activities of the entity, including the obligation to absorb losses or the right to receive residual returns.  ¶ 108.  ███████████████████████████████████

████████████████████████████████████████████████[8]  And as Defendants'

accounting expert, Thomas Linsmeier, █████████████████████████████████████

███████████████████████████████████████████████████████████

¶ 111.  Furthermore, the undisputed facts demonstrate that Effex had the power to direct all of its own activities, from operating its own trading system; to maintaining its own bank accounts, offices, and employees; to servicing dozens of counterparties besides FXCM; to possessing the sole discretion to accept or reject trades.  ¶ 40.  Most importantly, at all times Effex had the obligation to absorb losses and the right to receive residual returns from its operations.  ¶ 40.  Thus, Effex was not a VIE during the Class Period.

Having determined that Effex was not a VIE during the Class Period, the analysis need not go further.  However, there is no evidence that FXCM held a variable interest in Effex.  Whether the reporting entity has a variable interest in the VIE is determined by examining whether the reporting entity holds interests in the VIE that will absorb portions of the VIE's expected losses or receive portions of the VIE's expected residual returns.  ¶ 109.  The only interest FXCM can be said to have had in Effex is the fees it received pursuant to the Services Agreement.  Plaintiffs and their accounting expert have not identified any other interest that could serve as the variable interest for this prong of the consolidation analysis.  As previously established (*see supra* Argument Section I.A.2), ███████████████████████████████████████

███████████████████████████████   ████████████████████████████████████

--------

[8] For this reason, among others, in conjunction with this motion, Defendants have filed a Motion to Exclude the Reports, Testimony, and Opinions of John E. Barron.  ECF Nos. 237-39.

███████████████████████████████████████████

██████████████████████████   ¶ 59.

Having failed the first two steps of the VIE consolidation analysis, the third step of the analysis is entirely moot.  Nonetheless, the discovery record is clear that FXCM was not the primary beneficiary of Effex.  An entity is a primary beneficiary of a VIE if it has the power to direct its activities, or the obligation to absorb its losses or receive its profits.  ¶ 110.  FXCM did not have the power to direct the activities of Effex (¶ 40) and, as previously explained, had no obligation to absorb Effex's losses or right to receive Effex's profits (¶ 40).

In light of the foregoing, consolidation of Effex as a VIE was not required under applicable GAAP guidance at any point during the Class Period.  Thus, FXCM complied with GAAP in making its VIE disclosures.

### b.   FXCM Was Not Required To Disclose Effex As A Related Party During The Class Period

The parties agree that ASC 850 is controlling as to related party disclosures under GAAP, but Plaintiffs base their allegation that FXCM was required to make related party disclosures regarding Effex on a single prong of the ASC 850 analysis:  that FXCM was in a position to significantly influence Effex to the extent that Effex might have been prevented from fully pursuing its own separate interests.  Yet, this conclusion is supported only by facts present outside the Class Period, and is directly contradicted by documents and sworn testimony establishing that (1) Effex was capitalized with Effex's own funds (¶¶ 36-40); (2) Effex gained a broad customer base outside of and apart from FXCM during the Class Period (¶ 41); (3) Effex repaid the initial $2 million in prime-of-prime account funding in May 2010, before the Class Period (¶ 36); and (4) Effex operated its business independently from FXCM at all times during the Class Period (¶ 40).

Thus, under ASC 850 FXCM could not significantly influence the management or operating policies of Effex to an extent that Effex might have been prevented from fully pursuing its own separate interests and there is no genuine issue of fact that FXCM was not required to disclose Effex as a related party of FXCM at any point during the Class Period.

**B.     Plaintiffs Cannot Demonstrate A Genuine Issue Of Material Fact Regarding Scienter**

Defendants are also entitled to summary judgment on the independent ground that the robust evidentiary record in this case is devoid of any facts to support the conclusion that Defendants acted with scienter.  Summary judgment is appropriate where a plaintiff fails to "produce[] evidence from which a reasonable jury could infer that the defendant acted with the requisite scienter."  *Shenk*, 868 F. Supp. 2d at 307; *see also Steed Fin. LDC v. Nomura Sec. Int'l, Inc.*, 148 F. App'x 66, 69 (2d Cir. 2005) (affirming summary judgment because plaintiff failed to provide sufficient evidence that would enable a jury to find the requisite scienter) (summary order).[9]

To satisfy the scienter requirement at the summary judgment stage, Plaintiffs "must produce evidence '(1) showing that the defendants had both motive and opportunity to commit the fraud or (2) constituting strong circumstantial evidence of conscious misbehavior or recklessness.'"  *Shenk*, 868 F. Supp. 2d at 305 (quoting *ATSI Commc'ns, Inc. v. Shaar Fund, Ltd.*, 493 F.3d 87, 99 (2d Cir. 2007)).  As described in more detail below, Plaintiffs have failed to establish scienter under either of these bases.

---

[9] As several courts have recognized, it is difficult to prove scienter at the summary judgment stage. *See, e.g.*, *Mikhlin v. Oasmia Pharm. AB*, No. 19 Civ. 4349, 2021 WL 1259559, at *5 (E.D.N.Y. Jan. 6, 2021) (stating that it is "notably difficult to establish" the existence of a genuine issue of material fact regarding scienter); *In re Pall Corp.*, No. 07 Civ. 3359, 2013 WL 1702227, at *3 (E.D.N.Y. Apr. 8, 2013) (plaintiffs faced a "serious risk of losing on summary judgment on the issue of scienter, a difficult element to prove").

**1.      Plaintiffs Cannot Prove Motive And Opportunity**

In their TAC, Plaintiffs did not even attempt to plausibly allege that Defendants Niv or

Ahdout had motive and opportunity to commit the alleged fraud.  And now that discovery has

concluded, the evidence produced in this case has not suggested any hint of motive.  Indeed,

Plaintiffs cannot prove any of the facts that could typically establish motive, including that Niv or

Ahdout sold stock, benefited from increased bonuses, or had a personal interest of any kind in

Effex.  *See In re Northern Telecom Ltd. Sec. Litig.*, 116 F. Supp. 2d 446, 462 (S.D.N.Y. 2000)

("The absence of stock sales by insiders, or any other evidence of pecuniary gain by company

insiders at shareholders' expense, is inconsistent with an intent to defraud shareholders.").

Moreover, a general desire to increase a company's profitability does not establish motive.

*See Novak v. Kasaks*, 216 F.3d 300, 307 (2d Cir. 2000) (interests in sustaining the appearance of

corporate profitability and maintaining a high stock price to increase executive compensation held

insufficient).  Thus, there is no genuine issue of material fact regarding whether Niv or Ahdout

had motive and opportunity to commit fraud.

**2.      Plaintiffs Cannot Prove Conscious Misbehavior Or Recklessness In Connection With FXCM's Statements Concerning Its Agency Trading Model Or Financial Arrangement With Effex**

Scienter requires "more than a conscious failure to disclose . . . .  Rather, there must be

proof that the non-disclosure was intended to mislead."  *Reiss v. Pan Am. World Airways, Inc.*,

711 F.2d 11, 14 (2d Cir. 1983); *see also Pivot Point Capital Master LP v. Deutsche Bank AG*, No.

08 Civ. 2788, 2010 WL 9452230, at *4 (S.D.N.Y. Dec. 9, 2010).  At a minimum, proof of scienter

requires Plaintiffs to show reckless conduct.  *See In re Northern Telecom,* 116 F. Supp. 2d at 462.

The Second Circuit has cautioned that recklessness in the securities fraud context refers to "a state

of mind approximating actual intent, and not merely a heightened form of negligence."  *S. Cherry*

*St., LLC v. Hennessee Grp. LLC*, 573 F.3d 98, 109 (2d Cir. 2009) (quotation omitted).  To qualify

as reckless, the conduct must have been "*highly unreasonable*, 'representing an *extreme departure from the standards of ordinary care* . . . to the extent that the danger was either known to the defendant or so obvious that the defendant must have been aware of it.'" *Rothman v. Gregor*, 220 F.3d 81, 90 (2d Cir. 2000) (emphases added) (quoting *Rolf v. Blyth, Eastman Dillon & Co.*, 570 F.2d 38, 47 (2d Cir. 1978)).

Despite having ample opportunity to do so, Plaintiffs have failed to provide a shred of evidence that Niv or Ahdout affirmatively intended to mislead investors, much less that Niv or Ahdout acted in a way that constituted an "extreme departure from the standards of ordinary care." While the Court held at the motion to dismiss stage that Plaintiffs had adequately alleged scienter based on allegations that Niv and Ahdout "devised a plan to take advantage of FXCM's NDD clients through the use of a high frequency trading algorithm" (ECF No. 35 at 31), the evidence uncovered during discovery flatly contradicts this allegation.  In fact, the substantial evidence in this case shows that Niv and Ahdout acted in good faith ███████████████████████ ████████████████████████████████████████████████████████████ ¶¶ 88-90.

Specifically, there is simply no evidence that Niv or Ahdout believed that FXCM's business relationship with Effex somehow transformed FXCM's agency model, or No Dealing Desk, into a principal model, or Dealing Desk.  To the contrary, ████████████████ ████████████████████████████████████████████████████████████ ████████████████████████████████████████████████████████████ ████████████████████████████████████████████████████████████ █████████████████████████ ¶ 24.  As a result, Dittami formed an independent company, Effex, to stream foreign currency prices and provide foreign currency execution services to FXCM and other

FX counterparts.  ¶ 28.  Effex's operations were never controlled by FXCM and Dittami provided sworn testimony that Effex:  (1) hired, fired, and paid its own employees; (2) maintained its own independent bank accounts; (3) independently capitalized its prime broker relationship; (4) supplied all of its operating capital and risk capital; (5) provided FX retail pricing and execution services to over 30 counterparties (in addition to FXCM); (6) owned or leased all of its own computers, servers, and other equipment; (7) utilized its own proprietary trading software; (8) owned, operated, and maintained its own trading system; (9) leased its own office space; (10) had sole discretion to accept or reject trades; (11) retained all of Effex's trading profits; (12) assumed liability for all trading and operating losses and potential losses; and (13) had no common employees with FXCM.  ¶ 40.

Moreover, as FXCM represented to its investors, FXCM's interests were in fact aligned with those of its customers in connection with the Effex relationship.



¶ 19.

¶ 20.

¶ 21.

_____

[10] "Last look" is the liquidity providers' ability to reject an order after it has been received.  Last look can be abused by liquidity providers to choose the order flow they prefer, while rejecting the rest.  ¶ 20.

████████████████████████████████████████████████████████ ¶¶ 21-
22.

Additionally, the evidence in this case confirms FXCM's desire and success in improving

the experience of its customers through its liquidity relationship with Effex. ████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

██████████████████ ¶ 91. ████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████ ¶ 89.  This evidence is fatal to Plaintiffs' scienter

allegation.  *See ECD Inv'r Grp. v. Credit Suisse Int'l*, No. 14-CV-8486, 2017 WL 3841872, at *24

(S.D.N.Y. Sept. 1, 2017) (granting summary judgment on scienter grounds where discovery

revealed that "nonculpable inferences are the only ones that a reasonable factfinder could draw").

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

██████████████████ ¶ 92. ██████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

███████████████████████ ¶¶ 97-99.

Similarly, Plaintiffs cannot prove that Niv or Ahdout intended to mislead investors by

correctly portraying Effex's payments to FXCM as payments for order flow rather than as a profit-

sharing arrangement.  To begin with, as described above, ██████████████████████████



¶ 59.

¶ 72.

¶ 72.  But more importantly, there is zero evidence indicating

The record evidence shows facts that are inconsistent with any showing of scienter by Niv or Ahdout.  Plaintiffs can provide no reasonable inferences of scienter to support their claims.

### 3. Plaintiffs Cannot Prove Conscious Misbehavior Or Recklessness In Connection With The Alleged GAAP Misstatements

Plaintiffs also cannot establish that Niv or Ahdout acted with scienter in connection with Plaintiffs' alleged GAAP misstatements.  As the evidence has shown, Niv and Ahdout had no reason to believe that FXCM's accounting treatment of Effex violated GAAP.  Indeed, FXCM's independent auditor, EY, issued unqualified audit opinions for FXCM's financial statements throughout the Class Period

¶ 114.  EY's approval of FXCM's accounting treatment of Effex undercuts any claim by Plaintiffs that Niv or Ahdout intended to mislead investors.  *See In re REMEC Inc. Sec. Litig.*, 702 F. Supp. 2d 1202, 1246 (S.D. Cal. 2010); *In re Cirrus Logic Sec. Litig.*, 946 F. Supp. 1446, 1465 (N.D. Cal. 1996) (even if Plaintiffs raised an issue of material fact that company violated GAAP, review and approval by auditor "would have negated any inference of scienter").  What is more, EY had full access to conduct a thorough, professional, and independent audit of

FXCM each year during the Class Period, which "negate[s] an inference that [Niv or Ahdout] had a scheme to defraud investors." *In re REMEC*, 702 F. Supp. 2d at 1246.

Moreover, FXCM's decisions not to consolidate Effex as a VIE or disclose it as a related party complied with GAAP. While Plaintiffs' expert may have reached a different conclusion than Defendants' expert concerning the proper accounting treatment, where, as here, the evidence "clearly rebuts any inference of bad faith," "a plaintiff's expert's contrary opinion is insufficient to defeat summary judgment on scienter." *Id.* at 1250 (internal quotation marks and citation omitted). Nor is Plaintiffs' (and their expert's) disagreement regarding the treatment of a complicated accounting issue sufficient to demonstrate scienter. *See, e.g., In re Digi Int'l, Inc. Sec. Litig.*, 14 F. App'x 714, 717 (8th Cir. 2001) (affirming grant of summary judgment where district court determined that "no reasonable jury could find that Defendants acted with scienter since reasonable people could disagree" regarding proper accounting treatment); *Cirrus Logic*, 946 F. Supp. at 1457 ("GAAP is not a set of rules ensuring identical treatment of identical transactions; rather, it tolerates a range of reasonable treatments, leaving the choice among alternatives to management.").

Finally, "[a] corporate officer's job title does not prove that he was personally involved with the alleged fraud." *In re REMEC*, 702 F. Supp. 2d at 1247; *In re Marsh & McLennan Co., Inc. Sec. Litig.*, 501 F. Supp. 2d 452, 483 (S.D.N.Y. 2006) (organizational role of defendant does not establish his knowledge of facts constituting misconduct). Neither Niv, FXCM's CEO, nor Ahdout, one of FXCM's Managing Directors, should be held liable for securities fraud in connection with alleged GAAP violations simply because of their job titles, where there is no evidence in the record to establish that they knew or were reckless in not knowing that FXCM's related party and VIE disclosures did not comply with GAAP.

**4.** **Plaintiffs Cannot Prove FXCM's Scienter**

Plaintiffs also will not be able to establish FXCM's corporate scienter, which requires proof that an FXCM agent "committed a culpable act with the requisite scienter." *Teamsters Local 445 Freight Div. Pension Fund v. Dynex Capital Inc.*, 531 F.3d 190, 195 (2d Cir. 2008). To the extent Niv and Ahdout "d[id] not have the requisite scienter for [any] particular statement . . ., [FXCM] cannot have it either." *SEC v. Rio Tinto plc*, 17 Civ. 7994, 2019 WL 1244933, at *14 (S.D.N.Y. Mar. 18, 2019).

**C.** **Plaintiffs Cannot Demonstrate A Genuine Issue of Material Fact Regarding Loss Causation**

"Loss causation is the causal link between the alleged misconduct and the economic harm ultimately suffered by the plaintiff." *Lentell v. Merrill Lynch & Co.*, 396 F.3d 161, 172 (2d Cir. 2005) (quotations omitted). To establish the loss causation element of a securities fraud claim, a plaintiff must demonstrate "that the subject of the fraudulent statement or omission was the cause of the actual loss suffered." *Carpenters Pension Trust Fund of St. Louis v. Barclays PLC*, 750 F.3d 227, 232 (2d Cir. 2014) (quotation omitted). "The Second Circuit has articulated several methods for showing loss causation, the most common being the 'corrective disclosure' theory and the 'materialization of risk' theory." *Atlantica Holdings*, 477 F. Supp. 3d at 110 (citing *In re Omnicom Grp., Inc. Sec. Litig.*, 597 F.3d 501, 511 (2d Cir. 2010)). "Under the 'corrective disclosure' theory, a plaintiff must show that the market reacted negatively to a 'corrective disclosure,' which revealed an alleged misstatement's falsity or disclosed that allegedly material information had been omitted." *Id.* (quotation and citation omitted). By contrast, "[u]nder the 'materialization of risk' theory, the plaintiff must show that the alleged misstatement conceals a condition or event which then occurs and causes the plaintiff's loss." *Id.* (quotation and citation omitted).

Seeking to satisfy their loss causation burden, Plaintiffs proffer the reports, testimony and opinions of Dr. Adam Werner, their expert on loss causation and damages.  Plaintiffs' theory, as expressed through Werner, is that █████████████████████████████████████

████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████

██████████████████████████████  As explained below, Werner's conclusions are not admissible under *Daubert*.  Nor does the evidence support Plaintiffs' theory of loss causation. Finally, Plaintiffs have failed to put forth any evidence of loss causation whatsoever with respect to the alleged GAAP misstatements.  In sum, Plaintiffs fail to raise a genuine issue of material fact regarding loss causation and, therefore, summary judgment must be granted in favor of Defendants.

      1.      **Plaintiffs Cannot Prove Loss Causation Because Werner's Opinions Do Not Satisfy *Daubert* And Are Inadmissible**

As an initial matter, Plaintiffs' proof of loss causation fails because it depends on Werner's analysis, and his reports, testimony and opinions that are not admissible under Federal Rule of Evidence 702.  The only empirical analysis Werner performs to support his conclusions on loss causation is ████████.  While Defendants do not dispute that ████████ are frequently used in securities actions to analyze loss causation and damages, Werner's analysis is not the result of reliable principles and methods.  As such, it does not meet the standard required of an expert under *Daubert*.  Therefore, in conjunction with this motion, Defendants have filed a Motion to Exclude the Reports, Testimony, and Opinions of Dr. Adam Werner (the "Werner Motion").  ECF

Nos. 242-44.  The bases for Werner's exclusion are set forth in greater detail in the Werner Motion, but are summarized below.

Under Section 10(b) a plaintiff must "'disaggregate' losses caused by 'disclosure of the truth behind the alleged misstatements from losses caused by other factors, including changed economic circumstances, changed investor expectations, new industry-specific or firm-specific facts, conditions, [and] other events.'"  *Atlantica Holdings*, 477 F. Supp. 3d at 110 (quoting *In re Flag Telecom Holdings, Ltd. Sec. Litig.*, 574 F.3d 29, 36 (2d Cir. 2009)).  Plaintiffs admit that multiple pieces of news about FXCM entered the market on February 6, 2017—not just the CFTC and NFA's allegations about FXCM's relationship with Effex, but also FXCM's payment of a $7 million penalty, withdrawal from the U.S. markets, and plan to lay off 18% of its workforce.  But Werner fails to disaggregate the impact of these separate pieces of information.

Instead, his analysis—and Plaintiffs' entire theory of loss causation—is premised on the assumption ███████████████████████████████████████████████████████

███████████████     *See, e.g.*, ECF Nos. 245-1, 246-1  (Werner Report) ¶¶ 8, 46, 84. Indeed, Werner takes the position that ████████████████████████████████████████████

████████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████████

████████████████████     Yet, Werner offers no evidence to back up these assumptions.  *See* Dahan Decl. Ex.[11] 78 (Werner Tr.) at 368:9-372:16. ████████████████████████

████████████████████████████████████████████████████████████████████

---

[11] All citations to "Dahan Decl." are to the Declaration of Israel Dahan in Support of Defendants' Motion for Summary Judgment and Rule 56.1 Statement of Undisputed Material Facts.

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

█████████████████████████████   Because the problems with Werner's methodology are so

pervasive, exclusion is the appropriate remedy.

In light of the fact that Werner must be excluded under *Daubert*, summary judgment is also

appropriate as to Plaintiffs' Section 10(b) claim for failure to demonstrate loss causation.  *See, e.g.*,

*In re REMEC*, 702 F. Supp. 2d at 1275 (granting summary judgment where loss causation and

damages expert excluded under *Daubert*); *In re Williams Sec. Litig.*, 496 F. Supp. 2d 1195 (N.D.

Okl. 2007) (same); *see also Bricklayers and Trowel Trades Intern. Pension Fund v. Credit Suisse

Sec. (USA) LLC*, 752 F.3d 82, 97 (1st Cir. 2014) (affirming grant of summary judgment where loss

causation expert excluded under *Daubert*).

> ### 2.   There Is No Evidence The Prices Of FXCM's Securities Were Inflated At The End Of The Class Period Or That Plaintiffs Who Purchased FXCM Securities After August 2014 Sustained Losses Proximately Caused By The Alleged Misstatements

Plaintiffs' theory also stretches the loss causation element beyond what Section 10(b) was

designed to protect.  The Second Circuit has "described loss causation in terms of the tort-law

concept of proximate cause."  *Lentell v. Merrill Lynch & Co.*, 396 F.3d at 172.  However, "the tort

analogy is imperfect" and "a misstatement or omission is the 'proximate cause' of an investment

loss if the risk that caused the loss was within the zone of risk concealed by the misrepresentations

and omissions alleged by a disappointed investor."  *Id.* at 173.  "The zone of risk is determined by

the purposes of the securities laws, *i.e.*, to make sure that buyers of securities get what they think

they are getting."  *In re Omnicom Grp., Inc. Sec. Litig.*, 597 F.3d 501, 513 (2d Cir. 2010) (quotation

and citation omitted).  "[T]herefore, recovery is limited to only the foreseeable losses for which

the intent of the laws is served by recovery."  *Id.* (quotation and citation omitted).  Here, the

evidence in the record contradicts the proposition that any inflation, if it ever existed, remained in the price of the FXCM Securities as of February 6, 2017. Nor have Plaintiffs advanced a theory of loss causation that establishes that element as to purchasers of FXCM Securities after the Services Agreement terminated in August 2014.

FXCM terminated the Services Agreement as of August 1, 2014 and it did not receive order flow payments from Effex between that date and the end of the Class Period. ¶ 74. FXCM publicly disclosed in its 14Q3 and 2014 10-K that it was no longer receiving payments for order flow. ¶ 76. These facts cannot be genuinely disputed. Indeed, this Court already has acknowledged these facts and limited Plaintiffs' claims that FXCM made misstatements regarding its agency trading model or pay for flow relationship with Effex to the period before August 2014. ECF No. 135 at 38.

Moreover, as noted above, starting in January 2015, and after the alleged misstatement period, FXCM experienced dramatic changes in its business and financial condition unrelated to the alleged misstatements that dramatically affected the value of its securities. In particular, as a result of the SNB Flash Crash on January 15, 2015, FXCM customers with long positions in the euro/Swiss franc currency pair lost more than $275 million. ¶ 119. FXCM, in turn, faced a possible breach of its regulatory capital requirements, and to avoid liquidation it was forced to secure an emergency $300 million loan from Leucadia. ¶ 123. Within days of the SNB Flash Crash and the Leucadia bailout, the price of FXCM's common stock declined by nearly 90%, from $167 per share on January 15 to $16 per share on January 20, and the FXCM Notes traded substantially below par thereafter. ¶¶ 120-121. And the price of FXCM's Securities never returned to their previous trading levels during the Class Period. ¶ 122.

Given all of these factors, it will be impossible for Plaintiffs to prove loss causation. Not only did the Effex order flow relationship terminate in the middle of the Class Period, but as

Professor Terrence Hendershott, Defendants' loss causation and damages expert, points out, ███

███████████████████████████████████████████████████████████████████████

███████████████████████████████████████████████████████████████████████

█████████████████████████████████   Dahan Decl. Ex. 72 (Hendershott Report) ¶ 58.  Further,

given the dramatic decrease in the price of the FXCM Securities as a result of the SNB Flash Crash

and Leucadia bailout, Plaintiffs fail to explain how the prices of those securities were still inflated

as of February 6, 2017, especially given the lack of an alleged misstatement or omission

concerning the period after August 2014.  Nor do Plaintiffs explain how investors who purchased

after the termination of FXCM's order flow relationship with Effex, a development that was

disclosed prior to the SNB Flash Crash (¶ 76), could have sustained losses attributable to a prior

alleged misstatement or omission about the terminated pay-for-flow agreement with Effex.

Plaintiffs may argue that there is still a genuine material issue of fact regarding loss

causation because Defendants' misstatements and omissions concealed the regulatory risk the

Company faced as a result of its undisclosed relationship with Effex.  However, FXCM repeatedly

disclosed the risk of regulatory inquiries.  ¶ 125.  Moreover, this Court has already dismissed

Plaintiffs' claims that Defendants should have disclosed the CFTC and NFA investigations while

they were ongoing, holding that "there is no independent duty for a company to disclose that it is

being investigated by a regulatory agency," and that "companies do not have an affirmative duty

'to speculate or disclose uncharged, unadjudicated wrongdoings or mismanagement."  ECF No.

135 at 27-28 (quoting *In re UBS AG Sec. Litig.*, No. 07 Civ. 11225 (RJS), 2012 WL 4471265, at

*31 (S.D.N.Y. Sept. 28, 2012)).

### 3. Plaintiffs Cannot Prove Loss Causation Regarding The Alleged GAAP Misstatements

Finally, Plaintiffs cannot establish loss causation with respect to the alleged GAAP violations. Plaintiffs allege that FXCM's financial statements violated GAAP because the Company should have consolidated Effex as a VIE, or, in the alternative, disclosed Effex as a related party. *See* ECF No. 181 ¶¶ 13-14. As discussed above, these allegations are baseless. *See supra* Argument Section I.A.3. Furthermore, even if Plaintiffs could prove a material misstatement or omission by Defendants, as well as scienter—which they cannot—Plaintiffs must still prove "that the concealed information later reached the market and caused their loss." *Atlantica Holdings*, 477 F. Supp. 3d at 110. Specifically, Plaintiffs must establish "a causal link between Defendants' accounting violations and the drop in" the price of FXCM's Securities. *See, e.g.*, *In re Scientific Atlanta, Inc. Sec. Litig.*, 754 F. Supp. 2d 1339, 1371 (N.D. Ga. 2010).

However, Plaintiffs have adduced no evidence of a corrective disclosure that revealed FXCM's supposedly inappropriate accounting practices to the market and caused their losses. FXCM never restated any of its financial statements. ¶ 114. ██████████████████████ ██████████████████████████████████ ¶ 114. While Plaintiffs point to the disclosures on February 6, 2017 regarding FXCM's settlements with the CFTC and NFA concerning alleged regulatory violations as the corrective disclosure that revealed the "truth" to the market (¶ 126), those documents are devoid of any mention of FXCM's accounting practices with respect to Effex or otherwise. ¶¶ 130-131. Nor do the analyst reports that followed the February 6 disclosure contain any mention of FXCM's accounting. ¶ 132. And even Werner, Plaintiffs' expert on this issue, ██████████████████████████████████████████████ ██████████████████████████████████████████████ ██████████████████████████ ¶ 133.

The absence of a specific disclosure correcting the alleged GAAP misstatements to the market is fatal to Plaintiffs' claims. For example, in *In re Scientific Atlanta*, the plaintiffs alleged that the defendants had materially misrepresented the demand for the corporation's products, as well as its financial position by failing to disclose its channel-stuffing practices. 754 F. Supp. 2d at 1355. Plaintiffs also alleged that the defendants violated GAAP by improperly recognizing revenue, leading to revenue overstatements. *Id.* at 1358-59. Plaintiffs pointed to three press releases revealing excess customer inventories as corrective disclosures. Though the Court found these sufficient to demonstrate loss causation as to plaintiffs' channel stuffing claims, it granted summary judgment as to the GAAP allegations because the "cited disclosures provided the market with no new information about [defendants'] accounting practices," so plaintiffs could not "demonstrate that the removal of any inflationary component in the stock price resulted from a disclosure of these practices." *Id.* at 1371; *see also In re Retek Sec. Litig.*, 621 F. Supp. 2d 690, 704 (D. Minn. 2009) (stating it was "questionable" whether announcement that Retek reversed $4 million in deferred revenue for a joint venture was sufficient to alert market that accounting for the venture was fraudulent). Similarly, Plaintiffs fail to explain how the CFTC and NFA's allegations that FXCM's relationship with Effex resulted in a conflict of interest as to its No Dealing Desk platform was sufficient to alert the market that FXCM also should have consolidated Effex as a VIE or disclosed it as a related party.

### D.   Plaintiffs Cannot Demonstrate A Genuine Issue Of Material Fact Regarding Economic Loss

Even if Plaintiffs could demonstrate loss causation, summary judgment is still appropriate because Plaintiffs' damages model is irreparably flawed. "Traditionally, economic loss in Section 10(b) cases has been determined by the use of the 'out-of-pocket' measure for damages." *Action AG v. China North East Petroleum Holdings Ltd.*, 692 F.3d 34, 38 (2d Cir. 2012). "[T]he correct

measure of damages under § 28 of the Act, 15 U.S.C. § 78bb(a), is the difference between the fair value of all that the [plaintiff] received and the fair value of what he would have received had there been no fraudulent conduct." *Affiliated Ute Citizens v. United States*, 406 U.S. 128, 155 (1972). "In other words, damages in a securities fraud case are measured by the difference between the price at which a stock sold and the price at which the stock would have sold absent the alleged misrepresentations or omissions." *Crown Cork & Seal Co., Inc. Master Retirement Trust v. Credit Suisse First Boston Corp.*, No. 12 Civ. 05803, 2013 WL 978980, at *11 (S.D.N.Y. Mar. 12, 2013) (quotation and citation omitted).  And summary judgment has been granted where plaintiffs failed to present a satisfactory theory of damages.  *See, e.g.*, *In re BP p.l.c. Sec. Litig.*, No. 10 MD 2185, 2016 WL 3090779 (S.D. Tex. May 31, 2016).

In support of their claims for damages Plaintiffs again rely on Werner's reports, testimony and opinions.  As noted above, these are inadmissible under *Daubert*.  Furthermore, Werner uses

███████████████████████████████████████████████████████████████████

███████████████████████████████████████████ ECF Nos. 245-1, 246-1 (Werner Report) ¶¶ 61-84, 94-96.  Using that methodology, Werner opines that █████████████

██████████████████████████████████ *Id.* ¶ 97.   In other words, under Plaintiffs' proposed damages model, ██████████████████████████████████

███████████████████████████████████████████████████████████████████

██████████████████████████████ Similarly, and despite class certification being denied, Werner opines that ████████████████████████████████████████████

█████████████████████████████████ *Id.*[12] ███████████████████

---

[12] As noted above, since an FXCM Noteholder class was not certified, 683 Capital is the only remaining Plaintiff with respect to the FXCM Notes.

37

██████████████████████████████████████████████████████████

██████████████████████████████████████████████████████████

███████████████████████  *Id.* ¶¶ 8, 46, 84.  Put differently, Werner's damages analysis ██████████

██████████████████████████████████████████████████████████

██████████████████████████████████████████████████████████

██████████████████████████████████████████████████████████

██████████████████████████████████

This assumption renders Plaintiffs' damages model irreparably flawed and insufficient to establish the economic loss required under Rule 10(b).  For example, in *In re BP p.l.c.*, the plaintiffs claimed that BP had misrepresented its internal oil flow-rate estimate, causing the market to conclude that an oil spill would be relatively small, when in fact BP's internal estimates suggested that the flow rate was far more severe.  2016 WL 3090779 at *1.  Following an oil spill resulting from the Deepwater Horizon explosion, plaintiffs claimed damages under Section 10(b) for stock drops resulting from multiple corrective disclosures, including news that certain of BP's containment measures had failed and that BP might cut its stockholder dividend.  *Id.* at *3, 33. The Court granted summary judgment, finding that even if Plaintiffs could prove the news regarding the failure of BP's containment measures and the dividend was "related to" the misrepresented flow rate, plaintiffs' damages model was flawed because "when the corrective event is the materialization of an understated risk, the stock price movement on the date of the correction (*i.e.*, on the date that the risk materialized) will not equate to inflation on the date of purchase unless the probability of the risk materializing was 100 percent."  *Id.* (quotation omitted). Similarly, the proposition that the same negotiated regulatory settlement, including FXCM's

payment of a $7 million fine, withdrawal from its U.S. business, and the collateral effects thereof was probable with 100% certainty from March 15, 2012 onwards simply defies common sense.

## II.    Individual Plaintiff 683 Capital Cannot Prove Its Section 10(b) Claim

Even if this Court were to find that there are genuine issues of material fact with respect to the Class Plaintiffs' Section 10(b) claim, summary judgment is still appropriate as to individual Plaintiff 683 Capital's Section 10(b) claim. As described below, 683 Capital has failed to put forth sufficient evidence to prove the elements of reliance, loss causation, and economic loss for its individual claims, in addition to those discussed above with respect to the Class.

### A.    683 Capital Cannot Raise A Genuine Issue Of Material Fact Regarding Reliance

Defendants are entitled to summary judgment on 683 Capital's individual claims because there is no genuine dispute regarding its failure to demonstrate reliance, an indispensable element of a securities fraud claim under Section 10(b) and Rule 10b-5. "Reliance by the plaintiff upon the defendant's deceptive acts is an essential element of the § 10(b) private cause of action." *Erica P. John Fund, Inc. v. Halliburton Co.*, 563 U.S. 804, 810 (2011) (quoting *Stoneridge Inv. Partners, LLC v. Scientific-Atlanta, Inc.*, 552 U.S. 148, 159 (2008)). "This is because proof of reliance ensures that there is a proper 'connection between a defendant's misrepresentation and a plaintiff's injury.'" *Erica P. John Fund*, 563 U.S. at 810 (quoting *Basic Inc. v. Levinson*, 485 U.S. 224, 243 (1988)).

#### 1.    683 Capital Is Not Entitled To A Presumption Of Reliance

The Court has already determined that FXCM Noteholders are not entitled to a presumption of reliance under *Affiliated Ute* or *Basic*. ECF No. 229 at 23-24 (holding that "the *Affiliated Ute* presumption does not apply"); *id.* at 37 ("Because plaintiffs have not established that the FXCM Notes traded in an efficient market, they cannot rely on the *Basic* presumption of reliance as to the

notes, meaning that each note purchaser would be required to prove, individually, that it relied on defendants' allegedly false or misleading statements in making its purchases").  Therefore, in order to prevail on its claims under Section 10(b) and Rule 10b-5, 683 Capital must prove that it actually relied on the alleged misrepresentations that are the subject of the Third Amended Complaint when purchasing the FXCM Notes.

As explained below, the record is devoid of evidence of actual reliance on the part of 683 Capital.  Therefore, summary judgment is appropriate.

**2.    683 Capital Has Failed To Raise A Genuine Issue Of Material Fact Regarding Its Actual Reliance On the Alleged Misrepresentations And Omissions**

"In securities fraud cases, reliance is equated with 'transaction causation,' which requires the defendant's conduct be the 'but for' cause of the plaintiff's detrimental action." *Charney v. Wilkov*, 734 Fed. App'x 6, 9 (2d Cir. 2018) (internal citation and quotation omitted).  "The traditional (and most direct) way a plaintiff can demonstrate reliance is by showing that he was aware of a company's statement and engaged in a relevant transaction . . . based on that specific misrepresentation." *Erica P. John*, 563 U.S. at 810.  Whereas, "[a] plaintiff unaware of the relevant statement, on the other hand, could not establish reliance on that basis." *Id*.  "Thus, even if a corporation were to make statements which it knew to be false, a plaintiff could not recover in a 10b-5 action unless it can be shown that he or she directly or indirectly relied on misstatements in purchasing or selling the securities." *Richter v. Achs*, 962 F. Supp. 31, 34 (S.D.N.Y. 1997).  Here, the only evidence of reliance 683 Capital proffers is the deposition testimony of Joseph Patt, one of 683 Capital's partners and its corporate designee pursuant to Fed. R. Civ. P. 30(b)(6).  However, Patt's testimony is fatal to 683 Capital's ability to prove the reliance element.

As an initial matter, ████████████████████████████████████

████████████████████████████████████████████████████████████

███████████████████████████████████████████████████████████████

███████████████████████████████████████████████████████████████

█████████████████████████████████████████████████████████ ¶ 140.

683 Capital also has offered no evidence that any of its employees ever reviewed FXCM's website.

Defendants are not liable for documents and statements 683 Capital cannot prove it reviewed, let

alone relied on.  *See, e.g.*, *Pension Comm. of the Univ. of Montreal Pension Plan v. Banc of Am.*

*Sec., LLC*, 592 F. Supp. 2d 608, 630-31 (S.D.N.Y. 2009) (granting summary judgment where the

plaintiff did not show it received allegedly misstated documents or relied on allegedly misstated

information it did receive);  *Gabriel Capital, LP v. NatWest Fin., Inc.*, 177 F. Supp. 2d 169, 171

(S.D.N.Y. 2001) (granting summary judgment where one of plaintiffs' employees testified that he

had not fully read the relevant documents and the other testified that they "must have glanced

through"); *see also Gallup v. Clarion Sintered Metals, Inc.*, 489 Fed. App'x 553, 557 (3d Cir.

2012) (affirming grant of summary judgment where plaintiffs "did not read financial statements

and reports they received from [defendant]").

Nor has 683 Capital provided evidence that the allegedly false and misleading statements

were even relevant to, let alone the basis of, its decision to purchase the FXCM Notes.  As

discussed above, ████████████████████████████████████████████████

███████████████████████████████████████████ ¶ 135. ██████████████

███████████████████████████████████████████████████████████████

████████████████████████████████████████████ ¶ 135. █████████████

███████████████████████████████████████████ ¶ 121. ██████████████

███████████████████████████████████████████████████████████████

████████████ ¶ 141. ████████████████████████████████████████████

[redacted] ¶ 141. [redacted] ¶ 142. [redacted] ¶ 143. [redacted] ¶ 144. [redacted] *See, e.g.*, *Gruber v. Price Waterhouse*, 776 F. Supp. 1044, 1047 (S.D.N.Y. 1991) (finding no reliance because plaintiff purchased stock as "part of a larger strategy to acquire new issues" and "the new issue factor was primary, and the PW audited statements were irrelevant"). [redacted] ¶ 145. Again, none of those portions of FXCM's SEC filings are alleged to be false or misleading.

Indeed, despite being 683 Capital's corporate representative, [redacted] ¶ 146. [redacted]

███████████████████████████████████████████████████████████████

████████████████████████████████████████████████  ¶ 147.  Plaintiffs make no such

allegation.

**B.      683 Capital Cannot Raise Genuine Issues Of Material Fact Regarding Loss Causation And Economic Loss**

As previously discussed, proof of loss causation and economic loss are requisite elements of a Section 10(b) claim. *Supra* Argument Section I.  Like the Class Plaintiffs, 683 Capital proffers Werner's reports, testimony and opinions to make the requisite showing.  As explained above, *all* Plaintiffs have failed to raise a genuine issue of material fact regarding loss causation and damages because Werner's analysis is the product of an unreliable methodology and therefore does not meet the standard required of an expert under *Daubert*.  *Supra* Argument Sections I.C and I.D. However, the flaws that underlie Werner's methodology are particularly stark with respect to 683 Capital.

As discussed above, this Court denied Plaintiffs' request to certify a class of FXCM Noteholders on several grounds, one of which being that Plaintiffs "ha[d] not met their burden of demonstrating that the FXCM Notes traded in an efficient market throughout the Notes Period." ECF No. 229 at 37.  The Court noted that "[t]he only direct evidence of market efficiency in the record . . . [was] Dr. Werner's event study, which [was] of limited utility due to the nature (and timing) of the two events chosen."  *Id.*  Yet, despite this Court's holding that his methodology failed to provide sufficient evidence of market efficiency for the FXCM Notes at the class certification stage, Werner ████████████████████████████████████████████████████

███████████████████████████████████████████████████████████████

███████████████████████████████████████████████████████████████

██████████████████████████████████



As Hendershott explains █████████████████████████

███████████████████████████████████████████████████

██████████████████████████████████████████ Dahan Decl.

Ex. 72 (Hendershott Report) ¶ 86. ███████████████████

███████████████████████████████████████████████████

██████████████████████████ *Id.* ¶ 87. ██████████████

███████████████████████████████████████████████████

███████████████████████████████████████████████████

██████████████████ *Id.* ██████████████████████████

███████████████████████████████████████████████████

██████████████████████████████████████ *Id.*

As explained more fully in the Werner Motion, ██████████

███████████████████████████████████████████████████

███████████████████████████████████████████████████

████████████████████████ Thus, Plaintiffs have not presented

any evidence to support their theory of loss causation or economic loss for the FXCM Notes.

### III.   Plaintiffs Cannot Demonstrate A Genuine Issue Of Material Fact Regarding Their Section 20(a) Claim

To set forth a *prima facie* case of control person liability under Section 20(a), Plaintiffs

must show "(1) a primary violation by the controlled person, (2) control of the primary violator by

the defendant, and (3) that the defendant was, in some meaningful sense, a culpable participant in

the controlled person's fraud." *ATSI Commc'ns Inc. v. Shaar Fund, Ltd.,* 493 F.3d 87, 108 (2d

Cir. 2007); *see also* 15 U.S.C. § 78t(a).  If Plaintiffs cannot establish a *prima facie* case for a

Section 20(a) violation, summary judgment is proper.  *See, e.g.*, *In re Omnicom Grp., Inc. Sec.*

44

*Litig.*, 597 F.3d 501, 514 n.6 (2d Cir. 2010) (affirming grant of summary judgment on Section 20(a) claim due to plaintiff's failure to raise a genuine issue of material fact as to a primary violation); *Dodona I, LLC v. Goldman Sachs & Co.*, 132 F. Supp. 3d 505, 518 (S.D.N.Y. 2015) (same); *SEC v. Yorkville Advisors, LLC*, 305 F. Supp. 3d 486, 530 n.26 (S.D.N.Y. 2018) (similar).

Because Plaintiffs are not able to provide evidence of either a primary violation or evidence of culpable participation by Niv and Ahdout, Plaintiffs' Section 20(a) claim must be dismissed.

### A.      Plaintiffs Cannot Prove A Primary Violation

For the reasons stated above (*supra* Argument Section I), Defendants did not commit a primary violation of the Exchange Act.  Accordingly, Plaintiffs' § 20(a) claim must be dismissed. *See, e.g., Beleson v. Schwartz*, 419 Fed. Appx. 38, 42 (2d Cir. 2010) ("Because we affirm the district court's conclusion that there was no violation of section 10(b), we also affirm the district court's conclusion that the Section 20(a) claim should be dismissed for want of a primary violation.").

### B.      Plaintiffs Cannot Prove "Culpable Participation" By Niv And Ahdout

Nor can Plaintiffs point to evidence that Niv or Ahdout were "culpable participant[s]" in a fraud.  Culpable participation "requires 'particularized facts of the controlling person's conscious misbehavior or recklessness.'" *Special Situations Fund III QP, L.P. v. Deloitte Touche Tohmatsu CPA, Ltd.*, 33 F. Supp. 3d 401, 437 (S.D.N.Y. 2014); *see also Strougo v. Barclays PLC*, 334 F. Supp. 3d 591, 598 (S.D.N.Y. 2018) (defendant can prevail on a control person claim "by pointing out that there is an absence of evidence . . . to conclude that the defendant was a culpable participant in the alleged fraud").  Section 20(a)'s culpable participation requirement is "similar to the scienter requirement of Section 10(b)" and requires that "the controlling person knew or should have known that the primary violator . . . was engaging in fraudulent conduct."  *In re Refco, Inc. Sec. Litig.*, 503 F. Supp. 2d 611, 663 (S.D.N.Y. 2007) (noting that culpable participation requires

"actual involvement in the making of the fraudulent statements by the putatively controlled entity"); *Special Situations Fund III QP*, L.P., 33 F. Supp. 3d at 438-39.

For the same reasons that Plaintiffs cannot present evidence of scienter by any of the Defendants (*see supra* Argument Section I.B), Plaintiffs have likewise produced no evidence of culpable participation by Niv and Ahdout.  Accordingly, Plaintiffs' Section 20(a) claim against Niv and Ahdout must be dismissed.

## **<u>CONCLUSION</u>**

For all the reasons stated above, Defendants' motion for summary judgment should be granted in its entirety.

Dated: September 9, 2021

KING & SPALDING LLP

*/s/ Israel Dahan*
Israel Dahan
Peter Isajiw
Evan C. Ennis
Ryan Gabay
KING & SPALDING LLP
1185 Avenue of the Americas
New York, New York 10036-2601
Tel: (212) 556.2100
Fax: (212) 556.2200

Chelsea Corey
KING & SPALDING LLP
300 S. Tryon Street, Suite 1700
Charlotte, North Carolina 28202
Tel: (704) 503.2575
Fax: (704) 503.2622

*Attorneys for Defendants Global Brokerage, Inc. f/k/a/ FXCM, Inc., Dror Niv, and William Ahdout*