**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| |
|---|
| IN RE GLOBAL BROKERAGE, INC. F/K/A FXCM INC. SECURITIES LITIGATION |

Civ. No. 17-CV-00916 (RA)

## DEFENDANTS' RULE 56.1 STATEMENT OF UNDISPUTED MATERIAL FACTS

Pursuant to Rule 56.1 of the Local Rules of the United States District Court for the Southern District of New York, Defendants Global Brokerage, Inc. f/k/a FXCM Inc. ("FXCM" or the "Company"), Dror Niv, and William Ahdout hereby submit this statement of material facts as to which there is no genuine issue to be tried.[1] Documents referenced in this statement are attached to the accompanying Declaration of Israel Dahan in Support of Defendants' Motion for Summary Judgment and referred to as "Ex. __."

### I. FXCM Background

1. FXCM was founded in 1999 as an online provider of foreign exchange ("FX") trading and related services to both retail and institutional investors. Third Amended Consolidated Securities Class Action Complaint, ECF No. 181 ("TAC") ¶ 42; Ex. 1 (FXCM 2011 Form 10-K at 1). By 2010, FXCM was one of the largest retail FX brokers in the global online FX market. Ex. 2 (Expert Report of Simon Wilson-Taylor dated April 21, 2021 ("Wilson-Taylor Report") ¶ 41); Ex. 3 (Research Analyst Presentation, August 17, 2010, GLBR_00103494–552 at GLBR_00103498).

2. FXCM offered its retail customers access to over-the-counter FX markets through its proprietary technology platform. TAC ¶ 42; Ex. 1 (FXCM 2011 Form 10-K at 1).

---

[1] Defendants reserve the right to supplement this statement as appropriate during further briefing on the Motion.

## II.    FX Trading Models – Dealing Desk (Principal) And No Dealing Desk (Agency)

3.    There are primarily two trading models employed by FX services providers like FXCM: an agency model, or "No Dealing Desk," and a principal model, or "Dealing Desk." Ex. 2 (Wilson-Taylor Report ¶ 34).

4.    A No Dealing Desk (agency) model is an FX trading model in which the customer places an order with a broker, the broker charges the customer a commission, and then the customer's order is passed on to be executed with a liquidity provider—all of which happens in milliseconds. Ex. 4 (John Dittami Jan. 21, 2021 Tr. ("Dittami Tr.") 31:5-10); Ex. 5 (Simon Wilson-Taylor June 2, 2021 Tr. ("Wilson-Taylor Tr.") 65:5-11).

5.    In the No Dealing Desk (agency) model, the broker is not exposed to market risk; instead, that risk is passed on to the liquidity providers that execute the trades. Ex. 5 (Wilson-Taylor Tr. 65:5-11); Ex. 2 (Wilson-Taylor Report ¶ 11.d). Also, the broker primarily makes money by charging a commission or markup. Ex. 6 (Dror Niv February 11, 2021 Tr. ("Niv Tr.") 101:21-102:22).

6.    In contrast, in a Dealing Desk (principal) model the broker (principal) is the direct counterparty that executes the customer's trade. Ex. 4 (Dittami Tr. 359:7-13). Accordingly, the broker is exposed to market risk. *See id.*

7.    Further, in a Dealing Desk (principal) model, the broker makes money when the market price moves in its favor and loses money if the market prices moves in an adverse direction. Ex. 4 (Dittami Tr. 359:2-19).

8.    A No Dealing Desk (agency) model allows retail customers access to the best price from a wide range of FX liquidity providers, while in a Dealing Desk (principal) model the retail customer is only provided access to the price from the principal, which acts as the trade counterparty. Ex. 2 (Wilson-Taylor Report ¶¶ 35, 36).

9.      Prior to July 2007, FXCM primarily used the Dealing Desk (principal) model for its retail customers, under which it served as the sole counterparty to its customers' trades.  TAC ¶ 43; Ex. 1 (FXCM 2011 Form 10-K at 8).

10.      By July 2007, FXCM had completed its transition to a No Dealing Desk (agency) model.  TAC ¶ 44; Ex. 1 (FXCM 2011 Form 10-K at 8).

11.      During the Class Period, FXCM's primary trading method for its retail customers was the No Dealing Desk (agency) model.  Ex. 7 (FXCM 2012 Form 10-K at 1 ("We primarily offer our customers what is referred to as an agency model to execute their trades.")); Ex. 8 (FXCM 2013 Form 10-K at 7); Ex. 9 (FXCM 2014 Form 10-K at 8); Ex. 10 (FXCM 2015 Form 10-K at 7–8); Ex. 11 (FXCM 2016 Form 10-K at 68).  However, starting in 2012, FXCM again offered retail customers the option to trade with a Dealing Desk (principal) model.  Ex. 7 (FXCM 2012 Form 10-K at ("In 2012, in order to accommodate our expanding customer base, we began to offer our smaller retail clients the option to trade with dealing desk, or principal model execution.")).

12.      Under its No Dealing Desk model, FXCM passed on every trade request it received from a customer to a liquidity provider for execution.  Ex. 12 (Robert Lande January 14, 2021 Tr. ("Lande Tr.") 54:2-10); Ex. 13 (FXCM "No Dealing Desk" website page).  To this end, FXCM (as the broker) collected quotes from a range of liquidity providers and displayed the best bid and offer quote (after incorporating a markup) to FXCM's customers.  Ex. 14 (Forex Capital Markets, LLC, External Execution Rules); Ex. 15 (FXCM Trading Station II, User Guide to the No Dealing Desk Platform).  As explained in its "User Guide to the No Dealing Desk Platform," FXCM updated the markup-adjusted best bid and offer quotes on a continuous basis

as it received new quotes from liquidity providers. Ex. 15 (FXCM Trading Station II, User Guide to the No Dealing Desk Platform).

13.     FXCM's customers can submit a variety of order types through FXCM's No Dealing Desk trading platform. Based on the External Execution Rules, if the customer's order criteria are satisfied, FXCM automatically attempts to execute the order by sending a request to the liquidity provider with the best markup-adjusted price to execute the trade at the price quoted by the liquidity provider. Ex. 14 (Forex Capital Markets, LLC, External Execution Rules). The liquidity provider then decides whether to accept or reject the order. If the liquidity provider accepts the order, FXCM enters into the specified trade with the customer and simultaneously enters into an offsetting trade with the liquidity provider. Ex. 3 (Research Analyst Presentation, August 17, 2010, GLBR_00103494–552 at -513). On the other hand, if the liquidity provider rejects the order, FXCM either rejects the order or continues to attempt to execute the order until it is filled, depending on the terms of the order. Ex. 14 (Forex Capital Markets, LLC, External Execution Rules).

14.     Through its No Dealing Desk, FXCM primarily made money by charging commissions or markups on customers' trades. Ex. 6 (Niv Tr. 151:13-152:3); Ex. 1 (FXCM 2011 Form 10-K at 1). During the 2010 to 2014 period, FXCM also made money from payments for order flow. Ex. 17 (FXCM 2010 Form 10-K at 42); Ex. 1 (FXCM 2011 Form 10-K at 41); Ex. 7 (FXCM 2012 Form 10-K at 44); Ex. 8 (FXCM 2013 Form 10-K at 38); Ex. 9 (FXCM 2014 Form 10-K at 39); see also Ex. 18 (Plaintiffs' Responses and Objections to Defendants' First Set of Requests for Admission, dated February 18, 2021 ("Plaintiffs' Responses to RFAs") at 32).

15.     FXCM repeatedly disclosed that its retail trading revenue included payments from order flow arrangements.  TAC ¶¶ 148, 150; Ex. 1 (FXCM 2011 Form 10-K at 1, 45, 65); Ex. 7 (FXCM 2012 Form 10-K at 46, 74); Ex. 8 (FXCM 2013 Form 10-K at 40, 73); Ex. 9 (FXCM 2014 Form 10-K at 42, 79).

16.     In the years where FXCM received payment for order flow, using the order flow revenue figures asserted by Plaintiffs accounting expert, John Barron, those payments accounted for between 1.97% and 5.97% of FXCM's annual revenue, while the balance of trading revenue, composed of trading commissions, was between 94.03% and 98.03% of FXCM's annual revenue as detailed in the below chart:

| Year | Order Flow Revenue | | Retail Trading Revenue | | Order Flow Rev. as a % of Total Rev. | Non-Order Flow Trading Revenue |
|------|------|------|------|------|------|------|
| | (in millions) | | | | | |
| 2010 | $ | 15.6 | $ | 318.5 | 4.67% | 95.33% |
| 2011 | $ | 23.1 | $ | 363.8 | 5.97% | 94.03% |
| 2012 | $ | 17.9 | $ | 339.7 | 5.01% | 94.99% |
| 2013 | $ | 15.6 | $ | 365.3 | 4.10% | 95.90% |
| 2014 | $ | 6.8 | $ | 338.0 | 1.97% | 98.03% |
| | $79 | | $1,725.3 | | 4.38% | |

*See* ECF No. 240-1 (Barron Report) ¶ 110;[2] Ex. 17 (FXCM 2010 Form 10-K at 42); Ex. 1 (FXCM 2011 Form 10-K at 41); Ex. 7 (FXCM 2012 Form 10-K at 44); Ex. 8 (FXCM 2013 Form 10-K at 38); Ex. 9 (FXCM 2014 Form 10-K at 39); *see also* Ex. 18 (Plaintiffs' Responses to RFAs at 32).

---

[2] Any citations to the Barron Report or Barron Rebuttal are only to demonstrate the undisputed nature of the fact.  Defendants do not concede the admissibility of the Barron Report or Barron Rebuttal and have filed the Barron Motion to exclude those reports.

### III.    FXCM Hires John Dittami

17.     In September 2009, FXCM hired a high-frequency trader, John Dittami ("Dittami"), to establish a new division within FXCM that would manage algorithmic trading projects, including market making, proprietary trading, and algorithmic execution services.  TAC ¶ 50; Ex. 19 (John Dittami Employment Agreement dated September 4, 2009 ("Dittami Employment Agreement")); Ex. 20 (Board Meeting Notes dated October 26, 2009).

18.     FXCM entered into an employment agreement with Dittami to start up and manage this new venture.  Ex. 19 (Dittami Employment Agreement).

19.     ███████████████████████████████████████████████████

███████████████████████████████████████████████████

███████████████████████████████ Ex. 21 (Dror Niv May 25, 2016 Deposition Transcript ("Niv CFTC Tr.") 24:6-26:6); Ex. 6 (Niv Tr. 64:2-15); Ex. 22 (Evan Milazzo May 13, 2016 Deposition Transcript ("Milazzo CFTC Tr.") 53:22-54:17); Ex. 23 (Affidavit of John Dittami dated June 1, 2017 ("Dittami Affidavit") ¶ 2).

20.     ███████████████████████████████████████████████████

███████████████████████████████████████████████████

████████ Ex. 21 (Niv CFTC Tr. 24:6-26:6).  "Last look" is the liquidity providers' ability to reject an order after it has been received.  Last look can be abused by liquidity providers to choose the order flow they prefer, while rejecting the rest.  Ex. 60 (Quality of Execution Study FAQ at 12).  ███████████████████████████████████████████

███████████████ Ex. 21 (Niv CFTC Tr. 24:6-26:6); *see also* Ex. 24 (John Dittami April 7, 2016 Deposition Transcript ("Dittami CFTC Tr.") 50:24-51:14, 68:4-20).

21.      ███████████████████████████████████████████████████

██████████████████████████████████████████ Ex. 6 (Niv Tr. 64:16-65:2). ███████

█████████████████████████████████████████████████ *Id.*

22.      In the fall of 2009 through the spring of 2010, Dittami developed a trading algorithm to provide customers with a better FX trading experience.  TAC ¶¶ 50, 52.  The trading algorithm was referred to internally at FXCM as Execution Enhancement Services ("EES").  Ex. 25 (November 4, 2009 e-mail with the subject "RE: A very important question for you").

23.      ███████████████████████████████████████████████████

████████████████████████████████████████ Ex. 6 (Niv Tr. 70:8-16, 81:19-82:2); Ex. 26 (March 19, 2010 e-mail with the subject "Re: Successful Trading Today").

24.      ███████████████████████████████████████████████████

███████████████████████████████████████████████████████████

███████████████████████████████████████████████████████████

███████████████████████████████████████████████████████████

████████████████████████████████████ Ex. 21 (Niv CFTC Tr. 60:15-61:4); *see also* Ex. 18 (Plaintiffs' Responses to RFAs at 28).

25.      Dittami resigned from FXCM on April 14, 2010.  ██████████████

███████████████████████████████████████████████████████████

████████████████████████ Ex. 27 (Termination Agreement, dated April 14, 2010).

26.      Dittami was therefore an employee of FXCM for a total of approximately seven months and his employment ended prior to FXCM going public in December 2010.  Ex. 19 (Dittami Employment Agreement); Ex. 27 (Termination Agreement, dated April 14, 2010); TAC

¶ 28.  Dittami was not an employee or a principal of FXCM at any point during the Class Period. Ex. 18 (Plaintiffs' Responses to RFAs at 26).

27.     At the time of his resignation, Dittami agreed that he would waive the termination payment owed by FXCM under his Employment Agreement and he would reimburse FXCM the monies it had invested in the development of the EES trading algorithm in exchange for (i) undisputed ownership of the EES system and hardware necessary to operate the system; (ii) temporary office space, segregated from FXCM's operations; and (iii) allow an entity he intended to form (*i.e.*, Effex) to trade, on an interim basis, utilizing credit available through FXCM's prime-of-prime business arrangement with Citibank, conditioned on a personal guarantee provided by him to FXCM.  Ex. 23 (Dittami Affidavit ¶ 4).

## IV.    Dittami Forms Effex, An Independent Company, To Serve As An External Liquidity Provider

28.     On March 23, 2010, Dittami formed an independent company called Effex to stream foreign currency prices and provide foreign currency execution services to FXCM and other FX counterparties.  Ex. 23 (Dittami Affidavit ¶ 4); Ex. 28 (Certificate of Formation of Effex Capital, LLC dated March 23, 2010); Ex. 24 (Dittami CFTC Tr. 30:7-9; 108:13-20); *see also* Ex. 18 (Plaintiffs' Responses to RFAs at 25).

29.     Shortly after its formation, Effex began operating as a forex liquidity provider utilizing the trading system and algorithms he helped develop and ultimately purchased from FXCM.  Ex. 23 (Dittami Affidavit ¶¶ 4, 7).

30.     Since its founding, Dittami and the Dittami Dynasty Trust have owned at least 93% of the issued and outstanding units of Effex.  Ex. 23 (Dittami Affidavit ¶ 10).

31.     No FXCM entity, employee, officer, board member, or affiliate has ever held any equity interest in Effex.  Ex. 23 (Dittami Affidavit ¶¶ 10, 13); Ex. 4 (Dittami Tr. 128:24-129:4).

32.     None of FXCM's employees, officers, or affiliates have ever been a member of Effex or had any equity interest in Effex.  Ex. 23 (Dittami Affidavit ¶¶ 10; 13).

33.     ████████████████████████████████████████  Ex. 24 (Dittami CFTC Tr. 207:17–208:7).  ████████████████████████████████████████

████████████████████████████████  Ex. 4 (Dittami Tr. 82:16-84:9).

34.     However, consistent with the terms of Dittami's resignation, FXCM provided Effex access to $2 million in FXCM's prime-of-prime account with Citibank.  Ex. 23 (Dittami Affidavit, ¶ 4); Ex. 4 (Dittami Tr. 86:7–87:4); Ex. 29 (Secured Promissory Note, dated April 8, 2010).  ████████████████████████████  Ex. 30 (Sole Recourse Guaranty and Pledge Agreement, dated April 8, 2010).

35.     ████████████████████████████████████████

████████████████████████████████  Ex. 31 (William Ahdout February 16, 2021 Deposition Transcript ("Ahdout Tr.") 98:2-99:23).

36.     In May 2010, mere months after having access to FXCM's prime-of-prime account with Citibank, Effex reimbursed FXCM for the investment FXCM had made in that prime-of-prime account.  Ex. 23 (Dittami Affidavit ¶¶ 4, 7); Ex. 4 (Dittami Tr. 370:20-24); Ex. 32 (May 17, 2010 e-mail with the subject "RE: Loan").

37.     In June 2010, Effex ceased using FXCM's prime-of-prime account with Citibank. Ex. 23 (Dittami Affidavit ¶ 7).

38.     In July 2010, Effex entered into its own prime broker agreement with Citibank. Ex. 23 (Dittami Affidavit ¶ 7).  At the same time, Effex cancelled the promissory note to FXCM which guaranteed the credit made available to Effex.  Ex. 23 (Dittami Affidavit ¶ 7).

39.     In April 2011, prior to the Class Period, Effex moved to its own office space in Jersey City, New Jersey.  Ex. 23 (Dittami Affidavit ¶ 8); Ex. 24 (Dittami CFTC Tr. 58:3-13, 177:20-178:7); *see also* Ex. 18 (Plaintiffs' Responses to RFAs at 25); TAC ¶ 9.

40.     As Dittami swore in an affidavit, Effex's operations were never controlled by FXCM.  Effex (1) hired, fired, and paid its own employees; (2) maintained its own independent bank accounts; (3) independently capitalized its prime broker relationship; (4) supplied all of its operating capital and risk capital; (5) provided FX retail pricing and execution services to over 30 counterparties (in addition to FXCM); (6) owned or leased all of its own computers, servers, and other equipment; (7) utilized its own proprietary trading software; (8) owned, operated, and maintained its own trading system; (9) leased its own office space; (10) had sole discretion to accept or reject trades; (11) retained all of Effex's trading profits; (12) assumed liability for all trading and operating losses and potential losses; and (13) had no common employees with FXCM.  Ex. 23 (Dittami Affidavit ¶ 15).

41.     Effex had other customers and provided liquidity to FX trading platforms other than FXCM.  Ex. 24 (Dittami CFTC Tr. 34:14-19, 41:24-43:15); Ex. 4 (Dittami Tr. 368:7-15); Ex. 23 (Dittami Affidavit ¶ 15); *see also* Ex. 18 (Plaintiffs' Responses to RFAs at 31).

42.     There was no relationship or correlation between Effex's profits and losses and FXCM's customers' profits and losses.  Ex. 23 (Dittami Affidavit ¶ 13).

43.     Effex did not have knowledge of customer positions, stops, limits or resting orders, nor did Effex derive this information from any source.  Ex. 23 (Dittami Affidavit ¶ 13).

## V.     FXCM and Effex Negotiate A Payment for Order Flow Agreement

44.     ███████████████████████████████████████████████████

████████████████████████████████     *See, e.g.*, Ex. 33 (April 24, 2010 e-mail with the subject "Loan Documents").

45. ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ Ex.

34 (Services Agreement dated March 1, 2010); *see also, e.g.*, Ex. 21 (Niv CFTC Tr. 159:6-19; 162:16-24).

46. ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ Ex. 24 (Dittami CFTC Tr. 132:21-

133:5; 377:2-7); Ex. 35 (William Ahdout May 19, 2016 Deposition Transcript ("Ahdout CFTC Tr.") 114:24-115:4); *see also* Ex. 18 (Plaintiffs' Response to RFAs at 27, 29); ECF No. 240-3 (Barron Rebuttal at ¶ 33).

47. ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ Ex. 35 (Ahdout CFTC Tr. 117:9-118:8).

48. ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ *See* Ex. 21

(Niv CFTC Tr. 159:6-19; 162:16-24); Ex. 6 (Niv Tr. 122:8-123:15); Ex. 36 (Alex Dick November 18, 2020 Deposition Transcript ("Dick Tr.") 297:22-298:13).

49. ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ Ex. 37 (Option Agreement

dated April 14, 2010); Ex. 21 (Niv CFTC Tr. 155:5-11, 159:6-19, 162:16-24); Ex. 38 (Acknowledgement and Confirmation dated November 20, 2015).

50. ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

▮▮▮▮▮▮▮▮▮▮ Ex. 6 (Niv Tr. 119:2-22).

51. ███████████████████████████████████████████████

███████████████████████████ Ex. 31 (Ahdout Tr. 134:21-135:11).

52. ███████████████████████████████████████████████

███████████████████████████████████████████████

███████████████████████████████████████████████

███████████████████████████ Ex. 12 (Lande Tr. 99: 4-100:3).

53. ███████████████████████████████████████████████

███████████████████████████████████████████████

███████████████████████████████████████████████

████████████ Ex. 36 (Dick Tr. 304:9-305:2).

54. ███████████████████████████████████████████████

███████████████████████████████████████████████

████████████████████████ Ex. 4 (Dittami Tr. 98:22-99:3; 101:4-9).

55. ███████████████████████████████████████████████

████████████████████████████ *See, e.g.*, Ex. 40 (October 25, 2010 e-mail

with the subject "FW: FXCM").

56. ███████████████████████████████████████████████

███████████████████████████████████████████████

███████████████████████████████████████████████

███████ ██████ █ ████████ ████ ███ ███████ ███████ Ex.  38

(Acknowledgement and Confirmation dated November 20, 2015). ████████

███████████████████████████████████████████████



████████████████████████████████████████

████████████████ *Id.*

## VI.   The Services Agreement And Payments for Order Flow

57.   Forex Capital Markets, LLC, the U.S. trading arm of FXCM, ████████████

████████████████████████████████████████

████████████████████████████████████████

████████████████████████████████ Ex. 34 (Services Agreement dated

March 1, 2010); Ex. 23 (Dittami Affidavit ¶ 4); Ex. 1 (FXCM 2011 10-K at p. F-8).

58.   Thereafter, Effex and FXCM Holdings, LLC, a subsidiary of FXCM, ██████

████████████████████████████████████████

████████████████████████ Ex. 41 (Services Agreement dated May 1, 2010); Ex.

1 (FXCM 2011 10-K at p. F-8). ████████████████████████████████

████ *Id.*

59.   ████████████████████████

████████████████████████████████████████
████████████████████████████████████████
████████████████████████████████████████

Ex. 41 at Sect. 3.1 (Services Agreement dated May 1, 2010).

60.   ████████████████████████████████████

████████████████████ Ex. 41 at Sect. 4 (Services Agreement dated May 1, 2010).

61.   ████████████████████████████████████

████████████████████████████████ *See generally*

Ex. 41 (Services Agreement dated May 1, 2010).

62. ██████████████████████████████████████████████

████████████████████████████████████████ Ex. 24 (Dittami CFTC Tr. 132:21-

133:5); Ex. 22 (Milazzo CFTC Tr. 267:12-19); Ex. 35 (Ahdout CFTC Tr. 163:2-13 ████

████████████████████████████████████████████████████

█████████████████████, *see also* 119:17-120:12). ███████████████████████

████████████████████ Ex. 41 at Sect. 3.1 (Services Agreement dated May 1, 2010); Ex. 24

(Dittami CFTC Tr. 132:21-133:5, 158:16-21).  Indeed, payments to FXCM were due and owing

under the Services Agreement regardless of whether Effex made or lost money on the trades it

filled for FXCM retail customers.  Ex. 23 (Dittami Affidavit ¶ 11).

63. ██████████████████████████████████████████████

████████████████████████████████████████████████████

██████████████████████████ *See, e.g.*, Ex. 42 (December 22, 2010 e-mail with the

subject "Please pay"); Ex. 43 (February 17, 2011 e-mail with the subject "EFFEX – Rev and

Receivable WP"); Ex. 44 (Joshua Rosenfeld December 9, 2020 Deposition Transcript 103:16-

21); Ex. 45 (Compilation of all produced invoices from May 2010 to July 2014).

64. Effex's order flow payments to FXCM did not increase if Effex made money on a

particular trade or decrease if Effex lost money on a particular trade.  Ex. 18 (Plaintiffs'

Responses to RFAs at 32-33); Ex. 23 (Dittami Affidavit ¶ 11).

65. ██████████████████████████████████████████████

████████████████████████████████████████.  Ex. 2 (Wilson-Taylor Report ¶ 11.e,

████████████████████████████████████████████████████

████████████████████████████████); *see also* Ex. 18 (Plaintiffs' Responses to RFAs at

32-33).

66. ████████████████████████████████████████████████

████████████████████████ Ex. 45 (Compilation of all produced invoices from May

2010 to July 2014); Ex. 4 (Dittami Tr. at 347:2-20). ████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████ Ex. 4

(Dittami Tr. at 347:2-20). ████████████████████

████████████████████████████████████████ Ex. 23

(Dittami Affidavit ¶ 13); Ex. 24 (Dittami CFTC Tr. 41:24-43:5).

67. FXCM and Effex renegotiated the "per million" fee in the Services Agreement at

times between June 2011 and 2014 based on changing market conditions and the relative

bargaining power of each party.  TAC ¶ 61; Ex. 23 (Dittami Affidavit ¶ 11); Ex. 4 (Dittami Tr.

219:20-23); Ex. 24 (Dittami CFTC Tr. 148:4-7); Ex. 6 (Niv Tr. 150:5-20); *see also* Ex. 18

(Plaintiffs' Responses to RFAs at 28-29).

68. ████████████████████████████████████████████

████████████████████████████████████████████████

Ex. 46 (Amendment to Services Agreement dated September 1, 2011).

69. ████████████████████████████████████████████

████████████████████████████████████████ Ex. 4 (Dittami

Tr. 274:16-275:22, 278:23-279:3); Ex. 61 (June 21, 2013 e-mail with the subject "RE:

EUR/USD").  However, at all times, payments made pursuant to the Services Agreement were

based on notional volume of foreign currency of trades handled by Effex.  Ex. 23 (Dittami

Affidavit ¶ 11).

70. ███████████████████████████████████████████████████

███████████████████████ Ex. 2 (Wilson-Taylor Report ¶ 94).

71. ███████████████████████████████████████████████████

███████████████████████████████████████████████████ Ex. 6 (Niv

Tr. at 141:12–142:12).

72. FXCM's independent financial statement auditor, Ernst & Young LLP ("EY"),

███████████████████████████████████████████████████

███████████████████████████ *See, e.g.*, Ex. 47 (EY workpaper regarding June 2013

invoice); Ex. 48 (EY workpaper regarding Effex journal entries); Ex. 49 (EY workpaper

regarding February 2012 invoice). ███████████████████████████

███████████████████████████████████████████████████ *See,*

*e.g.*, Ex. 50 (Termination of Services Agreement in EY workpapers); Ex. 47 (EY workpaper

regarding June 2013 invoice); Ex. 51 (Amendment to Services Agreement in EY workpapers).

73. The revenue FXCM earned from Effex's monthly payments for order flow was

disclosed as such in FXCM's financial statements. Ex. 12 (Lande Tr. 42:15-24); *see also* Ex. 17

(FXCM 2010 Form 10-K at 1); Ex. 1 (FXCM 2011 Form 10-K at 1); Ex. 7 (FXCM 2012 Form

10-K at 46); Ex. 8 (FXCM 2013 Form 10-K at 40); Ex. 9 (FXCM 2014 Form 10-K at 42); *see*

*also* Ex. 18 (Plaintiffs' Responses to RFAs at 4-8).

74. FXCM and Effex executed a Termination of Services Agreement dated August

25, 2014. Ex. 39 (Termination of Services Agreement dated August 25, 2014); Ex. 18

(Plaintiffs' Responses to RFAs at 7-8). ███████████████████████

███████████████████████████████████████████████████

█████████████████████████████████████████████████

███████ Ex. 39 (Termination of Services Agreement dated August 25, 2014).

75.　████████████████████████████████████████

█████████████████████████████████████████████████

██████████████ Ex. 6 (Niv. Tr. 165:6-20, 175:9-13); Ex. 35 (Ahdout CFTC Tr. 259:18-260:10, 261:18-24).

76.　Effective August 1, 2014, FXCM stopped receiving payments for order flow from Effex. Ex. 53 (FXCM Form 10-Q for Q3 2014 at 40); Ex. 23 (Dittami Affidavit ¶ 11); Ex. 39 (Termination of Services Agreement dated August 25, 2014); Ex. 54 (August 14, 2014 e-mail with the subject "RE: PFOF"); Ex. 6 (Niv Tr. 156:9-19); *see also* Ex. 18 (Plaintiffs' Responses to RFAs at 7-8).

## VII.　Payment For Order Flow Was Not Uncommon Or Unlawful

77.　███████████████████████████████████ Ex. 6 (Niv Tr. 110:22-111:18).

78.　In the U.S. equities market, large brokers such as Charles Schwab and Interactive Brokers received payments for order flow during the Class Period. *See, e.g.*, Ex. 55 (The Charles Schwab Corporation 2013 Form 10-K at 25); Ex. 56 (Interactive Brokers Group, Inc. 2013 Form 10-K at 52).

79.　██████████████████████████████████████



██████████████ Ex. 2 (Wilson-Taylor Report ¶ 60).

80.　███████████████████████████████████ Ex. 22 (Milazzo CFTC Tr. 90:4-15). Indeed, FXCM paid $76.6 million to introducing brokers globally in 2012. Ex. 7 (FXCM 2012 Form 10-K at 44, 46-47).

81.     FXCM also had pay for flow arrangements with entities other than Effex.  Ex. 18 (Plaintiffs' Responses to RFAs at 30).

82.     ████████████████████████████████████████████████████  Ex. 35 (Ahdout CFTC Tr. 131:13-23, 201:21-202:3); Ex. 21 (Niv CFTC Tr. 140:16-141:12, 142:14-143:5); *see also* Ex. 18 (Plaintiffs' Responses to RFAs at 30).  ████████████████████ ████████████████████  Ex. 35 (Ahdout CFTC Tr. 132:9-12); Ex. 21 (Niv CFTC Tr. 140:16-141:12, 142:14-143:5, 208:7-14); Ex. 24 (Dittami CFTC Tr. 527:7-20); Ex. 57 (November 25, 2013 e-mail with the subject "RE: Payments for Order Flow"); *see also* Ex. 18 (Plaintiffs' Responses to RFAs at 30).

83.     ████████████████████████████████████████████████████ ████████████████████████████████████████████████████ ████████  Ex. 35 (Ahdout CFTC Tr. 251:4-11); *see also* Ex. 18 (Plaintiffs' Responses to RFAs at 31).

## VIII.   FXCM's December 2010 IPO

84.     On December 7, 2010, FXCM completed its initial public offering ("IPO").  TAC ¶ 28; Ex. 7 (FXCM 2012 Form 10-K at F-11).

85.     At the time of FXCM's IPO, Dittami was not an employee, officer, or director of FXCM.  Ex. 23 (Dittami Affidavit ¶ 4).

86.     Likewise, at the time of the IPO, Effex also no longer used FXCM's prime-of-prime account at Citibank.  Ex. 23 (Dittami Affidavit ¶ 7).  It also had repaid any funding that FXCM had initially provided.  Ex. 23 (Dittami Affidavit ¶ 7); Ex. 4 (Dittami Tr. 370:20-24); Ex. 32 (May 17, 2010 e-mail with the subject "RE: Loan").

## IX. Effex's Performance As A Liquidity Provider

87. Effex was a liquidity provider of FXCM beginning in 2010 and continuing through 2017. *See* Ex. 23 (Dittami Affidavit ¶¶ 4, 11, 36).

88. █████████████████████████████████████████████████████████

█████████████████████████████████████ *See* Ex. 6 (Niv Tr. 94:23-95:18, 99:2-101:20); Ex. 31 (Ahdout Tr. 165:7-14).

89. █████████████████████████████████████████████████████████

█████████████████████████████████████████████████████████ Ex. 24 (Dittami CFTC Tr. 313:14-314:8).

90. █████████████████████████████████████████████████████████

█████████████████████████████████████████████████████████

█████████████████████████████████████████████████████████

█████████████████ Ex. 6 (Niv Tr. 46:15-47:13).

91. █████████████████████████████████████████████████████████

█████████████████████████████████████████████████████████

█████████████████████████████████████████████████████████

█████████████████████████████████████████████████████████

█████████████████████ Ex. 58 (April 22, 2010 e-mail with the subject "Re: Slippage on limits").

92. █████████████████████████████████████████████████████████

█████████████████████████████████████████████████████████

████████████████ Ex. 22 (Milazzo CFTC Tr. 198:10-25, 213:4-215:9). █████████████

█████████████████████████████████████████████████████████

█████████████████████████████████████████████████████████

███████████████████████████████████████ Ex. 59 (Evan Milazzo December 2, 2020

Deposition Transcript ("Milazzo Dec. 2, 2020 Tr.") 57:12-24).

93.     ██████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████ Ex. 6

(Niv Tr. 91:16-93:18); Ex. 4 (Dittami Tr. 297:13-17); Ex. 60 (Quality of Execution Study FAQ

at 11-12).

94.     ██████████████████████████████████████████

████████████████████████████████████████████████████

███████     Ex. 6 (Niv Tr. 90:7-91:7); *see also* Ex. 61 (June 21, 2013 e-mail with the subject

"RE: EUR/USD"). ██████████████████████████████████████

██████████████████████████████████████ Ex. 4 (Dittami Tr.

298:15-299:4).

95.     ██████████████████████████████████████████

███████████████████████████████████████████ Ex. 59

(Milazzo Dec. 2, 2020 Tr. 121:12-19). ████████████████████████

█████████████████████████ Ex. 52 (Evan Milazzo December 1, 2020

Deposition Transcript 46:24-47:16, 118:19-119:7).

96.     ██████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

█████████████████████████████████████████████████ Ex. 6 (Niv

Tr. 94:11-95:18).

97.     ████████████████████████████████████

████████████████████████████ Ex. 62 (February 13, 2015 e-mail with the subject

"FW: FXCM's submission to NFA – Follow up"). ████████████████████████████

*Id.* ██████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████ *Id.*

98.     ████████████████████████████████████████

████████████████████████████████████████████████

██████ Ex. 62 (February 13, 2015 e-mail with the subject "FW: FXCM's submission to NFA –

Follow up"); Ex. 18 (Plaintiffs' Responses to RFAs at 34).

99.     ████████████████████████████████████████

████████████████████████████████████████████████

███████████████████████████████████████ Ex. 62

(February 13, 2015 e-mail with the subject "FW: FXCM's submission to NFA – Follow up");

Ex. 18 (Plaintiffs' Responses to RFAs at 34-35).

100.     ████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████ Ex. 62 (February 13, 2015 e-mail with the subject

"FW: FXCM's submission to NFA – Follow up"); Ex. 18 (Plaintiffs' Responses to RFAs at 34-

35).

## X. FXCM's Compliance With GAAP

101.    GAAP is a set of accounting principles promulgated by the Financial Accounting Standards Board, an independent body designated by the SEC to set accounting standards for public companies.  Ex. 63 (Linsmeier Report ¶ 22).  The Accounting Standards Codification ("ASC") is the source of GAAP for public companies.  *Id.*

102.    GAAP is a set of principles that tolerate a range of reasonable accounting treatments.  Ex. 18 (Plaintiffs' Responses to RFAs at 16-17).

103.    EY audited FXCM's Form 10-Ks for fiscal years 2011 through 2016, and it determined that the financial statements for each of those years fairly presented, in all material respects, the consolidated financial position of FXCM in accordance with GAAP.  *See* Ex. 1 (FXCM 2011 Form 10-K at F-2); Ex. 7 (FXCM 2012 Form 10-K at F-2); Ex. 8 (FXCM 2013 Form 10-K at F-2); Ex. 9 (FXCM 2014 Form 10-K at F-2); Ex. 10 (FXCM 2015 Form 10-K at F-2); Ex. 11 (FXCM 2016 Form 10-K at F-2); *see also* Ex. 18 (Plaintiffs' Responses to RFAs at 14-16).

104.    ████████████████████████████████████████████████████████████████

████████████████████████████████████████ Ex. 6 (Niv Tr. 48:17-24).

105.    The scope of EY's audit opinions included FXCM's variable interest entities, related party transactions, and retail trading revenue.  *See, e.g.*, Ex. 1 (FXCM 2011 Form 10-K); Ex. 7 (FXCM 2012 Form 10-K); Ex. 8 (FXCM 2013 Form 10-K); Ex. 9 (FXCM 2014 Form 10-K); Ex. 10 (FXCM 2015 Form 10-K); Ex. 11 (FXCM 2016 Form 10-K at F-2); *see also* Ex. 18 (Plaintiffs' Responses to RFAs at 16).

106.    ASC 810 provides the controlling methodology for determining whether a reporting entity is required to consolidate another entity as a Variable Interest Entity ("VIE").  ECF No. 240-1 (Barron Report ¶ 136); Ex. 63 (Linsmeier Report ¶¶ 36, 38).

107.	ASC 810 prescribes a three-step test: (1) whether the entity considered for consolidation is a VIE; (2) whether the reporting entity has a variable interest in the VIE; and (3) whether the reporting entity the primary beneficiary of the VIE.  ECF No. 240-3 (Barron Rebuttal ¶ 40); Ex. 63 (Linsmeier Report ¶ 63).

108.	Whether an entity is considered a VIE is determined by examining (1) whether there is sufficient equity at risk and (2) whether the equity holders in the entity have the power to direct the significant activities of the entity, including the obligation to absorb losses or the right to receive residual returns.  Ex. 63 (Linsmeier Report ¶ 66); ECF No. 240-3 (Barron Rebuttal ¶ 49).

109.	Whether the reporting entity has a variable interest in the VIE is determined by examining whether the reporting entity holds interests in the VIE that will absorb portions of the VIE's expected losses or receive portions of the VIE's expected residual returns.  Ex. 63 (Linsmeier Report ¶ 45); ECF No. 240-3 (Barron Rebuttal ¶ 65).

110.	An entity is a primary beneficiary of a VIE if it has the power to direct its activities and the obligation to absorb its losses or receive its profits.  ECF No. 240-1 (Barron Report ¶ 140); Ex. 63 (Linsmeier Report ¶ 95).

111.	███████████████████████████████████████████████████████
████████████████████████████████████████████████████████████
███████████████████████████████  Ex. 63 (Linsmeier Report ¶ 71).

112.	ASC 850 provides the controlling methodology for determining whether a reporting entity is required to disclose another entity as a related party.  ECF No. 240-1 (Barron Report ¶ 121); Ex. 63 (Linsmeier Report ¶ 53).

113.     ASC 850 provides that related parties are those that are: (a) affiliates of the entity; (b)  entities for which investments in their equity securities would be required to be accounted for by the equity method by the investing entity; (c) trusts for the benefit of employees, such as pension and profit-sharing trusts that are managed by or under the trusteeship of management; (d) principal owners of the entity and members of their immediate families; (e) management of the entity and members of their immediate families; (f) other parties with which the entity may deal if one party controls or can significantly influence the management or operating policies of the other to an extent that one of the transacting parties might be prevented from fully pursuing its own separate interests; or (g) other parties that can significantly influence the management or operating policies of the transacting parties or that have an ownership interest in one of the transacting parties and can significantly influence the other to the extent that one or more of the transacting parties might be prevent from fully pursuing its own separate interests.   ECF No. 240-1 (Barron Report ¶ 122); Ex. 63 (Linsmeier Report ¶ 54).

114.     ███████████████████████████████████████████████████

████████████████████████████████████████   *See* Ex. 65 (David Stollow January 25, 2021 Deposition Transcript 215: 19-23).  And FXCM has never restated its financial statements.  *See* Ex. 18 (Plaintiffs' Responses to RFAs at 14).

115.     ███████████████████████████████████████████████████

████████████████████████████████████████████████████████████████

██████████████████████████████   Ex. 66 (Memorandum titled "FXCM Inc.'s settlements with US regulators"); *see also* Ex. 18 (Plaintiffs' Responses to RFAs at 17-18); Ex. 67 (FXCM Form 8-K dated Feb. 7, 2017).  ███████████████████████████████████████████████

████████████████████████████████████████████████████████████████



Ex. 66 (Memorandum titled "FXCM Inc.'s settlements with US regulators").

*Id.* at EY-GBI-00004269.

116.

Ex. 68 ("Evaluation of Regulatory Matters & Impact on 2016 Financial Statements" Memorandum); *see also* Ex. 18 (Plaintiffs' Responses to RFAs at 18).

117.

Ex. 12 (Lande Tr. 83:21-87:2).

## XI. SNB Flash Crash

118.     On January 15, 2015, the Swiss National Bank announced that it would immediately end its three-year-old peg of 1.20 Swiss francs to one euro, just days after it had assured the market that it had no intention of removing the currency peg. This reversal resulted in widespread market disruption, causing a drop of nearly 30% in the value of the euro relative to the Swiss franc. Ex. 69 ("Swiss franc jumps 30 percent after Swiss National Bank dumps euro

ceiling," Reuters); Ex. 64 ("Swiss Franc Soars, Stocks Tank as Euro Peg Scrapped," CNBC); *see also* Ex. 18 (Plaintiffs' Responses to RFAs at 8).

119.    FXCM customers with positions in this currency pair lost more than $275 million, and FXCM faced a brief regulatory capital shortfall for the first and only time in its 17-year history.  Ex. 10 (FXCM 2015 Form 10-K at 13); Ex. 70 ("Swiss Franc Shocks Some FX Brokers; Regulators move in," Reuters); *see also* Ex. 18 (Plaintiffs' Responses to RFAs at 9).

120.    As a result of the SNB Flash Crash, the share price of FXCM stock decreased from $167.00 per share on January 15, 2015 to $16.00 per share on January 20, 2015.  Ex. 71 ("FXCM -Stock Price History," Macrotrends); *see also* Ex. 18 (Plaintiffs' Responses to RFAs at 10).

121.    Par for the FXCM Notes was $100.  Ex. 72 (Expert Report of Terrence Hendershott, Ph.D., dated June 10, 2021 ¶ 95).  After the SNB Flash Crash, the FXCM Notes traded below par.  Ex. 73 (Expert Report of Terrence Hendershott, Ph.D., dated June 12, 2020 ("2020 Hendershott Report") ¶ 42).

122.    The price of FXCM's Securities never returned to their previous trading levels during the Class Period.  Ex. 73 (2020 Hendershott Report, Ex. 5).

123.    On January 16, 2015, FXCM entered into a credit agreement with Leucadia for a $300 million, two-year term loan.  Ex. 74 (FXCM Form 8-K dated January 19, 2015); Ex. 18 (Plaintiffs' Responses to RFAs at 9).

124.    On January 19, 2015, FXCM announced the terms of its credit agreement with Leucadia, which had "an initial interest rate of 10% per annum, increasing by 1.5% per annum each quarter for so long as it is outstanding."  Ex. 74 (FXCM Form 8-K dated January 19, 2015); Ex. 18 (Plaintiffs' Responses to RFAs at 9).

**XII. CFTC and NFA Settlements**

125. During the Class Period, FXCM repeatedly disclosed the risk of regulatory inquiries. *See, e.g.*, Ex. 1 (FXCM 2011 Form 10-K at 13, 15-16); Ex. 7 (FXCM 2012 Form 10-K at 12, 17); Ex. 8 (FXCM 2013 Form 10-K at 10, 14); Ex. 9 (FXCM 2014 Form 10-K at 14, 16).

126. On February 6, 2017, FXCM announced simultaneous regulatory settlements with the NFA and the CFTC against Defendants concerning FXCM's business relationship with Effex and alleged regulatory violations. Ex. 67 (FXCM Form 8-K dated Feb. 7, 2017); Ex. 18 (Plaintiffs' Responses to RFAs at 11).

127. The CFTC's Order Instituting Proceedings Pursuant to Sections 6(c) and 6(d) of the Commodity Exchange Act, Making Findings, and Imposing Remedial Sanctions (the "CFTC Order") dated February 6, 2017 provides: "Without admitting or denying the findings or conclusions herein, Respondents consent to the entry and acknowledge service of this Order . . . ." TAC, Ex. 1 at 1. The CFTC Order also states: "Nor do Respondents consent to the use of the Offer or this Order, or the findings or conclusions in this Order consented to in the Offer, by any other party in any other proceeding." *Id.* at n.1.

128. The NFA's Decision dated February 6, 2017 provides: "FXCM, Ahdout, Niv and Ornit Niv submitted an Offer in which they neither admitted nor denied the allegations of the Complaint and proposed to settle the charges against them" on specified terms. Ex. 75 (NFA Decision).

129. Pursuant to the NFA Decision and CFTC Order, FXCM withdrew from its business in the United States. Ex. 67 (FXCM Form 8-K dated Feb. 7, 2017); Ex. 18 (Plaintiffs' Responses to RFAs at 11).

130. In the CFTC Order, the CFTC did not allege that Defendants had violated GAAP. *See* TAC Ex. 1; *see also* Ex. 18 (Plaintiffs' Responses to RFAs at 12).

131.     In the NFA Decision, the NFA did not allege that Defendants had violated GAAP. Ex. 75 (National Futures Association Decision dated February 6, 2017); *see also* Ex. 18 (Plaintiffs' Responses to RFAs at 12).

132.     Analyst reports that followed the disclosure of the CFTC Order and NFA Decision do not contain any mention of FXCM's accounting.   Ex. 76 ("Leucadia National Corporation: FXCM Negative Developments But Likely a Relatively Small Financial Impact on LUK," Oppenheimer); Ex. 77 ("FXCM Settles with Regulators, Plans to Exit U.S. Business," Cowen and Company).

133.      Ex. 78 (Adam Werner June 4, 2021 Deposition Transcript 487:19-489:19).

134.     The NFA Complaint and CFTC Order do not allege that FXCM had any voting power with Effex.  TAC Ex. 1 and Ex. 2; *see also* Ex. 18 (Plaintiffs' Responses to RFAs at 13).

## XIII.   Facts Relevant to 683 Capital's Individual Claims

135.     Ex. 18 (Plaintiffs' Responses to RFAs at 20).   *Compare* Ex. 53 (FXCM Form 10-Q for Q3 2014 at 40) *with* Ex. 18 (Plaintiffs' Responses to RFAs at 20).

136.     *Compare* Ex. 53 (FXCM Form 10-Q for Q3 2014 at 40) *with* Ex. 18 (Plaintiffs' Responses to RFAs at 21).

137.     Joseph Patt, one of 683 Capital's partners, testified as its corporate designee pursuant to Fed. R. Civ. P. 30(b)(6).  Ex. 16 (Joseph S. Patt April 23, 2020 Deposition Transcript ("Patt Tr.") 12:24-13:8)

138.     ███████████████████████████████████████

███████████████████████████  Ex. 16 (Patt Tr. 33:20-25).

139.     ███████████████████████████████████████

███████████████████████████████████████████████

███████  Ex. 16 (Patt Tr. 32:23-33:13); *see generally* TAC.

140.     ███████████████████████████████████████

███████████████████████████████████████████████

█████████████████████  Ex. 16 (Patt Tr. 33:2-13).

141.     ███████████████████████████████████████

█████████████████████████████████████  Ex. 16 (Patt Tr. 77:13-78:7).  ███████████████████████████████████████

████████████████████████  Ex. 16 (Patt Tr. 23:2-24:8).

142.     ███████████████████████████████████████

█████████████  Ex. 16 (Patt Tr. 73:3-18; 74:3-21).

143.     ███████████████████████████████████████

███████████████████████████████████████████████

████████████████  Ex. 16 (Patt Tr. 77:13-78:7; 129:4-13).

144.     ███████████████████████████████████████

███████████████████████████████████████████████



Ex. 16 (Patt Tr. 77:13-78:7).

145.

Ex. 16 (Patt Tr. 32:23-33:13).

146.

Ex. 16 (Patt Tr. 139:24-140:2).

147.

Ex. 16 (Patt Tr. 142:16-144:14).

Dated: September 9, 2021

KING & SPALDING LLP

*/s/ Israel Dahan*
Israel Dahan
Peter Isajiw
Evan C. Ennis
Ryan Gabay
KING & SPALDING LLP
1185 Avenue of the Americas
New York, New York 10036-2601
Tel: (212) 556.2100
Fax: (212) 556.2200

Chelsea Corey
KING & SPALDING LLP
300 S. Tryon Street, Suite 1700
Charlotte, North Carolina 28202

Tel: (704) 503.2575
Fax: (704) 503.2622

*Attorneys for Defendants Global Brokerage,*
*Inc. f/k/a/ FXCM, Inc., Dror Niv, and William*
*Ahdout*