# Exhibit 11

# UNITED STATES OF AMERICA

SECURITIES AND EXCHANGE COMMISSION

# ATTESTATION

IT IS HEREBY ATTESTED THAT:

The attached Form 10-K was received in this Commission on 3/20/2017, under the name of Global Brokerage, Inc., File No. 001-34986, pursuant to the relevant Act(s) of the Commission.

This certified document was produced from the files of this Commission on

_5/26/2021_
_Date_

It is hereby certified that the Secretary of the U.S. Securities and Exchange Commission, Washington, DC, which Commission was created by the Securities Exchange Act of 1934 (15 U.S.C. 78a et seq.) is official custodian of the records and files of said Commission and was such official custodian at the time of executing the above attestation.

For the Commission

Secretary

SEC 334 (3-19)

10-K 1 fxcm-20161231x10k.htm 10-K

**UNITED STATES**
**SECURITIES AND EXCHANGE COMMISSION**
**Washington, D.C. 20549**

**FORM 10-K**

☒   **ANNUAL REPORT PURSUANT TO SECTION 13 OR 15(d) OF THE SECURITIES EXCHANGE ACT OF 1934**
**For the fiscal year ended December 31, 2016**
or

☐   **TRANSITION REPORT PURSUANT TO SECTION 13 OR 15(d) OF THE SECURITIES EXCHANGE ACT OF 1934**
**For the transition period from        to        .**
**Commission file number 001-34986**

# Global Brokerage, Inc.
(Exact name of registrant as specified in its charter)

| | |
|---|---|
| **Delaware** | **27-3268672** |
| (State or other jurisdiction | (I.R.S. Employer |
| of incorporation or organization) | Identification No.) |

**55 Water Street, FL 50, New York, NY 10041**
(Address of principal executive offices) (Zip Code)
**(212) 897-7660**
(Registrant's telephone number, including area code)
Securities registered pursuant to Section 12(b) of the Act:

| **Title of each class** | **Name of each exchange on which registered** |
|---|---|
| Class A common stock, par value $0.01 per share | The NASDAQ Stock Market LLC |

Securities registered pursuant to Section 12(g) of the Act: **None**

Indicate by check mark if the registrant is a well-known seasoned issuer, as defined in Rule 405 of the Securities Act. Yes ☐ No ☒

Indicate by check mark if the registrant is not required to file reports pursuant to Section 13 or Section 15(d) of the Act. Yes ☐ No ☒

Indicate by check mark whether the registrant (1) has filed all reports required to be filed by Section 13 or 15(d) of the Securities Exchange Act of 1934 during the preceding 12 months (or for such shorter period that the registrant was required to file such reports), and (2) has been subject to such filing requirements for the past 90 days. Yes ☒ No ☐

Indicate by check mark whether the registrant has submitted electronically and posted on its corporate Website, if any, every Interactive Data File required to be submitted and posted pursuant to Rule 405 of Regulation S-T during the preceding 12 months (or for such shorter period that the registrant was required to submit and post such files). Yes ☒ No ☐

Indicate by check mark if disclosure of delinquent filers pursuant to Item 405 of Regulation S-K (§229.405 of this chapter) is not contained herein, and will not be contained, to the best of the registrant's knowledge, in definitive proxy or information statements incorporated by reference in Part III of this Form 10-K or any amendment to this Form 10-K. ☒

Indicate by check mark whether the registrant is a large accelerated filer, an accelerated filer, a non-accelerated filer, or a smaller reporting company. See the definitions of "large accelerated filer," "accelerated filer" and "smaller reporting company" in Rule 12b-2 of the Exchange Act. (Check one):

| | |
|---|---|
| Large accelerated filer ☐ | Accelerated filer ☐ |
| Non-accelerated filer ☐ (Do not check if a smaller reporting company) | Smaller reporting company ☒ |

Indicate by check mark whether the registrant is a shell company (as defined in Rule 12b-2 of the Act.) Yes ☐ No ☒

As of June 30, 2016, the aggregate market value of the registrant's voting and non-voting common equity held by non-affiliates was $40,776,705.

As of March 15, 2017, there were 6,143,297 shares outstanding of the registrant's Class A Common Stock, par value $0.01 per share, and 8 shares outstanding of the registrant's Class B common stock, par value $0.01 per share.

**DOCUMENTS INCORPORATED BY REFERENCE**

Portions of the registrant's Definitive Proxy Statement relating to its 2017 Annual Meeting of Stockholders to be filed with the Securities and Exchange Commission pursuant to Regulation 14A not later than 120 days after the end of the fiscal year covered by this Form 10-K are incorporated by reference in Part III, Items 10 – 14 of this Form 10-K.

**Table of Contents**

| Item Number | | Page |
|---|---|---|
| | **PART I** | |
| 1 | Business | 1 |
| 1A | Risk Factors | 13 |
| 1B | Unresolved Staff Comments | 37 |
| 2 | Properties | 37 |
| 3 | Legal Proceedings | 37 |
| 4 | Mine Safety Disclosures | 39 |
| | **PART II** | |
| 5 | Market for Registrant's Common Equity, Related Stockholder Matters and Issuer Purchases of Equity Securities | 40 |
| 6 | Selected Financial Data | 42 |
| 7 | Management's Discussion and Analysis of Financial Condition and Results of Operations | 43 |
| 7A | Quantitative and Qualitative Disclosures About Market Risk | 67 |
| 8 | Financial Statements and Supplementary Data | F-1 |
| 9 | Changes in and Disagreements With Accountants on Accounting and Financial Disclosure | 81 |
| 9A | Controls and Procedures | 81 |
| 9B | Other information | 82 |
| | **PART III** | |
| 10 | Directors, Executive Officers and Corporate Governance | 83 |
| 11 | Executive Compensation | 83 |
| 12 | Security Ownership of Certain Beneficial Owners and Management and Related Stockholder Matters | 83 |
| 13 | Certain Relationships and Related Transactions, and Director Independence | 84 |
| 14 | Principal Accountant Fees and Services | 84 |
| | **PART IV** | |
| 15 | Exhibits and Financial Statement Schedules | 85 |
| | Signatures | 86 |

**Forward-Looking Statements**

*This Annual Report on Form 10-K contains forward-looking statements within the meaning of Section 27A of the Securities Act of 1933 and Section 21E of the Securities Exchange Act of 1934, which reflect our current views with respect to, among other things, our operations and financial performance. You can identify these forward-looking statements by the use of words such as "outlook," "believes," "expects," "potential," "continues," "may," "will," "should," "seeks," "approximately," "predicts," "intends," "plans," "estimates," "anticipates" or the negative version of these words or other comparable words. Such forward-looking statements are subject to various risks and uncertainties. Accordingly, there are or will be important factors that could cause actual outcomes or results to differ materially from those indicated in these statements. We believe these factors include but are not limited to those described under the section "Risk Factors" in Item 1A of this Report. Additional risk factors may be described from time to time in our future filings with the Securities and Exchange Commission ("SEC"). We undertake no obligation to publicly update or review any forward-looking statement, whether as a result of new information, future developments or otherwise, except as required by law.*

*Global Brokerage, Inc. (f/k/a FXCM Inc.) is a holding company that was incorporated as a Delaware corporation on August 10, 2010 and its sole asset is an equity interest in Global Brokerage Holdings, LLC (f/k/a FXCM Holdings, LLC), of which Global Brokerage, Inc. is the sole managing member. Unless the context suggests otherwise, specifically, where "Holdings" refers to Global Brokerage Holdings, LLC and the "Corporation" refers to Global Brokerage, Inc., references in this report to "Global Brokerage," the "Company," "we," "us" and "our" refer to Global Brokerage, Inc. and its consolidated subsidiaries.*

PART I

**Item 1. Business**

**Overview**

In February 2017 we changed our name from "FXCM Inc." to "Global Brokerage, Inc." Global Brokerage, Inc. ("Global Brokerage" or the "Company") is a publicly traded company which, through its holding company, Global Brokerage Holdings, LLC ("Holdings") (f/k/a FXCM Holdings, LLC), owns 50.1% of FXCM Group, LLC. Through FXCM Group, LLC we are an online provider of foreign exchange ("FX") trading and related services to over 178,000 active retail accounts globally as of December 31, 2016. We offer our customers access to over-the-counter ("OTC") FX markets and have developed a proprietary technology platform that we believe provides our customers with an efficient and cost-effective way to trade FX. In an FX trade, a participant buys one currency and simultaneously sells another, a combination known as a "currency pair." Our platform seeks to present our FX customers with the best price quotations on 45 currency pairs from global banks, financial institutions and market makers ("FX market makers"). We also offer our non-U.S. customers the ability to trade contracts-for-difference ("CFDs").

Our operating subsidiaries are regulated in a number of jurisdictions outside the United States ("U.S."), including the United Kingdom ("U.K."), where regulatory passport rights have been exercised to operate in a number of European Economic Area jurisdictions, and Australia. We maintain offices in these jurisdictions, among others. We offer our trading software in 17 languages and provide customer support in 15 languages. In early 2017, as described further below, we withdrew from business in the U.S. and, on February 7, 2017, agreed to sell all of our U.S.-domiciled customer accounts to Gain Capital Group, LLC. For the year ended December 31, 2016, approximately 81.8% of our retail customer trading volume was derived from customers residing outside the U.S. We believe our global footprint provides us with access to emerging markets, diversifies our risk from regional economic conditions and allows us to draw our employees from a broad pool of talent.

We deploy two types of execution models in order to optimize customer experience, enhance our risk management program and increase trading revenue. For clients with high balances and aggressive or high risk trading strategies, we offer no dealing desk (NDD), or agency, execution, where when our customer executes a trade on the best price quotation offered by our FX market makers, we act as a credit intermediary, or riskless principal, simultaneously entering into offsetting trades with both the customer and the FX market maker. The agency model has the effect of hedging our positions and eliminating market risk exposure. We offer a dealing desk, or principal, execution model to smaller retail clients. Under the dealing desk model, we maintain our trading position and do not offset the trade with another party on a one for one basis. CFDs are primarily a dealing desk offering. By combining smaller positions and trading them out on an aggregate basis, we are able to optimize revenues from accounts that are less actively traded. Generally, under both models, we earn trading fees through commissions or by adding a markup to the price provided by the FX market makers. In certain geographic locations, we provide our customers with the price provided by the FX market makers and display trading fees and commissions separately. Revenues earned under the dealing desk model also include our realized and unrealized foreign currency trading gains or losses on our positions with customers.

We also earn other forms of revenue such as fees earned from: white label arrangements with other financial institutions to provide platform, back office and trade execution services, FX market prices and other various ancillary FX related services and joint ventures.

We operate our business in a single segment, retail trading. In addition, we own a 50.1% controlling interest in each of Lucid Markets Trading Limited ("Lucid"), an electronic market-maker and trader in the institutional foreign exchange spot and futures market, and V3 Markets ("V3"), an electronic market-maker and trader of a diverse set of products. Both Lucid and V3 are reflected as held for sale in our Consolidated Financial Statements.

**Sale of U.S.-domiciled Customer Accounts**

On February 7, 2017, Forex Capital Markets, LLC, a wholly-owned subsidiary of FXCM Group, LLC, in which we have a 50.1% interest, entered into an Asset Purchase Agreement (the "Asset Purchase Agreement"), pursuant to which Forex Capital Markets, LLC agreed to sell substantially all of its U.S.-domiciled customer accounts to Gain Capital Group, LLC (the "Buyer"). In consideration for the purchase of the accounts, Buyer has agreed, during the 153-day period following the closing date of the Asset Purchase Agreement (the "153-Day Period"), to pay Global Brokerage (i) five hundred ($500) dollars for each transferred client account for which the transferred client account opens at least one new trade during the first 76 calendar days of the 153-Day Period, and (ii) two hundred and fifty ($250) dollars for each transferred client account for which the

1

transferred client opens at least one new trade during the period from the 77th day through the 153rd day of the 153-Day Period. The closing took place on February 24, 2017.

**Events of January 15, 2015**

On January 15, 2015, the Company's customers suffered significant losses and generated negative equity balances ("debit balances") owed to it of approximately $275.1 million. This was due to the unprecedented volatility in the EUR/CHF currency pair after the SNB discontinued its currency floor of 1.2 CHF per EUR on that date. These debit balances resulted in a temporary breach of certain regulatory capital requirements.

On January 28, 2015, we issued a press release announcing a decision to forgive approximately 90% of the clients who incurred debit balances in certain jurisdictions as a result of the SNB announcement on January 15, 2015. We notified certain clients (such as institutional, high net worth and experienced traders who generally maintain higher account balances) that sustained debit balances as a result of the market events on January 15, 2015, that they will be required to pay their debit balances, pursuant to the terms of the Company's master trading agreements. This group represents approximately 10% of clients who incurred debit balances, but comprises over 60% of the total debit balances owed. We made the decision in the second quarter of 2015 to forgive the debit balances of additional retail clients, increasing the total debit balance forgiveness to approximately 97% of clients, and to return certain recoveries totaling approximately $0.1 million. Approximately 3% of clients remain who were previously notified that they will be required to pay their debit balances, which comprises approximately 10% of the total debit balances owed as a result of the events on January 15, 2015. In light of the numerous uncertainties associated with collection options, we cannot provide any assurance that we will be successful in recovering any portion of the clients' debit balances. We have recovered $0.1 million and $9.8 million in 2016 and 2015, respectively. In January 2017, we forgave the remaining debit balances owed.

<u>Leucadia Financing</u>

On January 16, 2015, Holdings and FXCM Newco, LLC ("Newco") entered into a credit agreement (as subsequently amended, the "Credit Agreement") with Leucadia National Corporation ("Leucadia"), as administrative agent and lender, and a related financing fee agreement (the "Fee Letter"). The financing provided to the Company pursuant to these agreements enabled the Company to maintain compliance with regulatory capital requirements and continue operations. On January 16, 2015, the Corporation, Holdings, Newco and Leucadia also entered into an agreement (as subsequently amended, the "Letter Agreement") that set the terms and conditions upon which the Corporation, Holdings and Newco will pay in cash to Leucadia and its assignees a percentage of the proceeds received in connection with certain transactions. In connection with these financing transactions, Holdings formed Newco and contributed all of the equity interests owned by Holdings in its subsidiaries to Newco.

*Restructuring Transaction*

On September 1, 2016, the Company and Leucadia agreed to amend the terms of the Credit Agreement and to terminate the Letter Agreement. FXCM Newco, LLC was renamed FXCM Group, LLC ("Group"), and the Letter Agreement was replaced with an Amended and Restated Limited Liability Company Agreement of FXCM Group, LLC (the "Group Agreement"). Pursuant to the Group Agreement, Leucadia acquired a 49.9% membership interest in Group, with Holdings owning the remaining 50.1% membership interest. Group and Holdings also entered into a Management Agreement (the "Management Agreement") pursuant to which Holdings manages the assets and day-to-day operations of Group and thereby retains control of Group. Additionally, Group adopted the 2016 Incentive Bonus Plan for Founders and Executives (the "Management Incentive Plan"), under which participants are entitled to certain distributions made after the principal and interest under the amended Credit Agreement are repaid. The events described herein are collectively referred to as the "Restructuring Transaction".

<u>Principal Changes to the Credit Agreement</u>

In connection with the Restructuring Transaction, we entered into the First Amendment to Amended and Restated Credit Agreement, which extends the maturity date of the term loan by one year to January 16, 2018. Additionally, as amended, the Credit Agreement permits the Company to defer any three of the remaining interest payments by paying interest in kind. Until the borrowings under the amended Credit Agreement are fully repaid, all distributions (with limited exception) and sales proceeds will continue to be used solely to repay the principal plus interest.

On February 22, 2017, Group, Holdings and Leucadia entered into a Second Amendment to the Credit Agreement pursuant to which the aggregate principal outstanding balance of the Credit Agreement was increased by $3.5 million in consideration of Leucadia's waiver of certain sections of the Credit Agreement regarding restricted payments and distributions.

<u>Principal Changes to the Letter Agreement</u>

Pursuant to the Restructuring Transaction, the Letter Agreement was terminated effective September 1, 2016 and the parties signed the Group Agreement. The Group Agreement provides that Group will be governed by a six-member board of directors, comprising three directors appointed by Leucadia and three directors appointed by the Company. The Group Agreement specifies the terms according to which the cash distributions and earnings or losses of Group are to be allocated to its members (the "Revised Waterfall"), which is described below. Pursuant to the Group Agreement, Leucadia and the Company will each have the right to request the sale of Group after January 16, 2018, subject to both Leucadia and the Company accepting the highest reasonable sales price.

<u>Management Agreement</u>

Leucadia has agreed to the Management Agreement with Holdings with an initial term through January 15, 2018, renewable automatically for successive one-year periods, unless terminated. In the Management Agreement, a number of rights are granted unilaterally to Holdings as the manager, including the right to create and implement a detailed budget, appoint and terminate the executive officers of Group and make day-to-day decisions in the ordinary course.

On February 2, 2017, the Management Agreement was amended to provide Board Members (as defined therein) with certain rights of termination. Specifically, the Management Agreement may now be terminated by a vote of at least three members of the Group Board after the occurrence of certain events, including a change of control.

<u>Management Incentive Plan</u>

In connection with the Restructuring Transaction, the Company adopted the 2016 Incentive Bonus Plan for Founders and Executives (the "Management Incentive Plan") effective September 1, 2016 ("Effective Date"). The Management Incentive Plan is a long-term incentive program with a five-year vesting period, with 25% vesting on the second anniversary of the Effective Date and each of the next three anniversaries thereafter. Distributions under the plan will be made only after the principal and interest under the amended Credit Agreement are repaid and will equal the distributions to Management noted below in the Revised Waterfall.

Long-term incentive plan participants will receive their share of any distributions or sales proceeds while unvested. A participant that terminates other than for cause will receive either a non-voting membership interest in Group that entitles the participant to the same share of distributions that would have otherwise been received under the incentive program, or a lump-sum cash payment, at the Company's discretion. A participant that terminates for cause will not be entitled to distributions following such termination and will forfeit all interests under the Management Incentive Plan. A termination payment will also be paid upon any change of control of Group.

On February 2, 2017, Group and Leucadia entered into an acknowledgment pursuant to which the parties agree that Leucadia may terminate the Management Incentive Plan on behalf of Group at any time and for any reason in its sole discretion.

*Allocations of Group Distributions (Revised Waterfall)*

The contractual provisions in the Group Agreement specify how certain distributions from Group are to be allocated among Leucadia, the Company and the Company's senior management members participating in the Management Incentive Plan (the "Revised Waterfall"). The distributions include net proceeds received in connection with certain transactions, including sales of assets, dividends or other capital distributions, the sale of Group (whether by merger, stock purchase, sale of all or substantially all of Group's assets or otherwise), the issuance of any debt or equity securities, and other specified non-ordinary course events, such as certain tax refunds and litigation proceeds. The Revised Waterfall will result in the following distributions from Group:

| Distributable Amount | Revised Waterfall |
| --- | --- |
| Amounts due under the Credit Agreement | 100% Leucadia |
| Next $350 million | 45% Leucadia / 45% Holdings / 10.0% Management |
| Next $500 million | 79.2% Leucadia / 8.8% Holdings / 12.0% Management |
| All aggregate amounts thereafter | 51.6% Leucadia / 34.4% Holdings / 14.0% Management |

**Credit Agreement**

Other than the changes described above, the principal terms of the Credit Agreement remain unchanged. The Credit Agreement provides for a $300.0 million term loan made by Leucadia to Holdings and Newco.

The loan has an initial interest rate of 10% per annum, increasing by 1.5% per annum each quarter for so long as it is outstanding, but in no event exceeding 20.5% per annum (before giving effect to any applicable default rate). The Company has the right to defer any three of the remaining interest payments by paying interest in kind. The Company has not deferred any interest payments to date.

The Credit Agreement requires the payment of a deferred financing fee in an amount equal to $10.0 million, with an additional fee of up to $30.0 million payable in the event the aggregate principal amount of the term loan outstanding on April 16, 2015 was greater than $250.0 million or the deferred financing fee of $10.0 million (plus interest) had not been paid on or before such date. Prior to April 16, 2015, the Company repaid approximately $56.5 million which reduced the aggregate principal to $243.5 million on April 16, 2015. Additionally, the Company paid the $10.0 million deferred financing fee prior to April 16, 2015. Accordingly, the Company was not obligated to pay the additional $30.0 million fee. As of December 31, 2016, the Company has paid $155.5 million of principal, of which $10.0 million was applied to the deferred financing fee.

**Disposition of Non-Core Assets**

Subsequent to the events of January 15, 2015, we undertook a strategic initiative to sell non-core assets. Throughout 2015, we completed or entered into agreements for the disposition of non-core assets including the sales of the equity trading business of FXCM Securities Limited, FXCM Asia Limited, FXCM Japan Securities, Co., Ltd., and the operations of Faros. We continue to explore opportunities for the sale of additional non-core assets, including Lucid, V3 and our equity interest in FastMatch, Inc., which are reflected as held for sale in our Consolidated Financial Statements.

**At-the-Market Securities Offering**

On October 3, 2016, we entered into an Equity Distribution Agreement (the "Equity Distribution Agreement") with Jefferies LLC, as sales agent (the "Sales Agent"). Pursuant to the terms of the Equity Distribution Agreement, we may, from time to time, issue and sell shares of our Class A common stock, having an aggregate offering price of up to $15.0 million through the Sales Agent. The Sales Agent will receive a commission of 3.0% of the gross sales price per share for any shares sold through it as our sales agent under the Equity Distribution Agreement.

Sales of our Class A common stock, if any, may be made in negotiated transactions or transactions that are deemed to be "at-the-market offerings" as defined in Rule 415 under the Securities Act of 1933, as amended, including sales made directly on the NASDAQ Global Market of the NASDAQ Stock Market LLC or sales made to or through a market maker other than on an exchange. The Common Stock will be sold pursuant to the Company's shelf registration statement on Form S-3 as amended (Registration No. 333-212489) declared effective by the Securities and Exchange Commission on August 2, 2016. The Company filed a prospectus supplement, dated October 3, 2016 to the prospectus, dated August 2, 2016, with SEC in connection with the offer and sale of its Class A common stock.

**2017 Strategy**

Our business strategy is centered on two core objectives: reducing debt incurred from the Leucadia financing and accelerating the growth of our core business.

### Reducing Debt Incurred from Leucadia Financing

We intend to significantly reduce the debt incurred from the Leucadia financing described above through the following means:

• cash generated through operations;
• sales of the U.S. accounts and other non-core assets; and
• cost savings through staff downsizing and restructuring

### Accelerate Growth of Core Business

We intend to accelerate the growth of our core business by:

• increasing focus on retail FX and CFD growth with expanded promotion, distribution and new product introduction;
• offering CFDs on an agency model basis in certain jurisdictions

## Our Products and Services

We offer three different account types allowing customers to have the best user experience for their specific trading needs. A majority of our clients open an individual mini account, trading on our proprietary Trading Station platform.

### Standard

With an FXCM Standard account, a client has access to 24/7 support and NDD execution. The Standard account offers tighter spreads and a commission pricing similar to stocks. Standard accounts have a $5,000 minimum, require higher margins and offer more trading instruments than the Mini account.

### Mini

With an FXCM Mini account, a client can open an account with a minimum of $50. Mini accounts trade on the dealing desk execution model, offer higher leverage and fewer trading instruments and are designed for clients with smaller account balances.

### Active Trader

With an FXCM Active Trader account, a client receives discounted commissions, preferential solutions, and trading support. This type of account receives access to the highest level of resources and services we offer and requires a minimum balance or trading volume in order to qualify (qualification thresholds may vary by region).

We offer both FX and CFD products but limit our product offerings to highly liquid instruments like the FX majors, including EUR/USD and USD/JPY, core commodities, including gold and oil, as well as leading equity indices, including the German 30. We believe that by restricting our product offerings we preserve the customer experience by offering a high standard of trade execution and pricing stability through volatile markets (as compared to less liquid instruments) as well as reducing market and counterparty risk for the firm.

### Rolling Spot FX Trading

We offer spot trading in 45 currency pairs. Of these pairs, our most popular seven currency pairs represent 82.9% of all trading volume, with the EUR/USD currency pair being the most popular, representing 26.7% of our trading volume in 2016. We add new currency pairs provided they meet our risk and regulatory standards. We restrict trading in currencies to instruments that are not subject to active government manipulation.

### Contracts-for-Difference

We offer our non-U.S. customers the ability to trade CFDs, which are agreements to exchange the difference in value of a particular asset, such as a stock index or oil or gold contract, between the time at which a contract is opened and the time at which it is closed. Our CFD offerings currently include contracts for metals, fixed income, energy and stock indices, and for the year ended December 31, 2016, CFD trading constituted approximately 34.0% of total retail trading volume from continuing operations. We will continue to introduce new products as permitted by applicable laws and regulations. CFD trading is offered through our Trading Station II and Meta Trader 4 ("MT4") platforms similar to our currency pairs. As most of our FX market makers cannot process agency model trades for CFDs, except for certain metals, these products are not currently offered on an agency basis.

### Spread Betting

We offer FX and CFD spread betting to our U.K. customers, which is where customers take a position against the value of an underlying financial instrument moving either upwards or downwards in the market. Customers can make spread betting trades on FX pairs, stock indices, gold, silver and oil. For the year ended December 31, 2016, spread betting constituted approximately 3.0% of total retail trading volume from continuing operations.

## Our Trading Systems

We offer a number of trading systems, all of which are supported by our sophisticated, proprietary technology infrastructure, which includes a price engine to configure and publish executable prices, an execution engine with risk management features and give up and settlement infrastructure, as well as a back office system to book trades, run and display reports to clients.

_Trading Station_ is our proprietary flagship technology platform. Trading Station is designed to serve the needs of our retail FX customers, but also offers advanced functionalities often used by professional money managers and our institutional customers. Trading Station is a Windows-based platform with a wide variety of customization options for users to choose from, including a choice of 17 languages. The platform provides an advanced chart offering called Marketscope which offers a wide array of customization features, technical analysis indicators, signal and alert functionality, as well as the ability to place trades directly from the chart. We grant many of our white labels a limited, non-exclusive, nontransferable, cost-free license to use Trading Station to facilitate trading volume and increase trading fees and commissions.

_Meta Trader 4_ is a third-party platform built and maintained by MetaQuotes Software Corp, and we have licensed the rights to offer it to our customer base. MT4 caters towards customers with automated trading systems that they have either developed themselves or have purchased from other developers. Our MT4 platform utilizes all the features of our back office system and order execution logic that are provided to users of our proprietary technology platforms. We have integrated MT4 into the same pricing engine as Trading Station, enabling its users to get the same pricing and execution.

_FXCM Pro_ is our institutional department which focuses on brokers who trade with us on an omnibus basis, catering to retail FX and CFD brokers, small hedge funds and emerging market banks. We also offer Prime of Prime services, FXCM Prime, where we provide small and medium sized high frequency trading customers access to prime broker services under our name. FXCM Pro provides retail brokers with tailored pricing and execution, cross collateralization of FX and CFDs in one account, and custom settlement solutions. FXCM Prime provides users centralized clearing across multiple venues, including direct access to single banks, along with pre-trade and post-trade risk monitoring. FXCM Prime adds value by connecting institutional customers to our FX market makers to gain access to preferred pricing.

### Other Platforms

_Trading Station Web_ is similar to Trading Station but is web-based. The browser based platform allows customers to access their account from any computer without installing any additional programs. Trading Station Web is also easy to use and has most of the customization options of Trading Station.

_Ninja Trader Platform_ ("Ninja Trader") is a third party trading software provider known for its high performance analytic and trade execution tools that maximize a trader's efficiency in fast-moving markets. Our clients can use the Ninja Trader technology to execute their trades through us.

We also offer mobile platforms for multiple mobile devices, including Android® and the iPhone®/iPad®. These platforms include a majority of the functionality found on the Trading Station and allow customers to log in and trade anywhere in the world.

**White Label and Referring Broker Opportunities**

We offer financial institutions the ability to offer retail FX trading services to their customers using our technology, our sales and support staff and/or our access to liquidity under their own brand name through white label partnerships, in exchange for a revenue sharing arrangement with us. We also have a wide network of referring brokers, which are third parties that advertise and sell our services in exchange for performance-based compensation. These partnerships allow us to expand into new markets around the world.

We believe we have a well-established presence in Asia and in Europe through our white label partnerships. We have a preferred arrangement with select white labels in strategic regions to whom we have licensed the use of our name as well as our technology.

Through our white label partners and referring brokers, we generated 37.7% of our retail trading volume from continuing operations for the year ended December 31, 2016. We intend to continue to build upon the success of our existing white label partnerships and referring broker networks and create new partnership opportunities around the world.

**Sales and Marketing**

Our sales and marketing strategy focuses on diverse customer acquisition channels to expand our customer base.

***Direct Marketing Channel***

Our direct marketing channel, through which we seek to attract new customers, is our most important marketing channel. In executing our direct marketing strategy, we use a mix of online banner advertising, search engine marketing, email marketing, event marketing, including educational seminars, expos and strategic public and media relations, all of which are aimed at driving prospective customers to FXCM.com domains. In those jurisdictions in which we are not regulated by governmental bodies and/or self-regulatory organizations, however, we are generally restricted from utilizing our direct marketing channel. See "Business - Regulation."

Our platform is available in 17 languages (English, French, Spanish, German, Russian, Korean, Turkish, Italian, Hebrew, Greek, Portuguese, Polish, Hungarian, Chinese (Traditional), Chinese (Simplified), Japanese, Arabic) and we have websites available in 15 languages (English, French, Spanish, German, Italian, Hebrew, Greek, Chinese (Traditional), Chinese (Simplified), Indonesian, Japanese, Tagalog, Malay, Vietnamese, Arabic). In the last several years, we have focused on expanding our global footprint by increasing the market share of our local offices in Europe and the Middle East and supporting this expansion with localized marketing campaigns. An international office provides us many benefits, including localized language support, enhanced local credibility via face-to-face client meetings and in-person seminars, local regulations and local deposit options. Currently, we maintain offices in the U.S., the U.K., France, Germany, Italy, Greece and Australia. We also have affiliate offices located in South Africa, Canada and Israel.

The primary objective of our marketing is to encourage prospective customers to register for free practice trading accounts or tradable accounts. Free registered practice trading accounts or "demo" accounts are our principal lead generation tool. We believe the demo account serves as an educational tool, providing prospective customers with the opportunity to try trading in a risk-free environment, without committing any capital. Additionally, it allows prospective customers to evaluate our technology platforms, pricing, tools and services. The demo account is identical to the platform used by our live trading customers, including the availability of live real-time streaming quotes. However, trades are not actually executed with our market makers.

During the trial period for the demo account, we provide customers with information about our firm's advantages, educational resources and trading tools. To complement these efforts, a team of highly trained and locally licensed sales representatives contact prospective customers by telephone to provide individualized assistance.

*Indirect Marketing Channels*

Our indirect channels utilize a network of referring brokers and white label partners.

Referring brokers are third parties that advertise and sell our services in exchange for performance-based compensation. Many referring brokers offer services that are complementary to our brokerage offering, such as trading education and automated trading software. While referring brokers are not permitted to use our name in their advertising, accounts originating from referring brokers are legally opened with an FXCM Group-owned entity. In most cases, the sales function is performed by the referring broker and customer service is provided by our staff.

Our white label channel enables financial institutions to offer retail trading services to their customers using one or more of the following services: (1) our technology; (2) our sales and support staff or (3) our liquidity and execution solutions. FXCM Group-branded white labels can add value to our core offering through increased positive name recognition on a regional or global scale while non-branded white label partners generally provide access to a large existing customer base in markets where we do not have an established brand.

*Marketing expertise*

We believe that our in-house marketing organization provides us with a competitive advantage. We seldom rely on outside marketing agencies to provide services because our marketing team acts as an in-house agency. Our marketing team handles functions such as creative, media buying, price-per-click advertising, website development, email and database marketing, and corporate communications. Many of these staff members have been with us for multiple years and have developed an internal knowledge base at our company that would probably not otherwise be available. This expertise has enabled us to assemble a tightly integrated digital marketing platform which encompasses our customer relationship management system (salesforce.com), Trading Back Office, Ad Serving, and Website Analytics. As a result, we can calculate the value of any media purchase with a high level of precision on a cost per lead and cost per account basis. We believe this analysis enables us to make intelligent media buying decisions allowing us to maximize our lead and account conversion.

**Customer Service**

We provide customer service 24 hours a day, seven days a week in English, handling customer inquiries via telephone, email and online chat. To provide efficient service to our growing customer base, we have segmented our customer demographic into three main categories.

*New to FX*: We cater to new customers seeking to open accounts by providing low barrier account minimums and in-depth educational resources on the FX market. We believe that education is an important factor for new customers, and we offer online videos for educating new customers on the FX market as well as free technical indicators, trading signals and free live webinars throughout the trading week.

*Experienced Customers*: We offer our experienced customers more sophisticated value-added resources and trading functionality. Through our proprietary charting package and integrated high-end third party charts, we offer a comprehensive library of technical indicators, free market data available for back testing strategies as well as platforms and resources to support and assist traders who would like to build and implement automated trading strategies.

*High Volume/Algorithmic Trading*: We offer support and specialized products for clients that trade with automated strategies or would like to automate their strategies. From various Application Program Interface options to free and tick data and backtesting functionality, we seek to facilitate algorithmic trading regardless of the level of technical sophistication of the system. Our Active Trader sales group caters to active customers. Active Trader customers can receive price discounts and enhanced service. High volume, automated trading has increased in popularity in the FX market. We have a dedicated programming services team that can code automated trading strategies on behalf of customers. Additionally, we offer multiple automated programming interfaces that allow customers with automated trading systems to connect to our execution system.

Our retail sales and customer service teams are not compensated on a commission basis. All customers receive the same commitment to service from our representatives. We believe this is a key differentiator for us compared to other retail FX firms that employ commission based sales forces who may not be motivated to provide support to smaller customers.

8

**Technology and Infrastructure**

### *Proprietary technology platform*

Our FX technology platform has been designed using proprietary technologies to deliver high standards in performance, flexibility and reliability. Our platform can be divided into three main groups: (1) front-end technology platforms and trading decision support tools, (2) agency model technology platform and (3) back office applications for account management, operations, reporting and reconciliation processes.

We believe that our technology and infrastructure platform provides us with a competitive advantage and enables us to provide innovative solutions to our customers and partners. As examples, we introduced the concept of real-time rebate calculation for referring brokers and automation of basic operations and account management routines to reduce processing time.

### *Reliability and Availability*

Our trading infrastructure is primarily hosted at collocation facilities run by Equinix and Xand. The two trading venues are located in New Jersey and Tokyo, with a disaster recovery location in Pennsylvania. The New Jersey and Pennsylvania datacenters are over 90 miles apart, on separate power grids and separate fiber connectivity. Each facility has uninterruptible power supply systems, generator systems, public utility power feeds, cooling systems, internet providers and private network providers. Locations on the eastern coast of the U.S. were chosen to achieve both optimal networking latency to price providers and required geographic distance separation.

Applications, servers, network, storage devices, power and temperature are monitored 24 hours a day, seven days a week by support personnel through a combination of industry standard monitoring and alerting tools, including Nagios, Cacti, SmokePing and NfSen. Custom written applets and scripts are used to report key resource usage in near real-time.

Personnel are distributed across five major office locations with key operations, such as dealing, customer support and technology support, staffed at multiple locations. Each office location utilizes redundant network connections to access datacenter resources.

### *Security*

Data security is of critical importance to us. We use industry standard products and practices throughout our facilities. We have strict policies and procedures with a minimal set of employees retaining access to customer data. Physical security at our datacenters is handled by security staff present 24 hours a day, seven days a week. In addition, we use biometric and card access systems, video surveillance, and "man traps" which refers to a small space having two sets of interlocking doors such that the first set of doors must close before the second set opens and also requires identification for each door. Physical access at our corporate headquarters is also handled by a security staff that is present 24 hours a day, seven days a week, as well as turnstiles and card access systems.

Our systems and policies are tested annually for Payment Card Industry ("PCI") compliance. Additionally, we engage a public accounting firm to perform an annual examination of our internal controls and issue a SSAE (Statements on Standards for Attestation Engagements) 16 *Report on Controls at a Service Organization.*

**Risk Management**

We primarily utilize a mix of agency and dealing desk execution models in order to balance our market risk as well as counterparty risk. While the agency model helps us avoid large market exposure brought on by clients with large positions or aggressive trading models, the dealing desk model allows us to minimize exposure to counterparties.

We manage our dealing desk exposure with strict position and loss limits, active monitoring and automation available for quick and seamless transitions of flow to the no dealing desk model should we decide to limit our risk exposure. We also restrict our dealing desk offering to smaller and less active clients as well as to select currency pairs.

Our FX trading operations require a commitment of our capital and involve risk of loss due to the potential failure of our customers to perform their obligations under these transactions. In order to minimize the incidence of a customer's losses exceeding the amount of cash in their account, which we refer to as negative equity, we require that each trade be collateralized in accordance with our collateral risk management policies. Each customer is required to have minimum funds in their account

for opening positions, referred to as the initial margin, and for maintaining positions, referred to as maintenance margin, depending on the currency pair being traded. Margin requirements are expressed as a percentage of the customer's total position in that currency, and the customer's total margin requirement is based on the aggregated margin requirement across all of the positions that a customer holds at any time. Each net position in a particular currency pair is margined separately. Our systems automatically monitor each customer's margin requirements in real-time and we confirm that each of our customers has sufficient cash collateral in their account before we execute their trades. If at any point in time a customer's trading position does not comply with the applicable margin requirement because our predetermined liquidation thresholds have been exceeded, the position will be automatically liquidated in accordance with our margin policies and procedures documented in our customer agreement.

We are also exposed to potential credit risk arising from our exposure to counterparties with which we hedge and financial institutions with whom we deposit cash. By transacting with several of the largest global financial institutions, we have limited our exposure to any one institution. In the event that our access to one or more financial institutions becomes limited, our ability to hedge may be impaired. We actively monitor credit ratings and financial performance of our counterparties and ensure that we are not overly exposed to any individual counterparty or ensure lower exposure to smaller or at risk counterparties.

**Relationships with Wholesale FX Market Makers and Prime Brokers**

We have entered into a prime brokerage agreement with Citibank ("Citi") and are currently in discussions with a second prime broker for our retail trading, which we believe will allow us to maximize our credit relationships and activities while improving efficiency. As our prime brokers, these firms operate as central hubs through which we transact with our FX market makers. Our prime brokers allow us to source liquidity from a variety of market makers, even though we maintain a credit relationship, place collateral, and settle with a single entity, the prime broker. We depend on the services of these prime brokers to assist in providing us access to liquidity for FX instruments. In return for paying a modest prime brokerage fee, we are able to aggregate our trading exposures, thereby reducing our transaction costs and increasing the efficiency of the capital we are required to post as collateral. Our prime brokerage agreements may be terminated at any time by either us or the prime broker upon complying with certain notice requirements. We are also obligated to indemnify our prime brokers and certain CFD market makers for certain losses they may incur.

We typically also enter into Master Trading Agreements (such as International Swaps and Derivatives Association or "ISDA" agreements, Futures Master Agreements, or Prime Broker Agreements) with each financial institution that we have a liquidity relationship with. These standardized agreements are widely used in the interbank market for establishing credit relationships and are typically customized to meet the unique needs of each liquidity relationship. These Master Trading Agreements outline the products supported as well as margin requirements for each product. We have had a number of key liquidity relationships in place for over five years and as such we believe we have developed a strong track record of meeting and exceeding the requirements associated with each relationship. However, our FX market makers have no obligation to provide liquidity to us and may terminate our standing arrangements with them at any time, and we currently have a number of effective ISDA agreements and other applicable agreements with other institutions should the need arise. Using the ISDA agreements, an industry standard, we also reduce the legal risk associated with custom legal forms for key relationships.

**Intellectual Property**

We rely on a combination of trademark and copyright laws in the U.S. and other jurisdictions to protect our intellectual property rights and our brand. We also enter into confidentiality and invention assignment agreements with our employees and consultants and confidentiality agreements with other third parties and rigorously control access to proprietary technology. Currently, we do not have any pending or issued patents.

We have applied or registered for the following material marks with various offices governing intellectual property around the world: FXCMPRO (word mark), FXCM (word mark and design mark), Trading Station (word mark), and StrategyTrader (word mark).

**Competition**

The retail FX trading market is fragmented and highly competitive. Our competitors in the retail market can be grouped into several broad categories based on size, business model, product offerings, target customers and geographic scope of operations. Competition in the institutional market can be grouped by type, technology and provider.

10

*International multi-product trading firms*: Outside the U.S. we compete with firms such as Saxo Bank, CMC Group and IG Group Holdings plc. Other than Saxo Bank, the international firms tend to focus on CFDs and spread betting.

*Other online trading firms*: To a lesser degree, we compete with traditional online equity brokers, such as TradeStation and Interactive Brokers. These firms generally tend to focus on listed products and may already, or will in the future, provide retail FX principally as a complementary offering.

*International banks and other financial institutions with significant FX operations*: We also compete with international banks that have FX operations. Financial institutions generally choose to enter into a joint venture with an independent retail currency firm in lieu of building a retail operation.

We attribute our competitive success to the quality of the service we offer our customers. We believe that our expertise in product innovation, trading technology and international scale will allow us to continue to compete globally as we expand our presence in existing markets and enter new ones.

## Regulation

### Overview

Our business and industry are highly regulated. Our operating subsidiaries are regulated in a number of jurisdictions, including the U.K. and Australia. Our market sector has been subject to significant regulatory scrutiny in a number of jurisdictions because of the complex and risky nature of the products and the frequently cross-border dimension of the activity that is predominantly internet based.

We are regulated by, among others; the Financial Conduct Authority ("FCA") in the U.K. and the Australian Securities and Investment Commission in Australia ("ASIC"). In addition, certain of our branch offices in Europe, while subject to local regulators including Commissione Nazionale per le Società e la Borsa (Consob); Hellenic Capital Markets Commission ("CMC") and Bundesanstalt für Finanzdienstleistungsaufsicht ("Ba fin"), are regulated by the FCA with respect to, among other things, FX, CFDs and net capital requirements. In any foreign jurisdiction in which we operate, there is a possibility that a regulatory authority could assert jurisdiction over our activities and seek to subject us to the laws, rules and regulations of that jurisdiction. The laws, rules and regulations of each foreign jurisdiction differ. In the jurisdictions where we have the most foreign customers, we may be either licensed or registered or believe we are exempt from licensing or registration due to our limited conduct, lack of solicitation in those jurisdictions, and/or other factors. In any jurisdiction where we are relying on an exemption from registration, there remains the risk that we could be required to register, and therefore, be subject to regulation and enforcement action or, in the alternative, to reduce or terminate our activities in these jurisdictions.

In the U.S. Over-the-Counter leveraged FX transactions are governed by the Commodity Exchange Act which gives the Commodities Futures Trading Commission jurisdiction over such transactions entered into with retail investors. The Commodities Futures Trading Commission ("CFTC") and the National Futures Association ("NFA") regulate the FX and futures markets and protect the interests of customers participating in those markets. In the first quarter of 2017, we withdrew our U.S. license.

### Patriot Act/EU Money Laundering Directive

As required by the Uniting and Strengthening America by Providing Appropriate Tools Required to Intercept and Obstruct Terrorism Act of 2001, or the Patriot Act, and the EU Money Laundering Directive, we have established comprehensive anti-money laundering and customer identification procedures, designated an anti-money laundering compliance officer, trained our employees and retained an independent audit of our program. There are significant criminal and civil penalties that can be imposed for violations of the Patriot Act and the EU Money Laundering Directive.

### Net Capital Requirements

Certain of our subsidiaries are subject to jurisdictional specific minimum net capital requirements, designed to maintain the general financial integrity and liquidity of a regulated entity. In general, net capital requirements require that at least a minimum specified amount of a regulated entity's assets be kept in relatively liquid form, usually cash or cash equivalents. Net capital is generally defined as net worth, assets minus liabilities, plus qualifying subordinated borrowings and discretionary liabilities, and less mandatory deductions that result from excluding assets that are not readily convertible into cash and from valuing conservatively other assets.

11

If a firm fails to maintain the minimum required net capital, its regulator and the self-regulatory organization may suspend or revoke its registration and ultimately could require its liquidation. The net capital requirements may prohibit payment of dividends, redemption of stock, prepayment of subordinated indebtedness and issuance of any unsecured advance or loan to a stockholder, employee or affiliate, if the payment would reduce the firm's net capital below minimum required levels.

In Europe, the Markets in Financial Instruments Directive I ("MiFID") organizational requirements on risk management and outsourcing business continuity and record keeping apply to some of our European businesses. The Capital Requirements Directive regulates the relevant prudential requirements including those on capital and liquidity. The capital requirements for different types of investment firms are divided into three different classes: a limited license requires holding capital equal to Euros €50,000; a limited risk license requires holding capital equal to €125,000; and a full license requires holding capital equal to €730,000. Our U.K. entity, which is regulated by the FCA, is a full scope IFPRU Investment Firm required to maintain the greater of €730,000, or the Financial Resources Requirement, which is calculated as the sum of our U.K. entity's operational, credit, counterparty, concentration, market and forex risk.

Global regulatory bodies continue to evaluate and modify regulatory capital requirements in response to market events in an effort to improve the stability of the international financial system. As of December 31, 2016, on a separate company basis, we were required to maintain approximately $60.6 million of minimum capital in the aggregate across all jurisdictions and approximately $33.3 million of minimum capital in the aggregate for our U.S. entity. As of December 31, 2016, we had approximately $97.1 million of excess adjusted net capital over this required regulated capital in all jurisdictions, including $14.2 million of excess capital in our U.S. entity. Effective from January 1, 2016, the FCA, which regulates our U.K. entity, introduced the "Capital Conservation Buffer" (CCB) and a "Countercyclical Capital Buffer" (CcyB) in line with the requirements set out in Capital Requirements Directive Article 160 Transitional Provisions for Capital Buffers. This requires all firms to maintain additional buffers on top of the minimum capital requirements noted above, which may vary at the direction of the FCA.

For further information regarding the risks associated with the regulation of our business and industry, please see "Item 1A. Risk Factors" included in this Annual Report on Form 10-K.

### Employees

As of December 31, 2016, we had a total of 787 full-time employees and 72 full-time contractors, 488 of which were based in the U.S. None of our domestic employees are covered by collective bargaining agreements. We believe that our relations with our employees are good.

As a result of the restructuring announced in February 2017 and our withdrawal from business in the U.S., we expect to terminate approximately 150 employees globally.

### Corporate Information

Our principal executive offices are located 55 Water Street, FL. 50, New York, NY 10041 and our telephone number is 212-897-7660. We were originally incorporated in the State of Delaware on August 10, 2010.

Effective February 24, 2017, we filed a Certificate of Amendment to our Amended and Restated Certificate of Incorporation to change the Company's name from "FXCM Inc." to "Global Brokerage, Inc." Also effective February 24, 2017, we amended our bylaws, as amended, to reflect the name change.

### Available Information

Our customer website address is *https://www.fxcm.com*, and our investor relations website is *http://ir.globalbrokerage.info*. The content on our websites is available for information purposes only. It should not be relied upon for investment purposes, nor is it incorporated by reference into this Annual Report, unless expressly noted. We file reports with the SEC, which we make available on our investor relations website free of charge. These reports include our Annual Report on Form 10-K, Quarterly Reports on Form 10-Q and Current Reports on Form 8-K, each of which is provided on our website as soon as reasonably practicable after we electronically file such materials with or furnish them to the SEC. We also make, or will make, available through our website other reports filed with or furnished to the SEC under the Securities Exchange Act of 1934, including our Proxy Statements and reports filed by officers and directors under Section 16(a) of that Act.

**Item 1A. Risk Factors**

An investment in our securities involves risks and uncertainties. The risks and uncertainties set forth below are those that we currently believe may materially and adversely affect us, our future business or results of operations, or investments in our securities. Additional risks and uncertainties that we are unaware of or that we currently deem immaterial may also materially and adversely affect us, our future business or results of operations, or investments in our securities.

**Risks Related to Our Business**

***Our revenue and profitability are influenced by trading volume and currency volatility, which are directly impacted by domestic and international market and economic conditions that are beyond our control.***

Our revenue is influenced by the general level of trading activity in the FX market. It is difficult to predict volatility and its effects in the FX markets. Our revenue and operating results may vary significantly from period to period due primarily to movements and trends in the world's currency markets and to fluctuations in trading levels. We have generally experienced greater trading volume and higher revenue in periods of volatile currency markets. Significant swings in the market volatility can also result in increased customer trading losses, higher turnover and reduced trading volume. In the event we experience lower levels of currency volatility, our revenue and profitability may be negatively affected.

Like other financial services firms, our business and profitability are directly affected by factors that are beyond our control, such as economic and political conditions, government actions like the unexpected actions of the SNB on January 15, 2015, broad trends in business and finance, changes in the volume of foreign currency transactions, changes in supply and demand for currencies, movements in currency exchange rates, changes in the financial strength of market participants, legislative and regulatory changes, changes in the markets in which such transactions occur, changes in how such transactions are processed and disruptions due to terrorism, war or extreme weather events. Any one or more of these factors, or other factors, may adversely affect our business and results of operations and cash flows. A weakness in equity markets could result in reduced trading activity in the FX market and therefore could have a material adverse effect on our business, financial condition and results of operations and cash flows. As a result, period to period comparisons of our operating results may not be meaningful and our future operating results may be subject to significant fluctuations or declines.

***Our risk management policies and procedures may not be effective and may leave us exposed to unidentified or unexpected risks.***

We are dependent on our risk management policies and the adherence to such policies by our trading staff. Our policies, procedures and practices are used to identify, monitor and control a variety of risks, including risks related to market exposure, human error, customer defaults, market movements, fraud and money-laundering. Some of our methods for managing risk are discretionary by nature and are based on internally developed controls and observed historical market behavior, and also involve reliance on standard industry practices. These methods may not adequately prevent losses, particularly as they relate to extreme market movements, which may be significantly greater than historical changes in market prices. Our risk management methods also may not adequately prevent losses due to technical errors if our testing and quality control practices are not effective in preventing software or hardware failures. In addition, we may elect to adjust our risk management policies to allow for an increase in risk tolerance, which could expose us to the risk of greater losses. Our risk management methods rely on a combination of technical and human controls and supervision that are subject to error and failure. These methods may not protect us against all risks or may protect us less than anticipated, in which case our business, financial condition and results of operations and cash flows may be materially adversely affected.

***We depend on our proprietary technology. Any disruption or corruption of our proprietary technology or our inability to maintain technological superiority in our industry could have a material adverse effect on our business, financial condition and results of operations and cash flows. We may experience failures while developing our proprietary technology.***

We rely on our proprietary technology to receive and properly process internal and external data. Any disruption for any reason in the proper functioning, or any corruption, of our software or erroneous or corrupted data may cause us to make erroneous trades, accept customers from jurisdictions where we do not possess the proper licenses, authorizations or permits, or require us to suspend our services and could have a material adverse effect on our business, financial condition and results of operations and cash flows. For example, our technology platform includes a real time margin-watcher feature to ensure that open positions are automatically closed out if a customer becomes at risk of going into a negative balance on his or her account. If we experience extreme market dysfunction, like the EUR/CHF flash crash following the SNB's January 15, 2015 announcement that it would allow the value of the Swiss Franc to fluctuate against the Euro, we may not be able to close out a

13

customer's position to avoid a negative equity balance. Any disruption or corruption of this feature would subject us to the risk that amounts owed to us by such customer exceed the collateral in such customer's account.

In order to remain competitive, we need to continuously develop and redesign our proprietary technology. In doing so, there is an ongoing risk that failures may occur and result in service interruptions or other negative consequences, such as slower quote aggregation, slower trade execution, erroneous trades, or mistaken risk management information.

Our success in the past has largely been attributable to our proprietary technology that has taken us many years to develop. We believe our proprietary technology has provided us with a competitive advantage relative to many FX market participants. If our competitors develop more advanced technologies, we may be required to devote substantial resources to the development of more advanced technology to remain competitive. The FX market is characterized by rapidly changing technology, evolving industry standards and changing trading systems, practices and techniques. We may not be able to keep up with these rapid changes in the future, develop new technology, realize a return on amounts invested in developing new technologies, and as such, may not remain competitive in the future.

***System failures could cause interruptions in our services or decreases in the responsiveness of our services, which could harm our business.***

If our systems fail to perform, we could experience disruptions in operations, slower response times or decreased customer service and customer satisfaction. Our ability to facilitate transactions successfully and provide high quality customer service depends on the efficient and uninterrupted operation of our computer and communications hardware and software systems. Our systems are vulnerable to damage or interruption from human error, natural disasters, power loss, telecommunication failures, break-ins, sabotage, computer viruses, intentional acts of vandalism and similar events. We do not have fully redundant capabilities. While we currently maintain a disaster recovery plan ("DRP"), which is intended to minimize service interruptions and secure data integrity, our DRP may not work effectively during an emergency. Any system failure that causes an interruption in our services, decreases the responsiveness of our services or affects access to our services could impair our reputation, damage our brand name and materially adversely affect our business, financial condition and results of operations and cash flows.

***We may not be able to protect our intellectual property rights or may be prevented from using intellectual property necessary for our business.***

We rely on a combination of trademark, copyright, trade secret and fair business practice laws in the U.S. and other jurisdictions to protect our proprietary technology, intellectual property rights and our brand. We also enter into confidentiality and invention assignment agreements with our employees and consultants, and confidentiality agreements with other third parties. We also rigorously control access to our proprietary technology. It is possible that third parties may copy or otherwise obtain and use our proprietary technology without authorization or otherwise infringe on our rights. We may also face claims of infringement that could interfere with our ability to use technology that is material to our business operations.

In the future, we may have to rely on litigation to enforce our intellectual property rights, protect our trade secrets, determine the validity and scope of the proprietary rights of others or defend against claims of infringement or invalidity. Any such litigation, whether successful or unsuccessful, could result in substantial costs and the diversion of resources and the attention of management, any of which could negatively affect our business.

***Our cost structure is largely fixed. If our revenues decline and we are unable to reduce our costs, our profitability will be adversely affected.***

Our cost structure is largely fixed. We base our cost structure on historical and expected levels of demand for our products and services, as well as our fixed operating infrastructure, such as computer hardware and software, hosting facilities and security and staffing levels. If demand for our products and services declines and, as a result, our revenues decline, we may not be able to adjust our cost structure on a timely basis and our profitability may be materially adversely affected.

***Attrition of customer accounts and failure to attract new accounts could have a material adverse effect on our business, financial condition and results of operations and cash flows. Even if we do attract new customers, we may fail to attract the customers in a cost-effective manner, which could materially adversely affect our profitability and growth.***

Our customer base is primarily comprised of individual retail customers. Although we offer products and tailored services designed to educate, support and retain our customers, our efforts to attract new customers or reduce the attrition rate

14

of our existing customers may not be successful. If we are unable to maintain or increase our customer retention rates or generate a substantial number of new customers in a cost-effective manner, our business, financial condition, results of operations and comprehensive income and cash flows would likely be adversely affected. For the year ended December 31, 2016, we incurred advertising and marketing expenses of $20.8 million from continuing operations. Although we have spent significant financial resources on advertising and marketing expenses, these efforts may not be a cost-effective way to attract new customers. We may be disadvantaged relative to our larger competitors in our ability to expand or maintain our advertising and marketing commitments, which may raise our customer acquisition costs. Additionally, our advertising and marketing methods are subject to regulation. The rules and regulations of various regulators impose specific limitations on our sales methods, advertising and marketing. If we do not achieve our advertising objectives, our profitability and growth may be materially adversely affected.

***We face risks related to the events of January 15, 2015.***

On January 15, 2015, our customers suffered significant losses and generated debit balances owed to us of approximately $275.1 million. This was due to the unprecedented and unexpected actions of the SNB, which caused extreme volatility in the EUR/CHF currency pair. As a result of customer debit balances following the historic movement of the Swiss Franc on January 15, 2015, certain of our regulators required those affected subsidiaries to supplement their respective net capital on an expedited basis. In order to achieve compliance with all regulatory capital requirements in all jurisdictions in which we operate, on January 16, 2015, we entered into a credit agreement with Leucadia that provided for a $300.0 million, two year term loan. See Note 19, "Leucadia Transaction" in the Notes to Consolidated Financial Statements in "Item 8. Financial Statements and Supplementary Data" for further detailed information regarding the transaction.

As a result of the events that took place on January 15, 2015, we already have been and may be subject to litigation by customers, stockholders, regulators or government agencies. While we are unable to predict the outcome of any existing or future litigation or future regulatory or governmental investigation, an unfavorable outcome in one or more of these matters could have a material adverse effect on our financial condition or ongoing operations.

Additionally, if our existing or potential future customers do not believe that we have satisfactorily addressed the issues related to the events of January 15, 2015, or if they have concerns about future issues, this could cause our existing or future customers to lose confidence in us which could adversely affect our reputation and ability to attract or maintain customers. In the event that we are not able to restore the confidence of our customers, we may experience reduced business activity and trading which could adversely impact the results of our operations.

***We operate in a heavily regulated environment that imposes significant compliance requirements and costs on us. Failure to comply with the rapidly evolving laws and regulations governing our FX and other businesses may result in regulatory agencies taking action against us and significant legal expenses in defending ourselves, which could adversely affect our revenues and the way we conduct our business.***

We are regulated by governmental bodies and/or self-regulatory organizations in a number of jurisdictions, including the U.K. and Australia. We are also exposed to substantial risks of liability under federal and state securities laws, other federal and state laws and court decisions, as well as rules and regulations promulgated by the SEC, the Federal Reserve and state securities regulators.

In alignment with the rules set for in the Markets in Financial Instruments Directive II ("MiFID II") a number of European nations have initiated new restrictions. France has recently introduced a prohibition on electronic advertising to retail investors. In Italy, Consob has issued a notice recommending that retail OTC products should only be offered via a regulated market or an authorized multilateral trading facility. In Germany, Ba Fin has restricted the distribution, or sale of OTC products unless accompanied by a no debit guarantee so that the retail client cannot lose more than is deposited in his or her trading account.

Concurrently, in the UK the FCA has proposed restrictions which will limit leverage in accordance with the experience of the retail customer.

Many of the regulations we are governed by are intended to protect the public, our customers and the integrity of the markets, and not necessarily our shareholders. Substantially all of our operations involving the execution and clearing of transactions in foreign currencies, CFDs, gold and silver are conducted through subsidiaries that are regulated by governmental bodies or self-regulatory organizations. We are also regulated in all regions by applicable regulatory authorities and the various exchanges of which we are members. For example, we are regulated by the FCA and ASIC. In addition, certain of our branch offices in Europe, while subject to local regulators, are regulated by the FCA with respect to, among other things, FX, CFDs

and net capital requirements. These regulators and self-regulatory organizations regulate the conduct of our business in many ways and conduct regular examinations of our business to monitor our compliance with these regulations. Among other things, we are subject to regulation with regard to:

- our sales practices, including our interaction with and solicitation of customers and our marketing activities;

- the custody, control and safeguarding of our customers' assets;

- account statements, record-keeping and retention;

- maintaining specified minimum amounts of capital and limiting withdrawals of funds from our regulated operating subsidiaries;

- making regular financial and other reports to regulators;

- anti-money laundering practices;

- licensing for our operating subsidiaries and our employees;

- the conduct of our directors, officers, employees and affiliates; and

- supervision of our business.

Compliance with these regulations is complicated, time consuming and expensive. Even minor, inadvertent irregularities can potentially give rise to claims that applicable laws and regulations have been violated. Failure to comply with all applicable laws and regulations could lead to fines and other penalties which could adversely affect our revenues and our ability to conduct our business as planned. In addition, we could incur significant legal expenses in defending ourselves against and resolving actions or investigations by such regulatory agencies.

Recently, we entered into simultaneous regulatory settlements with each of the NFA and CFTC related to actions against each of Forex Capital Markets, LLC and Global Brokerage Holdings, LLC and certain of our principals. Pursuant to such settlement agreements, we withdrew from business within the U.S. There can be no guarantee our regulators in others parts of the world do not bring similar actions to those of the NFA and/or CFTC. Moreover, there can be no guarantee that any resolution to such potential actions does not require withdrawal from additional localities, markets, regions, or countries. Requirements to withdraw from business in any geographic region could adversely affect our reputation, revenue and profitability.

***We accept customers from many jurisdictions in a manner which we believe does not require local registration, licensing or authorization. As a result, our growth may be limited by future restrictions in these jurisdictions, and we remain at risk that we may be exposed to civil or criminal penalties or be required to cease operations if we are found to be operating in jurisdictions without the proper license or authorization or if we become subject to regulation by local government bodies.***

Trading volume for 2016 with customers resident in jurisdictions in which we or our agents are not licensed or authorized by governmental bodies and/or self-regulatory organizations was, in the aggregate, approximately 52.3% of our total customer trading volume from continuing operations. We seek to deal with customers resident in foreign jurisdictions in a manner which does not breach any local laws or regulations where they are resident or require local registration, licensing or authorization from local governmental or regulatory bodies or self-regulatory organizations. We determine the nature and extent of services we can provide and the manner in which we conduct our business with customers resident in foreign jurisdictions based on a variety of factors.

In jurisdictions where we are not licensed or authorized, we are generally restricted from direct marketing to retail investors, including the operation of a website specifically targeted to investors in a particular foreign jurisdiction. This restriction may limit our ability to grow our business in such jurisdictions or may result in increased overhead costs or lower service quality to customers in such jurisdictions. Accordingly, we currently have only a limited presence in a number of significant markets and may not be able to gain a significant presence there unless and until legal and regulatory barriers to international firms in certain of those markets are modified. Existing and future legal and regulatory requirements and restrictions may adversely impact our international expansion on an ongoing basis and we may not be able to successfully develop our business in a number of markets, including emerging markets, as we currently plan.

We generally consult with local counsel in jurisdictions in which we are regulated and where, after conducting an internal risk assessment, we determine it may be necessary to receive advice from local counsel in order to appropriately comply with the local laws and regulations, new or otherwise, in these jurisdictions. We consult with local counsel in these jurisdictions for advice regarding whether we are operating in compliance with local laws and regulations (including whether

we are required to be licensed or authorized) or, in some cases where licensing or authorization requirements could be read to be applicable to foreign dealers without a local presence, whether such requirements are generally not enforced. In those jurisdictions in which we do not receive the advice of local counsel, we are accordingly exposed to the risk that we may be found to be operating in jurisdictions without required licenses or authorizations or without being in compliance with local legal or regulatory requirements. Furthermore, where we have taken legal advice, we are exposed to the risk that a local regulatory agency or other authority determines that our conduct is not in compliance with local laws or regulations (including local licensing or authorization requirements) and to the risk that the regulatory environment in a jurisdiction may change, including a circumstance where laws or regulations or licensing or authorization requirements that previously were not enforced become subject to enforcement.

In any of these circumstances, we may be subject to sanctions, fines and restrictions on our business or other civil or criminal penalties, and our contracts with customers may be void or unenforceable, which could lead to losses relating to restitution of client funds or principal risk on open positions. Any such action in one jurisdiction could also trigger similar actions in other jurisdictions. We may also be required to cease the conduct of our business with customers in any such jurisdiction and/or we may determine that compliance with the laws or licensing, authorization or other regulatory requirements for continuance of the business are too onerous to justify making the necessary changes to continue that business. In addition, any such event could impact our relationship with the regulators or self-regulatory organizations in the jurisdictions where we are subject to regulation, including our regulatory compliance or authorizations. If sanctions, fines, restrictions on our business or other penalties are imposed on us for failure to comply with applicable legal requirements, guidelines or regulations, our financial condition and results of operations, and our reputation and ability to engage in business, may be materially adversely affected.

We periodically evaluate our activities in relation to jurisdictions in which we are not currently regulated by governmental bodies and/or self-regulatory organizations on an ongoing basis. This evaluation may involve speaking with regulators, local counsel and referring brokers or white labels operating in any such jurisdiction and reviewing published regulatory guidance and examining the licenses that any competing firms may have. As a result of these evaluations we may determine to alter our business practices in order to comply with legal or regulatory developments in such jurisdictions and, at any given time, we are generally in various stages of updating our business practices in relation to various jurisdictions.

Potential future changes in our business practices in certain jurisdictions could result in customers deciding to transact their business with a different FX broker, which may adversely affect our revenue and profitability. We may also be subject to enforcement actions and penalties by the regulatory authorities of those jurisdictions or be subject to customer claims.

***Servicing customers via the internet may require us to comply with the laws and regulations of each country in which we are deemed to conduct business. Failure to comply with such laws may negatively impact our financial results.***

Since our services are available over the internet in foreign countries and we have customers residing in foreign countries, foreign jurisdictions may require us to qualify to do business in their country. We believe that the number of our customers residing outside of the U.S. will increase over time. We are required to comply with the laws and regulations of each country in which we conduct business, including laws and regulations currently in place or which may be enacted related to internet services available to their citizens from service providers located elsewhere. Any failure to develop effective compliance and reporting systems could result in regulatory penalties in the applicable jurisdiction, which could have a material adverse effect on our business, financial condition and results of operations and cash flows.

***Our failure to comply with regulatory requirements could subject us to sanctions and could have a material adverse effect on our business, financial condition and results of operations and cash flows.***

Many of the laws and regulations by which we are governed grant regulators broad powers to investigate and enforce compliance with their rules and regulations and to impose penalties and other sanctions for non-compliance. Our ability to comply with all applicable laws and regulations is dependent in large part on our internal compliance function as well as our ability to attract and retain qualified compliance personnel, which we may not be able to do. If a regulator finds that we have failed to comply with applicable rules and regulations, we may be subject to censure, fines, cease-and-desist orders, suspension of our business, removal of personnel, civil litigation or other sanctions, including, in some cases, increased reporting requirements or other undertakings, revocation of our operating licenses or criminal conviction. Any disciplinary action taken against us could result in negative publicity, potential litigation, remediation costs and loss of customers which could have a material adverse effect on our business, financial condition and results of operations and cash flows.

17

***The regulatory environment in which we operate is subject to continual change. Changes in the regulatory environment could have a material adverse effect on our business, financial condition and results of operations and cash flows.***

The legislative and regulatory environment in which we operate has undergone significant changes in the recent past and there may be future regulatory changes in our industry. The financial services industry in general has been subject to increasing regulatory oversight in recent years. The governmental bodies and self-regulatory organizations that regulate our business have proposed and may consider additional legislative and regulatory initiatives and may adopt new or revised laws and regulations. As a result, in the future, we may become subject to new regulations that may affect the way in which we conduct our business and may make our business less profitable. For example, a regulatory body may reduce the levels of leverage we are allowed to offer to our customers, which may adversely impact our business, financial condition and results of operations and cash flows. Changes in the interpretation or enforcement of existing laws and regulations by those entities may also adversely affect our business.

The European Markets Infrastructure Regulation ("EMIR") is the new European regulations on OTC derivatives, central counterparties and trade repositories. The EMIR has completed the European legislative process and is being implemented across the EU member states. The EMIR imposes three new requirements on our European operations: (a) report derivatives to a trade repository (b) clear OTC derivatives that have been declared subject to the clearing obligation through a central counterparty and (c) put in place certain risk management procedures for OTC derivative transactions that are not cleared. Reporting requirements came into effect in February 2014. In addition to the EMIR, we expect the FCA will be enforcing MiFID II in 2018. Principle areas of impact related to this directive will involve organized trade facilities for trading non-equity products, investor protection, a requirement to supply clients with more information, and pre- and post-trade transparency around non-equity products.

ASIC is continuing the focus on retail OTC derivative providers, including margin foreign exchanges, and conducting increasing surveillance of this industry. The Australian government has also started the consultation process to tighten the client money protection regime, as part of a wider response to a financial system inquiry paper. Recently, the Australian government has enacted new restrictions aimed at increasing protections for retail OTC clients. Among other things, the new law prohibits the use of client money in hedging transactions or as collateral with counterparties in conjunction with OTC products which are not listed on a regulated exchange. Additionally, the new law empowers ASIC to adopt additional rules regarding the reporting and reconciliation of client money.

The Foreign Account Tax Compliance Act ("FATCA"), enacted in 2010 as part of the Hiring Incentives to Restore Employment Act, imposes a system of information reporting and a 30% withholding tax on "withholdable" payments made by U.S. persons and others to foreign financial institutions ("FFI"s) and certain non-financial foreign entities ("NFFE"s) that do not meet the information reporting requirements of FATCA. In certain circumstances, certain of our non-U.S. entities through which payments are made may be required to withhold U.S. tax at a rate of 30% on all, or a portion of, payments made after June 30, 2014. Under FATCA, non-U.S. financial institutions generally will be required to enter into agreements with the U.S. Internal Revenue Service to identify financial accounts held by U.S. persons or entities with substantial U.S. ownership, as well as accounts of other financial institutions that are not themselves participating in, or otherwise exempt from, the FATCA reporting regime. Compliance with FATCA could have a material adverse effect on our business, financial condition and cash flow.

These and other future regulatory changes could have a material adverse effect on our business and profitability and the FX industry as a whole.

In addition, the regulatory enforcement environment has created uncertainty with respect to certain practices or types of transactions that, in the past, were considered permissible and appropriate among financial services firms, but that later have been called into question or with respect to which additional regulatory requirements have been imposed. Legal or regulatory uncertainty and additional regulatory requirements could adversely affect our business.

***We are required to maintain high levels of regulatory capital, which could constrain our growth and subject us to regulatory sanctions.***

Regulators maintain stringent rules requiring that we maintain specific minimum levels of regulatory capital in our operating subsidiaries that conduct our spot foreign exchange and CFDs, including contracts for gold, silver, oil and stock indices. As of December 31, 2016, on a separate company basis, we were required to maintain approximately $60.6 million of minimum net capital in the aggregate across all jurisdictions. Excluding the U.S. regulated entity, our minimum net capital requirement was approximately $27.3 million as of December 31, 2016. Regulators continue to evaluate and modify minimum

capital requirements from time to time in response to market events and to improve the stability of the international financial system.

The EU is in the process of implementing amendments to its Capital Requirements Directive ("CRD IV"), which seeks to strengthen its capital requirements and liquidity rules as well as expand certain reporting obligations. CRD IV legislation was entered into on January 1, 2014 and will gradually be implemented over a period until January 2019.

Even if regulators do not change existing regulations or adopt new ones, our minimum capital requirements will generally increase in proportion to the size of our business conducted by our regulated subsidiaries. As a result, we will need to increase our regulatory capital in order to expand our operations and increase our revenue, and our inability to increase our capital on a cost-efficient basis could constrain our growth. In addition, in many cases, we are not permitted to withdraw regulatory capital maintained by our subsidiaries without prior regulatory approval or notice, which could constrain our ability to allocate our capital resources most efficiently throughout our global operations. In particular, these restrictions could limit our ability to pay dividends or make other distributions on our shares and, in some cases, could adversely affect our ability to withdraw funds needed to satisfy our ongoing operating expenses, debt service and other cash needs.

Regulators monitor our levels of capital closely. We are required to report the amount of regulatory capital we maintain to our regulators on a periodic basis, and to report any deficiencies or material declines promptly. While we expect that our current amount of regulatory capital will be sufficient to meet anticipated short-term increases in requirements, any failure to maintain the required levels of regulatory capital, or to report any capital deficiencies or material declines in capital could result in severe sanctions, including fines, censure, restrictions on our ability to conduct business and revocation of our registrations. The imposition of one or more of these sanctions could ultimately lead to our liquidation, or the liquidation of one or more of our subsidiaries.

*Procedures and requirements of the Patriot Act and similar laws may expose us to significant costs or penalties.*

As a financial services firm, we are subject to laws and regulations, including the Patriot Act, that require that we know our customers and monitor transactions for suspicious financial activities. The cost of complying with the Patriot Act and related laws and regulations is significant. We face the risk that our policies, procedures, technology and personnel directed toward complying with the Patriot Act and similar laws and regulations are insufficient and that we could be subject to significant criminal and civil penalties or reputational damage due to noncompliance. Such penalties and subsequent remediation costs could have a material adverse effect on our business, financial condition and results of operations and cash flows.

*We are subject to litigation risk which could adversely affect our reputation, business, financial condition and results of operations and cash flows.*

Many aspects of our business involve risks that expose us to liability under U.S. federal and state laws, as well as the rules and enforcement efforts of our regulators and self-regulatory organizations worldwide. These risks include, among others, disputes over trade terms with customers and other market participants, customer losses resulting from system delay or failure and customer claims that we or our employees executed unauthorized transactions, made materially false or misleading statements or lost or diverted customer assets in our custody. We may also be subject to regulatory investigation and enforcement actions seeking to impose significant fines or other sanctions, which in turn could trigger civil litigation for our previous operations that may be deemed to have violated applicable rules and regulations in various jurisdictions.

The volume of claims and the amount of damages and fines claimed in litigation and regulatory proceedings against financial services firms have been increasing, particularly in the current environment of heightened scrutiny of financial institutions. The amounts involved in the trades we execute, together with rapid price movements in our currency pairs, can result in potentially large damage claims in any litigation resulting from such trades. Dissatisfied customers may make claims against us regarding the quality of trade execution, improperly settled trades, mismanagement or even fraud, and these claims may increase as our business expands.

Litigation may also arise from disputes over the exercise of our rights with respect to customer accounts. Although our customer agreements generally provide that we may exercise such rights with respect to customer accounts as we deem reasonably necessary for our protection, our exercise of these rights may lead to claims by customers that we did so improperly.

Even if we prevail in any litigation or enforcement proceedings against us, we could incur significant legal expenses defending against the claims, even those without merit. Moreover, because even claims without merit can damage our

reputation or raise concerns among our customers, we may feel compelled to settle claims at significant cost. The initiation of any claim, proceeding or investigation against us, or an adverse resolution of any such matter could have a material adverse effect on our reputation, business, financial condition and results of operations and cash flows.

Please see "Item 3. Legal Proceedings" included in this Annual Report on Form 10-K for a description of pending material legal proceedings we are currently involved in.

***We may be subject to customer litigation, financial losses, regulatory sanctions and harm to our reputation as a result of employee misconduct or errors that are difficult to detect and deter.***

There have been a number of highly publicized cases involving fraud or other misconduct by employees of financial services firms in recent years. Our employees could execute unauthorized transactions for our customers, use customer assets improperly or without authorization, carry out improper activities on behalf of customers or use confidential customer or company information for personal or other improper purposes, as well as misrecord or otherwise try to hide improper activities from us.

In addition, employee errors, including mistakes in executing, recording or reporting transactions for customers, may cause us to enter into transactions that customers disavow and refuse to settle. Employee errors expose us to the risk of material losses until the errors are detected and the transactions are reversed. The risk of employee error or miscommunication may be greater for products that are new or have non-standardized terms. Further, such errors may be more likely to occur in the aftermath of any acquisitions during the integration of or migration from technological systems.

Misconduct by our employees or former employees could subject us to financial losses or regulatory sanctions and seriously harm our reputation. It may not be possible to deter or detect employee misconduct and the precautions we take to prevent and detect this activity may not be effective in all cases. Our employees may also commit good faith errors that could subject us to financial claims for negligence or otherwise, as well as regulatory actions.

Misconduct by employees of our customers can also expose us to claims for financial losses or regulatory proceedings when it is alleged we or our employees knew or should have known that an employee of our customer was not authorized to undertake certain transactions. Dissatisfied customers can make claims against us, including claims for negligence, fraud, unauthorized trading, failure to supervise, breach of fiduciary duty, employee errors, intentional misconduct, unauthorized transactions by associated persons and failures in the processing of transactions.

***Our customer accounts may be vulnerable to identity theft and credit card fraud.***

Credit card issuers have adopted credit card security guidelines as part of their ongoing efforts to prevent identity theft and credit card fraud. We continue to work with credit card issuers to ensure that our services, including customer account maintenance, comply with these rules. There can be no assurances, however, that our services are fully protected from unauthorized access or hacking. If there is unauthorized access to credit card data that results in financial loss, we may experience reputational damage and parties could seek damages from us.

***A breach in the security of our systems could disrupt our business, result in the disclosure of confidential information, damage our reputation and create significant financial and legal exposure for us.***

Although we devote significant resources to maintain and regularly update our systems and processes that are designed to protect the security of our computer systems, software, networks and other technology assets and the confidentiality, integrity and availability of information belonging to us and our customers and clients, there is no assurance that all of our security measures will provide absolute security. We and other companies have reported significant breaches in the security of websites or other systems, some of which have involved sophisticated and targeted attacks intended to obtain unauthorized access to confidential information, destroy data, disrupt or degrade service, sabotage systems or cause other damage, including through the introduction of computer viruses or malware, cyberattacks and other means.

Despite our efforts to ensure the integrity of our systems, it is possible that we may not be able to anticipate, detect or recognize threats to our systems or to implement effective preventive measures against all security breaches of these types, especially because the techniques used change frequently or are not recognized until launched, and because cyberattacks can originate from a wide variety of sources, including third parties such as persons who are associated with external service providers or who are or may be involved in organized crime or linked to terrorist organizations or hostile foreign governments.

Those parties may also attempt to fraudulently induce employees, customers, third-party service providers or other users of our systems to disclose sensitive information in order to gain access to our data or that of our customers or clients.

A successful penetration or circumvention of the security of our systems could cause serious negative consequences for us, including significant disruption of our operations, misappropriation of confidential information belonging to us or to our customers, or damage to our computers or systems and those of our customers and counterparties, and could result in violations of applicable privacy and other laws, financial loss to us or our customers, loss of confidence in our security measures, customer dissatisfaction, significant litigation exposure and harm our reputation, all of which could have a material adverse effect on our business, financial condition and results of operations and cash flows. Moreover, these risks have grown in recent years due to increased sophistication and activities of organized crime, hackers, terrorists and other external parties.

***In the current environment facing financial services firms, a firm's reputation is critically important. If our reputation is harmed, or the reputation of the online financial services industry as a whole or retail FX industry is harmed, our business, financial condition and results of operations and cash flows may be materially adversely affected.***

Our ability to attract and retain customers and employees may be adversely affected if our reputation is damaged. If we fail, or appear to fail, to deal with issues that may give rise to reputation risk, we could harm our business prospects. These issues include, but are not limited to, issues related to and as a result of the events of January 15, 2015, issues related to our settlements with the CFTC and NFA, including our withdrawal from doing business in the U.S., appropriately dealing with potential conflicts of interest, legal and regulatory requirements, ethical issues, money-laundering, privacy, customer data protection, record-keeping, sales and trading practices, and the proper identification of the legal, credit, liquidity, operational and market risks inherent in our business. Failure to appropriately address these issues could also give rise to additional legal risk to us, which could, in turn, increase the size and number of claims and damages asserted against us or subject us to regulatory enforcement actions, fines and penalties. Any such sanction would materially adversely affect our reputation, thereby reducing our ability to attract and retain customers and employees.

In addition, our ability to attract and retain customers may be adversely affected if the reputation of the online financial services industry as a whole or retail FX industry is damaged. In recent years, a number of financial services firms have suffered significant damage to their reputations from highly publicized incidents that in turn resulted in significant and in some cases irreparable harm to their business. The perception of instability within the online financial services industry or of our company due to the events of January 15, 2015, could materially adversely affect our ability to attract and retain customers.

Recently, we entered into simultaneous regulatory settlements with each of the NFA and CFTC related to actions against each of Forex Capital Markets, LLC and Global Brokerage Holdings, LLC, and certain of our principals. The NFA and CFTC made certain allegations and findings within each of their respective settlement orders. Pursuant to such settlement agreements, we withdrew from business within the U.S. We could sustain reputational damage due to such withdrawal from the U.S. market and the allegations and findings made by the NFA and CFTC.

***The loss of members of our senior management could compromise our ability to effectively manage our business and pursue our growth strategy.***

We rely on members of our senior management to execute our existing business plans and to identify and pursue new opportunities. Certain members of our management team have been with us for most of our history and have significant experience in the FX industry. Our continued success is dependent upon the retention of these and other key executive officers and employees, as well as the services provided by our trading staff, technology and programming specialists and a number of other key managerial, marketing, planning, financial, technical and operations personnel. The loss of such key personnel could have a material adverse effect on our business. In addition, our ability to grow our business is dependent, to a large degree, on our ability to retain such employees.

***Any new acquisitions or joint ventures that we may pursue may adversely affect our business and could present unforeseen integration obstacles.***

We have completed several significant acquisitions since our inception. We may pursue new acquisitions or joint ventures that could present integration obstacles or costs. The process of integrating the operations of any acquired business with ours may require a disproportionate amount of resources and management attention. Any substantial diversion of management attention or difficulties in operating any of the combined business could affect our ability to achieve operational, financial and strategic objectives. The unsuccessful integration of any of the operations of any acquired business with ours may also have adverse short-term effects on reported operating results and may lead to the loss of key personnel. In addition,

customers from any acquired business may react unfavorably to the combination of our businesses or we may be exposed to additional liabilities of any acquired business, both of which could materially adversely affect our revenue and results of operations. In addition, future acquisitions or joint ventures may involve the issuance of additional limited liability company interests in Holdings ("Holdings Units"), or shares of our Class A common stock, which would dilute ownership.

***New lines of business or new products and services may subject us to additional risks.***

From time to time, we may implement new lines of business or offer new products and services within existing lines of business. There are substantial risks and uncertainties associated with these efforts, particularly in instances where the markets are not fully developed. In developing and marketing new lines of business and/or new products and services, we may invest significant time and resources. Initial timetables for the introduction and development of new lines of business and/or new products or services may not be achieved and price and profitability targets may not prove feasible. External factors, such as compliance with regulations, competitive alternatives and shifting market preferences, may also impact the successful implementation of a new line of business or a new product or service. Furthermore, any new line of business and/or new product or service could have a significant impact on the effectiveness of our system of internal controls. Failure to successfully manage these risks in the development and implementation of new lines of business or new products or services could have a material adverse effect on our business, results of operations and financial condition.

For example, we have expanded trading in CFDs and spread betting. We face the same risks with these products that we face in our FX trading business, including market risk, counterparty risk, liquidity risk, technology risk, third party risk and risk of human error. Furthermore, the volatility of the CFD and spread betting markets may have an adverse impact on our ability to maintain profit margins similar to the profit margins we have realized with respect to FX trading. The introduction of these and other potential financial products also poses a risk that our risk management policies, procedures and practices, and the technology that supports such activities, will be unable to effectively manage these new risks to our business. In addition, these offerings may be subject to regulation under applicable securities or other consumer protection laws. Our non-U.S. subsidiaries, UK LTD (which is licensed with the FCA in the U.K.) and FXCM Australia Limited ("Australia") (which is licensed with the ASIC) offer and sell CFDs outside the U.S. in compliance with applicable local regulatory requirements. CFDs are not and may not be offered in the U.S. In the event that an offer or sale of CFDs by our non-U.S. subsidiaries was to constitute an offer or sale of securities subject to the U.S. federal securities laws or swaps, futures, forwards or other instruments over which the CFTC has, or under the Dodd-Frank Act, will have jurisdiction, we would be required to comply with such U.S. laws with respect to such offering. In that event, we may determine that it would be too onerous or otherwise not feasible for us to continue such offers or sales of CFDs. We currently derive approximately 39.2% of our trading revenues from continuing operations from our CFD business.

***Lucid and V3 Markets, LLC subject us to a variety of additional risks.***

In June 2012, we acquired a 50.1% controlling interest in Lucid. In January 2014, we created a new entity with the principals of Lucid, V3, in which we also maintain a 50.1% controlling interest. V3 contains the assets purchased from Infinium Capital Holdings LLC ("Infinium Capital") and certain of Infinium Capital's affiliates.

Lucid and V3 may expose us to a variety of risks, including:

- Significant fluctuations in our revenues and profitability from period to period;
- Risk of trading losses;
- System failures and delays;
- Competition from new competitors; and
- Our failure to implement and apply risk management controls and procedures.

Lucid's and V3's revenues and operating results vary significantly from period to period, whether due to movements and trends in the underlying markets, to competitors who are willing to trade more aggressively by decreasing their bid/offer spreads and thereby assuming more risk in order to acquire market share, to fluctuations in trading levels or otherwise. As a result, our revenues and profitability may be subject to significant fluctuations or declines. Lucid and V3 are recorded as held for sale on our consolidated statements of financial condition and the operating results of Lucid and V3 are included in the results from discontinued operations in our consolidated statements of operations.

As a market maker, Lucid provides liquidity by buying from sellers and selling to buyers. Lucid may accumulate significant positions preceding unfavorable price movements in currencies, creating the potential for trading losses. Should these events occur or increase in frequency or magnitude, we could experience material losses.

The business activities of Lucid and V3 are heavily dependent on the integrity and performance of the computer and communications systems supporting them and the services of certain third parties. Our systems and operations are vulnerable to damage or interruption from human error, technological or operational failures, natural disasters, power loss, computer viruses, intentional acts of vandalism, terrorism and other similar events. The nature of Lucid's and V3's businesses involves a high volume of transactions made in rapid fashion which could result in certain errors being repeated or compounded before they are discovered and successfully rectified. Extraordinary trading volumes or other events could cause Lucid's or V3's computer systems to operate at an unacceptably slow speed or even fail. Lucid's and V3's necessary dependence upon automated systems to record and process transactions and large transaction volume may further increase the risk that technical flaws or employee tampering or manipulation of those systems will result in losses that are difficult to detect.

Lucid and V3 have expanded our market making and trading activities into options on selected exchange traded futures and over-the-counter FX. V3 may be exposed to additional risk due to incorrect recording and valuation of inventory as well as market events which impact large and/or illiquid positions. All of the risks that pertain to our FX business also apply to these products, and despite the measures taken to strengthen the risk oversight of V3, we have less experience in these markets and despite a slow and thoughtful expansion, unforeseen events may have an adverse effect on our business, financial condition and results of operation.

As a result of the business of Lucid and V3, we have additional competitors. Our competitors include sophisticated institutions which have larger customer bases, more established name recognition and substantially greater financial, marketing, technological and personnel resources than we do. These competitors, including commercial and investment banking firms, may have access to capital in greater amounts and at lower costs than we do, and therefore, may be better able to respond and to compete for market share generally. Additionally, our competitors may have better trading algorithms or faster connections which can affect profitability. We may not be able to compete effectively against these firms, particularly those with greater financial resources, and our failure to do so could materially affect our business, financial condition and results of operations and cash flows.

Lucid and V3 are dependent on risk management policies and the adherence to such policies by trading staff. Policies, procedures and practices are used to identify, monitor and control a variety of risks, including market risk and risks related to human error, customer defaults, market movements, fraud and money-laundering. Some of our methods for managing risk are discretionary by nature and are based on internally developed controls and observed historical market behavior, and also involve reliance on standard industry practices. The trading activities of Lucid and V3 as principals subject us to this risk and we may need to continually implement and apply new risk management controls and procedures. We may not successfully implement and apply risk management policies and procedures that will identify, monitor and control the risks associated with principal trading.

***We have expanded our principal model offered to smaller retail clients, which will expose us to additional risks, including the risk of material trading losses.***

We have expanded our principal model offered to smaller retail clients. In our agency model, when a customer executes a trade with us, we act as a credit intermediary, or riskless principal, simultaneously entering into trades with the customer and the FX market maker. In the principal model, however, we may maintain our trading position if we believe the price may move in our favor and against the customer and not offset the trade with another party. As a result, we may incur trading losses using principal model execution for a variety of reasons, including:

- Price changes in currencies;

- Lack of liquidity in currencies in which we have positions; and

- Inaccuracies in our proprietary pricing mechanism, or rate engine, which evaluates, monitors and assimilates market data and reevaluates our outstanding currency quotes and is designed to publish prices reflective of prevailing market conditions throughout the trading day.

These risks may affect the prices at which we are able to sell or buy currencies, or may limit or restrict our ability to either resell currencies that we have purchased or repurchase currencies that we have sold. In addition, competitive forces may

require us to match the breadth of quotes our competitors display and to hold varying amounts and types of currencies at any given time. By having to maintain positions in certain currencies, we may be subject to a high degree of market risk. We may not be able to successfully implement and apply risk management policies and procedures that address the risks associated with principal model execution and may otherwise fail to manage such risks successfully. Accordingly, we could experience significant losses from such activities, which could have a material adverse effect on our business, financial condition and results of operations and cash flows. In addition, the revenues we expect to record from our principal model broker activities consists primarily of trading gains and losses, and are more affected by market volatility. Finally, as we have for a number of years conducted our retail operations on the basis of the agency model, we could suffer reputational damage and additional regulatory scrutiny by offering execution to retail clients that creates an inherent conflict between the interests of the customer and our interests.

***We may be unable to effectively manage our growth and retain our customers.***

The growth of our business during our short history has placed significant demands on our management and other resources. If our business continues to grow at a rate consistent with our historical growth, we may need to expand and upgrade the reliability and scalability of our transaction processing systems, network infrastructure and other aspects of our proprietary technology. We may not be able to expand and upgrade our technology systems and infrastructure to accommodate such increases in our business activity in a timely manner, which could lead to operational breakdowns and delays, loss of customers, a reduction in the growth of our customer base, increased operating expenses, financial losses, increased litigation or customer claims, regulatory sanctions or increased regulatory scrutiny.

***We may be unable to respond to customers' demands for new services and products and our business, financial condition and results of operations and cash flows may be materially adversely affected.***

Our business is subject to rapid change and evolving industry standards. New services and products provided by our competitors may render our existing services and products less competitive. Our future success will depend, in part, on our ability to respond to customers' demands for new services and products on a timely and cost-effective basis and to adapt to address the increasingly sophisticated requirements and varied needs of our customers and prospective customers. We may not be successful in developing, introducing or marketing new services and products. In addition, our new service and product enhancements may not achieve market acceptance. Any failure on our part to anticipate or respond adequately to customer requirements or changing industry practices, or any significant delays in the development, introduction or availability of new services, products or service or product enhancements could have a material adverse effect on our business, financial condition and results of operations and cash flows.

***We face significant competition. Many of our competitors and potential competitors have larger customer bases, more established brand recognition and greater financial, marketing, technological and personnel resources than we do, which could put us at a competitive disadvantage. Additionally, some of our competitors and many potential competitors are better capitalized than we are and able to obtain capital more easily, which could put us at a competitive disadvantage.***

We compete in the FX market based on our ability to execute our customers' trades at competitive prices, to retain our existing customers and to attract new customers. Certain of our competitors have larger customer bases, more established name recognition, a greater market share in certain markets, such as Europe, and greater financial, marketing, technological and personnel resources than we do. These advantages may enable them, among other things, to:

- develop products and services that are similar to ours, or that are more attractive to customers than ours, in one or more of our markets;

- provide products and services we do not offer;

- provide execution and clearing services that are more rapid, reliable or efficient, or less expensive than ours;

- offer products and services at prices below ours to gain market share and to promote other businesses, such as FX options listed securities, CFDs, including contracts for precious metals, energy and stock indices, and OTC derivatives;

- adapt at a faster rate to market conditions, new technologies and customer demands;

- offer better, faster and more reliable technology;

- outbid us for desirable acquisition targets;

- more efficiently engage in and expand existing relationships with strategic alliances;

24

- market, promote and sell their products and services more effectively; and

- develop stronger relationships with customers.

These larger and better capitalized competitors, including commercial and investment banking firms, may have access to capital in greater amounts and at lower costs than we do and thus, may be better able to respond to changes in the FX industry, to compete for skilled professionals, to finance acquisitions, to fund internal growth and to compete for market share generally. Access to capital is critical to our business to satisfy regulatory obligations and liquidity requirements. Among other things, access to capital determines our creditworthiness, which if perceived negatively in the market could materially impair our ability to provide clearing services and attract customer assets, both of which are important sources of revenue. Access to capital also determines the degree to which we can expand our operations. Thus, if we are unable to maintain or increase our capital on competitive terms, we could be at a significant competitive disadvantage, and our ability to maintain or increase our revenue and earnings could be materially impaired. Also, new or existing competitors in our markets could make it difficult for us to maintain our current market share or increase it in desirable markets. In addition, our competitors could offer their services at lower prices, and we may be required to reduce our fees significantly to remain competitive. A fee reduction without a commensurate reduction in expenses would decrease our profitability. We may not be able to compete effectively against these firms, particularly those with greater financial resources, and our failure to do so could materially and adversely affect our business, financial condition and results of operations and cash flows. We may in the future face increased competition, resulting in narrowing bid/offer spreads which could materially adversely affect our business, financial condition and results of operations and cash flows.

***If we are unable to effectively compete in emerging international markets, either directly or through joint ventures with local firms, the future growth of our business may be adversely affected.***

We regard emerging international markets as an important area of our future growth. Due to cultural, regulatory and other factors relevant to those markets, however, we may be at a competitive disadvantage in those regions relative to local firms or to international firms that have a well-established local presence. In some regions, we may need to enter into joint ventures with local firms in order to establish a presence in the local market, and we may face intense competition from other international firms over relatively scarce opportunities for market entry. Given the intense competition from other international firms that are also seeking to enter these fast-growing markets, we may have difficulty finding suitable local firms willing to enter into the types of relationships with us that we may need to gain access to these markets. This competition could make it difficult for us to expand our business internationally as planned. For the year ended December 31, 2016, we generated approximately 81.8% of our customer trading volume from customers outside the U.S. Expanding our business in emerging markets is an important part of our growth strategy. We face significant risks in doing business in international markets, particularly in developing regions. These business, legal and tax risks include:

- less developed or mature local technological infrastructure and higher costs, which could make our products and services less attractive or accessible in emerging markets;

- difficulty in complying with the diverse regulatory requirements of multiple jurisdictions, which may be more burdensome, not clearly defined, and subject to unexpected changes, potentially exposing us to significant compliance costs and regulatory penalties;

- less developed and established local financial and banking infrastructure, which could make our products and services less accessible in emerging markets;

- reduced protection of intellectual property rights;

- inability to enforce contracts in some jurisdictions;

- difficulties and costs associated with staffing and managing foreign operations, including reliance on newly hired local personnel;

- tariffs and other trade barriers;

- currency and tax laws that may prevent or restrict the transfer of capital and profits among our various operations around the world; and

- time zone, language and cultural differences among personnel in different areas of the world.

In addition, in order to be competitive in these local markets, or in some cases because of restrictions on the ability of foreign firms to conduct business locally, we may seek to operate through joint ventures with local firms. Doing business

through joint ventures may limit our ability to control the conduct of the business and could expose us to reputational and greater operational risks.

**Our business could be adversely affected if global economic conditions continue to negatively impact our customer base.**

Our customer base is primarily comprised of individual retail customers who view foreign currency trading as an alternative investment class. If global economic conditions continue to negatively impact the FX market or adverse developments in global economic conditions continue to limit the disposable income of our customers, our business could be materially adversely affected as our customers may choose to curtail their trading in the FX market which could result in reduced customer trading volume and trading revenue.

**We face risks related to the passage of the recent "Brexit" referendum in the United Kingdom which could harm our business and operations.**

Following the U.K.'s adoption of the policy passed in its recent vote to leave the European Union ("E.U."), (the "Brexit"), we will likely face new regulatory and legal costs and challenges. The key mechanism for the cross-border provision of financial services within the E.U. is the passport under the E.U. single market directive. Our U.K. operations may no longer be able to take advantage of passporting financial services from the U.K. to other E.U. member states. In addition, the equivalence of the U.K.'s regulatory regime in terms of governance could also become uncertain. This may affect the way in which our operating companies in the U.K. manage their businesses.

Depending on the terms of Brexit, the U.K. could also lose access to the single E.U. market and to the global trade deals negotiated by the E.U. on behalf of its members. Such a decline in trade could affect the attractiveness of the U.K. as a global investment center and, as a result, could have a detrimental impact on U.K. growth. The uncertainty prior to the actual implementation of Brexit could also have a negative impact on the U.K. economy. Although we have an international customer base, we could be adversely affected by reduced growth and greater volatility in the U.K. economy.

Changes to U.K. and E.U. migration policy could likewise occur as a result of Brexit. London's role as a global center for business may decline, particularly if financial services entities shift their headquarters to the E.U. impacting our ability to recruit and retain talent. Any of the foregoing factors could have a material adverse effect on our business, results of operations or financial condition.

**We are subject to a wide variety of domestic and foreign tax laws and regulations that are constantly changing.**

We are subject to a wide variety of domestic and foreign tax laws and regulations that are constantly changing. We are affected by new laws and regulations, and changes to existing laws and regulations, including interpretations by courts and regulators. With the finalization of specific actions contained within the Organization for Economic Cooperation and Development's (the "OECD") Base Erosion and Profit study ("BEPS"), many OECD countries have acknowledged their intent to implement BEPS and update their local tax regulations. The extent (if any) to which countries in which we operate adopt and implement BEPS could affect our effective tax rate and our future results from non-U.S. operations.

**A systemic market event that impacts the various market participants with whom we interact could have a material adverse effect on our business, financial condition and results of operations and cash flows.**

We interact with various third parties through our relationships with our prime brokers, white labels and referring brokers. Some of these market participants could be overleveraged. In the event of sudden, large market price movements, such as the events of January 15, 2015, market participants may not be able to meet their obligations to brokers who, in turn, may not be able to meet their obligations to their counterparties. As a result, if a systemic collapse in the financial system were to occur, defaults by one or more counterparties could have a material adverse effect on our business, financial condition and results of operations and cash flows.

**The decline in short-term interest rates has had an adverse effect on our interest income and revenues.**

A portion of our revenue is derived from interest income. We earn interest on customer balances held in customer accounts and on our cash held in deposit accounts at various financial institutions. As a result of the decline in short-term interest rates, our interest income has declined significantly. Short-term interest rates are highly sensitive to factors that are beyond our control, including general economic conditions and the policies of various governmental and regulatory authorities. Our interest income from continuing operations was approximately $2.5 million and $1.8 million for the years ended

26

December 31, 2016 and 2015, respectively. Interest income may not return to the amount we reported in prior years, and any further deterioration in short-term interest rates could further adversely affect our interest income and revenue.

In addition, this decline in interest rates has narrowed cross-border interest rate differentials, which has adversely affected the "carry trade," a once popular investing strategy which involves buying a currency that offers a higher interest rate while selling a currency that offers a lower interest rate. We believe the decline in the carry trade has resulted in a decrease in retail FX volume. Accordingly, our growth could be impeded if cross-border interest rate differentials remain compressed.

***Our operations in certain developing regions may be subject to the risks associated with politically unstable and less economically developed regions of the world. Trading in the currencies of these developing regions may expose our customers and the third parties with whom we interact to sudden and significant financial loss as a result of exceptionally volatile and unpredictable price movements and could negatively impact our business.***

Our operations in some emerging markets may be subject to the political, legal and economic risks associated with politically unstable and less economically developed regions of the world, including the risks of war, insurgency, terrorism and government appropriation. For example, we do business in countries whose currencies may be less stable than those in our primary markets. Currency instability, government imposition of currency restrictions or capital controls in these countries could impede our operations in the FX markets in these countries. In addition, emerging markets may be subject to exceptionally volatile and unpredictable price movements that can expose customers and brokers to sudden and significant financial loss. Trading in these markets may be less liquid, market participants may be less well capitalized and market oversight may be less extensive, all of which could increase trading risk, particularly in markets for derivatives, commodities and currencies. Substantial trading losses by customers or customer or counterparty defaults, or the prospect of them, in turn, could drive down trading volume in these markets.

***We are dependent on FX market makers to continually provide us with FX market liquidity. In the event we lose access to current prices and liquidity levels, we may be unable to provide competitive FX trading services, which will materially adversely affect our business, financial condition and results of operations and cash flows.***

We rely on third party financial institutions to provide us with FX market liquidity. These FX market makers, although under contract with us, have no obligation to provide us with liquidity and may terminate our arrangements at any time. We also rely upon these FX market makers to provide us with competitive FX pricing which we can pass on to our customers. In the event we lose access to the competitive FX pricing and/or liquidity levels that we currently have, as occurred on January 15, 2015 and more recently as a result of the regulatory settlements reached with the CFTC and the NFA, we may be unable to provide competitive FX trading services, which will materially adversely affect our business, financial condition and results of operations and cash flows. When we act as a riskless principal between our customers and our FX market makers, we provide our customers with the best bid and offer price for each currency pair from our FX market makers. When a customer places a trade and opens a position, we act as the counterparty to that trade and our system immediately opens a trade between us and the FX market maker who provided the price that the customer selected. In the event that an offsetting trade fails, we could incur losses resulting from our trade with our customer.

In addition, whether as a result of exceptional volatility or situations affecting the market, the absence of competitive pricing from FX market makers and/or the suspension of liquidity would expose us to the risk of a default by the customer and consequently, trading losses. Although our margining practices are designed to mitigate this risk, we may be unable to close out customer positions at a level where margin posted by the customer is sufficient to cover the customer's losses. As a result, a customer may suffer losses greater than any margin or other funds or assets posted by that customer or held by us on behalf of that customer.

***We are subject to risk of default by financial institutions that hold our funds and our customers' funds.***

We have significant deposits with banks and other financial institutions. As of December 31, 2016, 30 financial institutions held our funds and our customer funds of $872.2 million, including $9.4 million classified within assets held for sale. Three financial institutions, including Barclays, Citibank and Bank of America, held, in aggregate, approximately 38.2% of the total of our funds and our customer funds. We aggregate our customers' funds and our funds and hold them in collateral and deposit accounts at various financial institutions. In the event of insolvency of one or more of the financial institutions with whom we have deposited these funds, both we and our customers may not be able to recover our funds. If any of such financial institutions becomes insolvent, a significant portion of our funds and our customer funds may not be recovered. In such an event, our business and cash flow would be materially adversely impacted. Because our customers' funds are aggregated with our own, they are not insured by the Federal Deposit Insurance Corporation or any other similar insurer domestically or abroad,

except to the extent of the maximum insured amount per deposit, which is unlikely to provide significant benefits to our customers. In any such insolvency, we and our customers would rank as unsecured creditors in respect of claims to funds deposited with any such financial institution. As a result, we may be subject to claims by customers due to the loss of customer funds and our business would be harmed by the loss of our own funds.

***We are subject to counterparty risk whereby defaults by parties with whom we do business can have an adverse effect on our business, financial condition and results of operations and cash flows.***

Our FX trading operations require a commitment of capital and involve risk of losses due to the potential failure of our customers to perform their obligations under these transactions. All retail customers are required to deposit cash collateral in order to trade on our retail platforms.

Certain institutional customers that use our retail trading platforms are not required to deposit cash collateral in order to trade on our retail platforms. In rare circumstances, we provide short term credit directly to certain institutional customers when initial collateral does not cover risk exposure.

Most of the institutional customers that use our institutional trading platforms trade via credits and limits set by the customers' prime brokers and by our prime brokers. As part of our arrangement with our prime brokers, they incur the credit risk regarding the trading of our institutional customers. We also, in certain situations, act in the capacity of a prime broker to a select number of institutional customers that use our institutional trading platform.

As of December 31, 2016, we have extended a minimal amount of credit to institutional customers that use our trading platforms. We have had no significant losses due to failure to repay amounts credited to those certain institutional customers.

We are also subject to counterparty risk with respect to clearing and prime brokers as well as banks with respect to our own deposits and deposits of customer funds. We are exposed to credit risk in the event that such counterparties fail to fulfill their obligations. Although we seek to manage the credit risk arising from institutional counterparties by setting exposure limits and monitoring exposure against such limits, carrying out periodic credit reviews, and spreading credit risk across a number of different institutions to diversify risk, if our credit and counterparty risk management processes are inadequate we could face significant liabilities which could have a material adverse effect upon our business, financial conditions, results of operations and cash flows.

***We depend on the services of prime brokers to assist in providing us access to liquidity through our FX market makers. The loss of one or more of our prime brokerage relationships could lead to increased transaction costs and capital posting requirements, as well as having a negative impact on our ability to verify our open positions, collateral balances and trade confirmations.***

We depend on the services of prime brokers to assist in providing us access to liquidity through our FX market makers. We currently have prime brokerage relationships which act as central hubs through which we are able to deal with our FX market makers. In return for paying a transaction-based prime brokerage fee, we are able to aggregate our trading exposures, thereby reducing our transaction costs. Since we trade with our FX market makers through our prime brokers, they also serve as a third party check on our open positions, collateral balances and trade confirmations. If we were to lose one or more of our prime brokerage relationships, we could lose this source of third party verification of our trading activity, which could lead to an increased number of record-keeping or documentation errors. Although we have relationships with FX market makers who could provide clearing services as a back-up for our prime brokerage services, if we were to experience a disruption in prime brokerage services due to a financial, technical, regulatory or other development adversely affecting any of our current prime brokers, our business could be materially adversely affected to the extent that we are unable to transfer positions and margin balances to another financial institution in a timely fashion. In the event of the insolvency of a prime broker, we might not be able to fully recover the assets we have deposited (and have deposited on behalf of our customers) with the prime broker or our unrealized profits since we will be among the prime broker's unsecured creditors.

***Failure of third-party systems or third-party service and software providers upon which we rely could adversely affect our business.***

We rely on certain third party computer systems or third party service and software providers, including technology platforms, back-office systems, internet service providers and communications facilities. Any interruption in these third party services, or deterioration in their performance or quality, could adversely affect our business. If our arrangement with any third party is terminated, we may not be able to find an alternative systems or services provider on a timely basis or on commercially

reasonable terms. This could have a material adverse effect on our business, financial condition and results of operations and cash flows.

***Our computer infrastructure may be vulnerable to security breaches. Any such problems could jeopardize confidential information transmitted over the internet, cause interruptions in our operations or give rise to liabilities to third parties.***

Our computer infrastructure is potentially vulnerable to physical or electronic computer break-ins, viruses and similar disruptive problems and security breaches. Any such problems or security breaches could give rise to liabilities to one or more third parties, including our customers, and disrupt our operations. A party able to circumvent our security measures could misappropriate proprietary information or customer information, jeopardize the confidential nature of information we transmit over the internet or cause interruptions in our operations. Concerns over the security of internet transactions and the safeguarding of confidential personal information could also inhibit the use of our systems to conduct FX transactions over the internet. To the extent that our activities involve the storage and transmission of proprietary information and personal financial information, security breaches could expose us to a risk of financial loss, litigation and other liabilities. Our current insurance policies may not protect us against all of such losses and liabilities. Any of these events, particularly if they result in a loss of confidence in our services, could have a material adverse effect on our business, financial condition and results of operations and cash flows.

***We have relationships with referring brokers who direct new customers to us. Failure to maintain these relationships could have a material adverse effect on our business, financial condition and results of operations and cash flows.***

We have relationships with referring brokers who direct new customers to us and provide marketing and other services for these customers. Many of our relationships with referring brokers are non-exclusive or may be terminated by the brokers on short notice. In addition, under our agreements with referring brokers, they have no obligation to provide us with new customers or minimum levels of transaction volume. Our failure to maintain our relationships with these referring brokers, the failure of the referring brokers to provide us with customers or our failure to create new relationships with referring brokers would result in a loss of revenue, which could have a material adverse effect on our business, financial condition and results of operations and cash flows. To the extent any of our competitors offer more attractive compensation terms to one of our referring brokers, we could lose the broker's services or be required to increase the compensation we pay to retain the broker. In addition, we may agree to set the compensation for one or more referring brokers at a level where, based on the transaction volume generated by customers directed to us by such brokers, it would have been more economically attractive to seek to acquire the customers directly rather than through the referring broker. To the extent we do not enter into economically attractive relationships with referring brokers, our referring brokers terminate their relationship with us or our referring brokers fail to provide us with customers, our business, financial condition and results of operations and cash flows could be materially adversely affected.

***Our relationships with our referring brokers may also expose us to significant reputational and legal risks as we could be harmed by referring broker misconduct or errors that are difficult to detect and deter.***

Our reputation may be harmed by, or we may be liable for, improper conduct by our referring brokers, even though we do not control their activities. Referring brokers maintain customer relationships and delegate to us the responsibilities associated with FX and back-office operations. Furthermore, many of our referring brokers operate websites, which they use to advertise our services or direct customers to us. It is difficult for us to closely monitor the contents of their websites to ensure that the statements they make in relation to our services are accurate and comply with applicable rules and regulations.

***We have relationships with white labels who direct customer trading volume to us. Failure to maintain these relationships or develop new white label relationships could have a material adverse effect on our business, financial condition and results of operations and cash flows.***

We have relationships with white labels that provide FX trading to their customers by using our technology platform and other services and therefore provide us with an additional source of revenue. In certain jurisdictions, we are only able to provide our services through white label relationships. Many of our relationships with white labels are non-exclusive or may be terminated by them on short notice. In addition, our white labels have no obligation to provide us with minimum levels of transaction volume. Our failure to maintain our relationships with these white labels, the failure of these white labels to continue to offer online FX trading services to their customers using our technology platform, the loss of requisite licenses by our white labels or our inability to enter into new relationships with white labels would result in a loss of revenue, which could have a material adverse effect on our business, financial condition and results of operations and cash flows. To the extent any of

29

our competitors offer more attractive compensation terms to one or more of our white labels, we could lose the white label relationship or be required to increase the compensation we pay to retain the white label.

White labels with whom we have relationships accept customers from many jurisdictions and are therefore subject to regulations in a number of jurisdictions. If such regulations, or changes in such regulations, increase the white labels' overhead costs, including compliance costs and legal fees and expenses, limit their ability to engage or grow their business and increase their market share or result in sanctions and fines, their business, financial condition and results of operations may be adversely affected. This could reduce the volume of customer trading that such white labels direct to us, which would, in turn, adversely affect our business and results of operations. Our relationships with our white labels also may expose us to significant regulatory, reputational and other risks as we could be harmed by white label misconduct or errors that are difficult to detect and deter. If any of our white labels provided unsatisfactory service to their customers or are deemed to have failed to comply with applicable laws or regulations, our reputation may be harmed or we may be subject to claims as a result of our association with such white label. Any such harm to our reputation or liability would have a material adverse effect on our business, financial condition and results of operations and cash flows.

**Risks Relating to Our Indebtedness**

*We have significant leverage.*

As of December 31, 2016, we owe $154.5 million aggregate principal to Leucadia and have $172.5 million aggregate principal amount of 2.25% convertible senior notes due 2018 (the "Convertible Notes") outstanding. This leverage may have important negative consequences for us and our stockholders, including:

- Increasing our vulnerability to general adverse economic and industry conditions;

- Requiring us to dedicate a portion of our cash flow from operations to payments on our indebtedness, thereby reducing the availability of cash flow to fund working capital, capital expenditures and other general corporate purposes;

- Making it difficult for us to optically manage the cash flow for our business;

- Limiting our flexibility in planning for, or reacting to, changes in our business and the markets in which we operate;

- Placing us at a competitive disadvantage compared to our competitors that have less debt; and

- Subjecting us to a number of restrictive covenants that, among other things, limit our ability to pay dividends and distributions, make acquisitions and dispositions, borrow additional funds, and make capital expenditures and other investments.

Our ability to pay down our indebtedness will depend on our future performance, our ability to generate cash flow and market conditions, each of which is subject to economic, financial, competitive and other factors beyond our control. Our business may not continue to generate cash flow from operations sufficient to service our debt. We also may decide to sell certain assets to pay down our debt. There are no assurances that we will be able to sell such assets on desirable terms which could result in a default on our debt obligations.

*The credit agreement we entered into with Leucadia is guaranteed by certain of our subsidiaries and is secured by a pledge of certain equity interests of our domestic and foreign subsidiaries. The credit agreement also contains financial covenants and other restrictions on our actions, and it could therefore limit our operational flexibility or otherwise adversely affect our financial condition.*

The credit agreement we entered into with Leucadia contains a number of restrictive covenants relating to limitations on liens, investments, restricted payments, fundamental changes, dispositions, the incurrence of indebtedness, and transactions with affiliates. The credit agreement contains customary events of default, including, among others, non-payments of principal and interest; breach of representations and warranties; failure to maintain compliance with covenants contained in the credit agreement; the existence of bankruptcy or insolvency proceedings; insolvency; and a change of control.

Failure to comply with these restrictive covenants could result from, among other things, changes in our results of operations or general economic conditions. These covenants may restrict our ability to engage in transactions that would otherwise be in our best interests. Failure to comply with any of the covenants under the credit agreement could result in a default. An event of default (including a cross-default under the Convertible Notes or other financing facilities) would permit our lenders to declare all amounts borrowed from them to be due and payable, together with accrued and unpaid interest. If

Leucadia accelerates the repayment of borrowings, we may not have sufficient assets to repay our debt or it would have a material adverse effect on our business, operations, financial condition and liquidity. See Note 19, "Leucadia Transaction" in the Notes to Consolidated Financial Statements in "Item 8. Financial Statements and Supplementary Data" for further information on our credit agreement.

*We may not have the ability to repay the Convertible Notes when they mature in June 2018 or the bi-annual interest payments on the Convertible Notes.*

The Convertible Notes mature on June 15, 2018. At that time, we will be obligated to repay the aggregate principal amount of the Convertible Notes. We may not have enough available cash or be able to obtain financing at that time to meet our repayment obligations. We expect that our principal source of cash flow will be distributions by Group to Global Brokerage, Inc. However, our agreements with Leucadia govern the distributions of cash by Group to Leucadia and Global Brokerage, Inc., and these provisions severely restrict the amount of cash that Group is permitted to distribute to Global Brokerage, Inc. to make payments of principal and interest on the Convertible Notes. Without access to sufficient cash from Group to repay the aggregate principal amount of the Convertible Notes, we may default on our repayment obligations under the Convertible Notes. The agreements with Leucadia also provide that we meet a specified minimum fixed charge coverage ratio prior to making the bi-annual interest payments due under the Convertible Notes. If we are unable to satisfy such minimum fixed charge coverage, we could default on our interest payment obligation under the Convertible Notes. A default could also lead to a default under other agreements governing our existing and future indebtedness. Any such default would have a material adverse effect on the equity value of our business and, therefore, the market price of our Class A common stock.

*We may not have the ability to raise the funds necessary to settle conversions of the Convertible Notes or to purchase the Convertible Notes upon a fundamental change, and our future debt may contain limitations on our ability to pay cash upon conversion or to purchase the Convertible Notes.*

Upon the occurrence of a fundamental change (as defined in the Convertible Notes), subject to certain conditions, holders of the Convertible Notes will have the right to require us to purchase their Convertible Notes for cash at 100% of their principal amount plus accrued and unpaid interest, if any. In addition, upon conversion of the Convertible Notes, we will be required to make cash payments of up to $1,000 for each $1,000 in principal amount of Convertible Notes converted. However, we may not have enough available cash or be able to obtain financing at the time we are required to make purchases of Convertible Notes surrendered for purchase upon a fundamental change or to make cash payments in respect of Convertible Notes that are being converted. In addition, our ability to purchase the Convertible Notes or to pay cash upon conversions of the Convertible Notes may be limited by law, by regulatory authority or by agreements governing our future indebtedness. Our failure to purchase Convertible Notes at a time when the purchase is required by the indenture or to pay any cash payable on conversions of the Convertible Notes as required by the indenture would constitute a default under the indenture. A default under the indenture or the fundamental change itself could also lead to a default under other agreements governing our existing and future indebtedness. If the repayment of the related indebtedness were to be accelerated after any applicable notice or grace periods, we may not have sufficient funds to repay the indebtedness and purchase the Convertible Notes or make cash payments upon conversions thereof.

*Future issuances of our Class A common stock may adversely affect our stock price.*

Sales of a substantial number of shares of our Class A common stock from the Convertible Notes, or the perception by the market that those sales could occur, could cause the trading price of the notes and the market price of our Class A common stock to decline or could make it more difficult for us to raise funds through the sale of equity in the future. In addition, a substantial number of shares of our Class A common stock is reserved for issuance upon conversion of the Convertible Notes, for equity grants pursuant to our equity compensation plans and for potential exchanges of Holdings Units for shares of Class A common stock. The issuance and sale of these shares of our Class A common stock, or the perception that such issuances and sales may occur, could adversely affect the trading price of the Convertible Notes and the market price of our Class A common stock and impair our ability to raise capital through the sale of additional equity securities.

We cannot be sure that we will not need to raise additional capital in the future, as a result of economic conditions or otherwise. If we do need to raise additional capital, there can be no assurance that we will be able to do so on favorable terms or at all. In addition, any such financing could be significantly dilutive to our existing shareholders and result in the issuance of securities that have rights, preferences and privileges that are senior to those of our Class A common stock.

*Provisions of the Convertible Notes could discourage an acquisition of us by a third party.*

Certain provisions of the Convertible Notes could make it more difficult or more expensive for a third party to acquire us. Upon the occurrence of certain transactions constituting a fundamental change, holders of the Convertible Notes have the right, at their option, to require us to repurchase all of their notes or any portion of the principal amount of such notes in integral multiples of $1,000. We may also be required to increase the conversion rate upon conversion in connection with certain fundamental change transactions. These provisions could deter unsolicited takeovers, including transactions in which stockholders might otherwise receive a premium for their shares over the then current market price or could limit the price that some investors might be willing to pay in the future for shares of our Class A common stock.

*The conditional conversion features of the Convertible Notes, if triggered, may adversely affect our financial condition and operating results.*

In the event the conditional conversion features of the Convertible Notes are triggered, holders of notes will be entitled to convert the Convertible Notes at any time during specified periods at their option. If one or more holders elect to convert their notes, we would be required to settle up to the principal amount of notes being converted through the payment of cash, which could adversely affect our liquidity. In addition, even if holders do not elect to convert their notes, we could be required under applicable accounting rules to classify all or a portion of the outstanding principal of the notes as a current liability rather than long-term liability, which would result in a material reduction of our net working capital.

*The convertible note hedge and warrant transactions we entered into in connection with our Convertible Notes issuance may affect the trading price of our Class A common stock.*

In connection with our offering of the Convertible Notes, we entered into privately negotiated convertible note hedge transactions with several financial institutions, or the hedge counterparties. We entered into these convertible note hedge transactions with the expectation that they will reduce the potential dilution to our Class A common stock and/or offset potential cash payments in excess of the principal amount of the Convertible Notes, as the case may be, upon conversion of the Convertible Notes. In the event that the hedge counterparties fail to deliver shares to us or potential cash payments, as the case may be, as required under the convertible note hedge documents, we would not receive the benefit of such transactions. Separately, we also entered into warrant transactions with the hedge counterparties. The warrant transactions could separately have a dilutive effect from the issuance of Class A common stock pursuant to the warrants.

In connection with hedging these transactions, the hedge counterparties and/or their affiliates may enter into various derivative transactions with respect to our Class A Common Stock, and may enter into, or may unwind, various derivative transactions and/or purchase or sell our Class A Common Stock or other securities of ours in secondary market transactions prior to maturity of the Convertible Notes (and are likely to do so during any conversion period related to any conversion of the Convertible Notes). These activities could have the effect of increasing or preventing a decline in, or could have a negative effect on, the value of our Class A Common Stock and could have the effect of increasing or preventing a decline in the value of our Class A Common Stock during any cash settlement averaging period related to a conversion of the Convertible Notes.

We do not make any representation or prediction as to the direction or magnitude of any potential effect that the transactions described above may have on the price of the Convertible Notes or the shares of our Class A common stock. In addition, we do not make any representation that the hedge counterparties will engage in these transactions or that these transactions, once commenced, will not be discontinued without notice.

*We are subject to counterparty risk with respect to the convertible note hedge transactions.*

The hedge counterparties are financial institutions or the affiliates of financial institutions, and we will be subject to the risk that the hedge counterparties may default under the convertible note hedge transactions. Our exposure to the credit risk of the hedge counterparties will not be secured by any collateral. Recent global economic conditions have resulted in the actual or perceived failure or financial difficulties of many financial institutions. If any of the hedge counterparties become subject to insolvency proceedings, we will become an unsecured creditor in those proceedings with a claim equal to our exposure at that time under the convertible note hedge transactions. Our exposure will depend on many factors, but, generally, the increase in our exposure may be correlated to the increase in our Class A common stock market price and in volatility of our Class A common stock. In addition, upon a default by a hedge counterparty, we may suffer dilution with respect to our Class A common stock. We can provide no assurance as to the financial stability or viability of the hedge counterparties.

*The accounting method for the Convertible Notes may have an adverse effect on our reported financial results and is subject to uncertainty.*

Under Accounting Standards Codification Topic 470-20, *Debt with Conversion and Other Options* ("ASC 470-20"), an entity must separately account for the liability and equity components of the convertible debt instruments (such as the Convertible Notes) that may be settled entirely or partially in cash upon conversion in a manner that reflects the issuer's economic interest cost. The effect of ASC 470-20 on the accounting for the Convertible Notes is that the equity component is included in the additional paid-in capital section of stockholders' equity on our consolidated statements of financial condition and the value of the equity component is treated as original issue discount for purposes of accounting for the debt component of the Convertible Notes. As a result, we are required to record a greater amount of non-cash interest expense in current periods presented as a result of the amortization of the discounted carrying value of the Convertible Notes to their face amount over the term of the Convertible Notes. We report lower net income in our financial results because ASC 470-20 requires interest to include both the current period's amortization of the debt discount and the instrument's coupon interest, which could adversely affect our reported or future financial results, the trading price of our Class A common stock and the trading price of the Convertible Notes.

In addition, the equity component of the Convertible Notes are accounted for utilizing the treasury stock method, the effect of which is that the shares of Class A common stock issuable upon conversion of the Convertible Notes are not included in the calculation of diluted earnings per share except to the extent that the conversion value of the securities exceeds their principal amount. Under the treasury stock method, for diluted earnings per share purposes, the transaction is accounted for as if the number of shares of Class A common stock that is necessary to settle such excess, if we elected to settle such excess in shares, are issued. We cannot be sure that accounting standards in the future will continue to permit the use of the treasury stock method. If we are unable to use the treasury stock method in accounting for the shares issuable upon conversion of the Convertible Notes, then our diluted earnings per share would be adversely affected. In addition, if we are permitted to utilize the treasury stock method, to the extent that the market price of our Class A common stock exceeds the strike price of the warrants we intend to sell to the hedge counterparties, the warrant transactions will be accounted for as if the number of shares of our Class A common stock that is necessary to settle such excess are issued. However, any shares we are entitled to receive from the hedge counterparties under the convertible note hedge transactions upon conversion of the notes, in the event that the market price of our Class A common stock exceeds the strike price of the convertible note hedge transactions, will not be reflected in our diluted earnings per share.

### Risks Related to Our Organizational Structure

*Global Brokerage, Inc.'s only material asset is its interest in Holdings, and Holdings' only material asset is its interest in Group. Accordingly, Global Brokerage, Inc. depends upon distributions from Group and from Holdings to pay taxes, make payments of principal and interest on the Convertible Notes, make payments under the tax receivable agreement and pay dividends.*

Global Brokerage, Inc. is a holding company and has no material assets other than its ownership of Holdings Units. Holdings is also a holding company and has no material assets other than its 50.1% interest in Group. Global Brokerage, Inc. has no independent means of generating revenue. Global Brokerage, Inc. intends to cause Holdings to make distributions to its unitholders in an amount sufficient to cover all applicable taxes at assumed tax rates, payments of principal and interest on the Convertible Notes, payments under the tax receivable agreement and dividends, if any, declared by it. In turn, the sole source of such funds for Holdings is distributions from Group. Deterioration in the financial condition, earnings or cash flow of Group and its subsidiaries for any reason could limit or impair their ability to pay such distributions. Additionally, to the extent that Global Brokerage, Inc. needs funds, and Holdings and Group are restricted from making such distributions under applicable law or regulation or under the terms of their financing arrangements, or is otherwise unable to provide such funds, it could materially adversely affect our liquidity and financial condition. In particular, the terms of Group's agreements with Leucadia significantly restrict the distributions that Group may make to Holdings, and these restrictions could materially impair the ability of Global Brokerage, Inc. to make payments on its obligations.

*Members of Holdings control a significant portion of the voting power in Global Brokerage, Inc., which may give rise to conflicts of interests.*

As of December 31, 2016, members of Holdings collectively held approximately 25.5% of the combined voting power of our Class A and Class B common stock. As a result, the members of Holdings have the ability to exercise significant influence over the election of the members of our board of directors and, therefore, significant influence over our management and affairs as well as matters requiring shareholder approval, including mergers and other material transactions. This

concentration of ownership could deprive our shareholders of an opportunity to receive a premium for their Class A common stock as part of a sale of our company and might ultimately affect the market price of our Class A common stock.

Because the members of Holdings hold their ownership interest in our business through Holdings in addition to through the public company, these owners may have conflicting interests with holders of shares of our Class A common stock. For example, if Holdings makes distributions to Global Brokerage, Inc., these owners will also be entitled to receive distributions pro rata in accordance with the percentages of their respective limited liability company interests in Holdings and their preferences as to the timing and amount of any such distributions may differ from those of our public shareholders. The members of Holdings may also have different tax positions from us which could influence their decisions regarding whether and when to dispose of assets, especially in light of the existence of the tax receivable agreement that we entered into in connection with our initial public offering ("IPO"), whether and when to incur new or refinance existing indebtedness, and whether and when Global Brokerage, Inc. should terminate the tax receivable agreement and accelerate its obligations thereunder. In addition, the structuring of future transactions may take into consideration these owners' tax or other considerations even where no similar benefit would accrue to us. See "Item 13. Certain Relationships and Related Person Transactions, and Director Independence."

### *Global Brokerage, Inc. will be required to pay the counterparties to the tax receivable agreement for certain tax benefits it may claim arising in connection with our IPO and related transactions, and the amounts it may pay could be significant.*

In connection with our IPO, we purchased Holdings Units from our pre-IPO owners, including members of our senior management. Subsequently, we have had additional unit conversions. At the IPO, we also entered into a tax receivable agreement with our pre-IPO owners that provides for the payment by Global Brokerage, Inc. to these parties of 85% of the benefits, if any, that Global Brokerage, Inc. is deemed to realize as a result of the increases in tax basis resulting from our purchases or exchanges of Holdings Units and certain other tax benefits related to our entering into the tax receivable agreement, including tax benefits attributable to payments under the tax receivable agreement. See "Item 13. Certain Relationships and Related Transactions, and Director Independence."

As of December 31, 2016, we have recorded a valuation allowance against the deferred tax benefit attributable to the increase in tax basis discussed above. As the expected liability under the tax receivable agreement is directly attributable to the tax benefit received, and we expect no tax benefit, during 2015 we wrote down the liability to $0.1 million, the amount due for the 2014 benefit. Assuming no material changes in the relevant tax law, and that we earn sufficient taxable income to realize all tax benefits that are subject to the tax receivable agreement or we have a triggering event as discussed below, as of December 31, 2016 future payments under the tax receivable agreement could aggregate to $145.6 million. The foregoing amount is merely an estimate and the actual payments could differ materially. It is possible that future transactions or events, including the events of January 15, 2015, could increase or decrease the actual tax benefits realized and the corresponding tax receivable agreement payments. There may be a material negative effect on our liquidity if, as a result of timing discrepancies or otherwise, the payments under the tax receivable agreement exceed the actual benefits we realize in respect of the tax attributes subject to the tax receivable agreement and/or distributions to Global Brokerage, Inc. by Holdings are not sufficient to permit Global Brokerage, Inc. to make payments under the tax receivable agreement after it has paid taxes. The payments under the tax receivable agreement are not conditioned upon our pre-IPO owners' continued ownership of us.

### *In certain cases, payments under the tax receivable agreement may be accelerated and/or significantly exceed the actual benefits Global Brokerage, Inc. realizes in respect of the tax attributes subject to the tax receivable agreement.*

The tax receivable agreement provides that upon certain mergers, asset sales, other forms of business combinations or other changes of control, or if, at any time, Global Brokerage, Inc. elects an early termination of the tax receivable agreement, Global Brokerage, Inc.'s (or its successor's) obligations with respect to exchanged or acquired Holdings Units (whether exchanged or acquired before or after such transaction) would be based on certain assumptions, including that Global Brokerage, Inc. would have sufficient taxable income to fully utilize the deductions arising from the increased tax deductions and tax basis and other benefits related to entering into the tax receivable agreement. As a result, (1) Global Brokerage, Inc. could be required to make payments under the tax receivable agreement that are greater than or less than the specified percentage of the actual benefits Global Brokerage, Inc. realizes in respect of the tax attributes subject to the tax receivable agreement and (2) if Global Brokerage, Inc. elects to terminate the tax receivable agreement early, Global Brokerage, Inc. would be required to make an immediate payment equal to the present value of the anticipated future tax benefits, which upfront payment may be made years in advance of the actual realization of such future benefits. Upon a subsequent actual exchange, any additional increase in tax deductions, tax basis and other benefits in excess of the amounts assumed at the change in control will also result in payments under the tax receivable agreement. In these situations, our obligations under the tax receivable agreement could have a substantial negative impact on our liquidity. There can be no assurance that we will be able

to finance our obligations under the tax receivable agreement. In addition, the present value of such anticipated future payments are discounted at a rate equal to LIBOR plus 100 basis points.

Payments under the tax receivable agreement will be based on the tax reporting positions that we determine. Although we are not aware of any issue that would cause the IRS to challenge a tax basis increase, Global Brokerage, Inc. will not be reimbursed for any payments previously made under the tax receivable agreement. As a result, in certain circumstances, payments could be made under the tax receivable agreement in excess of the benefits that Global Brokerage, Inc. actually realizes in respect of the increases in tax basis resulting from our purchases or exchanges of Holdings Units and certain other tax benefits related to our entering into the tax receivable agreement, including tax benefits attributable to payments under the tax receivable agreement.

***Anti-takeover provisions in our charter documents, Delaware law and our Amended and Restated Rights Agreement might discourage or delay acquisition attempts for us that you might consider favorable.***

Our certificate of incorporation and bylaws contain provisions that may make the acquisition of our company more difficult without the approval of our board of directors. Among other things, these provisions:

- authorize the issuance of undesignated preferred stock, the terms of which may be established and the shares of which may be issued without stockholder approval, and which may include super voting, special approval, dividend, or other rights or preferences superior to the rights of the holders of Class A common stock;

- prohibit stockholder action by written consent, which requires all stockholder actions to be taken at a meeting of our stockholders;

- provide that the board of directors is expressly authorized to make, alter, or repeal our bylaws and that our stockholders may only amend our bylaws with the approval of 80% or more of all of the outstanding shares of our capital stock entitled to vote; and

- establish advance notice requirements for nominations for elections to our board or for proposing matters that can be acted upon by stockholders at stockholder meetings.

Additionally, our stockholder rights plan, which was approved by the Company's Board of Directors to protect our NOLs (as defined below) during the effective period of the rights plan, could make it more difficult for a third party to acquire, or could discourage a third party from acquiring, Global Brokerage, Inc. or a large block of our Class A common stock. A third party that acquires 4.9% or more of our Class A common stock could suffer substantial dilution of its ownership interest under the terms of the rights plan through the issuance of common stock or common stock equivalents to all stockholders other than the acquiring person.

These anti-takeover provisions and other provisions under Delaware law could discourage, delay or prevent a transaction involving a change in control of our company, including actions that our stockholders may deem advantageous, or negatively affect the trading price of our Class A common stock. These provisions could also discourage proxy contests and make it more difficult for you and other stockholders to elect directors of your choosing and to cause us to take other corporate actions you desire.

***Our ability to use net operating loss carryforwards to offset future taxable income for U.S. federal income tax purposes may be limited.***

We have a federal net operating loss ("NOL") of $258.7 million as of December 31, 2016. These NOL carryforwards (expiring in 2032 through 2036) are available to offset future taxable income. The Company may recognize additional NOLs in the future.

Section 382 of the Internal Revenue Code of 1986, as amended (the "Code") imposes an annual limitation on the amount of taxable income that may be offset by a corporation's NOLs if the corporation experiences an "ownership change" as defined in Section 382 of the Code. An ownership change occurs when our "five-percent shareholders" (as defined in Section 382 of the Code) collectively increase their ownership in Global Brokerage, Inc. by more than 50 percentage points (by value) over a rolling three-year period. Additionally, various states have similar limitations on the use of state NOLs following an ownership change.

If an ownership change occurs, the amount of the taxable income for any post-change year that may be offset by a pre-change loss is subject to an annual limitation that is cumulative to the extent it is not all utilized in a year. This limitation is

derived by multiplying the fair market value of our Class A common stock as of the ownership change by the applicable federal long-term tax-exempt rate, which was 1.68% at December 31, 2016. To the extent that a company has a net unrealized built-in gain at the time of an ownership change, which is realized or deemed recognized during the five-year period following the ownership change, there is an increase in the annual limitation for each of the first five-years that is cumulative to the extent it is not all utilized in a year.

We have an ongoing study of the rolling three-year testing periods. Based upon the elections we have made and the information that has been filed with the Securities and Exchange Commission through March 15, 2017, we have not had a Section 382 ownership change through March 15, 2017.

If an ownership change should occur in the future, our ability to use the NOL to offset future taxable income will be subject to an annual limitation and will depend on the amount of taxable income generated by Global Brokerage, Inc. in future periods. There is no assurance that we will be able to fully utilize the NOL and we could be required to record an additional valuation allowance related to the amount of the NOL that may not be realized, which could impact our result of operations.

We believe that these NOL carryforwards are a valuable asset for us. Consequently, we have a stockholder rights plan in place, which was approved by the Company's Board of Directors, to protect our NOLs during the effective period of the rights plan. Although the rights plan is intended to reduce the likelihood of an "ownership change" that could adversely affect us, there is no assurance that the restrictions on transferability in the rights plan will prevent all transfers that could result in such an "ownership change."

The foregoing provisions may adversely affect the marketability of our Class A common stock by discouraging potential investors from acquiring our stock. In addition, these provisions could delay or frustrate the removal of incumbent directors and could make more difficult a merger, tender offer or proxy contest involving us, or impede an attempt to acquire a significant or controlling interest in us, even if such events might be beneficial to us and our stockholders.

**Risks Related to our Class A Common Stock**

***The market price of our Class A common stock may decline due to the large number of shares of Class A common stock eligible for exchange and future sale.***

The market price of shares of our Class A common stock could decline as a result of sales of a large number of shares of Class A common stock in the market or the perception that such sales could occur. These sales, or the possibility that these sales may occur, also might make it more difficult for us to sell shares of Class A common stock in the future at a time and at a price that we deem appropriate.

In addition, we and our pre-IPO owners entered into an exchange agreement under which they (or certain permitted transferees thereof) have the right, from and after the first anniversary of the date of the closing of the IPO (subject to the terms of the exchange agreement), to exchange their Holdings Units for shares of our Class A common stock on a one-for-one basis, subject to customary conversion rate adjustments. The market price of shares of our Class A common stock could decline as a result of the exchange or the perception that an exchange could occur. These exchanges, or the possibility that these exchanges may occur, also might make it more difficult for holders of our Class A common stock to sell such stock in the future at a time and at a price that they deem appropriate.

***If securities or industry analysts stop publishing research or reports about our business, or if they downgrade their recommendations regarding our Class A common stock, our stock price and trading volume could decline.***

The trading market for our Class A common stock is influenced by the research and reports that industry or securities analysts publish about us or our business. Some of the analysts who previously covered our company have discontinued coverage, and some have downgraded their recommendation of our company. If any of the analysts who continue to cover or resume covering us in the future downgrades our Class A common stock or publishes inaccurate or unfavorable research about our business, our Class A common stock price may decline. If additional analysts cease coverage of us or fail to regularly publish reports on us, we could lose visibility in the financial markets, which in turn could cause our Class A common stock price or trading volume to decline and our Class A common stock to be less liquid.

*The market price of shares of our Class A common stock may be volatile, which could cause the value of your investment to decline.*

The market price of our Class A common stock may be highly volatile and could be subject to wide fluctuations. Securities markets worldwide experience significant price and volume fluctuations. This market volatility, as well as general economic, market or political conditions, could reduce the market price of shares of our Class A common stock in spite of our operating performance. In addition, our operating results could be below the expectations of public market analysts and investors due to a number of potential factors, including variations in our quarterly operating results, additions or departures of key management personnel, failure to meet analysts' earnings estimates, publication of research reports about our industry, litigation and government investigations, changes or proposed changes in laws or regulations or differing interpretations or enforcement thereof affecting our business, adverse market reaction to any indebtedness we may incur or securities we may issue in the future, changes in market valuations of similar companies or speculation in the press or investment community, announcements by our competitors of significant contracts, acquisitions, dispositions, strategic partnerships, joint ventures or capital commitments, adverse publicity about the industries we participate in or individual scandals, and in response the market price of shares of our Class A common stock could decrease significantly. You may be unable to resell your shares of Class A common stock at or above the price you originally paid.

In the past few years, stock markets have experienced extreme price and volume fluctuations. In the past, following periods of volatility in the overall market and the market price of a company's securities, securities class action litigation has often been instituted against public companies. This litigation, if instituted against us, could result in substantial costs and a diversion of our management's attention and resources.

*You may be diluted by the future issuance of additional Class A common stock in connection with our incentive plans, acquisitions or otherwise.*

As of December 31, 2016, we had an aggregate of more than 2.99 billion shares of Class A common stock authorized but unissued, including approximately 2.1 million shares of Class A common stock issuable upon exchange of Holdings Units. Our certificate of incorporation authorizes us to issue these shares of Class A common stock and options, rights, warrants and appreciation rights relating to Class A common stock for the consideration and on the terms and conditions established by our board of directors in its sole discretion, whether in connection with acquisitions or otherwise. We have reserved 1,529,500 shares for issuance under our Amended and Restated 2010 Long-Term Incentive Plan, including, as of December 31, 2016, 711,447 shares issuable upon the exercise of stock options and 8,948 shares issuable upon the vesting of restricted stock units that we have granted to our officers, employees, independent contractors, outside directors and other. See "Item 11. Executive Compensation." Any Class A common stock that we issue, including under our Amended and Restated 2010 Long Term Incentive Plan or other equity incentive plans that we may adopt in the future, would dilute the percentage ownership held by the investors.

### Item 1B. Unresolved Staff Comments

None.

### Item 2. Properties

Our company headquarters is located at 55 Water Street, 50th Floor, New York, NY 10041, with other U.S. offices in Plano, TX, Chicago, IL and San Francisco, CA. Outside the U.S., we have offices in London, Paris, Berlin, Milan, Athens, Bulgaria, Hong Kong, Sydney, Melbourne, Tokyo, and multiple offices in China. We lease each of these facilities and do not own any real property. We believe we have adequate office space or will be able to find additional space on reasonable commercial terms to meet our projected growth rates.

### Item 3. Legal Proceedings

In the ordinary course of business, we and certain of our officers, directors and employees may from time to time be involved in litigation and claims incidental to the conduct of our businesses, including intellectual property claims. In addition, our business is also subject to extensive regulation, which may result in administrative claims, investigations and regulatory proceedings against us. We have been named in various arbitration and civil litigation cases brought by customers seeking damages for trading losses. Management has investigated these matters and believes that such cases are without merit and is defending them vigorously. However, the arbitrations and litigations are presently in various stages of the judicial process and no judgment can be made regarding the ultimate outcome of the arbitrators' and/or court's decisions.

In January 2014, the equity receiver for a former client of US, Revelation ForexFund ("Revelation"), its principal, Kevin G. White, and related entities RFF GP, LLC and KGM Capital Management, LLC, filed suit against US, and certain unrelated defendants, in Texas state court. The suit alleges that US is liable for damages in excess of $3.8 million, plus exemplary damages, interest, and attorneys' fees in connection with a Ponzi scheme run by Mr. White through his companies. In June 2015, that same equity receiver filed a complaint against US seeking $2.0 million, plus interest, and attorneys' fees, based on allegations that the amount in controversy represents the net fraudulent transfers from Revelation to US under New York law. In September 2015, the parties agreed to arbitration proceeding before the National Futures Association ("NFA") on these claims. In June 2016, the parties agreed to settle all related matters for $2.3 million.

In April 2014, the Securities and Futures Commission ("SFC") initiated an investigation relating to HK's past trade execution practices concerning the handling of price improvements in our trading system prior to August 2010. On October 19, 2016, the parties entered into a final settlement whereby HK voluntarily agreed to make full restitution to affected clients in the amount of $1.5 million and pay a fine of $0.5 million. We paid the $2.0 million settlement in November 2016.

On January 15, 2015, as a result of the unprecedented volatility in the EUR/CHF currency pair after the SNB discontinued its currency floor of 1.2 CHF per EUR, US suffered a temporary breach of certain regulatory capital requirements. On August 18, 2016, the Commodity Futures Trading Commission ("CFTC") filed a complaint, *U.S. Commodity Futures Trading Commission v. Forex Capital Markets, LLC*, in the U.S. District Court for the Southern District of New York, alleging that US was undercapitalized following the SNB's decision to remove the currency peg, that US failed to notify the CFTC of its undercapitalization, and that US guaranteed customer losses. On December 8, 2016, the CFTC filed an amended complaint. On or about February 13, 2017, US settled with the CFTC without admitting or denying any of the allegations, and pursuant to a consent order entered by the court, agreed to pay a civil monetary penalty in the amount of $0.7 million to the CFTC (see Note 28, "Subsequent Events" in the Notes to Consolidated Financial Statements in "Item 8. Financial Statements and Supplementary Data" for more information).

In connection with an earlier settlement between FSL and the Financial Conduct Authority regarding trade execution practices for the period 2006 to 2010, in February 2015, FSL paid an additional $0.7 million in restitution to affected clients.

On May 8, 2015, the International Union of Operating Engineers Local No. 478 Pension Fund filed a complaint against the Company, its former Chief Executive Officer and its Chief Financial Officer in the United States District Court for the Southern District of New York, individually and on behalf of all purchasers of the Company's common stock between June 11, 2013 and January 20, 2015. The complaint alleges that the defendants violated certain provisions of the federal securities laws and seeks compensatory damages as well as reasonable costs and expenses. An amended and consolidated complaint was filed on January 11, 2016. The Company filed a motion to dismiss the consolidated complaint on February 25, 2016 which was granted by the Court on August 18, 2016. On October 7, 2016, the District Court entered an order of final judgment closing the case. On November 3, 2016, plaintiffs filed a notice of appeal in the U.S. Court of Appeals for the Second Circuit to challenge the district court's order and final judgment that dismissed the case with prejudice. The appeal is currently pending.

In September 2015, US settled a complaint brought by the CFTC alleging that US failed to supervise an account determined to have been involved in wrongdoing and inadvertently omitted certain documents from its responses to document request. Under the terms of the settlement, US agreed, without admitting or denying any of the allegations, to pay a fine of $0.7 million to the CFTC and disgorge commissions and fees of $0.1 million.

On December 15, 2015, Brett Kandell, individually and on behalf of nominal defendant, Global Brokerage, Inc., filed a shareholder derivative complaint against the members of Global Brokerage's board of directors (the "Board") in the Delaware Court of Chancery. The case is captioned *Brett Kandell v. Dror Niv et al.*, C.A. No. 11812-VCG. On March 4, 2016, plaintiff filed an amended shareholder derivative complaint, which alleges claims for breach of fiduciary duty, contribution and indemnification, waste of corporate assets, abuse of control and unjust enrichment and seeks compensatory damages, rescission of certain agreements as well as reasonable costs and expenses. A second amended shareholder derivative complaint was filed on May 31, 2016 and the Board filed a motion to dismiss on July 15, 2016. Subsequently, plaintiff filed a third amended shareholder derivative complaint on September 1, 2016 and the Board filed a motion to dismiss on October 17, 2016. The court has not yet ruled on the motion to dismiss.

On February 6, 2017, US, Holdings, Dror Niv and William Ahdout entered into a settlement with the CFTC, and US, Messrs. Niv, Ahdout and Ornit Niv entered into a settlement with the NFA. During the relevant times, Mr. Niv was the Company's CEO, a member of Holdings, and/or the CEO of US; Mr. Ahdout was a member of Holdings and a Managing Director of US; and Ms. Niv was the CEO of US. Both settlements concerned allegations that aspects of US's relationship with one of its liquidity providers had not been disclosed to customers and regulators. The NFA settlement included additional,

38

unrelated allegations of violations of certain NFA Rules and Requirements. The Company's subsidiaries are cooperating with regulatory authorities outside the U.S. in relation to their requests for information arising from the settlements announced on February 6, 2017.

Under the settlement with the CFTC, the named entities and individuals were required, jointly and severally, to pay a civil monetary penalty of $7.0 million, agreed to withdraw from CFTC registration and agreed not to apply for or claim exemption from CFTC registration in the future. Under the settlement with the NFA, no monetary fine was imposed and the named individuals and entities agreed to withdraw from NFA membership and not to reapply for membership in the future. The named entities and individuals did not admit or deny the allegations associated with the settlements. The Company will be withdrawing from business in the U.S. and, on February 7, 2017, agreed to sell all of its U.S.-domiciled customer accounts to Gain Capital Group, LLC (see Note 28, "Subsequent Events" in the Notes to Consolidated Financial Statements in "Item 8. Financial Statements and Supplementary Data" for more information).

In response to Global Brokerage's announcement on February 6, 2017 regarding settlements with the NFA and the CFTC, three new putative securities class action lawsuits have been filed against Global Brokerage, Inc., Dror Niv, and Robert Lande in the U.S. District Court for the Southern District of New York. These putative securities class actions are captioned: (1) *Khoury v. FXCM Inc.*, Case No. 1:17-cv-916; (2) *Zhao v. FXCM Inc.*, Case No. 1:17-cv-955; and (3) *Blinn v. FXCM Inc.*, Case No. 1:17-cv-1028. The complaints in these three actions allege that the defendants violated certain provisions of the federal securities laws and seek compensatory damages as well as reasonable costs and expenses. The Company intends to vigorously defend against the claims asserted in these actions.

For the outstanding matters referenced above, including ordinary course of business litigation and claims referenced in the first paragraph hereto, for which a loss is more than remote but less than likely, whether in excess of an accrued liability or where there is no accrued liability, we have estimated a range of possible loss. Management believes the estimate of the aggregate range of possible loss in excess of accrued liabilities for such matters is between nil and $1.6 million as of December 31, 2016.

In view of the inherent difficulty of predicting the outcome of litigation and claims, we cannot predict what the eventual outcome of the pending matters will be, what the timing of the ultimate resolution of these matters will be, or what the eventual loss related to each pending matter may be. Furthermore, the above-referenced matters represented in the estimated aggregate range of possible loss will change from time to time and actual results may vary significantly from the current estimate. An adverse outcome in one or more of these matters could be material to our results of operations or cash flows for any particular reporting period.

**Item 4. Mine Safety Disclosure**

Not applicable.

**PART II**

**Item 5. Market for Registrant's Common Equity, Related Stockholder Matters and Issuer Purchases of Equity Securities**

**Market Information**

Our Class A common stock traded on the New York Stock Exchange ("NYSE") under the symbol "FXCM" until we voluntarily delisted from the NYSE on September 23, 2016. Effective September 26, 2016, our Class A common stock began trading on the NASDAQ Global Market of The NASDAQ Stock Market LLC ("NASDAQ") under the symbol "FXCM." On February 24, 2017, we changed our name to Global Brokerage, Inc. Our Class A common stock began trading on the NASDAQ under the symbol "GLBR" effective February 27, 2017.

The following tables set forth, for the previous two fiscal years, the high and low sales prices per share of our Class A common stock as reported by the NYSE and the NASDAQ, as applicable (adjusted for the impact of the one-for-ten reverse stock split effective on October 1, 2015).

| Fiscal 2016 | | Low | | High |
|---|---|---|---|---|
| First Quarter | $ | 9.46 | $ | 18.51 |
| Second Quarter | $ | 7.60 | $ | 12.90 |
| Third Quarter | $ | 7.87 | $ | 11.00 |
| Fourth Quarter | $ | 7.00 | $ | 9.80 |

| Fiscal 2015 | | Low | | High |
|---|---|---|---|---|
| First Quarter | $ | 12.80 | $ | 172.50 |
| Second Quarter | $ | 12.20 | $ | 23.10 |
| Third Quarter | $ | 7.40 | $ | 15.40 |
| Fourth Quarter | $ | 5.26 | $ | 24.77 |

Our Class B common stock is not publicly traded.

**Holders of Record**

On March 15, 2017, there were 25 holders of record of our Class A common stock and 8 holders of our Class B common stock. The number of record holders does not include persons who held our Class A common stock in nominee or "street name" accounts through brokers.

**Dividends**

During the years ended December 31, 2016 and 2015, we did not declare or pay any cash dividends on our Class A common stock. As a result of customer losses on January 15, 2015 and the subsequent financing arrangement we made with Leucadia, we do not expect to declare and pay dividends in the foreseeable future. The declaration, amount and payment of any future dividends on shares of our Class A common stock will be at the sole discretion of our board of directors. When determining whether to declare a dividend in the future, in addition to the financing arrangement with Leucadia, our board of directors may take into account general and economic conditions, our financial condition and operating results, our available cash and current and anticipated cash needs, capital requirements, contractual, legal, tax and regulatory restrictions and implications on the payment of dividends by us to our stockholders or by our subsidiaries to us, and such other factors as our board of directors may deem relevant. In addition, Holdings is generally prohibited under Delaware law from making a distribution to a member to the extent that, at the time of the distribution, after giving effect to the distribution, liabilities of Holdings (with certain exceptions) exceed the fair value of its assets. Subsidiaries of Holdings are generally subject to similar legal limitations on their ability to make distributions to Holdings. In addition, our regulated subsidiaries are subject to regulatory capital requirements that limit the distributions that may be made by those subsidiaries.

**Purchases of Equity Securities by the Issuer**

From time to time, in connection with the vesting of stock-based compensation awards, we have received shares of our Class A common stock in consideration of the tax withholdings due upon the vesting of stock-based compensation awards.

The following table sets forth the shares of Class A common stock repurchased by us during the quarter ended December 31, 2016:

**Issuer Repurchases of Equity Securities**

| Period | Total Number of Shares Purchased | Average Price Paid per Share | Total Number of Shares Purchased as Part of Publicly Announced Plans or Programs | Approximate Dollar Value of Shares that May Yet Be Purchased Under the Plans or Programs |
|---|---|---|---|---|
| Month 10: October 1, 2016 to October 31, 2016 | — | — | n/a | n/a |
| Month 11: November 1, 2016 to November 30, 2016 | — | — | n/a | n/a |
| Month 12: December 1, 2016 to December 31, 2016 | — | — | n/a | n/a |
| Total | — | — | n/a | |

Our Board of Directors previously approved the repurchase of $80.0 million of Global Brokerage, Inc.'s Class A common stock (the "Stock Repurchase Program"). In November 2014, our Board of Directors approved a $50.0 million incremental increase in the Stock Repurchase Program for an aggregate of $130.0 million. Since inception of the Stock Repurchase Program in May 2011 we repurchased a total of 5.1 million pre-reverse split shares of our Class A common stock under these authorizations. In November 2016, our Board of Directors canceled the Stock Repurchase Program.

**Item 6. Selected Financial Data**

We are not required to provide selected financial data disclosures because we are a smaller reporting company.

42

**Item 7. Management's Discussion and Analysis of Financial Condition and Results of Operations**

*The following discussion should be read in conjunction with our audited consolidated financial statements and the related notes included in Item 8. Financial Statements and Supplementary Data. This discussion contains forward-looking statements that are subject to known and unknown risks and uncertainties. Actual results and the timing of events may differ significantly from such forward-looking statements due to a number of factors, including those set forth in Item 1A. Risk Factors.*

**OVERVIEW**

*Executive Summary*

In February 2017 we changed our name from "FXCM Inc." to "Global Brokerage, Inc." ("Global Brokerage"). Concurrent with this change, the name of "FXCM Holdings, LLC" has been changed to "Global Brokerage Holdings, LLC" ("Holdings").

Since January 15 and 16, 2015 (discussed below), we have focused on reestablishing the strong competitive position we had prior to that date. Our efforts thus far have yielded significant results:

- We successfully restored our operations. Revenue per million is up 25% for the year ended December 31, 2016 compared to the year ended December 31, 2015, reflecting a higher proportion of revenue from dealing desk execution and higher CFD revenue per million.

- We sold DailyFX, our news and research website, to IG Group, a global leader in online trading, for a purchase price of $40.0 million. The transaction closed on October 28, 2016. Proceeds of $36.0 million were received at closing, which were used to pay down the term loan. The remaining proceeds will be similarly applied to the term loan, net of any closing costs. (See Note 4, "Dispositions" in the Notes to Consolidated Financial Statements in "Item 8. Financial Statements and Supplementary Data" for more information).

- During 2015, we completed the sales of FXCM Japan Securities Co., Ltd. ("FXCMJ"), the operations of Faros Trading LLC ("Faros"), FXCM Asia Limited ("HK") and the equity trading business of FXCM Securities Limited ("FSL") for a combined purchase price of $102.3 million.

- On September 1, 2016 we completed the restructuring of the financing arrangements with Leucadia (the "Restructuring Transaction"). As further described below under "Events of January 15 and 16, 2015," we entered into agreements to amend the terms of the Credit Agreement and replaced the Letter Agreement with a new Limited Liability Company Agreement of FXCM Group, LLC. The Restructuring Transaction deepens the partnership with Leucadia and provides Leucadia with a 49.9% membership interest in our operating entity, FXCM Group, LLC.

- We took certain steps to limit risk during and immediately after the historic Brexit vote in June 2016, including gradually raising margins and limiting exposure. These steps helped to ensure that our trading platform operated normally throughout the Brexit-related market volatility.

- On September 26, 2016, we transferred our stock exchange listing to the NASDAQ Global Market, which provides better alignment with our business.

- On October 3, 2016 we entered into an Equity Distribution Agreement to issue and sell up to $15.0 million of our Class A common stock, to be used to reduce our outstanding indebtedness and for other general corporate purposes. (See Note 16, "Stockholders' Equity" in the Notes to Consolidated Financial Statements in "Item 8. Financial Statements and Supplementary Data" for more information).

- On February 7, 2017 we entered into an Asset Purchase Agreement (the "Asset Purchase Agreement") with Gain Capital Group, LLC ("Gain") to sell substantially all of our U.S.-domiciled customer accounts to Gain. Under the terms of the Asset Purchase Agreement, Gain will pay proceeds to us on a per account basis for each acquired account that opens at least one new trade during the first 153 calendar days following the closing date. The transaction closed on February 24, 2017. Proceeds will be used to pay down the Leucadia term loan. (See

43

Note 28, "Subsequent Events" in the Notes to Consolidated Financial Statements in "Item 8. Financial Statements and Supplementary Data" for more information).

- We have withdrawn from FX trading activities in the U.S. and terminated our registration as a futures commission merchant and retail foreign exchange dealer (see Note 28, "Subsequent Events" in the Notes to Consolidated Financial Statements in "Item 8. Financial Statements and Supplementary Data" for more information). As a result of the release of regulatory capital in the U.S. entity, we repaid $30.0 million in principal on the Leucadia term loan in March 2017.

- In connection with the withdrawal from business in the U.S. we are implementing a restructuring plan that includes the termination of approximately 150 employees, which represents approximately 19% of our global workforce, and other cost savings measures which are expected to improve profitability.

Our near-term focus:

- Target significant reduction in the Leucadia debt through the sale of the U.S. accounts and other non-core asset sales and cash generated through operations. We have identified our investments in FastMatch, Inc. ("FastMatch"), Lucid Markets Trading Limited ("Lucid") and V3 Markets, LLC ("V3") as non-core and are in active sales processes for all of these assets.

- Accelerate the growth of core business through a number of FX and CFD initiatives.

On the latter objective, we have implemented the following:

- Further expand the dealing desk model for small retail FX customers who are less interested in an agency FX offering, which has had a favorable effect on our revenue per million.

- We recently implemented a number of new features and tools to enhance our customers' trading experience:

  ◦ Introduced historical Forex Price Data allowing clients to back test trading strategies.

  ◦ Launched a new Forex Market Depth Indicator on the Trading Station platform providing insights to levels of liquidity and depth for frequently traded currency pairs.

  ◦ Added features to the Trading Station platform for margin monitoring, simulations and search functionality.

  ◦ Enhanced our Application Program Interface ("API") technology services for algorithmic and institutional traders.

## Industry Environment

*Economic Environment* — Our revenue and profitability are influenced by volatility which is directly impacted by economic conditions. FX volatility in the year ended December 31, 2016 increased when compared to the year ended December 31, 2015. The daily JPMorgan Global FX Volatility Index was up 5.7% on average in 2016 compared with 2015. In general, in periods of elevated volatility customer trading volumes tend to increase. However, significant swings in market volatility can also result in increased customer trading losses, higher turnover and reduced trading volume. It is difficult to predict volatility and its effects on the FX market.

*Competitive Environment* — The retail FX trading market is highly competitive. Our competitors in the retail market can be grouped into several broad categories based on size, business model, product offerings, target customers and geographic scope of operations. These include retail FX brokers, international multi-product trading firms, other online trading firms, and international banks and other financial institutions with significant FX operations. We expect competition to remain strong for the foreseeable future.

*Regulatory Environment* — Our business and industry are highly regulated. Our operating subsidiaries are regulated in a number of jurisdictions, including the U.K. (where regulatory passport rights have been exercised to operate in a number of European Economic Area jurisdictions) and Australia. We are evaluating the impact of the Brexit vote and how it has structured the servicing of our European operations.

*Events of January 15 and 16, 2015*

On January 16, 2015, we reached a financing agreement with Leucadia National Corporation ("Leucadia") that permitted our regulated subsidiaries to meet their regulatory capital requirements and continue normal operations after significant losses were incurred due to unprecedented volatility in the EUR/CHF currency pair after the Swiss National Bank ("SNB") discontinued its currency floor of 1.2 CHF per Euro. Specifically, as a result of customer debit balances following the historic movement of the Swiss Franc on January 15, 2015, regulators required our regulated entities to supplement their respective net capital on an expedited basis (see Note 19, "Leucadia Transaction" in the Notes to Consolidated Financial Statements in "Item 8. Financial Statements and Supplementary Data" for more information).

At the time of the SNB announcement, affected clients held over $2 billion in open positions on EUR/CHF, of which we sent over $1 billion for execution. Those same clients held approximately $80.0 million of collateral in their accounts. This SNB action wiped out the account equity of those clients as well as generated debit balances owed to us of $275.1 million. The caveat of our no dealing desk ("NDD") execution system is that traders are off-set one-for-one with a liquidity provider. When a client entered a EUR/CHF trade with us, we had an identical trade with our liquidity providers. During the historic move, liquidity became extremely scarce and shallow, which affected execution prices. This liquidity issue resulted in some clients having a negative balance. While clients could not cover their margin call with us, we still had to cover the same margin call with our liquidity providers. When a client profits in the trade, we give the profits to the customer, however, when the client's loss exceeds its margin, we are required to pay the liquidity provider regardless of whether we collect the loss from the customer.

As a regulated entity, we are required to notify our regulators in a timely manner when any event occurs that adversely impacts clients. When we notified regulators, they required our regulated entities to supplement their respective net capital on an expedited basis. We explored multiple debt and equity financing alternatives in an effort to meet the regulators' deadline. The deal with Leucadia was the only financing that we were able to arrange in the very short timeframe we were given by the regulators, and represented the best opportunity for us to continue doing business.

On January 16, 2015, we entered into a credit agreement (as subsequently amended, the "Credit Agreement") with Leucadia, as administrative agent and lender. In connection with the Leucadia Credit Agreement, we also entered into an agreement (as subsequently amended, the "Letter Agreement") with Leucadia that set the terms and conditions upon which we will pay in cash to Leucadia and its assignees a percentage of the proceeds received in connection with certain transactions. In connection with these financing transactions, Holdings formed FXCM Newco, LLC ("Newco") and contributed all of the equity interests owned by Holdings in its subsidiaries to Newco. The Credit Agreement and Letter Agreement were subsequently amended on January 24, 2015. The amendments finalized certain terms of the Credit Agreement and Letter Agreement and the terms of the amended agreements were not substantially different from the initial agreements.

*Restructuring of the Leucadia Financing*

On September 1, 2016 we completed the restructuring of the financing arrangements with Leucadia, which was originally announced in March 2016. Key elements of the restructuring include:

Credit Agreement

- The maturity date of the Credit Agreement was extended one year to January 16, 2018 to allow us more time to optimize asset sales.

- We have the ability to defer any three of the remaining interest payments, permitting us flexibility to invest and grow our core business.

- On February 22, 2017, Group, Holdings and Leucadia entered into a Second Amendment to the Credit Agreement pursuant to which the aggregate principal outstanding balance of the Credit Agreement was increased by $3.5 million in consideration of Leucadia's waiver of certain sections of the Credit Agreement regarding restricted payments and distributions.

Letter Agreement

- The Letter Agreement was terminated and the material terms are now reflected in the Amended and Restated Limited Liability Company Agreement of FXCM Group, LLC (the "Group Agreement").

Group Agreement

- The Group Agreement replaces the existing FXCM Newco, LLC agreement; and FXCM Newco, LLC has been renamed FXCM Group, LLC ("Group").

- Leucadia acquired a 49.9% non-controlling interest in Group.

- The Group Agreement provides that Group will be governed by a six-member board, with three directors each appointed by Global Brokerage and Leucadia.

- We and Leucadia share the right to request a sale process after January 16, 2018, subject to both of us reasonably accepting the highest reasonable sales price.

Management Agreement

- Group and Holdings entered into a Management Agreement (the "Management Agreement") pursuant to which Holdings will manage the assets and day-to-day operations of Group and its subsidiaries.

- On February 2, 2017, the Management Agreement was amended to provide that the Management Agreement may be terminated by a vote of at least three members of the Group Board after the occurrence of certain events including a change of control.

Management Incentive Plan

- Group adopted the 2016 Incentive Bonus Plan for Founders and Executives (the "Management Incentive Plan"), in order to retain and incentivize senior management to maximize cash flow generation and grow the business.

- The Management Incentive Plan is a long-term plan with five-year vesting.

- Distributions under the plan are only made after the principal and interest under the Credit Agreement have been repaid.

- Distributions will range from 10% to 14% of distributions made by Group.

- If a participant terminates employment, they will receive either a non-voting membership in Group entitling them to the same share of distributions that they would have received, or a lump-sum cash payment, at our discretion.

- On February 2, 2017, Group and Leucadia entered into an Acknowledgment whereby Leucadia may terminate the Management Incentive Plan at any time for any reason in its sole discretion.

For additional information, see Note 19, "Leucadia Transaction" in the Notes to Consolidated Financial Statements in "Item 8. Financial Statements and Supplementary Data."

*Cybersecurity Incident*

In October 2015, we reported that we were the victim of a criminal cybersecurity incident involving unauthorized access to customer information. We immediately launched a full investigation, working with a leading cybersecurity firm, and that investigation has been concluded. Based on the investigation, we identified a small number of unauthorized wire transfers from customer accounts; however, all funds have been returned to the appropriate accounts and the customers have been contacted. We did not find any evidence of an ongoing intrusion into our network or that additional customer information had been stolen from our network as part of the cybersecurity incident. We also cooperated with an investigation by federal law enforcement.

We have incurred expenses subsequent to the cybersecurity incident to investigate and remediate this matter. These expenses are recognized in the periods in which they are incurred. Costs incurred related to investigative and other professional services, costs of communications with customers and remediation activities associated with the incident were $0.7 million for 2015. These costs were not material for 2016. We maintain insurance coverage for certain expenses of this nature, however, the coverage is subject to deductibles and may not be sufficient to entirely reduce the exposure to losses relating to this matter. During 2016, we recorded $0.2 million in insurance recoveries to reimburse for expenses incurred related to the cybersecurity incident.

### Primary Sources of Revenues

*Trading Revenue* — Trading revenue is our largest source of revenue and is primarily driven by: (i) the number of active FX accounts and the type of accounts - commission, spread or dealing desk; (ii) the volume these accounts trade, which is driven by the amount of customer equity and the overall volatility of the FX market; (iii) the amount of the commission or spread we receive, which varies by currency pair; (iv) the difference between the interest we receive from FX market makers and the interest paid to customers on open positions; (v) net gains/losses derived from our dealing desk; and (vi) revenues earned from CFD trading and fees earned through white label relationships.

*Other* — We are engaged in various ancillary FX related services and joint ventures, including use of our platform and trading facilities, providing technical expertise, and earning fees from data licensing.

### Primary Expenses

*Compensation and Benefits* — Compensation and benefits expense includes employee salaries, bonuses, stock compensation awards, benefits and employer taxes. Changes in this expense are driven by fluctuations in the number of employees, changes in the composition of our workforce, increases in wages as a result of inflation or labor market conditions, changes in rates for employer taxes and other cost increases affecting benefit plans. The expense associated with our bonus plans can also have a significant impact on this expense category and may vary from period to period. In the first quarter of 2015, we implemented a bonus plan aimed at retaining key employees following the significant decline in our stock price after the events of January 15, 2015.

At the time of our IPO and thereafter, we have periodically granted awards of stock options to purchase shares of our Class A common stock pursuant to the Amended and Restated Long-Term Incentive Plan (the "LTIP") to certain employees and independent directors. For the years ended December 31, 2016 and 2015, we recorded stock-based compensation expense related to stock options of $1.2 million and $1.9 million, respectively. The LTIP also provides for other stock based awards ("Other Equity Awards") that may be granted by our Executive Compensation Committee. In December 2014, we granted Restricted Stock Units ("RSUs") to employees. For the years ended December 31, 2016 and 2015, we recorded stock-based compensation expense related to RSUs of $0.7 million and $0.8 million, respectively. We did not incur any expense for Other Equity Awards for the years ended December 31, 2016 and 2015.

*Referring Broker Fees* — Referring broker fees consist primarily of compensation paid to our brokers and white labels. We generally provide white labels access to our platform systems and back-office services necessary for them to offer FX trading services to their customers. We also establish relationships with referring brokers that identify and direct potential FX trading customers to our platform. Referring brokers and white labels generally incur advertising, marketing and other expenses associated with attracting the customers they direct to our platform. Accordingly, we do not incur any incremental sales or marketing expense in connection with trading revenue generated by customers provided through our referring brokers and/or white labels. We do, however, pay a portion of the FX trading revenue generated by the customers of our referring brokers and/or white labels and record this expense as Referring broker fees.

*Advertising and Marketing* — Advertising and marketing expense consists primarily of electronic media, print and other advertising costs, as well as costs associated with our brand campaign and product promotion.

*Communications and Technology* — Communications and technology expense consists primarily of costs for network connections to our electronic trading platforms, telecommunications costs, and fees paid for access to external market data. This expense is affected primarily by the growth of electronic trading, our network/platform capacity requirements and by changes in the number of telecommunication hubs and connections which provide our customers with direct access to our electronic trading platforms.

*Trading Costs, Prime Brokerage and Clearing Fees* — Trading costs, prime brokerage and clearing fees primarily represent fees paid to third party clearing banks and prime brokers for clearing foreign exchange spot futures currency and

contract transactions, transaction fees paid to exchanges, equity options brokerage activity fees, and fees paid to third party providers for use of their platform for our market making business. Clearing fees primarily fluctuate based on changes in volume, rate of clearing fees charged by clearing banks and rate of fees paid to exchanges.

*General and Administrative* — We incur general and administrative costs to support our operations, including:

- *Professional fees and outside services expenses* — consisting primarily of legal, accounting and outsourcing fees;

- *Bank processing fees* — consisting of service fees charged by banks primarily related to our customer deposits and withdrawals;

- *Regulatory fees* — consisting primarily of fees from regulators overseeing our businesses which are largely tied to our overall trading revenues. Regulatory fees also includes fines and restitution imposed by regulators from time to time;

- *Occupancy and building operations expense* — consisting primarily of costs related to leased property including rent, maintenance, real estate taxes, utilities and other related costs; and

- *Other* — consisting primarily of a provision for forgiveness of a notes receivable and other miscellaneous client debit balances

*Bad Debt Expense* — As a result of the events of January 15, 2015, we experienced losses from client debit balances. The charge for these losses, net of recoveries, is included in Bad debt expense. We do not expect any further recoveries.

*Depreciation and Amortization* — Depreciation and amortization expense results primarily from the depreciation of long-lived assets purchased and internally-developed software that has been capitalized.

Amortization of purchased intangibles primarily includes amortization of intangible assets obtained through our various acquisitions. In addition, amortization of intangibles includes impairment charges resulting from impairment assessments.

*Goodwill Impairment Loss* — Goodwill impairment loss represents the charge from the reduction of goodwill resulting from impairment assessments.

*Gain (loss) on Derivative Liabilities — Letter and Credit Agreements* — We allocated the net proceeds from the Leucadia financing in 2015 of $279.0 million between the Credit Agreement and the Letter Agreement based on their relative fair values. The estimated fair values of the Letter Agreement and the Credit Agreement were determined using an option pricing model based on significant inputs such as volatility and assumptions on public market pricing inputs. We considered applicable accounting guidance and concluded that several features of the Letter and Credit Agreements require bifurcation as embedded derivatives and should be accounted for as derivative liabilities. The fair value of the Letter Agreement's embedded derivatives that were required to be bifurcated totaled $124.8 million at the inception of the loan, which was in excess of the amount of proceeds initially allocated to the Letter Agreement, resulting in a charge to earnings of $30.4 million for the three months ended March 31, 2015. On September 1, 2016, the Letter Agreement was terminated and its material terms are now reflected in the Group LLC Agreement. The derivative liability related to the Letter Agreement was derecognized and Leucadia's 49.9% non-controlling interest was recorded as a redeemable non-controlling interest in Group at $49.3 million, which represented the amount that Leucadia would have received assuming Group were liquidated at its recorded amount and the cash distributed according to the Revised Waterfall at that date. The change in the fair value of the Letter Agreement ($213.0 million gain for the year ended December 31, 2016) is recorded in Gain (loss) on derivative liabilities — Letter & Credit Agreements in the consolidated statements of operations. (See Note 19, "Leucadia Transaction" in the Notes to Consolidated Financial Statements in "Item 8. Financial Statements and Supplementary Data" for further information.)

The Credit Agreement contains mandatory prepayment provisions that may be triggered by events or circumstances that are not considered clearly and closely related to the Credit Agreement, such as asset sales, and, as such, represent embedded derivatives. The embedded derivatives are bifurcated from the Credit Agreement and accounted for separately as a derivative liability. As of December 31, 2016, the fair value of the derivative liability resulting from the mandatory prepayment provisions of the Credit Agreement was estimated at $6.2 million, and is included in Credit Agreement on the consolidated statements of financial position. The change in the fair value of the derivative liability associated with the mandatory prepayment provisions (loss of $6.2 million for the year ended December 31, 2016) is recorded in Gain (loss) on derivative liabilities — Letter & Credit Agreement in the consolidated statements of operations. (See Note 19, "Leucadia Transaction" in the Notes to Consolidated Financial Statements in "Item 8. Financial Statements and Supplementary Data" for further information.)

*Interest on Borrowings* — Interest on borrowings consists of interest expense, deferred interest and amortization of financing and issuance costs related to the Leucadia Credit Agreement, the Convertible Notes and borrowings under the Revolving Credit Agreement. On January 20, 2015, the Revolving Credit Agreement was terminated (See Note 20, "Debt" in the Notes to Consolidated Financial Statements in "Item 8. Financial Statements and Supplementary Data" for more information).

*Income Taxes* — Holdings operates in the U.S. as a limited liability company that is treated as a partnership for U.S. federal, state and local income tax purposes. Since January 2015, all of Holdings' operations are held by Group (formerly Newco), a limited liability company that is also treated as a partnership between Holdings and Leucadia for U.S. federal, state and local income tax purposes. As a result, neither Holdings' nor Group's income from its U.S. operations is subject to U.S. federal income tax because the income is attributable to its members. Accordingly, our U.S. tax provision is solely based on the portion of income attributable to the Corporation from the lower tier limited liability companies and excludes the income attributable to other members of Holdings whose income is included in Net income (loss) attributable to non-controlling interest in Global Brokerage Holdings, LLC in the consolidated statements of operations.

In addition to U.S. federal and state income taxes, Holdings is subject to New York City Unincorporated Business Tax which is attributable to Group's operations apportioned to New York City. Our foreign subsidiaries are also subject to local taxes.

***Other***

*Income (loss) from discontinued operations, net of tax* — As a result of the events of January 15 and 16, 2015 discussed in the Overview section, we made the decision to dispose of our interests in certain retail and institutional trading businesses in order to accelerate the pay down of the Leucadia Credit Agreement. The retail businesses are FXCM Asia Limited, FXCM Japan Securities Co., Ltd., and the equity business of FXCM Securities Limited. The institutional businesses are Faros Trading LLC, Lucid Markets Trading Limited and V3 Markets, LLC and our equity interest in FastMatch, Inc. We evaluated the criteria for reporting the results of operations for these entities as discontinued operations and determined that the dispositions qualify for treatment as discontinued operations. As such, the results of operations for these entities are reported in Income (loss) from discontinued operations, net of tax, in the consolidated statements of operations.

Tax expense for discontinued operations is primarily driven by the recognition of tax benefit associated with the generation of net operating loss and the write down of the deferred tax liability associated with the goodwill of Lucid Markets LLP ("Lucid LLP"), offset by the establishment of a valuation allowance on the net deferred tax assets of Lucid LLP. Lucid LLP is a limited liability partnership treated as a partnership for income tax purposes. As a result, Lucid LLP's income is not subject to U.K. corporate income tax because the income is attributable to its members. Therefore, Lucid's tax provision is solely based on the portion of its income attributable to its managing member, Lucid Markets Trading Limited, which is a U.K. corporation subject to U.K. corporate income tax, and excludes the income attributable to other members of Lucid LLP.

*Net income (loss) attributable to non-controlling interest in Global Brokerage Holdings, LLC* — Global Brokerage Inc. is a holding company, and its sole material asset is a controlling membership interest in Holdings. As the sole managing member of Holdings, Global Brokerage, Inc. operates and controls all of the business and affairs of Holdings and, through Holdings and its subsidiaries, conducts our business. Global Brokerage, Inc. consolidates the financial results of Holdings and its subsidiaries, and the ownership interest of the other members of Holdings is reflected as a non-controlling interest in our consolidated financial statements.

*Net income (loss) attributable to redeemable non-controlling interest in FXCM Group, LLC* — In conjunction with the restructuring of the Leucadia financing arrangement, the Letter Agreement was terminated and the material terms are now
reflected in the Group LLC Agreement. The Management Agreement gives us control of Group, which is therefore consolidated in our financial statements. Leucadia's 49.9% ownership interest in Group is reflected as a redeemable noncontrolling interest in our consolidated financial statements.

*Net income (loss) attributable to other non-controlling interests and allocation of net income to Lucid members for services provided* — We consolidate the financial results of Lucid in which we have a 50.1% controlling interest. The 49.9% ownership interest of the non-controlling Lucid members is reflected as follows:

- The portion of the 49.9% of earnings allocated among the non-controlling members of Lucid based on services provided to Lucid is reported as a component of compensation and benefits expense within Income (loss) from discontinued operations, net of tax in our consolidated statements of operations.

49

- The portion of the 49.9% of earnings allocated among the non-controlling members not allocated based on services provided is reported as a component of Net income (loss) attributable to other non-controlling interests in our consolidated statements of operations.

We also consolidate the financial results of other entities in which we have a controlling interest. The ownership interests of the non-controlling members is reported in net income (loss) attributable to other non-controlling interests in the consolidated statements of operations.

### Segment Information

Accounting Standards Codification Topic ("ASC") 280, *Segment Reporting*, establishes standards for reporting information about operating segments. Operating segments are defined as components of an enterprise about which separate financial information is available that is evaluated regularly by the chief operating decision maker, or decision making group, in deciding how to allocate resources and in assessing performance. The guidance defines reportable segments as operating segments that meet certain quantitative thresholds. As a result of the events of January 15, 2015 described above, and the decision to sell certain retail and institutional businesses, the composition of what we previously reported as our Institutional segment changed significantly, such that the remaining institutional business reported in continuing operations no longer meets the quantitative criteria for separate reporting. In addition, the remaining institutional business shares common management strategies, customer support and trading platforms with our retail business. Accordingly, we operate as a single operating segment for all periods presented.

### Common Stock Repurchase Program

Our Board of Directors has previously approved the repurchase of $80.0 million of our Class A common stock (the "Stock Repurchase Program"). In November 2014, our Board of Directors approved a $50.0 million incremental increase in the Stock Repurchase Program for an aggregate of $130.0 million. Since inception of the Stock Repurchase Program in May of 2011 through November 2016, we have repurchased 5.1 million pre-reverse split shares for $64.2 million under these authorizations. In November 2016, our Board of Directors canceled the Stock Repurchase Program.

Pursuant to an agreement between Global Brokerage, Inc. and Holdings, when Global Brokerage, Inc. repurchases shares of its Class A common stock, Holdings enters into an equivalent Holdings Units transaction with Global Brokerage, Inc. Therefore, as of December 31, 2016, Holdings has repurchased 5.1 million of pre-reverse split Holdings Units from Global Brokerage, Inc. related to Global Brokerage, Inc. Class A common stock repurchases noted above.

### At-the-Market Common Stock Offering

On October 3, 2016 we entered into an Equity Distribution Agreement to issue and sell up to $15.0 million of our Class A common stock. The stock will be offered under our effective shelf registration statement (including prospectus) filed with the Securities and Exchange Commission. We have not issued or sold any shares pursuant to the Equity Distribution Agreement during 2016.

**RESULTS OF OPERATIONS**

The following table sets forth our consolidated statements of operations for the years ended December 31, 2016 and 2015:

| | Years Ended December 31, | | | |
|---|---|---|---|---|
| | **2016** | | **2015** | |
| | (Amounts in thousands) | | | |
| **Revenues** | | | | |
| Trading revenue | $ | 276,000 | $ | 250,042 |
| Interest income | | 2,517 | | 1,827 |
| Brokerage interest expense | | (888) | | (818) |
| Net interest revenue | | 1,629 | | 1,009 |
| Other income | | 6,427 | | 151,227 |
| Total net revenues | | 284,056 | | 402,278 |
| **Operating Expenses** | | | | |
| Compensation and benefits | | 91,377 | | 93,413 |
| Referring broker fees | | 38,213 | | 54,827 |
| Advertising and marketing | | 20,849 | | 14,932 |
| Communication and technology | | 28,262 | | 33,545 |
| Trading costs, prime brokerage and clearing fees | | 3,585 | | 3,952 |
| General and administrative | | 75,790 | | 58,436 |
| Bad debt (recovery) expense | | (141) | | 256,950 |
| Depreciation and amortization | | 27,289 | | 28,331 |
| Goodwill impairment loss | | — | | 9,513 |
| Total operating expenses | | 285,224 | | 553,899 |
| **Operating loss** | | (1,168) | | (151,621) |
| **Other (Income) Expense** | | | | |
| (Gain) loss on derivative liabilities — Letter & Credit Agreements | | (206,777) | | 354,657 |
| Loss on equity method investments, net | | 3,053 | | 467 |
| Gain on sale of investment | | (37,157) | | — |
| Interest on borrowings | | 77,143 | | 126,560 |
| **Income (loss) from continuing operations before income taxes** | | 162,570 | | (633,305) |
| Income tax provision | | 777 | | 181,198 |
| **Income (loss) from continuing operations** | | 161,793 | | (814,503) |
| Loss from discontinued operations, net of tax | | (117,860) | | (118,294) |
| **Net income (loss)** | | 43,933 | | (932,797) |
| Net income (loss) attributable to non-controlling interest in Global Brokerage Holdings, LLC | | 33,408 | | (324,595) |
| Net loss attributable to redeemable non-controlling interest in FXCM Group, LLC | | (2,804) | | — |
| Net loss attributable to other non-controlling interests | | (57,314) | | (54,273) |
| Net income (loss) attributable to Global Brokerage, Inc. | $ | 70,643 | $ | (553,929) |

*Other Selected Customer Trading Metrics for Continuing Operations*

|  | | Years Ended December 31, | | |
|---|---|---|---|---|
|  | | 2016 | | 2015 |
| Customer equity (in millions) | $ | 662 | $ | 685 |
| Tradeable accounts | | 155,353 | | 161,632 |
| Active accounts | | 178,782 | | 177,847 |
| Daily average trades — retail customers | | 573,846 | | 529,496 |
| Daily average trades per active account | | 3.2 | | 3.0 |
| Total retail trading volume[1] (billions) | $ | 3,541 | $ | 3,862 |
| Retail trading revenue per million traded[1] | $ | 76 | $ | 61 |
| Average retail customer trading volume per day[1] (billions) | $ | 13.7 | $ | 14.9 |
| Trading days | | 259 | | 259 |

[1] Volume that customers traded in period translated into U.S. dollars.

*Highlights — Continuing Operations*

Total retail trading volumes decreased $321 billion, or 8%, to $3,541 billion for the year ended December 31, 2016 compared to the year ended December 31, 2015. The decrease in volume compared to the prior year period is primarily due to the lower volatility in the EUR/USD pair, which is one of our most popular major pairs traded, after the Brexit vote in June 2016. Retail trading revenue per million traded increased 25% to $76 per million, reflecting a higher proportion of revenue from dealing desk execution and higher revenue per million for CFDs. The number of total active retail customer accounts at December 31, 2016 was $178,782, an increase of 1% from December 31, 2015.

*Revenues from Continuing Operations*

|  | | Years Ended December 31, | | |
|---|---|---|---|---|
|  | | 2016 | | 2015 |
|  | | (In thousands) | | |
| **Revenues:** | | | | |
| Trading revenue | $ | 276,000 | $ | 250,042 |
| Interest income | | 2,517 | | 1,827 |
| Brokerage interest expense | | (888) | | (818) |
| Net interest revenue | | 1,629 | | 1,009 |
| Other income | | 6,427 | | 151,227 |
| **Total net revenues** | $ | 284,056 | $ | 402,278 |

Trading revenue increased by $26.0 million, or 10%, to $276.0 million for the year ended December 31, 2016 compared to the year ended December 31, 2015. The increase was primarily due to an increase in CFD revenues of $32.8 million. With the enhancements to our CFD technology implemented over the past year, we have been able to significantly increase the CFD revenue per million. Revenue from retail FX trading increased $2.5 million, primarily due to higher revenue from dealing desk execution, partially offset by lower revenue from spread and commissions related to lower trading volumes. Revenue from dealing desk execution was approximately 27% of trading revenue for the year ended December 31, 2016.

Revenues derived from the trading of institutional customers decreased $9.4 million for the year ended December 31, 2016 compared to the year ended December 31, 2015, of which $6.3 million was due to institutional customers trading via the FastMatch platform becoming direct customers of FastMatch as of July 1, 2015, and the remainder primarily due to lower revenues from FXCM Pro.

Net interest revenue of $1.6 million for the year ended December 31, 2016 was $0.6 million higher than net interest revenue for the year ended December 31, 2015 due to higher interest on cash held.

Other income of $6.4 million for the year ended December 31, 2016 primarily consists of $3.4 million of service fees related to post-sale services provided to the buyers of FXCMJ, HK, the equity trading business of FSL and Daily FX, $2.8 million of dormancy and ancillary fees and $0.1 million of services fees from FastMatch. Other income of $151.2 million for

the year ended December 31, 2015 primarily consists of $145.1 million attributable to the net reversal of our tax receivable agreement liability. During the first quarter of 2015, we reduced the contingent liability under the tax receivable agreement to zero based on the determination that it was more likely than not that the Corporation would not benefit from the tax deduction attributable to the tax basis step-up of which 85% of the benefit would be owed to members of Holdings under the tax receivable agreement. The determination to reduce the tax receivable agreement liability to zero was a direct result of the tax-deductible losses incurred on January 15, 2015 and our future projected taxable income before taking into account the amortization of basis associated with the tax receivable agreement. The remaining $6.1 million of other income in 2015 primarily consists of $2.6 million of service fees related to post-sale services provided to the buyers of FXCMJ, HK and the equity trading business of FSL, $0.3 million of service fees from FastMatch and $3.2 million of account dormancy and ancillary fees.

*Operating Expenses from Continuing Operations*

|  | Years Ended December 31, | | | |
|---|---|---|---|---|
|  | **2016** | | **2015** | |
|  | (In thousands) | | | |
| **Operating Expenses:** | | | | |
| Compensation and benefits | $ | 91,377 | $ | 93,413 |
| Referring broker fees | | 38,213 | | 54,827 |
| Advertising and marketing | | 20,849 | | 14,932 |
| Communication and technology | | 28,262 | | 33,545 |
| Trading costs, prime brokerage and clearing fees | | 3,585 | | 3,952 |
| General and administrative | | 75,790 | | 58,436 |
| Bad debt expense | | (141) | | 256,950 |
| Depreciation and amortization | | 27,289 | | 28,331 |
| Goodwill impairment loss | | — | | 9,513 |
| **Total operating expenses** | $ | 285,224 | $ | 553,899 |

Total compensation and employee benefits decreased $2.0 million, or 2%, to $91.4 million for the year ended December 31, 2016 compared to the year ended December 31, 2015. The decrease was primarily related to lower variable compensation expense of $1.1 million, primarily related to compensation plans implemented during the first quarter of 2015 to retain employees following the significant decline in our stock price after the events of January 15, 2015, and lower salary and benefits expense of $1.2 million, partially offset by a charge of $0.7 million in connection with the renegotiation of an employee contract and a charge of $0.4 million to write off employee advances. Stock-based compensation expense was lower by $0.8 million, largely due to the full vesting of stock grants.

Referring broker fees decreased $16.6 million, or 30%, to $38.2 million for the year ended December 31, 2016 compared to the year ended December 31, 2015. The decrease in referring broker fees is related to a decline in indirect trading volumes and reduced reliance on introducing brokers as we focus on organic growth.

Advertising and marketing expense increased $5.9 million, or 40%, to $20.8 million for the year ended December 31, 2016 compared to the year ended December 31, 2015. For most of 2015 advertising and marketing spend was curtailed as a result of the events of January 15, 2015. We increased spending to promote our dealing desk execution model and new CFD technology in 2016.

Communication and technology expense decreased $5.3 million, or 16%, to $28.3 million for the year ended December 31, 2016 compared to the year ended December 31, 2015. The net decrease is primarily attributable to $4.3 million of lower platform costs for FastMatch, due to institutional customers trading via the FastMatch platform becoming direct customers of FastMatch effective July 1, 2015, $2.2 million lower third party platform fees and $0.7 million lower communication costs, partially offset by $1.3 million higher software licensing and maintenance costs and $0.5 million of higher market data fees.

Trading costs, prime brokerage and clearing fees decreased $0.4 million, or 9%, to $3.6 million for the year ended December 31, 2016 compared to the year ended December 31, 2015. The net decrease is primarily attributable to lower prime broker fees related to FastMatch and FXCM Pro and lower trading volumes.

General and administrative expense increased $17.4 million, or 30%, to $75.8 million for the year ended December 31, 2016 compared to the year ended December 31, 2015. The increase of $17.4 million is primarily attributable to (i) a provision of $8.2 million for notes receivable that were forgiven (see Note 5, "Notes Receivable" in the Notes to Consolidated Financial Statements in "Item 8. Financial Statements and Supplementary Data" for further information); (ii) $7.7 million of fines related to settlements with the CFTC (see Note 28, "Subsequent Events" in the Notes to Consolidated Financial Statements in "Item 8. Financial Statements and Supplementary Data" for further information); (iii) the settlement of a litigation claim for $2.3 million (see Note 27, "Litigation" in the Notes to Consolidated Financial Statements in "Item 8. Financial Statements and Supplementary Data" for further information); (iv) $4.1 million of higher professional fees, including costs related to the Leucadia restructuring and the regulatory actions; (v) $2.5 million to forgive customer debit balances, primarily related to the Brexit event in June 2016 and the GBP flash crash in October 2016; (vi) $0.3 million higher local taxes (vii) $1.1 million of higher occupancy costs, and (viii) $0.8 million related to a recovery under a legal settlement recorded in the year ended December 31, 2015, partially offset by (ix) $1.4 million of insurance recoveries for costs incurred related to the events of January 15, 2015 and the cybersecurity incident; (x) $0.9 million of lower regulatory and bank processing fees; (xi) $0.4 million of lower travel costs, and (xii) a charge of $6.8 million against an uncollected broker receivable recorded in the year ended December 31, 2015.

Bad debt (recovery) expense for the year ended December 31, 2016 was a recovery of $0.1 million resulting from the events of January 15, 2015. Specifically, we experienced losses from customer debit balances of approximately $275.1 million on January 15, 2015, and as of December 31, 2015, we had recovered approximately $9.8 million, for a net loss after recoveries of $265.4 million for the year ended December 31, 2015. Of this total, $257.0 million is recorded in Bad debt expense and $8.4 million is recorded in Income (loss) from discontinued operations, net of tax.

Depreciation and amortization expense decreased $1.0 million, or 4%, to $27.3 million for the year ended December 31, 2016 compared to the year ended December 31, 2015. The $1.0 million decrease is primarily attributable to a decrease in depreciation expense of $1.2 million, which includes $1.4 million related to fully depreciated assets, partially offset by an increase in depreciation of $0.2 million for capitalized software. Amortization expense related to intangibles acquired from customer account acquisitions increased $0.2 million.

During the first quarter of 2015, we performed an interim impairment evaluation of goodwill due to the events of January 15, 2015. This evaluation resulted in the recording of goodwill impairment losses of $9.5 million primarily due to a reduction in the implied fair value of certain institutional businesses subsequent to January 15, 2015. There was no goodwill impairment loss for the year ended December 31, 2016.

### *Non-Operating Expenses*

#### Gain (Loss) on Derivative Liability — Letter Agreement & Credit Agreements

On September 1, 2016, the Letter Agreement was terminated and the material terms are now reflected in the Group LLC Agreement. The value of the derivative liability related to the Letter Agreement as of August 31, 2016 was reversed and the value of Leucadia's 49.9% non-controlling interest was recorded as a redeemable non-controlling interest in Group with a fair value of $235.5 million. The change in the derivative liability related to the Letter Agreement was a gain of $213.0 million for the year ended December 31, 2016, recorded in Gain (Loss) on Derivative Liabilities — Letter & Credit Agreements. The decrease in the estimated fair value of the derivative liability reflects a decrease in the fair value of the Letter Agreement due to the decline in our stock price and an increase in the volatility assumption used in the valuation. The change in the derivative liability related to the Credit Agreement was a loss of $6.2 million for the year ended December 31, 2016, recorded in Gain (Loss) on Derivative Liabilities — Letter & Credit Agreements, due to the change in the fair value of the derivative liability associated with the mandatory prepayment provisions in the Credit Agreement.

#### Loss on equity method investments, net

Loss on equity method investments of $3.1 million for the year ended December 31, 2016 includes impairment charges totaling $2.6 million to write down the value of our investments in a developer of FX trading software and a developer of FX analytical software due to the determination that the investments were other than temporarily impaired (see Note 6, "Equity Method Investments" in the Notes to Consolidated Financial Statements in "Item 8. Financial Statements and Supplementary Data" for further information).

**Gain on sale of investment**

Gain on sale of investment of $37.2 million for the year ended December 31, 2016 includes a gain on the sale of the DailyFX research website (see Note 4, "Dispositions" in the Notes to Consolidated Financial Statements in "Item 8. Financial Statements and Supplementary Data" for further information).

**Interest on Borrowings**

The following table sets forth total interest expense recognized for the period indicated:

|  | Years Ended December 31, | | | |
|---|---|---|---|---|
|  | 2016 | | 2015 | |
|  | (In thousands) | | | |
| *Contractual interest expense* |  |  |  |  |
| Leucadia Credit Agreement | $ | 33,879 | $ | 27,337 |
| Revolving Credit Agreement |  | — |  | 38 |
| Convertible Notes |  | 3,881 |  | 3,881 |
| *Deferred interest expense* |  |  |  |  |
| Leucadia Credit Agreement |  | (3,045) |  | 5,789 |
| *Amortization of Debt Discount* |  |  |  |  |
| Leucadia Credit Agreement original issue discount |  | 28,110 |  | 65,577 |
| Leucadia Credit Agreement issuance fee discount |  | 3,951 |  | 8,665 |
| Convertible Notes |  | 5,960 |  | 5,607 |
| *Amortization of Debt Issuance Costs* |  |  |  |  |
| Leucadia Credit Agreement deferred financing fee |  | 2,844 |  | 6,238 |
| Leucadia Credit Agreement debt acquisition costs |  | 353 |  | 774 |
| Revolving Credit Agreement |  | — |  | 1,444 |
| Convertible Notes |  | 1,210 |  | 1,210 |
| Total Interest on borrowings | $ | 77,143 | $ | 126,560 |

The decrease in Interest on borrowings of $49.4 million for the year ended December 31, 2016 compared to the year ended December 31, 2015 is primarily due to lower amortization of original issue discount, lower deferred interest and a lower principal balance on the Leucadia Credit Agreement. In addition to contractual interest expense, we record deferred interest for the difference between the current period's contractual rate based on the loan terms and the amortization of the incremental step-up in the contractual rate over the life of the loan. The Leucadia borrowing proceeds were allocated between the Credit Agreement and the Letter Agreement. The portion allocated to the Credit Agreement is reflected as an original issue discount to the Credit Agreement loan balance and amortized to interest expense using the effective interest method. Amortization is accelerated when payments on the Credit Agreement are made. In connection with the Restructuring Transaction on September 1, 2016, the term of the Credit Agreement was extended by one year to January 2018. The amortization of the remaining debt discounts and issuance costs will be recognized over the extended remaining term. (See Note 19, "Leucadia Transaction" in the Notes to Consolidated Financial Statements in "Item 8. Financial Statements and Supplementary Data" for more information).

The debt discount on the Convertible Notes is amortized to interest expense over the life of the Convertible Notes using the effective interest method.

The decrease in amortization of debt issuance costs is primarily related to (1) the termination of the Revolving Credit Agreement effective January 20, 2015, at which time the outstanding balance was repaid in full, which accelerated the amortization of the remaining debt issuance costs, and (2) lower amortization of deferred financing fees related to the Leucadia Credit Agreement.

*Income Taxes*

| | Years Ended December 31, | |
|---|---|---|
| | 2016 | 2015 |
| | (In thousands, except percentages) | |
| (Loss) income from continuing operations before income taxes | $ 162,570 | $ (633,305) |
| Income tax provision | 777 | 181,198 |
| Effective tax rate | 0.5% | (28.6)% |

Holdings operates in the U.S. as a limited liability company that is treated as a partnership for U.S. federal, state, and local income tax purposes. Since January 2015, all of Holdings' operations are held by Group, a limited liability company that is also treated as a partnership between Holdings and Leucadia for U.S. federal, state and local income tax purposes. As a result, neither Holdings' nor Group's income from its U.S. operations is subject to U.S. federal income tax because the income is attributable to its members. Accordingly, our U.S. tax provision is solely based on the portion of income attributable to the Corporation from the lower tier limited liability companies and excludes the income attributable to other members of Holdings and Group whose income is included in Net income (loss) attributable to non-controlling interest in Global Brokerage Holdings, LLC in the consolidated statements of operations.

The effective tax rates reflect the proportion of income recognized by Global Brokerage, Inc. taxed at the U.S. marginal corporate income tax rate of 34% and the proportion of income recognized by each of our international subsidiaries subject to tax at their respective local jurisdiction tax rates unless subject to U.S. tax by election or as a U.S. controlled foreign corporation.

The change in the effective tax rate for the year ended December 31, 2016 compared to the year ended December 31, 2015 is predominantly the result of reversing the valuation allowance previously established on the deferred tax assets of the Company to offset the tax provision associated with book income for the period. During 2015, we determined that, given the losses incurred from the events of January 15, 2015 and due to the Leucadia Transaction, it was not more likely than not that we would benefit from the tax deduction attributable to the tax basis step-up from the conversion of the non-controlling membership units of Holdings, nor would we receive tax benefit from the losses incurred. As a result, a valuation allowance was established on substantially all of the deferred tax assets of the Company due to their doubtful realizability, which was the primary driver of the tax provision recorded for the year ended December 31, 2015. The negative tax rate for the year ended December 31, 2015 reflects the recording of a tax provision on the book loss for the period.

**Loss from Discontinued Operations, Net of Tax**

Loss from discontinued operations, net of tax was $117.9 million for the year ended December 31, 2016 compared to a loss of $118.3 million for the year ended December 31, 2015. The loss for the year ended December 31, 2016 is primarily due to recording loss on classification as held for sale of $126.5 million on the remaining entities held for sale due to the determination that the fair value less costs to sell the assets did not exceed the carrying value of the assets, and a charge of $0.5 million for regulatory penalties related to pre-August 2010 trade execution practices of HK, partially offset by a gain of $0.7 million for the disposition of an equity method investment and operating profits from the remaining entities held for sale of $8.4 million. The loss of $118.3 million for the year ended December 31, 2015 is primarily due to (i) goodwill impairment losses of $54.9 million recorded in the first quarter of 2015, primarily due to a decline in the implied fair value of certain institutional businesses subsequent to the events of January 15, 2015; (ii) bad debt expense of $8.4 million related to losses from customer debit balances as a result of the events of January 15, 2015 and (iii) an intangible asset impairment charge of $5.4 million recorded in the first quarter of 2015 included in depreciation and amortization, primarily due to a decline in the implied fair value of certain institutional businesses subsequent to the events of January 15, 2015. We also recorded a net loss on classification as held for sale of $66.7 million due to decline in the fair value less costs to sell of the assets since classification of the businesses as held for sale. These amounts were offset by a net gain of $7.3 million related to the sales of FXCMJ, HK and the equity trading business of FSL during 2015, and net operating profit from the remaining held for sale entities of $9.8 million.

## LIQUIDITY AND CAPITAL RESOURCES

We anticipate that funds generated from our operations and proceeds from the disposition of non-core assets will be sufficient to fund our operating liquidity, capital needs and debt obligations for the next twelve months.

As of December 31, 2016, we had cash and cash equivalents of $210.3 million, including $9.4 million within assets held for sale. We primarily invest our cash and cash equivalents in short-term demand deposits at various financial institutions. In general, we believe all our deposits are with institutions of high credit quality and we have sufficient liquidity to conduct the operations of our businesses.

As a holding company, almost all of the funds generated from our operations are earned by our operating subsidiaries. We access these funds through receipt of dividends from our subsidiaries. Some of our subsidiaries are subject to requirements of various regulatory bodies relating to liquidity and capital standards, which may limit the funds available for the payment of dividends to us. We currently do not intend to permanently reinvest the earnings of our foreign subsidiaries and those earnings are available to be repatriated as needed.

The table below presents the minimum capital requirement, the capital, as defined by the respective regulatory authority, and the excess capital for our regulated entities, as of December 31, 2016:

| | As of December 31, 2016 | | | | | | |
|---|---|---|---|---|---|---|---|
| | Regulatory Jurisdiction | Minimum Regulatory Capital Requirements | | Capital Levels Maintained | | Excess Net Capital | |
| | | (In millions) | | | | | |
| Forex Capital Markets, LLC | U.S. | $ | 33.3 | $ | 47.5 | $ | 14.2 |
| Forex Capital Markets Limited | U.K. | $ | 22.0 | $ | 83.4 | $ | 61.4 |
| FXCM Australia Pty. Ltd. | Australia | $ | 1.1 | $ | 16.6 | $ | 15.5 |
| Lucid Markets LLP | U.K. | $ | 4.2 | $ | 10.2 | $ | 6.0 |

Effective from January 1, 2016, the Financial Conduct Authority ("FCA"), which regulates Forex Capital Markets Limited, introduced the "Capital Conservation Buffer" (CCB) and a "Countercyclical Capital Buffer" (CcyB) in line with the requirements set out in Capital Requirements Directive Article 160 Transitional Provisions for Capital Buffers. This requires all firms to maintain additional buffers on top of the minimum capital requirements noted above, which may vary at the direction of the FCA.

### *Cash Flow and Capital Expenditures — Continuing and Discontinued Operations*

The following table sets forth a summary of our cash flows for the years ended December 31, 2016 and 2015:

| | Years Ended December 31, | | | |
|---|---|---|---|---|
| | 2016 | | 2015 | |
| | (In thousands) | | | |
| Cash provided by (used in) operating activities | $ | 21,866 | $ | (293,345) |
| Cash provided by investing activities | | 15,324 | | 50,124 |
| Cash (used in) provided by financing activities | | (38,858) | | 120,622 |
| Effect of foreign currency exchange rate changes on cash and cash equivalents | | (2,680) | | (1,575) |
| Net decrease in cash and cash equivalents | | (4,348) | | (124,174) |
| Cash and cash equivalents – end of year | $ | 210,292 | $ | 214,640 |

Included in net cash flows are the following non-cash and other items which are reported in discontinued operations in the audited consolidated financial statements:

| | Years Ended December 31, | | | |
| --- | --- | --- | --- | --- |
| | 2016 | | 2015 | |
| | (In thousands) | | | |
| Depreciation and amortization | $ | — | $ | 12,359 |
| Equity-based compensation | $ | — | $ | 1,494 |
| Deferred tax expense | $ | — | $ | 6,181 |
| Goodwill impairment losses | $ | — | $ | 54,865 |
| Loss on classification as held for sale assets | $ | 126,511 | $ | 66,660 |
| Gain on business dispositions | $ | — | $ | 7,313 |
| Transaction costs associated with business dispositions | $ | — | $ | (7,410) |
| Gain (loss) on equity method investments, net | $ | 435 | $ | (1,267) |
| Purchases of office, communication and computer equipment, net | $ | (182) | $ | (338) |
| Proceeds from sale of office, communication and computer equipment | $ | — | $ | 499 |
| Proceeds from business dispositions, net of cash | $ | — | $ | 65,979 |
| Gain on disposition of equity method investment | $ | 679 | $ | — |

*Operating Activities*

Details of cash provided by (used in) operating activities are as follows, with amounts in thousands:

| | Years Ended December 31, | | | |
| --- | --- | --- | --- | --- |
| | 2016 | | 2015 | |
| | (In thousands) | | | |
| Net income (loss) and other adjustments | $ | 31,709 | $ | (100,203) |
| Non-cash equity-based compensation | | 1,857 | | 4,183 |
| Non-cash — change in tax receivable agreement liability | | 44 | | (145,080) |
| Net interest payments | | (37,761) | | (31,297) |
| Cash (paid) received for taxes | | (468) | | 399 |
| All other, net, including net current assets and liabilities | | 26,485 | | (21,347) |
| Net cash provided by (used in) operating activities | $ | 21,866 | $ | (293,345) |

Cash provided by operating activities of $21.9 million for the year ended December 31, 2016 is primarily attributable to an increase in net income, adjusted for certain non-cash items, a decrease in net due from/to broker balances of $9.0 million resulting from the net change in open trading positions primarily relating to discontinued operations, and an increase in accounts payable and accrued expenses of $8.6 million primarily due to accruals related to variable compensation and regulatory fines partially offset by interest payments of $37.8 million primarily related to the Leucadia Transaction. Cash used in operating activities of $293.3 million for the year ended December 31, 2015 was primarily attributable to the net losses we experienced from customer debit balances of $265.7 million resulting from the events of January 15, 2015 and interest payments of $31.3 million primarily related to the Leucadia Transaction.

*Investing Activities*

Details of cash provided by investing activities are as follows, with amounts in thousands:

| | Years Ended December 31, | | |
|---|---|---|---|
| | 2016 | | 2015 |
| | (In thousands) | | |
| Purchases of office, communication and computer equipment, net | $ | (18,226) | $ | (17,336) |
| Proceeds from sale of office, communication and computer equipment, net | | — | | 499 |
| Purchase of intangible assets | | (2,000) | | (518) |
| Proceeds from notes receivable | | — | | 1,500 |
| Proceeds from business dispositions, net of cash | | 36,000 | | 65,979 |
| Payment for equity method investment | | (450) | | — |
| Net cash provided by investing activities | $ | 15,324 | $ | 50,124 |

Cash provided by investing activities of $15.3 million during the year ended December 31, 2016 consisted primarily of $36.0 million of net proceeds from the sale of Daily FX, offset by $18.2 million of net capital expenditures, primarily for capitalized software, payments of $2.0 million under the terms of the asset purchase agreement for FX trading accounts acquired in the second quarter of 2015 and $0.5 million for the acquisition of an equity method investment.

Cash provided by investing activities of $50.1 million during the year ended December 31, 2015 consisted primarily of $66.0 million of net proceeds from the sales of FXCMJ, HK and the equity trading business of FSL and proceeds of $1.5 million from the collection of notes receivable, offset by $17.3 million of capital expenditures, primarily for capitalized software.

*Financing Activities*

Details of cash (used in) provided by financing activities are as follows, with amounts in thousands:

| | Years Ended December 31, | | |
|---|---|---|---|
| | 2016 | | 2015 |
| | (In thousands) | | |
| Distributions to non-controlling members | $ | (683) | $ | (14,507) |
| Proceeds from issuance of stock options | | — | | 321 |
| Common stock repurchases | | — | | (1) |
| Payments on borrowings under Revolving credit agreement | | — | | (25,000) |
| Proceeds from the Leucadia Transaction | | — | | 279,000 |
| Principal payments on borrowings under the Credit Agreement | | (38,175) | | (117,315) |
| Debt acquisition costs — Credit Agreement | | — | | (1,876) |
| Net cash (used in) provided by financing activities | $ | (38,858) | $ | 120,622 |

Cash used in financing activities of $38.9 million during the year ended December 31, 2016 consisted of $0.7 million of distributions to other non-controlling interests and $38.2 million of principal payments on borrowings under the Credit Agreement.

Cash provided by financing activities of $120.6 million during the year ended December 31, 2015 consisted primarily of net proceeds received from the Leucadia Transaction of $279.0 million, offset by principal payments of $117.3 million on borrowings under the Credit Agreement and a payment of $25.0 million on outstanding borrowings under the Revolving credit agreement in connection with its termination in January 2015. In addition, distributions of $14.5 million were made during the year ended December 31, 2015, which primarily included distributions of $14.1 million to other noncontrolling interests.

***Leucadia Transaction***

On January 16, 2015, Holdings and FXCM Newco, LLC ("Newco"), a newly-formed wholly-owned subsidiary of Holdings, entered into a credit agreement (the "Credit Agreement") with Leucadia National Corporation ("Leucadia"), as administrative agent and lender, and a related financing fee agreement (the "Fee Letter"). The financing enabled us to maintain compliance with regulatory capital requirements and continue operations. On January 16, 2015, in connection with the Leucadia Credit Agreement and the Fee Letter, the Corporation, Holdings, Newco and Leucadia also entered into an agreement (the "Letter Agreement") that set the terms and conditions upon which the Corporation, Holdings and Newco will pay in cash to Leucadia and its assignees a percentage of the proceeds received in connection with certain transactions. In connection with these financing transactions, Holdings formed Newco and contributed all of the equity interests owned by Holdings in its subsidiaries to Newco. The Credit Agreement and the Letter Agreement were subsequently amended on January 24, 2015. The amendments finalized certain terms of the Credit Agreement and Letter Agreement and the terms of the amended agreements were not substantially different from the initial agreements.

***Restructuring of the Leucadia Financing***

On September 1, 2016 we completed the restructuring of the financing arrangements with Leucadia that was originally announced in March 2016. Key elements of the restructuring include:

Credit Agreement

- The maturity date of the Credit Agreement was extended one year to January 16, 2018 to allow us more time to optimize asset sales.
- We have the ability to defer any three of the remaining interest payments, permitting us flexibility to invest and grow our core business.
- On February 22, 2017, Group, Holdings and Leucadia entered into a Second Amendment to the Credit Agreement pursuant to which the aggregate principal outstanding balance of the Credit Agreement was increased by $3.5 million in consideration of Leucadia's waiver of certain sections of the Credit Agreement regarding restricted payments and distributions.

Letter Agreement

- The Letter Agreement was terminated and the material terms are now reflected in the Amended and restated Limited Liability Company Agreement of Group, LLC (the "Group Agreement").

Group Agreement

- The Group Agreement replaces the existing FXCM Newco, LLC agreement and FXCM Newco, LLC has been renamed Group, LLC ("Group").
- Leucadia acquired a 49.9% non-controlling interest in Group.
- The Group Agreement provides that Group will be governed by a six-member board, with three directors each appointed by Global Brokerage and Leucadia.
- We and Leucadia share the right to request a sale process after January 16, 2018, subject to both of us reasonably accepting the highest reasonable sales price.

Management Agreement

- Group and Holdings entered into a Management Agreement (the "Management Agreement") pursuant to which Holdings will manage the assets and day to day operations of Group and its subsidiaries.
- On February 2, 2017, the Management Agreement was amended to provide that the Management Agreement may be terminated by a vote of at least three members of the Group Board after the occurrence of certain events including a change of control.

Management Incentive Plan

- Group adopted the 2016 Incentive Bonus Plan for Founders and Executives (the "Management Incentive Plan"), in order to retain and incentivize senior management to maximize cash flow generation and grow the business.
- The Management Incentive Plan is a long-term plan with five-year vesting.

- Distributions under the plan are only made after Leucadia's principal and interest under the Credit Agreement have been repaid.
- Distributions will range from 10% to 14% of distributions made by Group.
- If a participant terminates employment, they will receive either a non-voting membership in Group entitling them to the same share of distributions that they would have received, or a lump-sum cash payment, at our discretion.
- On February 2, 2017, Group and Leucadia entered into an Acknowledgment whereby Leucadia may terminate the Management Incentive Plan at any time for any reason in its sole discretion.

Leucadia will be entitled to receive additional distributions of proceeds that, when added to their 49.9% membership interest, will result in the following distribution percentages:

| Aggregate amount of proceeds | Original Waterfall | Revised Waterfall |
|---|---|---|
| Amounts due under the Credit Agreement | 100% Leucadia | 100% Leucadia |
| Next $350 million | 50% Leucadia / 50% FXCM | 45% Leucadia / 45% Holdings / 10.0% Management |
| Next $500 million | 90% Leucadia / 10% FXCM | 79.2% Leucadia / 8.8% Holdings / 12.0% Management |
| All aggregate amounts thereafter | 60% Leucadia / 40% FXCM | 51.6% Leucadia / 34.4% Holdings / 14.0% Management |

For additional information, (See Note 19, "Leucadia Transaction" in the Notes to Consolidated Financial Statements in "Item 8. Financial Statements and Supplementary Data" for further information.

*Revolving Credit Agreement*

On December 19, 2011, Holdings entered into a credit agreement (the "Revolving Credit Agreement") with a syndicate of financial institutions. In connection with the events described above under Leucadia Transaction, Holdings' outstanding borrowings under the Revolving Credit Agreement of $25.0 million were repaid in full and the Revolving Credit Agreement was terminated effective January 20, 2015.

Interest expense related to borrowings under the Revolving Credit Agreement, including the amortization of debt financing costs, included in Interest on borrowings in the consolidated statements of operations was nil and $1.5 million, for the years ended December 31, 2016 and 2015, respectively.

During the year ended December 31, 2016, the weighted average dollar amount of borrowings related to the Revolving Credit Agreement was nil and the weighted average interest rate was nil. During the year ended December 31, 2015, the weighted average dollar amount of borrowings related to the Revolving Credit Agreement was $1.3 million and the weighted average interest rate was 2.92%.

*Senior Convertible Notes due 2018*

In June 2013, we issued $172.5 million principal amount of 2.25% Convertible Notes maturing on June 15, 2018 and received net proceeds of $166.5 million, after deducting the initial purchasers' discount and offering expenses. The Convertible Notes pay interest semi-annually on June 15 and December 15 at a rate of 2.25% per year. The indenture governing the Convertible Notes does not prohibit us from incurring additional senior debt or secured debt, nor does it prohibit any of our subsidiaries from incurring additional liabilities.

The Convertible Notes are convertible at an initial conversion rate of 5.32992 shares of our Class A common stock per $1,000 principal amount of the Convertible Notes, which is equivalent to an initial conversion price of approximately $187.62 In addition, following certain corporate transactions that occur prior to the maturity date, we will, in certain circumstances, increase the conversion rate for a holder that elects to convert its Convertible Notes in connection with such corporate transaction. Upon conversion, we will deliver cash up to the principal amount. With respect to any conversion value in excess of the principal amount, we will deliver shares of Class A common stock (unless we elect to deliver cash in lieu of all or a portion of such shares).

*Off-Balance Sheet Arrangements*

As of December 31, 2016, we did not have any significant off-balance sheet arrangements as defined by the regulations of the SEC.

*Contractual Obligations and Commercial Commitments*

The following table reflects a summary of our contractual cash obligations and other commercial commitments as of December 31, 2016:

| | Total | Less Than 1 Year | 1 – 3 Years | 4 – 5 Years | More Than 5 Years |
|---|---|---|---|---|---|
| | Payments Due by Period | | | | |
| | | | (In thousands) | | |
| Lease obligations [1] | $ 35,777 | $ 6,468 | $ 12,773 | $ 6,471 | $ 10,065 |
| Leucadia Credit Agreement [2],[3] | 191,072 | 31,674 | 159,398 | — | — |
| Convertible Notes | 178,322 | 3,881 | 174,441 | — | — |
| Deferred payment for customer accounts acquisition | 2,982 | 2,012 | 970 | — | |
| Digital Advertising Agreement related to Sale of DailyFX | 9,406 | 3,117 | 6,289 | — | — |
| Tax Receivable Agreement [4] | 145,631 | — | — | — | 145,631 |
| **Total** | $ 563,190 | $ 47,152 | $ 353,871 | $ 6,471 | $ 155,696 |

[1] Includes leases that renewed in 2017

[2] Interest is based on the stated step-up coupon rate

[3] Reflects $3.5 million increase to the outstanding principal balance effective February 22, 2017 (see Note 28, "Subsequent Events" in the Notes to Consolidated Financial Statements in "Item 8. Financial Statements and Supplementary Data")

[4] Assumes sufficient taxable income is generated such that the Corporation fully realizes the tax benefits of the amortization specified in the Tax Receivable Agreement

## CRITICAL ACCOUNTING POLICIES AND ESTIMATES

The notes to our consolidated financial statements include disclosure of our significant accounting policies and estimates. In establishing these policies within the framework of U.S. GAAP, management must make certain assessments, estimates and choices that will result in the application of these principles in a manner that appropriately reflects our financial condition and results of operations. Critical accounting policies are those policies that we believe present the most complex or subjective measurements and have the most potential to affect our financial position and operating results. While all decisions regarding accounting policies are important, there are certain accounting policies and estimates that we consider to be critical. These critical policies, which are presented in detail in the notes to our consolidated financial statements, relate to revenue recognition, goodwill, other intangible assets, income taxes, litigation contingencies, due to related parties pursuant to tax receivable agreement, derivative liability — Letter Agreement, redeemable non-controlling interest and stock-based compensation.

A summary of our critical accounting policies and estimates is as follows:

*Revenue Recognition*

We make foreign currency markets for customers trading in FX spot markets. Transactions are recorded on the trade date and positions are marked to market daily with related gains and losses, including gains and losses on open spot transactions, recognized currently in income.

*Trading Revenue*

Under our retail agency FX offering, trading revenue is earned from charging a separate commission or by adding a markup to the price provided by FX market makers generating trading revenue based on the volume of transactions and is recorded on trade date. Under the agency model, when a customer executes a trade on the best price quotation presented by the FX market maker, we act as a credit intermediary, or a riskless principal, simultaneously entering into a trade with the customer and the FX market maker. This agency model has the effect of hedging our positions and eliminating market risk exposure. Trading revenues earned from commissions and mark-up principally represent the difference between our realized and unrealized foreign currency trading gains or losses on our positions with customers and the systematic hedge gains and losses from the trades entered into with the FX market makers. Under our dealing desk, or principal, execution model, revenues earned include the markup on the FX trade and the realized and unrealized foreign currency trading gains or losses with customers. Trading revenue also includes fees earned from arrangements with other financial institutions to provide platform, back office and other trade execution services. This service is generally referred to as a white label arrangement. We earn a commission or a percentage of the markup charged by the financial institutions to their customers. Fees from this service are recorded when earned on a trade date basis.

Additionally, we earn income from trading in CFDs, rollovers and spread betting. Income or loss on CFDs represents the difference between the realized and unrealized trading gains or losses on our positions and the hedge gains or losses with the other financial institutions. Income or loss on CFDs is recorded on a trade date basis. Income or loss on rollovers is the interest differential customers earn or pay on overnight currency pair positions held and the markup that we receive on interest paid or received on currency pair positions held overnight. Income or loss on rollovers is recorded on a trade date basis. Spread betting is where a customer takes a position against the value of an underlying financial instrument moving either upward or downward in the market. Income on spread betting is recorded as earned on a trade date basis.

Trading revenues from institutional customers include commission income generated by facilitating spot FX trades on behalf of institutional customers through the services provided by FXCM Pro and our Prime of Prime business, which allows these customers to obtain the best execution price from external banks and routes the trades to outside financial institutions that also hold customer account balances for settlement. We receive commission income on these trades without taking any market or credit risk. Revenue earned from institutional customers is recorded on a trade date basis.

We also earn income from market making and electronic trading in the institutional foreign exchange spot and futures markets through Lucid and market making and electronic trading into other asset classes through V3. Income on market making and electronic trading in foreign exchange spot and future currencies represents the spread between the bid and ask price for positions purchased and sold and the change in value of positions purchased and sold. Income on market making is recorded as trading gains, net of trading losses, on a trade date basis, and is included in Income (loss) from discontinued operations, net of tax in the consolidated statements of operations.

*Goodwill*

We recorded goodwill from various acquisitions. Goodwill represents the excess purchase price over the value assigned to the net tangible and identifiable intangible assets of a business acquired. The Company operates in a single operating segment, which also represents the reporting unit for purposes of the goodwill impairment test. Annually, or in interim periods if an event occurs or circumstances change that indicate the fair value of the reporting unit may be below its carrying amount ("triggering events"), the Company first performs a qualitative assessment as a basis for determining whether it is necessary to perform the quantitative goodwill impairment test in accordance with ASC 350, *Intangibles—Goodwill and Other* ("ASC 350"). If the qualitative assessment indicates that it is more likely than not that the fair value of the reporting unit is below its carrying amount, the Company proceeds with the quantitative test described below. The Company tests goodwill for impairment annually during the fourth quarter of its fiscal year using October 1 carrying values.

The first step of the two-step process involves a comparison of the estimated fair value of our reporting unit to its carrying amount, including goodwill. In performing the first step, we determine the fair value of the reporting unit using a discounted cash flow ("DCF") analysis. Determining fair value requires the exercise of significant judgment, including judgments about appropriate discount rates, perpetual growth rates and the amount and timing of expected future cash flows. The cash flows employed in the DCF analysis are based on our most recent budgets and business plans and, when applicable, various growth rates are assumed for years beyond the current business plan period. Discount rate assumptions are based on an assessment of the risk inherent in the future cash flows of the reporting unit. If the estimated fair value of the reporting unit exceeds its carrying amount, the goodwill of the reporting unit is not impaired and the second step of the impairment test is not necessary. If the carrying amount of the reporting unit exceeds its estimated fair value, then the second step of the goodwill impairment test must be performed. The second step of the goodwill impairment test compares the implied fair value of the

63

reporting unit's goodwill with its carrying amount to measure the amount of impairment loss, if any. The implied fair value of goodwill is determined in the same manner as the amount of goodwill recognized in a business combination (i.e., the estimated fair value of the reporting unit is allocated to all of the assets and liabilities of that reporting unit including any unrecognized intangible assets as if the reporting unit had been acquired in a business combination and the fair value of the reporting unit was the purchase price paid). If the carrying amount of the reporting unit's goodwill exceeds the implied fair value of the reporting unit's goodwill, an impairment loss is recognized in an amount equal to that excess.

Events such as economic weakness and unexpected significant declines in the operating results of our reporting unit may result in us having to perform a goodwill impairment test prior to our next required annual assessment. These types of events and the resulting analysis could result in goodwill impairment charges in the future.

### Other Intangible Assets, net

Other intangible assets, net, classified as held for use include customer relationships recorded from various acquisitions. Intangible assets classified as held for sale primarily include non-compete agreements, an executory contract, trade name and proprietary technology also recorded from various acquisitions.

The useful lives of our intangible assets are based on the period they are expected to contribute to future cash flows as determined by the Company's historical experience. The customer relationships are amortized on a straight-line basis over their estimated average useful life of 3 years. Prior to being classified as held for sale, the non-compete agreements, executory contract, trade name and proprietary technology were amortized on a straight-line basis over their estimated average useful lives of 1 years, 3 years, 3 years and 4 years, respectively, however amortization related to these intangible assets ceased as of the date they were determined to be held for sale.

For finite-lived intangible assets subject to amortization, impairment is considered upon certain "triggering events" and is recognized if the carrying amount is not recoverable and the carrying amount exceeds the fair value of the intangible asset.

Our indefinite-lived intangible asset, an FX trading license, is classified as held for use. Indefinite-lived assets are not amortized but tested for impairment. Our policy is to test for impairment at least annually or in interim periods if certain events occur indicating that the fair value of the asset may be less than its carrying amount. An impairment test on indefinite-lived assets is performed during the fourth quarter of our fiscal year using the October 1st carrying value. Impairment exists if the carrying value of the indefinite-lived intangible asset exceeds its fair value.

### Income Taxes

Holdings and Newco each operate in the U.S. as a limited liability company that is treated as a partnership for U.S. federal and state income tax purposes. As result, neither Holdings' nor Newco's income from its U.S. operations is subject to U.S. federal income tax because the income is attributable to its members. Accordingly, our U.S. tax provision is solely based on the portion of income attributable to the Corporation and excludes the income attributable to other members whose income is included in Net income attributable to non-controlling interest in Global Brokerage Holdings, LLC in the consolidated statements of operations.

Income taxes are accounted for in accordance with ASC 740, *Income Taxes* ("ASC 740"), which requires that deferred tax assets and liabilities are recognized, using enacted tax rates, for the effect of temporary differences between the book and tax basis of recorded assets and liabilities. Deferred tax assets, including net operating losses and income tax credits, are reduced by a valuation allowance if it is "more likely than not" that some portion or all of the deferred tax assets will not be realized. Significant judgment is required in determining the valuation allowance. In evaluating our ability to realize our deferred tax assets, we assess available positive and negative evidence, including historical operating results, ongoing tax planning strategies and expected future earnings on a jurisdiction-by-jurisdiction basis. Any change in our ability to realize our deferred tax assets would result in an increase or decrease in our tax provision in the period in which the assessment is changed.

In addition to U.S. federal and state income taxes, we are subject to Unincorporated Business Tax which is attributable to Holdings' operations apportioned to New York City. Our foreign subsidiaries are also subject to taxes in the jurisdictions they operate.

In accordance with ASC 740, we evaluate a tax position to determine whether it is more likely than not that the tax position will be sustained upon examination, based on the technical merits of the position. If the position does not meet a more likely than not threshold, a tax reserve is established and no income tax benefit is recognized. We are audited by U.S. federal

and state, as well as foreign, tax authorities. In some cases, many years may elapse before a tax return containing tax positions for which an ASC 740 reserve has been established is examined and an audit is completed. As audit settlements are reached, we adjust the corresponding reserves, if required, in the period in which the final determination is made. While it is difficult to predict the final outcome or timing of a particular tax matter, we believe that our reserves for uncertain tax positions are recorded pursuant to the provisions of ASC 740.

We currently do not plan to permanently reinvest the earnings of our foreign subsidiaries and therefore do record U.S. income tax expense for the applicable earnings. This treatment could change in the future.

### Litigation

We may from time to time be involved in litigation and claims that arise in the ordinary course of business, including intellectual property claims. In addition, our business is subject to extensive regulation, which may result in regulatory proceedings against us. We record a liability when we believe that it is both probable that a loss has been incurred and the amount of the loss can be reasonably estimated. When the reasonable estimate of the possible loss is within a range of amounts, the minimum of the range of possible loss is accrued, unless a higher amount within the range is a better estimate than any other amount within the range. Significant judgment is required to determine both probability and the estimated amount. We review these provisions at least quarterly and adjust them accordingly to reflect the impact of negotiations, settlements, rulings, advice of legal counsel, and updated information.

### Due to Related Parties Pursuant to Tax Receivable Agreement

In connection with our IPO, we purchased Holdings Units from our pre-IPO owners, including members of our senior management. Subsequently, we have had additional unit conversions.  At the IPO, we also entered into a tax receivable agreement with our pre-IPO owners that provides for the payment by Global Brokerage, Inc. to these parties of 85% of the benefits, if any, that Global Brokerage, Inc. is deemed to realize as a result of the increase in tax basis resulting from our purchases or exchanges of Holdings Units and certain other tax benefits related to our entering into the tax receivable agreement, including tax benefits attributable to payments under the tax receivable agreement. The Corporation expects to benefit from the remaining 15% in cash tax savings. Payments under the tax receivable agreement are based on the tax reporting positions that the Corporation takes in preparing its tax returns.

Holdings records an increase in its deferred tax assets for the estimated income tax effects of the increases in tax basis based on enacted federal and state tax rates at the date of the exchange and adjusts such amounts annually based on its latest estimate of benefit. To the extent that Holdings estimates that it will not benefit from the increase in basis, based on an analysis that will consider, among other things, its expectation of future earnings, the Company will reduce the deferred tax asset with a valuation allowance. Based on the Corporation's current financial position, it has recorded a full valuation allowance in 2015 as it does not expect to benefit from any increase in basis.

As discussed above, the Corporation records 85% of the estimated realizable tax benefit as an increase to the contingent liability due under the tax receivable agreement. The remaining 15% of the estimated realizable tax benefit is initially recorded as an increase to the Corporation's capital. Since the Corporation has recorded a total valuation allowance on the estimated tax benefit, it has correspondingly, written down the contingent liability to zero. However, if certain transactions or events were to occur in the future, the liability no longer stays contingent but rather becomes absolute and the corresponding tax receivable agreement payments could significantly increase. All of the effects to the deferred tax asset of changes in any of the estimates after the tax year of the exchange are reflected in the provision for income taxes.

### Derivative liability — Letter Agreement

The Letter Agreement provided that we would pay in cash to Leucadia a percentage of the net proceeds received in connection with certain transactions, including sales of assets, dividends or distributions, the sale or indirect sale of Group (Newco), the issuance of any debt or equity securities, and other specified non-ordinary course events, such as certain tax refunds and litigation proceeds. In accordance with the guidance in ASC 815, *Derivatives and Hedging*, several features under the Letter Agreement were accounted for separately as a derivative liability and reported at fair value. We estimated the fair value of the derivative liability under the Letter Agreement using a combination of approaches, including using the common stock price of Global Brokerage, a guideline public company method as well as a discounted cash flow method, then using an option pricing model for the allocation of enterprise value among various components. The valuation techniques used are sensitive to certain key assumptions, including expected volatility. Changes in the fair value of the derivative liability resulting from the Letter Agreement were recorded each quarter in our Consolidated Statements of Operations. Small changes in the assumptions in the models used could materially change the estimated fair value and could materially impact our results in a

given period. On September 1, 2016, the Letter Agreement was terminated (see "Redeemable Non-controlling Interest" below for further information).

### Redeemable Non-controlling Interest

In exchange for terminating the Letter Agreement, the Company issued a 49.9% non-controlling membership interest in Group to Leucadia. Following a Change of Control (as defined in the Group Agreement and described in Note 19, "Leucadia Transaction" in the Notes to Consolidated Financial Statements in "Item 8. Financial Statements and Supplementary Data"), the membership units held by Leucadia are redeemable for cash at an amount equal to the fair market value of Leucadia's economic rights under the Group Agreement. The non-controlling interest held by Leucadia is recorded as Redeemable non-controlling interest and is classified outside of permanent equity on the consolidated statements of financial condition pursuant to ASC 480, *Distinguishing Liabilities from Equity* ("ASC 480"). A change of control event that could trigger redemption of Leucadia's non-controlling interest is not solely within our control. We evaluate the probability of redemption at each reporting date by assessing whether there has been a Change of Control, and whether Leucadia has elected to redeem its non-controlling interest. If the non-controlling interest in Group becomes redeemable, or if redemption becomes probable, an adjustment will be made to adjust the Redeemable non-controlling interest to its estimated redemption value. As of December 31, 2016, we concluded that the non-controlling interest in Group is not currently redeemable and it is not probable that it will become redeemable and, accordingly, have not adjusted the Redeemable non-controlling interest to its estimated redemption value pursuant to ASC 480.

### Stock-Based Compensation

We account for stock-based compensation in accordance with ASC 718, *Compensation-Stock Compensation*, which requires measurement of equity-based awards, including stock options and restricted stock units, at the grant date fair value of the awards, with the resulting expense recognized on a straight-line basis over the requisite service period of the award. Stock-based compensation expense is recorded net of estimated forfeitures in our consolidated statements of operations based on the number of awards that we expect to vest. Our forfeiture assumption is based primarily on historical experience with regard to employee turnover. We periodically review our actual forfeiture rate, and revise the estimated forfeiture rate to reflect appropriate changes, if any. The expense we recognize in future periods will be affected by changes in the estimated forfeiture rate and may differ significantly from amounts recognized in the current period.

We measure the fair value of stock options on the date of grant using the Black-Scholes option pricing model which requires the use of highly subjective assumptions, including the estimated term for the stock options, the risk-free interest rate, the expected volatility of our stock price and our expected dividend yield. The assumptions used in calculating the fair value of our stock options represent our best estimates, but these estimates involve inherent uncertainties and the use of judgment. As a result, if factors change and we use different assumptions, our stock-based compensation expense may differ significantly in the future from amounts recognized in the current period.

### Management Incentive Plan

In connection with the Restructuring Transaction, we adopted the 2016 Incentive Bonus Plan for Founders and Executives (the "Management Incentive Plan"). The Management Incentive Plan is a long-term program with a five-year vesting period. Distributions under the plan will be made only after the principal and interest under the Credit Agreement have been repaid and will range from 10.0% to 14.0% of the distributions made from Group. If a participant terminates employment, he or she will receive either a non-voting membership interest in Group entitling the participant to the same share of distributions that would have otherwise been received, or a lump-sum cash payment, at the Company's discretion. We determined that the Management Incentive Plan is a share-based payment arrangement that will be accounted for as a liability award under ASC 718.

There is a performance condition associated with the Management Incentive Plan since it only becomes an obligation after the principal and interest under the amended Credit Agreement are fully repaid. Accordingly, we will begin recognizing compensation expense for the award over the requisite service period when it becomes probable that the performance condition would be satisfied pursuant to ASC 718. At each reporting date, we estimate the fair value of the Management Incentive Plan and assess the probability of repaying the amended Credit Agreement, and therefore of achieving the performance condition. Once the amended Credit Agreement has been repaid, or it is probable that it would be repaid, compensation expense will be recorded for the estimated fair value of the award, recognized using the accelerated attribution method over the five-year requisite service period, which could have an impact on our operating results in future periods. As of December 31, 2016, we determined that it is not probable that the performance condition would be satisfied and, accordingly, have not recognized compensation expense related to the award for the year ended December 31, 2016. As of December 31, 2016, the fair value of the Management Incentive Plan was estimated at $54.1 million.

**Recent Accounting Pronouncements**

See discussion of recent accounting pronouncements in Note 2, "Significant Accounting Policies and Estimates" in the Notes to Consolidated Financial Statements in "Item 8. Financial Statements and Supplementary Data."

**Item 7A. Quantitative and Qualitative Disclosures About Market Risk**

*Currency risk*

Currency risk arises from the possibility that fluctuations in foreign exchange rates will impact the value of our assets denominated in foreign currencies as well as our earnings due to the translation of our statements of financial condition and statements of operations from local currencies primarily to U.S. dollars. We currently have limited exposure to currency risk from customer open positions as we primarily utilize an agency model, simultaneously entering offsetting trades with both our customers and FX market makers. However, we do incur currency mismatch risk arising from customer accounts denominated in one currency being secured by cash deposits in a different currency. As exchange rates change, we could suffer a loss.

As of December 31, 2016, (2.6)% of our net current assets (current assets less current liabilities) were in British pounds, (1.6)% in Hong Kong Dollars, 1.2% in Euros and 1.0% in all other currencies other than the U.S. dollar. For illustrative purposes, if each of these currencies were to adversely change by 10% with no intervening hedging activity by ourselves, this would result in a pre-tax loss (gain) of $0.6 million in the case of British pounds, $0.4 million for Hong Kong Dollars and $(0.3) million for Euros.

*Interest rate risk*

Interest rate risk arises from the possibility that changes in interest rates will impact our financial statements.

Our cash and customer cash (on which we generally do not pay interest) is held primarily in short-term demand deposits at banks and at our FX market makers. Interest rates earned on these deposits and investments affects our interest revenue. We currently derive a minimal amount of interest income on our cash balances as interest rates are near-zero. Based on cash and customer cash held for continuing operations at December 31, 2016, we estimate that a 50 basis point change in interest rates would increase our annual pre-tax income from continuing operations by approximately $4.3 million.

The Convertible Notes pay a fixed rate of interest and are not subject to fluctuations in interest rates. If we were to refinance the debt, the interest rates in effect at that time may be different than the existing fixed rate. The Leucadia Credit Agreement has an initial interest rate of 10% per annum, increasing quarterly by 1.5% for so long as it is outstanding, but in no event exceeding 20.5% per annum (before giving effect to any applicable default rate) and is not subject to fluctuations in interest rates. Beginning with the fourth quarter of 2016, the interest rate on the Leucadia Credit Agreement is 20.5%, which is fixed until maturity.

*Credit risk*

Credit risk is the risk that a borrower or counterparty will fail to meet its obligations. We are exposed to credit risk from our customers, as well as institutional counterparties.

All retail customers are required to deposit cash collateral in order to trade on our platforms. Our policy is that retail customers are not advanced credit in excess of the cash collateral in their account and our systems are designed so that each customer's positions are revalued on a real-time basis to calculate the customer's usable margin. Usable margin is the cash the customer holds in the account after adding or deducting real-time gains or losses, less the margin requirement. The retail customer's positions are automatically closed once his or her usable margin falls to zero. While it is possible for a retail customer account to go negative in rare circumstances, for example, due to system failure, a final stop loss on the account is automatically triggered which will execute the closing of all positions. As a result of the foregoing measures, prior to the events of January 15, 2015, our customers rarely had significant negative equity balances, and exposure to credit risk from customers was therefore minimal. For the year ended December 31, 2016, losses incurred from customer accounts that had gone negative were approximately $2.5 million, primarily related to the Brexit event in June 2016 and the GBP flash crash in October 2016. For the year ended December 31, 2015, losses incurred from customer accounts that had gone negative were approximately $0.5 million (excluding the events of January 15, 2015).

On January 15, 2015, however, the SNB's decision to discontinue its currency floor of 1.2 CHF per EUR led to unprecedented volatility in the EUR/CHF currency pair. As a result, our customers suffered significant losses and generated debit balances owed to us of approximately $275.1 million. Following those events, we have taken a number of actions to reduce credit risk from our customers. We have increased margin requirements and discontinued currency pairs from our platform that we believe carry significant risk due to overactive manipulation by their respective governments either by a floor, ceiling, peg or band. We expect that these actions will reduce the risk that another event of increased volatility could lead to significant negative equity balances. However, while we believe these actions mitigate our exposure, we are still exposed to the risk of losses from negative equity balances. For example, at December 31, 2016, assuming a 10% reduction in GBP, EUR, JPY and AUD and no market liquidity (i.e., counterparties halt trading GBP, EUR, JPY and AUD), we estimate clients holding long GBP, EUR, JPY and AUD positions would incur debit balances of approximately $3.1 million, $11.2 million, $10.9 million and $5.0 million, respectively.

In addition, we are exposed to the following institutional counterparties: clearing and prime brokers as well as banks with respect to our own deposits and deposits of customer funds. We are exposed to credit risk in the event that such counterparties fail to fulfill their obligations. We manage the credit risk arising from institutional counterparties by setting exposure limits and monitoring exposure against such limits, carrying out periodic credit reviews, and spreading credit risk across a number of different institutions to diversify risk. As of December 31, 2016, our exposure to our three largest institutional counterparties, all major global banking institutions, was 32.0% of total assets and the single largest within the group was 13.6% of total assets.

*Market risk*

Market risk is the risk of losses in on- and off-balance sheet positions arising from movements in market prices. In our retail business, we operate predominantly on an agency execution model and are not exposed to the market risk of a position moving up or down in value with the exception of certain trades of our CFD customers. As of December 31, 2016, our net unhedged exposure to CFD customer positions was 12.9% of total assets. A hypothetical 10% fully correlated adverse change in the value of our unhedged CFD positions as of December 31, 2016 would result in a $13.4 million adverse impact to our annual pre-tax earnings or loss from continuing operations.

We offer our smaller retail clients with less than $20,000 in deposits the option to trade with a dealing desk, or principal model. In our agency execution model, when a customer executes a trade with us, we act as a credit intermediary, simultaneously entering into trades with the customer and the FX market maker. In the principal model, we may maintain our trading position and not offset the trade with another party. As a result, we may incur trading losses using principal model execution from changes in the prices of currencies where we are not hedged. We have established risk limits, policies and procedures to monitor risk on a continuous basis. As of December 31, 2016, our net unhedged exposure to FX customer positions was 5.9% of total assets. A hypothetical 10% fully correlated adverse change in the value of our unhedged FX positions as of December 31, 2016 would result in a $6.2 million adverse impact to our annual pre-tax earnings or loss from continuing operations.

We hold a 50.1% interest in Lucid, an electronic market maker and trader in the institutional foreign exchange spot and futures market. Lucid has risk limits by currency, trading strategy and overall exposure which are monitored continuously. In addition, Lucid seeks to close all open positions by the end of each foreign exchange trading day in New York. The average intra-day gross notional position in the year ended December 31, 2016 was $12.8 million and the maximum intra-day gross position was $59.7 million. A hypothetical 10% fully correlated decrease in value at the maximum intra-day position would result in an $6.0 million adverse impact to our annual pre-tax earnings or loss. Lucid has recently started a trading strategy in the over-the-counter options market on FX. Similar to its spot and futures markets trading, Lucid has position and risk limits that are monitored continuously.

We hold a 50.1% interest in V3, an entity created with the non-controlling members of Lucid. V3 expands Lucid's business model into a broader array of financial instruments and provides more robust connectivity to various financial exchanges. V3's market making and trading activities expose us to market risk. Market risks include price risk, volatility risk, liquidity risk and interest rate risk. Further risks may result from unexpected market reactions to economic data. V3 monitors these risks through risk limits, continuously monitoring positions and hedging strategies. V3's practices are designed to limit risk exposure assumed to approximately $1.5 million.

68

*Liquidity risk*

In normal conditions, our business of providing online FX trading and related services is self-financing as we generate sufficient cash flows to pay our expenses as they become due. As a result, we generally do not face the risk that we will be unable to raise cash quickly enough to meet our payment obligations as they arise. Our cash flows, however, are influenced by customer trading volume and the income we derive on that volume. These factors are directly impacted by domestic and international market and economic conditions that are beyond our control. In an effort to manage this risk, we maintain a substantial pool of liquidity. As of December 31, 2016, cash and cash equivalents held for continuing operations, excluding cash and cash equivalents held for customers, were 19.3% of total assets.

*Operational risk*

Our operations are subject to various risks resulting from technological interruptions, failures, or capacity constraints in addition to risks involving human error or misconduct. Regarding technological risks, we are heavily dependent on the capacity and reliability of computer and communications systems supporting our operations. We have established a program to monitor our computer systems, platforms and related technologies and to promptly address issues that arise. We have also established disaster recovery facilities in strategic locations to ensure that we can continue to operate with limited interruptions in the event that our primary systems are damaged. As with our technological systems, we have established policies and procedures designed to monitor and prevent both human errors, such as clerical mistakes and incorrectly placed trades, as well as human misconduct, such as unauthorized trading, fraud, and negligence. In addition, we seek to mitigate the impact of any operational issues by maintaining insurance coverage for various contingencies.

*Regulatory risk*

We operate in a highly regulated industry and are subject to the risk of sanctions from U.S., federal and state, and international authorities if we fail to comply adequately with regulatory requirements. Failure to comply with applicable regulations could result in financial and operational penalties. In addition, efforts to comply with applicable regulations may increase our costs and/or limit our ability to pursue certain business opportunities. Federal and state regulations significantly limit the types of activities in which we may engage. U.S. and international legislative and regulatory authorities change these regulations from time to time. See "Item 1A. Risk Factors."

Various government bodies and self-regulatory organizations responsible for overseeing our business activities require that we maintain specified minimum levels of regulatory capital in our operating subsidiaries. If not properly monitored or adjusted, our regulatory capital levels could fall below the required minimum amounts set by our regulators, which could expose us to various sanctions ranging from fines and censure to the imposition of partial or complete restrictions on our ability to conduct business. To mitigate this risk, we continuously evaluate the levels of regulatory capital at each of our operating subsidiaries and adjust the amounts of regulatory capital in each operating subsidiary as necessary to ensure compliance with all regulatory capital requirements. These may increase or decrease as required by regulatory authorities from time to time. We also maintain excess regulatory capital to provide liquidity during periods of unusual or unforeseen market volatility, and we intend to continue to follow this policy. In addition, we monitor regulatory developments regarding capital requirements to be prepared for increases in the required minimum levels of regulatory capital that may occur from time to time in the future. As of December 31, 2016, on a separate company basis, we were required to maintain approximately $60.6 million of minimum capital in the aggregate across all jurisdictions and approximately $33.3 million of minimum capital for our U.S. entity. As of December 31, 2016, we had approximately $97.1 million of excess adjusted net capital over this required regulated capital in all jurisdictions, including $14.2 million of excess capital in our U.S. entity.

Effective from January 1, 2016, the Financial Conduct Authority ("FCA"), which regulates our U.K. entity, introduced the "Capital Conservation Buffer" (CCB) and a "Countercyclical Capital Buffer" (CcyB) in line with the requirements set out in Capital Requirements Directive Article 160 Transitional Provisions for Capital Buffers. This requires all firms to maintain additional buffers on top of the minimum capital requirements noted above, which may vary at the direction of the FCA.

**Item 8. Financial Statements and Supplementary Data**

INDEX TO FINANCIAL STATEMENTS

**Global Brokerage, Inc.**

| | |
|---|---|
| Reports of Independent Registered Public Accounting Firm | F-2 |
| Global Brokerage, Inc. Consolidated Statements of Financial Condition as of December 31, 2016 and 2015 | F-4 |
| Global Brokerage, Inc. Consolidated Statements of Operations for the Years Ended December 31, 2016 and 2015 | F-5 |
| Global Brokerage, Inc. Consolidated Statements of Comprehensive Income (Loss) for the Years Ended December 31, 2016 and 2015 | F-6 |
| Global Brokerage, Inc. Consolidated Statements of Stockholders' Equity (Deficit) for the Years Ended December 31, 2016 and 2015 | F-7 |
| Global Brokerage, Inc. Consolidated Statements of Cash Flows for the Years Ended December 31, 2016 and 2015 | F-8 |
| Global Brokerage, Inc. Notes to Consolidated Financial Statements | F-10 |

**Report of Independent Registered Public Accounting Firm**

The Board of Directors and Stockholders of Global Brokerage, Inc.

We have audited the accompanying consolidated statements of financial condition of Global Brokerage, Inc. (the "Company") as of December 31, 2016 and 2015, and the related consolidated statements of operations, comprehensive income (loss), stockholders' equity (deficit) and cash flows for each of the two years in the period ended December 31, 2016. These financial statements are the responsibility of the Company's management. Our responsibility is to express an opinion on these financial statements based on our audits.

We conducted our audits in accordance with the standards of the Public Company Accounting Oversight Board (United States). Those standards require that we plan and perform the audit to obtain reasonable assurance about whether the financial statements are free of material misstatement. An audit includes examining, on a test basis, evidence supporting the amounts and disclosures in the financial statements. An audit also includes assessing the accounting principles used and significant estimates made by management, as well as evaluating the overall financial statement presentation. We believe that our audits provide a reasonable basis for our opinion.

In our opinion, the financial statements referred to above present fairly, in all material respects, the consolidated financial position of Global Brokerage, Inc. at December 31, 2016 and 2015, and the consolidated results of its operations and its cash flows for each of the two years in the period ended December 31, 2016, in conformity with U.S. generally accepted accounting principles.

We also have audited, in accordance with the standards of the Public Company Accounting Oversight Board (United States), Global Brokerage, Inc.'s internal control over financial reporting as of December 31, 2016, based on criteria established in Internal Control-Integrated Framework issued by the Committee of Sponsoring Organizations of the Treadway Commission (2013 framework) and our report dated March 17, 2017 expressed an unqualified opinion thereon.

/s/ Ernst & Young LLP

New York, New York
March 17, 2017

F-2

**Report of Independent Registered Public Accounting Firm**

The Board of Directors and Stockholders of Global Brokerage, Inc.

We have audited Global Brokerage, Inc.'s internal control over financial reporting as of December 31, 2016, based on criteria established in Internal Control-Integrated Framework issued by the Committee of Sponsoring Organizations of the Treadway Commission (2013 framework) (the COSO criteria). Global Brokerage, Inc.'s management is responsible for maintaining effective internal control over financial reporting, and for its assessment of the effectiveness of internal control over financial reporting included in the accompanying Management's Report on Internal Control over Financial Reporting. Our responsibility is to express an opinion on the company's internal control over financial reporting based on our audit.

We conducted our audit in accordance with the standards of the Public Company Accounting Oversight Board (United States). Those standards require that we plan and perform the audit to obtain reasonable assurance about whether effective internal control over financial reporting was maintained in all material respects. Our audit included obtaining an understanding of internal control over financial reporting, assessing the risk that a material weakness exists, testing and evaluating the design and operating effectiveness of internal control based on the assessed risk, and performing such other procedures as we considered necessary in the circumstances. We believe that our audit provides a reasonable basis for our opinion.

A company's internal control over financial reporting is a process designed to provide reasonable assurance regarding the reliability of financial reporting and the preparation of financial statements for external purposes in accordance with generally accepted accounting principles. A company's internal control over financial reporting includes those policies and procedures that (1) pertain to the maintenance of records that, in reasonable detail, accurately and fairly reflect the transactions and dispositions of the assets of the company; (2) provide reasonable assurance that transactions are recorded as necessary to permit preparation of financial statements in accordance with generally accepted accounting principles, and that receipts and expenditures of the company are being made only in accordance with authorizations of management and directors of the company; and (3) provide reasonable assurance regarding prevention or timely detection of unauthorized acquisition, use, or disposition of the company's assets that could have a material effect on the financial statements.

Because of its inherent limitations, internal control over financial reporting may not prevent or detect misstatements. Also, projections of any evaluation of effectiveness to future periods are subject to the risk that controls may become inadequate because of changes in conditions, or that the degree of compliance with the policies or procedures may deteriorate.

In our opinion, Global Brokerage, Inc. maintained, in all material respects, effective internal control over financial reporting as of December 31, 2016, based on the COSO criteria.

We also have audited, in accordance with the standards of the Public Company Accounting Oversight Board (United States), the consolidated statements of financial condition of Global Brokerage, Inc. as of December 31, 2016 and 2015, and the related consolidated statements of operations, comprehensive income (loss), stockholders' equity (deficit) and cash flows for each of the two years in the period ended December 31, 2016 and our report dated March 17, 2017 expressed an unqualified opinion thereon.

/s/ Ernst & Young LLP

New York, New York
March 17, 2017

TABLE OF CONTENTS

**Global Brokerage, Inc.**

**Consolidated Statements of Financial Condition**

| | | As of December 31, | | |
|---|---|---|---|---|
| | | **2016** | | **2015** |
| | | (In thousands, except share data) | | |
| **Assets** | | | | |
| Current assets | | | | |
| Cash and cash equivalents | $ | 200,914 | $ | 203,854 |
| Cash and cash equivalents, held for customers | | 661,936 | | 685,043 |
| Due from brokers | | 3,363 | | 3,781 |
| Accounts receivable, net | | 5,236 | | 1,636 |
| Tax receivable | | 199 | | 1,766 |
| Assets held for sale | | 97,103 | | 233,937 |
| Total current assets | | 968,751 | | 1,130,017 |
| Deferred tax asset | | 330 | | 14 |
| Office, communication and computer equipment, net | | 32,815 | | 35,891 |
| Goodwill | | 23,479 | | 28,080 |
| Other intangible assets, net | | 6,285 | | 13,782 |
| Notes receivable | | — | | 7,881 |
| Other assets | | 7,364 | | 11,421 |
| **Total assets** | $ | 1,039,024 | $ | 1,227,086 |
| **Liabilities, Redeemable Non-Controlling Interest and Stockholders' Deficit** | | | | |
| Current liabilities | | | | |
| Customer account liabilities | $ | 661,936 | $ | 685,043 |
| Accounts payable and accrued expenses | | 55,491 | | 38,298 |
| Due to brokers | | 1,471 | | 1,073 |
| Other liabilities | | 2,629 | | — |
| Due to related parties pursuant to tax receivable agreement | | — | | 145 |
| Liabilities held for sale | | 2,325 | | 14,510 |
| Total current liabilities | | 723,852 | | 739,069 |
| Deferred tax liability | | 215 | | 719 |
| Senior convertible notes | | 161,425 | | 154,255 |
| Credit Agreement — Related Party | | 150,516 | | 147,262 |
| Derivative liability — Letter Agreement | | — | | 448,458 |
| Other liabilities | | 7,319 | | 16,044 |
| **Total liabilities** | | 1,043,327 | | 1,505,807 |
| Commitments and Contingencies (see Notes 21 & 27) | | | | |
| **Redeemable non-controlling interest (see Note 3)** | | 46,364 | | — |
| **Stockholders' Deficit** | | | | |
| Class A common stock, par value $0.01 per share; 3,000,000,000 shares authorized, 6,143,297 and 5,602,534 shares issued and outstanding as of December 31, 2016 and 2015, respectively | | 61 | | 56 |
| Class B common stock, par value $0.01 per share; 1,000,000 shares authorized, 8 and 25 shares issued and outstanding as of December 31, 2016 and 2015, respectively | | 1 | | 1 |
| Additional paid-in-capital | | 389,917 | | 267,369 |
| Accumulated deficit | | (460,907) | | (531,550) |
| Accumulated other comprehensive (loss) income | | (2,312) | | 1,004 |
| Total stockholders' deficit Global Brokerage, Inc. | | (73,240) | | (263,120) |
| Non-controlling interests | | 22,573 | | (15,601) |
| **Total stockholders' deficit** | | (50,667) | | (278,721) |
| **Total liabilities, Redeemable non-controlling interest and stockholders' deficit** | $ | 1,039,024 | $ | 1,227,086 |

See accompanying notes to the consolidated financial statements.

F-4

TABLE OF CONTENTS

**Global Brokerage, Inc.**

**Consolidated Statements of Operations**

| | | For the Years Ended December 31, | | |
|---|---|---|---|---|
| | | 2016 | | 2015 |
| | | (Amounts in thousands, except per share data) | | |
| **Revenues** | | | | |
| Trading revenue | $ | 276,000 | $ | 250,042 |
| Interest income | | 2,517 | | 1,827 |
| Brokerage interest expense | | (888) | | (818) |
| Net interest revenue | | 1,629 | | 1,009 |
| Other income | | 6,427 | | 151,227 |
| **Total net revenues** | | 284,056 | | 402,278 |
| **Operating Expenses** | | | | |
| Compensation and benefits | | 91,377 | | 93,413 |
| Referring broker fees | | 38,213 | | 54,827 |
| Advertising and marketing | | 20,849 | | 14,932 |
| Communication and technology | | 28,262 | | 33,545 |
| Trading costs, prime brokerage and clearing fees | | 3,585 | | 3,952 |
| General and administrative | | 75,790 | | 58,436 |
| Bad debt (recovery) expense | | (141) | | 256,950 |
| Depreciation and amortization | | 27,289 | | 28,331 |
| Goodwill impairment loss | | — | | 9,513 |
| **Total operating expenses** | | 285,224 | | 553,899 |
| **Operating loss** | | (1,168) | | (151,621) |
| **Other (Income) Expense** | | | | |
| (Gain) loss on derivative liabilities — Letter & Credit Agreements | | (206,777) | | 354,657 |
| Loss on equity method investments, net | | 3,053 | | 467 |
| Gain on sale of investment | | (37,157) | | — |
| Interest on borrowings | | 77,143 | | 126,560 |
| **Income (loss) from continuing operations before income taxes** | | 162,570 | | (633,305) |
| Income tax provision | | 777 | | 181,198 |
| **Income (loss) from continuing operations** | | 161,793 | | (814,503) |
| Loss from discontinued operations, net of tax | | (117,860) | | (118,294) |
| **Net income (loss)** | | 43,933 | | (932,797) |
| Net income (loss) attributable to non-controlling interest in Global Brokerage Holdings, LLC | | 33,408 | | (324,595) |
| Net loss attributable to redeemable non-controlling interest in FXCM Group, LLC | | (2,804) | | — |
| Net loss attributable to other non-controlling interests | | (57,314) | | (54,273) |
| Net income (loss) attributable to Global Brokerage, Inc. | $ | 70,643 | $ | (553,929) |
| | | | | |
| Income (loss) from continuing operations attributable to Global Brokerage, Inc. | $ | 96,680 | $ | (513,600) |
| Loss from discontinued operations attributable to Global Brokerage, Inc. | | (26,037) | | (40,329) |
| Net income (loss) attributable to Global Brokerage, Inc. | $ | 70,643 | $ | (553,929) |
| | | | | |
| Weighted average shares of Class A common stock outstanding — Basic and Diluted | | 5,609 | | 5,087 |
| | | | | |
| Net income (loss) per share attributable to stockholders of Class A common stock of Global Brokerage, Inc. — Basic and Diluted: | | | | |
| Continuing operations | $ | 17.24 | $ | (100.96) |
| Discontinued operations | | (4.64) | | (7.93) |
| Net income (loss) attributable to Global Brokerage, Inc. | $ | 12.60 | $ | (108.89) |

See accompanying notes to the consolidated financial statements.

F-5

TABLE OF CONTENTS

**Global Brokerage, Inc.**

**Consolidated Statements of Comprehensive Income (Loss)**

|  | For the Years Ended December 31, | |
| --- | --- | --- |
|  | **2016** | **2015** |
|  | (Amounts in thousands) | |
| **Net income (loss)** | $ 43,933 | $ (932,797) |
| Other comprehensive (loss) income |  |  |
| Foreign currency translation loss | (5,198) | (4,013) |
| Realization of cumulative translation adjustment | — | 24,923 |
| Other comprehensive (loss) income, net of tax | (5,198) | 20,910 |
| **Comprehensive income (loss)** | 38,735 | (911,887) |
| Comprehensive income (loss) attributable to non-controlling interest in Global Brokerage Holdings, LLC | 31,903 | (316,552) |
| Comprehensive loss attributable to redeemable non-controlling interest in FXCM Group, LLC | (3,181) | — |
| Comprehensive loss attributable to other non-controlling interests | (57,314) | (54,289) |
| Comprehensive income (loss) attributable to Global Brokerage, Inc. | $ 67,327 | $ (541,046) |

See accompanying notes to the consolidated financial statements.

F-6

TABLE OF CONTENTS

Global Brokerage, Inc.

**Consolidated Statements of Stockholders' Equity (Deficit)**
**(In thousands, except share amounts)**

| | Non-controlling Interests | Retained Earnings (Accumulated Deficit) | Accumulated Other Comprehensive (Loss) Income | Additional Paid-in Capital | Common Stock - Class A | | Common Stock - Class B | | Total Stockholders' Equity (Deficit) |
|---|---|---|---|---|---|---|---|---|---|
| | | | | | Shares | Dollars | Shares | Dollars | |
| Balance as of January 1, 2015 | $ 358,328 | $ 22,379 | $ (11,879) | $ 274,139 | 4,788,994 | $ 48 | 34 | $ 1 | $ 643,016 |
| Net loss | (378,868) | (553,929) | — | — | — | — | — | | (932,797) |
| Other comprehensive income, net of tax | 8,027 | — | 12,883 | — | — | — | — | — | 20,910 |
| Comprehensive (loss) income | (370,841) | (553,929) | 12,883 | — | — | — | — | — | (911,887) |
| Class A common stock | | | | | | | | | |
| Repurchase of Class A common stock | (1) | — | — | — | (61) | — | — | — | (1) |
| Equity-based compensation | 2,083 | — | — | 2,254 | — | — | — | — | 4,337 |
| Exchange of Holdings Units to Class A common stock | 9,157 | — | — | (9,165) | 808,672 | 8 | (8) | — | — |
| Assignment of permitted transferees | — | — | — | — | — | — | (1) | — | — |
| Stock options issued | 123 | — | — | 198 | — | — | — | — | 321 |
| Vesting of restricted stock units | 57 | — | — | (57) | 4,929 | — | — | — | — |
| Distributions — non-controlling members | (14,507) | — | — | — | — | — | — | — | (14,507) |
| Balance as of December 31, 2015 | (15,601) | (531,550) | 1,004 | 267,369 | 5,602,534 | 56 | 25 | 1 | (278,721) |
| Net (loss) income | (23,906) | 70,643 | — | — | — | — | — | — | 46,737 |
| Other comprehensive loss, net of tax | (1,505) | — | (3,316) | — | — | — | — | — | (4,821) |
| Comprehensive (loss) income | (25,411) | 70,643 | (3,316) | — | — | — | — | — | 41,916 |
| Class A common stock | | | | | | | | | |
| Equity-based compensation | 541 | — | — | 1,155 | — | — | — | — | 1,696 |
| Exchange of Holdings Units to Class A common stock | 5,210 | — | — | (5,215) | 535,992 | 5 | (17) | — | — |
| Vesting of restricted stock units | 14 | — | — | (14) | 4,771 | — | — | — | — |
| Distributions — non-controlling members | (1,782) | — | — | — | — | — | — | — | (1,782) |
| Issuance of redeemable non-controlling interest (see Note 3) | 59,602 | — | — | 126,622 | — | — | — | — | 186,224 |
| Balance as of December 31, 2016 | $ 22,573 | $ (460,907) | $ (2,312) | $ 389,917 | 6,143,297 | $ 61 | 8 | $ 1 | $ (50,667) |

See accompanying notes to the consolidated financial statements.

TABLE OF CONTENTS

**Global Brokerage, Inc.**

**Consolidated Statements of Cash Flows**

| | For the Years Ended December 31, | |
|---|---|---|
| | **2016** | **2015** |
| | (Amounts in thousands) | |
| **Cash Flows From Operating Activities** | | |
| Net income (loss) | $ 43,933 | $ (932,797) |
| **Adjustments to reconcile net income (loss) to net cash provided by (used in) operating activities** | | |
| Depreciation and amortization | 27,289 | 40,690 |
| Equity-based compensation | 1,857 | 4,183 |
| Deferred tax (benefit) expense | (781) | 187,978 |
| Goodwill impairment losses | — | 64,378 |
| Loss on classification as held for sale assets | 126,511 | 66,660 |
| (Gain) loss on derivative liabilities — Letter & Credit Agreements | (206,777) | 354,657 |
| Amortization of deferred bond discount | 5,960 | 5,607 |
| Amortization of deferred financing cost | 1,210 | 2,653 |
| Amortization of original issue discount — Credit Agreement | 28,110 | 65,577 |
| Amortization of issuance fee, deferred financing fee and acquisition costs — Credit Agreement | 7,148 | 15,677 |
| Loss on equity method investments, net | 2,618 | 1,734 |
| Gain on disposition of equity method investment | (679) | — |
| Provision for debt forgiveness | 8,249 | — |
| Gain on business dispositions | (37,157) | (7,313) |
| Transaction costs associated with business dispositions | (1,755) | (7,410) |
| Due to related parties pursuant to tax receivable agreement | 44 | (145,080) |
| Changes in operating assets and liabilities | | |
| Cash and cash equivalents, held for customers | 23,980 | 299,572 |
| Due from brokers | 8,562 | 10,287 |
| Accounts receivable, net | (42) | 4,749 |
| Tax receivable, net | 1,567 | 92 |
| Other assets | 2,494 | (5,551) |
| Customer account liabilities | (23,107) | (298,598) |
| Accounts payable and accrued expenses | 8,621 | (5,465) |
| Other liabilities — Current | 2,629 | — |
| Other liabilities — Non-current | (6,759) | 6,514 |
| Payments for tax receivable agreement | (188) | (5,352) |
| Due to brokers | 443 | (15,240) |
| Securities sold, not yet purchased | (3,624) | (615) |
| Foreign currency remeasurement gain (loss) | 1,510 | (932) |
| **Net cash provided by (used in) operating activities** | **21,866** | **(293,345)** |
| **Cash Flows From Investing Activities** | | |
| Purchases of office, communication and computer equipment, net | (18,226) | (17,336) |
| Proceeds from sale of office, communication and computer equipment, net | — | 499 |
| Purchase of intangible assets | (2,000) | (518) |
| Proceeds from notes receivable | — | 1,500 |
| Proceeds from business dispositions, net of cash | 36,000 | 65,979 |
| Payments for equity investment, net of cash acquired | (450) | — |
| **Net cash provided by investing activities** | **15,324** | **50,124** |
| **Cash Flows From Financing Activities** | | |
| Distributions to non-controlling members | (683) | (14,507) |
| Proceeds from issuance of stock options | — | 321 |
| Common stock repurchases | — | (1) |
| Payments on borrowings under Revolving credit agreement | — | (25,000) |
| Proceeds from the Leucadia Transaction | — | 279,000 |
| Principal payments on borrowings under the Credit Agreement | (38,175) | (117,315) |
| Debt acquisition costs — Credit Agreement | — | (1,876) |
| **Net cash (used in) provided by financing activities** | **(38,858)** | **120,622** |
| Effect of foreign currency exchange rate changes on cash and cash equivalents | (2,680) | (1,575) |
| **Net decrease in cash and cash equivalents** | **(4,348)** | **(124,174)** |
| Cash and cash equivalents[(1)] | | |
| Beginning of year | 214,640 | 338,814 |
| End of year | $ 210,292 | $ 214,640 |

See accompanying notes to the consolidated financial statements.

F-8

**Global Brokerage, Inc.**

**Consolidated Statements of Cash Flows - (continued)**

| | For the Years Ended December 31, | |
|---|---|---|
| | 2016 | 2015 |
| | (Amounts in thousands) | |
| **Supplemental disclosures of cash flow activities** | | |
| Cash paid (received) for taxes | $ 468 | $ (399) |
| Cash paid for interest | $ 37,761 | $ 31,297 |
| **Supplemental disclosure of non-cash investing activities** | | |
| Exchange of Holdings Units for shares of Class A common stock | $ (5,210) | $ (9,157) |
| Deferred payment for purchase of intangible assets | $ — | $ 5,482 |
| Proceeds receivable from business disposition | $ 4,000 | $ — |
| **Supplemental disclosure of non-cash financing activities** | | |
| Non-cash distribution to non-controlling members | $ 1,099 | $ — |
| Exchange of Letter Agreement for Redeemable non-controlling interest | $ 235,509 | $ — |
| **The following amounts reflected in the statements of cash flows are included in discontinued operations:** | | |
| Depreciation and amortization | $ — | $ 12,359 |
| Equity-based compensation | $ — | $ 1,494 |
| Deferred tax expense | $ — | $ 6,181 |
| Goodwill impairment losses | $ — | $ 54,865 |
| Loss on classification as held for sale assets | $ 126,511 | $ 66,660 |
| Gain on business dispositions | $ — | $ 7,313 |
| Transaction costs associated with business dispositions | $ — | $ (7,410) |
| Gain (loss) on equity method investments, net | $ 435 | $ (1,267) |
| Purchases of office, communication and computer equipment, net | $ (182) | $ (338) |
| Proceeds from sale of office, communication and computer equipment | $ — | $ 499 |
| Proceeds from business dispositions, net of cash | $ — | $ 65,979 |
| Gain on disposition of equity method investment | $ 679 | $ — |

[1] Includes Cash and cash equivalents from continuing and discontinued operations

See accompanying notes to the consolidated financial statements.

TABLE OF CONTENTS

**Global Brokerage, Inc.**

**Notes to Consolidated Financial Statements**

**Note 1. Nature of Business and Organization**

Global Brokerage, Inc. ("Global Brokerage" or the "Corporation") (f/k/a "FXCM Inc."), a Delaware holding company incorporated on August 10, 2010, is an online provider of foreign exchange ("FX") trading, contracts for difference ("CFD") trading, spread betting and related services to retail and institutional customers worldwide. The Corporation operates through its managing membership interest in Global Brokerage Holdings, LLC ("Holdings") (f/k/a "FXCM Holdings, LLC"), the Corporation's sole operating asset. Holdings is a majority-owned, controlled and consolidated subsidiary of the Corporation. In January 2015, Holdings transferred its interest in its operating subsidiaries to FXCM Newco, LLC ("Newco"), which was then a wholly-owned subsidiary of Holdings, formed in connection with the financing arrangement entered into with Leucadia National Corporation ("Leucadia") ("the Leucadia Transaction") (see Note 19). On September 1, 2016, the Company completed a restructuring transaction with Leucadia (the "Restructuring Transaction") (see Note 19). In connection with the Restructuring Transaction, the financing arrangement with Leucadia was amended, Newco was renamed FXCM Group, LLC ("Group") and Leucadia acquired a 49.9% membership interest in Group, with Holdings owning the remaining 50.1% membership interest in Group. Group is a majority-owned, controlled and consolidated subsidiary of Holdings. As used in these notes, the term "Company" collectively refers to the Corporation, Holdings, Group and subsidiaries of Group.

As an online provider of FX trading, CFD trading, spread betting and related services, the Company offers its retail and institutional customers access to global over-the-counter FX markets. In a FX trade, a participant buys one currency and simultaneously sells another, a combination known as a "currency pair." The Company's proprietary trading platform presents its FX customers with the price quotations on several currency pairs from a number of global banks, financial institutions and market makers ("FX market makers"). The Company's primary FX offering to retail customers is what is referred to as agency execution or an agency model. Under the agency model, when a customer executes a trade on the price quotation presented by the FX market maker, the Company acts as a credit intermediary, or a riskless principal, simultaneously entering into a trade with the customer and the FX market maker. This agency model has the effect of hedging our positions and eliminating market risk exposure. The Company earns trading revenue from fees charged as a markup to the price provided by the FX market makers or commissions, not trading profit or losses. We offer a dealing desk, or principal, execution model to smaller retail clients. Under the dealing desk model, the Company maintains its trading position and does not offset the trade with another party on a one for one basis. As a result, the Company may incur trading losses under the dealing desk model from changes in the prices of currencies where the Company is not hedged. Additionally, the Company offers its customers the ability to trade CFDs and spread betting through its United Kingdom ("U.K.") subsidiaries. CFDs, primarily a dealing desk offering, allow for the exchange of the difference in the value of a particular asset such as a stock index or oil or gold contracts, between the time at which a contract is opened and the time at which it is closed. Spread betting allows our customers to bet on the price fluctuations of various financial markets such as FX, indices, oil and metals.

The Company's trading revenue also includes commission income generated by facilitating spot FX trades on behalf of institutional customers. The Company offers FX trading services to retail FX and CFD brokers, small hedge funds and emerging market banks, on an agency model basis, through its FXCM Pro offering. The Company also offers Prime of Prime services ("FXCM Prime") where it provides small and medium sized high frequency trading customers access to prime broker services under the Company's name. These services allow customers to obtain optimal prices offered by external banks and other price providers. The counterparties to these trades are external financial institutions that hold customer account balances and settle the transactions. The Company receives commissions for providing these services without taking any market or credit risk. The Company, through its 50.1% controlling interest in Lucid Markets Trading Limited, is also an electronic market-maker and trader in the institutional FX market. In addition, through its 50.1% controlling interest in V3 Markets, LLC, the Company has expanded its market making and electronic trading into other asset classes. As described below, Lucid Markets Trading Limited and V3 Markets, LLC are included in the Company's businesses to be disposed of as of December 31, 2016.

**Discontinued Operations**

During the first quarter of 2015, the Company commenced the process of disposing of its interests in certain retail and institutional trading businesses. The retail businesses are FXCM Asia Limited, FXCM Japan Securities Co., Ltd. and the equity trading business of FXCM Securities Limited. The institutional businesses are Faros Trading LLC, Lucid Markets Trading Limited, V3 Markets, LLC and the Company's equity interest in FastMatch, Inc. ("FastMatch"). In April 2015, the Company completed the sale of FXCM Japan Securities Co., Ltd. and Faros Trading LLC. In September 2015, the Company completed the sale of FXCM Asia Limited. In December 2015, the Company completed the sale of the equity trading business of FXCM Securities Limited. The Company remains committed to a plan to sell the remaining businesses which continue to be actively

TABLE OF CONTENTS

**Global Brokerage, Inc.**

**Notes to Consolidated Financial Statements**

**Note 1. Nature of Business and Organization - (continued)**

marketed.  As a result, these businesses are considered to be held for sale and their results of operations have been reported as discontinued operations (see Note 4).

**Note 2. Significant Accounting Policies and Estimates**

**Basis of Presentation**

*Basis of Consolidation*

The accompanying consolidated financial statements are presented in accordance with accounting principles generally accepted in the United States of America ("U.S. GAAP"). The Company consolidates those entities which it is the primary beneficiary of a variable-interest entity ("VIE") as required by Financial Accounting Standards Board ("FASB") Accounting Standards Codification Topic ("ASC") 810, *Consolidations* ("ASC 810"), or entities where it has a controlling interest. Entities that do not qualify as VIEs are evaluated for consolidation as voting interest entities under the voting interest model. Under the voting interest model, the Company consolidates those entities where it has a controlling financial interest through a majority voting interest. Intercompany accounts and transactions are eliminated in consolidation.

At the time of Newco's formation in connection with the Leucadia Transaction, the Company determined that Newco was a VIE and concluded that Holdings was the primary beneficiary of Newco, which resulted in the consolidation of the financial results of Newco by Holdings. The Company determined that the Restructuring Transaction (see Note 19) is a reconsideration event under ASC 810 and re-evaluated the previous conclusion that Newco (subsequently renamed to Group) is a VIE. Upon reconsideration, the Company determined that Group remains a VIE and concluded that Holdings is the primary beneficiary of Group since Holdings has the ability to direct the activities of Group that most significantly impact Group's economic performance and the obligation to absorb losses of Group or the right to receive benefits from Group that could be significant to Group. As a result, Holdings continues to consolidate the financial results of Group.

The Corporation records a non-controlling interest for the economic interest in Holdings not owned by the Corporation. The Corporation's and the non-controlling unit holders' economic interest in Holdings was 74.5% and 25.5%, respectively, as of December 31, 2016. The Corporation's and the non-controlling unit holders' economic interest in Holdings was 67.9% and 32.1%, respectively, as of December 31, 2015.

The Company's consolidated financial statements include the following significant subsidiaries of Holdings:

| | |
|---|---|
| FXCM Group, LLC[1] | ("Group") |
| FXCM Global Services, LLC | ("Global Services") |
| Forex Capital Markets, LLC | ("US") |
| FXCM Asia Limited[2] | ("HK") |
| Forex Capital Markets Limited | ("UK LTD") |
| FXCM Australia Pty. Limited | ("Australia") |
| FXCM Securities Limited[3] | ("FSL") |
| FXCM Japan Securities Co., Ltd.[4] | ("FXCMJ") |
| FXCM UK Merger Limited | ("Merger") |
| Lucid Markets Trading Limited | ("Lucid") |
| Lucid Markets LLP | ("Lucid LLP") |
| Faros Trading LLC[4] | ("Faros") |
| V3 Markets, LLC | ("V3") |

_____

[1] FXCM Newco, LLC was renamed FXCM Group, LLC effective September 1, 2016

[2] Sold by the Company in September 2015

[3] Sold by the Company in December 2015

[4] Sold by the Company in April 2015

TABLE OF CONTENTS

**Global Brokerage, Inc.**

**Notes to Consolidated Financial Statements**

**Note 2. Significant Accounting Policies and Estimates - (continued)**

Net income or loss attributable to the non-controlling interest in Holdings in the consolidated statements of operations represents the portion of earnings or loss attributable to the economic interest in Holdings held by the non-controlling unit holders.

Net income or loss attributable to redeemable non-controlling interest in the consolidated statements of operations represents the share of earnings or loss allocated to the non-controlling membership interest in Group held by Leucadia based on the hypothetical liquidation at book value method.

Net income or loss attributable to other non-controlling interests in the consolidated statements of operations represents the portion of earnings or loss attributable to the non-controlling interests of Lucid, Faros (prior to the sale of Faros' operations in the second quarter of 2015), V3 and other consolidated entities based on the economic interests held by the non-controlling members. The non-controlling members of Lucid, Faros (prior to the sale of Faros' operations in the second quarter of 2015) and V3 each hold a 49.9% economic interest in the respective entity. The portion of the 49.9% of Lucid earnings allocated among the non-controlling members of Lucid that is contingent on services being provided is reported as a component of compensation expense and is included in the determination of Income (loss) from discontinued operations, net of tax in the consolidated statements of operations (see Note 4).

Redeemable non-controlling interest on the consolidated statements of financial condition represents the non-controlling membership interest in Group held by Leucadia. Non-controlling interests on the consolidated statements of financial condition represents the equity attributable to the non-controlling interests of Holdings, Lucid, V3 and other consolidated entities.

Investments where the Company is deemed to exercise significant influence, but no control, are accounted for using the equity method of accounting. The Company records its pro-rata share of earnings or losses each period and records any dividends as a reduction in the investment balance. The carrying value of these investments is included in Other assets in the consolidated statements of financial condition and earnings or losses are included in Income or loss on equity method investments, net in the consolidated statements of operations. For the Company's equity method investments classified as discontinued operations, the carrying value of the investments is included in assets held for sale on the consolidated statements of financial condition and earnings or losses are included in the determination of Income or loss from discontinued operations, net of tax in the consolidated statements of operations (see Note 6).

*Reclassifications*

Certain reclassifications of prior period amounts related to the Company's retrospective adoption of Accounting Standards Update ("ASU") No. 2015-03, *Interest—Imputation of Interest (Subtopic 835-30): Simplifying the Presentation of Debt Issuance Costs*, have been made to conform to the current period's presentation in the consolidated statements of financial condition.

*Use of Estimates*

The preparation of consolidated financial statements in conformity with U.S. GAAP requires management to make estimates and assumptions that affect the reported amounts of assets and liabilities and disclosure of contingent assets and liabilities at the date of the consolidated financial statements as well as the reported amounts of revenue and expenses during the year. Actual results could differ from those estimates and could have a material impact on the consolidated financial statements.

*Discontinued Operations*

As discussed in Note 1, during the first quarter of 2015, management committed to a plan to dispose of certain businesses. The Company determined that these businesses represent components pursuant to ASC 205-20, *Presentation of Financial Statements — Discontinued Operations* ("ASC 205-20"). The unsold businesses are considered held for sale at the respective reporting dates. When viewed as a whole, the disposal of these components represents a strategic shift as contemplated by ASC 205-20 and the results of operations are reported as discontinued operations for each period presented (see Note 4).

F-12

TABLE OF CONTENTS

**Global Brokerage, Inc.**

**Notes to Consolidated Financial Statements**

**Note 2. Significant Accounting Policies and Estimates - (continued)**

*Segments*

ASC 280, *Segment Reporting* ("ASC 280") establishes standards for reporting information about operating segments. Operating segments are defined as components of an enterprise about which separate financial information is available that is evaluated regularly by the chief operating decision maker, or decision making group, in deciding how to allocate resources and in assessing performance. The guidance defines reportable segments as operating segments that meet certain quantitative thresholds. It was determined in the first quarter of 2015 that as a result of the events of January 15, 2015, and the decision to sell certain institutional assets, the composition of the Company's previously reported Institutional segment changed significantly, such that the remaining institutional business reported in continuing operations no longer meets the quantitative criteria for separate reporting. In addition, the continuing institutional business shares common management strategies, customer support and trading platforms with the Company's retail business. Accordingly, the Company operates in a single operating segment for all periods presented.

*Cash and Cash Equivalents*

Cash and cash equivalents include cash at banks, U.S. Treasury bills and other highly liquid instruments with original maturities of less than 90 days at the time of purchase and cash on deposit held with FX and CFD market makers related to economic hedging activities. At times, balances held in U.S. bank accounts may exceed federally insured limits. This potentially subjects the Company to concentration risk. The Company has not experienced losses in such accounts.

*Cash and Cash Equivalents, held for customers*

Cash and cash equivalents, held for customers represents cash held to fund customer liabilities. At times, balances held in U.S. bank accounts may exceed federally insured limits. This potentially subjects the Company to concentration risk. The Company has not experienced losses in such accounts.

The balance arises primarily from cash deposited by customers and net realized gains from customer trading activity. The Company maintains a corresponding liability in connection with this amount that is included in customer account liabilities in the consolidated statements of financial condition (see Note 11). A portion of the balance is not available for general use due to regulatory restrictions in certain jurisdictions. The restricted balances related to continuing operations were $0.3 billion and $0.4 billion as of December 31, 2016 and 2015, respectively.

*Due from/to Brokers*

Due from/to brokers represents the amount of the unsettled spot currency trades that the Company has with financial institutions. Also included in due from/to brokers is the fair value of derivative financial instruments discussed below. The Company has master netting agreements with its respective counterparties which allows the Company to present due from/to brokers on a net-by-counterparty basis in accordance with ASC 815, *Derivatives and Hedging* ("ASC 815"), and ASC 210, *Balance Sheet* ("ASC 210"). Due from/to brokers related to businesses classified as discontinued operations are included as a component of assets/liabilities held for sale on the consolidated statements of financial condition (see Note 4).

*Derivatives*

Derivative financial instruments are accounted for in accordance with ASC 815 and are included in Due from/to brokers in the consolidated statements of financial condition. The Company recognizes all derivative financial instruments in the consolidated statements of financial condition as either assets or liabilities at fair value. The Company enters into futures contracts to (i) economically hedge the open customer contracts on its CFD business and (ii) hedge trading in its electronic market making and institutional foreign exchange spot and futures markets. Futures contracts are exchange traded contracts to either purchase or sell a specific asset at a specified future date for a specified price. Gains or losses on futures contracts related to the Company's CFD business are included in Trading revenue in the consolidated statements of operations and gains or losses on hedge trading in the Company's electronic market making and institutional foreign exchange spot and futures markets and other asset classes are included in Income (loss) from discontinued operations, net of tax in the consolidated statements of operations (see Note 22).

F-13

TABLE OF CONTENTS

**Global Brokerage, Inc.**

**Notes to Consolidated Financial Statements**

**Note 2. Significant Accounting Policies and Estimates - (continued)**

*Fair Value Measurements*

Fair value is defined as the price that would be received to sell an asset or paid to transfer a liability in an orderly transaction between market participants at the measurement date. Fair value measurement establishes a fair value hierarchy that prioritizes the inputs of valuation techniques used to measure fair value. The hierarchy gives the highest priority to unadjusted quoted prices in active markets for identical assets or liabilities and the lowest priority to unobservable inputs. These three levels of fair value hierarchy are defined as follows:

*Level 1*:  Quoted prices in active markets for identical assets or liabilities, accessible by the Company at the measurement date.

*Level 2*:  Quoted prices for similar assets or liabilities in active markets, or quoted prices for identical or similar assets or liabilities in markets that are not active, or other observable inputs other than quoted prices.

*Level 3*:  Unobservable inputs for assets or liabilities.

When Level 1 inputs are available, those inputs are selected for determination of fair value. To value financial assets and liabilities that are characterized as Level 2 and 3, the Company uses observable inputs for similar assets and liabilities that are available from pricing services or broker quotes. These observable inputs may be supplemented with other methods, including internal models that result in the most representative prices for assets and liabilities with similar characteristics. Multiple inputs may be used to measure fair value, however, the fair value measurement for each financial asset or liability is categorized in its entirety in the same level of the fair value hierarchy as the lowest level input that is significant to the entire measurement (see Note 23).

*Accounts Receivable, net*

As of December 31, 2016 and 2015, Accounts receivable, net, consisted primarily of amounts due from institutional customers relating to the Company's FX business, fees receivable from the Company's white label service to third parties, interest receivable, a refund of regulatory fees and a broker receivable. As of December 31, 2016, Accounts receivable, net also includes proceeds receivable from the sale of an investment. Receivables are shown net of reserves for uncollectible accounts. The reserve for bad debts is maintained at a level that management believes to be sufficient to absorb estimated losses in the accounts receivable portfolio. The reserve is increased by the provision for bad debts which is charged against operating results and decreased by the amount of charge-offs, net of recoveries. The amount charged against operating results is based on several factors including, but not limited to, a continuous assessment of the collectability of each account, the length of time a receivable is past due and our historical experience with the particular customer. As of both December 31, 2016 and 2015, the reserve netted against receivables in the consolidated statements of financial condition was $6.8 million, which was recorded against an uncollected broker receivable.

As of December 31, 2016 and 2015, Accounts receivable, net, also includes advances to employees and non-controlling members of Holdings.

TABLE OF CONTENTS

**Global Brokerage, Inc.**

**Notes to Consolidated Financial Statements**

**Note 2. Significant Accounting Policies and Estimates - (continued)**

*Office, Communication and Computer Equipment, net*

Office, communication and computer equipment, net, consists of computer equipment, purchased technology hardware and software, internally-developed software, leasehold improvements, furniture and fixtures and other equipment, licenses and communication equipment. Office, communication and computer equipment are recorded at historical cost, net of accumulated depreciation. Additions and improvements that extend the lives of assets are capitalized, while expenditures for repairs and maintenance are expensed as incurred. Certain costs of software developed or obtained for internal use are capitalized. Depreciation is computed using the straight-line method. The Company depreciates these assets using the following useful lives:

| | |
|---|---|
| Computer equipment | 3 to 5 years |
| Capitalized software | 2 to 5 years |
| Leasehold improvements | Lesser of the estimated economic useful life or the term of the lease |
| Furniture and fixtures and other equipment | 3 to 5 years |
| Licenses | 2 to 3 years |
| Communication equipment | 3 to 5 years |

Office, communication and computer equipment, net related to businesses classified as discontinued operations are included as a component of assets held for sale on the consolidated statements of financial condition (see Note 4). Depreciation related to these assets ceased as of the date they were determined to be held for sale and is included in Income (loss) from discontinued operations, net of tax in the consolidated statements of operations.

*Valuation of Other Long-Lived Assets*

The Company assesses potential impairments of its other long-lived assets, including office, communication and computer equipment, when there is evidence that events or changes in circumstances indicate that the carrying amount of an asset may not be recovered. An impairment loss is recognized when the carrying amount of the long-lived asset exceeds its fair value and is not recoverable. The carrying amount of a long-lived asset is not recoverable if it exceeds the sum of the undiscounted cash flows expected to result from the use and eventual disposition of the asset. Any required impairment loss is measured as the amount by which the carrying amount of a long-lived asset exceeds its fair value and is recorded as a reduction in the carrying value of the related asset and a charge to operating results.

*Goodwill*

The Company recorded goodwill from various acquisitions. Goodwill represents the excess purchase price over the value assigned to the net tangible and identifiable intangible assets of a business acquired. The Company operates in a single operating segment, which also represents the reporting unit for purposes of the goodwill impairment test. Annually, or in interim periods if an event occurs or circumstances change that indicate the fair value of the reporting unit may be below its carrying amount ("triggering events"), the Company first performs a qualitative assessment as a basis for determining whether it is necessary to perform the quantitative goodwill impairment test in accordance with ASC 350, *Intangibles—Goodwill and Other* ("ASC 350"). If the qualitative assessment indicates that it is more likely than not that the fair value of the reporting unit is below its carrying amount, the Company proceeds with the quantitative test described below. The Company tests goodwill for impairment annually during the fourth quarter of its fiscal year using October 1 carrying values.

The first step of the two-step process involves a comparison of the estimated fair value of the reporting unit to its carrying amount, including goodwill. In performing the first step, the Company determines the fair value of the reporting unit using a discounted cash flow ("DCF") analysis. Determining fair value requires the exercise of significant judgment, including judgments about appropriate discount rates, perpetual growth rates and the amount and timing of expected future cash flows. The cash flows employed in the DCF analyses are based on the Company's most recent budgets and business plans and, when applicable, various growth rates are assumed for years beyond the current business plan period. Discount rate assumptions are based on an assessment of the risk inherent in the future cash flows of the reporting unit. If the estimated fair value of the

TABLE OF CONTENTS

**Global Brokerage, Inc.**

**Notes to Consolidated Financial Statements**

**Note 2. Significant Accounting Policies and Estimates - (continued)**

reporting unit exceeds its carrying amount, the goodwill of the reporting unit is not impaired and the second step of the impairment test is not necessary. If the carrying amount of the reporting unit exceeds its estimated fair value, then the second step of the goodwill impairment test must be performed. The second step of the goodwill impairment test compares the implied fair value of the reporting unit's goodwill with its carrying amount to measure the amount of impairment loss, if any. The implied fair value of goodwill is determined in the same manner as the amount of goodwill recognized in a business combination (i.e., the estimated fair value of the reporting unit is allocated to all of the assets and liabilities of that reporting unit including any unrecognized intangible assets as if the reporting unit had been acquired in a business combination and the fair value of the reporting unit was the purchase price paid). If the carrying amount of the reporting unit's goodwill exceeds the implied fair value of the reporting unit's goodwill, an impairment loss is recognized in an amount equal to that excess.

*Other Intangible Assets, net*

Other intangible assets, net, classified as held for use include customer relationships recorded from various acquisitions. Intangible assets classified as held for sale primarily include non-compete agreements, an executory contract, trade name and proprietary technology also recorded from various acquisitions.

The useful lives of these finite-lived intangible assets are based on the period they are expected to contribute to future cash flows as determined by the Company's historical experience. The customer relationships are amortized on a straight-line basis over their estimated average useful life of 3 to 9 years. Prior to being classified as held for sale, the non-compete agreements, executory contract, trade name and proprietary technology were amortized on a straight-line basis over their estimated average useful lives of 1 to 9 years, 3 years, 3 years and 4 to 7 years, respectively, however amortization related to these intangible assets ceased as of the date they were determined to be held for sale.

For finite-lived intangible assets subject to amortization, impairment is considered upon certain "triggering events" and is recognized if the carrying amount is not recoverable and the carrying amount exceeds the fair value of the intangible asset.

The Company's indefinite-lived intangible asset, an FX trading license, is classified as held for use. Indefinite-lived assets are not amortized but tested for impairment. The Company's policy is to test for impairment at least annually or in interim periods if certain events occur indicating that the fair value of the asset may be less than its carrying amount. An impairment test on this indefinite-lived asset is performed during the fourth quarter of the Company's fiscal year using the October 1st carrying value. Impairment exists if the carrying value of the indefinite-lived intangible asset exceeds its fair value.

*Equity Method Investments*

Investments where the Company is deemed to exercise significant influence, but no control, are accounted for using the equity method of accounting. The Company records its pro-rata share of earnings or losses each period and records any dividends as a reduction in the investment balance. Additionally, the carrying value of investments accounted for using the equity method of accounting is adjusted downward to reflect any impairment in value. For investments accounted for using the equity method of accounting, the Company evaluates information (e.g., budgets, business plans, financial statements, etc.) in addition to quoted market prices, if any, in determining whether an other-than-temporary decline in value exists. Factors indicative of an impairment in value include recurring operating losses, credit defaults and subsequent rounds of financing at an amount below the cost basis of the Company's investment.

The Company's equity method investments from continuing operations are included in Other assets in the consolidated statements of financial condition and its share of the earnings or losses is included in Loss on equity method investments, net in the consolidated statements of operations (see Note 6). The Company's equity method investments related to businesses classified as discontinued operations are included as a component of assets held for sale on the consolidated statements of financial condition and the share of earnings or losses is included in Income (loss) from discontinued operations, net of tax in the consolidated statements of operations (see Note 4).

TABLE OF CONTENTS

**Global Brokerage, Inc.**

**Notes to Consolidated Financial Statements**

**Note 2. Significant Accounting Policies and Estimates - (continued)**

*Notes Receivable*

Notes receivable represent receivables for notes acquired for cash plus accrued interest. Notes receivable are initially recorded at the amount of cash exchanged plus accrued interest. Interest income on the notes is recorded on an accrual basis and included in Interest income in the consolidated statements of operations. The Company individually assesses its notes receivables for impairment using methods including internally generated cash flow projections to determine if the notes will be repaid under the expected terms of the note agreements. If the Company concludes that the counterparty will not repay a note in accordance with its terms, the Company considers the note impaired and begins recognizing interest income on a cash basis, if any. To measure impairment, the Company calculates the estimated fair value of the collateral. If the estimated fair value of the collateral is less than the carrying value of the note receivable, the Company establishes an impairment reserve for the difference. If it is likely that a note will not be collected based on financial or other business indicators, the Company's policy is to charge off the note in the period which it deems it uncollectible (see Note 5).

*Other Assets*

Other assets include prepaid expenses, equity and cost method investments and deposits for rent security (see Note 10). Other assets related to businesses classified as discontinued operations are included as a component of assets held for sale on the consolidated statements of financial condition (see Note 4).

*Accounts Payable and Accrued Expenses*

Accounts payable and accrued expenses include operating expenses payable, commissions payable, which represents balances owed to referring brokers for trades transacted by customers that were introduced to the Company by such brokers, bonuses payable, income taxes payable, and interest due on borrowings (see Note 12). Accounts payable and accrued expenses related to businesses classified as discontinued operations, which includes amounts due to the Lucid non-controlling members for services provided, is included as a component of liabilities held for sale on the consolidated statements of financial condition (see Note 4).

*Litigation*

The Company may from time to time be involved in litigation and claims that arise in the ordinary course of business, including intellectual property claims. In addition, our business is subject to extensive regulation, which may result in regulatory proceedings against us. The Company records a liability when it is both probable that a loss has been incurred and the amount of the loss can be reasonably estimated. When the reasonable estimate of the possible loss is within a range of amounts, the minimum of the range of possible loss is accrued, unless a higher amount within the range is a better estimate than any other amount within the range. Significant judgment is required to determine both probability and the estimated amount. The Company reviews these provisions at least quarterly and adjusts them accordingly to reflect the impact of negotiations, settlements, rulings, advice of legal counsel, and updated information.

*Securities Sold, Not Yet Purchased*

Securities sold, not yet purchased, represent the Company's obligations to deliver a specified security at the contracted price at a future point in time, and thereby create a liability to repurchase the securities in the market at the prevailing prices. The liability for such securities sold short, included as a component of liabilities held for sale on the consolidated statements of financial condition, is marked to market based on the current fair value of the underlying security at the reporting date. Changes in fair value of securities sold, not yet purchased are recorded as unrealized gains or losses and included in Income (loss) from discontinued operations, net of tax in the consolidated statements of operations (see Note 4). The Company repurchased the securities sold short in August 2016 and realized a loss of $1.1 million for the year ended December 31, 2016. Total unrealized gains and losses related to these securities for the years ended December 31, 2016 and 2015 were a gain of $0.6 million and a loss of $0.1 million, respectively.

*Due to Related Parties Pursuant to Tax Receivable Agreement*

Exchanges of Holdings membership units ("Holdings Units") for the Corporation's Class A common stock that are executed by the members of Holdings result in transfers of and increases in the tax basis of the tangible and intangible assets of

F-17

TABLE OF CONTENTS

**Global Brokerage, Inc.**

**Notes to Consolidated Financial Statements**

**Note 2. Significant Accounting Policies and Estimates - (continued)**

Holdings, primarily attributable to a portion of the goodwill inherent in the business. These transfers and increases in tax basis will increase (for tax purposes) amortization and therefore reduce the amount of tax that the Company would otherwise be required to pay in the future. This increase in tax basis may also decrease gain (or increase loss) on future dispositions of certain capital assets to the extent tax basis is allocated to those capital assets. Holdings has entered into a tax receivable agreement with the members of Holdings whereby the Corporation has agreed to pay to the exchanging members 85% of the amount of cash tax savings, if any, in U.S. federal, state and local income tax that the Corporation realizes as a result of these increases in tax basis. The Corporation expects to benefit from the remaining 15% of cash tax savings, if any, in income tax it realizes. Payments under the tax receivable agreement will be based on the tax reporting positions that the Corporation takes in preparing its tax returns. The Corporation will not be reimbursed for any payments previously made under the tax receivable agreement if a tax basis increase is successfully challenged by the Internal Revenue Service.

Holdings records an increase in deferred tax assets for the estimated income tax effects of the increases in tax basis based on enacted federal and state tax rates at the date of the exchange. To the extent that Holdings estimates that the exchanging members will not realize the full benefit represented by the deferred tax asset, based on an analysis that will consider, among other things, its expectation of future earnings, the Company will reduce the deferred tax asset with a valuation allowance. The Corporation records 85% of the estimated realizable tax benefit (which is the recorded deferred tax asset less any recorded valuation allowance) as an increase to the contingent liability due under the tax receivable agreement. Presently, the liability is a contingent liability based on the estimated future earnings of the Corporation and the expected tax benefit realized by the Corporation, but upon certain events such as a change in control or a material breach of the tax receivable agreement, the liability no longer stays contingent but rather becomes absolute. The remaining 15% of the estimated realizable tax benefit is initially recorded as an increase to the Corporation's capital. All of the effects to the deferred tax asset of changes in any of the estimates after the tax year of the exchange will be reflected in the provision for income taxes. Similarly, the effect of subsequent changes in the enacted tax rates will be reflected in the provision for income taxes.

*Convertible Debt Transactions*

The Company separately accounts for the liability and equity components of convertible debt instruments that may be settled entirely or partially in cash upon conversion by allocating the proceeds from issuance between the liability component and the embedded conversion option, or equity component, in accordance with ASC 470, *Debt* ("ASC 470"). The value of the equity component is calculated by first measuring the fair value of the liability component, using the interest rate of a similar liability that does not have a conversion feature, as of the issuance date. The difference between the proceeds from the convertible debt issuance and the amount measured as the liability component is recorded as the equity component. The Company recognizes the accretion of the resulting discount as part of interest expense in the consolidated statements of operations.

*Derivative Liability — Letter Agreement*

At issuance in January 2015, the Letter Agreement was accounted for separately from the Credit Agreement. Pursuant to ASC 480, *Distinguishing Liabilities from Equity* ("ASC 480"), a financial instrument that is entered into in conjunction with some other transaction and is legally detachable and separately exercisable is a freestanding financial instrument and should be accounted for separately. Based on the Company's review of the Letter Agreement, the Company concluded that the Letter Agreement was legally detachable from the Credit Agreement because it could be freely transferred. In addition, the Company determined that the Letter Agreement was separately exercisable since payments to the holder of the Letter Agreement are made after the repayment of the Credit Agreement. Accordingly, the Letter Agreement was determined to be a freestanding financial instrument and was accounted for separately from the Credit Agreement. Further, the Company concluded that the legal form of the Letter Agreement was equity. The Company considered the guidance in ASC 480 and determined that the accounting for the Letter Agreement did not fall within the scope of ASC 480 since the Letter Agreement was not mandatorily redeemable and did not require settlement by issuance of a variable number of equity shares. The Company then considered the guidance under ASC 815, and concluded that several features of the Letter Agreement required bifurcation as embedded derivatives and should be accounted for as a derivative liability. Changes in the fair value of the derivative liability resulting from the Letter Agreement were recorded each reporting period in the consolidated statements of operations. On September 1, 2016, the Letter Agreement was terminated (see "Redeemable Non-controlling Interest" below for further information).

TABLE OF CONTENTS

**Global Brokerage, Inc.**

**Notes to Consolidated Financial Statements**

**Note 2. Significant Accounting Policies and Estimates - (continued)**

*Redeemable Non-controlling Interest*

In connection with the Restructuring Transaction completed on September 1, 2016 (see Note 19), the Amended and Restated Letter Agreement dated January 24, 2015 (the "Letter Agreement") was terminated and the parties signed the Amended and Restated Limited Liability Company Agreement of FXCM Group, LLC (the "Group Agreement"). The Group Agreement replaced the existing FXCM Newco, LLC agreement and FXCM Newco, LLC was renamed FXCM Group, LLC. In exchange for terminating the Letter Agreement, the Company issued a 49.9% non-controlling membership interest in Group to Leucadia. The remaining 50.1% controlling membership interest in Group is owned by Holdings and Holdings consolidates the financial results of Group as discussed above. Following a Change of Control (as defined in the Group Agreement and described in Note 19), the membership units held by Leucadia are redeemable for cash at an amount equal to the fair market value of Leucadia's economic rights under the Group Agreement. Accordingly, the non-controlling interest held by Leucadia is recorded as Redeemable non-controlling interest and is classified outside of permanent equity on the consolidated statements of financial condition pursuant to ASC 480.

The cash distributions and earnings or loss from Group subsequent to September 1, 2016 are allocated among its members based on the contractual provisions in the Group Agreement (the "Revised Waterfall"), which differ from the members' stated ownership percentages. The Company determined that the Revised Waterfall represents a substantive profit sharing arrangement and concluded that the appropriate methodology for allocating profits and losses of Group is the hypothetical liquidation at book value method (the "HLBV method"). The Company applies the HLBV method using a balance sheet approach. Under the HLBV method, a calculation is performed at each balance sheet date to determine the amount each member would hypothetically receive assuming Group were liquidated at its recorded amount determined in accordance with U.S. GAAP and the cash distributed according to the Revised Waterfall. The difference between the liquidating distribution amounts calculated at the beginning and end of each period, after adjusting for capital contributions and distributions, is the member's share of the net income or loss from Group.

As indicated above, the membership units held by Leucadia are redeemable for cash following a change of control event (see Note 19), which is not solely within the control of the Company. The Company evaluates the probability of redemption at each reporting date. The Company concluded that the non-controlling interest in Group is not currently redeemable and it is not probable that it will become redeemable. Accordingly, subsequent adjustment of the Redeemable non-controlling interest to its estimated redemption value is not required pursuant to ASC 480. If the non-controlling interest in Group becomes redeemable, or if redemption becomes probable, an adjustment will be made to adjust the Redeemable non-controlling interest to its estimated redemption value.

*Foreign Currency*

Foreign denominated assets and liabilities are re-measured into the functional currency at exchange rates in effect at the statements of financial condition dates through the consolidated statements of operations. Gains or losses resulting from foreign currency transactions are re-measured using the rates on the dates on which those elements are recognized during the period, and are included in Trading revenue in the consolidated statements of operations. The Company recorded gains of $0.8 million and $2.3 million for the years ended December 31, 2016 and 2015, respectively.

Translation gains or losses resulting from translating the Company's subsidiaries' financial statements from the functional currency to the reporting currency, net of tax, are included in Foreign currency translation gain (loss) in the consolidated statements of comprehensive income. Assets and liabilities are translated at the statement of financial condition date while revenues and expenses are translated at an applicable average rate.

*Revenue Recognition*

The Company makes foreign currency markets for customers trading in FX spot markets. FX transactions are recorded on the trade date and positions are marked to market daily with related gains and losses, including gains and losses on open spot transactions, recognized currently in income.

TABLE OF CONTENTS

Global Brokerage, Inc.

Notes to Consolidated Financial Statements

**Note 2. Significant Accounting Policies and Estimates - (continued)**

*Trading Revenue*

Under the Company's retail agency FX offering, trading revenue is earned from charging a separate commission or by adding a markup to the price provided by FX market makers generating trading revenue based on the volume of transactions and is recorded on trade date. Under the agency model, when a customer executes a trade on the best price quotation presented by the FX market maker, the Company acts as a credit intermediary, or a riskless principal, simultaneously entering into a trade with the customer and the FX market maker. This agency model has the effect of hedging the Company's positions and eliminating market risk exposure. Trading revenues earned from commissions and mark-up principally represent the difference between the Company's realized and unrealized foreign currency trading gains or losses on its positions with customers and the systematic hedge gains and losses from the trades entered into with the FX market makers. Under the Company's dealing desk, or principal, execution model, revenues earned include the markup on the FX trade and the Company's realized and unrealized foreign currency trading gains or losses on its positions with customers. Trading revenue also includes fees earned from arrangements with other financial institutions to provide platform, back office and other trade execution services. This service is generally referred to as a white label arrangement. The Company earns a commission or a percentage of the markup charged by the financial institutions to their customers. Fees from this service are recorded when earned on a trade date basis.

Additionally, the Company earns income from trading in CFDs, rollovers and spread betting. Income or loss on CFDs represents the difference between the realized and unrealized trading gains or losses on the Company's positions and the hedge gains or losses with the other financial institutions. Income or loss on CFDs is recorded on a trade date basis. Income or loss on rollovers is the interest differential customers earn or pay on overnight currency pair positions held and the markup that the Company receives on interest paid or received on currency pair positions held overnight. Income or loss on rollovers is recorded on a trade date basis. Spread betting is where a customer takes a position against the value of an underlying financial instrument moving either upward or downward in the market. Income on spread betting is recorded as earned on a trade date basis.

Trading revenues from institutional customers include commission income generated by facilitating spot FX trades on behalf of institutional customers through the services provided by FXCM Pro and FXCM Prime, which allow these customers to obtain the best execution price from external banks and routes the trades to outside financial institutions that also hold customer account balances for settlement. The Company receives commission income on these trades without taking any market or credit risk. Revenue earned from institutional customers is recorded on a trade date basis.

The Company also earns income from market making and electronic trading in the institutional foreign exchange spot and futures markets through Lucid and market making and electronic trading into other asset classes through V3. Income on market making and electronic trading in foreign exchange spot and future currencies represents the spread between the bid and ask price for positions purchased and sold and the change in value of positions purchased and sold. Income on market making is recorded as trading gains, net of trading losses, on a trade date basis, and is included in Income (loss) from discontinued operations, net of tax in the consolidated statements of operations.

*Interest Income*

Interest income consists of interest earned on cash and cash equivalents and cash and cash equivalents, held for customers and is recognized in the period earned. Interest income also includes interest on the Notes receivable.

*Other Income*

Other income includes amounts earned from the sale of market data, fees for post-sale services related to businesses sold, service fees related to an equity method investee, account maintenance fees, ancillary fee income and the net reversal of the tax receivable agreement liability.

*Communications and Technology*

Communications and technology expense consists primarily of costs for network connections to our electronic trading platforms, telecommunications costs, and fees paid for access to external market data. This expense is affected primarily by the growth of electronic trading, our network/ platform capacity requirements and by changes in the number of telecommunication hubs and connections which provide our customers with direct access to our electronic trading platforms.

TABLE OF CONTENTS

**Global Brokerage, Inc.**

**Notes to Consolidated Financial Statements**

**Note 2. Significant Accounting Policies and Estimates - (continued)**

*Trading Costs, Prime Brokerage and Clearing Fees*

Trading costs, prime brokerage and clearing fees primarily represent fees paid to third party clearing banks and prime brokers for clearing foreign exchange spot futures currency and contract transactions, transaction fees paid to exchanges, equity options brokerage activity fees, and fees paid to third party providers for use of their platform for the Company's market making trading business. Clearing fees primarily fluctuate based on changes in volume, rate of clearing fees charged by clearing banks and rate of fees paid to exchanges.

*Referring Broker Fees*

Referring broker fees represent commissions paid to brokers for introducing trading customers to the Company. Commissions are determined based on the number and size of transactions executed by the customers and are recorded on a trade date basis.

*Compensation and Benefits*

Compensation and benefits expense represents employee and member salaries and benefit expense, including stock-based compensation expense.

*Stock-Based Compensation*

The Company accounts for stock-based compensation in accordance with ASC 718, *Compensation-Stock Compensation* ("ASC 718"). The Company's stock-based compensation expense is measured at the date of grant, based on the estimated fair value of the award, and recognized on a straight-line basis over the requisite service period of the award, net of estimated forfeitures. The fair value of the Company's non-qualified stock options is estimated using the Black-Scholes option pricing model. The fair value of restricted stock units ("RSUs") is based on the fair market value of the Corporation's Class A common stock on the date of grant, adjusted for the present value of dividends expected to be paid on the Corporation's Class A common stock prior to vesting. Stock-based compensation expense is included in Compensation and benefits in the consolidated statements of operations (see Note 15).

*Management Incentive Plan*

In connection with the Restructuring Transaction, the Company adopted the 2016 Incentive Bonus Plan for Founders and Executives (the "Management Incentive Plan"). The Management Incentive Plan is a long-term program with a five-year vesting period. Distributions under the plan will be made only after the principal and interest under the Credit Agreement have been repaid and will range from 10.0% to 14.0% of the distributions made from Group. If a participant terminates employment, he or she will receive either a non-voting membership interest in Group entitling the participant to the same share of distributions that would have otherwise been received, or a lump-sum cash payment, at the Company's discretion. The Company determined that the Management Incentive Plan is a share-based payment arrangement that will be accounted for as a liability award under ASC 718.

*Advertising and Marketing*

Advertising and marketing costs are charged to operations when incurred.

*General and Administrative Expenses*

General and administrative expenses include bank processing and regulatory fees, professional and consulting fees, occupancy and equipment expense and other administrative costs. Bank processing fees are costs associated with the processing of credit and debit card transactions. Regulatory fees are volume-based costs and annual fees charged by certain regulatory authorities and include fines and restitution imposed by regulators from time to time. General and administrative expense also includes a provision for forgiveness of a notes receivable and other miscellaneous client debit balances.

TABLE OF CONTENTS

**Global Brokerage, Inc.**

**Notes to Consolidated Financial Statements**

**Note 2. Significant Accounting Policies and Estimates - (continued)**

### *Income Taxes*

Holdings operates in the U.S. as a limited liability company that is treated as a partnership for U.S. federal, state, and local income tax purposes. Since January 2015, all of Holdings' operations are held by Group, a limited liability company that is also treated as a partnership between Holdings and Leucadia for U.S. federal, state and local income tax purposes. As a result, neither Holdings' nor Group's income from its U.S. operations is subject to U.S. federal income tax because the income is attributable to its members. Accordingly, the Company's U.S. tax provision is solely based on the portion of income attributable to the Corporation from the lower tier limited liability companies and excludes the income attributable to other members whose income is included in Net income (loss) attributable to non-controlling interest in Global Brokerage Holdings, LLC in the consolidated statements of operations.

Income taxes are accounted for in accordance with ASC 740, *Income Taxes* ("ASC 740"), which requires that deferred tax assets and liabilities are recognized, using enacted tax rates, for the effect of temporary differences between the book and tax basis of recorded assets and liabilities. Deferred tax assets, including net operating losses and income tax credits, are reduced by a valuation allowance if it is "more likely than not" that some portion or all of the deferred tax assets will not be realized (see Note 24).

In addition to U.S. federal and state income taxes, the Company is subject to Unincorporated Business Tax which is attributable to Group's operations apportioned to New York City. The Company's foreign subsidiaries are also subject to taxes in the jurisdictions in which they operate.

In accordance with ASC 740, the Company evaluates a tax position to determine whether it is more likely than not that the tax position will be sustained upon examination, based on the technical merits of the position. If the position does not meet a more likely than not threshold, a tax reserve is established and no income tax benefit is recognized. The Company is audited by U.S. federal and state, as well as foreign, tax authorities. In some cases, many years may elapse before a tax return containing tax positions for which an ASC 740 reserve has been established is examined and an audit is completed. As audit settlements are reached, the Company adjusts the corresponding reserves, if required, in the period in which the final determination is made. While it is difficult to predict the final outcome or timing of a particular tax matter, the Company believes that its reserves for uncertain tax positions are recorded pursuant to the provisions of ASC 740.

The Company currently does not plan to permanently reinvest the earnings of its foreign subsidiaries and therefore does record U.S. income tax expense for the applicable earnings. This treatment could change in the future.

### *Recently Adopted Accounting Pronouncements*

In August 2014, the Financial Accounting Standards Board (the "FASB") issued ASU No. 2014-15, *Presentation of Financial Statements—Going Concern (Subtopic 205-40): Disclosure of Uncertainties about an Entity's Ability to Continue as a Going Concern*. The standard requires management to explicitly evaluate for each reporting period whether there are conditions or events that raise substantial doubt about an entity's ability to continue as a going concern and provide related footnote disclosure in certain circumstances. The standard is effective for the annual period ending after December 15, 2016, and for annual and interim periods thereafter. The Company adopted ASU No. 2014-15 for the year ended December 31, 2016.

In February 2015, the FASB issued ASU No. 2015-02, *Consolidation (Topic 810): Amendments to the Consolidation Analysis*. ASU No. 2015-02 changes the analysis that a reporting entity must perform to determine whether it should consolidate certain types of legal entities. Specifically, ASU No. 2015-02 (i) modifies the evaluation of whether limited partnership and similar legal entities are VIEs, (ii) eliminates the presumption that a general partner should consolidate a limited partnership, (iii) affects the consolidation analysis of reporting entities that are involved with VIEs that have fee arrangements and related party relationships, and (iv) provides a scope exception from consolidation guidance for certain investment companies and similar entities. The Company adopted ASU No. 2015-02 on January 1, 2016 which did not have an impact on the Company's consolidated financial statements.

In April 2015, the FASB issued ASU No. 2015-03, *Interest—Imputation of Interest (Subtopic 835-30): Simplifying the Presentation of Debt Issuance Costs*. ASU No. 2015-03 requires debt issuance costs to be presented in the balance sheet as a direct deduction from the corresponding debt liability rather than as an asset. The costs will continue to be amortized and reported as interest expense. The Company adopted ASU No. 2015-03 on January 1, 2016 on a retrospective basis. The

F-22

TABLE OF CONTENTS

**Global Brokerage, Inc.**

**Notes to Consolidated Financial Statements**

**Note 2. Significant Accounting Policies and Estimates - (continued)**

adoption of ASU No. 2015-03 resulted in the reclassification of $2.9 million of unamortized debt issuance costs related to the Senior convertible notes from Other assets to the Senior convertible notes liability within the consolidated statements of financial condition as of December 31, 2015 (see Note 20). The adoption of ASU No. 2015-03 also resulted in the reclassification of $0.5 million of unamortized debt issuance costs related to the Credit Agreement from Other assets to the Credit Agreement liability within the consolidated statements of financial condition as of December 31, 2015 (see Note 19). Other than these reclassifications, the adoption of ASU No. 2015-03 did not have an impact on the Company's consolidated financial statements.

*Recently Issued Accounting Pronouncements*

In May 2014, the FASB issued ASU No. 2014-09, *Revenue from Contracts with Customers (Topic 606)*. ASU No. 2014-09 replaces most existing revenue recognition guidance, and requires companies to recognize revenue based upon the transfer of promised goods and/or services to customers in an amount that reflects the consideration to which the entity expects to be entitled in exchange for those goods and/or services. In addition, the new guidance requires enhanced disclosures, including revenue recognition policies to identify performance obligations to customers and significant judgments in measurement and recognition. ASU No. 2014-09 is effective, as amended, for annual and interim periods beginning on or after December 15, 2017. The two permitted transition methods under the new standard are the full retrospective method, in which case the standard is applied to each prior period presented, or the modified retrospective method, in which case the cumulative effect of applying the standard is recognized as of the adoption date. The FASB has also issued the following standards which clarify ASU No. 2014-09, and have the same effective date and transition requirements as ASU No. 2014-09:

- ASU No. 2016-08, *Revenue from Contracts with Customers (Topic 606): Principal versus Agent Considerations (Reporting Revenue Gross versus Net)*
- ASU No. 2016-10, *Revenue from Contracts with Customers (Topic 606): Identifying Performance Obligations and Licensing*
- ASU No. 2016-12, *Revenue from Contracts with Customers (Topic 606): Narrow-Scope Improvements and Practical Expedients*
- ASU No. 2016-20, *Technical Corrections and Improvements to Topic 606, Revenue from Contracts with Customers*

The Company plans to adopt ASU No. 2014-09 on January 1, 2018. At this time, the Company has not yet selected a transition method; however, it is in the process of completing its analysis and expects to decide on a transition method in the first half of 2017. The Company initiated a project team to evaluate the impact of this standard, document the considerations for each revenue stream and begin the implementation process. The initial analysis identifying areas that will be impacted by the new guidance is substantially complete. As a result of the initial evaluation performed, the Company does not expect that there will be changes to the timing of recognition of revenue, but does anticipate certain changes to the classification of revenue in the consolidated statements of operations. The Company also expects additional disclosures to be provided in its consolidated financial statements after adoption of the new standard. The Company will continue to monitor additional modifications, clarifications or interpretations by the FASB that may impact its current conclusions, and will provide further updates in future periods.

In January 2016, the FASB issued ASU No. 2016-01, *Financial Instruments—Overall (Subtopic 825-10): Recognition and Measurement of Financial Assets and Financial Liabilities.* This guidance in this update amends various aspects of the recognition, measurement, presentation, and disclosure for financial instruments. The guidance in this update is effective for fiscal years beginning after December 15, 2017, including interim periods within those fiscal years. Early adoption by public entities is permitted only for certain provisions. The adoption of this standard may result in a cumulative-effect adjustment to the consolidated statement of financial condition as of the beginning of the year of adoption. The Company expects to adopt this guidance beginning January 1, 2018 and is currently evaluating the impact that adoption of this standard will have on its consolidated financial statements.

In February 2016, the FASB issued ASU No. 2016-02, *Leases (Topic 842)*. ASU No. 2016-02 requires lessees to recognize, on the balance sheet, assets and liabilities for the rights and obligations created by leases classified as operating leases of greater than twelve months. The accounting by lessors will remain largely unchanged. The guidance in this update is effective for fiscal years beginning after December 15, 2018, including interim periods within those fiscal years, with early adoption permitted. The new standard must be adopted using a modified retrospective approach, and provides for certain practical expedients. Transition will require application of the new guidance at the beginning of the earliest period presented.

F-23

TABLE OF CONTENTS

**Global Brokerage, Inc.**

**Notes to Consolidated Financial Statements**

**Note 2. Significant Accounting Policies and Estimates - (continued)**

The Company expects to adopt this guidance beginning January 1, 2019 and plans to initiate a project team to evaluate the impact this standard will have on its consolidated financial statements.

In March 2016, the FASB issued ASU No. 2016-06, *Derivatives and Hedging (Topic 815): Contingent Put and Call Options in Debt Instruments*. ASU No. 2016-06 clarifies the requirements for assessing whether contingent call (put) options that can accelerate the payment of principal on debt instruments are clearly and closely related to their debt hosts. An entity performing the assessment under the amendments in this update is required to assess the embedded call (put) options solely in accordance with the four-step decision sequence in ASC 815-15-25-42. The guidance in this update is effective for fiscal years beginning after December 15, 2016, including interim periods within those fiscal years. Early adoption is permitted. An entity should apply the amendments in this update on a modified retrospective basis to existing debt instruments as of the beginning of the fiscal year for which the amendments are effective. The Company adopted this guidance on January 1, 2017 and does not expect it will have a material impact on its consolidated financial statements.

In March 2016, the FASB issued ASU No. 2016-07, *Investments—Equity Method and Joint Ventures (Topic 323): Simplifying the Transition to the Equity Method of Accounting*. ASU No. 2016-07 eliminates the requirement that an investor retrospectively apply equity method accounting when an investment that it had accounted for by another method initially qualifies for the equity method. The guidance requires that an equity method investor add the cost of acquiring the additional interest in the investee to the current basis of the investor's previously held interest and adopt the equity method of accounting as of the date the investment becomes qualified for equity method accounting. The guidance in this update is effective for fiscal years beginning after December 15, 2016, including interim periods within those fiscal years. Earlier application is permitted. The Company adopted this guidance on January 1, 2017 and does not expect it will have a material impact on its consolidated financial statements.

In March 2016, the FASB issued ASU No. 2016-09, *Compensation—Stock Compensation (Topic 718): Improvements to Employee Share-Based Payment Accounting*. ASU No. 2016-09 simplifies certain aspects related to the accounting for share-based payment transactions, including income tax consequences, statutory withholding requirements, forfeitures and classification on the statement of cash flows. The guidance in this update is effective for fiscal years beginning after December 15, 2016, including interim periods within those fiscal years. Early adoption is permitted. Certain of the amendments related to timing of the recognition of tax benefits and tax withholding requirements should be applied using a modified retrospective transition method. Amendments related to classification on the statement of cash flows should be applied retrospectively. All other provisions may be applied on a prospective or modified retrospective basis. The Company adopted this guidance on January 1, 2017 and does not expect it will have a material impact on its consolidated financial statements.

In August 2016, the FASB issued ASU No. 2016-15, *Statement of Cash Flows (Topic 230): Classification of Certain Cash Receipts and Cash Payments*. ASU No. 2016-15 provides guidance on the following eight specific cash flow classification issues: (1) debt prepayment or debt extinguishment costs; (2) settlement of zero-coupon debt instruments; (3) contingent consideration payments made after a business combination; (4) proceeds from the settlement of insurance claims; (5) proceeds from the settlement of corporate-owned life insurance policies, including bank-owned life insurance policies; (6) distributions received from equity method investments; (7) beneficial interests in securitization transactions; and (8) separately identifiable cash flows and application of the predominance principle. Current U.S. GAAP does not include specific guidance on these eight cash flow classification issues. The amendments in ASU No. 2016-15 are effective for fiscal years beginning after December 15, 2017, and interim periods within those fiscal years. Earlier adoption is permitted, provided that all the amendments are adopted in the same period. The amendments in this update are to be applied on a retrospective basis. The Company expects to adopt this guidance beginning January 1, 2018 and is currently evaluating the impact that adoption of this standard will have on its consolidated financial statements.

In October 2016, the FASB issued ASU No. 2016-17, *Consolidation (Topic 810): Interests Held through Related Parties That Are under Common Control*. ASU No. 2016-17 amends the consolidation guidance in ASU No. 2015-02 on how a reporting entity that is the single decision maker of a VIE should treat indirect interests in the entity held through related parties that are under common control when performing the primary beneficiary analysis under the VIE model. Under ASU No. 2016-17, the single decision maker will consider an indirect interest held by a related party under common control on a proportionate basis. The amendments in ASU No. 2016-17 are effective for fiscal years beginning after December 15, 2016, and interim periods within those fiscal years, with early adoption permitted. Entities that already have adopted the amendments in ASU No. 2015-02 are required to apply the amendments in this update retrospectively to all relevant prior periods beginning

TABLE OF CONTENTS

**Global Brokerage, Inc.**

**Notes to Consolidated Financial Statements**

**Note 2. Significant Accounting Policies and Estimates - (continued)**

with the fiscal year in which the amendments in ASU No. 2015-02 initially were applied. The Company adopted this guidance on January 1, 2017 and does not expect it will have a material impact on its consolidated financial statements.

In November 2016, the FASB issued ASU No. 2016-18, *Statement of Cash Flows (Topic 230): Restricted Cash*. The amendments in ASU No. 2016-18 address diversity in the classification and presentation of changes in restricted cash on the statement of cash flows. Under this guidance, companies will be required to present restricted cash and restricted cash equivalents with cash and cash equivalents when reconciling the beginning-of-period and end-of-period amounts shown on the statement of cash flows. The amendments in ASU No. 2016-18 are required to be applied retrospectively and are effective for fiscal years beginning after December 15, 2017, and interim periods within those fiscal years, with early adoption permitted. The Company expects to adopt this guidance beginning January 1, 2018 and is currently evaluating the impact that adoption of this standard will have on its consolidated financial statements.

In January 2017, the FASB issued ASU No. 2017-04, *Intangibles—Goodwill and Other (Topic 350): Simplifying the Test for Goodwill Impairment*. Under ASU No. 2017-04, Step 2 of the goodwill impairment test has been eliminated. Step 2 of the goodwill impairment test required companies to determine the implied fair value of the reporting unit's goodwill. Under the new guidance, companies will perform their annual, or interim, goodwill impairment test by comparing the reporting unit's carrying value, including goodwill, to the fair value. An impairment charge would be recorded if the carrying value exceeds the reporting unit's fair value. ASU No. 2017-04 also eliminates the requirements for any reporting unit with a zero or negative carrying amount to perform a qualitative assessment and, if it fails that qualitative test, to perform Step 2 of the goodwill impairment test. Therefore, the same impairment assessment applies to all reporting units. An entity is required to disclose the amount of goodwill allocated to each reporting unit with a zero or negative carrying amount of net assets. An entity still has the option to perform the qualitative assessment for a reporting unit to determine if the quantitative impairment test is necessary. The amendments in ASU No. 2017-04 are required to be applied prospectively and are effective for annual or any interim goodwill impairment tests in fiscal years beginning after December 15, 2019. Early adoption is permitted for interim or annual goodwill impairment tests performed on testing dates after January 1, 2017. The Company expects to early adopt this guidance effective January 1, 2017 and is currently evaluating the impact that adoption of this standard will have on its consolidated financial statements.

**Note 3. Non-Controlling Interests**

***Redeemable Non-controlling Interest***

In connection with the Restructuring Transaction completed on September 1, 2016 (see Note 19), the Letter Agreement was terminated and the parties signed the Group Agreement as described in Note 2. In exchange for the Letter Agreement, the Company issued a 49.9% non-controlling membership interest in Group to Leucadia. The remaining 50.1% controlling membership interest in Group is owned by Holdings and Holdings consolidates the financial results of Group, as discussed in Note 2. The non-controlling interest held by Leucadia is redeemable for cash upon a contingent event that is not solely within the control of the Company and, accordingly, is classified outside of permanent equity on the consolidated statements of financial condition as Redeemable non-controlling interest. As of December 31, 2016, the non-controlling interest in Group is not redeemable and is not probable of becoming redeemable and, consequently, has not been adjusted to its estimated redemption value.

The Company recorded the following activity related to Redeemable non-controlling interest for the year ended December 31, 2016, with amounts in thousands:

| | | |
|---|---|---|
| Balance as of January 1, 2016 | $ | — |
| Issuance of redeemable non-controlling interest (net of HLBV allocation, discussed below) | | 49,285 |
| Net loss attributable to redeemable non-controlling interest | | (2,804) |
| Other comprehensive loss attributable to redeemable non-controlling interest | | (377) |
| Equity-based compensation | | 260 |
| Balance as of December 31, 2016 | $ | 46,364 |

F-25

TABLE OF CONTENTS

**Global Brokerage, Inc.**

**Notes to Consolidated Financial Statements**

**Note 3. Non-Controlling Interests - (continued)**

On the date of the Restructuring Transaction, in exchange for the Letter Agreement Leucadia was issued a redeemable non-controlling interest in Group which had a fair value of $235.5 million, which was also the fair value of the derivative liability related to the Letter Agreement. As a result, the Company derecognized the derivative liability related to the Letter Agreement and recorded the Redeemable non-controlling interest at $49.3 million, which represented the amount that Leucadia would receive assuming Group were liquidated at its recorded amount determined in accordance with U.S. GAAP and the cash distributed according to the Revised Waterfall at that date. This change was recorded as an equity transaction within Additional paid-in capital of the Corporation for the impact to the controlling and non-controlling unit holders of Holdings based on Holdings' 50.1% controlling financial interest in Group.

*Non-controlling Interests*

*Holdings*

The Corporation consolidates the financial results of Holdings and records a non-controlling interest for the economic interest in Holdings not owned by the Corporation. Pursuant to an agreement between the Corporation and Holdings, whenever the Corporation cancels, issues or repurchases shares of its Class A common stock, Holdings enters into an equivalent Holdings Unit transaction with the Corporation so that at all times the number of shares of Class A common stock is equal to the Corporation's membership units in Holdings. In addition, whenever the owners of Holdings prior to the initial public offering ("Existing Unit Holders") (other than the Corporation) exchange their Holdings Units for shares of the Corporation's Class A common stock, Holdings is required to transfer an equal amount of Holdings Units to the Corporation.

Changes in the non-controlling and the Corporation's interests in Holdings for the years ended December 31, 2015 and 2016 are presented in the following table:

| | Controlling Units | Non-Controlling Units | Total Units | Global Brokerage, Inc. | Non-Controlling | Total |
|---|---|---|---|---|---|---|
| **Balance as of January 1, 2015** | **4,788,994** | **3,445,761** | **8,234,755** | **58.1%** | **41.9 %** | **100.0%** |
| Exchange of Holdings Units to Class A common stock | 808,672 | (808,672) | — | 9.8% | (9.8)% | —% |
| Repurchase of Holdings Units related to repurchase of Class A common stock | (61) | — | (61) | —% | —% | —% |
| Vesting of restricted stock units | 4,929 | — | 4,929 | —% | —% | —% |
| **Balance as of December 31, 2015** | **5,602,534** | **2,637,089** | **8,239,623** | **67.9%** | **32.1 %** | **100.0%** |
| Exchange of Holdings Units to Class A common stock | 535,992 | (535,992) | — | 6.6% | (6.6)% | —% |
| Vesting of restricted stock units | 4,771 | — | 4,771 | —% | —% | —% |
| **Balance as of December 31, 2016** | **6,143,297** | **2,101,097** | **8,244,394** | **74.5%** | **25.5 %** | **100.0%** |

*Lucid, V3 and Other Non-Controlling Interests*

The Company owns controlling interests in Lucid, V3 and other entities and consolidates the financial results of these entities whereby it records a non-controlling interest for the economic interests not owned by the Company. Lucid and V3 are classified as discontinued operations and the assets and liabilities of Lucid and V3 are classified as held for sale on the consolidated statements of financial condition (see Note 4). The Company no longer holds a controlling interest in Faros as a result of the sale of Faros' operations in the second quarter of 2015.

**Note 4. Dispositions**

**Discontinued Operations**

As a result of the losses incurred by the Company on January 15, 2015 related to the Swiss National Bank ("SNB") releasing the peg of the Swiss Franc to the Euro and the subsequent Leucadia financing arrangement entered into by the Company on January 16, 2015, the Company committed to a plan during the first quarter of 2015 to sell its interests in certain

TABLE OF CONTENTS

**Global Brokerage, Inc.**

**Notes to Consolidated Financial Statements**

**Note 4. Dispositions - (continued)**

retail and institutional businesses in order to pay down the Leucadia debt. The retail businesses are HK, FXCMJ and the equity trading business of FSL. The institutional businesses are Faros, Lucid, V3 and the Company's equity interest in FastMatch. In April 2015, the Company completed the sales of FXCMJ and Faros. In September 2015, the Company completed the sale of HK. In December 2015, the Company completed the sale of the equity trading business of FSL. The Company remains committed to a plan to sell Lucid, V3 and its equity interest in FastMatch and continues to actively market these businesses.

The Company considered the guidance in ASC 205-20 in evaluating the accounting and presentation in the consolidated financial statements of the businesses that have been sold during the period and the remaining businesses to be sold. The operations and cash flows of these businesses are clearly distinguishable and, accordingly, have been determined to represent a group of components as defined in the guidance. It was further determined that the remaining businesses to be sold continue to meet the criteria for classification as held for sale as of December 31, 2016. Accordingly, the assets and liabilities of these businesses have been classified as assets and liabilities held for sale in the consolidated statements of financial condition as of December 31, 2016 and 2015.

In accordance with ASC 205-20, to qualify for reporting as a discontinued operation, components that are disposed of or classified as held for sale must represent a strategic shift that has or will have a major effect on the Company's operations and financial results. The Company believes that the dispositions of these businesses represent a strategic shift from the Company's diversification strategy undertaken for the past several years and concluded that the businesses to be disposed of qualify for reporting as discontinued operations. Accordingly, the results of operations of these businesses are reported in Income (loss) from discontinued operations, net of tax in the consolidated statements of operations for the years ended December 31, 2016 and 2015.

*Completed dispositions*

In April 2015, the Company completed the sale of FXCMJ to Rakuten Securities, Inc. ("Rakuten Sec") for a cash purchase price of $62.2 million. The Company recognized a net gain of approximately $2.0 million related to the sale, which included a reversal of $23.4 million of foreign currency translation loss out of accumulated other comprehensive income. The net gain was recorded in earnings as a component of Income (loss) from discontinued operations, net of tax for the year ended December 31, 2015. In connection with the sale of FXCMJ, the Company agreed to provide certain transitional services, including use of the Company's trading platform and data services, for no additional consideration for a period of nine months following the date of sale. The Company estimated the value of these services to be approximately $2.1 million and accordingly allocated $2.1 million of proceeds received as deferred income. The deferred income was entirely amortized into other income over the nine-month period ending December 31, 2015. The terms of the services agreement provided for the Company to receive a monthly fee for these services beginning January 1, 2016 for a period of ten months ending on October 31, 2016. The Company recorded other income for these transitional services of $1.6 million for the year ended December 31, 2016.

In April 2015, Faros completed the sale of its operations to Jefferies Group LLC. Consideration will be determined quarterly pursuant to an earn-out formula based on Faros' results beginning on the closing date and ending on November 30, 2017. Any consideration received will be divided among the Company and the non-controlling members of Faros based on a formula in the sales agreement. No consideration was received during the years ended December 31, 2016 and 2015.

In September 2015, the Company completed the sale of HK to Rakuten Sec for a cash purchase price of $37.9 million. The Company recognized a net gain related to the sale of approximately $12.4 million. The net gain was recorded in earnings as a component of Income (loss) from discontinued operations, net of tax for the year ended December 31, 2015. In connection with the sale of HK, the Company agreed to provide certain transitional services, including use of the Company's trading platform, data services and professional support, for no additional consideration for a period of nine months following the date of sale. The Company estimated the value of these services to be approximately $1.0 million and accordingly allocated $1.0 million of proceeds received as deferred income. The deferred income was amortized into other income over the nine-month period following the date of sale. The Company recorded $0.6 million and $0.4 million of other income for these transitional services for the years ended December 31, 2016 and 2015, respectively. The terms of the services agreement provide for the Company to receive a monthly fee for these services beginning in June 2016 for an expected period of nine months. The Company recorded other income of $1.2 million related to these service fees for the year ended December 31, 2016.

TABLE OF CONTENTS

**Global Brokerage, Inc.**

**Notes to Consolidated Financial Statements**

**Note 4. Dispositions - (continued)**

In December 2015, the Company completed the sale of the equity trading business of FSL to AS Expobank for a cash purchase price of $2.3 million. The Company recognized a loss of approximately $7.1 million related to the sale, which includes a reversal of $1.5 million of foreign currency translation loss out of accumulated other comprehensive income. The net loss was recorded in earnings as a component of Income (loss) from discontinued operations, net of tax for the year ended December 31, 2015. In connection with the sale of the equity trading business of FSL, the Company agreed to provide certain transitional services, primarily professional support, for no additional consideration for a period of twelve months following the date of sale. The Company estimated the value of these services to be approximately $0.5 million and accordingly allocated $0.5 million of proceeds received as deferred income. For the years ended December 31, 2016 and 2015, the amount of deferred income amortized into other income for these transitional services was $0.5 million and not material, respectively.

The following table presents the major classes of line items constituting the pretax and after-tax profit or loss of discontinued operations for the years ended December 31, 2016 and 2015, with amounts in thousands:

| | For the Years Ended December 31, | |
| --- | --- | --- |
| | 2016 | 2015 |
| **Revenues** | | |
| Trading revenue | $ 31,101 | $ 71,500 |
| Interest income | 309 | 272 |
| Brokerage interest expense | — | (100) |
| Net interest revenue | 309 | 172 |
| Other income | 113 | 5,700 |
| **Total net revenues** | 31,523 | 77,372 |
| **Operating Expenses** | | |
| Compensation and benefits | (248) | 14,708 |
| Allocation of net income to Lucid members for services provided | 3,029 | 5,064 |
| Total compensation and benefits | 2,781 | 19,772 |
| Referring broker fees | — | 208 |
| Advertising and marketing | — | 736 |
| Communication and technology | 5,694 | 8,248 |
| Trading costs, prime brokerage and clearing fees | 13,062 | 18,378 |
| General and administrative | 2,395 | 6,314 |
| Bad debt expense | — | 8,408 |
| Depreciation and amortization | — | 12,359 |
| Goodwill impairment loss | — | 54,865 |
| **Total operating expenses** | 23,932 | 129,288 |
| **Operating income (loss)** | 7,591 | (51,916) |
| **Other (Income) Expense** | | |
| (Gain) loss on equity method investments, net | (1,114) | 1,267 |
| Income (loss) from discontinued operations before income taxes | 8,705 | (53,183) |
| Net gain on completed dispositions | — | 7,313 |
| Loss on classification as held for sale before income taxes | 126,511 | 66,660 |
| Total loss from discontinued operations before income taxes* | (117,806) | (112,530) |
| Income tax provision | 54 | 5,764 |
| **Loss from discontinued operations, net of tax** | $ (117,860) | $ (118,294) |

* Total loss from discontinued operations before income taxes attributable to Global Brokerage, Inc. was $26.0 million and $38.7 million for the years ended December 31, 2016 and 2015, respectively.

TABLE OF CONTENTS

**Global Brokerage, Inc.**

**Notes to Consolidated Financial Statements**

**Note 4. Dispositions - (continued)**

The following is a summary of the carrying amounts of the assets and liabilities included as part of discontinued operations as of December 31, 2016 and 2015, with amounts in thousands:

| | As of December 31, | | | |
|---|---|---|---|---|
| | | 2016 | | 2015 |
| **Assets** | | | | |
| Cash and cash equivalents | $ | 9,378 | $ | 10,786 |
| Due from brokers [1] | | 14,090 | | 22,234 |
| Accounts receivable, net | | 251 | | 178 |
| Office, communication and computer equipment, net | | 1,336 | | 1,154 |
| Goodwill | | 223,613 | | 223,613 |
| Other intangible assets, net | | 27,269 | | 27,269 |
| Other assets [2][3] | | 14,337 | | 15,363 |
| Loss recognized on classification as held for sale | | (193,171) | | (66,660) |
| Total assets classified as held for sale on the consolidated statements of financial condition | $ | 97,103 | $ | 233,937 |
| | | | | |
| **Liabilities** | | | | |
| Accounts payable and accrued expenses [4] | $ | 2,266 | $ | 10,838 |
| Due to brokers [1] | | 45 | | — |
| Securities sold, not yet purchased | | — | | 3,624 |
| Other liabilities | | 14 | | 48 |
| Total liabilities classified as held for sale on the consolidated statements of financial condition | $ | 2,325 | $ | 14,510 |

[1] Includes as of December 31, 2016 and 2015: a) derivative assets, net of $1.6 million and $0.9 million, respectively; b) Unsettled spot FX, net of $0.2 million and $0.3 million, respectively; c) Unsettled common stock of nil and $3.0 million, respectively; and d) Excess cash collateral of $12.2 million and $18.0 million, respectively.

[2] Includes the Company's exchange memberships, which represent ownership interests and shares owned in CME Group Inc. and provide the Company with the right to conduct business on the exchanges. The exchange memberships are recorded at cost or, if an other-than-temporary impairment in value has occurred, at a value that reflects management's estimate of the impairment. The Company had previously owned shares in the Intercontinental Exchange which were sold in April 2015. The Company recognized a gain $0.1 million related to the sale which was recorded in earnings as a component of Income (loss) from discontinued operations, net of tax for the year ended December 31, 2015. During 2015, the Company acquired additional ownership interests and shares in CME Group Inc. from one of the non-controlling members of Lucid which were recorded at a total cost of $3.7 million. There were no exchange membership impairments for the years ended December 31, 2016 or 2015. As of both December 31, 2016 and 2015, the carrying value of ownership interests was $4.6 million and the carrying value of shares owned was $4.8 million. In January 2017, the Company sold its ownership interests and shares in CME Group Inc. and expects to recognize a gain of $0.8 million related to the sale during the first quarter of 2017.

[3] Includes the carrying value of the Company's equity interest in FastMatch of $4.6 million and $4.2 million as of December 31, 2016 and 2015, respectively. The carrying value of the Company's previously-held equity interest in the V3-related LLC of $1.5 million is included as of December 31, 2015 (see Note 6).

[4] Includes as of December 31, 2016 and 2015 amounts due related to the allocation of income to Lucid non-controlling members for services provided of $0.7 million and $6.5 million, respectively.

**Sale of Investment**

The Company sold its DailyFX business to FX Publications, Inc. on October 28, 2016 (the "Closing Date") for a cash purchase price of $40.0 million, payable in two installments. DailyFX is the leading portal for FX trading news, charts, indicators and analysis. The first installment of $36.0 million was paid to the Company on the Closing Date and the proceeds were used to pay down the term loan. The second installment of $4.0 million will be paid to the Company on the completion of

TABLE OF CONTENTS

**Global Brokerage, Inc.**

**Notes to Consolidated Financial Statements**

**Note 4. Dispositions - (continued)**

certain migration requirements. The migration was completed on February 24, 2017 and the final payment is expected in the first quarter of 2017. After transaction costs, the Company recognized a gain of $37.2 million related to the sale which is recorded in Gain on sale of investment in the consolidated statements of operations for the year ended December 31, 2016. The Company considered the guidance in ASC 205-20 and determined that since the operations and cash flows of the DailyFX business are not clearly distinguishable, it does not represent a component as defined in the guidance. Consequently, the DailyFX business does not qualify for reporting as a discontinued operation in the consolidated financial statements.

In connection with the sale of the DailyFX business, the Company agreed to provide certain transitional services, including the use of facilities, website and other data services, for no additional consideration for a period of three months following the date of sale. Certain services were subsequently extended for an additional three-month period to end in April 2017 in accordance with the terms of the services agreement. The Company estimated the value of these services to be approximately $0.3 million and accordingly allocated $0.3 million of proceeds received as deferred income, which is included in Accounts payable and accrued expenses on the consolidated statements of financial condition. The deferred income is amortized into other income over the respective three and six-month periods following the date of sale.  The Company recorded $0.1 million of other income for these transitional services for the year ended December 31, 2016.

In connection with the sale of the DailyFX business, the Company also entered into a three-year digital advertising agreement with FX Publications, Inc. The agreement provides for advertisements to be published on the DailyFX website in exchange for cash consideration payable by the Company in quarterly installments based on the number of leads (as defined in the agreement) generated by those advertisements. Until the website migration related to the sale is completed, the quarterly installment payable is approximately $0.7 million. Subsequent to the completion of the migration, the quarterly amount payable will be reduced or increased in accordance with a pre-determined formula based on the actual number of leads received in the previous quarter, compared to the baseline leads as defined in the agreement, not to exceed a total of $0.8 million per quarter. If actual leads received in any given quarter after the migration is complete do not meet a set threshold, the Company has the right to immediately terminate the agreement and will not be required to pay the quarterly fee. As of December 31, 2016, the Company recorded a liability of $0.4 million related to the digital advertising agreement, which is included in Accounts payable and accrued expenses on the consolidated statements of financial condition. The costs associated with the digital advertising agreement are expensed as incurred.

**Note 5. Notes Receivable**

In January 2014, in connection with the formation of V3 by the Company and the non-controlling members of Lucid, the non-controlling members of Lucid borrowed approximately $7.9 million from the Company to assist with funding their portion of the capital contribution. The amount borrowed was due in 2017 and bore interest at the rate of 2% per annum. During the second quarter of 2016, management determined that the non-controlling members of Lucid would not be required to repay the notes receivable and the debt would be forgiven. Accordingly, the Company recorded a provision for the debt forgiveness in the amount of $8.2 million for the principal amount thereof plus accrued interest, which is included in General and administrative expense in the consolidated statements of operations for the year ended December 31, 2016. The Company recorded $0.1 million and $0.2 million of interest income related to the notes receivable for the years ended December 31, 2016 and 2015, respectively.

**Note 6. Equity Method Investments**

The Company has a 22.2% equity interest in a developer of FX trading software which is accounted for using the equity method. During the fourth quarter of 2016, the Company evaluated its investment for impairment as a result of declines in the investee's financial condition, earnings and near-term operational prospects. The Company determined that an impairment of value had occurred that is other-than-temporary and recorded an impairment charge of $2.1 million, which is included in Loss on equity method investments, net in the consolidated statements of operations for the year ended December 31, 2016. The carrying value of the Company's equity interest in the FX trading software developer is nil and $2.6 million as of December 31, 2016 and 2015, respectively, and is included as a component of Other assets in the consolidated statements of financial condition. The Company's share of the loss of the FX trading software developer was $0.5 million for both of the years ended December 31, 2016 and 2015 and is included in Loss on equity method investments, net in the consolidated statements of operations.

TABLE OF CONTENTS

**Global Brokerage, Inc.**

**Notes to Consolidated Financial Statements**

**Note 6. Equity Method Investments - (continued)**

In November 2016, the Company acquired a 30.0% equity interest for $0.5 million in a developer of FX analytical software which is accounted for using the equity method. During the fourth quarter of 2016, the Company evaluated its investment for impairment as a result of declines in the investee's financial condition, earnings and near-term operational prospects. The Company determined that an impairment of value had occurred that is other-than-temporary and recorded an impairment charge of $0.5 million, which is included in Loss on equity method investments, net in the consolidated statements of operations for the year ended December 31, 2016. The carrying value of the Company's equity interest in the software developer is nil as of both December 31, 2016 and 2015. The Company's share of the loss of the FX analytical software developer was nil for both of the years ended December 31, 2016 and 2015.

The Company has a 34.4% non-controlling equity interest in FastMatch, an electronic communication network for foreign exchange trading, and exerts significant influence. The investment is accounted for using the equity method. As discussed in Note 4, the Company's equity interest in FastMatch is classified as a discontinued operation.

In conjunction with the V3 acquisition in January 2014, the Company acquired a 66.3% non-controlling interest in a limited liability company ("V3-related LLC") that held a 17.26% interest in a firm that delivers investment information to investment professionals. Until December 31, 2015, the other members of the V3-related LLC had not consented to the transfer of the 66.3% non-controlling interest to the Company and the investment had been accounted for using the equity method. On December 31, 2015, the other members of the V3-related LLC approved a resolution to transfer the 66.3% non-controlling interest to the Company and, in a related transaction, to distribute the assets held by the V3-related LLC to its members, including the Company, and subsequently liquidate the V3-related LLC. These transactions were completed during the first quarter of 2016 and resulted in the Company's acquisition of an equity interest in the firm described above which is accounted for using the cost method. The carrying value of the investment was $1.1 million as of December 31, 2016 and is included as a component of Other assets in the consolidated statements of financial condition (see Note 10). As discussed in Note 4, V3, including the equity interest previously held in the V3-related LLC, is classified as a discontinued operation. Income (loss) from discontinued operations, net of tax for the year ended December 31, 2016 includes a gain of $0.7 million related to the disposition of the V3-related LLC in 2016.

The carrying values of the Company's equity interest in FastMatch and the V3-related LLC (prior to its disposition) are included in assets held for sale in the consolidated statements of financial condition. As of December 31, 2016 and 2015, the carrying values of the Company's equity method investments included in assets held for sale were $4.6 million and $5.7 million, respectively. The Company's share of the income or loss of FastMatch and the V3-related LLC (prior to its disposition) is included in Income (loss) from discontinued operations, net of tax in the consolidated statements of operations. Total income (loss) on equity method investments included in Income (loss) from discontinued operations, net of tax was $0.4 million and $(1.3) million for the years ended December 31, 2016 and 2015, respectively.

The Company did not receive any dividend distributions from its equity method investments during the years ended December 31, 2016 and 2015.

F-31

TABLE OF CONTENTS

Global Brokerage, Inc.

Notes to Consolidated Financial Statements

**Note 7. Office, Communication and Computer Equipment, net**

Office, communication and computer equipment, net consisted of the following as of December 31, 2016 and 2015, with amounts in thousands:

| | As of December 31, | |
| --- | --- | --- |
| | 2016 | 2015 |
| Computer equipment | $ 12,633 | $ 17,637 |
| Capitalized software | 80,624 | 70,750 |
| Leasehold improvements | 8,775 | 10,024 |
| Furniture and fixtures and other equipment | 1,599 | 1,677 |
| Licenses | 2,883 | 3,026 |
| Communication equipment | 1,894 | 1,885 |
| Total office, communication and computer equipment | 108,408 | 104,999 |
| Less: Accumulated depreciation | (75,593) | (69,108) |
| Office, communication and computer equipment, net | $ 32,815 | $ 35,891 |

Depreciation is computed on a straight-line basis (see Note 2). Depreciation expense from continuing operations, including impairments, included in the consolidated statements of operations was $20.1 million and $21.3 million for the years ended December 31, 2016 and 2015, respectively. Also included in depreciation expense from continuing operations is amortization related to capitalized software development costs of $14.8 million and $14.5 million for the years ended December 31, 2016 and 2015, respectively. Unamortized capitalized software development costs were $23.9 million and $24.7 million as of December 31, 2016 and 2015, respectively.

During 2016 and 2015, the Company disposed of fully depreciated assets from continuing operations of $10.5 million and $13.2 million, respectively. During 2016, the Company recorded a charge of $1.1 million to fully impair the carrying amount of capitalized software and website development costs related to the DailyFX business as a result of its sale during the fourth quarter of 2016 (See Note 4). The impairment charge reduced the gain on sale and is included in Gain on sale of investments in the consolidated statements of operations for the year ended December 31, 2016. There were no impairments of fixed assets for the year ended December 31, 2015.

Office, communication and computer equipment related to businesses to be disposed of are included as a component of assets held for sale on the consolidated statements of financial condition and are not included in the table above. Depreciation related to these assets ceased as of the date they were determined to be held for sale. Depreciation expense related to these assets (prior to the date they were determined to be held for sale) is included in Income (loss) from discontinued operations, net of tax in the consolidated statements of operations.

**Note 8. Goodwill**

The Company performed its annual assessment of goodwill for impairment as of October 1, 2016, (the "Annual Assessment Date"). Due to the negative equity of the reporting unit, the Company performed a qualitative assessment to determine whether it would be necessary to perform the second step of the goodwill impairment test. The Company evaluated qualitative factors, including market and economic conditions, industry-specific events and company-specific financial results, and determined that it was not more likely than not that goodwill was impaired as of the Annual Assessment Date.

In conjunction with the qualitative assessment, the Company performed a calculation of the fair value of the reporting unit as of the Annual Assessment Date primarily using the income approach. The income approach incorporated the use of a discounted cash flow ("DCF") method whereby the estimated future cash flows and terminal values for the reporting unit are discounted to a present value using a discount rate. The estimated future cash flows are based on management's forecasts and projections for the reporting unit which are driven by key assumptions, including revenue growth, operating margins, capital expenditures, non-cash expenses and income tax rate. When applicable, various growth rates are assumed for years beyond the current business plan period. The discount rate is based on a market participant weighted-average cost of capital, calculated

F-32

TABLE OF CONTENTS

**Global Brokerage, Inc.**

**Notes to Consolidated Financial Statements**

**Note 8. Goodwill - (continued)**

based on the risk-free rate of return, beta, which is a measure of the level of non-diversifiable risk associated with comparable companies, market equity risk premium and a company-specific risk factor.

Due to the negative equity of the reporting unit at the Annual Assessment date, the Company assessed the reasonableness of the calculated fair value of the reporting unit by comparing the fair value of the reporting unit, adjusted for the fair value of interest-bearing debt and the fair value of Leucadia's non-controlling membership units in Group, to the market capitalization of the Company. An implied control premium was then estimated, which represents the excess of the reporting unit's fair value less adjustments over the market capitalization. Finally, the indicated carrying value of the reporting unit, represented by the negative equity of the reporting unit adjusted for the book value of interest-bearing debt and the fair value of Leucadia's non-controlling membership units in Group, was compared to the calculated fair value of the reporting unit. The calculated fair value of the reporting unit exceeded the indicated carrying value of the reporting unit. The fair value calculation was an additional factor considered within the overall qualitative assessment, indicating that it was not more likely than not that goodwill was impaired as of the Annual Assessment Date.

Due to the nature and significance of the regulatory events that occurred in February 2017 (see Note 28), the Company determined that a triggering event had occurred requiring an assessment of goodwill as of December 31, 2016. The Company performed a qualitative assessment to determine whether it was more likely than not that goodwill was impaired as of December 31, 2016. The qualitative assessment considered market conditions and overall financial performance during the fourth quarter of 2016, and included an updated fair value calculation using the same DCF methodology described above. In performing the DCF analysis as of December 31, 2016, the Company adjusted its estimated future cash flows assumptions and financial projections by reflecting the sale of its U.S. customer accounts and the implementation of cost reduction plans. In addition, inputs to the discount rate were revised to reflect changes to the risk-free rate of return and beta. Based on the analysis, the calculated fair value of the reporting unit exceeded its indicated carrying value as of December 31, 2016. As a result of the overall qualitative assessment performed, the Company determined that it was not more likely than not that goodwill was impaired as of December 31, 2016.

As noted above, the regulatory events that occurred subsequent to year-end are considered a triggering event, and will require an interim evaluation of goodwill in the first quarter of 2017. As of the report date, an estimate of the financial impact of this interim assessment cannot be made and will not be determined until the impairment testing is complete.

During the first quarter of 2015, the Company performed an interim impairment assessment of goodwill due to the events of January 15, 2015 and the Company's plan to sell certain businesses. This assessment resulted in the Company recording goodwill impairment losses of $9.5 million from continuing operations primarily due to a decline in the implied fair value of certain institutional businesses subsequent to January 15, 2015. The impairment loss is presented as a separate line item in the consolidated statements of operations and included as a component of Loss from continuing operations for the year ended December 31, 2015.

Changes in goodwill from continuing operations for the years ended December 31, 2015 and 2016 are presented in the following table and reflect the Company's single operating segment, with amounts in thousands:

| | | |
|---|---|---:|
| **Balance as of January 1, 2015** | $ | 39,242 |
| Impairment of goodwill | | (9,513) |
| Foreign currency translation and other adjustments | | (1,649) |
| **Balance at December 31, 2015** | | 28,080 |
| Foreign currency translation and other adjustments | | (4,601) |
| **Balance at December 31, 2016** | $ | 23,479 |

TABLE OF CONTENTS

**Global Brokerage, Inc.**

**Notes to Consolidated Financial Statements**

**Note 9. Other Intangible Assets, net**

The Company's acquired intangible assets consisted of the following as of December 31, 2016 and 2015, with amounts in thousands:

| | December 31, 2016 | | | December 31, 2015 | | |
|---|---|---|---|---|---|---|
| | Gross Carrying Amount | Accumulated Amortization | Net Carrying Amount | Gross Carrying Amount | Accumulated Amortization | Net Carrying Amount |
| Finite-lived intangible assets | | | | | | |
| Customer relationships | $ 35,460 | $ (27,522) | $ 7,938 | $ 35,460 | $ (21,223) | $ 14,237 |
| Foreign currency translation adjustment | (4,971) | 2,718 | (2,253) | (1,910) | 855 | (1,055) |
| Total finite-lived intangible assets | 30,489 | (24,804) | 5,685 | 33,550 | (20,368) | 13,182 |
| Indefinite-lived intangible assets | | | | | | |
| License | 600 | — | 600 | 600 | — | 600 |
| Total Other intangible assets, net | $ 31,089 | $ (24,804) | $ 6,285 | $ 34,150 | $ (20,368) | $ 13,782 |

During 2015, the Company acquired certain margin FX trading accounts from Citibank, N.A. and Citibank International Limited. The asset purchase agreement provides for cash consideration payable quarterly based on a pre-determined formula until total payments reach $6.0 million ("Threshold"). Additional cash consideration ("Contingent Consideration") is payable if total payments meet the Threshold before the expiration of an initial 30-month period. The acquired accounts represent customer relationships and are recorded as intangible assets at an initial cost of $6.0 million. Transaction costs incurred were not material. The Contingent Consideration is recognizable when it becomes payable, i.e., when it is probable and reasonably estimable, consistent with the guidance in ASC 450-20, *Loss Contingencies*, and, to the extent any amounts are recorded, included in the cost basis of the acquired intangible assets. There was no Contingent Consideration recorded as of December 31, 2016. The customer relationships are amortized on a straight-line basis over a weighted-average amortization period of three years.

Customer relationships are amortized on a straight-line basis over three to nine years which approximates the weighted-average useful lives. Indefinite-lived assets are not amortized (see Note 2). Amortization expense from continuing operations included in the consolidated statements of operations was $7.2 million and $7.0 million for the years ended December 31, 2016 and 2015, respectively.

Intangible assets related to businesses to be disposed of are included as a component of assets held for sale on the consolidated statements of financial condition and are not included in the table above. Amortization related to these intangible assets ceased as of the date they were determined to be held for sale. Amortization expense related to these assets (prior to the date they were determined to be held for sale) is included in Income (loss) from discontinued operations, net of tax in the consolidated statements of operations.

There was no impairment of intangible assets during the year ended December 31, 2016. During the first quarter of 2015, the Company performed an interim impairment evaluation of intangible assets due to the events of January 15, 2015 and the Company's plans to sell certain businesses. This evaluation resulted in the Company recording impairment losses of $5.4 million due to a decline in the implied fair value of certain institutional businesses subsequent to the events of January 15, 2015. The impairment charge is included as a component of amortization expense within discontinued operations for the year ended December 31, 2015.

TABLE OF CONTENTS

**Global Brokerage, Inc.**

**Notes to Consolidated Financial Statements**

**Note 9. Other Intangible Assets, net - (continued)**

Estimated future amortization expense for acquired intangible assets outstanding as of December 31, 2016 is as follows, with amounts in thousands:

| Year Ending December 31, | | |
|---|---|---|
| 2017 | | 3,983 |
| 2018 | | 1,401 |
| 2019 | | 301 |
| 2020 | | — |
| 2021 | | — |
| Thereafter | | — |
| | $ | 5,685 |

**Note 10. Other Assets**

Other assets were comprised of the following as of December 31, 2016 and 2015, with amounts in thousands:

| | As of December 31, | | | |
|---|---|---|---|---|
| | | 2016 | | 2015 |
| Prepaid expenses | $ | 4,229 | $ | 5,807 |
| Equity method investments | | — | | 2,603 |
| Cost method investment | | 1,103 | | — |
| Deposits | | 1,871 | | 2,727 |
| Other | | 161 | | 284 |
| Total | $ | 7,364 | $ | 11,421 |

As discussed in Note 2, as a result of the Company's adoption of ASU No. 2015-03 in the first quarter of 2016, deferred debt issuance costs of $3.4 million as of December 31, 2015 were reclassified from Other assets, as previously reported, to the respective debt liabilities on the consolidated statements of financial condition (see Notes 19 and 20).

Other assets related to businesses classified as discontinued operations are included as a component of assets held for sale on the consolidated statements of financial condition and are not included in the table above (see Note 4).

**Note 11. Customer Account Liabilities**

Customer account liabilities represent amounts due to customers related to cash and margin transactions. This includes cash deposits and gains and losses on settled FX, CFDs and spread betting trades as well as unrealized gains and losses on open FX commitments, CFDs and spread betting. Customer account liabilities were $661.9 million and $685.0 million as of December 31, 2016 and 2015, respectively.

TABLE OF CONTENTS

**Global Brokerage, Inc.**

**Notes to Consolidated Financial Statements**

**Note 12. Accounts Payable and Accrued Expenses**

Accounts payable and accrued expenses were comprised of the following as of December 31, 2016 and 2015, with amounts in thousands:

|  | As of December 31, | |
|---|---|---|
|  | 2016 | 2015 |
| Operating expenses payable | $ 24,926 | $ 16,529 |
| Commissions payable | 7,271 | 8,671 |
| Bonus payable | 22,210 | 11,551 |
| Income tax payable | 920 | 1,375 |
| Interest due on borrowings | 162 | 162 |
| Other | 2 | 10 |
| Total | $ 55,491 | $ 38,298 |

Accounts payable and accrued expenses related to businesses classified as discontinued operations are included as a component of liabilities held for sale on the consolidated statements of financial condition and are not included in the table above (see Note 4).

**Note 13. Earnings per Share**

Basic earnings per share ("EPS") measures the performance of an entity over the reporting period. Diluted EPS measures the performance of an entity over the reporting period while giving effect to all potentially dilutive instruments that were outstanding during the period. The Company uses the treasury stock method in accordance with ASC 260, *Earnings per Share* ("ASC 260"), to determine EPS. Due to the Corporation's loss from continuing operations for the year ended December 31, 2015, any potential common shares were not included in the computation of diluted EPS as they would have had an antidilutive effect since the shares would decrease the loss per share. As a result, basic and diluted net loss per share of Class A common stock are equal for the year ended December 31, 2015.

In accordance with ASC 260, all outstanding unvested share-based payments that contain rights to non-forfeitable dividends participate in the undistributed earnings with the common stockholders and are therefore participating securities. The Company's unvested restricted stock units ("RSUs") do not contain rights to dividends or dividend equivalents. As a result, unvested RSUs are not considered participating securities and are therefore not required to be included in computing basic EPS under the two-class method. The shares of Class B common stock do not share in the earnings of the Company and are not considered participating securities. Accordingly, basic and diluted net earnings per share of Class B common stock have not been presented.

In April 2015, the Company entered into an option agreement with a customer as part of a negative equity balance settlement and issued an immediately vested, two-year option to purchase 56,934 shares of Class A common stock of Global Brokerage, Inc. The option has a strike price of $22.50. For the years ended December 31, 2016 and 2015, the stock option was not included in the computation of diluted EPS because it was antidilutive under the treasury method.

In computing diluted EPS, outstanding stock options and other equity awards granted to certain employees, non-employees and independent directors in the aggregate of 721,622 and 749,856 for the years ended December 31, 2016 and 2015, respectively, were excluded because they were antidilutive under the treasury method.

As described in Note 20, in June 2013 Global Brokerage, Inc. issued $172.5 million principal amount of 2.25% senior convertible notes maturing on June 15, 2018 (the "Convertible Notes"). The Convertible Notes will be convertible at an initial conversion rate of 5.32992 shares of the Corporation's Class A common stock per $1,000 principal amount of the Convertible Notes, which is equivalent to an initial conversion price of approximately $187.62. In accordance with ASC 260, the shares of the Corporation's Class A common stock issuable upon conversion of the Convertible Notes are included in the calculation of diluted EPS to the extent that the conversion value of the securities exceeds the principal amount. For diluted EPS purposes, the

F-36

TABLE OF CONTENTS

**Global Brokerage, Inc.**

**Notes to Consolidated Financial Statements**

**Note 13. Earnings per Share - (continued)**

number of shares of the Corporation's Class A common stock that is necessary to settle such excess is considered issued. For the years ended December 31, 2016 and 2015, the conversion value did not exceed the principal amount and therefore the conversion effect was not included in the computation of diluted EPS because it was antidilutive under the treasury method.

As described in Note 20, the Company also entered into a warrant transaction whereby the Company sold to the counterparties warrants to purchase shares of the Corporation's Class A common stock. For the years ended December 31, 2016 and 2015, the warrants were not included in the computation of diluted EPS because they were antidilutive under the treasury method.

Additionally, the non-controlling members of Holdings have the right to exchange their Holdings Units for shares of the Corporation's Class A common stock on a one-for-one basis at fair value, subject to customary conversion rate adjustments for stock splits, stock dividends and reclassifications. These shares were also excluded from the computation of diluted EPS because the shares have no impact, or would not be dilutive or antidilutive under the treasury method. During the years ended December 31, 2016 and 2015, certain members of Holdings exchanged 0.5 million and 0.8 million, respectively, of their Holdings Units on a one-for-one basis, for shares of Class A common stock of the Corporation.

The following is a reconciliation of the numerator and denominator used in the basic and diluted EPS calculations, with amounts in thousands, except per share data:

| | For the Years Ended December 31, | | | |
| --- | --- | --- | --- | --- |
| | | 2016 | | 2015 |
| **Basic and diluted net income (loss) per share of Class A common stock:** | | | | |
| **Numerator** | | | | |
| Income (loss) from continuing operations attributable to Global Brokerage, Inc. | $ | 96,680 | $ | (513,600) |
| Loss from discontinued operations attributable to Global Brokerage, Inc. | | (26,037) | | (40,329) |
| Net income (loss) available to holders of Class A common stock | | 70,643 | | (553,929) |
| Earnings allocated to participating securities | | — | | — |
| Income (loss) available to common stockholders | $ | 70,643 | $ | (553,929) |
| **Denominator** | | | | |
| Weighted average shares of Class A common stock | | 5,609 | | 5,087 |
| Add dilutive effect of the following: | | | | |
| Stock options and RSUs[1] | | — | | — |
| Convertible note hedges | | — | | — |
| Warrants | | — | | — |
| Assumed conversion of Holdings Units for Class A common stock | | — | | — |
| Dilutive weighted average shares of Class A common stock | | 5,609 | | 5,087 |
| **Net income (loss) per share of Class A common stock — Basic and Diluted:** | | | | |
| Continuing operations | $ | 17.24 | $ | (100.96) |
| Discontinued operations | | (4.64) | | (7.93) |
| Basic net income (loss) per share of Class A common stock | $ | 12.60 | $ | (108.89) |

_____

[1] No dilutive effect for either period presented, therefore zero incremental shares included

TABLE OF CONTENTS

Global Brokerage, Inc.

Notes to Consolidated Financial Statements

**Note 14. Related Party Transactions**

Amounts receivable from, and payable to, related parties are set forth below, with amounts in thousands:

| | As of December 31, | | | |
|---|---|---|---|---|
| | **2016** | | **2015** | |
| **Receivables** | | | | |
| Advances to Holdings non-controlling members | $ | 3 | $ | 112 |
| Accounts receivable — Lucid non-controlling members | | — | | 15 |
| Advances to employees | | 55 | | 201 |
| Accounts receivable — Liquidity provider | | 308 | | — |
| Due from Liquidity provider | | 128 | | — |
| Notes receivable and interest — Lucid non-controlling members | | — | | 8,171 |
| Total receivables from related parties | $ | 494 | $ | 8,499 |
| | | | | |
| **Payables** | | | | |
| Employees and equity method investments | $ | 732 | $ | 1,370 |
| Accounts payable — Equity method investment | | 180 | | 90 |
| Due to Lucid non-controlling members in connection with the allocation of income to Lucid non-controlling members for services provided | | 741 | | 6,500 |
| Tax receivable agreement | | — | | 145 |
| Total payables to related parties | $ | 1,653 | $ | 8,105 |

The Company has advanced funds for withholding taxes to several non-controlling members of Holdings. The outstanding balances as of December 31, 2016 and 2015, included in the table above, are included in Accounts receivable, net in the consolidated statements of financial condition.

Included in Current assets held for sale in the consolidated statements of financial condition are advances to Lucid. As of December 31, 2016 and 2015, advances to the Lucid non-controlling members were nil and not material, respectively.

The Company has advanced funds to several employees. The outstanding balances as of December 31, 2016 and 2015, included in the table above, are included in Accounts receivable, net in the consolidated statements of financial condition.

In July 2016, UK LTD entered into a trading relationship with an affiliate of Leucadia to provide CFD pricing for the Company's clients. The Leucadia affiliate is 24.0% owned by Jefferies, LLC ("Jefferies"), a wholly-owned subsidiary of Leucadia. For the year ended December 31, 2016, the Company recorded trading profits of $0.7 million which is included in Trading revenue in the consolidated statements of operations. As of December 31, 2016 Accounts receivable, net in the consolidated statements of financial condition included a receivable from the Leucadia affiliate of $0.3 million for trading profits, and Due from broker included a balance of $0.1 million for open trade positions.

In January 2014, in connection with the formation of V3 by the Company and the non-controlling members of Lucid, the non-controlling members of Lucid borrowed approximately $7.9 million from the Company to assist with funding their portion of the capital contribution, which is included in Notes receivable in the consolidated statements of financial condition as of December 31, 2015. The amount borrowed was due in 2017 and bore interest at the rate of 2% per annum. During the second quarter of 2016, management determined that the non-controlling members of Lucid would not be required to repay the notes receivable and the debt would be forgiven. Accordingly, the Company recorded a provision for the debt forgiveness in the amount of $8.2 million for the principal amount thereof plus accrued interest, which is included in General and administrative expense in the consolidated statements of operations for the year ended December 31, 2016. The Company recorded $0.1 million and $0.2 million of interest income related to the notes receivable for the years ended December 31, 2016 and 2015, respectively.

TABLE OF CONTENTS

**Global Brokerage, Inc.**

**Notes to Consolidated Financial Statements**

**Note 14. Related Party Transactions - (continued)**

During the year ended December 31, 2015, Lucid acquired ownership interests and shares in CME Group Inc. from one of the non-controlling members of Lucid in a market-based transaction. The total carrying value of the ownership interests and shares was $3.7 million as of both December 31, 2016 and 2015 and is included in assets held for sale (see Note 4).

Customers account liabilities in the consolidated statements of financial condition included balances for employees and equity method investments.

Included in Accounts payable and accrued expenses in the consolidated statements of financial condition are amounts payable to an equity method investee for platform trading services of $0.2 million and $0.1 million as of December 31, 2016 and 2015, respectively. The Company recorded $1.1 million in each of the years ended December 31, 2016 and 2015 for such platform services, which is included in Communication and technology in the consolidated statements of operations.

Amounts due related to the allocation of income to Lucid non-controlling members for services provided were $0.7 million and $6.5 million as of December 31, 2016 and 2015, respectively, and are included in Current liabilities held for sale in the consolidated statements of financial condition (see Note 4).

Prior to July 1, 2015, the Company received commission or mark-up income from institutional customers' trades executed on FastMatch's electronic trading platform, an entity in which the Company owns a 34.4% equity interest (see Note 6). The Company paid a per trade fee to FastMatch for use of the platform. Effective July 1, 2015, institutional customers trading via the FastMatch platform became direct customers of FastMatch. Fees collected from customers for trades executed on the FastMatch platform were nil and $6.3 million for the years ended December 31, 2016 and 2015, respectively, and are included in Trading revenue in the consolidated statements of operations. Fees paid to FastMatch were nil and $4.3 million for the years ended December 31, 2016 and 2015, respectively, and are reflected as a component of Communication and technology in the consolidated statements of operations. The Company received $0.1 million and $0.3 million from FastMatch during the years ended December 31, 2016 and 2015, respectively, for occupancy and operational costs, which is included in Other income in the consolidated statements of operations.

**Exchange Agreement**

The members of Holdings (other than the Corporation) entered into an exchange agreement under which they (or certain permitted transferees thereof) have the right (subject to the terms of the exchange agreement as described therein) to exchange their Holdings Units for shares of the Corporation's Class A common stock on a one-for-one basis at fair value, subject to customary conversion rate adjustments for stock splits, stock dividends and reclassifications. During the years ended December 31, 2016 and 2015, certain members of Holdings exchanged 0.5 million and 0.8 million, respectively, of their Holding Units, on a one-for-one basis, for shares of Class A common stock of the Corporation pursuant to the exchange agreement.

**Equity Distribution Agreement**

Pursuant to the terms of the Equity Distribution Agreement (see Note 16), the Company may, from time to time, issue and sell shares of its Class A common stock, having an aggregate offering price of up to $15.0 million, through Jefferies as a sales agent. Jefferies will receive a commission of 3.0% of the gross sales price per share for any shares sold through it as the Company's sales agent under the Equity Distribution Agreement. For the year ended December 31, 2016, no amount has been paid to Jefferies. The Company has agreed to reimburse a portion of the expenses that Jefferies incurs in connection with the offer and sale of the common stock. The Company recorded $0.2 million for the year ended December 31, 2016 for reimbursements of such expenses.

**Payments under Tax Receivable Agreement**

The Corporation entered into a tax receivable agreement with the members of Holdings, including former members of Holdings (other than the Corporation) that will provide for the payment by the Corporation to Holdings' members (other than the Corporation) as defined therein. Assuming sufficient taxable income is generated such that the Corporation fully realizes the tax benefits of the amortization specified in the tax receivable agreement, the aggregate payments currently estimated that would be due are $145.6 million and $146.8 million as of December 31, 2016 and 2015, respectively. During the first quarter of

F-39

TABLE OF CONTENTS

**Global Brokerage, Inc.**

**Notes to Consolidated Financial Statements**

**Note 14. Related Party Transactions - (continued)**

2015, the Corporation determined that it was not more likely than not that it would benefit from the tax deduction attributable to the tax basis step-up for which a portion of the benefit would be owed to the non-controlling members of Holdings under the tax receivable agreement and reduced the contingent liability under the tax receivable agreement to zero. As of December 31, 2016, the Corporation continues to believe it will not benefit from the tax deduction and the contingent liability remains zero. During the years ended December 31, 2016 and 2015, payments of $0.2 million and $5.4 million, respectively, were made pursuant to the tax receivable agreement. The payment made during the year ended December 31, 2016 relates to the 2014 tax return year. The Corporation does not currently expect to make a payment for the 2015 and 2016 tax years.

**Leucadia Transaction**

Leucadia maintains a 49.9% equity interest in Group, the Company's operating subsidiary, and has three directors on the board of directors of Group. See Note 19 for amounts related to the financing transaction with Leucadia that took place in January 2015 and the various aspects of the restructuring transaction effective September 1, 2016.

**Other**

UK LTD was party to an arrangement with Global Finance Company (Cayman) Limited ("Global Finance") and Master Capital Group, S.A.L. ("Master Capital"). An affiliated shareholder of the Company beneficially owns more than 90% of the equity of Global Finance and Master Capital. Pursuant to such arrangement, Global Finance and Master Capital were permitted to use the brand name "FXCM" and the Company's technology platform to act as its local presence in certain countries in the Middle East and North Africa ("MENA"). UK LTD collected and remitted to Global Finance and Master Capital fees and commissions charged by Global Finance and Master Capital to customers in MENA countries. Effective May 4, 2015, UK LTD terminated the arrangement with Global Finance and Master Capital. For the years ended December 31, 2016 and 2015, the fees and commissions related to the arrangement were nil and $0.2 million, respectively, and are included in Referring broker fees in the consolidated statements of operations.

**Note 15. Stock-Based Compensation**

The Company's Amended and Restated 2010 Long-Term Incentive Plan (the "LTIP") permits the grant of various equity-based awards to employees, directors or other service providers of the Company and its subsidiaries. Under the LTIP, the Company has granted non-qualified stock options and other equity awards, including shares of the Corporation's Class A common stock ("Shares") and RSUs. The total number of Shares which may be issued under the LTIP is 1,529,500. The Shares issued may consist, in whole or in part, of unissued Shares or treasury Shares. The issuance of Shares shall reduce the total number of Shares available under the LTIP. As of December 31, 2016, 450,417 shares remained available for future issuance.

In arriving at stock-based compensation expense, the Company estimates the number of equity-based awards that will forfeit due to employee turnover. The Company's forfeiture assumption is based primarily on its turn-over historical experience. If the actual forfeiture rate is higher than the estimated forfeiture rate, then an adjustment will be made to increase the estimated forfeiture rate, which will result in a decrease to the expense recognized in the Company's financial statements. If the actual forfeiture rate is lower than the estimated forfeiture rate, then an adjustment will be made to lower the estimated forfeiture rate, which will result in an increase to expense recognized in the Company's financial statements. The expense the Company recognizes in future periods will be affected by changes in the estimated forfeiture rate and may differ significantly from amounts recognized in the current period.

**Stock Options**

Stock options to purchase Shares are granted to employees ("Employee Stock Options") and the independent members of the board of directors ("Independent Directors Options") (collectively, the "Stock Options"). Stock options are granted to employees and independent directors with exercise prices at least equal to the fair market value of a Share on the date the option is granted. The Employee Stock Options have a four-year graded vesting schedule and a contractual term of seven years from the date of grant. The Independent Directors Options vest on the first anniversary after the grant date and have a seven-year contractual term. Under the terms of the LTIP, the Company may issue new Shares or treasury shares upon share option exercise. During the years ended December 31, 2016 and 2015, the Company did not grant Employee Stock Options or Independent Directors Options.

F-40

TABLE OF CONTENTS

**Global Brokerage, Inc.**

**Notes to Consolidated Financial Statements**

**Note 15. Stock-Based Compensation - (continued)**

The following table summarizes the Company's activity related to the Stock Options as of December 31, 2016 and changes for the year then ended:

| Stock Options | Shares | | Weighted-Average Exercise Price | Weighted-Average Remaining Contractual Term (in years) | | Aggregate Intrinsic Value (In thousands) |
|---|---|---|---|---|---|---|
| Outstanding at January 1, 2016 | 678,019 | $ | 136.29 | | | |
| Granted | — | | — | | | |
| Exercised | — | | — | | | |
| Forfeited or expired | 22,825 | $ | 143.25 | | | |
| Outstanding at December 31, 2016 | 655,194 | $ | 136.05 | 1.49 | $ | — |
| Options vested and expected to vest at December 31, 2016 | 654,513 | $ | 136.03 | 1.49 | $ | — |
| Options exercisable at December 31, 2016 | 630,469 | $ | 135.09 | 1.39 | $ | — |

There were no options exercised in the years ended December 31, 2016 and 2015. The total grant-date fair value of options vested in the years ended December 31, 2016 and 2015 was $1.4 million and $3.1 million, respectively.

*Valuation Assumptions*

The fair value of each option awarded to employees is estimated on the date of grant using the Black-Scholes option pricing model, consistent with the provisions of ASC 718. Options granted to the Company's independent directors are considered options granted to employees under ASC 718 as defined therein.

Expected term for the Employee Stock Options and Independent Directors Options is based on the simplified method outlined in ASC 718. In accordance with ASC 718, options are considered to be exercised halfway between the average vesting date and the contractual term of each option grant. The simplified method is applicable for "plain-vanilla" stock options, as defined in ASC 718, only if the Company does not have sufficient historical share option exercise experience upon which to estimate an expected term. The Corporation's Shares have been publicly traded for approximately six years, however there is a lack of sufficient exercise history for Stock Options during this period, including the most recent two years. Consequently, the Company believes that the simplified method is an applicable methodology to estimate the expected term of the options as of the grant date.

The risk-free interest rates for the Employee Stock Options and Independent Directors Options are based on U.S. Treasury instruments whose terms are commensurate with the Stock Options' expected terms.

Expected volatility is based on a weighing of the historical and implied volatilities of the Company and for a set of public guideline companies deemed comparable to it. The guideline companies selected operate in a similar industry, pursue similar market opportunities, and are subject to similar risks of the Company. Changes in the subjective assumptions required in the valuation models may significantly affect the estimated value of the Company's Stock Options, the related stock-based compensation expense and, consequently, its results of operations and comprehensive income.

Dividend yield is determined based on the Company's expected dividend payouts.

Stock-based compensation expense before income taxes attributable to continuing operations for the Employee Stock Options, which is included in Compensation and benefits in the consolidated statements of operations, was $1.2 million and $1.9 million for the years ended December 31, 2016 and 2015, respectively. Stock-based compensation expense before income taxes attributable to continuing operations for the Independent Directors Options, which is included in Compensation and benefits in the consolidated statements of operations, was nil and not material for the years ended December 31, 2016 and 2015, respectively. The total compensation cost capitalized and included in Office, communication and computer equipment, net, in the consolidated statements of financial condition was not material and $0.1 million for the years ended December 31, 2016 and

F-41

TABLE OF CONTENTS

**Global Brokerage, Inc.**

**Notes to Consolidated Financial Statements**

**Note 15. Stock-Based Compensation - (continued)**

2015, respectively. The Company did not recognize any tax benefit related to stock-based compensation expense for the years ended December 31, 2016 and 2015.

As of December 31, 2016, there was $0.8 million of total unrecognized compensation cost related to unvested Stock Options that is expected to be recognized over a weighted average period of 1.1 years.

There were no cash proceeds received nor any income tax benefits realized from the exercise of Stock Options for the years ended December 31, 2016 and 2015.

**Other Equity Awards**

The LTIP provides for the grant of other stock-based awards ("Other Equity Awards") which may include Shares and other awards that are valued in whole or in part by reference to, or are otherwise based on the fair market value of, Shares.

*RSUs*

Service-based RSUs were granted to employees during 2014. The RSUs vest in equal annual installments over a four-year period following the date of grant, subject to the employees' continuing employment. RSUs that vest are settled by issuance of one Share for each RSU. If the employee terminates for any reason, any RSUs that have not vested as of the date of termination are forfeited and returned to the Company. There were no RSUs granted to employees during the years ended December 31, 2016 and 2015.

Holders of RSUs do not have dividend, voting or any other rights of a shareholder with respect to the Shares underlying the RSUs unless and until the RSUs vest and are settled by the issuance of such Shares. The fair value of RSUs is based on the fair market value of Shares on the date of grant, adjusted for the present value of dividends expected to be paid on Shares prior to vesting. Such value is recognized as an expense over the requisite service period, net of estimated forfeitures.

The following table summarizes the Company's unvested RSU activity as of December 31, 2016 and changes for the year then ended:

| RSUs | Units | | Weighted-Average Grant-Date Fair Value | Weighted-Average Remaining Contractual Term (in years) | | Aggregate Intrinsic Value (in thousands) |
|---|---|---|---|---|---|---|
| Unvested at January 1, 2016 | 14,903 | $ | 162.50 | | | |
| Granted | — | | — | | | |
| Vested | 4,771 | $ | 162.50 | | | |
| Forfeited | 638 | $ | 162.50 | | | |
| Unvested at December 31, 2016 | 9,494 | $ | 162.50 | 1.96 | $ | 67 |
| RSUs expected to vest at December 31, 2016 | 8,948 | $ | 162.50 | 1.96 | $ | 63 |

The total fair value of RSUs vested during the years ended December 31, 2016 and 2015 was not material.

Stock-based compensation expense before income taxes attributable to continuing operations for RSUs, which is included in Compensation and benefits in the consolidated statements of operations, was $0.7 million and $0.8 million for the years ended December 31, 2016 and 2015, respectively. The total compensation cost capitalized for RSUs, which is included in Office, communication and computer equipment, net, in the consolidated statements of financial condition, was $0.1 million for each of the years ended December 31, 2016 and 2015.

As of December 31, 2016, there was $1.4 million of total unrecognized compensation cost related to unvested RSUs that is expected to be recognized over a weighted-average period of 1.96 years.

TABLE OF CONTENTS

**Global Brokerage, Inc.**

**Notes to Consolidated Financial Statements**

**Note 15. Stock-Based Compensation - (continued)**

*Shares*

The Company did not grant Shares as Other Equity Awards during the years ended December 31, 2016 and 2015.

**Note 16. Stockholders' Equity**

The Corporation's authorized capital stock consists of 3,000,000,000 shares of Class A common stock, par value $0.01 per share, 1,000,000 shares of Class B common stock, par value $0.01 per share, and 300,000,000 shares of preferred stock, par value $0.01 per share, of which 55,120 shares have been designated as Series A Junior Participating Preferred Stock.

*Class A Common Stock*

Holders of shares of the Corporation's Class A common stock are entitled to one vote for each share held of record on all matters submitted to a vote of stockholders. Holders of shares of Class A common stock are entitled to receive dividends when and if declared by the Corporation's board of directors out of funds legally available therefore, subject to any statutory or contractual restrictions on the payment of dividends and to any restrictions on the payment of dividends imposed by the terms of any outstanding preferred stock. Upon dissolution or liquidation or the sale of all or substantially all of the Corporation's assets, after payment in full of all amounts required to be paid to creditors and to the holders of preferred stock having liquidation preferences, if any, the holders of shares of Class A common stock will be entitled to receive pro rata the Corporation's remaining assets available for distribution. Holders of shares of Class A common stock do not have preemptive, subscription, redemption or conversion rights.

*Class B Common Stock*

Each holder of the Corporation's Class B common stock is entitled, without regard to the number of shares of Class B common stock held by such holder, to one vote for each Holdings Unit in Holdings held by such holder. The unit holders of Holdings collectively have a number of votes in the Corporation that is equal to the aggregate number of Holdings Units that they hold. Holders of our Class B common stock do not have any right to receive dividends or to receive a distribution upon a liquidation or dissolution of the Corporation.

*Class A Common Stock Repurchase Program*

Our Board of Directors previously approved the repurchase of $80.0 million of Global Brokerage, Inc.'s Class A common stock (the "Stock Repurchase Program"). In November 2014, our Board of Directors approved a $50.0 million incremental increase in the Stock Repurchase Program for an aggregate of $130.0 million. Since inception of the Stock Repurchase Program in May 2011 through November 2016, the Company repurchased 5.1 million pre-reverse split shares for $64.2 million under these authorizations. In November 2016, the Board of Directors of the Company canceled the Stock Repurchase Program.

TABLE OF CONTENTS

**Global Brokerage, Inc.**

**Notes to Consolidated Financial Statements**

**Note 16. Stockholders' Equity - (continued)**

The following table presents the changes in the Company's Class A common stock outstanding during the years ended December 31, 2016 and 2015:

| Class A Common Stock | |
|---|---:|
| **Balance at January 1, 2015** | 4,788,994 |
| Issued | — |
| Repurchased in conjunction with vesting of RSUs | (61) |
| Exchange of Holdings Units to Class A common stock (see Note 3) | 808,672 |
| Vesting of RSUs | 4,929 |
| **Balance at December 31, 2015** | 5,602,534 |
| Issued | — |
| Repurchased | — |
| Exchange of Holdings Units to Class A common stock (see Note 3) | 535,992 |
| Vesting of RSUs (see Note 15) | 4,771 |
| **Balance at December 31, 2016** | 6,143,297 |

As of December 31, 2016 and 2015, there were 8 and 25 shares, respectively, of Class B common stock issued and held by the members of Holdings.

As of December 31, 2016 and 2015, there were no shares of the Company's Series A Junior Participating Preferred Stock outstanding.

Holders of shares of Class A common stock and Class B common stock vote together as a single class on all matters presented to the Company's stockholders for their vote or approval, except as otherwise required by applicable law.

*Option Agreement*

In April 2015, the Company entered into an Option Agreement (the "Option Agreement") pursuant to which the Company issued an option to purchase 56,934 shares of the Corporation's Class A common stock (the "Option") with an exercise price of $22.50. The Option was exercisable immediately, expires two years from the date of issuance, and includes standard anti-dilution protections. The Option Agreement was entered into as part of a negative equity balance settlement with a customer. The fair value of the Option on the date of issuance was estimated at $0.3 million and was determined using the Black-Scholes-Merton option pricing model. The Option was not exercised during the years ended December 31, 2016 and 2015.

*Amendment to Stockholder Rights Plan*

In January 2016, the Company entered into an Amended and Restated Rights Agreement (the "Amended Rights Agreement") which amended the Company's original Rights Agreement (the "Original Rights Agreement") dated January 29, 2015. In connection with the adoption of the Original Rights Agreement, the Corporation's Board of Directors declared a dividend distribution of one right on each outstanding share of the Corporation's Class A common stock. The Original Rights Agreement was amended to protect the interests of the Company and its stockholders by helping to preserve the value of the Company's net operating loss carryforwards and tax credits.

Under the terms of the Amended Rights Agreement, each right initially entitles stockholders to buy one one-thousandth (1/1000) of a share of the Series A Junior Participating Preferred Stock of the Corporation, at an initial exercise price of $44.12, in the event the rights become exercisable. As amended, the rights generally become exercisable if a person or group becomes the beneficial owner of 4.9% or more of (a) the outstanding Class A common stock of the Corporation or (b) the fair market value of all capital stock of the Corporation. Prior to this amendment, the beneficial ownership percentage threshold

F-44

TABLE OF CONTENTS

**Global Brokerage, Inc.**

**Notes to Consolidated Financial Statements**

**Note 16. Stockholders' Equity - (continued)**

to trigger the rights plan was 10.0% of all voting securities, a trigger that, after this amendment, remains in place in addition to the aforementioned 4.9% trigger.

The Amended Rights Agreement extends the expiration date of the rights from January 29, 2018 to January 26, 2019, unless the rights are earlier redeemed or exchanged in accordance with the Amended Rights Agreement or the Amended Rights Agreement is earlier terminated by the Company's Board of Directors.

As of December 31, 2016, the Company is not aware of the occurrence of any events that would trigger the exercise of the rights under the Amended Rights Agreement.

This amendment is not a taxable event, will not affect the reported financial condition or results of operations, including earnings per share, of the Corporation and will not change the manner in which the Corporation's Class A common stock is currently traded.

*Listing on the NASDAQ Global Market*

In September 2016, the Corporation provided written notice to the New York Stock Exchange ("NYSE") of its intention to voluntarily delist its Class A common stock on the NYSE and to list on the NASDAQ Global Market of The NASDAQ Stock Market LLC ("NASDAQ"). The listing and trading of the Corporation's Class A common stock on NYSE ceased at market close on September 23, 2016 and commenced on NASDAQ at market open on September 26, 2016. The Class A common stock traded on NASDAQ under the symbol "FXCM" until the Corporation changed its name to Global Brokerage, Inc. on February 24, 2017 (see Note 28). Effective at market open on February 27, 2017, the Corporation's Class A common stock trades on NASDAQ under the symbol "GLBR."

*At-the-Market Common Stock Offering*

In October 2016, the Company entered into an Equity Distribution Agreement (the "Equity Distribution Agreement") with Jefferies, as sales agent (the "Sales Agent"). Under the terms of the Equity Distribution Agreement, the Company may, from time to time, issue and sell shares of its Class A common stock, par value $0.01 per share, having an aggregate offering price of up to $15.0 million, through the Sales Agent. The common stock will be sold pursuant to the Company's shelf registration statement on Form S-3 which was declared effective by the Securities and Exchange Commission on August 2, 2016. The Company has not issued or sold any shares pursuant to the Equity Distribution Agreement during the year ended December 31, 2016.

**Note 17. Employee Benefit Plan**

The Company maintains a defined contribution employee profit-sharing and savings 401(k) plan for all eligible employees. The Company was not required to and made no contributions to the plan for the years ended December 31, 2016 and 2015.

TABLE OF CONTENTS

**Global Brokerage, Inc.**

**Notes to Consolidated Financial Statements**

**Note 18. Net Capital Requirements**

The company's regulated entities are subject to minimum capital requirements in their respective jurisdictions. The minimum capital requirements of the entities below may effectively restrict the payment of cash distributions by the subsidiaries. The tables below present the capital, as defined by the respective regulatory authority, the minimum capital requirement and the excess capital for the following regulated entities as of December 31, 2016 and 2015, with amounts in millions:

| | As of December 31, 2016 | | | | | | | |
|---|---|---|---|---|---|---|---|---|
| | US | | UK LTD | | Australia | | Lucid LLP | |
| Capital | $ | 47.5 | $ | 83.4 | $ | 16.6 | $ | 10.2 |
| Minimum capital requirement | | 33.3 | | 22.0 | | 1.1 | | 4.2 |
| Excess capital | $ | 14.2 | $ | 61.4 | $ | 15.5 | $ | 6.0 |

| | As of December 31, 2015 | | | | | | | |
|---|---|---|---|---|---|---|---|---|
| | US | | UK LTD | | Australia | | Lucid LLP | |
| Capital | $ | 43.6 | $ | 76.3 | $ | 12.0 | $ | 10.9 |
| Minimum capital requirement | | 28.3 | | 27.6 | | 0.7 | | 4.0 |
| Excess capital | $ | 15.3 | $ | 48.7 | $ | 11.3 | $ | 6.9 |

Effective from January 1, 2016, the Financial Conduct Authority ("FCA"), which regulates UK LTD, introduced the "Capital Conservation Buffer" (CCB) and a "Countercyclical Capital Buffer" (CcyB) in line with the requirements set out in Capital Requirements Directive Article 160 Transitional Provisions for Capital Buffers. This requires all firms to maintain additional buffers on top of the minimum capital requirements noted above, which may vary at the direction of the FCA.

As a result of regulatory settlements reached with the Commodity Futures Trading Commission (the "CFTC") and the National Futures Association (the "NFA") in February 2017, US has withdrawn from business in the U.S. and deregistered from the CFTC and the NFA (see Note 28).

**Note 19. Leucadia Transaction**

On January 15, 2015, the Company's customers suffered significant losses and generated negative equity balances ("debit balances") owed to it of approximately $275.1 million. This was due to the unprecedented volatility in the EUR/CHF currency pair after the SNB discontinued its currency floor of 1.2 CHF per EUR on that date. When a customer entered a EUR/CHF trade with the Company, the Company executed an identical trade with a FX market maker. During the historic move liquidity became extremely scarce and shallow, which affected execution prices. This liquidity issue resulted in some customers having losses in excess of their account balance. While customers could not cover their margin call with the Company, the Company still had to cover the same margin call with the FX market maker. When a customer profits in the trade, the Company gives the profits to the customer, however, when the customer is not profitable on that trade the Company is obligated to pay the FX market maker regardless of whether the Company collects the funds from its customers. These debit balances resulted in a temporary breach of certain regulatory capital requirements.

On January 16, 2015, Holdings and Newco entered into a credit agreement (the "Credit Agreement") with Leucadia, as administrative agent and lender, and a related financing fee agreement (the "Fee Letter"). The financing provided to the Company pursuant to these agreements, which is described below, enabled the Company to maintain compliance with regulatory capital requirements and continue operations. On January 16, 2015, the Corporation, Holdings, Newco and Leucadia also entered into an agreement (the "Letter Agreement") that set the terms and conditions upon which the Corporation, Holdings and Newco would pay in cash to Leucadia and its assignees a percentage of the proceeds received in connection with certain transactions. In connection with these financing transactions, Holdings formed Newco and contributed all of the equity

TABLE OF CONTENTS

**Global Brokerage, Inc.**

**Notes to Consolidated Financial Statements**

**Note 19. Leucadia Transaction - (continued)**

interests owned by Holdings in its subsidiaries to Newco. The Credit Agreement and the Letter Agreement were subsequently amended on January 24, 2015. On September 1, 2016, the Company completed a restructuring transaction with Leucadia that, among other changes, amended the Credit Agreement and the Letter Agreement. The principal changes resulting from the restructuring transaction with Leucadia are described below.

<u>Restructuring Transaction</u>

On September 1, 2016, pursuant to the Restructuring Transaction, the Company and Leucadia agreed to amend the terms of the Credit Agreement and to terminate the Letter Agreement. The Letter Agreement was replaced with an Amended and Restated Limited Liability Company Agreement of FXCM Group, LLC (the "Group Agreement"). The Group Agreement replaces the existing FXCM Newco, LLC agreement and FXCM Newco, LLC was renamed FXCM Group, LLC ("Group"). Pursuant to the Group Agreement, Leucadia acquired a 49.9% membership interest in Group, with Holdings owning the remaining 50.1% membership interest in Group. Group and Holdings also entered into a Management Agreement pursuant to which Holdings manages the assets and day-to-day operations of Group. Additionally, Group adopted the 2016 Incentive Bonus Plan for Founders and Executives (the "Management Incentive Plan") under which participants are entitled to certain distributions made after the principal and interest under the amended Credit Agreement are repaid. The events described herein are collectively referred to as the "Restructuring Transaction."

*Principal Changes to the Credit Agreement*

In connection with the Restructuring Transaction, the First Amendment to Amended and Restated Credit Agreement ("Amendment") became effective on September 1, 2016. The Amendment extends the maturity date of the term loan by one year to January 16, 2018. Additionally, the Amendment permits the Company to defer any three of the remaining interest payments by paying interest in kind. Until the term loan under the amended Credit Agreement is fully repaid, all distributions and sales proceeds will continue to be used solely to repay the principal plus interest.

The Company concluded that the terms of the amended Credit Agreement and the Credit Agreement dated January 24, 2015 are not substantially different. Accordingly, the Amendment is accounted for as a modification on a prospective basis pursuant to ASC 470. The components of interest expense related to the amended Credit Agreement, which are included in Interest on borrowings in the consolidated statements of operations, including contractual interest, deferred interest and previously unamortized discounts, fees and costs, are amortized as an adjustment to interest expense over the remaining term of the amended Credit Agreement using the effective interest method.

*Principal Changes to the Letter Agreement*

Pursuant to the Restructuring Transaction, the Letter Agreement was terminated effective September 1, 2016 and the parties signed the Group Agreement. The Group Agreement provides that Group will be governed by a six-member board of directors, comprising three directors appointed by Leucadia and three directors appointed by the Company. The Group Agreement specifies the terms according to which the cash distributions and earnings or loss of Group are to be allocated to its members (the "Revised Waterfall"), which is described below. Distributions from Group, other than certain permitted payments, cannot be made under the Group Agreement until the principal and interest due under the amended Credit Agreement are repaid. Pursuant to the Group Agreement, Leucadia and the Company will each have the right to request the sale of Group after January 16, 2018, subject to both Leucadia and the Company accepting the highest reasonable sales price.

*Management Agreement*

Leucadia has agreed to the Management Agreement with Holdings with an initial term through January 15, 2018, renewable automatically for successive one-year periods, unless terminated by Group or by the manager. In the Management Agreement, a number of rights are granted unilaterally to Holdings as the manager, including the right to create and implement a detailed budget, appoint and terminate the executive officers of Group and make day-to-day decisions in the ordinary course. The rights retained by the board of directors of Group are described below under "Leucadia's membership interest in Group." In February 2017, the Management Agreement was amended to provide the board of directors with certain rights of termination (see Note 28).

TABLE OF CONTENTS

**Global Brokerage, Inc.**

**Notes to Consolidated Financial Statements**

**Note 19. Leucadia Transaction - (continued)**

*Management Incentive Plan*

In connection with the Restructuring Transaction, the Company adopted the 2016 Incentive Bonus Plan for Founders and Executives (the "Management Incentive Plan") effective September 1, 2016 ("Effective Date") in order to retain and incentivize senior management to maximize cash flow generation and grow the business. The Management Incentive Plan is a long-term incentive program with a five-year vesting period, with 25% vesting on the second anniversary of the Effective Date (the "First Vesting Date") and an additional 25% vesting on each of the next three anniversaries of the First Vesting Date. Distributions under the plan will be made only after the principal and interest under the amended Credit Agreement are repaid and will equal the following:

- 10.0% of all distributions or sales proceeds from Group up to $350 million;

- 12.0% of all distributions or sales proceeds from Group from $350 million to $850 million; and

- 14.0% of all distributions or sales proceeds from Group above $850 million.

Long-term incentive plan participants will receive their share of any distributions or sales proceeds while unvested. In the event that a participant's employment is terminated other than for cause or due to a material breach of a restrictive covenant, that participant will receive either a non-voting membership interest in Group that entitles the participant to the same share of distributions that would have otherwise been received under the incentive program, or a lump-sum cash payment, at the Company's discretion. In the event that a participant's employment is terminated for cause or due to a material breach of a restrictive covenant, that participant will not be entitled to distributions following such termination and will forfeit all interests under the Management Incentive Plan. A termination payment will also be paid upon any change of control of Group. For this purpose, a change of control is defined as an event or series of events by which a person or group acquires 50% or more of the voting interests of Group or if, and at the time that, Leucadia's percentage of ownership of the value of the equity interests of Group becomes less than 16.67%. In February 2017, Group and Leucadia entered into an acknowledgment pursuant to which the parties agree that Leucadia may terminate the Management Incentive Plan on behalf of Group at any time and for any reason in its sole discretion (see Note 28).

The Company determined that the Management Incentive Plan is a share-based payment arrangement that will be accounted for as a liability award under ASC 718. As of the Effective Date, the Company estimated the fair value of the Management Incentive Plan at $53.5 million. The Management Incentive Plan includes a performance condition whereby it only becomes an obligation after the principal and interest under the amended Credit Agreement are fully repaid. Accordingly, the Company will begin recognizing compensation expense for the award over the requisite service period when it becomes probable that the performance condition would be satisfied pursuant to ASC 718. At each reporting date, the Company will estimate the fair value of the Management Incentive Plan and assess the probability of repaying the amended Credit Agreement, and therefore of achieving the performance condition. Once the amended Credit Agreement has been repaid, or it is probable that it would be repaid, compensation expense will be recorded for the estimated fair value of the award, recognized using the accelerated attribution method over the five-year requisite service period.

As of December 31, 2016, the fair value of the Management Incentive Plan was estimated at $54.1 million. As of December 31, 2016, the Company determined that it is not probable that the performance condition would be satisfied and, accordingly, has not recognized compensation expense related to the award for the year ended December 31, 2016.

TABLE OF CONTENTS

**Global Brokerage, Inc.**

**Notes to Consolidated Financial Statements**

**Note 19. Leucadia Transaction - (continued)**

*Allocations of Group Distributions (Revised Waterfall)*

The contractual provisions in the Group Agreement specify how certain distributions from Group are to be allocated among Leucadia, the Company and the Company's senior management members participating in the Management Incentive Plan (the "Revised Waterfall"). The distributions include net proceeds received in connection with certain transactions, including sales of assets, dividends or other capital distributions, the sale of Group (whether by merger, stock purchase, sale of all or substantially all of Group's assets or otherwise), the issuance of any debt or equity securities, and other specified non-ordinary course events, such as certain tax refunds and litigation proceeds. The Revised Waterfall will result in the following distributions from Group:

| Distributable Amount | Revised Waterfall |
|---|---|
| Amounts due under the amended Credit Agreement | 100% Leucadia |
| Next $350 million | 45% Leucadia / 45% Holdings / 10.0% Management |
| Next $500 million | 79.2% Leucadia / 8.8% Holdings / 12.0% Management |
| All aggregate amounts thereafter | 51.6% Leucadia / 34.4% Holdings / 14.0% Management |

**Leucadia's Membership Interest in Group**

As indicated above, in exchange for the Letter Agreement, the Company issued a 49.9% non-controlling membership interest in Group to Leucadia. The remaining 50.1% controlling membership interest in Group is owned by Holdings and Holdings consolidates the financial results of Group, as discussed in Note 2.

Leucadia has designated three directors to the board of directors of Group. As such, Leucadia participates in certain management, operational and investment decisions of Group, including, but not limited to, issuance of additional membership units or additional ownership interests in Group's subsidiaries, issuance of debt (subject to certain limited exceptions), sales of assets (subject to certain limited exceptions), merger or consolidation with respect to Group or its subsidiaries, review and approval of the annual summary budget, administration of the Management Incentive Plan, and entry into or exit from a material line of business.

In addition to the allocations of cash distributions and the net profit and net loss of Group described above, Leucadia and its assignees are entitled to tax distributions under the Group Agreement. If any such tax distributions are made, the amounts of such distributions reduce the payments to be made to Leucadia and its assignees pursuant to the Revised Waterfall (other than with respect to the repayment of the loan).

The Group Agreement provides that following January 16, 2018, or, if earlier, at any time following a change of control (defined below), Leucadia and the Company will each have the right to cause the sale of Holdings, Group, and/or any of their respective subsidiaries for cash at the highest reasonably available price, subject to both Leucadia and the Company reasonably accepting such sales price. Upon the occurrence of such event, Group will distribute the cash to Leucadia and the Company in accordance with the Revised Waterfall described above.

In the event of a change of control, at the election of Leucadia or its assignees, Holdings and Group will be required to pay Leucadia and its assignees in cash a one-time payment equal to the fair market value of their economic rights under the Group Agreement. For this purpose, change of control is generally defined as an event or series of events by which (i) a person or group acquires 40% or more of the voting interests of the Corporation, (ii) the Corporation and the existing members of Holdings cease to own 90% of the equity interests of Holdings, (iii) the Corporation ceases to be the sole managing member of Holdings or (iv) subject to certain exceptions, a majority of the members of the board of directors of the Corporation, Holdings or Group cease to be directors during a 12-month period.

The Company evaluated the rights that Leucadia has related to its membership interest in Group under the Group Agreement, including board seats, voting rights and participation in key decisions that affect Group, as described above. The Company concluded that the legal form of the membership interest held by Leucadia is equity. The Company then considered

TABLE OF CONTENTS

**Global Brokerage, Inc.**

**Notes to Consolidated Financial Statements**

**Note 19. Leucadia Transaction - (continued)**

the guidance under ASC 815 and concluded that none of the features of the Group Agreement are required to be bifurcated and accounted for separately as a derivative.

As the economic substance of the instrument significantly changed when Leucadia received non-controlling membership units in Group, the Company concluded that the exchange of the Letter Agreement for the membership interest is an extinguishment of the Letter Agreement. Accordingly, the derivative liability resulting from the Letter Agreement was derecognized as of the date of the Restructuring Transaction. As of the date of the Restructuring Transaction, the estimated fair value of the derivative liability was $235.5 million, which was also the fair value of the non-controlling membership units in Group, resulting in no gain or loss recognized on the exchange. The change in the estimated fair value of the derivative liability between January 1, 2016 and the date of the Restructuring Transaction was a gain of $212.9 million and is recorded in Gain (loss) on derivative liabilities — Letter & Credit Agreements in the consolidated statements of operations for the year ended December 31, 2016. As of December 31, 2015, the fair value of the derivative liability resulting from the Letter Agreement was estimated at $448.5 million and is included in Derivative liability — Letter Agreement on the consolidated statements of financial condition.

The Company considered the guidance in ASC 480 and determined that the non-controlling interest held by Leucadia falls within the scope of ASC 480 because it is redeemable for cash upon a contingent event that is not solely within the control of the Company and, accordingly, is classified outside of permanent equity on the consolidated statements of financial condition as Redeemable non-controlling interest. The Company evaluates the probability of redemption at each reporting date. As of December 31, 2016, the Company concluded that the non-controlling interest in Group is not currently redeemable and it is not probable that it will become redeemable as the likelihood that the redemption feature will be triggered is not considered probable. Accordingly, subsequent adjustment of the Redeemable non-controlling interest to its estimated redemption value is not required pursuant to ASC 480. If the non-controlling interest in Group becomes redeemable, or if redemption becomes probable, an adjustment will be made to adjust the Redeemable non-controlling interest to its estimated redemption value.

The allocation of the cash distributions and earnings or loss from Group based on the Revised Waterfall differs from the controlling and non-controlling members' stated ownership percentages. The Company determined that the Revised Waterfall represents a substantive profit sharing arrangement and concluded that the appropriate methodology for calculating the Redeemable non-controlling interest at each reporting date is the HLBV method, as discussed in Note 2. The Company applies the HLBV method using a balance sheet approach. Under the HLBV method, a calculation is performed at each balance sheet date to determine the amount the controlling and non-controlling member would each hypothetically receive assuming Group were liquidated at its recorded amount determined in accordance with U.S. GAAP and the cash distributed according to the Revised Waterfall. The difference between the liquidating distribution amounts calculated at the beginning and end of each period, after adjusting for capital contributions and distributions, is the controlling and non-controlling member's share of the earnings or loss from Group. The non-controlling member's share is reported in Net loss attributable to redeemable non-controlling interest in FXCM Group, LLC in the consolidated statements of operations.

At the date of the Restructuring Transaction, the Redeemable non-controlling interest was initially recorded at its fair value of $235.5 million, and subsequently adjusted for the allocation of the net assets of Group among the controlling and non-controlling members according to the terms of the Revised Waterfall to establish a carrying amount for the non-controlling interest at issuance on September 1, 2016 of $49.3 million (see Note 3). The share of the income and other comprehensive income of Group for the period from inception through December 31, 2016 attributable to the non-controlling member was allocated based on the HLBV method. As of December 31, 2016, the carrying amount of the Redeemable non-controlling interest on the consolidated statements of financial condition was $46.4 million.

**Amended and Restated Credit Agreement**

Other than the changes described above, the principal terms of the Amended and Restated Credit Agreement ("Credit Agreement"), dated January 24, 2015 remain unchanged. The Credit Agreement provides for a $300.0 million term loan made by Leucadia to Holdings and Newco. The net proceeds of the loan ($279.0 million) were used to replace capital in the Company's regulated entities to cover negative client balances and pay down outstanding revolving debt. Holdings' prior revolving credit agreement with Bank of America, N.A. was repaid in full and terminated effective January 20, 2015.

The loan matures on January 16, 2018. The obligations under the Credit Agreement are guaranteed by certain wholly-owned unregulated domestic subsidiaries of the Company and are secured by substantially all of the assets of Holdings and

TABLE OF CONTENTS

**Global Brokerage, Inc.**

**Notes to Consolidated Financial Statements**

**Note 19. Leucadia Transaction - (continued)**

certain subsidiaries of the Corporation, including a pledge of all of the equity interests in certain of Holdings' domestic subsidiaries and 65% of the voting equity interests in certain of its foreign subsidiaries.

The loan has an initial interest rate of 10% per annum, increasing by 1.5% per annum each quarter for so long as it is outstanding, but in no event exceeding 20.5% per annum (before giving effect to any applicable default rate). Beginning with the fourth quarter of 2016, the interest rate on the loan is 20.5%, which is fixed until maturity. Under certain circumstances, a default interest rate will apply on all obligations during the event of default at a per annum rate equal to 2% above the applicable interest rate. The Company has the right to defer any three of the remaining interest payments by paying interest in kind. The Company has not deferred any interest payments during the year ended December 31, 2016.

The Credit Agreement requires the payment of a deferred financing fee in an amount equal to $10.0 million, with an additional fee of up to $30.0 million payable in the event the aggregate principal amount of the term loan outstanding on April 16, 2015 was greater than $250.0 million or the deferred financing fee of $10.0 million (plus interest) had not been paid on or before such date. Prior to April 16, 2015, the Company repaid approximately $56.5 million which reduced the aggregate principal to $243.5 million on April 16, 2015. Additionally, the Company paid the $10.0 million deferred financing fee prior to April 16, 2015. Accordingly, the Company was not obligated to pay the additional $30.0 million fee. As of December 31, 2016, the Company has paid $155.5 million of principal, of which $10.0 million was applied to the deferred financing fee.

The Credit Agreement is subject to various conditions and terms such as requiring mandatory prepayments, including from proceeds of dispositions, condemnation and insurance proceeds, debt issuances, equity issuances, and capital contributions. The Credit Agreement requires monthly payments of the term loan from proceeds received during the immediately preceding calendar month from accounts receivable related to customer debit balances. The loan may be voluntarily prepaid without penalty.

The Credit Agreement includes a variety of restrictive covenants, including, but not limited to: limitations on the ability to merge, dissolve, liquidate, consolidate or sell, lease or otherwise transfer all or substantially all assets; limitations on the incurrence of liens; limitations on the incurrence of debt by subsidiaries; limitations on the ability of Group to make distributions in respect of its equity interests including distributions to pay interest due on the Company's convertible notes and limitations on transactions with affiliates, without the prior consent of the lender. The Credit Agreement also provides for events of default, including, among others: non-payments of principal and interest; breach of representations and warranties; failure to maintain compliance with the other covenants contained in the Credit Agreement; default under other material debt; the existence of bankruptcy or insolvency proceedings; insolvency; and a change of control.

The Company initially allocated the net proceeds of $279.0 million between the Credit Agreement and the Letter Agreement based on their relative fair values. The estimated fair values of the Letter Agreement and the Credit Agreement were determined using an option pricing model based on significant inputs such as volatility and assumptions on public market pricing inputs. The initially recorded amounts for the Letter Agreement and the Credit Agreement were approximately $94.4 million and $184.6 million, respectively, net of an issuance fee of $21.0 million. The effective interest method is used to accrete the initial carrying value of the Credit Agreement liability to the par amount of the debt plus the $10.0 million deferred financing fee using an effective interest rate of 7.1% post-Restructuring Transaction. The fair value of the Letter Agreement's embedded derivatives that were required to be bifurcated totaled $124.8 million, which is in excess of the amount of proceeds initially allocated to the Letter Agreement, resulting in a charge to earnings of $30.4 million which is included in the consolidated statements of operations for the year ended December 31, 2015.

The Credit Agreement contains mandatory prepayment provisions in the event of certain events described above. The mandatory prepayments may be triggered by events or circumstances that are not considered clearly and closely related to the Credit Agreement, and, as such, represent embedded derivatives in accordance with ASC 815. Beginning with the second quarter of 2016, a decline in the fair value of the Credit Agreement below par resulted in value attributable to the embedded derivatives. The Company assessed the fair value of the embedded derivatives and bifurcated their value from the fair value of the Credit Agreement.

As of December 31, 2016, the Company estimated the fair value of the derivative liability related to the embedded derivatives bifurcated from the Credit Agreement by using the "with" and "without" method. Using this methodology, the Credit Agreement is first valued with the mandatory prepayment provision (the "with" scenario) and subsequently valued without the mandatory prepayment provision (the "without" scenario). The fair value of the derivative liability resulting from

F-51

TABLE OF CONTENTS

**Global Brokerage, Inc.**

**Notes to Consolidated Financial Statements**

**Note 19. Leucadia Transaction - (continued)**

the mandatory prepayment provision is estimated as the difference between the fair values of the Credit Agreement in the "with" and "without" scenarios. The fair value of the Credit Agreement in the "with" and "without" scenarios was estimated using a risk-neutral valuation model which models expected cash flows over the life of the debt.

As of December 31, 2016 and 2015, the fair value of the derivative liability resulting from the Credit Agreement was estimated at $6.2 million and nil, respectively, and is included in Credit Agreement on the consolidated statements of financial condition. The change in the estimated fair value of the derivative liability at each reporting date is recorded in Gain (loss) on derivative liabilities — Letter & Credit Agreements in the consolidated statements of operations.

The balance of the Credit Agreement as of December 31, 2016 and 2015 was as follows, with amounts in thousands:

| | As of December 31, | | | |
| --- | --- | --- | --- | --- |
| | **2016** | | **2015** | |
| Debt principal | $ | 154,509 | $ | 192,685 |
| Original issue discount | | (7,857) | | (35,967) |
| Discount — issuance fee | | (1,276) | | (5,227) |
| Deferred financing fee | | (918) | | (3,762) |
| Debt issuance costs | | (114) | | (467) |
| Embedded derivative — Mandatory prepayment provision | | 6,172 | | — |
| Debt — net carrying value | $ | 150,516 | $ | 147,262 |

Interest expense related to the Credit Agreement, included in Interest on borrowings in the consolidated statements of operations for the years ended December 31, 2016 and 2015, consists of the following, with amounts in thousands:

| | For the Years Ended December 31, | | | |
| --- | --- | --- | --- | --- |
| | **2016** | | **2015** | |
| Contractual interest | $ | 33,879 | $ | 27,337 |
| Deferred interest | | (3,045) | | 5,789 |
| Amortization of original issue discount | | 28,110 | | 65,577 |
| Amortization of issuance fee discount | | 3,951 | | 8,665 |
| Amortization of deferred financing fee | | 2,844 | | 6,238 |
| Amortization of debt issuance costs | | 353 | | 774 |
| Total interest expense — Credit Agreement | $ | 66,092 | $ | 114,380 |

The Company records deferred interest for the difference between the current period's contractual rate based on the loan terms and the amortization of the incremental step-up in the contractual rate over the life of the loan.

The Company paid an issuance fee of $21.0 million to Jefferies LLC, an affiliate of Leucadia, at the inception of the loan. The issuance fee was allocated to the Credit Agreement and the Letter Agreement based on the initial fair value of the Credit Agreement and the Letter Agreement. The portion of the issuance fee allocated to the Credit Agreement was $13.9 million and the portion allocated to the Letter Agreement was $7.1 million. The portion allocated to the Credit Agreement is reflected as a discount to the Credit Agreement loan balance on the consolidated statements of financial condition, and is recorded to Interest on borrowings using the effective interest method. Subsequent to the date of the Restructuring Transaction, the discount is amortized over the remaining term of the amended Credit Agreement. Amortization of the issuance fee included in Interest on borrowings was $4.0 million and $8.7 million for the years ended December 31, 2016 and 2015, respectively. The portion allocated to the Letter Agreement is reflected in Gain (loss) on derivative liabilities — Letter & Credit Agreements in the consolidated statements of operations for the year ended December 31, 2015.

The Company incurred $1.8 million of issuance costs related to both the Credit Agreement and Letter Agreement. The issuance costs were allocated to the Credit Agreement and Letter Agreement based on the initial fair value of the Credit Agreement and Letter Agreement. The issuance costs allocated to the Credit Agreement and Letter Agreement were $1.2

TABLE OF CONTENTS

**Global Brokerage, Inc.**

**Notes to Consolidated Financial Statements**

**Note 19. Leucadia Transaction - (continued)**

million and $0.6 million, respectively. Issuance costs allocated to the Credit Agreement were recorded as deferred issuance costs and are amortized using the effective interest method. Subsequent to the date of the Restructuring Transaction, the deferred issuance costs are amortized over the remaining term of the amended Credit Agreement. Amortization of Credit Agreement issuance costs included in Interest on borrowings was $0.4 million and $0.8 million for the years ended December 31, 2016 and 2015, respectively. The portion allocated to the Letter Agreement is reflected in Gain (loss) on derivative liabilities — Letter & Credit Agreements in the consolidated statements of operations for the year ended December 31, 2015. As discussed in Note 2, as a result of the Company's adoption of ASU No. 2015-03 in the first quarter of 2016, unamortized debt issuance costs of $0.5 million as of December 31, 2015 were reclassified from Other assets, as previously reported, to the Credit Agreement liability on the consolidated statements of financial condition.

The deferred financing fee of $10.0 million is amortized using the effective interest method. Subsequent to the date of the Restructuring Transaction, the deferred financing fee is amortized over the remaining term of the amended Credit Agreement. Amortization of the deferred financing fee included in Interest on borrowings was $2.8 million and $6.2 million for the years ended December 31, 2016 and 2015, respectively. The deferred financing fee was paid on April 1, 2015.

The Company recorded a recovery of bad debt expense of $0.1 million from continuing operations in the consolidated statements of operations for the year ended December 31, 2016 related to the events of January 15, 2015. There was zero bad debt expense from discontinued operations in the consolidated statements of operations for the year ended December 31, 2016 related to the events of January 15, 2015. Bad debt expense from continuing operations in the consolidated statements of operations for the year ended December 31, 2015 includes net expense of $257.0 million related to the debit balances. Bad debt expense for the year ended December 31, 2015 includes $0.1 million of reversal of recoveries returned to clients, as well as $0.3 million reversal of recovery as payment for an option agreement entered into with a customer as part of a negative equity balance settlement (see Note 16). Bad debt expense from continuing operations for the year ended December 31, 2015 reflects net recoveries of $9.7 million. Bad debt expense included in Loss from discontinued operations, net of tax in the consolidated statements of operations for the year ended December 31, 2015 includes net expense of $8.4 million related to the debit balances, which reflects recoveries during this period of $0.1 million.

**Note 20. Debt**

*Revolving Credit Agreement*

In December 2011, Holdings entered into a credit agreement ("Revolving Credit Agreement") with a syndicate of financial institutions. In January 2015, in connection with the Leucadia Transaction, Holdings' outstanding balance under the Revolving Credit Agreement of $25.0 million was repaid in full and the Revolving Credit Agreement was terminated effective January 20, 2015.

Interest expense related to borrowings under the Revolving Credit Agreement, including the amortization of debt financing costs, included in Interest on borrowings in the consolidated statements of operations was $1.5 million for the year ended December 31, 2015. For the same period, the weighted average dollar amount of borrowings under the Revolving Credit Agreement was $1.3 million and the weighted average interest rate was 2.92%.

*Senior Convertible Notes due 2018*

In June 2013, the Corporation issued $172.5 million principal amount of 2.25% Convertible Notes maturing on June 15, 2018 and received net proceeds of $166.5 million, after deducting the initial purchasers' discount and offering expenses. The Convertible Notes pay interest semi-annually on June 15 and December 15 at a rate of 2.25% per year, commencing December 15, 2013. The indenture governing the Convertible Notes does not prohibit the Company from incurring additional senior debt or secured debt, nor does it prohibit any of its subsidiaries from incurring additional liabilities.

The Convertible Notes will be convertible at an initial conversion rate of 5.32992 shares of the Corporation's Class A common stock per $1,000 principal amount of the Convertible Notes, which is equivalent to an initial conversion price of approximately $187.62. In addition, following certain corporate transactions that occur prior to the maturity date, the Corporation will, in certain circumstances, increase the conversion rate for a holder that elects to convert its Convertible Notes in connection with such corporate transaction. Upon conversion, the Corporation will deliver cash up to the principal amount.

F-53

TABLE OF CONTENTS

**Global Brokerage, Inc.**

**Notes to Consolidated Financial Statements**

**Note 20. Debt - (continued)**

With respect to any conversion value in excess of the principal amount, the Corporation will deliver shares of its Class A common stock (unless it elects to deliver cash in lieu of all or a portion of such shares).

*Convertible Note Hedges*

     In connection with the offering of the Convertible Notes, the Company entered into privately negotiated convertible note hedge transactions with certain counterparties (the "Convertible Note Hedge Transaction"). The Convertible Note Hedge Transactions will cover, subject to customary anti-dilution adjustments, the number of shares of the Corporation's Class A common stock that will initially underlie the Convertible Notes. Concurrently with entering into the Convertible Note Hedge Transaction, the Company also entered into a separate, privately negotiated warrant transaction (the "Warrant Transaction") with the same counterparties, whereby the Company sold to the counterparties warrants to purchase, subject to customary anti-dilution adjustments, up to the same number of shares of the Corporation's Class A common stock as in the Convertible Note Hedge Transaction. The strike price of the Warrant Transaction will initially be $212.40 per share of the Corporation's Class A common stock. Subject to certain conditions, the Company may settle the warrants in cash or on a net-share basis.

     The Convertible Note Hedge Transaction and the Warrant Transaction have the effect of increasing the effective conversion price of the Convertible Notes to $212.40 per share. The cost of the Convertible Note Hedge Transaction and the proceeds from the Warrant Transaction was $29.1 million and $18.6 million, respectively. In accordance with ASC 815, the Company recorded the cost of the Convertible Note Hedge Transaction and the proceeds from the Warrant Transaction to additional paid-in capital in stockholders' equity in the consolidated statements of financial condition and the recorded values will not be adjusted for subsequent changes in their respective fair values.

     The Convertible Note Hedge Transaction and the Warrant Transaction are separate transactions, in each case, entered into by the Company with certain counterparties, and are not part of the terms of the Convertible Notes and will not affect any holder's right under the Convertible Notes. Holders of the Convertible Notes will not have any rights with respect to the Convertible Hedge Transaction or the Warrant Transaction.

     Under ASC 470, an entity must separately account for the liability and equity components of the convertible debt instruments (such as the Convertible Notes) that may be settled entirely or partially in cash upon conversion in a manner that reflects the issuer's economic interest cost. The effect of ASC 470 on the accounting for the Convertible Notes is that the fair value of the equity component is included in additional paid-in capital in the stockholders' equity section of the Company's consolidated statements of financial condition and the principal amount of the Convertible Notes is reduced by original issue discount to reflect the Convertible Notes fair value at issuance. At issuance, the equity component of the Convertible Notes was valued at $29.1 million and the Convertible Notes were valued at $144.1 million consisting of $172.5 million of principal net of original issuance discount of $29.1 million. The original issue discount will be amortized over the life of the Convertible Notes using the effective interest rate of 6.20%.

     The Company incurred $6.0 million of Convertible Notes issuance costs. The debt issuance costs will be amortized to interest expense over the life of the Convertible Notes. As discussed in Note 2, as a result of the Company's adoption of ASU No. 2015-03 in the first quarter of 2016, unamortized debt issuance costs of $2.9 million as of December 31, 2015 were reclassified from Other assets, as previously reported, to the Senior convertible notes liability on the consolidated statements of financial condition.

     The balances of the liability and equity components as of December 31, 2016 and 2015 were as follows, with amounts in thousands:

| | As of December 31, | | | |
| --- | --- | --- | --- | --- |
| | **2016** | | **2015** | |
| Liability component — principal | $ | 172,500 | $ | 172,500 |
| Deferred bond discount | | (9,355) | | (15,315) |
| Deferred debt issuance costs | | (1,720) | | (2,930) |
| Liability component — net carrying value | $ | 161,425 | $ | 154,255 |
| Equity component | $ | 29,101 | $ | 29,101 |

F-54

TABLE OF CONTENTS

**Global Brokerage, Inc.**

**Notes to Consolidated Financial Statements**

**Note 20. Debt - (continued)**

Interest expense related to the Convertible Notes, included in Interest on borrowings in the consolidated statements of operations, consists of the following, with amounts in thousands:

|  | For the Years Ended December 31, | | | |
|---|---|---|---|---|
|  | 2016 | | 2015 | |
| Stated coupon rate | $ | 3,881 | $ | 3,881 |
| Amortization of deferred bond discount | | 5,960 | | 5,607 |
| Amortization of debt issuance cost | | 1,210 | | 1,209 |
| Total interest expense — Convertible note | $ | 11,051 | $ | 10,697 |

**Note 21. Commitments**

*Digital Advertising Agreement*

In connection with the sale of the DailyFX business in October 2016, the Company entered into a three-year digital advertising agreement with FX Publications, Inc. The agreement provides for advertisements to be published on the DailyFX website in exchange for cash consideration payable by the Company in quarterly installments based on the number of leads (as defined in the agreement) generated by those advertisements (see Note 4). The Company has the right to immediately terminate the agreement if actual leads received in any given quarter do not meet a set threshold. The costs associated with the digital advertising agreement are expensed as incurred.

Future payments under the three-year digital advertising agreement are as follows as of December 31, 2016, with amounts in thousands:

| Year Ending December 31, | | |
|---|---|---|
| 2017 | $ | 3,117 |
| 2018 | | 3,281 |
| 2019 | | 3,008 |
| Total | $ | 9,406 |

The advertising expense under the digital advertising agreement was $0.4 million for the year ended December 31, 2016 and is included in Advertising and marketing expense in the consolidated statements of operations.

*Guaranty*

In July 2015, the Company entered into a guaranty with Citibank, N.A. (the "Guaranty") following the transition of certain institutional customers from the Company to FastMatch (see Note 14). Under the terms of the Guaranty, the Company agreed to guaranty FastMatch for any liabilities and other amounts that became due and payable by FastMatch for services provided by Citibank N.A. as the intermediating counterparty for trading transactions executed on the FastMatch platform. The Guaranty expired on March 1, 2016 and was not renewed. No payments were made by the Company to Citibank N.A. under the terms of the Guaranty.

TABLE OF CONTENTS

**Global Brokerage, Inc.**

**Notes to Consolidated Financial Statements**

**Note 21. Commitments - (continued)**

*Operating Lease Commitments*

The Company leases office space under operating leases. Some of the lease agreements contain renewal options ranging from 3 to 5 years at prevailing market rates. The leases for the office facilities are subject to escalation factors primarily related to property taxes and building operating expenses. As of December 31, 2016, future minimum lease payments under non-cancelable operating leases with terms in excess of one year, including leases that renewed in 2017, are as follows, with amounts in thousands:

| Year Ending December 31, | | |
|---|---|---|
| 2017 | $ | 6,468 |
| 2018 | | 4,768 |
| 2019 | | 4,633 |
| 2020 | | 3,372 |
| 2021 | | 3,390 |
| Thereafter | | 13,146 |
| | $ | 35,777 |

The aggregate operating lease expense from continuing operations, included in General and administrative expense in the consolidated statements of operations, for the years ended December 31, 2016 and 2015 was $7.3 million and $6.2 million, respectively. As of December 31, 2016, there were no sublease commitments. The Company leases its corporate office location under an operating lease agreement expiring in May 2026.

**Note 22. Derivative Financial Instruments**

Derivative financial instruments are accounted for in accordance with ASC 815 and are recognized as either assets or liabilities at fair value on the consolidated statements of financial condition. The Company has master netting agreements with its respective counterparties under which derivative financial instruments are presented on a net-by-counterparty basis in accordance with ASC 210 and ASC 815. The Company enters into futures contracts and CFD contracts to economically hedge the open customer contracts and positions on its CFD business. Futures contracts are exchange traded contracts to either purchase or sell a specific asset at a specified future date for a specified price. CFD contracts are non-exchange traded contracts between a buyer and seller to exchange the difference in the value of an underlying asset at the beginning and end of a stated period. The Company's derivative assets and liabilities associated with futures contracts and CFD contracts on its CFD business are recorded within Due from brokers and Due to brokers, respectively, on the consolidated statements of financial condition and gains or losses on these transactions are included in Trading revenue in the consolidated statements of operations.

Through its subsidiaries Lucid and V3, the Company also engages in hedge trading in its electronic market making and institutional foreign exchange spot and futures markets. As discussed in Note 4, Lucid and V3 are reported as discontinued operations for all periods presented. Accordingly, the gains or losses on hedge trading in the Company's electronic market making and institutional foreign exchange spot and futures markets are included in Income (loss) from discontinued operations, net of tax in the consolidated statements of operations.

The Company also enters into options, futures, forward foreign currency contracts and commodity contracts through Lucid and V3. Options grant the purchaser, for the payment of a premium, the right to either purchase from or sell to the writer a specified instrument under agreed terms. A forward contract is a commitment to purchase or sell an asset at a future date at a negotiated rate. The Company's derivative assets and liabilities held for trading purposes in connection with Lucid and V3 are recorded in Assets held for sale and Liabilities held for sale, respectively, on the consolidated statements of financial condition. Gains or losses on options, futures and forward contracts held for trading purposes in connection with Lucid and V3 are included in Income (loss) from discontinued operations, net of tax in the consolidated statements of operations.

The Company is exposed to risks relating to its derivatives trading positions from the potential inability of counterparties to perform under the terms of the contracts (credit risk) and from changes in the value of the underlying financial

TABLE OF CONTENTS

**Global Brokerage, Inc.**

**Notes to Consolidated Financial Statements**

**Note 22. Derivative Financial Instruments – (continued)**

instruments (market risk). The Company is subject to credit risk to the extent that any counterparty with which it conducts business is unable to fulfill its contractual obligations. The Company manages its trading positions by monitoring its positions with and the credit quality of the financial institutions that are party to its derivative trading transactions. Additionally, the Company's netting agreements provide the Company with the right, in the event of a default of the counterparty (such as bankruptcy or a failure to perform), to net a counterparty's rights and obligations under the agreement and to liquidate and set off collateral against any net amount owed by the counterparty.

The following tables present the gross and net fair values of the Company's derivative transactions and the related offsetting amount permitted under ASC 210 and ASC 815 as of December 31, 2016 and 2015. Derivative assets and liabilities are net of counterparty and collateral offsets. Collateral offsets include cash margin amounts posted with brokers. Under ASC 210, gross positive fair values are offset against gross negative fair values by counterparty pursuant to enforceable master netting agreements, with amounts in thousands:

| | | As of December 31, 2016 | | | | | | |
| | | Derivative Assets | | | | Derivative Liabilities | | |
| | Statement of Financial Condition Location | Fair Value | | Notional | | Fair Value | | Notional |
|---|---|---|---|---|---|---|---|---|
| Exchange traded options | Current assets held for sale[1] | $ | 3,209 | $ | 10,562 | $ | — | $ | — |
| CFD contracts | Due from brokers[2] | | 131 | | 24,286 | | — | | — |
| Futures contracts | Due from/Due to brokers and Current assets/liabilities held for sale [1] [2] | | 4,868 | | 839,975 | | 5,720 | | 763,605 |
| OTC options | Current assets/liabilities held for sale[1] | | 270 | | 24,595 | | 225 | | 33,249 |
| **Total derivatives, gross** | | $ | 8,478 | $ | 899,418 | $ | 5,945 | $ | 796,854 |
| Netting agreements and cash collateral netting | | | (4,854) | | | | (4,854) | | |
| **Total derivatives, net** | | $ | 3,624 | | | $ | 1,091 | | |

[1] As of December 31, 2016, the aggregate fair value of derivative assets and liabilities, gross attributable to discontinued operations is $4.3 million and $2.7 million, respectively. These amounts are offset by netting agreements and cash collateral netting of $2.7 million and $2.7 million, respectively.

[2] As of December 31, 2016, the aggregate fair value of derivative assets and liabilities, gross attributable to continuing operations is $4.2 million and $3.3 million, respectively. These amounts are offset by netting agreements and cash collateral netting of $2.2 million and $2.2 million, respectively.

| | | As of December 31, 2015 | | | | | | |
| | | Derivative Assets | | | | Derivative Liabilities | | |
| | Statement of Financial Condition Location | Fair Value | | Notional | | Fair Value | | Notional |
|---|---|---|---|---|---|---|---|---|
| Exchange traded options | Current assets/liabilities held for sale[3] | $ | 6,503 | $ | 15,399 | $ | 5,805 | $ | 18,282 |
| CFD contracts | Due from/Due to brokers[4] | | 206 | | 109,715 | | 36 | | 99,036 |
| Futures contracts | Due from/Due to brokers and Current assets/liabilities held for sale[3] [4] | | 4,212 | | 794,960 | | 3,102 | | 1,047,239 |
| **Total derivatives, gross** | | $ | 10,921 | $ | 920,074 | $ | 8,943 | $ | 1,164,557 |
| Netting agreements and cash collateral netting | | | (8,909) | | | | (8,909) | | |
| **Total derivatives, net** | | $ | 2,012 | | | $ | 34 | | |

TABLE OF CONTENTS

**Global Brokerage, Inc.**

**Notes to Consolidated Financial Statements**

**Note 22. Derivative Financial Instruments – (continued)**

[3] As of December 31, 2015, the aggregate fair value of derivative assets and liabilities, gross attributable to discontinued operations is $9.7 million and $8.8 million, respectively. These amounts are offset by netting agreements and cash collateral netting of $8.8 million and $8.8 million, respectively.

[4] As of December 31, 2015, the aggregate fair value of derivative assets and liabilities, gross attributable to continuing operations is $1.2 million and $0.1 million, respectively. These amounts are offset by netting agreements and cash collateral netting of $0.1 million and $0.1 million, respectively.

Gains (losses) on the Company's derivative instruments are recorded on a trade date basis. The following table presents the gains (losses) on derivative instruments recognized in the consolidated statements of operations for the years ended December 31, 2016 and 2015, with amounts in thousands:

| | For the Years Ended December 31, | | | |
|---|---|---|---|---|
| | **2016** | | **2015** | |
| Exchange traded options[5] | $ | 2,463 | $ | 8,573 |
| CFD contracts[6] | | (749) | | (9,166) |
| Futures contracts[7] | | (52,687) | | 49,485 |
| OTC options[5] | | 31 | | 1,086 |
| **Total** | $ | (50,942) | $ | 49,978 |

[5] Included in Income (loss) from discontinued operations, net of tax in the consolidated statements of operations.

[6] Included in Trading revenue in the consolidated statements of operations.

[7] The portion included in Income (loss) from continuing operations in the consolidated statements of operations is $(60.7) million and $31.2 million for the years ended December 31, 2016 and 2015, respectively.

**Note 23. Fair Value Measurements**

Fair value is defined as the price that would be received to sell an asset or paid to transfer a liability in an orderly transaction between market participants at the measurement date. Fair value measurement establishes a fair value hierarchy that prioritizes the inputs of valuation techniques used to measure fair value. The hierarchy gives the highest priority to unadjusted quoted prices in active markets for identical assets or liabilities and the lowest priority to unobservable inputs. The three levels of fair value hierarchy are defined as follows:

Level 1: Quoted prices in active markets for identical assets or liabilities, accessible by the Company at the measurement date.

Level 2: Quoted prices for similar assets or liabilities in active markets, or quoted prices for identical or similar assets or liabilities in markets that are not active, or other observable inputs other than quoted prices.

Level 3: Unobservable inputs for assets or liabilities.

When Level 1 inputs are available, those inputs are selected for determination of fair value. To value financial assets or liabilities that are characterized as Level 2 and 3, the Company uses observable inputs for similar assets and liabilities that are available from pricing services or broker quotes. These observable inputs may be supplemented with other methods, including internal models that result in the most representative prices for assets and liabilities with similar characteristics. Multiple inputs may be used to measure fair value, however, the fair value measurement for each financial asset or liability is categorized in its entirety in the same level of the fair value hierarchy as the lowest level input that is significant to the entire measurement.

F-58

TABLE OF CONTENTS

**Global Brokerage, Inc.**

**Notes to Consolidated Financial Statements**

**Note 23. Fair Value Measurements - (continued)**

The following tables present the Company's assets and liabilities that are measured at fair value on a recurring basis and the related hierarchy levels, with amounts in thousands:

| | | Fair Value Measurements on a Recurring Basis | | | |
| | | As of December 31, 2016 | | | |
| | Level 1 | Level 2 | Level 3 | Counterparty and Cash Collateral Netting | Total |
|---|---|---|---|---|---|
| **Financial Assets:** | | | | | |
| U.S. Treasury bills | $ 2,198 | $ — | $ — | $ — | $ 2,198 |
| Derivative assets: | | | | | |
|    Exchange traded options | 3,209 | — | — | — | 3,209 |
|    Futures contracts | 4,868 | — | — | — | 4,868 |
|    CFD contracts | — | 131 | — | — | 131 |
|    OTC options | — | 270 | — | — | 270 |
|      Netting | — | — | — | (4,854) | (4,854) |
|     Total derivative assets[1] | 8,077 | 401 | — | (4,854) | 3,624 |
| Total assets | $ 10,275 | $ 401 | $ — | $ (4,854) | $ 5,822 |
| | | | | | |
| **Financial Liabilities:** | | | | | |
| Customer account liabilities | $ — | $ 661,936 | $ — | $ — | $ 661,936 |
| Derivative liabilities: | | | | | |
|    Futures contracts | 5,720 | — | — | — | 5,720 |
|    OTC options | — | 225 | — | — | 225 |
|    Netting | — | — | — | (4,854) | (4,854) |
|     Total derivative liabilities[1] | 5,720 | 225 | — | (4,854) | 1,091 |
| Mandatory Prepayment Provision — Credit Agreement | — | — | 6,172 | — | 6,172 |
| Total liabilities | $ 5,720 | $ 662,161 | $ 6,172 | $ (4,854) | $ 669,199 |

As of December 31, 2016, the Company's total notional absolute value of open FX and CFD customer assets and liabilities by currency pair or product was $2.0 billion and $2.7 billion, respectively. The Company's total net notional value for open FX and CFD positions was $2.1 billion.

TABLE OF CONTENTS

**Global Brokerage, Inc.**

**Notes to Consolidated Financial Statements**

**Note 23. Fair Value Measurements - (continued)**

|  | Fair Value Measurements on a Recurring Basis | | | | |
|  | As of December 31, 2015 | | | | |
|  | Level 1 | Level 2 | Level 3 | Counterparty and Cash Collateral Netting | Total |
|---|---|---|---|---|---|
| **Financial Assets:** | | | | | |
| Derivative assets: | | | | | |
| Exchange traded options | $ 6,503 | $ — | $ — | $ — | $ 6,503 |
| CFD contracts | — | 206 | — | — | 206 |
| Futures contracts | 4,212 | — | — | — | 4,212 |
| Netting | — | — | — | (8,909) | (8,909) |
| Total derivative assets[1] | 10,715 | 206 | — | (8,909) | 2,012 |
| Total assets | $ 10,715 | $ 206 | $ — | $ (8,909) | $ 2,012 |
| **Financial Liabilities:** | | | | | |
| Customer account liabilities | $ — | $ 685,043 | $ — | $ — | $ 685,043 |
| Derivative liabilities: | | | | | |
| Exchange traded options | 5,805 | — | — | — | 5,805 |
| CFD contracts | — | 36 | — | — | 36 |
| Futures contracts | 3,102 | — | — | — | 3,102 |
| Netting | — | — | — | (8,909) | (8,909) |
| Total derivative liabilities[1] | 8,907 | 36 | — | (8,909) | 34 |
| Securities sold, not yet purchased[2] | 3,624 | — | — | — | 3,624 |
| Letter Agreement | — | — | 448,458 | — | 448,458 |
| Total liabilities | $ 12,531 | $ 685,079 | $ 448,458 | $ (8,909) | $ 1,137,159 |

As of December 31, 2015, the Company's total notional absolute value of open FX and CFD customer assets and liabilities by currency pair or product was $2.5 billion and $2.5 billion, respectively. The Company's total net notional value for open FX and CFD positions was $2.2 billion.

---

[1] Attributable to continuing and discontinued operations. See Note 22 for details of the classification of amounts on the consolidated statements of financial condition.

[2] Attributable to discontinued operations. Amounts classified as held for sale on the consolidated statements of financial condition (see Note 4).

### U.S. Treasury Bills

U.S. Treasury bills, included in Cash and cash equivalents on the consolidated statements of financial condition, are measured at fair value based on quoted market prices in an active market.

### Derivative Assets and Liabilities

Exchange traded options and open futures contracts are measured at fair value based on exchange prices. CFD contracts and over-the-counter ("OTC") options are measured at fair value based on market price quotations (where observable) obtained from independent brokers.

### Customer Account Liabilities

Customer account liabilities represent amounts due to customers related to cash and margin transactions, including cash deposits and gains and losses on settled FX, CFDs and spread betting trades as well as unrealized gains and losses on open

TABLE OF CONTENTS

**Global Brokerage, Inc.**

**Notes to Consolidated Financial Statements**

**Note 23. Fair Value Measurements - (continued)**

FX commitments, CFDs and spread betting. Customer account liabilities, included on the consolidated statements of financial condition, are measured at fair value based on the market prices of the underlying products.

*Securities Sold, Not Yet Purchased*

Securities sold, not yet purchased, represent the Company's obligations to deliver the specified security at the contracted price at a future point in time, and thereby create a liability to repurchase the securities in the market at the prevailing prices. The liability for such securities sold short, included on the consolidated statements of financial condition, is marked to market based on the current fair value of the underlying security at the reporting date which is determined based on exchange prices. Changes in fair value of securities sold, not yet purchased are recorded in Income (loss) from discontinued operations, net of tax in the consolidated statements of operations. These transactions may involve market risk in excess of the amount currently reflected in the consolidated statements of financial condition.

*Letter Agreement*

The embedded derivatives bifurcated from the Letter Agreement are accounted for separately as a derivative liability. The fair value of the derivative liability resulting from the Letter Agreement is determined by the use of valuation techniques that incorporate a combination of Level 1 and Level 3 inputs. The Level 1 input is comprised of the common stock price of the Corporation. The significant Level 3 inputs, summarized in the following table, are considered more relevant in the analysis and are given a higher weighting in the overall fair value determination.

On September 1, 2016, in conjunction with the Restructuring Transaction, the Letter Agreement was terminated and its material terms are now reflected in the Group Agreement (see Note 19). The Company determined the fair value of the derivative liability resulting from the Letter Agreement as of August 31, 2016 (just prior to the termination of the Letter Agreement) by using an enterprise valuation based on the traded (or closing) common stock price of the Corporation of $9.33. This valuation approach incorporated an option pricing model for the allocation of enterprise value between the derivative liabilities resulting from the Letter and Credit Agreements, the Management Incentive Plan, common stock and convertible debt.

The following table summarizes the significant Level 3 inputs used in the fair value determination of the Letter Agreement as of August 31, 2016 and December 31, 2015, respectively:

| | | As of | |
| --- | --- | --- | --- |
| **Valuation Technique** | **Significant Unobservable Inputs** | **August 31, 2016** | **December 31, 2015** |
| Option-Pricing Method | Term (years) | 1.8 | 2.5 |
| | Volatility | 131.1% | 79.1% |
| | Risk-free rate | 0.8% | 1.2% |
| | Dividend yield | —% | —% |
| | Reliance placed on public indication of value | 100.0% | 100.0% |

Prior to the date of the Restructuring Transaction, the derivative liability resulting from the Letter Agreement, included on the consolidated statements of financial condition, was marked to market at each reporting date and changes in the fair value were recorded through earnings in the consolidated statements of operations as gains or losses resulting from the Letter Agreement.

*Mandatory Prepayment Provision — Credit Agreement*

The Credit Agreement contains mandatory prepayment provisions that may be triggered by events or circumstances that are not considered clearly and closely related to the Credit Agreement, such as asset sales, and, as such, represent embedded derivatives in accordance with ASC 815. The embedded derivatives are bifurcated from the Credit Agreement and accounted for separately as a derivative liability. The fair value of the derivative liability resulting from the mandatory prepayment provisions of the Credit Agreement is estimated using the "with" and "without" method. Using this methodology,

TABLE OF CONTENTS

**Global Brokerage, Inc.**

**Notes to Consolidated Financial Statements**

**Note 23. Fair Value Measurements - (continued)**

the Credit Agreement is first valued with the mandatory prepayment provision (the "with" scenario) and subsequently valued without the mandatory prepayment provision (the "without" scenario). The fair value of the derivative liability resulting from the mandatory prepayment provision is estimated as the difference between the fair values of the Credit Agreement in the "with" and "without" scenarios. The fair value of the Credit Agreement in the "with" and "without" scenarios was estimated using a risk-neutral valuation model. Specifically, to estimate the fair value of the Credit Agreement, the expected cash flows were modeled over the life of the debt, including the extension of the maturity date by one year as part of the Restructuring Transaction.

The valuation of the derivative liability resulting from the mandatory prepayment provision primarily utilizes Level 3 inputs. The significant Level 3 inputs include the expected recovery rate in the case of a default and the expected timing for the remaining businesses to be sold. A recovery rate of 53.4% was used in the valuation as of December 31, 2016, which was estimated using market observed long-term average recovery rates for debt instruments of similar seniority. The timing for the remaining businesses to be sold was estimated by management to occur within the first half of 2017.

The derivative liability resulting from the mandatory prepayment provision, included in the Credit Agreement on the consolidated statements of financial condition, is marked to market at each reporting date and changes in the fair value are recorded through earnings in the consolidated statements of operations as gains or losses resulting from the Credit Agreement. The valuation techniques used are sensitive to certain key assumptions. For example, a 5.0% increase (decrease) in the market price of the Senior convertible notes would result in a decrease of approximately $2.7 million (increase of approximately $2.6 million) in this valuation, assuming no other change in any other factors considered.

The following tables present the carrying value, fair value and fair value hierarchy category of certain financial instruments that are not measured at fair value in the consolidated statements of financial condition, with amounts in thousands:

| | As of December 31, 2016 | | Fair Value Measurements using: | | |
| --- | --- | --- | --- | --- | --- |
| | Carrying Value | Fair Value | Level 1 | Level 2 | Level 3 |
| **Financial Assets:** | | | | | |
| Due from brokers — unsettled spot FX [4] | $ 1,600 | $ 1,600 | $ — | $ 1,600 | $ — |
| Due from brokers — excess cash collateral [5] | 12,229 | 12,229 | — | 12,229 | — |
| Exchange memberships [5] | 9,434 | 10,190 | — | 10,190 | — |
| Total assets | $ 23,263 | $ 24,019 | $ — | $ 24,019 | $ — |
| | | | | | |
| **Financial Liabilities:** | | | | | |
| Due to brokers — unsettled spot FX [4] | $ 425 | $ 425 | $ — | $ 425 | $ — |
| Senior convertible notes | 161,425 | 94,875 | — | 94,875 | — |
| Credit Agreement | 150,516 | 148,813 | — | — | 148,813 |
| Total liabilities | $ 312,366 | $ 244,113 | $ — | $ 95,300 | $ 148,813 |

TABLE OF CONTENTS

**Global Brokerage, Inc.**

**Notes to Consolidated Financial Statements**

**Note 23. Fair Value Measurements - (continued)**

| | As of December 31, 2015 | | | | Fair Value Measurements using: | | | | | |
| --- | --- | --- | --- | --- | --- | --- | --- | --- | --- | --- |
| | Carrying Value | | Fair Value | | Level 1 | | Level 2 | | Level 3 | |
| **Financial Assets:** | | | | | | | | | | |
| Due from brokers — unsettled spot FX [4] | $ | 2,939 | $ | 2,939 | $ | — | $ | 2,939 | $ | — |
| Due from brokers — unsettled common stock [5] | | 3,054 | | 3,054 | | — | | 3,054 | | — |
| Due from brokers — excess cash collateral [5] | | 18,010 | | 18,010 | | — | | 18,010 | | — |
| Notes receivable | | 7,881 | | 7,881 | | — | | — | | 7,881 |
| Exchange memberships [5] | | 9,434 | | 8,655 | | — | | 8,655 | | — |
| Total assets | $ | 41,318 | $ | 40,539 | $ | — | $ | 32,658 | $ | 7,881 |
| | | | | | | | | | | |
| **Financial Liabilities:** | | | | | | | | | | |
| Due to brokers — unsettled spot FX [4] | $ | 1,039 | $ | 1,039 | $ | — | $ | 1,039 | $ | — |
| Senior convertible notes | | 157,185 | | 121,187 | | — | | 121,187 | | — |
| Credit Agreement | | 147,729 | | 192,685 | | — | | — | | 192,685 |
| Total liabilities | $ | 305,953 | $ | 314,911 | $ | — | $ | 122,226 | $ | 192,685 |

_____

[4] Attributable to continuing and discontinued operations. See Note 4 for amounts classified as held for sale on the consolidated statements of financial condition.

[5] Attributable to discontinued operations and included in assets held for sale on the consolidated statements of financial condition (see Note 4).

***Due from/to Brokers — Unsettled Spot FX***

Unsettled spot FX, included in Due from/Due to brokers and assets and liabilities held for sale on the consolidated statements of financial condition, is carried at contracted amounts which approximate fair value based on market price quotations (where observable) obtained from independent brokers.

***Due from Brokers — Unsettled Common Stock***

The receivable for exchange membership shares sold short, included in assets held for sale on the consolidated statements of financial condition, is carried at the contracted amount which approximates fair value based on quoted prices.

***Due from Brokers — Excess Cash Collateral***

Excess cash collateral, included in assets held for sale on the consolidated statements of financial condition, is carried at contractual amounts which approximate fair value.

***Notes Receivable***

Notes receivable are carried at contracted amounts which approximate fair value.

***Exchange Memberships***

Exchange memberships, which include ownership interests and shares owned, are carried at cost. The fair value is based on quoted prices or recent sales.

***Senior Convertible Notes***

Senior convertible notes are carried at contractual amounts. The fair value of the Senior convertible notes is based on similar recently executed transactions and market price quotations (where observable) obtained from independent brokers.

TABLE OF CONTENTS

**Global Brokerage, Inc.**

**Notes to Consolidated Financial Statements**

**Note 23. Fair Value Measurements - (continued)**

*Credit Agreement*

Credit Agreement is carried at the contracted amount less original issue discount. The fair value of the Credit Agreement is based on a valuation model that considers the probability of default, Leucadia's secured interest and the observable trading value of the Senior convertible notes.

The following tables reconcile the opening and ending balances of the recurring fair value measurements categorized as Level 3, which are included in the consolidated statements of financial condition, and identifies the total gains and losses the Company recognized during the years ended December 31, 2016 and 2015, with amounts in thousands:

| | Year Ended December 31, 2016 | | | | | | | |
|---|---|---|---|---|---|---|---|---|
| | Balance as of December 31, 2015 | | Net Unrealized (Gain) Loss | | Addition/(Reversal) | | Balance as of December 31, 2016 | |
| Letter Agreement | $ | 448,458 | $ | (212,949) | $ | (235,509) | $ | — |
| Mandatory Prepayment Provision — Credit Agreement | | — | | 6,172 | | — | | 6,172 |
| Total Level 3 liabilities | $ | 448,458 | $ | (206,777) | $ | (235,509) | $ | 6,172 |

| | Year Ended December 31, 2015 | | | | | | | |
|---|---|---|---|---|---|---|---|---|
| | Balance as of December 31, 2014 | | Net Unrealized (Gain) Loss | | Addition/(Reversal) | | Balance as of December 31, 2015 | |
| Letter Agreement | $ | — | $ | 354,022 | $ | 94,436 | $ | 448,458 |
| Total Level 3 Liabilities | $ | — | $ | 354,022 | $ | 94,436 | $ | 448,458 |

The net unrealized gains and losses summarized in the tables above are related to the changes in the fair value of the Letter Agreement and the embedded derivative related to the mandatory prepayment provision of the Credit Agreement for the years ended December 31, 2016 and 2015 and are included in Gain (loss) on derivative liabilities — Letter & Credit Agreements in the consolidated statements of operations.

There were no transfers into or out of Level 1, 2 or 3 of the fair value hierarchy during the years ended December 31, 2016 and 2015.

**Note 24. Income Taxes**

Holdings operates in the U.S. as a limited liability company that is treated as a partnership for U.S. federal, state, and local income tax purposes. Since January 2015, all of Holdings' operations are held by Group, a limited liability company that is also treated as a partnership between Holdings and Leucadia for U.S. federal, state and local income tax purposes. As a result, neither Holdings' nor Group's income from its U.S. operations is subject to U.S. federal income tax because the income is attributable to its members. Accordingly, the Company's U.S. tax provision is solely based on the portion of income attributable to the Corporation from the lower tier limited liability companies and excludes the income attributable to other members of Holdings and Group whose income is included in Net income (loss) attributable to non-controlling interest in Global Brokerage Holdings, LLC in the consolidated statements of operations.

In addition to U.S. federal and state income taxes, the Company is subject to Unincorporated Business Tax which is attributable to Group's operations apportioned to New York City. The Company's foreign subsidiaries are also subject to local taxes.

Income (loss) from continuing operations before income taxes, as shown in the consolidated statements of operations, includes the following components, with amounts in thousands:

TABLE OF CONTENTS

**Global Brokerage, Inc.**

**Notes to Consolidated Financial Statements**

**Note 24. Income Taxes - (continued)**

| | For the Years Ended December 31, | | | |
| --- | --- | --- | --- | --- |
| | 2016 | | 2015 | |
| Domestic | $ | 100,414 | $ | (628,527) |
| Foreign | | 62,156 | | (4,778) |
| | $ | 162,570 | $ | (633,305) |

The provision for income taxes attributable to continuing operations consists of the following, with amounts in thousands:

| | For the Years Ended December 31, | | | |
| --- | --- | --- | --- | --- |
| | 2016 | | 2015 | |
| **Current** | | | | |
| Federal income tax benefit | $ | — | $ | (176) |
| State and local tax benefit | | (34) | | (11) |
| Foreign income tax expense (benefit) | | 1,592 | | (412) |
| Subtotal | | 1,558 | | (599) |
| | | | | |
| **Deferred** | | | | |
| Federal income tax | | — | | 172,618 |
| State and local income tax | | — | | 7,474 |
| Foreign income tax (benefit) expense | | (781) | | 1,705 |
| Subtotal | | (781) | | 181,797 |
| Total provision for taxes attributable to continuing operations | $ | 777 | $ | 181,198 |

The following table reconciles the provision for income taxes attributable to continuing operations to the U.S. federal statutory tax rate:

| | For the Years Ended December 31, | |
| --- | --- | --- |
| | 2016 | 2015 |
| Statutory U.S. federal income tax rate | 34.0 % | 34.0 % |
| Income passed through to non-controlling members | (10.6) | (17.0) |
| State and local income tax | 2.1 | 1.3 |
| Foreign income tax | (0.3) | (1.1) |
| Tax Receivable Agreement true-up | — | 7.8 |
| Loss on liquidation of subsidiary | (1.4) | — |
| Non-deductible penalty | 1.1 | — |
| Valuation allowance | (27.1) | (50.9) |
| Non-deductible interest | 2.3 | (2.3) |
| Other | 0.4 | (0.4) |
| Effective tax rate | 0.5 % | (28.6)% |

The change in the effective tax rate for the year ended December 31, 2016 compared to the year ended December 31, 2015 is predominantly the result of reversing the valuation allowance previously established on the deferred tax assets of the Company to offset the tax provision associated with the book income for the period. During 2015, the Corporation determined that, given the losses incurred from the events of January 15, 2015 and due to the Leucadia Transaction, it was not more likely than not that it would benefit from the tax deduction attributable to the tax basis step-up from the conversion of the non-controlling membership units of Holdings, nor would it receive tax benefit from the losses incurred. As a result, a valuation allowance was established on substantially all of the deferred tax assets of the Company due to their doubtful realizability, which was the primary driver of the tax provision recorded for the year ended December 31, 2015. The negative tax rate for the year ended December 31, 2015 reflects the recording of a tax provision on the book loss for the period.

TABLE OF CONTENTS

**Global Brokerage, Inc.**

**Notes to Consolidated Financial Statements**

**Note 24. Income Taxes - (continued)**

Deferred tax assets and liabilities are determined based on the differences between the financial statements and tax basis of assets and liabilities using enacted tax rates in effect for the year in which the differences are expected to reverse. A summary of the tax effects of the temporary differences from continuing operations is as follows, with amounts in thousands:

| | As of December 31, | | |
|---|---|---|---|
| | **2016** | | **2015** |
| **Deferred tax assets** | | | |
| Equity-based compensation | $ | 294 | $ 336 |
| Investment in partnership | | 190,844 | 277,775 |
| Fixed assets | | — | 747 |
| Tax loss carryforwards | | 125,898 | 120,580 |
| Intangible assets | | 679 | 302 |
| Tax credit carryforward/foreign sub income | | 4,539 | 5,090 |
| Gain/(Loss) on derivative liability — Letter Agreement | | — | 3,067 |
| Other | | 1,072 | 491 |
| **Gross deferred tax assets** | | 323,326 | 408,388 |
| **Less: valuation allowance** | | (322,201) | (407,590) |
| **Net deferred tax asset** | | 1,125 | 798 |
| **Deferred tax liabilities** | | | |
| Fixed assets | | 28 | 5 |
| Intangible assets | | 228 | 714 |
| Software development cost | | 171 | 245 |
| Other | | 583 | 539 |
| **Gross deferred tax liabilities** | | 1,010 | 1,503 |
| Net deferred tax asset (liability) | $ | 115 | $ (705) |

The increase in net deferred tax assets was primarily driven by a decrease in the deferred tax liability associated with certain identified intangibles and the reversal of valuation allowance. Additionally, the increase in deferred tax assets is driven by the increase in the Corporation's ownership in Holdings as a result of members of Holdings exchanging their membership units for the Corporation's Class A common stock. As Existing Unit Holders exchange their membership units, the Company records a deferred tax benefit related to Holdings election under Section 754 of the Internal Revenue Code (see Note 2). The increase in net operating loss carryforwards also contributed to the increase.

The Company assesses available positive and negative evidence to estimate if it is more-likely-than-not to use certain jurisdiction-based deferred tax assets including certain tax credits and net operating loss carryovers. On the basis of this assessment, a valuation allowance of $85.4 million was released during the year ended December 31, 2016.

As of December 31, 2016, the Company has $258.7 million of domestic net operating loss carryforwards and $480.1 million of foreign net operating loss carryforwards from all operations. The U.S. net operating loss carryforwards have various expiration dates through 2036 with the net operating losses generated by certain of our U.K. subsidiaries having indefinite carryforward periods.

The tax credit carryforward includes foreign tax credits of $3.5 million and a research and development credit of $0.5 million, each of which may be carried forward for a period of 10 years and begin to expire in 2021 and New York City unincorporated business tax credits of $0.5 million that may be carried forward for 7 years.

The Company does provide for deferred taxes on the excess of the financial reporting over the tax basis in its investments in foreign subsidiaries because the amounts are not deemed to be permanent in duration.

TABLE OF CONTENTS

**Global Brokerage, Inc.**

**Notes to Consolidated Financial Statements**

**Note 24. Income Taxes - (continued)**

Income tax payable as of December 31, 2016 and 2015 was $0.9 million and $1.4 million, respectively, and is included in Accounts payable and accrued expenses in the consolidated statements of financial condition (see Note 12). Tax receivable as of December 31, 2016 and 2015 was $0.2 million and $1.8 million, respectively.

The following is a tabular reconciliation of the total amounts of unrecognized tax benefits, with amounts in thousands:

| | For the Years Ended December 31, | | | |
| --- | --- | --- | --- | --- |
| | **2016** | | **2015** | |
| **Unrecognized tax benefits – January 1** | $ | 390 | $ | 409 |
| Gross increases – tax positions in prior period | | 36 | | — |
| Gross decreases – tax positions in prior period | | — | | (137) |
| Gross increases – tax positions in current period | | 166 | | 118 |
| Lapse of statute of limitations | | (51) | | — |
| **Unrecognized tax benefits – December 31** | $ | 541 | $ | 390 |

The Company recognizes interest and penalties related to unrecognized tax benefits within the income tax expense line in the consolidated statements of operations. Accrued interest and penalties are included within the related tax liability line in the consolidated statements of financial condition. Related to the unrecognized tax benefits noted above, the Company accrued penalties and interest of immaterial amounts during the years ended December 31, 2016 and 2015.

The Company does not believe that it will have a material increase in its unrecognized tax benefits during the coming year.

The Company is subject to taxation in the U.S. and various states and foreign jurisdictions. As of December 31, 2016, the Company's tax years for 2013, 2014 and 2015 are subject to examination by the tax authorities. Currently, the Company and Holdings' 2013 U.S. Federal tax returns are under examination along with the Company's 2013 and 2014 New York State tax returns. Additionally, several of the Company's U.K. subsidiaries are under examination for the 2012 tax year.

**Note 25. Foreign Currencies and Concentrations of Credit Risk**

Under the agency model, the Company accepts and clears FX spot contracts for the accounts of its customers (see Notes 1 and 2). These activities may expose the Company to off-balance sheet risk in the event that the customer or other broker is unable to fulfill its contracted obligations and the Company has to purchase or sell the financial instrument underlying the contract at a loss.

In connection with these activities, the Company executes and clears customers' transactions involving the sale of foreign currency not yet purchased, substantially all of which are transacted on a margin basis subject to internal policies. Such transactions may expose the Company to off-balance sheet risk in the event margin deposits are not sufficient to fully cover losses that customers may incur. In the event that a customer fails to satisfy its obligations, the Company may be required to purchase or sell financial instruments at prevailing market prices to fulfill the customer's obligation.

The Company controls such risks associated with its customer activities by requiring customers to maintain margin collateral, in the form of cash, in compliance with various internal guidelines. The Company's trading software technology monitors margin levels on a real time basis and, pursuant to such guidelines, requires customers to deposit additional cash collateral, or to reduce positions, if necessary. The system is designed to ensure that any breach in a customer's margin requirement as a result of losses on the trading account will automatically trigger a final liquidation, which will execute the closing of all positions.

Exposure to credit risk is dependent on market liquidity. Prior to the events of January 15, 2015, the Company's customers rarely had significant negative equity balances, and exposure to credit risk from customers was therefore minimal. Following the events of January 15, 2015, the Company took a number of actions to reduce credit risk from customers, including increasing margin requirements and discontinuing currency pairs from the trading platform that are believed to carry significant risk due to overactive manipulation by their respective governments either by a floor, ceiling, peg or band. For the

F-67

TABLE OF CONTENTS

**Global Brokerage, Inc.**

**Notes to Consolidated Financial Statements**

**Note 25. Foreign Currencies and Concentration of Credit Risk - (continued)**

year ended December 31, 2016, losses incurred from customer accounts that had gone negative were approximately $2.5 million, primarily related to the Brexit event in June 2016 and the GBP flash crash in October 2016. For the year ended December 31, 2015, losses incurred from customer accounts that had gone negative were $0.5 million (excluding the events of January 15, 2015).

Institutional customers are permitted credit pursuant to limits set by the Company's prime brokers. The prime brokers incur the credit risk relating to the trading activities of these customers in accordance with the respective agreements between such brokers and the Company.

The Company is engaged in various trading activities with counterparties which include brokers and dealers, futures commission merchants, banks and other financial institutions. In the event that such counterparties do not fulfill their obligations, the Company may be exposed to credit risk. The risk of default depends on the creditworthiness of the counterparty or issuer of the financial instrument. It is the Company's policy to: (i) perform credit reviews and due diligence prior to conducting business with counterparties; (ii) set exposure limits and monitor exposure against such limits; and (iii) periodically review, as necessary, the credit standing of counterparties using multiple sources of information. The Company's total Due from brokers balance included in the consolidated statements of financial condition was $17.5 million[1] and $26.0 million[1] as of December 31, 2016 and 2015, respectively. As of December 31, 2016 and 2015, 89.8% and 94.7%, respectively, of the Company's total Due from brokers balance was from three large financial institutions. Three banks held more than 10.0% each of the Company's total cash and cash equivalents and cash and cash equivalents, held for customers as of December 31, 2016. Five banks held more than 10.0% each of the Company's total cash and cash equivalents and cash and cash equivalents, held for customers as of December 31, 2015.

_____

[1] As of December 31, 2016 and 2015, $3.4 million and $3.8 million, respectively, is attributable to continuing operations. See Note 4 for amounts classified as assets held for sale on the consolidated statements of financial condition.

**Note 26. Segment Information**

ASC 280 establishes standards for reporting information about operating segments. Operating segments are defined as components of an enterprise about which separate financial information is available that is evaluated regularly by the chief operating decision maker, or decision making group, in deciding how to allocate resources and in assessing performance. The guidance defines reportable segments as operating segments that meet certain quantitative thresholds. It was determined in the first quarter of 2015 that as a result of the events of January 15, 2015, and the decision to sell certain institutional assets, the composition of the Company's previously reported Institutional segment changed significantly, such that the remaining institutional business reported in continuing operations no longer meets the quantitative criteria for separate reporting. In addition, the continuing institutional business shares common management strategies, customer support and trading platforms with the Company's retail business. Accordingly, the Company operates in a single operating segment for all periods presented.

TABLE OF CONTENTS

**Global Brokerage, Inc.**

**Notes to Consolidated Financial Statements**

**Note 26. Segment Information - (continued)**

*Geographic Locations*

Trading revenue from external customers is attributed to individual countries based on the customers' country of domicile. Trading revenue from continuing operations by geographical region is as follows, with amounts in thousands:

| | For the Years Ended December 31, | | | |
|---|---|---|---|---|
| | **2016** | | **2015** | |
| **Trading Revenue from Continuing Operations** | | | | |
| U.S. | $ | 37,002 | $ | 35,413 |
| Asia | | 108,905 | | 98,147 |
| Europe, Middle East and North Africa | | 103,375 | | 86,723 |
| Rest of World | | 21,421 | | 20,329 |
| Other | | 5,297 | | 9,430 |
| Total | $ | 276,000 | $ | 250,042 |

Trading revenue attributable to China represented 30.3% and 27.4% of total trading revenue from continuing operations for the years ended December 31, 2016 and 2015, respectively. Trading revenue attributable to the U.S. represented 13.4% and 14.2% of total trading revenue from continuing operations for the years ended December 31, 2016 and 2015, respectively.

As of December 31, 2016 and 2015, substantially all of the Company's long-lived assets were located in the U.S.

*Concentrations of Significant Customers*

No single customer accounted for 10.0% or more of total trading revenue from continuing operations for the years ended December 31, 2016 and 2015.

**Note 27. Litigation**

In the ordinary course of business, the Company and certain of its officers, directors and employees may from time to time be involved in litigation and claims incidental to the conduct of its businesses, including intellectual property claims. In addition, the Company's business is also subject to extensive regulation, which may result in administrative claims, investigations and regulatory proceedings against it. The Company has been named in various arbitration and civil litigation cases brought by customers seeking damages for trading losses. Management has investigated these matters and believes that such cases are without merit and is defending them vigorously. However, the arbitrations and litigations are presently in various stages of the judicial process and no judgment can be made regarding the ultimate outcome of the arbitrators' and/or court's decisions.

In January 2014, the equity receiver for a former client of US, Revelation Forex Fund ("Revelation"), its principal, Kevin G. White, and related entities RFF GP, LLC and KGM Capital Management, LLC, filed suit against US, and certain unrelated defendants, in Texas state court.  The suit alleges that US is liable for damages in excess of $3.8 million, plus exemplary damages, interest, and attorneys' fees in connection with a Ponzi scheme run by Mr. White through his companies. In June 2015, that same equity receiver filed a complaint against US seeking $2.0 million, plus interest, and attorneys' fees, based on allegations that the amount in controversy represents the net fraudulent transfers from Revelation to US under New York law. In September 2015, the parties agreed to arbitration proceeding before the National Futures Association ("NFA") on these claims. In June 2016, the parties agreed to settle all related matters for $2.3 million. The Company recorded a charge for $2.3 million in the year ended December 31, 2016, which is included in General and administrative expense in the consolidated statements of operations.

In April 2014, the Securities and Futures Commission ("SFC") initiated an investigation relating to HK's past trade execution practices concerning the handling of price improvements in the Company's trading system prior to August 2010. On October 19, 2016, the parties entered into a final settlement whereby HK voluntarily agreed to make full restitution to affected

F-69

TABLE OF CONTENTS

**Global Brokerage, Inc.**

**Notes to Consolidated Financial Statements**

**Note 27. Litigation - (continued)**

clients in the amount of $1.5 million and pay a fine of $0.5 million. The Company paid the $2.0 million settlement in November 2016.

On January 15, 2015, as a result of the unprecedented volatility in the EUR/CHF currency pair after the SNB discontinued its currency floor of 1.2 CHF per EUR, US suffered a temporary breach of certain regulatory capital requirements. On August 18, 2016, the Commodity Futures Trading Commission ("CFTC") filed a complaint, *U.S. Commodity Futures Trading Commission v. Forex Capital Markets, LLC*, in the U.S. District Court for the Southern District of New York, alleging that US was undercapitalized following the SNB's decision to remove the currency peg, that US failed to notify the CFTC of its undercapitalization, and that US guaranteed customer losses. On December 8, 2016, the CFTC filed an amended complaint. On or about February 13, 2017, US settled with the CFTC without admitting or denying any of the allegations, and pursuant to a consent order entered by the court, agreed to pay a civil monetary penalty in the amount of $0.7 million to the CFTC (see Note 28). The Company recorded a charge for $0.7 million in the year ended December 31, 2016, which is included in General and administrative expense in the consolidated statements of operations.

In connection with an earlier settlement between FSL and the Financial Conduct Authority regarding trade execution practices for the period 2006 to 2010, in February 2015, FSL paid an additional $0.7 million in restitution to affected clients.

On May 8, 2015, the International Union of Operating Engineers Local No. 478 Pension Fund filed a complaint against the Company, its former Chief Executive Officer and its Chief Financial Officer in the United States District Court for the Southern District of New York. The case is captioned *Brett Kandell v. Dror Niv et al.*, C.A. No. 11812-VCG. On March 4, 2016, plaintiff filed an amended shareholder derivative complaint, which alleges claims for breach of fiduciary duty, contribution and indemnification, waste of corporate assets, abuse of control and unjust enrichment and seeks compensatory damages, rescission of certain agreements as well as reasonable costs and expenses. A second amended shareholder derivative complaint was filed on May 31, 2016 and the Board filed a motion to dismiss on July 15, 2016. Subsequently, plaintiff filed a third amended shareholder derivative complaint on September 1, 2016 and the Board filed a motion to dismiss on October 17, 2016. The court has not yet ruled on the motion to dismiss.

On February 6, 2017, US, Holdings, Dror Niv and William Ahdout entered into a settlement with the CFTC, and US, Messrs. Niv, Ahdout and Ornit Niv entered into a settlement with the NFA. During the relevant times, Mr. Niv was the Company's CEO, a member of Holdings, and/or the CEO of US; Mr. Ahdout was a member of Holdings and a Managing Director of US; and Ms. Niv was the CEO of US. Both settlements concerned allegations that aspects of US's relationship with one of its liquidity providers had not been disclosed to customers and regulators. The NFA settlement included additional, unrelated allegations of violations of certain NFA Rules and Requirements. The Company's subsidiaries are cooperating with regulatory authorities outside the U.S. in relation to their requests for information arising from the settlements announced on February 6, 2017.

Under the settlement with the CFTC, the named entities and individuals were required, jointly and severally, to pay a civil monetary penalty of $7.0 million, agreed to withdraw from CFTC registration and agreed not to apply for or claim exemption from CFTC registration in the future. Under the settlement with the NFA, no monetary fine was imposed and the named individuals and entities agreed to withdraw from NFA membership and not to reapply for membership in the future. The

F-70

TABLE OF CONTENTS

**Global Brokerage, Inc.**

**Notes to Consolidated Financial Statements**

**Note 27. Litigation - (continued)**

named entities and individuals did not admit or deny the allegations associated with the settlements. The Company recorded a charge for $7.0 million in the year ended December 31, 2016, which is included in General and administrative expense in the consolidated statements of operations. As discussed more fully in Note 28, the Company will be withdrawing from business in the U.S. and, on February 7, 2017, agreed to sell all of its U.S.-domiciled customer accounts to Gain Capital Group, LLC.

In response to the Company's announcement on February 6, 2017 regarding settlements with the NFA and the CFTC, three new putative securities class action lawsuits have been filed against Global Brokerage, Inc., Dror Niv, and Robert Lande in the U.S. District Court for the Southern District of New York. These putative securities class actions are captioned: (1) *Khoury v. FXCM Inc.*, Case No. 1:17-cv-916; (2) *Zhao v. FXCM Inc.*, Case No. 1:17-cv-955; and (3) *Blinn v. FXCM Inc.*, Case No. 1:17-cv-1028. The complaints in these three actions allege that the defendants violated certain provisions of the federal securities laws and seek compensatory damages as well as reasonable costs and expenses. The Company intends to vigorously defend against the claims asserted in these actions.

For the outstanding matters referenced above, including ordinary course of business litigation and claims referenced in the first paragraph hereto, for which a loss is more than remote but less than likely, whether in excess of an accrued liability or where there is no accrued liability, we have estimated a range of possible loss. Management believes the estimate of the aggregate range of possible loss in excess of accrued liabilities for such matters is between nil and $1.6 million as of December 31, 2016.

In view of the inherent difficulty of predicting the outcome of litigation and claims, the Company cannot predict what the eventual outcome of the pending matters will be, what the timing of the ultimate resolution of these matters will be, or what the eventual loss related to each pending matter may be. Furthermore, the above-referenced matters represented in the estimated aggregate range of possible loss will change from time to time and actual results may vary significantly from the current estimate. An adverse outcome in one or more of these matters could be material to the Company's results of operations or cash flows for any particular reporting period.

**Note 28. Subsequent Events**

**Amendment to Management Agreement**

On February 2, 2017, Group, Holdings and Leucadia entered into Amendment No. 1 to the Management Agreement (the "Management Agreement Amendment"), which amended the Management Agreement dated September 1, 2016. Pursuant to the Management Agreement Amendment, the Management Agreement was modified to provide Board Members (as defined therein) with certain rights of termination. Specifically, the Management Agreement Amendment specifies that the Management Agreement may be terminated by a vote of at least three members of the Group Board after the occurrence of certain events, including a change of control.

**Acknowledgment Regarding Management Incentive Plan**

On February 2, 2017, Group and Leucadia also entered into an acknowledgment (the "Acknowledgment"), as it relates to the Management Incentive Plan that became effective September 1, 2016. Pursuant to the Acknowledgment, Group and Leucadia agreed that Leucadia may terminate the Management Incentive Plan on behalf of Group at any time and for any reason in its sole discretion.

**Regulatory Settlement Agreements**

On February 6, 2017, the Company announced simultaneous regulatory settlements with the NFA and the CFTC against US, Holdings and certain of its principals (the "Respondents"). The NFA settlement has no monetary fine, and the CFTC settlement has a $7.0 million fine imposed jointly and severally against the Respondents. The Company paid the $7.0 million fine on February 16, 2017, which is recorded in General and administrative expense in the consolidated statements of operations for the year ended December 31, 2016.

Pursuant to the aforementioned settlement agreements, the Company has withdrawn from business in the U.S. and deregistered from the CFTC and the NFA.

TABLE OF CONTENTS

**Global Brokerage, Inc.**

**Notes to Consolidated Financial Statements**

**Note 28. Subsequent Events - (continued)**

On February 8, 2017, the CFTC issued an order filing and settling charges against US for insufficient capital on January 15 and 16, 2015 due to the SNB event. The order requires Respondents to pay a monetary penalty of $0.7 million. The amount is recorded in General and administrative expense in the statement of operations for the year ended December 31, 2016. The funds were placed into escrow on February 8, 2017.

**Sale of U.S. Customer Accounts**

On February 7, 2017, the Company entered into an Asset Purchase Agreement (the "Asset Purchase Agreement"), pursuant to which the Company agreed to sell substantially all of its U.S.-domiciled customer accounts to Gain Capital Group, LLC ("Gain"). Under the terms of the Asset Purchase Agreement, Gain will pay proceeds to the Company on a per account basis for each acquired account that opens at least one new trade during the first 153 calendar days following the closing date. The closing took place on February 24, 2017.

**Restructuring Plan**

In connection with its withdrawal from business in the U.S. pursuant to the settlement agreements with the NFA and the CFTC, the Company intends to implement a restructuring plan that includes the termination of approximately 150 employees, which represents approximately 19% of its global workforce. The Company expects to recognize approximately $4.0 million to $5.0 million in pre-tax restructuring charges in the first quarter of 2017.

**Changes Related to FXCM Inc.**

On February 21, 2017, Mr. Dror Niv resigned from his positions as a member and Chairman of the Board of Directors (the "Board") of FXCM Inc., effective immediately, and as the Chief Executive Officer of FXCM Inc., to be effective upon the appointment of his successor.

Following Mr. Niv's departure from the Board, Mr. Bryan I. Reyhani has been appointed to serve as Chairman of the Board.

On February 21, 2017, Mr. William Ahdout resigned from his position as a member of FXCM Inc.'s Board, effective immediately.

On February 24, 2017, FXCM Inc. changed its name to Global Brokerage, Inc. At the opening of trading on February 27, 2017, the trading ticker symbol for the Corporation's Class A common stock on the NASDAQ Global Market changed to "GLBR."

**Second Amendment to Amended and Restated Credit Agreement**

In connection with the CFTC regulatory fine of $7.0 million described above, Leucadia consented to waive compliance with certain sections in the Credit Agreement and the LLC Agreement regarding restricted payments (as defined in the Credit Agreement) in order to permit the distribution of $3.5 million of funds from Group to Holdings with respect to the payment of the fine (the "Payment"). Furthermore, the members of Group consented to waive compliance with certain provisions of the LLC Agreement regarding distributions (as defined in the LLC Agreement) with respect to the Payment. In consideration for entering into the waiver, the Company agreed to pay a fee to Leucadia in the amount of $3.5 million. On February 22, 2017 (the "Effective Date"), Group, Holdings and Leucadia entered into a Second Amendment to the Amended and Restated Credit Agreement (the "Second Amendment"), which amended the Amended and Restated Credit Agreement dated January 24, 2015. Pursuant to the Second Amendment, the aggregate principal outstanding balance of the Credit Agreement was increased by $3.5 million, resulting in $158.0 million in total principal outstanding on the Credit Agreement as of the Effective Date. The Second Amendment will be accounted for as a modification on a prospective basis pursuant to ASC 470 beginning in the first quarter of 2017 and is not expected to have a material impact on the Company's consolidated financial statements.

F-72

TABLE OF CONTENTS

**Global Brokerage, Inc.**

**Notes to Consolidated Financial Statements**

**Note 28. Subsequent Events - (continued)**

**Repayment on the Credit Agreement**

     As a result of the release of regulatory capital in connection with the Company's withdrawal from business in the U.S. and termination of its registration as a futures commission merchant and retail foreign exchange dealer in the U.S., the Company repaid $30.0 million in principal on the Leucadia term loan on March 17, 2017.

**Item 9. Changes in and Disagreements with Accountants on Accounting and Financial Disclosure**

None.

**Item 9A. Controls and Procedures**

**Evaluation of Disclosure Controls and Procedures**

We maintain disclosure controls and procedures (as that term is defined in Rules 13a-15(e) and 15d-15(e) under the Exchange Act) that are designed to ensure that information required to be disclosed in our reports under the Exchange Act is recorded, processed, summarized and reported within the time periods specified in the SEC's rules and forms, and that such information is accumulated and communicated to our management, including our Chief Executive Officer and Chief Financial Officer, as appropriate, to allow timely decisions regarding required disclosures. Any controls and procedures, no matter how well designed and operated, can provide only reasonable assurance of achieving the desired control objectives. Our management, with the participation of our Chief Executive Officer and Chief Financial Officer, has evaluated the effectiveness of the design and operation of our disclosure controls and procedures as of December 31, 2016. Based upon that evaluation and subject to the foregoing, our Chief Executive Officer and Chief Financial Officer concluded that, as of December 31, 2016, the design and operation of our disclosure controls and procedures were effective to accomplish their objectives at the reasonable assurance level.

**Management's Report on Internal Control over Financial Reporting**

Our management is responsible for establishing and maintaining adequate controls over financial reporting (as that term is defined in Rules 13a-15(f) and 15d-15(f) under the Exchange Act). Internal control over financial reporting is a process designed to provide reasonable assurance regarding the reliability of our financial reporting and the preparation of our financial statements for external purposes in accordance with accounting principles generally accepted in the United States of America. Internal control over financial reporting includes maintaining records that, in reasonable detail, accurately and fairly reflect our transactions and dispositions of our assets, providing reasonable assurance that transactions are recorded as necessary for the preparation of our financial statements in accordance with accounting principles generally accepted in the United States of America, and that receipts and expenditures are made in accordance with authorizations of management and directors of the Company, and providing reasonable assurance that unauthorized acquisition, use or disposition of assets that could have a material effect on our financial statements would be prevented or detected on a timely basis. Because of its inherent limitations, internal control over financial reporting is not intended to provide absolute assurance that a misstatement of our financial statements would be prevented or detected.

Management conducted an evaluation of the effectiveness of our internal control over financial reporting based on the framework in *Internal Control — Integrated Framework* issued by the Committee of Sponsoring Organizations of the Treadway Commission (2013 framework). Based on this evaluation, management concluded that our internal control over financial reporting was effective as of December 31, 2016.

The effectiveness of our internal control over financial reporting has been audited by our independent registered public accounting firm, Ernst & Young LLP, as stated in their report which is included in Part II, Item 8. of this Annual Report on Form 10-K.

**Changes in Internal Control over Financial Reporting**

In connection with our Form 10-Q for the quarterly period ended September 30, 2016, we identified and disclosed a material weakness in our internal control over financial reporting with regard to accounting for the non-controlling interest in FXCM Group, LLC ("Group") issued to Leucadia National Corporation ("Leucadia") on September 1, 2016 ("Inception Date"). The material weakness resulted from ineffective controls maintained over the allocation of the net assets of Group to the controlling and non-controlling membership interests at the Inception Date under the hypothetical liquidation at book value method and, as a result, the beginning balances related to the respective interests were calculated incorrectly. This resulted in the restatement of our unaudited condensed consolidated financial statements as of September 30, 2016.

To remediate the material weakness described above, we modified the procedures related to the reconciliation of the net assets, or equity, of Group. In this regard, the allocation of net assets and changes in net assets of Group under the hypothetical liquidation at book value method include a monthly reconciliation of the beginning and ending balances of all components of net assets, including the redeemable non-controlling interest held by Leucadia, the controlling interest held by Global Brokerage Holdings, LLC and all other non-controlling interests of the consolidated subsidiaries of Group, to properly

account for all aspects of the changes in net assets on a monthly basis. As of December 31, 2016, management completed the testing necessary to conclude that this control is operating effectively and the material weakness has been remediated.

The changes in internal control over financial reporting identified in connection with the evaluation required by paragraph (d) of Securities Exchange Act Rules 13a-15 or 15d-15 that occurred during the quarter ended December 31, 2016 relate to the remediation of the material weakness.

**Item 9B. Other Information**

None.

**PART III**

The information required by Part III is incorporated by reference to the information to be set forth in our definitive Proxy Statement for the 2017 Annual Meeting of Stockholders (the "Proxy Statement"). The Proxy Statement is to be filed with the SEC pursuant to Regulation 14A of the Exchange Act, no later than 120 days after the end of the fiscal year covered by this Annual Report.

**Item 10. Directors, Executive Officers and Corporate Governance**

The information regarding our directors and executive officers set forth under the captions "Proposal No. 1 — Election of Directors" and "The Board of Directors and Certain Governance Matters — Executive Officers of the Company" in the Proxy Statement is incorporated herein by reference.

The information regarding compliance with Section 16(a) of the Exchange Act set forth under the caption "Section 16(a) Beneficial Ownership Reporting Compliance" in the Proxy Statement is incorporated herein by reference.

The information regarding our Code of Ethics, our audit committee and our audit committee financial expert under the captions "The Board of Directors and Certain Governance Matters — Code of Ethics for Financial Professionals," "The Board of Directors and Certain Governance Matters — Board Committees and Meetings" in the Proxy Statement is incorporated herein by reference.

**Code of Ethics**

The Company has adopted a Code of Ethics for Financial Professionals, which is applicable to our Chief Executive Officer, Chief Financial Officer, our principal accounting officer or controller and to other professionals of the Company serving in a finance, accounting, corporate treasury or tax role. The Code of Ethics for Financial Professionals may be found on our investor relations website at *http://ir.globalbrokerage.info* under Investor Relations: Corporate Governance: Code of Ethics for Financial Professionals. If the Company ever were to amend or waive any provision of its Code of Ethics for Financial Professionals, the Company intends to satisfy its disclosure obligations with respect to any such waiver or amendment by posting such information on its website set forth above rather than by filing a Form 8-K.

**Item 11. Executive Compensation**

The information contained in the sections captioned "Executive Compensation" and "Director Compensation" of the Proxy Statement is incorporated herein by reference.

**Item 12. Security Ownership of Certain Beneficial Owners and Management and Related Stockholder Matters**

The information contained in the section captioned "Ownership of Securities" of the Proxy Statement is incorporated herein by reference.

83

**Securities Authorized for Issuance Under Equity Compensation Plans**

The following table provides information about the securities authorized for issuance under our equity compensation plans as of December 31, 2016:

**Equity Compensation Plan Information**

| Plan category | (A)<br>Number of securities to<br>be issued upon exercise<br>of outstanding options,<br>warrants and rights | | (B)<br>Weighted-average<br>exercise price of<br>outstanding options,<br>warrants and rights | | (C)<br>Number of securities<br>remaining available for<br>future issuance under<br>equity compensation<br>plans (excluding<br>securities reflected in<br>column (A)) |
|---|---|---|---|---|---|
| Equity compensation plans approved by security holders | 664,688 | (1),(2) | $ 136.05 | (3) | 450,417 |
| Equity compensation plans not approved by security holders | — | | — | | — |

---

(1) Includes 655,194 shares subject to outstanding stock options and 9,494 shares subject to outstanding restricted stock units ("RSUs").

(2) Includes 33,678 stock options granted to our independent directors.

(3) Calculated exclusive of outstanding RSUs.

Equity compensation plans approved by security holders consist of our Amended and Restated 2010 Long-Term Incentive Plan.

**Item 13. Certain Relationships and Related Transactions, and Director Independence**

The information contained in the sections captioned "Certain Relationships and Related Person Transactions" and "The Board of Directors and Certain Governance Matters — Director Independence and Independence Determinations" in the Proxy Statement is incorporated herein by reference.

**Item 14. Principal Accountant Fees and Services**

The information regarding our independent registered public accounting firm fees and services in the section captioned "Proposal No. 2 — Ratification of Independent Registered Public Accounting Firm — Audit and Non-Audit Fees" of the Proxy Statement is incorporated herein by reference.

**PART IV**

**Item 15. Exhibits and Financial Statement Schedules**

(a) (1) Financial Statements

See Item 8 of Part II of this Annual Report on Form 10-K.

(a) (2) Financial Statement Schedules

All schedules have been omitted because they are not applicable or are not required or the information required to be set forth herein is included in the Consolidated Financial Statements or Notes thereto.

(a) (3) Exhibits

See Exhibit Index.

## SIGNATURES

Pursuant to the requirements of Section 13 or 15(d) of the Securities Exchange Act of 1934, the registrant has duly caused this Annual Report to be signed on its behalf by the undersigned, thereunto duly authorized, in the City of New York, New York.

**GLOBAL BROKERAGE, INC.**

Date:   March 17, 2017      By:    /s/ Dror (Drew) Niv
_____

Name: Dror (Drew) Niv

Title: Chief Executive Officer

## POWER OF ATTORNEY

Each of the officers and directors of Global Brokerage, Inc., whose signature appears below, in so signing, also makes, constitutes and appoints each of Dror (Drew) Niv, Robert Lande, and David S. Sassoon, and each of them, his true and lawful attorneys-in-fact, with full power and substitution, for him in any and all capacities, to execute and cause to be filed with the SEC any and all amendments to this Annual Report on Form 10-K, with exhibits thereto and other documents connected therewith and to perform any acts necessary to be done in order to file such documents, and hereby ratifies and confirms all that said attorneys-in-fact or their substitute or substitutes may do or cause to be done by virtue hereof.

Pursuant to the requirements of the Securities Exchange Act of 1934, this report has been signed below by the following persons on behalf of the registrant and in the capacities and on the dates indicated.

| Signature | Title | Date |
|---|---|---|
| /s/ Dror (Drew) Niv | Chief Executive Officer | March 17, 2017 |
| Dror (Drew) Niv | *(Principal Executive Officer)* | |
| /s/ Robert Lande | Chief Financial Officer | March 17, 2017 |
| Robert Lande | *(Principal Financial Officer)* | |
| /s/ David Sakhai | Director and Chief Operating Officer | March 17, 2017 |
| David Sakhai | | |
| /s/ Margaret Deverell | Chief Accounting Officer | March 17, 2017 |
| Margaret Deverell | *(Principal Accounting Officer)* | |
| /s/ Bryan I. Reyhani | Chairman of the Board of Directors | March 17, 2017 |
| Bryan I. Reyhani | | |
| /s/ Kenneth Grossman | Director | March 17, 2017 |
| Kenneth Grossman | | |
| /s/ Eduard Yusupov | Director | March 17, 2017 |
| Eduard Yusupov | | |
| /s/ James Brown | Director | March 17, 2017 |
| James Brown | | |
| /s/ Ryan Silverman | Director | March 17, 2017 |
| Ryan Silverman | | |
| /s/ Arthur Gruen | Director | March 17, 2017 |
| Arthur Gruen | | |
| /s/ Robin E. Davis | Director | March 17, 2017 |
| Robin E. Davis | | |
| /s/ Eric LeGoff | Director | March 17, 2017 |
| Eric LeGoff | | |

**EXHIBIT INDEX**

The agreements and other documents filed as exhibits to this report are not intended to provide factual information or other disclosure other than with respect to the terms of the agreements or other documents themselves, and should not be relied upon for that purpose. In particular, any representations and warranties made by the Company in these agreements or other documents were made solely within the specific context of the relevant agreement or document and may not describe the actual state of affairs as of the date they were made or at any other time.

| | |
|---|---|
| 2.1 | Agreement Relating to the Sale and Purchase of the Whole of the Issued Share Capital of Lucid Markets Trading Limited, dated June 21, 2012, among Mr. Reuter, Matthew Wilhelm, FXCM UK Merger Limited, FXCM Holdings LLC and the Issuer (incorporated by reference to Exhibit 2.1 to Current Report on Form 8-K filed by FXCM Inc. on June 25, 2012 (File No. 001-34986)). |
| 3.1 | Amended and Restated Certificate of Incorporation of FXCM Inc. (incorporated by reference to Exhibit 3.1 to the Registration Statement on Form S-1 filed by FXCM Inc. on September 3, 2010 (File No. 333-169234)). |
| 3.2 | Amended and Restated Bylaws of FXCM Inc. (incorporated by reference to Exhibit 3.2 to Amendment No. 1 to the Registration Statement on Form S-1 filed by FXCM Inc. on October 12, 2010 (File No. 333-169234)). |
| 3.3 | Certificate of Designations for FXCM Inc. Series A Junior Participating Preferred Stock, dated as of January 29, 2015 (incorporated by reference to Exhibit 3.1 to Current Report on Form 8-K filed by FXCM Inc. on January 30, 2015 (File No. 001-34986)). |
| 3.4 | Certificate of Amendment to Amended and Restated Certificate of Incorporation (incorporated by reference to Exhibit 3.1 to Current Report on Form 8-K filed by FXCM Inc. on September 29, 2015 (File No. 001-34986)). |
| 4.1 | Indenture, dated June 3, 2013, between the Company and The Bank of New York Mellon, as trustee (incorporated by reference to Exhibit 4.1 to Current Report on Form 8-K filed by FXCM Inc. on June 3, 2013 (File No. 001-34986)). |
| 4.2 | Form of 2.25% Convertible Senior Note due 2018 (included as Exhibit A and incorporated by reference to Exhibit 4.1 to Current Report on Form 8-K filed by FXCM Inc. on June 3, 2013 (File No. 001-34986)). |
| 4.3 | Rights Agreement, dated as of January 29, 2015, by and between FXCM Inc. and American Stock Transfer & Trust Company, LLC (which includes the form of Certificate of Designations of Series A Junior Participating Preferred Stock as Exhibit A to the Rights Agreement, the Summary of Rights to Purchase Series A Junior Participating Preferred Stock as Exhibit B to the Rights Agreement and the Form of Right Certificate as Exhibit C to the Rights Agreement) (incorporated by reference to Exhibit 4.1 to Current Report on Form 8-K/A filed by FXCM Inc. on January 30, 2015 (File No. 001-34986)). |
| 4.4 | Form of Option Agreement (incorporated by reference to Exhibit 4.1 to Current Report on Form 8-K filed by FXCM Inc. on April 21, 2015 (File No. 001-34986)). |
| 4.5 | Amended and Restated Rights Agreement, dated as of January 26, 2016, by and between FXCM Inc. and American Stock Transfer & Trust Company, LLC (which includes the form of Certificate of Designations of Series A Junior Participating Preferred Stock as Exhibit A to the Rights Agreement, the Summary of Rights to Purchase Series A Junior Participating Preferred Stock as Exhibit B to the Rights Agreement and the Form of Right Certificate as Exhibit C to the Rights Agreement) (incorporated by reference to Exhibit 4.1 to Current Report on Form 8-K filed by FXCM Inc. on January 26, 2016 (File No. 001-34986)). |
| 10.1 | Third Amended and Restated Limited Liability Company Agreement of FXCM Holdings, LLC, dated as of December 1, 2010 (incorporated by reference to Exhibit 10.1 to Current Report on Form 8-K filed by FXCM Inc. on December 7, 2010 (File No. 001-34986)). |
| 10.2 | Amendment No. 1 to the Third Amended and Restated Limited Liability Company Agreement of FXCM Holdings, LLC (incorporated by reference to Exhibit 10.7 to Quarterly Report on Form 10-Q filed by FXCM Inc. on August 8, 2013 (File No. 001-34986)). |
| 10.3 | Amendment No. 2 to the Third Amended and Restated Limited Liability Company Agreement of FXCM Holdings, LLC, dated as of January 29, 2015 (incorporated by reference to Exhibit 3.2 to Current Report on Form 8-K filed by FXCM Inc. on January 30, 2015 (File No. 001-34986)). |
| 10.4 | Exchange Agreement, dated as of December 1, 2010, among FXCM Inc., FXCM Holdings, LLC and the holders of Holdings Units from time to time party thereto (incorporated by reference to Exhibit 10.2 to Current Report on Form 8-K filed by FXCM Inc. on December 7, 2010 (File No. 001-34986)). |
| 10.5 | Tax Receivable Agreement, dated as of December 1, 2010, by and among FXCM Inc., FXCM Holdings, LLC and the TRA Parties from time to time party thereto (incorporated by reference to Exhibit 10.3 to Current Report on Form 8-K filed by FXCM Inc. on December 7, 2010 (File No. 001-34986)). |
| 10.6 | FXCM Inc. Amended and Restated 2010 Long-Term Incentive Plan (incorporated by reference to Exhibit 10.1 to Quarterly Report on Form 10-Q filed by FXCM Inc. on August 5, 2016 (File No. 001-34986)).† |

| 10.7 | Form of Annual Incentive Plan (incorporated by reference to Exhibit 10.6 to Amendment No. 1 to the Registration Statement on Form S-1 filed by FXCM Inc. on October 12, 2010 (File No. 333-169234)).† |
|---|---|
| 10.8 | Offer Letter of Robert Lande (incorporated by reference to Exhibit 10.7 to Amendment No. 1 to the Registration Statement on Form S-1 filed by FXCM Inc. on October 12, 2010 (File No. 333-169234)).† |
| 10.9 | Form of Option Award Agreement (incorporated by reference to Exhibit 10.9 to Amendment No. 2 to the Registration Statement on Form S-1 filed by FXCM Inc. on November 2, 2010 (File No. 333-169234)).† |
| 10.10 | Severance Protection Agreement between Dror (Drew) Niv and FXCM Holdings, LLC, dated as of December 1, 2010 (incorporated by reference to Exhibit 10.8 to Current Report on Form 8-K filed by FXCM Inc. on December 7, 2010 (File No. 001-34986)).† |
| 10.11 | Severance Protection Agreement between David Sakhai and FXCM Holdings, LLC, dated December 1, 2010 (incorporated by reference to Exhibit 10.9 to Current Report on Form 8-K filed by FXCM Inc. on December 7, 2010 (File No. 001-34986)).† |
| 10.12 | Form of Option Award Agreement for Non-Employee Directors (incorporated by reference to Exhibit 10.12 to Amendment No. 3 to the Registration Statement on Form S-1 filed by FXCM Inc. on November 15, 2010 (File No. 333-169234)).† |
| 10.13 | Form of Restricted Stock Unit Award Agreement (incorporated by reference to Exhibit 10.2 to Quarterly Report on Form 10-Q filed by FXCM Inc. on November 7, 2014 (File No. 001-34986)). |
| 10.14 | Amended and Restated Deed of Shareholders Agreement relating to Lucid Markets Trading Limited, by and among Dierk Reuter, Matthew Wilhelm, FXCM UK Merger Limited, FXCM Holdings, LLC and Lucid Markets Trading Limited (incorporated by reference to Exhibit 10.1 to Quarterly Report on Form 10-Q filed by FXCM Inc. on August 8, 2013 (File No. 001-34986)). |
| 10.15 | Purchase Agreement, dated May 28, 2013, between the Company and Credit Suisse Securities (USA) LLC and Merrill Lynch, Pierce, Fenner & Smith Incorporated, as representatives of the several purchasers named therein (incorporated by reference to Exhibit 10.1 to Current Report on Form 8-K filed by FXCM Inc. on June 3, 2013 (File No. 001-34986)). |
| 10.16 | Form of Convertible Bond Hedge Transaction Confirmation, dated May 28, 2013, between the Company and dealer (incorporated by reference to Exhibit 10.2 to Current Report on Form 8-K filed by FXCM Inc. on June 3, 2013 (File No. 001-34986)). |
| 10.17 | Form of Amendment to Convertible Bond Hedge Transaction Confirmation, dated May 30, 2013, between the Company and dealer (incorporated by reference to Exhibit 10.3 to Current Report on Form 8-K filed by FXCM Inc. on June 3, 2013 (File No. 001-34986)). |
| 10.18 | Form of Issuer Warrant Transaction Confirmation, dated May 28, 2013, between the Company and dealer (incorporated by reference to Exhibit 10.4 to Current Report on Form 8-K filed by FXCM Inc. on June 3, 2013 (File No. 001-34986)). |
| 10.19 | Form of Amendment to Issuer Warrant Transaction Confirmation, dated May 30, 2013, between the Company and dealer (incorporated by reference to Exhibit 10.5 to Current Report on Form 8-K filed by FXCM Inc. on June 3, 2013 (File No. 001-34986)). |
| 10.20 | Amended and Restated Letter Agreement, dated January 24, 2015 by and among FXCM Inc., FXCM Holdings, LLC, FXCM Newco, LLC and Leucadia National Corporation (incorporated by reference to Exhibit 10.1 to Current Report on Form 8-K filed by FXCM Inc. on January 26, 2015 (File No. 001-34986)). |
| 10.21 | Amended and Restated Credit Agreement, dated January 24, 2015 by and among FXCM Holdings, LLC, FXCM Newco, LLC, Leucadia National Corporation, as Administrative Agent and lender, and other lenders parties thereto from time to time (incorporated by reference to Exhibit 10.2 to Current Report on Form 8-K filed by FXCM Inc. on January 26, 2015 (File No. 001-34986)). |
| 10.22 | Amended and Restated Financing Fee Letter, dated January 24, 2015 by and among FXCM Holdings, LLC, FXCM Newco, LLC and Leucadia National Corporation (incorporated by reference to Exhibit 10.3 to Current Report on Form 8-K filed by FXCM Inc. on January 26, 2015 (File No. 001-34986)). |
| 10.23 | Amended and Restated Security and Guaranty Agreement, dated January 24, 2015 by and among FXCM Holdings, LLC, FXCM Newco, LLC, Forex Trading LLC, FXCM Systems, LLC, Yozma LLC, Financial Horizons Capital, LLC, Horizons Funding, LLC, FXCM Partners, LLC and Leucadia National Corporation (incorporated by reference to Exhibit 10.4 to Current Report on Form 8-K filed by FXCM Inc. on January 26, 2015 (File No. 001-34986)). |
| 10.24 | Form of Amended and Restated Severance Agreement for Founders (incorporated by reference to Exhibit 10.1 to Current Report on Form 8-K filed by FXCM Inc. on March 17, 2015 (File No. 001-34986)).† |
| 10.25 | Form of Severance Agreement for Selected Executives and Managers (incorporated by reference to Exhibit 10.2 to Current Report on Form 8-K filed by FXCM Inc. on March 17, 2015 (File No. 001-34986)).† |
| 10.26 | FXCM Inc. Annual Incentive Bonus Plan for Founder-Directors (2015-2016) (incorporated by reference to Exhibit 10.3 to Current Report on Form 8-K filed by FXCM Inc. on March 17, 2015 (File No. 001-34986)).† |

| 10.27 | FXCM Inc. Annual Incentive Bonus Plan for Specified Executive Officers (2015-2016) (incorporated by reference to Exhibit 10.4 to Current Report on Form 8-K filed by FXCM Inc. on March 17, 2015 (File No. 001-34986)).† |
|---|---|
| 10.28 | FXCM Inc. Amended and Restated Annual Incentive Bonus Plan for Founder-Directors (2015-2016) (incorporated by reference to Exhibit 10.1 to Quarterly Report on Form 10-Q filed by FXCM Inc. on May 6, 2016 (File No. 001-34986)).† |
| 10.29 | FXCM Inc. Amended and Restated Annual Incentive Bonus Plan for Specified Executive Officers (2015-2016) (incorporated by reference to Exhibit 10.2 to Quarterly Report on Form 10-Q filed by FXCM Inc. on May 6, 2016 (File No. 001-34986)).† |
| 10.31 | Amended and Restated Limited Liability Company Agreement of FXCM Group, LLC, dated as of September 1, 2016 (incorporated by reference to Exhibit 10.1 to Current Report on Form 8-K filed by FXCM Inc. on September 8, 2016 (File No. 001-34986)). |
| 10.32 | FXCM Group, LLC 2016 Incentive Bonus Plan for Founders and Executives, effective September 1, 2016 (incorporated by reference to Exhibit 10.2 to Current Report on Form 8-K filed by FXCM Inc. on September 8, 2016 (File No. 001-34986)). |
| 10.33 | Management Agreement, dated September 1, 2016, between FXCM Holdings, LLC and FXCM Group, LLC (incorporated by reference to Exhibit 10.3 to Current Report on Form 8-K filed by FXCM Inc. on September 8, 2016 (File No. 001-34986)). |
| 10.34 | First Amendment to Amended and Restated Credit Agreement, dated as of September 1, 2016, by and among FXCM Holdings, LLC, FXCM Newco, LLC, certain other loan parties, and Leucadia National Corporation (incorporated by reference to Exhibit 10.1 to Current Report on Form 8-K filed by FXCM Inc. on September 8, 2016 (File No. 001-34986)). |
| 10.35 | Equity Distribution Agreement, dated as of October 3, 2016, between FXCM Inc. and Jefferies LLC (incorporated by reference to Exhibit 10.1 to Current Report on Form 8-K filed by FXCM Inc. on October 3, 2016 (File No. 001-34986)). |
| 10.36 | FXCM Inc. 2017 Incentive Bonus Plan for Founder-Directors and Specified Executive Officers (2017) (incorporated by reference to Exhibit 10.1 to Current Report on Form 8-K filed by FXCM Inc. on November 9, 2016 (File No. 001-34986)). † |
| 10.37 | Order of Settlement, dated as of January 30, 2017, entered into by Forex Capital Markets, certain of its executives, and the National Future Association * |
| 10.38 | Order of Settlement, dated as of February 6, 2017, entered into by Forex Capital Markets, certain of its executives, and the Commodity Futures Trading Commission * |
| 10.39 | Amendment No. 1 to the Management Agreement of FXCM Group, LLC, dated as of February 2, 2017, by and among FXCM Group, LLC, FXCM Holdings, LLC, and LUK-FX Holdings, LLC.* |
| 10.40 | Acknowledgement, dated as of February 2, 2017, between FXCM Group, LLC and LUK-FX Holdings* |
| 10.41 | Asset Purchase Agreement, dated as of February 7, 2017, between Forex Capital Market LLC and GAIN Capital Group, LLC* |
| 10.42 | Asset Purchase Agreement, dated as of September 30, 2016, between Forex Capital Market LLC and FX Publications, Inc. (incorporated by reference to Exhibit 10.1 to Quarterly Report on Form 10-Q filed by FXCM Inc. on November 18, 2016 (File No. 001-34986)). |
| 21.1 | Subsidiaries of the Registrant* |
| 23.1 | Consent of Ernst & Young LLP as to Global Brokerage, Inc.* |
| 24.1 | Power of Attorney (included on signature page to this Report on Form 10-K)* |
| 31.1 | Certification of the Principal Executive Officer pursuant to Rule 13a-14(a)/15d-14(a) as adopted pursuant to Section 302 of the Sarbanes-Oxley Act of 2002* |
| 31.2 | Certification of the Principal Financial Officer pursuant to Rule 13a-14(a)/15d-14(a) as adopted pursuant to Section 302 of the Sarbanes-Oxley Act of 2002* |
| 32.1 | Certification of the Principal Executive Officer pursuant to 18 U.S.C. Section 1350, as adopted pursuant to Section 906 of the Sarbanes-Oxley Act of 2002.**[(1)] |
| 32.2 | Certification of the Principal Financial Officer pursuant to 18 U.S.C. Section 1350, as adopted pursuant to Section 906 of the Sarbanes-Oxley Act of 2002.**[(1)] |
| 101.INS | XBRL Instance Document |
| 101.SCH | XBRL Taxonomy Extension Schema Document |
| 101.CAL | XBRL Taxonomy Extension Calculation Linkbase Document |
| 101.DEF | XBRL Taxonomy Extension Definition Linkbase Document |
| 101.LAB | XBRL Taxonomy Extension Label Linkbase Document |

101.PRE          XBRL Taxonomy Extension Presentation Linkbase Document

_____

\*          Filed herewith

\*\*        Furnished herewith

*(1)  This exhibit should not be deemed to be "filed" for purposes of Section 18 of the Exchange Act.*

†          Indicates a management contract or compensatory plan or arrangement in which directors or executive officers are eligible to participate.

**NATIONAL FUTURES ASSOCIATION**
**BEFORE THE**
**BUSINESS CONDUCT COMMITTEE**

| | |
|---|---|
| In the Matter of: | ) |
| | ) |
| FOREX CAPITAL MARKETS, LLC | ) |
| (NFA ID #308179), | ) |
| | ) |
| WILLIAM AHDOUT | ) |
| (NFA ID #308182) | ) |
| | ) |
| DROR NIV | )          NFA Case No. 17-BCC-001 |
| (NFA ID #308183) | ) |
| | ) |
| and | ) |
| | ) |
| ORNIT NIV | ) |
| (NFA ID #427646), | ) |
| | ) |
| Respondents. | ) |

**DECISION**

Having reviewed all matters relevant to the Complaint issued by the Business Conduct Committee (BCC or Committee) of National Futures Association (NFA) against Forex Capital Markets, LLC (FXCM), William Ahdout (Ahdout), Dror Niv (Niv) and Ornit Niv, and having considered the Offer of Settlement (Offer) submitted by FXCM, Ahdout, Niv and Ornit Niv and having accepted their Offer, this Committee hereby issues this Decision.

**I**

**ALLEGED VIOLATIONS OF NFA REQUIREMENTS**

On February 6, 2017, this Committee issued a Complaint against FXCM, a futures commission merchant (FCM), retail foreign exchange dealer (RFED), provisionally registered swap dealer (SD) and Forex Dealer Member (FDM) of NFA, located in New York, New York.

The Complaint also named Ahdout, Niv and Ornit Niv as Respondents. Ahdout was an NFA Associate and an associated person (AP) of FXCM and currently is a principal of the firm. Niv and Ornit Niv are listed principals and APs of FXCM, and NFA Associates.

Count I of the Complaint alleged that FXCM advertised that it used a No Dealing Desk order execution model which was purportedly superior to the Dealing Desk model used by its competitors; that, contrary to its advertising claims, FXCM actually used what amounted to a Dealing Desk model by directing trades to a liquidity provider, Effex Capital, LLC (Effex), that FXCM actually supported and controlled; that Effex routinely captured 50% of FXCM's daily order flow and, in return, Effex paid rebates to FXCM that amounted at times to as much as 70% of Effex's profits from FXCM's order flow; that FXCM and its senior executives, Ahdout and Niv, allowed Effex to engage in execution tactics that denied FXCM's retail customers price improvement, which financially benefitted FXCM and Effex, to the detriment of customers; and that FXCM employees, including Niv, provided misleading information to NFA to conceal FXCM's relationship with Effex and its role in FXCM's order execution process. Based on these allegations, FXCM, Ahdout and Niv were charged with violating NFA Compliance Rules 2-36(b)(1) and 2-36(c), and FXCM and Niv were charged with violating NFA Compliance Rules 2-2(f) and 2-36(b)(5).

Count II of the Complaint charged FXCM with failing to implement an adequate anti-money laundering program, in violation of NFA Compliance Rule 2-9(c).

Count III of the Complaint charged that FXCM failed to implement an equitable margin and liquidation policy, in violation of NFA Compliance Rule 2-36(c), and failed to collect required security deposits on retail forex transactions, in violation of NFA Financial Requirements Section 12.

Count IV of the Complaint charged FXCM with failing to treat customers equally when giving price adjustments, in violation of NFA Compliance Rule 2-43(a)(1), and with failing to submit complete trade data to NFA, in violation of NFA Compliance Rule 2-48(a).

Count V of the Complaint alleged that FXCM failed to properly calculate and maintain required minimum adjusted net capital, in violation of NFA Financial Requirements Section 11(a); failed to promptly notify NFA of the firm's capital deficiencies, in violation of NFA Financial Requirements Section 11(d); failed to maintain adequate liquid assets to cover its liabilities to the firm's retail customers, in violation of NFA Financial Requirements Section 14; and, as a provisionally registered SD, failed to comply with chief compliance officer requirements and failed to implement an adequate risk management program, in violation of NFA Compliance Rule 2-49(a).

Count VI of the Complaint charged FXCM, Ahdout, Niv and Ornit Niv with failing to adequately supervise the firm's operations and its employees, in violation of NFA Compliance Rule 2-36(e).

## II

## OFFER OF SETTLEMENT

FXCM, Ahdout, Niv and Ornit Niv submitted an Offer in which they neither admitted nor denied the allegations of the Complaint and proposed to settle the charges against them on the following terms.

A.   FXCM agreed to be withdrawn from NFA membership within fifteen (15) days of the effective date of a Decision accepting its Offer, unless such period is extended by the BCC for good cause. Thereafter, FXCM agreed not to reapply for NFA membership or principal status or act as a principal of an NFA Member at any time in the future;

B.   Ahdout, Niv and Ornit Niv agreed to be withdrawn from NFA associate membership and principal status on or before fifteen (15) days after the effective date of a Decision accepting this Offer, unless such period is extended by the BCC for good cause. Thereafter, Ahdout, Niv and Ornit Niv agreed not to apply for NFA

membership, reapply for NFA associate membership or principal status, or act as a principal of an NFA Member at any time in the future; and

C.    FXCM, Ahdout, Niv and Ornit Niv acknowledged that any Decision accepting their Offer would include findings that they committed the violations alleged against them in the Complaint.

### III

### FINDINGS

The Committee finds that FXCM, Ahdout, Niv and Ornit Niv committed the violations alleged against them in the Complaint.

### IV

### PENALTY

Having considered the matter and having accepted the Offer of FXCM Ahdout, Niv and Ornit Niv this Committee orders:

A.    FXCM shall be withdrawn from NFA membership, within fifteen (15) days of the effective date of this Decision accepting its Offer, unless such period is extended by the BCC for good cause. Thereafter, FXCM shall not reapply for NFA membership or principal status or act as a principal of an NFA Member at any time in the future; and

B.    Ahdout, Niv and Ornit Niv shall be withdrawn from NFA associate membership and principal status on or before fifteen (15) days after the effective date of a Decision accepting this Offer, unless such period is extended by the BCC for good cause. Thereafter, Ahdout, Niv and Ornit Niv shall not apply for NFA membership, reapply for NFA associate membership or principal status, or act as a principal of an NFA Member at any time in the future.

The BCC's acceptance of this Offer shall settle the Complaint in this case and all matters relating to such Complaint and shall operate to bar any future Member Responsibility Actions or NFA disciplinary actions against FXCM and any current or former officer, director, or employee of FXCM, including Ahdout, Niv and Ornit Niv, for any conduct occurring up to the date of the Offer, of which NFA had corporate knowledge; and shall resolve and terminate all complaints, investigations, audits and examinations relating to FXCM and any current or former

officer, director, or employee of FXCM, including Ahdout, Niv and Ornit Niv, which were received or pending as of the date of the Offer.

**NATIONAL FUTURES ASSOCIATION**
**BUSINESS CONDUCT COMMITTEE**


Dated: February 6, 2017   /s/ James P. O'Hara_____
                                         By: James P. O'Hara
                                         Chairperson

EX-10.38 3 fxcm-20161231xex1038.htm EXHIBIT 10.38

**UNITED STATES OF AMERICA**
**Before the**
**COMMODITY FUTURES TRADING COMMISSION**

| | | |
|---|---|---|
| In the Matter of: | ) | |
|    Forex Capital Markets, LLC, FXCM | ) | CFTC Docket No. 17-09 |
|    Holdings, LLC, Dror Niv, and | ) | |
|    William Ahdout, | ) | |
| | ) | |
|               Respondents. | ) | |

**ORDER INSTITUTING PROCEEDINGS PURSUANT TO**
**SECTIONS 6(c) AND 6(d) OF THE COMMODITY EXCHANGE ACT, MAKING**
**FINDINGS, AND IMPOSING REMEDIAL SANCTIONS**

**I.**

The Commodity Futures Trading Commission ("Commission") has reason to believe that Forex Capital Markets, LLC ("FXCM"), FXCM Holdings, LLC ("FXCM Holdings"), Dror (Drew) Niv ("Niv"), and William Ahdout ("Ahdout") (collectively, "Respondents") have violated the Commodity Exchange Act (the "Act") and Commission Regulations ("Regulations"). Therefore, the Commission deems it appropriate and in the public interest that public administrative proceedings be, and hereby are, instituted to determine whether Respondents engaged in the violations set forth herein, and to determine whether any order shall be issued imposing remedial sanctions.

**II.**

In anticipation of the institution of an administrative proceeding, Respondents have submitted an Offer of Settlement ("Offer"), which the Commission has determined to accept. Without admitting or denying the findings or conclusions herein, Respondents consent to the entry and acknowledge service of this Order Instituting Proceedings Pursuant to Sections 6(c) and 6(d) of the Commodity Exchange Act, Making Findings, and Imposing Remedial Sanctions ("Order"). [1]

---

[1] Respondents consent to the entry of this Order and to the use of these findings in this proceeding and in any other proceeding brought by the Commission or to which the Commission is a party; provided, however, that Respondents do not consent to the use of the Offer, or the findings or conclusions in this Order, as the sole basis for any other proceeding brought by the Commission, other than in a proceeding in bankruptcy or to enforce the terms of this Order. Nor do Respondents consent to the use of the Offer or this Order, or the findings or conclusions in this Order consented to in the Offer, by any other party in any other proceeding.

III.

The Commission finds the following:

**A. Summary**

From September 4, 2009 through at least 2014 (the "Relevant Period"), FXCM and FXCM Holdings, by and through their officers, employees, and agents, including Respondents Niv and Ahdout, engaged in false and misleading solicitations of FXCM's retail foreign exchange ("forex") customers.

FXCM represented to its retail customers that when they traded forex on FXCM's "No Dealing Desk" platform, FXCM would have no conflict of interest. According to these representations, retail customers' profits or losses would be irrelevant to FXCM's bottom line, because FXCM's role in the customers' trades was merely as a credit intermediary. According to FXCM, the risk would be borne by banks and other independent "market makers" that provided liquidity to the platform.

Contrary to these representations, FXCM had an undisclosed interest in the market maker that consistently "won" the largest share of FXCM's trading volume - and thus was taking positions opposite FXCM's retail customers. That market maker was an FXCM-backed startup firm that was founded by a former FXCM executive while he was working at FXCM, that operated for the first year of its existence out of FXCM's offices, and that shared most of its trading profits with FXCM.

FXCM also made false statements to National Futures Association ("NFA") staff, in order to conceal FXCM's role in the creation of its principal market maker as well as the market maker's owner's previous role as an FXCM executive.

Niv and Ahdout directed and controlled FXCM's operations throughout the Relevant Period and were responsible, directly or indirectly, for violations described herein. Niv was responsible, directly or indirectly, for the false statements made to NFA.

**B. Respondents**

**Forex Capital Markets, LLC** ("FXCM") is a Delaware corporation with its principal place of business in New York, New York. FXCM offers trading platforms for foreign currency contracts and is registered with the Commission as a Futures Commission Merchant ("FCM") and Retail Foreign Exchange Dealer ("RFED") and is provisionally registered with the Commission as a Swap Dealer.

**FXCM Holdings, LLC** ("FXCM Holdings") is a holding company that during the Relevant Period was the immediate corporate parent of FXCM. FXCM Holdings was incorporated as a Delaware corporation on November 17, 2005.

**Dror Niv,** also known as Drew Niv, is an individual who resides in Connecticut. Niv was a founding partner of FXCM. From at least September 4, 2009 through May 20, 2014, Niv was Chief Executive Officer of FXCM, and he has been registered with the Commission as an

Associated Person and listed as a Principal of FXCM from 2001 to the present. Niv has been a partner in FXCM Holdings since its inception.

**William Ahdout** is an individual who resides in New York. Ahdout was a founding partner of FXCM. Since at least September 4, 2009, Ahdout has been a Managing Director of FXCM. Ahdout was registered with the Commission as an Associated Person of FXCM from 2001 until May 23, 2016, and he continues to be listed as a Principal of FXCM. Ahdout has been a partner in FXCM Holdings since its inception.

C. Facts

1.   FXCM's "No Dealing Desk" Model

FXCM, which was founded in 1999 and became a registered FCM in 2001, provides retail customers access to over-the-counter forex markets through a proprietary technology platform, and acts as counterparty in transactions with its retail customers in which customers can buy one currency and simultaneously sell another. As of July 31, 2016, FXCM had over 20,000 active retail customer accounts representing more than $170 million in liabilities.

Until approximately 2007, FXCM provided liquidity to its retail forex customers primarily through an internal dealing desk - a division of FXCM that determined the prices offered to customers and held positions opposite customers.

In or around 2007, FXCM transitioned from utilizing a dealing desk to transact with customers to using what it termed an "agency" model for the majority of its retail forex customers, which it described to customers as providing "No Dealing Desk" forex trading. (FXCM using its dealing desk to trade with retail customers, by contrast, was referred to as the "principal" model.)

Whereas a dealing desk broker "acts as a market maker" and "may be trading against your position," FXCM claimed that its agency model "eliminat[ed]" that "major conflict of interest" between broker and retail customer. In FXCM's agency model, price quotations were provided not by FXCM's internal dealing desk but by banks and other third-party "market makers" - sometimes also referred to as "liquidity providers" or "LPs." FXCM explained its agency model to its customers as follows: "When our customer executes a trade on the best price quotation offered by our FX market makers, we act as a credit intermediary, or riskless principal, simultaneously entering into offsetting trades with both the customer and the FX market maker." FXCM claimed that trading on its agency model was different from a dealing desk broker because: "We earn trading fees and commissions by adding a markup to the price provided by the FX market makers and generate our trading revenues based on the volume of transactions, not trading profits or losses."

2.   FXCM Creates an Algorithmic Trading System to Trade Opposite Customers

In 2009, Niv, Ahdout, and others at FXCM formulated a plan to create an algorithmic trading system - an FXCM computer program that could make markets to FXCM's customers and thereby either replace or compete with the independent market makers on FXCM's No Dealing Desk platform.

Niv and Ahdout hired a high-frequency trader (hereinafter, "HF Trader") to a Managing Director position at FXCM. HF Trader's employment agreement, signed by HF Trader and Ahdout, provided that FXCM would pay HF Trader a base salary plus a bonus of 30 percent of trading profits generated by HF Trader's algorithmic trading system, with FXCM keeping the remaining 70 percent. HF Trader began working for FXCM on October 5, 2009 and ultimately developed the algorithmic trading system for FXCM.

3.   FXCM Spun Off Its Algorithmic Trading System As a New Company Owned by HF Trader

In early 2010, when HF Trader was finalizing his trading algorithm, FXCM's Compliance department raised concerns that trading against FXCM retail customers might contradict FXCM's marketing statements about its No Dealing Desk model.

FXCM determined that HF Trader would form his own company and operate as an "external" liquidity provider for FXCM. On March 23, 2010, HF Trader formed his new company (hereinafter, "HFT Co"). FXCM intended that HF Trader, under the auspices of HFT Co, would use his trading algorithm to trade on FXCM's No Dealing Desk platform.

On April 14, 2010, HF Trader resigned from FXCM. HF Trader and FXCM agreed that HF Trader's

resignation would not change the economic relationship between FXCM and HF Trader, including, as stated in his employment contract, HF Trader's retention of 30 percent of his algorithmic trading profits, with FXCM capturing the residual 70 percent. To that end, a March 1, 2010 services agreement between HFT and FXCM, and a superseding May 1, 2010 services agreement between HFT Co and FXCM Holdings, provided that HFT Co would make monthly payments to FXCM in the amount of $21 per million dollars of trading volume executed by HFT Co. HF Trader and FXCM believed that this amount approximated 70 percent of HFT Co's profits from trading on FXCM's retail forex platform.

4.   HFT Co Maintained a Close Relationship With FXCM

To help launch HFT Co's operations, FXCM gave HFT Co a $2 million interest-free loan, and allowed HFT Co to use FXCM's prime broker through a "prime of prime" account. When HF Trader resigned from FXCM, he continued working from FXCM's offices, rent free. HFT Co was located in FXCM's offices in New York City until approximately April 2011, when the company finally moved into its own office space, in Jersey City, New Jersey.

HFT Co also used HF Trader's trading algorithm, which was FXCM's intellectual property, to conduct its trading. For a period of time, HFT Co used FXCM's servers and other technology, including FXCM's email systems. HF Trader actively used his FXCM email address until at least September 2011, and his FXCM email account was still receiving emails in 2014.

Two FXCM employees who assisted HFT Co received supplemental bonuses from FXCM, reimbursed by HFT Co, on account of their work. One of these employees spent approximately 80 percent of the work week at HFT Co's offices from 2011 until 2014.

5.   FXCM Received Nearly $80 Million in Revenue from HFT Co's Trading

Pursuant to the May 1, 2010 services agreement, FXCM sent HFT Co monthly invoices, which were to be paid by HFT Co to FXCM Holdings. Through August 2011, HFT Co. paid to FXCM Holdings $21 per million notional volume transacted by HFT Co on the FXCM retail forex platform and paid $16 per million from September 2011 through July 2014. From 2010 to 2014, no market maker besides HFT Co paid FXCM for order flow.

Notwithstanding the formal documentation of the monthly payments from HFT Co as reflecting a fixed $21 fee per "aggregated volume of Transactions executed," in reality the payments represented HFT Co and FXCM's agreement to share profits derived from HFT Co's trading against FXCM's retail customers.

FXCM viewed HFT Co's profits and losses ("P&L") from HFT Co's trading as essentially belonging to FXCM, less the 30 percent HFT Co was permitted to keep. For instance, FXCM calculated its monthly preliminary P&L statement, in part, by taking HFT Co's monthly P&L and simply subtracting 30 percent. When spreads tightened and HFT Co's profits dropped to considerably less than $30 per million trading, FXCM and HFT Co amended the services agreement to lower the payments per million dollars.

HFT Co reported its P&L to FXCM on a weekly basis for a period of time following its formation. The invoices FXCM sent HFT Co seeking "Rebate for FX Trades" described the amounts billed as "P&L." In exchange for these payments from HFT Co, FXCM agreed that it would favor HFT Co over other market makers in routing retail customer orders. FXCM permitted HFT Co to win all "ties" with other market makers; provided HFT Co with a real-time view of price quotations offered by other market makers; and added smaller markups to HFT Co prices than to prices provided by other market makers.

On the day of HF Trader's resignation from FXCM, HF Trader's trading algorithm was used in a "full-scale trading session" for the very first time. Based on the trading that day, FXCM anticipated that HFT Co would capture approximately 25-30% of overall trade volume on FXCM's No Dealing Desk Platform.

In addition to favoring HFT Co over other market makers, HFT Co made use of, and FXCM allowed HFT Co to use, a hold timer that enabled HFT Co to execute a trade at the start or end of a hold timer period, whichever was better for HFT Co. In late 2011 and 2012, HFT Co continued to make use of a hold timer but would accept or reject the trade based on the price at the end of the hold timer period. HFT Co also made use of a "previous quote" practice whereby HFT Co submitted a quote to FXCM and FXCM would respond with an execution request based on the trading limits contained in a customer limit order and not the previous quote provided by FXCM.

In total, through HFT Co's monthly payments from 2010 through 2014, HFT Co rebated to FXCM approximately $77 million of the trading revenue HFT Co achieved.

6.  <u>FXCM Concealed Its Relationship with HFT Co from Its Customers</u>

As of October 2010, FXCM's website promised "No conflict of interest between broker and trader" and "No dealer intervention in trades," stating that "[e]very trade is executed back to back with one of the world's premier banks or financial institutions, which compete to provide FXCM with bid and ask prices." FXCM did not disclose that its principal market maker, HFT Co, was a startup firm spun off of FXCM. For example, FXCM's website implied that its market makers were institutions independent of FXCM: "[W]e have obtained close banking relationships with some of the world's largest and most aggressive price providers." The website continued: "FXCM does not take a market position - eliminating a major conflict of interest. A dealing desk broker, which acts as a market maker, may be trading against your position. However, with our No Dealing Desk execution, we fill your orders from the best prices available to us from the banks."

As another example, in 2011, FXCM published a diagram showing banks that acted as market makers for FXCM and showing the "[p]ercentage of volume to each liquidity provider": BNP (13.5%), Citi (8.0%), Deutsche Bank (3.5%), Dresdner (13.3%), Goldman (14.4%), JP Morgan (3.6%), Morgan Stanley (8.0), and "Citi-Prime Broker (All Others)" (35.8%). HFT Co - the liquidity provider with by far the largest volume - was not specifically identified but instead listed under "Citi-Prime Broker (All Others)."

When a list of FXCM's top liquidity providers for the first half of 2010 was circulated internally, showing HFT Co with over 17 percent of the company's volume, an FXCM employee asked whether that reference should be "blacked out." Another employee responded: "Good catch, put them as HFT 1 . . . ."

In September 2011, an FXCM executive raised "Compliance Concerns" with members of FXCM's Compliance department, noting a problem with HFT Co "hanging orders" that arose from "the fact that the [HFT Co] adapter is different technology than the rest of the bank adapters." An FXCM compliance officer responded: "Given the sensitivity of the counter party involved we would prefer the events don't happen so that we do not draw unwanted attention."

FXCM did not disclose HFT Co as a market maker to the retail public until late 2012. Even then, at that time, in response to an individual posting about HFT Co on an online bulletin board called "Forex Factory," FXCM obfuscated HFT Co's relationship to FXCM.

The Forex Factory post, anonymously written by "fx insider," stated: "So I just heard something interesting from a friend about FXCM's 'no dealing desk'. Apparently their largest liquidity provider by far is a small firm named [HFT Co], which is owned by FXCM itself and was set up solely to act as counterparty to FXCM clients. They sit on top of FXCM's liquidity pool with last look so that for every FXCM trade, they can choose whether to take it or pass it on to normal liquidity providers. Can anyone confirm this? It would be interesting to know how much information is shared."

Two days' later, FXCM posted its response on Forex Factory, stating: "While FXCM does own a liquidity provider, the name of that company is Lucid Markets. It's an institutional level liquidity provider in the forex market and to date had provided no liquidity to FXCM's retail no dealing desk execution." FXCM then implied that it was restricted from identifying HFT Co to the public as one of its market makers, stating:

"Non-disclosure agreements mean that we don't normally name the 17 liquidity providers that stream prices on our No Dealing Desk feed." In fact, there was no non-disclosure agreement between FXCM and HFT Co, and, as noted above, FXCM had disclosed ten of its other market makers to the public.

FXCM's response also implied that HFT Co did not, as "fx insider" put it, have a unique ability to "choose whether to take" FXCM trades, and that FXCM lacked an ownership interest in HFT Co: "While the majority of liquidity providers in this list are banks, there are also some hedge funds and other financial institutions, one of which is [HFT Co]. However FXCM does not own them, nor do they have control over what orders can go to other liquidity providers." To the contrary, because HFT Co did have both real-time read of book of FXCM's other market makers and the ability to win all ties, "fx insider" was correct in stating that HFT Co had the power to choose to take whatever trades it wished.

7.   FXCM Made False Statements to NFA About HFT Co

In connection with NFA's 2013 examination of FXCM, NFA compliance staff met with FXCM executives in Chicago on October 24, 2013. In response to NFA's questions about FXCM's relationship with HFT Co, Niv omitted to mention any of the details described above concerning FXCM's relationship with HFT Co and its principal, HF Trader. Instead, Niv misrepresented that he had a prior working relationship with HF Trader from when HF Trader was a trader employed by other liquidity providers.

Members of FXCM's Compliance department also made a series of misstatements to NFA. On October 22, 2013, two days before FXCM's meeting with NFA, an FXCM compliance officer told NFA in an email: "FXCM LLC does not have any direct or indirect ownership, interest, or affiliation with entities that provide liquidity to retail clients . . . ." Given, among other things, FXCM' s interest in HFT Co, this statement was false. After NFA sought clarification of this statement, asking FXCM to "provide representation as it relates to owners, principals, APs [associated persons], employees, and affiliates of FXCM," another compliance officer compounded FXCM's previous misrepresentation in a March 24, 2014 email: "To my knowledge, there are no present or past owners, principals, APs, or employees of affiliates of FXCM LLC that have direct or indirect ownership, interest, or affiliation with entities that provide liquidity to retail clients on our No Dealing Desk Model." This was not true, as the compliance officer knew, because HF Trader, a former employee (and, indeed, an executive) of FXCM, was the principal and 100 percent owner of HFT Co, which was the primary provider of liquidity to retail clients on FXCM's No Dealing Desk platform.

On April 4, 2014, in response to further attempts by NFA to clarify the relationship between FXCM and HFT Co, an FXCM compliance officer stated in an email: "[HF Trader] served as a consultant for FXCM from October 2009 through April 2010. [HF Trader] worked primarily on software coding." Once again, the compliance officer's representation to NFA was false and misleading. HF Trader was not an FXCM "consultant" but an executive of FXCM with an employment agreement, and in light of NFA's obvious interest in FXCM's relationship with HFT Co it was deceptive to characterize HF Trader's work at FXCM - i.e., creating the trading algorithm that HFT Co used to trade opposite FXCM's customers - generically as "software coding." Niv generally participated in and approved of responses to NFA.

* * *

In accepting Respondents' Offer, the Commission recognizes Respondents' cooperation during the investigation of this matter by the CFTC's Division of Enforcement ("Division"), which included Respondents voluntarily producing information to the Division.

IV.
## LEGAL DISCUSSION

### A.  FXCM Violated Section 4b(a)(2) of the Act and Regulation 5.2(b)

Sections 4b(a)(2)(A) and (C) of the Act, 7 U.S.C. §§ 6b(a)(2)(A) and (C), provide, in relevant part, that it is unlawful for any person, in or in connection with any order to make, or the making of, any contract of sale of any commodity for future delivery that is made, or to be made, for or on behalf of, or with, any other person (A) to cheat or defraud or attempt to cheat or defraud the other person; or (C) willfully to deceive or attempt to deceive the other person by any means whatsoever in connection with such contract. Pursuant to Section 2(c)(2)(C)(iv) of the Act, 7 U.S.C. § 2(c)(2)(C)(iv), Section 4b of the Act applies to any retail forex agreement, contract, or transaction described in Section 2(c)(2)(C)(i) of the Act, 7 U.S.C. § 2(c)(2)(C)(i), as if the agreement, contract, or transaction were a contract of sale of a commodity for future delivery.

Regulations 5.2(b)(1) and (3), 17 C.F.R. §§ 5.2(b)(1) and (3), provide, in pertinent part, that it shall be unlawful for any person, by use of the mails or by any means or instrumentality of interstate commerce, directly or indirectly, in or in connection with any retail forex transaction: (1) to cheat or defraud or attempt to cheat or defraud any person; or (3) willfully to deceive or attempt to deceive any person by any means whatsoever.

To prove fraudulent misrepresentations and/or omissions in violation of Section 4b of the Act, the following elements are required: ( 1) a misrepresentation or failure to disclose certain information; (2) the materiality of the misrepresentation or omission; and (3) scienter. *See, e.g., CFTC v. R.J Fitzgerald & Co.,* 310 F.3d 1321, 1328 (11th Cir. 2002); *CFTC v. Rosenberg,* 85 F. Supp. 2d 424, 446-47 (D.N.J. 2000); *In re Slusser,* CFTC Docket No. 94-14, 1999 CFTC LEXIS 167, at *27 (July 19, 1999). All of those elements are present here.

First, as described above, FXCM made misrepresentations to, and omitted material facts from, FXCM's retail customers. In particular, FXCM misrepresented to retail customers that it was merely acting as an agent or intermediary between retail customers and market makers, and that it did not take positions opposite retail customers. To the contrary, FXCM did benefit from profits and losses sustained by retail customers through its substantial interest in HFT Co - its primary market maker. This was a major conflict of interest that FXCM did not disclose to its clients.

Second, FXCM's misrepresentations and omissions were material to its retail customers. A statement or omitted fact is material if "there is a substantial likelihood that a reasonable investor would consider the information important in making a decision to invest." *R&W Technical Serv. Ltd. v. CFTC,* 205 F.3d 165, 169 (5th Cir. 2000); *see also R.J Fitzgerald,* 310 F.3d at 1328-29. Materiality is an objective determination that "turns on whether a reasonable investor would regard the fact as significantly changing the total data available to him or her." *In re Citadel Trading Co. of Chicago, Ltd.,* [1986-1987 Transfer Binder] Comm. Fut. L. Rep. (CCH) 23,082 at 32,187-88 (CFTC May 23, 1986). Any fact that enables customers to assess independently the risk inherent in their investment and the likelihood of profit is a material fact. *See, e.g., In re Commodities Int'l Corp.,* CFTC Docket No. 83-43, 1997 CFTC LEXIS 8, at *25 (Jan. 14, 1997).

Here, in evaluating which forex trading platform would provide the best prices and execution, a reasonable customer would rely on FXCM's promises that its incentives were aligned with its customers' experience and that it had no conflicts of interest. Retail customers would want to know - given FXCM's claims to be merely an intermediary between customers and the independent market makers trading against customers - that FXCM had a significant interest in HFT Co.

Third, FXCM acted with scienter. Scienter is established by showing either knowledge of falsity or reckless disregard for the truth or falsity of one's statements. *See CFTC v. Noble Wealth Data Info. Servs., Inc.,* 90 F. Supp. 2d 676, 685 (D. Md. 2000). Conduct is reckless if it "departs so far from the standards of ordinary care that it is very difficult to believe the [actor] was not aware of what he was doing." *Drexel Burnham Lambert Inc. v. CFTC,* 850 F.2d 742, 748 (D.C. Cir. 1988) (internal quotation and citation omitted). FXCM

personnel had full knowledge of the representations that the firm was making to its customers about the No Dealing Desk model, as well as the facts about HF Trader and HFT Co's relationship with FXCM. Accordingly, FXCM knowingly or recklessly misrepresented and failed to disclose to retail customers the true nature of its relationship with HFT Co.

Accordingly, FXCM violated Sections 4b(a)(2)(A) and (C) of the Act, 7 U.S.C. §§ 6b(a)(2)(A) and (C), and Regulations 5.2(b)(l) and (3), 17 C.F.R. §§ 5.2(b)(l) and (3).

## B.  FXCM Violated Section 9(a)(4) of the Act

Section 9(a)(4) of the Act, 7 U.S.C. § 13(a)(4), in relevant part, makes it illegal for any person willfully to falsify, conceal, or cover up by any trick, scheme, or artifice a material fact, make any false, fictitious, or fraudulent statements or representations, or make or use any false writing or document knowing the same to contain any false, fictitious, or fraudulent statement or entry to a futures association, such as NFA, acting in furtherance of its official duties under the Act.

Throughout the Relevant Period, FXCM, as described above, made numerous false statements or representations to NFA concerning its relationship with HF Trader and HFT Co. Accordingly, FXCM violated Section 9(a)(4) of the Act.

## C.  FXCM and FXCM Holdings Are Liable for the Acts of FXCM's Agents

Section 2(a)(l)(B) of the Act, 7 U.S.C. § 2(a)(l)(B), and Regulation 1.2, 17 C.F.R. § 1.2, provide that "[t]he act, omission, or failure of any official, agent, or other person acting for any individual, association, partnership, corporation, or trust within the scope of his employment or office shall be deemed the act, omission, or failure of such individual, association, partnership, corporation, or trust." Under Section 2 and Regulation 1.2, a principal is strictly liable for the violations of its officials acting for it within the scope of their employment or office. *Rosenthal & Co. v. CFTC,* 802 F.2d 963, 966 (7th Cir. 1986).

All of the illegal actions described above were committed by employees and officials working for FXCM, and all of their actions and omissions were within the scope of their employment or office when their conduct violated Sections 4b and 9(a)(4) of the Act and Regulation 5.2. FXCM is therefore liable for its agents' violations of those provisions.

Likewise, FXCM Holdings is strictly liable as principal for FXCM's violations of the Act and Regulations, because FXCM Holdings was the parent company of FXCM, their interests and business activities were sufficiently intertwined, and FXCM Holdings directly controlled the operations of FXCM as they related to the violations.

## D.  Niv and Ahdout are Liable as Controlling Persons of FXCM

Section 13(b) of the Act, 7 U.S.C. § 13c(b), provides, in relevant part, that "[a]ny person who, directly or indirectly, controls any person who has violated any provision of this chapter or any of the rules, regulations, or orders issued pursuant to this chapter may be held liable for such violation in any action brought by the Commission to the same extent as such controlled person."

This provision allows the Commission "to reach behind the business entity to the controlling individual and to impose liability for violations of the Act directly on such individual." *CFTC v. Int'l Fin. Servs., Inc.,* 323 F. Supp. 2d 482, 504 (S.D.N.Y. 2004) (quoting *In re Currency Trading Sys.,* Docket No. 00-06, 2001 WL 1356196, at *12 (CFTC Nov. 6, 2001)). The Commission must show "that the defendant exercised general control over the operation of the entity principally liable and possessed the power or ability to control the specific transaction or activity upon which the primary violation was predicated, even if such power was not exercised." *Id.* at 504 (quoting *CFTC v. Baragosh,* 278 F.3d 319, 330 (4th Cir. 2002)). Control is "the possession, direct or indirect, of the power to direct or cause the direction of the management and policies of a

person, whether through the ownership of voting securities, by contract, or otherwise." *In re Spiegel*, [1987-1990 Transfer Binder] Comm. Fut. L. Rep. (CCH) 24,103 n.4 (CFTC Jan. 12, 1988). "Section [13(b)], therefore, is about power and imposing liability for those who fail to exercise it to prevent illegal conduct." *R.J Fitzgerald,* 310 F.3d at 1334.

A controlling person is liable for the controlled person's violations if that controlling person "did not act in good faith or knowingly induced, directly or indirectly, the act or acts constituting the violation." 7 U.S.C. § 13c(b). Proof of recklessness will demonstrate that the controlling person acted in bad faith, although negligence alone is insufficient. *Monieson v. CFTC,* 996 F.2d 852, 860 (7th Cir. 1993) (finding FCM's chairman of the board liable as controlling person because he failed to enforce supervision system with reasonable diligence, including failing to act in response to repeated charges of illegal behavior from different sources). "Knowing inducement" requires a showing that "the controlling person had actual or constructive knowledge of the core activities that constitute the violation at issue and allowed them to continue." *In re Spiegel,* [1987-1990 Transfer Binder], at 34,767.

Niv and Ahdout had both general control over FXCM and specific control over the conduct underlying FXCM's violations. Niv and Ahdout founded FXCM and retain partnership interests in FXCM Holdings, and during the Relevant Period they served, respectively, as CEO and Managing Director of FXCM. Niv and Ahdout directed and controlled FXCM's operations, and they were responsible, directly or indirectly, for violations described herein. Niv was responsible, directly or indirectly, for the false statements made to NFA. Niv and Ahdout are liable as controlling persons for FXCM's violations of Section 4b and Regulation 5.2(b), and Niv is liable as a controlling person for FXCM's violations of Section 9(a)(4).

## V.
## FINDINGS OF VIOLATIONS

Based on the foregoing, the Commission finds that, during the Relevant Period, all Respondents violated Sections 4b(a)(2), 7 U.S.C. § 6b(a)(2), and Regulation 5.2(b), 17 C.F.R. § 5.2(b), and Respondents FXCM, FXCM Holdings, and Niv violated Section 9(a)(4) of the Act, 7 U.S.C. § 13(a)(4).

## VI.
## OFFER OF SETTLEMENT

Respondents, without admitting or denying the findings or conclusions herein, have submitted the Offer in which they:

A.  Acknowledge receipt of service of this Order;

B.  Admit the jurisdiction of the Commission with respect to this Order only and for any action or proceeding brought or authorized by the Commission based on violation of or enforcement of this Order;

C.  Waive:

1.  the filing and service of a complaint and notice of hearing;

2.  a hearing;

3.  all post-hearing procedures;

4.  judicial review by any court;

5.  any and all objections to the participation by any member of the Commission's staff in the Commission's consideration of the Offer;

6.   any and all claims that they may possess under the Equal Access to Justice Act, 5
U.S.C. § 504 and 28 U.S.C. § 2412, and/or the rules promulgated by the Commission in conformity therewith, Part 148 of the Commission's Regulations, 17 C.F.R. §§ 148.1-30, relating to, or arising from, this proceeding;

7.   any and all claims that they may possess under the Small Business Regulatory Enforcement Fairness Act of 1996, Pub. L. No. 104-121, §§ 201-253, 110 Stat.
847, 857-868, as amended by Pub. L. No. 110-28, § 8302, 121 Stat. 112, 204-205,
relating to, or arising from, this proceeding; and

8.   any claims of Double Jeopardy based on the institution of this proceeding or the entry in this proceeding of any order imposing a civil monetary penalty or any other relief;

A   Stipulate that the record basis on which this Order is entered shall consist solely of the findings contained in this Order to which Respondents have consented in the Offer; and

B   Consent, solely on the basis of the Offer, to the Commission's entry of this Order that:

1.   makes findings by the Commission that Respondents violated Section 4b(a)(2), 7 U.S.C. § 6b(a)(2), and Regulation 5.2(b), 17 C.F.R. § 5.2(b), and makes
findings by the Commission that Respondents FXCM, FXCM Holdings, and Niv violated Section 9(a)(4) of the Act, 7 U.S.C. § 13(a)(4);

2.   orders Respondents to cease and desist from violating Sections 4b(a)(2), 7 U.S.C.
§ 6b(a)(2), and Regulation 5.2(b), 17 C.F.R. § 5.2(b), and orders Respondents FXCM, FXCM Holdings, and Niv to cease and desist from violating Section 9(a)(4) of the Act, 7 U.S.C. § 13(a)(4);

3.   orders Respondents, jointly and severally, to pay a civil monetary penalty in the amount of seven million dollars ($7,000,000) within ten (10) days of the date of entry of this Order; and

4.   orders Respondents and their successors and assigns to comply with the conditions and undertakings consented to in the Offer and as set forth in Part VII of this Order.

Upon consideration, the Commission has determined to accept the Offer.

## VII.
## ORDER

**Accordingly, IT IS HEREBY ORDERED THAT:**

A.   Respondents shall cease and desist from violating Section 4b(a)(2), 7 U.S.C. § 6b(a)(2), and Regulation 5.2(b), 17 C.F.R. § 5.2(b), and Respondents FXCM, FXCM Holdings, and Niv shall cease and desist from violating Section 9(a)(4) of the Act, 7 U.S.C. § 13(a)(4);

B.   Respondents shall pay, jointly and severally, a civil monetary penalty of seven million dollars ($7,000,000), within ten (10) days of the date of entry of this Order (the "CMP Obligation"). If the CMP Obligation is not paid in full within ten (10) days of the date of entry of this Order, then post-judgment interest shall accrue on the CMP Obligation beginning on the date of entry of this Order and shall be determined by using the
Treasury Bill rate prevailing on the date of entry of this Order pursuant to 28 U.S.C. § 1961. Respondents

shall pay the CMP Obligation by electronic funds transfer, U.S. postal money order, certified check, bank cashier's check, or bank money order. If payment is to be made other than by electronic funds transfer, then the payment shall be made payable to the Commodity Futures Trading Commission and sent to the address below:

> Commodity Futures Trading Commission
> Division of Enforcement
> ATTN: Accounts Receivables
> DOT/FAA/MMAC/AMZ-341 CFTC/CPSC/SEC
> 6500 S. MacArthur Blvd.
> Oklahoma City, OK 73169
> Telephone: (405) 954-7262 nikki.gibson@faa.gov

If payment is to be made by electronic funds transfer, Respondents shall contact Nikki Gibson or her successor at the above address to receive payment instructions and shall fully comply with those instructions. Respondents shall accompany payment of the CMP Obligation with a cover letter that identifies the paying Respondent and the name and docket number of this proceeding. The paying Respondent shall simultaneously transmit copies of the cover letter and the form of payment to the Chief Financial Officer, Commodity Futures Trading Commission, Three Lafayette Centre, 1155 21st Street, NW, Washington, D.C. 20581.

C.   Respondents and their successors and assigns shall comply with the following conditions and undertakings set forth in the Offer:

1.   FXCM agrees that it shall not accept new customer accounts following the entry of this Order.

2.   FXCM, Niv, and Ahdout agree that they shall, within thirty days of the date of entry of this Order, withdraw from registration with the Commission in all capacities, *provided, however,* that such date shall be extended to be coterminous to any extension by the NFA's Business Conduct Committee of the date upon which they must withdraw their NFA memberships.

3.   FXCM, Niv, and Ahdout agree that, after thirty days from the date of entry of this Order (subject to a coterminous extension granted pursuant to paragraph C.2, above), they shall never, directly or indirectly:

   a.   apply for registration or claim exemption from registration with the Commission in any capacity, or engage in any activity requiring such registration or exemption from registration with the Commission except as provided for in Regulation 4.14(a)(9), 17 C.F.R. § 4.14(a)(9); or

   b.   act as a principal (as that term is defined in Regulation 3.1(a), 17 C.F.R. § 3.1(a)), agent or any other officer or employee of any person (as that term is defined in Section la(38) of the Act, 7 U.S.C. § 1a(38)) registered, required to be registered, or exempted from registration with the Commission except as provided for in Regulation 4.14(a)(9), 17 C.F.R. § 4.14(a)(9).

4.   Respondents agree that neither they nor any of their successors and assigns, agents, or employees under their authority or control shall take any action or make any public statement denying, directly or indirectly, any findings or conclusions in this Order or creating, or tending to create, the impression that this Order is without a factual basis; provided, however, that nothing in this provision shall affect Respondents' (i) testimonial obligations, or (ii) right to take positions in other proceedings to which the Commission is not a party. Respondents and their

successors and assigns shall undertake all steps necessary to ensure that all of their agents and/or employees under their authority or control understand and comply with this agreement.

5.  Partial Satisfaction: Respondents understand and agree that any acceptance by the Commission of partial payment of Respondents' CMP Obligation shall not be deemed a waiver of their obligation to make further payments pursuant to this Order, or a waiver of the Commission's right to seek to compel payment of any remaining balance.

6.  Change of Address/Phone: Until such time as Respondents satisfy in full their CMP Obligation, Respondents shall provide written notice to the Commission by certified mail of any change to their telephone number and mailing address within ten ( 10) calendar days of the change.


**The provisions of this Order shall be effective as of this date.**

By the Commission.


/s/ Christopher J. Kirkpatrick
Christopher J. Kirkpatrick
Secretary of the Commission
Commodity Futures Trading Commission

Dated: February 6, 2017

EX-10.39 4 fxcm-20161231xex1039.htm EXHIBIT 10.39

## AMENDMENT NO. 1 TO THE MANAGEMENT AGREEMENT

## OF

## FXCM GROUP, LLC

This Amendment No. 1 to the FXCM Group LLC Management Agreement (this "Agreement") is entered into as of February 2, 2017 by and among FXCM Group, LLC, a Delaware limited liability company (the "Company"), FXCM Holdings, LLC, a Delaware limited liability company (the "Manager"), and LUK-FX Holdings, LLC ("Leucadia" and, collectively with the "Company" and the "Manager," the "Parties"). For good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the Parties hereby agree as follows:

1.    <u>Purpose</u>. The Parties desire to amend the FXCM Group LLC Management Agreement, dated as of the 1st day of September 2016, by and between the Company and the Manager, as amended and supplemented as of the date hereof (the "Management Agreement") in order to provide Board Members with certain rights of termination.

2.    <u>Defined Terms</u>. Capitalized terms used herein and not otherwise defined shall have the meanings as attributed to such terms in the Management Agreement.

3.    <u>Amendments</u>. The Management Agreement is hereby amended as follows:

In Section 5 entitled "<u>Terms and Termination</u>", Section 5.2 is deleted in its entirety and replaced by the following:

"5.2.    **Termination.** This Agreement may be terminated:

5.2.1   immediately by a vote of at least three (3) Board Members of the Company, upon written notice to the Manager (or after any cure period set forth below) after the occurrence of an event constituting Cause (defined below) or a Change of Control; or

5.2.2   by the Manager effective upon ninety (90) days' prior written notice of termination to the Company in the event of a breach by the Company of Section 4.1, and such default shall continue for a period of thirty (30) days after written notice thereof from the Manager.

5.2.3   The failure to exercise the termination rights in Section 5.2.1 for any act preceding, on, or following the date of this Management Agreement shall not be a waiver of such termination rights and they may be exercised at any time without limitation; for the avoidance of doubt, the termination rights provided in Section 5.2.1 cannot be waived.

5.2.4   "Cause" shall mean: (a) the Manager's engagement in misconduct which is injurious to the Company or any of its Subsidiaries; or (b) if the Manager breaches this Agreement and/or its representations and warranties contained herein; or (c) if the Manager takes any action that constitutes bad faith, gross negligence, fraud or willful misconduct or a breach of its fiduciary duties to the Company and its Members; or (d) Manager's failure to substantially perform the Rights set forth

herein to the Company or its Subsidiaries or otherwise to fulfill its obligations hereunder; or (e) the Manager's commission of an act or acts constituting any (A) fraud against, or misappropriation or embezzlement from the Company or any of its Subsidiaries or any other person or party, (B) crime involving moral turpitude, or (C) offense that could result in a jail sentence of at least 30 days; or (f) Manager's engagement in any competitive activity which would constitute a breach of Manager's obligations to the Company under this Agreement; or (g) the Manager's engagement in conduct or activities that violate any applicable governmental or quasi-governmental regulation involving securities or otherwise relating to the business of the Company or its Affiliates; or (h) the Manager's failure to have informed all Board Members about all regulatory and self-regulatory matters on a monthly basis regardless of materiality; or (i) the Manager's failure to promptly notify all Board Members of any indication by any regulatory or self-regulatory body that is opening an investigation or is considering the possibility of any regulatory action, regardless of materiality; or (j) any regulatory or self-regulatory body opening an investigation or considering the possibility of any regulatory action, regardless of materiality; or (k) Manager voluntarily commences any proceeding or files any relief under Title 11 of the United States Code or any other U.S. Federal or state bankruptcy or insolvency law; or (l) Manager fails to contest the filing of any petition described in 5.2.3(h) above; or makes a general assignment for the benefit of its credits."

4.      All other terms and conditions of the Management Agreement shall remain in full force and effect.

5.      The execution of this Agreement by the Manager shall serve as prior written consent to amend the Management Agreement by FXCM Holdings, LLC in its capacity as a member of the Company pursuant to Section 12.1(a) of the Company's Amended and Restated Limited Liability Company Agreement, as amended and supplemented as of the date hereof.

6.      This Agreement shall be governed by and construed in accordance with the laws of the State of Delaware without regard to the principles of conflicts of laws thereof.

7.      This Agreement (a) shall be binding as to the executors, administrators, estates, heirs and legal successors, or nominees or representatives, of the Parties and (b) may be executed in several counterparts with the same effect as if the parties executing the several counterparts had all executed one counterpart. This Agreement or any counterpart may be executed via facsimile or other electronic (e.g., PDF) transmission, and any such executed facsimile or other electronic copy shall be treated as an original.

*[Remainder of this page has been intentionally left blank. Signature page follows]*

IN WITNESS WHEREOF, the undersigned parties, intending to be legally bound hereby, has duly executed this Amendment No. 1 to the Management Agreement as of the date and year first aforesaid.

FXCM HOLDINGS, LLC

By: FXCM Inc., its sole managing member

By:     /s/ David S. Sassoon
        Name: DAVID S. SASSOON
        Title: GENERAL COUNSEL

LUK-FX HOLDINGS, LLC

By: Leucadia National Corporation, its sole member

By:     /s/ Michael Sharp
        Name: MICHAEL SHARP
        Title: EVP & GC

FXCM GROUP, LLC

By:     /s/ Dror Niv
        Name: DROR NIV
        Title: CEO

EX-10.40 5 fxcm-20161231xex1040.htm EXHIBIT 10.40

**Acknowledgement**

Reference is made to the FXCM Group, LLC (the "Company") Incentive Bonus Plan for Founders and Executives, effective September 1, 2016, as amended (the "Plan"). The Company and each undersigned Participant, as such term is defined in the Plan, agree that notwithstanding anything to the contrary in the Plan (including Sections 7 and 11 therein), LUK-FX Holdings, LLC may terminate the Plan on behalf of the Company at any time and for any reason in its sole and absolute discretion and, upon, and following, such termination, no payment will be due to the undersigned Participants. In addition, Section 8(b) and 8(c) of the Plan shall not apply to any termination of employment of any undersigned Participant with the Company or its affiliates unless the Company determines otherwise (subject to the consent of LUK-FX Holdings, LLC) at the time of the termination of employment of such undersigned Participant.

This acknowledgement shall be governed by and construed in accordance with the laws of the State of Delaware without reference to such state's principles of conflicts of law that would cause the laws of any other jurisdiction to apply.

*[Remainder of this page has been intentionally left blank. Signature page follows]*

IN WITNESS WHEREOF, the undersigned parties, intending to be legally bound hereby, has duly executed this acknowledgment as of this 2nd day of February, 2017.

FXCM GROUP, LLC
/s/ David S. Sassoon
By: DAVID S. SASSOON
Title: GENERAL COUNSEL

LUK-FX HOLDINGS, LLC
BY: Leucadia National Corporation, its sole member
/s/ Michael Sharp
By: MICHAEL SHARP
Title: EVP & GC

Agreed and acknowledged this 2nd day of February, 2017.

/s/ Dror Niv
Name: Dror Niv

/s/ Edward Yusupov
Name: Edward Yusupov

/s/ David Sakhai
Name: David Sakhai

/s/ William Ahdout
Name: William Ahdout

/s/ Ken Grossman
Name: Ken Grossman

[Signature Page to Bonus Plan Acknowledgment]

EX-10.41 6 fxcm-20161231xex1041.htm EXHIBIT 10.41

**EXECUTION COPY**

**ASSET PURCHASE AGREEMENT**

dated as of

February 7, 2017

between

**GAIN CAPITAL GROUP, LLC,**

**and**

**FOREX CAPITAL MARKETS L.L.C.**

## ASSET PURCHASE AGREEMENT

AGREEMENT (this "**Agreement**") dated as of February 7, 2017 by and between Gain Capital Group, LLC, a Delaware limited liability company ("**Buyer**") and Forex Capital Markets L.L.C., a Delaware limited liability company ("**Seller**"). Buyer and Seller are sometimes collectively referred to herein as the "**Parties**".

## W I T N E S S E T H :

WHEREAS, Seller operates an online trading service that offers Customers (as defined herein) foreign exchange trading (the "**Business**");

WHEREAS, in connection with the Business, Seller wishes to sell to Buyer, and Buyer wishes to purchase form Seller, the Purchased Assets (as defined below) upon the terms and subject to the conditions hereinafter set forth.

NOW, THEREFORE, in consideration of the mutual covenants and agreements hereinafter set forth, the Parties hereby agree as follows:

ARTICLE 1
Definitions

Section 1.01 *Definitions.* (a) The following terms, as used herein, have the following meanings:

"**Account Balance**" means, with respect to any Customer of the Business, the aggregate cash account balance for such Customer at the close of trading at the Agreed-Upon Closing Time on the Closing Date, after all trades and positions in such Customer's account have been closed and any profit/loss has been realized and after accounting for any fees and charges or other amounts owed by such Customer to Seller.

"**Affiliate**" means, with respect to any Person, any other Person directly or indirectly controlling, controlled by, or under common control with such other Person. For purposes of this definition, "**control**" when used with respect to any Person means the power to direct the management and policies of such Person, directly or indirectly, whether through the ownership of voting securities, by contract or otherwise, and the terms "**controlling**" and "**controlled**" have correlative meanings.

"**Agreed-Upon Closing Time**" means a time of day not earlier than 3:00 PM and not later than 5:00 PM (Eastern Time) to be mutually agreed upon in good faith by the Parties prior to the Closing.

"**Applicable Law**" means, with respect to any Person, any domestic or foreign federal, state or local law (statutory, common or otherwise), constitution, treaty, convention, ordinance, code, rule, regulation, order, injunction, judgment, decree, ruling or other similar requirement enacted, adopted, promulgated or applied by a Governmental Authority that is binding upon or applicable to such Person, as amended unless expressly specified otherwise.

"**Assumed Liabilities**" has the meaning set forth in Section 2.03.

"**Business**" has the meaning set forth in the recitals.

"**Business Day**" means a day, other than Saturday, Sunday or other day on which commercial banks in New York are authorized or required by Applicable Law to close.

"**CFTC**" means the U.S. Commodity Futures Trading Commission.

"**Closing Date**" means the date of the Closing.

"**Closing Rate**" means, unless otherwise mutually agreed in writing by the Parties, (i) for accounts set to FXCM's dealing desk setting, with respect to any currency, the mid rate published by Bloomberg as of the Agreed-Upon Closing Time on the Closing Date; and (ii) for accounts set to FXCM's no dealing desk setting, with respect to any currency, the 4PM ET mid rate published by Bloomberg on the Closing Date.

"**Confidentiality Agreement**" means that certain Nondisclosure Agreement, dated as of January 13, 2017 between Buyer and Seller.

"**Customer**" means each U.S. domiciled customer of the Business (with the exception of no more than six (6) Eligible Contract Participants that are U.S. domiciled (collectively, the "**ECPs**")) as of the Closing Date.

"**Customer List**" means a list containing the name of each Customer and such other information as reasonably requested by Buyer in "excel" or "csv" format.

"**Damages**" means all damages, losses, liabilities and expenses (including reasonable expenses of investigation and reasonable attorneys' fees and expenses in connection with any action, suit or proceeding whether involving a third-party claim or a claim solely between the Parties hereto and any incidental or indirect losses, liabilities or expenses), excluding any lost profits, consequential damages, diminution in value, losses based on valuation metrics or other multipliers or similar damages (*provided* that the foregoing limitation shall not apply if such damages are payable to third parties), in connection with or arising out of the transactions contemplated by this Agreement, in tort or otherwise.

"**GAAP**" means generally accepted accounting principles in the United States.

"**Governance Documents**" of any Person means the legal document(s) by which such Person (other than an individual) establishes its legal existence or which governs its internal affairs, as well as any agreements governing the rights of holders of equity interests with respect to such equity interests or the governance of the issuer of such equity interests.

"**Governmental Authority**" means any domestic or foreign federal, state or local governmental, regulatory or administrative authority, self-regulatory organization (including the U.S. Commodity Futures Trading Commission and the NFA (as hereinafter defined)), department, court or agency, including any political subdivision thereof.

"**knowledge**" of any Person that is not an individual means the knowledge of such Person's officers after reasonable inquiry.

"**Lien**" means, with respect to any property or asset, any mortgage, deed of trust, lien, pledge, charge, security interest, encumbrance or other adverse claim of any kind in respect of such property or asset. For the purposes of this Agreement, a Person shall be deemed to own subject to a Lien any property or asset which it has acquired or holds subject to the interest of a vendor or lessor under any conditional sale agreement, capital lease or other title retention agreement relating to such property or asset.

"**Measurement Period 1**" means the 76 calendar day period commencing on the first Business Day immediately following the Closing Date and through and including the 76th calendar day following the Closing Date.

"**Measurement Period 2**" means the 77 calendar day period commencing on the 77th calendar day following the Closing Date and through and including the 153rd calendar day following the Closing Date.

"**Notice**" has the meaning set forth in <u>Section 2.01(b)</u>.

"**Open Positions**" means, with respect to any Customer, all open trades of such Customer as of the Agreed-Upon Closing Time.

"**Person**" means an individual, corporation, partnership, limited liability company, association, trust or other entity or organization, including a Governmental Authority.

"**Pre-Closing Tax Period**" means (i) any Tax Period ending on or before the Closing Date and (ii) with respect to a Tax Period that commences before but ends after the Closing Date, the portion of such period up to and including the Closing Date.

"**Proceeding**" means any action, arbitration, audit, hearing, investigation, litigation, or suit (whether civil, criminal, administrative or investigative) commenced, brought, conducted, or heard by or before, or otherwise involving, any Governmental Authority.

"**Purchased Assets**" has the meaning set forth in <u>Section 2.01(a)</u>.

"**Representative**" of any Person means such Person's officers, directors, employees, agents and representatives (including any lender, investment banker, financial advisor, accountant, legal counsel, agent, representative or expert retained by or acting on behalf of such Person, its subsidiaries or its representatives).

"**Tax**" means (i) any tax, governmental fee or other like assessment or charge of any kind whatsoever (including withholding on amounts paid to or by any Person), together with any interest, penalty, addition to tax or additional amount imposed by any Governmental Authority (a "**Taxing Authority**") responsible for the imposition of any such tax, or (ii) liability for the payment of any amounts of the type described in (i) as a result of being a transferee or a party to any agreement or any express or implied obligation to indemnify any other Person.

"**Transferring Customers**" means the Customers whose accounts are to be transferred at Closing from Seller to Buyer or any of its controlled Affiliates, as described in <u>Section 2.01(b)</u>. Buyer agrees to open one account for each account a Transferring Customer maintained with Seller.

(b)   Each of the following terms is defined in the Section set forth opposite such term:

| <u>Term</u> | <u>Section</u> |
| --- | --- |
| Agreement | Preamble |
| Buyer | Preamble |
| Closing | 2.05 |
| Drop Dead Date | 9.11(b) |
| e-mail | 9.01 |
| Excluded Assets | 2.02 |
| Excluded Liabilities | 2.03 |
| Indemnified Party | 8.03 |
| Indemnifying Party | 8.03 |
| NFA | 2.01(b) |
| Parties | Preamble |
| Purchase Price | 2.04 |
| Rule 2-04 | 2.01(b) |
| Sanctions | 3.07(c) |
| Seller | Preamble |
| Seller Agreements | 3.02 |
| Set-Off Amount | 8.05 |
| Third Party Claim | 8.03 |
| Transfer Taxes | 6.01(b) |
| Warranty Breach | 8.02(a)(i) |

Section 1.02. *Other Definitional and Interpretative Provisions.* The words "hereof", "herein" and "hereunder" and words of like import used in this Agreement shall refer to this Agreement as a whole and not to any particular provision of this Agreement. The captions herein are included for convenience of reference only and shall be ignored in the construction or interpretation hereof. References to Articles, Sections, Exhibits and Schedules are to Articles, Sections, Exhibits and Schedules of this Agreement unless otherwise specified. All Exhibits and Schedules annexed hereto or referred to herein are hereby incorporated in and made a part of this Agreement as if set forth in full herein. Any capitalized terms used in any Exhibit or Schedule but not otherwise defined therein, shall have the meaning as defined in this Agreement. Any singular term in this Agreement shall be deemed to include the plural, and any plural term the singular. Whenever the words "include", "includes" or "including" are used in this Agreement, they shall be deemed to be followed by the words "without limitation", whether or not they are in fact followed by those words or words of like import. "Writing", "written" and comparable terms refer to printing, typing and other means of reproducing words (including electronic media) in a visible form. References to any statute shall be deemed to refer to such statute as amended from time to time and to any rules or regulations promulgated thereunder. References to any agreement or contract are to that agreement or contract as amended, modified or supplemented from time to time in accordance with the terms hereof and thereof; *provided* that with respect to any agreement or contract listed on any schedules hereto, all such amendments, modifications or supplements must also be listed in the appropriate schedule. References to any Person include the successors and permitted assigns of that Person. References from or through any date mean, unless otherwise specified, from and

including or through and including, respectively. References to "law", "laws" or to a particular statute or law shall be deemed also to include any and all Applicable Law.

ARTICLE 2
Purchase and Sale

Section 2.01. *Purchase and Sale.*

(a)     Upon the terms and subject to the conditions of this Agreement, Seller does hereby irrevocably sell, convey, transfer, assign and deliver to Buyer all of the right, title and interest of Seller in, to and under (i) the Account Balances for all Transferring Customers and (ii) the Customer List (collectively, the "**Purchased Assets**") at the Closing, in each case free and clear of all Liens, and Buyer does hereby accept all the right, title and interest of Seller in, to and under all of the Purchased Assets, free and clear of all Liens.

(b)     As promptly as practicable, but in no event later than one (1) Business Day after the execution of this Agreement, Buyer and Seller shall notify the National Futures Association (the "**NFA**") regarding a bulk assignment of the Transferring Customer Account Balances. Following such notification, Seller shall promptly provide to Buyer for review and comment a draft of a proposed notice to the Customers describing the proposed bulk assignment of the Customers' accounts to Buyer (the "**Notice**"). Seller agrees to make reasonable changes to the Notice pursuant to Buyer's request. The bulk assignment shall be pursuant to and in accordance with Seller's existing agreements with the Customers and Applicable Law, including NFA Compliance Rule 2-40: Procedures for the Bulk Assignment or Liquidation of Forex Positions; Cessation of Customer Business, as may be adjusted by agreement with the NFA ("**Rule 2-40**"), and any other requirements imposed by the NFA in order to complete the bulk assignment. The Notice shall specify the Agreed-Upon Closing Time as the assignment date and time, and shall detail the bulk assignment process, in each case in compliance with Rule 2-40. The Parties agree that the Notice shall be delivered to Customers promptly following the NFA's final approval of the Notice.

(c)     Promptly after the date of this Agreement, Seller shall provide to Buyer, in the form of a "excel" or "csv" spreadsheet or such other format as may be reasonably agreed to by Seller and Buyer and delivered by means of FTP or such other secure method or medium as may be reasonably agreed to by Seller and Buyer, the Customer List.

Section 2.02. *Excluded Assets.* Buyer expressly understands and agrees that all of Seller's assets other than the Purchased Assets shall be excluded from the transactions contemplated hereby (such excluded assets, the "**Excluded Assets**").

Section 2.03. *Assumption of Liabilities.* Effective as of the Closing, Buyer hereby assumes all liabilities and obligations of Seller associated with, arising out of or in respect of, the Account Balances and Open Positions of the Transferring Customers or any other Purchased Assets, in each case following the Closing ("**Assumed Liabilities**"). Except as set forth in the immediately preceding sentence, Buyer is not assuming any liability or obligation of Seller (or any predecessor of Seller, any prior owner of all or part of its businesses and assets or any other Affiliate of Seller) of whatever nature, whether presently in existence or arising hereafter ("**Excluded Liabilities**"), all of which shall be retained by and remain obligations and liabilities of Seller. For the avoidance of doubt, Excluded Liabilities include:

(a) any liability or obligation of Seller, or any member of any consolidated, affiliated, combined or unitary group of which Seller is or has been a member, for Taxes;

(b) any liability or obligation in respect of any pending or threatened claim or cause of action arising out of, relating to or otherwise in respect of the operation of the Business or the Purchased Assets to the extent such claim or cause of action relates to such operation on or prior to the Closing Date, including, without limitation, any enforcement or similar action brought by any Governmental Authority; and

(c) any liability or obligation relating to an Excluded Asset.

Section 2.04. *Purchase Price*. In consideration of the sale of the Purchased Assets, Buyer shall pay Seller the amounts set forth in Schedule 2.04. Any payments made pursuant to Schedule 2.04 are referred to herein as the "**Purchase Price**".

Section 2.05. *Closing*. The closing (the "**Closing**") of the purchase and sale of the Purchased Assets hereunder shall take place at the offices of Buyer on such date and time as Buyer and Seller may agree following the satisfaction or waiver of each condition set forth in Article 7 hereof. At the Closing:

(a) Seller shall close all of its Transferring Customer Open Positions at the Closing Rate and shall transfer all of the Transferring Customer Account Balances to Buyer in accordance with Section 2.05(b)(i) and Section 2.06. Buyer shall reopen each Transferring Customer Open Position at the Closing Rate used by Seller to close the Transferring Customer Open Positions on the Closing Date.

(b) Seller shall deliver or cause to be delivered to Buyer the following:

(i) at least ninety percent (90%) of the aggregate Transferring Customer Account Balances via a wire transfer for each native currency;

(ii) a final accounting spreadsheet (back office equity run and internal reconciliations) detailing, individually and in the aggregate, Transferring Customers' Account Balances by currency as of and through the Closing Date;

(iii) intentionally omitted;

(iv) copies (which may be in an electronic format) of each Transferring Customer's account documentation, including customer application(s) and agreement(s) in effect and any documentation collected from the Transferring Customer during the account opening stage;

(v) an officer's certificate of Seller certifying as to the incumbencies of each person executing this Agreement on behalf of Seller and the satisfaction of the conditions set forth in Section 7.02; and

(vi) such other documents, instruments or certificates as reasonably requested by Buyer.

(c)   Buyer shall deliver or cause to be delivered to Seller the following:

(i)   an officer's certificate of Buyer certifying as to the incumbencies of each person executing this Agreement on behalf of Buyer and the satisfaction of the conditions set forth in Section 7.03; and

(ii)   such other documents, instruments or certificates as reasonably requested by Seller.

All of the foregoing transactions shall be deemed to occur simultaneously and the Closing shall not be deemed to occur unless all of such transactions occur.

Section 2.06. *Post-Closing Deliveries by Seller*. No later than the first Business Day following the Closing Date, Seller shall deliver or cause to be delivered to Purchaser the remaining amount of the aggregate Transferring Customer Account Balances via a wire transfer for each native currency.

ARTICLE 3
Representations and Warranties of Seller

Except as set forth in the Seller Disclosure Schedule, Seller represents and warrants to Buyer as of the date hereof and as of the Closing Date:

Section 3.01. *Corporate Existence and Power*. Seller is a limited liability company duly organized, validly existing and in good standing under the laws of the State of Delaware and has all limited liability company powers required to carry on its business as now conducted.

Section 3.02. *Authorization*. Seller has the legal authority to enter into this Agreement and each other document, instrument or certificate contemplated herein (the "**Seller Agreements**"). Assuming the due authorization, execution and delivery by the other Parties hereto, the Seller Agreements constitute the valid and binding agreements of Seller, enforceable against Seller in accordance with their terms, (subject to applicable bankruptcy, insolvency, fraudulent transfer, reorganization, moratorium and other Applicable Laws affecting creditors' rights generally and general principles of equity).

Section 3.03. *Third Party Approvals*. The execution, delivery and performance by Seller of the Seller Agreement and the transactions contemplated hereby and thereby do not and will not require Seller to obtain any consents, waivers, authorizations or approvals or make any filings with any Person that have not been timely obtained by Seller, except for any notice to Customers required in order to complete the transaction contemplated by this Agreement and for notices required to be made to the NFA and CFTC.

Section 3.04. *Noncontravention*. The execution, delivery and performance by Seller of the Seller Agreements and the consummation of the transactions contemplated hereby and thereby do not and will not (a) violate the Governance Documents of Seller, (b) assuming compliance with the matters referred to in Section 3.03, violate any Applicable Law, (c) constitute a default or an event that, with or without notice or lapse of time or both, would constitute a default under or give rise to any right of termination, cancellation or acceleration of any right or obligation of Buyer or to a loss of any benefit relating to the Purchased Assets to which Seller is entitled under any provision of any agreement or other instrument

binding upon Seller or by which any of the Purchased Assets is or may be bound or (d) result in the creation or imposition of any Lien on any Purchased Asset.

Section 3.05. *Title to the Purchased Assets.* Seller is the sole and exclusive owner of the Purchased Assets, and upon consummation of the transactions contemplated hereby, Buyer will have acquired sole and exclusive ownership of, and good title in, to and under, each of the Purchased Assets, free and clear of all Liens.

Section 3.06. *Disclosure of Information.* Seller has not provided the specific individual customer information contained in the Customer List to any other Person other than (a) Seller's employees or Representatives, (b) any third-party, including any service provider, with which Seller works or has worked to execute transactions for the Customers or (c) as required by Applicable Law or as requested by a Governmental Authority having appropriate jurisdiction.

Section 3.07. *Compliance with Applicable Laws.* With respect to or involving the Purchased Assets:

(a)    Neither Seller nor any of its Affiliates is in violation of, and has not since December 31, 2011 violated, and to the knowledge of Seller is not under investigation with respect to and has not been threatened to be charged with or given notice of any violation of, any Applicable Law.

(b)    Neither Seller nor any of its Affiliates, nor any their respective Representatives, has taken any action in furtherance of an offer, payment, promise to pay, or authorization or approval of the payment or giving of money, property, gifts or anything else of value to (i) any "government official" (including any officer or employee of a government or government-owned or controlled entity or of a public international organization, or any person acting in an official capacity for or on behalf of any of the foregoing, or any political party or party official or candidate for political office) in order to influence official action, (ii) any person (whether or not a government official) to influence that person to act in breach of a duty of good faith, impartiality or trust ("acting improperly"), to reward the person for acting improperly, or in circumstances where the recipient would be acting improperly by receiving the thing of value; or (iii) any person while knowing or having reason to know that all or any portion of the money or other thing of value will be offered, promised or given to a government official in order to influence or reward official action or to any person to influence such person to act improperly or reward the person for doing so. Seller and its Affiliates have conducted their businesses in compliance with all applicable anti-corruption laws, including the Foreign Corrupt Practices Act (15 U.S.C. §§ 78m(b), 78dd-1, 78dd-2, 78ff),and have instituted and maintain and will continue to maintain policies and procedures designed to promote and achieve compliance with such laws and with the representation and warranty contained herein.

(c)    Neither Seller nor any of its Affiliates, nor any of their respective Representatives, is an individual or entity that is, or is owned or controlled by a Person that is: (i) the subject of any sanctions administered by the U.S. Department of Treasury's Office of Foreign Assets Control (OFAC), the United Nations Security Council or the European Union (collectively, "**Sanctions**"), or (ii) located, organized or resident in a country or territory that is the subject of Sanctions (including Cuba, Iran, North Korea, Sudan and Syria).

(d)    For the past five (5) years, neither Seller nor any of its Affiliates has engaged in, or is now engaged in, directly or, to the knowledge of the Company, indirectly, any dealings or transactions with any

Person, or in any country or territory, that, at the time of the dealing or transaction, is or was the subject of Sanctions with which such company is required to comply.

(e)   Seller and its Affiliates are, and for the past five (5) years have been, in compliance with, and, to Seller's knowledge, have not been penalized for or under investigation with respect to and have not been threatened to be charged with or given notice of any violation of, any applicable Sanctions or export controls laws.

Section 3.08 *Customer In-Take.* Each Transferring Customer account has been opened and maintained by Seller in compliance with all Applicable Laws and regulatory requirements of each Governmental Authority having appropriate jurisdiction.

Section 3.09. *Litigation.* Except for the announced settlements with the NFA and CFTC found here http://ir.fxcm.com/releasedetail.cfm?ReleaseID=1010639, there is no Proceeding pending against, or to the knowledge of Seller, threatened against or affecting, Seller before (or, in the case of threatened Proceedings, would be before) any Governmental Authority or arbitrator that would reasonably be expected to be material to Seller or the Purchased Assets or that in any manner challenges or seeks to prevent, enjoin, alter or materially delay the transactions contemplated by this Agreement.

Section 3.10. *Tax Matters.*

(a)   Seller has timely paid all Taxes due and payable, the non-payment of which would result in a Lien on any Purchased Asset or would result in Buyer becoming liable or responsible therefor.

(b)   Seller has established, in accordance with GAAP applied on a basis consistent with that of preceding periods, adequate reserves for the payment of all Taxes which arise from or with respect to the Purchased Assets, the non-payment of which would result in a Lien on any Purchased Asset or would result in Buyer becoming liable therefor.

Section 3.11. *Finders' Fees.* Other than Jefferies LLC, there is no investment banker, broker, finder or other intermediary that has been retained by or is authorized to act on behalf of Seller who might be entitled to any fee or commission in connection with the transactions contemplated by this Agreement.

Section 3.12. *ECPs.* The number of ECPs excluded from the definition of Customers under this Agreement shall not exceed six (6) and the aggregate assets held in the accounts of such ECPs does not exceed $1.5 million as of the date of this Agreement.


ARTICLE 4
Representations and Warranties of Buyer

Except as disclosed in the Buyer Disclosure Schedule, Buyer represents and warrants to Seller as of the date hereof and the Closing Date that:

Section 4.01. *Corporate Existence and Power.* Buyer is a limited liability company organized, validly existing and in good standing under the laws of the State of Delaware and has all necessary power and authority required to carry on its business as now conducted.

Section 4.02. *Corporate Authorization*. Buyer has the legal authority to enter into this Agreement. Assuming the due authorization, execution and delivery by the other Parties hereto, this Agreement constitutes the valid and binding agreements of Buyer, enforceable against Buyer in accordance with its terms, (subject to applicable bankruptcy, insolvency, fraudulent transfer, reorganization, moratorium and other Applicable Laws affecting creditors' rights generally and general principles of equity).

Section 4.03. *Third Party Approvals*. The execution, delivery and performance by Buyer of this Agreement and the transactions contemplated hereby do not and will not require Buyer to obtain any consents, waivers, authorizations or approvals or make any filings with any Person that have not been timely obtained by Buyer, except for any notice to Customers required in order to complete the transaction contemplated by this Agreement and for notices required to be made to the NFA and CFTC.

Section 4.04. *Noncontravention*. The execution, delivery and performance by Buyer of this Agreement and the consummation of the transactions contemplated hereby do not and will not (a) violate the Governance Documents of Buyer, (b) assuming compliance with the matters referred to in underline Section 4.03, violate any Applicable Law, (c) require any consent or other action by any Person under, constitute a default or an event that, with or without notice or lapse of time or both, would constitute a default under, or give rise to any right of termination, cancellation or acceleration of any right or obligation of Buyer or any of its subsidiaries or to a loss of any benefit to which Buyer or any of its subsidiaries is entitled under, any provision of any agreement or other instrument binding upon Buyer or any of its subsidiaries, except for such violations, conflicts, defaults, terminations or accelerations that would not, individually or in the aggregate have a material adverse effect on Buyer and its subsidiaries taken as a whole or (d) result in the creation or imposition of any Lien on the assets of Buyer.

Section 4.05. *Regulatory and Compliance Policies and Procedures*. Buyer's applicable regulatory and compliance policies and procedures are reasonable and customary for a retail foreign exchange trading business conducted in the jurisdictions where the Business has been conducted by Seller.

Section 4.06    *Finders' Fees*. There is no investment banker, broker, finder or other intermediary that has been retained by or is authorized to act on behalf of Buyer who might be entitled to any fee or commission in connection with the transactions contemplated by this Agreement.

ARTICLE 5
Covenants

Section 5.01. *Confidentiality*.

(a)    After the Closing, Seller and its Affiliates will hold, and will use commercially reasonable efforts to cause their respective Representatives to hold, in confidence, unless compelled to disclose by Applicable Law, all information, data, and trade secrets, and materials, documents and other tangible embodiments of the foregoing (in any form or medium) relating to or concerning the Purchased Assets, including all such information relating to or concerning the Transferring Customers, except to the extent that such information can be shown to have been (1) in the public domain through no fault of Seller or its Affiliates or (2) later lawfully acquired by Seller from sources other than those related to its prior ownership of the Purchased Assets.

(b)    On and after the Closing Date, Seller will afford promptly to Buyer and its agents reasonable access to its books and records, employees and auditors to the extent necessary or useful for

Buyer in connection with any audit, investigation, dispute or litigation or any other reasonable business purpose relating to the Purchased Assets; *provided* that any such access shall not unreasonably interfere with the conduct of the business of Seller. Any and all information obtained during such access shall be maintained in confidence by Buyer, its Affiliates and their respective agents. Such obligation of Buyer, its Affiliates and their respective agents to hold any such information in confidence shall be satisfied if they exercise the same care with respect to such information as they would take to preserve the confidentiality of their own similar information.

Section 5.02. *Reasonable Best Efforts; Further Assurances.* Subject to the terms and conditions of this Agreement, the Parties will use their reasonable best efforts to take, or cause to be taken, all actions and to do, or cause to be done, all things reasonably necessary or reasonably desirable under Applicable Laws to consummate the transactions contemplated by this Agreement, including (a) preparing and filing as promptly as practicable with any Governmental Authority or other third party all documentation to effect all reasonably necessary filings, notices, petitions, statements, registrations, submissions of information, applications and other documents and (b) obtaining and maintaining all approvals, consents, registrations, permits, authorizations and other confirmations required to be obtained from any Governmental Authority or other third party that are reasonably necessary, proper or advisable to consummate the transactions contemplated by this Agreement. The Parties agree to execute and deliver such other documents, certificates, agreements and other writings and to take such other actions as may be reasonably necessary or reasonably desirable in order to consummate or implement expeditiously the transactions contemplated by this Agreement and to vest in Buyer good title to the Purchased Assets.

Section 5.03. *Certain Filings.* The Parties shall cooperate in good faith and in a commercially reasonable manner with one another (a) in determining whether any action by or in respect of, or filing with, any Governmental Authority is required, or any actions, consents, approvals or waivers are required to be obtained from parties to any material contracts, in connection with the consummation of the transactions contemplated by this Agreement and (b) in taking such actions or making any such filings, furnishing information required in connection therewith and seeking timely to obtain any such actions, consents, approvals or waivers.

Section 5.04. *Public Announcements.* Each Party agrees not to issue any press release or make any public statement with respect to this Agreement or the transactions contemplated hereby without the prior written consent of each other Party hereto, except for any press releases and public statements the making of which may be required by Applicable Law or any listing agreement with any national securities exchange, in which case the disclosing Party shall give the other Party a reasonable opportunity to review such press release or statement to the extent permissible and practicable.

Section 5.05.   *Conduct of Business.* During the period from the date hereof and continuing until the earlier of the termination of this Agreement or the Closing Date, Seller agrees to use commercially reasonable efforts to maintain the corporate existence of Seller and carry on the Business as it relates to the Purchased Assets in the ordinary course consistent with past practice and in accordance with all applicable rules and regulations of all applicable regulatory or self-regulatory authorities. Seller further agrees that, except as contemplated by this Agreement, during the period between the date hereof and the Closing Date, Seller shall use commercially reasonable efforts to preserve intact its business relationships with the Customers consistent with past practice.

Section 5.06. *Use of Customer Information.* Seller agrees that, from and after the Closing Date, it will not use and will not permit its Representatives to use the information included in the Customer List or any other individual Customer information obtained in connection with the Business other than as

required by Applicable Law or as requested by a Governmental Authority having appropriate jurisdiction or for purposes of winding down the Business, and it will not transfer such information to any Person or contact or communicate with any Customer on the Customer List without Buyer's prior written consent.

Section 5.07.   *Preliminary Customer Accounting Run.* Seller agrees to use commercially reasonable efforts to provide, or cause to be provided, no later than one (1) Business Day prior to the Closing Date, to Buyer a preliminary accounting spreadsheet detailing, individually and in the aggregate, Transferring Customers' Account Balances by currency as of and through the close of business on such date.

Section 5.08.   *Expenses.* Except as otherwise provided in this Agreement, whether or not the transactions contemplated hereby are consummated, all costs and expenses incurred in connection with this Agreement and the transactions contemplated hereby shall be paid by the Party incurring such expense.

Section 5.09.   *Guarantee.* FXCM, Inc., the ultimate parent company of Seller, hereby guarantees the due and prompt payment and performance of all covenants, agreements, obligations and liabilities of Seller under this Agreement and each other Seller Agreement, including, without limitation, the indemnification obligations set forth in Section 8.02.

ARTICLE 6
Tax Matters

Section 6.01. *Post-Closing Tax Matters.*

(a)   Each of Buyer and Seller shall, and shall cause their Affiliates to, provide the other Party hereto with such cooperation, assistance and information as it may reasonably request in respect of statutory, governmental, federal, state, county, provincial, local, municipal or foreign taxes relating to the Purchased Assets and the preparation of any tax returns, including any information or similar returns required by Applicable Law to be provided to or filed with a Customer or a Governmental Entity.

(b)   All excise, sales, use, value added, registration stamp, recording, documentary, conveyancing, franchise, transfer and similar Taxes incurred in connection with the transactions contemplated by this Agreement (collectively, "**Transfer Taxes**") shall be borne by Seller. The Parties agree to timely sign and deliver such certificates or forms as may be necessary or appropriate to establish an exemption from (or otherwise reduce) or file any tax returns with respect to Transfer Taxes. Buyer and Seller shall cooperate in providing each other with any appropriate resale exemption certifications and other similar documentation.

ARTICLE 7
Conditions to Obligations of the Parties

Section 7.01.   *Conditions Precedent to Obligations of the Parties.* The respective obligations of Buyer, on the one hand, and Seller, on the other hand, to consummate the transactions contemplated by this Agreement shall be subject to the satisfaction (or waiver by the Parties) at or prior to the Closing Date of the following conditions:

(a)   No preliminary or permanent injunction or other similar order issued by, and no Proceeding by or before any Governmental Authority nor any Applicable Law promulgated or enacted by any Governmental Authority shall be in effect or pending which materially delays, restrains, enjoins or otherwise prohibits the transactions contemplated hereby.

(b)   Each Party shall have obtained all consents and approvals required by any Governmental Authority for the performance of their respective obligations under this Agreement and for the consummation of the transactions contemplated hereby.

Section 7.02.   *Conditions Precedent to the Obligations of Buyer.* The obligation of Buyer to consummate the transactions contemplated by this Agreement is subject to the satisfaction (or waiver by Buyer) at or prior to the Closing Date of each of the following additional conditions:

(a)   The representations and warranties of Seller contained herein, without giving effect to any materiality qualifications therein, shall be true and correct in all material respects on and as of the Closing Date as though made on and as of the Closing Date (or in the case of representations and warranties made as of a specified date, true and complete in all material respects as of such date), and Seller shall deliver to Buyer a certificate of an authorized officer to the foregoing effect.

(b)   Seller shall have performed all obligations and agreements contained in this Agreement required to be performed by it on or before the Closing Date.

(c)   At the Closing, and contemporaneously with all other actions provided for herein, Seller shall have executed and delivered the documents referenced in Section 2.05(b).

Section 7.03.   *Conditions Precedent to the Obligations of Seller.* The obligation of Seller to consummate the transactions contemplated by this Agreement is subject to the satisfaction (or waiver by Seller) at or prior to the Closing Date of each of the following additional conditions:

(a)   The representations and warranties of Buyer contained herein, without giving effect to any materiality qualifications therein, shall be true and correct in all material respects on and as of the Closing Date as though made on and as of the Closing Date (or in the case of representations and warranties made as of a specified date, true and correct in all material respects as of such date), and Buyer shall deliver to Seller a certificate of an authorized officer to the foregoing effect.

(b)   Buyer shall have performed all obligations and agreements contained in this Agreement required to be performed by it on or before the Closing Date.

(c)   At the Closing, and contemporaneously with all other actions provided for herein, Buyer shall have executed and delivered the documents referenced in Section 2.05(c).

ARTICLE 8
Survival; Indemnification

Section 8.01.   *Survival.* The representations and warranties of the Parties hereto contained in this Agreement or in any certificate or other writing delivered pursuant hereto or in connection herewith shall survive the Closing until the 24-month anniversary of the Closing Date, except for the representations and warranties contained in Sections 3.01, 3.02, 3.05, 3.11, 4.01, 4.02 and 4.06, each of which shall survive

Closing indefinitely. The covenants and agreements of the Parties hereto contained in this Agreement or in any certificate or other writing delivered pursuant hereto or in connection herewith shall survive the Closing indefinitely or for the shorter period explicitly specified therein, except that for such covenants and agreements that survive for such shorter period, breaches thereof shall survive indefinitely or until the latest date permitted by law. Notwithstanding the preceding sentences, any breach of covenant, agreement, representation or warranty in respect of which indemnity may be sought under this Agreement shall survive the time at which it would otherwise terminate pursuant to the preceding sentence, if notice of the inaccuracy thereof giving rise to such right of indemnity shall have been given to the Party against whom such indemnity may be sought prior to such time.

Section 8.02.    *Indemnification.*

(a)    Effective at and after the Closing, Seller hereby indemnifies Buyer, its Representatives and Affiliates and their respective successors and assignees against and agree to hold each of them harmless from any and all Damages incurred or suffered by Buyer, any of its Representatives or Affiliates or any of their respective successors and assignees arising out of:

(i)    any misrepresentation or breach of warranty (each such misrepresentation and breach of warranty a "**Warranty Breach**") or breach of covenant or agreement made or to be performed by Seller pursuant to this Agreement; or

(ii)    any Excluded Liability;

regardless of whether such Damages arise as a result of the negligence, strict liability or any other liability under any theory of law or equity of, or violation of any law by, Buyer, any of its Affiliates or any of their respective successors and assignees.

(b)    Effective at and after the Closing, Buyer hereby indemnifies Seller, its Representatives and Affiliates and their respective successors and assignees against and agrees to hold each of them harmless from any and all Damages incurred or suffered by Seller, any of its Representatives or Affiliates or any of their respective successors and assignees arising out of:

(i)    any Warranty Breach or breach of covenant or agreement made or to be performed by Buyer pursuant to this Agreement regardless of whether such Damages arise as a result of the negligence, strict liability or any other liability under any theory of law or equity of, or violation of any law by, Seller, any of its Affiliates or any of their respective successors and assignees; or

(ii)    any Assumed Liability or any liability or obligation arising out of or in respect of any account opened by Buyer for any Transferred Customer, in each case following the Closing.

Section 8.03.    *Third Party Claim Procedures.*

(a)    The Party seeking indemnification under Section 8.02 (the "**Indemnified Party**") agrees to give prompt notice in writing to the Party against whom indemnity is to be sought (the "**Indemnifying Party**") of the assertion of any claim or the commencement of any suit, action or proceeding by any third party ("**Third Party Claim**") in respect of which indemnity may be sought under such Section. Such notice shall set forth in reasonable detail such Third Party Claim and the basis for indemnification (taking into account the information then available to the Indemnified Party). The failure to so notify the Indemnifying Party shall not relieve the

Indemnifying Party of its obligations hereunder, except to the extent such failure shall have actually prejudiced the Indemnifying Party.

(b)   The Indemnifying Party shall be entitled to participate in the defense of any Third Party Claim and, subject to the limitations set forth in this Section 8.03, shall be entitled to control and appoint lead counsel for such defense, in each case at its own expense; *provided* that prior to assuming control of such defense, the Indemnifying Party must (i) acknowledge that it would have an indemnity obligation for the Damages resulting from such Third Party Claim as provided under this Article 8 and (ii) furnish the Indemnified Party with evidence that the Indemnifying Party has adequate resources to defend the Third Party Claim and fulfill its indemnity obligations hereunder.

(c)   The Indemnifying Party shall not be entitled to assume or maintain control of the defense of any Third Party Claim and shall pay the fees and expenses of counsel retained by the Indemnified Party if (i) the Indemnifying Party does not deliver the acknowledgment referred to in Section 8.03(b) (i) within 30 days of receipt of written notice of the Third Party Claim pursuant to Section 8.03(b), (ii) the Third Party Claim relates to or arises in connection with any criminal proceeding, action, indictment, allegation or investigation, (iii) the Third Party Claim seeks an injunction or equitable relief against the Indemnified Party or any of its Affiliates or (iv) the Indemnified Party reasonably believes an adverse determination with respect to the Third Party Claim would be detrimental to the reputation or future business prospects of the Indemnified Party or any of its Affiliates.

(d)   If the Indemnifying Party shall assume the control of the defense of any Third Party Claim in accordance with the provisions of this Section 8.03, the Indemnifying Party shall obtain the prior written consent of the Indemnified Party (which shall not be unreasonably withheld) before entering into any settlement of such Third Party Claim, if the settlement does not expressly unconditionally release the Indemnified Party and its affiliates from all liabilities and obligations with respect to such Third Party Claim or the settlement imposes injunctive or other equitable relief against the Indemnified Party or any of its affiliates.

(e)   In circumstances where the Indemnifying Party is controlling the defense of a Third Party Claim in accordance with paragraphs (b) and (c) above, the Indemnified Party shall be entitled to participate in the defense of any Third Party Claim and to employ separate counsel of its choice for such purpose, in which case the fees and expenses of such separate counsel shall be borne by the Indemnified Party; *provided* that in such event the Indemnifying Party shall pay the fees and expenses of such separate counsel incurred by the Indemnified Party prior to the date the Indemnifying Party assumes control of the defense of the Third Party Claim.

(f)   Each Party shall cooperate, and cause their respective affiliates to cooperate, in the defense or prosecution of any Third Party Claim and shall furnish or cause to be furnished such records, information and testimony, and attend such conferences, discovery proceedings, hearings, trials or appeals, as may be reasonably requested in connection therewith.

Section 8.04. *Direct Claim Procedures.* In the event an Indemnified Party has a claim for indemnity under Section 8.02 against an Indemnifying Party that does not involve a Third Party Claim, the Indemnified Party agrees to give prompt notice in writing of such claim to the Indemnifying Party. Such notice shall set forth in reasonable detail such claim and the basis for indemnification (taking into account the information then available to the Indemnified Party). The failure to so notify the Indemnifying Party shall not relieve the Indemnifying Party of its

obligations hereunder, except to the extent such failure shall have actually prejudiced the Indemnifying Party. If the Indemnifying Party has timely disputed its indemnity obligation for any Damages with respect to such claim, the Parties shall proceed in good faith to negotiate a resolution of such dispute and, if not resolved through negotiations, such dispute shall be resolved by litigation in an appropriate court of jurisdiction determined pursuant to Section 9.05.

Section 8.05.   *Set-off*. If at any time one or more indemnification claims have been finally adjudicated by a court of competent jurisdiction against Seller pursuant to this Article 8, any payment of Purchase Price that has become due but has not yet been paid by Buyer shall be reduced by the amount of Damages claimed in the indemnification notice(s) delivered by Buyer with respect to such indemnification claims (the "**Set-Off Amount**").

ARTICLE 9
Miscellaneous

Section 9.01.   *Notices*. All notices, requests and other communications to any Party hereunder shall be in writing (including facsimile transmission and electronic mail ("**e-mail**") transmission, so long as a receipt of such e-mail is requested and received) and shall be given,
if to Buyer, to:

c/o Gain Capital Holdings Inc.

135 US Highway 202/206
Suite 11
Bedminster, NJ 07921
Attention: Diego Rotsztain, General Counsel
Facsimile No.: (866) 861-1673
drotsztain@gaincapital.com

if to Seller, to:

Forex Capital Markets L.L.C.
c/o FXCM, Inc.
55 Water Street, FL 50
New York, NY 10041
Attention: David Sassoon, General Counsel
Facsimile No.: 646-432-2997
dsassoon@fxcm.com

or such other address or facsimile number as such Party may hereafter specify for the purpose by notice to the other Parties hereto. All such notices, requests and other communications shall be deemed received on the date of receipt by the recipient thereof if received prior to 5:00 p.m. in the place of receipt and such day is a Business Day in the place of receipt. Otherwise, any such notice, request or communication shall be deemed not to have been received until the next succeeding Business Day in the place of receipt.

Section 9.02.   *Amendments and Waivers*.

(a)    Any provision of this Agreement may be amended or waived if, but only if, such amendment or waiver is in writing, makes specific references to the provision to be amended or waived, and is signed, in the case of an amendment, by each Party to this Agreement, or in the case of a waiver, by the Party against whom the waiver is to be effective.

(b)    No failure or delay by any Party in exercising any right, power or privilege hereunder shall operate as a waiver thereof nor shall any single or partial exercise thereof preclude any other or further exercise thereof or the exercise of any other right, power or privilege. The rights and remedies herein provided shall be cumulative and not exclusive of any rights or remedies provided by law.

Section 9.03.    *Successors and Assigns*. The provisions of this Agreement shall be binding upon and inure to the benefit of the Parties hereto and their respective successors and assigns; *provided* that no Party may assign, delegate or otherwise transfer any of its rights or obligations under this Agreement without the written consent of each other Party hereto; except that any Party may transfer or assign its rights and obligations under this Agreement, in whole or from time to time in part, to (i) one or more of its Affiliates or (ii) to any Person who acquires all or substantially all of the capital stock or assets of a Party and agrees in writing to be bound by the provisions of this Agreement; *provided*, *that*, for the avoidance of doubt, Seller shall not have a consent right over any change of control, sale of or any other corporate transaction involving Buyer or its Affiliates.

Section 9.04.    *Governing Law.* This Agreement shall be governed by and construed in accordance with the law of the State of New York, without regard to the conflicts of law rules of such jurisdiction.

Section 9.05.    *Jurisdiction.* The Parties hereto agree that any suit, action or proceeding seeking to enforce any provision of, or based on any matter arising out of or in connection with, this Agreement or the transactions contemplated hereby shall only be brought in the United States District Court for the Southern District of New York or any New York State court sitting in the Borough of Manhattan, New York City, so long as one of such courts shall have subject matter jurisdiction over such suit, action or proceeding, and each of the Parties hereby irrevocably consents to the jurisdiction of such courts (and of the appropriate appellate courts therefrom) in any such suit, action or proceeding and irrevocably waives, to the fullest extent permitted by law, any objection that it may now or hereafter have to the laying of the venue of any such suit, action or proceeding in any such court or that any such suit, action or proceeding brought in any such court has been brought in an inconvenient forum. Process in any such suit, action or proceeding may be served on any Party anywhere in the world, whether within or without the jurisdiction of any such court. Without limiting the foregoing, each Party agrees that service of process on such Party as provided in Section 9.01 shall be deemed effective service of process on such Party.

Section 9.06. *WAIVER OF JURY TRIAL.*  EACH OF THE PARTIES HERETO HEREBY IRREVOCABLY WAIVES ANY AND ALL RIGHT TO TRIAL BY JURY IN ANY LEGAL PROCEEDING ARISING OUT OF OR RELATED TO THIS AGREEMENT OR THE TRANSACTIONS CONTEMPLATED HEREBY.

Section 9.07.    *Counterparts; Effectiveness; Third Party Beneficiaries.* This Agreement may be signed in any number of counterparts, each of which shall be an original, with the same effect as if the signatures thereto and hereto were upon the same instrument. This Agreement shall

become effective when each Party hereto shall have received a counterpart hereof signed by all of the other Parties hereto. Until and unless each Party has received a counterpart hereof signed by each other Party hereto, this Agreement shall have no effect and no Party shall have any right or obligation hereunder (whether by virtue of any other oral or written agreement or other communication). No provision of this Agreement is intended to confer any rights, benefits, remedies, obligations or liabilities hereunder upon any Person other than the Parties hereto and their respective successors and assigns.

Section 9.08.    *Entire Agreement*. This Agreement and the other agreements and certificates contemplated hereby and thereby constitute the entire agreement between the Parties with respect to the subject matter of this Agreement and supersede all prior agreements and understandings, both oral and written, between the Parties with respect to the subject matter of this Agreement.

Section 9.09.    *Severability*. If any term, provision, covenant or restriction of this Agreement is held by a court of competent jurisdiction or other authority to be invalid, void or unenforceable, the remainder of the terms, provisions, covenants and restrictions of this Agreement shall remain in full force and effect and shall in no way be affected, impaired or invalidated so long as the economic or legal substance of the transactions contemplated hereby is not affected in any manner materially adverse to any Party. Upon such a determination, the Parties shall negotiate in good faith to modify this Agreement so as to effect the original intent of the Parties as closely as possible in an acceptable manner in order that the transactions contemplated hereby are consummated as originally contemplated to the fullest extent possible.

Section 9.10.    *Specific Performance*. The Parties hereto agree that irreparable damage would occur if any provision of this Agreement were not performed in accordance with the terms hereof and that the Parties shall be entitled to an injunction or injunctions to prevent breaches of this Agreement or to enforce specifically the performance of the terms and provisions hereof, in addition to any other remedy to which they are entitled at law or in equity.

Section 9.11.    *Termination of Agreement*. This Agreement may be terminated and the transactions contemplated hereby abandoned at any time prior to the Closing:

(a)    By mutual consent of the Parties, acting jointly, in a written agreement executed by all of the Parties;

(b)    Upon written notice, by either Buyer or Seller, if the Closing shall not have occurred by March 31, 2017 (the "**Drop Dead Date**"); provided, however, that, if the Closing shall not have occurred on or before the Drop Dead Date due to a breach under, or failure to make a delivery contemplated by, this Agreement by a Party, the breaching Party may not terminate this Agreement pursuant to this Section 9.11(b); it being understood that no Party shall be deemed to be a breaching Party pursuant to this Section 9.11(b) as a result of any breach by such Party that was remedied prior to the Drop Dead Date and within the 30-day notice period referenced in Sections 9.11(c) and 9.11(d), as applicable;

(c)    Upon written notice, by either Buyer or Seller, if the NFA does not approve the transactions contemplated hereby for any reason or no reason; provided, that, if such failure to approve the transactions contemplated hereby shall be due to a breach under, or failure to make a delivery contemplated by, this Agreement by a Party, the breaching Party may not terminate this

Agreement pursuant to this Section 9.11(c); it being understood that no Party shall be deemed to be a breaching Party pursuant to this Section 9.11(c) as a result of any breach by such Party that was remedied prior to the NFA's determination not to approve the transactions contemplated hereby.

(d)   By Buyer, upon written notice to Seller, if Buyer has previously provided Seller written notice of any material inaccuracy in or material breach of any representation or warranty contained in this Agreement such that the condition in Section 7.02(a) or (b) cannot be satisfied, or a failure by Seller to perform or comply in any material respect with any covenant or obligation of Seller contained in this Agreement required to be performed or complied with by it prior to or at the Closing Date, and Seller has failed, within ten (10) days after the date of such notice, to remedy such inaccuracy or breach or to perform or comply with such covenant or obligation or provide reasonably adequate assurance as to Seller's ability to promptly remedy such inaccuracy or breach or to perform or comply with such covenant or obligation, provided, however, that Buyer shall not have the right to terminate this Agreement under this Section 9.11(c) if Buyer is then in breach of this Agreement.

(e)   By Seller, upon written notice to Buyer, if Seller has previously provided Buyer written notice of any material inaccuracy in or material breach of any representation or warranty contained in this Agreement such that the condition in Section 7.03(a) or (b) cannot be satisfied, or a failure by Buyer to perform or comply in any material respect with any covenant or obligation of Buyer contained in this Agreement required to be performed or complied with by it prior to or at the Closing Date, and Buyer has failed, within ten (10) days after the date of such notice, to remedy such inaccuracy or breach or to perform or comply with such covenant or obligation or provide reasonably adequate assurance as to Buyer's ability to promptly remedy such inaccuracy or breach or to perform or comply with such covenant or obligation, provided, however, that Seller shall not have the right to terminate this Agreement under this Section 9.11(d) if Seller is then in breach of this Agreement.

Section 9.12.   *Liabilities in Event of Termination*. In the event of any termination of this Agreement pursuant to Section 9.11, written notice thereof shall forthwith be given to each other Party specifying the provision hereof pursuant to which any such termination is made. In such event, this Agreement shall become wholly void and of no further force and effect, except for Sections 5.04, 5.08 and Article IX, which shall remain in full force and effect notwithstanding such termination. For the avoidance of doubt, in the event of any termination of this Agreement, the Confidentiality Agreement shall remain in full force and effect.

[SIGNATURE PAGE FOLLOWS]

[SIGNATURE PAGE TO ASSET PURCHASE AGREEMENT]

IN WITNESS WHEREOF, the Parties hereto have caused this Agreement to be duly executed by their respective authorized officers as of the day and year first above written.

GAIN CAPITAL GROUP, LLC

By:    /s/ Alex Bobinski
        Name:    Alex Bobinksi
        Title:    CEO

FOREX CAPITAL MARKETS L.L.C.

By:    /s/ Tong Yi Tsui
        Name:    Tong Yi Tsui
        Title:    COO

The undersigned has caused this Agreement to be duly executed by its authorized officer as of the day and year first above written with respect to the guarantee provided for in Section 5.09 of this Agreement.

FXCM, INC.

By:    /s/ Dror Niv
        Name:    Dror Niv
        Title:    CEO

EX-21.1 7 fxcm-20161231xex211.htm EXHIBIT 21.1

**Exhibit 21.1**

**List of Subsidiaries**

As of December 31, 2016, the following entities are subsidiaries of Global Brokerage, Inc.:

| Name of Subsidiary | State of Organization |
| --- | --- |
| Global Brokerage Holdings, LLC (74.5% owned) | Delaware |
| FXCM Group, LLC (50.1%) | Delaware |
| FXCM Global Services, LLC | Delaware |
| Forex Capital Markets, LLC | Delaware |
| Forex Trading L.L.C. | Delaware |
| Yozma LLC | Delaware |
| FastMatch Inc. (35.8% owned) | Delaware |
| Lucid Markets LLP | England and Wales |
| FXCM Systems, LLC | Delaware |
| FXCM Seoul, LLC | South Korea |
| FXCM Asia Pacific Pty Ltd. | Australia |
| Forex Capital Markets Limited | England and Wales |
| FXCM Australia Pty. Limited | Australia |
| Famous Group International Limited | Hong Kong |
| Technementals Technology (Shenzhen) Co., Ltd. | China |
| Technementals Technologies (Bulgaria) EAD | Bulgaria |
| Financial Horizons Capital, LLC | Delaware |
| Horizons Funding, LLC | Delaware |
| Tradency Inc. (22.1% owned) | British Virgin Islands |
| FXCM DMCC | UAE |
| Salex Holding SRL (33.0% owned) | Italy |
| FXCM Bullion Limited | Hong Kong |
| Orchid Hill Consulting Limited | Hong Kong |
| FXCM Consulting Limited | China |
| V3 Markets, LLC (50.1% owned) | Delaware |
| V4 Markets, LLC (50.1% owned) | Delaware |
| V4 Operator LLC (50.1% owned) | Delaware |
| Faros Trading, LLC (50.1% owned) | Delaware |
| FXCM Markets Limited | Bermuda |
| FXCM UK Merger Limited | England |
| Lucid Markets Trading Limited (50.1% owned) | England |

EX-23.1 8 fxcm-20161231xex231.htm EXHIBIT 23.1

**Exhibit 23.1**

**Consent of Independent Registered Public Accounting Firm**

We consent to the incorporation by reference in the following Registration Statements:

(1) Registration Statement (Form S-3/A No. 333-212489) of Global Brokerage, Inc.;

(2) Registration Statement (Form S-3 No. 333-184294) of Global Brokerage, Inc.;

(3) Registration Statement (Form S-3/A No. 333-178455) of Global Brokerage, Inc.;

(4) Registration Statement (Form S-8 No. 333-170905) pertaining to the Long Term Incentive Plan of Global Brokerage, Inc., and

of our reports dated March 17, 2017, with respect to the consolidated financial statements of Global Brokerage, Inc. and the effectiveness of internal control over financial reporting of Global Brokerage, Inc. included in this Annual Report (Form 10-K) of Global Brokerage, Inc. for the year ended December 31, 2016.

/s/ Ernst & Young LLP

New York, New York
March 17, 2017

EX-31.1 9 fxcm-20161231xex311.htm EXHIBIT 31.1

**Exhibit 31.1**

**CERTIFICATION OF CHIEF EXECUTIVE OFFICER PURSUANT TO
SECURITIES EXCHANGE ACT RULES 13a-14(a) AND 15d-14(a),
AS ADOPTED PURSUANT TO
SECTION 302 OF THE SARBANES-OXLEY ACT OF 2002**

I, Dror (Drew) Niv, certify that:

1.  I have reviewed this Annual Report on Form 10-K of Global Brokerage, Inc.;

2.  Based on my knowledge, this report does not contain any untrue statement of a material fact or omit to state a material fact necessary to make the statements made, in light of the circumstances under which such statements were made, not misleading with respect to the period covered by this report;

3.  Based on my knowledge, the financial statements, and other financial information included in this report, fairly present in all material respects the financial condition, results of operations and cash flows of the registrant as of, and for, the periods presented in this report;

4.  The registrant's other certifying officer and I are responsible for establishing and maintaining disclosure controls and procedures (as defined in Exchange Act Rules 13a-15(e) and 15d-15(e)) and internal control over financial reporting (as defined in Exchange Act Rules 13a-15(f) and 15d-15(f)) for the registrant and have:

    a.  Designed such disclosure controls and procedures, or caused such disclosure controls and procedures to be designed under our supervision, to ensure that material information relating to the registrant, including its consolidated subsidiaries, is made known to us by others within those entities, particularly during the period in which this report is being prepared;

    b.  Designed such internal control over financial reporting, or caused such internal control over financial reporting to be designed under our supervision, to provide reasonable assurance regarding the reliability of financial reporting and the preparation of financial statements for external purposes in accordance with generally accepted accounting principles;

    c.  Evaluated the effectiveness of the registrant's disclosure controls and procedures and presented in this report our conclusions about the effectiveness of the disclosure controls and procedures, as of the end of the period covered by this report based on such evaluation; and

    d.  Disclosed in this report any change in the registrant's internal control over financial reporting that occurred during the registrant's most recent fiscal quarter (the registrant's fourth fiscal quarter in the case of an annual report)] that has materially affected, or is reasonably likely to materially affect, the registrant's internal control over financial reporting; and

5.  The registrant's other certifying officer and I have disclosed, based on our most recent evaluation of internal control over financial reporting, to the registrant's auditors and the audit committee of the registrant's board of directors (or persons performing the equivalent functions):

    a.  All significant deficiencies and material weaknesses in the design or operation of internal control over financial reporting which are reasonably likely to adversely affect the registrant's ability to record, process, summarize and report financial information; and

    b.  Any fraud, whether or not material, that involves management or other employees who have a significant role in the registrant's internal control over financial reporting.

Date: March 17, 2017

/s/ Dror (Drew) Niv

Dror (Drew) Niv

*Chief Executive Officer*

*(Principal Executive Officer)*

EX-31.2 10 fxcm-20161231xex312.htm EXHIBIT 31.2

**Exhibit 31.2**

**CERTIFICATION OF CHIEF FINANCIAL OFFICER PURSUANT TO**
**SECURITIES EXCHANGE ACT RULES 13a-14(a) AND 15d-14(a),**
**AS ADOPTED PURSUANT TO**
**SECTION 302 OF THE SARBANES-OXLEY ACT OF 2002**

I, Robert Lande, certify that:

1.  I have reviewed this Annual Report on Form 10-K of Global Brokerage, Inc.;

2.  Based on my knowledge, this report does not contain any untrue statement of a material fact or omit to state a material fact necessary to make the statements made, in light of the circumstances under which such statements were made, not misleading with respect to the period covered by this report;

3.  Based on my knowledge, the financial statements, and other financial information included in this report, fairly present in all material respects the financial condition, results of operations and cash flows of the registrant as of, and for, the periods presented in this report;

4.  The registrant's other certifying officer and I are responsible for establishing and maintaining disclosure controls and procedures (as defined in Exchange Act Rules 13a-15(e) and 15d-15(e)) and internal control over financial reporting (as defined in Exchange Act Rules 13a-15(f) and 15d-15(f)) for the registrant and have:

    a.  Designed such disclosure controls and procedures, or caused such disclosure controls and procedures to be designed under our supervision, to ensure that material information relating to the registrant, including its consolidated subsidiaries, is made known to us by others within those entities, particularly during the period in which this report is being prepared;

    b.  Designed such internal control over financial reporting, or caused such internal control over financial reporting to be designed under our supervision, to provide reasonable assurance regarding the reliability of financial reporting and the preparation of financial statements for external purposes in accordance with generally accepted accounting principles;

    c.  Evaluated the effectiveness of the registrant's disclosure controls and procedures and presented in this report our conclusions about the effectiveness of the disclosure controls and procedures, as of the end of the period covered by this report based on such evaluation; and

    d.  Disclosed in this report any change in the registrant's internal control over financial reporting that occurred during the registrant's most recent fiscal quarter (the registrant's fourth fiscal quarter in the case of an annual report) that has materially affected, or is reasonably likely to materially affect, the registrant's internal control over financial reporting; and

5.  The registrant's other certifying officer and I have disclosed, based on our most recent evaluation of internal control over financial reporting, to the registrant's auditors and the audit committee of the registrant's board of directors (or persons performing the equivalent functions):

    a.  All significant deficiencies and material weaknesses in the design or operation of internal control over financial reporting which are reasonably likely to adversely affect the registrant's ability to record, process, summarize and report financial information; and

    b.  Any fraud, whether or not material, that involves management or other employees who have a significant role in the registrant's internal control over financial reporting.

Date: March 17, 2017

/s/ Robert Lande

Robert Lande

*Chief Financial Officer*

*(Principal Financial Officer)*

EX-32.1 11 fxcm-20161231xex321.htm EXHIBIT 32.1

**Exhibit 32.1**

**CERTIFICATION OF CHIEF EXECUTIVE OFFICER PURSUANT TO**
**18 U.S.C. SECTION 1350,**
**AS ADOPTED PURSUANT TO**
**SECTION 906 OF THE SARBANES-OXLEY ACT OF 2002**

In connection with the Annual Report on Form 10-K for the year ended December 31, 2016 of Global Brokerage, Inc. (the "Company") as filed with the Securities and Exchange Commission on the date hereof (the "Report"), I, Dror (Drew) Niv, Chief Executive Officer of the Company, certify, pursuant to 18 U.S.C. Section 1350, as adopted pursuant to Section 906 of the Sarbanes-Oxley Act of 2002, that:

(1)   The Report fully complies with the requirements of Section 13(a) or 15(d) of the Securities Exchange Act of 1934; and

(2)   The information contained in the Report fairly presents, in all material respects, the financial condition and results of operations of the Company.

Date: March 17, 2017

/s/ Dror (Drew) Niv
Dror (Drew) Niv
*Chief Executive Officer*
*(Principal Executive officer)*

\*   The foregoing certification is being furnished solely pursuant to 18 U.S.C. Section 1350 and is not being filed as part of the Report or as a separate disclosure document.

EX-32.2 12 fxcm-20161231xex322.htm EXHIBIT 32.2

**Exhibit 32.2**

**CERTIFICATION OF CHIEF FINANCIAL OFFICER PURSUANT TO**
**18 U.S.C. SECTION 1350,**
**AS ADOPTED PURSUANT TO**
**SECTION 906 OF THE SARBANES-OXLEY ACT OF 2002**

In connection with the Annual Report on Form 10-K for the year ended December 31, 2016 of Global Brokerage, Inc. (the "Company") as filed with the Securities and Exchange Commission on the date hereof (the "Report"), I, Robert Lande, Chief Financial Officer of the Company, certify, pursuant to 18 U.S.C. Section 1350, as adopted pursuant to Section 906 of the Sarbanes-Oxley Act of 2002, that:

    (1)   The Report fully complies with the requirements of Section 13(a) or 15(d) of the Securities Exchange Act of 1934; and

    (2)   The information contained in the Report fairly presents, in all material respects, the financial condition and results of operations of the Company.

Date: March 17, 2017

                    /s/ Robert Lande
                    Robert Lande
                    *Chief Financial Officer*
                    *(Principal Financial Officer)*

*   The foregoing certification is being furnished solely pursuant to 18 U.S.C. Section 1350 and is not being filed as part of the Report or as a separate disclosure document.

XML 19 R1.htm IDEA: XBRL DOCUMENT

| Document and Entity Information - USD ($) | 12 Months Ended Dec. 31, 2016 | Mar. 15, 2017 | Jun. 30, 2016 |
|---|---|---|---|
| **Document Information [Line Items]** | | | |
| Document Type | 10-K | | |
| Amendment Flag | false | | |
| Document Period End Date | Dec. 31, 2016 | | |
| Document Fiscal Year Focus | 2016 | | |
| Document Fiscal Period Focus | FY | | |
| Trading Symbol | GLBR | | |
| Entity Registrant Name | Global Brokerage, Inc. | | |
| Entity Central Index Key | 0001499912 | | |
| Current Fiscal Year End Date | --12-31 | | |
| Entity Well-known Seasoned Issuer | No | | |
| Entity Current Reporting Status | Yes | | |
| Entity Voluntary Filers | No | | |
| Entity Filer Category | Smaller Reporting Company | | |
| Entity Public Float | | | $ 40,776,705 |
| **Class A common stock** | | | |
| **Document Information [Line Items]** | | | |
| Entity Common Stock, Shares Outstanding | | 6,143,297 | |
| **Class B common stock** | | | |
| **Document Information [Line Items]** | | | |
| Entity Common Stock, Shares Outstanding | | 8 | |

XML 20 R2.htm IDEA: XBRL DOCUMENT

| Consolidated Statements of Financial Condition - USD ($) $ in Thousands | Dec. 31, 2016 | Dec. 31, 2015 |
|---|---|---|
| **Current assets** | | |
| Cash and cash equivalents | $ 200,914 | $ 203,854 |
| Cash and cash equivalents, held for customers | 661,936 | 685,043 |
| Due from brokers | 3,363 | 3,781 |
| Accounts receivable, net | 5,236 | 1,636 |
| Tax receivable | 199 | 1,766 |
| Assets held for sale | 97,103 | 233,937 |
| Total current assets | 968,751 | 1,130,017 |
| Deferred tax asset | 330 | 14 |
| Office, communication and computer equipment, net | 32,815 | 35,891 |
| Goodwill | 23,479 | 28,080 |
| Other intangible assets, net | 6,285 | 13,782 |
| Notes receivable | 0 | 7,881 |
| Other assets | 7,364 | 11,421 |
| Total assets | 1,039,024 | 1,227,086 |
| **Liabilities, Redeemable Non-Controlling Interest and Stockholders' Deficit** | | |
| Customer account liabilities | 661,936 | 685,043 |
| Accounts payable and accrued expenses | 55,491 | 38,298 |
| Due to brokers | 1,471 | 1,073 |
| Other liabilities | 2,629 | 0 |
| Due to related parties pursuant to tax receivable agreement | 0 | 145 |
| Liabilities held for sale | 2,325 | 14,510 |
| Total current liabilities | 723,852 | 739,069 |
| Deferred tax liability | 215 | 719 |
| Senior convertible notes | 161,425 | 154,255 |
| Credit Agreement — Related Party | 150,516 | 147,262 |
| Derivative liability — Letter Agreement | 0 | 448,458 |
| Other liabilities | 7,319 | 16,044 |
| Total liabilities | 1,043,327 | 1,505,807 |
| Commitments and Contingencies (see Notes 21 & 27) | | |
| Redeemable non-controlling interest (see Note 3) | 46,364 | 0 |
| **Stockholders' Deficit** | | |
| Additional paid-in-capital | 389,917 | 267,369 |
| Accumulated deficit | (460,907) | (531,550) |
| Accumulated other comprehensive (loss) income | (2,312) | 1,004 |
| Total stockholders' deficit Global Brokerage, Inc. | (73,240) | (263,120) |
| Non-controlling interests | 22,573 | (15,601) |
| Total stockholders' deficit | (50,667) | (278,721) |
| Total liabilities, Redeemable non-controlling interest and stockholders' deficit | 1,039,024 | 1,227,086 |
| **Class A common stock** | | |
| **Stockholders' Deficit** | | |
| Common stock | 61 | 56 |
| **Class B common stock** | | |
| **Stockholders' Deficit** | | |
| Common stock | $ 1 | $ 1 |

XML 21 R3.htm IDEA: XBRL DOCUMENT

| Consolidated Statements of Financial Condition (Parenthetical) | Oct. 01, 2015 |
|---|---|
| **Class A common stock** | |
| Ratio of reverse stock split | 0.1 |

XML 22 R4.htm IDEA: XBRL DOCUMENT

| Consolidated Statements of Operations - USD ($) shares in Thousands, $ in Thousands | 12 Months Ended | |
|---|---|---|
| | Dec. 31, 2016 | Dec. 31, 2015 |
| **Revenues** | | |
| Trading revenue | $ 276,000 | $ 250,042 |
| Interest income | 2,517 | 1,827 |
| Brokerage interest expense | (888) | (818) |
| Net interest revenue | 1,629 | 1,009 |
| Other income | 6,427 | 151,227 |
| Total net revenues | 284,056 | 402,278 |
| **Operating Expenses** | | |
| Compensation and benefits | 91,377 | 93,413 |
| Referring broker fees | 38,213 | 54,827 |
| Advertising and marketing | 20,849 | 14,932 |
| Communication and technology | 28,262 | 33,545 |
| Trading costs, prime brokerage and clearing fees | 3,585 | 3,952 |
| General and administrative | 75,790 | 58,436 |
| Bad debt (recovery) expense | (141) | 256,950 |
| Depreciation and amortization | 27,289 | 28,331 |
| Goodwill impairment loss | 0 | 9,513 |
| Total operating expenses | 285,224 | 553,899 |
| Operating loss | (1,168) | (151,621) |
| **Other (Income) Expense** | | |
| (Gain) loss on derivative liabilities — Letter & Credit Agreements | (206,777) | 354,657 |
| Loss on equity method investments, net | 3,053 | 467 |
| Gain on sale of investment | (37,157) | 0 |
| Interest on borrowings | 77,143 | 126,560 |
| Income (loss) from continuing operations before income taxes | 162,570 | (633,305) |
| Income tax provision | 777 | 181,198 |
| Income (loss) from continuing operations | 161,793 | (814,503) |
| Loss from discontinued operations, net of tax | (117,860) | (118,294) |
| Net income (loss) | 43,933 | (932,797) |
| Net (loss) income attributable to FXCM Inc. | 70,643 | (553,929) |
| Net income (loss) attributable to Global Brokerage, Inc. | 70,643 | (553,929) |
| **FXCM Holdings, LLC** | | |
| **Other (Income) Expense** | | |
| Net (loss) income attributable to noncontrolling interest | 33,408 | (324,595) |
| **FXCM Group LLC** | | |
| **Other (Income) Expense** | | |
| Net (loss) income attributable to noncontrolling interest | (2,804) | 0 |
| **Subsidiaries Excluding FXCM Holdings LLC** | | |
| **Other (Income) Expense** | | |
| Net (loss) income attributable to noncontrolling interest | (57,314) | (54,273) |
| **Class A common stock** | | |
| **Other (Income) Expense** | | |
| Net (loss) income attributable to FXCM Inc. | 70,643 | (553,929) |
| Income (loss) from continuing operations attributable to Global Brokerage, Inc. | 96,680 | (513,600) |
| Loss from discontinued operations attributable to Global Brokerage, Inc. | (26,037) | (40,329) |
| Net income (loss) attributable to Global Brokerage, Inc. | $ 70,643 | $ (553,929) |
| Weighted average shares of Class A common stock outstanding — Basic and Diluted | 5,609 | 5,087 |
| **Net (loss) income per share attributable to stockholders of Class A common stock of FXCM Inc.:** | | |
| Continuing operations (in dollars per share) | $ 17.24 | $ (100.96) |
| Discontinued operations (in dollars per share) | (4.64) | (7.93) |
| Basic net income (loss) per share of Class A common stock (in dollars per share) | $ 12.60 | $ (108.89) |

XML 23 R5.htm IDEA: XBRL DOCUMENT

| Consolidated Statements of Comprehensive (Loss) Income - USD ($) $ in Thousands | 12 Months Ended | |
|---|---|---|
| | Dec. 31, 2016 | Dec. 31, 2015 |
| Net income (loss) | $ 43,933 | $ (932,797) |
| **Other comprehensive (loss) income** | | |
| Foreign currency translation loss | (5,198) | (4,013) |
| Realization of cumulative translation adjustment | 0 | 24,923 |
| Other comprehensive (loss) income, net of tax | (5,198) | 20,910 |
| Comprehensive income (loss) | 38,735 | (911,887) |
| Comprehensive income (loss) attributable to Global Brokerage, Inc. | 67,327 | (541,046) |
| **FXCM Holdings, LLC** | | |
| **Other comprehensive (loss) income** | | |
| Comprehensive (loss) income attributable to non-controlling interest | 31,903 | (316,552) |
| **FXCM Group LLC** | | |
| **Other comprehensive (loss) income** | | |
| Comprehensive (loss) income attributable to non-controlling interest | (3,181) | 0 |
| **Subsidiaries Excluding FXCM Holdings LLC** | | |
| **Other comprehensive (loss) income** | | |
| Comprehensive (loss) income attributable to non-controlling interest | $ (57,314) | $ (54,289) |

XML 24 R6.htm IDEA: XBRL DOCUMENT

| Consolidated Statements of Stockholders' Equity (Deficit) - USD ($) $ in Thousands | Total | Common Stock - Class A | Non-controlling Interests | Retained Earnings (Accumulated Deficit) | Accumulated Other Comprehensive (Loss) Income | Additional Paid-in Capital | Common Stock Common Stock - Class A | Common Stock Common Stock - Class B |
|---|---|---|---|---|---|---|---|---|
| Balance as of beginning of period at Dec. 31, 2014 | $ 643,016 | | $ 358,328 | $ 22,379 | $ (11,879) | $ 274,139 | $ 48 | $ 1 |
| Balance as of beginning of period (in shares) at Dec. 31, 2014 | | | | | | | 4,788,994 | 34 |
| **Increase (Decrease) in Stockholders' Equity [Roll Forward]** | | | | | | | | |
| Net income (loss) | (932,797) | | (378,868) | (553,929) | | | | |
| Other comprehensive income (loss), net of tax | 20,910 | | 8,027 | | 12,883 | | | |
| Comprehensive income (loss) | (911,887) | | (370,841) | (553,929) | 12,883 | | | |
| Repurchase of Class A common stock | (1) | | $ (1) | | | | | |
| Repurchase of Class A common stock (in shares) | | (61) | 0 | | | | (61) | |
| Equity-based compensation | 4,337 | | $ 2,083 | | | 2,254 | | |
| Equity based compensation (in shares) | | | | | | | 0 | |
| Exchange of Holdings Units to Class A common stock | | | $ 9,157 | | | (9,165) | $ 8 | |
| Exchange of Holdings Units to Class A common stock (in shares) | | | (808,672) | | | | 808,672 | (8) |
| Assignment of permitted transferees (in shares) | | | | | | | | (1) |
| Stock options issued | 321 | | $ 123 | | | 198 | | |
| Vesting of restricted stock units | | | 57 | | | (57) | | |
| Vesting of restricted stock units (in shares) | | | | | | | 4,929 | |
| Distributions — non-controlling members | (14,507) | | (14,507) | | | | | |
| Balance as of end of period at Dec. 31, 2015 | (278,721) | | (15,601) | (531,550) | 1,004 | 267,369 | $ 56 | $ 1 |
| Balance as of end of period (in shares) at Dec. 31, 2015 | | | | | | | 5,602,534 | 25 |
| **Increase (Decrease) in Stockholders' Equity [Roll Forward]** | | | | | | | | |
| Net income (loss) | 46,737 | | (23,906) | 70,643 | | | | |
| Other comprehensive income (loss), net of tax | (4,821) | | (1,505) | | (3,316) | | | |
| Comprehensive income (loss) | 41,916 | | (25,411) | 70,643 | (3,316) | | | |
| Repurchase of Class A common stock (in shares) | | 0 | | | | | | |
| Equity-based compensation | 1,696 | | 541 | | | 1,155 | | |
| Exchange of Holdings Units to Class A common stock | | | $ 5,210 | | | (5,215) | $ 5 | |
| Exchange of Holdings Units to Class A common stock (in shares) | | | (535,992) | | | | 535,992 | (17) |
| Vesting of restricted stock units | | | $ 14 | | | (14) | | |
| Vesting of restricted stock units (in shares) | | | | | | | 4,771 | |
| Distributions — non-controlling members | (1,782) | | (1,782) | | | | | |
| Issuance of redeemable non-controlling interest (see Note 3) | 186,224 | | 59,602 | | | 126,622 | | |
| Balance as of end of period at Dec. 31, 2016 | $ (50,667) | | $ 22,573 | $ (460,907) | $ (2,312) | $ 389,917 | $ 61 | $ 1 |
| Balance as of end of period (in shares) at Dec. 31, 2016 | | | | | | | 6,143,297.000 | 8.000 |

XML 25 R7.htm IDEA: XBRL DOCUMENT

| Consolidated Statements of Cash Flows - USD ($) $ in Thousands | 12 Months Ended | |
|---|---|---|
| | Dec. 31, 2016 | Dec. 31, 2015 |
| **Cash Flows From Operating Activities** | | |
| Net income (loss) | $ 43,933 | $ (932,797) |
| **Adjustments to reconcile net income (loss) to net cash provided by (used in) operating activities** | | |
| Depreciation and amortization | 27,289 | 40,690 |
| Equity-based compensation | 1,857 | 4,183 |
| Deferred tax (benefit) expense | (781) | 187,978 |
| Goodwill impairment losses | 0 | 64,378 |
| Loss on classification as held for sale assets | 126,511 | 66,660 |
| (Gain) loss on derivative liabilities — Letter & Credit Agreements | (206,777) | 354,657 |
| Amortization of deferred bond discount | 5,960 | 5,607 |
| Amortization of deferred financing cost | 1,210 | 2,653 |
| Amortization of original issue discount — Credit Agreement | 28,110 | 65,577 |
| Amortization of issuance fee, deferred financing fee and acquisition costs — Credit Agreement | 7,148 | 15,677 |
| Loss on equity method investments, net | 2,618 | 1,734 |
| Gain on disposition of equity method investment | (679) | 0 |
| Provision for debt forgiveness | 8,249 | 0 |
| Gain on business dispositions | (37,157) | (7,313) |
| Transaction costs associated with business dispositions | (1,755) | (7,410) |
| Due to related parties pursuant to tax receivable agreement | 44 | (145,080) |
| **Changes in operating assets and liabilities** | | |
| Cash and cash equivalents, held for customers | 23,980 | 299,572 |
| Due from brokers | 8,562 | 10,287 |
| Accounts receivable, net | (42) | 4,749 |
| Tax receivable, net | 1,567 | 92 |
| Other assets | 2,494 | (5,551) |
| Customer account liabilities | (23,107) | (298,598) |
| Accounts payable and accrued expenses | 8,621 | (5,465) |
| Other liabilities — Current | 2,629 | 0 |
| Other liabilities — Non-current | (6,759) | 6,514 |
| Payments for tax receivable agreement | (188) | (5,352) |
| Due to brokers | 443 | (15,240) |
| Securities sold, not yet purchased | (3,624) | (615) |
| Foreign currency remeasurement gain (loss) | 1,510 | (932) |
| Net cash provided by (used in) operating activities | 21,866 | (293,345) |
| **Cash Flows From Investing Activities** | | |
| Purchases of office, communication and computer equipment, net | (18,226) | (17,336) |
| Proceeds from sale of office, communication and computer equipment, net | 0 | 499 |
| Purchase of intangible assets | (2,000) | (518) |
| Proceeds from notes receivable | 0 | 1,500 |
| Proceeds from business dispositions, net of cash | 36,000 | 65,979 |
| Payments for equity investment, net of cash acquired | (450) | 0 |
| Net cash provided by investing activities | 15,324 | 50,124 |
| **Cash Flows From Financing Activities** | | |
| Distributions to non-controlling members | (683) | (14,507) |
| Proceeds from issuance of stock options | 0 | 321 |
| Common stock repurchases | 0 | (1) |
| Payments on borrowings under Revolving credit agreement | 0 | (25,000) |
| Proceeds from the Leucadia Transaction | 0 | 279,000 |
| Principal payments on borrowings under the Credit Agreement | (38,175) | (117,315) |
| Debt acquisition costs — Credit Agreement | 0 | (1,876) |
| Net cash (used in) provided by financing activities | (38,858) | 120,622 |
| Effect of foreign currency exchange rate changes on cash and cash equivalents | (2,680) | (1,575) |

| | | | |
|---|---|---:|---:|
| Net decrease in cash and cash equivalents | | (4,348) | (124,174) |
| **Cash and cash equivalents(1)** | | | |
| Beginning of year | [1] | 214,640 | 338,814 |
| End of year | [1] | 210,292 | 214,640 |
| **Supplemental disclosures of cash flow activities** | | | |
| Cash paid (received) for taxes | | 468 | (399) |
| Cash paid for interest | | 37,761 | 31,297 |
| **Supplemental disclosure of non-cash investing activities** | | | |
| Exchange of Holdings Units for shares of Class A common stock | | (5,210) | (9,157) |
| Deferred payment for purchase of intangible assets | | 0 | 5,482 |
| Proceeds receivable from business disposition | | 4,000 | 0 |
| **Supplemental disclosure of non-cash financing activities** | | | |
| Exchange of Letter Agreement for Redeemable non-controlling interest | | 235,509 | 0 |
| **Discontinued Operations** | | | |
| **Adjustments to reconcile net income (loss) to net cash provided by (used in) operating activities** | | | |
| Depreciation and amortization | | 0 | 12,359 |
| Equity-based compensation | | 0 | 1,494 |
| Deferred tax (benefit) expense | | 0 | 6,181 |
| Goodwill impairment losses | | 0 | 54,865 |
| Loss on classification as held for sale assets | | 126,511 | 66,660 |
| Loss on equity method investments, net | | 435 | (1,267) |
| Gain on disposition of equity method investment | | 679 | 0 |
| Gain on business dispositions | | 0 | 7,313 |
| Transaction costs associated with business dispositions | | 0 | (7,410) |
| **Cash Flows From Investing Activities** | | | |
| Purchases of office, communication and computer equipment, net | | (182) | (338) |
| Proceeds from sale of office, communication and computer equipment, net | | 0 | 499 |
| Proceeds from business dispositions, net of cash | | 0 | 65,979 |
| **Non- controlling Interests** | | | |
| **Supplemental disclosure of non-cash financing activities** | | | |
| Non-cash distribution to non-controlling members | | $ 1,099 | $ 0 |

[1] (1) Includes Cash and cash equivalents from continuing and discontinued operations

XML 26 R8.htm IDEA: XBRL DOCUMENT

| Nature of Business and Organization | 12 Months Ended |
|---|---|
| | Dec. 31, 2016 |
| Accounting Policies [Abstract] | |
| Nature of Business and Organization | **Nature of Business and Organization** |

**Nature of Business and Organization**

Global Brokerage, Inc. ("Global Brokerage" or the "Corporation") (f/k/a "FXCM Inc."), a Delaware holding company incorporated on August 10, 2010, is an online provider of foreign exchange ("FX") trading, contracts for difference ("CFD") trading, spread betting and related services to retail and institutional customers worldwide. The Corporation operates through its managing membership interest in Global Brokerage Holdings, LLC ("Holdings") (f/k/a "FXCM Holdings, LLC"), the Corporation's sole operating asset. Holdings is a majority-owned, controlled and consolidated subsidiary of the Corporation. In January 2015, Holdings transferred its interest in its operating subsidiaries to FXCM Newco, LLC ("Newco"), which was then a wholly-owned subsidiary of Holdings, formed in connection with the financing arrangement entered into with Leucadia National Corporation ("Leucadia") ("the Leucadia Transaction") (see Note 19). On September 1, 2016, the Company completed a restructuring transaction with Leucadia (the "Restructuring Transaction") (see Note 19). In connection with the Restructuring Transaction, the financing arrangement with Leucadia was amended, Newco was renamed FXCM Group, LLC ("Group") and Leucadia acquired a 49.9% membership interest in Group, with Holdings owning the remaining 50.1% membership interest in Group. Group is a majority-owned, controlled and consolidated subsidiary of Holdings. As used in these notes, the term "Company" collectively refers to the Corporation, Holdings, Group and subsidiaries of Group.

As an online provider of FX trading, CFD trading, spread betting and related services, the Company offers its retail and institutional customers access to global over-the-counter FX markets. In a FX trade, a participant buys one currency and simultaneously sells another, a combination known as a "currency pair." The Company's proprietary trading platform presents its FX customers with the price quotations on several currency pairs from a number of global banks, financial institutions and market makers ("FX market makers"). The Company's primary FX offering to retail customers is what is referred to as agency execution or an agency model. Under the agency model, when a customer executes a trade on the price quotation presented by the FX market maker, the Company acts as a credit intermediary, or a riskless principal, simultaneously entering into a trade with the customer and the FX market maker. This agency model has the effect of hedging our positions and eliminating market risk exposure. The Company earns trading revenue from fees charged as a markup to the price provided by the FX market makers or commissions, not trading profit or losses. We offer a dealing desk, or principal, execution model to smaller retail clients. Under the dealing desk model, the Company maintains its trading position and does not offset the trade with another party on a one for one basis. As a result, the Company may incur trading losses under the dealing desk model from changes in the prices of currencies where the Company is not hedged. Additionally, the Company offers its customers the ability to trade CFDs and spread betting through its United Kingdom ("U.K.") subsidiaries. CFDs, primarily a dealing desk offering, allow for the exchange of the difference in the value of a particular asset such as a stock index or oil or gold contracts, between the time at which a contract is opened and the time at which it is closed. Spread betting allows our customers to bet on the price fluctuations of various financial markets such as FX, indices, oil and metals.

The Company's trading revenue also includes commission income generated by facilitating spot FX trades on behalf of institutional customers. The Company offers FX trading services to retail FX and CFD brokers, small hedge funds and emerging market banks, on an agency model basis, through its FXCM Pro offering. The Company also offers Prime of Prime services ("FXCM Prime") where it provides small and medium sized high frequency trading customers access to prime broker services under the Company's name. These services allow customers to obtain optimal prices offered by external banks and other price providers. The counterparties to these trades are external financial institutions that hold customer account balances and settle the transactions. The Company receives commissions for providing these services without taking any market or credit risk. The Company, through its 50.1% controlling interest in Lucid Markets Trading Limited, is also an electronic market-maker and trader in the institutional FX market. In addition, through its 50.1% controlling interest in V3 Markets, LLC, the Company has expanded its market making and electronic trading into other asset classes. As discussed below, Lucid Markets Trading Limited and V3 Markets, LLC are included in the Company's businesses to be disposed of as of December 31, 2016.

**Discontinued Operations**

During the first quarter of 2015, the Company commenced the process of disposing of its interests in certain retail and institutional trading businesses. The retail businesses are FXCM Asia Limited, FXCM Japan Securities Co., Ltd. and the equity trading business of FXCM Securities Limited. The institutional businesses are Faros Trading LLC, Lucid Markets Trading Limited, V3 Markets, LLC and the Company's equity interest in FastMatch, Inc. ("FastMatch"). In April 2015, the Company completed the sale of FXCM Japan Securities Co., Ltd. and Faros Trading LLC. In September 2015, the Company completed the sale of FXCM Asia Limited. In December 2015, the Company completed the sale of the equity trading business of FXCM Securities Limited. The Company remains committed to a plan to sell the remaining businesses which continue to be actively marketed. As a result, these businesses are considered to be held for sale and their results of operations have been reported as discontinued operations (see Note 4).

XML 27 R9.htm IDEA: XBRL DOCUMENT

| Significant Accounting Policies and Estimates | 12 Months Ended |
|---|---|
| | Dec. 31, 2016 |
| **Accounting Policies [Abstract]** | |
| Significant Accounting Policies and Estimates | **Significant Accounting Policies and Estimates** |

**Basis of Presentation**

*Basis of Consolidation*

The accompanying consolidated financial statements are presented in accordance with accounting principles generally accepted in the United States of America ("U.S. GAAP). The Company consolidates those entities in which it is the primary beneficiary of a variable-interest entity ("VIE") as required by Financial Accounting Standards Board ("FASB") Accounting Standards Codification Topic ("ASC") 810, *Consolidations* ("ASC 810"), or entities where it has a controlling interest. Entities that do not qualify as VIEs are evaluated for consolidation as voting interest entities under the voting interest model. Under the voting interest model, the Company consolidates those entities where it has a controlling financial interest through a majority voting interest. Intercompany accounts and transactions are eliminated in consolidation.

At the formation of Newco in connection with the Leucadia Transaction, the Company determined that Newco was a VIE and concluded that Holdings was the primary beneficiary of Newco, which resulted in the consolidation of the financial results of Newco by Holdings. The Company determined that the Restructuring Transaction (see Note 19) is a reconsideration event under ASC 810 and re-evaluated the previous conclusion that Newco (subsequently renamed to Group) is a VIE. Upon reconsideration, the Company determined that Group remains a VIE and concluded that Holdings is the primary beneficiary of Group since Holdings has the ability to direct the activities of Group that most significantly impact Group's economic performance and the obligation to absorb losses of Group or the right to receive benefits from Group that could be significant to Group. As a result, Holdings continues to consolidate the financial results of Group.

The Corporation records a non-controlling interest for the economic interest in Holdings not owned by the Corporation. The Corporation's and the non-controlling unit holders' economic interest in Holdings was 74.5% and 25.5%, respectively, as of December 31, 2016. The Corporation's and the non-controlling unit holders' economic interest in Holdings was 67.9% and 32.1%, respectively, as of December 31, 2015.

The Company's consolidated financial statements include the following significant subsidiaries of Holdings:

| | |
|---|---|
| FXCM Group, LLC[1] | ("Group") |
| FXCM Global Services, LLC | ("Global Services") |
| Forex Capital Markets, LLC | ("US") |
| FXCM Asia Limited[2] | ("HK") |
| Forex Capital Markets Limited | ("UK LTD") |
| FXCM Australia Pty. Limited | ("Australia") |
| FXCM Securities Limited[3] | ("FSL") |
| FXCM Japan Securities Co., Ltd.[4] | ("FXCMJ") |
| FXCM UK Merger Limited | ("Merger") |
| Lucid Markets Trading Limited | ("Lucid") |
| Lucid Markets LLP | ("Lucid LLP") |
| Faros Trading LLC[4] | ("Faros") |
| V3 Markets, LLC | ("V3") |

---

[1] FXCM Newco, LLC was renamed FXCM Group, LLC effective September 1, 2016

[2] Sold by the Company in September 2015

[3] Sold by the Company in December 2015

[4] Sold by the Company in April 2015

Net income or loss attributable to the non-controlling interest in Holdings in the consolidated statements of operations represents the portion of earnings or loss attributable to the economic interest in Holdings held by the non-controlling unit holders.

Net income or loss attributable to redeemable non-controlling interest in the consolidated statements of operations represents the share of earnings or loss allocated to the non-controlling membership interest in Group held by Leucadia based on the hypothetical liquidation at book value method.

Net income or loss attributable to other non-controlling interests in the consolidated statements of operations represents the portion of earnings or loss attributable to the non-controlling interests of Lucid, Faros (prior to the sale of Faros' operations in the second quarter of 2015), V3 and other consolidated entities based on the economic interests held by the non-controlling members. The non-controlling members of Lucid, Faros (prior to the sale of Faros' operations in the second quarter of 2015) and V3 each hold a 49.9% economic interest in the respective entity. The portion of the 49.9% of Lucid earnings allocated among the non-controlling members of Lucid that is contingent on services being provided is reported as a component of compensation expense and is included in the determination of Income (loss) from discontinued operations, net of tax in the consolidated statements of operations (see Note 4).

Redeemable non-controlling interest on the consolidated statements of financial condition represents the non-controlling membership interest in Group held by Leucadia. Non-controlling interests on the consolidated statements of financial condition represents the equity attributable to the non-controlling interests of Holdings, Lucid, V3 and other consolidated entities.

Investments where the Company is deemed to exercise significant influence, but no control, are accounted for using the equity method of accounting. The Company records its pro-rata share of earnings or losses each period and records any dividends as a reduction in the investment balance. The carrying value of these investments is included in Other assets in the consolidated statements of financial condition and earnings or losses are included in Income or loss on equity method investments, net in the consolidated statements of operations. For the Company's equity method investments classified as

discontinued operations, the carrying value of the investments is included in assets held for sale on the consolidated statements of financial condition and earnings or losses are included in the determination of Income or loss from discontinued operations, net of tax in the consolidated statements of operations (see Note 6).

### Reclassifications

Certain reclassifications of prior period amounts related to the Company's retrospective adoption of Accounting Standards Update ("ASU") No. 2015-03, *Interest—Imputation of Interest (Subtopic 835-30): Simplifying the Presentation of Debt Issuance Costs*, have been made to conform to the current period's presentation in the consolidated statements of financial condition.

### Use of Estimates

The preparation of consolidated financial statements in conformity with U.S. GAAP requires management to make estimates and assumptions that affect the reported amounts of assets and liabilities and disclosure of contingent assets and liabilities at the date of the consolidated financial statements as well as the reported amounts of revenue and expenses during the year. Actual results could differ from those estimates and could have a material impact on the consolidated financial statements.

### Discontinued Operations

As discussed in Note 1, during the first quarter of 2015, management committed to a plan to dispose of certain businesses. The Company determined that these businesses represent components pursuant to ASC 205-20, *Presentation of Financial Statements — Discontinued Operations* ("ASC 205-20"). The unsold businesses are considered held for sale at the respective reporting dates. When viewed as a whole, the disposal of these components represents a strategic shift as contemplated by ASC 205-20 and the results of operations are reported as discontinued operations for each period presented (see Note 4).

### Segments

ASC 280, *Segment Reporting* ("ASC 280") establishes standards for reporting information about operating segments. Operating segments are defined as components of an enterprise about which separate financial information is available that is evaluated regularly by the chief operating decision maker, or decision making group, in deciding how to allocate resources and in assessing performance. The guidance defines reportable segments as operating segments that meet certain quantitative thresholds. It was determined in the first quarter of 2015 that as a result of the events of January 15, 2015, and the decision to sell certain institutional assets, the composition of the Company's previously reported Institutional segment changed significantly, such that the remaining institutional business reported in continuing operations no longer meets the quantitative criteria for separate reporting. In addition, the continuing institutional business shares common management strategies, customer support and trading platforms with the Company's retail business. Accordingly, the Company operates in a single operating segment for all periods presented.

### Cash and Cash Equivalents

Cash and cash equivalents include cash at banks, U.S. Treasury bills and other highly liquid instruments with original maturities of less than 90 days at the time of purchase and cash on deposit held with FX and CFD market makers related to economic hedging activities. At times, balances held in U.S. bank accounts may exceed federally insured limits. This potentially subjects the Company to concentration risk. The Company has not experienced losses in such accounts.

### Cash and Cash Equivalents, held for customers

Cash and cash equivalents, held for customers represents cash held to fund customer liabilities. At times, balances held in U.S. bank accounts may exceed federally insured limits. This potentially subjects the Company to concentration risk. The Company has not experienced losses in such accounts.

The balance arises primarily from cash deposited by customers and net realized gains from customer trading activity. The Company maintains a corresponding liability in connection with this amount that is included in customer account liabilities in the consolidated statements of financial condition (see Note 11). A portion of the balance is not available for general use due to regulatory restrictions in certain jurisdictions. The restricted balances related to continuing operations were $0.3 billion and $0.4 billion as of December 31, 2016 and 2015, respectively.

### Due from/to Brokers

Due from/to brokers represents the amount of the unsettled spot currency trades that the Company has with financial institutions. Also included in due from/to brokers is the fair value of derivative financial instruments discussed below. The Company has master netting agreements with its respective counterparties which allows the Company to present due from/to brokers on a net-by-counterparty basis in accordance with ASC 815, *Derivatives and Hedging* ("ASC 815"), and ASC 210, *Balance Sheet* ("ASC 210"). Due from/to brokers related to businesses classified as discontinued operations are included as a component of assets/liabilities held for sale on the consolidated statements of financial condition (see Note 4).

### Derivatives

Derivative financial instruments are accounted for in accordance with ASC 815 and are included in Due from/to brokers in the consolidated statements of financial condition. The Company recognizes all derivative financial instruments in the consolidated statements of financial condition as either assets or liabilities at fair value. The Company enters into futures contracts to (i) economically hedge the open customer contracts on its CFD business and (ii) hedge trading in its electronic market making and institutional foreign exchange spot and futures markets. Futures contracts are exchange traded contracts to either purchase or sell a specific asset at a specified future date for a specified price. Gains or losses on futures contracts related to the Company's CFD business are included in Trading revenue in the consolidated statements of operations and gains or losses on hedge trading in the Company's electronic market making and institutional foreign exchange spot and futures markets and other asset classes are included in Income (loss) from discontinued operations, net of tax in the consolidated statements of operations (see Note 22).

### Fair Value Measurements

Fair value is defined as the price that would be received to sell an asset or paid to transfer a liability in an orderly transaction between market participants at the measurement date. Fair value measurement establishes a fair value hierarchy that prioritizes the inputs of valuation techniques used to measure fair value. The hierarchy gives the highest priority to unadjusted quoted prices in active markets for identical assets or liabilities and the lowest priority to unobservable inputs. These three

quoted prices at own market for identical assets or liabilities and the lowest priority to unobservable inputs. These three levels of fair value hierarchy are defined as follows:

*Level 1*: Quoted prices in active markets for identical assets or liabilities, accessible by the Company at the measurement date.

*Level 2*: Quoted prices for similar assets or liabilities in active markets, or quoted prices for identical or similar assets or liabilities in markets that are not active, or other observable inputs other than quoted prices.

*Level 3*: Unobservable inputs for assets or liabilities.

When Level 1 inputs are available, those inputs are selected for determination of fair value. To value financial assets and liabilities that are characterized as Level 2 and 3, the Company uses observable inputs for similar assets and liabilities that are available from pricing services or broker quotes. These observable inputs may be supplemented with other methods, including internal models that result in the most representative prices for assets and liabilities with similar characteristics. Multiple inputs may be used to measure fair value, however, the fair value measurement for each financial asset or liability is categorized in its entirety in the same level of the fair value hierarchy as the lowest level input that is significant to the entire measurement (see Note 23).

### Accounts Receivable, net

As of December 31, 2016 and 2015, Accounts receivable, net, consisted primarily of amounts due from institutional customers relating to the Company's FX business, fees receivable from the Company's white label service to third parties, interest receivable, a refund of regulatory fees and a broker receivable. As of December 31, 2016, Accounts receivable, net also includes proceeds receivable from the sale of an investment. Receivables are shown net of reserves for uncollectible accounts. The reserve for bad debts is maintained at a level that management believes to be sufficient to absorb estimated losses in the accounts receivable portfolio. The reserve is increased by the provision for bad debts which is charged against operating results and decreased by the amount of charge-offs, net of recoveries. The amount charged against operating results is based on several factors including, but not limited to, a continuous assessment of the collectability of each account, the length of time a receivable is past due and our historical experience with the particular customer. As of both December 31, 2016 and 2015, the reserve netted against receivables in the consolidated statements of financial condition was $6.8 million, which was recorded against an uncollected broker receivable.

As of December 31, 2016 and 2015, Accounts receivable, net, also includes advances to employees and non-controlling members of Holdings.

### Office, Communication and Computer Equipment, net

Office, communication and computer equipment, net, consists of computer equipment, purchased technology hardware and software, internally-developed software, leasehold improvements, furniture and fixtures and other equipment, licenses and communication equipment. Office, communication and computer equipment are recorded at historical cost, net of accumulated depreciation. Additions and improvements that extend the lives of assets are capitalized, while expenditures for repairs and maintenance are expensed as incurred. Certain costs of software developed or obtained for internal use are capitalized. Depreciation is computed using the straight-line method. The Company depreciates these assets using the following useful lives:

| | |
|---|---|
| Computer equipment | 3 to 5 years |
| Capitalized software | 2 to 5 years |
| Leasehold improvements | Lesser of the estimated economic useful life or the term of the lease |
| Furniture and fixtures and other equipment | 3 to 5 years |
| Licenses | 2 to 3 years |
| Communication equipment | 3 to 5 years |

Office, communication and computer equipment, net related to businesses classified as discontinued operations are included as a component of assets held for sale on the consolidated statements of financial condition (see Note 4). Depreciation related to these assets ceased as of the date they were determined to be held for sale and is included in Income (loss) from discontinued operations, net of tax in the consolidated statements of operations.

### Valuation of Other Long-Lived Assets

The Company assesses potential impairments of its other long-lived assets, including office, communication and computer equipment, when there is evidence that events or changes in circumstances indicate that the carrying amount of an asset may not be recovered. An impairment loss is recognized when the carrying amount of the long-lived asset exceeds its fair value and is not recoverable. The carrying amount of a long-lived asset is not recoverable if it exceeds the sum of the undiscounted cash flows expected to result from the use and eventual disposition of the asset. Any required impairment loss is measured as the amount by which the carrying amount of a long-lived asset exceeds its fair value and is recorded as a reduction in the carrying value of the related asset and a charge to operating results.

### Goodwill

The Company recorded goodwill from various acquisitions. Goodwill represents the excess purchase price over the value assigned to the net tangible and identifiable intangible assets of a business acquired. The Company operates in a single operating segment, which also represents the reporting unit for purposes of the goodwill impairment test. Annually, or in interim periods if an event occurs or circumstances change that indicate the fair value of the reporting unit may be below its carrying amount ("triggering events"), the Company first performs a qualitative assessment as a basis for determining whether it is necessary to perform the quantitative goodwill impairment test in accordance with ASC 350, *Intangibles—Goodwill and Other* ("ASC 350"). If the qualitative assessment indicates that it is more likely than not that the fair value of the reporting unit is below its carrying amount, the Company proceeds with the quantitative test described below. The Company tests goodwill for impairment annually during the fourth quarter of its fiscal year using October 1 carrying values.

The first step of the two-step process involves a comparison of the estimated fair value of the reporting unit to its carrying amount, including goodwill. In performing the first step, the Company determines the fair value of the reporting unit using a discounted cash flow ("DCF") analysis. Determining fair value requires the exercise of significant judgment, including

using a discounted cash flow ("DCF") analysis. Determining fair value requires the exercise of significant judgment, including judgments about appropriate discount rates, perpetual growth rates and the amount and timing of expected future cash flows. The cash flows employed in the DCF analyses are based on the Company's most recent budgets and business plans and, when applicable, various growth rates are assumed for years beyond the current business plan period. Discount rate assumptions are based on an assessment of the risk inherent in the future cash flows of the reporting unit. If the estimated fair value of the reporting unit exceeds its carrying amount, the goodwill of the reporting unit is not impaired and the second step of the impairment test is not necessary. If the carrying amount of the reporting unit exceeds its estimated fair value, then the second step of the goodwill impairment test must be performed. The second step of the goodwill impairment test compares the implied fair value of the reporting unit's goodwill with its carrying amount to measure the amount of impairment loss, if any. The implied fair value of goodwill is determined in the same manner as the amount of goodwill recognized in a business combination (i.e., the estimated fair value of the reporting unit is allocated to all of the assets and liabilities of that reporting unit including any unrecognized intangible assets as if the reporting unit had been acquired in a business combination and the fair value of the reporting unit was the purchase price paid). If the carrying amount of the reporting unit's goodwill exceeds the implied fair value of the reporting unit's goodwill, an impairment loss is recognized in an amount equal to that excess.

### Other Intangible Assets, net

Other intangible assets, net, classified as held for use include customer relationships recorded from various acquisitions. Intangible assets classified as held for sale primarily include non-compete agreements, an executory contract, trade name and proprietary technology also recorded from various acquisitions.

The useful lives of these finite-lived intangible assets are based on the period they are expected to contribute to future cash flows as determined by the Company's historical experience. The customer relationships are amortized on a straight-line basis over their estimated average useful life of 3 to 9 years. Prior to being classified as held for sale, the non-compete agreements, executory contract, trade name and proprietary technology were amortized on a straight-line basis over their estimated average useful lives of 1 to 9 years, 3 years, 3 years and 4 to 7 years, respectively, however amortization related to these intangible assets ceased as of the date they were determined to be held for sale.

For finite-lived intangible assets subject to amortization, impairment is considered upon certain "triggering events" and is recognized if the carrying amount is not recoverable and the carrying amount exceeds the fair value of the intangible asset.

The Company's indefinite-lived intangible asset, an FX trading license, is classified as held for use. Indefinite-lived assets are not amortized but tested for impairment. The Company's policy is to test for impairment at least annually or in interim periods if certain events occur indicating that the fair value of the asset may be less than its carrying amount. An impairment test on this indefinite-lived asset is performed during the fourth quarter of the Company's fiscal year using the October 1st carrying value. Impairment exists if the carrying value of the indefinite-lived intangible asset exceeds its fair value.

### Equity Method Investments

Investments where the Company is deemed to exercise significant influence, but no control, are accounted for using the equity method of accounting. The Company records its pro-rata share of earnings or losses each period and records any dividends as a reduction in the investment balance. Additionally, the carrying value of investments accounted for using the equity method of accounting is adjusted downward to reflect any impairment in value. For investments accounted for using the equity method of accounting, the Company evaluates information (e.g., budgets, business plans, financial statements, etc.) in addition to quoted market prices, if any, in determining whether an other-than-temporary decline in value exists. Factors indicative of an impairment in value include recurring operating losses, credit defaults and subsequent rounds of financing at an amount below the cost basis of the Company's investment.

The Company's equity method investments from continuing operations are included in Other assets in the consolidated statements of financial condition and its share of the earnings or losses is included in Loss on equity method investments, net in the consolidated statements of operations (see Note 6). The Company's equity method investments related to businesses classified as discontinued operations are included as a component of assets held for sale on the consolidated statements of financial condition and the share of earnings or losses is included in Income (loss) from discontinued operations, net of tax in the consolidated statements of operations (see Note 4).

### Notes Receivable

Notes receivable represent receivables for notes acquired for cash plus accrued interest. Notes receivable are initially recorded at the amount of cash exchanged plus accrued interest. Interest income on the notes is recorded on an accrual basis and included in Interest income in the consolidated statements of operations. The Company individually assesses its notes receivables for impairment using methods including internally generated cash flow projections to determine if the notes will be repaid under the expected terms of the note agreements. If the Company concludes that the counterparty will not repay a note in accordance with its terms, the Company considers the note impaired and begins recognizing interest income on a cash basis, if any. To measure impairment, the Company calculates the estimated fair value of the collateral. If the estimated fair value of the collateral is less than the carrying value of the note receivable, the Company establishes an impairment reserve for the difference. If it is likely that a note will not be collected based on financial or other business indicators, the Company's policy is to charge off the note in the period which it deems it uncollectible (see Note 5).

### Other Assets

Other assets include prepaid expenses, equity and cost method investments and deposits for rent security (see Note 10). Other assets related to businesses classified as discontinued operations are included as a component of assets held for sale on the consolidated statements of financial condition (see Note 4).

### Accounts Payable and Accrued Expenses

Accounts payable and accrued expenses include operating expenses payable, commissions payable, which represents balances owed to referring brokers for trades transacted by customers that were introduced to the Company by such brokers, bonuses payable, income taxes payable, and interest due on borrowings (see Note 12). Accounts payable and accrued expenses related to businesses classified as discontinued operations, which includes amounts due to the Lucid non-controlling members for services provided, is included as a component of liabilities held for sale on the consolidated statements of financial condition (see Note 4).

### Litigation

The Company may from time to time be involved in litigation and claims that arise in the ordinary course of business, including intellectual property claims. In addition, our business is subject to extensive regulation, which may result in regulatory

proceedings against us. The Company records a liability when it is both probable that a loss has been incurred and the amount of the loss can be reasonably estimated. When the reasonable estimate of the possible loss is within a range of amounts, the minimum of the range of possible loss is accrued, unless a higher amount within the range is a better estimate than any other amount within the range. Significant judgment is required to determine both probability and the estimated amount. The Company reviews these provisions at least quarterly and adjusts them accordingly to reflect the impact of negotiations, settlements, rulings, advice of legal counsel, and updated information.

### Securities Sold, Not Yet Purchased

Securities sold, not yet purchased, represent the Company's obligations to deliver a specified security at the contracted price at a future point in time, and thereby create a liability to repurchase the securities in the market at the prevailing prices. The liability for such securities sold short, included as a component of liabilities held for sale on the consolidated statements of financial condition, is marked to market based on the current fair value of the underlying security at the reporting date. Changes in fair value of securities sold, not yet purchased are recorded as unrealized gains or losses and included in Income (loss) from discontinued operations, net of tax in the consolidated statements of operations (see Note 4). The Company repurchased the securities sold short in August 2016 and realized a loss of $1.1 million for the year ended December 31, 2016. Total unrealized gains and losses related to these securities for the years ended December 31, 2016 and 2015 were a gain of $0.6 million and a loss of $0.1 million, respectively.

### Due to Related Parties Pursuant to Tax Receivable Agreement

Exchanges of Holdings membership units ("Holdings Units") for the Corporation's Class A common stock that are executed by the members of Holdings result in transfers of and increases in the tax basis of the tangible and intangible assets of Holdings, primarily attributable to a portion of the goodwill inherent in the business. These transfers and increases in tax basis will increase (for tax purposes) amortization and therefore reduce the amount of tax that the Company would otherwise be required to pay in the future. This increase in tax basis may also decrease gain (or increase loss) on future dispositions of certain capital assets to the extent tax basis is allocated to those capital assets. Holdings has entered into a tax receivable agreement with the members of Holdings whereby the Corporation has agreed to pay to the exchanging members 85% of the amount of cash tax savings, if any, in U.S. federal, state and local income tax that the Corporation realizes as a result of these increases in tax basis. The Corporation expects to benefit from the remaining 15% of cash tax savings, if any, in income tax it realizes. Payments under the tax receivable agreement will be based on the tax reporting positions that the Corporation takes in preparing its tax returns. The Corporation will not be reimbursed for any payments previously made under the tax receivable agreement if a tax basis increase is successfully challenged by the Internal Revenue Service.

Holdings records an increase in deferred tax assets for the estimated income tax effects of the increases in tax basis based on enacted federal and state tax rates at the date of the exchange. To the extent that Holdings estimates that the exchanging members will not realize the full benefit represented by the deferred tax asset, based on an analysis that will consider, among other things, its expectation of future earnings, the Company will reduce the deferred tax asset with a valuation allowance. The Corporation records 85% of the estimated realizable tax benefit (which is the recorded deferred tax asset less any recorded valuation allowance) as an increase to the contingent liability due under the tax receivable agreement. Presently, the liability is a contingent liability based on the estimated future earnings of the Corporation and the expected tax benefit realized by the Corporation, but upon certain events such as a change in control or a material breach of the tax receivable agreement, the liability no longer stays contingent but rather becomes absolute. The remaining 15% of the estimated realizable tax benefit is initially recorded as an increase to the Corporation's capital. All of the effects to the deferred tax asset of changes in any of the estimates after the tax year of the exchange will be reflected in the provision for income taxes. Similarly, the effect of subsequent changes in the enacted tax rates will be reflected in the provision for income taxes.

### Convertible Debt Transactions

The Company separately accounts for the liability and equity components of convertible debt instruments that may be settled entirely or partially in cash upon conversion by allocating the proceeds from issuance between the liability component and the embedded conversion option, or equity component, in accordance with ASC 470, *Debt* ("ASC 470"). The value of the equity component is calculated by first measuring the fair value of the liability component, using the interest rate of a similar liability that does not have a conversion feature, as of the issuance date. The difference between the proceeds from the convertible debt issuance and the amount measured as the liability component is recorded as the equity component. The Company recognizes the accretion of the resulting discount as part of interest expense in the consolidated statements of operations.

### Derivative Liability — Letter Agreement

At issuance in January 2015, the Letter Agreement was accounted for separately from the Credit Agreement. Pursuant to ASC 480, *Distinguishing Liabilities from Equity* ("ASC 480"), a financial instrument that is entered into in conjunction with some other transaction and is legally detachable and separately exercisable is a freestanding financial instrument and should be accounted for separately. Based on the Company's review of the Letter Agreement, the Company concluded that the Letter Agreement was legally detachable from the Credit Agreement because it could be freely transferred. In addition, the Company determined that the Letter Agreement was separately exercisable since payments to the holder of the Letter Agreement are made after the repayment of the Credit Agreement. Accordingly, the Letter Agreement was determined to be a freestanding financial instrument and was accounted for separately from the Credit Agreement. Further, the Company concluded that the legal form of the Letter Agreement was equity. The Company considered the guidance in ASC 480 and determined that the accounting for the Letter Agreement did not fall within the scope of ASC 480 since the Letter Agreement was not mandatorily redeemable and did not require settlement by issuance of a variable number of equity shares. The Company then considered the guidance under ASC 815, and concluded that several features of the Letter Agreement required bifurcation as embedded derivatives and should be accounted for as a derivative liability. Changes in the fair value of the derivative liability resulting from the Letter Agreement were recorded each reporting period in the consolidated statements of operations. On September 1, 2016, the Letter Agreement was terminated (see "Redeemable Non-controlling Interest" below for further information).

### Redeemable Non-controlling Interest

In connection with the Restructuring Transaction completed on September 1, 2016 (see Note 19), the Amended and Restated Letter Agreement dated January 24, 2015 (the "Letter Agreement") was terminated and the parties signed the Amended and Restated Limited Liability Company Agreement of FXCM Group, LLC (the "Group Agreement"). The Group Agreement replaced the existing FXCM Newco, LLC agreement and FXCM Newco, LLC was renamed FXCM Group, LLC. In exchange for terminating the Letter Agreement, the Company issued a 49.9% non-controlling membership interest in Group to Leucadia. The remaining 50.1% controlling membership interest in Group is owned by Holdings and Holdings consolidates the financial results of Group as discussed above. Following a Change of Control (as defined in the Group Agreement and described in Note 19), the membership units held by Leucadia are redeemable for cash at an amount equal to the fair market value of Leucadia's economic rights under the Group Agreement. Accordingly, the non-controlling interest held by Leucadia is recorded as Redeemable non-

controlling interest and is classified outside of permanent equity on the consolidated statements of financial condition pursuant to ASC 480.

The cash distributions and earnings or loss from Group subsequent to September 1, 2016 are allocated among its members based on the contractual provisions in the Group Agreement (the "Revised Waterfall"), which differ from the members' stated ownership percentages. The Company determined that the Revised Waterfall represents a substantive profit sharing arrangement and concluded that the appropriate methodology for allocating profits and losses of Group is the hypothetical liquidation at book value method (the "HLBV method"). The Company applies the HLBV method using a balance sheet approach. Under the HLBV method, a calculation is performed at each balance sheet date to determine the amount each member would hypothetically receive assuming Group were liquidated at its recorded amount determined in accordance with U.S. GAAP and the cash distributed according to the Revised Waterfall. The difference between the liquidating distribution amounts calculated at the beginning and end of each period, after adjusting for capital contributions and distributions, is the member's share of the net income or loss from Group.

As indicated above, the membership units held by Leucadia are redeemable for cash following a change of control event (see Note 19), which is not solely within the control of the Company. The Company evaluates the probability of redemption at each reporting date. The Company concluded that the non-controlling interest in Group is not currently redeemable and it is not probable that it will become redeemable. Accordingly, subsequent adjustment of the Redeemable non-controlling interest to its estimated redemption value is not required pursuant to ASC 480. If the non-controlling interest in Group becomes redeemable, or if redemption becomes probable, an adjustment will be made to adjust the Redeemable non-controlling interest to its estimated redemption value.

### Foreign Currency

Foreign denominated assets and liabilities are re-measured into the functional currency at exchange rates in effect at the statements of financial condition dates through the consolidated statements of operations. Gains or losses resulting from foreign currency transactions are re-measured using the rates on the dates on which those elements are recognized during the period, and are included in Trading revenue in the consolidated statements of operations. The Company recorded gains of $0.8 million and $2.3 million for the years ended December 31, 2016 and 2015, respectively.

Translation gains or losses resulting from translating the Company's subsidiaries' financial statements from the functional currency to the reporting currency, net of tax, are included in Foreign currency translation gain (loss) in the consolidated statements of comprehensive income. Assets and liabilities are translated at the statement of financial condition date while revenues and expenses are translated at an applicable average rate.

### Revenue Recognition

The Company makes foreign currency markets for customers trading in FX spot markets. FX transactions are recorded on the trade date and positions are marked to market daily with related gains and losses, including gains and losses on open spot transactions, recognized currently in income.

### Trading Revenue

Under the Company's retail agency FX offering, trading revenue is earned from charging a separate commission or by adding a markup to the price provided by FX market makers generating trading revenue based on the volume of transactions and is recorded on trade date. Under the agency model, when a customer executes a trade on the best price quotation presented by the FX market maker, the Company acts as a credit intermediary, or a riskless principal, simultaneously entering into a trade with the customer and the FX market maker. This agency model has the effect of hedging the Company's positions and eliminating market risk exposure. Trading revenues earned from commissions and mark-up principally represent the difference between the Company's realized and unrealized foreign currency trading gains or losses on its positions with customers and the systematic hedge gains and losses from the trades entered into with the FX market makers. Under the Company's dealing desk, or principal, execution model, revenues earned include the markup on the FX trade and the Company's realized and unrealized foreign currency trading gains or losses on its positions with customers. Trading revenue also includes fees earned from arrangements with other financial institutions to provide platform, back office and other trade execution services. This service is generally referred to as a white label arrangement. The Company earns a commission or a percentage of the markup charged by the financial institutions to their customers. Fees from this service are recorded when earned on a trade date basis.

Additionally, the Company earns income from trading in CFDs, rollovers and spread betting. Income or loss on CFDs represents the difference between the realized and unrealized trading gains or losses on the Company's positions and the hedge gains or losses with the other financial institutions. Income or loss on CFDs is recorded on a trade date basis. Income or loss on rollovers is the interest differential customers earn or pay on overnight currency pair positions held and the markup that the Company receives on interest paid or received on currency pair positions held overnight. Income or loss on rollovers is recorded on a trade date basis. Spread betting is where a customer takes a position against the value of an underlying financial instrument moving either upward or downward in the market. Income on spread betting is recorded as earned on a trade date basis.

Trading revenues from institutional customers include commission income generated by facilitating spot FX trades on behalf of institutional customers through the services provided by FXCM Pro and FXCM Prime, which allow these customers to obtain the best execution price from external banks and routes the trades to outside financial institutions that also hold customer account balances for settlement. The Company receives commission income on these trades without taking any market or credit risk. Revenue from institutional customers is recorded on a trade date basis.

The Company also earns income from market making and electronic trading in the institutional foreign exchange spot and futures markets through Lucid and market making and electronic trading into other asset classes through V3. Income on market making and electronic trading in foreign exchange spot and future currencies represents the spread between the bid and ask price for positions purchased and sold and the change in value of positions purchased and sold. Income on market making is recorded as trading gains, net of trading losses, on a trade date basis, and is included in Income (loss) from discontinued operations, net of tax in the consolidated statements of operations.

### Interest Income

Interest income consists of interest earned on cash and cash equivalents and cash and cash equivalents, held for customers and is recognized in the period earned. Interest income also includes interest on the Notes receivable.

### Other Income

Other income includes amounts earned from the sale of market data, fees for post-sale services related to businesses sold, service fees related to an equity method investee, account maintenance fees, ancillary fee income and the net reversal of

the tax receivable agreement liability.

### Communications and Technology

Communications and technology expense consists primarily of costs for network connections to our electronic trading platforms, telecommunications costs, and fees paid for access to external market data. This expense is affected primarily by the growth of electronic trading, our network/ platform capacity requirements and by changes in the number of telecommunication hubs and connections which provide our customers with direct access to our electronic trading platforms.

### Trading Costs, Prime Brokerage and Clearing Fees

Trading costs, prime brokerage and clearing fees primarily represent fees paid to third party clearing banks and prime brokers for clearing foreign exchange spot futures currency and contract transactions, transaction fees paid to exchanges, equity options brokerage activity fees, and fees paid to third party providers for use of their platform for the Company's market making trading business. Clearing fees primarily fluctuate based on changes in volume, rate of clearing fees charged by clearing banks and rate of fees paid to exchanges.

### Referring Broker Fees

Referring broker fees represent commissions paid to brokers for introducing trading customers to the Company. Commissions are determined based on the number and size of transactions executed by the customers and are recorded on a trade date basis.

### Compensation and Benefits

Compensation and benefits expense represents employee and member salaries and benefit expense, including stock-based compensation expense.

### Stock-Based Compensation

The Company accounts for stock-based compensation in accordance with ASC 718, *Compensation-Stock Compensation* ("ASC 718"). The Company's stock-based compensation expense is measured at the date of grant, based on the estimated fair value of the award, and recognized on a straight-line basis over the requisite service period of the award, net of estimated forfeitures. The fair value of the Company's non-qualified stock options is estimated using the Black-Scholes option pricing model. The fair value of restricted stock units ("RSUs") is based on the fair market value of the Corporation's Class A common stock on the date of grant, adjusted for the present value of dividends expected to be paid on the Corporation's Class A common stock prior to vesting. Stock-based compensation expense is included in Compensation and benefits in the consolidated statements of operations (see Note 15).

### Management Incentive Plan

In connection with the Restructuring Transaction, the Company adopted the 2016 Incentive Bonus Plan for Founders and Executives (the "Management Incentive Plan"). The Management Incentive Plan is a long-term program with a five-year vesting period. Distributions under the plan will be made only after the principal and interest under the Credit Agreement have been repaid and will range from 10.0% to 14.0% of the distributions made from Group. If a participant terminates employment, he or she will receive either a non-voting membership interest in Group entitling the participant to the same share of distributions that would have otherwise been received, or a lump-sum cash payment, at the Company's discretion. The Company determined that the Management Incentive Plan is a share-based payment arrangement that will be accounted for as a liability award under ASC 718.

### Advertising and Marketing

Advertising and marketing costs are charged to operations when incurred.

### General and Administrative Expenses

General and administrative expenses include bank processing and regulatory fees, professional and consulting fees, occupancy and equipment expense and other administrative costs. Bank processing fees are costs associated with the processing of credit and debit card transactions. Regulatory fees are volume-based costs and annual fees charged by certain regulatory authorities and include fines and restitution imposed by regulators from time to time. General and administrative expense also includes a provision for forgiveness of a notes receivable and other miscellaneous client debit balances.

### Income Taxes

Holdings operates in the U.S. as a limited liability company that is treated as a partnership for U.S. federal, state, and local income tax purposes. Since January 2015, all of Holdings' operations are held by Group, a limited liability company that is also treated as a partnership between Holdings and Leucadia for U.S. federal, state and local income tax purposes. As a result, neither Holdings' nor Group's income from its U.S. operations is subject to U.S. federal income tax because the income is attributable to its members. Accordingly, the Company's U.S. tax provision is solely based on the portion of income attributable to the Corporation from the lower tier limited liability companies and excludes the income attributable to other members whose income is included in Net income (loss) attributable to non-controlling interest in Global Brokerage Holdings, LLC in the consolidated statements of operations.

Income taxes are accounted for in accordance with ASC 740, *Income Taxes* ("ASC 740"), which requires that deferred tax assets and liabilities are recognized, using enacted tax rates, for the effect of temporary differences between the book and tax basis of recorded assets and liabilities. Deferred tax assets, including net operating losses and income tax credits, are reduced by a valuation allowance if it is "more likely than not" that some portion or all of the deferred tax assets will not be realized (see Note 24).

In addition to U.S. federal and state income taxes, the Company is subject to Unincorporated Business Tax which is attributable to Group's operations apportioned to New York City. The Company's foreign subsidiaries are also subject to taxes in the jurisdictions in which they operate.

In accordance with ASC 740, the Company evaluates a tax position to determine whether it is more likely than not that the tax position will be sustained upon examination, based on the technical merits of the position. If the position does not meet a more likely than not threshold, a tax reserve is established and no income tax benefit is recognized. The Company is audited by U.S. federal and state, as well as foreign, tax authorities. In some cases, many years may elapse before a tax return containing tax

positions for which an ASC 740 reserve has been established is examined and an audit is completed. As audit settlements are reached, the Company adjusts the corresponding reserves, if required, in the period in which the final determination is made. While it is difficult to predict the final outcome or timing of a particular tax matter, the Company believes that its reserves for uncertain tax positions are recorded pursuant to the provisions of ASC 740.

The Company currently does not plan to permanently reinvest the earnings of its foreign subsidiaries and therefore does record U.S. income tax expense for the applicable earnings. This treatment could change in the future.

### *Recently Adopted Accounting Pronouncements*

In August 2014, the Financial Accounting Standards Board (the "FASB") issued ASU No. 2014-15, *Presentation of Financial Statements—Going Concern (Subtopic 205-40): Disclosure of Uncertainties about an Entity's Ability to Continue as a Going Concern*. The standard requires management to explicitly evaluate for each reporting period whether there are conditions or events that raise substantial doubt about an entity's ability to continue as a going concern and provide related footnote disclosure in certain circumstances. The standard is effective for the annual period ending after December 15, 2016, and for annual and interim periods thereafter. The Company adopted ASU No. 2014-15 for the year ended December 31, 2016.

In February 2015, the FASB issued ASU No. 2015-02, *Consolidation (Topic 810): Amendments to the Consolidation Analysis*. ASU No. 2015-02 changes the analysis that a reporting entity must perform to determine whether it should consolidate certain types of legal entities. Specifically, ASU No. 2015-02 (i) modifies the evaluation of whether limited partnership and similar legal entities are VIEs, (ii) eliminates the presumption that a general partner should consolidate a limited partnership, (iii) affects the consolidation analysis of reporting entities that are involved with VIEs that have fee arrangements and related party relationships, and (iv) provides a scope exception from consolidation guidance for certain investment companies and similar entities. The Company adopted ASU No. 2015-02 on January 1, 2016 which did not have an impact on the Company's consolidated financial statements.

In April 2015, the FASB issued ASU No. 2015-03, *Interest—Imputation of Interest (Subtopic 835-30): Simplifying the Presentation of Debt Issuance Costs*. ASU No. 2015-03 requires debt issuance costs to be presented in the balance sheet as a direct deduction from the corresponding debt liability rather than as an asset. The costs will continue to be amortized and reported as interest expense. The Company adopted ASU No. 2015-03 on January 1, 2016 on a retrospective basis. The adoption of ASU No. 2015-03 resulted in the reclassification of $2.9 million of unamortized debt issuance costs related to the Senior convertible notes from Other assets to the Senior convertible notes liability within the consolidated statements of financial condition as of December 31, 2015 (see Note 20). The adoption of ASU No. 2015-03 also resulted in the reclassification of $0.5 million of unamortized debt issuance costs related to the Credit Agreement from Other assets to the Credit Agreement liability within the consolidated statements of financial condition as of December 31, 2015 (see Note 19). Other than these reclassifications, the adoption of ASU No. 2015-03 did not have an impact on the Company's consolidated financial statements.

### *Recently Issued Accounting Pronouncements*

In May 2014, the FASB issued ASU No. 2014-09, *Revenue from Contracts with Customers (Topic 606)*. ASU No. 2014-09 replaces most existing revenue recognition guidance, and requires companies to recognize revenue based upon the transfer of promised goods and/or services to customers in an amount that reflects the consideration to which the entity expects to be entitled in exchange for those goods and/or services. In addition, the new guidance requires enhanced disclosures, including revenue recognition policies to identify performance obligations to customers and significant judgments in measurement and recognition. ASU No. 2014-09 is effective, as amended, for annual and interim periods beginning on or after December 15, 2017. The two permitted transition methods under the new standard are the full retrospective method, in which case the standard is applied to each prior period presented, or the modified retrospective method, in which case the cumulative effect of applying the standard is recognized as of the adoption date. The FASB has also issued the following standards which clarify ASU No. 2014-09, and have the same effective date and transition requirements as ASU No. 2014-09:

- ASU No. 2016-08, *Revenue from Contracts with Customers (Topic 606): Principal versus Agent Considerations (Reporting Revenue Gross versus Net)*
- ASU No. 2016-10, *Revenue from Contracts with Customers (Topic 606): Identifying Performance Obligations and Licensing*
- ASU No. 2016-12, *Revenue from Contracts with Customers (Topic 606): Narrow-Scope Improvements and Practical Expedients*
- ASU No. 2016-20, *Technical Corrections and Improvements to Topic 606, Revenue from Contracts with Customers*

The Company plans to adopt ASU No. 2014-09 on January 1, 2018. At this time, the Company has not yet selected a transition method; however, it is in the process of completing its analysis and expects to decide on a transition method in the first half of 2017. The Company initiated a project team to evaluate the impact of this standard, document the considerations for each revenue stream and begin the implementation process. The initial analysis identifying areas that will be impacted by the new guidance is substantially complete. As a result of the initial evaluation performed, the Company does not expect that there will be changes to the timing of recognition of revenue, but does anticipate certain changes to the classification of revenue in the consolidated statements of operations. The Company also expects additional disclosures to be provided in its consolidated financial statements after adoption of the new standard. The Company will continue to monitor additional modifications, clarifications or interpretations by the FASB that may impact its current conclusions, and will provide further updates in future periods.

In January 2016, the FASB issued ASU No. 2016-01, *Financial Instruments—Overall (Subtopic 825-10): Recognition and Measurement of Financial Assets and Financial Liabilities*. This guidance in this update amends various aspects of the recognition, measurement, presentation, and disclosure for financial instruments. The guidance in this update is effective for fiscal years beginning after December 15, 2017, including interim periods within those fiscal years. Early adoption by public entities is permitted only for certain provisions. The adoption of this standard may result in a cumulative-effect adjustment to the consolidated statement of financial condition as of the beginning of the year of adoption. The Company expects to adopt this guidance beginning January 1, 2018 and is currently evaluating the impact that adoption of this standard will have on its consolidated financial statements.

In February 2016, the FASB issued ASU No. 2016-02, *Leases (Topic 842)*. ASU No. 2016-02 requires lessees to recognize, on the balance sheet, assets and liabilities for the rights and obligations created by leases classified as operating leases of greater than twelve months. The accounting by lessors will remain largely unchanged. The guidance in this update is effective for fiscal years beginning after December 15, 2018, including interim periods within those fiscal years, with early adoption permitted. The new standard must be adopted using a modified retrospective approach, and provides for certain practical expedients. Transition will require application of the new guidance at the beginning of the earliest period presented. The Company expects to adopt this guidance beginning January 1, 2019 and plans to initiate a project team to evaluate the impact this standard will have on its consolidated financial statements.

In March 2016, the FASB issued ASU No. 2016-06, *Derivatives and Hedging (Topic 815): Contingent Put and Call Options in Debt Instruments*. ASU No. 2016-06 clarifies the requirements for assessing whether contingent call (put) options that can accelerate the payment of principal on debt instruments are clearly and closely related to their debt hosts. An entity performing the assessment under the amendments in this update is required to assess the embedded call (put) options solely in accordance with the four-step decision sequence in ASC 815-15-25-42. The guidance in this update is effective for fiscal years beginning after December 15, 2016, including interim periods within those fiscal years. Early adoption is permitted. An entity should apply the amendments in this update on a modified retrospective basis to existing debt instruments as of the beginning of the fiscal year for which the amendments are effective. The Company adopted this guidance on January 1, 2017 and does not expect it will have a material impact on its consolidated financial statements.

In March 2016, the FASB issued ASU No. 2016-07, *Investments—Equity Method and Joint Ventures (Topic 323): Simplifying the Transition to the Equity Method of Accounting*. ASU No. 2016-07 eliminates the requirement that an investor retrospectively apply equity method accounting when an investment that it had accounted for by another method initially qualifies for the equity method. The guidance requires that an equity method investor add the cost of acquiring the additional interest in the investee to the current basis of the investor's previously held interest and adopt the equity method of accounting as of the date the investment becomes qualified for equity method accounting. The guidance in this update is effective for fiscal years beginning after December 15, 2016, including interim periods within those fiscal years. Earlier application is permitted. The Company adopted this guidance on January 1, 2017 and does not expect it will have a material impact on its consolidated financial statements.

In March 2016, the FASB issued ASU No. 2016-09, *Compensation—Stock Compensation (Topic 718): Improvements to Employee Share-Based Payment Accounting*. ASU No. 2016-09 simplifies certain aspects related to the accounting for share-based payment transactions, including income tax consequences, statutory withholding requirements, forfeitures and classification on the statement of cash flows. The guidance in this update is effective for fiscal years beginning after December 15, 2016, including interim periods within those fiscal years. Early adoption is permitted. Certain of the amendments related to timing of the recognition of tax benefits and tax withholding requirements should be applied using a modified retrospective transition method. Amendments related to classification on the statement of cash flows should be applied retrospectively. All other provisions may be applied on a prospective or modified retrospective basis. The Company adopted this guidance on January 1, 2017 and does not expect it will have a material impact on its consolidated financial statements.

In August 2016, the FASB issued ASU No. 2016-15, *Statement of Cash Flows (Topic 230): Classification of Certain Cash Receipts and Cash Payments*. ASU No. 2016-15 provides guidance on the following eight specific cash flow classification issues: (1) debt prepayment or debt extinguishment costs; (2) settlement of zero-coupon debt instruments; (3) contingent consideration payments made after a business combination; (4) proceeds from the settlement of insurance claims; (5) proceeds from the settlement of corporate-owned life insurance policies, including bank-owned life insurance policies; (6) distributions received from equity method investments; (7) beneficial interests in securitization transactions; and (8) separately identifiable cash flows and application of the predominance principle. Current U.S. GAAP does not include specific guidance on these eight cash flow classification issues. The amendments in ASU No. 2016-15 are effective for fiscal years beginning after December 15, 2017, and interim periods within those fiscal years. Earlier adoption is permitted, provided that all the amendments are adopted in the same period. The amendments in this update are to be applied on a retrospective basis. The Company expects to adopt this guidance beginning January 1, 2018 and is currently evaluating the impact that adoption of this standard will have on its consolidated financial statements.

In October 2016, the FASB issued ASU No. 2016-17, *Consolidation (Topic 810): Interests Held through Related Parties That Are under Common Control*. ASU No. 2016-17 amends the consolidation guidance in ASU No. 2015-02 on how a reporting entity that is the single decision maker of a VIE should treat indirect interests in the entity held through related parties that are under common control when performing the primary beneficiary analysis under the VIE model. Under ASU No. 2016-17, the single decision maker will consider an indirect interest held by a related party under common control on a proportionate basis. The amendments in ASU No. 2016-17 are effective for fiscal years beginning after December 15, 2016, and interim periods within those fiscal years, with early adoption permitted. Entities that already have adopted the amendments in ASU No. 2015-02 are required to apply the amendments in this update retrospectively to all relevant prior periods beginning with the fiscal year in which the amendments in ASU No. 2015-02 initially were applied. The Company adopted this guidance on January 1, 2017 and does not expect it will have a material impact on its consolidated financial statements.

In November 2016, the FASB issued ASU No. 2016-18, *Statement of Cash Flows (Topic 230): Restricted Cash*. The amendments in ASU No. 2016-18 address diversity in the classification and presentation of changes in restricted cash on the statement of cash flows. Under this guidance, companies will be required to present restricted cash and restricted cash equivalents with cash and cash equivalents when reconciling the beginning-of-period and end-of-period amounts shown on the statement of cash flows. The amendments in ASU No. 2016-18 are required to be applied retrospectively and are effective for fiscal years beginning after December 15, 2017, and interim periods within those fiscal years, with early adoption permitted. The Company expects to adopt this guidance beginning January 1, 2018 and is currently evaluating the impact that adoption of this standard will have on its consolidated financial statements.

In January 2017, the FASB issued ASU No. 2017-04, *Intangibles—Goodwill and Other (Topic 350): Simplifying the Test for Goodwill Impairment*. Under ASU No. 2017-04, Step 2 of the goodwill impairment test has been eliminated. Step 2 of the goodwill impairment test required companies to determine the implied fair value of the reporting unit's goodwill. Under the new guidance, companies will perform their annual, or interim goodwill impairment test by comparing the reporting unit's carrying value, including goodwill, to the fair value. An impairment charge would be recorded if the carrying value exceeds the reporting unit's fair value. ASU No. 2017-04 also eliminates the requirements for any reporting unit with a zero or negative carrying amount to perform a qualitative assessment and, if it fails that qualitative test, to perform Step 2 of the goodwill impairment test. Therefore, the same impairment assessment applies to all reporting units. An entity is required to disclose the amount of goodwill allocated to each reporting unit with a zero or negative carrying amount of net assets. An entity still has the option to perform the qualitative assessment for a reporting unit to determine if the quantitative impairment test is necessary. The amendments in ASU No. 2017-04 are required to be applied prospectively and are effective for annual or any interim goodwill impairment tests in fiscal years beginning after December 15, 2019. Early adoption is permitted for interim or annual goodwill impairment tests performed on testing dates after January 1, 2017. The Company expects to early adopt this guidance effective January 1, 2017 and is currently evaluating the impact that adoption of this standard will have on its consolidated financial statements.

| Non-Controlling Interests | 12 Months Ended |
|---|---|
| | Dec. 31, 2016 |
| **Noncontrolling Interest [Abstract]** | |
| Non-Controlling Interests | |

### Non-Controlling Interests

#### *Redeemable Non-controlling Interest*

In connection with the Restructuring Transaction completed on September 1, 2016 (see Note 19), the Letter Agreement was terminated and the parties signed the Group Agreement as described in Note 2. In exchange for the Letter Agreement, the Company issued a 49.9% non-controlling membership interest in Group to Leucadia. The remaining 50.1% controlling membership interest in Group is owned by Holdings and Holdings consolidates the financial results of Group, as discussed in Note 2. The non-controlling interest held by Leucadia is redeemable for cash upon a contingent event that is not solely within the control of the Company and, accordingly, is classified outside of permanent equity on the consolidated statements of financial condition as Redeemable non-controlling interest. As of December 31, 2016, the non-controlling interest in Group is not redeemable and is not probable of becoming redeemable and, consequently, has not been adjusted to its estimated redemption value.

The Company recorded the following activity related to Redeemable non-controlling interest for the year ended December 31, 2016, with amounts in thousands:

| | |
|---|---:|
| **Balance as of January 1, 2016** | $ — |
| Issuance of redeemable non-controlling interest (net of HLBV allocation, discussed below) | 49,285 |
| Net loss attributable to redeemable non-controlling interest | (2,804) |
| Other comprehensive loss attributable to redeemable non-controlling interest | (377) |
| Equity-based compensation | 260 |
| **Balance as of December 31, 2016** | $ 46,364 |

On the date of the Restructuring Transaction, in exchange for the Letter Agreement Leucadia was issued a redeemable non-controlling interest in Group which had a fair value of $235.5 million, which was also the fair value of the derivative liability related to the Letter Agreement. As a result, the Company derecognized the derivative liability related to the Letter Agreement and recorded the Redeemable non-controlling interest at $49.3 million, which represented the amount that Leucadia would receive assuming Group were liquidated at its recorded amount determined in accordance with U.S. GAAP and the cash distributed according to the Revised Waterfall at that date. This change was recorded as an equity transaction within Additional paid-in capital of the Corporation for the impact to the controlling and non-controlling unit holders of Holdings based on Holdings' 50.1% controlling financial interest in Group.

#### *Non-controlling Interests*

##### *Holdings*

The Corporation consolidates the financial results of Holdings and records a non-controlling interest for the economic interest in Holdings not owned by the Corporation. Pursuant to an agreement between the Corporation and Holdings, whenever the Corporation cancels, issues or repurchases shares of its Class A common stock, Holdings enters into an equivalent Holdings Unit transaction with the Corporation so that at all times the number of shares of Class A common stock is equal to the Corporation's membership units in Holdings. In addition, whenever the owners of Holdings prior to the initial public offering ("Existing Unit Holders") (other than the Corporation) exchange their Holdings Units for shares of the Corporation's Class A common stock, Holdings is required to transfer an equal amount of Holdings Units to the Corporation.

Changes in the non-controlling and the Corporation's interests in Holdings for the years ended December 31, 2015 and 2016 are presented in the following table:

| | Controlling Units | Non-Controlling Units | Total Units | Global Brokerage, Inc. | Non-Controlling | Total |
|---|---:|---:|---:|---:|---:|---:|
| **Balance as of January 1, 2015** | 4,788,994 | 3,445,761 | 8,234,755 | 58.1% | 41.9 % | 100.0% |
| Exchange of Holdings Units to Class A common stock | 808,672 | (808,672) | — | 9.8% | (9.8)% | —% |
| Repurchase of Holdings Units related to repurchase of Class A common stock | (61) | — | (61) | —% | — % | —% |
| Vesting of restricted stock units | 4,929 | — | 4,929 | —% | — % | —% |
| **Balance as of December 31, 2015** | 5,602,534 | 2,637,089 | 8,239,623 | 67.9% | 32.1 % | 100.0% |
| Exchange of Holdings Units to Class A common stock | 535,992 | (535,992) | — | 6.6% | (6.6)% | —% |
| Vesting of restricted stock units | 4,771 | — | 4,771 | —% | — % | —% |
| **Balance as of December 31, 2016** | 6,143,297 | 2,101,097 | 8,244,394 | 74.5% | 25.5 % | 100.0% |

##### *Lucid, V3 and Other Non-Controlling Interests*

The Company owns controlling interests in Lucid, V3 and other entities and consolidates the financial results of these entities whereby it records a non-controlling interest for the economic interest not owned by the Company. Lucid and V3 are classified as discontinued operations and the assets and liabilities of Lucid and V3 are classified as held for sale on the consolidated statements of financial condition (see Note 4). The Company no longer holds a controlling interest in Faros as a result of the sale of Faros' operations in the second quarter of 2015.

XML 29 R11.htm IDEA: XBRL DOCUMENT

| Dispositions | 12 Months Ended |
|---|---|
| | Dec. 31, 2016 |
| **Discontinued Operations and Disposal Groups [Abstract]** | |
| Dispositions | **Dispositions** |

**Dispositions**

**Discontinued Operations**

As a result of the losses incurred by the Company on January 15, 2015 related to the Swiss National Bank ("SNB") releasing the peg of the Swiss Franc to the Euro and the subsequent Leucadia financing arrangement entered into by the Company on January 16, 2015, the Company committed to a plan during the first quarter of 2015 to sell its interests in certain retail and institutional businesses in order to pay down the Leucadia debt. The retail businesses are HK, FXCMJ and the equity trading business of FSL. The institutional businesses are Faros, Lucid, V3 and the Company's equity interest in FastMatch. In April 2015, the Company completed the sales of FXCMJ and Faros. In September 2015, the Company completed the sale of HK. In December 2015, the Company completed the sale of the equity trading business of FSL. The Company remains committed to a plan to sell Lucid, V3 and its equity interest in FastMatch and continues to actively market these businesses.

The Company considered the guidance in ASC 205-20 in evaluating the accounting and presentation in the consolidated financial statements of the businesses that have been sold during the period and the remaining businesses to be sold. The operations and cash flows of these businesses are clearly distinguishable and, accordingly, have been determined to represent a group of components as defined in the guidance. It was further determined that the remaining businesses to be sold continue to meet the criteria for classification as held for sale as of December 31, 2016. Accordingly, the assets and liabilities of these businesses have been classified as assets and liabilities held for sale in the consolidated statements of financial condition as of December 31, 2016 and 2015.

In accordance with ASC 205-20, to qualify for reporting as a discontinued operation, components that are disposed of or classified as held for sale must represent a strategic shift that has or will have a major effect on the Company's operations and financial results. The Company believes that the dispositions of these businesses represent a strategic shift from the Company's diversification strategy undertaken for the past several years and concluded that the businesses to be disposed of qualify for reporting as discontinued operations. Accordingly, the results of operations of these businesses are reported in Income (loss) from discontinued operations, net of tax in the consolidated statements of operations for the years ended December 31, 2016 and 2015.

*Completed dispositions*

In April 2015, the Company completed the sale of FXCMJ to Rakuten Securities, Inc. ("Rakuten Sec") for a cash purchase price of $62.2 million. The Company recognized a net gain of approximately $2.0 million related to the sale, which included a reversal of $23.4 million of foreign currency translation loss out of accumulated other comprehensive income. The net gain was recorded in earnings as a component of Income (loss) from discontinued operations, net of tax for the year ended December 31, 2015. In connection with the sale of FXCMJ, the Company agreed to provide certain transitional services, including use of the Company's trading platform and data services, for no additional consideration for a period of nine months following the date of sale. The Company estimated the value of these services to be approximately $2.1 million and accordingly allocated $2.1 million of proceeds received as deferred income. The deferred income was entirely amortized into other income over the nine-month period ending December 31, 2015. The terms of the services agreement provided for the Company to receive a monthly fee for these services beginning January 1, 2016 for a period of ten months beginning on October 31, 2016. The Company recorded other income for these transitional services of $1.6 million for the year ended December 31, 2016.

In April 2015, Faros completed the sale of its operations to Jefferies Group LLC. Consideration will be determined quarterly pursuant to an earn-out formula based on Faros' results beginning on the closing date and ending on November 30, 2017. Any consideration received will be divided among the Company and the non-controlling members of Faros based on a formula in the sales agreement. No consideration was received during the years ended December 31, 2016 and 2015.

In September 2015, the Company completed the sale of HK to Rakuten Sec for a cash purchase price of $37.9 million. The Company recognized a net gain related to the sale of approximately $12.4 million. The net gain was recorded in earnings as a component of Income (loss) from discontinued operations, net of tax for the year ended December 31, 2015. In connection with the sale of HK, the Company agreed to provide certain transitional services, including use of the Company's trading platform, data services and professional support, for no additional consideration for a period of nine months following the date of sale. The Company estimated the value of these services to be approximately $1.0 million and accordingly allocated $1.0 million of proceeds received as deferred income. The deferred income was amortized into other income over the nine-month period following the date of sale. The Company recorded $0.6 million and $0.4 million of other income for these transitional services for the years ended December 31, 2016 and 2015, respectively. The terms of the services agreement provide for the Company to receive a monthly fee for these services beginning in June 2016 for an expected period of nine months. The Company recorded other income of $1.2 million related to these service fees for the year ended December 31, 2016.

In December 2015, the Company completed the sale of the equity trading business of FSL to AS Expobank for a cash purchase price of $2.3 million. The Company recognized a net loss of approximately $7.1 million related to the sale, which includes a reversal of $1.5 million of foreign currency translation loss out of accumulated other comprehensive income. The net loss was recorded in earnings as a component of Income (loss) from discontinued operations, net of tax for the year ended December 31, 2015. In connection with the sale of the equity trading business of FSL, the Company agreed to provide certain transitional services, primarily professional support, for no additional consideration for a period of twelve months following the date of sale. The Company estimated the value of these services to be approximately $0.5 million and accordingly allocated $0.5 million of proceeds received as deferred income. For the years ended December 31, 2016 and 2015, the amount of deferred income amortized into other income for these transitional services was $0.5 million and not material, respectively.

The following table presents the major classes of line items constituting the pretax and after-tax profit or loss of discontinued operations for the years ended December 31, 2016 and 2015, with amounts in thousands:

| | For the Years Ended December 31, | |
|---|---|---|
| | **2016** | **2015** |
| **Revenues** | | |

| | | | |
|---|---|---:|---:|
| Trading revenue | | $ 31,101 | $ 71,500 |
| Interest income | | 309 | 272 |
| Brokerage interest expense | | — | (100) |
| Net interest revenue | | 309 | 172 |
| Other income | | 113 | 5,700 |
| **Total net revenues** | | 31,523 | 77,372 |
| **Operating Expenses** | | | |
| Compensation and benefits | | (248) | 14,708 |
| Allocation of net income to Lucid members for services provided | | 3,029 | 5,064 |
| Total compensation and benefits | | 2,781 | 19,772 |
| Referring broker fees | | — | 208 |
| Advertising and marketing | | — | 736 |
| Communication and technology | | 5,694 | 8,248 |
| Trading costs, prime brokerage and clearing fees | | 13,062 | 18,378 |
| General and administrative | | 2,395 | 6,314 |
| Bad debt expense | | — | 8,408 |
| Depreciation and amortization | | — | 12,359 |
| Goodwill impairment loss | | — | 54,865 |
| **Total operating expenses** | | 23,932 | 129,288 |
| **Operating income (loss)** | | 7,591 | (51,916) |
| **Other (Income) Expense** | | | |
| (Gain) loss on equity method investments, net | | (1,114) | 1,267 |
| Income (loss) from discontinued operations before income taxes | | 8,705 | (53,183) |
| Net gain on completed dispositions | | — | 7,313 |
| Loss on classification as held for sale before income taxes | | 126,511 | 66,660 |
| Total loss from discontinued operations before income taxes* | | (117,806) | (112,530) |
| Income tax provision | | 54 | 5,764 |
| **Loss from discontinued operations, net of tax** | | $ (117,860) | $ (118,294) |

\* Total loss from discontinued operations before income taxes attributable to Global Brokerage, Inc. was $26.0 million and $38.7 million for the years ended December 31, 2016 and 2015, respectively.

The following is a summary of the carrying amounts of the assets and liabilities included as part of discontinued operations as of December 31, 2016 and 2015, with amounts in thousands:

| | | As of December 31, | |
|---|---|---:|---:|
| | | **2016** | **2015** |
| **Assets** | | | |
| Cash and cash equivalents | | $ 9,378 | $ 10,786 |
| Due from brokers [(1)] | | 14,090 | 22,234 |
| Accounts receivable, net | | 251 | 178 |
| Office, communication and computer equipment, net | | 1,336 | 1,154 |
| Goodwill | | 223,613 | 223,613 |
| Other intangible assets, net | | 27,269 | 27,269 |
| Other assets [(2) (3)] | | 14,337 | 15,363 |
| Loss recognized on classification as held for sale | | (193,171) | (66,660) |
| Total assets classified as held for sale on the consolidated statements of financial condition | | $ 97,103 | $ 233,937 |
| | | | |
| **Liabilities** | | | |
| Accounts payable and accrued expenses [(4)] | | $ 2,266 | $ 10,838 |
| Due to brokers [(1)] | | 45 | — |
| Securities sold, not yet purchased | | — | 3,624 |
| Other liabilities | | 14 | 48 |
| Total liabilities classified as held for sale on the consolidated statements of financial condition | | $ 2,325 | $ 14,510 |

[(1)] Includes as of December 31, 2016 and 2015: a) derivative assets, net of $1.6 million and $0.9 million, respectively; b) Unsettled spot FX, net of $0.2 million and $0.3 million, respectively; c) Unsettled common stock of nil and $3.0 million, respectively; and d) Excess cash collateral of $12.2 million and $18.0 million, respectively.

[(2)] Includes the Company's exchange memberships, which represent ownership interests and shares owned in CME Group Inc. and provide the Company with the right to conduct business on the exchanges. The exchange memberships are recorded at cost or, if an other-than-temporary impairment in value has occurred, at a value that reflects management's estimate of the impairment. The Company had previously owned shares in the Intercontinental Exchange which were sold in April 2015. The Company recognized a gain $0.1 million related to the sale which was recorded in earnings as a component of Income (loss) from discontinued operations, net of tax for the year ended December 31, 2015. During 2015, the Company acquired additional ownership interests and shares in one of the non-controlling members of Lucid which were recorded at a total cost of $3.7 million. There were no exchange membership impairments for the years ended December 31, 2016 or 2015. As of both December 31, 2016 and 2015, the carrying value of ownership interests was $4.6 million and the carrying value of shares owned was $4.8 million. In January 2017, the Company sold its ownership interests and shares in CME Group Inc. and

expects to recognize a gain of $0.8 million related to the sale during the first quarter of 2017.

[3] Includes the carrying value of the Company's equity interest in FastMatch of $4.6 million and $4.2 million as of December 31, 2016 and 2015, respectively. The carrying value of the Company's previously-held equity interest in the V3-related LLC of $1.5 million is included as of December 31, 2015 (see Note 6).

[4] Includes as of December 31, 2016 and 2015 amounts due related to the allocation of income to Lucid non-controlling members for services provided of $0.7 million and $6.5 million, respectively.

**Sale of Investment**

The Company sold its DailyFX business to FX Publications, Inc. on October 28, 2016 (the "Closing Date") for a cash purchase price of $40.0 million, payable in two installments. DailyFX is the leading portal for FX trading news, charts, indicators and analysis. The first installment of $36.0 million was paid to the Company on the Closing Date and the proceeds were used to pay down the term loan. The second installment of $4.0 million will be paid to the Company on the completion of certain migration requirements. The migration was completed on February 24, 2017 and the final payment is expected in the first quarter of 2017. After transaction costs, the Company recognized a gain of $37.2 million related to the sale which is recorded in Gain on sale of investment in the consolidated statements of operations for the year ended December 31, 2016. The Company considered the guidance in ASC 205-20 and determined that since the operations and cash flows of the DailyFX business are not clearly distinguishable, it does not represent a component as defined in the guidance. Consequently, the DailyFX business does not qualify for reporting as a discontinued operation in the consolidated financial statements.

In connection with the sale of the DailyFX business, the Company agreed to provide certain transitional services, including the use of facilities, website and other data services, for no additional consideration for a period of three months following the date of sale. Certain services were subsequently extended for an additional three-month period to end in April 2017 in accordance with the terms of the services agreement. The Company estimated the value of these services to be approximately $0.3 million and accordingly allocated $0.3 million of proceeds received as deferred income, which is included in Accounts payable and accrued expenses on the consolidated statements of financial condition. The deferred income is amortized into other income over the respective three and six-month periods following the date of sale. The Company recorded $0.1 million of other income for these transitional services for the year ended December 31, 2016.

In connection with the sale of the DailyFX business, the Company also entered into a three-year digital advertising agreement with FX Publications, Inc. The agreement provides for advertisements to be published on the DailyFX website in exchange for cash consideration payable by the Company in quarterly installments based on the number of leads (as defined in the agreement) generated by those advertisements. Until the website migration related to the sale is completed, the quarterly installment payable is approximately $0.7 million. Subsequent to the completion of the migration, the quarterly amount payable will be reduced or increased in accordance with a pre-determined formula based on the actual number of leads received in the previous quarter, compared to the baseline leads as defined in the agreement, not to exceed a total of $0.8 million per quarter. If actual leads received in any given quarter after the migration is complete do not meet a set threshold, the Company has the right to immediately terminate the agreement and will not be required to pay the quarterly fee. As of December 31, 2016, the Company recorded a liability of $0.4 million related to the digital advertising agreement, which is included in Accounts payable and accrued expenses on the consolidated statements of financial condition. The costs associated with the digital advertising agreement are expensed as incurred.

XML 30 R12.htm IDEA: XBRL DOCUMENT

| Notes Receivable | 12 Months Ended |
| --- | --- |
| | Dec. 31, 2016 |
| **Receivables [Abstract]** | |
| Notes Receivable | **Notes Receivable**<br><br>In January 2014, in connection with the formation of V3 by the Company and the non-controlling members of Lucid, the non-controlling members of Lucid borrowed approximately $7.9 million from the Company to assist with funding their portion of the capital contribution. The amount borrowed was due in 2017 and bore interest at the rate of 2% per annum. During the second quarter of 2016, management determined that the non-controlling members of Lucid would not be required to repay the notes receivable and the debt would be forgiven. Accordingly, the Company recorded a provision for the debt forgiveness in the amount of $8.2 million for the principal amount thereof plus accrued interest, which is included in General and administrative expense in the consolidated statements of operations for the year ended December 31, 2016. The Company recorded $0.1 million and $0.2 million of interest income related to the notes receivable for the years ended December 31, 2016 and 2015, respectively. |

XML 31 R13.htm IDEA: XBRL DOCUMENT

| Equity Method Investments | 12 Months Ended |
|---|---|
| | Dec. 31, 2016 |
| **Equity Method Investments and Joint Ventures [Abstract]** | |
| Equity Method Investments | **Equity Method Investments**

The Company has a 22.2% equity interest in a developer of FX trading software which is accounted for using the equity method. During the fourth quarter of 2016, the Company evaluated its investment for impairment as a result of declines in the investee's financial condition, earnings and near-term operational prospects. The Company determined that an impairment of value had occurred that is other-than-temporary and recorded an impairment charge of $2.1 million, which is included in Loss on equity method investments, net in the consolidated statements of operations for the year ended December 31, 2016. The carrying value of the Company's equity interest in the FX trading software developer is nil and $2.6 million as of December 31, 2016 and 2015, respectively, and is included as a component of Other assets in the consolidated statements of financial condition. The Company's share of the loss of the FX trading software developer was $0.5 million for both of the years ended December 31, 2016 and 2015 and is included in Loss on equity method investments, net in the consolidated statements of operations.

In November 2016, the Company acquired a 30.0% equity interest for $0.5 million in a developer of FX analytical software which is accounted for using the equity method. During the fourth quarter of 2016, the Company evaluated its investment for impairment as a result of declines in the investee's financial condition, earnings and near-term operational prospects. The Company determined that an impairment of value had occurred that is other-than-temporary and recorded an impairment charge of $0.5 million, which is included in Loss on equity method investments, net in the consolidated statements of operations for the year ended December 31, 2016. The carrying value of the Company's equity interest in the software developer is nil as of both December 31, 2016 and 2015. The Company's share of the loss of the FX analytical software developer was nil for both of the years ended December 31, 2016 and 2015.

The Company has a 34.4% non-controlling equity interest in FastMatch, an electronic communication network for foreign exchange trading, and exerts significant influence. The investment is accounted for using the equity method. As discussed in Note 4, the Company's equity interest in FastMatch is classified as a discontinued operation.

In conjunction with the V3 acquisition in January 2014, the Company acquired a 66.3% non-controlling interest in a limited liability company ("V3-related LLC") that held a 17.26% interest in a firm that delivers investment information to investment professionals. Until December 31, 2015, the other members of the V3-related LLC had not consented to the transfer of the 66.3% non-controlling interest to the Company and the investment had been accounted for using the equity method. On December 31, 2015, the other members of the V3-related LLC approved a resolution to transfer the 66.3% non-controlling interest to the Company and, in a related transaction, to distribute the assets held by the V3-related LLC to its members, including the Company, and subsequently liquidate the V3-related LLC. These transactions were completed during the first quarter of 2016 and resulted in the Company's acquisition of an equity interest in the firm described above which is accounted for using the cost method. The carrying value of the investment was $1.1 million as of December 31, 2016 and is included as a component of Other assets in the consolidated statements of financial condition (see Note 10). As discussed in Note 4, V3, including the equity interest previously held in the V3-related LLC, is classified as a discontinued operation. Income (loss) from discontinued operations, net of tax for the year ended December 31, 2016 includes a gain of $0.7 million related to the disposition of the V3-related LLC in 2016.

The carrying values of the Company's equity interest in FastMatch and the V3-related LLC (prior to its disposition) are included in assets held for sale in the consolidated statements of financial condition. As of December 31, 2016 and 2015, the carrying values of the Company's equity method investments included in assets held for sale were $4.6 million and $5.7 million, respectively. The Company's share of the income or loss of FastMatch and the V3-related LLC (prior to its disposition) is included in Income (loss) from discontinued operations, net of tax in the consolidated statements of operations. Total income (loss) on equity method investments included in Income (loss) from discontinued operations, net of tax was $0.4 million and $(1.3) million for the years ended December 31, 2016 and 2015, respectively.

The Company did not receive any dividend distributions from its equity method investments during the years ended December 31, 2016 and 2015. |

XML 32 R14.htm IDEA: XBRL DOCUMENT

| Office, Communication and Computer Equipment, net | 12 Months Ended |
| --- | --- |
| | Dec. 31, 2016 |
| **Property, Plant and Equipment [Abstract]** | |
| Office, Communication and Computer Equipment, net | **Office, Communication and Computer Equipment, net** |

Office, communication and computer equipment, net consisted of the following as of December 31, 2016 and 2015, with amounts in thousands:

| | As of December 31, | |
| --- | --- | --- |
| | **2016** | **2015** |
| Computer equipment | $    12,633 | $    17,637 |
| Capitalized software | 80,624 | 70,750 |
| Leasehold improvements | 8,775 | 10,024 |
| Furniture and fixtures and other equipment | 1,599 | 1,677 |
| Licenses | 2,883 | 3,026 |
| Communication equipment | 1,894 | 1,885 |
| Total office, communication and computer equipment | 108,408 | 104,999 |
| Less: Accumulated depreciation | (75,593) | (69,108) |
| Office, communication and computer equipment, net | $    32,815 | $    35,891 |

Depreciation is computed on a straight-line basis (see Note 2). Depreciation expense from continuing operations, including impairments, included in the consolidated statements of operations was $20.1 million and $21.3 million for the years ended December 31, 2016 and 2015, respectively. Also included in depreciation expense from continuing operations is amortization related to capitalized software development costs of $14.8 million and $14.5 million for the years ended December 31, 2016 and 2015, respectively. Unamortized capitalized software development costs were $23.9 million and $24.7 million as of December 31, 2016 and 2015, respectively.

During 2016 and 2015, the Company disposed of fully depreciated assets from continuing operations of $10.5 million and $13.2 million, respectively. During 2016, the Company recorded a charge of $1.1 million to fully impair the carrying amount of capitalized software and website development costs related to the DailyFX business as a result of its sale during the fourth quarter of 2016 (See Note 4). The impairment charge reduced the gain on sale and is included in Gain on sale of investments in the consolidated statements of operations for the year ended December 31, 2016. There were no impairments of fixed assets for the year ended December 31, 2015.

Office, communication and computer equipment related to businesses to be disposed of are included as a component of assets held for sale on the consolidated statements of financial condition and are not included in the table above. Depreciation related to these assets ceased as of the date they were determined to be held for sale. Depreciation expense related to these assets (prior to the date they were determined to be held for sale) is included in Income (loss) from discontinued operations, net of tax in the consolidated statements of operations.

XML 33 R15.htm IDEA: XBRL DOCUMENT

| Goodwill | 12 Months Ended |
|---|---|
| | Dec. 31, 2016 |
| **Goodwill and Intangible Assets Disclosure [Abstract]** | |
| Goodwill | **Goodwill** |

The Company performed its annual assessment of goodwill for impairment as of October 1, 2016, (the "Annual Assessment Date"). Due to the negative equity of the reporting unit, the Company performed a qualitative assessment to determine whether it would be necessary to perform the second step of the goodwill impairment test. The Company evaluated qualitative factors, including market and economic conditions, industry-specific events and company-specific financial results, and determined that it was not more likely than not that goodwill was impaired as of the Annual Assessment Date.

In conjunction with the qualitative assessment, the Company performed a calculation of the fair value of the reporting unit as of the Annual Assessment Date primarily using the income approach. The income approach incorporated the use of a discounted cash flow ("DCF") method whereby the estimated future cash flows and terminal values for the reporting unit are discounted to a present value using a discount rate. The estimated future cash flows are based on management's forecasts and projections for the reporting unit which are driven by key assumptions, including revenue growth, operating margins, capital expenditures, non-cash expenses and income tax rate. When applicable, various growth rates are assumed for years beyond the current business plan period. The discount rate is based on a market participant weighted-average cost of capital, calculated based on the risk-free rate of return, beta, which is a measure of the level of non-diversifiable risk associated with comparable companies, market equity risk premium and a company-specific risk factor.

Due to the negative equity of the reporting unit at the Annual Assessment date, the Company assessed the reasonableness of the calculated fair value of the reporting unit by comparing the fair value of the reporting unit, adjusted for the fair value of interest-bearing debt and the fair value of Leucadia's non-controlling membership units in Group, to the market capitalization of the Company. An implied control premium was then estimated, which represents the excess of the reporting unit's fair value less adjustments over the market capitalization. Finally, the indicated carrying value of the reporting unit, represented by the negative equity of the reporting unit adjusted for the book value of interest-bearing debt and the fair value of Leucadia's non-controlling membership units in Group, was compared to the calculated fair value of the reporting unit. The calculated fair value of the reporting unit exceeded the indicated carrying value of the reporting unit. The fair value calculation was an additional factor considered within the overall qualitative assessment, indicating that it was not more likely than not that goodwill was impaired as of the Annual Assessment Date.

Due to the nature and significance of the regulatory events that occurred in February 2017 (see Note 28), the Company determined that a triggering event had occurred requiring an assessment of goodwill as of December 31, 2016. The Company performed a qualitative assessment to determine whether it was more likely than not that goodwill was impaired as of December 31, 2016. The qualitative assessment considered market conditions and overall financial performance during the fourth quarter of 2016, and included an updated fair value calculation using the same DCF methodology described above. In performing the DCF analysis as of December 31, 2016, the Company adjusted its estimated future cash flows assumptions and financial projections by reflecting the sale of its U.S. customer accounts and the implementation of cost reduction plans. In addition, inputs to the discount rate were revised to reflect changes to the risk-free rate of return and beta. Based on the analysis, the calculated fair value of the reporting unit exceeded its indicated carrying value as of December 31, 2016. As a result of the overall qualitative assessment performed, the Company determined that it was not more likely than not that goodwill was impaired as of December 31, 2016.

As noted above, the regulatory events that occurred subsequent to year-end are considered a triggering event, and will require an interim evaluation of goodwill in the first quarter of 2017. As of the report date, an estimate of the financial impact of this interim assessment cannot be made and will not be determined until the impairment testing is complete.

During the first quarter of 2015, the Company performed an interim impairment assessment of goodwill due to the events of January 15, 2015 and the Company's plan to sell certain businesses. This assessment resulted in the Company recording goodwill impairment losses of $9.5 million from continuing operations primarily due to a decline in the implied fair value of certain institutional businesses subsequent to January 15, 2015. The impairment loss is presented as a separate line item in the consolidated statements of operations and included as a component of Loss from continuing operations for the year ended December 31, 2015.

Changes in goodwill from continuing operations for the years ended December 31, 2015 and 2016 are presented in the following table and reflect the Company's single operating segment, with amounts in thousands:

| | | |
|---|---|---|
| **Balance as of January 1, 2015** | $ | 39,242 |
| Impairment of goodwill | | (9,513) |
| Foreign currency translation and other adjustments | | (1,649) |
| **Balance at December 31, 2015** | | 28,080 |
| Foreign currency translation and other adjustments | | (4,601) |
| **Balance at December 31, 2016** | $ | 23,479 |

| Other Intangible Assets, net | 12 Months Ended |
|---|---|
| | Dec. 31, 2016 |
| **Goodwill and Intangible Assets Disclosure [Abstract]** | |
| Other Intangible Assets, net | |

**Other Intangible Assets, net**

The Company's acquired intangible assets consisted of the following as of December 31, 2016 and 2015, with amounts in thousands:

| | December 31, 2016 | | | December 31, 2015 | | |
|---|---|---|---|---|---|---|
| | Gross Carrying Amount | Accumulated Amortization | Net Carrying Amount | Gross Carrying Amount | Accumulated Amortization | Net Carrying Amount |
| Finite-lived intangible assets | | | | | | |
| Customer relationships | $ 35,460 | $ (27,522) | $ 7,938 | $ 35,460 | $ (21,223) | $ 14,237 |
| Foreign currency translation adjustment | (4,971) | 2,718 | (2,253) | (1,910) | 855 | (1,055) |
| Total finite-lived intangible assets | 30,489 | (24,804) | 5,685 | 33,550 | (20,368) | 13,182 |
| Indefinite-lived intangible assets | | | | | | |
| License | 600 | — | 600 | 600 | — | 600 |
| Total Other intangible assets, net | $ 31,089 | $ (24,804) | $ 6,285 | $ 34,150 | $ (20,368) | $ 13,782 |

During 2015, the Company acquired certain margin FX trading accounts from Citibank, N.A. and Citibank International Limited. The asset purchase agreement provides for cash consideration payable quarterly based on a pre-determined formula until total payments reach $6.0 million ("Threshold"). Additional cash consideration ("Contingent Consideration") is payable if total payments meet the Threshold before the expiration of an initial 30-month period. The acquired accounts represent customer relationships and are recorded as intangible assets at an initial cost of $6.0 million. Transaction costs incurred were not material. The Contingent Consideration is recognizable when it becomes payable, i.e., when it is probable and reasonably estimable, consistent with the guidance in ASC 450-20, *Loss Contingencies*, and, to the extent any amounts are recorded, included in the cost basis of the acquired intangible assets. There was no Contingent Consideration recorded as of December 31, 2016. The customer relationships are amortized on a straight-line basis over a weighted-average amortization period of three years.

Customer relationships are amortized on a straight-line basis over three to nine years which approximates the weighted-average useful lives. Indefinite-lived assets are not amortized (see Note 2). Amortization expense from continuing operations included in the consolidated statements of operations was $7.2 million and $7.0 million for the years ended December 31, 2016 and 2015, respectively.

Intangible assets related to businesses to be disposed of are included as a component of assets held for sale on the consolidated statements of financial condition and are not included in the table above. Amortization related to these intangible assets ceased as of the date they were determined to be held for sale. Amortization expense related to these assets (prior to the date they were determined to be held for sale) is included in Income (loss) from discontinued operations, net of tax in the consolidated statements of operations.

There was no impairment of intangible assets during the year ended December 31, 2016. During the first quarter of 2015, the Company performed an interim impairment evaluation of intangible assets due to the events of January 15, 2015 and the Company's plans to sell certain businesses. This evaluation resulted in the Company recording impairment losses of $5.4 million due to a decline in the implied fair value of certain institutional businesses subsequent to the events of January 15, 2015. The impairment charge is included as a component of amortization expense within discontinued operations for the year ended December 31, 2015.

Estimated future amortization expense for acquired intangible assets outstanding as of December 31, 2016 is as follows, with amounts in thousands:

| Year Ending December 31, | |
|---|---|
| 2017 | 3,983 |
| 2018 | 1,401 |
| 2019 | 301 |
| 2020 | — |
| 2021 | — |
| Thereafter | — |
| | $ 5,685 |

XML 35 R17.htm IDEA: XBRL DOCUMENT

| Other Assets | 12 Months Ended |
| --- | --- |
| | Dec. 31, 2016 |
| **Deferred Costs, Capitalized, Prepaid, and Other Assets Disclosure [Abstract]** | |
| Other Assets | **Other Assets**<br><br>Other assets were comprised of the following as of December 31, 2016 and 2015, with amounts in thousands: |

| | As of December 31, | | | |
| --- | --- | --- | --- | --- |
| | **2016** | | **2015** | |
| Prepaid expenses | $ | 4,229 | $ | 5,807 |
| Equity method investments | | — | | 2,603 |
| Cost method investment | | 1,103 | | — |
| Deposits | | 1,871 | | 2,727 |
| Other | | 161 | | 284 |
| Total | $ | 7,364 | $ | 11,421 |

As discussed in Note 2, as a result of the Company's adoption of ASU No. 2015-03 in the first quarter of 2016, deferred debt issuance costs of $3.4 million as of December 31, 2015 were reclassified from Other assets, as previously reported, to the respective debt liabilities on the consolidated statements of financial condition (see Notes 19 and 20).

Other assets related to businesses classified as discontinued operations are included as a component of assets held for sale on the consolidated statements of financial condition and are not included in the table above (see Note 4).

XML 36 R18.htm IDEA: XBRL DOCUMENT

| Customer Account Liabilities | 12 Months Ended |
|---|---|
| | Dec. 31, 2016 |
| **Other Liabilities Disclosure [Abstract]** | |
| Customer Account Liabilities | **Customer Account Liabilities**<br><br>Customer account liabilities represent amounts due to customers related to cash and margin transactions. This includes cash deposits and gains and losses on settled FX, CFDs and spread betting trades as well as unrealized gains and losses on open FX commitments, CFDs and spread betting. Customer account liabilities were $661.9 million and $685.0 million as of December 31, 2016 and 2015, respectively. |

XML 37 R19.htm IDEA: XBRL DOCUMENT

| Accounts Payable and Accrued Expenses | 12 Months Ended |
|---|---|
| | Dec. 31, 2016 |
| Payables and Accruals [Abstract] | |
| Accounts Payable and Accrued Expenses | **Accounts Payable and Accrued Expenses** |

Accounts payable and accrued expenses were comprised of the following as of December 31, 2016 and 2015, with amounts in thousands:

| | As of December 31, | |
|---|---|---|
| | 2016 | 2015 |
| Operating expenses payable | $ 24,926 | $ 16,529 |
| Commissions payable | 7,271 | 8,671 |
| Bonus payable | 22,210 | 11,551 |
| Income tax payable | 920 | 1,375 |
| Interest due on borrowings | 162 | 162 |
| Other | 2 | 10 |
| Total | $ 55,491 | $ 38,298 |

Accounts payable and accrued expenses related to businesses classified as discontinued operations are included as a component of liabilities held for sale on the consolidated statements of financial condition and are not included in the table above (see Note 4).

XML 38 R20.htm IDEA: XBRL DOCUMENT

| Earnings per Share | 12 Months Ended |
|---|---|
| | Dec. 31, 2016 |
| **Earnings Per Share [Abstract]** | |
| Earnings per Share | |

## Earnings per Share

Basic earnings per share ("EPS") measures the performance of an entity over the reporting period. Diluted EPS measures the performance of an entity over the reporting period while giving effect to all potentially dilutive instruments that were outstanding during the period. The Company uses the treasury stock method in accordance with ASC 260, *Earnings per Share* ("ASC 260"), to determine diluted EPS. Due to the Corporation's loss from continuing operations for the year ended December 31, 2015, any potential common shares were not included in the computation of diluted EPS as they would have had an antidilutive effect since the shares would decrease the loss per share. As a result, basic and diluted net loss per share of Class A common stock are equal for the year ended December 31, 2015.

In accordance with ASC 260, all outstanding unvested share-based payments that contain rights to non-forfeitable dividends participate in the undistributed earnings with the common stockholders and are therefore participating securities. The Company's unvested restricted stock units ("RSUs") do not contain rights to dividends or dividend equivalents. As a result, unvested RSUs are not considered participating securities and are therefore not required to be included in computing basic EPS under the two-class method. The shares of Class B common stock do not share in the earnings of the Company and are not considered participating securities. Accordingly, basic and diluted net earnings per share of Class B common stock have not been presented.

In April 2015, the Company entered into an option agreement with a customer as part of a negative equity balance settlement and issued an immediately vested, two-year option to purchase 56,934 shares of Class A common stock of Global Brokerage, Inc. The option has a strike price of $22.50. For the years ended December 31, 2016 and 2015, the stock option was not included in the computation of diluted EPS because it was antidilutive under the treasury method.

In computing diluted EPS, outstanding stock options and other equity awards granted to certain employees, non-employees and independent directors in the aggregate of 721,622 and 749,856 for the years ended December 31, 2016 and 2015, respectively, were excluded because they were antidilutive under the treasury method.

As described in Note 20, in June 2013 Global Brokerage, Inc. issued $172.5 million principal amount of 2.25% senior convertible notes maturing on June 15, 2018 (the "Convertible Notes"). The Convertible Notes will be convertible at an initial conversion rate of 5.32992 shares of the Corporation's Class A common stock per $1,000 principal amount of the Convertible Notes, which is equivalent to an initial conversion price of approximately $187.62. In accordance with ASC 260, the shares of the Corporation's Class A common stock issuable upon conversion of the Convertible Notes are included in the calculation of diluted EPS to the extent that the conversion value of the securities exceeds the principal amount. For diluted EPS purposes, the number of shares of the Corporation's Class A common stock that is necessary to settle such excess is considered issued. For the years ended December 31, 2016 and 2015, the conversion value did not exceed the principal amount and therefore the conversion effect was not included in the computation of diluted EPS because it was antidilutive under the treasury method.

As described in Note 20, the Company also entered into a warrant transaction whereby the Company sold to the counterparties warrants to purchase shares of the Corporation's Class A common stock. For the years ended December 31, 2016 and 2015, the warrants were not included in the computation of diluted EPS because they were antidilutive under the treasury method.

Additionally, the non-controlling members of Holdings have the right to exchange their Holdings Units for shares of the Corporation's Class A common stock on a one-for-one basis at fair value, subject to customary conversion rate adjustments for stock splits, stock dividends and reclassifications. These shares were also excluded from the computation of diluted EPS because the shares have no impact, or would not be dilutive or antidilutive under the treasury method. During the years ended December 31, 2016 and 2015, certain members of Holdings exchanged 0.5 million and 0.8 million, respectively, of their Holdings Units on a one-for-one basis, for shares of Class A common stock of the Corporation.

The following is a reconciliation of the numerator and denominator used in the basic and diluted EPS calculations, with amounts in thousands, except per share data:

| | For the Years Ended December 31, | |
|---|---|---|
| | 2016 | 2015 |
| **Basic and diluted net income (loss) per share of Class A common stock:** | | |
| **Numerator** | | |
| Income (loss) from continuing operations attributable to Global Brokerage, Inc. | $ 96,680 | $ (513,600) |
| Loss from discontinued operations attributable to Global Brokerage, Inc. | (26,037) | (40,329) |
| Net income (loss) available to holders of Class A common stock | 70,643 | (553,929) |
| Earnings allocated to participating securities | — | — |
| Income (loss) available to common stockholders | $ 70,643 | $ (553,929) |
| **Denominator** | | |
| Weighted average shares of Class A common stock | 5,609 | 5,087 |
| Add dilutive effect of the following: | | |
| Stock options and RSUs[1] | — | — |
| Convertible note hedges | — | — |
| Warrants | — | — |
| Assumed conversion of Holdings Units for Class A common stock | — | — |
| Dilutive weighted average shares of Class A common stock | 5,609 | 5,087 |
| **Net income (loss) per share of Class A common stock — Basic and Diluted:** | | |
| Continuing operations | $ 17.24 | $ (100.96) |
| Discontinued operations | (4.64) | (7.93) |

| | | | | |
|---|---|---|---|---|
| Basic net income (loss) per share of Class A common stock | $ | 12.60 | $ | (108.89) |

(1) No dilutive effect for either period presented, therefore zero incremental shares included

XML 39 R21.htm IDEA: XBRL DOCUMENT

| Related Party Transactions | 12 Months Ended |
| --- | --- |
| | Dec. 31, 2016 |
| **Related Party Transactions [Abstract]** | |
| Related Party Transactions | **Related Party Transactions** |

Amounts receivable from, and payable to, related parties are set forth below, with amounts in thousands:

| | As of December 31, | | | |
| --- | --- | --- | --- | --- |
| | **2016** | | **2015** | |
| **Receivables** | | | | |
| Advances to Holdings non-controlling members | $ | 3 | $ | 112 |
| Accounts receivable — Lucid non-controlling members | | — | | 15 |
| Advances to employees | | 55 | | 201 |
| Accounts receivable — Liquidity provider | | 308 | | — |
| Due from Liquidity provider | | 128 | | — |
| Notes receivable and interest — Lucid non-controlling members | | — | | 8,171 |
| Total receivables from related parties | $ | 494 | $ | 8,499 |
| | | | | |
| **Payables** | | | | |
| Employees and equity method investments | $ | 732 | $ | 1,370 |
| Accounts payable — Equity method investment | | 180 | | 90 |
| Due to Lucid non-controlling members in connection with the allocation of income to Lucid non-controlling members for services provided | | 741 | | 6,500 |
| Tax receivable agreement | | — | | 145 |
| Total payables to related parties | $ | 1,653 | $ | 8,105 |

The Company has advanced funds for withholding taxes to several non-controlling members of Holdings. The outstanding balances as of December 31, 2016 and 2015, included in the table above, are included in Accounts receivable, net in the consolidated statements of financial condition.

Included in Current assets held for sale in the consolidated statements of financial condition are advances to the Lucid non-controlling members. As of December 31, 2016 and 2015, advances to the Lucid non-controlling members were nil and not material, respectively.

The Company has advanced funds to several employees. The outstanding balances as of December 31, 2016 and 2015, included in the table above, are included in Accounts receivable, net in the consolidated statements of financial condition.

In July 2016, UK LTD entered into a trading relationship with an affiliate of Leucadia to provide CFD pricing for the Company's clients. The Leucadia affiliate is 24.0% owned by Jefferies, LLC ("Jefferies"), a wholly-owned subsidiary of Leucadia. For the year ended December 31, 2016, the Company recorded trading profits of $0.7 million which is included in Trading revenue in the consolidated statements of operations. As of December 31, 2016 Accounts receivable, net in the consolidated statements of financial condition included a receivable from the Leucadia affiliate of $0.3 million for trading profits, and Due from broker included a balance of $0.1 million for open trade positions.

In January 2014, in connection with the formation of V3 by the Company and the non-controlling members of Lucid, the non-controlling members of Lucid borrowed approximately $7.9 million from the Company to assist with funding their portion of the capital contribution, which is included in Notes receivable in the consolidated statements of financial condition as of December 31, 2015. The amount borrowed was due in 2017 and bore interest at the rate of 2% per annum. During the second quarter of 2016, management determined that the non-controlling members of Lucid would not be required to repay the notes receivable and the debt would be forgiven. Accordingly, the Company recorded a provision for the debt forgiveness in the amount of $8.2 million for the principal amount thereof plus accrued interest, which is included in General and administrative expense in the consolidated statements of operations for the year ended December 31, 2016. The Company recorded $0.1 million and $0.2 million of interest income related to the notes receivable for the years ended December 31, 2016 and 2015, respectively.

During the year ended December 31, 2015, Lucid acquired ownership interests and shares in CME Group Inc. from one of the non-controlling members of Lucid in a market-based transaction. The total carrying value of the ownership interests and shares was $3.7 million as of both December 31, 2016 and 2015 and is included in assets held for sale (see Note 4).

Customers account liabilities in the consolidated statements of financial condition included balances for employees and equity method investments.

Included in Accounts payable and accrued expenses in the consolidated statements of financial condition are amounts payable to an equity method investee for platform trading services of $0.2 million and $0.1 million as of December 31, 2016 and 2015, respectively. The Company recorded $1.1 million in each of the years ended December 31, 2016 and 2015 for such platform services, which is included in Communication and technology in the consolidated statements of operations.

Amounts due related to the allocation of income to Lucid non-controlling members for services provided were $0.7 million and $6.5 million as of December 31, 2016 and 2015, respectively, and are included in Current liabilities held for sale in the consolidated statements of financial condition (see Note 4).

Prior to July 1, 2015, the Company received commission or mark-up income from institutional customers' trades executed on FastMatch's electronic trading platform, an entity in which the Company owns a 34.4% equity interest (see Note 6). The Company paid a per trade fee to FastMatch for use of the platform. Effective July 1, 2015, institutional customers trading via the FastMatch platform became direct customers of FastMatch. Fees collected from customers for trades executed

on the FastMatch platform were nil and $6.3 million for the years ended December 31, 2016 and 2015, respectively, and are included in Trading revenue in the consolidated statements of operations. Fees paid to FastMatch were nil and $4.3 million for the years ended December 31, 2016 and 2015, respectively, and are reflected as a component of Communication and technology in the consolidated statements of operations. The Company received $0.1 million and $0.3 million from FastMatch during the years ended December 31, 2016 and 2015, respectively, for occupancy and operational costs, which is included in Other income in the consolidated statements of operations.

**Exchange Agreement**

The members of Holdings (other than the Corporation) entered into an exchange agreement under which they (or certain permitted transferees thereof) have the right (subject to the terms of the exchange agreement as described therein) to exchange their Holdings Units for shares of the Corporation's Class A common stock on a one-for-one basis at fair value, subject to customary conversion rate adjustments for stock splits, stock dividends and reclassifications. During the years ended December 31, 2016 and 2015, certain members of Holdings exchanged 0.5 million and 0.8 million, respectively, of their Holding Units, on a one-for-one basis, for shares of Class A common stock of the Corporation pursuant to the exchange agreement.

**Equity Distribution Agreement**

Pursuant to the terms of the Equity Distribution Agreement (see Note 16), the Company may, from time to time, issue and sell shares of its Class A common stock, having an aggregate offering price of up to $15.0 million, through Jefferies as a sales agent. Jefferies will receive a commission of 3.0% of the gross sales price per share for any shares sold through it as the Company's sales agent under the Equity Distribution Agreement. For the year ended December 31, 2016, no amount has been paid to Jefferies. The Company has agreed to reimburse a portion of the expenses that Jefferies incurs in connection with the offer and sale of the common stock. The Company recorded $0.2 million for the year ended December 31, 2016 for reimbursements of such expenses.

**Payments under Tax Receivable Agreement**

The Corporation entered into a tax receivable agreement with the members of Holdings, including former members of Holdings (other than the Corporation) that will provide for the payment by the Corporation to Holdings' members (other than the Corporation) as defined therein. Assuming sufficient taxable income is generated such that the Corporation fully realizes the tax benefits of the amortization specified in the tax receivable agreement, the aggregate payments currently estimated that would be due are $145.6 million and $146.8 million as of December 31, 2016 and 2015, respectively. During the first quarter of 2015, the Corporation determined that it was not more likely than not that it would benefit from the tax deduction attributable to the tax basis step-up for which a portion of the benefit would be owed to the non-controlling members of Holdings under the tax receivable agreement and reduced the contingent liability under the tax receivable agreement to zero. As of December 31, 2016, the Corporation continues to believe it will not benefit from the tax deduction and the contingent liability remains zero. During the years ended December 31, 2016 and 2015, payments of $0.2 million and $5.4 million, respectively, were made pursuant to the tax receivable agreement. The payment made during the year ended December 31, 2016 relates to the 2014 tax return year. The Corporation does not currently expect to make a payment for the 2015 and 2016 tax years.

**Leucadia Transaction**

Leucadia maintains a 49.9% equity interest in Group, the Company's operating subsidiary, and has three directors on the board of directors of Group. See Note 19 for amounts related to the financing transaction with Leucadia that took place in January 2015 and the various aspects of the restructuring transaction effective September 1, 2016.

**Other**

UK LTD was party to an arrangement with Global Finance Company (Cayman) Limited ("Global Finance") and Master Capital Group, S.A.L ("Master Capital"). An affiliated shareholder of the Company beneficially owns more than 90% of the equity of Global Finance and Master Capital. Pursuant to such arrangement, Global Finance and Master Capital were permitted to use the brand name "FXCM" and the Company's technology platform to act as its local presence in certain countries in the Middle East and North Africa ("MENA"). UK LTD collected and remitted to Global Finance and Master Capital fees and commissions charged by Global Finance and Master Capital to customers in MENA countries. Effective May 4, 2015, UK LTD terminated the arrangement with Global Finance and Master Capital. For the years ended December 31, 2016 and 2015, the fees and commissions related to the arrangement were nil and $0.2 million, respectively, and are included in Referring broker fees in the consolidated statements of operations.

XML 40 R22.htm IDEA: XBRL DOCUMENT

| Stock-Based Compensation | 12 Months Ended |
|---|---|
| | Dec. 31, 2016 |
| **Disclosure of Compensation Related Costs, Share-based Payments [Abstract]** | |
| Stock-Based Compensation | |

## Stock-Based Compensation

The Company's Amended and Restated 2010 Long-Term Incentive Plan (the "LTIP") permits the grant of various equity-based awards to employees, directors or other service providers of the Company and its subsidiaries. Under the LTIP, the Company has granted non-qualified stock options and other equity awards, including shares of the Corporation's Class A common stock ("Shares") and RSUs. The total number of Shares which may be issued under the LTIP is 1,529,500. The Shares issued may consist, in whole or in part, of unissued Shares or treasury Shares. The issuance of Shares shall reduce the total number of Shares available under the LTIP. As of December 31, 2016, 450,417 shares remained available for future issuance.

In arriving at stock-based compensation expense, the Company estimates the number of equity-based awards that will forfeit due to employee turnover. The Company's forfeiture assumption is based primarily on its turn-over historical experience. If the actual forfeiture rate is higher than the estimated forfeiture rate, then an adjustment will be made to increase the estimated forfeiture rate, which will result in a decrease to the expense recognized in the Company's financial statements. If the actual forfeiture rate is lower than the estimated forfeiture rate, then an adjustment will be made to lower the estimated forfeiture rate, which will result in an increase to expense recognized in the Company's financial statements. The expense the Company recognizes in future periods will be affected by changes in the estimated forfeiture rate and may differ significantly from amounts recognized in the current period.

**Stock Options**

Stock options to purchase Shares are granted to employees ("Employee Stock Options") and the independent members of the board of directors ("Independent Directors Options") (collectively, the "Stock Options"). Stock options are granted to employees and independent directors with exercise prices at least equal to the fair market value of a Share on the date the option is granted. The Employee Stock Options have a four-year graded vesting schedule and a contractual term of seven years from the date of grant. The Independent Directors Options vest on the first anniversary after the grant date and have a seven-year contractual term. Under the terms of the LTIP, the Company may issue new Shares or treasury shares upon share option exercise. During the years ended December 31, 2016 and 2015, the Company did not grant Employee Stock Options or Independent Directors Options.

The following table summarizes the Company's activity related to the Stock Options as of December 31, 2016 and changes for the year then ended:

| Stock Options | Shares | Weighted-Average Exercise Price | | Weighted-Average Remaining Contractual Term (in years) | Aggregate Intrinsic Value (In thousands) | |
|---|---|---|---|---|---|---|
| Outstanding at January 1, 2016 | 678,019 | $ | 136.29 | | | |
| Granted | — | | — | | | |
| Exercised | — | | — | | | |
| Forfeited or expired | 22,825 | $ | 143.25 | | | |
| Outstanding at December 31, 2016 | 655,194 | $ | 136.05 | 1.49 | $ | — |
| Options vested and expected to vest at December 31, 2016 | 654,513 | $ | 136.03 | 1.49 | $ | — |
| Options exercisable at December 31, 2016 | 630,469 | $ | 135.09 | 1.39 | $ | — |

There were no options exercised in the years ended December 31, 2016 and 2015. The total grant-date fair value of options vested in the years ended December 31, 2016 and 2015 was $1.4 million and $3.1 million, respectively.

*Valuation Assumptions*

The fair value of each option awarded to employees is estimated on the date of grant using the Black-Scholes option pricing model, consistent with the provisions of ASC 718. Options granted to the Company's independent directors are considered options granted to employees under ASC 718 as defined therein.

Expected term for the Employee Stock Options and Independent Directors Options is based on the simplified method outlined in ASC 718. In accordance with ASC 718, options are considered to be exercised halfway between the average vesting date and the contractual term of each option grant. The simplified method is applicable for "plain-vanilla" stock options, as defined in ASC 718, only if the Company does not have sufficient historical share option exercise experience upon which to estimate an expected term. The Corporation's Shares have been publicly traded for approximately six years, however there is a lack of sufficient exercise history for Stock Options during this period, including the most recent two years. Consequently, the Company believes that the simplified method is an applicable methodology to estimate the expected term of the options as of the grant date.

The risk-free interest rates for the Employee Stock Options and Independent Directors Options are based on U.S. Treasury instruments whose terms are commensurate with the Stock Options' expected terms.

Expected volatility is based on a weighing of the historical and implied volatilities of the Company and for a set of public guideline companies deemed comparable to it. The guideline companies selected operate in a similar industry, pursue similar market opportunities, and are subject to similar risks of the Company. Changes in the subjective assumptions required in the valuation models may significantly affect the estimated value of the Company's Stock Options, the related stock-based compensation expense and, consequently, its results of operations and comprehensive income.

Dividend yield is determined based on the Company's expected dividend payouts.

Stock-based compensation expense before income taxes attributable to continuing operations for the Employee Stock Options, which is included in Compensation and benefits in the consolidated statements of operations, was $1.2 million and $1.9 million for the years ended December 31, 2016 and 2015, respectively. Stock-based compensation expense before income taxes attributable to continuing operations for the Independent Directors Options, which is included in Compensation and benefits in the consolidated statements of operations, was nil and not material for the years ended December 31, 2016 and 2015, respectively. The total compensation cost capitalized and included in Office, communication and computer equipment, net, in the consolidated statements of financial condition was not material and $0.1 million for the years ended December 31, 2016 and 2015, respectively. The Company did not recognize any tax benefit related to stock-based compensation expense for the years ended December 31, 2016 and 2015.

As of December 31, 2016, there was $0.8 million of total unrecognized compensation cost related to unvested Stock Options that is expected to be recognized over a weighted average period of 1.1 years.

There were no cash proceeds received nor any income tax benefits realized from the exercise of Stock Options for the years ended December 31, 2016 and 2015.

**Other Equity Awards**

The LTIP provides for the grant of other stock-based awards ("Other Equity Awards") which may include Shares and other awards that are valued in whole or in part by reference to, or are otherwise based on the fair market value of, Shares.

*RSUs*

Service-based RSUs were granted to employees during 2014. The RSUs vest in equal annual installments over a four-year period following the date of grant, subject to the employees' continuing employment. RSUs that vest are settled by issuance of one Share for each RSU. If the employee terminates for any reason, any RSUs that have not vested as of the date of termination are forfeited and returned to the Company. There were no RSUs granted to employees during the years ended December 31, 2016 and 2015.

Holders of RSUs do not have dividend, voting or any other rights of a shareholder with respect to the Shares underlying the RSUs unless and until the RSUs vest and are settled by the issuance of such Shares. The fair value of RSUs is based on the fair market value of Shares on the date of grant, adjusted for the present value of dividends expected to be paid on Shares prior to vesting. Such value is recognized as an expense over the requisite service period, net of estimated forfeitures.

The following table summarizes the Company's unvested RSU activity as of December 31, 2016 and changes for the year then ended:

| RSUs | Units | | Weighted-Average Grant-Date Fair Value | Weighted-Average Remaining Contractual Term (in years) | | Aggregate Intrinsic Value (in thousands) |
|---|---|---|---|---|---|---|
| Unvested at January 1, 2016 | 14,903 | $ | 162.50 | | | |
| Granted | — | | — | | | |
| Vested | 4,771 | $ | 162.50 | | | |
| Forfeited | 638 | $ | 162.50 | | | |
| Unvested at December 31, 2016 | 9,494 | $ | 162.50 | 1.96 | $ | 67 |
| RSUs expected to vest at December 31, 2016 | 8,948 | $ | 162.50 | 1.96 | $ | 63 |

The total fair value of RSUs vested during the years ended December 31, 2016 and 2015 was not material.

Stock-based compensation expense before income taxes attributable to continuing operations for RSUs, which is included in Compensation and benefits in the consolidated statements of operations, was $0.7 million and $0.8 million for the years ended December 31, 2016 and 2015, respectively. The total compensation cost capitalized for RSUs, which is included in Office, communication and computer equipment, net, in the consolidated statements of financial condition, was $0.1 million for each of the years ended December 31, 2016 and 2015.

As of December 31, 2016, there was $1.4 million of total unrecognized compensation cost related to unvested RSUs that is expected to be recognized over a weighted-average period of 1.96 years.

*Shares*

The Company did not grant Shares as Other Equity Awards during the years ended December 31, 2016 and 2015.

XML 41 R23.htm IDEA: XBRL DOCUMENT

| Stockholders' Equity | 12 Months Ended |
|---|---|
| | Dec. 31, 2016 |
| **Equity [Abstract]** | |
| Stockholders' Equity | **Stockholders' Equity** |

The Corporation's authorized capital stock consists of 3,000,000,000 shares of Class A common stock, par value $0.01 per share, 1,000,000 shares of Class B common stock, par value $0.01 per share, and 300,000,000 shares of preferred stock, par value $0.01 per share, of which 55,120 shares have been designated as Series A Junior Participating Preferred Stock.

**Class A Common Stock**

Holders of shares of the Corporation's Class A common stock are entitled to one vote for each share held of record on all matters submitted to a vote of stockholders. Holders of shares of Class A common stock are entitled to receive dividends when and if declared by the Corporation's board of directors out of funds legally available therefore, subject to any statutory or contractual restrictions on the payment of dividends and to any restrictions on the payment of dividends imposed by the terms of any outstanding preferred stock. Upon dissolution or liquidation or the sale of all or substantially all of the Corporation's assets, after payment in full of all amounts required to be paid to creditors and to the holders of preferred stock having liquidation preferences, if any, the holders of shares of Class A common stock will be entitled to receive pro rata the Corporation's remaining assets available for distribution. Holders of shares of Class A common stock do not have preemptive, subscription, redemption or conversion rights.

**Class B Common Stock**

Each holder of the Corporation's Class B common stock is entitled, without regard to the number of shares of Class B common stock held by such holder, to one vote for each Holdings Unit in Holdings held by such holder. The unit holders of Holdings collectively have a number of votes in the Corporation that is equal to the aggregate number of Holdings Units that they hold. Holders of our Class B common stock do not have any right to receive dividends or to receive a distribution upon a liquidation or dissolution of the Corporation.

**Class A Common Stock Repurchase Program**

Our Board of Directors previously approved the repurchase of $80.0 million of Global Brokerage, Inc.'s Class A common stock (the "Stock Repurchase Program"). In November 2014, our Board of Directors approved a $50.0 million incremental increase in the Stock Repurchase Program for an aggregate of $130.0 million. Since inception of the Stock Repurchase Program in May 2011 through November 2016, the Company repurchased 5.1 million pre-reverse split shares for $64.2 million under these authorizations. In November 2016, the Board of Directors of the Company canceled the Stock Repurchase Program.

The following table presents the changes in the Company's Class A common stock outstanding during the years ended December 31, 2016 and 2015:

| **Class A Common Stock** | |
|---|---:|
| **Balance at January 1, 2015** | 4,788,994 |
| Issued | — |
| Repurchased in conjunction with vesting of RSUs | (61) |
| Exchange of Holdings Units to Class A common stock (see Note 3) | 808,672 |
| Vesting of RSUs | 4,929 |
| **Balance at December 31, 2015** | 5,602,534 |
| Issued | — |
| Repurchased | — |
| Exchange of Holdings Units to Class A common stock (see Note 3) | 535,992 |
| Vesting of RSUs (see Note 15) | 4,771 |
| **Balance at December 31, 2016** | 6,143,297 |

As of December 31, 2016 and 2015, there were 8 and 25 shares, respectively, of Class B common stock issued and held by the members of Holdings.

As of December 31, 2016 and 2015, there were no shares of the Company's Series A Junior Participating Preferred Stock outstanding.

Holders of shares of Class A common stock and Class B common stock vote together as a single class on all matters presented to the Company's stockholders for their vote or approval, except as otherwise required by applicable law.

**Option Agreement**

In April 2015, the Company entered into an Option Agreement (the "Option Agreement") pursuant to which the Company issued an option to purchase 56,934 shares of the Corporation's Class A common stock (the "Option") with an exercise price of $22.50. The Option was exercisable immediately, expires two years from the date of issuance, and includes standard anti-dilution protections. The Option Agreement was entered into as part of a negative equity balance settlement with a customer. The fair value of the Option on the date of issuance was estimated at $0.3 million and was determined using the Black-Scholes-Merton option pricing model. The Option was not exercised during the years ended December 31, 2016 and 2015.

**Amendment to Stockholder Rights Plan**

In January 2016, the Company entered into an Amended and Restated Rights Agreement (the "Amended Rights

Agreement") which amended the Company's original Rights Agreement (the "Original Rights Agreement") dated January 29, 2015. In connection with the adoption of the Original Rights Agreement, the Corporation's Board of Directors declared a dividend distribution of one right on each outstanding share of the Corporation's Class A common stock. The Original Rights Agreement was amended to protect the interests of the Company and its stockholders by helping to preserve the value of the Company's net operating loss carryforwards and tax credits.

Under the terms of the Amended Rights Agreement, each right initially entitles stockholders to buy one one-thousandth (1/1000) of a share of the Series A Junior Participating Preferred Stock of the Corporation, at an initial exercise price of $44.12, in the event the rights become exercisable. As amended, the rights generally become exercisable if a person or group becomes the beneficial owner of 4.9% or more of (a) the outstanding Class A common stock of the Corporation or (b) the fair market value of all capital stock of the Corporation. Prior to this amendment, the beneficial ownership percentage threshold to trigger the rights plan was 10.0% of all voting securities, a trigger that, after this amendment, remains in place in addition to the aforementioned 4.9% trigger.

The Amended Rights Agreement extends the expiration date of the rights from January 29, 2018 to January 26, 2019, unless the rights are earlier redeemed or exchanged in accordance with the Amended Rights Agreement or the Amended Rights Agreement is earlier terminated by the Company's Board of Directors.

As of December 31, 2016, the Company is not aware of the occurrence of any events that would trigger the exercise of the rights under the Amended Rights Agreement.

This amendment is not a taxable event, will not affect the reported financial condition or results of operations, including earnings per share, of the Corporation and will not change the manner in which the Corporation's Class A common stock is currently traded.

### Listing on the NASDAQ Global Market

In September 2016, the Corporation provided written notice to the New York Stock Exchange ("NYSE") of its intention to voluntarily delist its Class A common stock on the NYSE and to list on the NASDAQ Global Market of The NASDAQ Stock Market LLC ("NASDAQ"). The listing and trading of the Corporation's Class A common stock on NYSE ceased at market close on September 23, 2016 and commenced on NASDAQ at market open on September 26, 2016. The Class A common stock traded on NASDAQ under the symbol "FXCM" until the Corporation changed its name to Global Brokerage, Inc. on February 24, 2017 (see Note 28). Effective at market open on February 27, 2017, the Corporation's Class A common stock trades on NASDAQ under the symbol "GLBR."

### At-the-Market Common Stock Offering

In October 2016, the Company entered into an Equity Distribution Agreement (the "Equity Distribution Agreement") with Jefferies, as sales agent (the "Sales Agent"). Under the terms of the Equity Distribution Agreement, the Company may, from time to time, issue and sell shares of its Class A common stock, par value $0.01 per share, having an aggregate offering price of up to $15.0 million, through the Sales Agent. The common stock will be sold pursuant to the Company's shelf registration statement on Form S-3 which was declared effective by the Securities and Exchange Commission on August 2, 2016. The Company has not issued or sold any shares pursuant to the Equity Distribution Agreement during the year ended December 31, 2016.

XML 42 R24.htm IDEA: XBRL DOCUMENT

| Employee Benefit Plan | 12 Months Ended |
|---|---|
| | Dec. 31, 2016 |
| **Compensation and Retirement Disclosure [Abstract]** | |
| Employee Benefit Plan | **Employee Benefit Plan** |
| | The Company maintains a defined contribution employee profit-sharing and savings 401(k) plan for all eligible employees. The Company was not required to and made no contributions to the plan for the years ended December 31, 2016 and 2015. |

XML 43 R25.htm IDEA: XBRL DOCUMENT

| Net Capital Requirements | 12 Months Ended |
|---|---|
| | Dec. 31, 2016 |
| **Banking and Thrift [Abstract]** | |
| Net Capital Requirements | |

**Net Capital Requirements**

The company's regulated entities are subject to minimum capital requirements in their respective jurisdictions. The minimum capital requirements of the entities below may effectively restrict the payment of cash distributions by the subsidiaries. The tables below present the capital, as defined by the respective regulatory authority, the minimum capital requirement and the excess capital for the following regulated entities as of December 31, 2016 and 2015, with amounts in millions:

| | As of December 31, 2016 | | | |
|---|---|---|---|---|
| | US | UK LTD | Australia | Lucid LLP |
| Capital | $ 47.5 | $ 83.4 | $ 16.6 | $ 10.2 |
| Minimum capital requirement | 33.3 | 22.0 | 1.1 | 4.2 |
| Excess capital | $ 14.2 | $ 61.4 | $ 15.5 | $ 6.0 |

| | As of December 31, 2015 | | | |
|---|---|---|---|---|
| | US | UK LTD | Australia | Lucid LLP |
| Capital | $ 43.6 | $ 76.3 | $ 12.0 | $ 10.9 |
| Minimum capital requirement | 28.3 | 27.6 | 0.7 | 4.0 |
| Excess capital | $ 15.3 | $ 48.7 | $ 11.3 | $ 6.9 |

Effective from January 1, 2016, the Financial Conduct Authority ("FCA"), which regulates UK LTD, introduced the "Capital Conservation Buffer" (CCB) and a "Countercyclical Capital Buffer" (CcyB) in line with the requirements set out in Capital Requirements Directive Article 160 Transitional Provisions for Capital Buffers. This requires all firms to maintain additional buffers on top of the minimum capital requirements noted above, which may vary at the direction of the FCA.

As a result of regulatory settlements reached with the Commodity Futures Trading Commission (the "CFTC") and the National Futures Association (the "NFA") in February 2017, US has withdrawn from business in the U.S. and deregistered from the CFTC and the NFA (see Note 28).

XML 44 R26.htm IDEA: XBRL DOCUMENT

| Leucadia Transaction | 12 Months Ended |
|---|---|
| | Dec. 31, 2016 |
| **Extraordinary and Unusual Items [Abstract]** | |
| Leucadia Transaction | |

**Leucadia Transaction**

On January 15, 2015, the Company's customers suffered significant losses and generated negative equity balances ("debit balances") owed to it of approximately $275.1 million. This was due to the unprecedented volatility in the EUR/CHF currency pair after the SNB discontinued its currency floor of 1.2 CHF per EUR on that date. When a customer entered a EUR/CHF trade with the Company, the Company executed an identical trade with a FX market maker. During the historic move liquidity became extremely scarce and shallow, which affected execution prices. This liquidity issue resulted in some customers having losses in excess of their account balance. While customers could not cover their margin call with the Company, the Company still had to cover the same margin call with the FX market maker. When a customer profits in the trade, the Company gives the profits to the customer, however, when the customer is not profitable on that trade the Company is obligated to pay the FX market maker regardless of whether the Company collects the funds from its customers. These debit balances resulted in a temporary breach of certain regulatory capital requirements.

On January 16, 2015, Holdings and Newco entered into a credit agreement (the "Credit Agreement") with Leucadia, as administrative agent and lender, and a related financing fee agreement (the "Fee Letter"). The financing provided to the Company pursuant to these agreements, which is described below, enabled the Company to maintain compliance with regulatory capital requirements and continue operations. On January 16, 2015, the Corporation, Holdings, Newco and Leucadia also entered into an agreement (the "Letter Agreement") that set the terms and conditions upon which the Corporation, Holdings and Newco would pay in cash to Leucadia and its assignees a percentage of the proceeds received in connection with certain transactions. In connection with these financing transactions, Holdings formed Newco and contributed all of the equity interests owned by Holdings in its subsidiaries to Newco. The Credit Agreement and the Letter Agreement were subsequently amended on January 24, 2015. On September 1, 2016, the Company completed a restructuring transaction with Leucadia that, among other changes, amended the Credit Agreement and the Letter Agreement. The principal changes resulting from the restructuring transaction with Leucadia are described below.

**Restructuring Transaction**

On September 1, 2016, pursuant to the Restructuring Transaction, the Company and Leucadia agreed to amend the terms of the Credit Agreement and to terminate the Letter Agreement. The Letter Agreement was replaced with an Amended and Restated Limited Liability Company Agreement of FXCM Group, LLC (the "Group Agreement"). The Group Agreement replaces the existing FXCM Newco, LLC agreement and FXCM Newco, LLC was renamed FXCM Group, LLC ("Group"). Pursuant to the Group Agreement, Leucadia acquired a 49.9% membership interest in Group, with Holdings owning the remaining 50.1% membership interest in Group. Group and Holdings also entered into a Management Agreement pursuant to which Holdings manages the assets and day-to-day operations of Group. Additionally, Group adopted the 2016 Incentive Bonus Plan for Founders and Executives (the "Management Incentive Plan") under which participants are entitled to certain distributions made after the principal and interest under the amended Credit Agreement are repaid. The events described herein are collectively referred to as the "Restructuring Transaction."

*Principal Changes to the Credit Agreement*

In connection with the Restructuring Transaction, the First Amendment to Amended and Restated Credit Agreement ("Amendment") became effective on September 1, 2016. The Amendment extends the maturity date of the term loan by one year to January 16, 2018. Additionally, the Amendment permits the Company to defer any three of the remaining interest payments by paying interest in kind. Until the term loan under the amended Credit Agreement is fully repaid, all distributions and sales proceeds will continue to be used solely to repay the principal plus interest.

The Company concluded that the terms of the amended Credit Agreement and the Credit Agreement dated January 24, 2015 are not substantially different. Accordingly, the Amendment is accounted for as a modification on a prospective basis pursuant to ASC 470. The components of interest expense related to the amended Credit Agreement, which are included in Interest on borrowings in the consolidated statements of operations, including contractual interest, deferred interest and previously unamortized discounts, fees and costs, are amortized as an adjustment to interest expense over the remaining term of the amended Credit Agreement using the effective interest method.

*Principal Changes to the Letter Agreement*

Pursuant to the Restructuring Transaction, the Letter Agreement was terminated effective September 1, 2016 and the parties signed the Group Agreement. The Group Agreement provides that Group will be governed by a six-member board of directors, comprising three directors appointed by Leucadia and three directors appointed by the Company. The Group Agreement specifies the terms according to which the cash distributions and earnings or loss of Group are to be allocated to its members (the "Revised Waterfall"), which is described below. Distributions from Group, other than certain permitted payments, cannot be made under the Group Agreement until the principal and interest due under the amended Credit Agreement are repaid. Pursuant to the Group Agreement, Leucadia and the Company will each have the right to request the sale of Group after January 16, 2018, subject to both Leucadia and the Company accepting the highest reasonable sales price.

*Management Agreement*

Leucadia has agreed to the Management Agreement with Holdings with an initial term through January 15, 2018, renewable automatically for successive one-year periods, unless terminated by Group or by the manager. In the Management Agreement, a number of rights are granted unilaterally to Holdings as the manager, including the right to create and implement a detailed budget, appoint and terminate the executive officers of Group and make day-to-day decisions in the ordinary course. The rights retained by the board of directors of Group are described below under "Leucadia's membership interest in Group." In February 2017, the Management Agreement was amended to provide the board of directors with certain rights of termination (see Note 28).

*Management Incentive Plan*

In connection with the Restructuring Transaction, the Company adopted the 2016 Incentive Bonus Plan for Founders and Executives (the "Management Incentive Plan") effective September 1, 2016 ("Effective Date") in order to retain and incentivize senior management to maximize cash flow generation and grow the business. The Management Incentive Plan is a long-term incentive program with a five-year vesting period, with 25% vesting on the second anniversary of the Effective

Date (the "First Vesting Date") and an additional 25% vesting on each of the next three anniversaries of the First Vesting Date. Distributions under the plan will be made only after the principal and interest under the amended Credit Agreement are repaid and will equal the following:

- 10.0% of all distributions or sales proceeds from Group up to $350 million;

- 12.0% of all distributions or sales proceeds from Group from $350 million to $850 million; and

- 14.0% of all distributions or sales proceeds from Group above $850 million.

Long-term incentive plan participants will receive their share of any distributions or sales proceeds while unvested. In the event that a participant's employment is terminated other than for cause or due to a material breach of a restrictive covenant, that participant will receive either a non-voting membership interest in Group that entitles the participant to the same share of distributions that would have otherwise been received under the incentive program, or a lump-sum cash payment, at the Company's discretion. In the event that a participant's employment is terminated for cause or due to a material breach of a restrictive covenant, that participant will not be entitled to distributions following such termination and will forfeit all interests under the Management Incentive Plan. A termination payment will also be paid upon any change of control of Group. For this purpose, a change of control is defined as an event or series of events by which a person or group acquires 50% or more of the voting interests of Group or if, and at the time that, Leucadia's percentage of ownership of the value of the equity interests of Group becomes less than 16.67%. In February 2017, Group and Leucadia entered into an acknowledgment pursuant to which the parties agree that Leucadia may terminate the Management Incentive Plan on behalf of Group at any time and for any reason in its sole discretion (see Note 28).

The Company determined that the Management Incentive Plan is a share-based payment arrangement that will be accounted for as a liability award under ASC 718. As of the Effective Date, the Company estimated the fair value of the Management Incentive Plan at $53.5 million. The Management Incentive Plan includes a performance condition whereby it only becomes an obligation after the principal and interest under the amended Credit Agreement are fully repaid. Accordingly, the Company will begin recognizing compensation expense for the award over the requisite service period when it becomes probable that the performance condition would be satisfied pursuant to ASC 718. At each reporting date, the Company will estimate the fair value of the Management Incentive Plan and assess the probability of repaying the amended Credit Agreement, and therefore of achieving the performance condition. Once the amended Credit Agreement has been repaid, or it is probable that it would be repaid, compensation expense will be recorded for the estimated fair value of the award, recognized using the accelerated attribution method over the five-year requisite service period.

As of December 31, 2016, the fair value of the Management Incentive Plan was estimated at $54.1 million. As of December 31, 2016, the Company determined that it is not probable that the performance condition would be satisfied and, accordingly, has not recognized compensation expense related to the award for the year ended December 31, 2016.

### *Allocations of Group Distributions (Revised Waterfall)*

The contractual provisions in the Group Agreement specify how certain distributions from Group are to be allocated among Leucadia, the Company and the Company's senior management members participating in the Management Incentive Plan (the "Revised Waterfall"). The distributions include net proceeds received in connection with certain transactions, including sales of assets, dividends or other capital distributions, the sale of Group (whether by merger, stock purchase, sale of all or substantially all of Group's assets or otherwise), the issuance of any debt or equity securities, and other specified non-ordinary course events, such as certain tax refunds and litigation proceeds. The Revised Waterfall will result in the following distributions from Group:

| Distributable Amount | Revised Waterfall |
|---|---|
| Amounts due under the amended Credit Agreement | 100% Leucadia |
| Next $350 million | 45% Leucadia / 45% Holdings / 10.0% Management |
| Next $500 million | 79.2% Leucadia / 8.8% Holdings / 12.0% Management |
| All aggregate amounts thereafter | 51.6% Leucadia / 34.4% Holdings / 14.0% Management |

### Leucadia's Membership Interest in Group

As indicated above, in exchange for the Letter Agreement, the Company issued a 49.9% non-controlling membership interest in Group to Leucadia. The remaining 50.1% controlling membership interest in Group is owned by Holdings and Holdings consolidates the financial results of Group, as discussed in Note 2.

Leucadia has designated three directors to the board of directors of Group. As such, Leucadia participates in certain management, operational and investment decisions of Group, including, but not limited to, issuance of additional membership units or additional ownership interests in Group's subsidiaries, issuance of debt (subject to certain limited exceptions), sales of assets (subject to certain limited exceptions), merger or consolidation with respect to Group or its subsidiaries, review and approval of the annual summary budget, administration of the Management Incentive Plan, and entry into or exit from a material line of business.

In addition to the allocations of cash distributions and the net profit and net loss of Group described above, Leucadia and its assignees are entitled to tax distributions under the Group Agreement. If any such tax distributions are made, the amounts of such distributions reduce the payments to be made to Leucadia and its assignees pursuant to the Revised Waterfall (other than with respect to the repayment of the loan).

The Group Agreement provides that following January 16, 2018, or, if earlier, at any time following a change of control (defined below), Leucadia and the Company will each have the right to cause the sale of Holdings, Group, and/or any of their respective subsidiaries for cash at the highest reasonably available price, subject to both Leucadia and the Company reasonably accepting such sales price. Upon the occurrence of such event, Group will distribute the cash to Leucadia and the Company in accordance with the Revised Waterfall described above.

In the event of a change of control, at the election of Leucadia or its assignees, Holdings and Group will be required to pay Leucadia and its assignees in cash a one-time payment equal to the fair market value of their economic rights under the Group Agreement. For this purpose, change of control is generally defined as an event or series of events by which (i) a person or group acquires 40% or more of the voting interests of the Corporation, (ii) the Corporation and the existing members of Holdings cease to own 90% of the equity interests of Holdings, (iii) the Corporation ceases to be the sole

managing member of Holdings or (iv) subject to certain exceptions, a majority of the members of the board of directors of the Corporation, Holdings or Group cease to be directors during a 12-month period.

The Company evaluated the rights that Leucadia has related to its membership interest in Group under the Group Agreement, including board seats, voting rights and participation in key decisions that affect Group, as described above. The Company concluded that the legal form of the membership interest held by Leucadia is equity. The Company then considered the guidance under ASC 815 and concluded that none of the features of the Group Agreement are required to be bifurcated and accounted for separately as a derivative.

As the economic substance of the instrument significantly changed when Leucadia received non-controlling membership units in Group, the Company concluded that the exchange of the Letter Agreement for the membership interest is an extinguishment of the Letter Agreement. Accordingly, the derivative liability resulting from the Letter Agreement was derecognized as of the date of the Restructuring Transaction. As of the date of the Restructuring Transaction, the estimated fair value of the derivative liability was $235.5 million, which was also the fair value of the non-controlling membership units in Group, resulting in no gain or loss recognized on the exchange. The change in the estimated fair value of the derivative liability between January 1, 2016 and the date of the Restructuring Transaction was a gain of $212.9 million and is recorded in Gain (loss) on derivative liabilities — Letter & Credit Agreements in the consolidated statements of operations for the year ended December 31, 2016. As of December 31, 2015, the fair value of the derivative liability resulting from the Letter Agreement was estimated at $448.5 million and is included in Derivative liability — Letter Agreement on the consolidated statements of financial condition.

The Company considered the guidance in ASC 480 and determined that the non-controlling interest held by Leucadia falls within the scope of ASC 480 because it is redeemable for cash upon a contingent event that is not solely within the control of the Company and, accordingly, is classified outside of permanent equity on the consolidated statements of financial condition as Redeemable non-controlling interest. The Company evaluates the probability of redemption at each reporting date. As of December 31, 2016, the Company concluded that the non-controlling interest in Group is not currently redeemable and it is not probable that it will become redeemable as the likelihood that the redemption feature will be triggered is not considered probable. Accordingly, subsequent adjustment of the Redeemable non-controlling interest to its estimated redemption value is not required pursuant to ASC 480. If the non-controlling interest in Group becomes redeemable, or if redemption becomes probable, an adjustment will be made to adjust the Redeemable non-controlling interest to its estimated redemption value.

The allocation of the cash distributions and earnings or loss from Group based on the Revised Waterfall differs from the controlling and non-controlling members' stated ownership percentages. The Company determined that the Revised Waterfall represents a substantive profit sharing arrangement and concluded that the appropriate methodology for calculating the Redeemable non-controlling interest at each reporting date is the HLBV method, as discussed in Note 2. The Company applies the HLBV method using a balance sheet approach. Under the HLBV method, a calculation is performed at each balance sheet date to determine the amount the controlling and non-controlling member would each hypothetically receive assuming Group were liquidated at its recorded amount determined in accordance with U.S. GAAP and the cash distributed according to the Revised Waterfall. The difference between the liquidating distribution amounts calculated at the beginning and end of each period, after adjusting for capital contributions and distributions, is the controlling and non-controlling member's share of the earnings or loss from Group. The non-controlling member's share is reported in Net loss attributable to redeemable non-controlling interest in FXCM Group, LLC in the consolidated statements of operations.

At the date of the Restructuring Transaction, the Redeemable non-controlling interest was initially recorded at its fair value of $235.5 million, and subsequently adjusted for the allocation of the net assets of Group among the controlling and non-controlling members according to the terms of the Revised Waterfall to establish a carrying amount for the non-controlling interest at issuance on September 1, 2016 of $49.3 million (see Note 3). The share of the income and other comprehensive income of Group for the period from inception through December 31, 2016 attributable to the non-controlling member was allocated based on the HLBV method. As of December 31, 2016, the carrying amount of the Redeemable non-controlling interest on the consolidated statements of financial condition was $46.4 million.

**Amended and Restated Credit Agreement**

Other than the changes described above, the principal terms of the Amended and Restated Credit Agreement ("Credit Agreement"), dated January 24, 2015 remain unchanged. The Credit Agreement provides for a $300.0 million term loan made by Leucadia to Holdings and Newco.  The net proceeds of the loan ($279.0 million) were used to replace capital in the Company's regulated entities to cover negative client balances and pay down outstanding revolving debt. Holdings' prior revolving credit agreement with Bank of America, N.A. was repaid in full and terminated effective January 20, 2015.

The loan matures on January 16, 2018.  The obligations under the Credit Agreement are guaranteed by certain wholly-owned unregulated domestic subsidiaries of the Company and are secured by substantially all of the assets of Holdings and certain subsidiaries of the Corporation, including a pledge of all of the equity interests in certain of Holdings' domestic subsidiaries and 65% of the voting equity interests in certain of its foreign subsidiaries.

The loan has an initial interest rate of 10% per annum, increasing by 1.5% per annum each quarter for so long as it is outstanding, but in no event exceeding 20.5% per annum (before giving effect to any applicable default rate). Beginning with the fourth quarter of 2016, the interest rate on the loan is 20.5%, which is fixed until maturity. Under certain circumstances, a default interest rate will apply on all obligations during the event of default at a per annum rate equal to 2% above the applicable interest rate. The Company has the right to defer any three of the remaining interest payments by paying interest in kind. The Company has not deferred any interest payments during the year ended December 31, 2016.

The Credit Agreement requires the payment of a deferred financing fee in an amount equal to $10.0 million, with an additional fee of up to $30.0 million payable in the event the aggregate principal amount of the term loan outstanding on April 16, 2015 was greater than $250.0 million or the deferred financing fee of $10.0 million (plus interest) had not been paid on or before such date. Prior to April 16, 2015, the Company repaid approximately $56.5 million which reduced the aggregate principal to $243.5 million on April 16, 2015. Additionally, the Company paid the $10.0 million deferred financing fee prior to April 16, 2015. Accordingly, the Company was not obligated to pay the additional $30.0 million fee. As of December 31, 2016, the Company had paid $155.5 million of principal, of which $10.0 million was applied to the deferred financing fee.

The Credit Agreement is subject to various conditions and terms such as requiring mandatory prepayments, including from proceeds of dispositions, condemnation and insurance proceeds, debt issuances, equity issuances, and capital contributions. The Credit Agreement requires monthly payments of the term loan from proceeds received during the immediately preceding calendar month from accounts receivable related to customer debit balances. The loan may be voluntarily prepaid without penalty.

The Credit Agreement includes a variety of restrictive covenants, including, but not limited to: limitations on the

ability to merge, dissolve, liquidate, consolidate or sell, lease or otherwise transfer all or substantially all assets; limitations on the incurrence of liens; limitations on the incurrence of debt by subsidiaries; limitations on the ability of Group to make distributions in respect of its equity interests including distributions to pay interest due on the Company's convertible notes and limitations on transactions with affiliates, without the prior consent of the lender. The Credit Agreement also provides for events of default, including, among others: non-payments of principal and interest; breach of representations and warranties; failure to maintain compliance with the other covenants contained in the Credit Agreement; default under other material debt; the existence of bankruptcy or insolvency proceedings; insolvency; and a change of control.

The Company initially allocated the net proceeds of $279.0 million between the Credit Agreement and the Letter Agreement based on their relative fair values. The estimated fair values of the Letter Agreement and the Credit Agreement were determined using an option pricing model based on significant inputs such as volatility and assumptions on public market pricing inputs. The initially recorded amounts for the Letter Agreement and the Credit Agreement were approximately $94.4 million and $184.6 million, respectively, net of an issuance fee of $21.0 million. The effective interest method is used to accrete the initial carrying value of the Credit Agreement liability to the par amount of the debt plus the $10.0 million deferred financing fee using an effective interest rate of 7.1% post-Restructuring Transaction. The fair value of the Letter Agreement's embedded derivatives that were required to be bifurcated totaled $124.8 million, which is in excess of the amount of proceeds initially allocated to the Letter Agreement, resulting in a charge to earnings of $30.4 million which is included in the consolidated statements of operations for the year ended December 31, 2015.

The Credit Agreement contains mandatory prepayment provisions in the event of certain events described above. The mandatory prepayments may be triggered by events or circumstances that are not considered clearly and closely related to the Credit Agreement, and, as such, represent embedded derivatives in accordance with ASC 815. Beginning with the second quarter of 2016, a decline in the fair value of the Credit Agreement below par resulted in value attributable to the embedded derivatives. The Company assessed the fair value of the embedded derivatives and bifurcated their value from the fair value of the Credit Agreement.

As of December 31, 2016, the Company estimated the fair value of the derivative liability related to the embedded derivatives bifurcated from the Credit Agreement by using the "with" and "without" method. Using this methodology, the Credit Agreement is first valued with the mandatory prepayment provision (the "with" scenario) and subsequently valued without the mandatory prepayment provision (the "without" scenario). The fair value of the derivative liability resulting from the mandatory prepayment provision is estimated as the difference between the fair values of the Credit Agreement in the "with" and "without" scenarios. The fair value of the Credit Agreement in the "with" and "without" scenarios was estimated using a risk-neutral valuation model which models expected cash flows over the life of the debt.

As of December 31, 2016 and 2015, the fair value of the derivative liability resulting from the Credit Agreement was estimated at $6.2 million and nil, respectively, and is included in Credit Agreement on the consolidated statements of financial condition. The change in the estimated fair value of the derivative liability at each reporting date is recorded in Gain (loss) on derivative liabilities — Letter & Credit Agreements in the consolidated statements of operations.

The balance of the Credit Agreement as of December 31, 2016 and 2015 was as follows, with amounts in thousands:

|  | As of December 31, | |
|  | 2016 | 2015 |
| --- | --- | --- |
| Debt principal | $ 154,509 | $ 192,685 |
| Original issue discount | (7,857) | (35,967) |
| Discount — issuance fee | (1,276) | (5,227) |
| Deferred financing fee | (918) | (3,762) |
| Debt issuance costs | (114) | (467) |
| Embedded derivative — Mandatory prepayment provision | 6,172 | — |
| Debt — net carrying value | $ 150,516 | $ 147,262 |

Interest expense related to the Credit Agreement, included in Interest on borrowings in the consolidated statements of operations for the years ended December 31, 2016 and 2015, consists of the following, with amounts in thousands:

|  | For the Years Ended December 31, | |
|  | 2016 | 2015 |
| --- | --- | --- |
| Contractual interest | $ 33,879 | $ 27,337 |
| Deferred interest | (3,045) | 5,789 |
| Amortization of original issue discount | 28,110 | 65,577 |
| Amortization of issuance fee discount | 3,951 | 8,665 |
| Amortization of deferred financing fee | 2,844 | 6,238 |
| Amortization of debt issuance costs | 353 | 774 |
| Total interest expense — Credit Agreement | $ 66,092 | $ 114,380 |

The Company records deferred interest for the difference between the current period's contractual rate based on the loan terms and the amortization of the incremental step-up in the contractual rate over the life of the loan.

The Company paid an issuance fee of $21.0 million to Jefferies LLC, an affiliate of Leucadia, at the inception of the loan. The issuance fee was allocated to the Credit Agreement and the Letter Agreement based on the initial fair value of the Credit Agreement and the Letter Agreement. The portion of the issuance fee allocated to the Credit Agreement was $13.9 million and the portion allocated to the Letter Agreement was $7.1 million. The portion allocated to the Credit Agreement is reflected as a discount to the Credit Agreement loan balance on the consolidated statements of financial condition, and is recorded to Interest on borrowings using the effective interest method. Subsequent to the date of the Restructuring Transaction, the discount is amortized over the remaining term of the amended Credit Agreement. Amortization of the issuance fee included in Interest on borrowings was $4.0 million and $8.7 million for the years ended December 31, 2016 and 2015, respectively. The portion allocated to the Letter Agreement is reflected in Gain (loss) on derivative liabilities — Letter & Credit Agreements in the consolidated statements of operations for the year ended December 31, 2015.

The Company incurred $1.8 million of issuance costs related to both the Credit Agreement and Letter Agreement.

The issuance costs were allocated to the Credit Agreement and Letter Agreement based on the initial fair value of the Credit Agreement and Letter Agreement. The issuance costs allocated to the Credit Agreement and Letter Agreement were $1.2 million and $0.6 million, respectively. Issuance costs allocated to the Credit Agreement were recorded as deferred issuance costs and are amortized using the effective interest method. Subsequent to the date of the Restructuring Transaction, the deferred issuance costs are amortized over the remaining term of the amended Credit Agreement. Amortization of Credit Agreement issuance costs included in Interest on borrowings was $0.4 million and $0.8 million for the years ended December 31, 2016 and 2015, respectively. The portion allocated to the Letter Agreement is reflected in Gain (loss) on derivative liabilities — Letter & Credit Agreements in the consolidated statements of operations for the year ended December 31, 2015. As discussed in Note 2, as a result of the Company's adoption of ASU No. 2015-03 in the first quarter of 2016, unamortized debt issuance costs of $0.5 million as of December 31, 2015 were reclassified from Other assets, as previously reported, to the Credit Agreement liability on the consolidated statements of financial condition.

The deferred financing fee of $10.0 million is amortized using the effective interest method. Subsequent to the date of the Restructuring Transaction, the deferred financing fee is amortized over the remaining term of the amended Credit Agreement. Amortization of the deferred financing fee included in Interest on borrowings was $2.8 million and $6.2 million for the years ended December 31, 2016 and 2015, respectively. The deferred financing fee was paid on April 1, 2015.

The Company recorded a recovery of bad debt expense of $0.1 million from continuing operations in the consolidated statements of operations for the year ended December 31, 2016 related to the events of January 15, 2015. There was zero bad debt expense from discontinued operations in the consolidated statements of operations for the year ended December 31, 2016 related to the events of January 15, 2015. Bad debt expense from continuing operations in the consolidated statements of operations for the year ended December 31, 2015 includes net expense of $257.0 million related to the debit balances. Bad debt expense for the year ended December 31, 2015 includes $0.1 million of reversal of recoveries returned to clients, as well as $0.3 million reversal of recovery as payment for an option agreement entered into with a customer as part of a negative equity balance settlement (see Note 16). Bad debt expense from continuing operations for the year ended December 31, 2015 reflects net recoveries of $9.7 million. Bad debt expense included in Loss from discontinued operations, net of tax in the consolidated statements of operations for the year ended December 31, 2015 includes net expense of $8.4 million related to the debit balances, which reflects recoveries during this period of $0.1 million.

XML 45 R27.htm IDEA: XBRL DOCUMENT

| Debt | 12 Months Ended |
| --- | --- |
| | Dec. 31, 2016 |
| **Debt Disclosure [Abstract]** | |
| Debt | **Debt** |

**Debt**

***Revolving Credit Agreement***

In December 2011, Holdings entered into a credit agreement ("Revolving Credit Agreement") with a syndicate of financial institutions. In January 2015, in connection with the Leucadia Transaction, Holdings' outstanding balance under the Revolving Credit Agreement of $25.0 million was repaid in full and the Revolving Credit Agreement was terminated effective January 20, 2015.

Interest expense related to borrowings under the Revolving Credit Agreement, including the amortization of debt financing costs, included in Interest on borrowings in the consolidated statements of operations was $1.5 million for the year ended December 31, 2015. For the same period, the weighted average dollar amount of borrowings under the Revolving Credit Agreement was $1.3 million and the weighted average interest rate was 2.92%.

***Senior Convertible Notes due 2018***

In June 2013, the Corporation issued $172.5 million principal amount of 2.25% Convertible Notes maturing on June 15, 2018 and received net proceeds of $166.5 million, after deducting the initial purchasers' discount and offering expenses. The Convertible Notes pay interest semi-annually on June 15 and December 15 at a rate of 2.25% per year, commencing December 15, 2013. The indenture governing the Convertible Notes does not prohibit the Company from incurring additional senior debt or secured debt, nor does it prohibit any of its subsidiaries from incurring additional liabilities.

The Convertible Notes will be convertible at an initial conversion rate of 5.32992 shares of the Corporation's Class A common stock per $1,000 principal amount of the Convertible Notes, which is equivalent to an initial conversion price of approximately $187.62. In addition, following certain corporate transactions that occur prior to the maturity date, the Corporation will, in certain circumstances, increase the conversion rate for a holder that elects to convert its Convertible Notes in connection with such corporate transaction. Upon conversion, the Corporation will deliver cash up to the principal amount. With respect to any conversion value in excess of the principal amount, the Corporation will deliver shares of its Class A common stock (unless it elects to deliver cash in lieu of all or a portion of such shares).

***Convertible Note Hedges***

In connection with the offering of the Convertible Notes, the Company entered into privately negotiated convertible note hedge transactions with certain counterparties (the "Convertible Note Hedge Transaction"). The Convertible Note Hedge Transactions will cover, subject to customary anti-dilution adjustments, the number of shares of the Corporation's Class A common stock that will initially underlie the Convertible Notes. Concurrently with entering into the Convertible Note Hedge Transaction, the Company also entered into a separate, privately negotiated warrant transaction (the "Warrant Transaction") with the same counterparties, whereby the Company sold to the counterparties warrants to purchase, subject to customary anti-dilution adjustments, up to the same number of shares of the Corporation's Class A common stock as in the Convertible Note Hedge Transaction. The strike price of the Warrant Transaction will initially be $212.40 per share of the Corporation's Class A common stock. Subject to certain conditions, the Company may settle the warrants in cash or on a net-share basis.

The Convertible Note Hedge Transaction and the Warrant Transaction have the effect of increasing the effective conversion price of the Convertible Notes to $212.40 per share. The cost of the Convertible Note Hedge Transaction and the proceeds from the Warrant Transaction was $29.1 million and $18.6 million, respectively. In accordance with ASC 815, the Company recorded the cost of the Convertible Note Hedge Transaction and the proceeds from the Warrant Transaction to additional paid-in capital in the consolidated statements of financial condition and the recorded values will not be adjusted for subsequent changes in their respective fair values.

The Convertible Note Hedge Transaction and the Warrant Transaction are separate transactions, in each case, entered into by the Company with certain counterparties, and are not part of the terms of the Convertible Notes and will not affect any holder's right under the Convertible Notes. Holders of the Convertible Notes will not have any rights with respect to the Convertible Hedge Transaction or the Warrant Transaction.

Under ASC 470, an entity must separately account for the liability and equity components of the convertible debt instruments (such as the Convertible Notes) that may be settled entirely or partially in cash upon conversion in a manner that reflects the issuer's economic interest cost. The effect of ASC 470 on the accounting for the Convertible Notes is that the fair value of the equity component is included in additional paid-in capital in the stockholders' equity section of the Company's consolidated statements of financial condition and the principal amount of the Convertible Notes is reduced by original issue discount to reflect the Convertible Notes fair value at issuance. At issuance, the equity component of the Convertible Notes was valued at $29.1 million and the Convertible Notes were valued at $144.1 million consisting of $172.5 million of principal net of original issuance discount of $29.1 million. The original issue discount will be amortized over the life of the Convertible Notes using the effective interest rate of 6.20%.

The Company incurred $6.0 million of Convertible Notes issuance costs. The debt issuance costs will be amortized to interest expense over the life of the Convertible Notes. As discussed in Note 2, as a result of the Company's adoption of ASU No. 2015-03 in the first quarter of 2016, unamortized debt issuance costs of $2.9 million as of December 31, 2015 were reclassified from Other assets, as previously reported, to the Senior convertible notes liability on the consolidated statements of financial condition.

The balances of the liability and equity components as of December 31, 2016 and 2015 were as follows, with amounts in thousands:

| | As of December 31, | |
| --- | --- | --- |
| | **2016** | **2015** |
| Liability component — principal | $ 172,500 | $ 172,500 |
| Deferred bond discount | (9,355) | (15,315) |
| Deferred debt issuance costs | (1,720) | (2,930) |

| | | | |
|---|---|---|---|
| Liability component — net carrying value | $ 161,425 | $ | 154,255 |
| Equity component | $ 29,101 | $ | 29,101 |

Interest expense related to the Convertible Notes, included in Interest on borrowings in the consolidated statements of operations, consists of the following, with amounts in thousands:

| | For the Years Ended December 31, | | |
|---|---|---|---|
| | **2016** | | **2015** |
| Stated coupon rate | $ 3,881 | $ | 3,881 |
| Amortization of deferred bond discount | 5,960 | | 5,607 |
| Amortization of debt issuance cost | 1,210 | | 1,209 |
| Total interest expense — Convertible note | $ 11,051 | $ | 10,697 |

XML 46 R28.htm IDEA: XBRL DOCUMENT

| Commitments | 12 Months Ended |
|---|---|
| | Dec. 31, 2016 |
| **Commitments and Contingencies Disclosure [Abstract]** | |
| Commitments | **Commitments** |

**Commitments**

*Digital Advertising Agreement*

In connection with the sale of the DailyFX business in October 2016, the Company entered into a three-year digital advertising agreement with FX Publications, Inc. The agreement provides for advertisements to be published on the DailyFX website in exchange for cash consideration payable by the Company in quarterly installments based on the number of leads (as defined in the agreement) generated by those advertisements (see Note 4). The Company has the right to immediately terminate the agreement if actual leads received in any given quarter do not meet a set threshold. The costs associated with the digital advertising agreement are expensed as incurred.

Future payments under the three-year digital advertising agreement are as follows as of December 31, 2016, with amounts in thousands:

| Year Ending December 31, | | |
|---|---|---|
| 2017 | $ | 3,117 |
| 2018 | | 3,281 |
| 2019 | | 3,008 |
| Total | $ | 9,406 |

The advertising expense under the digital advertising agreement was $0.4 million for the year ended December 31, 2016 and is included in Advertising and marketing expense in the consolidated statements of operations.

*Guaranty*

In July 2015, the Company entered into a guaranty with Citibank, N.A. (the "Guaranty") following the transition of certain institutional customers from the Company to FastMatch (see Note 14). Under the terms of the Guaranty, the Company agreed to guaranty FastMatch for any liabilities and other amounts that became due and payable by FastMatch for services provided by Citibank N.A. as the intermediating counterparty for trading transactions executed on the FastMatch platform. The Guaranty expired on March 1, 2016 and was not renewed. No payments were made by the Company to Citibank N.A. under the terms of the Guaranty.

*Operating Lease Commitments*

The Company leases office space under operating leases. Some of the lease agreements contain renewal options ranging from 3 to 5 years at prevailing market rates. The leases for the office facilities are subject to escalation factors primarily related to property taxes and building operating expenses. As of December 31, 2016, future minimum lease payments under non-cancelable operating leases with terms in excess of one year, including leases that renewed in 2017, are as follows, with amounts in thousands:

| Year Ending December 31, | | |
|---|---|---|
| 2017 | $ | 6,468 |
| 2018 | | 4,768 |
| 2019 | | 4,633 |
| 2020 | | 3,372 |
| 2021 | | 3,390 |
| Thereafter | | 13,146 |
| | $ | 35,777 |

The aggregate operating lease expense from continuing operations, included in General and administrative expense in the consolidated statements of operations, for the years ended December 31, 2016 and 2015 was $7.3 million and $6.2 million, respectively. As of December 31, 2016, there were no sublease commitments. The Company leases its corporate office location under an operating lease agreement expiring in May 2026.

XML 47 R29.htm IDEA: XBRL DOCUMENT

| Derivative Financial Instruments | 12 Months Ended |
| --- | --- |
| | Dec. 31, 2016 |
| **Derivative Instruments and Hedging Activities Disclosure [Abstract]** | |
| Derivative Financial Instruments | |

**Derivative Financial Instruments**

Derivative financial instruments are accounted for in accordance with ASC 815 and are recognized as either assets or liabilities at fair value on the consolidated statements of financial condition. The Company has master netting agreements with its respective counterparties under which derivative financial instruments are presented on a net-by-counterparty basis in accordance with ASC 210 and ASC 815. The Company enters into futures contracts and CFD contracts to economically hedge the open customer contracts and positions on its CFD business. Futures contracts are exchange traded contracts to either purchase or sell a specific asset at a specified future date for a specified price. CFD contracts are non-exchange traded contracts between a buyer and seller to exchange the difference in the value of an underlying asset at the beginning and end of a stated period. The Company's derivative assets and liabilities associated with futures contracts and CFD contracts on its CFD business are recorded within Due from brokers and Due to brokers, respectively, on the consolidated statements of financial condition and gains or losses on these transactions are included in Trading revenue in the consolidated statements of operations.

Through its subsidiaries Lucid and V3, the Company also engages in hedge trading in its electronic market making and institutional foreign exchange spot and futures markets. As discussed in Note 4, Lucid and V3 are reported as discontinued operations for all periods presented. Accordingly, the gains or losses on hedge trading in the Company's electronic market making and institutional foreign exchange spot and futures markets are included in Income (loss) from discontinued operations, net of tax in the consolidated statements of operations.

The Company also enters into options, futures, forward foreign currency contracts and commodity contracts through Lucid and V3. Options grant the purchaser, for the payment of a premium, the right to either purchase from or sell to the writer a specified instrument under agreed terms. A forward contract is a commitment to purchase or sell an asset at a future date at a negotiated rate. The Company's derivative assets and liabilities held for trading purposes in connection with Lucid and V3 are recorded in Assets held for sale and Liabilities held for sale, respectively, on the consolidated statements of financial condition. Gains or losses on options, futures and forward contracts held for trading purposes in connection with Lucid and V3 are included in Income (loss) from discontinued operations, net of tax in the consolidated statements of operations.

The Company is exposed to risks relating to its derivatives trading positions from the potential inability of counterparties to perform under the terms of the contracts (credit risk) and from changes in the value of the underlying financial instruments (market risk). The Company is subject to credit risk to the extent that any counterparty with which it conducts business is unable to fulfill its contractual obligations. The Company manages its trading positions by monitoring its positions with and the credit quality of the financial institutions that are party to its derivative trading transactions. Additionally, the Company's netting agreements provide the Company with the right, in the event of a default of the counterparty (such as bankruptcy or a failure to perform), to net a counterparty's rights and obligations under the agreement and to liquidate and set off collateral against any net amount owed by the counterparty.

The following tables present the gross and net fair values of the Company's derivative transactions and the related offsetting amount permitted under ASC 210 and ASC 815 as of December 31, 2016 and 2015. Derivative assets and liabilities are net of counterparty and collateral offsets. Collateral offsets include cash margin amounts posted with brokers. Under ASC 210, gross positive fair values are offset against gross negative fair values by counterparty pursuant to enforceable master netting agreements, with amounts in thousands:

| | | As of December 31, 2016 | | | | | | |
| --- | --- | --- | --- | --- | --- | --- | --- | --- |
| | | Derivative Assets | | | | Derivative Liabilities | | |
| | Statement of Financial Condition Location | Fair Value | | Notional | | Fair Value | | Notional |
| Exchange traded options | Current assets held for sale[1] | $ | 3,209 | $ | 10,562 | $ | — | $ | — |
| CFD contracts | Due from brokers[2] | | 131 | | 24,286 | | — | | — |
| Futures contracts | Due from/Due to brokers and Current assets/liabilities held for sale [1] [2] | | 4,868 | | 839,975 | | 5,720 | | 763,605 |
| OTC options | Current assets/liabilities held for sale[1] | | 270 | | 24,595 | | 225 | | 33,249 |
| **Total derivatives, gross** | | $ | 8,478 | $ | 899,418 | $ | 5,945 | $ | 796,854 |
| Netting agreements and cash collateral netting | | | (4,854) | | | | (4,854) | | |
| **Total derivatives, net** | | $ | 3,624 | | | $ | 1,091 | | |

[1] As of December 31, 2016, the aggregate fair value of derivative assets and liabilities, gross attributable to discontinued operations is $4.3 million and $2.7 million, respectively. These amounts are offset by netting agreements and cash collateral netting of $2.7 million and $2.7 million, respectively.

[2] As of December 31, 2016, the aggregate fair value of derivative assets and liabilities, gross attributable to continuing operations is $4.2 million and $3.3 million, respectively. These amounts are offset by netting agreements and cash collateral netting of $2.2 million and $2.2 million, respectively.

| | As of December 31, 2015 | | |
| --- | --- | --- | --- |
| | Derivative Assets | Derivative Liabilities | |
| | Statement of Financial Condition | | |

| | Location | Fair Value | | Notional | | Fair Value | | Notional |
|---|---|---|---|---|---|---|---|---|
| Exchange traded options | Current assets/liabilities held for sale[1] | $ | 6,503 | $ | 15,399 | $ | 5,805 | $ | 18,282 |
| CFD contracts | Due from/Due to brokers[4] | | 206 | | 109,715 | | 36 | | 99,036 |
| Futures contracts | Due from/Due to brokers and Current assets/liabilities held for sale[3] [4] | | 4,212 | | 794,960 | | 3,102 | | 1,047,239 |
| **Total derivatives, gross** | | $ | 10,921 | $ | 920,074 | $ | 8,943 | $ | 1,164,557 |
| Netting agreements and cash collateral netting | | | (8,909) | | | | (8,909) | | |
| **Total derivatives, net** | | $ | 2,012 | | | $ | 34 | | |

_____

[3] As of December 31, 2015, the aggregate fair value of derivative assets and liabilities, gross attributable to discontinued operations is $9.7 million and $8.8 million, respectively. These amounts are offset by netting agreements and cash collateral netting of $8.8 million and $8.8 million, respectively.

[4] As of December 31, 2015, the aggregate fair value of derivative assets and liabilities, gross attributable to continuing operations is $1.2 million and $0.1 million, respectively. These amounts are offset by netting agreements and cash collateral netting of $0.1 million and $0.1 million, respectively.

Gains (losses) on the Company's derivative instruments are recorded on a trade date basis. The following table presents the gains (losses) on derivative instruments recognized in the consolidated statements of operations for the years ended December 31, 2016 and 2015, with amounts in thousands:

| | For the Years Ended December 31, | |
|---|---|---|
| | **2016** | **2015** |
| Exchange traded options[5] | $ 2,463 | $ 8,573 |
| CFD contracts[6] | (749) | (9,166) |
| Futures contracts[7] | (52,687) | 49,485 |
| OTC options[5] | 31 | 1,086 |
| **Total** | $ (50,942) | $ 49,978 |

_____

[5] Included in Income (loss) from discontinued operations, net of tax in the consolidated statements of operations.

[6] Included in Trading revenue in the consolidated statements of operations.

[7] The portion included in Income (loss) from continuing operations in the consolidated statements of operations is $(60.7) million and $31.2 million for the years ended December 31, 2016 and 2015, respectively.

| Fair Value Measurements | 12 Months Ended |
| --- | --- |
| | Dec. 31, 2016 |
| **Fair Value Disclosures [Abstract]** | |
| Fair Value Measurements | |

**Fair Value Measurements**

Fair value is defined as the price that would be received to sell an asset or paid to transfer a liability in an orderly transaction between market participants at the measurement date. Fair value measurement establishes a fair value hierarchy that prioritizes the inputs of valuation techniques used to measure fair value. The hierarchy gives the highest priority to unadjusted quoted prices in active markets for identical assets or liabilities and the lowest priority to unobservable inputs. The three levels of fair value hierarchy are defined as follows:

Level 1:  Quoted prices in active markets for identical assets or liabilities, accessible by the Company at the measurement date.

Level 2:  Quoted prices for similar assets or liabilities in active markets, or quoted prices for identical or similar assets or liabilities in markets that are not active, or other observable inputs other than quoted prices.

Level 3:  Unobservable inputs for assets or liabilities.

When Level 1 inputs are available, those inputs are selected for determination of fair value. To value financial assets or liabilities that are characterized as Level 2 and 3, the Company uses observable inputs for similar assets and liabilities that are available from pricing services or broker quotes. These observable inputs may be supplemented with other methods, including internal models that result in the most representative prices for assets and liabilities with similar characteristics. Multiple inputs may be used to measure fair value, however, the fair value measurement for each financial asset or liability is categorized in its entirety in the same level of the fair value hierarchy as the lowest level input that is significant to the entire measurement.

The following tables present the Company's assets and liabilities that are measured at fair value on a recurring basis and the related hierarchy levels, with amounts in thousands:

| | | | | | Fair Value Measurements on a Recurring Basis | | | | | |
| --- | --- | --- | --- | --- | --- | --- | --- | --- | --- | --- |
| | | | | | As of December 31, 2016 | | | | | |
| | | Level 1 | | Level 2 | | Level 3 | | Counterparty and Cash Collateral Netting | | Total |
| **Financial Assets:** | | | | | | | | | | |
| U.S. Treasury bills | $ | 2,198 | $ | — | $ | — | $ | — | $ | 2,198 |
| Derivative assets: | | | | | | | | | | |
| Exchange traded options | | 3,209 | | — | | — | | — | | 3,209 |
| Futures contracts | | 4,868 | | — | | — | | — | | 4,868 |
| CFD contracts | | — | | 131 | | — | | — | | 131 |
| OTC options | | — | | 270 | | — | | — | | 270 |
| Netting | | — | | — | | — | | (4,854) | | (4,854) |
| Total derivative assets[1] | | 8,077 | | 401 | | — | | (4,854) | | 3,624 |
| Total assets | $ | 10,275 | $ | 401 | $ | — | $ | (4,854) | $ | 5,822 |
| | | | | | | | | | | |
| **Financial Liabilities:** | | | | | | | | | | |
| Customer account liabilities | $ | — | $ | 661,936 | $ | — | $ | — | $ | 661,936 |
| Derivative liabilities: | | | | | | | | | | |
| Futures contracts | | 5,720 | | — | | — | | — | | 5,720 |
| OTC options | | — | | 225 | | — | | — | | 225 |
| Netting | | — | | — | | — | | (4,854) | | (4,854) |
| Total derivative liabilities[1] | | 5,720 | | 225 | | — | | (4,854) | | 1,091 |
| Mandatory Prepayment Provision — Credit Agreement | | — | | — | | 6,172 | | — | | 6,172 |
| Total liabilities | $ | 5,720 | $ | 662,161 | $ | 6,172 | $ | (4,854) | $ | 669,199 |

As of December 31, 2016, the Company's total notional absolute value of open FX and CFD customer assets and liabilities by currency pair or product was $2.0 billion and $2.7 billion, respectively. The Company's total net notional value for open FX and CFD positions was $2.1 billion.

| | | | | | Fair Value Measurements on a Recurring Basis | | | | | |
| --- | --- | --- | --- | --- | --- | --- | --- | --- | --- | --- |
| | | | | | As of December 31, 2015 | | | | | |
| | | Level 1 | | Level 2 | | Level 3 | | Counterparty and Cash Collateral Netting | | Total |
| **Financial Assets:** | | | | | | | | | | |
| Derivative assets: | | | | | | | | | | |
| Exchange traded options | $ | 6,503 | $ | — | $ | — | $ | — | $ | 6,503 |
| CFD contracts | | — | | 206 | | — | | — | | 206 |
| Futures contracts | | 4,212 | | — | | — | | — | | 4,212 |

| | | | | | |
|---|---|---|---|---|---|
| Netting | — | — | — | (8,909) | (8,909) |
| Total derivative assets[1] | 10,715 | 206 | — | (8,909) | 2,012 |
| Total assets | $ 10,715 | $ 206 | $ — | $ (8,909) | $ 2,012 |
| | | | | | |
| **Financial Liabilities:** | | | | | |
| Customer account liabilities | $ — | $ 685,043 | $ — | $ — | $ 685,043 |
| Derivative liabilities: | | | | | |
| Exchange traded options | 5,805 | — | — | — | 5,805 |
| CFD contracts | — | 36 | — | — | 36 |
| Futures contracts | 3,102 | — | — | — | 3,102 |
| Netting | — | — | — | (8,909) | (8,909) |
| Total derivative liabilities[1] | 8,907 | 36 | — | (8,909) | 34 |
| Securities sold, not yet purchased[2] | 3,624 | — | — | — | 3,624 |
| Letter Agreement | — | — | 448,458 | — | 448,458 |
| Total liabilities | $ 12,531 | $ 685,079 | $ 448,458 | $ (8,909) | $ 1,137,159 |

As of December 31, 2015, the Company's total notional absolute value of open FX and CFD customer assets and liabilities by currency pair or product was $2.5 billion and $2.5 billion, respectively. The Company's total net notional value for open FX and CFD positions was $2.2 billion.

---

[1] Attributable to continuing and discontinued operations. See Note 22 for details of the classification of amounts on the consolidated statements of financial condition.

[2] Attributable to discontinued operations. Amounts classified as held for sale on the consolidated statements of financial condition (see Note 4).

### *U.S. Treasury Bills*

U.S. Treasury bills, included in Cash and cash equivalents on the consolidated statements of financial condition, are measured at fair value based on quoted market prices in an active market.

### *Derivative Assets and Liabilities*

Exchange traded options and open futures contracts are measured at fair value based on exchange prices. CFD contracts and over-the-counter ("OTC") options are measured at fair value based on market price quotations (where observable) obtained from independent brokers.

### *Customer Account Liabilities*

Customer account liabilities represent amounts due to customers related to cash and margin transactions, including cash deposits and gains and losses on settled FX, CFDs and spread betting trades as well as unrealized gains and losses on open FX commitments, CFDs and spread betting. Customer account liabilities, included on the consolidated statements of financial condition, are measured at fair value based on the market prices of the underlying products.

### *Securities Sold, Not Yet Purchased*

Securities sold, not yet purchased, represent the Company's obligations to deliver the specified security at the contracted price at a future point in time, and thereby create a liability to repurchase the securities in the market at the prevailing prices. The liability for such securities sold short, included on the consolidated statements of financial condition, is marked to market based on the current fair value of the underlying security at the reporting date which is determined based on exchange prices. Changes in fair value of securities sold, not yet purchased are recorded in Income (loss) from discontinued operations, net of tax in the consolidated statements of operations. These transactions may involve market risk in excess of the amount currently reflected in the consolidated statements of financial condition.

### *Letter Agreement*

The embedded derivatives bifurcated from the Letter Agreement are accounted for separately as a derivative liability. The fair value of the derivative liability resulting from the Letter Agreement is determined by the use of valuation techniques that incorporate a combination of Level 1 and Level 3 inputs. The Level 1 input is comprised of the common stock price of the Corporation. The significant Level 3 inputs, summarized in the following table, are considered more relevant in the analysis and are given a higher weighting in the overall fair value determination.

On September 1, 2016, in conjunction with the Restructuring Transaction, the Letter Agreement was terminated and its material terms are now reflected in the Group Agreement (see Note 19). The Company determined the fair value of the derivative liability resulting from the Letter Agreement as of August 31, 2016 (just prior to the termination of the Letter Agreement) by using an enterprise valuation based on the traded (or closing) common stock price of the Corporation of $9.33. This valuation approach incorporated an option pricing model for the allocation of enterprise value between the derivative liabilities resulting from the Letter and Credit Agreements, the Management Incentive Plan, common stock and convertible debt.

The following table summarizes the significant Level 3 inputs used in the fair value determination of the Letter Agreement as of August 31, 2016 and December 31, 2015, respectively:

| | | As of | |
|---|---|---|---|
| **Valuation Technique** | **Significant Unobservable Inputs** | **August 31, 2016** | **December 31, 2015** |
| | | | |
| Option-Pricing Method | Term (years) | 1.8 | 2.5 |
| | Volatility | 131.1% | 79.1% |
| | Risk-free rate | 0.8% | 1.2% |

| | | |
|---|---|---|
| Dividend yield | —% | —% |
| Reliance placed on public indication of value | 100.0% | 100.0% |

Prior to the date of the Restructuring Transaction, the derivative liability resulting from the Letter Agreement, included on the consolidated statements of financial condition, was marked to market at each reporting date and changes in the fair value were recorded through earnings in the consolidated statements of operations as gains or losses resulting from the Letter Agreement.

***Mandatory Prepayment Provision — Credit Agreement***

The Credit Agreement contains mandatory prepayment provisions that may be triggered by events or circumstances that are not considered clearly and closely related to the Credit Agreement, such as asset sales, and, as such, represent embedded derivatives in accordance with ASC 815. The embedded derivatives are bifurcated from the Credit Agreement and accounted for separately as a derivative liability. The fair value of the derivative liability resulting from the mandatory prepayment provisions of the Credit Agreement is estimated using the "with" and "without" method. Using this methodology, the Credit Agreement is first valued with the mandatory prepayment provision (the "with" scenario) and subsequently valued without the mandatory prepayment provision (the "without" scenario). The fair value of the derivative liability resulting from the mandatory prepayment provision is estimated as the difference between the fair values of the Credit Agreement in the "with" and "without" scenarios. The fair value of the Credit Agreement in the "with" and "without" scenarios was estimated using a risk-neutral valuation model. Specifically, to estimate the fair value of the Credit Agreement, the expected cash flows were modeled over the life of the debt, including the extension of the maturity date by one year as part of the Restructuring Transaction.

The valuation of the derivative liability resulting from the mandatory prepayment provision primarily utilizes Level 3 inputs. The significant Level 3 inputs include the expected recovery rate in the case of a default and the expected timing for the remaining businesses to be sold. A recovery rate of 53.4% was used in the valuation as of December 31, 2016, which was estimated using market observed long-term average recovery rates for debt instruments of similar seniority. The timing for the remaining businesses to be sold was estimated by management to occur within the first half of 2017.

The derivative liability resulting from the mandatory prepayment provision, included in the Credit Agreement on the consolidated statements of financial condition, is marked to market at each reporting date and changes in the fair value are recorded through earnings in the consolidated statements of operations as gains or losses resulting from the Credit Agreement. The valuation techniques used are sensitive to certain key assumptions. For example, a 5.0% increase (decrease) in the market price of the Senior convertible notes would result in a decrease of approximately $2.7 million (increase of approximately $2.6 million) in this valuation, assuming no other change in any other factors considered.

The following tables present the carrying value, fair value and fair value hierarchy category of certain financial instruments that are not measured at fair value in the consolidated statements of financial condition, with amounts in thousands:

| | As of December 31, 2016 | | | Fair Value Measurements using: | | |
|---|---|---|---|---|---|---|
| | Carrying Value | Fair Value | Level 1 | Level 2 | Level 3 |
| **Financial Assets:** | | | | | | |
| Due from brokers — unsettled spot FX [(4)] | $ 1,600 | $ 1,600 | $ — | $ 1,600 | $ — |
| Due from brokers — excess cash collateral [(5)] | 12,229 | 12,229 | — | 12,229 | — |
| Exchange memberships [(5)] | 9,434 | 10,190 | — | 10,190 | — |
| Total assets | $ 23,263 | $ 24,019 | $ — | $ 24,019 | $ — |
| | | | | | |
| **Financial Liabilities:** | | | | | | |
| Due to brokers — unsettled spot FX [(4)] | $ 425 | $ 425 | $ — | $ 425 | $ — |
| Senior convertible notes | 161,425 | 94,875 | | 94,875 | |
| Credit Agreement | 150,516 | 148,813 | — | — | 148,813 |
| Total liabilities | $ 312,366 | $ 244,113 | $ — | $ 95,300 | $ 148,813 |

| | As of December 31, 2015 | | | Fair Value Measurements using: | | |
|---|---|---|---|---|---|---|
| | Carrying Value | Fair Value | Level 1 | Level 2 | Level 3 |
| **Financial Assets:** | | | | | | |
| Due from brokers — unsettled spot FX [(4)] | $ 2,939 | $ 2,939 | $ — | $ 2,939 | $ — |
| Due from brokers — unsettled common stock [(5)] | 3,054 | 3,054 | — | 3,054 | — |
| Due from brokers — excess cash collateral [(5)] | 18,010 | 18,010 | — | 18,010 | — |
| Notes receivable | 7,881 | 7,881 | — | — | 7,881 |
| Exchange memberships [(5)] | 9,434 | 8,655 | — | 8,655 | |
| Total assets | $ 41,318 | $ 40,539 | $ — | $ 32,658 | $ 7,881 |
| | | | | | |
| **Financial Liabilities:** | | | | | | |
| Due to brokers — unsettled spot FX [(4)] | $ 1,039 | $ 1,039 | $ — | $ 1,039 | $ — |
| Senior convertible notes | 157,185 | 121,187 | — | 121,187 | |
| Credit Agreement | 147,729 | 192,685 | — | — | 192,685 |
| Total liabilities | $ 305,953 | $ 314,911 | $ — | $ 122,226 | $ 192,685 |

(4) Attributable to continuing and discontinued operations. See Note 4 for amounts classified as held for sale on the consolidated statements of financial condition.

(5) Attributable to discontinued operations and included in assets held for sale on the consolidated statements of financial condition (see Note 4).

**Due from/to Brokers — Unsettled Spot FX**

Unsettled spot FX, included in Due from/Due to brokers and assets and liabilities held for sale on the consolidated statements of financial condition, is carried at contracted amounts which approximate fair value based on market price quotations (where observable) obtained from independent brokers.

**Due from Brokers — Unsettled Common Stock**

The receivable for exchange membership shares sold short, included in assets held for sale on the consolidated statements of financial condition, is carried at the contracted amount which approximates fair value based on quoted prices.

**Due from Brokers — Excess Cash Collateral**

Excess cash collateral, included in assets held for sale on the consolidated statements of financial condition, is carried at contractual amounts which approximate fair value.

**Notes Receivable**

Notes receivable are carried at contracted amounts which approximate fair value.

**Exchange Memberships**

Exchange memberships, which include ownership interests and shares owned, are carried at cost. The fair value is based on quoted prices or recent sales.

**Senior Convertible Notes**

Senior convertible notes are carried at contractual amounts. The fair value of the Senior convertible notes is based on similar recently executed transactions and market price quotations (where observable) obtained from independent brokers.

**Credit Agreement**

Credit Agreement is carried at the contracted amount less original issue discount. The fair value of the Credit Agreement is based on a valuation model that considers the probability of default, Leucadia's secured interest and the observable trading value of the Senior convertible notes.

The following tables reconcile the opening and ending balances of the recurring fair value measurements categorized as Level 3, which are included in the consolidated statements of financial condition, and identifies the total gains and losses the Company recognized during the years ended December 31, 2016 and 2015, with amounts in thousands:

| | Year Ended December 31, 2016 | | | | | | | |
|---|---|---|---|---|---|---|---|---|
| | Balance as of December 31, 2015 | | Net Unrealized (Gain) Loss | | Addition/(Reversal) | | Balance as of December 31, 2016 | |
| Letter Agreement | $ | 448,458 | $ | (212,949) | $ | (235,509) | $ | — |
| Mandatory Prepayment Provision — Credit Agreement | | — | | 6,172 | | — | | 6,172 |
| Total Level 3 liabilities | $ | 448,458 | $ | (206,777) | $ | (235,509) | $ | 6,172 |

| | Year Ended December 31, 2015 | | | | | | | |
|---|---|---|---|---|---|---|---|---|
| | Balance as of December 31, 2014 | | Net Unrealized (Gain) Loss | | Addition/(Reversal) | | Balance as of December 31, 2015 | |
| Letter Agreement | $ | — | $ | 354,022 | $ | 94,436 | $ | 448,458 |
| Total Level 3 Liabilities | $ | — | $ | 354,022 | $ | 94,436 | $ | 448,458 |

The net unrealized gains and losses summarized in the tables above are related to the changes in the fair value of the Letter Agreement and the embedded derivative related to the mandatory prepayment provision of the Credit Agreement for the years ended December 31, 2016 and 2015 and are included in Gain (loss) on derivative liabilities — Letter & Credit Agreements in the consolidated statements of operations.

There were no transfers into or out of Level 1, 2 or 3 of the fair value hierarchy during the years ended December 31, 2016 and 2015.

XML 49 R31.htm IDEA: XBRL DOCUMENT

| Income Taxes | 12 Months Ended |
|---|---|
| | Dec. 31, 2016 |
| **Income Tax Disclosure [Abstract]** | |
| Income Taxes | **Income Taxes** |

Holdings operates in the U.S. as a limited liability company that is treated as a partnership for U.S. federal, state, and local income tax purposes. Since January 2015, all of Holdings' operations are held by Group, a limited liability company that is also treated as a partnership between Holdings and Leucadia for U.S. federal, state and local income tax purposes. As a result, neither Holdings' nor Group's income from its U.S. operations is subject to U.S. federal income tax because the income is attributable to its members. Accordingly, the Company's U.S. tax provision is solely based on the portion of income attributable to the Corporation from the lower tier limited liability companies and excludes the income attributable to other members of Holdings and Group whose income is included in Net income (loss) attributable to non-controlling interest in Global Brokerage Holdings, LLC in the consolidated statements of operations.

In addition to U.S. federal and state income taxes, the Company is subject to Unincorporated Business Tax which is attributable to Group's operations apportioned to New York City. The Company's foreign subsidiaries are also subject to local taxes.

Income (loss) from continuing operations before income taxes, as shown in the consolidated statements of operations, includes the following components, with amounts in thousands:

| | For the Years Ended December 31, | | | |
|---|---|---|---|---|
| | **2016** | | **2015** | |
| Domestic | $ | 100,414 | $ | (628,527) |
| Foreign | | 62,156 | | (4,778) |
| | $ | 162,570 | $ | (633,305) |

The provision for income taxes attributable to continuing operations consists of the following, with amounts in thousands:

| | For the Years Ended December 31, | | | |
|---|---|---|---|---|
| | **2016** | | **2015** | |
| **Current** | | | | |
| Federal income tax benefit | $ | — | $ | (176) |
| State and local tax benefit | | (34) | | (11) |
| Foreign income tax expense (benefit) | | 1,592 | | (412) |
| Subtotal | | 1,558 | | (599) |
| | | | | |
| **Deferred** | | | | |
| Federal income tax | | — | | 172,618 |
| State and local income tax | | — | | 7,474 |
| Foreign income tax (benefit) expense | | (781) | | 1,705 |
| Subtotal | | (781) | | 181,797 |
| Total provision for taxes attributable to continuing operations | $ | 777 | $ | 181,198 |

The following table reconciles the provision for income taxes attributable to continuing operations to the U.S. federal statutory tax rate:

| | For the Years Ended December 31, | |
|---|---|---|
| | **2016** | **2015** |
| Statutory U.S. federal income tax rate | 34.0 % | 34.0 % |
| Income passed through to non-controlling members | (10.6) | (17.0) |
| State and local income tax | 2.1 | 1.3 |
| Foreign income tax | (0.3) | (1.1) |
| Tax Receivable Agreement true-up | — | 7.8 |
| Loss on liquidation of subsidiary | (1.4) | — |
| Non-deductible penalty | 1.1 | — |
| Valuation allowance | (27.1) | (50.9) |
| Non-deductible interest | 2.3 | (2.3) |
| Other | 0.4 | (0.4) |
| Effective tax rate | 0.5 % | (28.6)% |

The change in the effective tax rate for the year ended December 31, 2016 compared to the year ended December 31, 2015 is predominantly the result of reversing the valuation allowance previously established on the deferred tax assets of the Company to offset the tax provision associated with the book income for the period. During 2015, the Corporation determined that, given the losses incurred from the events of January 15, 2015 and due to the Leucadia Transaction, it was not more likely than not that it would benefit from the tax deduction attributable to the tax basis step-up from the conversion of the non-controlling membership units of Holdings, nor would it receive tax benefit from the losses incurred. As a result, a valuation allowance was established on substantially all of the deferred tax assets of the Company due to their doubtful realizability, which was the primary driver of the tax provision recorded for the year ended December 31, 2015. The negative

tax rate for the year ended December 31, 2015 reflects the recording of a tax provision on the book loss for the period.

Deferred tax assets and liabilities are determined based on the differences between the financial statements and tax basis of assets and liabilities using enacted tax rates in effect for the year in which the differences are expected to reverse. A summary of the tax effects of the temporary differences from continuing operations is as follows, with amounts in thousands:

| | As of December 31, | |
| | 2016 | 2015 |
|---|---|---|
| **Deferred tax assets** | | |
| Equity-based compensation | $ 294 | $ 336 |
| Investment in partnership | 190,844 | 277,775 |
| Fixed assets | — | 747 |
| Tax loss carryforwards | 125,898 | 120,580 |
| Intangible assets | 679 | 302 |
| Tax credit carryforward/foreign sub income | 4,539 | 5,090 |
| Gain/(Loss) on derivative liability — Letter Agreement | — | 3,067 |
| Other | 1,072 | 491 |
| **Gross deferred tax assets** | 323,326 | 408,388 |
| **Less: valuation allowance** | (322,201) | (407,590) |
| **Net deferred tax asset** | 1,125 | 798 |
| **Deferred tax liabilities** | | |
| Fixed assets | 28 | 5 |
| Intangible assets | 228 | 714 |
| Software development cost | 171 | 245 |
| Other | 583 | 539 |
| **Gross deferred tax liabilities** | 1,010 | 1,503 |
| Net deferred tax asset (liability) | $ 115 | $ (705) |

The increase in net deferred tax assets was primarily driven by a decrease in the deferred tax liability associated with certain identified intangibles and the reversal of valuation allowance. Additionally, the increase in deferred tax assets is driven by the increase in the Corporation's ownership in Holdings as a result of members of Holdings exchanging their membership units for the Corporation's Class A common stock. As Existing Unit Holders exchange their membership units, the Company records a deferred tax benefit related to Holdings election under Section 754 of the Internal Revenue Code (see Note 2). The increase in net operating loss carryforwards also contributed to the increase.

The Company assesses available positive and negative evidence to estimate if it is more-likely-than-not to use certain jurisdiction-based deferred tax assets including certain tax credits and net operating loss carryovers. On the basis of this assessment, a valuation allowance of $85.4 million was released during the year ended December 31, 2016.

As of December 31, 2016, the Company has $258.7 million of domestic net operating loss carryforwards and $480.1 million of foreign net operating loss carryforwards from all operations. The U.S. net operating loss carryforwards have various expiration dates through 2036 with the net operating losses generated by certain of our U.K. subsidiaries having indefinite carryforward periods.

The tax credit carryforward includes foreign tax credits of $3.5 million and a research and development credit of $0.5 million, each of which may be carried forward for a period of 10 years and begin to expire in 2021 and New York City unincorporated business tax credits of $0.5 million that may be carried forward for 7 years.

The Company does provide for deferred taxes on the excess of the financial reporting over the tax basis in its investments in foreign subsidiaries because the amounts are not deemed to be permanent in duration.

Income tax payable as of December 31, 2016 and 2015 was $0.9 million and $1.4 million, respectively, and is included in Accounts payable and accrued expenses in the consolidated statements of financial condition (see Note 12). Tax receivable as of December 31, 2016 and 2015 was $0.2 million and $1.8 million, respectively.

The following is a tabular reconciliation of the total amounts of unrecognized tax benefits, with amounts in thousands:

| | For the Years Ended December 31, | |
| | 2016 | 2015 |
|---|---|---|
| **Unrecognized tax benefits – January 1** | $ 390 | $ 409 |
| Gross increases – tax positions in prior period | 36 | — |
| Gross decreases – tax positions in prior period | — | (137) |
| Gross increases – tax positions in current period | 166 | 118 |
| Lapse of statute of limitations | (51) | — |
| **Unrecognized tax benefits – December 31** | $ 541 | $ 390 |

The Company recognizes interest and penalties related to unrecognized tax benefits within the income tax expense line in the consolidated statements of operations. Accrued interest and penalties are included within the related tax liability line in the consolidated statements of financial condition. Related to the unrecognized tax benefits noted above, the Company accrued penalties and interest of immaterial amounts during the years ended December 31, 2016 and 2015.

The Company does not believe that it will have a material increase in its unrecognized tax benefits during the coming year.

The Company is subject to taxation in the U.S. and various states and foreign jurisdictions. As of December 31, 2016, the Company's tax years for 2013, 2014 and 2015 are subject to examination by the tax authorities. Currently, the Company and Holdings' 2013 U.S. Federal tax returns are under examination along with the Company's 2013 and 2014 New York State tax returns. Additionally, several of the Company's U.K. subsidiaries are under examination for the 2012 tax year.

XML 50 R32.htm IDEA: XBRL DOCUMENT

| Foreign Currencies and Concentrations of Credit Risk | 12 Months Ended |
|---|---|
| | Dec. 31, 2016 |
| **Foreign Currency [Abstract]** | |
| Foreign Currencies and Concentrations of Credit Risk | **Foreign Currencies and Concentrations of Credit Risk** |

**Foreign Currencies and Concentrations of Credit Risk**

Under the agency model, the Company accepts and clears FX spot contracts for the accounts of its customers (see Notes 1 and 2). These activities may expose the Company to off-balance sheet risk in the event that the customer or other broker is unable to fulfill its contracted obligations and the Company has to purchase or sell the financial instrument underlying the contract at a loss.

In connection with these activities, the Company executes and clears customers' transactions involving the sale of foreign currency not yet purchased, substantially all of which are transacted on a margin basis subject to internal policies. Such transactions may expose the Company to off-balance sheet risk in the event margin deposits are not sufficient to fully cover losses that customers may incur. In the event that a customer fails to satisfy its obligations, the Company may be required to purchase or sell financial instruments at prevailing market prices to fulfill the customer's obligation.

The Company controls such risks associated with its customer activities by requiring customers to maintain margin collateral, in the form of cash, in compliance with various internal guidelines. The Company's trading software technology monitors margin levels on a real time basis and, pursuant to such guidelines, requires customers to deposit additional cash collateral, or to reduce positions, if necessary. The system is designed to ensure that any breach in a customer's margin requirement as a result of losses on the trading account will automatically trigger a final liquidation, which will execute the closing of all positions.

Exposure to credit risk is dependent on market liquidity. Prior to the events of January 15, 2015, the Company's customers rarely had significant negative equity balances, and exposure to credit risk from customers was therefore minimal. Following the events of January 15, 2015, the Company took a number of actions to reduce credit risk from customers, including increasing margin requirements and discontinuing currency pairs from the trading platform that are believed to carry significant risk due to overactive manipulation by their respective governments either by a floor, ceiling, peg or band. For the year ended December 31, 2016, losses incurred from customer accounts that had gone negative were approximately $2.5 million, primarily related to the Brexit event in June 2016 and the GBP flash crash in October 2016. For the year ended December 31, 2015, losses incurred from customer accounts that had gone negative were $0.5 million (excluding the events of January 15, 2015).

Institutional customers are permitted credit pursuant to limits set by the Company's prime brokers. The prime brokers incur the credit risk relating to the trading activities of these customers in accordance with the respective agreements between such brokers and the Company.

The Company is engaged in various trading activities with counterparties which include brokers and dealers, futures commission merchants, banks and other financial institutions. In the event that such counterparties do not fulfill their obligations, the Company may be exposed to credit risk. The risk of default depends on the creditworthiness of the counterparty or issuer of the financial instrument. It is the Company's policy to: (i) perform credit reviews and due diligence prior to conducting business with counterparties; (ii) set exposure limits and monitor exposure against such limits; and (iii) periodically review, as necessary, the credit standing of counterparties using multiple sources of information. The Company's total Due from brokers balance included in the consolidated statements of financial condition was $17.5 million[(1)] and $26.0 million[(1)] as of December 31, 2016 and 2015, respectively. As of December 31, 2016 and 2015, 89.8% and 94.7%, respectively, of the Company's total Due from brokers balance was from three large financial institutions. Three banks held more than 10.0% each of the Company's total cash and cash equivalents and cash and cash equivalents, held for customers as of December 31, 2016. Five banks held more than 10.0% each of the Company's total cash and cash equivalents and cash and cash equivalents, held for customers as of December 31, 2015.

---

[(1)] As of December 31, 2016 and 2015, $3.4 million and $3.8 million, respectively, is attributable to continuing operations. See Note 4 for amounts classified as assets held for sale on the consolidated statements of financial condition.

| Segment Information | 12 Months Ended |
|---|---|
| | Dec. 31, 2016 |
| **Segment Reporting [Abstract]** | |
| Segment Information | |

**Segment Information**

ASC 280 establishes standards for reporting information about operating segments. Operating segments are defined as components of an enterprise about which separate financial information is available that is evaluated regularly by the chief operating decision maker, or decision making group, in deciding how to allocate resources and in assessing performance. The guidance defines reportable segments as operating segments that meet certain quantitative thresholds. It was determined in the first quarter of 2015 that as a result of the events of January 15, 2015, and the decision to sell certain institutional assets, the composition of the Company's previously reported Institutional segment changed significantly, such that the remaining institutional business reported in continuing operations no longer meets the quantitative criteria for separate reporting. In addition, the continuing institutional business shares common management strategies, customer support and trading platforms with the Company's retail business. Accordingly, the Company operates in a single operating segment for all periods presented.

*Geographic Locations*

Trading revenue from external customers is attributed to individual countries based on the customers' country of domicile. Trading revenue from continuing operations by geographical region is as follows, with amounts in thousands:

| | For the Years Ended December 31, | | | |
|---|---|---|---|---|
| | **2016** | | **2015** | |
| **Trading Revenue from Continuing Operations** | | | | |
| U.S. | $ | 37,002 | $ | 35,413 |
| Asia | | 108,905 | | 98,147 |
| Europe, Middle East and North Africa | | 103,375 | | 86,723 |
| Rest of World | | 21,421 | | 20,329 |
| Other | | 5,297 | | 9,430 |
| Total | $ | 276,000 | $ | 250,042 |

Trading revenue attributable to China represented 30.3% and 27.4% of total trading revenue from continuing operations for the years ended December 31, 2016 and 2015, respectively. Trading revenue attributable to the U.S. represented 13.4% and 14.2% of total trading revenue from continuing operations for the years ended December 31, 2016 and 2015, respectively.

As of December 31, 2016 and 2015, substantially all of the Company's long-lived assets were located in the U.S.

*Concentrations of Significant Customers*

No single customer accounted for 10.0% or more of total trading revenue from continuing operations for the years ended December 31, 2016 and 2015.

XML 52 R34.htm IDEA: XBRL DOCUMENT

| Litigation | 12 Months Ended |
|---|---|
| | Dec. 31, 2016 |
| Commitments and Contingencies Disclosure [Abstract] | |
| Litigation | **Litigation** |

**Litigation**

In the ordinary course of business, the Company and certain of its officers, directors and employees may from time to time be involved in litigation and claims incidental to the conduct of its businesses, including intellectual property claims. In addition, the Company's business is also subject to extensive regulation, which may result in administrative claims, investigations and regulatory proceedings against it. The Company has been named in various arbitration and civil litigation cases brought by customers seeking damages for trading losses. Management has investigated these matters and believes that such cases are without merit and is defending them vigorously. However, the arbitrations and litigations are presently in various stages of the judicial process and no judgment can be made regarding the ultimate outcome of the arbitrators' and/or court's decisions.

In January 2014, the equity receiver for a former client of US, Revelation Forex Fund ("Revelation"), its principal, Kevin G. White, and related entities RFF GP, LLC and KGM Capital Management, LLC, filed suit against US, and certain unrelated defendants, in Texas state court. The suit alleges that US is liable for damages in excess of $3.8 million, plus exemplary damages, interest, and attorneys' fees in connection with a Ponzi scheme run by Mr. White through his companies. In June 2015, that same equity receiver filed a complaint against US seeking $2.0 million, plus interest, and attorneys' fees, based on allegations that the amount in controversy represents the net fraudulent transfers from Revelation to US under New York law. In September 2015, the parties agreed to arbitration proceeding before the National Futures Association ("NFA") on these claims. In June 2016, the parties agreed to settle all related matters for $2.3 million. The Company recorded a charge for $2.3 million in the year ended December 31, 2016, which is included in General and administrative expense in the consolidated statements of operations.

In April 2014, the Securities and Futures Commission ("SFC") initiated an investigation relating to HK's past trade execution practices concerning the handling of price improvements in the Company's trading system prior to August 2010. On October 19, 2016, the parties entered into a final settlement whereby HK voluntarily agreed to make full restitution to affected clients in the amount of $1.5 million and pay a fine of $0.5 million. The Company paid the $2.0 million settlement in November 2016.

On January 15, 2015, as a result of the unprecedented volatility in the EUR/CHF currency pair after the SNB discontinued its currency floor of 1.2 CHF per EUR, US suffered a temporary breach of certain regulatory capital requirements. On August 18, 2016, the Commodity Futures Trading Commission ("CFTC") filed a complaint, *U.S. Commodity Futures Trading Commission v. Forex Capital Markets, LLC*, in the U.S. District Court for the Southern District of New York, alleging that US was undercapitalized following the SNB's decision to remove the currency peg, that US failed to notify the CFTC of its undercapitalization, and that US guaranteed customer losses. On December 8, 2016, the CFTC filed an amended complaint. On or about February 13, 2017, US settled with the CFTC without admitting or denying any of the allegations, and pursuant to a consent order entered by the court, agreed to pay a civil monetary penalty in the amount of $0.7 million to the CFTC (see Note 28). The Company recorded a charge for $0.7 million in the year ended December 31, 2016, which is included in General and administrative expense in the consolidated statements of operations.

In connection with an earlier settlement between FSL and the Financial Conduct Authority regarding trade execution practices for the period 2006 to 2010, in February 2015, FSL paid an additional $0.7 million in restitution to affected clients.

On May 8, 2015, the International Union of Operating Engineers Local No. 478 Pension Fund filed a complaint against the Company, its former Chief Executive Officer and its Chief Financial Officer in the United States District Court for the Southern District of New York, individually and on behalf of all purchasers of the Company's common stock between June 11, 2013 and January 20, 2015. The complaint alleges that the defendants violated certain provisions of the federal securities laws and seeks compensatory damages as well as reasonable costs and expenses. An amended and consolidated complaint was filed on January 11, 2016. The Company filed a motion to dismiss the consolidated complaint on February 25, 2016 which was granted by the Court on August 18, 2016. On October 7, 2016, the District Court entered an order of final judgment closing the case. On November 3, 2016, plaintiffs filed a notice of appeal in the U.S. Court of Appeals for the Second Circuit to challenge the district court's order and final judgment that dismissed the case with prejudice. The appeal is currently pending.

In September 2015, US settled a complaint brought by the CFTC alleging that US failed to supervise an account determined to have been involved in wrongdoing and inadvertently omitted certain documents from its responses to document request. Under the terms of the settlement, US agreed, without admitting or denying any of the allegations, to pay a fine of $0.7 million to the CFTC and disgorge commissions and fees of $0.1 million.

On December 15, 2015, Brett Kandell, individually and on behalf of nominal defendant, Global Brokerage, Inc., filed a shareholder derivative complaint against the members of Global Brokerage's board of directors (the "Board") in the Delaware Court of Chancery. The case is captioned *Brett Kandell v. Dror Niv et al.*, C.A. No. 11812-VCG. On March 4, 2016, plaintiff filed an amended shareholder derivative complaint, which alleges claims for breach of fiduciary duty, contribution and indemnification, waste of corporate assets, abuse of control and unjust enrichment and seeks compensatory damages, rescission of certain agreements as well as reasonable costs and expenses. A second amended shareholder derivative complaint was filed on May 31, 2016 and the Board filed a motion to dismiss on July 15, 2016. Subsequently, plaintiff filed a third amended shareholder derivative complaint on September 1, 2016 and the Board filed a motion to dismiss on October 17, 2016. The court has not yet ruled on the motion to dismiss.

On February 6, 2017, US, Holdings, Dror Niv and William Ahdout entered into a settlement with the CFTC, and US, Messrs. Niv, Ahdout and Omit Niv entered into a settlement with the NFA. During the relevant times, Mr. Niv was the Company's CEO, a member of Holdings, and/or the CEO of US; Mr. Ahdout was a member of Holdings and a Managing Director of US; and Ms. Niv was the CEO of US. Both settlements concerned allegations that aspects of US's relationship with one of its liquidity providers had not been disclosed to customers and regulators. The NFA settlement included additional, unrelated allegations of violations of certain NFA Rules and Requirements. The Company's subsidiaries are cooperating with regulatory authorities outside the U.S. in relation to their requests for information arising from the settlements announced on February 6, 2017.

Under the settlement with the CFTC, the named entities and individuals were required, jointly and severally, to pay a

civil monetary penalty of $7.0 million, agreed to withdraw from CFTC registration and agreed not to apply for or claim exemption from CFTC registration in the future. Under the settlement with the NFA, no monetary fine was imposed and the named individuals and entities agreed to withdraw from NFA membership and not to reapply for membership in the future. The named entities and individuals did not admit or deny the allegations associated with the settlements. The Company recorded a charge for $7.0 million in the year ended December 31, 2016, which is included in General and administrative expense in the consolidated statements of operations. As discussed more fully in Note 28, the Company will be withdrawing from business in the U.S. and, on February 7, 2017, agreed to sell all of its U.S.-domiciled customer accounts to Gain Capital Group, LLC.

In response to the Company's announcement on February 6, 2017 regarding settlements with the NFA and the CFTC, three new putative securities class action lawsuits have been filed against Global Brokerage, Inc., Dror Niv, and Robert Lande in the U.S. District Court for the Southern District of New York. These putative securities class actions are captioned: (1) *Khoury v. FXCM Inc.*, Case No. 1:17-cv-916; (2) *Zhao v. FXCM Inc.*, Case No. 1:17-cv-955; and (3) *Blinn v. FXCM Inc.*, Case No. 1:17-cv-1028. The complaints in these three actions allege that the defendants violated certain provisions of the federal securities laws and seek compensatory damages as well as reasonable costs and expenses. The Company intends to vigorously defend against the claims asserted in these actions.

For the outstanding matters referenced above, including ordinary course of business litigation and claims referenced in the first paragraph hereto, for which a loss is more than remote but less than likely, whether in excess of an accrued liability or where there is no accrued liability, we have estimated a range of possible loss. Management believes the estimate of the aggregate range of possible loss in excess of accrued liabilities for such matters is between nil and $1.6 million as of December 31, 2016.

In view of the inherent difficulty of predicting the outcome of litigation and claims, the Company cannot predict what the eventual outcome of the pending matters will be, what the timing of the ultimate resolution of these matters will be, or what the eventual loss related to each pending matter may be. Furthermore, the above-referenced matters represented in the estimated aggregate range of possible loss will change from time to time and actual results may vary significantly from the current estimate. An adverse outcome in one or more of these matters could be material to the Company's results of operations or cash flows for any particular reporting period.

XML 53 R35.htm IDEA: XBRL DOCUMENT

| Subsequent Events | 12 Months Ended |
|---|---|
| | Dec. 31, 2016 |
| **Subsequent Events [Abstract]** | |
| Subsequent Events | **Subsequent Events** |

**Subsequent Events**

**Amendment to Management Agreement**

On February 2, 2017, Group, Holdings and Leucadia entered into Amendment No. 1 to the Management Agreement (the "Management Agreement Amendment"), which amended the Management Agreement dated September 1, 2016. Pursuant to the Management Agreement Amendment, the Management Agreement was modified to provide Board Members (as defined therein) with certain rights of termination. Specifically, the Management Agreement Amendment specifies that the Management Agreement may be terminated by a vote of at least three members of the Group Board after the occurrence of certain events, including a change of control.

**Acknowledgment Regarding Management Incentive Plan**

On February 2, 2017, Group and Leucadia also entered into an acknowledgment (the "Acknowledgment"), as it relates to the Management Incentive Plan that became effective September 1, 2016. Pursuant to the Acknowledgment, Group and Leucadia agreed that Leucadia may terminate the Management Incentive Plan on behalf of Group at any time and for any reason in its sole discretion.

**Regulatory Settlement Agreements**

On February 6, 2017, the Company announced simultaneous regulatory settlements with the NFA and the CFTC against US, Holdings and certain of its principals (the "Respondents"). The NFA settlement has no monetary fine, and the CFTC settlement has a $7.0 million fine imposed jointly and severally against the Respondents. The Company paid the $7.0 million fine on February 16, 2017, which is recorded in General and administrative expense in the consolidated statements of operations for the year ended December 31, 2016.

Pursuant to the aforementioned settlement agreements, the Company has withdrawn from business in the U.S. and deregistered from the CFTC and the NFA.

On February 8, 2017, the CFTC issued an order filing and settling charges against US for insufficient capital on January 15 and 16, 2015 due to the SNB event. The order requires Respondents to pay a monetary penalty of $0.7 million. The amount is recorded in General and administrative expense in the statement of operations for the year ended December 31, 2016. The funds were placed into escrow on February 8, 2017.

**Sale of U.S. Customer Accounts**

On February 7, 2017, the Company entered into an Asset Purchase Agreement (the "Asset Purchase Agreement"), pursuant to which the Company agreed to sell substantially all of its U.S.-domiciled customer accounts to Gain Capital Group, LLC ("Gain"). Under the terms of the Asset Purchase Agreement, Gain will pay proceeds to the Company on a per account basis for each acquired account that opens at least one new trade during the first 153 calendar days following the closing date. The closing took place on February 24, 2017.

**Restructuring Plan**

In connection with its withdrawal from business in the U.S. pursuant to the settlement agreements with the NFA and the CFTC, the Company intends to implement a restructuring plan that includes the termination of approximately 150 employees, which represents approximately 19% of its global workforce. The Company expects to recognize approximately $4.0 million to $5.0 million in pre-tax restructuring charges in the first quarter of 2017.

**Changes Related to FXCM Inc.**

On February 21, 2017, Mr. Dror Niv resigned from his positions as a member and Chairman of the Board of Directors (the "Board") of FXCM Inc., effective immediately, and as the Chief Executive Officer of FXCM Inc., to be effective upon the appointment of his successor.

Following Mr. Niv's departure from the Board, Mr. Bryan I. Reyhani has been appointed to serve as Chairman of the Board.

On February 21, 2017, Mr. William Ahdout resigned from his position as a member of FXCM Inc.'s Board, effective immediately.

On February 24, 2017, FXCM Inc. changed its name to Global Brokerage, Inc. At the opening of trading on February 27, 2017, the trading ticker symbol for the Corporation's Class A common stock on the NASDAQ Global Market changed to "GLBR."

**Second Amendment to Amended and Restated Credit Agreement**

In connection with the CFTC regulatory fine of $7.0 million described above, Leucadia consented to waive compliance with certain sections in the Credit Agreement and the LLC Agreement regarding restricted payments (as defined in the Credit Agreement) in order to permit the distribution of $3.5 million of funds from Group to Holdings with respect to the payment of the fine (the "Payment"). Furthermore, the members of Group consented to waive compliance with certain provisions of the LLC Agreement regarding distributions (as defined in the LLC Agreement) with respect to the Payment. In consideration for entering into the waiver, the Company agreed to pay a fee to Leucadia in the amount of $3.5 million. On February 22, 2017 (the "Effective Date"), Group, Holdings and Leucadia entered into a Second Amendment to the Amended and Restated Credit Agreement (the "Second Amendment"), which amended the Amended and Restated Credit Agreement dated January 24, 2015. Pursuant to the Second Amendment, the aggregate principal outstanding balance of the Credit Agreement was increased by $3.5 million, resulting in $158.0 million in total principal outstanding on the Credit Agreement as of the Effective Date. The Second Amendment will be accounted for as a modification on a prospective basis pursuant to ASC 470 beginning in the first quarter of 2017 and is not expected to have a material impact on the Company's consolidated financial statements.

**Repayment on the Credit Agreement**

As a result of the release of regulatory capital in connection with the Company's withdrawal from business in the U.S. and termination of its registration as a futures commission merchant and retail foreign exchange dealer in the U.S., the Company repaid $30.0 million in principal on the Leucadia term loan on March 17, 2017.

XML 54 R36.htm IDEA: XBRL DOCUMENT

| Significant Accounting Policies and Estimates (Policies) | 12 Months Ended |
|---|---|
| | Dec. 31, 2016 |
| **Accounting Policies [Abstract]** | |
| Basis of Consolidation | ***Basis of Consolidation*** |

The accompanying consolidated financial statements are presented in accordance with accounting principles generally accepted in the United States of America ("U.S. GAAP"). The Company consolidates those entities in which it is the primary beneficiary of a variable-interest entity ("VIE") as required by Financial Accounting Standards Board ("FASB") Accounting Standards Codification Topic ("ASC") 810, *Consolidations* ("ASC 810"), or entities where it has a controlling interest. Entities that do not qualify as VIEs are evaluated for consolidation as voting interest entities under the voting interest model. Under the voting interest model, the Company consolidates those entities where it has a controlling financial interest through a majority voting interest. Intercompany accounts and transactions are eliminated in consolidation.

At the time of Newco's formation in connection with the Leucadia Transaction, the Company determined that Newco was a VIE and concluded that Holdings was the primary beneficiary of Newco, which resulted in the consolidation of the financial results of Newco by Holdings. The Company determined that the Restructuring Transaction (see Note 19) is a reconsideration event under ASC 810 and re-evaluated the previous conclusion that Newco (subsequently renamed to Group) is a VIE. Upon reconsideration, the Company determined that Group remains a VIE and concluded that Holdings is the primary beneficiary of Group since Holdings has the ability to direct the activities of Group that most significantly impact Group's economic performance and the obligation to absorb losses of Group or the right to receive benefits from Group that could be significant to Group. As a result, Holdings continues to consolidate the financial results of Group.

The Corporation records a non-controlling interest for the economic interest in Holdings not owned by the Corporation. The Corporation's and the non-controlling unit holders' economic interest in Holdings was 74.5% and 25.5%, respectively, as of December 31, 2016. The Corporation's and the non-controlling unit holders' economic interest in Holdings was 67.9% and 32.1%, respectively, as of December 31, 2015.

The Company's consolidated financial statements include the following significant subsidiaries of Holdings:

| | |
|---|---|
| FXCM Group, LLC[(1)] | ("Group") |
| FXCM Global Services, LLC | ("Global Services") |
| Forex Capital Markets, LLC | ("US") |
| FXCM Asia Limited[(2)] | ("HK") |
| Forex Capital Markets Limited | ("UK LTD") |
| FXCM Australia Pty. Limited | ("Australia") |
| FXCM Securities Limited[(3)] | ("FSL") |
| FXCM Japan Securities Co., Ltd.[(4)] | ("FXCMJ") |
| FXCM UK Merger Limited | ("Merger") |
| Lucid Markets Trading Limited | ("Lucid") |
| Lucid Markets LLP | ("Lucid LLP") |
| Faros Trading LLC[(4)] | ("Faros") |
| V3 Markets, LLC | ("V3") |

[(1)] FXCM Newco, LLC was renamed FXCM Group, LLC effective September 1, 2016

[(2)] Sold by the Company in September 2015

[(3)] Sold by the Company in December 2015

[(4)] Sold by the Company in April 2015

Net income or loss attributable to the non-controlling interest in Holdings in the consolidated statements of operations represents the portion of earnings or loss attributable to the economic interest in Holdings held by the non-controlling unit holders.

Net income or loss attributable to redeemable non-controlling interest in the consolidated statements of operations represents the share of earnings or loss allocated to the non-controlling membership interest in Group held by Leucadia based on the hypothetical liquidation at book value method.

Net income or loss attributable to other non-controlling interests in the consolidated statements of operations represents the portion of earnings or loss attributable to the non-controlling interests of Lucid, Faros (prior to the sale of Faros' operations in the second quarter of 2015), V3 and other consolidated entities based on the economic interests held by the non-controlling members. The non-controlling members of Lucid, Faros (prior to the sale of Faros' operations in the second quarter of 2015) and V3 each hold a 49.9% economic interest in the respective entity. The portion of the 49.9% of Lucid earnings allocated among the non-controlling members of Lucid that is contingent on services being provided is reported as a component of compensation expense and is included in the determination of Income (loss) from discontinued operations, net of tax in the consolidated statements of operations (see Note 4).

Redeemable non-controlling interest on the consolidated statements of financial condition represents the non-controlling membership interest in Group held by Leucadia. Non-controlling interests on the consolidated statements of financial condition represents the equity attributable to the non-controlling interests of Holdings, Lucid, V3 and other consolidated entities.

Investments where the Company is deemed to exercise significant influence, but no control, are accounted for using the equity method of accounting. The Company records its pro-rata share of earnings or losses each period and records any dividends as a reduction in the investment balance. The carrying value of these investments is included in Other assets on the consolidated statements of financial condition and earnings or losses are included in Income or loss on equity method investments, net in the consolidated statements of operations. For the Company's equity method investments classified as discontinued operations, the carrying value of the investments is included in assets held for sale on the consolidated statements of financial condition and earnings or losses are included in the determination of Income or loss from discontinued operations, net of tax in the consolidated statements of operations (see Note 6).

| Reclassifications | ***Reclassifications*** |
|---|---|

Certain reclassifications of prior period amounts related to the Company's retrospective adoption of Accounting Standards Update ("ASU") No. 2015-03, *Interest—Imputation of Interest (Subtopic 835-30): Simplifying the Presentation of Debt Issuance Costs*, have been made to conform to the current period's presentation in the consolidated statements of financial condition.

| Use of Estimates | **_Use of Estimates_** |
|---|---|

The preparation of consolidated financial statements in conformity with U.S. GAAP requires management to make estimates and assumptions that affect the reported amounts of assets and liabilities and disclosure of contingent assets and liabilities at the date of the consolidated financial statements as well as the reported amounts of revenue and expenses during the year. Actual results could differ from those estimates and could have a material impact on the consolidated financial statements.

| Discontinued Operations | **_Discontinued Operations_** |
|---|---|

As discussed in Note 1, during the first quarter of 2015, management committed to a plan to dispose of certain businesses. The Company determined that these businesses represent components pursuant to ASC 205-20, *Presentation of Financial Statements — Discontinued Operations* ("ASC 205-20"). The unsold businesses are considered held for sale at the respective reporting dates. When viewed as a whole, the disposal of these components represents a strategic shift as contemplated by ASC 205-20 and the results of operations are reported as discontinued operations for each period presented (see Note 4).

| Segments | **_Segments_** |
|---|---|

ASC 280, *Segment Reporting* ("ASC 280") establishes standards for reporting information about operating segments. Operating segments are defined as components of an enterprise about which separate financial information is available that is evaluated regularly by the chief operating decision maker, or decision making group, in deciding how to allocate resources and in assessing performance. The guidance defines reportable segments as operating segments that meet certain quantitative thresholds. It was determined in the first quarter of 2015 that as a result of the events of January 15, 2015, and the decision to sell certain institutional assets, the composition of the Company's previously reported Institutional segment changed significantly, such that the remaining institutional business reported in continuing operations no longer meets the quantitative criteria for separate reporting. In addition, the continuing institutional business shares common management strategies, customer support and trading platforms with the Company's retail business. Accordingly, the Company operates in a single operating segment for all periods presented.

| Cash and Cash Equivalents | **_Cash and Cash Equivalents_** |
|---|---|

Cash and cash equivalents include cash at banks, U.S. Treasury bills and other highly liquid instruments with original maturities of less than 90 days at the time of purchase and cash on deposit held with FX and CFD market makers related to economic hedging activities. At times, balances held in U.S. bank accounts may exceed federally insured limits. This potentially subjects the Company to concentration risk. The Company has not experienced losses in such accounts.

| Cash and Cash Equivalents, held for customers, and Restricted Time Deposits | **_Cash and Cash Equivalents, held for customers_** |
|---|---|

Cash and cash equivalents, held for customers represents cash held to fund customer liabilities. At times, balances held in U.S. bank accounts may exceed federally insured limits. This potentially subjects the Company to concentration risk. The Company has not experienced losses in such accounts.

The balance arises primarily from cash deposited by customers and net realized gains from customer trading activity. The Company maintains a corresponding liability in connection with this amount that is included in customer account liabilities in the consolidated statements of financial condition (see Note 11). A portion of the balance is not available for general use due to regulatory restrictions in certain jurisdictions. The restricted balances related to continuing operations were $0.3 billion and $0.4 billion as of December 31, 2016 and 2015, respectively.

| Fair Value Measurements | **_Fair Value Measurements_** |
|---|---|

Fair value is defined as the price that would be received to sell an asset or paid to transfer a liability in an orderly transaction between market participants at the measurement date. Fair value measurement establishes a fair value hierarchy that prioritizes the inputs of valuation techniques used to measure fair value. The hierarchy gives the highest priority to unadjusted quoted prices in active markets for identical assets or liabilities and the lowest priority to unobservable inputs. These three levels of fair value hierarchy are defined as follows:

*Level 1*: Quoted prices in active markets for identical assets or liabilities, accessible by the Company at the measurement date.

*Level 2*: Quoted prices for similar assets or liabilities in active markets, or quoted prices for identical or similar assets or liabilities in markets that are not active, or other observable inputs other than quoted prices.

*Level 3*: Unobservable inputs for assets or liabilities.

When Level 1 inputs are available, those inputs are selected for determination of fair value. To value financial assets and liabilities that are characterized as Level 2 and 3, the Company uses observable inputs for similar assets and liabilities that are available from pricing services or broker quotes. These observable inputs may be supplemented with other methods, including internal models that result in the most representative prices for assets and liabilities with similar characteristics. Multiple inputs may be used to measure fair value, however, the fair value measurement for each financial asset or liability is categorized in its entirety in the same level of the fair value hierarchy as the lowest level input that is significant to the entire measurement (see Note 23).

| Accounts Receivable, net | **_Accounts Receivable, net_** |
|---|---|

As of December 31, 2016 and 2015, Accounts receivable, net, consisted primarily of amounts due from institutional customers relating to the Company's FX business, fees receivable from the Company's white label service to third parties, interest receivable, a refund of regulatory fees and a broker receivable. As of December 31, 2016, Accounts receivable, net also includes proceeds receivable from the sale of an investment. Receivables are shown net of reserves for uncollectible accounts. The reserve for bad debts is maintained at a level that management believes to be sufficient to absorb estimated losses in the accounts receivable portfolio. The reserve is increased by the provision for bad debts which is charged against operating results and decreased by the amount of charge-offs, net of recoveries. The amount charged against operating results is based on several factors including, but not limited to, a continuous assessment of the collectability of each account, the length of time a receivable is past due and our historical experience with the particular customer. As of both December 31, 2016 and 2015, the reserve netted against receivables in the consolidated statements of financial condition was $6.8 million, which was recorded

recorded against receivables at the consolidated statements of financial condition was $0.6 million, which was recorded against an uncollected broker receivable.

As of December 31, 2016 and 2015, Accounts receivable, net, also includes advances to employees and non-controlling members of Holdings.

| Office, Communication and Computer Equipment, net | **_Office, Communication and Computer Equipment, net_** |
|---|---|

Office, communication and computer equipment, net, consists of computer equipment, purchased technology hardware and software, internally-developed software, leasehold improvements, furniture and fixtures and other equipment, licenses and communication equipment. Office, communication and computer equipment are recorded at historical cost, net of accumulated depreciation. Additions and improvements that extend the lives of assets are capitalized, while expenditures for repairs and maintenance are expensed as incurred. Certain costs of software developed or obtained for internal use are capitalized. Depreciation is computed using the straight-line method. The Company depreciates these assets using the following useful lives:

| | |
|---|---|
| Computer equipment | 3 to 5 years |
| Capitalized software | 2 to 5 years |
| Leasehold improvements | Lesser of the estimated economic useful life or the term of the lease |
| Furniture and fixtures and other equipment | 3 to 5 years |
| Licenses | 2 to 3 years |
| Communication equipment | 3 to 5 years |

Office, communication and computer equipment, net related to businesses classified as discontinued operations are included as a component of assets held for sale on the consolidated statements of financial condition (see Note 4). Depreciation related to these assets ceased as of the date they were determined to be held for sale and is included in Income (loss) from discontinued operations, net of tax in the consolidated statements of operations.

| Valuation of Other Long-Lived Assets | **_Valuation of Other Long-Lived Assets_** |
|---|---|

The Company assesses potential impairments of its other long-lived assets, including office, communication and computer equipment, when there is evidence that events or changes in circumstances indicate that the carrying amount of an asset may not be recovered. An impairment loss is recognized when the carrying amount of the long-lived asset exceeds its fair value and is not recoverable. The carrying amount of a long-lived asset is not recoverable if it exceeds the sum of the undiscounted cash flows expected to result from the use and eventual disposition of the asset. Any required impairment loss is measured as the amount by which the carrying amount of a long-lived asset exceeds its fair value and is recorded as a reduction in the carrying value of the related asset and a charge to operating results.

| Goodwill | **_Goodwill_** |
|---|---|

The Company recorded goodwill from various acquisitions. Goodwill represents the excess purchase price over the value assigned to the net tangible and identifiable intangible assets of a business acquired. The Company operates in a single operating segment, which also represents the reporting unit for purposes of the goodwill impairment test. Annually, or in interim periods if an event occurs or circumstances change that indicate the fair value of the reporting unit may be below its carrying amount ("triggering events"), the Company first performs a qualitative assessment as a basis for determining whether it is necessary to perform the quantitative goodwill impairment test in accordance with ASC 350, _Intangibles—Goodwill and Other_ ("ASC 350"). If the qualitative assessment indicates that it is more likely than not that the fair value of the reporting unit is below its carrying amount, the Company proceeds with the quantitative test described below. The Company tests goodwill for impairment annually during the fourth quarter of its fiscal year using October 1 carrying values.

The first step of the two-step process involves a comparison of the estimated fair value of the reporting unit to its carrying amount, including goodwill. In performing the first step, the Company determines the fair value of the reporting unit using a discounted cash flow ("DCF") analysis. Determining fair value requires the exercise of significant judgment, including judgments about appropriate discount rates, perpetual growth rates and the amount and timing of expected future cash flows. The cash flows employed in the DCF analyses are based on the Company's most recent budgets and business plans and, when applicable, various growth rates are assumed for years beyond the current business plan period. Discount rate assumptions are based on an assessment of the risk inherent in the future cash flows of the reporting unit. If the estimated fair value of the reporting unit exceeds its carrying amount, the goodwill of the reporting unit is not impaired and the second step of the impairment test is not necessary. If the carrying amount of the reporting unit exceeds its estimated fair value, then the second step of the goodwill impairment test must be performed. The second step of the goodwill impairment test compares the implied fair value of the reporting unit's goodwill with its carrying amount to measure the amount of impairment loss, if any. The implied fair value of goodwill is determined in the same manner as the amount of goodwill recognized in a business combination (i.e., the estimated fair value of the reporting unit is allocated to all of the assets and liabilities of that reporting unit including any unrecognized intangible assets as if the reporting unit had been acquired in a business combination and the fair value of the reporting unit was the purchase price paid). If the carrying amount of the reporting unit's goodwill exceeds the implied fair value of the reporting unit's goodwill, an impairment loss is recognized in an amount equal to that excess.

| Other Intangible Assets, net | **_Other Intangible Assets, net_** |
|---|---|

Other intangible assets, net, classified as held for use include customer relationships recorded from various acquisitions. Intangible assets classified as held for sale primarily include non-compete agreements, an executory contract, trade name and proprietary technology also recorded from various acquisitions.

The useful lives of these finite-lived intangible assets are based on the period they are expected to contribute to future cash flows as determined by the Company's historical experience. The customer relationships are amortized on a straight-line basis over their estimated average useful life of 3 to 9 years. Prior to being classified as held for sale, the non-compete agreements, executory contract, trade name and proprietary technology were amortized on a straight-line basis over their estimated average useful lives of 1 to 9 years, 3 years, 3 years and 4 to 7 years, respectively, however amortization related to these intangible assets ceased as of the date they were determined to be held for sale.

For finite-lived intangible assets subject to amortization, impairment is considered upon certain "triggering events" and is recognized if the carrying amount is not recoverable and the carrying amount exceeds the fair value of the intangible asset.

The Company's indefinite-lived intangible asset, an FX trading license, is classified as held for use. Indefinite-lived assets are not amortized but tested for impairment. The Company's policy is to test for impairment at least annually or in interim periods if certain events occur indicating that the fair value of the asset may be less than its carrying amount. An impairment test

periods if certain events occur indicating that the fair value of the asset may be less than its carrying amount. An impairment test on this indefinite-lived asset is performed during the fourth quarter of the Company's fiscal year using the October 1st carrying value. Impairment exists if the carrying value of the indefinite-lived intangible asset exceeds its fair value.

| Equity Method Investments | ***Equity Method Investments*** |
|---|---|

Investments where the Company is deemed to exercise significant influence, but no control, are accounted for using the equity method of accounting. The Company records its pro-rata share of earnings or losses each period and records any dividends as a reduction in the investment balance. Additionally, the carrying value of investments accounted for using the equity method of accounting is adjusted downward to reflect any impairment in value. For investments accounted for using the equity method of accounting, the Company evaluates information (e.g., budgets, business plans, financial statements, etc.) in addition to quoted market prices, if any, in determining whether an other-than-temporary decline in value exists. Factors indicative of an impairment in value include recurring operating losses, credit defaults and subsequent rounds of financing at an amount below the cost basis of the Company's investment.

The Company's equity method investments from continuing operations are included in Other assets in the consolidated statements of financial condition and its share of the earnings or losses is included in Loss on equity method investments, net in the consolidated statements of operations (see Note 6). The Company's equity method investments related to businesses classified as discontinued operations are included as a component of assets held for sale on the consolidated statements of financial condition and the share of earnings or losses is included in Income (loss) from discontinued operations, net of tax in the consolidated statements of operations (see Note 4).

| Notes Receivable | ***Notes Receivable*** |
|---|---|

Notes receivable represent receivables for notes acquired for cash plus accrued interest. Notes receivable are initially recorded at the amount of cash exchanged plus accrued interest. Interest income on the notes is recorded on an accrual basis and included in Interest income in the consolidated statements of operations. The Company individually assesses its notes receivables for impairment using methods including internally generated cash flow projections to determine if the notes will be repaid under the expected terms of the note agreements. If the Company concludes that the counterparty will not repay a note in accordance with its terms, the Company considers the note impaired and begins recognizing interest income on a cash basis, if any. To measure impairment, the Company calculates the estimated fair value of the collateral. If the estimated fair value of the collateral is less than the carrying value of the note receivable, the Company establishes an impairment reserve for the difference. If it is likely that a note will not be collected based on financial or other business indicators, the Company's policy is to charge off the note in the period which it deems it uncollectible (see Note 5).

| Other Assets | ***Other Assets*** |
|---|---|

Other assets include prepaid expenses, equity and cost method investments and deposits for rent security (see Note 10). Other assets related to businesses classified as discontinued operations are included as a component of assets held for sale on the consolidated statements of financial condition (see Note 4).

| Accounts Payable and Accrued Expenses | ***Accounts Payable and Accrued Expenses*** |
|---|---|

Accounts payable and accrued expenses include operating expenses payable, commissions payable, which represents balances owed to referring brokers for trades transacted by customers that were introduced to the Company by such brokers, bonuses payable, income taxes payable, and interest due on borrowings (see Note 12). Accounts payable and accrued expenses related to businesses classified as discontinued operations, which includes amounts due to the Lucid non-controlling members for services provided, is included as a component of liabilities held for sale on the consolidated statements of financial condition (see Note 4).

| Litigation | ***Litigation*** |
|---|---|

The Company may from time to time be involved in litigation and claims that arise in the ordinary course of business, including intellectual property claims. In addition, our business is subject to extensive regulation, which may result in regulatory proceedings against us. The Company records a liability when it is both probable that a loss has been incurred and the amount of the loss can be reasonably estimated. When the reasonable estimate of the possible loss is within a range of amounts, the minimum of the range of possible loss is accrued, unless a higher amount within the range is a better estimate than any other amount within the range. Significant judgment is required to determine both probability and the estimated amount. The Company reviews these provisions at least quarterly and adjusts them accordingly to reflect the impact of negotiations, settlements, rulings, advice of legal counsel, and updated information.

| Securities Sold, Not Yet Purchased | ***Securities Sold, Not Yet Purchased*** |
|---|---|

Securities sold, not yet purchased, represent the Company's obligations to deliver a specified security at the contracted price at a future point in time, and thereby create a liability to repurchase the securities in the market at the prevailing prices. The liability for such securities sold short, included as a component of liabilities held for sale on the consolidated statements of financial condition, is marked to market based on the current fair value of the underlying security at the reporting date. Changes in fair value of securities sold, not yet purchased are recorded as unrealized gains or losses and included in Income (loss) from discontinued operations, net of tax in the consolidated statements of operations (see Note 4). The Company repurchased the securities sold short in August 2016 and realized a loss of $1.1 million for the year ended December 31, 2016. Total unrealized gains and losses related to these securities for the years ended December 31, 2016 and 2015 were a gain of $0.6 million and a loss of $0.1 million, respectively.

| Due to Related Parties Pursuant to Tax Receivable Agreement | ***Due to Related Parties Pursuant to Tax Receivable Agreement*** |
|---|---|

Exchanges of Holdings membership units ("Holdings Units") for the Corporation's Class A common stock that are executed by the members of Holdings result in transfers of and increases in the tax basis of the tangible and intangible assets of Holdings, primarily attributable to a portion of the goodwill inherent in the business. These transfers and increases in tax basis will increase (for tax purposes) amortization and therefore reduce the amount of tax that the Company would otherwise be required to pay in the future. This increase in tax basis may also decrease gain (or increase loss) on future dispositions of certain capital assets to the extent tax basis is allocated to those capital assets. Holdings has entered into a tax receivable agreement with the members of Holdings whereby the Company has agreed to pay to the exchanging members 85% of the amount of cash tax savings, if any, in U.S. federal, state and local income tax that the Corporation realizes as a result of these increases in tax basis. The Corporation expects to benefit from the remaining 15% of cash tax savings, if any, in income tax it realizes. Payments under the tax receivable agreement will be based on the tax reporting positions that the Corporation takes in preparing its tax returns. The Corporation will not be reimbursed for any payments previously made under the tax receivable agreement if a tax basis increase is successfully challenged by the Internal Revenue Service.

Holdings records an increase in deferred tax assets for the estimated income tax effects of the increases in tax basis based on enacted federal and state tax rates at the date of the exchange. To the extent that Holdings estimates that the

exchanging members will not realize the full benefit represented by the deferred tax asset, based on an analysis that will consider, among other things, its expectation of future earnings, the Company will reduce the deferred tax asset with a valuation allowance. The Corporation records 85% of the estimated realizable tax benefit (which is the recorded deferred tax asset less any recorded valuation allowance) as an increase to the contingent liability due under the tax receivable agreement. Presently, the liability is a contingent liability based on the estimated future earnings of the Corporation and the expected tax benefit realized by the Corporation, but upon certain events such as a change in control or a material breach of the tax receivable agreement, the liability no longer stays contingent but rather becomes absolute. The remaining 15% of the estimated realizable tax benefit is initially recorded as an increase to the Corporation's capital. All of the effects to the deferred tax asset of changes in any of the estimates after the tax year of the exchange will be reflected in the provision for income taxes. Similarly, the effect of subsequent changes in the enacted tax rates will be reflected in the provision for income taxes.

| Convertible Debt Transactions | **Convertible Debt Transactions** |
|---|---|

The Company separately accounts for the liability and equity components of convertible debt instruments that may be settled entirely or partially in cash upon conversion by allocating the proceeds from issuance between the liability component and the embedded conversion option, or equity component, in accordance with ASC 470, *Debt* ("ASC 470"). The value of the equity component is calculated by first measuring the fair value of the liability component, using the interest rate of a similar liability that does not have a conversion feature, as of the issuance date. The difference between the proceeds from the convertible debt issuance and the amount measured as the liability component is recorded as the equity component. The Company recognizes the accretion of the resulting discount as part of interest expense in the consolidated statements of operations.

| Derivative Liability - Letter Agreement | **Derivative Liability — Letter Agreement** |
|---|---|

At issuance in January 2015, the Letter Agreement was accounted for separately from the Credit Agreement. Pursuant to ASC 480, *Distinguishing Liabilities from Equity* ("ASC 480"), a financial instrument that is entered into in conjunction with some other transaction and is legally detachable and separately exercisable is a freestanding financial instrument and should be accounted for separately. Based on the Company's review of the Letter Agreement, the Company concluded that the Letter Agreement was legally detachable from the Credit Agreement because it could be freely transferred. In addition, the Company determined that the Letter Agreement was separately exercisable since payments to the holder of the Letter Agreement are made after the repayment of the Credit Agreement. Accordingly, the Letter Agreement was determined to be a freestanding financial instrument and was accounted for separately from the Credit Agreement. Further, the Company concluded that the legal form of the Letter Agreement was equity. The Company considered the guidance in ASC 480 and determined that the accounting for the Letter Agreement did not fall within the scope of ASC 480 since the Letter Agreement was not mandatorily redeemable and did not require settlement by issuance of a variable number of equity shares. The Company then considered the guidance under ASC 815, and concluded that several features of the Letter Agreement required bifurcation as embedded derivatives and should be accounted for as a derivative liability. Changes in the fair value of the derivative liability resulting from the Letter Agreement were recorded each reporting period in the consolidated statements of operations. On September 1, 2016, the Letter Agreement was terminated (see "Redeemable Non-controlling Interest" below for further information).

**Due from/to Brokers**

Due from/to brokers represents the amount of the unsettled spot currency trades that the Company has with financial institutions. Also included in due from/to brokers is the fair value of derivative financial instruments discussed below. The Company has master netting agreements with its respective counterparties which allows the Company to present due from/to brokers on a net-by-counterparty basis in accordance with ASC 815, *Derivatives and Hedging* ("ASC 815"), and ASC 210, *Balance Sheet* ("ASC 210"). Due from/to brokers related to businesses classified as discontinued operations are included as a component of assets/liabilities held for sale on the consolidated statements of financial condition (see Note 4).

**Derivatives**

Derivative financial instruments are accounted for in accordance with ASC 815 and are included in Due from/to brokers in the consolidated statements of financial condition. The Company recognizes all derivative financial instruments in the consolidated statements of financial condition as either assets or liabilities at fair value. The Company enters into futures contracts to (i) economically hedge the open customer contracts on its CFD business and (ii) hedge trading in its electronic market making and institutional foreign exchange spot and futures markets. Futures contracts are exchange traded contracts to either purchase or sell a specific asset at a specified future date for a specified price. Gains or losses on futures contracts related to the Company's CFD business are included in Trading revenue in the consolidated statements of operations and gains or losses on hedge trading in the Company's electronic market making and institutional foreign exchange spot and futures markets and other asset classes are included in Income (loss) from discontinued operations, net of tax in the consolidated statements of operations (see Note 22).

| Redeemable Noncontrolling Interest | **Redeemable Non-controlling Interest** |
|---|---|

In connection with the Restructuring Transaction completed on September 1, 2016 (see Note 19), the Amended and Restated Letter Agreement dated January 24, 2015 (the "Letter Agreement") was terminated and the parties signed the Amended and Restated Limited Liability Company Agreement of FXCM Group, LLC (the "Group Agreement"). The Group Agreement replaced the existing FXCM Newco, LLC agreement and FXCM Newco, LLC was renamed FXCM Group, LLC. In exchange for terminating the Letter Agreement, the Company issued a 49.9% non-controlling membership interest in Group to Leucadia. The remaining 50.1% controlling membership interest in Group is owned by Holdings and Holdings consolidates the financial results of Group as discussed above. Following a Change of Control (as defined in the Group Agreement and described in Note 19), the membership units held by Leucadia are redeemable for cash at an amount equal to the fair market value of Leucadia's economic rights under the Group Agreement. Accordingly, the non-controlling interest held by Leucadia is recorded as Redeemable non-controlling interest and is classified outside of permanent equity on the consolidated statements of financial condition pursuant to ASC 480.

The cash distributions and earnings or loss from Group subsequent to September 1, 2016 are allocated among its members based on the contractual provisions in the Group Agreement (the "Revised Waterfall"), which differ from the members' stated ownership percentages. The Company determined that the Revised Waterfall represents a substantive profit sharing arrangement and concluded that the appropriate methodology for allocating profits and losses of Group is the hypothetical liquidation at book value method (the "HLBV method"). The Company applies the HLBV method using a balance sheet approach. Under the HLBV method, a calculation is performed at each balance sheet date to determine the amount each member would hypothetically receive assuming Group were liquidated at its recorded amount determined in accordance with U.S. GAAP and the cash distributed according to the Revised Waterfall. The difference between the liquidating distribution amounts calculated at the beginning and end of each period, after adjusting for capital contributions and distributions, is the member's share of the net income or loss from Group.

As indicated above, the membership units held by Leucadia are redeemable for cash following a change of control event (see Note 19), which is not solely within the control of the Company. The Company evaluates the probability of redemption at each reporting date. The Company concluded that the non-controlling interest in Group is not currently

redeemable and it is not probable that it will become redeemable. Accordingly, subsequent adjustment of the Redeemable non-controlling interest to its estimated redemption value is not required pursuant to ASC 480. If the non-controlling interest in Group becomes redeemable, or if redemption becomes probable, an adjustment will be made to adjust the Redeemable non-controlling interest to its estimated redemption value.

| Foreign Currency | **Foreign Currency** |
|---|---|
| | Foreign denominated assets and liabilities are re-measured into the functional currency at exchange rates in effect at the statements of financial condition dates through the consolidated statements of operations. Gains or losses resulting from foreign currency transactions are re-measured using the rates on the dates on which those elements are recognized during the period, and are included in Trading revenue in the consolidated statements of operations. The Company recorded gains of $0.8 million and $2.3 million for the years ended December 31, 2016 and 2015, respectively. |
| | Translation gains or losses resulting from translating the Company's subsidiaries' financial statements from the functional currency to the reporting currency, net of tax, are included in Foreign currency translation gain (loss) in the consolidated statements of comprehensive income. Assets and liabilities are translated at the statement of financial condition date while revenues and expenses are translated at an applicable average rate. |
| Revenue Recognition | **Revenue Recognition** |
| | The Company makes foreign currency markets for customers trading in FX spot markets. FX transactions are recorded on the trade date and positions are marked to market daily with related gains and losses, including gains and losses on open spot transactions, recognized currently in income. |
| Trading Revenue | **Trading Revenue** |
| | Under the Company's retail agency FX offering, trading revenue is earned from charging a separate commission or by adding a markup to the price provided by FX market makers generating trading revenue based on the volume of transactions and is recorded on trade date. Under the agency model, when a customer executes a trade on the best price quotation presented by the FX market maker, the Company acts as a credit intermediary, or a riskless principal, simultaneously entering into a trade with the customer and the FX market maker. This agency model has the effect of hedging the Company's positions and eliminating market risk exposure. Trading revenues earned from commissions and mark-up principally represent the difference between the Company's realized and unrealized foreign currency trading gains or losses on its positions with customers and the systematic hedge gains and losses from the trades entered into with the FX market makers. Under the Company's dealing desk, or principal, execution model, revenues earned include the markup on the FX trade and the Company's realized and unrealized foreign currency trading gains or losses on its positions with customers. Trading revenue also includes fees earned from arrangements with other financial institutions to provide platform, back office and other trade execution services. This service is generally referred to as a white label arrangement. The Company earns a commission or a percentage of the markup charged by the financial institutions to their customers. Fees from this service are recorded when earned on a trade date basis. |
| | Additionally, the Company earns income from trading in CFDs, rollovers and spread betting. Income or loss on CFDs represents the difference between the realized and unrealized trading gains or losses on the Company's positions and the hedge gains or losses with the other financial institutions. Income or loss on CFDs is recorded on a trade date basis. Income or loss on rollovers is the interest differential customers earn or pay on overnight currency pair positions held and the markup that the Company receives on interest paid or received on currency pair positions held overnight. Income or loss on rollovers is recorded on a trade date basis. Spread betting is where a customer takes a position against the value of an underlying financial instrument moving either upward or downward in the market. Income on spread betting is recorded as earned on a trade date basis. |
| | Trading revenues from institutional customers include commission income generated by facilitating spot FX trades on behalf of institutional customers through the services provided by FXCM Pro and FXCM Prime, which allow these customers to obtain the best execution price from external banks and routes the trades to outside financial institutions that also hold customer account balances for settlement. The Company receives commission income on these trades without taking any market or credit risk. Revenue earned from institutional customers is recorded on a trade date basis. |
| | The Company also earns income from market making and electronic trading in the institutional foreign exchange spot and futures markets through Lucid and market making and electronic trading into other asset classes through V3. Income on market making and electronic trading in foreign exchange spot and future currencies represents the spread between the bid and ask price for positions purchased and sold and the change in value of positions purchased and sold. Income on market making is recorded as trading gains, net of trading losses, on a trade date basis, and is included in Income (loss) from discontinued operations, net of tax in the consolidated statements of operations. |
| Interest Income | **Interest Income** |
| | Interest income consists of interest earned on cash and cash equivalents and cash and cash equivalents, held for customers and is recognized in the period earned. Interest income also includes interest on the Notes receivable. |
| Other Income | **Other Income** |
| | Other income includes amounts earned from the sale of market data, fees for post-sale services related to businesses sold, service fees related to an equity method investee, account maintenance fees, ancillary fee income and the net reversal of the tax receivable agreement liability. |
| Communications and Technology | **Communications and Technology** |
| | Communications and technology expense consists primarily of costs for network connections to our electronic trading platforms, telecommunications costs, and fees paid for access to external market data. This expense is affected primarily by the growth of electronic trading, our network/ platform capacity requirements and by changes in the number of telecommunication hubs and connections which provide our customers with direct access to our electronic trading platforms. |
| Trading Costs, Prime Brokerage and Clearing Fees | **Trading Costs, Prime Brokerage and Clearing Fees** |
| | Trading costs, prime brokerage and clearing fees primarily represent fees paid to third party clearing banks and prime brokers for clearing foreign exchange spot futures currency and contract transactions, transaction fees paid to exchanges, equity options brokerage activity fees, and fees paid to third party providers for use of their platform for the Company's market making trading business. Clearing fees primarily fluctuate based on changes in volume, rate of clearing fees charged by clearing banks and rate of fees paid to exchanges. |
| Referring Broker Fees | **Referring Broker Fees** |
| | Referring broker fees represent commissions paid to brokers for introducing trading customers to the Company. Commissions are determined based on the number and size of transactions executed by the customers and are recorded on a |

trade date basis.

| | |
|---|---|
| Compensation and Benefits | **Compensation and Benefits**<br><br>Compensation and benefits expense represents employee and member salaries and benefit expense, including stock-based compensation expense. |
| Stock-Based Compensation and Management Incentive Plan | **Stock-Based Compensation**<br><br>The Company accounts for stock-based compensation in accordance with ASC 718, *Compensation-Stock Compensation* ("ASC 718"). The Company's stock-based compensation expense is measured at the date of grant, based on the estimated fair value of the award, and recognized on a straight-line basis over the requisite service period of the award, net of estimated forfeitures. The fair value of the Company's non-qualified stock options is estimated using the Black-Scholes option pricing model. The fair value of restricted stock units ("RSUs") is based on the fair market value of the Corporation's Class A common stock on the date of grant, adjusted for the present value of dividends expected to be paid on the Corporation's Class A common stock prior to vesting. Stock-based compensation expense is included in Compensation and benefits in the consolidated statements of operations (see Note 15).<br><br>**Management Incentive Plan**<br><br>In connection with the Restructuring Transaction, the Company adopted the 2016 Incentive Bonus Plan for Founders and Executives (the "Management Incentive Plan"). The Management Incentive Plan is a long-term program with a five-year vesting period. Distributions under the plan will be made only after the principal and interest under the Credit Agreement have been repaid and will range from 10.0% to 14.0% of the distributions made from Group. If a participant terminates employment, he or she will receive either a non-voting membership interest in Group entitling the participant to the same share of distributions that would have otherwise been received, or a lump-sum cash payment, at the Company's discretion. The Company determined that the Management Incentive Plan is a share-based payment arrangement that will be accounted for as a liability award under ASC 718. |
| Advertising and Marketing | **Advertising and Marketing**<br><br>Advertising and marketing costs are charged to operations when incurred. |
| General and Administrative Expenses | **General and Administrative Expenses**<br><br>General and administrative expenses include bank processing and regulatory fees, professional and consulting fees, occupancy and equipment expense and other administrative costs. Bank processing fees are costs associated with the processing of credit and debit card transactions. Regulatory fees are volume-based costs and annual fees charged by certain regulatory authorities and include fines and restitution imposed by regulators from time to time. General and administrative expense also includes a provision for forgiveness of a notes receivable and other miscellaneous client debit balances. |
| Income Taxes | **Income Taxes**<br><br>Holdings operates in the U.S. as a limited liability company that is treated as a partnership for U.S. federal, state, and local income tax purposes. Since January 2015, all of Holdings' operations are held by Group, a limited liability company that is also treated as a partnership between Holdings and Leucadia for U.S. federal, state and local income tax purposes. As a result, neither Holdings' nor Group's income from its U.S. operations is subject to U.S. federal income tax because the income is attributable to its members. Accordingly, the Company's U.S. tax provision is solely based on the portion of income attributable to the Corporation from the lower tier limited liability companies and excludes the income attributable to other members whose income is included in Net income (loss) attributable to non-controlling interest in Global Brokerage Holdings, LLC in the consolidated statements of operations.<br><br>Income taxes are accounted for in accordance with ASC 740, *Income Taxes* ("ASC 740"), which requires that deferred tax assets and liabilities are recognized, using enacted tax rates, for the effect of temporary differences between the book and tax basis of recorded assets and liabilities. Deferred tax assets, including net operating losses and income tax credits, are reduced by a valuation allowance if it is "more likely than not" that some portion or all of the deferred tax assets will not be realized (see Note 24).<br><br>In addition to U.S. federal and state income taxes, the Company is subject to Unincorporated Business Tax which is attributable to Group's operations apportioned to New York City. The Company's foreign subsidiaries are also subject to taxes in the jurisdictions in which they operate.<br><br>In accordance with ASC 740, the Company evaluates a tax position to determine whether it is more likely than not that the tax position will be sustained upon examination, based on the technical merits of the position. If the position does not meet a more likely than not threshold, a tax reserve is established and no income tax benefit is recognized. The Company is audited by U.S. federal and state, as well as foreign, tax authorities. In some cases, many years may elapse before a tax return containing tax positions for which an ASC 740 reserve has been established is examined and an audit is completed. As audit settlements are reached, the Company adjusts the corresponding reserves, if required, in the period in which the final determination is made. While it is difficult to predict the final outcome or timing of a particular tax matter, the Company believes that its reserves for uncertain tax positions are recorded pursuant to the provisions of ASC 740.<br><br>The Company currently does not plan to permanently reinvest the earnings of its foreign subsidiaries and therefore does record U.S. income tax expense for the applicable earnings. This treatment could change in the future. |
| Recent Accounting Pronouncements | **Recently Adopted Accounting Pronouncements**<br><br>In August 2014, the Financial Accounting Standards Board (the "FASB") issued ASU No. 2014-15, *Presentation of Financial Statements—Going Concern (Subtopic 205-40): Disclosure of Uncertainties about an Entity's Ability to Continue as a Going Concern*. The standard requires management to explicitly evaluate for each reporting period whether there are conditions or events that raise substantial doubt about an entity's ability to continue as a going concern and provide related footnote disclosure in certain circumstances. The standard is effective for the annual period ending after December 15, 2016, and for annual and interim periods thereafter. The Company adopted ASU No. 2014-15 for the year ended December 31, 2016.<br><br>In February 2015, the FASB issued ASU No. 2015-02, *Consolidation (Topic 810): Amendments to the Consolidation Analysis*. ASU No. 2015-02 changes the analysis that a reporting entity must perform to determine whether it should consolidate certain types of legal entities. Specifically, ASU No. 2015-02 (i) modifies the evaluation of whether limited partnership and similar legal entities are VIEs, (ii) eliminates the presumption that a general partner should consolidate a limited partnership, (iii) affects the consolidation analysis of reporting entities that are involved with VIEs that have fee arrangements and related party relationships, and (iv) provides a scope exception from consolidation guidance for certain investment companies and similar entities. The Company adopted ASU No. 2015-02 on January 1, 2016 which did not have an impact on the Company's |

consolidated financial statements.

In April 2015, the FASB issued ASU No. 2015-03, *Interest—Imputation of Interest (Subtopic 835-30): Simplifying the Presentation of Debt Issuance Costs*. ASU No. 2015-03 requires debt issuance costs to be presented in the balance sheet as a direct deduction from the corresponding debt liability rather than as an asset. The costs will continue to be amortized and reported as interest expense. The Company adopted ASU No. 2015-03 on January 1, 2016 on a retrospective basis. The adoption of ASU No. 2015-03 resulted in the reclassification of $2.9 million of unamortized debt issuance costs related to the Senior convertible notes from Other assets to the Senior convertible notes liability within the consolidated statements of financial condition as of December 31, 2015 (see Note 20). The adoption of ASU No. 2015-03 also resulted in the reclassification of $0.5 million of unamortized debt issuance costs related to the Credit Agreement from Other assets to the Credit Agreement liability within the consolidated statements of financial condition as of December 31, 2015 (see Note 19). Other than these reclassifications, the adoption of ASU No. 2015-03 did not have an impact on the Company's consolidated financial statements.

### *Recently Issued Accounting Pronouncements*

In May 2014, the FASB issued ASU No. 2014-09, *Revenue from Contracts with Customers (Topic 606)*. ASU No. 2014-09 replaces most existing revenue recognition guidance, and requires companies to recognize revenue based upon the transfer of promised goods and/or services to customers in an amount that reflects the consideration to which the entity expects to be entitled in exchange for those goods and/or services. In addition, the new guidance requires enhanced disclosures, including revenue recognition policies to identify performance obligations to customers and significant judgments in measurement and recognition. ASU No. 2014-09 is effective, as amended, for annual and interim periods beginning on or after December 15, 2017. The two permitted transition methods under the new standard are the full retrospective method, in which case the standard is applied to each prior period presented, or the modified retrospective method, in which case the cumulative effect of applying the standard is recognized as of the adoption date. The FASB has also issued the following standards which clarify ASU No. 2014-09, and have the same effective date and transition requirements as ASU No. 2014-09:

- ASU No. 2016-08, *Revenue from Contracts with Customers (Topic 606): Principal versus Agent Considerations (Reporting Revenue Gross versus Net)*
- ASU No. 2016-10, *Revenue from Contracts with Customers (Topic 606): Identifying Performance Obligations and Licensing*
- ASU No. 2016-12, *Revenue from Contracts with Customers (Topic 606): Narrow-Scope Improvements and Practical Expedients*
- ASU No. 2016-20, *Technical Corrections and Improvements to Topic 606, Revenue from Contracts with Customers*

The Company plans to adopt ASU No. 2014-09 on January 1, 2018. At this time, the Company has not yet selected a transition method; however, it is in the process of completing its analysis and expects to decide on a transition method in the first half of 2017. The Company initiated a project team to evaluate the impact of this standard, document the considerations for each revenue stream and begin the implementation process. The initial analysis identifying areas that will be impacted by the new guidance is substantially complete. As a result of the initial evaluation performed, the Company does not expect that there will be changes to the timing of recognition of revenue, but does anticipate certain changes to the classification of revenue in the consolidated statements of operations. The Company also expects additional disclosures to be provided in its consolidated financial statements after adoption of the new standard. The Company will continue to monitor additional modifications, clarifications or interpretations by the FASB that may impact its current conclusions, and will provide further updates in future periods.

In January 2016, the FASB issued ASU No. 2016-01, *Financial Instruments—Overall (Subtopic 825-10): Recognition and Measurement of Financial Assets and Financial Liabilities*. This guidance in this update amends various aspects of the recognition, measurement, presentation, and disclosure for financial instruments. The guidance in this update is effective for fiscal years beginning after December 15, 2017, including interim periods within those fiscal years. Early adoption by public entities is permitted only for certain provisions. The adoption of this standard may result in a cumulative-effect adjustment to the consolidated statement of financial condition as of the beginning of the year of adoption. The Company expects to adopt this guidance beginning January 1, 2018 and is currently evaluating the impact that adoption of this standard will have on its consolidated financial statements.

In February 2016, the FASB issued ASU No. 2016-02, *Leases (Topic 842)*. ASU No. 2016-02 requires lessees to recognize, on the balance sheet, assets and liabilities for the rights and obligations created by leases classified as operating leases of greater than twelve months. The accounting by lessors will remain largely unchanged. The guidance in this update is effective for fiscal years beginning after December 15, 2018, including interim periods within those fiscal years, with early adoption permitted. The new standard must be adopted using a modified retrospective approach, and provides for certain practical expedients. Transition will require application of the new guidance at the beginning of the earliest period presented. The Company expects to adopt this guidance beginning January 1, 2019 and plans to initiate a project team to evaluate the impact this standard will have on its consolidated financial statements.

In March 2016, the FASB issued ASU No. 2016-06, *Derivatives and Hedging (Topic 815): Contingent Put and Call Options in Debt Instruments*. ASU No. 2016-06 clarifies the requirements for assessing whether contingent call (put) options that can accelerate the payment of principal on debt instruments are clearly and closely related to their debt hosts. An entity performing the assessment under the amendments in this update is required to assess the embedded call (put) options solely in accordance with the four-step decision sequence in ASC 815-15-25-42. The guidance in this update is effective for fiscal years beginning after December 15, 2016, including interim periods within those fiscal years. Early adoption is permitted. An entity should apply the amendments in this update on a modified retrospective basis to existing debt instruments as of the beginning of the fiscal year for which the amendments are effective. The Company adopted this guidance on January 1, 2017 and does not expect it will have a material impact on its consolidated financial statements.

In March 2016, the FASB issued ASU No. 2016-07, *Investments—Equity Method and Joint Ventures (Topic 323): Simplifying the Transition to the Equity Method of Accounting*. ASU No. 2016-07 eliminates the requirement that an investor retrospectively apply equity method accounting when an investment that it had accounted for by another method initially qualifies for the equity method. The guidance requires that an equity method investor add the cost of acquiring the additional interest in the investee to the current basis of the investor's previously held interest and adopt the equity method of accounting as of the date the investment becomes qualified for equity method accounting. The guidance in this update is effective for fiscal years beginning after December 15, 2016, including interim periods within those fiscal years. Earlier application is permitted. The Company adopted this guidance on January 1, 2017 and does not expect it will have a material impact on its consolidated financial statements.

In March 2016, the FASB issued ASU No. 2016-09, *Compensation—Stock Compensation (Topic 718): Improvements to Employee Share-Based Payment Accounting*. ASU No. 2016-09 simplifies certain aspects related to the accounting for share-based payment transactions, including income tax consequences, statutory withholding requirements, forfeitures and classification on the statement of cash flows. The guidance in this update is effective for fiscal years beginning after December

15, 2016, including interim periods within those fiscal years. Early adoption is permitted. Certain of the amendments related to timing of the recognition of tax benefits and tax withholding requirements should be applied using a modified retrospective transition method. Amendments related to classification on the statement of cash flows should be applied retrospectively. All other provisions may be applied on a prospective or modified retrospective basis. The Company adopted this guidance on January 1, 2017 and does not expect it will have a material impact on its consolidated financial statements.

In August 2016, the FASB issued ASU No. 2016-15, *Statement of Cash Flows (Topic 230): Classification of Certain Cash Receipts and Cash Payments*. ASU No. 2016-15 provides guidance on the following eight specific cash flow classification issues: (1) debt prepayment or debt extinguishment costs; (2) settlement of zero-coupon debt instruments; (3) contingent consideration payments made after a business combination; (4) proceeds from the settlement of insurance claims; (5) proceeds from the settlement of corporate-owned life insurance policies, including bank-owned life insurance policies; (6) distributions received from equity method investments; (7) beneficial interests in securitization transactions; and (8) separately identifiable cash flows and application of the predominance principle. Current U.S. GAAP does not include specific guidance on these eight cash flow classification issues. The amendments in ASU No. 2016-15 are effective for fiscal years beginning after December 15, 2017, and interim periods within those fiscal years. Earlier adoption is permitted, provided that all the amendments are adopted in the same period. The amendments in this update are to be applied on a retrospective basis. The Company expects to adopt this guidance beginning January 1, 2018 and is currently evaluating the impact that adoption of this standard will have on its consolidated financial statements.

In October 2016, the FASB issued ASU No. 2016-17, *Consolidation (Topic 810): Interests Held through Related Parties That Are under Common Control*. ASU No. 2016-17 amends the consolidation guidance in ASU No. 2015-02 on how a reporting entity that is the single decision maker of a VIE should treat indirect interests in the entity held through related parties that are under common control when performing the primary beneficiary analysis under the VIE model. Under ASU No. 2016-17, the single decision maker will consider an indirect interest held by a related party under common control on a proportionate basis. The amendments in ASU No. 2016-17 are effective for fiscal years beginning after December 15, 2016, and interim periods within those fiscal years, with early adoption permitted. Entities that already have adopted the amendments in ASU No. 2015-02 are required to apply the amendments in this update retrospectively to all relevant prior periods beginning with the fiscal year in which the amendments in ASU No. 2015-02 initially were applied. The Company adopted this guidance on January 1, 2017 and does not expect it will have a material impact on its consolidated financial statements.

In November 2016, the FASB issued ASU No. 2016-18, *Statement of Cash Flows (Topic 230): Restricted Cash*. The amendments in ASU No. 2016-18 address diversity in the classification and presentation of changes in restricted cash on the statement of cash flows. Under this guidance, companies will be required to present restricted cash and restricted cash equivalents with cash and cash equivalents when reconciling the beginning-of-period and end-of-period amounts shown on the statement of cash flows. The amendments in ASU No. 2016-18 are required to be applied retrospectively and are effective for fiscal years beginning after December 15, 2017, and interim periods within those fiscal years, with early adoption permitted. The Company expects to adopt this guidance beginning January 1, 2018 and is currently evaluating the impact that adoption of this standard will have on its consolidated financial statements.

In January 2017, the FASB issued ASU No. 2017-04, *Intangibles—Goodwill and Other (Topic 350): Simplifying the Test for Goodwill Impairment*. Under ASU No. 2017-04, Step 2 of the goodwill impairment test has been eliminated. Step 2 of the goodwill impairment test required companies to determine the implied fair value of the reporting unit's goodwill. Under the new guidance, companies will perform their annual, or interim goodwill impairment test by comparing the reporting unit's carrying value, including goodwill, to the fair value. An impairment charge would be recorded if the carrying value exceeds the reporting unit's fair value. ASU No. 2017-04 also eliminates the requirements for any reporting unit with a zero or negative carrying amount to perform a qualitative assessment and, if it fails that qualitative test, to perform Step 2 of the goodwill impairment test. Therefore, the same impairment assessment applies to all reporting units. An entity is required to disclose the amount of goodwill allocated to each reporting unit with a zero or negative carrying amount of net assets. An entity still has the option to perform the qualitative assessment for a reporting unit to determine if the quantitative impairment test is necessary. The amendments in ASU No. 2017-04 are required to be applied prospectively and are effective for annual or any interim goodwill impairment tests in fiscal years beginning after December 15, 2019. Early adoption is permitted for interim or annual goodwill impairment tests performed on testing dates after January 1, 2017. The Company expects to early adopt this guidance effective January 1, 2017 and is currently evaluating the impact that adoption of this standard will have on its consolidated financial statements.

XML 55 R37.htm IDEA: XBRL DOCUMENT

| Significant Accounting Policies and Estimates (Tables) | 12 Months Ended |
|---|---|
| | Dec. 31, 2016 |
| **Accounting Policies [Abstract]** | |
| Schedule of Significant Subsidiaries | The Company's consolidated financial statements include the following significant subsidiaries of Holdings: |

| | |
|---|---|
| FXCM Group, LLC[(1)] | ("Group") |
| FXCM Global Services, LLC | ("Global Services") |
| Forex Capital Markets, LLC | ("US") |
| FXCM Asia Limited[(2)] | ("HK") |
| Forex Capital Markets Limited | ("UK LTD") |
| FXCM Australia Pty. Limited | ("Australia") |
| FXCM Securities Limited[(3)] | ("FSL") |
| FXCM Japan Securities Co., Ltd.[(4)] | ("FXCMJ") |
| FXCM UK Merger Limited | ("Merger") |
| Lucid Markets Trading Limited | ("Lucid") |
| Lucid Markets LLP | ("Lucid LLP") |
| Faros Trading LLC[(4)] | ("Faros") |
| V3 Markets, LLC | ("V3") |

[(1)] FXCM Newco, LLC was renamed FXCM Group, LLC effective September 1, 2016

[(2)] Sold by the Company in September 2015

[(3)] Sold by the Company in December 2015

[(4)] Sold by the Company in April 2015

| Schedule of Property, Plant and Equipment Useful Lives | The Company depreciates these assets using the following useful lives: |
|---|---|

| | |
|---|---|
| Computer equipment | 3 to 5 years |
| Capitalized software | 2 to 5 years |
| Leasehold improvements | Lesser of the estimated economic useful life or the term of the lease |
| Furniture and fixtures and other equipment | 3 to 5 years |
| Licenses | 2 to 3 years |
| Communication equipment | 3 to 5 years |

Office, communication and computer equipment, net consisted of the following as of December 31, 2016 and 2015, with amounts in thousands:

| | As of December 31, | |
|---|---|---|
| | **2016** | **2015** |
| Computer equipment | $ 12,633 | $ 17,637 |
| Capitalized software | 80,624 | 70,750 |
| Leasehold improvements | 8,775 | 10,024 |
| Furniture and fixtures and other equipment | 1,599 | 1,677 |
| Licenses | 2,883 | 3,026 |
| Communication equipment | 1,894 | 1,885 |
| Total office, communication and computer equipment | 108,408 | 104,999 |
| Less: Accumulated depreciation | (75,593) | (69,108) |
| Office, communication and computer equipment, net | $ 32,815 | $ 35,891 |

XML 56 R38.htm IDEA: XBRL DOCUMENT

| Non-Controlling Interests (Tables) | 12 Months Ended |
|---|---|
| | Dec. 31, 2016 |
| **Noncontrolling Interest [Abstract]** | |
| Redeemable Noncontrolling Interest | The Company recorded the following activity related to Redeemable non-controlling interest for the year ended December 31, 2016, with amounts in thousands: |

| | | |
|---|---|---|
| **Balance as of January 1, 2016** | $ | — |
| Issuance of redeemable non-controlling interest (net of HLBV allocation, discussed below) | | 49,285 |
| Net loss attributable to redeemable non-controlling interest | | (2,804) |
| Other comprehensive loss attributable to redeemable non-controlling interest | | (377) |
| Equity-based compensation | | 260 |
| **Balance as of December 31, 2016** | $ | 46,364 |

Schedule of Changes in the Non-controlling and Corporation's Interests in Holdings

Changes in the non-controlling and the Corporation's interests in Holdings for the years ended December 31, 2015 and 2016 are presented in the following table:

| | Controlling Units | Non-Controlling Units | Total Units | Global Brokerage, Inc. | Non-Controlling | Total |
|---|---|---|---|---|---|---|
| **Balance as of January 1, 2015** | 4,788,994 | 3,445,761 | 8,234,755 | 58.1% | 41.9 % | 100.0% |
| Exchange of Holdings Units to Class A common stock | 808,672 | (808,672) | — | 9.8% | (9.8)% | —% |
| Repurchase of Holdings Units related to repurchase of Class A common stock | (61) | — | (61) | —% | —% | —% |
| Vesting of restricted stock units | 4,929 | — | 4,929 | —% | —% | —% |
| **Balance as of December 31, 2015** | 5,602,534 | 2,637,089 | 8,239,623 | 67.9% | 32.1 % | 100.0% |
| Exchange of Holdings Units to Class A common stock | 535,992 | (535,992) | — | 6.6% | (6.6)% | —% |
| Vesting of restricted stock units | 4,771 | — | 4,771 | —% | —% | —% |
| **Balance as of December 31, 2016** | 6,143,297 | 2,101,097 | 8,244,394 | 74.5% | 25.5 % | 100.0% |

| Dispositions (Tables) | 12 Months Ended |
|---|---|
| | Dec. 31, 2016 |

**Discontinued Operations and Disposal Groups [Abstract]**

Schedule of Disposal Groups, Including Discontinued Operations, Effect on Income Statement and Balance Sheet

The following table presents the major classes of line items constituting the pretax and after-tax profit or loss of discontinued operations for the years ended December 31, 2016 and 2015, with amounts in thousands:

| | For the Years Ended December 31, | |
|---|---|---|
| | 2016 | 2015 |
| **Revenues** | | |
| Trading revenue | $ 31,101 | $ 71,500 |
| Interest income | 309 | 272 |
| Brokerage interest expense | — | (100) |
| Net interest revenue | 309 | 172 |
| Other income | 113 | 5,700 |
| **Total net revenues** | 31,523 | 77,372 |
| **Operating Expenses** | | |
| Compensation and benefits | (248) | 14,708 |
| Allocation of net income to Lucid members for services provided | 3,029 | 5,064 |
| Total compensation and benefits | 2,781 | 19,772 |
| Referring broker fees | — | 208 |
| Advertising and marketing | — | 736 |
| Communication and technology | 5,694 | 8,248 |
| Trading costs, prime brokerage and clearing fees | 13,062 | 18,378 |
| General and administrative | 2,395 | 6,314 |
| Bad debt expense | — | 8,408 |
| Depreciation and amortization | — | 12,359 |
| Goodwill impairment loss | — | 54,865 |
| Total operating expenses | 23,932 | 129,288 |
| **Operating income (loss)** | 7,591 | (51,916) |
| **Other (Income) Expense** | | |
| (Gain) loss on equity method investments, net | (1,114) | 1,267 |
| Income (loss) from discontinued operations before income taxes | 8,705 | (53,183) |
| Net gain on completed dispositions | — | 7,313 |
| Loss on classification as held for sale before income taxes | 126,511 | 66,660 |
| Total loss from discontinued operations before income taxes* | (117,806) | (112,530) |
| Income tax provision | 54 | 5,764 |
| **Loss from discontinued operations, net of tax** | $ (117,860) | $ (118,294) |

* Total loss from discontinued operations before income taxes attributable to Global Brokerage, Inc. was $26.0 million and $38.7 million for the years ended December 31, 2016 and 2015, respectively.

The following is a summary of the carrying amounts of the assets and liabilities included as part of discontinued operations as of December 31, 2016 and 2015, with amounts in thousands:

| | As of December 31, | |
|---|---|---|
| | 2016 | 2015 |
| **Assets** | | |
| Cash and cash equivalents | $ 9,378 | $ 10,786 |
| Due from brokers [1] | 14,090 | 22,234 |
| Accounts receivable, net | 251 | 178 |
| Office, communication and computer equipment, net | 1,336 | 1,154 |
| Goodwill | 223,613 | 223,613 |
| Other intangible assets, net | 27,269 | 27,269 |
| Other assets [2] [3] | 14,337 | 15,363 |
| Loss recognized on classification as held for sale | (193,171) | (66,660) |
| Total assets classified as held for sale on the consolidated statements of financial condition | $ 97,103 | $ 233,937 |
| | | |
| **Liabilities** | | |
| Accounts payable and accrued expenses [4] | $ 2,266 | $ 10,838 |
| Due to brokers [1] | 45 | — |
| Securities sold, not yet purchased | — | 3,624 |
| Other liabilities | 14 | 48 |
| Total liabilities classified as held for sale on the consolidated statements of financial condition | $ 2,325 | $ 14,510 |

[1] Includes as of December 31, 2016 and 2015: a) derivative assets, net of $1.6 million and $0.9 million, respectively; b)

Unsettled spot FX, net of $0.2 million and $0.3 million, respectively; c) Unsettled common stock of nil and $3.0 million, respectively; and d) Excess cash collateral of $12.2 million and $18.0 million, respectively.

[2] Includes the Company's exchange memberships, which represent ownership interests and shares owned in CME Group Inc. and provide the Company with the right to conduct business on the exchanges. The exchange memberships are recorded at cost or, if an other-than-temporary impairment in value has occurred, at a value that reflects management's estimate of the impairment. The Company had previously owned shares in the Intercontinental Exchange which were sold in April 2015. The Company recognized a gain $0.1 million related to the sale which was recorded in earnings as a component of Income (loss) from discontinued operations, net of tax for the year ended December 31, 2015. During 2015, the Company acquired additional ownership interests and shares in CME Group Inc. from one of the non-controlling members of Lucid which were recorded at a total cost of $3.7 million. There were no exchange membership impairments for the years ended December 31, 2016 or 2015. As of both December 31, 2016 and 2015, the carrying value of ownership interests was $4.6 million and the carrying value of shares owned was $4.8 million. In January 2017, the Company sold its ownership interests and shares in CME Group Inc. and expects to recognize a gain of $0.8 million related to the sale during the first quarter of 2017.

[3] Includes the carrying value of the Company's equity interest in FastMatch of $4.6 million and $4.2 million as of December 31, 2016 and 2015, respectively. The carrying value of the Company's previously-held equity interest in the V3-related LLC of $1.5 million is included as of December 31, 2015 (see Note 6).

[4] Includes as of December 31, 2016 and 2015 amounts due related to the allocation of income to Lucid non-controlling members for services provided of $0.7 million and $6.5 million, respectively.

XML 58 R40.htm IDEA: XBRL DOCUMENT

| Office, Communication and Computer Equipment, net (Tables) | 12 Months Ended |
|---|---|
| | Dec. 31, 2016 |
| **Property, Plant and Equipment [Abstract]** | |
| Schedule of Office, Communication, and Computer Equipment, Net | The Company depreciates these assets using the following useful lives: |

| | |
|---|---|
| Computer equipment | 3 to 5 years |
| Capitalized software | 2 to 5 years |
| Leasehold improvements | Lesser of the estimated economic useful life or the term of the lease |
| Furniture and fixtures and other equipment | 3 to 5 years |
| Licenses | 2 to 3 years |
| Communication equipment | 3 to 5 years |

Office, communication and computer equipment, net consisted of the following as of December 31, 2016 and 2015, with amounts in thousands:

| | As of December 31, | |
|---|---|---|
| | 2016 | 2015 |
| Computer equipment | $ 12,633 | $ 17,637 |
| Capitalized software | 80,624 | 70,750 |
| Leasehold improvements | 8,775 | 10,024 |
| Furniture and fixtures and other equipment | 1,599 | 1,677 |
| Licenses | 2,883 | 3,026 |
| Communication equipment | 1,894 | 1,885 |
| Total office, communication and computer equipment | 108,408 | 104,999 |
| Less: Accumulated depreciation | (75,593) | (69,108) |
| Office, communication and computer equipment, net | $ 32,815 | $ 35,891 |

XML 59 R41.htm IDEA: XBRL DOCUMENT

| Goodwill (Tables) | 12 Months Ended |
|---|---|
| | Dec. 31, 2016 |
| **Goodwill and Intangible Assets Disclosure [Abstract]** | |
| Schedule of Changes in Goodwill | Changes in goodwill from continuing operations for the years ended December 31, 2015 and 2016 are presented in the following table and reflect the Company's single operating segment, with amounts in thousands: |

| | | |
|---|---|---|
| **Balance as of January 1, 2015** | $ | 39,242 |
| Impairment of goodwill | | (9,513) |
| Foreign currency translation and other adjustments | | (1,649) |
| **Balance at December 31, 2015** | | 28,080 |
| Foreign currency translation and other adjustments | | (4,601) |
| **Balance at December 31, 2016** | $ | 23,479 |

XML 60 R42.htm IDEA: XBRL DOCUMENT

| Other Intangible Assets, net (Tables) | 12 Months Ended |
|---|---|
| | Dec. 31, 2016 |

**Goodwill and Intangible Assets Disclosure [Abstract]**

Schedule of Acquired Finite-lived Intangible Assets

The Company's acquired intangible assets consisted of the following as of December 31, 2016 and 2015, with amounts in thousands:

| | December 31, 2016 | | | December 31, 2015 | | |
|---|---|---|---|---|---|---|
| | Gross Carrying Amount | Accumulated Amortization | Net Carrying Amount | Gross Carrying Amount | Accumulated Amortization | Net Carrying Amount |
| Finite-lived intangible assets | | | | | | |
| Customer relationships | $ 35,460 | $ (27,522) | $ 7,938 | $ 35,460 | $ (21,223) | $ 14,237 |
| Foreign currency translation adjustment | (4,971) | 2,718 | (2,253) | (1,910) | 855 | (1,055) |
| Total finite-lived intangible assets | 30,489 | (24,804) | 5,685 | 33,550 | (20,368) | 13,182 |
| Indefinite-lived intangible assets | | | | | | |
| License | 600 | — | 600 | 600 | — | 600 |
| Total Other intangible assets, net | $ 31,089 | $ (24,804) | $ 6,285 | $ 34,150 | $ (20,368) | $ 13,782 |

Schedule of Acquired Indefinite-lived Intangible Assets

The Company's acquired intangible assets consisted of the following as of December 31, 2016 and 2015, with amounts in thousands:

| | December 31, 2016 | | | December 31, 2015 | | |
|---|---|---|---|---|---|---|
| | Gross Carrying Amount | Accumulated Amortization | Net Carrying Amount | Gross Carrying Amount | Accumulated Amortization | Net Carrying Amount |
| Finite-lived intangible assets | | | | | | |
| Customer relationships | $ 35,460 | $ (27,522) | $ 7,938 | $ 35,460 | $ (21,223) | $ 14,237 |
| Foreign currency translation adjustment | (4,971) | 2,718 | (2,253) | (1,910) | 855 | (1,055) |
| Total finite-lived intangible assets | 30,489 | (24,804) | 5,685 | 33,550 | (20,368) | 13,182 |
| Indefinite-lived intangible assets | | | | | | |
| License | 600 | — | 600 | 600 | — | 600 |
| Total Other intangible assets, net | $ 31,089 | $ (24,804) | $ 6,285 | $ 34,150 | $ (20,368) | $ 13,782 |

Schedule of Estimated Future Amortization Expense for Acquired Intangible Assets Outstanding

Estimated future amortization expense for acquired intangible assets outstanding as of December 31, 2016 is as follows, with amounts in thousands:

| Year Ending December 31, | |
|---|---|
| 2017 | 3,983 |
| 2018 | 1,401 |
| 2019 | 301 |
| 2020 | — |
| 2021 | — |
| Thereafter | — |
| | $ 5,685 |

XML 61 R43.htm IDEA: XBRL DOCUMENT

| Other Assets (Tables) | 12 Months Ended | | |
|---|---|---|---|
| | Dec. 31, 2016 | | |
| **Deferred Costs, Capitalized, Prepaid, and Other Assets Disclosure [Abstract]** | | | |
| Components of Other Assets | Other assets were comprised of the following as of December 31, 2016 and 2015, with amounts in thousands: | | |

| | As of December 31, | | |
|---|---|---|---|
| | **2016** | | **2015** |
| Prepaid expenses | $ 4,229 | $ | 5,807 |
| Equity method investments | — | | 2,603 |
| Cost method investment | 1,103 | | — |
| Deposits | 1,871 | | 2,727 |
| Other | 161 | | 284 |
| Total | $ 7,364 | $ | 11,421 |

XML 62 R44.htm IDEA: XBRL DOCUMENT

| Accounts Payable and Accrued Expenses (Tables) | 12 Months Ended |
|---|---|
| | Dec. 31, 2016 |

**Payables and Accruals [Abstract]**

Schedule of Accounts Payable and Accrued Expenses

Accounts payable and accrued expenses were comprised of the following as of December 31, 2016 and 2015, with amounts in thousands:

| | As of December 31, | | | |
|---|---|---|---|---|
| | | 2016 | | 2015 |
| Operating expenses payable | $ | 24,926 | $ | 16,529 |
| Commissions payable | | 7,271 | | 8,671 |
| Bonus payable | | 22,210 | | 11,551 |
| Income tax payable | | 920 | | 1,375 |
| Interest due on borrowings | | 162 | | 162 |
| Other | | 2 | | 10 |
| Total | $ | 55,491 | $ | 38,298 |

XML 63 R45.htm IDEA: XBRL DOCUMENT

| Earnings per Share (Tables) | 12 Months Ended |
|---|---|
| | Dec. 31, 2016 |

| **Earnings Per Share [Abstract]** | |
|---|---|
| Reconciliation of Numerator and Denominator Used in Basic and Diluted EPS Calculations | The following is a reconciliation of the numerator and denominator used in the basic and diluted EPS calculations, with amounts in thousands, except per share data: |

| | For the Years Ended December 31, | | | |
|---|---|---|---|---|
| | **2016** | | **2015** | |
| **Basic and diluted net income (loss) per share of Class A common stock:** | | | | |
| **Numerator** | | | | |
| Income (loss) from continuing operations attributable to Global Brokerage, Inc. | $ | 96,680 | $ | (513,600) |
| Loss from discontinued operations attributable to Global Brokerage, Inc. | | (26,037) | | (40,329) |
| Net income (loss) available to holders of Class A common stock | | 70,643 | | (553,929) |
| Earnings allocated to participating securities | | — | | — |
| Income (loss) available to common stockholders | $ | 70,643 | $ | (553,929) |
| **Denominator** | | | | |
| Weighted average shares of Class A common stock | | 5,609 | | 5,087 |
| Add dilutive effect of the following: | | | | |
| Stock options and RSUs[(1)] | | — | | — |
| Convertible note hedges | | — | | — |
| Warrants | | — | | — |
| Assumed conversion of Holdings Units for Class A common stock | | — | | — |
| Dilutive weighted average shares of Class A common stock | | 5,609 | | 5,087 |
| **Net income (loss) per share of Class A common stock — Basic and Diluted:** | | | | |
| Continuing operations | $ | 17.24 | $ | (100.96) |
| Discontinued operations | | (4.64) | | (7.93) |
| Basic net income (loss) per share of Class A common stock | $ | 12.60 | $ | (108.89) |

_____

[(1)] No dilutive effect for either period presented, therefore zero incremental shares included

XML 64 R46.htm IDEA: XBRL DOCUMENT

| Related Party Transactions (Tables) | 12 Months Ended |
|---|---|
| | Dec. 31, 2016 |

**Related Party Transactions [Abstract]**

Amounts receivable from, and payable to, related parties

Amounts receivable from, and payable to, related parties are set forth below, with amounts in thousands:

| | As of December 31, | | | |
|---|---|---|---|---|
| | 2016 | | 2015 | |
| **Receivables** | | | | |
| Advances to Holdings non-controlling members | $ | 3 | $ | 112 |
| Accounts receivable — Lucid non-controlling members | | — | | 15 |
| Advances to employees | | 55 | | 201 |
| Accounts receivable — Liquidity provider | | 308 | | — |
| Due from Liquidity provider | | 128 | | — |
| Notes receivable and interest — Lucid non-controlling members | | — | | 8,171 |
| Total receivables from related parties | $ | 494 | $ | 8,499 |
| | | | | |
| **Payables** | | | | |
| Employees and equity method investments | $ | 732 | $ | 1,370 |
| Accounts payable — Equity method investment | | 180 | | 90 |
| Due to Lucid non-controlling members in connection with the allocation of income to Lucid non-controlling members for services provided | | 741 | | 6,500 |
| Tax receivable agreement | | — | | 145 |
| Total payables to related parties | $ | 1,653 | $ | 8,105 |

XML 65 R47.htm IDEA: XBRL DOCUMENT

| Stock-Based Compensation (Tables) | 12 Months Ended |
|---|---|
| | Dec. 31, 2016 |

**Disclosure of Compensation Related Costs, Share-based Payments [Abstract]**

**Schedule of Share-based Compensation, Stock Options, Activity**

The following table summarizes the Company's activity related to the Stock Options as of December 31, 2016 and changes for the year then ended:

| Stock Options | Shares | | Weighted-Average Exercise Price | Weighted-Average Remaining Contractual Term (in years) | | Aggregate Intrinsic Value (In thousands) |
|---|---|---|---|---|---|---|
| Outstanding at January 1, 2016 | 678,019 | $ | 136.29 | | | |
| Granted | — | | — | | | |
| Exercised | — | | — | | | |
| Forfeited or expired | 22,825 | $ | 143.25 | | | |
| Outstanding at December 31, 2016 | 655,194 | $ | 136.05 | 1.49 | $ | — |
| Options vested and expected to vest at December 31, 2016 | 654,513 | $ | 136.03 | 1.49 | $ | — |
| Options exercisable at December 31, 2016 | 630,469 | $ | 135.09 | 1.39 | $ | — |

**Schedule of Share-based Compensation, Restricted Stock Units Award Activity**

The following table summarizes the Company's unvested RSU activity as of December 31, 2016 and changes for the year then ended:

| RSUs | Units | | Weighted-Average Grant-Date Fair Value | Weighted-Average Remaining Contractual Term (in years) | | Aggregate Intrinsic Value (in thousands) |
|---|---|---|---|---|---|---|
| Unvested at January 1, 2016 | 14,903 | $ | 162.50 | | | |
| Granted | — | | — | | | |
| Vested | 4,771 | $ | 162.50 | | | |
| Forfeited | 638 | $ | 162.50 | | | |
| Unvested at December 31, 2016 | 9,494 | $ | 162.50 | 1.96 | $ | 67 |
| RSUs expected to vest at December 31, 2016 | 8,948 | $ | 162.50 | 1.96 | $ | 63 |

XML 66 R48.htm IDEA: XBRL DOCUMENT

| Stockholders' Equity (Tables) | 12 Months Ended |
|---|---|
| | Dec. 31, 2016 |
| **Equity [Abstract]** | |
| Schedule of Changes in Class A Common Stock Outstanding | The following table presents the changes in the Company's Class A common stock outstanding during the years ended December 31, 2016 and 2015: |

| Class A Common Stock | |
|---|---:|
| **Balance at January 1, 2015** | 4,788,994 |
| Issued | — |
| Repurchased in conjunction with vesting of RSUs | (61) |
| Exchange of Holdings Units to Class A common stock (see Note 3) | 808,672 |
| Vesting of RSUs | 4,929 |
| **Balance at December 31, 2015** | 5,602,534 |
| Issued | — |
| Repurchased | — |
| Exchange of Holdings Units to Class A common stock (see Note 3) | 535,992 |
| Vesting of RSUs (see Note 15) | 4,771 |
| **Balance at December 31, 2016** | 6,143,297 |

XML 67 R49.htm IDEA: XBRL DOCUMENT

| Net Capital Requirements (Tables) | 12 Months Ended |
| --- | --- |
| | Dec. 31, 2016 |
| **Banking and Thrift [Abstract]** | |
| Schedule of Minimum Capital Requirements And the Excess Capital | The tables below present the capital, as defined by the respective regulatory authority, the minimum capital requirement and the excess capital for the following regulated entities as of December 31, 2016 and 2015, with amounts in millions: |

**As of December 31, 2016**

| | US | | UK LTD | | Australia | | Lucid LLP | |
| --- | --- | --- | --- | --- | --- | --- | --- | --- |
| Capital | $ | 47.5 | $ | 83.4 | $ | 16.6 | $ | 10.2 |
| Minimum capital requirement | | 33.3 | | 22.0 | | 1.1 | | 4.2 |
| Excess capital | $ | 14.2 | $ | 61.4 | $ | 15.5 | $ | 6.0 |

**As of December 31, 2015**

| | US | | UK LTD | | Australia | | Lucid LLP | |
| --- | --- | --- | --- | --- | --- | --- | --- | --- |
| Capital | $ | 43.6 | $ | 76.3 | $ | 12.0 | $ | 10.9 |
| Minimum capital requirement | | 28.3 | | 27.6 | | 0.7 | | 4.0 |
| Excess capital | $ | 15.3 | $ | 48.7 | $ | 11.3 | $ | 6.9 |

XML 68 R50.htm IDEA: XBRL DOCUMENT

| Leucadia Transaction (Tables) | 12 Months Ended |
|---|---|
| | Dec. 31, 2016 |

**Extraordinary and Unusual Items [Abstract]**

**Schedule of Allocation of Net Proceeds from Letter Agreement**

The Revised Waterfall will result in the following distributions from Group:

| Distributable Amount | Revised Waterfall |
|---|---|
| Amounts due under the amended Credit Agreement | 100% Leucadia |
| Next $350 million | 45% Leucadia / 45% Holdings / 10.0% Management |
| Next $500 million | 79.2% Leucadia / 8.8% Holdings / 12.0% Management |
| All aggregate amounts thereafter | 51.6% Leucadia / 34.4% Holdings / 14.0% Management |

**Schedule of the Balance of the Credit Agreement**

The balance of the Credit Agreement as of December 31, 2016 and 2015 was as follows, with amounts in thousands:

| | As of December 31, | |
|---|---|---|
| | 2016 | 2015 |
| Debt principal | $ 154,509 | $ 192,685 |
| Original issue discount | (7,857) | (35,967) |
| Discount — issuance fee | (1,276) | (5,227) |
| Deferred financing fee | (918) | (3,762) |
| Debt issuance costs | (114) | (467) |
| Embedded derivative — Mandatory prepayment provision | 6,172 | — |
| Debt — net carrying value | $ 150,516 | $ 147,262 |

**Schedule of Interest Expense Related to the Credit Agreement**

Interest expense related to the Credit Agreement, included in Interest on borrowings in the consolidated statements of operations for the years ended December 31, 2016 and 2015, consists of the following, with amounts in thousands:

| | For the Years Ended December 31, | |
|---|---|---|
| | 2016 | 2015 |
| Contractual interest | $ 33,879 | $ 27,337 |
| Deferred interest | (3,045) | 5,789 |
| Amortization of original issue discount | 28,110 | 65,577 |
| Amortization of issuance fee discount | 3,951 | 8,665 |
| Amortization of deferred financing fee | 2,844 | 6,238 |
| Amortization of debt issuance costs | 353 | 774 |
| Total interest expense — Credit Agreement | $ 66,092 | $ 114,380 |

XML 69 R51.htm IDEA: XBRL DOCUMENT

| Debt (Tables) | 12 Months Ended |
|---|---|
| | Dec. 31, 2016 |
| **Debt Disclosure [Abstract]** | |
| Convertible Debt | The balances of the liability and equity components as of December 31, 2016 and 2015 were as follows, with amounts in thousands: |

| | As of December 31, | | | |
|---|---|---|---|---|
| | **2016** | | **2015** | |
| Liability component — principal | $ | 172,500 | $ | 172,500 |
| Deferred bond discount | | (9,355) | | (15,315) |
| Deferred debt issuance costs | | (1,720) | | (2,930) |
| Liability component — net carrying value | $ | 161,425 | $ | 154,255 |
| Equity component | $ | 29,101 | $ | 29,101 |

Interest expense related to the Convertible Notes, included in Interest on borrowings in the consolidated statements of operations, consists of the following, with amounts in thousands:

| | For the Years Ended December 31, | | | |
|---|---|---|---|---|
| | **2016** | | **2015** | |
| Stated coupon rate | $ | 3,881 | $ | 3,881 |
| Amortization of deferred bond discount | | 5,960 | | 5,607 |
| Amortization of debt issuance cost | | 1,210 | | 1,209 |
| Total interest expense — Convertible note | $ | 11,051 | $ | 10,697 |

XML 70 R52.htm IDEA: XBRL DOCUMENT

| Commitments (Tables) | 12 Months Ended |
|---|---|
| | Dec. 31, 2016 |
| **Commitments and Contingencies Disclosure [Abstract]** | |
| Contractual Obligation, Fiscal Year Maturity Schedule | Future payments under the three-year digital advertising agreement are as follows as of December 31, 2016, with amounts in thousands: |

| **Year Ending December 31,** | | |
|---|---|---|
| 2017 | $ | 3,117 |
| 2018 | | 3,281 |
| 2019 | | 3,008 |
| Total | $ | 9,406 |

| Schedule of Future Minimum Rental Payments for Operating Leases | As of December 31, 2016, future minimum lease payments under non-cancelable operating leases with terms in excess of one year, including leases that renewed in 2017, are as follows, with amounts in thousands: |
|---|---|

| **Year Ending December 31,** | | |
|---|---|---|
| 2017 | $ | 6,468 |
| 2018 | | 4,768 |
| 2019 | | 4,633 |
| 2020 | | 3,372 |
| 2021 | | 3,390 |
| Thereafter | | 13,146 |
| | $ | 35,777 |

XML 71 R53.htm IDEA: XBRL DOCUMENT

| Derivative Financial Instruments (Tables) | 12 Months Ended |
|---|---|
| | Dec. 31, 2016 |

**Derivative Instruments and Hedging Activities Disclosure [Abstract]**

**Offsetting Assets**

Under ASC 210, gross positive fair values are offset against gross negative fair values by counterparty pursuant to enforceable master netting agreements, with amounts in thousands:

| | | As of December 31, 2016 | | | |
|---|---|---|---|---|---|
| | | Derivative Assets | | Derivative Liabilities | |
| | Statement of Financial Condition Location | Fair Value | Notional | Fair Value | Notional |
| Exchange traded options | Current assets held for sale[1] | $ 3,209 | $ 10,562 | $ — | $ — |
| CFD contracts | Due from brokers[2] | 131 | 24,286 | — | — |
| Futures contracts | Due from/Due to brokers and Current assets/liabilities held for sale [1][2] | 4,868 | 839,975 | 5,720 | 763,605 |
| OTC options | Current assets/liabilities held for sale[1] | 270 | 24,595 | 225 | 33,249 |
| **Total derivatives, gross** | | $ 8,478 | $ 899,418 | $ 5,945 | $ 796,854 |
| Netting agreements and cash collateral netting | | (4,854) | | (4,854) | |
| **Total derivatives, net** | | $ 3,624 | | $ 1,091 | |

[1] As of December 31, 2016, the aggregate fair value of derivative assets and liabilities, gross attributable to discontinued operations is $4.3 million and $2.7 million, respectively. These amounts are offset by netting agreements and cash collateral netting of $2.7 million and $2.7 million, respectively.

[2] As of December 31, 2016, the aggregate fair value of derivative assets and liabilities, gross attributable to continuing operations is $4.2 million and $3.3 million, respectively. These amounts are offset by netting agreements and cash collateral netting of $2.2 million and $2.2 million, respectively.

| | | As of December 31, 2015 | | | |
|---|---|---|---|---|---|
| | | Derivative Assets | | Derivative Liabilities | |
| | Statement of Financial Condition Location | Fair Value | Notional | Fair Value | Notional |
| Exchange traded options | Current assets/liabilities held for sale[3] | $ 6,503 | $ 15,399 | $ 5,805 | $ 18,282 |
| CFD contracts | Due from/Due to brokers[4] | 206 | 109,715 | 36 | 99,036 |
| Futures contracts | Due from/Due to brokers and Current assets/liabilities held for sale [3][4] | 4,212 | 794,960 | 3,102 | 1,047,239 |
| **Total derivatives, gross** | | $ 10,921 | $ 920,074 | $ 8,943 | $ 1,164,557 |
| Netting agreements and cash collateral netting | | (8,909) | | (8,909) | |
| **Total derivatives, net** | | $ 2,012 | | $ 34 | |

[3] As of December 31, 2015, the aggregate fair value of derivative assets and liabilities, gross attributable to discontinued operations is $9.7 million and $8.8 million, respectively. These amounts are offset by netting agreements and cash collateral netting of $8.8 million and $8.8 million, respectively.

[4] As of December 31, 2015, the aggregate fair value of derivative assets and liabilities, gross attributable to continuing operations is $1.2 million and $0.1 million, respectively. These amounts are offset by netting agreements and cash collateral netting of $0.1 million and $0.1 million, respectively.

**Offsetting Liabilities**

Under ASC 210, gross positive fair values are offset against gross negative fair values by counterparty pursuant to enforceable master netting agreements, with amounts in thousands:

| | | As of December 31, 2016 | | | |
|---|---|---|---|---|---|
| | | Derivative Assets | | Derivative Liabilities | |
| | Statement of Financial Condition Location | Fair Value | Notional | Fair Value | Notional |
| Exchange traded options | Current assets held for sale[1] | $ 3,209 | $ 10,562 | $ — | $ — |
| CFD contracts | Due from brokers[2] | 131 | 24,286 | — | — |
| Futures contracts | Due from/Due to brokers and Current assets/liabilities held for sale [1][2] | 4,868 | 839,975 | 5,720 | 763,605 |
| | Current | | | | |

| | | | | | | | |
|---|---|---|---|---|---|---|---|
| OTC options | assets/liabilities held for sale[1] | | 270 | 24,595 | | 225 | 33,249 |
| **Total derivatives, gross** | | $ | 8,478 | $ 899,418 | $ | 5,945 | $ 796,854 |
| Netting agreements and cash collateral netting | | | (4,854) | | | (4,854) | |
| **Total derivatives, net** | | $ | 3,624 | | $ | 1,091 | |

_____

[1] As of December 31, 2016, the aggregate fair value of derivative assets and liabilities, gross attributable to discontinued operations is $4.3 million and $2.7 million, respectively. These amounts are offset by netting agreements and cash collateral netting of $2.7 million and $2.7 million, respectively.

[2] As of December 31, 2016, the aggregate fair value of derivative assets and liabilities, gross attributable to continuing operations is $4.2 million and $3.3 million, respectively. These amounts are offset by netting agreements and cash collateral netting of $2.2 million and $2.2 million, respectively.

| | | As of December 31, 2015 | | | | |
|---|---|---|---|---|---|---|
| | | **Derivative Assets** | | **Derivative Liabilities** | | |
| | **Statement of Financial Condition Location** | **Fair Value** | **Notional** | **Fair Value** | **Notional** | |
| Exchange traded options | Current assets/liabilities held for sale[3] | $ 6,503 | $ 15,399 | $ 5,805 | $ 18,282 | |
| CFD contracts | Due from/Due to brokers[4] | 206 | 109,715 | 36 | 99,036 | |
| Futures contracts | Due from/Due to brokers and Current assets/liabilities held for sale[3] [4] | 4,212 | 794,960 | 3,102 | 1,047,239 | |
| **Total derivatives, gross** | | $ 10,921 | $ 920,074 | $ 8,943 | $ 1,164,557 | |
| Netting agreements and cash collateral netting | | (8,909) | | (8,909) | | |
| **Total derivatives, net** | | $ 2,012 | | $ 34 | | |

_____

[3] As of December 31, 2015, the aggregate fair value of derivative assets and liabilities, gross attributable to discontinued operations is $9.7 million and $8.8 million, respectively. These amounts are offset by netting agreements and cash collateral netting of $8.8 million and $8.8 million, respectively.

[4] As of December 31, 2015, the aggregate fair value of derivative assets and liabilities, gross attributable to continuing operations is $1.2 million and $0.1 million, respectively. These amounts are offset by netting agreements and cash collateral netting of $0.1 million and $0.1 million, respectively.

Gains (Losses) on Derivative Instruments    The following table presents the gains (losses) on derivative instruments recognized in the consolidated statements of operations for the years ended December 31, 2016 and 2015, with amounts in thousands:

| | For the Years Ended December 31, | |
|---|---|---|
| | **2016** | **2015** |
| Exchange traded options[5] | $ 2,463 | $ 8,573 |
| CFD contracts[6] | (749) | (9,166) |
| Futures contracts[7] | (52,687) | 49,485 |
| OTC options[5] | 31 | 1,086 |
| **Total** | $ (50,942) | $ 49,978 |

_____

[5] Included in Income (loss) from discontinued operations, net of tax in the consolidated statements of operations.

[6] Included in Trading revenue in the consolidated statements of operations.

[7] The portion included in Income (loss) from continuing operations in the consolidated statements of operations is $(60.7) million and $31.2 million for the years ended December 31, 2016 and 2015, respectively.

XML 72 R54.htm IDEA: XBRL DOCUMENT

| Fair Value Measurements (Tables) | 12 Months Ended |
| --- | --- |
| | Dec. 31, 2016 |

**Fair Value Disclosures [Abstract]**

Schedule of Assets and Liabilities Measured at Fair Value on Recurring Basis

The following tables present the Company's assets and liabilities that are measured at fair value on a recurring basis and the related hierarchy levels, with amounts in thousands:

**Fair Value Measurements on a Recurring Basis**

**As of December 31, 2016**

| | Level 1 | Level 2 | Level 3 | Counterparty and Cash Collateral Netting | Total |
| --- | --- | --- | --- | --- | --- |
| **Financial Assets:** | | | | | |
| U.S. Treasury bills | $ 2,198 | $ — | $ — | $ — | $ 2,198 |
| Derivative assets: | | | | | |
|     Exchange traded options | 3,209 | — | — | — | 3,209 |
|     Futures contracts | 4,868 | — | — | — | 4,868 |
|     CFD contracts | — | 131 | — | — | 131 |
|     OTC options | — | 270 | — | — | 270 |
|     Netting | — | — | — | (4,854) | (4,854) |
|       Total derivative assets[(1)] | 8,077 | 401 | — | (4,854) | 3,624 |
| Total assets | $ 10,275 | $ 401 | $ — | $ (4,854) | $ 5,822 |
| | | | | | |
| **Financial Liabilities:** | | | | | |
| Customer account liabilities | $ — | $ 661,936 | $ — | $ — | $ 661,936 |
| Derivative liabilities: | | | | | |
|     Futures contracts | 5,720 | — | — | — | 5,720 |
|     OTC options | — | 225 | — | — | 225 |
|     Netting | — | — | — | (4,854) | (4,854) |
|       Total derivative liabilities[(1)] | 5,720 | 225 | — | (4,854) | 1,091 |
| Mandatory Prepayment Provision — Credit Agreement | — | — | 6,172 | — | 6,172 |
| Total liabilities | $ 5,720 | $ 662,161 | $ 6,172 | $ (4,854) | $ 669,199 |

As of December 31, 2016, the Company's total notional absolute value of open FX and CFD customer assets and liabilities by currency pair or product was $2.0 billion and $2.7 billion, respectively. The Company's total net notional value for open FX and CFD positions was $2.1 billion.

**Fair Value Measurements on a Recurring Basis**

**As of December 31, 2015**

| | Level 1 | Level 2 | Level 3 | Counterparty and Cash Collateral Netting | Total |
| --- | --- | --- | --- | --- | --- |
| **Financial Assets:** | | | | | |
| Derivative assets: | | | | | |
|     Exchange traded options | $ 6,503 | $ — | $ — | $ — | $ 6,503 |
|     CFD contracts | — | 206 | — | — | 206 |
|     Futures contracts | 4,212 | — | — | — | 4,212 |
|     Netting | — | — | — | (8,909) | (8,909) |
|       Total derivative assets[(1)] | 10,715 | 206 | — | (8,909) | 2,012 |
| Total assets | $ 10,715 | $ 206 | $ — | $ (8,909) | $ 2,012 |
| | | | | | |
| **Financial Liabilities:** | | | | | |
| Customer account liabilities | $ — | $ 685,043 | $ — | $ — | $ 685,043 |
| Derivative liabilities: | | | | | |
|     Exchange traded options | 5,805 | — | — | — | 5,805 |
|     CFD contracts | — | 36 | — | — | 36 |
|     Futures contracts | 3,102 | — | — | — | 3,102 |
|     Netting | — | — | — | (8,909) | (8,909) |
|       Total derivative liabilities[(1)] | 8,907 | 36 | — | (8,909) | 34 |
| Securities sold, not yet purchased[(2)] | 3,624 | — | — | — | 3,624 |
| Letter Agreement | — | — | 448,458 | — | 448,458 |
| Total liabilities | $ 12,531 | $ 685,079 | $ 448,458 | $ (8,909) | $ 1,137,159 |

As of December 31, 2015, the Company's total notional absolute value of open FX and CFD customer assets and liabilities by currency pair or product was $2.5 billion and $2.5 billion, respectively. The Company's total net notional value for open FX and CFD positions was $2.2 billion.

(1) Attributable to continuing and discontinued operations. See Note 22 for details of the classification of amounts on the consolidated statements of financial condition.

(2) Attributable to discontinued operations. Amounts classified as held for sale on the consolidated statements of financial condition (see Note 4).

**Schedule of Significant Level 3 Inputs**

The significant Level 3 inputs, summarized in the following table, are considered more relevant in the analysis and are given a higher weighting in the overall fair value determination.

On September 1, 2016, in conjunction with the Restructuring Transaction, the Letter Agreement was terminated and its material terms are now reflected in the Group Agreement (see Note 19). The Company determined the fair value of the derivative liability resulting from the Letter Agreement as of August 31, 2016 (just prior to the termination of the Letter Agreement) by using an enterprise valuation based on the traded (or closing) common stock price of the Corporation of $9.33. This valuation approach incorporated an option pricing model for the allocation of enterprise value between the derivative liabilities resulting from the Letter and Credit Agreements, the Management Incentive Plan, common stock and convertible debt.

The following table summarizes the significant Level 3 inputs used in the fair value determination of the Letter Agreement as of August 31, 2016 and December 31, 2015, respectively:

| | | As of | |
|---|---|---|---|
| **Valuation Technique** | **Significant Unobservable Inputs** | **August 31, 2016** | **December 31, 2015** |
| Option-Pricing Method | Term (years) | 1.8 | 2.5 |
| | Volatility | 131.1% | 79.1% |
| | Risk-free rate | 0.8% | 1.2% |
| | Dividend yield | —% | —% |
| | Reliance placed on public indication of value | 100.0% | 100.0% |

**Schedule of Carrying Value, Fair Value and Hierarchy of Financial Instruments**

The following tables present the carrying value, fair value and fair value hierarchy category of certain financial instruments that are not measured at fair value in the consolidated statements of financial condition, with amounts in thousands:

| | As of December 31, 2016 | | Fair Value Measurements using: | | |
|---|---|---|---|---|---|
| | **Carrying Value** | **Fair Value** | **Level 1** | **Level 2** | **Level 3** |
| **Financial Assets:** | | | | | |
| Due from brokers — unsettled spot FX (4) | $ 1,600 | $ 1,600 | $ — | $ 1,600 | $ — |
| Due from brokers — excess cash collateral (5) | 12,229 | 12,229 | — | 12,229 | — |
| Exchange memberships (5) | 9,434 | 10,190 | — | 10,190 | — |
| Total assets | $ 23,263 | $ 24,019 | $ — | $ 24,019 | $ — |
| | | | | | |
| **Financial Liabilities:** | | | | | |
| Due to brokers — unsettled spot FX (4) | $ 425 | $ 425 | $ — | $ 425 | $ — |
| Senior convertible notes | 161,425 | 94,875 | — | 94,875 | — |
| Credit Agreement | 150,516 | 148,813 | — | — | 148,813 |
| Total liabilities | $ 312,366 | $ 244,113 | $ — | $ 95,300 | $ 148,813 |

| | As of December 31, 2015 | | Fair Value Measurements using: | | |
|---|---|---|---|---|---|
| | **Carrying Value** | **Fair Value** | **Level 1** | **Level 2** | **Level 3** |
| **Financial Assets:** | | | | | |
| Due from brokers — unsettled spot FX (4) | $ 2,939 | $ 2,939 | $ — | $ 2,939 | $ — |
| Due from brokers — unsettled common stock (5) | 3,054 | 3,054 | — | 3,054 | — |
| Due from brokers — excess cash collateral (5) | 18,010 | 18,010 | — | 18,010 | — |
| Notes receivable | 7,881 | 7,881 | — | — | 7,881 |
| Exchange memberships (5) | 9,434 | 8,655 | — | 8,655 | — |
| Total assets | $ 41,318 | $ 40,539 | $ — | $ 32,658 | $ 7,881 |
| | | | | | |
| **Financial Liabilities:** | | | | | |
| Due to brokers — unsettled spot FX (4) | $ 1,039 | $ 1,039 | $ — | $ 1,039 | $ — |
| Senior convertible notes | 157,185 | 121,187 | — | 121,187 | — |
| Credit Agreement | 147,729 | 192,685 | — | — | 192,685 |
| Total liabilities | $ 305,953 | $ 314,911 | $ — | $ 122,226 | $ 192,685 |

(4) Attributable to continuing and discontinued operations. See Note 4 for amounts classified as held for sale on the consolidated statements of financial condition.

(5) Attributable to discontinued operations and included in assets held for sale on the consolidated statements of financial condition (see Note 4).

<u>Schedule of Recurring Fair Value Measurements Categorized as Level 3</u>

The following tables reconcile the opening and ending balances of the recurring fair value measurements categorized as Level 3, which are included in the consolidated statements of financial condition, and identifies the total gains and losses the Company recognized during the years ended December 31, 2016 and 2015, with amounts in thousands:

| | Year Ended December 31, 2016 | | | |
| --- | --- | --- | --- | --- |
| | Balance as of December 31, 2015 | Net Unrealized (Gain) Loss | Addition/(Reversal) | Balance as of December 31, 2016 |
| Letter Agreement | $ 448,458 | $ (212,949) | $ (235,509) | $ — |
| Mandatory Prepayment Provision — Credit Agreement | — | 6,172 | — | 6,172 |
| Total Level 3 liabilities | $ 448,458 | $ (206,777) | $ (235,509) | $ 6,172 |

| | Year Ended December 31, 2015 | | | |
| --- | --- | --- | --- | --- |
| | Balance as of December 31, 2014 | Net Unrealized (Gain) Loss | Addition/(Reversal) | Balance as of December 31, 2015 |
| Letter Agreement | $ — | $ 354,022 | $ 94,436 | $ 448,458 |
| Total Level 3 Liabilities | $ — | $ 354,022 | $ 94,436 | $ 448,458 |

XML 73 R55.htm IDEA: XBRL DOCUMENT

| Income Taxes (Tables) | 12 Months Ended |
|---|---|
| | Dec. 31, 2016 |

**Income Tax Disclosure [Abstract]**

**Schedule of Income from Continuing Operations before Income Taxes**

Income (loss) from continuing operations before income taxes, as shown in the consolidated statements of operations, includes the following components, with amounts in thousands:

| | For the Years Ended December 31, | | | |
|---|---|---|---|---|
| | | 2016 | | 2015 |
| Domestic | $ | 100,414 | $ | (628,527) |
| Foreign | | 62,156 | | (4,778) |
| | $ | 162,570 | $ | (633,305) |

**Schedule of the Provision for Income Taxes**

The provision for income taxes attributable to continuing operations consists of the following, with amounts in thousands:

| | For the Years Ended December 31, | | | |
|---|---|---|---|---|
| | | 2016 | | 2015 |
| **Current** | | | | |
| Federal income tax benefit | $ | — | $ | (176) |
| State and local tax benefit | | (34) | | (11) |
| Foreign income tax expense (benefit) | | 1,592 | | (412) |
| Subtotal | | 1,558 | | (599) |
| **Deferred** | | | | |
| Federal income tax | | — | | 172,618 |
| State and local income tax | | — | | 7,474 |
| Foreign income tax (benefit) expense | | (781) | | 1,705 |
| Subtotal | | (781) | | 181,797 |
| Total provision for taxes attributable to continuing operations | $ | 777 | $ | 181,198 |

**Reconciliation of the Provision for Income Taxes to U.S. Statutory Tax Rate**

The following table reconciles the provision for income taxes attributable to continuing operations to the U.S. federal statutory tax rate:

| | For the Years Ended December 31, | |
|---|---|---|
| | 2016 | 2015 |
| Statutory U.S. federal income tax rate | 34.0 % | 34.0 % |
| Income passed through to non-controlling members | (10.6) | (17.0) |
| State and local income tax | 2.1 | 1.3 |
| Foreign income tax | (0.3) | (1.1) |
| Tax Receivable Agreement true-up | — | 7.8 |
| Loss on liquidation of subsidiary | (1.4) | — |
| Non-deductible penalty | 1.1 | — |
| Valuation allowance | (27.1) | (50.9) |
| Non-deductible interest | 2.3 | (2.3) |
| Other | 0.4 | (0.4) |
| Effective tax rate | 0.5 % | (28.6)% |

**Summary of the Tax Effects of Temporary Differences**

A summary of the tax effects of the temporary differences from continuing operations is as follows, with amounts in thousands:

| | As of December 31, | | | |
|---|---|---|---|---|
| | | 2016 | | 2015 |
| **Deferred tax assets** | | | | |
| Equity-based compensation | $ | 294 | $ | 336 |
| Investment in partnership | | 190,844 | | 277,775 |
| Fixed assets | | — | | 747 |
| Tax loss carryforwards | | 125,898 | | 120,580 |
| Intangible assets | | 679 | | 302 |
| Tax credit carryforward/foreign sub income | | 4,539 | | 5,090 |
| Gain/(Loss) on derivative liability — Letter Agreement | | — | | 3,067 |
| Other | | 1,072 | | 491 |
| **Gross deferred tax assets** | | 323,326 | | 408,388 |
| **Less: valuation allowance** | | (322,201) | | (407,590) |
| **Net deferred tax asset** | | 1,125 | | 798 |
| **Deferred tax liabilities** | | | | |
| Fixed assets | | 28 | | 5 |
| Intangible assets | | 228 | | 714 |
| Software development cost | | 171 | | 245 |

| | 2016 | 2015 |
|---|---|---|
| Other | 583 | 539 |
| **Gross deferred tax liabilities** | 1,010 | 1,503 |
| Net deferred tax asset (liability) | $ 115 | $ (705) |

**Reconciliation of Unrecognized Tax Benefits**

The following is a tabular reconciliation of the total amounts of unrecognized tax benefits, with amounts in thousands:

| | For the Years Ended December 31, | |
|---|---|---|
| | **2016** | **2015** |
| **Unrecognized tax benefits – January 1** | $ 390 | $ 409 |
| Gross increases – tax positions in prior period | 36 | — |
| Gross decreases – tax positions in prior period | — | (137) |
| Gross increases – tax positions in current period | 166 | 118 |
| Lapse of statute of limitations | (51) | — |
| **Unrecognized tax benefits – December 31** | $ 541 | $ 390 |

XML 74 R56.htm IDEA: XBRL DOCUMENT

| Segment Information (Tables) | 12 Months Ended |
|---|---|
| | Dec. 31, 2016 |
| **Segment Reporting [Abstract]** | |
| Schedule of Information by Geographic Region | Trading revenue from continuing operations by geographical region is as follows, with amounts in thousands: |

| | For the Years Ended December 31, | | | |
| --- | --- | --- | --- | --- |
| | 2016 | | 2015 | |
| **Trading Revenue from Continuing Operations** | | | | |
| U.S. | $ | 37,002 | $ | 35,413 |
| Asia | | 108,905 | | 98,147 |
| Europe, Middle East and North Africa | | 103,375 | | 86,723 |
| Rest of World | | 21,421 | | 20,329 |
| Other | | 5,297 | | 9,430 |
| Total | $ | 276,000 | $ | 250,042 |

XML 75 R57.htm IDEA: XBRL DOCUMENT

| Nature of Business and Organization (Details) | Dec. 31, 2016 | Sep. 01, 2016 |
|---|---|---|
| **Lucid Markets Trading Limited** | | |
| **Business Acquisition [Line Items]** | | |
| Non-controlling interest in subsidiary (as a percent) | 49.90% | |
| Acquisition of controlling interest | 50.10% | |
| **FXCM Group LLC | Leucadia** | | |
| **Business Acquisition [Line Items]** | | |
| Non-controlling interest in subsidiary (as a percent) | | 49.90% |
| Ownership percentage by parent (as a percent) | | 50.10% |

XML 76 R58.htm IDEA: XBRL DOCUMENT

| Significant Accounting Policies and Estimates - Additional Information (Detail) - USD ($) | 3 Months Ended | 12 Months Ended | |
|---|---|---|---|
| | Mar. 31, 2015 | Dec. 31, 2016 | Dec. 31, 2015 |
| **Significant Accounting Policies [Line Items]** | | | |
| Long-term incentive plan, vesting period | | 5 years | |
| Restricted cash and cash equivalents | | $ 300,000,000 | $ 400,000,000 |
| Allowance for doubtful accounts receivable | | 6,800,000 | 6,800,000 |
| Loss on securities repurchased | | 1,100,000 | |
| Unrealized gains (losses) related to securities sold but not yet purchased | | 600,000 | (100,000) |
| Foreign currency transaction gains (losses) | | 800,000 | 2,300,000 |
| Goodwill impairment loss | $ 9,500,000 | 0 | 9,513,000 |
| Tax receivable agreement | $ 0 | $ 0 | $ 145,000 |
| **Lucid Markets Trading Limited** | | | |
| **Significant Accounting Policies [Line Items]** | | | |
| Non-controlling interest in subsidiary (as a percent) | | 49.90% | |
| **FXCM Holdings, LLC** | | | |
| **Significant Accounting Policies [Line Items]** | | | |
| Economic interest in subsidiary (as a percent) | | 74.50% | 67.90% |
| Non-controlling interest in subsidiary (as a percent) | | 25.50% | 32.10% |
| Percent of cash tax savings to be paid to members of subsidiary | | 85.00% | |
| Percent of cash tax savings remaining with parent | | 15.00% | |
| Percent of estimated realizable tax benefits recorded as contingent liability | | 85.00% | |
| Percent of estimated realizable tax benefits recorded as increase in capital. | | 15.00% | |
| **Minimum** | | | |
| **Significant Accounting Policies [Line Items]** | | | |
| Long-term incentive plan, vesting percentages | | 10.00% | |
| **Maximum** | | | |
| **Significant Accounting Policies [Line Items]** | | | |
| Long-term incentive plan, vesting percentages | | 14.00% | |

XML 77 R59.htm IDEA: XBRL DOCUMENT

| Significant Accounting Policies and Estimates - Useful Lives of Assets (Detail) | 12 Months Ended Dec. 31, 2016 |
|---|---|
| **Trade name** | |
| **Property, Plant and Equipment [Line Items]** | |
| Intangible asset amortization period | 3 years |
| **Executory contract** | |
| **Property, Plant and Equipment [Line Items]** | |
| Intangible asset amortization period | 3 years |
| **Minimum | Customer relationships** | |
| **Property, Plant and Equipment [Line Items]** | |
| Intangible asset amortization period | 3 years |
| **Minimum | Non-compete agreements** | |
| **Property, Plant and Equipment [Line Items]** | |
| Intangible asset amortization period | 1 year |
| **Minimum | Proprietary technology** | |
| **Property, Plant and Equipment [Line Items]** | |
| Intangible asset amortization period | 4 years |
| **Maximum | Customer relationships** | |
| **Property, Plant and Equipment [Line Items]** | |
| Intangible asset amortization period | 9 years |
| **Maximum | Non-compete agreements** | |
| **Property, Plant and Equipment [Line Items]** | |
| Intangible asset amortization period | 9 years |
| **Maximum | Proprietary technology** | |
| **Property, Plant and Equipment [Line Items]** | |
| Intangible asset amortization period | 7 years |
| **Computer equipment | Minimum** | |
| **Property, Plant and Equipment [Line Items]** | |
| Property plant and equipment estimated useful lives | 3 years |
| **Computer equipment | Maximum** | |
| **Property, Plant and Equipment [Line Items]** | |
| Property plant and equipment estimated useful lives | 5 years |
| **Capitalized software | Minimum** | |
| **Property, Plant and Equipment [Line Items]** | |
| Property plant and equipment estimated useful lives | 2 years |
| **Capitalized software | Maximum** | |
| **Property, Plant and Equipment [Line Items]** | |
| Property plant and equipment estimated useful lives | 5 years |
| **Furniture and fixtures and other equipment | Minimum** | |
| **Property, Plant and Equipment [Line Items]** | |
| Property plant and equipment estimated useful lives | 3 years |
| **Furniture and fixtures and other equipment | Maximum** | |
| **Property, Plant and Equipment [Line Items]** | |
| Property plant and equipment estimated useful lives | 5 years |
| **Licenses | Minimum** | |
| **Property, Plant and Equipment [Line Items]** | |
| Property plant and equipment estimated useful lives | 2 years |
| **Licenses | Maximum** | |
| **Property, Plant and Equipment [Line Items]** | |
| Property plant and equipment estimated useful lives | 3 years |
| **Communication equipment | Minimum** | |
| **Property, Plant and Equipment [Line Items]** | |

| | |
|---|---|
| Property plant and equipment estimated useful lives | 3 years |
| **Communication equipment \| Maximum** | |
| **Property, Plant and Equipment [Line Items]** | |
| Property plant and equipment estimated useful lives | 5 years |

XML 78 R60.htm IDEA: XBRL DOCUMENT

| Non-Controlling Interests - Additional Information (Details) - USD ($) $ in Thousands | 12 Months Ended | |
|---|---|---|
| | Dec. 31, 2016 | Sep. 01, 2016 |
| **Noncontrolling Interest [Line Items]** | | |
| Redeemable noncontrolling interest in Group | | $ 235,500 |
| Issuance of redeemable non-controlling interest (net of HLBV allocation, discussed below) | $ 49,285 | |
| **Leucadia | FXCM Group LLC** | | |
| **Noncontrolling Interest [Line Items]** | | |
| Non-controlling interest in subsidiary (as a percent) | | 49.90% |
| Ownership percentage by parent (as a percent) | | 50.10% |

XML 79 R61.htm IDEA: XBRL DOCUMENT

| Non-Controlling Interests - Redeemable Noncontrolling Interest (Details) $ in Thousands | 12 Months Ended |
| --- | --- |
| | Dec. 31, 2016 USD ($) |
| **Stockholders' Equity Attributable to Noncontrolling Interest [Roll Forward]** | |
| Balance as of January 1, 2016 | $ 0 |
| Issuance of redeemable non-controlling interest (net of HLBV allocation, discussed below) | 49,285 |
| Net loss attributable to redeemable non-controlling interest | (2,804) |
| Other comprehensive loss attributable to redeemable non-controlling interest | (377) |
| Equity-based compensation | 260 |
| Balance as of December 31, 2016 | $ 46,364 |

XML 80 R62.htm IDEA: XBRL DOCUMENT

| Non-Controlling Interests (Details) - shares | 12 Months Ended | |
|---|---|---|
| | Dec. 31, 2016 | Dec. 31, 2015 |
| **Consolidation, Less than Wholly Owned Subsidiary, Parent Ownership Interest, Shares [Roll Forward]** | | |
| Exercise of stock options (in shares) | 0 | |
| **Controlling Units** | | |
| **Consolidation, Less than Wholly Owned Subsidiary, Parent Ownership Interest, Shares [Roll Forward]** | | |
| Beginning Balance (in shares) | 5,602,534 | 4,788,994 |
| Holdings Units acquired by FXCM Inc. related to exchanges of Holdings Units for shares of Class A common stock (in shares) | 535,992 | 808,672 |
| Holdings Units repurchased related to Class A common stock repurchased (in shares) | | (61) |
| Exercise of stock options (in shares) | 4,771 | 4,929 |
| Ending Balance (in shares) | 6,143,297 | 5,602,534 |
| **Consolidation, Less than Wholly Owned Subsidiary, Parent Ownership Interest, Percent [Roll Forward]** | | |
| Beginning balance (as a percent) | 67.90% | 58.10% |
| Holdings Units acquired by FXCM Inc. related to exchanges of Holdings Units for shares of Class A common stock (as a percent) | 6.60% | 9.80% |
| Holdings Units repurchased related to Class A common stock repurchased (as a percent) | | 0.00% |
| Exercise of stock options (as a percent) | 0.00% | 0.00% |
| Ending balance (as a percent) | 74.50% | 67.90% |
| **Non- controlling Interests** | | |
| **Consolidation, Less than Wholly Owned Subsidiary, Parent Ownership Interest, Shares [Roll Forward]** | | |
| Beginning Balance (in shares) | 2,637,089 | 3,445,761 |
| Holdings Units acquired by FXCM Inc. related to exchanges of Holdings Units for shares of Class A common stock (in shares) | (535,992) | (808,672) |
| Holdings Units repurchased related to Class A common stock repurchased (in shares) | | 0 |
| Exercise of stock options (in shares) | 0 | 0 |
| Ending Balance (in shares) | 2,101,097 | 2,637,089 |
| **Consolidation, Less than Wholly Owned Subsidiary, Parent Ownership Interest, Percent [Roll Forward]** | | |
| Noncontrolling interest beginning balance (as a percent) | 32.10% | 41.90% |
| Holdings Units acquired by FXCM Inc. related to exchanges of Holdings Units for shares of Class A common stock (as a percent) | (6.60%) | (9.80%) |
| Holdings Units repurchased related to Class A common stock repurchased (as a percent) | | 0.00% |
| Exercise of stock options (as a percent) | 0.00% | 0.00% |
| Noncontrolling interest ending balance (as a percent) | 25.50% | 32.10% |
| **Total Units** | | |
| **Consolidation, Less than Wholly Owned Subsidiary, Parent Ownership Interest, Shares [Roll Forward]** | | |
| Beginning Balance (in shares) | 8,239,623 | 8,234,755 |
| Holdings Units acquired by FXCM Inc. related to exchanges of Holdings Units for shares of Class A common stock (in shares) | 0 | 0 |
| Holdings Units repurchased related to Class A common stock repurchased (in shares) | | (61) |
| Exercise of stock options (in shares) | 4,771 | 4,929 |
| Ending Balance (in shares) | 8,244,394 | 8,239,623 |
| **Consolidation, Less than Wholly Owned Subsidiary, Parent Ownership Interest, Percent [Roll Forward]** | | |
| Beginning balance (as a percent) | 100.00% | 100.00% |
| Holdings Units acquired by FXCM Inc. related to exchanges of Holdings Units for shares of Class A common stock (as a percent) | 0.00% | 0.00% |
| Holdings Units repurchased related to Class | | |

| | | |
|---|---|---|
| A common stock repurchased (as a percent) | | 0.00% |
| Exercise of stock options (as a percent) | 0.00% | 0.00% |
| Ending balance (as a percent) | 100.00% | 100.00% |

XML 81 R63.htm IDEA: XBRL DOCUMENT

| Dispositions - Additional Information (Details) - USD ($) | Oct. 28, 2016 | Apr. 01, 2015 | 1 Months Ended | | 3 Months Ended | 12 Months Ended | |
|---|---|---|---|---|---|---|---|
| | | | Dec. 31, 2015 | Sep. 30, 2015 | Mar. 31, 2017 | Dec. 31, 2016 | Dec. 31, 2015 |
| **Income Statement, Balance Sheet and Additional Disclosures by Disposal Groups, Including Discontinued Operations [Line Items]** | | | | | | | |
| Realization of cumulative translation adjustment | | | | | | $ 0 | $ 24,923,000 |
| **FXCMJ** | | | | | | | |
| **Income Statement, Balance Sheet and Additional Disclosures by Disposal Groups, Including Discontinued Operations [Line Items]** | | | | | | | |
| Consideration received for disposal group | | $ 62,200,000 | | | | | |
| Gain (loss) on disposal of discontinued operation, net of tax | | 2,000,000 | | | | | |
| Realization of cumulative translation adjustment | | 23,400,000 | | | | | |
| Deferred gain from transitional services | | $ 2,100,000 | | | | | |
| Income recognized from transitional services | | | | | | 1,600,000 | |
| **Faros** | | | | | | | |
| **Income Statement, Balance Sheet and Additional Disclosures by Disposal Groups, Including Discontinued Operations [Line Items]** | | | | | | | |
| Consideration received for disposal group | | | $ 0 | | | 0 | 0 |
| **HK** | | | | | | | |
| **Income Statement, Balance Sheet and Additional Disclosures by Disposal Groups, Including Discontinued Operations [Line Items]** | | | | | | | |
| Consideration received for disposal group | | | | $ 37,900,000 | | | |
| Gain (loss) on disposal of discontinued operation, net of tax | | | | 12,400,000 | | | |
| Deferred gain from transitional services | | | | $ 1,000,000 | | | |
| Income recognized from transitional services | | | | | | 600,000 | 400,000 |
| Other income | | | | | | 1,200,000 | |
| **FSL** | | | | | | | |
| **Income Statement, Balance Sheet and Additional Disclosures by Disposal Groups, Including Discontinued Operations [Line Items]** | | | | | | | |
| Consideration received for disposal group | | | 2,300,000 | | | | 2,300,000 |
| Gain (loss) on disposal of discontinued operation, net of tax | | | (7,100,000) | | | | |
| Realization of cumulative translation adjustment | | | 1,500,000 | | | | |
| Deferred gain from transitional services | | | $ 500,000 | | | | $ 500,000 |
| Income recognized from transitional services | | | | | | 500,000 | |
| **DailyFX** | | | | | | | |
| **Income Statement, Balance Sheet and Additional Disclosures by Disposal Groups, Including Discontinued Operations [Line Items]** | | | | | | | |
| Consideration received for disposal group | $ 40,000,000 | | | | | | |
| Gain (loss) on disposal of discontinued operation, net of tax | 37,200,000 | | | | | | |
| Deferred gain from transitional services | 300,000 | | | | | | |
| Income recognized from transitional services | | | | | | 100,000 | |
| Proceeds from sale of disposal group | $ 36,000,000 | | | | | | |
| Additional period of continuing involvement after disposal | 3 months | | | | | | |
| **Scenario, Forecast \| DailyFX** | | | | | | | |
| **Income Statement, Balance Sheet and Additional Disclosures by Disposal Groups, Including Discontinued Operations [Line Items]** | | | | | | | |
| Proceeds from sale of disposal group | | | | | $ 4,000,000 | | |
| **Minimum \| DailyFX** | | | | | | | |
| **Income Statement, Balance Sheet and Additional Disclosures by Disposal Groups, Including Discontinued Operations [Line Items]** | | | | | | | |
| Period of continuing involvement after disposal | 3 months | | | | | | |
| **Maximum \| DailyFX** | | | | | | | |
| **Income Statement, Balance Sheet and Additional Disclosures by** | | | | | | | |

| | | | | | | | |
|---|---|---|---|---|---|---|---|
| **Groups, Including Discontinued Operations [Line Items]** | | | | | | | |
| Period of continuing involvement after disposal | 6 months | | | | | | |
| **FX Publications, Inc. \| DailyFX** | | | | | | | |
| **Income Statement, Balance Sheet and Additional Disclosures by Disposal Groups, Including Discontinued Operations [Line Items]** | | | | | | | |
| Period of continuing involvement after disposal | 3 years | | | | | | |
| Accrued advertising | | | | | | 400,000 | |
| **FX Publications, Inc.** | | | | | | | |
| **Income Statement, Balance Sheet and Additional Disclosures by Disposal Groups, Including Discontinued Operations [Line Items]** | | | | | | | |
| Quarterly advertising payable | | | | | | 700,000 | |
| Maximum potential quarterly advertising payments | | | | | | $ 800,000 | |

XML 82 R64.htm IDEA: XBRL DOCUMENT

| Dispositions - Effect on Income Statement (Details) - USD ($) $ in Thousands | 12 Months Ended | |
|---|---|---|
| | Dec. 31, 2016 | Dec. 31, 2015 |
| **Revenues** | | |
| Trading revenue | $ 31,101 | $ 71,500 |
| Interest income | 309 | 272 |
| Brokerage interest expense | 0 | (100) |
| Net interest revenue | 309 | 172 |
| Other income | 113 | 5,700 |
| Total net revenues | 31,523 | 77,372 |
| **Operating Expenses** | | |
| Compensation and benefits | (248) | 14,708 |
| Allocation of net income to Lucid members for services provided | 3,029 | 5,064 |
| Total compensation and benefits | 2,781 | 19,772 |
| Referring broker fees | 0 | 208 |
| Advertising and marketing | 0 | 736 |
| Communication and technology | 5,694 | 8,248 |
| Trading costs, prime brokerage and clearing fees | 13,062 | 18,378 |
| General and administrative | 2,395 | 6,314 |
| Bad debt expense | 0 | 8,408 |
| Depreciation and amortization | 0 | 12,359 |
| Goodwill impairment loss | 0 | 54,865 |
| Total operating expenses | 23,932 | 129,288 |
| Operating income (loss) | 7,591 | (51,916) |
| **Other (Income) Expense** | | |
| (Gain) loss on equity method investments, net | (1,114) | 1,267 |
| Income (loss) from discontinued operations before income taxes | 8,705 | (53,183) |
| Net gain on completed dispositions | 0 | 7,313 |
| Loss on classification as held for sale before income taxes | 126,511 | 66,660 |
| Total loss from discontinued operations before income taxes | (117,806) | (112,530) |
| Income tax provision | 54 | 5,764 |
| Loss from discontinued operations, net of tax | (117,860) | (118,294) |
| Total (loss) income from discontinued operation before taxes attributable to parent | $ (26,000) | $ (38,700) |

XML 83 R65.htm IDEA: XBRL DOCUMENT

| Dispositions - Effect on Balance Sheet (Details) - USD ($) $ in Thousands | | 3 Months Ended | 12 Months Ended | |
| --- | --- | --- | --- | --- |
| | | Mar. 31, 2017 | Dec. 31, 2015 | Dec. 31, 2016 |
| **Assets** | | | | |
| Cash and cash equivalents | | | $ 10,786 | $ 9,378 |
| Due from brokers | [1] | | 22,234 | 14,090 |
| Accounts receivable, net | | | 178 | 251 |
| Office, communication and computer equipment, net | | | 1,154 | 1,336 |
| Goodwill | | | 223,613 | 223,613 |
| Other intangible assets, net | | | 27,269 | 27,269 |
| Other assets | [2],[3] | | 15,363 | 14,337 |
| Loss recognized on classification as held for sale | | | (66,660) | (193,171) |
| Total assets classified as held for sale on the consolidated statements of financial condition | | | 233,937 | 97,103 |
| **Liabilities** | | | | |
| Accounts payable and accrued expenses | [4] | | 10,838 | 2,266 |
| Due to brokers | [1] | | 0 | 45 |
| Securities sold, not yet purchased | | | 3,624 | 0 |
| Other liabilities | | | 48 | 14 |
| Total liabilities classified as held for sale on the consolidated statements of financial condition | | | 14,510 | 2,325 |
| Due from correspondent brokers, derivative assets, net | | | 900 | 1,600 |
| Due from correspondent brokers, unsettled spot foreign exchange | | | 300 | 200 |
| Due from correspondent brokers, unsettled common stock | | | 3,000 | 0 |
| Due from correspondent brokers, excess cash collateral | | | 18,000 | 12,200 |
| **Income Statement, Balance Sheet and Additional Disclosures by Disposal Groups, Including Discontinued Operations [Line Items]** | | | | |
| Other assets, exchange memberships, cost of ownership interests | | | 4,600 | 4,600 |
| Other assets, exchange memberships, cost of shares owned | | | 4,800 | 4,800 |
| Accounts payable and accrued liabilities, due to related party | | | 6,500 | 700 |
| **Ownership Interests** | | | | |
| **Income Statement, Balance Sheet and Additional Disclosures by Disposal Groups, Including Discontinued Operations [Line Items]** | | | | |
| Memberships in exchanges owned | | | 3,700 | 3,700 |
| **International Exchanges** | | | | |
| **Income Statement, Balance Sheet and Additional Disclosures by Disposal Groups, Including Discontinued Operations [Line Items]** | | | | |
| Gain (loss) on disposal of discontinued operation, net of tax | | | 100 | |
| **FastMatch** | | | | |
| **Income Statement, Balance Sheet and Additional Disclosures by Disposal Groups, Including Discontinued Operations [Line Items]** | | | | |
| Other assets, equity method investments | | | 4,200 | $ 4,600 |
| **V3** | | | | |
| **Income Statement, Balance Sheet and Additional Disclosures by Disposal Groups, Including Discontinued Operations [Line Items]** | | | | |
| Other assets, equity method investments | | | $ 1,500 | |
| **Scenario, Forecast | CME** | | | | |
| **Income Statement, Balance Sheet and Additional Disclosures by Disposal Groups, Including Discontinued Operations [Line Items]** | | | | |
| Gain (loss) on disposal of discontinued operation, net of tax | | $ 800 | | |

[1] (1) Includes as of December 31, 2016 and 2015: a) derivative assets, net of $1.6 million and $0.9 million, respectively; b) Unsettled spot FX, net of $0.2 million and $0.3 million, respectively; c) Unsettled common stock of nil and $3.0 million, respectively; and d) Excess cash collateral of $12.2 million and $18.0 million, respectively.

[2] (2) Includes the Company's exchange memberships, which represent ownership interests and shares owned in CME Group Inc. and provide the Company with the right to conduct business on the exchanges. The exchange memberships are recorded at cost or, if an other-than-temporary impairment in value has occurred, at a value that reflects management's estimate of the impairment. The Company had previously owned shares in the Intercontinental Exchange which were sold in April 2015. The Company recognized a gain $0.1 million related to the sale which was recorded in earnings as a component of Income (loss) from discontinued operations, net of tax for the year ended December 31, 2015. During

2015, the Company acquired additional ownership interests and shares in CME Group Inc. from one of the non-controlling members of Lucid which were recorded at a total cost of $3.7 million. There were no exchange membership impairments for the years ended December 31, 2016 or 2015. As of both December 31, 2016 and 2015, the carrying value of ownership interests was $4.6 million and the carrying value of shares owned was $4.8 million. In January 2017, the Company sold its ownership interests and shares in CME Group Inc. and expects to recognize a gain of $0.8 million related to the sale during the first quarter of 2017.

[3]    (3) Includes the carrying value of the Company's equity interest in FastMatch of $4.6 million and $4.2 million as of December 31, 2016 and 2015, respectively. The carrying value of the Company's previously-held equity interest in the V3-related LLC of $1.5 million is included as of December 31, 2015 (see Note 6).

[4]    (4) Includes as of December 31, 2016 and 2015 amounts due related to the allocation of income to Lucid non-controlling members for services provided of $0.7 million and $6.5 million, respectively.

XML 84 R66.htm IDEA: XBRL DOCUMENT

| Notes Receivable (Details) - USD ($)<br>$ in Thousands | 1 Months Ended | 12 Months Ended | |
|---|---|---|---|
| | Jan. 31, 2014 | Dec. 31, 2016 | Dec. 31, 2015 |
| **Accounts, Notes, Loans and Financing Receivable [Line Items]** | | | |
| Bad debt (recovery) expense | | $ (141) | $ 256,950 |
| **Notes Receivable \| Lucid** | | | |
| **Accounts, Notes, Loans and Financing Receivable [Line Items]** | | | |
| Notes receivable | $ 7,900 | | |
| Related party transaction, interest rate | 2.00% | | |
| Bad debt (recovery) expense | | 8,200 | |
| Interest income, related party | | $ 100 | $ 200 |

XML 85 R67.htm IDEA: XBRL DOCUMENT

| Equity Method Investments (Details) - USD ($) | 1 Months Ended Nov. 30, 2016 | 12 Months Ended Dec. 31, 2016 | Dec. 31, 2015 | Jan. 31, 2014 |
|---|---|---|---|---|
| **Schedule of Equity Method Investments [Line Items]** | | | | |
| Loss on equity method investments, net | | $ 3,053,000 | $ 467,000 | |
| Payments for equity investment | | 450,000 | 0 | |
| Cost method investment | | 1,103,000 | 0 | |
| **Investment Advisory Company \| V3 Related LLC** | | | | |
| **Schedule of Equity Method Investments [Line Items]** | | | | |
| Percentage of equity interest | | | | 17.26% |
| **FASTMATCH and V3 Related LLC \| Assets held for sale** | | | | |
| **Schedule of Equity Method Investments [Line Items]** | | | | |
| Equity method investment | | 4,600,000 | 5,700,000 | |
| **FASTMATCH and V3 Related LLC \| Income (loss) from discontinued operations, net of tax** | | | | |
| **Schedule of Equity Method Investments [Line Items]** | | | | |
| Loss on equity method investments, net | | $ 400,000 | 1,300,000 | |
| **FX Trading Software Developer** | | | | |
| **Schedule of Equity Method Investments [Line Items]** | | | | |
| Percentage of equity interest | | 22.20% | | |
| Impairment of equity method investment | | $ 2,100,000 | | |
| Loss on equity method investments, net | | 500,000 | 500,000 | |
| **FX Trading Software Developer \| Other Assets** | | | | |
| **Schedule of Equity Method Investments [Line Items]** | | | | |
| Equity method investment | | 0 | 2,600,000 | |
| **FX Analytical Software** | | | | |
| **Schedule of Equity Method Investments [Line Items]** | | | | |
| Percentage of equity interest | 30.00% | | | |
| Impairment of equity method investment | | 500,000 | | |
| Equity method investment | | 0 | 0 | |
| Loss on equity method investments, net | | $ 0 | $ 0 | |
| Payments for equity investment | $ 500,000 | | | |
| **FastMatch** | | | | |
| **Schedule of Equity Method Investments [Line Items]** | | | | |
| Percentage of equity interest | | 34.40% | | |
| **V3 Related LLC** | | | | |
| **Schedule of Equity Method Investments [Line Items]** | | | | |
| Percentage of equity interest | | | 66.30% | 66.30% |
| **V3 Related LLC \| Other Assets** | | | | |
| **Schedule of Equity Method Investments [Line Items]** | | | | |
| Cost method investment | | $ 1,100,000 | | |
| **V3 Related LLC \| Income (loss) from discontinued operations, net of tax** | | | | |
| **Schedule of Equity Method Investments [Line Items]** | | | | |
| Gain on disposition of equity method investment | | $ 700,000 | | |

XML 86 R68.htm IDEA: XBRL DOCUMENT

| Office, Communication and Computer Equipment, net - Schedule of Office, Communication and Computer Equipment (Detail) - USD ($) $ in Thousands | Dec. 31, 2016 | Dec. 31, 2015 |
|---|---|---|
| **Property, Plant and Equipment [Line Items]** | | |
| Total office, communication and computer equipment | $ 108,408 | $ 104,999 |
| Less: Accumulated depreciation | (75,593) | (69,108) |
| Office, communication and computer equipment, net | 32,815 | 35,891 |
| **Computer equipment** | | |
| **Property, Plant and Equipment [Line Items]** | | |
| Total office, communication and computer equipment | 12,633 | 17,637 |
| **Capitalized software** | | |
| **Property, Plant and Equipment [Line Items]** | | |
| Total office, communication and computer equipment | 80,624 | 70,750 |
| **Leasehold improvements** | | |
| **Property, Plant and Equipment [Line Items]** | | |
| Total office, communication and computer equipment | 8,775 | 10,024 |
| **Furniture and fixtures and other equipment** | | |
| **Property, Plant and Equipment [Line Items]** | | |
| Total office, communication and computer equipment | 1,599 | 1,677 |
| **Licenses** | | |
| **Property, Plant and Equipment [Line Items]** | | |
| Total office, communication and computer equipment | 2,883 | 3,026 |
| **Communication equipment** | | |
| **Property, Plant and Equipment [Line Items]** | | |
| Total office, communication and computer equipment | $ 1,894 | $ 1,885 |

XML 87 R69.htm IDEA: XBRL DOCUMENT

| Office, Communication and Computer Equipment, net - Additional Information (Detail) - USD ($) | 3 Months Ended | 12 Months Ended | |
|---|---|---|---|
| | Mar. 31, 2015 | Dec. 31, 2016 | Dec. 31, 2015 |
| **Finite-Lived Intangible Assets [Line Items]** | | | |
| Depreciation | | $ 20,100,000 | $ 21,300,000 |
| Amortization related to capitalized software development costs | | 14,800,000 | 14,500,000 |
| Unamortized capitalized software development costs | | 23,900,000 | 24,700,000 |
| Disposal of assets | | 10,500,000 | 13,200,000 |
| Impairment of finite-lived intangible assets | $ 5,400,000 | 0 | $ 0 |
| **DailyFX** | | | |
| **Finite-Lived Intangible Assets [Line Items]** | | | |
| Impairment of finite-lived intangible assets | | $ 1,100,000 | |

XML 88 R70.htm IDEA: XBRL DOCUMENT

| Goodwill - Narrative (Details) - USD ($) $ in Thousands | 3 Months Ended | 12 Months Ended | |
|---|---|---|---|
| | Mar. 31, 2015 | Dec. 31, 2016 | Dec. 31, 2015 |
| **Goodwill and Intangible Assets Disclosure [Abstract]** | | | |
| Goodwill impairment loss | $ 9,500 | $ 0 | $ 9,513 |

XML 89 R71.htm IDEA: XBRL DOCUMENT

| Goodwill - Schedule of Changes in Goodwill (Details) - USD ($) $ in Thousands | 3 Months Ended | 12 Months Ended | |
| --- | --- | --- | --- |
| | Mar. 31, 2015 | Dec. 31, 2016 | Dec. 31, 2015 |
| **Goodwill [Roll Forward]** | | | |
| Beginning balance | $ 39,242 | $ 28,080 | $ 39,242 |
| Impairment of goodwill | $ (9,500) | 0 | (9,513) |
| Foreign currency translation and other adjustments | | (4,601) | (1,649) |
| Ending balance | | $ 23,479 | $ 28,080 |

XML 90 R72.htm IDEA: XBRL DOCUMENT

| Other Intangible Assets, net - Acquired Intangible Assets (Details) - USD ($) $ in Thousands | Dec. 31, 2016 | Dec. 31, 2015 |
|---|---|---|
| **Finite-lived intangible assets** | | |
| Gross Carrying Amount | $ 30,489 | $ 33,550 |
| Accumulated Amortization | (24,804) | (20,368) |
| Net Carrying Amount | 5,685 | 13,182 |
| **Indefinite-lived intangible assets** | | |
| Total intangible assets, gross (excluding goodwill) | 31,089 | 34,150 |
| Total intangible assets, net (excluding goodwill) | 6,285 | 13,782 |
| **Licenses** | | |
| **Indefinite-lived intangible assets** | | |
| Indefinite-lived intangible assets | 600 | 600 |
| **Customer relationships** | | |
| **Finite-lived intangible assets** | | |
| Gross Carrying Amount | 35,460 | 35,460 |
| Accumulated Amortization | (27,522) | (21,223) |
| Net Carrying Amount | 7,938 | 14,237 |
| **Foreign currency translation adjustment** | | |
| **Finite-lived intangible assets** | | |
| Gross Carrying Amount | (4,971) | (1,910) |
| Accumulated Amortization | 2,718 | 855 |
| Net Carrying Amount | $ (2,253) | $ (1,055) |

XML 91 R73.htm IDEA: XBRL DOCUMENT

| Other Intangible Assets, net - Additional Information (Details) - USD ($) | 3 Months Ended | 12 Months Ended | |
|---|---|---|---|
| | Mar. 31, 2015 | Dec. 31, 2016 | Dec. 31, 2015 |
| **Acquired Intangible Assets by Major Class [Line Items]** | | | |
| Intangible asset amortization expense | | $ 7,200,000 | $ 7,000,000 |
| Impairment of finite-lived intangible assets | $ 5,400,000 | $ 0 | 0 |
| **Customer relationships** | | | |
| **Acquired Intangible Assets by Major Class [Line Items]** | | | |
| Threshold of quarterly cash consideration payments | | | $ 6,000,000 |
| Initial benchmark period for contingent consideration payments | | | 30 months |
| Finite-lived intangible assets acquired | | | $ 6,000,000 |
| Weighted average amortization period | | 3 years | |
| **Customer relationships | Minimum** | | | |
| **Acquired Intangible Assets by Major Class [Line Items]** | | | |
| Intangible asset amortization period | | 3 years | |
| **Customer relationships | Maximum** | | | |
| **Acquired Intangible Assets by Major Class [Line Items]** | | | |
| Intangible asset amortization period | | 9 years | |

XML 92 R74.htm IDEA: XBRL DOCUMENT

| Other Intangible Assets, net - Estimated Future Amortization Expense for Acquired Intangible Assets Outstanding (Details) - USD ($) $ in Thousands | Dec. 31, 2016 | Dec. 31, 2015 |
|---|---|---|
| **Finite-Lived Intangible Assets, Net, Amortization Expense, Fiscal Year Maturity [Abstract]** | | |
| 2017 | $ 3,983 | |
| 2018 | 1,401 | |
| 2019 | 301 | |
| 2020 | 0 | |
| 2021 | 0 | |
| Thereafter | 0 | |
| Net Carrying Amount | $ 5,685 | $ 13,182 |

XML 93 R75.htm IDEA: XBRL DOCUMENT

| Other Assets (Details) - USD ($) $ in Thousands | Dec. 31, 2016 | Dec. 31, 2015 |
|---|---|---|
| **Deferred Costs, Capitalized, Prepaid, and Other Assets Disclosure [Abstract]** | | |
| Prepaid expenses | $ 4,229 | $ 5,807 |
| Equity method investments | 0 | 2,603 |
| Cost method investment | 1,103 | 0 |
| Deposits | 1,871 | 2,727 |
| Other | 161 | 284 |
| Total | $ 7,364 | $ 11,421 |

XML 94 R76.htm IDEA: XBRL DOCUMENT

| Other Assets Other Assets - Additional Information (Details) - Accounting Standards Update 2015-03 $ in Millions | Dec. 31, 2015 USD ($) |
|---|---|
| **Other Assets** | |
| **New Accounting Pronouncements or Change in Accounting Principle [Line Items]** | |
| Deferred debt issuance costs | $ (3.4) |
| **Long-term Debt** | |
| **New Accounting Pronouncements or Change in Accounting Principle [Line Items]** | |
| Deferred debt issuance costs | $ 3.4 |

XML 95 R77.htm IDEA: XBRL DOCUMENT

| Customer Account Liabilities (Details) - USD ($) $ in Thousands | Dec. 31, 2016 | Dec. 31, 2015 |
|---|---|---|
| **Other Liabilities Disclosure [Abstract]** | | |
| Customer account liabilities | $ 661,936 | $ 685,043 |

XML 96 R78.htm IDEA: XBRL DOCUMENT

| Accounts Payable and Accrued Expenses (Details) - USD ($) $ in Thousands | Dec. 31, 2016 | Dec. 31, 2015 |
|---|---|---|
| **Payables and Accruals [Abstract]** | | |
| Operating expenses payable | $ 24,926 | $ 16,529 |
| Commissions payable | 7,271 | 8,671 |
| Bonus payable | 22,210 | 11,551 |
| Income tax payable | 920 | 1,375 |
| Interest due on borrowings | 162 | 162 |
| Other | 2 | 10 |
| Total | $ 55,491 | $ 38,298 |

XML 97 R79.htm IDEA: XBRL DOCUMENT

| Earnings Per Share - Additional Information (Detail) | Apr. 15, 2015 $ / shares shares | 1 Months Ended Jun. 30, 2013 USD ($) $ / shares | 12 Months Ended Dec. 31, 2016 shares | Dec. 31, 2015 shares |
|---|---|---|---|---|
| **Antidilutive Securities Excluded from Computation of Earnings Per Share [Line Items]** | | | | |
| Stock option granted excluded from computation of earnings per share | | | 721,622 | 749,856 |
| **2.25% Senior Convertible Notes \| Convertible Debt** | | | | |
| **Antidilutive Securities Excluded from Computation of Earnings Per Share [Line Items]** | | | | |
| Face amount \| $ | | $ 172,500,000 | | |
| Interest rate | | 2.25% | | |
| Conversion ratio | | 0.00532992 | | |
| Conversion price (in dollars per share) \| $ / shares | | $ 187.62 | | |
| **Common Stock - Class A** | | | | |
| **Antidilutive Securities Excluded from Computation of Earnings Per Share [Line Items]** | | | | |
| Option agreement, duration of option agreement | 2 years | | | |
| Option agreement, number of shares available | 56,934 | | | |
| Option agreement, exercise price per share (in dollars per share) \| $ / shares | $ 22.50 | | | |
| Conversion ratio of Holdings Units for Class A common stock | | | 1 | 1 |
| **Common Stock - Class A \| Controlling Units** | | | | |
| **Antidilutive Securities Excluded from Computation of Earnings Per Share [Line Items]** | | | | |
| Holdings Units acquired by FXCM Inc. related to exchanges of Holdings Units for shares of Class A common stock (in shares) | | | 500,000 | 800,000 |

XML 98 R80.htm IDEA: XBRL DOCUMENT

| Earnings Per Share - Reconciliation of Numerator and Denominator Used in Basic and Diluted EPS Calculations (Detail) - USD ($) $ / shares in Units, $ in Thousands | 12 Months Ended | |
|---|---|---|
| | Dec. 31, 2016 | Dec. 31, 2015 |
| **Numerator** | | |
| Net income (loss) attributable to Global Brokerage, Inc. | $ 70,643 | $ (553,929) |
| **Common Stock - Class A** | | |
| **Numerator** | | |
| Income (loss) from continuing operations attributable to Global Brokerage, Inc. | 96,680 | (513,600) |
| Loss from discontinued operations attributable to Global Brokerage, Inc. | (26,037) | (40,329) |
| Net income (loss) attributable to Global Brokerage, Inc. | 70,643 | (553,929) |
| Earnings allocated to participating securities | 0 | 0 |
| Income (loss) available to common stockholders | $ 70,643 | $ (553,929) |
| **Earnings allocated to participating securities** | | |
| Weighted average shares of Class A common stock (in shares) | 5,609,000 | 5,087,000 |
| **Add dilutive effect of the following:** | | |
| Stock options and RSUs (in shares) | 0 | 0 |
| Convertible note hedges (in shares) | 0 | 0 |
| Warrants (in shares) | 0 | 0 |
| Assumed conversion of Holdings Units for Class A common stock (in shares) | 0 | 0 |
| Dilutive weighted average shares of Class A common stock (in shares) | 5,609,000 | 5,087,000 |
| **Net (loss) income per share of Class A common stock** | | |
| Continuing operations (in dollars per share) | $ 17.24 | $ (100.96) |
| Discontinued operations (in dollars per share) | (4.64) | (7.93) |
| Basic net income (loss) per share of Class A common stock (in dollars per share) | $ 12.60 | $ (108.89) |

XML 99 R81.htm IDEA: XBRL DOCUMENT

| Related Party Transactions - Amounts Receivable From, And Payable To, Related Parties (Details) - USD ($) | Dec. 31, 2016 | Dec. 31, 2015 | Mar. 31, 2015 |
|---|---|---|---|
| **Receivables** | | | |
| Advances to Holdings non-controlling members | $ 3,000 | $ 112,000 | |
| Advances to employees | 55,000 | 201,000 | |
| Due from Liquidity provider | 494,000 | 8,499,000 | |
| Total receivables from related parties | 494,000 | 8,499,000 | |
| **Payables** | | | |
| Employees and equity method investments | 732,000 | 1,370,000 | |
| Tax receivable agreement | 0 | 145,000 | $ 0 |
| Total payables to related parties | 1,653,000 | 8,105,000 | |
| **Lucid Markets Trading Limited** | | | |
| **Receivables** | | | |
| Accounts receivable, related parties | 0 | 15,000 | |
| Notes receivable and interest — Lucid non-controlling members | 0 | 8,171,000 | |
| **Payables** | | | |
| Due to Lucid non-controlling members in connection with the allocation of income to Lucid non-controlling members for services provided | 741,000 | 6,500,000 | |
| **Equity investee** | | | |
| **Payables** | | | |
| Accounts payable | 180,000 | 90,000 | |
| **Liquidity** | | | |
| **Receivables** | | | |
| Accounts receivable, related parties | 308,000 | 0 | |
| Due from Liquidity provider | 128,000 | 0 | |
| Total receivables from related parties | $ 128,000 | $ 0 | |

XML 100 R82.htm IDEA: XBRL DOCUMENT

| Related Party Transactions - Additional Information (Details) shares in Millions | 1 Months Ended | 12 Months Ended | | |
|---|---|---|---|---|
| | Jan. 31, 2014 USD ($) | Dec. 31, 2016 USD ($) shares | Dec. 31, 2015 USD ($) shares | Mar. 31, 2015 USD ($) |
| **Related Party Transaction [Line Items]** | | | | |
| Due to Related Parties, Current | | $ 0 | $ 145,000 | |
| Bad debt (recovery) expense | | (141,000) | 256,950,000 | |
| Initial estimate of liability from tax receivable agreement | | 145,600,000 | 146,800,000 | |
| Tax receivable agreement | | 0 | 145,000 | $ 0 |
| Payments for tax receivable agreement | | 188,000 | 5,352,000 | |
| Referring broker fees | | 38,213,000 | 54,827,000 | |
| Guarantor Obligations, Fees Collected | | $ 1,100,000 | $ 1,100,000 | |
| **Common Stock - Class A** | | | | |
| **Related Party Transaction [Line Items]** | | | | |
| Conversion ratio of Holdings Units for Class A common stock | | 1 | 1 | |
| **Common Stock - Class A \| Controlling Units** | | | | |
| **Related Party Transaction [Line Items]** | | | | |
| Exchange of Holdings Units to Class A common stock (in shares) \| shares | | 0.5 | 0.8 | |
| **Ownership Interests** | | | | |
| **Related Party Transaction [Line Items]** | | | | |
| Memberships in exchanges owned | | $ 3,700,000 | $ 3,700,000 | |
| **Referring Broker Fees \| Global Finance and Master Capital** | | | | |
| **Related Party Transaction [Line Items]** | | | | |
| Referring broker fees | | 0 | 200,000 | |
| **Lucid Markets Trading Limited** | | | | |
| **Related Party Transaction [Line Items]** | | | | |
| Accounts receivable, related parties | | 0 | 15,000 | |
| Due to other related parties | | 741,000 | 6,500,000 | |
| **Lucid Markets Trading Limited \| Notes Receivable** | | | | |
| **Related Party Transaction [Line Items]** | | | | |
| Notes receivable | $ 7,900,000 | | | |
| Related party transaction, interest rate | 2.00% | | | |
| Bad debt (recovery) expense | | 8,200,000 | | |
| Interest income, related party | | 100,000 | 200,000 | |
| **Equity investee** | | | | |
| **Related Party Transaction [Line Items]** | | | | |
| Accounts Payable and Accrued Liabilities | | 180,000 | 90,000 | |
| **FastMatch \| Institutional Trading Revenue** | | | | |
| **Related Party Transaction [Line Items]** | | | | |
| Brokerage commissions revenue | | 0 | 6,300,000 | |
| **FastMatch \| Communication and Technology** | | | | |
| **Related Party Transaction [Line Items]** | | | | |
| Exchange fees | | 0 | 4,300,000 | |
| **FastMatch \| Other Income** | | | | |
| **Related Party Transaction [Line Items]** | | | | |
| Revenue from related parties | | $ 100,000 | $ 300,000 | |
| **Shareholder \| Global Finance and Master Capital** | | | | |
| **Related Party Transaction [Line Items]** | | | | |
| Percentage of ownership interests (more than) | | 90.00% | | |
| **Affiliate of Leucadia [Member] \| Affiliated Entity [Member]** | | | | |
| **Related Party Transaction [Line Items]** | | | | |
| Percentage of ownership interests (more than) | | 24.00% | | |
| Revenue from related parties | | $ 700,000 | | |
| **Jefferies Group** | | | | |
| **Related Party Transaction [Line** | | | | |

| | | | | |
|---|---|---|---|---|
| **Items]** | | | | |
| Commission on transaction (as a percent) | 3.00% | | | |
| Payments for commissions | $ 0 | | | |
| Reimbursement of expenses | 200,000 | | | |
| **Jefferies Group \| Maximum \| Common Stock - Class A** | | | | |
| **Related Party Transaction [Line Items]** | | | | |
| Consideration received from sale of stock | 15,000,000.0 | | | |
| **Assets Held for Sale, Current \| Lucid Markets Trading Limited \| Affiliated Entity [Member]** | | | | |
| **Related Party Transaction [Line Items]** | | | | |
| Due to Related Parties, Current | 0 | | | |
| **Trading Profits Transactions \| Affiliate of Leucadia [Member] \| Affiliated Entity [Member]** | | | | |
| **Related Party Transaction [Line Items]** | | | | |
| Accounts receivable, related parties | 300,000 | | | |
| **Open Trade Position Transactions \| Affiliate of Leucadia [Member] \| Affiliated Entity [Member]** | | | | |
| **Related Party Transaction [Line Items]** | | | | |
| Accounts receivable, related parties | $ 100,000 | | | |

XML 101 R83.htm IDEA: XBRL DOCUMENT

| Stock-Based Compensation - Additional Information (Detail) | 12 Months Ended | | |
|---|---|---|---|
| | Dec. 31, 2016 USD ($) shares | Dec. 31, 2015 USD ($) shares | Dec. 31, 2014 |
| **Share-based Compensation Arrangement by Share-based Payment Award [Line Items]** | | | |
| Vesting period | 4 years | | |
| Fair value of vested stock options | $ 1,400,000 | $ 3,100,000 | |
| Duration of time stock has been publicly traded | 6 years | | |
| Unrecognized expense | $ 800,000 | | |
| Cash received from exercise of stock options | 0 | 0 | |
| Tax benefit from exercise of stock options | $ 0 | 0 | |
| **Employee Stock Option** | | | |
| **Share-based Compensation Arrangement by Share-based Payment Award [Line Items]** | | | |
| Stock options contractual term | 7 years | | |
| Recognition period | 1 year 1 month 6 days | | |
| **Employee Stock Option | Office, Communication and Computer Equipment, Net** | | | |
| **Share-based Compensation Arrangement by Share-based Payment Award [Line Items]** | | | |
| Capitalized compensation cost | $ 100,000 | 100,000 | |
| **Employee Stock Option | Compensation and Benefits** | | | |
| **Share-based Compensation Arrangement by Share-based Payment Award [Line Items]** | | | |
| Stock based compensation expense | $ 1,200,000 | $ 1,900,000 | |
| **Independent Directors Option** | | | |
| **Share-based Compensation Arrangement by Share-based Payment Award [Line Items]** | | | |
| Stock options contractual term | 7 years | | |
| **Independent Directors Option | Compensation and Benefits** | | | |
| **Share-based Compensation Arrangement by Share-based Payment Award [Line Items]** | | | |
| Stock based compensation expense | $ 0 | | |
| **Restricted Stock Units (RSUs)** | | | |
| **Share-based Compensation Arrangement by Share-based Payment Award [Line Items]** | | | |
| Total shares that may be issued (in shares) | shares | 0 | 0 | |
| Vesting period | | | 4 years |
| Recognition period | 1 year 11 months 16 days | | |
| Settlement of vested awards, shares issues per award | | | 1 |
| Unrecognized compensation expense | $ 1,400,000 | | |
| **Restricted Stock Units (RSUs) | Office, Communication and Computer Equipment, Net** | | | |
| **Share-based Compensation Arrangement by Share-based Payment Award [Line Items]** | | | |
| Capitalized compensation cost | 100,000 | $ 100,000 | |
| **Restricted Stock Units (RSUs) | Compensation and Benefits** | | | |
| **Share-based Compensation Arrangement by Share-based Payment Award [Line Items]** | | | |
| Stock based compensation expense | $ 700,000 | $ 800,000 | |
| **Long Term Incentive Plan** | | | |
| **Share-based Compensation Arrangement by Share-based Payment Award [Line Items]** | | | |
| Total shares that may be issued (in shares) | shares | 1,529,500 | | |
| Shares available for future issuance (in shares) | shares | 450,417 | | |

XML 102 R84.htm IDEA: XBRL DOCUMENT

| Stock-Based Compensation – Summary of Company's Stock Options Activity Under LTIP (Detail) $ / shares in Units, $ in Thousands | 12 Months Ended Dec. 31, 2016 USD ($) $ / shares shares |
|---|---|
| **Shares** | |
| Beginning balance outstanding (in shares) \| shares | 678,019 |
| Granted (in shares) \| shares | 0 |
| Exercised (in shares) \| shares | 0 |
| Forfeited or expired (in shares) \| shares | (22,825) |
| Ending balance outstanding (in shares) \| shares | 655,194 |
| Vested or expected to vest at period end (in shares) \| shares | 654,513 |
| Exercisable at period end (in shares) \| shares | 630,469 |
| **Weighted- Average Exercise Price** | |
| Beginning balance outstanding (in dollars per share) \| $ / shares | $ 136.29 |
| Granted (in dollars per share) \| $ / shares | 0.00 |
| Exercised (in dollars per share) \| $ / shares | 0.00 |
| Forfeited or expired (in dollars per share) \| $ / shares | 143.25 |
| Ending balance outstanding (in dollars per share) \| $ / shares | 136.05 |
| Vested or expected to vest at period end (in dollars per share) \| $ / shares | 136.03 |
| Exercisable at period end (in dollars per share) \| $ / shares | $ 135.09 |
| **Weighted- Average Remaining Contractual Term** | |
| Outstanding at period end | 1 year 5 months 27 days |
| Vested or expected to vest at end period | 1 year 5 months 27 days |
| Exercisable at end period | 1 year 4 months 21 days |
| **Aggregate Intrinsic Value** | |
| Outstanding at period end \| $ | $ 0 |
| Vested or expected to vest at period end \| $ | 0 |
| Exercisable at period end \| $ | $ 0 |

XML 103 R85.htm IDEA: XBRL DOCUMENT

| Stock-Based Compensation - Schedule of Company's Restricted Stock Units Activity (Details) - Restricted Stock Units (RSUs) - USD ($) $ / shares in Units, $ in Thousands | 12 Months Ended | |
|---|---|---|
| | Dec. 31, 2016 | Dec. 31, 2015 |
| **Units** | | |
| Unvested beginning balance (in shares) | 14,903 | |
| Granted (in shares) | | 0 |
| Vested (in shares) | | (4,771) |
| Forfeited (in shares) | | (638) |
| Unvested ending balance (in shares) | 9,494 | 14,903 |
| Expected to vest at period end (in shares) | 8,948 | |
| **Weighted- Average Grant-Date Fair Value** | | |
| Unvested beginning balance (in dollars per share) | $ 162.50 | |
| Granted (in dollars per share) | | $ 0.00 |
| Vested (in dollars per share) | | 162.50 |
| Forfeited (in dollars per share) | | 162.50 |
| Unvested ending balance (in dollars per share) | 162.50 | $ 162.50 |
| Expected to vest at period end (in dollars per share) | $ 162.50 | |
| **Weighted- Average Remaining Contractual Term** | | |
| Unvested at period end | 1 year 11 months 16 days | |
| Expected to vest at period end | 1 year 11 months 16 days | |
| **Aggregate Intrinsic Value** | | |
| Unvested at period end | $ 67 | |
| Expected to vest at period end | $ 63 | |

XML 104 R86.htm IDEA: XBRL DOCUMENT

| Stockholders' Equity – Additional Information (Details) | Apr. 15, 2015 USD ($) $ / shares shares | Jan. 29, 2015 | 12 Months Ended Dec. 31, 2016 USD ($) vote $ / shares shares | Nov. 30, 2016 USD ($) shares | Oct. 31, 2016 USD ($) $ / shares | Jan. 31, 2016 $ / shares | Dec. 31, 2015 $ / shares shares | Nov. 30, 2014 USD ($) | Jun. 30, 2013 $ / shares |
|---|---|---|---|---|---|---|---|---|---|
| **Stockholders Equity Note [Line Items]** | | | | | | | | | |
| Preferred stock, shares authorized | | | 300,000,000 | | | | | | |
| Preferred stock, par value (in dollars per share) | $ / shares | | $ 0.01 | | | | | | |
| Option agreement, fair value of options | $ | $ 300,000 | | | | | | | | |
| Common stock, dividends declared, per share, rights | | 1 | | | | | | | |
| Exercise price per right (in dollars per share) | $ / shares | | | | | | $ 44.12 | | | $ 212.4 |
| Conversion of stock, ownership percentage in corporation, outstanding, common stock threshold under stockholders right plan | | 10.00% | | | | 4.90% | | | |
| Preferred stock, conversion ratio | | | | | | 0.001 | | | |
| **Common Stock - Class A** | | | | | | | | | |
| **Stockholders Equity Note [Line Items]** | | | | | | | | | |
| Common stock, shares authorized (in shares) | | | 3,000,000,000 | | | | | 3,000,000,000 | | |
| Common stock, par value (in dollars per share) | $ / shares | | $ 0.01 | | $ 0.01 | | $ 0.01 | | |
| Common stock votes per share | vote | | | 1 | | | | | | |
| Stock repurchase under stock repurchase program | $ | | | $ 80,000,000.0 | | | | | $ 130,000,000.0 | |
| Increase in authorized stock repurchase under stock repurchase program | $ | | | | | | | | $ 50,000,000.0 | |
| Common stock, shares issued (in shares) | | | 6,143,297 | | | | | 5,602,534 | | |
| Option agreement, number of shares available | 56,934 | | | | | | | | |
| Option agreement, exercise price per share (in dollars per share) | $ / shares | | | $ 22.50 | | | | | | |
| Option agreement, duration of option agreement | 2 years | | | | | | | | |
| **Common Stock - Class B** | | | | | | | | | |
| **Stockholders Equity Note [Line Items]** | | | | | | | | | |
| Common stock, shares authorized (in shares) | | | 1,000,000 | | | | | 1,000,000 | | |
| Common stock, par value (in dollars per share) | $ / shares | | $ 0.01 | | | | | $ 0.01 | | |
| Common stock votes per share | vote | | | 1 | | | | | | |
| Common stock, shares issued (in shares) | | | 8 | | | | | 25 | | |
| **Series A Junior Participating Preferred Stock** | | | | | | | | | |
| **Stockholders Equity Note [Line Items]** | | | | | | | | | |
| Preferred stock, shares authorized | | | 55,120 | | | | | | | |
| Preferred outstanding (in shares) | | | 0 | | | | | 0 | | |
| **Pre-Reverse Split Shares** | | | | | | | | | |
| **Stockholders Equity Note [Line Items]** | | | | | | | | | |
| Stock repurchase under stock repurchase program | $ | | | | $ 64,200,000 | | | | | |
| Number of pre-reverse split shares repurchased (in shares) | | | | 5,100,000 | | | | | |
| **Private Placement | Common Stock - Class A** | | | | | | | | | |
| **Stockholders Equity Note [Line Items]** | | | | | | | | | |
| Potential future maximum aggregate offering price | $ | | | | $ 15,000,000.0 | | | | | |

XML 105 R87.htm IDEA: XBRL DOCUMENT

| Stockholders' Equity - Changes in Class A Common Stock Outstanding (Details) - shares | 12 Months Ended | |
|---|---|---|
| | Dec. 31, 2016 | Dec. 31, 2015 |
| **Stockholders' Equity Note [Roll Forward]** | | |
| Vesting of RSUs (in shares) | 0 | |
| **Common Stock - Class A** | | |
| **Stockholders' Equity Note [Roll Forward]** | | |
| Beginning Balance (in shares) | 5,602,534 | 4,788,994 |
| Issued (in shares) | 0 | 0 |
| Repurchased (in shares) | 0 | (61) |
| Exchange of Holdings units into Class A common stock (in shares) | 535,992 | 808,672 |
| Vesting of RSUs (in shares) | 4,771 | 4,929 |
| Ending Balance (in shares) | 6,143,297 | 5,602,534 |

XML 106 R88.htm IDEA: XBRL DOCUMENT

| Net Capital Requirements (Details) - USD ($) $ in Millions | Dec. 31, 2016 | Dec. 31, 2015 |
|---|---|---|
| **US** | | |
| **Capital Requirements on Foreign Financial Institutions [Line Items]** | | |
| Capital | $ 47.5 | $ 43.6 |
| Minimum capital requirement | 33.3 | 28.3 |
| Excess capital | 14.2 | 15.3 |
| **UK LTD** | | |
| **Capital Requirements on Foreign Financial Institutions [Line Items]** | | |
| Capital | 83.4 | 76.3 |
| Minimum capital requirement | 22.0 | 27.6 |
| Excess capital | 61.4 | 48.7 |
| Alternative Net Capital Requirement | 37.3 | |
| **Australia** | | |
| **Capital Requirements on Foreign Financial Institutions [Line Items]** | | |
| Capital | 16.6 | 12.0 |
| Minimum capital requirement | 1.1 | 0.7 |
| Excess capital | 15.5 | 11.3 |
| **Lucid LLP** | | |
| **Capital Requirements on Foreign Financial Institutions [Line Items]** | | |
| Capital | 10.2 | 10.9 |
| Minimum capital requirement | 4.2 | 4.0 |
| Excess capital | $ 6.0 | $ 6.9 |

XML 107 R89.htm IDEA: XBRL DOCUMENT

| Leucadia Transaction - Additional Information (Details) | Sep. 01, 2016 USD ($) director member | Apr. 16, 2015 USD ($) | Jan. 24, 2015 USD ($) | Jan. 15, 2015 USD ($) | 8 Months Ended Aug. 31, 2016 USD ($) | 12 Months Ended Dec. 31, 2016 USD ($) | 12 Months Ended Dec. 31, 2015 USD ($) |
|---|---|---|---|---|---|---|---|
| **Unusual or Infrequent Item [Line Items]** | | | | | | | |
| Number of board members \| member | 6 | | | | | | |
| Number of directors appointed by Leucadia \| director | 3 | | | | | | |
| Number of directors appointed by FXCM \| director | 3 | | | | | | |
| Long-term incentive plan, vesting period | | | | | | 5 years | |
| Loss on derivative | | | | | | $ 50,942,000 | $ (49,978,000) |
| Derivative liability — Letter Agreement | | | | | | 0 | 448,458,000 |
| Exchange of Letter Agreement for Redeemable non-controlling interest | $ 235,500,000 | | | | | | |
| Issuance of redeemable non-controlling interest (net of HLBV allocation, discussed below) | | | | | | 49,285,000 | |
| Redeemable non-controlling interest (see Note 3) | | | | | | 46,364,000 | 0 |
| Credit agreement — related party | | | | | | 150,516,000 | 147,262,000 |
| Deferred finance costs, gross | | | $ 1,800,000 | | | | |
| Effective interest rate | | | 7.10% | | | | |
| Debt instrument, issuance fee | | | $ 21,000,000 | | | | |
| Bad debt (recovery) expense | | | | | | $ (141,000) | 256,950,000 |
| **First Amendment to the Amended and Restated Credit Agreement [Member]** | | | | | | | |
| **Unusual or Infrequent Item [Line Items]** | | | | | | | |
| Debt instrument term | 1 year | | | | | | |
| **Group Agreement** | | | | | | | |
| **Unusual or Infrequent Item [Line Items]** | | | | | | | |
| Change of ownership, percentage of voting interests | | | | | | 40.00% | |
| Change of ownership, percentage of ownership in equity interest | | | | | | 90.00% | |
| **Letter Agreement** | | | | | | | |
| **Unusual or Infrequent Item [Line Items]** | | | | | | | |
| Fair value of derivative liability | $ 235,500,000 | | 124,800,000 | | | | |
| Loss on derivative | | $ 0 | | | | | 30,400,000 |
| Gain (loss) on derivative liabilities — Letter Agreements | | | | | $ 212,900,000 | | |
| Derivative liability — Letter Agreement | | | | | | | 448,500,000 |
| Deferred finance costs, gross | | | 1,200,000 | | | | |
| Debt instrument, issuance fee | | | 7,100,000 | | | | |
| **Credit Agreement** | | | | | | | |
| **Unusual or Infrequent Item [Line Items]** | | | | | | | |
| Derivative liability — Letter Agreement | | | | | | $ 6,200,000 | 0 |
| Credit agreement — related party | | | | | | 150,516,000 | 147,262,000 |
| Deferred finance costs, gross | | | 600,000 | | | | |
| Debt instrument, issuance fee | | | 13,900,000 | | | | |
| Amortization of issuance fee discount | | | | | | 3,951,000 | 8,665,000 |
| Deferred debt issuance costs | | | | | | 114,000 | 467,000 |
| Amortization of deferred financing fee | | | | | | 2,844,000 | 6,238,000 |
| **Credit Agreement \| Interest on Borrowings** | | | | | | | |
| **Unusual or Infrequent Item [Line Items]** | | | | | | | |
| Amortization of issuance fee discount | | | | | | 4,000,000 | 8,700,000 |
| Amortization of debt issuance costs | | | | | | 400,000 | 800,000 |
| Amortization of deferred financing fee | | | | | | 2,800,000 | $ 6,200,000 |
| **Leucadia \| Letter Agreement** | | | | | | | |
| **Unusual or Infrequent Item [Line Items]** | | | | | | | |
| Face amount | | | 94,400,000 | | | | |
| **Leucadia \| Credit Agreement** | | | | | | | |
| **Unusual or Infrequent Item [Line Items]** | | | | | | | |
| Face amount | | | 184,600,000 | | | | |
| **Holdings and Newco \| Loans Payable \| Leucadia** | | | | | | | |
| **Unusual or Infrequent Item [Line Items]** | | | | | | | |

| | | | | | | |
|---|---|---|---|---|---|---|
| Face amount | | | 300,000,000.0 | | | |
| Net proceeds from issuance of debt | | | $ 279,000,000 | | | |
| Interest rate | | | 10.00% | | | |
| Quarterly increase in interest rate | | | 1.50% | | | |
| Maximum interest rate | | | 20.50% | | | |
| Increase in interest rate in the event of default | | | 2.00% | | | |
| Deferred financing fee | | | $ 10,000,000.0 | | 10,000,000.0 | |
| Increase to deferred financing fee | | | 30,000,000.0 | | | |
| Threshold maximum amount outstanding to prevent increase in deferred financing fee | | | 250,000,000.0 | | | |
| Repayments of long-term debt | | $ 56,500,000 | | | $ 155,500,000 | |
| Credit agreement — related party | | $ 243,500,000 | | | | |
| Deferred finance costs, gross | | | $ 21,000,000 | | | |
| **Holdings** | | | | | | |
| **Unusual or Infrequent Item [Line Items]** | | | | | | |
| Non-controlling interest in subsidiary (as a percent) | | | | | 25.50% | 32.10% |
| **Holdings | Loans Payable | Leucadia** | | | | | | |
| **Unusual or Infrequent Item [Line Items]** | | | | | | |
| Percentage of equity interests pledged as collateral | | 65.00% | | | | |
| **Leucadia** | | | | | | |
| **Unusual or Infrequent Item [Line Items]** | | | | | | |
| Percentage of ownership limitation, termination payment due | 16.67% | | | | | |
| Exchange of Letter Agreement for Redeemable non-controlling interest | $ 235,500,000 | | | | | |
| Issuance of redeemable non-controlling interest (net of HLBV allocation, discussed below) | | | | | $ 49,300,000 | |
| Redeemable non-controlling interest (see Note 3) | | | | | 46,400,000 | |
| **Continuing Operations** | | | | | | |
| **Unusual or Infrequent Item [Line Items]** | | | | | | |
| Bad debt (recovery) expense | | | | | 100,000 | $ 257,000,000 |
| **Swiss National Bank** | | | | | | |
| **Unusual or Infrequent Item [Line Items]** | | | | | | |
| Currency floor of EUR/CHF | | | 1.2 | | | |
| **Leucadia | FXCM Group LLC** | | | | | | |
| **Unusual or Infrequent Item [Line Items]** | | | | | | |
| Non-controlling interest in subsidiary (as a percent) | 49.90% | | | | | |
| Ownership percentage by parent (as a percent) | 50.10% | | | | | |
| **Foreign Exchange** | | | | | | |
| **Unusual or Infrequent Item [Line Items]** | | | | | | |
| Margin receivable expected to be uncollected due to foreign currency losses by customers | | | $ 275,100,000 | | | |
| **Foreign Exchange | Margin Receivable | Continuing Operations** | | | | | | |
| **Unusual or Infrequent Item [Line Items]** | | | | | | |
| Bad debt (recovery) expense | | | | | | 9,700,000 |
| Allowance for doubtful accounts receivable, recoveries as payment for option agreement | | | | | | 300,000 |
| Allowance for doubtful accounts receivable, recoveries | | | | | | 100,000 |
| **Foreign Exchange | Margin Receivable | Discontinued Operations** | | | | | | |
| **Unusual or Infrequent Item [Line Items]** | | | | | | |
| Bad debt (recovery) expense | | | | | 0 | 8,400,000 |
| Allowance for doubtful accounts receivable, recoveries | | | | | | $ 100,000 |
| **Management** | | | | | | |
| **Unusual or Infrequent Item [Line Items]** | | | | | | |
| Long-term incentive plan, vesting period | 5 years | | | | | |
| **Management Incentive Plan** | | | | | | |
| **Unusual or Infrequent Item [Line** | | | | | | |

| | | | | | | | |
|---|---|---|---|---|---|---|---|
| Long-Term incentive plan, vesting percentage on second anniversary | 25.00% | | | | | | |
| Long-term incentive plan, vesting percentage on third anniversary | 25.00% | | | | | | |
| Long-term incentive plan, fair value of plan | $ 53,500,000 | | | | | 54,100,000 | |
| **Next $350 million** | | | | | | | |
| **Unusual or Infrequent Item [Line Items]** | | | | | | | |
| Stipulated amount of proceeds, per the Letter Agreement | $ 350,000,000 | | | | | $ 350,000,000 | |
| **Next $350 million \| Holdings** | | | | | | | |
| **Unusual or Infrequent Item [Line Items]** | | | | | | | |
| Allocation percentage under Letter Agreement of stipulated proceeds | | | | | | 45.00% | |
| **Next $350 million \| Leucadia** | | | | | | | |
| **Unusual or Infrequent Item [Line Items]** | | | | | | | |
| Allocation percentage under Letter Agreement of stipulated proceeds | | | | | | 45.00% | |
| **Next $350 million \| Management \| Holdings** | | | | | | | |
| **Unusual or Infrequent Item [Line Items]** | | | | | | | |
| Allocation percentage under Letter Agreement of stipulated proceeds | 10.00% | | | | | 10.00% | |
| **Next $500 million** | | | | | | | |
| **Unusual or Infrequent Item [Line Items]** | | | | | | | |
| Stipulated amount of proceeds, per the Letter Agreement | | | | | | $ 500,000,000 | |
| **Next $500 million \| Minimum** | | | | | | | |
| **Unusual or Infrequent Item [Line Items]** | | | | | | | |
| Stipulated amount of proceeds, per the Letter Agreement | $ 350,000,000 | | | | | | |
| **Next $500 million \| Maximum** | | | | | | | |
| **Unusual or Infrequent Item [Line Items]** | | | | | | | |
| Stipulated amount of proceeds, per the Letter Agreement | $ 850,000,000 | | | | | | |
| **Next $500 million \| Holdings** | | | | | | | |
| **Unusual or Infrequent Item [Line Items]** | | | | | | | |
| Allocation percentage under Letter Agreement of stipulated proceeds | | | | | | 8.80% | |
| **Next $500 million \| Leucadia** | | | | | | | |
| **Unusual or Infrequent Item [Line Items]** | | | | | | | |
| Allocation percentage under Letter Agreement of stipulated proceeds | | | | | | 79.20% | |
| **Next $500 million \| Management \| Holdings** | | | | | | | |
| **Unusual or Infrequent Item [Line Items]** | | | | | | | |
| Allocation percentage under Letter Agreement of stipulated proceeds | 12.00% | | | | | 12.00% | |
| **All aggregate amounts thereafter** | | | | | | | |
| **Unusual or Infrequent Item [Line Items]** | | | | | | | |
| Stipulated amount of proceeds, per the Letter Agreement | $ 850,000,000 | | | | | | |
| **All aggregate amounts thereafter \| Holdings** | | | | | | | |
| **Unusual or Infrequent Item [Line Items]** | | | | | | | |
| Allocation percentage under Letter Agreement of stipulated proceeds | | | | | | 34.40% | |
| **All aggregate amounts thereafter \| Leucadia** | | | | | | | |
| **Unusual or Infrequent Item [Line Items]** | | | | | | | |
| Allocation percentage under Letter Agreement of stipulated proceeds | | | | | | 51.60% | |
| **All aggregate amounts thereafter \| Management \| Holdings** | | | | | | | |
| **Unusual or Infrequent Item [Line Items]** | | | | | | | |
| Allocation percentage under Letter Agreement of stipulated proceeds | 14.00% | | | | | 14.00% | |

XML 108 R90.htm IDEA: XBRL DOCUMENT

| Leucadia Transaction - Schedule of Allocation of Proceeds from Letter Agreement (Details) - USD ($) | | 12 Months Ended |
| --- | --- | --- |
| | Sep. 01, 2016 | Dec. 31, 2016 |
| **Next $350 million** | | |
| **Unusual or Infrequent Item [Line Items]** | | |
| Stipulated amount of proceeds, per the Letter Agreement | $ 350,000,000 | $ 350,000,000 |
| **Next $500 million** | | |
| **Unusual or Infrequent Item [Line Items]** | | |
| Stipulated amount of proceeds, per the Letter Agreement | | $ 500,000,000 |
| **All aggregate amounts thereafter** | | |
| **Unusual or Infrequent Item [Line Items]** | | |
| Stipulated amount of proceeds, per the Letter Agreement | $ 850,000,000 | |
| **Leucadia | Amounts due under Leucadia term loan, including fees** | | |
| **Unusual or Infrequent Item [Line Items]** | | |
| Allocation percentage under Letter Agreement of stipulated proceeds | | 100.00% |
| **Leucadia | Next $350 million** | | |
| **Unusual or Infrequent Item [Line Items]** | | |
| Allocation percentage under Letter Agreement of stipulated proceeds | | 45.00% |
| **Leucadia | Next $500 million** | | |
| **Unusual or Infrequent Item [Line Items]** | | |
| Allocation percentage under Letter Agreement of stipulated proceeds | | 79.20% |
| **Leucadia | All aggregate amounts thereafter** | | |
| **Unusual or Infrequent Item [Line Items]** | | |
| Allocation percentage under Letter Agreement of stipulated proceeds | | 51.60% |
| **Holdings | Amounts due under Leucadia term loan, including fees** | | |
| **Unusual or Infrequent Item [Line Items]** | | |
| Allocation percentage under Letter Agreement of stipulated proceeds | | 0.00% |
| **Holdings | Next $350 million** | | |
| **Unusual or Infrequent Item [Line Items]** | | |
| Allocation percentage under Letter Agreement of stipulated proceeds | | 45.00% |
| **Holdings | Next $500 million** | | |
| **Unusual or Infrequent Item [Line Items]** | | |
| Allocation percentage under Letter Agreement of stipulated proceeds | | 8.80% |
| **Holdings | All aggregate amounts thereafter** | | |
| **Unusual or Infrequent Item [Line Items]** | | |
| Allocation percentage under Letter Agreement of stipulated proceeds | | 34.40% |
| **Management | Holdings | Amounts due under Leucadia term loan, including fees** | | |
| **Unusual or Infrequent Item [Line Items]** | | |
| Allocation percentage under Letter Agreement of stipulated proceeds | | 0.00% |
| **Management | Holdings | Next $350 million** | | |
| **Unusual or Infrequent Item [Line Items]** | | |
| Allocation percentage under Letter Agreement of stipulated proceeds | 10.00% | 10.00% |
| **Management | Holdings | Next $500 million** | | |
| **Unusual or Infrequent Item [Line Items]** | | |
| Allocation percentage under Letter Agreement of stipulated proceeds | 12.00% | 12.00% |
| **Management | Holdings | All aggregate amounts thereafter** | | |

| **Unusual or Infrequent Item [Line Items]** | | |
|---|---|---|
| Allocation percentage under Letter Agreement of stipulated proceeds | 14.00% | 14.00% |

XML 109 R91.htm IDEA: XBRL DOCUMENT

| Leucadia Transaction - Credit Agreement Carrying Value (Details) - USD ($) $ in Thousands | Dec. 31, 2016 | Dec. 31, 2015 |
|---|---|---|
| **Debt Instrument [Line Items]** | | |
| Debt — net carrying value | $ 150,516 | $ 147,262 |
| **Credit Agreement** | | |
| **Debt Instrument [Line Items]** | | |
| Debt principal | 154,509 | 192,685 |
| Original issue discount | 7,857 | 35,967 |
| Discount — issuance fee | 1,276 | 5,227 |
| Deferred financing fee | 918 | 3,762 |
| Debt issuance costs | (114) | (467) |
| Embedded derivative — Mandatory prepayment provision | 6,172 | 0 |
| Debt — net carrying value | $ 150,516 | $ 147,262 |

XML 110 R92.htm IDEA: XBRL DOCUMENT

| Leucadia Transaction - Credit Agreement Interest Expense (Details) - USD ($) $ in Thousands | 12 Months Ended | |
|---|---|---|
| | Dec. 31, 2016 | Dec. 31, 2015 |
| **Debt Instrument [Line Items]** | | |
| Amortization of original issue discount — Credit Agreement | $ 28,110 | $ 65,577 |
| Amortization of deferred financing cost | 1,210 | 2,653 |
| **Credit Agreement** | | |
| **Debt Instrument [Line Items]** | | |
| Contractual interest | 33,879 | 27,337 |
| Deferred interest | (3,045) | 5,789 |
| Amortization of original issue discount — Credit Agreement | 28,110 | 65,577 |
| Amortization of issuance fee discount | 3,951 | 8,665 |
| Amortization of deferred financing fee | 2,844 | 6,238 |
| Amortization of deferred financing cost | 353 | 774 |
| Total interest expense | $ 66,092 | $ 114,380 |

XML 111 R93.htm IDEA: XBRL DOCUMENT

| Debt - Additional Information (Details) | Jan. 20, 2015 USD ($) | 1 Months Ended Jun. 30, 2013 USD ($) $ / shares | 12 Months Ended Dec. 31, 2016 USD ($) | Dec. 31, 2015 USD ($) | Jan. 31, 2016 $ / shares | Jan. 24, 2015 |
|---|---|---|---|---|---|---|
| **Debt Instrument [Line Items]** | | | | | | |
| Repayments of lines of credit | | | $ 0 | $ 25,000,000 | | |
| Interest expense, borrowings | | | 77,143,000 | 126,560,000 | | |
| Warrant strike price (in dollars per share) \| $ / shares | | $ 212.4 | | | $ 44.12 | |
| Proceeds from sale of warrants | | $ 18,600,000 | | | | |
| Effective interest rate | | | | | | 7.10% |
| **Convertible Debt** | | | | | | |
| **Debt Instrument [Line Items]** | | | | | | |
| Equity component | | 29,100,000 | | | | |
| **2.25% Senior Convertible Notes** | | | | | | |
| **Debt Instrument [Line Items]** | | | | | | |
| Purchase of convertible note hedges | | (29,100,000) | | | | |
| **2.25% Senior Convertible Notes \| Convertible Debt** | | | | | | |
| **Debt Instrument [Line Items]** | | | | | | |
| Face amount | | $ 172,500,000 | | | | |
| Interest rate | | 2.25% | | | | |
| Proceeds from issuance of senior convertibles notes, net | | $ 166,500,000 | | | | |
| Conversion ratio | | 0.00532992 | | | | |
| Conversion price (in dollars per share) \| $ / shares | | $ 187.62 | | | | |
| Equity component | | | 29,101,000 | 29,101,000 | | |
| Liability component - net carrying value | | $ 144,100,000 | 161,425,000 | 154,255,000 | | |
| Effective interest rate | | 6.20% | | | | |
| Debt issuance cost | | $ 6,000,000 | | | | |
| Unamortized issuance costs | | | $ 1,720,000 | 2,930,000 | | |
| **Revolving Credit Facility** | | | | | | |
| **Debt Instrument [Line Items]** | | | | | | |
| Repayments of lines of credit | $ 25,000,000 | | | | | |
| Interest expense, borrowings | | | | 1,500,000 | | |
| Weighted average dollar amount of borrowings related to the credit agreement | | | | $ 1,300,000 | | |
| Debt, weighted average interest rate | | | | 2.92% | | |
| **Accounting Standards Update 2015-03 \| Other Noncurrent Assets \| 2.25% Senior Convertible Notes \| Convertible Debt** | | | | | | |
| **Debt Instrument [Line Items]** | | | | | | |
| Unamortized issuance costs | | | | $ 2,900,000 | | |

XML 112 R94.htm IDEA: XBRL DOCUMENT

| Debt - Convertible Debt (Details) - USD ($) $ in Thousands | 12 Months Ended | | |
|---|---|---|---|
| | Dec. 31, 2016 | Dec. 31, 2015 | Jun. 30, 2013 |
| **Interest Expense, Debt [Abstract]** | | | |
| Amortization of deferred bond discount | $ 28,110 | $ 65,577 | |
| Amortization of debt issuance cost | 1,210 | 2,653 | |
| **Convertible Debt** | | | |
| **Debt Instrument [Line Items]** | | | |
| Equity component | | | $ 29,100 |
| **2.25% Senior Convertible Notes \| Convertible Debt** | | | |
| **Debt Instrument [Line Items]** | | | |
| Liability component — principal | 172,500 | 172,500 | |
| Deferred bond discount | (9,355) | (15,315) | |
| Deferred Finance Costs, Net | (1,720) | (2,930) | |
| Liability component — net carrying value | 161,425 | 154,255 | $ 144,100 |
| Equity component | 29,101 | 29,101 | |
| **Interest Expense, Debt [Abstract]** | | | |
| Stated coupon rate | 3,881 | 3,881 | |
| Amortization of deferred bond discount | 5,960 | 5,607 | |
| Amortization of debt issuance cost | 1,210 | 1,209 | |
| Total interest expense | $ 11,051 | $ 10,697 | |

XML 113 R95.htm IDEA: XBRL DOCUMENT

| Commitments Commitments - Future Advertising Agreement Payments (Details) - Advertising Services $ in Thousands | Dec. 31, 2016 USD ($) |
|---|---|
| **Long-term Purchase Commitment [Line Items]** | |
| 2017 | $ 3,117 |
| 2018 | 3,281 |
| 2019 | 3,008 |
| Total | $ 9,406 |

XML 114 R96.htm IDEA: XBRL DOCUMENT

| Commitments - Additional Information (Detail) - USD ($) $ in Millions | 1 Months Ended | 12 Months Ended | |
|---|---|---|---|
| | Oct. 31, 2016 | Dec. 31, 2016 | Dec. 31, 2015 |
| **Commitments and Contingencies Disclosure [Line Items]** | | | |
| Operating lease rental expense | | $ 7.3 | $ 6.2 |
| **Minimum** | | | |
| **Commitments and Contingencies Disclosure [Line Items]** | | | |
| Lease renewal options | | 3 years | |
| **Maximum** | | | |
| **Commitments and Contingencies Disclosure [Line Items]** | | | |
| Lease renewal options | | 5 years | |
| **Advertising Services** | | | |
| **Commitments and Contingencies Disclosure [Line Items]** | | | |
| Purchase commitment, period | 3 years | | |
| Advertising expense | | $ 0.4 | |

XML 115 R97.htm IDEA: XBRL DOCUMENT

| Commitments - Future Minimum Lease Payments Under Noncancelable Operating Leases (Detail) $ in Thousands | Dec. 31, 2016 USD ($) |
|---|---|
| **Operating Leases, Future Minimum Payments Due, Fiscal Year Maturity [Abstract]** | |
| 2017 | $ 6,468 |
| 2018 | 4,768 |
| 2019 | 4,633 |
| 2020 | 3,372 |
| 2021 | 3,390 |
| Thereafter | 13,146 |
| Total | $ 35,777 |

XML 116 R98.htm IDEA: XBRL DOCUMENT

| Derivative Financial Instruments - Offsetting Assets and Liabilities (Details) - USD ($) $ in Thousands | Dec. 31, 2016 | Dec. 31, 2015 |
|---|---|---|
| **Derivative Assets** | | |
| Gross fair values | $ 8,478 | $ 10,921 |
| Netting agreements | (4,854) | (8,909) |
| Net fair values | 3,624 | 2,012 |
| Notional | 899,418 | 920,074 |
| **Derivative Liabilities** | | |
| Gross fair values | (5,945) | (8,943) |
| Netting agreements | (4,854) | (8,909) |
| Net fair values | (1,091) | (34) |
| Notional | 796,854 | 1,164,557 |
| **Discontinued Operations** | | |
| **Derivative Assets** | | |
| Gross fair values | 4,300 | 9,700 |
| Netting agreements | (2,700) | (8,800) |
| **Derivative Liabilities** | | |
| Gross fair values | (2,700) | (8,800) |
| Netting agreements | (2,700) | (8,800) |
| **Continuing Operations** | | |
| **Derivative Assets** | | |
| Gross fair values | 4,200 | 1,200 |
| Netting agreements | (2,200) | (100) |
| **Derivative Liabilities** | | |
| Gross fair values | (3,300) | (100) |
| Netting agreements | (2,200) | (100) |
| **Exchange traded options** | | |
| **Derivative Assets** | | |
| Gross fair values | 3,209 | 6,503 |
| Notional | 10,562 | 15,399 |
| **Derivative Liabilities** | | |
| Gross fair values | 0 | (5,805) |
| Notional | 0 | 18,282 |
| **CFD contracts** | | |
| **Derivative Assets** | | |
| Gross fair values | 131 | 206 |
| Notional | 24,286 | 109,715 |
| **Derivative Liabilities** | | |
| Gross fair values | 0 | (36) |
| Notional | 0 | 99,036 |
| **Futures contracts** | | |
| **Derivative Assets** | | |
| Gross fair values | 4,868 | 4,212 |
| Notional | 839,975 | 794,960 |
| **Derivative Liabilities** | | |
| Gross fair values | (5,720) | (3,102) |
| Notional | 763,605 | $ 1,047,239 |
| **OTC options** | | |
| **Derivative Assets** | | |
| Gross fair values | 270 | |
| Notional | 24,595 | |
| **Derivative Liabilities** | | |
| Gross fair values | (225) | |
| Notional | $ 33,249 | |

XML 117 R99.htm IDEA: XBRL DOCUMENT

| Derivative Financial Instruments - Gains and (Losses) on Derivative Instruments (Details) - USD ($) $ in Thousands | 12 Months Ended | |
|---|---|---|
| | Dec. 31, 2016 | Dec. 31, 2015 |
| **Derivative [Line Items]** | | |
| Gain (loss) on derivative | $ (50,942) | $ 49,978 |
| **Income (Loss) from Continuing Operations** | | |
| **Derivative [Line Items]** | | |
| Gain (loss) on derivative | (60,700) | 31,200 |
| **Exchange traded options** | | |
| **Derivative [Line Items]** | | |
| Gain (loss) on derivative | 2,463 | 8,573 |
| **CFD contracts** | | |
| **Derivative [Line Items]** | | |
| Gain (loss) on derivative | (749) | (9,166) |
| **Futures contracts** | | |
| **Derivative [Line Items]** | | |
| Gain (loss) on derivative | (52,687) | 49,485 |
| **OTC options** | | |
| **Derivative [Line Items]** | | |
| Gain (loss) on derivative | $ 31 | $ 1,086 |

XML 118 R100.htm IDEA: XBRL DOCUMENT

| Fair Value Measurements - Assets and Liabilities Measured at Fair Value on a Recurring Basis (Details) - USD ($) $ in Thousands | Dec. 31, 2016 | Dec. 31, 2015 |
|---|---|---|
| **Financial Assets:** | | |
| Derivative asset, fair value, gross asset | $ 8,478 | $ 10,921 |
| Derivative asset, fair value, gross liability | (4,854) | (8,909) |
| Derivative asset, fair value, amount not offset against collateral | 3,624 | 2,012 |
| **Financial Liabilities:** | | |
| Derivative liability, fair value, gross liablity | 5,945 | 8,943 |
| Derivative liability, fair value, gross asset | (4,854) | (8,909) |
| Derivative liability, fair value, amount not offset against collateral | 1,091 | 34 |
| Notional amount of open FX customer assets | 899,418 | 920,074 |
| Notional amount of open FX customer liabilities | 796,854 | 1,164,557 |
| **Open FX Positions** | | |
| **Financial Liabilities:** | | |
| Notional amount of open FX customer assets | 2,000,000 | 2,500,000 |
| Notional amount of open FX customer liabilities | 2,700,000 | 2,500,000 |
| Net notional amount of open FX positions | 2,100,000 | 2,200,000 |
| **Exchange traded options** | | |
| **Financial Assets:** | | |
| Derivative asset, fair value, gross asset | 3,209 | 6,503 |
| **Financial Liabilities:** | | |
| Derivative liability, fair value, gross liablity | 0 | 5,805 |
| Notional amount of open FX customer assets | 10,562 | 15,399 |
| Notional amount of open FX customer liabilities | 0 | 18,282 |
| **Futures contracts** | | |
| **Financial Assets:** | | |
| Derivative asset, fair value, gross asset | 4,868 | 4,212 |
| **Financial Liabilities:** | | |
| Derivative liability, fair value, gross liablity | 5,720 | 3,102 |
| Notional amount of open FX customer assets | 839,975 | 794,960 |
| Notional amount of open FX customer liabilities | 763,605 | 1,047,239 |
| **CFD contracts** | | |
| **Financial Assets:** | | |
| Derivative asset, fair value, gross asset | 131 | 206 |
| **Financial Liabilities:** | | |
| Derivative liability, fair value, gross liablity | 0 | 36 |
| Notional amount of open FX customer assets | 24,286 | 109,715 |
| Notional amount of open FX customer liabilities | 0 | 99,036 |
| **OTC options** | | |
| **Financial Assets:** | | |
| Derivative asset, fair value, gross asset | 270 | |
| **Financial Liabilities:** | | |
| Derivative liability, fair value, gross liablity | 225 | |
| Notional amount of open FX customer assets | 24,595 | |
| Notional amount of open FX customer liabilities | 33,249 | |
| **Level 1** | | |
| **Financial Assets:** | | |
| Total assets | 0 | 0 |
| **Financial Liabilities:** | | |
| Total liablities | 0 | 0 |
| **Level 2** | | |
| **Financial Assets:** | | |
| Total assets | 24,019 | 32,658 |
| **Financial Liabilities:** | | |
| Total liabilities | 95,300 | 122,226 |
| **Level 3** | | |

| | | |
|---|---:|---:|
| **Financial Assets:** | | |
| Total assets | 0 | 7,881 |
| **Financial Liabilities:** | | |
| Total liabilities | 148,813 | 192,685 |
| **Fair Value, Measurements, Recurring** | | |
| **Financial Assets:** | | |
| Derivative asset, fair value, gross liability | (4,854) | (8,909) |
| Derivative asset, fair value, amount not offset against collateral | 3,624 | 2,012 |
| Total assets | 5,822 | 2,012 |
| **Financial Liabilities:** | | |
| Customer account liabilities | 661,936 | 685,043 |
| Mandatory Prepayment Provision — Credit Agreement | 6,172 | |
| Derivative liability, fair value, gross asset | (4,854) | (8,909) |
| Derivative liability, fair value, amount not offset against collateral | 1,091 | 34 |
| Securities sold, not yet purchased | | 3,624 |
| Total liabilities | 669,199 | 1,137,159 |
| **Fair Value, Measurements, Recurring \| U.S. Treasury Bills** | | |
| **Financial Assets:** | | |
| Derivative asset, fair value, gross asset | 2,198 | |
| **Fair Value, Measurements, Recurring \| Exchange traded options** | | |
| **Financial Assets:** | | |
| Derivative asset, fair value, gross asset | 3,209 | 6,503 |
| **Financial Liabilities:** | | |
| Derivative liability, fair value, gross liability | | 5,805 |
| **Fair Value, Measurements, Recurring \| Futures contracts** | | |
| **Financial Assets:** | | |
| Derivative asset, fair value, gross asset | 4,868 | 4,212 |
| **Financial Liabilities:** | | |
| Derivative liability, fair value, gross liability | 5,720 | 3,102 |
| **Fair Value, Measurements, Recurring \| CFD contracts** | | |
| **Financial Assets:** | | |
| Derivative asset, fair value, gross asset | 131 | 206 |
| **Financial Liabilities:** | | |
| Derivative liability, fair value, gross liability | | 36 |
| **Fair Value, Measurements, Recurring \| OTC options** | | |
| **Financial Assets:** | | |
| Derivative asset, fair value, gross asset | 270 | |
| **Financial Liabilities:** | | |
| Derivative liability, fair value, gross liability | 225 | |
| **Fair Value, Measurements, Recurring \| Letter Agreement** | | |
| **Financial Liabilities:** | | |
| Derivative liability, fair value, gross liability | | 448,458 |
| **Fair Value, Measurements, Recurring \| Counterparty and Cash Collateral Netting** | | |
| **Financial Assets:** | | |
| Derivative asset, fair value, gross liability | (4,854) | (8,909) |
| **Financial Liabilities:** | | |
| Mandatory Prepayment Provision — Credit Agreement | 0 | |
| Derivative liability, fair value, gross asset | (4,854) | (8,909) |
| **Fair Value, Measurements, Recurring \| Level 1** | | |
| **Financial Assets:** | | |
| Derivative asset, fair value, gross asset | 8,077 | 10,715 |
| Total assets | 10,275 | 10,715 |
| **Financial Liabilities:** | | |
| Customer account liabilities | 0 | 0 |
| Derivative liability, fair value, gross liability | 5,720 | 8,907 |
| Mandatory Prepayment Provision — Credit Agreement | 0 | |
| Securities sold, not yet purchased | | 3,624 |
| Total liabilities | 5,720 | 12,531 |

| | | |
|---|---|---|
| **Fair Value, Measurements, Recurring \| Level 1 \| U.S. Treasury Bills** | | |
| **Financial Assets:** | | |
| Derivative asset, fair value, gross asset | 2,198 | |
| **Fair Value, Measurements, Recurring \| Level 1 \| Exchange traded options** | | |
| **Financial Assets:** | | |
| Derivative asset, fair value, gross asset | 3,209 | 6,503 |
| **Financial Liabilities:** | | |
| Derivative liability, fair value, gross liability | | 5,805 |
| **Fair Value, Measurements, Recurring \| Level 1 \| Futures contracts** | | |
| **Financial Assets:** | | |
| Derivative asset, fair value, gross asset | 4,868 | 4,212 |
| **Financial Liabilities:** | | |
| Derivative liability, fair value, gross liability | 5,720 | 3,102 |
| **Fair Value, Measurements, Recurring \| Level 1 \| CFD contracts** | | |
| **Financial Assets:** | | |
| Derivative asset, fair value, gross asset | 0 | 0 |
| **Financial Liabilities:** | | |
| Derivative liability, fair value, gross liability | | 0 |
| **Fair Value, Measurements, Recurring \| Level 1 \| OTC options** | | |
| **Financial Assets:** | | |
| Derivative asset, fair value, gross asset | 0 | |
| **Fair Value, Measurements, Recurring \| Level 1 \| Letter Agreement** | | |
| **Financial Liabilities:** | | |
| Derivative liability, fair value, gross liability | | 0 |
| **Fair Value, Measurements, Recurring \| Level 2** | | |
| **Financial Assets:** | | |
| Derivative asset, fair value, gross asset | 401 | 206 |
| Total assets | 401 | 206 |
| **Financial Liabilities:** | | |
| Customer account liabilities | 661,936 | 685,043 |
| Derivative liability, fair value, gross liability | 225 | 36 |
| Mandatory Prepayment Provision — Credit Agreement | 0 | |
| Securities sold, not yet purchased | | 0 |
| Total liabilities | 662,161 | 685,079 |
| **Fair Value, Measurements, Recurring \| Level 2 \| U.S. Treasury Bills** | | |
| **Financial Assets:** | | |
| Derivative asset, fair value, gross asset | 0 | |
| **Fair Value, Measurements, Recurring \| Level 2 \| Exchange traded options** | | |
| **Financial Assets:** | | |
| Derivative asset, fair value, gross asset | 0 | 0 |
| **Financial Liabilities:** | | |
| Derivative liability, fair value, gross liability | | 0 |
| **Fair Value, Measurements, Recurring \| Level 2 \| Futures contracts** | | |
| **Financial Assets:** | | |
| Derivative asset, fair value, gross asset | 0 | 0 |
| **Financial Liabilities:** | | |
| Derivative liability, fair value, gross liability | 0 | 0 |
| **Fair Value, Measurements, Recurring \| Level 2 \| CFD contracts** | | |
| **Financial Assets:** | | |
| Derivative asset, fair value, gross asset | 131 | 206 |
| **Financial Liabilities:** | | |
| Derivative liability, fair value, gross liability | | 36 |
| **Fair Value, Measurements, Recurring \| Level 2 \| OTC options** | | |
| **Financial Assets:** | | |
| Derivative asset, fair value, gross asset | 270 | |
| **Financial Liabilities:** | | |
| Derivative liability, fair value, gross liability | 225 | |

| | | |
|---|---|---|
| **Fair Value, Measurements, Recurring \| Level 2 \| Letter Agreement** | | |
| **Financial Liabilities:** | | |
| Derivative liability, fair value, gross liability | | 0 |
| **Fair Value, Measurements, Recurring \| Level 3** | | |
| **Financial Assets:** | | |
| Derivative asset, fair value, gross asset | 0 | 0 |
| Total assets | 0 | 0 |
| **Financial Liabilities:** | | |
| Customer account liabilities | 0 | 0 |
| Derivative liability, fair value, gross liability | 0 | 0 |
| Mandatory Prepayment Provision — Credit Agreement | 6,172 | |
| Securities sold, not yet purchased | | 0 |
| Total liabilities | 6,172 | 448,458 |
| **Fair Value, Measurements, Recurring \| Level 3 \| U.S. Treasury Bills** | | |
| **Financial Assets:** | | |
| Derivative asset, fair value, gross asset | 0 | |
| **Fair Value, Measurements, Recurring \| Level 3 \| Exchange traded options** | | |
| **Financial Assets:** | | |
| Derivative asset, fair value, gross asset | 0 | 0 |
| **Financial Liabilities:** | | |
| Derivative liability, fair value, gross liability | | 0 |
| **Fair Value, Measurements, Recurring \| Level 3 \| Futures contracts** | | |
| **Financial Assets:** | | |
| Derivative asset, fair value, gross asset | 0 | 0 |
| **Financial Liabilities:** | | |
| Derivative liability, fair value, gross liability | 0 | 0 |
| **Fair Value, Measurements, Recurring \| Level 3 \| CFD contracts** | | |
| **Financial Assets:** | | |
| Derivative asset, fair value, gross asset | $ 0 | 0 |
| **Financial Liabilities:** | | |
| Derivative liability, fair value, gross liability | | 0 |
| **Fair Value, Measurements, Recurring \| Level 3 \| Letter Agreement** | | |
| **Financial Liabilities:** | | |
| Derivative liability, fair value, gross liability | | $ 448,458 |

XML 119 R101.htm IDEA: XBRL DOCUMENT

| Fair Value Measurements - Significant Level 3 Inputs (Details) - Option-Pricing Method | 8 Months Ended | 12 Months Ended |
|---|---|---|
| | Aug. 31, 2016 | Dec. 31, 2015 |
| **Fair Value Measurements, Recurring and Nonrecurring, Valuation Techniques [Line Items]** | | |
| Term (years) | 1 year 9 months 18 days | 2 years 6 months 12 days |
| Volatility | 131.10% | 79.10% |
| Risk-free rate | 0.80% | 1.20% |
| Dividend yield | 0.00% | 0.00% |
| Reliance placed on public indication of value | 100.00% | 100.00% |

XML 120 R102.htm IDEA: XBRL DOCUMENT

| Fair Value Measurements - Fair Value by Balance Sheet Groupings (Details) - USD ($) $ in Thousands | Dec. 31, 2016 | Dec. 31, 2015 |
|---|---|---|
| **Level 1** | | |
| **Financial Assets:** | | |
| Due from brokers — unsettled spot FX | $ 0 | $ 0 |
| Due from brokers — unsettled common stock | | 0 |
| Due from brokers — excess cash collateral | 0 | 0 |
| Equity method investments | 0 | 0 |
| Notes receivable | | 0 |
| Exchange memberships | 0 | 0 |
| Total assets | 0 | 0 |
| **Financial Liabilities:** | | |
| Due to brokers — unsettled spot FX | 0 | 0 |
| Senior convertible notes | 0 | 0 |
| Note payable | 0 | 0 |
| Total liabilities | 0 | 0 |
| **Level 2** | | |
| **Financial Assets:** | | |
| Due from brokers — unsettled spot FX | 1,600 | 2,939 |
| Due from brokers — unsettled common stock | | 3,054 |
| Due from brokers — excess cash collateral | 12,229 | 18,010 |
| Equity method investments | 0 | 0 |
| Notes receivable | | 0 |
| Exchange memberships | 10,190 | 8,655 |
| Total assets | 24,019 | 32,658 |
| **Financial Liabilities:** | | |
| Due to brokers — unsettled spot FX | 425 | 1,039 |
| Senior convertible notes | 94,875 | 121,187 |
| Note payable | 0 | 0 |
| Total liabilities | 95,300 | 122,226 |
| **Level 3** | | |
| **Financial Assets:** | | |
| Due from brokers — unsettled spot FX | 0 | 0 |
| Due from brokers — unsettled common stock | | 0 |
| Due from brokers — excess cash collateral | 0 | 0 |
| Equity method investments | 10,534 | 19,043 |
| Notes receivable | | 7,881 |
| Exchange memberships | 0 | 0 |
| Total assets | 0 | 7,881 |
| **Financial Liabilities:** | | |
| Due to brokers — unsettled spot FX | 0 | 0 |
| Senior convertible notes | 0 | 0 |
| Note payable | 148,813 | 192,685 |
| Total liabilities | 148,813 | 192,685 |
| **Carrying Value** | | |
| **Financial Assets:** | | |
| Due from brokers — unsettled spot FX | 1,600 | 2,939 |
| Due from brokers — unsettled common stock | | 3,054 |
| Due from brokers — excess cash collateral | 12,229 | 18,010 |
| Equity method investments | 4,582 | 8,273 |
| Notes receivable | | 7,881 |
| Exchange memberships | 9,434 | 9,434 |
| Total assets | 23,263 | 41,318 |
| **Financial Liabilities:** | | |
| Due to brokers — unsettled spot FX | 425 | 1,039 |
| Senior convertible notes | 161,425 | 157,185 |
| Note payable | 150,516 | 147,729 |
| Total liabilities | 312,366 | 305,953 |
| **Fair Value** | | |
| **Financial Assets:** | | |
| Due from brokers — unsettled spot FX | 1,600 | 2,939 |
| Due from brokers — unsettled common stock | | 3,054 |
| Due from brokers — excess cash collateral | 12,229 | 18,010 |
| Equity method investments | 10,534 | 19,043 |
| Notes receivable | | 7,881 |
| Exchange memberships | 10,190 | 8,655 |

| | | |
|---|---:|---:|
| Total assets | 24,019 | 40,539 |
| **Financial Liabilities:** | | |
| Due to brokers — unsettled spot FX | 425 | 1,039 |
| Senior convertible notes | 94,875 | 121,187 |
| Note payable | 148,813 | 192,685 |
| Total liabilities | $ 244,113 | $ 314,911 |

XML 121 R103.htm IDEA: XBRL DOCUMENT

| Fair Value Measurements - Significant Unobservable Inputs Reconciliation (Details) - USD ($) $ in Thousands | 12 Months Ended | |
|---|---|---|
| | Dec. 31, 2016 | Dec. 31, 2015 |
| **Fair Value, Liabilities Measured on Recurring Basis, Unobservable Input Reconciliation, Calculation [Roll Forward]** | | |
| Beginning balance | $ 448,458 | |
| Net Unrealized/Realized (Gain) Loss | (206,777) | |
| Fair Value, Measurement with Unobservable Inputs Reconciliation, Recurring Basis, Liability, Purchases, (Sales), Issuances, (Settlements) | (235,509) | |
| Ending balance | 6,172 | $ 448,458 |
| **Letter Agreement** | | |
| **Fair Value, Liabilities Measured on Recurring Basis, Unobservable Input Reconciliation, Calculation [Roll Forward]** | | |
| Beginning balance | 448,458 | 0 |
| Net Unrealized/Realized (Gain) Loss | (212,949) | 354,022 |
| Fair Value, Measurement with Unobservable Inputs Reconciliation, Recurring Basis, Liability, Purchases, (Sales), Issuances, (Settlements) | (235,509) | 94,436 |
| Ending balance | 0 | 448,458 |
| **Mandatory Prepayment Provision** | | |
| **Fair Value, Liabilities Measured on Recurring Basis, Unobservable Input Reconciliation, Calculation [Roll Forward]** | | |
| Beginning balance | 0 | |
| Net Unrealized/Realized (Gain) Loss | 6,172 | |
| Fair Value, Measurement with Unobservable Inputs Reconciliation, Recurring Basis, Liability, Purchases, (Sales), Issuances, (Settlements) | 0 | |
| Ending balance | $ 6,172 | $ 0 |

XML 122 R104.htm IDEA: XBRL DOCUMENT

| Fair Value Measurements Fair Value Measurements - Additional Information (Details) - USD ($) $ / shares in Units, $ in Millions | 12 Months Ended | |
|---|---|---|
| | Dec. 31, 2016 | Aug. 31, 2016 |
| **Fair Value, Assets Measured on Recurring Basis, Unobservable Input Reconciliation [Line Items]** | | |
| Share price | | $ 9.33 |
| **Mandatory Prepayment Provision** | | |
| **Fair Value, Assets Measured on Recurring Basis, Unobservable Input Reconciliation [Line Items]** | | |
| Extension of maturity date term | 1 year | |
| Recovery rate | 53.40% | |
| Sensitivity analysis, effect of 5% increase in recovery rate, decrease in fair value | $ 2.7 | |
| Sensitivity analysis, effect of 5% increase in recovery rate, increase in fair value | $ 2.6 | |

XML 123 R105.htm IDEA: XBRL DOCUMENT

| Income Taxes - Income from Continuing Operations Before Income Taxes (Details) - USD ($) $ in Thousands | 12 Months Ended | |
|---|---|---|
| | Dec. 31, 2016 | Dec. 31, 2015 |
| **Income Tax Disclosure [Abstract]** | | |
| Domestic | $ 100,414 | $ (628,527) |
| Foreign | 62,156 | (4,778) |
| Income tax provision | $ 162,570 | $ (633,305) |

XML 124 R106.htm IDEA: XBRL DOCUMENT

| Income Taxes - Provision for Income Taxes (Details) - USD ($) $ in Thousands | 12 Months Ended | |
|---|---|---|
| | Dec. 31, 2016 | Dec. 31, 2015 |
| **Deferred** | | |
| Subtotal | $ (781) | $ 187,978 |
| Total provision for taxes attributable to continuing operations | 777 | 181,198 |
| **Continuing Operations** | | |
| **Current** | | |
| Federal income tax benefit | 0 | (176) |
| State and local tax benefit | (34) | (11) |
| Foreign income tax expense (benefit) | 1,592 | (412) |
| Subtotal | 1,558 | (599) |
| **Deferred** | | |
| Federal income tax | 0 | 172,618 |
| State and local income tax | 0 | 7,474 |
| Foreign income tax (benefit) expense | (781) | 1,705 |
| Subtotal | (781) | 181,797 |
| Total provision for taxes attributable to continuing operations | $ 777 | $ 181,198 |

XML 125 R107.htm IDEA: XBRL DOCUMENT

| Income Taxes - Reconciles Provision for Taxes (Detail) | 12 Months Ended | |
|---|---|---|
| | Dec. 31, 2016 | Dec. 31, 2015 |
| **Income Tax Disclosure [Abstract]** | | |
| Statutory U.S. federal income tax rate | 34.00% | 34.00% |
| Income passed through to non-controlling members | (10.60%) | (17.00%) |
| State and local income tax | 2.10% | 1.30% |
| Foreign income tax | (0.30%) | (1.10%) |
| Tax Receivable Agreement true-up | 0.00% | 7.80% |
| Loss on liquidation of subsidiary | (1.40%) | 0.00% |
| Non-deductible penalty | 1.10% | 0.00% |
| Valuation allowance | (27.10%) | (50.90%) |
| Non-deductible interest | 2.30% | (2.30%) |
| Other | (0.40%) | 0.40% |
| Effective tax rate | 0.50% | (28.60%) |

XML 126 R108.htm IDEA: XBRL DOCUMENT

| Income Taxes - Tax Effects of Temporary Differences (Detail) - USD ($) $ in Thousands | Dec. 31, 2016 | Dec. 31, 2015 |
|---|---|---|
| **Deferred tax assets** | | |
| Equity-based compensation | $ 294 | $ 336 |
| Investment in partnership | 190,844 | 277,775 |
| Fixed assets | 0 | 747 |
| Tax loss carryforwards | 125,898 | 120,580 |
| Intangible assets | 679 | 302 |
| Tax credit carryforward/foreign sub income | 4,539 | 5,090 |
| Gain/(Loss) on derivative liability — Letter Agreement | 0 | 3,067 |
| Other | 1,072 | 491 |
| Gross deferred tax assets | 323,326 | 408,388 |
| Less: valuation allowance | (322,201) | (407,590) |
| Net deferred tax asset | 1,125 | 798 |
| **Deferred tax liabilities** | | |
| Fixed assets | 28 | 5 |
| Intangible assets | 228 | 714 |
| Software development cost | 171 | 245 |
| Other | 583 | 539 |
| Gross deferred tax liabilities | 1,010 | 1,503 |
| Net deferred tax liability | | $ (705) |
| Net deferred tax asset | $ 115 | |

XML 127 R109.htm IDEA: XBRL DOCUMENT

| Income Taxes - Additional Information (Detail) - USD ($) $ in Thousands | 12 Months Ended | |
|---|---|---|
| | Dec. 31, 2016 | Dec. 31, 2015 |
| **Income Tax Contingency [Line Items]** | | |
| Increase in valuation allowance during period | $ (85,400) | |
| Income tax payable | 920 | $ 1,375 |
| Tax receivable | 200 | $ 1,800 |
| **Research and Development Credit** | | |
| **Income Tax Contingency [Line Items]** | | |
| Tax credit carryforward | $ 500 | |
| Tax credit carryforward, period | 10 years | |
| **Domestic Tax Authority** | | |
| **Income Tax Contingency [Line Items]** | | |
| Operating loss carry forwards, foreign | $ 258,700 | |
| **Foreign Tax Authority** | | |
| **Income Tax Contingency [Line Items]** | | |
| Operating loss carry forwards, foreign | 480,100 | |
| Tax credit carryforward | $ 3,500 | |
| Tax credit carryforward, period | 10 years | |
| **State and Local Jurisdiction \| Unincorporated Business Tax Credit** | | |
| **Income Tax Contingency [Line Items]** | | |
| Tax credit carryforward | $ 500 | |
| Tax credit carryforward, period | 7 years | |

XML 128 R110.htm IDEA: XBRL DOCUMENT

| Income Taxes - Reconciliation of Unrecognized Tax Benefits (Detail) - USD ($) $ in Thousands | 12 Months Ended | |
|---|---|---|
| | Dec. 31, 2016 | Dec. 31, 2015 |
| **Reconciliation of Unrecognized Tax Benefits, Excluding Amounts Pertaining to Examined Tax Returns [Roll Forward]** | | |
| Beginning balance | $ 390 | $ 409 |
| Gross increases – tax positions in prior period | 36 | 0 |
| Gross decreases – tax positions in prior period | 0 | (137) |
| Gross increases – tax positions in current period | 166 | 118 |
| Lapse of statute of limitations | (51) | 0 |
| Ending balance | $ 541 | $ 390 |

XML 129 R111.htm IDEA: XBRL DOCUMENT

| Foreign Currencies and Concentrations of Credit Risk (Details) $ in Thousands | 12 Months Ended | |
|---|---|---|
| | Dec. 31, 2016 USD ($) bank financial_institution | Dec. 31, 2015 USD ($) bank financial_institution |
| **Concentration Risk [Line Items]** | | |
| Losses from negative customer accounts | $ 2,500 | $ 500 |
| Due from brokers, including discontinued operations | 17,500 | 26,000 |
| Due from brokers | 3,363 | 3,781 |
| **Continuing Operations** | | |
| **Concentration Risk [Line Items]** | | |
| Due from brokers | $ 3,400 | $ 3,800 |
| **Due from Brokers \| Customer Concentration Risk** | | |
| **Concentration Risk [Line Items]** | | |
| Concentration risk, percentage | 89.80% | 94.70% |
| Number of large financial institutions \| financial_institution | 3 | 3 |
| **Cash and Cash Equivalents \| Cash Concentration Risk** | | |
| **Concentration Risk [Line Items]** | | |
| Number of banks \| bank | 3 | 5 |

XML 130 R112.htm IDEA: XBRL DOCUMENT

| Segment Information - Company's Operations by Geographical Reportable Segment (Details) - USD ($) $ in Thousands | 12 Months Ended | |
|---|---|---|
| | Dec. 31, 2016 | Dec. 31, 2015 |
| **Segment Reporting, Asset Reconciling Item [Line Items]** | | |
| Trading Revenue from Continuing Operations | $ 276,000 | $ 250,042 |
| **U.S.** | | |
| **Segment Reporting, Asset Reconciling Item [Line Items]** | | |
| Trading Revenue from Continuing Operations | $ 37,002 | $ 35,413 |
| **U.S. | Trading Revenue | Geographic Concentration Risk** | | |
| **Segment Reporting, Asset Reconciling Item [Line Items]** | | |
| Concentration risk, percentage | 13.40% | 14.20% |
| **Asia** | | |
| **Segment Reporting, Asset Reconciling Item [Line Items]** | | |
| Trading Revenue from Continuing Operations | $ 108,905 | $ 98,147 |
| **Europe, Middle East and North Africa** | | |
| **Segment Reporting, Asset Reconciling Item [Line Items]** | | |
| Trading Revenue from Continuing Operations | 103,375 | 86,723 |
| **Rest of World** | | |
| **Segment Reporting, Asset Reconciling Item [Line Items]** | | |
| Trading Revenue from Continuing Operations | 21,421 | 20,329 |
| **Other** | | |
| **Segment Reporting, Asset Reconciling Item [Line Items]** | | |
| Trading Revenue from Continuing Operations | $ 5,297 | $ 9,430 |
| **China | Trading Revenue | Geographic Concentration Risk** | | |
| **Segment Reporting, Asset Reconciling Item [Line Items]** | | |
| Concentration risk, percentage | 30.30% | 27.40% |

XML 131 R113.htm IDEA: XBRL DOCUMENT

| Litigation - Additional Information (Details) | Feb. 13, 2017 USD ($) | Feb. 06, 2017 USD ($) | Oct. 19, 2016 USD ($) | Jun. 15, 2015 USD ($) | 1 Months Ended | | | | 12 Months Ended | Jan. 15, 2015 |
| | | | | | Jun. 30, 2016 USD ($) | Sep. 30, 2015 USD ($) | Feb. 28, 2015 USD ($) | Jan. 31, 2014 USD ($) | Dec. 31, 2016 USD ($) | |
|---|---|---|---|---|---|---|---|---|---|---|
| **Loss Contingencies [Line Items]** | | | | | | | | | | |
| Range of loss, minimum | | | | | | | | | $ 0 | |
| Range of loss, maximum | | | | | | | | | 1,600,000 | |
| **Swiss National Bank** | | | | | | | | | | |
| **Loss Contingencies [Line Items]** | | | | | | | | | | |
| Currency floor of EUR/CHF | | | | | | | | | | 1.2 |
| **HK | Securities and Futures Commission** | | | | | | | | | | |
| **Loss Contingencies [Line Items]** | | | | | | | | | | |
| Contingency accrual payments | | | $ 1,500,000 | | | | | | | |
| Contingency accrual fine | | | $ 500,000 | | | | | | | |
| Loss contingency accrual | | | | | | | | | 2,000,000 | |
| **Texas Securities Act | Minimum** | | | | | | | | | | |
| **Loss Contingencies [Line Items]** | | | | | | | | | | |
| Damages claimed | | | | | | | | $ 3,800,000 | | |
| **US vs Revelation Forex Fund, Kevin G. White, and Related Entities | US** | | | | | | | | | | |
| **Loss Contingencies [Line Items]** | | | | | | | | | | |
| Damages claimed | | | | $ 2,000,000 | | | | | | |
| Settlement amount | | | | | $ 2,300,000 | | | | 2,300,000 | |
| **U.S. Commodity Futures Trading Commission v. Forex Capital Markets, LLC** | | | | | | | | | | |
| **Loss Contingencies [Line Items]** | | | | | | | | | | |
| Litigation settlement expense | | | | | | | | | 700,000 | |
| **Restitution to Affected Clients | FSL | Settlement with FCA** | | | | | | | | | | |
| **Loss Contingencies [Line Items]** | | | | | | | | | | |
| Settlement amount | | | | | | | | $ 700,000 | 7,000,000 | |
| **US vs Commodity Futures Trading Commission** | | | | | | | | | | |
| **Loss Contingencies [Line Items]** | | | | | | | | | | |
| Litigation settlement expense | | | | | | | | | $ 700,000 | |
| **US vs Commodity Futures Trading Commission | US** | | | | | | | | | | |
| **Loss Contingencies [Line Items]** | | | | | | | | | | |
| Settlement amount | | | | | | $ 700,000 | | | | |
| Disgorged commissions and fees | | | | | | $ 100,000 | | | | |
| **Subsequent Event | U.S. Commodity Futures Trading Commission v. Forex Capital Markets, LLC** | | | | | | | | | | |
| **Loss Contingencies [Line Items]** | | | | | | | | | | |
| Settlement amount | $ 700,000 | $ 7,000,000 | | | | | | | | |

XML 132 R114.htm IDEA: XBRL DOCUMENT

| Subsequent Events - Additional Information (Detail) $ in Millions | Mar. 17, 2017 USD ($) | Feb. 16, 2017 USD ($) | Feb. 13, 2017 USD ($) | Feb. 06, 2017 USD ($) employee | 12 Months Ended | |
| | | | | | Dec. 31, 2016 USD ($) | Feb. 22, 2017 USD ($) |
|---|---|---|---|---|---|---|
| **U.S. Commodity Futures Trading Commission v. Forex Capital Markets, LLC** | | | | | | |
| **Subsequent Event [Line Items]** | | | | | | |
| Litigation settlement expense | | | | | $ 0.7 | |
| **U.S. Commodity Futures Trading Commission v. Forex Capital Markets, LLC | Subsequent Event** | | | | | | |
| **Subsequent Event [Line Items]** | | | | | | |
| Settlement amount | | | $ (0.7) | $ (7.0) | | |
| Payments for legal settlement | | $ 7.0 | | | | |
| **US vs Commodity Futures Trading Commission** | | | | | | |
| **Subsequent Event [Line Items]** | | | | | | |
| Litigation settlement expense | | | | | $ 0.7 | |
| **Company's Withdrawal from Business in the U.S. | Subsequent Event** | | | | | | |
| **Subsequent Event [Line Items]** | | | | | | |
| Number of terminated employees | employee | | | | 150 | | |
| Reduction in workforce (as a percentage) | | | | 19.00% | | |
| **Company's Withdrawal from Business in the U.S. | Minimum | Subsequent Event** | | | | | | |
| **Subsequent Event [Line Items]** | | | | | | |
| Expected restructuring cost | | | | $ 4.0 | | |
| **Company's Withdrawal from Business in the U.S. | Maximum | Subsequent Event** | | | | | | |
| **Subsequent Event [Line Items]** | | | | | | |
| Expected restructuring cost | | | | 5.0 | | |
| **Revolving Credit Facility | Subsequent Event** | | | | | | |
| **Subsequent Event [Line Items]** | | | | | | |
| Total principal oustanding related to Credit Agreement | | | | | | $ 158.0 |
| **Revolving Credit Facility | U.S. Commodity Futures Trading Commission v. Forex Capital Markets, LLC | Subsequent Event** | | | | | | |
| **Subsequent Event [Line Items]** | | | | | | |
| Outstanding balance increase on credit agreement | | | | $ 3.5 | | |
| **Medium-term Notes | Subsequent Event** | | | | | | |
| **Subsequent Event [Line Items]** | | | | | | |
| Repayments of long-term debt | $ 30.0 | | | | | |