# Exhibit 23

**UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF ILLINOIS**
**EASTERN DIVISION**

| | |
|---|---|
| EFFEX CAPITAL, LLC and JOHN DITTAMI, | |
| Plaintiffs, | |
| v. | Case No. 17 Civ. |
| NATIONAL FUTURES ASSOCIATION, JOHN DOES 1-5, and JANE DOES 1-5, | |
| Defendants. | |

## AFFIDAVIT OF JOHN DITTAMI

State of Florida    )
                    )    ss:
County of Palm Beach)

John Dittami, being duly sworn, deposes and says as follows:

1.      I am the individual plaintiff in this action, managing member of plaintiff Effex Capital, LLC ("Effex") and am submitting this affidavit in support of Plaintiffs' Application for a Preliminary Injunction directing defendants to: (i) remove the NFA Complaint, Decision, Narrative and Press Release from its website, or, in the alternative, direct a name clearing hearing; and (ii) issue a new release stating that the Decision contained no judicial findings about either Effex or Dittami.

### EFFEX BACKGROUND

2.      On or about September 4, 2009, I entered into an employment agreement ("Agreement") with FXCM to establish a new venture. The primary goal of the venture was to utilize a non-dealing desk structure to improve FXCM's foreign currency customer execution by providing customized liquidity solutions, in competition with other liquidity providers.

Exhibit
0071

3. Pursuant to the Agreement, FXCM agreed to provide the initial capital necessary to fund: (i) the coding of the foreign currency trading ("Forex") algorithms ("Algorithms"), which I had already developed prior to my affiliation with FXCM; and (ii) create an electronic proprietary trading system ("Proprietary Trading System") to utilize the Algorithms. In creating the state of the art next generation Proprietary Trading System, I relied upon my prior experience in senior roles at both Banks and high frequency forex institutions.

4. On or about March 23, 2010, FXCM and I formally terminated the Agreement. I agreed that I would: (i) waive the termination payment owed by FXCM to me in the Agreement; and (ii) reimburse FXCM the monies ("FX Investment") it had invested in the development of the Proprietary Trading System, in exchange for: (a) undisputed ownership of the Proprietary Trading System, and hardware necessary to operate the Proprietary Trading System; (b) temporary office space, segregated from FXCM's operations; and (c) allow an entity I would form to trade, on an interim basis, utilizing the credit available through FXCM's prime of prime business arrangement with Citibank, conditioned on my personal guarantee. The personal guarantee was in the form of a two-million-dollar promissory note ("Note") executed by me. At that time, I also decided to form an entity (Effex) that would stream foreign currency prices and provide foreign currency execution services to FXCM, as well as to other forex counterparts. On March 23, 2010, Effex was formed to be a proprietary foreign exchange trading firm. FXCM and Effex entered into a Services Agreement dated March 1, 2010, which was subsequently modified on May 1, 2010 (the "Services Agreement"). Among other items, the Services Agreement provided that in consideration of FXCM's agreement to utilize Effex as one of its numerous forex liquidity providers, Effex would pay FXCM a fee ("Rebate Payments"), in the amount of twenty-one dollars per million units of base currency for execution requests filled by Effex for FXCM.

5.     Rebate Payments are not uncommon in financial markets. In certain instances, Rebate Payments enable smaller firms, like Effex, to be utilized as a counterpart alongside large, well-known financial institutions ("Big Banks").

6.     Effex is an eligible contract participant ("ECP") and has traded exclusively with other ECP's. As an ECP, Effex is exempt from registration with the Commodity Futures Trading Commission ("CFTC") and is not required to be a member of the National Futures Association ("NFA"). Neither Effex nor I are members of NFA or registered with CFTC. I was registered as an associated person from 2002 through 2005.

7.     Shortly after its formation, Effex began operating as a forex liquidity provider utilizing the trading system and algorithms developed by me. Within a few months Effex: (i) reimbursed FXCM for the FX Investment (in May 2010); (ii) ceased using the credit facility made available to Effex by FXCM through the above-referenced prime of prime customer account (in June 2010); (iii) entered into a prime broker agreement with Citibank (in July 2010); (iv) canceled the Note which guaranteed the credit made available to Effex by Citibank (in July 2010); and (v) commenced operations in Belfast, Ireland (October 2010).

8.     In January 2011, Effex located space and executed a lease for offices in Jersey City, New Jersey. Effex moved from the temporary segregated space provided by FXCM into its own space in April 2011. Subsequently, Effex opened offices in Tokyo, Japan, California and Boynton Beach, Florida. Effex currently maintains offices in Hoboken, New Jersey, Boynton Beach, Florida and Belfast, Ireland.

9.     Since its inception, I have been the managing member and have made all major decisions regarding Effex. This includes, but is not limited to, hiring, admitting and expelling members, establishing banking relationships, determining employee and independent contractor

compensation, handling tax matters, selecting office locations, client onboarding (including competitors of FXCM), vendor selection, prime broker selection and implementing measures to protect Effex's intellectual property ("Intellectual Property"). Effex has protected the Intellectual Property, the theories upon which it is built ("Trade Secrets"), and other proprietary information ("Proprietary Information," collectively referred to along with the Intellectual Property, Algorithms, Proprietary Trading System and Trade Secrets as "Confidential Information"), by: (i) requiring Effex's employees and consultants to execute confidentiality agreements; (ii) only permitting disclosure of the Confidential Information on a need to know basis; and (iii) protecting Effex's computers with passwords and other sophisticated security measures.

10. The ownership composition of Effex has never included any members other than me, the Dittami Dynasty Trust ("Trust") and select full time employees of Effex. At no time have the Trust (I am the Grantor and my children are the beneficiaries) and I ever owned less than 93% of all issued and outstanding units in Effex. None of FXCM's employees, officers or any affiliates of FXCM have: (i) ever been a member of or had any equity interest in Effex; or (ii) ever received any profits of Effex.

11. On various occasions between June 2011 through 2014, I renegotiated the Rebate Payments with FXCM, which resulted in reductions in payment per million, and in the fall of 2014 the Rebate Payments ceased. Such payments were based on notional volume of foreign currency handled by Effex and the payments due and owing to FXCM regardless of whether Effex made or lost money. Despite the termination of the Rebate Payments, FXCM continued to trade with Effex because Effex provided execution services superior to all other liquidity providers. For the period from 2010 to 2017, the Rebate Payments were approximately thirty percent of Effex's gross revenue and not seventy percent of profit from time to time as alleged by NFA.

12.     During the period that the Rebate Payments were in effect, Effex made Rebate Payments of $77 million dollars, which permitted FXCM to substantially reduce markups in execution requests on all liquidity providers, not just Effex, such that FXCM's end customer had a more attractive and competitive price. In addition to the foregoing benefit, Effex also provided FXCM with over: (i) $275 million in benefits directly measured by Effex providing best execution; and (ii) well over $100 million in value due to industry-wide spread tightening caused by the competitive prices quoted by Effex which inured to the benefit of public customers.

13.     Neither FXCM nor any of its principals ever owned any part of Effex, and Effex never paid FXCM for any business Effex transacted with non-FXCM counterparts. In addition, there is no relationship or correlation between Effex's profits and losses and FXCM's customers' profits and losses as is the case with a "Dealing Desk" model. Effex could not set prices like a dealing desk, and instead competed for FXCM's and other counterparts' business pursuant to the agency model. The agency model of providing currency pricing and liquidity, unlike the internal Dealing Desk model (which takes the opposite side of its own customer's trade), competes with other liquidity providers to secure the right to fill the order by providing either the best price or other execution services superior to that of its competitors. Also, unlike a dealing desk, Effex did not have knowledge of customer positions, stops, limits or resting orders, nor did Effex derive this information from any source.

14.     In addition to the customized liquidity it provided to FXCM, Effex also maintained separate, confidential and customized agreements with other counterparts delineating the specific execution services and the financial terms of such relationships.

15.     Effex's operations were never controlled by FXCM. In this regard, Effex:

    a.   hired, fired and paid in excess of 30 employees and consultants;
    b.   maintained its own independent bank accounts;

    c.    independently capitalized its prime broker relationship;

    d.    supplied all of its operating capital and risk capital;

    e.    provided Forex ("FX") retail pricing and execution services to over 30 counterparts in addition to FXCM, including FXCM's competitors;

    f.    owned and/or leased all of its computers, servers and other equipment;

    g.    utilized its own confidential, proprietary trading software to facilitate all of its OTC Forex trades;

    h.    owned managed, operated, maintained, updated and modified its own trading system;

    i.    leased its own office space;

    j.    had sole discretion to accept or reject trades;

    k.    retained all of Effex's trading profits;

    l.    assumed liability for all trading and operating losses and potential losses;

    m.    filed its own tax returns;

    n.    other than Dittami, no person or entity ever guaranteed any of Effex's obligations; and

    o.    had no common employees with FXCM.

16.     In addition, the elements cited by NFA to indicate FXCM controlled Effex all terminated by the end of 2010, except for the Rebate Payments which terminated in 2014.

17.     As stated above, Big Banks dominate foreign exchange currency trading, and due to the interrelationships between the banking and credit services, it is difficult to convince such institutions to trade with smaller entities such as Effex. In order to induce such entities to trade with Effex, Effex distinguished itself from other liquidity providers by: (i) offering differentiated liquidity specifically customized for each counterpart via the use of: (a) customized adaptors instead of the industry-wide fix adaptor, (b) customer specific algorithms; and (c) co-location where appropriate; (ii) offering to make Rebate Payments on filled orders in exchange for being permitted to stream pricing to such counterparts; and (iii) providing best execution compared to all other liquidity providers. Big Banks and other counterparties typically provide a wider, less consistent price and therefore control a much smaller percentage of the off-exchange forex market when competing with Effex. Due to Effex's more cost efficient structure it has the ability to make Rebate Payments.

## NFA INVESTIGATION

18.     NFA commenced an investigation of FXCM, Drew Niv, Ornit Niv and William Adhout on or about 2013 ("NFA Investigation"). Approximately 4 years later, at the conclusion of the investigation, NFA concurrently issued the NFA Complaint, Decision, Narrative and Release on February 6, 2017, copies of which are annexed to the supplemental affidavit of John Dittami sworn to on May 24, 2017 and filed under seal.

19.     Although not listed as a respondent or an actual party, NFA stated in paragraph 16 of the NFA Complaint, "NFA commenced an investigation about Effex and its involvement with FXCM in 2013." In addition, Effex and/or I were mentioned in 18 of 21 paragraphs associated with Count I of the NFA Complaint.

20.     NFA did not have jurisdiction over plaintiffs (Effex, an ECP, was exempt from registration) and never contacted Effex or me for any purpose in connection with the NFA Investigation.

21.     NFA never asked Effex or me to provide any documents, information or testimony for any item or issue concerning the NFA Investigation. Nor did NFA ever look at Effex's execution data or algorithms which would be required to determine if Effex's overall execution practices were abusive. Moreover, I believe that NFA ignored FXCM's studies which showed the tremendous benefits that Effex's excellent and best execution generated for FXCM's end customers.

22.     The NFA Complaint disclosed Effex's confidential information constituting trade secrets ("Trade Secrets") which formed the basis of its highly profitable trading strategies and algorithms.  The Trade Secrets are more fully discussed in my supplemental affidavit ("Supp. Aff.") sworn to on June 1, 2017 and filed under seal.

23.     In June of 2015, CFTC initiated a parallel and nearly identical investigation ("CFTC Investigation") of FXCM and Effex. During the course of the CFTC Investigation, Effex and I provided various documents, written submissions and I testified under oath at my deposition for two days. I believe that NFA received: (i) copies of the documents Effex provided to CFTC in the CFTC Investigation, all of which were marked private and confidential and requested Freedom of Information Act confidentiality protection; and (ii) the non-public deposition transcript of my testimony in the CFTC investigation. The documents produced to CFTC and my testimony explained the concepts underlying the Confidential Information, including the Algorithms.

24.     NFA concluded its investigation by entering into a settlement with FXCM and simultaneously publishing, without Plaintiffs' authorization, the NFA Complaint, Decision, Narrative and Release. Despite not being a party to the NFA Investigation, and having no right to appear, participate, intervene, appeal or any other post-deprivation remedy, Effex and I are falsely portrayed, mischaracterized and defamed throughout the Narrative, NFA Complaint, and Decision. Neither Effex nor I were even given advance notice of the publication of the NFA Complaint, Decision and Narrative containing the Confidential Information.

25.     The Narrative released by NFA summarizes the NFA Investigation, the NFA Complaint and Decision, as follows:

> On February 6, 2017, NFA issued a Complaint charging FXCM, Niv and Ahdout with engaging in fraudulent activities with respect to FXCM's retail customers by advertising that it used a No Dealing Desk order execution model – which it claimed was superior to the Dealing Desk model used by its competitors – when, in fact, it used what amounted to a Dealing Desk model by routing its customers' trades to Effex Capital, LLC (Effex), a liquidity provider that was purportedly independent but was actually supported and controlled by FXCM. In exchange for the order flow FXCM directed to Effex, the Complaint alleged that Effex paid rebates to FXCM that amounted at times to as much as 70% of Effex's profits from FXCM's order flow and which FXCM referred to internally as "P&L". The Complaint also charged FXCM, Niv and Ahdout with failing to observe

high standards of commercial honor and just and equitable principles of trade by allowing Effex and its principal, John Dittami, to engage in abusive execution practices that denied FXCM's retail customers favorable price improvement and benefitted Effex and FXCM financially, and which resembled the asymmetrical price slippage practices for which FXCM was sanctioned by NFA in 2011.

(see Exhibit C to the Supplemental Dittami Affidavit).

26.     The Narrative which was hyper-linked to the NFA Complaint and Decision, contained many false, misleading and defamatory statements, including, but not limited to:

     a.   referring to Effex as "what amounted to a Dealing Desk";
     b.   Effex "was actually supported and controlled by FXCM";
     c.   "Effex paid rebates to FXCM that amounted at times to as much of 70% of Effex's profits";
     d.   FXCM "allowing Effex and its principal, John Dittami, to engage in abusive execution practices that denied FXCM's retail customers favorable price improvement"; and

27.     None of the above false, misleading and defamatory statements were necessary for NFA to make the findings contained in the Decision, as the NFA Complaint was settled by consent of FXCM without any admissions or denial of the truth of NFA's allegations. Indeed, there was absolutely no need for NFA to name Effex or me, as NFA could have identified us as HFTCO and HFT, respectively. The sole purpose of including Effex and me in such documents was to harm Effex's business and our respective reputations and goodwill. To wit: out of sixty-four narratives issued by NFA since 2015, the Narrative was the only one that: (i) paraphrased the allegations contained in the underlying complaint and decision; (ii) discussed purported wrongdoing by third-parties; and (iii) disclosed confidential information and/or trade secrets of a third-party. Similarly, the sole purpose of stating Effex received preferential treatment was to harm Effex's business and Effex and my reputations and goodwill. Finally, NFA's claim that FXCM failed to disclose its relationship with Effex is simply false. No rule requiring such disclosure existed until 2016 at

which time FXCM disclosed Effex provided liquidity services to FXCM. Therefore, the only reason for such allegations was to disparage Effex and me.

## EFFEX HAD BEST EXECUTION,
## NOT ABUSIVE EXECUTION AS CLAIMED BY NFA

28. Contrary to NFA's allegations at paragraph 35 of the NFA Complaint that Effex received preferential treatment from FXCM, Effex was only routed execution orders if it first streamed the best price out of all liquidity providers that provided execution services to FXCM.

29. Effex was routinely able to offer its various counterparts, including FXCM, the best price because Effex utilized the Trade Secrets as described in the Supp. Aff.

30. Effex and FXCM were adhering to NFA's interpretive notice 9048—NFA Compliance Rule 2-4, in that Effex was awarded ties over competing liquidity providers only if it was the best execution provider. The NFA interpretive notice clarifies that routing decisions must award ties to liquidity provider that provides best execution. Effex allowed FXCM employees to monitor its trading activity such that it could police and ensure that Effex was following its best execution requirements.

31. Contrary to NFA's false allegations, Effex's execution services were superior to all other liquidity providers because:

   a. Effex, irrespective of prevailing price, filled over 99% of all orders routed to Effex from counterparts, including FXCM, compared to 88% for all other counterparts;

   b. Contrary to NFA's false statement in paragraph 17 of the NFA Complaint that "Effex engaged in abusive trade practices which resembled the asymmetrical price slippage practices for which FXCM was sanctioned by both NFA and CFTC in 2011" (see ¶17 of the NFA Complaint), Effex rendered execution services for FXCM in a manner that completely contradicts and discredits such statement. First, Effex is not in control over what price FXCM routes Previously Quoted requests. Effex could only fill at the rate identified per FXCM API specification, or reject the execution request. More specifically, and contrary to NFA's allegations and negative implications, for every execution request

    rejected by Effex to its benefit, it filled four execution requests to its detriment which constitutes asymmetrical price improvement in favor of the counterpart, and ultimately benefits the underlying customer of the counterpart;

    c.    Unlike other liquidity providers who would simply stop offering liquidity during periods of extreme volatility, Effex would readily price illiquid and difficult currency pairs for its counterparts, including FXCM;

    d.    Unlike other liquidity providers, Effex provided customized liquidity solutions to meet liquidity needs of its counterparts, including FXCM's; and

    e.    Unlike other liquidity providers, Effex provided FXCM with access to a customized dashboard to help FXCM better monitor market conditions.

32.    As a result of the execution services referenced above, and contrary to NFA's false allegations and inferences, Effex, in fact, provided mathematically verifiable execution benefits to FXCM for superior execution services provided by its competition. Upon information and belief, NFA received information from FXCM proving Effex provided best execution.

33.    Unlike other liquidity providers, Effex's superior execution also created the following substantial economic advantages for FXCM:

    a.    It permitted FXCM to consummate more trades on behalf of its customers and therefore generate more spread compensation which profits greatly exceeded the Rebate Payments. Thus, contrary to NFA's implications, there is no profit based incentive for FXCM to permit or assist Effex to engage in abusive execution practices despite the Rebate Payments. Indeed, FXCM's spread compensation generated by completed trades was a 5-10 multiple in value of the initial Rebate Payments of $21 per million (and an even greater multiple as Effex negotiated lower payments).

    b.    A transaction cost analysis, focusing on rejections of trade execution requests, shows that Effex's inclusion as a liquidity provider for FXCM, generated $80 million of value for FXCM. This calculation compares the cost of rejected trades to the FXCM's end customer by Effex, and the cost of rejected trades from all other providers;

    c.    A transaction cost analysis, focusing on filled trade execution requests, shows Effex reduced FXCM's customers' slippage by more than $110 million. The greatest cause for FXCM customer slippage came from having liquidity consumption demands greater than available liquidity, and as a result of Effex's

targeting of best price liquidity provision, it more than doubled available liquidity at the best price; and

d. A transaction cost analysis, focusing on filled trade execution requests, aside from the liquidity addition discussed above, compared slippage (where FXCM's best book was compared to where liquidity provider filled deal) and concluded Effex's better execution generated $81 million dollars for FXCM's customers.

36.     Contrary to NFA's false allegations and implications in paragraphs 43, 44, 45 and 46 of the NFA Complaint that Effex had poor and/or engaged in abusive execution, Effex consistently had best price and execution compared to the other liquidity providers who provided liquidity to FXCM (see ¶43 through 46 of the NFA Complaint). Indeed, NFA never had the raw data necessary to perform calculations relating to price and execution to substantiate such an allegation. Moreover, Effex did not violate a single CFTC or NFA rule or regulation.

37.     More than ninety five percent of the order flow not handled by Effex was handled by NFA member firms, the largest of which coincidentally had representation on NFA's board of directors and/or the NFA advisory committee. NFA stated that FXCM directed order flow to Effex and implied that it did so to generate a greater spread and thereby more profits for Effex through which it could make the Rebate Payments. As noted above, Effex only received execution requests from FXCM when it first offered best price, therefore the above inference is flawed and unsupportable.

38.     NFA harmed Effex by highlighting the value in a trading theory based on best execution in order to win ties. Contrary to NFA's claim that directing ties to Effex constituted preferential treatment, it actually illustrates FXCM's compliance with NFA's rules for proper routing – ties should be sent to liquidity provider with best execution. In all futures markets and forex generically, as wells as most other markets, a view of best book (other liquidity provider's pricing) is common, and often required by law, not a preferential treatment.

39.     NFA did not analyze the underlying trading data, and instead selected a handful of transactions which represented a small fraction of a percent of the total volume handled by Effex to falsely portray Effex as abusive and purposely damage Effex's reputation and business relationships. A review of NFA's handpicked examples reveal the blatant flaws in NFA's claims.

40.     **NZD/USD**. At paragraph 71 of the NFA Complaint, NFA alleges that "customers trading the New Zealand Dollar (NZD) related currency pairs had orders executed at off-market prices, due to bad prices FXCM received from Effex" (see ¶71 of the NFA Complaint). In reality, NFA failed to properly investigate because if it had done so it would have determined that: (i) because of the highly volatile nature of the prevailing market, only one or two other counterparts were pricing such pairing; (ii) both Reuters, Interbank and CME markets had no valid price for such pairing; (iii) Effex's spread was three times better or tighter than the next best offer available to FXCM's core retail pool; (iv) Effex undertook such transactions at its own risk, a risk that almost all other liquidity providers were unwilling to assume; and (v) such trades represented less than one billionth of Effex's total trading volume.

41.     **Hold Timer**. At paragraph 46 of the NFA Complaint, NFA falsely characterizes Effex's use of a "hold timer," a legally permissible institutional and industry-wide risk related practice as egregious and "abusive" (see ¶64 of NFA Complaint). This assertion is completely incorrect for the following reasons. First, there is no rule or regulation under the Commodity Exchange Act precluding the use of hold timers by ECP liquidity providers such as Effex. In fact, most liquidity providers regularly employ hold timers as an effective tool to manage risk and have done so since the inception of electronic forex trading. Second, during periods when Effex did utilize a hold timer, (typically during extremely volatile times), it did so for approximately one percent of the execution requests, in contrast to the industry-wide practice of using hold timer for

all trades, at all times. Third, Effex's rejection rate for price reasons was less than one percent of all execution requests, whereas the rejection rate from other liquidity providers was approximately 12% – meaning Effex accepted more execution requests to its detriment than other liquidity providers. The higher the rejection rate indicates greater use of the hold timer, while the lower the rejection rate indicates the opposite or reduced utilization of hold timer. Effex had the lowest rejection rate and therefore, by definition and based on objective factors, cannot have abused the hold timer. Had NFA conducted even a modicum of investigatory due diligence, it would have discovered that Effex's use of hold timer complete with price tolerance settings (a fact ignored by NFA) provided a net benefit of approximately 3.6 million dollars to FXCM's customers and to Effex's detriment. In reality, Effex was unquestionably the single best liquidity provider to FXCM with respect to its rejection policies.

42. **Previous Quote**. In paragraph 48 of the NFA Complaint, NFA falsely states that Effex utilized an execution tactic, known as "previous quote," in a manner that "deprived the customer of favorable price movement" (see ¶48 of NFA Complaint). First, Effex had no duty to FXCM's underlying customers, because Effex's customer was FXCM. Second, "previous quote" is another designation for a "fill or kill" order. The NFA also implied that Effex could pick and choose the rate it would fill it, which is in direct contradiction to what a Previously Quoted Order is, a better description of this order type is "Fill or Kill" order. Under a "Fill or Kill" order, FXCM chooses the fill price it routes on the order, not Effex. Effex filled 87% of the execution requests utilizing the "previous quote" at the price it received from FXCM, and approximately 12.5% of the execution requests utilizing "previous quote" price from FXCM at a better price for FXCM, (and merely .5% of the execution requests utilizing "previous quote" price at an inferior price for FXCM). In reality, and contrary to NFA's false statements, Effex's use of "previous quoted orders"

created a benefit in the form of price improvement for FXCM and its customers. NFA's knowingly false portrayal of "previous quote" as an "abusive execution tactic" was vexatious and was intended to harm Effex's business and both Effex's and my reputation and goodwill. In fact, Effex's actions created asymmetrical trading benefits via systematic price improvements. Moreover, these allegations were irrelevant to NFA's prosecution of any of its claims against FXCM as they were previously dealt with in a prior investigation.

## NFA PREJUDICE AND BIAS AGAINST RETAIL FOREX AND EFFEX

43.     NFA's overt bias and prejudice against OTC forex trading and deferential treatment for on-exchange traded products explains its disingenuous and purposeful efforts to defame and harm Effex's business. NFA's bias against OTC forex trading arises from: (i) the reduction in revenue for NFA members due to off-exchange trading; (ii) two thirds of its board of directors represent member firms which engage in on-exchange trading and their respective firms were routed over fifty percent of FXCMs orders which were not routed to Effex; and (iii) it has dedicated substantial amounts of its resources to this segment, although only 2 RFED's remain under its oversight of many thousands of fee paying firms. NFA's bias and prejudice is illustrated by the following statements made by NFA's recently retired President, Dan Roth:

a.     "I agree that forex is the current scam of choice among fraudsters". U.S. Senate, Committee on Banking, Housing and Urban Affairs. *The Commodity Futures Modernization Act of 2000 and Recent Market Developments*. Hearing, September 8, 2005 (S. Hrg. 109-910). Washington: Government Printing Office, 2007. See page 115.

b.     "If a regulator wants to kill a particular product, it will". Daniel J. Roth, *American Experience in Self-Regulations Over Futures Markets and Jurisdictional Boundaries Between Futures and Securities in U.S., National Futures Association*, November                                                                          12, 2014.https://www.nfa.futures.org/%5C/%5C/news/newsTestimony.asp?ArticleID =4497.

c. "There is one more forex problem… Section 2D of the CEA could be read to allow un regulated affiliates of FCM's to act as retail counterparts to retail customers…their sole reason for existence seems to be to create affiliates that do retail forex business in a completely unregulated environment."] U.S. Senate, Committee on Banking, Housing and Urban Affairs. *The Commodity Futures Modernization Act of 2000 and Recent Market Developments*. Hearing, September 8, 2005 (S. Hrg. 109-910). Washington: Government Printing Office, 2007. See Page 116.

d. "Certain provisions of the Commodities Futures and Modernization Act of 2000 and subsequent caselaw had the unintended consequence of making unsophisticated, retail customers the prey of fly by night operators." U.S. House, Subcommittee on General Farm Commodities and Risk Management of the Committee on Agriculture. *Hearing to Review Reauthorization of the Commodity Exchange Act*. Hearing, September 26, 2007 (Serial No. 110-27). Washington: Government Printing Office, 2009. See page 50.

e. "If you look at the firms that have caused virtually all of the customer protection problems in retail forex, they share a couple of traits. First of all, they are not really FCMs at all. Congress intended to allow FCMs, along with banks, broker-dealers and insurance companies, to act as counter parts to retail forex transactions because they are all otherwise regulated entities." U.S. House, Subcommittee on General Farm Commodities and Risk Management of the Committee on Agriculture. *Hearing to Review Reauthorization of the Commodity Exchange Act*. Hearing, September 26, 2007 (Serial No. 110-27). Washington: Government Printing Office, 2009. See page 51.

f. …the scammer element once again exploited the loophole to peddle retail forex created by the 2004 Zelener decision which held that CFTC had no jurisdiction over rolling spot forex. U.S. House, Subcommittee on General Farm Commodities and Risk Management of the Committee on Agriculture. *Hearing to Review Reauthorization of the Commodity Exchange Act*. Hearing, September 26, 2007 (Serial No. 110-27). Washington: Government Printing Office, 2009

44. NFA's bias against off-exchange trading manifested itself in: (i) NFA's failure to observe its obligations to preserve confidentiality obligations and as specifically requested by Effex to CFTC; (ii) the specific facts and details relating to Effex and Dittami in the Narrative which diverged from NFA's conventional simplistic and conclusory format and were irrelevant to the charges brought against FXCM; and (iii) the baseless, needless, blatantly false and incendiary references to Effex in the NFA Complaint and Narrative, which were made to destroy Effex, and

are consistent with Roth's statement in 43(b) above, made to Chinese regulators regarding the ability to eliminate such off exchange trading: "If a regulator wants to kill a particular product it will." Indeed, over the last few years, domestic off-exchange Forex dealers have decreased from 34 to 2, while the number of international off-exchange Forex dealers has dramatically increased.

## NFA DAMAGED EFFEX

44.     Attached are excerpts from various publications illustrating the damage that NFA's false and defamatory states and false portrayal of Effex have caused to Effex's reputation.

     a.  "The National Futures Association (NFA) complaint highlights how FXCM created an imbalanced playing field and in doing so it not only created revenue for Effex – part of which was, in an ironic twist on the usual venue/market maker relationship, kicked back to the platform. Effex was able to slip clients and arb immediately out of certain trades because it was seeing the other LPs feeds." (See *And Another Thing…*, Profits & Loss, (February 8, 2017); a copy of which is annexed hereto as **Exhibit 1**.);

     b.  "What really struck me, however, when going through the complaint, was the line, FXCM allowed Effex to engage in abusive execution tactics, which denied FXCM's retail customers favourable price improvement and benefitted Effex and FXCM financially." (See **Exhibit 1**);

     c.  "This says that Effex was complicit in the whole shoddy mess and, although I am told the firm is folding (I have no confirmation of this), one wonders where the regulatory action against this firm is. Yes, FXCM and its principals were clearly the drivers, but Effex Capital was just as clearly a willing accomplice." (See **Exhibit 1**);

     d.  "This is not the action of a firm whose reputation is "world class", it is the action of a cheat. I am not sure if this practice is illegal (it is, as the NFA says, "abusive") and speaking to people there is a real uncertainty over what regulatory authority could take action against the firm and its principals. But surely there has to be a proper investigation into this firm's role in this issue because not only is its own name being dragged through the gutter, there is a risk it will drag a bunch of other private trading firms – many of whom operate to the highest levels – down with them." (See **Exhibit 1**);

     e.  "Effex's website states that its "**domain knowledge and reputation within the FX markets are world-class.**" Your reputation is in the gutter. Good luck maintaining a customer base anywhere. There was no "top quality" execution. It *will* have an impact on your global business." (See **Exhibit 1**);

    f.    "FXCM was routing its customer's trades to Effex Capital - - a company it controlled and supported." (<u>See</u> Forex Scam Alerts, *FXCM Permanently Banned from the USA*, (February 7, 2017) http://www.forexscamalerts.com/fxcm-permanently-banned-usa-fined-7-million);

    g.    "But in fact, FXCM used a "Dealing Desk" model, by routing orders through market maker Effex Capital LLC that was actually supported and controlled by FXCM, allegedly in exchange for kickbacks to FXCM on profitable trades." (<u>See</u>, Robert A. Green, *Learn Why The NFA Barred FXCM And What It Means For Forex* Traders, Forbes (March 1, 2017) https://www.forbes.com/sites/greatspeculations/2017/03/01/learn-why-the-nfa-barred-fxcm-and-what-it-means-for-forex-traders/#24fccab6177c);

    h.    "…it has become clear that FXCM had been supporting the liquidity provider, and the firm had been paying rebates to FXCM of up to 70% of Effex Capital's profit" (<u>See</u> Andrew Saks-McLeod, *FXCM: Over and out, leave the keys on the table*, FinanceFeeds (February 7, 2017) http://financefeeds.com/fxcm-leave-keys-table-op-ed/); and

    i.    "By using Effex, the US regulator is asserting that FXCM has been using an execution practice that denied clients positive price improvement." (<u>See</u> Victor Golovtchenko, *Exclusive: NFA Charged FXCM for Using Own LP for No Dealing Desk Execution*, Finance Magnates (February 7, 2017) http://www.financemagnates.com/forex/brokers/exclusive-nfa-charged-fxcm-using-lp-no-dealing-desk-execution/).

## EFFEX HAS BEEN IRREPARABLY HARMED AND IS IN IMMINENT DANGER OF FURTHER IRREPARABLE HARM

    45.    Effex has experienced and will continue to experience irreparable harm stemming from the false and defamatory statements contained in the Narrative and Release because the public assumes a high level of legitimacy in the NFA Investigation, the NFA Complaint, Decision, Narrative and the Release.

    46.    As of the date of this affidavit, plaintiffs have suffered the foregoing irreparable harm:

a. On April 6, 2017, my bank advised Effex, the Trust and me that it was terminating our longstanding banking relationship and provided Effex, the Trust (on my children's behalf) myself, and even my wife's IRA's with a thirty-day notice to close all of our respective business and personal accounts and transfer the funds from such accounts elsewhere. In addition, the bank which serves as trustee to the Trust, provided notification that it was resigning as trustee of the Trust. Until now, both Effex and I have been coveted private banking customers, have been held in high regard, and the only colorable explanation for the notice of termination is because of the adverse, false and defamatory statements contained in the NFA Complaint, Decision, Narrative and Release. I believe the bank's notice of termination would not have been made but for NFA's false allegations and findings and innuendo regarding Effex's business practices. I believe Effex and I can resume our banking relationships if the Court orders NFA to correct its defamatory, false and misleading statements.

b. Within a few days after NFA published the NFA Complaint, Decision, Narrative and Release, Effex lost its business with FXCM in the United Kingdom because FXCM's other liquidity providers stated they will cease acting as liquidity providers for FXCM if FXCM trades with Effex, thereby causing FXCM to refuse to trade with Effex. Some of these liquidity providers have employees who sit on the board of the NFA, and almost all of them benefit from Effex taking a fall to cover up their execution, which all fell to standards far below Effex execution standards. If the Court orders NFA to issue a corrective statement, I believe FXCM would recommend trading with Effex in the United Kingdom;

c. Several prospective counterparty trading firms with whom Effex has engaged in extensive negotiations have delayed instituting trading with Effex and are waiting for further clarity or correction to ascertain whether there is any regulatory risk associated with doing business with Effex.

d. Two institutional counterparts with whom Effex has conducted business have terminated trading with Effex as a result of the concerns arising from NFA's defamatory, false and misleading allegations and findings regarding Effex. Effex believes that such business counterparties will resume trading with Effex if the Court orders NFA to issue a corrective statement;

e. Effex's ability to enter into trading relationships with certain new counterparts has become virtually impossible, in light of the fact that the best execution differentiators that Effex uses to market counterparts has been falsely portrayed by the NFA to be abusive. Effex believes that its ability to enter such relationships will be possible if the Court orders NFA to issue a corrective statement;

f. Effex's reputation has been damaged in the eyes of important business credit and technology vendors. As a result of the defamatory, false and misleading statements made by NFA, such credit and technology vendors have demanded that Effex remove their names from Effex's website. The reference to such credit and technology vendors helped established Effex's legitimacy in the forex industry. Effex believes that such credit and technology vendors will withdraw such demand if the Court orders NFA to issue a corrective statement;

g. On April 14, 2017, a class action was filed against various parties, which included baseless claims against Effex and me in the United States District Court for the Southern District of New York captioned *Nguyen, on behalf of herself and all others similarly situated v. Forex Capital Markets et al.,* Case No 17-CV-02729-PAC. The complaint clones the same false allegations against Effex and me contained in the NFA Complaint, Decision, Narrative and Release. This further harms Plaintiffs' reputations and ability to conduct business; and

h. Various prominent Electronic Communication Networks have terminated their relationships with Effex which has created a competitive disadvantage due to lack of access to institutional level liquidity of Effex's hedging and trading operations.

47. The items discussed in paragraph 46 above, endanger Effex's and my goodwill, reputation, continued existence and ability to conduct business.

As a result of the foregoing, I respectfully request that this Court grant Effex's and my application for a preliminary injunction directing NFA to: (i) remove the NFA Complaint, Decision, Narrative and Press Release from its website or in the alternative , order a name clearing hearing; and (ii) issue a new release stating na adjudicatory findings were made regarding Effex or me; and (iii) for such further and additional relief as this Court deems just and proper.

John Dittami

Sworn to before me this ___1___
day of June, 2017

Notary Public

JOHN MICHAEL SAYNE
MY COMMISSION #FF187727
EXPIRES February 3, 2019
(407) 398-0153    FloridaNotaryService.com

20

*NY 246544698v1*

# EXHIBIT 1



# And Another Thing...

*21:23 February 8th 2017 in* *Opinion, Profit & Loss*

FXCM Effex Capital Nfa CFTC

Let's start with some statements.

1. "EFFEX Capital's domain knowledge and reputation within the FX markets are world-class." Taken from the firm's website.

2. "There will be no changes to FXCM customers outside of the United States." A statement on FXCM's website as part of its announcement that it was exiting the US market.

3. "FXCM will for the interim period *continue* to service its U.S. customers and to provide top quality trade execution…" [my emphasis] from the same source.

4. "FXCM wants to stress that these settlements have no impact on any customer of FXCM's global businesses. FXCM and its global subsidiaries will continue to provide excellent execution and competitive pricing to its customers overseas through its award-winning technology, customer service and trading tools." Also from yesterday's announcement.

5. "The Financial Conduct Authority (FCA) has fined Forex Capital Markets Ltd and FXCM Securities Ltd ("FXCM UK") £4,000,000 for allowing the US based FXCM Group to withhold profits worth approximately £6 million ($9,941,970) that should have been passed on to FXCM UK's clients. *FXCM UK also failed to tell the FCA that the US authorities were investigating another part of the FXCM Group for the same misconduct.*" [my emphasis again] This from the UK's Financial Conduct Authority almost exactly three years ago when, incidentally, it fined FXCM just about $7 million.

The starting point is the pattern of allegations of abusive practices thrown at FXCM over the years (this was the fifth complaint brought by NFA and CFTC) and the series of fines accepted by the firm (always without admitting guilt). And it seems clear reading the NFA complaint and talking to people in the industry who were themselves victims of this practice, that the firm, specifically the people named in the compliant, were lying. This means, because they were also in the institutional space, they have managed to comprehensively undermine one of the foundations of any major financial market; trust.

Aside from yet another case of alleged misdemeanours by a US retail brokerage firm, I am a little mystified that few people are talking about the market maker. The aforementioned Effex Capital, who, I feel confident in saying, will no longer brag about its "world class" reputation.

The National Futures Association (NFA) complaint highlights how FXCM created an imbalanced playing field and in doing so it not only created revenue for Effex – part of which was, in an ironic twist on the usual venue/market maker relationship, kicked back to the platform. Effex was able to slip clients and arb immediately out of certain trades because it was seeing the other LPs feeds.

But there is also another side to this, the relationship also cost the other LPs significant revenue over the years.

FXCM's margin and liquidation practices were also, as paragraphs 62 and 63 highlight in the complaint, reprehensible in that they routinely allowed clients to enter positions only to be liquidated due to the firm's abusive practices around margin.

What really struck me, however, when going through the complaint, was the line, "…FXCM allowed Effex to engage in abusive execution tactics, which denied FXCM's retail customers favourable price improvement and benefitted Effex and FXCM financially."

This says that Effex was complicit in the whole shoddy mess and, although I am told the firm is folding (I have no confirmation of this), one wonders where the regulatory action against this firm is. Yes, FXCM and its principals were clearly the drivers, but Effex Capital was just as clearly a willing accomplice.

And don't even get me started on the fact it abused last look. I said to someone just last week that I still see last look as an accident waiting to happen to the FX market – well that accident has happened, we can only hope it doesn't turn into a multiple pile-up.

Not only was last look used to reject trades, it was used to run an adverse selection programme that meant it executed certain trades at the most disadvantageous rate to the customer.

This is not the action of a firm whose reputation is "world class", it is the action of a cheat. I am not sure if this practice is illegal (it is, as the NFA says, "abusive") and speaking to people there is a real uncertainty over what regulatory authority could take action against the firm and its principals. But surely there has to be a proper investigation into this firm's role

in this issue because not only is its own name being dragged through the gutter, there is a risk it will drag a bunch of other private trading firms – many of whom operate to the highest levels – down with them?

This is then, an industry wide issue – it is not limited to the retail FX market and it should be a concern to everyone.

Within 24 hours of this mess becoming public I started receiving statements from senior officials at other retail-orientated platforms stressing how they are committed to helping their clients and in no way would trade against them and how their technology reduces the chances of market abuse.

I am sure all are genuine in their desire to do the right thing but the sad fact is we heard exactly the same statements from FXCM, even after FXCM's UK arm was fined.

It is times like this that provide payback for those irritating sales statements full of clichés. I hate to be the bearer of bad tidings, but rolling out a statement of intent is nowhere near enough to convince the sceptics.

If I look across the retail industry (and I do include several "institutional" providers who are nothing of the sort) I like to look for firms that at least appear to go the extra distance. Regular readers know I have, in the past, criticised Saxo Bank at certain times for actions that I didn't agree with. This is part of a normal, healthy debate around market structure, and just to prove that point I will highlight Saxo as a retail-orientated provider that not only understands and celebrates its clients making money, but also, and importantly, is a vociferous supporter of the Global Code of Conduct.

And while it remains, at the moment, a retail issue, this event does have implications for the Code, which is, as we know, aimed at wholesale markets.

I look at a retail broker like Saxo, that openly supports the Code and I feel a lot more confidence in that model than someone rolling out tired clichés about customer-centric service.

This was clearly a case of an institutional participant, Effex Capital, conducting some of the abusive market practices the Global Code of Conduct will seek to stamp out. This then, represents something of a test, and an opportunity, for the Code's authors. How would the Code and the intended enforcement framework handle this issue? Could anything be done about a firm that has, according to a local regulator, been abusing its position in the market and lying about it?

One has to hope that the answer is in the positive and something could be done, beyond the (short term) shaming of a few individuals, otherwise the Code will be badly undermined before it has had a chance to get off the ground (especially in the eyes of US regulators one suspects).

But if, on the other hand, we believe the Code will solve the issues, and that it continues (as I believe it should) to be only aimed at wholesale markets, then we have to have stronger, firmer barriers between retail and institutional.

It is difficult to work out how these barriers could be put in place but surely a good starting point would be forcing all retail flow onto regulated exchanges or MTFs? Something is rotten at the heart of the retail FX market and the only way to remove the stench is by enforcing how and where these people trade.

The fact that this would also serve as a warning to the institutional industry as to what could happen if it also breaks the rules is no bad thing either.


And to those five statements at the top of this piece?

1. Your reputation is in the gutter.

2. Good luck maintaining a customer base anywhere.

3. There was no "top quality" execution to continue

4. It *will* have an impact on your global business.

5. A question. Was the industry asleep at the wheel on this? The FCA report noted the US was investigating the same practice but as an industry did we ask enough questions of FXCM and were we negligent in letting it continue to operate without stricter checks?

3