**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| In re Global Brokerage, Inc. f/k/a FXCM Inc. Securities Litigation | Master File No. 1:17-cv-00916(RA)(BCM) |
| | CLASS ACTION |
| This Document Relates To: All Actions | |

**PLAINTIFFS' MEMORANDUM OF LAW IN OPPOSITION TO DEFENDANTS' MOTION FOR SUMMARY JUDGMENT**

# TABLE OF CONTENTS

I.    PRELIMINARY STATEMENT ................................................................................. 1

II.   SUMMARY OF MATERIAL FACTS ................................................................... 2

      A.    Background of FXCM .............................................................................. 2

      B.    FXCM Hires Dittami to Create an In-House Liquidity Provider ........................... 3

      C.    FXCM and Effex Set up a Financial Relationship Mirroring FXCM's Profit-
            Sharing Arrangement with Dittami..................................................................... 5

      D.    Effex's Payments to FXCM Varied With Effex's Trading Profits........................ 8

      E.    Effex Depended on FXCM, Which Provided Effex Extensive Support and
            Granted Trading Advantages So Effex Would Win More Trading Volume ........ 11

      F.    Defendants Tried to Conceal FXCM's Relationship With Effex ......................... 11

      G.    Regulators Investigate FXCM's Relationship with Effex .................................... 14

III.  ARGUMENT......................................................................................................... 16

      A.    Defendants Bear a Heavy Burden on Their Motion for Summary Judgment....... 16

      B.    The Evidence Supports a Finding that Defendants Made Material
            Misrepresentations and Omissions ..................................................................... 17

            1.    Defendants' Statements About FXCM Offering Agency Model Trading
                  Were False and Misleading....................................................................... 18

            2.    Defendants' Statements and Omissions About Order Flow Payments
                  Were False and Misleading....................................................................... 21

            3.    FXCM's Financial Statements Violated GAAP and Were Misleading.... 26

                  a.    FXCM Was Required to Disclose Effex as a Related Party ......... 27

                  b.    FXCM Was Required to Consolidate Effex as a VIE.................. 29

                  c.    That FXCM's Auditor Approved FXCM's Financial Statements
                        Does Not Vindicate Defendants' GAAP Violations..................... 30

      C.    Plaintiffs' Evidence Supports a Finding that Defendants Acted With Scienter ... 32

            1.    Plaintiffs' Evidence Shows Defendants' Conscious Misbehavior or
                  Recklessness in Concealing FXCM's Relationship With Effex.............. 34

2.      Defendants' GAAP Violations Were Made with Scienter ...................... 36

D.      Plaintiffs' Evidence Supports a Finding of Loss Causation ................................. 39

E.      Plaintiffs' Evidence Supports a Finding that Plaintiffs and the Class Suffered Compensable Damages ....................................................................................... 43

F.      Plaintiffs' Evidence Supports 683 Capital's Individual Claims .......................... 46

G.      Plaintiffs' Evidence Supports Their Claims Under Section 20(a) ....................... 49

IV.   CONCLUSION ................................................................................................................. 50

# TABLE OF AUTHORITIES

Page(s)

**Cases**

*Acticon AG v. China N. E. Petroleum Holdings Ltd.*,
  692 F.3d 34 (2d Cir. 2012) ....................................................................................... 43

*Affiliated Ute Citizens of Utah v. United States*,
  406 U.S. 128 (1972) ................................................................................................. 43

*Anderson v. Liberty Lobby, Inc.*,
  477 U.S. 242 (1986) ................................................................................................. 17

*ATSI Commc'ns, Inc. v. Shaar Fund, Ltd.*,
  493 F.3d 87 (2d Cir. 2007) ................................................................................. 32, 46

*AUSA Life Ins. Co. v. Ernst & Young*,
  206 F.3d 202 (2d Cir. 2000) ..................................................................................... 32

*Baena v. Woori Bank*,
  515 F. Supp. 2d 414 (S.D.N.Y. 2007) ...................................................................... 36

*Barrows v. Seneca Foods Corp.*,
  512 F. App'x 115 (2d Cir. 2013) .............................................................................. 17

*Basic Inc. v. Levinson*,
  485 U.S. 224 (1988) ................................................................................................. 42

*Boguslavsky v. Kaplan*,
  159 F.3d 715 (2d Cir. 1998) ..................................................................................... 50

*Boston Ret. Sys. v. Alexion Pharms., Inc.*,
  No. 3:16-cv-2127(AWT), 2021 WL 3675180 (D. Conn. Aug. 19, 2021) ............... 50

*Celotex Corp. v. Catrett*,
  477 U.S. 317 (1986) ................................................................................................. 16

*Cuff ex rel. B.C. v. Valley Cent. Sch. Dist.*,
  677 F.3d 109 (2d Cir. 2012) ..................................................................................... 16

*Fine v. Am. Solar King Corp.*,
  919 F.2d 290 (5th Cir. 1990) (reversing ................................................................. 27

*Frost v. New York City Police Dep't*,
  980 F.3d 231 (2d Cir. 2020) ..................................................................................... 16

iii

*Gabriel Cap., L.P. v. NatWest Fin., Inc.*,
    177 F. Supp. 2d 169 (S.D.N.Y. 2001) ................................................................... 47

*Gallup v. Clarion Sintered Metals, Inc.*,
    489 F. App'x 553 (3d Cir. 2012) ........................................................................... 47

*Gruber v. Price Waterhouse*,
    776 F. Supp. 1044 (E.D. Pa. 1991) ....................................................................... 48

*Halperin v. eBanker USA.com, Inc.*,
    295 F.3d 352 (2d Cir. 2002) .................................................................................. 18

*In re Burlington Coat Factory Sec. Litig.*,
    114 F.3d 1410 (3d Cir. 1997) ................................................................................ 26

*In re Chicago Bridge & Iron Co. N.V. Sec. Litig.*,
    No. 17 CIV. 01580 (LGS), 2019 WL 5287980 (S.D.N.Y. Oct. 18, 2019) ............... 43

*In re Cirrus Logic Sec. Litig.*,
    946 F. Supp. 1446 (N.D. Cal. 1996) ...................................................................... 38

*In re Columbia Sec. Litig.*,
    155 F.R.D. 466 (S.D.N.Y. 1994) ........................................................................... 33

*In re Kidder Peabody Sec. Litig.*,
    10 F. Supp. 2d 398 (S.D.N.Y. 1998) ..................................................................... 33

*In re Lehman Bros. Sec. & ERISA Litig.*,
    903 F. Supp. 2d 152 (S.D.N.Y. 2012) .............................................................. 37, 38

*In re LIBOR-Based Fin. Instruments Antitrust Litig.*,
    No. 11 MDL 2262 (NRB), 2015 WL 6243526 (S.D.N.Y. Oct. 20, 2015) ........... 47, 48

*In re Longtop Fin. Techs. Ltd. Sec. Litig.*,
    32 F. Supp. 3d 464 (S.D.N.Y. 2014) ..................................................................... 33

*In re N. Telecom Ltd. Sec. Litig.*,
    116 F. Supp. 2d 446 (S.D.N.Y. 2000) ................................................................... 32

*In re Nature's Sunshine Prod. Sec. Litig.*,
    486 F. Supp. 2d 1301 (D. Utah 2007) ................................................................... 36

*In re Novatel Wireless Sec. Litig.*,
    No. 08CV1689 AJB (RBB), 2013 WL 12144150 (S.D. Cal. Oct. 25, 2013) ........... 44

*In re Puda Coal Sec. Inc. et al. Litig.*,
    No. 11-CV-2598 (DLC) (HBP) 2017 WL 65325 (S.D.N.Y. Jan. 6, 2017) ............... 46

*In re REMEC Inc. Sec. Litig.*,
　　702 F. Supp. 2d 1202 (S.D. Cal. 2010) ................................................................. 38

*In re Retek Inc. Sec. Litig.*,
　　621 F. Supp. 2d 690 (D. Minn. 2009) ................................................................... 43

*In re Scientific Atlanta, Inc. Sec. Litig.*,
　　754 F. Supp. 2d 1339 (N.D. Ga. 2010) ................................................................. 43

*In re Synchrony Fin. Sec. Litig.*,
　　988 F.3d 157 (2d Cir. 2021) .................................................................................. 18

*In re Time Warner Inc. Sec. Litig.*,
　　9 F.3d 259 (2d Cir. 1993) ..................................................................................... 33

*In re Vale S.A. Sec. Litig.*,
　　No. 1:15-CV-9539-GHW, 2017 WL 1102666 (S.D.N.Y. Mar. 23, 2017) ............. 43

*In re VEON Ltd. Sec. Litig.*,
　　No. 15-CV-08672 (ALC), 2017 WL 4162342 (S.D.N.Y. Sept. 19, 2017) .............. 21

*In re Vivendi Universal, S.A. Sec. Litig.*,
　　634 F. Supp. 2d 352 (S.D.N.Y. 2009) ................................................. 40, 41, 44, 46

*In re Vivendi, S.A. Sec. Litig.*,
　　838 F.3d 223 (2d Cir. 2016) ................................................................. 17, 39, 43

*In re: BP p.l.c. Sec. Litig.*,
　　No. 4:10-MD-2185, 2016 WL 3090779 (S.D. Tex. May 31, 2016) ................... 45, 46

*Indiana Pub. Ret. Sys. v. SAIC, Inc.*,
　　818 F.3d 85 (2d Cir. 2016) .................................................................................... 26

*Jaffer v. Hirji*,
　　887 F.3d 111 (2d Cir. 2018) .................................................................................. 16

*Kleinman v. Elan Corp., plc*,
　　706 F.3d 145 (2d Cir. 2013) .................................................................................. 17

*Lattanzio v. Deloitte & Touche LLP*,
　　476 F.3d 147 (2d Cir. 2007) .................................................................................. 39

*Lentell v. Merrill Lynch & Co.*,
　　396 F.3d 161 (2d Cir. 2005) .................................................................................. 39

*Liberty Media Corp. v. Vivendi Universal, S.A.*,
　　923 F. Supp. 2d 511 (S.D.N.Y. 2013) ................................................................... 44

*McMahan & Co. v. Wherehouse Ent., Inc.*,
   900 F.2d 576 (2d Cir. 1990) ................................................................................ 17

*Meyer v. Jinkosolar Holdings Co.*,
   761 F.3d 245 (2d Cir. 2014) ................................................................................ 18

*Pension Comm. of Univ. of Montreal Pension Plan v. Banc of Am. Sec., LLC*,
   592 F. Supp. 2d 608 (S.D.N.Y. 2009) .................................................................. 47

*Press v. Chem. Inv. Servs. Corp.*,
   166 F.3d 529 (2d Cir. 1999) ................................................................................ 33

*Provenz v. Miller*,
   102 F.3d 1478 (9th Cir. 1996) ............................................................................. 26

*S. Cherry St., LLC v. Hennessee Grp. LLC*,
   573 F.3d 98 (2d Cir. 2009) .................................................................................. 32

*S.E.C. v. Caserta*,
   75 F. Supp. 2d 79 (E.D.N.Y. 1999) ............................................................... 26, 37

*S.E.C. v. First Jersey Sec., Inc.*,
   101 F.3d 1450 (2d Cir. 1996) .............................................................................. 50

*SEC v. Gabelli*,
   653 F.3d 49 (2d Cir. 2011) .................................................................................. 17

*Singh v. Cigna Corp.*,
   918 F.3d 57 (2d Cir. 2019) .................................................................................. 17

*Stratte-McClure v. Morgan Stanley*,
   776 F.3d 94 (2d Cir. 2015) .................................................................................. 18

*Strougo v. Barclays PLC*,
   105 F. Supp. 3d 330 (S.D.N.Y. 2015) .................................................................. 26

*Szulik v. Tagliaferri*,
   966 F. Supp. 2d 339 (S.D.N.Y. 2013) .................................................................. 36

*Tellabs, Inc. v. Makor Issues & Rts., Ltd.*,
   551 U.S. 308 (2007) ............................................................................................ 32

*United States v. Erickson*,
   601 F.2d 296 (7th Cir. 1979) ............................................................................... 38

*Vanleeuwen v. Keyuan Petrochemicals, Inc.*,
   No. 13 CIV. 6057 PAC, 2014 WL 3891351 (S.D.N.Y. Aug. 8, 2014) .................. 36

*Villella v. Chem. & Mining Co. of Chile Inc.*,
   No. 15 CIV. 2106 (ER), 2017 WL 1169629 (S.D.N.Y. Mar. 28, 2017)................................. 26

*Wechsler v. Steinberg*,
   733 F.2d 1054 (2d Cir. 1984) ............................................................................................. 33

**Rules**

Fed. R. Civ. P. 56(a) ............................................................................................................. 16

**Regulations**

17 C.F.R. § 210.4-01(a)(1)..................................................................................................... 26

Lead Plaintiff 683 Capital Partners, LP ("683 Capital") and Class Representatives Shipco

Transport Inc. and E-Global Trade and Finance Group, Inc. (collectively, "Plaintiffs"), submit this

memorandum of law in opposition to Defendants' Motion for Summary Judgment (ECF. No. 247)

("Motion").[1]

## I.      PRELIMINARY STATEMENT

Defendants claim that a reasonable person could not find from the facts of this case that

Defendants committed securities fraud. In fact, reasonable persons have already done so. The U.S.

Commodities Futures Trading Commission ("CFTC") and National Futures Association ("NFA")

reviewed the same factual circumstances and found not only that Defendants publicly

misrepresented FXCM's relationship with Effex, but also that their misconduct was so severe it

merited barring Defendants from operating in the U.S. Defendants protest that they admitted no

wrongdoing in their settlements with the regulators, but the drastic penalties they agreed to speak

for themselves. This was no slap on the wrist. Indeed, settlements require concessions from both

sides, and barring Defendants from operating in the U.S. was the penalty that the regulators settled

for. A reasonable jury will easily be able to find, as the CFTC and NFA already did, that the facts

and evidence in this action support Plaintiffs' allegations of securities fraud.

Defendants' attempts to retrofit their conduct into a story of innocence do not hold water.

While FXCM claimed to be offering its customers a "No Dealing Desk" trading model free from

conflict of interest, in truth they were receiving the lion's share of trading profits from a market

maker, Effex Capital, LLC ("Effex"), trading against FXCM's retail customers. Effex was created

---

[1] References to "MSJ" are to Defendants' memorandum in support of their Motion. ECF. No. 248. References to "¶__" are to the paragraphs of Plaintiffs' Rule 56.1 Statement of Additional Material Facts, filed herewith (¶¶148-313), and to Defendants' Rule 56.1 Statement of Undisputed Material Facts (¶¶1-147) (ECF. No. 250). Emphasis is added and internal citations and quotations are omitted unless otherwise indicated.

when FXCM's compliance department determined that FXCM could not earn profits from its internal market making operation and still truthfully claim to offer a "No Dealing Desk," so FXCM spun off the operation as Effex. However, FXCM kept its share of Effex's profits and did not disclose the relationship to its customers or investors.

Contemporaneous documents show that FXCM's relationship with Effex was a profit-sharing arrangement and not an arm's length contractual agreement. Defendants attempt to self-exculpate by relying almost exclusively on their own self-serving statements, made years after the fact while facing down twin regulatory investigations. Defendants' say-so does not refute contemporaneous documentary evidence. Neither does the self-interested testimony of Effex's principal, John Dittami, as Effex was reliant on FXCM and complicit in attempting to hide the true nature of the companies' relationship.

This Court, or a jury, would hardly be the first to pass judgment on the facts of this case. Defendants' motion for summary judgment must be denied because not only *could* reasonable people find that the evidence supports Plaintiffs' claims, they already have.

## II.   SUMMARY OF MATERIAL FACTS

### A.   Background of FXCM

Defendants William Ahdout and Dror Niv, with four other partners, founded FXCM in 1999 to provide online foreign exchange ("forex") trading and related services. ¶¶1, 148. FXCM offered its retail customers access to over-the-counter forex trading through its online trading platform. ¶2. Until 2007, FXCM offered its customers a "dealing desk" trading model, where it acted as the direct counterparty to retail customers' forex trades. ¶9.

In 2007, FXCM debuted its "agency" or "No Dealing Desk" ("NDD") model for retail trading. ¶10. In this model, FXCM provided customers with a price based on bid/ask quotes from

a stable of liquidity providers – typically banks, financial institutions, and other market makers. ¶12. When a customer placed an order to execute a trade, FXCM would facilitate that order by simultaneously executing the customer's trade and an offsetting trade with the market maker offering the best price. ¶13. In the NDD model, FXCM made money primarily by adding a markup to the bid/ask quotes and keeping that markup as a commission for executing the trades. ¶14.

From the customer's perspective, in the NDD model FXCM was supposed to serve merely as an intermediary, and the counterparty on the other side of the customer's trade was not FXCM (other than in a technical sense in executing the simultaneous offsetting trades), but one of the supposedly independent market makers. The Company touted that its "agency model is fundamental to our core business philosophy because we believe that it aligns our interests with those of our customers." ¶149. FXCM told its customers and investors that the key difference between the dealing desk and NDD models was that the NDD model eliminated conflicts of interests because FXCM would no longer take the opposite side of customers' trades. ¶150. In other words, FXCM represented that in the NDD model, customers weren't betting against the house, they were betting against other players (the independent market makers) at FXCM's table. The shift to an NDD model proved a successful strategy for FXCM, and by 2010, FXCM was one of the largest forex brokers in the global online market. ¶1.

**B.    FXCM Hires Dittami to Create an In-House Liquidity Provider**

Unsatisfied with merely providing the table and taking a commission, Defendants decided they wanted a piece of the action too. ███████████████████████████████

████████████████████████████████████████████████

████████████████████████. ¶¶161-62. ████████████████████

████████████████████████████████████████████,



¶162.

¶22.

¶169.

¶165.

¶¶165, 167.

¶167.

¶167.

¶171.

¶172.

¶173.

*Id.*

¶168.

¶169.

*Id.*



¶180.

¶177.

¶174.          ¶¶175-76.

C.     **FXCM and Effex Set up a Financial Relationship Mirroring FXCM's Profit-Sharing Arrangement with Dittami**

¶178.

¶179.

¶¶181-82.

¶183.

¶184.          *Id.*



¶185.

¶186.

*Id.*

¶204.

¶186.

¶187.

¶188.

¶190.

191.

*Id.*



¶¶192-93.

¶192.

¶197.

¶194.

¶196.

¶¶200-01.

¶195.

¶¶205-210.

¶205.

*Id.*

¶199.

¶200.

████████████████████████████████████████████ ¶202. ███████████████

████████████████████████████████████████████████████

██████████████████████████████████ ¶203.

   ███████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████ ¶211. ███████████████████████

████████████████████████████████████████████████████

█████████████████ ¶212. ████████████████████████████

██████████████████████ ¶201. █████████████████████████

████████████████████████████████████████████████████

████████████████████████████ ¶213. ██████████████████

████████████████████████████████████████████████████

██████████████████████████ ¶214.

**D.     Effex's Payments to FXCM Varied With Effex's Trading Profits**

███████████████████████████████████████████

██████████ ¶215.

███████████████████████████████████ *Id.* ███████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████ ¶216.





*Id.*

¶226.

*Id.*

¶227.

¶228.

*Id.*

¶229.

¶231.

¶232.

¶234.

*Id.*



**E.     Effex Depended on FXCM, Which Provided Effex Extensive Support and Granted Trading Advantages So Effex Would Win More Trading Volume**

¶235.

*Id.*

. ¶236.

¶237.

. ¶238.

*Id.*

FXCM was Effex's main lifeline.

¶239.

*Id.*

¶240.

¶241.

11



¶242.

¶243.                                                    ¶244.

. *Id*.

¶245.

¶246.

¶247.

. ¶248.

From the beginning of Effex's existence, FXCM also provided significant trading advantages to Effex over other liquidity providers to allow Effex to win more trading volume.

¶250.

¶251.

¶¶95, 252.

. ¶253.



███████████████████ ¶254. ██████████████████████████████████

████████████████████████████████████████████████████████ *Id.*

███████████████████████████████████████████████████████████

███████████████████████████████████████████████████████████

██████ ¶255. ██████████████████████████████████████████████

███████████████████████████████████████████████████████████

████████████████████ *Id.*

████████████████████████████████████ *Id.*

███████████████████████████████████████████████████████████

███████████████████ ¶256. ██████████████████████████████████

██████████████████ *Id.*

████ ¶257. ████████████████████████████████████████████████

███████████████████████████████████████████████████████████

████████████████████ ¶258. ████████████████████████████████

████████████████████████████████████████████ ¶259. █████████

████████████████████████████████████████████████████ *Id.*

## F.      Defendants Tried to Conceal FXCM's Relationship With Effex

Throughout the Class Period, and with redoubled efforts once regulators began to investigate, Defendants attempted to conceal FXCM's relationship with Effex. █████████████

███████████████████████████████████████████████████████████

███████████████████████████ ¶261. ████████████████████████

███████████████████████████████████████████████████████████

███████████████████████████████████████████████████████████

████████████████████████████████████████ ¶262. ███████████

████████████████████████████████████████████████████

██████████████ *Id.* ███████████████████████████████████

████████████████████████████████████ ¶263. ████████

████████████████████████████████████████████████████

█████████████████████████████████ ¶264.

FXCM employees also provided false or misleading responses to regulators' questions regarding Dittami and Effex. ████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

█████████████████████████████ ¶265. ██████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

███████████████ ¶161, ███████████████████████████████

████████████ ¶266.

**G.    Regulators Investigate FXCM's Relationship with Effex**

████████████████████████████████████████████████████

███ ¶267. ████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████ ¶268. ███████████

████████████████████████████████████████████████████



can point to no contemporaneous evidence indicating otherwise.

In February 2017, after years of parallel regulatory investigations, FXCM entered into settlements with the NFA and CFTC. On February 6, 2017, the CFTC announced that it banned the Company from operating in the U.S. and fined the Company $7 million, after finding that FXCM was taking undisclosed positions opposite its retail customers. ¶273. In its Order dated February 6, 2017 ("CFTC Order"), the CFTC found that "FXCM and FXCM Holdings, by and through their officers, employees, and agents, including Respondents Niv and Ahdout, engaged in false and misleading solicitations of FXCM's retail foreign exchange ('forex') customers" by concealing that "FXCM had an undisclosed interest in the market maker [Effex] that consistently 'won' the largest share of FXCM's trading volume - and thus was taking positions opposite FXCM's retail customers." ¶274.

The same day, the NFA issued a Complaint and a Decision against FXCM, Niv, Ahdout, and Niv's sister, Ornit Niv. ¶275 The NFA found that the defendants committed the violations alleged in the NFA's Complaint, including that FXCM directed customer trades to a liquidity provider, Effex, "that was purportedly independent but which FXCM actually supported and controlled. *Id*. The NFA found that in exchange for the order flow that FXCM directed to Effex,

Effex paid rebates to FXCM that amounted at times to as much as 70% of Effex's profits from FXCM's order flow and which FXCM referred to internally as 'P&L'." ¶276.

The Company also issued a press release on February 6, 2017, disclosing the settlements with the NFA and CFTC and announcing that the Company would withdraw from doing business in the U.S. pursuant to the CFTC's order. ¶277. On this news, the Company's share price fell $3.40, over 68%, and the price of FXCM Notes fell over 42%. ¶278.

Two weeks later, Niv resigned as CEO and director, and FXCM changed its name to Global Brokerage Inc. ¶279. In December 2017, the Company filed for Chapter 11 bankruptcy. ¶280.

## III.    ARGUMENT

### A.    Defendants Bear a Heavy Burden on Their Motion for Summary Judgment

A motion for summary judgment may not be granted unless all of the submissions taken together "show[] that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). "An issue of fact is genuine if the evidence is such that a reasonable jury could return a verdict for the nonmoving party. A fact is material if it might affect the outcome of the suit under the governing law." *Frost v. New York City Police Dep't*, 980 F.3d 231, 242 (2d Cir. 2020). In making this determination, the court "constru[es] the evidence in the light most favorable to the nonmoving party and draw[s] all reasonable inferences and resolv[es] all ambiguities in its favor." *Jaffer v. Hirji*, 887 F.3d 111, 114 (2d Cir. 2018). The burden on this motion is on Defendants, as the moving party, to show that there are no open questions of material fact. *See Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986).

In deciding a motion for summary judgment, "[t]he role of the court is not to resolve disputed issues of fact but to assess whether there are any factual issues to be tried." *Cuff ex rel. B.C. v. Valley Cent. Sch. Dist.*, 677 F.3d 109, 119 (2d Cir. 2012). "Credibility determinations, the

16

weighing of the evidence, and the drawing of legitimate inferences from the facts are jury functions, not those of a judge." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986); *Barrows v. Seneca Foods Corp.*, 512 F. App'x 115, 117 (2d Cir. 2013).

To succeed on a claim brought under Section 10(b) of the Securities Exchange Act of 1934 ("Exchange Act") and Rule 10b-5 promulgated thereunder, a plaintiff must show (1) a material misrepresentation or omission (falsity), (2) scienter, (3) a connection with the purchase or sale of a security, (4) reliance, (5) economic loss, and (6) loss causation. *Singh v. Cigna Corp.*, 918 F.3d 57, 62 (2d Cir. 2019). Defendants have moved for summary judgment on Plaintiffs' and the Class's Section 10(b) claims with respect to the elements of falsity, scienter, loss causation, and economic loss, and with respect to the element of reliance only as to 683 Capital's individual claim.

### B.   The Evidence Supports a Finding that Defendants Made Material Misrepresentations and Omissions

To show falsity, a plaintiff must identify a statement "that is either 'untrue' outright or 'misleading' by virtue of what it omits to state." *In re Vivendi, S.A. Sec. Litig.*, 838 F.3d 223, 239 (2d Cir. 2016) ("*Vivendi II*"). Whether a statement is misleading must be "evaluated not only by literal truth, but by context and manner of presentation." *Singh*, 918 F.3d at 63. "Even a statement which is literally true, if susceptible to quite another interpretation by the reasonable investor, may properly be considered a material misrepresentation." *Kleinman v. Elan Corp., plc*, 706 F.3d 145, 153 (2d Cir. 2013); *see also SEC v. Gabelli*, 653 F.3d 49, 57 (2d Cir. 2011) ("The law is well settled ... that so-called half-truths--literally true statements that create a materially misleading impression--will support claims for securities fraud."), *rev'd on other grounds*, 568 U.S. 442 (2013). "For that reason, the disclosure required by the securities laws is measured not by literal truth, but by the ability of the material to accurately inform rather than mislead prospective buyers." *McMahan & Co. v. Wherehouse Ent., Inc.*, 900 F.2d 576, 579 (2d Cir. 1990).

An omission is actionable when the speaker "is subject to a duty to disclose the omitted facts." *In re Synchrony Fin. Sec. Litig.*, 988 F.3d 157, 167 (2d Cir. 2021). A duty to disclose "may arise when there is ... a statute or regulation requiring disclosure, or a corporate statement that would otherwise be inaccurate, incomplete, or misleading." *Stratte-McClure v. Morgan Stanley*, 776 F.3d 94, 101 (2d Cir. 2015). "Even when there is no existing independent duty to disclose information, once a company speaks on an issue or topic, there is a duty to tell the whole truth." *Meyer v. Jinkosolar Holdings Co.*, 761 F.3d 245, 250 (2d Cir. 2014). In assessing whether a statement is misleading, "[t]he touchstone of the inquiry is not whether isolated statements within a document were true, but whether defendants' representations or omissions, considered together and in context, would affect the total mix of information and thereby mislead a reasonable investor regarding the nature of the securities offered." *Halperin v. eBanker USA.com, Inc.*, 295 F.3d 352, 357 (2d Cir. 2002).

### 1. Defendants' Statements About FXCM Offering Agency Model Trading Were False and Misleading

█████████████████████████████████████████████████

█████████████████████████████████████████████████

██████████████████████████████████ 165. That was because Defendants recognized it would be untruthful or materially misleading to say that FXCM was not on the other side of customers' trades if it were, in fact, reaping the trading profits from a liquidity provider that was on the opposite side of customers' trades.

There were two honest paths Defendants could have chosen: disclose that FXCM was trading opposite its customers, through EES or Effex, and keep the trading profits, or forgo the trading profits and spin off EES as a truly independent liquidity provider. Instead, Defendants tried to have their cake and eat it too. They kept the trading profits, but instead of disclosing their conflict

of interest, they disguised the trading profits as "payments we receive for order flow from FX market makers." ¶155. Just as it was untruthful to claim that FXCM was operating an agency model when it earned profits from EES's trading against its customers, it was untruthful to make the same claims when FXCM took profits from Effex's trading against FXCM's customers.

The relevant facts are simple: (1) ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ ▮▮▮▮▮▮▮▮▮▮▮ ¶173; and (2) ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ ¶¶178-234. ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ ▮▮▮▮▮▮▮▮. Market participants do not make money only by buying a currency and hoping the market price for that currency moves in their favor while the trading partner does the same. In reality, market participants are free to pursue any number of trading strategies, just as Effex did. Whether Effex hedged its position or not, or how quickly it did so, does not change the fact that it traded opposite the customer. If Effex buys a customer's yen for euros, it does not matter what Effex does with those yen *after the trade*, just as it does not matter what the customer does with the euros. After the trade, either party could hold their new position, they could immediately hedge, or they could cash out and light their legal tender on fire if they felt so inclined.

The same is true in a dealing desk model. A dealing desk can do the same things after the customer trade—▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ as Effex did. ¶281. Therefore, to the extent Defendants argue that FXCM, through Effex's hedging strategies, was "not exposed to market risk," neither was a dealing desk. Likewise, to the extent Defendants argue that FXCM,

through Effex's hedging strategies, "did not earn profits that were causally linked to customers' profits and losses," MSJ at 16, the same was true of a dealing desk.

Indeed, this underscores that the principal appeal of FXCM's No Dealing Desk model, and the true distinction between a dealing desk model and the agency model that FXCM touted, was that when customers traded on FXCM's platform, FXCM purported not to have a stake in the opposing side of the trade. That was the "major conflict of interest" that FXCM repeatedly claimed to eliminate through the NDD model. ¶¶150, 153-54. That Effex (or FXCM's other liquidity providers) may have hedged their positions after a customer trade instead of simply holding their positions was indistinct from a dealing desk model.

Thus, Defendants' statements about FXCM's agency model, ¶¶149-54, were materially false and misleading because the kickbacks FXCM received from Effex meant that FXCM had a significant financial interest in the liquidity provider standing opposite its customers' trades. FXCM's majority stake in Effex's trading profits meant that: (1) FXCM's NDD model did not truly "align[] our interest with those of our customers," ¶149; (2) the risk that FXCM "could suffer reputational damage and additional regulatory scrutiny by offering execution to retail clients that creates an inherent conflict between the interests of the customer and our interests" was not based on FXCM separately and explicitly offering dealing desk execution, ¶150, but had already materialized based on the conflict of interest in the NDD model through Effex; (3) FXCM was not truly "commit[ted] to the agency model" due to its undisclosed conflict of interest with its customers, ¶151; (4) FXCM did not "predominantly operate [its] retail business on an agency

20

model," ¶152; and (5) that FXCM did not directly take a market position did not "eliminat[e] a major conflict of interest" between FXCM and its customers, ¶¶153-54.[2]

FXCM's statement that FXCM was not exposed to market risk through its agency model, ¶153, was also false and misleading. Plaintiffs do not claim that FXCM took market positions directly, but it was nonetheless exposed to market risk through its stake in Effex's trading profits. Effex was exposed to market risk in the same way that a dealing desk was – they were exposed to the extent they did not hedge their positions. When Effex's trading profits fell, it paid FXCM less. Thus, even if FXCM did not suffer direct losses due to market movements, its revenues decreased when Effex made less and paid FXCM less through the variable monthly payments.

### 2. Defendants' Statements and Omissions About Order Flow Payments Were False and Misleading

Defendants' statements about "order flow" payments FXCM received, ¶¶155-58, were materially misleading because they misrepresented the source of the payments and omitted that FXCM was receiving kickback payments comprising up to 70% of Effex's trading profits. Plaintiffs do not assert that Defendants' revenue figures were quantitatively inaccurate, but rather that Defendants misrepresented the source of FXCM's retail trading revenues and the nature of the purported "order flow" payments. *In re VEON Ltd. Sec. Litig.*, No. 15-CV-08672 (ALC), 2017 WL 4162342, at *6 (S.D.N.Y. Sept. 19, 2017) ("A company's misleading statements about the sources of its revenue do not make the company's statements of the revenue figures misleading," but falsity may nonetheless be found based on the "misleading statements themselves.").

---

[2] Defendants falsely assert that the alleged false statements from FXCM's website were not identified in the complaint. MSJ at 5-6, n. 2-3. In fact those statements are quoted verbatim in the complaint. ECF No. 181 ¶¶ 179-180. Statement No. 6 (MSJ at 6) was mistakenly described in the complaint as occurring in January 2014, an inadvertent typo, but as the link in the complaint makes clear, it occurred on February 5, 2013, as correctly identified in Plaintiffs' interrogatory responses.

Defendants' statements that FXCM's retail trading revenue was primarily driven by, among other things, "payments we receive for order flow from FX market makers," ¶155, and that this income "represents payments received from certain FX market makers in exchange for routing trade orders to these firms for execution," ¶156, were misleading because (1) the "order flow" payments FXCM received from Effex were actually kickbacks of Effex's trading profits ¶¶178-234; and (2) during the periods covered by these statements, no other market maker paid FXCM for order flow from retail trading. ¶¶205-10. Defendants' statements that FXCM "generate[s] our trading revenues based on the volume of transactions, not trading profits or losses," ¶157, were false and misleading because FXCM generated trading revenues not only based on volume, but also from kickback payments from Effex, which varied based on Effex's trading profits. ¶¶178-234. Finally, Defendants' statements that FXCM "no longer receive[d] payments for order flow," ¶158, were misleading because the only "payments for order flow" that FXCM received during the relevant periods were actually kickbacks of Effex's trading profits. ¶¶178-234.

The monthly payments FXCM received from Effex were order flow payments in name only.



. ¶192.

¶¶217, 220, 223, 225, 228, 231.

. ¶¶194, 217, 220, 223, 225, 228, 232.

. ¶¶217, 220, 225, 228, 231.



. ¶195.

In reality, Effex's payments to FXCM represented the parties' attempts to approximate a split of Effex's trading profits from FXCM trading volume whereby FXCM kept the lion's share of the profits.

¶183.

¶184.

.[3] ¶¶186-88. Defendants' only evidence to the contrary consists of self-serving statements made years later during regulators' investigations. *See* ¶¶49-56.

MSJ at 18,

¶¶271-72.

_____

[3]

MSJ at 18,

reflects that the parties still viewed the relationship as guided by the 70-30 profit-sharing split, not a fixed-rate fee for order flow strictly following the services agreements.



¶190. Thus, a reasonable juror could determine that the parties strove to maintain a profit-sharing relationship.

In contrast, the parties' actions demonstrate that the services agreement did not govern the payments. ███████████████████████████████████████

███████████████████████████████████████ ¶¶199-201. ███████████████████████████████ ¶¶217, 220, 225, 228, 231. ███████████████████████████ ¶215. ███ ███████████████████████████████████ (¶224), demonstrating that the parties did not view the agreement as governing Effex's payments to FXCM. These facts contradict Defendants' argument that the services agreements strictly governed the parties' payments and financial relationship.[4]

Testimony from Defendants' forex industry witness, Mr. Wilson-Taylor, also reveals that the circumstances of Effex's payments were unlike the payments for order flow that he and Defendants assert are "common" in forex or equities markets. MSJ at 11. ███████████████

---

[4] ███████████████████████████████████████████████, MSJ at 18, ███████████████████████████████████████, ¶¶217, 220, 225, 228, 231.



¶283.

¶¶285-86.

¶286.

*Id.*

¶¶205-10.

¶210.

MSJ at 26.

It defies logic to suggest that FXCM could strike a similar deal as it had with Effex in an arm's length transaction.

----

5

¶285.

████████████████████████ ¶210. These facts show that Effex's payments to FXCM were not standard payments common in the industry, but unique payments that FXCM extracted only from Effex.[6]

### 3.   FXCM's Financial Statements Violated GAAP and Were Misleading

SEC regulations dictate that where financial statements are not prepared in compliance with U.S. Generally Accepted Accounting Principles ("GAAP"), they are presumed to be misleading. 17 C.F.R. § 210.4-01(a)(1); *see also SAIC*, 818 F.3d at 93. Whether GAAP violations occurred is a fact-specific issue. *S.E.C. v. Caserta*, 75 F. Supp. 2d 79, 94 (E.D.N.Y. 1999) (denying summary judgment) (citing *In re Burlington Coat Factory Sec. Litig.*, 114 F.3d 1410, 1421 (3d Cir. 1997) ("it is a factual question whether [defendants'] accounting practices were consistent with GAAP"); *Provenz v. Miller*, 102 F.3d 1478, 1490 (9th Cir. 1996) (reversing grant of summary judgment because the "district court was wrong in resolving the factual disputes which exist as to the underlying transactions," particularly their accordance with GAAP)).

Determinations of GAAP violations frequently turn on expert testimony. *Caserta*, 75 F. Supp. 2d at 91 (citing *Provenz*, 102 F.3d at 1490 ("Not only have plaintiffs provided documentary

---

[6] Defendants do not expressly challenge materiality, including as to the statements about payments for order flow. However, Defendants imply that because the order flow payments represented only a small portion of FXCM's total revenues, the statements about order flow revenues were not material. MSJ at 9. This is not true. ████████████████████████████████████████████
████████████████████████ ¶295. In any event, Defendants' argument has been consistently rejected by courts in the Second Circuit. *See, e.g., Indiana Pub. Ret. Sys. v. SAIC, Inc.*, 818 F.3d 85, 96 (2d Cir. 2016) (undisclosed kickback scheme that "was worth a fraction of SAIC's yearly revenues" was material given company's "possible exposure to significant civil and even criminal liability"); *Villella v. Chem. & Mining Co. of Chile Inc.*, No. 15 CIV. 2106 (ER), 2017 WL 1169629, at *12 (S.D.N.Y. Mar. 28, 2017) (failure to account for bribery payments representing 0.5% of income, but which caused a decrease in stock price, affected the company's reputation, and subjected the company to regulatory penalties, was material to investors); *Strougo v. Barclays PLC*, 105 F. Supp. 3d 330, 349 & n.119 (S.D.N.Y. 2015) (statements regarding trading platform that accounted for 0.1% of total revenue, but which "call into question the integrity of the company as a whole" were material to investors).

evidence that defendants may have [violated GAAP], they also provided expert testimony in support of their contentions."); *Fine v. Am. Solar King Corp.*, 919 F.2d 290, 298 (5th Cir. 1990) (reversing grant of summary judgment because "a reasonable jury ... might believe the [p]laintiffs' expert and find that [defendant] knew that it was issuing a false and misleading report, or that it was severely reckless in issuing its report")).

There is no dispute as to whether FXCM made the disclosures or consolidation necessary if Effex were a related party or variable interest entity ("VIE"). It did not. The only dispute as to whether Defendants violated GAAP is whether the facts show that Effex was a related party or VIE. *See* MSJ at 19-22. Plaintiffs have proffered evidence which, as explained in the reports submitted by Plaintiffs' accounting expert, Mr. Barron (ECF Nos. 240-1 and 240-3), demonstrates at least a genuine issue of material fact as to whether Effex was a related party or VIE, and thus whether FXCM's financial statements violated GAAP.

### a.   FXCM Was Required to Disclose Effex as a Related Party



Defendants do not contest the standard Mr. Barron applied in reaching his opinion. MSJ at 21.

Mr. Barron based his opinion on a thorough review of the facts of the case. Specifically, Mr. Barron pointed to the facts that, among other considerations: (1) ▓▓▓▓▓▓▓▓▓▓▓▓▓ ▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓ ¶¶171-72; (2) ▓▓▓▓▓▓▓▓▓▓▓▓ ▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓ ¶¶174-176, 238-40; (3) ▓▓▓▓ ▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓ ¶235; (4) ▓▓▓▓ ▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓ ¶¶241-47; (5)



¶¶235-38; (6)

¶184; and (7)

, ¶¶178-234. *See* ECF No. 240-1 (Barron Report) at 5-6.

Mr. Barron's rebuttal report thoroughly refutes the arguments made by Defendants and their expert. ECF No. 240-3. Defendants and their expert rely almost exclusively on Defendants' and Dittami's self-serving statements, which were made years after the fact during the course of regulatory investigations and often contradicted contemporaneous documentary evidence. MSJ at 21. Defendants' examples of a few operational activities that Effex conducted on its own, *see id.*, do not preclude a finding that FXCM could significantly influence Effex's management.

FXCM also further proved its ability to significantly influence Effex through the negotiations of Effex's payments to FXCM.



¶¶205-10.

¶212.

¶¶181-85. The existence, magnitude, and intent of Effex's payments to FXCM demonstrate that FXCM both could and did significantly influence Effex's management, further demonstrating that Effex was a related party from 2010-2014.

### b. FXCM Was Required to Consolidate Effex as a VIE

In the alternative, Mr. Barron's reports demonstrate that Effex was a VIE of which FXCM was the primary beneficiary. Once again, the parties do not diverge on the standard for this determination under GAAP, MSJ at 19, only on the application of facts. FXCM was required to consolidate Effex if (1) Effex was a VIE; (2) FXCM had a variable interest in Effex; and (3) FXCM was the primary beneficiary of Effex as a VIE. *See id.*

Effex was a VIE because it had insufficient equity at risk to permit it to finance its activities without additional financial support. ECF No. 240-1 at 6-7.



¶296.

. ECF No. 240-3 (Barron Rebuttal) at 21.

Mr. Barron also explains how Effex's payments to FXCM demonstrated FXCM's variable interest in Effex. *Id.* at 25-26.

. *Id.* at 26.

¶¶217, 220, 223, 225, 228, 231.

29

███████████████████████████████████████████. ¶¶194, 217, 220, 223,

225, 228, 232. Defendants do not contend that Effex suffered losses which FXCM did not absorb.

Finally, Mr. Barron explains how the evidence shows, and FXCM's management once

again later confirmed, that FXCM was the primary beneficiary of Effex. ██████████████



████████████████████████ ¶297. ████████████████████████████

██████████████████ ECF No. 240-3 at 27. ████████████████████

███████████████████████████████████. ¶235. ████████████████

████ ¶¶250-58. █████████████████████████████████████

███████ ¶¶259-60.

### c.   That FXCM's Auditor Approved FXCM's Financial Statements Does Not Vindicate Defendants' GAAP Violations

Defendants' attempt to use their auditor's sign-off as shield to accounting misconduct also

fails. Defendants repeatedly argue that because FXCM's auditor, E&Y, issued unqualified audit

opinions in connection with FXCM's financial statements, and never required FXCM to restate its

financials, FXCM must have complied with GAAP. *E.g.,* MSJ at 18-19, 27, 35. ████████████



ECF No. 240-3 at 34-37; and

(2) _id._ at 37-42.

. _Id._

_Id._ at 32-33.

. ¶299.

. _Id._

¶300. Thus, the fact that E&Y issued clean audit opinions does not vindicate Defendants' GAAP violations. Rather, this evidence shows that Defendants' concealed FXCM's relationship with Effex from its auditor.[7]

---

[7] Defendants omit from their brief any mention of the Sarbanes-Oxley Act of 2002 ("SOX") certifications attached to each 10-K and 10-Q, ¶¶301-313, which Plaintiffs also allege were false and misleading. ECF No. 181 (complaint) ¶¶ 169-72; _see also_ ECF No. 252-79 (Plaintiffs' interrogatory responses) at 4-16. In the event Defendants belatedly attempt to challenge these

### C.       Plaintiffs' Evidence Supports a Finding that Defendants Acted With Scienter

The required level of scienter under Section 10(b) is an "intent to deceive, manipulate, or defraud," which may be satisfied by showing Defendants' "reckless disregard for the truth." *S. Cherry St., LLC v. Hennessee Grp. LLC*, 573 F.3d 98, 109 (2d Cir. 2009). Plaintiffs may meet this standard with either facts "(1) showing that the defendants had both motive and opportunity to commit the fraud or (2) constituting strong circumstantial evidence of conscious misbehavior or recklessness." *ATSI Commc'ns, Inc. v. Shaar Fund, Ltd.*, 493 F.3d 87, 99 (2d Cir. 2007).

As the Second Circuit has explained, however, the distinction between these two means of proving scienter diminishes in importance at the summary judgment stage. *AUSA Life Ins. Co. v. Ernst & Young*, 206 F.3d 202, 221 n.12 (2d Cir. 2000). Indeed at the summary judgment stage, "the issue is whether the evidence, taken as a whole, could support a finding by a reasonable juror that defendants acted with the intent to deceive, manipulate, or defraud investors." *In re N. Telecom Ltd. Sec. Litig.*, 116 F. Supp. 2d 446, 462 (S.D.N.Y. 2000). In *AUSA Life Ins.*, the Second Circuit reversed the district court's finding that a defendant "lacked the motivation to commit fraud," because the district court "inappropriately makes the scienter issue one of 'what did the defendant *want* to happen' as opposed to 'what could the defendant reasonably foresee as a potential result of his action.'" 206 F.3d at 221 (emphasis in original).[8] At the summary judgment stage, "it is sufficient for a plaintiff to allege and prove that a defendant could have foreseen the consequences of his actions but forged ahead nonetheless" *Id.*

---

statements, Plaintiffs' evidence is likewise sufficient to demonstrate a genuine issue of material fact as to Defendants' liability with respect to the SOX certifications.

[8] "While it is true that motive can be a relevant consideration … the absence of a motive allegation is not fatal." *Tellabs, Inc. v. Makor Issues & Rts., Ltd.*, 551 U.S. 308, 322 (2007). Contrary to Defendants' arguments, MSJ at 23, the absence of insider stock sales does not negate Defendants' scienter. *See id.* at 325 (lack of insider stock sales is not fatal to scienter).

The Second Circuit is lenient in allowing scienter issues to withstand summary judgment, even if the inferences are fairly tenuous. *See Press v. Chem. Inv. Servs. Corp.*, 166 F.3d 529, 538 (2d Cir. 1999) (citing *In re Time Warner Inc. Sec. Litig.*, 9 F.3d 259, 270–71 (2d Cir. 1993)). Moreover, scienter is a question of fact, and therefore "appropriate for resolution by the trier of fact." *Press*, 166 F.3d at 538; *see Wechsler v. Steinberg*, 733 F.2d 1054, 1058–59 (2d Cir. 1984) ("Issues of motive and intent are usually inappropriate for disposition on summary judgment."). *See also In re Kidder Peabody Sec. Litig.*, 10 F. Supp. 2d 398, 415 (S.D.N.Y. 1998) ("Whether a plaintiff can establish scienter usually cannot be decided on summary judgment."); *In re Columbia Sec. Litig.*, 155 F.R.D. 466, 479 (S.D.N.Y. 1994) ("Resolution of the question of scienter, as with any issue of motive or intent, generally requires examination of a witness's demeanor and credibility and is thus usually inappropriate for disposition on summary judgment.").

Defendants rely heavily on the self-serving, *post hoc* testimony given by interested parties (themselves and Dittami) during regulatory investigations. "Because credibility determinations fall squarely within the province of the jury, [Defendants'] overwhelming reliance upon witness testimony further supports the conclusion that summary judgment is inappropriate in this case." *In re Longtop Fin. Techs. Ltd. Sec. Litig.*, 32 F. Supp. 3d 464, 475 (S.D.N.Y. 2014) (denying motion for summary judgment). As the Court in *Longtop* cautioned:

> Too often, judges substitute their own judgment for that of the jury. … Encroaching upon the province of juries to decide questions of fact, such as the determination of a defendant's state of mind, violates not only the constitutional rights of the parties in a suit, but also the constitutional rights of the jurors themselves.

*Id.* at 474. Courts "may grant summary judgment only where the facts are so one-sided that reasonable parties could not disagree on the outcome." *Id.* at 475. This case presents no such facts.

1.      **Plaintiffs' Evidence Shows Defendants' Conscious Misbehavior or Recklessness in Concealing FXCM's Relationship With Effex**

Defendants do not contest that Niv and Ahdout knew about FXCM's financial arrangements with Dittami and Effex. ██████████████. ¶162. ██████

██████████████████████████████████████

███████████████████████. ¶163.

██████████████████████████████████████

████████████████████████████████. ¶165.

████████████████████████████. ¶¶171, 174-76.

████████████████████████████. ¶¶183-84.

███████████████████████████. ¶192.

████████████████████████. ¶¶190-91.

█████████████████. 194. ██████████████

██████████████████████████████████████

██████. ¶¶217, 220, 223, 225, 228, 231.

Instead of denying their knowledge, Defendants argue that they "acted in good faith with the intention of improving the experience of FXCM's customers." MSJ at 24. Defendants miss the point. The issue is not that Defendants failed to disclose that Effex was acting as a liquidity provider. The issue is that Defendants failed to disclose that Effex was paying FXCM kickbacks of most of its profits from its trading against FXCM customers.

After Defendants determined that they could not have EES trade against retail customers and still claim to operate a NDD model, they could have disclosed that EES was trading against customers and explained how it would create all of the purported benefits to customers that

Defendants pointed to after the fact.[9] They chose not to disclose. Once Defendants decided to spin off EES as Effex, they could have disclosed the financial relationship, explaining why the arrangement nonetheless created all of these purported benefits for customers or even why it supposedly avoided creating a conflict of interest. Once again, they chose not to disclose. Defendants' own actions beg the question: if FXCM's relationship with Effex was arranged in "good faith" (MSJ at 24), actually aligned FXCM's interests with its customers (MSJ at 25), and produced tangible benefits (MSJ at 26), why did they choose not disclose it? The answer, as a reasonable juror could easily find, is that Defendants knew, or could reasonably foresee, that customers, investors, and regulators would see the financial arrangement with Effex for what it was: kickbacks from Effex trading against FXCM's customers.

Even if Defendants had laudable reasons for FXCM's *trading* relationship with Effex, a reasonable juror could still find that they acted with scienter in failing to disclose FXCM's *financial* relationship with Effex, *i.e.* the kickbacks. The kickbacks made Defendants' statements untrue; they were the means of Defendants' "plan to take advantage of FXCM's NDD clients." MSJ at 24 (quoting the Court's holding on Plaintiffs' scienter allegations at the pleading stage). Tellingly, Defendants do not claim that the kickbacks played any role in achieving the purported benefits from having Effex as a liquidity provider. FXCM could still have worked closely with Effex to improve execution without the kickbacks. Without the kickbacks, Effex would still have been motivated to provide superior execution to gain trading advantages and win more trading volume. In truth, the kickbacks were the result of FXCM taking advantage of its dominant

---

[9] ██████████████████████████████████████
████████████ ¶270. ████████████████████
████████████████████ *Id.* ████████████████
████████████████████████████████

bargaining power with Effex. Effex depended on FXCM, ¶¶235-248, ██████████ ██████████████████████████████████ ¶238. ██████████████████████████████████████████████████ ¶210.

Defendants' attempts to cover up FXCM's relationship with Effex, both in their public statements and in their responses to regulators, also constitute evidence of scienter. *E.g., Szulik v. Tagliaferri*, 966 F. Supp. 2d 339, 365 (S.D.N.Y. 2013).[10] ██████████ ██████████████████████ ¶261, ████████████ ¶¶262-63, ████████████ ¶264. ██████████████████████████████████ ¶¶265-66.

These facts are sufficient to raise at least a genuine issue of material fact as to Niv and Ahdout's scienter. Defendants do not contest that Niv or Ahdout's scienter may properly be imputed to FXCM. MSJ at 29. Therefore these same facts are also sufficient to raise a genuine issue of material fact as to FXCM's scienter.

### 2.    Defendants' GAAP Violations Were Made with Scienter

This Court previously found that Plaintiffs adequately alleged scienter by pleading that Defendants were aware of facts underlying the alleged misrepresentations and omissions, which included the GAAP violations. *See* ECF No. 135 at 31-33 (citing *Vanleeuwen v. Keyuan Petrochemicals, Inc.*, No. 13 CIV. 6057 PAC, 2014 WL 3891351, at *3 (S.D.N.Y. Aug. 8, 2014) (finding scienter was supported by allegations that defendant was aware of related-party transactions but failed to disclose them)). Plaintiffs have now proffered evidence showing Defendants' knowledge of these same underlying facts. "[C]ourts have found that egregious

---

[10] *See also In re Nature's Sunshine Prod. Sec. Litig.*, 486 F. Supp. 2d 1301, 1310 (D. Utah 2007) ("Evidence that a defendant has taken steps to cover-up [sic] a misdeed is strong proof of scienter"); *Baena v. Woori Bank*, 515 F. Supp. 2d 414, 421 (S.D.N.Y. 2007) ("The subsequent lies — the cover up — [are] strong circumstantial evidence of [...] 'conscious behavior' which raises an inference of an intent to defraud.").

violations of GAAP, or GAAP violations together with other evidence, may suffice" to satisfy the scienter standard. *Caserta*, 75 F. Supp. 2d at 94 (collecting cases and denying defendants' motion for summary judgment on scienter grounds).

This is not a case, as Defendants claim, where Plaintiffs' accounting expert simply proffered a "disagreement regarding the treatment of a complicated accounting issue." MSJ at 28. Whether Effex was a related party or VIE is not a complicated or unusual accounting issue. In fact, FXCM disclosed other related party transactions in each of its annual and quarterly reports during the time Effex was paying FXCM, and included assessments of VIEs in its annual and quarterly reports through the first quarter of 2013, so these were not foreign concepts. ¶159. Defendants, their expert, and their auditor, are simply crediting a different set of facts. As demonstrated above, a reasonable juror could conclude from the facts of this case that the version of facts credited by Plaintiffs' expert, "would also have required [Defendants] to make certain accounting disclosures," ECF No. 135 at 25, such as Effex being a related party or VIE.

Defendants' argument that E&Y approved FXCM's financial statements, MSJ at 27, does not vitiate a finding of scienter. Defendants cannot insulate themselves via E&Y's review of the services agreements and invoices, ██████████████████████████████████ ████████████████ *Supra*, section III(B)(3)(c). Defendants' argument echoes the one rejected by the court in *In re Lehman Bros. Sec. & ERISA Litig.*, 903 F. Supp. 2d 152, 186 (S.D.N.Y. 2012), where the defendants argued that they "acted without culpable intent because Ernst & Young 'knew of, vetted and approved'" the practices in question. As the court found in *Lehman Bros.*:

> The best that can be said for the Officer Defendants in these circumstances is that Ernst & Young's knowing approval, if that is what ultimately is established, of Lehman's "window dressing" of its financial statements to manipulate its net leverage might give rise to an exculpatory inference that a jury would find persuasive. But a contrary inference would be cogent and at least as compelling—

> namely, that the Officer Defendants knew full well of the misleading effect of their failure to disclose the Repo 105 transactions, sought to have Lehman benefit from that deception, and intended to use Ernst & Young as a fig leaf if the house of cards came tumbling down, as indeed it did.

903 F. Supp. 2d at 186. That is precisely what happened here. Defendants used the "window dressing" of its financial statements by omitting Effex as a related party or VIE, and misrepresenting the order flow payments, to conceal FXCM's relationship with Effex. Now they are attempting to "use Ernst & Young as a fig leaf" as their fraud is revealed. *Id.*

In the cases cited by Defendants, MSJ at 27-28, the auditors had "full knowledge" of the relevant facts, and the evidence "clearly rebut[ted] any inference of bad faith," neither of which were true here.[11] ███████████████████████████████████████

████████████████████████████████████████████████

████████████████ ¶¶204, 219, 221. ████████████████████████

███████████████████ *Supra*, section III(B)(3)(c). Defendants' knowledge of facts showing that Effex was a related party or VIE, and their withholding of material facts from E&Y, would allow a reasonable juror to conclude that Defendants acted with scienter in filing financial statements that violated GAAP. "If a company officer knows that the financial statements are false or misleading and yet proceeds to file them, the willingness of an accountant to give an unqualified opinion with respect to them does not negate the existence of the requisite intent or establish good faith reliance." *United States v. Erickson*, 601 F.2d 296, 305 (7th Cir. 1979).

The counterfactual underscores how Defendants' scienter extends to the GAAP violations. Had Defendants accurately disclosed Effex as a related party or VIE, the disclosure would have

---

[11] *See In re REMEC Inc. Sec. Litig.*, 702 F. Supp. 2d 1202, 1246 (S.D. Cal. 2010); *In re Cirrus Logic Sec. Litig.*, 946 F. Supp. 1446, 1465 (N.D. Cal. 1996).

revealed the underlying fraud. Defendants' GAAP violations were part and parcel of their efforts to conceal FXCM's relationship with Effex.

### D.     Plaintiffs' Evidence Supports a Finding of Loss Causation

The Court has already held that "based on Plaintiffs allegations, there is little doubt that the regulatory settlement's disclosure of FXCM's purported fraud, and its order that FXCM effectively stop doing business within the United States, had an immediate and tangible effect on the Company's value," which is "more than sufficient" to satisfy loss causation. ECF No. 135 at 36. The evidence, including reports from Plaintiffs' expert, amply support Plaintiffs' allegations.

To show loss causation, the Second Circuit requires plaintiffs to produce sufficient evidence for the fact finder to "ascribe some rough proportion of the whole loss" to defendants' fraud. *Lattanzio v. Deloitte & Touche LLP*, 476 F.3d 147, 158 (2d Cir. 2007). The Second Circuit has clarified that it was not suggesting that "plaintiffs were required to allege the precise loss attributable" to defendants' fraud. *Lentell v. Merrill Lynch & Co.*, 396 F.3d 161, 177 (2d Cir. 2005). Causation is fundamentally a factual matter ill-suited for resolution at summary judgment. *Id.* at 174 (noting that as a general matter, "the chain of causation ... is a matter of proof at trial").

Establishing loss causation requires a showing that "the <u>subject</u> of the fraudulent statement or omission was the cause of the actual loss suffered." *Vivendi II*, 838 F.3d at 261 (emphasis in original). "[A] plaintiff can establish loss causation either by showing a 'materialization of risk' or by identifying a 'corrective disclosure' that reveals the truth behind the alleged fraud." *Id.* Corrective disclosures and materializations of risk are not "fundamentally different pathways for proving loss causation." *Id.* "Whether the truth comes out by way of a corrective disclosure describing the precise fraud inherent in the alleged misstatements, or through events constructively disclosing the fraud, does not alter the basic loss-causation calculus." *Id.* at 262.

"[C]ourts assessing plaintiffs' case for loss causation look to whether the alleged damages were reasonably foreseeable given the alleged false or misleading statements." *In re Vivendi Universal, S.A. Sec. Litig.*, 634 F. Supp. 2d 352, 360 (S.D.N.Y. 2009) ("*Vivendi I*"). "To prove that the loss-inducing event was foreseeable, plaintiffs must establish that the risk of the event occurring was within the zone of risk concealed by the misrepresentations and omissions alleged." *Id.* at 363. Investors are entitled to recover for their losses attributable to a corrective disclosure so long as these events are "sufficiently related to the fraud." *Id.* at 364.

Plaintiffs claim that Defendants' fraud artificially inflated the prices of FXCM common stock and the FXCM Notes during the Class Period, and was revealed through disclosures about the regulatory settlements made on a single date, February 6, 2017 (after the close of trading), which dissipated the artificial price inflation and damaged Plaintiffs and the Class as the prices dropped the following day. ECF No. 181 (complaint) ¶¶ 79-83. Plaintiffs' expert, Dr. Werner, has submitted detailed reports explaining how the facts of this case support Plaintiffs' theory. ECF Nos. 245-1 and 245-3. As explained in greater detail in Plaintiffs' opposition to Defendants' motion to exclude Dr. Werner's reports, Defendants' arguments are unfounded, illogical, and at best they amount to factual disputes, precluding summary judgment.

Defendants' argument that Dr. Werner failed to disaggregate losses caused by confounding factors is wrong on the facts and the law. First, Dr. Werner did disaggregate losses caused by the corrective disclosures from losses caused by other factors. ECF No. 245-1 (Werner Report) at 26. Second, the "multiple pieces of information" that entered the market, MSJ at 31, ▮▮▮▮▮ ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ ECF No. 245-4, are nothing more than the direct and foreseeable ramifications of Defendants' fraud. To wit, the $7 million fine and the ban from operating in the U.S. were the penalties imposed by the regulators, and agreed to by

40

Defendants, for the regulators' findings that Defendants made material misrepresentations about FXCM's relationship with Effex – the same misrepresentations at issue here. ¶¶274-76. That FXCM would lay off 18% of its workforce and sell its customer accounts were not separate news, MSJ at 31, those were simply the machinations of FXCM being barred from operating in the U.S. The penalties imposed by regulators for the very misconduct they revealed, the same as Plaintiffs allege here, were well within "the zone of risk concealed by the misrepresentations," "sufficiently related to the fraud," and thus the damages from their revelation were "reasonably foreseeable," and sufficient to show loss causation. *Vivendi I*, 634 F. Supp. 2d at 360 and 363-64.

Defendants' argument that the "precise form" of the regulatory penalties were not perfectly foreseeable, MSJ at 31, imagines a novel and impossible standard. ███████████████████ ████████████████████████████ ECF No. 245-2 at 465:10-16, if you commit murder, you need not know with certainty the exact sentence that will be imposed to reasonably foresee that you will be punished severely for your actions. A prison sentence imposed years later is well within the zone of risk created by your misconduct.

Defendants' argument that the revelation of FXCM's relationship with Effex was no longer value relevant at the time of the corrective disclosures likewise has no basis in fact or law. The information was value relevant in that it revealed Defendants' misrepresentations and undisclosed risks which had never been incorporated by the market into the price of FXCM's securities. ECF No. 245-1 at 25; ECF No. 245-3 (Werner Rebuttal) at 9. First, the February 6, 2017 disclosures revealed that FXCM had been lying to its customers and investors about its NDD model for retail trading, which was purportedly "fundamental to our core business philosophy" and "our largest source of revenue." ECF No. 245-3 at 9; ¶¶149, 155. Second, the disclosures revealed undisclosed risks, including the risks that FXCM would suffer reputational damage, lose customers, and face

severe regulatory penalties, which all materialized upon the February 6, 2017 disclosures. ECF

No. 245-3 at 9-11. The undisclosed risks were not that regulators might generally inquire into

FXCM's business, MSJ at 34, but that FXCM's relationship with Effex and Defendants' attempts

to conceal and misrepresent that relationship were likely to result in severe regulatory penalties.

*See* ECF No. 245-3 at 6-7, 9. ██████████████████████████████████

████████████████████████████████████████████████████████████

████████████████ *Id.* at 6.

Defendants also misconstrue Plaintiffs' theory of the case and conflate loss causation with

reliance. Defendants' misrepresentations and omissions introduced artificial inflation into the price

of FXCM's securities *throughout* the Class Period. Defendants do not contend, nor can they, that

the misrepresentations or omissions were ever corrected or that any intervening event removed the

artificial inflation prior to February 6, 2017.[12] Defendants' argument that Plaintiffs could not have

"sustained losses attributable to a prior misstatement or omission" flaunts the basic tenets of the

fraud-on-the-market theory and attempts to shoehorn a misguided reliance argument.[13] As the

Supreme Court explained in *Basic Inc. v. Levinson*, 485 U.S. 224, 241–421 (1988):

> The fraud on the market theory is based on the hypothesis that… the
> price of a company's stock is determined by the available material
> information regarding the company and its business.... The causal
> connection between the defendants' fraud and the plaintiffs'
> purchase of stock in such a case is no less significant than in a case
> of direct reliance on misrepresentations.

---

[12] The Court has also already rejected Defendants' spurious argument, MSJ at 33, that the SNB
Flash Crash—which occurred two years before the corrective disclosure and which Defendants do
not claim revealed any of the alleged misrepresentations or omissions—somehow precludes loss
causation. ECF No. 135 at 35-36.

[13] Defendants have conceded that the Class of FXCM stock purchasers are entitled to the *Basic*
presumption of reliance. ECF No. 187 at 18 n.14. Defendants' arguments regarding 683 Capital's
reliance also fail as outlined below in section III(F)(1).

Finally, Defendants' argument that Plaintiffs cannot prove loss causation with respect to the GAAP violations also fundamentally misses the point. Defendants argue that FXCM's GAAP violations cannot be "corrected" absent a restatement. This assumption is baseless. *See, e.g., In re Chicago Bridge & Iron Co. N.V. Sec. Litig.*, No. 17 CIV. 01580 (LGS), 2019 WL 5287980, at *25–32 (S.D.N.Y. Oct. 18, 2019) (finding corrective disclosure of GAAP violations based on analyst reports without a restatement). "There is no requirement that the corrective disclosure take a particular form or be of a particular quality," such that it be a "mirror image tantamount to a confession of fraud." *In re Vale S.A. Sec. Litig.*, No. 1:15-CV-9539-GHW, 2017 WL 1102666, at *29 (S.D.N.Y. Mar. 23, 2017). The February 6, 2017 disclosures revealed facts underpinning Defendants' GAAP violations, namely that Effex was an undisclosed related party or VIE. *See* ¶¶274-76. The corrective disclosures need not "describe[e] the precise fraud" in terms of the GAAP violations so long as they "constructively disclos[ed] the fraud," which is sufficient to demonstrate loss causation. *Vivendi II*, 838 F.3d at 262.[14]

### E.   Plaintiffs' Evidence Supports a Finding that Plaintiffs and the Class Suffered Compensable Damages

Traditionally, Section 10(b) damages are calculated using the "out-of-pocket" damages rule. *See Acticon AG v. China N. E. Petroleum Holdings Ltd.*, 692 F.3d 34, 38 (2d Cir. 2012) (noting a defrauded buyer is entitled to damages equal to the difference between the price paid and the value of the stock when purchased). Indeed, the Supreme Court adopted the "out of pocket" damages rule in *Affiliated Ute Citizens of Utah v. United States*, 406 U.S. 128, 155 (1972). The generally accepted practice in securities fraud cases is to estimate "out-of-pocket" damages by

---

[14] To the extent Defendants' out-of-circuit district court cases conflict with the standard espoused by the Second Circuit in *Vivendi II*, 838 F.3d at 262, they are neither persuasive nor controlling. MSJ at 36 (citing *In re Scientific Atlanta, Inc. Sec. Litig.*, 754 F. Supp. 2d 1339, 1371 (N.D. Ga. 2010) and *In re Retek Inc. Sec. Litig.*, 621 F. Supp. 2d 690, 704 (D. Minn. 2009)).

reference to the decline in the stock price when a concealed risk has materialized. *See, e.g., Vivendi I*, 634 F. Supp. 2d at 358-59, 370-71 & n.6 (acknowledging the constant-dollar inflation ribbon methodology to be a reliable estimate of per share inflation in materialization-of-the-risk cases); *In re Novatel Wireless Sec. Litig.*, No. 08CV1689 AJB (RBB), 2013 WL 12144150, at *10 (S.D. Cal. Oct. 25, 2013) (finding the "commonly accepted method to calculate the value line known as backcasting" was a "reasonable and logical" method to assess the true value and artificial inflation in the stock price prior to the date of the corrective disclosure).

Dr. Werner's constant-dollar inflation method is appropriate to the facts in this case. Utilizing a constant-dollar inflation ribbon, Dr. Werner estimated $3.39 per share in out-of-pocket damages, based on the drop in FXCM's stock price on February 7, 2017, following the corrective disclosures made after close of trading the day prior. ECF No. 245-1 at 29. Dr. Werner used this widely-accepted method because Defendants' misrepresentations and omissions concealed the risks described above, *supra* section III(D), throughout the Class Period, including the reasonably foreseeable regulatory penalties. ECF No. 245-3 at 14-15. At all times during the Class Period, investors were deprived of the opportunity to price the concealed risks into FXCM's stock and thus overpaid for their investment. Accordingly, Dr. Werner's damage estimate methodology is an excellent fit with the facts and plaintiffs' theory of liability, and his use of a constant inflation ribbon is reasonable and appropriate. *Vivendi I*, 634 F. Supp. 2d at 358-59, 370-71 & n.6; *Liberty Media Corp. v. Vivendi Universal, S.A.*, 923 F. Supp. 2d 511, 525 (S.D.N.Y. 2013).

Defendants' argument that the level of inflation would have varied during the Class Period, or that the risk of regulatory penalties may have varied, are pure speculation.[15] █████████

---

15 █████████████████████████████████████████████████████████████████ *, see* ECF No. 245-4, ████████████████████████████████████████████████

███████████████████████████████████████████████████████████

███████████████████████████████████████████████. ECF No. 245-3 at 14-15.

FXCM's undisclosed relationship with Effex, rendering its public statements false and misleading, began two years prior to the start of the Class Period. Thus, even on day one of the Class Period, FXCM had been lying about its NDD model and order flow payments for at least a year.[16] *Id.* Defendants' argument relies on baseless speculation that, if the truth had been disclosed earlier during the Class Period: (1) FXCM's customers might not care as much about FXCM lying about its core business, (2) regulators might impose lighter punishments for Defendants' misrepresentations, and (3) investors might not devalue FXCM's securities by as much in light of the same fraud perpetuated over fewer years. ECF No. 245-3 at 7. Even if the precise terms of the regulatory settlements were not a *fait accompli* during the Class Period, the settlements were merely materializations of the underlying concealed risks which were all but certain: that customers, regulators, and investors would penalize FXCM for its fraud.

Accordingly, this case is unlike *In re: BP p.l.c. Sec. Litig.*, No. 4:10-MD-2185, 2016 WL 3090779 (S.D. Tex. May 31, 2016), which Defendants cite for the proposition that "when the corrective event is the materialization of an understated risk, the stock price movement on the date of the correction (*i.e.*, on the date that the risk materialized) will not equate to inflation on the date of purchase unless the probability of the risk materializing was 100 percent." MSJ at 38. In that case, at issue was *a portion of* damages attributable to price drops on days where the plaintiffs alleged secondary materializations (failures of containment measures) of the primary risk (the infamous oil spill). Here, the corrective event was the disclosure of FXCM's relationship with

---

███████████████████████████████████████████████. *See* ECF No. 245-3 at 14. Dr. Werner's approach is both appropriate and more conservative. *Id.* at 16.

[16] *See, e.g.,* FXCM's annual report for 2010, filed in March 2011. ¶160.

Effex, which coincided with the materialization of the concealed risks (the regulatory penalties),

unlike in *BP*. This same argument, that "plaintiffs must disaggregate the additional damages

caused by the materialization of risk from those attributable to risk itself" was rejected in *Vivendi*

*I,* 634 F. Supp. 2d at 371:

> Finally, it is hard to see how price declines allegedly caused by the
> materialization of the risk should not be incorporated into plaintiffs'
> damages. … Defendants are essentially arguing that plaintiffs
> should bear a risk they did not assume and that was intentionally
> concealed from them. Imposing liability for this loss would not be
> downside insurance for investors. Not imposing liability, however,
> might be a windfall for fraudsters.

No more is required to defeat summary judgment. Defendants may advance any substantive

arguments they may have about alternative causation at trial.

### F.      Plaintiffs' Evidence Supports 683 Capital's Individual Claims

Defendants argue that 683 Capital "has failed to put forth sufficient evidence to prove the

elements of reliance, loss causation, and economic loss for its individual claims." MSJ at 39. To

the contrary, the record contains ample evidence supporting each of these elements.

#### 1.      The Evidence Sufficiently Shows 683 Capital's Actual Reliance

To establish reliance, "a plaintiff must demonstrate that 'but for the claimed

misrepresentations or omissions, the plaintiff would not have entered into the detrimental securities

transaction' that led to the loss." *In re Puda Coal Sec. Inc. et al. Litig.*, No. 11-CV-2598 (DLC)

(HBP), 2017 WL 65325 at *9 (S.D.N.Y. Jan. 6, 2017) (quoting *ATSI*, 493 F.3d at 106), *adopted*

*sub nom. In re Puda Coal Sec. Inc.*, No. 11-CV-2598 (DLC), 2017 WL 511834 (Feb. 8, 2017). A

plaintiff can establish reliance by showing it was "aware of a company's statement and engaged in

a relevant transaction … based on that specific misrepresentation." *Id.* Actual reliance means "that

a plaintiff actually learned of these statements, took these statements seriously … and incorporated

these statements into its decision-making." *In re LIBOR-Based Fin. Instruments Antitrust Litig.*, No. 11 MDL 2262 (NRB), 2015 WL 6243526, at *61 (S.D.N.Y. Oct. 20, 2015).

Defendants argue that the deposition testimony of 683 Capital's representative, Joseph Patt, is "fatal to [683 Capital's] ability to prove the reliance element," MSJ at 40, because: (1) it is unclear which SEC filings 683 Capital reviewed (MSJ at 40); (2) there is no evidence that the alleged false and misleading statements were relevant to 683 Capital's decision to purchase FXCM Notes (MSJ at 41); and (3) Patt "had little understanding of the allegations" in the complaint (MSJ at 42). These arguments are without merit and are contradicted by Patt's deposition testimony.



¶288.

*Id.*

¶289. 683 Capital's review of FXCM's relevant SEC filings distinguishes this case from those cited by Defendants. *See* MSJ at 41 (citing *Pension Comm. of Univ. of Montreal Pension Plan v. Banc of Am. Sec., LLC*, 592 F. Supp. 2d 608, 630–31 (S.D.N.Y. 2009) (plaintiff did not receive the relevant documents); *Gabriel Cap., L.P. v. NatWest Fin., Inc.*, 177 F. Supp. 2d 169, 171 (S.D.N.Y. 2001) (plaintiff had not fully read the relevant documents); *Gallup v. Clarion Sintered Metals, Inc.*, 489 F. App'x 553, 557 (3d Cir. 2012) (plaintiffs did not read the relevant documents)).

Second, there is ample evidence that not only did 683 Capital read the documents at issue, but also that the false and misleading statements contained therein formed the basis of 683

Capital's decision to purchase FXCM Notes. ████████████████████████████
████████████████████████████████████████████████████. ¶290. ███████
████████████████████████████████████████████████████████████████
████████████████████████████████████████████████████████████████
████████████████████████████████████████████████████████████████
████████████████████████████████████████████████████████████████

████████ ¶291. That 683 Capital also considered other banal factors in making its investment decision does not negate the evidence that the misrepresentations in the documents 683 Capital reviewed affected 683 Capital's purchase decisions and were incorporated into its investment decision-making process.[17] *LIBOR-Based Fin. Instruments*, 2015 WL 6243526, at *61. Unlike in *Gruber v. Price Waterhouse*, 776 F. Supp. 1044, 1047 (E.D. Pa. 1991), cited by Defendants (MSJ at 42), the evidence shows that the misrepresentations here were not "irrelevant" to 683 Capital's investment decision.

Third, Defendants' argument that Patt had "little understanding of the allegations" in the complaint, MSJ at 42, is once again contradicted by his testimony. ████████████████
████████████████████████████████████████████████████████████████
████████████████████████████████████████████████████████████████
████████████████████████████████████████████████████████████████
████████████████████████████████ ¶293. ████████████████████████

---

[17] To the extent that ████████████████████████████████████████████████
████████████████████████████, there is no evidence that those factors were the "primary focus" of 683 Capital's investment decision, MSJ at 42, except insofar as those unremarkable opinions are held by any investor purchasing any security.

██████████████████ MSJ at 42, is of no moment because he nonetheless provided a substantive

and accurate explanation of the central claims in this case:



¶294. Patt's deposition testimony is sufficient to raise a genuine issue of material fact regarding

683 Capital's reliance, precluding summary judgment.

### 2. 683 Capital Raises Genuine Issues of Material Fact Regarding Loss Causation and Economic Loss

The standards for proving loss causation and economic loss are detailed above. *See supra*,

sections III(D) and (E). Defendants argue that because the Court found Plaintiffs "ha[d] not met

their burden of demonstrating that the FXCM Notes traded in an efficient market throughout the

Notes Period," ECF No. 229 at 37, therefore "Dr. Werner has no basis to conclude that the price

decline observed for the FXCM Notes on February 7, 2017, is a reliable and unbiased measure of

the price impact on that date." MSJ at 43-44. As Defendants merely regurgitate their meritless

arguments from their motion to exclude Dr. Werner's reports, Plaintiffs refer the Court to

Plaintiffs' memorandum in opposition to that motion. Dr. Werner's expert reports are reliable,

admissible, and sufficient to raise genuine issues of material fact as to the elements of loss

causation and economic loss with respect to 683 Capital's claims.

### G. Plaintiffs' Evidence Supports Their Claims Under Section 20(a)

Under Second Circuit law, to prove a claim under Section 20(a) of the Exchange Act, "a

plaintiff must show (1) a primary violation by a controlled person; (2) control of the primary

violator by the defendant; and (3) 'that the controlling person was in some meaningful sense a

culpable participant' in the primary violation." *Boguslavsky v. Kaplan*, 159 F.3d 715, 720 (2d Cir. 1998) (quoting *S.E.C. v. First Jersey Sec., Inc.*, 101 F.3d 1450, 1472 (2d Cir. 1996)). Defendants challenge only the first and third elements: a primary violation and culpable participation.

As demonstrated above, Plaintiffs have proffered sufficient evidence to raise a genuine issue of material fact as to whether FXCM committed a primary violation of Section 10(b). As further demonstrated above, Plaintiffs' evidence likewise raises a genuine issue of material fact as to whether Defendants Niv and Ahdout acted with scienter. This Court has previously equated the culpable participation element to scienter. ECF. No. 135 at 38 (finding that Plaintiffs adequately alleged culpable participation as to Niv and Ahdout because Plaintiffs adequately alleged Niv and Ahdout's scienter). Plaintiffs' evidence thus shows a genuine issue of material fact as to Niv and Ahdout's culpable participation.[18]

## IV.   CONCLUSION

The Court must deny Defendants' Motion because Plaintiffs have proffered evidence demonstrating genuine issues of material fact with respect to each of the challenged elements of Plaintiffs' claims: (1) that Defendants made false and misleading statements of material fact; (2) that Defendants acted with scienter; (3) that Defendants' misrepresentations and omissions proximately caused Plaintiffs' losses; and (4) that 683 Capital relied on Defendants' misrepresentations and omissions in purchasing the FXCM Notes.

---

[18] Alternatively, the Court may find Niv and Ahdout were "in some meaningful sense a culpable participant even though they do not meet the scienter requirements." *Boston Ret. Sys. v. Alexion Pharms., Inc.*, No. 3:16-cv-2127(AWT), 2021 WL 3675180, at *28-29 (D. Conn. Aug. 19, 2021) ("It is not apparent why a control person cannot be found, based on an individualized determination, to have been in some meaningful sense a culpable participant even when that control person does not have "conscious recklessness....").

Dated: December 9, 2021

**THE ROSEN LAW FIRM P.A.**

By: */s/ Joshua Baker*
Laurence M. Rosen
Phillip Kim
Joshua Baker
275 Madison Avenue, 40th Floor
New York, New York 10016
Telephone: (212) 686-1060
Fascimile:  (212) 202-3827
Email: lrosen@rosenlegal.com
        pkim@rosenlegal.com
        jbaker@rosenlegal.com

*Counsel for Plaintiffs and the Class*

**WOLF HALDENSTEIN ADLER
FREEMAN & HERZ LLP**
Matthew M. Guiney
270 Madison Ave.
New York, NY 10016
Tel: (212) 545-4600
Email: guiney@whafh.com

*Additional Counsel*

## <u>CERTIFICATE OF SERVICE</u>

I, the undersigned say:

I am not a party to the above case, and am over eighteen years old. On December 9, 2021, I served true and correct copies of the foregoing PLAINTIFFS' MEMORANDUM OF LAW IN OPPOSITION TO DEFENDANTS' MOTION FOR SUMMARY JUDGMENT, by posting the document electronically to the ECF website of the United States District Court for the Southern District of New York, for receipt electronically by the parties listed on the Court's Service List.

I affirm under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

Executed on December 9, 2021, at Jenkintown, Pennsylvania.

*/s/ Joshua Baker*

Joshua Baker
