# EXHIBIT 205



**WESTLAW CLASSIC**

SELECTED TOPICS

Securities Regulation

Federal Regulation
    False Registration Statement Provision and Prospectuses and Communications

**Secondary Sources**

**Conduct creating civil liability, under sec. 12(2) of Securities Act of 1933 (15 U.S.C.A. sec. 77l(a)(2)), based on misrepresentations in or omissions from prospectus or oral communication regarding sale of security**

112 A.L.R. Fed. 387 (Originally published in 1993)

...Section 12(2) of the Securities Act of 1933 (15 U.S.C.A. § 77l(a)(2)) imposes civil liability against a seller or offeror of securities if the seller or offeror has made a misrepresentation or has omit...

**Cause of Action for Securities Fraud Under Section 12(2) of the 1933 Securities Act**

11 Causes of Action 2d 1 (Originally published in 1998)

...This Article discusses the elements that must be pleaded and proved in order to entitle a plaintiff to recover for an alleged violation of Section 12(2) of the 1933 Securities Act, 15 U.S.C.A. §§ 77l(a...

**APPENDIX III-RELATED STATUTES, RULES, NOTICES**

Money Manager's Compliance Guide Appendix III

...As used in this Act As used in this **chapter**: The term "alternative trading system" means an organization, association, or group of persons that -- (A) is registered as a **broker** or dealer pursuant to se...

See More Secondary Sources

**Briefs**

**Brief for the United States as Amicus Curiae in Support of Vacatur and Remand**

2014 WL 2703331
OMNICARE, INC., et al., Petitioners, v. LABORERS DISTRICT COUNCIL CONSTRUCTION INDUSTRY PENSION FUND, et al.
Supreme Court of the United States
June 12, 2014

...The United States, through the Department of Justice and the Securities and Exchange Commission (SEC or Commission), administers and enforces the federal securities laws. This case concerns Section 11 ...

**Brief for the Respondents**

2014 WL 4253028
OMNICARE, INC., et al., Petitioners, v. LABORERS DISTRICT COUNCIL CONSTRUCTION INDUSTRY PENSION FUND, et al., Respondents.
Supreme Court of the United States
Aug. 25, 2014

59 Bus. Law. 1419

SECURITIES FRAUD, STOCK PRICE VALUATION, AND LOSS CAUSATION: TOWARD A CORPORATE FINANCE-BASED THEORY OF...

59 BUSLAW 1419    Jay W. Eisenhofer, Geoffrey C. Jarvis, James R. Banko    Business Lawyer    *(Approx. 36 pages)*

Article

Jay W. Eisenhofer, Geoffrey C. Jarvis, James R. Banko [a1]

Copyright © 2004 by American Bar Association; Jay W. Eisenhofer, Geoffrey C. Jarvis, James R. Banko

# SECURITIES FRAUD, STOCK PRICE VALUATION, AND LOSS CAUSATION: TOWARD A CORPORATE FINANCE-BASED THEORY OF LOSS CAUSATION

## I. INTRODUCTION

Over the last twenty years, the calculation of damages in securities class action litigation has increasingly become based upon principles of corporate finance. Moving from initial, relatively unsophisticated damage ribbons to highly complex event studies, the courts, often spurred by defendants seeking to minimize their exposure to potentially ruinous damages, have sought to require plaintiffs to propound damages theories that accurately reflect the various factors affecting stock price and rely upon only those factors actually related to fraudulent activity as the basis for damages.

Some recent decisions in securities cases, however, addressing the concept of "loss causation," have deviated from the basic principles of corporate finance. In particular, certain courts and commentators have concluded that a stock drop following the disclosure of fraudulent activity is essential to establish loss causation and, hence, is a *sine qua non* for a plaintiff to prevail on the merits and ultimately recover damages.[1] Other courts and commentators, although not directly adopting such a rule, have implicitly done so by arguing that any loss causation standard that does not require a direct link between the fraud and the reduction in value in the investment (as opposed to plaintiff's loss) equates loss causation with transaction causation, which, they argue, allows loss causation to be proven merely through a showing that there was "fraud-on-the-market."[2]

The classic securities fraud case, where the stock price collapses upon disclosure of fraud, typically does not present a difficult loss causation issue. Assume *\*1420* that the stock of Company A is priced at $10 per share at the beginning of a period and, thereafter, Company A makes false statements about revenues and profits that cause the stock to increase to $30 per share. Eventually, when Company A admits it has falsely inflated its revenues and profits, the price per share immediately falls to $10 per share. In this case, under any theory, there clearly is loss causation because the

announcement of the true information causes an immediate and substantial decline in the share price.

The more difficult situation, however, and the one that is addressed in this Article, is where Company A, after releasing false information that causes its price to increase to $30 per share, over time releases true financial information that more accurately reflects the true performance of the business, and the stock slowly declines to $10 per share prior to any disclosure of fraud. Then, assume that Company A, after the price has declined to $10, admits that its older financial information was false, but its more recent information is accurate, and assume further that the share price does not decline further. Under such circumstances, some of the decisions and commentators referenced above would take the position that there is no loss causation because the share price did not decline after the disclosure of the existence of the fraud. Yet investors in both scenarios have suffered the same injury--the purchase of Company A's securities at a price inflated due to fraud--with the only difference being the manner in which the fraud is disclosed.

This Article takes the position that those decisions and commentators are either incorrect or over-broad in their statements and should not be followed. Under sound principles of corporate finance, where expectations of future cash flow have been artificially inflated because of fraud, then the resulting stock price also is artificially inflated by fraud. Under such circumstances, if the plaintiff can demonstrate that he or she overpaid for the stock as a result of the fraud, and the price of the stock declined as a result of an explicit (or implicit) disclosure of diminished future cash flow expectations, such a showing should be sufficient to meet the loss causation requirement, even if the share price decline was prior to any explicit disclosure of the fraud. This is because the reduction in the share price was caused by the revelation of true information that corrected the fraudulent information and reduced the expectation of future cash flows. A requirement that there be a strict linkage between disclosure of the fraud and a stock price drop would allow a sophisticated entity that recognized its fraud was unsupportable to release information in such a way that the fraud was revealed through innocuous appearing announcements and only when the fraudulent information had been fully corrected announce that a fraud had occurred. Under such circumstances, even though a fraud clearly had taken place and harmed investors, a savvy entity could escape liability for its fraud under the rule postulated by those decisions and commentators that requires a strict linkage between the disclosure of the fraud and the stock price decline. Thus, the failure of the stock price to decline after a fraud is disclosed should not act as a bar to an action for securities fraud.

Part II of this Article provides a short summary of modern principles of corporate finance applicable to stock valuation and Part III provides a discussion of *1421 the significance courts have placed on event studies in the damages context. Part IV addresses the development of the loss causation doctrine and Part V discusses the evolution of that doctrine and the resulting differences between courts as to the appropriate standard. Part V.A discusses cases that have expanded the doctrine to require a showing that the fraud complained of caused the decline in the price of the stock at issue, including a showing that the price of the stock declined after the disclosure of the fraud by plaintiffs. Part V.B discusses the less restrictive cases that have narrowly applied the doctrine, holding that loss causation is established merely by showing that the share price was inflated. Part V.C discusses the uneven, and even contradictory, decisions on loss causation in the Second Circuit and its district courts, arguably the most influential forums for the development of the securities laws. Part VI sets forth an appropriate standard for pleading and proving loss causation based upon principles of corporate finance.

...Petitioners are Omnicare, Inc. ("Omnicare"), Joel F. Gemunder, David W. Froesel, Jr., Cheryl D. Hodges, the estate of the late Edward L. Hutton, and Sandra E. Laney. Respondents are the Laborers Distri...

**Brief in Opposition to Petition for a Writ of Certiorari**

2014 WL 131656
OMNICARE, INC., et al., Petitioner, v. THE LABORERS DISTRICT COUNCIL CONSTRUCTION INDUSTRY PENSION FUND and The Cement Masons Local 526 Combined Funds, Respondents.
Supreme Court of the United States
Jan. 09, 2014

...Petitioners are Omnicare, Inc. ("Omnicare"), Joel F. Gemunder, David W. Froesel, Jr., Cheryl D. Hodges, the estate of the late Edward L. Hutton, and Sandra E. Laney. Respondents are the Laborers Distri...

See More Briefs

**Trial Court Documents**

**Federal Home Loan Bank of Chicago v. Banc of America Fundingcorporation**

2012 WL 4364410
FEDERAL HOME LOAN BANK OF CHICAGO, Plaintiff, v. BANC OF AMERICA FUNDINGCORPORATION, et al., Defendants.
Circuit Court of Illinois
Sep. 19, 2012

...Defendants move to dismiss Plaintiff Federal Home Loan Bank of Chicago's Corrected Amended Complaint for Rescission and Damages. The various motions are brought pursuant to section 2-619.1, 2-615, and ...

**Huizenga Managers Fund, LLC v. A.R. Thane Ritchie**

2015 WL 8492433
HUIZENGA MANAGERS FUND, LLC, Plaintiff, v. A.R. THANE RITCHIE, et al., Defendants.
Circuit Court of Illinois
Jan. 27, 2015

...This cause comes before the Court for decision after trial. The trial covered all or part of 26 days, included 11 witnesses and thousands of exhibits (plaintiffs' exhibit list includes over 2,500 exhibits,...

**Navistar Intern. Corp. v. Deloitte & Touche LLP**

2012 WL 4043283
NAVISTAR INTERNATIONAL CORPORATION, Plaintiff, v. DELOITTE & TOUCHE LLP, Defendant.
Circuit Court of Illinois
July 25, 2012

...Defendant Deloitte & Touche LLP moves to dismiss plaintiff Navistar International Corporation's first amended complaint under Section 2-615 of the Code of Civil Procedure. 735 ILCS 5/2-615. Navistar, a...

See More Trial Court Documents

## II. STOCK PRICE AS DISCOUNTED VALUE OF FUTURE CASH FLOW

Corporate finance theory holds that the stock price of a company reflects the market's estimation of the company's future cash flows, discounted back to the present at the company's cost of capital. [3] This approach to valuation is broadly agreed upon by financial economists and is the basis for substantial portions of modern corporate finance books. [4]

Discounted cash flow ("DCF") analysis is typically used to determine the value of a company by calculating the present value of its future cash flows. The DCF analysis is premised on the assumption that the value of all of a corporation's assets is equal to the present value of the expected cash flow from those assets while they are held by the corporation. [5]

*1422* There are three components to the DCF analysis: (i) cash flow projections, (ii) terminal value, and (iii) the discount rate. [6] The precise mathematics of the valuation is as follows:

**V = PV cash flows + PV terminal value**

Where:      Cash Flows = Cash flow forecasted during the projection period
          Terminal Value = Value of the firm at the end of the forecast period
                 PV = Present value as of the valuation date using the debtor's weighted average cost of capital as the discount rate. [7]

The methodology under the DCF approach is as follows: First, future cash flows over a specified period are estimated. [8] For the purposes of a DCF analysis, "cash flow" means the difference between cash and noncash inflows and outflows from operating activities reduced by taxes actually paid, net working capital investments, and capital expenditures. [9] The cash flow projections often cover a five-year period. [10]

Second, a terminal value equal to the future value, as of the end of the specified period, of the company's cash flows beyond the projection period is derived. [11]

Third, an appropriate discount rate is selected and then used to reduce the cash flow and terminal value components to present value. It has been suggested that "[t]he costs of obtaining and using the funds necessary for production of income is the most natural choice for a discount rate." [12] Because a corporation's capital will generally come from different sources (e.g., retained earnings or new stock issues), each source will have a different cost. "It is, therefore, necessary to compute a weighted average cost of capital to accurately reflect the corporation's cost of capital." [13] The cost of each source of capital determines the "weighted average cost." [14] Weights are assigned to the corporation's capital and multiplied by their cost which equals the weighted average cost of capital ("WACC").

An alternative way to value a company, and accordingly the shares of its stock, is to measure the present value of the company's projected future dividends. Brealey and Myers analyze stock value based upon anticipated dividends as follows:

*1423* The discounted-cash-flow (DCF) formula for the present value of stock is just the same as it is for the present value of any other asset. We just discount the cash flows [in this case the dividend stream] by the return that can be earned in the capital market on securities of comparable risk. Shareholders receive cash from the company in the form of a stream of dividends. So **PV (stock) = PV (expected future dividends)**. [15]



Brealey and Myers explain that although the above formula may seem "implausible because it seems to ignore capital gains," in fact the formula is "*derived* from the assumption that [stock] price in any period is determined by expected dividends *and* capital gains over the next period" and by using as a discount rate the return that can be earned on companies of comparable risk.[16] The use of return information from such comparable companies incorporates capital gains into the valuation. Brealey and Myers caution that:

> [I]t is *not* correct to say that the value of a share is equal to the sum of the discounted stream of earnings per share. Earnings are generally larger than dividends because part of those earnings is reinvested in new plant, equipment, and working capital. Discounting earnings would recognize the rewards of that investment (a higher *future* dividend) but not the sacrifice (a lower dividend *today*). The correct formulation states that share value is equal to the discounted stream of dividends per share.[17]

Although the basic principles outlined above--that stock prices are a reflection of future cash flows[18]--have received judicial acceptance by numerous courts in valuation and bankruptcy settings,[19] those principles have not been widely employed ***1424*** in securities litigation. This is a mistake because these concepts have great relevance in that area. When a company publicly discloses its *present* or *past* financial performance, this information is relevant to the company's stock price as an indicator of the company's *future* cash flows.[20] Thus, looking at cash flows and at the information, whether correct or incorrect, that impacts such flows, can be of substantial value to courts attempting to ascertain whether particular information provided to the public by defendants has actually impacted the price of a stock at issue in a particular case.

## III. DAMAGES AND THE USE OF EVENT STUDIES

A plaintiff's damages are usually calculated as the out-of-pocket loss that was suffered.[21] That out-of-pocket loss is measured as the difference between the purchase price and "true value" of the stock (i.e., the price at which the stock would have sold absent the alleged misrepresentations or omissions).[22] Although the measure of damages is well-established, actually determining the amount of damages (i.e., measuring the disparity between the actual purchase price and the true value of the security) has proven to be a thorny issue over the last thirty-plus ***1425*** years. Older authorities simply fixed the damages as the difference between the price paid for the securities and the value of the securities determined as of the time of the discovery of the fraud.[23] This methodology was simple enough, but met with opposition from defendants and commentators because it ignored factors impacting stock price, such as overall economic and industry factors, that were unrelated to any possible fraud.[24]

In 1976, Judge Sneed of the United States Court of Appeals for the Ninth Circuit, in a concurring opinion in *Green v. Occidental Petroleum Corp.*,[25] set forth a theory for measuring damages that proved to be a milestone. Judge Sneed postulated that in a securities fraud class action, the best way to measure the loss proximately caused by the misrepresentation of a defendant is to create a chart containing a "price line" and a "value line."[26] Pursuant to Judge Sneed's method, damages are calculated by subtracting the true value of the stock on the date of purchase from the price actually paid, with the spread between the price and value lines varying over time.[27]

As courts began to adopt Judge Sneed's "value line" concept, an issue arose as to the best methodology for determining what a stock's "true value," i.e., value absent



the fraud, should be. A methodology that began gaining some measure of acceptance was the use of an "event study" to determine true value. [28]

An event study is a statistical regression analysis that examines the effect of an event on a dependent variable, such as a corporation's stock price. [29] This approach assumes that the price and value of the security move together except during days when disclosures of company-specific information influence the price of the stock. The analyst then looks at the days when the stock moves differently than anticipated solely based upon market and industry factors--so-called days of "abnormal *1426 returns." The analyst then determines whether those abnormal returns are due to fraud or non-fraud related factors. [30]

Event studies have been called "among the most successful uses of econometrics in policy analysis." [31] Event studies have been used in a variety of corporate-related contexts, from determining the impact of various factors (such as, for example, state of incorporation) on corporate value to the efficacy of various corporate governance measures. [32] Of particular relevance here, the event study methodology has been used by financial economists as a tool to measure the effect on market prices from all types of new information relevant to a company's equity valuation. [33]

Over time, the majority of courts have recognized the utility of the event study methodology in the securities context and begun to require experts to include an event study with their damage report because of the need "to distinguish between the fraud-related and non-fraud related influences on the stock's price behavior." [34] Indeed, a number of courts have rejected or refused to admit into evidence damages reports or testimony by damages experts in securities cases which fail to include event studies or something similar. In *In re Northern Telecom Securities Litigation*, [35] the court granted defendants' motion for summary judgment where the defendants' expert had conducted an event study concluding that none of the allegedly fraudulent statements resulted in inflation of defendants' stock price. [36] The testimony by plaintiffs' expert, on the other hand, was "fatally deficient in that he did not perform an event study or similar analysis to remove the effects on stock price of market and industry information and he did not challenge the event study performed by defendants' expert." [37] Similarly, in *In re Oracle Securities *1427 Litigation*, the court rejected a plaintiff's expert's report for failure to perform an event study. [38] The court found that the "[u]se of an event study or similar analysis is necessary more accurately to isolate the influences of information specific to Oracle which defendants allegedly have distorted" and determined that "[a]s a result of his failure to employ such a study, the results reached by [plaintiffs' expert] cannot be evaluated by standard measures of statistical significance." [39]

An important recent case on the need for a proper use of an event study to determine damages is *In re Executive Telecard, Ltd. Securities Litigation*. [40] In *Executive Telecard*, plaintiffs' expert first submitted a report on the damages incurred by the class as a result of defendants' alleged fraud (the "Original Report"), measured by comparing the defendant company's actual historical stock price during the class period to what the expert argued was the stock's "true value," which he calculated as the average stock price for the ten days following a key, allegedly fraud-related, disclosure by the company. The expert further adjusted the stock price to reflect a decline in the Standard & Poor's Long Distance Telephone Index (the "Telecom Index"), an index which included major, well-financed companies such as AT&T. The expert then submitted a supplemental report that purported to adjust for "market factors," which included the performance of telecommunications stocks and the market in general.



Accepting arguments by defendants, the court in *Executive Telecard* held the expert's report was flawed for two reasons.[41] First, the expert's failure to indicate whether he conducted an "event study" to determine whether the company's stock price was affected by *company specific factors* exclusive of the challenged fraud called into question the reliability of the expert's report.[42] For example, the expert did not consider the effect on the company's stock price of a proposed spin-off of certain divisions.[43] Second, in addressing the market risk factors, the expert relied exclusively on the Telecom Index.[44] The Telecom Index, however, did not have a meaningful correlation with the company's stock price because the company was far more volatile than the stocks--such as AT&T--which composed the Telecom Index. The court stated in a footnote that in contrast to comparing Telecom to AT&T, a "small cap" index would have a greater price correlation with the company's stock.[45]

As a result of cases such as *Executive Telecard*, defendants have created an environment in which plaintiffs' damages analyses are required in most cases to comply with basic principles of corporate finance and include as damages only those factors that are related to the fraud.[46] Thus, an event study is required to **\*1428** exclude factors from the overall economy (such as an overall stock price decline), factors impacting the relevant industry, and factors related to the specific company that are not fraud related. In fact, many defense experts have made extensive use of this last requirement, parsing every announcement by a company to attempt to isolate factors that negatively impacted the stock price, but which were not related to the alleged fraud. Not surprisingly, plaintiffs' experts take a different approach, generally defining the fraud as broadly as possible so that all of a company's announcements that harmed the stock price are deemed to be fraud-related. This "battle of the experts" is at the heart of many of today's securities cases.

## IV. DEVELOPMENT OF THE LOSS CAUSATION DOCTRINE

The causation element of a section 10(b) claim is clear:

> It is settled that causation under federal securities laws is two-pronged: a plaintiff must allege both transaction causation, *i.e.*, that *but for* the fraudulent statement or omission, the plaintiff would not have entered into the transaction; and loss causation, *i.e.*, that the subject of the fraudulent statement or omission was the cause of the actual loss suffered.[47]

The requirement that a plaintiff in a securities case prove loss causation has been codified by the Private Securities Litigation Reform Act (PSLRA), which requires that "[i]n any private action arising under this chapter, the plaintiff shall have the burden of proving that the act or omission of the defendant alleged to violate this title *caused the loss* for which the plaintiff seeks to recover damages."[48]

Notwithstanding the well-established need for plaintiffs to prove causation, until the 1980s, defendants and commentators focused more on methodologies for determining damages than on the related issue of loss causation.[49] In recent **\*1429** years, however, defendants have increasingly focused their efforts on attacking plaintiffs for a purported lack of loss causation because success on causation issues can eliminate all liability. In particular, some defense lawyers have argued that plaintiffs' loss causation allegations may be insufficient where a company's stock price declined prior to the revelation of the alleged fraud.[50] They have suggested that:

> A promising scenario for challenging loss causation is where the decline in the stock price, which plaintiffs allege to have caused their injury, actually



occurred prior to the disclosure of the alleged fraud. Because plaintiffs' injury cannot be linked to the defendants' fraud where the decline occurs before the market becomes aware of the fraud, courts have held that loss causation is lacking.[51]

To understand this argument, it is necessary to review the development of the doctrine.

The origin of the terms "loss causation" and "transaction causation" in case law is from the Second Circuit's 1974 decision in *Schlick v. Penn-Dixie Cement Corp*.[52] In *Schlick*, the court defined loss causation as a showing that a defendant's fraud "caused the economic harm," but concluded that such a showing could "easily" be made by any proof of injury.[53] Since *Schlick*, the concept of loss causation has enjoyed an uneven reception, with courts referring to loss causation as "'ungainly,' 'exotic,' 'confusing,' and even 'unhappy.'"[54]

The initial post-*Schlick* decisions placed little emphasis on loss causation and concluded, as did the court in *Schlick*, that it was relatively easy for plaintiffs to plead and prove.[55] In 1981, however, the Fifth Circuit issued its decision in *Huddleston v. Herman & MacLean*[56] in which it adopted a much more stringent requirement for pleading and proving loss causation, holding that the loss causation requirement is met "only if the misrepresentation touches upon the reasons for the investment's decline in value."[57]

In *Huddleston*, the Fifth Circuit remanded a securities fraud case for retrial because, among other reasons, the trial judge had failed to instruct the jury on issues of loss causation.[58] At trial, the investors proved only that the promoters ***1430*** of an automobile racetrack and the promoters' accountants had fraudulently induced them to purchase stock by overstating the company's working capital and understating the costs of completing the project.[59] Subsequently, the business failed and the company filed for bankruptcy. The district court awarded the defrauded buyers the difference between the purchase price of the securities and the proceeds received by them on any sale of the securities.[60] The Fifth Circuit, however, rejected this rescissional measure of damages and held that the jury should have been instructed to make a finding on the issue of loss causation.[61] Addressing loss causation, the Fifth Circuit held that the plaintiff could prevail only if "the untruth was in some reasonably direct, or proximate, way responsible for his loss."[62] Because the defendants attributed the company's failure to the materialization of risks described in the prospectus, such as bad weather conditions and lack of spectator attendance at the racetrack, the trial court erred in failing to instruct the jury on the issue of proximate cause.[63]

## V. THE EVOLUTION OF THE LOSS CAUSATION DOCTRINE HAS RESULTED IN SUBSTANTIAL DIFFERENCES AMONG COURTS AS TO THE APPROPRIATE STANDARD

As a result of the judicial origin of the doctrine of loss causation, and the lack of any substantial guidance from the Supreme Court, different federal courts have taken widely varying, and sometimes wholly contradictory, approaches to determining whether a plaintiff has adequately alleged or proven loss causation. Some courts have taken a very strict view of loss causation, holding that the requirement that fraud "touch[ed] upon the reasons for the investment's decline in value" requires that the plaintiff prove that the decline in value of the stock at issue was due to fraud and necessitating a showing that the stock declined after the fraud was disclosed.[64]



Other courts have taken a more lenient approach, holding that loss causation is established merely by a showing that a plaintiff paid an inflated price for the stock, regardless of whether the fraud at issue actually caused the stock price decline.[65] The differences in the positions of the various federal circuit courts of appeals (and sometimes within circuits) are set forth below. None of the approaches--whether stringent or lenient--are well-grounded economically. In the next section, a theory of loss causation based upon modern principles of corporate finance is set forth.

### *1431 A. SOME CIRCUITS REQUIRE A SHOWING THAT THE FRAUD COMPLAINED OF CAUSED THE DECLINE IN THE PRICE OF THE STOCK AT ISSUE, INCLUDING A SHOWING THAT THE PRICE OF THE STOCK DECLINED AFTER THE DISCLOSURE OF THE FRAUD

After *Huddleston*, some courts began using the doctrine of loss causation to deny all recovery to plaintiffs in securities fraud actions. The decision of the Seventh Circuit in *Bastian v. Petren Resources Corp.*[66] represents an early and influential decision taking loss causation in a direction well beyond that envisioned in the early decisions establishing the doctrine. In *Bastian*, plaintiffs purchased limited partnership interests in oil and gas partnerships, which became worthless several years later. Plaintiffs brought suit arguing that they would not have invested had the defendants not made several material omissions in violation of Rule 10b-5, including the fact that certain defendants faced lawsuits in connection with other ventures they had promoted and/or had defaulted on loans in connection with those other ventures and that the defendant company had no previous operating history and had fired its president and chief petroleum engineer for incompetence and recklessness.[67]

In an opinion written by Judge Posner, the Seventh Circuit affirmed dismissal of the amended complaint, holding plaintiffs failed to adequately allege loss causation.[68] Judge Posner found that plaintiffs' amended complaint suggested no reason why the investment was wiped out, but only that they were fraudulently induced into purchasing the particular partnerships at issue: "[t]hey say they have no idea why their investment was wiped out and it does not matter."[69] Thus, Judge Posner found that the plaintiffs alleged only the cause of their entering into the *transaction*, "but not the cause of the transaction's turning out to be a losing one."[70] Judge Posner found that it was incumbent upon plaintiffs to allege that the fraud somehow caused the decline in value of the investment and that it was not related to general economic factors:

> No social purpose would be served by encouraging everyone who suffers an investment loss because of an unanticipated change in market conditions to pick through offering memoranda with a fine-tooth comb in the hope of uncovering a misrepresentation. Defrauders are a bad lot and should be punished, but Rule 10b-5 does not make them insurers against national economic calamities. If the defendants' oil and gas ventures failed not because of the personal shortcomings that the defendants concealed but because of industry-wide phenomena that destroyed all or most such ventures, then the *\*1432* plaintiffs, given their demonstrated desire to invest in such ventures, lost nothing by reason of the defendants' fraud and have no claim to damages.[71]

The Fourth Circuit in *Gasner v. Board of Supervisors*[72] articulated a test very similar to that used by Judge Posner in *Bastian*, requiring plaintiffs to demonstrate "[a] direct or proximate relationship between the loss and the [alleged] misrepresentation."[73] In *Gasner*, plaintiffs sued under section 10b-5 after purchasing bonds for recycling



equipment to be installed in a waste processing facility that subsequently suffered financial failure. Plaintiffs alleged the defendants, in their municipal bond offering statement dated April 1993, misrepresented that the waste plant technology to be used at the facility was "proven," when a subsequent study showed that it used an "emerging technology" not "actually proven" over the "long term."

The Fourth Circuit required plaintiffs to allege a "direct or proximate relationship between the loss and the misrepresentation." [74] It found the challenged statements--whether the technology was proven or unproven--had "little to do" with the alleged injury, which was actually caused by other "economic factors," including inexperienced personnel, the company's weak financial structure, and the plant's inability to attract other municipal waste contracts. [75] It concluded, under the "direct or proximate test," that there was an insufficient causal relationship to permit recovery. [76]

More recently, in *Robbins v. Koger Properties, Inc.,* [77] plaintiffs alleged that the defendant accounting firm ("Deloitte") had misrepresented the cash flow of Koger Properties, Inc. ("KPI") and that, as a result, they purchased the stock at an inflated price. [78] They brought suit and recovered a jury verdict of $81 million. [79] The Eleventh Circuit reversed the jury verdict, finding that the decline in the stock price ***1433** that was at the heart of plaintiffs' claims was caused by a cut in the dividend in 1990, not a disclosure of accounting problems in 1992. [79] The court concluded that loss causation must be based upon a linkage between the fraud and the decline in the share price:

> Plaintiffs here offered no evidence of a connection between Deloitte's misrepresentations and the decline in price of KPI stock throughout the class period or following the October 1990 dividend cut. In fact, the claims presented to the jury do not attempt to link Deloitte's misrepresentations to any decline in the value of plaintiffs' investment. Instead, plaintiffs simply claim they paid too much. But there is no evidence that this price inflation was removed from the market price of KPI stock, causing plaintiffs a loss. [80]

The court specifically rejected an argument that loss causation could be established by an allegation that a plaintiff purchased stock at an inflated price: "This showing of price inflation, however, does not satisfy the loss causation requirement. Our cases do not hold that proof that a plaintiff purchased securities at an artificially inflated price, without more, satisfies the loss causation requirement." [81]

The holdings in *Bastian, Gasner, Kroger*, and their progeny have been expanded by some courts to require evidence of a stock drop after the announcement of the fraud as a *sine qua non* of loss causation. For example, in *In re IKON Office Solutions, Inc. Securities Litigation*, [82] after plaintiffs settled with the corporation and resolved some of the allegations against Ikon's accounting firm, Ernst & Young, the sole remaining claim was an allegation of fraud pertaining to an announcement of an overstatement of revenue in connection with Ikon's financial statements for fiscal 1997. After the announcement of the overstatement, however, the price of Ikon's stock did not move and defendants argued that there was no loss causation. The court agreed, holding that:

> plaintiffs must show that the stock price "dropped in response to disclosure of the alleged misrepresentations," because "[w]here the value of the security does not actually decline as a result of an alleged misrepresentation, it cannot be said that there is in fact an economic loss attributable to that misrepresentation." [83]



*1434* Finally, in *Oran v. Stafford*,[84] a pharmaceutical company delayed for several months in releasing information about the links between the diet drug Phen-Phen and heart disease. When the linkage was announced (on July 8, 1998), however, there was no appreciable negative impact on the stock price of the company. The lower court concluded, therefore, that the information was not material and dismissed the case.[85] The Third Circuit affirmed, holding that "[b]ecause in an efficient market 'the concept of materiality translates into information that alters the price of the firm's stock,' if a company's disclosure of information has no effect on stock prices, 'it follows that the information disclosed ... was immaterial as a matter of law.'"[86]

## B. A NUMBER OF COURTS HAVE HELD THAT LOSS CAUSATION IS ESTABLISHED MERELY BY SHOWING THAT THE SHARE PRICE WAS INFLATED

Other courts addressing loss causation issues have held that a strict linkage between the alleged fraud and the decline in the price of the stock at issue is not necessarily a requirement for pleading purposes and that loss causation can be shown where there is only some linkage between the fraud and the share price decline, or, in some cases, without a showing of any linkage at all. For example, the Ninth Circuit in *No. 84 Employer-Teamster Joint Council Pension Trust Fund v. America West Holding Corp.*,[87] addressed a case premised upon the materiality of the defendant's failure to timely disclose deferral of maintenance costs and a Federal Aviation Administration (FAA) investigation and settlement. The district court held that alleged omissions and misrepresentations regarding defendant's maintenance issues, the FAA investigation, and the FAA settlement agreement imposing substantial fines, were immaterial as a matter of law because the market did not immediately react to the public announcement of the fine.[88] The Ninth Circuit reversed.[89] It refused to adopt a *per se* rule that "if there has been no immediate change in the stock price, the alleged misrepresentations or omissions *1435* must have been immaterial."[90] The court then held that the misrepresentations could have been material and remanded for further proceedings.[91]

In *Gebhardt v. Conagra Foods, Inc.*,[92] the Eighth Circuit held that plaintiffs sufficiently alleged loss causation where the market price of their stock actually *increased* in the weeks following the company's disclosure of fraud.[93] On May 23, 2001, Conagra announced that it was required to restate its earnings, both past and present. The company's stock dropped from $20.61 to $20.07 on heavy trading the day after the May announcement. Nevertheless, the stock price quickly recovered and began to trade higher. Its average closing price during the ninety days following the announcement was a few cents higher than the stock's price on the day of the May announcement.

The district court dismissed the complaint on loss causation grounds because it found the May 23, 2001 press release had no effect on ConAgra's stock price.[94] The Eighth Circuit disagreed, holding that plaintiffs need only show "some causal nexus" between the improper conduct and their losses.[95] Accordingly, the court held that it was sufficient that plaintiff pled that the stock dropped by roughly four percent the day after the May 2001 announcement because "[t]his was a sufficient allegation of a causal link between the company's misbehavior and a subsequent decline, though it was a modest one."[96]

An even broader view of loss causation can be found in *Danis v. USN Communications, Inc.*,[97] which involved a situation where a stock had declined over an extended period following an IPO and several years after the IPO, the company

announced that it lacked certain technical capabilities to carry out the business plan in the initial offering documents. The stock, which was trading below $1 per share at the time of the negative announcement, did not decline as a result. Plaintiffs alleged that their losses resulted from paying an inflated price for defendants' stock because of the misrepresentations and omissions occurring prior to and throughout the class period. The court agreed, requiring no showing of a link between the stock price decline and the fraud, instead holding that "[p]laintiffs' allegations of an inflated purchase price suffice to meet their burden of pleading loss causation." [98]

Likewise, in *Broudo v. Dura Pharmaceuticals, Inc.*, [99] a case which has been granted *certiorari* review by the Supreme Court, the Ninth Circuit rejected the *1436 notion that a 10(b) complaint strictly must allege a disclosure strictly linked to a stock drop. [100] That case involved an alleged failure to disclose material information in November 1998, where the stock drop complained of had occurred ten months earlier. The court held that

> it is not necessary that a disclosure and subsequent drop in the market price of the stock have actually occurred, *because the injury occurs at the time of the transaction .... [L]oss causation does not require pleading a stock price drop following a corrective disclosure or otherwise.* It merely requires pleading that the price at the time of purchase was overstated and sufficient identification of the cause. [101]

The above and other similar cases have held that where false statements result in an inflated stock price, plaintiffs can establish loss causation with only a slight (or no) nexus between the fraud and the price decline, so long as they establish that the stock price was inflated. [102] Although these cases may be correct as a legal matter under Rule 12(b)(6), they have not provided sufficient guidance as to the proof that will be required to eventually prove the plaintiffs' claims. Absent a firm basis in corporate finance theory, plaintiffs will remain vulnerable to defendants' arguments that the decline in the stock price was due to non-fraud factors and thus no liability should attach. [103] This dispute, however, could be resolved by the *1437 Supreme Court in its next term as a result of its decision to grant *certiorari* in *Dura Pharmaceuticals*. [104]

## C. DIFFERENT STANDARDS EMPLOYED BY COURTS WITHIN THE SECOND CIRCUIT EXEMPLIFY THE PROBLEMS WITH THE CURRENT APPROACHES TO LOSS CAUSATION

The Second Circuit is a particularly influential circuit on issues related to the enforcement of the securities laws. Unfortunately, the courts within this circuit have reached differing results on loss causation issues, highlighting the confusion that has plagued the loss causation doctrine.

In *Marbury Management, Inc. v. Kohn*, [105] a trainee at a brokerage firm had falsely represented that he was a stockbroker and had advised various clients in making investments. The investment subsequently lost value as the result of a general decline in the market. The Second Circuit affirmed a finding below that loss causation was shown because, even though the loss in value came as a result of external market forces and not because of the trainee's lack of credentials, the court concluded that the brokerage firm trainee's misleading of his clients regarding his expertise caused plaintiffs both to purchase the securities that lost value and to continue to hold them when the price declined. [106]

In *Bennett v. United States Trust Co.*,[107] the court took a much harder position on loss causation. *Bennett* involved a case where the defendant had misrepresented that a particular investment was not subject to certain federal margin requirements and plaintiffs asserted that they would not have made the investment had they known the margin rules were applicable. The investment subsequently lost money and when plaintiffs brought suit their complaint was dismissed on loss causation grounds because the court found that the margin rules that they alleged were misrepresented had no relation to the decline in value of the investment.[108] The Second Circuit affirmed the dismissal.[109] The court distinguished *Marbury* on the grounds that in that case the misrepresentation related to the value of the shares-- specifically, the reliability of the trainee's valuation--although in *Bennett* the representations were unrelated to the value of the shares.[110] Because the margin rules at issue were "extrinsic" to the stock, there was no loss causation.[111]

In *Suez Equity Investors, L.P. v. Toronto-Dominion Bank*,[112] the defendant proposed an investment to plaintiff, but omitted material information about the past business problems of the principals in the investment. The investment collapsed soon ***1438*** after plaintiff made its purchase as a result of mismanagement by the principal and the plaintiff sued, alleging that the misrepresentations led plaintiff to believe management was more competent than turned out to be the case. The lower court dismissed the complaint for failure to show loss causation, finding that certain preexisting liquidity problems, and not inadequacies in management, caused the decline of the investment.[113] The Second Circuit reversed and found that loss causation was shown because "the defendants' misrepresentations induced a disparity between the transaction price and the true 'investment quality' of the securities at the time of transaction."[114]

As a result of the somewhat different approaches to loss causation taken by the differing panels of the Second Circuit, district courts within the circuit have struggled to reconcile the cases. In *In re Merrill Lynch & Co.*[115] plaintiffs claimed that false research reports issued by defendant Merrill Lynch and a failure by Merrill Lynch to disclose conflicts of interest between its investment bankers and analysts caused losses in two stocks when the prices of the stocks declined as part of the collapse of the "Internet Bubble." Judge Pollack dismissed the claims, finding that plaintiffs had failed to adequately plead loss causation because they did not allege that the fraudulent acts by Merrill Lynch identified in the complaint caused the declines in the prices of the stocks at issue.[116] He found that the "bursting" of the internet bubble, which led to the share price decline, was not the result of any action by Merrill Lynch:

> The cited alleged omissions of conflicts of interest could not have caused the loss of market value. The alleged omissions are not the 'legal cause' of the plaintiff's losses. There was no causal connection between the burst of the bubble and the alleged omissions; it was the burst which caused the market drop and the resultant losses a considerable time thereafter when plaintiffs decided it was time to sell. A defendant does not become an insurer against an intervening cause unrelated to the acquisition, e.g., a precipitous price decline caused by a market crash. The plaintiffs controlled their ultimate exit from the stocks after waiting no doubt for a market reversal.[117]

Significantly, Judge Pollack specifically rejected plaintiffs' claim that showing inflation in share prices due to fraud was sufficient to establish loss causation, entitling a section of his opinion: "Merely Alleging 'Artificial Inflation' is Not Sufficient to Satisfy Loss Causation."[118]



***1439*** In contrast, in *Burstyn v. Worldwide Xceed Group, Inc.*,[119] Judge Lynch, addressing an e-commerce stock that had accounting problems and that declined when the internet bubble burst, reached a holding directly opposite to that of Judge Pollack in *Merrill Lynch*. Judge Lynch held that the plaintiffs had sufficiently alleged loss causation, notwithstanding a general decline in stock prices due to the bursting of the e-commerce bubble, because

> the fraudulent statements all portrayed Xceed as healthy and viable, while the company was allegedly failing, thereby encouraging investors to purchase stock and creating a disparity between the transaction price and the true value of the securities. These alleged accounting violations were ultimately revealed to the market with the foreseeable consequence that share price would decline. ***While a trier of fact might blame market forces rather than accounting violations for that decline, the allegations in the Complaint are sufficient to carry plaintiffs' claims through this motion to dismiss.***[120]

Also contrary to Judge Pollack is Judge Scheindlin's February 2003 opinion in *In re Initial Public Offering Securities Litigation*.[121] In that action, plaintiffs alleged that the underwriters of initial public offerings ("IPOs") of Internet-related companies engaged in a scheme to defraud the investing public by fraudulently driving up the stock price in hundreds of companies in the immediate aftermarket of their IPOs. The underwriter defendants contended that there could be no loss causation because the defendants' actions were revealed only after the stock prices had collapsed. Judge Scheindlin rejected defendants' argument, finding that loss causation was properly pled by allegations of a scheme to inflate the price of the securities: "'In a fraud-on-the-market case, plaintiffs establish loss causation if they have shown that the price on the date of purchase was inflated because of the misrepresentation.'"[122]

Similarly, in *In re WorldCom, Inc. Securities Litigation*,[123] the plaintiffs alleged that WorldCom's management, directors, auditors, underwriters, and investment bankers, engaged in an elaborate scheme to artificially inflate the price of WorldCom stock by concealing costs and overstating the company's earnings. The plaintiffs ***1440*** in *WorldCom* alleged Citigroup, Inc., Salomon Smith Barney, Inc., and Jack Grubman provided support to this scheme through positive analyst reports that were specifically intended to boost the price of WorldCom stock as a *quid pro quo* for receiving substantial investment banking fees from the company.[124] Judge Cote, using the same "foreseeability" test employed by Judge Pollack in *Merrill Lynch*, found these allegations sufficient for purposes of pleading loss causation because

> it was reasonably foreseeable that the loss the plaintiffs allege that they suffered was a natural consequence of the alleged misrepresentations and omissions in the Grubman analyst reports. It was reasonably foreseeable that the unmasking of those misrepresentations and omissions would affect not only the price of WorldCom's securities, but also, given the magnitude and nature of the alleged misrepresentations and omissions and the prominence of Grubman's role as a WorldCom and telecommunications industry analyst, the economic health of WorldCom itself.[125]

Recently (September 2003), the Second Circuit, in *Emergent Capital Investment Management, LLC v. Stonepath Group, Inc.*,[126] has issued an opinion that, although attempting to eliminate some of the confusion, in many ways exemplifies the difficulties created by the current approaches to establishing loss causation. In *Emergent*, the plaintiff investor alleged a scheme whereby defendants misrepresented the value of a significant asset, and their own success in other

businesses, inducing plaintiffs to purchase their stock. Thereafter, plaintiffs suffered
substantial losses when the price declined. Using language similar to that in many of
the cases that take a very strict approach to loss causation (e.g., *Merrill Lynch*), the
*Emergent* court nonetheless achieved a result that appears to be more consistent
with the more lenient approach toward loss causation. [127] Specifically, the court
concluded that "[w]e have often compared loss causation to the tort law concept of
proximate cause, 'meaning that the damages suffered by plaintiff must be a
foreseeable consequence of any misrepresentation or material omission.'" [128]
Notwithstanding *1441 its strict, "foreseeability-based" interpretation of the loss
causation standard, the court held that "[b]ecause the second amended complaint
may be read as alleging that [the company at issue] was a 'pump and dump' scheme,
appellant has adequately alleged loss causation for the purposes of its federal
securities fraud claims." [129] The court concluded, however, clarifying the decision in
*Suez Equity*, that price inflation alone was insufficient to establish loss causation. [130]

One of the first decisions to apply the test announced in *Emergent* was a
reconsideration decision by Judge Scheindlin in *Initial Public Offering Securities
Litigation* ("*IPO Litigation*"). [131] After the decision in *Emergent*, the underwriter
defendants in *IPO Litigation* renewed their motion to dismiss. Upholding the February
2003 opinion's outcome, but applying the test set forth in *Emergent*, Judge Scheindlin
held: "[t]he content of Underwriters' misstatements was, in essence: 'this is a fair,
efficient market, unaffected by manipulation.' In fact (according to plaintiffs), the
market was manipulated .... [T]hat market manipulation was a cause of plaintiffs' loss.
Therefore, the misstatements that concealed that manipulation also were a cause of
plaintiffs' loss." [132]

## VI. AN APPROPRIATE STANDARD FOR PLEADING AND PROVING LOSS CAUSATION SHOULD BE BASED UPON SOUND PRINCIPLES OF CORPORATE FINANCE

As described above, from the origins of the doctrine, courts have struggled with the
appropriate test for determining whether a specific set of facts establishes loss
causation. Courts want a standard that requires the defendant's fraud to have caused
the plaintiff's loss, but are struggling in those increasingly frequent cases where there
is not a clear disclosure of fraudulent conduct followed immediately by a material
decline in the price of the company's stock. As shown above, some courts have
effectively refused to consider the issue at all, finding that there can be no loss
causation if a stock decline does not immediately follow a disclosure of fraud. [133]
This makes no sense because there are clear cases of fraud where the stock
declined substantially prior to the formal announcement of the fraud, [134] *1442 and
thus there was little room for further decline after the fraud was announced. Other
courts (many in the Second Circuit) have tried to impose the "foreseeability" test used
for proximate cause in tort cases, but that test has effectively allowed courts to reach
contrary results on equivalent facts. [135] Some courts have gone to the other extreme,
allowing recovery for plaintiffs on nothing more than reliance, without any showing
that the loss was related to the alleged fraud. [136] In order to make loss causation a
predictable and logically sound part of the federal securities jurisprudence, an
alternative test for establishing loss causation needs to be adopted. As explained
below, such a test should be based upon the principles of corporate finance that
govern stock prices and which have increasingly been applied in other contexts.

Under basic principles of corporate finance theory, as described above, the stock
price of a company reflects the market's estimation of the company's future cash
flows, discounted back to the present at the company's cost of capital. [137] In other

words, the market price of a publicly-traded stock is based on the public's projections of how that company is going to perform in the future. [138] Where a company publicly discloses its *present or past* financial performance, the market will use this information as an indicator of the company's *future* cash flows. [139] Thus, a disclosure (whether of current performance or anticipated future performance) that causes the market to believe that future performance will fall short of expectations, will deflate a stock price. If it is later revealed that the initial expectations upon which investors relied were based upon fraudulent reporting of results, investors have been victimized by the fraud, even if disclosure of the fraud was subsequent to the stock price decline.

Accordingly, where a defendant makes a materially misleading statement to the investing public in a deliberate attempt to artificially inflate the stock price of a company, and the plaintiff, in reliance on the market price of those securities as manipulated by the defendant, purchases the company's stock at such artificially inflated prices, the plaintiff should be deemed to have suffered a loss caused by the defendant to the extent of the inflation so long as the earlier disclosures were fraudulent. Loss causation should be found even where the disclosures that contradict the earlier, fraudulent disclosures appear, when made, merely to be the reporting of truthful information about the company. The questions are: (i) was the stock price inflated by fraud; and (ii) has the stock price declined because the *1443 fraud is no longer propping up the price? These questions can be answered affirmatively without any disclosure of fraud or with a disclosure that post-dates the decline in stock price. The test is wholly consistent with the Second Circuit's decision in *Emergent Capital*.

The following hypothetical will demonstrate the application of the proposed test. Assume that ABC, Inc. has sufficient real cash flow for the present and future such that its stock should properly be valued at $50 per share. Assume further that management fraudulently reports revenues by reporting sham sales to XYZ Corp. that were not real transactions in quarters one to ten such that, based upon the discounted future value of its (artificially inflated) cash flow, the market concludes the company is worth $75 per share, even though, in reality, it is worth only $50 per share. Our plaintiff purchases at this point in time at $75 per share.

Finally, assume that XYZ Corp. files for bankruptcy at the end of quarter ten. From that point in time forward, ABC knows it will no longer be able to book the sham transactions. It promptly discloses that its future performance will be somewhat less than was previously expected (but not why) and, over quarters eleven to sixteen, releases revenue numbers, with attendant cash flows, that result in a company with a value of only $40 per share. At the end of quarter sixteen, ABC announces that the revenue and cash flow numbers from quarters one to ten were fraudulent, but that its current numbers are correct and, indeed, that its future numbers will be improved due to a lucrative new contract. Its stock price stays at $40 per share. [140]

Under the above facts, the plaintiff has been defrauded and, under the test we postulate, should be able to prove loss causation and recover damages for the difference between the purchase price ($75 per share) and the true value ($50 per share), but not for any decline in the price below $50 per share, because that was unrelated to the fraud.

This result is wholly consistent with the decisions in *Bastian, Emergent*, and other cases that require more than mere inflation in a share price to establish loss causation, but instead require a linkage between the fraud and the decline in the price of the security at issue. In this case, it is entirely foreseeable that where a company lies about its financial information, the ultimate disclosure of the true

information, whether the disclosure is labeled as fraud or appears to be nothing more than the release of truthful information, will cause the market to adjust its expectations and will result in the decline of the price of the stock. This scenario is essentially equivalent to the "pump and dump" scheme that the Second Circuit determined in *Emergent* was sufficient to establish loss causation.

The contrary rule would allow a company that was involved in fraud, and was sophisticated on loss causation issues, to release information in such a way that its stock price declined without any disclosure of wrongdoing and then never admit that its financials were incorrect or only make such an admission after its stock price had fully reflected the true information. For example, in the scenario we posited above, ABC, Inc. structured its disclosures so that its admission that *1444* fraud had occurred was made only after the market had fully absorbed the economic impact of the non-fraudulent information, and thus the revelation that there had been fraud had no impact on its share price because the market had already adjusted the share price to reflect its true cash flows. Thus, under a rule requiring a strict linkage between disclosure of a fraud and a stock price drop, such a company could escape liability, even though many of its shareholders clearly were injured by a fraudulently inflated share price.

In fact, assume that the defendant has announced at the end of quarter sixteen that it was restating its numbers for quarters one to ten but that its mistake was an innocent one and there was no fraud. But a whistle-blower or short-seller or cranky columnist suggested otherwise--that in fact the numbers had been inflated by fraud. Because the company's future cash flows supported its $40 stock price, the market yawned over this debate and ABC's stock price did not move. ABC purchasers in quarters one to ten still should have a fraud claim, albeit one that may be difficult to prove. They purchased shares at an inflated price due to fraud and they lost money as the stock declined when the fraudulent inflation left the stock. A different result makes no sense. It would simply reward wrongdoers who refuse to acknowledge their wrongs. The company that admits fraud would have liability while the one that proclaims innocence would have none. Not only is this an unfair dichotomy, but it surely diminishes the possibility of companies coming clean, which presumably should be encouraged.

The test we postulate, however, would not allow a showing of loss causation merely through the showing of an inflated stock price--there would have to be some disclosure related to the fraud that impacts the stock price. The key, however, is that the disclosure that drives down the stock price need not be a disclosure that fraud has taken place. It may simply be that future performance will be less than previously expected. The plaintiffs' lawyers would then have to link those prior expectations to the fraud.

This test would require a different result in many, but not all, cases that have required a showing of a stock price decline immediately after the disclosure of the fraud. Under our analysis, plaintiffs might well be able to establish loss causation under the facts set forth in *Merrill Lynch*. In that case, plaintiffs could easily have claimed that the allegedly misleading research reports falsely created increased expectations of future cash flows and that when those false reports were "corrected" by truthful information--**an "implicit" disclosure**--about the companies at issue, the price fell. This would satisfy loss causation under the test we propose. The fraud inflated the cash flow expectation and the later information corrected that fraudulently established expectation, establishing loss causation. On the other hand, the results of some of the "strict linkage" cases would be unchanged. For example, *Bastian* would not change because the plaintiffs in that case made no attempt to provide any linkage

between the fraud and the impact of the fraud on the company's cash flow and stock price.

An essential underpinning of our test is determining whether specific disclosures that reveal the effect of the fraud (whether or not described by the speaker as revealing fraud) actually impacted the share price of the stock at issue. Central *1445 to this analysis is the event study, which would be invaluable to help plaintiffs and defendants determine whether particular statements that may have revealed the effect of the fraud had an impact on share price and, if so, the magnitude of that impact. For example, if the alleged fraud relates to overstatement of revenues (and hence cash flows), and over time a company makes revenue announcements that have the effect of revealing, through apparently truthful statements, the fact that revenues were misstated, an event study could be used to determine how the market reacted to those statements and the extent to which the share price was (if at all) overstated. The event study first would be used to eliminate all market and industry-related factors and determine those dates of "abnormal returns" when the stock price moved differently than would be expected. The analyst would then look at the disclosures on those days of abnormal returns and ascertain whether there was any information that reached the market that related to some aspect of the fraud. To the extent that no information related to the fraud had any impact on the share price through an abnormal return, there would be insufficient linkage between the fraud and the share price and loss causation would not be shown. On the other hand, the existence of an abnormal return in conjunction with the release of information to the market that arguably is fraud-related should, in conjunction with a showing that the market price was inflated, be sufficient to let a trier of fact determine whether in fact the loss was caused by the fraud.

## CONCLUSION

The stock price of a company reflects the market's estimation of the company's future cash flows, discounted back to the present at the company's cost of capital. In other words, the market price of a publicly-traded stock is based on the public's projections of how that company is going to perform in the future. Where a company publicly represents its *present or past* financial performance, therefore, this information is relevant to the company's stock price as an indicator of the company's *future* cash flows. Where expectations of future cash flows are inflated because of a defendant's fraud, allegations at the pleading stage, and proof at a later stage, that the price was improperly inflated during a prior period should be sufficient to meet the loss causation requirement of a securities fraud claim, even where disclosure that fraud has occurred is not followed by a decline in share price, so long as there is some linkage between the market's original cash-flow expectations and subsequent disclosures related to the fraud (whether perceived by the market as fraud or merely as the release of truthful information) that negatively impacted the share price. Courts should reject the economically simplistic and pseudo-scientific approach of requiring an admission followed directly by a stock price decline. There is no basis for such a mechanistic approach in either law or economics.

| Footnotes |
| --- |

a1    Jay W. Eisenhofer and Geoffrey C. Jarvis are directors of Grant and Eisenhofer, P.A. James R. Banko is an associate of the firm.

1    *See, e.g.,* Arduini/Messina P'ship v. Nat'l Med. Fin. Servs. Corp., 74 F. Supp. 2d 352, 361-62 (S.D.N.Y. 1999); Anderson v. First Sec. Corp., 249 F. Supp. 2d 1256, 1268 (D. Utah 2002); *In re* Sprint Corp. Sec. Litig., 232 F. Supp. 2d 1193, 1228 (D. Kan. 2002); Brian E. Pastuszenski et al., *Beyond Materiality and*



*Scienter: Strategies For Successfully Defending Securities Class Actions By Attacking Plaintiffs' Loss Causation and Damages Theories* 565, 572-73 (ALI-ABA Course of Study, May 10, 2001), SF86 ALI-ABA 565.

2    *See, e.g.*, David M. Brodsky & Jeff G. Hammel, *The Fraud on the Market Theory and Securities Fraud Claims*, N.Y. L.J., Oct. 24, 2003; Robbins v. Koger Properties, Inc., 116 F.3d 1441, 1448 (11th Cir. 1997); *In re* Merrill Lynch & Co., 273 F. Supp. 2d 351, 363 (S.D.N.Y. 2003).

3    Lynn A. Stout, *The Unimportance of Being Efficient: An Economic Analysis of Stock Market Pricing and Securities Regulation*, 87 MICH. L. REV. 613, 616 n.11 (1988) ("Efficient market prices which reflect all available information relevant to the value of the stock are thought to measure rationally the 'worth' of stocks as financial instruments in terms of the present value of their expected future earnings, discounted for nondiversifiable risk."); *see also* RICHARD BREALEY & STEWART MYERS, CAPITAL INVESTMENT AND VALUATION 77 (2003) ("The value of a stock is equal to the stream of cash payments discounted at the rate of return that investors expect to receive on comparable securities."); De Bondt & Thaler, *Anomalies: A Mean-Reverting Walk Down Wall Street*, J. ECON. PERSP., Winter 1989, at 189 (equating the intrinsic value of a stock with a "rational forecast of the present value of future dividend payments"); Jacobs & Levy, *On the Value of 'Value*,' FIN. ANALYSTS J., July-Aug. 1988, at 47-48 (using the present discounted value of dividends to represent the "fair" or "intrinsic" value of a share of common stock); Burton G. Malkiel, *Is the Stock Market Efficient?* 243 Sct. 1313, 1316 (1989) (describing the standard "rational" model of share pricing as one of determining the present discounted value of the future stream of dividends).

4    *See* RICHARD BREALEY & STEWART MYERS, PRINCIPLES OF CORPORATE FINANCE (7th ed. 2002).

5    BREALEY & MYERS, *supra* note 3, at 53 ("the discounted-cash-flow (DCF) formula for the present value of a stock is just the same as it is for the present value of any other asset. We just discount the cash flows by the return ... in the capital market on securities of comparable risk."); Neal v. Alabama By-Products Corp., No. 8282, 1990 WL 109243, at *7 (Del. Ch. Aug. 1, 1990), *aff'd*, 588 A.2d 255 (Del. 1991) ((noting that DCF analysis is considered by valuation experts to be a "preeminent valuation methodology") (*citing* PRATT, VALUING A BUSINESS: THE ANALYSIS AND APPRAISAL OF CLOSELY HELD COMPANIES (2d ed. 1989)).

6    Onti, Inc. v. Integra Bank, 751 A.2d 904, 917 (Del. Ch. 1999); *In re* Radiology Assocs., 611 A.2d 485, 490 (Del. Ch. 1991); Cede & Co. v. Technicolor, Inc., Civ. A. No. 7129, 1990 WL 161084, at *7 (Del. Ch. Oct. 17, 1990).

7    Peter V. Pantaleo & Barry W. Ridings, *Reorganization Value*, 51 BUS. LAW. 419, 427 (1996).

8    *Radiology Assocs.*, 611 A.2d at 490; *Cede & Co.*, 1990 WL 161084, at *7.

9    *In re* Cellular Info. Sys., Inc., 171 B.R. 926, 931 n.13 (Bankr. S.D.N.Y. 1994) ("cash flow [for DCF analysis] is Earnings Before Interest, Taxes, Depreciation, and Amortization ("EBITDA"), less capital expenditures, net changes in working capital accounts, and cash taxes").

10   *See Radiology Assocs.*, 611 A.2d at 491 (using five-year cash flow projection); *Cede & Co.*, 1990 WL 161084, at *26 (parties used five years of cash flow data).

11   *Cede & Co.*, 1990 WL 161084, at *7.

12   Joseph E. Calio, *New Appraisals of Old Problems: Reflections on the Delaware Appraisal Proceedings*," 32 AM. BUS. L.J. 1, 52 (1994).

13   *Id.* at 52-53 (citing J. FRED WESTON & EUGENE F. BRIGHAM, ESSENTIALS OF FINANCIAL MANAGEMENT 564 (8th ed. 1987); *see also Radiology Assocs.*, 611 A.2d at 493 (using weighted average cost of capital); *Cede & Co.*, 1990 WL 161084, at *23 (using weighted average cost of capital).

14   Calio, *supra* note 12, at 53.

15   BREALEY & MYERS, *supra* note 3, at 53.

16   *Id.* at 55 (emphasis in original).

17   *Id.* at 56. This point by Brealey & Myers was adopted in a securities fraud case by the Northern District of California in *In re Oracle Sec. Litig.*, 829 F. Supp. 1176, 1181 (N.D. Cal. 1993), where the court stated unequivocally that *a security's value varies with "the discounted value of future cash flows which are expected to accrue to the security."* (emphasis added).

18   Steven N. Kaplan & Richard S. Ruback, *The Valuation of Cash Flow Forecasts: An Empirical Analysis*, J. FIN. 1059, 1091-92 (1995) (finding a strong relation between the market value of over fifty highly leveraged transactions and the discounted value of their corresponding cash flow forecasts); J.Y. Cho & K. Jung, *Earnings Response Coefficients: A Synthesis of Theory and Empirical Evidence*, 10 J. OF ACCOUNTING LIT. 85-116 (1991) (showing relation between accounting information releases and stock prices). *See also* Jonathan R. Macey, *State Anti-Takeover Legislation and the National Economy*, 1988 WIS. L. REV. 467, 480 (1988) ("The price of such stock reflects the market's estimation of the present value of the net future earnings of the firm. This estimate, in turn, is based on the publicly available information about the firm's performance, and the market's estimate of the firm's future earnings prospects. This observation is virtually self-evident. After all, a share of stock is simply an asset and asset values are a function of discounted future flows.").

19   *See* Onti, Inc. v. Integra Bank, 751 A.2d 904, 916 (Del. Ch. 1999) (in action for declaratory judgment on fairness of cash-out merger court stated "this Court has frequently employed the discounted cash flow as at least one method of valuation"); Neal v. Alabama By-Products Corp., No. 8282, 1990 WL 109243, at *7 (Del. Ch. Aug. 1, 1990), *aff'd*, 588 A.2d 255 (Del. 1991) (noting that DCF analysis is considered by valuation experts to be "preeminent valuation methodology"); Cede & Co. v. Technicolor, Inc., Civ. A. No. 7129, 1990 WL 161084, at *7 (Del. Ch. Oct. 17, 1990) ("[i]n many situations, the discounted cash flow technique is in theory the single best technique to estimate the value of an economic asset."); *see also* In re Valley-Vulcan Mold Co., No. 99-4129, 2001 WL 224066, at **3 (6th Cir. Feb. 26, 2001) (noting, with approval, that expert's "valuations were based on discounted cash-flow valuation, a well-recognized methodology for determining a business's going-concern values."); In re Genesis Health Ventures, Inc., 266 B.R. 591, 613 (Bankr. D. Del. 2001) (noting the use of the discounted cash flow method as one method to support value of an enterprise); *In re* Grant Broadcasting of Philadelphia, Inc., 75 B.R. 819, 824 (Bankr. E.D. Pa. 1987) ("the Debtors' expert used a valuation method, the 'multiple of cash flow method,' which *both* parties' experts agreed was the most frequently used in the broadcast industry to determine the value of stations."); Burlington Northern Railroad Co. v. Bair, 815 F. Supp. 1223,

1229 (S.D. Iowa 1993) (approving the discounted cash flow methodology as one of several available "methods of arriving at true market value").

20      WILLIAM BEAVER, FINANCIAL REPORTING: AN ACCOUNTING REVOLUTION 69 (3d ed. 1998) ("A conceptual relationship can be developed between accounting earnings and the price of common stocks by introducing three critical links: (1) a link between security price and future dividends, (2) a link between future dividends and future earnings, and (3) a link between future earnings and current earnings"); TOM COPELAND, TIM KOLLER & JACK MURRIN, VALUATION: MEASURING AND MANAGING THE VALUE OF COMPANIES 157 (3d ed. 2000) ("[t]he first step in valuing a business is analyzing its historical performance. A sound understanding of the company's past performance provides an essential perspective for developing and evaluating forecasts of future performance"); GEORGE FOSTER, FINANCIAL STATEMENT ANALYSIS, 220-24 (2d ed. 1986) ("[t]he accounting literature contains many statements about what information is (or should be) impounded into security prices .... *A common assumption is that there is a mechanistic relation between reported accounting earnings and stock prices*") (emphasis in original); *see also* J. Ohlson, *Earnings, Books Values, and Dividends In Equity Valuation*, CONTEMP. ACCT. RES., 661, 661-87 (1995) (describing relationships between earnings, future earnings and firm values); Bernadette A. Minton et al., *Improving Cash Flow Forecasts for Valuation: The Role of Cash Flow Volatility and Firm Characteristics*, 2 (Sept. 2000), *available at* http://fisher.osu.edu/fin/faculty/minton/vol0925001.pdf (last visited Aug. 1, 2004) (describing the importance of historical financial data in forecasting cash flows as part of a DCF valuation); Daniel R. Fischel, *Use of Modern Finance Theory in Securities Fraud Cases Involving Actively Traded Securities*, 38 BUS. LAW. 1, 19 (1982) (discussing use of current and historical data in determining cash flows for valuation).

21      *See* Randall v. Loftsgaarden, 478 U.S. 647, 662 (1986) (damages for violations of § 10(b) and Rule 10b-5 usually measured by "out-of-pocket" loss); *In re* Credit Suisse First Boston Corp. Sec. Litig., No. 97 Civ. 4760, 1998 WL 734365, at *12 (S.D.N.Y. Oct. 20, 1998) ("Out of pocket damages are the typical measure of damages awarded in securities fraud cases brought under § 10(b) and Rule 10b-5. They are measured as 'the difference between the purchase price and true value of the stock.'").

22      Affiliated Ute Citizens of Utah v. United States, 406 U.S. 128, 155 (1972); Green v. Occidental Petroleum Corp., 541 F.2d 1335, 1341-46 (9th Cir. 1976); *In re* Executive Telecard, Ltd. Sec. Litig., 979 F. Supp. 1021, 1025 (S.D.N.Y. 1997).

23      *See* Esplin v. Hirschi, 402 F.2d 94, 104-05 (10th Cir. 1968), *cert. denied*, 394 U.S. 928 (1969) (court held the defrauded buyer is entitled to recover the difference between the price paid for the securities and the value of the securities determined as of the time of the discovery of the fraud); Harris v. Am. Inv. Co., 523 F.2d 220, 226-27 (8th Cir. 1975), *cert. denied*, 423 U.S. 1054 (1976) (appropriate date for ascertaining damages sustained to stockholder as result of violation of securities laws prohibiting publishing of false and misleading statements and filing of false and misleading information was the date of public discovery of fraud).

24      *See, e.g.*, Barry Reder, *Measuring Buyers' Damages in 10b-5 Cases*, 31 BUS. LAW. 1839, 1846-50 (1976); Note, *Rule 10b-5 Damage Computation: Application of Financial Theory to Determine Net Economic Loss*, 51 FORDHAM L. REV. 838, 839 n.10 (1983).

25    541 F.2d 1335, 1341 (9th Cir. 1976) (Sneed, J. concurring).

26    *Id.* at 1344.

27    *See* Bradford Cornell & R. Gregory Morgan, *Using Finance Theory to Measure Damages in Fraud on the Market Cases*, 37 UCLA L. REV. 883, 887 fig. 1 (1990).

28    *See, e.g.,* Wool v. Tandem Computers, Inc., 818 F.2d 1433, 1437 (9th Cir. 1987) (recognizing the significance of fraud-related and non-fraud related influences on the stock's price behavior and stating "the increment of artificial inflation caused by misrepresentations may fluctuate 'as a result of market forces operating on the misrepresentations.'"); *In re* Oracle Sec. Litig., 829 F. Supp. 1176, 1181 (N.D. Cal. 1993) (requiring use of an event study or similar analysis to more accurately isolate the influences of information specific to the Company which defendants allegedly distorted).

29    RMED Int'l, Inc. v. Sloan's Supermarkets, Inc., No. 94 Cir. 5587 RKL RLE, 2000 WL 310352, at *6 (S.D.N.Y. Mar. 24, 2000) (citing Jon Koslow, *Estimating Aggregate Damages in Class-Action Litigation Under Rule 10b-5 for Purposes of Settlement*, 59 FORDHAM L. REV. 811, 822 & n.50 (1991)).

30    *See* Cornell & Morgan, *supra* note 27, at 899-900.

31    Sanjai Bhagat & Roberta Romano, *Event Studies and the Law: Part I: Technique and Corporate Litigation*, YALE INT'L CENTER FOR FINANCE, Working Paper No. 00-31 at 2 (Apr. 2001), *available at* http:// papers.ssrn.com/paper.taf?abstract_id=268283.

32    Sanjai Bhagat & Roberta Romano, *Event Studies and the Law: Part II--Empirical Studies of Corporate Law*, YALE INT'L CENTER FOR FINANCE, Working Paper No. 00-33 (Apr. 2001), *available at* http://papers.ssrn.com/paper.taf? abstract_id=268285.

33    *See, e.g.,* Sanjai Bhagat, *The Costs of Inefficient Bargaining and Financial Distress: Evidence from Corporate Lawsuits*, 35 J. FIN. ECON. 221 (1994) (analyzing the effect of lawsuits on the value of corporate litigants); John M. Bizjak & Jeffrey L. Coles, *The Effect of Private Antitrust Litigation on the Stock Market Valuation of the Firm*, 85 AM. ECON. REV. 436 (1995); Michael I. Muoghalu et al., *Hazardous Waste Lawsuits, Stockholder Returns, and Deterrence*, 57 S. ECON. J. 357 (1990); David Prince & Paul Rubin, *The Effects of Product Liability Litigation on the Value of Firms*, 4 AM. L. & ECON. REV. 44 (2002); W. K. Viscusi & J. Hersch, *The Market Response to Product Safety Litigation*, 2 J. REG. ECON. 215 (1990) (assessing the impact of product safety litigation on firm value).

34    *In re* Oracle Sec. Litig., 829 F. Supp. 1176, 1181 (N.D. Cal. 1993). Courts have held that the event study method is "an accepted method for the evaluation of materiality damages to a class of stockholders in a defendant corporation." *In re Gaming Lottery Sec. Litig.*, 96 Civ. 5567, 2000 WL 193125, at *1 (S.D.N.Y. Feb. 16, 2000) (citing Fama et al., *The Adjustment of Stock Prices to New Information*, 10 INT'L ECON. REV. 1 (1969)); Mark Mitchell & Jeffrey Netter, *The Role of Financial Economics in Securities Fraud Cases: Applications at the Securities and Exchange Commission*, 49 BUS. LAW. 545 (1994); David Tabak & Frederick Dunbar, *Materiality and Magnitude: Event Studies in the Courtroom*, NERA Working Paper No. 34 (Apr. 1999), *available at* http://ssrn.com/so13/papers.cfm?abstract_id=166408#PaperDownload).

35    116 F. Supp. 2d 446 (S.D.N.Y. 2000).



36           *Id.* at 460, 468.

37           *Id.* at 460.

38           *Oracle*, 829 F. Supp. at 1181.

39           *Id.*

40           979 F. Supp. 1021 (S.D.N.Y. 1997).

41           *Id.* at 1026.

42           *Id.* at 1025.

43           *Id.* at 1026.

44           *Id.* at 1027.

45           *Id.* at 1027-28 n.3.

46           *See, e.g.*, *In re* WorldCom, Inc. Sec. Litig., 219 F.R.D. 267, 299 n.42 (S.D.N.Y. 2003) (even as early as the motion for class certification, to counter defendants' expert submission, the plaintiffs had their expert submit an event study identifying "eighteen instances during the Class Period in which Grubman's analyst reports introduced new or unanticipated information into the market" to show that Grubman's reports caused subsequent changes in WorldCom's stock price); *interlocutory appeal petition granted in part*, Hevesi v. Citigroup, Inc., 366 F.3d 70, 76-77 (2d Cir. 2004) (holding Salomon Smith Barney's, Citibank's, and Jack Grubman's interlocutory appeal pursuant to FED. R. CIV. P. 23(f) could be brought on issue of applicability of fraud-on-the-market doctrine to WorldCom analysts' opinions). *See also* DeMarco v. Lehman Bros., Inc., 222 F.R.D. 243, 247, 249 (S.D.N.Y. 2004) (holding "fraud-on-the-market" doctrine applies in a case premised on a securities analyst's false and fraudulent opinions or recommendations only where plaintiff can make a showing that the analyst's statements materially impacted the market price in a reasonably quantifiable respect--but denying motion for class certification for investors' failure to make a prima facie showing of same); John C. Coffee Jr., *Security Analyst Litigation*, N.Y. L.J., Sept. 20, 2001, at 5.

47           *See* Suez Equity Investors, L.P. v. Toronto-Dominion Bank, 250 F.3d 87, 95 (2d Cir. 2001).

48           15 U.S.C. §78u-4(b)(4) (2000) (emphasis added).

49           David S. Escoffery, *A Winning Approach to Loss Causation Under Rule 10b-5 in Light of the Private Securities Litigation Reform Act of 1995 ("PSLRA")*, 68 FORDHAM L. REV. 1781, 1781 (2000) ("[t]he loss causation controversy can be traced back to loss causation's unstable foundation") (citing Michael J. Kaufman, *Loss Causation: Exposing A Fraud on Securities Law Jurisprudence*, 24 IND. L. REV. 357, 357-58 (1991)); M. Fiala & M. Gold, *Loss Causation*, 653 PLI/CORP 679, 683 (1989) ("[w]hile the loss causation concept is well accepted, the courts have frequently applied the rule inconsistently and have only recently begun to discuss the requirement in any detail").

50           Brian E. Pastuszenski et al., *supra* note 1, at 572-73 (citing to Arduini/Messina P'ship v. Nat'l Med. Fin. Servs. Corp., 74 F. Supp. 2d 352, 359 (S.D.N.Y. 1999)).

51           *Id.*

52      507 F.2d 374 (2d Cir. 1974). The "scholarly currency" for the origin of "loss causation" and "transaction causation" appears to refer to a Yale Law School note. Note, *Causation and Liability in Private Actions for Proxy Violations*, 80 YALE L.J. 107, 117 (1970).

53      507 F.2d at 380.

54      *See* Kaufman, *supra* note 49, at 357-58 (internal citations omitted).

55      *Id.* at 364.

56      640 F.2d 534 (5th Cir. 1981), *aff'd in part and rev'd in part*, 459 U.S. 375 (1983).

57      *Id.* at 549.

58      *Id.* at 538.

59      *Id.* at 539-40 n.2.

60      *Id.* at 554.

61      *Id.* at 555.

62      *Id.* at 549.

63      *Id.* at 549-50.

64      *Id.* at 549.

65      *See, e.g.*, No. 84 Employer-Teamster Joint Council Pension Trust Fund v. America West Holding Corp., 320 F.3d 920 (9th Cir. 2003), *infra* note 87.

66      892 F.2d 680 (7th Cir. 1990), *cert. denied*, 496 U.S. 906 (1990).

67      *See* Bastian v. Petren Res. Corp., 699 F. Supp. 161, 165 (N.D. Ill. 1988) (citing to plaintiffs' amended complaint).

68      *Bastian*, 892 F.2d at 686.

69      *Id.* at 683.

70      *Id.* at 684.

71      *Id.* at 685. *See also In re* Elec. Data Sys. Corp. Sec. and ERISA Litig., 298 F. Supp. 2d 544, 560 (E.D. Tex. 2004) (causation adequately pled where plaintiffs allege the misrepresentations "touched upon" the reason for the decline in the stock's value; thus motion to dismiss denied where defendant EDS's misrepresentations inflated the stock value such that stock's value decreased when investors learned of problems with major EDS contract with U.S. Navy); *cf. In re* Enron Corp. Sec., Derivative & ERISA Litig., 310 F. Supp. 2d 819, 832, 836 (S.D. Tex. 2004) (quoting "touched upon" standard and holding: (i) that "[w]hile information about Merrill Lynch's individual role in the Nigerian barge transaction and the sham power swaps may not have been made public until long after the Enron bankruptcy, that fact [did] not relieve Merrill Lynch of responsibility for Enron's collapse; Merrill Lynch's alleged substantial participation in the deceptive business practices contributed to the artificial inflation of the price of the securities and thereby was a direct and major cause of plaintiffs' financial loss;" and (ii) that plaintiffs "adequately alleged loss causation in asserting that the price of Enron's publicly traded securities [was] artificially inflated during the Class Period, when [plaintiffs] purchased their Enron securities, in part because of [structured tax deals by Deutsche Bank

entities], which did not provide Enron with any actual cash flow; [but which permitted Enron to record,] at least on paper approximately $446 million income from 1997 and 2001, which affected the valuations of Enron securities.").

72    103 F.3d 351 (4th Cir. 1996).

73    *Id.* at 360.

74    *Id.*

75    *Id.*

76    *Id.*

77    Robbins v. Koger Properties, Inc., 116 F.3d 1441 (11th Cir. 1997).

78    *Id.* at 1446.

79    *Id.* at 1448.

80    *Id.*

81    *Id. Cf.* La Grasta v. First Union Sec., Inc., 358 F.3d 840, 851 (11th Cir. 2004) (on remand posing questions concerning the impact of the PSLRA on the substantive elements of and pleading requirements for loss causation (and thus on the *Robbins* decision)--e.g., "what effect, if any, did the passage of the [PSLRA] have on this circuit's loss causation precedent"-- without suggesting any answers.).

82    131 F. Supp. 2d 680 (E.D. Pa. 2001), *aff'd*, 277 F.3d 658 (3d Cir. 2002) (the Third Circuit did not address the lower court findings on loss causation: "Because the record fails to establish a triable issue with respect to scienter, we will affirm the judgment of the district court without addressing loss causation ...").

83    131 F. Supp. 2d at 687 (citing Semerenko v. Cendant Corp., 223 F.3d 165, 184-87 (3d Cir. 2000)).

84    226 F.3d 275 (3d Cir. 2000) (misrepresentations or omissions are immaterial as a matter of law if the market does not react immediately upon disclosure of the information).

85    *Id.* at 282.

86    *Id.* (quoting *In re* Burlington Coat Factory Sec. Litig., 114 F.3d 1410, 1425 (3d Cir. 1997)). *See also* Greenberg v. Crossroads Systems, Inc., 364 F.3d 657, 666 (5th Cir. 2004) (court determined that there must be linkage between false statement and share price to maintain "fraud-on-the-market" and found that where there was not a showing of price increase following a false statement, that "in order for plaintiffs to show that a stock's price was actually affected through evidence of a significant price decrease following the revelation of the alleged 'truth' of earlier false statements, plaintiffs must demonstrate: (1) that the negative 'truthful' information causing the decrease in price is related to an allegedly false, non-confirmatory positive statement made earlier and (2) that it is more probable than not that it was this negative statement, and not other unrelated negative statements, that caused a significant amount of the decline.").

87    320 F.3d 920 (9th Cir. 2003).

88    *Id.* at 934.



89    *Id.* at 924.

90    *Id.* at 934.

91    *Id.* at 946.

92    335 F.3d 824 (8th Cir. 2003), *reh'g denied*, No. 02-3130, 2003 U.S. App. LEXIS
      17920 (8th Cir. Aug. 27, 2003).

93    335 F.3d at 831-32.

94    *Id.* at 828.

95    *Id.* at 831.

96    *Id.*

97    73 F. Supp. 2d 923 (N.D. Ill. 1999).

98    *Id.* at 943.

99    339 F.3d 933 (9th Cir. 2003), *cert. granted*, 72 U.S.L.W. 3768 (U.S. June 28,
      2004) (No. 03-932). The issue raised in the petition for *certiorari* in *Brouda v.
      Dura Pharmaceuticals*--whether a securities fraud plaintiff invoking the fraud-
      on-the-market theory must demonstrate loss causation by pleading and
      proving a causal connection between the alleged fraud and the investment's
      subsequent decline in price--should be resolved by the Supreme Court during
      its 2004-05 term.

100   *Id.* at 939.

101   *Id.* at 938 (internal citations omitted, emphasis added).

102   *See* Knapp v. Ernst & Whinney, 90 F.3d 1431, 1438 (9th Cir. 1996) (upholding
      the trial judge's instruction that the jury should find loss causation if it found
      that there were material mis-representations or omissions that caused the
      market price of the stock purchased by plaintiffs to be higher than it otherwise
      would have been had the true facts been known); *see also* Nanopierce
      Technologies, Inc. v. Southridge Capital Mgmt. LLC, No. 02-Civ. 0767, 2003
      WL 21507294, *5 (S.D.N.Y. June 30, 2003) (allegations that defendant's
      misrepresentations caused plaintiff to purchase shares at "artificially inflated
      price" sufficient to allege loss causation); *In re* PSS World Medical, Inc. Sec.
      Litig., 250 F. Supp. 2d 1335, 1351 (M.D. Fla. 2002) ("The Court also disagrees
      with the Defendants regarding the loss causation element of securities fraud.
      The Court finds that the Plaintiffs have averred that the Defendants'
      misrepresentations or omissions caused the Plaintiffs' to purchase the inflated
      stock, and that the Defendants' fraud in committing GAAP violations and
      improprieties was part of a course of conduct that was ultimately the proximate
      cause of the Plaintiffs' loss"); *In re* Compuware Sec. Litig., 301 F. Supp. 2d
      672, 690 (E.D. Mich. 2004) (where defendants claimed that even if plaintiff
      could otherwise prove the elements of a securities fraud claim, plaintiff "would
      not be able to prove loss causation because [plaintiff] did not own any
      Compuware stock on March 12, 2002, the date the lawsuit against IBM, the
      trigger event for Plaintiff's alleged injuries, was filed." The court nevertheless
      denied motion to dismiss holding that for loss causation to exist, it is *not*
      necessary there was a disclosure and an actual subsequent drop in market
      price); *In re* Peoplesoft, Inc., [2000 Transfer Binder] Fed. Sec. L. Rep. (CCH) ¶
      91,035, at 94,808 (N.D. Cal. May 25, 2000) (holding that loss causation was
      adequately alleged where complaint "allege[d] that the stock price was inflated

during the class period due to the failure to disclose known bad news and due to forecasts ... that were unrealistic when made.").

103    *Ambassador Hotel Co., Ltd. v. Wei-Chuan Inv.*, 189 F.3d 1017, 1027 (9th Cir. 1999) (To prove loss causation, plaintiffs must show that the false and misleading statements touched upon the reasons for the investment's decline in value.); *In re* Rent-Way Sec. Litig., 209 F. Supp. 2d 493, 513 (W.D. Pa. 2002) (citing EP MedSystems, Inc. v. Echocath, Inc., 235 F.3d 865, 884 (3d Cir. 2000) (quoting *In re* Control Data Corp. Sec. Litig., 933 F.2d 616, 619 (8th Cir. 1991))).

104    Brouda v. Dura Pharmaceuticals, 339 F.3d 933 (9th Cir. 2003), *cert. granted*, 72 U.S.L.W. 3768 (U.S. June 28, 2004) (No. 03-932).

105    629 F.2d 705 (2d Cir. 1980).

106    *Id.* at 710.

107    770 F.2d 308 (2d Cir. 1985).

108    *Id.* at 311.

109    *Id.*

110    *Id.* at 314.

111    *Id.*

112    250 F.3d 87 (2d Cir. 2001).

113    *Id.* at 95.

114    *Id.* at 97-98; *see* Castellano v. Young & Rubicam, Inc., 257 F.3d 171, 187 (2d Cir. 2001) (applying the *Suez Equity* rule on "disparity between the transaction price and the true 'investment quality' of the securities").

115    273 F. Supp. 2d 351 (S.D.N.Y. 2003).

116    *Id.* at 362-64.

117    *Id.* at 362.

118    *Id.* at 364 (emphasis removed). *See also In re* Merrill Lynch Tyco Research Sec. Litig., No. 03 Civ. 4080, 2004 WL 305809, at *1 (S.D.N.Y. Feb. 18, 2004) (where complaint made only conclusory allegation that plaintiff "purchased the common stock of Tyco at an artificially inflated price during the Class Period ... and has been damaged thereby," and that the decline of Tyco's stock from its opening price on June 6, 2002 to its opening price on June 7, 2002 was "directly attributable to Merrill Lynch's disclosure on June 6, 2002 that Defendants did not support Tyco's stock, management, and operations," Judge Pollack granted the motion to dismiss on the basis that the language in Merrill Lynch's June 6, 2002 report that plaintiff characterized as a disclosure did not "actually 'disclose' anything relevant to Plaintiff's claim.").

119    No. 01 Civ. 1125, 2002 WL 31191741 (S.D.N.Y. Sept. 30, 2002).

120    *Id.* at *6 (emphasis added).

121    241 F. Supp. 2d 281 (S.D.N.Y. 2003).

122    *Id.* at 377 n.145 (quoting Knapp v. Ernst & Whinney, 90 F.3d 1431, 1438 (9th Cir. 1996); *see also* Fellman v. Electro Optical Sys. Corp., No. Civ. 6403, 2000 WL 489713, at *12 (S.D.N.Y. Apr. 25, 2000) (following the Ninth Circuit's fraud

on the market theory of loss causation as stated in *Knapp*.); *see also* In re Control Data, 933 F.2d 616, 619 (8th Cir. 1991) (reversing directed verdict for defendant in "fraud on the market case" even though plaintiff's expert testified that no drop in CDC stock price immediately after restatement meant the restatement caused no damages; the court found causation lay in the fact that plaintiff relied on the market price of the stock as an indicator of future value of the stock and that jury could have found improper accounting artificially altered CDC stock price in a variety of ways).

123     294 F. Supp. 2d 392 (S.D.N.Y. 2003).

124     Two recent cases suggesting an approach to loss causation in the context of analyst reports are *Fogarazzo v. Lehman Bros., Inc.*, No. 03 Civ. 5194(SAS), 2004 WL 1151542, at *13 (S.D.N.Y. May 21, 2004) (denying investment banks' motions to dismiss where investment bank's analysts allegedly touted RSL Communications, Inc. stock, all the while knowing RSL was failing and finding loss causation was adequately pled against the individual bank defendants because: (i) upon a number of occasions, the banks issued new reports to counteract the negative effects of restructuring charges and/or write-downs in earnings so as to prop up the price of RSL stock; and (ii) when the banks dropped coverage of RSL, the banks disclosed their previous recommendations were mistaken "just as surely a disclosure as a restated analyst report with a 'Sell' would have been), *motion to certify denied*, No. 03 Civ. 5194 (SAS), 2004 WL 1555136 (S.D.N.Y. July 9, 2004) (denying interlocutory review of order denying defendants' motion to dismiss) and *Miller v. Asensio & Co.*, 101 F. Supp. 2d 395, 409 (D.S.C. 2000) (denying motion to dismiss against stock research analyst/investment bank which allegedly issued false "research report" and "strong sell recommendation" on CCSI and its bilirubin measurement product facilitating defendant's "short selling" on the "down tick"), *aff'd*, 364 F.3d 223 (4th Cir. 2004).

125     *Id.* at 428 (S.D.N.Y. 2003); *see also* In re Blech Sec. Litig., 961 F. Supp. 569, 586 (S.D.N.Y. 1997) (court found the existence of loss causation against a brokerage firm using the same foreseeability test that Judge Pollack used in *Merrill Lynch* to reject a finding of loss causation).

126     343 F.3d 189 (2d Cir. 2003).

127     *See, e.g.*, *WorldCom*, 294 F. Supp. 2d. 392.

128     *Emergent*, 343 F.3d at 197 (citation omitted).

129     *Id.* at 198.

130     *Id.* at 198-99 (citation omitted).

131     In re Initial Pub. Offering Sec. Litig., 297 F. Supp. 2d 668 (S.D.N.Y. 2003).

132     *Id.* at 675. *See also* DeMarco v. Robertson Stephens Inc., 318 F. Supp. 2d 110, 123-24 (S.D.N.Y. 2004) (denying motion to dismiss where defendant investment bank and its equity research analyst engaged in a pump and dump scheme to defraud buyers of stock in Corvis Corporation, a manufacturer of optical networking equipment, Judge Lynch held, "the publication of the intentionally false opinions that allegedly distorted the market price of Corvis stock contained the seeds of loss causation. Unless an intervening event were to occur first, the author of the false opinion will be appropriately held responsible when the market eventually corrects the artificially inflated price by bursting the bubble." Although defendants were not company insiders and did not "control[] the market sufficiently to manipulate the price at will," nor did the

"rapid sell-off of defendants' shares cause[] the price drop," they were alleged to have "misused their status as market commentators to prop up the [company's] stock price until they could unload their own shares.").

133    *See, e.g., In re* Ikon Office Solutions, Inc. Secs. Litig., 131 F. Supp. 2d 680 (E.D. Pa. 2001).

134    *See, e.g.,* Danis v. USN Communications, Inc., 73 F. Supp. 2d 923 (N.D. Ill. 1999); Greenberg v. Crossroads, 364 F.3d 657 (5th Cir. 2004).

135    *Compare In re* Merrill Lynch & Co., 273 F. Supp. 2d 351 (S.D.N.Y. 2003), *with* Burstyn v. Worldwide Xceed Group, Inc., No. 01 Civ. 1125, 2002 WL 31191741 (S.D.N.Y. Sept. 30, 2002).

136    *See, e.g., Danis,* 73 F. Supp. 2d 923; *In re* Initial Public Offering Sec. Litig., 241 F. Supp. 2d 281 (S.D.N.Y. 2003).

137    *See* Stout, *supra* note 3; *see also* BREALEY & MYERS, *supra* note 3, at 77 ("The value of a stock is equal to the stream of cash payments discounted at the rate of return that investors expect to receive on comparable securities").

138    *See* Thomas Lee Hazen, *The Short-Term/Long-Term Dichotomy and Investment Theory: Implications for Securities Market Regulation and for Corporate Law,* 70 N.C. L. REV. 137, 147 (1991); Jonathan Fuerbringer, *Yesterday's Earnings Don't Move Stocks. Tomorrow's Do,* N.Y. TIMES, Aug. 8, 2004, § 3, at 7 (citing analysis by Birinyi Associates demonstrating that expected future earnings, not past earnings, are the driver of stock prices).

139    *See supra* note 20.

140    Of course, it is possible in this scenario that the stock price would increase.

59 BUSLAW 1419

---

**End of Document**          © 2021 Thomson Reuters. No claim to original U.S. Government Works.

