# EXHIBIT 207

**Loyola University Chicago, School of Law**
**LAW eCommons**

Faculty Publications & Other Works

2010

# Regressing: The Troubling Dispositive Role of Event Studies in Securities Fraud Litigation.

Michael J. Kaufman
mkaufma@luc.edu

Follow this and additional works at: http://lawcommons.luc.edu/facpubs

 Part of the Securities Law Commons

Recommended Citation
Kaufman, Michael J., Regressing: The Troubling Dispositive Role of Event Studies in Securities Fraud Litigation, 15 Stanford J. L. Bus. Fin. 1 (2010)

This Article is brought to you for free and open access by LAW eCommons. It has been accepted for inclusion in Faculty Publications & Other Works by an authorized administrator of LAW eCommons. For more information, please contact law-library@luc.edu.

# Regressing: The Troubling Dispositive Role of Event Studies in Securities Fraud Litigation.

Michael J. Kaufman[*]

John M. Wunderlich[**]

## Abstract

*An event study is a statistical regression analysis that merely provides one method of examining the effect of an event, such as a disclosure of information on the market price of a security. Yet the law governing event studies has become inseparable from the substantive law governing securities fraud litigation. Courts have effectively collapsed securities fraud actions into a single question: Whether the defendant's misrepresentation or omission created a disparity between the transaction price of a security and its true value measured by the precise reaction of the market price to the disclosure of the concealed information. A misrepresentation or omission that creates that disparity is material. Plaintiffs who invest at a market price that com-*

---

[*] Professor of Law and Associate Dean for Academic Affairs at Loyola University Chicago School of Law.
[**] Staff law clerk for the United States Court of Appeals for the Seventh Circuit; J.D. Loyola University Chicago School of Law, May 2009.

183

*municates that disparity have shown reliance by the fraud on that market price. The disclosure of the previously concealed information alters the market price to create economic loss, so plaintiffs can establish loss causation. The measure of damages then quantifies that precise alteration or correction in the market price.*

*The interrelated questions of materiality, reliance, loss causation, and damages all require an event study for their resolution. As such, an investor who fails to offer an event study performed by a qualified expert has little chance of prevailing. The dispositive role now played by event studies, however, is inconsistent with the Seventh Amendment and the federal securities laws. Rather, an event study requirement poses an unconstitutional and unwarranted barrier to meritorious securities fraud suits.*

I. Introduction..................................................................................................186
II. Event Studies and Securities Litigation.....................................................188
    A.   Admitting an Event Study as Evidence and Conducting a Proper
        Analysis...........................................................................................189
        1.  Meeting the *Daubert* Standard...............................................189
        2.  Conducting a Proper Event Study Analysis. ........................190
    B.   Event Studies as They Relate to Securities Fraud Actions. .......................194
III. The Essential Elements of Securities Fraud Claims Require Post-Disclosure
Price Movement. ...............................................................................................199
    A.   Materiality and Post-Disclosure Price Movement....................................200
    B.   Reliance in Fraud-on-the-Market Cases......................................................201
    C.   Loss Causation and Damages. ..................................................................204
IV. A Proper Event Study is an Essential Element: The Only Way to Show Price
Movement Caused by Disclosure is Through an Event Study....................208
    A.   An Event Study is Necessary to Connect Post-Disclosure Price
        Movement to the Fraud..............................................................................208

Fall 2009     Regressing: The Troubling Dispositive Role Of Event          185
Studies in Securities Fraud Litigation

B.   Class Certification: The *Fener v. Operating Engineers* Example. ...............211
    1.   Dueling Experts. .......................................................................211
    2.   The Procedural Posture: Class Certification. ........................213
C.   Summary Judgment: The *In re Williams* Example.........................213
    1.   The Rise and Fall of WCG: Fraudulent Spin-Offs? ..............213
    2.   The Plaintiffs' Expert and His Theories of Loss. ..................215
        a.   Scenario 1: The Leakage Theory. ......................................216
        b.   Scenario 2: The Corrective Disclosure Theory...............218
        c.    The Notes and the Absent Regression Analysis............218
    3.   The Procedural Posture: Summary Judgment. .....................218
C.   An Adequate Event Study May be Necessary *and Sufficient.*....................219
V.The Event Study Requirement Is Inconsistent With the Seventh Amendment......220
    A.   Materiality, Reliance, Loss Causation, and Damages Are
         Quintessential Fact Questions. .......................................................221
        1.   A Jury Must Resolve Factual Determinations of Materiality,
             Reliance, Loss Causation, and Damages. ..............................222
        2.   Even a "Reasonableness" Standard is an Affront to the Jury's
             Role. ......................................................................................225
    B.   The Event Study Requirement Allows the Judge to Usurp the Jury's
         Power to Assess Otherwise Reliable Expert Analyses in Reaching its
         Factual Determinations. ..................................................................227
        1.   The Judge Precludes the Jury from Weighing Competing Expert
             Opinions.................................................................................227
        2.   The Judge Precludes the Jury from Discounting the Testimony
             from Otherwise Reliable Experts..........................................228
    C.   An Event Study Assists a Trier of Fact; It Does Not Replace It. ...............230
VI.The "Event Study" Element is Inconsistent with the Federal Securities Laws. ....233
    A.   The Federal Securities Laws Do Not Require a Post-Disclosure
         Decline as a Precondition to Recovery.........................................233
        1.   The Plain Language of the PSLRA Does Not Require A Post-
             Transaction Decline and Event Study....................................234
        2.   The Common Law Distinguishes Between Out-of-Pocket Losses
             and Losses Resulting from a Post-Transaction Decline......................235
        3.   Corporate Finance Theory Dictates that an Event Study Need
             Not Link a Post-Transaction Decline to the Defendant's
             Fraudulent Conduct to Demonstrate Loss. ..........................236
    B.   Requiring an Event Study Imposes an Unjustified Barrier to

Meritorious Securities Fraud  Claims..........................................................239
1.  The Fictional Underpinnings of the Event Study Requirement.........240
    a.  The *In Terrorem* Concept Is Illogical..............................................240
    b.  Abusive Discovery Concerns Are Insufficient to Justify an
        Event Study Analysis.....................................................................242
        i.   Discovery Abuse is Misperceived............................................243
        ii.  Both Plaintiffs and Defendants Are Prone to Discovery
             Abuse......................................................................................246
        iii. Discovery Promotes Merits Resolution...................................247
        iv.  The Event Study Requirement Increases Discovery Costs...248
2.  An Event Study Requirement Inflicts Significant Harm on
    Meritorious Actions................................................................................249
    a.  Letting the Air out of the Inflation Balloon: Requiring Post-
        Transaction Decline Enables Concealment of Fraud....................249
    b.  Private Actions Supplement Otherwise Deficient SEC
        Actions............................................................................................250
    c.  Securities Class Actions Compensate Investor-Plaintiffs.............254
    d.  Additional Securities Fraud Suits Will Not Inevitably Result
        in a Flood of Expensive Suits........................................................258
VII. Conclusion..........................................................................................260

## I.   Introduction.

An event study is a statistical regression analysis that merely provides one method of examining the effect of an event, such as the disclosure of information on the market price of a particular security.  Yet the law governing event studies has become inseparable from the substantive law governing securities fraud litigation. Courts have effectively collapsed securities fraud actions into a single question:

> Whether the defendant's misrepresentation or omission created a disparity between the transaction price of a security and its true value measured by the precise reaction of the market price to the disclosure of the concealed information.

A misrepresentation or omission that creates that disparity is material.  Plaintiffs who invest at a market price that communicates that disparity have shown reliance by the fraud on that market price.  The disclosure of the previously concealed information alters the market price to create economic loss, so plaintiffs can establish loss causation.  The measure of damages then quantifies that precise alteration or correction in the market price.

The interrelated questions of materiality, reliance, loss causation, and damages all require an event study for their resolution. The overriding substantive issue in securities fraud cases has become whether an expert has proffered an opinion based on a reliable event study. Thus, event studies have become an indispensable element to securities fraud actions.[1] As such, a defrauded investor who fails to offer a reliable event study performed by a qualified expert has little chance of prevailing. The dispositive role now played by event studies, however, is inconsistent with the Seventh Amendment and the federal securities laws. Rather, an event study requirement poses an unconstitutional and unwarranted barrier to meritorious securities fraud suits.

This Article will show that a properly conducted event study[2] is not just a helpful way to present evidence of essential elements of a securities fraud action, it has become a substantive and essential element of a securities fraud claim itself. First, Part II of this Article details the steps necessary to conduct a proper and admissible event study for purposes of securities litigation. This Part also shows how the elements of securities actions uniquely lend themselves to event study analysis.[3]

---

[1] This could just be further evidence of the federal courts' continuing hostility to the private Rule 10b-5 action. *See, e.g.,* Joanne Doroshow, *Gordon Gekko Justice Makes a Comeback,* 132 RECORDER 56 (Mar. 21, 2008) (arguing the Supreme Court in *Stoneridge* ushered in an era of "Gordon Gekko justice" whereby shareholders are more vulnerable and the integrity of American markets more exposed than in decades); Michael J. Kaufman & John M. Wunderlich, *Congress, the Supreme Court, and the Proper Role of Confidential Informants in Securities Fraud Litigation,* 36 SEC. REG. L.J. 345, 354-57 (2008) (arguing that the federal courts have unjustifiably heightened the pleading standard for confidential informants in securities litigation making private recovery more difficult); Charles W. Murdock, *Sarbanes-Oxley, Corporate Corruption, and the Complicity of Courts and Legislatures,* 6 BERKELEY BUS. L.J. (forthcoming 2009) (arguing Congress and the Supreme Court have been complicit in fraud from the late 1970s by gradually rescinding investor protections or outright enacting investor-hostile procedures); Matthew L. Mustokoff, *Fraud Not on the Market: Rebutting the Presumption of Classwide Reliance Twenty Years After Basic Inc v. Levinson,* 4 HASTINGS BUS. L.J. 225, 226 (2008) (stating, "In a wave of recent decisions, the courts have made it tougher for plaintiffs to demonstrate that a particular security trades in an efficient market for purposes of triggering the classwide presumption of reliance.... [A principal reason for this is that] the courts have interpreted Federal Rule of Civil Procedure 23 . . . more stringently in recent years."); Samuel H. Rudman, *Oscar: Misinterpretation of the Fraud-on-the-Market Theory,* 240 N.Y.L.J. 3 (July 17, 2008) (stating that two recent federal court decisions are in direct conflict with controlling Supreme Court precedent and erroneously create a new class certification requirement by placing a burden on plaintiffs to prove the merits of their case before trial)..

[2] Throughout this Article, the terms "event study," "regression analysis," and "event study analysis" will be used interchangeably. Event studies are used in a variety of other litigation settings outside of securities fraud cases.

[3] *See infra* Part II (discussing requirements to admit an event study as evidence and what constitutes a "reliable" event study).

Part III of this Article next demonstrates that the elements of materiality, reliance in fraud-on-the-market cases, loss causation, and damages as defined by the federal courts all depend on a showing of post-disclosure price movement.[4] Then, as Part IV shows, courts have recently held that the only way to show that a stock price movement was caused by disclosure is through a properly conducted event study.[5] Nevertheless, as Part V establishes, requiring an event study at the initial stages of the plaintiffs' case takes fact questions regarding materiality, reliance, causation and damages from the province of the jury in contravention of the Seventh Amendment right to a jury trial.[6] Additionally, it imposes an unjustifiable barrier to meritorious claims inconsistent with the language of the securities laws. Moreover, any requirement that an expert be called to present a statistical regression analysis to establish materiality, reliance, loss causation, and damages is inconsistent with the policies underlying the federal securities laws.[7]

## II.   Event Studies and Securities Litigation.

"The securities markets have grown increasingly complex."[8] This increasing complexity has created new challenges in prosecuting and defending securities fraud cases.[9] To meet these new challenges, securities fraud plaintiffs often employ experts armed with event studies.[10] Part of the resounding success of event study analysis in securities fraud actions is because event studies provide a metric for measuring a specific event's effect on stock prices.[11] Thus, there has been an overwhelming endorsement in the federal courts for the use of event studies in securities litigation.[12]

---

[4]   *See infra* Part III (discussing the elements of materiality, reliance in fraud-on-the-market cases, loss causation, and damages).

[5]   *See infra* Part IV (demonstrating how the federal courts have dismissed a securities fraud action absent a reliable event study).

[6]   *See infra* Part V (stating that the event study requirement takes factual determinations from the jury and also usurps the jury's function to preference competing experts).

[7]   *See infra* Part VI (showing that the securities laws do not require a post-transaction price decline or an event study for that matter; and that such a requirement unnecessarily impedes meritorious securities class actions).

[8]   Joseph W. Martini et al., *The Need for Expert Testimony in Complex Securities Cases, Jurors Might Require Extra Help*, 34 CONN. L. TRIB. 20 (May 26, 2008).

[9]   *Id.*

[10]   *See, e.g.*, Mark L. Mitchell & Jeffry M. Netter, *The Role of Financial Economics in Securities Fraud Cases: Applications at the Securities and Exchange Commission*, 49 BUS. LAW. 545, 545-46 (1994).

[11]   Sanjai Bhagat & Roberta Romano, *Event Studies and the Law: Part II: Empirical Studies of Corporate Law*, 4 AM. L. & ECON. REV. 380 (2002).

[12]   *See, e.g.*, Elaine Buckberg & Frederick Dunbar, *Disgorgement: Punitive Demands and Remedial Offers*, 63 BUS. LAW. 347, 362 (2008) (stating that in securities litigation courts widely accept event studies); Madge S. Thorsen et al., *Rediscovering the Economics of Loss Causation*, 6 J. BUS. & SEC. L. 93 (2006) (describing the event study as the "gold standard" accepted by courts

This Section demonstrates that event studies, as a useful (and essential) tool in securities litigation, must first constitute admissible evidence.[13]  In other words, event studies must meet the traditional *Daubert* test for scientific evidence.  Next, this Part discusses what constitutes a proper event study.  After detailing the requirements for a proper event study, this Part will provide a brief overview of the essential elements of a securities fraud claim to illuminate how a securities fraud claim is particularly well-suited for event study analysis.[14]

**A.   Admitting an Event Study as Evidence and Conducting a Proper Analysis.**

### 1.Meeting the *Daubert* Standard.

Under Federal Rule of Evidence 702 an expert is someone with specialized knowledge.[15]  An expert may testify when it will assist the trier of fact in understanding the evidence or determining a fact in issue.[16]  An expert can base his testimony on facts or data of three kinds, so long as they are of the kind reasonably relied upon by experts in the field: (1) an expert can rely on facts or data learned by firsthand observation before the hearing; (2) an expert may rely on facts or data that he learns at the hearing; and (3) an expert may rely on what amounts to outside data, or information garnered by consulting other sources.[17]

In *Daubert v. Merrill Dow Pharmaceuticals*, the Supreme Court held that expert testimony set forth as scientific evidence must satisfy a special standard: the scientific

and economists).

[13]   *See infra* Part II.A.

[14]   *See infra* Part II.B.

[15]   FED. R. EVID. 702 ("If scientific, technical, or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue, a witness qualified as an expert by knowledge, skill, experience, training, or education, may testify thereto in the form of an opinion or otherwise, if (1) the testimony is based upon sufficient facts or data, (2) the testimony is the product of reliable principles and methods, and (3) the witness has applied the principles and methods reliably to the facts of the case.").

[16]   FED. R. EVID. 702.  The standard is intended to be generous.  CHRISTOPHER B. MUELLER & LAIRD C. KIRKPATRICK, EVIDENCE UNDER THE RULES 603 (5th ed. 2004).

[17]   FED. R. EVID. 703 ("The facts or data in the particular case upon which an expert bases an opinion or inference may be those perceived by or made known to the expert at or before the hearing. If of a type reasonably relied upon by experts in the particular field in forming opinions or inferences upon the subject, the facts or data need not be admissible in evidence in order for the opinion or inference to be admitted. Facts or data that are otherwise inadmissible shall not be disclosed to the jury by the proponent of the opinion or inference unless the court determines that their probative value in assisting the jury to evaluate the expert's opinion substantially outweighs their prejudicial effect.").

evidence must be generally accepted in the pertinent community.[18]  Under the *Daubert* test, the court must ascertain that: (1) the theory or technique has been appropriately tested and found valid; (2) the theory or technique has been subjected to peer review; (3) the error rate is low enough so that the theory or technique is reliable; and (4) the theory or technique is generally accepted within the profession.[19]  When an expert employs an event study, his opinion: (1) becomes testable, (2) is supported by published literature / peer review, (3) is subject to a known or potential rate of error, and (4) follows procedures that derive from objective standards making it generally accepted.[20]  In other words, through an event study, an expert's testimony can meet all the prongs of the Supreme Court's *Daubert* standard.[21]

### 2.Conducting a Proper Event Study Analysis.

For an event study to be admissible it has to be proper so as not to constitute junk science.  The traditional definition of an event study is "a statistical regression analysis that examines the effect of an event, such as an allegedly fraudulent statement or omission, on a dependent variable, such as a company's stock price."[22]  Event study methodology is founded on the efficient market hypothesis,[23] a hypothesis endorsed by the Supreme Court.[24]  Under the efficient market hypothesis, a security's price reflects all publicly available information.[25]  Thus, in terms of an event study, a change in stock price in light of a public announcement is owing to the arrival of new information in the market provided by that announcement.[26]  A proper

---

[18]    Daubert v. Merrill Dow Pharm. Inc., 509 U.S. 579, 593-94 (1993); MUELLER & KIRKPATRICK, *supra* note 16, at 620.  Whether an expert's scientific data is admissible only arises after it is established that the individual whose testimony is being offered is an expert in the particular field.  *In re* Apollo Group, Inc., Sec. Litig., 527 F. Supp. 2d 957, 960 (D. Ariz. 2007).

[19]    *Daubert*, 509 U.S. at 593-94; *see also* Kumho Tire Co. v. Carmichael, 526 U.S. 137, 148 (1999) (extending *Daubert* to all expert testimony presenting technical or specialized material).

[20]    MICHAEL J. KAUFMAN, *The PSLRA's Damages Formula and Experts, in* 26 SEC. LITIG. DAMAGES § 3:14.50 (Thomson/West 2008).

[21]    Morgan v. United Parcel Serv. of Am. Inc., 380 F.3d 459 (8th Cir. 2004) (stating that a regression analysis is subject to *Daubert* for expert scientific testimony); Tracinda Corp. v. Daimler-Chrysler AG, 362 F. Supp. 2d 487, 494 (D. Del. 2005) (stating expert testimony was admissible under *Daubert* where experts employed standard regression analysis).  "The Ninth Circuit has approved the use of regression analyses as 'common statistical tool[s]." *In re* Apollo Group, Inc., Sec. Litig., 527 F. Supp. 2d 957, 963 (D. Ariz. 2007) (quoting E.E.O.C. v. Gen. Tel. Co. of Nw., Inc., 885 F.3d 575, 577 n.3 (9th Cir. 1989)).

[22]    MICHAEL J. KAUFMAN, *Event Studies, in* 26 SECURITIES LITIGATION: DAMAGES § 25:B (Thomson/West 2008) ("An event study combines principles of finance (e.g. what factors influence a company's stock price or the extent to which a company's stock price incorporates all publicly available information) with principles of statistics (e.g., collecting and analyzing data and identifying, isolating, and quantifying numerous variables that may account for the resulting pattern of data).").

[23]    Mitchell & Netter, *supra* note 10, at 557.

[24]    Basic v. Levinson, 485 U.S. 224, 245-47 (1989).

[25]    Mitchell & Netter, *supra* note 10, at 557.

[26]    *Id.*  Studies support this hypothesis, showing that stock prices react quickly to the arrival

event study consists of four general steps:

   *Step One.Identify the Event.*[27]

   First, an event study must identify the "event" that causes investors to change their expectations about the value of the company.[28]  Some examples of "events" include takeovers, equity offerings, change in the state of incorporation, adoption of antitakeover provisions, filing lawsuits, deaths of corporate executives, and product recalls to name a few.[29]  In securities fraud, the "event" is the subject of the alleged fraud.  After the event is identified, the expert must determine when the event was made known to the public, or the "announcement date."[30]  This assessment requires that it be known when the news reached the market.  Also, there must be no reason to believe that the market anticipated the news, otherwise it would not be the date upon which the market learned of the event.

   *Step Two. Establish an Event Window.*

   Once an event has been identified, the expert must select an "event window" or a period over which stock price movements are calculated.[31]  Typically, this window starts at the end of the trading day, or before news of the event reached the public.[32]  The difficulty in establishing an event window lies in determining the cut-off date for the window.[33]  The longer an event window, the more likely it is to incorporate the release of the news and the market's reaction to it.  But it is also then more likely that the market reaction will be related to other effects unrelated to the studied event.[34]  Because information may leak several days before the actual fraudulent

---

of new information, often within a matter of seconds.  *Id.*

   [27]  This is generally the most important part of the event study methodology.  It is not left up to the experts conducting the event study.  Rather, the event is determined by the plaintiffs' attorneys.  Linda Allen, *Meeting Daubert Standards in Calculating Damages for Shareholder Class Action Litigation*, 62 Bus. Law. 955, 958 (2007).

   [28]  Mitchell & Netter, *supra* note 10, at 557.

   [29]  Sanjai Bhagat & Roberta Romano, *Event Studies and the Law: Part I: Technique and Corporate Litigation*, 4 Am. L. & Econ. Rev. 141, 144 (2002).

   [30]  Bhagat & Romano, *Event Studies Part I*, *supra* note 29, at 144.  The *Wall Street Journal Index, Lexis-Nexis,* and *Thompson Financial Securities Data* are increasingly used as popular sources for announcement dates.  *Id.*  Some events may have several event dates or several announcement dates, i.e., through a leakage theory.  *Id.* at 145.

   [31]  David Tabak & Frederick Dunbar, *Materiality and Magnitude: Event Studies in the Courtroom* 7 (NERA Working Paper No. 34, (Apr. 1999), http://papers.ssrn.com/sol3/papers.cfm?abstract_id=166408.

   [32]  Tabak & Dunbar, *Materiality and Magnitude: Event Studies in the Courtroom*, *supra* note 31 at 7.

   [33]  Allen, *supra* note 27, at 958; *see* U.S. v. Ferguson, 584 F. Supp. 2d 447, 453 (D. Conn. 2008) (stating that an event study was not justified because the event window was too long).

   [34]  Tabak & Dunbar, *Materiality and Magnitude: Event Studies in the Courtroom*, *supra* note

*Stanford Journal of Law, Business & Finance*

event, and because the market may take a day to react to the information if the announcement is made just after the market closes or late in the trading day, experts usually employ a three-day event window starting a day before and ending a day after the event.[35]

   *Step Three.Control for Market and Industry Effects to Get an Estimated Relationship Between the Company and the Market.*

   Third, the expert must examine the stock price performance around the event.[36] This requires that the expert isolate the effect of the event from other market, industry, or company-specific factors simultaneously affecting the company's stock price.[37]

> Suppose, for example, that defendants make a false, unexpected, and positive announcement about an issuer and the price of that issuer's stock rises on the next trading day. But suppose that the market generally improves on that day and that the prices of other stocks in the issuer's industry also enjoy gains on that day. The question that an event study examines is whether the false announcement caused the price of the issuer's stock to go up at all – instead of market and industry developments causing the entire price rise – and if the defendant's announcement did have some price effect, what part of the company's stock price increase was attributable to the announcement as opposed to other factors.[38]

   After ruling out other factors, the expert attempts to determine whether the

---

31 at 8.

   [35] Allen, *supra* note 27, at 958; *see also* Janet Cooper Alexander, *The Value of Bad News in Securities Class Actions*, 41 UCLA L. REV. 1421, 1435 (1994).

   [36] Mitchell & Netter, *supra* note 10, at 560.

   [37] *In re* Seagate Tech. II Sec. Litig., 843 F. Supp. 1341, 1348 (N.D. Cal. 1994). To isolate the effect of market forces and industry factors, an event study will employ a comparative index model: R = a + bMR + cMR = e

   Where:

   R = the return on the stock (i.e., its movement for each day in question)

   a = "alpha"; the constant return on the stock regardless of market or industry forces (generally presumed to be zero)

   b = "beta"; the percentage of linear correlation between the return of the stock price of a company and the return of the market, measured by an index. Indices include the S&P 500 Index for example. The beta is multiplied by the market return (MR).

   c = the percentage of linear correlation between the return of the stock price of a company and the average return on the stock of a peer group (similar industry) measured by an index. This is multiplied by the industry return (IR).

   e = "epsilon"; the error term of the regression.

   KAUFMAN, Event Studies, supra note 22.

   [38] William O. Fisher, *Does the Efficient Market Theory Help Us Do Justice in a Time of Madness?*, 54 EMORY L.J. 843, 872 (2005).

stock price movement is abnormal.[39]  "A large abnormal stock price movement occurring at the same time the market receives news about an event suggests that the event caused the abnormal price movement."[40]

To rule out other market and industry factors, the expert must calculate the relationship of the specific company's stock with the general market.  The expert will measure the stock price's sensitivity to general market conditions.[41]  To do this, an expert will run a "regression" of the company's stock price on a market and/or industry index over a period of time ("estimation window").  The period of time selected for the regression analysis is generally close to the event window.[42]  The result of this regression analysis is a quantified relationship between the company and the market.  The regression analysis will reveal a statistic measure of the strength of the relationship between the company's stock price movements and the market and industry indices.[43]

*Step Four.Estimate the Effects of the Event.*

Fourth, the estimated relationships achieved by the regression analysis are applied to control for market and industry movements in the event window.[44]  Then, the predicted return is compared to the actual return in the event window.  The difference between the two is the abnormal or excess return.  This return must be statistically significant so the results are not because of mere chance.  This excess return is multiplied by the company stock price to provide an estimate of the per-share dollar effect of the event.[45]

To summarize:

> [A]n event study is similar to a medical experiment in which there is a control group and a treatment group.  The control group provides the benchmark against which the treatment group is compared to determine if the event being studied had any effect.  In a securities setting, the control group is established by modeling the normal relationship of a stock's price movements to movements of a market and/or industry index.  The difference between the stock

---

[39]  Mitchell & Netter, *supra* note 10, at 560.
[40]  *Id.*
[41]  Allen, *supra* note 27, at 957.
[42]  Tabak & Dunbar, *supra* note 31, at 9.  Generally, an estimation window is placed slightly before the event window so it covers a "clean" period untainted by any fraud that may have affected the stock price.  *Id.*  Where multiple events are studied, the estimation window may encompass the event windows. *Id.*
[43]  *Id.* at 10.
[44]  *Id.* at 11.
[45]  *Id.*

price movement we actually observe and the movement we expected to observe (i.e. the difference between the treatment and the control group) that occurs upon the release of a particular piece of information is called the excess price movement of the stock at the time of the event. This excess price movement is tested for statistical significance to see whether the result is unusual or unlikely to be explained by the normal random variations of the stock price.[46]

As the following Subpart demonstrates, the event study methodology is particularly compatible with securities fraud actions.

## B.   Event Studies as They Relate to Securities Fraud Actions.

Securities fraud actions uniquely lend themselves to event study analysis. Securities fraud actions brought under Section 10 of the Securities Exchange Act[47] and the Securities and Exchange Commission's ("SEC") Rule 10b-5[48] allow a private plaintiff to recover damages caused by an act or omission resulting in fraud or deceit in connection with the purchase or sale of any security.[49] To state a cause of action under Rule 10b-5, a plaintiff must allege and prove six elements: (1) that the defendant made a material misrepresentation or omission (materiality); (2) that the defendant acted with a wrongful state of mind (scienter[50]); (3) that the material misrepre-

---

[46]   DAVID TABAK, NERA, MAKING ASSESSMENTS ABOUT MATERIALITY LESS SUBJECTIVE THROUGH    THE    USE    OF    CONTENT    ANALYSIS    694    (2007), http://www.nera.com/image/PUB_Tabak_Content_Analysis_SEC1646-FINAL.pdf.    An event study is most useful in determining the effects of new information on security prices when: (1) there is a well-defined public disclosure or announcement; (2) the time that the news item reaches the market is known; (3) there is no reason to believe that the market anticipated the news item; and (4) it is possible to isolate the effect of the news item from market, industry, and other issuer-specific factors simultaneously affecting the price. *Id.*

[47]   Securities Exchange Act § 10, 15 U.S.C. § 78j (1934) ("It shall be unlawful for any person . . . to sue or employ, in connection with the purchase or sale of any security . . . any manipulative or deceptive device in contravention of such rules and regulations as the Commission may prescribe as necessary or appropriate in the public interest or for the protection of investors.").

[48]   17 C.F.R. § 240.10b-5. The Rule 10b-5 action is an implied right of action. *See, e.g.*, Ernst & Ernst v. Hochfelder, 425 U.S. 185, 196 (1976); Superintendent of Ins. of N.Y. v. Bankers Life & Cas. Co., 404 U.S. 6, 13 n.9 (1971). The availability of a Rule 10b-5 action is now beyond doubt because of legislative acquiescence, judicial consensus, and the test of time. MICHAEL J. KAUFMAN, *Conclusion, in* 26A SEC. LITIG. DAMAGES §29:1 (Thomson/West 2009).

[49]   17 C.F.R. § 240.10b-5.

[50]   Scienter is a mental state embracing intent to deceive, manipulate, or defraud. *Ernst & Ernst*, 425 U.S. at 185 n.1. Currently, there are three different ways to establish scienter: (1) plaintiffs can state a claim by pleading either (a) motive and opportunity or (b) strong circumstantial evidence of recklessness or conscious misbehavior, Novak v. Kasaks, 216 F.3d 300, 309–10 (2d Cir. 2000), (2) plaintiffs can state a claim by pleading facts showing (a) simple recklessness or (b) a motive to commit fraud and opportunity, *In re* Silicon Graphics, Inc. Sec. Litig., 183 F.3d 970, 974 (9th Cir. 1999), and (3) plaintiffs can state a claim by pleading enough facts that establish altogether a strong inference of scienter. *see, e.g.*, Ottmann v. Hangar Or-

sentation or omission was made in connection with the purchase or sale of a security (in connection with); (4) that the plaintiff relied on the material misrepresentation (reliance); (5) that the plaintiff suffered an economic loss as a result (economic loss); and (6) that the material misrepresentation actually caused the loss (loss causation).[51] Event studies have been a well-established method for calculating the effect of an event on stock prices for more than forty years.[52]  Because event studies can isolate the effect of each false statement on a stock's price, they are used to establish materiality, reliance, damages, and loss causation.[53]

*Materiality.*  A misrepresented or omitted fact is material if there is a substantial likelihood that it would be important to a reasonable investor.[54]  The test for materiality is whether the subject fraud altered the total mix of information available to investors in such a way as to affect their investment decisions.[55]  Definitions of materiality all tend to relate back to whether the decision by a reasonable investor to trade at a particular price would have been affected by knowing the omitted or misstated information.[56]  The materiality standard is objective.[57]  Thus, materiality can be objectively measured with an event study, as an event study can determine the likelihood that a stock price changed as a result of the fraud and not as a result of some other factor.[58]  The event study method is an accepted method of evaluating materiality.[59]

---

thopedic Group, Inc., 353 F.3d 338, 345 (4th Cir. 2003); Helwig v. Vencor, Inc., 251 F.3d 540, 550–52 (6th Cir. 2000).  Scienter also must be established with a "strong inference."  15 U.S.C. § 78u-4(b)(2) (2009).  The Supreme Court recently clarified that this strong inference requirement mandates a holistic assessment whereby courts weigh both culpable and nonculpable inferences on a Rule 12(b)(6) motion.  Tellabs, Inc. v. Makor Issues & Rights, Ltd., 551 U.S. 308, 323-24 (2007).

[51]  Dura Pharm. Inc. v. Broudo, 544 U.S. 336, 341–42 (2005).

[52]  Allen, *supra* note 27, at 957.

[53]  Fisher, *supra* note 38, at 847; Mitchell & Netter, *supra* note 10, at 547-50.

[54]  TSC Indus. Inc. v. Northway, Inc., 426 U.S. 438, 445 (1976).  "Whether information is material . . . depends on other information already available to the market; unless the statement 'significantly altered the total mix of information' available, it will not be considered material."  *In re* Sprint Corp. Sec. Litig., 232 F. Supp. 2d 1193, 1215 (D. Kan. 2002).

[55]  Frederick C. Dunbar & Dana Heller, *Fraud on the Market Meets Behavioral Finance*, 31 DEL. J. CORP. L. 455, 468 (2006).

[56]  *Id.* at 467.

[57]  *TSC Indus. Inc.*, 426 U.S. at 445.

[58]  Tabak & Dunbar, *Materiality and Magnitude: Event Studies in the Courtroom, supra* note 31, at 3.  Puffing is a concept related to materiality.  Soft "puffing" statements generally lack materiality because the market price of a share is not inflated by vague statements.  JOHN C. COFFEE ET AL., SECURITIES REGULATION 984 (10th ed. 2007).

[59]  Gen. Elec. Co. v. Jackson, 595 F. Supp. 2d 8, 23-24 (D.D.C. 2009) (stating that a regression analysis is an acceptable method of demonstrating the effect of an event on stock

For instance, if the information causes more investors to want to buy the stock, the price will rise until the demand for the stock equals the supply.[60] Materially positive news causes a stock's price to rise, but if the information is immaterial, then investors' decisions to buy are unaffected.[61] Thus, an expert—usually an accountant, economist, or investment banker— may be used to track the movement of a stock's price in reaction to the disclosure of the allegedly material facts. The expert can then opine as to the probability that this movement was caused by the release of the material information or by events unrelated to the disclosure.[62] If the event study discloses no significant or abnormal change in the stock price, the information is deemed immaterial.[63]

*Reliance in Fraud-on-the-Market Cases.* Securities fraud plaintiffs must also demonstrate that they relied on the defendant's misrepresentation or omission. Reliance is an essential element for Rule 10b-5 liability because it ensures that there is the requisite causal connection between a defendant's misrepresentation and the injury.[64] Plaintiffs can either present direct evidence of their actual reliance, in which case there is no role for an expert or event study analysis, or they can invoke a presumption of reliance. In *Stoneridge Investment Partners v. Scientific-Atlanta*, the Court noted that there are two instances when a rebuttable presumption of reliance exists: (1) if there is an omission of a material fact by one with a duty to disclose; and (2) if the statement at issue becomes public, thereby falling under the fraud-on-the-market presumption.[65]

The second instance, the "fraud-on-the-market" presumption, presumes a plaintiff's reliance when the statement at issue becomes public. According to the presumption, because all public information is reflected in the market price of the security,[66] it can be assumed that an investor who buys or sells stock at the market price relies upon false statements made publicly.[67] Judge Richard A. Posner aptly il-

---

price); *In re* Imperial Credit Indus., Inc. Sec. Litig., 252 F. Supp. 2d 1005, 1014 (C.D. Cal. 2003).

[60]   Dunbar & Heller, *Fraud on the Market Meets Behavioral Finance, supra* note 55, at 468.

[61]   *In re* Burlington Coat Factory Sec. Litig., 114 F.3d 1410 (3d Cir. 1997) ("In the context of an 'efficient' market, the concept of materiality translates into information that alters the price of the firm's stock."); Dunbar & Heller, *supra* note 55, at 468.

[62]   MICHAEL J. KAUFMAN, *Materiality, in* EXPERT WITNESSES: SECURITIES CASES §2:23 (Thomson/West 2008).

[63]   PETER B. FRANK ET AL., LITIGATION SERVICES HANDBOOK: THE ROLE OF THE ACCOUNTANT AS EXPERT WITNESS 167 (1990).

[64]   Stoneridge Inv. Partners v. Scientific-Atlanta, Inc. 552 U.S. 148, 159 (2008).

[65]   *Id.* (citing Affiliated Ute Citizens v. United States, 406 U.S. 128 (1972) (presuming fraud where there is an omission and a duty to disclose) and Basic, Inc. v. Levinson, 485 U.S. 224 (1988) (presuming fraud under the fraud-on-the-market presumption)).

[66]   *Basic, Inc.,* 485 U.S. at 241-42.

[67]   Jonathan Eisenberg, *Beyond the Basics, Seventy-Five Defenses Securities Litigators Need to Know,* 62 BUS. LAW. 1281, 1323 (2007).

lustrates the fraud-on-the-market presumption:

> Suppose . . . that a misrepresentation in a prospectus for a
> new issue of stock leads brokers who read the prospectus to buy
> large amounts of the stock and to recommend that their customers
> do likewise. As a result, the price rises. Suppose someone who has
> no knowledge of the prospectus – in fact no idea why the stock's
> price has risen – buys it at its higher price. Later the fraud is un-
> masked and the price falls. Should this someone be allowed to sue
> the issuer? The Supreme Court has announced yes, and this is the
> economically correct answer. The fraud is impounded in the market
> price, and the person who buys without knowledge of the prospec-
> tus is acting on false information to the same extent as those who
> buy with knowledge.[68]

The plaintiff is presumed to have relied on that information known by the
market and incorporated into the market price. For the presumption to apply, the
plaintiff must show: (1) that the defendant made public material misstatements; (2)
that the defendant's shares were traded in an efficient market;[69] and (3) that the
plaintiff traded shares between the time the misrepresentations were made and the
time the truth was revealed.[70] Similar to materiality, an event study can show that a
misrepresentation or corrective disclosure had a statistically significant effect on the
price of a stock, thereby demonstrating that the market 'relied' on the misrepresenta-
tion.

*Loss Causation.* An event study is also useful to demonstrate loss causation.
Loss causation is an essential element of Rule 10b-5 liability.[71] Loss causation refers

---

[68] RICHARD A. POSNER, ECONOMIC ANALYSIS OF LAW 459 (6th ed. 2003).
[69] Whether a market is an "efficient" market depends on certain factors including:
(1) the average trading volume; (2) the number of securities analysts following the stock; (3)
the number of market makers; (3) whether a company is entitled to file a registration statement
for trading; and (5) certain evidence of a cause and effect relationship between news and stock-
price changes. *In re* Nature's Sunshine Prods. Inc., Sec. Litig., No. 2:06-CV-267-TS, 2008 WL
436588, at *6 (D. Utah Sept. 25, 2008).
[70] Oscar Private Equity Invs. v. Allegiance, 487 F.3d 261, 264 (5th Cir. 2007).
[71] Dura Pharm., Inc. v. Broudo, 544 U.S. 336, 341–42 (2005). It was codified as an
element in the Private Securities Litigation Reform Act ("PSLRA"). 15 U.S.C. § 78u-4(b)(4).
Loss causation has been called ungainly, exotic, confusing, and even unhappy. Michael J.
Kaufman, *Loss Causation: Exposing a Fraud on Securities Law Jurisprudence*, 24 IND. L. REV. 357,
357 (1991). The very first court to employ the term "loss causation" accorded it relative insig-
nificance. *Id.* at 360. Since its inception, loss causation has proven to be a muddied and mi-
sunderstood element, leading some to advocate for its outright abandonment. *Id.* at 359.

to the direct causal link between the misstatement and the economic loss.[72]  It requires that plaintiffs prove that the defendant's misrepresentations or omissions not only caused them to invest, but also were the cause of their actual economic losses.[73]  In *Dura Pharmaceuticals v. Broudo,* the Supreme Court held that securities fraud plaintiffs could not adequately allege loss causation by alleging only that the plaintiffs purchased securities at an artificially high price.[74]  Rather, according to the Court, the plaintiffs had to allege that they suffered an actual "economic loss"[75] proximately caused by the defendant's misrepresentation.[76]  Post-*Dura,* because an event study can show the true value of the stock, event study analysis has been used to demonstrate both that the economic loss occurred and that this loss was proximately caused by the defendant's misrepresentation.[77]  In other words, an event study is used to show the requisite causal link between the defendant's misstatement or omission and the plaintiffs' suffered loss.

   *Damages.*   In addition, to make a viable securities fraud claim, plaintiffs must establish damages.[78]  The primary measure of damages in a securities fraud action is the plaintiffs' out-of-pocket losses.[79]  It is the difference between the amount the plaintiffs would have paid and the "true value" of the stock.[80]  That measure is calculated by the actual difference between the price at which the plaintiffs actually invested and the price at which they would have invested had the truth been known at the time of the transaction.[81]  The hypothetical amount that the plaintiffs would have paid or received had the truth been known ("true value") is typically provided through an expert opinion and event study.[82]  Experts employ event studies to arrive at the "true value."[83]  Event studies answer, "what would the price of the stock have

---

[72]  Huddleston v. Herman & MacLean, 640 F.2d 534, 549 (5th Cir. 1981).

[73]  Garber v. Legg Mason, Inc., 537 F. Supp. 2d 597, 616 (S.D.N.Y. 2008).

[74]  *Dura Pharm., Inc.,* 544 U.S. at 342-43.  Justice Breyer delivered the opinion of a unanimous court.  *Id.* at 337.

[75]  The term "economic loss" however does not appear in the PSLRA as an element of loss causation.

[76]  *Dura Pharm., Inc.,* 544 U.S. at 343.

[77]  MICHAEL J. KAUFMAN, *Loss Causation, in* EXPERT WITNESSES: SECURITIES CASES, §1:26 (Thomson/West 2008).

[78]  Courts do not hesitate to dismiss a claim where the plaintiff fails to prove damages. *See, e.g.,* Law v. Medco Research, Inc., 113 F.3d 781, 786-87 (7th Cir. 1997); Bass v. Janney Montgomery Scott, Inc., 152 F. App'x 456, 459 (6th Cir. 2005).

[79]  Affiliated Ute Citizens v. United States, 406 U.S. 128 (1972).

[80]  Eisenberg, *supra* note 67, at 1302.

[81]  MICHAEL J. KAUFMAN, *The PSLRA's Damages Formula and Experts, in* 26 SECURITIES LITIGATION: DAMAGES § 3:14.50 (Thomson/West 2008).

[82]  MICHAEL J. KAUFMAN, *Damages, in* EXPERT WITNESSES: SECURITIES CASES, § 1:27 (Thomson/West 2008).

[83]  An event study looks to how the price of the stock changed after the fraud was disclosed, but only as evidence of the amount by which it was inflated prior to disclosure.  Allen, *supra* note 27, at 956. The "true value" concept is derived from Judge Sneed of the United

been during the class period but for the fraudulent behavior?"[84]   Federal district courts often rely on expert testimony in computing damages.[85]

As the next Part demonstrates, each of these elements—materiality, reliance, loss causation, and damages—depends on a showing of post-disclosure price movement. Stated differently, the stock price must change in response to the disclosure of the fraud. An adequate demonstration of post-disclosure price movement as a result of the defendant's fraud in turn depends on the plaintiffs' ability to put forth an event study that can link this post-disclosure price movement to the fraud.

### III. The Essential Elements of Securities Fraud Claims Require Post-Disclosure Price Movement.

Since the Supreme Court's *Dura* decision in 2005, the key inquiry for securities fraud actions—particularly those dependent on the fraud-on-the-market presumption—is the amount by which the stock declined as a result of the market becoming aware of the alleged fraud.[86]   Securities fraud plaintiffs must show a change in the value of their investment caused by the defendant's fraud. Event studies serve to link the subsequent stock price movement to the alleged fraud. Primarily, as this Part shows, the elements of materiality, reliance, loss causation, and damages all depend on an initial showing of post-disclosure price movement.[87]

---

States Court of Appeals for the Ninth Circuit in a concurring opinion in *Green v. Occidental Petroleum Corp.*, where Judge Sneed stated that the best way to measure the loss proximately caused by the defendant's fraudulent conduct is to create a chart containing a "price line" and a "value line," and then subtracting the true value of the stock on the date of purchase from the price actually paid. *In re* Seagate Tech. II Sec. Litig., 843 F. Supp. 1341, 1346-47 (N.D. Cal. 1994); Jay W. Eisenhofer et al., *Securities Fraud, Stock Price Valuation, and Loss Causation: Toward a Corporate Finance-Based Theory of Loss Causation*, 59 BUS. LAW. 1419, 1425 (2004).

[84]   Allen, *supra* note 27, at 956. *See generally* Jeffrey M. Goldman, *Avoiding Blurred Lines: The Computation of Damages in Rule 10b-5 Securities Class Action Lawsuits in the Ninth Circuit and a Proposal for a More Sensible System*, 2 HASTINGS BUS. L.J. 261 (2006).

[85]   MICHAEL J. KAUFMAN, *Expert Testimony*, 26 SECURITIES LITIGATION DAMAGES § 24:7 (Thomson/West 2007); *see, e.g.*, *In re* Imperial Credit Indus., Inc. Sec. Litig., 252 F. Supp. 2d 1005, 1014 (C.D. Cal. 2003); *In re* Oracle Sec. Litig., 829 F. Supp. 1176 (N.D. Cal. 1993); *see also* Allen, *supra* note 27, at 957-65 (discussing computing share price inflation using event studies).

[86]   Eisenberg, *supra* note 67, at 1300 (citing Glaser v. Enzo Biochem, Inc., 464 F.3d 474, 478-79 (4th Cir. 2006)); *see also* Thorsen, *supra* note 12 ("In the immediate aftermath, courts started focusing on the nature and extent of 'corrective disclosures,' *with an emphasis on the nature, size, and immediacy of stock price drops*.") (emphasis added).

[87]   A corrective disclosure is an admission by the company that one or more of its previous statements were false or misleading followed by a corrected, truthful, and complete version of those statements. In re Vivendi Univ., S.A. Sec. Litig., 605 F. Supp. 2d 586, 598 (S.D.N.Y. 2009). The federal courts currently disagree over the extent to which this corrective

### A.   Materiality and Post-Disclosure Price Movement.

If the plaintiffs invoke the fraud-on-the-market presumption and, in turn, the efficient market hypothesis, materiality can be proven by showing a post-transaction stock price decline.[88] In fact, "market impact" was once the dominant method of establishing materiality.[89] A court "committed to the efficient market hypothesis" will deem information material if, once the information is disclosed, there is post-transaction price movement.[90] For example, in *In re Merck & Co.*, the plaintiffs brought a securities fraud class action against Merck Co. and its officers claiming that the company and its officers made material misstatements and omissions in registration statements for Merck's subsidiary spin-off's initial public offering ("IPO").[91] Merck planned to spin off Medco Health Solutions Inc. ("Medco") in a 2002 IPO.[92] The plaintiffs alleged that Medco had been engaging in improper accounting practices which were not disclosed until after Merck filed an amended registration statement with the SEC.[93] The plaintiffs claimed that Merck and Medco had made misleading statements concerning the independence of Merck and Medco's IPO in violation of Section 10(b) of the Securities Exchange Act.[94]

In examining whether the alleged misstatements by the defendants were material and thus actionable, the Third Circuit stated that materiality is the "first step" for securities fraud plaintiffs.[95] According to the Third Circuit:

> Our Court . . . has one of the clearest commitments to the efficient market hypothesis. . . . [T]he materiality of disclosed information may be measured post hoc by looking to the movement in the

---

disclosure must "reveal" the fraud. Some courts require that a corrective disclosure identify which prior representation is being corrected. *See, e.g., In re* Dell Sec. Litig., 591 F. Supp. 2d 877, 907-08 (W.D. Tex. 2008); *In re* Odyssey Health Care Inc. Sec. Litig., 424 F. Supp. 2d 880 n.4 (N.D. Tex. 2005). Other courts permit a corrective disclosure to be more indirect, including downwards earnings guidance by the company, reporting of financial statements in public filings, newspaper articles, announcements by a short-seller, and even in the form of a credit ratings downgrade. Matthew L. Fry, *Pleading and Proving Loss Causation in Fraud-on-the-Market Based Securities Suits Post-Dura Pharmaceuticals*, 36 SEC. REG. L.J. 3 (2008); *see also In re Vivendi Univ., S.A. Sec. Litig.*, 605 F. Supp. 2d at 598.

[88]   Arnold S. Jacobs, *Objective Definition of Materiality – An Analysis of the Tests – Anticipated Change, in* MARKET PRICE, *in* DISCLOSURE AND REMEDIES UNDER THE SECURITIES LAWS § 12:34 (2009).

[89]   Jacobs, *supra* note 88, at § 12:34.

[90]   *In re* Merck & Co. Sec. Litig., 432 F.3d 261, 269 (3d Cir. 2005).

[91]   *Id.* at 263-64.

[92]   *Id.* at 264.

[93]   *Id.*

[94]   *Id.*

[95]   *Id.* at 268. Specifically, the Third Circuit stated that establishing materiality is the first step *for a Section 10(b) claim. Id.* (emphasis added). Section 10(b) and Rule 10b-5's concept of materiality, however, is the same throughout the various securities regulations. THOMAS LEE HAZEN, THE LAW OF SECURITIES REGULATION 284 n.3 (5th ed. 2005).

period immediately following disclosure of the price of the firm's stock.[96]

Thus, information is material if its revelation causes post-disclosure price movement. Applying this standard, the Third Circuit held that even though Merck's stock dropped eventually, it was not within the period immediately following disclosure. Therefore, the information, as it resulted in no stock price movement immediately following disclosure, was immaterial.[97] The Third Circuit's *Merck* decision illustrates the general approach to assessing materiality.[98]

## B. Reliance in Fraud-on-the-Market Cases.

Similarly, reliance in fraud-on-the-market cases can also be shown with post-transaction price movement. The Fifth Circuit in *Oscar Private Equity Investments v. Allegiance Telecom, Inc.* has required post-transaction price movement for both reliance and loss causation.[99] The Fifth Circuit held that a showing of movement in price is a *prerequisite* to reliance in fraud-on-the-market cases.[100]

In *Oscar*, Allegiance Telecom Inc. ("Allegiance") was a publicly traded, national telecommunications company.[101] In April 2001, Allegiance released its financial results for the first three quarters which indicated that Allegiance had outperformed analysts' estimates, raising the stock price.[102] Then in February 2002,

---

[96]   *In re Merck & Co. Sec. Litig.*, 432 F.3d at 269 (internal citations and quotations omitted).

[97]   *Id.* at 269-70.

[98]   *See, e.g., In re* Apple Computer Sec. Litig., 886 F.2d 1109, 1116 (9th Cir. 1989); Steiner v. Medquist, Inc., No. 04-5487 (JBS), 2006 WL 2827740, at *8 (D.N.J. Sept. 29, 2006); *In re* Home Health Corp. of Am. Inc. Sec. Litig., No. CIV A. 98-834, 1999 WL 78057, at *7 (E.D. Pa. Jan. 29. 1999); *In re* Gaming Lottery Sec. Litig., No. 96 CIV 5567, 1998 WL 276177, at *7 n.10 (S.D.N.Y. May 29, 1998); Voit v. Wonderware Corp., 977 F. Supp. 363, 369 (E.D. Pa. 1997); Marksman Partners, L.P. v. Chantal Pharm. Corp. 927 F. Supp. 1297, 1306 (C.D. Cal. 1996); Jaroslewicz v. Engelhard Corp., 704 F. Supp. 1296, 1305 (D.N.J. 1989); *see also* David Tabak & Marcia Kramer Mayer, *Making Assessments About Materiality Less Subjective Through the Use of Content Analysis*, PLI Order No. 11072, at 693 (Sept. 2007).

[99]   Oscar Private Equity Invs. v. Allegiance Telecom Inc., 487 F.3d 261 (5th Cir. 2007).

[100]   *Id.* The *Oscar* decision has been heavily criticized, *see* Rudman, *supra* note 1, at 3 (stating that *Oscar* is in direct conflict with controlling Supreme Court precedent and erroneously creates a new certification requirement by placing a burden on plaintiffs to prove the merits of their case before trial), but it has been recently reaffirmed by the Fifth Circuit. Alaska Elec. Pension Fund v. Flowserve Corp., 572 F.3d 221, 228 (5th Cir. 2009) (per curiam) and Fener v. Operating Eng'rs Constr. Indus. & Misc. Pension Fund, 579 F.3d 401, 412 (5th Cir. 2009).

[101]   *Oscar Private Equity Invs.*, 487 F.3d at 262.

[102]   *Id.* at 263.

Allegiance released its fourth-quarter financial results which fell short of analysts' earnings estimates, thereby restating its total installed-cable line count by over 100,000 lines.[103] The stock price fell twenty-eight percent.[104] Oscar Private Equity Investments filed suit in federal court alleging that Allegiance violated Section 10(b) and Section 20(a) of the Securities Exchange Act of 1934 and Rule 10b-5.[105] The plaintiffs alleged that Allegiance fraudulently misrepresented its line-installation count in its first three quarterly announcements in 2001.[106] As a result, the plaintiffs asserted that they purchased Allegiance shares at an artificially inflated price.[107] When Allegiance corrected its line count, the plaintiffs alleged they were injured because of the resulting stock decline.[108] The plaintiffs moved to certify a class of all individuals who purchased Allegiance's shares between its first- and fourth-quarter releases.[109] The district court certified the class, specifically allowing the plaintiffs to establish a rebuttable, class-wide presumption of reliance through the fraud-on-the-market theory.[110]

The Fifth Circuit vacated the proposed class "for wont of any showing that the market reacted to the corrective disclosure"[111] and insisted that class certification be supported by a showing of loss causation.[112] The Fifth Circuit required more than proof of a material misstatement for the plaintiffs to invoke the fraud-on-the-market presumption of reliance; rather the court required that the plaintiffs show that the misstatement *actually move* the market.[113] According to the court, plaintiffs must initially establish loss causation to trigger the-fraud-on-the-market presumption.[114]

---

[103]   *Id.* Not only had Allegiance restated its installed-line count, it missed analysts' earnings per share expectations, and announced greater losses than analysts expected. *Id.* Allegiance missed its revenue covenants which put its credit lines in default, ultimately forcing Allegiance into bankruptcy. *Id.*

[104]   *Id.*

[105]   *Id.* at 262.

[106]   *Id.* at 263.

[107]   *Id.*

[108]   *Id.*

[109]   *Id.*

[110]   *Id.*

[111]   *Id.* at 262. The dissent characterized the majority's holding as a "breathtaking revision of securities class action procedure that eviscerates *Basic's* fraud-on-the-market presumption, creates a split from other circuits by requiring mini-trials on the merits of cases at the class certification stage, and effectively overrules legitimately binding circuit precedent." *Id.* at 272 (Dennis, J., dissenting).

[112]   *Id.* at 262.

[113]   *Id.* at 265 (emphasis in original); *but see In re* Salomon Analyst Metromedia Litig., 544 F.3d 474, 483 (2d Cir. 2008) (rejecting this "actually moved" language).

[114]   *Oscar Private Equity Invs.*, 487 F.3d at 265, 269. The *Oscar* decision erroneously conflates reliance and loss causation. As Professor Michael J. Kaufman has noted, reliance is independent of loss causation. Michael J. Kaufman, *At a Loss: Congress, The Supreme Court and Causation under the Federal Securities Laws*, 2 N.Y.U. J.L. & BUS. 1, 37 (2005). Professor Kaufman states:

The court required: (1) that the misstatement actually move the market to prove loss causation; (2) that only when loss causation is established will the plaintiffs be entitled to the fraud-on-the-market presumption; (3) the plaintiff must establish this by a preponderance of the evidence; and (4) all this must be done on a motion for class certification.[115]

The court required that the plaintiffs show post-transaction price movement this early in the litigation because "[i]ts 'proof' is drawn from public data and public filings. . . . It is largely an empirical judgment that can be made [at class certification] as well as later in the litigation."[116]   Ultimately, after weighing all the evidence—expert reports both for and against the plaintiffs—the court decided that the factual conclusion drawn by the plaintiffs' expert that linked the defendant's fraud to the stock price movement was "untenable," and because the plaintiffs had not established loss causation, the plaintiff class could not show reliance by way of the fraud-on-the-market theory.[117]

---

[R]eliance – even in a fraud-on-the-market case – is distinct from the element of loss causation.  The Court in Basic declared that plaintiffs must also demonstrate the requisite causal connection between a defendant's misrepresentation and the plaintiff's injury.  The causal connection required is that the defendants' misstatements or omissions created a quantifiable disparity between the transaction price and the true value of the securities on the date of the transaction.  That particular causal connection can be broken by defendants by showing that the market price would not have been affected by their misrepresentations.  Reliance requires proof that defendants' misrepresentations or omissions influenced plaintiff's' decision whether to invest at all.  As developed by the Supreme Court in Basic, and as ultimately codified by Congress in the PSLRA, loss causation is proof that these misrepresentations or omissions created a measurable difference between the price which plaintiffs actually paid for their securities and the price that they would have paid in the absence of those misrepresentations or omissions.

Id. at 38. (internal citations and quotations omitted).
[115]   Oscar Private Equity Invs., 487 F.3d at 266.  The Fifth Circuit's Oscar decision is evidence of the unjustified judicial creation of Rule 23 trials in securities fraud litigation.  See Michael J. Kaufman & John M. Wunderlich, The Unjustified Judicial Creation of Rule 23 Trials in Securities Fraud Litigation, 43 U. MICH. J.L. REFORM 331-34 (2010).
[116]   Oscar Private Equity Invs., 487 F.3d at 266.
[117]   Id. at 270.  The majority found the evidence to be little more than well-informed speculation.  Id. at 271.  The plaintiff's expert, according to the majority, offered only raw opinion of the defendant's expert's analysis without a supporting study of the market at issue.  Id. The dissent characterized the court's review as de novo, as opposed to abuse of discretion, and thus improper.  Id. at 272 (Dennis, J., dissenting).

### C.  Loss Causation and Damages.[118]

Loss causation, originally a judge-made requirement,[119] was codified by Congress in the Private Securities Litigation Reform Act ("PSLRA"): "In any private action arising under this chapter, the plaintiff shall have the burden of proving that the act or omission of the defendant alleged to violate this chapter caused the loss for which the plaintiff seeks to recover damages."[120]  *Oscar* illustrates that both loss causation and reliance in some cases depend on a proper showing of stock price movement linked to the defendant's fraud.  The *Oscar* decision is quite mainstream in that respect; the federal courts generally require post-disclosure price movement linked to the defendant's fraud to establish essential elements such as loss causation and even damages.  For example, in 2005, the Supreme Court in *Dura Pharmaceuticals* stated that an inflated purchase price will not itself cause economic loss.[121]  After *Dura*, the federal courts interpreted this to mean that establishing loss causation and damages require that the plaintiff show post-transaction price movement.[122]  For instance, a post-*Dura* decision from the Fourth Circuit, *Glaser v. Enzo Biochem Inc.*, held that to adequately allege securities fraud, the plaintiffs must show that a corrective disclosure preceded a decline in the defendant's stock price.[123]  In *Glaser*, the plaintiffs brought a common law fraud claim against Enzo Biochem Inc., a publicly traded

---

[118]  "Causation and damage rules are intertwined."  Dane A. Holbrook, *Measuring and Limiting Recovery Under Rule 10b-5: Optimizing Loss Causation and Damages in Securities Fraud Litigation*, 39 TEX. J. BUS. 215, 226 (2003).  Addressing the loss causation issue necessarily includes addressing the measure of damages in a Rule 10b-5 suit.  *Id.*

Generally, securities damages must be proven with expert testimony coupled with a valid event study.  *Compare* Freeland v. Iridium World Commc'ns, Ltd., 545 F. Supp. 2d 59 (D.D.C. 2008) (stating damages are an element of securities fraud that plaintiffs must prove only by expert testimony) *and In re* Sunbeam Sec. Litig., 176 F. Supp. 2d 1323 (S.D. Fla. 2001) (requiring expert testimony to establish damages) *and In re* Warner Commc'ns Sec. Litig., 618 F. Supp. 735 (S.D.N.Y. 1985) *and In re* Gen. Instrument Sec. Litig., 209 F. Supp. 2d 423 (E.D. Pa. 2001) *with* Wortley v. Camplin, 333 F.3d 284 (1st Cir. 2003) (stating that while expert testimony may be helpful, it is not required in every category of federal securities fraud case).  "Many courts have found an event study is necessary for proof of damages in a securities fraud claim."  TABAK, *supra* note 46, at 694; Holbrook, *supra* note 118, at 233-34.

[119]  *See In re* Moody's Corp. Sec. Litig., 599 F. Supp. 2d 493, 511 (S.D.N.Y. 2009).

[120]  15 U.S.C. § 78u-4(b)(4).

[121]  Dura Pharm., Inc. v. Broudo, 544 U.S. 336, 342 (2005) (Breyer, J.).

[122]  Michael J. Kaufman, *Pleading and Proving Loss Causation*, 26A SEC. LITIG. DAMAGES §24:2:60 (Thomson/West 2009) (citing cases stating that loss causation requires post-transaction price movement); *see also* Metzler Invs. GMBH, v. Corinthian Coll., Inc., 540 F.3d 1049, 1063 (9th Cir. 2008); McCabe v. Ernst & Young, LLP, 494 F.2d 418, 426 (3d Cir. 2007); *In re* Impax Labs., Sec. Litig., No. C 04-04802, 2008 WL 1766943, at *3 (N.D. Cal. Apr. 17, 2008).  Even before the *Dura* decision securities cases . . . addressing the concept of 'loss causation' . . . have deviated from the basic principles of corporate finance.  In particular certain courts and commentators have concluded that a stock drop following the disclosure of fraudulent activity is essential to establish loss causation, and hence, is a *sine qua non* for a plaintiff to prevail on the merits and ultimately recover damages.  Eisenhofer, *supra* note 83, at 1425.

[123]  Glaser v. Enzo Biochem, Inc., 464 F.3d 474, 479 (4th Cir. 2006).

biotechnology company doing research and development of treatments for HIV.[124] The plaintiffs alleged Enzo exaggerated the success of its HIV therapies through press releases and statements made by its officers.[125] The district court dismissed the plaintiffs' common law fraud claim holding that they failed to adequately allege loss causation.[126]

On appeal the Fourth Circuit interpreted *Dura* and held that the Supreme Court required that fraudulent conduct cause post-transaction price movement to establish loss causation.[127] The Fourth Circuit stated:

> It is only after the fraudulent conduct is disclosed to the investing public, *followed by a drop in value of the stock*, that the . . . investor has suffered a "loss" that is actionable after the Supreme Court's decision in *Dura*. In other words, so long as the fraud is undisclosed, normal fluctuations in price attendant to any market may have a direct effect on the value of the investor's portfolio, but cannot be said to be a "loss" that is actionable under the federal securities law . . .[128]

Applying *Dura*, the Fourth Circuit held that the plaintiffs failed to plead loss causation because they did not link any corrective disclosure to a subsequent drop in the stock price.[129] The Fourth Circuit reasoned that this result was required by *Dura* and employed the following hypothetical:

> Assume an investor purchased 100 shares of Enzo for $12 per share on January 12, 2000, after the alleged misrepresentations were made. If the market had known the truth . . . instead of trading for $12 per share, the stock would have traded for only $1 per share.
>
> Plaintiffs in this case would have stopped the analysis there, contending that, on the very day of purchase, the investor has suffered a loss of $1,100 - the difference between the price paid ($1,200) and the price that *would have been paid* ($100) had the true facts been known. This analysis ignores the fact that the true facts are not yet

---

[124]   *Id.* at 476.

[125]   The plaintiffs alleged Enzo exaggerated or made misstatements about its pre-clinical and clinical trials, its stealth vector, and its patent estate among other things. *Id.*

[126]   *Id.*

[127]   *Id.*

[128]   *Glaser*, 464 F.3d at 479; *see also* Catogas v. Cyberonics, Inc., 292 F. App'x 311, 316 (5th Cir. 2008) (holding plaintiffs failed to establish loss causation where even though statements revealed fraud and thus constituted corrective disclosures, the statements did not significantly effect the stock price).

[129]   *Glaser*, 464 F.3d at 479.

O

known and the hypothetical investor has not yet suffered a loss.

If the stock later drops, as a result of normal market fluctuations, to $6 per share (again assuming the fraud has not yet been disclosed), then the investor owns stock worth only one-half of what was paid for it. If he sells at this point, he has lost $600 of his initial $1,200 investment, to be sure, but this loss was not *caused by* the fraudulent conduct, because, under the hypothetical, the market is still unaware of the misrepresentations.[130]

*Glaser* illustrates the general approach to loss causation. The Seventh Circuit likewise requires post-transaction price movement to establish loss causation and damages.[131] For example, in *Ray v. Citigroup Global Markets*, the plaintiffs, a group of more than 100 retail investors, bought millions of dollars worth of stock in Smart-Serve Online ("SSOL") between 2000 and 2002.[132] SSOL was a small company in the wireless data business.[133] The value of its shares went from $1 to $170 per share from October 1999 to February 2000, and settled between $70 and $90 per share in April 2000.[134] Spatz, a stockbroker employed by Citigroup, worked with retail brokers who directly advised the plaintiffs to buy SSOL stock.[135]

The plaintiffs alleged that Spatz fraudulently induced the plaintiffs to buy ever-increasing amounts of SSOL stock during a general market decline because SSOL had signed substantial contracts with large corporations that would produce millions of dollars in revenue.[136] What Spatz did not disclose, however, was that SSOL had problems with its current contracts with other large companies.[137] The plaintiffs argued that Spatz's statements lured them into thinking that Citigroup genuinely believed that SSOL was a safe investment and that there was little risk.[138] Later, SSOL disclosed in public filings that it had yet to derive any significant revenue from its wireless data business.[139] After the truth emerged, the stock price, which was more than $80 in June 2000, plunged to only about $1 per share.[140] SSOL's competitors' share values likewise dropped.[141]

The district court dismissed the plaintiffs' claims, citing *Dura* for the proposi-

---

[130]   *Id.* at 478-79.
[131]   Ray v. Citigroup Global Mkts, Inc., 482 F.3d 991, 995 (7th Cir. 2007).
[132]   *Id.* at 992-93
[133]   *Id.* at 993.
[134]   *Id.*
[135]   *Id.* Citigroup is a global financial services firm. *Id.*
[136]   Such corporations included Microsoft, Swisscom, Qualcomm, Verizon Wireless, IBM, and Citigroup. *Ray*, 482 F.3d at 993.
[137]   SSOL had problems with its contracts with GoAmerica, Hutchison, Telecom, and Sunday Telecommunications. *Id.*
[138]   *Id.*
[139]   *Id.*
[140]   *Id.*
[141]   *Id.*

tion that the loss causation element was missing because plaintiffs had no evidence to show that the misrepresentations had a causal connection to the loss.[142] The Seventh Circuit affirmed the district court holding that the plaintiffs did not plead loss causation.[143] In doing so, the Seventh Circuit laid out three ways that plaintiffs could establish loss causation:

> The first is sometimes called the "materialization of risk standard.". . . requiring the plaintiff to prove that it was the very facts about which the defendant lied which caused his injuries. The second approach is the "fraud-on-the-market" scenario, . . . [whereby] plaintiffs must show both that the defendants' alleged misrepresentations artificially inflated the price of the stock *and that the value of the stock declined once the market learned of the deception*. Finally . . . loss causation might be shown if a broker falsely assures the plaintiff that a particular investment is "risk-free."[144]

The Seventh Circuit dismissed the materialization of the risk standard because no evidence existed to support a jury's conclusion that the drop in value of the stock was because of the alleged misrepresentations.[145] Rather, the court noted that the defendants introduced expert testimony claiming that the company lost its value because of market forces rather than fraud.[146] According to the Seventh Circuit, the plaintiffs did not rebut this evidence.[147] In addition, the Seventh Circuit dismissed the fraud-on-the-market theory because the stock had already collapsed by the time the market discovered the alleged misrepresentations.[148] In essence, loss causation required a post-transaction decline.[149] Thus, without this post-transaction price de-

---

[142]   *Id.* at 994.

[143]   *Id.*

[144]   *Id.* at 995 (internal quotations and citations omitted and emphasis added). However, the Court left open the possibility that "risk-free" assurances may no longer survive *Dura.* *Id.* at 996. The lower federal courts have since adhered to *Ray's* three ways to allege loss causation. *See In re* Northfield Labs., Inc., Sec. Litig., No. 06-C-1493, 2008 WL 4372743, at *5 (N.D. Ill. Sept. 23, 2008).

[145]   *Ray*, 482 F.3d at 995.

[146]   *Id.*

[147]   *Id.*

[148]   *Id.* at 995-96. Last, the court dismissed the "risk free" concept because statements like "it was a certain money winner" made "against a backdrop of public available information suggesting that ... [it was] a volatile stock," do not amount to assertions that the stock was risk free. *Id.* at 996.

[149]   *See also* Robbins v. Koger Properties, 116 F.3d 1441 (11th Cir. 1997) (holding that the plaintiffs failed to establish loss causation where there was disclosure after the stock price already declined); *In re* Warnaco Group Sec. Litig., 288 F. Supp. 2d 307, 317 (S.D.N.Y. 2005)

208          *Stanford Journal of Law, Business & Finance*          Vol 15:1

cline, the plaintiffs could not connect that stock decline to the defendant's fraud.

## IV. A Proper Event Study is an Essential Element: The Only Way to Show Price Movement Caused by Disclosure is Through an Event Study.

As shown above, in fraud-on-the-market cases in particular, for securities fraud plaintiffs to recover, they must show post-disclosure movement of the defendant company's stock price.[150]  The essential elements of a securities fraud claim—materiality, reliance, loss causation, and damages—all require that the fraud result in some post-disclosure price movement.[151]  Not only do courts require this post-disclosure price movement, the federal courts have held that the only way to link price movement to the defendant's fraud is through an event study analysis.[152]  Thus, a proper event study is now a necessary element in a securities fraud claim.  As this Section shows, absent a proper event study, a securities fraud plaintiff has little chance of success.  To illustrate the critical importance of an event study in securities litigation, this Part will explore two recent decisions: *Fener v. Operating Engineers* from the Fifth Circuit, which illustrates that absent a reliable event study a plaintiff class will not be certified, and *In re Williams* from the Tenth Circuit, which illustrates that a court will grant summary judgment in favor of the defendants if the plaintiffs fail to offer an adequate event study.[153]

### A.   An Event Study is Necessary to Connect Post-Disclosure Price Movement to the Fraud.

It is common practice for the federal courts to admit expert testimony based on an appropriate event study, but to exclude testimony based on infirm event studies.[154]  In *In re Seagate Technologies II*, the federal district court granted summary

---

(holding the same).

[150]  Eckstein v. Balcor Film Invs., 58 F.3d 1162, 1170 (7th Cir. 1995); *In re* Seagate Tech. II Sec. Litig., 843 F. Supp. 1341, 1357 (N.D. Cal. 1994); *In re* Verifone Sec. Litig., 784 F. Supp. 1471, 1479 (N.D. Cal. 1994); Alon Brav & J.B. Heaton, *Market Indeterminacy*, 28 J. CORP. L. 517, 536 (2003) (stating that courts often dismiss cases where the plaintiff fails to offer an event study).

[151]  *See supra* Part III.

[152]  *See* Fisher, *supra* note 38, at 881 (2005) (citing *numerous* courts that have denied plaintiffs' experts because of failure to conduct or produce an event study).

[153]  *See infra* Part IV.B and Part IV.C.

[154]  Nicholas I. Crew et al., *Federal Securities Acts and Areas of Expert Analysis*, *in* § 18 LITIGATION SERVICES HANDBOOK: THE ROLE OF THE FINANCIAL EXPERT 18 (Roman L. Weil et al., 2007).  *Compare In re* Executive Telecard Ltd., Sec. Litig., 979 F. Supp. 2d 1021 (S.D.N.Y. 1997) (refusing to admit expert testimony in securities litigation because expert failed to conduct an event study) *with* Freeland v. Iridium World Commc'ns, Ltd., 545 F. Supp. 2d 59, 87-88 (D.D.C. 2008) (denying summary judgment to the defendant as to loss causation and damages where the plaintiff offered an expert who conducted an event study analyzing abnormal return and

judgment for the defendant where the defendant's expert armed with an event study was unopposed by the plaintiffs with an expert armed with an event study of his own.[155] Another federal court stated that, "[the plaintiff's] expert's testimony would be accorded no weight in [the] securities fraud action . . . where [the] expert did not perform an event study or similar analysis . . . and did not challenge [the] event study performed by the [defendant's] expert."[156] One commentator has noted that even materiality *depends* on an event study.[157] Likewise, where the plaintiff fails to offer an expert with a proper event study as to market efficiency, the plaintiff will not be able to invoke the fraud-on-the-market theory of reliance.[158] In addition, the federal courts require an event study to establish loss causation and damages.[159] The Fifth Circuit in *Oscar* and *Fener* flatly stated that proof that a culpable disclosure moved the market (loss causation) *should* take the form of an event study.[160] The ab-

---

other indicators f efficient markets).

[155] *In re* Seagate Tech. II Sec. Litig., 843 F. Supp. 1341, 1368 (N.D. Cal. 1994). A problem with this approach, however, is that the relative resources of the parties in a given case could determine whose expert event study prevails. *Cf.* Samuel W. Buell, *Reforming Punishment of Financial Reporting Fraud*, 28 CARDOZO L. REV. 1611, 1633 (2007).

[156] *In re* N. Telecom Ltd. Sec. Litig., 116 F. Supp. 2d 446, 461 (S.D.N.Y. 2000).

[157] Dunbar & Heller, *supra* note 55, at 468 (citing cases); *see also* DeMarco v. Lehman Bros., 222 F.R.D. 243, 247-49 (S.D.N.Y. 2004) (denying class certification because the plaintiff's expert's conclusion on the materiality of a securities analyst's recommendations were 'facially unreliable' and 'plainly irrelevant' in the absence of an event study); Lynn A. Stout, *The Mechanisms of Market Inefficiency: An Introduction to the New Finance*, 28 J. CORP. L. 635, 652 (2003) (event studies are used to determine whether a statement or omission was material).

[158] Bell v. Ascendant Solutions, Inc., 422 F.3d 307, 310-11 (5th Cir. 2005); *see also* Ray v. Citigroup Global Mkts, Inc., 482 F.3d 991, 995 (7th Cir. 2007) ("There is no evidence from the record from which a jury could conclude that the drop in the value of the . . . shares was attributable somehow to . . . [the] alleged misrepresentations. The defendants introduced expert evidence that SSOL lost its value because of market forces, and the plaintiffs have offered nothing to rebut that theory - no expert testimony suggesting that the collapse was caused by the lack of the fraudulently promised contracts . . . .").

[159] Dunbar & Heller, *supra* note 55, at 469-71; *see also* Oscar Private Equity Invs. v. Allegiance Telecom, Inc., 487 F.3d 261, 265 n.22 (5th Cir. 2007); *Freeland*, 545 F. Supp. 2d at 81 ("[D]amages are an element of a securities fraud claim which Plaintiffs must prove, and that can be done only by expert testimony."); Behrens v. Wometco Enters., Inc., 118 F.R.D. 534, 542 (S.D. Fla. 1988) ("[P]roof of damages in a securities fraud case is always difficult and requires expert testimony."); *In re* Warner Commc'ns Sec. Litig., 618 F. Supp. 735, 744 (S.D.N.Y. 1985) ("[E]xpert testimony would be needed to fix not only the amount, but existence, of actual damages.").

[160] *See Oscar Private Equity Invs.*, 487 F.3d at 265 n.22; Fener v. Operating Eng'rs Constr. Indus. & Misc. Pension Fund, 579 F.3d 401, 409 (5th Cir. 2009). The Fifth Circuit stopped short of insisting on *only* event studies to establish loss causation. *Oscar Private Equity Invs.*, 487 at 271. The *Fener* court was not so ambiguous however: "Although analyst reports and stock prices are helpful in any inquiry, the testimony of an expert – along with some kind

sence of an event study for damages, in particular, will often result in summary judgment in favor of the defendant.[161] "[D]amages are an element of a securities fraud claim which plaintiffs must prove, and that can be done *only by expert testimony*."[162] Damages calculations require expert testimony accompanied with a reliable event study because to determine damages under the securities laws, the plaintiffs must distinguish between fraud-related and non-fraud-related influences on the stock's price.[163] "Over the years many courts in shareholder class actions have required that an expert's analysis of the effect of information be in the form of an event study or a similar analysis where possible."[164]

To illustrate the effect of failing to include an event study, consider the following federal district court's statement:

> [T]he Court takes *judicial notice* of the fact that there were other events at the pertinent time – the third and fourth quarters of 1998 – which might have influenced the drop in stock prices, . . . specifically the Russian default, the Asian crisis and the Long Term Capital default, and that these external events resulted in dramatic changes in interest rates, thereby affecting participants in the credit industry. . . . These are market events for which Defendants cannot be held responsible. *However, absent an event study or similar analysis, Plaintiffs cannot eliminate that portion of the price decline . . .* which is unrelated to the alleged wrong. . . . The Court therefore excludes [the expert report]. . . on the ground that its methodology is flawed.[165]

The absence of an event study allows the court to take judicial notice—meaning the defendant does not have to produce *any* evidence—of other existing market conditions and reject the expert's testimony as flawed. An event study links the fraud to the claimed loss and rules out other factors of the decline. Thus, per the federal courts, an expert armed with a reliable event study has become an indispensable element of securities fraud claims.

---

of analytical research or event study – is required to show loss causation." *Fener*, 579 F.3d at 409.

[161] *See Freeland*, 545 F. Supp. 2d at 81 (granting summary judgment for defendants where plaintiffs sought to establish damages based on lay opinion evidence).

[162] *Id.* (citing Behrens v. Wometco Enters. Inc., 118 F.R.D. 534, 542 (S.D. Fla. 1988)).

[163] *In re* Imperial Credit Indus., Inc. Sec. Litig., 252 F. Supp. 2d 1005, 1015 (C.D. Cal. 2003); *see also In re* N. Telecom Sec. Litig., 116 F. Supp. 2d 446, 460 (S.D.N.Y. 2000); *In re* Executive Telecard, Ltd., Sec. Litig., 979 F. Supp. 1021, 1024-26 (S.D.N.Y. 1997); *In re* Oracle Sec. Litig., 829 F. Supp. 1176, 1181 (N.D. Cal. 1993); Eisenhofer, *supra* note 83, at 1426; Stout, *supra* note 151, at 652 (stating event studies are necessary to determine damages)..

[164] TABAK, *supra* note 46, at 693. "The actual effect of each false statement on a stock's price, as it fluctuated to incorporate new information within its efficient market, is often tested by an 'event study.'" Fisher, *supra* note 38, at 847.

[165] *In re Imperial Credit Indus.*, 252 F. Supp. 2d at 1015-16 (emphasis added).

**B.   Class Certification: The *Fener v. Operating Engineers* Example.**

    *Fener v. Operating Engineers* illustrates that absent an event study that rules out other causes of a stock price decline, a court will deny class certification to the plaintiff class.[166]  In *Fener*, the plaintiffs filed a Section 10(b) and Rule 10b-5 action against Belo Corporation, a media company that owned the *Dallas Morning News*.[167] The plaintiffs alleged that Belo inflated the *Dallas Morning News'* record circulation, rigged its audits, and implemented a no-return policy to inflate profits.[168]  In March 2004, Belo announced that the *Dallas Morning News'* future circulation would be down.[169]  Then, in August 2004, after the market closed, Belo issued a press release stating that Belo (1) admitted an internal investigation had revealed questionable circulation practices, (2) recognized that the disclosure was coupled with the March 9th reduction announcement, and (3) recognized that the disclosure was coupled with an industry-wide decline in newspaper circulation.[170]  When the market opened the next day, Belo's stock dropped from $23.21 to $18.00 and finished the day at $21.55.[171] "Several securities analysts lowered their earning estimates for Belo and downgraded its stock."[172]

**1.   Dueling Experts.**

    Originally, the plaintiffs submitted no expert testimony with their class certification motion, only excerpts from Belo's SEC Form 10-K for two years, Belo's historical stock prices, Belo's SEC S-3 forms from 1996-2006, financial data from Yahoo! Finance, and a chart of Belo's daily share price.[173]  The defendants then responded with expert testimony and an event study that suggested the stock price decline was primarily related to the non-fraudulent disclosures in the press release relating to the March 9th announcement and the industry-wide decline.[174]  The plaintiffs responded with expert testimony from Dr. Scott Hakala who conducted an event study and attributed much of the decline to the revelation of the fraud.[175]  Specifically, the plain-

---

    [166]   Fener v. Operating Eng'rs Constr. Indus. & Misc. Pension Fund, 579 F.3d 401, 409-10 (5th Cir. 2009).
    [167]   *Id.* at 404.  Revenue from the *Dallas Morning News* makes up about 60% of Belo's publishing revenue and 30% of its total revenue.  *Id.*
    [168]   *Id.*
    [169]   *Id.*
    [170]   *Id.* at 405.
    [171]   *Id.*
    [172]   *Id.*
    [173]   *Id.* at 408.
    [174]   *Id.*
    [175]   *Id.* at 408-09.

tiffs' expert concluded that the press release could not be separated into three separate disclosures, and even still, the market had already absorbed the non-fraudulent disclosures' information.[176]

The district court denied class certification and the Fifth Circuit affirmed.[177] The Fifth Circuit first stated that the plaintiffs' original motion without any expert testimony or event study was insufficient to show that the fraudulent disclosure caused a reduction in Belo's stock.[178] According to the Fifth Circuit, "[a]lthough analyst reports and stock prices are *helpful* in any inquiry, the testimony of an expert — *along with some kind of analytical research or event study* — is *required* to show loss causation."[179] Then, the court rejected the plaintiffs' expert's conclusion that the press release constituted a single corrective disclosure, not three distinct disclosures; rather, the Fifth Circuit accepted the defendant's expert's version.[180] The Fifth Circuit stated:

> Even considering the plaintiffs' analyst commentary and stock price information together with Hakala's testimony and event study, the motion for class certification still falls short. As the district court correctly held, Hakala's testimony was fatally flawed; he wedded himself to the idea that the press release was only one piece of news and conducted his event study based on that belief. We reject any event study that shows only how a stock reacted to the entire bundle of negative information, rather than examining the evidence linking the culpable disclosure to the stock-price movement. Because Hakala based his study on that incorrect assumption, it cannot be used to support a finding of loss causation.[181]

Once the court disregarded the event study as flawed, the court then stated that the plaintiffs' expert's testimony alone was insufficient to prove loss causation.[182]

---

[176]   *Id.* at 409.
[177]   *Id.* at 408..
[178]   *Id.* at 409.
[179]   *Id.* at 409-10 (citing Oscar Private Equity Invs. v. Allegiance Telecom, Inc., 487 F.3d 261, 271 (5th Cir. 2007)).
[180]   *Id.* at 409.  The Fifth Circuit stated:
> By its plain language, the press release consists of three separate pieces of information, and – contrary to plaintiffs [sic] and Hakala's belief – [the defendant's expert] did not invent the three-part classification.  The press release first discusses the fraudulent 'overstatement' and the estimated 'decline in circulation related to this matter.'  It then recognizes that the disclosure is 'coupled with' the earlier reduction announcement and the 'anticipated lower circulation' over a six-month period.  Thus, the release divides the news into fraudulent and non-fraudulent information related to possible future circulation declines.
> Id.
[181]   *Id.* at 410-11 (internal citations and quotations omitted).
[182]   *Id.*

### 2.    The Procedural Posture: Class Certification.

Absent a demonstration of loss causation common to the class, the Fifth Circuit refused to certify the class.[183]   The Fifth Circuit was particularly concerned that "Class certification creates insurmountable pressure on defendants to settle. . ." and that "[t]he risk of facing an all-or-nothing verdict presents too high a risk, even when the probability of an adverse judgment is low."[184]   The Fifth Circuit then observed that securities class certification resembles "a shake-down or judicial blackmail."[185]   Thus, without a reliable event study, the plaintiffs could not certify a class.

## C.   Summary Judgment: The *In re Williams* Example.

A recent decision from the Tenth Circuit Court of Appeals, *In re Williams Securities Litigation*, illustrates that a reliable event study is *necessary* to connect post-transaction stock movement to the defendant's fraud; absent an event study, a court will grant summary judgment for the defendant.[186]   In *Williams*, a class of investors that purchased stock or notes issued by Williams Communications Group (WCG) brought a securities fraud class action alleging violations of Section 10(b) and Rule 10b-5.[187]   The Tenth Circuit affirmed the district court's grant of summary judgment in favor of the defendant because the plaintiffs' offered expert failed to conduct a "reliable" event study.[188]

### 1.    The Rise and Fall of WCG: Fraudulent Spin-Offs?

Williams Companies, Inc. ("WMB") was an energy company that produced and transported natural gas.[189]   As part of its business operations, WMB owned a large network of pipelines.[190]   WMB transformed its decommissioned pipelines into a telecommunications subsidiary that later became known as WCG.[191]

---

[183]   *Id.* at 411.
[184]   *Id.* at 406.
[185]   *Id.*
[186]   *In re* Williams, Sec. Litig., 558 F.3d 1130, 1135 (10th Cir. 2009).
[187]   *Id.* at 1132.  The plaintiffs also brought an action under Section 20(a) of the Securities Exchange Act.  *In re* Williams Sec. Litig., 496 F. Supp. 2d 1195, 1230 (N.D. Okla. 2007).  Under Section 20(a), or commonly referred to as "controlling person liability," every person who directly or indirectly controls any liable person under Section 10(b) or Rule 10b-5 is jointly and severally liable to the same extent as the controlled person.  15 U.S.C. § 78t.
[188]   *In re Williams, Sec. Litig.*, 558 F.3d at 1132.
[189]   *Id.*
[190]   *Id.*
[191]   *Id.*  Originally, Williams formed WilTel I in 1985, but sold this subsidiary in 1995 and entered into a temporary non-compete agreement preventing Williams from reentering the telecommunications industry until 1998.  *Id.*  After this non-compete agreement expired,

When WCG was formed in 1998, the NASDAQ U.S. Telecommunications Index ("Telecom Index") ended at 306.60, a forty-two percent increase from the previous year.[192]  In 1999, the Telecom Index reached 616.80.[193]  At this time, WCG conducted an IPO to raise capital for expansion.[194]  The WCG 1999 IPO offered shares of common stock and high yield notes.[195]  In March of 2000, WCG's share price peaked at $61.81 and the Telecom Index likewise peaked at 1248.06.[196]  The amount raised from the IPO however, proved to be insufficient.  When WCG updated its internal capital expenditure plans, it showed that capital expenditures would be almost a billion dollars higher than the previous year.[197]

By July 2000, WCG's stock price declined, falling more than fifty percent.[198]  During this same period, the Telecom Index fell by twenty-eight.[199]  At the end of July, WMB announced that it would spin-off WCG and make it a stand-alone company.[200]  The plaintiffs alleged that WMB, WCG, and other corporate officers misrepresented the reasons for the spin-off, the prospects for WCG's survival, and the adequacy of WCG's capitalization.[201]  For example, WMB issued a press release stating that the goal of the spin-off was to ensure effective and efficient access to capital to fuel growth, but private internal discussions within the WMB board indicated that WCG's growing capital needs were a drain on WMB's balance sheet.[202]  The "gap" between the public representations and internal assessments continued until and after the spin-off in April 2001.[203]

Then, in January 2002, WMB issued a press release announcing that it would delay its 2001 earnings report pending an assessment of WMB's contingent obliga-

---

Williams formed a new subsidiary using the decommissioned pipelines known as WCG.  *Id.*

[192]  *Id.*  The Telecom Index was at 215.71 at the beginning of 1997.  *Id.*  At the end of 1998, the Telecom Index closed at 500.91, an increase of sixty-three percent.  *In re Williams Sec. Litig.*, 496 F. Supp. 2d at 1205.

[193]  *In re Williams, Sec. Litig.*, 558 F.3d at 1133.

[194]  *Id.*

[195]  *In re Williams Sec. Litig.*, 496 F. Supp. 2d at 1206.

[196]  *In re Williams, Sec. Litig.*, 558 F.3d at 1133.

[197]  *In re Williams Sec. Litig.*, 496 F. Supp. 2d at 1206-07.

[198]  *In re Williams, Sec. Litig.*, 558 F.3d at 1133.  By July 21, 2000, WCG's stock price was at $29.38.  *Id.*

[199]  *Id.*

[200]  *Id.*  The stock price dropped by 2.98% after the announcement.  *In re Williams Sec. Litig.*, 496 F. Supp. 2d at 1211.

[201]  *In re Williams, Sec. Litig.*, 558 F.3d at 1133.

[202]  *Id.*  One of the defendant CEO's told shareholders that WCG was strongly positioned for success with sufficient financial resources and that WCG was pre-funded for its capital needs.  *Id.*  Other senior executives stated the spin-off better enabled each company to execute is business plain and optimized access to capital.  *Id.*  Internally however, officers warned that WCG was underfunded and that it would have to sell non-core assets.  *Id.*

[203]  *Id.*

tions with respect to WCG.[204]  Also that day, one of WCG's competitors wrote down $3.2 billion worth of assets, another competitor announced bankruptcy, and the plaintiffs' law firm of Milberg Weiss[205] filed suit against WCG.[206]  WCG's stock fell from $1.63 to $1.34.[207]  In February 2002, WCG announced to its lenders that it may default; the stock price fell from $1.42 to $1.00.[208]  WCG then announced that it was considering Chapter 11 bankruptcy; the stock price fell to $0.22.[209]  At the end of April 2002, WCG filed for bankruptcy; its stock bottomed out at $0.06 a share.[210]

The plaintiffs brought a securities fraud class action under Section 10(b) and Rule 10b-5 claiming that the defendants' statements painted a rosy view of WCG's future prospects when in reality, they were directly contrary to the situation: the reason for the spin-off was because WCG's future was in doubt.[211]  The plaintiffs thus claimed that WCG's stock and note prices were artificially inflated.

### 2.   The Plaintiffs' Expert and His Theories of Loss.

The plaintiffs offered expert testimony to link the stock price movement to the alleged fraud.[212]  The defendants challenged the plaintiffs' expert with respect to materiality, market efficiency (reliance), loss causation, and damages.[213]  But the district court found it necessary to only address the defendants' challenges relating to loss causation.[214]  The plaintiffs' expert presented two scenarios in an attempt to demonstrate that the price decline was attributable (or linked) to the fraud: (1) a leakage theory; and (2) a corrective disclosure theory.[215]  But because the plaintiffs could not produce an event study to the satisfaction of the court that linked the post-transaction price movement to the fraud, the Tenth Circuit ruled against the plaintiffs

---

[204]  *Id.* at 1134.

[205]  The law firm of Milberg Weiss was recently embroiled in a kickback scandal where the infamous plaintiffs' firm is accused of "paid to play" tactics. Peter Elkind, *Milberg Weiss Faces the Music*, CnnMoney.com (Oct. 3, 2007), *available at* http://money.cnn.com/2007/10/01/news/companies/Melvyn_weiss.fortune/index.htm.

[206]  *In re Williams, Sec. Litig.*, 558 F.3d at 1134.

[207]  *Id.*

[208]  *Id.*

[209]  *Id.*

[210]  *Id.*

[211]  *Id.*

[212]  *Id.*  The plaintiffs' expert was retained to provide expert opinions on market efficiency, loss causation, materiality, and damages.  *In re Williams Sec. Litig.*, 496 F. Supp. 2d at 1252.

[213]  *In re Williams Sec. Litig.*, 496 F. Supp. 2d at 1253.

[214]  *Id.*

[215]  *In re Williams, Sec. Litig.*, 558 F.3d at 1134.

as a matter of law and granted summary judgment to the defendant.[216]

### a. Scenario 1: The Leakage Theory.

First, in Scenario 1, the expert employed a leakage theory, which posited that the fraud was not revealed by a single corrective disclosure, but rather by a leakage of WCG's true financial condition during the class period.[217]  In other words, losses were caused by the materialization of concealed risks.[218]  Under Scenario 1, the plaintiffs' expert attributed ninety-eight-percent of WCG's value to fraud and claimed that almost the entire stock price decline was the result of the gradual revelation of this truth to the market.[219]

The district court rejected Scenario 1 for two reasons: (1) the expert failed to remove market and industry effects on the value of WCG stock and notes; and (2) the expert had not identified specific public disclosures that revealed the fraud.[220]  The district court emphasized that there must be a showing of post-transaction price movement,[221] and that not only was an event study required, but that it had to link the culpable disclosure to the fraud rather than merely demonstrate that the stock reacted to an entire bundle of negative information.[222]

The Tenth Circuit agreed.  The Tenth Circuit acknowledged that a leakage theory in itself does not run afoul of the Supreme Court's *Dura* decision.[223]  Nevertheless, the Tenth Circuit required that the plaintiffs identify the ways in which the truth was revealed and how the market responded:

> To satisfy the requirements of *Dura* . . . any theory – even a leakage theory that posits a gradual exposure of the fraud rather than a full and immediate disclosure – will have to show some mechanism for how the truth was revealed. . . . A plaintiff cannot simply state that the market had learned the truth by a certain date, and

---

[216]  *Id.* at 1136.

[217]  *Id.* at 1138.

[218]  *Id.*  The Seventh Circuit has recognized this as a viable method of establishing loss causation.  Ray v. Citigroup Global Mkts., Inc., 482 F.3d 991, 995 (7th Cir. 2007).

[219]  *In re Williams, Sec. Litig.*, 558 F.3d at 1135.

[220]  *Id.*  The defendants' expert, Dr. David Tabak of NERA Economic Consulting, rebutted the plaintiffs' expert by arguing that the methods employed by the plaintiffs' expert failed to properly account for differences between fraud-related and other influences on the stock price.  *NERA Expert's Role in* In re Williams Securities Litigation, 1 (2009), www.nera.com.

[221]  *In re Williams Sec. Litig.*, 496 F. Supp. 2d at 1264 ("In a case (such as the case at bar) that presupposed an efficient market, as fraud-on-the-market cases must do . . . the showing of causation which must be made . . . is a showing that the fraud premium was removed from the price of the stock by way of the efficient market's reaction to a corrective disclosure that was responsive to the misstatement or omission that created the fraud premium in the first instance.").

[222]  *Id.*

[223]  *In re Williams, Sec. Litig.*, 558 F.3d at 1138.

because the learning was a gradual process, attribute all prior losses to the revelation of the fraud. The inability to point to a single corrective disclosure does not relieve the plaintiff of showing how the truth was revealed; he cannot say 'Well the market *must* have known.'[224]

More specifically, the Tenth Circuit rejected Scenario 1 because the expert failed to segregate the effects of company-specific and market- or industry-specific news, thus linking the fraud to the post-transaction decline.[225] The Tenth Circuit then intimated that had the plaintiffs offered a *reliable* event study, the result would have been different, stating:

> WCG's share price fell from $28.50 to $1.63 during that period, and while [the plaintiff's expert] could not explain how the market learned of the fraud over that year-and-a-half, he claimed that the decline must have resulted from its revelation and not from the 'tangle of factors' that affect a company's stock price – despite the fact that the same period witnessed the bankruptcies of WCG competitors, a decline in the telecommunications industry as a whole, and the overall market declines that followed the 9/11 terrorist attacks.[226]

The Tenth Circuit thus warned that the failure to show a causal connection between the fraud and the loss would turn the securities laws into "just the sort of broad insurance against market losses that *Dura* rejected."[227]

---

[224] *Id.* (internal citations omitted).

[225] *Id.* ("The majority of these allegedly corrective disclosures . . . were actually either news that was generally applicable to the telecommunications industry as a whole, or was an upbeat rather than negative statement about WCG."). The Tenth Circuit stated:
> While the truth could be revealed by the actual materialization of the concealed risk rather than by a public disclosure that the risk exists, *see Lentell v. Merrill Lynch & Co., Inc.,* 396 F.3d 161, 173 (2d Cir. 2005) (loss can be caused by "materialization of the concealed risk"), any theory of loss causation would still have to identify when the materialization occurred and link it to a corresponding loss.

*Id. But see* RMED Int'l v. Sloan's Supermarkets, Inc., No. 94 Civ. 5587, 2000 WL 310352, at *6–*8 (S.D.N.Y. Mar. 24, 2000) (permitting leakage theory even in the absence of an event study because the company's entire trading history was tainted by fraud).

[226] *In re Williams, Sec. Litig.,* 558 F.3d at 1139.

[227] *Id.* (internal quotations omitted).

### b. Scenario 2: The Corrective Disclosure Theory.

The plaintiffs' expert's alternative second scenario ("Scenario 2"), fared no better. Under Scenario 2, the expert conducted a regression analysis, or event study, to connect the decline in value to four separate disclosures.[228] These disclosures were: (1) WMB's announcement that it was assessing its contingent obligations related to WGC; (2) WCG's informing lenders of the possibility of default; (3) WCG's statement that it was considering bankruptcy protection; and (4) WCG's announcement of bankruptcy.[229] The district court likewise rejected Scenario 2 because it failed to distinguish between declines attributable to disclosures of fraud and non-fraud related effects.[230] The district court stated that even though the plaintiffs' expert supported his testimony with a regression analysis, the testimony was unreliable because the expert failed to connect the alleged corrective disclosures to a specific price drop.[231] The Tenth Circuit likewise rejected Scenario 2 reasoning that the plaintiffs' expert failed to connect the price decline to any of the four disclosures.[232]

### c. The Notes and the Absent Regression Analysis.

The district court's treatment of the plaintiffs' expert's event studies regarding the fraudulent notes is most telling. The plaintiffs' expert conducted an event study with respect to the sale of notes issued by WCG. Yet the district court flatly refused the plaintiffs' expert's testimony "because what [the plaintiffs' expert] calls an event study does not even purport to differentiate between forces related to the fraud and those not related to the fraud."[233] The district court stated, "[The expert] simply did not perform an event study with respect to the notes, and no assertion that 'yes, he found that note prices dropped on the disclosure dates can change that fact."[234] The district court aptly summarized its holding stating "[w]hat is required is an event study . . . ."[235] The issue surrounding the notes was not addressed by the Tenth Circuit.

### 3. The Procedural Posture: Summary Judgment.

Because the plaintiffs failed to offer a reliable event study (or an event study at all, with respect to the notes), the district court granted summary judgment in fa-

---

[228] *Id.* at 1139-40.
[229] *Id.* at 1139.
[230] *Id.* at 1136. The district court's analysis for Scenario 2, applies with equal force to the expert's "Scenario 2-alternative." *In re Williams Sec. Litig.,* 496 F. Supp. 2d at 1270.
[231] *In re Williams Sec. Litig.,* 496 F. Supp. 2d at 1269 n.53.
[232] *In re Williams, Sec. Litig.,* 558 F.3d at 1136.
[233] *In re Williams Sec. Litig.,* 496 F. Supp. 2d at 1273.
[234] *Id.* at 1274.
[235] *Id.*

vor of all defendants.[236]  In other words, as a matter of law, the plaintiffs could not prevail.  The Tenth Circuit affirmed this decision.  According to the Tenth Circuit, the plaintiffs had to link post-disclosure price movement to the defendant's fraud through an event study that sufficiently ruled out all other factors.[237]

As *Williams* demonstrates, because event studies can isolate the effect of each false announcement on the stock's price, the federal courts have held that event studies are a necessary device to prove loss causation, materiality, reliance or market efficiency, and damages.[238]  Absent a reliable event study, a securities plaintiff's claim will likely fail.

## C.   An Adequate Event Study May be Necessary *and Sufficient.*

Nevertheless, while the absence of an event study is generally fatal to a plaintiff's securities fraud claim, the presence of one may serve to satisfy essential elements of securities fraud actions.[239]  For instance, in *In re Flag Telecom*, the court found an expert's testimony admissible as to loss causation.[240]  Using the testimony, the court traced when the expert employed an event study, identified material events, analyzed possible market indices and the most comparable companies in the specific industry, and used an integrated regression analysis to ultimately measure the effect of each event.[241]  Additionally, a reliable event study can establish that a market was efficient and thus serve to invoke the fraud-on-the-market presumption of reliance that is usually vital to certifying a class.[242]  To invoke the fraud-on-the-market presumption of reliance, the plaintiff must establish that the market was 'efficient.'[243]  To establish an efficient market, the plaintiff must meet certain factors,[244]

---

[236]  *Id.* at 1275-76.
[237]  *In re Williams, Sec. Litig.*, 558 F.3d at 1137.
[238]  Fisher, *supra* note 38, at 847.
[239]  *In re* Flag Telecom Holdings, Ltd., Sec. Litig., 245 F.R.D. 147, 170 (S.D.N.Y. 2007).
[240]  *Id.* at 169.
[241]  *Id.*
[242]  *In re* Xcelera.com Sec. Litig., 430 F.3d 503 (1st Cir. 2005).
[243]  *In re* DVI Inc. Sec. Litig., 249 F.R.D. 196, 209 (E.D. Pa. 2008).
[244]     To establish the fraud-on-the-market presumption, the plaintiff must demonstrate that the market is efficient. Ten factors are relevant in determining whether a market is efficient: whether the securities are (1) traded on a public exchange; (2) had large trading volumes; (3) were followed by market analysts; (4) had several market makers; (5) could be registered on SEC Form S-3; and (6) responded quickly to the release of company-specific information. Cammer v. Bloom, 711 F. Supp. 1264, 1286-87 (D.N.J. 1989).  Additionally, courts assess: (7) the size of market capitalization; (8) size of the public float for the stock; (9) the ability to short sell the stock; and (10) the level of autocorrelation.  Krogman v. Sterritt, 202 F.R.D. 467, 477-78 (N.D. Tex. 2001); *see also In re* Polymedica Corp. Sec. Litig., 453 F. Supp. 2d 260, 276-77

one of which is that the unexpected corporate events or financial releases *caused* an immediate response in the price of the security.[245] With the demonstration of the causal relationship, a court will easily presume that the market integrated the released information into its price.[246] According to the Second Circuit, "[a]n event study that correlates the disclosures of unanticipated, material information about a security with corresponding fluctuations in price has been considered prima facie evidence of the existence of such a causal relationship."[247] In addition, some courts hold by rote that if the plaintiffs offer an expert who conducts an event study as to market efficiency, the plaintiffs will have fulfilled the market efficiency requirement.[248]

### V.   The Event Study Requirement Is Inconsistent With the Seventh Amendment.

As shown above, the federal courts have made an event study an essential element of a securities fraud claim because they may serve to link subsequent price movement to the defendant's fraud. This event study requirement, however, is incompatible with the right of securities fraud plaintiffs to a trial by jury under the Seventh Amendment. A plaintiff seeking monetary damages under the anti-fraud provisions of the federal securities laws is entitled to a jury trial.[249] The event study requirement infringes on the Seventh Amendment jury trial right in two significant ways: (1) requiring an event study to establish essential elements of a securities fraud case removes quintessential factual determinations from the jury; and (2) the event study requirement allows the judge to usurp the jury's power to assess otherwise reliable expert analyses in reaching its factual determinations. These problems are compounded by the fact that event studies are not perfect science. As this Section shows, the results of event studies are malleable to a large degree and thus, the results must be assessed by the factfinder and cannot be the basis for a determination as a matter of law.

---

(D. Mass. 2006).

[245]   Teamsters Local 445 Freight Div. Pension Fund v. Bombardier, 546 F.3d 196, 207 (2d Cir. 2008) (emphasis added). This has been deemed the "essence of an efficient market and the foundation for the fraud-on-the-market theory." *Id.* (citing *Cammer*, 711 F. Supp. at 1287).

[246]   *Id.*

[247]   *Id.* at 207-08 (citing *In re Excelera.com*, 430 F.3d at 512-14, 516); *see also In re DVI Inc.*, 249 F.R.D. at 196 (certifying a class based on the fraud-on-the-market presumption as the plaintiff offered expert testimony as to the efficiency of the market); *In re Parmalat Sec. Litig.*, No. 04 MD 1653 (LAK), 2008 WL 3895539, at *10 (S.D.N.Y. Aug. 21, 2008) (holding same); *In re Nature's Sunshine Prods. Sec. Litig.*, 251 F.R.D. 656, 664 (D. Utah 2008).

[248]   *In re Alstom SA Sec. Litig.*, 253 F.R.D. 266, 280 (S.D.N.Y. 2008); *In re Xcelera.com*, 430 F.3d at 503.

[249]   Mosesian v. Peat, Marwick, Mitchell, & Co., 727 F.2d 873, 876 n.4 (9th Cir. 1984), *cert. denied*, 469 U.S. 932.

### A.   Materiality, Reliance, Loss Causation, and Damages Are Quintessential Fact Questions.

Absent an event study, courts refuse to put a securities fraud case before a jury.[250] In essence, prohibiting a jury, absent an event study, from finding materiality, loss causation, or even damages, removes these factual determinations from the jury. Without an event study, a jury will never hear, nor decide these issues. This violates securities plaintiffs' right to have quintessential fact questions determined by the jury.

The Seventh Amendment provides that in suits at common law, the right to a trial by jury shall be preserved.[251] The right to a jury trial is not absolute.[252] Current Supreme Court Seventh Amendment jurisprudence requires only the preservation of the *substance* of the English common law jury trial as it existed in 1791.[253] In the Eng-

---

[250]   *See supra* Part IV.

[251]   U.S. CONST. amend. VII; *see also* Atlas Roofing Co. v. Occupational Safety & Health Review Comm'n, 430 U.S. 442, 459-60 (1977). The Seventh Amendment ensures citizenship by preserving an active role for citizens in the administration of both civil and criminal justice. CASS SUNSTEIN, THE SECOND BILL OF RIGHTS, 113 (2004). "Jury trials give a continuing place to ordinary people in designing the content of law – especially when the stakes are very high." *Id.* Interestingly, the Seventh Amendment, through its invocation of "the common law," is the only part of the Constitution that explicitly through the text requires the application of originalism. Suja A. Thomas, *The Unconstitutionality of Summary Judgment: A Status Report*, 93 IOWA L. REV. 1613, 1616 (2008) [hereinafter Thomas, *Summary Judgment: A Status Report*]. Our nations' founders and the states themselves were firmly committed to trial by jury. *See generally* AKHIL REED AMAR, AMERICA'S CONSTITUTION 233-42, 329-30 (2005). Jury trials protect litigants from oppressive judges. Suja A. Thomas, *Why Summary Judgment is Still Unconstitutional: A Reply to Professors Brunet and Nelson*, 93 IOWA L. REV. 1667, 1680 (2008) [hereinafter Thomas, *Why Summary Judgment is Still Unconstitutional: A Reply*].

[252]   The Seventh Amendment does not create a right, but rather preserves the right to a trial by jury as it existed under the common-law in 1791. Suja A. Thomas, *Why Summary Judgment is Unconstitutional*, 93 VA. L. REV. 139, 146 (2007) [hereinafter Thomas, *Summary Judgment*]. Traditionally, equity matters were not afforded a jury trial, but legal matters were. Parsons v. Bedford, 28 U.S. 433 (1830); *see also* Chevron v. Oubre, 93 F.R.D. 622, 623 (M.D. La. 1982) (holding an action to cancel a mineral lease is equitable and not subject to trial by jury). Rule 10b-5 claims are governed by the Seventh Amendment. *See* Tellabs v. Makor Issues & Rights, Ltd., 551 U.S. 308, 327 (2007).

[253]   Markman v. Westview Instruments, Inc., 517 U.S. 370, 376 (1996) (Souter, J.). The Supreme Court has described the Seventh Amendment inquiry as a two step process:

> [W]e ask, first, whether we are dealing with a cause of action that either was tried at law at the time of the founding or is at least analogous to one that was. . . . If the action in question belongs in the law category, we then ask whether the particular trial decision must fall to the jury in order to preserve the substance of the common-law right as it existed in 1791.
> *Id.* (internal citations omitted).

See also Suja A. Thomas, The Seventh Amendment, Modern Procedure, and the Eng-

lish common law, juries decided only questions of fact and not questions of law.[254] Therefore, at present, questions of fact are reserved for the jury, not the court.[255] Issues of materiality, reliance and market efficiency, loss causation, and damages are quintessential fact questions for a jury to resolve. When the federal courts deny securities plaintiffs the opportunity to put their case before a jury because of the absence of an event study, the court invades the jury's exclusive role to determine quintessential fact questions.

### 1.  A Jury Must Resolve Factual Determinations of Materiality, Reliance, Loss Causation, and Damages.

Materiality, reliance, loss causation, and damages are quintessential fact questions that must be resolved by the factfinder. The Supreme Court has consistently indicated that the jury function in securities litigation deserves more than flippant consideration. In *TSC Industries v. Northway, Inc.*, where the Supreme Court defined materiality,[256] the Court stated that materiality could only be determined as a matter of law when the facts were not in dispute or no different inferences could be drawn from undisputed facts.[257] The *TSC* Court recognized that "the issue of materiality *may* be characterized as a mixed question of law and fact, involving as it does the application of a legal standard to a particular set of facts."[258] But the Court qualified this broad pronouncement and delineated when materiality may be subject to summary judgment: "In considering whether summary judgment on the issue is appropriate, we must bear in mind that the underlying objective facts, *which will often be free from dispute,* are merely the starting point for the ultimate determination of materiality."[259] Thus, a decision regarding materiality as a matter of law is only appropriate when the facts are undisputed. The Court reasoned that this is because "[t]he determination requires delicate assessments of the inferences a 'reasonable shareholder' would draw from a given set of facts and the significance of those inferences to him, and these assessments are peculiarly ones for the trier of fact."[260] The Supreme Court affirmed this position in *Basic v. Levinson*, stating that courts would do well to recog-

---

lish Common Law, 82 WASH. U. L. Q. 687, 700 (2004) [hereinafter Thomas, The Seventh Amendment, Modern Procedure].

[254]  Thomas, *Summary Judgment, supra* note 252, at 578.

[255]  *In re* Peterson, 253 U.S. 300, 310 (1920) ("[U]ltimate determination of issues of fact by the jury [should] not [be] interfered with."); Walker v. New Mexico, 165 U.S. 593, 596 (1897) (issues of fact in common-law actions are to be settled by the jury).

[256]  TSC Indus. Inc. v. Northway Inc., 426 U.S. 438 (1976) (Marshall, J.).

[257]  *Id.* at 450.

[258]  *Id.* (emphasis added).

[259]  *Id.* (emphasis added).

[260]  *Id.; see also* SEC v. First Jersey Sec., Inc., 101 F.3d 1450, 1466-67 (2d Cir. 1996).

nize that materiality is inherently fact-specific and that courts should refrain from confining materiality to a formula or a specific fact or occurrence.[261]  Therefore, according to the Supreme Court, the jury ought to determine whether the subject fraud is material — whether the information altered the total mix of information available to investors in such a way as to affect their investment decisions[262] — even if the plaintiff fails to offer an event study.

Similarly, the Supreme Court unequivocally stated in *Basic v. Levinson* that market efficiency or the fraud-on-the-market presumption of reliance is an issue to be determined by a jury.[263]  Requiring plaintiffs to rule out other factors that may affect an efficient market is irreconcilable with Supreme Court precedent.  The Court in *Basic* definitively established that the fraud-on-the-market presumption is rebuttable only at trial.[264]  The Supreme Court stated:

> [I]f, despite petitioners' allegedly fraudulent attempt to manipulate market price, news of the merger discussions credibly entered the market and dissipated the effects of the misstatements, those who traded Basic shares after the corrective statements would have no direct or indirect connection with the fraud.
>
> . . . We note there may be a certain incongruity between the assumption that Basic shares are traded on a well-developed, efficient, and information-hungry market, and the allegation that such a market could remain misinformed, and its valuation of Basic shares depressed . . . on the basis of the three public statements.  *Proof of that sort is a matter for trial*, throughout which the District Court retains the authority to amend the certification order as may be appropriate.[265]

This statement implies that the defendant's burden of rebuttal to show that the market price was not affected by the misrepresentation is a matter for trial.[266]  In other words, a defense of "non-reliance," or market inefficiency, should not be de-

---

261    Basic, Inc. v. Levinson, 485 U.S. 224, 236 (1988) (rejecting a bright-line rule that information concerning merger discussions is immaterial as a matter of law).  "Whether merger discussions in any particular case are material therefore depends on the facts. . . . [A] factfinder will need to look to indicia of interest in the transaction at the highest corporate levels." *Id.* at 239.

262    Dunbar & Heller, *supra* note 55, at 468.

263    *Basic Inc.*, 485 U.S. at 248 (emphasis added).

264    *Id.*

265    *Id.* at 248-49, 249 n.29.

266    Kaplan v. Rose, 49 F.3d 1363, 1368 n.3 (9th Cir. 1994); *In re* Micron Techs., Inc. Sec. Litig., 247 F.R.D. 627, 634 (D. Idaho 2007) (citing *Basic*, 485 U.S. at 249 n.29).

termined by the judge.[267]

Additionally, the Supreme Court's seminal loss causation decision, *Dura Pharmaceuticals v. Broudo*, is a case about pleadings.[268] While the *Dura* Court ultimately required a plaintiff to isolate the effect of all other factors and quantify the precise amount of the fraud with some specificity, *Dura* did not require the plaintiff to make this showing with experts armed with event studies at the pleading stage.[269] Neither did *Dura* suggest that the failure of a plaintiff's expert to isolate other factors with an event study is grounds for summary judgment. Rather, it is hornbook law that causation is generally a question of fact for the jury,[270] and *Dura* recognized this. *Dura's* citation to the Restatement (Second) of Torts suggests that proximate causation issues are issues of fact; issues not typically disposed of at the motion to dismiss or summary judgment stage.[271] Thus, decisions like *Williams* and *Fener* usurp the jury's function to determine fact questions regarding loss causation and market efficiency. For instance, in *Williams*, the plaintiffs' expert demonstrated that share prices fell as a result of fraud.[272] The Tenth Circuit rejected the plaintiffs' expert, though, because he failed to sufficiently rule out other factors.[273] The Fifth Circuit in *Fener* likewise disregarded the plaintiffs' expert because his event study failed to treat the press release as three separate disclosures.[274] To the extent other factors might explain this drop in value, however, they are to be introduced as part of a discrediting process at trial and not as a basis for dismissing the case at the summary judgment stage.[275]

To best illustrate how causation is a classic fact question for the jury, consider the following:

> Determining whether [the alleged fraud] is the but-for cause
> of [an adverse effect on stock price], then, requires postulating a like-

---

[267] Rudman, *supra* note 1.

[268] Dura Pharm. Inc. v. Broudo, 544 U.S. 336, 342 (2005) (assessing whether a plaintiff's complaint adequately alleged loss causation).

[269] J. Robert Brown, *Using Loss Causation to Repeal Rule 10b-5: In re Williams Securities Litigation (Part 4)*, (Mar. 23, 2009), http://www.theracetothebottom.org.

[270] 75A AM. JUR. 2D *Trial* § 657 Cause and Effect (2008). If the facts are disputed or if different inferences can be drawn from undisputed facts, the question of causation is one for the jury. *Id.* Proximate cause in particular is more often a question of fact than law. 65A C.J.S. *Negligence* § 857 (2008).

[271] Scott D. Hakala, *Current Economic and Expert Issues in Securities Litigation*, at 4, https://plusweb.org/files/Events/all.star7Econ.%20Issues%20-%20Securities%20Lit.pdf (last visited Aug. 11, 2009).

[272] *In re* Williams Sec. Litig., 496 F. Supp. 2d 1195, 1253 (N.D. Okla. 2007).

[273] *In re* Williams Sec. Litig., 558 F.3d 1130, 1143 (10th Cir. Feb. 18, 2009).

[274] Fener v. Operating Eng'rs Constr. Indus. & Misc. Pension Fund, 579 F.3d 401, 409 (5th Cir. 2009).

[275] Brown, *supra* note 269; *see also* Freeland v. Iridium World Commc'ns, Ltd., 545 F. Supp. 2d 59, 88 (D.D.C. 2008) (stating that it is not proper for a court to exclude expert testimony because the factual bases for the expert's opinions are weak. Rather, that goes to the credibility of the testimony, making it a cross-examination issue and determination for the jury).

ly course of events and asking whether [the negative effect on stock prices] would be likely to occur in the absence of [the alleged fraud]. Determining whether [the alleged fraud] is the proximate cause or legal cause of [the negative stock price effect] requires similar but more nuanced considerations.  The decision maker must decide whether [the alleged fraud] is sufficiently extraordinary given the expected course of events to be designated a "cause" rather than a "condition" of [the negative stock price effect] for purposes of assigning fault.  In their focus on the likely course of events, both questions of but-for cause and questions of proximate cause require probabilistic inferences about hypothetical conditions in the world – the events that were most likely to happen given the state of the world prior to the injury.[276]

Because materiality, reliance, and loss causation require probabilistic inferences, they lead to conjectural conclusions about the world, and hence to new knowledge, thus making them fact decisions reserved for the jury.[277]  An event study seeks to determine what would have happened to the stock but-for the alleged fraud.[278]  An assessment whether something would occur given some postulated set of circumstances is archetypal, inductive reasoning reserved for the fact-finding jury.[279]

### 2.   Even a "Reasonableness" Standard is an Affront to the Jury's Role.

Even if courts couch the event study requirement as a finding that "no reasonable jury could find these elements absent a reliable event study," it is still an affront to the jury's role.  Professor and noted Seventh Amendment scholar Suja A. Thomas has written extensively on Seventh Amendment implications involving procedural devices such as the motion to dismiss and the motion for summary judgment.[280]  Her thesis—that both procedural devices as currently practiced are uncons-

---

[276]   Paul F. Kirgis, *The Right to a Jury Decision on Questions of Fact Under the Seventh Amendment*, 64 OHIO ST. L. J. 1125, 1156-57 (2003).  The issue of damages is generally accepted as a question of fact as well.  *See, e.g.*, Cooper Indus., Inc. v. Leatherman Tool Group, Inc., 532 U.S. 424, 437 (2001) (Stevens, J.) (stating that the measure of actual damages suffered presents a question of historical or predictive fact); Gasperini v. Ctr. for Humanities, Inc., 518 U.S. 415, 453 (1996) (stating that generally the proper measure of damages is a question of fact); Dimick v. Scheidt, 293 U.S. 474, 486 (1935) (recognizing that the measure of damages is a question of fact).

[277]   *See* Kirgis, *supra* note 276, at 1157.
[278]   TABAK, *supra* note 46, at 694.
[279]   Kirgis, *supra* note 276, at 1155.
[280]   *See* Suja A. Thomas, *Why the Motion to Dismiss is Now Unconstitutional*, 92 MINN. L. REV. 1851 (2008) [hereinafter Thomas, *The Motion to Dismiss*]; Suja A. Thomas, *Why Summary*

titutional — is steadily gaining ground.[281]  Professor Thomas maintains that the modern use of both summary judgment and the motion to dismiss in securities litigation is unconstitutional.[282]  According to Thomas, the framework for determining the constitutionality of procedural devices in lieu of Seventh Amendment concerns is as follows: (1) under the common law, only the jury or the parties determine the facts; (2) a court determines the sufficiency of the evidence only after a jury trial, and even then, if evidence is believed to be insufficient, the court orders a new trial; and (3) a jury decides a case with any evidence, however improbable.[283]  The hallmark of her thesis is that the common law only allowed a judge to consider the sufficiency of the evidence *after* a jury trial and verdict.[284]  Even a court considering only the reasonableness of inferences drawn from the evidence presented contravenes common law procedures, which require the judge to accept *all* allegations of the party as true, reregardless of the improbability of those allegations.[285]

This view of the Seventh Amendment illustrates how the event study requirement is unconstitutional.  In *In re Williams*, for example, the Tenth Circuit affirmed the district court's grant of summary judgment, reasoning that the plaintiffs "have failed to present evidence suggesting that the declines in price were the result of the revelation of the truth and not some other factor."[286]  Yet the plaintiffs did in fact present a great deal of evidence showing the causal link between the price-decline and the revelation of the truth, including — but not limited to — the analysis of an expert whose qualifications were beyond challenge.[287]  Nonetheless, the Tenth

---

*Judgment is Unconstitutional*, 93 VA. L. REV. 139 (2007); Suja A. Thomas, *Why Summary Judgment is Still Unconstitutional: A Reply to Professors Brunet and Nelson*, 93 IOWA L. REV. 1667 (2008); Suja A. Thomas, *The Unconstitutionality of Summary Judgment: A Status Report*, 93 IOWA L. REV. 1613 (2008); Suja A. Thomas, *Judicial Modesty and the Jury*, 76 UNIV. COLO. L. REV. 767 (2005); Suja A. Thomas, *The Seventh Amendment, Modern Procedure, and the English Common Law*, 82 WASH. UNIV. L. Q. 687 (2004); Suja A. Thomas, *Re-Examining the Constitutionality of Remittitur Under the Seventh Amendment*, 64 OHIO STATE L. J. 731 (2003).

[281]  *See generally* Thomas, *Summary Judgment: A Status Report, supra* note 251, at 1621-23.

[282]  Thomas, *Summary Judgment, supra* note 252, at 140.

[283]  *Id.* at 180.  Much of the debate in early nineteenth century focused on the jury's power to determine the law, not fact, implicitly accepting that the jury was the sole arbiter of fact. ROBERT P. BURNS, THE DEATH OF THE AMERICAN TRIAL, 53-68 (2009).

[284]  Thomas, *Summary Judgment, supra* note 252, at 161.  Even then, where a judge found insufficient evidence, another jury would decide the second case, and not the judge.  *Id.* Summary judgment was originally enacted with the expectation that it would be available only as a device for resolving commercial disputes relating to liquidated debt claims.  BURNS, *supra* note 283, at 66.

[285]  Thomas, *Summary Judgment, supra* note 252, at 159.  While one may worry that such an approach would result in a wave of expensive securities fraud suits going to trial, Section VI.B.2.d explains how additional securities fraud suits will not *a fortiori* result in higher settlements or more expensive suits.

[286]  *In re* Williams, Sec. Litig., 558 F.3d 1130, 1143 (10th Cir. Feb. 18, 2009).

[287]  The plaintiffs' expert, Dr. Blaine Nye, has testified as an expert in numerous se-

Circuit concluded that the jury should not be entitled to weigh that evidence because it did not include the judge's own preferred methodology – a statistical regression analysis.  The plaintiffs in *Fener* likewise presented the defendant company's SEC Form 10-Ks for two years and SEC S-3 forms for ten years, historical stock price information, financial data, a chart of daily share price, and eventually expert testimony armed with an event study.[288] The Fifth Circuit, however, ruled that this evidence could not establish loss causation and denied class certification.[289]  According to a proper reading of the Seventh Amendment, however, the jury must decide these facts.  The judge could assess the sufficiency of the evidence only *after* a jury verdict; and then the judge could order a new trial.  The plaintiffs' expert in *Williams* offered evidence on materiality, reliance, loss causation, and damages; the jury should have assessed that evidence, as improbable as it may have been in the Tenth Circuit's eyes.

## B.   The Event Study Requirement Allows the Judge to Usurp the Jury's Power to Assess Otherwise Reliable Expert Analyses in Reaching its Factual Determinations.

The event study requirement precludes the jury from assessing reliable expert testimony.  The judge's decision to preclude the jury from assessing reliable expert testimony regarding factual issues also infringes on the Seventh Amendment by constituting an impermissible invasion of the jury's factfinding function in two discrete ways: (1) the judge precludes the jury from weighing competing expert opinions; and (2) the judge precludes the jury from discounting the testimony from otherwise reliable experts.

### 1.   The Judge Precludes the Jury from Weighing Competing Expert Opinions.

An approach similar to *Williams* and *Fener*, where the court decides whether

---

curities fraud actions. *See, e.g., In re* Vivendi Universal, S.A., Sec. Litig., No. 02 CIV.5571 RJH HBP, 2009 WL 886222 (S.D.N.Y. Mar. 31, 2009) (superseded by 634 F. Supp. 2d 352); *In re* Enron Corp. Sec., 529 F. Supp. 2d 644 (S.D. Tex. 2006); Schwab v. Philip Morris, USA, Inc., 449 F. Supp. 2d 992 (E.D.N.Y. 2006); *In re* Worldcom, Inc., Sec. Litig., No. 02 CIV. 3288 (DLC), 2005 WL 627720 (S.D.N.Y. Mar. 16, 2005); *In re* Physician Corp. of Am. Sec. Litig., No. 97-3678-CIV, 2002 WL 34477593 (S.D. Fla. July 24, 2002); *In re* Gen. Instrument Sec. Litig., 209 F. Supp. 2d 423 (E.D. Pa. 2001).

[288]  Fener v. Operating Eng'rs Constr. Indus. & Misc. Pension Fund, 579 F.3d 401, 408 (5th Cir. 2009).

[289]  *Id.* at 408-10.

to believe the expert's testimony and preferences the defendant's expert over the plaintiff's, constitutes an impermissible invasion of the jury's factfinder function. A judge only determines whether the expert testimony can *assist* the trier of fact.[290] The jury determines which expert, if any, to believe.[291] In *In re Williams*, the court decided between two competing experts and found that as a matter of law, the plaintiffs' expert failed to demonstrate loss causation.[292] Similarly, in *Oscar*, the judged weighed competing expert reports both for and against the plaintiff, and then the court decided that the factual conclusion drawn by the plaintiff's expert was "untenable."[293] This occurred in *Fener* as well.[294] But which expert was correct - the plaintiffs' expert or the defendant's expert - is an issue for the jury, not the judge.[295] "The Court's role is not to determine whether [the expert's] testimony is correct, but rather whether it falls outside the range where experts might reasonably differ, and where the jury must decide among the conflicting views of different experts, even though the evidence is 'shaky.'"[296]

### 2.   The Judge Precludes the Jury from Discounting the Testimony from Otherwise Reliable Experts.

Second, the jury ultimately decides whether to accept *any* expert testimony at all.[297] In *In re Williams*, the Tenth Circuit usurped the jury's role in evaluating the plaintiffs' expert opinion because the court dismissed the expert opinion for failure to include an event study that ruled out the effects of other market factors at the summary judgment stage.[298] This approach raises serious Seventh Amendment concerns. Whether the expert has ruled out the effects of other factors is a merit assessment that

---

[290]   Daubert v. Merrill Dow Pharm. Inc., 509 U.S. 579, 593-94 (1993).

[291]   Lapin v. Goldman Sachs & Co., 254 F.R.D. 168, 186 (S.D.N.Y. 2008).

[292]   *See In re Williams, Sec. Litig.*, 558 F.3d at 1143; *NERA Expert's Role in* In Re Williams Securities Litigation, 1 (2009), www.nera.com (describing how the defendant's expert successfully rebutted the plaintiffs' expert at the summary judgment stage).

[293]   *Oscar Private Equity Invs.*, 487 F.3d at 270.

[294]   Fener v. Operating Eng'rs Constr. Indus. & Misc. Pension Fund, 579 F.3d 401, 408-10 (5th Cir. 2009).

[295]   *See, e.g.,* City of Mansion Hills v. Sexton, 160 P.3d 812 (Kan. 2007) (stating that the trier of fact resolves conflicting expert testimony); Miller v. Comm. Contractors Equip., Inc., 711 N.W.2d 893 (Neb. 2006) (stating same); Salerian v. Maryland State Bd. of Physicians, 932 A.2d 1225 (Md. App. Cat. 2007).

[296]   Freeland v. Iridium World Commc'ns, Ltd., 545 F. Supp. 2d 59, 88 (D.D.C. 2008).

[297]   *See, e.g.,* Lange v. Freund, 855 N.E.2d 162 (Ill. App. Ct. 2006); Med. Review Panel v. Bernice Comm. Rehab. Hosp., 915 So.2d 254 (La. App. Ct. 2005); Gibson v. Ferguson, 562 S.W.2d 188 (Tenn. 1976) (stating that the jury decides whether to ultimately accept or reject expert testimony).

[298]   *In re* Williams, Sec. Litig., 558 F.3d 1130, 1143 (10th Cir. Feb. 18, 2009).

should be dealt with on cross-examination and rebuttal.[299]   When a court, as the Tenth Circuit in *Williams*, requires that the plaintiffs' expert rule out the effects of other factors, the court usurps the jury's function of determining facts.  Professor Miller aptly describes the division between judge and jury with respect to expert witnesses:

> [Consider] the case of expert witnesses to fact.  What is their function?  It is just this, of judging facts.  They are called in because they are men of skill and can interpret phenomena which other men cannot, or cannot safely interpret. . . . It is perfectly well settled in our law that such opinions or judgments are merely those of a witness, they are to aid the jury or the judge of fact, and not to bind them; the final judgment is for the jury, and unquestionably, the judgment is one of fact.[300]

The jury assesses the character of the expert, the expert's demeanor on the witness stand, the weight and process of the expert's reasoning, possible biases of the expert, and any other issues.  In other words, evaluating an expert's testimony concerning issues such as materiality, reliance, loss causation, and damages falls within the jury's province to listen, weigh, accept, or reject expert testimony.[301]  Professor Miller further explains:

> [t]here is a significant difference between allowing a judge to dispose of a case by applying a determinative legal principle to undisputed facts and allowing a judge to decide a factual issue because he or she believes the evidence allows only one conclusion.  A judge always decides the former.  As to the latter, if one or more facts are in dispute or different inferences may be drawn from undisputed facts, a jury should be allowed to find for either party.[302]

---

[299]   Brown, *supra* note 269; *see also* Tracinda Corp. v. DaimlerChrysler AG, 362 F. Supp. 2d 487, 494 (D. Del. 2005) (stating that whether an expert failed to consider other relevant factors is an issue for cross-examination and goes to the weight afforded to the expert's opinion).

[300]   Arthur R. Miller, *The Pretrial Rush to Judgment: Are the 'Litigation Explosion,' 'Liability Crisis,' and Efficiency Clichés Eroding Our Day in Court and Jury Trial Commitments?*, 78 N.Y.U. L. REV. 982, 1104 n.622 (2003) (citing James B. Thayer, *'Law and Fact' in Jury Trials*, 4 HARV. L. REV. 147, 154-55 (1890)).

[301]   *See* Miller, *supra* note 300, at 1104.

[302]   Miller, *supra* note 300, at 1091-92.  Abrogating the Seventh Amendment cannot be justified for securities class actions on the basis of efficiency and cost because the Seventh Amendment makes no such allowance; rather the Seventh Amendment gives power to the

This is the case with materiality,[303] loss causation, reliance, and damages—at best, different inferences can be drawn from undisputed facts.[304]

It has been suggested that requiring post-disclosure price movement is necessary because judges and juries cannot be trusted to sort out a misstatement's real financial fronts.[305]  As an initial matter, our Constitution's framers and our nation's founders did not express such distrust of the jury system.[306]  Moreover, by removing these kinds of cases from the jury's purview we may cause juror ignorance over these issues to persist.[307]  Additionally, empirical studies refute the idea that jurors are incapable of grasping the nuances involved in complex cases.  For example, empirical studies have found that there is no correlation between the complexity of a case and the likelihood of disagreement between a judge and jury as to the outcome.[308]  Rather, empirical studies demonstrate that the case facts are the most important determinant of jury verdicts.[309]  Moreover, to saddle a plaintiff with proving the generally indeterminable fact of what would have happened but for the omission or misrepresentation that skewed the market value of the stock would reduce the protection against fraud afforded by Section 10(b).[310]

### C.   An Event Study Assists a Trier of Fact; It Does Not Replace It.

An event study must *assist* the trier of fact in reaching its ultimate conclusion;[311] an event study does not replace the trier of fact as the arbiter of ultimate issues.  The jury must assess expert testimony based on an event study for two additional reasons: experts exercise substantial discretion in the process of conducting an event study which must be subject to the jury's review; and there is no magic talis-

---

jury that cannot be eliminated by Congress or the courts.  Thomas, *The Motion to Dismiss*, *supra* note 280, at 1887.

[303]   Materiality is generally an issue for the trier of fact.  Oxford Asset Mgmt, Ltd. v. Jaharis, 297 F.3d 1182, 1189 (11th Cir. 2002); Marsh Group v. Prime Retail Inc., 46 F. App'x 140, 1444-45 (4th Cir. 2002).

[304]   *See* Freeland v. Iridium World Commc'ns, Ltd., 545 F. Supp. 2d 59, 80 (D.D.C. 2008) (stating that summary judgment is generally inappropriate where an expert's testimony supports a nonmoving party's case).

[305]   Patrick J. Coughlin, *What's Brewing in Dura v. Broudo? The Plaintiffs' Attorneys Review the Supreme Court's Opinion and Its Import for Securities Fraud Litigation*, 37 LOY. U. CHI. L.J. 1, 39-40 (2005) (quoting Professor John C. Coffee as stating that securities fraud losses require a visible market reaction to disclosure because judges and juries cannot be trusted to sort out a misstatement's real financial effect).

[306]   U.S. CONST. amend. VII.

[307]   SUNSTEIN, *supra* note 251, at 113-14 (stating that the Seventh Amendment serves to educate the public about law and policy).

[308]   BURNS, *supra* note 283, at 20.

[309]   *Id.* at 21.

[310]   Du Pont v. Brady, 828 F.2d 75, 78 (2d Cir. 1987).

[311]   FED. R. EVID. 702.

man for what constitutes a correct event study under any given set of circums-
tances.[312]  First, while there are general parameters within which an expert must ex-
ercise his discretion, an expert still exercises considerable discretion therein.  For in-
stance, the length of an event window can have a substantial effect on the amount of
damages.  While a general rule of thumb is that an event window should constitute
three days, a different length does not automatically discredit the results of the event
study.[313]  A jury must decide whether to accept or reject the expert's discretion in this
regard.

Second, determining a securities fraud action as a matter of law based on the
absence or presence of an event study is flawed because an event study can be ex-
ploited in estimating what would have been the effect of the truth had it been told at
the time it was covered up.[314]  Thus, a jury must evaluate an event study and deter-
mine whether to accept or reject such expert evidence.  For example, Esther Bruegger
and Frederick C. Dunbar of NERA Economic Consulting insightfully demonstrate
how the standard event study in securities litigation is much more limited than is
commonly accepted.[315]  At best, according to Bruegger and Dunbar, the event study
is a starting point, rather than a definitive resolution, and in some cases, it is unne-
cessary altogether.[316]  Bruegger and Dunbar demonstrate that there often comes a
point in event study analysis where arbitrary allocations are made by the experts.[317]

Bruegger and Dunbar isolate three conditions regarding a studied event that
may affect event study reliability: (1) the presence of confounding information; (2) a
buildup of inflation per share over the class period; and (3) allocating liability to co-
defendants.[318]  First, as often occurs, the corrective disclosure which alerts the market
to corporate fraud is contained in a news announcement that also contains material

---

[312]  Indeed, even the term "statistically significant" has more than one meaning and
is not a talismanic term.  Hakala, *supra* note 271, at 13 n.21.  Some suggest that event studies as
currently performed should be categorically ruled inadmissible by judges on reliability
grounds because error rates are unknown.  Jonah Gelbach, *Valid Inference in Single-Firm, Single-
Event Studies Used in Scholarship and Securities Litigation: A Research Agenda*, 4 (Searle Center on
Law, Reg., and Econ. Growth, Working Paper, Feb. 12, 2009).

[313]  *See* Lehocky v. Tidel Techs., Inc., 220 F.R.D. 491, 506-07 (S.D. Tex. 2004) (conclud-
ing that plaintiff's expert's event study using a two-day window was sufficient to demonstrate
that a cause and effect relationship between company-specific announcements and stock price
may exist).

[314]  Esther Bruegger & Frederick C. Dunbar, *Estimating Financial Fraud Damages with
Response Coefficients*, 35 J. CORP. L. (forthcoming 2009).

[315]  *Id.*

[316]  *Id.*

[317]  *Id.*

[318]  *Id.*

information unrelated to the alleged misrepresentation. This was the problem in *Fener*.[319] Factors other than the revelation of the fraud may simultaneously be affecting the stock price.[320] For instance, a defendant corporation may issue a press release in which it reveals the prior fraud, but also announces news favorable or unfavorable to the business wholly unrelated to the fraud. Therefore, the presence of confounding information in a studied event may skew reliability; a jury is required to weigh this evidence.

Next, there is the problem of a buildup of inflation per share. Usually defendants make a series of misrepresentations over time with the consequence that damages per share are increasing throughout the class period, but the corrective disclosure (or revelation of the truth) is not in a form that each distinct misrepresentation is corrected in an isolated and separate announcement.[321] An event study in this situation may overestimate or underestimate damages per share depending on whether confounding factors unrelated to the fraud have positive or negative effects on the stock price.[322]

Last, Bruegger and Dunbar note that in securities fraud cases different sets of codefendants are alleged to be responsible for different misrepresentations that are nonetheless revealed altogether in a solitary corrective disclosure.[323] According to Bruegger and Dunbar, an event study is usually of limited value in determining proportionate liability because the event study itself cannot distinguish between which part of a price decline is due to which defendant's fraud.[324] Thus, a factfinder must allocate liability and attribute price decline to the respective defendants.

Moreover, A.C. MacKinlay studied the power of the event study and concluded that the accuracy of the event study varies as the number of firms in the sample increase, as the number of days in the event window decrease, and as the alternative of a larger abnormal return is considered against a null hypothesis of zero abnormal return.[325] For example, MacKinlay finds that in a sample size of twenty-five companies, the probabilities of detecting an abnormal return (or an effect on the

---

[319]   Fener v. Operating Eng'rs Constr. Indus. & Misc. Pension Fund, 579 F.3d 401, 408-10 (5th Cir. 2009).

[320]   Bruegger & Dunbar, *supra* note 314; *see also* Bhagat & Romano, *supra* note 11, at 399; Fisher, *supra* note 38, at 880.

[321]   This is the essence of the "true financial condition" theory. *See In re* Dell Sec. Litig.*, 591 F. Supp. 2d 877, 911-12 (W.D. Tex. 2008).

[322]   Bruegger & Dunbar, *supra* note 314.

[323]   *Id.*

[324]   *Id.*

[325]   Bhagat & Romano, *supra* note 29, at 149 (discussing the MacKinlay study); Hakala, *supra* note 271, at 10 n.16 ("Event studies can vary in practice, including differences in assumptions and levels of investigation and, consequently, different event studies can result in significantly different levels of precision.").

stock price) of 0.5%, 1% and 2% is 24%, 71% and 100% respectively.[326]  But if the sample size is increased to 100 companies, the probabilities of detecting an abnormal return of 0.5%, 1%, and 2% is 71%, 94%, and 100% respectively.[327]  Thus, there is significant difference in detecting an abnormal return, or effect on the stock price, depending on the size of the event study.  Similarly, the power of an event study diminishes substantially as the event period is increased by just a single day.[328]

As shown, an event study is not perfect science.  The adversary process must be used to mitigate the methodological concerns and gaps identified.  Experts employed in litigation should highlight these methodological concerns and the jury must then assess and weigh such evidence.

## VI.  The "Event Study" Element is Inconsistent with the Federal Securities Laws.

Apart from the Constitutional infirmities of treating an event study as an essential element of securities fraud claims, the event study requirement is inconsistent with the plain language of the federal securities laws.  It is inconsistent with the language of the Private Securities Litigation Reform Act ("PSLRA"), the common law, and corporate finance theory.  Moreover, requiring plaintiffs to produce an event study itself is inconsistent with the underlying purpose of the federal securities laws as it unjustifiably inhibits meritorious suits, weakening the integrity of our securities markets.

## A.  The Federal Securities Laws Do Not Require a Post-Disclosure Decline as a Precondition to Recovery.

An event study as an essential element in securities fraud claims lacks support in the federal securities laws.  Event studies should not be used as a roundabout way to improperly require investors bringing securities fraud claims to prove that the defendants' misrepresentations or omissions caused a post-transaction decline in the value of their investments.[329]  Contrary to the Supreme Court's indication in *Dura*, such an approach is inconsistent with the federal securities laws.  Moreover, the Private Securities Litigation Reform Act ("PSLRA") does not require that a plaintiff show that a defendant's conduct caused a post-transaction decline in the value of

---

[326]  MacKinlay, A. C., "Event Studies in Economics and Finance," *Journal of Economic Literature* Vol. XXXV, Issue 1 (March 1997).

[327]  *Id.*

[328]  Bhagat & Romano, *supra* note 29, at 149-50.

[329]  *See* Michael J. Kaufman, *Loss Causation Revisited*, 32 SEC. REG. L.J. 2 (2004).

the plaintiff's investment.[330]  This interpretation is required by the plain language of the statute, references to common law, and basic principles of corporate finance theory.

### 1.   The Plain Language of the PSLRA Does Not Require A Post-Transaction Decline and Event Study.

The PSLRA specifically defines loss as the "loss for which the plaintiff seeks to recover damages."[331]  Under the PSLRA, the plaintiff does not need to establish a causal link between the wrongdoing and any losses for which the plaintiffs do not seek to recover damages, let alone an event study establishing this.[332]  Rather, the PSLRA has a defined recovery structure.  First, under the PSLRA, the plaintiff must define the *precise losses* for which the plaintiff seeks damages.[333]  Second, "[a]fter — *but only after* — the losses for which [the] plaintiff seeks damages are defined with precision, can a determination be made regarding whether [the] plaintiff can establish a causal link between the defendants' challenged conduct and the losses."[334]  The difference between the consideration paid by the plaintiffs and the consideration that they would have paid had the alleged misrepresentations not been made is a "loss" recoverable under the PSLRA; these losses are called "out-of-pocket losses."[335]  For example, where the plaintiff purchases a security for $100 a share, but would have

---

[330] Kaufman, *At a Loss, supra* note 114, at 6.  This approach is analogous to other provisions contained in the securities laws.  For example:

> The express antifraud rights of action in the 1933 Act clearly do not require the plaintiffs to prove that the defendant's conduct caused their investments to decline in value.  Section 11 of the 1933 Act expressly allows acquirers of securities offered pursuant to a registration statement containing a material misstatement or omission to obtain damages from the issuer, its officer, directors, and professionals.  Section 11(e) contains an elaborate damage formula that allows plaintiffs to recover the difference between the offering price and either the 'value' of the security at the time of the suit or the price received if sold before suit.

Kaufman, *Loss Causation: Exposing a Fraud on Securities Law Jurisprudence, supra* note 71, at 366.  However, in Section 11, to the extent that Congress has recognized the concept of loss causation, it has placed the burden on the defendant to prove the absence of causation.  As one can see, Section 11 does not require the plaintiff to come forward, armed with an expert and a statistical regression analysis.

[331] 15 U.S.C. § 78u-4(b)(4).

[332] Kaufman, *At a Loss, supra* note 114, at 6.  *But see* Nathaniel Carden, Comment, *Implications of the Private Securities Litigation Reform Act of 1995 for Judicial Presumptions of Market Efficiency,* 65 U. CHI. L. REV. 879 (1998) (arguing the PSLRA indicates an essential distrust of the efficient market hypothesis).

[333] Kaufman, *At a Loss, supra* note 114, at 6.

[334] *Id.* at 7 n.19 (discussing *Dura*).  *But see* Fry, *supra* note 87 (arguing that the Supreme Court's *Dura* decision was consistent with Congressional intent).

[335] Kaufman, *At a Loss, supra* note 114, at 7.

paid only $60 had the alleged misrepresentation not been made, the $40 difference is a loss recoverable under the PSLRA.

The plaintiff must establish a causal link to these out-of-pocket losses. Prior to *Dura,* the Supreme Court, federal courts, and Congress repeatedly declared that securities plaintiffs could recover these out-of-pocket losses.[336] If the plaintiff sought to recover out-of-pocket losses, the plaintiff needed only to establish a causal connection to this precise loss and the defendant's misrepresentation.[337] The plaintiff only needed to show that the defendant's misrepresentations caused a quantifiable artificiality in the purchase price, calculated as of the purchase date.[338] The plaintiff did not need to establish a causal link to the defendant's misrepresentation and any post-transaction decline in value.[339] While a post-transaction decline may serve as *evidence* of out-of-pocket losses, the post-transaction decline is not in and of itself an out-of-pocket loss.[340]

### 2.   The Common Law Distinguishes Between Out-of-Pocket Losses and Losses Resulting from a Post-Transaction Decline.

This interpretation is also supported by the common law of fraud.[341] Under the common law of fraud, a plaintiff could recover both direct damages and consequential damages.[342] Consequential damages are damages the plaintiff seeks *in addition* to the direct damages from a fraudulent transaction.[343] Consequential damages were recoverable if, but only if, the plaintiff can establish that these consequential

---

[336]   *Id.* at 7-8.  *But see* Dura Pharm., Inc. v. Broudo, 544 U.S. 336, 341–42 (2005) (stating that plaintiffs cannot recover by alleging artificial inflation at the time of purchase).

[337]   Kaufman, *At a Loss, supra* note 114, at 8.  This interpretation is supported by the legislative history of the PSLRA and Congressional intent.  *Id.* at 8-21.

[338]   *Id.* at 11.

[339]   *Id. But see* Glaser v. Enzo Biochem, Inc., 464 F.3d 474, 478-79 (4th Cir. 2006) (arguing that because at the time of the purchase the fraud is not yet known, there is no loss under Virginia common law fraud).

[340]   Kaufman, *Loss Causation Revisited, supra* note 329.

[341]   Kaufman, *At a Loss, supra* note 114, at 20-21.  The Restatement (Second) of Torts likewise supports this interpretation of the loss causation.  Kaufman, *Loss Causation: Exposing a Fraud on Securities Law Jurisprudence, supra* note 71, at 381. The *Dura* Court neglected the common law difference between direct and consequential damages, instead relying solely on the common law requirement that there be some pecuniary loss. Dura Pharm., Inc. v. Broudo, 544 U.S. 336, 343-44 (2005).  *See* Elizabeth Chamblee Burch, *Reassessing Damages in Securities Fraud Class Actions,* 66 Md. L. Rev. 348, 361-62 (2007) (discussing the confusing common law origins of securities fraud remedies).

[342]   Kaufman, *At a Loss, supra* note 114, at 20.

[343]   *Id.* (emphasis added).

damages are related to the misrepresentation.[344]   The concept of direct and conse-
quential damages easily translates to securities fraud claims: (1) direct damages con-
sist of the out-of-pocket loss suffered by the plaintiff; and (2) consequential damages
consist of any post-transaction decline in value in the plaintiff's investment.[345]   There-
fore, under the common law of fraud, the plaintiff could recover his out-of-pocket
loss as a direct damage of the fraud without any showing that the misrepresentation
caused additional consequential damage, or post-transaction decline.[346] For example,
where the plaintiff purchased a security for $100 a share, but would have paid only
$60 but for the misrepresentation, the $40 difference is a loss recoverable under the
PSLRA; they are direct out-of-pocket damages as a result of the defendant's fraud.  If
the stock price declines by $10 because of disclosure of the fraud, that additional $10
decline would represent consequential damages.

### 3.   Corporate Finance Theory Dictates that an Event Study Need Not Link a Post-Transaction Decline to the Defendant's Fraudulent Conduct to Demonstrate Loss.

Corporate finance theory also dictates that economic loss can occur because
of a purchase of stock at an artificially inflated price.[347]  Requiring an event study that
connects fraud to a post-transaction decline relies on an incoherent concept of eco-
nomic loss because it fails to acknowledge that an investor who purchases securities
at an artificially inflated price and resells those securities has suffered a loss simply
through his initial purchase at the inflated price.[348]

---

[344]   *Id.*

[345]   *Id.*

[346]   *Id.*  Indeed, share price declines are largely disconnected from the true value of
the company. Baruch Lev & Meiring de Villiers, *Stock Price Crashes and 10b-5 Damages: A Legal,
Economic, and Policy Analysis*, 47 STAN. L. REV. 7, 10, 26-33 (1994) (arguing that market crashes—
extreme stock price declines—are consequential damages at best, but should never be recover-
able, even where there is a sufficient nexus between the defendant's conduct and the plaintiff's
loss, as it would violate the spirit of the business judgment rule).

[347]   Kaufman, *At a Loss, supra* note 114, at 39-40. "Damages in securities class action
litigation has increasingly become based upon principles of corporate finance." Eisenhofer,
*supra* note 83.

[348]   Kaufman, *At a Loss, supra* note 114, at 39.  The Supreme Court however flatly re-
jected this position in *Dura*, ignoring principles of corporate finance:

> For one thing, as a matter of pure logic, at the moment the transac-
> tion takes place, the plaintiff has suffered no loss; the inflated purchase
> payment is offset by ownership of a share that *at that instant* possesses
> equivalent value.  Moreover, the logical link between the inflated share pur-
> chase price and any later economic loss is not invariably strong.  Shares are
> normally purchased with an eye toward a later sale.  But if, say, the pur-
> chaser sells the shares quickly before the relevant truth begins to leak out,

> Under basic principles of corporate finance theory, the market price (the transaction price) of a security reflects the market's estimation of the company's future cash flow, discounted to the present at the company's cost of capital.  Where a company falsely represents its present or past financial performance the market will use this information as an indicator of the company's future cash flows.  If the purchasers of securities have purchased at a price that reflects expectations of future cash flow that have been artificially inflated by the defendant's fraud, the purchasers have suffered a recognizable loss.  That economic loss is recognizable because the investors have purchased securities at a price which falsely inflated their expectations of the company's future cash flow.  The loss exists *even if there has been no subsequent corrective disclosure of the fraud followed by a decline in price.*[349]

The attorneys who represented the plaintiffs before the Supreme Court in *Dura* similarly explain how stock price decline is not a necessary condition for establishing loss causation in fraud-on-the-market cases:

> Market valuations are based upon expected future cash flows discounted by the cost of capital.  These cash flows are commonly referred to as discounted cash flows.  Open market frauds commonly manipulate stock market price increases by artificially raising cash flow expectations.  Conversely, cash-flow expectations just as easily can be lowered to reduce fraud-induced inflation without any overt disclosure of the fraud by defendants issuing further statements – true or false – that on their face may or may not appear to be directly related to the original fraud.[350]

Basic corporate finance principles dictate that a stock price is a reflection of the market's estimation of the company's future cash flows, discounted back to the

---

the misrepresentation will not have led to any loss.  If the purchaser sells later after the truth makes its way into the marketplace, an initially inflated purchase price *might* mean a later loss.  But that is far from inevitably so.  When the purchaser subsequently resells such shares, even at a lower price, that lower price may reflect, not the earlier misrepresentation, but changed economic circumstances, changed investor expectations, new industry-specific or firm-specific facts, conditions or other events, which taken separately or together account for some or all of that lower price.
Dura Pharm., Inc. v. Broudo, 544 U.S. 336, 342-43 (2005).
[349]  Kaufman, *At a Loss, supra* note 114, at 40.
[350]  Coughlin, *supra* note 305, at 23.

present at the company's cost of capital.[351] Therefore, a plaintiff investor can suffer a loss even if the stock never declines below the purchase price or if it declines before the corrective disclosure.[352] "Under sound principles of corporate finance, where expectations of future cash flow have been artificially inflated because of fraud, then the resulting stock price also is artificially inflated by fraud . . . . [I]f the plaintiff can demonstrate that he or she overpaid for the stock as a result of the fraud, and the price of the stock declined as a result of an explicit (or implicit) disclosure of diminished further cash flow expectations, such a showing would be sufficient . . . even if the share price decline was prior to any explicit disclosure . . . ."[353] There need not be a post-transaction price drop for a plaintiff to suffer loss: inflating the price at the time of purchase reduces an investment's expected future rate of return at the time of purchase, causes an economic loss of the time value of the money associated with the inflationary purchase, and reduces the quality of the investment and increases the risk of loss associated with it.[354] Moreover, academic finance literature indicates that securities prices often incorporate new information before it is formally announced.[355] For example, prices may decline on rumors of insider trading before a formal release and disclosures of varying credibility may gradually become public throughout a lengthy period.[356] Scott D. Hakala, often a testifying expert in securities litigation, lucidly explains how an inflationary loss can occur regardless of the disclosure of bad news:

> [S]uppose an investor buys a share of stock for $100 and the company discloses a significant restatement one month later such that the share price falls from $100 to $50 on the corrective disclosure. We would all presumably agree that loss causation exists and the loss is $50 in this simple case. Suppose however, a month after the corrective disclosure, the company loses a major lawsuit and files for bankruptcy before the investor sells the share, with the value of

---

[351]  Eisenhofer, *supra* note 83, at 1442.

[352]  Kaufman, *Loss Causation Revisited, supra* note 329.  Stock price reflects the market's estimation of the company's future cash flows, discounted back to the present at the company's cost of capital.  Eisenhofer, *supra* note 83, at 1421.

Value = PV cash flows + PV terminal value.

Cash flows = cash flow forecasted during the projection period;

Terminal value = value of the firm at the end of the forecast period;

PV = present value as of the valuation date using the debtor's weighted average cost of capital as the discount rate.

*Id.* at 1422.

[353]  Eisenhofer, *supra* note 83, at 1420; *see also* Thorsen, *supra* note 12 ("Inflationary loss occurs whenever an investor who paid too much is unable to get that overpayment back in the marketplace.").

[354]  Hakala, *supra* note 271, at 6 n.7.

[355]  Coughlin, *supra* note 305, at 25.

[356]  Coughlin, *supra* note 305, at 25-26.

the shares falling to zero. The investor has suffered a $100 investment loss, of which $50 is the inflationary loss in this example.

... However, rearrange the order of the events in this example such that the news of the adverse legal decision follows one month after the purchase of the share and the share price falls to zero upon the filing of bankruptcy. Then the company discloses a month after the bankruptcy that it had committed fraud and needed to restate its prior financial reports. Applying the principles underlying the out-of-pocket theory of loss previously stated, the investor suffered a $100 investment loss and $50 inflationary loss.

... Regardless of the timing of the two events following the fraud-induced inflation in the purchase price, the investor is in identically the same position at the end. Clearly, $50 of the $100 investment loss was solely caused by the fraud, in that, had the fraud not existed and the transaction still occurred the investor would have avoided $50 of the $100 loss.[357]

Regardless of the timing of the disclosure, the investor suffered inflationary loss.

Thus, requiring an event study that connects a post-transaction decline in stock price to the alleged fraud to establish a securities fraud claim is unsupported by the federal securities laws, common law concepts of recoverable loss, and corporate finance principles of economic loss. A plaintiff can suffer loss even absent a post-disclosure price movement.

## B.   Requiring an Event Study Imposes an Unjustified Barrier to Meritorious Securities Fraud Claims.

Besides lacking a textual basis, the event study requirement is inconsistent with the underlying purposes of the federal securities laws. As evidenced by the Supreme Court's recent *Stoneridge* decision, a policy justification in securities case law is exceedingly important.[358] Heightened pleading and evidentiary standards in securities laws are premised on the assumption that securities claims are frivolous, inefficient, and abusive[359] and that they present an *in terrorem* threat of settlement.[360] In

---

[357]   Hakala, *supra* note 271, at 7.
[358]   *See* Stoneridge Inv. Partners v. Scientific-Atlanta, Inc., 552 U.S. 148, 163 (2008); *see also* 26 MICHAEL J. KAUFMAN, *Examining Policy Implications in a Securities Fraud Action*, *in* SECURITIES LITIGATION: DAMAGES § 15:7:05 (Thomson/West 2008).
[359]   The *in terrorem* criticism has been recognized by the legislature, S. REP. NO. 104-

*Stanford Journal of Law, Business & Finance*

fact, the Supreme Court's *Dura* decision—the catalyst for the event study require-
ment—sought to prevent a plaintiff "with a largely groundless claim to simply take
up the time of a number of other people, with the right to do so representing an *in
terrorem* increment of the settlement value, rather than a reasonably founded hope
that the discovery process will reveal relevant evidence."[361]  As this Subpart shows,
however, the event study requirement—which is nothing short of a heightened
pleading and evidentiary standard—lacks any legitimate policy objective.  Rather, it
inflicts serious harm on meritorious securities fraud actions.

### 1. The Fictional Underpinnings of the Event Study Requirement.

The event study requirement lacks policy support.  The assumed harm
averted by the event study requirement is illusory.  The prevention of *in terrorem* se-
curities fraud settlements is too weak in theory and in fact to justify a heightened
pleading and evidentiary burden.  As this Subpart shows, the *in terrorem* concept is
illogical and concerns about abusive discovery do not warrant an event study re-
quirement.

### a.   The *In Terrorem* Concept Is Illogical.

The *in terrorem* concept suffers from logical deficiencies.  To complain that

---

98, at 4 (1995) *as reprinted in* 1995 U.S.C.C.A.N. 679, 683 (discussing the purpose of the PSLRA
was to curb perceived abuses); S. REP. NO. 104-98, at 5 (1995) *as reprinted in* 1995 U.S.C.C.A.N.
679, 684 (noting the system is being abused and misused); H.R. REP. NO. 104-369, at 31 (1995)
(Conf. Rep.), *as reprinted in* 1995 U.S.C.C.A.N. 730, 730 (abusive practices include (1) routine
filing of lawsuits against issuers whenever there is a significant change in the stock price with-
out regard to culpability, (2) targeting deep pocket defendants and individuals covered by in-
surance, (3) imposing burdensome discovery costs to push a settlement, and (4) class action
manipulation), the Supreme Court, *Stoneridge Inv. Partners*, 552 U.S. at 163-64 (stating securities
fraud actions chill foreign investment); Tellabs Inc. v. Makor Issues & Rights, Ltd., 551 U.S.
308, 313 (2007) (stating that securities fraud actions impose substantial costs on companies
when employed abusively); Dura Pharm., Inc. v. Broudo, 544 U.S. 336, 347 (2005) (stating that
securities actions present an *in terrorem* threat), the federal appellate courts, Higginbotham v.
Baxter Int'l, Inc., 495 F.3d 753, 757 (7th Cir. 2007) (distrusting plaintiff's attorneys by implying
they fabricate witnesses); Oscar Private Equity Invs. v. Allegiance Telecom, Inc., 487 F.3d 261,
267 (5th Cir. 2007), and commentators, U.S. CHAMBER INSTITUTE FOR LEGAL REFORM, SECURITIES
CLASS ACTION LITIGATION: THE PROBLEM, ITS IMPACT, AND THE PATH TO REFORM. (July 2008).

360  *See* Fener v. Operating Eng'rs Constr. Indus. & Misc. Pension Fund, 579 F.3d 401,
406 (5th Cir. 2009); *Oscar Private Equity Invs.*, 487 F.3d at 267; *Securities Litigation – Class Certifi-
cation – Fifth Circuit Holds that Plaintiffs Must Prove Loss Causation Before Being Certified as a
Class*, 121 HARV. L. REV. 890 (2008) (stating that courts have erected additional barriers to class
certification in securities actions to guard defendants from settling frivolous claims).  Despite
the fact that this policy concern is insufficient to justify a rigorous standard, there is a compet-
ing policy concern that mandates *against* a rigorous standard: a rigorous standard can make it
harder for victims to pursue smaller claims absent a class action device. David S. Evans, *Class
Certification, the Merits, and Expert Evidence*, 11 GEO. MASON L. REV. 1 (2002).

361  *Dura Pharm., Inc.*, 544 U.S. at 347 (citing Blue Chip Stamps v. Manor Drug Stores,
421 U.S. 723, 741 (1975)).

defendants are forced into settlement ignores the well-settled principle that the law favors settlement of merited claims.[362] Those that presume the frivolity of securities class actions generally argue that such actions force defendants *in terrorem* into settlement. If the action is not frivolous, but is merited,[363] the defendants' entering into a settlement is a *good thing*.[364] Settlement compensates the injured party, spares both parties litigation costs, and promotes judicial economy.[365] The main problem with the *in terrorem* policy concern is that it is inapplicable where a claim has merit.[366]

In addition, whether a claim is "frivolous" is an untestable rhetorical asser-

---

[362]  *See supra* Part V.A.1.a.

[363]  Instances of legitimate corporate fraud — as opposed to plaintiff fear mongering — are not unheard of. For example, as Alan Greenspan, former Chairman of the Federal Reserve noted that modern corporate accounting practices responsible for the Enron and Worldcom debacles provided corporate management with broad discretion "to favorably bias their results to the edge of outright fraud. Some clearly went over the line." ALAN GREENSPAN, THE AGE OF TURBULENCE: ADVENTURES IN A NEW WORLD 431 (2007); *see also* BETHANY MCLEAN & PETER ELKIND, THE SMARTEST GUYS IN THE ROOM: THE AMAZING RISE AND SCANDALOUS FALL OF ENRON (2003) (chronicling the massive Enron accounting scandal); Coughlin, *supra* note 305, at 27-31 (discussing real-world examples of corporate fraud and inflationary loss).

[364]  Courts recognize that there is a strong judicial policy in favor of settlement, and in particular, in the class action context. *In re* Gen. Motors Corp. Pick-Up Truck Fuel Tank Prods. Liab. Litig., 55 F.3d 768, 784 (3d Cir. 1995); *In re* Pac. Enters. Sec. Litig., 47 F.3d 373, 378 (9th Cir. 1995); Weinberger v. Kendrick, 698 F.2d 61, 73 (2d Cir. 1982); Piambino v. Bailey, 610 F.2d 1306, 1328 (11th Cir. 1980); *In re* Blech Sec. Litig., No. 94 CIV. 7696, 2000 WL 661680, at *1 (S.D.N.Y. May 19, 2000); Adair v. Bristol Tech. Sys., Inc., No. 97 CIV. 5874, 1999 WL 1037878, at *1 (S.D.N.Y. Nov. 16, 1999); *In re* Gulf Oil/Cities Serv. Tender Offer Litig., 142 F.R.D. 588, 590 (S.D.N.Y. 1992). "Class action suits readily lend themselves to compromise because of the difficulties of proof, the uncertainties of the outcome, and the typical length of the litigation. There is a strong public interest in quieting any litigation; this is particularly true in class actions." *In re* Prudential Sec. Inc. Ltd. P'ships Litig., 163 F.R.D. 200, 209 (S.D.N.Y. 1995).

[365]  Evans, *supra* note 360, at 3-6; *see also In re* Hydrogen Peroxide Antitrust Litig., 552 F.3d 305, 309 n.6 (3d Cir. 2008); Eisen v. Carlisle & Jacqueline, 417 U.S. 156, 186 n.8 (1974) (Douglas, J., concurring in part, dissenting in part). Magistrate Judge Morton Denlow for the United States District Court for the Northern District of Illinois has gone so far as to suggest that both plaintiffs and defendants should include in their initial pleadings requests for a mediated settlement conference to facilitate settlement. Morton Denlow, *Making Full Use of the Court: Come to Settle First, Litigate Second*, 35 A.B.A. LITIG. 28, 29 (Fall 2008).

[366]  Should defendants and other still be heard to complain of litigation costs where the claim has merit, a very simple, yet often overlooked, response exists: "'Why Not Tell the Truth?' Justice Brandeis observed that sunlight is a great disinfectant. If we focus on telling the truth, rather than obfuscating financial results, we can have the best of all worlds: an efficient market and minimal litigation." Charles W. Murdock, *Sarbanes-Oxley Five Years Later: Hero or Villain*, 39 LOY. U. CHI. L.J. 525, 568-69 (2008). Moreover, "[i]n a typical litigation scenario, the courts merely serve as a background for the bargaining between two parties to reach a settlement. Thus to single out settlements in securities litigation as nuisance-driven ignores the fact that most litigation is aimed at achieving settlement." John M. Wunderlich, Note, *Tellabs v. Makor Issues & Rights, Ltd.: The Weighing Game*, 39 LOY. U. CHI. L.J. 613, 658 (2007).

*Stanford Journal of Law, Business & Finance*     Vol 15:1

tion insufficient to deny investors a remedy for harmful conduct.[367]   Proponents of securities reform claim that securities actions cost millions of dollars in unnecessary legal expenses, and often are settled without regard to the merits solely to avoid the expense and risks of defending "frivolous" suits.[368]   These claims, however, are based more on rhetoric than on empirical proof.[369]   Additionally, there is the logistical problem that there is little substantial means by which to respond to the mantra that 'most securities class actions have little merit,'[370] as defendants require plaintiffs to enter into strict confidentiality agreements before engaging in document production and to return or destroy all documents on the closing of a case.[371]   Thus, plaintiffs' attorneys are generally unable to respond to vague public attacks on the validity of securities fraud suits by pointing to specific evidence of uncovered fraud.[372]

### b.   Abusive Discovery Concerns Are Insufficient to Justify an Event Study Analysis.

Hand in hand with the *in terrorem* criticism is the concern that excessive and abusive discovery puts a gun to the head of corporate defendants and forces them to settle regardless of the merit of a claim.[373]   Yet concerns about expensive securities class discovery do not warrant an event study requirement on the part of plaintiffs. As this Section shows, discovery abuse in general is not as rampant as the misperception of its abuse is.   Moreover, discovery abuse is a two-way street: both plaintiffs

---

[367] John C. Coffee, Jr., *Reforming the Securities Class Action: An Essay on Deterrence and its Implementation*, 106 COLUM. L. REV. 1534, 1536 n.5 (2006).

[368] *See* Evans, *supra* note 360, at 36 ("Class actions can put a gun to the head of companies. Maybe the company will win, but maybe they will get a verdict that will kill them."); ROBERT E. LITAN, U.S. CHAMBER OF COMMERCE INST. FOR LEGAL REFORM, THROUGH THEIR EYES: HOW FOREIGN INVESTORS VIEW AND REACT TO THE U.S. LEGAL SYSTEM, 13 (Aug. 2007) (stating that "some defendants can feel financially pressured to settle even if they have done nothing wrong, believing it not to be worth betting their companies on a subsequent mistaken jury verdict that can be difficult to overturn on an appeal.").

[369] D. Brian Hufford, *Deterring Fraud vs. Avoiding the "Strike Suit": Reaching an Appropriate Balance*, 61 BROOK. L. REV. 593, 633 (1995). As John C. Coffee, Jr., securities law expert, states:

> The true 'strike suit' nuisance action, filed only because it was too expensive to defend, is, in this author's judgment, a beast like the unicorn, more discussed than directly observed.   Although small settlements may have been impelled in part by the high cost of defense, the corresponding observation is that the small damages in these cases also did not justify much effort on the plaintiff's side.   Neither side wanted to invest much effort in them – but this does not make them inherently frivolous.   Similarly, the economic evidence that strike suits predominate also seems unpersuasive.

Coffee, Jr., *supra* note 367, at 1536 n.5.

[370] Hufford, *supra* note 369, at 637.

[371] *Id.*

[372] *Id.*

[373] *See supra* note 342 and accompanying text.

and defendants impose costs and use discovery as a pressure tool. Additionally, discovery promotes merits resolution. Finally, and most important, requiring an event study actually increases securities litigation costs.

### i.    Discovery Abuse is Misperceived.

First, there is widespread sentiment that discovery is abusive and high discovery costs force defendants to settle.[374] This misperception is particularly acute in securities class action litigation.[375] Empirical research about discovery in civil litigation, however, has yielded results that differ from this conventional wisdom.[376] In other words, the concern about abusive discovery practices rests on prevailing sentiments that discovery is excessive and abusive rather than on actual hard data.[377] "Most studies measuring the incidence of discovery survey only opinions, impres-

---

[374] *See* Judith A. McKenna & Elizabeth C. Wiggins, *Empirical Research on Civil Discovery*, 39 B.C. L. REV. 785, 787 (1998) (stating that the debate over discovery reform was based on salient personal experiences, and not with the benefit of empirical evidence); Linda S. Mullenix, *Discovery in Disarray: The Pervasive Myth of Pervasive Discovery Abuse and the Consequences for Unfounded Rulemaking*, 46 STAN. L. REV. 1393 (1994) [hereinafter Mullenix, *Discovery in Disarray*] (documenting "Faludi-style," the myth of pervasive discovery abuse). However, there is still no working definition of what constitutes "appropriate" discovery. Linda S. Mullenix, *The Pervasive Myth of Pervasive Discovery Abuse: The Sequel*, 39 B.C. L. REV. 683, 688 (1998) [hereinafter Mullenix, *The Discovery Abuse Sequel*].

[375] Mullenix, *Discovery in Disarray*, *supra* note 374, at 1398 (citing Jonathan Racuh, *The Parasite Economy*, 24 NAT'L L.J. 980, 980 (1992) ("Like ticks on hounds, the lawyering and lobbying classes are sucking billions from the economy that might otherwise be used for productive investment. And the public is getting plenty sore about it.").

[376] Thomas E. Willging et al., *An Empirical Study of Discovery and Disclosure Practice under the 1993 Federal Rule Amendments*, 39 B.C. L. REV. 525, 527 (1998). The discovery reform agenda is based on "questionable social science, cosmic anecdote, and pervasive, media-perpetrated myths." Mullenix, *Discovery in Disarray*, *supra* note 374, at 1396 (internal quotations omitted). Discovery data has in fact remained constant over time. Mullenix, *The Discovery Abuse Sequel*, *supra* note 374, at 684.

[377] Wunderlich, *supra* note 366, at 655. "Perceptions based on potentially unrepresentative experiences coalesced in a widely shared belief that discovery abuse was a pervasive and serious phenomena." McKenna & Wiggins, *supra* note 374, at 787. "Proposals for discovery reform are typically impelled by anecdotal evidence and rhetorical, but highly compelling, reports of discovery abuse. Mullenix, *The Discovery Abuse Sequel*, *supra* note 374, at 684. Similarly, Professor Charles Yablon argues that discovery is misperceived as zealous advocacy. Charles Yablon, *Stupid Lawyer Tricks: An Essay on Discovery Abuse*, 96 COLUM. L. REV. 1618, 1620 (1996). According to Yablon, this is because of the inherent tension between the cooperative nature of discovery and the adversarial nature of the litigation system. *Id.* at 1625. To remedy this over-zealous discovery advocacy, Professor Yablon suggests that courts treat lawyers much like a parent treats their kids on long car trips when they act up: tell them to "shut up and knock it off." *Id.* at 1619. This approach would have the effect of deterring abusive discovery by making it "less fun." *Id.* at 1640.

sions, or billable hours."[378]  The Columbia Field Project study, the first major study into the actual effects of discovery practice, found that there was no widespread failing in the scope or availability of discovery.[379]  Likewise, a 1978 study by the Federal Judicial Center found that in fifty-three percent of cases no discovery was requested at all, and fewer than five percent of these cases had more than ten discovery requests.[380]  The Federal Judicial Center study also found that in seventy-two percent of the cases, there were no more than two discovery requests.[381]  Similarly, a study by the National Center for State Courts found that only forty-two percent of the cases in the sample group conducted discovery.[382]  Empirical data suggests that a majority of ordinary cases involve no discovery and that the majority of the cases that do conduct discovery generally involve only two discovery requests.  Thus, abusive discovery is not widespread; rather what is widespread is the *misperception* that discovery is excessive and abusive.[383]

Admittedly securities class action litigation suffers, on average, from a higher incidence of discovery.[384]  But securities class actions *alone* do not suffer from this higher incidence of discovery.[385]  For example, intellectual property cases, trade regulation claims, tort claims, admiralty claims, contract cases, and antitrust cases all suffer from a higher volume of discovery.[386]  In all larger and more complex cases discovery is used more extensively and intensively and thus consumes a dominant percentage of litigation resources.[387]  Thus, more extensive and intensive discovery in

---

[378]  Charles W. Sorenson, Jr., *Disclosure Under Federal Rule of Civil Procedure 26(a)—"Much Ado About Nothing?"*, 46 HASTINGS L.J. 679, 681 (1995) (referencing "[t]he widespread public and professional perception of a 'litigation explosion'" (citing WALTER K. OLSON, THE LITIGATION EXPLOSION: WHAT HAPPENED WHEN AMERICA UNLEASHED THE LAWSUIT (1991)).  One such study found that, in terms of time, discovery is what lawyers statistically spend most of their time on in the course of ordinary litigation.  David M. Trubek et al., *The Costs of Ordinary Litigation*, 31 UCLA L. REV. 72, 91 (1983) (surveying a random sample of cases and lawyers finding lawyers spend about 16.7% of their time on discovery matters).

[379]  McKenna & Wiggins, *supra* note 374, at 786–87 (citing the Columbia Project field survey).

[380]  Peggy E. Bruggman, *Reducing the Costs of Civil Litigation: Discovery Reform*, PLRI HASTINGS, Fall 1995, at 1, 12, *available at* http://w3.uchastings.edu/plri/fal95tex/discov.html.  The Federal Judicial Center study examined 3,000 cases in six United States district courts.  *Id.*

[381]  McKenna & Wiggins, *supra* note 374, at 790.

[382]  Bruggman, *supra* note 380, at 13.

[383]  Wunderlich, *supra* note 366, at 655.

[384]  Willging, *supra* note 376, at 578.

[385]  Kevin LaCroix, *Private Securities Litigation: Important Deterrent or Wasteful Churn?*, THE D&O DIARY, Oct. 16, 2008, http://www.dandodiary.com/2008/10/articles/securities-litigation/private-securities-litigation-important-deterrent-or-wasteful-churn/.

[386]  Willging, *supra* note 376, at 552; Wunderlich, *supra* note 366, at 656.

[387]  McKenna & Wiggins, *supra* note 374, at 801.  Larger and more complex cases also are more influenced by tactical decisions.  *Id.*  However, massive amounts of discovery presents a clichéd "chicken-or-the-egg" type problem: "broad discovery can contribute to megalitigation in part by unearthing evidence that supports claims by many."  Richard L. Marcus,

higher stakes litigation may explain any existence of a higher incidence of discovery abuse.[388]  In higher stakes litigation, there tends to be more involvement in the discovery process, i.e., privileges are invoked more frequently and clients play a more active role in discovery matters.[389]  In other words, the higher incidence of discovery problems in larger class actions does not imply that more problems are *likely* to occur.[390]  Instead, a high incidence of discovery problems for larger cases may just indicate that there is plainly *more* discovery in those cases.[391]  And notably, a high incidence of discovery in *all* complex cases does not justify a heightened pleading or evidentiary standard for *securities class actions alone.*

Even if discovery data emerges finding that securities actions abound with high discovery costs more so than any other complex litigation, high discovery costs are to be expected in securities class actions which claim millions of dollars in investor losses.  Discovery costs are proportional to both parties' needs and the stakes in the case.[392]  One study found, quite intuitively, that the size of monetary stakes in the case had the strongest relationship to the total litigation costs more so than any other studied characteristic.[393]  Litigation in general, not just securities fraud class actions, is an interactive investment process, which is influenced by actual and anticipated expenditures of both the litigant and his opponent.[394]  The high costs of securities lit-

---

*Reassessing the Magnetic Pull of Megacases on Procedure,* 51 DePaul L. Rev. 457, 470 (2001).  Thus, whether a big case generates big discovery or whether big discovery generates a big case is an issue.

[388]    *See* Todd Foster et al., NERA Economic Consulting, Recent Trends in Shareholder Class Action Litigation: Filings Stay Low and Average Settlements Stay High—But Are These Trends Reversing?   8   (Sept.   2007), http://www.nera.com/image/PUB_RecentTrends_Sep2007-FINAL_4color.pdf (listing top ten shareholder class actions in securities as all exceeding $1 billion in 2007).

[389]    McKenna & Wiggins, *supra* note 374, at 801.

[390]    Marcus, *supra* note 387, at 471 n.60.

[391]    *Id.*

[392]    Willging, *supra* note 376, at 531.  Indeed, the likelihood of discovery problems increased as the stakes, factual complexity, and contentiousness increased. Mullenix, *The Discovery Abuse Sequel, supra* note 374, at 685-86.

[393]    Willging, *supra* note 376, at 532.  Other factors studied included the percentage of litigation costs attributable to document production, the number of hours spent in depositions, the size of the law firm, the complexity and contentiousness of the case, and the type of the case.  *Id.*  High stakes also influenced the length of the litigation: the higher the stakes, the longer the case lasted.  *Id.* at 533.

[394]    Trubek, *supra* note 378, at 76, 77 (discussing the idea that litigation is an investment of scarce resources to achieve a future result); *see also* Patrick E. Higginbotham, *Judge Robert A. Ainsworth, Jr. Memorial Lecture, Loyola University School of Law: So Why do We Call Them Trial Courts?,* 55 SMU L. Rev. 1405, 1412 (2002) (saying all decisions on whether to go to trial are based on cost concerns).

igation are not attributable to frivolous litigation or abusive discovery, but rather this symbiotic relationship.

### ii.   Both Plaintiffs and Defendants Are Prone to Discovery Abuse.

Second, even if discovery abuse is prevalent, this two-edged criticism does not justify an event study requirement for *plaintiffs alone.* Courts have imposed barriers on *plaintiffs* because of discovery concerns, but "[d]efendant's attorneys (58%) were more likely than plaintiff's attorneys (42%) to report that they had no problems [with disclosure or discovery in their case]."[395] Consequently, plaintiffs have more problems with discovery than defendants. Also, discovery problems come from both sides. Defendants can assert that plaintiffs will use discovery as a club to impose costs on defendants just as easily as plaintiffs can assert that defendants use 'dump-truck' and warehouse discovery responses as methods of overwhelming the plaintiffs.[396] As one commentator explained:

> While companies claim that frivolous litigations result in unnecessary defense costs, what they fail to acknowledge is that frivolous defenses to valid claims have perhaps an even greater impact on the costs and delay inherent in litigation. Defense firms universally choose to file substantial motions to dismiss or for summary judgment, even for cases which clearly satisfy the pleading standards with valid underlying claims. Defense attorneys also oppose class certification even in the most routine situations and usually attempt to delay or stymie legitimate discovery efforts. As a result, cases involving even the most obvious frauds take years to litigate and often result in settlements below what investors should, in all fairness, receive. In response to the argument that plaintiffs' firms file frivolous suits in order to 'extort' settlements, it can just as easily be asserted that defendants delay litigation and file frivolous defenses in order to force plaintiffs to accept low settlements.[397]

In addition to the fact that discovery abuse is likely to occur on both sides of the fence, there is some indication that a lengthened discovery process will actually *benefit* defendants. For example, studies find that "[d]iscovery is not cost-effective for

---

[395]  Willging, *supra* note 376, at 553.

[396]  Marcus, *supra* note 387, at 470.

[397]  Hufford, *supra* note 369, at 639; *see also* Mullenix, *Discovery in Disarray, supra* note 374, at 1401-02 ("Corporate defendants withhold necessary evidence or inundate requesting plaintiffs with thousands of documents (in either instance, imposing extra cost, harassment, and delay on requesting plaintiffs). When discovery abuse occurs, it seems equally likely to be an attempt by a corporate defendant to bankrupt a plaintiff and to induce abandonment of the lawsuit as a plaintiff's attempt to harass a defendant.").

all parties. . . . [F]or plaintiffs, increased lawyer time spent on discovery was asso-
ciated with *decreased* measures of success. . . . [D]iscovery is less profitable for plain-
tiffs. The more days plaintiffs spent in recovery, the lower their recovery relative to
expectations."[398]

Another interesting paradox with the *in terrorem* and abusive discovery ar-
gument is that discovery studies find that cases with *more* discovery are actually *less*
likely to settle.[399] The number of days spent in discovery was associated with both
increases in the number of disagreements between sides concerning factual and legal
issues and lower proportions of cases settling before trial. Cases where neither side
engaged in discovery settled out of court in ninety-seven percent of cases.[400] Thus, it
is inconsistent to claim that high discovery costs force defendants to settle when, in
reality, higher incidences of discovery meant the parties were actually less likely to
settle.

### iii.  Discovery Promotes Merits Resolution.

Third, discovery plays an important role in the litigation drama. There is no
dispute that defendants incur substantial costs defending against securities actions.
But the issue is not whether these defendants would have saved money by avoiding
litigation expenses as they obviously could have.[401] "The real question is whether the
benefits of a system that can adequately deter fraud outweigh the benefits of a sys-
tem that discourages both frivolous and meritorious fraud suits."[402] "Discovery is
designed to promote resolution of cases on the merits. Neither defendants nor plain-
tiffs could adequately assess the strength of their own claim or their opponent's claim

---

[398]  McKenna & Wiggins, *supra* note 374, at 795-96 (emphasis added); *see also* Baker &
Griffith, *infra* note 406, at 777-78 ("[T]he defendant's higher costs do not necessarily give the
plaintiff an advantage, as defense costs reduce available insurance limits. Assuming that the
claim will settle within insurance limits, this means that increasing defense costs also decreases
the total pot available to plaintiffs in settlement. Thus plaintiffs may also have a strong incen-
tive to avoid high discovery costs.").

[399]  McKenna & Wiggins, *supra* note 374, at 796.

[400]  *Id.*

[401]  Hufford, *supra* note 369, at 635. Ultimately, whether discovery is 'abusive' or
'wasteful' may just be a matter of perspective: "[F]rom the judge's perspective the lawyers
have wasted a lot of time and energy on useless papers and gotten yelled at in the process. But
from the plaintiff's counsel's perspective, plaintiff's deposition got postponed for at least two
months while lawyers drafted and served new interrogatories and answers, and that obvious-
ly felt like a victory, even if it had little impact on the ultimate outcome of the case." Yablon,
*supra* note 377, at 1622.

[402]  Hufford, *supra* note 369, at 636.

absent discovery requests."[403]    And neither can the court adequately assess the strength of the claims absent discovery.  Full access to evidence through open discovery ends trial by ambush and promotes settlement.[404]  Discovery is designed to facilitate a resolution on the merits.

### iv.  The Event Study Requirement Increases Discovery Costs.

Last, requiring an event study increases securities litigation costs.  Expert discovery is the second most costly type of discovery.[405]  If courts require securities plaintiffs to expend more time and money on the case by procuring event studies, plaintiffs will require greater settlements to recoup their costs.[406]  An event study requirement precludes parties from entering into agreements to forgo costly types of discovery, such as expert discovery.[407]   Additionally, in describing the two main sources of dissatisfaction with the use of expert witnesses, Judge Posner states that a battle of the experts creates added costs without any added benefits:

> First, because the experts are paid by the respective parties, it is feared that they are partisans of whoever hired them ("hired guns") rather than being disinterested, and hence presumptively truthful, witnesses.  This of course does not distinguish them sharply from a number of other types of witness, notably the parties themselves . . . But, second, it is feared that expert witnesses can mislead judges and juries more readily than lay witnesses can because they are more difficult to pick apart on cross-examination; they can hide behind an impenetrable expertise expressed in an unintelligible jargon.  A subordinate concern, though closely related to the concern with intelligibility, is that opposing experts often simply cancel each other out.  The expected outcome is unaffected, and so the use of the experts creates costs without any benefits.[408]

---

[403]  Wunderlich, *supra* note 366, at 658.  *In re* Stratosphere Corp. Sec. Litig., 1 F. Supp. 2d 1096 (D. Nev. 1998), provides a good illustration of the difference discovery can make: Prior to discovery, the plaintiffs' initial complaint was dismissed, but after the benefit of discovery in a bankruptcy proceeding, the court granted leave to amend the complaint. *Id.*

[404]    McKenna & Wiggins, *supra* note 374, at 785-86 ("Full access to the evidence would end trial by ambush and surprise.  Open discovery would promote settlements; with both sides obliged to turn over all their important cards, secrets would disappear and realistic negotiations would occur.") (internal citation omitted).

[405]  Willging, *supra* note 376, at 540.

[406]   Tom Baker & Sean J. Griffith, *How the Merits Matter: Directors and Officers' Insurance and Securities Settlements*, 157 U. PA. L. REV. 755, 771 (2009).  It is generally recommended that where a case is significant enough, you should often employ two experts: one to testify and one to consult.  Eric T. Chaffin, *De-Escalate the Expert Discovery Wars*, 44 TRIAL 36, 37 (June 2008).

[407]   *See In re* Parmalat Sec. Litig., 493 F. Supp. 2d 723 (S.D.N.Y. 2007).

[408]   POSNER, ECONOMIC ANALYSIS OF LAW, *supra* note 68, at 628.

By mandating an event study, the federal courts impose a considerable cost on the parties, increasing the overall cost of securities litigation.

### 2.  An Event Study Requirement Inflicts Significant Harm on Meritorious Actions.

Not only does the event study requirement serve illusory ends, but it also impedes meritorious actions unnecessarily.[409]  As this Part shows, requiring post-transaction declines for securities fraud actions enables savvy defendants to conceal fraudulent conduct.  Moreover, securities class actions serve the convenience of the parties, encourage efficient judicial administration,[410] and promote the market's integrity by supplementing otherwise deficient SEC enforcement.  Also, private securities class actions compensate harmed investors, providing a much needed remedy when there has been a wrong.  Last, it is important to note that increased securities trials may actually serve to lower securities litigation costs.

### a.  Letting the Air out of the Inflation Balloon: Requiring Post-Transaction Decline Enables Concealment of Fraud.

Requiring that plaintiffs offer an event study that links post-transaction price decline to the defendant's fraudulent conduct provides a ready tool with which defendants can conceal fraud.  Because the plaintiffs must link the disclosure of the fraud to a drop in the stock price, sophisticated defendants can release information in such a way that their fraud will be revealed to the market through innocuous appearing announcements, and only then when the fraudulent information has been fully corrected in the market price, announce that a fraud occurred.[411]  "If plaintiffs must establish that the defendants' fraud caused a post-disclosure price correction, then a savvy entity could escape liability for its fraud that clearly harmed investors."[412]  In-

---

[409]  See Rudman, *supra* note 1 ("The disadvantage that *Oscar's* holding causes to investors is evidenced by the decisions of the district courts in the Fifth Circuit that have followed *Oscar's* approach in requiring proof of loss causation at class certification.  These district court decisions have led to premature dismissal of potentially meritorious claims, thereby leaving injured plaintiffs without possibility of recovery.").

[410]  Eisen v. Carlisle & Jacqueline, 417 U.S. 156, 185 (1974) (Douglas, J., concurring in part, dissenting in part).

[411]  Kaufman, *Loss Causation Revisited, supra* note 329.

[412]  *Id.* (internal citations omitted); *see also* Thorsen, *supra* note 12, at 120 (stating that this approach gives defendants a wild card and encourages companies to affirmatively guide down expectations to mute the effect of fraud); Coughlin, *supra* note 305, at 26 (warning of the

deed, this was the exact allegation in a recent securities fraud case before the Eighth Circuit Court of Appeals in *In re Ceridian*.[413]  In *In re Ceridian,* the plaintiffs alleged that the defendant corporation announced that it was restating its financial statements five times over two years and that it calibrated the restatements to "leak this information in bits and pieces to walk the stock price down, thereby avoiding the catastrophic impact of a single cumulative disclosure of massive accounting violations."[414]

Additionally, in cases of clear fraud, if the stock price substantially declines prior to a formal announcement of fraud, leaving little room for further decline after the fraud is announced, plaintiffs suffering from legitimate harm have no remedy.[415] An event study requirement assumes that "undisclosed fraud [is] an ordinary market risk that investors are expected to bear.  This logic is entirely contrary to the purpose of the federal securities law—to prevent that particular risk from entering into the marketplace *in the first instance*."[416]  As the Supreme Court in *Basic* stated, "a fundamental purpose of the various Securities Acts was to substitute a philosophy of full disclosure for a philosophy of caveat emptor and thus to achieve a high standard of business ethics in the securities industry."[417]

### b. Private Actions Supplement Otherwise Deficient SEC Actions.

Additionally, private causes of action for securities fraud serve two vital functions as they relate to the Securities and Exchange Commission ("SEC"): (1) they supplement enforcement efforts; and (2) they ensure against agency capture by the industry.[418]

First, private causes of action supplement the SEC's securities regulation enforcement power.[419]  Private and public enforcement is complementary: both securi-

---

risk of a sophisticated entity, adept at committing fraud, and adept at concealing it, walking down the stock price with selective disclosures to avoid a sudden stock-price reaction).

[413]   *In re* Ceridian Corp. Sec. Litig., 542 F.3d 240, 245 (8th Cir. 2008); Coughlin, *supra* note 305, at 27-31 (discussing three additional real world problems focusing exclusively on disclosure-induced stock drops, including Enron, WorldCom, and HealthSouth).

[414]   *In re Ceridian Corp. Sec. Litig.,* 542 F.3d at 245.

[415]   Eisenhofer, *supra* note 83, at 1441-42; *see also* Thorsen, *supra* note 12 (stating that requiring a disclosure that precisely reverses the prior misrepresentation deprives persons who actually suffered inflationary loss from any recovery).

[416]   Thorsen, *supra* note 12, at 120 (emphasis added).

[417]   Basic, Inc. v. Levinson, 485 U.S. 224, 234 (1988) (citing SEC v. Capital Gains Research Bureau, Inc., 375 U.S. 180, 186 (1963)).

[418]   Samuel Issacharoff, *Regulating After the Fact*, 5 DEPAUL L. REV. 375, 379 (2007).

[419]   *In re* Seagate Tech. II Sec. Litig., 843 F. Supp. 1341, 1350 (N.D. Cal. 1994) ("[T]he class action device is viewed as a necessary and desirable supplement to enforcement efforts of the Securities and Exchange Commission.").  The risk of restricting shareholders' ability to combat fraud through private litigation becomes especially critical in light of the heavy burden

ties plaintiffs' attorneys and the SEC seek to recover damages on behalf of investors for violations of the securities laws.[420] Private securities class actions have been justified as a necessary supplement to SEC enforcement because the SEC cannot monitor the nation's markets alone.[421] Congress has recognized this through its enactment of the PSLRA.[422]

Moreover, the SEC, as a government organization, is limited by other bu-

---

already placed on regulators who are not in a position to replace the efforts of private attorneys general. Hufford, *supra* note 369, at 638. "There is little dispute about the centrality of private actions in enforcing the complex web of securities law. Indeed, the most sophisticated critical assessments of securities laws turn not on the lack of public enforcement, but on the insufficiency of private enforcement to deter misconduct as a result of complicated incentive structures . . . ." Issacharoff, *supra* note 418, at 381.

[420]    Hufford, *supra* note 369, at 596; Luis A. Aguilar, SEC Commissioner, Speech at North American Securities Administrators Association's Winter Enforcement Conference: Empowering the Markets Watchdog to Effect Real Results (Jan. 10, 2009), *available at* http://www.sec.gov [hereinafter Aguilar, Empowering the Markets] ("The SEC's mission is very clear. It is to protect investors; maintain fair, orderly and efficient markets; and facilitate capital formation.").

[421]    *See, e.g.*, Marcy Gordon, *SEC Enforcement Chief Linda Thomsen Leaving Amid Criticism of Agency's Failure in Madoff Case*, CHI. TRIB., Feb. 9, 2009, *available at* www.chicagotribune.com/business/sns-ap-enforcement-chief-resignation,06505866.story (stating that the SEC Commission was a lightning rod of criticism for the SEC's failure to detect a fifty billion dollar Ponzi scheme despite red flags raised by outsiders over the course of a decade); Amit R. Paley & David S. Hilzenrath, *SEC Chief Defends His Restraint*, WASH. POST, Dec. 24, 2008, at A1, http://www.washingtonpost.com/wp-dyn/content/article/2008/12/23/AR2008122302765_pf.html (stating that the SEC failed to detect the fraud of the largest Ponzi scheme in history); Theo Francis, *SEC's Cox Catches Blame for Financial Crisis*, BUS. WEEK, Sept. 19, 2008, *available at* http://www.businessweek.com/print/bwdaily/dnflash/content/sep2008/db20080918_764469.ht m (quoting the former head of the Congressional Budget Office as stating that the SEC "failed in its most fundamental oversight and surveillance functions."); Nicholas Rummell, *Tumble in Restatements Sparks Criticism of SEC*, FIN. WEEK, Aug. 25, 2008, *available at* http://www.financialweek.com (stating that a steep decline in restatements and material weaknesses in 2008 was more to do with a sleepier securities watchdog than with compliance with the Sarbanes-Oxley Act). There is also evidence that the SEC suffers from certain behavioral biases. Stephen J. Choi & A.C. Pritchard, *Behavioral Economics and the SEC*, 56 STAN. L. REV. 1, 20-37 (2003) (cataloguing behavioral biases, such as bounded search, bounded rationality, availability and hindsight, framing, overconfidence, confirmation, and group think biases, that plague the SEC). While there is no indication that these same biases do not also affect private enforcers, plural forms of enforcement of the securities laws lessens the likelihood that one bias will dominant effective enforcement.

[422]    *See* Geoffrey C. Rapp, *Beyond Protection: Invigorating Incentives for Sarbanes-Oxley Corporate and Securities Fraud Whistleblowers*, 94 B.U. L. REV. 91, 105 (2007) ("Congress could have simply eliminated private rights of action with the PSLRA, but chose not to. Congress found that private securities litigation amounted to an indispensable tool that promotes public and global confidence in our capital markets and helps deter wrongdoing.") (quotations omitted).

reaucratic barriers absent from private enforcement.[423]  Until recently, bureaucratic constraints caused SEC investigations and subpoenas to logjam.[424]  An additional vice of public enforcement—absent from private attorneys general—is that the SEC as an enforcement agency has been hampered with inadequate funding.[425]  The SEC is annually appropriated and apportioned, subjecting it to political pressures virtually year round.[426]  As one SEC Commissioner noted: "In the last few years, the Enforcement Division of the SEC has been coping with less staff and fewer resources. This is clearly not what has been needed in a time of deregulation and clearly not what Congress had in mind when it enacted Sarbanes-Oxley."[427]  Indeed, by 2006, SEC staff turnover was at its highest level in five years and the number of attorneys in well-staffed enforcement groups dwindled.[428]  From 2005 to 2008, the total number of attorneys able to investigate fraud cases decreased by ten percent.[429]  The SEC's budget allocation has been relatively flat from 2005 to 2008 as well.[430]  A stagnant SEC budget has had severe consequences.[431]  Compare the SEC's budget with that of the FDIC's:

> With often less than $900 million in hand and approximately

---

[423]   Gordon, *supra* note 421 (stating that there were serious questions about the impartiality and fairness of the SEC's investigation of alleged insider trading scheme for a hedge fund and claiming there was alleged political interference into the investigation by agency officials); Paley & Hilzenrath, *supra* note 421, at A01 (describing how SEC Chief, Christopher Cox, agreed to three-week ban on short selling because of intense pressure from the Treasury Secretary and Federal Reserve Chairman); Issacharoff, *supra* note 418, at 381 (stating that private enforcement frees individuals from dependence on collective bureaucratic remedies and gives them a personal stake in administering justice).

[424]   Aguilar, Empowering the Markets, *supra* note 420.  However, newly appointed Mary Schapiro has changed this bureaucratic structure by replacing antiquated approval orders with 'permission slips' to be approved by a single member of the Commission rather than all five.  Mary L. Schapiro, SEC Chairman, Address to Practising Law Institute's 'SEC Speaks in 2009' Program (Feb. 6, 2009) (transcript available at http://www.sec.gov).

[425]   Paley & Hilzenrath, *supra* note 421, at A01 (quoting Colleen M. Kelly, the president of the National Treasury Employees Union, as stating that there have not been enough resources or staffing over the years for the SEC to oversee the number of companies for which it is responsible).

[426]   Aguilar, Empowering the Markets, *supra* note 420.

[427]   *Id.*  The SEC has had to freeze hiring as well to keep pace with year-to-year expense increases. *Id.*

[428]   *Id.* (noting that enforcement groups composed of fifteen lawyers often had only seven or eight lawyers by 2006).

[429]   *Id.*

[430]   *Id.* (stating that the budget was 888 million in 2005, 888.1 in 2006, 888.6 in 2007, and 906 million in 2008).

[431]   Luis A. Aguilar, SEC Commissioner, Remarks at the 'SEC Speaks in 2009': Increasing Accountability and Transparency to Investors (Feb. 6, 2009) (transcript available at http://www.sec.gov) [hereinafter Aguilar, Increasing Accountability] (stating that a stagnant SEC budget results in a limited hiring ability, difficulty in retaining adequate staff, limited technological advancements, curbed development, and limited ability to initiate new programs and investigations).

3,500 staff, the SEC is tasked with regulating tens of thousands of entities including public companies, investment advisers, broker-dealers, transfer agents, exchanges, credit rating agencies, and several SROs. . . . [T]he FDIC has a staff of 5,000 to oversee 8,300 FDIC insured banks with a budget in the range from $1.2 to $2.2 billion dollars. Moreover, the FDIC is independently funded and thus, has control over its own budget and long term projects.[432]

In 2009 SEC Commissioners acknowledged that the SEC has been disempowered and the focus of the SEC has been on cases with little market reach.[433] As a result, private enforcement fills this gap. A recent study from NERA Economic Consulting indicates that this is precisely what happens: "[M]ost SEC settlements do not parallel shareholder class actions. In 2007, only 22% of SEC settlements were with public companies or their employees and related to misstatements, and were therefore closely comparable to shareholder class actions."[434] Thus, where public enforcement stops, private enforcement picks up, providing holistic regulation of the securities markets.

Aside from bureaucratic barriers, there now exists some support for the tentative hypothesis that SEC officials may not engage in truly impartial enforcement; in other words, there is evidence of agency capture.[435] For example, a recent study concludes that the SEC pursues broker-dealer violations by initiating administrative proceedings as opposed to civil lawsuits to avoid courts because they are a worse fo-

---

[432] Aguilar, Increasing Accountability, *supra* note 431.

[433] Aguilar, Empowering the Markets, *supra* note 420 (calling for empowerment of enforcement staff and a concentration of resources on cases with greater market reach).

[434] Jan Larsen et al., *SEC Settlements: A New Era Post-Sox*, NERA Economic Consulting, 7 (Nov. 2008), *available at* http://www.nera.com/image/Settlements_Report_8.5x11_1108.pdf. A recent study by Pricewaterhouse Coopers reports that there was a five percent *decrease* in SEC involvement with the filings of securities class actions. Pricewaterhouse Coopers, LLP, *2008 Securities Litigation Study*, at 32, *available at* http://10b5.pwc.com/PDF/NY-09-0894%20SECURITIES%20LIT%20STUDY%20FINAL.PDF. In fact, the last time SEC involvement was as low as it has been in 2008 and 2007 was as far back as 1999. *Id.*

[435] Stavros Gadinis, *Is Investor Protection the Top Priority of SEC Enforcement? Evidence from Actions Against Broker-Dealers*, 5 (HARV. JOHN M. OLIN CTR. FOR LAW, ECON., AND BUS. FELLOWS, Working Discussion Paper No. 27, 2009, *available at* http://www.law.harvad.edu/programs/olin_center/). *See also* Lucian Arye Bebchuk & Zvika Neeman, *Investor Protection and Interest Group Politics*, 28-33 (HARV. JOHN M. OLIN CTR. FOR LAW, ECON., AND BUS. FELLOWS, Working Discussion Paper No. 603, Nov. 1, 2008, http://ssrn.com/abstract=1030355) (discussing how lobbying by interest groups can affect the level of investor protection). The authors of this Article truly doubt that such behavior is intentional. Nevertheless, the fact that it occurs is disconcerting.

rum for finance professionals.[436]  In addition, in administrative cases, the study concludes that for the same violation and comparable levels of harm to investors, big firms and their employees are less likely to receive a ban from the securities industry when compared to small firms and their employees.[437]  The study then discredits the possibility that these enforcement disparities can be explained by the arguably better compliance systems larger firms have in place by finding that small and big firm violations for failing to supervise subordinates were virtually indistinguishable.[438]  Last, the study connects the enforcement disparity to post-SEC career trajectories of agency officials.[439]  As a result, the study concludes that SEC officials may be responding to future employment prospects by giving prospective employers favorable treatment.[440]

The public/private partnership that has evolved contributes to a more comprehensive enforcement of the securities laws.[441]  Corporate officials will have a strong desire to avoid accusations of fraud, even if they come only in the form of a private securities lawsuit.[442]  Thus, private securities class actions empower an otherwise impotent class of harmed investors that may have been lost in the bureaucratic shuffle or self-serving aims of SEC officials.[443]

### c. Securities Class Actions Compensate Investor-Plaintiffs.

Private securities class actions supplement SEC enforcement, while also compensating injured investors.  "With more investment opportunities available including increasingly complex financial products, and more investors relying on managers and other intermediaries, the need for honesty and integrity is greater than ever.  Investor confidence has been badly shaken, and we need to reestablish stability by returning to the bedrock principle that the capital markets should be known for

---

[436]  Gadinis, *supra* note 435, at 4.

[437]  *Id.*

[438]  *Id.* at 5.

[439]  *Id.*

[440]  *Id.*  The problem of revolving doors in government practice comes as no surprise as even lawyer ethics rules address such concerns.  *See* MODEL RULES OF PROF'L RESP. 1.9, 1.10, 1.11.  However, affording different SEC sanctions based on employment prospects does not serve any legitimate public policy.

[441]  LaCroix, *supra* note 385 (paraphrasing Professor James Cox's debate at the Forum for Institutional Investors).

[442]  LaCroix, *supra* note 385.  Indeed, corporate officials have more of a desire to avoid private accusations of fraud as those accusations may raise the specter of SEC enforcement.

[443]  Nancy Trejos, *Irate Investors Filing More Class-Action Lawsuits*, L.A. TIMES, Jan. 20, 2009, *available at* http://www.latimes.com/business/la-fi-investsuits20-2009jan20,0,4581867,print.story ("To cut down on legal expenses and exert their power in numbers, investors are banding together in securities class-action lawsuits.").

their integrity and honesty."[444] Yet "a securities class-action plaintiff must thread the eye of a needle made smaller and smaller over the years by judicial decree and congressional action."[445]   As Justice Stevens has recognized, plaintiffs wronged in the market should have a remedy.[446]   A recent news report claims that securities class-action plaintiffs claim that they have lost as much as $856 billion dollars.[447]

Despite these astounding losses, scholars criticize securities class actions, claiming that they serve no valid compensatory function.[448] The seminal criticism of securities fraud class actions claims that active traders with diversified portfolios are as likely to be on the gaining side of a transaction tainted by securities fraud as on the losing side.[449]   In other words, as often as an investor loses five dollars on account of fraud, that same investor is just as likely to gain five dollars on account of fraud. Thus, under this portfolio theory diversified investors have no expected net losses from fraud because their expected losses will match their expected gains.[450]   Howev-

---

[444]   Aguilar, Empowering the Markets, *supra* note 420.  Commissioner Mary L. Schapiro noted in a speech given in February:

Trillions of dollars of wealth have been lost.  Our economy is in recession.   And investor confidence has been badly shaken.   Middle-class families who were relying on that nest egg to send a son or daughter to college or for a secure retirement now don't know where to turn.

Schapiro, Address to Practising Law Institute, *supra* note 424.

[445]   Ala. Elec. Pension Fund v. Flowserve Corp., 572 F.3d 221, 235 (5th Cir. 2009).

[446]   Stoneridge Invs. Partners, LLC v. Scientific-Atlanta, Inc., 552 U.S. 148, 180 (2008) (Stevens, J., dissenting) ("Congress enacted § 10(b) with the understanding that federal courts respected the principle that every wrong would have a remedy.").

[447]   Trejos, *supra* note 443.

[448]   Alicia Davis Evans, *The Investor Compensation Fund*, 33 J. CORP. L. 223, 225 (2007) (discussing Frank Easterbrook and Daniel Fischel's article concerning the inefficiency of securities class action damages).

[449]   Frank H. Easterbrook & Daniel R. Fischel, *Optimal Damages in Securities Cases*, 52 U. CHI. L. REV. 611, 642 (1985).  The fact that a large number of sophisticated, well-informed and profit motivated institutional investors continue to actively participate in these cases however indicates that these institutions believe that litigation is within their financial interest. LaCroix, *supra* note 385.  Indeed, in 2008, public and union pension funds were lead plaintiff in forty-eight percent of all cases filed during 2008.  Pricewaterhouse Coopers, LLP, *2008 Securities Litigation Study*, at 26,
http://10b5.pwc.com/PDF/NY-09-0894%20SECURITIES%20LIT%20STUDY%20FINAL.PDF.

Other critics contend that the private action serves only to transfer wealth from one shareholder to the next.  Coffee, *supra* note 367.  However, studies demonstrate that securities settlements typically fall within available insurance coverage, indicating that money is not going from just shareholder to shareholder.  Baker & Griffith, *supra* note 406, at 761 ("[T]he vast majority of securities claims settle within or just above the limits of the defendant corporation's D&O coverage."); *see also* James D. Cox, *Making Securities Fraud Class Actions Virtuous*, 39 ARIZ. L. REV. 497, 511-13 (1997).

[450]   Evans, *The Investor Compensation Fund, supra* note 448, at 225 (citing Frank H. Eas-

er, as Professor Alicia Davis Evans ascertains, "securities fraud can cause substantial injury to investors of all types. Compensation, therefore, is justified to make those investors whole."[451] Professor Evans first establishes that there is a fundamental *asymmetry* from a market's reaction to fraudulent announcements.[452] For gains and losses to be equivalent over time, according to Evans, an investor must find himself on the winning side of fraud-tainted trades more, by dollar volume, than the investor finds himself on the losing side because losses of investors on the losing side of trades tainted by fraud likely exceed the gains of the investors on the winning side of these trades.[453] An oversimplified explanation of Evans's assertion would be as follows: Gains from fraud-tainted trades amount to only five dollars, but losses from fraud-tainted transactions amount to ten dollars. Thus, for gains to equal losses, there must be twice as many fraud-tainted gains to offset the fraud-tainted losses.

Second, according to Evans, even large, diversified investors are not immune to this asymmetry and can suffer substantial losses.[454] Evans explains that the findings from a 2005 U.S. Chamber of Commerce Institute for Legal Reform indicate that it is possible for gains and losses to be significantly different for even large, diversified investors.[455] Moreover, even if a diversified institutional investor could come out ahead, at a minimum, this does not apply to the initial public offering and merger-and-acquisition contexts.[456] Third, Evans clarifies that even losses of buy-and-hold investors are likely to exceed any gains from fraud because one must sell stocks with prices that are inflated by fraud as often as one buys stocks with prices that are inflated by fraud.[457] Last, Evans notes that the portfolio theory only applies to diver-

---

terbrook & Daniel R. Fishel, *Optimal Damages in Securities Cases*, 52 U. CHI. L. REV. 611, 641 (1985)).

[451] *Id.* at 228.

[452] *Id.* at 229. Consumers of all types, whether they are buying orange juice or eggs, exhibit this asymmetrical behavior, overacting to bad news. ORI BRAFMAN & ROM BRAFMAN, SWAY: THE IRRESISTIBLE PULL OF IRRATIONAL BEHAVIOR 17-19 (2008) (discussing purchasers' more intense reaction when the price of eggs and juice rises as compared with purchasers' reaction when the price drops).

[453] Evans, *The Investor Compensation Fund*, supra note 448, at 229. Additionally, the "portfolio theory is not raised as an objection to other types of commercial litigation where one company sues another to recover damages. The same pocket shifting argument could be applied to all commercial litigation, but no one is suggesting that all commercial litigation be eliminated as unjustified under the portfolio theory." LaCroix, *supra* note 385 (paraphrasing Professor Cox).

[454] Evans, *The Investor Compensation Fund*, supra note 448, at 230.

[455] *Id.* at 231.

[456] LaCroix, *supra* note 385 (discussing Professor Cox's statements at the Forum for Institutional Investors).

[457] Evans, *The Investor Compensation Fund*, supra note 448, at 232. Professor Evans sets forth the following hypothetical to illustrate:

Imagine the extreme case of the buy-and-hold investor that buys, but never sells (i.e., she holds the stocks in her portfolio until infinity). If this

sified investors and that undiversified investors can suffer substantial harm from securities fraud. [458] Thus, concluding that there is an ascertainable wrong, there ought to be a remedy.[459]

Further, Congress has indicated that securities actions serve a compensatory purpose. In 2002, Congress enacted Section 308 of Sarbanes-Oxley ("SOX"), or the "Fair Fund Provision."[460] The Fair Fund Provision established a system whereby the SEC could distribute funds recovered from civil penalties for federal securities law violations.[461] The Fair Fund Provision has been used as a flagstaff for the business community's campaign against private actions; because the SEC can collect funds for injured investors, private litigation is unnecessary.[462] The presence of this Fair Fund Provision, however, actually aids the argument for private enforcement. The pres-

---

investor purchases a stock with a price that is inflated by fraud, the amount of this overpayment will never be recouped by a gain from selling a stock that also has an inflated price. This investor never sells. It is, of course, somewhat unrealistic to speak of an investor that never sells stock. Liquidity needs prompt virtually every investor to sell some stock eventually. However, the net buyer (rare seller) is not likely to have equivalent gains and losses from fraud. Thus, it is clear that this type of investor, who is following rational investment strategy, is not going to be economically indifferent to the incidence of fraud.
Id.

[458]  Id. at 235-36. This point should not be readily dismissed. In an age where stock trading is within the keystrokes of almost every individual, see E*Trade, more and more unsophisticated investors will be able to dabble in market investment who lack the wherewithal to develop a diversified portfolio.

[459]  Evans, The Investor Compensation Fund, supra note 448, at 235-36.

[460]  Sarbanes-Oxley, § 308, 15 U.S.C. § 7246(a) (2002). Section 308(a) states that if in any judicial or administrative action brought by the SEC under the securities laws the SEC obtains an order requiring disgorgement against any person for violating any such securities laws or regulations, or such a person agrees in settlement of such actions to disgorgement, and the SEC obtains a civil penalty against such person, the amount of that penalty shall become part of a disgorgement fund for the benefit of the victims of such violations. Id.

[461]  Id.

[462]  Barbara Black, Should the SEC be a Collection Agency for Defrauded Investors?, 63 BUS. LAW. 317, 319 (2008). Professor Black maintains that the recovery should not be a primary aim of the SEC's enforcement policy however, because the SEC has many other competing considerations—such as the enforcement of aiding and abetting liability, enforcement against small companies, and enforcement against individuals—that are essential to ensuring the integrity of American financial markets. Id. at 342-45.

Black's hypothesis appears to be supported by data. While during 2007 the SEC saw its first increase in new accounting-related litigation since the enactment of SOX in 2002, in 2008, the number of new accounting-related litigation releases fell once again. Pricewaterhouse Coopers, LLP, 2008 Securities Litigation Study 36 (2009), http://10b5.pwc.com/PDF/NY-09-0894%20SECURITIES%20LIT%20STUDY%20FINAL.PDF. Correlatively, in 2008, the SEC reached record settlements in the history of the SEC. Id. at 38.

ence of this Fair Fund Provision indicates Congress's recognition that plaintiffs do indeed suffer damages and that securities actions serve a compensatory function. If securities actions did not compensate investors, this Fair Fund Provision of SOX would be just as futile and detrimental as private recovery. The Fair Fund Provision provides an emphatic "yes" to whether compensating investors is ever a worthwhile goal. This, taken together with the above assertion that private enforcement supplements otherwise deficient SEC actions, establishes a compelling compensatory basis for private securities fraud actions.[463]

### d.    Additional Securities Fraud Suits Will Not Inevitably Result in a Flood of Expensive Suits.

Last, it is important to address the concern that absent heightened pleading and evidentiary requirements, such as the event study requirement, too many securities fraud actions will proceed to trial. Yet an increase in securities fraud trials and a proper interpretation of summary judgment – the one offered by Professor Thomas – would not result in the hyperbolic parade of horribles.[464] Professor Thomas notes that summary judgment is used in a limited set of cases and the presence or absence of summary judgment would not affect litigants' desire to settle.[465] The absence of the rigorous summary judgment standard currently in place may encourage settlement to remove the possibility of outlier jury verdicts from trials.[466] Yet there is a particular concern in securities cases that any procedural standard which is less than rigorous would encourage plaintiffs to file more cases with weak evidence. Thus, the absence of the current summary judgment device would lead to more frivolous claims. But the absence of summary judgment for securities actions in particular would not result in a deluge of meritless claims and excessive jury verdicts. Currently, more securities class actions are dismissed at the motion to dismiss stage.[467] The majority of remaining cases settles *before* getting to the summary judgment stage.[468]

---

[463]   *See supra* Part VI.B.2 (stating that the SEC is marred by bureaucratic red tape and other agency restrictions absent in private enforcement). The SEC as a source of compensation only makes sense in limited circumstances: (1) when no private right of action exists, or (2) when public enforcement is cheaper than a private action. Verity Winship, *Fair Funds and the SEC's Compensation of Injured Investors*, 60 FLA. L. REV. 1103, 1131–41 (2008).

[464]   Thomas, *Why Summary Judgment is Still Unconstitutional: A Reply, supra* 251, at 1684.

[465]   *Id.*

[466]   *Id.*

[467]   Markedly, Cornerstone Research reports that among class actions resolved after filing in 2005, forty-one percent were dismissed. Cornerstone Research, *Securities Class Action Filings:    2008    A    Year    in    Review*,    16    (2008),    *available    at* http://securities.cornerstone.com/pdfs/YIR2008.

[468]   *Id.*

In other words, on a purely quantitative basis, the presence or absence of summary judgment will not have a significant effect.

Additionally, the absence of summary judgment may actually *lower* securities litigation and settlement costs. First, refusing summary judgment frees significant judicial resources.[469] The courts will no longer have to review evidence presented on motions for summary judgment and litigants will no longer have to go through the expense of preparing a motion for summary judgment. Second, by encouraging securities fraud actions to go to trial, settlement amounts may lower on average. In a recent article by Tom Baker and Sean J. Griffith, the authors insightfully demonstrate how additional verdicts can result in lower settlements.[470] Consider the following:

Current securities fraud settlements are based on available insurance coverage.[471]

Insurance policies cover expected losses, which in turn are based on predicted jury verdicts.

Additional securities verdicts resulting in findings for the defendants, or just lower than sought after damages, would add additional *lower* figures upon which insurers can base their coverage policies.[472]

Less available insurance coverage would translate into lower securities fraud settlements.

In other words, additional data—findings for the defendant or low verdicts—can lower sought after damages. But because so few securities fraud lawsuits actually result in a verdict,[473] there is little data upon which to gauge the likelihood of

---

[469]  Thomas, *Summary Judgment*, *supra* note 252, at 178-79.

[470]  Baker & Griffith, *supra* note 406.

[471]  *Id.* at 761 ("[T]he vast majority of securities claims settle within or just above the limits of the defendant corporation's D&O coverage.").

[472]  *See id.* at 786. "If, as is generally the case, D&O insurance limits are significantly lower than potential investor losses, then average settlements will tend to be pulled down to a range closer to typical policy limits. Average settlement amounts thus reflect trends in D&O insurance policies as much as they do the severity of corporate fraud." *Id.* at 805.

[473]  Tom Baker & Sean J. Griffith state:

> Trial . . . is virtually unheard of. In an empirical study going back to 1980, a period in which thousands of securities fraud cases were filed, Black, Cheffins, and Klausner found only thirty-seven securities law cases seeking damages they were tried to judgment. RiskMetrics' Securities Litigation Watch reports that only six cases have gone to trial since 1996. The JDS Uniphase trial in late 2007 would appear to be the exception that proves the rule. As a result, once a claim survives a motion to dismiss, all involved know the odds strongly favor an eventual settlement.

success of an action.[474]  The lack of securities fraud trials "skew[s] the process of settlement by which most cases have ended and continue to end.  [The] loss is disorienting for lawyers seeking to value and settle cases: without trials we would have a context suffused with legal uncertainty because the disputing parties' assessment of both the merit and magnitude of their case would correspond only coincidentally."[475]  Thus, as of now, securities settlements and available insurance coverage may overestimate a securities plaintiff's true likelihood of recovery.  Additional verdicts may set a lower benchmark for securities class action settlements.  Therefore, additional securities fraud trials may lower securities litigation costs.

### VII. Conclusion.

A reliable event study is now the crux of a securities fraud action.  A reliable event study can demonstrate a material disparity, reliance on the market price, and economic loss and loss causation by subsequent price movement.  The essential elements of a securities fraud claim have been folded into a single question: whether the plaintiff has offered a reliable event study.  A plaintiff who fails to put forth an event study analysis by a qualified expert has little chance of success.  Perhaps seduced by the illusion of certainty created by a statistical regression analysis, the federal courts have begun to bar victims of securities fraud from pursuing otherwise valid claims if they cannot produce this analysis before trial.  As demonstrated by this Article, however, this event study requirement poses considerable Seventh Amendment concerns and is inconsistent with the federal securities laws.  The requirement undoubtedly will preclude juries from assessing the proper measure of damages to award to the victims of securities fraud who have otherwise proven each of the essential elements of their securities fraud claims.  It serves illusory aims at the expense of inhibiting merited securities claims.

---

*Id.* at 776 (internal citations omitted).
[474] BURNS, *supra* note 283, at 89, 91.
[475] *Id.* at 120.