# Exhibit 232



# U.S. COMMODITY FUTURES TRADING COMMISSION
Three Lafayette Centre
1155 21st Street, NW, Washington, DC 20581
*www.cftc.gov*

Office of Proceedings

RECEIVED CFTC

Office of Proceedings
Proceedings Clerk
1:31 pm, Oct 16, 2019

|  |  |
|---|---|
| SHANNON D. O'BRIEN, <br> Complainant, <br><br> v. <br><br> FOREX CAPITAL MARKETS, <br> LLC, d/b/a FXCM, <br> Respondent. | \* <br> \* <br> \* <br> \* <br> \* <br> \* <br> \* <br> \* <br> \* <br> \* |

CFTC Docket No. 17-R006
**Served electronically**

## <u>INITIAL DECISION &</u>
## <u>ORDER DISMISSING THE COMPLAINT</u>

*Before:*   Kavita Kumar Puri, Judgment Officer
Commodity Futures Trading Commission
Washington, D.C.

*Appearances:*   Shannon O'Brien, *self-represented litigant*
Syracuse, NY
For Complainant

William Johnson, Esq.
Israel Dahan, Esq.
King & Spalding LLP
New York, NY
For Respondent

Shannon O'Brien, appearing in this forum as a self-represented litigant and

by way of a summary proceeding, seeks between $26,853 and $30,000 in damages

for his "trading commissions" over the life of his account.[1]  He alleges these losses

---

[1] *See* Compl. Schedule A.  Complainant's actual purported trading commissions amount to
$36,757.24, but he elected to limit his damages claim in order to use the summary

were caused by "the willful deception in connection with services rendered." Compl.
Schedule A (Feb. 8, 2017).  This deceptive practice is, according to Complainant,
related to "[t]he utilization of HFT Co. as a liquidity provider," which posed a
"conflict of interest" that was not disclosed.  Compl. Schedule B (Feb. 24, 2017).

To substantiate these allegations, O'Brien attaches:  (1) a schedule of his
losses and commissions from 2012 through 2017; (2) an FXCM Summary Statement
from November 29, 2012 through February 24, 2017; (3) an unattributed, undated
article entitled *FXCM and CEO Drew Niv Banned from US:  Full details of FXCM's
several years of trading against customers;* (4) an article posted on the Zero Hedge
blog entitled *Largest Retail FX Broker FXCM Banned By CFTC, Fined $7 Million
For Taking Positions Against Clients* (Feb. 6, 2017); (5) and an alert from
www.forexscamalerts.com entitled *FXCM Permanently Banned From The USA –
Fined $7 Million* (August 29, 2017).

In its defense, FXCM produced FXCM's 10-K for the fiscal year ending
December 31, 2014 (FXCM 2014 10-K); an FXCM client agreement, dated October
26, 2012 (FXCM Client Agreement); an FXCM Annual Report for 2010 (FXCM 2010
Annual Report); the Commodity Futures Trading Commission's Order Instituting
Proceedings Pursuant to Sections 6(c) and 6(d) of the Commodity Exchange Act,
Making Findings, and Imposing Remedial Sanctions, CFTC Dkt. No. 17-09 (Feb. 6,
2017) (CFTC Consent Order); and a declaration by Evan Milazzo, Chief Technology

---

decisional procedure.  He elected to limit his damages even further in his Response to
Respondent's Motion for Summary Judgment and Cross Motion for Summary Judgment
(August 29, 2017).

Officer of FXCM from 2002 through December 2016, dated May 17, 2017, attesting that O'Brien received the best bid or offer available from FXCM's eligible liquidity providers, including trades in which HFT Co. (HFT) served as the liquidity provider.

After carefully considering the record, I am dismissing the Complaint.

## I. Summary of Parties and Proceedings

### A. The Parties

Complainant Shannon O'Brien is a resident of Syracuse, New York. Although he does not state when and with what amount he opened an account with Respondent, he does attach a schedule of trading losses and commissions starting in 2012, Compl. Schedule A, as well as a statement summary from November 29, 2012 through February 24, 2017, Compl. Schedule B.

Respondent Forex Capital Markets d/b/a/ FXCM (FXCM) was registered with the Commission as a Futures Commission Merchant (FCM) and Retail Foreign Exchange Dealer (RFED), until March 10, 2017. *See* NFA Basic Research, *available at* https://www.nfa.futures.org/basicnet/Details.aspx?entityid=uy8vi7mVysc%3d&r n=N. On February 6, 2017, the Commission entered the CFTC Consent Order with FXCM finding, among other things, a conflict of interest existed from its "pay-for-flow" agreement with HFT. *See infra* at 5-6. In accordance with the settlement and Consent Order, FXCM has been permanently barred from registering with the Commission and NFA since March 10, 2017. *Id.*

B. Procedural History

O'Brien filed his Complaint on February 8, 2017, and a complaint supplement on February, 24, 2017.  Respondent FXCM filed its Motion to Dismiss, Answer and Affirmative Defenses on May 19, 2017.  Eugene Smith, Director of this Office, denied that Motion on June 22, 2017.  Director Smith noted, however, that nothing prevented FXCM from refiling its motion once the case had been formally assigned to my docket.  Respondent refiled its Motion to Dismiss on August 8, 2017, after the case was assigned to me for adjudication.

Discovery then commenced.  O'Brien requested no discovery of FXCM before the discovery deadline, which was August 30, 2017.  Notice of Summary Proceeding 4-5 (July 31, 2017).  FXCM, in contrast, served interrogatories, requests for admission, and document requests on August 16, 2017.  O'Brien did not answer these discovery requests except to append the three articles noted above and to enter a narrative response to FXCM's Motion to Dismiss.

In his response, O'Brien asserts that this forum is meant for "arbitration" and refers to me as the "arbitrator."  O'Brien Response and Cross Motion for Dismissal at 1-2.  He also implies that I am "in a position to know if HFT had the ability to 'see into' FXCM clients' existing positions."  *Id.*  He also states that the "crux of this proceeding will be . . . the lack of disclosures to customers, including [himself]," because "no rational person would ever place trades with a forex dealer wherein there was and did occur an undisclosed counter party."  *Id.* at 2-3

4

After carefully reviewing the parties' discovery submissions and pleadings, I am converting Respondent's Motion to Dismiss into a Motion for Summary Disposition, *see* Commission Rule 12.310, and dismissing the Complaint.

## II. Background Regarding Commission's Settlement with FXCM

Although O'Brien never expressly relies on the CFTC Consent Order, the allegations disclosed in that Order underlie this case and the articles that O'Brien did produce as evidence. That CFTC Consent Order was entered into on February 6, 2017 upon an Offer of Settlement made by FXCM, among others. FXCM neither admitted nor denied the following findings or conclusions set forth in the CFTC Consent Order.

According to the CFTC Consent Order, from September 4, 2009 through at least 2014, FXCM represented to its customers that if they traded through FXCM's No-Dealing Desk platform, FXCM's role in the transaction would pose no conflict of interest because the risk of those trades would be borne by independent liquidity providers. CFTC Consent Order at 2. In other words, contrary to FXCM's traditional model in which FXCM took positions opposite its customers' trades (in essence betting against their trades), FXCM's No-Dealing Desk model claimed to eliminate the inherent conflict of interest between it as the forex broker and its customer by using third-party market makers (or liquidity providers). *Id.* at 3. In this No-Dealing Desk model, therefore, FXCM's role would be reduced to an impartial credit intermediary with no stake in the outcome of the trade. *See, e.g.,* Motion to Dismiss Ex. 1 (FXCM 2014 10K) at 73.

However, one of those "independent" third-party market-makers—HFT—was launched by FXCM. Not only was HFT started by FXCM, but it remitted monthly payments to FXCM totaling about 70% of the profits HFT generated trading through FXCM's retail trading platform. CFTC Consent Order at 2-4. In other words, according to the CFTC Consent Order, HFT was sharing most of the profits it earned on FXCM's platform with FXCM itself. These "pay-for-flow" arrangements between HFT and FXCM allowed HFT to capture the largest share of FXCM's trading volume. *Id.* at 6. The Commission found that this relationship between HFT and FXCM meant that FXCM did have a conflict of interest when customers were trading through its No-Dealing Desk platform, contrary to its customer disclosures. *Id.* at 6-8. The agreements between FXCM and HFT were discontinued sometime in 2014, though the precise time is not specified in the record. Motion to Dismiss at 9; CFTC Consent Order at 2.[2]

### III. Findings of Fact

FXCM charged O'Brien $0 in commissions before August 1, 2014. *See* Compl. Schedule A; Resp. Ex. 5 (Milazzo Decl. ¶¶ 6-7 (May 17, 2017)). O'Brien paid commissions on his trading activity only between October 27, 2014 and August 24, 2015, and those amounted to $36,750. *Id.* ¶¶ 6, 10 & Attachment A (O'Brien Account Summary). However, of those total commissions, $9,897 were charged on

---

[2] Although O'Brien does not raise NFA's simultaneous action against FXCM, NFA also issued a Complaint against FXCM, among others, on February 6, 2017—the same day the CFTC Consent Order was issued—that alleged substantially the same facts, as well as the settlement agreement FXCM entered into with NFA on the same day. As in the CFTC Consent Order, FXCM settled NFA's charges without admitting them.

the No-Dealing Desk using a liquidity provider other than HFT. *Id.* ¶ 11. This leaves $26,853 in commissions in which HFT took either side of the trade. *Id.* ¶ 12. And O'Brien received the best prices available from FXCM's liquidity providers, including HFT, to fulfill these trades on the No-Dealing Desk. *Id.* ¶¶ 14-16 & Attachments B-C.

## IV. Legal Analysis and Conclusions

Reading O'Brien's complaint both liberally and generously, he argues that his losses stemmed from FXCM's nondisclosure of its relationship with HFT. He essentially contends that he would not have suffered any losses because he would have never opened an account with FXCM had he known about the relationship between FXCM and HFT. O'Brien Response and Cross Motion at 3. Respondent counters that this case should be dismissed because O'Brien cannot demonstrate the elements of fraud. I find that O'Brien's evidence of misconduct is not admissible to prove that misconduct, and that he has therefore not proven, by a preponderance of the evidence, misconduct by FXCM that proximately caused any or all of his account losses.

   A. <u>Because the CFTC Consent Order and Articles Referencing the Order Do Not Constitute Evidence of Misconduct in This Reparations Matter, O'Brien Has Not Proved, by a Preponderance of the Evidence, Any Violation of the CEA that Proximately Caused Him Damages.</u>

In order to show fraud under the CEA, a complainant must show that respondent "willfully deceive[d] or attempt[ed] to deceive the other person by any means whatsoever." CEA § 4b(a)(2); 7 U.S.C. § 6b(a)(2)). This deceit must be proved by a preponderance of the evidence. *In re Citadel Trading Co.*, CFTC Nos.

77-8, 80-11, 1986 WL 66170, *9 (CFTC May 12, 1986) (noting judge must determine "what the preponderance of the evidence shows most likely did happen").

Here, however, O'Brien does not provide any supporting evidence for his claims of fraud and non-disclosure other than articles describing the CFTC Consent Order.  But courts, including the Commission, have held that consent orders cannot be used as evidence in subsequent litigation because the consenting party has agreed to certain terms in exchange for the cessation of litigation—no court or adjudicatory forum has actually made any findings of fact as a result of litigation and the defendants neither admit nor deny the facts contained in those orders.  *See e.g.*, *United States v. Armour & Co.*, 402 U.S. 673, 681-682 (1971) (holding courts cannot read consent decrees as if "plaintiff established factual claims and theories in litigation"); *In the Matter of Mates*, CFTC Dkt. No. 79-10, 1980 WL 15665 at *3 (CFTC Dec. 2, 1980) (finding that because respondent "consented . . . to a statement of finding and  . . . certain sanctions solely for purposes of terminating the SEC action and without admitting any allegation of wrongdoing, [Commission] may not rely upon the order as evidence."); *Lipsky v. Commonwealth United Corp.*, 551 F.2d 887, 893 (2d Cir. 1976) ("[A] consent judgment between a federal agency and a private corporation which is not the result of an actual adjudication of any of the issues [cannot] be used as evidence in subsequent litigation between that corporation and another party.").[3]

_____

[3] This analysis does not address situations in which a settling party in fact admits the facts set forth in a Consent Order, which could constitute a public admission of wrongdoing.

In other words, no facts have been proven by the CFTC Consent Order where the settling party neither admitted nor denied the allegations. They therefore cannot be treated as proven facts in subsequent litigation. And if the CFTC Consent Order's allegations cannot be treated as facts, certainly the allegations contained in any articles describing that CFTC Consent Order cannot be admitted as facts in subsequent litigation.

Even assuming O'Brien had shown by a preponderance of the evidence that FXCM had deceived him, he has not shown that such deceit proximately caused him damages, as he must under 7 U.S.C. Section 18. "In determining whether proximate cause exists, the Commission looks . . . to whether the loss was a reasonably probable consequence of respondents' conduct." *Muniz v. Lassila*, CFTC No. 87-R395, 1992 WL 10629, *7 (CFTC Jan. 17, 1992) (internal quotation marks and citations omitted). But here there is no evidence that O'Brien's commissions were caused by FXCM's nondisclosure of its relationship with HFT other than O'Brien's assertion that he would not have invested with FXCM at all. And that assertion is weak. First, O'Brien received the best price with respect to his trades even when HFT was the liquidity provider, suggesting that the purported conflict of interest between HFT and FXCM had no adverse impact on his account. Given there was no adverse impact on his account, it is difficult to believe O'Brien nonetheless would have foregone doing all business with FXCM. Second, and more importantly, the purportedly inappropriate relationship between FXCM and HFT ceased some time in 2014, and all of O'Brien's supposed damages were incurred in

the period between October 27, 2014 and August 24, 2015. Without any evidence that the inappropriate relationship existed at the time his damages were incurred, non-disclosure of that relationship could not have caused those damages. In short, O'Brien's cursory response that he would not have invested with FXCM at all does not sufficiently tie his commissions (which is the measure of his damages) to the alleged nondisclosure by a preponderance of the evidence.

In fact, O'Brien never showed any intention to prosecute his claims in this reparations proceeding other than bringing to this Office's attention the CFTC Consent Order. He was expressly informed by the Office of Proceedings website that "*[t]he Judgment Officer will not investigate your case for you. You must collect and submit to the Judgment Officer* all information and evidence supporting your claim of a violation along with your calculation of damages." *See* https://www.cftc.gov/ConsumerProtection/reparationsprogram/index.htm. Despite this admonition, O'Brien failed to serve any discovery requests on FXCM, instead attempting to foist that responsibility on the Judgment Officer by arguing that the Judgment Officer would have better access to FXCM's records. But O'Brien never requested those records in the first place as he was both authorized and empowered to do. And he made no attempts to "prove any alleged violation proximately causing damages by a *preponderance of the evidence*" as this Office informed him he must. Notice of Summary Proceeding at 1 (July 31, 2017) (emphasis in original).[4]

---

[4] From his repeated reference to me as the "arbitrator" rather than "adjudicator" or "Judgment Officer," and his unwillingness to comply with the discovery requests submitted by FXCM, it appears he may have misunderstood the nature of these proceedings, despite having been notified of his burdens of proof and the procedures he was to use to meet those burdens.

## CONCLUSION

O'Brien's evidence of fraud is inadmissible and he has not proven a violation of the Commodity Exchange Act by a preponderance of the evidence.  Even if he had, he has failed to show any nexus between that purported fraud and his damages by a preponderance of the evidence.  Respondent's Motion to Dismiss is therefore GRANTED and O'Brien's case is DISMISSED.

Dated:  October 16, 2019

Kavita Kumar Puri
Judgment Officer

## U.S. COMMODITY FUTURES TRADING COMMISSION
Three Lafayette Centre
1155 21st Street, NW, Washington, DC 20581
*www.cftc.gov*

Office of Proceedings



RECEIVED CFTC

Office of Proceedings
Proceedings Clerk
**1:14 pm, Apr 16, 2020**

---

MARCUS JOHNSON,
    Complainant,

      v.

DROR NIV, alias DREW NIV, and
FOREX CAPITAL MARKETS,
LLC, d/b/a FXCM,
    Respondents.

\* \* \* \* \* \* \* \* \* \* \*

CFTC Docket No. 17-R010
**Served electronically**

---

## INITIAL DECISION &
## ORDER DISMISSING THE COMPLAINT

*Before:*      Kavita Kumar Puri, Judgment Officer
               Commodity Futures Trading Commission
               Washington, D.C.

*Appearances:*    Marcus Johnson, *self-represented litigant*
               Baltimore, MD
               For Complainant

               William Johnson, Esq.
               Israel Dahan, Esq.
               King & Spalding LLP
               New York, NY
               For Respondent

      Marcus Johnson, appearing in this forum as a self-represented litigant and

by way of a summary proceeding, seeks $2,987.44 in trading losses and commissions

over the life of his account.  He alleges these losses were caused by Respondents'

representation to its clients that trading on Forex Capital Markets LLC's (FXCM)

No-Dealing Desk platform, which uses third-party liquidity providers, did not create a conflict of interest between FXCM and its customers.  Compl.  He further alleges his damages are a result of Respondents' misrepresentations, execution slippage, and unauthorized trading between February 14, 2017 and February 17, 2017.  *Id.*; Complainant Response to Disc. Order (May 15, 2018).

To substantiate these allegations, Johnson attaches screenshots of:  (1) $7,995 in tuition he paid to Market Traders Institute, Inc.; (2) FXCM's client login portal; (3) an excerpt from FXCM's website detailing, among other things, a statement on "What is Forex" and FXCM's statement on "Fair and Transparent Execution"; (4) an excerpt from FXCM's website with a graph detailing Johnson's profits and losses for his account from June 27, 2016 through February 17, 2017 (from the account's inception to its closing); and (5) an excerpt from FXCM's website describing the performance for Johnson's account from June 27, 2016 through February 16, 2017.

In its defense, Respondents produced FXCM's 10-K for the fiscal year ending December 31, 2014 (FXCM 2014 10-K); an FXCM client agreement, dated October 26, 2012 (FXCM Client Agreement); the Commodity Futures Trading Commission's (CFTC) *Order Instituting Proceedings Pursuant to Sections 6(c) and 6(d) of the Commodity Exchange Act (CEA), Making Findings, and Imposing Remedial Sanctions*, CFTC Dkt. No. 17-09 (Feb. 6, 2017) (CFTC Consent Order); and a declaration by Evan Milazzo, Chief Technology Officer of FXCM from 2002 through December 2016, dated October 11, 2017, attesting that Johnson received the best

bid or offer prices available from FXCM's eligible liquidity providers, including trades in which HFT Co. (HFT) served as the liquidity provider, and attesting to the trades at issue from February 14, 2017 to February 17, 2017.[1]

After carefully considering the record, I am dismissing the Complaint.

## I. Summary of Parties and Proceedings

A. The Parties

Complainant Marcus Johnson (Johnson) is a resident of Baltimore, Maryland.  Johnson opened a non-discretionary forex trading account with FXCM on June 27, 2016.  Compl.; Compl. Addendum; Resp. Motion to Dismiss at ¶¶ 27-28 and 34.  He closed his account on February 17, 2017.  *Id.*

Respondent Forex Capital Markets d/b/a/ FXCM (FXCM) was registered with the Commission as a Futures Commission Merchant (FCM) and Retail Foreign Exchange Dealer (RFED), until March 10, 2017.  *See* National Futures Association (NFA) Basic Research, *available at* https://www.nfa.futures.org/basicnet/ Details.aspx?entityid=uy8vi7mVysc%3d&r n=N.  On February 6, 2017, the Commission entered the CFTC Consent Order with FXCM finding, among other things, a conflict of interest existed from its "pay-for-flow" agreement with HFT. *See infra* at 5-6.  In accordance with the settlement and Consent Order, FXCM has been permanently barred from registering with the Commission and NFA since March 10, 2017.  *Id.*

---

[1] Exhibits 1-4 are attached to Respondents' Motion to Dismiss (Oct. 11, 2017).

Respondent Dror Niv, alias Drew Niv (Niv) formerly served as FXCM's Chief Executive Officer and Chairman of FXCM's parent company's Board of Directors. Motion to Dismiss at 4.

B. Procedural History

Johnson filed his Complaint originally seeking to recoup $10,982.44 in damages ($2,987.44 in trading losses and $7,995 for tuition he paid to the Market Traders Institute for Education) asserting claims of fraud and unauthorized trading by Respondents regarding FXCM's trading arrangements and agreements with its liquidity providers.  Compl. (received May 9, 2017).[2]  On May 31, 2017, Belinda Pugh, the Complaint Specialist for the Office of Proceedings, sent Johnson a Deficiency Letter informing Johnson that his damages could not include losses unless they were proximately caused by Respondents' violation of the CEA.  Pugh Deficiency Letter to Johnson (May 31, 2017).  In that same letter, Johnson was further informed that William Adhout was unregistered and therefore could not be a Respondent in this reparations matter.  *Id.*

Johnson filed his Complaint Addendum decreasing his damages claim to $2,987.44 in trading losses, and naming Dror Niv and FXCM as Respondents. Compl. Addendum (June 10, 2017).  Respondents filed their Answer, denying each

---

[2] Johnson filed his reparations complaint as a Voluntary Proceeding, attaching the requisite $50 check with his Complaint.  Respondents raised this case to a Summary Proceeding by attaching a $75 check with their Answer.

and every allegation, on August 22, 2017.[3]  This case was forwarded to my docket on

October 10, 2017, and discovery commenced shortly thereafter.

Respondents filed their Motion to Dismiss on October 11, 2017.  On October

13, 2017, by way of Order, the parties were informed that Respondents' Motion

would not stay discovery.  Order (Oct. 13, 2017).  However, discovery in this case

was nonexistent as neither side filed discovery requests.  In the absence of any

discovery by the parties, I ordered Johnson to file his response to Respondents'

Motion, and to identify:  (1) the specific trades he believes were subjected to

slippage or other misconduct, including the execution prices of each trade and what

the price range he believes the trades should have been executed at; and (2) which

type of fraud (false statements, unauthorized trades, and/or execution errors) were

associated with each specific trade.  Order (Apr. 4, 2018).

Johnson timely filed his responses to Respondents' Motion and my April 4

Order on May 18, 2018.  However, instead of providing any evidence, Johnson

simply stated that all his trades were subjected to misconduct, without providing

any evidence or even a reason for his statement.  He then asked this Office to

"subpoena" 1,714 trades "as evidence of racketeering, and misconduct in this case."[4]

---

[3] Respondents' original Answer did not include their address and contact information
during business hours.  *See* Pugh Deficiency Letter to Respondents (Sept. 13, 2017);
Commission Rule 12.18(a)(1).  That deficiency was cured with Respondents' amendment to
their Answer filed September 13, 2017.

[4] To the extent this is even a valid request for subpoena, it is denied here.  First, as a party
in the case, Johnson could have requested any evidence he needed to support his claims from
Respondents themselves.  Despite being given the opportunity, he failed to do so.  Second,
it is not at all clear what the content of the subpoena was supposed to be; in other
words, what information was Johnson looking for with respect to these trades.  What is

Respondents' Motion to Dismiss has been fully briefed.  After carefully reviewing the parties' discovery submissions and pleadings, I am dismissing the Complaint.

## II.  Background Regarding the Commission's Settlement with FXCM

Johnson cites the CFTC Consent Order in his Complaint and Complaint Addendum, and relies heavily (if not exclusively) on the Consent Order as evidence of Respondents' purported fraud.  That CFTC Consent Order was entered into on February 6, 2017 upon an Offer of Settlement made by FXCM, among others. FXCM neither admitted nor denied the following findings or conclusions set forth in the CFTC Consent Order.

According to the CFTC Consent Order, from September 4, 2009 through at least 2014, FXCM represented to its customers that if they traded through FXCM's No-Dealing Desk platform, FXCM's role in the transaction would pose no conflict of interest because the risk of those trades would be borne by independent liquidity providers.  CFTC Consent Order at 2.[5]  In other words, contrary to FXCM's traditional model in which FXCM took positions opposite its customers' trades (in essence betting against their trades), FXCM's No-Dealing Desk model claimed to eliminate the inherent conflict of interest between it as the forex broker and its

---

clear is that Johnson sought to impermissibly convert this Office from an impartial adjudication forum into an independent investigative and enforcement office carrying out his instructions.  That effort cannot be sustained here.

[5] Commission Consent Order, styled *in the Matter of Forex Capital Markets, LLC, FXCM Holdings, LLC, Dror Niv, and William Ahdout*, CFTC Dkt. No. 17-09 (Feb. 6, 2017)(Consent Order).

customer by using third-party market makers (or liquidity providers). *Id.* at 3.  In this No-Dealing Desk model, therefore, FXCM's role would be reduced to an impartial credit intermediary with no stake in the outcome of the trade. *See, e.g.*, Motion to Dismiss Ex. 1 (FXCM 2014 10K) at 73.

However, one of those "independent" third-party market-makers—HFT—was launched by FXCM.  Not only was HFT started by FXCM, but it remitted monthly payments to FXCM totaling about 70% of the profits HFT generated trading through FXCM's retail trading platform.  CFTC Consent Order at 2-4.  In other words, according to the CFTC Consent Order, HFT was sharing most of the profits it earned on FXCM's platform with FXCM itself.  These "pay-for-flow" arrangements between HFT and FXCM allowed HFT to capture the largest share of FXCM's trading volume.  *Id.* at 6.  The Commission found that this relationship between HFT and FXCM meant that FXCM did have a conflict of interest when customers were trading through its No-Dealing Desk platform, contrary to its customer disclosures.  *Id.* at 6-8.  The agreements between FXCM and HFT were discontinued sometime in 2014, though the precise time is not specified in the record.  Motion to Dismiss at 9; CFTC Consent Order at 2.

### III. Findings of Fact

Johnson opened his account with FXCM on June 27, 2016 and closed it on February 17, 2017.  Compl.; Compl. Addendum; Motion to Dismiss at ¶¶ 27-28.  From June 27, 2016 to December 12, 2016, Johnson traded solely on FXCM's Dealing Desk platform.  Motion to Dismiss Ex. 4 at ¶6 (Milazzo Declaration).  The Dealing Desk platform is not at issue in this Complaint, since FXCM expressly

acted as the sole liquidity provider and took positions opposite its customers on its Dealing Desk platform.  Motion to Dismiss at 7.  Johnson incurred $668.57 in net trading losses, commissions, and rollover fees while using the Dealing Desk platform.  *Id.* at 9.  These losses have no connection with FXCM's No-Dealing Desk platform with HFT as the liquidity provider.

From December 14, 2016 to February 17, 2017, Johnson traded solely on FXCM's No-Dealing Desk platform.  Motion to Dismiss Ex. 4 at ¶6 (Milazzo Declaration).  A total of 526 trades were made on this platform during this time— 394 trades without HFT as the liquidity provider, which resulted in $1,357.58 in losses.  *Id.* at 10-11 and Ex. 4 at Attachment A (Milazzo Declaration).  In total, $2,026.15 of Johnson's trading losses had no connection with HFT as the liquidity provider, leaving $961.29 in trading losses in dispute with respect to the facts alleged in the CFTC Consent Order.  *Id.*

The February 2017 trades at issue, specifically February 14 and 17, were placed from Johnson's IP address and using his login credentials.  Motion to Dismiss at 19-21.  The trades made by Johnson throughout the life of his self-directed account, from June 27, 2016 through February 17, 2017, all occurred well after the Commission found the pay-for-flow agreement between FXCM and HFT ceased to exist sometime in 2014.  Motion to Dismiss at 1, 8-9; CFTC Consent Order at 2.

### IV.  Legal Analysis and Conclusions

In the Complaint, Johnson argues that FXCM caused his losses by: 1) misrepresenting its business relationship and pay-for-flow agreement with one of its

liquidity providers, HFT; 2) failing to fill his orders at the Best Bid Offer (BBO); and 3) placing unauthorized trades in his account.  Compl.; Compl. Addendum.[6] Respondent counters that this case should be dismissed because Johnson cannot demonstrate the elements of fraud, and moreover that he opened his account over two years after the Commission found that FXCM's and HFT's pay-for-flow agreement had ceased to exist.

I find that Johnson's evidence of misconduct—that is the CFTC Consent Order—is not admissible.  Even if it were admissible, the record shows that the pay-for-flow agreements between FXCM and HFT were discontinued some time in 2014, and the trades at issue in this case occurred well after that time period.  Thus Johnson has not proven, by a preponderance of the evidence, misconduct by FXCM that proximately caused any or all of his account losses.

A. Because the CFTC Consent Order Does Not Constitute Evidence of Misconduct in This Reparations Matter, Johnson Has Not Proved, by a Preponderance of the Evidence, Any Violation of the CEA that Proximately Caused Him Damages.

In order to show fraud under the CEA, a complainant must show that respondent "willfully deceive[d] or attempt[ed] to deceive the other person by any means whatsoever."  CEA § 4b(a)(2); 7 U.S.C.  § 6b(a)(2)).  This deceit must be

---

[6] In his response to my April 14, 2018, Discovery Order, Johnson also argues that FXCM executed "all of [his] trades," including those on the Dealing Desk platform, at prices that caused negative slippage.  Compl. Response to Disc. Order (May 15, 2018).  He provides no supporting evidence for his claim beyond the bare assertion of the claim, and thus fails to substantiate this claim by a preponderance of the evidence.  It therefore must be dismissed. *See, e.g., Scobey v. Hornblower & Weeks-Hemphill, Noyes, Inc.,* 1985 WL 55141, CFTC Dkt. No. R78-390-79-31 (CFTC Jun. 12, 1985) (rejecting churning claim because of insufficient documentary evidence); *Lissberger v. Jayne, Anderson & Company, Inc., et al.,* 1991 WL 280427, CFTC Dkt. No.  89-R274 (CFTC Jun. 21, 1991) (same).

proved by a preponderance of the evidence.  *In re Citadel Trading Co.*, CFTC Nos.
77-8, 80-11, 1986 WL 66170, *9 (CFTC May 12, 1986) (noting judge must determine
"what the preponderance of the evidence shows most likely did happen").

Here, however, Johnson does not provide any supporting evidence for his
claims of fraud and nondisclosure other than citing to the CFTC Consent Order and
producing screenshots from FXCM's website.  *See supra* at 2.  But courts, including
the Commission, have held that consent orders cannot be used as evidence in
subsequent litigation because the consenting party has agreed to certain terms in
exchange for the cessation of litigation—no court or adjudicatory forum has actually
made any findings of fact as a result of litigation and the defendants neither admit
nor deny the facts contained in those orders.  *See e.g.*, *United States v. Armour &
Co.*, 402 U.S. 673, 681-682 (1971) (holding courts cannot read consent decrees as if
"plaintiff established factual claims and theories  in litigation"); *In the Matter of
Mates*, CFTC Dkt. No. 79-10, 1980 WL 15665 at *3 (CFTC Dec. 2, 1980) (finding
that because respondent "consented . . . to a statement of finding and  . . . certain
sanctions solely for purposes of terminating the SEC action and without admitting
any allegation of wrongdoing, [Commission] may not rely upon the order as
evidence."); *Lipsky v. Commonwealth United Corp.,* 551 F.2d 887, 893 (2d Cir. 1976)
("[A] consent judgment between a federal agency and a private corporation which is
not the result of an actual adjudication of any of the issues [cannot] be used as
evidence in subsequent litigation between that corporation and another party.").[7]

---

[7] This analysis does not address situations in which a settling party in fact admits the facts
set forth in a Consent Order, which could constitute a public admission of wrongdoing.

In other words, no facts have been proven by the CFTC Consent Order where the settling party neither admitted nor denied the allegations. They therefore cannot be treated as proven facts in subsequent litigation.

Even assuming Johnson had shown by a preponderance of the evidence that FXCM had deceived him, he has not shown that such deceit proximately caused him damages, as he must under 7 U.S.C. Section 18. "In determining whether proximate cause exists, the Commission looks . . . to whether the loss was a reasonably probable consequence of respondents' conduct." *Muniz v. Lassila*, CFTC No. 87-R395, 1992 WL 10629, *7 (CFTC Jan. 17, 1992) (internal quotation marks and citations omitted). But here there is no evidence that Johnson's losses were caused by FXCM's nondisclosure of its relationship with HFT. First, Johnson received the best price with respect to his trades even when HFT was the liquidity provider, suggesting that the purported conflict of interest between HFT and FXCM had no adverse impact on his account, including the February 14, 2017 trade. Motion to Dismiss at 10-12; Exhibit 4 at 2-3 and Attachment B (Milazzo Declaration); *see also* Compl. Given there was no adverse impact on his account, it is difficult to believe Johnson would continue to place trades if he truly believed he was not receiving the BBO. Second, and more importantly, the purportedly inappropriate relationship between FXCM and HFT ceased some time in 2014, and all of Johnson's supposed damages were incurred in the period between June 27, 2016 and February 17, 2017. Without any evidence that the inappropriate

relationship existed at the time his damages were incurred, non-disclosure of that relationship could not have caused those damages.

Moreover, Johnson knew of CFTC Consent Order on February 10, 2017 and continued to trade his account for seven more days, placing trades he himself admits to on February 14 and February 17, 2017.  This weakens Johnson's already unsupported contention that had he been informed of the relationship between FXCM and HFT, he would not have traded through FXCM.  *See* Complaint.

Further, Johnson also failed to serve any discovery requests on FXCM, instead attempting to foist that responsibility on the Judgment Officer by attempting to subpoena "all 1,714 trades" (but apparently no information regarding the trades) he himself placed in his account.  Complainant May 15, 2018 Response to Discovery Order; *supra* n.4.  But Johnson never requested those records during discovery as he was both authorized and empowered to do.  And he made no attempts to "prove any alleged violation proximately causing damages by a *preponderance of the evidence*" as this Office informed him he must.  Notice of Summary Proceeding at 1 (October 10, 2017) (emphasis in original).

B. Johnson Has Failed to Show Unauthorized Trades Occurred in His Account, Including The February 17, 2017 Trade at Issue.

Johnson alleges in the Complaint that FXCM placed unauthorized trades in his account, and points to a February 17, 2017 instance where he placed a EUR/AUD Forex trade.  Compl.; Compl. Addendum.  This is the only instance Johnson cites to as proof of unauthorized trading, and he does not specify any other trades that were placed without his consent.  He claims that he heard a chime,

through his earbuds, once he placed the trade.  *Id.*  He further states that he heard

"three different chimes" afterwards that made him suspicious and caused him to

close the trades "immediately."  *Id.*  Johnson states this suspicious chiming

precipitated his decision to close his account with FXCM on February 17.  *Id.*  But

Johnson admits that he himself opened and closed the purportedly unauthorized

trade.  *Id.;* Motion to Dismiss at 11.  And FXCM's records indicate that all of

Johnson's trades, including the February 17 trade, were placed using Johnson's IP

address and his login credentials.  Motion to Dismiss at 21.

Johnson never objects to this evidence, and he does not produce any rebuttal

evidence.  Without any evidence that someone other than him placed or closed the

trades at issue, Johnson has failed to prove unauthorized trading by a

preponderance of the evidence.  *See Photakis v. Madda Trading Co., Comm. Fut. L.*

*Rep.* (CCH) ¶ 20,504 (CFTC 1977) (Complainant bears the burden of alleging and

proving unauthorized trades occurred); *Bahkosky v. A.G. Edwards & Sons, Inc.,*

CFTC Dkt. No. 96-R23, 1997 WL 345637 (CFTC Initial Dec. 1997) (Complainant

must specifically identify trades that are unauthorized or will be precluded from a

finding that unauthorized trades were placed).

## CONCLUSION

Johnson's evidence of fraud is inadmissible and he has not proven a violation

of the Commodity Exchange Act by a preponderance of the evidence.  Even if he

had, he has failed to show any nexus between that purported fraud and his

damages by a preponderance of the evidence.  Moreover, the pay-for-flow agreement

13

between FXCM and HFT detailed in the CFTC Consent Order, the evidence Johnson leans on heavily as proof of misconduct, ceased to exist two years before Johnson opened his self-directed account with FXCM and was non-existent during the time at issue.  Respondent's Motion to Dismiss is therefore GRANTED and Johnson's Complaint is DISMISSED.

Dated:  April 16, 2020

<u>/s/ Kavita Kumar Puri</u>
Kavita Kumar Puri
Judgment Officer

14



**U.S. COMMODITY FUTURES TRADING COMMISSION**
Three Lafayette Centre
1155 21st Street, NW, Washington, DC 20581
*www.cftc.gov*

Office of Proceedings

RECEIVED CFTC

Office of Proceedings
Proceedings Clerk
12:59 pm, Jul 08, 2019

---

NATHAN CROSSETT,
  Complainant,

    v.

FOREX CAPITAL MARKETS LLC,
d/b/a FXCM,
   Respondent.

\*
\*
\*
\*
\*
\*
\*
\*
\*
\*

CFTC Docket No. 17-R007
**Served electronically**

---

## <u>ORDER DISMISSING THE COMPLAINT</u>

*Before:*   Kavita Kumar Puri, Judgment Officer
      Commodity Futures Trading Commission
      Washington, D.C.

*Appearances:*  Nathan Crossett, *pro se*
      New York, NY
      For Complainant

      William Johnson, Esq.
      Israel Dahan, Esq.
      King & Spalding LLP
      New York, NY
      For Respondent

  Nathan Crossett, appearing in this forum *pro se* and by way of a formal

proceeding, seeks $166,061.95 in damages for his trading losses, commissions and

fees, covering the life of his forex account.[1]  He alleges these losses were caused by

---

[1] *See* Compl. at 1; Answer at ¶ 28; and Declaration of Evan Milazzo at ¶ 8 (attached as Ex.
6 to Answer).

the failure of Forex Capital Markets LLC (FXCM) to disclose a "pay-for-flow" affiliate relationship with one of its liquidity providers, Effex or HFT Co. (HFT), which served as a market maker for FXCM's clients on its "No-Dealing Desk" model.[2] Compl. at 1; FXCM Motion to Dismiss at 1 (Aug. 7, 2017). Crossett further alleges that the failure to disclose this relationship amounts to fraud, without which he would not have opened an account with FXCM. Compl. Crossett thus alleges that his damages amount to $166,061.95, or the entire amount of his account losses plus fees and commissions. *Id.*

For the reasons that follow, I am dismissing the Complaint.

## I. Summary of Parties and Proceedings

A. The Parties

Complainant Nathan Crossett (Crossett) a resident of New York, NY, has been trading with FXCM since April 2009. Motion to Dismiss at ¶ 27. The account at issue, Account No. XXXX0456, was opened on February 17, 2012 and actively traded and maintained until its closing on February 9, 2017. *Id.*, *see also* Compl. at 1.

Respondent Forex Capital Markets d/b/a/ FXCM (FXCM) was registered with the Commission as a Futures Commission Merchant (FCM) and Retail Foreign Exchange Dealer (RFED), until March 10, 2017. *See* NFA Basic Research, *available at* https://www.nfa.futures.org/basicnet/Details.aspx?entityid=uy8vi7mVysc%3d&r

---

[2] *See* Commission Consent Order, styled *In the Matter of Forex Capital Markets, LLC, FXCM Holdings, LLC, Dror Niv, and William Ahdout,* CFTC Dkt. No. 17-09 (Feb. 6, 2017) (CFTC Consent Order).

n=N.  On February 6, 2017, the Commission entered a Consent Order and

Settlement Agreement with FXCM finding, among other things, a conflict of

interest existed from its "pay-for-flow" agreement with HFT.  *See infra* at 4-5.  In

accordance with the settlement and Consent Order, FXCM has been permanently

barred from registering with the Commission and NFA since March 10, 2017.  *Id.*

    B.  <u>Procedural History</u>

Crossett filed his Complaint on February 8, 2017, and Respondent filed its

Answer and Affirmative Defenses along with a Motion to Dismiss on May 19, 2017.

The Director of the Office of Proceedings denied the motion "because the criteria for

forwarding this complaint and for initiating a reparations proceeding [had] been

met."  *See* Letter from Director to Respondent (June 22, 2017).  Respondent re-filed

its Motion to Dismiss on August 7, 2017, once the proceeding was formally assigned

to my docket.[3]  Discovery began thereafter, and concluded on September 11, 2017,

once Crossett filed his Summary Argument.  During discovery, FXCM filed a Motion

to Exclude Immaterial Evidence on August 17, 2017,[4] and Crossett responded on

---

[3] Respondent's Answer & Affirmative Defenses is identical to its Motion to Dismiss.
Therefore, all citations throughout this Order reference the Motion to Dismiss, but also act
as a parallel citation to the Answer.

[4] In its Motion to Exclude, FXCM argued the following evidence presented by Complainant
is inadmissible—the CFTC Consent Order, NFA Complaint, and NFA Decision.  Resp.
Motion to Exclude (August 17, 2017).  These documents are defined and discussed in
further detail below.  Although the substance of this Motion is addressed in this Initial
Decision, the Motion to Exclude itself is denied as moot, since the Complaint is dismissed
by way of this decision. Respondent further filed a motion for the confidential treatment of
its discovery responses because they contain trade secrets, information protected by other
litigation proceedings, or information from third parties.  Respondent's Response and
Objections to Complainant's Discovery Requests at 3-6 (Aug. 31, 2017).  Respondent's
request for confidential treatment of its discovery responses is granted in part and denied
in part, as discussed below. *See infra* at 14-15.

September 11, 2017. After carefully reviewing the parties' discovery submissions and pleadings, I am converting Respondent's Motion to Dismiss into a Motion for Summary Disposition, *see* Commission Rule 12.310, and dismissing the Complaint.

## II. Factual Background

A. Commission Order and Settlement with FXCM

In order to allege and prove FXCM's purported fraud, Crossett relies principally on a consent order entered between FXCM and the Commission as evidence of the misconduct that lies at the heart of his Complaint. That CFTC Consent Order was entered into on February 6, 2017 upon an Offer of Settlement made by FXCM, among others. *See supra* n.1. FXCM neither admitted nor denied the following findings or conclusions set forth in the CFTC Consent Order.

From September 4, 2009 through at least 2014, FXCM represented to its customers that if they traded through FXCM's No-Dealing Desk platform, FXCM's role in the transaction would pose no conflict of interest because the risk of those trades would be borne by independent liquidity providers. CFTC Consent Order at 2. In other words, contrary to FXCM's traditional model in which FXCM took positions opposite its customers' trades (in essence betting against their trades), FXCM's No-Dealing Desk model claimed to eliminate the inherent conflict of interest between it as the forex broker and its customer by using third-party market makers (or liquidity providers). *Id.* at 3. In this No-Dealing Desk model, therefore, FXCM's role would be reduced to an impartial credit intermediary with no stake in the outcome of the trade. *See, e.g.*, Motion to Dismiss Ex. 1 (2014 10K) at 73.

4

However, one of those "independent" third-party market-makers—HFT—was launched by FXCM. Not only was HFT started by FXCM, but it remitted monthly payments to FXCM totaling about 70% of the profits HFT generated trading through FXCM's retail trading platform. CFTC Consent Order at 2-4. In other words, according to the CFTC Consent Order, HFT was sharing most of the profits it earned on FXCM's platform with FXCM itself. These "pay-for-flow" arrangements between HFT and FXCM allowed HFT to capture the largest share of FXCM's trading volume. *Id.* at 6. The Commission found that this relationship between HFT and FXCM meant that FXCM did have a conflict of interest when customers were trading through its No-Dealing Desk platform, contrary to its customer disclosures. *Id.* at 6-8. The agreements between FXCM and HFT were discontinued on August 1, 2014. Motion to Dismiss ¶ 12.

   B.   The NFA Complaint and NFA Decision

Crossett further relies on a complaint filed by NFA (NFA Complaint) on February 6, 2017—the same day the Commission Order was issued—that alleged substantially the same facts, as well as the settlement agreement FXCM entered into with NFA on the same day (NFA Decision). As in the Commission Order, FXCM settled NFA's charges without admitting them. *See* NFA Decision at 3.

   C.   Crossett's Account and Trading Relationship with FXCM

On February 17, 2012, Crossett opened Account No. XXXX0456 and actively traded the account through February 9, 2017. Motion to Dismiss at ¶ 27. Crossett traded on both FXCM's Dealing Desk and No-Dealing Desk trading platforms, *id.* at

¶ 31; and Ex. 6 at ¶ 8, and made a total of 7,648 total trades during this time. Complainant lost $166,062 during the life of his account in both trading losses and fees and commissions.

Complainant's claim for damages equals the entire amount of his trading losses plus commissions and rollover fees. However, roughly $106,000 of these damages have no connection to the underlying alleged misconduct, because they are associated with either the Dealing Desk model or did not use HFT as the liquidity provider on the No-Dealing Desk model. Motion to Dismiss at 11 & Ex. 6, Attachment A. Of the roughly $60,000 in remaining damages, approximately $15,000 were incurred after the relationship between HFT and FXCM ceased on August 1, 2014. *Id.* That leaves roughly $45,000 in trading losses and fees incurred using HFT as the liquidity provider on the No-Dealing Desk model. Crossett, however, contends that the full amount of his trading losses constitutes the true measure of his damages because he would not have entered a relationship with FXCM had they disclosed their conflict of interest with HFT. Crossett Summary Argument at 1 (Sept. 11, 2017).

C.    The General Release and Confidentiality Agreement

Crossett and FXCM entered into a General Release and Settlement on July 16, 2015 related to the following set of facts. Motion to Dismiss at Ex. 5 (Release). On June 10, 2015, Complainant placed a GBP/NZD trade following an interest rate decision from the New Zealand central bank. Crossett Summary Argument at 2. Prior to placing the trade, Crossett had $27,411.69 in his account, and immediately

following, the trade, he had ($42,093.81) in his account. Believing that FXCM executed the trade at the wrong price, he notified FXCM of his complaint and FXCM adjusted his balance to $4,428.21 on June 18, 2015. Resp. to RFA 10; Crossett Summary Argument, Exhibit 5 (Account Balance Adjustment Emails). After further email discussion, the two parties agreed that FXCM would further adjust his account balance by restoring the full $69,505.50 that was lost from his account. Respondent's Document Production, FXCM Document 5 (filed August 31, 2017).

> Crossett admits he signed the Release, which released FXCM from
>
> all manner of action(s), cause(s) of action, suits, debts, sums of money, accounts, reckonings, bonds, bills, specialties, covenants, contracts, controversies, agreements, promises, variances, trespasses, damages, judgments, executions, claims and demands whatsoever, in law or in equity, which [Crossett] ever had, now has, or . . . shall or may have, against [FXCM], by reason of any matter, cause or thing whatsoever, from the beginning of time to the date of this instrument.

Settlement Agreement (July 16, 2015) (emphasis added).

### III. Legal Analysis and Conclusions

Respondent argues that this case should be dismissed because Crossett cannot demonstrate the elements of fraud, namely that his losses stemmed from FXCM's alleged nondisclosure of its relationship with HFT, and that in any case he released all claims that accrued before July 16, 2015. Crossett contends that he should be awarded the full amount of his account losses—$166,061.95—because he would have never opened an account with FXCM had he known about the relationship between FXCM and HFT. Crossett Summary Argument at 1. Crossett also objects to FXCM's argument regarding the General Release and Confidentiality

Agreement he signed, stating that FXCM "took advantage of the situation by only agreeing to make my account whole . . . if I signed an overly broad general release with language that absolved them from all prior and future misconduct[];" and that he believes the Agreement should only be enforceable as to the particular trade that was the subject of his complaint. *Id.* at 2.

I find that Crossett's evidence of misconduct is not admissible to prove that misconduct, and that Crossett therefore has not proven, by a preponderance of the evidence, misconduct by FXCM that proximately caused any or all of his account losses. Alternatively, I find that Crossett released any claims he had against FXCM, which precludes his recovery here. Accordingly, any further litigation of Crossett's reparations Complaint would waste this Office's and the parties' resources, warranting dismissal here.

A. <u>Because Respondent's Consent Orders Do Not Constitute Evidence of Misconduct in This Reparations Matter, Crossett Has Not Proved, by a Preponderance of the Evidence, Any Violation of the CEA that Proximately Caused Him Damages.</u>

In order to show fraud under the CEA, a complainant must show "(1) a material misrepresentation, (2) scienter, (3) reliance [on that misrepresentation] and (4) damages." *Chenli Chu v. Peregrine Fin. Group, Inc.*, CFTC No. 07-R029, 2013 WL 4785177, at *6 (CFTC Sept. 5, 2013) (discussing elements of fraud under CEA § 4b(a)(2); 7 U.S.C. § 6b(a)(2)). Each of these elements must be proved by a preponderance of the evidence. *In re Citadel Trading Co.*, CFTC Nos. 77-8, 80-11, 1986 WL 66170, *9 (CFTC May 12, 1986) (noting judge must determine "what the preponderance of the evidence shows most likely did happen").

Here, however, Crossett does not provide any supporting evidence for his claims of fraud and non-disclosure other than the CFTC and NFA Orders previously detailed, except for a copy of his combined account statements. *See* Complainant's Ex. 4 (filed Aug. 18, 2017).[5]  Courts, including the Commission, have held that consent orders cannot be used as evidence in subsequent litigation because the consenting party has agreed to certain terms in exchange for the cessation of litigation—no court or adjudicatory forum has actually made any findings of fact as a result of litigation and the defendants neither admit nor deny the facts contained in those orders. *See e.g., United States v. Armour & Co.*, 402 U.S. 673, 681-682 (1971) (holding courts cannot read consent decrees as if "plaintiff established factual claims and theories  in litigation"); *In the Matter of Mates*, CFTC Dkt. No. 79-10, 1980 WL 15665 at *3 (CFTC Dec. 2, 1980) (finding that because respondent "consented . . . to a statement of finding and  . . . certain sanctions solely for purposes of terminating the SEC action and without admitting any allegation of wrongdoing, [Commission] may not rely upon the order as evidence."); *Lipsky v. Commonwealth United Corp.,* 551 F.2d 887, 893 (2d Cir. 1976) ("[A] consent judgment between a federal agency and a private corporation which is not the result of an actual adjudication of any of the issues [cannot] be used as evidence in subsequent litigation between that corporation and another party.").

---

[5] Although FXCM did produce a copy of its trading agreement with HFT as well as a spreadsheet of fees remitted to HFT, these documents alone do not independently corroborate the fraud without additional information.  Moreover, Crossett never cites to them in his Summary Argument, relying solely on the fact of FXCM's settlement with the Commission.

Even assuming Crossett had shown by a preponderance of the evidence that a material misrepresentation had occurred, he has not shown that he relied on this misrepresentation.  Simply stating that he would have not have engaged in <u>any relationship</u> with FXCM is insufficient, particularly when most of his losses were incurred without using HFT as a liquidity provider, and some were incurred through the Dealing Desk model, which had nothing to do with the purported fraud at issue.  On the other hand, FXCM submitted evidence showing that Crossett in fact received the best price available from FXCM's liquidity providers eligible to fill his trade orders, including those trades in which HFT served as the liquidity provider.  *See* Resp. Motion to Dismiss, Exhibit 6 (Decl. of Evan Milazzo ¶¶ 15-16 & Attachments B-C (May 17, 2017)).  Crossett never produces or refers to any admissible facts to rebut this defense.

For the same reasons Crossett has not shown that he relied on the purported misrepresentation, he cannot prove that any damages were "proximately caused" by the conduct at issue.  *See* 7 U.S.C. § 18 (requiring that reparations complainants show that their damages were "proximately caused" by violations of the CEA or rules promulgated thereunder to recover).  "In determining whether proximate cause exists, the Commission looks . . . to whether the loss was a reasonably probable consequence of respondents' conduct."  *Muniz v. Lassila*, CFTC No. 87-R395, 1992 WL 10629, *7 (CFTC Jan. 17, 1992) (internal quotation marks and citations omitted).  Simply put, there is no evidence that Crossett's losses were caused by HFT's services and not his own trading decisions.  And FXCM submitted

evidence that in fact Crossett received the best price with respect to his trades even when HFT was the liquidity provider.  Crossett provides no rebuttal to this evidence, and he has not proved damages by a preponderance of the evidence.

Crossett's evidence of fraud is inadmissible and he has not proven a violation of the Commodity Exchange Act by a preponderance of the evidence.  Even if he had, he has certainly not shown reliance on the fraud, or any nexus between that purported fraud and his damages by a preponderance of the evidence and his case is therefore dismissed.

B. The General Settlement and Release Agreement Relieves FXCM From Liability in Connection With Crossett's Claims From February 27, 2012 Through July 16, 2015

In addition, Crossett has released the claims at issue here.[6]  Although this Office typically requires respondents to move for summary disposition to establish affirmative defenses, like proof of prior settlement, "dismissal is nonetheless appropriate when the complaint clearly reveals a meritorious defense." *Hillpot v. Dorrity*, CFTC Dkt. No. 08-R031, 2008 WL 4553068, at *1 (CFTC Oct. 10, 2008).  Here, the Complaint itself did not reference the General Settlement and Release Agreement, but for purposes of judicial efficiency, I convert this Motion to Dismiss to a Motion for Summary Disposition, pursuant to Commission Rule 12.310.  "Summary disposition is proper (and required) if the undisputed pleaded facts, affidavits, other

---

[6] Crossett also cites an NFA decision, which details alleged findings by NFA that "customers trading the New Zealand Dollar (NZD) related currency pairs had orders executed at off-market prices, due to bad prices FXCM received from [HFT]." *Id.*  But even if that NFA decision were admissible as evidence, that FXCM may have committed wrongdoing does not invalidate the Release.

verified statements, admissions, stipulations, and matters of official notice, show that: (1) there is no genuinely disputed issue of material fact, (2) we need not further develop facts in the record and (3) the moving party is entitled to a decision as a matter of law." *Id.* at *2. In deciding whether these standards are met, all justifiable inferences are to be drawn in the non-movant's favor, and any "significant doubt" as to the facts preclude summary disposition. *Id.*

Here, there is substantial evidence in the record as to Respondent's affirmative defense that Complainant already settled these claims, and summary disposition on the issue is warranted here. Although Complainant never filed a response to Respondent's Motion to Dismiss, he did file a Summary Argument that specifically addressed Respondent's various Motion to Dismiss arguments. With regard to the Release, Crossett "argue[s] that FXCM took advantage of the situation by only agreeing to make my account whole on the trade if I signed an <u>overly broad general release</u> with language that absolved them from all prior and future misconduct." Crossett Summary Argument at 2 (emphasis in original). He further contends that the settlement agreement "should only have covered [the GBP/NZD]" trade that was the subject of his complaint. *Id.*

By way of his arguments, Complainant does several things. First, he admits he signed the Release. Second, he confirms that he understands that the Release was a broad one and that it absolved FXCM "from all prior and

future misconduct." Having admitted that he signed (and in fact understood) the Release, the only remaining issue is whether it is enforceable.

New York law governs this contractual question. Resp. Motion to Dismiss Ex. 2 (Client Agreement, Trading Agreement ¶ 22 (noting that "This Client Agreement, and the rights and obligations of the parties hereto, shall be governed by, construed and enforced in all respects by the laws of the State of New York.")). New York "recognizes that 'a clear and unambiguous release . . . should be enforced according to its terms.'" *Consorcio Prodipe, S.A. de C.V. v. Vinci, S.A.*, 544 F. Supp. 2d 178, 189 (2008) (quoting *Booth v. 3669 Delaware, Inc.*, 92 N.Y.2d 934, 935 (1998)). And "a valid release constitutes a complete bar to an action on a claim which is the subject of the release." *Centro Empresarial Cempresa S.A. v. American Movil, S.A.B. de C.V.*, 17 N.Y.3d 269, 276 (N.Y. 2011). "Notably, a release may encompass unknown claims, including unknown fraud claims, if the parties so intend and the agreement is fairly and knowingly made." *Id.* (quotation marks and citation omitted). The contract is voidable only if it is the product of "fraud, duress or undue influence." *Consorcio Prodipe, S.A. de C.V.*, 544 F. Supp. 2d at 189; *see also Hillpot*, 2008 WL 5146713 at *2 (voiding agreements "[i]f a party's manifestation of assent is induced by either a fraudulent or material misrepresentation by the other party upon which the recipient is justified in relying, the contract is voidable by the recipient.").

13

Thus in construing the scope of the release at issue, two questions must be answered: (1) Is the Release unambiguous as to the broad scope of the claims encompassed within it; and, if so (2) Was Crossett somehow tricked or lied to in signing it. The first question is easily answered. The Release covered "<u>all manner of action(s), cause(s) of action</u>, . . . in law or in equity, which [Crossett] <u>ever had, now has, or . . . shall or may have</u>, against [FXCM], by reason of <u>any matter, cause or thing whatsoever, from the beginning of time to the date of this instrument</u>." Settlement Agreement (July 16, 2015) (emphasis added). There is no manner of trickery or obfuscation in this Release language—it is plainly worded, unambiguous on its face, and so extreme in the breadth that it covers that the Releasor—here Crossett—would be hard-pressed to argue that he neither saw nor understood it. *See Centro Empresarial Cempresa S.A.*, 17 N.Y.3d at 277 (finding that similar language encompassed unknown claims). In relevant part, it plainly covers all claims accruing prior to July 16, 2015.

As to the second question—whether Crossett signed the Release under some sort of trickery or duress—there is no evidence in the record to substantiate any such claim. In fact, the email communications produced by Crossett make clear that Crossett would have to release claims in exchange for restoring his balance, and that Crossett was eager to do so. On July 15, 2015, Marco Konte from FXCM wrote Crossett an email in response to his complaint about the GDP/NZD trade's execution stating that: "Due to the size of this adjustment, the account holder will have to sign a release form

14

which will be sent by the FXCM operations team within the next 2 to 3 days."
Crossett Summary Argument Exhibit 5. Crossett responded the next day,
asking "Do you think I'll get the document from operations today/tomorrow?"
*Id.* That same day, Konte replied "My colleague has informed me that the
release form was sent over to you." *Id.* And Crossett replied that he "[w]ould
like to have the money in account by end of day if possible." *Id.* Nothing
about this email exchange indicates trickery was involved.

There is also no evidence, or indeed argument by Crossett himself, that
he was incapable of understanding the contract's terms or otherwise lacked
the capacity to bind himself. Crossett is not an unsophisticated client. He is
employed by Evercore Partners "a prestigious investment banking advisory
firm in New York, New York [and] holds FINRA Series 7, 63, 86, and 87
[licenses]." Motion to Dismiss at 10.

The Release is plain and unambiguous as to its broad scope. Further,
there is thus no evidence in the record that he was duped into signing the
agreement or otherwise lacked the capacity to understand its terms. The
Release therefore disposes of all claims in this reparations proceeding.

C. <u>FXCM's Request For Confidential Treatment of Its Discovery Submissions</u>

FXCM requested that its discovery submissions be treated as confidential
under the Freedom of Information Act (FOIA). In connection with Complainant's
discovery requests, Respondent filed the following:

- A Service Agreement between FXCM and HFT.

15

- An Excel spreadsheet detailing Complainant's trades in the account at issue from February 27, 2012 through January 4, 2017.

- A Prime Brokerage Customer-to-Customer Agreement between FXCM, HFT, and Citibank.

- A spreadsheet detailing payments made between FXCM and HFT.

- Documents detailing FXCM's investigation into Crossett's complaint regarding a GBP/NZD Forex trade that resulted in $69,505.50 in losses due to what appears to be a system malfunction; and emails between Complainant and Respondent detailing the agreement and signing of the General Release and Confidentiality Agreement.

The record does not reflect whether Respondent has requested confidential treatment of its submissions under FOIA with the FOIA Office. This Office will take reasonable steps to ensure that Respondent's confidential submissions are treated as such *by this Office*. However, this Office takes no position on any request already made or that will be made to the FOIA Office because it is not before this Office. *See* Commission Rule §145.9. Accordingly, Respondent's request for confidential treatment of the above-detailed submissions is GRANTED in-part, and DENIED in-part.

## CONCLUSION

Crossett does not prove, by a preponderance of the evidence, that he either relied on or suffered damages proximately caused by, FXCM's purported fraud. Even if he had, Crossett agreed to release FXCM from any and all claims and damages prior to July 16, 2015 when he signed the General Release and Confidentiality Agreement. Respondent's Motion to Dismiss is hereby GRANTED, and the Complaint is DISMISSED with prejudice.

Dated:  July 8, 2019

Kavita Kumar Puri
Judgment Officer