UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| In re Global Brokerage, Inc. f/k/a FXCM, Inc. Securities Litigation | Master File No. 1:17-cv-00916-RA |
| | CLASS ACTION |
| | ORAL ARGUMENT REQUESTED |
| This Document Relates To:  All Actions | |

**DEFENDANTS' MEMORANDUM OF LAW IN SUPPORT OF THEIR MOTION TO
EXCLUDE THE REPORTS, TESTIMONY, AND OPINIONS OF JOHN E. BARRON**

Israel Dahan
Peter Isajiw
Evan Ennis
Ryan Gabay
KING & SPALDING LLP
1185 Avenue of the Americas
New York, New York 10036-2601
Tel:  (212) 556.2100
Fax: (212) 556.2200

Chelsea Corey
KING & SPALDING LLP
300 S. Tryon Street, Suite 1700
Charlotte, North Carolina 28202
Tel: (704) 503.2575
Fax: (704) 503.2622

*Attorneys for Defendants Global Brokerage, Inc. f/k/a/
FXCM, Inc., Dror Niv, and William Ahdout*

**TABLE OF CONTENTS**

PRELIMINARY STATEMENT ................................................................................. 1

BACKGROUND .................................................................................................... 2

LEGAL STANDARD ............................................................................................. 5

ARGUMENT ........................................................................................................ 7

    I.      Barron's Factual Narrative Is Unhelpful And Should Be Excluded ...................... 7

    II.     Barron's VIE Opinions Are Unreliable And Should Be Excluded ....................... 8

           A.     Barron Does Not Follow The GAAP-Prescribed Methodology To Determine Whether VIE Consolidation And Disclosure Is Required ...................................................................................................8

           B.     Barron's VIE Opinions Are Conclusory, Unsupported By The Factual Record, And Based On Speculation And Conjecture ..................13

    III.    Barron's Related Party Opinions Are Conclusory And Inadmissible ................. 17

    IV.    Barron Usurps The Fact Finder In Opining On Materiality ................................. 18

    CONCLUSION ................................................................................................ 20

## <u>TABLE OF AUTHORITIES</u>

**Cases**                                                                                           **Page(s)**

*Amorgianos v. Nat'l R.R. Passenger Corp.*,
    303 F.3d 256 (2d Cir. 2002)......................................................................................6, 8

*Daubert v. Merrell Dow Pharms., Inc.*,
    509 U.S. 579 (1993).............................................................................................5, 6, 8

*Feinberg v. Katz*,
    No. 01 CIV. 2739 (CSH), 2007 WL 4562930 (S.D.N.Y. Dec. 21, 2007) .....................2, 18, 19

*In re Fosamax Prods. Liab. Litig.*,
    645 F. Supp. 2d 164 (S.D.N.Y. 2009).........................................................................6

*General Electric Co. v. Joiner*,
    522 U.S. 136 (1997)..............................................................................................13

*Highland Cap. Mgmt., L.P. v. Schneider*,
    379 F. Supp. 2d 461 (S.D.N.Y. 2005).......................................................................7, 18

*Jarvis v. Ford Motor Co.*,
    No. 92 CIV. 2900 (NRB), 1999 WL 461813 (S.D.N.Y. July 6, 1999) ...................................6

*LinkCo, Inc. v. Fujitsu Ltd.*,
    No. 00 Civ. 7242, 2002 WL 1585551 (S.D.N.Y. July 16, 2002) ............................................7

*Major League Baseball Properties, Inc. v. Salvino, Inc.*,
    542 F.3d 290 (2d Cir. 2008).....................................................................................13

*Media Sport & Arts s.r.l. v. Kinney Shoe Corp.*,
    No. 95 CIV. 3901,1999 WL 946354 (S.D.N.Y. Oct. 19, 1999) ...............................................7

*Nimely v. City of N.Y.*,
    414 F.3d 381 (2d Cir. 2005)....................................................................................5, 13

*In re Rezulin Prod. Liab. Litig.*,
    309 F. Supp. 2d 531 (S.D.N.Y. 2004).........................................................................7

*Ruggiero v. Warner-Lambert Co.*,
    424 F.3d 249 (2d Cir. 2005).....................................................................................6

*Taylor v. Evans*,
    No. 94 Civ. 8425, 1997 WL 154010 (S.D.N.Y. Apr. 1, 1997).................................................7

*United States v. Dukagjini*,
    326 F.3d 45 (2d Cir. 2003)........................................................................................6

*United States v. Williams*,
    506 F.3d 151 (2d Cir. 2007)..................................................................................5

**Statutes**

Exchange Act Section 10(b) ....................................................................................3

Exchange Act Section 20(a) ....................................................................................3

Fed. R. Evid. 403 .....................................................................................................5

Fed. R. Evid. 702 ..................................................................................................5, 6

Rule 10b-5 ................................................................................................................3

**Other Authorities**

ASC Topic 810, *Consolidation*................................................................................2

ASC Topic 850, *Related Party Disclosures* ...........................................................3

Defendants Global Brokerage Inc. f/k/a FXCM Inc. ("FXCM" or the "Company"), Dror Niv and William Ahdout (collectively, "Defendants") respectfully submit this memorandum of law in support of their Motion to Exclude the Reports, Testimony, and Opinions of John E. Barron (the "Motion").

## PRELIMINARY STATEMENT

Plaintiffs proffer John E. Barron ("Barron") as an accounting expert and seek to rely on his two reports and deposition testimony to support their allegations that FXCM violated Generally Accepted Accounting Principles ("GAAP") during the Class Period by failing to (1) consolidate Effex Capital, LLC ("Effex") as a variable interest entity ("VIE") and make related disclosures or, in the alternative, (2) disclose Effex as a related party as well as make related party disclosures concerning FXCM's business relationship and transactions with Effex.  As detailed below, Barron's reports, testimony, and opinions should be excluded because the opinions he provides therein are conclusory, unhelpful to the trier of fact, and simply unreliable.

To begin with, nearly two-thirds of Barron's initial report is nothing more than his one-sided and misleading summary of background "facts" that are properly presented through percipient witnesses, rather than an individual with no first-hand knowledge.  Courts in this Circuit routinely exclude such extensive factual narratives by an expert witness.  But more significantly, Barron's actual opinions themselves are conclusory and unreliable.   In particular, Barron acknowledges a GAAP-prescribed method of analyzing whether a VIE disclosure is required, but then fails to apply that full methodology in performing his VIE analysis.  And the scant few steps of that methodology he does apply are not substantively or correctly analyzed.  Similarly, Barron rests his opinion concerning FXCM's related party disclosures on his conclusion that FXCM was in a position to significantly influence Effex.  But to support this conclusion, Barron relies on

irrelevant interactions between FXCM and Effex *prior to* the Class Period and conveniently ignores factual evidence establishing the contrary.

Lastly, Barron seeks to offer opinions that would usurp the role of the fact finder. Specifically, Barron opines that FXCM's purported VIE and related party disclosure failures were "material misstatements." Opinions on materiality, a complex factual and legal question appropriately determined by the fact finder, are improper from an accounting expert. As one court put it, in a ruling that could be adopted for Barron's proposed opinion on materiality, Barron "manages in a single sentence to both usurp the trial judge's function of instructing the jury on the law and tell the jury what result to reach on the facts: a breathtaking *tour de force* of inadmissibility." *Feinberg v. Katz*, No. 01 CIV. 2739 (CSH), 2007 WL 4562930, at *26 (S.D.N.Y. Dec. 21, 2007).

Accordingly, for these reasons, the Court should grant Defendants' motion and exclude the reports, testimony, and opinions of Barron.

## BACKGROUND

GAAP is a set of accounting principles promulgated by the Financial Accounting Standards Board ("FASB"), an independent body designated by the SEC to set accounting standards for public companies. The Accounting Standards Codification ("ASC") is the source of GAAP for public companies. GAAP requires a company that has a controlling financial interest in another entity to consider whether that other entity must be consolidated into the company's financial statements. The authoritative guidance on the consolidation of VIEs is codified in ASC Topic 810, *Consolidation* ("ASC 810"). ASC 810 requires a multi-step analysis in order to conclude that an entity should be consolidated on a reporting entity's financial statements as a VIE. This multi-step analysis is further discussed below in Argument Section II.A, and also described in Exhibit 2 attached hereto. GAAP also requires that a company that has significant transactions with parties

that are related or are under common control make certain disclosures about those transactions. The authoritative guidance on related party disclosures is codified in ASC Topic 850, *Related Party Disclosures* ("ASC 850").

Plaintiffs claim that FXCM's public filings contained materially false and misleading statements and omissions in violation of Section 10(b) of the Exchange Act and Rule 10b-5 promulgated thereunder, as well as Section 20(a) of the Exchange Act, based on, among other alleged disclosure violations, violations of GAAP. *See* ECF No. 181 ¶¶ 131-145. The Class Period as defined in Plaintiffs' Third Amended Complaint ("TAC") is March 15, 2012 to February 6, 2017. *Id.* ¶ 1. Plaintiffs have retained Barron to serve as their expert witness on matters relating to FXCM's compliance with GAAP. Barron submitted an expert report dated April 21, 2021 (the "Barron Report"), was deposed on June 7, 2021, and submitted a rebuttal report on July 12, 2021 (the "Rebuttal Report").

The large majority of Barron's Report is comprised of a lengthy factual narrative spanning from paragraph 18 to paragraph 114 of his 150-paragraph report. In that almost 100-paragraph factual narrative, characterized as "Overview and Background" and "Analysis of FXCM and Effex Relationship," Barron selectively summarizes documents and testimony that he believes are supportive of his opinions.

Regarding the VIE consolidation and disclosure issue, Barron opines that "[a]t inception, Effex met the criteria of a Variable Interest Entity . . . of which FXCM was the primary beneficiary. This required FXCM to consolidate the financial statements of Effex and make certain disclosures in FXCM's consolidated financial statements in accordance with GAAP." Ex. 1, Barron Report

¶ 11.[1]  In support of this opinion, Barron concludes that "John Dittami, the holder of 100% of the equity interest in Effex, did not have sufficient equity at risk for Effex to finance its activities without the support of FXCM." *Id.* ¶ 11.1.  Further, according to Barron, FXCM met the definition of a "primary beneficiary" of Effex because "FXCM had the right to receive benefits from Effex in the form of order flow payments that were significant to Effex" and "FXCM had the power to direct the activities of Effex that most significantly impacted Effex's economic performance . . . ." *Id.* ¶ 11.2.  Barron then concludes that, "[a]s the Primary Beneficiary, FXCM was required to— but did not—consolidate Effex in FXCM's consolidated financial statements." *Id.* ¶ 11.3.

According to Barron, "FXCM's failure to consolidate Effex's financial statements and make the required disclosures, including information about FXCM's involvement with Effex, as required by GAAP, caused FXCM's consolidated financial statements to be materially misstated." *Id.* ¶ 12.  Barron then qualifies this opinion by stating "[a]t a minimum, such consolidation was required for the year ended, December 31, 2010, the period in which Effex was formed and commenced operations." *Id.*  Significantly, financial statements related to the fiscal year ended December 31, 2010 are **not** within the Class Period and Plaintiffs have not alleged those disclosures to be misstated.

Regarding the related party disclosure issue, Barron opines that "Effex was a Related Party with respect to FXCM as defined by GAAP" because "FXCM was in a position to significantly influence the management or operating policies of Effex to the extent that Effex might be prevented from fully pursuing its own separate interests." *Id.* ¶ 7.  According to Barron, FXCM's

---

[1] Citations to "Ex. __" are to the exhibits attached to the September 9, 2021 Declaration of Israel Dahan in Support of Defendants' Motion to Exclude the Reports, Testimony, and Opinions of John E. Barron.

ability to significantly influence the management or operating policies of Effex was due to "(1) Effex's creation by FXCM, run by a former FXCM employee; (2) FXCM's provision of financial and other support enabling Effex to commence operations; and (3) Effex's continuing dependence on FXCM for the substantial majority of Effex's business transactions." *Id.* Further, Barron concludes that "subsequent to the formation of Effex, the two companies continued to maintain a profit-sharing arrangement which, in substance, was the same economic arrangement FXCM had in place with Effex's owner under his previous employment agreement with FXCM . . . ." *Id.* Barron then opines that "the transactions between FXCM and Effex were material to FXCM's consolidated financial statements," (*id.* ¶ 10), reasoning that the transactions were quantitatively material because "the nature of the order flow payments, which were based on the trading profits of Effex, differed substantially from what FXCM described in its financial statements as its core business philosophy and principal source of revenue . . . ." *Id.* ¶ 9.

## LEGAL STANDARD

The Federal Rules of Evidence require courts to serve as gatekeepers to "ensur[e] that an expert's testimony both rests on a reliable foundation and is relevant to the task at hand." *Daubert v. Merrell Dow Pharms., Inc.*, 509 U.S. 579, 597 (1993). Federal Rule of Evidence 702 governs whether an expert witness's testimony is admissible. It provides that proffered testimony is only admissible if:

> (a) the expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue; (b) the testimony is based on sufficient facts or data; (c) the testimony is the product of reliable principles and methods; and (d) the expert has reliably applied the principles and methods to the facts of the case.

Fed. R. Evid. 702. "[T]he proponent of expert testimony has the burden of establishing by a preponderance of the evidence that the admissibility requirements of Rule 702 are satisfied[.]" *United States v. Williams*, 506 F.3d 151, 160 (2d Cir. 2007); *see also Nimely v. City of N.Y.*, 414

5

F.3d 381, 397 (2d Cir. 2005).  In addition, under Federal Rule of Evidence of 403, relevant evidence may be excluded "if its probative value is substantially outweighed by the danger of . . . unfair prejudice, confusing the issues, [or] misleading the jury."  Fed. R. Evid. 403.

With respect to the analysis as to whether an expert's opinions will be helpful to the trier of fact, it is improper for an expert to present "a narrative of the case" or "an historical commentary of what happened."  *In re Fosamax Prods. Liab. Litig.*, 645 F. Supp. 2d 164, 192 (S.D.N.Y. 2009) (expert not permitted "to merely read, selectively quote from, or 'regurgitate' the evidence") (citations omitted); *see also United States v. Dukagjini*, 326 F.3d 45, 54 (2d Cir. 2003) (explaining that parties cannot "unfairly provid[e] . . . an additional summation by having the expert interpret the evidence") (internal citations and quotations omitted).

Regarding reliability, this assessment "focuses on whether the reasoning or methodology underlying the testimony is scientifically valid.  The expert's testimony must be grounded in the methods and procedures of science and must be more than unsupported speculation or subjective belief."  *Jarvis v. Ford Motor Co.*, No. 92 CIV. 2900 (NRB), 1999 WL 461813, at *2 (S.D.N.Y. July 6, 1999).  "[W]hen an expert opinion is based on data, a methodology, or studies that are simply inadequate to support the conclusions reached, *Daubert* and Rule 702 mandate the exclusion of that unreliable opinion testimony."  *Amorgianos v. Nat'l R.R. Passenger Corp.*, 303 F.3d 256, 266 (2d Cir. 2002); *see also Ruggiero v. Warner-Lambert Co.*, 424 F.3d 249, 255 (2d Cir. 2005).

As demonstrated below, the opinions of Barron are neither helpful to the trier of fact nor reliable; thus, they should be excluded.

<u>**ARGUMENT**</u>

**I.    Barron's Factual Narrative Is Unhelpful And Should Be Excluded**

"[A]n expert cannot be presented to the jury solely for the purpose of constructing a factual narrative based upon record evidence." *Highland Cap. Mgmt., L.P. v. Schneider*, 379 F. Supp. 2d 461, 469 (S.D.N.Y. 2005).  Thus, courts in the Second Circuit routinely exclude extensive factual narratives by an expert that a "lay juror is equally capable of constructing." *Taylor v. Evans*, No. 94 Civ. 8425, 1997 WL 154010, at *2 (S.D.N.Y. Apr. 1, 1997); *see also In re Rezulin Prod. Liab. Litig.*, 309 F. Supp. 2d 531, 551 (S.D.N.Y. 2004); *LinkCo, Inc. v. Fujitsu Ltd.*, No. 00 Civ. 7242, 2002 WL 1585551, at *1-*2 (S.D.N.Y. July 16, 2002); *Media Sport & Arts s.r.l. v. Kinney Shoe Corp.*, No. 95 CIV. 3901, 1999 WL 946354, at *3 (S.D.N.Y. Oct. 19, 1999).

In his Report, Barron provides a lengthy factual narrative—spanning more than 40 of its 68 pages—that cherry picks deposition testimony and documents out of context, ignores other sworn testimony without any explanation, and summarizes background information that is wholly immaterial.  As Professor Linsmeier describes in his report, many of the facts that comprise Barron's factual background section existed only outside the Class Period—which provide little utility to any analysis of GAAP compliance during the Class Period.  Moreover, there is a wealth of countervailing evidence, as detailed in Exhibit 2A of the Linsmeier Report, that Barron fails to address or even consider.  *See* Ex. 2, Linsmeier Report at Ex. 2A.

Barron's lengthy background section (paragraphs 18 through 114 of the Report) is precisely the type of factual narrative courts routinely exclude because it is properly presented through percipient witnesses rather than through an expert.  In fact, "the glosses that [Barron] interpolates into his narrative are simple inferences drawn from uncomplicated facts that serve only to buttress plaintiffs' theory of the case." *In re Rezulin Prod. Liab. Litig.*, 309 F. Supp. 2d at 551 (finding plaintiffs' expert's testimony on the factual background to be inadmissible).

Moreover, Barron's incomplete and one-sided presentation of "facts," many of which are irrelevant to a GAAP analysis or outside the Class Period, is also likely to confuse or mislead a jury. Thus, in accordance with well-established precedent, Barron's narrative of the facts should be found inadmissible under Federal Rules of Evidence 702 and 403.

## II.   Barron's VIE Opinions Are Unreliable And Should Be Excluded

### A.   Barron Does Not Follow The GAAP-Prescribed Methodology To Determine Whether VIE Consolidation And Disclosure Is Required

The Second Circuit has opined that "when an expert opinion is based on data, a methodology, or studies that are simply inadequate to support the conclusions reached, *Daubert* and Rule 702 mandate the exclusion of that unreliable opinion testimony." *Amorgianos*, 303 F.3d at 266 (citation omitted). Moreover, an expert's opinions and testimony should be excluded when he fails to adhere to the proper methodology for reaching those opinions. *Id.* at 268-69 (affirming the district court's exclusion of expert testimony because the expert's opinion rested on faulty assumptions due to his failure to apply his stated methodology reliably to the facts of the case).

With respect to the applicable methodology for assessing GAAP compliance with VIE consolidation and disclosure standards, Barron recognizes that ASC 810, "is the authoritative accounting standard under GAAP concerning consolidation." Ex. 1, Barron Report ¶ 136. As described in Professor Linsmeier's Expert Report, ASC 810 requires a three-step analysis in order to conclude that a company should be consolidated on a reporting entity's financial statements as a VIE. Ex. 2, Linsmeier Report ¶ 63. The analytical steps to be performed are:

- First, is the entity considered for consolidation a VIE?

- Second, does the reporting entity have a variable interest in the VIE?

- Third, is the reporting entity the primary beneficiary of the VIE?

Although Barron recognizes that ASC 810 is controlling, in his report he analyzes only the factors he finds persuasive and ignores others, causing his analysis to be incomplete and fundamentally flawed.  It was not until his Rebuttal Report that Barron even acknowledged the three-step analysis that ASC 810 requires (Ex. 3, Barron Rebuttal ¶ 40), and even then, Barron simply dismisses the factors he fails to analyze, claiming that he need not perform that analysis in order to reach his conclusions.  *See, e.g.*, *id.* ¶ 63.

> Step One:  Is the Entity Considered for Consolidation a VIE?

The first step of the ASC 810 VIE analysis requires consideration of whether the entity considered for consolidation (here, Effex) is a VIE.  *See* Ex. 2, Linsmeier Report ¶¶ 38-43; Ex. 3, Barron Rebuttal ¶ 40.  This requires analysis of (1) whether the equity holders have insufficient equity at risk in the potential VIE or (2) whether equity holders, as a group, do <u>not</u> have the power to direct the significant activities of the potential VIE, the obligation to absorb losses, or the right to receive residual returns.  *See* Ex. 2, Linsmeier Report ¶ 38 and Ex. 1A.

In addressing this first step, Barron summarily concludes that "John Dittami, the holder of 100% of the equity interest in Effex, did not have sufficient equity at risk for Effex to finance its activities without the support of FXCM," and avers that the lack of sufficient equity at risk "is evident from the support required from FXCM during the initial and early stages of Effex's operations."  Ex. 1, Barron Report ¶ 11.1.  This reductive and incomplete analysis is not supported by a substantive analysis of Dittami's equity at risk in Effex or the amount of equity investment that was sufficient to fund Effex's operations.

In order to properly analyze equity at risk one must consider the following:  (1) if the entity is a development-stage enterprise, whether the equity invested in it is sufficient to permit it to finance the activities it is currently engaged in; or (2) if the entity is not a development-stage

enterprise, whether the equity investment at risk is less than 10 percent of the entity's total assets. *See* Ex. 2, Linsmeier Report ¶¶ 39, 40. Barron makes no determination whatsoever of (1) whether or not Effex was a development-stage enterprise; (2) what the equity invested in Effex even was; (3) what level of equity investment at risk would have been sufficient to permit Effex to finance its activities at any stage; or (4) Effex's assets, in order to determine whether the equity investment at risk met the 10 percent threshold. In other words, Barron simply fails to perform a GAAP analysis of equity at risk—a necessary step before making any conclusion regarding consolidation under GAAP.[2]

Having failed to analyze the sufficiency of the equity that Effex's equity holders had at risk, Barron also failed to analyze the equity holders' power and obligation to absorb losses and receive returns. Though Barron acknowledges that this inquiry is part of the relevant analytical framework (Ex. 1, Barron Report ¶ 138), it is entirely lacking from his Report. In his Rebuttal Report, Barron asserts that because he concluded that Effex had insufficient equity at risk, he need not analyze this prong. Ex. 3, Barron Rebuttal ¶ 63. However, as noted above, Barron's analysis of the equity at risk is insufficient, and given his failure to analyze Effex's equity holders' power and obligation to absorb losses, Barron has no basis under GAAP to conclude that Effex was a VIE.

---

[2] In his Rebuttal Report, Barron attempted to supplement his analysis by asserting that the fact that Effex shared office space with FXCM for a year, that Effex used a prime-of-prime account linked to FXCM's prime brokerage account with Citibank, and that Effex's servers were co-located with FXCM's servers, was evidence that "Effex lacked sufficient equity at risk at the time of its formation and beyond." Ex. 3, Barron Rebuttal ¶ 50. Yet, this supplemental analysis offers no actual support for Barron's opinions because there is still no analysis of either the equity invested in Effex or the level of equity necessary to fund the operations of Effex, and, again, these facts are largely only present *outside* the Class Period.

Step Two:  Does the Reporting Entity have a Variable Interest In the VIE?

Assuming the entity is a VIE—which Barron has not shown—the second step of the ASC 810 analysis considers whether the reporting entity (here, FXCM) has a variable interest in the VIE (here, Effex, assuming it is a VIE in the first place).  Ex. 2, Linsmeier Report ¶¶ 44-45; Ex. 3; Barron Rebuttal ¶ 40.  In order to hold a variable interest in Effex, FXCM would have had to hold investments or other interests that would have absorbed portions of Effex's expected losses or receive portions of Effex's expected residual returns (or profits).  Ex. 2, Linsmeier Report ¶ 45; Ex. 3, Barron Rebuttal ¶ 65.

In his Report, Barron skips this step entirely.  Yet, in his Rebuttal Report, Barron concludes, with little (if any) cogent analysis, that "[t]he services agreement met the definition of a variable interest as it would cause FXCM to either absorb portions of Effex's expected losses or to receive portions of Effex's expected residual returns."  Ex. 3, Barron Rebuttal ¶ 66.  The Services Agreement, agreed to among FXCM and Effex, provides that:

> FXCM shall receive from Effex a fee equal to $21.00 USD per million units of Base Currency . . . for the aggregated volume of Transactions executed via the Trading System (the "Fees").  The Fee shall be calculated by FXCM on a monthly basis.  FXCM shall provide Effex an invoice for all unpaid Fees.  . . . As used herein, 'Base Currency' means the first currency of the given currency pair as displayed on the FXCM Trade Station II platform.

Ex. 5, March 1, 2010 Services Agreement; Ex. 6, May 1, 2010 Services Agreement.  How Barron is able to arrive at the conclusion that the Services Agreement met the definition of a variable interest, while also acknowledging that the Services Agreement was a fixed-fee contract based solely on trade volume, (*see* Ex. 4, John E. Barron Deposition Transcript taken June 7, 2021 ("Barron Tr.") at 68:10-13), eludes comprehension.  The Services Agreement is devoid of any language obligating FXCM to absorb any losses of Effex or providing that FXCM will share in the expected profits of Effex.  Even at his deposition, Barron acknowledged that there is no

mention in the Services Agreement of FXCM sharing in the losses or profits of Effex.  *See id.* at 68:14-69:17.

Nonetheless, Barron attempts to argue that the Services Agreement meets the definition of a variable interest because "[t]he rate was fixed but the actual payments were variable."  Ex. 3, Barron Rebuttal ¶ 68.  While it is correct that the volume of the order flow that Effex received from FXCM's customers on a monthly basis varied and, therefore, the monthly payment to FXCM varied, Barron fails to explain how this is evidence that FXCM participated in Effex's profits or absorbed Effex's losses.  In reality, Effex did not make a fixed amount on each customer trade and its profits were not correlated to FXCM customer losses and profits.  Ex. 7, John Dittami Deposition Transcript taken April 8, 2016 ("Dittami CFTC Tr.") at 83:21-84:18; Ex. 8, Affidavit of John Dittami dated June 1, 2017 ("Dittami Affidavit") ¶ 13.  Further, as Barron acknowledged at his deposition, Effex made profits by acting as a liquidity provider for other entities besides FXCM (*see* Ex. 4, Barron Tr. at 130:8-131:17)—profits or losses which are unrelated to the payments for order flow Effex made pursuant to the Services Agreement.  Even more bizarre, in support of his argument that FXCM shared in Effex's profits and losses, Barron appears to place some analytical weight on a purported attempt by Effex and FXCM to mirror the 70/30 profit split of Dittami's 2009 employment contract.  *See* Ex. 1, Barron Report ¶¶ 32, 47, 51, 58, 59; Ex. 3, Barron Rebuttal ¶¶ 14, 68, 69.  Yet, Barron also asserts that "the service agreement was **not** amended to incorporate Mr. Dittami's requests to . . . preserve the 70/30 profit split . . . ."  Ex. 3, Barron Rebuttal ¶ 33 (emphasis added).  And Barron acknowledged at his deposition that there is no mention in the Services Agreement of a 70/30 profit split.  *See* Ex. 4, Barron Tr. at 69:2-10.  Simply put, Barron's conclusion that FXCM shared in Effex's profits and losses is at odds with

the terms of the Services Agreement and contradicts his own summary of the facts, including his characterization of that very agreement.

<u>Step Three:  Is the Reporting Entity the Primary Beneficiary of the VIE?</u>

Assuming the reporting entity is shown to have a variable interest in a VIE, the final question under ASC 810 is whether the reporting entity is the primary beneficiary of the VIE.  *See* Ex. 2, Linsmeier Report ¶¶ 46-52; Ex. 3, Barron Rebuttal ¶ 40.  The relevant question is whether the reporting entity has the power to direct the activities of the VIE that most significantly impact the VIE's economic performance and the obligation to absorb losses and right to receive residual returns.  Ex. 2, Linsmeier Report ¶ 47; Ex. 3, Barron Rebuttal ¶ 71.  This is the only element of the analytical framework that Barron substantively addresses in his Report, although as explained below, he reaches several unsupported conclusions along the way (*see infra* Argument Section II.B).

**B.     Barron's VIE Opinions Are Conclusory, Unsupported By The Factual Record, And Based On Speculation And Conjecture**

Opinions that are conclusory, "without factual basis and . . . based on speculation or conjecture are . . . inappropriate material for consideration . . . ." *Major League Baseball Properties, Inc. v. Salvino*, *Inc.*, 542 F.3d 290, 311 (2d Cir. 2008); *see also Nimely*, 414 F.3d at 396-97. 2005).  Moreover, a court should disallow expert testimony where it concludes "there is simply too great an analytical gap between the data and the opinion proffered."  *General Electric Co. v. Joiner*, 522 U.S. 136, 146 (1997) (citation omitted).  Barron's Report and Rebuttal Report are rife with conclusory opinions that are either entirely unsupported or directly contradicted by

documents or testimony that he fails to address.  Such conclusory opinions must be excluded as they are unreliable and misleading.

By way of example, in support of his opinion that FXCM was the primary beneficiary of Effex, Barron opines that "[c]learly, if FXCM had requested Effex to modify its activities, Effex would have been forced to comply or face the loss of the substantial majority of its business and the non-monetary support being provided by FXCM." Ex. 1, Barron Report ¶ 145.  Yet, Barron fails to explain why this conclusion is "clear," and Barron points to no evidence in the record that FXCM ever requested that Effex modify its activities.   To the contrary, Dittami provided sworn testimony that:

> Since its inception, I have been the managing member and have made all major decisions regarding Effex. This includes, but is not limited to, hiring, admitting and expelling members, establishing banking relationships, determining employee and independent contractor compensation, handling tax matters, selecting office locations, client onboarding (including competitors of FXCM), vendor selection, prime broker selection and implementing measures to protect Effex's intellectual property ("Intellectual Property").
> . . .
> Effex's operations were never controlled by FXCM. In this regard, Effex: a. hired, fired and paid in excess of 30 employees and consultants; b. maintained its own independent bank accounts; c. independently capitalized its prime broker relationship; d. supplied all of its operating capital and risk capital; e. provided Forex ("FX") retail pricing and execution services to over 30 counterparts in addition to FXCM, including FXCM's competitors; f. owned and/or leased all of its computers, servers and other equipment; g. utilized its own confidential, proprietary trading software to facilitate all of its OTC Forex trades; h. owned managed, operated, maintained, updated and modified its own trading system; i. leased its own office space; j. had sole discretion to accept or reject trades; k. retained all of Effex's trading profits; l. assumed liability for all trading and operating losses and potential losses; m. filed its own tax returns; n. other than Dittami, no person or entity ever guaranteed any of Effex's obligations; and o. had no common employees with FXCM.

Ex. 8, Dittami Affidavit ¶¶ 9, 15.

Moreover, in support of his opinion that FXCM had the power to direct Effex's activities, Barron states "I **believe** that the existence of the signed option agreement entitling FXCM to

14

acquire 70% interest in FXCM for a nominal amount provides additional evidence of FXCM's ability to significantly influence the management and operating policies of Effex and the power of FXCM to direct the activities of Effex, most significantly impacting Effex's economic performance during period including 2010 through 2014." Ex. 1, Barron Report ¶ 109 (emphasis added).   Again, Barron's unsupported belief is contradicted by the factual record, including uncontroverted testimony from Dittami and Niv that the Option Agreement was never in effect or valid.  Ex. 9, John Dittami Deposition Transcript taken January 21, 2021 ("Dittami Tr.") at 158:2–161:2; Ex. 10, Dror Niv Deposition Transcript taken May 25, 2016 ("Niv CFTC Tr.") at 155:10–163:7.  Per this testimony, neither Effex nor FXCM viewed the Option Agreement, which would have granted FXCM the option to purchase a portion of Effex, as an enforceable agreement.  *See id.*  It is inexplicable how Barron could form a belief that the existence of an Option Agreement could have power over an entity whose owner thought the Option Agreement was never in effect.

Further, in support of his opinion that Effex was a VIE, Barron opines that "Mr. Dittami's equity investment at risk was not sufficient to finance its activities without the support of FXCM." Ex. 1, Barron Report ¶ 144.  Once again, Barron's conclusion is unsupported.  Indeed, Barron ignores evidence that the equity investment at risk in Effex was more than sufficient, including:

- John Dittami testified that Effex was capitalized with his "personal funds."  Ex. 7, Dittami CFTC Tr. at 207:17–208:7.

- John Dittami gave sworn testimony that, "[w]ithin a few months [of its formation], Effex: (i) reimbursed FXCM for the [funds it had invested in the development of Effex's trading system] (in May 2010); (ii) ceased using the credit facility made available to Effex by FXCM through the above-referenced prime of prime customer account (in June 2010); (iii) entered into a prime broker agreement with Citibank (in July 2010); (iv) canceled the Note which guaranteed the credit made available to Effex by Citibank (in July 2010); and (v) commenced operations in Belfast, Ireland (October 2010)."  Ex. 8, Dittami Affidavit ¶ 7.

Thus, Dittami's testimony, which Barron does not meaningfully address in his Report, demonstrates that Dittami had sufficient equity at risk in Effex and that Effex was not reliant on financial support from FXCM.

Similarly, in support of his conclusion that FXCM's disclosures were materially misstated (which, in and of itself is an improper opinion to proffer, *see infra* Argument Section IV), Barron opines that "[g]iven the lengths to which FXCM had gone to avoid having trading profits reflected in its consolidated financial statements and being able to say that it operated on a no-dealing desk basis, it is clear that the consolidation of Effex and making the required disclosures related to Effex was qualitatively material to FXCM's financial statements."  Ex. 1, Barron Report ¶ 150.  Even if it were true that FXCM took affirmative steps to avoid consolidating Effex into its financial statements—an assertion for which there is no evidentiary or testimonial support—this does not support a conclusion of materiality, which is determined by "what influences or makes a difference to an investor or other decision maker."  Ex. 2, Linsmeier Report ¶ 30 (quoting FASB Concept Statement No. 8).

Likewise, Barron claims that "FXCM formed Effex," (Ex. 1, Barron Report ¶ 7) and "Mr. Dittami was installed as CEO," (*id.* ¶ 33).  When asked at his deposition about the basis for his position that FXCM formed Effex, Barron testified "I **believe** it was FXCM's decision to go out and form Effex."  Ex. 4, Barron Tr. at 136:9-10 (emphasis added).  Yet again, Barron's unsupported belief is contradicted by sworn testimony from John Dittami, Effex's founder, in which he:

- Affirmed the truth of his prior sworn statement that, "Effex Capital was formed by Mr. Dittami on March 23rd, 2010." Ex. 9, Dittami Tr. at 42:21-43:3;

- Testified that, in forming Effex, he "[s]igned a document to open an LLC.  I bought a website, got an e-mail, things like this."  *Id.* at 43:7-10; and

16

- Provided a sworn statement that he "formed Effex as an independent forex liquidity provider to compete with other liquidity providers."  Ex. 11, Reply Affidavit of John Dittami dated August 21, 2017 ("Dittami Reply Affidavit") ¶ 3.

Barron's Report does not meaningfully address this evidence.  Barron's conclusory opinions are based on nothing more than speculation and conjecture, and, therefore, are misleading and unhelpful to the fact finder.  Accordingly, these conclusory opinions should be excluded.

## III.    Barron's Related Party Opinions Are Conclusory And Inadmissible

Barron's opinion that FXCM failed to disclose Effex as a related party is based on one foundational, conclusory premise:  FXCM was in a position to significantly influence Effex to the extent that Effex might have been prevented from fully pursuing its own separate interests.  *See* Ex. 1, Barron Report ¶ 127.  Barron's conclusory premise is based on his finding that:  (1) FXCM created Effex (*id.* ¶ 127.1); (2) FXCM was Effex's first and primary customer at the beginning of Effex's history (*id.* ¶ 127.2); (3) Effex used FXCM's prime-of-prime account and received certain trading advantages (*id.* ¶ 127.3); and (4) FXCM had the discretion to terminate the Services Agreement and trading advantages (*id.* ¶ 127.4).

Barron, however, refuses to engage with the fact that certain of these findings are directly controverted by sworn testimony and documents, and that many of the events he relies upon **did not exist** during the Class Period.  For example, as discussed above, Dittami testified under oath that he formed Effex and it was capitalized with his own funds.  *See* Ex. 9, Dittami Tr. at 42:21-43:3; Ex. 7, Dittami CFTC Tr. at 30:7-9, 207:17-25.  Dittami also explained that while FXCM was Effex's first customer, Effex quickly gained a customer base and began working with entities other than FXCM.  Ex. 7, Dittami CFTC Tr. at 41:24-43:15.  In fact, Effex provided liquidity for numerous customers, other than FXCM.  Ex. 7, Dittami CFTC Tr. at 34:14-35:9 (testified that Effex provided liquidity for EBS, Hot Spot, Currenex, Reuters, Fast Match, and FXL).  Further, witnesses have confirmed that the initial $2 million in prime-of-prime funding was repaid in July

17

2010, at which time Effex maintained its own accounts.  Ex. 12, Dror Niv Deposition Transcript taken February 11, 2021 ("Niv Tr.") at 121:23-122:4; Ex. 8, Dittami Affidavit ¶¶ 7, 15.  In other words, it was repaid even before FXCM was a public reporting entity and five months before the start of any reporting period encompassed by the Class Period.  Finally, while it is not in dispute that FXCM could terminate the Services Agreement and certain trading advantages provided to Effex, the mere existence of a terminable, significant contract cannot and does not transform the signatories to that contract into related parties.  If that were the case, every small company with a significant contract would be transformed into a related party of its contractual counterparty.  Furthermore, Barron ignores the fact that FXCM terminated the Services Agreement in August 2014—during the Class Period—and Effex continued to operate.  *See* Ex. 12, Niv Tr. at 156:12-19.

Thus, the cornerstone of Barron's related party analysis is a conclusory opinion that is unsupported and, in fact, contradicted by the evidence.  Moreover, Barron's deliberate confusion of the relevant timeline and inability to provide opinions during the time period relevant to Plaintiffs' claims will profoundly confuse a jury and, coordinately, prejudice Defendants.  Accordingly, Barron's related party opinions should be excluded under Rules 702 and 403.

## IV.  Barron Usurps The Fact Finder In Opining On Materiality

An expert's application of legal principles to the facts of the case, resulting in an opinion that the securities laws have been violated, "usurps the jury's role in finding the facts and applying those facts to the law as instructed by the court" and is the "type of expert testimony that is not permitted."  *Highland Cap. Mgmt., L.P.*, 379 F. Supp. 2d at 470-71 (internal quotation marks and citation omitted).  For example, in *Feinberg v. Katz*, the court granted defendant's motion to exclude the testimony of the plaintiff's expert, a CPA, opining that defendants' alleged omissions

and misrepresentations from its financial statements were "material."  2007 WL 4562930, at *10.

As the court observed, "it is clear from [the expert's] report (stating that the alleged omission and

misrepresentations at issue are 'material'  . . . ) that he is applying legal principles to the facts of

the case . . . . [and] has crossed the line between a permissible conclusion as to an ultimate issue

of fact and an impermissible legal conclusion." *Id.* at *11.  Said differently, "[a]n expert witness's

opinion may not merely tell the jury what result to reach and it may not usurp the trial judge's

function of instructing the jury on the law." *Id.* at *7 (quotation marks and citations omitted).

      As in *Feinberg*, Barron has provided an opinion on the ultimate issue of materiality with

respect to FXCM's related party disclosures:  "Because Effex was a related party, which FXCM

did not consolidate in its financial statements, and **because the transactions between FXCM and**

**Effex were material** to FXCM's consolidated financial statements, FXCM was required by GAAP

to make certain disclosures, but it did not." Ex. 1, Barron Report ¶ 10 (emphasis added).  And

Barron's opinion on materiality extends not only to his opinion on FXCM's related party

disclosures, but also to FXCM's VIE consolidation and disclosures:  "FXCM's failure to

consolidate Effex's financial statements and make the required disclosures, including information

about FXCM's involvement with Effex, as required by GAAP, caused FXCM's consolidated

financial statements to be **materially misstated**." *Id.* ¶ 12 (emphasis added).  Indeed, according

to Barron, "[t]aken individually, each [of] the two GAAP departures caused FXCM's consolidated

financial statements to be **materially misstated** for the periods specified." *Id.* ¶ 13 (emphasis

added).  In offering these opinions Barron has entirely usurped the jury's role and has applied legal

principles to facts.   Paradoxically, Barron offers these materiality opinions despite his

acknowledgement that materiality is a complex analysis involving "the evaluation of whether a

misstatement or omission in financial statements is material is viewed from the standpoint of a

reasonable investor and the likelihood that a misstatement or omission would have significantly altered decisions of the investor, considering the circumstances, including both quantitative and qualitative factors, and the nature of the item and its location within the financial statements." *Id.* ¶ 120.

Simply put, Barron's opinions concerning materiality provide no help to the trier of fact, but rather instruct them as to what legal and factual conclusions to reach. Consequently, Barron's opinions regarding materiality must be excluded.

## **CONCLUSION**

For all the foregoing reasons, Defendants respectfully request that the Court grant Defendants' motion to exclude the Report, Rebuttal Report, testimony, and opinions of Plaintiffs' proffered accounting expert, John E. Barron.

Dated: September 9, 2021

KING & SPALDING LLP

*/s/ Israel Dahan*
Israel Dahan
Peter Isajiw
Evan C. Ennis
Ryan Gabay
KING & SPALDING LLP
1185 Avenue of the Americas
New York, New York 10036-2601
Tel: (212) 556.2100
Fax: (212) 556.2200

Chelsea Corey
KING & SPALDING LLP
300 S. Tryon Street, Suite 1700
Charlotte, North Carolina 28202
Tel: (704) 503.2575
Fax: (704) 503.2622

*Attorneys for Defendants Global Brokerage,*
*Inc. f/k/a/ FXCM, Inc., Dror Niv, and William*
*Ahdout*