# Exhibit 1

## UNITED STATES DISTRICT COURT

## SOUTHERN DISTRICT OF NEW YORK

| | | |
|---|---|---|
| | ) | |
| In re Global Brokerage, Inc. f/k/a FXCM Inc. | ) | Master File No. 1: 17-cv-00916-RA-BCM |
| Securities Litigation | ) | |
| | ) | |
| | ) | |

---

**Expert Report**

**By**

**John E. Barron, CPA**

**April 21, 2021**

---

# TABLE OF CONTENTS

I.      SUBJECT OF LITIGATION ................................................................................ 3

II.     SCOPE OF ASSIGNMENT AND METHODOLOGY ......................................... 3

III.    SUMMARY OF OPINIONS ............................................................................... 4

    A.   **Effex Was a Related Party to FXCM and FXCM Failed to Make Related Party Disclosures as Required by GAAP** ................................................................ 4

    B.   **Effex Was a Variable Interest Entity of Which FXCM Was the Primary Beneficiary. FXCM Failed to Consolidate the Financial Statements of Effex and Make Disclosures Required by GAAP** ................................................... 6

    C.   **Each of the GAAP Departures was Material to FXCM's Consolidated Financial Statements** ........................................................................................ 9

IV.   EXPERT QUALIFICATIONS ........................................................................... 9

V.    OVERVIEW AND BACKGROUND ............................................................... 10

    A.   **FXCM Organization** ........................................................................................ 10

    B.   **FXCM's Retail Trading Revenue and Use of the Agency Model** ............... 10

    C.   **Income from Order Flow was Included in Retail Trading Revenue** ........... 13

    D.   **Creation of EES** .............................................................................................. 13

    E.   **Formation of Effex** ......................................................................................... 17

VI.   ANALYSIS OF FXCM AND EFFEX RELATIONSHIP ............................... 22

    A.   **The Various Agreements Entered Into between FXCM and Effex Represented a Continuation of Sharing of Profits That Had Existed under Mr. Dittami's Employment Agreement** .................................................... 22

    B.   **Effex Relied Upon FXCM for the Substantial Majority of Effex's Business** ........ 33

    C.   **Adjustments to Rates of Payment under the Services Agreements Provide Further Evidence That FXCM Was Supporting Effex's Operations** ........... 35

    D.   **Other Forms of Support and Advantages Provided by FXCM to Effex** ............... 37

    E.   **April 14, 2010 Option Agreement** ................................................................ 48

    F.   **Revenue Earned by FXCM from Order Flow Payments Received from Effex** ............... 50

VII.  MATERIALITY OF MISSTATEMENTS ...................................................... 52

VIII. GAAP – RELATED PARTY DISCLOSURES ............................................... 55

    A.   **Definition of Related Parties** ....................................................................... 55

    B.   **Required Disclosures** ..................................................................................... 56

IX.   OPINION – RELATED PARTY DISCLOSURES .......................................... 57

    A.   **Effex Was a Related Party** ............................................................................. 57

**B.** **FXCM's Failure to Make Related Party Disclosures Required by GAAP** .............................. 59

**C.** **FXCM's Consolidated Financial Statements Were Not Prepared in Accordance with GAAP and the Failure to Make the Related Party Disclosures Required by GAAP Caused FXCM's Consolidated Financial Statements To Be Materially Misstated.** ............................... 59

**X.** **GAAP – CONSOLIDATION - VARIABLE INTEREST ENTITIES** .................................... 62

    **A.** **Applicable Standards** ............................................................................................................ 62

    **B.** **Variable Interest Entities Subject to Consolidation** .................................................... 62

    **C.** **Primary Beneficiaries of VIEs Required To Consolidate the VIE** ........................... 63

    **D.** **Required Disclosures** ............................................................................................................ 64

**XI.** **OPINION – CONSOLIDATION – VARIABLE INTEREST ENTITIES** ......................... 65

    **A.** **Effex Was a VIE** ..................................................................................................................... 65

    **B.** **FXCM Was the Primary Beneficiary of Effex as a VIE** ............................................ 65

    **C.** **FXCM Failed to Consolidate the Financial Statements of Effex and Make the Disclosure Required by GAAP** ....................................................................................... 66

    **D.** **FXCM's Failure to Consolidate the Financial Statements of Effex and to Make the Required Disclosures Caused FXCM's Consolidated Financial Statements to Be Materially Misstated** ......................................................................................................... 67

**EXHIBITS**

**A – John Barron CV**

**B – Documents, Testimony and Other Materials Considered**

## I.    SUBJECT OF LITIGATION

1.      This litigation relates to FXCM Inc.'s ("FXCM's" or the "Company's") creation of a separate legal entity, Effex Capital, LLC ("Effex"), to conduct business using certain technology developed by an individual, John Dittami, while employed by FXCM, and the subsequent arrangements between FXCM and Effex.

## II.    SCOPE OF ASSIGNMENT AND METHODOLOGY

2.      In the matter of Global Brokerage, Inc. f/k/a FXCM Inc. Securities Litigation, I have been asked by counsel for plaintiffs to do the following:

2.1.    Evaluate the relationship and transactions between FXCM and Effex and related financial reporting of FXCM.

2.2.    Determine whether FXCM's consolidated financial statements were prepared in conformity with Generally Accepted Accounting Principles in the United States of America ("GAAP")[1] during the periods 2010 through 2014.

3.      The principal focus of my assignment was to evaluate the financial reporting and disclosures in FXCM's consolidated financial statements with respect to its relationship and transactions with Effex, giving consideration to FASB Accounting Standards Codification Topic 850, *Related Party Disclosures* ("ASC 850") and Topic 810, *Consolidation,* including the subsection on Variable Interest Entities ("ASC 810").

4.      I have reviewed over two thousand pages of documents that were produced in the course of discovery in this matter as well as transcripts of the depositions of certain fact witnesses

---

[1] GAAP refers to the framework of guidelines for financial accounting used by accountants to prepare financial statements. The SEC has the statutory authority to set accounting standards and has delegated that authority to the Financial Standards Accounting Board ("FASB"). The FASB accounting standards codification ("ASC") and the SEC rules and interpretive releases are sources of authoritative GAAP for SEC registrants. SEC Staff also issues Staff Accounting Bulletins ("SABs") which represent practices followed by the SEC staff in administering SEC disclosure requirements. ASC 105-10-05-1. SEC Regulation S-X states that financial statements filed with the SEC that are not presented in accordance with GAAP are presumed to be misleading, regardless of footnotes or other disclosures. 17 C.F.R. § 210.4-01(a)(1).

and considered this information in light of applicable GAAP and my professional knowledge, training, and experience in accounting and financial reporting. The materials I considered in forming my opinions are attached to this report as Exhibit B.

5.      The opinions expressed in this report are my present opinions based on information I have considered to date. Prior to the time I testify at trial in this matter, I may review additional evidence that is provided to me, as well as reports of other experts. Therefore, the opinions expressed herein may change as a result of my review of additional evidence. Accordingly, I reserve the right to supplement, update or otherwise modify this report at a later date.

## III.   SUMMARY OF OPINIONS

6.      EES,[2] the predecessor to Effex, was a division created within FXCM headed by an FXCM employee, John Dittami, intended to improve FXCM's trade execution and the trading experience of FXCM's retail customers, and to increase FXCM trading volume while, at the same time, generating millions of dollars in trading profits for FXCM. FXCM's CEO, Dror (Drew) Niv, testified that he considered the EES/Effex operation to be that of a market maker.[3] FXCM's consolidated financial statements for the years 2010 through 2014 did not disclose the relationship between FXCM and Effex and the nature and dollar amount of transactions between the entities. In addition, Effex was not consolidated into FXCM's consolidated financial statements.

### A.  Effex Was a Related Party to FXCM and FXCM Failed to Make Related Party Disclosures as Required by GAAP

7.      Effex was a Related Party with respect to FXCM as defined by GAAP.[4] Specifically, FXCM was in a position to significantly influence the management or operating policies of Effex to the extent that Effex might be prevented from fully pursuing its own separate

---

[2] EES stands for Electronic Execution Systems. Ahdout CFTC transcript 64:23 – 25.
[3] Niv transcript 64:2 – 65:11, 68:20 – 69:25, 77:5 – 10, 83:20 – 84:16.
[4] ASC 850-10-20.

interests. FXCM's ability to significantly influence the management or operating policies of Effex was due to a combination of factors including, but not limited to: (1) Effex's creation by FXCM, run by a former FXCM employee; (2) FXCM's provision of financial and other support enabling Effex to commence operations; and (3) Effex's continuing dependence on FXCM for the substantial majority of Effex's business transactions.[5] Given the nature of the relationship and Effex's dependence on FXCM, FXCM was in a position to significantly influence the management and operating policies of Effex. In addition, subsequent to the formation of Effex, the two companies continued to maintain a profit-sharing arrangement which, in substance, was the same economic arrangement FXCM had in place with Effex's owner under his previous employment agreement with FXCM, indicating that no substantial change had occurred when FXCM formed Effex as a separate legal entity.[6]

8.      Based on agreements between FXCM and the newly formed Effex, FXCM received a majority of Effex's trading profits in the form of order flow payments made by Effex to FXCM. Beginning with the year ended December 31, 2010, through the year ended December 31, 2014, the revenues recognized by FXCM based on order flow payments received from Effex were quantitatively material to FXCM's consolidated financial statements. During these periods, the revenue recognized by FXCM from these order flow payments represented from approximately 15.0% to 38.0% of FXCM's pre-tax income, averaging approximately 26% over the five-year period (see Section VI.F., below).

9.      In addition, the nature of the order flow payments, which were based on the trading profits of Effex, differed substantially from what FXCM described in its financial statements as its core business philosophy and principal source of revenue, namely markups on prices provided by

---

[5] Dittami transcript 173:8 – 15; 343:9 – 24; Dittami Ex. 69, GLBR_00103994 – 95.
[6] Dittami transcript 113:18 – 114:22; Dittami Ex. 19, E Capital-000049.

"external" market makers.  The decision by FXCM to create EES and essentially "spin-off" EES as a separate legal entity was based on "the optics" of how it would look for FXCM to  take on the role of a market maker, contrary to FXCM's no dealing desk (agency) model disclosed in its consolidated financial statements.[7]  The decision by FXCM to separate the EES division into a separate legal entity is evidence that the distinction between business models (i.e., dealing vs a no dealing desk) and how it would appear to third parties was of significant importance to FXCM. This is an indication of qualitative materiality.

10.     Because Effex was a related party, which FXCM did not consolidate in its financial statements, and because the transactions between FXCM and Effex were material to FXCM's consolidated financial statements, FXCM was required by GAAP to make certain disclosures, but it did not.  The failure to make the following disclosures caused FXCM's consolidated financial statements to be materially misstated beginning with the year ended December 31, 2010, through the year ended December 31, 2014:[8]

- The nature of the relationship between FXCM and Effex;
- A description of the transactions between FXCM and Effex, including those to which no amounts were ascribed;
- The dollar amounts of the transactions between FXCM and Effex; and
- Amounts due from or to Effex.

**B.  Effex Was a Variable Interest Entity of Which FXCM Was the Primary Beneficiary.  FXCM Failed to Consolidate the Financial Statements of Effex and Make Disclosures Required by GAAP**

11.     At inception, Effex met the criteria of a Variable Interest Entity ("VIE") of which FXCM was the Primary Beneficiary.  This required FXCM to consolidate the financial statements of Effex and make certain disclosures in FXCM's consolidated financial statements in accordance

---

[7] Niv transcript 44:3 – 47:13; Ahdout transcript 43:14 – 44:6; Ahdout CFTC transcript 98:15 – 100:23.
[8] ASC 850-10-50-1.

with GAAP.

11.1.    Effex met the criteria of a Variable Interest Entity at the date FXCM first became involved with Effex.  Specifically, John Dittami, the holder of 100% of the equity interest in Effex, did not have sufficient equity at risk for Effex to finance its activities without the support of FXCM.  This is evident from the support required from FXCM during the initial and early stages of Effex's operations.

11.2.    FXCM met the definition of the Primary Beneficiary of Effex as a Variable Interest Entity.  FXCM was the source of a substantial majority of Effex's business, and Effex relied upon FXCM for financial and other support to commence and continue operations.  Due to its size, Effex had difficulty obtaining external customers.  Initially, Effex had no external customers.  FXCM had the right to receive benefits from Effex in the form of order flow payments that were significant to Effex, one of the two criteria for determining the primary beneficiary.  In addition, FXCM had an option to acquire 70% of Effex for a nominal amount.[9]  Given Effex's near-total dependency on FXCM, FXCM had the power to direct the activities of Effex that most significantly impacted Effex's economic performance, which is the second of the two criteria for classification of FXCM as the primary beneficiary.

11.3.    As the Primary Beneficiary, FXCM was required to—but did not—consolidate Effex in FXCM's consolidated financial statements.  Had FXCM consolidated Effex, FXCM would have been required to disclose the following information in its consolidated financial statements:[10]

• The methodology used by FXCM for determining whether FXCM was the

---

[9] E Capital-000050 – 51.
[10] ASC 810-10-50-3 and ASC 810-10-50-5A.

primary beneficiary of Effex;

- Qualitative and quantitative information about FXCM's involvement with Effex;

- Carrying amounts and classifications of Effex's assets and liabilities included in FXCM's consolidated statements of financial condition;

- Financial or other support provided by FXCM to Effex and the primary reasons for providing the support;

- Lack of recourse that Effex's creditors or beneficial interest holders have against FXCM;

- Terms of arrangements, if any, that could require FXCM to provide financial support to Effex, including events and circumstances which could expose FXCM to a loss; and

- If facts and circumstances had changed with respect to the initial decision to consolidate Effex, disclosure of the primary factors that caused the change and the effect on FXCM's financial statements.

12.     FXCM's failure to consolidate Effex's financial statements and make the required disclosures, including information about FXCM's involvement with Effex, as required by GAAP, caused FXCM's consolidated financial statements to be materially misstated. At a minimum, such consolidation was required for the year ended, December 31, 2010, the period in which Effex was formed and commenced operations.  If FXCM had consolidated Effex's financial statements in 2010, as required by GAAP, and later determined that Effex no longer met the criteria of a variable interest entity or that FXCM was no longer the primary beneficiary of Effex, additional disclosures would have been required.

### C.  Each of the GAAP Departures was Material to FXCM's Consolidated Financial Statements

13.     Taken individually, each the two GAAP departures caused FXCM's consolidated financial statements to be materially misstated for the periods specified.

## IV.     EXPERT QUALIFICATIONS

14.     I am a certified public accountant ("CPA") licensed to practice continuously since November 1987 by the state of Georgia (1987-1998) and New York (1998-present), a total of 34 years.  During that time, I have been directly involved in performing or overseeing hundreds of audits of financial statements prepared in accordance with GAAP.  I was employed by Deloitte for a total of 21 years, including twelve years as an audit partner.

15.     I presently serve as a consulting expert to Arcadia Consulting, LLC in New York and as the Director of Quality Control at Frost, PLLC, in Little Rock ("Frost"), where I perform final pre-issuance reviews of all audit engagements and coordinate periodic inspections of Frost by the AICPA and the United States Public Company Accounting Oversight Board ("PCAOB"). My duties at Frost include consultation on the application of technical accounting and auditing standards, and conducting professional training in accounting and auditing.

16.     From 2003 through today, I have testified and been accepted as an expert in four administrative proceedings before the U.S. Securities and Exchange Commission ("SEC") or the PCAOB and have been deposed as an expert witness three times in matters related to U.S. federal court proceedings, including one matter within the last four years.[11]

17.     My qualifications are further documented in my curriculum vitae which is attached to this report as Exhibit A.  I am being compensated for my time on this matter at a rate of $425

---

[11] American Realty Capital Properties, Inc. litigation, Civil Action No. 1:15-mc-00040-AKH, United States District Court, Southern District of New York.

per work hour.

## V.   OVERVIEW AND BACKGROUND

### A.  FXCM Organization

18.    FXCM became a publicly traded company in December 2010, following its initial

public offering.[12]  As disclosed in its Form 10-K for the year ended December 31, 2010 ("2010

Form 10-K"), FXCM was a holding company whose sole asset was a controlling interest in FXCM

Holdings, LLC ("Holdings").[13]   The Company operated through Holdings and its global

subsidiaries, including Forex Capital Markets, LLC ("FXCM US").[14]  The Company operated in

a highly regulated environment:

> Our business and industry are highly regulated. Our operating subsidiaries are
> regulated in a number of jurisdictions, including the United States, the United
> Kingdom (where regulatory passport rights have been exercised to operate in a
> number of European Economic Area jurisdictions), Hong Kong and Australia. As
> a result of our acquisition of ODL, which was consummated on October 1, 2010,
> we are also regulated in Japan.
>
> In the United States, we are primarily regulated by the Securities and Exchange
> Commission, the New York Stock Exchange, the Commodities Futures Trading
> Commission, or CFTC, and the National Futures Association, or NFA. These
> regulatory bodies are charged with safeguarding the integrity of the markets. The
> CFTC and the NFA specifically target the FX and futures markets and protect the
> interests of customers participating in those markets.[15]

19.    Unlike its operating subsidiaries, Holdings was not subject to local regulatory

requirements.[16]

### B.  FXCM's Retail Trading Revenue and Use of the Agency Model

20.    As described in its SEC filings, FXCM provided foreign exchange ("FX") trading

---

[12] Form S-1/A and Notice of Effectiveness filed with the SEC on December 1, 2010.
[13] 2010 Form 10-K, page 1.
[14] 2010 Form 10-K, page F-8.
[15] 2010 Form 10-K, page 10.
[16] 2010 Form 10-K, page F-8.  Holdings was structured as a holding company, which held a controlling ownership interest in several operating subsidiaries which were regulated in the respective jurisdictions. Forex Capital Markets, LLC ("FXCM US") was Holdings' regulated retail foreign-exchange dealer in the United States. Niv CFTC transcript 44:11 – 47:6.

and other services, acting as an intermediary or riskless principal between its customers and FX

market makers.  FXCM utilized what it referred to as an agency model in which FXCM earned

trading fees and commissions by adding markups to prices provided by FX market makers:

> We are an online provider of foreign exchange, or FX, trading and related services
> to approximately 136,000 active retail and institutional customers globally. We
> offer our customers access to over-the-counter, or OTC, FX markets through our
> proprietary technology platform. In a FX trade, a participant buys one currency and
> simultaneously sells another, a combination known as a "currency pair". Our
> platform presents our FX customers with the best price quotations on up to 56
> currency pairs from up to 25 global banks, financial institutions and market makers,
> or FX market makers, which we believe provides our customers with an efficient
> and cost-effective way to trade FX. We utilize what is referred to as an agency
> model. When our customer executes a trade on the best price quotation offered by
> our FX market makers, we act as a credit intermediary, or riskless principal,
> simultaneously entering into offsetting trades with both the customer and the FX
> market maker. We earn trading fees and commissions by adding a markup to the
> price provided by the FX market makers and generate our trading revenues based
> on the volume of transactions, not trading profits or losses….[17]
> (Emphasis added)

21.     Under its agency model FXCM acted as a "riskless principal" eliminating market

risk through hedging against any changes in the prices provided by FX market makers.

> Retail trading revenue is earned by adding a markup to the price provided by FX
> market makers generating trading revenue based on the volume of transactions and
> is recorded on trade date. The retail trading revenue is earned utilizing an agency
> model.  Under the agency model, when a customer executes a trade on the best
> price quotation presented by the FX market maker, the Company acts as a credit
> intermediary, or a riskless principal, simultaneously entering into a trade with the
> customer and the FX market maker. This agency model has the effect of
> automatically hedging the Company's positions and eliminating market risk
> exposure. Retail trading revenues principally represent the difference of the
> Company's realized and unrealized foreign currency trading gains or losses on its
> positions with customers and the systematic hedge gains and losses from the trades
> entered into with the FX market makers. …[18]  (Emphasis added.)

22.     The Company considered its agency model, also referred to as a no-dealing desk

---

[17] 2010 Form 10-K. Page 1.  A similar disclosure reflecting an increase in the number of customers, currency pairs,
and market makers was made on page 1 of the 2011 – 2013 Forms 10-K.
[18] 2011 Form 10-K.  Page F-16.

model,[19] fundamental to its core business philosophy which differed significantly from a principal or dealing desk model used by majority of retail FX brokers.  Unlike FXCM's use of an agency model, revenue earned by principal model brokers consists primarily of trading gains and losses affected by market volatility.  According to FXCM, the agency model aligned the Company's interests with those of its customers.:

> Our agency model is fundamental to our core business philosophy because we believe that it aligns our interests with those of our customers, reduces our risks and provides distinct advantages over the principal model used by the majority of retail FX brokers. In the principal model, the retail FX broker sets the price it presents to the customer and may maintain its trading position if it believes the price may move in its favor and against the customer. We believe this creates an inherent conflict between the interests of the customer and those of the principal model broker. Principal model brokers' revenues typically consist primarily of trading gains or losses and are more affected by market volatility than those of brokers utilizing the agency model.[20]

23.     During the five-year period beginning in 2010 through 2014, the Company's retail trading revenue represented between 73% and 88% of FXCM's total revenues.[21]  For 2010 and 2011, the Company's agency execution represented 93% and 86% of FXCM's retail trading volume, respectively.[22]

24.     Beginning in 2012, FXCM started offering its small retail clients the option to trade with a dealing desk or a principal model where FXCM acts as the counterparty for its customer's transactions, earning revenue on trading gains or losses:

> In 2012, in order to accommodate our expanding customer base, we began to offer our smaller retail clients the option to trade with dealing desk, or principal model execution. In the principal model, we act as counterparty for our customer's transactions with revenue affected by trading gains or losses. We may maintain our trading position if we believe the price may move in our favor and against the customer and not offset the trade with another party.[23]

---

[19] Ahdout CFTC transcript 34:7 – 34:12.
[20] Page 1 of 2010 and 2011 Forms 10-K. Similar statements made on page 1 of 2012, 2013, and 2014, Forms 10-K.
[21] Page F-4 of 2010 - 2014 Forms 10-K, Consolidated Statements of Operations.
[22] Page 8 of 2010 and 2011 Forms 10-K.  This information was not found in the Company's subsequent filings.
[23] 2012 Form 10-K, page 8.

* * *

> Recently we launched an initiative to offer our smaller retail clients the option to trade with a dealing desk, or principal model. In our agency execution model, when a customer executes a trade with us, we act as a credit intermediary, simultaneously entering into trades with the customer and the FX market maker.[24]

25.     According to Ernst & Young ("E&Y"), FXCM's auditor, revenue earned by FXCM from its dealing desk was immaterial.[25]

### C.  Income from Order Flow was Included in Retail Trading Revenue

26.     FXCM's retail trading revenues included payments for order flow earned from routing trade orders to market makers for execution:

> … Income earned on order flow represents payments received from certain FX market makers in exchange for routing trade orders to these firms for execution. The Company's order routing software ensures that payments for order flow do not affect the routing of orders in a manner that is detrimental to its retail customers. The Company recognizes payments for order flow as earned. …[26]

27.     During the five-year period from 2010 to 2014, FXCM recognized a total of $79.0 million in revenue from order flow payments from Effex.[27]   This amount represented approximately 26% of FXCM's reported income before income taxes over this same period (see Section VI.F., below).

### D.  Creation of EES

28.     In late 2009, FXCM established a new division, a trading venture referred to internally as EES.  FXCM hired John Dittami to manage this new venture.[28]  The goal of EES was to provide better execution for FXCM's retail customers and generate profits for FXCM through

---

[24] 2012 Form 10-K, page 80.
[25] EY-GBI-WP-00002772.
[26] 2011 Form 10-K, page F-16.
[27] EY-GBI-WP-00002874 and EY-GBI-WP-00002678.
[28] Dittami transcript 26:12 – 15, 27:6 – 15, 33:12 – 34:4. Dittami Ex 4, GLBR_00110697 – 712.

competition with the other liquidity providers.[29]   Dror Niv, FXCM's CEO, testified that he

expected EES would become a market maker and FXCM partner William Ahdout testified that it

was expected that EES would generate profits as a market maker for FXCM's retail customers.[30]

Mr. Niv testified that if FXCM had kept EES and Mr. Dittami in-house, "[FXCM] could not call

it a non-dealing desk, we would have to call it a dealing desk."[31]

29.     Mr. Dittami's employment agreement dated September 4, 2009, contained the

following key elements:[32]

    29.1.   FXCM intended to invest $3 million in the venture to be applied to salary and wages

        of individuals providing services to the venture and amounts payable to executives and

        third parties for "computer systems, code for the programs the venture requires in order

        to perform its intended mission …", and similar costs.

    29.2.   For his employment services, Mr. Dittami was to receive an annual base salary of

        $250,000, increasing to $300,000 after six months, and a management bonus equal to

        30% of venture profits, based on gross revenues less all direct costs.[33]

    29.3.   Mr. Dittami was required to disclose and assign to FXCM "all necessary detail for

        a complete understanding of … all developments, know-how, discoveries, inventions,

        improvements, concepts, ideas writings, formulae, programs, systems, systems

        specifications, flow diagrams, practices, techniques, compounds, works-in-progress,

        data, derivative works, hardware, processes and methods … and other developments

---

[29] Dittami transcript 30:4 – 19; Ahdout CFTC transcript 65:2 – 4, 71:18 – 24; Ahdout transcript 36:5 – 8, 37:24 – 38:12, 42:19 – 43:13; Niv 68:20 – 69:25, 77:5 – 77:10; 83:20 – 84:16.

[30] Niv transcript 68:20 – 69:25, 77:5 – 77:10, 83:20 – 84:16; Ahdout transcript 42:19 – 44:6.

[31] Niv CFTC transcript 77:16 – 78:8.

[32] Dittami Ex 4, GLBR_00110697 – 712.

[33] Venture profits were defined as the venture's gross revenues less 100% of all direct costs. Direct costs included costs of prime brokerage accounts, employee compensation, including Mr. Dittami's base salary, software costs, travel and entertainment, and amounts of FXCM's initial $3 million investment that were expended. Dittami Ex 4, GLBR_00110697 – 712 at GLBR_00110697 – 699.

made, received, conceived, developed or acquired or written …" during Mr. Dittami's period of employment.

29.4.   During the time of Mr. Dittami's employment, and for a period of one-year thereafter, Mr. Dittami was precluded from engaging in any business activity similar to that of the venture.

29.5.   In the event of separation, Mr. Dittami would not be able to use the code for commercial purposes for one year following the separation.

29.6.   In the event that the Company elected to terminate its involvement in the venture, Mr. Dittami was given the right of first refusal and permitted to propose a purchase price to acquire the venture from FXCM.

30.      Prior to EES becoming fully operational, FXCM's chief compliance officer, James Sanders, raised a concern that operating EES as a division of FXCM would conflict with the Company's core business philosophy of operating under a no-dealing desk model.  Consequently, other than executing a small number of test trades, EES did not become operational while it was part of FXCM.[34]  Mr. Ahdout's testimony on the subject is as follows:

> Q. Did there come a time when he [James Sanders] came back to you and told you whether you were compliant with all the disclosures and materials?
> A. Yes.
>
> Q. What did he say?
> A. Absolutely not.
>
> Q. To not go forward with the trading?
> A. Yes.
>                                        * * *
> Q. What were the compliance issues raised by James Sanders?
> A. Non-dealing desk issues.
>
> Q. Correct me if I am wrong, his concern was trading by EES could be interpreted as a dealing desk for FXCM?

---

[34] Ahdout CFTC transcript 301:20 – 302:13.

A. He said it's a very gray area of whether it can be interpreted or not, but I would like to take a very conservative approach.

Q. What was your reaction?
A. Are you being too conservative?

Q. What did he say?
A. I would like to be too conservative if I can.
Q. Was there a resolution of the issue reached?

A. After discussing with my other partners we decided that we're not going to go ahead with the EES division. [35]

* * *

Q. Was the intention for EES to serve as a market maker for FXCM's retail customers?
A. Yes.

Q. But, I think, you previously testified that that never got off the ground; is that correct?
A. Correct, correct.
Q. Do you recall why it didn't get off the ground?
A. If I recall correctly, we were told by compliance that it would be better if he wasn't owned by FXCM, if he was an external company rather than an internal company. [36]

31.     FXCM's CEO, Dror Niv, testified that prior to FXCM going public the Company was having an internal debate over whether to retain its no dealing desk (agency) model or go back to a dealing desk model. [37]  Ultimately, FXCM decided to retain its no dealing desk model and stay with "external execution."  Mr. Niv testified that, in addition to the view taken by FXCM's compliance department that Mr. Dittami should not remain an employee, marketing and sales were opposed as well and sided with compliance.  Mr. Niv testified that FXCM wanted to be able to make a strong statement about not being on the other side of trades with customers and the algorithmic market trading system, developed by Mr. Dittami, would "blur the line and most

---

[35] Ahdout CFTC transcript 98:15 – 100:23.
[36] Ahdout transcript 43:18 – 44:6.
[37] Niv transcript 44:3 – 22, 68:20 – 69:25.

Page 16

people would not understand."[38]   Ultimately, FXCM decided that Mr. Dittami could not be an

employee of Effex.[39]   Essentially, the decision was based on the "optics" of having an internal

market maker:

> Q.    When you said, "could not be an employee," was it your understanding that
>       there was some rule or law or issue that would prevent him from being an
>       employee?
> A.    It was just the optics of, you know, how it would look like.
>
> Q.    And could you elaborate a little bit on what you mean by "how it would
>       look like"?
> A.    We wanted to have only external entities as market makers.
>
> Q.    And at the time that FXCM went public, was Effex a liquidity provider for
>       FXCM?
> A.    Correct.[40]

32.    FXCM's employment agreement with Mr. Dittami provided that FXCM would

retain 70% of the EES venture profits.[41] On April 14, 2010, FXCM and Mr. Dittami terminated

their employer/employee relationship in connection with the formation of Effex, a trading firm to

be owned by Mr. Dittami.  Mr. Dittami's April 14, 2010 termination letter, which he described

during his deposition as a "side letter", countersigned by Mr. Ahdout, states that "[i]t is the

understanding of both parties to enter into a license agreement on economic terms similar to the

employment agreement."[42]

### E.  Formation of Effex

33.    Effex was formed on March 23, 2010, with the assistance of FXCM's General

Counsel.[43]  Mr. Dittami was installed as the CEO and owner of 100% of the membership interest

---

[38] Niv CFTC transcript 96:5 – 97:4, 183:22 – 184:14.
[39] Niv transcript 44:3 – 22, 68:20 – 69:25.
[40] Niv transcript 45:7 – 19.
[41] GLBR_00110697 – 712 at GLBR_00110697 – 698.
[42] Dittami Ex 5, E Capital-000096 – 100 at E Capital-000097; Dittami Ex 19, E Capital-000049; Dittami transcript 113:9 – 115:11.
[43] Dittami transcript 43:7 – 23; GLBR_00218039.

in Effex.[44]

34.    In April 2014, FXCM set up a Prime of Prime ("PoP") account so that Effex could start its trading activities as an "external" entity.[45]   This required FXCM to post $2 million collateral with Citibank:

> In order to initiate its trading activities, Effex required a trading line of credit and a brokerage account for its trading activities which FXCM agreed to provide while Effex pursued establishing its own prime brokerage account. During this interim period FXCM posted $2,000,000 in an institutional prime of prime account to allow for trading. The $2,000,000 was never transferred to Effex or John Dittami. In June of 2010, the $2,000,000 was removed by FXCM from the prime of prime account. In July of 2010, Effex discontinued using the prime of prime account, as it had completed the process for establishing a prime brokerage account with Citi.[46]

35.    On April 8, 2014, FXCM and Effex entered into a $2 million promissory note[47] which was secured by Mr. Dittami's 100% ownership interest in Effex.[48]  This secured promissory note was executed in connection with FXCM opening the aforementioned $2 million PoP trading account.   Although the $2 million promissory note had a 3.5% stated interest rate, Mr. Ahdout testified that FXCM did not charge Effex interest.[49]  During his deposition, Mr. Niv acknowledged that, as a new business, Effex would have had to pay high interest rate, which FXCM did not charge..  Not charging a market rate of interest, or any interest at all, indicates that this was not an arm's-length transaction between unrelated parties.[50]

36.    Mr. Ahdout provided the following testimony when asked about the $2 million promissory note:

---

[44] Mr. Dittami later assigned small profit-sharing interests in Effex to four of his employees/contractors.  In December 2012, a trust established for Mr. Dittami's children received 28% owner interest in Effex.  Dittami Ex. 5, E Capital-000096 – 100 at E Capital-000097 – 98; Dittami transcript 43:4 – 20, 45:17 – 47:7.
[45] An April 8, 2010 email from FXCM's Patricia Muchinsky to Joshua Rosenfield, an FXCM accountant, indicates that EES was "moving to a PoP [Prime of Prime] in the next week or so." Dittami Ex 7, GLBR_00028840.
[46] Dittami Ex. 11, E Capital-000107 – 108.
[47] Dittami Ex. 12, E Capital-000026 – 30.
[48] Dittami Ex. 13, E Capital-000034 – 45.
[49] Ahdout transcript 98:15 – 20; Ahdout CFTC transcript 108:20 – 24.
[50] Niv CFTC transcript 177:12 – 178:8.

Q.      Do you recall whether FXCM loaned $2 million to Mr. Dittami or to Effex?

                                      * * *

Q.      Do you recall whether it actually happened?
A.      I believe it did, yes.

Q.      If so, how did that $2 million get loaned to Effex or to Mr. Dittami?
A.      It really wasn't a loan per se as you can take a loan and go buy a Ferrari with it. It was an extension of prime brokerage line in terms of credit.

Q.      So would it be fair to characterize that as a $2 million extension of credit from FXCM US to Mr. Dittami or Effex?
A.      It was an extension of prime brokerage.

Q.      But would it be fair to characterize that as a form of extension of credit?
A.      It's an extension of prime brokerage lines.

Q.      Okay. So what is the distinction between the "extension of prime brokerage lines" and the "extension of credit"?
A.      "Credit" means that he can take it and go buy a house with it. "Prime brokerage lines" mean that he can trade off of it.[51]

37.     According to Mr. Niv's testimony, FXCM's collateralization of a prime brokerage account was done to allow Effex access to the FX market, which Effex would not have been able to obtain as an independent institution:

Q.      Is it true that FXCM loaned Effex $2 million?
A.      No. So FXCM -- I mean, technically semi-true but not really. FXCM, essentially, collateralized the prime brokerage account to enable Mr. Dittami to get prime brokerage access to the FX market, which he would not have otherwise been able to do as an independent institution. That is a service FXCM did for others as well.
                                      * * *
Q.      Okay. And is it fair to say that you know if this wasn't a loan, this was FXCM allowing Effex to use $2 million as collateral which Effex then paid back you said after a few months?
A.      Correct.[52]
                                      * * *

MR. TOMER: The $2 million loan that we've talked about that was provided to Effex and paid back relatively quickly, what was the purpose of that loan?

---

[51] Ahdout transcript 96:23 – 97:25.
[52] Niv transcript 120:24 – 122:4.

THE WITNESS: I believe primarily it was -- there was some -- there's some startup expenses that he had, and primarily there was the – needed collateral at Citibank for prime brokerage account.

MR. TOMER: Primarily that loan was not to set up infrastructure but to have collateral at the prime brokerage?
THE WITNESS: To -- I believe primarily so, yes.[53]

38.     Mr. Dittami and FXCM ended their employer/employee relationship on April 14, 2010.[54]  Also on April 14, 2010, FXCM and Mr. Dittami entered into an option agreement which allowed FXCM to acquire 70% of Mr. Dittami's membership interest in Effex for one dollar.[55]

39.     Subsequently, FXCM US and Effex entered into a Services Agreement dated March 1, 2010 (before Effex' formation).[56]  The agreement provided, in relevant part, for Effex to act as a liquidity provider to FXCM by providing FXCM with executable prices through Effex's trading system in exchange for a fee equal to $21.00 per one million units:

## RECITALS

A. **WHEREAS**, FXCM desires to obtain executable prices from Effex at which Effex may enter into spot foreign exchange and precious metals transactions with immediate give-up to one or more prime broker banks, such as Citibank NA., as agreed to by the Parties independent of this Agreement ("Prime Broker").

B. **WHEREAS**, Effex will publish executable prices to FXCM and FXCM will send a response to Effex ("Orders") via Effex's Proprietary Execution Environment System ("Trading System"). Effex may accept or reject an Order and each Order accepted by Effex as evidenced by the Trading System, shall be considered a valid binding trade governed by the terms and conditions contained herein ("Transactions").

**NOW THEREFORE**, In consideration of the foregoing recitals and the mutual covenants and agreements set forth herein, and for other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the Parties agree as follows:

---

[53] Niv CFTC transcript 328:25 – 329:16.
[54] Dittami Ex 19, E Capital-000049.
[55] Dittami Ex.15, E Capital 000050 – 51.
[56] Dittami Ex. 14, E Capital-000004 – 11.

**AGREEMENT**

1. **Trading System**.

      1.1 Trade Prices. Effex shall provide to FXCM executable trade prices through the Trading System for entering into Transactions with Effex. For each financial product where executable prices are provided to the Trading System, Effex will disseminate a bid and offer.

* * *

3. **Fees**.

      3.1 FXCM shall receive from Effex a fee equal to $21.00 USD per one million units of Base Currency (defined below) for the aggregated volume of Transactions executed via the Trading System (the "Fees"). The Fee shall be calculated by FXCM on a monthly basis. FXCM shall provide Effex an invoice for all unpaid Fees. Upon request, Effex shall deliver to FXCM a written report (in form and substance and with such detail as FXCM shall reasonably request) setting forth its calculation of volume of Transactions executed by FXCM via the Trading System in Base Currency, for such month, which FXCM shall reconcile against its own records to calculate the Fee. As used herein, "Base Currency" means the first currency of the given currency pair as displayed on the FXCM Trade Station II platform.

      3.2 <u>Payment Terms</u>. The Fee shall be due seventy-five (75) days after the receipt of the monthly invoice from FXCM, payable in United States dollars, unless otherwise agreed by the Parties in writing. Failure to provide an invoice shall not waive FXCM's rights to any Fees and shall not relieve Effex from its obligation to pay in full all Fees earned. All payments shall be made by wire transfer of immediately available funds to an account designated by FXCM. ...[57]
[Emphasis in the original.]

    40.    According to Mr. Dittami's statement through his attorney to the CFTC, after Mr. Dittami ceased to be an FXCM employee, he and his team "proceeded with the continued build-out of the technology and development of the forex institutional liquidity trading system through Effex Capital."[58]   Mr. Dittami acknowledged during his deposition that the trading system specified in the aforementioned services agreement was developed on the basis of the EES trading system:

---

[57] Dittami Ex. 14, E Capital_000004 – 11.
[58] Dittami Ex 5, E Capital-000096 – 100 at E Capital-000097.

Q.     First page under "Recitals," Paragraph B.
A.     Okay, I see.

Q.     And is that the same trading system we spoke about earlier today that began as EES?
A.     It's a similar trading system, yes. It's the – the basis of it – some of which was done at EES.[59]

41.     Effex and FXCM executed another services agreement dated May 1, 2010 on terms which were substantially the same as the March 1, 2010 services agreement. The only significant difference was that the May 1, 2010 services agreement was between Holdings and Effex (as opposed to FXCM US and Effex).[60]

42.     In October 2011, Effex and Holdings executed an amendment to the May 1, 2010 services agreement which reduced the fee per million units from $21 to $16, effective September 1, 2011.[61]

43.     Subsequently, FXCM adjusted the fee per million for the JPY/USD currency pair to $3 effective February 2013, and to $6 for the EUR/USD currency pair effective June 2013, respectively, without amending its service agreement with Effex.[62]

44.     In August 2014 a UK regulator took a position against payments for order flow and on August 25, 2014, FXCM and Effex terminated their May 1, 2010 services agreement and the April 14, 2010 "side letter."  Both terminations were effective August 1, 2014.[63]

## VI.     ANALYSIS OF FXCM AND EFFEX RELATIONSHIP

### A.  The Various Agreements Entered Into between FXCM and Effex Represented a Continuation of Sharing of Profits That Had Existed under Mr. Dittami's Employment Agreement

---

[59] Dittami transcript 94:18 – 25.
[60] Dittami Ex. 21, E Capital-000052 – 59.
[61] Dittami Ex. 35, E Capital-000060.
[62] EY-GBI-WP-00002874; GLBR_00185174 – 75; GLBR_00185332 – 33.
[63] Niv transcript 165:10 – 166:3, 175:10 – 13; GLBR_00062622 – 24; Dittami Ex. 39, GLBR_00125304; Dittami Ex. 40, GLBR_00110713 – 714.

45.     Prior to the formation of Effex and Mr. Dittami's resignation from FXCM, his employment agreement provided for an annual base salary of $250,000, increasing to $300,000 after six months, and a management bonus equal to 30% of venture profits, based on gross revenues less all direct costs.[64]   Mr. Dittami testified that he expected the management bonus to be substantially more than his base salary and considered this arrangement to be splitting the trading profits generated by EES with FXCM (with FXCM receiving 70% and Mr. Dittami receiving 30%):

> Q.     … My question to you will be, do these sections provide that your compensation will be a base salary of $250,000 rising to 300,000 after six months plus a management bonus equal to 30 percent of the profits generated by EES?
> A.     Yes, it does.
>
> Q.     So is it fair to say that under this agreement you would split the trading profits generated by EES with FXCM with FXCM getting 70 percent and you keeping 30 percent?
> A.     Yes.[65]
>
> * * *
>
> Q.     Did you have an expectation as to the size of your management bonus relative to your base salary?
> A.     I expected it would be multiples there.
>
> Q.     Multiples of your base salary?
> A.     Correct.[66]

46.     While the letter terminating Mr. Dittami's employment (the aforementioned April 14, 2010 "side letter") included the understanding that he and FXCM would enter into a license agreement on economic terms similar to his employment agreement (which included the 70/30

---

[64] Venture profits were defined as the venture's gross revenues less 100% of all direct costs.  Direct costs included costs of prime brokerage accounts, employee compensation, including Mr. Dittami's base salary, software costs, travel and entertainment, and a portion of FXCM's initial $3 million investment that were expended. Dittami Ex 4. GLBR_00110697 – 712 at GLBR_00110697 – 699.
[65] Dittami transcript 35:4 – 14.
[66] Dittami transcript 37:9 – 15.

split of EES profits), the parties instead entered into a services agreement that based payments from Effex to FXCM on a fixed dollar amount applied to the total amount of FXCM's transaction volume routed to Effex.  Mr. Niv testified about the reasons for the change from the license agreement contemplated in Mr. Dittami's letter of termination to the fixed amount of transaction volume approach of the services agreement.  In his testimony, Mr. Niv acknowledged that the 70/30 profit share had already been negotiated but was not practical based on the fact that Effex would have other customers.  There is nothing in Mr. Niv's testimony to indicate that FXCM intended to change the economic substance of the prior arrangement.  It was simply a matter of practicality:

> Q.    Okay. And in those discussions, generally, do you remember discussing other structural alternatives besides pay for flow?
>
> A.    So, obviously, again, the original concept was we were going to have 70/30 profit share, you know. But, again, as I explained previously, that is just not practical given the reality of once he has his own firm and he's taking other clients and that flow from Client A is intermixed with flow from Client B, that's just not possible -- excuse me -- to differentiate between profits from Client A to Client B. And, you know, it is also, you know, like I said, just something that, you know, just -- and not practical really and not standard in the industry. So that's why we -- initially, we went through a this should be a profit share to look like the employment agreement, because that's a deal we already negotiated and worked out, to that it's just not practical under him having his own firm and, therefore, he has to change into what we changed it to.[67]

47.    Moreover, Mr. Ahdout testified that although the order flow rate was supposed to approximate a 70/30 split, it was based on rate per million rather than a profit-sharing percentage to avoid appearance of ownership:

> MR. TOMER: Do you recall having a discussion about paying 70 percent of the profit the with Mr. Dittami?
> THE WITNESS: Yes.
>
> MR. TOMER: What was the nature of that discussion?
> THE WITNESS: That we have the same similarities in the framework that we

---

[67] Niv transcript 138:2 – 24.

created in the employment discussion.

* * *

THE WITNESS: The initial meeting we had was the framework would be somewhere around 70 percent - - 70 percent of Effex' s EBITDA

MR. TOMER: Okay. You said it would be a framework as opposed to an outright 70 percent?
THE WITNESS: Yes.

MR. TOMER: What do you mean by that?
THE WITNESS: I meant that I had a discussion with him that this was something that I was okay with. I would have to take it back to my partners and compliance officers and see if that would be okay.

MR. TOMER: Did you do that?
THE WITNESS: Yes.

MR. TOMER: What was the nature of those discussions?
THE WITNESS: That can we get 70 percent of John's EBITDA from his company.

MR. TOMER: What was the answer?
THE WITNESS: No.

MR. TOMER: Who was at this meeting?
THE WITNESS: I believe it was James Sanders.

MR. TOMER: Anyone else?
THE WITNESS: Ken Grossman.

MR. TOMER: Anyone else?
THE WITNESS: Possibly Drew.

MR. TOMER: Was Mr. Dittami present?
THE WITNESS: No.

MR. TOMER: Was an alternative discussed during that meeting?
THE WITNESS: Yes.

MR. TOMER: What was that?
THE WITNESS: That Effex can pay FXCM a hard pay for flow dollar number.

MR. TOMER: How would that dollar number be configured or determined?
THE WITNESS: $21 per million.

MR. TOMER: Why 21?

Page 25

THE WITNESS: Again, the framework was something that we were trying to work around after we had already made agreements.

MR. TOMER: Sure. Was it believed that the 21 would approximate the 70 percent of EBITDA?
THE WITNESS: It would be in the ballpark, but it wouldn't be exact.

* * *

MR. TOMER: This framework where Effex would pay $21 per million to approximate or ballpark, as you said, the 70 percent EBITDA split, did you have that discussion with Mr. Sanders present?
THE WITNESS: Yes.

MR. TOMER: What was his reaction to that?
THE WITNESS: As long as you have a solid number that doesn't fluctuate with P&L -- doesn't fluctuate with P&L, doesn't go up and down, doesn't vary, he might make a lot of money, he might lose a lot of money, whatever happens you're still getting $21 per million.

MR. TOMER: He said that would be okay?
THE WITNESS: He said that would be okay.

* * *

MR. NEWMAN: Did Mr. Sanders say what he meant by having a solid number or a number that doesn't fluctuate?
THE WITNESS: A number that's not a percentage. If a number is a percentage, you make a hundred dollars and I'm getting 70 percent, I get $70. If you make $10, I get $7. If no matter what I get $70 or I get $50, doesn't matter how much you make, matters how much you pay me.

MR. NEWMAN: Did he say why it would be a problem to do a percentage?
THE WITNESS: He said the percentage can be perceived as something that could possibly be perceived as ownership.[68]

48.    Although the description of payments to FXCM and their calculation methods changed from the employment agreement, the intent was the same, as Mr. Dittami, through Effex, continued to share Effex's profits with FXCM as he had agreed to do under the employment agreement.

49.    On April 14, 2010, Mr. Dittami sent an email to David Sassoon, FXCM's General

---

[68] Ahdout CFTC transcript 115:5 – 121:23.

Counsel, which outlined the steps to be taken in connection with the formation of Effex and Mr. Dittami's resignation from FXCM. The email, which is consistent with the executed option agreement of the same date,[69] clearly indicates the intention to provide FXCM with an option to acquire Effex for $1 and for Effex to pay FXCM 70% of Effex's earnings before interest, taxes, depreciation and amortization (EBITDA):

- <u>Signing of an option agreement allowing FXCM to buy 70% of Effex for $1.</u>
- Signing of a letter of resignation.
- Preparation of a side letter providing a penalty of terminating the license agreement.
- Signing a promissory note for the $2 million FXCM used to fund the Prime of Prime ("PoP") account.
- Preparation of a licensing agreement.
  - Transfer of IP/code from Effex in event FXCM exercises option.
  - <u>"Effex will pay FXCM 70% of all EBITDA. This distribution will be made before any distribution to LLC member (myself) can be made. This will happen quarterly (so that I can distribute to pay my quarterly tax)."</u>
- "All directly related trading costs are charged to Effex thru its prime of prime relationship just like it does with other pop customers."[70]
  (Emphasis added)

50.    Based on Mr. Dittami's April 14, 2020 resignation letter, signed and acknowledged by FXCM, the parties understood that they would enter into a license agreement on economic terms similar to the employment agreement:

> It is the understanding of both parties to enter into an [sic] license agreement on economic terms similar to the employment agreement.[71]

51.    When asked what was meant by "economic terms similar to the employment agreement," Mr. Dittami testified that it meant "similar holistic terms."

> Q.    And in the next paragraph you write, "It is the understanding of both parties to enter into a license agreement on economic terms similar to the employment agreement."
> A.    Yes.

---

[69] Dittami Ex. 15, E Capital-000050 – 51.
[70] Dittami Ex. 18, GLBR_00189079.
[71] Dittami Ex. 19, E Capital-000040.

Q.     Do you see that?  Are you, again, referring to the same employment
       agreement we looked at earlier today?
A.     Yes.

Q.     And what economic terms were you referring to?
A.     All the economic terms but, primarily, the intellectual property payments,
       the ability to get sold at six times EBITDA was the biggest one, penalties
       if they terminate, the basis of $3 million number was a big one and those
       were the ones that were my concern.

Q.     <u>When you reference "economic terms" in that letter, does that also refer to
       the 70/30 split of trading profits from your employment agreement?</u>
MR. DAHAN: Objection to form.
A.     <u>I didn't specify it here; just similar holistic economic terms.</u>

Q.     Okay. Did you sign this letter?
A.     Yes.

Q.     And did William Ahdout sign this letter on behalf of FXCM US?
A.     Yes.[72] (Emphasis added)

52.     Mr. Ahdout testified that Effex and FXCM did not have a written agreement at the

time of Mr. Dittami's departure from FXCM and that such agreements were entered into "a long

time" after Mr. Dittami's departure from FXCM:

       MR. TOMER: <u>Do you have a recollection of what form of agreement FXCM would
       have with Mr. Dittami or his company</u>?
       THE WITNESS: <u>At the time he left he didn't have any agreement. We
       hammered those out later</u>.

       MR. TOMER: Okay. How much later?
       THE WITNESS: Throughout many, many months.

       MR. TOMER: Do you recall what months we're talking about here?
       THE WITNESS: Not sure exactly.

       MR. TOMER: Spring of 2010? Earlier? Later?
       THE WITNESS: <u>I know it dragged out for a long time. I don't know exactly the
       time -- the time horizon</u>.[73]
       (Emphasis added)

---

[72] Dittami transcript 113:18 – 114:22.
[73] Ahdout CFTC transcript 111:10 – 112:4.

53.     The fact that Mr. Dittami and FXCM were comfortable operating without a written agreement for an extended period is itself indicative of a relationship unlike an arms-length business relationship typically seen between independent, unrelated parties.

54.     It is not clear when FXCM and Effex actually executed their March 1 and May 1, 2010 services agreements.  However, throughout 2010 and 2011, Mr. Dittami and FXCM had continued discussions about formalizing various agreements to govern their relationship.  Mr. Dittami testified that he was discussing changes to Effex/FXCM contractual relationship for as long as he could:

> Q.     And so, in October of 2010, were you discussing changes to the contractual relationship between Effex and FXCM?
> A.     I was discussing it for as long as I could until they told me to stop it.[74]

55.     As documented below, the substance of these communications underscores their tie to a sharing of Effex's profits.   At least through November 2011, it was Mr. Dittami's understanding that the split of profits would mirror the original agreement documented in his letter of resignation.[75]

56.     An email dated July 19, 2010 from Mr. Dittami to Mr. Ahdout, on the subject of "reviewed agreement," attached a copy of the initial employment agreement in which Mr. Dittami had struck through portions that were not relevant:

> Before we chat on this, I figured you may want to read our initial agreement. Actually no one really likes to read these things, so I crossed out all the stuff that really isn't relevant. I appreciate your thoughts\input on what is left and the best way to handle them.
> Thanks,
> John[76]

---

[74] Dittami transcript 158:25 – 159:5.
[75] Dittami transcript 192:10 – 193:5; Dittami Ex. 37, GLBR_00152765.
[76] Dittami Ex. 25, GLBR_00152107 – 136 at GLBR_00152107.

57.     The section of the agreement attached to the email providing for bonus compensation was struck through with the following note:

> Note:  All replaced with Per MM payment for flow, noted that this may change over time.[77]

58.     With respect to this note, Mr. Dittami testified that the 70/30 split from the employment agreement was replaced with the per million payments for order flow:

> Q.     Did you mean that the 70/30 split of trading profits from your employment agreement was replaced by per million payments for order flow?
> A.     Yes.
>
> Q.     And those are payments that Effex would make to FXCM?
> A.     Correct.[78]

59.     As detailed below, emails exchanged between Mr. Dittami and FXCM in August – October 2010 appear focused on maintaining the compensation under the services agreement at the 70/30 split included in Mr. Dittami's initial employment agreement.

60.     In an August 30, 2010 email to Ken Grossman, FXCM's then-Chief Financial Officer ("CFO"), Alexander Dick, FXCM's in-house counsel, and Mr. Ahdout on the subject of "Effex services doc," Mr. Dittami requested that FXCM prepare a side letter documenting the intent to preserve economic terms of his initial employment agreement:

> Lastly if you could do a little side letter just saying that modification to this will occur and intent is to maintain same economic terms as initial employment agreement it will cover us in full.[79]

61.     On October 25, 2010, Mr. Dittami sent an email to Messrs. Ahdout, Grossman, and Dick asking to schedule a time to review drafts of legal documents, which included a side letter:

> I have completed drafts of legal docs.
>
> Can we schedule a time to review together?

---

[77] Dittami Ex. 25, GLBR_00152107 – 136 at GLBR_00152114.
[78] Dittami transcript 140:4 – 11.
[79] Dittami Ex. 29, GLBR_0189088 – 89.

They are as follows:
… Side letter to the service agreement, just says per mm won't exceed 70 percent
… ."[80]

62.     Less than an hour later, Mr. Dittami emailed drafts of several agreements to the

same persons at FXCM.  The documents included an "Addendum to the Services Agreement Dated

August 17, 2010," which provided that the payments from Effex to FXCM would not exceed 70%

of Effex's net income:

> It is hereby agreed by and between Effex Capital, LLC (eFFex") and Forex Capital
> Markets, LLC ("FXCM") that the payments due FXCM under the Services
> Agreement dated August 17, 2010 shall never exceed seventy percent of eFFex's
> net income.[81]

63.     Mr. Dittami's testimony regarding the draft addendum to the services agreements,

which provided for the cap of 70% of Effex's net income, indicates that he was looking for

"protection" once he relinquished control to FXCM under the new agreement.  Mr. Dittami wished

to be no worse off than he was under the employment agreement:

> Q.     And does this draft addendum reflect your intents at the time of the e-mail
>        attaching this to maintain a 70/30 split of trading profits between FXCM
>        and yourself?
>                                    * * *
> A.     The intent of that was to put a cap if I'm under the control of FXCM that
>        they don't apply expenses or apply changes to per – make payments that
>        put me in a bad position for protection in case of this new relationship gets
>        enacted, to ensure that I don't get taken advantage of once we -- I
>        relinquish control into this proposed agreement.
>
> Q.     And how did you arrive at the figure 70 percent?
> A.     I wanted to make sure I was better off, at least, as good off or better off
>        with any new agreement than the initial best agreement that we had done,
>        which was the employment agreement. The goal was always to do better
>        and not worse.[82]
>        (Emphasis added)

---

[80] Dittami Ex. 31, GLBR_00054454 – 55.
[81] Dittami Ex. 30, GLBR_00124982 – 125014 at GLBR_125014.
[82] Dittami transcript 163:15 – 164:22.

64.     On October 13, 2011, FXCM and Effex amended the May 1, 2010 services agreement, effective September 1, 2011, to reduce the fee from $21.00 to $16.00 per million.[83]

65.     In an email dated November 11, 2011, from Mr. Dick to Mr. Dittami, Mr. Dick indicated that he would be starting on drafting new documents but in the meantime, they were going to have to terminate all prior agreements (except for the service agreement).  A draft of a Termination of Agreements was attached to the email, whereby the parties would agree to void and terminate the option agreement, promissory note, and license agreement and to terminate the side letter:

> … the Parties hereby mutually acknowledge and agree that no Option rights currently exist or ever existed, and hereby mutually void and terminate the Note, and License Agreement as of April 14, 2010. Furthermore, the Parties also agree to mutually terminate the side letter attached hereto as Exhibit B and to release each other from any obligations contemplated therein.[84]

66.     The "side letter" attached to the November 11, 2011 email as Exhibit B was a copy of Mr. Dittami's aforementioned April 14, 2010 letter of resignation which included the statement: "It is the understanding of both parties to enter into a license agreement on economic terms similar to the employment agreement."[85]

67.     Based on a series of emails from Mr. Dittami to Mr. Dick that followed on the same November 11, 2011 date, it is clear that Mr. Dittami did not wish to relinquish the "side letter" retaining economic terms substantially the same as the employment agreement:

> … I'm not comfortable terminating our side letter saying we will do something mirroring initial agreement. Other than that this is fine. …[86]

* * *

---

[83] Dittami EX 35, E Capital-000060.
[84] Dittami Ex. 36, GLBR_00152760 – 64.
[85] GLBR_00152764.
[86] Dittami Ex. 37, GLBR_00152765.

Ok... I meant who did the request come from, I can't possibly cancel the only document that gives me any protection which is the side letter.[87]

68.     In summary, through all of the agreements and changes in agreements, including the employment agreement, the understanding in the employment termination letter, the proposed license agreement, and the two services agreements, the economic substance of the FXCM – Effex relationship did not change.  Effex shared its profits with FXCM on terms intended to approximate the economic substance of the employment agreement.

**B.  Effex Relied Upon FXCM for the Substantial Majority of Effex's Business**

69.     Effex relied upon FXCM for all, or nearly all, of its business during the first few years of Effex's operation.  Mr. Dittami testified that approximately 90% of Effex's business came from FXCM in 2010 and 2011.  According to Mr. Dittami, by early 2014, FXCM still represented between 50% and 90% of Effex's business.[88]

70.     Based on a November 15, 2010 instant messenger conversation between Mr. Dittami and Mr. Bradley, a partner of Mr. Dittami in Effex, 100% of Effex's business was coming from FXCM, as no external customer would accept Effex's current size, indicating that FXCM was considered an internal customer:

Mr. Dittami:

… anyhow, we have a full slate of growth inside FXCM now anyways that will keep us busy and give us oppts [sic] for next 6 month and everything we do there is more forgiving so when we go out to other places we will be in much better shape but that is where real big money is, as we get 100% at moment doesn't matter to yourself, as your percentage is pre split but once we move outside of fxcm it will matter

---

[87] Dittami Ex. 38, GLBR_00152767 – 68.
[88] Mr. Dittami testified that all of Effex's income came from FXCM at inception. Dittami CFTC transcript 43:6 – 15.  Nearly all of Effex's business came from FXCM in July 2010. Dittami CFTC transcript 230:18 – 231:10.  He also testified that  around 90% of Effex's business came from FXCM in at the end of 2010 and during 2011 and that ratio declined to between 50% and 90% through March 2014. Dittami transcript 173:8 – 15, 334:24 – 335:24, 343:9 – 344:12, Dittami Ex. 67, GLBR_00004262 – 63; Dittami Ex. 69, GLBR_00103994 – 95.

Mr. Bradley:

Could we not try for an external customer sooner?  It would be interesting?

Mr. Dittami (cont.)

as [it] gives you much greater equity value on sale, well we have to get our stuff straight, no external customer will take our current size and we are working on that, hedging, taking more, etc. plus we need better ebs\prediction or we will get killed we are working on those things, …[89]
(Emphasis added)

71.     When asked about this conversation, Mr. Dittami testified that it was very difficult, based on the size of Effex starting out, to get new customers:

Q.     So would it be fair -- would it make sense to say that FXCM would not take Effex's current size?

A.     No external customer will take our -- no, FXCM took my -- so, first of all, I don't know what -- I can't without context of the day know what I meant by "current size." "Size" likely means the size of our entity, which was just formed. So FXCM took our current size. We had to make payments as part of that, because we weren't a bank. We weren't Citigroup. We weren't in the same credit criteria. It makes it very difficult to get new customers as a small brand new entity when you're competing with Citigroup, J.P. Morgan and Morgan Stanley.[90]

72.     Thus, from 2010 to 2014, Effex remained heavily dependent on FXCM for the substantial majority and needed the support of FXCM's more "forgiving" relationship, which accepted Effex's relatively small size, while Effex attempted to build its operations with "external" customers.  Effex's reliance on FXCM is further demonstrated by the financial and other assistance provided during Effex's start-up phase, including establishment of the Prime of Prime account, adjustments of order flow payment rates based on Effex's financial condition, use of FXCM office space and personnel for technical support, and certain competitive advantages provided to Effex described below.

---

[89] Dittami Ex. 32, GLBR_00041735 (rows 18426 – 39).
[90] Dittami transcript 175:11 – 25.

### C. Adjustments to Rates of Payment under the Services Agreements Provide Further Evidence That FXCM Was Supporting Effex's Operations

73.     As discussed above, the original services agreement providing for payments of $21 per million units of base currency was amended to $16 per million, effective September 1, 2011. However, the following emails show that FXCM and Effex were communicating in 2010 and 2011 about "figuring out" payment rates to accommodate Effex's reserves, despite purportedly having a service agreement in place for a set rate.

74.     An October 24, 2010, email chain between Mr. Dittami and FXCM's Ahdout and Joshua Rosenfeld, an FXCM accountant, among others, discusses setting the order flow rate for October 2010.  In response to Mr. Rosenfeld's inquiry whether to use a $16 per million rate for October, Mr. Dittami expressed a desire to set the rate at $14 to keep enough capital at Citibank for trading but, as an alternative, offered to use the rate of $17.50:

> Joshua Rosenfeld:
>
> Does 16 per mil seem like the figure we'll have to go with for Oct?
>
> John Dittami:
>
> That's what I'm working out.... I'd rather go 14, as I don't want to eat into my reserve, if FXCM needs the extra revenue we can likely chew the reserve to 0 and do higher per mM.
>
> * * *
>
> William,
> We need to figure out a per MM for October, looking closely we can likely swing it again at $21 per MM and chew the reserve down to 0, but then our trading profits thru the month will be needed to fund the trading. At the moment our reserve gives us enough to keep capital at Citi for trading of $1MM minimum and we let it grow thru the month.… The other alternative is we go half way at $17.50

and cut the reserve a little, but give us a whole other month to work out how this
will shake out.
Please advise,
Thanks,
John[91]

75.     FXCM initially invoiced Effex for order flow at $17.50 for October and November

2010.[92]  However, at the end of December 2010, Effex remitted an additional $678,000 to FXCM

for "underpayment of fees by Effex in those months."[93]  Having received the underpayment before

the end of the year enabled FXCM to represent to E&Y that order flow was charged at $21

consistently throughout 2010.[94]

76.     There were other communications showing that changes to order flow payment

rates were contemplated based on Effex's financial situation.

77.     A February 10, 2011 email from Mr. Rosenfeld to Mr. Dittami on the subject of

January volume:

        Can we still bill @ $21?

78.     A February 10, 2011 reply from Mr. Dittami to Mr. Rosenfeld:

        Probably not, let me check, I think it will need to drop to $18 again while we
        reassess...[95]

79.     A February 14, 2011 email from Mr. Dittami to Baruch Greenbaum, another FXCM

accountant, and others on the subject of the January 2011 invoice:

        … 21 is fine for jan [sic], still have some reserve which it hits but that's what reserve
        is for[96]

80.     An April 13, 2011 email from FXCM's Baruch Greenbaum email to Chris Meyer,

---

[91] Dittami Ex. 43, GLBR_00188166 – 67.
[92] Rosenfeld Ex. 12, GLBR_00184107 – 108; Rosenfeld Ex. 13, GLBR_00184113 – 114.
[93] Rosenfeld Ex. 14, GLBR_00184115.
[94] Rosenfeld Ex. 16, GLBR_00184140 – 41; Rosenfeld transcript 193:16 – 196:7.
[95] Dittami Ex. 46, GLBR_00184132 – 133.
[96] Dittami Ex. 47, GLBR_00184136 – 37.

Effex's COO, and Mr. Dittami, among others:

> Can we remain @ $21 per Million for March?[97]

81.     This back and forth between FXCM and Effex about changing the order flow payment rates to accommodate Effex's financial condition is not indicative of negotiations between unrelated independent parties.   Neither is the communication and sharing of internal financial details.

82.     Further evidence of FXCM monitoring of Effex's financial performance for purposes of adjusting the order flow rate is documented in a July 22, 2010 instant message conversation between Mr. Dittami and FXCM's Joshua Rosenfeld:

> Rosenfeld:  Hi, What's up?  Oh by the way I need access to your new Citi acct.
> Dittami: ?? As Effex separate entity, and separate funding, what do you need access to it for ???  I'm sure I can get another login, just curious
> Rosenfeld:  We'll stille [sic] be tracking your expenses and income for now so that we can see if the $21 fee should be adjusted.
> Dittami:  yes, thats why the quickbooks question... This month and June FXCM's share was less than 21 may and april more so it catches up some in last 2 months, as pnl per mm was down
> Rosenfeld:  so what is the question?
> Dittami:  but once I get my financials together can send you something cleaner
> Rosenfeld:  great[98] (Emphasis added.)

83.     Although Mr. Rosenfeld testified that the information FXCM obtained from accessing Effex's account was similar to information provided to it by other liquidity providers, the other liquidity providers themselves supplied this information to FXCM in their own formats, rather than having FXCM obtain access to their trading account.[99]

### D.  Other Forms of Support and Advantages Provided by FXCM to Effex

84.     In addition to the credit support in establishing Effex's PoP account (see Section

---

[97] Rosenfeld Ex. 17, GLBR_00118420 – 22.
[98] Rosenfeld Ex 6, GLBR_00041735 (line 604 – 615).
[99] Rosenfeld transcript 114:20 – 118:4.

V.E., above) and supplying it with volume of business (see Section VI.B., above), FXCM provided Effex with other forms of support which enabled Effex to establish and successfully execute its operations.

**Use of Office Space**

85.     After its formation, Effex continued to operate out of FXCM's office for approximately one year.  However, even after moving into its own office space, Mr. Dittami maintained a desk at FXCM's office.[100]  I have not seen any evidence that Effex paid rent to FXCM for the use of its office space, which is consistent with Mr. Niv's testimony, in which he said it was a way of helping Mr. Dittami start up and save money:

> Q.     … Do you recall any discussions about whether Mr. Dittami should or would continue to use FXCM office space after his resignation on April 14, 2010?
> A .     I know that we were, you know, as part of, essentially, helping him start up and to save money -- were definitely giving him some leeway to stay in our office for a while, because it's fairly expensive and hard to do for a completely brand new startup to go get bigger security deposit, et cetera, et cetera, to do all these things, so I know we gave him some time until we made him move out, but we did make him move out.
>                                                                                        ***
> Q.     Did FXCM charge Mr. Dittami or Effex rent for using its office space?
> A.     I don't believe so.[101]

**Use of Trading System**

86.     According to Mr. Niv's testimony, FXCM turned over the trading system—which was created by Mr. Dittami while he was an FXCM employee—to Effex for further development and use:

> Q     Was this trading system described here in recital B in the second whereas paragraph, which I guess I refer to as the trading system because that's how the agreement calls it, was this proprietary to Effex?
> A     This is theirs, yes.

---

[100] Dittami CFTC transcript 57:5 – 58:13, 177:20 – 179:16, 180:23 – 181:12, 184:11 – 185:24.
[101] Niv CFTC transcript 310:8 – 311:7.

Q   Wasn't this trading system something that Mr. Dittami had developed during his employment at FXCM?

A   Developed some portions of it.[102]

* * *

Q   Under his employment agreement, that system or the parts of it that he developed as an employee of FXCM, that all belonged to FXCM; is that right?

A   Correct. But FXCM could not use any of this without him, so it's useless.

Q   I think you testified earlier that to your knowledge FXCM didn't lose the rights to Mr. Dittami's work product that he had done as an FXCM employee prior to Mr. Dittami's resignation on April 14, 2010; is that right?

A   Legally.

Q   So FXCM at this time had the rights or ownership rights and rights to use the whole, I'll use the term venture -- that's the term used in the employment agreement -- FXCM had the complete rights to the venture minus its obligations to Mr. Dittami under the employment contract; is that right?

A   Yes. Again, the practical usage is nil – it's a thing that has to change and has to constantly adapt. So without him essentially updating it, changing it, upkeeping it, it is essentially useless to us.

Q   So FXCM is saying here in this agreement that this trading system that was substantially created by Mr. Dittami as an employee now is a proprietary, belongs to Effex Capital, correct?

A   Correct.[103]

* * *

MR. TOMER: I think yesterday we talked about Mr. Dittami not having the infrastructure to be a market maker while he was an employee of FXCM. I assume that that was set up pretty soon after he left the employ of FXCM?

THE WITNESS: Correct.

MR. TOMER: Was that provided by FXCM, that infrastructure?

THE WITNESS: Some of it is not, and it's in his office in his the analytics-related things. The trading-related infrastructure, it's hard to make the two things completely separate, but the actual order routing -- not routing -- we have the order routing mechanism, but his pricing engine that's collocated with us, I believe it was our hardware, as would be customary. That's what you would do.[104]

---

[102] Niv CFTC transcript 136:10 – 19.
[103] Niv CFTC transcript 137:11 – 138:15.
[104] Niv CFTC transcript 328:5 – 24.

### Co-location of Effex's Computer Servers

87.     Effex's servers were co-located with FXCM's at a New Jersey location, referred to as NY7, in a space owned or leased by FXCM, and Effex initially relied on FXCM to back up its servers.[105]  I have not seen any evidence that Effex paid or reimbursed FXCM for the use of the location or backing up of Effex's servers.

88.     After its formation, Effex continued to access its computer servers via FXCM's Virtual Private Network ("VPN") and rely on FXCM's staff for technical support until at least 2013.[106]  Mr. Dittami and James Bradley, Mr. Dittami's partner in Effex, maintained desktop computers at FXCM's offices at least through December 2012.[107]  Mr. Dittami's December 27, 2012 email demonstrates how little control Effex had over accessing its own files to run its "INDEPENDENT" business:

> Guys, this is super super frustrating, again, I can't log onto vpn to my desktop, issue happened last week was fixed, issue has happened over and over again.
> Yes I have terminal, but its not the same as a desktop, and I'm trying to run an INDPENDENT [sic] business here. The business requires that I have access to OUR boxes that unfortunately we can't access except thru your VNP of which we have no control.[108]

### Use of FXCM Personnel

89.     As Mr. Niv testified that, at inception, Effex did not have enough staff to monitor its system, which was done by FXCM employees:

> Q.     If you know, what access did FXCM personnel have to Effex, either to its office or to its systems?
> A.     To its office I don't recall access. We had some personnel with access to, you know, some monitoring of their system when -- before they had enough employees to monitor the system on a 24-hour basis.

---

[105] Dittami CFTC transcript 44:23 – 46:5.
[106] Dittami CFTC transcript 187:19 – 191:3, 193:8 – 194:23, 201:14 – 17.
[107] Dittami CFTC transcript 200:10 – 22.
[108] GLBR_00028063 – 65.

Q.     Do you know who that was?

A.     Some of the dealers . I don't recall.

Q.     What were they -- can you describe your understanding of what those people were doing, those FXCM employees?

A.     We had, obviously, a 24 -hour staff already in place to run our operations, particularly in dealing, because essentially you have customers that would call 24 hours a day, and they have to monitor our systems 24 hours a day, because it's a 24 -hour a day market. Mr. Dittami in the beginning of the relationship did not have enough staff to monitor for 24 hours a day, and essentially, before he got enough wherewithal and organization to go do that, we helped monitor his system overnight. Again, it's an algo that trades. We're not doing trades on it, but there are things that go wrong. We have to turn it off. We have to do different things to it.[109]

**Use of Instant Messenger and Email Services**

90.     Effex used FXCM's instant messenger service until at least 2012 and FXCM's email services until 2013.[110] Mr. Dittami and others at Effex continued to use FXCM email address for months after leaving FXCM.[111] I have not seen any evidence that Effex paid FXCM for the use of its email and instant messenger services.

**Ability To See Real Time Prices Submitted by Other Liquidity Providers**

91.     From the start, FXCM gave Effex access to see real-time prices submitted to FXCM by other liquidity providers, this was referred to as  real-time "read of book."[112] In an August 14, 2011 weekly update to FXCM, Mr. Dittami referred to "[g]reater Effex PNL [profit and loss] with real time read of book and better understanding of FXCM's internal workings" as an "Effex advantage."[113] Mr. Dittami testified that having the real-time read of book enabled Effex to win greater trading volume and improved its earnings:

---

[109] Niv CFTC transcript 320:17 – 321:23.
[110] Dittami CFTC transcript 199:23 – 200:9, 207:8 – 16.
[111] Dittami CFTC transcript 203:15 – 206:4.
[112] Dittami transcript 324:22-325:10; Ahdout CFTC transcript 226:16 – 227:2.
[113] Dittami Ex. 66, GLBR_00008068 – 73.

> Q.      Would having realtime read a book help Effex to realize greater trading P&L on order flow from FXCM than it would have without realtime read a book?
>
> MR. PAYKIN: Objection.
>
> A.      Probably realtime read a book in conjunction with Effex's use of intellectual property on how to use it allowed Effex to meet greater profitability, yes.
>
> Q.      Did having realtime read a book help Effex to win more trading volume for FXCM than it would have without realtime read a book?
>
> MR. PAYKIN: Objection.
>
> A.      Along side's Effex's IP, yes.[114]

**Win All Ties**

92.     An April 8, 2010 email exchange between Mr. Niv and Mr. Dittami shows that Effex was given the ability to win ties from the start.  The email reads, in the relevant part: "[w]e are next in line for update to win ties so that we can add USD/JPY and EUR/USD."[115]  Mr. Dittami testified that this statement meant that Effex was next in line for a technology update which would allow Effex to win all ties with other liquidity providers and FXCM would route the trade to Effex:

> Q.      And what kind of update were you talking about here?
>
> A.      "We are next in line for update to win ties." So it must have been a technology update that allowed us to win ties against other LPs of the same kind.
>
> Q.      Okay. When you said, "win ties," were you referring to a situation when EFFEX quoted a bid or offer price that was equal to the price quoted by another liquidity provider and FXCM routed the trade to EFFEX?
>
> A.      That is correct. Provided the trade to -- when two people have the identical price, routing to ties as to who wins that price.[116]

93.     Mr. Niv testified that from 2010 to 2014, Effex won ties the  "majority of the time" because it was the best performing liquidity provider.[117]  According to Mr. Ahdout, winning ties

---

[114] Dittami transcript 325:19 – 326:8.
[115] Dittami Ex. 8, GLBR_0046387 – 88.
[116] Dittami transcript 68:4 – 17.
[117] Niv transcript 94:11 – 95:22.

was one of the advantages FXCM provided to Effex.[118]

94.     Mr. Dittami testified that Effex was allowed to win all ties provided it had better execution than competing liquidity providers.  Mr. Dittami testified that FXCM threatened Effex a lot to take the ability to win all ties away in the event that Effex did not provide the best execution

Q.     Did FXCM allow Effex to have priority over other identical bids and offers made by market makers allowing Effex orders to be executed over identical bids and offers made by other market makers?

A.     Yes, they allowed us to win ties but it was allowed with a contingency.

Q.     What's the contingency?

A.     We have to be best execution, if we're not best execution we lose ties. I think they might have taken it away from us at some points, they threatened to a lot at least. We have to be best execution or we don't win ties.[119]

* * *

Q.     To your knowledge, did other liquidity providers have the ability to win all ties?

A.     To my knowledge, every liquidity provider had the ability to win ties if they were best execution.

Q.     So there were times with other liquidity providers would win ties and not Effex?

A.     I think there were a few times, but as a general rule Effex was always best execution. So as a general rule and I don't know -- it's not  -- I can't be perfect in all way but, you know, we were best execution every single month since we ever began.[120]

95.     Mr. Dittami testified that in addition to generating higher earnings, winning ties generated the volume which was critical for Effex, given its size in comparison to larger competitors.  Effex's model needed the volume to work:

Q.     Did the winning of all ties help Effex in realizing profit in its market making trades?

A.     Yes and no, but net yes.

Q.     Could you explain?

A.     So what it helps us do is increase our volumes, right, it's very tight and very

---

[118] Ahdout CFTC transcript 226:9 – 15.
[119] Dittami CFTC transcript 327:13 – 25.
[120] Dittami CFTC transcript 331:6 – 19.

competitive, less than half of what the interbank market is. So it helps us get volume, getting volume, as any market maker knows, why the banks -- I said to you earlier, pay attention to volume not necessarily P&L is because volume equals P&L, the more volume you have it allows you to take your inventory and your inventory flips, meaning you go long/short, long/short, long/short faster, this means you face less of the natural cost to a market maker which is after a market maker gets a deal, there's a market impact for that deal and it goes against you. The quicker you get out of a deal, i.e., the more volume you have, i.e. the less market impact you have. So it's true everywhere. <u>Getting volume I recognized was critical for me, right, and because I have to compete against Citi with 50 yards, with much more volume than I have, volume is critical for me. So that helps me, that volume is helpful. There's a bad side to winning ties which is why my model, and the model needs that volume to work.</u> …[121]
(Emphasis added)

96.    Mr. Ahdout acknowledged during his testimony that having the ability to view real-time prices submitted by other liquidity providers and the ability to win ties gave Effex a competitive advantage over other market makers.[122]

**Lower Markups on Prices Provided by Effex**

97.    An April 11, 2010 email from Mr. Niv shows that as early as April 2010, FXCM planned on adjusting its markups in order to increase Effex's[123] trading volume, once it was "reliably capturing allot [sic] of flow" and to "turn off, or severely handicap with extra markups some of the slower banks.  So we have [Effex], and fast banks only winning most of the business."[124] Mr. Niv testified that this action was to penalize slower and less reliable banks.[125]

98.    On May 16, 2010, just a month later, Mr. Dittami sent an email to Mr. Ahdout and others proposing adjustments to FXCM's historic "back office" markups.[126]  According to Mr.

---

[121] Dittami CFTC transcript 331:20 – 332:25.
[122] Ahdout CFTC transcript 241:13 – 24.
[123] Although the email refers to EES, Mr. Niv testified that he used EES and Effex interchangeably. Niv transcript 98:8 – 21.
[124] Niv Ex. 34, GLBR_00002696 - 97.
[125] Niv transcript 101:21 – 103:9.
[126] Dittami, Ex. 57, GLBR_00005534 and attachments; Dittami transcript 282:2 – 282:16.

Dittami's email, key changes included the following:

> … removing spread advantage in Citi on the recent pairs owned by DR. Moving DR from spread disadvantage to same as other banks (and monitor if there [sic] changes worked before giving them back advantage), giving Effex .2 advantage on less liquid pairs, and .1 on liquid pairs in return for maximum spread logic we are implementing later this week.
>
> We gave GSAGG and .1 advantage on Usdjpy, and backed off Effex's advantage on the offer for Eur\Usd versus Goldman, to try to get them some more volume.[127]

99.     Mr. Dittami testified that for a short period in 2010 FXCM shared with him the markups it applied to Effex and other liquidity providers.[128]

100.     According to Mr. Ahdout's testimony, FXCM used markups to reward liquidity providers with better execution and Effex was rewarded majority of the time:

> MR. TOMER: What about markups?
> THE WITNESS: Markups was not -- I wouldn't call markups an advantage. Markups were differentiated by performance of price providers, so if you're very good, fast, low rejects, quick response, no slippage, we moved you to the front of the line, and if you are slow, you don't respond, you reject, you don't answer, you hang up, we move you to the back of the line.
>
> Q.     The front of the line would be lower markups?
> A.     Yes.
>
> Q.     And the end of the line would be higher markups?
> A.     Yes.
>
> Q.     There would be a penalty for being slow?
> A.     In reality, what -- the goal was to have the best execution on top of the book and should really turn everybody else off. They shouldn't really be there at all, because they're not making sufficient prices.
>
> Q.     When you say "they," I'm having a little bit of trouble with prepositions. You mean other liquidity providers?
> A.     Other liquidity providers who are not as good. Whoever is ranking on top of the book, maybe the top one, two, three people, the rest should really be turned off, but we kept them on -- kept them on the system as backups in case something or somebody goes down, and we have more support for

---

[127] Dittami, Ex. 57, GLBR_00005534.
[128] Dittami transcript 282:22 – 283:15, 288:3 – 11.

liquidity as backup.[129]

* * *

Q.   To your knowledge did FXCM ever impose a larger markup on the bid-ask spreads of other liquidity providers in order to make Effex's bid-ask spread more competitive?

A.   Yes.

Q.   When?

A.   I don't have exact date.

Q.   Who widened the spreads?
(Reporter clarification.)

A.   Computer programmers.

Q.   Why was that decision made?

A.   Again, to put the fastest, best execution guys in front of the execution line and put the worst guys in the back of the line.

MR. TOMER: Do you know on average how often Effex was at the top of the heap there?
THE WITNESS: Majority of time. I'm sorry, how much was he at the top of the book?
MR. TOMER: Yeah.
THE WITNESS: Majority of the time.

MR. TOMER: By "majority," you mean all of 2011, all of 2012?
THE WITNESS: Probably, yes.

MR. TOMER: 2013?
THE WITNESS: Probably.

MR. TOMER: 2014?
THE WITNESS: Probably.

MR. TOMER: 2015?
THE WITNESS: Probably.

MR. TOMER: 2016?
THE WITNESS: Probably.[130]

---

[129] Ahdout CFTC transcript 227:16 – 229:2.
[130] Ahdout CFTC transcript 240:2 – 241:12.

101.    An October 25, 2010 email from Mr. Dittami to FXCM shows just how important these many advantages were to Effex.  The email attached drafts of various agreements which included a limited put option to be executed between Mr. Dittami and FXCM.  The draft of the limited put option acknowledges the support being provided to Effex by FXCM and requires FXCM to purchase Mr. Dittami's ownership interest in Effex at a multiple of EBITDA in the event that FXCM stops providing such support.[131]   In other words, had FXCM ceased providing these forms of support, Mr. Dittami sought the option to put Effex back to FXCM.

> **WHEREAS**, FXCM currently provides certain information and support to eFFex;
> **WHEREAS**, Dittami and eFFex desire that FXCM continue to provide such support:
>
> * * *
>
> FXCM agrees to purchase Dittami's ownership in eFFex, in the event that FXCM: **(a) fails to provide eFFex with accurate and timely data; (b) fails to provide changes to the matching engine within a reasonable time following eFFex's request; (c) provides preference in tie prices to other providers; (d) provides other providers any other preference; (e) allows other providers access to real time book information; (f) allows collocation by other providers; (g) grants other entities most favored nation status in addition to eFFex; or (h) materially ceases to support eFFex in its business activities if any of the above occurs,** and is not remedied, within 15 days following receipt of written notice ("Notice of Breach") from the Executive specifying the breach.
>
> The purchase price shall be the greater of six or the price earnings ratio of FXCM multiplied by the EBITDA of the eFFex. (EBITDA shall be based on the greater of the last quarter annualized or the last twelve (12) months prorated.) Such payment shall be made in six equal monthly installments commencing thirty days after delivery of the Notice of Breach.[132] (Emphasis added and in the original.)

102.    The draft of the limited put option underscores the significance Mr. Dittami placed on the support Effex received from FXCM, including the preferences granted to Effex in the event of ties, access to real time book information, collocation of servers, granting other provides "favored nation" or any other preferences, or ceasing to support Effex in its business activities.

---

[131] Dittami Ex. 30, GLBR_00124982 – 5014 at GLBR_00125012.
[132] Dittami Ex. 30, GLBR_00124982 – 5014 at GLBR_00125012.

103.    In summary, the above-described support, not denominated in dollars, provides further evidence of Effex's reliance on FXCM.

**E.  April 14, 2010 Option Agreement**

104.    Mr. Dittami and FXCM executed an agreement dated April 14, 2010, providing FXCM with the option to acquire 70% Effex for $1.  The April 14, 2010, option agreement made reference to a license agreement and a $2 million secured promissory note which were provided to Mr. Dittami "on terms more favorable than Dittami would have obtained in an arms-length transaction:"

* * *

> WHEREAS, Dittami is the sole member of Effex Capital, LLC, a Delaware limited liability company ("Effex");
>
> WHEREAS, FXCM has loaned to Effex the sum of $2,000,000 pursuant to that Secured Promissory Note, dated the date hereof (the "Note"), on terms more favorable than Dittami would have, obtained in an arm's-length transaction;
>
> WHEREAS, FXCM has agreed to license to Effex certain intellectual property pursuant to that certain License Agreement, dated as of the date hereof (the "License Agreement"), between Effex and FXCM, on terms more favorable than Dittami would have obtained in an 'arm's-length transaction;
>
> WHEREAS, Dittami as the sole member of Effex, will benefit from the Note and the License Agreement and the transactions contemplated thereby;
>
> NOW THEREFORE, for good and valuable consideration, the receipt and adequacy of which are hereby acknowledged, Dittami hereby covenants and agrees as follows:
>
>> 1.  Option.  Upon written notice to Dittami by FXCM, Dittami agrees to sell, transfer and assign seventy percent of his membership interests in and to Effex to FXCM for the sum of $1.00.[133]

* * *

105.    The $2 million secured promissory note was executed and took the form of

---

[133] Dittami Ex. 15, E Capital-000050 – 51.

extension of credit for Effex's PoP account (see paragraphs 34 - 37, above).  From inception, Effex received the use of the intellectual property developed by FXCM's EES division without entering into a licensing agreement.[134]  Rather than entering into a licensing agreement, the parties entered into a services agreement dated March 1, 2010, which was later replaced by a May 1, 2010 services agreement (see paragraphs 39 and 41, above), pursuant to which it made payments to FXCM. E&Y workpapers show that internally FXCM recorded payments it received from Effex as "Other Income: Licensing Fees Effex."[135]

106.    Mr. Niv testified that the nominal price for the option to purchase 70% of Effex was based on the risks related to start-ups and the total dependency of Effex on FXCM:

> … That's the risk there, but it's cheap, right, because, you know, you're buying no track record, you're buying -- they're still dependent only on us, but, again, the risk is they're only dependent on us. They have to fulfill a whole slew of requirements to get there. It's dicey. It is no different than any startup investment in that sense, right? …[136]  (Emphasis added)

107.    In November 2015, more than five years later, Mr. Dittami and FXCM's General Counsel signed a document acknowledging that the April 14, 2010 option agreement "has  never had any legal force or effect" because the aforementioned loan and license agreement did not take place.[137]  However, Mr. Ahdout testified that he believed that the option agreement was in effect "for a couple of days," and claims to have later found out that the option agreement was not in effect.[138] It appears that the parties had attempted to, but did not, terminate the April 14, 2010

---

[134] According to Mr. Dittami's employment agreement, the technology developed by EES was assigned to FXCM and Mr. Dittami could not use it commercially for a term of one year in the event he separated from FXCM.  Mr. Dittami could, however, purchase the technology from FXCM (see paragraph 29.6, above).  Mr. Dittami made conflicting statements about the ownership of this technology during his deposition, on the one hand stating that he believed he always owned the technology, and on the other hand testifying that Effex had reimbursed FXCM for the costs it incurred during the employer/employee phase.  Dittami transcript 83:5 – 84:22, 357:14 – 358:2.
[135] EY-GBI-WP-00002177.
[136] Niv CFTC transcript 224:18 – 228:4 at 226:6 – 14.
[137] Dittami Ex. 41, GLBR_00189371 – 74.
[138] Ahdout transcript 145:20 – 146:16.

option prior to November 2015.[139]  I have not seen any contemporaneous documentation prior to November 2015 that invalidates or rescinds the April 14, 2010 option agreement and Mr. Dittami could not recall signing such document.[140]

108.    As stated above, subsequent to Effex's formation, FXCM and Effex continued discussions about renegotiating various agreements to govern their relationship.  On October 25, 2010, Mr. Dittami emailed a draft of such documents to FXCM.  The documents included a draft of a new option agreement which, similar to the April 14, 2010 option agreement, allowed FXCM to purchase 70% of Mr. Dittami's membership interest in Effex for a nominal amount.[141]

109.    Although the validity and enforceability of the April 14, 2010 option agreement requires a legal opinion, I believe that the existence of the signed option agreement entitling FXCM to acquire 70% interest in FXCM for a nominal amount provides additional evidence of FXCM's ability to significantly influence the management and operating policies of Effex and the power of FXCM to direct the activities of Effex, most significantly impacting Effex's economic performance during period including 2010 through 2014.

## F.  Revenue Earned by FXCM from Order Flow Payments Received from Effex

110.    Schedules summarizing the Effex order flow payments which FXCM prepared for E&Y show that from March 2010 through September 2014, FXCM recognized and collected $79 million in order flow revenue, as shown below:[142]

---

[139] A November 11, 2011 unsigned termination agreement sent to Mr. Dittami by FXCM's Alexander Dick, proposes to terminate the April 14, 2010 option agreement. Dittami Ex. 36, GLBR_00152760 – 64.
[140] Dittami transcript 200:7 – 201:5.
[141] Dittami Ex. 30, GLBR_00124982 – 5014 at GLBR_00125009 – 11; Dittami Ex. 15, E Capital-000050 – 51.
[142] EY-GBI-WP-00002874 and EY-GBI-WP-00002678. Annual amounts of total net revenues and income before income taxes are from FXCM's Forms 10-K for the years ended December 31, 2010 through 2014.  Percentage calculations, not presented in the Form 10-K, were performed by John Barron.

| Year | Order Flow Revenue | Retail Trading Revenues | Order Flow As % of Trading Rev | Pre-Tax Income | Order Flow As % of Pre-Tax Income |
|------|------|------|------|------|------|
| | | | (amounts in millions) | | |
| 2010 | $ 15.6 | $ 318.5 | 4.9% | $ 104.3 | 15.0% |
| 2011 | 23.1 | $ 363.8 | 6.3% | 69.6 | 33.2% |
| 2012 | 17.9 | $ 339.7 | 5.3% | 47.5 | 37.7% |
| 2013 | 15.6 | $ 365.3 | 4.3% | 51.9 | 30.0% |
| 2014 | 6.8 | $ 338.0 | 2.0% | 25.6 | 26.6% |
| | $ 79.0 | $ 1,725.3 | 4.6% | $ 298.9 | 26.4% |

111.    Although not disclosed in FXCM's consolidated financial statements, nearly all of the order flow payments received by FXCM came from Effex.

112.    In October 2013, FXCM received an email from an investigator at the National Futures Association ("NFA") Compliance Department which noted that "it seems only one entity paid FXCM for order flow during the calendar year" and requested FXCM provide it with a "record of payment from all liquidity providers for the period 10/13/08-1/1/13."[143]  In response, an FXCM compliance officer, Eric Estrada, attached a spreadsheet with the heading, "Receipts from Effex for order flow, Inception though January 31, 2013."  The spreadsheet lists 30 individual payments received from Effex beginning on July 15, 2010, through December 18, 2012, aggregating $55,305,428.[144]  This listing represented payments received from Effex through the end of 2012 for order flow revenue shown in the table above.[145]  Mr. Rosenfeld testified that all of the payments for order flow during 2013 came from Effex.[146]

113.    In addition to the significant order flow payments received from Effex, FXCM received what Mr. Niv described as "tiny" payments for order flow from BNP for institutional

[143] GLBR_00110416 – 20.
[144] GLBR_00110416 – 20 at GLBR_00110420; .
[145] EY-GBI-WP-00002874.
[146] Rosenfeld transcript 212:20 – 214:19; Rosenfeld Ex. 19, GLBR_00189377.

clients.[147]  When asked why FXCM received order flow payments only from Effex, and possibly

BNP, Mr. Niv testified that discussions with other liquidity providers about FXCM receiving order

flow payments in exchange for preferential treatment failed due to the size of other liquidity

providers:

> Q.   But only with respect to Effex and possibly BNP at this time; is that correct, with
> respect to the payment order flows?
> A.   At this time, yes, because the other discussions failed, you know. And these are
> large institutions, they're not going to enter this agreement without getting
> preferential treatment and doing a substantial amount of more business because
> this would then not be sufficiently big enough for them to get into this agreement.
> You know, when Charles Schwab and Ameritrade and Robin Hood are giving
> payment for order flow, they're doing it to only a few counterparties and, you
> know, who are each getting a substantial piece of the share. That's why there is
> that. When they route it to other venues, they don't receive payment for order
> flow.[148]

114.    Thus, it was due to Effex's small size and the significance of the flow FXCM routed

to Effex that Effex made order flow payments to FXCM.  Effex's reliance on business from FXCM

put FXCM in the position of requiring such payments from Effex, which larger entities were

unwilling to do.

## VII.    MATERIALITY OF MISSTATEMENTS

115.    I consider *SEC Staff Accounting Bulletin: No. 99 - Materiality* ("SAB 99") to offer

the most comprehensive guidance on the determination of materiality of misstatements of financial

statements.   SAB 99 brings together guidance from financial accounting standards, auditing

standards, and decisions of the United States Supreme Court ("Supreme Court").   SAB 99

addresses misstatements or omission of amounts, classifications, manner of presentation and

disclosures in financial statements.  SAB 99 provides an interpretative response to the question of

whether a registrant or an auditor may assume that misstatements falling below a certain

---

[147] Niv transcript 158:4 – 11, 189:5 – 190:22; Niv Deposition Ex. 48, GLBR_00022930 – 31.
[148] Niv transcript 162:2-20.

percentage threshold are immaterial.  SAB 99 provides that a percentage, such as 5%,[149] may provide the basis for a preliminary assumption that a misstatement less than such a threshold is unlikely to be material but that the final assessment must be based on consideration of all relevant circumstances--the "total mix" of information, including the size of the misstatement and the context in which the user of the financial statements would view the item.  "The shorthand in the accounting and auditing literature for this analysis is that financial management and the auditor must consider both 'quantitative' and 'qualitative' factors in assessing an item's materiality."

116.    SAB 99 and the statements on auditing standards[150] make reference to Supreme Court decisions in which it was held that a fact is material if there is "a substantial likelihood that the … fact would have been viewed by the reasonable investor as having significantly altered the 'total mix' of information made available."[151]

117.    For audit planning purposes, PCAOB standards require the auditor to determine materiality with respect to the financial statements as a whole, expressing materiality at a specified dollar amount, giving consideration to a company's earnings and other relevant factors.[152]  Such standards recognize that misstatements of lesser amounts may be material for certain accounts or disclosures based on the likelihood that misstatements of these accounts or disclosures would influence the judgment of reasonable investors.[153]

118.    SAB 99 sets forth the SEC Staff's view that there are circumstances in which

---

[149] For public companies, it is my experience as an auditor, that pretax income is the most commonly used benchmark for determining materiality with respect to the financial statements taken as a whole and 5% is the most commonly used percentage applied to that benchmark.  When other benchmarks are used, such as total revenues, total assets or total shareholders' equity, the percentage normally drops down to the 1% to 2% range.

[150] SAB 99, issued in 1999, makes reference to AICPA Auditing Standard AU 312, *Audit Risk and Materiality*, which has since been replaced by PCAOB Auditing Standard No. 11 ("AS 11"), *Consideration of Materiality in Planning and Performing an Audit* (currently codified in AS 2105).

[151] TSC Industries v. Northway, Inc., 426 U.S. 438, 449 (1976). See also Basic, Inc. v. Levinson, 485 U.S. 224 (1988).  TSC Industries, 426 U.S. at 450.

[152] AS 11.6.

[153] AS 11.7.

misstatements below a percentage threshold could be material:

> Evaluation of materiality requires a registrant and its auditor to consider all the relevant circumstances, and the staff believes that there are numerous circumstances in which misstatements below 5% could well be material.

119.    Both SAB 99 and PCAOB standards address the need to consider the materiality of

certain accounts or disclosures within the financial statements:

> The auditor should evaluate whether, in light of the particular circumstances, there are certain accounts or disclosures for which there is a substantial likelihood that misstatements of lesser amounts than the materiality level established for the financial statements as a whole would influence the judgment of a reasonable investor. If so, the auditor should establish separate materiality levels for those accounts or disclosures to plan the nature, timing, and extent of audit procedures for those accounts or disclosures.

>> Note: Lesser amounts of misstatements could influence the judgment of a reasonable investor because of qualitative factors, e.g., because of the sensitivity of circumstances surrounding misstatements, such as conflicts of interest in related party transactions.[154]

>> * * *

> The materiality of a misstatement may turn on where it appears in the financial statements. For example, a misstatement may involve a segment of the registrant's operations. In that instance, in assessing materiality of a misstatement to the financial statements taken as a whole, registrants and their auditors should consider not only the size of the misstatement but also the significance of the segment information to the financial statements taken as a whole. …[155]

120.    In summary, the evaluation of whether a misstatement or omission in financial

statements is material is viewed from the standpoint of a reasonable investor and the likelihood

that a misstatement or omission would have significantly altered decisions of the investor,

considering the circumstances, including both quantitative and qualitative factors, and the nature

of the item and its location within the financial statements.  Percentage or numerical thresholds are

a reasonable starting point, but it may not be assumed that misstatements falling below such

---

[154]AS 11.
[155] SAB 99.

thresholds are immaterial.

## VIII.    GAAP – RELATED PARTY DISCLOSURES

121.    With respect to related parties, GAAP focuses on disclosure of transactions and relationships with related parties.   ASC 850, *Related Party Disclosures*, is the authoritative accounting standard under GAAP concerning related party disclosures in a company's financial statements.[156]

### A. Definition of Related Parties

122.    According to ASC 850, related parties include the following:[157]

    a.  Affiliates[158] of the entity;
    b.  Entities for which investments in their equity securities would be required
    c.  Trusts for the benefit of employees;
    d.  Principal owners of the entity and members of their immediate families;
    e.  Management of the entity and members of their immediate families;
    f.  Other parties with which the entity may deal if one party controls or can significantly influence the management or operating policies of the other to an extent that one of the transacting parties might be prevented from fully pursuing its own separate interests; and
    g.  Other parties that can significantly influence the management or operating policies of the transacting parties or that have an ownership interest in one of the transacting parties and can significantly influence the other to an extent that one or more of the transacting parties might be prevented from fully pursuing its own separate interests.

123.    Examples of common transactions between related parties include the following:[159]

    a.  Sales, purchases, and transfers of real and personal property;
    b.  Services received or furnished, such as accounting, management, engineering, and legal services;
    c.  Use of property and equipment by lease or otherwise;
    d.  Borrowings, lendings, and guarantees;

---

[156] ASC 850-10-05-1, ASC 850-10-60-7.
[157] ASC 850-10-20.
[158] An "affiliate" is defined as "[a] party that, directly or indirectly through one or more intermediaries, controls, is controlled by, or is under common control with an entity. …."  Control is defined as "[t]he possession, direct or indirect, of the power to direct or cause the direction of the management and policies of an entity through ownership, by contract, or otherwise."  ASC 850-10-20.
[159] ASC 850-10-05-4.

e.   Maintenance of compensating bank balances for the benefit of a related party;
f.   Intra-entity billings based on allocations of common costs; and
g.   Filings of consolidated tax returns.

124.   Related party transactions also include those which have not been given accounting recognition and services provided without charge:[160]

> Transactions between related parties are considered to be related party transactions even though they may not be given accounting recognition. For example, an entity may receive services from a related party without charge and not record receipt of the services. While not providing accounting or measurement guidance for such transactions, this Topic requires their disclosure nonetheless.

## B.   Required Disclosures

125.   GAAP requires financial statements to include the following disclosures of material related party transactions:[161]

> a.   The nature of the relationship(s) involved;
> b.   A description of the transactions, including transactions to which no amounts or nominal amounts were ascribed, for each of the periods for which income statements are presented, and such other information deemed necessary to an understanding of the effects of the transactions on the financial statements;
> c.   The dollar amounts of transactions for each of the periods for which income statements are presented and the effects of any change in the method of establishing the terms from that used in the preceding period; and
> d.   Amounts due from or to related parties as of the date of each balance sheet presented and, if not otherwise apparent, the terms and manner of settlement.

126.   The basic objective of the above requirements is to ensure disclosure of useful information which would make a difference in decision making for users of the financial statements:

> Information about transactions with related parties is useful in comparing an entity's results of operations and financial position with those of prior periods and with those of other entities. It helps users of financial statements to detect and explain possible differences.[162]

---

[160] ASC 850-10-05-5.
[161] Related party transaction disclosure requirements do not apply to compensation arrangements, expense allowances, and other similar items in the ordinary course of business. ASC 850-10-50-1.
[162] ASC 850-10-05-2.

Information about transactions with related parties that would make a difference in decision making shall be disclosed so that users of the financial statements can evaluate their significance. Therefore, this Topic establishes requirements to disclose certain significant related party transactions and control relationships. Relevant information is omitted if the disclosures required by this Topic are not made.[163]

## IX.   OPINION – RELATED PARTY DISCLOSURES

### A. Effex Was a Related Party

127.    FXCM was in a position to significantly influence the management or operating policies of Effex to the extent that Effex might have been prevented from fully pursuing its own separate interests.   This ability of FXCM and its management to significantly influence the management or operating policies of Effex existed based on numerous factors:

127.1.  FXCM's creation of Effex as a separate legal entity and the decision to end Mr. Dittami's employment was done for the purpose of avoiding potentially adverse consequences to FXCM of using and operating certain technology in-house through EES.  The decision was based on the views of FXCM' compliance, sales and marketing personnel.   Such adverse consequences related to the appearance that FXCM was operating in a way that was inconsistent with its stated core business philosophy of operating under a no-dealing desk (agency) model.[164]  Absent these appearance issues, FXCM had no apparent reason to move the operation of EES to a separate legal entity.. The various agreements between FXCM and Effex, represented a continuation of the sharing of Effex's profits equivalent to the economic arrangement existing between FXCM and John Dittami prior to the creation of Effex.  Nothing of substance really

---

[163] ASC 850-10-10-1.
[164] Ahdout transcript 43:14 – 44:6; Ahdout CFTC transcript 98:15 – 100:23; Niv CFTC transcript 77:16 – 78:8, 106:10 – 23.

changed with the formation of Effex from what had been contemplated with EES.

127.2.  Effex could not have begun operations without the financial and other support of FXCM.  As a small, brand-new entity, it was very difficult for Effex to obtain new customers.  Initially, nearly all of Effex's revenues came from FXCM.[165]  According Mr. Niv's testimony, the purchase price in the option agreement was set at only a nominal amount due to Effex's lack of a track record and the fact that Effex was "still dependent only on [FXCM]."[166]

127.3.  Effex relied upon on FXCM to create the credit arrangements necessary for Effex to begin its operations and, in its early stages, relied upon FXCM employees, office space, and technology to operate.  In addition to the use of the pricing algorithms developed by Mr. Dittami while employed by FXCM, FXCM provided Effex with trading advantages over other liquidity providers, such as co-locating its servers in the same location to improve execution speed, ability to win ties, access to real time prices quoted by competing liquidity providers, and lower markups on Effex prices.[167] Without these advantages, Effex would not have been able to adopt a trading strategy that allowed Effex to maximize its volume and profits, the majority of which flowed back to FXCM.

127.4.  Effex owed its existence and its ability to operate in the manner it did to FXCM. At any time, FXCM could have chosen to withdraw or limit its financial and other support provided to Effex in the form of the business directed to Effex and the

---

[165] Dittami CFTC transcript 43:6 – 15, 230:18 – 231:10; Dittami transcript 173:8 – 15, 175:11 – 25, 334:24 – 335:24, 343:9 – 344:12.
[166] Niv CFTC transcript 226:6 – 14.
[167] Ahdout CFTC transcript 226:9 – 229:5, 240:2 – 241:24 ; Dittami transcript 324:11 – 326:8; Dittami CFTC transcript 323:8 – 330:22.

preferences given to Effex (or exercise its option to acquire substantially all of Effex). These facts put FXCM in the position to significantly influence the management and operating policies of Effex to an extent that Effex might be prevented from fully pursuing its own separate interests.

**B.  FXCM's Failure to Make Related Party Disclosures Required by GAAP**

128.    From the date of creation of Effex through the end of 2014, FXCM's consolidated financial statements, included in its filings with the SEC, contained no disclosures of: (1) the nature of FXCM's relationship with Effex; (2) description of the transactions between FXCM and Effex; (3) the amounts of the transactions between FXCM and Effex; or (4) amounts due to or from Effex.

**C.  FXCM's Consolidated Financial Statements Were Not Prepared in Accordance with GAAP and the Failure to Make the Related Party Disclosures Required by GAAP Caused FXCM's Consolidated Financial Statements To Be Materially Misstated.**

129.    The order flow payments received by FXCM from Effex during the years ended December 31, 2010, through December 31, 2014, represented from 2.0% to 6% of FXCM's total retail revenues and from 15.0% to 38.0% of FXCM's reported income before income taxes (see Section VI.F., above).  Based on my experience as an auditor, in determining amounts that are quantitatively material to financial statements taken as a whole, it is common practice to apply percentages from 5% to 10% of income before income taxes or lesser percentages (1% to 2%) if applied to other benchmarks such as total revenues.  Consistent with my experience, in conducting its audit of FXCM's consolidated financial statements for the year ended December 31, 2011, E&Y set audit planning materiality at 5% of FXCM's income before income taxes.[168]  Over the five-year period ending December 31, 2014, order flow payments represented 26% of FXCM's income before income taxes and almost 5% of FXCM's total retail trading revenue.  Thus, the order flow

---

[168] EY-GBI-WP-00000010 – 11.

payments were clearly material to FXCM's consolidated financial statements during these reporting periods, exceeding multiples of what is normally considered to be quantitatively material for financial statements of public companies.

130.    In determining whether a misstatement is material to financial statements, both quantitative and qualitative considerations must be taken into account.  In some cases, amounts that are not quantititvely material may be material to the financial statements based on qualitative considerations.  FXCM's public filings disclosed that its retail trading revenue was earned by adding markups to prices provided to FXCM by market makers.  FXCM also disclosed that it used an agency model in which it acted as a "riskless principal," hedging its trading positions and eliminating market risks.  FXCM contrasted its agency model to those entities using the principal model in which the revenues of a principal broker consisted primarily of trading gains and losses. Thus, FXCM's financial statements led users to believe that FXCM did not earn significant income from trading gains or losses in connection with transactions with its retail customers.  In fact, FXCM was earning material amounts of revenue from trading profits in the form of order flow payments received from Effex, a related party, representing FXCM's share of Effex's trading profits.  Knowledge of this information would have made a difference to the users of FXCM's consolidated financial statements, including its customers, as it was contrary to what FXCM described as fundamental to its core business philosophy.

131.    While the Company's consolidated financial statements disclosed that retail trading revenue included payments for order flow, the significance of these payments was not disclosed and, more importantly, no disclosure was made that all or nearly all of the income from order flow was received from a related party.[169]

---

[169] 2010 Form 10-K, page F-14; 2011 Form 10-K. page F-16; 2012 Form 10-K, page F-18, 2013 Form 10-K, page F-18; 2014 Form 10-K, pages F-17 – F-18.

132.     In an email exchange between John Wrobel, an FXCM Business Analyst, and David Sakhai, FXCM's Chief Operating Officer, Mr. Wrobel communicated that he had spoken with Mr. Dittami about whether Mr. Dittami [Effex] was a riskless principal regarding offsetting trades.   According to this email, Mr. Dittami told Mr. Wrobel that Effex was not a riskless principal, but it was Mr. Wrobel's opinion that Effex was on the other side of client trades:

> … Regarding the counterparty item, I did ask John directly if he was a riskless principle [sic] regarding offsetting trades and he said that he wasn't. In my estimation, he has the backing of Citi but he is or was the other side of client trades executed through his pricing and liquidity. …[170]

133.     When asked about this email, Mr. Dittami testified as follows:

> Q.     Okay. And you said before that it was not accurate that -- to say that EFFEX was not a riskless principal with respect to offsetting trades?
> A.     Yeah, EFFEX has no relationship with the customer. EFFEX holds positions for a living. Counterparty's FXCM, so I don't -- I don't know what he was getting at here.
>
> Q.     Okay. And to break down, I guess, the mechanics of that trade, so is it your understanding that with trades on FXCM's no dealing desk platform that a customer would enter into a trade with FXCM and FXCM would offset that trade with a liquidity provider?
> A.     Yes, I understand that to be the case.[171]

134.     Mr. Dittami's statement that Effex was "hold[ing] positions for a living," is consistent with Effex's generation of significant net trading profits, the significant majority of which were paid to FXCM and included in FXCM's consolidated financial statements in the form of order flow payments.   Contrary to FXCM's disclosures concerning its use of the riskless principal (agency) model, a material portion of FXCM's revenue and income before income taxes was generated from trading profits.   The fact that FXCM went to the lengths that it did to move operations that were begun with EES out from under FXCM to a separate legal entity shows just

---

[170] Dittami Ex. 10, GLBR_00121206 – 208.
[171] Dittami transcript 76:12 – 77:2.

how important the "optics" of being a no dealing desk (agency) were.

135.    The order flow payments received by FXCM from Effex were clearly material to FXCM's consolidated financial statements.  FXCM's failure to make the related party disclosures required by GAAP caused FXCM's consolidated financial statements to be materially misstated for each of the years beginning with the year ended December 31, 2010 and ending with the year ended December 31, 2014.

## X.    GAAP – CONSOLIDATION - VARIABLE INTEREST ENTITIES

### A.  Applicable Standards

136.    FASB Accounting Standards Codification ("ASC") Topic 810, *Consolidation*, is the authoritative accounting standard under GAAP concerning consolidation.  GAAP has two models for consolidation: (1) the voting interest entity model; and (2) the variable interest model.[172]  Under the voting interest model, consolidation is generally required when an entity has a controlling financial interest in another entity through ownership of a majority voting interest.[173]

137.    The sections within ASC Topic 810 which are relevant to this litigation address the characteristics and consolidation of Variable Interest Entities ("VIEs").  The issues involve determining whether a legal entity meets the criteria of a VIE and whether another entity meets the criteria as the primary beneficiary of the VIE, requiring consolidation of the VIE by the primary beneficiary.

### B.  Variable Interest Entities Subject to Consolidation

138.    An entity is considered a VIE subject to consolidation when:[174]

    a.    The total equity investment …at risk [in the VIE] is not sufficient to permit the legal entity to finance its activities without additional subordinated financial support provided by any parties, including equity holders…. [or]

---

[172] ASC 810.
[173] ASC 810-10-05-8 and ASC 810-10-10-1.
[174] ASC 810-10-15-14.

      b. As a group the holders of the equity investment at risk lack any one of the following three characteristics:

         (1) The power, through voting rights or similar rights, to direct the activities of a legal entity that most significantly impact the entity's economic performance.

         (2) The obligation to absorb the expected losses[175] of the legal entity

         (3) The right to receive the expected residual returns.[176]

139.    The initial determination of whether a legal entity is a VIE is made on the date at which the reporting entity initially becomes involved with the legal entity. For this purpose, involvement refers to ownership, contractual, or other interests that may be determined to be variable interests.[177]

### C. Primary Beneficiaries of VIEs Required To Consolidate the VIE

140.    Reporting entities with both of the following characteristics are considered to have a controlling financial interest and are required to consolidate a VIE:[178]

      a. The power to direct the activities of a VIE that most significantly impact the VIE's economic performance.

      b. The obligation to absorb losses of the VIE that could potentially be significant to the VIE or the right to receive benefits from the VIE that could potentially be significant to the VIE.[179]

141.    Reporting entities with a controlling financial interest in a VIE are referred to as a primary beneficiary of the VIE.[180]

---

[175] A legal entity that has no history of net losses and expects to continue to be profitable in the foreseeable future can be a variable interest entity (VIE). A legal entity that expects to be profitable will have expected losses. A VIE's expected losses are the expected negative variability in the fair value of its net assets exclusive of variable interests and not the anticipated amount or variability of the net income or loss. ASC 810-10-20.

[176] A VIE's expected residual returns are the expected positive variability in the fair value of its net assets exclusive of variable interests. ASC 810-10-20.

[177] ASC 810-10-25-37.

[178] ASC 810-10-05-8A and ASC 810-10-25-38A.

[179] The quantitative approach described in the definitions of the terms expected losses, expected residual returns, and expected variability is not required and shall not be the sole determinant as to whether a reporting entity has these obligations or rights. ASC 810-10-25-38A.

[180] ASC 810-10-20; ASC 810-10-25-38 through 25-38J.

### D.  Required Disclosures

142.   Disclosures required by reporting entities that are a primary beneficiary of a VIE

include the following:[181]

    a.  Its methodology for determining whether the reporting entity is the primary beneficiary of a variable interest entity … One way to meet this disclosure requirement would be to provide information about the types of involvements a reporting entity considers significant, supplemented with information about how the significant involvements were considered in determining whether the reporting entity is the primary beneficiary.

    b.  If facts and circumstances change such that the conclusion to consolidate a variable interest entity has changed in the most recent financial statements …, the primary factors that caused the change and the effect on the reporting entity's financial statements.

    c.  Whether the reporting entity has provided financial or other support (explicitly or implicitly) during the periods presented to the VIE that it was not previously contractually required to provide or whether the reporting entity intends to provide that support, including both of the following:
        1.  The type and amount of support, including situations in which the reporting entity assisted the VIE in obtaining another type of support
        2.  The primary reasons for providing the support.

    d.  Qualitative and quantitative information about the reporting entity's involvement (giving consideration to both explicit arrangements and implicit variable interests) with the VIE, including, but not limited to, the nature, purpose, size, and activities of the VIE, including how the VIE is financed. ….

    e.  The carrying amounts and classification of the VIE's assets and liabilities in the statement of financial position that are consolidated in accordance with the Variable Interest Entities Subsections, including qualitative information about the relationship(s) between those assets and liabilities. For example, if the VIE's assets can be used only to settle obligations of the VIE, the reporting entity shall disclose qualitative information about the nature of the restrictions on those assets.

    f.  Lack of recourse if creditors (or beneficial interest holders) of a consolidated VIE have no recourse to the general credit of the primary beneficiary.

---

[181] ASC 810-10-50-3 and ASC 810-10-50-5A.

g.  Terms of arrangements, giving consideration to both explicit arrangements and implicit variable interests that could require the reporting entity to provide financial support (for example, liquidity arrangements and obligations to purchase assets) to the VIE, including events or circumstances that could expose the reporting entity to a loss.

## XI.   OPINION – CONSOLIDATION – VARIABLE INTEREST ENTITIES

### A.  Effex Was a VIE

143.   The determination of whether an entity is a VIE is made on the date that the reporting entity, FXCM, first became involved with Effex.  In this case, this initial determination would have been made during the year ended December 31, 2010.

144.   At the time of its creation, Mr. Dittami's equity investment at risk was not sufficient to finance its activities without the support of FXCM.  There is no evidence that Mr. Dittami paid for the equity interest that he obtained upon the formation of Effex.  The funds needed to commence operations were invested by FXCM in the form of the costs of the initial development and testing of the algorithmic trading system which was the principal asset upon which Effex could commence operations.  In addition, FXCM provided the $2 million needed for Effex to obtain a Prime of Prime account so that it could begin trading.  FXCM also provided support in the form of office space, technical support and employees.  These initial investments by FXCM represented subordinated financial support, which enabled Effex to begin and continue its operations in the initial stages of its existence.

### B.  FXCM Was the Primary Beneficiary of Effex as a VIE

145.   FXCM was the source of nearly all of Effex's business transactions.  In its second year of operation, FXCM was still providing approximately 90% of Effex's business transactions. In other words, only approximately 10% of Effex's business was coming from customers other than FXCM.  Even after it began its operations, Effex required periodic adjustments of payment

obligations owed to FXCM in order to maintain needed liquidity (reserves).  The nature of the relationship between FXCM and Effex and Effex's near total reliance on FXCM, provided FXCM power to direct the activities of Effex.  Clearly, if FXCM had requested Effex to modify its activities, Effex would have been forced to comply or face the loss of the substantial majority of its business and the non-monetary support being provided by FXCM.  In addition, the existence of the purchase option would have provided an added layer of power to direct Effex's activities.  The nominal exercise price of the purchase option was based on Effex's total dependence on FXCM (see paragraph 127.2).   Finally, based on the terms of Effex's services agreements with FXCM, FXCM had the right to receive benefits from Effex that could potentially be significant to Effex, the other key criteria for establishing FXCM as the primary beneficiary.

146.    The determination of whether Effex was a VIE and whether FXCM was the primary beneficiary is made when the two entities first become associated.  In its earliest stages, Effex relied entirely on FXCM's financial and other support to commence and continue its operations.

### C.  FXCM Failed to Consolidate the Financial Statements of Effex and Make the Disclosure Required by GAAP

147.    Because FXCM met the criteria of the primary beneficiary of the VIE (Effex), FXCM was required to consolidate the financial statements of Effex into its own consolidated financial statements and make certain disclosures about the methodology used by FXCM in determining whether it was the primary beneficiary of Effex, such as providing information about the types of involvements that FXCM had with Effex.  At a minimum, such consolidation was required for the year ended, December 31, 2010, the period in which Effex was formed.  If FXCM had consolidated Effex's financial statements in 2010, as required by GAAP, and later determined that Effex no longer met the criteria of a variable interest entity or that FXCM was no longer primary beneficiary, additional disclosures would have been required.

**D. FXCM's Failure to Consolidate the Financial Statements of Effex and to Make the Required Disclosures Caused FXCM's Consolidated Financial Statements to Be Materially Misstated**

148.    As previously discussed, from a purely quantitative standpoint, the transactions between FXCM and Effex were material to FXCM's consolidated financial statements in each of the five years ended December 31, 2010, 2011, 2012, 2013, and 2014.

149.    Had FXCM consolidated the financial statements of Effex, as required by GAAP, the transactions between the two entities, principally the order flow payments, would have been eliminated in consolidation.  In other words, the order flow expense on Effex's books would have been eliminated against the order flow income on FXCM's books.  Upon consolidation, 100% of Effex's revenues and expenses, excluding the order flow payment expenses, would have been included in FXCM's consolidated financial statements.  Thus, 100% of the revenue from trading profits would be included in FXCM's consolidated statements of income.  A portion of Effex's net profits would be attributed to Mr. Dittami's minority (non-controlling) interest such that net income attributable to FXCM shareholders should not have changed significantly as a result of the consolidation.  However, total revenues (and total expenses) would have changed by material amounts.  After all, FXCM's share of Effex's profits was quantitatively material to FXCM's consolidated financial statements so, clearly, 100% of the profits attributable to order flow from Effex would also be material.  At first blush, the consolidation of Effex, would not seem to negatively impact FXCM's consolidated statements of operations.[182]  In fact, reported revenues would increase and net income attributable to FXCM's shareholders would remain unchanged.

---

[182] The intercompany balances due to/from Effex would be eliminated in consolidation.  However, I am unable to assess additional impact that consolidation of Effex would have on FXCM's consolidated statements of financial condition.

150.    The issue from FXCM's standpoint was that consolidation of Effex would require all of the numerous disclosures described above (see paragraph 142) as well as disclosure that a material amount of FXCM's consolidated revenues was derived from the trading profits of Effex. This was not consistent with what FXCM disclosed with respect to its use of the agency or riskless principal (no-dealing desk) model, fundamental to its core business philosophy.  Given the lengths to which FXCM had gone to avoid having trading profits reflected in its consolidated financial statements and being able to say that it operated on a no-dealing desk basis, it is clear that the consolidation of Effex and making the required disclosures related to Effex was qualitatively material to FXCM's financial statements.


*John E. Barron, CPA*

JOHN E. BARRON, CPA                                                    April 21, 2021

**Exhibit A**

**CURRICULUM VITAE**

**JOHN E. BARRON, CPA**

## Consulting Expert, Arcadia Consulting, LLC, NY, November 2020 to present

Expert services related to the application of PCAOB standards and the application of generally accepted accounting principles.

## Director of Quality Control, Frost, PLLC, Little Rock, AR, November 2016 to present

Responsibilities as director of quality control include oversight of the firm's assurance practice with respect to compliance with AICPA and PCAOB quality control standards. Responsibilities include development of quality control policies, oversight of PCAOB and AICPA Peer Review inspections, conducting annual internal inspections of selected engagements for compliance with applicable standards, performing detailed second partner reviews of a majority of the firm's audit and attest engagements, consulting on accounting technical matters, and conducting internal training.

## Sole Practitioner, litigations services, April 2014 to November 2016

Expert services, including testimony on behalf of the Enforcement Division of the Securities and Exchange Commission on three matters related to the application of PCAOB standards and the application of generally accepted accounting principles.

## Marks Paneth LLP, CPAs, New York, Director, Litigation Services, February 2003 to April 2014

Expert services, including testimony, on behalf of the SEC, PCAOB and private legal counsel in matters related to financial reporting, application of generally accepted accounting principles, and PCAOB audit standards.  Industries included banking, real estate, securities, and financial services.  The two most significant cases involved a $12 billion restatement by Fannie Mae involving its accounting for derivative instruments, and litigation involving a Madoff "feeder fund".

## Adjunct professor of accounting – Baruch College, New York, 2008 – 2012

Instructed undergraduate courses in financial accounting, auditing, and managerial accounting

## Deloitte LLP, Atlanta, GA and New York, NY - Audit Partner (1990 – 2003); Audit Senior Manager (1987 to 1990)

Rejoined the firm in 1987 as a senior manager in the firm's Atlanta office, admitted to the partnership in 1990 and relocated to the firm's New York office in 1998, specializing in financial services, real estate, mortgage investments, construction, and private and public investment funds. Clients included Fortress Investments, MetLife, Equitable Life, Kajima Construction, various Morgan Stanley and Merrill Lynch private investment funds, and four publicly traded real estate investment trusts. Was designated a financial instruments specialist to assist with implementation of accounting for derivative instruments and hedging activities.

**Exhibit A**

**<u>Private real estate investment company - June 1976 to August 1987</u>**

Chief Financial Officer of privately owned real estate investment firm specializing in the acquisition and sale of commercial properties subject to net leases.

**<u>Haskins & Sells, Atlanta, GA, June 1970 to June 1976</u>**

Began on audit staff, promoted to audit manager in 1975. Clients industries included broadcasting, construction, savings and loan associations, and a publicly traded real estate investment trust.

**<u>Education</u>**

University of Florida - B.S. in Business Administration-Accounting, with Honors, June 1970

**<u>Testimony during the prior four years</u>**

Deposition on June 11 and June 12, 2019 in the American Realty Capital Properties, Inc. Litigation. United States District Court for the Southern District of New York.  Civil Action No. 1:15-mc-00040-AKH.

**<u>Publications authored in previous ten years</u>**

"Owner-Manager Fraud," White-Collar Crime Fighter, April 2012

Exhibit B

## DOCUMENTS, TESTIMONY AND OTHER MATERIALS CONSIDERED

**Legal Filings:**

- February 17, 2017 Class Action Complaint for Violations of the Federal Securities Laws.
- June 19, 2017 Consolidated Securities Class Action Complaint.
- April 6, 2018 Second Amended Consolidated Securities Class Action Complaint.
- March 28, 2019 Opinion and Order.
- April 17, 2020 Third Amended Consolidated Securities Class Action Complaint.
- September 21, 2020 Plaintiffs' Mediation Statement (including exhibits).
- February 18, 2021 Plaintiff's Second Amended Responses and Objections to Defendants' Interrogatories 1-6.
- March 18, 2021 Report and Recommendation to The Honorable Ronnie Abrams.

**Depositions:**

- December 9, 2020 deposition of Joshua Rosenfeld (including exhibits).
- January 14, 2021 deposition of Robert Lande (including exhibits).
- January 21, 2021 deposition of John Dittami (including exhibits).
- January 25, 2021 deposition of David Stollow (including exhibits).
- February 11, 2021 deposition of Dror (Drew) Niv (including exhibits).
- February 16, 2021 deposition of William Ahdout (including exhibits).
- April 7 - 8, 2016 CFTC deposition of John Dittami.
- May 19, 2016 CFTC deposition of William Ahdout.
- May 25 - 26, 2016 CFTC deposition of Dror (Drew) Niv.

**FXCM's SEC Filings:**

- December 1, 2010 Notice of Effectiveness.
- December 1, 2010 Form S-1/A.
- December 3, 2010 Final Prospectus.
- 2010 – 2016 Forms 10-K (including amended filings, if any).
- Q1 – Q3 Forms 10-Q for 2011 – 2016 (including amended filings, if any).

**Other Materials:**

- SAB 99 - Materiality.
- Relevant sections of the Accounting Standards Codification, including:
  - ASC 105 – Generally Accepted Accounting Principles.
  - ASC 810 - Consolidation.
  - ASC 850 - Related Party Disclosures.

**Exhibit B**

- Con 2 - Qualitative Characteristics of Accounting Information.
- Con 8 - Chapter 1, Chapter 1, The Objective of General Purpose Financial Reporting, and Chapter 3, Qualitative Characteristics of Useful Financial Information (a replacement of FASB Concepts Statements No. 1 and No. 2).
- PCAOB AS 11 - Consideration of Materiality in Planning and Performing an Audit.
- PCAOB Auditing Standards.
- SEC Regulation S-X. 17 C.F.R. § 210.4-01(a)(1).
- www.fxcm.com/markets/about-fxcm/liquidity-providers/ (March 5, 2021).

**Documents:**[1]

E Capital-000001 through E Capital-000119, inclusive.

EY-GBI-WP-00000001 through EY-GBI-WP-2414, inclusive.

| | | |
|---|---|---|
| GLBR_00002696 | GLBR_00125012 | GLBR_00218789 |
| GLBR_00004262 | GLBR_00125014 | GLBR_00022930 |
| GLBR_00005534 | GLBR_00125304 | |
| GLBR_00007733 | GLBR_00135452 | |
| GLBR_00008068 | GLBR_00152107 | |
| GLBR_00008069 | GLBR_00152760 | |
| GLBR_00022930 | GLBR_00152765 | |
| GLBR_00028063 | GLBR_00152767 | |
| GLBR_00028840 | GLBR_00184107 | |
| GLBR_00041735 | GLBR_00184113 | |
| GLBR_00046387 | GLBR_00184115 | |
| GLBR_00054006 | GLBR_00184132 | |
| GLBR_00054454 | GLBR_00184136 | |
| GLBR_00062622 | GLBR_00184140 | |
| GLBR_00103994 | GLBR_00185174 | |
| GLBR_00118420 | GLBR_00185332 | |
| GLBR_00110416 | GLBR_00188104 | |
| GLBR_00110420 | GLBR_00188166 | |
| GLBR_00110697 | GLBR_00189008 | |
| GLBR_00110713 | GLBR_00189079 | |
| GLRB_00120647 | GLBR_00189088 | |
| GLBR_00121206 | GLBR_00189350 | |
| GLBR_00124229 | GLBR_00189352 | |
| GLBR_00124982 | GLBR_00189371 | |
| GLBR_00124984 | GLBR_00189377 | |
| GLBR_00125000 | GLBR_00194774 | |
| GLBR_00125001 | GLBR_00194776 | |
| GLBR_00125008 | GLBR_00218039 | |
| GLBR_00125009 | GLBR_00218043 | |

---

[1] In certain instances, the Bates number listed is the first page of a range.