# Exhibit 2

United States District Court
Southern District of New York

|                                                        |   |                             |
|--------------------------------------------------------|---|-----------------------------|
|                                                        | x |                             |
| IN RE GLOBAL BROKERAGE, INC. f/k/a                     | : |                             |
| FXCM INC. SECURITIES LITIGATION                        | : |                             |
|                                                        | : |                             |
|                                                        | : | Case No. 1:17-cv-00916-RA-BCM |
|                                                        | : |                             |
|                                                        | : |                             |
|                                                        | : |                             |
|                                                        | : |                             |
|                                                        | : |                             |
|                                                        | : |                             |
|                                                        | : |                             |
|                                                        | : |                             |
|                                                        | : |                             |
|                                                        | x |                             |

EXPERT REPORT OF THOMAS LINSMEIER, PH.D.
June 10, 2021

## Table of Contents

I.      Qualifications ................................................................................................ 1

II.     Assignment ................................................................................................... 2

III.    Summary of Opinions .................................................................................. 3

IV.     Background .................................................................................................. 3

    A.    FXCM ................................................................................................ 3

    B.    Effex .................................................................................................. 5

    C.    Plaintiffs' Allegations Pertaining to GAAP ...................................... 5

V.      Financial Accounting and Reporting ........................................................... 6

    A.    Participants in the Financial Accounting and Reporting Environment ................. 6

        1.    Standard Setters and Regulators ............................................. 6

        2.    Management ............................................................................ 7

        3.    Independent Auditor ............................................................... 8

    B.    Materiality ....................................................................................... 10

    C.    Accounting for Variable Interest Entities ....................................... 12

        1.    Is the Entity Being Evaluated a VIE Such That the VIE Model Is Applicable? ....................................................... 13

        2.    Does the Reporting Company Have a Variable Interest in the VIE? ....... 16

        3.    Is the Reporting Company the Primary Beneficiary of the VIE? ............ 17

    D.    Related Party Disclosures ............................................................... 19

VI.     Barron Report Opinions ............................................................................ 20

VII.    Mr. Barron's Conclusion That FXCM Should Have Consolidated Effex Is Fundamentally Flawed ....................................................................... 23

    A.    Mr. Barron Has Not Established That Effex Was a VIE and That the VIE Model Is Applicable .......................................................... 24

    B.    Mr. Barron Has Not Established That FXCM Had a Variable Interest in Effex .. 30

    C.    Mr. Barron Has Not Established That FXCM Was the Primary Beneficiary of Effex ........................................................................ 38

    D.    Mr. Barron Has Not Established That FXCM Was Required to Consolidate Effex in Its Financial Statements as of December 31, 2010 or during the Class Period 43

VIII.   Mr. Barron Fails to Establish That FXCM Should Have Disclosed Effex as a Related Party .......................................................................... 44

IX.     Mr. Barron's Materiality Opinions Are Moot............................................ 46

X.      Mr. Barron Fails to Reconcile His Opinion with EY's Opinion That Effex Did Not Need to Be Consolidated or Disclosed as a Related Party ....................................................... 46

## I.      Qualifications

1.      I am a Professor and the Thomas G. Ragatz Accounting and Law Distinguished Chair in the Department of Accounting and Information Systems at the University of Wisconsin–Madison's Wisconsin School of Business.  Prior to joining the faculty of University of Wisconsin–Madison, I served as a member of the Financial Accounting Standards Board ("FASB") from 2006 to 2016.  Until 2006, I was the Russell E. Palmer Endowed Professor and Chairperson of the Department of Accounting and Information Systems at Michigan State University.  I also served as academic fellow and special consultant to the Office of the Chief Accountant at the U.S. Securities and Exchange Commission ("SEC"), chair of the Financial Accounting Standards Committee, and president of the Financial Accounting and Reporting Section of the American Accounting Association.

2.      During my tenure as a member of the FASB, I reviewed and voted on a number of accounting standard updates, including the Statement on Financial Accounting Standards No. 167 ("FAS 167") and subsequent Accounting Standard Updates issued through June 2016 pertaining to the consolidation of variable interest entities ("VIEs").

3.      I have published dozens of scholarly articles and book chapters on the role of accounting information in securities markets.  My research has explored the usefulness to investors of fair value and market risk management disclosures, the relevance of earnings component information for company valuation, and the economic effects of changes in accounting regulations/standards. I have also provided oral and written testimony on the role of financial accounting standards for consumer and investor protection, including testimony about derivatives and risk management at Congressional hearings.

4.      My work has been published in leading academic journals such as *The Accounting Review*, *Journal of Accounting Research*, *Review of Accounting Studies*, *Accounting Horizons*, *Management Science*, *Journal of Accounting, Auditing, and Finance*, and *Journal of Business, Finance and Accounting*, among others.

5.      I hold a Ph.D. and an MBA in Accounting from the University of Wisconsin–Madison and received my BBA in Accounting from the University of Wisconsin–Milwaukee.

6.      A copy of my curriculum vitae, which includes a list of my publications in the last ten years, is attached hereto as **Appendix A**.  I have not provided expert testimony in the last four years.

## II.    Assignment

7.      I have been retained by King & Spalding LLP, counsel for Global Brokerage, Inc. (f/k/a FXCM Inc.), William Ahdout, and Dror Niv ("Defendants"), to provide expert testimony in *In re Global Brokerage, Inc. f/k/a FXCM Inc. Securities Litigation*.[1]  I was asked to respond to the opinions Mr. John Barron issued in his report dated April 21, 2021 (the "Barron Report") regarding whether the financial statements issued by FXCM Inc. ("FXCM") between March 15, 2012 and February 6, 2017 ("Class Period") complied with U.S. generally accepted accounting principles ("GAAP").  Specifically, I was asked to analyze whether, at any time during the Class Period, FXCM was required under U.S. GAAP to (1) consolidate Effex Capital, LLC ("Effex") as a VIE and make related disclosures, or (2) disclose Effex as a related party as well as make related party disclosures concerning FXCM's business relationship and transactions with Effex.

8.      As part of this assignment, I have reviewed various materials, including legal pleadings in this matter, deposition testimony and accompanying exhibits, SEC filings, and documents produced in this matter.  A list of the materials I have relied upon is set forth in **Appendix B**.  I reserve the right to revise my opinions should additional information become available to me.

9.      I am being compensated at my usual rate of $1,000 per hour.  I have been assisted by individuals at Cornerstone Research, who worked under my direct supervision.  I receive compensation from Cornerstone Research based on its collected staff billings for its support of me in this matter.  Neither my compensation nor Cornerstone Research's is dependent on my conclusions or on the outcome of this matter.

---

[1] *In re Global Brokerage, Inc. f/k/a FXCM Inc. Securities Litigation*, United States District Court, Southern District of New York, Master File No. 1: 17-cv-00916-RA-BCM, Third Amended Consolidated Securities Action Complaint ("Amended Complaint").

### III.      Summary of Opinions

10.      Based on my analysis of the SEC filings, documentary records, and accounting literature, I have formed the opinions below:

      a.   Mr. Barron's conclusion that FXCM should have consolidated Effex as a VIE and make related disclosures is based on an incomplete and fundamentally flawed analysis.  Specifically, Mr. Barron fails to establish any, let alone all, of the three required elements of an appropriate VIE analysis:  (1) whether Effex was a VIE, (2) whether FXCM had a variable interest in Effex, and (3) whether FXCM was the primary beneficiary of Effex.  As a result, Mr. Barron has not shown that FXCM was required to consolidate Effex in its financial statements as of December 31, 2010 or during the Class Period.  Based on my analysis of the facts and circumstances surrounding FXCM's relationship with Effex as a whole, it is my opinion that FXCM was not required under U.S. GAAP to consolidate Effex into and make related VIE disclosures in its financial statements for the year ended December 31, 2010 or during the Class Period.

      b.   Mr. Barron's conclusion that FXCM should have disclosed Effex as a related party is likewise based on flawed analysis.  Specifically, Mr. Barron fails to establish that FXCM could significantly influence the management or operating policies of Effex to an extent that Effex might be prevented from fully pursuing its own separate interests.  Based on my analysis of the facts and circumstances surrounding FXCM's relationship with Effex as a whole, it is my opinion that FXCM was not required under U.S. GAAP to disclose Effex as a related party for the year ended December 31, 2010 or during the Class Period.

### IV.      Background

####      A.      FXCM

11.      According to its SEC filings, during the Class Period, FXCM provided online foreign exchange ("FX") trading and related services to retail accounts globally.[2]  FXCM offered its

---

[2] FXCM Inc. Form 10-K for the period ended December 31, 2011 ("2011 Form 10-K"), p. 1.

customers access to over-the-counter FX markets and provided them with a way to trade FX through its proprietary technology platform.[3]

12.     In an FX trade, a participant buys one currency and simultaneously sells another, a combination known as a "currency pair."[4]  FXCM's platform sought to present its FX customers with the best price quotations on several currency pairs from global banks, financial institutions and market makers.[5]

13.     During the Class Period, according to its SEC filings, FXCM chiefly used an "agency model" (also known as a "No Dealing Desk" model) in conducting its FX retail brokerage business.[6]  Under the agency model, FXCM would act as an intermediary between a customer and the FX market marker (often referred to as the "liquidity provider"), simultaneously entering into offsetting trades with both the customer and the market maker.[7]  FXCM earned fees and commissions on such trades by adding a markup to the price quoted by the market maker, and generated revenues based on the volume and the markup charged on the transactions occurring on its platform.[8]

14.     During the Class Period, FXCM also offered a dealing desk, or principal, execution model ("Dealing Desk Model") to smaller retail clients beginning in 2012.[9]  Under the Dealing Desk Model, FXCM would not simultaneously offset the trade with another party,[10] and therefore acted as the counterparty to the customers' trades.  FXCM previously used this business model until 2007.[11]  Under the Dealing Desk Model, FXCM not only earned "trading fees through commissions or by adding a markup to the price provided by the FX market

---

[3] 2011 Form 10-K, p. 1.
[4] 2011 Form 10-K, p. 1.
[5] 2011 Form 10-K, p. 1.
[6] 2011 Form 10-K, p. 1; Global Brokerage, Inc. Form 10-K for the period ended December 31, 2016 ("2016 Form 10-K"), p. 1.
[7] 2011 Form 10-K, p. 1.
[8] 2011 Form 10-K, p. 1.
[9] FXCM Inc. Form 10-K for the period ended December 31, 2012 ("2012 Form 10-K"), p. 1.
[10] 2012 Form 10-K, p. 1.
[11] 2011 Form 10-K, p. 8.

makers" but also "realized and unrealized foreign currency trading gains or losses on [its] positions with customers."[12]

15. FXCM also "earn[ed] other forms of revenue such as fees earned from: referring broker fees and white label arrangements with other financial institutions to provide platform, back office and trade execution services, trading in contract-for-difference ('CFDs'), trading in equities and equity options, payments for order flow, FX market prices and other various ancillary FX related services and joint ventures."[13]

### B. Effex

16. According to documentary evidence available to me, including the deposition testimony and affidavit of its founder, John Dittami, Effex is a proprietary trading firm that operated as an FX liquidity provider to FXCM and other financial institutions.[14] Mr. Dittami founded Effex in March 2010.[15] Mr. Dittami has been Effex's sole or majority owner since its inception.[16]

17. According to his affidavit, Mr. Dittami was an employee of FXCM from 2009 to early 2010.[17] While at FXCM, his role was to establish a new division responsible for managing the company's algorithmic endeavors, including market making and other services.[18]

### C. Plaintiffs' Allegations Pertaining to GAAP

18. I understand plaintiffs in the above-captioned matter ("Plaintiffs") allege that FXCM "knowingly misled investors in the Company's [financial statements] and other public statements by falsely claiming that its customers who transacted on FXCM's 'No Dealing Desk' ('NDD')

---

[12] 2016 Form 10-K, p. 1. *See also* FXCM Inc. Form 10-K for the period ended December 31, 2015, pp. 1, 73; FXCM Inc. Form 10-K for the period ended December 31, 2014, pp. 78, F-17; FXCM Inc. for the period ended December 31, 2013, ("2013 Form 10-K"), pp. 73, F-17; 2012 Form 10-K, pp. 74, F-17.

[13] 2013 Form 10-K, pp. 1, 40, 73. *See also* 2012 Form 10-K, pp. 1, 46, 74, F-48; 2011 Form 10-K, pp. 1, 45, 65, F-16; Form 10-K for the period ended December 31, 2010 ("2010 Form 10-K"), pp. 1, 45, 63, F-14.

[14] Deposition of John Dittami, In re: Global Brokerage, Inc. f/k/a FXCM Inc. Securities Litigation, January 21, 2021 ("Dittami GLBR Deposition"), Exhibit 71, Affidavit of John Dittami, Effex Capital, LLC and John Dittami v. National Futures Association, et al., June 6, 2017 ("Dittami Affidavit"), ¶ 3.

[15] Dittami Affidavit, ¶ 4.

[16] Dittami Affidavit, ¶ 10.

[17] Dittami Affidavit, ¶¶ 2, 4

[18] Dittami GLBR Deposition Exhibit 4, Employment Agreement, September 4, 2009, GLBR_00110697–712 at 697.

platform would be free from conflicts of interest because FXCM would not be on the other side of the trade or have any financial interest in the trade."[19]

19.     I understand Plaintiffs claim that FXCM had an undisclosed financial interest in Effex during the Class Period.[20]  Thus, Plaintiffs assert that:

> FXCM's financial statements violated SEC regulations and [GAAP] for failing to disclose FXCM's economic interest in, contractual and related party relationship with, and control over, Effex during the Class Period.  Given that FXCM was entitled to 70% of Effex's profits, FXCM was required to (but did not) consolidate Effex's operations as a variable interest entity.  Alternatively, even if Effex were not required to be consolidated, it was still a related party to FXCM and therefore, FXCM was required to (but did not) disclose the related party nature of the business relationship and the amount of profits FXCM was earning from Effex.[21]

## V.      Financial Accounting and Reporting

20.     This section presents an overview of the financial accounting and reporting rules that apply when reviewing the issues that are relevant to the current matter.  Those financial accounting and reporting rules are promulgated, implemented, and enforced by a variety of stakeholders who have different roles and responsibilities.  Thus, this section begins with a summary of the roles and responsibilities of those stakeholders.

### A.      Participants in the Financial Accounting and Reporting Environment

#### 1.      Standard Setters and Regulators

21.     The SEC oversees public companies and enforces federal securities laws.  As part of its oversight, the SEC reviews the financial statements and related filings of registered companies to ensure they comply with federal securities laws.[22]

---

[19] Amended Complaint, ¶ 2.
[20] Amended Complaint, ¶ 5.
[21] Amended Complaint, ¶ 13.
[22] "What We Do," *U.S. Securities and Exchange Commission*, https://www.sec.gov/about/what-we-do, accessed May 24, 2021.

22.     The FASB is an independent body recognized by the SEC as the designated accounting standard setter for public companies.[23]  The FASB promulgates GAAP, which is a set of established concepts, objectives, standards, and conventions that have evolved over time to guide how financial statements are prepared and presented to investors and other financial statement users.[24]  The Accounting Standards Codification ("ASC") is the single source of authoritative GAAP for public companies in the U.S.[25]  Authoritative accounting literature is designed to provide a general framework, based on which users may be required to exercise professional judgment.  It is not uncommon for GAAP to require management to choose one of several acceptable alternative accounting methods.[26]  Thus, interpreting and implementing GAAP often requires considerable professional judgment.

23.     The Public Company Accounting Oversight Board ("PCAOB") oversees the audits of public companies and SEC-registered brokers and dealers.[27]  Its mission is to protect investors and further the public interest in the preparation of informative, accurate, and independent audit reports.  The PCAOB is directed by the Sarbanes-Oxley Act of 2002 to establish auditing and related professional practice standards for registered public accounting firms to follow in the preparation of audit reports for public companies, other issuers, and broker-dealers.[28]  The PCAOB is subject to oversight by the SEC.[29]

### 2.     Management

24.     Management is responsible for overseeing the financial statements, including managing the accounting policies and maintaining internal controls.[30]  The fair presentation of financial

---

[23] "About GAAP," *Financial Accounting Foundation*, https://www.accountingfoundation.org/jsp/Foundation/Page/FAFBridgePage%26cid%3D1176164538898, accessed May 24, 2021.

[24] "About GAAP," *Financial Accounting Foundation*, https://www.accountingfoundation.org/jsp/Foundation/Page/FAFBridgePage%26cid%3D1176164538898, accessed May 24, 2021.

[25] "About the Codification," *Financial Accounting Standards Board*, https://asc.fasb.org/printerFriendlyHelp&cid=1176163588636, accessed June 1, 2021.

[26] *See, e.g.*, ASC 235-10-50-3.

[27] "About," *Public Company Accounting Oversight Board*, https://pcaobus.org/about, accessed May 24, 2021.

[28] "Auditing Standards," *Public Company Accounting Oversight Board*, https://pcaobus.org/oversight/standards/auditing-standards, accessed May 24, 2021.

[29] "About," *Public Company Accounting Oversight Board*, https://pcaobus.org/about, accessed May 24, 2021.

[30] AU § 110, Responsibilities and Functions of the Independent Auditor (AU § 110), .03.

statements in conformity with GAAP is an implicit and integral part of management's responsibility.[31]

### 3.    Independent Auditor

25.    The independent auditor of publicly traded companies is appointed by the audit committee to conduct quarterly reviews and annual audits of the company's financial statements that are submitted to the SEC.[32]   The auditor's objective when conducting annual audits is to express an opinion as to whether the financial statements, taken as a whole, are presented fairly in all material respects in conformity with GAAP.[33]   To do so, the independent auditor obtains reasonable assurance "by reducing audit risk to an appropriately low level through applying due professional care, including obtaining sufficient appropriate audit evidence."[34]   Audit risk "is the risk that the auditor expresses an inappropriate audit opinion when the financial statements are materially misstated."[35]

26.    Depending on the results of the audit procedures conducted, the independent auditor may issue different types of opinions:

    a.    Unqualified (*i.e.*, clean) audit opinion in which the auditor states that the financial statements present fairly, in all material respects, the financial position, results of operations, and cash flows of the entity in conformity with GAAP.[36]

    b.    Qualified opinion in which the auditor states that the financial statements are presented fairly, except for the effects of matter(s) to which the qualification relates.[37]

---

[31] AU § 110.03.

[32] 17 CFR § 240.10A-3 (F) (2), *Electronic Code of Federal Regulations*, https://www.ecfr.gov/cgi-bin/text-idx?node=pt17.4.240&rgn=div5#se17.4.240_10_610, accessed June 9, 2021.

[33] AU § 110.03; AU § 110.01.

[34] Auditing Standard No. 8, Audit Risk ("AS 8"), .03.

[35] AS 8, .04.

[36] AU § 508, Reports on Audited Financial Statements, .10 ("*Unqualified opinion*. An unqualified opinion states that the financial statements present fairly, in all material respects, the financial position, results of operations, and cash flows of the entity in conformity with generally accepted accounting principles. This is the opinion expressed in the standard report discussed in paragraph .08…").

[37] AU § 508, Reports on Audited Financial Statements, .10 ("*Qualified opinion*. A qualified opinion states that, except for the effects of the matter(s) to which the qualification relates, the financial statements present fairly, in all material respects, the financial position, results of operations, and cash flows of the entity in conformity with generally accepted accounting principles.").

      c.    Adverse opinion in which the auditor states that the financial statements are not presented fairly.[38]

      d.    Disclaimer of opinion in which the auditor does not express an opinion.[39]

27.    In addition to the annual audit, the SEC requires registrants to engage an independent auditor to review their interim (*i.e.*, quarterly) financial information.[40]  The objective of a review of the interim financial statements is "to provide the accountant with a basis for communicating whether he or she is aware of any material modifications that should be made to the interim financial information for it to conform with [GAAP]."[41]  In conducting the interim review, the independent auditor "performs [] procedures to obtain a basis for communicating whether he or she is aware of any material modifications that should be made to the interim financial information for it to conform with [GAAP]."[42]

28.    As part of their work, the auditor is required to communicate the misstatements identified over the course of the audit to management so that the company has an opportunity to correct them.[43]  At the end of the audit, the auditor should assess if it has obtained sufficient appropriate audit evidence, including the significance of any remaining uncorrected misstatements and the likelihood of their having a material effect on the company's financial statements.[44]  If the auditor has not obtained sufficient appropriate audit evidence about a relevant assertion or has substantial doubt about a relevant assertion, the auditor should perform procedures to obtain further audit evidence to address the matter.[45]  If the auditor is unable to obtain sufficient appropriate audit evidence to have a reasonable basis to conclude about whether the financial

---

[38] AU § 508, Reports on Audited Financial Statements, .10 ("*Adverse opinion*. An adverse opinion states that the financial statements do not present fairly the financial position, results of operations, or cash flows of the entity in conformity with generally accepted accounting principles.").

[39] AU § 508, Reports on Audited Financial Statements, .10 ("*Disclaimer of opinion*. A disclaimer of opinion states that the auditor does not express an opinion on the financial statements.").

[40] AU § 722, Interim Financial Information ("AU § 722"), .03.

[41] AU § 722, .07.

[42] AU § 722, .15.

[43] AS 14, Evaluating Audit Results ("AS 14"), .15.

[44] AS 14, .34.

[45] AS 14, .35.

statements as a whole are free of material misstatement, the auditor should express a qualified opinion or a disclaimer of opinion.[46]

29.     If after the issuance of its report upon audited financial statements, the auditor becomes aware of facts that may have existed at the date of the report, the auditor should perform certain procedures pursuant to auditing standards of the PCAOB.[47]  Specifically, the auditor should undertake to determine whether the information is reliable and whether the facts existed at the date of the audit report.[48]  In evaluating the nature and effect of the matter, the auditor should consider, among other things, the time elapsed since the financial statements were issued.[49]  If the auditor concludes that action should be taken to prevent future reliance on the audit report, the auditor should advise company management to make appropriate disclosure of the newly discovered facts and their impact on the financial statements.[50]  If the company refuses to make the disclosures advised by the auditor, the auditor should notify each member of the board of directors of such refusal and of the fact that the auditor will take steps to prevent future reliance upon the audit report.[51]

### B.    Materiality

30.     The concept of materiality concerns "what influences or makes a difference to an investor or other decision maker."[52]  The concept of materiality is used to make financial reporting decisions about whether to disclose certain information or correct it.[53]  Both the FASB in its

---

[46] AS 14, .35.

[47] AU § 561, Subsequent Discovery of Facts Existing at the Date of the Auditor's Report ("AU § 561"), .1.

[48] AU § 561, .4.

[49] AU § 561, .5.

[50] AU § 561, .6.

[51] AU § 561, .8.

[52] FASB Concept Statement No. 8 (As Issued) ("CON 8"), Chapter 3, ¶ QC6, 11 ("Relevant financial information is capable of making a difference in the decisions made by users. Information may be capable of making a difference in a decision even if some users choose not to take advantage of it or already are aware of it from other sources... Information is material if omitting it or misstating it could influence decisions that users make on the basis of the financial information of a specific reporting entity.").

[53] CON 8, Chapter 3, ¶ QC11A ("A decision not to disclose certain information or recognize an economic phenomenon may be made, for example, because the amounts involved are too small to make a difference to an investor or other decision maker (they are immaterial).  However, magnitude by itself, without regard to the nature of the item and the circumstances in which the judgment has to be made, generally is not a sufficient basis for a materiality judgment.").

Concept Statement No. 8, and the SEC, in Staff Accounting Bulletin No. 99 ("SAB 99"),[54] define materiality as follows:

> The omission or misstatement of an item in a financial report is material if, in light of surrounding circumstances, the magnitude of the item is such that it is probable that the judgment of a reasonable person relying upon the report would have been changed or influenced by the inclusion or correction of the item.[55]

31.     Determining whether an item is material depends on the facts and circumstances specific to the matter at issue.[56]  Thus, materiality determinations require the application of professional judgment.[57]  Such determinations of whether an omission or misstatement is material require the assessment of both quantitative and qualitative factors.[58]  Quantitative factors consist of the numerical or percentage magnitude of the item, while qualitative factors relate to the nature of the item in the context of the information that is important to the users of the company's financials.[59]  A quantitative materiality assessment is generally not sufficient to determine the materiality of an omission or misstatement.[60]

32.     Quantitative materiality factors require considering the size of the impact of the transaction, other events, or conditions against measures of the entity's financial position, financial performance, and cash flows.[61]

---

[54] SAB 99 is included in the FASB's Accounting Standards Codification.  *See* ASC 250, Accounting Changes and Error Corrections, ASC 250-10-S99.

[55] ASC Topic 250-10-S99-1.  *See also* U.S. Securities and Exchange Commission, Staff Accounting Bulletin No. 99 ("SAB 99"), § 1.

[56] SAB 99, § 1 ("Under the governing principles, an assessment of materiality requires that one views the facts in the context of the 'surrounding circumstances,' as the accounting literature puts it, or the 'total mix' of information, in the words of the Supreme Court.  In the context of a misstatement of a financial statement item, while the 'total mix' includes the size in numerical or percentage terms of the misstatement, it also includes the factual context in which the user of financial statements would view the financial statement item.  The shorthand in the accounting and auditing literature for this analysis is that financial management and the auditor must consider both 'quantitative' and 'qualitative' factors in assessing an item's materiality.").

[57] SAB 99, § 1.

[58] See SAB 99, § 1.

[59] SAB 99, § 1.

[60] *See* SAB 99, § 1.

[61] SAB 99, footnote 24 ("Quantitative materiality assessments often are made by comparing adjustments to revenues, gross profit, pretax and net income, total assets, stockholders' equity, or individual line items in the financial statements. The particular items in the financial statements to be considered as a basis for the materiality determination depend on the proposed adjustment to be made and other factors, such as those identified in this SAB. For example, an adjustment to inventory that is immaterial to pretax income or net income may be material to the financial statements because it may affect a working capital ratio or cause the registrant to be in default of loan covenants.")

33.     Qualitative materiality factors are factors that may render relatively small dollar amounts material.[62]  According to SAB 99, examples of qualitative factors include whether the error or misstatement:

- "… arises from an item capable of precise measurement or whether it arises from an estimate and, if so, the degree of imprecision inherent in the estimate
- … masks a change in earnings or other trends
- … hides a failure to meet analysts' consensus expectations for the enterprise
- … changes a loss into income or vice versa
- … concerns a segment or other portion of the registrant's business that has been identified as playing a significant role in the registrant's operations or profitability
- …affects the registrant's compliance with regulatory requirements
- …affects the registrant's compliance with loan covenants or other contractual requirements
- … has the effect of increasing management's compensation – for example, by satisfying requirements for the award of bonuses or other forms of incentive compensation
- … involves concealment of an unlawful transaction."[63]

### C.     Accounting for Variable Interest Entities

34.     GAAP requires a company that has a controlling financial interest in another legal entity to consider whether that other entity needs to be consolidated in its financial statements or if it should be accounted for differently.[64]  The FASB's guidance for identifying and accounting for VIEs has evolved over time.  It issued FASB Interpretation No. 46 ("FIN 46R") in 2003 to improve financial reporting by enterprises involved with VIEs.  While pre-existing guidance generally only required a company to consolidate another entity when it controlled the entity through voting interests, FIN 46R created a requirement for entities to be consolidated by their primary beneficiaries if the primary beneficiary absorbed a majority of the risks and residual returns of the entity.[65]

---

[62] SAB 99, § 1 ("Qualitative factors may cause misstatements of quantitatively small amounts to be material.").

[63] SAB 99, § 1.

[64] ASC Topic 810-10-05.  Legal entity is defined as "[a]ny legal structure used to conduct activities or to hold assets. Some examples of such structures are corporations, partnerships, limited liability companies, grantor trusts, and other trusts."  *See* ASC Topic Master Glossary.

[65] FIN-46(R) -3.

35.     The impact of the financial crisis in the late 2000s on the structures and financial statements of several companies as well as concerns about the consolidation conclusions reached under FIN 46R resulted in the FASB's reconsideration of the variable interest entity model ("VIE Model") introduced by FIN 46R.  Thus, the FASB issued FAS 167 in 2009, which superseded FIN 46R.[66]  FAS 167 retained the concept of a VIE but it amended the guidance for accounting for a VIE to require companies to consolidate a VIE if they have both (1) the power to direct the activities of the VIE that most significantly affect the VIE's economic performance, and (2) a variable interest in the VIE that creates an obligation to absorb losses or a right to receive benefits that are potentially significant to the VIE.[67]  In contrast, FIN 46R focused the consolidation evaluation on the reporting entity's economic exposure to the VIE.[68]

36.     The authoritative guidance to which I refer in this report is that which is outlined in FAS 167 and was effective as of January 1, 2010 through December 31, 2014, as codified in ASC Topic 810, *Consolidation.*

37.     This section presents aspects of the ASC Topic 810 guidance for evaluating whether a legal entity is a VIE and whether a VIE should be consolidated as relevant to this matter.

### 1.     Is the Entity Being Evaluated a VIE Such That the VIE Model Is Applicable?

38.     As shown in **Exhibit 1A**, under ASC Topic 810, there are two main models to evaluate consolidation:  (1) the voting interest entity model ("VOE Model")[69] and (2) the VIE Model.[70] Whether to apply the VOE Model or the VIE Model requires one to determine first whether the entity under consideration has the characteristics of a VIE.[71]  The VIE Model is applicable, if either of the two situations are present:[72]

---

[66] FAS 167.

[67] FAS 167, p. 2.

[68] FIN-46(R) -14–15.

[69] ASC Topic 810-10-15-3.  *See also* ASC Topic 810-10-05-8.  The version of ASC Topic 810 that existed as of December 31, 2010 does not use the term "Voting Interest Entity Model" to characterize the approach taken when an entity does not meet the definition of a VIE but does describe that approach in ASC Topic 810-10-05-8.  The term "Voting Interest Entity Model" was introduced in ASC Topic 810 in 2015.

[70] ASC Topic 810-10-05-8.

[71] ASC Topic 810 also describes certain scope exceptions in ASC Topic 810-10-15-12.

[72] Scope exceptions from the VIE Model are listed in ASC Topic 810-10-15-12 and ASC Topic 810-10-15-17.

a. The total equity investment (*i.e.*, interests that are required to be reported as equity in the entity's financial statements) at risk is not sufficient to permit the legal entity to finance its activities without additional subordinated financial support.  To be considered part of the equity investment at risk, equity interests must:[73]

    i. Participate significantly in profits and losses;

    ii. Not be issued in exchange for subordinated interests in other VIEs;

    iii. Not be received from the legal entity or by parties involved with the legal entity; and

    iv. Not be financed by the legal entity or other parties involved with the legal entity.

b. As a group, the holders of the equity investment at risk lack any one of the following three characteristics:[74]

    i. The power to direct the most significant activities of the legal entity;

    ii. The obligation to absorb the expected losses of the legal entity;

    iii. The right to receive the expected residual returns of the legal entity.

39.  As shown in **Exhibit 1B**, entities that are in the development stage are deemed to have sufficient equity at risk if it can be demonstrated that the equity invested in them is sufficient to permit them to finance the activities they are *currently* engaged in (e.g., if the entity has already obtained financing without additional subordinated financial support) and provisions in their governing documents and contractual arrangements allow additional equity investments.[75]

40.  For other than development-stage enterprises, an equity investment at risk of less than 10 percent of the entity's total assets is not considered sufficient to allow the entity to finance its activities without subordinated financial support in addition to the equity investment.  As shown in **Exhibit 1B** if the equity at risk is more than 10 percent of total assets, ASC Topic 810 requires

---

[73] ASC Topic 810-10-15-14.
[74] ASC Topic 810-10-15-14.
[75] ASC Topic 810-10-15-16.

qualitative analysis, quantitative analysis, or a combination of both to evaluate whether the equity at risk is sufficient. These analyses include whether:

    a. The legal entity has demonstrated that it can finance its activities without additional subordinated financial support.

    b. The legal entity has at least as much equity invested as other entities that hold only similar assets of similar quality in similar amounts and operate with no additional subordinated financial support.

    c. The amount of equity invested in the legal entity exceeds the estimate of the legal entity's expected losses based on reasonable quantitative evidence.[76]

41.    The analyses outlined in paragraphs 39 and 40 above require assessments that depend on the facts and circumstances specific to the potential VIE, including qualitative considerations such as the design of the legal entity and the apparent intentions of the parties that created the legal entity.[77] Therefore, they require a considerable amount of professional judgment.[78]

42.    If the analyses outlined in paragraphs 39 and 40 suggest there is sufficient equity at risk and if equity holders as a group have the power to direct the most significant activities of the legal entity, the obligation to absorb the expected losses of the legal entity, and the right to receive the expected residual returns of the legal entity, assessments about whether an entity needs to be consolidated should be done based on the VOE Model described in ASC Topic 810.[79] As shown in **Exhibit 1A**, under the VOE Model, consolidation is required when a reporting entity has a controlling financial interest in another entity, primarily in the form of a majority voting interest.[80]

43.    As shown in **Exhibit 1A**, when applicable, the VIE Model for assessing whether a VIE should be consolidated requires answering the following two additional questions:[81]

---

[76] ASC Topic 810-10-15-14, 16. *See also* ASC Topic 810-10-25-45.

[77] ASC Topic 810-10-25-45–47.

[78] ASC Topic 810-10-50-8.

[79] ASC Topic 810-10-05-8.

[80] ASC Topic 810-10-25-1 ("Consolidation is appropriate if a reporting entity has a controlling financial interest in another entity and a specific scope exception does not apply. The usual condition for a controlling financial interest is ownership of a majority voting interest, but in some circumstances control does not rest with the majority owner.").

[81] ASC Topic 810-10-25-21.

    a.   Does the reporting entity have a variable interest in the VIE?

    b.   Is the reporting entity the primary beneficiary of the VIE?

       **2.**       **Does the Reporting Company Have a Variable Interest in the VIE?**

44.    To determine whether an entity identified as a VIE needs to be evaluated for consolidation, a reporting company must first determine if it has a variable interest in that entity. As part of this assessment, the reporting company should identify the variability to which the entity is subject, which in turn requires analyzing the design of the entity as outlined in the following steps:

    a.   Step 1:  Analyze the nature of the risks in the legal entity.  Those risks include credit risk, interest rate risk (including prepayment risk), foreign currency exchange risk, commodity price risk, equity price risk, and operations risk. [82]

    b.   Step 2:  Determine the purpose(s) for which the legal entity was created and determine the variability (created by the risks identified in Step 1) the legal entity is designed to create and pass along to its interest holders.[83]  The facts and circumstances that should be considered to identify the purpose(s) of the legal entity include but are not limited to:  the activities of the legal entity, the terms of the contracts the legal entity has entered into, the nature of the legal entity's interests issued, how the legal entity's interests were negotiated with or marketed to potential investors, and which parties participated significantly in the design or redesign of the legal entity.[84]

45.    According to ASC Topic 810, a reporting company has a variable interest in another entity when it holds investments or other interests that will absorb portions of a VIE's expected losses or receive portions of the entity's expected residual returns.[85]  Variable interests typically

---

[82] ASC Topic 810-10-25-22, 24

[83] ASC Topic 810-10-25-22, 25.

[84] ASC Topic 810-10-25-25.

[85] ASC Topic 810-10-20, Glossary ("*Variable Interest*:  The investments or other interests that will absorb portions of a variable interest entity's (VIE's) expected losses or receive portions of the entity's expected residual returns are called variable interests. Variable interests in a VIE are contractual, ownership, or other pecuniary interests in a VIE that change with changes in the fair value of the VIE's net assets exclusive of variable interests.").

reside in the VIE's liabilities or equity, which absorb the variability of the VIE, contrary to the VIE's assets and operations.[86]  However, the role of a contract or arrangement in the design of the legal entity, regardless of its legal form or accounting classification, determines whether that interest should be treated as creating variability for the entity or absorbing variability.[87]  In other words, the labeling of an item as an asset, liability, equity, or as a contractual arrangement does not necessarily mean that the item is a variable interest.  It is the role of the item—to absorb or receive the legal entity's variability—that indicates whether it is a variable interest.[88]  Examples of potential variable interests include long-term liabilities, equity instruments, put or call options written by the VIE or potential VIE on specified assets that it owns, or guarantees of the value of specified assets or liabilities of a VIE.[89]

### 3.    Is the Reporting Company the Primary Beneficiary of the VIE?

46.    According to ASC Topic 810, a reporting company should consolidate the VIE in which it has variable interest(s) when that variable interest provides it with a controlling interest in the VIE.[90]  If such control exists, the reporting company is considered to be the VIE's primary beneficiary.[91]

47.    A reporting company is deemed to have a controlling interest in a VIE if it has **both** of the following characteristics:

    a.    The power to direct the activities of the VIE that most significantly impact the VIE's economic performance; and

---

[86] ASC Topic 810-10-25-26.

[87] ASC Topic 810-10-25-26.

[88] ASC Topic 810-10-25-26.

[89] "Consolidation, A Roadmap to Identifying a Controlling Financial Interest," Deloitte, December 2015 ("Deloitte Guidance 2015"), pp. 57–58.  ASC Topic 810 also identifies arrangements whereby fees are paid to a decision maker or service provider as potential variable interests.  The FASB defined a decision maker in Accounting Standards Unit ("ASU") 2015-02 as "an entity… with the power to direct the activities of another legal entity that most significantly impact the legal entity's economic performance according to the provisions of the Variable Interest Entities Subsections of Subtopic 810-10."  *See* ASU 2015-02, p. 8.  The FASB does not define the term "service provider"; however, it appears to be used with its general meaning based on the illustrative guidance that is included in ASC Topic 810.  *See* ASC Topic 810 Glossary.  I note that Mr. Barron does not show that FXCM meets either definition.  Also see the analysis presented in Section VII.C that suggests that FXCM did not have power to direct the activities that most significantly impact the economic performance of Effex.

[90] ASC Topic 810-10-25-38.

[91] ASC Topic 810-10-25-38.

    b.   The obligation to absorb losses of the VIE that could potentially be significant to the VIE, or the right to receive benefits from the VIE that could potentially be significant to the VIE.[92]

48.    Only one reporting entity, if any, is expected to be identified as the primary beneficiary of a VIE.  Although more than one reporting entity could have the characteristic in (b) of the paragraph above, only one reporting entity, if any, will have the power to direct the activities of a VIE that most significantly impact the VIE's economic performance.[93]

49.    To determine whether a reporting company has the power to direct the activities of the VIE that most significantly impact the VIE's economic performance, the company should first identify what those activities are.[94]  Another element in this portion of the analysis is to distinguish between the ability to make significant decisions in the ordinary course of business and the ability to make decisions in exceptional circumstances or to veto or prevent certain fundamental changes (e.g., protective rights), because the latter does not give the reporting entity the power to direct the significant activities of the VIE.[95]

50.    Moreover, although a reporting company may be significantly involved with the design of a VIE, that involvement does not, in isolation, establish that company as the entity with the power to direct the activities that most significantly impact the economic performance of the VIE.  For the reporting company to have power over the VIE, the two entities need to have established arrangements that result in the company being the variable interest holder with the power to direct the activities of the VIE.[96]

51.    While a VIE may be dependent on certain parties, this does not invariably mean that these parties have power over the VIE.  For example, the debtholders of a company substantially

---

[92] ASC Topic 810-10-05-8A, 810-10-25-38A.

[93] ASC Topic 810-10-25-38A.

[94] ASC Topic 810-10-25-38B.

[95] Deloitte Guidance 2015, pp. 156–157; ASC Topic 810-10-25-38C.

[96] ASC Topic 810-10-25-38F ("Although a reporting entity may be significantly involved with the design of a VIE, that involvement does not, in isolation, establish that reporting entity as the entity with the power to direct the activities that most significantly impact the economic performance of the VIE. However, that involvement may indicate that the reporting entity had the opportunity and the incentive to establish arrangements that result in the reporting entity being the variable interest holder with that power. For example, if a sponsor has an explicit or implicit financial responsibility to ensure that the VIE operates as designed, the sponsor may have established arrangements that result in the sponsor being the entity with the power to direct the activities that most significantly impact the economic performance of the VIE.").

financed with debt securities would not be considered to have power over the VIE if they do not have voting or other rights that give the power to unilaterally direct the activities that most significantly impact the VIE's performance.[97]

52.     Guidance from accounting firms also suggests that to assess which party has the power to direct the significant activities of the VIE, one needs to consider the level in the VIE at which the significant operating and capital decisions are made as well as the level at which the operating and capital budgets are set.[98]

### D.     Related Party Disclosures

53.     Companies that have significant transactions with related parties or are under certain common control with other entities are subject to certain disclosure requirements, which are set forth in ASC Topic 850.[99]  The FASB recognizes that transactions between related parties commonly occur in the normal course of business.[100]  Specifically, ASC Topic 850 requires the disclosure of information about transactions with related parties that would make a difference in decision making so that users of the financial statements can evaluate their significance.[101]

54.     According to the FASB, related parties include:[102]

   a.   Affiliates of the entity.

   b.   Entities for which investments in their equity securities would be required to be accounted for by the equity method by the investing entity.

   c.   Trusts for the benefit of employees, such as pension and profit-sharing trusts that are managed by or under the trusteeship of management.

---

[97] ASC Topic 810-10-55-117–121.

[98] Deloitte Guidance 2015, p. 157.  *See also* "Consolidation," PwC, November 2020, Chapter 1, pp. 17–18, and Chapter 2, pp. 73–75.  The FASB considers accounting and financial reporting practices that are not included in the Codification (including accounting textbooks, handbooks, and articles) as non-authoritative.  According to the FASB, the appropriateness of other sources of accounting guidance depends on its relevance to particular circumstances, the specificity of the guidance, the general recognition of the issuer or author as an authority, and the extent of its use in practice.  *See* ASC 105-10-05-3.

[99] ASC Topic 850-10-05-1.

[100] ASC Topic 850-10-05-4.

[101] ASC Topic 850-10-10-1 ("[I]nformation about transactions with related parties that would make a difference in decision making shall be disclosed so that users of the financial statements can evaluate their significance. Therefore, this Topic establishes requirements to disclose certain significant related party transactions and control relationships.").

[102] ASC Topic 850-10-20.

    d.   Principal owners of the entity and members of their immediate families.

    e.   Management of the entity and members of their immediate families.

    f.   Other parties with which the entity may deal if one party controls[103] or can significantly influence the management or operating policies of the other to an extent that one of the transacting parties might be prevented from fully pursuing its own separate interests.

    g.   Other parties that can significantly influence the management or operating policies of the transacting parties or that have an ownership interest in one of the transacting parties and can significantly influence the other to an extent that one or more of the transacting parties might be prevented from fully pursuing its own separate interests.

55.    Companies are required to include in their financial statements certain disclosures of material related party transactions.[104]  Pursuant to ASC Topic 850, the disclosures include, among other items, (1) the nature of the relationship between the parties, (2) a description of the transactions, and (3) the dollar amounts of the transactions.[105]

## VI.    Barron Report Opinions

56.    In his report, Mr. Barron opines that the financial statements of FXCM were materially misstated beginning with the year ended December 31, 2010, through the year ended December 31, 2014 for two main reasons:  (1) FXCM failed to disclose the transactions with Effex as related party transactions, and (2) FXCM failed to consolidate the financial statements of Effex and make disclosures required by GAAP.[106]

57.    First, Mr. Barron opines that Effex was a related party to FXCM and that FXCM's failure to make certain disclosures required by GAAP for related party relationships caused its financial

---

[103] The FASB defines "control" as "[t]he possession, direct or indirect, of the power to direct or cause the direction of the management and policies of an entity through ownership, by contract, or otherwise."  *See* ASC Topic 850-10-20, Glossary.

[104] ASC Topic 850-10-50-1.

[105] ASC Topic 850-10-50-1.

[106] Barron Report, ¶ 6.

statements to be materially misstated.[107]   To support his opinion, Mr. Barron first asserts that Effex was a related party to FXCM because FXCM "was in a position to significantly influence the management or operating policies of Effex to the extent that Effex might be prevented from fully pursuing its own separate interests."[108]   Mr. Barron then claims that FXCM's financial statements from the date of creation of Effex through the end of 2014 failed to include the following disclosures:

- "The nature of the relationship between FXCM and Effex;
- A description of the transactions between FXCM and Effex, including those to which no amounts were ascribed;
- The dollar amounts of the transactions between FXCM and Effex; and
- Amounts due from or to Effex."[109]

58.   Mr. Barron further asserts in his opinion that beginning with the year ended December 31, 2010, through the year ended December 31, 2014, the revenues recognized by FXCM based on order flow payments received from Effex were quantitatively material to FXCM's consolidated financial statements.[110]   He also asserts that those payments were qualitatively material because "the nature of the payments for order flow … differed substantially from what FXCM described in its financial statements as its core business philosophy and principal source of revenue, namely markups on prices provided by 'external' market makers,"[111] and that "the distinction between business models (*i.e.*, dealing vs a no dealing desk) and how it would appear to third parties was of significant importance to FXCM," which he claims "is an indication of qualitative materiality."[112]   Thus, Mr. Barron concludes that the absence of related party relationship disclosures in FXCM's financial statements caused those statements to be materially misstated beginning with the year ended December 31, 2010, through the year ended December 31, 2014.[113]

---

[107] Barron Report, ¶ 10.
[108] Barron Report, ¶¶ 7, 127.
[109] Barron Report, ¶ 10.
[110] Barron Report, ¶ 8.
[111] Barron Report, ¶ 9.
[112] Barron Report, ¶ 9.
[113] Barron Report, ¶ 10.

59.     Second, Mr. Barron opines that Effex was a VIE of which FXCM was the primary beneficiary, and that FXCM's failure to consolidate Effex's financial statements and make disclosures required by GAAP caused FXCM's financial statements to be materially misstated.[114] In support of his conclusion, Mr. Barron asserts that Effex met the criteria of a VIE at the date FXCM first became involved with Effex because Mr. Dittami did not have sufficient equity at risk for Effex to finance its activities without the support of FXCM.[115]  Mr. Barron then asserts that FXCM met the definition of the primary beneficiary of Effex as a VIE for the following reasons:

> FXCM was the source of a substantial majority of Effex's business, and Effex relied upon FXCM for financial and other support to commence and continue operations.  Due to its size, Effex had difficulty obtaining external customers. Initially, Effex had no external customers.  FXCM had the right to receive benefits from Effex in the form of order flow payments that were significant to Effex, one of the two criteria for determining the primary beneficiary.  In addition, FXCM had an option to acquire 70% of Effex for a nominal amount. Given Effex's near-total dependency on FXCM, FXCM had the power to direct the activities of Effex that most significantly impacted Effex's economic performance, which is the second of the two criteria for classification of FXCM as the primary beneficiary.[116]

60.     Mr. Barron claims that, "as the Primary Beneficiary, FXCM was required to—but did not—consolidate Effex in FXCM's consolidated financial statements," and therefore did not make certain disclosures in its consolidated financial statements.[117]  Thus, Mr. Barron concludes that "FXCM's failure to consolidate Effex's financial statements and make the required disclosures, including information about FXCM's involvement with Effex, as required by GAAP, caused FXCM's consolidated financial statements to be materially misstated" and that "[a]t a minimum, such consolidation was required for the year ended, December 31, 2010."[118] Notably, Mr. Barron's conclusions pertain to a period that precedes the Class Period.

61.     For the financial statements that were issued during the Class Period through 2014 (*i.e.*, for the years ended December 31, 2011 through 2014), Mr. Barron merely adds that "[i]f FXCM

---

[114] Barron Report, ¶¶ 11, 12.
[115] Barron Report, ¶ 11.1.
[116] Barron Report, ¶ 11.2
[117] Barron Report, ¶ 11.3.
[118] Barron Report, ¶ 12.

had consolidated Effex's financial statements in 2010, as required by GAAP, and later determined that Effex no longer met the criteria of a variable interest entity or that FXCM was no longer the primary beneficiary of Effex, additional disclosures would have been required."[119]

## VII.    Mr. Barron's Conclusion That FXCM Should Have Consolidated Effex Is Fundamentally Flawed

62.    The Barron Report offers the opinions that "at inception, Effex met the criteria of a VIE of which FXCM was the Primary Beneficiary,"[120] and that "this required FXCM to consolidate the financial statements of Effex and make certain disclosures in FXCM's consolidated financial statements in accordance with GAAP."[121]  Mr. Barron fails to put forth an appropriate analysis to support his assertions pursuant to ASC Topic 810.  His analysis is flawed and incomplete, which renders his conclusions unreliable regarding VIE consolidation and related party disclosures.

63.    As described in Section V.C above, per ASC Topic 810 the determination of whether a company should consolidate another entity as a VIE is threefold.  As such, the following elements should be evaluated:

> a.    Whether the entity under examination (*i.e.*, Effex) meets the characteristics of a VIE;
>
> b.    Whether the reporting company (*i.e.*, FXCM) has a variable interest in the entity under examination (*i.e.*, Effex); and
>
> c.    Whether the reporting company (*i.e.*, FXCM) is the primary beneficiary of the entity under examination (*i.e.*, Effex).

64.    Mr. Barron fails to perform an appropriate and complete analysis of the three relevant questions of the VIE analysis as of the end of 2010 or subsequently.  As explained in the following sections, Mr. Barron has not established that any, let alone all, of the three required elements of an appropriate VIE analysis: (1) Effex was a VIE, (2) FXCM had a variable interest in Effex, and (3) FXCM had power over Effex such that FXCM was the primary beneficiary of

---

[119] Barron Report, ¶ 12.
[120] Barron Report, ¶ 11.
[121] Barron Report, ¶ 11.

Effex.  Based on my analysis of the facts and circumstances surrounding FXCM's relationship with Effex as a whole, it is my opinion that consolidation of Effex and related VIE disclosures were not required in FXCM's financial statements as of December 31, 2010, or during the Class Period.

### A.    Mr. Barron Has Not Established That Effex Was a VIE and That the VIE Model Is Applicable

65.    Mr. Barron does not assess whether the VIE Model is even applicable to the determination of whether Effex should have been consolidated by FXCM.  Instead, he claims, without any reliable basis, that Effex was a VIE and that "Mr. Dittami's equity investment at risk was not sufficient to finance its activities without the support of FXCM."[122]  Mr. Barron's bare assertion that Effex was a VIE is not supported by an analysis of Effex's equity at risk and the characteristics of the equity holders as a group.  He, therefore, fails to establish that Effex was a VIE as of December 31, 2010, let alone during the Class Period.[123]

66.    As described in Section V.C above, establishing whether Effex is a VIE and therefore is subject to the VIE Model requires one to assess (1) whether its equity at risk was insufficient to finance its activities, and (2) whether equity holders as a group lack any one of the following three characteristics:

    a.    The power, through voting rights or similar rights, to direct the activities of a legal entity that most significantly impact the entity's economic performance.

    b.    The obligation to absorb the expected losses of the legal entity.

    c.    The right to receive the expected residual returns of the legal entity.[124]

67.    If either or both of these situations are present, Effex would be considered a VIE and the VIE model would be applicable.[125]  Mr. Barron fails to conduct both of these assessments in his expert report.

---

[122] Barron Report, ¶¶ 143–144.

[123] As such, Mr. Barron has not addressed the applicability of the VOE Model in the assessment of whether FXCM should have consolidated Effex.  Under the VOE Model, I have not seen evidence that FXCM should have consolidated Effex.

[124] ASC Topic 810-10-15-14.

[125] See Exhibit 1A for the analytical framework to be applied to a VIE analysis.

68.    ***Equity at risk assessment.***  Mr. Barron does not put forth evidence or analysis of Effex's equity at risk to support his opinion that Effex was a VIE.[126]  Such analysis would require a review of Effex's ownership structure, its financing arrangements, and its governance structure. The analysis also would require an evaluation of whether Effex should be considered a development-stage entity for the purpose of the VIE analysis.  As Mr. Barron acknowledges in his expert report, Effex was formed in March 2010.[127]  Moreover, Effex was developing its client base starting in 2010.[128]  However, Mr. Barron has not analyzed whether Effex met the definition of a development-stage entity nor assessed the implications of such a conclusion.  As described in Section V.C above and illustrated in **Exhibit 1B**, an entity that is in the development stage is deemed to have enough equity at risk if it can be demonstrated that the equity invested in it is sufficient to permit it to finance the legal entity's activities it is currently engaged in.[129]  If Effex did not meet the definition of a development-stage entity, Mr. Barron would also need to evaluate whether Effex could finance the activities in which it was currently engaged without obtaining subordinated financial support.[130]  Mr. Barron does not present any such evaluation.

69.    Even if Effex were not considered a development-stage enterprise, Mr. Barron fails to evaluate the sufficiency of Effex's equity at risk.  As such, Mr. Barron's VIE analysis is incomplete.  Specifically, Mr. Barron fails to evaluate whether Effex's equity investment at risk was less than 10 percent of its total assets such that it would not be considered sufficient to allow it to finance its activities without subordinated financial support.[131]  If the equity at risk was more than 10 percent of Effex's total assets, Mr. Barron also fails to provide additional qualitative analysis, quantitative analyses, or a combination of both as prescribed by ASC Topic 810, to evaluate whether the equity at risk was sufficient for Effex to operate without additional subordinated financial support.[132]

---

[126] As described in Section V above, an entity is considered to be a VIE if, by design, the identified equity investment at risk is not sufficient to finance the legal entity's operations without additional subordinated financial support.

[127] Barron Report, ¶ 33.

[128] Barron Report, ¶ 69.

[129] ASC Topic 810-10-15-16.

[130] ASC Topic 810-10-15-16.

[131] ASC Topic 810-10-25-45.

[132] ASC Topic 810-10-25-45.

70.     Instead, Mr. Barron presents the following unsupported or misleading assertions:

    a.  "There is no evidence that Mr. Dittami paid for the equity interest that he obtained
        upon the formation of Effex.  The funds needed to commence operations were
        invested by FXCM in the form of the costs of the initial development and testing
        of the algorithmic trading system which was the principal asset upon which Effex
        could commence operations."[133]

    b.  "FXCM provided the $2 million needed for Effex to obtain a Prime of Prime
        account so that it could begin trading."[134]

71.     The documentary evidence that I have reviewed and which is described in further detail
in the next sections of this report provides more context on the above assertions by Mr. Barron.
For instance, Mr. Barron's assertions regarding Effex's equity is contradicted by (i) documents
indicating that Effex had no additional capital requirements as of December 2010,[135]
(ii) deposition testimony from Mr. Dittami that Effex was capitalized using his personal funds,[136]
and (iii) Mr. Dittami's sworn affidavit in which he states that:

> [W]ithin a few months [of its formation], Effex:  (i) reimbursed FXCM for the
> [funds it had invested in the development of Effex's trading system] (in May
> 2010); (ii) ceased using the credit facility made available to Effex by FXCM
> through the above-referenced prime of prime customer account (in June 2010);
> (iii) entered into a prime broker agreement with Citibank (in July 2010); (iv)
> canceled the Note which guaranteed the credit made available to Effex by
> Citibank (in July 2010); and (v) commenced operations in Belfast, Ireland
> (October 2010).[137]

---

[133] Barron Report, ¶ 144.

[134] Barron Report, ¶ 144.

[135] Dittami GLBR Deposition Exhibit 64, Email from Mr. Dittami to Mr. Niv, "Working on year end financials," December 27, 2010, GLBR_00003957 ("We now have built a reserve that just covers our funding requirements, as Effex builds out new business, it can start to replace that reserve with independent profits and have that reserve put aside for payment on a rainy day. We have 0 additional capital requirements at this time, and as reserve grows from here, we can shift our distribution dates close to end of month…").

[136] CFTC Deposition of John Dittami, *In the Matter of: Retail Forex Fraud*, April 7–8, 2016 ("Dittami CFTC Deposition"), 207:17–208:7 ("Q When Effex Capital was formed how was it capitalized? A how was it capitalized. Well, with my personal funds, John Dittami personal funds, the only owner, et cetera there. The trading margin which is not Effex Capital, the trading -- getting a line to do trading was through that Effex prime account, that's my line to do trading but that's not my capital. …Q How much was that line? A That was the $2 million and, again, I don't know if it's an accounting entry or real entry, I don't understand in the FXCM systems but the funds to run the business are my personal funds.").

[137] Dittami Affidavit, ¶¶ 4, 7.

72.     Mr. Dittami further testified that when he founded Effex he used his own resources to pay FXCM for Effex's right to obtain ownership of the trading system and algorithms.[138] Additionally, according to Mr. Dittami's testimony, Effex's equity holders only included Mr. Dittami, the Dittami Dynasty Trust (the "Trust," a trust whose grantor and beneficiaries were Mr. Dittami and his children, respectively), and select full-time employees of Effex.[139]  Mr. Dittami and the Trust never owned less than 93 percent of Effex's issued and outstanding shares.[140]  At all times after the inception of Effex, Mr. Dittami was the managing member and made all major decisions regarding Effex.[141]  Consistent with Mr. Dittami's statements, FXCM's CEO, Mr. Niv, testified that FXCM had no equity interest in Effex.[142]

73.     As such, Mr. Barron has not established that Effex financed its activities from sources other than equity investments by Mr. Dittami.

74.     Moreover, Mr. Barron's claim that FXCM's providing temporary office space, technical support, and a couple employees to Effex constituted equity or other subordinated financial support in performing a VIE analysis is unfounded.[143]  "Subordinated financial support" is defined under GAAP as variable interests that will absorb some or all of a VIE's expected losses.[144]  Mr. Barron has not shown that the temporary office space, technical support, and employee resources FXCM put at Effex's disposal constituted variable interests that would absorb Effex's losses.  Notably, Mr. Barron fails to acknowledge deposition testimony by Mr.

---

[138] Dittami GLBR Deposition, 82:16–84:9 ("Q. Okay. And as described in this letter, is it correct that only a portion of the $3 million was actually used to fund EES? A. Only a portion was used to fund, although that was paid back in full. So no portion was used to fund. A portion was used and repaid. Q. Okay. And do you recall, approximately, how much of the $3 million that portion was? A. I don't recall. It was less than -- less than a million, substantially less than a million. But I don't recall the exact amount.")

[139] Dittami Affidavit, ¶ 10.

[140] Dittami Affidavit, ¶ 10.

[141] Dittami Affidavit, ¶ 9.

[142] CFTC Deposition of Drew Niv, *In the Matter of: Retail Forex Fraud*, May 25–26, 2016 ("Niv CFTC Deposition"), 155:5–8 ("Q Isn't it the case that FXCM had an equity interest in Effex? A No."), 66:6–20 ("Q Is it fair to say that whatever FXCM's interest was in the profits to be derived from the venture and the work that Mr. Dittami had done prior to his resignation, that whatever those interests are, still belonged to FXCM? MR. GARCIA: When, after he was terminated? MR. NEWMAN: As of the date of termination. A As of the date of termination he is now his own separate company. His company is his company. We absolutely helped him start that company for reasons I stated, but it's his company at this point, because you know, it has to be a separate firm.").

[143] Barron Report, ¶ 144.  *See also*, Email Chain between Ryan Leonard, John Dittami, and Evan Milazzo, "RE: My desktop access," GLBR_00028063–65.

[144] ASC Topic 810-10-20, Glossary ("*Subordinated Financial Support*: Variable interests that will absorb some or all of a variable interest entity's (VIE's) expected losses.").

Dittami that indicates that Effex moved into its own offices in April 2011, before the Class Period.[145]

75.     Similarly, Mr. Barron is misleading in claiming that FXCM provided Effex "$2 million needed for Effex to obtain a Prime of Prime account so that it could begin trading."[146]  As further explained in Section VII.B below, while the prime of prime account Effex used until July 2010—before FXCM even became a reporting company—was conditioned on a $2 million promissory note executed between FXCM and Effex, according to Mr. Dittami, no amount was ever drawn under that promissory note and the note was canceled by July 2010.[147]  Thus, contrary to Mr. Barron's claim, the $2 million promissory note did not provide incremental financial support to Effex.

76.     Accordingly, it is my opinion that Mr. Barron has not established that Effex lacked sufficient equity at risk to finance its activities during its developmental and later stages nor that it needed additional subordinated financial support to finance its activities.

77.     ***Assessment of the characteristics of equity holders as a group***.  Mr. Barron also has not shown that Effex's equity holders lacked the power to direct Effex's significant activities, did not have the obligation to absorb Effex's expected losses, or did not have the right to receive Effex's expected residual returns.  As shown above, I have not seen evidence suggesting that a party other than Mr. Dittami had the power to direct Effex's significant business operations.  I have also not seen evidence suggesting that Mr. Dittami did not have the obligation to absorb Effex's expected losses, or that he did not have the right to receive Effex's expected residual returns.

78.     ***Additional observations***.  The Barron Report conflates the timing of the events that took place during 2010 between FXCM and Effex, with that of the VIE analysis.  Mr. Barron fails to acknowledge that FXCM was not required to conduct a formal VIE consolidation analysis for external financial reporting purposes until the preparation of its 2010 annual financial statements.  Indeed, FXCM only became subject to SEC interim reporting requirements upon completing its

---

[145] Dittami CFTC Deposition, 55:5–58:13.

[146] Barron Report, ¶144.  *See also*, Dittami GLBR Exhibit 8, Email Chain between John Dittami and Drew Niv, "RE: how are things going with testing," April 8, 2010, GLBR_00046387–89.

[147] Dittami CFTC Deposition, 144:7–145:7; Dittami GLBR Deposition 87:16—88:9; Dittami CFTC Deposition, 208:8–209:24.

initial public offering in December 7, 2010.[148]  As such, prior to year-end 2010 (*i.e.*, December 31, 2010), FXCM was not required to file interim financial reports under SEC regulations.  I am not aware of facts suggesting that FXCM was subject to a requirement to prepare interim financial reports by other regulators or third parties or that it did prepare interim financial reports.[149]  Therefore, I have not seen evidence that FXCM was required to perform an evaluation of whether Effex constituted a VIE or needed to be consolidated in its financial statements until year-end 2010.

79.     Given that FXCM was not required to assess whether Effex needed to be consolidated as a VIE before year-end 2010, Mr. Barron fails to analyze the totality of the facts and circumstances available as of year-end 2010.  According to ASC Topic 810, the initial assessment of whether an entity is a VIE should be based on circumstances present on the date at which the reporting entity first becomes involved with the potential VIE, including future changes that are required in existing governing documents and existing contractual arrangements.[150]  Given that FXCM was not a reporting entity until year-end 2010, the VIE analysis should take in consideration those changes made already in existing governing documents and existing contractual arrangements as of the time of the analysis (*i.e.*, at year-end 2010).

80.     ASC Topic 810 requires a company to reassess conclusions made in relation to whether an entity that should be accounted as a VIE if circumstances suggest that the status of the entity has changed.[151]  Mr. Barron also fails to consider how the relationship between Effex and FXCM evolved during the Class Period (*i.e.*, 2012 and onwards).  As further explained below, several of the items Mr. Barron lists as purported indicators that Effex was a VIE that needed to be

---

[148] 2010 Form 10-K, p. 48.  SEC reporting under the Exchange Act rules require that public registrants file a Form 10-Q prepared in conformity with GAAP after their first registration statement is effective.  *See* "Financial Reporting Manual, SEC Division of Corporation Finance, Topic 1," *U.S. Securities and Exchange Commission*, available at https://www.sec.gov/corpfin/cf-manual/topic-1, accessed June 4, 2021, 1330.4, 1410.

[149] Moreover, the 2010 annual financial statements of FXCM were included as comparative figures in the 2011 annual financial statements of FXCM.  *See* Deposition of John E. Barron, CPA, June 7, 2021 ("Barron Deposition"), 117:17–119:21.

[150] ASC Topic 810-10-25-37 ("The initial determination of whether a legal entity is a VIE shall be made on the date at which a reporting entity becomes involved with the legal entity. For purposes of the Variable Interest Entities Subsections, involvement with a legal entity refers to ownership, contractual, or other pecuniary interests that may be determined to be variable interests. That determination shall be based on the circumstances on that date including future changes that are required in existing governing documents and existing contractual arrangements.").

[151] ASC Topic 810-10-35-4.

consolidated no longer existed or changed substantially as of year-end 2010 and during the Class Period.[152]

81.     In summary, Mr. Barron's assertion that Effex was a VIE is not supported by an analysis of Effex's equity that is in line with ASC Topic 810.  As such, Mr. Barron has not shown that Effex had either of the two characteristics of a VIE as of year-end 2010, let alone during the Class Period, and he has not ruled out the fact that Effex would not need to be consolidated into FXCM's financial statements under the VOE Model.  Under the VOE Model, consolidation is required when a reporting entity has a controlling financial interest in another entity, primarily in the form of a majority voting interest.[153]  Since, as Mr. Barron acknowledged in his deposition, FXCM did not have any equity in Effex let alone a majority voting interest, I have not seen evidence suggesting that Effex would need to be consolidated into FXCM's financial statements under the VOE Model.[154]

### B.     Mr. Barron Has Not Established That FXCM Had a Variable Interest in Effex

82.     The Barron Report does not present an analysis of whether FXCM had a variable interest in Effex that is consistent with the requirements of ASC Topic 810.  Therefore, Mr. Barron has not established that FXCM was responsible for absorbing the risks and rewards (*i.e.*, profits and losses) stemming from Effex's operations.  As explained below, Mr. Barron has not shown that FXCM had a variable interest in Effex as of year-end 2010.

83.     As introduced in Section V.C.2 above, to determine whether a company has a variable interest in another entity one must, based on the facts and circumstances present at the time of the assessment: (1) identify the risks the entity is exposed to and get an understanding of the purpose and design of the entity, and (2) consider whether the company has interests that absorb the risks related to the entity.

---

[152] See also **Exhibits 2A and 2B**.

[153] ASC Topic 810-10-25-1.  The usual condition for a controlling financial interest is ownership of a majority voting interest, but in some circumstances control does not rest with the majority owner (e.g. when non-controlling shareholders have rights that allow them to participate in the ordinary course of business, such as determining the financial and operating decisions of the entity.).

[154] Barron Deposition, 43:7–45:2 ("Q. Did [FXCM] have equity voting rights in Effex, yes or no? A. No.").

84.     The relevant facts and circumstances surrounding the relationship between Effex and FXCM as of December 31, 2010 are summarized as follows:

a.  As mentioned above, Effex's equity holders only included Mr. Dittami, the Trust, and select full-time employees of Effex.[155]  Mr. Dittami and the Trust never owned less than 93 percent of Effex's issued and outstanding shares.[156]  Mr. Dittami retained a right of first offer and first refusal related to investments in Effex.[157]  At all times after the inception of Effex, Mr. Dittami was the managing member and made all major decisions regarding Effex.[158]  According to deposition testimony by Mr. Robert Lande, FXCM's former Chief Financial Officer, FXCM never had voting rights in Effex, representation on its board of directors or management, and Mr. Dittami "was his own man and was … making his own decisions."[159]

b.  Effex operated as an FX liquidity provider using a proprietary trading system and algorithms that appear to be its main productive assets, and were developed by Mr. Dittami.[160]  While the proprietary trading system and algorithms were initially funded using capital provided by FXCM before Effex was created, Effex reimbursed FXCM's initial investment in software licenses as well as hardware and consulting costs in full in May 2010.[161]  Mr. Dittami testified that Effex paid FXCM to obtain ownership of the trading system and algorithms.[162]

c.  From the testimony of Mr. Dittami and Mr. Niv, I understand that the market-making algorithm Mr. Dittami designed while employed by FXCM and which was subsequently used by Effex was created to resolve the pricing and market access issues retail customers experienced when dealing with large liquidity

---

[155] Dittami Affidavit, ¶ 10.

[156] Dittami Affidavit, ¶ 10.

[157] Dittami Exhibit 4, GLBR_00110697–712 at 706–707.

[158] Dittami Affidavit, ¶ 19.

[159] Deposition of Robert N. Lande, *In re: Global Brokerage, Inc. f/k/a FXCM Inc. Securities Litigation*, January 14, 2021 ("Lande GLBR Deposition"), 83:21–86:10.

[160] Dittami Affidavit, ¶¶ 4, 7.

[161] Dittami Affidavit, ¶¶ 3, 7; Dittami GLBR Deposition Exhibit 11, E Capital-000107–108 at 107.

[162] Dittami GLBR Deposition, 82:16–84:9.

providers via FXCM's platform.[163]  According to Mr. Dittami he created Effex in March 2010 to compete with other liquidity providers by providing customized liquidity solutions and filling the gaps other liquidity providers were not servicing and, to improve foreign currency customer execution.[164]

d. Effex entered into a payment for order flow arrangement with FXCM in 2010,[165] which was documented in a series of agreements (collectively the "Services Agreements").[166]  According to Mr. Niv and Mr. Dittami, the payment for order flow arrangement was terminated in August 2014.[167]  As Mr. Barron acknowledged in his deposition, under the terms of this arrangement Effex was to pay a fixed fee each month to FXCM based on the volume of orders Effex filled on FXCM's platform.[168]

85.    Based on my understanding of Effex's business operations, FX market makers provide liquidity by being ready to meet customer demand to trade at a given time.[169]  As an FX liquidity provider, Effex could quote both "ask" and "bid" prices to customers who inquire about prices for a currency pair to trade.[170]  By trading on both bid and ask prices, Effex could earn profits

---

[163] According to Mr. Dittami, the primary goal of this venture was to "utilize a non-dealing desk structure to improve FXCM's foreign currency customer execution by providing customized liquidity solutions, in competition with other liquidity providers." *See* Dittami Affidavit, ¶ 2.  Mr. Niv, the CEO of FXCM at the time, testified that Mr. Dittami was initially hired to investigate the causes of and potentially remediate the negative customer experiences arising from trades with large liquidity providers.  *See* Niv CFTC Deposition, 24:6–26:6.

[164] Dittami Affidavit, ¶ 2; Dittami GLBR Deposition, 30:4–24.

[165] Dittami GLBR Deposition Exhibit 14, Services Agreement, March 1, 2010, E Capital-00004–11.

[166] I understand that the payment for order flow arrangement was first outlined in a March 2010 service agreement (*see* Dittami GLBR Deposition Exhibit 14, Services Agreement, March 1, 2010, E Capital-00004–11), which was superseded by a May 2010 service agreement (*see* Dittami GLBR Deposition Exhibit 21, Services Agreement, May 1, 2010, E Capital 000052–59 at 52), which was amended in September 2011 (*see* Dittami GLBR Deposition Exhibit 35, Amendment to Services Agreement, September 1, 2011, E Capital-000060).

[167] Dittami Affidavit, ¶ 11; Deposition of Dror Niv, *In re: Global Brokerage, Inc. f/k/a FXCM Inc. Securities Litigation*, February 11, 2021 ("Niv GLBR Deposition") Exhibit 44, Letter from David S. Sassoon to John Dittami, "Termination of Services Agreement dated as of May 1, 2010," August 25, 2014, GLBR_00125304; Niv GLBR Deposition, 156:12–19 ("[I]n August 2014, we ended payment for order flow and for the next few years we still gave them the same preferences and had the same relationship, you know, minus the payment for order flow because of that -- you now, because of their, you know, ability to make our service that much more competitive.").

[168] Barron Deposition, 67:20–68:13; Dittami GLBR Deposition Exhibit 21, Services Agreement, May 1, 2010, E Capital 000052–59 at 53; Dittami GLBR Deposition Exhibit 14, Services Agreement, March 1, 2010, E Capital-00004–11; Dittami GLBR Deposition Exhibit 35, Amendment to Services Agreement, September 1, 2011, E Capital-000060.

[169] Grossman, S. J. and M. H. Miller "Liquidity and Market Structure," *The Journal of Finance* 43, no. 3 (1988): 617–633, p. 617.

[170] Stoll, H. R., "Market Microstructure," in *Handbook of the Economics of Finance*, Volume 1, Part A, edited by G. M. Constantinides, M. Harris and R. Stulz, North Holland, 2003. ("Stoll (2003)"), p. 558 ("A pure dealer market is one in which dealers post bids and offers at which public investors can trade. The investor cannot trade directly with another investor but must buy at the dealers ask and sell at the dealers bid. Bond markets and currency markets are dealer markets.").

from the bid-ask spreads from its market-making activities.[171]  As an FX liquidity provider, Effex could be exposed to market risk, specifically, price risk.  Price risk in general represents the risk that the value of a given position will decrease if the market price (e.g., FX price) moves in an adverse direction.[172]  Under the express terms of the Services Agreements, as I understand, Effex agreed to pay a fixed fee based on the total amount of FXCM customer flow Effex provided liquidity for, rather than, say, based on the profits or losses Effex made on each customer trade.[173]  As such, I have not seen evidence suggesting that FXCM absorbed the market risk that Effex's operations were exposed to as of year-end 2010 or during the Class Period.

86.    A company has a variable interest in another entity when it holds investments or other interests that will absorb portions of a VIE's expected losses or receive portions of the entity's expected residual returns.[174]  Mr. Barron's "analysis of [the] FXCM and Effex relationship"[175] points to various agreements and other "forms of support and advantages"[176] provided by FXCM to Effex.  As shown in **Exhibits 2A and 2B**, the assertions Mr. Barron makes with regard to these purported "forms of support and advantages" are contradicted by information I have reviewed.

87.    Furthermore, the "forms of support and advantages" Mr. Barron points to that were provided by FXCM either (1) were not in place at December 31, 2010 (the first public reporting date of FXCM), or (2) were not shown by Mr. Barron to absorb the variability present in Effex.

---

[171] Stoll (2003), p. 556 ("Dealers trade for their own accounts as principals and earn revenues from the difference between their buying and selling prices.").

[172] See "SEC Market Risk Disclosure," Ernst & Young, May 2010, Section 2, p. 4 ("Market risk is a broad term related to economic losses due to adverse changes in the fair value of a financial instrument. While market risk embodies several elements, including liquidity and basis risk, the SEC"s Market Risk Rule focuses on only one element of market risk — that is, price risk. Price risk relates to changes in the level of prices due to changes in (a) interest rates, (b) foreign exchange rates or (c) other factors that relate to market volatilities of the rate, index or price underlying the financial instrument"), https://www.ey.com/en_us/assurance/accountinglink/sec-market-risk-disclosures, accessed June 3, 2021.

[173] Dittami GLBR Deposition Exhibit 21, Services Agreement, May 1, 2010, E Capital 000052–59 at 53; Dittami GLBR Deposition Exhibit 14, Services Agreement, March 1, 2010, E Capital-00004–11 at 05; Dittami GLBR Deposition Exhibit 35, Amendment to Services Agreement, September 1, 2011, E Capital-000060.  This appears to be Mr. Barron's understanding of the payment terms of the Services Agreements as well.  See Barron Deposition, 67:20–68:13.

[174] ASC Topic 810-10-20, Glossary ("*Variable Interest*:  The investments or other interests that will absorb portions of a variable interest entity's (VIE's) expected losses or receive portions of the entity's expected residual returns are called variable interests. Variable interests in a VIE are contractual, ownership, or other pecuniary interests in a VIE that change with changes in the fair value of the VIE's net assets exclusive of variable interests.").

[175] Barron Report, Section VI.

[176] Barron Report, Sections VI.A and VI.D.

88.     First, both the purported option agreement and $2 million promissory note were not in place as of December 31, 2010:

    a.  Deposition testimony from multiple witnesses indicates that the option agreement (to which Mr. Barron alludes) [177] was never effective.  FXCM and Effex contemplated entering into an agreement under the terms of which FXCM would have the option to buy a portion of Effex (the "Option Agreement"). [178]  The draft Option Agreement was dated April 14, 2010 and signed by Mr. Dittami and Mr. Ahdout, and provided that "[u]pon written notice to Dittami by FXCM, Dittami agrees to sell transfer and assign seventy percent of his membership interests in and to Effex to FXCM for the sum of $1.00." [179]  As I understand from the deposition testimonies of Mr. Dittami and Mr. Ahdout, [180] and as noted in a memorandum drafted by management in 2017, the Option Agreement was never in effect. [181]  Mr. Niv testified that, while the Option Agreement was signed, it had been rejected by FXCM's legal and compliance department.  As such, the agreement was never brought before the board of directors for approval, so it was not considered valid. [182]  A formal written termination of the Option Agreement was executed in November 2015 and states:  "[t]he Parties acknowledge and agree that no rights or obligations currently exist or ever existed as a result of the Option Document and that the Option Document currently has no, and has never had, any legal force or effect." [183]  In addition, according to Mr. Lande, FXCM discussed with Ernst & Young ("EY") the implications of the draft Option

---

[177] Barron Report, ¶ 38, Barron Report, footnote 55; Dittami GLBR Deposition Exhibit 15, Option Agreement, April 14, 2010, E Capital-000050–51.

[178] Niv CFTC Deposition, 155:5–18.

[179] Dittami GLBR Deposition Exhibit 41, Termination of the Option Agreement, November 20, 2015, GLBR_00189371–74 at 73.  *See* EY-GBI-WP-00003862–66 at 63 ("It is also worth noting that the Option Agreement specified that 'FXCM has agreed to license to Effex certain intellectual property pursuant to that certain License Agreement ... between Effex and FXCM.' Although FXCM and Effex exchanged draft License Agreements pursuant to which Effex would pay FXCM a licensing fee for use of FXCM's algorithm, they never executed a License Agreement.")

[180] Dittami GLBR Deposition, 154:2–160:3; Deposition of William Ahdout, *In re: Global Brokerage, Inc. f/k/a FXCM Inc. Securities Litigation*, February 16, 2021 ("Ahdout Deposition"), 145:3–146:16.

[181] *See* EY-GBI-WP-00003862–68, at 63.

[182] Niv CFTC Deposition, 155:8–163:7; Lande GLBR Deposition, 99:4–100:19.  *See also* Dittami GLBR Deposition, 158:2–160:3; Niv GLBR Deposition, 119:2–22.

[183] Lande GLBR Deposition Exhibit 15, GLBR_00189371–74 at 71.

Agreement with Effex, and the auditor concluded that since the agreement was not in force it did not have financial reporting implications.[184]  Based on the foregoing, the draft Option Agreement did not constitute a variable interest in Effex.

b.  The $2 million promissory note executed between FXCM and Mr. Dittami in connection with Effex's use of the Citibank prime of prime account did not constitute an initial investment in Effex by FXCM as Mr. Barron claims,[185] and did not constitute a variable interest.  FXCM made a $2 million credit line through its prime of prime business arrangement with Citibank available to Effex until July 2010.[186]  The prime of prime arrangement was conditioned on a personal guarantee put forth by Mr. Dittami on behalf of Effex in the form of a $2 million promissory note that was granted to Effex by FXCM,[187] and which was guaranteed by a guaranty and pledge agreement signed by Mr. Dittami.[188]  This prime of prime arrangement could be construed as having exposed FXCM to Effex's counterparty risk; however, Mr. Dittami testified that Effex never needed to resort to the $2 million promissory note.[189]  In addition, the prime of prime arrangement and the promissory note were terminated in July 2010 when Effex obtained its own prime of prime account.[190]  Based on these facts and circumstances, the prime of prime account did not constitute a variable interest as of year-end 2010.

---

[184] Lande GLBR Deposition, 99:4–100:3 ("Q. Do you recall any specific conversations between yourself or anyone else from FXCM with anyone from ENY about EFFEX in particular in 2010? A. No, I -- I mean, besides that's a long time ago. I don't think there was anything particularly unique about this relationship that I would, you know, remember something that was uniquely done on this relationship. I think -- I don't know when exactly it was, but at some point there was some discussion about whether an option on EFFEX was valid or not. The conclusion that we reached and legal reached and, you know, it was certainly borne out my memory is by future communications with EFFEX is that the option was never in effect. But options are -- you know, I do remember having some discussions about options with ENY because options are tricky things to value in financial statements and the disclosures around them can be tricky. And so I do remember having some discussions with them around the option, but then it was concluded that this option wasn't in force and so that was -- there was nothing more to be done on that.")

[185] Barron Report, ¶ 144.

[186] Dittami Affidavit, ¶ 4; Dittami GLBR Deposition, 86:7–13; Dittami CFTC Deposition, 207:17–209:24.

[187] Dittami GLBR Deposition Exhibit 12, Secured Promissory Note, April 8, 2010, E Capital-000026–33.

[188] Dittami Affidavit, ¶ 4; Dittami GLBR Deposition, 89:14–91:20; Dittami GLBR Deposition Exhibit 41, Termination of the Option Agreement, November 20, 2015, GLBR_00189371–74 at -73 ; Dittami GLBR Deposition Exhibit 13, Sole Recourse Guaranty and Pledge Agreement, April 8, 2010, E Capital-000034–48.

[189] Dittami CFTC Deposition, 144:7–145:7.

[190] Dittami GLBR Deposition, 87:16–88:9; Dittami CFTC Deposition, 208:8–209:24.

89.     Second, the other forms of purported "support" FXCM provided to Effex in the early stages of its creation during 2010 did not give rise to variable interests.  Mr. Barron points to Effex's use of FXCM's office space and system monitoring resources, the colocation of Effex's computer servers, and Effex's ability to see real-time prices and win ties.[191]  However, Mr. Barron does not present evidence indicating that these forms of support caused FXCM to be exposed to the variability in Effex's operation, and to absorb the profits or losses of Effex.

90.     Mr. Barron does not explicitly identify the payment for order flow arrangement Effex and FXCM entered into as a variable interest.[192]  He compares it, however, to a profit-sharing arrangement.[193]  This comparison is flawed.  As noted previously and acknowledged by Mr. Barron in his deposition, the express terms of the Services Agreements provide that the order flow payments were based on a monthly fixed-fee per volume structure.[194]  There is no clause in the Services Agreements providing that FXCM would share in Effex's profits for the flow it filled under the terms of the Services Agreements as acknowledged by Mr. Barron in his deposition.[195]  According to Mr. Dittami, payments were due to FXCM whether Effex was profitable or not.[196]  In addition, if Effex's trading and market-making strategy was particularly successful, allowing Effex to earn a high profit in a particular month, it would still pay the same fixed-fee to FXCM.[197]  Thus, payments under the Services Agreements were not contingent on Effex's profitability and did not cause FXCM to absorb Effex's market risk.

91.     Although the parties renegotiated the fee in the Services Agreements at various times between June 2011 and August 2014 (at which time the parties terminated the Services

---

[191] Barron Report, Section VI.D.

[192] Dittami GLBR Deposition Exhibit 21, Services Agreement, May 1, 2010, E Capital 000052–59 at 53; Dittami GLBR Deposition Exhibit 14, Services Agreement, March 1, 2010, E Capital-00004–11 at 05; Dittami GLBR Deposition Exhibit 35, Amendment to Services Agreement, September 1, 2011, E Capital-000060.

[193] Barron Report, ¶¶ 47, 55, 68; Barron Deposition 68:14–21, 180:22–181:13.

[194] Barron Deposition, 67:20–68:13; Dittami GLBR Deposition Exhibit 21, Services Agreement, May 1, 2010, E Capital 000052–59 at 53; Dittami GLBR Deposition Exhibit 14, Services Agreement, March 1, 2010, E Capital-00004–11 at 05; Dittami GLBR Deposition Exhibit 35, Amendment to Services Agreement, September 1, 2011, E Capital-000060.

[195] Barron Deposition, 68:14–69:17; Dittami GLBR Deposition Exhibit 21, Services Agreement, May 1, 2010, E Capital 000052–59 at 53; Dittami GLBR Deposition Exhibit 14, Services Agreement, March 1, 2010, E Capital-00004–11 at 05; Dittami GLBR Deposition Exhibit 35, Amendment to Services Agreement, September 1, 2011, E Capital-000060.

[196] Dittami GLBR Deposition, 364:16–19; Dittami Affidavit, ¶ 11 ("Such payments were … due and owing to FXCM regardless of whether Effex made or lost money").

[197] Dittami GLBR Deposition, 347:2–20.

Agreements),[198] the fees charged throughout the period were not dependent on Effex's profitability on the flow provided under the Services Agreement.  A Services Agreement outlining the terms of the payment for order flow was made effective March 1, 2010.[199]  Therein, the two companies agreed on a fee of $21 per one million units of base currency.[200]  According to documentary evidence, the Services Agreement was amended on September 1, 2011 such that the parties agreed to reduce the fee to $16 per one million units of base currency.[201]  Further, in certain months, and on certain currency pairs, Effex paid reduced rates of $6 or $3 per one million units of the base currency of the relevant pair.[202]

92.    Given the nature of the activities of Effex, the frequency of the fee changes would not have matched the frequency of changes in Effex's profits.  Mr. Dittami testified that during certain periods, Effex's profit was as high as $35 per one million units of base currency, but Effex never paid FXCM more than the $21 per one million units of base currency agreed upon in the March 2010 and May 2010 Services Agreements.[203]  Mr. Dittami specifically rejected the idea that Effex had ever entered into a profit sharing arrangement with FXCM.[204]  Mr. Niv testified that the fee changes were requested by Mr. Dittami and that they were in line with how the market as a whole evolved.[205]  Further, I understand from Mr. Niv's testimony that the fee changes were not unusual in a context where all market makers were facing narrowing bid-ask spreads:

---

[198] Dittami Affidavit, ¶ 11; Niv GLBR Deposition Exhibit 44, Letter from David S. Sassoon to John Dittami, "Termination of Services Agreement dated as of May 1, 2010," August 25, 2014, GLBR_00125304; Niv GLBR Deposition, 156:12–19 ("[I]n August 2014, we ended payment for order flow and for the next few years we still gave them the same preferences and had the same relationship, you know, minus the payment for order flow because of that -- you now, because of their, you know, ability to make our service that much more competitive.").  I note that the payment for order flow arrangement was terminated in August 2014.  Thus, even if the payment for order flow arrangement were to have constituted a variable interest in Effex, such a variable interest no longer existed as of the end of 2014.

[199] Dittami GLBR Deposition Exhibit 14, Services Agreement, March 1, 2010, E Capital-00004–11 at 05.

[200] Dittami GLBR Deposition Exhibit 14, Services Agreement, March 1, 2010, E Capital-00004–11 at 05; Dittami GLBR Deposition Exhibit 21, Services Agreement, May 1, 2010, E Capital 000052–59 at 53.

[201] Dittami GLBR Deposition Exhibit 35, Amendment to Services Agreement, September 1, 2011, E Capital-000060.  The signatures on the amendment are dated October 13, 2011.

[202] For instance, in April 2013, Effex paid different rates for the USD/JPY at $3 per one million units of base currency, and in June 2013, Effex paid EUR/USD currency pair at $6 per one million.  See, Dittami GLBR Deposition Exhibit 55, Email chain from B. Greenbaum to Chris Meyer, "February Invoice," April 3, 2013, GLBR_00185174–75 at 75. See Dittami GLBR Deposition Exhibit 56, Email chain from B. Greenbaum to A. Harding and A. Kartalyan, "RE: EUR/USD," June 21, 2013, GLBR_00185323–24.

[203] Dittami GLBR Deposition, 347:5–20.

[204] Dittami GLBR Deposition, 347:2–7.

[205] Niv GLBR Deposition, 150:5–153:12.

Q. Mr. Niv, when these services agreement[s] were first signed, was it your understanding that the $21 per million that Effex would pay was based on all of the order flow that Effex captured from FXCM?  A. Yes.  Q. And was there a time when that changed?  A. Yes.  Q. When was that?  A. So as time went on and this became a big success and, you know, spreads, you know, basically narrowed by about 80 to 90 percent over the next few years, particularly, spreads in euro/dollar and dollar/yen, you know, obviously, it became -- you know, over time we had to make a few changes and it became unattainable for them to pay us more than a tiny fee because they just weren't making, I know, that type of money.  So obviously all market makers as you noted previously make less money on narrower spread currency.  And as the spreads were narrowing, you know, in like I said by significant amounts, you -- they could not afford to pay us the amounts that we initially signed for.[206]

93. Considering the aforementioned facts and circumstances, Mr. Barron has not established that the Services Agreements constitute a variable interest in Effex under the guidance of ASC Topic 810.[207]

94. Based on my analysis of the facts and circumstances surrounding FXCM's relationship with Effex as of December 31, 2010 and during the Class Period, the information available to me, and of the various arrangements at issue in this matter, Mr. Barron has not established that FXCM had interests in Effex that would have caused it to absorb the losses or given it the right to receive residual returns (*i.e.*, profits) of Effex such that FXCM would have had a variable interest in Effex.

### C.    Mr. Barron Has Not Established That FXCM Was the Primary Beneficiary of Effex

95. As discussed earlier, two criteria must both be met for one to determine that the VIE needs to be consolidated:  (1) the company has the power to direct the activities of a VIE that most significantly impact the entity's economic performance, and (2) the company has the obligation to absorb losses or the right to receive benefits from the entity that could potentially

---

[206] Niv GLBR Deposition, 141:12–142:12.

[207] As discussed in Section V.C.2 above, ASC Topic 810 provides guidance to help determine whether arrangements whereby fees are paid to a decision maker or service provider constitute variable interests.  *See* ASC Topic 810-10-55-37.  However, Mr. Barron has not established that FXCM was a service provider to Effex under the Services Agreements.  According to Mr. Niv's deposition testimony, Effex was viewed as a "vendor" to FXCM instead.  *See* Niv GLBR Deposition, 357:8–358:1.  Similarly, as explained in Section VII.C below, Mr. Barron has not established that FXCM met the definition of a decision maker by virtue of having the power to direct the activities of Effex that most significantly impact the Effex's economic performance according to the provisions of ASC Topic 810-10.  In other words, Mr. Barron has not demonstrated that this guidance would apply in the situation here.

be significant to the VIE.  With respect to the "power" assessment in the VIE consolidation analysis, Mr. Barron claims that "[t]he nature of the relationship between FXCM and Effex and Effex's near total reliance on FXCM, provided FXCM power to direct the activities of Effex."[208]

96.     To support his claims, Mr. Barron asserts, without citing actual evidence, that "if FXCM had requested Effex to modify its activities, Effex would have been forced to comply or face the loss of the substantial majority of its business and the non-monetary support being provided by FXCM."[209]  Moreover, Mr. Barron adds that "the existence of the purchase option would have provided an added layer of power to direct Effex's activities."[210]  Thus, according to Mr. Barron, FXCM failed to consolidate the financial statements of Effex at a minimum for the year-ended December 31, 2010.[211]  Mr. Barron's assertions are not supported by an analysis consistent with the requirements of ASC Topic 810.

97.     As an initial matter, as described in Section VII.B above, the purchase option which Mr. Barron alludes to was not effective as of year-end 2010 or during the Class Period.  Therefore, it does not provide "an added layer of power" as claimed by Mr. Barron.[212]

98.     Second, as described in Section V.C, according to ASC Topic 810, a company should consolidate the VIE in which it has variable interest(s) when that variable interest provides it with a controlling interest in the VIE.[213]  If such controlling interest exists, then the company is considered to be the VIE's primary beneficiary.[214]  Notwithstanding the fact that I have not seen evidence that Effex was a VIE or that FXCM had a variable interest in Effex, I show below that FXCM did not have a controlling interest in Effex.

99.     The first indicator of the presence of a controlling interest in a VIE is the power to direct the activities of the VIE that most significantly impact the VIE's economic performance.[215]  As introduced in Section VII.A, Mr. Dittami and his Trust owned the majority of Effex's equity and

---

[208] Barron Report, ¶ 145.
[209] Barron Report, ¶ 145.
[210] Barron Report, ¶ 145.
[211] Barron Report, Sections X.B–C, ¶ 147.
[212] Barron Report, ¶ 145.
[213] ASC Topic 810-10-25-38.
[214] ASC Topic 810-10-25-38.
[215] ASC Topic 810-10-25-38A.

FXCM owned none.[216]  Mr. Barron acknowledged during his deposition, that FXCM had no equity voting rights, power over, management positions, or Board representation in Effex.[217] Moreover, both Mr. Dittami's affidavit and deposition testimony by Mr. Dittami and Mr. Lande indicate that, since the inception of Effex, Mr. Dittami was the managing member and made all major decisions regarding Effex in the ordinary course of business.[218]  These decisions included "hiring, admitting and expelling members, establishing banking relationships, determining employee and independent contractor compensation, handling tax matters, selecting office locations, client onboarding (including competitors of FXCM), vendor selection, prime broker selection and implementing measures to protect Effex's intellectual property."[219]

100.    By contrast, FXCM did not hold any decision-making power in Effex.  According to deposition testimony by Mr. Lande, FXCM was not "calling the shots" in Effex's business operations.[220]  Mr. Lande testified that FXCM never had voting rights in Effex or representation on its board of directors or management, and that Mr. Dittami made his own decisions regarding Effex.[221]  Mr. Barron asserts that "[c]learly, if FXCM had requested Effex to modify its activities, Effex would have been forced to comply or face the loss of the substantial majority of its business and the non-monetary support being provided by FXCM."[222]  Yet, Mr. Barron provides no evidence that Effex was ever "forced" to comply with any FXCM request that would be at odds with its own business interest.  The fact that Mr. Dittami initiated renegotiations of the payment for order flow fee structure also suggests that Mr. Dittami had the power to pursue Effex's own separate interests.[223]  Another example of Mr. Dittami's agency in the management of Effex and power of decision is his refusal to take Mr. Niv's advice about taking on more risk in trading.[224]

---

[216] Dittami GLBR Deposition, 45:21–46:9; Lande GLBR Deposition, 83:21–86:10.

[217] Barron Deposition, 43:16–45:2.

[218] Dittami Affidavit, ¶¶ 9, 15; Dittami GLBR Deposition, 349:5–22; Lande GLBR Deposition, 83:21–86:10.

[219] Dittami Affidavit, ¶ 9.

[220] Lande GLBR Deposition, 86:11–87:2.

[221] Lande GLBR Deposition, 86:2–10.

[222] Barron Report, ¶ 145.

[223] Niv GLBR Deposition, 150:5–153:12; Dittami GLBR Deposition, 184:10–185.4; Dittami GLBR Deposition Exhibit 35, Amendment to Services Agreement, September 1, 2011, E Capital-000060.

[224] Dittami CFTC Deposition, 411:2–14, 412:14–16 ("Q Why is Mr. Niv advising you that he is now more comfortable with you taking higher risks to enhance P&L? A This is another reason for giving P&L numbers on weekly updates. I think Drew is naturally concerned, we're a small company, we just started trading in April, September, Drew is a big -- Drew has to worry

101.    Mr. Barron also claims that "Effex's near total reliance on FXCM" allowed FXCM to have power to direct Effex's activities.[225]  Mr. Barron also cites to email communications indicating that FXCM estimated that 80 percent of Effex's revenue came from FXCM's retail and institutional volume.[226]  Yet Mr. Barron fails to acknowledge that Effex started providing liquidity for EBS and Reuters in 2010, which were its first non-FXCM customers.[227]  According to Mr. Niv, Effex's independence from FXCM allowed Mr. Dittami to market its business to other large FX players, including FXCM's competitors.[228]  According to Mr. Dittami's testimony, the profit Effex made from the flows generated from FXCM's customers declined each year from 2010 to 2015, and as of 2017, Effex provided liquidity via 170 venues including major Electronic Communication Networks (EBS, Hotspot, Currenex, Reuters, Fast Match), large brokers (Alpari, Saxo), and end customers.[229]  Moreover, the declaration of the audit partner of Effex, Mr. Sheldon Adams, indicates that trading expenses from payments to FXCM declined from 59.0% of Effex's revenue in 2011 to 20.9% of revenue in 2014.[230]

102.    The second indicator of controlling interest referenced in ASC Topic 810 is the presence of an obligation to absorb losses of the VIE that could potentially be significant to the VIE, or the right to receive benefits from the VIE that could potentially be significant to the VIE.[231]  As an FX liquidity provider, Effex generates profits through the spread between the buy and sell prices associated with customer orders.[232]  Thus, the economic performance of Effex is significantly impacted by its ability to exploit market price spreads.

---

about my counterpart -- Drew has to worry about the risk I'm taking as a provider to him, he has to know that I'm a stable provider to his pool, I think he's concerned about that." "I always tried to explain to him, Drew, taking more risk does not equal more profits."); Niv CFTC Deposition, 449:5–18 ("Q. What changes, if any, were made to Mr. Dittami's trading strategies in response to these conversations? A. None. That's the obstinate part. He wrote long e-mails and didn't change anything. Q. He never ended up giving you the kind of size that you wanted? A. Over -- over the years it has increased, and it's taken, you know, forests of these. Q. A lot of arm twisting. A. A lot of arm twisting to get this.").

[225] Barron Report, ¶ 145.

[226] Dittami GLBR Deposition Exhibit 69, Email Chain between Derik Reuter, Mark Palchak, and Drew Niv, "RE: Events signal for effex," March 23, 2014, GLBR_00103994–95.

[227] Dittami CFTC Deposition, 41:24–42:18.

[228] Niv CFTC Deposition, 383:7–384:14.

[229] Dittami CFTC Deposition, 34:14–19, 41:24–42:23.

[230] E Capital-000116–18.

[231] ASC Topic 810-10-25-38A.

[232] Stoll (2003), p. 558.

103.    Mr. Barron acknowledged during his deposition that whether an entity having an obligation to absorb the losses of a VIE is an element of the VIE analysis.[233]  As explained in Section VII.B above, Mr. Barron has not established that arrangements between FXCM and Effex gave rise to an obligation on FXCM's part to absorb Effex's losses or a right to receive its residual returns or profits.  Mr. Barron claims that "based on the terms of Effex's services agreements with FXCM, FXCM had the right to receive benefits from Effex that could potentially be significant to Effex, the other key criteria for establishing FXCM as the primary beneficiary."[234]  However, he has not shown that the Services Agreements, which rested on a fixed-fee structure based on volume of order flow, exposed FXCM to Effex's profits or losses. Notably, deposition testimony by Mr. Lande indicates that EY did not consider that FXCM had the obligation to absorb losses of Effex.[235]  Furthermore, the changes in the fee structure that occurred between 2010 and 2014 occurred at Mr. Dittami's request (not FXCM's), and did not stem from profit-seeking actions by FXCM.[236]

104.    Based on the above, Mr. Barron fails to put forth—and I have not seen—evidence that FXCM had the power to direct the activities of Effex that most significantly impact the Effex's economic performance as of year-end 2010 and during the Class Period, or the obligation or right to absorb or receive Effex's losses or profits.

---

[233] Barron Deposition 39:10–23.

[234] Barron Report, ¶ 145.

[235] Lande GLBR Deposition, 85:13–16 ("You know, one key element is if that entity has losses, are you on the hook for those losses?  Well, in the case of EFFEX, that clearly was not the case.").

[236] Dittami GLBR Deposition, 158:25–159:5 ("Q. And so, in October of 2010, were you discussing changes to the contractual relationship between Effex and FXCM? A. I was discussing it for as long as I could until they told me to stop it."), 186:24–187:11 ("Was the effect of this amendment to change the fee per million that Effex would pay to FXCM Holdings under the May 1st, 2010 services agreement from $21 to $16? A. It was."), 182:2–185:4 ("[L]ooking at the bottom e-mail in this chain from Mr. Meyer and he writes, 'John and I met with Ken, William and Drew last night and booted up the contract discussion. As a first step, we'd like to get the "service agreement" put in place."), 206:25–207:23 ("Q. And, just to clarify, I'm just asking about how often you would have discussed [payment for order flow], as opposed to how often you actually changed it. Does that change your answer? A. We would have discussed it every time we were doing a negotiation for a new situation whenever -- whenever I kept trying to negotiate into a new position, this would have been one of the many elements of it, as part of those negotiations but not as part of the service contract. Q. And in these discussions about changing the rate for order flow payment, would that have been something -- a discussion you had with Mr. Ahdout? A. It would have been with William, yes. Q. Was anyone else typically involved in those conversations? A. Whoever is involved in the negotiations and document negotiations. To actually officially implement the change, like, the one to $16, I would have discussed that with Drew as well."), 275:10–276:23 ("Q. And did you inform Mr. Ahdout or anyone -- or Mr. Niv that trading in this payor was less profitable for Effex on a per million basis at this time? A. Yes. I would have informed them that I'm not going to provide liquidity to the dollar/yen, because I lose money given the fees I pay."), 278:17–279:19 ("Q. And did you inform Mr. Ahdout and Mr. Niv that trading in this payor was less profitable for Effex on a per million basis at this time? A. Yes, I would have informed him as I did dollar/yen.").

**D.      Mr. Barron Has Not Established That FXCM Was Required to Consolidate Effex in Its Financial Statements as of December 31, 2010 or during the Class Period**

105.     In summary, the foregoing analysis shows that:

a.   Mr. Barron's assertion that Effex was a VIE is not supported by an analysis of Effex's equity at risk, and/or the characteristics of the equity holders as a group as required by ASC Topic 810.  Mr. Barron, therefore, fails to establish that Effex was a VIE as of year-end 2010, let alone during the Class Period.

b.   The Barron Report does not present an analysis of whether FXCM had a variable interest in Effex that is consistent with the requirements of ASC Topic 810. Specifically, Mr. Barron has not established that the facts and circumstances surrounding the relationship between FXCM and Effex at year-end 2010 and during the Class Period created a variable interest in Effex for FXCM.

c.   Similarly, Mr. Barron has not established that FXCM had the power to direct the activities of Effex that most significantly impact Effex's economic performance, or that FXCM had the obligation to absorb the losses or the right to receive benefits (*i.e.*, residual returns or profits) that could be significant to Effex.

106.     Each of these analyses is necessary to conclude that consolidation is required under GAAP.  Accordingly, I have not seen evidence that the financial statements of Effex needed to be consolidated into those of FXCM at year-end 2010 or during the Class Period.  I have also not seen evidence that additional VIE-related disclosures would be needed under GAAP.  As a result, Mr. Barron has no reliable basis for asserting that FXCM's financial statements were materially misstated because FXCM failed to consolidate Effex's financial statements and make related disclosures.[237]

---

[237] Barron Report, Sections XI.C and XI.D.

## VIII.  Mr. Barron Fails to Establish That FXCM Should Have Disclosed Effex as a Related Party

107.    Mr. Barron asserts that "FXCM was in a position to significantly influence the management or operating policies of Effex to the extent that Effex might have been prevented from fully pursuing its own separate interests."[238]  However, the evidence that I have seen does not support this assertion.

108.    As introduced in Section V.D, ASC Topic 850 lists several types of related parties.[239]  I have not seen evidence that FXCM and Effex are related parties under criteria (a) through (e). Therefore, as highlighted in **Figure 1** below, only situations (f) or (g) may apply.

### <u>Figure 1</u>



109.    However, the situations described in (f) and (g) also are inconsistent with the facts and circumstances surrounding the relationship between FXCM and Effex.  As explained in Section VII.B above, FXCM did not have an ownership interest in Effex.  Furthermore, the analysis presented in Section VII.C above suggests that FXCM did not have power over the management or operating policies of Effex, including to the extent that it might be prevented from pursuing its own separate interests.  On the contrary, documentary evidence and deposition testimony I reviewed indicate that Mr. Dittami made all major decisions concerning Effex.[240]  Mr. Dittami renegotiated the payment for order flow fees over the course of Effex's relationship with

---

[238] Barron Report, ¶ 127.

[239] ASC Topic 850-10-20.

[240] Dittami Affidavit, ¶ 9; Dittami GLBR Deposition, 349:11–22 ("Q. Did Mr. Niv decide who Effex hired? A. No. MR. BAKER: Objection to form. Q. Did William Ahdout decide those hirings? MR. BAKER: Objection to form. A. No. Q. Who made those hiring decisions? A. Myself and/or the managers who the hire would report to. Q. Anybody from FXCM? A. No.").

FXCM.[241]  For instance, Mr. Dittami obtained amendments reducing the May 2010 Services Agreement fee from $21 per million units of base currency to $16,[242] and in 2013, Effex paid different rates for certain currency pairs such as the USD/JPY pair ($3 per million units of base currency), and the EUR/USD currency pair ($6 per million units of base currency).[243] Furthermore, Effex pursued clients other than FXCM.  These examples show that Mr. Dittami could freely pursue Effex's own separate interests.[244]

110.    Based on the above, Mr. Barron has not established that FXCM could control or "significantly influence the management or operating policies" of Effex or otherwise meet the requirements under U.S. GAAP to be considered a related party of FXCM during the Class Period.  Therefore, Mr. Barron has no reliable basis for his opinion that FXCM's financial statements were materially misstated because they did not disclose Effex as a related party.

111.    Based on my analysis of the facts and circumstances surrounding FXCM's relationship with Effex as a whole, it is my opinion that FXCM was not required under U.S. GAAP to

---

[241] Dittami GLBR Deposition, 158:25–159:5 ("Q. And so, in October of 2010, were you discussing changes to the contractual relationship between Effex and FXCM? A. I was discussing it for as long as I could until they told me to stop it."),  186:24–187:11 ("Was the effect of this amendment to change the fee per million that Effex would pay to FXCM Holdings under the May 1st, 2010 services agreement from $21 to $16? A. It was"), 183:2–185:4 ("looking at the bottom e-mail in this chain from Mr. Meyer and he writes, "John and I met with Ken, William and Drew last night and booted up the contract discussion. As a first step, we'd like to get the 'service agreement' put in place."), 206:25–207:23 ("Q. And, just to clarify, I'm just asking about how often you would have discussed [payment for order flow], as opposed to how often you actually changed it. Does that change your answer? A. We would have discussed it every time we were doing a negotiation for a new situation whenever -- whenever I kept trying to negotiate into a new position, this would have been one of the many elements of it, as part of those negotiations but not as part of the service contract. Q. And in these discussions about changing the rate for order flow payment, would that have been something -- a discussion you had with Mr. Ahdout? A. It would have been with William, yes. Q. Was anyone else typically involved in those conversations? A. Whoever is involved in the negotiations and document negotiations. To actually officially implement the change, like, the one to $16, I would have discussed that with Drew as well."), 275:10–276:23 ("Q. And did you inform Mr. Ahdout or anyone -- or Mr. Niv that trading in this payor was less profitable for Effex on a per million basis at this time? A. Yes. I would have informed them that I'm not going to provide liquidity to the dollar/yen, because I lose money given the fees I pay."), 278:17–279:19 ("Q. And did you inform Mr. Ahdout and Mr. Niv that trading in this payor was less profitable for Effex on a per million basis at this time? A. Yes, I would have informed him as I did dollar/yen.").

[242] Dittami GLBR Deposition Exhibit 35, Amendment to Services Agreement, September 1, 2011, E Capital-000060.

[243] *See*, Dittami GLBR Deposition Exhibit 55, Email chain from B. Greenbaum to Chris Meyer, "February Invoice," April 3, 2013, GLBR_00185174–175, at -5175. *See* Dittami GLBR Deposition Exhibit 56, Email chain from B. Greenbaum to A. Harding and A. Kartalyan, "RE: EUR/USD," June 21, 2013, GLBR_00185323–24.

[244] Dittami CFTC Deposition, 41:24–42:18 ("When Effex Capital was first organized what entities did it provide liquidity for? A. When it was first organized it only provided liquidity to FXCM. Q. For how long? A. Until we added Interbank. EBS, we were the designated market maker for the smallest contracts for the largest Interbank in the world, that's EBS. Q. When did that take place? A. 2010. I'm not going to get the date right but we were out trying to sell everyone as quick as possible. Gain Capital they wouldn't take it. EBS I think was the first and then Reuter's was the second, that was in 2010, both of those, then we were out hitting the street. I can't remember when we started pricing Alpari. We were very quickly on boarding. Q. So it changed over time? A. It changed over time, yeah. Q. How did it change over time? A. We've had, like I said, 170 different connections over this these years. A Streams, you know, to different ECNs, to end customers through an ECN, to big brokers, Alpari, Saxal Bank. Every competitor of FXCM we tried to sell our liquidity to.")

disclose Effex as a related party for the year ended December 31, 2010 or during the Class Period.

## IX.    Mr. Barron's Materiality Opinions Are Moot

112.    In his expert report, Mr. Barron offers the opinion that the financial statements of FXCM were materially misstated as a result of the alleged failure to make related party disclosures and to consolidate the financial statements of Effex.[245]  Mr. Barron's materiality opinion, however, is based on the premise that FXCM's financial statements were misstated.  As I have described above, Mr. Barron's analyses in support of his assertion are fundamentally flawed.  Therefore, Mr. Barron has not established that there were any misstatements in the financial statements of FXCM, which renders moot his materiality opinions.

113.    To the extent that Mr. Barron is correct in asserting that FXCM received order flow payments from Effex that are quantitatively material,[246] he has not reconciled his materiality opinion with the fact that, as he acknowledges,[247] FXCM disclosed both the fact that it received payments for order flow from FX market makers and that the amount of revenue stemming from such payments were included in the amount of revenues reported on its financial statements under "Retail Trading Revenue."[248]

## X.    Mr. Barron Fails to Reconcile His Opinion with EY's Opinion That Effex Did Not Need to Be Consolidated or Disclosed as a Related Party

114.    Mr. Barron fails to reconcile his opinions with the fact that EY issued an unqualified (*i.e.*, clean) audit opinion on FXCM's financial statements as of December 31, 2010 or those released during the Class Period.  EY also concluded that the regulatory settlements with the Commodities and Futures Trading Commission ("CFTC") and the National Futures Association

---

[245] Barron Report, ¶¶ 129–135, 148–150.

[246] Barron Report, ¶ 113.

[247] Barron Report, ¶¶ 26–27

[248] 2013 Form 10-K, pp. 1, 40, 73.  *See also* 2012 Form 10-K, pp. 1, 46, 74, F-48; 2011 Form 10-K, pp. 1, 45, 65, F-16; 2010 Form 10-K, pp. 1, 45, 63, F-14.

("NFA") did not have an impact on financial statements for the fiscal year ended on December 31, 2016 or on financial statements of previous fiscal years.[249]

115.    As an initial matter, according to testimony from Mr. Lande, EY never raised concerns about the relationship between FXCM and Effex or recommended that Effex be consolidated as a VIE:

> Q. And you had previously referenced that [EY] had supported or come to a determination as to whether EFFEX needed to be consolidated or declared as a VIE.  Do you recall when [EY] came to that conclusion?
>
> A. Well, they would have -- they would have come to that conclusion right from the beginning of the relationship.  You know, I don't remember, specifically, then.  That's a long time ago.  But, you know, any new substantive relationship we have, any new substantive contract we have, everything is considered then.  So it wasn't anything unique about the EFFEX relationship.  It was a substantial relationship, you know.  They could see very clearly in our general ledger system, you know, the lines that were dedicated to revenues or receivables you know, coming from EFFEX, you know, like they would likewise look at any detail from any of the lines in there pretty extensive review.  So, no, I don't remember any moment as such where, you know, they concluded it wasn't a VIE, that this was an ongoing process that never stopped and would have started, you know, right from when, you know, results from EFFEX would have started showing up in our results.
>
> Q. So when you testified earlier as to [EY] agreeing with that determination, are you referring to anything -- any specific document or instant or, is that just on the basis of your understanding of this process as it's played out from 2010 through 2016?
>
> A. Yeah, the latter.  If [EY] had a problem, trust me we would have all known about it.[250]

116.    Further, in early 2017, EY assessed the implications of the allegations brought by the CFTC and NFA against FXCM, on the 2014, 2015, and 2016 financial statements,[251] as described

---

[249] Stollow GLBR Deposition Exhibit 11, "FXCM Inc.'s settlements with US regulators," March 1, 2017 EY-GBI-WP-00004260–71 at 68 ("Based on the above considerations, we believe that the previously issued financial statements for the Issuer and Forex continue to be appropriate and are in accordance with US GAAP.")

[250] Lande GLBR Deposition, 97:16–99:3.

[251] Deposition of David Stollow, CPA, *In re: Global Brokerage, Inc. f/k/a FXCM Inc. Securities Litigation*, January 25, 2021 ("Stollow GLBR Deposition"), 102:25–103:18 ("When we start in 2015 and 2016 as the NFA and CFTC allegations are being brought forth more publicly, the discussion and analysis in the 2016 work papers, which you started to refer to before, became more prominent. We did assess the allegations in relation to our financial statements that were publicly available still in 2014, in 2015, in 2016 based on those allegations and for a host of reasons believed that they were fairly presented and accurate from an

in a memorandum dated March 1, 2017, which was reviewed by EY's engagement quality reviewer.[252]  Among other procedures, the memorandum documented EY's assessment of whether the regulators' allegations had the "potential for having more than an inconsequential effect on the financial statement," and whether they caused EY to doubt the integrity of FXCM's management.[253]  The memorandum provided a detailed description of procedures performed by the audit team, which included discussions with the Company's general counsel and CFO, meetings with the external counsel at Weil Gotshal & Manges LLP and Sidley Austin LLP, inquiries of the legal counsel, management and the audit committee chair, and engagement of the Fraud Investigation & Dispute Services, among other procedures.[254]  Based on this assessment, EY concluded that "there was no impact to financial statement reporting as a result of the regulatory matters in the current or prior years and [it] may accept management's representations as appropriate audit evidence."[255]  EY's conclusions are consistent with my conclusions in Section VII above, and Mr. Barron acknowledged, during his deposition, that EY did not find that FXCM's financial statements did not conform with GAAP and did not request FXCM to restate its financial statements.[256]  EY also never required FXCM to restate its previously issued financial statements.[257]

117.    As part of its annual audit of FXCM, EY also evaluated the appropriateness of related party disclosures in the financial statements.[258]  These evaluations are documented in a "Related

---

audit financial statement opinion."). As for other periods, Mr. Stollow confirmed that "there's no recollection of … a consideration or a … presentation or a disclosure of Effex as a … 'related party' in 2010 through 2013 that I am aware of." *See* Stollow GLBR Deposition, 106:3–7.

[252] Stollow GLBR Deposition Exhibit 11, "FXCM Inc.'s settlements with US regulators," March 1, 2017, EY-GBI-WP-00004260–71 at 64–65.

[253] Stollow GLBR Deposition Exhibit 11, "FXCM Inc.'s settlements with US regulators," March 1, 2017, EY-GBI-WP-00004260–71 at 64–65.

[254] Stollow GLBR Deposition Exhibit 11, "FXCM Inc.'s settlements with US regulators," March 1, 2017, EY-GBI-WP-00004260–71 at 64–65.

[255] Stollow GLBR Deposition Exhibit 11, "FXCM Inc.'s settlements with US regulators," March 1, 2017, EY-GBI-WP-00004260–71 at 69.

[256] Barron Deposition, 53:15–25; 101:16–19; 102:5–11.

[257] Stollow GLBR Deposition, 215:19–215:22.

[258] Stollow GLBR Deposition, 69:8–70:11 ("Q. And what is the purpose of related party transaction memo, if you know? A. Sure. It, essentially, is an evaluation of related party considerations in the financial statements, board presentation and disclosure purposes. So it's, essentially, a summary of many of the procedures that we would perform and the evaluation and conclusions reached at a high level. This covers many years. Q. That's what I'm looking for just a high level. That's fine. So would it be fair to say that in connection with its work on the audit of FXCM Inc., and FXCM US in the period between 2009, 2015, that E&Y produced memoranda like this on a regular basis? A. On a basis related to the audits. I don't know what 'regular' per se means. But as it relates to each of the financial statements audits under -- being conducted, yes. Q. So would one of these be composed

Party Transaction Memo."[259]  Mr. Barron acknowledged that EY's related party evaluations were consistent with PCAOB standards and appropriate.[260]  According to the memorandum, EY performed audit procedures to determine whether "all material related party transactions of FXCM, Inc. and its subsidiaries are properly classified, described and disclosed in the financial statements and the notes in conformity with GAAP."[261]  For example, on the memorandum published on March 1, 2012, EY concluded that it had "ensured that all related party transactions were properly classified, described and disclosed in the financial statements and the footnotes" and noted that "all related party transactions were in the ordinary course of business."[262]  Similar language was found in the 2013, 2014, and 2015 memoranda.[263]  EY's conclusions are consistent with my conclusions in Section VIII above.

Executed this 10th of June, 2021

_Thomas J. Linsmeier_

Thomas Linsmeier, Ph.D.

---

annually for each of the audits being conducted? A. It might. There could be other forms of audit documentation that would be sufficient as well, but, generally we use these memorandum to help summarize the related party considerations.").

[259] Stollow GLBR Deposition Exhibit 5, EY Related Party Transaction Memo, March 1, 2012, EY-GBI-WP-00000549–50.  *See also* Stollow GLBR Deposition Exhibit 6, EY Related Party Transaction Memo, March 12, 2013, EY-GBI-WP-00002059–61; Stollow GLBR Deposition Exhibit 7, EY Related Party Transaction Memo, March 3, 2014, EY-GBI-WP-00002200–02; Stollow GLBR Deposition Exhibit 8, EY Related Party Transaction Memo, February 26, 2015, EY-GBI-WP-00002715–17.

[260] Barron Deposition, 54:15–56:9.

[261] Stollow GLBR Deposition Exhibit 5, EY Related Party Transaction Memo, March 1, 2012, EY-GBI-WP-00000549–50.  *See also* Stollow GLBR Deposition Exhibit 6, EY Related Party Transaction Memo, March 12, 2013, EY-GBI-WP-00002059–61; Stollow GLBR Deposition Exhibit 7, EY Related Party Transaction Memo, March 3, 2014, EY-GBI-WP-00002200–02; Stollow GLBR Deposition Exhibit 8, EY Related Party Transaction Memo, February 26, 2015, EY-GBI-WP-00002715–17.

[262] Stollow GLBR Deposition Exhibit 5, EY Related Party Transaction Memo, March 1, 2012, EY-GBI-WP-00000549–50.

[263] Stollow GLBR Deposition Exhibit 6, EY Related Party Transaction Memo, March 12, 2013, EY-GBI-WP-00002059–61; Stollow GLBR Deposition Exhibit 7, EY Related Party Transaction Memo, March 3, 2014, EY-GBI-WP-00002200–02; Stollow GLBR Deposition Exhibit 8, EY Related Party Transaction Memo, February 26, 2015, EY-GBI-WP-00002715–17.

# Appendix A

VITA
**THOMAS J. LINSMEIER**

OFFICE ADDRESS AND PHONE:      Wisconsin School of Business
975 University Avenue
Madison, WI 53706
Voice: (608) 265-2985
Email: thomas.linsmeier@wisc.edu

HOME ADDRESS AND PHONE:      1810 Waunona Way
Madison, WI 53713
Voice: (517) 862-3560

EDUCATION/ PROFESSIONAL CERTIFICATION:

Ph.D., Business Administration: Accounting, University of Wisconsin-Madison, 1985
MBA, Accounting, University of Wisconsin-Madison, 1980
BBA, Accounting, University of Wisconsin-Milwaukee, 1978
Certified Public Accountant: Wisconsin (inactive)

PROFESSIONAL EMPLOYMENT:

Member, Financial Accounting Standards Board, July 2006-June 2016
Special Consultant to Market Risk Disclosure Project, United States Securities and
Exchange Commission, August 1995-April 1997
Academic Fellow, Office of the Chief Accountant, United States Securities and Exchange
Commission, August 1994-July 1995
Intern, Peat, Marwick, Mitchell & Company - Milwaukee, 1976-1977

POSITIONS AT COLLEGES AND UNIVERSITIES:

Affiliate Faculty Member, University of Wisconsin-Madison Law School, March 2017 -
present
Professor and Thomas G. Ragatz Accounting and Law Distinguished Chair, University of
Wisconsin-Madison, July 2016 - present
Chairperson, Department of Accounting and Information Systems, Michigan State
University, July 2002-June 2006
Professor and Russell E. Palmer Endowed Professor of Accounting, Michigan State
University, July 2002-June 2006
Associate Professor, Department of Accounting and Information Systems, Michigan State
University, August 1999-June 2002
Visiting Scholar, Queen's University, Summer 1999
Senior Research Scientist, National Center for Supercomputing Applications, University
of Illinois at Urbana-Champaign, February 1997-August 1999
Assistant Professor, Department of Accountancy, University of Illinois at Urbana-
Champaign, August 1995-August 1999
Assistant Professor, Department of Accounting, University of Iowa, September 1985-July
1994
Lecturer, University of Wisconsin-Madison, 1984-1985
Teaching Assistant, University of Wisconsin-Madison, 1978-1983

# Appendix A

ACADEMIC HONORS:

     Outstanding Accounting Educator Award, American Accounting Association, 2019

     Lifetime Service Award, Financial Accounting and Reporting Section of the American Accounting Association, 2016

     Distinguished Accounting Alumnus Award, Department of Accounting and Information Systems, University of Wisconsin-Madison, 2008

     Alumnus of the Year, Department of Accounting & Taxation, University of Wisconsin-Milwaukee, 2006

     Committee on Institutional Cooperation/ Academic Leadership Program Fellow, Michigan State University, 2005-06

     Best Paper Award, KPMG/JAAF Conference, 2002

     Outstanding Instructor Award, Executive MBA Program, University of Illinois at Urbana-Champaign, 2000

     Outstanding Instructor Award, Executive MBA Program, University of Illinois at Urbana-Champaign, 1999

     St. Louis Accountancy Committee Excellence in Teaching Award, Department of Accountancy, University of Illinois at Urbana-Champaign, 1998

     Outstanding Instructor Award, Executive MBA Program, University of Illinois at Urbana-Champaign, 1997

     Finalist for University of Iowa Excellence in Instruction Award, 1989 and 1991

     Gilbert P. Maynard Excellence in Accounting Instruction Award, University of Iowa, 1986

     Delta Sigma Pi College of Business Outstanding Instruction Award, University of Iowa, 1986

     University of Wisconsin-Madison Graduate School Fellowship, 1984

     Excellence in Teaching Award, University of Wisconsin-Madison, 1983

     Deloitte, Haskins & Sells Doctoral Fellow, 1982-84

     Passed Ph.D. Comprehensive Examination with Distinction, 1982

     Excellence in Teaching Award, University of Wisconsin-Madison, 1981

     Excellence in Teaching Award, University of Wisconsin-Madison, 1980

     University of Wisconsin-Milwaukee Alumni Association Scholarship, 1978

     Alpha Kappa Psi Senior Student Gold Medal, 1978

     Arthur Andersen and Company Scholarship, 1977-78

     Beta Gamma Sigma, Phi Kappa Phi, Phi Eta Sigma

PUBLICATIONS:

<u>Publications in Refereed Journals/Books</u>

     Linsmeier, T. and E. Wheeler, "The Debate over Subsequent Accounting for Goodwill", forthcoming *Accounting Horizons* (June 2021)

     Linsmeier, T., "Discussion of Moving the Conceptual Framework Forward: Accounting for Uncertainty", *Contemporary Accounting Research*, Vol. 37 No. 1, 2020, pp. 346-353.

     Linsmeier, T. "A Revised Model for Presentation in the Statement(s) of Financial Performance: Implications for the Measurement Chapter of the Conceptual Framework", *Accounting Horizons*, Vol. 30, 2016, pp.485-498.

# Appendix A

E. Blankespoor, E., K. Petroni, T. Linsmeier, and C. Shakespeare, "Fair Value Accounting for Financial Instruments: Does it improve the association between Bank Leverage and Credit Risk?", *The Accounting Review* Vol. 88, 2013, pp.1143-1177.

Linsmeier, T. "A Standard Setter's Framework for Selecting between Fair Value and Historical Cost Measurement Attributes: A Basis for Discussion of "Does fair value accounting for nonfinancial assets pass the market test?", *Review of Accounting Studies"* Vol. 18, 2013, pp. 776-782.

Leisenring, J., T. Linsmeier, K. Schipper, and E. Trott, "Business-model (Intent)-based Accounting", *Accounting and Business Research,* Vol. 42, 2012. pp. 329-344.

Linsmeier, T., "Financial Reporting and Financial Crises: The Case for Measuring Financial Instruments at Fair Value in the Financial Statements", *Accounting Horizons*, Vol. 25, 2011, pp. 409-417.

Chambers, D., T. Linsmeier, C. Shakespeare, and T. Sougiannis, "An Evaluation of SFAS No. 130 Comprehensive Income Disclosures", *Review of Accounting Studies,* Vol. 12, 2007, pp. 557-593.

Linsmeier, T. and T. Carroll, "The Effects of Accounting Regulation on Tax Credit Utilization Propensity", *Research in Accounting Regulation*, Vol. 17, 2004, pp.39-65.

Carroll, T., T. Linsmeier and K. Petroni, "Fair Value vs. Historical Cost Accounting: Evidence from Closed-End Mutual Funds", *Journal of Accounting, Auditing and Finance*, Winter 2003, pp. 1-23.   [Received the "Best Paper" award at the 2002 JAAF-KPMG Peat Marwick Conference, "The Economics of Financial Statements: Conservatism and Earnings Quality" held at New York University on January 17-18, 2002.]

Linsmeier, T., D. Thornton, M. Venkatachalam and M. Welker, "The Effect of Mandated Market Risk Disclosures on Trading Volume Sensitivity to Interest Rate, Exchange Rate, and Commodity Price Movements", *The Accounting Review*, April 2002, pp. 343-377.

Dietrich, R., S. Kachelmeier, D. Kleinmuntz, and T. Linsmeier, "Market Efficiency, Bounded Rationality, and Supplemental Business Reporting Disclosures," *Journal of Accounting Research*, September 2001, pp. 243-268.

Linsmeier, T. and N. Pearson, "Value at Risk," *Financial Analysts Journal*, March/April 2000, pp. 47-67. [A previous version has received more than 15,000 downloads at LogEcToplisting, making this working paper the #4 downloaded item at this site since its' existence.]

Elmy, F., L. LeGuyader, and T. Linsmeier, "Review of Initial Filings under SEC Market Risk Disclosure Rules," *Journal of Corporate Accounting and Finance*, Summer 1998, pp. 33-45.

Linsmeier, T. and N. Pearson, "Quantitative Disclosures of Market Risk in the SEC Release," *Accounting Horizons*, March 1997, pp. 107-135.

Linsmeier, T., "The Securities and Exchange Commission: Research, Teaching and Career Opportunities," *Accounting Horizons*, September 1996, pp. 130-136.

# Appendix A

Balakrishnan, R., T. Linsmeier and M. Venkatachalam, "Financial Benefits from JIT Adoption: Effects of Customer Concentration and Cost Structure," *The Accounting Review*, April 1996, pp. 183-205. [Received "Citation for Excellence," ANBAR Electronic Services.]

Linsmeier, T., G. Lobo and G. Kanaan, "Dispersion in Industry Price Changes and the Relative Association Between Alternative Income Measures and Security Returns," *Journal of Accounting, Auditing and Finance*, Spring 1995, pp. 365-382.

Linsmeier, T. and G. Lobo, "Cross-Sectional Differences in the Association Between Alternate Income Measures and Market Returns: The Case of Rate Regulated vs. Unregulated Firms," in Asset Valuation, Stephen A. Butler, editor, The Center for Economic and Management Research, University of Oklahoma, 1994.

Warfield, T. and T. Linsmeier, "Tax Planning, Earnings Management and the Differential Information Content of Bank Earnings Components," *The Accounting Review*, July 1992, pp. 546-562.

Wasley, C. and T. Linsmeier, "A Further Examination of the Economic Consequences of SFAS No. 2," *Journal of Accounting Research*, Spring 1992, pp. 156-164.

Linsmeier, T., R. Nair and J. Weygandt, "U.K. Tax Legislation and the Switch to the Liability Method for Income Taxes," *Journal of Business, Finance and Accounting*, Autumn 1988, pp. 335-351.

Biggs, S., J. Bedard, B. Gaber and T. Linsmeier, "The Effect of Task Size and Similarity on the Decision Behavior of Bank Loan Officers," *Management Science*, August 1985, pp. 970-987.

## Publications in Federal Register: U.S. Securities Law Reports

Principal author with S. Swad, "Disclosure of Accounting Policies for Derivative Financial Instruments and Derivative Commodity Instruments and Disclosure of Quantitative and Qualitative Information About Market Risk Inherent in Derivative Financial Instruments, Other Financial Instruments and Derivative Commodity Instruments," Release Nos. 33-7386, 34-38223; IC-22487; FR-48; International Series No. 1047, January 28, 1997.

Principal author with S. Swad, "Proposed Amendments to Require Disclosure of Accounting Policies for Derivative Financial Instruments and Derivative Commodity Instruments and Disclosure of Qualitative and Quantitative Information About Market Risk Inherent in Derivative Financial Instruments, Other Financial Instruments, and Derivative Commodity Instruments," Securities Act Release No. 7250, Securities Exchange Act Release No. 33643, December 28, 1995; 61 FR 578, January 8, 1996.

## Committee Commentaries on Financial Reporting Standards: Where I was Principal Author

Linsmeier, T., et al.*, "Criteria for Assessing the Quality of An Accounting Standard," *Accounting Horizons*, June 1998, pp. 161-162.

Linsmeier, T., et al.*, "Response to Discussion Paper Issued by the IASC/CICA Steering Committee on Financial Instruments--Accounting for Financial Assets and Financial Liabilities," *Accounting Horizons*, March 1998, pp. 90-97. (K. Petroni principal co-author)

# Appendix A

Linsmeier, T., et al. **, "Response to FASB Exposure Draft: Proposed Statement of Financial Accounting Standards-- Accounting for Derivatives and Similar Financial Instruments and for Hedging Activities," *Accounting Horizons*, March 1997 pp. 157-163.

*1997-98 AAA Financial Accounting Standards Committee: T. Linsmeier (Chair); J. Boatsman; R. Herz; R. Jennings; G. Jonas; M. Lang; K. Petroni; D. Shores; J. Wahlen.
**1996-97 AAA Financial Accounting Standards Committee: T. Linsmeier (Chair); J. Gribble; R. Jennings; M. Lang; S. Penman; K. Petroni; D. Shores; J. Smith; T. Warfield

Committee Commentaries on Financial Reporting Standards: Other

Linsmeier, T., et al.*, "Response to FASB Exposure Draft:  Proposed Statement of Financial Accounting Concepts--Using Cash Flow Information in Accounting Measurements," *Accounting Horizons*, September 1998, pp. 304-311. (R. Jennings, principal author)

Linsmeier, T., et al.*, "Response to IASC Exposure Draft--Intangible Assets," *Accounting Horizons*, September 1998, pp. 312-316. (J. Boatsman, principal author)

Linsmeier, T., et al.*, "Response to IASC Exposure Draft--Provisions, Contingent Liabilities and Contingent Assets," *Accounting Horizons*, June 1998, pp. 192-200. (J. Wahlen, principal author)

Linsmeier, T., et al.*, "Response to FASB Exposure Draft:  Proposed Statement of Financial Accounting Standards--Employers Disclosures about Pensions and Other Postretirement Benefits," *Accounting Horizons*, June 1998, pp. 201-207. (M. Lang, principal author)

Linsmeier, T., et al.*, "Response to FASB Special Report--Issues Associated with the FASB Project on Business Combinations, *Accounting Horizons*, March 1998, pp. 87-89. (J. Boatsman, principal author)

Linsmeier, T., et al.**, "An Issues Paper on Comprehensive Income," *Accounting Horizons*, June 1997, pp. 120-126. (S. Penman, principal author)

Linsmeier, T., et al.**, "Response to FASB Exposure Draft:  Proposed Statement of Financial Accounting Standards-- Reporting Comprehensive Income," *Accounting Horizons*, June 1997, pp.117-119. (T. Warfield, principal author)

Linsmeier, T., et al. **, "Response to FASB Invitation to Comment --Recommendations of the AICPA Special Committee on Financial Reporting and the Association for Investment Management and Research," *Accounting Horizons*, March 1997, pp. 139-156. (M. Lang and T. Warfield, principal authors)

Warfield, T., et al.***, "Response to FASB Exposure Draft:  Proposed Statement of Financial Accounting Standards-- Accounting for Certain Liabilities Related to Closure or Removal of Long-lived Assets," *Accounting Horizons*, December 1996, pp. 137-141. (D. Shores, principal author)

# Appendix A

Warfield, T., et al.***, "Response to FASB Exposure Draft:  Proposed Statement of Financial Accounting Standards-- Consolidated Financial Statements:  Policy and Procedures," *Accounting Horizons*, September 1996, pp. 182-185. (M. Lang, principal author)

Warfield, T., et al.***, "Response to FASB Exposure Draft:  Proposed Statement of Financial Accounting Standards-- Accounting for Transfers and Servicing of Financial Assets and Extinguishment of Liabilities," *Accounting Horizons*, September 1996, pp. 178-181. (T. Warfield, principal author)

*       1997-98 AAA Financial Accounting Standards Committee: T. Linsmeier (Chair); J. Boatsman; R. Herz; R. Jennings; G. Jonas; M. Lang; K. Petroni; D. Shores; J. Wahlen.

**      1996-97 AAA Financial Accounting Standards Committee: T. Linsmeier (Chair); J. Gribble; R. Jennings; M. Lang; S. Penman; K. Petroni; D. Shores; J. Smith; T. Warfield.

***     1995-96 AAA Financial Accounting Standards Committee: T. Warfield (Chair); J. Gribble; M. Lang; C. Lee; T. Linsmeier; S. Penman; D. Shores; R. Stephens; J. Smith

Chapters in Non-Refereed Books/ CD-Rom

Wallace J. and T. Linsmeier, "Implementing FAS 133 Workshop CD-Rom", Treasury Management International: London 2000.

Linsmeier, T. and N. Pearson, "Risk Management Disclosures," Chapter 10 in Treasury Risk Management, edited by Rob Jameson, Risk Publications: London 1997.

Herz, R., T. Linsmeier and R. Bhave, "Regulatory Issues: Accounting and Reporting for Instruments Subject to Global Currency Risk," Chapter 17 in FX: Managing Global Currency Risk: The Definitive Handbook for Corporations and Financial Institutions, edited by Gary Klopfenstein, Glenlake Publishing: Chicago 1997.

Linsmeier, T. and N. Pearson, "Risk Measurement," Chapter 13 in FX: Managing Global Currency Risk: The Definitive Handbook for Corporations and Financial Institutions, edited by Gary Klopfenstein, Glenlake Publishing: Chicago 1997.

Linsmeier, T., "Tonka Corporation - Hasbro, Inc.," Case in Corporate Financial Reporting: Text and Cases by Brownlee, Ferris and Haskins, Irwin: 1994 and 1997.  [Reprinted in Financial Accounting and Corporate Reporting: A Casebook by K. Ferris, Irwin: 1995.]

Linsmeier, T., "Harnischfeger Corp.," Case in Corporate Financial Reporting: Text and Cases by Brownlee, Ferris and Haskins, Irwin: 1994 and 1997.

Congressional Hearings

"FASB Derivative Accounting Standards", Oral and Written Testimony before the Subcommittee on Commerce, Trade and Consumer Protection, United States House of Representatives, July 22, 2003.

"Are Current Financial Accounting Standards Protecting Investors? Ten Lessons I Learned From Enron", Oral and Written Testimony before the Subcommittee on Commerce, Trade and Consumer Protection, United States House of Representatives, February 14, 2002.

# Appendix A

Prepared Written Testimony on Market Risk Disclosure Rules of the U.S. Securities and Exchange Commission, Presented by Commissioner Wallman Before The Subcommittee on Securities Committee on Banking, Housing, and Urban Affairs, United States Senate, March 4, 1997.

Published Translation of Conference Proceedings

(In Taiwanese) Linsmeier, T., "Contemporary Auditing Problems: Derivatives," *Quarterly Journal of Government Auditing*, April 1998.

WORKING PAPERS:

King, Z., T. Linsmeier and D. Wangerin, "Differences in the Valuation Relevance of Identifiable Intangible Assets".

Linsmeier, T., C. Partridge, and C. Shakespeare, " Investors' Assessment of the Dilution and Solvency Effects of Hybrid Instruments".

Linsmeier, T., D. Wangerin and E. Wheeler, "The Underlying Economic Components of Goodwill".

Gee, K., T. Linsmeier and C. Partridge, "Non-GAAP EPS Denominator Choices".

M. Liang and T. Linsmeier, "Are Capital Expenditures Operating or Investing Activities or Both?".

COMPETITIVE RESEARCH GRANTS AND CONTRACTS:

PricewaterhouseCoopers Foundation Grant ($66,589), "An Experimental Investigation of Market Risk Disclosures," 1998-1999 (with R. Dietrich, S. Kachelmeier and D. Kleinmuntz).
PricewaterhouseCoopers Foundation Grant ($78,519), "An Experimental Laboratory for Financial Accounting Standards," 1996-1997 (with R. Dietrich, S. Kachelmeier and D. Kleinmuntz).
Old Gold Summer Fellowship ($1,500), University of Iowa, 1991.
College of Business Administration Summer Research Grant, University of Iowa ($5,000), 1990.
College of Business Administration Summer Research Grant, University of Iowa ($4,500), 1989
College of Business Administration Summer Research Grant, University of Iowa ($5,000), 1988.
National Center for Automated Information Retrieval Competitive Research Grant ($16,800), 1987-1988.
Old Gold Summer Fellowship ($1,000), University of Iowa, 1987.
Old Gold Summer Fellowship ($1,000), University of Iowa, 1986.

**Appendix A**

8

EDITORIAL SERVICE:

Editorial Boards

Advisory Editor, SSRN Journal in Behavioral & Experimental Accounting, December
2004-present
Member, *Journal of Derivatives Accounting*, September 2004-2006.
Member, *Accounting Horizons*, 1997-2006.
Member, *International Journal of Accounting*, 1997-2000.
Member, *The Accounting Review*, 1996-1997.
Member, *The Accounting Review*, 1992-1995.
Member, *The Accounting Review*, 1988-1990.

Ad Hoc Referee

ABO Research Conference
*Accounting Horizons*
*The Accounting Review*
*Contemporary Accounting Research*
*International Journal of Accounting*
*Issues in Accounting Education*
*Journal of Accounting, Auditing and Finance*
*Journal of Accounting and Public Policy*
*Journal of Accounting Research*
*Journal of Operations Management*
*Management Science*
*Review of Accounting Studies*
National Meetings of American Accounting Association
Midwest Regional Meetings of American Accounting Association

DOCTORAL DISSERTATION COMMITTEES:

| Name | Department | Year | Chair | Member |
|------|-----------|------|-------|--------|
| **University of Wisconsin-Madison:** | | | | |
| Clay Partridge | Acctg & Info Systems | 2020 | Yes | |
| Erika Wheeler | Acctg & Info Systems | 2020 | Yes | |
| Ben Osswald | Acctg & Info Systems | 2020 | | Yes |
| Zach King | Acctg & Info Systems | 2021 | Yes | |
| Mayer Liang | Acctg & Info Systems | 2021 | Yes | |
| Mary Vernon | Acctg & Info Systems | 2021 | | Yes |
| **At Michigan State University:** | | | | |
| Han Yi | Acctg & Info Systems | 2006 | Yes | |
| Chang Song | Acctg & Info Systems | 2004 | Yes | |
| **At University of Illinois:** | | | | |
| Catherine Shakespeare | Accountancy | 2002 | | Yes |
| Vernon Richardson | Accountancy | 1997 | | Yes |

# Appendix A

**At University of Iowa:**

| | | | | |
|---|---|---|---|---|
| Charlie Sparks | Accounting | 1995 | | Yes |
| Terry Warfield | Accounting | 1989 | Yes | |
| Russell Lundholm | Accounting | 1987 | | Yes |
| Charlie Wasley | Accounting | 1987 | | Yes |
| S. P. Kothari | Accounting | 1986 | | Yes |
| Judy Rayburn | Accounting | 1985 | | Yes |

TENURE/PROMOTION REVIEW ACTIVITIES

> Promotion Review, Indiana University, August 2020
> Tenure and Promotion Review, Simmons University, August 2020
> Tenure and Promotion Review, University of Georgia, August 2018
> Tenure and Promotion Review, Michigan State University, November 2017
> Tenure and Promotion Review, University of Arizona, November 2016
> Tenure and Promotion Review, Harvard University, September 2015
> Tenure and Promotion Review, Indiana University, August 2015
> Promotion Review, Indiana University, August 2009
> Promotion Review, University of Tennessee, November 2005
> Tenure and Promotion Review, University of Wisconsin-Madison, November 2004
> Tenure and Promotion Review, University of Wisconsin-Milwaukee, August 2004

INVITED ACADEMIC WORKSHOP AND CONFERENCE PRESENTATIONS:

> Oklahoma University, December 2020
> University of Wisconsin-Milwaukee, January 2020
> Michigan State University, March 2019
> Brazilian Accounting Association Conference, June 2018
> Queens University, March 2018
> Michigan State University, January 2018
> Financial Reporting Issues Conference, January 2017
> Contemporary Accounting Research Conference, October 2016
> Canisius College, October 2016
> National Meetings of American Accounting Association, (CPE and numerous other
>     sessions), annually from August 2006 – August 2016.
> Seventh Conference on Accounting and Regulation, Siena, Italy, July 2016
> University of Kansas, May 2016
> University of Georgia, October 2015
> Indiana University, October 2015
> University of Wisconsin-Madison, September 2015
> University of Notre Dame, September 2015
> Singapore Management University, January 2015
> National Taiwan University, January 2015
> Michigan State University, Annually from 2006-2015
> University of Wisconsin-Madison, Ten times from 2006-2015
> Mid-year Meeting of Financial Accounting and Reporting Section of American Accounting
>     Association, Annually from January 2007 – January 2014.
> Saxe Distinguished Lectureship, Baruch College, November 2012
> Review of Accounting Studies Conference, November 2012

# Appendix A

University of Central Florida, October 2012
Office of the Comptroller of the Currency, October 2012
Institute of Chartered Accountants of England and Wales, Better Financial Markets
       Conference, December 2011
Yale University, July 2011
CEASA-CARE Conference, Columbia Business School, April 2011
Second Conference on Accounting and Regulation, Siena, Italy, September 2010
International Monetary Fund, December 2009
Duke University, October 2008.
KPMG-Journal of Accounting Auditing and Finance Conference, September 2008
Boston Area Research Colloquium, October 2007
University at Buffalo, February 2007.
University of Wisconsin-Milwaukee, November 2006.
Michigan Accountancy Foundation's Educators Symposium, November 2006.
New York University, International Accounting Convergence and Capital Markets
       Conference, October 2006.
Duke University, April 2006
Accounting Program Leaders Group Federation of Schools of Accountancy Conference,
       San Antonio, February 2006.
National Meetings of American Accounting Association, (two presentations), August 2005
Deloitte/Federation of Schools of Accountancy Faculty Consortium, Chicago, May 2005
Accounting Program Leaders Group Federation of Schools of Accountancy Conference,
       Scottsdale, February 2005.
Oklahoma State University, October 2004
National Meetings of American Accounting Association, (CPE session), August 2004
Ohio State University, November 2003
National Meetings of American Accounting Association, (CPE session), August 2003
Canadian Academic Accounting Association (plenary speech), May 2003
Deloitte & Touche/ Federation of Schools of Accountancy Faculty Consortium, May 2003
Bear Markets Conference, University of Illinois: Urbana-Champaign, December 2002
Case Western Reserve University, December 2002
National Meetings of American Accounting Association, (CPE session), August 2002
Midwest Regional Meetings of American Accounting Association, (two presentations),
       April 2002
JAAF-KPMG Peat Marwick Conference, "The Economics of Financial Statements:
       Conservatism and Earnings Quality," New York University, January 2002.
National Meetings of American Accounting Association, (CPE session), August 2001
Joint Symposium of the 11th Financial Economics and Accounting Conference and the
7th Mitsui Life Symposium on Global Financial Markets, University of Michigan,
       November 2000
National Meetings of American Accounting Association, (two presentations and a CPE
       session), August 2000
Midwest Regional Meetings of American Accounting Association, April 2000
Arizona State University, December 1999
National Meetings of American Accounting Association (CPE session), August 1999
Queen's University, June 1999
Michigan State University, April 1999
Midwest Regional Meetings of American Accounting Association (two presentations),
       April 1999
MBA and Executive MBA Alumni Review Conference, University of Illinois, January 1999
National Meetings of INFORMS, October 1998.
University of Washington, October 1998

# Appendix A

Joint IAAER/CIERA Conference on Global Advances in International Accounting Research (plenary speech), October 1998.

National Meetings of American Accounting Association, (two presentations and a CPE session), August 1998.

Chicago Risk Management Conference, May 1998.

AAA/FASB Financial Reporting Issues Conference, December 1997.

Eighth Accounting Theory and Practice Conference and The International Auditing Symposium, November 1997.

University of Tennessee, November 1997.

University of Alabama, September 1997.

National Meetings of the American Accounting Association, August 1997.

Queen's School of Business Symposium on Accounting for Derivatives and Other Financial Instruments (Keynote speech), June 1997.

Midwest Regional Meetings of American Accounting Association, April 1997.

University of Wisconsin-Madison, February 1997.

AAA/FASB Financial Reporting Issues Conference, December 1996.

Indiana University, November 1996.

Ohio State University, October 1996.

University of Wisconsin-Madison Accounting Doctoral Alumni Conference, August 1996.

Conference in Honor of Fischer Black, Corporate Risk Management: Theory and Practice (Keynote speech), UCLA, March 1996.

National Meetings of American Accounting Association (one presentation and a CPE session), August 1995

Boston Accounting Research Colloquium, May 1995.

University of Wisconsin-Madison, May 1995.

Oklahoma State University, April 1995.

University of Georgia, January 1995.

University of Illinois, December 1994

Conference on Asset Valuation, University of Oklahoma, October 1994.

University of North Carolina, September 1994.

International Symposium on Forecasting, June 1994.

Management Accounting Research Conference, April 1994.

National Meetings of American Accounting Association, August 1993.

Syracuse University, May 1993.

University of Wisconsin-Milwaukee, December 1992.

National Meetings of American Accounting Association, August 1992.

Midwest Regional Meetings of the American Accounting Association, April 1990.

Purdue University, December 1989.

University of Iowa, July 1989.

International Symposium on Forecasting, June 1989.

Washington State University, April 1989.

Midwest Regional Meetings of the American Accounting Association, April 1989.

National Meetings of Canadian Academic Accounting Association, June 1988.

University of Wisconsin-Madison, February 1988.

Florida State University, October 1987.

Michigan State University, May 1987.

Midwest Regional Meetings of the American Accounting Association, April 1987.

Oklahoma State University, November 1985.

University of Iowa, March 1984.

Wharton School of Business, March 1984.

University of Minnesota, March 1984.

University of Michigan, February 1984.

# Appendix A

Joint National Meeting on ORSA/TIMS, April 1982.
Midwest Regional Meetings of the American Accounting Association, April 1981.
Northwest Regional Meetings of the American Accounting Association, April 1981.

## SESSION CHAIR AND CONFERENCE ORGANIZER:

Plenary Session Moderator, "Expanding Use of Fair Values: An Evaluation", 4th Midyear Meeting of Financial Accounting and Reporting Section, American Accounting Association, January 2006.

Conference Organizer, 1st Midyear meeting of Financial Accounting and Reporting Section, American Accounting Association, January 2003.

Moderator and Session Chair, "Panel on Enron: Causes and Consequences", National Meetings of American Accounting Association, August 2002.

Moderator, Stock Options Research session, National Meetings of American Accounting Association, August 2001.

Moderator and Session Chair, "Recent National and International Developments in Implementing FAS 133 and IAS 39 and Associated Research Opportunities", National Meetings of American Accounting Association, August 2000.

Moderator and Session Chair, "Panel on International Accounting Standards," International Accounting Conference, University of Illinois, April 1999.

Conference Organizer, Roedger's Seminar Series, sponsored by University of Illinois Department of Accountancy, June 1996.

Conference Organizer, "Commodity and Financial Risk Management: Uses and Financial Reporting of Derivatives and the New SEC Release," sponsored by Financial Executives Institute and University of Illinois, April 1996.

## SERVICE: NON-UNIVERSITY

### American Accounting Association

Member, Research Committee, August 2020 - present

Chairperson, 2006 AAA/FASB Financial Reporting Issues Conference Planning Committee, June 2005-December 2006.

Academic Member, Board of Governors, Accounting Programs Leadership Group, American Accounting Association, August 2005-June 2006.

Member, 2005 AAA/FASB Financial Reporting Issues Conference Planning Committee, August 2004-December 2005.

Member, APLG/FSA Conference Planning Committee, 2004-2005.

Member, COSO Review Team, 2002-2003

Member, 2002 AAA/FASB Financial Reporting Issues Conference Planning Committee, August 2001-2002.

President, Financial Accounting and Reporting Section, American Accounting Association, August 2001-August 2002.

Financial Accounting and Reporting Section Representative, American Accounting Association National Council, 1999-2000 and 2001-2002.

Member, Academic Fellow Nominating Subcommittee of SEC Liaison Committee of American Accounting Association, October 1995-2002.

Chair, Doctoral Fellowships Committee, American Accounting Association, August 2000-2001.

Member, Steering Committee of Financial Accounting and Reporting Section of American Accounting Association, August 1999-July 2000.

# Appendix A

Member, Ad Hoc Planning Committee, Financial Accounting and Reporting Section of American Accounting Association, March 1999-August 1999.

AAA Faculty Development Liaison, Midwest Region of American Accounting Association, April 1998-April 1999.

Member, Steering Committee of Midwest Region of American Accounting Association, April 1996-April 1999.

Chair, Financial Accounting Standards Committee of American Accounting Association, August 1996-July 1998.

Member, "Best Paper" Committee of Financial Reporting Section of American Accounting Association, 1996-1997.

Member, Special Planning Committee of Midwest Region of American Accounting Association, August 1996-1997.

Member, Financial Accounting Standards Committee of American Accounting Association, August 1995-July 1996.

Author, "Proposal Requesting AAA Support for the Academic Fellowship Program of the Office of the Chief Accountant, U.S. Securities and Exchange Commission," July 1995.

Federation of Schools of Accountancy

Academic Member, Board of Directors, Federation of Schools of Accountancy, February 2006-June 2006.

Other

Member, Academic Advisory Board, Hawaii Accounting Research Doctoral Institute (HARDI)

Professional

**Expert Testimony in Court Cases:**

Accounting and Financial Reporting Matters, ASA Investerings Partnership, AlliedSignal, Inc., Tax Matters Partner, Docket No. 27320-96, April 1998

**Consulting:**

King and Spaulding LLP, Consult on Consolidation Policy Issue, January 2021 – present.

Cravath, Swaine & Moore, LLP, Consult on Derivatives Valuation Issue, January 2018-September 2018.

Beck, Chaet, Bamberger & Polsky, S.C., Consult on Consult on Insurance Receivable Measurement Issue, February 2017

Munger, Tolles & Olson LLP and Gibson, Dunn & Crutcher LLP, Consult on Debt Classification Issue, December 2016-January 2017

Ernst and Young LLP and Morrison & Foerster LLP, Consult on Segment Disclosure Issue, October 2016- March 2017

Quinn, Emmanuel, Urquhart, Oliver & Hedges LLP, Consult on Energy Contract Accounting Matters for One Client, April 2005-June 2006.

Wade, Cummins, Smith and Chelsey LLP, Consult on Derivative Accounting Issues for Two Clients, September 2004-June 2006.

Fried, Frank, Harris, Shriver & Jacobson LLP, Consult on Derivative Accounting Issues for One Client, May 2004-August 2004.

Internal Revenue Service, Consult on Derivative Accounting Matters Related to an IRS

# Appendix A

Investigation, December 2003-March 2004.

Fulbright & Jaworski, LLP, Consult on Derivative Accounting Issues for Two Clients, October 2003-June 2004.

Kelley, Drye and Warren LLP, Consult on Energy Contract Accounting Matters for One Client, June-August 2002.

Dickie Group, Facilitate Securities Lawyers Understanding of SFAS 133, September 2000-May 2003.

Morgan Stanley Inc., Facilitate Analysts and Dealers Understanding of Derivatives and Risk Management Reporting Required by FASB and SEC, November 1999 - March 2001

Greenwich Treasury Advisors, Facilitate Implementation of SFAS 133 by Fortune 100 Companies, October 1998 - August 2000.

Managed Funds Association, Facilitate Commodity Pools' Compliance with SEC Market Risk Disclosure Requirements and Advise on Associations' Comment Letter on Proposed CFTC Rulemaking on Reporting Hedge Funds' Risks, December 1998-June 2000

First National Bank of Chicago, Prepare Response to SEC Exposure Draft, April 1984.

**Financial Accounting Standards Board (FASB) and Other Standard-Setting-Related Activities:**

Chair, Performance Review Committee of Accounting Standards Oversight Council, CPA Canada, April 2019-present

Member, Ad Hoc Executive Committee of Accounting Standards Oversight Council, CPA Canada, April 2019-present

Member, Accounting Standards Oversight Council, CPA Canada, October 2016-present

Member, Academic Resource Group, FASB, July 2016- present

Member, Financial Accounting Standards Board, July 2006-July 2016

Member, FASB Financial Reporting Issues Conference Planning Committee, 2006-2017.

Member, Financial Accounting Standards Advisory Council, January 2006-June 2006.

Member of Industry Working Group, FASB Business Reporting Research Project, September 1998-June 2000. [Work published in Improving Business Reporting: Insights into Enhancing Voluntary Disclosure, Norwalk, CT: FASB (2001)]

Oral Testimony on Proposed Standards on "Accounting for Derivatives and Similar Financial Instruments and for Hedging Activities" and "Reporting Comprehensive Income," FASB, Norwalk, Connecticut, November 20, 1996.

Roundtable Participant, "Quantitative Measures of Market Risk," FASB, Norwalk, Connecticut, June 29, 1995.

**Speeches to Practitioner Community (Before and After FASB):**

[During my term as member of the FASB (July 2006 – June 2016), I made over 100 speeches to the practitioner community. The following is a listing of such speeches before and after I became a member of FASB.]

"Future of Financial Accounting: Performance Reporting and Measurement," Professional Accounting Centre Conference, University of Toronto, September 15, 2017

"Future of FASB Standard Setting," Financial Executives International Madison Chapter, March 13, 2017

"Future of Standard Setting," PwC In Practice Session, Milwaukee, WI, December 6, 2016.

# Appendix A

"Overview of Research Findings on Segment Reporting Under the SFAS 131 Management Approach," FASB, Norwalk, CT, November 3, 2016.

"FASB Update," State of Wisconsin Investment Board Research Task Force, Madison, WI, September 8, 2016.

"Accounting Framework: Foundation for Integrity of Financial Information," International Monetary Fund Symposium, November 6, 2006.

"Fair Values in Financial Reporting", 17th Annual Conference on Financial Reporting, San Francisco, CA, October 27, 2006.

"Accounting for Derivatives in Periodic Financial Reports", Cincinnati. OH, June 2006

"Accounting for Derivatives in Periodic Financial Reports", Wade, Cummins, Smith and Chelsey LLP, Cincinnati. OH, October 23, 2004

"Building a Framework for Effective Audit Committee Oversight", KPMG Audit Committee Institute Roundtable, Detroit, MI, May 15, 2003.

"Accounting for Derivatives in Periodic Financial Reports", Moore & Van Allen LLP, Charlotte, NC, April 17, 2003.

"Accounting for Derivatives in Periodic Financial Reports", Skadden, Arps, Slate, Meagher & Flom LLP, New York City, April 14, 2003.

"Corporate Accountability Reforms: Challenges Facing Your Audit Committee", KPMG Audit Committee Institute Roundtable, Southfield, MI, November 19, 2002

"Internal Auditing Issues in a Post-Enron World", Lansing Chapter of Institute of internal Auditors, East Lansing, MI, September 17, 2002.

"Ten Lessons Learned from Enron", Conference on Financial Reporting & Auditing for the Energy Industry, Monterey, CA, July 29, 2002.

"A Focus on Current Issues Dominating the Audit Committee Agenda", KPMG Audit Committee Institute Roundtable, Troy, MI, May 16, 2002.

"Introduction to Derivatives", Covington and Burling LLP, New York City, June 9, 2001.

"Accounting for Derivatives in Financial Statements", Skadden, Arps, Slate, Meagher & Flom LLP, New York City, November 10, 2000.

"Accounting for Derivatives in Financial Statements", Davis, Polk and Wardwell LLP, New York City, October 27, 2000.

"Measuring and Reporting Market Risk, Morgan Stanley Inc., New York City, October 26, 2000.

"Accounting for Derivatives in Financial Statements", Morgan Stanley Inc., New York City, October 19, 2000.

"Accounting for Derivatives in Financial Statements", Davis, Polk and Wardwell LLP, New York City, September 19, 2000.

"FX Hedging Under FAS 133", Morgan Stanley Inc., New York City, July 18, 2000

"FAS 133: Basic Concepts", Morgan Stanley Inc., New York City, July 13, 2000

"FAS 133: Basic Concepts", Morgan Stanley Inc., New York City, June 15, 2000

"SEC Market Risk Disclosures", Morgan Stanley Inc., New York City, June 15, 2000

"FAS 133: Basic Concepts", Morgan Stanley Inc., New York City, June 14, 2000

"FAS 133: Basic Concepts", Implementing FAS 133 Workshop, Munich, April 11, 2000.

"FAS 133: Compliance Issues", Implementing FAS 133 Workshop, Munich, April 11, 2000.

"FAS 133: Basic Concepts", Implementing FAS 133 Workshop, Brussels, April 10, 2000.

"FAS 133: Compliance Issues", Implementing FAS 133 Workshop, Brussels, April 10, 2000.

"FAS 133: Basic Concepts", Implementing FAS 133 Workshop, Paris, April 7, 2000.

"FAS 133: Compliance Issues", Implementing FAS 133 Workshop, Paris, April 7, 2000.

"FAS 133: Basic Concepts", Implementing FAS 133 Workshop, London, April 4, 2000.

"FAS 133: Compliance Issues", Implementing FAS 133 Workshop, London, April 4, 2000.

"FAS 133: Basic Concepts", Morgan Stanley Inc., New York City, March 2, 2000

# Appendix A

"FAS 133: Effectiveness Testing," Conference on FAS 133 Implementation, New York City, June 22, 1999

"FAS 133: Transition Issues," Conference on FAS 133 Implementation, New York City, June 22, 1999

"FAS 133: Basic Concepts and Transition Issues," Workshop on Implementing FAS 133, New York City, March 4, 1999.

"Derivatives Disclosure Requirements," Conference on Implementing FAS 133, New York City, October 29, 1998.

"Regulatory Update on SEC Market Risk Disclosure Rule," Conference on Implementing Value at Risk, New York City, October 13, 1998.

"New SEC Market Risk Disclosure Rules," Chicago Risk Management Conference, Chicago, May 6, 1998.

"Understanding Market Risk and Meeting Regulatory Requirements," Conference on Applying Value at Risk to Corporate Finance, Orlando, January 29, 1998.

"High Quality Accounting Standards," AAA/FASB Financial Reporting Issues Conference, Norwalk, CT, December 13, 1997.

"New SEC Market Risk Disclosure Rules," Conference on Integrated Approaches to Risk Measurement in the Financial Services Industry, Atlanta, December 8, 1997.

"Contemporary Auditing Problems: Derivatives," Eighth Accounting and Theory Conference and the International Auditing Symposium, Taipei, Taiwan, November 25, 1997.

"Information Reporting with VAR," Conference on Adapting Value at Risk for Corporations, New York City, June 11, 1997.

"Quantitative Market Risk Disclosures," Queen's School of Business Symposium on Accounting for Derivatives and Other Financial Instruments, Kingston, Ontario, Canada, June 6, 1997.

"Information Reporting with VAR," Conference on Practical Implementation of Value at Risk to Quantify Risk, New York City, May 14, 1997.

"Assessing the Latest Developments in the Regulatory Focus on Risk Management," 1997 Conference on Risk Management and Control, Scottsdale, AZ, February 12, 1997.

"Information Reporting with VAR," Conference on Practical Implementation of Value at Risk to Quantify Risk, New York City, January 29, 1997.

"Portrayal of Risk in Financial Statements," AAA/FASB Financial Reporting Issues Conference, Norwalk, CT, December 14, 1996.

"Panel: Opportunities in Financial Engineering," Business Model Symposium, National Center for Supercomputing Applications, University of Illinois at Urbana-Champaign, April 30, 1996.

"Commodity and Financial Risk Management: Uses and Financial Reporting of Derivatives and the New SEC Release," primary presenter at daylong conference sponsored by the Financial Executives Institute/University of Illinois, Chicago, April 12, 1996.

"Quantitative Measures of Market Risk and the New SEC Release," National Offices of KPMG Peat Marwick, New York City, March 7, 1996.

"Potential New SEC Disclosures," Financial Executives Institute Conference on Year-end FASB/SEC Reporting Issues and Derivatives Update for User Companies, Washington, D.C., December 14, 1995.

"Potential New SEC Disclosures," Financial Executives Institute Conference on Year-end FASB/SEC Reporting Issues and Derivatives Update for User Companies, Chicago, December 11, 1995.

"Potential New SEC Disclosures," Price Waterhouse Roundtable on Value at Risk, New York City, October 19, 1995.

# Appendix A

"Emerging Developments in Derivatives Disclosure: What is Coming? What is Needed?" Conference on De-Mystifying Financial Statement Derivatives Disclosure:  What the Analyst Should Know, Boston University, October 5, 1995.

"Reporting Value at Risk Measures of Market Risk," Continuing Education Program of Office of the Chief Accountant and the Division of Corporation Finance, United States Securities and Exchange Commission, August 8, 1995.

"Financial Reporting: Value at Risk Measures of Market Risk," Conference on Value at Risk for Corporations, New York City, July 19, 1995.

"Office of the Chief Accountants-- Current Projects-- Part II," 22nd Annual AICPA National Conference on Current SEC Developments, Washington, D.C., January 10, 1995.

**Media**

[During my term as member of the FASB (July 2006-Junw 2016), I was quoted or provided background information for innumerable articles in the business press. The following is a listing of media mentions in articles in the business press before and after I became a member of the FASB.]

*Global Finance* (August 1995).

*Risk* (September 1995 and January 1996).

*Treasury and Risk Management* (March/April 1996 and March/April 1997).

*International Treasurer* (November 1998 and July 1, 2002).

*Wall Street Journal* (September 21, 2000, April 9, 2001, June 1, 2001, December 4, 2001, January 15, 2003, March 27, 2003, April 2, 2003, June 20, 2003, July 22, 2003, September 27, 2004, September 28, 2004, December 17, 2004, March 3, 2020, and July 21, 2020).

*Dow Jones Newswire/Wall Street Journal Online* (February 8, 2001 and June 27, 2003).

*E-Risk* (February 8, 2001).

*The Macomb Daily* (August 13, 2002).

*The Washington Post* (August 23, 2002 and December 17, 2004).

*Shareholder Value* (Sept./Oct. 2002 and January 2003).

*Strategic Finance* (January 2003).

*Business Week* (July 7, 2003).

*BNA Daily Tax Report* (July 23, 2003).

*New York Times* (October 30, 2003).

*TheStreet.Com* (November 20, 2003).

*Financial Times* (September 29, 2004).

*Compliance Week* (February 7, 2006).

*Accounting Policy and Practice Report* (February 2006).

*BNA Securities Regulation and Law Report* (April 22, 2006).

*The New Yorker* (January 8, 2007).

Bloomberg BNA (January 9, 2017, March 14, 2017, and February 27, 2018).

Bloomberg Financial Accounting News (July 22, 2019).

SERVICE: UNIVERSITY

Department

**At University of Wisconsin-Madison:**

Chair, Professional Programs Committee, August 2019-present
Member, Faculty Review Committee, 2017 and 2019

# Appendix A

Member, Enhanced Enrollment Group, Fall 2017
Member, Faculty Recruiting Committee, August 2016-May 2018
Member, Professional Programs Committee, August 2016-July 2018

**At Michigan State University:**

Chairperson, Department of Accounting and Information Systems, July 2002–June 2006.
[Raised more than $5 Million during time as chairperson]
Chair, Accreditation Maintenance Committee, September 2004-March 2006.
Member, Communications Course Curriculum Committee, September 2004-December
    2005
Faculty Adviser, Deloitte and Touche Case Competitions, 2000 -2003
Chair, Curriculum Review Committee, 2001-2002
Chair, Financial Reporting Professorship Recruiting Committee, 2001-2002
Member, Chairperson Search Committee, 2001-2002
Chair, ACC 201 Book Selection Committee, 2001
Member, ACC 300/301 Book Selection Committee, 2001
Coordinator, Department Research Workshop, 2000-2001
Member, Financial Reporting Professorship Recruiting Committee, 2000-2001
Member, Masters of Science in Accounting Admissions Committee, 2000-2001
Member, Instruction Committee, Strategic Planning Process, 2000
Member, Curriculum Development Committee, Masters of Science in Accounting and
    Business Processes, 1999
Member, Palmer Professorship Recruiting Committee, 1999

**At University of Illinois:**

Reviewer, Thirteenth Audit Symposium, 1998
Faculty Adviser, Deloitte and Touche Case Competitions, 1997-1998.
Project Discovery Teaching Mentor to Ph.D. Student, 1997.
Reviewer, Tax Symposium, 1997.
Member, Ph.D. Program Committee, 1995-1997.
Member, MAS Committee, 1995-1997.
Member, Executive Development Committee, 1995-1997.
Organizer, Roedger's Seminar, 1996.
Reviewer, Twelfth Audit Symposium, 1996.
Reviewer, International Seminar on Accounting, 1996.
Reviewer, Recruiting Files, 1996.

**At University of Iowa:**

Masters of Accounting and Ph.D. Oral Committees (over fifty students), 1985-1994.
Member, Professional Program Committee, 1986-1988, 1991-1993.
Member, Faculty Scholar Selection Committee, 1986-1988, 1991-1993.
Curriculum Presentation, Iowa Community College and University Accounting Seminar,
    Ames, Iowa, April 9-10, 1992.
Member, Intermediate and Introductory Financial Accounting Book Selection
    Committees, 1985-1986, 1991-1992.
Member, Maynard Teaching Award Selection Committee, 1987-1990.
Member, Recruiting Committee, 1985-1989.
Editor, University of Iowa Accounting Department Newsletter, 1986-1988.

# Appendix A

<u>College</u>

**At University of Wisconsin-Madison:**

Chairperson, Committee to Perform Five-year Review of Tenured Faculty Member, Terry
    Warfield, Fall 2020
Chair, Subcommittee of the Executive Committee, August 2019-present
Member, Academic Planning Council, August 2018-present
Co-Chair, Strategic Planning Task Force, August 2019-January 2020
Member, Subcommittee of the Executive Committee, August 2018-July 2019
Chairperson, Committee to Perform Five-year Review of Tenured Faculty Member, Brian
    Mayhew, Fall 2018
Member, Committee to Perform Five-year Review of Tenured Faculty Member, Urban
    Wemmerlov, Fall 2018
Chairperson, Committee to Perform Five-year Review of Tenured Faculty Member, Karla
    Johnstone, Spring 2018
Member, Committee to Perform Five-year Review of Tenured Faculty Member, David
    Brown, Spring 2017
Member, Committee to Perform Five-year Review of Tenured Faculty Member, Tim
    Riddiough, Spring 2017
Member, Recruiting Committee for Assistant Dean for Human Resources, Fall 2016

**At Michigan State University:**

Member, Portfolio Committee, September 2004-August 2005
Member, Strategic Planning Committee, December 2003-August 2004
Member, Ethics & Corporate Governance Panel, Broad School Advisory Board, February
    27, 2003
Member, Strategic Vision Integration Committee, 2002-2003
Panel member, The Eli Broad College of Business Leadership Forum: Ethics and
    Corporate Governance, Kellogg Center, September 30, 2002.

**At University of Illinois:**

Member, Admission's Committee, EMBA Program, 1999.
Member, Executive Education Committee, 1997-1999.
Member, Committee to Select Assistant Director of EMBA program, 1998
Chair, International Studies Committee, 1997-1998.
Member, International Studies Committee, 1996-1997.
Organizer, Financial Risk Management Conference, 1996

<u>University</u>

**At Michigan State University:**

Ad Hoc Study Group to Explore More Flexible Tenure System, February 2006-June
    2006.
Advisory Board, Office of Faculty & Organizational Development in Office of the Provost,
    2004-June 2006.

# Appendix A

**At University of Iowa:**

Faculty Mentor, Opportunity at Iowa Minority Program, 1988, 1989, and 1990.

INSTRUCTIONAL INNOVATIONS AND DEVELOPMENTS:

**At University of Wisconsin-Madison:**

Major Course Revision, Seminar in Financial Reporting Theory, Fall 2018
Major Course Revision, Professional Practice Issues in Accounting, Auditing and
    Taxation, Spring 2017
New Course Development and Major Course Revision, Accounting for Lawyers, Fall
    2016 and Fall 2017, respectively

**At Michigan State University:**

Curriculum Redesign, Chair of Department Curriculum Review Committee, Spring 2001-
    July 2002.
New Course Development, Financial Statement Analysis, Elective MBA & MS Course,
    Spring 2002.
Major Course Revision, Intermediate Financial Accounting I, Required Undergraduate
    Course, Spring 2001.
New Course Development, Corporate Financial Reporting, Elective MBA Course, Fall
    2000.

**At University of Illinois:**

Developed Module on Financial Instruments, CPA Review, Spring 1998.
Distance Learning Adaptation, Executive MBA Course, Managerial Perspective on
    Financial Accounting, Fall 1997
Developed Module on Accounting for Certificate of Business Administration Program, Fall
    1997.
Major Course Revision, Institutions and Regulation, Required Undergraduate Course
    Spring 1996.
New Course Development, Managerial Perspective on Financial Accounting, Required
    Executive MBA Course, Fall 1995.

**At University of Iowa:**

New Course Development, Financial Reporting in 1990's and Beyond, Elective MA
    Course, Summer 1994.
New Course Development, Income Measurement and Asset Valuation, Required BBA
    Course, Fall 1993.
New Course Development, Selected Issues in International Accounting, Elective MA
    Course, Summer 1993.
Curriculum Redesign, Co-chair of Department of Accounting Curriculum Design
    Committee, Fall 1992 and Spring 1993.
Developed Computerized Accounting Component, Introduction to Financial Accounting,
    Fall 1991.
Developed Computerized Accounting Component, Financial Accounting I, Fall 1988.

# Appendix A

New Course Development, Accounting Theory II, Required MA Course, Spring 1988.

INDEPENDENT STUDY STUDENTS:

| Name | Department | Year |
| --- | --- | --- |

**Ph.D. Students, University of Wisconsin-Madison**

| | | |
| --- | --- | --- |
| Derek Christensen | Accounting and Info. Systems | 2010-present |
| Mayer Liang | Accounting and Info. Systems | 2017-present |
| Zach King | Accounting and Info. Systems | 2017-present |
| Erika Wheeler | Accounting and Info. Systems | 2017-2020 |
| Clay Partridge | Accounting and Info. Systems | 2016-2020 |

**Ph.D. Students, Michigan State University:**

| | | |
| --- | --- | --- |
| Han Yi | Accounting and Info. Systems | 2003-2006 |
| Chang Song | Accounting and Info. Systems | 2000-2002 |

**Ph.D. Students, University of Illinois:**

| | | |
| --- | --- | --- |
| Cathy Shakespeare | Accountancy | 1997-1998 |
| Joe Comprix | Accountancy | 1997 |

**Honors Thesis Students, University of Iowa:**

| | | |
| --- | --- | --- |
| Scott Erickson | Accounting | 1994 |
| Marshall Shubach | Accounting | 1991 |
| Eric Engstrom | Accounting | 1989 |

OTHER TEACHING-RELATED ACTIVITIES:

Taught Class at University of Wisconsin-Milwaukee, 2020
Taught Class at Stanford University, 2017
Instructor in Broad School CPE Program for Kellogg, 2005
Instructor in The Broad School Executive Seminar, 2004
Instructor in CPA Review, University of Illinois at Urbana-Champaign, 1998-1999.
Instructor in Certificate of Business Program, University of Illinois at Urbana-Champaign, 1997-1999.
Coordinator of Introductory Financial Accounting Course, University of Iowa, 1993-1994.
Instructor in CPA Review, University of Iowa, 1986-1993.
Instructor, School for Bank Administration, 1984.

FORMAL DEVELOPMENT AND RENEWAL:

Conferences Attended (without making a presentation prior to and after FASB)

FASB Financial Reporting Issues Conference, LaKota Oaks, Norwalk, CT, January 2020.
FASB Financial Reporting Issues Conference, LaKota Oaks, Norwalk, CT, January 2019.
Midwest Accounting Conference, University of Wisconsin-Madison, June 2017
FASB Financial Reporting Issues Conference, Dolce Center, Norwalk, CT, January 2017.
AAA/FASB Financial Reporting Issues Conference, Dolce Center, Norwalk, CT,

# Appendix A

December 2006.

Committee on Institutional Cooperation Academic Leadership Program Seminar II: Strategic Planning and Budgeting, Michigan State University, February 2006.

AAA/FASB Financial Reporting Issues Conference, Dolce Center, Norwalk, CT, December 2005.

Committee on Institutional Cooperation Academic Leadership Program Seminar I: Leadership for Excellence, University of Illinois at Urbana-Champaign, September/October 2005.

AAA/FASB Financial Reporting Issues Conference, Prudential Learning Center, Norwalk, CT, December 2004.

PricewaterhouseCoopers Faculty Symposium, Orlando, August 2004.

Accounting Program Leaders Group, American Accounting Association, Las Vegas, February 2004.

Midyear Meeting of Financial Accounting and Reporting Section of AAA, Austin, TX, January 2004.

AAA/FASB Financial Reporting Issues Conference, Prudential Learning Center, Norwalk, CT, December 2003.

PricewaterhouseCoopers Faculty Symposium, Honolulu, HI, August 2003.

KPMG Institute, Hedging and Accounting for Interest Rate Risk, Chicago, IL, June 2003.

Accounting Program Leaders Group, American Accounting Association, New Orleans, February 2003.

Midyear Meeting of Financial Accounting and Reporting Section of AAA, Orlando, January 2003.

AAA/FASB Financial Reporting Issues Conference, Prudential Learning Center, Norwalk, CT, December 2002.

Big Ten Doctoral Consortium, University of Wisconsin, May 2002.

AAA/FASB Financial Reporting Issues Conference, Prudential Learning Center, Norwalk, CT, November/December 2001.

Big 10+ Research Conference, University of Iowa, June 2001.

AAA/FASB Financial Reporting Issues Conference, Prudential Learning Center, Norwalk, CT, December 2000.

PricewaterhouseCoopers Faculty Symposium, Philadelphia, PA, August 2000.

Paton Accounting Center Harvey Kapnick Workshop Series Spring Conference, University of Michigan, May 2000.

Conference on Financial Information and Valuation, Ohio State University, January 2000.

AAA/FASB Financial Reporting Issues Conference, Prudential Learning Center, Norwalk, CT, December 1999.

PricewaterhouseCoopers Faculty Symposium, New Orleans, August 1998.

AAA/FASB Financial Reporting Issues Conference, Prudential Learning Center, Norwalk, CT, December 1998.

Big 10+ Research Conference, Indiana University, July 1998.

Distance Learning in an Executive MBA Program, University of Illinois, December 1997

AICPA Business Reporting Symposium, A Proposed Comprehensive Model of Business Reporting, New York City, October 1996.

Multimedia Uses in the Classroom, University of Illinois, October 1996.

American Accounting Association Corporate Accounting Policies Conference, New Orleans, September 1996.

Big Ten Doctoral Consortium, Indiana University, May 1996.

Collaborative Approach to Teaching or Opening the Classroom Door: Another Aspect of Professional Collegiality, University of Illinois, March 1996.

AAA/FASB Financial Reporting Issues Conference, University of Michigan, December 1995.

# Appendix A

Arthur Andersen/Chase Manhattan Conference on Accounting for Hedges: Current Developments and Market Impacts, Washington, D.C., March 1995.

AAA/FASB Financial Reporting Issues Conference, Northwestern University, December 1994.

Journal of Accounting, Auditing and Finance/KPMG Research Conference, Montvale, NJ, September 1992.

SEC Conference on Market Value Accounting, Washington, D.C., October 1991.

Journal of Accounting, Auditing and Finance/KPMG Research Conference, Montvale, NJ, September 1991.

Big Ten Doctoral Consortium, University of Wisconsin, May 1990.

Big Ten Doctoral Consortium, Northwestern University, May 1986.

American Accounting Association Trueblood Seminar, Chicago, February 1986.

American Accounting Association New Faculty Consortium, St. Charles, IL, February 1986.

Big Ten Doctoral Consortium, University of Iowa, May 1985.

University of Chicago Empirical Conference, May 1982.

American Accounting Association Doctoral Consortium, Chicago, August 1981.

Robert Beyer Lecture Series, University of Wisconsin, June 198

Memberships in Academic/ Professional Organizations

American Accounting Association

Financial Accounting and Reporting Section - American Accounting Association

International Accounting Section - American Accounting Association

# Appendix B
# Documents Considered
# Expert Report of Thomas Linsmeier

**Pleadings and Legal Documents**

- Order Instituting Proceedings Pursuant to Sections 6(C) and 6(D) of the Commodity Exchange Act, Making Findings, and Imposing Remedial Sanctions, *In Matter of: Forex Capital Markets LLC, FXCM Holdings, LLC, Dror Niv, and William Ahdout*, February 6, 2017

- Amended Complaint, *Effex Capital, LLC et al v. National Futures Association et al*, July 31, 2017, ECF No. 45

- Third Amended Consolidated Securities Class Action Complaint, *In re Global Brokerage, Inc. f/k/a FXCM Inc. Securities Litigation*, April 17, 2020, ECF No. 181

**Expert Reports**

- Expert Report of John E. Barron, *In re: Global Brokerage, Inc. F/k/a FXCM, Inc., Securities Litigation*, April 21, 2021

**Depositions**

- Deposition of John Dittami, *In the Matter of: Retail Forex Fraud*, April 7–8, 2016

- Deposition of Evan Milazzo, *In the Matter of: Retail Forex Fraud*, May 13, 2016

- Deposition of William Ahdout, *In the Matter of: Retail Forex Fraud*, May 19, 2016

- Deposition of Drew Niv, *In the Matter of: Retail Forex Fraud*, May 25–26, 2016

- Deposition of Alexander W. Dick, *In re: Global Brokerage, Inc. F/k/a FXCM, Inc., Securities Litigation*, November 18, 2020, with exhibits

- Deposition of Evan Milazzo, *In re: Global Brokerage, Inc. F/k/a FXCM, Inc., Securities Litigation,* December 1, 2020, with exhibits

- Deposition of Robert N. Lande, *In re: Global Brokerage, Inc. F/k/a FXCM, Inc., Securities Litigation*, January 14, 2021, with exhibits

- Deposition of John Dittami, *In re: Global Brokerage, Inc. F/k/a FXCM, Inc., Securities Litigation*, January 21, 2021, with exhibits

- Deposition of David Stollow, *In re: Global Brokerage, Inc. F/k/a FXCM, Inc., Securities Litigation*, January 25, 2021, with exhibits

# Appendix B
# Documents Considered
# Expert Report of Thomas Linsmeier

- Deposition of Dror Niv, *In re: Global Brokerage, Inc. F/k/a FXCM, Inc., Securities Litigation*, February 11, 2021, with exhibits

- Deposition of William Ahdout, *In re: Global Brokerage, Inc. F/k/a FXCM, Inc., Securities Litigation*, February 16, 2021, with exhibits

- Deposition of John E. Barron, *In re: Global Brokerage, Inc. F/k/a FXCM, Inc., Securities Litigation*, June 7, 2021, with exhibits

**Academic Literature**

- Stoll, H. R., "Market Microstructure," in *Handbook of the Economics of Finance*, Volume 1, Part A, edited by G. M. Constantinides, M. Harris and R. Stulz, North Holland, 2003

- Grossman, S. J. and M. H. Miller "Liquidity and Market Structure," *The Journal of Finance* 43, no. 3 (1988): 617–633

**Accounting and Auditing Literature**

- "About," *Public Company Accounting Oversight Board*, https://pcaobus.org/about, accessed May 24, 2021

- "About GAAP," *Financial Accounting Foundation*, https://www.accountingfoundation.org/jsp/Foundation/Page/FAFBridgePage%26cid%3D1176164538898, accessed May 24, 2021

- "About the Codification," *Financial Accounting Standards Board*, https://asc.fasb.org/printerFriendlyHelp&cid=1176163588636, accessed June 1, 2021

- "Auditing Standards," *Public Company Accounting Oversight Board*, https://pcaobus.org/oversight/standards/auditing-standards, accessed May 24, 2021

- "Consolidation," PwC, November 2020

- "Consolidation: A Roadmap to Identifying a Controlling Financial Interest," Deloitte, December 2015

- Accounting Standard Codification ("ASC") Master Glossary

- ASC 105, Generally Accepted Accounting Principles

- ASC 235, Notes to Financial Statements

- ASC 250, Accounting Changes and Error Corrections

- ASC 810, Consolidation

- ASC 850, Related Party Disclosure

- AU Section 110 - Responsibilities and Functions of the Independent Auditor

- AU Section 508 - Reports on Audited Financial Statements

# Appendix B
# Documents Considered
# Expert Report of Thomas Linsmeier

- AU Section 561 - Subsequent Discovery of Facts Existing at the Date of the Auditor's Report

- AU Section 722 - Interim Financial Information

- Auditing Standard No. 8 - Audit Risk

- Auditing Standard No. 14 - Evaluating Audit Results

- Financial Accounting Series No. 2015-02, Consolidation (Topic 810) - Amendments to the Consolidation Analysis, Financial Accounting Standards Board, February 2015

- Financial Accounting Series No. 311, Statement of Financial Accounting Standards No. 167 - Amendments to FASB Interpretation NO. 46(R), Financial Accounting Standards Board, June 2009

- Financial Accounting Standards Board, Original Pronouncements – FASB Interpretation No. 46, December 2003

- Statement of Financial Accounting Concepts No. 8 - Conceptual Framework for Financial Reporting, Financial Accounting Standards Board, September 2010

**SEC Filings**

- FXCM Form 10-K for the fiscal year ended December 31, 2010, filed March 11, 2011

- FXCM Form 10-K for the fiscal year ended December 31, 2011, filed March 15, 2012

- FXCM Form 10-K for the fiscal year ended December 31, 2012, filed March 18, 2013

- FXCM Form 10-K for the fiscal year ended December 31, 2013, filed March 17, 2014

- FXCM Form 10-K for the fiscal year ended December 31, 2014, filed March 16, 2015

- FXCM Form 10-K for the fiscal year ended December 31, 2015, filed March 11, 2016

- Global Brokerage, Inc. Form 10-K for the fiscal year ended December 31, 2016, filed March 17, 2017

**Produced Documents[1]**

- E Capital-000001 through E Capital-000119

---

[1] In certain instances, the Bates number listed is the first page of a range.

# Appendix B
# Documents Considered
# Expert Report of Thomas Linsmeier

- EY-GBI-WP-00000001 through EY-GBI-WP-00004321

- GLBR_00002696
- GLBR_00003957
- GLBR_00004262
- GLBR_00005534
- GLBR_00007733
- GLBR_00008068
- GLBR_00008069
- GLBR_00022930
- GLBR_00028063
- GLBR_00028840
- GLBR_00041735
- GLBR_00046387
- GLBR_00054006
- GLBR_00054454
- GLBR_00062622
- GLBR_00103994
- GLBR_00110416
- GLBR_00110420
- GLBR_00110697
- GLBR_00110713
- GLBR_00118420
- GLBR_00121206
- GLBR_00124229
- GLBR_00124982
- GLBR_00124984
- GLBR_00125000
- GLBR_00125001
- GLBR_00125008

- GLBR_00125009
- GLBR_00125012
- GLBR_00125014
- GLBR_00125304
- GLBR_00130836
- GLBR_00130837
- GLBR_00135452
- GLBR_00152107
- GLBR_00152760
- GLBR_00152765
- GLBR_00152767
- GLBR_00184107
- GLBR_00184113
- GLBR_00184115
- GLBR_00184132
- GLBR_00184136
- GLBR_00184140
- GLBR_00185174
- GLBR_00185323
- GLBR_00185332
- GLBR_00188104
- GLBR_00188166
- GLBR_00189008
- GLBR_00189079
- GLBR_00189088
- GLBR_00189350
- GLBR_00189352
- GLBR_00189371

# Appendix B
# Documents Considered
# Expert Report of Thomas Linsmeier

- GLBR_00189377
- GLBR_00194774
- GLBR_00194776
- GLBR_00218039

- GLBR_00218043
- GLBR_00218789
- GLRB_00120647


**Websites and Other Materials**

- "17 CFR § 240.10A-3 (F) (2)," *Electronic Code of Federal Regulations*, https://www.ecfr.gov/cgi-bin/text-idx?node=pt17.4.240&rgn=div5#se17.4.240_10_610, accessed June 9, 2021

- "Financial Reporting Manual, SEC Division of Corporation Finance, Topic 1," *U.S. Securities and Exchange Commission*, available at https://www.sec.gov/corpfin/cf-manual/topic-1, accessed June 4, 2021

- "SEC Market Risk Disclosures," *Ernst & Young*, https://assets.ey.com/content/dam/ey-sites/ey-com/en_us/topics/assurance/accountinglink/ey-bb0688-05-11-2010.pdf?download, accessed June 3, 2021

- "SEC Staff Accounting Bulletin: No. 99 - Materiality," *U.S. Securities and Exchange Commission*, August 12, 1999, https://www.sec.gov/interps/account/sab99.htm, accessed May 12, 2021

- "What We Do," *U.S. Securities and Exchange Commission*, https://www.sec.gov/about/what-we-do, accessed May 24, 2021


Note: In addition to the documents on this list, I considered all documents cited in my report and exhibits to form my opinion.

# Exhibit 1A
# Variable Interest Entity ("VIE")
# Consolidation Decision Tree[1]



Source: ASC Topic 810

Note:

[1] This decision tree presents only those aspects of the ASC Topic 810 guidance for evaluating whether a legal entity is a VIE and whether a VIE should be consolidated that are relevant to this matter.

# Exhibit 1B
# Sufficiency of Equity at Risk Assessment
# and Follow on Consolidation Analysis

Is the potential VIE a development stage entity?

**YES**     **NO**

Does the potential VIE have insufficient equity invested to permit it to finance the activities it is currently engaged in?

Does the potential VIE have an equity investment at risk of less than 10% of its total assets?

No     Yes     Yes     No

Do equity holders, as a group, **not** have the power to direct the significant activities of the potential VIE, the obligation to absorb losses, or the right to receive residual returns?

Is the equity at risk **insufficient** based on a qualitative analysis, quantitative analysis, or a combination of both?

Yes     No

No     Yes

Do equity holders, as a group, **not** have the power to direct the significant activities of the potential VIE, the obligation to absorb losses, or the right to receive residual returns?

Yes     No

Proceed with **VOE Model Consolidation Analysis** (see *Exhibit 1A*)

Proceed with **VIE Model Consolidation Analysis** (*see Exhibit 1A*)

Proceed with **VIE Model Consolidation Analysis** (*see Exhibit 1A*)

Proceed with **VOE Model Consolidation Analysis** (*see Exhibit 1A*)

Source: ASC Topic 810

**Exhibit 2A**
**Analysis of Factual Assertions Made by Mr. Barron**
**Assertions Not Present During Class Period**

| Assertion by Mr. Barron | Barron Report Source | Additional Facts Not Acknowledged by Mr. Barron | Source |
|---|---|---|---|
| "According to Mr. Dittami's statement through his attorney to the CFTC, after Mr. Dittami ceased to be an FXCM employee, he and his team 'proceeded with the continued buildout of the technology and development of the forex institutional liquidity trading system through Effex Capital.'"<br><br>"FXCM turned over the trading system—which was created by Mr. Dittami while he was an FXCM employee—to Effex for further development and use." | Barron ¶40<br><br>Barron ¶86 | Mr. Dittami testified that he "viewed [the intellectual property] would be [his] own" and that his employment agreement had clauses to protect it. | Dittami GLBR Deposition 37:9–39:11 |
| Id. | | Mr. Dittami testified that there was a clear line of demarcation between his employment duties and Effex's actitivities when Effex obtained a line of credit independent from FXCM. | Dittami GLBR Deposition 67:10–22 |
| Id. | | Mr. Dittami testified that Effex paid less than $1 million to "keep its clean ownership of intellectual property" and avoid ownership disputes. | Dittami GLBR Deposition 82:16–84:9 |
| Id. | | A letter to the CFTC states that "Effex repaid FXCM for software licenses, hardware costs, and external consulting costs which FXCM incurred during the employee/employer phase." | Dittami GLBR Deposition Exhibit 11, E Capital-000107 at -107 |
| "There is no evidence that Mr. Dittami paid for the equity interest that he obtained upon the formation of Effex." | Barron ¶144 | Mr. Dittami testified that Effex was capitalized with his personal funds.  The $2 million trading margin associated with FXCM's Prime of Prime account was not a capital investment into Effex. A letter to the CFTC states that "Effex repaid FXCM for software licenses, hardware costs, and external consulting costs which FXCM incurred during the employee/employer phase." | Dittami CFTC Deposition 207:17–208:7; Dittami GLBR Deposition Exhibit 11, E Capital-000107 at -107 |

**Exhibit 2A**
**Analysis of Factual Assertions Made by Mr. Barron**
**Assertions Not Present During Class Period**

| Assertion by Mr. Barron | Barron Report Source | Additional Facts Not Acknowledged by Mr. Barron | Source |
|---|---|---|---|
| "In April 201[0], FXCM set up a Prime of Prime ("PoP") account so that Effex could start its trading activities as an "external" entity.45 This required FXCM to post $2 million collateral with Citibank."<br><br>"On April 8, 2014, FXCM and Effex entered into a $2 million promissory note which was secured by Mr. Dittami's 100% ownership interest in Effex... Although the $2 million promissory note had a 3.5% stated interest rate, Mr. Ahdout testified that FXCM did not charge Effex interest... Not charging a market rate of interest, or any interest at all, indicates that this was not an arm's-length transaction between unrelated parties." | Barron ¶34<br><br>Barron ¶35 | Mr. Ahdout testified, "It really wasn't a loan per se as you can take a loan and go buy a Ferrari with it.  It was an extension of prime brokerage line in terms of credit."<br>In addition, Mr. Ahdout testified that the $2 million credit facility was an extension of prime brokerage services that "[FXCM] did this for a lot of clients" and that he "do[esn't] think [they]... charged anybody interest." | Ahdout GLBR Deposition 96:23–98.20 |
| Id. | | Mr. Dittami stated in his affidavit that "Within a few months Effex: (i) reimbursed FXCM for the FX Investment (in May 2010); (ii) ceased using the credit facility made available to Effex by FXCM through the above-referenced prime of prime customer account (in June 2010); (iii) entered into a prime broker agreement with Citibank (in July 2010); (iv) canceled the Note which guaranteed the credit made available to Effex by Citibank (in July 2010)..." | Dittami Affidavit ¶7 |
| | | Mr. Niv testified that FXCM also set up accounts for others, like Lucid, who became a market maker.  Additionally, Mr. Niv testified that Effex reimbursed FXCM for the costs of setting up the account. | Niv CFTC Deposition 336:2–337:21 |
| Id. | | Mr. Dittami testified that "in July of 2010, Effex discontinued using the prime of prime account" as they established their own prime brokerage account with Citi. | Dittami GLBR Deposition 88.2–88:9 |
| "[O]n April 14, 2010, FXCM and Mr. Dittami entered into an option agreement which allowed FXCM to acquire 70% of Mr. Dittami's membership interest in Effex for one dollar."<br><br>"It appears that the parties had attempted to, but did not, terminate the April 14, 2010 option prior to November 2015." | Barron ¶38<br><br>Barron ¶107 | Mr. Niv testified that FXCM did not consider the option agreement valid.  According to Mr. Niv, although the option agreement was signed by Mr. Ahdout, it was signed "for expediency."  It was subsequently rejected by FXCM's Compliance and Legal department and was therefore was canceled.  It was never brought before for the board of directors for approval. | Niv CFTC Deposition 155:10–163:7 |
| Id. | | Mr. Dittami testified that there was "no option agreement in place," "no operating agreement ever agreed to", and that none of them were ever finalized.  As for the draft employment agreement that was to come in effect if FXCM exercised its right under the option agreement, Mr. Dittami testified that it was also never enforced. | Dittami GLBR Deposition 158:2–161:2 |

**Exhibit 2A**
**Analysis of Factual Assertions Made by Mr. Barron**
**Assertions Not Present During Class Period**

| Assertion by Mr. Barron | Barron Report Source | Additional Facts Not Acknowledged by Mr. Barron | Source |
|---|---|---|---|
| Id. | | Mr. Dick testified that the option agreement "was terminated by both parties orally… the date it was signed" or some time shortly afterwards.  Mr. Dick further testified that the option agreement was terminated in writing in 2014 *[sic]*. | Dick GLBR Deposition 257:12–258:25 |
| Id. | | As of November 20, 2015, a formal written termination of the option agreement states "The Parties acknowledge and agree that no rights or obligations currently exist or ever existed as a result of the Option Document and that the Option Document currently has no, and has never had, any legal force or effect." | Lande GLBR Deposition Exhibit 15, GLBR_00189371 –74 |
| Id. | | Mr. Ahdout testified that he "[believed the option agreement] was in effect and then I found out it really wasn't in effect." | Ahdout GLBR Deposition 145:3–146:16 |
| "After its formation, Effex continued to operate out of FXCM's office for approximately one year... I have not seen any evidence that Effex paid rent to FXCM for the use of its office space." | Barron ¶85 | Mr. Dittami testified that FXCM "kicked [him] out" of their dealing room when they separated.  FXCM moved Mr. Dittami to an unused conference room until April or March 2011, after which point Effex moved into its own office in Jersey City. | Dittami CFTC Deposition 55:5–58:13 |
| Id. | | Mr. Niv testified that Mr. Dittami "wanted a cleaner separation of entities between Effex and FXCM" since "[Mr. Dittami] wanted to make sure that customers understood" the separation of Effex and FXCM "because he [was] primarily trying to sell to competitors of [FXCM]." | Niv CFTC Deposition 383:7–384:14 |
| "Effex's servers were co-located with FXCM's at a New Jersey location, referred to as NY7, in a space owned or leased by FXCM, and Effex initially relied on FXCM to back up its servers. I have not seen any evidence that Effex paid or reimbursed FXCM for the use of the location or backing up of Effex's servers." | Barron ¶87 | Mr. Dittami testified that Effex initially used servers at NY7, which was co-located with FXCM, but later in 2010 moved to NY2/4.  Mr. Dittami also testified that the servers were "Effex servers paid for by Effex, but they resided in NY7 in a space that FXCM owned or leased."  FXCM initially helped back up the Effex servers "in [the] very, very early days," but Mr. Dittami testified that Effex took over that process.  In addition, Mr. Dittami testified that "Effex's operations were never controlled by FXCM...Effex... owned and/or leased all of its computers, servers and other equipment." | Dittami CFTC Deposition 44:23–46:5; Dittami Affidavit ¶15 |
| Id. | | Mr. Niv testified that FXCM "offered [collocation of servers] to everyone, because it is, like, a hair faster...but because NY4 and NY7 are so close together, and if you'are collcating NY4 you get to take that matching in your pricing engine and use it with the whole market, if you will, in its time zone."  Therefore FXCM "helped Effex with collocation... [and] that some of their systems are collocated in [FXCM's] racks at Equinix, server racks, as is customary... with these situations [to provide setup for the collocation]." | Niv CFTC Deposition 256:3–11; 327:12–328:4 |

**Exhibit 2A**
**Analysis of Factual Assertions Made by Mr. Barron**
**Assertions Not Present During Class Period**

| Assertion by Mr. Barron | Barron Report Source | Additional Facts Not Acknowledged by Mr. Barron | Source |
|---|---|---|---|
| Id. | | Mr. Milazzo testified that "in these data centers there are separate servers, some of the servers were owned and operated by FXCM, others of the servers belonged to EFFEX. They might have been physically co-located but were logically separated by fire walls and such, access controls." | Milazzo GLBR 30(b)6 Deposition 57:5–14 |
| Id. | | Mr. Milazzo also testified that "[t]he concept of co-location is that a company can lease physical space inside of a data center, and then it can essentially sublease some of that space out to another company... Effex Capital has been co-located by definition that I gave earlier where they have physical space but no direct access to our systems. I believe GetCo also did, Lucid." | Milazzo CFTC Deposition 34:23–37:10 |
| "Throughout 2010 and 2011, Mr. Dittami and FXCM had continued discussions about formalizing various agreements to govern their relationship." | Barron ¶54 | The "Services Agreement" was the only deal "that was valid throughout our relationship," which was made effective March 1, 2010, and later amended. | Dittami GLBR Deposition 158:2–161:2; Dittami GLBR Deposition Exhibit 14, E Capital-000004–11; Dittami GLBR Deposition Exhibit 35, E Capital-000060 |
| "Mr. Dittami emailed drafts of several agreements to [Messrs. Ahdout, Grossman, and Dick] at FXCM. The documents included an "Addendum to the Services Agreement Dated August 17, 2010," which provided that the payments from Effex to FXCM would not exceed 70% of Effex's net income". | Barron ¶62 | Mr. Dittami testified that he "[does] not believe" they ever executed the service agreement dated August 17, 2010.  Mr. Dittami testified that "[t]he intent of [the addendum] was to put a cap" on payments in the event that FXCM excersied the option agreement and took ownership of Effex, though the option agreement was never executed. | Dittami GLBR Deposition 162:23–164:14 |

Source:  Expert Report of John E. Barron, CPA April 21, 2021 ("Barron");  Affidavit of John Dittami, June 6, 2017 ("Dittami Affidavit");  CTFC Deposition of Drew Niv, May 25, 2016 ("Niv CTFC Deposition");  CTFC Deposition of John Dittami, April 7, 2016 ("Dittami CFTC Deposition"):  Deposition of Alexander W. Dick, Esq., November 18, 2020 ("Dick GLBR Deposition):  Deposition of Evan Milazzo, December 1, 2020 ("Milazzo GLBR Deposition");  Deposi ion of John Dittami and Exhibits, January 21, 2021 ("Dittami GBLR Deposition"):  Deposi ion of William Ahdout, February 16, 2021 ("Ahdout GLBR Deposition")

## Exhibit 2B
## Analysis of Factual Assertions Made by Mr. Barron
## Assertions Existing During the Class Period

| Assertion by Mr. Barron | Barron Report Source | Additional Facts Not Acknowledged by Mr. Barron | Source |
|---|---|---|---|
| "Effex was given the ability to win ties from the start." | Barron ¶92 | Mr. Niv testified that FXCM broke ties between liquidity providers based on several performance metrics, and that Effex won most of the ties but that "Effex was always by far and away the best performer on all the metrics."  Mr. Niv also testified that other liquidity providers received advantages at different times, such as Dresdner Bank, Cit bank, Goldman Sachs, and BNP. | Niv GLBR Deposition 94:11–96:14 |
| Id. | | Mr. Dittami testified that if Effex did not provide the best execution, other liquidity providers would have received advantages in ties.  Mr. Dittami testified that "[his] reject rates have to be lower than all the other providers, if [he is] not lower than the other providers [then] the other providers get the ties," and gave an example of Effex not winning ties. | Dittami CFTC Deposition 327:13–329:9; 337:5–338:4 |
| Id. | | FXCM's Quality of Execution Study states the standards for rejection rate, wide spreads, high quotes per seconds, high frequency, and latency, on which liquidity providers are ranked.  The study states, "Liquidity providers providing the best pricing and execution according to these rules may gain an advantage over other liquidity providers which could result in an increase in orders captured. Poorly performing liquidity providers are ranked lower and ultimately could be removed from our platform until they return to compliance." | Lande GLBR Deposition Exhibit 6, pp. 11–12 |
| "[A]s early as April 2010, FXCM planned on adjusting its markups in order to increase Effex's trading volume, once it was 'reliably capturing allot [sic] of flow' and to 'turn off, or severely handicap with extra markups some of the slower banks. So we have [Effex], and fast banks only winning most of the business.'" | Barron ¶97 | Mr. Niv testified that banks whose "prices [are] less reliable, because their metrics were not very good, because they would reject a lot... they would take too long... we penalized them by putting extra markets."  Mr. Niv testified that without the markup, Effex "would win the same volume. Unfortunately, they would be the second hit... the customer experience would be significantly impacted because they would be -- they would have to wait longer until they got executed and they would get executed at worse prices."  Additionally, "Effex had the lowest rejection rate, the fastest turn around time, the fastest response rate and, you know, you can see it in the performance.  And not only did it tighten spreads, but they, you know, eliminated enormous amount of slippage, you know, boosted our price improvement, you know, to our customers where customers were getting a better price than they requested.  So our price improvement percentages tripled because of Effex, you know, all of those things." | Niv GLBR Deposition 99:20–105:18 |
| Id. | | Mr. Ahdout testified that lower markup were an advantage FXCM gave to Effex since it had the best execution and "[m]arkups were differentiated by performance of price providers, so if you're very good, fast, low rejects, quick response, no slippage, we moved you to the front of the line."  Mr. Ahdout testified that Effex had the best execution from 2011 to 2016 at a minimum, and that everyone else could have seen Effex having the best bids and offers on the FXCM API (application programming interface). | Ahdout CFTC Deposition 227:16–229:2; 240:2–244:5 |
| Id. | | Mr. Dittami testified that FXCM shared the markups being applied to other liquidity providers "probably more often in May, June and as I'm transitioning.  As I've left FXCM and transitioning, that stuff I looked at as an employee, but after 2011 or so... really never, very rare." Mr. Dittami testified that he gave opinions on poss ble changes to FXCM's markups, some of which were implemented, but not all. | Dittami GLBR Deposition 282:2–288:15; Dittami GLBR Deposition Exhibit 57, GLBR_00005534 |

# Exhibit 2B
## Analysis of Factual Assertions Made by Mr. Barron
## Assertions Existing During the Class Period

| Assertion by Mr. Barron | Barron Report Source | Additional Facts Not Acknowledged by Mr. Barron | Source |
|---|---|---|---|
| "[FXCM and Effex] entered into a services agreement that based payments from Effex to FXCM on a fixed dollar amount applied to the total amount of FXCM's transaction volume routed to Effex… Mr. Niv acknowledged that the 70/30 profit share had already been negotiated but was not practical based on the fact that Effex would have other customers. There is nothing in Mr. Niv's testimony to indicate that FXCM intended to change the economic substance of the prior arrangement. It was simply a matter of practicality." | Barron ¶46 | Mr. Ahdout testified that "[to] pay 70 percent of the profits was not part of the agreement" with Effex. Mr. Ahdout testified that the fee per volume structure was configured so that payment to Effex would not fluctuate with profit so that "as long as you have a solid number that doesn't fluctuate with P&L… doesn't go up and down, doesn't vary, he might make a lot of money, he might lose a lot of money, whatever happens you're still getting $21 per million." | Ahdout CFTC Deposition 115:5–121:23 |
| Id. | | Mr. Niv testified a profit sharing arrangement was not feasible with Effex because "you can't really put a percentage of FX -- of flow because the [profit and loss] is produced by the interaction of our flow with other people's flow too. So, at the end, it was not practical to do percentages and we did fixed amounts." Effex would "be making money from other places" based on "factors outside of FXCM" and "you can't really sequester one sort of flow from the other" at market making firms. | Niv GLBR Deposition 109:15–111:18 |
| "The [services] agreement provided, in relevant part, for Effex to act as a liquidity provider to FXCM by providing FXCM with executable prices through Effex's trading system in exchange for a fee equal to $21.00 per one million units." | Barron ¶¶39, 41 | Mr. Niv testified that "a set payment is better and more market standard… payment for order flow is a standard practice for stock brokers. We were like what is, you know, standard practice that all the big firms on Wall Street were doing and so… we went with the fixed fee." Mr. Niv further testified that the fee amount changed over time from $21 to $16 per million since "spreads were shrinking [and] markets were less volatile." FXCM also ta ked to other market participates "about the market quite frequently." Mr. Niv also testified that the agreement was terminated because "the UK regulator made a determination that they do not like payment for order flow and ordered all of the regulated firms in their -- regulated by them are not allowed to accept payment for order flow… we had a UK subsidiary where we made a determination that if… one jurisdiction forbids it, it is best practice to, essentially, forbid it in all jurisdictions and we ended it." | Niv GLBR Deposition 109:15–111:18; 150:5–153:12; 165:6–166:3 |
| | | Mr. Lande testified that "It was well-known that e-Trade was selling its order flow to Citadel and TD Ameritrade to UBS back in '08, '09." and that "payments for order flow were well-known in the equity industry and not particularly well thought of, but also not illegal and was common place for some of the big brokers." | Lande GLBR Deposition 185:8-11; 190:5-8 |
| Id. | | Mr. Ahdout testified that the fee per volume structure was configured so that payment to Effex would not fluctuate with profit so that "as long as you have a solid number that doesn't fluctuate with P&L... doesn't go up and down, doesn't vary, he might make a lot of money, he might lose a lot of money, whatever happens you're still getting $21 per million" and that Mr. Dittami indicated he would be fine with this arrangement. FXCM also wanted to avoid an agreement on receiving a percentage of profit as specified in Mr. Dittami's original employment agreement since "that could poss bly be perceived as ownership." | Ahdout CFTC Deposition 115:5–121:23 |

**Exhibit 2B**
**Analysis of Factual Assertions Made by Mr. Barron**
**Assertions Existing During the Class Period**

| Assertion by Mr. Barron | Barron Report Source | Additional Facts Not Acknowledged by Mr. Barron | Source |
|---|---|---|---|
| Id. | | Mr. Dittami testified that he could pay the $21 per million fee, but that it would "chew the reserve [on his Citi account] down to zero." Mr. Dittami testified that he sought to negotiate a lower fee because "when you pay more fees, you have less earnings and capital, which is the reserve that funds your capital that's required [for] Effex to keep capital at Citi. If I pay less fees, I have more income and I can accumulate more capital with my Citi prime brokerage. If I pay more, I have less capital to fund my Citi trading, which has a $1 million minimum plus additional reserves for taking risk and carrying risk, and you have a minimum capital and then you have to fund your positions. If I pay more money, I have less money to fund my positions. If I pay less money, I have more money to fund my positions." | Dittami GLBR Deposition 214:3–220:23 |
| "In October 2011, Effex and Holdings executed an amendment to the May 1, 2010 services agreement which reduced the fee per million units from $21 to $16, effective September 1, 2011." | Barron ¶42 | Mr. Niv testified that the fee amount changed over time from $21 to $16 per million since "spreads were shrinking [and] markets were less volatile." FXCM also talked to other market participates "about the market quite frequently." | Niv GLBR Deposition 150:5–153:12 |
| "Mr. Dittami testified that approximately 90% of Effex's business came from FXCM in 2010 and 2011. According to Mr. Dittami, by early 2014, FXCM still represented between 50% and 90% of Effex's business." | Barron ¶69 | Mr. Dittami testified that in November 2010, "[c]loser to 90 percent" of "Effex's trading revenues came from FXCM," and that between 2011 and 2014, "there would have been an increased percentage of P&L outside of FXCM" with more than 50 percent of "Effex's revenue came from FXCM" in 2014. | Dittami GLBR Deposition 173:8–15; 335:4–24 |
| Id. | | Mr. Abrams, an external account for Effex, stated that "[t]rading expenses incurred by Effex Capital with FXCM" declined from 59.0% in 2011 to 20.9% in 2014. | E Capital-000116–18 at 18 |
| "FXCM was in a position to significantly influence the management or operating policies of Effex to the extent that Effex might have been prevented from fully pursuing its own separate interests." | Barron ¶127 | Mr. Dittami's affidavit states "Effex's operations were never controlled by FXCM," and that Effex "hired, fired and paid in excess of 30 employees and consultants; maintained its own independent bank accounts; independently capitalized its prime broker relationship; supplied all of its operating capital and risk capital; provided Forex ("FX") retail pricing and execution services to over 30 counterparts in addition to FXCM, including FXCM's competitors; owned and/or leased all of its computers, servers and other equipment; utilized its own confidential, proprietary trading software to facilitate all of its OTC Forex trades; owned managed, operated, maintained, updated and modified its own trading system; leased its own office space; had sole discretion to accept or reject trades; retained all of Effex's trading profits; assumed liability for all trading and operating losses and potential losses; filed its own tax returns; other than [Mr.] Dittami, no person or entity ever guaranteed any of Effex's obligations; and had no common employees with FXCM." | Dittami Affidavit ¶15 |
| "FXCM gave Effex access to see real-time prices submitted to FXCM by other liquidity providers, this was referred to as real-time 'read of book.'" | Barron ¶91 | Mr. Milazzo testified "higher end retail customers either in terms of their deposit size or in terms of their trading volume or trade size" were able "to see not only the best bid and offer but other bids and offers that were the next best down further in the book." | Milazzo CFTC Deposition 238:8–20 |
| Id. | | Mr. Milazzo testified that FXCM "[gave] access to many liquidity providers, probably all of them at some point in time" to the "price feed... made up of the best bide and offer from liquidity providers." Effex was allowed to view "the raw quotes from the liquidity providers" because "of the high level of quality and service and execution that they provided." | Milazzo GLBR Deposition 39:9–40:6; 42:14–43:15 |

## Exhibit 2B
## Analysis of Factual Assertions Made by Mr. Barron
## Assertions Existing During the Class Period

| Assertion by Mr. Barron | Barron Report Source | Additional Facts Not Acknowledged by Mr. Barron | Source |
|---|---|---|---|
| "FXCM adjusted the fee per million for the JPY/USD currency pair to $3 effective February 2013." | Barron ¶43 | Mr. Dittami testified that Effex paid $3 per million on the JPY/USD transactions starting February 2013 rather than $16 per million.  Mr. Dittami testified that at $16 per million, he would not provide liquidity to the dollar/yen, because I lose money given the fees I pay." | Dittami GLBR Deposition 274:16–277:16 |
| Id. | | Mr. Dittami testified that "trading in the euro/dollar currency payor [was] less profitable to Effex" and that he "informed [Mr. Ahdout and Mr. Niv] as [he] did [the] dollar/yen" that he would not provide liquidity for this currency pair with the $16 per million fee. | Dittami GLBR Deposition 278:17–280:14 |

Source:  Expert Report of John E. Barron, CPA, April 21, 2021 ("Barron");  Affidavit of John Dittami ("Dittami Affidavit"), June 6, 2017;  CFTC Deposition of Drew Niv, May 25, 2016 ("Niv CFTC Deposition"); CFTC Deposition of Evan Milazzo, May 13, 2016 ("Milazzo CFTC Deposition"):  CTFC Deposition of John Dittami, April 7, 2016 ("Dittami CFTC Deposition");   CFTC Deposition of William Ahdout, May 19, 2016 ("Ahdout CFTC Deposition"):  Deposition of Dror (Drew) Niv and Exhibits, February 11, 2021 ("Niv GLBR Deposition");  Deposition of Evan Milazzo, December 1, 2020 ("Milazzo GLBR Deposition"); Deposition of John Dittami and Exhibits, January 21, 2021 ("Dittami GLBR Deposition");  Deposition of Robert N. Lande and Exhibits, January 14, 2021 ("Lande GLBR Deposition"): E Capital-000116–18