# Exhibit 3

# UNITED STATES DISTRICT COURT

# SOUTHERN DISTRICT OF NEW YORK

| | | |
|---|---|---|
| | ) | |
| In re Global Brokerage, Inc. f/k/a FXCM Inc. | ) | Master File No. 1: 17-cv-00916-RA-BCM |
| Securities Litigation | ) | |
| | ) | |
| | ) | |

---

**Rebuttal Expert Report**

**By**

**John E. Barron, CPA**

**July 12, 2021**

---

**TABLE OF CONTENTS**

I.    EXPERT QUALIFICATIONS ........................................................................................... 3

II.   ASSIGNMENT ............................................................................................................... 4

III.  OVERVIEW OF THE RELATIONSHIP BETWEEN FXCM AND EFFEX AND THE
      DISCLOSURE ISSUES ................................................................................................... 5

IV.   RELATED PARTY DISCLOSURES ................................................................................ 7

      A.  Opinion Expressed in the Linsmeier Report ......................................................... 7

      B.  Portion of the Linsmeier Report Devoted to the Related Party Disclosure Issue ................... 7

      C.  Background Section of the Linsmeier Report with Respect to the Formation of Effex ......... 8

      D.  Major Differences in Terminology Used in ASC Topic 850 (Related Party Disclosures) and
          ASC Topic 810 (Consolidation) ............................................................................. 9

      E.  Misuse of Terminology in the Linsmeier Report .................................................. 10

      F.  Lack of Basis for Dr. Linsmeier's Opinion with Regard to Related Party Disclosures ......... 11

      G.  Related Party Disclosures Summary ..................................................................... 15

V.    CONSOLIDATION OF EFFEX ..................................................................................... 15

      A.  Opinion Expressed in the Linsmeier Report ......................................................... 15

      B.  Three-step Analysis ............................................................................................... 16

      C.  Requirement to Evaluate the Relationship at the Date of Initial Involvement ................... 16

      D.  Effex Was a VIE ................................................................................................... 19

      E.  FXCM Had a Variable Interest in Effex ................................................................ 24

      F.  FXCM Was the Primary Beneficiary ..................................................................... 26

      G.  Consolidation of Effex as a VIE – Summary ........................................................ 29

VI.   MATERIALITY ............................................................................................................ 31

VII.  CONSIDERATION OF E&Y'S OPINIONS ON FXCM'S HISTORICAL FINANCIAL
      STATEMENTS AND PROCEDURES PERFORMED BY E&Y IN CONNECTION WITH THE
      CFTC AND NFA INVESTIGATIONS AND SETTLEMENT ....................................... 32

      A.  Criticism Contained in the Linsmeier Report ....................................................... 32

      B.  Response to Dr. Linsmeier's criticism - Summary ............................................... 32

      C.  Linsmeier Report Shows Lack of Knowledge of E&Y's Audit Procedures ........... 33

      D.  E&Y's Audit Procedures Did Not Address the FXCM Effex Relationship ........... 34

      E.  E&Y Memoranda Regarding CFTC and NFA Investigation and Settlement ......... 37

      F.  Management Memo Attached to the March 1, 2017, E&Y Memo ......................... 40

**EXHIBITS**

**A – John Barron CV (Updated)**

**B – Documents, Testimony and Other Materials Considered (Updated)**

## I.   EXPERT QUALIFICATIONS

1.      I am a certified public accountant ("CPA") licensed to practice continuously since November 1987 by the state of Georgia (1987-1998) and New York (1998-present), a total of 34 years.  During that time, I have been directly involved in performing or overseeing hundreds of audits of financial statements prepared in accordance with GAAP.  I was employed by Deloitte for a total of 21 years, including twelve years as an audit partner.

2.      I presently serve as a consulting expert to Arcadia Consulting, LLC, in New York and as the Director of Quality Control at Frost, PLLC, in Little Rock ("Frost"), where I perform final pre-issuance reviews of all audit engagements and coordinate periodic inspections of Frost by the AICPA and the United States Public Company Accounting Oversight Board ("PCAOB"). My duties at Frost include consultation on the application of technical accounting and auditing standards and conducting professional training in accounting and auditing.

3.      From 2003 through today, I have testified and been accepted as an expert in four administrative proceedings before the U.S. Securities and Exchange Commission ("SEC") or the PCAOB and have been deposed as an expert witness four times in matters related to U.S. federal court proceedings, including two matters within the last four years, excluding the deposition I gave on June 7, 2021, on this litigation.[1]

4.      My qualifications are further documented in my curriculum vitae which is attached to this report as Exhibit A.  Also attached to this report as Exhibit B is an updated listing of all documents and information considered, including additional information received and research performed subsequent to the issuance of the Initial Report.  Additional information includes, but

---

[1] Terrorist Attacks on September 11, 2001, deposition on April 29, 2021.  Case No. 03-MDL-1750 (GBD) (SN) (SDNY). American Realty Capital Properties, Inc. litigation, deposition on June 11 and June 12, 2019. Civil Action No. 1:15-mc-00040-AKH, (SDNY).

is not limited to, the report of Dr. Thomas Linsmeier (see below)and certain documents referenced therein.  I am being compensated for my time on this matter at a rate of $425 per work hour.

## II.   ASSIGNMENT

5.      In the matter of Global Brokerage, Inc. f/k/a FXCM Inc. Securities Litigation, I have been asked by counsel for plaintiffs to respond to the opinions of Dr. Thomas Linsmeier expressed in his report dated June 10, 2021 (the "Linsmeier Report") regarding whether the financial statements issued by FXCM between March 15, 2012 and February 6, 2017 (the "Class Period)[2] conformed with U.S. Generally Accepted Accounting Principles ("GAAP"), and whether any non-conformity caused these financial statements to be materially misstated.  The specific accounting areas I was asked to address include the financial reporting and disclosures associated with the relationship between FXCM and Effex Capital LLC ("Effex").

6.      This rebuttal report supplements my initial expert report of April 21, 2021 ("Initial Report").  After reading the Linsmeier Report and the documents referred to therein, I reaffirm my opinions that (a) Effex was a related party to FXCM, and FXCM failed to make related party disclosures as required by GAAP; and (b) Effex was a variable interest entity, of which FXCM was the primary beneficiary, and FXCM failed to consolidate the financial statements of Effex and make disclosures required by GAAP.

7.      I have not repeated the majority of the background and other information included in my Initial Report which is relevant to my assessment of the Linsmeier Report.  Therefore, this report should be read in conjunction with my Initial Report.

8.      The accounting issues addressed in this litigation relate to the periods (fiscal years 2010 – 2014) during which FXCM was involved with Effex and received payments from Effex

---

[2] FXCM's financial statements for the year ended December 31, 2010 through the year ended December 31, 2014 were included in SEC filings during the Class Period.

which are described in FXCM's financial statements as order flow payments.  The two separate accounting issues relate to (1) whether Effex met the definition of a related party and should have been disclosed as such in FXCM's consolidated financial statements in accordance with the provisions of Accounting Standards Codification ("ASC") Topic 850, *Related Party Disclosures*; and (2) whether the financial statements of Effex should have been included in the consolidated financial statements of FXCM in accordance with the provisions of ASC Topic 810, *Consolidation*.

9.      In this case, FXCM's failure to fairly present its financial information in conformity with either ASC Topic 850 or ASC Topic 810 would cause FXCM's consolidated financial statements to be materially misstated.

## III.   OVERVIEW OF THE RELATIONSHIP BETWEEN FXCM AND EFFEX AND THE DISCLOSURE ISSUES

10.     The overarching issue is whether the presentations and disclosures made in FXCM's consolidated financial statements provided sufficient information to users of the financial statements regarding the relationship between FXCM and Effex and the nature of the transactions between the two entities to permit users of the financial statements to make informed decisions.

11.     During the period of FXCM's involvement with Effex, disclosures in FXCM's financial statements informed users that in accordance with its core business philosophy FXCM operated what it described as an "agency model," also described as a riskless principal or a non-dealing desk, in which FXCM acted strictly as an intermediary between its customers and market makers.  FXCM disclosed that its revenues using the agency model were derived from markups to prices provided by FX market makers and not from trading profits or losses.[3]

---

[3]  2010 Form 10-K. Page 1.  A similar disclosure reflecting an increase in the number of customers, currency pairs, and market makers was made on page 1 of the 2011 – 2013 Forms 10-K.  2011 Form 10-K.  Page F-16.

12.     In 2009, FXCM created EES as an internal division run by employee John Dittami that would operate as a market maker on FXCM's trading platform.  Through EES, FXCM's goal was to improve FXCM's trade execution and customer "trading experience," increase trading volume, and generate millions of dollars of trading profits for FXCM.[4]  However, prior to EES becoming fully operational, concerns were raised by FXCM's compliance, marketing and sales departments about how such an arrangement would look to FXCM's customers, regulators, and shareholders, and whether the operation of EES as a market maker within FXCM would conflict with what FXCM disclosed in its financial statements as its core business philosophy of deriving revenue from adding markups to prices provided by external market makers, rather than acting as a market maker earning trading profit.[5]

13.     In response to these concerns, it was decided that Mr. Dittami could not be an employee of FXCM, and that the EES operation would be carried out by Effex as a separate legal entity, to be owned and operated by Mr. Dittami.[6]  Initially, FXCM was Effex's only source of revenue.  Mr. Dittami testified that approximately 90% of Effex's business came from FXCM in 2010 and 2011, and that by 2014, FXCM still represented between 50% and 90% of Effex's business.[7]  The fact that the portion of Effex's revenues derived from FXCM declined over the four-year period was consistent with FXCM's original plan for EES to compete with other market makers.

14.     FXCM's payments from Effex, structured to achieve approximately the same

---

[4] Niv transcript 64:2 – 65:11, 68:20 – 69:25, 77:5 – 10, 83:20 – 84:16.  Dittami transcript 26:12 – 15, 27:6 – 15, 33:12 – 34:4. Dittami Ex 4, GLBR_00110697 – 712
[5] Ahdout CFTC transcript 98:15-100:23; 301:20 – 302:13. Ahdout transcript 43:18 – 44:6.  Niv transcript 44:3 – 22, 68:20 – 69:25.
[6] Niv transcript 44:3 – 22, 68:20 – 69:25.  Niv transcript 45:7 – 19.
[7] Dittami CFTC transcript 43:6 – 15; 230:18 – 231:10. Dittami transcript 173:8 – 15, 334:24 – 335:24, 343:9 – 344:12, Dittami Ex. 67, GLBR_00004262 – 63; Dittami Ex. 69, GLBR_00103994 – 95.
Dittami Ex. 67, GLBR_00004262 – 63; Dittami Ex. 69, GLBR_00103994 – 95.

economic results as the employment arrangement between Mr. Dittami and FXCM,[8] were reported in FXCM's financial statements as order flow "from certain market makers."[9]  This choice of wording failed to properly convey that nearly all of FXCM's income from order flow was coming from a single entity, Effex.   Order flow payments coming from other market makers were described by FXCM CEO Dror Niv as "tiny."[10]  Discussions with other liquidity providers about making order flow payments to FXCM had failed.[11]  FXCM did not name Effex in its financial statements or disclose that virtually all of FXCM's order flow payments were received from Effex.

15.    No information was disclosed in FXCM's financial statements with respect to FXCM's relationship with Effex or the nature and substance of the transactions between the entities, including the fact that over 25% of FXCM's pre-tax income was derived from Effex's trading profits.[12]

## IV.    RELATED PARTY DISCLOSURES

### A.  Opinion Expressed in the Linsmeier Report

16.    Dr. Linsmeier expressed his opinion that "FXCM was not required under U.S. GAAP to disclose Effex as a related party for the year ended December 31, 2010, or during the class period."[13]  Said differently, it was Dr. Linsmeier's opinion that FXCM was not required to disclose Effex as a related party in its consolidated financial statements for the year ended December 31, 2010, or for any subsequent reporting period.

### B.  Portion of the Linsmeier Report Devoted to the Related Party Disclosure Issue

17.    Dr. Linsmeier's analysis of the related party issue, contained in Section VIII of the

---

[8] Ahdout CFTC transcript 115:5 – 121:23.
[9] 2011 Form 10-K, page F-16.
[10] Niv transcript 158:4 – 11, 189:5 – 190:22; Niv Deposition Ex. 48, GLBR_00022930 – 31.
[11] Niv transcript 162:2-20.
[12] See paragraph 110 of my April 21, 2021 report.
[13] The Linsmeier Report, par. 10.b.

Linsmeier Report, comprises less than three pages and contains wording taken from the Variable Interest Entity ("VIE") consolidation issue (ASC Topic 810), while largely ignoring the criteria for defining a related party (ASC Topic 850).  As discussed in detail below, the wording used in the Linsmeier Report with respect to the related party disclosure issue is inconsistent with the provisions of ASC Topic 850; thereby, combining and confusing what are two independent separate issues: (1) whether FXCM should have disclosed Effex as a related party under ASC Topic 850, and (2) whether FXCM should have consolidated Effex as a variable-interest entity under ASC Topic 810.

**C.  Background Section of the Linsmeier Report with Respect to the Formation of Effex**

18.     The formation of Effex is a point of contention in this litigation bearing on the relationship between FXCM and Effex.  With respect to the formation of Effex as a separate legal entity, the Linsmeier Report says: "Mr. Dittami founded Effex in March 2010."[14]  This simple statement fails to acknowledge the circumstances surrounding the creation of Effex as a separate legal entity, which is important to a full understanding of the relationship.  The decision to create Effex was made by FXCM.  According to the testimony of Mr. Niv, if FXCM had kept the ESS operation run by Mr. Dittami in-house, FXCM would have had to call it a dealing desk,[15] which would have been contrary to the disclosures in FXCM's financial statements in which FXCM was described as operating a non-dealing, agency model.  FXCM's decision not to operate ESS as an internal division was based on concerns expressed by its compliance, marketing, and sales departments.[16]

19.     The simple statement in the Linsmeier Report that "Mr. Dittami founded Effex in

---

[14] Linsmeier Report, par. 16.
[15] Niv CFTC transcript. 77:16-78:8
[16] Ahdout transcript.  43:18-44.6.  Ahdout CFTC transcript.  98:15-100,23. Niv CFTC transcript 96:5 – 97:4, 183:22 – 184:14.

March 2010" fails to address the context and circumstances surrounding the transaction through which Effex was created.

20.     It is important to keep in mind that after its formation, Effex carried out the same plan that was originally envisioned for the internal EES division.  The plan was that EES would become a market maker for FXCM customers, generate profits for FXCM, and compete with other market makers.[17]  Nothing of substance changed as a result of the formation of Effex as a separate legal entity, as Dittami and FXCM acknowledged that they intended to enter into an agreement on economic terms similar Mr. Dittami's employment agreement.[18]

**D.  Major Differences in Terminology Used in ASC Topic 850 (Related Party Disclosures) and ASC Topic 810 (Consolidation)**

21.     The provisions of ASC Topic 850 addressing related party disclosures are relativity straightforward.  If an entity meets the definition of a Related Party, certain disclosures are required.

22.     Because FXCM did not hold an equity investment in Effex, was not a principal owner of Effex, and was not a member of Effex's management, either of the following GAAP criteria could be applied in determining whether Effex was a related party as defined in ASC Topic 850:

> Related parties include:
>
> f.  Other parties with which the entity may deal **if one party controls or can significantly influence** the management or operating policies of the other to an extent that one of the transacting parties **might be prevented from fully pursuing its own separate interests**.
>
> g.     Other parties that **can significantly influence** the management or operating

---

[17] Dittami transcript 30:4 – 19; Ahdout CFTC transcript 65:2 – 4, 71:18 – 24; Ahdout transcript 36:5 – 8, 37:24 – 38:12, 42:19 – 43:13; Niv 68:20 – 69:25, 77:5 – 77:10; 83:20 – 84:16.  Niv transcript 68:20 – 69:25, 77:5 – 77:10, 83:20 – 84:16; Ahdout transcript 42:19 – 44:6.
[18] Dittami Ex 5, E Capital-000096 – 100 at E Capital-000097; Dittami Ex 19, E Capital-000049; Dittami transcript 113:9 – 115:11.

policies of the transacting parties or that have an ownership interest in one of the transacting parties and can significantly influence the other to an extent that one or more of the transacting parties **might be prevented from fully pursuing its own separate interests.**
[Emphasis added]

23.     The key words from ASC Topic 850 used to define related parties are: **<u>significantly influence</u>** another party such that the other party **<u>might be prevented</u>** from pursuing its own separate interests.  These criteria defining related parties is far different from the **<u>power to direct the activities</u>** criteria used in ASC Topic 810 to determine whether an entity is the primary beneficiary of a VIE and required to consolidate the VIE.

**E.  Misuse of Terminology in the Linsmeier Report**

24.     I have underlined below the language included in Section VIII of the Linsmeier Report addressing the related party issue, which is not found in ASC 850,

109. However, the situations described in (f) and (g) also are inconsistent with the facts and circumstances surrounding the relationship between FXCM and Effex. As explained in Section VII.B above, FXCM did not have an ownership interest in Effex. Furthermore, the analysis presented in Section VII.C above suggests **<u>that FXCM did not have power over the management or operating policies of Effex,</u>** including to the extent that it might be prevented from pursuing its own separate interests. … [Emphasis added.]

25.     The words "power over" appears to have been taken from ASC Topic 810 which uses the term "power to direct," neither of which terms is a requirement of ASC Topic 850.  To meet the definition of a related party, the question is whether one of the entities can significantly influence the management or operating policies of the other entity, which is far different than having power over another entity's management and operating policies.

26.     When asked whether "power over" was a component of a related party analysis, Dr. Linsmeier testified that power is related to control and "power is part of it." [19]  This confuses the requirements of the two separate accounting standards by setting a criterion that is not found

---

[19] Linsmeier transcript 138:13-20.

in ASC Topic 850, *Related Party Disclosures*, seriously undermining the credibility of Dr. Linsmeier's opinion on the related party disclosure issue.  To meet the definition of a related party, it is not a requirement to have power or control over the other the entity, it is only necessary that one party can significantly influence the management or operating policies of the other to the extent that the other entity "might be" prevented from "fully pursuing" its own separate interests. Dr. Linsmeier's interpretation would essentially make the criteria the same for both of the accounting issues in this litigation, and this was obviously not the intention of the drafters of ASC Topic 850.

**F.   Lack of Basis for Dr. Linsmeier's Opinion with Regard to Related Party Disclosures**

27.     Section VIII of the Linsmeier Report provides the basis for Dr. Linsmeier's criticisms of my report and for Dr. Linsmeier's affirmative opinion that "FXCM was not required under U.S. GAAP to disclose Effex as a related party for the year ended December 31, 2010 or during the Class Period."[20]

28.     Dr. Linsmeier's opinions with respect to the related party disclosure issue rest on three examples taken from an affidavit of Mr. Dittami:[21]

a.   Mr. Dittami and his managers made the hiring decisions at Effex;

b.   Mr. Dittami negotiated certain amendments to the services agreement with FXCM; and

c.   Effex pursued clients other than FXCM.

29.     The fact that Mr. Dittami and his managers made hiring decisions at Effex does not support the conclusion that FXCM could not significantly influence Effex's management or operating policies through other means.

---

[20] Linsmeier Report, par. 111.
[21] Linsmeier Report, par. 109 - 111.

30.     With respect to Mr. Dittami's negotiation of amendments to the services agreement, Dr. Linsmeier refers to changes in the services agreement reducing the payments for order flow from $21 to $16 per million units of base currency (October 2011) and the changes made to create separate rates for JPY/USD (February 2013) and EUR/USD currency pairs (June 2013). These changes were the result of changes in market conditions. The fact that certain market-driven changes were agreed to between the parties does not support a conclusion that FXCM could not significantly influence Effex's management or operating policies.

31.     The Linsmeier Report does not mention the negotiations for changes to the agreements sought by Mr. Dittami that were of equal if not greater importance to Mr. Dittami and Effex than the changes referred to in the Linsmeier Report noted above. In connection with FXCM's internal discussions about changing from a 70/30 split of Effex's EBIDA profits, as provided in the Dittami employment agreement, to an order flow payment based on a rate per million units of base currency, FXCM partner William Ahdout, testified that the $21 per million payment "would be in the ballpark" of the 70/30 split, but not exact.[22] However, based on documents and testimony I have reviewed, Mr. Dittami was not comfortable with the proposed new arrangement. In July and August 2010, and again in October 2011, when Mr. Dittami was negotiating amendments to the various agreements with FXCM, including the services agreement which provided payments for order flow, Mr. Dittami requested a side letter or an addendum to the services agreement that would preserve the 70/30 split of profits that had existed under his employment agreement or that would put a cap on the order flow payments to FXCM such that such payments would never exceed 70% of Effex's net income.[23]

_____

[22] Ahdout CFTC transcript 115:5-121:23.
[23] Dittami EX 30. GLBR_00124982-124014 at GLBR_125014. Dittami EX 25, GLBR_00152107-00152136 at 00152107 and 00152114. Dittami EX 37. GLBR_00152765. Dittami EX 29. GLBR_0189088-0189089, Dittami EX. 31. GLBR_00054454-0005455.

32.    Mr. Dittami testified that he proposed putting a cap on payments to FXCM, so that

he would not be taken advantage of once he relinquished control into the proposed agreement:

> Q: And does this draft addendum reflect your intents at the time of the e-mail
> attaching this to maintain a 70/30 split of trading profits between FXCM and
> yourself?
>
> * * *
>
> A.  The intent of that was to put a cap if I'm under the control of FXCM that they
> don't apply expenses or apply changes to per – make payments that put me in a bad
> position for protection in case of this new relationship gets enacted, to ensure that
> I don't get taken advantage of once we -- I relinquish control into this proposed
> agreement.
>
> Q.  And how did you arrive at the figure 70 percent?
> A.  I wanted to make sure I was better off, at least, as good off or better off with
> any new agreement than the initial best agreement that we had done, which was the
> employment agreement. The goal was always to do better and not worse.[24]

33.    In connection with proposed changes to the contractual relationship between

FXCM and Effex, Mr. Dittami testified that he was discussing changes for as long as he could,

until he was told by FXCM to "stop it."[25]  Based on the documents and testimony I have reviewed,

the service agreement was not amended to incorporate Mr. Dittami's requests to either preserve

the 70/30 profit split or to limit FXCM's share of Effex's profits.

34.    As stated above, the definition of a related party includes situations in which one

party controls or **can significantly influence** the management or operating policies of the other to

an extent that one of the transacting parties **might be prevented** from fully pursuing its own

separate interests.  The amount of profit earned or retained by an entity directly affects its ability

to make investments in its operations, satisfy existing obligations, take on new obligations, hire

additional personnel, pay operating expenses, and pursue growth opportunities.  FXCM's denial

of Mr. Dittami's requests concerning profits to be retained by Effex demonstrates that FXCM

---

[24] Dittami transcript 163:15 – 164:22.
[25] Dittami transcript 158:25 – 159:5.

could significantly influence the management or operating policies of Effex such that Effex might be prevented from fully pursuing its own separate interests.

35.     The Linsmeier Report makes reference to Effex's move from FXCM's offices in April 2011 (a year after it was formed).[26] The Linsmeier Report fails to point out that the move was at the direction and insistence of FXCM.  Likewise, Effex had no say in which part of FXCM's office space it could occupy prior to its move.[27]  FXCM's ability to direct where Effex would operate demonstrates the ability of FXCM to significantly influence the management or operating policies of Effex.

36.     In reaching his opinion that "FXCM was not required under U.S. GAAP to disclose Effex as a related party for the year ended December 31, 2010, or during the Class Period," Dr. Linsmeier failed to acknowledge Effex's near total dependence on FXCM for its revenues and other forms of support and assistance, especially during the early years of Effex's existence. FXCM provided approximately 90% of Effex's revenues through 2010 and 2011.[28] Mr. Dittami testified that having the volume of transactions provided by FXCM was critical for his model to work.[29]  If for any reason FXCM had chosen to reduce its support or the volume of transactions directed to Effex, Effex might have been prevented from fully pursuing its own separate interests. Again, "might be prevented" is the relevant criteria from ASC Topic 850 which must be met to be considered a related party.

---

[26] The Linsmeier Report, par. 74.
[27] Dittami CFTC transcript 57:5 – 58:13.
[28] In November 2010, 100% of Effex's revenues were coming from FXCM.  Dittami Ex. 32, GLBR_00041735 (rows 18426 – 39).  In 2010 and 2011, FXCM still accounted for 90% of Effex's business.  Mr. Dittami testified that all of Effex's income came from FXCM at inception. Dittami CFTC transcript 43:6 – 15.  Nearly all of Effex's business came from FXCM in July 2010. Dittami CFTC transcript 230:18 – 231:10. He also testified that around 90% of Effex's business came from FXCM in the end of 2010 and during 2011 and that ratio declined to between 50% and 90% through March 2014. Dittami transcript 173:8 – 15, 334:24 – 335:24, 343:9 – 344:12, Dittami Ex. 67, GLBR_00004262 – 63; Dittami Ex. 69, GLBR_00103994 – 95.
[29] Dittami CFTC transcript 331:20 – 332:25.

37.     With respect to related party disclosures, the Linsmeier Repost mentions only the fact that FXCM disclosed that it received order flow payments from market makers and that the amounts received from order flow were included in "Retail Trading Revenue."[30] FXCM's disclosure did not provide information that would have made a difference in decision making such that users of the financial statements could evaluate their significance as required by ASC Topic 850-10-10.  I searched FXCM's consolidated financial statements included in its 2010 Annual Report on Form 10-K, and found no disclosures related to Effex.  FXCM's disclosure that it was receiving order flow payments from "certain market makers" failed to disclose the source of the payments or the nature of the relationship between FXCM and Effex.

### G.  Related Party Disclosures Summary

38.     In summary, Dr. Linsmeier's affirmative and rebuttal opinions with respect to related party disclosures are not based on relevant authoritative GAAP, use terminology from the VIE standard that confuse the issue, and ignore relevant facts regarding the relationship between FXCM and Effex, including the context of the formation of FXCM as a separate legal entity, the structure and terms of the agreement for payment of order flow intended to approximate the economic substance of the Dittami employment agreement, the source of the order flow payments, and the extent of Effex's reliance on FXCM.  The one disclosure cited in the related party disclosure section of the Linsmeier Report provided no information whatsoever about FXCM's relationship with Effex.

## V.    CONSOLIDATION OF EFFEX

### A.  Opinion Expressed in the Linsmeier Report

39.     Dr. Linsmeier expressed his opinion that "FXCM was not required under U.S.

---

[30] Linsmeier Report, par. 112.

GAAP to consolidate Effex into and make related VIE disclosures in its financial statements for the year ended December 31, 2010 or during the Class Period."[31]  Said differently, it is Dr. Linsmeier's opinion that FXCM was not required to consolidate Effex into its financial statements or make related VIE disclosures in its financial statements either for the year ended December 31, 2010, or for any subsequent reporting period.

**B. Three-step Analysis.**

40.    As pointed out in the Linsmeier Report there are only three criteria to be addressed in analyzing the consolidation issue:[32]

      a.  Was Effex a VIE?

      b.  If so, did FXCM have a variable interest in Effex?

      c.  If so, was FXCM the Primary Beneficiary of Effex as a VIE?

41.    As discussed in detail below, all three criteria were met requiring the consolidation of Effex's financial statements in FXCM's financial statements, at the very least for the year ended December 31, 2010, when FXCM first became involved with Effex.

**C. Requirement to Evaluate the Relationship at the Date of Initial Involvement**

42.    ASC Topic 810 required FXCM to make an initial determination of whether Effex was a VIE on the date at which FXCM became involved with Effex, based on circumstances existing on that date, including future changes that are required in existing governing documents and existing contractual relationships.[33]

43.    This assessment was required in connection with the preparation of FXCM's consolidated financial statements for the year ended December 31, 2010, the period in which the

---

[31] The Linsmeier Report, par. 10.a.
[32] Linsmeier Report, par. 63 and ASC Topic 810-10-25-21.
[33] ASC Topic 810-10-25-37.

involvement began.  It is important to keep in mind that FXCM's financial statements for the year ended December 31, 2010, included both its financial position as of December 31, 2010, a point in time, and its income statement showing the results of operations for the entire year ended December 31, 2010.  If, for example, Effex met the requirements for consolidation for even one month during 2010, then Effex's operating results for that one month would need to be consolidated, which would require including Effex's revenues and expenses for that one-month period in FXCM's consolidated financial statements for the year ended December 31, 2010, along with the required disclosures.  This would be true no matter what the circumstances were at the end of year balance sheet date.  The balance sheet presents assets and liabilities existing at a point in time, whereas the income statement presents all revenues and expenses occurring over the course of the entire reporting period.

44.    Dr. Linsmeier improperly applies the provisions of ASC Topic 810 when he asserts that the VIE analysis prepared as of December 31, 2010, should take into "consideration those changes made already in existing governing documents and existing contractual arrangements as of the time of the analysis (i.e., at year-end 2010)."[34]  This is not what the standard provides.  The actual wording of ASC Topic 810-10-25-37 provides:

> [the initial] determination of whether a legal entity is a VIE shall be made on the date at which a reporting entity becomes involved with the legal entity.  … That determination shall be based on the circumstances on that date including future changes that are required in existing governing documents and existing contractual arrangements." [Emphasis added.]

45.    On the date of initial involvement there were no required changes to existing governing documents or contractual arrangements.  In fact, the parties operated under the same

---

[34] The Linsmeier Report, par. 79.

May 1, 2010, services agreement throughout 2010 and beyond.[35]

46.     Contrary to Dr. Linsmeier's assertion, for purposes of determining whether an entity is a VIE requiring consolidation, what mattered were the circumstances at the point in time of initial involvement, not events or circumstances occurring or existing subsequent to the point of initial involvement.

47.     As pointed out in the Linsmeier Report ASC Topic 810 has two models to evaluate whether an entity should be consolidated.  The first and most common model is based on the ability to control another entity through holding a majority voting interest in that entity (voting interest model).  The second and less common model is the variable interest or VIE model in which an entity has the ability to control another entity through means other than a majority voting interest. Both models involve control.

48.     To simplify the provision in the VIE model in which the determination is made at the time of initial involvement and not based on circumstances arising at some later date, it is helpful to draw a parallel to the voting interest model.  For example, if FXCM had acquired a majority voting interest in Effex at the time that FXCM first become involved with Effex (at Effex's inception), FXCM would be required to consolidate the operations of Effex until such time as it no longer held a majority voting interest, even if the change occurred within the same fiscal reporting period.  However, if at the time that FXCM acquired a majority voting interest in Effex there was an agreement in place requiring FXCM to later reduce its holdings in Effex to a minority interest (*i.e.,* the control was expected to be temporary), that fact would be taken into consideration in assessing whether the financial statements of Effex should have been included in FXCM's

[35] FXCM and Effex entered into two services agreements during 2010 with substantially identical terms, the only difference was that the agreements were with two different FXCM subsidiaries.  Dittami Ex. 14, E Capital_000004-0000011; Dittami Ex. 21, E Capital-000052 – 000059.

consolidated financial statements at December 31, 2010. Absent a <u>required</u> change in voting interest on the date that FXCM first became involved with Effex, FXCM would be required to consolidate the revenues and expenses of Effex from inception, and make the required disclosures, until the date that FXCM reduced its majority voting interest in Effex whether before or after December 31, 2010. Similarly, in this case, if Effex met the requirements for consolidation under the VIE model for only a portion of fiscal year 2010, the results of Effex's operations for that portion of the year would need to be consolidated in FXCM's financial reporting for the year ended December 31, 2010.

**D. Effex Was a VIE**

49.    The criteria for determining whether a legal entity is a VIE contains two parts, either one of which satisfies the criteria. If one of the two criteria is met there is no need to consider the second. The criteria met by Effex was the insufficiency of its total equity at risk to permit it to finance its activities without additional subordinated financial support.[36]

50.    The conclusion in my report that Effex lacked sufficient equity at risk at the time of its formation and beyond is based on the facts and circumstances evidenced in the documents and testimony presented in this litigation showing the support that was provided by FXCM:

    a.   Rent-free office space given to help Effex as a brand-new startup.[37]

    b.   FXCM's trading system, created by Mr. Dittami as an employee of FXCM.[38]

    c.   Use of FXCM's order routing mechanism.[39]

---

[36] Subordinated Financial Support is defined as: "Variable interests that will absorb some or all of a variable interest entity's (VIE's) expected losses." ASC 810-10-20 Glossary. Expected losses are defined as follows: "A legal entity that has no history of net losses and expects to continue to be profitable in the foreseeable future can be a variable interest entity (VIE). A legal entity that expects to be profitable will have expected losses. A VIE's expected losses are the expected negative variability in the fair value of its net assets exclusive of variable interests and not the anticipated amount or variability of the net income or loss. ASC 810-10-20 Glossary.

[37] Niv CFTC transcript 310:8 – 311:7

[38] Niv CFTC transcript 137:11 – 138:15.

[39] Niv CFTC transcript 328:5 – 24.

      d.   Co-location of Effex servers with FXCM's servers.[40]

      e.   Monitoring of Effex's system and trading activity by FXCM employees due to lack of Effex personnel.[41]

      f.   Arranging a prime brokerage account at Citibank to allow Effex to begin trading in exchange for a $2 million promissory note executed by Effex and FXCM[42]

51.    This support was in addition to the support from the services agreement. As explained below, the services agreement represented FXCM's variable interest in Effex.

52.    My conclusion with respect to Effex's lack of sufficient equity at risk is consistent with the conclusions later reached by FXCM's management:

> Landing in that FXCM may have had a variable interest in Effex, as the entity likely did not have sufficient equity to fund its activities (given the support FXCM was giving at the time of its start-up in 2010 (use of FXCM office space for a period of time including the use by Effex for four months between March 2010 and June 2010 of a FXCM subcontract account at Citibank Prime Brokerage so that it could trade)), the next question is whether FXCM was the primary beneficiary—i.e., did FXCM have both power and benefits.[43]

53.    It is important to note that in arriving at a conclusion regarding whether Effex had sufficient equity at risk to finance its activities without additional subordinated support, U.S. GAAP provides that "[o]ften, no single factor will be conclusive and the determination will be based on the preponderance of evidence."[44]

54.    FXCM management reached its conclusion that Effex "likely did not have

---

[40] Dittami CFTC transcript 44:23 – 46:5.
[41] Niv CFTC transcript 320:17 – 321:23.
[42] Dittami Ex. 11, E Capital-000107-000108. Dittami Ex. 18, GLBR_00189079.
[43] Memo dated March 14, 2017 titled, *Evaluation of Regulatory Matters & Impact on 2016 financial statements.* EY-GBI-WP-00003862 – 68 and EY-GBI-WP-00004035 – 41.
[44] ASC 810-10-25-47.

sufficient equity to fund its activities" based on the support being given to Effex at the time of its start-up in 2010, including Effex's use of FXCM office space and the use of a subcontract account at Citibank Prime Brokerage for four months.  Thus, even though portions of the support may have been temporary, FXCM management concluded it was likely  Effex lacked sufficient equity at risk at the time of its formation to conduct its operations.  In fact, I have seen nothing to show that Effex had other available financial support throughout the 2010- 2014 period, apart from the support provided by FXCM and the profits afforded Effex by the services agreement with FXCM. In reaching its conclusion in 2017 that Effex likely did not have sufficient equity to fund its activities, as noted in the preceding paragraph, management of FXCM would certainly have been aware of any other financing arrangements available to Effex  had such arrangements existed.

55.    The Linsmeier Report cites information from Mr. Dittami's affidavit to the effect that at December 31, 2010, Effex had no additional capital requirements; and within a few months of its formation, Effex had reimbursed FXCM for the funds that FXCM had invested in the development of the trading system, ceased using the credit facility made available by FXCM, canceled the $2 million promissory note, and commenced operations in Ireland.[45]  These events, subsequent to the date of FXCM's initial involvement with Effex are not indictive of circumstances existing at the time that FXCM first became involved in its relationship with Effex and are therefore not relevant to the analysis.  These events also fail to demonstrate that Effex could continue its operations without the ongoing financial support afforded by the services agreement, especially during the early stages of Effex's existence.

56.    The statement attributed to Mr. Dittami in paragraphs 71 and 72 of the Linsmeier Report are inconsistent.  Paragraph 71 contains the following:

"Within a few months of its formation, Effex: reimbursed FXCM for the [funds it

_____

[45] Linsmeier Report, par. 71.

had invested in the development of Effex's trading system] (in May 2010); …

57.     Paragraph 72 of the Linsmeier Report contains the following: "Mr. Dittami testified further that when he founded Effex he used his own resources to pay FXCM for Effex's right to obtain ownership of the trading system and algorithms." These two statements are at odds. The first indicates that the payment made to FXCM was made in May 2010 and the second indicates that the payment was made at Effex's formation

58.     In addition to this discrepancy, I believe, based on the documents produced in this case and deposition testimony, it is likely that the trading platform was contributed by FXCM to Effex, and the funds used by Mr. Dittami to make the various payments to FXCM following the formation were derived from funds generated from the services agreement and trading business routed to Effex by FXCM.

59.     During his deposition, Dr. Linsmeier made it clear that his analysis of whether Effex had sufficient equity at risk relies on the basic accounting concept:[46]

$$\text{Assets} = \text{Liabilities} + \text{Equity}$$

60.     According to Dr. Linsmeier, Effex's primary asset was its trading platform, valued at approximately \$1 million, and, according to Dr. Linsmeier, Effex's liabilities were "very limited short-term," such that Effex's equity was substantially equal to its assets and was, therefore, sufficient to finance its operations.[47] However, in reaching his conclusion, Dr. Linsmeier failed to recognize that at the time of formation (before Dittami repaid FXCM for the cost of developing the trading platform), the trading platform was either (a) contributed to Effex by FXCM, thus constituting FXCM's equity investment in Effex not Mr. Dittami's, or (b) was contributed by FXCM and Effex had an obligation (liability) to repay the cost of developing this platform to

---

[46] Linsmeier transcript 58:19-61:6, 80:25-83:12, 151:16-154:10.
[47] Linsmeier transcript 80:25-82:4.

FXCM.  In either case, Effex would have had no significant equity apart from what may have been contributed by FXCM.  Effex either had a liability to FXCM equal to the value of the contributed trading platform or Effex's equity was contributed by FXCM.

61.     During his deposition, Dr. Linsmeier acknowledged that any investment made by FXCM would not be considered as Effex's equity at risk.[48]  Likewise, as explained below, if Mr. Dittami's investment (in the form of the trading platform) was financed by an obligation to repay FXCM for the cost of developing the trading platform, such "contribution" would not constitute equity at risk.

62.     The Linsmeier report acknowledged the GAAP requirement that "[t]o be considered part of the equity at risk, equity interests must [among other things] [n]ot be received from the legal entity or by parties involved with the legal entity; and [n]ot be financed by the legal entity or other parties involved with the legal entity.[49]   During his deposition, Dr. Linsmeier admitted that he failed to consider the requirement that equity at risk must not be financed by the legal entity or other parties involved with the legal entity.  Moreover, Dr. Linsmeier testified that any equity investment made with "recycled" funds should not be considered as equity investment at risk.[50] Nor could any amounts funded by FXCM through loans or other extensions of credit.[51]

63.     The Linsmeier Report asserts that I have "not shown that Effex's equity holders lacked the power to direct significant activities, did not have the obligation to absorb Effex's expected losses, or did not have the right to receive Effex's expected residual returns."[52]  This section of the Linsmeier Report fails to point out that the lack of power on the part of Effex's

---

[48] Linsmeier transcript 77:3-19.
[49] Linsmeier Report, par. 38.a.
[50] Linsmeier transcript 77:20-78:9.
[51] Linsmeier transcript 66:8-18, 91:19-92:7.
[52] Linsmeier Report, par. 77.

equity holders to direct its significant activities is only one of the two requirements for determining whether an entity is a VIE and is not required so long as the other criteria is met—that there is insufficient equity at risk in the potential VIE, which is demonstrated above.[53]

64.    The Linsmeier Report asserts that in my report I failed to "consider how the relationship between Effex and FXCM evolved during the Class Period (i.e., 2012 and onwards)."[54]  This point is not important, as it would not matter whether the circumstances changed after the year ended December 31, 2010.  What matters is whether Effex was a VIE at the point that FXCM first became involved with Effex.

**E.  FXCM Had a Variable Interest in Effex**

65.    GAAP defines variable interests as investments or other interests that will either absorb portions of a VIE's expected losses or receive a portion of the entity's expected residual returns.  Such interests may be in the form of ownership, contractual or other pecuniary interests:

> **Variable Interests**
>
> The investments or other interests that will absorb portions of a variable interest entity's (VIE's) expected losses or receive portions of the entity's expected residual returns are called variable interests.  Variable interests in a VIE are contractual, ownership, or other pecuniary interests in a VIE that change with changes in the fair value of the VIE's net assets exclusive of variable interests. …[55]

66.    The services agreement met the definition of a variable interest as it would cause FXCM to either absorb portions of Effex's expected losses or to receive portions of Effex's expected residual returns.

67.    For purposes of a VIE analysis, GAAP defines expected losses and expected residual returns as follows:

---

[53] ASC  810-10-15-14.
[54] Linsmeier Report, par. 80.
[55] FASB Codification – Master Glossary.

### Expected losses

A legal entity that has no history of net losses and expects to continue to be profitable in the foreseeable future can be a variable interest entity (VIE). A legal entity that expects to be profitable will have expected losses. A VIE's expected losses are the expected negative variability in the fair value of its net assets exclusive of variable interests and not the anticipated amount or variability of the net income or loss.[56]

### Expected Residual Returns

A variable interest entity's (VIE's) expected residual returns are the expected positive variability in the fair value of its net assets exclusive of variable interests.[57]

68.     As set forth in my initial report, Mr. Dittami's employment agreement provided that FXCM would retain 70% of the EES venture profits.[58] A side letter to Mr. Dittami's resignation letter provided that the parties would enter into a license agreement on economic terms similar to the employment agreement.[59] Rather than enter into a license agreement, the parties entered into a services agreement which required Effex to make payments to FXCM for order flow based on a fee equal to $21.00 per one million units of Base Currency. Mr. Dittami testified that for Effex "volume equals P&L [i.e., earnings]."[60] The rate was fixed but the actual payments were variable. Although the order flow rate was expected to be "in the ballpark" of 70/30 profit split, FXCM chose the rate per million as a matter of practicality and because it would avoid the appearance of ownership.[61]

69.     Thus, the services agreement put FXCM in the position of either absorbing Effex's expected losses or receiving Effex's expected residual returns. Whether Effex was profitable or not profitable did not matter. Expected losses or expected residual returns are based on expected

---

[56] FASB Codification – Master Glossary.
[57] FASB Codification – Master Glossary.
[58] GLBR_00110697 – 0011712 at GLBR_00110697 –00110 698.
[59] Dittami Ex 5, E Capital-000096 – 100 at E Capital-000097; Dittami Ex 19, E Capital-000049; Dittami transcript 113:9 – 115:11.
[60] Dittami CFTC transcript 331:25 – 332:22.
[61] Niv transcript 138:2 – 24; Ahdout CFTC transcript 115:5 – 121:23.

positive or negative variability in the fair value of the entity's net assets. The fair value of Effex's net assets would naturally increase or decrease based on its profits or losses, and because the order flow payments were expected to be "in the ballpark" of a 70/30 split, FXCM would either be absorbing or receiving negative or positive variability in the fair value of Effex's net assets.

70.     The very fact that the rates of payment under the services agreements were changed from time to time based on market conditions affecting Effex's operations or Effex's financial condition shows that the services agreements were causing FXCM to absorb negative variability or receive positive variability in the changes in the fair value of Effex's net assets. Instances in which the timing and rates of payments under the services agreement varied based on Effex's reserve levels (without amendments to the services agreement) clearly demonstrate that FXCM was absorbing negative variability in the fair value of Effex's net assets.[62] If there was any doubt, these facts prove that FXCM had a variable interest in Effex.

### F.  FXCM Was the Primary Beneficiary

71.     There are two requirements for determining whether an entity is the primary beneficiary of a VIE: (1) the entity has the power to direct the activities of the VIE that most significantly impact the VIE's economic performance; and (2) the entity has the obligation to absorb losses of the VIE that could potentially be significant to the VIE **or** the right to receive benefits from the VIE that could potentially be significant to the VIE.[63]

72.     The order flow payments provided in the services agreement clearly represented benefits to FXCM that could potentially be significant to Effex.

73.     Consistent with my own opinion, FXCM management concluded FXCM met the criteria of having the right to receive benefits from Effex that could potentially be significant to

---

[62] See examples in Section VI.C. of my Initial Report.
[63] ASC 810-10-05-8A and ASC 810-10-25-38A.

Effex:

> With respect to benefits, it is likely that FXCM did meet the benefits criterion. While it did not have the obligation to absorb losses, FXCM received what is believed to be a significant portion of the revenues of Effex through the payments for order flow (although financial statements of Effex are not available).[64]
> [Emphasis added.]

74.     In evaluating whether FXCM had the power to direct the activities of Effex that most significantly impacted Effex's economic performance, the Linsmeier Report observes that FXCM had no ownership or voting rights with respect to Effex and no board or management representation at Effex, and t decisions made by Mr. Dittami included, among others, hiring, setting employee and contractor compensation establishing banking relationships, tax matters, selecting office locations, and "onboarding" new clients.[65]

75.     This analysis ignores other means by which an entity may have the power to direct the activities of another entity that most significantly impact the other entity's economic performance. This was especially relevant in the early stages of the relationship between FXCM and Effex, when FXCM was Effex's only customer. Effex was also dependent on other benefits provided by FXCM designed to increase Effex's trading volume, which in turn would increase Effex's profitability ("winning all ties," or the ability to see competitive prices in real time and lowering of mark-ups on prices provided by Effex). Trading volume would impact Effex's size and profile within the market, which would later make it possible to obtain external customers.[66] As an indication of the importance to Effex of these other forms of support provided by FXCM, Mr. Dittami proposed contracting for the right to "put" the ownership of Effex back to FXCM in

---

[64] Memo dated March 14, 2017 titled, *Evaluation of Regulatory Matters & Impact on 2016 financial statements.* EY-GBI-WP-00003862-00003868
[65] Linsmeier Report, par. 99.
[66] Dittami Ex. 32, GLBR_00041735 (rows 18426 – 39); Dittami transcript 175:11 – 25.

the event that certain of these advantages were no longer provided.[67]

76.    It was always part of FXCM's plan that EES and then Effex would compete with other liquidity providers, but Effex needed the support of FXCM to be in a position to grow and begin obtaining external customers.[68]

77.    The Linsmeier Report asserts, based on the testimony of Mr. Dittami, that the percentage of Effex's order flows generated from FXCM declined each year from 2010 to 2015, that as of 2017, Effex provided liquidity via 170 venues, and that Effex's trading expenses from payments to FXCM declined from 59% in 2011 to 20.9% in 2014.[69]  None of this is relevant to the circumstances that existed during the early stages of Effex's operations, including the circumstances existing at the date that FXCM first became involved with Effex and throughout 2010.

78.    Given Effex's near total dependence on FXCM during the early stages of its operations, Mr. Dittami would have been forced to agree with any changes in Effex's operations insisted upon by FXCM.  GAAP provides that a "reporting entity does not have to exercise its power in order to have power to direct the activities of a VIE.[70]  The fact that FXCM never made requests that Effex objected to does not mean that FXCM did not have the power to do so.

79.    On the basis that the services agreement was based on a fixed-fee structure (applied to variable volume), the Linsmeier Report questions whether the services agreement gave rise to an obligation on the part of FXCM to absorb losses or a right to receive the residual returns or profits of Effex.[71]  The order flow payments did not represent a fixed-fee arrangement.  While the

---

[67] Dittami Ex. 30, GLBR_00124982 – 5014 at GLBR_00125012.
[68] Dittami transcript 30:4 – 19; Ahdout CFTC transcript 65:2 – 4, 71:18 – 24; Ahdout transcript 36:5 – 8, 37:24 – 38:12, 42:19 – 43:13; Niv 68:20 – 69:25, 77:5 – 77:10; 83:20 – 84:16.  Niv transcript 68:20 – 69:25, 77:5 – 77:10, 83:20 – 84:16; Ahdout transcript 42:19 – 44:6.
[69] Linsmeier Report, par. 101.
[70] ASC 810-10-25-38B.
[71] Linsmeier Report, par.103.

rate per million was fixed, the actual payments varied up or down based on the trading volume directed by FXCM. Trading volume impacted Effex's profits and FXCM shared in those profits through the order flow payments.

80.     The fact that the rates of payment under the services agreements changed from time to time based on market conditions affecting Effex's operations or Effex's financial condition (*e.g.,* reserve levels) is further evidence that the services agreements were causing FXCM to absorb negative variability or receive positive variability resulting from Effex's operations.[72]

81.     The Linsmeier Report asserts that the agreement giving FXCM the option to purchase 70% of Effex for one dollar was not effective as of December 31, 2010.[73]  Whether or not this was actually the case would require a legal opinion.  The option agreement was signed by Mr. Dittami and FXCM on April 14, 2010,[74] and it was more than five years later, in November 2015, that the parties executed a document acknowledging that the option agreement never had legal force or effect.[75]  One of the issues for this acknowledgement was that the existence of the option agreement would give the appearance of ownership.

### G.  Consolidation of Effex as a VIE – Summary

82.     The Linsmeier Report includes the following affirmative opinion:

> Based on my analysis of the facts and circumstances surrounding FXCM's relationship with Effex as a whole, it is my opinion that FXCM was not required under U.S. GAAP to consolidate Effex into and make related VIE disclosures in its financial statements for the year ended December 31, 2010 or during the Class Period.[76]

83.     However, the section of the Linsmeier Report addressing the VIE consolidation

---

[72] See examples in Section VI.C. of my Initial Report.
[73] Linsmeier Report, par. 97.
[74] Dittami Ex.15, E Capital 000050 – 51.
[75] Dittami Ex. 41, GLBR_00189371 – 74.
[76] Linsmeier Report, par. 10.

issue provides very little support for Dr. Linsmeier's affirmative opinion.  Instead, it consists almost entirely of criticisms of my report and largely ignores the substance of the arrangements between FXCM and Effex.

84.    Contrary to the provisions of the relevant accounting standard, Dr. Linsmeier's analysis of whether Effex was a VIE, requiring consolidation by FXCM, disregards or discounts the circumstances existing at the date that FXCM initially became involved with Effex.  The Linsmeier Report refers to an evolution of the relationship between FXCM and Effex "during the Class Period (i.e., 2012 and onwards)."[77] Any evolution that may have occurred from 2012 and onward would have no bearing on whether FXCM should have consolidated the financial statements of Effex during the year ended December 31, 2010.

85.    In addressing the sufficiency of Effex's equity at risk, the Linsmeier Report relies for its conclusion on events taking place after the time of FXCM's initial involvement with Effex, while discounting the importance of non-monetary support provided to Effex during its early stages.[78]

86.    Most importantly, the Linsmeier Report fails to appropriately acknowledge the importance of the services agreement through which FXCM would absorb portions of Effex's expected losses or receive portions of Effex's residual returns.  The Linsmeier Report also fails to acknowledge that Effex's near total reliance on the revenue from the services agreement for its support provided FXCM with the power to direct the activities of Effex.  Had FXCM chosen to do so, reducing support provided through the services agreement would have financially crippled Effex during its early stages of operation, when Effex was most vulnerable.

87.    Even if upon evaluation of all the evidence, a jury were not completely satisfied

---

[77] Linsmeier report, par. 80.
[78] See Section V.D., above.

that FXCM was required to consolidate the financial statements of Effex as a VIE during 2010 or any later periods, it would not obviate the requirement for FXCM to make the related party disclosures under ASC Topic 850.

## VI.    MATERIALITY

88.     First, the Linsmeier Report considers the issue of materiality moot on the basis that Dr. Linsmeier believes the financial statements were not misstated.[79]  With respect to materiality of related party disclosures, the Linsmeier report focuses only on the quantitative materiality of the order flow payments and the fact that, in its financial statements, FXCM disclosed that order flow payments were included in its revenues:[80]

> … FXCM disclosed both the fact that it received payments for order flow from FX market makers and the amount of revenues stemming from such payments [but not the actual amounts] were included in the amount of revenues reported on its financial statements under "Retail Trading Revenue." [81]

89.     However, FXCM's financial statement presentation failed to disclose:  (1) that Effex was a related party (or a VIE); (2) the nature of the relationship between FXCM and Effex; (3) the fact that nearly all order flow payments were coming from Effex and, by design, represented a majority share of Effex's trading profits.[82]  One of the reasons that FXCM settled on the fixed payment applied to variable order flow was to avoid the perception of ownership.[83]  The substance and intent of the order flow payments, based on profits from a market maker, representing over 25% of FXCM's pre-tax income, differed substantially from what FXCM described in its financial statements as its core business philosophy and principal source of revenue, namely markups on prices provided by "external" market makers.  The efforts made by FXCM to disguise and not

---

[79] Linsmeier Report, par. 112.
[80] Ibid., par 113.
[81] Linsmeier Report, par. 113.
[82] Ahdout CFTC transcript 115:5 – 121:23.
[83] *Ibid*.

disclose the nature of the relationship illustrates that FXCM believed these facts were material and would make a difference to the users of FXCM's financial statements.

90.     The two-paragraph Section IX of the Linsmeier Report addressing materiality avoids the question of materiality altogether, either quantitively or qualitatively, with respect to the VIE consolidation issue.  With respect to the materiality of a failure to make the required related party disclosures, the Linsmeier Report cites only that FXCM received order flow payments from market makers and that the revenues were reported in FXCM's financial statements.  This limited disclosure provided absolutely no information to the financial statement users with respect to the relationship between FXCM and Effex.

## VII.   CONSIDERATION OF E&Y'S OPINIONS ON FXCM'S HISTORICAL FINANCIAL STATEMENTS AND PROCEDURES PERFORMED BY E&Y IN CONNECTION WITH THE CFTC AND NFA INVESTIGATIONS AND SETTLEMENT

### A.  Criticism Contained in the Linsmeier Report

91.     In section X, paragraph 114 of his report, Dr. Linsmeier asserts the following:

> Mr. Barron fails to reconcile his opinions with the fact that EY issued an unqualified (*i.e.,* clean) audit opinion on FXCM's financial statements as of December 31, 2010 or those released during the Class Period.  EY also concluded that the regulatory settlements with the Commodities and Futures Trading Commission ("CFTC") and the National Futures Association ("NFA") did not have an impact on financial statements for the fiscal year ended on December 31, 2016 or on financial statements of previous fiscal years.

### B.  Response to Dr. Linsmeier's criticism - Summary

92.     First, there is no need to reconcile my opinions with the fact that E&Y issued unqualified audit opinions on FXCM's historical financial statements during the relevant periods.  As discussed in detail below, based on my review of the available E&Y audit working papers coupled with the testimony of the E&Y audit partner, E&Y's audit procedures did not include an evaluation of the relationship between FXCM and Effex for purposes of determining whether

Effex should have been considered a related party or whether Effex's financial statements should have been included in FXCM's consolidated financial statements.  Further, the procedures performed by E&Y in connection with FXCM's settlement with the CFTC and NFA did not include an independent analysis by E&Y of these two accounting issues.

### C.  Linsmeier Report Shows Lack of Knowledge of E&Y's Audit Procedures

93.     According to Appendix A to the Linsmeier Report, Dr. Linsmeier's experience in auditing consists of one year spent as an intern with Peat, Marwick, Michell & Company in 1976-1977.  The Linsmeier Report points to the testimony of Mr. Lande that, "EY never raised concerns about the relationship between FXCM and Effex … ."[84]  Dr. Linsmeier's testimony shows his lack of understanding of the audit process and the procedures performed by E&Y.  Dr. Linsmeier's position is essentially that in connection with the audit, FXCM either would have brought everything to the attention of E&Y or E&Y would have discovered the relevant facts in the course of carrying out its audit procedures.  This ignores the possibility that FXCM failed to communicate to E&Y a complete and full understanding of the nature of FXCM's relationship with Effex such that E&Y would be in a position to evaluate the relationship.  In fact, Dr. Linsmeier testified that based on his review of a management representation letter given by FXCM to E&Y, FXCM did not raise the issue with respect to Effex being a related party.[85]  Dr. Linsmeier testified that having seen the amount of revenues coming from Effex, it would cause E&Y to consider whether it was a related party transaction.[86]  Auditors rely primarily upon management to identify related parties and bring them to the auditor's attention.  Beyond inquiry and management representations, there would need to be something unusual about a transaction or transactions to cause an auditor to

---

[84] Linsmeier Report, par. 115.
[85] Linsmeier transcript 141:18-142:8.
[86] Linsmeier transcript 143:17-145:6.

question whether it was from a related party.  Based on my over 30 years' experience as an auditor, the simple fact that a significant amount of revenue was coming from one party would not cause an auditor to raise an issue with respect to related parties.  Dr. Linsmeier testified that he could not tell what actual procedures were performed by E&Y.[87]

### D. E&Y's Audit Procedures Did Not Address the FXCM Effex Relationship

94.     E&Y audit partner, David Stollow, testified that prior to the investigation by the NFA and CFTC, he had no recollection of E&Y inquiring specifically about whether Effex should have been disclosed as a related party or whether, during the years 2010 – 2013, E&Y considered whether FXCM should have been reporting its relationship with Effex as a potential VIE.[88]  Mr. Stollow testified that during the periods prior to the CFTC and NFA investigations E&Y was aware of Effex as a liquidity provider from a transactional perspective, but first became aware of the arrangement between Mr. Dittami and FXCM over the course of the NFA and CFTC communications in 2015 and 2016.[89]  Mr. Stollow testified that E&Y was aware of the payments for order flow in the service agreement, but prior to the time of the NFA and CFTC investigation, E&Y was not aware of the entire relationship.[90]

95.     The testimony of Mr. Stollow is consistent with what I found in reviewing E&Y's audit working papers covering the years ended December 31, 2011 through 2014.[91]  I found no documentation to show that E&Y evaluated FXCM's relationship with Effex for purposes of determining whether the financial statements of Effex should have been consolidated in FXCM's consolidated financial statements or whether Effex should be considered a related party.

---

[87] Linsmeier transcript 145:7-13.
[88] Stollow transcript 103:19-104:10, 107:6-107:15.
[89] Stollow transcript 114:14-115:7.
[90] Stollow transcript 118:17-119:4.
[91] I did not have access to E&Y's working papers supporting its audit opinions on FXCM's consolidated financial statements for the year ended December 31, 2010.

96.     FXCM management acknowledged its responsibility for the preparation and fair presentation of FXCM's financial statements (including disclosures) in conformity with GAAP.[92] In its management representation letter for the years ended December 31, 2011,[93] 2012, and 2013, FXCM management represented to E&Y that it had:  (1) appropriately identified variable interest entities ("VIEs"); (2) consolidated VIEs (where appropriate); (3) considered its related parties and de facto agents in making the determination as to whether a VIE should be consolidated; and (4) reconsidered the initial determination of whether an entity is a VIE and whether it is the VIE's primary beneficiary. Management also represented that it had disclosed to E&Y the identity of FXCM's related parties.[94]

97.     Based on the testimony of FXCM CFO, Robert Lande, quoted in Dr. Linsmeier's report, it appears that neither FXCM management nor E&Y discussed or raised any issue concerning the effect of FXCM's relationship with Effex on FXCM's financial statements in connection with E&Y's audit of FXCM's consolidated financial statements.  Mr. Lande testified that he could not recall E&Y coming to a conclusion regarding whether Effex needed to be considered a VIE or consolidated.  Mr. Lande testified that E&Y would have seen the revenue from order flow payments included in the general ledger and "If [EY] had a problem, trust me we would have known about it."[95]  This suggests that FXCM management did not raise the issue with E&Y in connection with E&Y's audits and that E&Y did not independently identify the relationship as an issue with respect to consolidation.  As discussed below, given the nature of E&Y's audit procedures, it is not surprising that E&Y did not identify an issue with respect to

---

[92] Management representation letters EY-GBI-WP-00002514;00000581; 00003019.
[93] The 2011 management representation letter dated March 15, 2012, covered the years ended December 31, 2010, and December 31, 2011
[94] EY-GBI-WP-00002518; 00002519;00002521; 00000583; 00000584; 00003024; 00003026.
[95] Linsmeier report, par.115.

either related parties or consolidation absent any disclosure of the nature of the relationship from FXCM management.

98.     As described below, with respect to related party transactions and possible consolidation of VIEs, E&Y's procedures consisted principally of inquiries and obtaining representations from management.

99.     In addition to information contained in E&Y's Summary Review Memoranda and related party memos, the only substantive audit documentation I could find related to transactions between FXCM and Effex consisted of recalculating order flow amounts invoiced by Effex based on reported volume and agreeing such amounts to FXCM's general ledger or journal entries.[96]

100.     E&Y's working papers included summaries of its procedures with respect to related parties.  The procedures consisted of obtaining lists of related parties from management, obtaining an understanding of management's process for identifying related parties and prohibiting certain transactions, reconciliations and verifications of recorded amounts with respect to identified related party transactions, review of board minutes, regulatory filings, responses from legal counsel and review of various audit working papers.[97]  Unless FXCM management had raised the issue with E&Y, these standard procedures would not have been expected to lead E&Y to evaluate the relationship between FXCM and Effex for purposes of determining whether Effex was a related party or whether Effex's financial statements should have been consolidated in FXCM's consolidated financial statements.

101.     I also reviewed E&Y's Summary Review Memoranda ("SRM") prepared at the conclusion of the audits for the years ended December 31, 2011, 2012, 2013, and 2014.  With

---

[96] EY-GBI-WP-0000372.  Similar procedures were documented in E&Y's workpapers for the 2012, 2013, and 2014 audits.  EY-GBI-WP-00002071; 0002207; 00003248.
[97] EY-GBI-WP-00000549-00000550; 000002059-00002061; 00002200-00002202; 00003076-00003078.  The language was substantially the same in each year.

respect to related party procedures, the SRMs I reviewed included the following:

> We have performed a search for related party transactions though the examination of the general ledger, inquiries of management, and Board of Director minutes.  We also verified that all related party activity is properly disclosed in the financial statements.  No material issues were noted.[98]

102.    With respect to income from order flow payments, the SRMs included the dollar amounts of order flow payments and percentages of total retail revenue and indicated that E&Y performed walkthroughs and tests of controls over retail trading process, including gaining an understanding of the various components of retail trading revenue including payments for order flow.  The SRMs contained no evaluation of the relationship between FXCM and Effex.

103.    In summary, I found no documentation in E&Y's audit working papers that I reviewed to show that E&Y evaluated FXCM's relationship with Effex for purposes of determining whether Effex's financial statements should be consolidated in FXCM's financial statements or that Effex should be considered a related party.

**E.  E&Y Memoranda Regarding CFTC and NFA Investigation and Settlement**

104.    I reviewed two E&Y memoranda, one dated February 21, 2017 (*Sufficiency Memo – FXCM Inc.'s Settlements with US Regulators*) written by E&Y's Fraud Investigation & Dispute Services ("FIDS") Practice,[99] and the other dated March 1, 2017 (*FXCM Inc.'s settlements with US Regulators*), drafted by an E&Y Partner and Senior Manager.[100]  The E&Y memo dated March 1, 2017 has as an attachment the "Order Instituting Proceedings Pursuant To Sections 6(c) and

---

[98] EY-GBI-WP 00000222-00000236 at 00000233; EY-GBI-WP-00002010-00002026 at 00002023; 00002452-00002475 at 00002471; 00003079-00003092 at 00003089.  The wording in the 2014 SRM differed slightly and included the following: "We believe that our strategy for identifying and testing related party transactions was appropriate. As a result of completing our procedures, we noted that all significant related party transactions related to other affiliates, including related broker-dealers, the Company's employees including officers and directors, and the Company's equity method investments were properly disclosed in the financial statements."
[99] EY-GBI-WP-00004317-00004321.
[100] EY-GBI-WP-00004260-00004271.

6(d) of the Commodities Exchange Act, Making Findings, and Imposing Remedial Sanctions" in

the matter of Forex Capital Markets, LLC, FXCM Holdings, LLC, Dror Niv, and William Ahdout,

dated February 6, 2017 (the "Order").[101]  It is noted that the Order did not specifically address the

financial statements of FXCM.  However, issues identified in the Order were essentially the same

as the issues in this case. [102]

105.    In its memo of March 1, 2017, E&Y described a portion of the regulatory

complaints which is exactly on point with this litigation — that Effex was functionally acting in

the capacity of a dealing desk for Forex:

> … As reflected in the complaints and associated settlement
> documents (the "Settlement Materials"), the CFTC and the
> NFA alleged that, during 2010-2014, Forex and FXCM Inc.
> management concealed its relationship with Effex, and that
> Effex functionally was acting in a capacity of a dealing desk for
> Forex. …[103]

106.    E&Y's March 1, 2017 memo contained the following description of the purpose of

the memorandum:

> **<u>Purpose of this memorandum</u>**
>
> This memorandum documents our evaluation of the settlements and
> allegations contained in the complaints, which noted instances of non-
> compliance with laws and regulations, including fraud (US APM 1.14).
>
> The issues to be addressed are:
>
> - whether there are any matters of illegal conduct or fraud that would
>   cause us to resign as auditor;
> - whether any matters had been raised through the process that would
>   indicate misstatements in financial statements of prior years;
> - whether we believe we remain in a position to rely on the
>   representations of those in management, specifically from those who
>   are the subject of the aforementioned settlements; and

---

[101] EY-GBI-WP-00004330-00004343.
[102] The CFTC Order was attached to the E&Y memo dated March 1, 2017 and referred to in that memo.  EY-GBI-WP-00004260-00004271.
[103] EY-GBI-WP-00004260-00004271 at 00004682.

- the impact of these matters on our risk assessment and audit strategy

107.   Based on the March 1, 2017 memo, E&Y's procedures consisted of meetings and discussions with management, the audit committee and Weil, Gotshal and Manges, LLP ("Weil"), and obtaining a legal letter and representation from the audit committee.[104]

108.   With respect to implications for FXCM's financial statements, described as an "Other matter" in the March 1, 2017 memo, E&Y noted that Weil's services were not performed specifically to focus on financial reporting, but Weil found "no indications of any matters of error, indications of concealment or management override" with respect to financial reporting.[105]   I place this into the category of negative assurance, as this was not Weil's focus.   Further, a law firm would not be knowledgeable in financial reporting matters such as the issues involved in this litigation and, again, this was not Weil's focus.

109.   E&Y's March 1, 2017, memo included a section titled *Impact on financial statements*.   With respect to the order flow payments reported by FXCM, E&Y noted that the arrangement for order flow "was included in the income statement," was "appropriately accounted for," and that it "followed the contractual parties to the arrangement."   The memo also noted that "the regulators, in the settlement, did not require any financial reporting to be revised (neither the Issuer nor Forex)."   Based on these considerations, E&Y concluded that "the previously issued financial statements for the Issue and Forex continue to be appropriate and are in accordance with US GAAP."

110.   Nowhere in this memorandum did E&Y discuss any procedures performed or reach any conclusion as to whether Effex should have been disclosed as a related party or whether FXCM

---

[104] EY-GBI-WP-00004264 - 4265.
[105] EY-GBI-WP-00004266.

was required under GAAP to consolidate Effex as a variable-interest entity.

111.    E&Y's memorandum dated February 21, 2017, prepared by E&Y's Fraud

Investigation & Dispute Services ("FIDS") unit, described the role of Weil as representing FXCM

in the matter, not acting as independent counsel:

> Management engaged Weil, Gotshal and Manges, LLP ("Weil") to advise and
> represent FXCM Inc., including FOREX, on these matters.  Weil was not retained
> to conduct an investigation into the facts and circumstances underlying the
> allegations included in the regulatory complaints and eventual settlements but was
> instead representing the Companies as counsel relative to these matters.  Weill has
> represented FXCM and Forex on prior matters and is therefore not acting as an
> "independent" party in evaluating the issues present here.[106]

112.    To summarize, neither of the E&Y memorandums provide an independent

assessment by E&Y of the two accounting issues that are the subject of this litigation. During the

course of its audits of FXCM's consolidated financial statements for the years ended December

31, 2010, through December 31, 2014, E&Y did not evaluate the relationship between FXCM and

Effex for purposes of determining whether Effex was a related party or whether Effex's financial

statements should have been included in FXCM's financial statements for any period.  Based on

the E&Y audit working papers and the testimony of E&Y audit partner David Stollow, these issues

were never discussed.   The procedures performed by E&Y in 2017 in connection with the

subsequent investigation and settlement with the regulators did not address the impact or

implications of the investigation or subsequent settlement on FXCM's previously issued financial

statements with respect to the two accounting issues relevant to this litigation.  Accordingly, there

was no need for me to reconcile my opinions with those of E&Y.

**F.  Management Memo Attached to the March 1, 2017, E&Y Memo**

113.    A memo dated March 14, 2017, prepared by FXCM management and titled

---

[106] EY-GBI-WP-00004317 -  4321 at 00004318 - 4319.  The same memo describes the retention of Sidley Austin
LLP ("Sidley") to advise the independent directors on the matter.

"Evaluation of Regulatory Matters & Impact on 2016 Financial Statements," was attached to

E&Y's March 1, 2017 memo. [107]

114.    With respect to the issue of VIE consolidation, the management memo included the

following:

> However, it is not reasonable to conclude that FXCM had the power over Effex.
> Power means having the ability, through voting rights or similar rights, to direct the
> activities of a legal entity that most significantly impact the entity's economic
> performance (e.g., the entity's revenues, expenses, margins, gains and losses, cash
> flows, financial position).  Significant activities may include purchasing or selling
> significant assets, incurring additional debt, making acquisition and/or divestiture
> decisions or determining the strategic operating direction of the entity.
>
> FXCM had no Board representation, no equity or voting interests, no management
> representation or rights and had only committed to providing Effex connectivity to
> its platform in return for a certain $/million of volume traded for volume executed
> by Effex through a service agreement. It would not appear that FXCM had power
> over Effex and not consolidating was appropriate.

115.    Management's conclusion with respect to the VIE consolidation issue was narrowly

focused on board representation, voting interests, and management representation, acknowledging

only that an agreement for order flow existed.  Management failed to consider the nature of the

arrangement between the parties and Effex's near total reliance upon FXCM, especially when

FXCM first became involved with Effex, the very point in time that a determination with respect

to the VIE issue was required to be made.

116.    With respect to the related party disclosure issue, the management memo included

the following:

> In these cases, Effex did not account for a substantial portion of the revenue
> of FXCM and while it did on occasion account for a significant amount of
> volume, this was a function that could be easily replaced with the other
> market makers pricing into the FXCM pricing flow. Looking at the other
> side, while FXCM did account for a substantial portion of Effex's revenues
> and volumes, it was by no means the only trading venue that Effex operated.

---

[107] EY-GBI-WP-00004035 - 4041.

> Effex's algorithms were developed to price foreign exchange and Effex
> traded at other retail FX operators and institutional FX venues. While
> FXCM and Effex would on occasion have conversations and renegotiate the
> price of which Effex would trade with FXCM, it cannot be said that FXCM
> could have prevented Effex from fully pursuing its own separate interest. In
> fact, since Effex has been terminated completely from pricing FXCM, it
> continues to trade and operate on the other providers and venues with which
> it has a relationship.

117.    I take issue with a number of points in management's memo.  First, by focusing on the impact of the order flow payments on FXCM's revenues, management totally ignored the fact that the order flow payments from Effex represented 25% of FXCM's pre-tax income.  If any company were suddenly to lose 25% of its pre-tax income, there is no question that this would make a difference to users of the financial statements.  With respect to the financial impact on Effex, to say that FXCM was not the only trading venue on which Effex operated, grossly understates the significance of Effex's revenues generated from FXCM, starting at 100% and still at 90% in the second year.  With respect to the termination of the services agreement in August 2014, management's memo fails to point out that the termination of order flow payments by Effex to FXCM was caused by a position taken by a UK regulator and that FXCM continued to route trades to Effex following the termination of the services agreement.  Mr. Dittami testified that Effex benefited substantially from not having to make payments for order flow.[108]  Thus, Effex continued to benefit from its relationship with FXCM even after termination of the services agreement.

JOHN E. BARRON, CPA                                        July 12, 2021

---

[108] Dittami CFTC deposition transcript 347:15 – 348:10.

Exhibit A

## CURRICULUM VITAE

## JOHN E. BARRON, CPA

### Consulting Expert, Arcadia Consulting, LLC, NY, November 2020 to present

Expert services related to the application of PCAOB standards and the application of generally accepted accounting principles.

### Director of Quality Control, Frost, PLLC, Little Rock, AR, November 2016 to present

Responsibilities as director of quality control include oversight of the firm's assurance practice with respect to compliance with AICPA and PCAOB quality control standards. Responsibilities include development of quality control policies, oversight of PCAOB and AICPA Peer Review inspections, conducting annual internal inspections of selected engagements for compliance with applicable standards, performing detailed second partner reviews of a majority of the firm's audit and attest engagements, consulting on accounting technical matters, and conducting internal training.

### Sole Practitioner, litigations services, April 2014 to November 2016

Expert services, including testimony on behalf of the Enforcement Division of the Securities and Exchange Commission on three matters related to the application of PCAOB standards and the application of generally accepted accounting principles.

### Marks Paneth LLP, CPAs, New York, Director, Litigation Services, February 2003 to April 2014

Expert services, including testimony, on behalf of the SEC, PCAOB and private legal counsel in matters related to financial reporting, application of generally accepted accounting principles, and PCAOB audit standards.  Industries included banking, real estate, securities, and financial services.  The two most significant cases involved a $12 billion restatement by Fannie Mae involving its accounting for derivative instruments, and litigation involving a Madoff "feeder fund".

### Adjunct professor of accounting – Baruch College, New York, 2008 – 2012

Instructed undergraduate courses in financial accounting, auditing, and managerial accounting

### Deloitte LLP, Atlanta, GA and New York, NY - Audit Partner (1990 – 2003); Audit Senior Manager (1987 to 1990)

Rejoined the firm in 1987 as a senior manager in the firm's Atlanta office, admitted to the partnership in 1990 and relocated to the firm's New York office in 1998, specializing in financial services, real estate, mortgage investments, construction, and private and public investment funds. Clients included Fortress Investments, MetLife, Equitable Life, Kajima Construction, various Morgan Stanley and Merrill Lynch private investment funds, and four publicly traded real estate investment trusts. Was designated a financial instruments specialist to assist with implementation of accounting for derivative instruments and hedging activities.

**Exhibit A**

**<u>Private real estate investment company - June 1976 to August 1987</u>**

Chief Financial Officer of privately owned real estate investment firm specializing in the acquisition and sale of commercial properties subject to net leases.

**<u>Haskins & Sells, Atlanta, GA, June 1970 to June 1976</u>**

Began on audit staff, promoted to audit manager in 1975. Clients industries included broadcasting, construction, savings and loan associations, and a publicly traded real estate investment trust.

**<u>Education</u>**

University of Florida - B.S. in Business Administration-Accounting, with Honors, June 1970

**<u>Testimony during the prior four years</u>**

Terrorist Attacks on September 11, 2001, deposition on April 29, 2021.  Case No. 03-MDL-1750 (GBD) (SN) (SDNY).

Deposition on June 11 and June 12, 2019 in the American Realty Capital Properties, Inc. Litigation. United States District Court for the Southern District of New York.  Civil Action No. 1:15-mc-00040-AKH.

**<u>Publications authored in previous ten years</u>**

"Owner-Manager Fraud," White-Collar Crime Fighter, April 2012

**Exhibit B**

# DOCUMENTS, TESTIMONY AND OTHER MATERIALS CONSIDERED

**Legal Filings:**

- February 17, 2017 Class Action Complaint for Violations of the Federal Securities Laws.
- June 19, 2017 Consolidated Securities Class Action Complaint.
- April 6, 2018 Second Amended Consolidated Securities Class Action Complaint.
- March 28, 2019 Opinion and Order.
- April 17, 2020 Third Amended Consolidated Securities Class Action Complaint.
- September 21, 2020 Plaintiffs' Mediation Statement (including exhibits).
- February 18, 2021 Plaintiff's Second Amended Responses and Objections to Defendants' Interrogatories 1-6.
- March 18, 2021 Report and Recommendation to The Honorable Ronnie Abrams.

**Depositions:**

- December 9, 2020 deposition of Joshua Rosenfeld (including exhibits).
- January 14, 2021 deposition of Robert Lande (including exhibits).
- January 21, 2021 deposition of John Dittami (including exhibits).
- January 25, 2021 deposition of David Stollow (including exhibits).
- February 11, 2021 deposition of Dror (Drew) Niv (including exhibits).
- February 16, 2021 deposition of William Ahdout (including exhibits).
- June 30, 2021 deposition of Thomas Linsmeier, Ph.D. (including exhibits).
- April 7 - 8, 2016 CFTC deposition of John Dittami.
- May 19, 2016 CFTC deposition of William Ahdout.
- May 25 - 26, 2016 CFTC deposition of Dror (Drew) Niv.

**Reports of Other Experts:**

- June 10, 2021 Expert Report of Thomas Linsmeier, Ph.D.

**FXCM's SEC Filings:**

- December 1, 2010 Notice of Effectiveness.
- December 1, 2010 Form S-1/A.
- December 3, 2010 Final Prospectus.
- 2010 – 2016 Forms 10-K (including amended filings, if any).
- Q1 – Q3 Forms 10-Q for 2011 – 2016 (including amended filings, if any).

**Other Materials:**

- SAB 99 - Materiality.
- Relevant sections of the Accounting Standards Codification, including:
  - ASC 105 – Generally Accepted Accounting Principles.
  - ASC 810 - Consolidation.
  - ASC 850 - Related Party Disclosures.

**Exhibit B**

- ARB 51, Consolidated Financial Statements.
- FIN 46, Consolidation of Variable Interest Entities an interpretation of ARB No. 51.
- FIN 46 (R), Consolidation of Variable Interest Entities an interpretation of ARB No. 51.
- SFAS 167, Amendments to FASB Interpretation No. 46(R).
- Con 2 - Qualitative Characteristics of Accounting Information.
- Con 8 - Chapter 1, Chapter 1, The Objective of General Purpose Financial Reporting, and Chapter 3, Qualitative Characteristics of Useful Financial Information (a replacement of FASB Concepts Statements No. 1 and No. 2).
- PCAOB AS 11 - Consideration of Materiality in Planning and Performing an Audit.
- PCAOB Auditing Standards.
- SEC Regulation S-X. 17 C.F.R. § 210.4-01(a)(1).
- www.fxcm.com/markets/about-fxcm/liquidity-providers/ (March 5, 2021).

**Documents:**[1]

E Capital-000001 through E Capital-000119, inclusive.

EY-GBI-WP-00000001 through EY-GBI-WP-5872, inclusive.

| | | |
|---|---|---|
| GLBR_00002696 | GLBR_00125000 | GLBR_00189350 |
| GLBR_00004262 | GLBR_00125001 | GLBR_00189352 |
| GLBR_00005534 | GLBR_00125008 | GLBR_00189371 |
| GLBR_00007733 | GLBR_00125009 | GLBR_00189377 |
| GLBR_00008068 | GLBR_00125012 | GLBR_00194774 |
| GLBR_00008069 | GLBR_00125014 | GLBR_00194776 |
| GLBR_00022930 | GLBR_00125304 | GLBR_00218039 |
| GLBR_00028063 | GLBR_00135452 | GLBR_00218043 |
| GLBR_00028840 | GLBR_00152107 | GLBR_00218789 |
| GLBR_00041735 | GLBR_00152760 | GLBR_00022930 |
| GLBR_00046387 | GLBR_00152765 | |
| GLBR_00054006 | GLBR_00152767 | |
| GLBR_00054454 | GLBR_00184107 | |
| GLBR_00062622 | GLBR_00184113 | |
| GLBR_00103994 | GLBR_00184115 | |
| GLBR_00118420 | GLBR_00184132 | |
| GLBR_00110416 | GLBR_00184136 | |
| GLBR_00110420 | GLBR_00184140 | |
| GLBR_00110697 | GLBR_00185174 | |
| GLBR_00110713 | GLBR_00185332 | |
| GLRB_00120647 | GLBR_00188104 | |
| GLBR_00121206 | GLBR_00188166 | |
| GLBR_00124229 | GLBR_00189008 | |
| GLBR_00124982 | GLBR_00189079 | |
| GLBR_00124984 | GLBR_00189088 | |

---

[1] In certain instances, the Bates number listed is the first page of a range.