# Exhibit 4

Page 1

UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF NEW YORK

In re:                            :
                                  : Master File No.
Global Brokerage, Inc.   : 1:17-cv-00916-RA
F/k/a FXCM, Inc.            :
Securities Litigation     :
-----------------------   :

** CONFIDENTIAL **

REMOTE VIDEO DEPOSITION OF:
JOHN E. BARRON, CPA
MONDAY, JUNE 7, 2021

REPORTED BY:
SILVIA P. WAGE, CCR, CRR, RPR

Page 66

CONFIDENTIAL - JOHN E. BARRON, CPA

2 Q. Are you aware that the metadata
3 indicates that this document also was an in E&Y's
4 2011 work paper files?
5     A. Yes.
6     Q. And this is an agreement for services
7 between Effex and FXCM, correct?
8     A. Yes.
9     Q. Okay. And if you look at this -- now
10 this was an amendment to the service agreement,
11 correct?
12    A. I know it was amended. I don't know
13 whether this is the original or the amended one.
14    Q. It says on top, "amendment to service
15 agreement."
16       Do you see that?
17    A. Okay, right.
18    Q. Okay. And in the second where --
19 first whereas clause, "Effex and FXCM entered
20 into a service agreement as of May 1st, 2010
21 agreement."
22       Do you see that?
23    A. Yes.
24    Q. And it says, "The parties wish to
25 modify and amend that agreement," correct?

Page 67

CONFIDENTIAL - JOHN E. BARRON, CPA

2    A. Yes.
3    Q. Okay. And they amend Section 3.1 the
4 first sentence to read as follows, correct?
5    A. Um.
6       MR. LaPOINTE: Object to the form of
7 the question.
8    A. I'm sorry. I didn't mean to
9 interrupt. I was looking for 3.1.
10   Q. No, no.
11      Do you see that it says in No. 1,
12 "The first sentence of Section 3.1 is deleted and
13 shall be replaced with the following"? Do you
14 see that?
15   A. Yes.
16   Q. And they're referring to Section 3.1
17 that was Section 3.1 in the original agreement,
18 correct?
19   A. Yes.
20   Q. Okay. And do you recall that the
21 original 3.1 had -- that fee amount would be $21
22 per million?
23   A. Yes, that's my recollection.
24   Q. Now, they're changing it to $16 per
25 million, correct?

Page 68

CONFIDENTIAL - JOHN E. BARRON, CPA

2    A. Yes.
3    Q. And it says, "FXCM shall receive from
4 Effex a fee equal to $16 per 1 million units of
5 base currency for the aggregated volume of
6 transactions executed via the trading system
7 fees."
8       Do you see that?
9    A. Yes.
10   Q. Okay. So the fees that FXCM was to
11 agree were determined by the volume of
12 transactions on the trading system, correct?
13   A. That's right.
14   Q. Okay. Do you see anywhere in this
15 document that it says that the fee amount would
16 be based on how much profit or loss Effex made on
17 a particular trade?
18   A. This document doesn't refer to it,
19 but I'm, certainly, aware of other information
20 that would indicate this was considered in the
21 ballpark so-to-speak of the 70/30.
22   Q. I didn't ask you that. I asked you a
23 very simple.
24      Does it say in here -- okay, we'll
25 start with that.

Page 69

CONFIDENTIAL - JOHN E. BARRON, CPA

2       Does it say in here that Effex will
3 pay 70 percent of the profits that it makes on
4 the trade? Does it say that?
5    A. No.
6    Q. Okay. Does it say that in the
7 service agreement that Effex will pay 70 percent
8 of its profits it makes on the trade? Does it
9 say that in the service agreement, yes or no?
10   A. No.
11   Q. Okay. Does it say in this agreement
12 that FXCM will be responsible for losses that
13 Effex incurs on a trade?
14   A. No.
15   Q. Does it say that in the service
16 agreement?
17   A. No.
18   Q. Let's look at another document,
19 EY-GBI-WP 1808.
20   A. 1808? Okay.
21   Q. It will have a nine next to it,
22 sorry, yes.
23   A. I have it.
24   Q. Okay.
25      (Deposition Exhibit 9, 3/19/12

| Page 130 | Page 132 |
|---|---|
| CONFIDENTIAL - JOHN E. BARRON, CPA | CONFIDENTIAL - JOHN E. BARRON, CPA |

Page 130

1  CONFIDENTIAL - JOHN E. BARRON, CPA
2  hundred percent to 90 percent of their business
3  was coming from FXCM. They couldn't find any
4  other customers until probably after 2011. After
5  2011, I think, it would be fair to say that Effex
6  was able to look for other customers that were
7  external versus FXCM, which was internal.
8      Q. Okay, sir.
9         Are you aware that Effex had
10 relationships and provided liquidity, FX
11 liquidity to, approximately, 30 other
12 counterparties?
13     A. I don't know the number. I know it
14 was less than majority, significantly less than
15 majority of the --
16     Q. Sir, how about you -- listen, I know
17 however your Counsel prepared you, because you'll
18 look like a fool at the trial if you give answers
19 like this. But just answer the questions I'm
20 asking. You don't have to put in your spin that
21 you want, sir.
22     MR. LaPOINTE: Objection.
23     Q. It's a simple question.
24     MR. LaPOINTE: Objection to the form
25 of the question.

Page 131

1  CONFIDENTIAL - JOHN E. BARRON, CPA
2      Q. It's a simple question.
3      MR. LaPOINTE: Objection to
4  badgering.
5      MR. DAHAN: Just object to the form.
6         Okay, very good.
7      Q. Okay, simple question, sir.
8         Did Effex provide liquidity to,
9  approximately, 30 other counterparties, yes or
10 no? Do you see any of that testimony in the
11 record?
12     A. Would you please specify what dates
13 or periods you're talking about?
14     Q. By 2014.
15     A. By the end or August of 2014, I don't
16 know how many other. I know it was a lot less
17 than the majority.
18     Q. Okay. And that's your recollection
19 of the record, sir?
20     A. Absolutely.
21     Q. Okay. You said you read the exhibits
22 of Mr. Dittami's deposition, at least, according
23 to your report, right, sir?
24     A. Can you -- excuse me -- repeat that
25 question?

Page 132

1  CONFIDENTIAL - JOHN E. BARRON, CPA
2      Q. Sure. In your report, you state that
3  you also reviewed the exhibits that were
4  introduced at Mr. Dittami's deposition.
5      A. Yes.
6      Q. Okay. Are you aware from Mr.
7  Dittami's deposition that Effex after sometime in
8  20 -- after 2017 settlement -- I'm sorry.
9         Are you aware that Effex sued the
10 NFA?
11     A. I'm sorry. I didn't hear that last
12 part of the question.
13     Q. Sure. Are you aware that after FXCM
14 settled with the regulators in 2017, Effex sued
15 the NFA? Are you aware of that?
16     MR. LaPOINTE: Object to the form of
17 the question.
18     A. You know, I don't recall that.
19     Q. No?
20     A. It was not part of my assignment to
21 look at those outside the scope of what I looked
22 at.
23     Q. Did you look at the exhibits that
24 were introduced at Mr. Dittami's deposition, sir?
25     A. I looked at -- yeah, I would have

Page 133

1  CONFIDENTIAL - JOHN E. BARRON, CPA
2  looked at the exhibits.
3      Q. Did you read his deposition
4  testimony? Do you know if he was asked about
5  that at his deposition?
6      A. I don't recall.
7      Q. Okay. Well, let's look at an exhibit
8  from Mr. Dittami's deposition that you allegedly
9  looked at. Let's look at what was Exhibit 71.
10     A. Okay. What number would that be on
11 my screen?
12     Q. That will come up as No. 15 and it
13 says, "John Dittami 71.pdf."
14        Do you see that?
15        (Deposition Exhibit 15, Affidavit of
16 John Dittami signed 1/6/17 and attachments, was
17 marked for identification.)
18     A. Let me refresh it and see.
19        Oh, yeah, got it now; okay.
20     MR. DAHAN: This was -- so the record
21 is clear for purposes of today's deposition, this
22 is Exhibit 15. This was also Exhibit 71 at the
23 deposition of John Dittami.
24     Q. Sir, do you recall reviewing this in
25 connection with your report?

Page 134

CONFIDENTIAL - JOHN E. BARRON, CPA

 1
 2  A. Not specifically. I don't recall.
 3  Q. Do you know what an "affidavit" is?
 4  A. Well, I'm not a lawyer, but I think I
 5  have an understanding of it.
 6  Q. Do you have an understanding that
 7  those are statements made under oath and are
 8  subject to penalty of perjury?
 9  A. I believe that's true, yeah.
10  Q. Okay. Are you aware that Mr. Dittami
11  was asked about this affidavit at his deposition
12  in this case?
13  A. No, I don't recall that part of his
14  deposition.
15  Q. I bet you don't.
16      And do you recall that I asked him
17  questions about this very affidavit during his
18  deposition in this case?
19  A. No, I don't.
20  Q. Alright. Are you aware of whether
21  Mr. Dittami has been accused of perjury in
22  connection with this affidavit?
23  A. No, I don't recall that.
24  Q. Okay. Do you see where Mr. Dittami
25  says in Paragraph 4, sir...

Page 135

CONFIDENTIAL - JOHN E. BARRON, CPA

 1
 2  A. Oh, I'm at four.
 3  Q. Do you see in the beginning he talks
 4  about how "on or about March 23rd, 2010 FXCM and
 5  I formally terminated the agreement," and he's
 6  referring to his employment agreement, correct?
 7  A. Right.
 8  Q. Okay. And then he goes and says in
 9  the middle of that paragraph, "At that time, I
10  also decided to form an entity Effex that would
11  stream foreign currency prices and provide
12  foreign currency execution services to FXCM as
13  well as to other forex counterparties."
14      Do you see that sentence?
15  A. I'm catching up with you here.
16      Okay, let me read it just for a
17  second.
18      Okay, I saw that sentence, yes.
19  Q. Okay. So he says that he decided to
20  form Effex "to provide streams of foreign
21  currency prices and foreign currency execution
22  services to FXCM, as well as to other forex
23  counterparties."
24      Do you see that?
25  A. I see what it says here.

Page 136

CONFIDENTIAL - JOHN E. BARRON, CPA

 1
 2  Q. Okay. And do you have any reason to
 3  say that he's lying?
 4  A. I can't call, you know, Mr. Dittami a
 5  liar. I know that from the documents and
 6  testimony I reviewed, it was FXCM's decision to
 7  discontinue the activities under EES because of
 8  the problem it would create with their
 9  disclosures. So I believe it was FXCM's decision
10  to go out and form Effex.
11  Q. Okay. So they could decide to stop
12  doing business, but you can't see a difference
13  between then who decides to form events.
14      Have you seen any testimony -- we'll
15  go back, sir.
16      Cite me any person who has testified
17  in this case, not your interpretation, not your,
18  you know, your assertion, someone in this case
19  whose testified that Effex was created by FXCM?
20      Can you cite me a person --
21      MR. LaPOINTE: Objection to form.
22  Q. -- who questioned like that, sir?
23  A. I think I've answered that already.
24  Q. Right. Okay, sir.
25      If you go to Paragraph 7, sir, Mr.

Page 137

CONFIDENTIAL - JOHN E. BARRON, CPA

 1
 2  Dittami says under oath the following.
 3      Paragraph 7, you with me, sir?
 4  A. Yes.
 5  Q. "Shortly after its formation, Effex
 6  began operating as a forex liquidity provider
 7  utilizing the trading system and algorithms
 8  developed by me. Within a few months Effex, one,
 9  reimbursed FXCM with Effex investment in
10  May 2010."
11      Do you state that fact in your
12  report, sir?
13  A. I don't recall whether I did or did
14  not.
15  Q. Okay. "Two, ceased using the credit
16  facility made available to Effex by FXCM through
17  the above referenced prime to prime customer
18  account in June 2010."
19      Do you see that, sir?
20  A. Yes.
21  Q. "Three, entered into a prime broker
22  agreement with Citibank in July 2010."
23      Do you see that, sir?
24  A. Yes.
25  Q. Do you state those facts of Roman II

35 (Pages 134 - 137)