# Exhibit 10

COMMODITY FUTURES TRADING COMMISSION

---------------------------------------------X

IN THE MATTER OF:

RETAIL FOREX FRAUD

---------------------------------------------X

140 Broadway
New York, New York

May 25, 2016
9:39 A.M.

DEPOSITION of DREW NIV, the witness herein, taken by the Commodity Futures Trading Commission, pursuant to Agreement, held at the above-noted time and place, before a Notary Public of the State of New York.



A P P E A R A N C E S :

COMMODITY FUTURES TRADING COMMISSION
DIVISION OF ENFORCEMENT
140 Broadway - 19th Floor
New York, New York 10005
BY: DAVID C. NEWMAN, ESQ.
XAVIER ROMEU-MATTA, ESQ.
BRENT TOMER, ESQ.
CHRISTOPHER M. GIGLIO, Investigator

WEIL, GOTSHAL & MANGES, LLP
Attorneys for Witness
767 Fifth Avenue
New York, New York 10153
BY: CHRISTOPHER L. GARCIA, ESQ.
RAQUEL KELLERT, ESQ.
ZOE DELUZIO, ESQ.



o0o

MR. NEWMAN: We are on the record. It's 9:39 a.m. on May 15th, 2016.

Can you swear in the witness, please.

D R E W N I V,

having been duly sworn by a Notary Public for the State of New York, testified as follows:

EXAMINATION

BY MR. NEWMAN:

Q Can you please state and spell your full name for the record.

A Sure. My name is Dror Niv, D-r-o-r.

Q And you also go by Drew?

A Drew, correct.

Q D-r-e-w?

A Correct.

Q Can you tell me your full address, please?

A 78 Pecksland Road, Greenwich, Connecticut 06831.

Q My name is David Newman. I am here with my colleagues, Brent Tomer, Chris Giglio, Xavier Romeu-Matta. Xavier, Brent and I are attorneys, with the Division of Enforcement of the



Drew Niv

Commodities Futures Trading Commission, the CFTC. Chris is an investigator also with the Division. For purposes of this proceeding, we are all officers of the Commission.

This is an investigation by the CFTC in the matter of Retail Forex Fraud to determine whether there have been violations of certain provisions of the Commodities Exchange Act and the Commission's regulations. The facts developed in this investigation might also constitute violations of other laws, federal, state, civil or criminal.

You are represented by counsel here; is that right?

A Yes.

MR. NEWMAN: Can counsel please identify yourselves for the record.

MR. GARCIA: Christopher Garcia from Weil, Gotshal & Manges on behalf of the witness and FXCM.

MS. KELLERT: Raquel Kellert from Weil, Gotshal & Manges on behalf of the witness and FXCM.

MS. DELUZIO: Zoe Deluzio from Weil,

Drew Niv

because of competition, and market conditions changed dramatically, which obviously did happen over the years.

Q That would be related to his P&L per million, right, the change in competition or market conditions?

A Yes.

Q Is there anything besides a change in his P&L per million that you contemplated could cause an adjustment in the payments for order flow?

A Not that I recall.

Q As far as you can recall, were there any discussions within FXCM including with the compliance department about this arrangement of setting the payment for order flow at $21 per million with the idea of adjusting it if Effex's P&L went up or down?

A Compliance was involved in obviously all, essentially we were trying to mimic what happened, you know, in other arrangements in equities where there were standards already set for this, and obviously as in equities, as for example, options used to have lots of payment for



Drew Niv

order flow, as there's lots of more exchanges and competition, proliferation of exchanges and big increase in competition, those spreads narrowed and therefore the payment for order flow payments went down. Happened in options, happened in equities, contemplated that would happen here, that's not abnormal.

Q So you had discussions internally at FXCM including with compliance personnel about the idea that this adjustable payment for order flow would be appropriate because it's similar to what's been done in other -- with payment for order flow in other markets?

A Correct.

Q Do you recall anyone in particular who was involved in making that point or discussing that point with you?

A It was the same crowd we were discussing.

Q And do you recall any e-mails or memos or other documents where that point may have been discussed?

A It's too long ago to remember the details.



Drew Niv

Q There may have been, there may not have been, you are not sure either way?

A Correct.

Q Isn't it the case that FXCM had an equity interest in Effex?

A No.

Q Did FXCM have an option to buy a portion of Effex Capital?

A One of the contemplated negotiating things we did, but we did not do a deal.

Q To your recollection, when in the process was it contemplated?

A Like I said over -- between 2010 and 2012 we went through a bunch of permutations and a bunch of deliberations whether to do this or not. Ended up buying Lucid instead of Effex, and that was the end of that.

Q Do you recall if it was something that was considered at this same time that Effex was being formed in the first part of 2010?

A I don't recall the exact specifics because I think William did more of the negotiating and all of that and came up with lots of different ideas and had lots of conversations.



Drew Niv

We never implemented the options agreement or anything else. We had a rolling series of discussions and negotiations depending what was going on at the time about these issues, but it never came to pass, never happened.

Q So let me take that one part at a time. You have a recollection that an options agreement was drafted in the time period before Mr. Dittami resigned from FXCM?

A I don't remember the time period. I do recall the option agreement and I do recall talking about the option agreement.

Q Do you recall whether it was around the time that Mr. Dittami was preparing to leave FXCM?

A I don't recall the time. It is too long ago for me to recall the exact time. I know that one exists and I know we spoke about it. It was one of those things where compliance said the option would make it look, you know, essentially that's not the conservative read of what we would want to do and therefore should not happen.

Obviously this was certainly early on in the process, not exactly before he left. But early on before the company had more customers and

was worth more. He was clearly within a year later he was worth a lot more than that and we couldn't do that.

MR. GARCIA: Can we take a break?

MR. NEWMAN: Sure, we can take a break. Off the record. The time is 3:01.

(Brief recess, 3:01 - 3:19 p.m.)

MR. NEWMAN: Back on the record at 3:19 p.m.

Please mark this.

(Option Agreement was marked Deposition Exhibit 10 for identification.)

BY MR. NEWMAN:

Q Mr. Niv, I am going to hand you what's been marked Exhibit 10, it is titled Option Agreement. Do you recognize this document?

A Yes.

Q What is it?

A It's the contemplated option agreement with FXCM.

Q You see it's dated April 14, 2010?

A Yes.

Q Just to be clear, that's the date that





Mr. Dittami tendered his resignation from FXCM?

A Yeah.

Q Did you -- I take it you saw this document in your preparation for this deposition?

A Yes.

Q Prior to seeing it in your preparation, had you seen this before?

A I don't believe so.

Q Were you aware that there was an option agreement dated April 14th?

A Yes, I was aware there was an option agreement, not what date it was.

Q Were you aware that it was dated approximately April 14, 2010? In other words, around the time of Mr. Dittami's departure from FXCM?

A I don't recall that information. Like I say, I know that we had contemplated, you know, we discussed this, so I knew about the option agreement because we discussed this as an option that there would be an option agreement. But I don't recall the dates and specifics.

Q Looking at the second page of the document, do you agree it appears to be executed





by John Dittami as well as by William Ahdout for Forex Capital Markets LLC?

A I know that this document is signed but it was not executed.

Q Can you explain the difference?

A When I say -- we did not consider this valid.

Q When you say you didn't consider it valid, I guess I'm a little confused because you testified a minute ago that you weren't aware that an option agreement had been signed as of this date, April 14, 2010.

A Like I said, I was aware we were having discussions about, you know, using the option of having an option agreement, you know to potentially make it easier to own or buy Effex Capital down the road. We rejected that option and I know we did not go forward with it.

Q Do you recall when was the timing of the decision not to go the route of entering into an option agreement?

A I don't recall the specifics. I know that I -- compliance said no, so I said no, and this never came to the board for approval or





anything like that.

BY MR. LATORRE:

Q Just to be clear, Mr. Ahdout is an authorized signatory of FXCM?

A Yes, he is. But this would be a board of directors of the company would have to approve. Couldn't sign it.

Q Who were the board of directors of Capital Markets LLC in 2010?

A The holding company founders, FXCM, plus a bunch of external directors.

Q Mr. Ahdout was a director at the time?

A One of the directors, yes.

BY MR. NEWMAN:

Q He was a director of the holding company?

A Yes, the sub does not have a board.

Q I see. So you are saying your opinion is that, your view is that for the sub to enter an agreement like this it would have had to be approved of by directors of the holding company?

A It's a division of the company. Like the holding company is the company, U.S. branch, for lack of a better word, is a division of the

Drew Niv

company.

Q I get that. I am just -- my question was more, in your view, this is something that Mr. Ahdout wouldn't have authorization to do without a vote of the directors?

A Without board consent, correct.

Q Is that based on something in the bylaws of FXCM or is it more based on just your understanding and your informal understanding among partners what you are permitted to do?

A There were other shareholders by that time so there's external directors representing those shareholders. Some of those external shareholders were also on the board representing all the external nonfounder shareholders. And the agreement and understanding with everyone was that if we were going to buy something, this is not a normal day-to-day operation, the decision. If we were going to buy a company we obviously run it by them.

Q That understanding would apply to either buying a company or entering an option agreement to have the option to buy a company?

A That would be a precursor.



Drew Niv

Q It would be treated the same way for purposes --

A Right. It is largely the same. Obviously it is not the same thing but it's, you know, there's the potential for us to buy at that point and we would need to run that by them.

BY MR. ROMEU-MATTA:

Q Was this understanding put in writing in bylaws of FXCM Holding?

A I don't recall the specifics of the bylaws but you know, we have everything changed after the IPO. And but you couldn't just do -- this would be too big for someone to do by themselves.

Q So your testimony essentially is that William Ahdout shouldn't have signed the document we are looking at at this point in time?

A Again, he signed it for expediency. He thought this would get approved, he thought it was just an option agreement and not really a big thing. Obviously compliance and legal said this is not something that we should be entering into, so we canceled it.

Q Did you have a conversation with William



Drew Niv

Ahdout about signing this document?

A I had a conversation about canceling it.

Q Could you tell me what the conversation was?

A That compliance said that we can't do that.

Q And the basis for compliance's position that he could not do that was what?

A They have a conservative stance, this would essentially make it appear that we have control over that.

Q I guess I'm not understanding compliance was not saying that William Ahdout could not sign this document, they were saying they wanted to be more conservative in approach?

A They would not approve this, us having an option agreement.

BY MR. TOMER:

Q During this conversation was it known that there was a signed agreement in place?

A When we were discussing the option agreement, initial discussion -- again, these were all discussions, multiple meetings, initial discussion with no conclusion reached yet, William



Drew Niv

sort of was negotiating all of these things because there were a bunch of documents being done at the same time. He obviously rushed into this and we in subsequent discussion came to the conclusion this is not something that was going to be approved and therefore if it's not approved this document did not get carried out.

BY MR. ROMEU-MATTA:

Q You say "we" in subsequent discussion. Who are you referring to?

A The same people who were involved. Partners of FXCM plus compliance, legal, you know, top executives.

Q Was this understanding reduced to writing?

A I'm sure we have it somewhere. I don't recall. Again, this is too long ago to recall every little thing but we certainly have had, if you look at discussions post this, we have had discussions with John about buying Effex and about doing that afterwards, you know, so there's still negotiations. If we had this option agreement we --

Q Would discussions be also found in some