# Exhibit 12

Page 1

```
 1
 2           UNITED STATES DISTRICT COURT
           FOR THE SOUTHERN DISTRICT OF NEW YORK
 3
       In re:                     :
 4                                : Master File No.
       Global Brokerage, Inc.     : 1:17-cv-00916-RA
 5     F/k/a FXCM, Inc.           :
       Securities Litigation      :
 6     ----------------------     :
 7                 CONFIDENTIAL
 8          REMOTE VIDEO DEPOSITION OF:
 9                   DROR NIV
10          THURSDAY, FEBRUARY 11, 2021
11
...
24     REPORTED BY:
       SILVIA P. WAGE, CCR, CRR, RPR
25
```

|  | Page 118 |  | Page 120 |
|---|---|---|---|
| 1 | CONFIDENTIAL - DROR NIV | 1 | CONFIDENTIAL - DROR NIV |
| 2 | A. Yes. | 2 | at people, you know, that's why we have lawyers |
| 3 | Q. Okay. Please take a minute to review | 3 | internally. That's their job. |
| 4 | this document. | 4 | Q. Were you aware of anything in writing |
| 5 | MR. BAKER: For the record, | 5 | that rendered this agreement "null and void"? |
| 6 | Exhibit 37 is E Capital 50, 5-0. | 6 | A. No, I don't do the details. |
| 7 | Q. Mr. Niv, let me know when you've had | 7 | Q. Looking at Paragraph 1 of this |
| 8 | a minute to review. | 8 | document about halfway down the first page, is it |
| 9 | A. I know this agreement, you know. | 9 | fair to say -- |
| 10 | Yeah, I reviewed, yeah. | 10 | A. Yes. |
| 11 | Q. So do you recognize this document? | 11 | Q. Sorry. Is it fair to say that under |
| 12 | A. Yes. | 12 | this agreement, FXCM had the right to purchase a |
| 13 | Q. And is this an Option Agreement | 13 | 70 percent interest in Effex for $1? |
| 14 | between Mr. Dittami and FXCM US dated April 14, | 14 | A. Correct. |
| 15 | 2010? | 15 | Q. Under the second whereas clause, it's |
| 16 | A. This is -- this is an agreement that | 16 | the third paragraph from the top, it says, "FXCM |
| 17 | Mr. Ahdout and Mr. Dittami signed, correct. | 17 | has loaned to Effex the sum of $2 million |
| 18 | Q. Okay. And the agreement is dated the | 18 | pursuant to that secured promissory note dated |
| 19 | same day as Mr. Dittami left FXCM? | 19 | the date here of (the note) on terms more |
| 20 | A. Yeah. | 20 | favorable than Dittami would have obtained in an |
| 21 | Q. When did you first see this document? | 21 | arm's length transaction." |
| 22 | A. I don't recall the date. | 22 | Do you see that? |
| 23 | Q. Was it sometime around when it was | 23 | A. Yes. |
| 24 | signed? | 24 | Q. Is it true that FXCM loaned Effex |
| 25 | A. I would imagine so, yeah. | 25 | $2 million? |

|  | Page 119 |  | Page 121 |
|---|---|---|---|
| 1 | CONFIDENTIAL - DROR NIV | 1 | CONFIDENTIAL - DROR NIV |
| 2 | Q. And were you aware of before this -- | 2 | A. No. So FXCM -- I mean, technically |
| 3 | before or around when this document was signed, | 3 | semi-true but not really. FXCM, essentially, |
| 4 | were you generally aware of the agreement and | 4 | collateralized the prime brokerage account to |
| 5 | what the basic terms of it? | 5 | enable Mr. Dittami to get prime brokerage access |
| 6 | A. Excuse me. | 6 | to the FX market, which he would not have |
| 7 | The -- again, this is part of the, | 7 | otherwise been able to do as an independent |
| 8 | you know, ongoing debate we had internally over, | 8 | institution. That is a service FXCM did for |
| 9 | you know, when people like William did not, you | 9 | others as well. |
| 10 | know, still believe that we should roll back from | 10 | You know, this was something that we |
| 11 | external execution and they wanted to, you know, | 11 | -- I mean, he paid it after a few months and he |
| 12 | if Effex exceeds to buy out Effex -- Effex | 12 | got his own relationships. But this is in the |
| 13 | Capital. And we -- and he wanted to have this to | 13 | beginning he had to, you know, to get going, we |
| 14 | help them get started to return to these options. | 14 | had to help him get going, which we did for a |
| 15 | But we, you know, we told him that it is not | 15 | number of people in similar situations in the |
| 16 | possible and we no longer -- | 16 | high frequency trading space like, for example, |
| 17 | THE STENOGRAPHER: I'm sorry, you cut | 17 | Lucid Markets, which we did end up buying, you |
| 18 | out. | 18 | know, for -- you know, we bought 50 percent, |
| 19 | A. We null and voided this document and | 19 | which I believe was 180 or $150 million in 2013. |
| 20 | told both him and Mr. Dittami that this is not | 20 | But in 2009, 2010, we did help him |
| 21 | possible, you know, our legal team said this is, | 21 | get going with the exact same arrangement, this |
| 22 | you know, not doable. | 22 | prime brokerage arrangement. |
| 23 | Q. And when you say you "null and voided | 23 | Q. Okay. And is it fair to say that you |
| 24 | this document," how did you do so? | 24 | know if this wasn't a loan, this was FXCM |
| 25 | A. I'm not the details guy. I just yell | 25 | allowing Effex to use $2 million as collateral |

Page 122

1  CONFIDENTIAL - DROR NIV
2  which Effex then paid back you said after a few
3  months?
4      A. Correct.
5      Q. Did Effex pay any interest on this
6  amount of money?
7      A. I don't know the specifics.
8      Q. Would you agree that the terms of
9  that say financial transaction were more
10 favorable than for Mr. Dittami than he would have
11 been able to obtain in an arm's length
12 transaction?
13     MR. DAHAN: Objection to form.
14     A. It depends on -- I mean, it really
15 depends on how much somebody else believed that
16 they wanted his business. I mean, it's clearly
17 we would have done that -- high frequency trading
18 space in those times was a very attractive, you
19 know, business. And Lucid, you know, and other
20 firms, you know, were making a lot of money by --
21 arbitrage was in between financial institution --
22 exchanges was very easy -- easier at the time.
23 It was not as competitive a business. This was
24 the business that everybody was trying to get
25 into and, you know, we as well. So we, clearly,

Page 123

1  CONFIDENTIAL - DROR NIV
2  did this for, you know, a number of people, you
3  know, not just him, you know, in that space.
4      And would other people have done it
5  for him? Possibly, possibly not. It would
6  demand a relationship and time spent. And, you
7  know, at that moment in time he probably couldn't
8  get a better deal, but I don't know if that would
9  be the case or not. I, certainly, know people
10 who got similar deals.
11     But, I think, you know, at the end of
12 the day it doesn't matter because we did not --
13 we helped him get started, but we did not, you
14 know, exercise this option or do anything, you
15 know. We null and voided this agreement.
16     Q. When you say, "we helped him get
17 started," were there other ways in which FXCM
18 helped Effex get started?
19     A. Yes.
20     Q. Such as what?
21     A. We temporarily gave him office space.
22 We have a department in FXCM called Programming
23 Services where we do custom work for our clients
24 to enable them to better connect and interface
25 their software to our software. And so we had,

Page 124

1  CONFIDENTIAL - DROR NIV
2  you know, people in that department work with
3  him, you know, to help him interface better with
4  the FXCM system. Again, we used to do that for a
5  whole bunch of people each in a different
6  circumstance.
7      But, you know, generally, the
8  incubating -- incubation services that, you know,
9  multiple prime of primes offer, you know, that's
10 not an abnormal relationship. You know, I think
11 that -- it was limited to this.
12     Q. Okay. I'm going to show you the next
13 document.
14     (Deposition Exhibit 38, 4/14/10
15 e-mail from John Dittami to David Sassoon
16 GLBR_00189079 marked Confidential, was marked for
17 identification.)
18     Q. This is Exhibit 38 and please let me
19 know when you can see it.
20     A. I can see it.
21     Q. Okay. And I'll note that you do not
22 appear on this e-mail, but please take a minute
23 to review. I'm just going to ask you some --
24 well, I'll ask you a few questions.
25     MR. BAKER: For the record,

Page 125

1  CONFIDENTIAL - DROR NIV
2  Exhibit 38 is GLBR 189079.
3      Q. Mr. Niv, just let me know when you're
4  ready.
5      A. I'm ready.
6      Q. Okay. And, as I mentioned, this is
7  an e-mail that you do not appear to be on, but
8  have you seen this document before?
9      A. I don't recall.
10     Q. Okay. But do you see that -- would
11 you agree this appears to be an e-mail from Mr.
12 Dittami to David Sassoon, Mr. Ahdout and
13 Mr. Grossman?
14     A. Yes.
15     Q. And Mr. Dittami writes, "Just to
16 confirm steps for meeting."
17     Based on the context of this e-mail
18 and the date, do you remember if you attended
19 that meeting?
20     A. I have no idea. No, I don't recall.
21     Q. Do you remember if you would have
22 been, at least, aware of this meeting?
23     A. I don't recall. You know, again, big
24 company, lots going on.
25     Q. Is this something that -- is this

32 (Pages 122 - 125)

|  | Page 154 |  | Page 156 |
|---|---|---|---|
| 1 | CONFIDENTIAL - DROR NIV | 1 | CONFIDENTIAL - DROR NIV |
| 2 | know, like, again, we had lawyers in our | 2 | know, preference. |
| 3 | employment.  That's what their job was.  That | 3 |     Q.  So, in the time that Effex was paying |
| 4 | wasn't mine. | 4 | FXCM for order flow, was it generally true that |
| 5 |     Q.  And so the times that the rate that | 5 | Effex had the best executions you referred to |
| 6 | Effex paid to FXCM did change, were you involved | 6 | with rejection rates and the other metrics that |
| 7 | in or aware of those discussions each time? | 7 | we discussed today? |
| 8 |     A.  I would approve the change of rate, | 8 |     A.  Yes, by far. |
| 9 | yes.  Again, big substantive issues like change | 9 |     Q.  And because of that, FXCM gave them |
| 10 | of rate I would approve. | 10 | certain advantages like winning ties or lower |
| 11 |     Q.  Okay. | 11 | markups; is that accurate? |
| 12 |     A.  That would probably be the only | 12 |     A.  Correct.  And we kept that -- in |
| 13 | thing.  The only other issue would be the | 13 | August 2014, we ended payment for order flow and |
| 14 | benchmark conditions, right, under which this | 14 | for the next few years we still gave them the |
| 15 | thing agreed -- rests.  So, you know, kind of we | 15 | same preferences and had the same relationship, |
| 16 | obsessed over the -- we got frequent reports | 16 | you know, minus the payment for order flow |
| 17 | about what the rejection rates are for all the | 17 | because of that -- you know, because of their, |
| 18 | liquidity providers and we provided that to all | 18 | you know, ability to make our service that much |
| 19 | of them and so they can compare to one another. | 19 | more competitive. |
| 20 | We would -- you know, all of the, again, sort of | 20 |     Q.  So, if they had the best execution, |
| 21 | speed of reply, hold time speeds, the -- for each | 21 | why did they have to pay you for order flow? |
| 22 | maker, you know, performance, how much price | 22 |     A.  Because it's standard practice. |
| 23 | improvements we would receive, you know, not us, | 23 | That's what, you know, it's very common.  That's |
| 24 | clients would receive because of their | 24 | what everybody does in the market, not just |
| 25 | interaction, all of those metrics that are used | 25 | Effex, in equities too. |

|  | Page 155 |  | Page 157 |
|---|---|---|---|
| 1 | CONFIDENTIAL - DROR NIV | 1 | CONFIDENTIAL - DROR NIV |
| 2 | to, you know, average spread paid, slippage, all | 2 |     Q.  Were there other liquidity providers |
| 3 | of those things.  So we had those discussions | 3 | who had worse execution than Effex paying FXCM |
| 4 | with people, right, and that was a frequent -- | 4 | for order flow? |
| 5 | because those were the metrics under which we | 5 |     A.  We had some agreements with some |
| 6 | were judged by our clients. | 6 | other people for limited periods of time.  But |
| 7 |     Q.  Okay.  And, just to make sure I | 7 | they, you know, we just had this -- could never |
| 8 | understand, were those sort of metrics for | 8 | come to terms with them on -- they could -- it's |
| 9 | rejection rates that you were talking about, was | 9 | not come to terms.  They could never execute what |
| 10 | that tied to the rate per million that Effex | 10 | they promised.  So, as you saw in previous |
| 11 | would pay to FXCM? | 11 | e-mails that you showed me, we had different |
| 12 |     A.  Those, basically, underpinned the | 12 | arrangements with Dresdner, with Citibank, with |
| 13 | agreement.  So he would have to be the best and | 13 | BNP, with Goldman, we had lots of others over, |
| 14 | the best by far for him to enjoy the preferential | 14 | you know, trying to give them either preferential |
| 15 | status that he received in terms of winning ties. | 15 | markup or payment for order flow with winning |
| 16 |     Q.  Was that -- the preferential status | 16 | ties and to see if this would improve.  You know, |
| 17 | that he received, was that part of this services | 17 | they would therefore step up and do much lower |
| 18 | agreement? | 18 | rejection rate and much faster response time and |
| 19 |     A.  I don't recall specifics, but that | 19 | basically eliminate -- if we go back to one of |
| 20 | was the -- you know, that's how we determined it. | 20 | the first e-mails you showed me the two big |
| 21 |     Q.  And so, with him to use your words | 21 | problems we had, which was spreads widening |
| 22 | being the best in terms of execution, was that | 22 | during market movements in Asian markets and the |
| 23 | connected to the rate of -- that Effex would pay | 23 | slippage that our clients were receiving.  So |
| 24 | FXCM for order flow? | 24 | they would have to show us larger sizes.  You |
| 25 |     A.  No.  It would just affect their, you | 25 | know, most banks just failed at doing that and |