# Exhibit 2

Page 328

1          CONFIDENTIAL - ADAM WERNER, Ph.D.
2              UNITED STATES DISTRICT COURT
          FOR THE SOUTHERN DISTRICT OF NEW YORK
3

      In re:                    :
4                               :  Master File No.
      Global Brokerage, Inc.   :  1:17-cv-00916-RA
5     F/k/a FXCM, Inc.          :
      Securities Litigation    :
6     ----------------------    :

7

8              REMOTE VIDEO DEPOSITION OF:
9                 ADAM WERNER, Ph.D.
10               FRIDAY, JUNE 4, 2021
11
12
13
14
15
16
17
18
19
20
21
22
23
24     REPORTED BY:
       SILVIA P. WAGE, CCR, CRR, RPR
25     JOB NO. 4577228

Page 329

1    CONFIDENTIAL - ADAM WERNER, Ph.D.
2
3
        JUNE 4, 2021
4        11:03 a.m.
5    Remote Videotape deposition via Zoom of
6    ADAM WERNER, Ph.D., pursuant to agreement before
7    SILVIA P. WAGE, a Certified Shorthand Reporter,
8    Certified Realtime Reporter, Registered
9    Professional Reporter, and Notary Public for the
10   States of New Jersey and New York.
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25

Page 330

1        CONFIDENTIAL - ADAM WERNER, Ph.D.
2    A P P E A R A N C E S :
3
     THE ROSEN LAW FIRM
4    Attorneys for Plaintiffs
     101 Greenwood Avenue, Suite 440
5    Jenkintown, Pennsylvania 19046
     (215) 600-2817
6    Jbaker@rosenlegal.com
     Blapointe@rosenlegal.com
7    BY:  JOSHUA BAKER, ESQ.
     BY:  BRENT LaPOINTE, ESQ.
8
9
     KING & SPALDING LLP
10   Attorneys for Defendants
     1185 Avenue of the Americas
11   New York, New York  10036-2601
     (212) 556-2262
12   PIsajiw@KSLAW.com
     EEnnis@KSLAW.com
13   Idahan@kslaw.com
     BY:  PETER ISAJIW, ESQ.
14   BY:  EVAN C. ENNIS, ESQ.
     BY:  ISRAEL DAHAN, ESQ.
15
16
17   A L S O   P R E S E N T :
18
     MARCELO RIVERA
19   VIDEOGRAPHER
20
21
22
23
24
25

Page 331

1        CONFIDENTIAL - ADAM WERNER, Ph.D.
2        I N D E X
3    WITNESS:  ADAM WERNER, Ph.D.          PAGE
4    EXAMINATION BY MR. ISAJIW          334
5
6        E X H I B I T S
7    NO.        DESCRIPTION        PAGE
8    Exhibit Werner 8   Report of Loss Causation  336
                     and Damages by Dr. Adam
                     Werner April 21, 2021
9    Exhibit Werner 9   Rebuttal Report on      341
                     Market Efficiency by Dr.
10                    Adam Werner July 27,
                     2020
11   Exhibit Werner 10  Report and            351
                     Recommendations to the
12                    Honorable Ronnie Abrams
     Exhibit Werner 11  Order Adopting Report &   351
13                    Recommendation
     Exhibit Werner 12  Order Instituting        452
14                    Proceedings Pursuant to
                     Sections 6(c) and 6(d)
15                    of the Commodity
                     Exchange Act, Making
16                    Findings, and Imposing
                     Remedial Sanctions
17
18        PREVIOUSLY MARKED EXHIBITS
19   NO.        DESCRIPTION        PAGE
20   Exhibit Werner 3   Notice of Errata,       339
                     Certificate of Service
21                    and Exhibit 1 Corrected
                     Opening Report on Market
22                    Efficiency of Dr. Adam
                     Werner January 10, 2020
23   Exhibit Werner 7   Opinion & Order        471
24
25

Page 332

1        CONFIDENTIAL - ADAM WERNER, Ph.D.
2        - - -
3        DEPOSITION SUPPORT INDEX
4        - - -
5
6    Direction to Witness Not to Answer
     Page Line
7
     395      3
8    397      3
9
     Request for Production of Documents
10   Page Line
11
12
     Stipulations
13   Page Line
14
15
     Question Marked
16   Page Line
17
18
     Reservation
19   Page Line
20
21
     Motion to Strike
22   Page Line
23
24
25

2 (Pages 329 - 332)

Page 333

CONFIDENTIAL - ADAM WERNER, Ph.D.
1    CONFIDENTIAL - ADAM WERNER, Ph.D.
2        THE VIDEOGRAPHER:  Good morning.
3    We're going on the record at 11:03 a.m., on
4    June 4th, 2021.
5        This deposition is being taken
6    remotely of Mr. -- I mean, excuse me, Dr. Adam
7    Werner in the matter Global Brokerage Inc., f/k/a
8    FXCM Inc., securities litigation.
9        My name is Marcelo Rivera from
10   Veritext Legal Solutions and I am the
11   Videographer.
12       The Court Reporter is Silvia Wage in
13   association with Veritext Legal Solutions.
14       I am not related to any party in this
15   action.  Nor am I financially interested in the
16   outcome.
17       Counsel and all present remotely will
18   now state their appearances and affiliations for
19   the record.  If there are any objections to
20   proceeding, please state them at the time of your
21   appearance beginning with noticing attorney.
22       MR. ISAJIW:  Peter Isajiw with King &
23   Spalding for Defendants FXCM.
24       MR. DAHAN:  Israel Dahan from King &
25   Spalding for the Defendants as well.

Page 334

1    CONFIDENTIAL - ADAM WERNER, Ph.D.
2        MS. ENNIS:  Evan Ennis for King &
3    Spalding for the Defendants.
4        MR. BAKER:  Josh Baker with the Rosen
5    Law Firm for Plaintiffs and the witness.
6        MR. LaPOINTE:  Brent LaPointe with
7    the Rosen Law Firm for the Plaintiff and the
8    witness.
9        THE VIDEOGRAPHER:  The Court Reporter
10   please swear in the witness.
11   ADAM WERNER, Ph.D.,
12       960 Wadsworth Avenue, Pismo Beach,
13       California  93445, after having been duly
14       sworn, was examined and testified as
15       follows:
16       THE STENOGRAPHER:  Thank you.
17   You may proceed.
18       MR. ISAJIW:  Thank you.
19   EXAMINATION BY MR. ISAJIW:
20       Q.  Good morning, Dr. Werner.  Thank you
21   for joining us again today.
22       Given that this is your second
23   deposition in the matter, I know you're familiar
24   with the process.  But given that this deposition
25   is being conducted over the Zoom platform, I just

Page 335

1    CONFIDENTIAL - ADAM WERNER, Ph.D.
2    want to encourage at the very beginning for us to
3    be mindful not to speak over each other because
4    it's very difficult for the Court Reporter to get
5    it down.  It's even more so on the Zoom platform.
6    So I just wanted to ask you to be mindful of that
7    and I'll do the same; is that okay?
8        A.  Sure.
9        Q.  Okay.  Also, any exhibits I upload
10   today will be introduced through the Exhibit
11   Share platform.
12       Just to confirm you do have access to
13   that; is that right?
14       A.  Yes, I have that open in front of me.
15       Q.  Okay.  And where are you currently
16   located?
17       A.  Pismo Beach, California.
18       Q.  And is anyone else with you in the
19   room?
20       A.  No.
21       Q.  Okay.  And do you have any materials
22   with you today that are related to this case?
23       A.  No.
24       Q.  Okay.  You were asked by Plaintiffs
25   to provide an expert opinion regarding loss

Page 336

1    CONFIDENTIAL - ADAM WERNER, Ph.D.
2    causation and damages in this matter; is that
3    correct?
4        A.  At this stage, I believe, for the
5    purposes of this deposition, I believe, that is
6    correct.
7        Q.  Okay.  And I want to introduce our
8    first exhibit, which I believe will be Werner
9    Exhibit No. 8 using sequential numbers from your
10   prior deposition.  And that would be the
11   April 21, 2021 report on loss causation and
12   damages that you filed in this matter.
13       MR. ISAJIW:  Evan, can you put that
14   up on Exhibit Share please.
15       (Deposition Exhibit Werner 8, Report
16   of Loss Causation and Damages by Dr. Adam Werner
17   April 21, 2021, was marked for identification.)
18       MS. ENNIS:  It should be there.
19       Q.  Can you take a look at the folder and
20   see if you can see that, Dr. Werner?
21       A.  Yeah, I'm just resetting it.
22       Okay, here we go.
23       Q.  Okay.  And Werner 8, this is your
24   report on loss causation and damages submitted in
25   this case April 21, 2021, correct?

3 (Pages 333 - 336)

Page 337

CONFIDENTIAL - ADAM WERNER, Ph.D.
1
2      A.  It appears to be, yes.
3      Q.  And did you write this report?
4      A.  I did.
5      Q.  Anyone assist you with it?
6      A.  I believe people assisted me in
7  drafting it, yes.
8      Q.  Can you -- who assisted you, was that
9  someone from Crowninshield?
10     A.  Yes.
11     Q.  And who helped with the drafting of
12 this report?
13     A.  Nariner Walia or Valia -- again, if
14 the Court Reporter wants me to spell any of
15 these, just go ahead, although they're probably
16 -- those name probably appear in earlier
17 depositions -- Daniel Bettencourt and Alex Huang.
18     Q.  Anyone else?
19     A.  Not as I sit here today -- not that I
20 can think of as I sit here today.
21     Q.  And can you estimate how much time
22 Nariner Walia spent assisting you with this
23 report?
24     A.  No.
25     Q.  How about Daniel Bettencourt?

Page 338

CONFIDENTIAL - ADAM WERNER, Ph.D.
1
2      A.  No.
3      Q.  What about Alex Huang?
4      A.  No.
5      Q.  Do you have any idea what the
6  billable rate for each of those people is?
7      A.  Not as I sit here today.  I -- I
8  believe -- if you hold on one second.  I don't
9  know if it's stated here or if you go to my
10 original report, my original market efficiency
11 report.  I believe that the range of rates or the
12 possible range of rates for those individuals can
13 be found there.
14     Q.  And they haven't changed since those
15 reports, as far as you know?
16     A.  No.
17     Q.  How much time did you spend on this
18 report?
19     A.  As I sit here, I don't recall.
20     Q.  Do you have a rough approximation?
21     A.  Less than 50 hours, more than
22 15 hours.
23     Q.  And what is your current billable
24 rate?
25     A.  That's an excellent question.  It's

Page 339

CONFIDENTIAL - ADAM WERNER, Ph.D.
1
2  the same rate that was -- that appears in my
3  original market efficiency report.
4      Q.  Okay.  Aside from the Crowninshield
5  employees we just talked about, did anybody else
6  assist with drafting this report?
7      A.  I don't believe so.
8      Q.  And have you done anymore work on
9  this matter since filing the report?
10     A.  With regards to damages and loss
11 causation, no.
12     Q.  Okay.  I want to introduce a document
13 that had been previously marked as Werner
14 Exhibit 3.  This is your January 10th, 2020
15 Corrected Werner Opening Report on Market
16 Efficiency.
17     MR. ISAJIW:  Evan, can you put that
18 up please.
19     MS. ENNIS:  Just give me one second.
20     (Deposition Exhibit Werner 3, Notice
21 of Errata, Certificate of Service and Exhibit 1
22 Corrected Opening Report on Market Efficiency of
23 Dr. Adam Werner January 10, 2020, was previously
24 marked for identification.)
25     MS. ENNIS:  It should be loaded.

Page 340

CONFIDENTIAL - ADAM WERNER, Ph.D.
1
2      Q.  And, Dr. Werner, let me know when you
3  have access to that.
4      A.  Okay.  It just showed up.
5      Q.  Okay.  And this is your opening
6  report on market efficiency, correct?
7      A.  I believe it's the corrected report
8  of my opening report on market efficiency.
9      Q.  So this would be the operative
10 opening report so-to-speak; is that correct?
11     A.  That is correct.
12     MR. BAKER:  I'll just note like there
13 seems to be another document preceding the
14 report, Notice of Errata that was filed with --
15 or as part of this exhibit.
16     Q.  Okay.  And behind the Notice of
17 Errata is the corrected report.
18     The notice is indicating that the --
19 this corrected report is superseding the original
20 report that was submitted in the matter; is that
21 correct?
22     A.  Correct.
23     Q.  Okay.  And then I would like to
24 introduce one more exhibit just so that we have
25 it in the report and that would be the July 27,

Page 341

1        CONFIDENTIAL - ADAM WERNER, Ph.D.
2    2020 Werner Rebuttal Report on Market Efficiency.
3    And I believe this will be Werner Exhibit No. 9.
4        (Deposition Exhibit Werner 9,
5    Rebuttal Report on Market Efficiency by Dr. Adam
6    Werner July 27, 2020, was marked for
7    identification.)
8        MS. ENNIS:  Loaded.
9        Q.  Dr. Werner, let me know when you have
10   access.
11       A.  Still loading.  Oh, wait.  No, that's
12   the wrong one.  Hold on.
13       Okay, I have it in front of me now.
14       Q.  And that's your rebuttal report on
15   market efficiency, correct?
16       A.  That is correct.
17       Q.  Okay.  And so do these three reports,
18   the loss causation report, the corrected opening
19   report on market efficiency and the rebuttal
20   report on market efficiency embody the totality
21   of your opinions in this matter?
22       MR. BAKER:  Object to the form.
23       A.  As of today, yes.
24       Q.  Are there any opinions that you've
25   been asked to provide with respect to this matter

Page 342

1        CONFIDENTIAL - ADAM WERNER, Ph.D.
2    that are not included in these reports?
3        A.  Not that I can think of.
4        Q.  Other than the materials disclosed in
5    your reports, are there any other materials that
6    you relied on to form the basis of your opinions
7    in this matter?
8        A.  And so when you say, "materials," I'm
9    assuming you're referring to, essentially,
10   Exhibit 2 on each of these reports?
11       Q.  That's correct.
12       A.  That is correct.
13       Q.  Okay.  Let's turn --
14       A.  You may want to re-ask the question.
15   I'm not sure I answered -- I haven't considered
16   any other documents outside of those listed in
17   Exhibit 2 of the three reports in front of me.
18       Q.  Okay.  Thank you for that.
19       Looking at your loss causation
20   report, can you turn to Exhibit 1, which is your
21   CV.  And it's on Page 39 of that report.
22       A.  You may not know this.  Is there a
23   way to keep multiple documents open?
24       THE STENOGRAPHER:  Yes.  You can
25   download them to your computer and open

Page 343

1        CONFIDENTIAL - ADAM WERNER, Ph.D.
2    individual screens.
3        THE WITNESS:  Ah, okay.  Let me do --
4    I think this is the right one.
5        Q.  And if you're going to do that, it
6    may make sense to download the other two as well.
7        A.  Okay.
8        MR. BAKER:  Peter, when you're
9    talking about the CV on Page 39, you're talking
10   about the PDF numbers or the report page numbers
11   --
12       MR. ISAJIW:  The report page numbers.
13       MR. BAKER:  The report page numbers
14   looks like it starts on 37, not 39.
15       MR. ISAJIW:  That's correct.  The
16   portion that I want to point him to begins on
17   Page 39.
18       MR. BAKER:  Okay.  That's fine.
19       Q.  And just let me know when you're
20   ready, Dr. Werner.
21       A.  Okay.  I think these are all
22   downloaded now.
23       So let's go to Page 37 of my
24   April 21st report?
25       Q.  That's fine.

Page 344

1        CONFIDENTIAL - ADAM WERNER, Ph.D.
2        A.  Okay, I'm there.
3        Q.  And 37 is the beginning of your
4    curriculum vitae; is that correct?
5        A.  That is correct.
6        Q.  And if you flip to Page 39, there's a
7    section called, "Expert Reports and Testimony."
8    Let me know when you're there.
9        A.  Okay, I'm there.
10       Q.  Comparing this curriculum vitae to
11   the ones included in your prior market efficiency
12   report, it seems to me that you issued reports
13   and declarations in three additional cases the
14   Nova Life, Array Biopharma and Innocoll Holdings;
15   is that correct?
16       MR. BAKER:  You mean since his
17   previous report?
18       MR. ISAJIW:  That's correct.
19       A.  So hold on.  Sorry, if you go between
20   documents, it takes you back to the first page
21   so...
22       Q.  Yeah.
23       A.  Bear with me.
24       Q.  That's okay.
25       A.  Just to the best of my recollection,

CONFIDENTIAL - ADAM WERNER, Ph.D.
1
2    as I sit here, I believe also -- and this is --
3    there is a space missing, so I'm on Page 40 of my
4    report dated -- in April of this year.
5            It looks like there is a Michael
6    Tietz versus Crytobloc Technology Corp report.
7    But that's a report in Canada.  I don't know if
8    you include that in your additional reports.
9        Q.  Oh, I see.
10           So, when you say, "there is a space
11   missing," that is combined with the paragraph for
12   Innocoll Holdings; is that correct?
13       A.  Exactly.
14       Q.  Other than those four matters, any
15   other additional engagements or opinions
16   regarding market efficiency since your last
17   deposition?
18       A.  It's possible, but as I sit here
19   today I can't think of any.
20       Q.  Were there any -- focusing on your
21   loss causation report in this matter, were there
22   any materials that you requested as part of your
23   engagement that you did not receive from either
24   the Rosen Law Firm or Crowninshield or any other
25   source?

CONFIDENTIAL - ADAM WERNER, Ph.D.
1
2        A.  No.
3        Q.  And did you conduct any loss
4    causation or damages analysis that's not
5    reflected in your loss causation report?
6            MR. BAKER:  With respect to this
7    case?
8            MR. ISAJIW:  Yes.
9        A.  No.
10       Q.  And are there any materials that you
11   relied upon or considered in connection with your
12   analysis of loss causation in this case that are
13   not listed under the documents considered in
14   Exhibit 2 of any of the other reports?
15       A.  And this report?  I don't believe so.
16       Q.  And this report, yeah.
17           And since you filed this particular
18   loss causation report, are there any other
19   materials that you have reviewed relating to this
20   case that are relevant to your opinions?
21       A.  No.
22       Q.  Okay.
23       A.  Oh, wait.  I don't believe so would
24   be a more accurate answer.
25       Q.  Is there anything that you're

CONFIDENTIAL - ADAM WERNER, Ph.D.
1
2    thinking of that you're unsure of?
3        A.  No, but it's possible.  I mean, it's
4    possible that I saw something.  I just don't
5    recall as I sit here today.
6        Q.  If you turn to Paragraph 1, Page 1 of
7    your loss causation report, you define "FXCM
8    notes" as a "2.25 percent convertible senior note
9    due in 2018," correct?
10       A.  That is correct.
11       Q.  So, if I use the term "FXCM notes"
12   today, you'll understand that I'm referring to
13   those notes; is that okay?
14       A.  Yes.
15       Q.  And you define the class period as
16   March 15th, 2012 through February 6th, 2017; is
17   that correct?
18       A.  For the notes?
19       Q.  For the class period.
20       A.  So I'm sorry.  Can you repeat the
21   question?
22       Q.  Yeah.  I just want to make sure
23   we're on the same page getting started on defined
24   terms.
25           So you define the term in this

CONFIDENTIAL - ADAM WERNER, Ph.D.
1
2    paragraph "class period" to mean the time between
3    March 15th, 2012 and February 6th, 2017; is that
4    correct?
5        A.  For the equity?
6        Q.  For the term "class period" as a
7    defined term at the end.  I believe it's the
8    second to last sentence of Paragraph 1.
9        A.  Yeah, I think we're talking semantics
10   here.
11           So, yes, I have defined that as the
12   class period.  But I think of the note period as
13   a different period since it is a subset of that
14   time period.
15       Q.  We'll get to the note period next.
16           I just want to make sure when we use
17   the term "class period," as you define it, you're
18   talking about March 15th, 2012 to February 6th,
19   2017?
20       A.  Okay, sure.
21       Q.  And when we use the term "notes
22   period," as you defined it, you're talking about
23   June 24, 2014 through February 6th, 2017; is that
24   correct?
25       A.  Correct.

Page 349

CONFIDENTIAL - ADAM WERNER, Ph.D.

1         CONFIDENTIAL - ADAM WERNER, Ph.D.
2    Q.  Okay.  And so throughout today, if
3 we're using the terms "class period" or "notes
4 period," I just want to make sure we can
5 shorthand and use those same time definitions; is
6 that okay?
7    A.  As long as we're being clear as to
8 whether or not we're talking about the equity or
9 the notes, yes.
10    Q.  Okay.  And to the extent we're not
11 clear, please let me know if you have a question
12 about it and I will do my best to clarify, okay?
13    A.  Yes.
14    Q.  Okay.  Turning to Page 2 of your
15 report under "Conclusions."  You conclude in
16 Paragraph 7 that the prices of the FXCM stock and
17 the FXCM notes were artificially inflated over
18 the course of the class period; is that correct?
19    A.  That is correct.
20    Q.  Okay.  And as you know, the Court
21 held an evidentiary hearing on class
22 certification in this matter, right?
23    A.  Correct.
24    Q.  And that hearing dealt with market
25 efficiency with respect to FXCM notes; is that

Page 350

CONFIDENTIAL - ADAM WERNER, Ph.D.

1 correct?
2    A.  It may have touched on the -- on
3 general calculation of damages.  As I sit here, I
4 don't recall.  But, generally, that's correct.
5    Q.  Yeah.  And so, I guess, what I'm
6 asking is you were aware that hearing dealt with
7 market efficiency in connection with the FXCM
8 notes, correct?
9    A.  Among other things, yes.
10    Q.  And you testified at the hearing; is
11 that right?
12    A.  I did.
13    Q.  And Dr. Hendershott also testified at
14 the hearing?
15    A.  He did.
16    Q.  And I want to introduce two exhibits
17 related to that hearing.  The first is a
18 March 18, 2021 Report and Recommendation to the
19 Honorable Ronnie Abrams.
20    MR. ISAJIW:  Evan, can you load that.
21    MS. ENNIS:  Okay.
22    MR. ISAJIW:  And the second is
23 March 23, 2020 Order Adopting the Order and
24 Recommendation.
25

Page 351

CONFIDENTIAL - ADAM WERNER, Ph.D.

1    MS. ENNIS:  It's loaded.
2    (Deposition Exhibit Werner 10, Report
3 and Recommendations to the Honorable Ronnie
4 Abrams, was marked for identification.)
5    (Deposition Exhibit Werner 11, Order
6 Adopting Report & Recommendation, was marked for
7 identification.)
8    MS. ENNIS:  That should be loaded as
9 well.
10    A.  Okay, I have them in front of me.
11    Q.  Okay.  Did you review the Court's
12 decision regarding Plaintiffs' motion for class
13 certification before drafting your loss causation
14 report?
15    A.  I'm sorry.  Could you repeat that
16 question please?
17    Q.  Yeah.  Did you review the Court's
18 decision regarding Plaintiffs' motion for class
19 certification before drafting your loss causation
20 report?
21    A.  So let's go look at my documents
22 relied upon for my April -- wait.
23    When did this decision come out?
24    Q.  It's filed March 18, 2021.

Page 352

CONFIDENTIAL - ADAM WERNER, Ph.D.

1    A.  Okay.  So, prior to the filing of
2 this report.
3    It's possible.  I don't recall, as I
4 sit here.
5    Q.  Is it listed in Exhibit 2 of your
6 report?
7    A.  It is not.
8    Q.  Okay.  Can you turn to Page 37 of the
9 Report and Recommendation, which is Exhibit
10 Werner 10.
11    A.  Okay.
12    Q.  Okay.  At Page 37 the Court says, "I
13 further find that balancing all of the Cammer and
14 Krogman factors Plaintiffs have not met their
15 burden of demonstrating that the FXCM notes
16 traded in an efficient market throughout the
17 notes period.  The issue size was relatively
18 small, smaller than any of the cases relied on by
19 Plaintiffs in their reports and the notes were
20 unregistered, initially restricted and thereafter
21 traded only among a fairly small number of QIBs.
22 No analyst followed the FXCM notes as opposed to
23 the FXCM stock and none of the ratings agencies
24 rated them.  Moreover, the volume and frequency

7 (Pages 349 - 352)

Page 353

CONFIDENTIAL - ADAM WERNER, Ph.D.
1
2  of the trading decreased over the course of the
3  noise period with the volume dipping below the
4  camera benchmarks after October 2015.  The only
5  direct evidence of market efficiency in the
6  record offered to show a cause and effect
7  relationship between the release of
8  'company-specific news' and changes to the price
9  of the FXCM notes is Dr. Werner's event study,
10  which is of limited utility due to the nature and
11  timing of the two events chosen.  Because the
12  Plaintiffs have not established that the FXCM
13  notes traded in an efficient market, they cannot
14  rely on the basic presumption of reliance as to
15  the notes meaning that each note purchaser would
16  be required to prove individually that it relied
17  on the Defendant's allegedly false and misleading
18  statements in making its purchases.  This in turn
19  means that the Plaintiffs cannot satisfy the
20  predominance requirement of Rule 23(b)(3) with
21  respect to the notes."
22       Did I read that correctly?
23       A.  I believe the last sentence was with
24  respect to the FXCM notes but otherwise, yes.
25       Q.  Thanks.

Page 354

CONFIDENTIAL - ADAM WERNER, Ph.D.
1
2       And if you turn to Page 40 of that
3  same decision.
4       A.  Okay.
5       Q.  You'll see the Court says, "For the
6  reason set forth above, I recommend respectfully
7  that Plaintiffs' class certification motion be
8  granted in part as to the FXCM stock and denied
9  in part as to the FXCM notes."
10       Did I read that correctly?
11       A.  Yes.
12       Q.  Okay.  So going back to your opinion
13  in Paragraph 7 of your loss causation report
14  where you state that the FXCM notes were
15  "artificially inflated over the course of the
16  class period," are you aware that the Court has
17  already determined that there is no class or
18  class period for the FXCM notes in this case?
19       MR. BAKER:  Objection to form.  Just
20  where it refers to the -- the term being as
21  defined as class period before versus -- we're
22  hopping between multiple documents here.  So I
23  want to be clear that which definitions of which
24  periods we're using here.
25       Q.  Dr. Werner, do you understand the

Page 355

CONFIDENTIAL - ADAM WERNER, Ph.D.
1
2  question?
3       A.  Well, I'm slightly confused because
4  we're talking about the class period versus the
5  note period.  So are you referring to the class
6  period or the note period?
7       Q.  I'm referring to your Paragraph 7 of
8  your loss causation report.  Take a look at that.
9       A.  Well, I will in a second, but I'm
10  just trying to answer your question based on this
11  paragraph or the statement you just read to me.
12  So I'm trying to get clarification on what you
13  mean.
14       Q.  I'm helping you get clarification by
15  referring to Paragraph 7 of your report.
16       A.  Alright.  We'll agree to disagree.
17       So now you want me to go to
18  Paragraph 7 of my April 21st report, correct?
19       Q.  That's correct.
20       A.  Okay.
21       Q.  In the third sentence you say, "The
22  alleged representations and omissions caused the
23  prices of FXCM stock and FXCM notes to be
24  artificially inflated over the course of the
25  class period."

Page 356

CONFIDENTIAL - ADAM WERNER, Ph.D.
1
2       Do you see that?
3       A.  I do see that.
4       Q.  And I'm just asking that when you
5  state that the FXCM notes were artificially
6  inflated over the course of the class period, are
7  you aware that the Court has already determined
8  that there is no class for the FXCM notes?
9       A.  Okay.
10       MR. BAKER:  Objection.
11       A.  So let's --
12       THE WITNESS:  Oh, go ahead.  Sorry,
13  Josh.
14       MR. BAKER:  It's alright.
15       Objection to form.
16       But if you understand it, you can
17  answer it.
18       A.  Okay.  So let's separate out a couple
19  of things.  So it probably -- the sentence is
20  somewhat inarticulate on my part.  I probably
21  should have specified the notes period with
22  regards to the notes.
23       To the extent that the class for the
24  notes wasn't certified, that has nothing to do
25  with whether or not I'm able to calculate or

CONFIDENTIAL - ADAM WERNER, Ph.D.
1
2 estimate damages for individual plaintiffs.
3      Q.  When you drafted your loss causation
4 report, were you aware that the Court had
5 determined that there was no class for note
6 holders?
7      A.  I believe the answer to that question
8 is, yes.
9      Q.  And were you aware that the Court had
10 already rejected your opinion and conclusion that
11 the FXCM notes traded in an efficient market?
12      MR. BAKER:  Objection to form.
13      A.  Yes.
14      Q.  Does the fact that the Court had
15 already determined that there was no class for
16 the FXCM notes change your conclusion on loss
17 causation for the notes here?
18      A.  No.
19      Q.  Does the fact that the Court has
20 rejected your contention that the FXCM notes
21 traded in an efficient market changed your
22 conclusion on loss causation for the FXCM notes
23 here?
24      A.  I'm sorry.  Could you repeat that
25 question?

1      CONFIDENTIAL - ADAM WERNER, Ph.D.
2      Q.  Does the fact that the Court has
3 already rejected your contention that the FXCM
4 notes traded in an efficient market change your
5 conclusion on loss causation for the FXCM notes
6 here?
7      A.  No.
8      Q.  Switching to the FXCM common stock,
9 you begin the class period on March 15th, 2012.
10      What event do you contend marks the
11 start of the class period?
12      A.  I don't understand the question.
13      MR. BAKER:  Yeah, objection to form.
14      Q.  Focusing on the common stock, you
15 define the class period as the period of time
16 between March 15, 2012 and February 6, 2017,
17 correct?
18      A.  That is correct.
19      Q.  What is your understanding of the
20 event that created the beginning point of the
21 class period of March 15, 2012?
22      A.  So, to answer that question
23 accurately, I'd need to -- and I have them in
24 front of me, and so I'm happy to refer to them,
25 if you'd like me to -- my amended -- or my

1      CONFIDENTIAL - ADAM WERNER, Ph.D.
2 corrected original report and possibly to my
3 rebuttal report on market efficiency.
4      Would you like me to do that?
5      Q.  Sitting here today based on your work
6 on this matter thus far, you don't have the
7 ability to answer that question without reference
8 to your report; is that correct?
9      A.  No.
10      Q.  Okay.  That's not correct, or you
11 cannot answer the question without reference to
12 your report?
13      A.  That is not correct.
14      Q.  So, if you can answer the question
15 without reference to your report, I just want to
16 get your understanding sitting here today as to
17 what event you understood marked the beginning of
18 the class period March 15, 2012.
19      MR. BAKER:  He said he doesn't know
20 sitting here today already; asked and answered.
21      A.  Like I said, I want to be as accurate
22 as possible in this deposition.  So I'm happy to
23 refer to my previous reports to refresh my memory
24 to make sure that I'm as accurate as possible in
25 answering your question.

1      CONFIDENTIAL - ADAM WERNER, Ph.D.
2      So it seems to me that it's -- I --
3 well, I choose as I sit here today -- if you want
4 me to answer that question, I'm happy to refer to
5 my other reports to make sure I'm giving you the
6 most accurate answer that I possibly can.
7      Q.  And can you answer the question
8 sitting here today without reference to the
9 report?
10      MR. BAKER:  Objection, asked and
11 answered.
12      A.  I refer to my previous answer to that
13 question.
14      Q.  Was that previous answer a yes or no?
15      I'm just trying to clarify the
16 record.
17      MR. BAKER:  How many times do we need
18 to ask this?
19      MR. ISAJIW:  Until he answers it.
20      MR. BAKER:  He answered it twice.
21      A.  I'm -- do you want -- let me know
22 when you guys are ready for me to answer.
23      Q.  We're ready.
24      A.  Okay.  I refer to -- if the Court
25 Reporter wants to go back and read my previous

Page 361

1 CONFIDENTIAL - ADAM WERNER, Ph.D.
2 answer to that question, I'm more than happy to
3 have her do that, if you can't remember the
4 answers to my questions. But I've provided my
5 answer to those questions.
6 Q. Okay. So you can't answer the
7 question without reference to the report. We'll
8 ask a second question.
9 A. I'm sorry, wait. Is that what I
10 stated?
11 Q. I believe so.
12 A. I believe you're mischaracterizing my
13 statement. I'll let Josh -- I'll let Josh object
14 to it, if he sees fit.
15 MR. BAKER: Why don't we move to the
16 next question instead of asking the same one over
17 and over. What's the next question?
18 Q. What event marks the end of the class
19 period?
20 A. I'm just trying to give you the most
21 accurate answer possible. I mean, one possible
22 answer -- and, I mean, I can give you a more --
23 comprehensive answers is the one listed in
24 Paragraph 8 of my report. That be -- when I say,
25 "my report," I'm referring to my loss causation

Page 362

1 CONFIDENTIAL - ADAM WERNER, Ph.D.
2 report of April this year.
3 "The corrected disclosure at the end
4 of the class period provided the market with the
5 understanding that the company's purported lack
6 of conflict of interest was false and as a result
7 of the company's business model would no longer
8 be sustainable and FXCM would be subject to
9 regulatory repercussions. Following the
10 corrective disclosure, analyst valuation models
11 reflected the reality that the company could no
12 longer operate its businesses in the US and that
13 FXCM had previously misrepresented the veracity
14 of its agency business model. Thus corrective
15 disclosures and their inextricable ramifications
16 dissipated the artificial inflation in the prices
17 of FXCM securities and thereby cause investor
18 losses."
19 And before you jump in...
20 THE WITNESS: I apologize to the
21 Court Reporter if I've been going too fast. If
22 you'd like me to slow down, please let me know.
23 Q. Let's focus on the paragraph before
24 that, on Paragraph 7. In Paragraph 7 you
25 conclude that, "the artificial inflation in the

Page 363

1 CONFIDENTIAL - ADAM WERNER, Ph.D.
2 prices of FXCM securities resulted from certain
3 alleged misrepresentations and omissions"; is
4 that correct?
5 A. So you're reading -- I'm sorry.
6 You're reading from the first sentence in
7 Paragraph 7? I mean, we might as well just read
8 into the record.
9 "The alleged misrepresentation and
10 omissions caused the price of the FXCM stock and
11 FXCM notes to be artificially inflated over the
12 course of the class period."
13 And, again, you and I have had
14 disagreements in the last, I don't know, 5 or
15 10 minutes about whether or not with regards to
16 the notes I'm talking about the class period or
17 the notes period. Again, I believe I was
18 probably inarticulate in the writing of that
19 sentence. And so, with regards to the notes, I
20 probably should have said "notes period."
21 Q. What were "the alleged
22 misrepresentations and omissions" you're
23 referring to in Paragraph 7?
24 A. So, turning to Paragraph 26 of my
25 report -- and, again, when I say -- can we agree

Page 364

1 CONFIDENTIAL - ADAM WERNER, Ph.D.
2 when I say, "my report," unless I specify
3 otherwise, we're talking about my April report
4 with regard to loss causation and damages?
5 Q. That's fine.
6 A. Okay. So looking at Paragraph 26 and
7 beginning with subpoint A, retail customers
8 profits or losses would have -- or maybe let me
9 read the previous sentence.
10 "Plaintiffs allege that FXCM falsely
11 represented/omitted to investors and market
12 participants that, A, retail customer's profits
13 or losses would have no effect on FXCM's interest
14 because FXCM's role was merely as an agent or
15 credit intermediary. B, despite the company's
16 claims of having no conflicts of interest for its
17 retail customer's trading on the NDD platform,
18 FXCM, in fact, had an undisclosed financial
19 interest in the market maker that consistently
20 'won'" -- and that "won" is in quotation marks --
21 "the largest share of FXCM's NDD" -- D as in
22 David -- "trading volume, Effex Capital (Effex).
23 C, Effex was essentially a front created by FXCM
24 allowing for FXCM to hold positions opposite its
25 customers and financially benefit at its

10 (Pages 361 - 364)

Page 365

CONFIDENTIAL - ADAM WERNER, Ph.D.
1    CONFIDENTIAL - ADAM WERNER, Ph.D.
2    customers expense in direct contravention to the
3    company's representations to investors and to its
4    own customers of conflict free trading on the
5    NDD."  Subpoint D, "FXCM manipulated its NDD
6    platform by putting Effex" -- and now when I say
7    "Effex" that's the word E-F-F-E-X, as opposed to
8    FX, the letters as in FXCM -- "in front of
9    independent market makers in routing retail
10   customer orders while also permitting Effex to
11   win all 'ties' with other market makers.  FXCM
12   provided Effex" -- again, that's the company
13   Effex -- "with the realtime view of price
14   quotations offered by other market makers and
15   added smaller markups to Effex" -- again, that's
16   the company -- "prices then to prices provided by
17   other market makers.  This way FXCM ensured that
18   the bulk of its order flow would go to Effex" --
19   the company -- "and generate profits for FXCM.
20   C, Effex" -- again, that's the company --
21   "payment to FXCM were disguised as order flow
22   payments which no other market maker was making
23   to FXCM.  FXCM's financial statements violated
24   SEC regulations and Generally Accepted Accounting
25   Principles (GAAP) for failing to disclose FXCM's

Page 366

1    CONFIDENTIAL - ADAM WERNER, Ph.D.
2    economic interest in contractual and related
3    partnership with and control over Effex" -- with
4    an E -- "during the class period."
5    Q.  And Paragraph 26 represents your sum
6    total understanding of "the alleged
7    misrepresentations and omissions" in this case?
8    A.  No, I believe, there are other
9    portions of this report, as well as my previous
10   reports that cover that subject matter.
11   Q.  For Paragraph 26 for each of those
12   allegations, you cite the complaint that was
13   filed in this matter; is that correct?
14   A.  That appears to be correct.
15   Q.  Other than reference to the
16   complaint, are there any other sources of
17   material that you analyzed in connection with the
18   allegations listed in Paragraph 26?
19   A.  Yes.
20   Q.  What are those?
21   A.  Well, okay.  So do you want me to
22   begin with my market efficiency report and going
23   through the list of documents I've reviewed?
24   Q.  I don't.  I'm just asking what
25   additional materials you relied on in connection

Page 367

1    CONFIDENTIAL - ADAM WERNER, Ph.D.
2    with your understanding of the allegations of
3    misrepresentations and omissions in this matter.
4    A.  Any other articles or material that
5    I've cited in any of my three reports when I'm
6    dealing with the corrective disclosure and/or the
7    alleged misrepresentations/omissions of the
8    Defendants in this matter.
9    Q.  Okay.  Turning back to Paragraph 8 of
10   your report, you conclude in Paragraph 8 that,
11   "The artificial inflation in the price of FXCM
12   securities was dissipated as a result of the
13   corrective disclosures and its inextricable
14   ramifications"; is that right?
15   A.  You read that correctly, yes.
16   Q.  Okay.  What are the "inextricable
17   ramifications" you're referring to?
18   A.  I'm sorry, I don't understand the
19   question.
20   Q.  You wrote, "Thus corrective
21   disclosures and their 'inextricable
22   ramifications' dissipated the artificial
23   inflation in the prices of FXCM securities and
24   thereby caused investor losses"; is that correct?
25   A.  That is correct.

Page 368

1    CONFIDENTIAL - ADAM WERNER, Ph.D.
2    MR. BAKER:  Objection.
3    A.  I believe so.  I'm --
4    MR. BAKER:  I think you added another
5    quote.
6    A.  Yeah, I'm now parsing through the
7    report to get to the part where I can be
8    responsive to your question so...
9    Q.  So sitting here today I'm just asking
10   you what are the "inextricable ramifications" you
11   are referring to in Paragraph 8 of your
12   conclusions?
13   A.  Right.  And I'm going to the portion
14   of my report that will give you the most accurate
15   description or answer to your question.
16   Okay.  So beginning in Paragraph 44
17   of my report -- and I'll just read this --
18   "Analysts and news commentary deemed the above
19   news as negative.  Oppenheimer and Cowen and
20   Company analyzed comment as follow:  Yesterday
21   FXCM made an announcement (see below) that led to
22   a 50 percent decline in FXCM share price.  One
23   component but in our view by no means the most
24   valuable component of Luk's investment" -- oh, is
25   this the right one, hold on.  Yes -- "investment

11 (Pages 365 - 368)

Page 369

CONFIDENTIAL - ADAM WERNER, Ph.D.
1  
2 in FXCM as a 49.9 percent ownership stake in FXCM
3 and this has, of course, raised concerns about
4 the valuation of the asset. To settle the
5 charges, FXCM will pay $7 million to the CFTC and
6 no monetary damages to the NFA."
7       I should note that I believe at one
8 point in this report I wrote "CFA" instead of
9 what I meant to say NFA. So, if you run across
10 that, I don't mean certified financial analyst, I
11 mean NFA.
12       "The company will also be shutting
13 down its US business. On February 6th, FXCM
14 announced a $7 million settlement with the CFTC,
15 which essentially forced them to sell their US
16 business. The CFTC complaint said FXCM and two
17 of its founding principals made false and
18 misleading solicitations by concealing from
19 customers that a chief market maker was
20 re-bidding, roughly, 70 percent of its revenue to
21 FXCM. It obviously sounds like a terrible fact
22 pattern." And that is from an Oppenheimer
23 report.
24       Now let me continue. "FXCM announced
25 late yesterday that it had reached agreement with

Page 370

1       CONFIDENTIAL - ADAM WERNER, Ph.D.
2 the National Futures Association (NFA) and
3 Commodity Futures Trading Commission (CFTC),
4 settling charges that the company did not
5 disclose to customers that it had an interest in
6 the market maker that traded the largest share of
7 FXCM's trading volume. The CFTC order found that
8 the market maker paid, roughly, 70 percent of the
9 revenues generated from FXCM's platform back to
10 FXCM. To be clear, this matter was not the
11 August complaint from the CFTC. We believe this
12 new settlement resolves this new issue and, at
13 least, some of the issues that had been part of
14 the original August complaint. To settle the
15 charges, FXCM will pay $7 million to the CFTC and
16 no monetary damages to the NFA. The company will
17 also be shutting down its US business. Also, as
18 a financial services company, it is certainly not
19 a good thing for their ongoing foreign operations
20 that they were pretty much forced out of the US
21 and that their debt and equity prices put parent
22 level solvency into question (at least, in the
23 market's mind). Solvency was, of course, always
24 a question but" not in -- [now] it is a front and
25 center question." And that is from a Cowen

Page 371

1       CONFIDENTIAL - ADAM WERNER, Ph.D.
2 report dated February 7th of 2017.
3       Finally, FXCM -- oh, I shouldn't say
4 "finally." There's actually two more portions
5 here.
6       "FXCM plans to layoff about 150
7 workers for about 18 percent of its workforce as
8 it restructures operations following two
9 regulatory settlements that forced it to exit the
10 US market. The foreign exchange broker, which is
11 selling its US customer accounts to Gain expects
12 to" -- and that's a company name, so capital G in
13 Gain -- expects to recognize the bulk of selling
14 its US customers -- oh, sorry, "expects to
15 recognize the bulk of the pre-tax restructuring
16 charge in the March quarter, according to a
17 regulatory filing shares drop 54 percent to
18 $3.13." And that is from a Dow Jones
19 institutional News article dated February 7th of
20 2017.
21       "Finally" -- and now I use that word
22 properly -- the Commodity Futures Trading
23 Commission hit forex capital markets parent
24 company FXCM Holdings and two founding partners
25 with $7 million fine over" -- excuse me --

Page 372

1       CONFIDENTIAL - ADAM WERNER, Ph.D.
2 "alleged trading misrepresentations. Now FXCM
3 Incorporated as pulling out of the US in an exit
4 that will free up almost $52 million in capital.
5 Gain Capital Holdings Incorporated is acquiring
6 the US client base."
7       And that is from S&L Financial Extra,
8 again, dated -- oh, but the article is, "J.P.
9 Morgan Gain China Interbank Bond Market
10 Licenses."
11       So that's what I mean when I say
12 inextricably -- or let's go back to the exact
13 language. I haven't had all my coffee yet today.
14       That's what I mean when I say
15 "inextricable ramifications." And, again, here
16 I'm referring to Paragraph 7 of my report.
17       Q. Is it your opinion that there were no
18 -- I'm sorry, back up.
19       So those are the "inextricable
20 ramifications" of the corrective disclosure in
21 February of 2017; is that correct?
22       A. I'm not sure. Let me just read this
23 to make sure.
24       Q. Let me ask a better question.
25       In Paragraph 8, the one that we were

Page 373

CONFIDENTIAL - ADAM WERNER, Ph.D.
1  CONFIDENTIAL - ADAM WERNER, Ph.D.
2  referring to, which you were just responding to,
3  I believe, you wrote, "Thus the corrective
4  disclosures and their inextricable ramifications
5  dissipated the artificial inflation of the prices
6  of FXCM securities and thereby caused investor
7  losses."
8      I believe you just gave me your best
9  as answer as to what you meant by the
10  "inextricable ramifications."
11     I'm now asking, are those
12  ramifications of which corrective disclosures?
13     A. I'm sorry. Are there -- are there
14  multiple corrective disclosures in this case?
15     Q. That's what I'm asking you.
16     You wrote, "The corrective
17  disclosures and their inextricable
18  ramifications."
19     What do you understand the corrective
20  disclosures to be in that -- as you used it in
21  that sentence?
22     A. Oh, I'm sorry. Now, I'm confused.
23     So -- oh, I see what you're saying.
24     Yes, you should probably get rid of
25  the "S" in disclosures and make that disclosure,

Page 374

1  CONFIDENTIAL - ADAM WERNER, Ph.D.
2  singular, as I mention in Paragraph 9 when I'm
3  talking about the corrective disclosure singular
4  on February 7th, 2017.
5      Q. In your opinion, are there no prior
6  disclosures or events that dissipated the alleged
7  artificial inflation in the price of FXCM
8  securities during the class period?
9      MR. BAKER: To be clear, we're
10  talking about prior to February 6th, 2017?
11     MR. ISAJIW: Correct.
12     A. So, prior to February 6th, I don't
13  believe so.
14     Q. You conduct an event study for this
15  loss causation report; is that right?
16     A. I did.
17     Q. And was that the same event study
18  that you used in connection with your prior
19  report on market efficiency?
20     A. That is correct.
21     Q. And you relied on that event study to
22  conclude that the February 2017 corrective
23  disclosure dissipated the artificial inflation in
24  the price of FXCM securities, right?
25     A. Among other things, yes.

Page 375

1  CONFIDENTIAL - ADAM WERNER, Ph.D.
2      Q. And you relied on that same event
3  study to conclude that the dissipation of
4  artificial inflation in the price of FXCM
5  securities caused investor losses; is that right?
6      A. Among other things, yes.
7      Q. In looking at Paragraph 10 of your
8  loss causation report, you say that, "These
9  conclusions were based on fundamental principles
10  of finance and valuation, company statements,
11  internal company documents, news articles,
12  analyst reports and event study analysis"; is
13  that correct?
14     A. That is correct.
15     Q. And I believe we discussed earlier
16  that all of the documents you considered in
17  connection with your opinions in this matter are
18  listed in Exhibit 2 of the loss causation reports
19  and your prior report; is that right?
20     A. I believe that is correct, yes.
21     Q. If you flip to Exhibit 2 of this
22  report.
23     A. Okay.
24     Q. You do not list any documents that
25  were produced by FXCM, correct?

Page 376

1  CONFIDENTIAL - ADAM WERNER, Ph.D.
2      A. In this -- in this particular -- in
3  this exhibit, it doesn't appear so. But, again,
4  I -- it -- what -- I also have any other
5  documents and data cited in the report. I'm
6  happy to go through the entire report and look at
7  every footnote and re-read it to let you know if
8  there's anything that I referred to,
9  specifically, with regard to the company.
10     Do you want me to do that or...
11     Q. I don't want you to do that. We've
12  done that and we did not see reference to any
13  documents produced buy FXCM in this case.
14     And if you take a look at Exhibit 2
15  to your January 2020 Corrected Opening Report on
16  Market Efficiency, which is Page 76 to 92 of that
17  document.
18     A. I'm sorry, which report are we
19  talking about now?
20     Q. Your Opening Report on Market
21  Efficiency, which is Werner Exhibit 3.
22     A. Right, okay.
23     And where would you like me to go?
24     Q. Exhibit 2, which begins on Page 76
25  and goes to 92.

13 (Pages 373 - 376)

1           CONFIDENTIAL - ADAM WERNER, Ph.D.
2       A. Okay.
3       Q. Again, there are no documents
4    produced by FXCM listed there, correct?
5       A. Well, I don't know how to answer that
6    question. I don't know exactly what FXCM has
7    produced, the company itself has produced in this
8    case.
9       Q. The documents that you reviewed are
10   all publically available documents; isn't that
11   correct?
12      A. It's an interesting question. I
13   don't know.
14          Do you believe that all investment
15   banking analyst articles are publically
16   available?
17      Q. Let's assume for the sake of this
18   question that they are.
19      A. Okay.
20      Q. With that assumption, the list is all
21   publically available documents; is that correct?
22      A. I mean, as I sit here today, I
23   believe -- well, you know, hold on. Let me
24   finish this; no.
25      Q. Of the documents that you are unsure

1           CONFIDENTIAL - ADAM WERNER, Ph.D.
2    whether they're publically available, were they
3    produced by FXCM in this matter?
4       A. I don't know one way or the other as
5    I sit here today.
6       Q. And if you take a look at Exhibit 2
7    to your July 2020 rebuttal report, again --
8       A. Well, hold on.
9       Q. Sure.
10      A. Okay, here we go. Okay, I'm there
11   now.
12      Q. Again, there are no documents
13   produced by FXCM listed in that exhibit; is that
14   correct?
15      A. Again, I don't know whether that's
16   correct or not. I don't know exactly what FXCM
17   has turned over in this case.
18      Q. Again, they are all publically
19   available documents that you listed; is that
20   correct?
21      A. Well, so, to the extent that we're
22   talking about any other documents and data cited
23   in the report, without going through the report,
24   I can't accurately answer your question.
25      Q. We have gone through the report and I

1           CONFIDENTIAL - ADAM WERNER, Ph.D.
2    will represent to you that we did not find any
3    documents produced by FXCM relied on in
4    connection with your reports or listed on
5    Exhibit 2 of any of your reports.
6           With that in mind, turning back to
7    Paragraph 10 of your loss causation report, you
8    say that your conclusions are based on "amongst
9    other things internal company documents."
10          Which "internal company documents"
11   are you referring to?
12      A. As I sit here today, I don't know.
13      Q. And none are listed in the Exhibit 2
14   of any of the reports we just went through; is
15   that correct?
16      A. Well, I don't -- I'm not sure that's
17   an accurate statement. I mean, to the extent
18   that the complaint may have referred to internal
19   company documents, the CFTC or the TFA -- no, not
20   TFA -- FTA, sorry there we go, referred to
21   internal client -- I mean, client documents --
22   FXCM documents. I mean, there is a whole host of
23   things in here that I've listed as materials
24   relied upon that refer to FXCM internal
25   documents.

1           CONFIDENTIAL - ADAM WERNER, Ph.D.
2       So, as I sit here today, I don't know
3    how to answer that question accurately.
4       Q. To the extent --
5       A. I, certainly -- I, certainly, can't
6    give you a fully inclusive answer, as I sit here
7    today.
8       Q. In connection with your work in this
9    matter, did you review any documents produced by
10   Effex Capital?
11      A. As I sit here today, I don't recall.
12      Q. How about Ernst & Young?
13      A. It's certainly possible.
14      Q. Do you recall -- do you recall any
15   specific Ernst & Young-produced documents?
16      A. Well, why don't we go -- if you would
17   like to introduce some of the firm's financials
18   as exhibits, I'd be happy to look through those
19   and let you know if Ernst & Young provided any
20   opinions in that or any of the other financial
21   documents I referred to or any of the analyst
22   reports that might possibly refer to Ernst &
23   Young.
24      Q. But sitting here today, you can't
25   recall any specific documents produced by Ernst &

14 (Pages 377 - 380)

Page 381

CONFIDENTIAL - ADAM WERNER, Ph.D.
1  CONFIDENTIAL - ADAM WERNER, Ph.D.
2  Young that you relied in connection within your
3  report, correct?
4      A. My answer is what it is.
5      Q. Did you read the deposition
6  transcript of Drew Niv in this matter?
7      A. That name sounds familiar, but I
8  don't recall. It's certainly possible.
9      Q. Is the deposition -- well, I'll
10  represent to you that the deposition transcript
11  of Drew Niv is not referenced anywhere in
12  Exhibit 2 to any of your reports. Nor is it
13  referenced in any footnotes in any of your
14  reports.
15      Does that refresh your recollection
16  as to whether or not you ever reviewed the
17  deposition of Drew Niv?
18      A. It doesn't only because I know I have
19  seen, at least, one deposition -- at least, one
20  deposition in this case that I reviewed. I don't
21  know if it was that individual's.
22      And to the extent I haven't included
23  it in my Exhibit 2 to any of my reports, it was
24  an oversight on my part.
25      Q. Did you review the deposition

Page 382

1  CONFIDENTIAL - ADAM WERNER, Ph.D.
2  transcript of John Dittami?
3      A. As I sit here today, I don't know one
4  way or the other.
5      Q. Did you review the deposition
6  transcript of William Ahdout?
7      A. As I sit here today, I don't know one
8  way or the other.
9      Q. It fair to say that to the extent
10  that these documents are not listed as documents
11  relied upon in any of your reports that you do
12  not base your conclusions on any of these
13  documents; is that correct?
14      A. I can't answer that one way or the
15  other, as I sit here today.
16      Q. I think earlier today you answered
17  that you listed all of the documents in your
18  Exhibit 2s to your report or otherwise in
19  footnotes to the extent that you relied on them
20  in connection with your opinions; isn't that
21  correct?
22      A. That is correct. I believe so. I
23  mean, I'm happy to have the Court Reporter go
24  back and try to find the answer to that question.
25      Would the Court Reporter like to do

Page 383

1  CONFIDENTIAL - ADAM WERNER, Ph.D.
2  that?
3      Q. It's not necessary.
4      I'm just asking you to confirm that
5  your answer was that you listed the documents
6  that you relied on in connection with your report
7  in your report, correct.
8      MR. BAKER: Objection as asked and
9  answered but...
10      A. I'm sorry. I'm trying to give you
11  the most precise answer that I can. So, you
12  know, you guys always ask all sorts of
13  hypothetical questions like is it possible. So
14  rather than -- let's eliminate is it
15  possible aspect of --
16      Q. Dr. Werner, my question did not have
17  "is it possible" --
18      A. Let me finish.
19      MR. BAKER: Counsel, let the witness
20  --
21      A. I'm sorry. Let me finish. Let me
22  finish. I'm speaking.
23      To the extent that I'm trying to be
24  as accurate as possible, let's go back to my
25  original answer to that question rather than

Page 384

1  CONFIDENTIAL - ADAM WERNER, Ph.D.
2  asking me if I recall that that is what I said.
3  That's what I would like to do.
4      Q. Okay.
5      A. And to the extent my job here is to
6  be as accurate as possible, that's what I would
7  like to do.
8      Q. That is unnecessary.
9      The original answer has been
10  recorded. I was just asking you to confirm it.
11  We can move along, but I...
12      In paragraph --
13      A. Okay. I'm sorry. So you have the
14  answer?
15      Q. I believe you testified, which is --
16  I believe you testified that to the extent you
17  relied on documents or information in connection
18  with your reports, you listed them in Exhibit 2
19  to those reports or otherwise referred to them in
20  the footnotes of those reports; is that correct?
21      MR. BAKER: Asked and answered.
22      A. Well, that's what your belief --
23      THE WITNESS: I'm sorry. Go ahead,
24  Josh.
25      MR. BAKER: Objection, asked and

15 (Pages 381 - 384)

Page 385

1    CONFIDENTIAL - ADAM WERNER, Ph.D.
2  answered.  And I thought we were about to move
3  on.
4        A.  That's what your belief is.  But
5  since we have the record, we don't have to rely
6  our belief, right.  We can go back to the record
7  and we can then know if that is the answer to my
8  -- to the question that you're asking.
9        Q.  I'm asking you to answer that
10  question sitting here right now today.
11        MR. BAKER:  Objection, asked and
12  answered, as he was sitting here earlier today.
13        MR. ISAJIW:  Josh, "objection to
14  form" is sufficient.
15        MR. BAKER:  Asking a question once is
16  sufficient.
17        A.  I refer to my answer earlier today.
18        Q.  Okay.  In Paragraph 11 of your
19  report, you concluded that, "The price of FXCM's
20  common stock was inflated by, at least, $3.39 per
21  share during the class period"; is that right?
22        A.  I'm sorry.  I'm looking at the wrong
23  report.  So let me get to the right report.  Let
24  me make sure that this is the right report.
25        You're speaking of Exhibit 8,

Page 386

1    CONFIDENTIAL - ADAM WERNER, Ph.D.
2  correct?
3        Q.  Your loss causation report.
4        A.  Right.  And so I'm just making sure
5  we're talking about Exhibit 8, because it appears
6  to me as Plaintiffs' expert report.  I assume
7  that's my loss causation report, but I'm just
8  trying to make sure that I'm at the right place.
9        Q.  Earlier today at your suggestion we
10  agreed when I say, "your report," you would refer
11  to your loss causation report.
12        A.  Well, I'm happy to have the Court
13  Reporter go ahead and read that back, if you're
14  asking me that.  I'm just trying -- look, I've
15  got like five documents open now, right.  It's
16  not like I have papers sitting in front of me.
17  So I'm just going back and forth between the
18  tabs.
19        So you need to be a little patient
20  when you keep going back and forth between
21  different documents.  Does that seem reasonable?
22        Q.  Dr. Werner, I'm just asking you to
23  look at Paragraph 11 of your loss causation
24  report.
25        A.  Okay.  So let's take a pause.  Let me

Page 387

1    CONFIDENTIAL - ADAM WERNER, Ph.D.
2  get to my loss causation report and then I'll
3  look at that paragraph.
4        Okay.
5        Q.  In Paragraph 11, you concluded that,
6  "The price of FXCM's common stock was inflated
7  by, at least, $3.39 per share during the class
8  period"; is that correct?
9        A.  That's -- you read that correctly.
10        Q.  And in this paragraph, you also
11  concluded that, "The price of FXCM's notes were
12  inflated by, at least, $16.31 per $100 of par
13  throughout the notes period"; is that correct?
14        A.  That is what I wrote.
15        Q.  And in Paragraph 12, you concluded
16  that, "The damages for investors who held FXCM's
17  common stock until February 7th, 2017 are up to
18  $3.39 per share"; is that right?
19        A.  That is what I wrote and it should --
20  it should -- and I wrote the same thing about the
21  notes.  It should really say "at least," as it
22  did in Paragraph 11 for both of those -- for both
23  the notes and the equity.
24        Q.  As we've discussed, this loss
25  causation report and your prior market efficiency

Page 388

1    CONFIDENTIAL - ADAM WERNER, Ph.D.
2  report represent the full extent of your opinions
3  in the matter regarding loss causation and
4  damages; is that right?
5        A.  I believe that's correct.
6        Q.  And they reflect the full universe of
7  documents and information you relied on in
8  connection with forming your conclusions; is that
9  correct?
10        MR. BAKER:  Objection, asked and
11  answered.
12        A.  I think we --
13        THE WITNESS:  I'm sorry, Josh, were
14  you objecting?
15        MR. BAKER:  So you can go ahead.
16        A.  I think we've -- I've asked and
17  answered that question multiple times now.
18        MR. ISAJIW:  Now is probably a good
19  time for a five-minute break.
20        THE VIDEOGRAPHER:  The time is
21  12:12 p.m. and we're going off the record.
22        (Recess taken 12:12 to 12:19 p.m.)
23        THE VIDEOGRAPHER:  The time is
24  12:19 p.m. and we're back on the record.
25        Q.  Dr. Werner, are you familiar with an

16 (Pages 385 - 388)

Page 389

1    CONFIDENTIAL - ADAM WERNER, Ph.D.
2  entity called 683 Capital?
3         A.  Am I familiar?  I believe so.
4         Q.  And who is 683 Capital?
5         A.  Well, if you'd like -- the best way
6  for me to answer that is for you to introduce the
7  Complaint in this matter to ensure that I give
8  the most accurate response.
9         Q.  I don't think that's necessary.
10        Do you understand that 683 Capital
11 was one of the Plaintiffs in this matter?
12        MR. BAKER:  Object to form.
13        A.  Again, I believe, that's correct.
14 But I'm happy to take a look at the Complaint --
15 was there an Amended Complaint in this case?
16        Either way, I'm happy to look at
17 either those or -- to make sure that I'm being
18 accurate.
19        Q.  You submitted a market efficiency
20 report in support of Plaintiffs' motion for class
21 certification and to be appointed as class
22 representative in this case, correct?
23        A.  Are you now referring to my original
24 market efficiency report --
25        Q.  I am.

Page 390

1    CONFIDENTIAL - ADAM WERNER, Ph.D.
2         A.  -- or amended market efficiency
3  report?
4         Q.  I am.
5         A.  Yes.
6         Q.  Okay.  And that market efficiency
7  report was used in support of Plaintiffs' motion
8  for class certification and to be appointed as
9  class representative in this matter; is that
10 right?
11        A.  I believe so.
12        Q.  And 683 Capital was one of those
13 Plaintiffs; is that correct?
14        A.  Again, I'm happy to verify that by
15 looking at the Complaint.  But, to the best of my
16 recollection, which, again, this isn't really a
17 memory test, I believe that is correct.
18        If you want to represent to me that
19 they're one of the Plaintiffs in this case, I'm
20 happy to agree with you.
21        Q.  Okay.  Do you know whether or not 683
22 Capital was a notes purchaser in connection with
23 this case?
24        A.  Again, I'm happy to look at the
25 Complaint to answer that question.  I don't want

Page 391

1    CONFIDENTIAL - ADAM WERNER, Ph.D.
2  to speculate, as I sit here today.
3         Q.  Let's take another look at the
4  March 18th, 2021 Report and Recommendation to the
5  Honorable Ronnie Abrams, which is, I believe,
6  Exhibit 10.
7         A.  I thought I had downloaded it, but
8  evidently I haven't so...
9         Oh, okay.  Yeah, I have it in front
10 of me.
11        Q.  Okay.  If you look at the bottom of
12 Page 1, the Court says, "For the reasons that
13 follow, I respectfully recommend that the motion
14 be granted as FXCM's Class A common stock."
15        A.  Sorry, I'm not there yet.  I just
16 have the document open.  I haven't gotten to the
17 part where you're reading.
18        So we're talking -- I'm sorry, what
19 paragraph?
20        Q.  The very last paragraph on the first
21 page?
22        A.  Oh, okay, I'm there.
23        Q.  "For the reasons that follow, I
24 respectfully recommend that the motion be granted
25 as to FXCM's Class A Common Stock and denied as

Page 392

1    CONFIDENTIAL - ADAM WERNER, Ph.D.
2  to its 2.25 percent convertible senior notes due
3  in 2018."
4         And if you turn to Page 14 of this
5  opinion -- let me know when you're there.
6         A.  Okay.
7         Q.  In the middle of the first full
8  paragraph on that page the Court says,
9  "Defendants do not contest the predominance as to
10 the stock class but argue vigorously that the
11 notes class cannot be certified because the FXCM
12 notes did not trade in an efficient market,
13 meaning, that the purchasers of those securities
14 cannot rely on the fraud on the market hypothesis
15 and would instead be required to establish on an
16 individual basis that each of them actually
17 relied on Defendant's misleading statements.  I
18 agree.  Therefore, even if the notes class were
19 sufficiently numerous, I would not recommend
20 certifying."
21        Do you see that?
22        A.  I do.
23        Q.  And then if you turn to Page 37 at
24 the bottom, the Court says, Because --
25        A.  Hold on, hold on.  Okay.

17 (Pages 389 - 392)

Page 393

CONFIDENTIAL - ADAM WERNER, Ph.D.

1
2    Q. At the bottom the paragraph says,
3 "Because Plaintiffs have not established that the
4 FXCM notes traded in an efficient market, they
5 cannot rely on the basic presumption of reliance
6 as to the notes, meaning, that each note
7 purchaser would be required to prove individually
8 that it relied on Defendant's allegedly false or
9 misleading statements in making its purchases.
10 This in turn means that Plaintiffs cannot satisfy
11 the predominance requirement of Rule 23(b)(3)
12 with respect to the FXCM notes."
13       Do you see that?
14    A. I do.
15    Q. Do you understand that 683 Capital is
16 now an individual plaintiff and not a class
17 representative in this matter?
18    A. Again --
19       MR. BAKER: Objection to form. I'm
20 sorry let me -- objection to the extent that it
21 calls for a legal conclusion.
22       You can answer.
23    A. I'm happy to look at whatever court
24 documents that will refresh my memory on this.
25 If you want to stipulate to that, it's fine.

Page 394

CONFIDENTIAL - ADAM WERNER, Ph.D.

1
2 I'll believe you.
3       But, you know, is it my
4 understanding? Off the top of my head, I don't
5 remember. But I do know that I've seen the
6 documents about them before. I believe that they
7 are individual Plaintiffs in this matter.
8       But it simply be easier when you're
9 asking questions like this, if you're assuming
10 they're correct, that you just stipulate to that
11 so I need to look at other documents to refresh
12 my memory.
13    Q. Have you been separately retained by
14 683 Capital as an individual Plaintiff to provide
15 a damages analysis on their behalf, as opposed to
16 on behalf of a notes class?
17       MR. BAKER: Objection to the form.
18    A. I don't know how to answer that. I
19 believe -- well, I refer to -- I defer to
20 Counsel. I'm not sure if that's privileged or
21 not. If it's not privileged, I'm happy to
22 answer.
23       MR. BAKER: Yeah, to the extent you
24 can answer outside of any conversations you had
25 with Counsel, you can answer, if you have any

Page 395

CONFIDENTIAL - ADAM WERNER, Ph.D.

1
2 outside knowledge of that.
3       [INSTRUCTION] But if it's based on,
4 you know, communications with Counsel, I would
5 instruct you not to answer.
6       THE WITNESS: Okay.
7    A. Based on advice of Counsel I'm not
8 going to answer that.
9    Q. Just to be clear -- and I don't want
10 you to reveal any information that Counsel may
11 have provided you in a privileged context.
12       But sitting here today, you cannot
13 answer the question of whether or not you've been
14 separately retained by 683 Capital as an
15 individual plaintiff without resort to privileged
16 information; is that correct?
17    A. Okay, so...
18    Q. I just want to be sure I'm --
19    A. When you say -- no, look, I
20 understand. I'm trying to make these as simple
21 as possible, because these are very vague
22 question.
23       So, when you say, "retained
24 separately," what do you mean by retained
25 separately?

Page 396

CONFIDENTIAL - ADAM WERNER, Ph.D.

1
2    Q. As an individual plaintiff, as
3 opposed to being retained to provide an opinion
4 on behalf of a notes class.
5    A. So how do I --
6       MR. BAKER: Objection.
7       THE WITNESS: I'm sorry, go ahead.
8       MR. BAKER: No. Same objection and
9 instruction. To the extent that you can answer
10 without relying on conversations between yourself
11 and Counsel, you can answer.
12    A. Alright. So, if the question is,
13 have I signed a separate contract with the entity
14 you were discussing, they haven't been retained
15 me or -- and I'll be generous here. When we talk
16 about me, we should also probably include
17 Crowninshield.
18       I don't know.
19    Q. Have you calculated 683 Capital's
20 damages on an individual basis?
21    A. Again, I defer to Counsel as to
22 whether or not I can answer that. I don't know
23 if that information is privileged or not.
24       MR. BAKER: Let's say if you can
25 answer outside of conversations with Counsel, if

18 (Pages 393 - 396)

Page 397

CONFIDENTIAL - ADAM WERNER, Ph.D.
1    there's something in your report, then you can
2    answer the question.  [INSTRUCTION] But to the
3    extent that the question involves conversations
4    between you and your Counsel, I would instruct
5    you not to answer.
6        A.  Alright.  Based on Counsel's
7    representations, I cannot answer those questions
8    or that question.
9        Q.  Is it fair to say that nothing in
10   your loss causation report expresses an opinion
11   regarding the specific damages of 683 Capital as
12   an individual in connection with their purchase
13   of FXCM securities; is that correct?
14       A.  No.
15       Q.  Where in your report do you specify
16   683 Capital's individual damages?
17       MR. BAKER:  Objection to form.
18       A.  Well, I have --
19       THE WITNESS:  I'm sorry, Josh.  I
20   don't mean to keep interrupting you.  I didn't
21   hear your objection, so go ahead.
22       MR. BAKER:  Objection to form.
23       And you can answer, if you know the
24   answer.

Page 398

CONFIDENTIAL - ADAM WERNER, Ph.D.
1        A.  So, when you say, "individual
2    damages," what do you mean?
3        Q.  I mean, the damages 683 Capital
4    allegedly suffered in connection with their
5    purchase of FXCM securities.
6        A.  So you're --
7        THE WITNESS:  And, Josh, if you want
8    to object, go ahead.
9        A.  But your question's imprecise, right.
10   They as note holders suffered damages per note.
11   So, yes, to the extent that I calculated those
12   damages, I have calculated damages in this report
13   for that entity.  If you're talking about
14   aggregate damages, that is not presented here in
15   this report.
16       Q.  So you offer no opinion on 683
17   Capital's aggregate damages in connection with
18   your loss causation report?
19       A.  Without --
20       MR. BAKER:  Objection to form.
21       I'm sorry.
22       Objection to the extent that his
23   prior answer answered that question.
24       But if you have anything to add,

Page 399

CONFIDENTIAL - ADAM WERNER, Ph.D.
1    please go ahead.
2        A.  I don't have anything to add.
3        Q.  I want to switch to talking, again,
4    about your event study conducted in connection
5    with the loss causation report here.
6        You would agree that it's possible
7    for a security to over or under react to news; is
8    that right?
9        A.  Oh, again --
10       MR. BAKER:  Objection to form.
11       Go ahead.
12       A.  You may be -- is it possible --
13   look --
14       Q.  I'm asking your opinion as an expert
15   is it possible.
16       A.  Let me answer the question.
17       You are answering extremely imprecise
18   questions.  So, when you ask me, "is it
19   possible," I believe, can you refer to my
20   previous deposition testimony when we discussed
21   the possibilities of over or under reactions.
22       Did this occur here?  That is not --
23   no.  I mean, obviously, it's your deposition.  I
24   hope Josh has sent you the bill for this.  We can

Page 400

CONFIDENTIAL - ADAM WERNER, Ph.D.
1    go as long as you want.  But, look, I'm just try
2    to be as accurate as possible here.
3        Q.  In your opinion, is it more likely
4    for a security to over or under react to news in
5    an inefficient market, a market that is not
6    efficient, than it would be to over or under
7    react in an efficient market?
8        MR. BAKER:  Objection, incomplete
9    hypothetical.
10       Answer, if you are able.
11       A.  Yeah, I don't know how to answer your
12   hypothetical question.
13       Q.  Efficient markets incorporate news
14   into the price of a security quickly and fully,
15   would you agree with that statement?
16       A.  I'm happy to read the -- if you want
17   me to point me to what you're reading off of, I'm
18   happy to review that statement and tell you
19   whether or not I agree with you in the context of
20   where I've written that.
21       Q.  I'm just asking as background to your
22   opinions in this matter, as your role as an
23   economist, would you agree with the statement
24   that efficient markets incorporate news into the

19 (Pages 397 - 400)

Page 401

CONFIDENTIAL - ADAM WERNER, Ph.D.
1    CONFIDENTIAL - ADAM WERNER, Ph.D.
2  price of a security quickly and fully?
3       A. Right.  And I believe that that's a
4  quote from one of my reports.  And so, to the
5  extent that you're quoting one of my reports and
6  you would like me to review it, I'm happy to do
7  it.
8       Q. But I'm not quoting your report.  I'm
9  asking a general proposition question.
10      A. As a general proposition?  So
11 generally, yes, I believe that's accurate.
12      Q. Okay.  And that's one of the reasons
13 an event study can help determine investor losses
14 in an efficient market; is that right?
15      A. I believe that is correct.
16      Q. Because an efficient market the
17 prices would quickly and fully reflect any
18 alleged corrective information; is that correct?
19      A. It's going to depend upon the
20 security.
21      Q. Is it more likely for the price of a
22 security to quickly and fully reflect alleged
23 corrective information in a market that is
24 efficient or a market that is not efficient?
25      MR. BAKER:  Objection, incomplete

Page 402

CONFIDENTIAL - ADAM WERNER, Ph.D.
1    CONFIDENTIAL - ADAM WERNER, Ph.D.
2  hypothetical.
3       But you can answer.
4       A. Yeah, as I sit here today, I don't
5  know how to answer your hypothetical question.
6       Q. Would you agree as a general
7  proposition that inefficient market do not
8  incorporate news into the price of a security
9  quickly and fully?
10      A. Again, I don't know how to answer
11 your hypothetical question.
12      Q. I don't believe it's a hypothetical.
13 I think it's a general proposition question.
14      A. Okay.  Repeat the question then,
15 please.
16      Q. Inefficient -- would you agree that
17 inefficient markets do not incorporate news into
18 the price of a security quickly and fully?
19      A. Not necessarily.
20      THE WITNESS:  I'm sorry, Josh, were
21 you going to say something?
22      MR. BAKER:  No, that's fine.  I think
23 previously he said general proposition but I
24 think we clarified that for now.  So that's fine.
25      A. Not necessarily.

Page 403

CONFIDENTIAL - ADAM WERNER, Ph.D.
1    CONFIDENTIAL - ADAM WERNER, Ph.D.
2       Q. When you conducted the event study
3  here for the FXCM notes, did you assume that the
4  market for the FXCM notes was efficient?
5       A. Well, to the extent that I was trying
6  to prove efficiency, I don't think -- I don't
7  believe I made it an assumption one way or the
8  other.
9       Q. Were you trying to prove efficiency
10 in connection with your loss causation report?
11      A. No.
12      Q. Okay.  In connection with the
13 analysis that you did with your loss causation
14 report, you conducted an event study, correct?
15      A. I mean, I had previously conducted an
16 event study in my original market efficiency
17 report.  I relied on that analysis for this
18 report.  And when I say, "this," I'm talking
19 about my loss causation and damages report.
20      Q. And in connection with your analysis
21 for your loss causation and damages report, when
22 you relied on the event study for the FXCM notes,
23 did you assume in your loss causation analysis
24 that the market for FXCM notes was efficient?
25      A. That's not anything I considered or I

Page 404

CONFIDENTIAL - ADAM WERNER, Ph.D.
1    CONFIDENTIAL - ADAM WERNER, Ph.D.
2  considered in submitting this report.  So I have
3  to think about that.
4       Q. So sitting here today, you can't tell
5  me whether or not your loss causation analysis
6  for the FXCM notes assumed an efficient market?
7       A. I defer to my previous answer.
8       Q. If you did not assume that the notes
9  market was efficient, how can you be certain that
10 the alleged corrective disclosure caused a price
11 drop in the FXCM notes?
12      MR. BAKER:  Object to the form.
13      A. I don't understand the question.
14      Q. We just discussed and, I believe, you
15 agreed that an efficient market news is
16 incorporated into the price of a security quickly
17 and fully; is that right?
18      A. I think I said generally.
19      Q. Okay.
20      A. That is correct.
21      Q. So, if the market is not efficient
22 and therefore it is not likely that news would
23 incorporate itself into the price of a security
24 quickly and fully, how can you be certain that
25 alleged corrective information causes a price

20 (Pages 401 - 404)

1    CONFIDENTIAL - ADAM WERNER, Ph.D.
2    drop?
3         MR. BAKER:  Objection to form.  There
4    is a bunch of assumptions in there that are not
5    what we talked about before.
6         The Witness:  You're right.  So --
7    I'm sorry, Josh.
8         MR. BAKER:  If you understand the
9    question, you can answer.
10        THE WITNESS:  No, no, Josh.  I
11   actually was going to say that.
12        A.  You've made a ton of assumptions in
13   that question.  And so, without exploring those
14   assumptions more, I can't answer that question.
15   It's only -- I only laugh because Josh -- as he
16   was making that objection, I was like, no,
17   there's a lot of assumption in there, so I can't
18   answer that question.
19        Q.  Generally speaking, as an economist,
20   do you believe that an event study can properly
21   form the basis of a loss causation analysis if
22   the market for a security is not efficient?
23        A.  That's -- that's not anything that I
24   ever thought about.  Sure, it's certainly
25   possible that an event study can form the

1    CONFIDENTIAL - ADAM WERNER, Ph.D.
2    foundation of a damage analysis if a market for a
3    stock is inefficient or not efficient, I should
4    say.
5         Q.  Would you need to make any
6    modifications to your event study methodology to
7    accommodate for an inefficient, not efficient
8    market?
9         MR. BAKER:  Objection to the form.
10   So we're clear inefficient and not efficient are
11   not necessarily the same thing.
12        So are you asking -- and I just want
13   to make sure I understand what you're asking.
14   Are you asking in either situation, or are you
15   saying that they're the same one?
16        MR. ISAJIW:  Again, Josh, I think
17   objection to form is generally sufficient.
18        But what I was trying to do was
19   clarify for the Court Reporter the difference
20   between efficient and inefficient by saying "not
21   efficient."
22        Q.  So, to ask the question again --
23        A.  Well, go ahead.
24        MR. BAKER:  Just, you know, Mr.
25   Werner's previous answer he differentiated

1    CONFIDENTIAL - ADAM WERNER, Ph.D.
2    between the two and --
3         THE STENOGRAPHER:  I'm sorry, Josh.
4    You're going to have to get closer to the
5    microphone.  I'm getting like every other word.
6    Sorry about that.
7         MR. BAKER:  Sorry.
8         I believe in Dr. Werner's previous
9    answer, he described that there would be -- sort
10   of mentioned that there would be a difference
11   between inefficient and not efficient in various
12   context and so that's what I'm trying to clarify
13   to make sure we are all understanding and
14   answering the same question.
15        Q.  If the market for a security is
16   inefficient, are there any modifications to your
17   event study methodology that would be required to
18   accommodate for the fact that the market is
19   inefficient?
20        A.  That's not something I've thought
21   about as of today.  I would need to think about
22   that more.
23        Q.  Did you make any accommodations to
24   your event study methodology in this case to
25   accommodate for an inefficient market for the

1    CONFIDENTIAL - ADAM WERNER, Ph.D.
2    FXCM notes?
3         MR. BAKER:  Object to form, assumes
4    facts.
5         A.  Well, I --
6         MR. BAKER:  Assumes facts not in the
7    record.
8         Go ahead.
9         A.  I don't know what you mean by
10   "modifications."  Could you define those
11   "modifications" that you're thinking of and maybe
12   I would be able to give you an answer to that
13   question?
14        Q.  When analyzing the event study in
15   connection with your loss causation and damages
16   conclusions, did you make any modifications as to
17   the event study between the -- in connection with
18   the FXCM common stock versus the FXCM notes?
19        A.  Again, without a definition of
20   "modifications" or some notion of what you're
21   talking about, I can't answer those questions or
22   that individual question or the series of
23   questions.
24        Q.  Again, we discussed it earlier, but
25   the Court has rejected the conclusion that the

21 (Pages 405 - 408)

1          CONFIDENTIAL - ADAM WERNER, Ph.D.
2    FXCM notes traded in an in -- an efficient
3    market, correct?
4          A.  Do you want to repeat that question?
5    I heard an in and efficient and inefficient.  So
6    I don't understand the question.
7          Q.  The Court rejected your conclusion
8    that the market for the FXCM notes was efficient,
9    correct?
10         A.  I believe I've answered that question
11   previously.  So I defer to my earlier answer.
12         Q.  Did you modify your loss causation
13   and damages analysis in connection with the notes
14   in any way to accommodate for the Court's
15   conclusion that the FXCM notes market was not
16   efficient?
17             MR. BAKER:  Object to form.
18         You can answer.
19         A.  Again, I don't know what you mean by
20   "modify" and there was jumbling of inefficient
21   and not efficient.
22             If you want to repeat the question
23   and explain what you mean by "modify," I'll make
24   an attempt to answer the question.
25         Q.  I'm just asking if your analysis

1          CONFIDENTIAL - ADAM WERNER, Ph.D.
2    required any modification to accommodate for the
3    Court's ruling on market efficiency in connection
4    with the notes in this matter?
5              MR. BAKER:  Object to form.
6         And, Counsel, he said numerous times
7    that he needs clarification of what
8    "modifications" you're talking about.  So, if you
9    want to clarify something, he's asked that
10   multiple times and you keep on using the same
11   words.  So it's understandably confusing.
12         A.  I refer to my previous answer on this
13   question or on this topic.
14         Q.  Is there anything in your report
15   describing a modification to your loss causation
16   analysis in connection with the notes to
17   accommodate for the Court's ruling on market
18   efficiency for the notes in this matter?
19             MR. BAKER:  Same objection.
20         A.  Same answer.
21         Q.  I don't understand what the "same
22   answer" is.  This is a different question and
23   it's yes or no.
24         A.  Same --
25             MR. BAKER:  Same objection.  You're

1          CONFIDENTIAL - ADAM WERNER, Ph.D.
2    using the same term that the witness has
3    repeatedly asked you to clarify without
4    clarifying that term.
5              MR. ISAJIW:  Josh, your speaking
6    objections are getting a little extreme.
7         Q.  If we -- did you -- is there anything
8    in your loss causation report describing any type
9    of change to your loss causation analysis to
10   accommodate for the fact that the Court has made
11   a ruling on market efficiency in connection with
12   the notes in this matter?
13             MR. BAKER:  Objection to form.
14         You can answer.
15         A.  I don't know how to answer that
16   question.
17         Q.  Did the Court's ruling on market
18   efficiency for the notes in this matter factor
19   into your loss causation and damages analysis in
20   connection with the notes?
21         A.  Did it factor in?  I mean, I suppose
22   to the extent that I knew about it, it may have
23   factored in but, no, in general, no.
24         Q.  Okay.  Let's take a look at Page 32
25   of your report and the section entitled,

1          CONFIDENTIAL - ADAM WERNER, Ph.D.
2    "Artificial Inflation Ribbon."
3         A.  Hold on.  Let me get there.
4         Okay.  I'm sorry what page?
5         Q.  32.
6         A.  32.  Okay, I'm there.
7         Q.  Paragraph 88 of this report you
8    define "artificial inflation" as "the difference
9    between what a securities price actually was at a
10   point of time and what the price would have been
11   absent the alleged fraud"; is that correct?
12         A.  You read that correctly.
13         Q.  Would you agree that the price of a
14   security absent the artificial inflation impact
15   of any alleged fraud is referred to generally as
16   the "but for price"?
17         A.  I believe that's correct.
18         Q.  And in order to determine the but for
19   price of a company's security, you need to
20   determine what price would -- the security would
21   have been had the company made the allegedly
22   corrective disclosure at an earlier point in
23   time; is that correct?
24         A.  I believe that statement is correct.
25         Q.  And assuming there is no confounding

22 (Pages 409 - 412)

Page 413

CONFIDENTIAL - ADAM WERNER, Ph.D.

1    CONFIDENTIAL - ADAM WERNER, Ph.D.
2  information, the residual price decline following
3  an allegedly corrective disclosure demonstrates
4  the level of artificial inflation in a security
5  immediately before that corrective disclosure; is
6  that right?
7       A. I'm sorry, could you repeat that
8  question please?
9       Q. Assuming there is no confounding
10  information, the residual price decline following
11  an allegedly corrective disclosure demonstrates
12  the level of artificial inflation in a security
13  immediately before that corrective disclosure; is
14  that correct?
15       A. At least.
16       Q. Would you agree that the level of
17  inflation in a security can change over time
18  during a class period?
19       A. As a general statement -- as a
20  general premise, that statement is correct.
21       Q. And, generally speaking, what are the
22  circumstances that could create a situation where
23  the level of inflation could change over time?
24       A. I mean, there's an expansive number
25  of answers.  I mean, I could give you some

Page 414

1    CONFIDENTIAL - ADAM WERNER, Ph.D.
2  examples.  One would be an additional corrective
3  disclosure.  One could be a statement -- an
4  allegedly fraudulent statement that may serve to
5  increase the stock price or the inflation.  I
6  mean, it's an extremely large question.  But I
7  think those two are two examples of situations
8  where inflation might change during the class
9  period.
10       Q. And would you agree that any analysis
11  of inflation would need to explore those
12  potential circumstances to determine whether
13  inflation did, in fact, change over a class
14  period?
15       A. I think that statement's accurate.
16       Q. And would you agree that you can't
17  use a residual price decline on one day alone
18  without more information to measure artificial
19  inflation in the price of a security over a
20  multi-year period?
21       A. I don't know how to answer that
22  question.
23       Q. Let me ask it another way.
24       Just because the price declines at
25  the end of a multi-year class period, does not by

Page 415

1    CONFIDENTIAL - ADAM WERNER, Ph.D.
2  itself indicate that the inflation amount
3  reflected in that price decline was constant
4  throughout the whole class period, does it?
5       A. So, I mean, there's all sorts of
6  assumptions that would go into giving you an
7  accurate answer to that statement.
8       But I think -- I mean, if you want --
9  if you want to repeat the question, I can give
10  you a general answer to an extremely complex
11  question.  But this won't -- as to the facts of
12  this case, I'm not sure if the answer would apply
13  one way or the other.
14       Q. Just -- I'm looking for just general
15  -- we'll get to the facts of this case in a
16  minute.
17       I'm just looking for a general answer
18  to the question of just because the price
19  declines at the end of multi-year class period
20  does not by itself indicate that the inflation
21  amount reflected in that price decline was
22  constant throughout that class period, would you
23  agree with that statement?
24       A. I think as a general statement, that
25  is correct.

Page 416

1    CONFIDENTIAL - ADAM WERNER, Ph.D.
2       Q. Is it possible that the substance of
3  information a company could or should have
4  disclosed to correct an allegedly fraudulent
5  misstatement could change during the class
6  period?
7       A. I'm sorry, so the question -- could
8  you re-read the question please?  Because, I
9  think, it -- it either started with, could it --
10  and, again, now we're -- when you ask questions
11  like "could," are we talking about likelihoods or
12  a tale possibility?
13       So go ahead and re-read the question.
14  I'll try to answer it, as you've stated it.
15       Q. It possible that the substance of
16  information a company could or should disclose to
17  correct an allegedly fraudulent misstatement
18  could change during the class period?
19       MR. BAKER: I'm going to object to
20  form.
21       But you can answer.
22       A. To the extent that anything is
23  possible, in the same sense that -- I mean, I
24  don't know -- I don't know what percentage to put
25  on this.

23 (Pages 413 - 416)

CONFIDENTIAL - ADAM WERNER, Ph.D.
1      I mean, is it possible Trump actually
2  won the 2020 election?  I suppose it's possible.
3  Is it probable?  No.
4      So, again, it's an overly broad
5  question.  I mean, if you ask me if something is
6  possible, anything is possible, right.
7      Is it possible that my ceiling has a
8  crack in it and there's about to be water flowing
9  in on my head?  It's possible.  Probable, no.
10     So I don't know how to answer these
11 questions about -- that are vaguely asked.  So,
12 because if I -- when you ask questions like is it
13 possible, if I say, ah, yes, it is possible, then
14 all of the sudden it's like, oh, Dr. Werner said
15 it's possible, right.  But possible and probable
16 are two different things.
17     So, I mean, generally, anything is
18 possible.
19     Q.  Would you agree that in conducting a
20 loss causation analysis and damages analysis, you
21 would need to explore the possibility that the
22 substance of a potential corrective disclosure
23 could change during the class period?
24     A.  As a general principle, yes.

CONFIDENTIAL - ADAM WERNER, Ph.D.
1      Q.  Would you agree that you would also
2  need to explore the possibility that the impact
3  of any potential corrective disclosure would
4  change over the course of a class period?
5      A.  Okay.  Could you re-read that
6  sentence please?
7      Q.  Would you agree that you would also
8  need to explore the possibility that the impact
9  of any potential corrective disclosure on the
10 price of a security could change over the course
11 of a class period?
12     A.  So, to quote you, possibly.
13     Q.  Okay.  I want to focus on the
14 disclosure assumptions in your analysis today.
15     In your report, you do not list
16 specific but for disclosures that FXCM should
17 have made or when they should have made them; is
18 that correct?
19     A.  Could you re-read the question
20 please?
21     Q.  In your report, you do not list
22 specific but for disclosures that FXCM should
23 have made or when they could have made them; is
24 that correct?

CONFIDENTIAL - ADAM WERNER, Ph.D.
1      MR. BAKER:  Objection to form.
2      You can answer again.
3      A.  I don't know how to answer that
4  question.  Yeah, I don't know how to answer that
5  question.
6      Q.  Is there any section in your loss
7  causation report where you detail but for
8  disclosures that you believe FXCM should have
9  made during the class period?
10     A.  Well, so, ultimately, it's not up to
11 me to decide what FXCM should have disclosed
12 during the class period.  The court will decide
13 what FXCM should have disclosed during the class
14 period and when they should have disclosed it.
15     It seems to me, though, that the
16 information contained in the corrective
17 disclosure at the end of the class period as a
18 general principle to the extent that FXCM was
19 aware of any information associated with it
20 should have been announced earlier.
21     Q.  And what information contained in the
22 corrective disclosure do you believe FXCM should
23 have made earlier?
24     A.  Well, again -- well, alright.  Let's

CONFIDENTIAL - ADAM WERNER, Ph.D.
1  go to their corrective disclosure.
2      So -- and I'm referring now to
3  Paragraph 26 of my report.  "I believe Plaintiffs
4  are saying that FXCM should have disclosed that
5  retail customer's profits or losses would have an
6  effect on FXCM interest because FXCM's role was
7  merely as an agent or a credit intermediary."
8      "They should have disclosed that they
9  had a financial interest in the market maker that
10 consistently won the largest share of FXCM's NDD
11 trading volume."
12     "Plaintiffs allege that they should
13 have stated that Effex" -- that's, again, with
14 capital E so we're talking about the company --
15 was, "essentially, a front created by FXCM
16 allowing for FXCM to hold positions opposite its
17 customers and financially benefit at its
18 customers expense in direct contravention to the
19 company's representations to investors and its
20 own customers of" conflict trading -- or
21 "conflict-free trading on the NDD."
22     "Plaintiffs allege that or suggest
23 that FXCM should have announced or told the
24 market that it had manipulated its NDD platform

1          CONFIDENTIAL - ADAM WERNER, Ph.D.
2    by putting Effex" -- again, that's with a capital
3    E -- "in front of independent market makers and
4    routing retail customer orders while also
5    permitting Effex to win all ties with other
6    market makers."
7          "FXCM provided Effex" -- again, with
8    a capital E -- "with a realtime view of price
9    quotations offered by other market makers and
10   added smaller markups to Effex" -- capital E --
11   "prices than the prices provided by other market
12   makers.  This way FXCM ensured that the bulk of
13   its order flow would go to Effex -- capital E --
14   and generate profits for FXCM."
15         I believe that they believed --
16   "Plaintiffs believe that Effex should not have
17   disguised its order flow payments, which no other
18   market maker was making to FXCM."
19         And I believe that it's alleged that
20   they should have corrected their financial
21   statements so they did not violate SEC
22   regulations and Generally Accepted Accounting
23   Principles for failing to disclose FXCM economic
24   interest in contractual and related-party
25   relationship with and control over Effex --

1          CONFIDENTIAL - ADAM WERNER, Ph.D.
2    capital E -- during the class period.
3          Q.  So those are Plaintiffs' allegations
4    in the Complaint.
5          And I'm just asking in connection
6    with your expert opinion in this matter, is there
7    any place in this report where you independently
8    opine what FXCM should have disclosed in
9    connection with each of those allegations or when
10   it could have disclosed them?
11         A.  Do I independently do it?
12         I'm not sure how to answer that
13   question.
14         Q.  In connection with your loss
15   causation and damages analysis, did you assume
16   that FXCM should have disclosed Effex by name as
17   a liquidity provider from which it received pay
18   for flow payments?
19         MR. BAKER:  Objection to form.
20         A.  Yeah, I -- I'm not sure how to answer
21   that question.  I mean, ultimately, I think,
22   Plaintiffs will have to prove one way or another
23   what should have been disclosed and what period
24   of time it should have been disclosed.
25         Q.  Sitting here today do you have an

1          CONFIDENTIAL - ADAM WERNER, Ph.D.
2    expert opinion on whether FXCM should have
3    disclosed Effex by name as a liquidity provider
4    from which it received pay for flow payments?
5          A.  Well, okay, so couple questions; by
6    name as opposed to what?
7          Q.  As opposed to, I guess, a general
8    description of receiving pay for flow payments.
9          A.  You mean alleged pay for flow
10   statements?
11         Q.  I'm asking if you have formed an
12   opinion as to whether FXCM should have disclosed
13   Effex by name as a liquidity provider from which
14   it received pay for flow payments?
15         A.  I don't have an opinion about that
16   one way or another.  It's an extremely -- I'll
17   leave it at that.
18         Q.  Do you have an opinion as to whether
19   or not FXCM should have disclosed that its
20   relationship with Effex was being investigated by
21   regulators?
22         A.  So, again, to the extent you're
23   asking me should they have done that, that's not
24   in my purview.
25         Q.  Do you have any opinion as to whether

1          CONFIDENTIAL - ADAM WERNER, Ph.D.
2    or not FXCM should have issued a different set of
3    financial statements consolidating Effex as a
4    variable interest entity?
5          A.  Same answer to the previous question.
6          Q.  Have you done any analysis as to
7    whether consolidating Effex into FXCM's financial
8    reporting would negatively affect FXCM's
9    financials?
10         A.  As a GAAP principle?
11         Q.  In any way.
12         Have you done any analysis?
13         A.  I don't understand the question.
14         Q.  Did you analyze in connection with
15   the scope of work for your retention as an expert
16   in this matter whether consolidating Effex into
17   FXCM's financial reporting would negatively
18   affect FXCM's financials?
19         A.  Same answer.
20         Q.  And, to be clear, the "same answer"
21   that you're referring to was, "that's not in my
22   purview"; is that correct?
23         A.  I believe that's what I stated.  But
24   if you would like the Court Reporter to read back
25   exactly what I state, I'm happy to have them do

Page 425

CONFIDENTIAL - ADAM WERNER, Ph.D.
that. Or if you want to stipulate that's what I said, I won't disagree with you.
Q. I believe that's what you said. And I just want to make sure, because we had a colloquy between your end.
A. Well, okay. So now to the extent you "believe" that's what I said, you might as well just refer to what the Court Reporter wrote.
Q. I am happy to do that.
MR. ISAJIW: Ms. Wage, are you able to read back the previous answer to his questions?
MR. BAKER: Which question?
MR. ISAJIW: The one that he's referring to when he says, "same answer."
THE STENOGRAPHER: Just give me a moment, so I can find it.
MR. ISAJIW: Sure.
MR. BAKER: He said the "same answer" a couple of times. Is he referring to the same one. But just, Silvia -- for the clear record, Peter, if there's a certain part of the draft like lines or pages that you can refer to, maybe that would help clear things up just as a...

Page 426

CONFIDENTIAL - ADAM WERNER, Ph.D.
MR. ISAJIW: I'm literally looking for clarity as well.
MR. BAKER: Okay.
A. Just if I may ask, at some point in the next hour, my sixth grade son is going to his graduation. I would like to pause the proceedings because it looks like I won't be making that graduation and, at least, wish him good luck; is that okay?
Q. What time are you asking for a break?
A. Well, I don't know what time he's leaving. The graduation starts at 11. So I don't know. We live ten minutes from the school. I don't know what his mom is thinking in regards to traffic, et cetera. I don't know.
So, again, sometime in the next hour or, I guess, now 45 minutes --
Q. I'm happy to accommodate --
A. I'm sorry. You asked me a question and I'm explaining the answer.
Within the next 51 minutes, I would like to take a break to wish my son well in his graduation of sixth grade.
Q. Sure. It's the first I've heard of

Page 427

CONFIDENTIAL - ADAM WERNER, Ph.D.
this. And I'm happy to accommodate you. Just let us know -- give us five minutes in advance. As long as there is no question pending, it should be fine.
A. Okay. Well, when I hear the dogs barking, I'll know that he's about to leave.
THE STENOGRAPHER: Okay. Every time you guys talk, I can't look at the transcript. So just pause for one second. I'm sorry.
A. Well, okay, why don't we take a break while she's tracking down the answer, if that's okay.
Q. I'm happy to go off the record.
A. I would -- I'd like to take a break for a minute.
Q. I'm happy to go off the record.
A. Okay.
THE VIDEOGRAPHER: The time is 1:10 p.m. We're going off the record.
(Recess taken 1:10 to 1:19 p.m.)
(Whereupon, the questions and answers are read back as follows off he record:
"Question: Do you have an opinion whether or not FXCM should have disclosed that

Page 428

CONFIDENTIAL - ADAM WERNER, Ph.D.
its relationship with Effex was being investigated by regulators?
Answer: So, again, to the extent you're asking me should they have done that, that's not in my purview.
Question: Do you have any opinion as to whether or not FXCM should have issued a different set of financial statements consolidating Effex as a variable interest entity?
Answer: Same answer to the previous question.
Question: Have you done any analysis as to whether consolidating Effex into FXCM's financial reporting would negatively affect FXCM's financials?
Answer: As a GAAP principle?
Question: In any way.
Have you done any analysis?
Answer: I don't understand the question.
Question: Did you analyze in connection with the scope of work for your retention as an expert in this matter whether

1          CONFIDENTIAL - ADAM WERNER, Ph.D.
2    consolidating Effex into FXCM's financial
3    reporting would negatively affect FXCM's
4    financials?
5          Answer:  Same answer.
6          Question:  And, to be clear, the
7    'same answer' that you're referring to was,
8    'that's not in my purview'; is that correct?
9          Answer:  I believe that's what I
10   stated.")
11         THE VIDEOGRAPHER:  The time is
12   1:19 p.m.  We're going back on the record.
13         Q.  Dr. Werner, before we went off the
14   record, I asked, did you analyze in connection
15   with the scope of work for your retention as an
16   expert in this matter whether consolidating Effex
17   into FXCM's financial reporting would negatively
18   affect FXCM's financials.
19         A.  Okay.  And I don't understand the
20   question.
21         Q.  Did you do any analysis in connection
22   with the scope of work in this matter to
23   determine in your expert opinion as to whether
24   FXCM consolidating Effex into FXCM's financial
25   reporting would negatively affect FXCM's

1          CONFIDENTIAL - ADAM WERNER, Ph.D.
2    financials?
3          A.  To the extent that I don't understand
4    the question, I can't answer it.
5          Q.  You don't understand whether you did
6    that analysis?
7          A.  Well, I don't understand your
8    question.  So, if I don't know what you're
9    talking about, I can't say one way or the other
10   whether I did the analysis associated with your
11   question.
12         Q.  Was it within your purview as an
13   expert retained for loss causation and damages in
14   this matter to analyze whether FXCM should have
15   consolidated Effex in its financial reporting?
16         A.  So, again, to the extent that I don't
17   understand the question, I don't know how to
18   answer it.
19         Q.  Did -- in connection with your scope
20   of work in this matter, did you do any analysis
21   as to whether FXCM should have issued a different
22   set of financial statements consolidating Effex
23   as a variable interest entity?
24         MR. BAKER:  Objection to form.
25         You can answer, if you're able.

1          CONFIDENTIAL - ADAM WERNER, Ph.D.
2          A.  Again, I don't understand the
3    question.  So, to the extent that I don't
4    understand the question, I don't know -- I don't
5    know how to give you an accurate answer one way
6    or other.  It's possible, in using that word that
7    everyone loves to use in litigation.  But as I
8    sit here today, I don't know.
9          Q.  Do you understand what a variable
10   interest entity is?
11         A.  Do I understand what a variable
12   interest entity?  You know, as I sit here today,
13   I'm not sure.
14         Q.  Do you have any opinion as to whether
15   FXCM should have issued a different set of
16   financials consolidating Effex as a variable
17   interest entity?
18         MR. BAKER:  Objection to form.
19         A.  Again, I don't understand the
20   question.  So I don't know how to give you an
21   accurate answer.
22         Q.  In connection with your scope of work
23   for the loss causation and damages report in this
24   matter, did you analyze whether FXCM should have
25   issued financial statements disclosing

1          CONFIDENTIAL - ADAM WERNER, Ph.D.
2    transactions with Effex as related-party
3    transactions?
4          A.  Again, I don't understand the
5    question.  So, to the extent that I don't
6    understand the question, I can't answer it.
7          Q.  And I'm just asking whether or not
8    these are analyses you performed.
9          So I'm not asking for any
10   conclusions.  I'm just asking if you have done
11   these analyses.
12         A.  Right.  And so, again, to the extent
13   that I don't understand your questions, I don't
14   know how to answer the -- I don't know how to
15   answer them.
16         Did I perform some analyses?
17   Possible.  But I don't understand the question
18   so...
19         I've given you the best answer I can.
20         Q.  Okay.  Let's look at Paragraph 7 of
21   your loss causation report again.  Please let me
22   know when you're there.
23         A.  I'm in the wrong report.
24         Okay, Paragraph 7, I'm there.
25         Q.  In Paragraph 7 you say, "FXCM misled

Page 433

1       CONFIDENTIAL - ADAM WERNER, Ph.D.
2    the market about the company's purported lack of
3    conflict of interest with customer transactions
4    on FXCM's NDD platform."
5           Did I read that correctly?
6       A. You did.
7       Q. Are you offering an opinion that
8    receiving payment for order flow created a
9    conflict of interest with customer transactions
10   on FXCM's NDD platform?
11      A. I don't know how to answer that
12   question. I mean, look, companies pay for order
13   flow all the time. It's not just the question of
14   paying for order flow. There's a whole miasma of
15   things going on here.
16          So I'm not quite sure how to answer
17   that question without going into the entirety of
18   this question.
19      Q. Have you analyzed in connection with
20   your work as an expert on this matter whether
21   FXCM's relationship with Effex was detrimental or
22   beneficial to its customers during the class
23   period?
24      A. Well, I mean, to the extent that I've
25   previously during this deposition read analyst

Page 434

1       CONFIDENTIAL - ADAM WERNER, Ph.D.
2    quotes that suggest that it was detrimental, I
3    suppose it could -- certainly could be.
4       Q. Was it within your purview as an
5    expert to opine on whether FXCM's relationship
6    with Effex was detrimental or beneficial to its
7    customers during the class period?
8       A. That's an interesting question. I'm
9    not sure whether or not I've been asked to opine
10   on that.
11      Q. Was it within your purview to analyze
12   whether an agency or no dealing desk model would
13   be more beneficial to FXCM's business operations
14   during the class period than a principal or
15   dealing desk model?
16      A. Could you re-read the question
17   please?
18         MR. ISAJIW: Ms. Wage, can you
19   re-read the question please.
20         (Whereupon, the question is read back
21   as follows:
22          "Question: Was it within your
23   purview to analyze whether an agency or no
24   dealing desk model would be more beneficial to
25   FXCM's business operations during the class

Page 435

1       CONFIDENTIAL - ADAM WERNER, Ph.D.
2    period than a principal or dealing desk model?")
3       A. And I don't really understand the
4    question, but I'll ask some clarifying questions
5    in an attempt to answer that.
6           So from whose perspective?
7       Q. From anyone's perspective, were you
8    asked to analyze that issue?
9       A. Yeah, I don't know one way or the
10   other, as I sit here today.
11      Q. You go on to say in that paragraph
12   that, "FXCM misled market participants about the
13   extent of FXCM's exposure to regulatory
14   scrutiny."
15          Did I read that correctly?
16      A. I'm sorry. We're back at Paragraph 7
17   or 8?
18      Q. Seven.
19      A. (The witness reads to himself out
20   loud.)
21          Okay. So you stopped after
22   "regulatory scrutiny"?
23      Q. I did.
24      A. Okay. Yeah, you read that correctly.
25      Q. Are you offering an opinion regarding

Page 436

1       CONFIDENTIAL - ADAM WERNER, Ph.D.
2    FXCM's exposure to regulatory scrutiny in this
3    matter?
4       A. I don't understand the question. My
5    opinions are laid out here in my report. I -- so
6    I don't know.
7       Q. Do you have any expertise that would
8    allow you to opine on the potential exposure to
9    regulatory scrutiny for FXCM?
10         MR. BAKER: Objection to form.
11      A. Define "expertise."
12         Am I familiar with it, the topic?
13   Yeah, I'm familiar with the topic. I don't know
14   if that makes me an expert. I mean, just in
15   general I understand what regulators do to
16   financial firms and the impact that those
17   regulators sometimes have on those financial
18   firms. So I don't know exactly what you're
19   asking here or how you're defining expert.
20      Q. In the manner in which you define
21   "expertise," are you offering an opinion as to
22   the exposure to regulatory scrutiny of FXCM in
23   this matter?
24         MR. BAKER: Objection to form.
25      A. Again, I don't understand the

28 (Pages 433 - 436)

1           CONFIDENTIAL - ADAM WERNER, Ph.D.
2   question.
3           Q.  Later in that paragraph you state
4   that "market participants were misled about the
5   viability and sustainability of FXCM's business
6   model."
7           What "business model," specifically,
8   are you referring to there?
9           A.  FXCM's business model.
10          Q.  Are you referring to, for instance,
11  the no dealing desk, forex trading generally,
12  their operations in the United States, their
13  operations globally?  Which specific "business
14  model" are you referring to?
15          A.  Well, those are all part of its
16  business model, correct?
17          Q.  So you are referring to all of those
18  when you say that "market participants were
19  misled about the viability and sustainability of
20  FXCM's business model"?
21          A.  I believe "business model" -- I mean,
22  I'm using that in the general sense of "business
23  model."  I mean, does that include FXCM's claim
24  that they were -- that they had an NDD platform?
25  That certainly would be one of them.  That's

1           CONFIDENTIAL - ADAM WERNER, Ph.D.
2   certainly part -- my understanding is that's part
3   of their "business model" among other things.
4           Q.  Are you offering an opinion about the
5   viability of FXCM's no dealing desk in connection
6   with your scope of engagement in this matter?
7           A.  I don't understand the question.  I
8   mean, they didn't have -- what do you mean "the
9   viability"?
10          My understanding is they didn't have
11  a no dealing desk.
12          Q.  I'm just trying to get a sense of
13  which "business model" and what specific
14  "business model" you're discussing in your
15  report.
16          A.  I mean, I gave you certainly an
17  example of what I mean by their "business model."
18  That was one part of it.
19          Q.  Are you --
20          A.  I don't know -- I don't know if their
21  "business model" is to spinoff a company that,
22  basically, appeared to be kicking back profits to
23  them.  I'm not sure if I meant that that was part
24  of their "business model" or not, as I sit here
25  today among other things.

1           CONFIDENTIAL - ADAM WERNER, Ph.D.
2           Q.  Are you offering an opinion about the
3   "viability and sustainability" of FXCM's overall
4   operations in forex trading generally?
5           MR. BAKER:  Objection to form.
6           A.  No.  I mean, again, I refer back to
7   those investment analysts quotes that I referred
8   to earlier.  I'm happy to read them again.
9   That's my understanding of the firm's "viability
10  and sustainability."  Or that, certainly,
11  represents my understanding of their "viability
12  and sustainability."
13          Q.  Other than by reference to the
14  analyst quotes, do you have any personal
15  expertise in forex trading sufficient for you to
16  determine independently the sustainability of
17  FXCM's business model, generally?
18          MR. BAKER:  Objection to form.
19          A.  Again, I don't know what you mean by
20  "expertise."  I mean, I TA'ed a course on
21  international finance in graduate schools by one
22  of the foremost international finance experts
23  where we dealt with foreign exchange markets.  I
24  don't know if that makes me an expert.  I
25  certainly, teach about foreign exchange or FX

1           CONFIDENTIAL - ADAM WERNER, Ph.D.
2   trading in my macroeconomics class.  I don't know
3   if that makes me an expert.
4           I mean, I suppose if I'm asked,
5   ultimately, it will be up to the Court to decide
6   whether or not I'm an expert, if I am, in fact,
7   asked that question by the Court.
8           Q.  In connection with your loss
9   causation and damages report, do you believe that
10  you've been retained as an expert concerning
11  forex trading and the sustainability of FXCM's
12  business model?
13          A.  I believe that in this matter -- and
14  I'm now reading from Paragraph 4 of my report.
15  "I was asked by lead Counsel for the Plaintiffs
16  to determine whether the losses of the Plaintiffs
17  and the class were caused by Defendant's alleged
18  misrepresentations and omissions (i.e., loss
19  causation) as described in the third amended
20  consolidated securities class action complaint
21  dated April 17, 2020 (Complaint).
22          Furthermore, I was asked to quantify
23  the loss, if any, due to the Defendant's alleged
24  misrepresentations and omission of both a per
25  share and per note basis (i.e., damages)."

29 (Pages 437 - 440)

Page 441

CONFIDENTIAL - ADAM WERNER, Ph.D.

1  CONFIDENTIAL - ADAM WERNER, Ph.D.
2  That's what I was retained to do in this matter.
3      Q.  Okay.  Further in Paragraph 7 you
4  say, "The alleged fraud also concealed from the
5  market the inextricable ramifications that would
6  manifest upon corrective disclosure."
7          Earlier we discussed your view of
8  "the inextricable ramifications."
9          What I want to know what is your
10 basis for contending those ramifications were
11 "inextricable"?
12     A.  All the material that I reviewed in
13 forming my opinions, all of my opinions in this
14 matter.
15     Q.  And which "ramifications,"
16 specifically, are you referring to as the
17 "inextricable ramifications"?
18     A.  The same ones I referred to when you
19 asked me this question earlier.
20     Q.  So the myriad of things defined --
21 explained, sorry, in the analyst report quotes
22 that you read earlier; is that correct?
23     MR. BAKER:  Objection.
24     A.  Well, I'm not sure that I would use
25 the word "myriad."  That's your qualification of

Page 442

1  CONFIDENTIAL - ADAM WERNER, Ph.D.
2  what I read to you earlier.
3          So, to the extent that I'm not sure I
4  agree with your representation or the way I
5  structured your sentence, I'm not sure I can
6  answer that question.  But I believe to the
7  extent that you've asked this question
8  previously, without injecting additional
9  adjectives or nouns, maybe a noun, I've answered
10 the question.  So I can refer to that.
11     Q.  In your view in this case, could the
12 same corrective disclosure that was made on
13 February 7th, 2017 have been made on March 15th,
14 2012, which is the first day of the class period?
15     MR. BAKER:  Objection to form.
16     A.  Could have a corrective disclosure
17 have been made?
18     THE WITNESS:  I'm sorry, Josh.
19     MR. BAKER:  It assumes facts not in
20 the record.
21     You can answer.
22     A.  Yeah.  Could it have happened?  I
23 don't know.  I mean, it's another really broad
24 question.
25         Is it possible?  Sure, it's possible.

Page 443

1  CONFIDENTIAL - ADAM WERNER, Ph.D.
2      Q.  What corrective information do you
3  believe could have been disclosed on March 15th,
4  2012?
5      A.  Well, I believe that Plaintiffs are
6  contending that whatever information was
7  disclosed on the February 7th, '17 -- 2017 could
8  have been disclosed at the beginning of the class
9  period.
10     Q.  And have you independently analyzed
11 that contention and formed a belief as to whether
12 or not that is accurate?
13     A.  Well, I have not seen any evidence to
14 indicate that that assumption is inaccurate.
15     Q.  Do you have an opinion as to what
16 specific corrective information could have been
17 disclosed to the market on March 15th, 2012?
18     A.  I believe Plaintiffs are maintaining
19 that all information -- the corrective
20 disclosures that occurred at the end of the class
21 period could have occurred at the beginning of
22 the class period.
23     Q.  Is it your opinion that had that
24 information been disclosed on March 15th, 2012
25 that the stock would have reacted in the same way

Page 444

1  CONFIDENTIAL - ADAM WERNER, Ph.D.
2  as it did in February of 2017?
3      A.  What do you mean by "the same way"?
4      Q.  Would the stock have had the same
5  price reaction as it did upon revelation of the
6  alleged corrective disclosure in February of 2017
7  if that alleged corrective disclosure was
8  disclosed on March 15th, 2012?
9      MR. BAKER:  Objection to form.
10     A.  I mean, to all -- based on all the
11 evidence I reviewed, it would have, at least,
12 fallen by that amount.
13     Q.  And what information do you believe
14 would have caused it to fall by that amount if
15 the corrective disclosure was made on March 15th,
16 2012?
17     A.  Well, okay.  So, again, let's first
18 -- I just said "at least," correct?  Did you miss
19 that part of my answer?
20         Because I want to make sure that it's
21 understood that I said it would, "at least," fall
22 to that amount at the beginning of the class
23 period.
24         What information?  All the
25 information I reviewed in forming my opinions in

30 (Pages 441 - 444)

CONFIDENTIAL - ADAM WERNER, Ph.D.

1  CONFIDENTIAL - ADAM WERNER, Ph.D.
2  this case.
3      Q.  Do you believe that if FXCM disclosed
4  its relationship with Effex on March 15th, 2012
5  that the stock would have had the same price
6  reaction as it did upon the corrective
7  disclosures in February of 2017?
8      A.  Well, I refer to my definition or my
9  discussion of these things as being -- as having
10 "inextricable ramification."  So, if that
11 specific component had been told to the market on
12 that date without the regulators going ahead and
13 saying, you can no longer operate in the US -- is
14 that the hypothetical question you want me to
15 answer?
16     Q.  Yes.
17     A.  Okay.  And nothing about their
18 reputation or what the analyst thought about what
19 it would do to their business?
20     Q.  I'm asking you for your opinion as to
21 what the effect of that disclosure would have
22 been made on March 15th, 2012.
23     A.  And, again, I -- if you're talking
24 about the corrective disclosure and the -- as
25 well as the response by market analysts, as well

1  CONFIDENTIAL - ADAM WERNER, Ph.D.
2  as the government saying or the CFTC saying, you
3  can no longer operate in the US, it would have --
4  I believe it would have, at least, caused that
5  amount of price decline.  But hence, again, the
6  word "inextricable."
7      Oh, I left out FXCM lying about the
8  fact that they had a no deal desk.  Because I
9  think the lying actually played a part in the
10 analyst -- I'm sorry, in the regulatory body's
11 decisions.
12     Q.  Did you analyze whether the
13 revelation of the relationship between Effex and
14 FXCM by itself, if that was the disclosed in
15 March 15th, 2012, did you analyze whether the
16 price reaction to the stock would have been the
17 same as it was in February 2017, just that one
18 piece of information?
19     A.  So, again, so just that they had a
20 relationship, not that they were possibly trading
21 in front of their clients and that regulators
22 would -- because they had been lying to the
23 market would shut them down or not allow them to
24 operate in the US?
25         I'm not sure that as a standalone --

1  CONFIDENTIAL - ADAM WERNER, Ph.D.
2  I'm not sure you can disaggregate that, that
3  particular statement, because all of these things
4  are woven together.  Look, if they hadn't lied
5  about it, you know, it's not -- presumably, the
6  regulators may not have come down on them that
7  hard and market participants wouldn't have said,
8  oh, these guys are teetering on the edge of
9  bankruptcy or they may not be solvent.
10         So I'm not -- as I sit here today,
11 I'm not quite sure how to parse that out.
12     Q.  Let's look at the CFTC and NFA
13 settlement for a minute.
14         And correct me if I'm wrong, but
15 these settlements are the basis in your view of
16 the corrective disclosure, which occurred on
17 February 6th, 2017; is that correct?
18     A.  I don't understand.  What do you mean
19 by "the basis"?
20     Q.  You identified the public disclosure
21 contained in FXCM's settlements with the CFTC and
22 the NFA on February 6th, 2017 as the corrective
23 disclosure in this case; isn't that right?
24     A.  Where are you looking at?
25     Q.  I'm not looking at anything in

1  CONFIDENTIAL - ADAM WERNER, Ph.D.
2  particular.
3         I'm just -- do you disagree with
4  that?
5      A.  I don't disagree or agree one way or
6  the other.  As I sit here, I don't recall exactly
7  that that's exactly verbatim what I said.
8      Q.  I'm not asking for --
9      A.  So if you want to point me to the
10 part in the report or I can go to the part in the
11 report where I talk about the corrective
12 disclosure.
13     Q.  As a general -- as a general matter,
14 do you disagree that the information that your
15 analysis assumes is the corrective disclosure is
16 taken from the information contained in the CFTC
17 and NFA settlements in February of 2017?
18         MR. BAKER:  Objection.
19     A.  Again, I refer to Paragraph 7 of my
20 report.  "The alleged misrepresentations and
21 omissions caused the price of the Effex FXCM
22 stock and FXCM notes to be artificially inflated
23 over the course of the class period.  FXCM misled
24 the market about the company's purported lack of
25 conflict of interest with customer transactions

31 (Pages 445 - 448)

CONFIDENTIAL - ADAM WERNER, Ph.D.
1  CONFIDENTIAL - ADAM WERNER, Ph.D.
2  on FXCM's NDD platform.  This in turn misled
3  market participants about the extent of FXCM's
4  exposure to regulatory scrutiny, the viability
5  and sustainability of its business model and
6  FXCM's future profitability.  The alleged fraud
7  also concealed from the market the inextricable
8  ramifications that would manifest upon corrective
9  disclosures all of which in turn" -- excuse me --
10  "caused the price of FXCM securities to be
11  artificially inflated."
12        Q.  And, again, do you disagree that the
13  alleged corrective disclosure, the information
14  that was allegedly corrective disclosure, came
15  from the CFTC and NFA settlements in February of
16  2017?
17        MR. BAKER:  Objection to form.
18        A.  Well, let's go to Paragraph 17 and
19  read exactly what I say.
20        "On February 6, 2017, the US
21  Commodities Future Trades Commission (CFTC) found
22  that FXCM, 'engaged in false and misleading
23  solicitations of FXCM retail foreign exchange
24  (forex) customers.'  While FXCM told its retailer
25  customers that it had no conflict of interest and

1  CONFIDENTIAL - ADAM WERNER, Ph.D.
2  that it acted only as a credit intermediary on
3  its 'no dealing desk' platform, FXCM 'had an
4  undisclosed interest' in the market maker that
5  consistently 'won' the largest share of FXCM's
6  trading volume,'" end quote.
7        "The market makers 'shared most of
8  its trading profits with FXCM."  From 2010 and
9  through 2014, FXCM received, approximately,
10  $77 million from the market maker, which FXCM did
11  not disclose to its customers.  The CFTC order
12  required FXCM to pay a civil monetary penalty of
13  $7 million and to cease and desist from further
14  violations of the Commodity Exchange Act and CFTC
15  regulations as charged."
16        Q.  So, the February 6th, 2017 settlement
17  with the CFTC that you just referred to, are you
18  aware that that settlement was a negotiated
19  agreement between FXCM and the CFTC?
20        A.  I don't know if I knew that one way
21  or the other as I sit here.  But I'm happy -- do
22  you just want to introduce those agreements as
23  evidence and we can review them?
24        Q.  Have you reviewed them in connection
25  with your work before?

1  CONFIDENTIAL - ADAM WERNER, Ph.D.
2        A.  I believe so.
3        Q.  Have you heard the term "no admit no
4  deny settlement" before?
5        A.  As a general principle, yes.
6        Q.  And what does that mean to you?
7        A.  It means that you don't admit to any
8  wrongdoings.  Nor do you deny any wrongdoing.
9        Q.  Are you aware that FXCM settlements
10  with the CFTC and the NFA were "no admit no deny
11  settlements"?
12        A.  Again, I'm happy to look at them.  I
13  mean, most of these settlements are that way.  It
14  doesn't mean you didn't do anything wrong.
15        Q.  Sitting here today are you aware that
16  these particular settlements on which you base
17  your analysis were "no admit no deny
18  settlements"?
19        A.  Well, let's look at the settlement
20  agreement.
21        MR. BAKER:  Objection.
22        A.  So, I guess, my son left without me.
23        MR. ISAJIW:  Evan, can you introduce
24  the February 6th, 2017 CFTC order and let me know
25  what number that would be.

1  CONFIDENTIAL - ADAM WERNER, Ph.D.
2        (Deposition Exhibit Werner 12, Order
3  Instituting Proceedings Pursuant to Sections 6(c)
4  and 6(d) of the Commodity Exchange Act, Making
5  Findings, and Imposing Remedial Sanctions, was
6  marked for identification.)
7        MS. ENNIS:  It's loaded as
8  Exhibit 12.
9        Q.  Dr. Werner, let me know when you have
10  access to Exhibit 12.
11        A.  Okay, I've got it.
12        Q.  On Page 1 under paragraph numbered
13  Roman Numeral II -- first of all, for the record,
14  Exhibit 12 is the Forex Capital Markets LLC, FXCM
15  Holdings LLC, Dror Niv and William Ahdout, CFTC
16  Order Instituting Proceedings Pursuant to
17  Section 60 and 60 of the Commodity Exchange Act
18  Making Findings and Imposing Remedial Sanctions.
19        Under Roman Numeral II, first
20  paragraph it says, "In anticipation of the
21  institution of administrative proceedings,
22  Respondents have submitted an offer of
23  settlement, which the Commission has determined
24  to accept.  Without admitting or denying the
25  findings or conclusions herein, Respondents

32 (Pages 449 - 452)

Page 453

CONFIDENTIAL - ADAM WERNER, Ph.D.
1    consent to the entry and acknowledge service of
2    this order instituting proceedings pursuant to 60
3    and 6D of the Commodity Exchange Act, making
4    findings and imposing remedial sanctions."
5          It says, "without admitting or
6    denying the findings or conclusions herein."
7          Were you aware of that condition --
8          A. Yeah, I mean, that's pretty
9    boilerplate language.
10         Q. Let me ask the question.
11         A. Oh, I'm sorry. Well, you just asked
12   me if I was aware of it, right, so I answered
13   that question. But if I interrupted you, I
14   apologize. Go ahead.
15         Q. In connection with -- prior to
16   drafting your loss causation report, were you
17   aware that these were "no admit no deny
18   settlements"?
19         A. I don't know one way or the other, as
20   I sit here today.
21         Q. Are you aware --
22         A. But that having been said -- whoa,
23   whoa, whoa, whoa, whoa.
24             That having been said, right, that

Page 454

CONFIDENTIAL - ADAM WERNER, Ph.D.
1    type of language is boilerplate. So let's go
2    back to the -- let's go to the section of this
3    proceeding where they talk about what they're
4    going to do in response to neither admitting or
5    denying any wrongdoing.
6          "Respondents and their successors and
7    assigns shall comply with the following
8    conditions and undertaking set forth in the
9    offering."
10         You know what, I'm just going to
11   refer to Subsection C as well as Point 4 in what
12   is referred to as Werner Exhibit 12 as to what
13   informs my opinion about the language of "no deny
14   no admit" and whether it's industry practice to
15   include that type of boilerplate language in
16   these types of agreements.
17         Q. Are you aware that no court has
18   determined that the CFTC and NFA allegations are
19   true?
20         A. I'm not sure whether or not -- I
21   don't know whether or not the courts have
22   determined that or not. I mean, presumably, that
23   would be something that the Court would determine
24   here in this matter.

Page 455

CONFIDENTIAL - ADAM WERNER, Ph.D.
1          Q. Are you aware of any other court that
2    has already determined that the allegations in
3    the CFTC and NFA settlements are true?
4          A. I don't believe so.
5          Q. Are you aware that the CFTC itself
6    has taken the position that allegations in "no
7    admit no deny" settlements are not evidence of
8    fraud?
9          A. Am I familiar with that type of
10   boilerplate language?
11         Q. No. I'm asking you if you're --
12         A. At the same time -- whoa, whoa, whoa,
13   whoa, whoa.
14             At the same time if you're going to
15   go ahead and do that, I don't understand why you
16   would agree to close down your US trading
17   operations.
18         Q. But you do understand that you would
19   agree to do that, it was a negotiated resolution
20   to a regulatory inquiry, correct?
21         A. Right. And I'm saying that me as a
22   normal person, if I hadn't done anything wrong,
23   it occurs to me that I probably wouldn't have
24   agreed to shut down my business.

Page 456

CONFIDENTIAL - ADAM WERNER, Ph.D.
1          Q. In your experience, do you believe a
2    company could enter a settlement with its
3    regulator for business reasons?
4          A. Is it possible? Certainly, it's
5    possible.
6          Q. And would you agree that regulatory
7    penlites for any alleged violations could vary
8    depending on several factors in connection with a
9    negotiation with regulators?
10         A. As a general principle, yeah.
11         Q. Okay. Do you know what portion of
12   FXCM's gross revenue was generated by its US
13   business in 2016 and early 2017?
14         A. I believe it was somewhere between 20
15   and 30 percent. I might be off on those numbers.
16         Q. And do you know whether FXCM's net
17   revenue benefitted from the closure of its US
18   business?
19             MR. BAKER: Objection to form.
20         A. "Benefitted" as in increased?
21         Q. Improved.
22         A. I'm sorry, "improved"?
23         Q. Yes.
24         A. Hmm interesting question; not as I

33 (Pages 453 - 456)

Page 457

CONFIDENTIAL - ADAM WERNER, Ph.D.

1      CONFIDENTIAL - ADAM WERNER, Ph.D.
2   sit here today.
3      Q.  Are you aware that FXCM continues to
4   operate as an online forex broker outside of the
5   United States?
6      A.  Yeah, I believe, after it declared
7   bankruptcy, it may have restructured.  And so, to
8   the best of my knowledge, it's still operational.
9      I know I looked for financials, its
10  current financial and because it's private
11  entity, I was unable to find them, which is a
12  long way of saying, yes, to your -- or answering
13  yes to your question but giving it a little
14  context.
15     Q.  So the current financials were not a
16  component of your loss causation and damages
17  analysis as expressed in your report?
18     MR. BAKER:  Objection.
19     A.  To the extent that I haven't seen
20  them, the current financials -- I don't believe
21  I've seen any of their current financials.  And
22  so, to the extent I haven't seen them, I don't
23  believe that they played any part in the
24  formation of my opinions in this report.
25     Q.  Let's take a look at Paragraph 91 of

Page 458

1      CONFIDENTIAL - ADAM WERNER, Ph.D.
2  your report.  Let me know when you're there.
3     A.  Okay, I'm there.
4     Q.  In Paragraph 91 you state, "The
5  residual decline following the corrective
6  disclosure through which the" --
7     A.  Okay.  We're in the middle.  Okay, go
8  ahead.
9     Q.  Yes.
10     (Continuing.)  "Through which the
11  market learned the truth about the company's
12  purportedly conflict free agency model and the
13  ramifications associated therewith, including the
14  company's business model would no longer be
15  sustainable and FXCM would be subject to
16  regulatory repercussions equals the diminution of
17  value stemming from the market's new
18  understanding of the truth of the company's
19  exposure to regulatory scrutiny, systemic shocks
20  to its business model, its future profitability
21  and the market's prior underestimation of the
22  risks of foreseeable ramifications had the truth
23  been disclosed."
24     Did I read that correctly?
25     A.  You did.

Page 459

1      CONFIDENTIAL - ADAM WERNER, Ph.D.
2     Q.  In your opinion, at what point in
3  time between March 15th, 2012 and February 16th,
4  2017 was it foreseeable that FXCM would settle
5  the CFTC investigation by agreeing to pay a fine
6  and withdraw from the US market?
7     MR. BAKER:  Objection to form.
8     A.  Right.  So, to the extent that you're
9  talking about something that hypothetically would
10  have occurred in 2012, I haven't seen any
11  evidence that indicates to me that that would not
12  have been their price reaction or, at least, the
13  price reaction throughout the entire class
14  period, if that statement -- if these statements
15  or these clarifications had become known at the
16  beginning of the class period.
17     Q.  That's not --
18     A.  And I have reviewed all the -- well,
19  I have reviewed all the data or all of the
20  documents associated with this case, at least, to
21  the extent that they're reflected in my three
22  reports.
23     Q.  That's not the question I asked.
24     I asked, in your opinion, at what
25  point between March 15th, 2012 and February 6th,

Page 460

1      CONFIDENTIAL - ADAM WERNER, Ph.D.
2  27 [sic] was it foreseeable that FXCM would
3  settle the CFTC investigation by agreeing to pay
4  a fine and withdraw from the US market?
5     MR. BAKER:  Objection to form.
6     A.  Yeah, I mean, I refer to my previous
7  answer.
8     Q.  Did you analyze --
9     A.  I don't understand -- I believe
10  that's responsive to your question.
11     Q.  Did you analyze at what date in
12  between the start of the class period and the end
13  of the class period it would have been
14  foreseeable for FXCM to settle the investigations
15  by agreeing to pay a fine and withdraw from the
16  US market?
17     MR. BAKER:  Objection to form.
18     A.  I believe Plaintiffs contended it
19  would have been foreseeable as of the date of the
20  beginning of the class period.  And I see no
21  evidence to suggest otherwise.
22     Q.  So the class period began March 15th,
23  2012, correct?
24     A.  That is correct.
25     Q.  And according to your report,

34 (Pages 457 - 460)

Page 461

CONFIDENTIAL - ADAM WERNER, Ph.D.
1
2   Paragraph 35E --
3       A.  Hold on; 35E.  Ah, yes.
4       Q.  The NFA investigation started, at
5   least, by the beginning of April 2014; is that
6   correct?
7       A.  "At least," yeah, certainly, "at
8   least."
9       Q.  And if you look at your report --
10      A.  Oh, wait, I'm sorry.  Wait.  Whoa,
11  whoa, whoa, whoa.
12          I mean, "at least," yeah, it
13  certainly could have happened prior to that.
14      Q.  What is your understanding of the
15  date of when the NFA investigation began?  Was it
16  on or about April of 2014?
17      A.  I don't -- I don't know one way or
18  the other.  I just know that FXCM was receiving
19  payment for order flow with an entity that was
20  directly related to it as of 2010.  So, I mean,
21  as to when the violation or the alleged violation
22  began occurring as early as 2010.
23      Q.  And I'm asking as to when the
24  investigations began.
25      A.  Yeah, as I sit here today, I don't

Page 462

CONFIDENTIAL - ADAM WERNER, Ph.D.
1
2   know.
3       Q.  Okay.  And if you look at
4   Paragraph 36 of your report, it indicates that,
5   "On or about October 15th, 2014 the CFTC sent a
6   request to accept FXCM for production of
7   documents and information relating to Effex's
8   business and/or financial relationship with FXCM
9   including but not limited to Effex's relationship
10  as a liquidity provider to FXCM," correct?
11      A.  Yeah, you read that correctly.
12      Q.  So it's your understanding that the
13  CFTC investigation began at the end of 2014,
14  correct?
15          MR. BAKER:  Objection.  That
16  misstates the record.
17      A.  Yeah, I don't think that's my
18  understanding one way or the other.
19      Q.  Do you have an understanding one way
20  or the other as to whether or -- when the CFTC
21  investigation began?
22      A.  The exact date, no, not as I sit here
23  today.
24      Q.  Do you have an approximate date?
25      A.  Well, it appears, at least, as of

Page 463

CONFIDENTIAL - ADAM WERNER, Ph.D.
1
2   October 15, 2014.
3       Q.  Okay.  So assuming that the NFA
4   investigation started in the beginning of
5   April 2014 and the CFTC investigation began at
6   the end of 2014 -- let me break that up.
7           The NFA investigation started at the
8   beginning of April 2014.
9           So that investigation was going on
10  for nearly three years before the end of the
11  class period in February 2017; is that correct?
12          MR. BAKER:  Objection to form,
13  assumes facts not in the record.
14      A.  Yeah, I mean, based on your
15  representation, I -- I mean, I'll assume it's
16  correct but...
17      Q.  And assuming the CFTC investigation
18  began at the end of 2014, that would have been
19  ongoing for more than two years before the
20  completion of the class period in February 2017;
21  is that correct?
22          MR. BAKER:  Same objection.
23      A.  I mean, again -- I'd use the same
24  answer as the other question just changing the
25  date in the entity.

Page 464

CONFIDENTIAL - ADAM WERNER, Ph.D.
1
2       Q.  Okay.  So is it your position that
3   FXCM should have anticipated the outcome of those
4   multi-year investigations at the start of the
5   class period in March of 2012, two years before
6   the investigations began?
7           MR. BAKER:  Objection, assumes facts
8   not in the record.
9           If you understand the question, you
10  can answer.
11      A.  Well, I believe, that's the theory
12  that Plaintiffs' lawsuit is based on.
13      Q.  And is that a theory you are putting
14  forth as your opinion in this matter?
15          MR. BAKER:  Objection to form.
16      A.  I have not --
17          THE WITNESS:  Oh, sorry.  Go ahead.
18          MR. BAKER:  That's it.
19      A.  I have not seen any evidence to
20  suggest that that opinion is incorrect.
21      Q.  Have you done any analysis to
22  affirmatively confirm that that opinion is
23  correct?
24      A.  Well, I mean, I'm familiar with what
25  the company was doing as of 2010.

35 (Pages 461 - 464)

Page 465

CONFIDENTIAL - ADAM WERNER, Ph.D.
1
2        Is it foreseeable that when they were
3   breaking CFTC regulations and lying about what
4   they were doing that it was foreseeable that the
5   CFTC would go ahead and fine them and tell them
6   that they could not operate in the US?  It's
7   certainly possible.  And I, certainly, haven't
8   seen anything to suggest that that is not the
9   case.
10        I mean, it's like if you ask me
11   today, okay, so, if I murdered someone today and
12   five years before I knew I was going to murder
13   someone, is it foreseeable that I would go to
14   jail five years ago?  Yeah, it's foreseeable I
15   would go to jail five years ago, if I knew I was
16   going to murder someone today.
17        Q.  So you're talking about CFTC
18   regulations.
19        Do you have -- are you familiar with
20   the rules and regulations governing foreign
21   exchange brokers?
22        A.  Am I familiar with them?  "Familiar,"
23   yes.
24        Q.  Are you offering any expert opinions
25   as to what rules and regulations govern foreign

Page 466

CONFIDENTIAL - ADAM WERNER, Ph.D.
1
2   exchange brokers in this matter?
3        A.  I mean, I think, we've already gone
4   over what I've been asked to opine upon.  I'm not
5   sure that that was in that -- that would fall
6   under what I've been asked to opine upon.
7        Q.  Do you know if there were any rules
8   or regulations regarding foreign exchange brokers
9   receiving payments for order flow during the
10   class period?
11        A.  Oh, just as a matter?  Well, I mean,
12   we already talked about this, right.  We said
13   generally paying for order flow is not uncommon.
14   That's not what -- that's what's at issue in this
15   case.
16        Or I should say that in and of itself
17   is not what is at issue in this case, to the best
18   of my understanding.
19        Q.  Do you know when FXCM management
20   became aware of the NFA investigations regarding
21   FXCM's relationship with Effex?
22        A.  Well, it looks like based -- at
23   least, as of the dates that you pointed to -- me
24   to earlier.  But, certainly, it could be possible
25   that it was before that.

Page 467

CONFIDENTIAL - ADAM WERNER, Ph.D.
1
2        Q.  So you don't know other than what's
3   in your report?
4        A.  I mean, I think, my answer speaks for
5   itself.
6        If it's besides what's in my report?
7   Are we talking about things that are besides
8   what's in my report?
9        Q.  I'm talking about whether or not
10   you're offering an expert opinion as to when FXCM
11   management became aware of the NFA investigations
12   regarding its relationship with Effex.
13        A.  I believe I've asked and answered
14   that questions multiple times now.
15        Is now -- can I take a five-minute
16   break?  I just need to go get some water, if
17   that's okay.  It doesn't even have to be five
18   minutes.  It can be two minutes.  I'm just going
19   to the kitchen.
20        Q.  That's fine.  We can take a break.
21        A.  Alright.  I haven't heard anything.
22   So I'm going to assume that -- -
23        THE VIDEOGRAPHER:  The time is
24   2:09 p.m.  We're going off the record.
25        (Recess taken 2:09 to 2:23 p.m.)

Page 468

CONFIDENTIAL - ADAM WERNER, Ph.D.
1
2        THE VIDEOGRAPHER:  The time is
3   2:23 p.m. and we're back on the record.
4        Q.  Dr. Werner, in connection with your
5   analysis for loss causation and damages submitted
6   in your report, did you review any prior CFTC
7   settlements to see if similar penlites were
8   imposed in comparable cases?
9        MR. BAKER:  Objection to form.
10        A.  No, I did not.
11        Q.  And did you review any prior court
12   decisions in cases brought by the CFTC to see if
13   similar penlites were imposed in comparable
14   cases?
15        MR. BAKER:  Objection to form.
16        A.  Alright.  So maybe I should give a
17   little clarification.  In the context of this
18   case, no.  With regards to those two questions,
19   this question and the last question, I mean, I've
20   certainly looked at these types of agreements.
21   But with regards -- but in -- with regards to
22   this case, the answer is, no.
23        Q.  Were you aware generally of any
24   comparable cases where a foreign exchange broker
25   withdrew from the US markets?

Page 469

CONFIDENTIAL - ADAM WERNER, Ph.D.
1
2    A. That's an interesting question.
3        MR. BAKER: Objection to -- I'm
4    sorry. Objection to form.
5        Go ahead.
6    A. Not as I sit here today.
7    Q. And earlier today we were discussing
8    the foreseeability from FXCM's perspective of
9    settling regulatory inquiries beginning as early
10   as 2012.
11       Do you recall that conversation?
12   A. I'm sorry. Can you repeat the
13   question?
14   Q. We had a series of questions and
15   answers regarding whether or not it would have
16   been foreseeable to FXCM in March of 2012 that it
17   would ultimately have to settle regulatory
18   investigations through an agreement that required
19   among other things withdrawing from the US
20   market.
21   A. I'm not -- I don't remember that
22   specific conversation. If you want to point to
23   something where we talked about that earlier...
24   Q. Is it your opinion that it was
25   foreseeable to FXCM in March of 2012 that they

Page 470

CONFIDENTIAL - ADAM WERNER, Ph.D.
1
2    would enter into a settlement with the CFTC which
3    would involve amongst other things withdrawal
4    from the US market?
5        MR. BAKER: Objection, asked and
6    answered.
7    A. Right. So I refer to my previous
8    answers. I mean, certainly, the Plaintiffs
9    contend that that was foreseeable. I haven't
10   seen any evidence to suggest that it wasn't
11   foreseeable to the extent -- to the same extent
12   that I talked about a "murder" -- an example
13   using "murder" previously, you know.
14       If I think about murdering somebody
15   and then actually do it five years later, do I
16   know when I'm thinking about it that I can go to
17   jail for murdering somebody? Yeah, I know -- I
18   know that.
19   Q. Okay. Are you aware that the Court
20   issued an opinion and order on the Defendant's
21   motion to dismiss the complaint in this matter on
22   March 28, 2015?
23   A. I -- I'm sorry, what was the date?
24   Q. March 28, 2015.
25   A. March 28th? So let's -- I don't

Page 471

CONFIDENTIAL - ADAM WERNER, Ph.D.
1
2    recall. But we can, certainly, look at my
3    earlier reports or I can look at my earlier
4    reports to refresh my memory.
5    Q. We can pull up the opinion as well.
6        MR. ISAJIW: Evan, can you add that
7    to the folder please.
8    A. Yeah, I mean, it's your deposition,
9    whatever you'd like to do.
10       MS. ENNIS: It's been introduced. It
11   was previously marked as Werner Exhibit 7.
12       (Deposition Exhibit Werner 7, Opinion
13   & Order, was previously marked for
14   identification.)
15   Q. Okay. Let me know when you have
16   access to it?
17   A. Okay, hold on one second.
18       Huh. Exhibit 328 -- ah, there we go,
19   alright.
20       Wait, wait, wait. The 3/28/19
21   opinion?
22   Q. That's correct.
23   A. Okay. And so -- ah, and this is
24   Exhibit 7. Yeah, okay.
25   Q. Okay. Did you review this opinion in

Page 472

CONFIDENTIAL - ADAM WERNER, Ph.D.
1
2    connection with your loss causation analysis?
3    A. Well, to the extent it appears to be
4    an exhibit from my earlier deposition, I suppose
5    the answer is, yes.
6    Q. Okay. And can you turn to Page 27 of
7    that opinion.
8    A. Okay.
9    Q. And from Pages 27 to 29, the Court
10   discusses the complaint's allegation that FXCM
11   should have disclosed the regulatory
12   investigations by the CFTC and NFA and the Court
13   dismissed those claims stating on Page 28 at the
14   bottom, "As courts in this district have
15   repeatedly held, companies do not have an
16   affirmative duty to speculate or disclose
17   uncharged, unadjudicated wrongdoings or
18   mismanagement. Thus the Court concludes that
19   Plaintiffs have failed to allege that FXCM made
20   false or misleading statements with respect to
21   regulatory investigations that it was
22   undergoing."
23       Have you read that before in
24   connection with your loss causation report?
25   A. I believe so. But then, again, you

37 (Pages 469 - 472)

1          CONFIDENTIAL - ADAM WERNER, Ph.D.
2    might as well read the next sentence.
3    "Plaintiffs are correct that in light of this
4    expressed disclosure, the company was acquired to
5    speak truthfully about any ongoing investigations
6    that it was undergoing."
7          Q.  In your view, is something that is
8    "speculative," "uncharged," "unadjudicated"
9    foreseeable?
10         MR. BAKER:  Objection to form.
11         A.  Again, I mean, I hate to keep going
12   back to this simple example.  But look, again, if
13   I think about murdering someone five years ago
14   and I end up doing it today, was it foreseeable
15   that I could go to jail five years ago when I was
16   thinking about killing somebody?  Yeah, it was
17   foreseeable.
18         I mean, it's the same issue.  We keep
19   coming back to this.  My understanding is, you
20   know, this behavior began in 2010, which is two
21   years before the class period.
22         Look, if I'm doing something illegal,
23   is it foreseeable I might go to jail some day?
24   Yeah, I'm certainly going to weigh that in or
25   look at that as a real possibility.

1          CONFIDENTIAL - ADAM WERNER, Ph.D.
2          So I'm not sure where all these
3    questions going.  I mean, I understand where all
4    these questions are going, but, you know, my
5    answer is going to be the same.
6          Plaintiffs believe it was
7    foreseeable.  I see no evidence to indicate that
8    it's not foreseeable.  And if you're asking me is
9    it foreseeable I'm going to be punished for
10   something that I'm doing in the past which I know
11   to be legal?  Yeah, it's foreseeable.
12         Q.  And you are aware that the Court has
13   already dismissed Plaintiffs' claims of
14   misstatements relating to the regulatory
15   investigation in this case, correct?
16         A.  Right, in the same way that I am
17   familiar with the fact that Plaintiffs are
18   correct, that in light of the expressed
19   disclosure, the company was required to speak
20   truthfully about any ongoing investigations that
21   it was undergoing.
22         Q.  And it dismissed the claims related
23   to the allegations that it didn't do so, correct?
24         A.  I don't -- I'm not sure how else to
25   answer that question.  I think I've answered it

1          CONFIDENTIAL - ADAM WERNER, Ph.D.
2    two times now.  I don't have a --
3          Q.  Let's switch gears for a moment.
4          Are you familiar with the "SNB flash
5    crash"?
6          A.  Are you speaking of the crash in
7    2015?
8          Q.  I am.
9          A.  Is there a reason -- so, to the
10   extent that this -- I've discussed it numerous
11   times in my previous reports; is there an
12   indication that I'm not familiar with it?
13         Q.  Do you know whether the SNB flash
14   crash affected the CFTC and NFA investigations?
15         MR. BAKER:  Objection to form.
16         A.  As I sit here, I don't know one way
17   or the other.
18         Q.  Do you know whether the CFTC and NFA
19   investigations concerning the Effex relationship
20   were paused prior to the SNB flash crash?
21         A.  I don't have knowledge of that one
22   way or the other.
23         Q.  Do you know whether those
24   investigations restarted after the flash crash?
25         A.  I don't know one way or the other.

1          CONFIDENTIAL - ADAM WERNER, Ph.D.
2          Q.  If those investigations were paused
3    prior to the flash crash, is it still your
4    position that FXCM should have foreseen that it
5    would have to withdraw from the US business
6    before the flash crash?
7          A.  I mean, we're -- we keep going over
8    this.  So that's -- I believe that's what the
9    Plaintiffs are alleging.
10         Again, I'll go back to the "murder"
11   example because I think it's simple.  If I'm
12   thinking about committing murder and, you know, I
13   have committed murder and there's an
14   investigation of me having committed murder and
15   that investigation pauses and starts up again at
16   some point in the future and I'm charged with
17   murder, if you're asking me if it was foreseeable
18   that I was going to be charged with murder, yeah,
19   it was foreseeable that that was a real
20   possibility.
21         I mean, if my analogy doesn't work,
22   go ahead and tell me why but...
23         Q.  Yeah, I mean, I struggle with that
24   analogy on a multitude of levels.  But I think I
25   now have your best testimony on it, which is all

Page 477

CONFIDENTIAL - ADAM WERNER, Ph.D.
1    that I'm looking to get.
2        I believe I asked you before and you
3    conceded that pay for flow arrangements in
4    general weren't prohibited under the CFTC
5    application's rules and regulations, correct?
6        A.  I believe that's what I stated, yes.
7        MR. BAKER:  Objection to the form --
8        THE WITNESS:  Go ahead.  Sorry, Josh.
9        MR. BAKER:  Objection to the extent
10   that it misrepresents prior testimony.
11       But you can answer.
12       A.  Alright.  So I refer to my prior
13   testimony.  But, in general -- in general, so not
14   in this case specific, you know, there's payment
15   for order flow.  That's not unusual.
16       Q.  Let's switch gears.
17       Would you agree that information that
18   is value relevant to investors -- sorry, let me
19   ask a better question.
20       Do you agree that information would
21   be value relevant to investors if it has an
22   impact on the future cash flows of a company?
23       A.  I mean, there's all sorts --
24   generally, I believe your statement is correct.

Page 478

CONFIDENTIAL - ADAM WERNER, Ph.D.
1    I mean, there's all sorts of qualifiers you
2    should probably put in there like material
3    information.  I mean, look if my cash flows are
4    going to increase by a dollar and I earn a
5    billion dollars a years, is that going to make a
6    big difference to the market?  Probably not.
7        So a it's poorly worded question.  To
8    the extent that you're talking about in general,
9    it's probably -- it's not an inaccurate
10   statement.
11       Q.  Are you aware that Effex stopped
12   paying FXCM for order flow before the end of the
13   class period?
14       A.  That is my understanding.
15       Q.  And are you aware that Effex stopped
16   paying FXCM for order flow as of August of 2014?
17       A.  I believe that jogs with my
18   recollection.
19       Q.  And are you aware that FXCM
20   publically disclosed in its SEC filings that it
21   had stopped receiving payments for order flow as
22   of August 1, 2014?
23       A.  I am, yes.
24       Q.  Given that the payments for order

Page 479

CONFIDENTIAL - ADAM WERNER, Ph.D.
1    flow stopped in August 2014, is it your opinion
2    that FXCM continued to have a conflict of
3    interest with its customers after August of 2014?
4        A.  Hmm.  That's an interesting question.
5    I don't know what FXCM was doing.  But, I mean,
6    look, this case isn't strictly about payment for
7    order flow.  It's about not explaining the true
8    relationship between the two entities where this
9    order flow is occurring.  I mean, this was the
10   only firm that was paying for order flow.
11       I mean, there's all sorts of
12   tangential facts here that you're ignoring.  So,
13   to the extent that I can give you an accurate
14   answer with regards to the fact specific issues
15   of this case, it's really -- it's really
16   difficult to do that.
17       If you're asking me as general
18   practice do people pay for order flow?  That's my
19   understanding.
20       So going back to my crime analogy, if
21   I stopped committing crimes in 2014, is it
22   foreseeable that I might be punished for that?
23   2019?  Yeah, it's foreseeable that I still might
24   be punished for crimes that I stopped committing

Page 480

CONFIDENTIAL - ADAM WERNER, Ph.D.
1    in 2014.
2        Q.  The question that I asked you is
3    whether or not you had an opinion as to whether
4    FXCM continued to have a conflict of interest
5    with its customers after August 2014 when the
6    payment for order flow stopped?
7        MR. BAKER:  Objection, asked and
8    answered.
9        A.  Yeah, I answered that question.  I
10   refer to the same answer I just gave or the
11   answer to that specific question that I
12   previously gave.
13       Q.  Do you have an opinion as to whether
14   the nature of the information FXCM should have
15   disclosed to the market changed after August 2014
16   when Effex stopped paying FXCM for order flow?
17       MR. BAKER:  Objection to form.
18       A.  Yeah, I don't understand the
19   question.
20       Q.  Did you do any analysis to determine
21   whether or not the nature of the information that
22   FXCM should have disclosed to the market changed
23   after August 2014 when the payment for order flow
24   stopped?

39 (Pages 477 - 480)

Page 481

CONFIDENTIAL - ADAM WERNER, Ph.D.
1
2          MR. BAKER:  Same objection.
3          A.  Same answer.
4          Q.  Given that the payment for order flow
5     relationship stopped in August of 2014, what
6     impact could the disclosure of FXCM's prior pay
7     for flow relationship with Effex have on the
8     future value of FXCM going forward beyond August
9     of 2014?
10         A.  Well, presumably, something similar
11    to what happened at the end of the class period.
12         Q.  And you believe what happened at the
13    end of the class period was, specifically,
14    related to the revelation of the prior payment
15    for order flow relationship with Effex?
16         A.  Most certainly, among other things.
17    I mean, that's what we keep talking.  And let's
18    go back to my report.  Where is it?
19            I think it's -- and, again, it takes
20    me a little while to get there.  I'm pretty sure
21    if I remember correctly it's Paragraph 7 or 8 in
22    my report.  Bup, bup, bup...
23            Yeah, this -- thus correct -- and
24    this is Paragraph 8 of my report, "Thus
25    corrective disclosures and their inextricable

Page 482

CONFIDENTIAL - ADAM WERNER, Ph.D.
1
2     ramification dissipated artificial inflation of
3     the prices of FXCM securities and thereby caused
4     investor losses."
5          Q.  Okay.  Putting aside any regulatory
6     ramifications, is it your opinion that the
7     disclosure of FXCM's prior relationship with
8     Effex impacted the value of FXCM after
9     August 2014?
10            MR. BAKER:  Objection to form.
11         A.  Yeah, I mean, that's an incomplete
12    hypothetical.  I mean, it's not even an
13    incomplete hypothetical.  It's just a
14    hypothetical that I have no ability to answer one
15    way or the other.
16            It assumes facts not in evidence.  I
17    don't know.  I'm not a lawyer.
18         Q.  Let me try to ask it a different way.
19            On February 6, 2017, the market
20    learned of the CFTC's allegation that FXCM had an
21    undisclosed interest in Effex; is that correct?
22         A.  Are you reading from somewhere?
23         Q.  I am not.  I'm just asking you --
24         A.  Alright.  So let's go to my
25    discussion of the news that's released on that

Page 483

CONFIDENTIAL - ADAM WERNER, Ph.D.
1
2     date, to make sure I give an accurate response to
3     your question.
4          Right, so to save time, all of my
5     opinions about that and the full scope of what
6     was disclosed on that date can be found in
7     Paragraph 17 of my report.
8          Q.  Okay.  So one of the things the
9     market learned on February 6th, 2017 was of the
10    CFTC's allegation that FXCM had an undisclosed
11    interest in Effex.
12            Would you agree with that?
13         A.  It had an "undisclosed interest in
14    the market maker that consistently won the
15    largest share of FXCM's trading volume."  That's
16    from Paragraph 17.  And "the market maker" we're
17    discussing there is Effex or Effex, however you
18    want to pronounce it.
19         Q.  Another piece of information that was
20    disclosed to the market on February 6th, 2017 was
21    that FXCM had agreed to pay a $7 million fine and
22    withdraw from the US business.
23            Do you agree with that?
24         A.  I believe that's correct.
25         Q.  In your analysis for loss causation

Page 484

CONFIDENTIAL - ADAM WERNER, Ph.D.
1
2     and damages, did you assume that both of these
3     pieces of information, one, the undisclosed
4     relationship with Effex and, two, the withdraw of
5     the US business were corrective of the alleged
6     fraud?
7             MR. BAKER:  Objection to form.
8          A.  Yeah, I -- well, again, I turn to
9     Paragraph 8 of my report.  These things are all
10    inextricably linked.
11         Q.  And did you assume that both of these
12    pieces of information contributed to the decline
13    of the price for the FXCM securities?
14            MR. BAKER:  Objection to form.
15         A.  I mean, I think my report speaks for
16    itself with regards to that question.
17         Q.  Did you attempt to quantify the price
18    impact of each of those pieces of information
19    separately?
20         A.  Well, to the extent that I believe
21    they are inextricably linked, I don't think it's
22    -- it would be very difficult or next to
23    impossible to do that type of analysis.
24         Q.  Is it possible that the price
25    reaction for FXCM securities was entirely

40 (Pages 481 - 484)

Page 485

CONFIDENTIAL - ADAM WERNER, Ph.D.
1      CONFIDENTIAL - ADAM WERNER, Ph.D.
2  attributable to the withdraw from its US business
3  as opposed to attributable to the undisclosed
4  interest in Effex?
5      MR. BAKER:  Objection.
6      THE WITNESS:  I'm sorry.  Go ahead,
7  Josh.
8      MR. BAKER:  Objection to the form.
9      Go ahead.
10     THE WITNESS:  Sorry.
11    A.  So you're using that word "possible"
12 again.  And I don't know.  I mean, I don't know
13 what absurd example you want me to come up with.
14     But when you ask the word, "is it
15 possible," short of something being a hundred
16 percent, something happening with a hundred
17 percent certainty, it's possible.
18    Q.  And is it also possible that the
19 price reaction was mostly attributable to FXCM's
20 withdraw from the US market, as opposed to the
21 undisclosed interest with Effex?
22      MR. BAKER:  Same objection.
23    A.  Again, it's -- again, it's a poorly
24 worded question.  "Is it possible?"  I mean, I
25 referred back to my previous discussions about

Page 486

1      CONFIDENTIAL - ADAM WERNER, Ph.D.
2  the possibility -- about the theory of
3 possibility.
4     You know, "is it possible?"  I --
5 again, anything's possible, unless there's a
6 hundred percent chance that it's impossible.
7    Q.  And, on your analysis, you did not
8 attempt to quantify the price reaction for each
9 of those pieces of information separately,
10 correct?
11      MR. BAKER:  Objection, asked and
12 answered.
13     THE WITNESS:  I'm glad you said that
14 because I was about to say "asked and answered."
15    A.  Or instead of "asked and answered,"
16 since I'm not the lawyer here, I refer to my
17 previous answer to that question, which I think
18 has been asked a couple of times now.
19    Q.  In connection with your work for the
20 loss causation and damages report, did you
21 analyze whether an agency or no dealing desk
22 model is preferable to a principal or dealing
23 desk model from a valuation standpoint for FXCM?
24    A.  For FXCM?  I don't believe so.
25    Q.  Did you analyze the value

Page 487

1      CONFIDENTIAL - ADAM WERNER, Ph.D.
2  implications for FXCM of operating as a dealing
3 desk versus a no dealing desk in connection with
4 your work in the loss causation and damages
5 report?
6    A.  I valued FXCM -- well, I don't
7 believe so.  I mean, there is an implication that
8 I did do that because we're talking about the but
9 for world and the actual world.  And so, to the
10 extent that there's a corrective disclosure at
11 the end of the class period, it's implied that I
12 looked at that.
13    Q.  But you did no explicit analysis in
14 connection with that?
15    A.  "Explicit"?  I mean, again, to the
16 extent that I looked at the price decline at the
17 end of the class period, I don't know if that is
18 -- falls under your rubric of "explicit."
19    Q.  Does your loss causation and damages
20 analysis include an analysis of Plaintiffs'
21 allegation relating to any GAAP violations?
22      MR. BAKER:  Objection.
23    A.  So --
24     THE WITNESS:  Oh, sorry.  Go ahead,
25 Josh.

Page 488

1      CONFIDENTIAL - ADAM WERNER, Ph.D.
2      MR. BAKER:  Objection to form.
3     That's fine.
4    A.  So, as I've stated previously, I've
5 assumed that Plaintiffs' allegations are correct.
6 I have not seen anything to suggest that they are
7 incorrect.  I mean, based on my understanding of
8 accounting is what they did a GAAP violation.
9 I'm not sure I've been preferred here as -- or
10 proffered here as an expert on accounting.
11     I believe and don't quote me on this
12 and I, certainly, wouldn't want to charge someone
13 for this opinion, but it was a GAAP -- what they
14 did was a GAAP violation, but I am not sure as I
15 sit here today.
16    Q.  You're aware that FXCM did not
17 restate its financial statements following the
18 CFTC and NFA settlements; is that right?
19    A.  At what point in time?
20    Q.  After the CFTC and NFA settlements.
21    A.  So immediately after?
22    Q.  At anytime after.
23    A.  Well, I don't know.  I haven't seen
24 their private financials.  I don't remember what
25 happened in the context of their bankruptcy.  But

41 (Pages 485 - 488)

Page 489

CONFIDENTIAL - ADAM WERNER, Ph.D.
1      CONFIDENTIAL - ADAM WERNER, Ph.D.
2  if you want to stipulate to that, I'll -- I have
3  no reason to think you're wrong.
4      Q.  Do you offer any opinion in your loss
5  causation and damages report about a purported
6  corrective disclosure with regard to GAAP and
7  FXCM's accounting?
8      A.  My report speaks for itself as to
9  what I've considered.  And so, you know, I refer
10 to Paragraph 7 of my report as to what I looked
11 at in forming this -- that's what I've been asked
12 to do.
13     Q.  Are you aware that the CFTC and NFA
14 settlement do not address FXCM's compliance with
15 GAAP?
16        MR. BAKER:  Objection, assumes facts
17 not in the record.
18     A.  I don't know one way or the other as
19 I sit here.
20     Q.  I think this would be a good time to
21 take another short break.  Maybe give us ten
22 minutes so I can regroup and see how much further
23 we have.
24        MR. ISAJIW:  So let's go off the
25 record.

Page 490

1      CONFIDENTIAL - ADAM WERNER, Ph.D.
2        THE VIDEOGRAPHER:  The time is
3  2:51 p.m.  We're going off the record.
4        (Lunch recess taken 2:51 to
5  p.m.)
6        THE VIDEOGRAPHER:  The time is
7  3:55 p.m. and we're back on the record.
8      Q.  Dr. Werner, just a few more questions
9  hopefully to finish this up.
10        In connection with your loss
11 causation and damages analysis, did you use
12 valuation multiple models?
13     A.  Did I use "valuation multiple
14 models"?  Hmm.  I think I know what you're
15 talking about.  Can you give me an example?
16     Q.  I can't.  But let's put a pin on that
17 and I'll ask another question and come back to
18 it.
19     A.  Okay.
20     Q.  Did you use a discounted cash flow
21 model?
22     A.  Well, I mean -- okay, so that's a
23 difficult question to answer only to the extent
24 that, you know, the change in the stock price
25 will be -- should reflect the same answer you get

Page 491

1      CONFIDENTIAL - ADAM WERNER, Ph.D.
2  if you use DCF analysis.  So it's implied.  But
3  if you're asking if I separately did a DCF cash
4  flow analysis for this, I did not.
5      Q.  Okay.  And did you apply a return
6  retribution analysis?
7      A.  I'm not sure I've ever heard of that,
8  "a return retribution," like I'm getting revenge
9  on somebody?
10     Q.  I'm sorry, a return attribution.
11     A.  Oh, okay.
12     Q.  I apologize.
13     A.  It's been a long day.  Sorry.
14        A "return attribution analysis"?  So
15 do you mean attributing a return -- different
16 parts of a return to different factors?
17     Q.  So I, actually, am looking to get
18 that information from you.  What I -- let me back
19 up and maybe this will give it more context.
20     A.  Okay.
21     Q.  In your market efficiency reports,
22 you did not perform a loss causation and damages
23 analysis, correct?
24     A.  That is correct, yes.
25     Q.  But if you recall, there were

Page 492

1      CONFIDENTIAL - ADAM WERNER, Ph.D.
2  discussions about how you would potentially
3  conduct such analysis in those reports; is that
4  correct?
5      A.  I do not recall.  It's possible.  I
6  don't recall those conversations, as I sit here
7  today.
8      Q.  Fair enough.
9        Can you take a look at your rebuttal
10 report, which is Exhibit 9.
11     A.  Exhibit 3...  Hold on.  Sorry.
12        Rebuttal report, okay, I've got it.
13     Q.  And you recall that -- and I'm not
14 looking for specifics here.  Just at a very
15 general level, Dr. Hendershott -- Professor
16 Hendershott submitted a report where he had
17 criticisms of your potential loss causation
18 analysis; is that correct?
19     A.  Well, so, to the extent that I didn't
20 perform a loss causation analysis for that
21 report, I don't -- I'm not sure I would
22 characterize it that way or I'm not sure that
23 that's an accurate characterization of what Dr.
24 Hendershott did.
25     Q.  Fair enough.

42 (Pages 489 - 492)

Page 493

CONFIDENTIAL - ADAM WERNER, Ph.D.
1
2      If you look at Paragraph 83 of your
3  rebuttal report on market efficiency.
4      A. Hold on.  Sorry.
5          Okay, yeah, I'm there.
6      Q. And then if you take a look at
7  Paragraph 85 of your -- of the same report.
8      A. Okay.
9      Q. And in Paragraph 85 in response to
10  Dr. Hendershott's criticisms you note, "The
11  Forensic analyst has in their employ a variety of
12  valuation tools designed to accommodate the
13  potential valuation complexities identified by
14  Dr. Hendershott.  Among the commonly used
15  valuation tools that are available are valuation
16  multiple models such as those based on earnings,
17  EBITDA, revenue, book value and cash flow."
18         Did you use any of those valuation
19  multiple models in connection with your loss
20  causation and damages report?
21      A. So I would answer the question this
22  way.  I considered all of those models in
23  presenting my opinions in my loss causation
24  report, which is Exhibit 8.  But I did not -- I
25  did not present any of those.  That's probably

Page 494

CONFIDENTIAL - ADAM WERNER, Ph.D.
1
2  the wrong way to say it.
3         I did not -- I considered those
4  analyses.  I did not perform any of them.
5      Q. Okay.  And so that's true for the
6  discounted cash flow and the return attribution
7  analyses as well?
8      A. Well, to the extent -- and I hate to
9  keep taking -- bringing you back to this
10  sentence.  To the extent that -- let's just make
11  sure.
12         And I'm reading from Paragraph 7 of
13  my report in this matter.  The alleged fraud --
14  or I should say so Exhibit 8.  The fraud -- "The
15  alleged fraud also concealed from the market the
16  inextricable ramification that would manifest
17  upon corrective disclosures, all of which in turn
18  caused the price of FXCM's securities to be
19  artificially inflated."
20         So, to the extent that there were
21  "inextricable ramifications" with regard to those
22  returns, I did not --  and I think we discussed
23  this at length earlier.
24         I did not attribute -- I attributed
25  the entire decline to the corrective disclosures.

Page 495

CONFIDENTIAL - ADAM WERNER, Ph.D.
1
2  I did not try to -- to the extent that it was --
3  one would be unable to disentangle those
4  attributes or whatever you want to call it.  No,
5  I did not do that.
6      Q. Okay.
7      A. So, again, I considered doing it, but
8  I did not.
9      Q. Thank you.
10         In Paragraph 8 of your loss causation
11  report you state that, "Following the corrective
12  disclosure, analyst valuation models reflected
13  the reality that the company could no longer
14  operate the business in the US and that FXCM had
15  previously misrepresented the veracity of its
16  agency business model."
17         But you don't cite to any analyst
18  reports in support of that statement in
19  Paragraph 8.
20         Do you know which analyst reports
21  you're referring to?
22      A. The collection of analyst reports
23  that came out after February 6th of that year.
24      Q. Any ones in particular that you're
25  referring to where the "analyst valuation models

Page 496

CONFIDENTIAL - ADAM WERNER, Ph.D.
1
2  reflected the reality that the company could no
3  longer operate its business in the US"?
4      A. So what I would suggest if we really
5  want to go through this is let's look at my --
6  well, I don't know what exhibit, maybe Exhibit 2
7  to my original report.
8         I guess what I would say is let's
9  take a look at all of the analyst reports that
10  were issued after February 6th, 2017.  I can walk
11  through each one of those and talk about the
12  extent that those -- the information contained in
13  those are responsive to your question.
14      Q. Is it fair to say that you're
15  referring just generally to those analyst reports
16  as opposed to a specific analyst report that
17  you're citing in Paragraph 8?  So the totality of
18  those analyst reports as opposed to one
19  individual?  I'm just trying to get a sense of
20  the universe of documents that are relevant?
21      A. Sure.  And so I'm not sure that that
22  is a correct characterization.  I think to give
23  you the best possible answer I could, I would
24  need to look at each one of those reports
25  individually.

43 (Pages 493 - 496)

Page 497

CONFIDENTIAL - ADAM WERNER, Ph.D.
1    CONFIDENTIAL - ADAM WERNER, Ph.D.
2        Q.  I'm not going to ask you to do that
3  here because there are a number of them and I
4  think that would be cumbersome.
5        Have you reviewed the expert report
6  of John Barron, which was submitted by Plaintiffs
7  in this matter?
8        A.  As I sit here, I don't recall.
9        Q.  I want to take a look at Paragraph 95
10  of your report.  Again, it's the loss causation
11  report when I say "your report."
12        A.  Okay.
13        Q.  And in Paragraph 95, you conclude --
14  I'm sorry.
15        In Paragraph 95 you state, "For a
16  number of reasons, a stable dollar based ribbon
17  is the more conservative inflation ribbon design
18  in the instant case."
19        Did I read that correctly?
20        A.  You did, yeah.
21        Q.  Are you saying that in your loss
22  causation and damages report you considered using
23  both a stable dollar based ribbon and a
24  percentage inflation based ribbon?
25        A.  Did I consider it?  I mean, I suppose

Page 498

1    CONFIDENTIAL - ADAM WERNER, Ph.D.
2  there's an implication that I considered it.  I
3  mean, to the extent that whenever I calculate
4  damages, I mean, I think about different ways to
5  calculate inflation.
6        Q.  So, In Paragraph 90 -- I'm just
7  trying to get a sense of the process here.
8        In Paragraph 94 you say, "The design
9  of the inflation ribbon can either be dollar
10  based or percentage based."
11        And I'm just trying to understand if
12  between Paragraphs 94 and 95 you're saying that
13  you considered a dollar based and a percentage
14  based and then determined that the dollar base
15  was the more conservative of the two possible
16  options?
17        A.  Well, in this example, by definition
18  it's the more conservative of the two options.
19  In other words, if I were to use a percentage
20  based decline per share -- I mean, I'd have in
21  and out damages and per share damages,
22  ultimately -- you know, I should say aggregate
23  damages, whatever they turn out to be, would be
24  significantly higher than what would be estimated
25  when one uses a constant dollar inflation ribbon.

Page 499

1    CONFIDENTIAL - ADAM WERNER, Ph.D.
2        Q.  Have you ever used a constant
3  percentage inflation ribbon in a loss causation
4  analysis?
5        A.  So, just so we're clear -- and when
6  you say, "loss causation analysis," do you
7  include like any damage analysis?  Because,
8  certainly, I have used a percentage base ribbon
9  in damage analysis, which I have not submitted as
10  expert testimony.  It is possible that in a --
11  that I can think of maybe one case -- excuse me
12  -- where I may have used a percentage ribbon --
13  constant percentage ribbon in a loss causation
14  report.  But, you know, that's the best of my
15  recollection.
16        Q.  Just to narrow it down to loss
17  causation and damages reports that you have
18  submitted in connection with securities fraud
19  cases, have you used a constant percentage
20  inflation ribbon methodology?
21        A.  Without looking at each one of those
22  reports, I would say it's not -- it's not likely,
23  but it is possible.
24        Q.  Are you aware of any court decisions
25  that have accepted the use of a constant

Page 500

1    CONFIDENTIAL - ADAM WERNER, Ph.D.
2  percentage inflation ribbon in connection with
3  loss causation and damages analysis in a
4  securities fraud case?
5        A.  As I sit here today, I don't know one
6  way or the other what courts have done with
7  regard to constant percentage ribbon.
8        Q.  Later on in Paragraph 95, second to
9  last sentence you say, "Empirically observed
10  declines elicited by disclosure at the end of the
11  class period would therefore have had a bigger
12  effect if the disclosure had occurred earlier."
13        Are you saying there that using
14  constant dollar inflation in this case is more
15  conservative than using some form of time varying
16  inflation that accounts for differences in --
17  earlier in the class period?
18        A.  I don't think that's -- I don't think
19  that's what I'm saying.  I'm just suggesting
20  that, certainly, my estimate of inflation is a
21  floor, not a ceiling.
22        Q.  Did you consider conducting an
23  analysis for damages that would measure inflation
24  as it could vary over time during the class
25  period?

44 (Pages 497 - 500)

CONFIDENTIAL - ADAM WERNER, Ph.D.
1
2    A.  Yes.
3    Q.  Why did you determine not to use that
4  methodology for a measure of inflation?
5    A.  Because I saw no evidence to suggest
6  that that would be appropriate.
7    Q.  And what types of evidence would,
8  generally speaking, suggest that that type of
9  methodology would be appropriate?
10    A.  In this matter, I'm not quite sure.
11  I mean, it's going to vary from case to case.
12  You know, I mean, yeah, I'd be speculating at
13  this point as to what the proper answer to that
14  question is.  But, generally, I mean, there is a
15  whole host of factors that could influence that
16  decision.
17    Q.  So is it fair to say that you could
18  have performed an analysis for the inflation
19  ribbon that would have taken into account
20  variations of inflation during different points
21  of the class period, but determined that the
22  constant dollar inflation ribbon methodology was
23  the one that you would use in this case?
24    A.  Well, so, again, I believe to the
25  extent -- based my understanding of the facts and

CONFIDENTIAL - ADAM WERNER, Ph.D.
1
2  not seeing any evidence to the contrary, I
3  believe, the methodology I used was the most
4  conservative.
5        Now, ultimately, if the Court were to
6  come out and find that there were other things
7  that changed the inflation during the class
8  period, I'd certainly need to take that into
9  consideration in re-estimating a possible
10  inflation ribbon.
11    Q.  Okay.  Thank you for that.
12        Give me one second please.
13    A.  Sure.
14    Q.  How much time did you spend preparing
15  for this deposition?
16    A.  Total?  Less than ten hours.
17    Q.  And what did you to do prepare for
18  this deposition?
19    A.  I re-read most of my -- all of my --
20  or all of the reports in this, matter, not just
21  mine, to the extent that I referred to them in my
22  reports.  I had a conversation -- I spoke with
23  Mr. Baker for about -- with Nariner Walia for
24  about 45 minutes I believe yesterday.  I mean, I
25  probably -- I probably looked at a couple of

CONFIDENTIAL - ADAM WERNER, Ph.D.
1
2  analyst reports and couple of SEC documents.  I
3  mean, I basically reviewed documents including
4  reports in this matter.
5    Q.  Okay.  And is it fair to say
6  consistent with my understanding of your prior
7  testimony that those documents would have been
8  the documents that you cited to in your reports,
9  any of the three in one way or another?
10    A.  Well, so you've given a couple of
11  examples of things that I may have reviewed.  So
12  I don't remember reviewing the Judge's opinion
13  with regards to market efficiency in preparing
14  for this deposition.  I mean, did I -- it's
15  possible I glanced at it.  I don't think I
16  discussed any of the deposition testimony that
17  you referred to earlier that I may have
18  previously seen.  So I think that's a fair
19  characterization.
20    Q.  So, other than the meetings that you
21  just discussed with Mr. Baker and, I believe,
22  there's one other member of your support staff at
23  Crowninshield -- the name is escaping me -- were
24  there any other meetings in preparation for this
25  deposition with anybody else?

CONFIDENTIAL - ADAM WERNER, Ph.D.
1
2    A.  I may have just had a discussion with
3  Mr. Walia, who is the other person in the meeting
4  yesterday.  I may have had a couple of
5  conversations with him over the course of
6  reviewing for my deposition, but that would be
7  it.  I mean, those conversations wouldn't have
8  lasted more than a couple of minutes.
9    Q.  Give me one more minute.
10        Okay.  With that I think that is all
11  the questions I have for you today.  Again, I
12  thank you for your time today.
13        MR. ISAJIW:  Josh, do you have
14  anything?
15        MR. BAKER:  No, thank you.
16        Thank you.
17    Q.  So I'll give you back the rest of the
18  day.  Thank you, sir.
19    A.  Fantastic.  Thank you.
20        THE VIDEOGRAPHER:  The time is
21  4:16 p.m.  We're going off the record.
22        (Time noted 4:16 p.m.)
23
24
25

45 (Pages 501 - 504)

Page 505

1     CERTIFICATE OF DEPONENT
2
3         I have read the foregoing transcript of
4   my deposition and except for any corrections or
5   changes noted on the errata sheet, I hereby
6   subscribe to the transcript as an accurate record
7   of the statements made by me.
8
9
            _____
10              ADAM WERNER, Ph.D.
11
12        SUBSCRIBED AND SWORN before and to me
13   this ____ day of _____, 20___.
14
15
16          _____
17              NOTARY PUBLIC
18
19
20  My Commission expires:
21
22
23
24
25

Page 507

ERRATA SHEET
VERITEXT/NEW YORK REPORTING, LLC
1
2   CASE NAME:
    In Re Global Brokerage, Inc.
3   DATE OF DEPOSITION: 6/4/2021
    WITNESSES' NAME: Dr. Adam Werner
4
5   PAGE  LINE (S)    CHANGE        REASON
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21            Dr. Adam Werner
22  SUBSCRIBED AND SWORN TO BEFORE ME
    THIS ____ DAY OF _____, 20__.
23
24
    _____
25  (NOTARY PUBLIC)        MY COMMISSION EXPIRES:

Page 506

1     CONFIDENTIAL - ADAM WERNER, Ph.D.
2     C E R T I F I C A T E   O F   R E P O R T E R
3        I, SILVIA P. WAGE, a Certified Shorthand
4   Reporter, Certified Realtime Reporter and Registered
5   Reporter, herby certify that the witness in the
6   foregoing deposition was by me duly sworn to tell
7   the truth, the whole truth, and nothing but the
8   truth in the within-entitled cause; that said
9   deposition was taken down in shorthand by me, a
10  disinterested person, at the time and place
11  therein stated, and that the testimony of the
12  said witness was thereafter reduced to
13  typewriting, by computer, under my direction and
14  supervision; that before completion of the
15  deposition, review of the transcript [X] was [ ]
16  was not requested.  If requested, any changes
17  made by the deponent (and provided to the reporter)
18  during the period allowed are appended hereto.
19     I further certify that I am not of counsel
20  or attorney for either or any of the parties to
21  the said deposition, nor in any way interested in
22  _____ and that I am not
23  _____ es thereto.
24
25  License No. 30X100182700  dated: June 8th, 2021.

46 (Pages 505 - 507)

**&**

**&**   330:9 331:12,23
333:22,24 334:2
351:7 380:12,15
380:19,22,25
471:13

**0**

**00916**   328:4

**1**

**1**   331:21 339:21
342:20 347:6,6
348:8 391:12
452:12 478:23
**10**   331:11,22
339:23 351:3
352:11 363:15
375:7 379:7 391:6
**100**   387:12
**10036-2601**
330:11
**101**   330:4
**10th**   339:14
**11**   331:12 351:6
385:18 386:23
387:5,22 426:13
**1185**   330:10
**11:03**   329:4 333:3
**12**   331:13 387:15
452:2,8,10,14
454:13
**12:12**   388:21,22
**12:19**   388:22,24
**14**   392:4
**15**   338:22 358:16
358:21 359:18
463:2
**150**   371:6
**15th**   347:16 348:3
348:18 358:9
442:13 443:3,17

443:24 444:8,15
445:4,22 446:15
459:3,25 460:22
462:5
**16.31**   387:12
**16th**   459:3
**17**   440:21 443:7
449:18 483:7,16
**18**   350:19 351:25
371:7
**18th**   391:4
**19046**   330:5
**1:10**   427:20,21
**1:17**   328:4
**1:19**   427:21
429:12

**2**

**2**   342:10,17 346:14
349:14 352:6
375:18,21 376:14
376:24 378:6
379:5,13 381:12
381:23 384:18
496:6
**2.25**   347:8 392:2
**20**   456:15 505:13
507:22
**2010**   450:8 461:20
461:22 464:25
473:20
**2012**   347:16 348:3
348:18 358:9,16
358:21 359:18
442:14 443:4,17
443:24 444:8,16
445:4,22 446:15
459:3,10,25
460:23 464:5
469:10,16,25
**2014**   348:23 450:9
461:5,16 462:5,13

463:2,5,6,8,18
478:17,23 479:2,4
479:22 480:2,6,16
480:24 481:5,9
482:9
**2015**   353:4 470:22
470:24 475:7
**2016**   456:14
**2017**   347:16 348:3
348:19,23 358:16
371:2,20 372:21
374:4,10,22
387:17 442:13
443:7 444:2,6
445:7 446:17
447:17,22 448:17
449:16,20 450:16
451:24 456:14
459:4 463:11,20
482:19 483:9,20
496:10
**2018**   347:9 392:3
**2019**   479:24
**2020**   331:10,22
339:14,23 341:2,6
350:24 376:15
378:7 417:3
440:21
**2021**   328:10 329:3
331:8 333:4
336:11,17,25
350:19 351:25
391:4 506:25
**21**   331:8 336:11,17
336:25
**212**   330:11
**215**   330:5
**21st**   343:24 355:18
**23**   350:24 353:20
393:11

**24**   348:23
**26**   363:24 364:6
366:5,11,18 420:4
**27**   331:10 340:25
341:6 460:2 472:6
472:9
**28**   470:22,24
472:13
**28th**   470:25
**29**   472:9
**2:09**   467:24,25
**2:23**   467:25 468:3
**2:51**   490:3,4
**2s**   382:18

**3**

**3**   331:20 332:7,8
339:14,20 353:20
376:21 393:11
492:11
**3.13.**   371:18
**3.39**   385:20 387:7
387:18
**3/28/19**   471:20
**30**   456:16
**30x100182700**
506:25
**32**   411:24 412:5,6
**328**   471:18
**334**   331:4
**336**   331:7
**339**   331:20
**341**   331:9
**351**   331:11,12
**35e**   461:2,3
**36**   462:4
**37**   343:14,23 344:3
352:9,13 392:23
**39**   342:21 343:9,14
343:17 344:6
**395**   332:7

**[397 - adam]**                                                    Page 2

**397**   332:8
**3:55**   490:7

**4**

**4**   328:10 329:3
   440:14 454:12
**40**   345:3 354:2
**44**   368:16
**440**   330:4
**45**   426:18 502:24
**452**   331:13
**4577228**   328:25
**471**   331:23
**49.9**   369:2
**4:16**   504:21,22
**4th**   333:4

**5**

**5**   363:14
**50**   338:21 368:22
**51**   426:22
**52**   372:4
**54**   371:17
**556-2262**   330:11

**6**

**6**   331:14,14 358:16
   449:20 452:3,4
   482:19
**6/4/2021**   507:3
**60**   452:17,17 453:3
**600-2817**   330:5
**683**   389:2,4,10
   390:12,21 393:15
   394:14 395:14
   396:19 397:12,17
   398:4,17
**6d**   453:4
**6th**   347:16 348:3
   348:18,23 369:13
   374:10,12 447:17
   447:22 450:16
   451:24 459:25

**7**

**7**   331:23 349:16
   354:13 355:7,15
   355:18 362:24,24
   363:7,23 369:5,14
   370:15 371:25
   372:16 432:20,24
   432:25 435:16
   441:3 448:19
   450:13 471:11,12
   471:24 481:21
   483:21 489:10
   494:12
**70**   369:20 370:8
**76**   376:16,24
**77**   450:10
**7th**   371:2,19 374:4
   387:17 442:13
   443:7

**8**

**8**   331:7 336:9,15
   336:23 361:24
   367:9,10 368:11
   372:25 385:25
   386:5 435:17
   481:21,24 484:9
   493:24 494:14
   495:10,19 496:17
**83**   493:2
**85**   493:7,9
**88**   412:7
**8th**   506:25

**9**

**9**   331:9 341:3,4
   374:2 492:10
**90**   498:6
**91**   457:25 458:4

**92**   376:16,25
**93445**   334:13
**94**   498:8,12
**95**   497:9,13,15
   498:12 500:8
**960**   334:12
**9932**   506:24

**a**

**a.m.**   329:4 333:3
**ability**   359:7
   482:14
**able**   356:25
   400:11 408:12
   425:11 430:25
**abrams**   331:12
   350:20 351:5
   391:5
**absent**   412:11,14
**absurd**   485:13
**accept**   452:24
   462:6
**accepted**   365:24
   421:22 499:25
**access**   335:12
   340:3 341:10
   452:10 471:16
**accommodate**
   406:7 407:18,25
   409:14 410:2,17
   411:10 426:19
   427:2 493:12
**accommodations**
   407:23
**account**   501:19
**accounting**   365:24
   421:22 488:8,10
   489:7
**accounts**   371:11
   500:16
**accurate**   346:24
   359:21,24 360:6

361:21 368:14
379:17 383:24
384:6 389:8,18
400:3 401:11
414:15 415:7
431:5,21 443:12
479:14 483:2
492:23 505:6
**accurately**   358:23
   378:24 380:3
**acknowledge**
   453:2
**acquired**   473:4
**acquiring**   372:5
**act**   331:15 450:14
   452:4,17 453:4
**acted**   450:2
**action**   333:15
   440:20
**actual**   487:9
**adam**   328:1,9
   329:1,6 330:1
   331:1,3,8,10,22
   332:1 333:1,6
   334:1,11 335:1
   336:1,16 337:1
   338:1 339:1,23
   340:1 341:1,5
   342:1 343:1 344:1
   345:1 346:1 347:1
   348:1 349:1 350:1
   351:1 352:1 353:1
   354:1 355:1 356:1
   357:1 358:1 359:1
   360:1 361:1 362:1
   363:1 364:1 365:1
   366:1 367:1 368:1
   369:1 370:1 371:1
   372:1 373:1 374:1
   375:1 376:1 377:1
   378:1 379:1 380:1

| | | | |
|---|---|---|---|
| 381:1 382:1 383:1 | 504:1 505:10 | 392:18 399:7 | **allegations** 366:12 |
| 384:1 385:1 386:1 | 506:1 507:3,21 | 400:16,20,24 | 366:18 367:2 |
| 387:1 388:1 389:1 | **add** 398:25 399:3 | 402:6,16 412:13 | 422:3,9 454:19 |
| 390:1 391:1 392:1 | 471:6 | 413:16 414:10,16 | 455:3,7 474:23 |
| 393:1 394:1 395:1 | **added** 365:15 | 415:23 417:20 | 488:5 |
| 396:1 397:1 398:1 | 368:4 421:10 | 418:2,8 442:4 | **allege** 364:10 |
| 399:1 400:1 401:1 | **additional** 344:13 | 448:5 455:17,20 | 420:13,23 472:19 |
| 402:1 403:1 404:1 | 345:8,15 366:25 | 456:7 477:18,21 | **alleged** 355:22 |
| 405:1 406:1 407:1 | 414:2 442:8 | 483:12,23 | 363:3,9,21 366:6 |
| 408:1 409:1 410:1 | **address** 489:14 | **agreed** 386:10 | 367:7 372:2 374:6 |
| 411:1 412:1 413:1 | **adjectives** 442:9 | 404:15 455:25 | 401:18,22 404:10 |
| 414:1 415:1 416:1 | **administrative** | 483:21 | 404:25 412:11,15 |
| 417:1 418:1 419:1 | 452:21 | **agreeing** 459:5 | 421:19 423:9 |
| 420:1 421:1 422:1 | **admit** 451:3,7,10 | 460:3,15 | 440:17,23 441:4 |
| 423:1 424:1 425:1 | 451:17 453:18 | **agreement** 329:6 | 444:6,7 448:20 |
| 426:1 427:1 428:1 | 454:15 455:8 | 369:25 450:19 | 449:6,13 456:8 |
| 429:1 430:1 431:1 | **admitting** 452:24 | 451:20 469:18 | 461:21 484:5 |
| 432:1 433:1 434:1 | 453:6 454:5 | **agreements** | 494:13,15 |
| 435:1 436:1 437:1 | **adopting** 331:12 | 450:22 454:17 | **allegedly** 353:17 |
| 438:1 439:1 440:1 | 350:24 351:7 | 468:20 | 393:8 398:5 |
| 441:1 442:1 443:1 | **advance** 427:3 | **ah** 343:3 417:14 | 412:21 413:3,11 |
| 444:1 445:1 446:1 | **advice** 395:7 | 461:3 471:18,23 | 414:4 416:4,17 |
| 447:1 448:1 449:1 | **affect** 424:8,18 | **ahdout** 382:6 | 449:14 |
| 450:1 451:1 452:1 | 428:16 429:3,18 | 452:15 | **alleging** 476:9 |
| 453:1 454:1 455:1 | 429:25 | **ahead** 337:15 | **allow** 436:8 |
| 456:1 457:1 458:1 | **affiliations** 333:18 | 356:12 384:23 | 446:23 |
| 459:1 460:1 461:1 | **affirmative** 472:16 | 386:13 388:15 | **allowed** 506:18 |
| 462:1 463:1 464:1 | **affirmatively** | 396:7 397:22 | **allowing** 364:24 |
| 465:1 466:1 467:1 | 464:22 | 398:9 399:2,12 | 420:17 |
| 468:1 469:1 470:1 | **agencies** 352:24 | 406:23 408:8 | **alright** 355:16 |
| 471:1 472:1 473:1 | **agency** 362:14 | 416:13 445:12 | 356:14 396:12 |
| 474:1 475:1 476:1 | 434:12,23 458:12 | 453:15 455:16 | 397:7 419:25 |
| 477:1 478:1 479:1 | 486:21 495:16 | 458:8 464:17 | 467:21 468:16 |
| 480:1 481:1 482:1 | **agent** 364:14 | 465:5 469:5 | 471:19 477:13 |
| 483:1 484:1 485:1 | 420:8 | 476:22 477:9 | 482:24 |
| 486:1 487:1 488:1 | **aggregate** 398:15 | 485:6,9 487:24 | **amended** 358:25 |
| 489:1 490:1 491:1 | 398:18 498:22 | **alex** 337:17 338:3 | 389:15 390:2 |
| 492:1 493:1 494:1 | **ago** 465:14,15 | **allegation** 472:10 | 440:19 |
| 495:1 496:1 497:1 | 473:13,15 | 482:20 483:10 | **americas** 330:10 |
| 498:1 499:1 500:1 | **agree** 355:16 | 487:21 | **amount** 415:2,21 |
| 501:1 502:1 503:1 | 363:25 390:20 | | 444:12,14,22 |

446:5
**analogy** 476:21,24
479:21
**analyses** 432:8,11
432:16 494:4,7
**analysis** 346:4,12
375:12 394:15
403:13,17,20,23
404:5 405:21
406:2 409:13,25
410:16 411:9,19
414:10 417:21,21
418:15 422:15
424:6,12 428:14
428:20 429:21
430:6,10,20
448:15 451:17
457:17 464:21
468:5 472:2
480:21 483:25
484:23 486:7
487:13,20,20
490:11 491:2,4,6
491:14,23 492:3
492:18,20 499:4,6
499:7,9 500:3,23
501:18
**analyst** 352:23
362:10 369:10
375:12 377:15
380:21 433:25
439:14 441:21
445:18 446:10
493:11 495:12,17
495:20,22,25
496:9,15,16,18
503:2
**analysts** 368:18
439:7 445:25
**analyze** 424:14
428:23 429:14

430:14 431:24
434:11,23 435:8
446:12,15 460:8
460:11 486:21,25
**analyzed** 366:17
368:20 433:19
443:10
**analyzing** 408:14
**announced** 369:14
369:24 419:21
420:24
**announcement**
368:21
**answer** 332:6
346:24 355:10
356:17 357:7
358:22 359:7,11
359:14 360:4,6,7
360:12,14,22
361:2,5,6,21,22
368:15 373:9
377:5 378:24
380:3,6 381:4
382:14,24 383:5
383:11,25 384:9
384:14 385:7,9,17
389:6 390:25
393:22 394:18,22
394:24,25 395:5,8
395:13 396:9,11
396:22,25 397:3,6
397:8,24,25
398:24 399:17
400:11,12 402:3,5
402:10 404:7
405:9,14,18
406:25 407:9
408:12,21 409:11
409:18,24 410:12
410:20,22 411:14
411:15 414:21

415:7,10,12,17
416:14,21 417:11
419:3,4,5 422:12
422:20 424:5,19
424:20 425:12,16
425:20 426:21
427:12 428:4,12
428:12,18,21
429:5,5,7,9 430:4
430:18,25 431:5
431:21 432:6,14
432:15,19 433:11
433:16 435:5
442:6,21 444:19
445:15 460:7
463:24 464:10
467:4 468:22
472:5 474:5,25
477:12 479:15
480:11,12 481:3
482:14 486:17
490:23,25 493:21
496:23 501:13
**answered** 342:15
359:20 360:11,20
382:16 383:9
384:21 385:2,12
388:11,17 398:24
409:10 442:9
453:13 467:13
470:6 474:25
480:9,10 486:12
486:14,15
**answering** 359:25
399:18 407:14
457:12
**answers** 360:19
361:4,23 413:25
427:22 469:15
470:8

**anticipated** 464:3
**anticipation**
452:20
**anybody** 339:5
503:25
**anymore** 339:8
**anyone's** 435:7
**anything's** 486:5
**anytime** 488:22
**apologize** 362:20
453:15 491:12
**appear** 337:16
376:3
**appearance**
333:21
**appearances**
333:18
**appeared** 438:22
**appears** 337:2
339:2 366:14
386:5 462:25
472:3
**appended** 506:18
**application's**
477:6
**apply** 415:12
491:5
**appointed** 389:21
390:8
**appropriate** 501:6
501:9
**approximate**
462:24
**approximately**
450:9
**approximation**
338:20
**april** 331:8 336:11
336:17,25 343:24
345:4 351:23
355:18 362:2

364:3 440:21
461:5,16 463:5,8
**argue** 392:10
**arrangements**
477:4
**array** 344:14
**article** 371:19
372:8
**articles** 367:4
375:11 377:15
**artificial** 362:16
362:25 367:11,22
373:5 374:7,23
375:4 412:2,8,14
413:4,12 414:18
482:2
**artificially** 349:17
354:15 355:24
356:5 363:11
448:22 449:11
494:19
**aside** 339:4 482:5
**asked** 335:24
341:25 359:20
360:10 383:8
384:21,25 385:11
388:10,16 410:9
411:3 417:12
426:20 429:14
434:9 435:8 440:4
440:7,15,22
441:19 442:7
453:12 459:23,24
466:4,6 467:13
470:5 477:3 480:3
480:8 486:11,14
486:15,18 489:11
**asking** 350:7
356:4 361:16
366:24 368:9
373:11,15 383:4

384:2,10 385:8,9
385:15 386:14,22
394:9 399:15
400:22 401:9
406:12,13,14
409:25 422:5
423:11,23 426:11
428:5 432:7,9,10
436:19 445:20
448:8 455:12
461:23 474:8
476:17 479:18
482:23 491:3
**aspect** 383:15
**asset** 369:4
**assigns** 454:8
**assist** 337:5 339:6
**assisted** 337:6,8
**assisting** 337:22
**associated** 419:20
430:10 458:13
459:20
**association** 333:13
370:2
**assume** 377:17
386:6 403:3,23
404:8 422:15
463:15 467:22
484:2,11
**assumed** 404:6
488:5
**assumes** 408:3,6
442:19 448:15
463:13 464:7
482:16 489:16
**assuming** 342:9
394:9 412:25
413:9 463:3,17
**assumption**
377:20 403:7
405:17 443:14

**assumptions** 405:4
405:12,14 415:6
418:15
**attempt** 409:24
435:5 484:17
486:8
**attorney** 333:21
506:20
**attorneys** 330:4,10
**attributable** 485:2
485:3,19
**attribute** 494:24
**attributed** 494:24
**attributes** 495:4
**attributing** 491:15
**attribution** 491:10
491:14 494:6
**august** 370:11,14
478:17,23 479:2,4
480:6,16,24 481:5
481:8 482:9
**available** 377:10
377:16,21 378:2
378:19 493:15
**avenue** 330:4,10
334:12
**aware** 350:7
354:16 356:7
357:4,9 419:20
450:18 451:9,15
453:8,13,18,22
454:18 455:2,6
457:3 466:20
467:11 468:23
470:19 474:12
478:12,16,20
488:16 489:13
499:24

**b**

**b** 331:5 353:20
364:15 393:11
**back** 344:20
354:12 360:25
367:9 370:9
372:12,18 379:6
382:24 383:24
385:6 386:13,17
386:20 388:24
424:24 425:12
427:23 429:12
434:20 435:16
438:22 439:6
454:3 468:3
473:12,19 476:10
479:21 481:18
485:25 490:7,17
491:18 494:9
504:17
**background**
400:22
**baker** 330:7 334:4
334:4 340:12
341:22 343:8,13
343:18 344:16
346:6 354:19
356:10,14 357:12
358:13 359:19
360:10,17,20
361:15 368:2,4
374:9 383:8,19
384:21,25 385:11
385:15 388:10,15
389:12 393:19
394:17,23 396:6,8
396:24 397:18,23
398:21 399:11
400:9 401:25
402:22 404:12
405:3,8 406:9,24

407:7 408:3,6
409:17 410:5,19
410:25 411:13
416:19 419:2
422:19 425:14,20
426:4 430:24
431:18 436:10,24
439:5,18 441:23
442:15,19 444:9
448:18 449:17
451:21 456:20
457:18 459:7
460:5,17 462:15
463:12,22 464:7
464:15,18 468:9
468:15 469:3
470:5 473:10
475:15 477:8,10
480:8,18 481:2
482:10 484:7,14
485:5,8,22 486:11
487:22 488:2
489:16 502:23
503:21 504:15
**balancing** 352:14
**banking** 377:15
**bankruptcy** 447:9
457:7 488:25
**barking** 427:7
**barron** 497:6
**base** 372:6 382:12
451:16 498:14
499:8
**based** 355:10
359:5 375:9 379:8
395:3,7 397:7
444:10 463:14
464:12 466:22
488:7 493:16
497:16,23,24
498:10,10,13,14

498:20 501:25
**basic** 353:14 393:5
**basically** 438:22
503:3
**basis** 342:6 392:16
396:20 405:21
440:25 441:10
447:15,19
**beach** 334:12
335:17
**bear** 344:23
**began** 460:22
461:15,22,24
462:13,21 463:5
463:18 464:6
473:20
**beginning** 333:21
335:2 344:3
358:20 359:17
364:7 368:16
443:8,21 444:22
459:16 460:20
461:5 463:4,8
469:9
**begins** 343:16
376:24
**behalf** 394:15,16
396:4
**behavior** 473:20
**belief** 384:22
385:4,6 443:11
**believe** 336:4,5,8
337:6 338:8,11
339:7 340:7 341:3
345:2 346:15,23
348:7 353:23
357:7 361:11,12
363:17 366:8
368:3 369:7
370:11 373:3,8
374:13 375:15,20

377:14,23 382:22
384:15,16 388:5
389:3,13 390:11
390:17 391:5
394:2,6,19 399:20
401:3,11,15
402:12 403:7
404:14 405:20
407:8 409:10
412:17,24 419:9
419:23 420:4
421:15,16,19
424:23 425:4,8
429:9 437:21
440:9,13 442:6
443:3,5,18 444:13
445:3 446:4 451:2
455:5 456:2,15
457:6,20,23 460:9
460:18 464:11
467:13 472:25
474:6 476:8 477:3
477:7,25 478:18
481:12 483:24
484:20 486:24
487:7 488:11
501:24 502:3,24
503:21
**believed** 421:15
**benchmarks** 353:4
**beneficial** 433:22
434:6,13,24
**benefit** 364:25
420:18
**benefitted** 456:18
456:21
**best** 344:25 349:12
373:8 389:5
390:15 432:19
457:8 466:17
476:25 496:23

499:14
**bettencourt**
337:17,25
**better** 372:24
477:20
**beyond** 481:8
**bidding** 369:20
**big** 478:7
**bigger** 500:11
**bill** 399:25
**billable** 338:6,23
**billion** 478:6
**biopharma** 344:14
**blapointe** 330:6
**body's** 446:10
**boilerplate** 453:10
454:2,16 455:11
**bond** 372:9
**book** 493:17
**bottom** 391:11
392:24 393:2
472:14
**break** 388:19
426:11,23 427:11
427:15 463:6
467:16,20 489:21
**breaking** 465:3
**brent** 330:7 334:6
**bringing** 494:9
**broad** 417:5
442:23
**broker** 371:10
457:4 468:24
**brokerage** 328:4
333:7 507:2
**brokers** 465:21
466:2,8
**brought** 468:12
**bulk** 365:18
371:13,15 421:12

bunch 405:4
bup 481:22,22,22
burden 352:16
business 362:7,14
  369:13,16 370:17
  434:13,25 437:5,7
  437:9,13,16,20,21
  437:22 438:3,13
  438:14,17,21,24
  439:17 440:12
  445:19 449:5
  455:25 456:4,14
  456:19 458:14,20
  462:8 476:5
  483:22 484:5
  485:2 495:14,16
  496:3
businesses 362:12
buy 376:13

**c**

c 330:2,14 331:14
  364:23 365:20
  452:3 454:12
  506:2,2
calculate 356:25
  498:3,5
calculated 396:19
  398:12,13
calculation 350:4
california 334:13
  335:17
call 495:4
called 344:7 389:2
calls 393:21
camera 353:4
cammer 352:14
canada 345:7
capital 364:22
  371:12,23 372:4,5
  380:10 389:2,4,10
  390:12,22 393:15

394:14 395:14
397:12 398:4
420:15 421:2,8,10
421:13 422:2
452:14
capital's 396:19
  397:17 398:18
case 335:22
  336:25 346:7,12
  346:20 354:18
  366:7 367:8
  373:14 376:13
  377:8 378:17
  381:20 389:15,22
  390:19,23 407:24
  415:12,15 442:11
  445:2 447:23
  459:20 465:9
  466:15,17 468:18
  468:22 474:15
  477:15 479:7,16
  497:18 499:11
  500:4,14 501:11
  501:11,23 507:2
cases 344:13
  352:19 468:8,12
  468:14,24 499:19
cash 477:23 478:4
  490:20 491:3
  493:17 494:6
causation 331:7
  336:2,11,16,24
  339:11 341:18
  342:19 345:21
  346:4,5,12,18
  347:7 351:14,20
  354:13 355:8
  357:3,17,22 358:5
  361:25 364:4
  374:15 375:8,18
  379:7 386:3,7,11

386:23 387:2,25
388:3 397:11
398:19 399:6
403:10,13,19,21
403:23 404:5
405:21 408:15
409:12 410:15
411:8,9,19 417:21
419:8 422:15
430:13 431:23
432:21 440:9,19
453:17 457:16
468:5 472:2,24
483:25 486:20
487:4,19 489:5
490:11 491:22
492:17,20 493:20
493:23 495:10
497:10,22 499:3,6
499:13,17 500:3
cause 353:6
  362:17 506:8,22
caused 355:22
  363:10 367:24
  373:6 375:5
  404:10 440:17
  444:14 446:4
  448:21 449:10
  482:3 494:18
causes 404:25
ccr 328:24
cease 450:13
ceiling 417:8
  500:21
center 370:25
certain 363:2
  404:9,24 425:23
certainly 370:18
  380:5,5,13 381:8
  405:24 434:3
  437:25 438:2,16

439:10,25 456:5
461:7,13 465:7,7
466:24 468:20
470:8 471:2
473:24 481:16
488:12 499:8
500:20 502:8
certainty 485:17
certificate 331:20
  339:21 505:1
certification
  349:22 351:14,20
  354:7 389:21
  390:8
certified 329:7,8
  356:24 369:10
  392:11 506:3,4
certify 506:5,19
certifying 392:20
cetera 426:16
cfa 369:8
cftc 369:5,14,16
  370:3,7,11,15
  379:19 446:2
  447:12,21 448:16
  449:15,21 450:11
  450:14,17,19
  451:10,24 452:15
  454:19 455:4,6
  459:5 460:3 462:5
  462:13,20 463:5
  463:17 465:3,5,17
  468:6,12 470:2
  472:12 475:14,18
  477:5 488:18,20
  489:13
cftc's 482:20
  483:10
chance 486:6
change 357:16
  358:4 411:9

413:17,23 414:8
414:13 416:5,18
417:24 418:5,11
490:24 507:5
**changed** 338:14
357:21 480:16,23
502:7
**changes** 353:8
505:5 506:16
**changing** 463:24
**characterization**
492:23 496:22
503:19
**characterize**
492:22
**charge** 371:16
488:12
**charged** 450:15
476:16,18
**charges** 369:5
370:4,15
**chief** 369:19
**china** 372:9
**choose** 360:3
**chosen** 353:11
**circumstances**
413:22 414:12
**cite** 366:12 495:17
**cited** 367:5 376:5
378:22 503:8
**citing** 496:17
**civil** 450:12
**claim** 437:23
**claims** 364:16
472:13 474:13,22
**clarification**
355:12,14 410:7
468:17
**clarifications**
459:15

**clarified** 402:24
**clarify** 349:12
360:15 406:19
407:12 410:9
411:3
**clarifying** 411:4
435:4
**clarity** 426:3
**class** 347:15,19
348:2,6,12,17
349:3,18,21
351:13,19 354:7
354:16,17,18,21
355:4,5,25 356:6,8
356:23 357:5,15
358:9,11,15,21
359:18 361:18
362:4 363:12,16
366:4 374:8
385:21 387:7
389:20,21 390:8,9
391:14,25 392:10
392:11,18 393:16
394:16 396:4
413:18 414:8,13
414:25 415:4,19
415:22 416:5,18
417:24 418:5,12
419:10,13,14,18
422:2 433:22
434:7,14,25 440:2
440:17,20 442:14
443:8,20,22
444:22 448:23
459:13,16 460:12
460:13,20,22
463:11,20 464:5
466:10 473:21
478:14 481:11,13
487:11,17 500:11
500:17,24 501:21

502:7
**clear** 349:7,11
354:23 370:10
374:9 395:9
406:10 424:20
425:22,25 429:6
499:5
**client** 372:6
379:21,21
**clients** 446:21
**close** 455:17
**closer** 407:4
**closure** 456:18
**coffee** 372:13
**collection** 495:22
**colloquy** 425:6
**combined** 345:11
**come** 351:24 447:6
485:13 490:17
502:6
**coming** 473:19
**comment** 368:20
**commentary**
368:18
**commission** 370:3
371:23 449:21
452:23 505:20
507:25
**committed** 476:13
476:14
**committing**
476:12 479:22,25
**commodities**
449:21
**commodity** 331:15
370:3 371:22
450:14 452:4,17
453:4
**common** 358:8,14
385:20 387:6,17
391:14,25 408:18

**commonly** 493:14
**communications**
395:4
**companies** 433:12
472:15
**company** 353:8
362:11 365:12,16
365:19,20 368:20
369:12 370:4,16
370:18 371:12,24
375:10,11 376:9
377:7 379:9,10,19
412:21 416:3,16
420:15 438:21
456:3 464:25
473:4 474:19
477:23 495:13
496:2
**company's** 362:5
362:7 364:15
365:3 412:19
420:20 433:2
448:24 458:11,14
458:18
**comparable** 468:8
468:13,24
**comparing** 344:10
**complaint** 366:12
366:16 369:16
370:11,14 379:18
389:7,14,15
390:15,25 422:4
440:20,21 470:21
**complaint's**
472:10
**completion** 463:20
506:14
**complex** 415:10
**complexities**
493:13

compliance
  489:14
comply   454:8
component   368:23
  368:24 445:11
  457:16
comprehensive
  361:23
computer   342:25
  506:13
concealed   441:4
  449:7 494:15
concealing   369:18
conceded   477:4
concerning   440:10
  475:19
concerns   369:3
conclude   349:15
  362:25 367:10
  374:22 375:3
  497:13
concluded   385:19
  387:5,11,15
concludes   472:18
conclusion   357:10
  357:16,22 358:5
  393:21 408:25
  409:7,15
conclusions
  349:15 368:12
  375:9 379:8
  382:12 388:8
  408:16 432:10
  452:25 453:7
condition   453:8
conditions   454:9
conduct   346:3
  374:14 492:3
conducted   334:25
  399:5 403:2,14,15

conducting   417:20
  500:22
confidential   328:1
  329:1 330:1 331:1
  332:1 333:1 334:1
  335:1 336:1 337:1
  338:1 339:1 340:1
  341:1 342:1 343:1
  344:1 345:1 346:1
  347:1 348:1 349:1
  350:1 351:1 352:1
  353:1 354:1 355:1
  356:1 357:1 358:1
  359:1 360:1 361:1
  362:1 363:1 364:1
  365:1 366:1 367:1
  368:1 369:1 370:1
  371:1 372:1 373:1
  374:1 375:1 376:1
  377:1 378:1 379:1
  380:1 381:1 382:1
  383:1 384:1 385:1
  386:1 387:1 388:1
  389:1 390:1 391:1
  392:1 393:1 394:1
  395:1 396:1 397:1
  398:1 399:1 400:1
  401:1 402:1 403:1
  404:1 405:1 406:1
  407:1 408:1 409:1
  410:1 411:1 412:1
  413:1 414:1 415:1
  416:1 417:1 418:1
  419:1 420:1 421:1
  422:1 423:1 424:1
  425:1 426:1 427:1
  428:1 429:1 430:1
  431:1 432:1 433:1
  434:1 435:1 436:1
  437:1 438:1 439:1
  440:1 441:1 442:1

443:1 444:1 445:1
  446:1 447:1 448:1
  449:1 450:1 451:1
  452:1 453:1 454:1
  455:1 456:1 457:1
  458:1 459:1 460:1
  461:1 462:1 463:1
  464:1 465:1 466:1
  467:1 468:1 469:1
  470:1 471:1 472:1
  473:1 474:1 475:1
  476:1 477:1 478:1
  479:1 480:1 481:1
  482:1 483:1 484:1
  485:1 486:1 487:1
  488:1 489:1 490:1
  491:1 492:1 493:1
  494:1 495:1 496:1
  497:1 498:1 499:1
  500:1 501:1 502:1
  503:1 504:1 506:1
confirm   335:12
  383:4 384:10
  464:22
conflict   362:6
  365:4 420:21,22
  433:3,9 448:25
  449:25 458:12
  479:3 480:5
conflicts   364:16
confounding
  412:25 413:9
confused   355:3
  373:22
confusing   410:11
connection   346:11
  350:8 366:17,25
  374:18 375:17
  379:4 380:8 381:2
  382:20 383:6
  384:17 388:8

390:22 397:13
  398:5,18 399:5
  403:10,12,20
  408:15,17 409:13
  410:3,16 411:11
  411:20 422:5,9,14
  424:14 428:24
  429:14,21 430:19
  431:22 433:19
  438:5 440:8
  450:24 453:16
  456:9 468:4 472:2
  472:24 486:19
  487:3,14 490:10
  493:19 499:18
  500:2
consent   453:2
conservative
  497:17 498:15,18
  500:15 502:4
consider   497:25
  500:22
consideration
  502:9
considered   342:15
  346:11,13 375:16
  403:25 404:2
  489:9 493:22
  494:3 495:7
  497:22 498:2,13
consistent   503:6
consistently
  364:19 420:11
  450:5 483:14
consolidated
  430:15 440:20
consolidating
  424:3,7,16 428:10
  428:15 429:2,16
  429:24 430:22
  431:16

**constant**  415:3,22
  498:25 499:2,13
  499:19,25 500:7
  500:14 501:22
**contained**  419:17
  419:22 447:21
  448:16 496:12
**contend**  358:10
  470:9
**contended**  460:18
**contending**  441:10
  443:6
**contention**  357:20
  358:3 443:11
**contest**  392:9
**context**  395:11
  400:20 407:12
  457:14 468:17
  488:25 491:19
**continue**  369:24
**continued**  479:3
  480:5
**continues**  457:3
**continuing**  458:10
**contract**  396:13
**contractual**  366:2
  421:24
**contrary**  502:2
**contravention**
  365:2 420:19
**contributed**
  484:12
**control**  366:3
  421:25
**conversation**
  469:11,22 502:22
**conversations**
  394:24 396:10,25
  397:4 492:6 504:5
  504:7

**convertible**  347:8
  392:2
**corp**  345:6
**correct**  336:3,6,25
  340:6,10,11,21,22
  341:15,16 342:11
  342:12 343:15
  344:4,5,15,18
  345:12 347:9,10
  347:17 348:4,24
  348:25 349:18,19
  349:23 350:2,5,9
  355:18,19 358:17
  358:18 359:8,10
  359:13 363:4
  366:13,14 367:24
  367:25 372:21
  374:11,20 375:13
  375:14,20,25
  377:4,11,21
  378:14,16,20
  379:15 381:3
  382:13,21,22
  383:7 384:20
  386:2 387:8,13
  388:5,9 389:13,22
  390:13,17 394:10
  395:16 397:14
  401:15,18 403:14
  404:20 409:3,9
  412:11,17,23,24
  413:14,20 415:25
  416:4,17 418:19
  418:25 424:22
  429:8 437:16
  441:22 444:18
  447:14,17 455:21
  460:23,24 461:6
  462:10,14 463:11
  463:16,21 464:23
  471:22 473:3

  474:15,18,23
  477:6,25 481:23
  482:21 483:24
  486:10 488:5
  491:23,24 492:4
  492:18 496:22
**corrected**  331:21
  339:15,22 340:7
  340:17,19 341:18
  359:2 362:3
  376:15 421:20
**corrections**  505:4
**corrective**  362:10
  362:14 367:6,13
  367:20 372:20
  373:3,12,14,16,19
  374:3,22 401:18
  401:23 404:10,25
  412:22 413:3,5,11
  413:13 414:2
  417:23 418:4,10
  419:17,23 420:2
  441:6 442:12,16
  443:2,16,19 444:6
  444:7,15 445:6,24
  447:16,22 448:11
  448:15 449:8,13
  449:14 458:5
  481:25 484:5
  487:10 489:6
  494:17,25 495:11
**correctly**  353:22
  354:10 367:15
  387:9 412:12
  433:5 435:15,24
  458:24 462:11
  481:21 497:19
**counsel**  333:17
  383:19 394:20,25
  395:4,7,10 396:11
  396:21,25 397:5

  410:6 440:15
  506:19
**counsel's**  397:7
**couple**  356:18
  423:5 425:21
  486:18 502:25
  503:2,10 504:4,8
**course**  349:18
  353:2 354:15
  355:24 356:6
  363:12 369:3
  370:23 418:5,11
  439:20 448:23
  504:5
**court**  328:2
  333:12 334:9
  335:4 337:14
  349:20 352:13
  354:5,16 356:7
  357:4,9,14,19
  358:2 360:24
  362:21 382:23,25
  386:12 391:12
  392:8,24 393:23
  406:19 408:25
  409:7 411:10
  419:13 424:24
  425:9 440:5,7
  454:18,24 455:2
  468:11 470:19
  472:9,12,18
  474:12 499:24
  502:5
**court's**  351:12,18
  409:14 410:3,17
  411:17
**courts**  454:22
  472:14 500:6
**cover**  366:10
**cowen**  368:19
  370:25

**crack** 417:9
**crash** 475:5,6,14
  475:20,24 476:3,6
**create** 413:22
**created** 358:20
  364:23 420:16
  433:8
**credit** 364:15
  420:8 450:2
**crime** 479:21
**crimes** 479:22,25
**criticisms** 492:17
  493:10
**crowninshield**
  337:9 339:4
  345:24 396:17
  503:23
**crr** 328:24
**crytobloc** 345:6
**cumbersome**
  497:4
**current** 338:23
  457:10,15,20,21
**currently** 335:15
**curriculum** 344:4
  344:10
**customer** 365:10
  371:11 421:4
  433:3,9 448:25
**customer's** 364:12
  364:17 420:6
**customers** 364:7
  364:25 365:2,4
  369:19 370:5
  371:14 420:18,19
  420:21 433:22
  434:7 449:24,25
  450:11 479:4
  480:6
**cv** 328:4 342:21
  343:9

**d**

**d** 331:2,14 364:21
  365:5 452:4
**dahan** 330:14
  333:24,24
**damage** 406:2
  499:7,9
**damages** 331:8
  336:2,12,16,24
  339:10 346:4
  350:4 357:2 364:4
  369:6 370:16
  387:16 388:4
  394:15 396:20
  397:12,17 398:3,4
  398:11,13,13,15
  398:18 403:19,21
  408:15 409:13
  411:19 417:21
  422:15 430:13
  431:23 440:9,25
  457:16 468:5
  484:2 486:20
  487:4,19 489:5
  490:11 491:22
  493:20 497:22
  498:4,21,21,23
  499:17 500:3,23
**daniel** 337:17,25
**data** 376:5 378:22
  459:19
**date** 445:12
  460:11,19 461:15
  462:22,24 463:25
  470:23 483:2,6
  507:3
**dated** 345:4 371:2
  371:19 372:8
  440:21 506:25
**dates** 466:23

**david** 364:22
**day** 414:17 442:14
  473:23 491:13
  504:18 505:13
  507:22
**dcf** 491:2,3
**deal** 446:8
**dealing** 367:6
  434:12,15,24
  435:2 437:11
  438:5,11 450:3
  486:21,22 487:2,3
**dealt** 349:24 350:7
  439:23
**debt** 370:21
**decide** 419:12,13
  440:5
**decision** 351:13,19
  351:24 354:3
  501:16
**decisions** 446:11
  468:12 499:24
**declarations**
  344:13
**declared** 457:6
**decline** 368:22
  413:2,10 414:17
  415:3,21 446:5
  458:5 484:12
  487:16 494:25
  498:20
**declines** 414:24
  415:19 500:10
**decreased** 353:2
**deemed** 368:18
**defendant's**
  353:17 392:17
  393:8 440:17,23
  470:20
**defendants** 330:10
  333:23,25 334:3

367:8 392:9
**defer** 394:19
  396:21 404:7
  409:11
**define** 347:7,15,25
  348:17 358:15
  408:10 412:8
  436:11,20
**defined** 347:23
  348:7,11,22
  354:21 441:20
**defining** 436:19
**definition** 408:19
  445:8 498:17
**definitions** 349:5
  354:23
**demonstrates**
  413:3,11
**demonstrating**
  352:16
**denied** 354:8
  391:25
**deny** 451:4,8,10
  451:17 453:18
  454:14 455:8
**denying** 452:24
  453:7 454:6
**depend** 401:19
**depending** 456:9
**deponent** 505:1
  506:17
**deposition** 328:8
  329:5 332:3 333:5
  334:23,24 336:5
  336:10,15 339:20
  341:4 345:17
  351:3,6 359:22
  381:5,9,10,17,19
  381:20,25 382:5
  399:21,24 433:25
  452:2 471:8,12

| | | | |
|---|---|---|---|
| 472:4 502:15,18 | 417:17 424:2 | **disclosure** 362:3 | **disentangle** 495:3 |
| 503:14,16,25 | 428:9 430:21 | 362:10 367:6 | **disguised** 365:21 |
| 504:6 505:4 506:6 | 431:15 482:18 | 372:20 373:25 | 421:17 |
| 506:9,15,21 507:3 | 491:15,16 498:4 | 374:3,23 404:10 | **disinterested** |
| **depositions** 337:17 | 501:20 | 412:22 413:3,5,11 | 506:10 |
| **described** 407:9 | **differentiated** | 413:13 414:3 | **dismiss** 470:21 |
| 440:19 | 406:25 | 417:23 418:4,10 | **dismissed** 472:13 |
| **describing** 410:15 | **difficult** 335:4 | 418:15 419:18,23 | 474:13,22 |
| 411:8 | 479:17 484:22 | 420:2 441:6 | **dissipated** 362:16 |
| **description** 331:6 | 490:23 | 442:12,16 444:6,7 | 367:12,22 373:5 |
| 331:19 368:15 | **diminution** 458:16 | 444:15 445:21,24 | 374:6,23 482:2 |
| 423:8 | **dipping** 353:3 | 447:16,20,23 | **dissipation** 375:3 |
| **design** 497:17 | **direct** 353:5 365:2 | 448:12,15 449:13 | **district** 328:2,2 |
| 498:8 | 420:19 | 449:14 458:6 | 472:14 |
| **designed** 493:12 | **direction** 332:6 | 473:4 474:19 | **dittami** 382:2 |
| **desist** 450:13 | 506:13 | 481:6 482:7 | **document** 339:12 |
| **desk** 434:12,15,24 | **directly** 461:20 | 487:10 489:6 | 340:13 376:17 |
| 435:2 437:11 | **disaggregate** | 495:12 500:10,12 | 391:16 |
| 438:5,11 446:8 | 447:2 | **disclosures** 362:15 | **documents** 332:9 |
| 450:3 486:21,23 | **disagree** 355:16 | 367:13,21 373:4 | 342:16,23 344:20 |
| 487:3,3 | 425:3 448:3,5,14 | 373:12,14,17,20 | 346:13 351:22 |
| **despite** 364:15 | 449:12 | 373:25 374:6 | 354:22 366:23 |
| **detail** 419:8 | **disagreements** | 418:17,23 419:9 | 375:11,16,24 |
| **determine** 401:13 | 363:14 | 443:20 445:7 | 376:5,13 377:3,9 |
| 412:18,20 414:12 | **disclose** 365:25 | 449:9 481:25 | 377:10,21,25 |
| 429:23 439:16 | 370:5 416:16 | 494:17,25 | 378:12,19,22 |
| 440:16 454:24 | 421:23 450:11 | **discounted** 490:20 | 379:3,9,10,19,21 |
| 480:21 501:3 | 472:16 | 494:6 | 379:22,25 380:9 |
| **determined** | **disclosed** 342:4 | **discussed** 375:15 | 380:15,21,25 |
| 354:17 356:7 | 416:4 419:12,14 | 387:24 399:21 | 382:10,10,13,17 |
| 357:5,15 452:23 | 419:15 420:5,9 | 404:14 408:24 | 383:5 384:17 |
| 454:19,23 455:3 | 422:8,10,16,23,24 | 441:7 475:10 | 386:15,21 388:7 |
| 498:14 501:21 | 423:3,12,19 | 494:22 503:16,21 | 393:24 394:6,11 |
| **detrimental** | 427:25 443:3,7,8 | **discusses** 472:10 | 459:20 462:7 |
| 433:21 434:2,6 | 443:17,24 444:8 | **discussing** 396:14 | 496:20 503:2,3,7,8 |
| **difference** 406:19 | 445:3 446:14 | 438:14 469:7 | **dogs** 427:6 |
| 407:10 412:8 | 458:23 472:11 | 483:17 | **doing** 464:25 |
| 478:7 | 478:21 480:16,23 | **discussion** 445:9 | 465:4 473:14,22 |
| **differences** 500:16 | 483:6,20 | 482:25 504:2 | 474:10 479:6 |
| **different** 348:13 | **disclosing** 431:25 | **discussions** 485:25 | 495:7 |
| 386:21 410:22 | | 492:2 | |

**dollar** 478:5
  497:16,23 498:9
  498:13,14,25
  500:14 501:22
**dollars** 478:6
**dow** 371:18
**download** 342:25
  343:6
**downloaded**
  343:22 391:7
**dr** 331:8,9,22
  333:6 334:20
  336:16,20 339:23
  340:2 341:5,9
  343:20 350:14
  353:9 354:25
  383:16 386:22
  388:25 407:8
  417:15 429:13
  452:9 468:4 490:8
  492:15,23 493:10
  493:14 507:3,21
**draft** 425:23
**drafted** 357:3
**drafting** 337:7,11
  339:6 351:14,20
  453:17
**drew** 381:6,11,17
**drop** 371:17
  404:11 405:2
**dror** 452:15
**due** 347:9 353:10
  392:2 440:23
**duly** 334:13 506:6
**duty** 472:16

**e**

**e** 330:2,2,17,17
  331:2,5 365:7,7
  366:4 420:15
  421:3,8,10,13
  422:2 506:2,2,2,2

**earlier** 337:16
  375:15 382:16
  385:12,17 386:9
  408:24 409:11
  412:22 419:21,24
  439:8 441:7,19,22
  442:2 466:24
  469:7,23 471:3,3
  472:4 494:23
  500:12,17 503:17
**early** 456:14
  461:22 469:9
**earn** 478:5
**earnings** 493:16
**easier** 394:8
**ebitda** 493:17
**economic** 366:2
  421:23
**economist** 400:24
  405:19
**edge** 447:8
**eennis** 330:12
**effect** 353:6
  364:13 420:7
  445:21 500:12
**effex** 364:22,22,23
  365:6,7,10,12,13
  365:15,18,20
  366:3 380:10
  420:14 421:2,5,7
  421:10,13,16,25
  422:16 423:3,13
  423:20 424:3,7,16
  428:2,10,15 429:2
  429:16,24 430:15
  430:22 431:16
  432:2 433:21
  434:6 445:4
  446:13 448:21
  466:21 467:12
  475:19 478:12,16

  480:17 481:7,15
  482:8,21 483:11
  483:17,17 484:4
  485:4,21
**effex's** 462:7,9
**efficiency** 331:9
  331:22 338:10
  339:3,16,22 340:6
  340:8 341:2,5,15
  341:19,20 344:11
  345:16 349:25
  350:8 353:5 359:3
  366:22 374:19
  376:16,21 387:25
  389:19,24 390:2,6
  403:6,9,16 410:3
  410:18 411:11,18
  491:21 493:3
  503:13
**efficient** 352:17
  353:13 357:11,21
  358:4 392:12
  393:4 400:7,8,14
  400:25 401:14,16
  401:24,24 403:4
  403:24 404:6,9,15
  404:21 405:22
  406:3,7,10,20,21
  407:11 409:2,5,8
  409:16,21
**either** 345:23
  389:16,17 406:14
  416:9 498:9
  506:20
**election** 417:3
**elicited** 500:10
**eliminate** 383:14
**embody** 341:20
**empirically** 500:9
**employ** 493:11

**employees** 339:5
**encourage** 335:2
**engaged** 449:22
**engagement**
  345:23 438:6
**engagements**
  345:15
**ennis** 330:14 334:2
  334:2 336:18
  339:19,25 341:8
  350:22 351:2,9
  452:7 471:10
**ensure** 389:7
**ensured** 365:17
  421:12
**enter** 456:3 470:2
**entire** 376:6
  459:13 494:25
**entirely** 484:25
**entirety** 433:17
**entities** 479:9
**entitled** 411:25
  506:8
**entity** 389:2
  396:13 398:14
  424:4 428:11
  430:23 431:10,12
  431:17 457:11
  461:19 463:25
**entry** 453:2
**equals** 458:16
**equity** 348:5 349:8
  370:21 387:23
**ernst** 380:12,15,19
  380:22,25
**errata** 331:20
  339:21 340:14,17
  505:5 507:1
**escaping** 503:23
**esq** 330:7,7,13,14
  330:14

**essentially** 342:9
364:23 369:15
420:16
**establish** 392:15
**established** 353:12
393:3
**estimate** 337:21
357:2 500:20
**estimated** 498:24
**estimating** 502:9
**et** 426:16
**evan** 330:14 334:2
336:13 339:17
350:21 451:23
471:6
**event** 353:9
358:10,20 359:17
361:18 374:14,17
374:21 375:2,12
399:5 401:13
403:2,14,16,22
405:20,25 406:6
407:17,24 408:14
408:17 506:22
**events** 353:11
374:6
**evidence** 353:5
443:13 444:11
450:23 455:8
459:11 460:21
464:19 470:10
474:7 482:16
501:5,7 502:2
**evidentiary**
349:21
**evidently** 391:8
**exact** 372:12
462:22
**exactly** 345:13
377:6 378:16
424:25 436:18

448:6,7 449:19
**examination** 331:4
334:19
**examined** 334:14
**example** 438:17
470:12 473:12
476:11 485:13
490:15 498:17
**examples** 414:2,7
503:11
**excellent** 338:25
**exchange** 331:15
371:10 439:23,25
449:23 450:14
452:4,17 453:4
465:21 466:2,8
468:24
**excuse** 333:6
371:25 449:9
499:11
**exhibit** 331:7,9,11
331:12,13,20,21
331:23 335:10
336:8,9,14,15
339:14,20,21
340:15,24 341:3,4
342:10,17,20
346:14 351:3,6
352:6,10 375:18
375:21 376:3,14
376:21,24 378:6
378:13 379:5,13
381:12,23 382:18
384:18 385:25
386:5 391:6 452:2
452:8,10,14
454:13 471:11,12
471:18,24 472:4
492:10,11 493:24
494:14 496:6,6

**exhibits** 331:18
335:9 350:17
380:18
**exit** 371:9 372:3
**expansive** 413:24
**expects** 371:11,13
371:14
**expense** 365:2
420:19
**experience** 456:2
**expert** 335:25
344:7 386:6
399:15 422:6
423:2 424:15
428:25 429:16,23
430:13 433:20
434:5 436:14,19
439:24 440:3,6,10
465:24 467:10
488:10 497:5
499:10
**expertise** 436:7,11
436:21 439:15,20
**experts** 439:22
**expires** 505:20
507:25
**explain** 409:23
**explained** 441:21
**explaining** 426:21
479:8
**explicit** 487:13,15
487:18
**explore** 414:11
417:22 418:3,9
**exploring** 405:13
**exposure** 435:13
436:2,8,22 449:4
458:19
**expressed** 457:17
473:4 474:18

**expresses** 397:11
**extent** 349:10
356:23 378:21
379:17 380:4
381:22 382:9,19
383:23 384:5,16
388:2 393:20
394:23 396:9
397:4 398:12,23
401:5 403:5
411:22 416:22
419:19 423:22
425:7 428:4 430:3
430:16 431:3
432:5,12 433:24
435:13 442:3,7
449:3 457:19,22
459:8,21 470:11
470:11 472:3
475:10 477:10
478:9 479:14
484:20 487:10,16
490:23 492:19
494:8,10,20 495:2
496:12 498:3
501:25 502:21
**extra** 372:7
**extreme** 411:6
**extremely** 399:18
414:6 415:10
423:16

**f**

**f** 328:5 333:7
365:7,7 506:2,2
**fact** 357:14,19
358:2 364:18
369:21 407:18
411:10 414:13
440:6 446:8
474:17 479:15

**factor** 411:18,21
**factored** 411:23
**factors** 352:15
  456:9 491:16
  501:15
**facts** 408:4,6
  415:11,15 442:19
  463:13 464:7
  479:13 482:16
  489:16 501:25
**failed** 472:19
**failing** 365:25
  421:23
**fair** 382:9 397:10
  492:8,25 496:14
  501:17 503:5,18
**fairly** 352:22
**fall** 444:14,21
  466:5
**fallen** 444:12
**falls** 487:18
**false** 353:17 362:6
  369:17 393:8
  449:22 472:20
**falsely** 364:10
**familiar** 334:23
  381:7 388:25
  389:3 436:12,13
  455:10 464:24
  465:19,22,22
  474:17 475:4,12
**fantastic** 504:19
**far** 338:15 359:6
**fast** 362:21
**february** 347:16
  348:3,18,23
  358:16 369:13
  371:2,19 372:21
  374:4,10,12,22
  387:17 442:13
  443:7 444:2,6

  445:7 446:17
  447:17,22 448:17
  449:15,20 450:16
  451:24 459:3,25
  463:11,20 482:19
  483:9,20 495:23
  496:10
**file** 328:4
**filed** 336:12
  340:14 346:17
  351:25 366:13
**filing** 339:9 352:2
  371:17
**filings** 478:21
**finally** 371:3,4,21
**finance** 375:10
  439:21,22
**financial** 364:18
  365:23 369:10
  370:18 372:7
  380:20 420:10
  421:20 424:3,7,17
  428:9,16 429:2,17
  429:24 430:15,22
  431:25 436:16,17
  457:10 462:8
  488:17
**financially** 333:15
  364:25 420:18
**financials** 380:17
  424:9,18 428:17
  429:4,18 430:2
  431:16 457:9,15
  457:20,21 488:24
**find** 352:14 379:2
  382:24 425:18
  457:11 502:6
**findings** 331:16
  452:5,18,25 453:5
  453:7

**fine** 343:18,25
  364:5 371:25
  393:25 402:22,24
  427:5 459:5 460:4
  460:15 465:5
  467:20 483:21
  488:3
**finish** 377:24
  383:18,21,22
  490:9
**firm** 330:3 334:5,7
  345:24 479:11
**firm's** 380:17
  439:9
**firms** 436:16,18
**first** 336:8 344:20
  350:18 363:6
  391:20 392:7
  426:25 442:14
  444:17 452:13,19
**fit** 361:14
**five** 386:15 388:19
  427:3 465:12,14
  465:15 467:15,17
  470:15 473:13,15
**flash** 475:4,13,20
  475:24 476:3,6
**flip** 344:6 375:21
**floor** 500:21
**flow** 365:18,21
  421:13,17 422:18
  423:4,8,9,14 433:8
  433:13,14 461:19
  466:9,13 477:4,16
  478:13,17,22
  479:2,8,10,11,19
  480:7,17,24 481:4
  481:7,15 490:20
  491:4 493:17
  494:6

**flowing** 417:9
**flows** 477:23 478:4
**focus** 362:23
  418:14
**focusing** 345:20
  358:14
**folder** 336:19
  471:7
**follow** 368:20
  391:13,23
**followed** 352:23
**following** 362:9
  371:8 413:2,10
  454:8 458:5
  488:17 495:11
**follows** 334:15
  427:23 434:21
**footnote** 376:7
**footnotes** 381:13
  382:19 384:20
**forced** 369:15
  370:20 371:9
**foregoing** 505:3
  506:6
**foreign** 370:19
  371:10 439:23,25
  449:23 465:20,25
  466:8 468:24
**foremost** 439:22
**forensic** 493:11
**foreseeability**
  469:8
**foreseeable** 458:22
  459:4 460:2,14,19
  465:2,4,13,14
  469:16,25 470:9
  470:11 473:9,14
  473:17,23 474:7,8
  474:9,11 476:17
  476:19 479:23,24

**foreseen** 476:4
**forex** 371:23
  437:11 439:4,15
  440:11 449:24
  452:14 457:4
**form** 341:22 342:6
  354:19 356:15
  357:12 358:13
  385:14 389:12
  393:19 394:17
  397:18,23 398:21
  399:11 404:12
  405:3,21,25 406:9
  406:17 408:3
  409:17 410:5
  411:13 416:20
  419:2 422:19
  430:24 431:18
  436:10,24 439:5
  439:18 442:15
  444:9 449:17
  456:20 459:7
  460:5,17 463:12
  464:15 468:9,15
  469:4 473:10
  475:15 477:8
  480:18 482:10
  484:7,14 485:8
  488:2 500:15
**formation** 457:24
**formed** 423:11
  443:11
**forming** 388:8
  441:13 444:25
  489:11
**forth** 354:6 386:17
  386:20 454:9
  464:14
**forward** 481:8
**found** 338:13
  370:7 449:21

483:6
**foundation** 406:2
**founding** 369:17
  371:24
**four** 345:14
**fraud** 392:14
  412:11,15 441:4
  449:6 455:9 484:6
  494:13,14,15
  499:18 500:4
**fraudulent** 414:4
  416:4,17
**free** 365:4 372:4
  420:22 458:12
**frequency** 352:25
**friday** 328:10
**front** 335:14
  341:13 342:17
  351:11 358:24
  364:23 365:8
  370:24 386:16
  391:9 420:16
  421:3 446:21
**fta** 379:20
**full** 388:2,6 392:7
  483:5
**fully** 380:6 400:15
  401:2,17,22 402:9
  402:18 404:17,24
**fundamental**
  375:9
**further** 352:14
  441:3 450:13
  489:22 506:19
**furthermore**
  440:22
**future** 449:6,21
  458:20 476:16
  477:23 481:8
**futures** 370:2,3
  371:22

**fx** 365:8 439:25
**fxcm** 328:5 333:8
  333:23 347:7,11
  349:16,17,25
  350:8 352:16,23
  352:24 353:9,12
  353:24 354:8,9,14
  354:18 355:23,23
  356:5,8 357:11,16
  357:20,22 358:3,5
  358:8 362:8,13,17
  363:2,10,11
  364:10,18,23,24
  365:5,8,11,17,19
  365:21,23 367:11
  367:23 368:21,22
  369:2,2,5,13,16,21
  369:24 370:10,15
  371:3,6,24 372:2
  373:6 374:7,24
  375:4,25 376:13
  377:4,6 378:3,13
  378:16 379:3,22
  379:24 392:11
  393:4,12 397:14
  398:6 403:3,4,22
  403:24 404:6,11
  408:2,18,18 409:2
  409:8,15 418:17
  418:23 419:9,12
  419:14,19,23
  420:5,7,16,17,24
  421:7,12,14,18,23
  422:8,16 423:2,12
  423:19 424:2
  427:25 428:8
  429:24 430:14,21
  431:15,24 432:25
  435:12 436:9,22
  445:3 446:7,14
  448:21,22,23

  449:10,22,23,24
  450:3,8,9,10,12,19
  451:9 452:14
  457:3 458:15
  459:4 460:2,14
  461:18 462:6,8,10
  464:3 466:19
  467:10 469:16,25
  472:10,19 476:4
  478:13,17,20
  479:3,6 480:5,15
  480:17,23 481:8
  482:3,8,20 483:10
  483:21 484:13,25
  486:23,24 487:2,6
  488:16 495:14
**fxcm's** 364:13,14
  364:21 365:23,25
  370:7,9 385:19
  387:6,11,16
  391:14,25 420:7
  420:11 424:7,8,17
  424:18 428:15,17
  429:2,3,17,18,24
  429:25 433:4,10
  433:21 434:5,13
  434:25 435:13
  436:2 437:5,9,20
  437:23 438:5
  439:3,17 440:11
  447:21 449:2,3,6
  450:5 456:13,17
  466:21 469:8
  481:6 482:7
  483:15 485:19
  489:7,14 494:18

**g**

**g** 371:12
**gaap** 365:25
  424:10 428:18
  487:21 488:8,13

| | | | **h** |
|---|---|---|---|

488:14 489:6,15
**gain** 371:11,13
  372:5,9
**gears** 475:3
  477:17
**general** 350:4
  401:9,10 402:6,13
  402:23 411:23
  413:19,20 415:10
  415:14,17,24
  417:25 419:19
  423:7 436:15
  437:22 448:13,13
  451:5 456:11
  477:5,14,14 478:9
  479:18 492:15
**generally** 350:5
  365:24 401:11
  404:18 405:19
  406:17 412:15
  413:21 417:18
  421:22 437:11
  439:4,17 466:13
  468:23 477:25
  496:15 501:8,14
**generate** 365:19
  421:14
**generated** 370:9
  456:17
**generous** 396:15
**getting** 347:23
  407:5 411:6 491:8
**give** 339:19 361:20
  361:22 368:14
  380:6 383:10
  389:7 408:12
  413:25 415:9
  425:17 427:3
  431:5,20 468:16
  479:14 483:2
  489:21 490:15

491:19 496:22
  502:12 504:9,17
**given** 334:22,24
  432:19 478:25
  481:4 503:10
**giving** 360:5 415:6
  457:13
**glad** 486:13
**glanced** 503:15
**global** 328:4 333:7
  507:2
**globally** 437:13
**go** 336:22 337:15
  338:9 343:23
  344:19 351:22
  355:17 356:12
  360:25 365:18
  372:12 376:6,23
  378:10 379:20
  380:16 382:23
  383:24 384:23
  385:6 386:13
  388:15 396:7
  397:22 398:9
  399:2,12 400:2
  406:23 408:8
  415:6 416:13
  420:2 421:13
  427:14,17 435:11
  448:10 449:18
  453:15 454:2,3
  455:16 458:7
  464:17 465:5,13
  465:15 467:16
  469:5 470:16
  471:18 473:15,23
  476:10,22 477:9
  481:18 482:24
  485:6,9 487:24
  489:24 496:5

**goes** 376:25
**going** 333:3 343:5
  354:12 362:21
  366:22 368:13
  378:23 386:17,20
  388:21 395:8
  401:19 402:21
  405:11 407:4
  416:19 426:6
  427:20 429:12
  433:15,17 445:12
  454:5,11 455:15
  463:9 465:12,16
  467:18,22,24
  473:11,24 474:3,4
  474:5,9 476:7,18
  478:5,6 479:21
  481:8 490:3 497:2
  501:11 504:21
**good** 333:2 334:20
  370:19 388:18
  426:10 489:20
**gotten** 391:16
**govern** 465:25
**governing** 465:20
**government** 446:2
**grade** 426:6,24
**graduate** 439:21
**graduation** 426:7
  426:9,13,24
**granted** 354:8
  391:14,24
**greenwood** 330:4
**gross** 456:13
**guess** 350:6 423:7
  426:18 451:22
  496:8
**guys** 360:22
  383:12 427:9
  447:8

**h** 331:5
**happened** 442:22
  461:13 481:11,12
  488:25
**happening** 485:16
**happy** 358:24
  359:22 360:4
  361:2 376:6
  380:18 382:23
  386:12 389:14,16
  390:14,20,24
  393:23 394:21
  400:17,19 401:6
  424:25 425:10
  426:19 427:2,14
  427:17 439:8
  450:21 451:12
**hard** 447:7
**hate** 473:11 494:8
**head** 394:4 417:10
**hear** 397:22 427:6
**heard** 409:5
  426:25 451:3
  467:21 491:7
**hearing** 349:21,24
  350:7,11,15,18
**held** 349:21
  387:16 472:15
**help** 401:13
  425:25
**helped** 337:11
**helping** 355:14
**hendershott**
  350:14 492:15,16
  492:24 493:14
**hendershott's**
  493:10
**herby** 506:5
**hereto** 506:18

higher 498:24
hit 371:23
hmm 456:25 479:5
  490:14
hold 338:8 341:12
  344:19 364:24
  368:25 377:23
  378:8 392:25,25
  412:3 420:17
  461:3 471:17
  492:11 493:4
holders 357:6
  398:11
holdings 344:14
  345:12 371:24
  372:5 452:15
honorable 331:12
  350:20 351:4
  391:5
hope 399:25
hopefully 490:9
hopping 354:22
host 379:22
  501:15
hour 426:6,17
hours 338:21,22
  502:16
huang 337:17
  338:3
huh 471:18
hundred 485:15
  485:16 486:6
hypothesis 392:14
hypothetical
  383:13 400:10,13
  402:2,5,11,12
  445:14 482:12,13
  482:14
hypothetically
  459:9

i
i.e. 440:18,25
idahan 330:13
idea 338:5
identification
  336:17 339:24
  341:7 351:5,8
  452:6 471:14
identified 447:20
  493:13
ignoring 479:13
ii 452:13,19
illegal 473:22
immediately 413:5
  413:13 488:21
impact 412:14
  418:3,9 436:16
  477:23 481:6
  484:18
impacted 482:8
implication 487:7
  498:2
implications 487:2
implied 487:11
  491:2
imposed 468:8,13
imposing 331:16
  452:5,18 453:5
impossible 484:23
  486:6
imprecise 398:10
  399:18
improved 456:22
  456:23
inaccurate 443:14
  478:10
inarticulate
  356:20 363:18
include 345:8
  396:16 437:23
  454:16 487:20

499:7
included 342:2
  344:11 381:22
including 458:13
  462:9 503:3
inclusive 380:6
incomplete 400:9
  401:25 482:11,13
incorporate
  400:14,25 402:8
  402:17 404:23
incorporated
  372:3,5 404:16
incorrect 464:20
  488:7
increase 414:5
  478:5
increased 456:21
independent 365:9
  421:3
independently
  422:7,11 439:16
  443:10
index 332:3
indicate 415:2,20
  443:14 474:7
indicates 459:11
  462:4
indicating 340:18
indication 475:12
individual 343:2
  357:2 392:16
  393:16 394:7,14
  395:15 396:2,20
  397:13,17 398:2
  408:22 496:19
individual's
  381:21
individually
  353:16 393:7
  496:25

individuals 338:12
industry 454:15
inefficient 400:6
  402:7,16,17 406:3
  406:7,10,20
  407:11,16,19,25
  409:5,20
inextricable
  362:15 367:13,16
  367:21 368:10
  372:15,19 373:4
  373:10,17 441:5,8
  441:11,17 445:10
  446:6 449:7
  481:25 494:16,21
inextricably
  372:12 484:10,21
inflated 349:17
  354:15 355:24
  356:6 363:11
  385:20 387:6,12
  448:22 449:11
  494:19
inflation 362:16
  362:25 367:11,23
  373:5 374:7,23
  375:4 412:2,8,14
  413:4,12,17,23
  414:5,8,11,13,19
  415:2,20 482:2
  497:17,24 498:5,9
  498:25 499:3,20
  500:2,14,16,20,23
  501:4,18,20,22
  502:7,10
influence 501:15
information
  384:17 388:7
  395:10,16 396:23
  401:18,23 404:25
  413:2,10 414:18

416:3,16 419:17
419:20,22 443:2,6
443:16,19,24
444:13,24,25
446:18 448:14,16
449:13 462:7
477:18,21 478:4
480:15,22 483:19
484:3,12,18 486:9
491:18 496:12
**informs** 454:14
**initially** 352:21
**injecting** 442:8
**innocoll** 344:14
345:12
**inquiries** 469:9
**inquiry** 455:21
**instance** 437:10
**instant** 497:18
**instituting** 331:13
452:3,16 453:3
**institution** 452:21
**institutional**
371:19
**instruct** 395:5
397:5
**instruction** 395:3
396:9 397:3
**interbank** 372:9
**interest** 362:6
364:13,16,19
366:2 370:5 420:7
420:10 421:24
424:4 428:10
430:23 431:10,12
431:17 433:3,9
448:25 449:25
450:4 479:4 480:5
482:21 483:11,13
485:4,21

**interested** 333:15
506:21
**interesting** 377:12
434:8 456:25
469:2 479:5
**intermediary**
364:15 420:8
450:2
**internal** 375:11
379:9,10,18,21,24
**international**
439:21,22
**interrupted**
453:14
**interrupting**
397:21
**introduce** 336:7
339:12 340:24
350:17 380:17
389:6 450:22
451:23
**introduced** 335:10
471:10
**investigated**
423:20 428:3
**investigation**
459:5 460:3 461:4
461:15 462:13,21
463:4,5,7,9,17
474:15 476:14,15
**investigations**
460:14 461:24
464:4,6 466:20
467:11 469:18
472:12,21 473:5
474:20 475:14,19
475:24 476:2
**investment** 368:24
368:25 377:14
439:7

**investor** 362:17
367:24 373:6
375:5 401:13
482:4
**investors** 364:11
365:3 387:16
420:20 477:19,22
**involve** 470:3
**involves** 397:4
**isajiw** 330:13
331:4 333:22,22
334:18,19 336:13
339:17 343:12,15
344:18 346:8
350:21,23 360:19
374:11 385:13
388:18 406:16
411:5 425:11,15
425:19 426:2
434:18 451:23
471:6 489:24
504:13
**israel** 330:14
333:24
**issue** 352:18
370:12 435:8
466:14,17 473:18
**issued** 344:12
424:2 428:8
430:21 431:15,25
470:20 496:10
**issues** 370:13
479:15

**j**

**j.p.** 372:8
**jail** 465:14,15
470:17 473:15,23
**january** 331:22
339:14,23 376:15
**jbaker** 330:6

**jenkintown** 330:5
**jersey** 329:10
**job** 328:25 384:5
**jogs** 478:18
**john** 382:2 497:6
**joining** 334:21
**jones** 371:18
**josh** 334:4 356:13
361:13,13 384:24
385:13 388:13
397:20 398:8
399:25 402:20
405:7,10,15
406:16 407:3
411:5 442:18
477:9 485:7
487:25 504:13
**joshua** 330:7
**judge's** 503:12
**july** 331:10 340:25
341:6 378:7
**jumbling** 409:20
**jump** 362:19
**june** 328:10 329:3
333:4 348:23
506:25

**k**

**k** 328:5 333:7
**keep** 342:23
386:20 397:21
410:10 473:11,18
476:7 481:17
494:9
**kicking** 438:22
**killing** 473:16
**king** 330:9 333:22
333:24 334:2
**kitchen** 467:19
**knew** 411:22
450:20 465:12,15

**know** 334:23
338:9,15 340:2
341:9 342:22
343:19 344:8
345:7 349:11,20
359:19 360:21
362:22 363:14
376:7 377:5,6,13
377:23 378:4,15
378:16 379:12
380:2,19 381:18
381:21 382:3,7
383:12 385:7
390:21 392:5
394:3,5,18 395:4
396:18,22 397:24
400:12 402:5,10
406:24 408:9
409:19 411:15
414:21 416:24,24
417:11 419:4,5
426:12,14,15,16
427:3,7 430:8,17
431:4,5,8,12,20
432:14,14,22
433:11 435:9
436:6,13,18
438:20,20 439:19
439:24 440:2
441:9 442:23
447:5 450:20
451:24 452:9
453:20 454:11,22
456:12,17 457:9
458:2 461:17,18
462:2 466:7,19
467:2 470:13,16
470:17,18 471:15
473:20 474:4,10
475:13,16,18,23
475:25 476:12

477:15 479:6
482:17 485:12,12
486:4 487:17
488:23 489:9,18
490:14,24 495:20
496:6 498:22
499:14 500:5
501:12
**knowledge** 395:2
457:8 475:21
**known** 459:15
**krogman** 352:15
**kslaw.com** 330:12
330:12,13

**l**

**l** 330:17
**lack** 362:5 433:2
448:24
**laid** 436:5
**language** 372:13
453:10 454:2,14
454:16 455:11
**lapointe** 330:7
334:6,6
**large** 414:6
**largest** 364:21
370:6 420:11
450:5 483:15
**lasted** 504:8
**late** 369:25
**laugh** 405:15
**law** 330:3 334:5,7
345:24
**lawsuit** 464:12
**lawyer** 482:17
486:16
**layoff** 371:6
**lead** 440:15
**learned** 458:11
482:20 483:9

**leave** 423:17 427:7
**leaving** 426:13
**led** 368:21
**left** 446:7 451:22
**legal** 333:10,13
393:21 474:11
**length** 494:23
**letters** 365:8
**level** 370:22 413:4
413:12,16,23
492:15
**levels** 476:24
**license** 506:25
**licenses** 372:10
**lied** 447:4
**life** 344:14
**light** 473:3 474:18
**likelihoods** 416:11
**limited** 353:10
462:9
**line** 332:6,10,13
332:16,19,22
507:5
**lines** 425:24
**linked** 484:10,21
**liquidity** 422:17
423:3,13 462:10
**list** 366:23 375:24
377:20 418:16,22
**listed** 342:16
346:13 352:6
361:23 366:18
375:18 377:4
378:13,19 379:4
379:13,23 382:10
382:17 383:5
384:18
**literally** 426:2
**litigation** 328:5
333:8 431:7

**little** 386:19 411:6
457:13 468:17
481:20
**live** 426:14
**llc** 452:14,15 507:1
**llp** 330:9
**load** 350:21
**loaded** 339:25
341:8 351:2,9
452:7
**loading** 341:11
**located** 335:16
**long** 349:7 400:2
427:4 457:12
491:13
**longer** 362:7,12
445:13 446:3
458:14 495:13
496:3
**look** 336:19
351:22 355:8
376:6,14 378:6
380:18 386:14,23
387:3 389:14,16
390:24 391:3,11
393:23 394:11
395:19 399:14
400:2 411:24
427:9 432:20
433:12 447:4,12
451:12,19 457:25
461:9 462:3 471:2
471:3 473:12,22
473:25 478:4
479:7 492:9 493:2
493:6 496:5,9,24
497:9
**looked** 457:9
468:20 487:12,16
489:10 502:25

**looking** 342:19
364:6 375:7
385:22 390:15
415:14,17 426:2
447:24,25 477:2
491:17 492:14
499:21
**looks** 343:14 345:5
426:8 466:22
**loss** 331:7 335:25
336:11,16,24
339:10 341:18
342:19 345:21
346:3,5,12,18
347:7 351:14,20
354:13 355:8
357:3,16,22 358:5
361:25 364:4
374:15 375:8,18
379:7 386:3,7,11
386:23 387:2,24
388:3 397:11
398:19 399:6
403:10,13,19,21
403:23 404:5
405:21 408:15
409:12 410:15
411:8,9,19 417:21
419:7 422:14
430:13 431:23
432:21 440:8,18
440:23 453:17
457:16 468:5
472:2,24 483:25
486:20 487:4,19
489:4 490:10
491:22 492:17,20
493:19,23 495:10
497:10,21 499:3,6
499:13,16 500:3

**losses** 362:18
364:8,13 367:24
373:7 375:5
401:13 420:6
440:16 482:4
**lot** 405:17
**loud** 435:20
**loves** 431:7
**luck** 426:10
**luk's** 368:24
**lunch** 490:4
**lying** 446:7,9,22
465:3

**m**

**macroeconomics**
440:2
**maintaining**
443:18
**maker** 364:19
365:22 369:19
370:6,8 420:10
421:18 450:4,10
483:14,16
**makers** 365:9,11
365:14,17 421:3,6
421:9,12 450:7
**making** 331:15
353:18 365:22
386:4 393:9
405:16 421:18
426:9 452:4,18
453:4
**management**
466:19 467:11
**manifest** 441:6
449:8 494:16
**manipulated**
365:5 420:25
**manner** 436:20
**marcelo** 330:18
333:9

**march** 347:16
348:3,18 350:19
350:24 351:25
358:9,16,21
359:18 371:16
391:4 442:13
443:3,17,24 444:8
444:15 445:4,22
446:15 459:3,25
460:22 464:5
469:16,25 470:22
470:24,25
**marked** 331:18
332:15 336:17
339:13,24 341:6
351:5,7 359:17
452:6 471:11,13
**market** 331:9,21
338:10 339:3,15
339:22 340:6,8
341:2,5,15,19,20
344:11 345:16
349:24 350:8
352:17 353:5,13
357:11,21 358:4
359:3 362:4
364:11,19 365:9
365:11,14,17,22
366:22 369:19
370:6,8 371:10
372:9 374:19
376:16,20 387:25
389:19,24 390:2,6
392:12,14 393:4
400:6,6,8 401:14
401:16,23,24
402:7 403:4,16,24
404:6,9,15,21
405:22 406:2,8
407:15,18,25
409:3,8,15 410:3

410:17 411:11,17
420:10,25 421:3,6
421:9,11,18 433:2
435:12 437:4,18
441:5 443:17
445:11,25 446:23
447:7 448:24
449:3,7 450:4,7,10
458:11 459:6
460:4,16 469:20
470:4 478:7
480:16,23 482:19
483:9,14,16,20
485:20 491:21
493:3 494:15
503:13
**market's** 370:23
458:17,21
**markets** 371:23
400:14,25 402:17
439:23 452:14
468:25
**marks** 358:10
361:18 364:20
**markups** 365:15
421:10
**master** 328:4
**material** 366:17
367:4 441:12
478:3
**materials** 335:21
342:4,5,8 345:22
346:10,19 366:25
379:23
**matter** 333:7
334:23 336:2,12
339:9 340:20
341:21,25 342:7
345:21 349:22
359:6 366:10,13
367:3 370:10

375:17 378:3
380:9 381:6 388:3
389:7,11 390:9
393:17 394:7
400:23 410:4,18
411:12,18 422:6
424:16 428:25
429:16,22 430:14
430:20 431:24
433:20 436:3,23
438:6 440:13
441:2,14 448:13
454:25 464:14
466:2,11 470:21
494:13 497:7
501:10 502:20
503:4
**matters** 345:14
**mean** 333:6
344:16 347:3
348:2 355:13
361:21,22 363:7
369:10,11 372:11
372:14 377:22
379:17,21,22
382:23 395:24
397:21 398:3,4
399:24 403:15
408:9 409:19,23
411:21 413:24,25
414:6 415:5,8
416:23 417:2,6,18
422:21 423:9
433:12,24 436:14
437:21,23 438:8,8
438:16,17 439:6
439:19,20 440:4
442:23 444:3,10
447:18 451:6,13
451:14 453:9
454:23 460:6

461:12,20 463:14
463:15,23 464:24
465:10 466:3,11
467:4 468:19
470:8 471:8
473:11,18 474:3
476:7,21,23
477:24 478:2,4
479:6,10,12
481:17 482:11,12
484:15 485:12,24
487:7,15 488:7
490:22 491:15
497:25 498:3,4,20
501:11,12,14
502:24 503:3,14
504:7
**meaning** 353:15
392:13 393:6
**means** 353:19
368:23 393:10
451:7
**meant** 369:9 373:9
438:23
**measure** 414:18
500:23 501:4
**meeting** 504:3
**meetings** 503:20
503:24
**member** 503:22
**memory** 359:23
390:17 393:24
394:12 471:4
**mention** 374:2
**mentioned** 407:10
**merely** 364:14
420:8
**met** 352:15
**methodology**
406:6 407:17,24
499:20 501:4,9,22

502:3
**miasma** 433:14
**michael** 345:5
**microphone** 407:5
**middle** 392:7
458:7
**million** 369:5,14
370:15 371:25
372:4 450:10,13
483:21
**mind** 370:23 379:6
**mindful** 335:3,6
**mine** 502:21
**minute** 388:19
415:16 427:16
447:13 467:15
504:9
**minutes** 363:15
426:14,18,22
427:3 467:18,18
489:22 502:24
504:8
**mischaracterizing**
361:12
**misleading** 353:17
369:18 392:17
393:9 449:22
472:20
**misled** 432:25
435:12 437:4,19
448:23 449:2
**mismanagement**
472:18
**misrepresentation**
363:9
**misrepresentatio...**
363:3,22 366:7
367:3,7 372:2
440:18,24 448:20
**misrepresented**
362:13 495:15

**misrepresents**
477:11
**missing** 345:3,11
**misstatement**
416:5,17
**misstatements**
474:14
**misstates** 462:16
**model** 362:7,14
434:12,15,24
435:2 437:6,7,9,14
437:16,20,21,23
438:3,13,14,17,21
438:24 439:17
440:12 449:5
458:12,14,20
486:22,23 490:21
495:16
**models** 362:10
490:12,14 493:16
493:19,22 495:12
495:25
**modification**
410:2,15
**modifications**
406:6 407:16
408:10,11,16,20
410:8
**modify** 409:12,20
409:23
**mom** 426:15
**moment** 425:18
475:3
**monetary** 369:6
370:16 450:12
**morgan** 372:9
**morning** 333:2
334:20
**motion** 332:21
351:13,19 354:7
389:20 390:7

391:13,24 470:21
**move** 361:15
384:11 385:2
**multi** 414:20,25
415:19 464:4
**multiple** 342:23
354:22 373:14
388:17 410:10
467:14 490:12,13
493:16,19
**multitude** 476:24
**murder** 465:12,16
470:12,13 476:10
476:12,13,14,17
476:18
**murdered** 465:11
**murdering** 470:14
470:17 473:13
**myriad** 441:20,25

**n**

**n** 330:2,17 331:2
**name** 333:9
337:16 371:12
381:7 422:16
423:3,6,13 503:23
507:2,3
**nariner** 337:13,22
502:23
**narrow** 499:16
**national** 370:2
**nature** 353:10
480:15,22
**ndd** 364:17,21
365:5,5 420:11,22
420:25 433:4,10
437:24 449:2
**nearly** 463:10
**necessarily** 402:19
402:25 406:11
**necessary** 383:3
389:9

**need** 358:23
360:17 386:19
394:11 406:5
407:21 412:19
414:11 417:22
418:3,9 467:16
496:24 502:8
**needs** 410:7
**negative** 368:19
**negatively** 424:8
424:17 428:16
429:3,17,25
**negotiated** 450:18
455:20
**negotiation** 456:10
**neither** 454:5
**net** 456:17
**new** 328:2 329:10
329:10 330:11,11
370:12,12 458:17
507:1
**news** 353:8 368:18
368:19 371:19
375:11 399:8
400:5,14,25 402:8
402:17 404:15,22
482:25
**nfa** 369:6,9,11
370:2,16 447:12
447:22 448:17
449:15 451:10
454:19 455:4
461:4,15 463:3,7
466:20 467:11
472:12 475:14,18
488:18,20 489:13
**niv** 381:6,11,17
452:15
**noise** 353:3
**normal** 455:23

**notary** 329:9
505:17 507:25
**note** 340:12 347:8
348:12,15 353:15
355:5,6 357:5
369:7 393:6
398:11,11 440:25
493:10
**noted** 504:22
505:5
**notes** 347:8,11,13
347:18 348:21
349:3,9,17,25
350:9 352:16,18
352:20,23 353:9
353:13,15,21,24
354:9,14,18
355:23 356:5,8,21
356:22,24 357:11
357:16,17,20,22
358:4,5 363:11,16
363:17,19,20
387:11,13,21,23
390:22 392:2,11
392:12,18 393:4,6
393:12 394:16
396:4 403:3,4,22
403:24 404:6,8,11
408:2,18 409:2,8
409:13,15 410:4
410:16,18 411:12
411:18,20 448:22
**notice** 331:20
339:20 340:14,16
340:18
**noticing** 333:21
**notion** 408:20
**noun** 442:9
**nouns** 442:9
**nova** 344:14

**number** 352:22
413:24 451:25
497:3,16
**numbered** 452:12
**numbers** 336:9
343:10,10,12,13
456:16
**numeral** 452:13
452:19
**numerous** 392:19
410:6 475:10

**o**

**o** 330:17 506:2,2
**object** 341:22
361:13 389:12
398:9 404:12
408:3 409:17
410:5 416:19
**objecting** 388:14
**objection** 354:19
356:10,15 357:12
358:13 360:10
368:2 383:8
384:25 385:11,13
388:10 393:19,20
394:17 396:6,8
397:18,22,23
398:21,23 399:11
400:9 401:25
405:3,16 406:9,17
410:19,25 411:13
419:2 422:19
430:24 431:18
436:10,24 439:5
439:18 441:23
442:15 444:9
448:18 449:17
451:21 456:20
457:18 459:7
460:5,17 462:15
463:12,22 464:7

464:15 468:9,15
469:3,4 470:5
473:10 475:15
477:8,10 480:8,18
481:2 482:10
484:7,14 485:5,8
485:22 486:11
487:22 488:2
489:16
**objections** 333:19
411:6
**observed** 500:9
**obviously** 369:21
399:24
**occur** 399:23
**occurred** 443:20
443:21 447:16
459:10 500:12
**occurring** 461:22
479:10
**occurs** 455:24
**october** 353:4
462:5 463:2
**offer** 398:17
452:22 489:4
**offered** 353:6
365:14 421:9
**offering** 433:7
435:25 436:21
438:4 439:2
454:10 465:24
467:10
**oh** 341:11 345:9
346:23 356:12
368:24 371:3,14
372:8 373:22,23
391:9,22 399:10
417:15 446:7
447:8 453:12
461:10 464:17
466:11 487:24

491:11
**okay** 335:7,9,15
335:21,24 336:7
336:22,23 339:4
339:12 340:4,5,16
340:23 341:13,17
342:13,18 343:3,7
343:18,21 344:2,9
344:24 346:22
347:13 348:20
349:2,6,10,12,14
349:20 350:22
351:11,12 352:2,9
352:12,13 354:4
354:12 355:20
356:9,18 359:10
360:24 361:6
364:6 366:21
367:9,16 368:16
375:23 376:22
377:2,19 378:10
378:10 384:4,13
385:18 386:25
387:4 390:6,21
391:9,11,22 392:6
392:25 395:6,17
401:12 402:14
403:12 404:19
411:24 412:4,6
418:6,14 423:5
425:7 426:4,10
427:6,8,11,13,18
429:19 432:20,24
435:21,24 441:3
444:17 445:17
452:11 456:12
458:3,7,7 462:3
463:3 464:2
465:11 467:17
470:19 471:15,17
471:23,24,25

472:6,8 482:5
483:8 490:19,22
491:5,11,20
492:12 493:5,8
494:5 495:6
497:12 502:11
503:5 504:10
**omission** 440:24
**omissions** 355:22
363:3,10,22 366:7
367:3,7 440:18
448:21
**omitted** 364:11
**once** 385:15
**ones** 344:11
441:18 495:24
**ongoing** 370:19
463:19 473:5
474:20
**online** 457:4
**open** 335:14
342:23,25 386:15
391:16
**opening** 331:21
339:15,22 340:5,8
340:10 341:18
376:15,20
**operate** 362:12
445:13 446:3,24
457:4 465:6
495:14 496:3
**operating** 487:2
**operational** 457:8
**operations** 370:19
371:8 434:13,25
437:12,13 439:4
455:18
**operative** 340:9
**opine** 422:8 434:5
434:9 436:8 466:4
466:6

**opinion** 331:23
335:25 354:12
357:10 372:17
374:5 392:5 396:3
397:11 398:17
399:15 400:4
422:6 423:2,12,15
423:18,25 427:24
428:7 429:23
431:14 433:7
435:25 436:21
438:4 439:2
443:15,23 445:20
454:14 459:2,24
464:14,20,22
467:10 469:24
470:20 471:5,12
471:21,25 472:7
479:2 480:4,14
482:6 488:13
489:4 503:12
**opinions** 341:21
341:24 342:6
345:15 346:20
375:17 380:20
382:20 388:2
400:23 436:5
441:13,13 444:25
457:24 465:24
483:5 493:23
**oppenheimer**
368:19 369:22
**opposed** 352:23
365:7 394:15
396:3 423:6,7
485:3,20 496:16
496:18
**opposite** 364:24
420:17
**options** 498:16,18

**order** 331:12,13
331:23 350:24,24
351:6 365:18,21
370:7 412:18
421:13,17 433:8
433:12,14 450:11
451:24 452:2,16
453:3 461:19
466:9,13 470:20
471:13 477:16
478:13,17,22,25
479:8,10,11,19
480:7,17,24 481:4
481:15
**orders** 365:10
421:4
**original** 338:10,10
339:3 340:19
359:2 370:14
383:25 384:9
389:23 403:16
496:7
**outcome** 333:16
464:3
**outside** 342:16
394:24 395:2
396:25 457:4
**overall** 439:3
**overly** 417:5
**oversight** 381:24
**ownership** 369:2

**p**

**p** 328:24 329:7
330:2,2,17 506:2,3
**p.m.** 388:21,22,24
427:20,21 429:12
467:24,25 468:3
490:3,5,7 504:21
504:22
**page** 331:3,6,19
332:6,10,13,16,19

332:22 342:21
343:9,10,12,13,17
343:23 344:6,20
345:3 347:6,23
349:14 352:9,13
354:2 376:16,24
391:12,21 392:4,8
392:23 411:24
412:4 452:12
472:6,13 507:5
**pages** 425:24
472:9
**paid** 370:8
**papers** 386:16
**par** 387:12
**paragraph** 345:11
347:6 348:2,8
349:16 354:13
355:7,11,15,18
361:24 362:23,24
362:24 363:7,23
363:24 364:6
366:5,11,18 367:9
367:10 368:11,16
372:16,25 374:2
375:7 379:7
384:12 385:18
386:23 387:3,5,10
387:15,22 391:19
391:20 392:8
393:2 412:7 420:4
432:20,24,25
435:11,16 437:3
440:14 441:3
448:19 449:18
452:12,20 457:25
458:4 461:2 462:4
481:21,24 483:7
483:16 484:9
489:10 493:2,7,9
494:12 495:10,19

496:17 497:9,13
497:15 498:6,8
500:8
**paragraphs**
498:12
**parent** 370:21
371:23
**parse** 447:11
**parsing** 368:6
**part** 340:15
345:22 354:8,9
356:20 368:7
370:13 381:24
391:17 425:23
437:15 438:2,2,18
438:23 444:19
446:9 448:10,10
457:23
**participants**
364:12 435:12
437:4,18 447:7
449:3
**particular** 346:17
376:2 447:3 448:2
451:16 495:24
**parties** 506:20,23
**partners** 371:24
**partnership** 366:3
**parts** 491:16
**party** 333:14
421:24 432:2
**patient** 386:19
**pattern** 369:22
**pause** 386:25
426:7 427:10
**paused** 475:20
476:2
**pauses** 476:15
**pay** 369:5 370:15
422:17 423:4,8,9
423:14 433:12

450:12 459:5
460:3,15 477:4
479:19 481:6
483:21
**paying** 433:14
466:13 478:13,17
479:11 480:17
**payment** 365:21
433:8 461:19
477:15 479:7
480:7,24 481:4,14
**payments** 365:22
421:17 422:18
423:4,8,14 466:9
478:22,25
**pdf** 343:10
**penalty** 450:12
**pending** 427:4
**penlites** 456:8
468:7,13
**pennsylvania**
330:5
**people** 337:6
338:6 479:19
**percent** 347:8
368:22 369:2,20
370:8 371:7,17
392:2 456:16
485:16,17 486:6
**percentage** 416:24
497:24 498:10,13
498:19 499:3,8,12
499:13,19 500:2,7
**perform** 432:16
491:22 492:20
494:4
**performed** 432:8
501:18
**period** 347:15,19
348:2,6,12,12,13
348:14,15,17,22

349:3,4,18 352:18
353:3 354:16,18
354:21 355:4,5,6,6
355:25 356:6,21
358:9,11,15,15,21
359:18 361:19
362:4 363:12,16
363:17,20 366:4
374:8 385:21
387:8,13 413:18
414:9,14,20,25
415:4,19,22 416:6
416:18 417:24
418:5,12 419:10
419:13,15,18
422:2,23 433:23
434:7,14 435:2
442:14 443:9,21
443:22 444:23
448:23 459:14,16
460:12,13,20,22
463:11,20 464:5
466:10 473:21
478:14 481:11,13
487:11,17 500:11
500:17,25 501:21
502:8 506:18
**periods** 354:24
**permitting** 365:10
421:5
**person** 455:23
504:3 506:10
**personal** 439:14
**perspective** 435:6
435:7 469:8
**peter** 330:13
333:22 343:8
425:23
**ph.d.** 328:1,9
329:1,6 330:1
331:1,3 332:1

333:1 334:1,11
335:1 336:1 337:1
338:1 339:1 340:1
341:1 342:1 343:1
344:1 345:1 346:1
347:1 348:1 349:1
350:1 351:1 352:1
353:1 354:1 355:1
356:1 357:1 358:1
359:1 360:1 361:1
362:1 363:1 364:1
365:1 366:1 367:1
368:1 369:1 370:1
371:1 372:1 373:1
374:1 375:1 376:1
377:1 378:1 379:1
380:1 381:1 382:1
383:1 384:1 385:1
386:1 387:1 388:1
389:1 390:1 391:1
392:1 393:1 394:1
395:1 396:1 397:1
398:1 399:1 400:1
401:1 402:1 403:1
404:1 405:1 406:1
407:1 408:1 409:1
410:1 411:1 412:1
413:1 414:1 415:1
416:1 417:1 418:1
419:1 420:1 421:1
422:1 423:1 424:1
425:1 426:1 427:1
428:1 429:1 430:1
431:1 432:1 433:1
434:1 435:1 436:1
437:1 438:1 439:1
440:1 441:1 442:1
443:1 444:1 445:1
446:1 447:1 448:1
449:1 450:1 451:1
452:1 453:1 454:1

455:1 456:1 457:1
458:1 459:1 460:1
461:1 462:1 463:1
464:1 465:1 466:1
467:1 468:1 469:1
470:1 471:1 472:1
473:1 474:1 475:1
476:1 477:1 478:1
479:1 480:1 481:1
482:1 483:1 484:1
485:1 486:1 487:1
488:1 489:1 490:1
491:1 492:1 493:1
494:1 495:1 496:1
497:1 498:1 499:1
500:1 501:1 502:1
503:1 504:1
505:10 506:1
**piece** 446:18
483:19
**pieces** 484:3,12,18
486:9
**pin** 490:16
**pisajiw** 330:12
**pismo** 334:12
335:17
**place** 386:8 422:7
506:10
**plaintiff** 334:7
393:16 394:14
395:15 396:2
**plaintiffs** 330:4
334:5 335:24
351:13,19 352:15
352:20 353:12,19
354:7 357:2
364:10 386:6
389:11,20 390:7
390:13,19 393:3
393:10 394:7
420:4,13,23

421:16 422:3,22
440:15,16 443:5
443:18 460:18
464:12 470:8
472:19 473:3
474:6,13,17 476:9
487:20 488:5
497:6
**plans** 371:6
**platform** 334:25
335:5,11 364:17
365:6 370:9
420:25 433:4,10
437:24 449:2
450:3
**played** 446:9
457:23
**please** 333:20
334:10 336:14
339:18 349:11
351:17 362:22
399:2 402:15
413:8 416:8 418:7
418:21 432:21
434:17,19 471:7
502:12
**point** 343:16
358:20 369:8
400:18 412:10,22
426:5 448:9
454:12 459:2,25
469:22 476:16
488:19 501:13
**pointed** 466:23
**points** 501:20
**poorly** 478:8
485:23
**portion** 343:16
368:13 456:12
**portions** 366:9
371:4

position 455:7
464:2 476:4
positions 364:24
420:17
possibilities
399:22
possibility 416:12
417:22 418:3,9
473:25 476:20
486:2,3
possible 338:12
345:18 347:3,4
352:4 359:22,24
361:21,21 380:13
381:8 383:13,15
383:17,24 384:6
395:21 399:7,13
399:16,20 400:3
405:25 416:2,15
416:23 417:2,3,7,7
417:8,10,14,14,16
417:16,19 431:6
432:17 442:25,25
456:5,6 465:7
466:24 484:24
485:11,15,17,18
485:24 486:4,5
492:5 496:23
498:15 499:10,23
502:9 503:15
possibly 359:2
360:6 380:22
418:13 446:20
potential 414:12
417:23 418:4,10
436:8 492:17
493:13
potentially 492:2
practice 454:15
479:19

pre 371:15
preceding 340:13
precise 383:11
predominance
353:20 392:9
393:11
preferable 486:22
preferred 488:9
premise 413:20
preparation
503:24
prepare 502:17
preparing 502:14
503:13
present 333:17
493:25
presented 398:15
presenting 493:23
presumably 447:5
454:23 481:10
presumption
353:14 393:5
pretty 370:20
453:9 481:20
previous 344:17
359:23 360:12,14
360:25 364:9
366:9 399:21
404:7 406:25
407:8 410:12
424:5 425:12
428:12 460:6
470:7 475:11
485:25 486:17
previously 331:18
339:13,23 362:13
402:23 403:15
409:11 433:25
442:8 470:13
471:11,13 480:13
488:4 495:15

503:18
price 353:8 363:10
365:13 367:11
368:22 374:7,24
375:4 385:19
387:6,11 400:15
401:2,21 402:8,18
404:10,16,23,25
412:9,10,13,16,19
412:20 413:2,10
414:5,17,19,24
415:3,18,21
418:11 421:8
444:5 445:5 446:5
446:16 448:21
449:10 459:12,13
484:13,17,24
485:19 486:8
487:16 490:24
494:18
prices 349:16
355:23 362:16
363:2 365:16,16
367:23 370:21
373:5 401:17
421:11,11 482:3
principal 434:14
435:2 486:22
principals 369:17
principle 417:25
419:19 424:10
428:18 451:5
456:11
principles 365:25
375:9 421:23
prior 336:10
344:11 352:2
374:5,10,12,18
375:19 387:25
398:24 453:16
458:21 461:13

468:6,11 475:20
476:3 477:11,13
481:6,14 482:7
503:6
private 457:10
488:24
privileged 394:20
394:21 395:11,15
396:23
probable 417:4,10
417:16
probably 337:15
337:16 356:19,20
363:18,20 373:24
388:18 396:16
455:24 478:3,7,10
493:25 502:25,25
proceed 334:17
proceeding 333:20
454:4
proceedings
331:14 426:8
452:3,16,21 453:3
process 334:24
498:7
produced 375:25
376:13 377:4,7,7
378:3,13 379:3
380:9,15,25
production 332:9
462:6
professional 329:9
professor 492:15
proffered 488:10
profitability 449:6
458:20
profits 364:8,12
365:19 420:6
421:14 438:22
450:8

**prohibited** 477:5
**pronounce** 483:18
**proper** 501:13
**properly** 371:22
  405:20
**proposition** 401:9
  401:10 402:7,13
  402:23
**prove** 353:16
  393:7 403:6,9
  422:22
**provide** 335:25
  341:25 394:14
  396:3
**provided** 361:4
  362:4 365:12,16
  380:19 395:11
  421:7,11 506:17
**provider** 422:17
  423:3,13 462:10
**public** 329:9
  447:20 505:17
  507:25
**publically** 377:10
  377:15,21 378:2
  378:18 478:21
**pull** 471:5
**pulling** 372:3
**punished** 474:9
  479:23,25
**purchase** 397:13
  398:6
**purchaser** 353:15
  390:22 393:7
**purchasers** 392:13
**purchases** 353:18
  393:9
**purported** 362:5
  433:2 448:24
  489:5

**purportedly**
  458:12
**purposes** 336:5
**pursuant** 329:6
  331:14 452:3,16
  453:3
**purview** 423:24
  424:22 428:6
  429:8 430:12
  434:4,11,23
**put** 336:13 339:17
  370:21 416:24
  478:3 490:16
**putting** 365:6
  421:2 464:13
  482:5

---

**q**

**qibs** 352:22
**qualification**
  441:25
**qualifiers** 478:2
**quantify** 440:22
  484:17 486:8
**quarter** 371:16
**question** 332:15
  338:25 342:14
  347:21 349:11
  351:17 355:2,10
  357:7,25 358:12
  358:22 359:7,11
  359:14,25 360:4,7
  360:13 361:2,7,8
  361:16,17 367:19
  368:8,15 370:22
  370:24,25 372:24
  377:6,12,18
  378:24 380:3
  382:24 383:16,25
  385:8,10,15
  388:17 390:25
  395:13,22 396:12

397:3,4,9 398:24
399:17 400:13
401:9 402:5,11,13
402:14 404:13
405:9,13,14,18
406:22 407:14
408:13,22 409:4,6
409:10,22,24
410:13,22 411:16
413:8 414:6,22
415:9,11,18 416:7
416:8,13 417:6
418:20 419:5,6
422:13,21 424:5
424:13 425:14
426:20 427:4,24
428:7,13,14,19,22
428:23 429:6,20
430:4,8,11,17
431:3,4,20 432:5,6
432:17 433:12,13
433:17,18 434:8
434:16,19,20,22
435:4 436:4 437:2
438:7 440:7
441:19 442:6,7,10
442:24 445:14
453:11,14 456:25
457:13 459:23
460:10 463:24
464:9 468:19,19
469:2,13 474:25
477:20 478:8
479:5 480:3,10,12
480:20 483:3
484:16 485:24
486:17 490:17,23
493:21 496:13
501:14
**question's** 398:10

**questions** 361:4,5
  383:13 394:9
  397:8 399:19
  408:21,23 416:10
  417:12,13 423:5
  425:13 427:22
  432:13 435:4
  467:14 468:18
  469:14 474:3,4
  490:8 504:11
**quickly** 400:15
  401:2,17,22 402:9
  402:18 404:16,24
**quite** 433:16
  447:11 501:10
**quotation** 364:20
**quotations** 365:14
  421:9
**quote** 368:5 401:4
  418:13 450:6
  488:11
**quotes** 434:2
  439:7,14 441:21
**quoting** 401:5,8

---

**r**

**r** 330:2,17 506:2,2
  506:2,2
**ra** 328:4
**raised** 369:3
**ramification**
  445:10 482:2
  494:16
**ramifications**
  362:15 367:14,17
  367:22 368:10
  372:15,20 373:4
  373:10,12,18
  441:5,8,10,15,17
  449:8 458:13,22
  482:6 494:21

**range** 338:11,12
**rate** 338:6,24
  339:2
**rated** 352:25
**rates** 338:11,12
**ratings** 352:24
**reached** 369:25
**react** 399:8 400:5
  400:8
**reacted** 443:25
**reaction** 444:5
  445:6 446:16
  459:12,13 484:25
  485:19 486:8
**reactions** 399:22
**read** 353:22
  354:10 355:11
  360:25 363:7
  364:9 367:15
  368:17 372:22
  376:7 381:5
  386:13 387:9
  400:17 412:12
  416:8,13 418:6,20
  424:24 425:12
  427:23 433:5,25
  434:16,19,20
  435:15,24 439:8
  441:22 442:2
  449:19 458:24
  462:11 472:23
  473:2 497:19
  502:19 505:3
**reading** 363:5,6
  391:17 400:18
  440:14 482:22
  494:12
**reads** 435:19
**ready** 343:20
  360:22,23

**real** 473:25 476:19
**reality** 362:11
  495:13 496:2
**really** 387:21
  390:16 435:3
  442:23 479:16,16
  496:4
**realtime** 329:8
  365:13 421:8
  506:4
**reason** 354:6
  475:9 489:3 507:5
**reasonable** 386:21
**reasons** 391:12,23
  401:12 456:4
  497:16
**rebuttal** 331:9
  341:2,5,14,19
  359:3 378:7 492:9
  492:12 493:3
**recall** 338:19
  347:5 350:5 352:4
  380:11,14,14,25
  381:8 384:2 448:6
  469:11 471:2
  491:25 492:5,6,13
  497:8
**receive** 345:23
**received** 422:17
  423:4,14 450:9
**receiving** 423:8
  433:8 461:18
  466:9 478:22
**recess** 388:22
  427:21 467:25
  490:4
**recognize** 371:13
  371:15
**recollection**
  344:25 381:15
  390:16 478:19

  499:15
**recommend** 354:6
  391:13,24 392:19
**recommendation**
  331:13 350:19,25
  351:7 352:10
  391:4
**recommendations**
  331:11 351:4
**record** 333:3,19
  353:6 360:16
  363:8 385:5,6
  388:21,24 408:7
  425:22 427:14,17
  427:20,23 429:12
  429:14 442:20
  452:13 462:16
  463:13 464:8
  467:24 468:3
  489:17,25 490:3,7
  504:21 505:6
**recorded** 384:10
**reduced** 506:12
**refer** 358:24
  359:23 360:4,12
  360:24 379:24
  380:22 385:17
  386:10 394:19
  399:20 410:12
  425:9,24 439:6
  442:10 445:8
  448:19 454:12
  460:6 470:7
  477:13 480:11
  486:16 489:9
**reference** 359:7,11
  359:15 360:8
  361:7 366:15
  376:12 439:13
**referenced** 381:11
  381:13

**referred** 376:8
  379:18,20 380:21
  384:19 412:15
  439:7 441:18
  450:17 454:13
  485:25 502:21
  503:17
**referring** 342:9
  347:12 355:5,7,15
  361:25 363:23
  367:17 368:11
  372:16 373:2
  379:11 389:23
  420:3 424:21
  425:16,21 429:7
  437:8,10,14,17
  441:16 495:21,25
  496:15
**refers** 354:20
**reflect** 388:6
  401:17,22 490:25
**reflected** 346:5
  362:11 415:3,21
  459:21 495:12
  496:2
**refresh** 359:23
  381:15 393:24
  394:11 471:4
**regard** 364:4
  376:9 489:6
  494:21 500:7
**regarding** 335:25
  345:16 351:13,19
  388:3 397:12
  435:25 466:8,20
  467:12 469:15
**regards** 339:10
  356:22 363:15,19
  426:15 468:18,21
  468:21 479:15
  484:16 503:13

Veritext Legal Solutions
www.veritext.com
212-279-9424     212-490-3430

**registered** 329:8
506:4
**regroup** 489:22
**regulations** 365:24
421:22 450:15
465:3,18,20,25
466:8 477:6
**regulator** 456:4
**regulators** 423:21
428:3 436:15,17
445:12 446:21
447:6 456:10
**regulatory** 362:9
371:9,17 435:13
435:22 436:2,9,22
446:10 449:4
455:21 456:7
458:16,19 469:9
469:17 472:11,21
474:14 482:5
**rejected** 357:10,20
358:3 408:25
409:7
**related** 333:14
335:22 350:18
366:2 421:24
432:2 461:20
474:22 481:14
506:23
**relating** 346:19
462:7 474:14
487:21
**relationship** 353:7
421:25 423:20
428:2 433:21
434:5 445:4
446:13,20 462:8,9
466:21 467:12
475:19 479:9
481:5,7,15 482:7
484:4

**relatively** 352:18
**release** 353:7
**released** 482:25
**relevant** 346:20
477:19,22 496:20
**reliance** 353:14
393:5
**relied** 342:6
346:11 351:23
352:19 353:16
366:25 374:21
375:2 379:3,24
381:2 382:11,19
383:6 384:17
388:7 392:17
393:8 403:17,22
**rely** 353:14 385:5
392:14 393:5
**relying** 396:10
**remedial** 331:16
452:5,18 453:5
**remember** 361:3
394:5 469:21
481:21 488:24
503:12
**remote** 328:8
329:5
**remotely** 333:6,17
**repeat** 347:20
351:16 357:24
402:14 409:4,22
413:7 415:9
469:12
**repeatedly** 411:3
472:15
**repercussions**
362:9 458:16
**report** 331:7,9,11
331:12,21 336:11
336:15,24 337:3
337:12,23 338:10

338:11,18 339:3,6
339:9,15,22 340:6
340:7,8,10,14,17
340:19,20,25
341:2,5,14,18,19
341:20 342:20,21
343:10,12,13,24
344:12,17 345:4,6
345:7,21 346:5,15
346:16,18 347:7
349:15 350:19
351:3,7,15,21
352:3,7,10 354:13
355:8,15,18 357:4
359:2,3,8,12,15
360:9 361:7,24,25
362:2 363:25
364:2,3 366:9,22
367:10 368:7,14
368:17 369:8,23
371:2 372:16
374:15,19 375:8
375:19,22 376:5,6
376:15,18,20
378:7,23,23,25
379:7 381:3
382:18 383:6,7
385:19,23,23,24
386:3,6,7,10,11,24
387:2,25 388:2
389:20,24 390:3,7
391:4 397:2,11,16
398:13,16,19
399:6 401:8
403:10,14,17,18
403:19,21 404:2
410:14 411:8,25
412:7 418:16,22
419:8 420:4 422:7
431:23 432:21,23
436:5 438:15

440:9,14 441:21
448:10,11,20
453:17 457:17,24
458:2 460:25
461:9 462:4 467:3
467:6,8 468:6
472:24 481:18,22
481:24 483:7
484:9,15 486:20
487:5 489:5,8,10
492:10,12,16,21
493:3,7,20,24
494:13 495:11
496:7,16 497:5,10
497:11,11,22
499:14
**reported** 328:24
**reporter** 329:7,8,9
333:12 334:9
335:4 337:14
360:25 362:21
382:23,25 386:13
406:19 424:24
425:9 506:4,4,5,17
**reporting** 424:8
424:17 428:16
429:3,17,25
430:15 507:1
**reports** 338:15
341:17 342:2,5,10
342:17 344:7,12
345:8 346:14
352:20 359:23
360:5 366:10
367:5 375:12,18
379:4,5,14 380:22
381:12,14,23
382:11 384:18,19
384:20 401:4,5
459:22 471:3,4
475:11 491:21

492:3 495:18,20
495:22 496:9,15
496:18,24 499:17
499:22 502:20,22
503:2,4,8
**represent** 379:2
381:10 388:2
390:18
**representation**
442:4 463:15
**representations**
355:22 365:3
397:8 420:20
**representative**
389:22 390:9
393:17
**represented**
364:11
**represents** 366:5
439:11
**reputation** 445:18
**request** 332:9
462:6
**requested** 345:22
506:16,16
**required** 353:16
392:15 393:7
407:17 410:2
450:12 469:18
474:19
**requirement**
353:20 393:11
**reservation**
332:18
**resetting** 336:21
**residual** 413:2,10
414:17 458:5
**resolution** 455:20
**resolves** 370:12
**resort** 395:15

**respect** 341:25
346:6 349:25
353:21,24 393:12
472:20
**respectfully** 354:6
391:13,24
**respondents**
452:22,25 454:7
**responding** 373:2
**response** 389:8
445:25 454:5
483:2 493:9
**responsive** 368:8
460:10 496:13
**rest** 504:17
**restarted** 475:24
**restate** 488:17
**restricted** 352:21
**restructured**
457:7
**restructures** 371:8
**restructuring**
371:15
**result** 362:6
367:12
**resulted** 363:2
**retail** 364:7,12,17
365:9 420:6 421:4
449:23
**retailer** 449:24
**retained** 394:13
395:14,23,24
396:3,14 430:13
440:10 441:2
**retention** 424:15
428:25 429:15
**retribution** 491:6
491:8
**return** 491:5,8,10
491:14,15,16
494:6

**returns** 494:22
**reveal** 395:10
**revelation** 444:5
446:13 481:14
**revenge** 491:8
**revenue** 369:20
456:13,18 493:17
**revenues** 370:9
**review** 351:12,18
380:9 381:25
382:5 400:19
401:6 450:23
468:6,11 471:25
506:15
**reviewed** 346:19
366:23 377:9
381:16,20 441:12
444:11,25 450:24
459:18,19 497:5
503:3,11
**reviewing** 503:12
504:6
**ribbon** 412:2
497:16,17,23,24
498:9,25 499:3,8
499:12,13,20
500:2,7 501:19,22
502:10
**rid** 373:24
**right** 335:13 343:4
349:22 350:12
367:14 368:13,25
374:15,24 375:5
375:19 376:22
385:6,10,21,23,24
386:4,8,15 387:18
388:4 390:10
398:10 399:9
401:3,14 404:17
405:6 413:6 417:7
417:16 432:12

447:23 453:13,25
455:22 459:8
466:12 470:7
474:16 483:4
488:18
**risks** 458:22
**rivera** 330:18
333:9
**role** 364:14 400:23
420:7
**roman** 452:13,19
**ronnie** 331:12
350:20 351:4
391:5
**room** 335:19
**rosen** 330:3 334:4
334:7 345:24
**rosenlegal.com**
330:6,6
**rough** 338:20
**roughly** 369:20
370:8
**routing** 365:9
421:4
**rpr** 328:24
**rubric** 487:18
**rule** 353:20 393:11
**rules** 465:20,25
466:7 477:6
**ruling** 410:3,17
411:11,17
**run** 369:9

**s**

**s** 330:2,17,17
331:5 373:25
507:5
**s&l** 372:7
**sake** 377:17
**sanctions** 331:16
452:5,18 453:5

satisfy 353:19
393:10
save 483:4
saw 347:4 501:5
saying 373:23
406:15,20 420:5
445:13 446:2,2
455:22 457:12
497:21 498:12
500:13,19
says 352:13 354:5
391:12 392:8,24
393:2 425:16
452:20 453:6
school 426:14
schools 439:21
scope 424:15
428:24 429:15,22
430:19 431:22
438:6 483:5
screens 343:2
scrutiny 435:14,22
436:2,9,22 449:4
458:19
sec 365:24 421:21
478:21 503:2
second 334:22
338:8 339:19
348:8 350:23
355:9 361:8
427:10 471:17
500:8 502:12
section 344:7
411:25 419:7
452:17 454:3
sections 331:14
452:3
securities 328:5
333:8 362:17
363:2 367:12,23
373:6 374:8,24

375:5 392:13
397:14 398:6
412:9 440:20
449:10 482:3
484:13,25 494:18
499:18 500:4
security 399:8
400:5,15 401:2,20
401:22 402:8,18
404:16,23 405:22
407:15 412:14,19
412:20 413:4,12
413:17 414:19
418:11
see 336:20,20
345:9 354:5 356:2
356:3 368:21
373:23 376:12
392:21 393:13
460:20 468:7,12
474:7 489:22
seeing 502:2
seen 381:19 394:5
443:13 457:19,21
457:22 459:10
464:19 465:8
470:10 488:6,23
503:18
sees 361:14
sell 369:15
selling 371:11,13
semantics 348:9
senior 347:8 392:2
sense 343:6 416:23
437:22 438:12
496:19 498:7
sent 399:25 462:5
sentence 348:8
353:23 355:21
356:19 363:6,19
364:9 373:21

418:7 442:5 473:2
494:10 500:9
separate 356:18
396:13
separately 394:13
395:14,24,25
484:19 486:9
491:3
sequential 336:9
series 408:22
469:14
serve 414:4
service 331:20
339:21 453:2
services 370:18
set 354:6 424:2
428:9 430:22
431:15 454:9
settle 369:4 370:14
459:4 460:3,14
469:17
settlement 369:14
370:12 447:13
450:16,18 451:4
451:19 452:23
456:3 470:2
489:14
settlements 371:9
447:15,21 448:17
449:15 451:9,11
451:13,16,18
453:19 455:4,8
468:7 488:18,20
settling 370:4
469:9
seven 435:18
share 335:11
336:14 364:21
368:22 370:6
385:21 387:7,18
420:11 440:25

450:5 483:15
498:20,21
shared 450:7
shares 371:17
sheet 505:5 507:1
shocks 458:19
short 485:15
489:21
shorthand 329:7
349:5 506:3,9
show 353:6
showed 340:4
shut 446:23
455:25
shutting 369:12
370:17
sic 460:2
signature 506:24
signed 396:13
significantly
498:24
silvia 328:24 329:7
333:12 425:22
506:3
similar 468:7,13
481:10
simple 395:20
473:12 476:11
simply 394:8
singular 374:2,3
sir 504:18
sit 337:19,20 338:7
338:19 345:2,18
347:5 350:4 352:5
360:3 377:22
378:5 379:12
380:2,6,11 382:3,7
382:15 391:2
402:4 431:8,12
435:10 438:24
447:10 448:6

450:21 453:21
457:2 461:25
462:22 469:6
475:16 488:15
489:19 492:6
497:8 500:5
**sitting** 359:5,16,20
360:8 368:9
380:24 385:10,12
386:16 395:12
404:4 422:25
451:15
**situation** 406:14
413:22
**situations** 414:7
**sixth** 426:6,24
**size** 352:18
**slightly** 355:3
**slow** 362:22
**small** 352:19,22
**smaller** 352:19
365:15 421:10
**snb** 475:4,13,20
**solicitations**
369:18 449:23
**solutions** 333:10
333:13
**solvency** 370:22
370:23
**solvent** 447:9
**somebody** 470:14
470:17 473:16
491:9
**somewhat** 356:20
**son** 426:6,23
451:22
**sorry** 344:19
347:20 351:16
356:12 357:24
361:9 363:5
367:18 371:14

372:18 373:13,22
376:18 379:20
383:10,21 384:13
384:23 385:22
388:13 391:15,18
393:20 396:7
397:20 398:22
402:20 405:7
407:3,6,7 412:4
413:7 416:7
426:20 427:10
435:16 441:21
442:18 446:10
453:12 456:23
461:10 464:17
469:4,12 470:23
477:9,19 485:6,10
487:24 491:10,13
492:11 493:4
497:14
**sort** 407:9
**sorts** 383:12 415:5
477:24 478:2
479:12
**sounds** 369:21
381:7
**source** 345:25
**sources** 366:16
**southern** 328:2
**space** 345:3,10
**spalding** 330:9
333:23,25 334:3
**speak** 335:3
340:10 473:5
474:19
**speaking** 383:22
385:25 405:19
411:5 413:21
475:6 501:8
**speaks** 467:4
484:15 489:8

**specific** 353:8
380:15,25 397:12
418:17,23 437:13
438:13 443:16
445:11 469:22
477:15 479:15
480:12 496:16
**specifically** 376:9
437:7 441:16
481:13
**specifics** 492:14
**specified** 356:21
**specify** 364:2
397:16
**speculate** 391:2
472:16
**speculating**
501:12
**speculative** 473:8
**spell** 337:14
**spend** 338:17
502:14
**spent** 337:22
**spinoff** 438:21
**spoke** 502:22
**stable** 497:16,23
**staff** 503:22
**stage** 336:4
**stake** 369:2
**standalone** 446:25
**standpoint** 486:23
**start** 358:11
460:12 464:4
**started** 347:23
416:9 461:4 463:4
463:7
**starts** 343:14
426:13 476:15
**state** 333:18,20
354:14 356:5
424:25 437:3

458:4 495:11
497:15
**stated** 338:9
361:10 416:14
420:14 424:23
429:10 477:7
488:4 506:11
**statement** 355:11
361:13 379:17
400:16,19,24
412:24 413:19,20
414:3,4 415:7,23
415:24 447:3
459:14 477:25
478:11 495:18
**statement's**
414:15
**statements** 353:18
365:23 375:10
392:17 393:9
421:21 423:10
424:3 428:9
430:22 431:25
459:14 472:20
488:17 505:7
**states** 328:2
329:10 437:12
457:5
**stating** 472:13
**stemming** 458:17
**stenographer**
334:16 342:24
407:3 425:17
427:8
**stipulate** 393:25
394:10 425:2
489:2
**stipulations**
332:12
**stock** 349:16
352:24 354:8

355:23 358:8,14
363:10 385:20
387:6,17 391:14
391:25 392:10
406:3 408:18
414:5 443:25
444:4 445:5
446:16 448:22
490:24
**stopped** 435:21
478:12,16,22
479:2,22,25 480:7
480:17,25 481:5
**strictly** 479:7
**strike** 332:21
**structured** 442:5
**struggle** 476:23
**study** 353:9
374:14,17,21
375:3,12 399:5
401:13 403:2,14
403:16,22 405:20
405:25 406:6
407:17,24 408:14
408:17
**subject** 362:8
366:10 458:15
**submitted** 336:24
340:20 389:19
452:22 468:5
492:16 497:6
499:9,18
**submitting** 404:2
**subpoint** 364:7
365:5
**subscribe** 505:6
**subscribed** 505:12
507:22
**subsection** 454:12
**subset** 348:13

**substance** 416:2
416:15 417:23
**successors** 454:7
**sudden** 417:15
**suffered** 398:5,11
**sufficient** 385:14
385:16 406:17
439:15
**sufficiently** 392:19
**suggest** 420:23
434:2 460:21
464:20 465:8
470:10 488:6
496:4 501:5,8
**suggesting** 500:19
**suggestion** 386:9
**suite** 330:4
**sum** 366:5
**superseding**
340:19
**supervision**
506:14
**support** 332:3
389:20 390:7
495:18 503:22
**suppose** 411:21
417:3 434:3 440:4
472:4 497:25
**sure** 335:8 342:15
347:22 348:16,20
349:4 359:24
360:5 372:22,23
378:9 379:16
385:24 386:4,8
389:17 394:20
395:18 405:24
406:13 407:13
415:12 422:12,20
425:5,19 426:25
431:13 433:16
434:9 438:23

441:24 442:3,5,25
444:20 446:25
447:2,11 454:21
466:5 474:2,24
481:20 483:2
488:9,14 491:7
492:21,22 494:11
496:21,21 501:10
502:13
**sustainability**
437:5,19 439:3,10
439:12,16 440:11
449:5
**sustainable** 362:8
458:15
**swear** 334:10
**switch** 399:4 475:3
477:17
**switching** 358:8
**sworn** 334:14
505:12 506:6
507:22
**systemic** 458:19

**t**

**t** 330:17 331:5
506:2,2,2
**ta'ed** 439:20
**tabs** 386:18
**take** 336:19 355:8
376:14 378:6
386:25 389:14
391:3 411:24
426:23 427:11,15
457:25 467:15,20
489:21 492:9
493:6 496:9 497:9
502:8
**taken** 333:5
388:22 427:21
448:16 455:7
467:25 490:4

501:19 506:9
**takes** 344:20
481:19
**tale** 416:12
**talk** 396:15 427:9
448:11 454:4
496:11
**talked** 339:5 405:5
466:12 469:23
470:12
**talking** 343:9,9
348:9,18,22 349:8
355:4 363:16
364:3 374:3,10
376:19 378:22
386:5 391:18
398:14 399:4
403:18 408:21
410:8 416:11
420:15 430:9
445:23 459:9
465:17 467:7,9
478:9 481:17
487:8 490:15
**tangential** 479:13
**tax** 371:15
**teach** 439:25
**technology** 345:6
**teetering** 447:8
**tell** 400:19 404:4
465:5 476:22
506:6
**ten** 426:14 489:21
502:16
**term** 347:11,25
348:6,7,17,21
354:20 411:2,4
451:3
**terms** 347:24
349:3

terrible 369:21
test 390:17
testified 334:14
  350:11,14 384:15
  384:16
testimony 344:7
  399:21 476:25
  477:11,14 499:10
  503:7,16 506:11
tfa 379:19,20
thank 334:16,18
  334:20 342:18
  495:9 502:11
  504:12,15,16,18
  504:19
thanks 353:25
theory 464:11,13
  486:2
thereto 506:23
therewith 458:13
thing 370:19
  387:20 406:11
things 350:10
  356:19 374:25
  375:6 379:9,23
  417:17 425:25
  433:15 438:3,25
  441:20 445:9
  447:3 467:7
  469:19 470:3
  481:16 483:8
  484:9 502:6
  503:11
think 337:20
  342:3 343:4,21
  345:19 348:9,12
  368:4 382:16
  388:12,16 389:9
  402:13,22,24
  403:6 404:3,18
  406:16 407:21

414:7,15 415:8,24
416:9 422:21
446:9 462:17
466:3 467:4
470:14 473:13
474:25 476:11,24
481:19 484:15,21
486:17 489:3,20
490:14 494:22
496:22 497:4
498:4 499:11
500:18,18 503:15
503:18 504:10
thinking 347:2
  408:11 426:15
  470:16 473:16
  476:12
third 355:21
  440:19
thought 385:2
  391:7 405:24
  407:20 445:18
three 341:17
  342:17 344:13
  367:5 459:21
  463:10 503:9
ties 365:11 421:5
tietz 345:6
time 333:20
  337:21 338:17
  348:2,14 349:5
  358:15 388:19,20
  388:23 412:10,23
  413:17,23 422:24
  426:11,12 427:8
  427:19 429:11
  433:13 455:13,15
  459:3 467:23
  468:2 483:4
  488:19 489:20
  490:2,6 500:15,24

502:14 504:12,20
  504:22 506:10
times 360:17
  388:17 410:6,10
  425:21 467:14
  475:2,11 486:18
timing 353:11
today 334:21
  335:10,22 337:19
  337:20 338:7
  341:23 345:19
  347:5,12 349:2
  359:5,16,20 360:3
  360:8 368:9
  372:13 377:22
  378:5 379:12
  380:2,7,11,24
  382:3,7,15,16
  385:10,12,17
  386:9 391:2
  395:12 402:4
  404:4 407:21
  418:15 422:25
  431:8,12 435:10
  438:25 447:10
  451:15 453:21
  457:2 461:25
  462:23 465:11,11
  465:16 469:6,7
  473:14 488:15
  492:7 500:5
  504:11,12
told 420:24 445:11
  449:24
ton 405:12
tools 493:12,15
top 394:4
topic 410:13
  436:12,13
total 366:6 502:16

totality 341:20
  496:17
touched 350:3
tracking 427:12
trade 392:12
traded 352:17,22
  353:13 357:11,21
  358:4 370:6 393:4
  409:2
trades 449:21
trading 353:2
  364:17,22 365:4
  370:3,7 371:22
  372:2 420:12,21
  420:22 437:11
  439:4,15 440:2,11
  446:20 450:6,8
  455:17 483:15
traffic 426:16
transactions 432:2
  432:3 433:3,9
  448:25
transcript 381:6
  381:10 382:2,6
  427:9 505:3,6
  506:15
true 454:20 455:4
  479:8 494:5
trump 417:2
truth 458:11,18,22
  506:7,7,8
truthfully 473:5
  474:20
try 382:24 400:2
  416:14 482:18
  495:2
trying 355:10,12
  360:15 361:20
  383:10,23 386:8
  386:14 395:20
  403:5,9 406:18

407:12 438:12
496:19 498:7,11
**turn** 342:13,20
347:6 352:9
353:18 354:2
392:4,23 393:10
449:2,9 472:6
484:8 494:17
498:23
**turned** 378:17
**turning** 349:14
363:24 367:9
379:6
**twice** 360:20
**two** 343:6 350:17
353:11 369:16
371:4,8,24 407:2
414:7,7 417:17
463:19 464:5
467:18 468:18
473:20 475:2
479:9 484:4
498:15,18
**type** 411:8 454:2
454:16 455:10
484:23 501:8
**types** 454:17
468:20 501:7
**typewriting**
506:13

**u**

**ultimately** 419:11
422:21 440:5
469:17 498:22
502:5
**unable** 457:11
495:3
**unadjudicated**
472:17 473:8
**uncharged** 472:17
473:8

**uncommon** 466:13
**underestimation**
458:21
**undergoing**
472:22 473:6
474:21
**understand**
347:12 354:25
356:16 358:12
367:18 373:19
389:10 393:15
395:20 404:13
405:8 406:13
409:6 410:21
424:13 428:21
429:19 430:3,5,7
430:17 431:2,4,9
431:11,19 432:4,6
432:13,17 435:3
436:4,15,25 438:7
447:18 455:16,19
460:9 464:9 474:3
480:19 498:11
**understandably**
410:11
**understanding**
358:19 359:16
362:5 366:6 367:2
394:4 407:13
438:2,10 439:9,11
458:18 461:14
462:12,18,19
466:18 473:19
478:15 479:20
488:7 501:25
503:6
**understood**
359:17 444:21
**undertaking** 454:9
**undisclosed**
364:18 450:4

482:21 483:10,13
484:3 485:3,21
**united** 328:2
437:12 457:5
**universe** 388:6
496:20
**unnecessary** 384:8
**unregistered**
352:21
**unsure** 347:2
377:25
**unusual** 477:16
**upload** 335:9
**use** 347:11 348:16
348:21 349:5
371:21 414:17
431:7 441:24
463:23 490:11,13
490:20 491:2
493:18 498:19
499:25 501:3,23
**uses** 498:25
**utility** 353:10

**v**

**vague** 395:21
**vaguely** 417:12
**valia** 337:13
**valuable** 368:24
**valuation** 362:10
369:4 375:10
486:23 490:12,13
493:12,13,15,15
493:18 495:12,25
**value** 458:17
477:19,22 481:8
482:8 486:25
493:17
**valued** 487:6
**variable** 424:4
428:10 430:23
431:9,11,16

**variations** 501:20
**variety** 493:11
**various** 407:11
**vary** 456:8 500:24
501:11
**varying** 500:15
**veracity** 362:13
495:15
**verbatim** 448:7
**verify** 390:14
**veritext** 333:10,13
507:1
**versus** 345:6
354:21 355:4
408:18 487:3
**viability** 437:5,19
438:5,9 439:3,9,11
449:4
**video** 328:8
**videographer**
330:19 333:2,11
334:9 388:20,23
427:19 429:11
467:23 468:2
490:2,6 504:20
**videotape** 329:5
**view** 365:13
368:23 421:8
441:7 442:11
447:15 473:7
**vigorously** 392:10
**violate** 421:21
**violated** 365:23
**violation** 461:21
461:21 488:8,14
**violations** 450:14
456:8 487:21
**vitae** 344:4,10
**volume** 352:25
353:3 364:22
370:7 420:12

450:6 483:15

**w**

**wadsworth** 334:12
**wage** 328:24 329:7
  333:12 425:11
  434:18 506:3
**wait** 341:11
  346:23 351:23
  361:9 461:10,10
  471:20,20,20
**walia** 337:13,22
  502:23 504:3
**walk** 496:10
**want** 335:2 336:7
  339:12 342:14
  343:16 347:22
  348:16 349:4
  350:17 354:23
  355:17 359:15,21
  360:3,21 366:21
  376:10,11 390:18
  390:25 393:25
  395:9,18 398:8
  399:4 400:2,17
  406:12 409:4,22
  410:9 415:8,9
  418:14 425:2,5
  441:9 444:20
  445:14 448:9
  450:22 469:22
  483:18 485:13
  488:12 489:2
  495:4 496:5 497:9
**wanted** 335:6
**wants** 337:14
  360:25
**water** 417:9
  467:16
**way** 342:23 365:17
  378:4 382:4,8,14
  389:5,16 403:7

409:14 414:23
415:13 421:12
422:22 423:16
424:11 428:19
430:9 431:5 435:9
442:4 443:25
444:3 448:5
450:20 451:13
453:20 457:12
461:17 462:18,19
474:16 475:16,22
475:25 482:15,18
489:18 492:22
493:22 494:2
500:6 503:9
506:21
**ways** 498:4
**we've** 376:11
  387:24 388:16
  466:3
**weigh** 473:24
**went** 379:14
  429:13
**werner** 328:1,9
  329:1,6 330:1
  331:1,3,7,8,9,10
  331:11,12,13,20
  331:22,23 332:1
  333:1,7 334:1,11
  334:20 335:1
  336:1,8,15,16,20
  336:23 337:1
  338:1 339:1,13,15
  339:20,23 340:1,2
  341:1,2,3,4,6,9
  342:1 343:1,20
  344:1 345:1 346:1
  347:1 348:1 349:1
  350:1 351:1,3,6
  352:1,11 353:1
  354:1,25 355:1

356:1 357:1 358:1
359:1 360:1 361:1
362:1 363:1 364:1
365:1 366:1 367:1
368:1 369:1 370:1
371:1 372:1 373:1
374:1 375:1 376:1
376:21 377:1
378:1 379:1 380:1
381:1 382:1 383:1
383:16 384:1
385:1 386:1,22
387:1 388:1,25
389:1 390:1 391:1
392:1 393:1 394:1
395:1 396:1 397:1
398:1 399:1 400:1
401:1 402:1 403:1
404:1 405:1 406:1
407:1 408:1 409:1
410:1 411:1 412:1
413:1 414:1 415:1
416:1 417:1,15
418:1 419:1 420:1
421:1 422:1 423:1
424:1 425:1 426:1
427:1 428:1 429:1
429:13 430:1
431:1 432:1 433:1
434:1 435:1 436:1
437:1 438:1 439:1
440:1 441:1 442:1
443:1 444:1 445:1
446:1 447:1 448:1
449:1 450:1 451:1
452:1,2,9 453:1
454:1,13 455:1
456:1 457:1 458:1
459:1 460:1 461:1
462:1 463:1 464:1
465:1 466:1 467:1

468:1,4 469:1
470:1 471:1,11,12
472:1 473:1 474:1
475:1 476:1 477:1
478:1 479:1 480:1
481:1 482:1 483:1
484:1 485:1 486:1
487:1 488:1 489:1
490:1,8 491:1
492:1 493:1 494:1
495:1 496:1 497:1
498:1 499:1 500:1
501:1 502:1 503:1
504:1 505:10
506:1 507:3,21
**werner's** 353:9
  406:25 407:8
**whoa** 453:23,24
  453:24,24,24
  455:13,13,13,14
  455:14 461:10,11
  461:11,11
**william** 382:6
  452:15
**win** 365:11 421:5
**wish** 426:9,23
**withdraw** 459:6
  460:4,15 476:5
  483:22 484:4
  485:2,20
**withdrawal** 470:3
**withdrawing**
  469:19
**withdrew** 468:25
**witness** 331:3
  332:6 334:5,8,10
  343:3 356:12
  362:20 383:19
  384:23 388:13
  395:6 396:7
  397:20 398:8

402:20 405:6,10
411:2 435:19
442:18 464:17
477:9 485:6,10
486:13 487:24
506:5,12
**witnesses'**  507:3
**won**  364:20,20
417:3 420:11
450:5 483:14
**word**  365:7 371:21
407:5 431:6
441:25 446:6
485:11,14
**worded**  478:8
485:24
**words**  410:11
498:19
**work**  339:8 359:5
380:8 424:15
428:24 429:15,22
430:20 431:22
433:20 450:25
476:21 486:19
487:4
**workers**  371:7
**workforce**  371:7
**world**  487:9,9
**woven**  447:4
**write**  337:3
**writing**  363:18
**written**  400:21
**wrong**  341:12
385:22 432:23
447:14 451:14
455:23 489:3
494:2
**wrongdoing**  451:8
454:6
**wrongdoings**
451:8 472:17

**wrote**  367:20
369:8 373:3,16
387:14,19,20
425:9

| x |
|---|

**x**  331:2,5 365:7
506:15

| y |
|---|

**yeah**  336:21
344:22 346:16
347:22 348:9
350:6 351:18
358:13 368:6
391:9 394:23
400:12 402:4
419:5 422:20
435:9,24 436:13
442:22 453:9
456:11 457:6
460:6 461:7,12,25
462:11,17 463:14
465:14 470:17
471:8,24 473:16
473:24 474:11
476:18,23 479:24
480:10,19 481:23
482:11 484:8
493:5 497:20
501:12
**year**  345:4 362:2
414:20,25 415:19
464:4 495:23
**years**  463:10,19
464:5 465:12,14
465:15 470:15
473:13,15,21
478:6
**yesterday**  368:20
369:25 502:24
504:4

**york**  328:2 329:10
330:11,11 507:1
**young**  380:12,15
380:19,23 381:2

| z |
|---|

**zoom**  329:5
334:25 335:5

Federal Rules of Civil Procedure

Rule 30

(e) Review By the Witness; Changes.

(1) Review; Statement of Changes. On request by the
deponent or a party before the deposition is
completed, the deponent must be allowed 30 days
after being notified by the officer that the
transcript or recording is available in which:

(A) to review the transcript or recording; and

(B) if there are changes in form or substance, to
sign a statement listing the changes and the
reasons for making them.

(2) Changes Indicated in the Officer's Certificate.
The officer must note in the certificate prescribed
by Rule 30(f)(1) whether a review was requested
and, if so, must attach any changes the deponent
makes during the 30-day period.

DISCLAIMER:  THE FOREGOING FEDERAL PROCEDURE RULES
ARE PROVIDED FOR INFORMATIONAL PURPOSES ONLY.
THE ABOVE RULES ARE CURRENT AS OF APRIL 1,
2019.  PLEASE REFER TO THE APPLICABLE FEDERAL RULES
OF CIVIL PROCEDURE FOR UP-TO-DATE INFORMATION.

VERITEXT LEGAL SOLUTIONS
COMPANY CERTIFICATE AND DISCLOSURE STATEMENT

Veritext Legal Solutions represents that the foregoing transcript is a true, correct and complete transcript of the colloquies, questions and answers as submitted by the court reporter. Veritext Legal Solutions further represents that the attached exhibits, if any, are true, correct and complete documents as submitted by the court reporter and/or attorneys in relation to this deposition and that the documents were processed in accordance with our litigation support and production standards.

Veritext Legal Solutions is committed to maintaining the confidentiality of client and witness information, in accordance with the regulations promulgated under the Health Insurance Portability and Accountability Act (HIPAA), as amended with respect to protected health information and the Gramm-Leach-Bliley Act, as amended, with respect to Personally Identifiable Information (PII). Physical transcripts and exhibits are managed under strict facility and personnel access controls. Electronic files of documents are stored in encrypted form and are transmitted in an encrypted fashion to authenticated parties who are permitted to access the material. Our data is hosted in a Tier 4 SSAE 16 certified facility.

Veritext Legal Solutions complies with all federal and State regulations with respect to the provision of court reporting services, and maintains its neutrality and independence regardless of relationship or the financial outcome of any litigation. Veritext requires adherence to the foregoing professional and ethical standards from all of its subcontractors in their independent contractor agreements.

Inquiries about Veritext Legal Solutions' confidentiality and security policies and practices should be directed to Veritext's Client Services Associates indicated on the cover of this document or at www.veritext.com.