**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

IN RE GLOBAL BROKERAGE, INC.
F/K/A FXCM INC. SECURITIES
LITIGATION

Civ. No. 17-CV-00916 (RA)

## DEFENDANTS' RULE 56.1 STATEMENT OF UNDISPUTED MATERIAL FACTS

Pursuant to Rule 56.1 of the Local Rules of the United States District Court for the Southern District of New York, Defendants Global Brokerage, Inc. f/k/a FXCM Inc. ("FXCM" or the "Company"), Dror Niv, and William Ahdout hereby submit this statement of material facts as to which there is no genuine issue to be tried.[1]  Documents referenced in this statement are attached to the accompanying Declaration of Israel Dahan in Support of Defendants' Motion for Summary Judgment and referred to as "Ex. __."

### I.      FXCM Background

1.      FXCM was founded in 1999 as an online provider of foreign exchange ("FX") trading and related services to both retail and institutional investors.   Third Amended Consolidated Securities Class Action Complaint, ECF No. 181 ("TAC") ¶ 42; Ex. 1 (FXCM 2011 Form 10-K at 1).  By 2010, FXCM was one of the largest retail FX brokers in the global online FX market.  Ex. 2 (Expert Report of Simon Wilson-Taylor dated April 21, 2021 ("Wilson-Taylor Report") ¶ 41); Ex. 3 (Research Analyst Presentation, August 17, 2010, GLBR_00103494–552 at GLBR_00103498).

2.      FXCM offered its retail customers access to over-the-counter FX markets through its proprietary technology platform.  TAC ¶ 42; Ex. 1 (FXCM 2011 Form 10-K at 1).

---

[1] Defendants reserve the right to supplement this statement as appropriate during further briefing on the Motion.

II.      **FX Trading Models – Dealing Desk (Principal) And No Dealing Desk (Agency)**

3.      There are primarily two trading models employed by FX services providers like FXCM:  an agency model, or "No Dealing Desk," and a principal model, or "Dealing Desk." Ex. 2 (Wilson-Taylor Report ¶ 34).

4.      A No Dealing Desk (agency) model is an FX trading model in which the customer places an order with a broker, the broker charges the customer a commission, and then the customer's order is passed on to be executed with a liquidity provider—all of which happens in milliseconds.  Ex. 4 (John Dittami Jan. 21, 2021 Tr. ("Dittami Tr.") 31:5-10); Ex. 5 (Simon Wilson-Taylor June 2, 2021 Tr. ("Wilson-Taylor Tr.") 65:5-11).

5.      In the No Dealing Desk (agency) model, the broker is not exposed to market risk; instead, that risk is passed on to the liquidity providers that execute the trades.  Ex. 5 (Wilson-Taylor Tr. 65:5-11); Ex. 2 (Wilson-Taylor Report ¶ 11.d).  Also, the broker primarily makes money by charging a commission or markup.  Ex. 6 (Dror Niv February 11, 2021 Tr. ("Niv Tr.") 101:21-102:22).

6.      In contrast, in a Dealing Desk (principal) model the broker (principal) is the direct counterparty that executes the customer's trade.  Ex. 4 (Dittami Tr. 359:7-13).  Accordingly, the broker is exposed to market risk.  *See id.*

7.      Further, in a Dealing Desk (principal) model, the broker makes money when the market price moves in its favor and loses money if the market prices moves in an adverse direction.  Ex. 4 (Dittami Tr. 359:2-19).

8.      A No Dealing Desk (agency) model allows retail customers access to the best price from a wide range of FX liquidity providers, while in a Dealing Desk (principal) model the retail customer is only provided access to the price from the principal, which acts as the trade counterparty.  Ex. 2 (Wilson-Taylor Report ¶¶ 35, 36).

9.      Prior to July 2007, FXCM primarily used the Dealing Desk (principal) model for its retail customers, under which it served as the sole counterparty to its customers' trades.  TAC ¶ 43; Ex. 1 (FXCM 2011 Form 10-K at 8).

10.      By July 2007, FXCM had completed its transition to a No Dealing Desk (agency) model.  TAC ¶ 44; Ex. 1 (FXCM 2011 Form 10-K at 8).

11.      During the Class Period, FXCM's primary trading method for its retail customers was the No Dealing Desk (agency) model.  Ex. 7 (FXCM 2012 Form 10-K at 1 ("We primarily offer our customers what is referred to as an agency model to execute their trades.")); Ex. 8 (FXCM 2013 Form 10-K at 7); Ex. 9 (FXCM 2014 Form 10-K at 8); Ex. 10 (FXCM 2015 Form 10-K at 7–8); Ex. 11 (FXCM 2016 Form 10-K at 68).  However, starting in 2012, FXCM again offered retail customers the option to trade with a Dealing Desk (principal) model.  Ex. 7 (FXCM 2012 Form 10-K at ("In 2012, in order to accommodate our expanding customer base, we began to offer our smaller retail clients the option to trade with dealing desk, or principal model execution.")).

12.      Under its No Dealing Desk model, FXCM passed on every trade request it received from a customer to a liquidity provider for execution.  Ex. 12 (Robert Lande January 14, 2021 Tr. ("Lande Tr.") 54:2-10); Ex. 13 (FXCM "No Dealing Desk" website page).  To this end, FXCM (as the broker) collected quotes from a range of liquidity providers and displayed the best bid and offer quote (after incorporating a markup) to FXCM's customers.  Ex. 14 (Forex Capital Markets, LLC, External Execution Rules); Ex. 15 (FXCM Trading Station II, User Guide to the No Dealing Desk Platform).  As explained in its "User Guide to the No Dealing Desk Platform," FXCM updated the markup-adjusted best bid and offer quotes on a continuous basis

as it received new quotes from liquidity providers.  Ex. 15 (FXCM Trading Station II, User Guide to the No Dealing Desk Platform).

13.     FXCM's customers can submit a variety of order types through FXCM's No Dealing Desk trading platform.  Based on the External Execution Rules, if the customer's order criteria are satisfied, FXCM automatically attempts to execute the order by sending a request to the liquidity provider with the best markup-adjusted price to execute the trade at the price quoted by the liquidity provider.  Ex. 14 (Forex Capital Markets, LLC, External Execution Rules).  The liquidity provider then decides whether to accept or reject the order.  If the liquidity provider accepts the order, FXCM enters into the specified trade with the customer and simultaneously enters into an offsetting trade with the liquidity provider.  Ex. 3 (Research Analyst Presentation, August 17, 2010, GLBR_00103494–552 at -513).  On the other hand, if the liquidity provider rejects the order, FXCM either rejects the order or continues to attempt to execute the order until it is filled, depending on the terms of the order.  Ex. 14 (Forex Capital Markets, LLC, External Execution Rules).

14.     Through its No Dealing Desk, FXCM primarily made money by charging commissions or markups on customers' trades.  Ex. 6 (Niv Tr. 151:13-152:3); Ex. 1 (FXCM 2011 Form 10-K at 1).  During the 2010 to 2014 period, FXCM also made money from payments for order flow.  Ex. 17 (FXCM 2010 Form 10-K at 42); Ex. 1 (FXCM 2011 Form 10-K at 41); Ex. 7 (FXCM 2012 Form 10-K at 44); Ex. 8 (FXCM 2013 Form 10-K at 38); Ex. 9 (FXCM 2014 Form 10-K at 39); see also Ex. 18 (Plaintiffs' Responses and Objections to Defendants' First Set of Requests for Admission, dated February 18, 2021 ("Plaintiffs' Responses to RFAs") at 32).

15.     FXCM repeatedly disclosed that its retail trading revenue included payments from order flow arrangements.  TAC ¶¶ 148, 150; Ex. 1 (FXCM 2011 Form 10-K at 1, 45, 65); Ex. 7 (FXCM 2012 Form 10-K at 46, 74); Ex. 8 (FXCM 2013 Form 10-K at 40, 73); Ex. 9 (FXCM 2014 Form 10-K at 42, 79).

16.     In the years where FXCM received payment for order flow, using the order flow revenue figures asserted by Plaintiffs accounting expert, John Barron, those payments accounted for between 1.97% and 5.97% of FXCM's annual revenue, while the balance of trading revenue, composed of trading commissions, was between 94.03% and 98.03% of FXCM's annual revenue as detailed in the below chart:

| Year | Order Flow Revenue | | Retail Trading Revenue | | Order Flow Rev. as a % of Total Rev. | Non-Order Flow Trading Revenue |
|---|---|---|---|---|---|---|
| | (in millions) | | | | | |
| 2010 | $ | 15.6 | $ | 318.5 | 4.67% | 95.33% |
| 2011 | $ | 23.1 | $ | 363.8 | 5.97% | 94.03% |
| 2012 | $ | 17.9 | $ | 339.7 | 5.01% | 94.99% |
| 2013 | $ | 15.6 | $ | 365.3 | 4.10% | 95.90% |
| 2014 | $ | 6.8 | $ | 338.0 | 1.97% | 98.03% |
| | | $79 | | $1,725.3 | 4.38% | |

*See* ECF No. 240-1 (Barron Report) ¶ 110;[2] Ex. 17 (FXCM 2010 Form 10-K at 42); Ex. 1 (FXCM 2011 Form 10-K at 41); Ex. 7 (FXCM 2012 Form 10-K at 44); Ex. 8 (FXCM 2013 Form 10-K at 38); Ex. 9 (FXCM 2014 Form 10-K at 39); *see also* Ex. 18 (Plaintiffs' Responses to RFAs at 32).

---

[2] Any citations to the Barron Report or Barron Rebuttal are only to demonstrate the undisputed nature of the fact.  Defendants do not concede the admissibility of the Barron Report or Barron Rebuttal and have filed the Barron Motion to exclude those reports.

### III.  FXCM Hires John Dittami

17.     In  September  2009,  FXCM  hired  a  high-frequency  trader,  John  Dittami ("Dittami"), to establish a new division within FXCM that would manage algorithmic trading projects, including market making, proprietary trading, and algorithmic execution services.  TAC ¶ 50; Ex. 19 (John Dittami Employment Agreement dated September 4, 2009 ("Dittami Employment Agreement")); Ex. 20 (Board Meeting Notes dated October 26, 2009).

18.     FXCM  entered  into  an  employment  agreement  with  Dittami  to  start  up  and manage this new venture.  Ex. 19 (Dittami Employment Agreement).

19.     FXCM hired Dittami to investigate whether FXCM's customer experience could be improved through better quality pricing and execution and to evaluate any issues that were being  caused  by  FXCM's  external  liquidity  providers.   Ex.  21  (Dror  Niv  May  25,  2016 Deposition Transcript ("Niv CFTC Tr.") 24:6-26:6); Ex. 6 (Niv Tr. 64:2-15); Ex. 22 (Evan Milazzo May 13, 2016 Deposition Transcript ("Milazzo CFTC Tr.") 53:22-54:17); Ex. 23 (Affidavit of John Dittami dated June 1, 2017 ("Dittami Affidavit") ¶ 2).

20.     Dittami found that FXCM's external liquidity providers were using unnecessary, defensive  tactics,  including  a  failure  to  offer  sufficient  liquidity  and  overly  aggressive  use  of "last look."  Ex. 21 (Niv CFTC Tr. 24:6-26:6).  "Last look" is the liquidity providers' ability to reject an order after it has been received.  Last look can be abused by liquidity providers to choose the order flow they prefer, while rejecting the rest.  Ex. 60 (Quality of Execution Study FAQ at 12).  Dittami concluded that there was room for significant improvement in the FXCM customer experience.  Ex. 21 (Niv CFTC Tr. 24:6-26:6); *see also* Ex. 24 (John Dittami April 7, 2016 Deposition Transcript ("Dittami CFTC Tr.") 50:24-51:14, 68:4-20).

21.     FXCM attempted to work with its liquidity providers to resolve the issues uncovered by Dittami, but these efforts were unsuccessful.  Ex. 6 (Niv Tr. 64:16-65:2).  FXCM asked Dittami to potentially set up a market making operation to fix these issues.  *Id.*

22.     In the fall of 2009 through the spring of 2010, Dittami developed a trading algorithm to provide customers with a better FX trading experience.  TAC ¶¶ 50, 52.  The trading algorithm was referred to internally at FXCM as Execution Enhancement Services ("EES").  Ex. 25 (November 4, 2009 e-mail with the subject "RE: A very important question for you").

23.     In March 2010, the EES trading algorithm was tested on a limited number of trades in Japan, but it never went live to FXCM's U.S. retail customers.  Ex. 6 (Niv Tr. 70:8-16, 81:19-82:2); Ex. 26 (March 19, 2010 e-mail with the subject "Re: Successful Trading Today").

24.     At that time, FXCM decided to halt the new venture and discussed termination of Dittami's employment.  FXCM's Chief Executive Officer, Drew Niv, testified under oath to the CFTC that, as a result of concerns raised by FXCM's compliance department, FXCM "wanted Mr. Dittami to separate and form what became Effex Trading, a separate company, they will be a market maker separately and join the other market makers."  Ex. 21 (Niv CFTC Tr. 60:15-61:4); *see also* Ex. 18 (Plaintiffs' Responses to RFAs at 28).

25.     Dittami resigned from FXCM on April 14, 2010.  In that resignation, Dittami recommended that he and FXCM release one another from their respective responsibilities under Dittami's employment agreement.  Ex. 27 (Termination Agreement, dated April 14, 2010).

26.     Dittami was therefore an employee of FXCM for a total of approximately seven months and his employment ended prior to FXCM going public in December 2010.  Ex. 19 (Dittami Employment Agreement); Ex. 27 (Termination Agreement, dated April 14, 2010); TAC

¶ 28.  Dittami was not an employee or a principal of FXCM at any point during the Class Period. Ex. 18 (Plaintiffs' Responses to RFAs at 26).

27.     At the time of his resignation, Dittami agreed that he would waive the termination payment owed by FXCM under his Employment Agreement and he would reimburse FXCM the monies it had invested in the development of the EES trading algorithm in exchange for (i) undisputed ownership of the EES system and hardware necessary to operate the system; (ii) temporary office space, segregated from FXCM's operations; and (iii) allow an entity he intended to form (*i.e.*, Effex) to trade, on an interim basis, utilizing credit available through FXCM's prime-of-prime business arrangement with Citibank, conditioned on a personal guarantee provided by him to FXCM.  Ex. 23 (Dittami Affidavit ¶ 4).

## IV.     Dittami Forms Effex, An Independent Company, To Serve As An External Liquidity Provider

28.     On March 23, 2010, Dittami formed an independent company called Effex to stream foreign currency prices and provide foreign currency execution services to FXCM and other FX counterparties.  Ex. 23 (Dittami Affidavit ¶ 4); Ex. 28 (Certificate of Formation of Effex Capital, LLC dated March 23, 2010); Ex. 24 (Dittami CFTC Tr. 30:7-9; 108:13-20); *see also* Ex. 18 (Plaintiffs' Responses to RFAs at 25).

29.     Shortly after its formation, Effex began operating as a forex liquidity provider utilizing the trading system and algorithms he helped develop and ultimately purchased from FXCM.  Ex. 23 (Dittami Affidavit ¶¶ 4, 7).

30.     Since its founding, Dittami and the Dittami Dynasty Trust have owned at least 93% of the issued and outstanding units of Effex.  Ex. 23 (Dittami Affidavit ¶ 10).

31.     No FXCM entity, employee, officer, board member, or affiliate has ever held any equity interest in Effex.  Ex. 23 (Dittami Affidavit ¶¶ 10, 13); Ex. 4 (Dittami Tr. 128:24-129:4).

32.     None of FXCM's employees, officers, or affiliates have ever been a member of Effex or had any equity interest in Effex.  Ex. 23 (Dittami Affidavit ¶¶ 10; 13).

33.     As Dittami testified, Effex was capitalized with his "personal funds."  Ex. 24 (Dittami CFTC Tr. 207:17–208:7).  Moreover, Effex paid FXCM for the intellectual property (trading system and algorithm) Dittami had created.  Ex. 4 (Dittami Tr. 82:16-84:9).

34.     However, consistent with the terms of Dittami's resignation, FXCM provided Effex access to $2 million in FXCM's prime-of-prime account with Citibank.  Ex. 23 (Dittami Affidavit, ¶ 4); Ex. 4 (Dittami Tr. 86:7–87:4); Ex. 29 (Secured Promissory Note, dated April 8, 2010).  In exchange, Dittami provided a personal guaranty.  Ex. 30 (Sole Recourse Guaranty and Pledge Agreement, dated April 8, 2010).

35.     FXCM provided similar prime-of-prime access and financial assistance to other liquidity providers with whom it had a trading relationship.  Ex. 31 (William Ahdout February 16, 2021 Deposition Transcript ("Ahdout Tr.") 98:2-99:23).

36.     In May 2010, mere months after having access to FXCM's prime-of-prime account with Citibank, Effex reimbursed FXCM for the investment FXCM had made in that prime-of-prime account.  Ex. 23 (Dittami Affidavit ¶¶ 4, 7); Ex. 4 (Dittami Tr. 370:20-24); Ex. 32 (May 17, 2010 e-mail with the subject "RE: Loan").

37.     In June 2010, Effex ceased using FXCM's prime-of-prime account with Citibank. Ex. 23 (Dittami Affidavit ¶ 7).

38.     In July 2010, Effex entered into its own prime broker agreement with Citibank. Ex. 23 (Dittami Affidavit ¶ 7).  At the same time, Effex cancelled the promissory note to FXCM which guaranteed the credit made available to Effex.  Ex. 23 (Dittami Affidavit ¶ 7).

39.     In April 2011, prior to the Class Period, Effex moved to its own office space in Jersey City, New Jersey.   Ex. 23 (Dittami Affidavit ¶ 8); Ex. 24 (Dittami CFTC Tr. 58:3-13, 177:20-178:7); *see also* Ex. 18 (Plaintiffs' Responses to RFAs at 25); TAC ¶ 9.

40.     As Dittami swore in an affidavit, Effex's operations were never controlled by FXCM.  Effex (1) hired, fired, and paid its own employees; (2) maintained its own independent bank accounts; (3) independently capitalized its prime broker relationship; (4) supplied all of its operating capital and risk capital; (5) provided FX retail pricing and execution services to over 30 counterparties (in addition to FXCM); (6) owned or leased all of its own computers, servers, and other equipment; (7) utilized its own proprietary trading software; (8) owned, operated, and maintained its own trading system; (9) leased its own office space; (10) had sole discretion to accept or reject trades; (11) retained all of Effex's trading profits; (12) assumed liability for all trading and operating losses and potential losses; and (13) had no common employees with FXCM.  Ex. 23 (Dittami Affidavit ¶ 15).

41.     Effex had other customers and provided liquidity to FX trading platforms other than FXCM.  Ex. 24 (Dittami CFTC Tr. 34:14-19, 41:24-43:15); Ex. 4 (Dittami Tr. 368:7-15); Ex. 23 (Dittami Affidavit ¶ 15); *see also* Ex. 18 (Plaintiffs' Responses to RFAs at 31).

42.     There was no relationship or correlation between Effex's profits and losses and FXCM's customers' profits and losses.  Ex. 23 (Dittami Affidavit ¶ 13).

43.     Effex did not have knowledge of customer positions, stops, limits or resting orders, nor did Effex derive this information from any source.  Ex. 23 (Dittami Affidavit ¶ 13).

## V.     FXCM and Effex Negotiate A Payment for Order Flow Agreement

44.     Beginning in the spring of 2010, FXCM and Dittami commenced negotiations concerning a trading relationship between FXCM and Effex.  *See, e.g.*, Ex. 33 (April 24, 2010 e-mail with the subject "Loan Documents").

45.     The parties considered and rejected a number of ways to structure their trading relationship.  Ultimately, FXCM and Effex agreed on and executed a Services Agreement.  Ex. 34 (Services Agreement dated March 1, 2010); *see also, e.g.*, Ex. 21 (Niv CFTC Tr. 159:6-19; 162:16-24).

46.     As part of the negotiations of the Services Agreement, the parties discussed, but FXCM ultimately rejected, a 70/30 profit-sharing agreement.  Ex. 24 (Dittami CFTC Tr. 132:21-133:5; 377:2-7); Ex. 35 (William Ahdout May 19, 2016 Deposition Transcript ("Ahdout CFTC Tr.") 114:24-115:4); *see also* Ex. 18 (Plaintiffs' Response to RFAs at 27, 29); ECF No. 240-3 (Barron Rebuttal at ¶ 33).

47.     As William Ahdout testified, FXCM rejected any proposal to enter into a profit-sharing agreement with Dittami, instead choosing to enter into an agreement where "Effex can pay FXCM a hard pay for flow dollar number."  Ex. 35 (Ahdout CFTC Tr. 117:9-118:8).

48.     Also, as part of these negotiations, FXCM and Effex discussed a potential option agreement under which FXCM would be able to purchase 70% of Effex for $1.00.  *See* Ex. 21 (Niv CFTC Tr. 159:6-19; 162:16-24); Ex. 6 (Niv Tr. 122:8-123:15); Ex. 36 (Alex Dick November 18, 2020 Deposition Transcript ("Dick Tr.") 297:22-298:13).

49.     Although Ahdout and Dittami signed the proposed option agreement on April 14, 2010, the parties did not view the agreement as valid or enforceable.  Ex. 37 (Option Agreement dated April 14, 2010); Ex. 21 (Niv CFTC Tr. 155:5-11, 159:6-19, 162:16-24); Ex. 38 (Acknowledgement and Confirmation dated November 20, 2015).

50.     Specifically, Niv testified that FXCM's legal team determined that it was not practicable for FXCM to have an option to buy out Effex and that the executed option agreement was "null and voided."  Ex. 6 (Niv Tr. 119:2-22).

51.     Likewise, Ahdout testified that "this Option Agreement was never a reality, it never even came to be in existence." Ex. 31 (Ahdout Tr. 134:21-135:11).

52.     Further, FXCM's Chief Financial Officer, Robert Lande, testified that, although he "remember[ed] having some discussions about options" with the accountants auditing FXCM's financials, "it was concluded that this option wasn't in force and so . . . there was nothing more to be done on that." Ex. 12 (Lande Tr. 99: 4-100:3).

53.     In noting why the Option Agreement was not terminated in writing until 2015, Alexander Dick, FXCM's Rule 30(b)(6) corporate representative stated that "the company didn't consider memorializing in writing necessary because the option didn't exist, the consideration never occurred." Ex. 36 (Dick Tr. 304:9-305:2).

54.     Effex similarly did not view the Option Agreement as valid and enforceable. Dittami testified that he "did not believe that [the Option Agreement] was consummated" and that "[t]his idea was thrown out early." Ex. 4 (Dittami Tr. 98:22-99:3; 101:4-9).

55.     Indeed, conversations among the parties subsequent to April 2010 indicate that draft option agreements were still being considered. *See, e.g.*, Ex. 40 (October 25, 2010 e-mail with the subject "FW: FXCM").

56.     For the avoidance of doubt, on November 20, 2015, the parties signed an Acknowledgement and Confirmation that stated that "Dittami and FXCM signed the document labeled 'Option Agreement' attached as Exhibit A" and "the Parties never effected the License Agreement contemplated as consideration for the Option Agreement." Ex. 38 (Acknowledgement and Confirmation dated November 20, 2015). It further stated "The Parties acknowledge and agree that no rights or obligations currently exist or ever existed as a result of

the Option document and that the Option Document currently has no, and has never had, any legal force or effect." *Id.*

## VI.     The Services Agreement And Payments for Order Flow

57.     Forex Capital Markets, LLC, the U.S. trading arm of FXCM, and Effex entered into a Services Agreement, dated March 1, 2010, under which Effex agreed to pay Forex Capital Markets, LLC a fixed monthly fee of $21 per million units of base currency for execution requests filled by Effex for Forex Capital Markets, LLC.   Ex. 34 (Services Agreement dated March 1, 2010); Ex. 23 (Dittami Affidavit ¶ 4); Ex. 1 (FXCM 2011 10-K at p. F-8).

58.     Thereafter, Effex and FXCM Holdings, LLC, a subsidiary of FXCM, executed a new Services Agreement formalizing their relationship, which terminated and superseded the Services Agreement dated March 1, 2010.   Ex. 41 (Services Agreement dated May 1, 2010); Ex. 1 (FXCM 2011 10-K at p. F-8).   That new Services Agreement had an effective date of May 1, 2010.   *Id.*

59.     The Services Agreement provided that:

FXCM shall receive from Effex a fee equal to $21.00 USD per million units of Base Currency . . . for the aggregated volume of Transactions executed via the Trading System (the 'Fees').   The Fee shall be calculated by FXCM on a monthly basis.   FXCM shall provide Effex an invoice for all unpaid Fees. . . . As used herein, 'Base Currency' means the first currency of the given currency pair as displayed on the FXCM Trade Station II platform.

Ex. 41 at Sect. 3.1 (Services Agreement dated May 1, 2010).

60.     Either FXCM or Effex could terminate the Services Agreement, for any reason or no reason, upon 30 days' notice.   Ex. 41 at Sect. 4 (Services Agreement dated May 1, 2010).

61.     There is no language in the Services Agreement indicating that FXCM was entitled to a proportionate share (70% or any other proportion) of Effex's profits.   *See generally* Ex. 41 (Services Agreement dated May 1, 2010).

62.     The signatories to the Services Agreement confirmed that it was a pay-for-flow agreement that was not tied to Effex's profits or losses.  Ex. 24 (Dittami CFTC Tr. 132:21-133:5); Ex. 22 (Milazzo CFTC Tr. 267:12-19); Ex. 35 (Ahdout CFTC Tr. 163:2-13 ("Whether he makes a profit or he makes a loss or he makes more money or he makes less money, the hard number is the hard number."), *see also* 119:17-120:12).   FXCM received a flat fee based on customer trading volume.  Ex. 41 at Sect. 3.1 (Services Agreement dated May 1, 2010); Ex. 24 (Dittami CFTC Tr. 132:21-133:5, 158:16-21).  Indeed, payments to FXCM were due and owing under the Services Agreement regardless of whether Effex made or lost money on the trades it filled for FXCM retail customers.  Ex. 23 (Dittami Affidavit ¶ 11).

63.     Payment invoices sent pursuant to the Services Agreement also confirm that the amount payable from Effex was based on the volume of customer trading that Effex executed that month, multiplied by the agreed fee.  *See, e.g.*, Ex. 42 (December 22, 2010 e-mail with the subject "Please pay"); Ex. 43 (February 17, 2011 e-mail with the subject "EFFEX – Rev and Receivable WP"); Ex. 44 (Joshua Rosenfeld December 9, 2020 Deposition Transcript 103:16-21); Ex. 45 (Compilation of all produced invoices from May 2010 to July 2014).

64.     Effex's order flow payments to FXCM did not increase if Effex made money on a particular trade or decrease if Effex lost money on a particular trade.   Ex. 18 (Plaintiffs' Responses to RFAs at 32-33); Ex. 23 (Dittami Affidavit ¶ 11).

65.     As a result, FXCM was not exposed to market risk and did not earn profits that were causally linked to customers' profits and losses.  Ex. 2 (Wilson-Taylor Report ¶ 11.e, "FXCM's payment for order flow agreement with Effex and use of Effex as a liquidity provider did not affect FXCM's market risk exposure"); *see also* Ex. 18 (Plaintiffs' Responses to RFAs at 32-33).

66.     At no point did Effex ever pay FXCM more than $21 per million, even when Effex earned more than $21 per million. Ex. 45 (Compilation of all produced invoices from May 2010 to July 2014); Ex. 4 (Dittami Tr. at 347:2-20).  For example, Dittami testified that, during certain periods of time, Effex's profit was as high as $35 per million of order flow, but Effex never paid FXCM more than the $21 per million agreed upon in the Services Agreement.  Ex. 4 (Dittami Tr. at 347:2-20).  Further, FXCM was not entitled to receive and did not receive any portion of the revenue or profit that Effex earned from its dozens of non-FXCM clients.  Ex. 23 (Dittami Affidavit ¶ 13); Ex. 24 (Dittami CFTC Tr. 41:24-43:5).

67.     FXCM and Effex renegotiated the "per million" fee in the Services Agreement at times between June 2011 and 2014 based on changing market conditions and the relative bargaining power of each party.  TAC ¶ 61; Ex. 23 (Dittami Affidavit ¶ 11); Ex. 4 (Dittami Tr. 219:20-23); Ex. 24 (Dittami CFTC Tr. 148:4-7); Ex. 6 (Niv Tr. 150:5-20); *see also* Ex. 18 (Plaintiffs' Responses to RFAs at 28-29).

68.     For example, on September 1, 2011, FXCM and Effex executed an amendment to the Services Agreement in which the fee was modified to $16 per million units of base currency. Ex. 46 (Amendment to Services Agreement dated September 1, 2011).

69.     Beginning in 2013, Effex paid different rates for certain currency pairs ($3 per million units for USD/JPY trades and $6 per million units for EUR/USD trades).  Ex. 4 (Dittami Tr. 274:16-275:22, 278:23-279:3); Ex. 61 (June 21, 2013 e-mail with the subject "RE: EUR/USD").  However, at all times, payments made pursuant to the Services Agreement were based on notional volume of foreign currency of trades handled by Effex.  Ex. 23 (Dittami Affidavit ¶ 11).

70.     Renegotiation of a payment for order flow fee over the course of a multi-year relationship is not unusual.  Ex. 2 (Wilson-Taylor Report ¶ 94).

71.     Niv testified that the reason the Services Agreement fees were renegotiated was because spreads tightened over time, making the $21 per million fee impracticable.  Ex. 6 (Niv Tr. at 141:12–142:12).

72.     FXCM's independent financial statement auditor, Ernst & Young LLP ("EY"), confirmed in the course of a number of audits that the payments Effex made to FXCM matched the amounts payable on the invoices.  *See, e.g.*, Ex. 47 (EY workpaper regarding June 2013 invoice); Ex. 48 (EY workpaper regarding Effex journal entries); Ex. 49 (EY workpaper regarding February 2012 invoice).  Indeed, EY was provided the Services Agreement, Effex invoices, and Effex payment receipts, which were incorporated into EY's audit workpapers.  *See, e.g.*, Ex. 50 (Termination of Services Agreement in EY workpapers); Ex. 47 (EY workpaper regarding June 2013 invoice); Ex. 51 (Amendment to Services Agreement in EY workpapers).

73.     The revenue FXCM earned from Effex's monthly payments for order flow was disclosed as such in FXCM's financial statements.  Ex. 12 (Lande Tr. 42:15-24); *see also* Ex. 17 (FXCM 2010 Form 10-K at 1); Ex. 1 (FXCM 2011 Form 10-K at 1); Ex. 7 (FXCM 2012 Form 10-K at 46); Ex. 8 (FXCM 2013 Form 10-K at 40); Ex. 9 (FXCM 2014 Form 10-K at 42); *see also* Ex. 18 (Plaintiffs' Responses to RFAs at 4-8).

74.     FXCM and Effex executed a Termination of Services Agreement dated August 25, 2014.  Ex. 39 (Termination of Services Agreement dated August 25, 2014); Ex. 18 (Plaintiffs' Responses to RFAs at 7-8).  The Termination of Services Agreement provides that "[e]ffective as of August 1, 2014, both parties agree to terminate Services Agreement dated May

1, 2010; and both parties waive the requirement of 30 days prior written notice for termination to be effective." Ex. 39 (Termination of Services Agreement dated August 25, 2014).

75.     The Services Agreement was terminated because the UK Financial Conduct Authority changed a regulation affecting FXCM's ability to receive payment for order flow in the United Kingdom.  Ex. 6 (Niv. Tr. 165:6-20, 175:9-13); Ex. 35 (Ahdout CFTC Tr. 259:18-260:10, 261:18-24).

76.     Effective August 1, 2014, FXCM stopped receiving payments for order flow from Effex.  Ex. 53 (FXCM Form 10-Q for Q3 2014 at 40); Ex. 23 (Dittami Affidavit ¶ 11); Ex. 39 (Termination of Services Agreement dated August 25, 2014); Ex. 54 (August 14, 2014 e-mail with the subject "RE: PFOF"); Ex. 6 (Niv Tr. 156:9-19); *see also* Ex. 18 (Plaintiffs' Responses to RFAs at 7-8).

## VII.   Payment For Order Flow Was Not Uncommon Or Unlawful

77.     During the Class Period, payment for order flow was a "standard practice."  Ex. 6 (Niv Tr. 110:22-111:18).

78.     In the U.S. equities market, large brokers such as Charles Schwab and Interactive Brokers received payments for order flow during the Class Period.  *See, e.g.*, Ex. 55 (The Charles Schwab Corporation 2013 Form 10-K at 25); Ex. 56 (Interactive Brokers Group, Inc. 2013 Form 10-K at 52).

79.     Many institutional FX trading platforms in Europe receive payments for order flow from liquidity providers.  Ex. 2 (Wilson-Taylor Report ¶ 60).

80.     FXCM itself paid for order flow received from introducing brokers.  Ex. 22 (Milazzo CFTC Tr. 90:4-15).  Indeed, FXCM paid $76.6 million to introducing brokers globally in 2012.  Ex. 7 (FXCM 2012 Form 10-K at 44, 46-47).

81.     FXCM also had pay for flow arrangements with entities other than Effex.  Ex. 18 (Plaintiffs' Responses to RFAs at 30).

82.     Specifically, Goldman Sachs paid FXCM for order flow prior to 2010.  Ex. 35 (Ahdout CFTC Tr. 131:13-23, 201:21-202:3); Ex. 21 (Niv CFTC Tr. 140:16-141:12, 142:14-143:5); *see also* Ex. 18 (Plaintiffs' Responses to RFAs at 30).  And BNP paid FXCM for order flow during the Class Period.  Ex. 35 (Ahdout CFTC Tr. 132:9-12); Ex. 21 (Niv CFTC Tr. 140:16-141:12, 142:14-143:5, 208:7-14); Ex. 24 (Dittami CFTC Tr. 527:7-20); Ex. 57 (November 25, 2013 e-mail with the subject "RE: Payments for Order Flow"); *see also* Ex. 18 (Plaintiffs' Responses to RFAs at 30).

83.     When Goldman Sachs was paying FXCM for order flow, it received advantages from FXCM, including but not limited to "[t]op of book, ties, wider spread on other liquidity providers."  Ex. 35 (Ahdout CFTC Tr. 251:4-11); *see also* Ex. 18 (Plaintiffs' Responses to RFAs at 31).

## VIII.   FXCM's December 2010 IPO

84.     On December 7, 2010, FXCM completed its initial public offering ("IPO").  TAC ¶ 28; Ex. 7 (FXCM 2012 Form 10-K at F-11).

85.     At the time of FXCM's IPO, Dittami was not an employee, officer, or director of FXCM.  Ex. 23 (Dittami Affidavit ¶ 4).

86.     Likewise, at the time of the IPO, Effex also no longer used FXCM's prime-of-prime account at Citibank.  Ex. 23 (Dittami Affidavit ¶ 7).  It also had repaid any funding that FXCM had initially provided.  Ex. 23 (Dittami Affidavit ¶ 7); Ex. 4 (Dittami Tr. 370:20-24); Ex. 32 (May 17, 2010 e-mail with the subject "RE: Loan").

IX.     **Effex's Performance As A Liquidity Provider**

87.     Effex was a liquidity provider of FXCM beginning in 2010 and continuing through 2017.  *See* Ex. 23 (Dittami Affidavit ¶¶ 4, 11, 36).

88.     FXCM's management believed that Effex's presence as an available liquidity provider was in the best interests of FXCM's customers.  *See* Ex. 6 (Niv Tr. 94:23-95:18, 99:2-101:20); Ex. 31 (Ahdout Tr. 165:7-14).

89.     Niv's "mo[d]us operandi constantly" was to make changes to the retail business only if they were consistent with the best interests of both FXCM and its customers.  Ex. 24 (Dittami CFTC Tr. 313:14-314:8).

90.     Niv further testified that FXCM "needed to keep being competitive and needed to being on whatever provided the best customer experience and most competitive customer experience is what was going to . . . carry us forward and that—Effex [was] part of that conversation, right." Ex. 6 (Niv Tr. 46:15-47:13).

91.     FXCM's customers benefited from Effex's presence from the early stages of its existence.  Specifically, on April 22, 2010, Niv stated to David Sakhai and Ahdout that "all evidence is pointing to (early signs) that volume is increasing because clients are getting executed faster and with price improvements as [Dittami] passes market order price improvements to customers."  Ex. 58 (April 22, 2010 e-mail with the subject "Re: Slippage on limits").

92.     FXCM rewarded Effex and other liquidity providers with lower markups to their price quotes when those liquidity providers provided a higher level of service in terms of pricing and execution.  Ex. 22 (Milazzo CFTC Tr. 198:10-25, 213:4-215:9).  By providing lower markups to liquidity providers that provided higher levels of service to FXCM, the Company was able to provide its customers with a better experience through lower reject rates, higher

consistency and prices, and better overall spreads.  Ex. 59 (Evan Milazzo December 2, 2020 Deposition Transcript ("Milazzo Dec. 2, 2020 Tr.") 57:12-24).

93.     During the Class Period, when Effex and another liquidity provider both offered the best markup-adjusted price to FXCM, Effex would win the tie on certain currency pairs and receive the customer order if it provided superior service in certain areas identified by FXCM as contributing to the best customer experience possible, namely, reject rate and size quoted.  Ex. 6 (Niv Tr. 91:16-93:18); Ex. 4 (Dittami Tr. 297:13-17); Ex. 60 (Quality of Execution Study FAQ at 11-12).

94.     Effex frequently won ties because it often offered larger trading sizes than other liquidity providers and matched the best markup-adjusted bid or offer from other liquidity providers.  Ex. 6 (Niv Tr. 90:7-91:7); *see also* Ex. 61 (June 21, 2013 e-mail with the subject "RE: EUR/USD").  Other liquidity providers won ties as well during the Class Period, and Effex's ability to win ties did not expand across all currency pairs at FXCM.  Ex. 4 (Dittami Tr. 298:15-299:4).

95.     FXCM allowed Effex to view all quotes that FXCM received from liquidity providers, whereas the customer-facing data feeds included only aggregated data.  Ex. 59 (Milazzo Dec. 2, 2020 Tr. 121:12-19).  FXCM would have considered providing similar access to other liquidity providers had they requested it.  Ex. 52 (Evan Milazzo December 1, 2020 Deposition Transcript 46:24-47:16, 118:19-119:7).

96.     Niv testified that "Effex was always by far and away the best performer on all the metrics and there was a whole slew of metrics. And, you know, that's why, you know, over the years from 2010 to 2015, '14, you know, our trading spreads, you know, declined by 90 percent,

right. So the improvement to customers was pretty significant, almost 90 percent."  Ex. 6 (Niv Tr. 94:11-95:18).

97.     On February 13, 2015, FXCM prepared a memorandum analyzing the benefits to its customers as a result of Effex's pricing.  Ex. 62 (February 13, 2015 e-mail with the subject "FW: FXCM's submission to NFA – Follow up").  This memorandum was provided to the NFA. *Id.*  As detailed in the memorandum, FXCM's analysis found that Effex's pricing resulted in approximately $123 million of savings for FXCM's customers through lower reject rates, added depth of liquidity at the best price available (top of the book), and spread protection during volatile periods. *Id.*

98.     The memorandum also stated that "Effex dramatically improved FXCM's pricing for the benefit of FXCM's clients and created no negative effect or disadvantage for FXCM's clients."  Ex. 62 (February 13, 2015 e-mail with the subject "FW: FXCM's submission to NFA – Follow up"); Ex. 18 (Plaintiffs' Responses to RFAs at 34).

99.     In addition, the memorandum stated: "Without Effex as one of FXCM's liquidity providers, FXCM's clients collectively would have paid approximately $123 million dollars more for the same trades, just over the period of April 2011 through January 2015."  Ex. 62 (February 13, 2015 e-mail with the subject "FW: FXCM's submission to NFA – Follow up"); Ex. 18 (Plaintiffs' Responses to RFAs at 34-35).

100.    This memorandum further states:  "FXCM engaged Effex to compete with the banks to dramatically improve pricing offered to FXCM's clients. And Effex did just that, with astonishing benefits for FXCM's clients."  Ex. 62 (February 13, 2015 e-mail with the subject "FW: FXCM's submission to NFA – Follow up"); Ex. 18 (Plaintiffs' Responses to RFAs at 34-35).

## X.      FXCM's Compliance With GAAP

101.    GAAP is a set of accounting principles promulgated by the Financial Accounting Standards Board, an independent body designated by the SEC to set accounting standards for public companies.  Ex. 63 (Linsmeier Report ¶ 22).  The Accounting Standards Codification ("ASC") is the source of GAAP for public companies.  *Id.*

102.    GAAP is a set of principles that tolerate a range of reasonable accounting treatments.  Ex. 18 (Plaintiffs' Responses to RFAs at 16-17).

103.    EY audited FXCM's Form 10-Ks for fiscal years 2011 through 2016, and it determined that the financial statements for each of those years fairly presented, in all material respects, the consolidated financial position of FXCM in accordance with GAAP.  *See* Ex. 1 (FXCM 2011 Form 10-K at F-2); Ex. 7 (FXCM 2012 Form 10-K at F-2); Ex. 8 (FXCM 2013 Form 10-K at F-2); Ex. 9 (FXCM 2014 Form 10-K at F-2); Ex. 10 (FXCM 2015 Form 10-K at F-2); Ex. 11 (FXCM 2016 Form 10-K at F-2); *see also* Ex. 18 (Plaintiffs' Responses to RFAs at 14-16).

104.    Niv testified that EY, outside counsel, and the FXCM Board of Directors reviewed FXCM's annual and quarterly reports before they were filed.  Ex. 6 (Niv Tr. 48:17-24).

105.    The scope of EY's audit opinions included FXCM's variable interest entities, related party transactions, and retail trading revenue.  *See, e.g.*, Ex. 1 (FXCM 2011 Form 10-K); Ex. 7 (FXCM 2012 Form 10-K); Ex. 8 (FXCM 2013 Form 10-K); Ex. 9 (FXCM 2014 Form 10-K); Ex. 10 (FXCM 2015 Form 10-K); Ex. 11 (FXCM 2016 Form 10-K at F-2); *see also* Ex. 18 (Plaintiffs' Responses to RFAs at 16).

106.    ASC 810 provides the controlling methodology for determining whether a reporting entity is required to consolidate another entity as a Variable Interest Entity ("VIE").  ECF No. 240-1 (Barron Report ¶ 136); Ex. 63 (Linsmeier Report ¶¶ 36, 38).

22

107.    ASC 810 prescribes a three-step test: (1) whether the entity considered for consolidation is a VIE; (2) whether the reporting entity has a variable interest in the VIE; and (3) whether the reporting entity the primary beneficiary of the VIE.  ECF No. 240-3 (Barron Rebuttal ¶ 40); Ex. 63 (Linsmeier Report ¶ 63).

108.    Whether an entity is considered a VIE is determined by examining (1) whether there is sufficient equity at risk and (2) whether the equity holders in the entity have the power to direct the significant activities of the entity, including the obligation to absorb losses or the right to receive residual returns.  Ex. 63 (Linsmeier Report ¶ 66); ECF No. 240-3 (Barron Rebuttal ¶ 49).

109.    Whether the reporting entity has a variable interest in the VIE is determined by examining whether the reporting entity holds interests in the VIE that will absorb portions of the VIE's expected losses or receive portions of the VIE's expected residual returns.  Ex. 63 (Linsmeier Report ¶ 45); ECF No. 240-3 (Barron Rebuttal ¶ 65).

110.    An entity is a primary beneficiary of a VIE if it has the power to direct its activities and the obligation to absorb its losses or receive its profits.  ECF No. 240-1 (Barron Report ¶ 140); Ex. 63 (Linsmeier Report ¶ 95).

111.    Defendants' accounting expert, Thomas Linsmeier, has opined the available evidence indicates that Dittami did have sufficient equity at risk in Effex, which he founded and capitalized using his personal funds.  Ex. 63 (Linsmeier Report ¶ 71).

112.    ASC 850 provides the controlling methodology for determining whether a reporting entity is required to disclose another entity as a related party.  ECF No. 240-1 (Barron Report ¶ 121); Ex. 63 (Linsmeier Report ¶ 53).

113.    ASC 850 provides that related parties are those that are: (a) affiliates of the entity; (b)  entities for which investments in their equity securities would be required to be accounted for by the equity method by the investing entity; (c) trusts for the benefit of employees, such as pension and profit-sharing trusts that are managed by or under the trusteeship of management; (d) principal owners of the entity and members of their immediate families; (e) management of the entity and members of their immediate families; (f) other parties with which the entity may deal if one party controls or can significantly influence the management or operating policies of the other to an extent that one of the transacting parties might be prevented from fully pursuing its own separate interests; or (g) other parties that can significantly influence the management or operating policies of the transacting parties or that have an ownership interest in one of the transacting parties and can significantly influence the other to the extent that one or more of the transacting parties might be prevent from fully pursuing its own separate interests.   ECF No. 240-1 (Barron Report ¶ 122); Ex. 63 (Linsmeier Report ¶ 54).

114.    EY has never required that FXCM restate its prior year financial statements with respect to its contractual relationship with Effex.  *See* Ex. 65 (David Stollow January 25, 2021 Deposition Transcript 215: 19-23).  And FXCM has never restated its financial statements.  *See* Ex. 18 (Plaintiffs' Responses to RFAs at 14).

115.    On March 1, 2017, after FXCM's announced settlement with the NFA and CFTC (discussed *infra*), EY prepared a memorandum to FXCM's audit file titled "FXCM Inc.'s settlements with US regulators."  Ex. 66 (Memorandum titled "FXCM Inc.'s settlements with US regulators"); *see also* Ex. 18 (Plaintiffs' Responses to RFAs at 17-18); Ex. 67 (FXCM Form 8-K dated Feb. 7, 2017).  In that memorandum, EY stated that it had determined that "[t]he [Effex] arrangement for order flow was included in the income statement and disclosed in the FXCM

Inc. financial reporting in prior Form 10-Ks.  The arrangement was appropriately accounted for and followed the contractual parties to the arrangement. . . .  [W]e believe that the previously issued financial statements for [FXCM] continue to be appropriate and are in accordance with US GAAP."  Ex. 66 (Memorandum titled "FXCM Inc.'s settlements with US regulators").  EY concluded that "[b]ased on all of the procedures mentioned above, we believe that there was no impact to financial statement reporting as a result of the regulatory matters in the current or prior years . . . ."  *Id.* at EY-GBI-00004269.

116.    Further, a memorandum from FXCM dated March 14, 2017 entitled "Evaluation of Regulatory Matters & Impact on 2016 Financial Statements" states "FXCM had no Board representation, no equity or voting interests, no management representation or rights and had only committed to providing Effex connectivity to its platform in return for a certain $/million of volume traded for volume executed by Effex through a service agreement. It would not appear that FXCM had power over Effex and not consolidating was appropriate."  Ex. 68 ("Evaluation of Regulatory Matters & Impact on 2016 Financial Statements" Memorandum); *see also* Ex. 18 (Plaintiffs' Responses to RFAs at 18).

117.    Lande testified that FXCM's financial statements correctly determined that Effex was not a VIE of FXCM because FXCM had no power over Effex, nor did it absorb any losses. Ex. 12 (Lande Tr. 83:21-87:2).

## XI.    SNB Flash Crash

118.    On January 15, 2015, the Swiss National Bank announced that it would immediately end its three-year-old peg of 1.20 Swiss francs to one euro, just days after it had assured the market that it had no intention of removing the currency peg.  This reversal resulted in widespread market disruption, causing a drop of nearly 30% in the value of the euro relative to the Swiss franc.  Ex. 69 ("Swiss franc jumps 30 percent after Swiss National Bank dumps euro

ceiling," Reuters); Ex. 64 ("Swiss Franc Soars, Stocks Tank as Euro Peg Scrapped," CNBC); *see also* Ex. 18 (Plaintiffs' Responses to RFAs at 8).

119.    FXCM customers with positions in this currency pair lost more than $275 million, and FXCM faced a brief regulatory capital shortfall for the first and only time in its 17-year history.  Ex. 10 (FXCM 2015 Form 10-K at 13); Ex. 70 ("Swiss Franc Shocks Some FX Brokers; Regulators move in," Reuters); *see also* Ex. 18 (Plaintiffs' Responses to RFAs at 9).

120.    As a result of the SNB Flash Crash, the share price of FXCM stock decreased from $167.00 per share on January 15, 2015 to $16.00 per share on January 20, 2015.  Ex. 71 ("FXCM -Stock Price History," Macrotrends); *see also* Ex. 18 (Plaintiffs' Responses to RFAs at 10).

121.    Par for the FXCM Notes was $100.  Ex. 72 (Expert Report of Terrence Hendershott, Ph.D., dated June 10, 2021 ¶ 95).  After the SNB Flash Crash, the FXCM Notes traded below par.  Ex. 73 (Expert Report of Terrence Hendershott, Ph.D., dated June 12, 2020 ("2020 Hendershott Report") ¶ 42).

122.    The price of FXCM's Securities never returned to their previous trading levels during the Class Period.  Ex. 73 (2020 Hendershott Report, Ex. 5).

123.    On January 16, 2015, FXCM entered into a credit agreement with Leucadia for a $300 million, two-year term loan.  Ex. 74 (FXCM Form 8-K dated January 19, 2015); Ex. 18 (Plaintiffs' Responses to RFAs at 9).

124.    On January 19, 2015, FXCM announced the terms of its credit agreement with Leucadia, which had "an initial interest rate of 10% per annum, increasing by 1.5% per annum each quarter for so long as it is outstanding."  Ex. 74 (FXCM Form 8-K dated January 19, 2015); Ex. 18 (Plaintiffs' Responses to RFAs at 9).

**XII.    CFTC and NFA Settlements**

125.    During the Class Period, FXCM repeatedly disclosed the risk of regulatory inquiries.  *See, e.g.*, Ex. 1 (FXCM 2011 Form 10-K at 13, 15-16); Ex. 7 (FXCM 2012 Form 10-K at 12, 17); Ex. 8 (FXCM 2013 Form 10-K at 10, 14); Ex. 9 (FXCM 2014 Form 10-K at 14, 16).

126.    On February 6, 2017, FXCM announced simultaneous regulatory settlements with the NFA and the CFTC against Defendants concerning FXCM's business relationship with Effex and alleged regulatory violations.   Ex. 67 (FXCM Form 8-K dated Feb. 7, 2017); Ex. 18 (Plaintiffs' Responses to RFAs at 11).

127.    The CFTC's Order Instituting Proceedings Pursuant to Sections 6(c) and 6(d) of the Commodity Exchange Act, Making Findings, and Imposing Remedial Sanctions (the "CFTC Order") dated February 6, 2017 provides:   "Without admitting or denying the findings or conclusions herein, Respondents consent to the entry and acknowledge service of this Order . . . ." TAC, Ex. 1 at 1.  The CFTC Order also states:  "Nor do Respondents consent to the use of the Offer or this Order, or the findings or conclusions in this Order consented to in the Offer, by any other party in any other proceeding."  *Id.* at n.1.

128.    The NFA's Decision dated February 6, 2017 provides:  "FXCM, Ahdout, Niv and Ornit Niv submitted an Offer in which they neither admitted nor denied the allegations of the Complaint and proposed to settle the charges against them" on specified terms.  Ex. 75 (NFA Decision).

129.    Pursuant to the NFA Decision and CFTC Order, FXCM withdrew from its business in the United States.  Ex. 67 (FXCM Form 8-K dated Feb. 7, 2017); Ex. 18 (Plaintiffs' Responses to RFAs at 11).

130.    In the CFTC Order, the CFTC did not allege that Defendants had violated GAAP. *See* TAC Ex. 1; *see also* Ex. 18 (Plaintiffs' Responses to RFAs at 12).

131.    In the NFA Decision, the NFA did not allege that Defendants had violated GAAP. Ex. 75 (National Futures Association Decision dated February 6, 2017); *see also* Ex. 18 (Plaintiffs' Responses to RFAs at 12).

132.    Analyst reports that followed the disclosure of the CFTC Order and NFA Decision do not contain any mention of FXCM's accounting.   Ex. 76 ("Leucadia National Corporation: FXCM Negative Developments But Likely a Relatively Small Financial Impact on LUK," Oppenheimer); Ex. 77 ("FXCM Settles with Regulators, Plans to Exit U.S. Business," Cowen and Company).

133.    Plaintiffs' damages expert, Dr. Adam Werner, could not even identify a single corrective disclosure related to FXCM's compliance with GAAP during his deposition.   Ex. 78 (Adam Werner June 4, 2021 Deposition Transcript 487:19-489:19).

134.    The NFA Complaint and CFTC Order do not allege that FXCM had any voting power with Effex.   TAC Ex. 1 and Ex. 2; *see also* Ex. 18 (Plaintiffs' Responses to RFAs at 13).

**XIII.   Facts Relevant to 683 Capital's Individual Claims**

135.    683 Capital's first investment in FXCM securities occurred the day after the SNB Flash Crash, January 16, 2015.   Ex. 18 (Plaintiffs' Responses to RFAs at 20).   That was five months after the termination of FXCM's pay for flow agreement with Effex.   *Compare* Ex. 53 (FXCM Form 10-Q for Q3 2014 at 40) *with* Ex. 18 (Plaintiffs' Responses to RFAs at 20).

136.    683 Capital's first investment in FXCM securities occurred after FXCM disclosed in its Form 10-Q for the quarterly period ended September 30, 2014 that it "no longer receive[d] payments for order flow."   *Compare* Ex. 53 (FXCM Form 10-Q for Q3 2014 at 40) *with* Ex. 18 (Plaintiffs' Responses to RFAs at 21).

137.    Joseph Patt, one of 683 Capital's partners, testified as its corporate designee pursuant to Fed. R. Civ. P. 30(b)(6).  Ex. 16 (Joseph S. Patt April 23, 2020 Deposition Transcript ("Patt Tr.") 12:24-13:8)

138.    Patt testified only that 683 Capital looked at the Company's "latest documents," the "10-K or 10 – and 8, you know 10-Qs."  Ex. 16 (Patt Tr. 33:20-25).

139.    The only documents Patt could specifically recall reviewing were the indenture and intercreditor agreement for the FXCM Notes, which Plaintiffs have not alleged are misleading.  Ex. 16 (Patt Tr. 32:23-33:13); *see generally* TAC.

140.    To the extent that 683 Capital reviewed any of FXCM's SEC filings, Patt testified that he examined the portions concerning FXCM's balance sheets and investments, and the rescue financing from Leucadia.  Ex. 16 (Patt Tr. 33:2-13).

141.    Patt's testimony indicates that 683 Capital's decision to purchase the FXCM Notes was based on its calculation that the bonds were undervalued.  Ex. 16 (Patt Tr. 77:13-78:7).  One of 683 Capital's investment strategies is to look for opportunities to capitalize on "dislocation or distress" in the market.  Ex. 16 (Patt Tr. 23:2-24:8).

142.    683 Capital viewed the SNB Flash Crash as a dislocation, and FXCM as a distressed company.  Ex. 16 (Patt Tr. 73:3-18; 74:3-21).

143.    Patt testified that 683 Capital decided to invest in the FXCM Notes based on its calculation that the FXCM Notes were "really cheap," and that they were worth a lot more than their current price reflected.  Ex. 16 (Patt Tr. 77:13-78:7; 129:4-13).

144.    683 Capital calculated that, despite FXCM's losses stemming from the SNB Flash Crash, it appeared from FXCM's balance sheet that given the value of the Company's assets and

what the business had been worth, that despite the FXCM Notes "trading in the forties," they were likely "to recover a hundred cents on the dollar."  Ex. 16 (Patt Tr. 77:13-78:7).

145.    To the extent that 683 Capital reviewed some unidentified FXCM SEC filings, its primary focus was on information relevant to whether the FXCM Notes would regain their value, *i.e.*, the portions concerning FXCM's balance sheets and investments, and the rescue financing from Leucadia.  Ex. 16 (Patt Tr. 32:23-33:13).

146.    Patt testified that he did not "know what that is," when asked during his deposition if he had any understanding of the term "No Dealing Desk."  Ex. 16 (Patt Tr. 139:24-140:2).

147.    Patt testified that he understood that the basis of 683 Capital's securities fraud claim was not that FXCM was secretly engaged in a profit-sharing relationship with Effex, but that they were selling their customer's information to Effex.  Ex. 16 (Patt Tr. 142:16-144:14).

Dated: September 9, 2021

KING & SPALDING LLP

*/s/ Israel Dahan*
Israel Dahan
Peter Isajiw
Evan C. Ennis
Ryan Gabay
KING & SPALDING LLP
1185 Avenue of the Americas
New York, New York 10036-2601
Tel: (212) 556.2100
Fax: (212) 556.2200

Chelsea Corey
KING & SPALDING LLP
300 S. Tryon Street, Suite 1700
Charlotte, North Carolina 28202

Tel: (704) 503.2575
Fax: (704) 503.2622

*Attorneys for Defendants Global Brokerage, Inc. f/k/a/ FXCM, Inc., Dror Niv, and William Ahdout*