**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| In re Global Brokerage, Inc. f/k/a FXCM Inc. Securities Litigation | Master File No. 1:17-cv-00916(RA)(BCM) |
| | CLASS ACTION |
| This Document Relates To: All Actions | |

**PLAINTIFFS' MEMORANDUM OF LAW IN OPPOSITION TO DEFENDANTS' MOTION FOR SUMMARY JUDGMENT**

**TABLE OF CONTENTS**

I.   PRELIMINARY STATEMENT ............................................................................... 1

II.  SUMMARY OF MATERIAL FACTS ................................................................... 2

    A.   Background of FXCM ................................................................................. 2

    B.   FXCM Hires Dittami to Create an In-House Liquidity Provider ........................... 3

    C.   FXCM and Effex Set up a Financial Relationship Mirroring FXCM's Profit-Sharing Arrangement with Dittami.......................................................... 5

    D.   Effex's Payments to FXCM Varied With Effex's Trading Profits........................ 8

    E.   Effex Depended on FXCM, Which Provided Effex Extensive Support and Granted Trading Advantages So Effex Would Win More Trading Volume ........ 11

    F.   Defendants Tried to Conceal FXCM's Relationship With Effex ......................... 11

    G.   Regulators Investigate FXCM's Relationship with Effex .................................... 14

III. ARGUMENT........................................................................................................ 16

    A.   Defendants Bear a Heavy Burden on Their Motion for Summary Judgment....... 16

    B.   The Evidence Supports a Finding that Defendants Made Material Misrepresentations and Omissions ....................................................... 17

        1.   Defendants' Statements About FXCM Offering Agency Model Trading Were False and Misleading....................................................... 18

        2.   Defendants' Statements and Omissions About Order Flow Payments Were False and Misleading.................................................. 21

        3.   FXCM's Financial Statements Violated GAAP and Were Misleading.... 26

            a.   FXCM Was Required to Disclose Effex as a Related Party......... 27

            b.   FXCM Was Required to Consolidate Effex as a VIE.................. 29

            c.   That FXCM's Auditor Approved FXCM's Financial Statements Does Not Vindicate Defendants' GAAP Violations.................... 30

    C.   Plaintiffs' Evidence Supports a Finding that Defendants Acted With Scienter ... 32

        1.   Plaintiffs' Evidence Shows Defendants' Conscious Misbehavior or Recklessness in Concealing FXCM's Relationship With Effex.............. 34

       2.     Defendants' GAAP Violations Were Made with Scienter ...................... 36

D.     Plaintiffs' Evidence Supports a Finding of Loss Causation .................................. 39

E.     Plaintiffs' Evidence Supports a Finding that Plaintiffs and the Class Suffered Compensable Damages ........................................................................................ 43

F.     Plaintiffs' Evidence Supports 683 Capital's Individual Claims .......................... 46

G.     Plaintiffs' Evidence Supports Their Claims Under Section 20(a) ....................... 49

IV.  CONCLUSION .................................................................................................................. 50

# TABLE OF AUTHORITIES

Page(s)

**Cases**

*Acticon AG v. China N. E. Petroleum Holdings Ltd.*,
   692 F.3d 34 (2d Cir. 2012) ......................................................................................... 43

*Affiliated Ute Citizens of Utah v. United States*,
   406 U.S. 128 (1972) .................................................................................................... 43

*Anderson v. Liberty Lobby, Inc.*,
   477 U.S. 242 (1986) .................................................................................................... 17

*ATSI Commc'ns, Inc. v. Shaar Fund, Ltd.*,
   493 F.3d 87 (2d Cir. 2007) ................................................................................... 32, 46

*AUSA Life Ins. Co. v. Ernst & Young*,
   206 F.3d 202 (2d Cir. 2000) ....................................................................................... 32

*Baena v. Woori Bank*,
   515 F. Supp. 2d 414 (S.D.N.Y. 2007) ........................................................................ 36

*Barrows v. Seneca Foods Corp.*,
   512 F. App'x 115 (2d Cir. 2013) ................................................................................ 17

*Basic Inc. v. Levinson*,
   485 U.S. 224 (1988) .................................................................................................... 42

*Boguslavsky v. Kaplan*,
   159 F.3d 715 (2d Cir. 1998) ....................................................................................... 50

*Boston Ret. Sys. v. Alexion Pharms., Inc.*,
   No. 3:16-cv-2127(AWT), 2021 WL 3675180 (D. Conn. Aug. 19, 2021) .................. 50

*Celotex Corp. v. Catrett*,
   477 U.S. 317 (1986) .................................................................................................... 16

*Cuff ex rel. B.C. v. Valley Cent. Sch. Dist.*,
   677 F.3d 109 (2d Cir. 2012) ....................................................................................... 16

*Fine v. Am. Solar King Corp.*,
   919 F.2d 290 (5th Cir. 1990) (reversing ..................................................................... 27

*Frost v. New York City Police Dep't*,
   980 F.3d 231 (2d Cir. 2020) ....................................................................................... 16

*Gabriel Cap., L.P. v. NatWest Fin., Inc.*,
   177 F. Supp. 2d 169 (S.D.N.Y. 2001) ...................................................................... 47

*Gallup v. Clarion Sintered Metals, Inc.*,
   489 F. App'x 553 (3d Cir. 2012) .............................................................................. 47

*Gruber v. Price Waterhouse*,
   776 F. Supp. 1044 (E.D. Pa. 1991) .......................................................................... 48

*Halperin v. eBanker USA.com, Inc.*,
   295 F.3d 352 (2d Cir. 2002) ..................................................................................... 18

*In re Burlington Coat Factory Sec. Litig.*,
   114 F.3d 1410 (3d Cir. 1997) ................................................................................... 26

*In re Chicago Bridge & Iron Co. N.V. Sec. Litig.*,
   No. 17 CIV. 01580 (LGS), 2019 WL 5287980 (S.D.N.Y. Oct. 18, 2019) .............. 43

*In re Cirrus Logic Sec. Litig.*,
   946 F. Supp. 1446 (N.D. Cal. 1996) ........................................................................ 38

*In re Columbia Sec. Litig.*,
   155 F.R.D. 466 (S.D.N.Y. 1994) .............................................................................. 33

*In re Kidder Peabody Sec. Litig.*,
   10 F. Supp. 2d 398 (S.D.N.Y. 1998) ........................................................................ 33

*In re Lehman Bros. Sec. & ERISA Litig.*,
   903 F. Supp. 2d 152 (S.D.N.Y. 2012) ................................................................ 37, 38

*In re LIBOR-Based Fin. Instruments Antitrust Litig.*,
   No. 11 MDL 2262 (NRB), 2015 WL 6243526 (S.D.N.Y. Oct. 20, 2015) .......... 47, 48

*In re Longtop Fin. Techs. Ltd. Sec. Litig.*,
   32 F. Supp. 3d 464 (S.D.N.Y. 2014) ........................................................................ 33

*In re N. Telecom Ltd. Sec. Litig.*,
   116 F. Supp. 2d 446 (S.D.N.Y. 2000) ...................................................................... 32

*In re Nature's Sunshine Prod. Sec. Litig.*,
   486 F. Supp. 2d 1301 (D. Utah 2007) ...................................................................... 36

*In re Novatel Wireless Sec. Litig.*,
   No. 08CV1689 AJB (RBB), 2013 WL 12144150 (S.D. Cal. Oct. 25, 2013) ........... 44

*In re Puda Coal Sec. Inc. et al. Litig.*,
   No. 11-CV-2598 (DLC) (HBP)2017 WL 65325 (S.D.N.Y. Jan. 6, 2017) ................ 46

*In re REMEC Inc. Sec. Litig.*,
  702 F. Supp. 2d 1202 (S.D. Cal. 2010) ................................................................. 38

*In re Retek Inc. Sec. Litig.*,
  621 F. Supp. 2d 690 (D. Minn. 2009) ................................................................. 43

*In re Scientific Atlanta, Inc. Sec. Litig.*,
  754 F. Supp. 2d 1339 (N.D. Ga. 2010) ................................................................. 43

*In re Synchrony Fin. Sec. Litig.*,
  988 F.3d 157 (2d Cir. 2021) ................................................................. 18

*In re Time Warner Inc. Sec. Litig.*,
  9 F.3d 259 (2d Cir. 1993) ................................................................. 33

*In re Vale S.A. Sec. Litig.*,
  No. 1:15-CV-9539-GHW, 2017 WL 1102666 (S.D.N.Y. Mar. 23, 2017) .............................. 43

*In re VEON Ltd. Sec. Litig.*,
  No. 15-CV-08672 (ALC), 2017 WL 4162342 (S.D.N.Y. Sept. 19, 2017) .............................. 21

*In re Vivendi Universal, S.A. Sec. Litig.*,
  634 F. Supp. 2d 352 (S.D.N.Y. 2009) ................................................ 40, 41, 44, 46

*In re Vivendi, S.A. Sec. Litig.*,
  838 F.3d 223 (2d Cir. 2016) ................................................................. 17, 39, 43

*In re: BP p.l.c. Sec. Litig.*,
  No. 4:10-MD-2185, 2016 WL 3090779 (S.D. Tex. May 31, 2016) .................................. 45, 46

*Indiana Pub. Ret. Sys. v. SAIC, Inc.*,
  818 F.3d 85 (2d Cir. 2016) ................................................................. 26

*Jaffer v. Hirji*,
  887 F.3d 111 (2d Cir. 2018) ................................................................. 16

*Kleinman v. Elan Corp., plc*,
  706 F.3d 145 (2d Cir. 2013) ................................................................. 17

*Lattanzio v. Deloitte & Touche LLP*,
  476 F.3d 147 (2d Cir. 2007) ................................................................. 39

*Lentell v. Merrill Lynch & Co.*,
  396 F.3d 161 (2d Cir. 2005) ................................................................. 39

*Liberty Media Corp. v. Vivendi Universal, S.A.*,
  923 F. Supp. 2d 511 (S.D.N.Y. 2013) ................................................................. 44

*McMahan & Co. v. Wherehouse Ent., Inc.*,
  900 F.2d 576 (2d Cir. 1990) ......................................................................... 17

*Meyer v. Jinkosolar Holdings Co.*,
  761 F.3d 245 (2d Cir. 2014) ......................................................................... 18

*Pension Comm. of Univ. of Montreal Pension Plan v. Banc of Am. Sec., LLC*,
  592 F. Supp. 2d 608 (S.D.N.Y. 2009) ......................................................... 47

*Press v. Chem. Inv. Servs. Corp.*,
  166 F.3d 529 (2d Cir. 1999) ......................................................................... 33

*Provenz v. Miller*,
  102 F.3d 1478 (9th Cir. 1996) ..................................................................... 26

*S. Cherry St., LLC v. Hennessee Grp. LLC*,
  573 F.3d 98 (2d Cir. 2009) ........................................................................... 32

*S.E.C. v. Caserta*,
  75 F. Supp. 2d 79 (E.D.N.Y. 1999) ....................................................... 26, 37

*S.E.C. v. First Jersey Sec., Inc.*,
  101 F.3d 1450 (2d Cir. 1996) ....................................................................... 50

*SEC v. Gabelli*,
  653 F.3d 49 (2d Cir. 2011) ........................................................................... 17

*Singh v. Cigna Corp.*,
  918 F.3d 57 (2d Cir. 2019) ........................................................................... 17

*Stratte-McClure v. Morgan Stanley*,
  776 F.3d 94 (2d Cir. 2015) ........................................................................... 18

*Strougo v. Barclays PLC*,
  105 F. Supp. 3d 330 (S.D.N.Y. 2015) ......................................................... 26

*Szulik v. Tagliaferri*,
  966 F. Supp. 2d 339 (S.D.N.Y. 2013) ......................................................... 36

*Tellabs, Inc. v. Makor Issues & Rts., Ltd.*,
  551 U.S. 308 (2007) ..................................................................................... 32

*United States v. Erickson*,
  601 F.2d 296 (7th Cir. 1979) ....................................................................... 38

*Vanleeuwen v. Keyuan Petrochemicals, Inc.*,
  No. 13 CIV. 6057 PAC, 2014 WL 3891351 (S.D.N.Y. Aug. 8, 2014) .................... 36

*Villella v. Chem. & Mining Co. of Chile Inc.*,
   No. 15 CIV. 2106 (ER), 2017 WL 1169629 (S.D.N.Y. Mar. 28, 2017)................................. 26

*Wechsler v. Steinberg*,
   733 F.2d 1054 (2d Cir. 1984) ...................................................................................... 33

**Rules**

Fed. R. Civ. P. 56(a) ........................................................................................................ 16

**Regulations**

17 C.F.R. § 210.4-01(a)(1)................................................................................................ 26

Lead Plaintiff 683 Capital Partners, LP ("683 Capital") and Class Representatives Shipco Transport Inc. and E-Global Trade and Finance Group, Inc. (collectively, "Plaintiffs"), submit this memorandum of law in opposition to Defendants' Motion for Summary Judgment (ECF. No. 247) ("Motion").[1]

## I.   PRELIMINARY STATEMENT

Defendants claim that a reasonable person could not find from the facts of this case that Defendants committed securities fraud. In fact, reasonable persons have already done so. The U.S. Commodities Futures Trading Commission ("CFTC") and National Futures Association ("NFA") reviewed the same factual circumstances and found not only that Defendants publicly misrepresented FXCM's relationship with Effex, but also that their misconduct was so severe it merited barring Defendants from operating in the U.S. Defendants protest that they admitted no wrongdoing in their settlements with the regulators, but the drastic penalties they agreed to speak for themselves. This was no slap on the wrist. Indeed, settlements require concessions from both sides, and barring Defendants from operating in the U.S. was the penalty that the regulators settled for. A reasonable jury will easily be able to find, as the CFTC and NFA already did, that the facts and evidence in this action support Plaintiffs' allegations of securities fraud.

Defendants' attempts to retrofit their conduct into a story of innocence do not hold water. While FXCM claimed to be offering its customers a "No Dealing Desk" trading model free from conflict of interest, in truth they were receiving the lion's share of trading profits from a market maker, Effex Capital, LLC ("Effex"), trading against FXCM's retail customers. Effex was created

---

[1] References to "MSJ" are to Defendants' memorandum in support of their Motion. ECF. No. 248. References to "¶__" are to the paragraphs of Plaintiffs' Rule 56.1 Statement of Additional Material Facts, filed herewith (¶¶148-313), and to Defendants' Rule 56.1 Statement of Undisputed Material Facts (¶¶1-147) (ECF. No. 250). Emphasis is added and internal citations and quotations are omitted unless otherwise indicated.

when FXCM's compliance department determined that FXCM could not earn profits from its internal market making operation and still truthfully claim to offer a "No Dealing Desk," so FXCM spun off the operation as Effex. However, FXCM kept its share of Effex's profits and did not disclose the relationship to its customers or investors.

Contemporaneous documents show that FXCM's relationship with Effex was a profit-sharing arrangement and not an arm's length contractual agreement. Defendants attempt to self-exculpate by relying almost exclusively on their own self-serving statements, made years after the fact while facing down twin regulatory investigations. Defendants' say-so does not refute contemporaneous documentary evidence. Neither does the self-interested testimony of Effex's principal, John Dittami, as Effex was reliant on FXCM and complicit in attempting to hide the true nature of the companies' relationship.

This Court, or a jury, would hardly be the first to pass judgment on the facts of this case. Defendants' motion for summary judgment must be denied because not only *could* reasonable people find that the evidence supports Plaintiffs' claims, they already have.

## II.    SUMMARY OF MATERIAL FACTS

### A.    Background of FXCM

Defendants William Ahdout and Dror Niv, with four other partners, founded FXCM in 1999 to provide online foreign exchange ("forex") trading and related services. ¶¶1, 148. FXCM offered its retail customers access to over-the-counter forex trading through its online trading platform. ¶2. Until 2007, FXCM offered its customers a "dealing desk" trading model, where it acted as the direct counterparty to retail customers' forex trades. ¶9.

In 2007, FXCM debuted its "agency" or "No Dealing Desk" ("NDD") model for retail trading. ¶10. In this model, FXCM provided customers with a price based on bid/ask quotes from

a stable of liquidity providers – typically banks, financial institutions, and other market makers. ¶12. When a customer placed an order to execute a trade, FXCM would facilitate that order by simultaneously executing the customer's trade and an offsetting trade with the market maker offering the best price. ¶13. In the NDD model, FXCM made money primarily by adding a markup to the bid/ask quotes and keeping that markup as a commission for executing the trades. ¶14.

From the customer's perspective, in the NDD model FXCM was supposed to serve merely as an intermediary, and the counterparty on the other side of the customer's trade was not FXCM (other than in a technical sense in executing the simultaneous offsetting trades), but one of the supposedly independent market makers. The Company touted that its "agency model is fundamental to our core business philosophy because we believe that it aligns our interests with those of our customers." ¶149. FXCM told its customers and investors that the key difference between the dealing desk and NDD models was that the NDD model eliminated conflicts of interests because FXCM would no longer take the opposite side of customers' trades. ¶150. In other words, FXCM represented that in the NDD model, customers weren't betting against the house, they were betting against other players (the independent market makers) at FXCM's table. The shift to an NDD model proved a successful strategy for FXCM, and by 2010, FXCM was one of the largest forex brokers in the global online market. ¶1.

### B.    FXCM Hires Dittami to Create an In-House Liquidity Provider

Unsatisfied with merely providing the table and taking a commission, Defendants decided they wanted a piece of the action too. To this end, in 2009 Ahdout and Niv hired John Dittami to develop a trading algorithm for FXCM that would act as a liquidity provider in FXCM, competing against FXCM's independent marker makers. ¶¶161-62. The plan was two-fold: (1) creating an in-house liquidity provider would help FXCM improve execution quality for its customers, ¶19,

and (2) it would allow FXCM to earn trading profits on top of the commissions they were receiving. ¶162. The trading algorithm was known internally at FXCM as "EES." ¶22.

By early 2010, EES was nearly ready to roll out for live trading action. ¶169. However, FXCM's compliance department raised serious concerns about FXCM continuing to claim that it was not on the other side of customers' trades while EES was acting as a liquidity provider, taking positions opposite FXCM's customers. ¶165. Ahdout and Niv decided with FXCM's other principals that, per the compliance department's recommendation, FXCM could not operate EES internally and still claim to its customers that it was operating a NDD model and not taking positions on the other side of customer trades. ¶¶165, 167. Ultimately, Niv and Ahdout decided they would have to spin off EES as an external entity, headed by Dittami. ¶167.

After deciding to spin off EES, Ahdout and Niv informed Dittami of their decision and set about helping Dittami to establish a new entity, Effex. ¶167. Ahdout and FXCM's general counsel helped Dittami to set up Effex, and Dittami even consulted with them on the name of the entity. ¶171. Within FXCM, Effex was seen as merely a continuation of EES, and FXCM employees continued to refer to Effex as EES in internal correspondence and in nomenclature within FXCM's accounting and trading systems. ¶172. As a liquidity provider, Effex traded opposite FXCM's retail customers and could benefit from customer losses. ¶173. As Dittami explained, "Effex holds positions for a living." *Id*.

Even after the spin-off decision was made, Dittami continued to develop the trading algorithm at FXCM. ¶168. In fact, EES even ran test trades in March and April 2010, which were real trades opposite FXCM's retail customers. ¶169. These trades continued after Niv and Ahdout had determined that Dittami would have to trade as Effex, not EES. *Id*. Thus they knew that the testing was conducted while Dittami was still employed by FXCM, but for Effex's benefit.

FXCM agreed to provide up to $3 million to help develop EES, and it spent part of that sum while Dittami was employed by FXCM. ¶180. After Dittami left FXCM, Effex repaid FXCM for those expenses. ¶177. FXCM also helped to incubate Effex in its early stages, providing Effex with access to a prime-of-prime account with FXCM's prime broker and allowing Effex to use $2 million of FXCM's money as trading collateral, both of which Effex needed to be able to trade. ¶174. FXCM charged Effex no interest and required no material collateral. ¶¶175-76.

### C.   FXCM and Effex Set up a Financial Relationship Mirroring FXCM's Profit-Sharing Arrangement with Dittami

When he joined FXCM, Dittami signed an employment contract providing that he would be compensated primarily by a base salary of $250,000 and a bonus of 30% of the trading profits from EES. ¶178. FXCM would keep the other 70%. Dittami's 30% profit share was expected to be significantly higher, indeed "multiples" of his salary, in the order of millions of dollars. ¶179.

When Dittami left FXCM, the parties intended that Dittami's post-employment relationship with FXCM would mirror the economic terms of his employment agreement, meaning the 70-30 split of trading profits. ¶¶181-82. In Dittami's resignation letter on April 14, 2010, he and Ahdout (who signed the letter in acknowledgement) explicitly acknowledged that the parties intended to work out an agreement mirroring the main economic terms from Dittami's employment agreement, meaning the 70-30 profit split. ¶183.

On the same day as Dittami's resignation letter, Dittami and Ahdout also executed an option agreement by which FXCM had the option to purchase a 70% share in Effex for a nominal fee of $1. ¶184. Niv was also aware of the option agreement. *Id*. This option agreement meant that FXCM had the ability to own and control a 70% share of Effex at its discretion. Even without exercising the option, Defendants and Dittami knew that FXCM could always take its 70% share of Effex, inherently shaping the parties' future negotiations and dealings.

The parties' contemporaneous communications show that Defendants and Dittami sought to maintain the 70-30 split of trading profits in their post-spin-off relationship. Dittami referred in his communications with Defendants to "payment on profits to FXCM," FXCM's "70% share," Effex's "profit share percentage," exercise of the option agreement, and a "revenue split" where Effex would "pay out net 70% to FXCM." ¶185.

Contemporaneous communications also show that the parties viewed the option agreement as being in effect. For instance, Dittami questioned the interplay between a contemplated loan from FXCM and the 70% term in the option agreement. ¶186. Dittami referred to the option agreement in the present tense in July 2010. *Id.* In August 2010, FXCM's CFO instructed the company's accounting department not to mention the option agreement to Ernst & Young LLP ("E&Y"), FXCM's auditors. ¶204. In November 2010, Dittami noted to a colleague that with potential non-FXCM business, unlike FXCM business, "I'm not constrained by existing agreement and not giving 70% away." ¶186. In November 2011, FXCM's in-house counsel discussed with Dittami a document terminating the option agreement, as well as the parties' agreement in Dittami's resignation letter. ¶187. Dittami expressed unease with the idea and the parties opted not to execute the contemplated termination agreement. ¶188.

Effex provided regular updates to Ahdout, Niv, and others at FXCM. ¶190. These updates, which continued through at least 2012, typically included information concerning Effex's trading profits in dollars per million units of volume, on a weekly or monthly basis. *Id.* No other market makers provided similar updates to FXCM. *Id.* FXCM also initially tracked Effex's expenses and income directly. ¶191. This way, Defendants were able to keep tabs on Effex's trading profits and use that information to determine how much Effex would kick back to FXCM in its monthly payments. *Id.*

In June 2010, Dittami and certain principals of FXCM, including Ahdout and Niv, began to discuss disguising the FXCM-Effex profit-sharing relationship as payments for order flow. ¶¶192-93. Under this arrangement, Effex paid FXCM a certain rate in dollars per million units of FXCM trading volume executed by Effex. ¶192. The parties intended for the order flow payments to mimic Dittami's employment agreement with respect to the 70-30 split of trading profits. ¶197. To this end, the parties intended that the rate per million would adjust up or down, varying as Effex's trading profits, or "P&L," waxed or waned. ¶194. Dittami specifically noted in discussions with Ahdout that the 70-30 split of profits from his employment contract was replaced directly by the payments for order flow. ¶196. By this time, Effex had already been trading opposite FXCM's retail customers as a liquidity provider and making payments to FXCM based on its trading profits, for at least three months. ¶¶200-01. When FXCM billed Effex each month, the payments were described as "Rebates," and the amounts as "P&L," shorthand for profits (and loss). ¶195.

During the time that Effex paid FXCM for retail order flow, they were the only liquidity provider to do so. ¶¶205-210. BNP Paribas ("BNP") briefly had a different agreement with FXCM to pay for order flow during that time, but only with respect to certain institutional liquidity streams, not retail trading. ¶205. BNP's payments for order flow were "tiny" compared to Effex's payments; the payments were a "joke" at FXCM and "[n]ot considered a real business." *Id.*

In August 2010, as FXCM was preparing to go public, it began to paper over its financial arrangement with Effex. Just days before filing its IPO registration statement, FXCM and Effex executed services agreements that were back-dated to March 1, 2010 (with FXCM's US operating subsidiary) and May 1, 2010 (with FXCM Holdings, LLC). ¶199. The March 1 services agreement was dated three weeks before Effex was even formed, and over six weeks before Dittami left his employment with FXCM. ¶200. The May 1, 2010 agreement provided for payments to be made

directly to FXCM Holdings, which was not a regulated entity. ¶202. Other than the payments from Effex, FXCM Holdings did not typically have any direct sources of revenue, only upstream payments from FXCM's (regulated) operating subsidiaries. ¶203.

The parties decided that Effex would pay $21 per million to start with because they projected that Effex would earn roughly $30 per million in trading profits, so $21 per million approximated FXCM's 70% share. ¶211. Even if the percentages did not remain at exactly 70-30, Defendants intended that the rate per million would reflect that FXCM would get a bigger share of the profits than Effex. ¶212. The services agreements merely memorialized the $21 per million rate that Effex was already paying. ¶201. Even as the parties were executing the service agreements, Dittami expressed that the parties expected to modify the agreements with the intent of maintaining the 70-30 split of trading profits. ¶213. Dittami consistently maintained in contemporaneous correspondence with FXCM, including Ahdout, that the parties' understanding was that Effex's payments would not exceed 70%. ¶214.

### D.   Effex's Payments to FXCM Varied With Effex's Trading Profits

Effex and FXCM had continuous discussions about what rate per million Effex would pay for a given month. ¶215. Often these discussions occurred after the month at issue had concluded and the amount of order flow that Effex captured was known. *Id*. Thus, when FXCM and Effex were discussing what rate Effex should pay for the previous month, they already knew what Effex's profits were and could calculate what the rate needed to be to maintain the split of profits. Ahdout was the main point of contact at FXCM in discussions with Dittami or Effex's COO about what rate per million FXCM would charge Effex, and Niv was aware of any rate changes that resulted from those conversations. ¶216.

As early as July 2010, Dittami discussed with FXCM retroactively adjusting the rate per million that Effex would pay for certain months based on Effex's profitability. ¶217. In August 2010, FXCM recorded a retroactive accounting adjustment for June 2010 so that FXCM's accounting records would show payments of $21 per million from Effex, meaning that Effex had actually paid a different rate previously. ¶218. This retroactive accounting adjustment was not included in materials FXCM provided to E&Y, FXCM's auditors. ¶219. In October 2010, Dittami and Ahdout discussed what the rate should be for that month in light of Effex earning lower profits per million on its trading. ¶220. Dittami suggested $17.50 per million, and FXCM billed Effex $17.50 per million for October and November 2010. *Id*. The services agreement was not amended to reflect this new rate, and the fact that FXCM billed Effex $17.50 per million for two months in 2010 instead of $21 per million was not shared with E&Y. ¶221. At year-end 2010, Dittami emailed Niv and Ahdout, spelling out Effex's trading profits – annualized to approximately $33.5 million – and his calculation of FXCM's share, which was approximately $23 million, or roughly 70% of Effex's trading profits from FXCM order flow. ¶222. In late 2011, when spreads tightened in the market and Effex's trading on FXCM order flow became less profitable, the parties agreed to reduce Effex's payments to $16 per million. ¶223. This was the only time that the parties actually amended the services agreement to reflect one of the changes to the per million rate. ¶224.

Effex and FXCM also discussed at various times whether certain liquidity streams would count toward the calculations of monthly trading volume underlying Effex's payments to FXCM. ¶225. Effex provided several liquidity streams to FXCM. *Id.* Dittami and Effex had multiple discussions with Ahdout and Niv about including or excluding certain streams in the volume calculations because of how profitable or unprofitable they were for Effex. *Id*. These conversations occurred in 2011 and 2012, and resulted in certain liquidity streams being excluded from the

volume calculations, and thus from Effex's payments. *Id.* Neither the services agreement nor any amendments ever specified which liquidity streams Effex would or would not pay for. ¶226. The invoices for these months did not reflect which liquidity streams were included or excluded. *Id.* Changing which streams were included in the volume calculations was another way of manipulating Effex's payments to align with the parties' division of Effex's trading profits.

In December 2012, Dittami emailed Niv and Ahdout, noting that while Effex did not plan to drop the per million rate it was paying for January, "its good to know option is available if needed for February." ¶227. This reflected the parties' understanding that the rate per million was a fluid figure that the parties could change month-to-month to maintain their split of profits.

In April 2013, Dittami, Ahdout, and Niv agreed that Effex would pay a reduced rate per million for trading volume in the dollar-yen currency pair. ¶228. The basis for this change was that dollar-yen trading volume had become much less profitable for Effex. *Id*. Beginning with February 2013 (retroactively), FXCM billed Effex separately for dollar-yen volume at only $3 per million. ¶229. In June 2013, Dittami, Ahdout, and Niv agreed that Effex would, and thereafter did, likewise split out trading volume in the euro-dollar currency pair, with Effex paying only $6 per million on that volume. ¶231. Once again, the reason for this change was that euro-dollar trading volume had become much less profitable for Effex. ¶232. The effect of these changes was to reduce the effective rate that Effex was paying to account for changes in Effex's trading profits. During the time that FXCM billed Effex separately for dollar-yen and/or euro-dollar trading volume (February 2013 through July 2014), those currency pairs accounted for over one third of the total FXCM trading volume that Effex captured for those months, and for some months over half of the total volume. ¶234. These manipulations reduced the effective rate Effex paid to under $12 per million for that time period, and for some months it was less than $10 per million. *Id*.

In sum, although Effex was nominally paying FXCM on the basis of trading volume from FXCM, in reality the payments varied month-to-month depending on Effex's trading profits. The parties regularly discussed what rate they would set, often retroactively, once the trading volume and Effex's profitability were known for a given month. On multiple occasions, the parties billed and paid different rates from what the services agreements provided, either by varying the rate, carving out certain liquidity streams from the monthly volume calculations, or by parsing out the volumes from currency pairs that were less profitable and paying lower rates for those trades.

### E.   Effex Depended on FXCM, Which Provided Effex Extensive Support and Granted Trading Advantages So Effex Would Win More Trading Volume

In the beginning of its operations, all of Effex's revenues came from FXCM. ¶235. Effex gradually added other revenue sources, but through 2016 trading volume from FXCM accounted for most of Effex's revenues. *Id.* In late 2010 and early 2011, approximately 90% of Effex's trading profits came from FXCM trading volume. ¶236. Dittami estimated that by 2014, most of Effex's revenues still came from FXCM, and that was still true in 2016. ¶237. Niv estimated in March 2014 that approximately 80% of Effex's revenues came from FXCM trading volume. ¶238. As Niv explained in an email, Effex had "alllot [sic] to lose if they piss us off." *Id.*

FXCM was Effex's main lifeline. Throughout the class period, many trading venues outside of FXCM would not accept non-bank liquidity providers like Effex. ¶239. When Effex began operations in 2010, almost no other companies would accept them as a liquidity provider. *Id*. Dittami believed that if not for his relationship with FXCM as a prior employee, FXCM would not have accepted liquidity from Effex either. ¶240.

In its early stages, Effex was dependent upon FXCM to support its operations. Effex operated its trading algorithm through FXCM servers and on FXCM's network. ¶241. FXCM allowed Effex to operate out of FXCM's offices rent-free for a full year after Effex became a

separate entity. ¶242. Dittami maintained an FXCM email address for months after leaving FXCM. ¶243. Effex initially used FXCM servers to host their email services. ¶244. Effex employees also used FXCM's instant messenger service from Effex's inception into 2012. *Id*. Dittami and others at Effex also maintained VPN access to desktop computers at FXCM through the end of 2012, and Effex could not fully conduct its business except through VPN connection to FXCM. ¶245.

Multiple FXCM employees also worked for Effex on a regular basis spanning multiple years, at times spending four days per week doing work for Effex. ¶246. FXCM personnel also spent time monitoring Effex's trading dashboard for Effex's benefit, which continued to late 2013 or early 2014. ¶247. In 2013 and at least one other year, Effex paid bonuses (FXCM paid the bonuses at Effex's request, and Effex reimbursed FXCM) of tens of thousands of dollars to two of these employees for their work done on Effex's behalf. ¶248.

From the beginning of Effex's existence, FXCM also provided significant trading advantages to Effex over other liquidity providers to allow Effex to win more trading volume. One of these advantages was that Effex would win ties when Effex and another liquidity provider submitted the same price quote. ¶250. Although there were "a few times" that other liquidity providers would win ties, FXCM granted Effex this advantage throughout most of the time that Effex was paying FXCM for order flow. ¶251. Another advantage FXCM granted to Effex was that Effex had access to real-time read of book, allowing it to see in real-time the prices submitted by other liquidity providers, data which FXCM gave to no other liquidity provider. ¶¶95, 252. FXCM also allowed Effex to co-locate with FXCM's servers, which decreased latency between Effex and FXCM – an important advantage for Effex's high-frequency trading algorithm. ¶253. FXCM also applied lower mark-ups to the prices provided by Effex as compared to prices from

other liquidity providers. ¶254. FXCM even consulted with Dittami as to what mark-ups it should apply to other liquidity providers – which it did not do with any other liquidity providers. *Id*.

These advantages allowed Effex to have the "winning" price more often, even if Effex's raw price (before applying the mark-up) was not the lowest, directing more trading volume to Effex. ¶255. With these anticompetitive advantages, Effex could essentially choose when it wanted to offer a price to FXCM that would allow it to win a trade or portion of a trade, and what exact price would achieve that end. *Id.* Without these advantages Effex would have had to compete on equal footing with other market makers to offer the best price. *Id.*

On net, due to its algorithmic trading strategies, the more trading volume Effex captured, the more profitable its trading was. ¶256. By giving Effex these advantages, FXCM allowed Effex to capture more trading volume. *Id.* With more trading volume, Effex paid FXCM more for order flow. ¶257. Thanks in part to these trading advantages, throughout the time that Effex was paying FXCM for order flow, from 2010 to 2014, Effex captured more of FXCM's retail trading volume than any other liquidity provider. ¶258. When FXCM terminated its relationship with Effex in February 2017, Effex lost its prime broker relationship and numerous other clients. ¶259. Effex was unable to support itself without FXCM and went out of business shortly thereafter. *Id.*

## F.   Defendants Tried to Conceal FXCM's Relationship With Effex

Throughout the Class Period, and with redoubled efforts once regulators began to investigate, Defendants attempted to conceal FXCM's relationship with Effex. For example, Niv told an FXCM employee that he did not want to share with other liquidity providers how much of FXCM's trading volume Effex was capturing. ¶261. When FXCM's CFO, Robert Lande, asked Niv about what language to use "for 'payment for order flow' as applied to us (i.e., Datami [sic])," so that "you can see & decide whether too sensitive," Niv responded that "we definitely want to

not highlight" the order flow payments in the Company's SEC filings. ¶262. Indeed, FXCM did

not identify that Effex was the source of all, or substantially all, of its order flow payment revenue

in its SEC filings. *Id*. Dittami also recognized that sharing how much of FXCM's trading volume

Effex was capturing "brings up questions [FXCM] may not want brought up." ¶263. An FXCM

compliance officer noted that "[g]iven the sensitivity of the counter party involved [Effex] we

would prefer …[to] do not draw unwanted attention [from the NFA]." ¶264.

FXCM employees also provided false or misleading responses to regulators' questions

regarding Dittami and Effex. Members of FXCM's compliance department made a series of

misstatements to the NFA, including the Chief Compliance Officer's statement that "there are no

present or past … employees of affiliates of FXCM LLC that have direct or indirect ownership,

interest, or affiliation with entities that provide liquidity to retail clients on our No Dealing Desk

Model," omitting Dittami and his ownership of Effex. ¶265. FXCM's Chief Compliance Officer

also told the NFA that Dittami "served as a consultant for FXCM" who "worked primarily on

software coding"—a clear attempt to downplay Dittami's senior role, management title (per his

employment contract, ¶161, "Managing Director"), and connection to FXCM in connection with

NFA's investigation. ¶266.

### G.    Regulators Investigate FXCM's Relationship with Effex

The NFA and CFTC began investigating FXCM's relationship with Effex in 2013 and

2014. ¶267. As the regulatory investigations intensified in the spring of 2014 and FXCM realized

that the payments it received from Effex were being heavily scrutinized, FXCM decided to stop

taking payments for order flow, which it was receiving only from Effex. ¶268. On August 25,

2014, FXCM and Dittami executed two termination letters, terminating the services agreement –

and with it the order flow payments – and Dittami's resignation letter stating that the parties intended to maintain the economic terms from his employment agreement. ¶269.

In November 2015, as the NFA and CFTC investigations further intensified, Effex and FXCM signed an "Acknowledgement and Confirmation" purporting that the April 14, 2010 option agreement had never gone into effect. ¶271. The parties had never executed anything in writing prior to 2015 cancelling the option agreement or stating that it was not in effect. ¶272. Defendants can point to no contemporaneous evidence indicating otherwise.

In February 2017, after years of parallel regulatory investigations, FXCM entered into settlements with the NFA and CFTC. On February 6, 2017, the CFTC announced that it banned the Company from operating in the U.S. and fined the Company $7 million, after finding that FXCM was taking undisclosed positions opposite its retail customers. ¶273. In its Order dated February 6, 2017 ("CFTC Order"), the CFTC found that "FXCM and FXCM Holdings, by and through their officers, employees, and agents, including Respondents Niv and Ahdout, engaged in false and misleading solicitations of FXCM's retail foreign exchange ('forex') customers" by concealing that "FXCM had an undisclosed interest in the market maker [Effex] that consistently 'won' the largest share of FXCM's trading volume - and thus was taking positions opposite FXCM's retail customers." ¶274.

The same day, the NFA issued a Complaint and a Decision against FXCM, Niv, Ahdout, and Niv's sister, Ornit Niv. ¶275 The NFA found that the defendants committed the violations alleged in the NFA's Complaint, including that FXCM directed customer trades to a liquidity provider, Effex, "that was purportedly independent but which FXCM actually supported and controlled. *Id*. The NFA found that in exchange for the order flow that FXCM directed to Effex,

Effex paid rebates to FXCM that amounted at times to as much as 70% of Effex's profits from FXCM's order flow and which FXCM referred to internally as 'P&L'." ¶276.

The Company also issued a press release on February 6, 2017, disclosing the settlements with the NFA and CFTC and announcing that the Company would withdraw from doing business in the U.S. pursuant to the CFTC's order. ¶277. On this news, the Company's share price fell $3.40, over 68%, and the price of FXCM Notes fell over 42%. ¶278.

Two weeks later, Niv resigned as CEO and director, and FXCM changed its name to Global Brokerage Inc. ¶279. In December 2017, the Company filed for Chapter 11 bankruptcy. ¶280.

## III.   ARGUMENT

### A.   Defendants Bear a Heavy Burden on Their Motion for Summary Judgment

A motion for summary judgment may not be granted unless all of the submissions taken together "show[] that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). "An issue of fact is genuine if the evidence is such that a reasonable jury could return a verdict for the nonmoving party. A fact is material if it might affect the outcome of the suit under the governing law." *Frost v. New York City Police Dep't*, 980 F.3d 231, 242 (2d Cir. 2020). In making this determination, the court "constru[es] the evidence in the light most favorable to the nonmoving party and draw[s] all reasonable inferences and resolv[es] all ambiguities in its favor." *Jaffer v. Hirji*, 887 F.3d 111, 114 (2d Cir. 2018). The burden on this motion is on Defendants, as the moving party, to show that there are no open questions of material fact. *See Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986).

In deciding a motion for summary judgment, "[t]he role of the court is not to resolve disputed issues of fact but to assess whether there are any factual issues to be tried." *Cuff ex rel. B.C. v. Valley Cent. Sch. Dist.*, 677 F.3d 109, 119 (2d Cir. 2012). "Credibility determinations, the

weighing of the evidence, and the drawing of legitimate inferences from the facts are jury functions, not those of a judge." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986); *Barrows v. Seneca Foods Corp.*, 512 F. App'x 115, 117 (2d Cir. 2013).

To succeed on a claim brought under Section 10(b) of the Securities Exchange Act of 1934 ("Exchange Act") and Rule 10b-5 promulgated thereunder, a plaintiff must show (1) a material misrepresentation or omission (falsity), (2) scienter, (3) a connection with the purchase or sale of a security, (4) reliance, (5) economic loss, and (6) loss causation. *Singh v. Cigna Corp.*, 918 F.3d 57, 62 (2d Cir. 2019). Defendants have moved for summary judgment on Plaintiffs' and the Class's Section 10(b) claims with respect to the elements of falsity, scienter, loss causation, and economic loss, and with respect to the element of reliance only as to 683 Capital's individual claim.

### B.   The Evidence Supports a Finding that Defendants Made Material Misrepresentations and Omissions

To show falsity, a plaintiff must identify a statement "that is either 'untrue' outright or 'misleading' by virtue of what it omits to state." *In re Vivendi, S.A. Sec. Litig.*, 838 F.3d 223, 239 (2d Cir. 2016) ("*Vivendi II*"). Whether a statement is misleading must be "evaluated not only by literal truth, but by context and manner of presentation." *Singh*, 918 F.3d at 63. "Even a statement which is literally true, if susceptible to quite another interpretation by the reasonable investor, may properly be considered a material misrepresentation." *Kleinman v. Elan Corp., plc*, 706 F.3d 145, 153 (2d Cir. 2013); *see also SEC v. Gabelli*, 653 F.3d 49, 57 (2d Cir. 2011) ("The law is well settled ... that so-called half-truths--literally true statements that create a materially misleading impression--will support claims for securities fraud."), *rev'd on other grounds*, 568 U.S. 442 (2013). "For that reason, the disclosure required by the securities laws is measured not by literal truth, but by the ability of the material to accurately inform rather than mislead prospective buyers." *McMahan & Co. v. Wherehouse Ent., Inc.*, 900 F.2d 576, 579 (2d Cir. 1990).

An omission is actionable when the speaker "is subject to a duty to disclose the omitted facts." *In re Synchrony Fin. Sec. Litig.*, 988 F.3d 157, 167 (2d Cir. 2021). A duty to disclose "may arise when there is ... a statute or regulation requiring disclosure, or a corporate statement that would otherwise be inaccurate, incomplete, or misleading." *Stratte-McClure v. Morgan Stanley*, 776 F.3d 94, 101 (2d Cir. 2015). "Even when there is no existing independent duty to disclose information, once a company speaks on an issue or topic, there is a duty to tell the whole truth." *Meyer v. Jinkosolar Holdings Co.*, 761 F.3d 245, 250 (2d Cir. 2014). In assessing whether a statement is misleading, "[t]he touchstone of the inquiry is not whether isolated statements within a document were true, but whether defendants' representations or omissions, considered together and in context, would affect the total mix of information and thereby mislead a reasonable investor regarding the nature of the securities offered." *Halperin v. eBanker USA.com, Inc.*, 295 F.3d 352, 357 (2d Cir. 2002).

### 1. Defendants' Statements About FXCM Offering Agency Model Trading Were False and Misleading

FXCM's own compliance department determined, and Defendants Niv and Ahdout agreed, that if (and when) EES traded with FXCM's retail customers as a liquidity provider, FXCM could not truthfully tell customers that it was operating an agency model. ¶165. That was because Defendants recognized it would be untruthful or materially misleading to say that FXCM was not on the other side of customers' trades if it were, in fact, reaping the trading profits from a liquidity provider that was on the opposite side of customers' trades.

There were two honest paths Defendants could have chosen: disclose that FXCM was trading opposite its customers, through EES or Effex, and keep the trading profits, or forgo the trading profits and spin off EES as a truly independent liquidity provider. Instead, Defendants tried to have their cake and eat it too. They kept the trading profits, but instead of disclosing their conflict

of interest, they disguised the trading profits as "payments we receive for order flow from FX market makers." ¶155. Just as it was untruthful to claim that FXCM was operating an agency model when it earned profits from EES's trading against its customers, it was untruthful to make the same claims when FXCM took profits from Effex's trading against FXCM's customers.

The relevant facts are simple: (1) as a liquidity provider, Effex took positions against FXCM's retail customers, ¶173; and (2) Effex paid kickbacks to FXCM of up to 70% of its profits from trading against FXCM's retail customers, ¶¶178-234. That Effex engaged in high-frequency trading strategies of quickly hedging its risks rather than simply holding its post-trade positions does not change anything. Indeed, Defendants' arguments implying that Effex did not make (or lose) money only when a customer lost (or made) money, MSJ at 10 and 17, presupposes an overly simplistic market. Market participants do not make money only by buying a currency and hoping the market price for that currency moves in their favor while the trading partner does the same. In reality, market participants are free to pursue any number of trading strategies, just as Effex did. Whether Effex hedged its position or not, or how quickly it did so, does not change the fact that it traded opposite the customer. If Effex buys a customer's yen for euros, it does not matter what Effex does with those yen *after the trade*, just as it does not matter what the customer does with the euros. After the trade, either party could hold their new position, they could immediately hedge, or they could cash out and light their legal tender on fire if they felt so inclined.

The same is true in a dealing desk model. A dealing desk can do the same things after the customer trade—"hedge its position or choose not to hedge"—as Effex did. ¶281. Therefore, to the extent Defendants argue that FXCM, through Effex's hedging strategies, was "not exposed to market risk," neither was a dealing desk. Likewise, to the extent Defendants argue that FXCM,

through Effex's hedging strategies, "did not earn profits that were causally linked to customers' profits and losses," MSJ at 16, the same was true of a dealing desk.

Indeed, this underscores that the principal appeal of FXCM's No Dealing Desk model, and the true distinction between a dealing desk model and the agency model that FXCM touted, was that when customers traded on FXCM's platform, FXCM purported not to have a stake in the opposing side of the trade. That was the "major conflict of interest" that FXCM repeatedly claimed to eliminate through the NDD model. ¶¶150, 153-54. That Effex (or FXCM's other liquidity providers) may have hedged their positions after a customer trade instead of simply holding their positions was indistinct from a dealing desk model.

Thus, Defendants' statements about FXCM's agency model, ¶¶149-54, were materially false and misleading because the kickbacks FXCM received from Effex meant that FXCM had a significant financial interest in the liquidity provider standing opposite its customers' trades. FXCM's majority stake in Effex's trading profits meant that: (1) FXCM's NDD model did not truly "align[] our interest with those of our customers," ¶149; (2) the risk that FXCM "could suffer reputational damage and additional regulatory scrutiny by offering execution to retail clients that creates an inherent conflict between the interests of the customer and our interests" was not based on FXCM separately and explicitly offering dealing desk execution, ¶150, but had already materialized based on the conflict of interest in the NDD model through Effex; (3) FXCM was not truly "commit[ted] to the agency model" due to its undisclosed conflict of interest with its customers, ¶151; (4) FXCM did not "predominantly operate [its] retail business on an agency

20

model," ¶152; and (5) that FXCM did not directly take a market position did not "eliminat[e] a major conflict of interest" between FXCM and its customers, ¶¶153-54.[2]

FXCM's statement that FXCM was not exposed to market risk through its agency model, ¶153, was also false and misleading. Plaintiffs do not claim that FXCM took market positions directly, but it was nonetheless exposed to market risk through its stake in Effex's trading profits. Effex was exposed to market risk in the same way that a dealing desk was – they were exposed to the extent they did not hedge their positions. When Effex's trading profits fell, it paid FXCM less. Thus, even if FXCM did not suffer direct losses due to market movements, its revenues decreased when Effex made less and paid FXCM less through the variable monthly payments.

### 2. Defendants' Statements and Omissions About Order Flow Payments Were False and Misleading

Defendants' statements about "order flow" payments FXCM received, ¶¶155-58, were materially misleading because they misrepresented the source of the payments and omitted that FXCM was receiving kickback payments comprising up to 70% of Effex's trading profits. Plaintiffs do not assert that Defendants' revenue figures were quantitatively inaccurate, but rather that Defendants misrepresented the source of FXCM's retail trading revenues and the nature of the purported "order flow" payments. *In re VEON Ltd. Sec. Litig.*, No. 15-CV-08672 (ALC), 2017 WL 4162342, at *6 (S.D.N.Y. Sept. 19, 2017) ("A company's misleading statements about the sources of its revenue do not make the company's statements of the revenue figures misleading," but falsity may nonetheless be found based on the "misleading statements themselves.").

---

[2] Defendants falsely assert that the alleged false statements from FXCM's website were not identified in the complaint. MSJ at 5-6, n. 2-3. In fact those statements are quoted verbatim in the complaint. ECF No. 181 ¶¶ 179-180. Statement No. 6 (MSJ at 6) was mistakenly described in the complaint as occurring in January 2014, an inadvertent typo, but as the link in the complaint makes clear, it occurred on February 5, 2013, as correctly identified in Plaintiffs' interrogatory responses.

Defendants' statements that FXCM's retail trading revenue was primarily driven by, among other things, "payments we receive for order flow from FX market makers," ¶155, and that this income "represents payments received from certain FX market makers in exchange for routing trade orders to these firms for execution," ¶156, were misleading because (1) the "order flow" payments FXCM received from Effex were actually kickbacks of Effex's trading profits ¶¶178-234; and (2) during the periods covered by these statements, no other market maker paid FXCM for order flow from retail trading. ¶¶205-10. Defendants' statements that FXCM "generate[s] our trading revenues based on the volume of transactions, not trading profits or losses," ¶157, were false and misleading because FXCM generated trading revenues not only based on volume, but also from kickback payments from Effex, which varied based on Effex's trading profits. ¶¶178-234. Finally, Defendants' statements that FXCM "no longer receive[d] payments for order flow," ¶158, were misleading because the only "payments for order flow" that FXCM received during the relevant periods were actually kickbacks of Effex's trading profits. ¶¶178-234.

The monthly payments FXCM received from Effex were order flow payments in name only. The payments were ostensibly based on a certain rate per million units of FXCM trading volume executed by Effex. ¶192. However, the parties repeatedly manipulated both the rate and the volume calculations to change how much Effex would pay. ¶¶217, 220, 223, 225, 228, 231. When Effex's trading profits decreased, the parties decreased Effex's payments accordingly by adjusting the inputs to the order flow payment calculations. ¶¶194, 217, 220, 223, 225, 228, 232. The services agreements served only to paper over the payments Effex was already making to FXCM, and the payments were changed notwithstanding the terms of the services agreement on multiple occasions. ¶¶217, 220, 225, 228, 231. Indeed, the invoices from FXCM were termed

"Rebates" and referred to Effex's payments as "P&L," reflecting the parties' understanding that the payments were intended to reflect payments to FXCM of Effex's profits. ¶195.

In reality, Effex's payments to FXCM represented the parties' attempts to approximate a split of Effex's trading profits from FXCM trading volume whereby FXCM kept the lion's share of the profits. Guiding these ongoing discussions were two agreements. First, Dittami's resignation letter, which Ahdout signed, stated that the parties intended to work out an agreement mirroring the main economic terms from Dittami's employment agreement, meaning the 70-30 profit split. ¶183. Second, on the same date as Dittami's resignation, Dittami and Ahdout signed the option agreement whereby FXCM could purchase a 70% stake in Effex for $1. ¶184. Contemporaneous correspondence between the parties demonstrate that the parties believed these agreements were operative, and indeed they even discussed, but opted against, terminating these agreements over one year after they were signed.[3] ¶¶186-88. Defendants' only evidence to the contrary consists of self-serving statements made years later during regulators' investigations. *See* ¶¶49-56. The timing of the 2015 Acknowledgement and Confirmation (purporting that no option agreement ever went into effect) and the conspicuous absence of any contemporaneous evidence supporting it, suggests that this document was not signed "for the avoidance of doubt," MSJ at 18, but as an attempt to retcon significant compromising facts during regulatory investigations. ¶¶271-72.

Regardless of whether FXCM ever exercised its option, the fact that FXCM could take its 70% share at its discretion meant the parties knew FXCM would not take a substantially worse

---

[3] That the parties were considering a different potential option agreement in October 2010, which also contemplated FXCM being able to purchase a 70% share in Effex for $1, MSJ at 18, does not mean they viewed the original, signed option agreement as nonexistent. To the contrary, that the parties discussed, but did not consummate, new potential agreements to restructure their relationship reflects that the parties still viewed the relationship as guided by the 70-30 profit-sharing split, not a fixed-rate fee for order flow strictly following the services agreements.

deal when they repeatedly renegotiated Effex's payments. Indeed, Niv testified that even if the percentages did not remain at exactly 70-30 through the course of renegotiating Effex' payments, FXCM intended that the rate per million would reflect that FXCM would get a bigger share of the profits than Effex. ¶212. Conversely, Dittami's resignation letter provided Effex with protection so that it was not paying more than 70%. ¶214. The regular updates that Effex sent to FXCM helped the parties determine how much Effex should pay. ¶190. Thus, a reasonable juror could determine that the parties strove to maintain a profit-sharing relationship.

In contrast, the parties' actions demonstrate that the services agreement did not govern the payments. First, Effex began making payments to FXCM as early as March or April 2010, but the services agreements were not actually finalized and signed until the end of August 2010 and were backdated to cover the prior payments. ¶¶199-201. Second, the parties negotiated different rates of payment without modifying the services agreement on multiple occasions. ¶¶217, 220, 225, 228, 231. Third, even when they didn't actually change the rate, Effex and FXCM frequently discussed what rate would apply for a given month, often after that month had ended. ¶215. Those discussions did not involve amending the services agreement, other than once (¶224), demonstrating that the parties did not view the agreement as governing Effex's payments to FXCM. These facts contradict Defendants' argument that the services agreements strictly governed the parties' payments and financial relationship.[4]

Testimony from Defendants' forex industry witness, Mr. Wilson-Taylor, also reveals that the circumstances of Effex's payments were unlike the payments for order flow that he and Defendants assert are "common" in forex or equities markets. MSJ at 11. For instance, Mr. Wilson-

---

[4] That the services agreement was not amended to expressly incorporate a 70-30 profit split, MSJ at 18, is irrelevant. The services agreement was also not amended to reflect multiple changes to the rate per million or exclusion of certain liquidity streams. ¶¶217, 220, 225, 228, 231.

Taylor could not identify any liquidity providers, other than Effex, that derived most of their business from a single broker during the time that Effex paid FXCM for order flow. ¶283. Mr. Wilson-Taylor also could not identify any liquidity providers during that timeframe, other than Effex, that paid for retail forex order flow at all, much less any that paid more than half of their trading profits from that flow.[5] ¶¶285-86. Mr. Wilson-Taylor also testified that in his own experience, as a matter of policy, order flow payments would be memorialized in written agreements and the agreements would be amended if the payment rate changed. ¶286. As Mr. Wilson-Taylor explained: "your policy should always be to make sure that the agreements reflect the nature of the relationship," and he could not think of any instances in which he would not want to amend the written agreement to reflect a rate change for order flow payments. *Id.*

Further contradicting Defendants' argument that these payments from Effex were common in the industry is the fact that not a single one of FXCM's other market makers paid FXCM for retail order flow during the roughly four and a half years that Effex was making these payments. ¶¶205-10. As Niv testified, FXCM tried to extract order flow payments from its other retail market makers, but they were not willing to pay. ¶210. Defendants claim that the various trading advantages FXCM granted to Effex were because Effex provided consistently superior execution compared to the other market makers. MSJ at 26. Yet, despite providing better execution, earning trading advantages, and capturing more trading volume than any other market maker, which presumably would give Effex *more* negotiating power than competitors offering worse execution, Effex was still the only one who paid FXCM for order flow. It defies logic to suggest that FXCM could strike a similar deal as it had with Effex in an arm's length transaction. In practice, its

---

[5] To the extent that liquidity providers in other contexts may have briefly paid "substantial" amounts comprising over half of their trading profits, Mr. Wilson-Taylor described such practices as "not sustainable." ¶285.

attempts to do so failed. ¶210. These facts show that Effex's payments to FXCM were not standard payments common in the industry, but unique payments that FXCM extracted only from Effex.[6]

### 3.   FXCM's Financial Statements Violated GAAP and Were Misleading

SEC regulations dictate that where financial statements are not prepared in compliance with U.S. Generally Accepted Accounting Principles ("GAAP"), they are presumed to be misleading. 17 C.F.R. § 210.4-01(a)(1); *see also SAIC*, 818 F.3d at 93. Whether GAAP violations occurred is a fact-specific issue. *S.E.C. v. Caserta*, 75 F. Supp. 2d 79, 94 (E.D.N.Y. 1999) (denying summary judgment) (citing *In re Burlington Coat Factory Sec. Litig.*, 114 F.3d 1410, 1421 (3d Cir. 1997) ("it is a factual question whether [defendants'] accounting practices were consistent with GAAP"); *Provenz v. Miller*, 102 F.3d 1478, 1490 (9th Cir. 1996) (reversing grant of summary judgment because the "district court was wrong in resolving the factual disputes which exist as to the underlying transactions," particularly their accordance with GAAP)).

Determinations of GAAP violations frequently turn on expert testimony. *Caserta*, 75 F. Supp. 2d at 91 (citing *Provenz*, 102 F.3d at 1490 ("Not only have plaintiffs provided documentary

---

[6] Defendants do not expressly challenge materiality, including as to the statements about payments for order flow. However, Defendants imply that because the order flow payments represented only a small portion of FXCM's total revenues, the statements about order flow revenues were not material. MSJ at 9. This is not true. As Plaintiffs' accounting expert explained, the revenue from these payments represented approximately 26% of FXCM's pre-tax income during the years it received these payments from Effex. ¶295. In any event, Defendants' argument has been consistently rejected by courts in the Second Circuit. *See, e.g., Indiana Pub. Ret. Sys. v. SAIC, Inc.*, 818 F.3d 85, 96 (2d Cir. 2016) (undisclosed kickback scheme that "was worth a fraction of SAIC's yearly revenues" was material given company's "possible exposure to significant civil and even criminal liability"); *Villella v. Chem. & Mining Co. of Chile Inc.*, No. 15 CIV. 2106 (ER), 2017 WL 1169629, at *12 (S.D.N.Y. Mar. 28, 2017) (failure to account for bribery payments representing 0.5% of income, but which caused a decrease in stock price, affected the company's reputation, and subjected the company to regulatory penalties, was material to investors); *Strougo v. Barclays PLC*, 105 F. Supp. 3d 330, 349 & n.119 (S.D.N.Y. 2015) (statements regarding trading platform that accounted for 0.1% of total revenue, but which "call into question the integrity of the company as a whole" were material to investors).

evidence that defendants may have [violated GAAP], they also provided expert testimony in support of their contentions."); *Fine v. Am. Solar King Corp.*, 919 F.2d 290, 298 (5th Cir. 1990) (reversing grant of summary judgment because "a reasonable jury ... might believe the [p]laintiffs' expert and find that [defendant] knew that it was issuing a false and misleading report, or that it was severely reckless in issuing its report")).

There is no dispute as to whether FXCM made the disclosures or consolidation necessary if Effex were a related party or variable interest entity ("VIE"). It did not. The only dispute as to whether Defendants violated GAAP is whether the facts show that Effex was a related party or VIE. *See* MSJ at 19-22. Plaintiffs have proffered evidence which, as explained in the reports submitted by Plaintiffs' accounting expert, Mr. Barron (ECF Nos. 240-1 and 240-3), demonstrates at least a genuine issue of material fact as to whether Effex was a related party or VIE, and thus whether FXCM's financial statements violated GAAP.

### a.      FXCM Was Required to Disclose Effex as a Related Party

Mr. Barron's reports explain that Effex was a related party of FXCM under GAAP because FXCM was in a position to significantly influence the management or operating policies of Effex to the extent that Effex might have been prevented from fully pursuing its own separate interests. Defendants do not contest the standard Mr. Barron applied in reaching his opinion. MSJ at 21.

Mr. Barron based his opinion on a thorough review of the facts of the case. Specifically, Mr. Barron pointed to the facts that, among other considerations: (1) FXCM helped to spin off EES into Effex, which served as a continuation of EES, ¶¶171-72; (2) Effex could not have begun operations without the financial and other support of FXCM, ¶¶174-176, 238-40; (3) Effex was initially entirely dependent on FXCM for its revenues and trading volume, ¶235; (4) Effex relied on FXCM's employees, office space, and technology, ¶¶241-47; (5) Effex continued to depend on

FXCM for the substantial majority of Effex's business throughout the time it paid FXCM for order flow, ¶¶235-38; (6) the signed option agreement entitled FXCM to acquire a 70% interest in Effex for $1, ¶184; and (7) the companies maintained a profit-sharing arrangement tracking the economic terms of Dittami's employment contract, ¶¶178-234. *See* ECF No. 240-1 (Barron Report) at 5-6.

Mr. Barron's rebuttal report thoroughly refutes the arguments made by Defendants and their expert. ECF No. 240-3. Defendants and their expert rely almost exclusively on Defendants' and Dittami's self-serving statements, which were made years after the fact during the course of regulatory investigations and often contradicted contemporaneous documentary evidence. MSJ at 21. Defendants' examples of a few operational activities that Effex conducted on its own, *see id.*, do not preclude a finding that FXCM could significantly influence Effex's management.

FXCM also further proved its ability to significantly influence Effex through the negotiations of Effex's payments to FXCM. First, the fact that none of FXCM's other liquidity providers were willing to pay for retail order flow, despite the fact that they were providing worse execution and receiving less volume without Effex's trading advantages, shows that FXCM was able to influence Effex because FXCM was not able to extract these payments from other market makers in actual arm's length negotiations. ¶¶205-10. Second, that Effex's payments to FXCM constituted a majority of Effex's trading profits from FXCM trading volume further shows FXCM's influence over Effex. ¶212. Finally, Dittami and Defendants expressed that they intended for Effex's payments to FXCM to mirror the 70-30 split of trading profits from Dittami's employment agreement with FXCM. ¶¶181-85. The existence, magnitude, and intent of Effex's payments to FXCM demonstrate that FXCM both could and did significantly influence Effex's management, further demonstrating that Effex was a related party from 2010-2014.

### b.      FXCM Was Required to Consolidate Effex as a VIE

In the alternative, Mr. Barron's reports demonstrate that Effex was a VIE of which FXCM was the primary beneficiary. Once again, the parties do not diverge on the standard for this determination under GAAP, MSJ at 19, only on the application of facts. FXCM was required to consolidate Effex if (1) Effex was a VIE; (2) FXCM had a variable interest in Effex; and (3) FXCM was the primary beneficiary of Effex as a VIE. *See id.*

Effex was a VIE because it had insufficient equity at risk to permit it to finance its activities without additional financial support. ECF No. 240-1 at 6-7. As Mr. Barron concluded in his report, based on contemporaneous documents, and later confirmed by FXCM's management, Effex lacked sufficient equity at risk at the time of its formation and beyond. Indeed, FXCM's management concluded that Effex "likely did not have sufficient equity to fund its activities" based on the support FXCM gave at Effex's inception, including the use of FXCM's office space and use of a prime-of-prime account with FXCM's prime broker, which Effex needed in order to trade. ¶296. Defendants' arguments that Effex later stopped needing some of FXCM's support, MSJ at 20, fail to show that Effex could continue its operations without FXCM's ongoing support. ECF No. 240-3 (Barron Rebuttal) at 21.

Mr. Barron also explains how Effex's payments to FXCM demonstrated FXCM's variable interest in Effex. As Mr. Barron explained, "[e]xpected losses or expected residual returns are based on expected positive or negative variability in the fair value of the entity's net assets." *Id.* at 25-26. The fair value of Effex's net assets varied based on its profitability. As FXCM was receiving approximately 70% of Effex's profits from FXCM trading volume, FXCM would thus be absorbing or receiving that variability in the fair value of Effex's net assets. *Id.* at 26. FXCM's variable interest in Effex is shown by the variation of Effex's payments to FXCM, which followed the variation in Effex's trading profits. ¶¶217, 220, 223, 225, 228, 231. When Effex made less

29

money, the parties changed the payments so that FXCM made less money. ¶¶194, 217, 220, 223, 225, 228, 232. Defendants do not contend that Effex suffered losses which FXCM did not absorb.

Finally, Mr. Barron explains how the evidence shows, and FXCM's management once again later confirmed, that FXCM was the primary beneficiary of Effex. FXCM management concluded that FXCM satisfied the criteria of having the right to receive benefits from Effex that could potentially be significant to Effex in that FXCM received a majority of Effex's trading revenues from trading against FXCM customers. ¶297. FXCM also had the power to direct the activities of Effex that most significantly impacted Effex's economic performance, satisfying the other criteria of a primary beneficiary. ECF No. 240-3 at 27. This was particularly true in the early stages of the relationship, when FXCM was Effex's only customer. ¶235. Effex also relied on trading advantages granted by FXCM to increase Effex's trading volume, which would impact Effex's size and profile within the market, which would eventually allow Effex to obtain other customers. ¶¶250-58. Indeed, despite Defendants' argument that Effex eventually developed some customers outside of FXCM and thus established its independence, the proof is in the pudding: once FXCM terminated its relationship with Effex in 2017, Effex was unable to support itself and quickly went out of business. ¶¶259-60.

### c.   That FXCM's Auditor Approved FXCM's Financial Statements Does Not Vindicate Defendants' GAAP Violations

Defendants' attempt to use their auditor's sign-off as shield to accounting misconduct also fails. Defendants repeatedly argue that because FXCM's auditor, E&Y, issued unqualified audit opinions in connection with FXCM's financial statements, and never required FXCM to restate its financials, FXCM must have complied with GAAP. *E.g.,* MSJ at 18-19, 27, 35. As Mr. Barron explains in his rebuttal report, this argument fails because (1) E&Y's audit procedures did not include an evaluation of the relationship between FXCM and Effex for purposes of determining

whether Effex should have been considered a related party or VIE, ECF No. 240-3 at 34-37; and (2) the *post mortem* procedures performed by E&Y in connection with Defendants' regulatory settlements likewise did not include an independent analysis by E&Y of these two accounting issues, *id.* at 37-42.

E&Y's self-interested analysis, coming after regulators heavily penalized FXCM, relied chiefly on representations from Defendants. *Id.* Defendants failed to provide E&Y with a complete understanding of the nature of FXCM's relationship with Effex such that E&Y would know to, or be able to, independently evaluate the relationship. As Mr. Barron explained, "[a]uditors rely primarily upon management to identify related parties" and "the simple fact that a significant amount of revenue was coming from one party [*i.e.,* the order flow payments from Effex] would not cause an auditor to raise an issue with respect to related parties." *Id.* at 32-33.

In fact, E&Y's corporate representative testified that E&Y first became aware of the arrangement between Mr. Dittami and FXCM over the course of the NFA and CFTC communications in 2015 and 2016. ¶299. He also testified that prior to the time of the NFA and CFTC investigations, E&Y was not aware of the entire relationship between FXCM and Effex, only the records of the payments. *Id*. Furthermore, testimony from Lande shows that neither FXCM management nor E&Y discussed the effect of FXCM's relationship with Effex on FXCM's financial statements in connection with E&Y's audits. ¶300. Thus, the fact that E&Y issued clean audit opinions does not vindicate Defendants' GAAP violations. Rather, this evidence shows that Defendants' concealed FXCM's relationship with Effex from its auditor.[7]

---

[7] Defendants omit from their brief any mention of the Sarbanes-Oxley Act of 2002 ("SOX") certifications attached to each 10-K and 10-Q, ¶¶301-313, which Plaintiffs also allege were false and misleading. ECF No. 181 (complaint) ¶¶ 169-72; *see also* ECF No. 252-79 (Plaintiffs' interrogatory responses) at 4-16. In the event Defendants belatedly attempt to challenge these

**C.      Plaintiffs' Evidence Supports a Finding that Defendants Acted With Scienter**

The required level of scienter under Section 10(b) is an "intent to deceive, manipulate, or defraud," which may be satisfied by showing Defendants' "reckless disregard for the truth." *S. Cherry St., LLC v. Hennessee Grp. LLC*, 573 F.3d 98, 109 (2d Cir. 2009). Plaintiffs may meet this standard with either facts "(1) showing that the defendants had both motive and opportunity to commit the fraud or (2) constituting strong circumstantial evidence of conscious misbehavior or recklessness." *ATSI Commc'ns, Inc. v. Shaar Fund, Ltd.*, 493 F.3d 87, 99 (2d Cir. 2007).

As the Second Circuit has explained, however, the distinction between these two means of proving scienter diminishes in importance at the summary judgment stage. *AUSA Life Ins. Co. v. Ernst & Young*, 206 F.3d 202, 221 n.12 (2d Cir. 2000). Indeed at the summary judgment stage, "the issue is whether the evidence, taken as a whole, could support a finding by a reasonable juror that defendants acted with the intent to deceive, manipulate, or defraud investors." *In re N. Telecom Ltd. Sec. Litig.*, 116 F. Supp. 2d 446, 462 (S.D.N.Y. 2000). In *AUSA Life Ins.*, the Second Circuit reversed the district court's finding that a defendant "lacked the motivation to commit fraud," because the district court "inappropriately makes the scienter issue one of 'what did the defendant *want* to happen' as opposed to 'what could the defendant reasonably foresee as a potential result of his action.'" 206 F.3d at 221 (emphasis in original).[8] At the summary judgment stage, "it is sufficient for a plaintiff to allege and prove that a defendant could have foreseen the consequences of his actions but forged ahead nonetheless" *Id.*

---

statements, Plaintiffs' evidence is likewise sufficient to demonstrate a genuine issue of material fact as to Defendants' liability with respect to the SOX certifications.

[8] "While it is true that motive can be a relevant consideration … the absence of a motive allegation is not fatal." *Tellabs, Inc. v. Makor Issues & Rts., Ltd.*, 551 U.S. 308, 322 (2007). Contrary to Defendants' arguments, MSJ at 23, the absence of insider stock sales does not negate Defendants' scienter. *See id.* at 325 (lack of insider stock sales is not fatal to scienter).

The Second Circuit is lenient in allowing scienter issues to withstand summary judgment, even if the inferences are fairly tenuous. *See Press v. Chem. Inv. Servs. Corp.*, 166 F.3d 529, 538 (2d Cir. 1999) (citing *In re Time Warner Inc. Sec. Litig.*, 9 F.3d 259, 270–71 (2d Cir. 1993)). Moreover, scienter is a question of fact, and therefore "appropriate for resolution by the trier of fact." *Press*, 166 F.3d at 538; *see Wechsler v. Steinberg*, 733 F.2d 1054, 1058–59 (2d Cir. 1984) ("Issues of motive and intent are usually inappropriate for disposition on summary judgment."). *See also In re Kidder Peabody Sec. Litig.*, 10 F. Supp. 2d 398, 415 (S.D.N.Y. 1998) ("Whether a plaintiff can establish scienter usually cannot be decided on summary judgment."); *In re Columbia Sec. Litig.*, 155 F.R.D. 466, 479 (S.D.N.Y. 1994) ("Resolution of the question of scienter, as with any issue of motive or intent, generally requires examination of a witness's demeanor and credibility and is thus usually inappropriate for disposition on summary judgment.").

Defendants rely heavily on the self-serving, *post hoc* testimony given by interested parties (themselves and Dittami) during regulatory investigations. "Because credibility determinations fall squarely within the province of the jury, [Defendants'] overwhelming reliance upon witness testimony further supports the conclusion that summary judgment is inappropriate in this case." *In re Longtop Fin. Techs. Ltd. Sec. Litig.*, 32 F. Supp. 3d 464, 475 (S.D.N.Y. 2014) (denying motion for summary judgment). As the Court in *Longtop* cautioned:

> Too often, judges substitute their own judgment for that of the jury. … Encroaching upon the province of juries to decide questions of fact, such as the determination of a defendant's state of mind, violates not only the constitutional rights of the parties in a suit, but also the constitutional rights of the jurors themselves.

*Id.* at 474. Courts "may grant summary judgment only where the facts are so one-sided that reasonable parties could not disagree on the outcome." *Id.* at 475. This case presents no such facts.

     1.     **Plaintiffs' Evidence Shows Defendants' Conscious Misbehavior or Recklessness in Concealing FXCM's Relationship With Effex**

Defendants do not contest that Niv and Ahdout knew about FXCM's financial arrangements with Dittami and Effex. Niv and Ahdout hired Dittami. ¶162. They stayed abreast of his efforts to develop EES into an internal liquidity provider that was intended to, and did, trade against FXCM retail customers. ¶163. They knew that FXCM's compliance department determined that EES could not continue to trade without rendering FXCM's statements about the NDD untruthful, when FXCM would have kept 70% of EES's trading profits. ¶165. They helped Dittami to spin off EES as Effex and provided resources to incubate Effex. ¶¶171, 174-76. They signed or were aware of the option agreement and Dittami's resignation letter. ¶¶183-84. They were part of the efforts to structure Effex's payments as payments for order flow. ¶192. They received regular updates from Dittami on Effex's trading profits. ¶¶190-91. They knew Effex' payments would vary over time. ¶194. They agreed to change Effex's payments on multiple occasions, approximating the original split of trading profits and generally ignoring the services agreement. ¶¶217, 220, 223, 225, 228, 231.

Instead of denying their knowledge, Defendants argue that they "acted in good faith with the intention of improving the experience of FXCM's customers." MSJ at 24. Defendants miss the point. The issue is not that Defendants failed to disclose that Effex was acting as a liquidity provider. The issue is that Defendants failed to disclose that Effex was paying FXCM kickbacks of most of its profits from its trading against FXCM customers.

After Defendants determined that they could not have EES trade against retail customers and still claim to operate a NDD model, they could have disclosed that EES was trading against customers and explained how it would create all of the purported benefits to customers that

Defendants pointed to after the fact.[9] They chose not to disclose. Once Defendants decided to spin off EES as Effex, they could have disclosed the financial relationship, explaining why the arrangement nonetheless created all of these purported benefits for customers or even why it supposedly avoided creating a conflict of interest. Once again, they chose not to disclose. Defendants' own actions beg the question: if FXCM's relationship with Effex was arranged in "good faith" (MSJ at 24), actually aligned FXCM's interests with its customers (MSJ at 25), and produced tangible benefits (MSJ at 26), why did they choose not disclose it? The answer, as a reasonable juror could easily find, is that Defendants knew, or could reasonably foresee, that customers, investors, and regulators would see the financial arrangement with Effex for what it was: kickbacks from Effex trading against FXCM's customers.

Even if Defendants had laudable reasons for FXCM's *trading* relationship with Effex, a reasonable juror could still find that they acted with scienter in failing to disclose FXCM's *financial* relationship with Effex, *i.e.* the kickbacks. The kickbacks made Defendants' statements untrue; they were the means of Defendants' "plan to take advantage of FXCM's NDD clients." MSJ at 24 (quoting the Court's holding on Plaintiffs' scienter allegations at the pleading stage). Tellingly, Defendants do not claim that the kickbacks played any role in achieving the purported benefits from having Effex as a liquidity provider. FXCM could still have worked closely with Effex to improve execution without the kickbacks. Without the kickbacks, Effex would still have been motivated to provide superior execution to gain trading advantages and win more trading volume. In truth, the kickbacks were the result of FXCM taking advantage of its dominant

---

[9] FXCM created a memorandum in 2015 espousing the purported customer benefits that Effex helped to create. ¶270. The NFA and CFTC reviewed the memorandum and the NFA forbade FXCM from publishing it in the U.S. *Id*. The memorandum did not change the regulators' minds in barring FXCM from operating in the U.S.

bargaining power with Effex. Effex depended on FXCM, ¶¶235-248, and as Niv recognized, Effex had "[a lot] to lose if they piss [FXCM] off." ¶238. None of FXCM's other market makers were willing to pay for order flow, FXCM could extract the payments only from Effex. ¶210.

Defendants' attempts to cover up FXCM's relationship with Effex, both in their public statements and in their responses to regulators, also constitute evidence of scienter. *E.g., Szulik v. Tagliaferri*, 966 F. Supp. 2d 339, 365 (S.D.N.Y. 2013).[10] Defendants hid FXCM's relationship with Effex from competitors, ¶261, from FXCM's SEC filings, ¶¶262-63, and from regulators, ¶264. Defendants also attempted to mislead the NFA during its investigation. ¶¶265-66.

These facts are sufficient to raise at least a genuine issue of material fact as to Niv and Ahdout's scienter. Defendants do not contest that Niv or Ahdout's scienter may properly be imputed to FXCM. MSJ at 29. Therefore these same facts are also sufficient to raise a genuine issue of material fact as to FXCM's scienter.

## 2.    Defendants' GAAP Violations Were Made with Scienter

This Court previously found that Plaintiffs adequately alleged scienter by pleading that Defendants were aware of facts underlying the alleged misrepresentations and omissions, which included the GAAP violations. *See* ECF No. 135 at 31-33 (citing *Vanleeuwen v. Keyuan Petrochemicals, Inc.*, No. 13 CIV. 6057 PAC, 2014 WL 3891351, at *3 (S.D.N.Y. Aug. 8, 2014) (finding scienter was supported by allegations that defendant was aware of related-party transactions but failed to disclose them)). Plaintiffs have now proffered evidence showing Defendants' knowledge of these same underlying facts. "[C]ourts have found that egregious

---

[10] *See also In re Nature's Sunshine Prod. Sec. Litig.*, 486 F. Supp. 2d 1301, 1310 (D. Utah 2007) ("Evidence that a defendant has taken steps to cover-up [sic] a misdeed is strong proof of scienter"); *Baena v. Woori Bank*, 515 F. Supp. 2d 414, 421 (S.D.N.Y. 2007) ("The subsequent lies — the cover up — [are] strong circumstantial evidence of [...] 'conscious behavior' which raises an inference of an intent to defraud.").

violations of GAAP, or GAAP violations together with other evidence, may suffice" to satisfy the scienter standard. *Caserta*, 75 F. Supp. 2d at 94 (collecting cases and denying defendants' motion for summary judgment on scienter grounds).

This is not a case, as Defendants claim, where Plaintiffs' accounting expert simply proffered a "disagreement regarding the treatment of a complicated accounting issue." MSJ at 28. Whether Effex was a related party or VIE is not a complicated or unusual accounting issue. In fact, FXCM disclosed other related party transactions in each of its annual and quarterly reports during the time Effex was paying FXCM, and included assessments of VIEs in its annual and quarterly reports through the first quarter of 2013, so these were not foreign concepts. ¶159. Defendants, their expert, and their auditor, are simply crediting a different set of facts. As demonstrated above, a reasonable juror could conclude from the facts of this case that the version of facts credited by Plaintiffs' expert, "would also have required [Defendants] to make certain accounting disclosures," ECF No. 135 at 25, such as Effex being a related party or VIE.

Defendants' argument that E&Y approved FXCM's financial statements, MSJ at 27, does not vitiate a finding of scienter. Defendants cannot insulate themselves via E&Y's review of the services agreements and invoices, as E&Y did not conduct independent assessments of the relevant accounting issues. *Supra*, section III(B)(3)(c). Defendants' argument echoes the one rejected by the court in *In re Lehman Bros. Sec. & ERISA Litig.*, 903 F. Supp. 2d 152, 186 (S.D.N.Y. 2012), where the defendants argued that they "acted without culpable intent because Ernst & Young 'knew of, vetted and approved'" the practices in question. As the court found in *Lehman Bros.*:

> The best that can be said for the Officer Defendants in these circumstances is that Ernst & Young's knowing approval, if that is what ultimately is established, of Lehman's "window dressing" of its financial statements to manipulate its net leverage might give rise to an exculpatory inference that a jury would find persuasive. But a contrary inference would be cogent and at least as compelling—

37

> namely, that the Officer Defendants knew full well of the misleading effect of their failure to disclose the Repo 105 transactions, sought to have Lehman benefit from that deception, and intended to use Ernst & Young as a fig leaf if the house of cards came tumbling down, as indeed it did.

903 F. Supp. 2d at 186. That is precisely what happened here. Defendants used the "window dressing" of its financial statements by omitting Effex as a related party or VIE, and misrepresenting the order flow payments, to conceal FXCM's relationship with Effex. Now they are attempting to "use Ernst & Young as a fig leaf" as their fraud is revealed. *Id.*

In the cases cited by Defendants, MSJ at 27-28, the auditors had "full knowledge" of the relevant facts, and the evidence "clearly rebut[ted] any inference of bad faith," neither of which were true here.[11] Here, Defendants withheld material facts from E&Y about FXCM's relationship with Effex in connection with E&Y's audits of FXCM's financial statements until the regulators were closing in on FXCM. ¶¶204, 219, 221. E&Y did not conduct an independent assessment of FXCM's relationship with Effex. *Supra*, section III(B)(3)(c). Defendants' knowledge of facts showing that Effex was a related party or VIE, and their withholding of material facts from E&Y, would allow a reasonable juror to conclude that Defendants acted with scienter in filing financial statements that violated GAAP. "If a company officer knows that the financial statements are false or misleading and yet proceeds to file them, the willingness of an accountant to give an unqualified opinion with respect to them does not negate the existence of the requisite intent or establish good faith reliance." *United States v. Erickson*, 601 F.2d 296, 305 (7th Cir. 1979).

The counterfactual underscores how Defendants' scienter extends to the GAAP violations. Had Defendants accurately disclosed Effex as a related party or VIE, the disclosure would have

---

[11] *See In re REMEC Inc. Sec. Litig.*, 702 F. Supp. 2d 1202, 1246 (S.D. Cal. 2010); *In re Cirrus Logic Sec. Litig.*, 946 F. Supp. 1446, 1465 (N.D. Cal. 1996).

revealed the underlying fraud. Defendants' GAAP violations were part and parcel of their efforts to conceal FXCM's relationship with Effex.

### D.    Plaintiffs' Evidence Supports a Finding of Loss Causation

The Court has already held that "based on Plaintiffs allegations, there is little doubt that the regulatory settlement's disclosure of FXCM's purported fraud, and its order that FXCM effectively stop doing business within the United States, had an immediate and tangible effect on the Company's value," which is "more than sufficient" to satisfy loss causation. ECF No. 135 at 36. The evidence, including reports from Plaintiffs' expert, amply support Plaintiffs' allegations.

To show loss causation, the Second Circuit requires plaintiffs to produce sufficient evidence for the fact finder to "ascribe some rough proportion of the whole loss" to defendants' fraud. *Lattanzio v. Deloitte & Touche LLP*, 476 F.3d 147, 158 (2d Cir. 2007). The Second Circuit has clarified that it was not suggesting that "plaintiffs were required to allege the precise loss attributable" to defendants' fraud. *Lentell v. Merrill Lynch & Co.*, 396 F.3d 161, 177 (2d Cir. 2005). Causation is fundamentally a factual matter ill-suited for resolution at summary judgment. *Id.* at 174 (noting that as a general matter, "the chain of causation ... is a matter of proof at trial").

Establishing loss causation requires a showing that "the <u>subject</u> of the fraudulent statement or omission was the cause of the actual loss suffered." *Vivendi II*, 838 F.3d at 261 (emphasis in original). "[A] plaintiff can establish loss causation either by showing a 'materialization of risk' or by identifying a 'corrective disclosure' that reveals the truth behind the alleged fraud." *Id.* Corrective disclosures and materializations of risk are not "fundamentally different pathways for proving loss causation." *Id.* "Whether the truth comes out by way of a corrective disclosure describing the precise fraud inherent in the alleged misstatements, or through events constructively disclosing the fraud, does not alter the basic loss-causation calculus." *Id.* at 262.

"[C]ourts assessing plaintiffs' case for loss causation look to whether the alleged damages were reasonably foreseeable given the alleged false or misleading statements." *In re Vivendi Universal, S.A. Sec. Litig.*, 634 F. Supp. 2d 352, 360 (S.D.N.Y. 2009) ("*Vivendi I*"). "To prove that the loss-inducing event was foreseeable, plaintiffs must establish that the risk of the event occurring was within the zone of risk concealed by the misrepresentations and omissions alleged." *Id.* at 363. Investors are entitled to recover for their losses attributable to a corrective disclosure so long as these events are "sufficiently related to the fraud." *Id.* at 364.

Plaintiffs claim that Defendants' fraud artificially inflated the prices of FXCM common stock and the FXCM Notes during the Class Period, and was revealed through disclosures about the regulatory settlements made on a single date, February 6, 2017 (after the close of trading), which dissipated the artificial price inflation and damaged Plaintiffs and the Class as the prices dropped the following day. ECF No. 181 (complaint) ¶¶ 79-83. Plaintiffs' expert, Dr. Werner, has submitted detailed reports explaining how the facts of this case support Plaintiffs' theory. ECF Nos. 245-1 and 245-3. As explained in greater detail in Plaintiffs' opposition to Defendants' motion to exclude Dr. Werner's reports, Defendants' arguments are unfounded, illogical, and at best they amount to factual disputes, precluding summary judgment.

Defendants' argument that Dr. Werner failed to disaggregate losses caused by confounding factors is wrong on the facts and the law. First, Dr. Werner did disaggregate losses caused by the corrective disclosures from losses caused by other factors. ECF No. 245-1 (Werner Report) at 26. Second, the "multiple pieces of information" that entered the market, MSJ at 31, which Defendants' expert calls "collateral consequences," ECF No. 245-4, are nothing more than the direct and foreseeable ramifications of Defendants' fraud. To wit, the $7 million fine and the ban from operating in the U.S. were the penalties imposed by the regulators, and agreed to by

Defendants, for the regulators' findings that Defendants made material misrepresentations about FXCM's relationship with Effex – the same misrepresentations at issue here. ¶¶274-76. That FXCM would lay off 18% of its workforce and sell its customer accounts were not separate news, MSJ at 31, those were simply the machinations of FXCM being barred from operating in the U.S. The penalties imposed by regulators for the very misconduct they revealed, the same as Plaintiffs allege here, were well within "the zone of risk concealed by the misrepresentations," "sufficiently related to the fraud," and thus the damages from their revelation were "reasonably foreseeable," and sufficient to show loss causation. *Vivendi I*, 634 F. Supp. 2d at 360 and 363-64.

Defendants' argument that the "precise form" of the regulatory penalties were not perfectly foreseeable, MSJ at 31, imagines a novel and impossible standard. To rephrase an analogy from Dr. Werner's deposition testimony, ECF No. 245-2 at 465:10-16, if you commit murder, you need not know with certainty the exact sentence that will be imposed to reasonably foresee that you will be punished severely for your actions. A prison sentence imposed years later is well within the zone of risk created by your misconduct.

Defendants' argument that the revelation of FXCM's relationship with Effex was no longer value relevant at the time of the corrective disclosures likewise has no basis in fact or law. The information was value relevant in that it revealed Defendants' misrepresentations and undisclosed risks which had never been incorporated by the market into the price of FXCM's securities. ECF No. 245-1 at 25; ECF No. 245-3 (Werner Rebuttal) at 9. First, the February 6, 2017 disclosures revealed that FXCM had been lying to its customers and investors about its NDD model for retail trading, which was purportedly "fundamental to our core business philosophy" and "our largest source of revenue." ECF No. 245-3 at 9; ¶¶149, 155. Second, the disclosures revealed undisclosed risks, including the risks that FXCM would suffer reputational damage, lose customers, and face

severe regulatory penalties, which all materialized upon the February 6, 2017 disclosures. ECF No. 245-3 at 9-11. The undisclosed risks were not that regulators might generally inquire into FXCM's business, MSJ at 34, but that FXCM's relationship with Effex and Defendants' attempts to conceal and misrepresent that relationship were likely to result in severe regulatory penalties. *See* ECF No. 245-3 at 6-7, 9. Third, as Dr. Werner explains in his rebuttal report, "[t]hat a disclosure of fraud can have a significant negative valuation impact on a company is a generally-accepted principle." *Id.* at 6.

Defendants also misconstrue Plaintiffs' theory of the case and conflate loss causation with reliance. Defendants' misrepresentations and omissions introduced artificial inflation into the price of FXCM's securities *throughout* the Class Period. Defendants do not contend, nor can they, that the misrepresentations or omissions were ever corrected or that any intervening event removed the artificial inflation prior to February 6, 2017.[12] Defendants' argument that Plaintiffs could not have "sustained losses attributable to a prior misstatement or omission" flaunts the basic tenets of the fraud-on-the-market theory and attempts to shoehorn a misguided reliance argument.[13] As the Supreme Court explained in *Basic Inc. v. Levinson*, 485 U.S. 224, 241–421 (1988):

> The fraud on the market theory is based on the hypothesis that… the price of a company's stock is determined by the available material information regarding the company and its business.... The causal connection between the defendants' fraud and the plaintiffs' purchase of stock in such a case is no less significant than in a case of direct reliance on misrepresentations.

---

[12] The Court has also already rejected Defendants' spurious argument, MSJ at 33, that the SNB Flash Crash—which occurred two years before the corrective disclosure and which Defendants do not claim revealed any of the alleged misrepresentations or omissions—somehow precludes loss causation. ECF No. 135 at 35-36.

[13] Defendants have conceded that the Class of FXCM stock purchasers are entitled to the *Basic* presumption of reliance. ECF No. 187 at 18 n.14. Defendants' arguments regarding 683 Capital's reliance also fail as outlined below in section III(F)(1).

Finally, Defendants' argument that Plaintiffs cannot prove loss causation with respect to the GAAP violations also fundamentally misses the point. Defendants argue that FXCM's GAAP violations cannot be "corrected" absent a restatement. This assumption is baseless. *See, e.g., In re Chicago Bridge & Iron Co. N.V. Sec. Litig.*, No. 17 CIV. 01580 (LGS), 2019 WL 5287980, at *25–32 (S.D.N.Y. Oct. 18, 2019) (finding corrective disclosure of GAAP violations based on analyst reports without a restatement). "There is no requirement that the corrective disclosure take a particular form or be of a particular quality," such that it be a "mirror image tantamount to a confession of fraud." *In re Vale S.A. Sec. Litig.*, No. 1:15-CV-9539-GHW, 2017 WL 1102666, at *29 (S.D.N.Y. Mar. 23, 2017). The February 6, 2017 disclosures revealed facts underpinning Defendants' GAAP violations, namely that Effex was an undisclosed related party or VIE. *See* ¶¶274-76. The corrective disclosures need not "describe[e] the precise fraud" in terms of the GAAP violations so long as they "constructively disclos[ed] the fraud," which is sufficient to demonstrate loss causation. *Vivendi II*, 838 F.3d at 262.[14]

### E.   Plaintiffs' Evidence Supports a Finding that Plaintiffs and the Class Suffered Compensable Damages

Traditionally, Section 10(b) damages are calculated using the "out-of-pocket" damages rule. *See Acticon AG v. China N. E. Petroleum Holdings Ltd.*, 692 F.3d 34, 38 (2d Cir. 2012) (noting a defrauded buyer is entitled to damages equal to the difference between the price paid and the value of the stock when purchased). Indeed, the Supreme Court adopted the "out of pocket" damages rule in *Affiliated Ute Citizens of Utah v. United States*, 406 U.S. 128, 155 (1972). The generally accepted practice in securities fraud cases is to estimate "out-of-pocket" damages by

---

[14] To the extent Defendants' out-of-circuit district court cases conflict with the standard espoused by the Second Circuit in *Vivendi II*, 838 F.3d at 262, they are neither persuasive nor controlling. MSJ at 36 (citing *In re Scientific Atlanta, Inc. Sec. Litig.*, 754 F. Supp. 2d 1339, 1371 (N.D. Ga. 2010) and *In re Retek Inc. Sec. Litig.*, 621 F. Supp. 2d 690, 704 (D. Minn. 2009)).

reference to the decline in the stock price when a concealed risk has materialized. *See, e.g., Vivendi I*, 634 F. Supp. 2d at 358-59, 370-71 & n.6 (acknowledging the constant-dollar inflation ribbon methodology to be a reliable estimate of per share inflation in materialization-of-the-risk cases); *In re Novatel Wireless Sec. Litig.*, No. 08CV1689 AJB (RBB), 2013 WL 12144150, at *10 (S.D. Cal. Oct. 25, 2013) (finding the "commonly accepted method to calculate the value line known as backcasting" was a "reasonable and logical" method to assess the true value and artificial inflation in the stock price prior to the date of the corrective disclosure).

Dr. Werner's constant-dollar inflation method is appropriate to the facts in this case. Utilizing a constant-dollar inflation ribbon, Dr. Werner estimated $3.39 per share in out-of-pocket damages, based on the drop in FXCM's stock price on February 7, 2017, following the corrective disclosures made after close of trading the day prior. ECF No. 245-1 at 29. Dr. Werner used this widely-accepted method because Defendants' misrepresentations and omissions concealed the risks described above, *supra* section III(D), throughout the Class Period, including the reasonably foreseeable regulatory penalties. ECF No. 245-3 at 14-15. At all times during the Class Period, investors were deprived of the opportunity to price the concealed risks into FXCM's stock and thus overpaid for their investment. Accordingly, Dr. Werner's damage estimate methodology is an excellent fit with the facts and plaintiffs' theory of liability, and his use of a constant inflation ribbon is reasonable and appropriate. *Vivendi I*, 634 F. Supp. 2d at 358-59, 370-71 & n.6; *Liberty Media Corp. v. Vivendi Universal, S.A.*, 923 F. Supp. 2d 511, 525 (S.D.N.Y. 2013).

Defendants' argument that the level of inflation would have varied during the Class Period, or that the risk of regulatory penalties may have varied, are pure speculation.[15] As Dr. Werner

---

[15] It is no surprise that Defendants' expert did not offer his own competing model of damages, *see* ECF No. 245-4, as FXCM's higher market capitalization and valuation earlier in the Class Period

explains in his rebuttal report, a constant-dollar inflation ribbon is appropriate here because the concealed risks existed even prior to the start of the Class Period. ECF No. 245-3 at 14-15. FXCM's undisclosed relationship with Effex, rendering its public statements false and misleading, began two years prior to the start of the Class Period. Thus, even on day one of the Class Period, FXCM had been lying about its NDD model and order flow payments for at least a year.[16] *Id.* Defendants' argument relies on baseless speculation that, if the truth had been disclosed earlier during the Class Period: (1) FXCM's customers might not care as much about FXCM lying about its core business, (2) regulators might impose lighter punishments for Defendants' misrepresentations, and (3) investors might not devalue FXCM's securities by as much in light of the same fraud perpetuated over fewer years. ECF No. 245-3 at 7. Even if the precise terms of the regulatory settlements were not a *fait accompli* during the Class Period, the settlements were merely materializations of the underlying concealed risks which were all but certain: that customers, regulators, and investors would penalize FXCM for its fraud.

Accordingly, this case is unlike *In re: BP p.l.c. Sec. Litig.*, No. 4:10-MD-2185, 2016 WL 3090779 (S.D. Tex. May 31, 2016), which Defendants cite for the proposition that "when the corrective event is the materialization of an understated risk, the stock price movement on the date of the correction (*i.e.*, on the date that the risk materialized) will not equate to inflation on the date of purchase unless the probability of the risk materializing was 100 percent." MSJ at 38. In that case, at issue was *a portion of* damages attributable to price drops on days where the plaintiffs alleged secondary materializations (failures of containment measures) of the primary risk (the infamous oil spill). Here, the corrective event was the disclosure of FXCM's relationship with

---

would have resulted in a significantly *higher* damages estimate. *See* ECF No. 245-3 at 14. Dr. Werner's approach is both appropriate and more conservative. *Id.* at 16.

[16] *See, e.g.,* FXCM's annual report for 2010, filed in March 2011. ¶160.

Effex, which coincided with the materialization of the concealed risks (the regulatory penalties), unlike in *BP*. This same argument, that "plaintiffs must disaggregate the additional damages caused by the materialization of risk from those attributable to risk itself" was rejected in *Vivendi I,* 634 F. Supp. 2d at 371:

> Finally, it is hard to see how price declines allegedly caused by the materialization of the risk should not be incorporated into plaintiffs' damages. … Defendants are essentially arguing that plaintiffs should bear a risk they did not assume and that was intentionally concealed from them. Imposing liability for this loss would not be downside insurance for investors. Not imposing liability, however, might be a windfall for fraudsters.

No more is required to defeat summary judgment. Defendants may advance any substantive arguments they may have about alternative causation at trial.

### F.    Plaintiffs' Evidence Supports 683 Capital's Individual Claims

Defendants argue that 683 Capital "has failed to put forth sufficient evidence to prove the elements of reliance, loss causation, and economic loss for its individual claims." MSJ at 39. To the contrary, the record contains ample evidence supporting each of these elements.

#### 1.    The Evidence Sufficiently Shows 683 Capital's Actual Reliance

To establish reliance, "a plaintiff must demonstrate that 'but for the claimed misrepresentations or omissions, the plaintiff would not have entered into the detrimental securities transaction' that led to the loss." *In re Puda Coal Sec. Inc. et al. Litig.*, No. 11-CV-2598 (DLC) (HBP), 2017 WL 65325 at *9 (S.D.N.Y. Jan. 6, 2017) (quoting *ATSI*, 493 F.3d at 106), *adopted sub nom. In re Puda Coal Sec. Inc.*, No. 11-CV-2598 (DLC), 2017 WL 511834 (Feb. 8, 2017). A plaintiff can establish reliance by showing it was "aware of a company's statement and engaged in a relevant transaction … based on that specific misrepresentation." *Id.* Actual reliance means "that a plaintiff actually learned of these statements, took these statements seriously … and incorporated

these statements into its decision-making." *In re LIBOR-Based Fin. Instruments Antitrust Litig.*, No. 11 MDL 2262 (NRB), 2015 WL 6243526, at *61 (S.D.N.Y. Oct. 20, 2015).

Defendants argue that the deposition testimony of 683 Capital's representative, Joseph Patt, is "fatal to [683 Capital's] ability to prove the reliance element," MSJ at 40, because: (1) it is unclear which SEC filings 683 Capital reviewed (MSJ at 40); (2) there is no evidence that the alleged false and misleading statements were relevant to 683 Capital's decision to purchase FXCM Notes (MSJ at 41); and (3) Patt "had little understanding of the allegations" in the complaint (MSJ at 42). These arguments are without merit and are contradicted by Patt's deposition testimony.

First, as Defendants admit, MSJ at 41, Patt testified that he reviewed FXCM's annual (10-K), quarterly (10-Q), and current (8-K) reports throughout the Class Period. ¶288. For example, Patt testified that he was "following the company closely," and, contrary to Defendants' mischaracterizations, he repeatedly testified that he and 683 Capital reviewed the company's public filings, including the annual and quarterly reports. *Id*. Defendants also ignore Patt's testimony that he reviewed the specific filing that revealed that FXCM no longer received payments for order flow, the quarterly report for the third quarter of 2014. ¶289. 683 Capital's review of FXCM's relevant SEC filings distinguishes this case from those cited by Defendants. *See* MSJ at 41 (citing *Pension Comm. of Univ. of Montreal Pension Plan v. Banc of Am. Sec., LLC*, 592 F. Supp. 2d 608, 630–31 (S.D.N.Y. 2009) (plaintiff did not receive the relevant documents); *Gabriel Cap., L.P. v. NatWest Fin., Inc.*, 177 F. Supp. 2d 169, 171 (S.D.N.Y. 2001) (plaintiff had not fully read the relevant documents); *Gallup v. Clarion Sintered Metals, Inc.*, 489 F. App'x 553, 557 (3d Cir. 2012) (plaintiffs did not read the relevant documents)).

Second, there is ample evidence that not only did 683 Capital read the documents at issue, but also that the false and misleading statements contained therein formed the basis of 683

Capital's decision to purchase FXCM Notes. Indeed, Patt testified that if FXCM had disclosed its relationship with Effex, it would have changed 683 Capital's investment decision. ¶290. As Patt further explained, "[w]e thought it was an agency business that was providing leverage. Instead it was something else with a lot of risk to potentially operating. Like, they were getting -- by putting themselves at risk of being banned, which they clearly were, because they were, they took off a lot of the upside tail in this investment or just general upside, frankly, or any upside. But we didn't know that." ¶291. That 683 Capital also considered other banal factors in making its investment decision does not negate the evidence that the misrepresentations in the documents 683 Capital reviewed affected 683 Capital's purchase decisions and were incorporated into its investment decision-making process.[17] *LIBOR-Based Fin. Instruments*, 2015 WL 6243526, at *61. Unlike in *Gruber v. Price Waterhouse*, 776 F. Supp. 1044, 1047 (E.D. Pa. 1991), cited by Defendants (MSJ at 42), the evidence shows that the misrepresentations here were not "irrelevant" to 683 Capital's investment decision.

Third, Defendants' argument that Patt had "little understanding of the allegations" in the complaint, MSJ at 42, is once again contradicted by his testimony. Patt's testimony reflects his understanding that the basis of 683 Capital's claims involved, among other things, (1) an undisclosed relationship with Effex as a related party, (2) that because of this undisclosed relationship FXCM had conflicts of interest with its customers contradicting its public statements, and (3) kickback payments made by Effex to FXCM. ¶293. That Patt did not recall the particular

---

[17] To the extent that 683 Capital considered the FXCM Notes to be undervalued, or that it expected the price of the FXCM Notes to increase, there is no evidence that those factors were the "primary focus" of 683 Capital's investment decision, MSJ at 42, except insofar as those unremarkable opinions are held by any investor purchasing any security.

term "no dealing desk," MSJ at 42, is of no moment because he nonetheless provided a substantive

and accurate explanation of the central claims in this case:

> [T]hey said they were, basically, an agency business that allowed
> institutional clients to trade … FX products and lever -- and lever
> them up. But it turns out they were also like, effectively, betting, you
> know, against their clients or taking risk or doing something it
> clearly meant they weren't an agency product, which put their core
> business at risk from a regulatory perspective, because they were
> misrepresenting what they were doing to their clients and to their
> investors.

¶294. Patt's deposition testimony is sufficient to raise a genuine issue of material fact regarding

683 Capital's reliance, precluding summary judgment.

### 2. 683 Capital Raises Genuine Issues of Material Fact Regarding Loss Causation and Economic Loss

The standards for proving loss causation and economic loss are detailed above. *See supra*,

sections III(D) and (E). Defendants argue that because the Court found Plaintiffs "ha[d] not met

their burden of demonstrating that the FXCM Notes traded in an efficient market throughout the

Notes Period," ECF No. 229 at 37, therefore "Dr. Werner has no basis to conclude that the price

decline observed for the FXCM Notes on February 7, 2017, is a reliable and unbiased measure of

the price impact on that date." MSJ at 43-44. As Defendants merely regurgitate their meritless

arguments from their motion to exclude Dr. Werner's reports, Plaintiffs refer the Court to

Plaintiffs' memorandum in opposition to that motion. Dr. Werner's expert reports are reliable,

admissible, and sufficient to raise genuine issues of material fact as to the elements of loss

causation and economic loss with respect to 683 Capital's claims.

### G. Plaintiffs' Evidence Supports Their Claims Under Section 20(a)

Under Second Circuit law, to prove a claim under Section 20(a) of the Exchange Act, "a

plaintiff must show (1) a primary violation by a controlled person; (2) control of the primary

violator by the defendant; and (3) 'that the controlling person was in some meaningful sense a

culpable participant' in the primary violation." *Boguslavsky v. Kaplan*, 159 F.3d 715, 720 (2d Cir. 1998) (quoting *S.E.C. v. First Jersey Sec., Inc.*, 101 F.3d 1450, 1472 (2d Cir. 1996)). Defendants challenge only the first and third elements: a primary violation and culpable participation.

As demonstrated above, Plaintiffs have proffered sufficient evidence to raise a genuine issue of material fact as to whether FXCM committed a primary violation of Section 10(b). As further demonstrated above, Plaintiffs' evidence likewise raises a genuine issue of material fact as to whether Defendants Niv and Ahdout acted with scienter. This Court has previously equated the culpable participation element to scienter. ECF. No. 135 at 38 (finding that Plaintiffs adequately alleged culpable participation as to Niv and Ahdout because Plaintiffs adequately alleged Niv and Ahdout's scienter). Plaintiffs' evidence thus shows a genuine issue of material fact as to Niv and Ahdout's culpable participation.[18]

## IV.   CONCLUSION

The Court must deny Defendants' Motion because Plaintiffs have proffered evidence demonstrating genuine issues of material fact with respect to each of the challenged elements of Plaintiffs' claims: (1) that Defendants made false and misleading statements of material fact; (2) that Defendants acted with scienter; (3) that Defendants' misrepresentations and omissions proximately caused Plaintiffs' losses; and (4) that 683 Capital relied on Defendants' misrepresentations and omissions in purchasing the FXCM Notes.

---

[18] Alternatively, the Court may find Niv and Ahdout were "in some meaningful sense a culpable participant even though they do not meet the scienter requirements." *Boston Ret. Sys. v. Alexion Pharms., Inc.*, No. 3:16-cv-2127(AWT), 2021 WL 3675180, at *28-29 (D. Conn. Aug. 19, 2021) ("It is not apparent why a control person cannot be found, based on an individualized determination, to have been in some meaningful sense a culpable participant even when that control person does not have "conscious recklessness....").

Dated: December 9, 2021          **THE ROSEN LAW FIRM P.A.**

By: */s/ Joshua Baker*
Laurence M. Rosen
Phillip Kim
Joshua Baker
275 Madison Avenue, 40th Floor
New York, New York 10016
Telephone: (212) 686-1060
Fascimile:  (212) 202-3827
Email: lrosen@rosenlegal.com
      pkim@rosenlegal.com
      jbaker@rosenlegal.com

*Counsel for Plaintiffs and the Class*

**WOLF HALDENSTEIN ADLER
FREEMAN & HERZ LLP**
Matthew M. Guiney
270 Madison Ave.
New York, NY 10016
Tel: (212) 545-4600
Email: guiney@whafh.com

*Additional Counsel*

## <u>CERTIFICATE OF SERVICE</u>

I, the undersigned say:

I am not a party to the above case, and am over eighteen years old. On December 9, 2021, I served true and correct copies of the foregoing PLAINTIFFS' MEMORANDUM OF LAW IN OPPOSITION TO DEFENDANTS' MOTION FOR SUMMARY JUDGMENT, by posting the document electronically to the ECF website of the United States District Court for the Southern District of New York, for receipt electronically by the parties listed on the Court's Service List.

I affirm under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

Executed on December 9, 2021, at Jenkintown, Pennsylvania.

*/s/ Joshua Baker*
Joshua Baker