**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| In re Global Brokerage, Inc. f/k/a FXCM Inc. Securities Litigation | Master File No. 17-CV-00916-RA-BCM |
| This Document Relates To: All Actions | CLASS ACTION |

## PLAINTIFFS' RULE 56.1 STATEMENT OF ADDITIONAL MATERIAL FACTS

Pursuant to Local Rule 56.1, Lead Plaintiff 683 Capital Partners, LP ("683 Capital") and Class Representatives Shipco Transport Inc. and E-Global Trade and Finance Group, Inc. (collectively, "Plaintiffs") submit this statement of additional material facts as to which Plaintiffs contend that there exists a genuine issue to be tried. Documents referenced in this statement are attached to the accompanying Declaration of Joshua Baker and referred to as "Ex. __."

## Company Background and Alleged False and Misleading Statements

148. William Ahdout and Drew Niv were two of the six founding partners of FXCM. Ex. 80 (Ahdout Tr. 27:22-28:2); Ex. 81 (Niv Tr. 22:19-20).

149. FXCM's annual reports ("10-K") for 2011, 2012, and 2013 stated in substantially similar, if not identical, form:

> We primarily offer our customers what is referred to as an agency model to execute their trades. Our agency model is fundamental to our core business philosophy because we believe that it aligns our interests with those of our customers and reduces our risks. In the agency model, when our customer executes a trade on the best price quotation offered by our FX market makers, we act as a credit intermediary, or riskless principal, simultaneously entering into offsetting trades with both the customer and the FX market maker. We earn trading fees and commissions by adding a markup to the price provided by the FX market makers and generate our trading revenues based on the volume of transactions and the spread earned on transactions.

ECF No. 252-1 (2011 10-K); ECF No. 252-7 (2012 10-K); ECF No. 252-8 (2013 10-K).

150. FXCM's quarterly report ("10-Q") for the second quarter of 2012 ("12Q2") and its 2013 10-K stated:

> [A]s we have for a number of years conducted our retail operations on the basis of the agency model, we could suffer reputational damage and additional regulatory scrutiny by offering execution to retail clients that creates an inherent conflict between the interests of the customer and our interests.

Ex. 83 (12Q2 10-Q); ECF No. 252-8 (2013 10-K).

151. FXCM's 2012 10-K stated: "Our commitment to the agency model is one example of our core business philosophy to reduce risks." ECF No. 252-7 (2012 10-K).

152. FXCM's 13Q1 10-Q, 13Q2 10-Q, 13Q3 10-Q, 14Q1 10-Q, 14Q2 10-Q, and 14Q3 10-Q stated: "As we predominantly operate our retail business on an agency model with the exception of certain trades of our CFD customers we are not exposed to the market risk of a position moving up or down in value." Ex. 85 (13Q1 10-Q). Ex. 86 (13Q2 10-Q). Ex. 87 (13Q3 10-Q); Ex. 88 (14Q1 10-Q); Ex. 89 (14Q2 10-Q); Ex. 90 (14Q3 10-Q).

153. On January 27, 2013, FXCM's website stated: "FXCM does not take a market position-eliminating a major conflict of interest." ECF No. 252-13. Niv approved the "main messages" of the content published to FXCM's website, including in 2013. Ex. 81 (Niv Tr. 59:12-15) ("Q. Is the type of content shown on this page something that you would have reviewed and approved back in 2013? A. Yes.").

154. On February 5, 2013, FXCM's website stated: "FXCM can see your waiting orders when you trade with No Dealing Desk execution. But this does not create a conflict of interest between you and FXCM because we aren't taking a market position." Ex. 91 (website printout). Niv stated that he would have reviewed or approved the content. Ex. 81 (Niv Tr. 61:24-62-18).

155.    FXCM's 2011 10-K, 12Q1 10-Q, 12Q2 10-Q, 12Q-3 10-Q, 2012 10-K, 13Q1 10-Q, 13Q2 10-Q, 13Q3 10-Q, 2013 10-K, 14Q1 10-Q, 14Q2 10-Q, 14Q3 10-Q and 2014 10-K stated in substantially similar, if not identical, form: "Retail trading revenue is our largest source of revenue and is primarily driven by: . . . (iv) the amount of additional retail revenues earned, including . . . payments we receive for order flow from FX market makers." ECF No. 252-1 (2011 10-K); Ex. 82 (12Q1 10-Q); Ex. 83 (12Q2 10-Q); Ex. 84 (12Q3 10-Q); ECF No. 252-7 (2012 10-K); Ex. 85 (13Q1 10-Q); Ex. 86 (13Q2 10-Q); Ex. 87 (13Q3 10-Q); ECF No. 252-8 (2013 10-K); Ex. 88 (14Q3 10-Q); Ex. 89 (14Q3 10-Q); Ex. 90 (14Q3 10-Q); ECF No. 252-9 (2014 10-K). Niv signed each of the 10-Qs and 10-Ks, and Ahdout signed each of the 10-Ks. *Id.*

156.    FXCM's 12Q1 10-Q, 12Q2 10-Q, 12Q3 10-Q, 2012 10-K, 2013 10-K, and 2014 10-K stated in substantially similar, if not identical, form: "Income earned on order flow represents payments received from certain FX market makers in exchange for routing trade orders to these firms for execution. The Company's order routing software ensures that payments for order flow do not affect the routing of orders in a manner that is detrimental to its retail customers." Ex. 82 (12Q1 10-Q); Ex. 83 (12Q2 10-Q); Ex. 84 (12Q3 10-Q); ECF No. 252-7 (2012 10-K); ECF No. 252-8 (2013 10-K); ECF No. 252-9 (2014 10-K).

157.    FXCM's 2011 10-K, 12Q2 10-Q and 12Q3 10-Q stated in substantially similar, if not identical, form: "We earn trading fees and commissions by adding a markup to the price provided by the FX market makers and generate our trading revenues based on the volume of transactions, not trading profits or losses." ECF No. 252-1 (2011 10-K); Ex. 83 (12Q2 10-Q); Ex. 84 (12Q3 10-Q).

158.    FXCM's 14Q3 10-Q and 2014 10-K: The Company "no longer receive[d] payments for order flow." Ex. 90 (14Q3 10-Q); ECF No. 252-9 (2014 10-K).

159.     FXCM disclosed other related party transactions in each of its annual and quarterly reports during time Effex paid FXCM, and included assessments of VIEs in its annual and quarterly reports through the first quarter of 2013. ECF No. 252-1 (2011 10-K); ECF No. 252-7 (2012 10-K); ECF No. 252-8 (2013 10-K); ECF No. 252-9 (2014 10-K); Ex. 82 (12Q1 10-Q); Ex. 83 (12Q2 10-Q); Ex. 84 (12Q3 10-Q); Ex. 85 (13Q1 10-Q); Ex. 86 (13Q2 10-Q); Ex. 87 (13Q3 10-Q); Ex. 88 (14Q1 10-Q); Ex. 89 (14Q2 10-Q); Ex. 90 (14Q3 10-Q).

160.     FXCM's 2010 10-K included the following statements:

> We utilize what is referred to as agency execution or an agency model. When our customer executes a trade on the best price quotation offered by our FX market makers, we act as a credit intermediary, or riskless principal, simultaneously entering into offsetting trades with both the customer and the FX market maker. We earn trading fees and commissions by adding a markup to the price provided by the FX market makers and generate our trading revenues based on the volume of transactions, not trading profits or losses. In addition to trading fees and commissions, we also earn other forms of revenue such as fees earned from: arrangements with other financial institutions to provide platform, back office and trade execution services, trading in contracts-for-difference, or CFDs, trading in equities and equity options, payments for order flow, FX market prices and other various ancillary FX related services and joint ventures.

> Our agency model is fundamental to our core business philosophy because we believe that it aligns our interests with those of our customers, reduces our risks and provides distinct advantages over the principal model used by the majority of retail FX brokers. In the principal model, the retail FX broker sets the price it presents to the customer and may maintain its trading position if it believes the price may move in its favor and against the customer. We believe this creates an inherent conflict between the interests of the customer and those of the principal model broker. Principal model brokers' revenues typically consist primarily of trading gains or losses and are more affected by market volatility than those of brokers utilizing the agency model.

> *     *     *

> Retail trading revenue is our largest source of revenue and is primarily driven by: … (iv) the amount of additional retail

> revenues earned, including … payments we receive for order flow from FX market makers.

*    *    *

> Income earned on order flow represents payments received from certain FX market makers in exchange for routing trade orders to these firms for execution.

ECF No. 252-17 (2010 10-K).

### Dittami Joins FXCM

161.    FXCM hired John Dittami to a Managing Director position in or around September 2009. ECF No. 252-19 (Dittami employment contract). William Ahdout and Drew Niv were involved in the hiring of Dittami. Ex. 81 (Niv Tr. 72:2-18).

162.    Ahdout and Niv hired Dittami to, among other things, develop an algorithmic trading system, which became known within FXCM as EES, that would serve as a liquidity provider for FXCM. Ex. 81 (Niv Tr. 64:2-65:2). One of the goals for EES was for FXCM to earn trading profits generated by EES. Ex. 81 (Niv Tr. 68:21-69:25); Ex. 92 (Dittami Tr. 30:10-16).

163.    Niv and Ahdout received updates from Dittami on a regular basis regarding his work on EES. Ex. 81 (Niv Tr. 66:2-17).

164.    As a liquidity provider, EES was intended to take the opposite side of trades with FXCM's customers on FXCM's No Dealing Desk platform. Ex. 93 (GLBR_00121206, at GLBR_00121207) ("Regarding the counterparty item, I did ask John directly if he was a riskless principle regarding offsetting trades and he said that he wasn't. In my estimation, he has the backing of Citi but he is or was the other side of client trades executed through his pricing and liquidity"); Ex. 94 (GLBR_00060316, at GLBR_00060317) ("For exposure purposes EES will not be clicked on since they are not a true hedge. They are positions we are taking against customers.").

165. In 2010, FXCM's compliance department determined, and Ahdout and Niv agreed, that FXCM could not operate EES as an internal liquidity provider and still claim to its customers that it was operating a "no dealing desk" model and was not on the other side of their trades. Ex. 95 (Niv CFTC Tr. 77:16-78:8) ("We came to the -- compliance and legal came to the conclusion that we could not do it [operate the EES trading algorithm as a liquidity provider] from inside FXCM and continue to call a no -dealing desk a no -dealing desk… And we could not, if we did internalize him, we could not call it a non -dealing desk, we would have to call it a dealing desk."); ECF No. 252-66 (Ernst & Young LLP ("E&Y") memorandum stating that "Compliance came to the view that operating [Dittami's] algorithm within [FXCM US] would be inconsistent with the no dealing desk arrangement that FXCM used to market itself to customers").

166. FXCM's compliance department later confirmed that if FXCM were to buy Effex and Effex continued to operate as a liquidity provider for FXCM, FXCM could no longer represent to its clients that it operated a "no dealing desk" model. Ex. 95 (Niv CFTC Tr. 183:11-184:8).

167. Accordingly, FXCM decided that Dittami would have to operate EES as an external liquidity provider. Ex. 81 (Niv Tr. 87:20-88:10) ("we decided to end that venture [EES] and continue with external execution"). Ahdout informed Dittami of this decision and set about helping Dittami to establish a new entity, which would become Effex Capital, LLC ("Effex"). Ex. 96 (Dittami CFTC Tr. 108:21-109:6).

168. Dittami continued to develop and operate EES at FXCM until he left FXCM on April 14, 2010. Ex. 97 (E Capital-000096 at E Capital-000097); Ex. 92 (Dittami Tr. 42:13-19).

169.     EES began to run "test trades" in March and April 2010, which were real trades opposite FXCM's retail customers. Ex. 98 (GLBR_00153994); Ex. 92 (Dittami Tr. 56:15-57:9) Niv and Ahdout were aware of these test trades. Ex. 95 (Niv CFTC Tr. 68:9-12); Ex. 99 (Ahdout CFTC Tr. 78:2-19). These trades continued after Niv and Ahdout had determined that Dittami would have to trade separately as Effex, so that the test trades were conducted before Dittami had left FXCM, but for Effex's benefit. Ex. 100 (GLBR_00046387); Ex. 95 (Niv CFTC Tr. 88:9-13).

170.     Niv testified to the CFTC that he believed that if these test trades had continued in larger volumes with Dittami still at FXCM, it would not be consistent with FXCM's representations of operating a "no dealing desk" model. Ex. 95 (Niv CFTC Tr. 105:15-106:23).

**FXCM Helps Form and Incubate Effex**

171.     Effex was first formed on March 23, 2010. Ex. 97 (E Capital-000096 at E Capital-000097). Ahdout and FXCM's general counsel helped set up Effex, and Dittami consulted with them on the name of the entity. Ex. 101 (GLBR_00218039); Ex. 92 (Dittami Tr. 43:11-16).

172.     Effex served as a continuation of EES – other than becoming a separate legal entity the work continued, the operations continued, the test trades continued, and FXCM employees continued to refer to Effex as EES in internal correspondence and nomenclature within FXCM's accounting and trading systems. Ex. 102 (GLBR_00188104) (Dittami: "do you have any issues from your end on us starting to trade under Effex capital name?"); Ex. 103 (GLBR_00184106) (Rosenfeld asking Dittami for "EES" income figures for October 2010); Ex. 104 (GLBR_00005808 at GLBR_00005808) (FXCM employee referring to "AEES (John Dittami's company, aka EFFEX Capital)").

173. As a liquidity provider for FXCM, Effex traded opposite FXCM's retail customers, and had the potential to benefit from customer losses. Ex. 95 (Niv CFTC Tr. 199:10-20, 204:13-9). As Dittami explained, "Effex holds positions for a living." Ex. 92 (Dittami Tr. 76:12-77:2).

174. With the knowledge and/or approval of Ahdout and Niv, FXCM helped incubate Effex by providing $2 million of trading collateral in a prime-of-prime account, which Effex required to begin trading. Ex. 105 (E Capital-000107 at E Capital-000108); Ex. 80 (Ahdout Tr. 96:23-97:15); Ex. 81 (Niv Tr. 120:15-122:4).

175. The $2 million of trading collateral was secured with a promissory note and personal guaranty signed by Dittami, who guaranteed the note with his stake in Effex. ECF No. 252-29 (note); ECF No. 252-30 (guaranty). However, this guaranty was essentially worthless, as Effex lacked any material assets at the time. *See* ECF No. 240-3 (Barron Rebuttal) at 20-23.

176. FXCM provided the $2 million line of credit on terms that Dittami would not have been able to obtain in an arms' length transaction, charging no interest and requiring no material collateral. Ex. 95 (Niv CFTC Tr. 177:12-178:8); ECF No. 252-37 (option agreement) ("FXCM has loaned to Effex the sum of $2,000,000 pursuant to that Secured Promissory Note, dated the date hereof (the 'Note'), on terms more favorable than Dittami would have obtained in an arm's-length transaction.").

177. Effex also repaid FXCM for the portion of EES's expenses that FXCM had funded. Ex. 105 (E Capital-000107 at E Capital-000107).

**The Financial Relationship Between FXCM and Effex**

178.     On September 4, 2009, Dittami and FXCM entered into an employment contract providing that Dittami would be compensated primarily by a base salary of $250,000 and a bonus of 30% of the trading profits from EES. ECF No. 252-19 (Dittami employment contract).

179.     Dittami's 30% profit share was expected to be significantly higher, indeed "multiples" of the base salary, in the order of millions of dollars. Ex. 92 (Dittami Tr. 37:9-15); Ex. 81 (Niv Tr. 77:5-10).

180.     Dittami's employment contract also provided that FXCM would commit to spending up to $3 million in expenses to help develop and support EES. ECF No. 252-19 (Dittami employment contract). FXCM expended a portion of the $3 million to help develop and support EES. Ex. 105 (E Capital-000107 at E Capital-000107).

181.     When Dittami left FXCM, the parties intended to maintain the 70%-30% split of trading profits from Dittami's employment contract. Ex. 106 (GLBR_00189079); Ex. 81 (Niv Tr. 138:2-24) ("the original concept was we were going to have 70/30 profit share"); Ex. 92 (Dittami Tr. 99:9-16).

182.     As Dittami testified, he understood that his post-employment relationship with FXCM would mirror the economic terms of his employment agreement, including the 70-30 split of trading profits. Ex. 96 (Dittami CFTC Tr. 132:6-20) ("Q: That would mean that in mirroring the employment agreement there would be a 70/30 splint [sic] under the agreement? A: It would be roughly approximate, yes.").

183.     In Dittami's resignation letter on April 14, 2010, he and Ahdout acknowledged that the parties intended to work out an agreement mirroring the main economic terms from Dittami's employment agreement. Ex. 107 (E Capital-000049). As Dittami testified, the

economic terms referred to in the resignation letter included the 70-30 split of trading profits. Ex. 96 (Dittami CFTC Tr. 136:11-137:7, 138:6-15). Niv was also aware of the resignation letter and the parties' intent. Ex. 81 (Niv Tr. 108:12-108:24).

184.    On the same day, as part of the efforts to replace the 70-30 profit split, Dittami and Ahdout executed an option agreement by which FXCM had the option to purchase a 70% share in Effex for the nominal price of $1. ECF No. 252-37 (option agreement). Niv was also aware of the option agreement. Ex. 81 (Niv Tr. 118:11-25).

185.    Subsequent correspondence by the parties confirmed that they sought to maintain the 70-30 profit split. Ex. 108 (GLBR_00007733) (Dittami referring to "payment on profits to FXCM," FXCM's "70% share," Effex's "profit share percentage," and a "revenue split" where Effex would "pay out net 70% to FXCM"); Ex. 96 (Dittami CFTC Tr. 145:8-24) (Dittami confirming that the reference to Effex's "profit share percentage" refers to the approximately 30% share of trading profits that Effex received pursuant to the services agreement).

186.    Additional correspondence between the parties shows that they viewed the option agreement as being in effect. ECF No. 252-33 (Dittami questioning the interplay between a contemplated loan from FXCM and the 70% term in the option agreement); Ex. 109 (GLBR_00218789 at GLBR_00218789) (Dittami referring to option agreement in present tense in July 2010); Ex. 110 (GLBR_00041735, ConvID: 11/15/2010 1:45, lines 18383-18439) (Dittami noting in November 2010 that with potential non-FXCM business, unlike FXCM business, "I'm not constrained by existing agreement and not giving 70% away").

187.    In November 2011, FXCM's in-house counsel discussed with Dittami a document terminating prior agreements between FXCM and Effex except for the services agreement. Ex.

111 (GLBR_00152760 at GLBR_00152760). Specifically, they discussed terminating the option agreement. Ex. 111 (GLBR_00152760 at GLBR_00152762).

188.     Dittami expressed unease with terminating the parties' agreement to follow the economic terms of the employment agreement and the parties opted not to execute the contemplated termination agreement. Ex. 112 (GLBR_00152765); Ex. 113 (GLBR_00152767 at GLBR_00152767).

189.     Dittami testified that "FXCM had a stake in the trades effected by Effex Capital" in the form of Effex's order flow payments, and that when the order flow payments stopped, FXCM "didn't have a stake then." Ex. 96 (Dittami CFTC Tr. 432:15-434:20).

190.     Effex provided regular updates to Ahdout, Niv, and others at FXCM. These updates typically included information concerning Effex's trading profits in dollars per million units of volume, on a weekly or monthly basis. These updates continued in various frequency through at least 2012. *See, e.g.,* Ex. 114 (GLBR_00189082); Ex. 115 (GLBR_00003915); Ex. 116 (GLBR_00003957); Ex. 117 (GLBR_00036290); Ex. 118 (GLBR_00008068); Ex. 119 (GLBR_00004262); Ex. 120 (GLBR_00004527). No other liquidity providers provided similar updates to FXCM. Ex. 95 (Niv CFTC Tr. 346:19-23).

191.     FXCM also tracked Effex's expenses and income for at least a certain time in mid-2010. Ex. 110 (GLBR_00041735, ConvID: 7/22/2010 17:12, at lines 602-630) ("We'll stille [sic] be tracking your expenses and income for now so that we can see if the $21 fee should be adjusted"). In this way FXCM, including Ahdout and Niv, were able to keep tabs on Effex's profitability and use that information to determine how much of Effex's profits it would pay to FXCM. Ex. 96 (Dittami CFTC Tr. 153:5-9) ("Q: Do you know whether they would be wanting

to track your payments and expenses so that the rate you were paying could be adjusted to a 70/30 split? A: Yeah, I think so.").

**FXCM and Effex Attempted to Disguise Their Profit Sharing as Payments for Order Flow**

192.     In June 2010, Dittami and certain principals of FXCM, including Ahdout and Niv, began to discuss structuring the FXCM-Effex profit-sharing relationship as payments for order flow. Ex. 114 (GLBR_00189082). Under this arrangement, Effex paid FXCM a certain rate in dollars per million units of FXCM trading volume executed by Effex. *See id.*

193.     The parties were still discussing the idea of potentially structuring the relationship as payments for order flow, as well as other alternative structures, as of mid-July 2010, months after the purported date of the services agreements. Ex. 109 (GLBR_00218789 at GLBR_00218789).

194.     The parties intended that the rate per million would adjust up or down over time, varying as Effex's profitability, or "P&L," waxed or waned. Ex. 95 (Niv CFTC Tr. 131:7-22). Ex. 121 (GLBR_00036220 at GLBR_00036222) (Dittami: "We are going to start with $21 PER MM, although this may need to adjust up or down over time"); Ex. 80 (Ahdout Tr. 200:2-7) (the rate of payment "was a very fluid situation and it was negotiated many times"); Ex. 95 (Niv CFTC Tr. 150:15-25, 153:9-13) (Effex's payments for order flow would be adjusted "if Effex's P&L per million of order flow changed").

195.     When FXCM billed Effex each month, the payments were described as "Rebates" and the amounts billed were described as "P&L," shorthand for profits (and loss). *E.g.,* Ex. 122 (GLBR_00184107 at GLBR_00184108); ECF No. 252-42 (November 2010 invoice); Ex. 123 (GLBR_00185174 at GLBR_00185175).

196.    Dittami specifically noted in discussions with Ahdout that the 30% share of profits from his employment contract was replaced by the variable per million payments for order flow. Ex. 124 (GLBR_00152107 at GLBR_00152110-14) (Dittami sending Ahdout draft changes to employment agreement with Management Bonus (30% profit share) section deleted and Dittami comments: "replaced with Per MM payment for flow, noted that this may change over time").

197.    Niv confirmed that the parties "initial thought" was for the order flow payments to "mimic" Dittami's employment agreement with respect to the 70-30 split of trading profits. Ex. 81 (Niv Tr. 108:25-109:24).

198.    FXCM filed its initial registration statement for its initial public offering on in early September 2010. Ex. 81 (Niv Tr. 42:8-13); Ex. 125 (excerpts from Form S-1 registration statement filed with the SEC).

199.    In August 2010, as FXCM was about to go public, it started to paper over the deal with Effex. Just days before filing the S-1, FXCM and Effex executed services agreements that were back-dated to March 1, 2010 (with FXCM US) and May 1, 2010 (with FXCM Holdings). Ex. 126 (GLBR_00194774) (Lande: "This is what we are planning on executing with Datami [sic]. My understanding is that we were not operating under a signed agreement up to now."); Ex. 127 (GLBR_00194756) (FXCM in-house counsel to Dittami, attaching undated services agreement identical to executed March 1, 2010 services agreement: "Here is the updated version of the services agreement. ... The PDF version is for you to sign."); ECF No. 252-34 (March 1 Services Agreement); ECF No. 252-41 (May 1 Services Agreement).

200.    The March 1 services agreement was backdated three weeks before Effex was even formed, and over six weeks before Dittami left FXCM. ECF No. 252-34 (March 1 Services

Agreement); Ex. 97 (E Capital-000096 at E Capital-000097); Ex. 107 (E Capital-000049). The March 1 agreement was needed to paper over payments that Effex had made to FXCM for March and April 2010. *See* Ex. 126 (GLBR_00194774) (Lande, attaching execution copy of services agreement, "this is $21/million. How does that dovetail with what we were recording in April, May, June, July and now?").

201. The services agreements, each signed by Ahdout, memorialized the $21 per million rate for order flow payments that Effex was already paying to FXCM. ECF No. 252-34 (March 1 Services Agreement); ECF No. 252-41 (May 1 Services Agreement); Ex. 126 (GLBR_00194774). Niv was also aware of the agreements at the time. Ex. 81 (Niv Tr. 112:15-4, 128:12-129:4).

202. The second agreement provided for payments to be made directly to FXCM Holdings, which was not a regulated entity. ECF No. 252-41 (May 1 Services Agreement); Ex. 81 (Niv Tr. 29:25-30:3).

203. FXCM Holdings typically did not have any other external sources of direct revenue. Ex. 128 (Rosenfeld Tr. 130:11-21). Its only normal revenues, other than the purported order flow payments from Effex, came from upstream payments from FXCM's regulated operating subsidiaries. Ex. 81 (Niv Tr. 134:21-13); Ex. 129 (EY-GBI-WP-00003862 at EY-GBI-WP-00003868) ("[FXCM] Holdings does not have any other source of revenues other than distributions from its subsidiaries").

204. In the lead up to going public, FXCM's CFO instructed the company's accounting department not to mention the option agreement to E&Y, FXCM's auditors. Ex. 126 (GLBR_00194774) (Lande: "No further mention of any option to E&Y").

**Effex was the Only Retail Liquidity Provider Who Paid FXCM for Order Flow Between 2010-2014**

205. During the time that Effex paid FXCM for retail order flow, it was the only liquidity provider to do so. BNP Paribas briefly had a different agreement with FXCM to pay for order flow during the same timeframe, but only with respect to certain institutional liquidity streams (not retail trading). Ex. 81 (Niv Tr. 188:22-189:13). Niv described BNP's payments as "tiny" compared to Effex's payments, and they were considered a "joke" at FXCM and "[n]ot considered a real business." Ex. 130 (GLBR_00022930 at GLBR_00022930); Ex. 81 (Niv Tr. 189:17-25); Ex. 95 (Niv CFTC Tr. 142:14-145:6).

206. In response to the NFA's inquiry to "provide record of payment from all liquidity providers for the period 10/13/08-1/1/13," FXCM responded by attaching a spreadsheet showing over $55 million in payments from Effex, and none from any other entity. Ex. 131 (GLBR_00110416 at GLBR_00110416) (NFA: "As it seems only one entity paid FXCM for order flow during the calendar year, please provide record of payment from all liquidity providers for the period 10/13/08-1/1/13" FXCM: "Please see the attached file"); *Id.* (GLBR_00110416 at GLBR_00110420) (spreadsheet titled "Receipts from Effex for order Flow, Inception through January 31, 2013").

207. In November 2013, an FXCM accountant noted that "As far as I know the only third party payer for order flow, as of October '13, was EEFEX [sic]." ECF No. 252-57.

208. When FXCM stopped taking payments for order flow from Effex in August 2014, an FXCM employee noted that "Effex was the only LP that we were receiving PFOF [payments for order flow]." ECF No. 252-54.

209. In 2010, FXCM had over 15 liquidity providers that it worked with for retail trading. Ex. 81 (Niv Tr. 99:12-13).

210.    FXCM tried to get its other market makers, who were providing worse execution than Effex, to pay for order flow but those discussions failed as the other market makers were not willing to pay FXCM for order flow. *See* Ex. 81 (Niv Tr. 159:8-162:6).

**The Rate of Effex's Payments Varied With Effex's Profitability and Did Not Always Match the Services Agreements**

211.    The parties decided that Effex would pay $21 per million to start with because they projected that Effex would earn roughly $30 per million in trading profits. Ex. 96 (Dittami CFTC Tr. 133:6-133:19, 142:5-20) ("Q: But the per million was essentially a 70/30 split? A: Initially it was set to my estimation, yes, correct, 70/30 if my estimation as to what the income would be at that point in time.") ("Q: How was the fee of 21 million arrived at? A: It was to be a rough approximation of the 70/30 initial economic terms, the employment agreement.").

212.    Even if the percentages did not remain at exactly 70-30, FXCM intended that the rate per million would reflect that FXCM would get a bigger share of the profits than Effex. Ex. 95 (Niv CFTC Tr. 132:2-9).

213.    As the parties were executing the back-dated service agreements, Dittami expressed to FXCM's in-house counsel that the parties expected to modify the agreements with the intent of maintaining the 70-30 split of trading profits. Ex. 132 (GLBR_00189088 at GLBR_00189089) (Dittami: "modification to this [services agreement] will occur and intent is to maintain same economic terms as initial employment agreement"); Ex. 133 (GLBR_00218184 at GLBR_00218185) (Dittami: "what we want to maintain is that we are still looking to finalize agreements that reflect the same economic terms similar to initial employment agreement, and doing so on back of this new agreement [referring to attached draft services agreement] will make me feel a lot better.").

214.    Dittami consistently maintained in correspondence with FXCM, including Ahdout, that the parties' understanding was that Effex's payments would not exceed 70%. Ex. 134 (GLBR_00054454 at GLBR_00054454) (Dittami references side letter that "says per mm won't exceed 70 percent"); *See also* ECF No. 252-33; Ex. 108 (GLBR_00007733).

215.    Effex and FXCM had continuous discussions about what rate per million Effex would pay for a given month. *E.g.,* Ex. 121 (GLBR_00036220 at GLBR_00036222) (Dittami in June 2010: "We are going to start with $21 PER MM, although this may need to adjust up or down over time"); Ex. 135 (GLBR_00188143) (Dittami in July 2010: "Can we retro back to beginning of our trading the PER MM charge to $23 from the $21, looking closer I think $23 is more appropriate ?"); Ex. 136 (GLBR_00188166 at GLBR_00188166) (Rosenfeld in October 2010 to Dittami: "Does 16 per mil seem like the figure we'll have to go for Oct?"); Ex. 137 (GLBR_00184132 at GLBR_00184132) (Rosenfeld in February 2011 regarding "January Volume": "John, can we still bill @ $21?"; Dittami: "Probably not, let me check, I think it will need to drop to $18 again while we reassess"); Ex. 138 (GLBR_00184136 at GLBR_00184136) (Dittami in February 2011: "21 is fine for jan[uary 2011]"); Ex. 139 (GLBR_00118420 at GLBR_00118420) (FXCM accountant to Effex COO in April 2011: "Can we remain @ $21 per Million for March?"); Ex. 140 (GLBR_00119217 at GLBR_00119217-18) (Effex COO to FXCM accountant in August 2012: "I had told you we'd go to $17.50 [for July 2012] but we need to wait a month - we should be able to do that for August"; Effex COO responding to FXCM accountant's inquiry in September 2012: "I'd like to … not raise the per MM to $17.50 … That's our very strong preference and it's in line with what we've discussed with William and Drew"; FXCM accountant: "OK, I  understand (… keep it @ $16 per MM)"). Often these

discussions occurred after the month at issue had concluded and the amount of order flow that Effex captured was known. *See id.*

216. Ahdout was the main point of contact at FXCM in discussions with Dittami or Effex's COO about what rate per million FXCM would charge Effex. Ex. 92 (Dittami Tr. 207:12-23, 214:19-24) ("Any negotiations I had [about setting the rate for Effex's payments to FXCM] would have been with William and, you know, Drew"). Niv was aware of any changes that resulted from those conversations. Ex. 81 (Niv Tr. 154:5-10).

217. As early as July 2010, Dittami discussed with FXCM retroactively adjusting the rate per million that Effex would pay for certain months based on Effex's profitability. Ex. 135 (GLBR_00188143) (Dittami: "Can we retro back to beginning of our trading the PER MM charge to $23 from the $21, looking closer I think $23 is more appropriate ?"); Ex. 110 (GLBR_00041735, ConvID: 7/22/2010 17:12, lines 602-630) (Dittami: "This month and June FXCM's share was less than 21. May and April more.").

218. In August 2010, as the services agreements were signed, FXCM recorded an accounting adjustment in its books for June 2010 as a retroactive correction so that it would show payments of $21 per million from Effex, meaning that Effex had paid a different rate for some months prior. Ex. 141 (GLBR_00194784 at GLBR_00194784) (Rosenfeld: "Tf [if] you look at US in June there is small negative for Effex. This was a retro correction to brng all Effex income to the $21 per mil rate so that rate is what we are showing since the project began."); Ex. 128 (Rosenfeld Tr. 148:10-149:17).

219. This retroactive correction from June 2010 was not noted in materials FXCM provided to E&Y. ECF No. 252-43 (email from FXCM accountant to E&Y attaching chart showing payments from Effex in 2010); Ex. 128 (Rosenfeld Tr. 193:9-194:17, 222:6-223:3).

220.    In October 2010, Dittami discussed with Ahdout what the rate should be for that month in light of Effex earning lower profits per million on its trading. Ex. 136 (GLBR_00188166 at GLBR_00188166) (Dittami to Ahdout: "We need to figure out a per MM for October, looking closely we can likely wing it again at $21 per MM… The other alternative is we go half way at $17.50."). Dittami suggested $17.50, and FXCM billed Effex $17.50 per million for October 2010, and again for November 2010. Ex. 122 (GLBR_00184107 at GLBR_00184108); ECF No. 252-42 (November 2010 invoice).

221.    The operative services agreement in October and November 2010 provided for payments at $21 per million, ECF No. 252-41 (May 1 Services Agreement), and it was not amended to reflect this new rate of $17.50 per million. Ex. 92 (Dittami Tr. 225:7-11) (Dittami: "I don't recall there being one [a services agreement] for $17.50"). Materials submitted to E&Y did not show that FXCM billed Effex $17.50 per million for these two months instead of $21 per million. ECF No. 252-43 (email from FXCM accountant to E&Y attaching chart showing payments from Effex in 2010); Ex. 128 (Rosenfeld Tr. 194:18-25, 223:4-15).

222.    At year-end 2010, Dittami emailed Niv and Ahdout with Effex's trading profits – annualized to approximately $33.5 million – and FXCM's share, which was approximately $23 million. Ex. 116 (GLBR_00003957) ("we are looking at 35.5MM annualized revenue, expenses just under $2MM, so 33.5MM net income for effex. That's about $23MM annualized to bottom line for FXCM."). Dittami testified that he reached this estimate by approximating the 70-30 split of Effex's trading profits, which Niv and Ahdout knew was being used as a guideline. Ex. 96 (Dittami CFTC Tr. 164:22-166:4).

223.    In October 2011, when spreads tightened and Effex's trading on FXCM order flow became less profitable for Effex, Dittami and Ahdout agreed to reduce Effex's payments to

$16 per million. Ex. 142 (GLBR_00189249) (Dittami in October 2011: "We had a discussion on the flows and payment with Ken Grossman and William late yesterday. … were also going to lower the per millions fee to $16 going forward."); Ex. 81 (Niv Tr. 141:22-142:12, 151:6-22) (explaining that as spreads narrowed, "they [Effex] just weren't making, you know, that type of money. So, obviously, all market makers, as you noted previously, make less money on narrower spread currencies. And as the spreads were narrowing, you know, in like I said by significant amounts, you -- they could not afford to pay us the amounts that we initially signed for" and that Dittami wanted to reduce Effex's payments because when "spreads contracted … market makers … make less money per trade").

224.    This time the parties amended the services agreement to reflect the new rate. ECF No. 252-46 (Amendment to Services Agreement). The amendment was backdated to September 1, 2011. *Id*. (Amendment signed October 13, 2011, with an effective date of September 1, 2011). The parties did not execute any other amendments to the services agreement.

225.    Effex provided several liquidity streams to FXCM. Ex. 92 (Dittami Tr. 244:8) ("We did over many years many streams with FXCM"). Dittami had multiple discussions with Ahdout and Niv about including or excluding certain streams in the volume calculations because of how profitable or unprofitable they were for Effex. These conversations occurred in at least 2011 and 2012, and resulted in certain streams being excluded from the volume calculations. Ex. 143 (GLBR_00003094 at GLBR_00003096) (Effex COO: "we spoke to William about two liquidity streams we've been providing for some time that do not generate the same revenue, both at the request of FXCM. Thus we've subtracted those volumes for July and August out of the payment calculation."); Ex. 142 (GLBR_00189249) (Effex COO: "I need to clarify the exact streams we're paying for flow on and then you should be set to invoice."); Ex. 144

(GLBR_00118665 at GLBR_00118665) (FXCM employee: "I have additional volume from two new CITEX [Effex] spokes identified as CITIEXL2 and CITIEXJ. Can you confirm if we should be including this volume or we should exempt this activity?"; Effex COO: "We actually haven't discussed payments on these new streams with William yet. Therefore, we won't exempt them for now."); Ex. 145 (GLBR_00119021 at GLBR_00119021-22) (Effex COO: "We can't pay the fees on the CitiEXJ stream. We have paid on it in past months because the volume has been so small. However, with these volumes we'd like to omit it."; FXCM accountant: "We will adjust the April 2012 invoice accordingly."; FXCM accountant: "William approved it."); Ex. 140 (GLBR_00119217 at GLBR_00119217-18) (Effex COO responding to inquiry from FXCM accountant in August 2012 regarding July 2012 volume calculations: "Yes, include EXJ and EXL2 this month. We should be able to include the P3B and P3C streams next month, and probably also P3A"; Effex COO responding to inquiry from FXCM accountant in September 2012 regarding August 2012 volume calculations: "I'd like to include P3A …. That's our very strong preference and it's in line with what we've discussed with William and Drew").

226.   Neither the services agreement nor any amendments ever specified which liquidity streams Effex would or would not pay for. Ex. 92 (Dittami Tr. 258:10-23). The invoices FXCM sent to Effex for these months did not reflect which liquidity streams were included or excluded. *E.g.,* Ex. 146 (GLBR_00119092 at GLBR_00119092 and GLBR_00119096) (email discussion of excluding liquidity stream and corresponding invoice).

227.   In December 2012, Dittami sent an update to Niv and Ahdout, stating in the context of changing the per million rate of payments to FXCM, that "on our per MM payment, for now we are not going to drop it as per our last discussion. … Given we are so close to

January, we will keep the payment steady for Jan as well, and its good to know option is available if needed for February." Ex. 120 (GLBR_00004527 at GLBR_00004528).

228.    In April 2013, Dittami, Ahdout, and Niv agreed that Effex would pay a reduced rate per million for trading volume from the dollar-yen currency pair. Ex. 92 (Dittami Tr. 275:23-276:9). The basis for this change was that dollar-yen trading volume had become much less profitable for Effex. Ex. 92 (Dittami Tr. 275:18-276:23).

229.    Beginning with February 2013 (retroactively), FXCM billed Effex separately for dollar-yen volume at only $3 per million, reducing the effective rate that Effex was paying for total order flow. Ex. 123 (GLBR_00185174 at GLBR_00185175).

230.    For each of the months that FXCM billed Effex separately for dollar-yen volume at the lower rate, dollar-yen trading volume comprised a substantial portion of the total trading volume for the month, averaging approximately 24%. *See* Ex. 123 (GLBR_00185174 at GLBR_00185175) (February 2013 invoice); Ex. 147 (GLBR_00185248) (March 2013 invoice); Ex. 148 (GLBR_00120028) (April 2013 invoice); Ex. 149 (GLBR_00217444) (May 2013 invoice); Ex. 150 (GLBR_00120227) (June 2013 invoice); Ex. 151 (GLBR_00185335) (July 2013 invoice); Ex. 152 (GLBR_00120656) (August 2013 invoice); Ex. 153 (GLBR_00185361) (October 2013 invoice); Ex. 154 (GLBR_00185363) (November 2013 invoice); Ex. 155 (GLBR_00185365) (December 2013 invoice); Ex. 156 (GLBR_00121084) (January 2014 invoice); Ex. 157 (GLBR_00121085) (February 2014 invoice); Ex. 158 (GLBR_00121083) (March 2014 invoice); Ex. 159 (GLBR_00154607) (April 2014 invoice); Ex. 160 (GLBR_00154608) (May 2014 invoice); Ex. 161 (GLBR_00154609) (June 2014 invoice); Ex. 162 (GLBR_00120896) (July 2014 invoice).

231. In June 2013, Dittami, Ahdout, and Niv agreed that Effex would, and thereafter did, likewise split out trading volume in the euro-dollar currency pair, with Effex paying only $6 per million. Ex. 150 (GLBR_00120227); Ex. 92 (Dittami Tr. 278:23-279:7); ECF No. 252-61. This change likewise reduced the effective rate that Effex was paying for total order flow.

232. The reason for this change was that euro-dollar trading volume had become much less profitable for Effex. Ex. 92 (Dittami Tr. 279:8-19).

233. For each of the months that FXCM billed Effex separately for euro-dollar volume at the lower rate, euro-dollar trading volume comprised a substantial portion of the total trading volume for the month, averaging approximately 15%. *See* Exs. 162-74 (invoices for June 2013 through July 2014).

234. During the time that FXCM billed Effex separately for dollar-yen and/or euro-dollar trading volume (February 2013 through July 2014), those currency pairs together accounted for approximately 34% of the total FXCM trading volume that Effex captured for those months, and for some months over half of the total volume. The effective rate Effex paid for total order flow (total payments divided by total volume) for this time period was less than $12 per million, and for some months, less than $10 per million. *See* Exs. 129 and 159-74 (invoices for February 2013 through July 2014).

**Effex Depended on FXCM, Which Gave Effex Advantages to Win Trading Volume**

235. In the beginning of its operations, all of Effex's revenues came from FXCM. *See* Ex. 96 (Dittami CFTC Tr. 230:18-21). Effex gradually added other revenue sources, but through 2016 trading volume from FXCM comprised a substantial majority of Effex's revenues. Ex. 92 (Dittami Tr. 335:4-24).

236.    In late 2010 and 2011, approximately 90% of Effex's trading profits came from FXCM trading volume. Ex. 92 (Dittami Tr. 172:20-173:15, 335:4-12) (Dittami estimating that "in 2011 that it [Effex's trading P&L from FXCM order flow] was around, roughly, 90 percent"); Ex. 119 (GLBR_00004262) (Dittami providing update to Niv and Ahdout, explaining that roughly 90% of Effex's revenues for the week came from FXCM as opposed to "external venues").

237.    Dittami estimated that by 2014, "more than 50 [percent]" of Effex's revenues still came from FXCM. Ex. 92 (Dittami Tr. 335:18-24). That was still true in 2016, when the "majority" of Effex's profits were derived from FXCM. Ex. 96 (Dittami CFTC Tr. 35:14-19).

238.    Niv estimated in March 2014 that approximately 80% of Effex's revenues came from FXCM trading volume. Ex. 163 (GLBR_00103994) (Niv: "We have a great relationship with them [Effex] with lots of transparency on what they do. 80 percent of their revenues come from fxcms retail and institutional volume that they make markets to, so they have alllot to lose if they piss us off.").

239.    Throughout the class period, many trading venues outside of FXCM would not accept non-bank liquidity providers like Effex. Ex. 96 (Dittami CFTC Tr. 39:16-24). When Effex began operations in 2010, almost no other companies would accept them. *Id.*; Ex. 110 (GLBR_00041735, ConvID: 11/15/2010 1:45, Excel lines 18383-18439) (Dittami: "we have to get our stuff straight, no external [non-FXCM] customer will take our current size").

240.    Dittami testified that if not for his relationship with FXCM as a prior employee, FXCM probably would not have accepted liquidity from Effex either. Ex. 96 (Dittami CFTC Tr. 41:8-14).

241.    In its early stages, Effex operated its trading algorithm through FXCM servers and on FXCM's network and relied upon FXCM information technology and programming staff to implement its trading systems. *See* Ex. 96 (Dittami CFTC Tr. 188:13-203:17).

242.    FXCM allowed Effex to operate out of FXCM's offices rent-free for a full year after Effex became a separate entity. Ex. 96 (Dittami CFTC Tr. 57:5-58:9).

243.    Dittami maintained and used an FXCM email address for months after he terminated his employment with FXCM. Ex. 164 (GLBR_00046543) (email sent from "John Dittami <jdittami@fxcm.com>" on July 8, 2010).

244.    Effex initially used FXCM servers to host their email services. Ex. 96 (Dittami CFTC Tr. 188:13-203:17). Effex employees also used FXCM's instant messenger service from Effex's inception into 2012. Ex. 96 (Dittami CFTC Tr. 207:3-16).

245.    Dittami and others at Effex also maintained VPN access to desktop computers at FXCM through at least the end of 2012. Ex. 96 (Dittami CFTC Tr. 200:10-19). Dittami testified that Effex could not fully conduct its business except through VPN connection to FXCM. Ex. 96 (Dittami CFTC Tr. 201:14-17); Ex. 165 (GLBR_00028063) (Dittami: "The business requires that I have access to OUR boxes that unfortunately we can't access except thru your VNP of which we have no control.").

246.    Multiple FXCM employees also worked for Effex on a regular basis spanning multiple years, at times spending four days per week with Effex. Ex. 96 (Dittami CFTC Tr. 216:4-16) ("We did use FXCM employees to perform work for Effex Capital, yes"); Ex. 166 (Kochel CFTC Tr. 97:18-17) (FXCM employee testifying that he worked in Effex's offices four days per week); Ex. 167 (Meyer Tr. 201:13-202:5) (Chris Meyer, Effex's COO, explaining that another FXCM employee performed work for Effex for "a few months").

247.     Effex also used FXCM personnel to monitor Effex' trading dashboard for Effex's benefit, which continued to late 2013 or early 2014. Ex. 96 (Dittami CFTC Tr. 232:9-235:18).

248.     In 2013 and at least one other year Effex paid bonuses (FXCM paid the bonuses at Effex's request and Effex reimbursed FXCM) of tens of thousands of dollars to two of these employees for their work done on Effex's behalf. Ex. 168 (GLBR_00185250) (Effex COO: "Effex would like to pay bonuses to two FXCM employees, as we've done in the past. I believe that you facilitated this for us. Can you help again? We'd like to pay $30,000 to Darren Merwitz and $20,000 to Alex Kochel."); Ex. 167 (Meyer Tr. 207:6-22) (Effex COO confirming that bonuses were paid in multiple years for work that Merwitz and Kochel performed for Effex while they were employed by FXCM).

249.     One of these FXCM employees also used an Effex email address for the purposes of communicating with entities outside of Effex and FXCM, such as Citibank, to hide the fact that an FXCM employee was performing work for Effex. Ex. 96 (Dittami CFTC Tr. 281:18-283:22).

250.     FXCM also provided significant trading advantages to Effex over other liquidity providers to allow Effex to win more trading volume. One of these advantages was that Effex would win ties when Effex and another liquidity provider submitted the same price. Ex. 96 (Dittami CFTC Tr. 327:13-19, 331:12-15).

251.     During the time that Effex paid FXCM for order flow, Effex won ties a majority of the time. Ex. 81 (Niv Tr. 94:11-95:22). Dittami testified that there were "a few times" where liquidity providers other than Effex would win ties, but as a general rule Effex would win all ties. Ex. 96 (Dittami CFTC Tr. 331:12-15).

252.    Another advantage FXCM granted to Effex was that Effex had access to real-time read of book, allowing it to see in real-time the prices submitted by other liquidity providers; Ex. 118 (GLBR_00008068); Ex. 92 (Dittami Tr. 324:22-326:8). In an update sent to FXCM, Dittami described "real time read of book" as an "Effex Advantage" providing "Greater Effex PNL." Ex. 118 (GLBR_00008068 at GLBR_00008069). FXCM did not give this data to any other liquidity providers. ECF No. 250 ¶ 95.

253.    FXCM also allowed Effex to co-locate with FXCM's servers, which decreased latency between Effex and FXCM. Ex. 96 (Dittami CFTC Tr. 37:23-38:8, 44:23-45:15).

254.    FXCM also applied lower mark-ups to the prices provided by Effex as compared to prices from other liquidity providers a majority of the time from 2011 through 2016. Ex. 99 (Ahdout CFTC Tr. 240:2-241:12). FXCM even consulted with Dittami as to what mark-ups it should apply to other liquidity providers – which it did not do with any other liquidity providers. Ex. 169 (GLBR_00005534) (Dittami sending Ahdout suggestted markups for FXCM to apply to Effex and to other market makers); Ex. 92 (Dittami Tr. 283:3-14, 284:10-15) (Dittami discussed what markups FXCM should apply to liquidity providers other than Effex on "several occasions" after Dittami had left FXCM, and Ahdout implemented some of these recommendations).

255.    These advantages allowed Effex to have the "winning" price more often, even if Effex's raw price (before applying the mark-up) was not the lowest, directing more trading volume to Effex. Ex. 92 (Dittami Tr. 300:20-301:3) (Dittami: "if you did not win ties, you win less volume"); Ex. 96 (Dittami CFTC Tr. 430:4-9) (due to lower markups and winning ties, Effex could win a trade even if it provided a worse price). With these advantages, Effex could essentially choose when it wanted to offer a price to FXCM that would allow it to win a trade or portion of a trade, and what exact price would achieve that end, instead of competing purely on

price. Ex. 96 (Dittami CFTC Tr. 430:10-15) (Effex "could choose to price to win a trade or a portion of a trade"); Ex. 95 (Niv CFTC Tr. 419:6-14). Effex having the ability to win ties, lower mark-ups, and access to a realtime feed of the prices offered by competing liquidity providers, allowed Effex to know exactly what prices it had to offer to win each trade. Ex. 170 (Wilson-Taylor Tr. 139:7-23). If Effex wanted to win a trade, it would have no reason to offer a price better than the next best price except by the smallest possible margin, or by no margin if it won ties. Ex. 170 (Wilson-Taylor Tr. 140:19-24).

256.    On net, due to its algorithmic trading strategies, the more trading volume Effex captured, the more profitable its trading was. Ex. 96 (Dittami CFTC Tr. 331:20-332:22). By giving Effex these advantages, FXCM allowed Effex to capture more trading volume. Ex. 96 (Dittami CFTC Tr. 430:20-25) ("Q: The ability to win all ties and see all the bids and offers and the .1 PIP advantage in the Euro U.S. dollar were beneficial to Effex because it allowed Effex to capture a larger portion of trades; is that correct? A Yes, that's correct.").

257.    With more trading volume, Effex paid FXCM more for order flow. Ex. 81 (Niv Tr. 160:10-22) ("as part of receiving preferential treatment, they [Effex] have to pay for order flow, yes, because they are receiving -- therefore, preferential treatment gives them a large portion of the order flow."); Ex. 96 (Dittami CFTC Tr. 432:9-14) (confirming that Effex's advantages of winning ties, lower markups, and real-time read of book "is also beneficial to FXCM because FXCM is receiving a rebate from [trades] that are effected by Effex Capital").

258.    Thanks in part to these trading advantages, throughout the time that Effex was paying FXCM for order flow, from 2010 to 2014, Effex captured at least a plurality, if not a majority, of FXCM's retail trading volume. Ex. 99 (Ahdout CFTC Tr. 129:25-130:24).

259.     FXCM terminated its relationship with Effex around February 2017. Ex. 81 (Niv Tr. 275:2-24).

260.     After FXCM terminated Effex, Effex lost its prime broker and numerous other clients. Ex. 81 (Niv Tr. 276:12-18). Effex was unable to support itself without FXCM and went out of business shortly thereafter. *Id.*

**Defendants Sought to Conceal FXCM's Relationship With Effex**

261.     Niv expressed to an FXCM employee that he did not want to share with other liquidity providers how much of FXCM's trading volume Effex was capturing. Ex. 171 (GLBR_00004281 at GLBR_00004281) ("Provide it and lump all funds like sun, lucid and effex into one bucket and tell the banks its 3 funds who share the pie don't give specifics").

262.     Niv expressed to Lande that FXCM should not highlight in its SEC filings the order flow payments, in response to Lande's question about what language to use "for 'payment for order flow' as applied to us (i.e., Datami [sic])." Ex. 172 (GLBR_00003881 at GLBR_00003882). Lande wrote that "I will show you where this will show up … so you can see & decide whether too sensitive," and Niv responded "We definitely want to not highlight it." *Id.* (GLBR_00003881 at GLBR_00003881). In its SEC filings, FXCM did not identify that Effex was the source of all, or substantially all, of its order flow payment revenue. *See, e.g.,* ECF Nos. 252-1, 252-7, 252-8, and 252-9 (FXCM 10-Ks for 2011-2014); Exs. 82-90 (FXCM 10-Qs for 2012-2014).

263.     Dittami stated that sharing how much of FXCM's order flow Effex was capturing "brings up questions [FXCM] may not want brought up." Ex. 173 (GLBR_00151710 at GLBR_00151710).

264. An FXCM compliance officer noted in an email, cited in the CFTC Order, that "Given the sensitivity of the counter party involved [Effex] we would prefer the events don't happen so that we do not draw unwanted attention [from the NFA]." Ex. 174 (GLBR_00007684 at GLBR_00007686).

265. On October 22, 2013, an FXCM compliance officer told the NFA: "FXCM LLC does not have any direct or indirect ownership, interest, or affiliation with entities that provide liquidity to retail clients...." Ex. 175 (GLBR_00029513 at GLBR_00029518). After the NFA sought clarification of this statement, FXCM's Chief Compliance Officer stated on March 24, 2014: "To my knowledge, there are no present or past owners, principals, APs, or employees of affiliates of FXCM LLC that have direct or indirect ownership, interest, or affiliation with entities that provide liquidity to retail clients on our No Dealing Desk Model." *Id.* (GLBR_00029513 at GLBR_00029513).

266. On April 4, 2014, in response to further attempts by the NFA to clarify the FXCM-Effex relationship, FXCM's Chief Compliance Officer stated that Dittami "served as a consultant for FXCM" who "worked primarily on software coding." Ex. 176 (GLBR_00110437 at GLBR_00110437).

**Regulators Investigate FXCM's Relationship With Effex**

267. The NFA and CFTC began investigating FXCM's relationship with Effex in 2013 and 2014. Ex. 81 (Niv Tr. 166:5-167:7).

268. As the NFA's investigation intensified in the spring of 2014, FXCM decided to stop taking payments for order flow. Ex. 81 (Niv Tr. 167:10-170:2); Ex. 177 (GLBR_00104025 at GLBR_00104026) (Niv in May 2014: "We have never said NO to them [the NFA], if they want us to change payments for order flow we will.").

269. FXCM and Dittami executed two termination letters on August 25, 2014, terminating the services agreement – and with it the order flow payments – and Dittami's resignation letter stating that the parties intended to maintain the economic terms from the employment agreement. Ex. 178 (GLBR_00125304) (letter terminating services agreement); ECF No. 252-27 (letter terminating Dittami's resignation letter).

270. On February 13, 2015, FXCM prepared a memorandum analyzing the benefits to its customers as a result of Effex's pricing. ECF No. 252-62. The memorandum was provided to the NFA, *id.*, and CFTC, Ex. 81 (Niv Tr. 262:12-14), during their investigations. The NFA did not allow FXCM to publish the memorandum in the U.S. Ex. 179 (EY-GBI-WP-00004278 at EY-GBI-WP-00004279) ("the NFA refused to allow FXCM US to print its execution study"); Ex. 81 (Niv Tr. 256:25-257:21).

271. In November 2015, as the NFA and CFTC investigations further intensified, Ex. 81 (Niv Tr. 178:9-179:6), Effex and FXCM signed an acknowledgement and confirmation purporting that the April 14, 2010 option agreement had never gone into effect. ECF No. 252-38 (Acknowledgement and Confirmation).

272. The parties never executed anything in writing prior to 2015 cancelling the option agreement or stating that it was not in effect. Ex. 81 (Niv Tr. 120:4-6); Ex. 92 (Dittami Tr. 200:19-24).

273. On February 6, 2017, the CFTC announced that it banned the Company from operating in the U.S. and fined the Company $7 million after finding that FXCM was taking undisclosed positions opposite its retail customers. Ex. 180 (CFTC Press Release).

274. In its Order dated February 6, 2017 ("CFTC Order"), the CFTC found that "FXCM and FXCM Holdings, by and through their officers, employees, and agents, including

Respondents Niv and Ahdout, engaged in false and misleading solicitations of FXCM's retail foreign exchange ('forex') customers" by concealing that "FXCM had an undisclosed interest in the market maker that consistently 'won' the largest share of FXCM's trading volume - and thus was taking positions opposite FXCM's retail customers." ECF No. 245-7 at 2 (CFTC Order). The market maker referenced in the CFTC Order was Effex. Ex. 181 (Defendants' responses to Plaintiffs' requests for admission) at 22.

275.    The same day, the NFA issued a Complaint and a Decision against FXCM, Niv, Ahdout, and Niv's sister, Ornit Niv. ECF Nos. 245-5 (NFA Decision) and 245-6 (NFA Complaint). The NFA found that the defendants committed the violations alleged in the NFA's Complaint, ECF No. 245-5, including that FXCM directed customer trades to a liquidity provider, Effex, "that was purportedly independent but which FXCM actually supported and controlled. ECF No. 245-6 at 4-5.

276.    The NFA found that in exchange for the order flow that FXCM directed to Effex, Effex paid rebates to FXCM that amounted at times to as much as 70% of Effex's profits from FXCM's order flow and which FXCM referred to internally as 'P&L'." ECF No. 245-6 at 5.

277.    The Company also issued a press release on February 6, 2017, disclosing the settlements with the NFA and CFTC and announcing that the Company would withdraw from doing business in the U.S., pursuant to the CFTC's order, and sell its U.S. customer accounts. ECF No. 245-13 at 8.

278.    On this news, the Company's share price fell $3.40, over 68%, and the price of FXCM Notes fell over 42%. ECF No. 245-1 (Report of Plaintiffs' expert, Adam Werner) at 7.

279.    On February 21, 2017, Niv resigned as CEO and from the FXCM board of directors. Ex. 182 (FXCM Form 8-K). That same day, FXCM announced its name change to Global Brokerage Inc. *Id.*

280.    On December 11, 2017, the Company filed for Chapter 11 bankruptcy. Ex. 183 (Chapter 11 Petition).

## Wilson-Taylor Report and Deposition Testimony

281.    Defendants' witness, Simon Wilson-Taylor, submitted a report in connection with this action. ECF No. 252-2 (Wilson-Taylor Report). In Wilson-Taylor's report, he explained that in a dealing desk model, a broker "can either hedge its position or choose not to hedge." *Id.* at 14 (Figure 1).

282.    Wilson-Taylor could not identify any liquidity providers, other than Effex, who customized its services for the needs of a single FX broker. Ex. 170 (Wilson-Taylor Tr. 64:22-65:2).

283.    Wilson-Taylor could not identify any liquidity providers, other than Effex, that derived most of their business from a single broker during 2010-2014 timeframe. Ex. 170 (Wilson-Taylor Tr. 77:22-78:2).

284.    Wilson-Taylor could not identify any liquidity providers, other than Effex, that paid for order flow for retail forex trading volume in the 2010-2014 timeframe. Ex. 170 (Wilson-Taylor Tr. 86:19-87:6).

285.    Wilson-Taylor could not identify any liquidity providers, other than Effex, that paid more than 50% of its profits in order flow payments on retail forex trading volume. Ex. 170 (Wilson-Taylor Tr. 104:2-7). To the extent that liquidity providers may have briefly paid

"substantial" amounts, Wilson-Taylor deemed that such practices were "not sustainable." Ex. 170 (Wilson-Taylor Tr. 153:16-154:13).

286. In Wilson-Taylor's own experience, in which his former employers received order flow payments from liquidity providers in other contexts, as a matter of policy order flow payments would be memorialized in written agreements, and the agreements would be amended if the rate of the order flow payments changed. As Wilson-Taylor stated: "your policy should always be to make sure that the agreements reflect the nature of the relationship," and he could not think of any instances in which he would not want to amend the written agreement to reflect a change in the rate for order flow payments. Ex. 170 (Wilson-Taylor Tr. 121:7-122:15).

287. Wilson-Taylor could not identify any forex brokers, other than FXCM, who were receiving order flow payments from liquidity providers outside the U.K., but stopped doing so after the FCA's 2014 thematic review. Ex. 170 (Wilson-Taylor Tr. 124:8-14).

**683 Capital Deposition Testimony**

288. 683 Capital's representative, Joseph Patt, testified at his deposition that he reviewed FXCM's annual (10-K), quarterly (10-Q), and current (8-K) reports throughout the Class Period. Ex. 184 (Patt Tr. 33:20-25). For example, Patt testified that he was "following the company closely," Ex. 184 (Patt Tr. 30:25, 103:20), and he repeatedly testified that he and 683 Capital reviewed the company's public filings. Ex. 184 (Patt Tr. 35:2, 126:16-19 ("based on the filings, we believed [FXCM] to be a good business"), 129:19-20 ("Based on the filings that had been, you know, that we read"), 139:9-10 ("By reading the public filings from FXCM"), 148:4-7 (Q: "Would you have generally reviewed the 10-Ks, 10-Qs, et cetera, in connection with your investment of -- in FXCM?" A: "Yes.")).

289. Patt also testified that he reviewed the very document that revealed that FXCM no longer received payments for order flow: "Q: Do you recall reviewing a 10-K [sic] for Q3 of 2014? A: Yes." Ex. 184 (Patt Tr. 148:8-10).

290. Patt testified that if FXCM had disclosed its relationship with Effex, it would have changed 683 Capital's investment decision. Ex. 184 (Patt Tr. 151:9-25) ("if it had been clear disclosed with valuations, I probably would have -- might have paid a lower price … Because it wasn't what we thought it was.").

291. As Patt further explained, "[w]e thought it was an agency business that was providing leverage. Instead it was something else with a lot of risk to potentially operating. Like, they were getting -- by putting themselves at risk of being banned, which they clearly were, because they were, they took off a lot of the upside tail in this investment or just general upside, frankly, or any upside. But we didn't know that." Ex. 184 (Patt Tr. 152:2-10).

292. 683 Capital's calculation that it was likely to recover the full value of the FXCM Notes was based on not only FXCM's balance sheet, but also public filings and 683 Capital's assessment of FXCM's public statements about the historical value of their business. Ex. 184 (Patt Tr. 77:23-78:7).

293. Patt's testimony reflects his understanding that the basis of 683 Capital's claims involved, among other things: (1) an undisclosed relationship with Effex as a related party, Ex. 184 (Patt Tr. 142:16-22); (2) that because of this undisclosed relationship FXCM had conflicts of interest with its customers contradicting its public statements, Ex. 184 (Patt Tr. 143:12-17); and (3) kickback payments made by Effex to FXCM, Ex. 184 (Patt Tr. 144:13-14).

294. Patt provided a substantive and accurate explanation of the central claims in this case:

[T]hey said they were, basically, an agency business that allowed institutional clients to trade … FX products and lever -- and lever them up. But it turns out they were also like, effectively, betting, you know, against their clients or taking risk or doing something it clearly meant they weren't an agency product, which put their core business at risk from a regulatory perspective, because they were misrepresenting what they were doing to their clients and to their investors.

Ex. 184 (Patt Tr. 29:11-25).

**Barron Expert Report and Supporting Deposition Testimony**

295.    Plaintiff's accounting expert, John Barron, submitted his expert reports in connection with this Action. ECF No. 240-1 (Barron Report) and 240-3 (Barron Rebuttal). In Barron's report, he calculated that "the revenue recognized by FXCM from these order flow payments [from Effex] represented … approximately 26% over the five-year period [in which Effex made these payments.]" ECF No. 240-1 at 5.

296.    FXCM's management concluded that "Landing in that FXCM may have had a variable interest in Effex, as the entity likely did not have sufficient equity to fund its activities (given the support FXCM was giving at the time of its start-up in 2010 (use of FXCM office space for a period of time including the use by Effex for four months between March 2010 and June 2010 of a FXCM subcontract account at Citibank Prime Brokerage so that it could trade))." ECF No. 240-3 (Barron Rebuttal) at 20 (quoting Ex. 129 (EY-GBI-WP-00003862)).

297.    FXCM's management concluded that FXCM satisfied the VIE criteria of having the right to receive benefits from Effex that could potentially be significant to Effex. "With respect to benefits, it is likely that FXCM did meet the benefits criterion. While it did not have the obligation to absorb losses, FXCM received what is believed to be a significant portion of the revenues of Effex through the payments for order flow." ECF No. 240-3 (Barron Rebuttal) at 26-27 (quoting Ex. 129 (EY-GBI-WP-00003862)).

298.    E&Y audit partner, David Stollow, testified that prior to the investigation by the NFA and CFTC, he had no recollection of E&Y inquiring specifically about whether Effex should have been disclosed as a related party or whether, during the years 2010 – 2013, E&Y considered whether FXCM should have been reporting its relationship with Effex as a potential VIE. Ex. 185 (Stollow Tr. 103:19-104:10, 107:6-107:15).

299.    Stollow also testified that during the periods prior to the CFTC and NFA investigations E&Y was aware of Effex as a liquidity provider from a transactional perspective, but first became aware of the arrangement between Dittami and FXCM over the course of the NFA and CFTC communications in 2015 and 2016. Ex. 185 (Stollow Tr. 114:14-115:7). Stollow further testified that E&Y was aware of the payments for order flow in the service agreement, but prior to the time of the NFA and CFTC investigation, E&Y was not aware of the entire relationship. Ex. 185 (Stollow Tr. 118:17-119:4).

300.    Lande testified that he could not recall E&Y coming to a conclusion regarding whether Effex needed to be considered a VIE or consolidated. Ex. 186 (Lande Tr. 97:16–99:3). Lande testified that E&Y would have seen the revenue from order flow payments included in the general ledger and "If [EY] had a problem, trust me we would have known about it." *Id*. As Barron's rebuttal report explains, "[t]his suggests that FXCM management did not raise the issue with E&Y in connection with E&Y's audits and that E&Y did not independently identify the relationship as an issue with respect to consolidation." ECF No. 240-3 (Barron Rebuttal) at 35.

**Defendants' False and Misleading SOX Certifications**

301.    The 2011 10-K also contained Sarbanes-Oxley Act of 2002 ("SOX") certifications attesting to the accuracy of the report, certifying that "this report does not contain any untrue [or misleading] statement of a material fact," and certifying that Niv disclosed "[a]ny

fraud, whether or not material" to FXCM's auditor and audit committee. Niv signed his 2011 10-K SOX certification. Ex. 187 (2011 10-K SOX certification).

302.    The 12Q1 10-Q also contained SOX certifications attesting to the accuracy of the report, certifying that "this report does not contain any untrue [or misleading] statement of a material fact," and certifying that Niv disclosed "[a]ny fraud, whether or not material" to FXCM's auditor and audit committee. Niv signed his 12Q1 10-Q SOX certification. Ex. 188 (12Q1 10-Q SOX certification).

303.    The 12Q2 10-Q also contained SOX certifications attesting to the accuracy of the report, certifying that "this report does not contain any untrue [or misleading] statement of a material fact," and certifying that Niv disclosed "[a]ny fraud, whether or not material" to FXCM's auditor and audit committee. Niv signed his 12Q2 10-Q SOX certification. Ex. 189 (12Q2 10-Q SOX certification).

304.    The 12Q3 10-Q also contained SOX certifications attesting to the accuracy of the report, certifying that "this report does not contain any untrue [or misleading] statement of a material fact," and certifying that Niv disclosed "[a]ny fraud, whether or not material" to FXCM's auditor and audit committee. Niv signed his 12Q3 10-Q SOX certification. Ex. 190 (12Q3 10-Q SOX certification).

305.    The 2012 10-K also contained SOX certifications attesting to the accuracy of the report, certifying that "this report does not contain any untrue [or misleading] statement of a material fact," and certifying that Niv disclosed "[a]ny fraud, whether or not material" to FXCM's auditor and audit committee. Niv signed his 2012 10-K SOX certification. Ex. 191 (2012 10-K SOX certification).

306.     The 13Q1 10-Q also contained SOX certifications attesting to the accuracy of the report, certifying that "this report does not contain any untrue [or misleading] statement of a material fact," and certifying that Niv disclosed "[a]ny fraud, whether or not material" to FXCM's auditor and audit committee. Niv signed his 13Q1 10-Q SOX certification. Ex. 192 (13Q1 10-Q SOX certification).

307.     The 13Q2 10-Q also contained SOX certifications attesting to the accuracy of the report, certifying that "this report does not contain any untrue [or misleading] statement of a material fact," and certifying that Niv disclosed "[a]ny fraud, whether or not material" to FXCM's auditor and audit committee. Niv signed his 13Q2 10-Q SOX certification. Ex. 193 (13Q2 10-Q SOX certification).

308.     The 13Q3 10-Q also contained SOX certifications attesting to the accuracy of the report, certifying that "this report does not contain any untrue [or misleading] statement of a material fact," and certifying that Niv disclosed "[a]ny fraud, whether or not material" to FXCM's auditor and audit committee. Niv signed his 13Q3 10-Q SOX certification. Ex. 194 (13Q3 10-Q SOX certification).

309.     The 2013 10-K also contained SOX certifications attesting to the accuracy of the report, certifying that "this report does not contain any untrue [or misleading] statement of a material fact," and certifying that Niv disclosed "[a]ny fraud, whether or not material" to FXCM's auditor and audit committee. Niv signed his 2013 10-K SOX certification. Ex. 195 (2013 10-K SOX certification).

310.     The 14Q1 10-Q also contained SOX certifications attesting to the accuracy of the report, certifying that "this report does not contain any untrue [or misleading] statement of a material fact," and certifying that Niv disclosed "[a]ny fraud, whether or not material" to

FXCM's auditor and audit committee. Niv signed his 14Q1 10-Q SOX certification. Ex. 196 (14Q1 10-Q SOX certification).

311.    The 14Q2 10-Q also contained SOX certifications attesting to the accuracy of the report, certifying that "this report does not contain any untrue [or misleading] statement of a material fact," and certifying that Niv disclosed "[a]ny fraud, whether or not material" to FXCM's auditor and audit committee. Niv signed his 14Q2 10-Q SOX certification. Ex. 197 (14Q2 10-Q SOX certification).

312.    The 14Q3 10-Q also contained SOX certifications attesting to the accuracy of the report, certifying that "this report does not contain any untrue [or misleading] statement of a material fact," and certifying that Niv disclosed "[a]ny fraud, whether or not material" to FXCM's auditor and audit committee. Niv signed his 14Q3 10-Q SOX certification. Ex. 198 (14Q3 10-Q SOX certification).

313.    The 2014 10-K also contained SOX certifications attesting to the accuracy of the report, certifying that "this report does not contain any untrue [or misleading] statement of a material fact," and certifying that Niv disclosed "[a]ny fraud, whether or not material" to FXCM's auditor and audit committee. Niv signed his 2014 10-K SOX certification. Ex. 199 (2014 10-K SOX certification).


Dated: December 9, 2021                    **THE ROSEN LAW FIRM, P.A.**

                                           By: */s/ Joshua Baker*
                                           Laurence M. Rosen
                                           Phillip Kim
                                           Joshua Baker
                                           275 Madison Ave, 40th Floor
                                           New York, NY 10016
                                           Phone: (212) 686-1060
                                           Fax: (212) 202-3827

Email: lrosen@rosenlegal.com
pkim@rosenlegal.com
jbaker@rosenlegal.com

*Lead Counsel for Plaintiffs and the Class*

**WOLF HALDENSTEIN ADLER
FREEMAN & HERZ LLP**
Matthew M. Guiney
270 Madison Avenue
New York, NY 10016
Tel: (212) 545-4600
Email: guiney@whafh.com

*Additional Counsel*