# UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| In re Global Brokerage, Inc. f/k/a FXCM Inc. Securities Litigation | Master File No. 17-CV-00916-RA-BCM |
| This Document Relates To: All Actions | CLASS ACTION |

**PLAINTIFFS' RESPONSE IN OPPOSITION TO DEFENDANTS' *DAUBERT* MOTION TO EXCLUDE THE TESTIMONY OF PLAINTIFFS' EXPERT DR. ADAM WERNER**

## <u>TABLE OF CONTENTS</u>

I.     INTRODUCTION ......................................................................................................... 1

II.    LEGAL STANDARD.................................................................................................... 1

III.   ARGUMENT................................................................................................................. 3

   A.    Dr. Werner's Opinions are Based on Reliable Data and Methodology............................ 3

   B.    Dr. Werner Need Not "Disentangle" The Impact of Corrective Disclosures From Their
       Direct and Predictable Consequences .............................................................................. 5

   C.    Dr. Werner Demonstrates the Market Deemed the Corrective Disclosures Material, and
       Therefore Relevant to the Market Value of FXCM Securities ......................................... 9

   D.    Dr. Werner's Constant-Dollar Approach to Estimating Damages is Reliable and
       Reasonable ..................................................................................................................... 11

   E.    Dr. Werner's Opinions Regarding Loss Causation and Damages Arising from FXCM's
       Violations of U.S. GAAP are Based on Reliable Data and Methodology....................... 17

   F.    Dr. Werner's Opinions Regarding Loss Causation and Damages with Respect to the
       FXCM Notes are Based on Reliable Data and Methodology .......................................... 21

IV.    Conclusion ................................................................................................................... 23

# <u>TABLE OF AUTHORITIES</u>

**<u>Page(s)</u>**

**<u>Cases</u>**

*Acticon AG v. China N. E. Petroleum Holdings Ltd.*,
  692 F.3d 34 (2d Cir. 2012) .......................................................................................... 12

*Affiliated Ute Citizens v. United States*,
  406 U.S. 128 (1972) ............................................................................................... 12, 21

*Amorgianos v. Nat'l R.R. Passenger Corp.*,
  303 F.3d 256 (2d Cir. 2002) .......................................................................................... 2

*Atlantica Holdings, Inc. v. Sovereign Wealth Fund Samruk-Kazyna JSC*,
  477 F. Supp. 3d 88 (S.D.N.Y. 2020) ........................................................................ 5, 10

*Baker v. SeaWorld Ent., Inc.*,
  423 F. Supp. 3d 878 (S.D. Cal. 2019) ......................................................................... 11

*Basic v. Levinson*,
  485 U.S. 224 (1988) ....................................................................................................... 9

*Blackie v. Barrack*,
  524 F.2d 891 (9th Cir. 1975) ....................................................................................... 13

*Borawick v. Shay*,
  68 F.3d 597 (2d Cir. 1995) ............................................................................................ 2

*Campbell ex rel. Campbell v. Metro. Prop. & Cas. Ins. Co.*,
  239 F.3d 179 (2d Cir. 2001) .......................................................................................... 2

*Carpenters Pension Tr. Fund of St. Louis v. Barclays PLC*,
  310 F.R.D. 69 (S.D.N.Y. 2015) ..................................................................................... 9

*Celotex Corp. v. Catrett*,
  477 U.S. 317, 106 S.Ct. 2548, 91 L. Ed. 2d 265 (1986) .............................................. 7

*Daubert v. Merrell Dow Pharm., Inc.*,
  509 U.S. 579 (1993) .................................................................................................. 1, 2

*Dura Pharmaceuticals, Inc. v. Broudo*,
  544 U.S. 336 (2005) ..................................................................................................... 15

*Elkind v. Liggett & Myers, Inc.*,
  635 F.2d 156 (2d Cir. 1980) ........................................................................................ 12

*Freudenberg v. E*Trade Fin. Corp.*,
  712 F. Supp. 2d 171 (S.D.N.Y. 2010) .................................................................... 19

*Goldberg v. Household Bank, F.S.B.*,
  890 F.2d 965 (7th Cir. 1986) ................................................................................. 13

*Harris v. Union Elec. Co.*,
  787 F.2d 355 (8th Cir. 1986) ................................................................................. 13

*In re Bank of Am. Corp. Sec., Derivative, & Emp. Ret. Income Sec. Act (ERISA) Litig.*,
  281 F.R.D. 134 (S.D.N.Y. 2012) ....................................................................... 9, 11

*In re BP p.l.c. Sec. Litig.*,
  No. 10-md-2185, 2014 WL 2112823 (S.D. Tex. May 20, 2014)............................ 12

*In re Chicago Bridge & Iron Co. N.V. Sec. Litig.*,
  No. 17 Civ. 02414 (LGS), 2019 WL 5287980 (S.D.N.Y 2019) .............................. 18

*In re Enron Corp. Securities*,
  529 F. Supp. 2d 644 (S.D. Tex. 2006) .................................................................. 12

*In re Flag Telecom Holdings, Ltd. Sec. Litig.*,
  574 F.3d 29 (2d Cir. 2009) ...................................................................................... 5

*In re Imperial Credit Indus., Inc. Sec. Litig.*,
  252 F. Supp. 2d 1005 (C.D. Cal. 2003) ................................................................... 3

*In re Initial Pub. Offering Sec. Litig.*,
  544 F. Supp. 2d 277 (S.D.N.Y. 2008) ................................................................... 19

*In re Joint E. & S. Dist. Asbestos Litig.*,
  52 F.3d 1124 (2d Cir. 1995) .................................................................................... 2

*In re Novatel Wireless Sec. Litig.*,
  No. 08cv1689 AJB (RBB), 2013 WL 12144150 (S.D. Cal. Oct. 25, 2013) ............ 12

*In re Novatel Wireless Sec. Litig.*,
  No. 08CV1689 AJB (RBB), 2013 WL 12247558 (S.D. Cal. Nov. 19, 2013) .......... 11

*In re Royal Dutch/Shell Transp. Sec. Litig.*,
  404 F. Supp. 2d 605 (D.N.J. 2005) ....................................................................... 13

*In re Signet Jewelers Ltd. Sec. Litig.*,
  No. 16CIV6728CMRWL 2019 WL 3001084 (S.D.N.Y. July 10, 2019)................... 19

*In re SLM Corp. Sec. Litig.*,
  No. 08 CIV. 1029 WHP, 2012 WL 209095, at (S.D.N.Y. Jan. 24, 2012) ........ 10, 11

*In re Vale S.A. Sec. Litig.*,
   No. 1:15-CV-9539-GHW, 2017 WL 1102666 (S.D.N.Y. Mar. 23, 2017) .............................. 19

*In re Vivendi Universal, S.A. Sec. Litig.*,
   765 F. Supp. 2d 512 (S.D.N.Y. 2011) ............................................................. 6, 19, 20

*In re Vivendi Universal, S.A. Sec. Litig.*,
   634 F. Supp. 2d 352 (S.D.N.Y. 2009) ................................................................ passim

*In re Wireless Tel. Servs. Antitrust Litig.*,
   385 F. Supp. 2d 403 (S.D.N.Y. 2005) ....................................................................... 14

*Katt v. City of New York*,
   151 F. Supp. 2d 313 (S.D.N.Y.2001) ........................................................................... 2

*Kumho Tire Co. v. Carmichael*,
   526 U.S. 137, 119 S. Ct. 1167, 143 L. Ed. 2d 238 (1999) ........................................... 2

*Lattanzio v. Deloitte & Touche LLP*,
   476 F.3d 147 (2d Cir. 2007) ....................................................................................... 8

*Lentell v. Merrill Lynch & Co.*,
   396 F.3d 161 (2d Cir. 2005) ....................................................................................... 7

*Levine v. Seilon, Inc.*,
   439 F.2d 328 (2d Cir. 1971) ..................................................................................... 12

*Liberty Media Corp. v. Vivendi Universal, S.A.*,
   923 F. Supp. 2d 511 (S.D.N.Y. 2013) ...................................................................... 16

*McCullock v. H.B. Fuller Co.*,
   61 F.3d 1038 (2d Cir. 1995) ....................................................................................... 2

*MCI Commc'ns Corp. v. Am. Tel. & Tel. Co.*,
   708 F.2d 1081 (7th Cir. 1983) .................................................................................. 16

*McIntire v. China MediaExpress Holdings, Inc.*,
   38 F. Supp. 3d 415 (S.D.N.Y. 2014) ........................................................................ 22

*Rowe v. Maremont Corp.*,
   850 F.2d 1226 (7th Cir. 1988) .................................................................................. 16

*Ruiz-Troche v. Pepsi Cola of Puerto Rico Bottling Co.*,
   161 F.3d 77 (1st Cir. 1998) ...................................................................................... 22

*S.E.C. v. Goldstone*,
   No. CIV 12-057 JB/LFG, 2016 WL 3135651 (D.N.M. May 10, 2016) .................................... 3

*Smilovits v. First Solar, Inc.,*
   No. CV12-0555-PHX-DGC, 2019 WL 7282026 (D. Ariz. Dec. 27, 2019) ............................ 11

*Story Parchment Co. v. Paterson Parchment Paper Co.*,
   282 U.S. 555 (1931) ........................................................................................................ 16

*Wechsler v. Hunt Health Sys.,*
   381 F.Supp.2d 135 (S.D.N.Y. 2003) ................................................................................. 5

**<u>Rules</u>**

Fed. R. Evid. 104(a) ................................................................................................................ 2

Fed. R. Civ. Proc. 702 ............................................................................................................. 2

Fed. R. Evid. 702 .............................................................................................................. 2, 12

**<u>Other Authorities</u>**

C Justin Robinson & Prosper Bangwayo-Skeete, *'Semi-strong Form Market Efficiency in Stock
   Markets with Low Levels of Trading Activity: Evidence from Stock Price Reaction to Major
   National and International Events'* (2017) 18 GLOBAL BUS REV 1447 ................................... 21

Jay W. Eisenhofer, Geoffrey C. Jarvis, James R. Banko, *Securities Fraud, Stock Price Valuation,
   and Loss Causation: Toward A Corporate Finance-Based Theory of Loss Causation*, 59 BUS.
   LAW. 1419 (2004) ................................................................................................................... 3

Macintosh, Jeffrey, *Event Study Methodology and the Computation of Damages for Secondary
   Market Misrepresentations: Striving for a Technicolor Palette,* SSRN ELECTRONIC JOURNAL
   (January 2020) ...................................................................................................................... 21

Michael J. Kaufman & John M. Wunderlich, *Regressing: The Troubling Dispositive Role of
   Event Studies in Securities Fraud Litigation.*, 15 STAN. J.L. BUS. & FIN. 183 (2009) ............... 9

## I.     INTRODUCTION

Defendants' motion to strike Dr. Adam Werner's expert testimony on loss causation and damages is a trial argument miscast as a *Daubert* challenge. Defendants concede that Dr. Werner is qualified on the subjects upon which he issues expert opinions. They agree he has relevant expertise.

Dr. Werner follows reliable methodology throughout his reports. He describes that methodology, the sources he reviewed and analyzed, and the reasoning behind each of his expert conclusions. Dr. Werner discusses exactly how he concluded that February 6, 2017 was a corrective disclosure date. Dr. Werner lays out in detail why news disclosed that day had not been disclosed on or before February 6, 2017. Where necessary, Dr. Werner refers to academic literature to support his methodology and conclusions. Dr. Werner disaggregates non-fraud-related information on each of the corrective disclosure dates, or describes that after review he determined that none existed. Finally, Dr. Werner describes in detail his entire damages assessment methodology and implementation. Dr. Werner employed reliable methods to reach his opinions.

Defendants' motion is meritless and should be denied. Defendants are unable to effectively challenge the relevance of Dr. Werner's expertise, the reliability of his event study methodology, or the consistency of his opinions. For the reasons explained herein, Defendants motion should be denied and the Court should admit Dr.  Werner's expert opinions.

## II.     LEGAL STANDARD

In *Daubert v. Merrell Dow Pharm., Inc.*, 509 U.S. 579, 588, 596 (1993), the Supreme Court established a liberal approach to admitting expert testimony. Expert testimony will be admitted if it is both relevant and reliable. *Id.* at 594-95. "The focus [of the *Daubert* analysis] must be solely on principles and methodology, not on the conclusions that they generate." *Id.* at 595. "Vigorous

cross-examination, presentation of contrary evidence, and careful instruction on the burden of proof are the traditional and appropriate means of attacking shaky but admissible evidence." *Id.* at 596. "[T]he rejection of expert testimony is the exception rather than the rule." Fed. R. Civ. Proc. 702 (Adv. Cmte. Notes to 2000 Amendments).

This Court's gatekeeping function applies not only to proffered scientific expert testimony, but also to "testimony based on `technical' and `other specialized' knowledge." *Kumho Tire Co. v. Carmichael*, 526 U.S. 137, 141, 119 S. Ct. 1167, 143 L. Ed. 2d 238 (1999); *see also, Katt v. City of New York,* 151 F. Supp. 2d 313, 353-57 (S.D.N.Y.2001). In this role, district judges have broad discretionary authority "to determine [the] reliability [of an expert's testimony] in light of the particular facts and circumstances of the particular case." *Kumho*, 526 U.S. at 158.

"The `admissibility' and `sufficiency' of scientific evidence necessitate different inquiries and involve different stakes. Admissibility entails a *threshold* inquiry over whether a certain piece of evidence ought to be admitted at trial." *In re Joint E. & S. Dist. Asbestos Litig.*, 52 F.3d 1124, 1132 (2d Cir. 1995) (emphasis in original); *see* Fed. R. Evid. 104(a). Rule 702 of the Federal Rules of Evidence and *Daubert,* discussed below, govern the admissibility of expert testimony. The trier of fact, on the other hand, is tasked with considering the sufficiency, or weight, of admitted expert testimony, and does so only after an opponent has an opportunity to challenge the expert testimony with "vigorous cross-examination, presentation of contrary evidence," and summation. *Daubert*, 509 U.S. at 596; *Amorgianos v. Nat'l R.R. Passenger Corp.*, 303 F.3d 256, 267 (2d Cir. 2002); *Campbell ex rel. Campbell v. Metro. Prop. & Cas. Ins. Co.*, 239 F.3d 179, 186 (2d Cir. 2001) ("[T]he weight of the evidence is a matter to be argued to the trier of fact...."); *Borawick v. Shay*, 68 F.3d 597, 610 (2d Cir. 1995) ("[T]he Court [in *Daubert*] expressed its faith in the power of the adversary system to test shaky but admissible evidence." (internal quotations omitted)); *McCullock*

*v. H.B. Fuller Co.*, 61 F.3d 1038, 1043 (2d Cir. 1995) ("[Defendant's] quibble with [plaintiff's expert's] academic training ... and his other alleged shortcomings ... were properly explored on cross-examination and went to his testimony's weight.").

## III.   ARGUMENT

### A.   Dr. Werner's Opinions are Based on Reliable Data and Methodology

Defendants acknowledge that the technique Dr. Werner employed, an event study, is "routinely used to assess loss causation and damages in securities cases." Mot. at 2. Event studies are, in fact, universally employed to prove loss causation and damages, and many courts have *required* event studies to admit expert testimony on loss causation and market efficiency. *See, e.g., S.E.C. v. Goldstone*, No. CIV 12-0257 JB/LFG, 2016 WL 3135651, at *49 (D.N.M. May 10, 2016) (*citing* to *In re Imperial Credit Indus., Inc. Sec. Litig.*, 252 F. Supp. 2d 1005, 1015 (C.D. Cal. 2003), *aff'd sub nom. Mortensen v. Snavely*, 145 F. App'x 218 (9th Cir. 2005)). "Over time, the majority of courts have recognized the utility of the event study methodology in the securities context and begun to require experts to include an event study with their damage report." *Goldstone*, 2016 WL 3135651, *48 (*quoting* Jay W. Eisenhofer, Geoffrey C. Jarvis, James R. Banko, *Securities Fraud, Stock Price Valuation, and Loss Causation: Toward A Corporate Finance-Based Theory of Loss Causation*, 59 BUS. LAW. 1419, 1426 (2004))[1]. So, Dr. Werner clearly employs "established methods."

Defendants admit that "event studies are commonly used in loss causation and damages analyses," Mot. at 11. Dr. Werner employed an "event study" in its usual manner to provide evidence of loss causation and damages. Report on Loss Causation and Damages by Dr. Adam

---

[1] Attached as Exhibit 205 to Declaration of Joshua Baker ("Baker Decl."), filed contemporaneously herewith.

Werner, April 21, 2021 ("Werner Report")[2], ¶¶24-28. Dr. Werner laid out in detail the principles of the event study and its application. *Id.*, ¶¶24-30. Dr. Werner next analyzed the application of the event study to the specific corrective disclosure dates and stated his expert opinions. *Id.,* ¶¶29-31. Dr. Werner explained the application of the event study to a damages analysis and how he constructed and applied the "constant-dollar inflation ribbon" to the facts of this case, *Id.,* ¶¶85-95, and details how per-share and per-note damages will be calculated. *Id.,* ¶¶97-98.

Dr. Werner effectively responds to and rebuts Dr. Hendershott's "variety of concerns and critiques", which he notes are all "baseless or misguided." Rebuttal Report on Loss Causation and Damages by Dr. Adam Werner, July 12, 2021 ("Rebuttal")[3], ¶III.7. Defendants ignore Dr. Werner's responses almost entirely. Dr. Hendershott does not contest Dr. Werner's measurement of the residual decline in FXCM's stock price in response to the corrective disclosure on February 7, 2017. *Id.,* ¶II.i. Dr. Hendershott likewise does not contest that the residual return on that date was presumptively highly statistically significant. *Id.* Dr. Hendershott offers no damages model of his own, and nowhere presents and alternative calculations of per-share damages suffered by the Class. *Id.,* ¶II.ii. Dr. Werner describes Dr. Hendershott's contention that "collateral consequences" and confounding non-fraud-related information as "baseless, at odds with the economic literature, and [ignoring] the factual record in this case." *Id.* ¶¶II.iv, 10-18. Dr. Werner adds that his application of a "constant-dollar" inflation ribbon is not only appropriate, but *conservative* in this case, compared with the available alternatives. *Id.,* ¶¶II.v, 23-27.

Dr. Werner concludes—and Dr. Hendershott does not contest—that the market for FXCM common stock was efficient throughout the Class Period, *Id.,* ¶7, and that the disclosures on

---

[2] Attached as Exhibit 1 to the Declaration of Israel Dahan in Support of Defendants' Motion to Exclude the Reports, Testimony, and Opinions of Adam Werner (ECF No. 245-1)
[3] Attached as Exhibit 3 to the Declaration of Israel Dahan in Support of Defendants' Motion to Exclude the Reports, Testimony, and Opinions of Adam Werner (ECF No. 245-3)

February 7, 2017 was not previously known to the market and caused the price of FXCM securities to decline on February 7, 2017. *Id.,* ¶10, 12. Dr. Werner specifically tied the corrective disclosures to Defendants' false statements and, though Defendants say otherwise, disaggregated fraud-related from non-fraud-related losses. That Defendants do not like the results of Dr. Werner's able analysis is not grounds to exclude him. To the extent Defendants and their expert take issue with Dr. Werner's conclusions or the minutiae of his analysis, they are free to explore those objections at trial. Defendants' arguments "go to the weight of [the expert's] testimony rather than the admissibility." *Wechsler v. Hunt Health Sys.,* 381 F.Supp.2d 135, 144-45 (S.D.N.Y. 2003).

### B.    Dr. Werner Need Not "Disentangle" The Impact of Corrective Disclosures From Their Direct and Predictable Consequences

What Defendants DO claim is that Dr. Werner did not disaggregate non-fraud-related news, ignoring that Dr. Werner actually did so in his opening report. *Id*. Defendants suggest that Dr. Werner's analysis failed to "'disaggregate' losses caused by 'disclosures of the truth behind the alleged misstatements from losses caused by other factors, including changed economic circumstances, changed investor expectations, new industry-specific or firm-specific facts, conditions, [and] other events." Motion at 9 (quoting *Atlantica Holdings, Inc. v. Sovereign Wealth Fund Samruk-Kazyna JSC*, 477 F. Supp. 3d 88, 110 (S.D.N.Y. 2020), which in turn quotes *In re Flag Telecom Holdings, Ltd. Sec. Litig.*, 574 F.3d 29, 36 (2d Cir. 2009)).

However, Defendants' reliance on this authority is misplaced, because their argument rests on a false ***factual*** premise—that there existed some "other factors"—unrelated to the alleged fraud—that Dr. Werner should have disaggregated. In his rebuttal to Defendants' expert, explains that Defendants' suggestion that "the regulatory penalties were wholly distinct and separate from the allegation-related corrective information is at odds with the financial literature" and "defies both logic and economic principles." Rebuttal ¶¶13-15. Each of the "multiple pieces of

5

information… released to the market on February 6, 2017," which Defendants identify as "separate pieces of information", were directly and proximately related to Defendants' fraud: (1) the CFTC and NFA's revelations regarding FXCM's material misrepresentations concerning its relationship with Effex (which are the very misrepresentations upon which Plaintiffs' fraud claims are based); (2) that FXCM would pay a penalty of $7 million to settle the CFTC and NFA's claims (a consequence arising from the same fraud); (3) that FXCM would be forced to withdraw from its U.S. business (also in consequence of the same fraud); and (4) that FXCM would lay off 18% of its workforce (as a direct result of withdrawing from its U.S. business, in consequence of the same fraud). These are plainly "materializations" of the same, foreseeable risk, as laid out by this Court in *In re Vivendi Universal, S.A. Sec. Litig.*, 634 F. Supp. 2d 352, 370–72 (S.D.N.Y. 2009) ("*Vivendi I*"), and *In re Vivendi Universal, S.A. Litig.*, 765 F. Supp. 2d 512, 555-561 (S.D.N.Y. 2011) ("*Vivendi II*"). Dr. Werner's language of "inextricable ramifications" is simply a different expression of the same principle. Neither Defendants nor their expert, Dr. Hendershott, ***posit a single arguably independent confounding factor*** which they assert Dr. Werner should have, and failed to, disaggregate.[4]

The defendants in *Vivendi* asserted a very similar argument to that on offer here, which this court there properly rejected:

---

[4] FXCM's allusion, in Footnote 7 of their Motion, to the effect of the January 15, 2017, Swiss National Bank Euro-Franc pegging crisis ("SNB Flash Crash") is frankly bizarre. The SNB Flash Crash had a substantial and lasting depressing effect on FXCM's market capitalization and share price, which—even assuming that the event was wholly unrelated to the misrepresentations upon which Plaintiffs' claims are based—would have had the effect of artificially *reducing* the observed price inflation under Dr. Werner's analysis by applying the constant-dollar value of the observed price impact *after* the SNB event exerted downward pressure on the stock price. Rebuttal ¶31. Application of a constant-percentage ribbon would have implied a proportionately higher price inflation earlier in the Class Period. *Id.*

For the most part, however, defendants do not point to an obvious competing cause on each of the eleven days. Instead, defendants make the novel argument that plaintiffs have failed to disaggregate damages caused by the risk from damages caused by the materialization of the risk… defendants argue [that] plaintiffs must disaggregate the additional damages caused by the materialization of risk from those attributable to risk itself. Defendants cite no case law for this argument, and the Court has not found any.

The first problem with defendants' argument is that [plaintiffs' expert] Dr. Nye opines that "all the pieces were there"… While defendants argue that "Dr. Nye performed no analysis to arrive at this conclusion", this is an argument better made in a challenge to Dr. Nye's credibility as an expert rather than a summary judgment motion. Dr. Nye's opinion alone creates a genuine issue of material fact on this point. Second, if the Court analyzes the problem through the lens of tort law and proximate cause, the Court reaches the same result. The Restatement (Second) of Torts concludes that plaintiffs seeking damages for fraud are entitled to seek out-of-pocket damages *and* "pecuniary loss suffered otherwise as a consequence of the recipient's reliance upon the misrepresentation." … Prosser and Keeton concurs, noting that plaintiffs can recover for "losses which might be expected to follow from the fraud and from events that are reasonably foreseeable." … Prosser and Keeton notes that "if the plaintiff stores his goods in a warehouse represented [to] him to be fireproof and they are destroyed when it burns down, he can recover, and likewise, when he invests in an automobile agency, after false assurance of profits make by similar agencies, and the agency goes bankrupt." *Id.* In the goods example, plaintiff is entitled to recover not only the inflated price he paid for a fireproof storage facility, but also the cost of the goods lost in the fire. In the agency example, the plaintiff is entitled to recover not only the inflated price he paid for equity in the agency, but also whatever portion of the bankruptcy loss that was foreseeable. …

Finally, it is hard to see how price declines allegedly caused by the materialization of the risk should not be incorporated into plaintiffs' damages. Stocks are risky investments, and purchasers assume a variety of risks to the value of their stock…. Defendants are essentially arguing that plaintiffs should bear a risk they did not assume and that was intentionally concealed from them. Imposing liability for this loss would not be downside insurance for investors. Not imposing liability, however, might be a windfall for fraudsters.

Defendants point incredulously at Dr. Nye's assertion that 100% of the price decline on each of the eleven days was due to fraud-related revelations. ...Surely, they argue, some part of that price decline was due to some other factor. Defendants are technically correct. If five top Vivendi executives had resigned the same day as a ratings downgrade, it may be incumbent on plaintiffs to produce evidence establishing roughly how much of the price

7

decline was due to the downgrade and how much to the resignations. But the key term here is "roughly." Indeed, given the admonishment by the Court of Appeals that plaintiffs "were [not] required to allege the precise loss attributable" to the fraud, *Lentell,* 396 F.3d at 177, it seems logical that the shorter the time frame considered, the rougher the proportion need be. Furthermore, in most cases, "the chain of causation ... is a matter of proof at trial." *Id.* at 174. Given that plaintiffs have produced evidence that Vivendi's liquidity risk did gradually materialize on days when the stock price declined, defendants must at least adduce competing causal events that plaintiffs have failed to disaggregate. *See Celotex,* 477 U.S. at 325.

*Vivendi I,* 634 F. Supp. 2d at 370-371.

"For an event to qualify as a materialization of the risk, [the alleged disclosure] need only disclose **part** of the truth that was previously concealed by the fraud." *Id.* At 364 (emphasis added). The materializations of risk arising from the disclosure of Defendants' misrepresentations—e.g. reputational harm and/or regulatory investigations and penalties, as in this case—may contribute to investors losses, and investors are entitled to recover for their losses attributable to these collateral consequences, so long as these events are "***sufficiently related*** to the fraud to qualify as materializations of the risk." *Id.* (emphasis added). It is the role of an expert to disaggregate losses arising from the disclosure and the "sufficiently related" consequences of that disclosure from price movement due to unrelated factors. "Sorting out which declines were caused by such extraneous factors and which were caused by a materialization of the concealed risk is generally the province of an expert…. that produces the almost obligatory 'event study'…" *Id.* While Plaintiffs bear the burden of showing loss causation, "it is important not to confuse causation with damages when comparing competing causes for a stock decline… plaintiffs need only prove that they suffered *some* damage from the fraud. Liability obviously does not hinge on how much…" *Id.*

Plaintiffs do not need to show the exact proportion of the loss caused by the materialization of risk—rather, in the Second Circuit, Plaintiffs need only be able to "ascribe some rough

proportion of the whole loss" to Defendants' fraud. *Id.* At 365, citing *Lattanzio v. Deloitte & Touche LLP*, 476 F.3d 147, 158 (2d Cir. 2007). Dr. Werner has done exactly that here. Dr. Werner's constant-dollar inflation method is wholly appropriate to the facts in this case. *See Vivendi I*, 634 F. Supp. 2d at 371 (the constant-dollar inflation approach is most appropriate where the risk of the loss is virtually certain at the beginning of the Class Period and where the magnitude of that risk is significant). Defendants clearly understood the impact of their "no-dealing desk" platform announcement while concealing their undisclosed relationship with Effex and conflict of interest would have on FXCM's stock price. That is precisely why they deliberately withheld the information from investors.

Defendants claim Dr. Werner should have attributed a portion of the stock price decline on confounding factors, but as shown above, the factors that Defendants identify are actually "inextricable consequences" of Defendants' material misrepresentations. Such consequences are so intimately factually connected with the alleged misrepresentations that there exists no economically defensible way to disaggregate them from the underlying misrepresentations.

C.    **Dr. Werner Demonstrates the Market Deemed the Corrective Disclosures Material, and Therefore Relevant to the Market Value of FXCM Securities**

Defendants also suggest that Dr. Werner's analysis is unreliable because he does not "demonstrate that the allegedly corrective information would have been value relevant to investors." This is nonsense—this is precisely what Dr. Werner's event study does. In an efficient market, available information is incorporated into the price of the security in real-time. The U.S. Supreme Court endorsed this in establishing the fraud-on-the-market theory in *Basic v. Levinson,* 485 U.S. 224 (1988). By isolating the price impact of the disclosure from external factors, the event study isolates the portion of the price decline which is attributable to the novel information

introduced by the disclosure.[5] Thus, once extrinsic factors are accounted for, the price impact attributable to the disclosure demonstrates the "value relevance" of the information disclosed. "The market's reaction to the alleged corrective disclosures provides some evidence of the alleged misstatements' materiality." *In re Bank of Am. Corp. Sec., Derivative, & Emp. Ret. Income Sec. Act (ERISA) Litig.*, 281 F.R.D. 134, 143 (S.D.N.Y. 2012) (citing *In re SLM Corp. Sec. Litig.*, No. 08 CIV. 1029 WHP, 2012 WL 209095, at *6 (S.D. N.Y. Jan. 24, 2012) ("…evidence of a stock price movement following corrective disclosures may be a relevant factor in the legal assessment of materiality.")

Defendants assert—without citation to any supporting authority[6] that FXCM's material omissions regarding its pay-for-flow arrangement with Effex could not have been "value relevant" to investors in February of 2017 because by that time, "FXCM had not received payments for order flow from Effex for more than two years" and therefore could not have been "relevant to FXCM's future cash flows." Mot. at 15. Defendants' argument is willfully obtuse—the information was "value relevant" in that it revealed undisclosed risks which had never been incorporated by the market into the price of FXCM's securities.  First, the February 6, 2017 disclosures revealed that FXCM had been lying to its customers and investors about its NDD model for retail trading, which

---

[5] "An event study has four parts: defining the event (*e.g.,* an earnings announcement), establishing the announcement window (*i.e.,* the period over which stock price changes are calculated), measuring the expected return of the stock, and computing the abnormal return (which is the actual return minus the expected return). ***Performing the third step requires the expert to isolate the effect of the event from other market, industry, or company-specific factors… A large abnormal stock price movement occurring at the same time the market receives news about an event suggests that the event caused the abnormal price movement***." *Carpenters Pension Tr. Fund of St. Louis v. Barclays PLC*, 310 F.R.D. 69, 80 (S.D.N.Y. 2015) (citing Michael J. Kaufman & John M. Wunderlich, *Regressing: The Troubling Dispositive Role of Event Studies in Securities Fraud Litigation.*, 15 STAN. J.L. BUS. & FIN. 183, 190 (2009) (Attached as Exhibit 207 to the Baker Decl.) (internal quotations omitted, emphasis added).

[6] Defendants cite *Atlantica Holdings, Inc.*, 477 F. Supp. 3d at 110, solely for the general proposition that Plaintiffs should attempt to disaggregate losses attributable to the alleged disclosure(s) from losses caused by "other factors"—Defendants' reliance upon that proposition here is wholly misplaced, as Plaintiffs have thoroughly expounded in the foregoing sections.

was purportedly "fundamental to our core business philosophy" and "our largest source of revenue." Third Amended Complaint ("TAC") (ECF No. 181), ¶146, 148. Second, the disclosure revealed undisclosed risks, regarding "the extent of FXCM's exposure to regulatory scrutiny, the viability and sustainability of its business model, and FXCM's future profitability. The alleged fraud also concealed from the market the inextricable ramifications that would manifest upon corrective disclosure, all of which in turn caused the prices of FXCM Securities to be artificially inflated." Werner Report ¶45, Rebuttal ¶¶3,7. Third, as Dr. Werner explains in his rebuttal report, "[t]hat a disclosure of fraud can have a significant negative valuation impact on a company is a generally-accepted principle." Werner Report ¶13. Finally, the "value-relevance" of the information is demonstrated by the sheer scale of the price impact attributable to the corrective disclosure—the price of FXCM's securities lost more than 50% of their market value in a single day, which largely speaks for itself. *See In re Bank of America Corp. Securities, Derivative, and Employee Retirement Income Sec. Act (ERISA) Litigation*, 281 F.R.D. 134; *In re SLM Corp. Securities Litigation*, 2012 WL 209095, at *6 (holding that stock price movement is probative of materiality of the corrective disclosure).

###    D.    Dr. Werner's Constant-Dollar Approach to Estimating Damages is Reliable and Reasonable

Defendants devote a substantial amount of their brief to criticizing Dr. Werner's reliance on the "constant inflation ribbon" methodology to estimate damages. *See* Mot. at 3, 16-20. What defendants fail to acknowledge is that courts have widely recognized the constant-dollar inflation ribbon as the gold-standard for estimating class-wide damages in securities fraud cases. *See, e.g. Vivendi I,* 634 F. Supp. 2d at 359; *Baker v. SeaWorld Ent., Inc.*, 423 F. Supp. 3d 878 (S.D. Cal. 2019), *Smilovits v. First Solar, Inc* No. CV12-0555-PHX-DGC, 2019 WL 7282026 *7-9 (D. Ariz. Dec. 27, 2019) (denying a motion to exclude plaintiff's expert's "constant-dollar information"

method, on the basis that "[d]efendants' arguments go more to the correctness of [plaintiff's expert's] conclusions than the method by which he reaches them… the Court concludes that the jury must assess the validity of [the expert's] conclusions."); *In re Novatel Wireless Sec. Litig.*, No. 08CV1689 AJB (RBB), 2013 WL 12247558, at *3 (S.D. Cal. Nov. 19, 2013) (finding that the two alternative calculations for calculating damages – the constant dollar and constant percentage methods – "may properly be presented to a jury for determination as to which is the more reasonable measurement of damages").

Contrary to Defendants' arguments, Dr. Werner's methodology is eminently reasonable and will assist a jury in making factual findings concerning damages. *See* Fed. R. Evid. 702.

Traditionally, §10(b) damages are calculated using the "out-of-pocket" damages rule. *See Acticon AG v. China N. E. Petroleum Holdings Ltd.*, 692 F.3d 34, 38 (2d Cir. 2012) (noting a defrauded buyer is entitled to damages equal to the difference between the price paid and the value of the stock when purchased) (citing *Levine v. Seilon, Inc.*, 439 F.2d 328, 334 (2d Cir. 1971); *Elkind v. Liggett & Myers, Inc.*, 635 F.2d 156, 168 (2d Cir. 1980)). Indeed, the "out of pocket" rule of damages was adopted by the Supreme Court in *Affiliated Ute Citizens v. United States*, 406 U.S. 128, 155 (1972).

It is the generally accepted practice to estimate "out-of-pocket" damages in securities fraud cases by reference to the decline in the stock price when an allegedly concealed risk has materialized. *See Vivendi I*, 634 F. Supp. 2d at 358-59, 370-71 & n.6 (acknowledging the constant-dollar inflation ribbon methodology to be a reliable estimate of per share inflation in materialization of the risk cases);[7] *In re Novatel Wireless Sec. Litig.*, No. 08cv1689 AJB (RBB),

---

[7] *See also In re BP p.l.c. Sec. Litig.*, MDL No. 10-md-2185, 2014 WL 2112823, at *9-*10, *12 n.14 (S.D. Tex. May 20, 2014) ("[T]he 'out-of-pocket' measure of damages employed in most securities fraud cases is particularly consonant with the 'fraud-on-the-market' theory. Because the value of the unpriced risk is

2013 WL 12144150, at *10-*11 (S.D. Cal. Oct. 25, 2013) (finding the "commonly accepted method to calculate the value line known as backcasting" was a "reasonable and logical" method to assess the true value and artificial inflation in the stock price prior to the date of the corrective disclosure); *In re Enron Corp. Securities*, 529 F. Supp. 2d 644, 716 (S.D. Tex. 2006) (observing the "out-of-pocket measure . . . allows 'a purchaser to recover the difference between the purchase price and the true value of the securities absent the alleged fraud as measured by the correction in the market price following [a] curative disclosure'"); *In re Royal Dutch/Shell Transp. Sec. Litig.*, 404 F. Supp. 2d 605, 610 (D.N.J. 2005) (observing the out-of-pocket rule permits "a purchaser to recover the difference between the purchase price and the true value . . . measured by the correction in the market price following curative disclosure"); *Goldberg v. Household Bank, F.S.B.*, 890 F.2d 965, 966-67 (7th Cir. 1986) (holding that the stock price "drop when the truth appears is a good measure of the value of the information, making it the appropriate measure of damages"); *Harris v. Union Elec. Co.*, 787 F.2d 355, 368 (8th Cir. 1986) (holding that the true value of securities when sold "is reflected by the drop in the market price once the fraud was discovered"); *Blackie v. Barrack*, 524 F.2d 891, 909 n.25 (9th Cir. 1975) (noting that "the change in [stock] price after a corrective release" is "evidence of the inflation when purchased").

Defendants conspicuously avoid authority, including that from within this District that clearly explains why the constant-dollar inflation ribbon methodology is particularly appropriate in cases like this one. This Court already endorsed constant-dollar inflation ribbon analysis in *Vivendi I*. There, economist Dr. Blaine Nye applied both a "constant-dollar" (in that case, constant-euro) inflation ribbon and a constant-percentage inflation ribbon. Dr. Nye explained:

> If the magnitude of the inflation on the date the misrepresentation is made or the fraud is revealed is not expected to be influenced by market, industry, or

_____

considered from the perspective of the marketplace as a whole, it remains constant across the [class] of investors.")

13

non-fraud-related company-specific events, or indeed based on any available information, then from the standpoint of financial economics, the best estimate of the inflation on the date of purchase is simply the dollar value of the inflation on the date of the initial inflation or the date the fraud was revealed, i.e., the inflation remains constant over the relevant period (constant-dollar inflation). On the other hand, if inflation is expected to be influenced by market, industry and non-fraud-related company-specific events, as would any misrepresentations or omissions about the condition and business operations of the company and thus its earnings and earnings growth, from the standpoint of financial economics the best estimate of inflation at the time of purchase is the percentage change in share price at the point of initial inflation or at the time of revelation of the fraud, as adjusted by market, industry and non-fraud-related company-specific returns during the period between the date of purchase and the date the fraud is revealed (constant percentage inflation).

The *Vivendi* court went on to say:

> [I]t is hard to see how price declines should not be incorporated into plaintiffs' damages. Plaintiffs allege that they could not have assumed the risk . . . because it was concealed from them. Defendants are essentially arguing that plaintiffs should bear a risk they did not assume and that was intentionally concealed from them. Imposing liability for this loss would not be downside insurance for investors. Not imposing liability, however, might be a windfall for fraudsters.

*Vivendi I*, 634 F. Supp. 2d at 371 (emphasis added).

Defendants suggest the constant-dollar method is "inherently unreliable" because it does not "control for the nature of the alleged disclosure" (a vacuous characterization for which Defendants fail to offer any meaningful explanation) and FXCM's specific "financial situation and… value relevance of that disclosure to investors" changed over time. But Defendants' critique is as self-serving as it is meritless. Defendants' entire argument rests on their unsubstantiated assertion that there existed some alternative, confounding variable for which Dr. Werner's analysis fails to control—however, each of the putatively confounding variables that Defendants offer up is directly related to the conduct alleged in the complaint and the foreseeable consequences of that

conduct, and therefore ***not independent*** contributors to investors' losses.[8] As the case Defendants themselves quote states, "[w]here an expert conducts a regression analysis and fails to incorporate ***major independent variables***, such analysis may be excluded as irrelevant." Mot. at 16-17, quoting *In re Wireless Tel. Servs. Antitrust Litig.*, 385 F. Supp. 2d 403, 427 (S.D.N.Y. 2005).

Defendants' suggestion the constant-dollar method would be reasonable only if "the regulatory outcome and its collateral effects were ***perfectly foreseeable*** and inextricable" is absurd—this posits an impossible standard. This argument was advanced and explicitly rejected by the court in *Vivendi I*: "Finally, it is hard to see how price declines allegedly caused by the materialization of the risk should not be incorporated into plaintiffs' damages. … Defendants are essentially arguing that plaintiffs should bear a risk they did not assume and that was intentionally concealed from them. Imposing liability for this loss would not be downside insurance for investors." *Vivendi I,* 634 F. Supp. 2d at 371.[9] Future events are ***never*** "perfectly foreseeable"— some variation in outcome must always be expected. That the outcome cannot be predicted with 100% accuracy does not render that outcome unforeseeable—it is enough that the consequence be ***reasonably foreseeable,*** i.e. predictable in the general sense. Indeed, Judge Holwell ably addressed this point in *Vivendi,* noting that "[a]s when assessing proximate cause, courts assessing plaintiffs' case for loss causation look to whether the alleged damages were ***reasonably foreseeable*** given the alleged false or misleading statements." 634 F. Supp. 2d at 360 (emphasis added).[10] "To prove that the loss-inducing event was foreseeable, plaintiffs must establish that the risk of the event

---

[8] *See* discussion in Section B, s*upra.*
[9] *See* additional discussion in Plaintiff's Memorandum of Law in Opposition to Defendants' Motion for Summary Judgment ("MSJ Opp."), filed contemporaneously herewith, at Section E, pp. 44-46.
[10] *See also Dura Pharmaceuticals, Inc. v. Broudo,* 544 U.S. 336 (2005) ("… neither the Rules nor the securities statutes impose any special further requirement in respect to the pleading of proximate causation or economic loss.").

occurring was within the zone of risk *concealed* by the misrepresentations and omissions alleged by the disappointed investor." *Id.* At 363 (emphasis in original).

Utilizing a constant-dollar inflation ribbon, Dr. Werner estimated $3.39 per share in "out-of-pocket" damages. *See* Werner Report ¶¶96-97. His estimate of Class Period inflation is reliably based on FXCM's residual stock price drop on February 7, 2017. *See id.*, ¶¶78-79. Dr. Werner utilized this widely-accepted and traditional method of estimating damages with a constant inflation ribbon because Defendants' misleading statements and omission are alleged to have concealed risks associated with FXCM's concealment of its relationship with Effex throughout the Class Period, and the wholly foreseeable regulatory investigations and enforcement actions that followed. *See id.*, ¶¶91-95. As alleged by Plaintiffs, at all times during the Class Period investors were deprived of the opportunity to price those risks into FXCM's stock and, thus overpaid for their investment. *See* Dkt. No. 181, ¶¶186-190. Accordingly, Dr. Werner's damage estimate methodology is an excellent fit with the facts and Plaintiffs' theory of liability, and application of a constant inflation ribbon in this case is reasonable and appropriate. *Vivendi I*, 634 F. Supp. 2d at 358-59, 370-71 & n.6; *Liberty Media Corp. v. Vivendi Universal, S.A.*, 923 F. Supp. 2d 511, 525 (S.D.N.Y. 2013) ("*Vivendi III")*.

No more is required. Defendants may advance any substantive arguments they may have about alternative causation at trial. Once liability has been established, the jury may determine the amount of damages by a just and reasonable estimate. *Story Parchment Co. v. Paterson Parchment Paper Co.*, 282 U.S. 555, 562-63 (1931); *MCI Commc'ns Corp. v. Am. Tel. & Tel. Co.*, 708 F.2d 1081, 1161 (7th Cir. 1983). The jury is not required to calculate damages with mathematical precision; a verdict is appropriate if there is sufficient evidence from which to intelligently estimate damages. *Rowe v. Maremont Corp.*, 850 F.2d 1226, 1243 (7th Cir. 1988); *see Story Parchment*,

282 U.S. at 563 ("[W]hile the damages may not be determined by mere speculation or guess, it will be enough if the evidence show the extent of the damages as a matter of just and reasonable inference, although the result be only approximate."). Accordingly, when calculating damages, a degree of uncertainty is acceptable. *See MCI*, 708 F.2d at 1161 ("[T]he Supreme Court has been willing to accept a degree of uncertainty in the calculation of damages . . . .").

In providing a reliable estimate of class-wide damages, a damages expert often will disaggregate "some rough percentage of the decline[] from losses resulting from other, non-fraud-related events." *Vivendi I*, 634 F. Supp. 2d at 365. Dr. Werner has done just that, reliably extricating the price impact of all ***non-fraud-related*** factors from the fraud-related decline. *See* Werner Report ¶¶59-75. Moreover, Dr. Werner has reasonably and reliably estimated what portions of the negative returns of $3.39 per FXCM common share and $16.31 per $100 par value of the FXCM Notes were due to non-fraud related factors. That is, he has reliably disaggregated Plaintiffs' fraud-related damages consistent with controlling law.

**E.     Dr. Werner's Opinions Regarding Loss Causation and Damages Arising from FXCM's Violations of U.S. GAAP are Based on Reliable Data and Methodology**

Defendants next argue that Dr. Werner's opinions should be excluded to the extent they bear upon loss causation stemming from FXCM's violations of U.S. Generally-Accepted Accounting Principles ("GAAP") because, they suggest, "he provides *zero* analysis regarding loss causation and damages related to the alleged GAAP violations." Mot. at 21.

Defendants fundamentally miss the point. Plaintiff's allegations and testimony from accounting expert Mr. John Barron are part-and-parcel to Plaintiffs' other allegations regarding Defendants' omissions to disclose the nature of FXCM's profit-sharing arrangement with Effex and John Dittami. Plaintiffs allege that FXCM's statements regarding its "no-dealing-desk" business model—which was ostensibly free from conflicts of interest vis-à-vis FXCM's

17

customers—were materially misleading, because, in fact, FXCM maintained a profit-sharing relationship through its putative "pay-for-flow" arrangement with Effex, an entity in which FXCM had an undisclosed financial interest and over which FXCM exercised material control. Complaint, ¶¶2-4.

Contrary to its public statements, FXCM manipulated its platform to prioritize Effex over other market-makers, permitting it to win all "ties" in pricing, and thereby capturing the lion's share of trading volume. Plaintiffs' Rule 56.1 Statement of Additional Material Facts ("Plaintiff SOF"), ¶¶250-251. Effex then kicked back up to 70% of its trading profits to FXCM, disguised as "payments for order flow." Rebuttal ¶11, Plaintiff SOF ¶¶181-186, 213, 281. FXCM's quarterly and annual reports misrepresented that FXCM had no interest in trades executed on its "no-dealing-desk" platform. Plaintiff SOF ¶¶149-153. Additionally, FXCM's financial statements were materially misstated, in violation of U.S. GAAP and SEC regulations, for failing to disclose FXCM's economic interest in and related-party transactions with Effex. Expert Report of John E. Barron, CPA ("Barron Report")[11], ¶¶10-13. FXCM was required, under U.S. GAAP, to consolidate Effex's results of operations with its own as a variable-interest entity, as well as to disclose Effex and Dittami as related parties. *Id*. As a result, each of FXCM's annual and quarterly reports and financial statements during the Class Period were materially misstated.

Had FXCM's periodic reports to the SEC complied with U.S. GAAP, they would have disclosed the true nature of the FXCM's relationship with Effex, revealed that FXCM's statements regarding lack of conflicts of interest were untrue, and revealed the true source and nature of the revenues reported as payments for order flow. Thus, FXCM's GAAP violations are an inseparable part of the same materially misleading annual and quarterly reports.

---

[11] Attached as Exhibit 1 to the Declaration of Israel Dahan in Support of Defendants' Motion to Exclude the Reports, Testimony, and Opinions of John E. Barron (ECF No. 240-1).

Defendants argue that Plaintiffs "have not identified any disclosure that 'corrected' the alleged GAAP violations." Mot. at 21. They appear to be operating under the misapprehension that FXCM's GAAP violations cannot be "corrected" absent a restatement by FXCM of the affected reports. This assumption is baseless. *See, e.g., In re Chicago Bridge & Iron Co. N.V. Sec. Litig.,* No. 17 Civ. 02414 (LGS), 2019 WL 5287980, at *25-32 (S.D.N.Y, Oct. 18, 2019) (Hon. Shira A. Scheindlin, Special Master)(finding partial corrective disclosure of GAAP violations by analyst reports calling into question subject's accounting well before the company discussed any restatement). "There is no requirement that the corrective disclosure take a particular form or be of a particular quality," such that it be a "mirror image tantamount to a confession of fraud." *In re Vale S.A. Sec. Litig.*, No. 1:15-CV-9539-GHW, 2017 WL 1102666, at *29 (S.D.N.Y. Mar. 23, 2017) (citing *Freudenberg v. E*Trade Fin. Corp.*, 712 F. Supp. 2d 171, 202 (S.D.N.Y. 2010) (noting that no court addressing the loss causation pleading standard requires "a corrective disclosure be a 'mirror image' tantamount to a confession of fraud"); *In re Initial Pub. Offering Sec. Litig.*, 544 F. Supp. 2d 277, 289 (S.D.N.Y. 2008) ("[T]here is no requirement that the disclosure take a particular form or be of a particular quality.")). *See also*, *In re Signet Jewelers Ltd. Sec. Litig.,* No. 16CIV6728CMRWL 2019 WL 3001084, at *17 (S.D.N.Y. July 10, 2019) (analyzing corrective disclosures and finding that a corrective disclosure need not "take the form of a 'flashing neon light' with an explicit message stating that it is a intended to cure an earlier fraudulent statement, in order for it to qualify as corrective"). The disclosures that corrected the GAAP violations—revealing the actual nature of FXCM's business arrangement with Effex and of the revenues previously reported as payments for order flow—were the same February 6, 2017 CFTC Press Release, NFA Complaint, and FXCM Press Release (Complaint, ¶¶79-81) that revealed FXCM's other contemporaneous misrepresentations.

Defendants produce no authority—and Plaintiffs are aware of none—which would require Plaintiffs' expert to disaggregate the price impact attributable to individual misstatements and reiterations of misstatements which are corrected by the same corrective disclosure. This is both unnecessary and likely impossible, as has been recognized by this Court previously. *Vivendi II*, 765 F. Supp. 2d at 562 ("… plaintiffs need not prove the amount of loss caused by each misstatement with complete mathematical precision…. It may be impossible for an expert witness to reliably disaggregate the impact of any particular misstatement from the continued force of previous statements... inflation in a company's stock price is difficult to quantify with mathematical precision in any case, and that in a case where a company repeatedly makes statements that omit information [about the same topic],  it is reasonable to conclude that each misstatement played a role… even if it is not possibly [sic] to quantify the exact impact that each statement had on the inflation.").[12]  Such an exercise is not part of the customary practice of experts offering economic testimony on loss causation, or in the conduct of event studies in securities litigation generally, and would be a fruitless waste of time. In any case, it cannot serve as a legitimate basis to exclude Dr. Werner's testimony.

---

[12] The *Vivendi II* court went on to explain:

> To hold, as Vivendi argues, that inflation must rise each time a misstatement is reiterated, and that plaintiffs in securities fraud cases must quantify the precise amount of the rise in inflation due to each such misstatement would produce a perverse result: it would make it harder for plaintiffs to prove loss causation when a company makes numerous similar misstatements over a long time period than when a company makes a single, isolated fraudulent statement, even though the former situation involves a more pervasive and widespread fraud. Such a rule could permit a company to avoid Section 10(b) liability by repeating its misstatements so many times that it becomes impossible for an expert to prove that any particular misstatement, viewed in isolation, caused a quantifiable increase in inflation. That runs contrary to the Second Circuit's guidance that plaintiffs need not show the precise loss attributable to defendant's fraud in order to make out a securities fraud claim.

*Id.,* at 562-63 (internal citations omitted).

**F.     Dr. Werner's Opinions Regarding Loss Causation and Damages with Respect to the FXCM Notes are Based on Reliable Data and Methodology**

Finally, Defendants contend that Dr. Werner's application of an event study is inappropriate to assess *loss causation* with respect to the FXCM Notes, in light of the Court's finding that Plaintiffs had not "establish[ed] that the FXCM Notes traded in an efficient market." Dr. Hendershott opines that, "absent market efficiency, Dr. Werner has no basis to conclude that the price decline observed for the FXCM Notes… is a reliable and unbiased measure of the price impact on that date." Mot. at 22, quoting Expert Report of Terrence Hendershott, Ph.D., June 10, 2021 ("Hendershott Report")[13], at ¶86.

Defendants (and their expert) put their carts before their horses here. As Dr. Werner correctly explains, that the Court found insufficient affirmative evidence of efficiency to support a class-wide ***presumption of reliance***[14] for certification of the FXCM Notes class, should not be confused with an ***affirmative finding*** that the market for the FXCM Notes was "inefficient." Market efficiency is not an either-or proposition—markets may be informationally efficient to varying degrees, and the market price of an individual security may impound novel information more or less efficiently in different time periods.

Where a market for a given security exhibits fewer or weaker indicia of efficiency, this does not—as Defendants suggest—render event study methodology unreliable. Event study methodology remains the gold-standard for establishing loss causation and damages in securities litigation even in slower-clearing markets. *See generally*, C Justin Robinson & Prosper Bangwayo-Skeete, *'Semi-strong Form Market Efficiency in Stock Markets with Low Levels of Trading Activity: Evidence from Stock Price Reaction to Major National and International Events'* (2017)

---

[13] Attached as Exhibit 4 to the Declaration of Israel Dahan in Support of Defendants' Motion to Exclude the Reports, Testimony, and Opinions of Adam Werner (ECF No. 245-4).
[14] Under *Affiliated Ute Citizens of Utah*, 406 U.S. 128 (1972).

18 GLOBAL BUS REV 1447.[15] *See also*, Macintosh, Jeffrey, *Event Study Methodology and the Computation of Damages for Secondary Market Misrepresentations: Striving for a Technicolor Palette,* SSRN ELECTRONIC JOURNAL (January 2020)[16] ("Macintosh") (discussing application of event study methodology in litigation of thinly-traded securities on Canadian markets).

To show loss causation, plaintiffs must demonstrate that the price decline following a corrective disclosure was significant (after disaggregating ***independent and unrelated*** firm-specific events) and produce enough evidence for the fact finder to "ascribe some rough proportion of the loss to defendants' fraud." *Vivendi I,* 634 F.Supp.2d at 364-65 (internal quotation omitted). However, it remains entirely possible to show statistically significant price impact with a high degree of confidence even in thinly-traded markets. "To this end, expert witnesses should be given wide latitude in choosing a defensible application of [event study methodology]…" Macintosh, at 60-61. That the market for FXCM Notes was thinly-traded relative to FXCM Stock does not render Dr. Werner's event-study methodology unreliable—rather, it goes to the weight to be afforded to the results, which is a question for the finder of fact—and fundamentally inappropriate to resolution in the context of a *Daubert* motion. *McIntire v. China MediaExpress Holdings, Inc.*, 38 F. Supp. 3d 415, 43–31 (S.D.N.Y. 2014) (Defendants' argument that event study fails to demonstrate market efficiency "go to the weight to be given to the event study, and not to its admissibility.") (internal citation omitted). As Dr. Werner states in his Rebuttal, "[e]ven absent a finding of market efficiency, the damages analysis I provided… for the FXCM Notes is informative for investors…" Rebuttal, ¶II.vi. Defendants are free to address the credibility of Dr. Werner's conclusions and any alleged omissions in his analysis at trial. *See, Vivendi I*, 634 F.Supp.2d at 371 ("While defendants argue that '[plaintiff's expert] performed no analysis to arrive

---

[15] Attached as Exhibit 204 to the Baker Decl.
[16] Attached as Exhibit 206 to the Baker Decl.

at this conclusion', this is an argument better made in a challenge to [his] credibility as an expert rather than a summary judgment motion. [The expert's] opinion alone creates a genuine issue of material fact on this point.") "As long as an expert's scientific testimony rests upon good grounds, based on what is known, it should be tested by the adversary process—competing expert testimony and active cross-examination—rather than excluded from jurors' scrutiny for fear that they will not grasp its complexities or satisfactorily weigh its inadequacies." *Ruiz-Troche v. Pepsi Cola of Puerto Rico Bottling Co.*, 161 F.3d 77, 85 (1st Cir. 1998).

## IV.   Conclusion

The Court should deny Defendants' motion to exclude the reports and testimony of Plaintiffs' expert Dr. Adam Werner.

Dated: December 9, 2021

**THE ROSEN LAW FIRM, P.A.**

By: */s/ Joshua Baker*
Laurence M. Rosen
Phillip Kim
Joshua Baker
Brent J. LaPointe
275 Madison Ave, 40th Floor
New York, NY 10016
Phone: (212) 686-1060
Fax: (212) 202-3827
Email: lrosen@rosenlegal.com
            pkim@rosenlegal.com
            jbaker@rosenlegal.com
            blapointe@rosenlegal.com

*Lead Counsel for Plaintiffs and the Class*

**WOLF HALDENSTEIN ADLER
FREEMAN & HERZ LLP**
Matthew M. Guiney
270 Madison Avenue
New York, NY 10016
Tel: (212) 545-4600
Email: guiney@whafh.com

*Additional Counsel*

## CERTIFICATE OF SERVICE

I hereby certify that on December 9, 2021, I electronically transmitted the attached using the ECF system for filing, which will send notification of such filing to all counsel registered through the ECF System.

*/s/ Joshua Baker*