# EXHIBIT 184

Page 1

1
2              UNITED STATES DISTRICT COURT
               SOUTHERN DISTRICT OF NEW YORK
3
4       In re:                        :
                                      :  Master File No.
        Global Brokerage, Inc.        :  1:17-cv-00916-RA
5       F/k/a FXCM, Inc.              :
        Securities Litigation         :
6       -----------------------       :
7
8
9            ** C O N F I D E N T I A L **
10       REMOTE VIDEO DEPOSITION OF:  JOSEPH S. PATT
11              THURSDAY, APRIL 23, 2020
12
13
14
15
16
17
18
19
20
21
22
23
24      REPORTED BY:
25      SILVIA P. WAGE, CCR, CRR, RPR

Page 29

1       JOSEPH PATT - CONFIDENTIAL
2  Defendants?
3       A.  Because they -- you know, they
4  misrepresented the nature of the core business in
5  their SEC filings and in their marketing
6  agreement, which, you know, made it -- made our
7  investment not what we thought it was.
8       Q.  And what do you think -- what do you
9  think those misrepresentations were?  Can you
10 summarize the allegations for me?
11      A.  Sure, that they -- they said they
12 were, basically, an agency business that allowed
13 institutional clients to trade --
14          (There is a discussion off the
15 record.)
16      A.  (Continuing.) Institutional and
17 retail clients to trade FX products and lever --
18 and lever them up.  But it turns out they were
19 also like, effectively, betting, you know,
20 against their clients or taking risk or doing
21 something it clearly meant they weren't an agency
22 product, which put their core business at risk
23 from a regulatory perspective, because they were
24 misrepresenting what they were doing to their
25 clients and to their investors.

Page 30

1   JOSEPH PATT - CONFIDENTIAL
2        Q.   And what specific evidence did 683
3   Capital have to support those allegations, as you
4   understand them?
5        A.   The regulatory filings that came out
6   at the beginning of 2000 -- you know, the
7   beginning of 2017 where they admitted to doing it
8   and got banned from doing business in US.
9        Q.   Okay.  Other than those regulatory
10  filings, are you aware of any facts to support
11  those allegations?
12       A.   No.  But those are pretty damning
13  filings and a result.  They got banned.
14       Q.   Okay.  Aside from deposition
15  preparation, when did you first speak to anyone
16  at The Rosen Law Firm about potentially bringing
17  this case?
18       A.   After -- well, at some point after
19  they announced that they were bringing a case,
20  the press release.
21       Q.   And who approached who?
22       A.   We approached them.
23       Q.   How did you find out about the case?
24       A.   We saw the press release.  I mean, we
25  were following the company closely.

Page 33

1  JOSEPH PATT - CONFIDENTIAL
2        A.   We read the public announcements and
3   the SEC filings, both about their balance sheet
4   and their -- the investments, the rescue
5   financing investment that came from Leucadia.  We
6   read, you know, the indenture on the convertible
7   bonds that we bought and we looked for the
8   intercreditor agreement between the convertible
9   bonds and the upstream and we read those
10  documents, did our analysis as to what the
11  balance sheet would be like post what their
12  public filing said and decided it was a good
13  investment.
14        Q.   So, in terms of the types of
15  information that you analyzed in connection with
16  your investment, you're looking at their public
17  filings about the "SNB Flash Crash"; is that
18  correct?
19        A.   Yes.
20        Q.   The Leucadia, the other -- what other
21  sources of information about the company did you
22  look at and analyze?
23        A.   I mean, 10-K or 10 -- and 8, you
24  know, 10-Qs, the latest documents.  And the --and
25  the --

Page 35

JOSEPH PATT - CONFIDENTIAL

A. Typically, again, public filings, you know, ongoing, you know, earnings announcements, that sort of thing. In this case, there were lots, you know, there were lots of those.

And what else did we do? Actually, we would look at comparable companies to see how they were trading and what they were doing and we would talk to management, if we could.

Q. Who would you talk to at management?

A. Whoever they would -- it depends how they would make it available, typically. It could be all sorts of people. But, you know --

Q. So, in connection -- I'm sorry.

A. I was going to say IR, CFOs, CEOs, typically.

Q. So, in connection with FXCM, specifically, who in management did you talk to?

A. I don't recall.

Q. Do you recall speaking to management at FXCM at any point in connection with your investment decisions?

A. I don't, actually.

Q. So sitting here --

A. It's a long time ago. I just don't

Page 77

1      JOSEPH PATT - CONFIDENTIAL
2   understanding of that event's effect on FXCM?
3          A.   So my recollection was and based on
4   what they said was, you know, they had clients
5   that were say short the Swiss franc on a very
6   levered basis.  The Swiss franc moved, you know,
7   in an unprecedented fashion.  It moved through
8   all their clients' equity, well-passed whatever
9   their clients could pay back and they were --
10  they had counterparties and they suffered a loss
11  as a result because it became their loss, once it
12  moved enough through their client's equity.
13         Q.   And so why would that make -- why
14  would you be interested in investing in FXCM at
15  that time?
16         A.   Because at that moment then -- they
17  announced how much their losses were or they said
18  their losses were.  You could look at their
19  balance sheet based on the public filings.  You
20  could see that they were getting, you know, a
21  rescue financing from Leucadia.  So they weren't
22  going to have to, like, liquidate immediately.
23              And there was information based on
24  the money that was coming in and statements
25  around that that you could value their assets

Page 78

1  JOSEPH PATT - CONFIDENTIAL
2  based on what they said and for what their
3  business had been worth based, again, on what
4  they said and it looked like you were well
5  covered, that the bottoms were easily going to
6  recover a hundred cents on the dollar and they
7  were trading in the 40s, I believe.
8       Q.  Okay.  So what FXCM securities did
9  683 Capital purchase at that point?
10      A.  The convertible bonds, convertible
11  notes.
12      Q.  The Rule 144A notes?
13      A.  I thought they were registered.
14  That's my recollection.  Am I incorrect?
15          I think the 144A, when they were
16  issued and then became -- I may be wrong about
17  this.  So it's a long time since -- a long time
18  since we did this.
19          But I thought they were issued maybe
20  144A and then had become registered, because they
21  were convertible.  So they had stock underlying
22  them.  So the typical pattern on a convertible
23  bond is -- like that it is gets issued as a 144A
24  and then it's quickly -- registered in the next
25  six months or it becomes registered just by the

Page 103

1       JOSEPH PATT - CONFIDENTIAL
2   point, then how much we would have ultimately
3   lost.
4        Q.  Okay.  But it's not -- that is math
5   you can do from this sheet, but it's not
6   summarized in this sheet?
7        A.  I don't see it in this sheet, but you
8   can, certainly, do it from this sheet.
9        Q.  Okay.  And if you look at -- again,
10  still focusing on the bond portion of this sheet,
11  in October of 2015, there are additional buys of
12  the 2.25 percent --
13       A.  Correct.
14       Q.  What was the rationale for purchasing
15  at that point?
16       A.  Price again.
17       Q.  Can you explain that in more detail?
18       A.  Yeah, price had come down quite a
19  bit.  Time had passed a bit, so the yield was a
20  lot higher.  We had been following the company
21  and they had been, you know, achieving some of
22  their sales and milestones.  Money had been going
23  back to Leucadia.  So the money was senior to us
24  was coming back.  We were more optimistic in the
25  value of the business and the value of our

Page 126

JOSEPH PATT - CONFIDENTIAL

2    options purchases in connection with FXCM
3    securities?
4        A.  Again, I haven't -- I haven't looked
5    at the sum total of trades.  I just looked at a
6    few of those trades.  But my recollection is
7    mostly to, you know, bet on them going up.
8            We were -- it was a very small market
9    cap at that point.  There was a lot of thinking
10   that, you know, their customers could get excited
11   again.  There is a lot of reasons why the stock
12   could go up a lot.
13       Q.  I guess what I'm trying to under --
14       A.  This was a good business.
15       Q.  I'm trying --
16       A.  This was a good business.  It paid
17   like $140 million in 2013 or 2014, like, you
18   know, based on the filings, we believed it to be
19   a good business, I should say.
20           And given that, like, the idea that
21   it could -- you know, it was trading at a tiny
22   market cap seemed like, you know, a good
23   risk/reward.  And if you buy options, you can get
24   a really levered upside return if it went back to
25   what it used to be worth.

Page 142

1    JOSEPH PATT - CONFIDENTIAL
2    right, and I'll trade them for you and you just
3    pass on my execution and somehow I can use that
4    value, especially, in a much less regulated
5    market like FX trading.  I can use that flow to
6    get long the franc ahead of somebody else or get
7    short the yen ahead of somebody else, which is,
8    you know, not something you want to hear your
9    brokers doing while you're trading an asset.
10        Q.  So you're general understanding of
11   paper flow arrangements have to do with front
12   running situations for the brokers who have the
13   arrangements?
14        A.  For the guy who is paying for the
15   flow, yes.
16        Q.  What is your understanding of paper
17   flow as it is relevant to your complaint against
18   FXCM?
19        A.  Yeah, my understanding is they were
20   effectively through, you know, a semi-controlled
21   or sister or friendly entity trading against our
22   customers.
23        Q.  And what do you mean by trading
24   against their customers?
25        A.  Taking positions, you know, when

Page 143

1      JOSEPH PATT - CONFIDENTIAL
2      they're either -- not necessarily in-house but
3      sisterly to house -- that their customer --
4      against their customer's flow.  They were making
5      money based on which way their customers were
6      going.
7           Q.   Is that --
8           A.   Or thinking they were.
9           Q.   So, when you say trading against the
10     customers, as alleged in the complaint here, you
11     mean, something other than hedging a position?
12          A.   Yes, they were an agency.  In other
13     words, their interests weren't aligned with their
14     customers.  They were using the information that
15     their customers were giving them to monetize it
16     somehow or so they believed in contravention of
17     what they were representing to their customers.
18          Q.   And what were they "representing" --
19     what they were "representing" to their customers?
20          A.   That they were efficient agency
21     traders of FX giving you access to a market you
22     couldn't get as a retail investor and giving you
23     leverage you couldn't get as a retail investor or
24     even an institutional investor.  They were on
25     your side helping you make big bets in FX as

Veritext Legal Solutions
212-279-9424          www.veritext.com          212-490-3430

Page 144

1  JOSEPH PATT - CONFIDENTIAL
2  efficiently as possible.
3          And that's clearly --  it seems not
4  to be what they were doing based on what they
5  admitted to the regulator and were banned from
6  doing in this country.
7      Q.  And what is your understanding of
8  what they "admitted to the regulator"?
9      A.  That they were using their
10 information from their customers to make money,
11 selling that information to an undisclosed
12 sisterly-related party friendly organization of
13 former employees and who knows what other
14 kickbacks and side money was involved.
15     Q.  Okay.  Are you familiar with a
16 company called Effex, E-F-F-E-X?
17     A.  I believe that is the name of that
18 company that was mentioned in the regulatory
19 filings.
20     Q.  Okay.  And what is your understanding
21 of the FXCM's relationship with Effex?
22     A.  So, based on my recollection or based
23 on the press release in the announcement, it was
24 former employees and there were some payments
25 back and forth and Effex was taking the orders

                                                      Page 148

1                JOSEPH PATT - CONFIDENTIAL
2        2014?
3              A.   No.
4              Q.   Would you have generally reviewed the
5        10-Ks, 10-Qs, et cetera, in connection with your
6        investment of -- in FXCM?
7              A.   Yes.
8              Q.   Do you recall reviewing a 10-K for Q3
9        of 2014?
10             A.   Yes.  But I don't recall everything
11       in it.
12                  Did that disclosure state that they
13       were in risk of being banned?
14             Q.   Is that your understanding of the
15       allegations in the nature of your claim?
16             A.   It's part of it, yeah.
17             Q.   And in what way is that "part of it"?
18             A.   They had not disclosed to the market
19       what they had been doing, the true scope and
20       nature of it and that it could have cause a risk
21       of being banned among other things and, frankly,
22       that their historical business may not have been
23       as profitable as we thought it was, because they
24       never disclosed and I still don't know, like, how
25       much of the money they made was truly through

```
                                                        Page 151
1               JOSEPH PATT - CONFIDENTIAL
2       much it was, maybe they never did.  But, like, to
3       the extent that they -- that that was really what
4       was the source of maybe some of their profits, I
5       don't know.  But, like, you know, that would have
6       changed the nature of what we thought the true so
7       call it undisturbed un-Swiss franc impacted
8       business was worth.
9            Q.  If disclosed its prior relationship
10      with Effex at the end of 2014 and that the
11      relationship had ended, would that have changed
12      your investment decision?
13              MR KIM:  Objection to form, calls for
14      speculation.
15           Q.  You can answer.
16           A.  If they had disclosed it with full
17      ramifications, it -- like, i.e., how much profit
18      it was due, what the business -- business, you
19      know, impact was, the risk of them getting
20      banned, how value -- if it had been really -- if
21      it had been clear disclosed with valuations, I
22      probably would have -- might have paid a lower
23      price, I don't know.  It might have been willing
24      to pay a lower price, probably.  Because it
25      wasn't what we thought it was.
```

Page 152

1           JOSEPH PATT - CONFIDENTIAL
2                We thought it was an agency business
3       that was providing leverage.  Instead it was
4       something else with a lot of risk to potentially
5       operating.  Like, they were getting -- by putting
6       themselves at risk of being banned, which they
7       clearly were, because they were, they took off a
8       lot of the upside tail in this investment or just
9       general upside, frankly, or any upside.  But we
10      didn't know that.
11               MR. ISAJIW:  Okay.  I want to
12      introduce another exhibit.
13               Ashley, this is 25.  What number are
14      we on?
15               MR KIM:  The last one was 12, which
16      was the spreadsheet.
17               MR. ISAJIW:  So this -- so this will
18      be 13.
19               (Deposition Exhibit 13, Credit Suisse
20      Statement of Account 2/1/17 to 2/28/17
21      PLA-00002403 to PLA-00002406, was marked for
22      identification.)
23               MS. DePALMA:  Okay, it should be
24      uploaded.
25               A.  I see it.

Page 228

CERTIFICATE OF REPORTER

I, SILVIA P. WAGE, a Certified Shorthand Reporter, Certified Realtime Reporter and Registered Reporter, herby certify that the witness in the foregoing deposition was by me duly sworn to tell the truth, the whole truth, and nothing but the truth in the within-entitled cause; that said deposition was taken down in shorthand by me, a disinterested person, at the time and place therein stated, and that the testimony of the said witness was thereafter reduced to typewriting, by computer, under my direction and supervision; that before completion of the deposition, review of the transcript [X] was [ ] was not requested.  If requested, any changes made by the deponent (and provided to the reporter) during the period allowed are appended hereto.

I further certify that I am not of counsel or attorney for either or any of the parties to the said deposition, nor in any way interested in the event of this cause, and that I am not related to any of the parties thereto.

<%9932,Signature%>
SIGNED_____dated: April 30, 2020
License No. 30X100182700