# EXHIBIT 200

UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF NEW YORK

In re: :
: Master File No.
Global Brokerage, Inc. : 1:17-cv-00916-RA
F/k/a FXCM, Inc. :
Securities Litigation :
---------------------- :

** CONFIDENTIAL **

REMOTE VIDEO DEPOSITION OF:
JOHN E. BARRON, CPA
MONDAY, JUNE 7, 2021

REPORTED BY:
SILVIA P. WAGE, CCR, CRR, RPR

Page 14

CONFIDENTIAL - JOHN E. BARRON, CPA
A. Yes.
Q. Okay. Do you recall when you began drafting your report?
A. I don't recall the exact date. It would have been -- it would have been sometime in March or -- probably sometime in March.
Q. Okay. Did you initiate the drafting of the report?
A. Yes.
Q. Okay. And did anyone assist you in drafting the report?
A. I had an associate who read drafts of the report.
Q. Okay. What's that associate's name?
A. Arcady Zaydenverg.
Q. Maybe for the Court Reporter, if you could spell that.
A. Arcady is A-R-C-A-D-Y and Zaydenverg is Z-A-Y-D-E-N-V-E-R-G.
Q. I apologize; is that a male or female?
A. Male.
Q. Okay. And did he -- and he is, I guess, employed by Arcadia Consultants?

Page 15

CONFIDENTIAL - JOHN E. BARRON, CPA
A. Yes.
Q. Okay. Did anyone else assist you in drafting the report?
A. No.
Q. Did you get any assistance from Counsel for Plaintiffs?
A. No.
Q. The section, "Overview and Background," in your report --
A. Okay, let me scroll up to that; yes.
Q. Okay. Did you draft that section in its entirety?
A. Yes.
Q. Did you get any comments from Counsel on that section?
A. Not that I recall, no. I mean, I drafted the whole report.
Q. Okay. And Exhibit B to your report is the documents you considered, correct?
A. That's correct.
Q. Who chose the documents that you received?
A. Well, I did with -- along with Arcady.

Page 16

CONFIDENTIAL - JOHN E. BARRON, CPA
Q. And how do you know what documents existed?
A. I'm sorry. Could you repeat that please?
Q. Yeah. How did you know what documents existed for review?
A. Well, we knew that based on discussions with Counsel.
Q. Okay. Now, you list certain E&Y documents that were produced by E&Y that you considered, correct?
A. We reviewed the entirety E&Y production.
Q. Okay. So that's what I wanted to get clarity on.
So you reviewed the entire production, but you're just identifying certain ones that you considered?
A. Well, as far as "considered," I would view that as everything that was in their production.
Q. So it's your understanding that you're citing to the entirety of E&Y production?
A. We did review everything that was in

Page 17

CONFIDENTIAL - JOHN E. BARRON, CPA
the E&Y production, yes.
Q. Okay. So you believe that what you cite in your report is the entire E&Y production?
A. No, not that I cited in the report. I'm saying considered.
Q. Not cited but identified as documents that you considered.
A. I --
Q. You say EY-GBI-WP 1 through 2414, right?
A. That's --
Q. Is it your understanding that's the entire E&Y production?
A. Yes.
Q. Okay. Who told you that?
A. Counsel.
Q. Okay. Now, you're a licensed CPA, correct?
A. Yes.
Q. Okay. And, according to your CV, which is Exhibit A to your report, you were an audit partner at Deloitte from 1990 to 2003, correct?
A. That's correct.

Page 34

CONFIDENTIAL - JOHN E. BARRON, CPA
Weil is W-E-I-L.
Q. Let's talk about some of the documents you say you considered.
You state in your report that you reviewed and considered the January 14, 2021 deposition transcript and the deposition exhibits of Robert Lande, correct?
A. I'm sorry. What was the first name?
Q. Robert Lande, the CFO --
A. Oh, yes, yes.
Q. -- of FXCM, right?
A. Yes.
MR. DAHAN: Alright. I want to introduce what we'll mark now as Exhibit 3, the deposition transcript in this case of Mr. Lande.
A. Okay. I'm going to do my best to get back there.
Q. Yeah, let me know when you see that.
A. Well, I've clicked on marked exhibits, but No. 3 hasn't come up yet.
Q. Yeah, sometimes it takes a minute or so. So no problem.
A. No, at least, I'm not killing the screen.

Page 35

CONFIDENTIAL - JOHN E. BARRON, CPA
Q. No.
MS. COREY: Yes, I apologize. It's taking some time to load.
MR. LaPOINTE: Mr. Barron, you can force a refresh of your screen by pressing control plus F5 on your keyboard.
THE WITNESS: Control and what's the other one?
MR. LaPOINTE: F5.
THE WITNESS: Okay.
MR. LaPOINTE: There should also be a little symbol that you can click on in your browser. It will look like a little spinning wheel arrow, basically, that refreshes.
Q. Okay. I've refreshed the screen and it's still not showing up when I press the folder marked exhibits.
MS. COREY: Can we go off the record for a moment?
MR. DAHAN: Sure.
MR. LaPOINTE: No problem.
THE VIDEOGRAPHER: Stand by.
We are now off the record at 10:41 a.m.

Page 36

CONFIDENTIAL - JOHN E. BARRON, CPA
(Recess taken 10:41 to 10:50 a.m.)
(Deposition Exhibit 3, 1/14/21 deposition transcript of Robert Lande, was marked for identification.)
THE VIDEOGRAPHER: We are now on the record at 10:50 a.m.
Q. Okay. So you should now see, Mr. Barron, there is a document that's captioned, "In Re: Global Brokerage Inc., securities litigation," that's this case and, "remote deposition via Zoom of Robert Lande, Thursday, January 14, 2021."
Do you see that?
A. Yeah.
Q. Do you recall reviewing this transcript as part of your report?
A. I do.
Q. Okay. And did you read like this like cover to cover, skim it, like, what do you recall?
A. I would have read it cover to cover.
Q. Okay. Now, based on your review of Mr. Lande's deposition transcript, you're aware that he was the CFO of FXCM during the class

Page 37

CONFIDENTIAL - JOHN E. BARRON, CPA
period, correct?
A. That's right.
Q. And he was a COO of FXCM when FXCM went public in December of 2010, correct?
MR. LaPOINTE: Object to the form of the question.
You can answer.
A. He was -- he was the CFO, I believe, starting in 2010. I don't recall the exact date.
Q. Okay. When you were an audit partner with Deloitte, would the CFO an of audit client be one of your primary points of contact?
A. Typically, that would be the case, yes.
Q. Okay. Now, based on your review of Mr. Lande's deposition transcript, you know that he testified that he had formed an understanding of the applicable guidance on related party transactions under US GAAP?
A. I don't recall that specific part of the testimony.
Q. Okay. Why don't we go to Page 82 of his transcript. So not Page 82 of the -- of this PDF, but 82 of the deposition transcript.

Page 42

CONFIDENTIAL - JOHN E. BARRON, CPA
you see that in any of the testimony of Mr. Dittami?
A. I don't recall -- I don't recall the document or testimony. I know that when FXCM actually created Effex, Dittami was put in as the CEO.
Q. Did you see that -- did you see anyone testify that FXCM "created Effex"?
A. Yes.
Q. Who testified to that? Excuse me.
Who testified that FXCM "created Effex"? Did Mr. Dittami testify to that?
A. I don't recall if it's testimony or documents. It's in my report.
Q. Yeah, I know. We'll get to your report in a second, trust me.
Let me ask you.
Do you know if Mr. Dittami was asked at his deposition about whether or not FXCM was -- absorbed losses of Effex?
A. No, I don't recall that.
Q. Do you recall the fact that he testified that FXCM did not absorb losses of Effex?

Page 43

CONFIDENTIAL - JOHN E. BARRON, CPA
MR. LaPOINTE: Objection, asked and answered.
Q. Do you recall that, Mr. Barron?
A. No, as I said just earlier, I don't recall that.
Q. Alright. Now, Mr. Lande also testified that power is an element of a VIE analysis.
Do you agree with that?
A. Yes.
Q. Right. In fact, that's in Paragraph 138 of your report as well, correct?
A. I don't know the exact paragraph. But, yes, it's in my report I'm sure.
Q. And are you aware that Mr. Lande testified that FXCM did not have power over Effex? Do you recall that testimony?
A. I don't recall that exact testimony. But it sounds reasonable. But I don't recall that exact testimony.
Q. Did FXCM have any equity voting rights in Effex?
A. No. Their power --
Q. Yes or no, did they or did they not?

Page 44

CONFIDENTIAL - JOHN E. BARRON, CPA
A. I'm sorry. Do you want to let me finish my answer?
Q. Did they have equity voting rights in Effex, yes or no?
A. No, they --
MR. LaPOINTE: Objection, asked and answered.
Q. Did FXCM have a management position in Effex?
A. No.
Q. Did FXCM have any Board representation on Effex?
A. No, they did not.
Q. Okay. Are you aware that you do not cite to Mr. Lande's deposition once in your entire report?
MR. LaPOINTE: Object to the form of the question.
You can answer.
A. I -- excuse me. I'm not aware whether I did or didn't, honestly.
Q. Are you aware that you don't quote any portion of Mr. Lande's deposition testimony in your report?

Page 45

CONFIDENTIAL - JOHN E. BARRON, CPA
A. Not at this point, no.
Q. Now, you also state that you reviewed and considered in drafting your report the deposition transcript and exhibits of David Stollow?
Do you recall that?
A. I'm sorry, which -- oh, Stollow?
Q. Yeah.
A. Yes.
Q. Alright. And he was an audit partner at E&Y, correct?
A. That's correct.
Q. He was a CPA, correct?
A. He would have to be.
MR. DAHAN: Okay. Let's introduce as Exhibit 4 -- and if we can't mark it, we can do it later -- the deposition transcript of Mr. Stollow in this case.
(Deposition Exhibit 4, 1/25/21 deposition transcript of David Stollow, CPA, was marked for identification.)
A. Well, unfortunately, I just pulled up Lande. Let me go back.
Oh, okay. It popped up to the top.

Page 62

CONFIDENTIAL - JOHN E. BARRON, CPA

parentheses, "(B02.03) and October" -- and it's got "(B02.04) bank statements," and then it says, "W/M/D."

Do you have an understanding what that -- isn't that without material difference, correct?

A. Yes.

Q. This means E&Y was saying that the Effex invoices agreed to the payments that were being made, correct?

A. Yes.

Q. Okay. And then if you go to the next page, do you see that it lists amounts?

A. I see amounts there.

Q. For February 2011, March 2011 invoice, April 2011 invoice you see and so forth?

A. Yes, I do.

Q. And you see the numbers range somewhere between 1 and $2 million -- in the 1 and $2 million digits?

A. Again, I'm looking at a line at the bottom. I don't know if that's total balance brought forward. It looks like a million 338, something like that.

Page 63

CONFIDENTIAL - JOHN E. BARRON, CPA

Q. Okay. I'm not talking about that.

I'm talking if you look -- scroll down to various amounts on this list --

A. Yeah.

Q. -- you see that invoices amounts were in the 1 to $2 million ranges?

A. Yes.

Q. Okay. And if you go to the next page, that's metadata.

Do you know what that means?

A. You know, I really don't.

Q. Okay. Well, that's how you can tell where a document appeared and when it appeared in the file.

And you see it says and, "from the custodian author recipient data August 2011"?

A. (No response.)

Q. Do you have an understanding that that means that this is a document that was in E&Y's audit files in 2011?

A. Well, I mean, when I look at the work paper, it appears to me that this was part of their 2011 work papers.

Q. Okay. So the point is they were

Page 64

CONFIDENTIAL - JOHN E. BARRON, CPA

aware of this, all these accounts receivable amounts that were being paid by Effex in 2011, correct?

A. Yes.

Q. Okay. Now, are you aware that you do not cite or discuss this document anywhere in your report?

A. I don't know if this is -- I do have -- I do cite some E&Y documents that list payments from Effex in my report. I don't know if this is the same one I cite or not. But I do have some E&Y work papers cited in my report as to payments from Effex.

Q. Are you aware you do not cite to this document in your report?

MR. LaPOINTE: Objection, asked and answered.

Q. Either you're you aware or you're not? The record will reflect -- your report will reflect what it is.

I'm asking if you were aware that, in fact, you do not cite to this document?

A. Honestly, I don't know --

MR. LaPOINTE: Objection to form.

Page 65

CONFIDENTIAL - JOHN E. BARRON, CPA

A. I would have to look at the reference in my report to the E&Y documents that I did cite from to know whether this was one or not.

Q. Okay. We'll move on. Your report will speak for itself.

MR. DAHAN: Let's introduce another document. Let's do EY-GBI-WP 151.

(Deposition Exhibit 8, 5/1/10 Amendment to Services Agreement EY-GBI-WP-000000151 and metadata page with no Bates marked Confidential, was marked for identification.)

A. I'm sorry. Are you pulling up another...

Q. Yes, I'm telling -- yeah, you'll see now there is a new document that's EY-GBI-WP 151. That's Exhibit 8 or it has an 8 next to it.

A. Okay, hang on a sec.

Okay, got it.

Q. Alright. And you reviewed and considered this document, correct?

A. Yes.

Q. Okay. And if you go to the last page of this document, that's metadata again.

Page 66

CONFIDENTIAL - JOHN E. BARRON, CPA
Are you aware that the metadata indicates that this document also was an in E&Y's 2011 work paper files?
A. Yes.
Q. And this is an agreement for services between Effex and FXCM, correct?
A. Yes.
Q. Okay. And if you look at this -- now this was an amendment to the service agreement, correct?
A. I know it was amended. I don't know whether this is the original or the amended one.
Q. It says on top, "amendment to service agreement."
Do you see that?
A. Okay, right.
Q. Okay. And in the second where -- first whereas clause, "Effex and FXCM entered into a service agreement as of May 1st, 2010 agreement."
Do you see that?
A. Yes.
Q. And it says, "The parties wish to modify and amend that agreement," correct?

Page 67

CONFIDENTIAL - JOHN E. BARRON, CPA
A. Yes.
Q. Okay. And they amend Section 3.1 the first sentence to read as follows, correct?
A. Um.
MR. LaPOINTE: Object to the form of the question.
A. I'm sorry. I didn't mean to interrupt. I was looking for 3.1.
Q. No, no.
Do you see that it says in No. 1, "The first sentence of Section 3.1 is deleted and shall be replaced with the following"? Do you see that?
A. Yes.
Q. And they're referring to Section 3.1 that was Section 3.1 in the original agreement, correct?
A. Yes.
Q. Okay. And do you recall that the original 3.1 had -- that fee amount would be $21 per million?
A. Yes, that's my recollection.
Q. Now, they're changing it to $16 per million, correct?

Page 68

CONFIDENTIAL - JOHN E. BARRON, CPA
A. Yes.
Q. And it says, "FXCM shall receive from Effex a fee equal to $16 per 1 million units of base currency for the aggregated volume of transactions executed via the trading system fees."
Do you see that?
A. Yes.
Q. Okay. So the fees that FXCM was to agree were determined by the volume of transactions on the trading system, correct?
A. That's right.
Q. Okay. Do you see anywhere in this document that it says that the fee amount would be based on how much profit or loss Effex made on a particular trade?
A. This document doesn't refer to it, but I'm, certainly, aware of other information that would indicate this was considered in the ballpark so-to-speak of the 70/30.
Q. I didn't ask you that. I asked you a very simple.
Does it say in here -- okay, we'll start with that.

Page 69

CONFIDENTIAL - JOHN E. BARRON, CPA
Does it say in here that Effex will pay 70 percent of the profits that it makes on the trade? Does it say that?
A. No.
Q. Okay. Does it say that in the service agreement that Effex will pay 70 percent of its profits it makes on the trade? Does it say that in the service agreement, yes or no?
A. No.
Q. Okay. Does it say in this agreement that FXCM will be responsible for losses that Effex incurs on a trade?
A. No.
Q. Does it say that in the service agreement?
A. No.
Q. Let's look at another document, EY-GBI-WP 1808.
A. 1808? Okay.
Q. It will have a nine next to it, sorry, yes.
A. I have it.
Q. Okay.
(Deposition Exhibit 9, 3/19/12

CONFIDENTIAL - JOHN E. BARRON, CPA

Invoice #02-2012 and e-mail string EY-GBI-WP-00001808 to EY-GBI-WP-00001810 marked Confidential, was marked for identification.)

Q. Now, you reviewed this document in making your report, correct?

A. Yes, I've seen this document.

Q. Okay. Now, this document, for the record, it's a FXCM document that says -- it's an invoice to Effex Capital. March 19, 2012 is the date of the invoice.

Do you see that?

A. Yes.

Q. And it's an invoice for February 2012?

A. Yes.

Q. Okay. And the middle it has a fee per million and it says $16, correct?

A. Yes.

Q. And it's got a volume of 122,214.

Do you see that?

A. Yes.

Q. Okay. And then it has an amount owed of 1,955,424?

A. Yes.

CONFIDENTIAL - JOHN E. BARRON, CPA

Q. And you would agree that that is what 122,214 times 16 equals?

A. I mean it looks like that's how they calculate it. I haven't done the math.

Q. Okay. Now, on the top, it has a note by E&Y, right? "E&Y obtained the e-mail invoice from Baruch Greenbaum, Senior Accountant, and agreed the volume and amount invoiced to the Effex monthly P&L schedule" -- and it's got brackets -- "[B20.01]," and it's got "W/O/E," right?

MR. LaPOINTE: Object to the form of the question.

Q. That means without event, correct?

MR. LaPOINTE: Object to the form of the question.

Q. Do you have an understanding of "W/O/E" stands for from your experience?

A. I'm sorry. Could you ask that again?

Q. Yeah. Do you see where it says "W/O/E" at the end of that sentence?

A. You know, honestly, when I'm looking at the top of the screen, I see "B20.01."

Q. What does it say after that?

CONFIDENTIAL - JOHN E. BARRON, CPA

A. "W/O/E," without exception.

Q. Right. So that's what I asked you if you have an understanding --

A. No, no, sir, I'm -- honestly, I apologize. I'm having a little difficulty hearing you, so I wanted to ask you to repeat that.

Q. Yeah, I just wanted to know if you had an understanding of what that stood for it then.

A. I do have an understanding. I do.

Q. And, again, this is a document that was produced by E&Y and was in their audit files, correct?

A. Yes.

Q. Okay. Do you see anywhere on this invoice where it says -- where FXCM billed Effex asking it to pay 70 percent of the profits that Effex made on a trade?

A. No.

Q. I'm sorry. I didn't hear your answer.

A. I answered, "no." Is that what you, --

CONFIDENTIAL - JOHN E. BARRON, CPA

Q. Okay. I didn't hear it, so thank you.

Let's look at another document.

MR. DAHAN: Let's look at EY-GBI-WP 2178.

(Deposition Exhibit 10, 8/13/13 Invoice #06-2013 and e-mail string EY-GBI-WP-00002178 to EY-GBI-WP-00002180 marked Confidential, was marked for identification.)

Q. It will have a ten next to it.

A. Exhibit or Item 10?

Q. Yeah.

A. I've got a David Stollow CPA 21 PDF.

Q. Yeah.

A. Okay.

Q. Are you aware that this was Exhibit 21, actually, to Mr. Stollow's deposition?

A. Not without going back to look at it. But I'll take that on faith.

Q. Okay.

A. Okay.

Q. And this document also given the Bates number on the bottom right evidences it was

Page 74

CONFIDENTIAL - JOHN E. BARRON, CPA

a document produced by E&Y and was in their work paper files, correct?

A. That's correct.

Q. Okay. If you go to the top, there is a note by E&Y?

Do you see that note top of Page 1?

A. I see the note, E&Y.

Q. Yeah. It says, "EY re-performed internal audits testing of by inspecting the invoice."

Do you see that?

A. Yes, they inspected the invoice. I see that.

Q. "We re-performed the procedures of the reviewer by agreeing the volumes from FXO to the invoiced amount and journal entries."

Do you see that?

A. Yeah, they agreed volumes to the invoiced amount. I see that.

Q. Okay. And this is dated August 13, 2013, correct?

A. That's right.

Q. Okay. Do you see on the top of Page 2 of this document another note by E&Y?

Page 75

CONFIDENTIAL - JOHN E. BARRON, CPA

A. Yes.

Q. And here E&Y says, "E&Y re-performed internal audits testing of the following e-mail verifying the volume invoiced by Effex from Baruch Greenbaum, Senior Accountant. This e-mail is from Alex Kochel FXM IT."

You see that?

A. Yes.

Q. Okay. And then it says, the end of the last sentence, "We agreed the volumes to the invoice above," it's got a "1" in brackets and again without exception, correct?

A. Yeah, I'm just scrolling through the document.

Q. Well, I'm asking you what it says in the note.

A. Yes, I can see what it says with the note, yes.

Q. Okay. Now, are you aware that, again, you do not cite either of the two documents -- invoices we just looked at and that had notes by E&Y anywhere in your report, are you aware of that?

A. I don't recall citing from this. I

Page 76

CONFIDENTIAL - JOHN E. BARRON, CPA

-- as I said, I cited from other E&Y work papers regarding payments.

Q. Okay. Now, you're aware from the materials you reviewed that in 2017 after the announcement of FXCM settlement with the CFTC and NFA relating to the Effex relationship, E&Y conducted a further analysis of the Effex relationship and whether it required any restatements of FXCM's prior issued financial statements?

Do you recall that --

MR. LaPOINTE: Object to the form of the question.

Q. -- that process by E&Y?

MR. LaPOINTE: Object to the form of the question.

You can answer.

A. Are you referring to something in their work papers in 2014?

Q. No. Listen to my question, sir.

Are you aware in 2017, okay, after the announcement of FXCM's settlement with the CFTC and NFA relating to the Effex relationship that E&Y conducted a further analysis of the

Page 77

CONFIDENTIAL - JOHN E. BARRON, CPA

Effex relationship and whether it required any restatement of FXCM's prior issued financial statements? Are you aware of that subsequent analysis by E&Y?

MR. LaPOINTE: Object to the form of the question.

A. I've read memos from March 2017. I don't recall without re-reading whether they talk about an analysis of the relationship.

Q. Okay. So we'll go and look at those memos and refresh your memory.

A. Okay.

MR. DAHAN: Let's look at EY-GBI-WP 4317.

(Deposition Exhibit 11, 2/21/17 Internal Memorandum to FXCM Inc., and Effex Capital LLC Audit Files from Fraud Investigation & Dispute Services and attachments EY-GBI-WP-00004317 to EY-GBI-WP-00004329 marked Confidential, was marked for identification.)

Q. It will have an 11 next to it and it will say "Stollow 13."

A. I do. I see it.

MS. COREY: And, just for the record,

Page 78

CONFIDENTIAL - JOHN E. BARRON, CPA

this is Exhibit 11.

MR. DAHAN: Yes, which was also Exhibit 13 to Mr. Stollow's deposition.

Q. Now, can you tell from this Bates number that this was an E&Y-produced document from their work papers, correct?

A. Their work papers -- I guess it would have been in 2017 work papers.

Q. Yes, I understand that.

But that these were -- this document came from E&Y, correct?

A. Yes.

Q. Okay. And, in fact, the heading of this document shows that it's an internal memo of E&Y, correct?

A. Yes.

Q. Okay. And you reviewed this document, correct?

A. Yes.

Q. And this says in the caption area, "to: FXCM Inc., and Forex Capital Markets LLC audit files," "from: Fraud investigation and Dispute Services Practice," right, that's E&Y Fraud Investigation and Dispute Services

Page 79

CONFIDENTIAL - JOHN E. BARRON, CPA

Practice, correct?

A. Well, you said two and I was looking for the two. I see a Roman Numeral II.

Q. If you look at the top of the document, the word, T-O, "to," who is this memo to? Do you see that?

A. No. Please tell me what page you're on.

Q. The top of the first page, sir.

A. Okay.

Q. You see the word T-O?

A. Is this in the background section? Where is this?

Q. Okay, sir. You see on the very very top of the document it says, "E&Y building a better working world"? Do you see that, sir.

A. Yes, I do.

Q. Okay. And then it says underneath, "internal memorandum."

Do you see that, sir?

A. Yes.

Q. What does it say under that?

A. It says, "FXCM Inc., and Forex Capital Markets LLC audit files."

Page 80

CONFIDENTIAL - JOHN E. BARRON, CPA

Q. It doesn't say the word "to" before that?

A. Oh, yeah.

Q. Okay. And then it says who it's from.

Do you see that, sir?

A. Yes.

Q. Okay. I want to make sure we're all now squared away.

A. Yes.

Q. And it says, "from: The Fraud Investigation and Dispute Services Practice" of E&Y, correct?

A. Yes.

Q. Okay. And it's dated February 21, 2017, correct?

A. It is.

Q. That's before March 2017, correct? Is February 21st, 2017 before March 2017?

A. I don't see the March -- I see is the February 21st.

Q. Sir, in a calendar, does February come before March?

A. Best I recall, yes.

Page 81

CONFIDENTIAL - JOHN E. BARRON, CPA

Q. Okay. Very good. I just want to make sure we only got a CPA to know that.

Okay. It says, "RE."

Do you see the "RE"?

A. Yes.

Q. And it says, "what's this regarding? Investigation of FXCM's settlements with US regulators."

Do you recall that the settlement occurred about February 6th of 2017, a few weeks before? This.

A. I don't recall the date of the settlement, no.

Q. Okay. And then they're CC Bradley Massam, Partner of FIDS?

Do you see that?

A. Yes, I do.

Q. And then it says, "Sufficiency memo FXCM Inc., settlements with US regulators."

Do you see that?

A. Yes.

Q. Okay. Do you know what a "sufficiency memo" is, sir?

A. I've never used that term, never seen

Page 90

CONFIDENTIAL - JOHN E. BARRON, CPA

to Page 4.

You see on top it says, "Page 4"?

A. Yeah.

Q. And then there's italics that says "objectivity overall adequacy of an investigative team," there is an italics for the word "conclusions."

A. I do. I see it now, yes.

Q. Oh, okay.

And in the -- first of all, in the "overall adequacy of the investigative team," E&Y states in this memo, "We have no concerns regarding the competence or objectivity of the Weil work."

Do you see that?

A. Down in the "Conclusion" section now?

Q. Sir, this right above "conclusions."

A. Okay.

Q. There is a different italic word.

A. Right.

Q. It says, "overall adequacy of the investigative team."

Do you see that, sir?

A. Yes, I do.

Page 91

CONFIDENTIAL - JOHN E. BARRON, CPA

Q. Read me what it says.

A. It says, "We have no concerns regarding the competence or objectivity of the Weil work."

Q. And that was E&Y's conclusion in this memo, correct?

A. That's right.

Q. Okay. Then it says, "Conclusions."

Do you see that?

A. Yes.

Q. And it says, "Based on the work performed and experience of FIDS, we believe the work performed by Weil was sufficient such that E&Y may rely on it in connection with the 2016 audit."

Do you see that?

A. Yes.

Q. It goes on to say, "Weil's procedures were extensive as would be required to understand the history of Effex and its connection to the companies in order to represent those companies in response to the claims asserted by regulators. The information reviewed and the criteria developed to focus that review appear reasonable

Page 92

CONFIDENTIAL - JOHN E. BARRON, CPA

in the context of the claims asserted by the regulators."

Do you see that?

A. Yes.

Q. Are you aware that you do not cite in your report this sufficiency memo anywhere in your report?

A. I'm sure I would not have.

Q. Okay. I bet you wouldn't.

Okay. In fact, you don't discuss any of the work of Weil Gotshal and any of its investigative work in your report, do you?

A. I don't believe Weil Gotshal was focused on the issues that I was focused on.

Q. Just answer my question. And your lawyer can ask you any what4ever questions he wants to ask you.

You don't discuss the Weil Gotshal investigation anywhere in your report, correct?

A. No, I don't.

Q. Right. You don't even discuss E&Y's assessment of that investigation anywhere in your report, do you?

A. No, I don't.

Page 93

CONFIDENTIAL - JOHN E. BARRON, CPA

Q. Right.

Alright. Let's look at another document. Let's look at what's EY-GBI-WP 4260 and, I believe, that also was an exhibit to Mr. Stollow's deposition.

(Deposition Exhibit 12, 3/1/17 memorandum to FXCM Inc., and Forex Capital Markets LLC Audit Files from Ankit Varia and David Stollow EY-GBI-WP-00004260 to EY-GBI-WP-00004271 marked Confidential, was marked for identification.)

A. Let's see.

Q. That will come up. There will be a 12 --

A. Okay, I've got it.

Q. And then it will say, "David Stollow CPA 11."

A. Okay.

MR. DAHAN: So, just so the record is clear, since we're not, you know, just a little confused given the Bates numbers, this document is EY-GBI-WP 4260. It will be in this case Exhibit 12 and it happens to have also been Exhibit 11 to the Stollow deposition.

Page 94

CONFIDENTIAL - JOHN E. BARRON, CPA

Q. Now, did you review this document in connection with your report?

A. Yes.

Q. Okay. Now, this document is dated March 1, 2017, correct?

A. Yes.

Q. Okay. And this document also is an E&Y memo, correct?

A. Yes.

Q. It is a document that was produced by E&Y as part of their work papers, correct?

A. Yes.

Q. Okay. And now so there's no confusion, all the way at the top you see the word that says, T-O, "to"?

A. I do.

Q. Okay. And that's, again, a document that E&Y -- it's to the FXCM audit files, correct?

A. Yes.

Q. And it's from Ankit Varia, a Senior Manager, and David Stollow, Partner.

Do you see that?

A. Yes.

Page 95

CONFIDENTIAL - JOHN E. BARRON, CPA

Q. Okay. And then they're CC'ing Chris Kalyvas, Engagement Quality Reviewer, and then Robert Schirling, the CFO Region Professional Practice Partner.

Do you see that?

A. I'm sorry. What paragraph are you in?

Q. No paragraph, sir. I am still in the "to," "date," "from," "CC."

A. Oh, okay, sure.

Q. Okay. Now, in your review of Mr. Stollow's transcript that, apparently, you read cover to cover, right, you're aware that the Engagement Quality Reviewer, right, is a second partner that signs off on the engagement as part of a quality control process? Are you aware of that?

MR. LaPOINTE: Object to the form of the question.

You may answer.

A. Well, that would be the typical role.

Q. Okay. Are you aware that David Stollow, in fact, testified to that fact at his deposition?

Page 96

CONFIDENTIAL - JOHN E. BARRON, CPA

A. If he was a second partner viewed or signed off on the engagement?

Q. No. That the Engagement Quality Reviewer that's identified in the CC line --

A. Right.

Q. -- is a second partner that signs off on the engagement as part of a quality control process, are you aware of that from his testimony?

A. I don't recall that, specifically, but that would be typical.

Q. Okay. And do you also understand from the testimony of Mr. Stollow that the FSO Region Professional Practice Partner is brought on from time to time and was brought on in this instance due to the CFTC and NFA's allegations? Are you aware of that from his testimony?

A. Yes.

Q. Okay. And in this memo, there is a section "Background" and then it discusses "FXCM's company and business," and it then discusses "relationship with Effex."

Do you see that?

A. Yes, I see that sentence.

Page 97

CONFIDENTIAL - JOHN E. BARRON, CPA

Q. And then is at the bottom of Page 2, there is a section called, "CFTC and NFA matters."

Do you see that?

A. Yes.

Q. Okay. And it discusses the settlement, correct?

A. So you're saying, does it discuss the settlement?

Q. Yes, sir.

A. Okay. I'm just reading through it.

Yes, I see a discussion of settlement.

Q. Okay. And, in fact, it attaches -- if you go to the bottom of Page 4, it says, "Please find the CFTC complaint and settlement and Attachment A and the NFA complaint, the settlement and attachment B," right?

A. Yes.

Q. And then it discusses "external legal Counsel," right?

A. Yes.

Q. And then it says on the top of Page 5, "Purpose of this Memorandum."

Page 114

CONFIDENTIAL - JOHN E. BARRON, CPA

reference to the option agreement? Are you aware of that?

MR. LaPOINTE: Object to the form of the question.

You can answer.

A. I have to go back and read that and see to see if it does or doesn't.

Q. Okay, sir.

Now, let's go to the next paragraph. It says, "Based on the above considerations, we believe that the previously issued financial statements for the issuer in Forex continue to be appropriate and in accordance with US GAAP."

You see that, sir?

A. Well, I'm reading assessing the effect on our audit considerations --

Q. Sir -- sir, are you having difficulty hearing me? I asked you a question.

A. Yes, I am having difficulty.

Q. Okay. So here's my question to you, sir.

Top of Page 9, second full paragraph.

A. Okay.

Q. It says, "Based on the above

Page 115

CONFIDENTIAL - JOHN E. BARRON, CPA

considerations, we believe that the previously issued financial statements for the issuer and Forex continue to be appropriate and are in accordance with US GAAP."

Did I read that correctly?

A. Yeah, based on the above considerations that they outline, those three or four bullets, yes.

Q. Oh, really, okay.

And that's E&Y's conclusions, correct?

A. That's what they say, yes.

Q. Yes. And you do not cite or discuss this memo anywhere in your report, do you, sir?

A. No, I don't.

Q. Right.

Do you have an understanding of what the class period is in this case or the proposed class period?

A. I'm sorry. Can you repeat that?

Q. Yeah, sure.

Do you have an understanding of what the class period is in this case?

A. I don't have those dates in front of

Page 116

CONFIDENTIAL - JOHN E. BARRON, CPA

me.

Q. Alright. Let's -- we'll make it easier.

MR. DAHAN: Why don't we introduce the complaint in this case, the Third Amended Complaint. Let's just load that up.

(Deposition Exhibit 13, Third Amended Consolidated Securities Class Action Complaint, was marked for identification.)

Q. So it will have a 13 next to it. It says, "Third Amended Complaint."

A. Well, let's see. So far I don't see a 13. Let me push the button again.

Q. Okay. Give it a second.

A. Okay. I've got it open.

Q. Okay. Now, you reviewed this as part of your work, correct?

A. Yes.

Q. Okay. And you're aware that Plaintiffs are alleging that FXCM's financial statements during the class period were false and misleading, correct?

A. Yes.

Q. Okay. And if you go to Paragraph 1

Page 117

CONFIDENTIAL - JOHN E. BARRON, CPA

of the complaint on Page 1, you'll see it has dates in there. It says, "From March 15, 2012 to February 6th, 2017, both dates inclusive," and it identifies that as the class period.

Do you see that, sir?

A. Yes.

Q. Okay. Are you aware that Plaintiffs allege that the -- are you aware that the first alleged misleading financial statement is for the public statement that was released on March 15, 2012?

A. Yes.

Q. And that was in relation to FXCM's fiscal 2011, right?

A. Yes.

Q. Okay. And are you aware that your opinion encompasses reporting by FXCM in its financial statements for December 31, 2010 before the class period?

A. Yeah, I -- my coverage of the years that are relevant to Effex.

Q. I didn't ask that.

I said, are you aware that you are identifying in your report alleged false

Page 118

CONFIDENTIAL - JOHN E. BARRON, CPA

financial statements that were done before the class period? That's all, yes or no?

A. Yes.

MR. LaPOINTE: Objection to form of the question.

Q. Now, if you go to your report, which I think was Exhibit 1.

A. Okay.

Q. Okay. You say on Paragraph 10 -- in Paragraph 10, if you go to Paragraph 10 of your report.

A. Let me get there; okay.

Q. You say in the second sentence, "The failure to make the following disclosures caused FXCM's consolidated financial statements to be materially misstated beginning with the year ended December 31st, 2010" -- which we acknowledge is before the class period, correct?

A. Well --

Q. Is it before the class period, yes or no, sir?

MR. LaPOINTE: Object to the form of the question.

You can answer.

Page 119

CONFIDENTIAL - JOHN E. BARRON, CPA

A. I really -- I think I need to clarify. The 2010 financial statements are included in the 2011 filings, so just to clarify that.

Q. Sir, very simple, is the December 2011 -- sorry.

Is the December 2011 -- sorry, December 31st, 2010 financial statement before the class period? Was it released before the class period, yes or no?

MR. LaPOINTE: Object to the form of the question.

Q. Do you know if Plaintiffs are challenging the financial statements -- are alleging in this case that the financial statements in 2010 were false? Do you know that? Do you know yes or no?

A. Yes, the 2010 financials that were included in the 2011 10-K are false -- not false. They're materially misstated.

Q. Okay. So you believe in the complaint that Plaintiffs allege in the December 2010 -- sorry, the December 31st, 2010 financial statements were false? Do Plaintiffs

Page 120

CONFIDENTIAL - JOHN E. BARRON, CPA

allege that in the complaint, yes or no?

MR. LaPOINTE: Object to the form of the question.

A. I don't use the term "false." That's not something that accountants would use.

Q. Okay, misstated.

Are they alleging in this case in their complaint anywhere that the financial statements of FXCM issued for 2000 -- for fiscal 2010 were false -- or, sorry, were materially misstated, is that alleged anywhere in Plaintiffs's complaint, yes or no?

MR. LaPOINTE: Objection to the form of the question. It calls for a legal conclusion. I think he's already answered the question, so asked and answered also.

You can answer, if you understand the question.

A. Well, we were just looking at the complaint and 2011 would have included the financial statements for the year ended 2010.

Q. Okay, sir, no problem.

Now, you say at the end of this sentence, "through the year ended December 31st,

Page 121

CONFIDENTIAL - JOHN E. BARRON, CPA

2014," correct.

A. Yes.

Q. So you do not include in here for the year ending December 31st, 2015, are you?

A. That's correct.

Q. Or for December 31st, 2016, are you?

A. No.

Q. Okay. Or any financial statements for 2017, are you?

A. No. I'm focused solely on the --

Q. Okay.

A. -- next relationship.

Q. Alright. We touched on this earlier. So let's look at your report now. Let's look at Paragraph 1 of your report.

A. I'm sorry, which paragraph?

Q. Paragraph 1.

A. I'm looking at Paragraph 1; okay.

Q. Okay. You state that FXCM created Effex, correct?

A. That's right. Well, wait -- I'm sorry, you're looking at Paragraph 1?

Q. Yeah. You say, "This litigation relates to FXCM's creation of a separate legal

Page 182

CONFIDENTIAL - JOHN E. BARRON, CPA

THE VIDEOGRAPHER: Alright. So stand by. Stand by please.

We are off the record at 2:34 p.m. And this concludes today's testimony given by John E. Barron.

The total number of Media Units was three and will be retained by Veritext New York.

(Time noted: 2:35 p.m.)

Page 183

CERTIFICATE OF REPORTER

I, SILVIA P. WAGE, a Certified Shorthand Reporter, Certified Realtime Reporter and Registered Reporter, herby certify that the witness in the foregoing deposition was by me duly sworn to tell the truth, the whole truth, and nothing but the truth in the within-entitled cause; that said deposition was taken down in shorthand by me, a disinterested person, at the time and place therein stated, and that the testimony of the said witness was thereafter reduced to typewriting, by computer, under my direction and supervision; that before completion of the deposition, review of the transcript [X] was [ ] was not requested. If requested, any changes made by the deponent (and provided to the reporter) during the period allowed are appended hereto.

I further certify that I am not of counsel or attorney for either or any of the parties to the said deposition, nor in any way interested in the [illegible] at I am not rel[illegible] ereto.

SIGNED ________________ dated: June 8, 2021

License No. 30X100182700

Page 184

BRENT LaPOINTE, ESQ.
Blapointe@rosenlegal.com

June 15, 2021

RE: In Re Global Brokerage, Inc.
6/7/2021, John E. Barron (#4614388)

The above-referenced transcript is available for review.

Within the applicable timeframe, the witness should read the testimony to verify its accuracy. If there are any changes, the witness should note those with the reason, on the attached Errata Sheet.

The witness should sign the Acknowledgment of Deponent and Errata and return to the deposing attorney. Copies should be sent to all counsel, and to Veritext at erratas-cs@veritext.com

Return completed errata within 30 days from receipt of testimony.

If the witness fails to do so within the time allotted, the transcript may be used as if signed.

Yours,
Veritext Legal Solutions

Page 185

In Re Global Brokerage, Inc.
6/7/2021 - John E. Barron (#4614388)

ERRATA SHEET

PAGE____ LINE____ CHANGE_______________
______________________________
REASON________________________
PAGE____ LINE____ CHANGE_______________
______________________________
REASON________________________
PAGE____ LINE____ CHANGE_______________
______________________________
REASON________________________
PAGE____ LINE____ CHANGE_______________
______________________________
REASON________________________
PAGE____ LINE____ CHANGE_______________
______________________________
REASON________________________
PAGE____ LINE____ CHANGE_______________
______________________________
REASON________________________

____________________ __________
John E. Barron Date