# Exhibit 4

1          CONFIDENTIAL -  JOHN DITTAMI

2          UNITED STATES DISTRICT COURT

      FOR THE SOUTHERN DISTRICT OF NEW YORK

3

   In re:                    :

4                            :  Master File No.

   Global Brokerage, Inc.   :  1:17-cv-00916-RA

5   F/k/a FXCM, Inc.         :

   Securities Litigation    :

6   ----------------------   :

7

8          REMOTE VIDEO DEPOSITION OF:

9               JOHN DITTAMI

10          THURSDAY, JANUARY 21, 2021

11

12

13

14

15

16

17

18

19

20

21

22

23

24   REPORTED BY:

   SILVIA P. WAGE, CCR, CRR, RPR

25

Page 30

CONFIDENTIAL - JOHN DITTAMI

1
2    Q.  And who did you speak to about that?
3    A.  William Ahdout.
4    Q.  And what did you generally talk about
5    with Mr. Ahdout with respect to the scope or goal
6    of EES?
7    A.  Provide better execution for their
8    retail customers, fill the gaps other liquidity
9    providers were not billing.
10   Q.  Did you have an expectation that EES
11   would generate profits for FXCM?
12   A.  Yes, I did.
13   Q.  And, in general terms, how did you
14   expect EES to generate profits for FXCM?
15   A.  Be its trading activity and
16   competition with the other LPs.
17   Q.  By "LPs" are you referring to
18   liquidity providers?
19   A.  Yes.
20   Q.  And so did you intend for EES to
21   provide liquidity for trading on FXCM's no
22   dealing desk platform?
23   A.  I intended it to provide liquidity to
24   FXCM, not the no dealing desk.
25   Q.  Take a step back.

Page 31

CONFIDENTIAL - JOHN DITTAMI

1
2    Are you familiar with FXCM's no
3    dealing desk platform?
4    A.  Yes.
5    Q.  And what is your general
6    understanding of what that platform is?
7    A.  FXCM's core platform to provide to
8    their retail clients liquidity that they gather
9    from all their other liquidity providers, the
10   competition.
11   Q.  Are there particular segments of
12   FXCM's trading volume that you intended for EES
13   to provide liquidity to?
14   A.  Yes.
15   Q.  What segments?
16   A.  UK business in particular.
17   Q.  Any other segments?
18   A.  Japanese, Japanese retail business.
19   Basically, wherever liquidity was needed within
20   FXCM, their institutional business.
21   Q.  Did you intend for EES to provide
22   liquidity to FXCM's US retail business?
23   A.  It was the ultimate goal to, yes.  It
24   was my ultimate desire to.
25   Q.  When you were hired by FXCM, did you

Page 32

CONFIDENTIAL - JOHN DITTAMI

1
2    enter into an employment agreement?
3    A.  Yes, I did.
4    Q.  I'm going to introduce the next
5    exhibit.
6    (Deposition Exhibit 4, 9/4/09
7    Employment Agreement Execution Copy stamped
8    Original GLBR_00110697 to GLBR_00110712 marked
9    Confidential, was marked for identification.)
10   Q.  Okay.  This should be Exhibit 4.  And
11   please let me know when you can see it.
12   A.  It's not appeared.  I'll click down
13   and see if it appears.
14   Q.  Sometimes you have to -- if you click
15   the folder again or refresh, it takes a minute.
16   A.  I'll try that.  It's appeared.
17   Q.  Okay, great.  Please take a minute to
18   review Exhibit 4.
19   While you do, I will state for the
20   record Exhibit 4 is GLBR 110697.
21   And, Mr. Dittami, let me know when
22   you're ready.
23   A.  I'm ready.
24   Q.  Is this the employment agreement that
25   you entered into with Forex Capital Markets LLC?

Page 33

CONFIDENTIAL - JOHN DITTAMI

1
2    A.  Yes, it is.
3    Q.  And have you heard Forex Capital
4    Markets LLC referred to as FXCM US?
5    A.  I have -- after this.  I had not at
6    the time of this agreement, but I have
7    subsequently USW.
8    Q.  And if I refer to FXCM US today, will
9    you understand that to mean Forex Capital Markets
10   LLC?
11   A.  Yes.
12   Q.  Okay.  If you look at the employment
13   agreement in the first "whereas" clause on the
14   first page you see the agreement reads, "The
15   company and the executive desire to establish a
16   new division of the company managing certain of
17   the company's algorithmic endeavors which shall
18   include but not limited to market making,
19   proprietary trading and algorithmic execution
20   services, (the venture)."
21   Do you see that?
22   A.  Yes, I see that.
23   Q.  Do you understand "the venture"
24   described in this agreement to refer to the
25   trading system you described -- referred to as

9 (Pages 30 - 33)

Page 82

CONFIDENTIAL - JOHN DITTAMI

1    CONFIDENTIAL - JOHN DITTAMI
2  or invested. I'm just asking if that's referring
3  to the same thing.
4        MR. DAHAN:  Whatever.  Objection to
5  form; whatever.
6        MR. PAYKIN:  Objection to form as
7  well.
8        THE WITNESS:  Joe, am I to attempt to
9  answer that, Joe?
10        MR. PAYKIN:  You can attempt to
11  answer it.
12    A.  This refers to the language in the
13  initial employment agreement with a proposed
14  maximum investment into the employment agreement
15  venture.
16    Q.  Okay.  And as described in this
17  letter, is it correct that only a portion of the
18  $3 million was actually used to fund EES?
19    A.  Only a portion was used to fund,
20  although that was paid back in full.  So no
21  portion was used to fund.  A portion was used and
22  repaid.
23    Q.  Okay.  And do you recall,
24  approximately, how much of the $3 million that
25  portion was?

Page 83

1    CONFIDENTIAL - JOHN DITTAMI
2    A.  I don't recall.  It was less than --
3  less than a million, substantially less than a
4  million.  But I don't recall the exact amount.
5    Q.  Okay.  And then in the same
6  paragraph, you write or the letter says, "EFFEX
7  repaid FXCM for software licenses, hardware costs
8  and external consulting costs, which FXCM
9  incurred during the employee/employer phase."
10        Do you see that?
11    A.  Yes.
12    Q.  And is that accurate?
13    A.  Yes.
14    Q.  Were those expenses and costs the
15  same as the portion of the $3 million initial
16  investment that was used to fund the EES or were
17  they something else?
18    A.  The description that I just answered
19  in the previous question where less than a
20  million was utilized was these items that were
21  repaid noted in this sentence here.
22    Q.  Okay.  And why did EFFEX repay FXCM
23  for costs that FXCM incurred while you were an
24  FXCM employee?
25    A.  Because EFFEX was becoming an

Page 84

1    CONFIDENTIAL - JOHN DITTAMI
2  independent venture and wanted to keep its clean
3  ownership of intellectual property.
4        THE STENOGRAPHER:  "Clean ownership"
5  I'm sorry?
6    A.  Clean ownership of intellectual
7  property of all technology built.  EFFEX wanted
8  to make sure it was paid for so that we know the
9  date or dispute of the ownership thereof.
10    Q.  And did you discuss this repayment
11  with anyone at FXCM?
12    A.  I would have had to have speak to the
13  accountants and get bills for exactly what the
14  costs were.
15    Q.  Did you speak to any principals of
16  FXCM about this repayment?
17    A.  I am sure I spoke to William, but I
18  can't recall, specifically.
19    Q.  Do you know who first proposed this
20  repayment, whether it was you or someone else?
21    A.  I don't know who first -- I don't
22  know who first did it.  I would have wanted it.
23    Q.  Okay.  On the next page, you write,
24  "In order to initiate its trading activities,
25  EFFEX required a trading line of credit and a

Page 85

1    CONFIDENTIAL - JOHN DITTAMI
2  brokerage account for its trading activities."
3        Is that accurate?
4    A.  That's accurate, uh-huh.
5    Q.  And for what purposes did EFFEX need
6  a trading line of credit and brokerage account?
7    A.  Every trading in foreign exchange
8  requires credit between the two counterparts on
9  the sides of the trade.
10    Q.  And, I think, we touched on this
11  before, but to, I guess, clarify a bit.
12        Did EES require a trading line of
13  credit in a brokerage account for its trading
14  activities?
15    A.  No, because EES at the time was part
16  of FXCM.  FXCM and EES is one counterpart.  EFFEX
17  and FXCM were two different counterparts and
18  there is a credit risk between those parties.
19    Q.  And what did EES use for the purposes
20  of the trading line of credit in brokerage
21  account?
22    A.  Initially, EES established a prime of
23  prime account.
24        MR. PAYKIN:  EES or EFFEX, John?
25    A.  EFFEX established a prime of prime

22 (Pages 82 - 85)

Page 86

CONFIDENTIAL - JOHN DITTAMI

1
2    account.  I apologize.
3         Q.  Thank you.  I'm asking about EES.
4         A.  EES didn't have a prime -- EES was
5    part of the FXCM entity.  It was -- fell under
6    FXCM's credit.
7         Q.  Did FXCM provide EFFEX with a
8    $2 million trading line of credit at some point
9    in 2010?
10        A.  Yes.
11        Q.  And do you recall when?
12        A.  Mid 2010 right when it started --
13   like, right when EFFEX started trading.
14        Q.  And was that transaction documented
15   at the time that FXCM provided the line of
16   credit?
17        A.  I'm sure it's documented in these
18   prime of prime accounts.
19        Q.  And was it documented at the time
20   that FXCM provided the line of credit?
21        A.  It would have to have been documented
22   before they provided the line of credit.
23        Q.  Okay.  And do you know how it was
24   documented?
25        A.  I don't know.  I don't know.  It was

Page 87

CONFIDENTIAL - JOHN DITTAMI

1
2    a loan agreement of some sort.  It was part of
3    the loan agreement, but it wasn't a loan
4    agreement.  So it's misleading.
5         Q.  And I'll ask you to please read the
6    rest of this paragraph on Page 2 beginning with,
7    "During this interim period, FXCM posted
8    $2 million," and continuing from there.  I'll
9    just ask you to read that to yourself and let me
10   know when you're ready.
11        A.  I'm ready.
12        Q.  Is this an accurate summary of the
13   approximate timeline for when FXCM provided EFFEX
14   line of credit and access to a prime of prime
15   account?
16        A.  It says, "During the interim period."
17   I don't know what the "interim period" is but...
18        Yes, during the interim period of
19   transition in 2010, yes, it was provided in that
20   period.
21        Q.  Okay.  And this entire timeline as
22   provided in that section of the paragraph is
23   accurate?
24        A.  In June it was removed is accurate,
25   yes.

Page 88

CONFIDENTIAL - JOHN DITTAMI

1
2         Q.  And in July of 2010, EFFEX
3    discontinued using the prime of prime account; is
4    that accurate?
5         A.  That's correct.
6         Q.  And at that time EFFEX had completed
7    the process for establishing a prime brokerage
8    account with Citi?
9         A.  That's correct.
10        Q.  Okay.  Thank you.
11        We've been going about an hour and a
12   half.  I have a couple more very quick documents
13   and then we'll take a break.
14        Does that sound alright?
15        MR. PAYKIN:  Yeah, that's fine.
16        A.  You said you have an hour and a half
17   you said?
18        MR. PAYKIN:  Not an hour and a half.
19   He's going to do a couple more documents and then
20   take a break.
21        THE WITNESS:  Ah, fine.
22        Q.  Okay.  I'm introducing what should be
23   Exhibit 12.
24        (Deposition Exhibit 12, 4/8/10
25   Secured Promissory Note Execution copy E

Page 89

CONFIDENTIAL - JOHN DITTAMI

1
2    Capital-000026 to E Capital-000033, was marked
3    for identification.)
4         Q.  Please let me know when you can see
5    it.
6         A.  I see it.
7         Q.  Okay.  And take a minute to review.
8    I'm just going to have some general questions
9    about this document for you.
10        MR. BAKER:  For the record,
11   Exhibit 12 is E Capital 26.
12        Q.  Let me know when you're ready.
13        A.  I'm ready.
14        Q.  Is this a secured promissory note for
15   $2 million between EFFEX and FXCM US?
16        A.  It does.
17        Q.  And was this note made in connection
18   with the $2 million line of credit that FXCM
19   provided to EFFEX in 2010?
20        A.  This transitioned into that backing
21   to the $2 million line of credit, yes.  I can't
22   remember the details, but this became the secured
23   promissory note underlying that line of credit,
24   yes.
25        Q.  Okay.  And did you sign this note on

23 (Pages 86 - 89)

Page 98

CONFIDENTIAL - JOHN DITTAMI

1        CONFIDENTIAL - JOHN DITTAMI
2    Agreement E Capital 0000050 & E Capital 0000051,
3    was marked for identification.)
4        Q. It should be No. 15. And you know
5    the drill now. Please just let me know when you
6    can see it.
7        A. I see it.
8        Q. Okay. And take a minute to review.
9        As you do, for the record, I'll note
10    Exhibit 15 is E Capital 50. It's 5-0.
11        And, Mr. Dittami, let me know when
12    you're ready.
13        A. I'm ready.
14        Q. Is this an Option Agreement between
15    yourself and FXCM US dated April 14, 2010?
16        A. It is.
17        Q. And did you sign this agreement?
18        A. Yes.
19        Q. Did William Ahdout sign this
20    agreement on behalf of FXCM US?
21        A. Yes.
22        Q. Did this Option Agreement give FXCM
23    the right to purchase a 70 percent share of EFFEX
24    for $1?
25        A. I don't believe that it was

Page 99

1        CONFIDENTIAL - JOHN DITTAMI
2    consummated. But that was the writing in the
3    document.
4        Q. Was it your intent in executing this
5    option to maintain the 70/30 split of trading
6    profits originally set out in the management
7    bonus in your employment agreement?
8        A. No.
9        Q. Did you have any discussions with
10    anyone at FXCM about continuing the 70/30 split
11    of trading profits from your employment
12    agreement?
13        A. Yes.
14        Q. And who did you speak to about that?
15        A. It would have been William Ahdout and
16    Ken Grossman.
17        Q. And at the time -- when did you have
18    those discussions?
19        A. It would have been in 2010.
20        Q. And did Mr. Ahdout and Mr. Grossman
21    express to you that they also wanted to -- sorry,
22    let me strike that.
23        Okay. Did Mr. Ahdout or Mr. Grossman
24    express to you that they also wanted to maintain
25    the 70/30 split of trading profits?

Page 100

1        CONFIDENTIAL - JOHN DITTAMI
2        A. No, they expressed they did not want
3    to maintain the 70/30 split.
4        Q. Under the second "whereas" clause
5    between the third paragraph on the first page, it
6    states that, "FXCM has loaned to EFFEX the sum of
7    $2 million pursuant to that secured promissory
8    note dated the date here of (the note) on terms
9    more favorable than Dittami would have obtained
10    in an arm's length transaction."
11        Do you see that?
12        A. Yes.
13        Q. Is that referring to the same note we
14    looked at earlier today?
15        A. Yes.
16        Q. And is it accurate to say that the
17    terms of the notes were more favorable than you
18    would have been able to obtain in an arm's length
19    transaction?
20        A. I don't know if it was more favorable
21    or not.
22        Q. Did you or EFFEX execute any other
23    versions of this agreement with any FXCM entity?
24        A. I don't recall them being executed.
25    There were discussions for sure about future, you

Page 101

1        CONFIDENTIAL - JOHN DITTAMI
2    know, work together, but I don't recall anything
3    being executed.
4        Q. And did you or EFFEX execute any
5    other agreement with any FXCM entity that you
6    would refer to as an options agreement?
7        A. I don't believe there was another
8    agreement executed. This idea was thrown out
9    early.
10        Q. Okay. I'm introducing the next
11    exhibit.
12        (Deposition Exhibit 16, 4/13/10
13    e-mail from John Dittami to David Sassoon and
14    William Ahdout and attachment GLBR_00218040 to
15    GLBR_00218042 marked Confidential, was marked for
16    identification.)
17        Q. This will be Exhibit 16. And please
18    let me know when you can see it.
19        A. I see it.
20        Q. It's actually loading a little bit
21    ahead of me.
22        Okay. Please take a minute to
23    review.
24        MR. BAKER: For the record,
25    Exhibit 16 is GLBR 218040 and an attachment which

Page 126

CONFIDENTIAL - JOHN DITTAMI

1  credit inside my credit prime of prime account,
2  like, I can't say...
3
4      Q.  So, when you refer to "the loan" and
5  the "line of credit," are those two different
6  things in your mind?  I just want to make sure
7  we're talking about the same thing.
8      A.  In my mind, there was -- "loan" is a
9  poor word.  It's a line of credit, line of credit
10  required to trade is how I think of the $2
11  million.
12      Q.  And is the line of credit what you're
13  referring to as a "loan" in this e-mail?
14      A.  Yes, the loan doc, yes, it is, yes.
15      Q.  And so when you say, "we are setting
16  it to the $2 million," were you saying that at
17  this point at time of this e-mail you were
18  setting the amount of the line of credit?
19      A.  Again, I don't -- you know, it could
20  have -- I'd be guess -- I don't want to guess.
21  It's line of credit or the loan.  It's one or the
22  other.  I viewed them as the same, but I can't
23  infer the details from this.
24      Q.  Do you recall if the full $2 million
25  line of credit that you've been discussing was

Page 127

CONFIDENTIAL - JOHN DITTAMI

1
2  ever placed into EFFEX's prime of prime account?
3      MR. DAHAN:  Objection to form.
4      A.  I don't know if the funds were ever
5  placed there or if they were represented as an
6  accounting entry.  I don't know the mechanics of
7  the prime of prime on FXCM's side.
8      Q.  Okay.  In the next paragraph in your
9  e-mail you write, "I was confused on how the
10  capital that I replaced to fund trading should be
11  handled in conjunction with a payment on profits
12  to FXCM."
13      By "payment on profits," were you
14  referring to the 70/30 split of EFFEX's trading
15  profits between Effex and FXCM?
16      MR. DAHAN:  Object to the form.
17      A.  No, I'm referring to the payments --
18  I don't know if -- I don't know what I'm
19  referring; the payments the $21 premium payments.
20      Q.  Were those 21 per million -- $21 per
21  million payments denoted as a payment on profits
22  in anywhere that you recall?
23      A.  No.  It's a misnomer.
24      Q.  In the next paragraph you say, "There
25  are basically two choices.  One is that FXCM

Page 128

CONFIDENTIAL - JOHN DITTAMI

1
2  somehow leaves its 70 percent share in to
3  support/fund trading and the upsides are that
4  this is clearly recouped when option is exercised
5  and accounted for as such.  Downside is perhaps
6  shows greater level of interest."
7      By the "option," were you referring
8  to the Option Agreement we looked at earlier
9  today?
10      A.  I don't believe so.  I believe this
11  is that negotiated -- that negotiated discussions
12  we were having as discussed earlier -- as
13  mentioned earlier, continued negotiation.
14      Q.  I'm sorry.  I think we talked over
15  each other there.
16      What did you say?
17      A.  I just said continued negotiation.
18      Q.  Okay, thank you.
19      And the e-mail where you say,
20  "downside is perhaps shows greater level of
21  interest," what audience were you describing
22  showing "a greater level of interest" to?
23      A.  I don't -- I can't recall.
24      Q.  And by "level of interest," were you
25  referring to FXCM's ownership interest in Effex?

Page 129

CONFIDENTIAL - JOHN DITTAMI

1
2      A.  FXCM had no ownership in Effex.  So I
3  don't know if -- I don't know.  Maybe you can
4  rephrase the question, I guess.
5      Q.  Sure.  Do you know what you were
6  referring to by "level of interest"?
7      A.  No.
8      Q.  And in the next paragraph you write,
9  "The other option is that the account for trading
10  is fully funded by my profit share percentage and
11  then I just create liability to Effex to myself
12  so that in event of option exercise, this amount
13  doesn't get double dipped."
14      And when you say, "profit share
15  percentage," what were you referring to here?
16      A.  Again, this is that me attempting to
17  negotiate with FXCM that what we never came to
18  terms on, same economic terms trying to negotiate
19  a structure.
20      Q.  And by, "in the event of option
21  exercise," were you referring to the option
22  agreement or discussions about the option
23  agreement that we looked at earlier today?
24      A.  I'm referring to the -- a proposed in
25  negotiation structure, not that specific option

33 (Pages 126 - 129)

CONFIDENTIAL - JOHN DITTAMI

1
2 -- this.
3    Q. So, if neither of you wanted this, do
4 you have an understanding of why you signed it?
5    A. No. You asked --
6    MR. DAHAN: Wait. Sorry, "signed"
7 what? Signed options back in --
8    MR. BAKER: Signed the
9 acknowledgment --
10    MR. DAHAN: Oh, okay.
11    MR. BAKER: -- Exhibit 41.
12    MR. DAHAN: But I don't think he said
13 that none of us one wanted the acknowledgment
14 signed. I don't think that's what he said.
15    A. That's not what I was saying, yeah.
16    Q. Did you -- sorry. Then can you
17 clarify what you meant by, none of us would want
18 this?
19    A. None of us wanted an old document
20 that wasn't in effect and wasn't in play, that
21 was one of a thousand negotiated -- you know, God
22 knows how many discussions the ones we
23 discussed -- you know, it wasn't in play.
24 There's -- no option existed, so just cleaning up
25 all of our documentation, making sure everything

CONFIDENTIAL - JOHN DITTAMI

1
2 is in order and accurate and correct.
3    Q. So do you recall any particular
4 reason that you or FXCM had for executing this
5 document in November and December of 2015?
6    MR. DAHAN: Asked and answered.
7    Q. You can still answer.
8    A. You know, we wanted it clean and
9 clear. I mean, the document ever existed. This
10 was when I am under CFTC, et cetera. So this
11 document wasn't correct. We never implemented.
12    Why there's signature on it, I don't
13 know. But this was never in play. We never
14 viewed it in play. We needed to make that very
15 clear.
16    Q. And when you say, you were under
17 CFTC, et cetera, what are you referring to there?
18    A. I had that subpoena from the CFTC for
19 retail fraud, the deposition we discussed
20 earlier, that I was a part of. I didn't know
21 this document even existed until then.
22    Q. And you've talked about, I think, in
23 re: Retail fraud.
24    Was that matter regarding FXCM?
25    A. Matter regarding FXCM, matter

CONFIDENTIAL - JOHN DITTAMI

1
2 involving CFTC and, you know, investigating Effex
3 as well, I believe.
4    Q. Okay. I think now is probably a good
5 time for a lunch break.
6    THE VIDEOGRAPHER: Okay. Let me read
7 us off.
8    The time is, approximately, 1:26 p.m.
9 We are going off the record.
10    (Lunch recess taken 1:26 to
11 p.m.)
12    THE VIDEOGRAPHER: The time is,
13 approximately, 2:03 p.m. We are back on the
14 record.
15    Q. Welcome back, Mr. Dittami. I've
16 introduced another document.
17    (Deposition Exhibit 42, 7/6/10 e-mail
18 from John Dittami to William Ahdout GLBR_00188143
19 marked Confidential, was marked for
20 identification.)
21    Q. This is Exhibit 42. Please let me
22 know when you can see it.
23    A. It's open.
24    Q. Okay. And take a minute to review.
25    MR. BAKER: And for the record,

CONFIDENTIAL - JOHN DITTAMI

1
2 Exhibit 42 is GLBR 188143.
3    A. Yes.
4    Q. And my first question to you will be,
5 is this an e-mail from yourself to Mr. Ahdout and
6 Mr. Rosenfeld?
7    A. Yes, it is.
8    Q. And in that e-mail you write, "Can we
9 retro back to beginning of our trading? The per
10 MM charge to $23 from the $21 looking closer. I
11 think $23 is more appropriate."
12    Were you referring to the rate per
13 million that Effex paid to FXCM for order flow?
14    A. Yes.
15    Q. And were you proposing a retroactive
16 change in the rate of payment?
17    A. Yes.
18    Q. And were you asking Mr. Ahdout if he
19 could retroactively change the rate that Effex
20 was paying FXCM for order flow from $21 per
21 million to $23 per million?
22    A. Yes.
23    Q. Were there other occasions on which
24 you discussed retroactively changing the rate
25 what Effex was paying FXCM for order flow?

CONFIDENTIAL - JOHN DITTAMI

1  it says that E is from or the sender.
2
3      A.  Then, yes, then Column E is my name
4  to Joshua.
5      Q.  Okay.  And in that line you write,
6  "This month in June FXCM's share was less than
7  21.  May and April more."
8      A.  Yes, I see that.
9      Q.  What were you referring to by "FXCM's
10  share"?
11     A.  I'm guessing I was benchmarking to a
12  change what it would have been compared to the
13  employment agreement.  I guess that's what I'm
14  doing, tracking how -- tracking if I'm better off
15  or worse off.  It's a guess.  It's back 2010.
16     Q.  And when you're referring to the
17  employment agreement, are you referring to the
18  70/30 profit sharing split from the employment
19  agreement?
20     A.  Yes, I would be comparing my -- how
21  I'm doing versus my last negotiated set.
22     Q.  Okay.  And when you say 21, were you
23  referring to the rate per million that Effex was
24  paying FXCM for order flow for these months?
25     A.  Yes.

CONFIDENTIAL - JOHN DITTAMI

1
2      Q.  And did you mean that based on a
3  70 percent share of Effex's trading profits, FXCM
4  should receive less than 21 million -- 21 per
5  million for June and July 2010 and more than 21
6  per million for April and May 2010?
7      A.  No, that's not what I said.  In the
8  conversation I said, what do you need to look at
9  my books for.  But I offered up -- but I offered
10  up -- clearly, I'm offering up how we're doing
11  relative to this, to the previous benchmark.  But
12  you see in that same conversation, saying what do
13  you need my books for.
14     Q.  Okay.  And when you say, FXCM's share
15  was less than 21 -- sorry, "This month and June
16  FXCM's share was less than 21," did you mean that
17  70 -- were you referring to 70 percent of Effex's
18  trading profits at that time were less than $21
19  per million?
20     A.  I believe I was implying that FXCM
21  made in the negotiation of $21 per million,
22  which is what you do when you need to prepare to
23  adjust to try to negotiate.  I believe I'm
24  applying that they got a good bargain on our
25  transition.

CONFIDENTIAL - JOHN DITTAMI

1
2      Q.  And then for May and April, it went
3  the other way?
4      A.  Yeah.  Well, this was less more --
5  yeah.  Every month is different is what I'm
6  telling him.
7      Q.  And when you say, "FXCM's share was
8  less than 21 in this month in June, May and April
9  more," were you referring to the actual payments
10  that Effex made to FXCM?
11     A.  I don't know if I had made payments
12  on that date.  What I was -- I think -- again,
13  this is an old e-mail -- old messaging.  But I
14  think what I'm saying is we negotiated $21 per
15  million from the two months previous when I was
16  an employee at 70 percent.  Josh is the
17  accountant for having to figure out how to bill
18  me invoice, et cetera.
19         I think what I'm saying is, you don't
20  need my books.  We're not -- we're separate at
21  the top and you don't need to question the deal.
22  It was good, you know, worked out well for you
23  one month and bad for you these months.  That's
24  what I'm reading here.
25     Q.  And with respect to the deal working

CONFIDENTIAL - JOHN DITTAMI

1
2  out, good for FXCM or good for Effex for these
3  months, is that something that you would have
4  discussed with Mr. Ahdout at this time?
5      A.  I'm sure I would have discussed it
6  with him whenever it suited my negotiation needs.
7  I don't know if I discuss it right at this time.
8  I am sure I would have discussed it if it was
9  going against me.
10     Q.  Okay.  I'm going to show had you the
11  next document.
12         (Deposition Exhibit 43, e-mail string
13  GLBR_00188166 & GLBR_00188167 marked
14  Confidential, was marked for identification.)
15     A.  Open, No. 43.
16     Q.  Okay.  Take a minute to review this
17  document.
18         As you do, for the record, Exhibit 43
19  is GLBR 188166.
20         Mr. Dittami, just let me know when
21  you're ready.
22     A.  I'm ready.
23     Q.  Is this the e-mail chain from
24  yourself to Mr. Rosenfeld copying Mr. Filko,
25  Aaron Harding and Mr. Ahdout?

54 (Pages 210 - 213)

CONFIDENTIAL - JOHN DITTAMI

1
2      A. It is, yes.
3      Q. And looking at the e-mail from
4   Mr. Rosenfeld, the second e-mail from the bottom
5   on Page 1 and Mr. Rosenfeld writes, "Does 16 per
6   mill seem like the figure we'll have to go for
7   Oct?"
8      A. I see that.
9      Q. Did you understand that to mean the
10   16 per million to refer to the rate for Effex's
11   payments to FXCM for order flow?
12      A. I refer to it discussing, yeah, if we
13   can change it.
14      Q. And that's for the month of
15   October 2010?
16      A. That's what the e-mail says, yes.
17   That would be -- from that point forth is what
18   would have been under discussion.
19      Q. And do you recall having discussions
20   with Mr. Rosenfeld or other people at FXCM about
21   setting the rate for Effex's payments to FXCM for
22   order flow for October 2010?
23      A. Any negotiations I had would have
24   been with William and, you know, Drew.
25   Discussions with Joshua Rosenfeld would be --

CONFIDENTIAL - JOHN DITTAMI

1
2   he's the guy who has to create an invoice and his
3   job is to, you know, police on paying and when I
4   should be charged so...
5      I wouldn't be negotiating with Joshua
6   for payment. But with William and Drew, if I'm
7   going to make a change, yes, at least, what
8   negotiating means.
9      Q. And do you recall if the 16 per
10   million figure originated with you or with
11   someone at FXCM?
12      A. I don't know where it originated. In
13   this e-mail, I'm actually asking for 14.
14      Q. And that was my next question. When
15   you say in your e-mail responding to that, that
16   I'd rather go 14, are you saying you rather Effex
17   paid $14 per million for order flow for
18   October 2010?
19      A. It looks like I'm trying to negotiate
20   better than 14, yes.
21      Q. And on the top of Page 1, you write
22   to William; is that Mr. Ahdout?
23      A. Yes.
24      Q. And you write, "We need to figure out
25   a per MM for October. Looking closely we can

CONFIDENTIAL - JOHN DITTAMI

1
2   likely swing it again at $21 per MM and chew the
3   reserve down to zero."
4      Were you telling Mr. Ahdout that
5   Effex could pay FXCM $21 per million for order
6   flow for this month, but doing so would cause
7   Effex to lose money?
8      A. I didn't -- I am saying we can pay
9   them $21. I did not say it was because Effex was
10   losing money. I said --
11      Q. What did you mean -- sorry, go ahead.
12      A. It says, I am building reserves for
13   my Citi prime broker account. They're no longer
14   give me prime of prime. The loan is closed.
15   Good time to negotiate. I have to fund my own
16   capital. I'm saying, I got to fund my own
17   capital. Citi is requiring me to put a million
18   dollars up there, you know, I can't afford to pay
19   you $21 per million and fund my capital at Citi.
20   I wanted to negotiate lower than 14. Obviously,
21   we didn't negotiate a 14, so they didn't accept
22   that.
23      Q. And what I'm getting at is I guess
24   the connection between paying $21 per million and
25   in your words here, "chew the reserve down to

CONFIDENTIAL - JOHN DITTAMI

1
2   zero," or is that what you referred to as the
3   funding for your own capital?
4      A. Yes, it says, our reserve is capital
5   for Citi's trading of a million dollar in the
6   next sentence.
7      Q. And so -- sorry go ahead.
8      And so are you saying that paying $21
9   per million would result in "chewing" the reserve
10   down, meaning, that the reserve that Effex was
11   using to fund its trading?
12      A. There's less money to pay to fund my
13   trading when I pay more in fees.
14      Q. And what I'm getting at so is the
15   connection between paying $21 per million, is
16   that directly resulting in "chewing the reserve
17   down to zero"?
18      MR. DAHAN: Objection to form.
19   Objection to form.
20      You can answer.
21      A. I'm saying paying more -- paying less
22   money as far as Effex Capital is concerned allows
23   Effex to grow its capital accounts with Citi, who
24   is extended -- who is now its credit providing.
25   I'm no longer getting benefits from FXCM in

55 (Pages 214 - 217)

Page 218

CONFIDENTIAL - JOHN DITTAMI

1   CONFIDENTIAL - JOHN DITTAMI
2   credit, et cetera. I need to fund my own
3   accounts with my own money. I'm negotiate -- I'm
4   trying to negotiate him down to 14. He didn't
5   agree.
6        Q. And so I'll just -- I'll try one more
7   time to clarify my question and then if maybe if
8   we're not connecting, we can move on.
9        But you say, "We can likely swing it
10  again at $21 per million, meaning, that Effex can
11  pay FXCM $21 per million for order flow," and you
12  say, "and chew the reserve down to zero."
13       And I'm asking if those two things
14  were connected in your mind at this time?
15       A. In the -- yes, it went -- when you
16  pay more fees, you have less earnings and
17  capital, which is the reserve that funds your
18  capital that's required Effex to keep capital at
19  Citi. If I pay less fees, I have more income and
20  I can accumulate more capital with my Citi prime
21  brokerage. If I pay more, I have less capital to
22  fund my Citi trading, which has a $1 million
23  minimum plus additional reserves for taking risk
24  and carrying risk, and you have a minimum capital
25  and then you have to fund your positions. If I

Page 219

1   CONFIDENTIAL - JOHN DITTAMI
2   pay more money, I have less money to fund my
3   positions. If I pay less money, I have more
4   money to fund my positions.
5        Q. Okay. At the last sentence of that
6   paragraph starting in the second to last line you
7   write, "The other alternative is we go halfway at
8   $17.50 and cut the reserve a little but give us a
9   whole other month to work out how this will shake
10  out."
11       Is 17.50 halfway between $14 the
12  proposed and $21?
13       MR. DAHAN: Objection to form. I
14  imagine --
15       A. It's, approximately, halfway, yes.
16       MR. DAHAN: Yes.
17       Q. From Effex's perspective, who had the
18  final say on determining the rate that Effex
19  should pay FXCM for order flow for a given month?
20       A. It was a negotiation. They either
21  agreed to it or didn't agree to it. The final
22  say is a negotiation between two parties and our
23  service contract.
24       Q. Who had the authority --
25       A. Effex -- at Effex I had the

Page 220

1   CONFIDENTIAL - JOHN DITTAMI
2   authority.
3        Q. Okay.
4        A. And at FXCM, I'm not sure how it is,
5   you know.
6        Q. Thank you. That was going to be my
7   next question.
8        And so was the rate that Effex should
9   pay FXCM for order flow for a given month
10  determined by an agreement between you and
11  Mr. Ahdout?
12       A. It was determined by the services
13  agreement.
14       MR. DAHAN: Objection, form.
15       Q. Were you aware of anyone else at FXCM
16  who was involved in the negotiations over the
17  rate that Effex should pay FXCM for order flow
18  for a given month?
19       A. William would be my primary first
20  contact and I would, you know, pitch it to Drew
21  when I felt like I was close enough to be able to
22  make a change, try to negotiate, William and Drew
23  effectively.
24       Q. Okay. I'm going to show you the next
25  document.

Page 221

1   CONFIDENTIAL - JOHN DITTAMI
2        (Deposition Exhibit 44, e-mail string
3   and attachment GLBR_00184107 & GLBR_00184108
4   marked Confidential, was marked for
5   identification.)
6        Q. Okay. Let me know when you can see
7   Exhibit 44.
8        A. I can see Exhibit 44.
9        Q. Take a minute to review this
10  document.
11       MR. BAKER: For the record,
12  Exhibit 44 is GLBR 184107 and an attachment which
13  is GLBR 184108.
14       Q. Mr. Dittami, just let me know when
15  you're ready.
16       A. I'm ready.
17       Q. Is this an e-mail from Josh Rosenfeld
18  to yourself copying two other individuals and
19  attaching with an attachment?
20       A. It is.
21       Q. In your second e-mail here, you
22  write, "Please provide me with updated invoice
23  for services for First Derivatives and payment
24  due to" holdings -- "to holding," sorry.
25       By "payment due to holding," were you

56 (Pages 218 - 221)

Page 274

CONFIDENTIAL - JOHN DITTAMI

1       CONFIDENTIAL - JOHN DITTAMI
2       Q.   And you can see it?
3       A.   Yes, I do.
4       Q.   Please take a minute to review.
5       MR. BAKER:  For the record,
6    Exhibit 55 is GLBR 185174 and an attachment which
7    is GLBR 185175.
8       Q.   My first question will be is this an
9    e-mail from Mr. Greenbaum to Mr. Meyer attaching
10   an invoice?
11      A.   It is.
12      Q.   In Mr. Greenbaum's e-mail he writes,
13   "Please take note this is the first month in
14   which the fee per million has been split."
15      A.   I see that.
16      Q.   And if you look down to the
17   attachment, is this an invoice from FXCM to Effex
18   for order flow for February 2013?
19      A.   It looks that way, yes.
20      Q.   And I'll note that it appears to say
21   January 2013 in the e-mail, but based on the --
22   or sorry.
23           It says January 2013 in the invoice,
24   but based on the e-mail, the date of the e-mail,
25   the invoice number or the date of the invoice,

Page 275

CONFIDENTIAL - JOHN DITTAMI

1       CONFIDENTIAL - JOHN DITTAMI
2    does it appear that January 2013 is a typo?
3       A.   I don't know what the -- the invoice
4    number says -- has an 02 referring to February
5    so... And the title says February, so it appears
6    to be a February invoice.
7       Q.   Okay.
8       A.   Yes, I believe the January is a typo
9    and it should say February.
10      Q.   Okay.  And under -- or in the invoice
11   in the first column, do you see where it says
12   "JPY/USD"?
13      A.   Yes.
14      Q.   And that's the dollar/yen currency
15   payor?
16      A.   That is the dollar/yen currency
17   payor.
18      Q.   And so, in this invoice, was FXCM
19   charging Effex $3 per million for order flow in
20   the dollar/yen currency payor and $16 per million
21   for order flow in all other currency payors?
22      A.   That is correct.
23      Q.   Did you have any discussions with
24   Mr. Ahdout or anyone at FXCM about Effex paying a
25   reduced rate of $3 per million on order flow for

Page 276

CONFIDENTIAL - JOHN DITTAMI

1       CONFIDENTIAL - JOHN DITTAMI
2    the dollar/yen currency payor?
3       A.   Yes, that one I know I had
4    discussions with him.
5       Q.   And who else was involved in those
6    discussions, if anyone?
7       A.   William and because we made this
8    final, I'm sure I had -- I'm sure I had also had
9    to negotiate with that Drew but William and Drew.
10      Q.   Was trading in the dollar/yen
11   currency payor less profitable for Effex on a per
12   million basis at this time --
13      A.   Yes.
14      Q.   -- compared to all other currencies?
15      A.   Yes, it was.
16      Q.   And did you inform Mr. Ahdout or
17   anyone -- or Mr. Niv that trading in this payor
18   was less profitable for Effex on a per million
19   basis at this time?
20      A.   Yes.  I would have informed them that
21   I'm not going to provide liquidity to the
22   dollar/yen, because I lose money given the fees I
23   pay.
24      Q.   And did Effex and FXCM execute or
25   amend a services agreement to reflect a different

Page 277

CONFIDENTIAL - JOHN DITTAMI

1       CONFIDENTIAL - JOHN DITTAMI
2    rate of payment for trading in the dollar/yen
3    payor compared to all other currencies?
4       A.   I don't know if we made an amendment.
5    I'm not sure if there's a formal amendment for
6    it.
7       Q.   Are you aware of any other formal
8    agreement between Effex and FXCM that documents
9    this new rate?
10      A.   Just the Services Agreement and if
11   there are any amendments to the Services
12   Agreement in their e-mails so...
13      Q.   And does this match your recollection
14   that Effex started paying a reduced rate for
15   dollar/yen currency payor around February 2013?
16      A.   Yes, this matches my recollection.
17      Q.   Okay.  I'm going to show you another
18   document.
19           (Deposition Exhibit 56, e-mail string
20   GLBR_00185323 & GLBR_00185324 marked
21   Confidential, was marked for identification.)
22      Q.   Exhibit 56.  Please let me know when
23   you can see it.
24      A.   I can see it.
25      Q.   Okay.  And please take a minute to

70 (Pages 274 - 277)

Page 278

CONFIDENTIAL - JOHN DITTAMI

1    review and let me know when you're ready.
2    MR. BAKER: For the record,
3    Exhibit 56 is GLBR 185323.
4    A. I'm ready.
5    Q. And is this an e-mail from Baruch
6    Greenbaum to Aaron Harding, Alexan Kartalyan and
7    copying Chris Meyer?
8    A. Yes, it is.
9    Q. And looking at -- and I'll note that
10   you do not appear to be on the e-mails in this
11   chain.
12   Looking at the bottom of Page 1, the
13   e-mail from Baruch Greenbaum at 2:35 p.m.
14   Do you see that?
15   A. Yes.
16   Q. And he writes, "Chris, what will the
17   new fee rate per million per volume from EUR/USD
18   for June and going forward?"
19   And above Mr. Meyer responds, "It's
20   $6 per million for June and beyond."
21   A. Yes.
22   Q. Was it your understanding that as of
23   June 2013, Effex would pay only $6 per million on
24   euro/dollar trading volume in its order flow
25

Page 279

CONFIDENTIAL - JOHN DITTAMI

1    payments to FXCM?
2    A. Yes, that's my recollection.
3    Q. And is that something you discussed
4    with Mr. Ahdout or Mr. Niv?
5    A. That would have been discussed with
6    both of them, yes.
7    Q. Was trading in the euro/dollar
8    currency payor less profitable for Effex on a per
9    million basis at this time?
10   A. Yes.
11   Q. And did you inform Mr. Ahdout and Mr.
12   Niv that trading in this payor was less
13   profitable for Effex on a per million basis at
14   this time?
15   A. Yes, I would have informed him as I
16   did dollar/yen. But they already knew that.
17   Every other LP probably felt and did the same
18   thing.
19   Q. Did Effex and FXCM execute or amend
20   any services agreement to reflect a different
21   rate of payment for trading in the euro/dollar
22   payor?
23   A. I don't know -- I don't know if an
24   amendment was made or wasn't made.
25

Page 280

CONFIDENTIAL - JOHN DITTAMI

1    Q. Were you aware of any?
2    A. I don't recall any. I don't have all
3    my amendments in front of me.
4    Q. And were you aware of any formal
5    agreement between Effex and FXCM documenting this
6    new rate per million for the euro/dollar?
7    A. If there would have been one, I
8    would have been an amendment to the Services
9    Agreement, if there's one.
10   Q. But you're not specifically aware of
11   any amendment; is that fair?
12   A. Not specific -- not specifically
13   aware of any amendment, no.
14   Q. Okay. I'm going to show you another
15   document.
16   (Deposition Exhibit 57, e-mail string
17   GLBR_00005534 and attachment marked Confidential,
18   was marked for identification.)
19   Q. This is Exhibit 57. And please let
20   me know when you can see it.
21   A. I see it.
22   Q. Take a minute to review.
23   A. I'm ready.
24   Q. This is a series of charts and
25

Page 281

CONFIDENTIAL - JOHN DITTAMI

1    numbers in this e-mail. I'm not going to be
2    asking you about specifics at this time, but feel
3    free to review the document as needed.
4    MR. BAKER: For the record,
5    Exhibit 57 is GLBR 5534 and an attachment which
6    is GLBR 5535.
7    Q. Mr. Dittami, does it appear that the
8    attachment to Mr. Milazzo's e-mail appears to be
9    the same attachment from your e-mail that he's
10   forwarding?
11   A. I can't compare line by line, but
12   it's similar information.
13   Q. So there's only one attachment shown
14   here, which is the attachment to Mr. Milazzo's
15   e-mail. Take a step back.
16   Is this an e-mail from Mr. Milazzo to
17   Raelyn Tsai forwarding an e-mail from you?
18   MR. PAYKIN: Objection to the extent
19   that you can -- I mean, you don't know it; if you
20   can tell by looking at it. The document speaks
21   for itself.
22   A. It looks like a forward from Evan of
23   it. Yes, it looks like a forward of an e-mail
24   from me, yes.
25

71 (Pages 278 - 281)

Page 294

CONFIDENTIAL - JOHN DITTAMI

1  your e-mail the end of the second paragraph in
2  your e-mail. And the last part of that line you
3  write, "It brings up questions you may not want
4  brought up."
5      Do you know what you were referring
6  to here?
7      A. Let me find it again.
8      I don't know what I'm referring to
9  here. But I don't want my share being shown to
10  any other LP. I know how other LPs will respond
11  to seeing me having my share. They will not be
12  happy. It would not be a good thing for me. It
13  would not be a good thing for FXCM.
14      Q. And why would that not be a good
15  thing for FXCM?
16      A. You have to have good relationship
17  with all of your liquidity providers. No one
18  likes to be told they aren't winning. It would
19  be embarrassing to my two ex-employees, Citigroup
20  and Sun Trading that I was taking their loss.
21  That does not bode well for positive
22  relationships in business.
23      Q. Okay. I'm going to show you another
24  document.

Page 295

CONFIDENTIAL - JOHN DITTAMI

1      (Deposition Exhibit 60, 10/15/12
2  Conversation between John@effexcapital.com and
3  pmuchinsky@fxcm.com GLBR_00217369 & GLBR_00217370
4  marked Confidential, was marked for
5  identification.)
6      Q. Please let me know when you can see
7  Exhibit 60.
8      A. I see Exhibit 60.
9      Q. Please take a minute to review this
10  document.
11      MR. BAKER: For the record,
12  Exhibit 60 is GLBR 217369.
13      Q. Mr. Dittami just let me know when
14  you're ready.
15      A. I'm ready.
16      Q. Is this an e-mail from you to Ms.
17  Muchinsky, which includes a transcript from an
18  instant messaging conversation between yourself
19  and Ms. Muchinsky?
20      A. This is an e-mail. I see an
21  e-mail. I see a transcript. I do not know why
22  they're sitting on top of each other. I don't
23  recognize the format of -- I'm confused by the
24  format of the instant message transcript in an

Page 296

CONFIDENTIAL - JOHN DITTAMI

1  e-mail together.
2      Q. Okay. Would you agree that this
3  appears to be a transcript of an instant
4  messaging conversation between yourself and Ms.
5  Muchinsky?
6      A. I would agree that I see a transcript
7  of an instant message conversation. And it was
8  between me and Ms. Muchinsky, yes.
9      Q. Okay, thank you.
10      I'm going to ask you and you might
11  have to read through the conversation a little
12  bit.
13      But just what is the context for the
14  conversation you were having with Ms. Muchinsky?
15  Are you referring to an e-mail that was sent out
16  to some or all of FXCM's liquidity providers?
17      A. I have to read this whole thing. I
18  have...
19      Q. Please go ahead.
20      A. It's very hard to interpret. But
21  generically it seems like it's a conversation
22  about me asking Trisha if she's communicated with
23  liquidity providers about their execution
24  quality. That's the best I can glean. It's very

Page 297

CONFIDENTIAL - JOHN DITTAMI

1  broken and out of context, but that's all I can
2  glean from this.
3      Q. To your knowledge, did FXCM have a
4  system to determine how to route orders in case
5  of a tie between the prices offered by different
6  liquidity providers?
7      A. To my knowledge, they had guidelines
8  for what dictated who won ties, who won ties
9  between liquidity providers.
10      Q. Have you heard those guidelines
11  referred to as a "priority system"?
12      A. I have not heard that name used.
13  Maybe FXCM uses it. I know there are guidelines
14  as to LP that I had to follow or other LPs would
15  have to follow in order to win ties, which is
16  prioritized or priority, similar words.
17      Q. And did you provide input to FXCM on
18  allowing Effex or other liquidity providers to
19  win ties with other liquidity providers?
20      A. I would have provide input to
21  whenever it was to my benefit. I'd let FXCM know
22  if other liquidity providers I was competing with
23  were not following good execution and I would, of
24  course, for my business interest argue for any

75 (Pages 294 - 297)

CONFIDENTIAL - JOHN DITTAMI

1   CONFIDENTIAL - JOHN DITTAMI
2   implication, insinuation or otherwise if anyone
3   else would win ties other than Effex, unless
4   their execution quality is consistent with that.
5   Yes, very important for me to regularly ensure
6   that I am the best execution and winning ties for
7   that policy accordingly.
8       Q. And, to your knowledge, did Effex
9   have the ability to win all ties with other
10  liquidity providers at some point during the 2010
11  to 2014 time frame?
12      A. Yes. We had the ability to win ties
13  upon meeting the standards that were outlined,
14  yes.
15      Q. And did the ability to win ties apply
16  across all currency payors that Effex traded with
17  FXCM?
18      A. The ability to win ties did not
19  expand across all currency payors at FXCM.
20      Q. Which currency payors did it apply
21  to, if you remember?
22      A. It would depend on my performance and
23  standards and FXCM's decisions. There were times
24  other liquidity providers won ties. I think
25  dollar/yen, maybe euro/dollar, maybe gold. I

1   CONFIDENTIAL - JOHN DITTAMI
2   can't recall, exactly. Those are ones that come
3   to mind as ones that Effex did not win ties on
4   for periods of times.
5       Q. In that period of time from 2010 to
6   2014, did Effex have the ability to win ties with
7   respect to a majority of the currency payors that
8   it traded with FXCM?
9       MR. PAYKIN: Objection.
10      Q. You can answer.
11      A. The majority of the currency payors
12  minus the ones and times that I just mentioned
13  that I would have to go back and see what times
14  we did and didn't win ties.
15      Q. And would there be records of that
16  reflected somewhere within Effex?
17      A. Not now, no; when Effex was in
18  business, yeah.
19      Q. Was there any sort of --
20      A. (Inaudible.)
21      Q. Sorry, I didn't catch that last part.
22      A. There wouldn't have been formal
23  records. I would have to have quants and
24  analysts go try scroll through data to go figure
25  it out and create a historical record. I don't

1   CONFIDENTIAL - JOHN DITTAMI
2   have quants and analysts anymore.
3       Q. Were there any documents that you
4   received from FXCM showing when and for what
5   currency payors Effex had the ability to win all
6   ties?
7       A. No, I don't recall. I recall
8   discussions when I wasn't winning ties, but I
9   don't recall documents specific to it.
10      Q. Was there any other way that you were
11  able to discern whether Effex was winning ties on
12  the currency payor, other than doing the data
13  analysis that you referred to?
14      A. No, it was just data analysis, very
15  obvious. We were winning a lot of volume and
16  stopped winning a lot of volume. We're not
17  winning ties. We create a very tight price and
18  you look at volume and we're not winning ties.
19  It's data driven.
20      Q. Is it your experience that as a
21  general matter if you were not winning ties with
22  respect to a certain currency payor, you would be
23  -- you would not be winning as much volume with
24  respect to that currency payor?
25      MR. DAHAN: Objection.

1   CONFIDENTIAL - JOHN DITTAMI
2       A. Yes, if you did not win ties, you win
3   less volume.
4       Q. Okay. I'm going to show you another
5   document.
6       (Deposition Exhibit 61, e-mail string
7   GLBR_00186222 to GLBR_00186224 marked
8   Confidential, was marked for identification.)
9       A. Okay, Document 60 has appeared.
10      MR. DAHAN: Is this 61?
11      MR. BAKER: Yes, this will be 61.
12      A. I knew it would be worth checking it
13  each time.
14      MR. DAHAN: Don't worry. You already
15  won the award for most exhibits in a deposition
16  so...
17      A. Oh; deposition 61.
18      Q. Okay, you have it up?
19      A. Yes.
20      Q. Okay. Please take a minute to
21  review.
22      MR. BAKER: For the record,
23  Exhibit 61 is GLBR 186222.
24      Q. And I'm just going to -- feel free to
25  review the entirety of this document. I'm just

CONFIDENTIAL -  JOHN DITTAMI

1
2    2010.
3          Do you recall that?
4    A.  Yes.
5          Q.  And both of those had in there the
6    agreement that Effex agreed to pay $21 per
7    million flow.
8          Do you recall that?
9    A.  Yes, I do.
10         Q.  Okay.  Now, to -- and you were the
11   owner of Effex at the time, correct?
12   A.  Yes, that's correct.
13   Q.  You would know --
14         MR. BAKER:  Which time?
15         MR. DAHAN:  2010.
16   Q.  Correct?
17   A.  That is correct.
18   Q.  And so you would know what Effex
19   agreed to, correct?
20   A.  Correct.
21   Q.  Did Effex agree to pay FXCM
22   70 percent of Effex's profits?
23   A.  No.
24   Q.  Did it ever do that?
25   A.  No.

CONFIDENTIAL -  JOHN DITTAMI

1
2    Q.  Did FXCM demand that Effex pay its
3    70 percent of profits?
4    A.  No.
5    Q.  Did Effex enter into a profit sharing
6    agreement with FXCM?
7    A.  No.  You were shown some documents
8    earlier where you reported that for certain
9    periods of time that Effex was -- had a P&L of
10   over $35.
11         Do you remember that?
12   A.  There were occasions --
13   Q.  You saw some documents.
14   A.  There were occasions where it was $35
15   per million in some of those documents.
16   Q.  And did Effex --
17   A.  On occasion.
18   Q.  And did Effex agree to pay more than
19   $21 when it did that?
20   A.  No.
21   Q.  You were shown -- let me see what
22   exhibit that was.  It was early in the day.  Hold
23   on -- I think it was Exhibit 5.  If we can go
24   back to Exhibit 5.
25   A.  I have Exhibit 5 open.

CONFIDENTIAL -  JOHN DITTAMI

1
2    Q.  Right.  And Counsel for Plaintiffs
3    went through some chosen sentences in here.
4          Do you recall that?
5    A.  I -- I recall going through
6    questions, but you'll --
7    Q.  Yeah.
8    A.  -- need to refresh my memory.
9    Q.  Let me go through he, obviously,
10   didn't ask you about.
11         It says -- on Page 3 of the document,
12   there's a paragraph saying, "At the time of its
13   formation, John Dittami owned a hundred percent
14   of the membership."
15         Do you see that?
16   A.  I see that.
17   Q.  And it describes certain people who
18   had small other interest in Effex?
19   A.  I see that.
20   Q.  And then it says, "None of the
21   foregoing persons were ever affiliated with
22   FXCM."
23         Do you see that?
24   A.  Yes.
25   Q.  Is that a true statement to your

CONFIDENTIAL -  JOHN DITTAMI

1
2    knowledge?
3    A.  That's a true statement to my
4    knowledge, yes.
5    Q.  Okay.  And it says, "Since March of
6    2010, Effex Capital hired, approximately, 30
7    full-time employees, consultants, independent
8    contractors."
9          Do you see that?
10   A.  Yes.
11   Q.  Did Mr. Niv decide who Effex hired?
12   A.  No.
13         MR. BAKER:  Objection to form.
14   Q.  Did William Ahdout decide those
15   hirings?
16         MR. BAKER:  Objection to form.
17   A.  No.
18   Q.  Who made those hiring decisions?
19   A.  Myself and/or the managers who the
20   hire would report to.
21   Q.  Anybody from FXCM?
22   A.  No.
23   Q.  Okay.  If you go to Page 4, there's a
24   conclusion.
25         Do you see that?

CONFIDENTIAL - JOHN DITTAMI
1
2     But I have to look closely.
3         Q.  If we can go to Paragraph 60.
4         A.  Okay.
5         Q.  Right.  If you go to Paragraph 60,
6     you identified certain statements that were
7     posted by the NFA, correct?
8         A.  Correct.
9         Q.  And then you identify in Paragraph 61
10    additional statements posted by the NFA.
11        You see that?
12        A.  Yes.
13        Q.  And then you say, in Paragraph 62,
14    "The foregoing statements in Paragraph 60A
15    through D and 61A through E are above all false
16    and defamatory."
17        Do you see that?
18        A.  Yes.
19        Q.  Did you believe that those statements
20    by the NFA were false?
21        A.  I believe the statements by the NFA
22    were false.
23        Q.  I'm going to focus on 60B, okay.
24    Now --
25        A.  Okay.

CONFIDENTIAL - JOHN DITTAMI
1
2         Q.  -- "Effex's relationship with FXCM
3     amounted to a dealing desk model"; did you agree
4     with the NFA on that?
5         A.  No.
6         Q.  Why?  Why not?
7         A.  The dealing desk model assumed that
8     the retail definition of dealing desk model is
9     that you would be on the other side of, you know,
10    customers made money, you made money.  If
11    customers lost -- I'm sorry.  If customers made
12    money, you lost money.  If they lost money, you
13    made money.
14        I can't speak to what FXCM but
15    Effex's P&L had nothing to do with it.  I could
16    make money, customers could make money, I could
17    lose money, customers could make money.  There
18    was no -- I didn't have a mirrored position to
19    the customer's.
20        Q.  It says, "Effex was controlled by
21    FXCM."
22        Was that a true statement by the NFA?
23        A.  That was a false statement by the
24    NFA.
25        Q.  It says, "In exchange for the order

CONFIDENTIAL - JOHN DITTAMI
1
2     flow directed to Effex and paid rebates to FXCM
3     that amounted at times as much as 70 percent of
4     Effex's profits."
5         Was that true?
6         A.  That's not true.
7         Q.  Do you remember submitting to the
8     CFTC --
9         A.  I want to be -- I want to be
10    specific.
11        Q.  Go ahead.
12        A.  In exchange for order flow -- oh,
13    yeah, no, that's false.  That -- D was not true.
14        Q.  Do you, in fact, recall an accounting
15    done by an accounting firm hired by Effex -- an
16    auditing firm by Effex and submitted to the CFTC
17    about what percentage of its revenue after
18    expenses, ultimately, went to Effex in the form
19    of, let's say, order flow?
20        A.  Yes.
21        MR. PAYKIN:  That went to FXCM.
22        Q.  To FXCM in the form of order flow?
23        A.  Yes.
24        Q.  Do you recall that audit showing
25    anything close to 70 percent being provided to

CONFIDENTIAL - JOHN DITTAMI
1
2     FXCM during the 2010 to '14 period?
3         A.  I can't remember exactly.  In 2010,
4     it was in the 60s.  But after that, no, the
5     percentages continued to decline each year.
6         Q.  In fact, you recall in 2014 it was
7     somewhere in the 20 percent?
8         MR. PAYKIN:  Don't guess.
9         A.  That sounds reasonable.
10        MR. PAYKIN:  Don't guess if you don't
11    remember, John.
12        A.  I don't have the document in front of
13    me, no.
14        Q.  And 61A, if you go to 61A, the NFA
15    stated that, "FXCM provided Effex access to data
16    for which Effex could derive customer order and
17    position information."
18        Was that a true statement?
19        A.  No.
20        Q.  You mentioned earlier that there was
21    also an injunction that you sought of the NFA in
22    that case.
23        Do you remember that?
24        A.  Yes.
25        Q.  Do you recall submitting affidavits

91 (Pages 358 - 361)

Page 366

CONFIDENTIAL - JOHN DITTAMI

1    CONFIDENTIAL - JOHN DITTAMI
2    A. Yes.
3    Q. You say, "Neither FXCM nor any of its
4    principals ever owned any part of Effex and Effex
5    never paid FXCM for any business Effex transacted
6    with non-FXCM counterparties."
7        Do you see that?
8    A. Yes.
9    Q. Is that a true statement?
10   A. Yes.
11   Q. "In addition, there is no
12   relationship or correlation between Effex's
13   profits and losses and FXCM's customers profits
14   and losses as is the case with the dealing desk
15   model."
16       Do you see that?
17   A. Yes.
18   Q. Was that a true statement?
19   A. Yes.
20   Q. You say at the end of this paragraph,
21   "Also unlike the dealing desk, Effex did not have
22   knowledge, customer positions, stops, limits or
23   resting orders nor did Effex derive this
24   information from any source."
25       Was that a true statement?

Page 367

1    CONFIDENTIAL - JOHN DITTAMI
2    A. Yes.
3    Q. Did you believe that Effex's superior
4    execution created an economic advantage for
5    FXCM's customers?
6        MR. BAKER:  Objection to form.
7    A. Yes.
8    Q. If you go to Paragraph 33?
9    A. Okay.  I'm on Paragraph 33.
10   Q. You say in B, "A transaction cost
11   analysis focusing on rejections of trade
12   execution requests shows that Effex's inclusion
13   as a liquidity provider of FXCM generated 80
14   million of value for FXCM."
15       Do you recall that?  Do you see that?
16   A. Yes.
17   Q. Whose transaction cost analysis?
18   A. This is the transaction cost analysis
19   my quants would have completed.
20   Q. You then say in C, "A transaction
21   cost analysis focusing on bill trade execution
22   requests shows Effex reduced FXCM's customer
23   slippage by more than $110 million."
24       Do you see that?
25   A. Yes.

Page 368

1    CONFIDENTIAL - JOHN DITTAMI
2    Q. Whose analysis was that?
3    A. It would also be from my quants.
4    Q. Do you have any reason to doubt that
5    analysis?
6    A. No.
7    Q. Did Effex provide liquidity to other
8    FX companies other than FXCM?
9    A. Yes.
10   Q. About how many?
11   A. I think there are 30 counterparts in
12   total over the years, roughly.
13   Q. Did FXCM tell Effex it's not allowed
14   to do business with other counterparties?
15   A. No.
16   Q. I want to go to -- you also submitted
17   a reply affidavit in connection with that
18   injunction motion.  Let me load that up as
19   Exhibit 72.  Let me know when you see that.
20       (Deposition Exhibit 72, Reply
21   Affidavit of John Dittami in Effex Capital and
22   John Dittami v. NFA, was marked for
23   identification.)
24       MR. ENNIS:  It should be up now.
25   A. Okay.  Okay, I have 72 open.

Page 369

1    CONFIDENTIAL - JOHN DITTAMI
2    Q. Have you seen this document before?
3    A. Yes.
4    Q. Is this a reply affidavit that you
5    submitted in August of 2017 in connection with
6    your lawsuit against the NFA?
7    A. It's the reply affidavit I've
8    submitted, yes.  It's dated August 17th.  Hold
9    on.
10   Q. And, again, you made this under oath?
11   A. I made this under oath; August 21st.
12   Q. If you go to Paragraph 3.
13   A. Yes, I'm there.
14   Q. You say at the last sentence, "At all
15   times Effex and FXCM maintained separate books
16   and records and never commingled funds."
17       Do you see that?
18   A. Yes.
19   Q. Is that a true statement?
20   A. Yes.
21   Q. If you go to Paragraph 15.
22   A. I'm on Paragraph 15.
23   Q. Are you aware that this is a
24   securities class action, this lawsuit?
25   A. Yes.

93 (Pages 366 - 369)

CONFIDENTIAL - JOHN DITTAMI

1

2     Q. Alright.  Are you aware that the
3  beginning of the class period in this case is
4  March 2012?
5     A. I don't know.  I don't know that
6  detail.
7     Q. If you go to Paragraph 15 of your
8  affidavit or reply affidavit in the handle there.
9  You say, "Effex did not share space with FXCM
10  since early 2011."
11        Do you see that?
12     A. Yes.
13     Q. Is that a true statement?
14     A. Yes.
15     Q. You say, "Effex did not use FXCM's
16  prime of prime relationship since the summer of
17  2010."
18        Was that a true statement?
19     A. Yes.
20     Q. You said, "Effex paid back all prime
21  of prime margin funding to FXCM by the summer of
22  2010."
23        Was that a true statement?
24     A. Yes.
25     Q. You say, "Effex did not use previous

CONFIDENTIAL - JOHN DITTAMI

1

2  quote in the reference manner since 2010."
3        Was that a true statement?
4     A. Yes.
5     Q. Are you aware that FXCM did not even
6  become a public company until December of 2010?
7     A. I am aware that they didn't become
8  public to the end.  You just told me December.  I
9  wouldn't know the exact month.
10     Q. Okay.  It says, "Effex reimbursed
11  FXCM for every dime it expended in developing the
12  trading system by the summer of 2010."
13        Was that a true statement?
14     A. Yes.
15     Q. You say, "Effex's payments to FXCM
16  were based on per million dollar order flow per
17  contract which were paid regardless of whether
18  Effex mailed a profit."
19        Was that a true statement?
20     A. Yes.
21     Q. You say, "Moreover, as CFTC stated,
22  such payments ceased in 2014."
23        Was that a true statement?
24     A. Yes.
25     Q. In Paragraph 16, in the middle you

CONFIDENTIAL - JOHN DITTAMI

1

2  say, "In stating that Effex's use of hold timer
3  was egregious due to lack of asymmetrical
4  tolerance configurations, NFA ignored that.  In
5  2010, Effex only used hold timer seven days,
6  rarely utilized if thereafter, infrequently used
7  it with tolerance configurations and assure
8  asymmetrical price improvements to FXCM's
9  customer's benefit and Effex's detriment."
10        Was that a true statement?
11     A. Yes.
12     Q. You then say, "Again, Effex's profits
13  and loss is not and was never correlated to any
14  customer's profit and loss including but not
15  limited to FXCM."
16        Was that a true statement?
17     A. Yes.
18     Q. And you then finish with, "In
19  addition, Effex did not have access to FXCM's
20  customer resting, stop limits" and positions --
21  "or positions and was only rather trade when
22  offered best price."
23        Do you see that?
24     A. Yes.
25     Q. In Paragraph 17 you say, "FXCM

CONFIDENTIAL - JOHN DITTAMI

1

2  provided Goldman Sachs, Citibank and Commerce
3  Bank pricing advantages through May 2010."
4        Was that a true statement?
5     A. Yes.
6     Q. Do you know if FXCM ever had a pay
7  for flow relationship with anyone other than
8  Effex?
9     A. I don't know.  I believe they did
10  but...
11     Q. Okay.
12     A. Actually, I believe they didn't for
13  the period involved.
14     Q. You were shown at the beginning of
15  your deposition a CFTC transcript of a deposition
16  you gave in April 2016.
17     A. Okay.
18     Q. Those are Exhibits 1 and 2 of your
19  deposition today?
20     A. I remember seeing them, yep.
21     Q. Okay.  You testified in your
22  deposition as follows.
23        You were asked by the CFTC, "Did the
24  EES divisions cease to be a division of FXCM
25  because it was a concern that it could be seen as

94 (Pages 370 - 373)