# Exhibit 6

Page 1

1

2            UNITED STATES DISTRICT COURT

         FOR THE SOUTHERN DISTRICT OF NEW YORK

3

     In re:                      :

4                                :  Master File No.

     Global Brokerage, Inc.   :  1:17-cv-00916-RA

5    F/k/a FXCM, Inc.          :

     Securities Litigation     :

6    ----------------------    :

7                   CONFIDENTIAL

8            REMOTE VIDEO DEPOSITION OF:

9                    DROR NIV

10            THURSDAY, FEBRUARY 11, 2021

11

12

13

14

15

16

17

18

19

20

21

22

23

24     REPORTED BY:

     SILVIA P. WAGE, CCR, CRR, RPR

25

Page 42

CONFIDENTIAL - DROR NIV
1
2     Q.  Was it in 2010?
3     A.  Yes.
4     Q.  Were you responsible for making the
5  final decision to take FXCM public?
6     A.  The Board was and, you know, as
7  Chairman of the Board, I was part of that.
8     Q.  Okay.  And do you recall when FXCM's
9  initial registration statement was filed with the
10  SEC?
11     A.  I don't recall the exact date.  I
12  want to say probably around September of 2010,
13  maybe August, around that time.
14     Q.  Okay.  And did FXCM take any steps to
15  prepare the company for going public before the
16  registration statement was filed?
17     A.  Yes.
18     Q.  And in a broad sense, what were those
19  steps?
20     A.  We made lots of, you know, lots of
21  corporate governance changes, lots of, you know,
22  different -- I don't recall now the -- this is
23  over ten years ago, but, you know, I remember
24  lots of changes.
25     Q.  Do you remember what say a couple of

Page 43

CONFIDENTIAL - DROR NIV
1
2  the most significant changes that the company had
3  to make for?
4     MR. DAHAN:  Objection to form.
5     A.  Again, I don't recall because this is
6  11 years ago.  But I know we had to get external
7  board members that were not existing shareholders
8  and, you know, independent Board members because
9  it was an MIC listed company, so you had to have
10  majority independent board members, a whole bunch
11  of things around there.
12     Q.  Were there any changes that the
13  company had to make to its operations before
14  going public?
15     A.  I don't recall at the time.
16     Q.  Were there any particular compliance
17  or legal concerns that the company had to address
18  as it prepared to go public?
19     A.  I don't recall specifics.
20     Q.  Were you aware of any contractual
21  issues that needed to be cleared up before FXCM
22  went public?
23     A.  Again, I don't recall.  I mean, there
24  was -- I'm sure there was a lot.  I do not recall
25  every little detail, you know, what it was at the

Page 44

CONFIDENTIAL - DROR NIV
1
2  time.
3     Q.  Were you aware of any issues relating
4  to Effex that needed to be addressed before FXCM
5  went public?
6     MR. DAHAN:  Objection to form.
7     A.  We had a debate about whether to
8  continue our no dealing desk model or to go back
9  to the dealing desk model and we had an ongoing
10  debate for the last few years of -- prior to
11  going public.  And we decided that -- you know,
12  so if we were -- you know, the decision to
13  continue and move all the business to the no
14  dealing desk model, the rest of the business, if
15  you will, no dealing desk model was made, then
16  that decision is the decision that we basically
17  made so we could not have a dealing desk inside.
18     Q.  And did that relate to Effex?
19     A.  That related, yes, to -- so two
20  things, one, that John could not be an employee
21  of FXCM and, two, that we were not going to buy
22  Effex Capital.
23     Q.  And "John" is John Dittami?
24     A.  Yes.
25     Q.  And why was it your understanding

Page 45

CONFIDENTIAL - DROR NIV
1
2  that John could not be an employee of FXCM at
3  that time?
4     MR. DAHAN:  Objection to form.
5     A.  It's just a direction that we wanted
6  to move in.
7     Q.  When you said, "could not be an
8  employee," was it your understanding that there
9  was some rule or law or issue that would prevent
10  him from being an employee?
11     A.  It was just the optics of, you know,
12  how it would look like.
13     Q.  And could you elaborate a little bit
14  on what you mean by "how it would look like"?
15     A.  We wanted to have only external
16  entities as market makers.
17     Q.  And at the time that FXCM went
18  public, was Effex a liquidity provider for FXCM?
19     A.  Correct.
20     Q.  And you talked about the debate over
21  whether to have a dealing desk versus no dealing
22  desk and how that relates to Effex.
23     Was -- what part of that debate was
24  shaped by FXCM going public at that time?
25     A.  Well, it was shaped by -- you know,

12 (Pages 42 - 45)

Page 46

CONFIDENTIAL - DROR NIV

1      CONFIDENTIAL - DROR NIV
2  it didn't matter public or not.  It was shaped by
3  what was going to be best, you know, for the
4  interest of the firm and the interest of its
5  clients in terms of, you know, can we provide a
6  good trading -- you know, a superior trading
7  experience to other firms, which was our
8  competitive advantage.  And, you know, we had a
9  debate internally ongoing even after going
10  public, should we go back, and that's why we had
11  debates whether to acquire Effex or not going
12  forward, which is why there's so many documents
13  about it, but in the end we decided not to buy
14  Effex Capital.
15      Q.  Okay.  And to sort of wrap this up, I
16  guess, this...
17          Was there anything about FXCM going
18  public that played a factor in the debate that
19  you were discussing earlier about dealing desk
20  versus no dealing desk and Effex's involvement?
21      A.  The debate is really not specific to
22  Effex.  It's about specific to once you're a
23  public company, your results must be more
24  consistent and predictable.  And the results, you
25  know, just needs -- and you need to grow and

Page 47

CONFIDENTIAL - DROR NIV

1      CONFIDENTIAL - DROR NIV
2  therefore, you know, we -- cause shareholders are
3  buying it in order for a stock to go up.
4  Obviously, as the largest shareholders in the
5  company, we wanted the stock to go up because we
6  would be the disproportionate beneficiaries, you
7  know, of such a thing.  And, you know, for that
8  to happen, we needed to keep being competitive
9  and needed to being on whatever provided the best
10  customer experience and most competitive customer
11  experience is what was going to, you know, carry
12  us forward and that -- Effex is part of that
13  conversation, right.
14      Q.  Okay.  Once FXCM went public, did you
15  have any involvement as CEO with FXCM's public
16  filings with the SEC?
17      A.  Yes.
18      Q.  And while you were CEO, what was your
19  role with respect to FXCM's annual or quarterly
20  reports with the SEC, specifically?
21      A.  I would have to sign, right.  And I
22  had to present, you know, in the conference
23  calls, the earnings conference call to investors
24  the results.
25      Q.  Who at FXCM was chiefly involved in

Page 48

CONFIDENTIAL - DROR NIV

1      CONFIDENTIAL - DROR NIV
2  drafting FXCM's annual and quarterly reports?
3      A.  Robert Lande, the CFO.
4      Q.  Thank you.
5          Was there anyone else who was
6  primarily involved in drafting.
7      A.  Robert Lande's staff.
8      Q.  Who at FXCM was involved or primarily
9  involved in reviewing the annual and quarterly
10  reports?
11          MR. DAHAN:  Objection to form.
12  "Reviewing" when?
13      A.  Define "reviewing."
14      Q.  Did you review FXCM's annual and
15  quarterly reports before they were filed?
16      A.  Of course.
17      Q.  And other than yourself, was there
18  anyone else involved in reviewing FXCM's annual
19  and quarterly reports before they were filed?
20      A.  I mean, we had Ernst & Young as an
21  auditor and, you know, Counsel that -- you know,
22  outside Counsel in a big firm in Manhattan, I
23  forgot their name, that reviewed it.  That's for
24  sure.  And the Board also reviewed it.
25      Q.  Okay.  While you were reviewing the

Page 49

CONFIDENTIAL - DROR NIV

1      CONFIDENTIAL - DROR NIV
2  annual or quarterly reports, if you had any
3  questions or concerns about the contents, did you
4  have access to all the information you would need
5  to satisfy your questions or concerns?
6      A.  Yes.
7      Q.  Did you have final signoff on the
8  content of the annual and -- FXCM's annual and
9  quarterly reports before they were filed?
10      A.  It was me and the Board, yes.
11      Q.  And would FXCM's annual or quarterly
12  reports with the SEC be filed without your
13  signoff as CEO?
14      A.  No.
15      Q.  And did that ever happen while you
16  were CEO?
17      A.  Not that I recall.
18      Q.  Okay.  So I'm going to ask you to
19  look back at Exhibit Share starting on, I
20  believe, this should be Exhibit 3.
21          (Deposition Exhibit 3, Form 10-K for
22  the Fiscal year ended December 31, 2011, was
23  marked for identification.)
24      Q.  And just let me know when you have
25  that pulled up.

13 (Pages 46 - 49)

Page 62

CONFIDENTIAL - DROR NIV

1  (entry, stop and limit) with dealing desk
2  execution, why can't you see them with dealing
3  desk execution?"  Is that a section that you
4  would have reviewed or approved the content for?
5      A.  Yes.
6      Q.  And the answer to that question, not
7  just the question itself, to be clear?
8      A.  You want me to answer that question?
9      Q.  No, no, I meant by -- would you have
10 been involved in the review or approval of the
11 answer to that question here --
12     A.  Yes, yes.
13     Q.  -- as opposed to the question itself?
14     A.  Yes.
15     Q.  I just wanted to clarify.
16     A.  Yeah, when I say, I approved a
17 question, I approved the answer.
18     Q.  Yeah, thank you.  I just wanted to
19 make sure we had a clear record on that.
20     MR. BAKER:  Okay.  I'm about to move
21 into a different section.  We've been going about
22 an hour.  Do we want to take a break now or push
23 through?  Either is fine with me.
24     MR. DAHAN:  We can take a short

Page 63

CONFIDENTIAL - DROR NIV

1  break.  That's fine.
2      MR. BAKER:  Alright.  You want to
3  take five?
4      MR. DAHAN:  Sure.  Thank you.
5      THE VIDEOGRAPHER:  Off the record at
6  10:51.
7      (Recess taken 10:51 to 11:00 a.m.)
8      THE VIDEOGRAPHER:  On the record
9  11:00 a.m.
10     Q.  Welcome back, Mr. Niv.
11         Earlier you mentioned John Dittami.
12         But who is John Dittami?
13     A.  He is the CEO of Effex Capital.
14     Q.  And when did you first meet Mr.
15 Dittami?
16     A.  I don't recall the exact date, but it
17 was late 2000 sometime.
18     Q.  And did Mr. Dittami ever work for
19 FXCM?
20     A.  Yes.
21     Q.  Do you recall when that was?
22     A.  It was -- I don't recall the exact
23 dates, but it was for a few months before it went
24 public.  I don't recall exactly when.

Page 64

CONFIDENTIAL - DROR NIV

1      Q.  Was there a particular venture or
2  project that Mr. Dittami worked on while at FXCM?
3      A.  Mr. Dittami was hired, essentially,
4  to help us figure out the problems we were having
5  -- to analyze data and help us figure out the
6  problems we were having with external liquidity
7  providers, other market makers and help fix those
8  issues.  That was the reason he was...
9      Q.  Sorry, you're trailing off at the end
10 there.
11     A.  So the original purpose was for him
12 to do data analysis and to go figure out the --
13 why we were having problems with some of our --
14 many of our liquidity providers.
15     Q.  And other than the sort of analysis
16 figuring out these problems, was there any other
17 project that Mr. Dittami worked on while he was
18 at FXCM?
19     A.  And so, once we could not filing out
20 -- once we analyzed the problems and the issues
21 the other people were having, we tried to get
22 them to fix it and when they would not
23 sufficiently fix them, we hired Mr. Dittami to
24 potentially look into basically setting up a

Page 65

CONFIDENTIAL - DROR NIV

1  market making operation, you know, to fix it.
2      Q.  And that "operation" was within FXCM?
3      A.  Yeah.  So, as part of the debate that
4  we were ongoing so that if we could not fix these
5  problems, that we would have to, you know, we
6  would have to -- we would have to end the no
7  dealing desk execution model because we would
8  have withdraw from it and then, you know, we
9  would need to substitute it with something.  And
10 so Mr. Dittami would be -- would do that.
11     Q.  And the market making operation, did
12 that have a name that it was referred to at FXCM?
13     A.  I don't -- I don't recall exactly,
14 EES or one of those types of things.
15     Q.  "EES" you said?
16     A.  Yeah.  I don't recall the exact name.
17 I know when I see it.
18     Q.  Okay.  And, to your knowledge, were
19 there any other names used at FXCM to refer to
20 Mr. Dittami's market making operation?
21     MR. DAHAN:  Objection to form.
22     A.  I don't recall the terminology.  You
23 know, I recall the substance, not the
24 terminology.

17 (Pages 62 - 65)

Page 70

CONFIDENTIAL - DROR NIV

1
2    Q. Which side of that debate were you
3  on?
4    A. I was on the side of continuing
5  external execution.
6        Mr. Ahdout was on the withdraw from
7  external execution.
8    Q. Okay. And, I guess, to be clear, so
9  while Mr. Dittami and his market making
10 operations were still at FXCM, when you say they
11 continue external execution, was -- did you
12 consider Mr. Dittami's operation to be external
13 execution at that time?
14   A. Mr. Dittami was never operational,
15 you know, inside of FXCM. He conducted studies,
16 tests, you know, but we never went live.
17   Q. And in those "tests," was that a test
18 -- does that mean using his operation to provide
19 liquidity for customers on FXCM's no dealing desk
20 model?
21       MR. DAHAN: Objection to form.
22   A. By "test," I mean, we are basically,
23 yes, we are using him as a liquidity provider,
24 right, to see if he improves the customer
25 experience.

Page 71

CONFIDENTIAL - DROR NIV

1
2    Q. And was there a particular segment of
3  FXCM's trading volume that you intended for Mr.
4  Dittami's operation to provide liquidity for?
5    A. It was different segments. It was
6  going to start in steps, you know -- you know,
7  for different segments of the clients that were
8  having more difficulties than others or we
9  thought -- it's not even "difficulties"; where we
10 thought that we could significantly improve it
11 above what it is today and -- or at the time.
12       The -- you know, do I remember the
13 exact sequence of how that went, no. But it was
14 not meant to be rolled out for everyone
15 immediately all at once.
16   Q. Do you remember what particular
17 segments? Was retail one of those segments?
18   A. Yes.
19   Q. Okay. And at the time period still
20 while Mr. Dittami was at FXCM, was the intent for
21 his operation to provide liquidity to FXCM retail
22 customers?
23   A. If we were to withdraw from the
24 external execution model, that would be the
25 intent, yes.

Page 72

CONFIDENTIAL - DROR NIV

1
2    Q. Okay. When FXCM hired Mr. Dittami,
3  did it enter into an employment agreement with
4  him?
5    A. Yes.
6    Q. What was your role with respect to
7  FXCM hiring Mr. Dittami?
8    A. I approved it.
9    Q. Were you involved at any other point
10 in the hiring process?
11   A. I interviewed him.
12   Q. Were you involved in negotiating the
13 terms of Mr. Dittami's employment agreement?
14   A. Mr. Ahdout did all the terms.
15   Q. Did Mr. Ahdout inform you or keep you
16 aware of major terms that went into Mr. Dittami's
17 employment agreement?
18   A. Yes.
19   Q. I'm going to introduce another
20 exhibit. These things might take a little bit
21 longer because they were not preloaded, so bear
22 with me.
23       (Deposition Exhibit 31, Employment
24 Agreement 9/4/09 between Forex Capital Markets
25 LLC and John Dittami GLBR_00110697 to

Page 73

CONFIDENTIAL - DROR NIV

1
2  GLBR_00110712 marked Confidential, was marked for
3  identification.)
4    Q. So this will be -- you might have to
5  refresh the folder in Exhibit Share. This will
6  be Exhibit 31. And, first, just please let me
7  know when you're able to see it.
8    A. Let me see. Employment agreement, I
9  see it.
10   Q. Okay. And I'm mostly going to ask
11 you some general questions, but feel free to
12 review the entire document as you need.
13       MR. BAKER: For the record,
14 Exhibit 31 GLBR 110697.
15   Q. Mr. Niv, just let me know when you're
16 ready.
17   A. Okay, let me see. You know, I don't
18 want to take up time reviewing 31 pages, so if
19 there are any pages you want to ask about.
20   Q. Yeah. I'm just looking for you to
21 familiarize yourself with it generally, but I can
22 go ahead and ask you. You know, like I said
23 before, you can always review the entire thing
24 for context, if you need it.
25       My first question, Mr. Niv, is, do

19 (Pages 70 - 73)

Page 74

CONFIDENTIAL - DROR NIV

1  CONFIDENTIAL - DROR NIV
2  you recognize this document?
3      A. Yes.
4      Q. And is this the Employment Agreement
5  between John Dittami and Forex Capital Markets
6  LLC?
7      A. I believe so.
8      Q. When did you first see this
9  agreement?
10     A. I don't remember the date.
11     Q. Do you remember when you -- excuse
12 me.
13     Was it in 2009?
14     A. I don't -- I don't review legal
15 documents.  So, you know, would I have even seen
16 a document in 2009, no.  Do I know the major, you
17 know, compensation items, yes.
18     Q. Okay.  And so is it fair to say you
19 first became aware of this agreement -- and I'm
20 not asking for a particular date -- but around
21 before or when it was signed?
22     A. Of course, yes.
23     Q. Okay.  On the first page in the first
24 "whereas" clause, the agreements reads, "The
25 company and the executive desire to establish a

Page 75

1  CONFIDENTIAL - DROR NIV
2  new division of the company managing certain of
3  the company's algorithmic endeavors, which shall
4  include but not be limited to market making,
5  proprietary trading, algorithmic execution
6  services."  And then it defines that as the
7  "venture."
8      Do you see that?
9      A. Yes.
10     Q. And do you understand that to be the
11 same venture as we were just talking about for
12 Mr. Dittami at FXCM?
13     A. Yes.
14     Q. And did you ever consider this
15 venture to be a division of FXCM?
16     A. Had it got off the ground, that's
17 what it was meant to be.
18     Q. Okay.  And moving down to the Section
19 No. 1 "Employment."
20     Do you see the paragraph under that?
21     A. Yes.
22     Q. When Mr. Dittami was employed by
23 FXCM, did he hold the title of Managing Director?
24     A. Yes.
25     Q. Did he hold any other titles that you

Page 76

1  CONFIDENTIAL - DROR NIV
2  were aware of?
3      A. I am not aware.
4      Q. And moving to the next page, I'd like
5  to focus your attention on Sections 4 and 5.
6      Were you aware in 2009 that Mr.
7  Dittami's compensation was a base salary of
8  $250,000 plus 30 percent of the profits generated
9  by his venture?
10     A. Yes.
11     Q. And so was it your understanding that
12 at this time FXCM would split the trading profits
13 generated by his venture with Mr. Dittami with
14 FXCM keeping 70 percent, if and when it traded?
15     MR. DAHAN:  Objection to the
16 reference of "his venture."  Looking at the
17 document it doesn't say its "his venture" but...
18     Other than that objection, you can
19 answer.
20     A. The split was to be 70/30 had this
21 venture got off the ground, yes.
22     Q. Okay.  And when FXCM hired Mr.
23 Dittami, did you have an expectation as to the
24 amount of profits that this market making
25 operation would generate on an annual basis?

Page 77

1  CONFIDENTIAL - DROR NIV
2      A. We had no idea to do, that's why we
3  were testing and we were experimenting phase by
4  phase, client by client.
5      Q. Did you have any expectation as to
6  the order of magnitude of trading profits that it
7  might accomplish when Mr. Dittami was first hired
8  in terms of millions, tens of millions,
9  thousands?
10     A. Millions.
11     Q. Okay.  In going back to Page 1 under
12 Section 2, do you see a reference to a $3 million
13 initial investment?
14     A. Page 2.
15     Q. Page 1, Section 2.
16     A. Oh, yes, okay.
17     Q. Did FXCM -- sorry?
18     A. I see it, yes.
19     Q. Okay.  Did FXCM provide any of that
20 initial investment to Mr. Dittami?
21     MR. DAHAN:  Objection.  There's no
22 reference here that it's to Mr. Dittami.  Please
23 come on stop.  It says, "to the venture."  Can
24 you -- can you --
25     MR. BAKER:  Okay.  I'll --

20 (Pages 74 - 77)

CONFIDENTIAL - DROR NIV

1
2    MR. DAHAN:  Come on.
3    MR. BAKER:  I'll rephrase.
4    MR. DAHAN:  Thank you.
5    Q.  Did FXCM provide any of the initial
6  investment referenced here to the venture
7  referred to in this contract?
8    A.  I believe a little bit of it.
9    Q.  Do you recall, approximately, how
10  much, was it a million, less, more?
11    A.  It was not a lot.  I don't recall.
12    Q.  And do you recall if that amount of
13  money was paid back?
14    A.  No.  I mean, it -- that money was --
15  again, we stopped the venture.
16    Q.  Okay.  I'm going to show you the next
17  exhibit.
18    (Deposition Exhibit 32, e-mail string
19  GLBR_00152843 & GLBR_00152844 marked
20  Confidential, was marked for identification.)
21    Q.  This will be Exhibit 32.  And please
22  let me know when you can see it.
23    A.  I can see it.
24    Q.  Okay.  Please take a minute to
25  review.

CONFIDENTIAL - DROR NIV

1
2    MR. BAKER:  For the record,
3  Exhibit 32 is GLBR 152843.
4    Q.  Mr. Niv, just let me know when you're
5  ready.  I'm just going to be focusing down on the
6  e-mail in the second page.
7    A.  I'm ready.
8    Q.  Okay.  So I'll note that you're not
9  on the top e-mails in this chain, but you appear
10  to be on the first two e-mails at the bottom of
11  this chain here.
12    And is this an e-mail chain between
13  Mr. Dittami and Mr. Ahdout, yourself,
14  Mr. Yusupov, Mr. Grossman and Mr. Sakhai, which
15  then breaks off later to some of those
16  participants?
17    A.  I'm sorry.  Are you asking me if it
18  is?
19    Q.  Yes.
20    A.  That's what it looks like.
21    Q.  Okay.  And in the bottom e-mail from
22  Mr. Dittami, the caption of the e-mail starts at
23  the bottom of the Page 1 but the body is on
24  Page 2.
25    Do you see that?

CONFIDENTIAL - DROR NIV

1
2    A.  Yes.
3    Q.  And Mr. Dittami writes, We went live
4  today to FXCM Japan accounts only -- I'm sorry.
5  "We went live today to FXCM Japan accounts only
6  for 30 minutes"...
7    A.  It said, "two pairs."
8    Q.  Yes.
9    A.  Yes.
10    Q.  And this e-mail was March 19, 2010.
11    Do you see that?
12    A.  Yes.
13    Q.  Do you know if Mr. Dittami was
14  referring to his venture at -- to the venture at
15  FXCM in this e-mail?
16    A.  Yes.
17    Q.  What is "FXCM Japan"?
18    A.  Subsidiary of FXCM Holdings.
19    Q.  A subsidiary similar in the way that
20  FXCM US was a subsidiary, another regulated
21  entity --
22    A.  Correct.
23    Q.  -- in a different --
24    A.  Right.
25    Q.  -- in the space in Japan?

CONFIDENTIAL - DROR NIV

1
2    A.  -- obviously in Japan, yes.
3    Q.  Thank you.
4    MR. DAHAN:  You have to wait for him
5  to finish, so this way the Court Reporter can get
6  both answers.
7    A.  Sorry.
8    Q.  Sorry.  I think that was me too.  So
9  we'll both try to be better at that.
10    Okay.  So the accounts that are being
11  referred to here, do you know if these are retail
12  accounts?
13    A.  I believe so.
14    Q.  And is it your understanding that at
15  this time, these accounts would have been trading
16  in FXCM's no dealing desk model?
17    A.  I don't recall.  Most of the accounts
18  at the time were but not all of them.
19    Q.  And when Mr. Dittami says, "We went
20  live today to FXCM Japan accounts," what do you
21  understand that to mean?
22    A.  This was a test conducted for
23  30 minutes on two pairs FXCM offered more for 40
24  currency payors to clients.  So this was a test
25  to see how, you know, it performs in a live

Page 82

CONFIDENTIAL - DROR NIV

1
2 environment.
3      Q.  And this test were these actual
4 trades conducted, though?
5      A.  Yes.
6      Q.  In the next paragraph of the e-mail
7 about the middle of the second line, Mr. Dittami
8 writes, "P&L per MM was far above expectations."
9      Do you see that?
10     A.  Yes.
11     Q.  And in this context, does "P&L per
12 MM" refer to the venture's trading profits per
13 million units of volume?
14     A.  Yes.
15     Q.  And do you understand "P&L" to mean
16 profit and loss?
17     A.  Correct.
18     Q.  And that's the same whether it's
19 expressed PNL or P&L?
20     A.  Correct.
21     Q.  And "per MM," do you generally
22 understand that to mean per million?
23     A.  Yes.
24     Q.  Okay.  And that was going to speed
25 things up for later today.  But if there's ever a

Page 83

CONFIDENTIAL - DROR NIV

1
2 question or you're not sure about it, feel free
3 to ask.
4      Did you have any discussions with Mr.
5 Dittami or others at FXCM about expectations for
6 the venture's P&L?
7      A.  I mean, we, obviously, had
8 discussions where, you know, he presented what he
9 thought would happen.  We had no -- you know, he
10 was -- we did not know him very well, so he was
11 new.  So we wanted to conduct tests to see how it
12 was going to go.
13     Q.  And so, when he says that, "P&L per
14 million was far above expectations," was that --
15 was it your understanding that those were his
16 expectations or was that something shared, was
17 there something, in particular, that he was
18 referral to that you're aware of?
19     A.  His expectations.
20     Q.  Okay.
21     A.  Our expectation was the majority of
22 the money we make was -- is from trading with our
23 clients from the fees they pay us.  And so our
24 expectation was, if we improve, you know, the
25 trading experience, we will get more trades,

Page 84

CONFIDENTIAL - DROR NIV

1
2 right.
3      We were, you know, we went from
4 six-person operation to one of the largest retail
5 FX providers, in general, in the world, right,
6 because we had a superior customer experience,
7 you know, and we wanted to make sure that we grow
8 that experience and got as far and above what we,
9 you know, make most of our money on the venture
10 was never going to be more than a rounding error
11 in our financials.  But it was to improve our
12 execution and to ensure that we are competitive,
13 which would, obviously, be very important to
14 bottom line to ensure that, you know, our
15 customer experience, you know, is superior to
16 others.
17     Q.  Okay.  I'm introducing the next
18 exhibit.
19     (Deposition Exhibit 33, e-mail string
20 GLBR_00046387 to GLBR_00046388 marked
21 Confidential, was marked for identification.)
22     Q.  Well, I guess, just before we do
23 that, I want to clarify something in your last
24 answer.
25     I think you said that "the venture

Page 85

CONFIDENTIAL - DROR NIV

1
2 was never going to be more than a rounding error
3 in your financials."
4      A.  Correct.
5      Q.  Before when we were looking at the
6 employment contract, you were saying -- you said
7 that the general expectation was that the
8 operation would generate trading profit somewhere
9 in the millions, roughly; am I restating all of
10 that correctly?
11     A.  Correct.
12     Q.  So, that the trading profits in the
13 millions, is that what you're saying would be
14 just a "rounding error" in FXCM's financials?
15     A.  So revenues in 2010 were over
16 $300 million.  So, you know, as we made
17 $10 million or $20 million, that would be a
18 rounding error.
19     Q.  Okay.  That's fine.  I just wanted to
20 clarify the order of magnitude that we're talking
21 about there.
22     Okay.  So, to the next exhibit, this
23 is Exhibit 33.  Please let me know when you can
24 see it.
25     A.  I can see it.

22 (Pages 82 - 85)

Page 90

CONFIDENTIAL - DROR NIV

1   what?  I'm sorry.
2       A.  Outside -- again, if it's testing, it
3   was testing internally but, you know, once it
4   goes live for real, we only went live as Effex
5   Capital.
6       Q.  Okay.  And were you aware in 2010
7   that FXCM would allow Effex to win ties with
8   other liquidity providers?
9       A.  So somebody has to win ties.  And so
10  what you usually do in a situation that, you
11  know, if you look at the exchanges like NYSE or
12  CME, you know, these kind of major trading
13  venues, you know, the -- you first choose a price
14  prove based on best price.  But if two providers
15  have best price, how do you decide who gets
16  clicked on?
17      Generally speaking, that tie breaker
18  is decided by trading size, okay.  So the market
19  maker who offers the largest trading size wins
20  that tie.  We told Mr. Dittami that in order, you
21  know, for him to win the tie, he would have to
22  provide a larger trading size.  So, therefore, it
23  would be commensurate with the logic that is on
24  every major, you know, trading exchange in the

Page 91

CONFIDENTIAL - DROR NIV

1   world that, you know, volume -- not volume --
2   trading size is what the size -- the next most
3   important factor after price in determining who
4   wins.  So, routinely, Mr. Dittami would offer
5   trading sizes three to five times what the next
6   LP would offer.
7       Q.  And when you said -- I think you
8   said, we told Mr. Dittami that for him to win the
9   tie, he would need to have a largest trading size
10  win that tie.
11      Was that true for other liquidity
12  providers to win ties as well?
13      A.  Yeah, that's the logic of the
14  software.
15      Q.  And were there other factors that
16  went into the decision of who would win ties
17  other than the largest size that was offered?
18      A.  Yes.  So is there the -- there is
19  basically -- obviously, there's most competitive
20  price is the No. 1 factor.
21      No. 2 factor is, you know, the issue
22  of, you know, obviously, size and then there is
23  the highest quality price in terms of how -- is
24  it always available -- how is it -- excuse me,

Page 92

CONFIDENTIAL - DROR NIV

1   let me rephrase; how is it -- how available is
2   it, which is a captured really by a rejection
3   ratio, which is how often do you not honor that
4   price and want to change it because the trade has
5   gone against you.
6       And Mr. Dittami had the lowest
7   rejection rate by far of any liquidity provider
8   and lower by, you know, like 90 percent lower.
9   So, you know, one of the problems we had with
10  other liquidity providers was they were rejecting
11  trades way too frequently, which led to customers
12  needing to resubmit the order and hit the next
13  best available price creating slippage, which
14  means they paid, essentially, extra spread and we
15  wanted to minimize that, again, to keep our
16  competitive advantage.  The slippage is a major
17  issue.
18      As well as if a bank provided us with
19  a price for a small amount, even if it was most
20  competitive, we -- and we had hundreds of
21  thousands of customers trading on these prices
22  and there was more demand for that price than
23  there was size available, then the first clients
24  would get the price that they requested and then

Page 93

CONFIDENTIAL - DROR NIV

1   the next clients would, again, experience
2   slippage where they would get the next best
3   available price so we would be paying more and
4   that's, again, a normal function in the market,
5   which is why marketplaces, you know, offer
6   advantage to size, so more customers get the size
7   -- get the price that is displayed on the screen
8   than not and minimize the slippage.  That's why
9   it's best practice.
10      Q.  And FXCM with respect to breaking
11  ties, was the size offered always the first
12  priority in terms of the deciding how to break
13  the ties?
14      A.  Size and quality of price, yes,
15  meaning, how low the rejection quality -- the
16  rejections were.  That would be the next two,
17  yes.
18      Q.  So size was not always necessarily
19  the determining factor?
20      A.  Yes, because if some bank decided
21  that, you know, we had this issue with a number
22  of people who would give us very competitive
23  prices but then not honor them by a decent
24  percentage of the time, when customers needed

Page 94

CONFIDENTIAL - DROR NIV

1    CONFIDENTIAL - DROR NIV
2    them the most and therefore would cause, you
3    know, customers to actually pay, you know, too
4    much, you know, and there was -- you know, it
5    was, essentially, a misleading best price.  It
6    was not real.  Without being a low rejection
7    rate, the best price is not really the best
8    price.
9        Q.  Okay.
10       A.  It's just a bait and switch.
11       Q.  And were you involved in determining
12   -- or in setting the system for which liquidity
13   providers would win ties?
14       A.  Yes.  So, as you can see here, we at
15   times gave advantages to Dresdner Bank, to
16   Citibank, Goldman Sachs, to BNP, to other
17   institutions.  They just -- we experimented, you
18   know, prior to Mr. Dittami with lots of
19   different, you know, institutions in trying to
20   improve the trading operation for -- for our
21   clients.  It's just we're not compelling enough
22   of an improvement.
23       Q.  And once Effex started trading with
24   FXCM, was there a time when Effex did not have
25   the ability to win ties?

Page 95

1    CONFIDENTIAL - DROR NIV
2        A.  I don't recall.  I don't recall exact
3    specifics, if there was instances.  I do recall
4    the fact that we, you know, sent a scorecard to
5    all our liquidity providers and, you know, if you
6    rated too low, you were booted from the FXCM and
7    we did boot some liquidity providers off of the
8    mix or de-prioritized them more so.  And we also,
9    you know, obviously, prioritized those who did
10   better.
11       Effex was always by far and away the
12   best performer on all the metrics and there was a
13   whole slew of metrics.  And, you know, that's
14   why, you know, over the years from 2010 to 2015,
15   '14, you know, our trading spreads, you know,
16   declined by 90 percent, right.  So the
17   improvement to customers was pretty significant,
18   almost 90 percent.
19       Q.  And in the time period from 2010 to
20   let's say 2014 -- through 2014, is it fair to say
21   that Effex would win ties majority of the time?
22       A.  Yes.
23       Q.  Was it 90 percent of the time or more
24   or higher?
25       A.  I don't recall the specifics.

Page 96

1    CONFIDENTIAL - DROR NIV
2        Q.  Okay.
3        A.  Because there were -- you know, at
4    times, they were not quoting certain currency
5    pairs or, you know, there were certain customers
6    they would not -- yeah, there certain -- not
7    customers; customer segments that a, you know,
8    would not quote, so I don't recall.
9        Q.  Okay.  But in that same time period
10   from 2010 through 2014, is it fair to say that
11   Effex won ties the majority of the time for the
12   currency pairs in which they were trading with
13   FXCM?
14       A.  Yes.
15       Q.  Okay.  I'm going to show you the next
16   document.
17       (Deposition Exhibit 34, 4/12/10
18   e-mail forward from John Dittami to Alexander
19   Kochel GLBR_00002696 & GLBR_00002697 marked
20   Confidential, was marked for identification.)
21       Q.  Okay.  This is Exhibit 34.  Mr. Niv,
22   just let me know when you can see it.
23       A.  It's not -- hold on.  Okay, I can see
24   it.
25       Q.  Okay.  And please take a minute to

Page 97

1    CONFIDENTIAL - DROR NIV
2    review.
3        MR. BAKER:  As you do, I'll note for
4    the record Exhibit 34 is GLBR 2696.
5        Q.  Mr. Niv, just let me know when you're
6    ready.
7        A.  I am ready.
8        Q.  Okay.  Mr. Niv, aside from the top
9    e-mail in this chain, is this an e-mail from
10   yourself to a number of individuals including
11   Mr. Ahdout and Mr. Dittami?
12       A.  Yes.
13       Q.  And I'm going to point you down about
14   halfway down the first page.
15       A.  This is mostly -- this is to
16   employees to us.  This is Patricia, Evan and Art.
17   Those people you are referring to are CC'd.
18       Q.  Yes.  Or it seems that they're in the
19   "to" line of the e-mail here; is that right?
20       A.  Yes.
21       Q.  Okay.  And do you recall if Mr.
22   Dittami was still employed by FXCM at this time?
23       A.  I believe he officially left on the
24   14th.
25       Q.  April 14th, 2010?

25 (Pages 94 - 97)

Page 98

CONFIDENTIAL - DROR NIV

1
2   A. Yes.
3   Q. Okay. So about halfway down your
4 e-mail where you write, "Steps we need to take
5 and must be priority," and then there is a number
6 of numbered paragraphs, do you see that?
7   A. Yes.
8   Q. And in paragraph numbered two you
9 write, "Once EES is reliably capturing a lot of
10 flow, we turn off or severely handicap with extra
11 markup some of the slower banks so we have EES
12 and fast banks only winning most of the business.
13 Dresdner and UBS are at the top of the list to
14 get booted."
15   When you say, "EES," does that
16 refresh your recollection as to whether you're
17 referring to the venture at FXCM?
18   A. It's a technical configuration. So
19 it refers interchangeably to the, you know, to
20 the venture but that, you know, we'd refer to
21 Effex as EES too for a long time.
22   So it's really a technical connection
23 in combination the system that we sort of
24 designated for them on the -- you know, there's
25 no meaning for the actual word.

Page 99

CONFIDENTIAL - DROR NIV

1
2   Q. Okay. In this section of your
3 e-mail, were you talking about FXCM's retail
4 trading?
5   A. Correct. As you can see from
6 Paragraph 2, there's the problems I was talking
7 about -- Point 2. Problems I was talking about
8 is that the slow banks basically would -- you
9 know, the metrics, basically, were terrible and
10 were costing our clients, you know, a lot of
11 money.
12   So we wanted -- we had a lot of
13 liquidity providers, over 15 at the time. And we
14 wanted to, you know, the ones that were causing
15 problems for clients but could not do that
16 without sacrificing spread competition unless we
17 had Effex up and running tightening up spreads,
18 you know, and making sure that our competition is
19 still significant.
20   Q. Okay. And in this Paragraph 2 of
21 this section, were you instructing the people on
22 your e-mail to stop trades from going to certain
23 banks or to severely handicap the ability of
24 those banks to win trades by adding higher
25 markups to their prices?

Page 100

CONFIDENTIAL - DROR NIV

1
2   A. This was -- once we get comfortable
3 that we, you know, are seeing that we can live
4 without those institutions, then we will be
5 turning off some of them and handicapping others.
6 Because, again, as I explain in the last
7 question, it was the -- or second to last -- it
8 was if you are providing us a price that is the
9 best price but with a 20 percent rejection rate
10 -- and that's a big switch -- it is not the best
11 price, because 20 percent of the time -- and it
12 usually would come at 20 percent of the time when
13 the market is really moving and the customer
14 needs you the most, you're not really there. So
15 that price is, essentially, fake a percentage of
16 the time. So how reliable is that price matters.
17   And so speed in terms of the slow
18 banks, how fast they can determine that the trade
19 has been executed, right, and how fast and how
20 much they wait to see whether they want to do the
21 trade or not matters a lot. And that's, you
22 know, because if this bank does not want it, we
23 need to pass it to the next best available. So
24 how fast we get -- they are evaluating and how
25 fast they respond to us is also a criteria, which

Page 101

CONFIDENTIAL - DROR NIV

1
2 is why, you know, we basically do not -- because
3 of all of these factors -- and there's others
4 that, you know, impact -- it's not a linear
5 situation, you know, of what is the best price.
6 And that is something that, you know, we had to
7 take into account and it was an ongoing process,
8 you know, to improve this.
9   But that's what Effex did so well,
10 right. So Effex had the lowest rejection rate,
11 the fastest turn around time, the fastest
12 response rate and, you know, you can see it in
13 the performance. And not only did it tighten
14 spreads, but they, you know, eliminated enormous
15 amount of slippage, you know, boosted our price
16 improvement, you know, to our customers where
17 customers were getting a better price than they
18 requested. So our price improvement percentages
19 tripled because of Effex, you know, all of those
20 things.
21   Q. Oh, thank you.
22   And when you mention, "extra markups"
23 here, did FXCM apply -- the "markups" that you're
24 referring to, is that the banks or liquidity
25 providers would offer a bid or bid or offer price

26 (Pages 98 - 101)

CONFIDENTIAL - DROR NIV

1  to FXCM, FXCM would then add a markup to that
2  price before showing it to the customer; is that
3  an accurate description.
4      A.  So our -- entire business model
5  of how we made money is our banks would offer us
6  price.  We would take the best bid offer of the
7  mix of those prices and add up a markup.  So all
8  trades had a markup.  That was, essentially, our
9  commission, okay, how we made most of our money
10  as a broker.  That was the hundreds of millions
11  of dollars of revenue that we are talking about
12  between that and interest.
13      And then because of what I explained
14  previously, because of certain people would --
15  essentially, their prices be less reliable,
16  because their metrics were not very good, because
17  they would reject a lot, you know, they would
18  take too long, you know, and that would cause us
19  -- let's say our metrics to decline with our
20  clients, we penalized them by putting extra
21  markups.
22      Q.  Okay.  So FXCM would sometimes apply
23  different markups to the prices provided by
24  different liquidity providers?

CONFIDENTIAL - DROR NIV

1      A.  Correct.  Depending on the quality of
2  the price that they sent, be it size, be it,
3  again, rejection rate, speed of response, speed
4  of evaluation, you know, which is like what
5  people refer to as hold time, all of that.
6      Q.  Okay.  And just to, I guess, clarify
7  one point in that workflow that you were
8  describing with the markups.
9      So would FXCM apply the markups after
10  the best price was determined or would it apply
11  markups to different banks and then taking the, I
12  guess, combined price plus markup determine where
13  the best price was?
14      A.  No.  We would add -- the system would
15  change configurations on the system over years.
16  In the beginning, we would add different markups
17  to different banks and then we -- then we would
18  aggregate the best bid offer of that, okay.
19      Over time we changed it to do it the
20  first way I described and we just -- we did not
21  differential markups.  We would -- booted, you
22  know, providers that did not meet the minimum
23  standards.
24      Q.  Do you recall around when that change

CONFIDENTIAL - DROR NIV

1  happened?
2      A.  I do not recall.
3      Q.  Do you remember if that was prior to
4  2015 or after?
5      A.  I believe prior to 2015.
6      Q.  Okay.  And after 2010?
7      A.  Yes.
8      Q.  Okay.  So was it is your
9  understanding that Effex would not have won as
10  much volume if you did not turn on or apply the
11  extra markups to the slower banks?
12      MR. DAHAN:  Objection to form.
13      A.  Essentially, they would win the same
14  volume.  Unfortunately, they would be hit second.
15  So what would happen is that, you know, a
16  customer would click on a slow bank.  The bank
17  would reject that customer.  That order would
18  come back to us.  We would have to route it,
19  again, to the next best available bank or Effex
20  or other market maker.
21      And, unfortunately, time has now
22  elapsed.  As the customer sent the order, the
23  bank took a while looking at it, then said, no.
24  We sent the order back and now we have to send it

CONFIDENTIAL - DROR NIV

1  to a different one, you know, this is, obviously,
2  all in milliseconds, but this is robbing, you
3  know, execution time from the customer, which
4  then means that, most likely, the customer is
5  likely to receive a worst price, you know, from
6  the next best available and not the price that he
7  initially requested.
8      So we necessarily have the one -- a
9  less flow, no, but they -- the customer
10  experience would be significantly impacted
11  because they would be -- they would have to wait
12  longer until they got executed and they would get
13  executed at worse prices.
14      That was the whole theory behind why
15  we would penalize on banks, you know, that were
16  too slow or had unreliable statistics in terms of
17  rejection rate.
18      Q.  Okay.  So I'm about to move onto a
19  new document, I guess, a new section as well.
20  We've been going about an hour.  I don't know if
21  we want to maybe take a five-minute break now or
22  we can push through.  We can take a lunch break.
23  I'm open to whatever, Mr. Niv.  I don't know if
24  you have a preference.

27 (Pages 102 - 105)

1            CONFIDENTIAL - DROR NIV
2            THE WITNESS:  Israel, you tell me
3    what you want to do.
4            MR. DAHAN:  It's your call.  We can
5    go another hour and take lunch.  We can take
6    lunch now and go straight.  It's however you want
7    to divide your day, Drew.
8        A.  Yeah, let's do lunch now and then we
9    can go no, problem.
10       Q.  Alright.
11           THE VIDEOGRAPHER:  We're off the
12   record 12:02.
13           (Lunch recess taken 12:02 to
14   p.m.)
15           THE VIDEOGRAPHER:  We are on the
16   record 12:32.
17       Q.  Welcome back, Mr. Niv.
18           (Deposition Exhibit 35, 4/4/10 letter
19   to John Dittami and William Ahdout from William
20   Ahdout E Capital 000049, was marked for
21   identification.)
22       Q.  I've introduced the next exhibit, if
23   you want to take a look and let me know.  This is
24   Exhibit 35.  Let me know when you can see it.
25       A.  I can see it.

1            CONFIDENTIAL - DROR NIV
2        Q.  Okay.  And please take a minute to
3    review.
4            MR. BAKER:  For the record,
5    Exhibit 35 is Bates stamped E Capital 49.
6        Q.  Mr. Niv, just let me know when you're
7    ready.
8        A.  I'm ready.
9        Q.  Do you recognize this document?
10       A.  Yes.
11       Q.  And is this a letter from Mr. Dittami
12   resigning from FXCM on April 14, 2010?
13       A.  Yes.
14       Q.  When did you first see this document?
15       A.  I don't remember.  But, obviously, we
16   spoke about this even before that.  So we knew
17   that this was a foregone conclusion.  A decision
18   was involved.
19       Q.  Okay.  And so you were aware at or
20   around this time that Mr. Dittami and FXCM had
21   terminated Mr. Dittami's employment contract?
22       A.  Correct.
23       Q.  And just, I guess, specifically, with
24   regard to this document, this letter, do you
25   recall when you first saw this document?

1            CONFIDENTIAL - DROR NIV
2        A.  I don't.
3        Q.  Okay.  Do you recall if it was around
4    the time that Mr. Dittami left FXCM?
5        A.  No.  I'm pretty sure I saw this -- I
6    don't -- honestly, I don't recall when I saw it.
7    I know, obviously, that, you know -- because I
8    ultimately, you know, as a Board, you know, made
9    the decision not to do this.  So, you know, I
10   knew this was happening.  So, I mean, I don't
11   need a letter to do that.
12       Q.  Okay.  And in this letter.  Mr.
13   Dittami writes in the last paragraph, "It is the
14   understanding of both parties to enter into a
15   license agreement on economic terms similar to
16   the employment agreement."
17           Do you see that?
18       A.  Yes.
19       Q.  And this letter is also signed by
20   Mr. Ahdout on behalf of FXCM US?
21       A.  Yes.
22       Q.  Were you aware of the understanding
23   that Mr. Dittami references in this letter?
24       A.  Yes.
25       Q.  And did you have any conversations

1            CONFIDENTIAL - DROR NIV
2    with Mr. Dittami about that understanding?
3        A.  Yes.  So, you know, Mr. Dittami was
4    going to open his own firm and is going to be,
5    you know, taking on FXCM plus other clients.
6    And, eventually, he had over 30 clients, I
7    believe.  Obviously, one of the big ones was
8    FXCM.
9            But the payment for flow that we
10   would get, right, that's -- kind of the initial
11   thought was that it would mimic this employment
12   agreement.  It's not how we ended it.  It's not
13   what we decided at the end, but that was the
14   initial thing.
15       Q.  And when you say the payment for flow
16   would "mimic" the employment agreement, what part
17   of the employment agreement, in particular?
18       A.  The P&L split of FXCM's trading of
19   FXCM's flow, right, but not, obviously, of flow
20   outside of FXCM.
21       Q.  Understood.
22           So that's the 70/30 split that we
23   looked at earlier?
24       A.  Yes.
25       Q.  And did you have any conversations

28 (Pages 106 - 109)

CONFIDENTIAL - DROR NIV

1
2  with Mr. Dittami about maintaining that 70/30
3  split around this time in 2010?
4      A. We were negotiating throughout the
5  spring and summer over ways to skin that cat.
6  But because he was going to take over -- he was
7  going to take on other customers and do
8  proprietary trading things that were not related
9  to FXCM, you know, it made all of this -- and,
10  obviously, in trading you can't really sequester
11  one sort of flow from the other because at one of
12  these firms -- at these market making firms, they
13  try to, obviously, scale up so, you know, they
14  can buy from one client and sell to the next and
15  cross that.  That's how they make their money.
16      So it's really -- you can't really
17  put a percentage of FX -- of flow because the P&L
18  is produced by the interaction of our flow with
19  other people's flow too.  So, at the end, it was
20  not practical to do percentages and we did fixed
21  amounts.
22      Q. Okay.  And so, that I understand you
23  right, so you're saying it wasn't practical to
24  determine say a 70/30 split of only the trading
25  that came from FXCM as opposed from other

CONFIDENTIAL - DROR NIV

1
2  entities; is that what you're saying?
3      A. Correct, correct.  So, basically,
4  he'll be making money from other places but that
5  money would -- I mean, he would make -- you know,
6  depending market conditions and all the other
7  issues, he would take more or less depending on
8  how much scale he had and that's related to
9  another factors outside of FXCM.
10      And so, you know, we decided that a
11  set payment is better and more market standard in
12  accordance we were looking at what do all the
13  major -- so payment for order flow is a standard
14  practice for stock brokers.  We were like what
15  is, you know, standard practice that all the big
16  firms on Wall Street were doing and so this was
17  -- the fixed fee was more standard practice, so
18  we went with the fixed fee.
19      Q. Okay.  I'm showing you the next
20  document.
21      (Deposition Exhibit 36, Service
22  Agreement E Capital-000004 to E Capital-000011,
23  was marked for identification.)
24      Q. I believe Exhibit 36 and please let
25  me know when you can see it.

CONFIDENTIAL - DROR NIV

1
2      A. I can see it.
3      Q. Okay.  And please take a minute to
4  review.  I'm, generally, just going to be asking
5  you some general questions about this.  And --
6  but take whatever time you need.
7      MR. BAKER:  For the record,
8  Exhibit 36 is Bate stamped E Capital 4.
9      Q. Mr. Niv, just let me know when you're
10  ready.
11      A. I am ready.
12      Q. Okay.  Do you recognize this
13  document?
14      A. Yes.
15      Q. And is this a Services Agreement
16  between Effex and FXCM US?
17      A. Yes.
18      Q. And that's dated the effective date
19  of March 1st, 2010?
20      A. Correct.
21      Q. Do you recall when you first saw this
22  agreement?
23      A. No.  But I approved this agreement,
24  so I definitely saw it.
25      Q. And was that -- so around -- before

CONFIDENTIAL - DROR NIV

1
2  or around when it was signed is when you believe
3  that you first saw it?
4      A. I believe so.
5      Q. And is this something that you would
6  have seen a draft of before it was signed?
7      A. Yes.
8      Q. Do you remember seeing drafts or
9  reviewing drafts of this document?
10      A. I don't recall.  It's too long -- too
11  long ago.
12      Q. Did you exchange e-mails about this
13  agreement before it was signed?
14      A. I don't recall specifics.  It's just
15  too long ago.  I'm sure it makes sense I would.
16  I don't recall.
17      Q. Have you ever referred to this
18  agreement as anything other than the Services
19  Agreement?
20      A. I don't recall that either.
21      Q. Do you remember hearing anyone else
22  at FXCM referring to this agreement as other than
23  a Services Agreement?
24      A. No, I don't recall.
25      Q. And so were you aware that FXCM had

29 (Pages 110 - 113)

Page 118

CONFIDENTIAL - DROR NIV

1   A. Yes.
2   Q. Okay. Please take a minute to review
3   this document.
4   MR. BAKER: For the record,
5   Exhibit 37 is E Capital 50, 5-0.
6   Q. Mr. Niv, let me know when you've had
7   a minute to review.
8   A. I know this agreement, you know.
9   Yeah, I reviewed, yeah.
10   Q. So do you recognize this document?
11   A. Yes.
12   Q. And is this an Option Agreement
13   between Mr. Dittami and FXCM US dated April 14,
14   2010?
15   A. This is -- this is an agreement that
16   Mr. Ahdout and Mr. Dittami signed, correct.
17   Q. Okay. And the agreement is dated the
18   same day as Mr. Dittami left FXCM?
19   A. Yeah.
20   Q. When did you first see this document?
21   A. I don't recall the date.
22   Q. Was it sometime around when it was
23   signed?
24   A. I would imagine so, yeah.

Page 119

CONFIDENTIAL - DROR NIV

1   Q. And were you aware of before this --
2   before or around when this document was signed,
3   were you generally aware of the agreement and
4   what the basic terms of it?
5   A. Excuse me.
6   The -- again, this is part of the,
7   you know, ongoing debate we had internally over,
8   you know, when people like William did not, you
9   know, still believe that we should roll back from
10   external execution and they wanted to, you know,
11   if Effex exceeds to buy out Effex -- Effex
12   Capital. And we -- and he wanted to have this to
13   help them get started to return to these options.
14   But we, you know, we told him that it is not
15   possible and we no longer --
16   THE STENOGRAPHER: I'm sorry, you cut
17   out.
18   A. We null and voided this document and
19   told both him and Mr. Dittami that this is not
20   possible, you know, our legal team said this is,
21   you know, not doable.
22   Q. And when you say you "null and voided
23   this document," how did you do so?
24   A. I'm not the details guy. I just yell

Page 120

CONFIDENTIAL - DROR NIV

1   at people, you know, that's why we have lawyers
2   internally. That's their job.
3   Q. Were you aware of anything in writing
4   that rendered this agreement "null and void"?
5   A. No, I don't do the details.
6   Q. Looking at Paragraph 1 of this
7   document about halfway down the first page, is it
8   fair to say --
9   A. Yes.
10   Q. Sorry. Is it fair to say that under
11   this agreement, FXCM had the right to purchase a
12   70 percent interest in Effex for $1?
13   A. Correct.
14   Q. Under the second whereas clause, it's
15   the third paragraph from the top, it says, "FXCM
16   has loaned to Effex the sum of $2 million
17   pursuant to that secured promissory note dated
18   the date here of (the note) on terms more
19   favorable than Dittami would have obtained in an
20   arm's length transaction."
21   Do you see that?
22   A. Yes.
23   Q. Is it true that FXCM loaned Effex
24   $2 million?

Page 121

CONFIDENTIAL - DROR NIV

1   A. No. So FXCM -- I mean, technically
2   semi-true but not really. FXCM, essentially,
3   collateralized the prime brokerage account to
4   enable Mr. Dittami to get prime brokerage access
5   to the FX market, which he would not have
6   otherwise been able to do as an independent
7   institution. That is a service FXCM did for
8   others as well.
9   You know, this was something that we
10   -- I mean, he paid it after a few months and he
11   got his own relationships. But this is in the
12   beginning he had to, you know, to get going, we
13   had to help him get going, which we did for a
14   number of people in similar situations in the
15   high frequency trading space like, for example,
16   Lucid Markets, which we did end up buying, you
17   know, for -- you know, we bought 50 percent,
18   which I believe was 180 or $150 million in 2013.
19   But in 2009, 2010, we did help him
20   get going with the exact same arrangement, this
21   prime brokerage arrangement.
22   Q. Okay. And is it fair to say that you
23   know if this wasn't a loan, this was FXCM
24   allowing Effex to use $2 million as collateral

31 (Pages 118 - 121)

Page 122

CONFIDENTIAL - DROR NIV

1
2  which Effex then paid back you said after a few
3  months?
4      A. Correct.
5      Q. Did Effex pay any interest on this
6  amount of money?
7      A. I don't know the specifics.
8      Q. Would you agree that the terms of
9  that say financial transaction were more
10 favorable than for Mr. Dittami than he would have
11 been able to obtain in an arm's length
12 transaction?
13     MR. DAHAN: Objection to form.
14     A. It depends on -- I mean, it really
15 depends on how much somebody else believed that
16 they wanted his business. I mean, it's clearly
17 we would have done that -- high frequency trading
18 space in those times was a very attractive, you
19 know, business. And Lucid, you know, and other
20 firms, you know, were making a lot of money by --
21 arbitrage was in between financial institution --
22 exchanges was very easy -- easier at the time.
23 It was not as competitive a business. This was
24 the business that everybody was trying to get
25 into and, you know, we as well. So we, clearly,

Page 123

CONFIDENTIAL - DROR NIV

1
2  did this for, you know, a number of people, you
3  know, not just him, you know, in that space.
4      And would other people have done it
5  for him? Possibly, possibly not. It would
6  demand a relationship and time spent. And, you
7  know, at that moment in time he probably couldn't
8  get a better deal, but I don't know if that would
9  be the case or not. I, certainly, know people
10 who got similar deals.
11     But, I think, you know, at the end of
12 the day it doesn't matter because we did not --
13 we helped him get started, but we did not, you
14 know, exercise this option or do anything, you
15 know. We null and voided this agreement.
16     Q. When you say, "we helped him get
17 started," were there other ways in which FXCM
18 helped Effex get started?
19     A. Yes.
20     Q. Such as what?
21     A. We temporarily gave him office space.
22 We have a department in FXCM called Programming
23 Services where we do custom work for our clients
24 to enable them to better connect and interface
25 their software to our software. And so we had,

Page 124

CONFIDENTIAL - DROR NIV

1
2  you know, people in that department work with
3  him, you know, to help him interface better with
4  the FXCM system. Again, we used to do that for a
5  whole bunch of people each in a different
6  circumstance.
7      But, you know, generally, the
8  incubating -- incubation services that, you know,
9  multiple prime of primes offer, you know, that's
10 not an abnormal relationship. You know, I think
11 that -- it was limited to this.
12     Q. Okay. I'm going to show you the next
13 document.
14     (Deposition Exhibit 38, 4/14/10
15 e-mail from John Dittami to David Sassoon
16 GLBR_00189079 marked Confidential, was marked for
17 identification.)
18     Q. This is Exhibit 38 and please let me
19 know when you can see it.
20     A. I can see it.
21     Q. Okay. And I'll note that you do not
22 appear on this e-mail, but please take a minute
23 to review. I'm just going to ask you some --
24 well, I'll ask you a few questions.
25     MR. BAKER: For the record,

Page 125

CONFIDENTIAL - DROR NIV

1
2  Exhibit 38 is GLBR 189079.
3      Q. Mr. Niv, just let me know when you're
4  ready.
5      A. I'm ready.
6      Q. Okay. And, as I mentioned, this is
7  an e-mail that you do not appear to be on, but
8  have you seen this document before?
9      A. I don't recall.
10     Q. Okay. But do you see that -- would
11 you agree this appears to be an e-mail from Mr.
12 Dittami to David Sassoon, Mr. Ahdout and
13 Mr. Grossman?
14     A. Yes.
15     Q. And Mr. Dittami writes, "Just to
16 confirm steps for meeting."
17     Based on the context of this e-mail
18 and the date, do you remember if you attended
19 that meeting?
20     A. I have no idea. No, I don't recall.
21     Q. Do you remember if you would have
22 been, at least, aware of this meeting?
23     A. I don't recall. You know, again, big
24 company, lots going on.
25     Q. Is this something that -- is this

32 (Pages 122 - 125)

Page 138

CONFIDENTIAL - DROR NIV

1
2    Q.  Okay.  And in those discussions,
3  generally, do you remember discussing other
4  structural alternatives besides pay for flow?
5    A.  So, obviously, again, the original
6  concept was we were going to have 70/30 profit
7  share, you know.  But, again, as I explained
8  previously, that is just not practical given the
9  reality of once he has his own firm and he's
10  taking other clients and that flow from Client A
11  is intermixed with flow from Client B, that's
12  just not possible -- excuse me -- to
13  differentiate between profits from Client A to
14  Client B.
15    And, you know, it is also, you know,
16  like I said, just something that, you know, just
17  -- and not practical really and not standard in
18  the industry.  So that's why we -- initially, we
19  went through a this should be a profit share to
20  look like the employment agreement, because
21  that's a deal we already negotiated and worked
22  out, to that it's just not practical under him
23  having his own firm and, therefore, he has to
24  change into what we changed it to.
25    Q.  Okay.  And I think I understand what

Page 139

CONFIDENTIAL - DROR NIV

1
2  you're saying there.
3    I guess what I'm getting at, were
4  there other structural alternative other than
5  those, you know, that you're -- what you
6  described as the profit share or pay for flow,
7  was there other ways of structuring this
8  arrangement that were discussed at that time?
9    A.  I'm sure there -- I have no
10  recollection of specific structures.  But, I
11  mean, these are long discussions over long
12  periods of time that, you know, took research
13  and, you know, lots of different, you know,
14  opinions and there -- like I said, there are
15  still arguments going on about what's our
16  ultimate, you know, business goal here, you know,
17  because the -- this is too early.  This is still
18  2010.  So the jury is still out on, you know,
19  whether external execution is going to work as a
20  business model long-term or not.
21    Q.  Okay.  And when you were having these
22  discussions and figuring out how to structure the
23  Effex/FXCM relationship as pay for flow, did the
24  70/30 -- original 70/30 split come into play in
25  terms of setting the rate that Effex would pay

Page 140

CONFIDENTIAL - DROR NIV

1
2  FXCM for order flow?
3    A.  How we set the rate I don't recall
4  exactly.  But, you know, the problem with setting
5  rates is that every currency has a different
6  spread and, therefore, the market making profits
7  on every currency is different.  The -- how much
8  volume is done in each currency changes from day
9  to day depending on the interest of clients in
10  that currency.  We don't control that.  The
11  spreads change.  Market conditions change.  So,
12  you know, in volatile times market makers make
13  more money than in dead times.  So there's lots
14  of different reasons when, you know -- you know a
15  number would be a high percentage or a low
16  percentage of profit depending on whose currency
17  was traded, which, you know, which -- what time
18  day it was, what market conditions were.  All
19  things are just completely un-forecastable.  So
20  they're just not practical to really benchmark it
21  around a certain number because you have to take
22  into account lots of different things.
23    Q.  The $21 per million rate for order
24  flow, that was applied to all -- was that applied
25  to all of the FXCM order flow that Effex

Page 141

CONFIDENTIAL - DROR NIV

1
2  captured?
3    MR. DAHAN:  When, Counsel?  I mean,
4  we know that there's -- I mean, no mystery here.
5  We know there were different agreements,
6  amendments.  So when?  I mean, let's --
7    MR. BAKER:  Yeah, I'm trying to think
8  how to clarify.
9    MR. DAHAN:  Pick a time.  Pick a time
10  period, that's all.  We, obviously, know that's
11  not the case.  (INAUDIBLE) So pick a time.
12    Q.  Mr. Niv, when these services
13  agreement were first signed, was it your
14  understanding that the $21 per million that Effex
15  would pay was based on all of the order flow that
16  Effex captured from FXCM?
17    A.  Yes.
18    Q.  And was there a time when that
19  changed?
20    A.  Yes.
21    Q.  When was that?
22    A.  So, as time went on and this became a
23  big success and, you know, spreads, you know,
24  basically, narrowed by about 80 to 90 percent
25  over the next few years, particularly, spreads in

36 (Pages 138 - 141)

Page 142

CONFIDENTIAL - DROR NIV

1         CONFIDENTIAL - DROR NIV
2 euro/dollar and dollar/yen, you know, obviously,
3 it became -- you know, over time we had to make a
4 few changes and it became unattainable for them
5 to pay us more than a tiny fee because they just
6 weren't making, you know, that type of money.
7 So, obviously, all market makers, as you noted
8 previously, make less money on narrower spread
9 currencies. And as the spreads were narrowing,
10 you know, in like I said by significant amounts,
11 you -- they could not afford to pay us the
12 amounts that we initially signed for.
13     Q. Okay. And, I think, now maybe I
14 understand where the source of the confusion with
15 my original question.
16     So regardless of what the fee -- the
17 specific fee per million was at anytime, was it
18 your understanding that throughout the time that
19 Effex was paying FXCM for order flow that it was
20 paying for all order flow that Effex captured
21 from FXCM as opposed to segments of that order
22 flow?
23     A. I do not recall a hundred percent
24 everything because there were -- there may have
25 been some stuff that's not there that's excluded.

Page 143

CONFIDENTIAL - DROR NIV

1         CONFIDENTIAL - DROR NIV
2 But I don't recall. But I do recall that we did
3 change -- when spreads on Euro/dollar and
4 dollar/yen became, you know, extremely narrow and
5 we could no longer afford it, we did delineate
6 between those two currencies and the rest of the
7 currencies.
8     Q. Okay. And we're going to get into
9 that a little bit later today.
10     Were you aware of any written
11 agreement, which includes a services agreement --
12 and if you need to flip back you can -- which set
13 out specifically how -- from what liquidity
14 streams or which liquidity streams Effex would
15 pay FXCM order flow on?
16     A. I would not be involved in those
17 discussions.
18     Q. Okay. I'm going to show you the next
19 document.
20     (Deposition Exhibit 41, e-mail string
21 and attachment GLBR_00194774 to GLBR_00194783
22 marked Confidential, was marked for
23 identification.)
24     Q. Okay. Exhibit 41 should be up now.
25 Mr. Niv, please let me know if you can see it.

Page 144

CONFIDENTIAL - DROR NIV

1         CONFIDENTIAL - DROR NIV
2     A. Yes, I see it.
3     Q. Okay. And please take a minute to
4 review. I am just going to be asking you some
5 general questions here.
6     MR. BAKER: For the record,
7 Exhibit 41 is GLBR 194774, and an attachment
8 which is GLBR 194776.
9     Q. Mr. Niv, I'll note that you do not
10 appear to be on the e-mails. So I'm just going
11 to ask you some general questions here.
12     But does this appear to be an e-mail
13 from Robert Lande to Joshua Rosenfeld and Joe
14 Filko with an attachment?
15     A. Yeah.
16     Q. And in the bottom e-mail on this
17 chain, which is from Alexander Dick to John
18 Dittami copying Mr. Grossman, Mr. Ahdout and
19 Mr. Sassoon, Mr. Dick writes, "Here is the
20 updated version of the Services Agreement."
21     And he says, "The PDF version is for
22 you to sign."
23     Do you see that?
24     A. Yeah.
25     Q. And then further up in the chain, Mr.

Page 145

CONFIDENTIAL - DROR NIV

1         CONFIDENTIAL - DROR NIV
2 Lande is forwarding an attachment titled, "Effex
3 Services AGMT 17 AUG 10 (execution copy)."
4     Do you see that?
5     A. Yes.
6     Q. And he writes, "This is what we are
7 planning to executing with Dittami."
8     Were you aware of a new services
9 agreement in August 2010 separate from the two
10 agreements that we looked at earlier today?
11     MR. DAHAN: Objection to form.
12     A. Again, I don't know -- I'm not aware
13 -- I'm aware of the substance of the agreement.
14 I am not aware of drafts and, you know, these
15 other entity switches and all the other details.
16     Q. In general, would you have expected
17 to be informed if Effex and FXCM were changing
18 their written agreements or entering in new ones?
19     MR. DAHAN: Objection to the extent
20 that they're changing or entering into new ones,
21 lack of foundation.
22     Q. You can answer.
23     A. We can -- again, if in the substance
24 the payment terms are changing or the, you know,
25 conditions under which, you know, all this is

37 (Pages 142 - 145)

Page 150

CONFIDENTIAL - DROR NIV
1
2  get the 'service agreement' put in place."
3       Do you recall that meeting?
4       A. I don't recall that meeting, sorry.
5       Q. Do you remember discussing services
6  agreement or an amendment with Mr. Grossman,
7  Mr. Ahdout, Mr. Dittami, Mr. Meyer in or around
8  October 2011?
9       A. I don't. This is, again, ten years
10 ago. I don't recall what happened then.
11      Q. In the top e-mail?
12      A. I know the substance of moving --
13 dollars per million came up a whole bunch of time
14 and we did move it a few times during the life of
15 the agreement, I think, two times or three times.
16 That I remember that we had to do that because,
17 you know, again, spreads were shrinking, markets
18 were less volatile, et cetera, et cetera, like he
19 wasn't making a trade like he thought he would
20 make it.
21      Q. Okay. And looking at the top e-mail,
22 does this appear to be a discussion about one of
23 those instances you described where Effex and
24 FXCM changed the rate that Effex would pay for
25 order flow?

Page 151

CONFIDENTIAL - DROR NIV
1
2       A. Correct.
3       Q. And this is from $21 per million to
4  $16 per million?
5       A. Correct.
6       Q. Do you recall who wanted to change
7  the fee at this time?
8       A. John.
9       Q. And do you recall -- did he tell you
10 why?
11      MR. DAHAN: Objection, asked and
12 answered, 15 times today. I mean, do it again.
13      A. You know, again, over time spreads
14 contracted, right, and which is exactly what we
15 wanted to happen happened. You know, we wanted
16 spreads to go down. We wanted, right,
17 essentially, clients to have cheaper American
18 competitive price and that was happening. But as
19 that happens, that squeezes the, you know, the
20 market makers or the suppliers. They make less
21 money per trade and, therefore, they can pay less
22 money per trade. So that is the whole point
23 because we would get more trades and the bulk of
24 the money that FXCM made, you know, which is 97
25 or 96 percent, right, was from the markups which,

Page 152

CONFIDENTIAL - DROR NIV
1
2  you know, basically, depended on how much volume
3  of trades. So the more -- the tighter the
4  spreads, generally speaking, the more volume you
5  get. Therefore, we were always better off that
6  way. So we were happy to do it because it was
7  happening for the right reasons.
8       Q. Okay. And you mentioned a little bit
9  earlier that the conversation about moving the
10 dollars per million came up a bunch of times and
11 I think you said you remember doing it two or
12 three times during the life of the agreement; is
13 that an accurate recollection of your testimony?
14      A. Yes.
15      Q. Do you recall about how many times or
16 how often those conversations would come up about
17 changing the fee per million between Effex and
18 FXCM?
19      A. I don't recall, you know.
20      Q. Was it multiple times a year, once
21 every couple of years?
22      A. I mean, John would keep us abreast,
23 you know, that, you know, intermittently how much
24 money he was make and how well the market was and
25 what the situations are. But we also would see

Page 153

CONFIDENTIAL - DROR NIV
1
2  it ourselves in terms of talking to other market
3  makers and then, you know, getting their lay of
4  the land and what they were seeing, you know, and
5  if things were getting better or worse for them.
6  And, obviously, again, mix of currencies change,
7  mix of, you know, different things in the market,
8  different issues and so those -- we would talk
9  about the market quite frequently. So I'm sure
10 the subject of, you know, how is that impacting
11 his business comes up. How many times did he
12 want to change the fee, I don't remember.
13      Q. So -- and when you say that Effex and
14 FXCM did change the fee two or three times during
15 the life of the agreement, do you recall if the
16 Services Agreement was amended for there was a
17 new services agreement put in place each of those
18 times?
19      A. I wouldn't know those details.
20      Q. Would you expect that to be true?
21      MR. DAHAN: Objection to form.
22      A. I -- again, you know, this is -- I
23 only deal with the big substantive issues, you
24 know. I would not have time to worry about or
25 know what documents people were using and, you

39 (Pages 150 - 153)

Page 154

CONFIDENTIAL - DROR NIV

1    CONFIDENTIAL - DROR NIV
2    know, like, again, we had lawyers in our
3    employment.  That's what their job was.  That
4    wasn't when.
5        Q.  And so the times that the rate that
6    Effex paid to FXCM did change, were you involved
7    in or aware of those discussions each time?
8        A.  I would approve the change of rate,
9    yes.  Again, big substantive issues like change
10   of rate I would approve.
11       Q.  Okay.
12       A.  That would probably be the only
13   thing.  The only other issue would be the
14   benchmark conditions, right, under which this
15   thing agreed -- rests.  So, you know, kind of we
16   obsessed over the -- we got frequent reports
17   about what the rejection rates are for all the
18   liquidity providers and we provided that to all
19   of them and so they can compare to one another.
20   We would -- you know, all of the, again, sort of
21   speed of reply, hold time speeds, the -- for each
22   maker, you know, performance, how much price
23   improvements we would receive, you know, not us,
24   clients would receive because of their
25   interaction, all of those metrics that are used

Page 155

1    CONFIDENTIAL - DROR NIV
2    to, you know, average spread paid, slippage, all
3    of those things.  So we had those discussions
4    with people, right, and that was a frequent --
5    because those were the metrics under which we
6    were judged by our clients.
7        Q.  Okay.  And, just to make sure I
8    understand, were those sort of metrics for
9    rejection rates that you were talking about, was
10   that tied to the rate per million that Effex
11   would pay to FXCM?
12       A.  Those, basically, underpinned the
13   agreement.  So he would have to be the best and
14   the best by far for him to enjoy the preferential
15   status that he received in terms of winning ties.
16       Q.  Was that -- the preferential status
17   that he received, was that part of this services
18   agreement?
19       A.  I don't recall specifics, but that
20   was the -- you know, that's how we determined it.
21       Q.  And so, with him to use your words
22   being the best in terms of execution, was that
23   connected to the rate of -- that Effex would pay
24   FXCM for order flow?
25       A.  No.  It would just affect their, you

Page 156

1    CONFIDENTIAL - DROR NIV
2    know, preference.
3        Q.  So, in the time that Effex was paying
4    FXCM for order flow, was it generally true that
5    Effex had the best executions you referred to
6    with rejection rates and the other metrics that
7    we discussed today?
8        A.  Yes, by far.
9        Q.  And because of that, FXCM gave them
10   certain advantages like winning ties or lower
11   markups; is that accurate?
12       A.  Correct.  And we kept that -- in
13   August 2014, we ended payment for order flow and
14   for the next few years we still gave them the
15   same preferences and had the same relationship,
16   you know, minus the payment for order flow
17   because of that -- you know, because of their,
18   you know, ability to make our service that much
19   more competitive.
20       Q.  So, if they had the best execution,
21   why did they have to pay you for order flow?
22       A.  Because it's standard practice.
23   That's what, you know, it's very common.  That's
24   what everybody does in the market, not just
25   Effex, in equities too.

Page 157

1    CONFIDENTIAL - DROR NIV
2        Q.  Were there other liquidity providers
3    who had worse execution than Effex paying FXCM
4    for order flow?
5        A.  We had some agreements with some
6    other people for limited periods of time.  But
7    they, you know, we just had this -- could never
8    come to terms with them on -- they could -- it's
9    not come to terms.  They could never execute what
10   they promised.  So, as you saw in previous
11   e-mails that you showed me, we had different
12   arrangements with Dresdner, with Citibank, with
13   BNP, with Goldman, we had lots of others over,
14   you know, trying to give them either preferential
15   markup or payment for order flow with winning
16   ties and to see if this would improve.  You know,
17   they would therefore step up and do much lower
18   rejection rate and much faster response time and
19   basically eliminate -- if we go back to one of
20   the first e-mails you showed me the two big
21   problems we had, which was spreads widening
22   during market movements in Asian markets and the
23   slippage that our clients were receiving.  So
24   they would have to show us larger sizes.  You
25   know, most banks just failed at doing that and

40 (Pages 154 - 157)

1           CONFIDENTIAL - DROR NIV
2        Q.  But only with respect to Effex and
3    possibly BNP at this time; is that correct, with
4    respect to the payment order flows?
5        A.  At this time, yes, because the other
6    discussions failed, you know.  And these are
7    large institutions, they're not going to enter
8    this agreement without getting preferential
9    treatment and doing a substantial amount of more
10   business because this would then not be
11   sufficiently big enough for them to get into this
12   agreement.
13         You know, when Charles Schwab and
14   Ameritrade and Robin Hood are giving payment for
15   order flow, they're doing it to only a few
16   counterparties and, you know, who are each
17   getting a substantial piece of the share.  That's
18   why there is that.  When they route it to other
19   venues, they don't receive payment for order
20   flow.
21       Q.  Okay.  I think we can move on.
22         I'm going to introduce the next
23   exhibit.
24         (Deposition Exhibit 43, Amendment to
25   Service Agreement E Capital-000060, was marked

1           CONFIDENTIAL - DROR NIV
2    for identification.)
3        Q.  Okay.  This is Exhibit 43.  Please
4    let me know when you can see it.
5        A.  I can see it.
6        Q.  Okay.  And please take a minute to
7    review.
8         MR. BAKER:  For the record,
9    Exhibit 43 is E Capital 60.  It's 6-0.
10       Q.  Mr. Niv, my first question will be,
11   do you recognize this document?
12       A.  No.  I know what it is about, but I
13   don't see these documents.
14       Q.  And is this an executed
15   amendment to the May 1, 2010 services agreement
16   that we looked at earlier today?
17       A.  Yes.
18       Q.  Have you ever seen this agreement
19   before?
20       A.  I don't recall.  And I would not in
21   normal course of business see documents like
22   this.  I would know about the change, as I said
23   before.  I would know and approve the change, the
24   substance of it.  But the papering of it and all
25   the legal semantics behind it, I would not be the

1           CONFIDENTIAL - DROR NIV
2    one taking care of, you know, and so would not be
3    doing that.
4        Q.  Okay.  I'm going to show you another
5    document.
6         (Deposition Exhibit 44, 8/25/14
7    letter to John Dittami from David Sassoon
8    GLBR_00125304 marked Confidential, was marked for
9    identification.)
10       Q.  Okay.  This is Exhibit 44.  It should
11   be up now.  Please let me know if you can see it.
12       A.  I see it.
13       Q.  Okay.  And take a minute to review.
14         MR. BAKER:  For the record,
15   Exhibit 44 is GLBR 125304.
16       Q.  And, Mr. Niv, my first question will
17   be, do you recognize this document?
18       A.  Yeah, I know the -- I don't see the
19   -- I, generally, don't recall seeing these
20   documents, but I know the substance of what's in
21   it and why we did that.
22       Q.  And were you aware of these documents
23   or the substance at the time that they were
24   executed?
25       A.  Yes.

1           CONFIDENTIAL - DROR NIV
2        Q.  And is this a letter terminating the
3    May 1, 2010 Services Agreement that we looked at
4    earlier today?
5        A.  Yes.
6        Q.  Were you involved in the decision to
7    terminate the Services Agreement with Effex?
8        A.  Yes.
9        Q.  What was your involvement?
10       A.  It's -- the UK regulator made a
11   determination that they do not like payment for
12   order flow and ordered all of the regulated firms
13   in their -- regulated by them are not allowed to
14   accept payment for order flow.
15       Q.  And do you know --
16       A.  And so we had an over -- we had a UK
17   subsidiary where we made a determination that if
18   we -- you know, if one jurisdiction forbids it,
19   it is best practice to, essentially, forbid it in
20   all jurisdictions and we ended it.
21       Q.  Alright.  So you were part of the
22   discussions about ending the payments for order
23   flow?
24       A.  Right.  I mean, obviously, it was by
25   regulatory decree for the UK entity.  But we made

CONFIDENTIAL - DROR NIV

1              CONFIDENTIAL - DROR NIV
2 to, you know, terminate the payment for order
3 flow.
4     Q. And is this -- with this document in
5 particular, is this a letter terminating the
6 resignation letter that we looked at earlier
7 today?
8     A. Again, I have no idea, you know, like
9 this is not -- I mean, that's -- you're showing
10 me two documents I've never seen before. So I
11 don't know, you know. I'm not involved in these
12 little details.
13     I know that we terminated payment for
14 order flow. That is what I know.
15     Q. Okay. Were you involved in any
16 discussions about terminating Mr. Dittami's
17 resignation letter?
18     A. That makes no sense to me. I don't
19 recall that at all.
20     Q. Well -- sure. To clarify, there was
21 a resignation letter from Mr. Dittami that we
22 looked at earlier today --
23     A. Right.
24     Q. -- which I'll represent to us appears
25 -- is also Exhibit B within Exhibit 45. And the

1              CONFIDENTIAL - DROR NIV
2 first page of Exhibit 45 appears to be a letter
3 terminating the termination agreement.
4     Am I characterizing that accurately
5 based on the document?
6     A. I -- I've never seen it before, so I
7 don't know. Maybe this is a mistake, because it
8 doesn't make any sense.
9     Q. Okay.
10     A. I know -- again, my explanation prior
11 stands. This is -- we -- I know we terminated
12 the payment for order flow, you know, in 2014
13 because of our UK edict.
14     Do I know which document, which
15 dates, how it was all sent? No idea.
16     Q. And was Mr. Dittami's termination
17 letter, which is the second page here and the one
18 we looked at earlier today, was that connected to
19 payments for order flow?
20     A. No recollection of how that would be
21 connected.
22     Q. Okay. I'm going to show you another
23 document.
24     (Deposition Exhibit 46,
25 Acknowledgement and Confirmation GLBR_00189371 to

1              CONFIDENTIAL - DROR NIV
2 GLBR_00189374 marked Confidential, was marked for
3 identification.)
4     Q. Okay. Exhibit 46 should be loaded
5 now.
6     Please let me know if you can see it.
7     A. I can see it.
8     Q. Okay. And please take a minute to
9 review.
10     MR. BAKER: For the record,
11 Exhibit 46 is GLBR 189371.
12     Q. And, Mr. Niv, take a minute to
13 review.
14     But my first question will be, do you
15 recognize this document?
16     A. I do not.
17     Q. Does this appear to be an executed
18 Acknowledgment and Confirmation stating that the
19 Option Agreement we looked at earlier today never
20 went into effect?
21     A. Correct.
22     Q. And have you ever seen this document
23 before?
24     A. I don't recall the document. I
25 recall the discussion to not do it.

1              CONFIDENTIAL - DROR NIV
2     Q. Do you recall a discussion -- I'll
3 focus you down to the second page here, which in
4 the signature block the signatures are in
5 November and December 2015.
6     Do you see that?
7     A. Yeah.
8     Q. Do you recall discussions around that
9 time period about executing some sort of document
10 like this with regard to the option agreement?
11     MR. DAHAN: Yeah, I'm just going to
12 -- first, again, if you can answer yes or no, but
13 only on if you remember discussions. But,
14 obviously, to the extent there were discussions
15 with in-house counsel or external Counsel on this
16 document, I don't want you revealing that. So
17 yes or no do you remember discussions, you can
18 answer just a yes or no for now and let's see --
19     A. I don't recall discussions.
20     Q. Okay. Were you aware of any
21 significant developments in the NFA or CFTC
22 investigations between when each of those started
23 and November 2015?
24     MR. DAHAN: Objection to form,
25 "significant developments"? I don't even know a

45 (Pages 174 - 177)