# Exhibit 12

CONFIDENTIAL

Page 1

1          CONFIDENTIAL - ROBERT N. LANDE

2              UNITED STATES DISTRICT COURT

         FOR THE SOUTHERN DISTRICT OF NEW YORK

3

     In re:                     :

4                               :  Master File No.

     Global Brokerage, Inc.    :  1:17-cv-00916-RA

5    F/k/a FXCM, Inc.,          :

     Securities Litigation     :

6    ----------------------    :

7

8        REMOTE VIDEO DEPOSITION VIA ZOOM OF:

9                 ROBERT N. LANDE

10     PURSUANT TO RULE 30(b)(6) and INDIVIDUALLY

11            THURSDAY, JANUARY 14, 2021

12

13

14

15

16

17

18

19

20

21

22

23

24    REPORTED BY:

     SILVIA P. WAGE, CCR, CRR, RPR

25    JOB NO. 4379162

CONFIDENTIAL

CONFIDENTIAL - ROBERT N. LANDE

1  CONFIDENTIAL - ROBERT N. LANDE
2  directors of -- a director of some of the
3  subsidiary companies, but other than that, no.
4      My path at FXCM has been from 2010
5  until a couple of years ago, I was Chief
6  Financial Officer and then I've now become
7  President.
8      Q. And in the time period from 2010 to
9  2016, did you ever hold any position with a
10 company called Forex Capital LLC -- or sorry, I
11 misstated, EFFEX Capital LLC?
12     A. No.
13     Q. Are you familiar with that company?
14     A. Yes.
15     Q. And what is the basis of your
16 familiarity with EFFEX Capital LLC?
17     A. EFFEX was a market maker to the FXCM
18 group and a substantial one. It also paid FXCM
19 for order flow and those were disclosures that I
20 would make in the financial statements that that
21 was a source of revenues for FXCM that we
22 received payment for order flow from various
23 market makers. So I've known about EFFEX, you
24 know, for quite a long time then.
25     Q. And if I refer simply to EFFEX, will

1  CONFIDENTIAL - ROBERT N. LANDE
2  you understand me to be referring to EFFEX
3  Capital LLC unless otherwise clarified?
4      A. Yeah, that's fine.
5      Q. And in connection with your work with
6  respect to EFFEX, did you have any contact with a
7  person named John Dittami?
8      A. I've had very little interaction with
9  John Dittami. But, yes, over the years I have
10 had interaction with him.
11     Q. Did you have any familiarity with Mr.
12 Dittami before taking on the role of CFO with
13 FXCM?
14     A. No.
15     Q. Before taking on the role of CFO with
16 FXCM, did you have any prior relationship or
17 familiarity with anyone in particular associated
18 with FXCM?
19     A. No.
20     Q. So did you have any relationship or
21 association with Drew Niv before becoming CFO?
22     A. No.
23     Q. Same question with regard to William
24 Ahdout and David Sakhai, Ken Grossman?
25     A. Yes. No, I didn't know any of them

1  CONFIDENTIAL - ROBERT N. LANDE
2  beforehand.
3      Q. And you said that your most recent
4  and current position is President of the current
5  FXCM US-based entity; is that correct? Or
6  sorry --
7      A. No, not US based, FXCM Group LLC.
8  Yes, I'm President of that, yeah.
9      Q. And can you give me sort of a broad
10 level overview of the nature of your work in that
11 role as President?
12     A. Yeah. There's Chief Executive
13 Officer, who is based in London, and I'm the
14 President based in New York. Together, you know,
15 we effectively set the strategy of the firm and
16 oversee all of their operations. From a
17 practical perspective, you know, we've divided
18 up, you know, a number of the key elements of the
19 company, you know, for direct day to day
20 oversight. So Human Resources, legal, finance
21 and the trading is under my direct purview. And
22 the rest of the business, marketing, sales,
23 operations is under his. But we set the strategy
24 and we oversee all operations of the company.
25     Q. And is the role of President superior

1  CONFIDENTIAL - ROBERT N. LANDE
2  to or on the same level as the role of CFO within
3  that organization?
4      A. Superior. The Chief Financial
5  Officer reports to me.
6      Q. And who is the Chief Financial
7  Officer of the organization currently?
8      A. It's Margaret Deverell,
9  D-E-V-R-E-R-E-L-L.
10     Q. And could you -- your previous role
11 you testified was as CFO from 2010 to 2016; is
12 that correct?
13     A. Yes.
14     Q. And you continued to occupy that role
15 until January of 2018; is that correct?
16     A. Yes.
17     Q. And could you just give a high level
18 overview of what your role as CFO entailed?
19     A. CFO? Well, we were for most of the
20 entire period a public company. So I was in
21 charge of external reporting. I was in charge of
22 internal management reporting, was in charge of
23 working with the Audit Committee to ensure that
24 we had an adequate internal audit function and
25 appropriate thoughts controls were in place, was

CONFIDENTIAL

Page 54

CONFIDENTIAL - ROBERT N. LANDE
1
2     Q.  What was your understanding of the
3 nature of that?
4     A.  That, you know, trades when they came
5 in would be passed through to liquidity providers
6 that FXCM aggregated and that whoever was the
7 best bid or offer at the time would execute the
8 trade.  But it was not -- it was not FXCM on the
9 other side of the trade, which typically is
10 called in our industry dealing desk.
11     Q.  And were you familiar with how that
12 camp was used in the industry outside of FXCM?
13     A.  A no dealing desk?  I wasn't aware of
14 it being used outside -- I had only heard of it
15 in the nature of FX.
16     Q.  Alright.  And is it your
17 understanding that you've been designated by FXCM
18 or the current entity Global Brokerage to testify
19 as a corporate representative on certain topics
20 today?
21     A.  I guess so.
22     Q.  Did you review anything,
23 specifically, with your attorneys in advance of
24 testifying as corporate representative?
25     A.  To be honest, I'm not aware of the

Page 55

CONFIDENTIAL - ROBERT N. LANDE
1
2 difference of what my testimony is here, whether
3 I'm testifying as corporate representative or
4 whatever it is.
5     Q.  Would you understand that as -- to
6 testify as a corporate representative you would
7 be asked to testify not simply as your
8 personal knowledge but, rather, as to knowledge
9 that's available to the entity itself, Global
10 Brokerage?
11     A.  Ah, okay.  I guess so.
12     Q.  Okay.  I'm going to show you a
13 document quickly.  Just a moment while I make
14 that available to you.
15     (Deposition Exhibit 1, Schedule A
16 Instructions and Definitions, was marked for
17 identification.)
18     MR. LaPOINTE:  And I'm going to mark
19 this as Exhibit No. 1.  I would -- I'm going to
20 introduce it now.
21     Q.  Please let me know when you're able
22 to see it and I'll give you some time after that
23 to review it and then you can tell me when you're
24 ready and we can talk about it.
25     Does that sound okay?

Page 56

CONFIDENTIAL - ROBERT N. LANDE
1
2     A.  Yeah, let me see if I can get it
3 first.
4     Ah, okay, I've been able to get it.
5     Okay, give me a minute here.  Okay,
6 I've taken a look at it.
7     Q.  Alright.  First question is have you
8 seen this document before?
9     A.  Yes, I did.  I saw this yesterday.
10     Q.  So did you review this document with
11 your Counsel in advance of the deposition
12 testimony here today?
13     A.  Very briefly, you know.  I don't
14 think I -- not in great detail.  But, yes, I've
15 seen this yesterday.
16     Q.  And did you discuss with your Counsel
17 any of the topics that are listed here beginning
18 on Page No. 4?
19     A.  Yes, I did.
20     Q.  Did they discuss with you which
21 specific documents you might be called upon to
22 testify?
23     A.  Yes, I think they did.
24     Q.  And which were those, to your
25 knowledge?

Page 57

CONFIDENTIAL - ROBERT N. LANDE
1
2     A.  I think Topic 1.  I think Topic 1 is
3 the one that I would have been involved in.
4     Q.  And looking at the subtopics in
5 Topic 1, is there anything there that you feel
6 uncomfortable or that you're not prepared to
7 testify about today?
8     A.  No, other than, you know, some of
9 this was quite a while ago, so I may not have a
10 recollection exactly of some of the elements of
11 it.  But, no, I'm not uncomfortable.
12     Q.  So, at this time I would like to
13 transition to asking you some questions on -- in
14 your role as a corporate representative
15 deposition under Rule 30(b)(6).
16     Would you like to take a brief break
17 before we get started on that?
18     A.  Yeah, I wouldn't mind, actually.
19     Q.  Alright, that's fine.  Can we take
20 five minutes?
21     A.  That would be great.
22     MR. LaPOINTE:  Is that okay with you,
23 Israel?
24     MR. DAHAN:  Yes.
25     MR. LaPOINTE:  I think you said, yes.

15 (Pages 54 - 57)

CONFIDENTIAL

1           CONFIDENTIAL - ROBERT N. LANDE
2 implications.  If a contract with SalesForce.com
3 is up for renewal and it has elements of
4 maintenance, it has elements of new
5 functionality, you know, just whether elements of
6 this should be capitalized or not capitalized,
7 what should be expensed, if it's going to be
8 capitalized, what should be depreciated over, you
9 know, so there is a constant process of reviewing
10 all relationships through -- in the accounting
11 group to ensure that we are properly accounting
12 for and then as well properly disclosing what
13 needs to be disclosed.
14           Q.  And in your role as CFO, did you
15 yourself develop an understanding of the
16 applicable guidance on related party transactions
17 of US GAAP?
18           A.  Yes, I did.
19           Q.  And how did you go about doing that?
20           A.  Well, there's literally a white paper
21 that is on related party disclosures that Ernst &
22 Young puts together.  There are certain -- Ernst
23 & Young puts together white papers, which was
24 available through that portal, as I mentioned to
25 you.  But there's papers on pretty much anything

1           CONFIDENTIAL - ROBERT N. LANDE
2 you would want; on consolidation, on deferred
3 taxes, you know.  There's -- they have extensive
4 documents, which will take you through what GAAP
5 guidance is and then how it should be applied and
6 then it gives you examples.
7           So, yes, I would have had that
8 available to me on related parties, on all
9 accounting matters.  And I frequently did read
10 those, particularly, when I knew there was
11 something that was new or something, you know,
12 for example, revenue recognition became a big
13 theme of the month and there were a number of
14 changes in it.  So you know, when you're going to
15 start that period now with new rec rules, you
16 know, what it is that you need to be considering.
17           So I would read -- even though I'm
18 not a CPA, you know, I would read those.
19 Certainly, my group was well on top of them as
20 well.
21           Q.  And did you also develop an
22 understanding of the applicable US GAAP on what
23 are called variable interest entities or VIEs?
24           A.  Oh, yeah.
25           Q.  And what is your understanding of

1           CONFIDENTIAL - ROBERT N. LANDE
2 that term and what it means?
3           A.  Well, variable interest entity is,
4 you know, when you're going through consolidation
5 guidance, you know, and after you get by, you
6 know, you know, some elements that are pretty
7 obvious to the eye or not whether you should be
8 consolidating, you then, you know, will land
9 yourself into also looking at whether you have a
10 variable interest in this entity.  And that, you
11 know, is typical.  There is a decision tree to
12 through, you know, on that and, you know, my
13 memory of this is now, you know, it's a while
14 back now.  I haven't been as involved in this
15 lately.
16           But, you know, my memory is that you
17 would start with, you know, are you, you know,
18 does this entity rely on you entirely for its --
19 for its existence.  Does it have sufficient
20 activity outside of you to fund its activities or
21 is it reliant entirely on you for its existence?
22           You know, I think, probably, you
23 know, in the early days of the EFFEX
24 relationship, you know, that you might land that
25 that was -- that was the case, that he hadn't

1           CONFIDENTIAL - ROBERT N. LANDE
2 sufficiently broadened out his business at that
3 time to not rely on us.  But then you land -- if
4 memory serves me into a place then of, well, do
5 you have -- do you have -- you know are you the
6 primary beneficiary of this, meaning, do you have
7 both the power and the benefits of this
8 relationship.
9           And, you know, with regard to
10 benefits, you know, I -- and it wasn't just
11 EFFEX.  I had -- we had -- I remember this
12 assessment in other investments along the way.
13 You know, one key element is if that entity has
14 losses, are you on the hook for those losses?
15           Well, in the case of EFFEX, that
16 clearly was not the case.  We had no ownership
17 interest in EFFEX and we had no obligation to
18 compensate for any losses.
19           That being said, though, it's still,
20 you know, you had had an extensive relationship.
21 They're heavily reliant on you.  So then let's
22 look at power.
23           Well, power, I think, was very clear
24 that we didn't have over EFFEX.  So we had no
25 ownership.  We didn't have any voting rights.  We

22 (Pages 82 - 85)

CONFIDENTIAL

Page 86

CONFIDENTIAL - ROBERT N. LANDE

1 weren't sitting on its Board of Directors. You
2 know, John Dittami was his own man and was his
3 own -- making his own decisions. And so I think
4 on balance we concluded that EFFEX was not a VIE
5 and, you know, with us having no board
6 representation, equity voting rights, no
7 management representation, I don't -- you know,
8 we didn't conclude that this was a VIE and Ernst
9 & Young supported that.
10     Q. So, just to elaborate a little bit on
11 what you said your understanding of the prong
12 let's say of the inquiry related to power over
13 the entity, is it your understanding that that
14 specifically requires voting or voting power or
15 formal corporate ownership power over the entity
16 in order to be declared as a VIE?
17     A. Well, it could take a number of ways.
18 But, you know, voting rights, similar rights, you
19 know, a right to appoint management, even though
20 you don't have voting rights, you know -- you
21 know, I think it's probably broader than just
22 having actual ownership interest, you know. I
23 think you need to see evidence that you are
24 controlling and calling the shot there. And that

Page 87

CONFIDENTIAL - ROBERT N. LANDE

1 was not the case with us and EFFEX.
2     Q. So if there was an entity in which
3 FXCM held a let's say majority voting interest or
4 control voting interest, would that be
5 consolidated as VIE or would that be consolidated
6 as a subsidiary under the applicable US GAAP in
7 your understanding?
8     A. Well, you would run through
9 consolidation guidance. But, you know, now
10 remember that this was something that I would ran
11 into with Lucid.
12     As I mentioned, Lucid, the minority
13 had very extensive rights. And so, you know,
14 after -- but, again, after -- through
15 consideration, there were certain rights that
16 they did not have and that on balance tilted it
17 in favor that we did control it and then we did
18 consolidate it.
19     So, yeah, I mean, typically you do
20 consolidate if you have a majority of the voting
21 and economic rights of the entities but not
22 always. Like I said, there -- you know, you
23 could have given away enough power that you may
24 not be able to demonstrate control and so it

Page 88

CONFIDENTIAL - ROBERT N. LANDE

1 would not -- it would not be necessarily
2 consolidated.
3     Q. Are there circumstances under which
4 US GAAP would require consolidation or
5 declaration of an entity as a VIE where the
6 president declaring or consolidating entity did
7 not have corporate voting control or director
8 control of the underlying entity?
9     MR. DAHAN: Yeah, I'm going to
10 object. First of all, we're not going to answer
11 hypotheticals. So, if you have something
12 specific, something that's real and relevant...
13     He's not a GAAP expert here or you
14 can ask Devlin. He had two expert discovery.
15 But Mr. Lande is not an expert here. I'm not
16 going to have him answer hypotheticals. If you
17 have real facts and foundation, you are welcome
18 to answer.
19     [INSTRUCTION] So you're instructed
20 not to answer the hypothetical.
21     Q. So, Mr. Lande, I don't want you to
22 ask you to answer any hypotheticals. I'm really
23 just looking for what your understanding is,
24 whether there could be such a situation.

Page 89

CONFIDENTIAL - ROBERT N. LANDE

1     MR. DAHAN: Again, that is. There is
2 no facts or circumstances you're setting forth a
3 foundation for. And so we'll move on.
4     [INSTRUCTION] I instruct not to
5 answer.
6     Q. So moving back a little bit, in your
7 role as CFO, did or during your tenure as CFO,
8 did FXCM have a policy or procedure in place by
9 which it would evaluate entities with which it
10 did business for potential related party or VIE
11 status?
12     A. Any -- yeah, I mean, like I said,
13 through the closing checklist, this is just one
14 of a myriad activities that are done at every
15 quarter and yearend. So I don't remember a
16 specific element of that that had VIE assessment.
17 But, you know, VIE and whether you're
18 consolidating or not consolidating, whether you
19 are VIE or not, it's so fundamental that I'm
20 pretty sure you can assume that this is something
21 that the auditors are very keyed on in that it
22 is, certainly, discussed and reviewed every year.
23     Q. And you referred to the auditors and
24 inquiries that they may have with regard to

23 (Pages 86 - 89)

CONFIDENTIAL

Page 98

CONFIDENTIAL - ROBERT N. LANDE
1
2  ago.  But, you know, any new substantive
3  relationship we have, any new substantive
4  contract we have, everything is considered then.
5  So it wasn't anything unique about the EFFEX
6  relationship.  It was a substantial relationship,
7  you know.  They could see very clearly in our
8  general ledger system, you know, the lines that
9  were dedicated to revenues or receivables you
10  know, coming from EFFEX, you know, like they
11  would likewise look at any detail from any of the
12  lines in there pretty detail review.
13        So, no, I don't remember any moment
14  as such where, you know, they concluded it wasn't
15  a VIE, that this was an ongoing process that
16  never stopped and would have started, you know,
17  right from when, you know, results from EFFEX
18  would have started showing up in our results.
19        Q.  So when you testified earlier as to
20  ENY agreeing with that determination, are you
21  referring to anything -- any specific document or
22  instant or, is that just on the basis of your
23  understanding of this process as it's played out
24  from 2010 through 2016?
25        A.  Yeah, the latter.  If ENY had a

Page 99

CONFIDENTIAL - ROBERT N. LANDE
1
2  problem, trust me we would have all known about
3  it.
4        Q.  Do you recall any specific
5  conversations between yourself or anyone else
6  from FXCM with anyone from ENY about EFFEX in
7  particular in 2010?
8        A.  No, I -- I mean, besides that's a
9  long time ago.  I don't think there was anything
10  particularly unique about this relationship that
11  I would, you know, remember something that was
12  uniquely done on this relationship.  I think -- I
13  don't know when exactly it was, but at some point
14  there was some discussion about whether an option
15  on EFFEX was valid or not.  The conclusion that
16  we reached and legal reached and, you know, it
17  was certainly borne out my memory is by future
18  communications with EFFEX is that the option was
19  never in effect.  But options are -- you know, I
20  do remember having some discussions about options
21  with ENY because options are tricky things to
22  value in financial statements and the disclosures
23  around them can be tricky.  And so I do remember
24  having some discussions with them around the
25  option, but then it was concluded that this

Page 100

CONFIDENTIAL - ROBERT N. LANDE
1
2  option wasn't in force and so that was -- there
3  was nothing more to be done on that.
4        Other than, that I don't really
5  remember having a whole lot of conversations with
6  EFFEX with them.  We, as you know, disclosed in
7  our MDNA, you know -- you know, the percentage of
8  revenues we got from order flow.  We got order --
9  payments from other firms as well, bank of Paris,
10  I think, Goldman Sachs at one point.  I don't
11  know.
12        So, you know, there was nothing
13  particularly unusual about EFFEX and, you know,
14  we did what was appropriately disclosed and so
15  other than discussions around -- I do remember
16  having some discussions on options and how
17  options would get valued in the financial
18  statement, if they were in effect, but they
19  weren't in effect so it was a nonevent.
20        Q.  But do you remember when those
21  discussions were?
22        A.  2010, 20 -- I doubt it was 2010
23  because we were going public.  I think this would
24  have probably been -- I don't know, maybe it was.
25  I do not know.  It was 2010, 2011.  It would have

Page 101

CONFIDENTIAL - ROBERT N. LANDE
1
2  been around that time.  I don't know exactly
3  when.
4        Q.  So I may want to talk a little bit
5  more about some of the specific things you said
6  later in the contention of your individual
7  deposition.
8        But I would like to switch gears a
9  little bit to talk about the management
10  representation letters that were issued by FXCM
11  during this time period while we're still in the
12  30(b)(6) corporate representative.
13        A.  Okay.
14        Q.  So I'm going to show you a document.
15        (Deposition Exhibit 2, 3/30/12 letter
16  to Ernst & Young from FXCM and attachment
17  EY-GBI-WP-00000018 to EY-GBI-WP-00000026 marked
18  Confidential, was marked for identification.)
19        Q.  And, once again, if you can just let
20  me know when you're able to see that so I know
21  that you can see it and then I'll give you some
22  time to review.
23        MR. LaPOINTE:  I am labeling this --
24        Q.  You shouldn't be able to see it yet.
25        A.  Oh.

26 (Pages 98 - 101)