# Exhibit 16

Page 1

UNITED STATES DISTRICT COURT

SOUTHERN DISTRICT OF NEW YORK

In re:                              :
                                    : Master File No.
Global Brokerage, Inc.   : 1:17-cv-00916-RA
F/k/a FXCM, Inc.             :
Securities Litigation     :
----------------------   :

\*\* C O N F I D E N T I A L \*\*

REMOTE VIDEO DEPOSITION OF:  JOSEPH S. PATT

THURSDAY, APRIL 23, 2020

REPORTED BY:

SILVIA P. WAGE, CCR, CRR, RPR

Page 10

JOSEPH PATT - CONFIDENTIAL

1
2  so...
3      Q. That's fair. We'll be as flexible as
4  we can.
5      A. There is no way to get to the kitchen
6  without going through here. So we're --
7  anyway...
8      Q. Totally understood.
9         And other than your Counsel, did you
10 invite anyone else onto the conference room or to
11 the video chat today?
12     A. I didn't -- I didn't invite anybody.
13 They joined so...
14     Q. Okay. Good to know.
15        Have you ever been deposed before?
16     A. Yes.
17     Q. And how many times?
18     A. Somewhere between five and ten.
19     Q. Okay. And in what context?
20     A. Various context. You know, I worked
21 at Citigroup, you know, so there were a couple
22 then and a couple where -- in my current job.
23     Q. Okay. At Citigroup, what types of
24 cases were they?
25     A. Involving derivatives and trading in

Page 11

JOSEPH PATT - CONFIDENTIAL

1
2  civil, if that's what you're asking.
3      Q. So civil lawsuits related to
4  derivative trading while you were at Citigroup?
5      A. Yes.
6      Q. And were you a defendant or a
7  plaintiff or just a witness?
8      A. Witness.
9      Q. And at your current position, what
10 types of cases were they?
11     A. Same thing, civil witnesses.
12     Q. Also, related to trading?
13     A. Yes.
14     Q. And, also, you were not a party?
15     A. Correct.
16     Q. Okay. So, since you've done it
17 before, it still helps to go over some of the
18 ground rules.
19        When I ask questions, just try to
20 remember to answer the question out loud;
21 otherwise, you know, nodding your head, et
22 cetera, it's harder for the Court Reporter to
23 take down. That's going to be, particularly,
24 true given this remote format.
25        We should also be careful not to talk

Page 12

JOSEPH PATT - CONFIDENTIAL

1
2  over each other. I'll do my best to let you
3  answer before I ask follow-up questions. But we
4  should just be cognizant of that so that the
5  record can reflect what we're saying.
6         So, please, wait for me to finish the
7  question before you answer it. And if you answer
8  it, I'll assume you understand it. If you don't
9  understand it, please, ask me the question to
10 make sure you do understand it.
11     A. I'll do my best.
12     Q. And if you need a break at -- if you
13 need a break at anytime, let me know. Happy to
14 do it. Just we would want to break only after
15 the question is answered, as opposed to having a
16 break when a question is pending.
17        Anything today that would prevent you
18 from giving truthful answers to the questions I
19 ask you?
20     A. No.
21     Q. Okay. And you're being represented
22 by The Rosen Law Firm; is that right?
23     A. Yes.
24     Q. Okay. And you have been designated
25 as a 30(b)(6) deposition witness today.

Page 13

JOSEPH PATT - CONFIDENTIAL

1
2         Do you understand that your
3  testifying on behalf of 683 Capital Partners --
4      A. Yes.
5      Q. -- as a 30(b)(6) witness?
6         And you understand your answers are
7  binding on the company; is that correct?
8      A. Yes.
9      Q. I'm going to try to introduce as our
10 first exhibit the 30(b)(6) deposition notice in
11 this matter.
12        MR. ISAJIW: Ashley, do you have that
13 available?
14        MS. DePALMA: Yes, just one moment.
15     Q. And while she's doing that, just to
16 go back to your prior deposition testimony, while
17 at 683 Capital, you were a witness but was 683
18 Capital a plaintiff or a defendant in any of
19 those cases?
20     A. No.
21     Q. Okay.
22        MS. DePALMA: The exhibit should now
23 be introduced.
24     Q. What we've introduced through the
25 software is what we're marking as Exhibit 1 for

4 (Pages 10 - 13)

Page 22

JOSEPH PATT - CONFIDENTIAL

Q. And what are your responsibilities at 683?

A. You know, a lot of things. There's only nine employees and we're max employee title. But, basically, I'm the junior second partner. My job is to, effectively, help the PM come up with ideas, argue against his ideas, frankly, to, you know, to sit as a sounding board devil's advocate to help him decide, you know, how big to make the ideas, frankly, to deal with things that he doesn't like to deal with like manage other people and, you know, and I deal with the tax stuff given my background and lots of stuff.

Q. Okay. What type of an organization is 683 Capital Partners?

A. It's a small to midsize hedge fund depending on how you define size.

Q. So, when you say, "small to midsize," what metrics are you using to measure that?

A. Basically, number of employees, which is -- and partners, which is, you know, three and -- three partners, nine employees and, you know, assets under management, which is 900 million at the moment, ish.

Page 23

JOSEPH PATT - CONFIDENTIAL

Q. Okay. And in terms of 683 Capital's investment strategies, is there a general sector or investment goal that 683 adheres to or follows?

A. So there is no specific sector. The general goal is quite simply is to try and make -- make and compound capital as -- at a high rate as possible over a longest term as possible. So we'll do things for, you know, a two-minute horizon and a 20-year horizon.

We -- you know, the whole portfolio is considered a whole portfolio. We balance things. We, you know, we don't sit there and say we're the, like, the one specific sector or one, you know, asset class for -- you know, the idea is that, you know, not that everybody should put any huge chunk of their money with them, but if they did -- we do, we put our -- a huge chunk of our own personal money in.

And so it's all balanced. We go all over the place. We've invested in -- we have biotech. We invest in financials. We invest in, you know, Argentinian bonds. We go all over the place.

Page 24

JOSEPH PATT - CONFIDENTIAL

But the other thing that we do is that we, generally, try and be nimble and quick in places where there's -- how do I say this -- dislocation or distress, where people are, you know, acting emotionally for whatever reasons and we can try and take the other side of that. We try and look for situations like that.

Q. Okay. And how many clients do you manage money for at 683 Capital?

A. Roughly, 50 different plus -- it's over that. I, you know, I'm not on top of that. That's not my responsibility. I know it's over 50.

Q. Okay. And you said that you have a huge chunk of personal money invested in 683?

A. Sure, yes.

Q. Okay. So is that invested in any -- just generally in the company or in particular investment funds in the company?

A. We have only one investment fund --
   (Stenographer clarification.)
   (There is a discussion off the record.)

Q. So, I think, the next question I

Page 25

JOSEPH PATT - CONFIDENTIAL

asked is -- just to repeat it, probably not verbatim, but, Mr. Patt, you mentioned that you have personal money involved in 683 Capital.

A. Uh-huh.

Q. And I was asking if it was involved in just the company, generally speaking, different funds and you were explaining.

A. Yeah, so we have one main fund. There are two ways you get into the fund. One is for US taxable and one is offshore. And, obviously, in US taxable and it's probably about half of our -- my family's net worth.

Q. Okay. And was that money also invested in everything that 683 Capital was invested in, or is it just in portions of 683 Capital?

A. No, everything's one fund. Everybody guess the same investments. There -- you know, there's different treatment gives you different type of tax thing, but you're otherwise in the same stuff.

Q. Okay. So, to the extent 683 Capital had investments in FXCM, you would also have personal money in connection with those

Page 30

JOSEPH PATT - CONFIDENTIAL

Q. And what specific evidence did 683 Capital have to support those allegations, as you understand them?

A. The regulatory filings that came out at the beginning of 2000 -- you know, the beginning of 2017 where they admitted to doing it and got banned from doing business in US.

Q. Okay. Other than those regulatory filings, are you aware of any facts to support those allegations?

A. No. But those are pretty damning filings and a result. They got banned.

Q. Okay. Aside from deposition preparation, when did you first speak to anyone at The Rosen Law Firm about potentially bringing this case?

A. After -- well, at some point after they announced that they were bringing a case, the press release.

Q. And who approached who?

A. We approached them.

Q. How did you find out about the case?

A. We saw the press release. I mean, we were following the company closely.

Page 31

JOSEPH PATT - CONFIDENTIAL

Q. So you saw a press release by The Rosen Law Firm about the case and you reached out to The Rosen Law Firm?

A. Yes.

Q. Are you the primary contact for Rosen at 683 Capital?

A. Yes.

Q. Had you ever spoken to anyone at Wolf Haldenstein law firm?

A. No.

Q. When did you first hear about FXCM?

A. Sometime before -- that's a vague question, but heard about them first time sometime -- well, sometime before 2015. I can't remember.

Q. And how did you first become aware of the company?

A. I don't remember how I first became aware of the company.

Q. Alright. Was it in connection with an investment decision?

A. No.

Q. Do you remember, generally speaking, what it was in connection with?

Page 32

JOSEPH PATT - CONFIDENTIAL

A. Not really, no.

Q. And can you describe for me what sort of business FXCM is?

A. What they're in, what their business is?

Q. Yes.

A. They're business is to offer retail and institutional clients the opportunity to trade FX. So I, you know, I -- yen versus dollar, Euro versus Swiss franc and they often provide leverage to clients to do that.

Q. So, at some point before 2015, you became aware of FXCM and its business. When did you become interested in investing in FXCM?

A. After the announcement that they lost, you know, a whole bunch of money as related to the Swiss franc de-pegging.

Q. So, after that announcement, is when you became interested in investing in FXCM?

A. Yes.

Q. Okay. And what did you do to further understand that situation, the company's business in connection with your investment decision?

Page 33

JOSEPH PATT - CONFIDENTIAL

A. We read the public announcements and the SEC filings, both about their balance sheet and their -- the investments, the rescue financing investment that came from Leucadia. We read, you know, the indenture on the convertible bonds that we bought and we looked for the intercreditor agreement between the convertible bonds and the upstream and we read those documents, did our analysis as to what the balance sheet would be like post what their public filing said and decided it was a good investment.

Q. So, in terms of the types of information that you analyzed in connection with your investment, you're looking at their public filings about the "SNB Flash Crash"; is that correct?

A. Yes.

Q. The Leucadia, the other -- what other sources of information about the company did you look at and analyze?

A. I mean, 10-K or 10 -- and 8, you know, 10-Qs, the latest documents. And the --and the --

9 (Pages 30 - 33)

|   | Page 70 |   | Page 72 |
|---|---|---|---|
| 1 | JOSEPH PATT - CONFIDENTIAL | 1 | JOSEPH PATT - CONFIDENTIAL |
| 2 | depends, you know, in times of bond stress or | 2 | expressed in the marketing materials that you |
| 3 | situations, specific situations where bonds are | 3 | would send to clients? |
| 4 | trading cheaply, we'll do it. | 4 | A.  Yeah, or in the LP agreement. |
| 5 | We rarely buy things that don't have | 5 | Q.  And who at 683 Capital would have |
| 6 | in our minds, at least, hopefully, a very high | 6 | access to the marketing materials and LP |
| 7 | implied return.  And, frankly, you know, so that | 7 | agreements? |
| 8 | drives all things. | 8 | A.  I mean, Mimi does, but we all do have |
| 9 | Q.  Okay.  So that 683 will invest in | 9 | access to it. |
| 10 | equity securities, debt securities, Rule 144A | 10 | MR. ISAJIW:  Okay.  I don't think |
| 11 | bonds; any other types of securities? | 11 | we've seen either of the marketing materials or |
| 12 | A.  I mean, options, derivatives. | 12 | LP agreements.  [REQUEST] So, Phil, if we can |
| 13 | Q.  And does 683 Capital's investment | 13 | talk about that later, but we would like to |
| 14 | strategy -- what types of trading is involved; | 14 | request those. |
| 15 | for instance, would you look at shorting equity | 15 | MR KIM:  Yeah, we'll take the request |
| 16 | securities in connection with an overall | 16 | under advisement and then if we can talk about |
| 17 | investment? | 17 | it, you know, post-depo. |
| 18 | A.  Yes. | 18 | (INAUDIBLE COMMENT MADE BY WITNESS.) |
| 19 | Q.  Investing in options and derivatives, | 19 | Q.  And the decision make strategy for |
| 20 | I think, you mentioned as well; is that correct? | 20 | 683 investment -- 683 Capital's investment, in |
| 21 | A.  Yes. | 21 | terms of risk tolerance or the types of |
| 22 | Q.  Do you, generally speaking, pursue | 22 | investments you're looking at, is that documented |
| 23 | hedging transactions in connection with your | 23 | anywhere? |
| 24 | investments? | 24 | A.  We have very vague and wide |
| 25 | A.  Sometimes. | 25 | flexibility.  Our investors know that we move |
|   | Page 71 |   | Page 73 |
| 1 | JOSEPH PATT - CONFIDENTIAL | 1 | JOSEPH PATT - CONFIDENTIAL |
| 2 | Q.  And can you describe for me, | 2 | around a lot. |
| 3 | generally speaking, what those would be? | 3 | Q.  In connection with the FXCM |
| 4 | A.  Like, for example, we owned some | 4 | investments, can you walk me through the |
| 5 | metallurgical coal miners and we short some met | 5 | decision-making process between you and |
| 6 | coal against it, contracts. | 6 | Mr. Zweiman in connection with the deciding to |
| 7 | Q.  And what about arbitrage strategies? | 7 | invest initially in a company? |
| 8 | A.  Sometimes. | 8 | A.  So, as I believe we described |
| 9 | Q.  In connection with your investment | 9 | earlier, like we saw the Swiss franc crash.  We |
| 10 | for FXCM, what strategy would you say best | 10 | both saw news stories about it.  We read it.  We |
| 11 | describes that investment? | 11 | talked about what it meant.  We looked into the |
| 12 | A.  Long, owning the bonds. | 12 | filings.  We looked into the documents and the |
| 13 | Q.  Is any of this, 683 Capital's | 13 | indentures and together we concluded that it |
| 14 | investment strategies, documented anywhere? | 14 | seemed like this was a good risk reward to own |
| 15 | A.  I mean, we have LP agreements and, | 15 | the bonds. |
| 16 | you know -- I think, you've got out | 16 | Q.  So when -- would you view this as |
| 17 | organizational chart.  I assume we gave you our | 17 | investing in a distressed company at the time you |
| 18 | marketing materials. | 18 | made the investment? |
| 19 | Q.  Yeah, I don't -- I, actually, don't | 19 | A.  Yes. |
| 20 | think that we've seen any of those "marketing | 20 | Q.  And is that something that 683, |
| 21 | materials" and I'm just trying to get a sense -- | 21 | typically, does? |
| 22 | A.  Yeah, I mean, we're -- we have a wide | 22 | A.  Often does. |
| 23 | range and our clients know we have a wide range | 23 | Q.  Do you have a rough sense of |
| 24 | of things we can do. | 24 | percentage of investments that are in distress |
| 25 | Q.  Okay.  And that "range of things" is | 25 | companies at 683 right now? |

Page 74

JOSEPH PATT - CONFIDENTIAL

 2    A.  Ten percent, roughly.
 3    Q.  And is the -- was the SNB Flash Crash
 4  an example of one of the "dislocations" you were
 5  discussing earlier?
 6    A.  Yes.
 7    Q.  Okay.  And can you just explain to me
 8  just so I better understand what you mean when
 9  you say "dislocations"?
10    A.  So a moment when investors in some
11  asset sort of wake up or because FX decided it
12  isn't actually what they were invested in and so
13  they're selling for emotional or panic reasons as
14  opposed to analytical reasons.
15        People who are used to investing in
16  something, a bond at par, you know, don't like
17  when it trades at 50 or, I mean, nobody does.
18  But it doesn't fit their business model often.
19    Q.  So you're looking to capitalize on
20  those situations?
21    A.  Yes.
22    Q.  And how do you monitor individual
23  investments for performance once you've invested?
24    A.  I mean, lots of different ways.  We
25  follow the public filings.  We -- as we discussed

Page 75

JOSEPH PATT - CONFIDENTIAL

 2  before, sometimes we talk to management.
 3  Sometimes we talk to research analysts who watch
 4  the stock prices or the bond prices, I mean.
 5    Q.  You said you talk to research
 6  analysts and not just look at their research but
 7  you actually can pick up the phone --
 8    A.  Sometimes both, I mean -- yes, both.
 9    Q.  Does 683 Capital use investment
10  managers at all?
11    A.  No.  You mean outside managers to
12  manage --
13    Q.  Yes.
14    A.  Puts the capital with other people,
15  no.
16    Q.  Yes.
17    A.  No.  I mean, one could argue say
18  anytime you invest in say Coke-a-Cola, the
19  management team of Coke-a-Cola is your investment
20  manager for that business but...
21    Q.  I guess that is theoretically an
22  argument one can make.  But I was referring to
23  contractually putting capital with investment
24  managers outside of the firm.
25    A.  No.

Page 76

JOSEPH PATT - CONFIDENTIAL

 2    Q.  And is any portion of 683 Capital
 3  portfolio passively managed?
 4    A.  No, not by the definition of
 5  "passive," no.
 6    Q.  So we referred to the "SNB Flash
 7  Crash" a couple of times.
 8        What is your understanding of that
 9  event?
10    A.  Yeah, up until then the -- up until
11  that day, everybody thought that the Swiss franc
12  would be pegged to a certain level of the Euro.
13        And I said, you know, nah, and then
14  let it re-peg at a different price.  And it
15  seemed that way --
16    Q.  Okay.  And what was -- what was the
17  effect on --
18    A.  -- 40 percent movement today.
19        What?
20    Q.  I'm sorry, I think you were just
21  answering.
22    A.  Yeah, I think there was a 40 percent
23  move today in that moment.  I mean, it happened
24  over night.
25    Q.  What was your -- and what was your

Page 77

JOSEPH PATT - CONFIDENTIAL

 2  understanding of that event's effect on FXCM?
 3    A.  So my recollection was and based on
 4  what they said was, you know, they had clients
 5  that were say short the Swiss franc on a very
 6  levered basis.  The Swiss franc moved, you know,
 7  in an unprecedented fashion.  It moved through
 8  all their clients' equity, well-passed whatever
 9  their clients could pay back and they were --
10  they had counterparties and they suffered a loss
11  as a result because it became their loss, once it
12  moved enough through their client's equity.
13    Q.  And so why would that make -- why
14  would you be interested in investing in FXCM at
15  that time?
16    A.  Because at that moment then -- they
17  announced how much their losses were or they said
18  their losses were.  You could look at their
19  balance sheet based on the public filings.  You
20  could see that they were getting, you know, a
21  rescue financing from Leucadia.  So they weren't
22  going to have to, like, liquidate immediately.
23        And there was information based on
24  the money that was coming in and statements
25  around that that you could value their assets

20 (Pages 74 - 77)

Page 78

JOSEPH PATT - CONFIDENTIAL

 2  based on what they said and for what their
 3  business had been worth based, again, on what
 4  they said and it looked like you were well
 5  covered, that the bottoms were easily going to
 6  recover a hundred cents on the dollar and they
 7  were trading in the 40s, I believe.
 8      Q.  Okay.  So what FXCM securities did
 9  683 Capital purchase at that point?
10      A.  The convertible bonds, convertible
11  notes.
12      Q.  The Rule 144A notes?
13      A.  I thought they were registered.
14  That's my recollection.  Am I incorrect?
15          I think the 144A, when they were
16  issued and then became -- I may be wrong about
17  this.  So it's a long time since -- a long time
18  since we did this.
19          But I thought they were issued maybe
20  144A and then had become registered, because they
21  were convertible.  So they had stock underlying
22  them.  So the typical pattern on a convertible
23  bond is -- like that it is gets issued as a 144A
24  and then it's quickly -- registered in the next
25  six months or it becomes registered just by the

Page 79

JOSEPH PATT - CONFIDENTIAL

 2  waiting period, so -- and they were over
 3  six-months old those bonds so...
 4      Maybe I'm wrong.  I just -- that's my
 5  recollection.
 6      Q.  Okay.  Any other securities?
 7      A.  That we bought in the company, no.
 8      MR. ISAJIW:  Okay.  I'm going to
 9  introduce -- I think, we're at Exhibit 8 -- the
10  Memorandum of Law in support of 683 Capital
11  Partners and Shipco's motions to consolidate the
12  related actions and appoint Co-Lead Plaintiffs.
13      Ashley, can you help me with that?
14      (Deposition Exhibit 8, Memorandum of
15  Law in Support of Motion of 683 Capital Partners,
16  LP and Shipco Transport Inc. To: (1) Consolidate
17  Related Actions; (2) Appoint Co-Lead Plaintiffs;
18  and (3) Approve Co-Lead Plaintiffs' Selection of
19  Counsel, was marked for identification.)
20      MS. DePALMA:  It should now be
21  introduced.
22      A.  This is -- I'm downloading it now.
23  Hold on.
24      Okay.  This is Exhibit 8, yeah, okay.
25      Q.  And so you'll see at the top, there's

Page 80

JOSEPH PATT - CONFIDENTIAL

 2  a Page No. 1 of 10 and it also --
 3      A.  Yeah.
 4      Q.  -- says that this was filed April 10,
 5  2017.
 6      A.  Yeah.
 7      Q.  If you flip to page -- I want to
 8  point you to Exhibit 2 of this document --
 9      A.  Uh-huh.  Yep.
10      Q.  -- which could be your certification.
11      A.  Yes.
12      Q.  Okay.  So we mentioned -- I was
13  asking before about other types of securities in
14  FXCM that you purchased?
15          And before we dive into this
16  document, other than the bonds, did 683 Capital
17  trade in any other FXCM securities, as far as you
18  know?
19      A.  We traded in the stocks and, I think,
20  we might have traded some options.  I can't
21  remember I have a hazy recollection that we did,
22  but I don't remember exactly.
23      Q.  So, if you look at the document that
24  we just marked as Exhibit 8, Paragraph 4 of your
25  certification indicates that, "The following is a

Page 81

JOSEPH PATT - CONFIDENTIAL

 2  list of purchases and sales I have made in FXCM
 3  notes during the class period as set forth in the
 4  complaint.  I have made no transactions during
 5  the class period in the debt or equities
 6  securities that are subject of this lawsuit
 7  except for those set forth below."
 8      And then attached it says, "See
 9  attached."  And attached on the next page is
10  "Schedule A of 683 Capital Partners Transactions
11  in Global Brokerage Inc., 2.25 percent," dated
12  6/15/18 CVT.
13      Do you see that?
14      A.  Uh-huh.
15      Q.  Did you prepare this document?
16      A.  No.
17      Q.  Who prepared it?
18      A.  I believe our attorneys.
19      Q.  Did you review the document before it
20  was submitted?
21      A.  Yes.
22      Q.  Okay.  And did you do anything to
23  verify that the information there is correct?
24      A.  I just looked at my memory, which
25  turned out to be incorrect because there's some

21 (Pages 78 - 81)

Page 126

JOSEPH PATT - CONFIDENTIAL

1
2  options purchases in connection with FXCM
3  securities?
4      A. Again, I haven't -- I haven't looked
5  at the sum total of trades. I just looked at a
6  few of those trades. But my recollection is
7  mostly to, you know, bet on them going up.
8      We were -- it was a very small market
9  cap at that point. There was a lot of thinking
10 that, you know, their customers could get excited
11 again. There is a lot of reasons why the stock
12 could go up a lot.
13     Q. I guess what I'm trying to under --
14     A. This was a good business.
15     Q. I'm trying --
16     A. This was a good business. It paid
17 like $140 million in 2013 or 2014, like, you
18 know, based on the filings, we believed it to be
19 a good business, I should say.
20     And given that, like, the idea that
21 it could -- you know, it was trading at a tiny
22 market cap seemed like, you know, a good
23 risk/reward. And if you buy options, you can get
24 a really levered upside return if it went back to
25 what it used to be worth.

Page 127

JOSEPH PATT - CONFIDENTIAL

1
2      Q. To me it would be helpful if you
3  could just explain to me when you buy an option,
4  what type of financial contract are you making?
5      A. When you buy a call option, you're
6  betting -- you say paying a small amount now for
7  the right to buy the stock at some price at
8  anytime between now and the expiry and that stock
9  price is the strike price.
10     Q. Yeah, a predetermined strike price?
11     A. Yes, a predetermined strike price.
12     Q. So, in that situation, you have the
13 right but not the obligation to purchase the
14 security, if the price does hit the strike price?
15     A. Correct.
16     Can I --
17     Q. So how does -- I'm sorry?
18     A. -- have 30 seconds to approve our
19 firm's, you know, payments today just to go -- I
20 just got a text.
21     Q. Sure.
22     A. Is that okay? I'll be really quick.
23     MR. ISAJIW: [REQUEST] And, Phil,
24 while he's doing that, I don't think we've seen
25 any of the confirms and we would be interested in

Page 128

JOSEPH PATT - CONFIDENTIAL

1
2  getting a production of these trades that would
3  include the options, if possible. So, again,
4  just wanted to make a request and we can talk
5  about it after the deposition.
6      MR KIM: Yeah, we can talk about it
7  afterwards. I mean, I think, those transactions
8  are reflected in the account statement. So I
9  don't know why you would need another piece of
10 paper, but we can discuss it later.
11     A. I'm back. Thank you. I just need
12 to...
13     Q. Understood.
14     So, I guess, what I'm trying to
15 understand is in the overall trading strategy of
16 683 Capital in connection with the FXCM
17 Securities, 683 is purchasing notes. It is
18 shorting securities -- I'm sorry. It is shorting
19 common stock. It is --
20     A. Sometimes.
21     Q. -- purchasing -- "sometimes." It is
22 buying call options and other options.
23     First of all, any other transactions
24 related to FXCM securities that were missing?
25     A. Not that were -- not that I recall.

Page 129

JOSEPH PATT - CONFIDENTIAL

1
2  I mean, I think you've got them all in the
3  statements but...
4      Q. Okay. So how do all those different
5  types of securities transactions fit into an
6  overall strategy? That's what I'm trying to
7  understand.
8      A. Sure. We thought that the bonds were
9  really really cheap and we wanted to own as much
10 of them as we can risk tolerate. And at various
11 points we changed our mind as to whether or not
12 the stock was cheap relative to the bonds, cheap
13 on its own or expensive.
14     Q. Okay. So you thought the bonds were
15 worth more than their current market price, the
16 stock --
17     A. By a lot.
18     Q. By a lot?
19     A. Based on the filings that had been,
20 you know, that we read.
21     Q. Okay. You thought that the stock at
22 some points was worth less than its current
23 market price and at other points potentially
24 worth more than its current market price?
25     A. And at other points we thought, well,

33 (Pages 126 - 129)

Page 138

| | |
|---|---|
| 1 | JOSEPH PATT - CONFIDENTIAL |
| 2 | frankly.  And, you know, to the extent we've got |
| 3 | bandwidth, we'll read everything, if we can. |
| 4 | Q.  And specifically -- and that's |
| 5 | generally. |
| 6 | But, specifically, in connection with |
| 7 | FXCM, do you recall any specific analyst that you |
| 8 | either consulted with or read the reports of? |
| 9 | A.  I have this vague memory that -- and |
| 10 | I keep thinking it was Citigroup -- that there |
| 11 | was somebody who covered the company sort of all |
| 12 | the way through for a long period into this but |
| 13 | really beforehand when it was -- before it was a |
| 14 | distressed situation who didn't truly understand |
| 15 | the nature of the financing that Leucadia had |
| 16 | done.  And I feel like it was a Citigroup thing |
| 17 | and we read their reports and maybe chatted with |
| 18 | them once at some point, not at the beginning but |
| 19 | later on.  But I just -- you know, I could be |
| 20 | wrong.  I just have to go back and look. |
| 21 | Q.  And were any of the -- do you recall |
| 22 | any analyst coverage on the notes, specifically, |
| 23 | as opposed to the common stock? |
| 24 | A.  I don't.  But, I mean, you should be |
| 25 | recovering them all.  I just don't remember, |

Page 139

| | |
|---|---|
| 1 | JOSEPH PATT - CONFIDENTIAL |
| 2 | specifically, FXCM. |
| 3 | Q.  And you said that you have a vague |
| 4 | memory of dealing with an analyst who didn't |
| 5 | fully understand the Leucadia transaction. |
| 6 | How did you, ultimately, get |
| 7 | comfortable with your understanding of the |
| 8 | Leucadia transaction? |
| 9 | A.  By reading the public filings from |
| 10 | FXCM and Leucadia. |
| 11 | Q.  And do you feel as though you did |
| 12 | understand the Leucadia transaction? |
| 13 | A.  Yeah, I did.  Now, you're asking me |
| 14 | now about the details of a complicated M&A |
| 15 | transaction three years later or five years |
| 16 | later -- no -- five years later, yeah.  It's |
| 17 | going to be hard for me to remember it. |
| 18 | Q.  No, I'm just asking at the time you |
| 19 | made your investment decisions in FXCM |
| 20 | securities, whether you felt comfortable that you |
| 21 | understood the transaction -- the Leucadia |
| 22 | transaction? |
| 23 | A.  Yeah, we felt comfortable. |
| 24 | Q.  What is your understanding of a "no |
| 25 | dealing desk"? |

Page 140

| | |
|---|---|
| 1 | JOSEPH PATT - CONFIDENTIAL |
| 2 | A.  I don't know what that is. |
| 3 | Q.  How many other FX trading entities is |
| 4 | 683 Capital invested in? |
| 5 | A.  None.  Well, sorry.  We're invested |
| 6 | in banks like Wells Fargo and JP Morgan right now |
| 7 | and we've been invested in Citigroup and Bank of |
| 8 | America and they have FX trading desks. |
| 9 | Q.  Okay. |
| 10 | A.  So, you know, I was thinking, |
| 11 | specifically, an FX-only company, but lots of |
| 12 | institutions we've been invested in trade FX. |
| 13 | Q.  How familiar are you with the FX |
| 14 | trading model as a business? |
| 15 | A.  I'm familiar with FXCM's description |
| 16 | of what their business was. |
| 17 | Q.  Do you have any other investments |
| 18 | whose primary revenue is driven by FX trading? |
| 19 | A.  No.  We looked at other ones that did |
| 20 | like Gain Capital, I believe, also had a lot of |
| 21 | that too.  And so we looked at that all during |
| 22 | the course of our investment. |
| 23 | Q.  What is your understanding of paper |
| 24 | flow arrangement in connection with FX trading? |
| 25 | A.  So, in general, I understand pay for |

Page 141

| | |
|---|---|
| 1 | JOSEPH PATT - CONFIDENTIAL |
| 2 | flow in the context of equity, as I assume it's |
| 3 | similar in the context of -- what I understand |
| 4 | that term to be, right, is you say, okay -- and |
| 5 | we hate it when we're on the other side of it in |
| 6 | terms of equity, which is where we mostly trade. |
| 7 | We would stay away from it. |
| 8 | Like, my understanding is Citadel |
| 9 | does that with e-trade, which they, basically, |
| 10 | control.  And the idea being is that, you know, |
| 11 | I'll, basically, like, give you money as a broker |
| 12 | to some other introducing broker or customer |
| 13 | facing broker for all your orders, which is |
| 14 | information that I can effectively trade against |
| 15 | or front run, effectively, and use as advantage |
| 16 | to position myself. |
| 17 | Q.  So your understanding of -- |
| 18 | A.  So I would -- in FX, when I hear that |
| 19 | phrase, I would assume what it means is you say, |
| 20 | okay, I -- know, if you were going to say go to |
| 21 | Citigroup or Deutsche Bank, who are big FX |
| 22 | traders -- let's say, we created, you know -- if |
| 23 | it was me, Joseph Patt, FX broker, I'd go to |
| 24 | Citigroup and say, you know what, I'll pay you a |
| 25 | hundred grand a year to get all your orders, |

36 (Pages 138 - 141)

Page 142

1  JOSEPH PATT - CONFIDENTIAL
2  right, and I'll trade them for you and you just
3  pass on my execution and somehow I can use that
4  value, especially, in a much less regulated
5  market like FX trading.  I can use that flow to
6  get long the franc ahead of somebody else or get
7  short the yen ahead of somebody else, which is,
8  you know, not something you want to hear your
9  brokers doing while you're trading an asset.
10     Q.  So you're general understanding of
11  paper flow arrangements have to do with front
12  running situations for the brokers who have the
13  arrangements?
14     A.  For the guy who is paying for the
15  flow, yes.
16     Q.  What is your understanding of paper
17  flow as it is relevant to your complaint against
18  FXCM?
19     A.  Yeah, my understanding is they were
20  effectively through, you know, a semi-controlled
21  or sister or friendly entity trading against our
22  customers.
23     Q.  And what do you mean by trading
24  against their customers?
25     A.  Taking positions, you know, when

Page 143

1  JOSEPH PATT - CONFIDENTIAL
2  they're either -- not necessarily in-house but
3  sisterly to house -- that their customer --
4  against their customer's flow.  They were making
5  money based on which way their customers were
6  going.
7     Q.  Is that --
8     A.  Or thinking they were.
9     Q.  So, when you say trading against the
10  customers, as alleged in the complaint here, you
11  mean, something other than hedging a position?
12     A.  Yes, they were an agency.  In other
13  words, their interests weren't aligned with their
14  customers.  They were using the information that
15  their customers were giving them to monetize it
16  somehow or so they believed in contravention of
17  what they were representing to their customers.
18     Q.  And what were they "representing" --
19  what they were "representing" to their customers?
20     A.  That they were efficient agency
21  traders of FX giving you access to a market you
22  couldn't get as a retail investor and giving you
23  leverage you couldn't get as a retail investor or
24  even an institutional investor.  They were on
25  your side helping you make big bets in FX as

Page 144

1  JOSEPH PATT - CONFIDENTIAL
2  efficiently as possible.
3     And that's clearly -- it seems not
4  to be what they were doing based on what they
5  admitted to the regulator and were banned from
6  doing in this country.
7     Q.  And what is your understanding of
8  what they "admitted to the regulator"?
9     A.  That they were using their
10  information from their customers to make money,
11  selling that information to an undisclosed
12  sisterly-related party friendly organization of
13  former employees and who knows what other
14  kickbacks and side money was involved.
15     Q.  Okay.  Are you familiar with a
16  company called Effex, E-F-F-E-X?
17     A.  I believe that is the name of that
18  company that was mentioned in the regulatory
19  filings.
20     Q.  Okay.  And what is your understanding
21  of the FXCM's relationship with Effex?
22     A.  So, based on my recollection or based
23  on the press release in the announcement, it was
24  former employees and there were some payments
25  back and forth and Effex was taking the orders

Page 145

1  JOSEPH PATT - CONFIDENTIAL
2  and, effectively, filling them as -- but I'm not
3  sure how much I can trust because that's what
4  they were admitting and, obviously, in
5  contravention with the -- that's what they -- the
6  level which they -- I don't know if they got away
7  with worse or there was extra.  It could be a lot
8  worse.  If I had the power of subpoena and the
9  government, I'd probably find out worse.  Because
10  once you find somebody behaving like that, you
11  know, in contravention to their entire stated
12  business model and marketing, who knows what they
13  were really doing.
14     Q.  And do you have any evidence of any
15  other alleged misconduct similar to the nature
16  you just alluded to?
17     A.  No, I just -- what's the phrase?
18  When there's smoke, there's fire.  When there's
19  fire, there's a bond fire so...
20     Q.  Okay.  And is it your understanding
21  that FXCM had a paper flow relationship with
22  Effex?
23     A.  That was my understanding based on,
24  you know, what was in the public document.
25     Q.  And were you aware that FXCM