# Exhibit 19

ORIGINAL

*EXECUTION COPY*

## EMPLOYMENT AGREEMENT

EMPLOYMENT AGREEMENT (this "Agreement") made as of September 4, 2009, between Forex Capital Markets, LLC (the "Company") and John Dittami (the "Executive") (collectively, the "Parties").

## W I T N E S S E T H:

**WHEREAS**, the Company and the Executive desire to establish a new division of the Company managing certain of the Company's algorithmic endeavors, which shall include, but not be limited to, market making, proprietary trading and algorithmic execution services (the "Venture"); and

**WHEREAS**, the Company desires that Executive be employed to serve in a senior executive capacity with the Company for the purpose of starting up and managing the Venture, and Executive desires to be so employed by the Company in such capacity, upon the terms and subject to the conditions herein set forth, effective as of October 5, 2009 ("Start Date"); and

**NOW, THEREFORE**, in consideration of the promises and mutual covenants contained herein and for other good and valuable consideration, the receipt and sufficiency of which are mutually acknowledged, the Parties hereby agree as follows:

1.    EMPLOYMENT.

The Company hereby agrees to employ Executive and Executive hereby accepts such employment, subject to the terms and conditions herein set forth. Executive shall hold the title of Managing Director of the Venture and shall report directly to William Ahdout (or Mr. Ahdout's successor).

2.    STRUCTURE OF THE VENTURE.

The Venture shall operate as a division of the Company. The Company agrees to initially invest the sum of $3,000,000 (the "Initial Investment") in the Venture. The Initial Investment shall be applied to establishing the infrastructure of the Venture, which shall include expenditures (i) for the salary and wages of individuals providing services to the Venture and all amounts payable to Executive and third parties hereunder, and (ii) upon the mutual consent of the Parties (which shall not be unreasonably withheld by either of the Parties), for computer systems, code for the programs that the Venture requires in order to perform its intended mission, and other requirements of the Venture ("Use of Proceeds"). For avoidance of a doubt, any amounts of the Initial Investment that are not expended in one calendar year, including the part year ending on December 31, 2009, shall carryover to the next following calendar year.

Only costs directly related to the Venture, including, but not limited to, prime brokerage fees and charges, shall be charged against the Initial Investment. Costs incurred under contract obligations shall be prorated to the date upon which the Management Bonus (as defined below) is calculated. In addition, any costs charged to the Venture that also benefit other affiliates of the Company shall be allocated among the Venture and the affiliates in a reasonable manner. Profits and/or losses of the Venture shall be applied to or against the Initial Investment.

CONFIDENTIAL

3.    EMPLOYMENT AT WILL.

Executive's employment with the Company shall be on an at-will basis. Either Executive or the Company may terminate Executive's employment relationship with the Company at any time with or without cause, subject to the notice and termination provisions contained herein.

4.    COMPENSATION AND BENEFITS.

(a)    As compensation for the employment services to be rendered by Executive hereunder, the Company agrees to pay, or cause to be paid, to Executive, and Executive agrees to accept, payable in equal installments in accordance with the Company's normal payroll practices, an initial salary at the rate of $250,000 annually, which shall be increased to the rate of $300,000 annually on the six (6) month anniversary of Executive's Start Date ("Base Salary").

(b)    Executive shall be eligible, annually during the term of his employment with the Company, for four weeks vacation, without loss or diminution of compensation.

(c)    Executive shall be eligible to participate in and shall have the benefit of all the Company's benefit plans, programs or arrangements as are or will be generally made available to similarly situated executives of the Company ("Benefits"). Nothing in this paragraph shall be construed to require the Company to establish, maintain or continue any benefit plan, program or arrangement. Except as otherwise expressly provided by their terms, such benefit plans, programs or arrangements are subject to modification or termination by the Company at any time.

5.    MANAGEMENT BONUS.

(a)    During the term of Executive's employment, Executive will be entitled to an annual "Management Bonus" in an amount equal to thirty percent (30%) of "Venture Profits" (determined on a calendar year basis) or, subject to the Parties mutual consent, such lower percentage as set forth in Section 5(d)(i) hereof (the "Bonus Percentage"). Venture Profits shall be calculated as follows:

(i)    the total gross revenues of the Venture generated through operations that are realized by the Company and its affiliates (hereinafter, the "Company Group") commencing after the Start Date;

(ii)    *less*, one hundred percent (100%) of all direct costs arising from, relating to or in connection with the Venture including, without limitation, prime brokerage costs, employee compensation and benefits (including Executive's Base Salary and Benefits, but excluding the Management Bonus and Bonus Pool), software and travel and entertainment expenses. For avoidance of a doubt, direct costs shall include all amounts of the Initial Investment expended in accordance with Section 2 hereof (excluding the Management Bonus and Bonus Pool); provided, however, if the Company shall fail to provide the Venture with accurate and timely data or fail to provide changes to the matching engine, all recurring costs (other than compensation costs) incurred by the Venture, beyond a reasonable period of time following a request from the Venture, shall not be considered in the calculation.

2

CONFIDENTIAL

(b)     Executive's Management Bonus shall be calculated following each calendar year, including the calendar year ending on December 31, 2009, and shall be paid to Executive no later than March 15 following the calendar year for which the Management Bonus is calculated.

(c)     In the event that the Management Bonus for any calendar year, including the part year ending on December 31, 2009, is a negative amount, such negative amount will carryover into the next succeeding calendar year or years and reduce the Management Bonus that would otherwise be payable in the succeeding calendar year or years.

(d)     The Parties may establish a bonus pool for new executives of the Venture or the Company Group other than Executive (the "Bonus Pool"). For any calendar year, including the part year ending on December 31, 2009, the Bonus Pool shall be determined as follows:

(i)     Upon the mutual consent of the Parties, a Bonus Pool may be established in an amount less than or equal to one third (1/3rd) of the Management Bonus for any calendar year, provided that, half of the amount distributed from the Bonus Pool shall reduce on a dollar for dollar basis the Management Bonus that would otherwise be payable for such year and the Bonus Percentage shall be reduced to no less than twenty five percent (25%) according to the following formula:

$$\text{Bonus Percentage} = 30 - \frac{50(\text{Amount distributed from the Bonus Pool in dollars})}{(\text{Venture Profits in dollars})}$$

(ii)     Upon the mutual consent of the Parties, a Bonus Pool may be established in an amount in excess of one third (1/3rd) of the Management Bonus for any calendar year, provided that, a portion of the amount distributed from the Bonus Pool shall reduce the Management Bonus that would otherwise be payable for such year and the Bonus Percentage in an amount to be mutually agreed upon by the Parties.

(iii)     The Company may, in its sole discretion, establish a Bonus Pool in any amount, provided that it does not reduce the funds allocated to the Management Bonus.

(e)     During the term of Executive's employment, Executive shall be entitled to receive a portion of the profits generated by algorithmic traders employed by the Company or the Venture and working under the management of Executive, provided that, the Executive may not hire any such algorithmic traders without the Company's written approval. The portion of the profits described in the previous sentence to which Executive is entitled shall equal twenty percent (20%) of the Company's portion of the net profits generated by such algorithmic traders. All payments to Executive pursuant to this Paragraph 5(e) shall be calculated following each calendar year, and shall be paid to Executive no later than March 15 following the calendar year for which the relevant profits are calculated, provided that, Executive remains an employee of the Company on such payment date. For the avoidance of doubt, it is agreed and understood between the Parties that Executive shall only be entitled to payment pursuant to this Paragraph 5(e) to the extent the profits generated by such other algorithmic traders employed by the Company or the Venture are not included in the calculation of Venture Profits.

CONFIDENTIAL

GLBR_00152956

6.   REIMBURSEMENT.

(a)   The Company shall reimburse Executive, upon presentment of suitable vouchers, for all reasonable business expenses which may be incurred by Executive in connection with his employment hereunder in accordance with Company policy as established from time to time. Executive shall comply with such restrictions and shall keep such records as the Company may deem necessary to meet the requirements of the Code, and regulations promulgated thereunder.

(b)   Subject to and in accordance with the Company's policies with regard to such matters, the Company shall promptly reimburse Executive for properly documented expenses relating to Executive's relocation from Chicago, Illinois to the New York area, up to a maximum of $25,000.00; which shall include the costs of moving Executive, his family and possessions to the New York area and lease-break penalties.

7.   DUTIES.

(a)   Executive shall perform such reasonable duties and customary functions of a managing director of a similar type of Venture focusing on the profits and best interests of the Venture.   Executive shall comply with the policies of the Company, and be subject to the direction of the Chief Executive Officer of the Company and William Ahdout (or Mr. Ahdout's successor).

(b)   During the term of employment, Executive shall devote all of his business time and attention to the business of the Company Group as necessary to fulfill his duties.  Executive shall perform the duties assigned to him with fidelity and to the best of his ability.  Executive shall not engage in any other business or occupation during his period of employment with the Company, including, without limitation, any activity that (x) conflicts with the interests of any member of the Company Group, (y) interferes with the proper and efficient performance of his duties for the Company, or (z) interferes with the exercise of his judgment in the Company's best interests.   Notwithstanding the foregoing, nothing herein shall preclude Executive from (i) serving, with the prior written consent of the Board which shall not be unreasonably withheld or delayed, as a member of a board of directors or advisory board (or an equivalent body in the case of a non-corporate entity), (ii) engaging in charitable activities and community affairs, and (iii) managing his passive personal investments and affairs; provided, however, that the activities set out in clauses (i), (ii) and (iii) shall be limited by Executive  so as not to materially interfere, individually  or  in  the  aggregate,  with  the  performance  of  his  duties  and  responsibilities hereunder.

(c)   Executive agrees to comply with all policies of the Company and to satisfy and maintain all regulatory licenses necessary for the performance of Executive's duties hereunder. As of the date of this Agreement, the Company represents that it is not aware of any license that Executive must maintain.

8.   TERMINATION OF EMPLOYMENT; EFFECT OF TERMINATION.

(a)   Executive's employment hereunder may be terminated at any time (i) upon written notice by the Company with or without Cause, or (ii) upon thirty (30) day's written notice by Executive with or without Good Reason.

4

CONFIDENTIAL

GLBR_00152957

(b)     For the purposes of this Agreement, the term "Cause" shall mean:  (i) Executive's repeated failure or refusal to materially perform his duties pursuant to, or Executive's material breach of, this Agreement, which is not remedied, in the Company's reasonable determination, within fifteen (15) days after receipt of written notice from the Company specifying such failure or material breach.; (ii) Executive's conviction of or entry of any pleas other than "not guilty" to any felony, or to any misdemeanor involving the misappropriation of money or property of the Company or any member of the Company Group; (iii) Executive's performance of any material act or his failure to act which constitutes, in the reasonable good faith determination of the Company, dishonesty, fraud or a breach of a fiduciary trust, including without limitation, misappropriation of funds or a material misrepresentation of the Venture's operating results or financial condition to the Board or any executive officer of the Company; (iv) any intentional unauthorized disclosure by Executive to any person, firm or corporation other than the members of the Company Group and their respective directors, managers, officers and employees, of any confidential information or trade secret of the Company Group; (v) any attempt by Executive to secure any personal profit against the interests of the Venture; (vi) Executive's knowing engagement in conduct or activities that materially violate any applicable material securities or commodities regulations; (vii) Executive's illegal use of controlled substances; (viii) any act or omission by Executive involving recklessness or gross negligence in the performance of Executive's duties, which is not remedied, in the Company's reasonable determination, within fifteen (15) days after receipt of written notice from the Company specifying such recklessness or gross negligence, or without notice if Executive's gross negligence cannot be remedied, (ix) Executive's failure to satisfy and maintain all regulatory licenses necessary for the performance of Executive's duties hereunder following written notice from the Company to Executive of the existence of a licensing deficiency and a reasonable period of time for Executive to cure the deficiency, or (x) the Venture has trading losses of One Million and /100 Dollars ($1,000,000) or more in the aggregate.

(c)     For purposes of this Agreement, the term "Good Reason" shall mean the occurrence, without Executive's consent, of one or more of the following events:  (i) the Company materially reduces Executive's duties or position in the Venture or the Company, or reduces Executive's Base Salary or Management Bonus opportunity, (ii) the removal of Executive from the principal position held by the Executive with the Company on the Start Date, (iii) the relocation of the Executive's principal place of employment to a location more than fifty (50) miles from the Executive's principal place of employment (unless such relocation is as a result of the relocation of the executive offices of the Company and such relocation does not increase the Executive's daily commute by more than twenty (20) miles), (iv) the failure by the Company to obtain the written agreement of any successor to the Company to assume and agree to perform this Agreement,  (v) there is a Change of Control (as hereinafter defined), (vi) the Company materially ceases to support the Venture in its business activities as provided herein, or (vii) the Company's failure to provide the Venture with accurate and timely data or fails to provide changes to the matching engine after a reasonable period of time following a request from the Venture)  and the breach is not remedied, within 15 days following receipt of written notice from the Executive specifying the breach.

(d)     For purposes of this Agreement, the term "Change of Control" shall mean any one Person or more than one Person acting as a group (as determined under Treas. Reg. Section 1.409A-3(i)(5)(v)(B)), other than any Person directly or indirectly owned by the Company,

5

acquiring on an arm's length basis ownership of the Company's units that, together with units held by such Person or group, constitutes more than fifty percent (50%) of the total fair market value or total voting power of the Company. However, if any one Person (or more than one Person acting as a group) is considered to own more than fifty percent (50%) of the total fair market value or total voting power of the Company's units prior to the acquisition, any acquisition of additional units by the same Person or Persons is not considered to cause a change in the ownership of the Company. For purposes of this Section 8(d), "Person" shall mean any natural person, sole proprietorship, general partnership, limited partnership, limited liability company, joint venture, trust, unincorporated organization, association, corporation, governmental authority, or any other organization, irrespective of whether it is a legal entity and includes any successor (by merger or otherwise) of such entity.

(e)     Upon termination of Executive's employment with the Company for any reason, Executive shall be entitled only to (i) such portions of Executive's Base Salary and reimbursement of expenses pursuant to Sections 4(a) and 6(a) hereof as have been accrued through the date of his termination of employment; (ii) a prorated portion of Executive's Management Bonus from the calendar year of Executive's termination, if any, calculated through the date upon which Executive's employment terminates; (iii) Executive's Management Bonus from a previous calendar year, if any, that has not been distributed to Executive; and (iv) any other benefits required by law. If Executive's employment is terminated by the Company without "Cause", by the Executive for "Good Reason", or by reason of Executive's death or permanent disability, then in addition to the payments and benefits described in the previous sentence, Executive shall be entitled, subject to Executive's delivery of the release substantially in the form attached hereto as Exhibit A (the "Release") which shall be executed (and not revoked) within sixty (60) days following termination, a payment equivalent to the greater of: (i) fifty percent (50%) of the difference between the Initial Investment and the amount of the Initial Investment which has been expended according to the terms of Section 2 hereof through the date of termination and; (ii) six (6) times the EBITDA of the Venture (after deducting the amount used from the Initial Investment) multiplied by Executive's Bonus Percentage (the " Payment"). (EBITDA shall be based on the greater of the last quarter annualized or the last twelve (12) months prorated.) Neither the Management Bonus nor the Payment shall be considered in the EBITDA calculation. If Executive terminates his employment other than for Good Reason, Executive shall make a payment to the Company in the amount of $100,000.00 (the "Termination Penalty"). Neither the Payment nor Termination Penalty shall be payable in the event Executive purchases the Venture in accordance with Section 13 hereof. All payments due pursuant to this paragraph shall be made no later than thirty (30) days following the date of termination of Executive's employment. Within sixty (60) days of the commencement of this Agreement, the Parties will attempt to negotiate in good faith a modified compensation structure for the Executive in the event of sale of the Venture in its entirety.

(f)     Nothing in this Section 8 shall be read as changing the at-will nature of the employment relationship between Executive and the Company or as creating an employment relationship between Executive and any affiliate of the Company.

6

GLBR_00152959

9.    REPRESENTATIONS AND WARRANTIES.

(a)    Executive represents and warrants that he is free to enter into this Agreement and to perform the duties required hereunder, and except as expressly set forth below, that there are no employment contracts or understandings, restrictive covenants or other restrictions, whether written or oral, preventing the performance of his duties hereunder.

(b)    Executive represents and warrants that he is not subject to any restrictive covenants with any entity that in any way restrict or limit his business activities.

(c)    Executive represents and warrants that he has not disclosed and does not intend to disclose to any person any trade secrets or other confidential, proprietary or non-public information of any of his prior employers whether in tangible or intangible form.

(d)    Executive represents and warrants that the Company has informed him that neither it nor any of its affiliates have any interest in obtaining any trade secrets or other proprietary or non-public information of any of his prior employers whether in tangible or intangible form.

(e)    The Company represents and warrants that it has the authority to enter into this Agreement and that this Agreement does not conflict with or violate any applicable statute, law, regulation, regulatory requirement or internal corporate documents or policies.

(f)    The Company represents and warrants that it is in compliance with all laws, rules and regulations pertaining to the Company's business activities.

(g)    During the term of Executive's employment with the Company, the Company shall not establish any affiliate or provide financial support to any other business entity within the Company that is in direct competition to the Venture.

(h)    Unless otherwise explicitly agreed by the Parties to the contrary in writing, Executive acknowledges and agrees that nothing in this Agreement shall create any ownership or equity interest for Executive in the Venture or the Company, or establish an actual or implied partnership.

10.    NON-COMPETITION.

(a)    In view of the unique and valuable services expected to be rendered by Executive to the Company Group, Executive's knowledge of the trade secrets and other proprietary information relating to the business of the Company Group and in consideration of the compensation to be received hereunder, Executive agrees that during the time Executive is employed by the Company or any of its affiliates and for a period of one-year thereafter (the "Non-Competition Period") Executive shall not, anywhere in the United States, whether for compensation or without compensation, directly or indirectly, as an owner, principal, partner, member, shareholder, independent contractor, employee, consultant, joint venturer, investor, licensor, lender or in any other capacity whatsoever, alone, or in association with any other person or entity, carry on, be engaged or take part in, or render services or advice to, own, share in the earnings of, invest in the stocks, bonds or other securities of, or otherwise become

7

GLBR_00152960

financially interested in, any person or entity engaged in a business substantially similar to that of the Venture ("Non-Compete"). The record or beneficial ownership by Executive of up to two percent (2%) of the shares of any corporation whose shares are publicly traded on a national securities exchange or in the over-the-counter market shall not in and of itself constitute a breach hereunder. Executive shall not, directly or indirectly, during the Non-Competition Period, (i) solicit the business of any person or business entity who is a customer of the Venture; or (ii) cause, induce or attempt to cause or induce any customer, supplier, licensee, licensor, franchisee, employee, consultant or other entity that has a business relationship with the Venture to (a) cease doing business with the Venture or (b) transact business with any competitor of the Venture ("Non-Solicit"). In addition, Executive shall not, directly or indirectly, during the Non-Competition Period, solicit, hire, retain or attempt to solicit, hire or retain any employee or independent contractor of the Venture or in any way interfere with the relationship between the Venture and any of its respective employees or independent contractors ("No-Hire").

(b)    Executive shall be subject to the Non-Compete only if and so long as the Company continues to provide Executive with his salary in accordance with the Company's normal payroll practices during the Non-Competition Period. Executive shall cease to be subject to the Non-Compete restrictions upon the earlier of (i) the end of the Non-Competition Period and (ii) that time that the Company ceases payment of Executive's salary or fails to timely pay to Executive any other monies due and owing pursuant to Section 8(e) of this Agreement. The Company's obligation to pay the Executive his salary during the Non-Competition Period shall cease if Executive violates the Non-Compete.

(c)    If any portion of the restrictions set forth in this Section 10 should, for any reason whatsoever, be declared invalid by a court of competent jurisdiction, the validity or enforceability of the remainder of such restrictions shall not thereby be adversely affected.

(d)    Executive acknowledges that the territorial and time limitations set forth in this Section 10 are reasonable and properly required for the adequate protection of the business of the Company Group. Executive hereby waives, to the extent permitted by law, any and all right to contest the validity of this Section 10 on the ground of breadth of its geographic coverage or length of term. In the event any such territorial or time limitation is deemed to be unreasonable by a court of competent jurisdiction, Executive agrees to the reduction of the territorial or time limitation to the area or period which such court shall deem reasonable.

(e)    The existence of any claim or cause of action by Executive against the Company or any other member of the Company Group shall not constitute a defense to the enforcement by the Company Group of the foregoing restrictive covenants, but such claim or cause of action shall be litigated separately.

(f)    Notwithstanding this Section 10, in the event that Executive purchases the Venture in accordance with Section 13 hereof, then (i) Executive shall not be subject to the Non-Compete and (ii) the Company Group shall not, for a period of one-year following such time as Executive purchases the Venture, establish any entity that directly competes with the Venture, or otherwise interfere with the Venture in bad faith.

8

GLBR_00152961

11.    INVENTIONS AND DISCOVERIES.

(a)    Executive shall promptly and fully disclose to the Company, with all necessary detail for a complete understanding of the same, all developments, know-how, discoveries, inventions, improvements, concepts, ideas, writings, formulae, programs, systems, system specifications, flow diagrams, practices, techniques, compounds, works-in-progress, formulae, data, derivative works, hardware, software, processes and methods (whether copyrightable, patentable or otherwise), and other developments made, received, conceived, developed, acquired or written during working hours, or otherwise, by Executive (whether solely or jointly with others and whether or not at the request or upon the suggestion of the Company) during his period of employment, solely or jointly with others, using the Company Group's resources, or relating to any current or proposed business or activities of the Company Group known to him as a consequence of his employment or the rendering of advisory and consulting services hereunder (collectively, the "Subject Matter").

(b)    Executive hereby assigns and transfers, and agrees to assign and transfer, to the Company all of his rights, title and interest in and to the Subject Matter. Executive further agrees to deliver to the Company any and all drawings, notes, specifications and data relating to the Subject Matter, and to execute, acknowledge and deliver all such further papers, including applications for trademarks, copyrights or patents, as may be necessary to obtain trademarks, copyrights and patents for any thereof in any and all countries and to vest title thereto in the Company.  Executive shall assist the Company in obtaining such trademarks, copyrights or patents during Executive's period of employment, and any time thereafter on reasonable notice and at mutually convenient times, and Executive agrees to testify in any prosecution or litigation involving any of the Subject Matter; provided, however, that following termination of employment, Executive shall be reasonably compensated for his time and reimbursed his reasonable out-of-pocket expenses incurred in rendering such assistance or giving or preparing to give such testimony.

(c)    Subject to the terms set forth in this Paragraph 11(c), Executive shall have a non-exclusive right to the use of the code (for Executive's personal use only and no commercial purpose) created on behalf of the Venture (the "Code Usage Right") if the Company terminates Executive's employment without Cause or if Executive terminates his employment with the Company for Good Reason (except for Change of Control 8(c)(v) above).  For the avoidance of doubt, Executive shall not be entitled to the Code Usage Right if Executive terminates his employment solely for the reason set forth in Paragraph 8(c)(v) above (i.e., following a Change of Control).  Executive shall not receive or otherwise be entitled to the Code Usage Right under the circumstances set forth in this Paragraph for a period of one (1) year from the date of Executive's termination of Employment with the Company.

12.    NON-DISCLOSURE OF CONFIDENTIAL INFORMATION.

(a)    Executive shall not, during his period of employment or at any time thereafter, directly or indirectly, disclose or permit to be known (other than as is required in the regular course of his duties (including without limitation disclosures to the Company's advisors and consultants) or as is required by law (in which case Executive shall give the Company prior written notice of such required disclosure) or with the prior written consent of the Board), to any

9

GLBR_00152962

person, firm or corporation, any confidential information acquired by him during the course of, or as an incident to, his employment hereunder, relating to the Company Group, any client of the Company Group, or any corporation, partnership or other entity owned or controlled, directly or indirectly, by any of the foregoing, or in which any of the foregoing has a beneficial interest, including, but not limited to, the business affairs of each of the foregoing.  Such confidential information shall include, but shall not be limited to, proprietary technology, trade secrets, patented processes, research and development data, know-how, market studies and forecasts, competitive analyses, pricing policies, employee lists, personnel policies, the substance of agreements with customers, suppliers and others, marketing or dealership arrangements, servicing and training programs and arrangements, confidential and proprietary customer pricing information, profit and loss statements, productivity data, financial models and computer software programs, source or object code, electronic trading platforms, trading records, customer lists, information about direct communication lines, screen systems and wiring instructions, the Company Group's business prospects and opportunities (including the prospects and opportunities that Executive pursued on behalf of the Company Group during his period of employment), all other information about any customer (including, without limitation volume discounts, details of trading volumes, details of discounts and operating costs and trading patterns) to whom the Company or its affiliates provide services during Executive's period of employment, any other confidential or proprietary information of the Company Group and any other documents embodying such confidential information.  This confidentiality obligation shall not apply to any confidential information which becomes publicly available from sources unrelated to Executive.

(b)      All information and documents relating to the Company Group as hereinabove described (or other business affairs) shall be the exclusive property of the Company Group, and Executive shall use commercially reasonable best efforts to prevent any publication or disclosure thereof.   Upon termination of Executive's employment with the Company, all documents, records, reports, writings, electronically stored information, and other similar documents containing confidential information, including copies thereof, then in Executive's possession or control shall be immediately returned and left with the Company.

13.     RIGHTS OF FIRST OFFER AND FIRST REFUSAL

(a)      In the event the Company desires to terminate its involvement in the Venture, the Company shall notify the Executive of its intention in writing ("ROFO Notice").  The Executive shall have thirty (30) days from the receipt of the ROFO Notice to propose a purchase price (which may be paid over a term of seven (7) years with principal paid in equal annual installments and interest to be paid on the unpaid principal at the rate of prime plus one percent (1%)) and all other matters related to such sale.  The Company shall have up to thirty (30) days to accept the offer from Executive.  In the event that the Company does not accept the offer, the purchase price shall be determined by an appraiser to be selected by both Parties.

(b)      In the event that the Company receives a bona fide offer from a third party to purchase (all or part of) the Venture, then the Company shall promptly deliver to Executive a written notice of the bona fide offer which shall include the proposed purchase price and all other matters related to such sale ("ROFR Notice").  The ROFR Notice shall constitute a binding offer by the Company to sell (all or part of) the Venture to the Executive on the terms designated

CONFIDENTIAL

GLBR_00152963

therein. Executive shall have fifteen (15) days from the receipt of the ROFR Notice to accept the terms of the ROFR Notice. If the transaction is not closed within thirty (30) days thereafter, then the Company may sell the Venture to the third party offeree at a price and on terms no less favorable to the Company than described in the ROFR Notice. In the event a sale of all or part of the Venture to a third party, Executive shall be entitled to the Bonus Percentage of the proceeds, including but not limited to, cash, warrants, options and earnout generated from such transaction, provided that in the event that Executive receives a payment under this Paragraph 13(b), he shall not also be entitled to the Payment under Paragraph 8(e) hereunder.

14.     SPECIFIC PERFORMANCE.

Executive agrees that if he breaches, or threatens to commit a breach of, any of the provisions of Sections 10, 11 or 12 hereof (the "Restrictive Covenants"), the Company shall have, in addition to, and not in lieu of, any other rights and remedies available to the Company under law and in equity, the right to injunctive relief and/or to have the Restrictive Covenants specifically enforced by a court of competent jurisdiction, without the posting of any bond or other security, it being agreed that any breach or threatened breach of the Restrictive Covenants would cause irreparable injury to the Company Group and that money damages would not provide an adequate remedy to the Company. Notwithstanding the foregoing, nothing herein shall constitute a waiver by Executive of his right to contest whether a breach or threatened breach of any Restrictive Covenant has occurred. The Executive shall inform any future employer of the Restrictive Covenants and provide such employer with a copy thereof, prior to the commencement of that employment.

15.     INDEMNIFICATION

The Company will, to the fullest extent permitted by Delaware law, defend, indemnify and hold harmless the Executive against any costs, losses, claims, suits, proceedings, damages or liabilities to which the Executive may become subject which arise out of, are based upon or relate to the Executive's employment by the Company, including without limitation reimbursement for any legal or other expenses reasonably incurred by the Executive in connection with defending against any such costs, losses, claims, suits, proceedings, damages or liabilities.    However, Executive agrees to repay any expenses paid or reimbursed by the Company if it is ultimately determined that the Executive is not legally entitled to be indemnified by the Company. Notwithstanding the above, the Company shall not be required to indemnify or hold harmless the Executive against any costs, losses, claims, suits, proceedings, damages or liabilities to which the Executive may become subject which arise out of, are based upon or relate to an action or proceeding brought by one or more of Executive's former employers alleging a theft of trade secrets, a breach of fiduciary duty, or a violation of any contractual obligation Executive holds with the former employer, including but not limited to any restrictive covenant.

16.     GOVERNING LAW AND CHOICE OF FORUM.

This Agreement shall be governed by and construed in accordance with the laws of the State of New York applicable to agreements made and to be performed therein. Any proceeding or action seeking equitable or other relief based on this Agreement must be commenced in the

11

GLBR_00152964

federal district court in the Southern District of New York, or, in the absence of federal jurisdiction, then in any state court of competent jurisdiction located in the borough of Manhattan in the state of New York.

17.    SEVERABILITY.

The holding of any provision of this Agreement to be invalid or unenforceable by a court of competent jurisdiction shall not affect any other provision of this Agreement, which shall remain in full force and effect.

18.    WITHHOLDING.

The Company may deduct and withhold from the payments to be made to Executive hereunder any amounts required to be deducted and withheld by the Company under the provisions of any applicable statute, law, regulation or ordinance now or hereafter enacted.

19.    CODE SECTION 409A.

(a)    The intent of the parties is that payments and benefits under this Agreement comply with Section 409A of the Code and, accordingly, to the maximum extent permitted, the Agreement shall be interpreted to be in compliance therewith.  The Parties acknowledge and agree that the interpretation of Section 409A and its application to the terms of this Agreement is uncertain and may be subject to change as additional guidance and interpretations become available. Anything to the contrary herein notwithstanding, all benefits or payments provided by the Company to Executive that would be deemed to constitute "nonqualified deferred compensation" subject to  Section 409A are intended to comply with Section 409A. If, however, any such benefit or payment is deemed to not comply with Section 409A, the Company and Executive agree to renegotiate in good faith any such benefit or payment (including, without limitation, as to the timing of the Payment payable hereunder) so that either (i) Section 409A will not apply or (ii) compliance with Section 409A will be achieved; provided, however, that any resulting renegotiated terms shall provide to Executive the after-tax economic equivalent (determined without regard to the application of Section 409A to the terms that were renegotiated) of what otherwise has been provided to Executive pursuant to the terms of this Agreement, and provided further, that any deferral of payments or other benefits shall be only for such time period as may be required to comply with Section 409A. In no event whatsoever shall the Company be liable for any tax, interest or penalties that may be imposed on Executive by Section 409A of the Code or any damages for failing to comply with Section 409A.

(b)    A termination of employment shall not be deemed to have occurred for purposes of any provision of this Agreement providing for the payment of any amounts or benefits subject to Section 409A upon or following a termination of employment until such termination is also a "separation from service" within the meaning of Section 409A: and for purposes of any such provision of this Agreement, references to a "resignation," "termination," "terminate," "termination of employment" or like terms shall mean separation from service.

(c)    All reimbursements for costs and expenses under this Agreement shall be paid in no event later than the end of the calendar year following the calendar year in which the Executive incurs such expense.   With regard to any provision herein that provides for

12

GLBR_00152965

reimbursement of costs and expenses or in-kind benefits, except as permitted by Section 409A, (i) the right to reimbursement or in-kind benefits shall not be subject to liquidation or exchange for another benefit, and (ii) the amount of expenses eligible for reimbursements or in-kind benefits provided during any taxable year shall not affect the expenses eligible for reimbursement or in-kind benefits to be provided in any other taxable year, provided, however, that the foregoing clause (ii) shall not be violated with regard to expenses reimbursed under any arrangement covered by Section 105(b) of the Code solely because such expenses are subject to a limit related to the period the arrangement is in effect.

(d)     Whenever a payment under this Agreement specifies a payment period with reference to a number of days (e.g., "payment shall be made within thirty (30) days following the date of termination"), the actual date of payment within the specified period shall be within the sole discretion of the Company.

(e)     If under this Agreement, an amount is paid in two or more installments, for purposes of Section 409A, each installment shall be treated as a separate payment.

20.     PROFIT TRACK RECORD OF THE VENTURE

The parties agree that Executive shall have a non-exclusive right to the profit track record of the Venture following his termination of employment with the Company.

21.     NOTICES.

Any notices required or permitted to be given hereunder shall be sufficient if in writing, and if delivered by hand or courier, or sent by certified mail, return receipt requested, to the appropriate party's last known address, and shall be deemed given as of the date of the delivery or at the expiration of three days in the event of a mailing.

22.     COUNTERPARTS AND FACSIMILE SIGNATURES.

This Agreement may be signed in counterparts with the same effect as if the signatures to each counterpart were upon a single instrument, and all such counterparts together shall be deemed an original of this Agreement.  For purposes of this Agreement, a facsimile copy of a party's signature shall be sufficient to bind such party.

23.     WAIVER OR BREACH.

It is agreed that a waiver by either party of a breach of any provision of this Agreement shall not operate, or be construed, as a waiver of any subsequent breach by that same party.

24.     ENTIRE AGREEMENT AND BINDING EFFECT.

This Agreement contains the entire agreement of the parties with respect to the subject matter hereof, supersedes all prior and contemporaneous agreements, both written and oral, between the parties with respect to the subject matter hereof, including but not limited to the Letter of Intent between Executive and the Company dated July 27, 2009, and may be modified only by a written instrument signed by each of the parties hereto.  This Agreement shall be

CONFIDENTIAL                                                                            GLBR_00152966

binding upon and inure to the benefit of the parties hereto and their respective legal representatives, heirs, distributors, successors and assigns; provided, however, that Executive shall not be entitled to assign or delegate any of his rights or obligations hereunder without the prior written consent of the Company.  It is intended that Sections 10, 11, 12 and 14 hereof benefit each of the Company and each other member of the Company Group, each of which is entitled to enforce the provisions of Sections 10, 11, 12 and 14 hereof.

25.   SURVIVAL.

Except as otherwise expressly provided herein, the termination of Executive's employment hereunder shall not affect the enforceability of Sections 8(e), 10, 11, 12 and 14 hereof.

26.   FURTHER ASSURANCES.

The parties agree to execute and deliver all such further documents, agreements and instruments and take such other and further action as may be necessary or appropriate to carry out the purposes and intent of this Agreement.

27.   CONSTRUCTION OF AGREEMENT.

No provision of this Agreement or any related document shall be construed against or interpreted to the disadvantage of any party hereto by any court or other governmental or judicial authority by reason of such party having or being deemed to have structured or drafted such provision.

28.   HEADINGS.

The Section headings appearing in this Agreement are for the purposes of easy reference and shall not be considered a part of this Agreement or in any way modify, demand or affect its provisions.

[REMAINDER OF PAGE INTENTIONALLY LEFT BLANK]

14

CONFIDENTIAL

GLBR_00152967

IN WITNESS WHEREOF, the parties hereto have executed this Agreement as of the date and year first above written.

Forex Capital Markets, LLC

By: _____

Name:        William Ahdout

Title:        Managing Director

_____
John Dittami

15

**CONFIDENTIAL**

**Exhibit A**

**Release**

    In exchange for the good and valuable consideration to be provided in accordance with the terms and conditions of the Employment Agreement (the "Agreement") between John Dittami (the "Executive") and Forex Capital Markets LLC (the "Company") dated as of September 4, 2009, Executive releases and discharges the Company and its parents, subsidiaries, affiliates, successors, assigns, officers, directors, employees and representatives ("Company Releasees"), of and from any and all rights, claims, demands, debts, dues, sums of money, accounts, attorneys' fees, complaints, judgments, executions, actions and causes of action of any nature whatsoever, cognizable at law or equity, which Executive has or claims, or might hereafter have or claim, against the Company Releasees.  This release includes, without limitation, any claims based on the Agreement, any and all statutory claims and/or claims based upon race, age, gender, national origin, color, disability, religion, or any other violation of any equal employment opportunity law, ordinance, rule, regulation or order, including, but not limited to, 42 U.S.C. § 1981; Title VII of the Civil Rights Act of 1964, as amended; the Civil Rights Act of 1991; the Americans with Disabilities Act; the Age Discrimination in Employment Act of 1967, as amended; the Employee Retirement Income Security Act of 1974, as amended; or any other federal, state, or local laws or regulations regarding employment discrimination, termination of employment, or employee benefits.  This release also includes, but is not limited to, any common law claims, including but not limited to claims for wrongful discharge, defamation, negligence, intentional or negligent infliction of emotional distress, public policy tort, or any other state law claims or any claims grounded in tort or contract; provided, however, that the Agreement specifically does not release any claims that Executive cannot waive by operation of law, including the right to file a charge with or participate in an investigation conducted by the Equal Employment Opportunity Commission ("EEOC").  Executive is waiving, however, his right to any monetary recovery or other relief should the EEOC or any other agency pursue claims on his behalf.  This release specifically excludes: (i) any right to indemnification that Executive might have as a Director, Officer, or employee pursuant to applicable law and/or the Company's certificate of incorporation, bylaws, articles of organization or operating agreement; (ii) any right by Executive to obtain any vested balance in accounts under any pension or retirement plan or agreement; (iii) any COBRA rights; and (iv) any conversion or continuation coverage rights under any Employer welfare benefits plan.

It is expressly understood that nothing in this Release shall be deemed to constitute a waiver by the Executive of any rights that Executive may have in the future with respect to any actions or non-actions taken by Releasees following the execution of this Release.

_____
  John Dittami

Date:_____

16

**CONFIDENTIAL**                              **GLBR_00152969**