# Exhibit 21

## Page 1

COMMODITY FUTURES TRADING COMMISSION
------------------------------------X
IN THE MATTER OF:
RETAIL FOREX FRAUD
------------------------------------X

        140 Broadway
        New York, New York

        May 25, 2016
        9:39 A.M.

    DEPOSITION of DREW NIV, the witness herein, taken by the Commodity Futures Trading Commission, pursuant to Agreement, held at the above-noted time and place, before a Notary Public of the State of New York.

## Page 2

APPEARANCES:

COMMODITY FUTURES TRADING COMMISSION
DIVISION OF ENFORCEMENT
  140 Broadway - 19th Floor
  New York, New York 10005
BY:  DAVID C. NEWMAN, ESQ.
    XAVIER ROMEU-MATTA, ESQ.
    BRENT TOMER, ESQ.
    CHRISTOPHER M. GIGLIO, Investigator

WEIL, GOTSHAL & MANGES, LLP
Attorneys for Witness
  767 Fifth Avenue
  New York, New York 10153
BY:  CHRISTOPHER L. GARCIA, ESQ.
    RAQUEL KELLERT, ESQ.
    ZOE DELUZIO, ESQ.

## Page 3

        o0o

    MR. NEWMAN: We are on the record. It's 9:39 a.m. on May 15th, 2016.
    Can you swear in the witness, please.

D R E W   N I V,
  having been duly sworn by a Notary
  Public for the State of New York,
  testified as follows:

EXAMINATION
BY MR. NEWMAN:
    Q  Can you please state and spell your full name for the record.
    A  Sure. My name is Dror Niv, D-r-o-r.
    Q  And you also go by Drew?
    A  Drew, correct.
    Q  D-r-e-w?
    A  Correct.
    Q  Can you tell me your full address, please?
    A  78 Pecksland Road, Greenwich, Connecticut 06831.
    Q  My name is David Newman. I am here with my colleagues, Brent Tomer, Chris Giglio, Xavier Romeu-Matta. Xavier, Brent and I are attorneys, with the Division of Enforcement of the

## Page 4

        Drew Niv

Commodities Futures Trading Commission, the CFTC. Chris is an investigator also with the Division. For purposes of this proceeding, we are all officers of the Commission.
    This is an investigation by the CFTC in the matter of Retail Forex Fraud to determine whether there have been violations of certain provisions of the Commodities Exchange Act and the Commission's regulations. The facts developed in this investigation might also constitute violations of other laws, federal, state, civil or criminal.
    You are represented by counsel here; is that right?
    A  Yes.
    MR. NEWMAN: Can counsel please identify yourselves for the record.
    MR. GARCIA: Christopher Garcia from Weil, Gotshal & Manges on behalf of the witness and FXCM.
    MS. KELLERT: Raquel Kellert from Weil, Gotshal & Manges on behalf of the witness and FXCM.
    MS. DELUZIO: Zoe Deluzio from Weil,

21

Drew Niv

A There was -- I don't recall the instance, a number of times, but a few times I gave testimony in private litigation. And I believe that I gave testimony in an NFA arbitration hearing.

Q Was that NFA arbitration hearing relating to your position at FXCM?

A Yes. All that we are discussing is related to FXCM.

Q With respect to the private litigation, can you describe generally the matters and the time period in which you gave testimony?

A I don't recall every instance, but I recall there was, you know, I'm struggling to recall exact cases, but I do recall giving testimony. I just don't recall. I'm getting the cases confused. There's some cases I know of, but it's FXCM versus, you know, private litigation. There was an IP, intellectual property software dispute. I believe that was one of them, but I'm not sure.

Q Did any of the litigation or arbitrations, in your mind, relating to FXCM, have anything to do with Effex Capital or with the

22

Drew Niv

liquidity providers used by FXCM in its retail Forex business?

A No.

Q Have you testified in court or only in depositions?

A In court.

Q Do you recall the instance in which you testified in court?

A During the CFTC case in 2005.

Q Okay. Any other times?

A I don't recall.

Q I will include the CFTC case in this, the Gibralter case, but have you ever been subject of an investigation or action by the CFTC or any other governmental regulatory authority?

A I have been named in an investigation, yes.

Q What was the circumstances?

A It was to my recollection, the CFTC case from 2011 that was settled. I was in the investigation, not in the settlement. I believe there's an NFA case where I was named.

Q That was going to be my next question which is, have you been the subject of any

23

Drew Niv

disciplinary action by a self-regulated organization or futures association like the NFA?

A No, not that I recall. Again the subject of an investigation.

Q So that's my question. Without respect to the outcome of the investigation or action, have you been the subject of an NFA investigation?

A Yes. I was named, as the CEO of the company, I was named in a number of investigations.

Q Do you recall the outcomes of those investigations?

A They were all settled without admitting or denying.

Q And the NFA action in 2011, is that correct?

A Correct.

Q Also one in 2007?

A Correct.

Q Any others?

A Not that I recall.

Q Any other investigations or actions other than before the NFA?

A Not that I recall.

24

Drew Niv

Q Changing gears, I would like to talk to you about John Dittami. Who at FXCM hired Mr. Dittami?

A Mr. Ahdout.

Q What was Mr. Dittami hired to do for FXCM?

A Mr. Dittami was hired for a number of tasks. One was to investigate essentially to quantify and investigate the causes of essentially what we perceived as negative customer experiences having to do with the NDD business model.

Q When you say NDD business model, do you mean the no-dealing desk business model?

A Yes.

Q Sorry, continue.

A And essentially with the negative customer experiences arising from bad practices by external market makers, and that was task one. Task two was essentially to research a remedy for those, you know, ailments, if you like.

Q And what were the remedies that Mr. Dittami arrived at in his time working for FXCM?

A Mr. Dittami arrived at the analysis of

25

Drew Niv

essentially quantifying for us what we are seeing visually was that there was too many cases where market makers, we believed, could have done a lot better on behalf of clients. There was too many instances where there was not enough liquidity, there was too many instances where we believed slippage was excessive given the type of customers that are trading on the system. So if you benchmark to exchanges and other commercial venues, the slippage was on par or less. But there are so many more predatory customers on those ventures that require therefore more defensive mechanisms on behalf of the market makers, that essentially that's how those outcomes come about. So the market makers put smaller bids and offers, pull them very quickly, refresh too quick, you know, use last look too aggressively.

And with our client base this was an unnecessary -- we believed it was an unnecessary defense mechanism that was not needed. The market makers in question would not lose money, would not need that level of protection because the customers were mostly not that level of predatory, the order flow was more friendly, and therefore,

26

Drew Niv

we could have done much better for the clients.

Mr. Dittami came to the conclusion, quantified that to be that there's room for very significant improvement in the customer experience. And then that was his job.

Q  Okay. And did his job ultimately or at some point become designing an internal market-making system at FXCM that would operate as a liquidity provider alongside the external liquidity providers?

A  Well, that engendered, yes, he designed -- essentially he built a market-making algorithm from scratch to be a market maker. We had a discussion internally whether we would need to revert back to a dealing desk model and replace the external market makers with just one market maker, which is our own.

Without going back to the pre-dealing desk days of us being, you know, running the dealing desk ourselves, essentially doing it in a more modern algorithmic fashion, we wanted to essentially run market making in a more modern algorithmic fashion. So essentially that started a debate, should we go back or should we

27

Drew Niv

essentially separate Mr. Dittami and have him be an external market maker alongside other market makers.

Q  What were the terms of Mr. Dittami's employment with FXCM?

A  I don't recall the salary, but it was essentially a compensation plan that involved a percentage of profits generated from trading.

Q  And when you say profits generated from trading, that would have been the trading done by the internal market maker that he was creating?

A  Had we gone to an internal market-making model, that's what it would have entailed, yes.

Q  So he was going to be a salaried employee also with potential for percentage of profits?

A  That was one of the outcomes contemplated, yes.

Q  What type of work product was Mr. Dattami generating when he was working for FXCM? You mentioned algorithm. Was he writing computer code or other type of work product?

A  There was a number of -- there's computer code for the algorithm, there's just a

28

Drew Niv

code for the analytics programs themselves. Essentially he had to build from scratch a high-frequency type surveillance and monitoring system that would take essentially measure and quantify all the different statistics that we measure customer interaction with the market maker with.

So how long does it take for an order to get from the client, you know, to our system, from our system to the market maker, from the -- if the market maker rejects, how long does it take each market maker to -- or accepts, right, how long does it take them to confirm, exceptions and rejections in different market time. There's lots of -- we could go through, we would be all day, there's many, many details. But that's the substance of those details, examples of the substance of that.

Q  And all the work product that Mr. Dattami created, everything that you described or described by example, when he was working for FXCM, that all belonged to FXCM, correct?

A  I believe so.

MR. ROMEU-MATTA:  David?

57

Drew Niv

2  A  In sales, yes.
3  Q  How long, if you recall, did Mr. Dittami
4  work as an employee of FXCM?
5  A  I don't recall the exact, you know,
6  time, six months or.
7  Q  I can represent to you that FXCM has
8  produced to us a resignation letter signed by Mr.
9  Dittami and dated April 14 of 2010. Do you know
10 if you've seen that letter?
11 A  I've seen that letter.
12 Q  In that letter Mr. Dittami says that he
13 and FXCM have an employment contract in place. Is
14 that right? I'm sorry, I'm asking you a question
15 about a document I haven't put in front of you.
16 Let me rephrase the question.
17    I will represent to you that in the
18 resignation letter he says that he has an
19 employment contract in place with Mr. Dittami. Is
20 that consistent with your understanding as of
21 April 14, 2010?
22 A  Yes.
23 Q  Is it the employment agreement that we
24 looked at as Exhibit Number 5?
25 A  I'm assuming so.

58

Drew Niv

2  Q  Were there any, to your knowledge, were
3  there any modifications to that employment
4  agreement?
5  A  I don't recall the specifics.
6  Q  Do you recall generally?
7  A  Again, I think that I recall -- I was
8  involved, you know, and there's been very much a
9  rolling discussion of between, of what we wanted
10 to accomplish and what the research is finding out
11 as we are doing different things and coming up
12 with different scenarios of how to accomplish the
13 same goal. And we had obviously differences of
14 opinion internally as to how to get there. So
15 there's a rolling argument and a rolling -- things
16 that continues in different format for the next
17 two years. So there's lots of permutations and to
18 say -- I cannot put my hand on and say this
19 contract presents these permutations.
20    So there were changes in my general
21 understanding of how we were going about this. I
22 don't know where that's all represented on paper.
23 Q  I think you may have answered but do you
24 have any general or specific recollection of any
25 written modifications to this employment

59

Drew Niv

2  agreement, Exhibit 5, between September '09 and
3  the date of Mr. Dittami's resignation?
4  A  I do not know the specifics.
5  Q  Do you have any general or specific
6  recollection of any oral or non-written
7  modifications to the agreement?
8  A  The big, if you will, argument, so this
9  kind of a rolling argument that we had and
10 continues in different format is, given what is
11 going on, what's the remedy, should we move
12 towards as I described before, to roll back all or
13 partially to dealing desks, non-dealing desk,
14 and/or -- that's two scenarios. Scenario three is
15 to have Mr. Dittami form a separate company and
16 join the other sixteen or so market makers that
17 are making markets to us. Those are general sort
18 of arguments back and forth, and we went on,
19 discussions between executives, between compliance
20 on this issue.
21 Q  Could I ask you to turn to page 13 of
22 Exhibit 5 toward the end of the document, the
23 bottom of page 13 there's an item number 24 titled
24 Entire Agreement and Binding Effect. Do you see
25 that?

60

Drew Niv

2  A  Yes.
3  Q  And it continues on to page 15, that
4  paragraph. Do you agree that this provision of
5  Mr. Dittami's employment agreement states that the
6  agreement may be modified only by a written
7  agreement between the parties?
8  A  I hear what it says. I do not know if
9  this is standard language in all of these
10 employment agreements or in business contracts in
11 general or is this specifically negotiated to be
12 that way. I'm not aware.
13 Q  You don't recall either way?
14 A  No.
15 Q  To your knowledge, was there any point
16 prior to April 14, 2010 when Mr. Dittami resigned
17 that FXCM ceased to be the owner of the venture or
18 the work that Mr. Dittami had done as an employee
19 of FXCM?
20 A  There were discussions, you know, to
21 separate, you know, Mr. Dittami -- the conclusion
22 we came to even though not a final conclusion was
23 that even though we may want to roll to the
24 no-dealing desk later, this was not the time, and
25 we wanted Mr. Dittami to separate and form what

61

Drew Niv

became Effex Trading, a separate company, they will be a market maker separately and join the other market makers.

The exact date and when all of this, you know, it's too long ago for me to remember all of those things. But I viewed this in multiple stages. There was a stage he was inside doing research and he -- and when we said even though we have not come to the conclusion finally, that as of this moment in time we do not want to go back, and therefore meaning for him to be separate, at that time there were still people at the firm contemplating that if this venture succeeds, his company succeeds, we should buy him and roll back at that point.

So essentially there was an argument that taking 16 proven market makers to replace them with one start-up that is not proven yet, or rather shown on back tests that it works, but not shown on an industrial scale that we could replace. So that's one argument. And there was still a contemplation that if he does prove that he can and he is sufficiently good to replace all of those market makers, we may buy him and roll

62

Drew Niv

back at that point. But at that point he would have to be a bigger, bring more economics to the venture, be a bigger thing.

But in order for him to take a step of making markets he would have to separate from FXCM, could not be a part of FXCM.

Q   I guess the question I want to ask is a little bit more focused, which is, can you think of a time -- was there a time prior to April 14, 2010 that you have in your mind that the venture as defined in this agreement and the work that Mr. Dittami did as part of the venture as described in the employment agreement ceased to be the property of FXCM?

A   Yeah, if he resigned -- I don't recall the dates here, but if he resigned on April 14th, then obviously the discussion that he should separate happened way before then.

Q   And --

A   He is not resigning, we are not telling him on Tuesday you are fired on Wednesday. So if he resigned on April 14th, it's highly likely that we took our time making that decision. This was a very contentious and essential issue to the

63

Drew Niv

company, it was not done lightly. There were lots of people were in the decision.

Q   Was there a point during the decision making or the discussion process that you're referring to that you can think of during which the venture as defined in the agreement for Mr. Dittami's work done as part of the venture was no longer the property of FXCM, no longer owned by FXCM?

A   I don't recall us thinking in those terms. Do you see what I mean? You are phrasing it that way, we didn't think in those terms. The terms were should we be a market maker or not. The answer was not, therefore he had to go and be his own company.

Q   I can also represent to you that in Mr. Dittami's resignation letter he says that he and FXCM should release each other from obligations under the contract. And I'll also represent to you that Mr. Ahdout countersigned the letter on behalf of FXCM. Do you have any independent recollection of that?

A   I don't.

Q   Do you agree though, based on me telling

64

Drew Niv

you the letter was dated April 14, 2010, that Mr. Dittami's employment contract was terminated as of that date?

A   Officially as of that date it was terminated.

Q   Do you have an understanding or a belief as to what effect that termination, what effect if any that termination and release on April 14, 2010 had on FXCM's ownership of the venture or of the work that Mr. Dittami had already done prior to that date?

A   FXCM, as I said before, essentially can't use any of that information. It's like getting a genetic code testing machine without a geneticist to test it. You know, the plumber cannot do that job. So we cannot use any of this stuff because we don't have the people to do it. And therefore he essentially went to start off his own company obviously using some of the work that was done in FXCM.

Q   Is it fair to say that your understanding is that FXCM still owned the venture, owned the work that had been done pursuant to the venture, but couldn't do much with

137

Drew Niv

stuff he had prewritten before when he worked in other places. He built his own system based on that knowledge.

Q   I guess I don't mean the experience and the knowledge that he came to FXCM with, but the work he did building the trading system at FXCM?

A   I believe he was working on stuff before we employed him. There is substantial parts of this that is written --

Q   Under his employment agreement, that system or the parts of it that he developed as an employee of FXCM, that all belonged to FXCM; is that right?

A   Correct. But FXCM could not use any of this without him, so it's useless.

Q   I think you testified earlier that to your knowledge FXCM didn't lose the rights to Mr. Dittami's work product that he had done as an FXCM employee prior to Mr. Dittami's resignation on April 14, 2010; is that right?

A   Legally.

Q   So FXCM at this time had the rights or ownership rights and rights to use the whole, I'll use the term venture -- that's the term used in

138

Drew Niv

the employment agreement -- FXCM had the complete rights to the venture minus its obligations to Mr. Dittami under the employment contract; is that right?

A   Yes. Again, the practical usage is nil -- it's a thing that has to change and has to constantly adapt. So without him essentially updating it, changing it, upkeeping it, it is essentially useless to us.

Q   So FXCM is saying here in this agreement that this trading system that was substantially created by Mr. Dittami as an employee now is a proprietary, belongs to Effex Capital, correct?

A   Correct.

Q   And that's consistent with the employment agreement because FXCM has a right to 70 percent of Effex Capital; is that right?

A   I don't think so.

Q   How do you understand this?

A   Again, from a practical perspective, I can't do anything with this software, I need him to update it. We are using this software and have used it for years for trade surveillance, and we had to write our own trade surveillance, you know,

139

Drew Niv

stuff; it would have cost us an enormous amount of money. That part we did retain, and we are not paying for it.

Q   And as you said, if Mr. Dittami had to give up everything that he had worked on on the trading system during his approximately six months of employment at FXCM, that would take him a long time and cost a lot of resources as well?

A   He would have had to rewrite analytics and trading, we would have had to rewrite surveillance. This way he doesn't have to rewrite analytics and trading, we don't have to rewrite surveillance, fairly simple.

Q   After -- going ahead to Mr. Dittami's resignation on April 14, 2010, after that date, what did you understand to be the nature of FXCM's interest in the operations of Effex?

A   Just wasn't getting our loan repaid. Our interest, that was a critical piece in terms of that near term objective. Long-term objective is really, we believe was accomplished very successfully, was to make him successful so he would provide competition, so prices go down, and we'll benefit. And as evidenced by the various

140

Drew Niv

studies we had published, this task was largely accomplished very successfully and I think the industry actually moved in a better direction because of it.

Q   There's another way to summarize what you just said, you had an interest in receiving the services that you anticipated he was going to provide pursuant to the services agreement?

A   Correct.

Q   Did FXCM also have, I guess, in addition to the more intangible services, FXCM also had an interest in receiving $21 per million of the order flow that Effex was going to get, right?

A   That's correct.

Q   Did other liquidity providers at this time in and around April 2010, did other liquidity providers pay you for order flow?

A   I don't remember the exact dates but we had numerous agreements with numerous providers, you know, that lived at different times. We had one with Goldman Sachs, didn't last very long. We had one with BNP that lasted longer but also ended. We had a bunch of deals, some involved payment, some involved advantage in return for

141

Drew Niv

benefits to clients.

And essentially we had a bad experience with all these deals. These deals were essentially to large institutions, FXCM was this tiny insignificant customer. These institutions had staff turnover particularly because of the financial crisis, there was a big turnover in capital market trading stuff that led to essentially people redoing agreements every time a new manager would come in. Also because FX trading was recent in electronic trading.

The world before electronic trading was a twenty-four hour market. At 4:00 OR 5:00 New York time, all Deutsche Bank, all trading ceases in the United States, and if a client calls he is now routed to Singapore or Australia, right, and the clock turns and that goes from London and the clock turns, back to the United States.

As banks went electronic, the hub system was still there for most people. And so even within the same bank you have three different clients, three different managers, three different centers that things would go through. And it was very, very difficult to get all of those centers,

142

Drew Niv

even within the same institution. Different bonus plans, everything, same interest because it was the same bank.

It was outrageously difficult to do. We shopped around a lot. It was very important to us to do all these things and, you know, part of -- you know, this whole discussion about employment by John Dittami, Effex, turning back to the dealing desk, discussion around frustrations in not being able to essentially cure what we are trying to cure, which is this customer issue.

BY MR. ROMEU-MATTA:

Q  You mentioned that there were other payments for order flow with liquidity providers?

A  Yes.

Q  Do you recall which ones?

A  Goldman Sachs and BNP.

Q  Any others?

A  I don't recall.

Q  Do you remember an approximate date for the payment with Goldman Sachs?

A  I don't know.

Q  Was it between 2008 and 2013?

A  Yes.

143

Drew Niv

Q  How about BNP?

A  Around the same.

Q  It would have been within those dates?

A  Within those dates.

MR. ROMEU-MATTA:  Thank you.

BY MR. NEWMAN:

Q  To your recollection, it would have been Goldman Sachs and BNP were paying you for order flow at the same time that these service agreements are being signed with Effex Capital?

A  I do not recall exact dates. Some may have been before. BNP was for a longer period of time so it may have overlapped, I'm pretty sure it overlapped with Effex on certain subsets of customers.

Q  Yes.

A  I'm more certain there. I'm not sure of dates, but more certain it overlapped. Goldman I'm not certain because it was a shorter period of time.

Q  Just to be clear, we are talking about payment for order flow with respect to your retail customers and to the no-dealing desk model.

A  There was also on the institutional

144

Drew Niv

side, I think BNP was mostly on the institutional side. I don't recall if we had a retail one too, but it was mostly institutional.

Q  So payment for order flow would have been, BNP may not have included the retail side?

A  I don't recall exactly.

Q  Okay, what about Goldman Sachs, did that--

A  That was retail.

Q  That was retail?  You said that was a short period of time?

A  Yes, they reneged two months in or three months into it, one of the most pathetic things I have ever seen.

Q  Do you think that was before 2010?

A  It was before.

Q  Do you know, just out of curiosity, do you know what the amount of the payments were per million, if that's the way it was calculated?

A  I don't recall.

Q  Was it substantially more than $21 per million?

A  I don't know.  I just have no recollection of it.

153

Drew Niv

because of competition, and market conditions changed dramatically, which obviously did happen over the years.

Q   That would be related to his P&L per million, right, the change in competition or market conditions?

A   Yes.

Q   Is there anything besides a change in his P&L per million that you contemplated could cause an adjustment in the payments for order flow?

A   Not that I recall.

Q   As far as you can recall, were there any discussions within FXCM including with the compliance department about this arrangement of setting the payment for order flow at $21 per million with the idea of adjusting it if Effex's P&L went up or down?

A   Compliance was involved in obviously all, essentially we were trying to mimic what happened, you know, in other arrangements in equities where there were standards already set for this, and obviously as in equities, as for example, options used to have lots of payment for

154

Drew Niv

order flow, as there's lots of more exchanges and competition, proliferation of exchanges and big increase in competition, those spreads narrowed and therefore the payment for order flow payments went down.  Happened in options, happened in equities, contemplated that would happen here, that's not abnormal.

Q   So you had discussions internally at FXCM including with compliance personnel about the idea that this adjustable payment for order flow would be appropriate because it's similar to what's been done in other -- with payment for order flow in other markets?

A   Correct.

Q   Do you recall anyone in particular who was involved in making that point or discussing that point with you?

A   It was the same crowd we were discussing.

Q   And do you recall any e-mails or memos or other documents where that point may have been discussed?

A   It's too long ago to remember the details.

155

Drew Niv

Q   There may have been, there may not have been, you are not sure either way?

A   Correct.

Q   Isn't it the case that FXCM had an equity interest in Effex?

A   No.

Q   Did FXCM have an option to buy a portion of Effex Capital?

A   One of the contemplated negotiating things we did, but we did not do a deal.

Q   To your recollection, when in the process was it contemplated?

A   Like I said over -- between 2010 and 2012 we went through a bunch of permutations and a bunch of deliberations whether to do this or not.  Ended up buying Lucid instead of Effex, and that was the end of that.

Q   Do you recall if it was something that was considered at this same time that Effex was being formed in the first part of 2010?

A   I don't recall the exact specifics because I think William did more of the negotiating and all of that and came up with lots of different ideas and had lots of conversations.

156

Drew Niv

We never implemented the options agreement or anything else.  We had a rolling series of discussions and negotiations depending what was going on at the time about these issues, but it never came to pass, never happened.

Q   So let me take that one part at a time.  You have a recollection that an options agreement was drafted in the time period before Mr. Dittami resigned from FXCM?

A   I don't remember the time period.  I do recall the option agreement and I do recall talking about the option agreement.

Q   Do you recall whether it was around the time that Mr. Dittami was preparing to leave FXCM?

A   I don't recall the time.  It is too long ago for me to recall the exact time.  I know that one exists and I know we spoke about it.  It was one of those things where compliance said the option would make it look, you know, essentially that's not the conservative read of what we would want to do and therefore should not happen.

Obviously this was certainly early on in the process, not exactly before he left.  But early on before the company had more customers and

157

Drew Niv

was worth more. He was clearly within a year later he was worth a lot more than that and we couldn't do that.

MR. GARCIA: Can we take a break?

MR. NEWMAN: Sure, we can take a break. Off the record. The time is 3:01.

(Brief recess, 3:01 - 3:19 p.m.)

MR. NEWMAN: Back on the record at 3:19 p.m.

Please mark this.

(Option Agreement was marked Deposition Exhibit 10 for identification.)

BY MR. NEWMAN:

Q   Mr. Niv, I am going to hand you what's been marked Exhibit 10, it is titled Option Agreement. Do you recognize this document?

A   Yes.

Q   What is it?

A   It's the contemplated option agreement with FXCM.

Q   You see it's dated April 14, 2010?

A   Yes.

Q   Just to be clear, that's the date that

158

Drew Niv

Mr. Dittami tendered his resignation from FXCM?

A   Yeah.

Q   Did you -- I take it you saw this document in your preparation for this deposition?

A   Yes.

Q   Prior to seeing it in your preparation, had you seen this before?

A   I don't believe so.

Q   Were you aware that there was an option agreement dated April 14th?

A   Yes, I was aware there was an option agreement, not what date it was.

Q   Were you aware that it was dated approximately April 14, 2010? In other words, around the time of Mr. Dittami's departure from FXCM?

A   I don't recall that information. Like I say, I know that we had contemplated, you know, we discussed this, so I knew about the option agreement because we discussed this as an option that there would be an option agreement. But I don't recall the dates and specifics.

Q   Looking at the second page of the document, do you agree it appears to be executed

159

Drew Niv

by John Dittami as well as by William Ahdout for Forex Capital Markets LLC?

A   I know that this document is signed but it was not executed.

Q   Can you explain the difference?

A   When I say -- we did not consider this valid.

Q   When you say you didn't consider it valid, I guess I'm a little confused because you testified a minute ago that you weren't aware that an option agreement had been signed as of this date, April 14, 2010.

A   Like I said, I was aware we were having discussions about, you know, using the option of having an option agreement, you know to potentially make it easier to own or buy Effex Capital down the road. We rejected that option and I know we did not go forward with it.

Q   Do you recall when was the timing of the decision not to go the route of entering into an option agreement?

A   I don't recall the specifics. I know that I -- compliance said no, so I said no, and this never came to the board for approval or

160

Drew Niv

anything like that.

BY MR. LATORRE:

Q   Just to be clear, Mr. Ahdout is an authorized signatory of FXCM?

A   Yes, he is. But this would be a board of directors of the company would have to approve. Couldn't sign it.

Q   Who were the board of directors of Capital Markets LLC in 2010?

A   The holding company founders, FXCM, plus a bunch of external directors.

Q   Mr. Ahdout was a director at the time?

A   One of the directors, yes.

BY MR. NEWMAN:

Q   He was a director of the holding company?

A   Yes, the sub does not have a board.

Q   I see. So you are saying your opinion is that, your view is that for the sub to enter an agreement like this it would have had to be approved of by directors of the holding company?

A   It's a division of the company. Like the holding company is the company, U.S. branch, for lack of a better word, is a division of the

161

Drew Niv

company.

Q   I get that. I am just -- my question was more, in your view, this is something that Mr. Ahdout wouldn't have authorization to do without a vote of the directors?

A   Without board consent, correct.

Q   Is that based on something in the bylaws of FXCM or is it more based on just your understanding and your informal understanding among partners what you are permitted to do?

A   There were other shareholders by that time so there's external directors representing those shareholders. Some of those external shareholders were also on the board representing all the external nonfounder shareholders. And the agreement and understanding with everyone was that if we were going to buy something, this is not a normal day-to-day operation, the decision. If we were going to buy a company we obviously run it by them.

Q   That understanding would apply to either buying a company or entering an option agreement to have the option to buy a company?

A   That would be a precursor.

162

Drew Niv

Q   It would be treated the same way for purposes --

A   Right. It is largely the same. Obviously it is not the same thing but it's, you know, there's the potential for us to buy at that point and we would need to run that by them.

BY MR. ROMEU-MATTA:

Q   Was this understanding put in writing in bylaws of FXCM Holding?

A   I don't recall the specifics of the bylaws but you know, we have everything changed after the IPO. And but you couldn't just do -- this would be too big for someone to do by themselves.

Q   So your testimony essentially is that William Ahdout shouldn't have signed the document we are looking at at this point in time?

A   Again, he signed it for expediency. He thought this would get approved, he thought it was just an option agreement and not really a big thing. Obviously compliance and legal said this is not something that we should be entering into, so we canceled it.

Q   Did you have a conversation with William

163

Drew Niv

Ahdout about signing this document?

A   I had a conversation about canceling it.

Q   Could you tell me what the conversation was?

A   That compliance said that we can't do that.

Q   And the basis for compliance's position that he could not do that was what?

A   They have a conservative stance, this would essentially make it appear that we have control over that.

Q   I guess I'm not understanding compliance was not saying that William Ahdout could not sign this document, they were saying they wanted to be more conservative in approach?

A   They would not approve this, us having an option agreement.

BY MR. TOMER:

Q   During this conversation was it known that there was a signed agreement in place?

A   When we were discussing the option agreement, initial discussion -- again, these were all discussions, multiple meetings, initial discussion with no conclusion reached yet, William

164

Drew Niv

sort of was negotiating all of these things because there were a bunch of documents being done at the same time. He obviously rushed into this and we in subsequent discussion came to the conclusion this is not something that was going to be approved and therefore if it's not approved this document did not get carried out.

BY MR. ROMEU-MATTA:

Q   You say "we" in subsequent discussion. Who are you referring to?

A   The same people who were involved. Partners of FXCM plus compliance, legal, you know, top executives.

Q   Was this understanding reduced to writing?

A   I'm sure we have it somewhere. I don't recall. Again, this is too long ago to recall every little thing but we certainly have had, if you look at discussions post this, we have had discussions with John about buying Effex and about doing that afterwards, you know, so there's still negotiations. If we had this option agreement we --

Q   Would discussions be also found in some

205

Drew Niv

1
2  high-frequency operations today, which is the bulk
3  of market-making these days, in every instrument
4  are essentially buying at price A and selling at
5  price B.
6     Q   I think when he asked for a period of
7  time he meant even nanoseconds, they make profit
8  or loss by trading opposite customers?
9     A   Yes, correct.
10 BY MR. NEWMAN:
11    Q   The next paragraph begins, "Our agency
12 model is fundamental to our core business
13 philosophy because we believe in alliance of our
14 interests with those of our customers."  Do you
15 see that sentence?
16    A   Yes.
17    Q   That agency model is referring again to
18 the no dealing desk model?
19    A   Correct.
20    Q   Those terms are interchangeable in your
21 mind?
22    A   Yes.
23    Q   The next sentence discusses something
24 that is referred to as the principal model.  Is
25 that the dealing desk model?

206

Drew Niv

1
2     A   Yes.
3     Q   And you say in the sentence after that
4  that "We believe this" -- I think referring to the
5  principal model -- "creates an inherent conflict
6  between the interests of the customer and those of
7  the broker."  Do you see that?
8     A   Sorry, I lost you.
9     Q   So it's in the paragraph, the last full
10 paragraph on the page, that begins "Our agency
11 model is fundamental," and it's the sentence
12 talking about, the second from last sentence in
13 that paragraph, "We believe this creates."
14    A   Yes, I'm here.
15    Q   All right.  Was there any concern
16 internally at FXCM about whether these
17 representations in this 10-K or representations
18 like it, were consistent with the existence of the
19 option agreement that we looked at previously?
20    A   They were consistent in our
21 understanding of what our arrangement was with
22 Effex, and again the arrangement with Effex did
23 not include an option agreement.
24    Q   But not consistent with the existence of
25 an operative option agreement?

207

Drew Niv

1
2     A   We did not opine on that right away on
3  all of these things because it was not part of the
4  equation at the time.
5     Q   When you learned of the existence of the
6  signed option agreement, were you concerned about
7  an inconsistency between these representations and
8  the existence of that signed agreement?
9     A   I think compliance clearly made its
10 determination not to because they saw that there
11 may be -- they specifically said it's not
12 necessarily that way but it could be perceived as
13 that, and therefore we don't think this is a good
14 idea and we don't support this.  And therefore we
15 said no.  I think that is definitely consistent.
16 I again want to say that we had a legal opinion
17 that if we had an option agreement these are
18 misleading, but at the same time we said we don't
19 want to take that chance.
20    Q   Going back to the first paragraph under
21 the overview, do you see the last sentence of this
22 paragraph that begins with the words "In addition
23 to trading fees and commissions," do you see that?
24    A   Yes.
25    Q   It says, "In addition to trading fees

208

Drew Niv

1
2  and commissions, we also earn other forms of
3  revenue such as fees earned from" -- there's a
4  list of ways that FXCM earns fees, and do you see
5  that one of them is payments for order flow?
6     A   Yes.
7     Q   At the time, to the extent you remember,
8  at this time period that's being covered by this
9  10-K which was fiscal year 2010, was any liquidity
10 provider paying for order flow besides Effex
11 within the context of your no dealing desk model?
12    A   I do not recall precisely.  I believe
13 BNP was as well, some amount, but I don't recall
14 if that was 2010.
15    Q   Was there any consideration as to
16 whether this 10-K should have or might have
17 disclosed that the sources of the payments for
18 order flow, which liquidity provider were?
19    A   We did not feel the need to because very
20 large public companies do that, and equity brokers
21 do not do that.
22    Q   Was there any consideration to whether
23 this list of revenue sources should have or could
24 have also included revenue from sharing of profits
25 with a liquidity provider?