# Exhibit 40

| | |
|---|---|
| **From:** | John Dittami <john@effexcapital.com> on behalf of John Dittami |
| **Sent:** | Monday, October 25, 2010 09:24 AM |
| **To:** | 'Paykin, Joseph'; 'Alexander Dick' |
| **Cc:** | 'William Ahdout'; 'Ken Grossman' |
| **Subject:** | FW: FXCM |
| **Attachments:** | employment.agreement.dittami.v.7.10.22.10.doc; Operating Agreement proposed v 5.10.22.10.DOC; FXCM EFFEX  Option Agreement V.7.10.22.10.doc; Limited Put Option.V.2.doc; Addendum to Services Agreemetn Dated August 17.V.2.doc |

Alex,

Please find attached proposed docs for FXCM\Effex Arrangement.

For legalese type questions you can find Joe's information below.  For business related questions please let me know if you have any questions and we can review with Ken and William.

Thanks,
John

---

**From:** Paykin, Joseph [mailto:JPaykin@hhk.com]
**Sent:** Friday, October 22, 2010 11:10 AM
**To:** John Dittami
**Subject:** FXCM

*I made a few additional changes.*

**Joseph N. Paykin, Esq.**
Hinman, Howard & Kattell, LLP
Attorneys at Law
185 Madison Avenue, 7th Floor
New York, NY 10016
Telephone: (212) 725-4428
Direct Fax: (646) 558-8002
www.hhk.com

This transmission is intended only for the use of the individual or entity to which it is addressed, and may contain confidential information belonging to the sender which is protected by the attorney-client privilege.  If you are not the intended recipient, you are hereby notified that any disclosure, copying, distribution or the taking of any action in reliance on the contents of this information is strictly prohibited.  If you have received this transmission in error, immediately notify us by telephone to arrange for its return.

To ensure compliance with U.S. Treasury Department regulations, we advise that, unless otherwise expressly indicated, any discussion of Federal tax issues in this communication was not intended or written to be used, and cannot be  used (i) to avoid any penalties imposed under the Internal Revenue Code or applicable provisions of state or local tax law or (ii) to promote, market or recommend to another party any transaction or matter addressed therein.

**FOIA Confidential Treatment Requested by FXCM**
**CONFIDENTIAL**

## EMPLOYMENT AGREEMENT

EMPLOYMENT AGREEMENT (this "Agreement") made as of ~~September~~ ___, 2009, between ~~Effex Forex Capital  Markets~~, LLC (the "Company") and John Dittami (the "Executive") (collectively, the "Parties").

### W I T N E S S E T H:

**WHEREAS**, the Company is established in the business of ~~and the Executive desire to establish a new division of the Company managing certain of the Company's algorithmic endeavors, which shall include, but not be limited to, ma~~market making, proprietary trading and algorithmic execution services ~~(the "Venture")~~; and

**WHEREAS**, the Company desires that the Executive continue to be employed to serve in a senior executive capacity with the Company for the purpose of ~~starting up and~~ managing the ~~Company~~Venture, and Executive desires to be so employed by the Company in such capacity, upon the terms and subject to the conditions herein set forth~~, effective as of October 5, 2009 ("Start Date")~~; and

**NOW, THEREFORE**, in consideration of the promises and mutual covenants contained herein and for other good and valuable consideration, the receipt and sufficiency of which are mutually acknowledged, the Parties hereby agree as follows:

1.   UNDERLINE EMPLOYMENT.

The Company hereby agrees to employ Executive and Executive hereby accepts such employment, commencing on the date hereof ("Start Date") and terminating one year later (unless otherwise renewed) subject to the terms and conditions herein set forth.  Executive shall hold the title of Managing ~~Member~~Director of the ~~Company~~Venture and shall report solely to its board of directors~~directly to William Ahdout (or Mr. Ahdout's successor)~~.

~~2.   STRUCTURE OF THE VENTURE.~~

~~The Venture shall operate as a division of the Company.  The Company agrees to initially invest the sum of $3,000,000 (the "Initial Investment") in the Venture.  The Initial Investment shall be applied to establishing the infrastructure of the Venture, which shall include expenditures (i) for the salary and wages of individuals providing services to the Venture and all amounts payable to Executive and third parties hereunder, and (ii) upon the mutual consent of the Parties (which shall not be unreasonably withheld by either of the Parties), for computer systems, code for the programs that the Venture requires in order to perform its intended mission, and other requirements of the Venture ("Use of Proceeds").  For avoidance of a doubt, any amounts of the Initial Investment that are not expended in one calendar year, including the part year ending on December 31, 2009, shall carryover to the next following calendar year.~~

~~Only costs directly related to the Venture, including, but not limited to, prime brokerage fees and charges, shall be charged against the Initial Investment.  Costs incurred under contract obligations shall be prorated to the date upon which the Management Bonus (as defined below) is calculated.  In addition, any costs charged to the Venture that also benefit other affiliates of the~~

~~Company shall be allocated among the Venture and the affiliates in a reasonable manner. Profits and/or losses of the Venture shall be applied to or against the Initial Investment.~~

~~3.        EMPLOYMENT AT WILL.~~

~~Executive's employment with the Company shall be on an at-will basis. Either Executive or the Company may terminate Executive's employment relationship with the Company at any time with or without cause, subject to the notice and termination provisions contained herein.~~

4.2.      COMPENSATION AND BENEFITS.

(a)      As compensation for the employment services to be rendered by Executive hereunder, the Company agrees to pay, or cause to be paid, to Executive, and Executive agrees to accept, ~~payable in equal installments in accordance with the Company's normal payroll practices, an initial~~ salary at the rate of $~~250,000 annually, which shall be increased to the rate of~~ $300,000 annually ~~on the six (6) month anniversary of Executive's Start Date~~ ("Base Salary").

(b)      Executive shall be eligible, annually during the term of his employment with the Company, for four weeks vacation, without loss or diminution of compensation.

(c)      Executive shall be eligible to participate in and shall have the benefit of all the Company's benefit plans, programs or arrangements as are or will be generally made available to similarly situated executives of the Company ("Benefits"). ~~Nothing in this paragraph shall be construed to require t~~The Company will at a minimum~~to~~ establish, maintain and~~or~~ continue all~~any~~ benefit plans, programs or arrangements that the Executive participated in prior to the execution of this Agreement. Except as otherwise expressly provided by their terms, such benefit plans, programs or arrangements are subject to modification or termination by the Company at any time.

~~5.        MANAGEMENT BONUS.~~

~~(a)        During the term of Executive's employment, Executive will be entitled to an annual "Management Bonus" in an amount equal to thirty percent (30%) of "Venture Profits" (determined on a calendar year basis) or, subject to the Parties mutual consent, such lower percentage as set forth in Section 5(d)(i) hereof (the "Bonus Percentage"). Venture Profits shall be calculated as follows:~~

~~(i)        the total gross revenues of the Venture generated through operations that are realized by the Company and its affiliates (hereinafter, the "Company Group") commencing after the Start Date;~~

~~(ii)        less, one hundred percent (100%) of all direct costs arising from, relating to or in connection with the Venture including, without limitation, prime brokerage costs, employee compensation and benefits (including Executive's Base Salary and Benefits, but excluding the Management Bonus and Bonus Pool), software and travel and entertainment expenses. For avoidance of a doubt, direct costs shall include all amounts of the Initial Investment expended in accordance with Section 2 hereof (profits and losses to be applied against Initial Investment) (excluding the Management Bonus and Bonus Pool); provided,~~

2

however, that any time beyond a reasonable period of time following a request from the Venture, if the Company shall fail to provide the Venture with accurate and timely data or fail to provide changes to the matching engine, all recurring costs (other than compensation costs) incurred by the Venture, during that period beyond the a reasonable period of time period following a request from the Venture, shall not be considered in the calculation.

(b)      Executive's Management Bonus shall be calculated following each calendar year, including the calendar year ending on December 31, 2009, and shall be paid to Executive no later than March 15 following the calendar year for which the Management Bonus is calculated.

(c)      In the event that the Management Bonus for any calendar year, including the part year ending on December 31, 2009, is a negative amount, such negative amount will carryover into the next succeeding calendar year or years and reduce the Management Bonus that would otherwise be payable in the succeeding calendar year or years.

(d)      The Parties may establish a bonus pool for new executives of the Venture or the Company Group other than Executive (the "Bonus Pool"). For any calendar year, including the part year ending on December 31, 2009, the Bonus Pool shall be determined as follows:

(i)      Upon the mutual consent of the Parties, a Bonus Pool may be established in an amount less than or equal to one third (1/3rd) of the Management Bonus for any calendar year, provided that, half of the amount distributed from the Bonus Pool shall reduce on a dollar for dollar basis the Management Bonus that would otherwise be payable for such year and the Bonus Percentage shall be reduced to no less than twenty five percent (25%) according to the following formula:

$$\text{Bonus Percentage} = 30 \quad 50\frac{(\text{Amount distributed from the Bonus Pool in dollars})}{(\text{Venture Profits in dollars})}$$

(ii)      Upon the mutual consent of the Parties, a Bonus Pool may be established in an amount in excess of one third (1/3rd) of the Management Bonus for any calendar year, provided that, a portion of the amount distributed from the Bonus Pool shall reduce the Management Bonus that would otherwise be payable for such year and the Bonus Percentage in an amount to be mutually agreed upon by the Parties.

(iii)      The Company may, in its sole discretion, establish a Bonus Pool in any amount, provided that it does not reduce the funds allocated to the Management Bonus.

(e)      During the term of Executive's employment, Executive shall be entitled to receive a portion of the profits generated by algorithmic traders employed by the Company or the Venture and working under the management of Executive, provided that, the Executive may not hire any such algorithmic traders without the Company's written approval. The portion of the profits described in the previous sentence to which Executive is entitled shall equal twenty percent (20%) of the Company's portion of the net profits generated by such algorithmic traders. All payments to Executive pursuant to this Paragraph 5(e) shall be calculated following each calendar year, and shall be paid to Executive no later than March 15 following the calendar year for which the relevant profits are calculated, provided that, Executive remains an employee of

3

the Company on such payment date. For the avoidance of doubt, it is agreed and understood between the Parties that Executive shall only be entitled to payment pursuant to this Paragraph 5(e) if to the extent the profits generated by such other algorithmic traders employed by the Company or the Venture are not included in the calculation of Venture Profits.

### 6.3.   REIMBURSEMENT.

(a)      The Company shall reimburse Executive, upon presentment of suitable vouchers, for all reasonable business expenses which may be incurred by Executive in connection with his employment hereunder in accordance with Company policy as established from time to time. Executive shall comply with such restrictions and shall keep such records as the Company may deem necessary to meet the requirements of the Code, and regulations promulgated thereunder.

(b)      Subject to and in accordance with the Company's policies with regard to such matters, the Company shall promptly reimburse Executive for properly documented expenses relating to Executive's relocation from Chicago, Illinois to the New York area, up to a maximum of $25,000.00; which shall include the costs of moving Executive, his family and possessions to the New York area and lease-break penalties.

### 7.4.   DUTIES.

(a)      Executive shall perform such reasonable duties and customary functions of a managing director of a similar type of CompanyVenture focusing on the profits and best interests of the CompanyVenture.  Executive shall comply with the policies of the Company., and be subject to the direction of the Chief Executive Officer of the Company and William Ahdout (or Mr. Ahdout's successor).

(b)(a)   During the term of employment, Executive shall devote sufficient all of his business time and attention to the business of the Company Group as necessary to fulfill his duties.  Executive shall perform the duties assigned to him with fidelity and to the best of his ability.  Executive shall not engage in any other business or occupation during his period of employment with the Company, including, without limitation, any activity that (x) conflicts with the interests of any member of the Company Group, (y) interferes with the proper and efficient performance of his duties for the Company, or (z) interferes with the exercise of his judgment in the Company's best interests.  Notwithstanding the foregoing, nothing herein shall preclude Executive from (i) continuing to serve as Managing Member of Effex Capital II which shall be permitted to continue in all lines of business that it serviced prior to the termination; (ii) serving, with the prior written consent of the Board which shall not be unreasonably withheld or delayed, as a member of a board of directors or advisory board (or an equivalent body in the case of a non-corporate entity), (iii) engaging in charitable activities and community affairs, and (iiiv) managing his passive personal investments and affairs; provided, however, that the activities set out in clauses (i), (ii) and (iii) shall be limited by Executive  so as not to materially interfere, individually or in the aggregate, with the performance of his duties and responsibilities hereunder.

(c)(b)   Executive agrees to comply with all policies of the Company and to satisfy and maintain all regulatory licenses necessary for the performance of Executive's duties hereunder.

FOIA Confidential Treatment Requested by FXCM
CONFIDENTIAL

FXCM-CFTC_00089775
GLBR_00218138

As of the date of this Agreement, the Company represents that it is not aware of any license that Executive must maintain.

8.5.    TERMINATION OF EMPLOYMENT; EFFECT OF TERMINATION.

(a)    Executive's employment hereunder may be terminated at any time (i) upon written notice by the Company with or without Cause, or (ii) upon thirty (30) day's written notice by Executive with or without Good Reason.

(b)    For the purposes of this Agreement, the term "Cause" shall mean:  (i) Executive's repeated failure or refusal to materially perform his duties pursuant to, or Executive's material breach of, this Agreement, which is not remedied, in the ~~Company's~~ reasonable determination of JAMS, within fifteen (15) days after receipt of written notice from the Company specifying such failure or material breach.; (ii) Executive's conviction of or entry of any pleas other than "not guilty" to any felony, or to any misdemeanor involving the misappropriation of money or property of the Company or any member of the Company Group; (iii) Executive's performance of any material act or his failure to act which constitutes (as determined by JAMS), ~~in the reasonable good faith determination of the Company,~~ dishonesty, fraud or a breach of a fiduciary trust, including without limitation, misappropriation of funds or a material misrepresentation of the Company's ~~Venture's~~ operating results or financial condition to the Board or any executive officer of the Company; ~~(iv) any intentional unauthorized disclosure by Executive to any person, firm or corporation other than the members of the Company Group and their respective directors, managers, officers and employees, of any confidential information or trade secret of the Company Group; (v) any attempt by Executive to secure any personal profit against the interests of the Venture;~~ (v~~iii~~) Executive's knowing engagement in conduct or activities that materially violate any applicable material securities or commodities regulations; (v~~iv~~i) Executive's illegal use of controlled substances; (v~~iii~~ii) any act or omission by Executive involving recklessness or gross negligence in the performance of Executive's duties, which is not remedied, in the Company's reasonable determination, within fifteen (15) days after receipt of written notice from the Company specifying such recklessness or gross negligence, ~~or without notice if Executive's gross negligence cannot be remedied,~~ (i~~x~~vi) Executive's failure to satisfy and maintain all regulatory licenses necessary for the performance of Executive's duties hereunder following written notice from the Company to Executive of the existence of a licensing deficiency and a reasonable period of time for Executive to cure the deficiency.~~, or (x) the Venture has trading losses of One Million and /100 Dollars ($1,000,000) or more in the aggregate (without regard to the Initial Investment)~~.

For purposes of this Agreement, the term "Good Reason" shall mean the occurrence, without Executive's consent, of one or more of the following events:  (i) the Company materially reduces Executive's duties or position in the ~~Venture or the~~ Company, or reduces Executive's Base Salary ~~or Management Bonus opportunity~~, (ii) the removal of Executive from the principal position held by the Executive with the Company on the Start Date, (iii) the relocation of the Executive's principal place of employment to a location more than fifty (50) miles from the Executive's principal place of employment (unless such relocation is as a result of the relocation of the executive offices of the Company and such relocation does not increase the Executive's daily commute by more than twenty (20) miles), (iv) the failure by the Company to obtain the written agreement of any successor to the Company to assume and agree to perform this

5

FOIA Confidential Treatment Requested by FXCM
CONFIDENTIAL

FXCM-CFTC_00089776
GLBR_00218139

DRAFT

Agreement; (v)  Forex Capital Markets, LLC ("FXCM") : (a)  fails to provide eFFex with accurate and timely data; (b) fails to provide changes to the matching engine within a reasonable time following eFFex's request;  (c) provides preference in tie prices to other providers; (d) provides other providers  any other preference; (e) allows other providers access to real time book information; (f) allows collocation by other providers;  (g) grants other entities most favored nation status in addition to eFFex; or (h) materially ceases to support eFFex in its business activities, the Company, and the breach is not remedied, within 15 days following receipt of written notice ("Notice of Breach")  from the Executive specifying the breach.

~~(c)          , (v) there is a Change of Control (as hereinafter defined), (vi) the Company materially ceases to support the Venture in its business activities as provided herein, or (vii) the Company shall materially breach the terms of this Agreement (including the Company's failure to provide the Venture with accurate and timely data or fails to provide changes to the matching engine after a reasonable period of time following a request from the Venture)  and the breach is not remedied, , within 15 days following receipt of written notice from the Executive specifying the breach.~~

~~(d)          For purposes of this Agreement, the term "Change of Control" shall mean any one Person or more than one Person acting as a group (as determined under  Treas. Reg.  Section 1.409A-3(i)(5)(v)(B)), other than any Person directly or indirectly owned by the Company, acquiring on an arm's length basis ownership of the Company's units that, together with units held by such Person or group, constitutes more than fifty percent (50%) of the total fair market value or total voting power of the Company.  However, if any one Person (or more than one Person acting as a group) is considered to own more than fifty percent (50%) of the total fair market value or total voting power of the Company's units prior to the acquisition, any acquisition of additional units by the same Person or Persons is not considered to cause a change in the ownership of the Company.  For purposes of this Section 8(d), "Person" shall mean any natural person, sole proprietorship, general partnership, limited partnership, limited liability company,  joint  venture,  trust,  unincorporated  organization,  association,  corporation, governmental authority, or any other organization, irrespective of whether it is a legal entity and includes any successor (by merger or otherwise) of such entity.~~

~~(e)~~(c)   Upon termination of Executive's employment with the Company for any reason, Executive shall be entitled ~~only~~ to (i) such portions of Executive's Base Salary and reimbursement of expenses pursuant to Sections 4(a) and 6(a) hereof as have been accrued through the date of his termination of employment; ~~(ii) a prorated portion of Executive's Management Bonus from the calendar year of Executive's termination, if any, calculated through the date upon which Executive's employment terminates; (iii) Executive's Management Bonus from a previous calendar year, if any, that has not been distributed to Executive; and (iv) any~~ other benefits required by law; and (iii).   ~~If Executive's employment is terminated  by the Company without "Cause", by the Executive for "Good Reason", or by reason of Executive's death or permanent disability, then in addition to the payments and benefits described in the previous sentence, Executive shall be entitled,~~ subject to Executive's delivery of Effex Holdings LLC membership units in the Company and a the release substantially in the form attached hereto as Exhibit A (the "Release") which shall be executed (and not revoked) within sixty (60) days following termination, a payment equivalent to ~~the greater of~~  the greater of six  or the price earnings ratio of Forex Capital Markets LLC multiplied by the EBITDA of the Company. ~~(i) fifty percent (50%) of the difference between the Initial Investment and the amount of the~~

6

~~Initial Investment which has been expended according to the terms of Section 2 hereof through the date of termination and; (ii) six (6) times the EBITDA of the Venture~~ (after deducting the amount used from the Initial Investment) ~~multiplied by Executive's Bonus Percentage (the "Payment").~~ (EBITDA shall be based on the greater of the last quarter annualized or the last twelve (12) months prorated.) ~~Neither the Management Bonus nor the Payment shall be considered in the EBITDA calculation. If Executive terminates his employment other than for Good Reason, Executive shall make a payment to the Company in the amount of $100,000.00 (the "Termination Penalty"). Neither the Payment nor Termination Penalty shall be payable in the event Executive purchases the Venture in accordance with Section 13 hereof. All payments due pursuant to this paragraph shall be made no later than thirty (30) days following the date of termination of Executive's employment. Within sixty (60) days of the commencement of this Agreement, the Parties agree~~ will attempt ~~to negotiate in good faith~~ a modified alternative compensation structure for the Executive in the event of sale of the Venture ~~in its entirety~~ with respect to the sale of the Venture only. Such payment shall be made in six equal monthly installments commencing fifteen days after Executive ceases employment with the Company.

~~(f)     Nothing in this Section 8 shall be read as changing the at-will nature of the employment relationship between Executive and the Company or as creating an employment relationship between Executive and any affiliate of the Company.~~

9.~~6.~~    REPRESENTATIONS AND WARRANTIES.

(a)     Executive represents and warrants that he is free to enter into this Agreement and to perform the duties required hereunder, and except as expressly set forth below, that there are no employment contracts or understandings, restrictive covenants or other restrictions, whether written or oral, preventing the performance of his duties hereunder.

(b)     Executive represents and warrants that he is not subject to any restrictive covenants with any entity that in any way restrict or limit his business activities.

(c)     Executive represents and warrants that he has not disclosed and does not intend to disclose to any person any trade secrets or other confidential, proprietary or non-public information of any of his prior employers whether in tangible or intangible form.

(d)     Executive represents and warrants that the Company has informed him that neither it nor any of its affiliates have any interest in obtaining any trade secrets or other proprietary or non-public information of any of his prior employers whether in tangible or intangible form.

(e)     The Company represents and warrants that it has the authority to enter into this Agreement and that this Agreement does not conflict with or violate any applicable statute, law, regulation, regulatory requirement or internal corporate documents or policies.

(f)     The Company represents and warrants that it is in compliance with all laws, rules and regulations pertaining to the Company's business activities.

7

~~During the term of Executive's employment with the Company, T~~The Company shall not establish any affiliate or provide financial support to any other business entity within the Company that is in direct competition to the Venture.

~~(g)   Executive acknowledges and agrees that nothing in this Agreement shall create any ownership or equity interest for Executive in the Venture or the Company, or establish an actual or implied partnership.~~

~~10.~~7.   NON-COMPETITION.

(a)   In view of the unique and valuable services expected to be rendered by Executive to the Company ~~Group~~, Executive's knowledge of the trade secrets and other proprietary information relating to the business of the Company ~~Group~~ and in consideration of the compensation to be received hereunder, Executive agrees that during the time Executive is employed by the Company ~~or any of its affiliates~~ and for a period of one-year thereafter (the "Non-Competition Period") Executive shall not, anywhere in the United States, whether for compensation or without compensation, directly or indirectly, as an owner, principal, partner, member, shareholder, independent contractor, employee, consultant, joint venturer, investor, licensor, lender or in any other capacity whatsoever, alone, or in association with any other person or entity, carry on, be engaged or take part in, or render services or advice to, own, share in the earnings of, invest in the stocks, bonds or other securities of, or otherwise become financially interested in, any person or entity engaged in a business substantially similar to that of the Company ~~Venture~~ ("Non-Compete").  The record or beneficial ownership by Executive of up to two percent (2%) of the shares of any corporation whose shares are publicly traded on a national securities exchange or in the over-the-counter market shall not in and of itself constitute a breach hereunder.  Executive shall not, directly or indirectly, during the Non-Competition Period, (i) solicit the business of any person or business entity who is a customer of the Venture; or (ii) cause, induce or attempt to cause or induce any customer, supplier, licensee, licensor, franchisee, employee, consultant or other entity that has a business relationship with the Venture to (a) cease doing business with the Venture or (b) transact business with any competitor of the Venture ("Non-Solicit").  ~~In addition, Executive shall not, directly or indirectly, during the Non-Competition Period, solicit, hire, retain or attempt to solicit, hire or retain any employee or independent contractor of the Venture or in any way interfere with the relationship between the Venture and any of its respective employees or independent contractors ("No-Hire").~~ Notwithstanding the foregoing, Effex Capital II shall be permitted to continue in all lines of business that it pursued prior to the execution of this Agreement.

(b)~~(a)~~   ~~Executive~~ Executive shall be subject to the Non-Compete only if and so long as the Company continues to provide Executive with his salary in accordance with the Company's normal payroll practices during the Non-Competition Period.  ~~In addition, Executive shall be subject to the Non-Compete only if Executive has been paid all monies due and owing under Section 8(e) of this Agreement.~~ Executive shall cease to be subject to the Non-Compete restrictions upon the earlier of (i) the end of the Non-Competition Period and (ii) that time that the Company ceases payment of Executive's salary or fails to underline timely pay to Executive any other monies due and owing pursuant to ~~Section 8(e)~~ of this Agreement.  The Company's obligation to pay the Executive his salary during the Non-Competition Period shall cease if Executive violates the Non-Compete.

8

DRAFT

(e)(b)    If any portion of the restrictions set forth in this Section 10 should, for any reason whatsoever, be declared invalid by a court of competent jurisdiction, the validity or enforceability of the remainder of such restrictions shall not thereby be adversely affected.

(d)(c)    Executive acknowledges that the territorial and time limitations set forth in this Section 10 are reasonable and properly required for the adequate protection of the business of the Company Group.  Executive hereby waives, to the extent permitted by law, any and all right to contest the validity of this Section 10 on the ground of breadth of its geographic coverage or length of term.  In the event any such territorial or time limitation is deemed to be unreasonable by a court of competent jurisdiction, Executive agrees to the reduction of the territorial or time limitation to the area or period which such court shall deem reasonable.

(e)(d)    The existence of any claim or cause of action by Executive against the Company or any other member of the Company Group shall not constitute a defense to the enforcement by the Company Group of the foregoing restrictive covenants, but such claim or cause of action shall be litigated separately.

(f)    Notwithstanding this Section 10, in the event that Executive purchases the Venture in accordance with Section 13 hereof, then (i) Executive shall not be subject to the Non-Compete and (ii) the Company Group shall not, for a period of one-year following such time as Executive purchases the Venture, establish any entity that directly competes with the Venture, or otherwise interfere with the Venture in bad faith.

INVENTIONS AND DISCOVERIES.

(f)    Executive shall promptly and fully disclose to the Company, with all necessary detail for a complete understanding of the same, all developments, know-how, discoveries, inventions, improvements, concepts, ideas, writings, formulae, programs, systems, system specifications, flow diagrams, practices, techniques, compounds, works-in-progress, formulae, data, derivative works, hardware, software, processes and methods (whether copyrightable, patentable or otherwise), and other developments made, received, conceived, developed, acquired or written during working hours, or otherwise, by Executive (whether solely or jointly with others and whether or not at the request or upon the suggestion of the Company) during his period of employment, solely or jointly with others, using the Company Group's resources, or relating to any current or proposed business or activities of the Company Group known to him as a consequence of his employment or the rendering of advisory and consulting services hereunder (collectively, the "Subject Matter").

(g)    Executive hereby assigns and transfers, and agrees to assign and transfer, to the Company all of his rights, title and interest in and to the Subject Matter. Executive further agrees to deliver to the Company any and all drawings, notes, specifications and data relating to the Subject Matter, and to execute, acknowledge and deliver all such further papers, including applications for trademarks, copyrights or patents, as may be necessary to obtain trademarks, copyrights and patents for any thereof in any and all countries and to vest title thereto in the Company.  Executive shall assist the Company in obtaining such trademarks, copyrights or patents during Executive's period of employment, and any time thereafter on reasonable notice and at mutually convenient times, and Executive agrees to testify in any prosecution or litigation

9

involving any of the Subject Matter; provided, however, that following termination of employment, Executive shall be reasonably compensated for his time and reimbursed his reasonable out-of-pocket expenses incurred in rendering such assistance or giving or preparing to give such testimony.

(h)        Subject to the terms set forth in this Paragraph 11(c), Executive shall have a non-exclusive right to the use of the code (for Executive's personal use only and no commercial purpose) created on behalf of the Venture (the "Code Usage Right") if the Company terminates Executive's employment without Cause or if Executive terminates his employment with the Company for Good Reason (except for Change of Control 8(c)(v) above).  For the avoidance of doubt, Executive shall not be entitled to the Code Usage Right if Executive terminates his employment solely for the reason set forth in Paragraph 8(c)(v) above (*i.e.*, following a Change of Control).  Executive shall not receive or otherwise be entitled to the Code Usage Right under the circumstances set forth in this Paragraph for a period of one (1) year from the date of Executive's termination of Employment with the Company.

11.8.    NON-DISCLOSURE OF CONFIDENTIAL INFORMATION.

(a)        Executive shall not, during his period of employment or at any time thereafter, directly or indirectly, disclose or permit to be known (other than as is required in the regular course of his duties (including without limitation disclosures to the Company's advisors and consultants) or as is required by law (in which case Executive shall give the Company prior written notice of such required disclosure) or with the prior written consent of the Board), to any person, firm or corporation, any confidential information acquired by him during the course of, or as an incident to, his employment hereunder, relating to the Company Group, any client of the Company.  Group, or any corporation, partnership or other entity owned or controlled, directly or indirectly, by any of the foregoing, or in which any of the foregoing has a beneficial interest, including, but not limited to, the business affairs of each of the foregoing.  Such confidential information shall include, but shall not be limited to, proprietary technology, trade secrets, patented processes, research and development data, know-how, market studies and forecasts, competitive analyses, pricing policies, employee lists, personnel policies, the substance of agreements with customers, suppliers and others, marketing or dealership arrangements, servicing and training programs and arrangements, confidential and proprietary customer pricing information, profit and loss statements, productivity data, financial models and computer software programs, source or object code, electronic trading platforms, trading records, customer lists, information about direct communication lines, screen systems and wiring instructions, the Company Group's business prospects and opportunities (including the prospects and opportunities that Executive pursued on behalf of the Company Group during his period of employment), all other information about any customer (including, without limitation volume discounts, details of trading volumes, details of discounts and operating costs and trading patterns) to whom the Company or its affiliates provide services during Executive's period of employment, any other confidential or proprietary information of the Company Group and any other documents embodying such confidential information.  This confidentiality obligation shall not apply to any confidential information which becomes publicly available from sources unrelated to Executive.

FOIA Confidential Treatment Requested by FXCM
CONFIDENTIAL

FXCM-CFTC_00089781
GLBR_00218144

DRAFT

(b)      ~~All information and documents relating to the Company Group as hereinabove described (or other business affairs) shall be the exclusive property of the Company Group, and Executive shall use commercially reasonable best efforts to prevent any publication or disclosure thereof. Upon termination of Executive's employment with the Company, all documents, records, reports, writings, electronically stored information, and other similar documents containing confidential information, including copies thereof, then in Executive's possession or control shall be immediately returned and left with the Company.~~

~~12.      RIGHTS OF FIRST OFFER AND FIRST REFUSAL.~~

~~(a)      In the event the Company desires to terminate its involvement in the Venture, the Company shall notify the Executive of its intention in writing ("ROFO Notice"). The Executive shall have thirty (30) days from the receipt of the ROFO Notice to propose a purchase price (which may be paid over a term of seven (7) years with principal paid in equal annual installments and interest to be paid on the unpaid principal at the rate of prime plus one percent (1%)) and all other matters related to such sale. The Company shall have up to thirty (30) days to accept the offer from Executive. In the event that the Company does not accept the offer, the purchase price shall be determined by an appraiser to be selected by both Parties.~~

~~(b)      In the event that the Company receives a bona fide offer from a third party to purchase (all or part of) the Venture, then the Company shall promptly deliver to Executive a written notice of the bona fide offer which shall include the proposed purchase price and all other matters related to such sale ("ROFR Notice"). The ROFR Notice shall constitute a binding offer by the Company to sell (all or part of) the Venture to the Executive on the terms designated therein. Executive shall have fifteen (15) days from the receipt of the ROFR Notice to accept the terms of the ROFR Notice. If the transaction is not closed within thirty (30) days thereafter, then the Company may sell the Venture to the third party offeree at a price and on terms no less favorable to the Company than described in the ROFR Notice. In the event a sale of all or part of the Venture to a third party occurs, the Executive shall be entitled to the Bonus Percentage of the proceeds, including but not limited to, cash, warrants, options and earnout generated from such transaction, provided that in the event that Executive receives a payment under this Paragraph 13(b), he shall not also be entitled to the Payment under Paragraph 8(e) hereunder.~~

~~13.~~9.      SPECIFIC PERFORMANCE.

Executive agrees that if he breaches, or threatens to commit a breach of, any of the provisions of Sections ~~10, 11~~7 or ~~12~~8 hereof (the "Restrictive Covenants"), the Company shall have, in addition to, and not in lieu of, any other rights and remedies available to the Company under law and in equity, the right to injunctive relief and/or to have the Restrictive Covenants specifically enforced by a court of competent jurisdiction, without the posting of any bond or other security, it being agreed that any breach or threatened breach of the Restrictive Covenants would cause irreparable injury to the Company ~~Group~~ and that money damages would not provide an adequate remedy to the Company. Notwithstanding the foregoing, nothing herein shall constitute a waiver by Executive of his right to contest whether a breach or threatened breach of any Restrictive Covenant has occurred. The Executive shall inform any future employer of the Restrictive Covenants and provide such employer with a copy thereof, prior to the commencement of that employment.

11

14.10.  INDEMNIFICATION

The Company will, to the fullest extent permitted by Delaware law, defend, indemnify and hold harmless the Executive against any costs, losses, claims, suits, proceedings, damages or liabilities to which the Executive may become subject which arise out of, are based upon or relate to the Executive's employment by the Company, including without limitation reimbursement for any legal or other expenses reasonably incurred by the Executive in connection with defending against any such costs, losses, claims, suits, proceedings, damages or liabilities. ~~However, Executive agrees to repay any expenses paid or reimbursed by the Company if it is ultimately determined that the Executive is not legally entitled to be indemnified by the Company.~~ Notwithstanding the above, the Company shall not be required to indemnify or hold harmless the Executive against any costs, losses, claims, suits, proceedings, damages or liabilities to which the Executive may become subject which arise out of, are based upon or relate to an action or proceeding brought by one or more of Executive's former employers alleging a theft of trade secrets, a breach of fiduciary duty, or a violation of any contractual obligation Executive holds with the former employer, including but not limited to any restrictive covenant.

15.11.  GOVERNING LAW AND CHOICE OF FORUM.

This Agreement shall be governed by and construed in accordance with the laws of the State of New York applicable to agreements made and to be performed therein. Any proceeding or action seeking equitable or other relief based on this Agreement must be commenced in the federal district court in the Southern District of New York, or, in the absence of federal jurisdiction, then in any state court of competent jurisdiction located in the borough of Manhattan in the state of New York.

16.12.  SEVERABILITY.

The holding of any provision of this Agreement to be invalid or unenforceable by a court of competent jurisdiction shall not affect any other provision of this Agreement, which shall remain in full force and effect.

17.13.  WITHHOLDING.

The Company may deduct and withhold from the payments to be made to Executive hereunder any amounts required to be deducted and withheld by the Company under the provisions of any applicable statute, law, regulation or ordinance now or hereafter enacted.

18.14.  CODE SECTION 409A.

(a)  The intent of the parties is that payments and benefits under this Agreement comply with Section 409A of the Code and, accordingly, to the maximum extent permitted, the Agreement shall be interpreted to be in compliance therewith. The Parties acknowledge and agree that the interpretation of Section 409A and its application to the terms of this Agreement is uncertain and may be subject to change as additional guidance and interpretations become available. Anything to the contrary herein notwithstanding, all benefits or payments provided by the Company to Executive that would be deemed to constitute "nonqualified deferred

FOIA Confidential Treatment Requested by FXCM
CONFIDENTIAL

FXCM-CFTC_00089783
GLBR_00218146

compensation" subject to Section 409A are intended to comply with Section 409A. If, however, any such benefit or payment is deemed to not comply with Section 409A, the Company and Executive agree to renegotiate in good faith any such benefit or payment (including, without limitation, as to the timing of the Payment payable hereunder) so that either (i) Section 409A will not apply or (ii) compliance with Section 409A will be achieved; provided, however, that any resulting renegotiated terms shall provide to Executive the after-tax economic equivalent (determined without regard to the application of Section 409A to the terms that were renegotiated) of what otherwise has been provided to Executive pursuant to the terms of this Agreement, and provided further, that any deferral of payments or other benefits shall be only for such time period as may be required to comply with Section 409A. In no event whatsoever shall the Company be liable for any tax, interest or penalties that may be imposed on Executive by Section 409A of the Code or any damages for failing to comply with Section 409A.

(b)     A termination of employment shall not be deemed to have occurred for purposes of any provision of this Agreement providing for the payment of any amounts or benefits subject to Section 409A upon or following a termination of employment until such termination is also a "separation from service" within the meaning of Section 409A: and for purposes of any such provision of this Agreement, references to a "resignation," "termination," "terminate," "termination of employment" or like terms shall mean separation from service.

(c)     All reimbursements for costs and expenses under this Agreement shall be paid in no event later than the end of the calendar year following the calendar year in which the Executive incurs such expense.   With regard to any provision herein that provides for reimbursement of costs and expenses or in-kind benefits, except as permitted by Section 409A, (i) the right to reimbursement or in-kind benefits shall not be subject to liquidation or exchange for another benefit, and (ii) the amount of expenses eligible for reimbursements or in-kind benefits provided during any taxable year shall not affect the expenses eligible for reimbursement or in-kind benefits to be provided in any other taxable year, provided, however, that the foregoing clause (ii) shall not be violated with regard to expenses reimbursed under any arrangement covered by Section 105(b) of the Code solely because such expenses are subject to a limit related to the period the arrangement is in effect.

(d)     Whenever a payment under this Agreement specifies a payment period with reference to a number of days (e.g., "payment shall be made within thirty (30) days following the date of termination"), the actual date of payment within the specified period shall be within the sole discretion of the Company.

(e)     If under this Agreement, an amount is paid in two or more installments, for purposes of Section 409A, each installment shall be treated as a separate payment.

19.     PROFIT TRACK RECORD OF THE VENTURE

The parties agree that Executive shall have a non-exclusive right to the profit track record of the Venture following his termination of employment with the Company.

13

20.15.  NOTICES.

Any notices required or permitted to be given hereunder shall be sufficient if in writing, and if delivered by hand or courier, or sent by certified mail, return receipt requested, to the appropriate party's last known address, and shall be deemed given as of the date of the delivery or at the expiration of three days in the event of a mailing.

21.16.  COUNTERPARTS AND FACSIMILE SIGNATURES.

This Agreement may be signed in counterparts with the same effect as if the signatures to each counterpart were upon a single instrument, and all such counterparts together shall be deemed an original of this Agreement.  For purposes of this Agreement, a facsimile copy of a party's signature shall be sufficient to bind such party.

22.17.  WAIVER OR BREACH.

It is agreed that a waiver by either party of a breach of any provision of this Agreement shall not operate, or be construed, as a waiver of any subsequent breach by that same party.

23.18.  ENTIRE AGREEMENT AND BINDING EFFECT.

This Agreement contains the entire agreement of the parties with respect to the subject matter hereof, supersedes all prior and contemporaneous agreements, both written and oral, between the parties with respect to the subject matter hereof, including but not limited to the Letter of Intent between Executive and the Company dated July 27, 2009, and may be modified only by a written instrument signed by each of the parties hereto.  This Agreement shall be binding upon and inure to the benefit of the parties hereto and their respective legal representatives, heirs, distributors, successors and assigns; provided, however, that Executive shall not be entitled to assign or delegate any of his rights or obligations hereunder without the prior written consent of the Company.  It is intended that Sections 10, 11, 12 and 14 hereof benefit each of the Company and each other member of the Company Group, each of which is entitled to enforce the provisions of Sections 10, 11, 12 and 14 hereof.

SURVIVAL.

Except as otherwise expressly provided herein, the termination of Executive's employment hereunder shall not affect the enforceability of Sections 7, 8 and 8(e), 10, 11, 12 and 149 hereof.

24.19.  FURTHER ASSURANCES.

The parties agree to execute and deliver all such further documents, agreements and instruments and take such other and further action as may be necessary or appropriate to carry out the purposes and intent of this Agreement.

14

25.20.  <u>CONSTRUCTION OF AGREEMENT</u>.

No provision of this Agreement or any related document shall be construed against or interpreted to the disadvantage of any party hereto by any court or other governmental or judicial authority by reason of such party having or being deemed to have structured or drafted such provision.

26.21.  <u>HEADINGS</u>.

The Section headings appearing in this Agreement are for the purposes of easy reference and shall not be considered a part of this Agreement or in any way modify, demand or affect its provisions.

[REMAINDER OF PAGE INTENTIONALLY LEFT BLANK]

15

DRAFT

IN WITNESS WHEREOF, the parties hereto have executed this Agreement as of the date and year first above written.

~~Forex Capital Markets~~<u>Effex Capital</u>, LLC

By:_____
   Name:
   Title:

_____
   John Dittami

**FOIA Confidential Treatment Requested by FXCM**
**CONFIDENTIAL**

**FXCM-CFTC_00089787**
**GLBR_00218150**

**Exhibit A**

**Release**

       In exchange for the good and valuable consideration to be provided in accordance with the terms and conditions of the Employment Agreement (the "Agreement") between John Dittami (the "Executive") and ~~Effex~~Forex Capital Markets LLC (the "Company") dated September ____ , 2009____, Executive releases and discharges the Company and its parents, subsidiaries, affiliates, successors, assigns, officers, directors, employees and representatives ("Company Releasees"), of and from any and all rights, claims, demands, debts, dues, sums of money, accounts, attorneys' fees, complaints, judgments, executions, actions and causes of action of any nature whatsoever, cognizable at law or equity, which Executive has or claims, or might hereafter have or claim, against the Company Releasees.  This release includes, without limitation, any claims based on the Agreement, any and all statutory claims and/or claims based upon race, age, gender, national origin, color, disability, religion, or any other violation of any equal employment opportunity law, ordinance, rule, regulation or order, including, but not limited to, 42 U.S.C. § 1981; Title VII of the Civil Rights Act of 1964, as amended; the Civil Rights Act of 1991; the Americans with Disabilities Act; the Age Discrimination in Employment Act of 1967, as amended; the Employee Retirement Income Security Act of 1974, as amended; or any other federal, state, or local laws or regulations regarding employment discrimination, termination of employment, or employee benefits.  This release also includes, but is not limited to, any common law claims, including but not limited to claims for wrongful discharge, defamation, negligence, intentional or negligent infliction of emotional distress, public policy tort, or any other state law claims or any claims grounded in tort or contract; provided, however, that the Agreement specifically does not release any claims that Executive cannot waive by operation of law, including the right to file a charge with or participate in an investigation conducted by the Equal Employment Opportunity Commission ("EEOC").  Executive is waiving, however, his right to any monetary recovery or other relief should the EEOC or any other agency pursue claims on his behalf.  This release specifically excludes: (i) any right to indemnification that Executive might have as a Director, Officer, or employee pursuant to applicable law and/or the Company's certificate of incorporation, bylaws, articles of organization or operating agreement; (ii) any right by Executive to obtain any vested balance in accounts under any pension or retirement plan or agreement; (iii) any COBRA rights; and (iv) any conversion or continuation coverage rights under any Employer welfare benefits plan.

       It is expressly understood that nothing in this Release shall be deemed to constitute a waiver by the Executive of any rights that Executive may have in the future with respect to any actions or non-actions taken by Releasees following the execution of this Release.


_____
     John Dittami

Date:_____

17

**FOIA Confidential Treatment Requested by FXCM**
**CONFIDENTIAL**

**FXCM-CFTC_00089788**
**GLBR_00218151**

# FIRST AMENDED

## LIMITED LIABILITY COMPANY AGREEMENT

## OF

## EFFEX CAPITAL, LLC

This First Amended Operating Agreement (this **"Agreement"**) of Effex Capital, LLC is entered into as of          , 20     , by the members signing below and each other person, if any, who shall become a party to this Agreement (whether by counterpart, separate signature page or otherwise) and is hereafter admitted to the Company (each a "Member" and collectively the "Members).  The Member hereby agrees as follows:

          1.      <u>Certain Basic Definitions and Meanings</u>.

          (a)      For purposes of this Agreement:

The term "**Act**" shall mean the Delaware Limited Liability  Act, as the same may be amended from time to time.

The term "**affiliate**" means with reference to any person, any partner, officer, director, shareholder, trustee, employee or agent of such person or any person directly or indirectly controlling, controlled by or under common control with such person, or any person who is a member of the family of any such partner, officer, director, shareholder, trustee, employee or agent, or a trustee or beneficiary of any trust for the benefit of any such person or any such partner, officer, director, shareholder, employee or agent or any such family member.

The term "**Majority in Interest**" with respect to the Members means, at any time, the Members whose then Percentage Interests constitute, singly or in the aggregate, a majority of the aggregate Percentage Interests of all Members at such time.

The term "**Membership Interest**" means a Member's aggregate rights in the Company, including, without limitation, the Member's right to shares of various categories of net income and net loss, the right to receive distributions from the Company and any right, if any, to vote, grant consents and participate in the management of the Company.  The Members of the Company and the Percentage Interest of each are as set forth on <u>Schedule A</u> hereto, as the same may be amended or modified from time to time pursuant to this Agreement ("<u>Schedule A</u>").

The "**Percentage Interest**" of a Member shall mean, from time to time, the ratio, expressed as a percentage, of the Membership Interest of such Member to the aggregate Membership Interest of all Members.

*490625.3*

The term "**person**" means any association, corporation, estate, general partnership, limited partnership, limited liability company, joint venture, natural person, real estate investment trust, business or other trust, custodian, or nominee, or any individual or other entity in its own or any representative capacity.

2.    Formation; Effect of Agreement.

(a)    The Company has been formed by  filing  the Articles of Organization in accordance with the Act.

(b)    It is the express intention of the Members that this Agreement shall be the sole source of agreement of the parties, and, except to the extent a provision of this Agreement is expressly prohibited or ineffective under the Act, this Agreement shall govern, even when inconsistent with, or different than, the provisions of the Act.  To the extent any provision of this Agreement is prohibited or ineffective under the Act, this Agreement shall be considered amended to the smallest degree possible in order to make it effective under the Act.  In the event the Act is subsequently amended or interpreted in such a way to make any provision of this Agreement that was formerly invalid valid, such provision shall be considered to be valid from the effective date of such interpretation or amendment.

3.    Name.  The name of the limited liability company is Effex Capital LLC (the **"Company"**).  The business of the Company may be conducted, upon compliance with all applicable laws, under any other name designated by the Member.

4.    Management.  The business and affairs of the Company shall be managed by and under the direction of the Members.  Any action of, or consent required by, the Company shall require the affirmative vote in the Majority in Interest of the Members.   The Managing Member shall be Effex Holdings, LLC.

5.    Principal Office.

(a)    The principal office of the Company shall be          , New York, New York.

(b)    The Members are authorized to qualify the Company to do business in such jurisdictions as they or the Company may determine from time to time, and in furtherance thereof, the Members may qualify the Company using the Company's name or an assumed name to be determined by the Members, as may be required by law.

6.    Purposes.  The purposes of the Company are:  (a) to engage in any lawful act or activity for which limited liability companies may be formed under the Act; and (b) to do any and all other acts and things which may be necessary, appropriate or incidental to the carrying out of any or all of such purposes.

7.    Dissolution.  The Company shall dissolve and its affairs shall be wound up upon the first to occur of the following:  (a) the unanimous written consent of the Members, or (b) the entry of a decree of judicial dissolution.

*490625.3*

2

8.     <u>Allocation of Profits and Losses</u>.  The Company's profits and losses shall be allocated to the Members according to their percentage ownership interest.

9.     <u>Distributions</u>.  Distributions shall be made to the Members quarterly,  and in the aggregate amounts determined by the Members.  Notwithstanding the foregoing, the  Company shall distribute all of its funds quarterly except those necessary for working capital purposes which shall not exceed $_____

10.     <u>Transfer of Units.</u>  <u>Except</u> for  Transfers of Units in connection with any Sale of the Company which has been consented to by the prior written consent of all the Members, or  Transfers of Units pursuant to this <u>Section 10</u>, as applicable, no UNITHOLDER shall Transfer any Units.

(a)     <u>Tag-Along Rights</u>.   In the event that any  UNITHOLDER ("Seller") intends to Transfer any of his or its Units, the remaining  Unitholder(s) ("Remaining  Unitholder")   shall have the right to require, as a condition to such Transfer, that the Proposed Transferee purchase their units  on the same terms and conditions and at the same price per Unit as the Seller is to receive.  Each Seller shall promptly notify the Remaining Unitholder of any proposed Transfer subject to the rights set forth in this <u>Section 10(a)</u> and shall deliver to the Remaining Unitholder any  offer ("Offer")  received by him or it within seven (7) days of the initial receipt thereof by such Seller.  The Offer  shall be accompanied by copies of all writings relating to the proposed Transfer and which notice shall fully disclose all material terms of the proposed Transfer, including, but not limited to, the  name and address of the Proposed Transferee, the purchase price or other consideration, timing of closing, terms of payment if not payable in cash in full at the time of purchase, the period of purchase, the period of payment, rate of interest on any unpaid balance of any deferred purchase price and security, if any, to be given by the proposed Transferee

<u>The  Remaining Unitholder may</u> elect to participate in the  sale by delivering written notice to the Seller within thirty (30) days of the receipt of the  Offer.   The Seller will use his or its best efforts to obtain the agreement of the Proposed Transferee to the participation of the Remaining Unitholder in the proposed Transfer and will not Transfer any Units to the Proposed Transferee if such Proposed Transferee refuses to allow the participation of the Remaining Unitholder in accordance with this <u>Section 10</u>.

(b)     <u>Drag-Along Rights</u>.

(i)     For so long as this Agreement is in effect, Forex Capital Markets LLC ("FXCM") shall have the right to require the Company and all of the other UNITHOLDERS to participate, in accordance with this <u>Section 10(b)</u>, in a Sale of the Company.  To exercise such right, FXCM shall give written notice of  such proposed Sale of the Company to the Company and the other UNITHOLDERS not less than thirty (30) days prior to the consummation of such Sale of the Company (the "<u>Disposition Notice</u>").  The Disposition Notice shall disclose in reasonable detail the identity of the proposed transferee(s) and the principal terms and conditions of the proposed Sale of the Company.

**FOIA Confidential Treatment Requested by FXCM**          **FXCM-CFTC_00089791**
**CONFIDENTIAL**                                              **GLBR_00218154**

(ii)      The Company and each other UNITHOLDER shall, if required under applicable law, consent to and approve the Sale of the Company, shall raise no objections against the Sale of the Company, shall waive all applicable dissenters' rights [or other approval rights under Delaware  Law] and shall take all necessary and desirable action in connection with the consummation of the Sale of the Company, Section  10(b)(i) above to participate in the Sale of the Company, including, without limitation, if required under applicable law, calling a meeting of the Board and UNITHOLDERS of the Company to approve such Sale of the Company.  Without limiting the generality of the foregoing, each UNITHOLDER, in his or its capacity as an officer, director, Board member, or UNITHOLDER, as may be appropriate, shall take all necessary and desirable actions in connection with the consummation of the Sale of the Company as requested by FXCM.

(iii)      In the event (A) a Sale of the Company does not require the transfer of all of the outstanding Units and (B) FXCM exercises its right under Section 10(b)(i) to require each other UNITHOLDER to participate in such Sale of the Company, each such other UNITHOLDER to transfer all of its Units in such disposition) shall transfer a number of the Units (on an as-converted basis) owned by such other UNITHOLDER equal to the product of (1) number of such UNITHOLDER's Units (on an as-converted basis) multiplied by a (2) fraction, the numerator of which is the number of Units (on an as-converted basis) to be transferred in such Sale of the Company by all of the UNITHOLDERS (other than the Investor) and the denominator of which is the total number of Units (on an as-converted basis) owned by all of the UNITHOLDERS (other than the Investor).

(iv)      Each UNITHOLDER shall bear its pro rata share (based upon the number of Units sold) of the costs of any sale of Units pursuant to a Sale of the Company to the extent such costs are incurred for the benefit of all UNITHOLDERS and are not otherwise paid by the Company or the acquiring third Person or Persons.  Costs incurred by UNITHOLDERS on their own behalf shall not be considered costs of the Sale of the Company hereunder.

(c)   In the event FXCM exercises its drag along  rights as set forth in   Section 10(b) of this Agreement, FXCM guarantees that the other Unitholders will receive the greater of six, or the current price earnings ratio of FXCM, multiplied by the Company's EBITDA.  For purposes of the calculation, the Company's EBITDA shall be the greater of its earnings for the prior quarter annualized or the last twelve months pro-rated.

(d)  In the event FXCM exercises its drag along rights as set forth in Section 10(b) of this Agreement, Holdings will cause its managing member, John Dittami  to enter into a new one year employment agreement with the Company.

*490625.3*

4

11.   <u>Admission of Additional Members</u>.  One or more additional members of the Company may be admitted to the Company only with the unanimous consent of the Members.

12.   <u>No Personal Liability</u>.

(a)   Neither the authorized person (referred to in Section 2(a) hereof) nor any Member shall have any personal liability whatsoever for any obligations or liabilities of the Company whatsoever except if and then only to the extent expressly provided in the Act.

(b)   None of the Members nor any of their affiliates shall have any personal liability to the Company or any other Member for damages for any breach of duty as a Member of the Company or as an agent, as the case may be, and/or when acting with the consent of the Members; provided that the foregoing provision shall not eliminate or limit the liability of any such person if a judgment or other final adjudication adverse thereto establishes that the acts or omissions thereof were the result of fraud or bad faith and willful and intentional misconduct or constituted such other conduct which under applicable law precludes the elimination or limitation of such liability.

(c)   No Member shall be personally liable for the return or payment of all or any portion of the capital of or profits allocable to or loans to the Company by any other Member (or any successor, assignee or transferee thereof), it being expressly agreed that any such return of capital or payment of profits made pursuant to this Agreement, or any payment or repayment in respect of any such loan, shall be made solely from the assets of the Company (which shall not include any right of contribution from any Member).

13.   <u>Indemnification</u>.  The Company shall indemnify, defend and hold harmless the authorized person (referred to in Section 2(a) hereof), the Members, and, if and to the extent a Majority in Interest of the Members shall expressly so require, any of agents, directors, employees, advisors and consultants as may be expressly designated from time to time by such Members with reference to this Agreement as entitled in a specific instance to indemnification hereunder, from and against any and all loss, liability, damage, cost or expense, including reasonable attorneys' fees, suffered or incurred in defense of any demands, claims or lawsuits against such  person, in or as a result of or relating to his or its capacity, actions or omissions as the Members, or as such an agent, director, employee, advisor or consultant, or concerning the Company or any of its direct or indirect subsidiaries or any activities undertaken on behalf of the Company or any of its direct or indirect subsidiaries, provided that the acts or omissions of such person entitled to indemnification are not found by a court of competent jurisdiction upon entry of a final judgment to be the result of fraud or bad faith and willful and intentional misconduct, or to have violated such a lesser standard of conduct as under applicable law prevents indemnification hereunder.  Upon request therefor by any indemnified party, the Company may, in its sole discretion thereof, determine to make advances to such

FOIA Confidential Treatment Requested by FXCM
CONFIDENTIAL

indemnified party, to cover the costs of defending any claim or action against such indemnified party; provided, that such advances shall be repaid to the Company, without interest, if such indemnified party is found by a court of competent jurisdiction upon entry of a final judgment to have violated the standards for indemnification set forth in the immediately preceding sentence. The right to indemnification conferred in this Section 13 shall not be exclusive of any other right which any person may have or hereafter acquire under any statute, agreement, vote, determination of the Members or otherwise. The Company may, in its sole discretion, maintain insurance, at its expense, to protect any person referred to in this Section 13 against any expense, liability or loss, whether or not the Company would have the power to indemnify such person against such expense, liability or loss under the provisions of this Section 13.

      14.   <u>Fiscal Year</u>. The fiscal year of the Company shall be the calendar year unless otherwise determined by the Members.

<u>Information.</u>   While this agreement is in effect, FXCM shall not establish any affiliate or provide financial support to any other business entity that is in direct competition to the Company. In addition, FXCM shall: (1) continue to provide the Company with accurate and timely data in a similar format to that supplied prior to the execution of this Agreement; (2) not provides preference in tie prices to other providers; (3) not provide other providers any other preference; (4) not allow other providers access to real time book information; (5) not allow collocation by other providers; and (6) not grant other entities most favored nation status in addition to eFFex.

      15.   . In the event FXCM breaches this provision and such breach is not cured within fifteen days of written demand by the Company, then FXCM shall be obligated to purchase Effex Holdings, II, LLC's membership interest in the Company for the the greater of six, or the current price earnings ratio of FXCM, multiplied by the Company's EBITDA. For purposes of the calculation Effex' EBITDA shall be the greater of its earnings for the prior quarter annualized or the last twelve months pro-rated. Payments under this section shall be made in six equal monthly installments, with the first payment made within thirty days of the notice of breach described above.

      16.   Employment Agreement.   Upon execution of this Agreement, Effex Holdings, LLC will cause John Dittami to enter into a one year employment agreement with the Company, in the form annexed hereto as Exhibit 1.

      17.   <u>Amendments</u>. This Agreement may not be amended except by a writing executed by each of the Members, except that (a) this Agreement shall be automatically amended, including <u>Schedule A</u> hereto, without the consent of any Member (i) to reflect changes validly made in the membership of the Company and corresponding changes in the terms and provisions of this Agreement necessary to reflect or conform with any such change in membership, or (ii) to reflect changes permitted in accordance with this Agreement in the Percentage Interests of the Members, and (b) this Agreement shall be amended from time to time (without any required consent of the Members) in each and every manner deemed necessary or appropriate by the Majority in Interest of the

FOIA Confidential Treatment Requested by FXCM
CONFIDENTIAL

FXCM-CFTC_00089794
GLBR_00218157

Members to comply with the then existing requirements of the Code and the Regulations and the Rulings of the Treasury Department or Internal Revenue Service affecting the Company.

        18.    <u>No Third Party Benefits</u>.  This Agreement shall be binding upon and inure to the benefit of the successors and assigns of each party hereto.  This Agreement shall not inure to the benefit of or be enforceable by any creditor of the Company or any creditor of any Member or be deemed to create any rights in favor of or be for the benefit of any person not a party hereto.

        19.    <u>Change in Control of FXCM</u>.  In the event FXCM has a change in control, Holdings will have the option to put its ownership interests in the Company to FXCM at a price which shall be the greater of  six, or the current price earnings ratio of FXCM, multiplied by the Company's EBITDA.  For purposes of the calculation Effex' EBITDA shall be the greater of its earnings for the prior quarter annualized or the last twelve months pro-rated.  Such payment will be made within thirty days of the change of control.

        20.    <u>Severability</u>.  If any provision of this Agreement would be held to be invalid, prohibited or unenforceable in any jurisdiction for any reason, such provision, as to such jurisdiction only, shall be ineffective to the extent of such invalidity, prohibition, unenforceability, without invalidating the remaining provisions of this Agreement, and the validity, legality and enforceability of such remaining provisions shall not be affected in any way thereby.

        21.    <u>Governing Law</u>.  This Agreement shall be governed by, and construed under, the laws of the State of Delaware.

        IN WITNESS WHEREOF, the undersigned, intending to be legally bound hereby, has duly executed this Limited Liability Partnership Agreement as of the date and year first aforesaid.

EFFEX CAPITAL, LLC


By: _____
        Effex Holdings, LLC, Member


FOREX CAPITAL MARKETS,LLC

By: _____

**FOIA Confidential Treatment Requested by FXCM**
**CONFIDENTIAL**

**FXCM-CFTC_00089795**
**GLBR_00218158**

Schedule A

| Member | Percentage Interest |
|---|---|
| Effex Holdings, LLC | 30% |
| FOREX CAPITAL MARKETS,LLC | 70% |

**FOIA Confidential Treatment Requested by FXCM**                    **FXCM-CFTC_00089796**
**CONFIDENTIAL**                                                                                   **GLBR_00218159**

**OPTION AGREEMENT**

This OPTION AGREEMENT, dated as of ~~October~~April __, 2010, between John Dittami~~Effex HoldingsDittami LLC, a Delaware limited liability company~~ ("~~Holdings~~Dittami") , and Forex Capital Markets, LLC, a Delaware limited liability company ("FXCM").

WHEREAS, ~~Holdings~~Dittami is the sole member of Effex Capital, LLC, a Delaware limited liability company ("Effex");

WHEREAS, Effex has entered into a Services Agreement ("Services Agreement" a copy of which is annexed hereto as Exhibit 1) with FXCM dated August 17, 2010;

NOW THEREFORE, for good and valuable consideration, the receipt and adequacy of which are hereby acknowledged, ~~Holdings~~Dittami hereby covenants and agrees as follows:

1.      Option.   Upon written notice to ~~Holdings~~Dittami by FXCM, ~~Holdings~~Dittami agrees to sell, transfer and assign seventy percent of its membership interests in and to Effex to FXCM for the sum of $1.00.   It is understood that after such transaction, FXCM will not issue additional interests in  Effex without Dittami's prior written consent.  In the event FXCM exercises this option Section 3.1 of the Services Agreement shall be replaced with the following:

> FXCM shall receive from Effex a fee equal to $00.01 USD per one million units of Base Currency (defined below) for the aggregated volume of Transactions executed via the Trading System (the "Fees").  The Fee shall be calculated by FXCM on a monthly basis.  FXCM shall provide Effex an invoice for all unpaid Fees.  Upon request, Effex shall deliver to FXCM a written report (in form and substance and with such detail as FXCM shall reasonably request) setting forth its calculation of volume of Transactions executed by FXCM via the Trading System in Base Currency, for such months, which FXCM shall reconcile against its own records to calculate the Fee.  As used herein, "Base Currency" means the first currency of the given currency pair as displayed on the VSCM Trade Station II platform.

2.      Ownership of Membership Interests.  ~~Holdings~~Dittami  represents and warrants that ~~he~~it is the sole member of Effex and is the owner of 100% of the outstanding membership interests of Effex, free and clear of all liens and encumbrances.

*492664.1*

3.      Condition to Option.  As a condition to exercising the option set forth in Section 1 above:

a.      FXCM and ~~Holdings~~Dittami will enter into an operating agreement ("Operating Agreement) which shall provide: (i) that ~~Holdings~~Dittami shall be the managing member of Effex; (ii) ) that ~~Holdings~~Dittami shall have Tag Along rights in the event FXCM seeks to sell its interest in Effex; (iii) that FXCM shall have Drag Along Rights in the event it seeks to sell its interest in Effex which shall guarantee that ~~Holdings~~Dittami receives the greater of six or the current p/e ratio of FXCM multiplied by the Effex's EBITDA  (For purposes of the calculation Effex's Ebitda shall be the greater of the last quarter annualized or the last twelve months prorated).  A copy of the Operating Agreement is annexed hereto as Exhibit 2;

b.      Effex shall extend a one year employment contract ("Employment Agreement") to ~~Holding's principal John~~ Dittami; and ~~Holdings~~Dittami shall ~~ensure that John Dittami~~ executes the Employment Agreement.  A copy of the Employment Agreement is annexed hereto as Exhibit 3;

c.      Effex shall satisfy all outstanding financial obligations, and distribute the remainder of its capital (including clearing deposit) to ~~Holdings~~Dittami; and

d.      ~~Holdings~~Dittami and FXCM shall recapitalize Effex in an amount to be mutually agreed upon and contributed in proportion to their respective ownership interests in Effex.

4.      Notice of Sale.  ~~Holdings~~Dittami agrees that prior to selling, transferring, assigning or granting any lien or encumbrance on any of the membership interests of Effex, ~~Holdings~~Dittami shall provide FXCM thirty (30) days prior written notice of the same.  Any such notice shall be sent to: Forex Capital Markets, 32 Old Slip, 10th Floor, New York, NY 10005, Attn: General Counsel. No sale, transfer, assignment, lien or encumbrance shall be effective absence the delivery of such thirty (30) days notice to FXCM.  Notwithstanding the foregoing, Dittami shall be permitted to transfer his interests in Effex to an entity wholly controlled by him, and assign his rights and obligations under this document to such entity.

5.      Miscellaneous.  This Option Agreement shall be governed by the law of the State of New York, without regard to any conflict of laws principal.  This Option Agreement shall inure to the benefit of, and may be enforced by, FXCM's successors and assigns and shall be binding upon, and enforceable against ~~Holdings~~Dittami successors and assigns, provided that ~~Holdings~~Dittami  may not assign this Option Agreement (except as set forth above) without the written consent of FXCM.  This Option Agreement may be executed in counterparts, which take together shall constitute one and the same instrument.

*492664.1*                                        2

EFFEX ~~HOLDINGS~~DITTAMI, LLC

_____
By:  John Dittami, Managing Member


FOREX CAPTIAL MARKETS, LLC


By: _____
    Name:
    Title:

**FOIA Confidential Treatment Requested by FXCM**
**CONFIDENTIAL**

**FXCM-CFTC_00089799**
**GLBR_00218162**

**Limited Put Option**

This put option agreement ("Agreement") made as of October     , 2010, between John Dittami, ("Dittami"), eFFex Capital, LLC ("eFFex") and Forex Capital Markets, LLC ("FXCM").

**WHEREAS**, FXCM currently provides certain information and support to eFFex;

**WHEREAS**, Dittami and eFFex desire that FXCM continue to provide such support:

**Now, therefore**, in consideration of the promises and mutual covenants contained herein and for other good and valuable consideration, the receipt and sufficiency of which are mutually acknowledged, the Parties hereby agree as follows:

FXCM agrees to purchase Dittami's ownership  in eFFex, in the event that FXCM: (a) fails to provide eFFex with accurate and timely data; (b) fails to provide changes to the matching engine within a reasonable time following eFFex's request;  (c) provides preference in tie prices to other providers; (d) provides other providers  any other preference; (e) allows other providers access to real time book information; (f) allows collocation by other providers;  (g) grants other entities most favored nation status in addition to eFFex; or (h) materially ceases to support eFFex in its business activities if any of the above occurs, and is not remedied, within 15 days following receipt of written notice ("Notice of Breach")  from the Executive specifying the breach.

The purchase price shall be  the greater of six  or the price earnings ratio of FXCM multiplied by the EBITDA of the eFFex.    (EBITDA shall be based on the greater of the last quarter annualized or the last twelve (12) months prorated.)   Such payment shall be made in six equal monthly installments commencing thirty days after delivery of the Notice of Breach.

Dittami may assign his rights under this agreement, to any entity controlled by him, to which he transfer's his ownership interest in eFFex.

eFFex Capital, LLC                        Forex Capital markets, LLC


_____          _____

By:  John Dittami, Managing Member       By:                  , Managing Member


_____

John Dittami, Individually

**FOIA Confidential Treatment Requested by FXCM**
**CONFIDENTIAL**

**FXCM-CFTC_00089801**
**GLBR_00218164**

**Addendum to Services Agreement Dated August 17, 2010**

It is hereby agreed by and between Effex Capital, LLC ("eFFex") and Forex Capital Markets, LLC ("FXCM") that the payments due FXCM under the Services Agreement dated August 17, 2010 shall never exceed seventy percent of eFFex's net income.

Dated:   October     , 2010


Effex Capital, LLC                        Forex Capital Markets, LLC


_____          _____
By: John Dittami, Managing Member         By: