# Exhibit 66



Ernst & Young LLP  
5 Times Square  
New York, NY  10036-6530

Tel: +1 212 773 3000  
Fax: +1 212 773 6350  
ey.com

**To:** FXCM Inc. and Forex Capital Markets LLC Audit Files

**Date:** March 1, 2017

**From:** Ankit Varia, Senior Manager  
David Stollow, Partner

**cc:** Chris Kalyvas, Engagement Quality Reviewer  
Robert Schirling, FSO Region Professional Practice Partner

## FXCM Inc.'s settlements with US regulators

### Background

Company and business
FXCM Inc. ("FXCM" or the "Company"), an Issuer, is a holding corporation and its sole material asset is a controlling equity interest in its subsidiary FXCM Holdings, LLC ("Holdings").  As the sole managing member of Holdings, FXCM Inc. operates and controls all of the business and affairs of Holdings through Holdings and its subsidiaries. In the US, these business activities are conducted through Forex Capital Markets LLC ("Forex").

Forex is registered as a futures commission merchant, retail foreign exchange dealer, provisionally registered swap dealer and a forex dealer member with the U.S Commodities Futures Trading Commission ("CFTC") and the National Futures Association ("NFA"). Forex transacts with customers primarily in foreign exchange transactions. Affiliates of Forex, through other regulated subsidiaries of FXCM Inc. around the globe, transact in various foreign exchange transactions, primarily with retail customers.  Affiliates also act as referring brokers, passing customer transactions to Forex.

Relationship with Effex
In 2009, FXCM management hired an algorithmic trader named John Dittami ("Dittami") for the purpose of developing an algorithm to address the need for liquidity in the market for retail customers. As Dittami was developing his algorithm, the compliance function determined that the use of this algorithm would be problematic in light of the "no dealing desk" model that Forex had marketed to customers.  Compliance came to the view that operating this algorithm within Forex would be inconsistent with the no dealing desk arrangement that FXCM used to market itself to customers, but operating this model as an independent liquidity provider would not.  Thus, the Company determined that

Page | 1



Dittami would operate under a services arrangement whereby Forex would be compensated based on the volume of transactions sent to Dittami (an arrangement referred to as "pay for flow").  To effect this arrangement, Dittami left the Company and formed his own business, Effex Capital, LLC ("Effex").  In exchange for the pay for flow compensation that Forex would be receiving from Effex, Forex agreed to make available to Effex certain bid/ask and other market quote information for transactions prior to execution.  Under the Forex-Effex arrangement, to the extent Effex could provide more favorable pricing or match the quotes available for a particular transaction, the transaction would be awarded to them as the liquidity provider.

EY Engagements
Our engagement as auditors commenced at the time of the FXCM Inc.'s IPO (registration statement covered 2009-2011).  For FXCM Inc. we perform an integrated audit of both the financial statements and internal control over financial reporting in accordance with PCAOB standards.  Furthermore, we perform interim reviews of the unaudited interim consolidated financial statements of the Company in accordance with PCAOB standards.

For Forex, we perform an audit of the financial statements (also under PCAOB standards) as required under CFTC Regulation 1.10 and also issue an internal control report (commonly referred to as the Material Inadequacy "MI" Letter), as required by CFTC Regulation 1.10. Forex's audited financial statements and the MI Letter are filed on a confidential basis with CFTC, NFA and any other required regulatory or governmental agencies.  We are also engaged to audit Forex's balance sheet and related footnotes in accordance with PCAOB standards.  The audited balance sheet is filed with CFTC and is publicly available, as required by regulation.

Other EY member firms are also engaged to audit the financial statements of certain subsidiaries of FXCM Inc. due to local statutory/regulatory reporting requirements in the UK, Australia, Hong Kong, and Bulgaria.

**CFTC and NFA Matters**
Prior to 2015, in addition to routine inquiries from the NFA (with which the Company complied), the NFA made informal inquiries to the Company seeking information regarding trade execution with liquidity providers.  The Company complied with these inquiries.

On July 1, 2015, the CFTC issued a formal order of investigation regarding Forex in connection with a non-public investigation of retail foreign exchange fraud.  On July 2, 2015, the CFTC issued a subpoena to Forex seeking documents with respect Forex's business and/or financial relationship with Effex.  Company management complied with CFTC document requests in 2015 and certain Company personnel sat for deposition

Confidential                                                                                                                      EY-GBI-WP-00004261



testimony in early 2016.  The Company did not receive further requests for information from either the CFTC or NFA following early 2016.

In late November 2016, the NFA communicated to Forex that it believed violations of certain laws and/or regulations had occurred and that it was seeking to proceed with a complaint.  In early December 2016, the CFTC made a similar communication to Forex.  Following negotiations between the Company and the CFTC and NFA, on February 6, 2017, both regulators announced settlements with FXCM Inc. (and subsidiaries, including Forex).

The matters to which the settlements related focused on Forex's transactions with customers that were trading foreign exchange during the time period from 2010 to 2014.  During this time period all customer trading in foreign exchange was conducted through Forex (all other affiliates introduced trades to Forex for execution with liquidity providers).  FXCM Inc.'s business practice prior to early 2015 had been publicly communicated as a 'no dealing desk model' where clients trade in an agency-like arrangement.  Although still acting as principal, under the no dealing desk model, Forex itself did not take the risk of the other side of the trade with clients in offering liquidity, but instead matched transactions with other liquidity providers and earned profits through spreads.

As reflected in the complaints and associated settlement documents (the "Settlement Materials"), the CFTC and the NFA alleged that, during 2010-2014, Forex and FXCM Inc. management concealed its relationship with Effex, and that Effex functionally was acting in a capacity of a dealing desk for Forex.  The allegations in the Settlement Materials were based on the terms and conditions of the relationship with Effex (described above), which were unique compared to other Forex liquidity providers.  Accordingly, the Settlement Materials alleged that customers were harmed through trading tactics viewed as abusive in such a relationship and that appropriate trading disclosures were not made to customers regarding the relationship with Effex and its impact on the no dealing desk policy.  The Settlement Materials also alleged that the Company's marketing and communications to customers were therefore fraudulent.  The Settlement Materials also accused certain Company employees, including certain compliance personnel and directors, of providing false information to the regulators during the course of their investigations.

Under the terms of the settlements, the Company and the individuals named in the Settlement Materials neither admitted nor denied the allegations in the Settlement Materials.  Nevertheless, our understanding is that many of the facts of concerning the Forex-Effex relationship were not materially in dispute, and the Company and the regulators disagreed about whether those facts and related circumstances supported the allegations of wrongdoing in the Settlement Materials. In reviewing these matters with the Company, it was noted that while the Settlement Materials make reference to

Confidential

EY-GBI-WP-00004262



certain trading tactics, there were no specific allegations that demonstrating harm to customers from the Forex-Effex arrangement, nor were any amounts mandated by the regulators for any restitution for customers.

The NFA settlement has no monetary fine, and the CFTC settlement includes a $7 million fine. Pursuant to the Settlement Materials, the Company and certain executives (see below) will be withdrawing from business in the United States.

The scope of the Settlement Materials also included other historical regulatory capital violations and risk management matters.  These regulatory capital violations and risk management matters specifically related to the Swiss National Bank ("SNB") currency movement event which occurred on January 15, 2015 and associated customer losses that resulted in Forex being undercapitalized for regulatory purposes.  Leucadia National Corporation provided emergency financing at that time.  Further, the Settlement Materials also discuss certain other matters such as slippage (movements in price that can occur at the time of a foreign exchange transaction), anti-money laundering matters, and supervision, all of which concern matters that occurred prior to 2016 (and some of which were previously noted in regulatory exam findings and responded to by management).

Our assessment of the currency movement event and the other matters described in the preceding paragraph have been separately evaluated by the engagement team and are not the subject of this memorandum.

Finally, as noted above, the Settlement Materials contain allegations that certain individuals misled the regulators, in some cases intentionally, during the course of the investigations:
- Drew Niv – the CEO of FXCM Inc. (and formerly the CEO of Forex) and a founder of the business
- Ornit Niv – the CEO of Forex (prior to assuming CEO role was responsible for risk management for FXCM US and other affiliates)
- William Ahdout – the head trader of Forex and a founder of the business

Please find the CFTC complaint and settlement at Attachment A and the NFA complaint and settlement at Attachment B.

### External legal counsel
Management engaged Weil, Gotshal and Manges, LLP ("Weil") to advise and represent FXCM Inc., including Forex, since the beginning of the CFTC investigation in 2015.

Confidential



The independent directors of FXCM Inc. retained Sidley Austin LLP ("Sidley") to advise on the matter.

Management and the audit committee chair have verbally represented that no separate or special investigation was deemed necessary given the context of the factual matter itself, Weil's procedures and the views of the business practice being presented (the audit committee will provide formal written representations as discussed later in this memorandum).

**Purpose of this memorandum**
This memorandum documents our evaluation of the settlements and allegations contained in the complaints, which noted instances of non-compliance with laws and regulations, including fraud (US APM 1.14).

The issues to be addressed are:
- whether there are any matters of illegal conduct or fraud that would cause us to resign as auditor;
- whether any matters had been raised through the process that would indicate misstatements in financial statements of prior years;
- whether we believe we remain in a position to rely on the representations of those in management, specifically from those who are the subject of the aforementioned settlements; and
- the impact of these matters on our risk assessment and audit strategy.

FXCM Inc. and Forex will address the loss contingency assessments and the resulting settlements for presentation and disclosure in its financial statements. That is not the subject of this memorandum and will be addressed by the team in the audit work papers.

**Procedures performed by audit team**
Our initial assessment considered:
- The relevance of the matter to the audit.
- Allegations of non-compliance, made by a regulator.
- Whether the matter has potential for having more than an inconsequential effect on the financial statements.
- Whether the matter may cause us to doubt the integrity of management.

The audit team has performed the following procedures in response to the complaints and settlements (some of which were performed in the period when the Company was negotiating the terms of the settlements with the NFA and CFTC):
- We had discussions with the Company's general counsel and CFO (neither the subject of the settlements nor alleged to have been involved in the underlying

Confidential    EY-GBI-WP-00004264



- conduct alleged therein) to address the regulatory matters, including the evolution of the discussions and negotiations with the regulators. We also held similar discussions with the audit committee chair.
- We held meetings with Weil and Sidley to discuss the nature of the allegations, including their views regarding whether the assertions by the regulators in the complaints represented illegal acts and non-compliance with laws, or fraud, and the impact to the Company's business and financial reporting. We also discussed the impact of the assertions made in the complaints on representations to be made by executives named in the complaints and overall management integrity.
- We made inquiries of Weil, management and the audit committee chair to understand the process used to assess the Effex matter and the decision to proceed without an investigation other than the procedures undertaken by Weil in connection with representing the company in the regulatory matters.
- We were kept apprised of developments in the regulatory matters, including being provided with draft complaints and updates on settlement negotiations.
- We also met with Drew Niv and Ornit Niv to understand their views of the allegations due to their roles as CEOs of FXCM Inc. and Forex, respectively.
- Engaged Bradley Massam, from the Fraud Investigation & Dispute Services ("FIDS") practice, to support the audit team during our procedures. FIDS supported the audit team by reviewing and formulating questions, participating in certain meetings with Weil to discuss the allegations and the process used by Weil during the course of their work, reviewing certain documents and providing insights on matters to consider throughout our procedures. See Attachment C for details.
- We obtained a legal letter from Weil to confirm that the complaints were settled consistent with Attachments A and B.
- We will obtain a representation letter from the audit committee that will include the following representations:
    - The audit committee has made available to us all information that the audit committee has obtained regarding non-compliance or possible non-compliance with laws and regulations that may have been committed by FXCM Inc. and Forex, or any of its agents or employees.
    - The audit committee has concluded that no further investigation of such matters is necessary.
    - The audit committee is not aware of any intention of FXCM Inc. or Forex, nor its executive officers, to violate the law and that no acts of non-compliance with laws and regulations have occurred.

**Results of procedures performed**

Weil asserted that, in its view, there were no illegal acts or illegal conduct of the parties with respect to the allegations made in the complaints that were settled. Although Weil's procedures were performed in defense of Forex and all of FXCM Inc., counsel indicated

Confidential



that they would not have approached their services differently and would not have performed any additional tasks if the services were performed as an investigation. We discussed with Weil the scope of procedures Weil performed, including:

- the scope of response documents
- email addresses selected for search
- individuals interviewed, and
- key words used in the searches of e-mails.

**Other matters:** We also discussed with Weil evidence it obtained through interviews, testimony and conversations with the regulators. We inquired about contrary evidence within all aspects of their work, noting no matters that would contradict the views Weil expressed regarding non-compliance or indicate fraud or illegal acts. Weil also noted that although their services were not performed specifically to focus on financial reporting, there were no indications of any matters of error, indications of concealment or management override.  They further indicated that if there were any indications of fraud, illegal acts, or issues with financial reporting uncovered at any point during the course of their work, they would have recommended further investigation.

The conclusions reached by Weil were also corroborated though our discussion with the audit committee chair (and the board's counsel Sidley who were present during our initial meeting with Weil) and discussions with general counsel, the CFO and the CEO's of FXCM Inc. and Forex. Further, there have been no terminations or sanctions of any employees as a result of the settlement. However, on February 21, 2017, Drew Niv and William Ahdout resigned from their positions on the Board of Directors of FXCM Inc. and certain subsidiaries, but will continue to be employed and serve in advisory roles. Drew Niv will continue as CEO of FXCM Inc. until a suitable replacement is determined.  Ornit Niv will continue as CEO of Forex until the de-registration of Forex occurs with the CFTC. Management indicated that both Niv and Ahdout were stepping down due to their concern of being a distraction to the business and wanted to help retain shareholder value (of which they are still shareholders), specifically they were concerned about the four banks that withdrew as liquidity providers in the week following the settlements. They were also concerned their continued leadership would be a distraction with foreign regulator inquiries.  No other issues were expressed.  That explanation was consistent with a discussion with the audit committee chair and Sidley.

We also considered, in light of the evidence, whether we can accept the representations of management.  We discussed this matter with the audit committee chair (who provided us with the views expressed on behalf of the Board of Directors) in light of the allegations.  The board does not believe the actions of the individuals were illegal or improper.  As noted, none of the individuals sanctioned have been terminated or reprimanded. We also considered the references to Drew Niv and Ornit Niv in the

Confidential

EY-GBI-WP-00004266



complaints. Ornit Niv is not mentioned in the complaints, aside from being a respondent in the NFA complaint. Drew Niv was accused of misleading the regulators for his response in how he knew John Dittami. The matters noted were in the context of the financial relationship with Effex and the disclosures made to customers. No matters were noted that conflicted with our understanding of the transactions with Effex related to financial reporting of FXCM Inc. or Forex. We also note that the current CFO and general counsel were not employed by FXCM Inc. in 2010 but were involved in representations to us from the time of the IPO and onward (the CFO for financial reporting, the general counsel for loss contingency matters). We have had no reason to doubt their integrity. We also have accepted representations from other financial reporting personnel since the IPO, including the current chief accounting officer/global controller for the past three years. We also have no reason to doubt her integrity. We also considered Drew Niv's role in the financial reporting process for the current and prior years and note that his direct involvement was limited to his role as the CEO with the process driven by the CFO, chief accounting officer/global controller and the rest of the finance and accounting group. Accordingly, we have concluded that we can continue to rely on representations made by other members of management and are not overly reliant on representations made by Drew Niv.

**Impact on financial statements**

The arrangement for order flow discussed in the complaint had been subject to our audit procedures as part of our past audits. The complaints, however, contains an allegation that management concealed the Effex-related pay for flow revenue from the regulators.

We considered the following in reference to the allegations and our previous audit work:
- **FXCM Inc:** The arrangement for order flow was included in the income statement and disclosed in the FXCM Inc. financial reporting in prior Form 10-Ks. The arrangement was appropriately accounted for and followed the contractual parties to the arrangement. Further, given the entities being discussed, there were no relevant tax or transfer pricing matters impacting financial reporting requiring consideration.
- **Forex:** Even if a contrary view was used for recording revenue, namely that the revenue should have been more appropriately recorded at the NFA/CFTC regulated entity Forex (there is no relevant requirement for a push-down concept of this revenue at Forex), these amounts would have increased profits but would not have had any other substantive impact on regulatory reporting. The receivable from parent would have either been deemed a non-allowable asset for regulatory capital purposes or the receivable itself would have been deemed an equity transaction and reclassified into capital as there was no expectation of cash being remitted from parent to subsidiary.
- **FXCM Inc. and Forex:** The regulators, in the settlement, did not require any financial reporting to be revised (neither the Issuer nor Forex).

Confidential

EY-GBI-WP-00004267

Case 1:17-cv-00916-RA-BCM   Document 305-50   Filed 08/28/22   Page 10 of 13



The initial drafts of the complaints made reference to an option agreement that was not disclosed to FXCM's customers. We further note that this option agreement was not recognized on the financial statements. Management has asserted that the option agreement was not legally enforceable and as a result did not require accounting treatment. Management has obtained a legal analysis from counsel to support their assertion. We reviewed the legal analysis and concur with management's conclusions.

Based on the above considerations, we believe that the previously issued financial statements for the Issuer and Forex continue to be appropriate and are in accordance with US GAAP.

**APM 1.14.8 "Assessing the effect on our audit" considerations**

We considered the guidance contained in US Assurance Policy 1.14 with an emphasis on the items contained in *APM 1.14.8 assessing the effect on our audit*:

- Our evaluation of entity-level controls (e.g., indications that the tone-at-the-top is inappropriate):

    *Audit Team Response: We do not believe that the Company's entity level controls are impacted by the above noted issues. The tone-at-the-top is not solely driven by the CEO but also includes the rest of the C-suite. The overall tone-at-the-top is still appropriate in light of the circumstances.*

- Our identification and assessment of risks (e.g., considering what else could have gone wrong or what other areas face similar pressures or incentives)

    Potential effect on determined materiality, considered both quantitatively and qualitatively

    Potential effect on our combined risk assessments

    *Audit Team Response: Given the low level of materiality in place and the scopes set for our audit work, and the fact that financial reporting was not the focal point of the complaints, we did not assess any new risks requiring additional audit emphasis. We continue to believe as an audit team that no specific fraud risks exist with respect to the business activities. We are not aware of any trends or changes in the customer complaints relevant to the Effex matter or operational activities. We are also not aware of any recent whistleblower communications. Lastly we re-assessed audit risk, combined risk assignments and considered management override,*

Page | 9

Confidential

EY-GBI-WP-00004268



*yielding no change. We will continue to assess risks through the completion of the audits.*

- Implications on contingencies:

*Audit Team Response: FXCM Inc. and Forex will address the loss contingency assessments and the resulting settlements for presentation and disclosure in its financial statements. That is not the subject of this memorandum and will be addressed by the team in the audit work papers.*

- The reliability of management representations

*Audit Team Response: As discussed in previous section, we accept management's representations as appropriate audit evidence.*

- Assessing whether the non-compliance matter or the potential financial disclosures fundamentally affect the financial statements (e.g., by affecting the entity's ability to continue as a going concern)

*Audit Team Response: The matter noted above did not have an impact on financial reporting. The audit team will assess management's ability to continue as a going concern during the course of the audit procedures.*

- We consider the need to obtain representations from those charged with governance or specially charged with the investigation of the possible non-compliance matter:

*Audit Team Response: We are obtaining a separate representation letter from the Audit Committee.*

Lastly we considered guidance contained in *APM 1.14.8b Effects on auditors' reports* and note that no change to previous reports or the current year report is required.

### Conclusion
Based on all of the procedures mentioned above, we believe that there was no impact to financial statement reporting as a result of the regulatory matters in the current or prior years and we may accept management's representations as appropriate audit evidence.

### Attachments:

Attachment A: CFTC complaint and settlement

Page | 10



Attachment B: NFA complaint and settlement
Attachment C: FIDS memorandum

**Approvals are documented in the Concurrence Management Database.**

Confidential                                                                                               EY-GBI-WP-00004270



## Attachment A: CFTC complaint and settlement



CFTC Order - Executed.pdf

## Attachment B: NFA complaint and settlement



NFA Complaint.pdf   NFA Decision.pdf   NFA Executed Offer of Settlement.pdf

## Attachment C: FIDS memorandum



FIDS FXCM Sufficiency Memoran

Confidential                                                                 EY-GBI-WP-00004271