# Exhibit 68

| | |
|---|---|
| **To:** | File |
| **Re:** | Evaluation of Regulatory... |
| **Date:** | Draft of March 14, 2017 |

> [Note: EY obtained the following Evaluation of Regulatory Matters & Impact on 2016 Financial Statements memo from Robert Lande, CFO. This memo outlines Management's assessment and conclusions on the Company's relationship with Effex.
>
> See EY memo at A02.12 - FXCM regulatory settlement consultation memo.]

**Background**

On February 6, 2017, the Company reached simultaneous regulatory settlements with the NFA and CFTC regarding allegations made against the Company, FXCM Holdings, LLC and certain of its principals (the "Respondents"). Under the terms of the settlements, the Respondents neither admitted nor denied the allegations made by the regulators. The complaints were focused on the business relationship and activities with Effex Capital, LLC ("Effex"). The complaints allege violations with respect to actions of the Respondents. Pursuant to the settlement agreements, the Respondents will be permanently withdrawing from the US regulated business activities in 2017. The NFA settlement has no monetary fine aside from the future withdrawal noted earlier. The CFTC settlement has a $7.0 million fine imposed jointly and severally against the Respondents. The Company and Holdings each paid half of the fine or $3.5 million on February 16, 2017, however these amounts were accrued for in the 2016 financial reporting.

In addition, The Company has also settled outstanding litigation with respect to net capital violations with the regulators for approximately $0.6 million, a portion of which had been previously accrued.

There are a number items arising from both complaints and prior versions of the complaints that could have potential accounting implications on FXCM. This memo assesses these accounting items.

**Relationship with Effex**

In 2009, FXCM initiated a project to create an algorithmic trading system that could make markets to FXCM's customers. FXCM hired John Dittami, a high-frequency trader formerly of Citibank's FX Group to develop the algorithmic trading system.

In early 2010, as Dittami was finalizing his trading algorithm, FXCM's Compliance department raised concerns that trading against FXCM retail customers might contradict FXCM's No Dealing Desk model. Dittami left FXCM and formed a new company, Effex to become an external liquidity provider to FXCM.

On March 1, 2010 Effex and FXCM US entered into a services agreement providing for Effex to make monthly payments to FXCM in the amount of $21 per million dollars of trading volume executed by Effex.

On April 14, 2010, FXCM and Effex signed an agreement that provided that FXCM had the option to purchase 70% of Effex for $1.

Shortly thereafter, William Adhout an officer of FXCM communicated to John Dittami of Effex that the option agreement could not be in effect as Adhout was informed from the FXCM Compliance department that the option agreement could be interpreted as FXCM owning an interest in Effex and this could be questioned in light of FXCM's NDD model.

It is also worth noting that the Option Agreement specified that "FXCM has agreed to license to Effex certain intellectual property pursuant to that certain License Agreement . . . between Effex and FXCM." Although FXCM and Effex exchanged draft License Agreements pursuant to which Effex would pay FXCM a licensing fee for use of FXCM's algorithm, they never executed a License Agreement. In addition, the Option Agreement made reference to a potential $2 million loan from FXCM to Effex. This too was never executed. In March 2010, FXCM, as it frequently does in a prime of prime relationship, in return for either a fixed fee or a fee per volume traded, set up a $2 million subaccount in its Citibank prime brokerage account which Effex used until June 2010 and which was terminated thereafter.

On May 1, 2010 the services agreement between Effex and FXCM US was superseded by a services agreement between Effex and FXCM Holdings, providing for monthly payments under the same terms.

In October 2010, Dittami circulated a draft option agreement to FXCM. This draft option agreement suggests that neither FXCM nor Effex thought that the April 2010 Option Agreement was operative: it does not mention that it is superseding an April 2010 agreement. Instead, it actually strikes the April 2010 date and replaces it with an October date.

On June 15, 2011, Alexander Dick, a lawyer at FXCM, sent Dittami drafts of several documents, including a draft option agreement and a "new [Effex] operating agreement which would only be effective in the event FXCM exercised option." This draft option agreement also does not mention that it is superseding a prior option agreement.

In September 2011, the services agreement between Effex and FXCM US was amended so that monthly payments were now calculated at $16 per million.

On June 18, 2012, FXCM paid approximately $180 million to acquire a 50.1% interest in Lucid, which, like Effex, is a non-bank electronic market making and trading firm.

FXCM terminated its pay-for-flow arrangement with Effex in August 2014 when the FCA banned such arrangements.

In November 2015, FXCM and Effex signed an Acknowledgment and Confirmation prepared in consultation with external counsel to FXCM in this matter, Weil Gotshal, that confirmed that (i) the parties never entered into a license agreement, which was consideration for the Option Agreement, and (ii) the Option Agreement was never operative.

**Assessment**

There are a number items arising from both complaints as well as prior versions of the complaints that could have potential accounting implications.

1. ***Should an option to acquire 70% of Effex signed by William Adhout of FXCM and John Dittami of Effex on April 14, 2010 have been valued and recorded in FXCM results.***

As was previously discussed, shortly after signing, William Adhout of FXCM communicated orally to John Dittami of Effex that the option agreement could not be in effect as Adhout was informed by the FXCM Compliance department that the option agreement could be interpreted as FXCM owning an interest in Effex and this could be questioned in light of FXCM's NDD model. Both Adhout and Dittami in sworn testimony to the CFTC have confirmed that neither side believed the option was ever in force or effect because of this and this is corroborated by all subsequent communications between FXCM and Effex. In November 2015, for the avoidance of any doubt, both sides signed an Acknowledgment and Confirmation prepared in consultation with external counsel to FXCM in this matter, Weil Gotshal, that confirmed that (i) the parties never entered into a license agreement, which was consideration for the Option Agreement, and (ii) the Option Agreement was never operative.

King & Spalding, outside counsel to FXCM, Redacted by Counsel for FXCM - Attorney Work Product

**Redacted by Counsel for FXCM - Attorney Work Product**

As the option was never in force or effect, it is appropriate that FXCM did not value nor record the option in its financial statements.

2. **Whether FXCM should have been consolidating the results of Effex.**

Reviewing the consolidation guidance in place at the time of the initiation of the relationship between Effex and FXCM, after determining that none of the scope exceptions apply to Effex, the first question is whether FXCM had a variable interest in Effex.

Landing in that FXCM may have had a variable interest in Effex, as the entity likely did not have sufficient activity to fund its activities (given the support FXCM was giving at the time of its start-up in 2010 (use of FXCM office space for a period of time including the use by Effex for four months between March 2010 and June 2010 of a FXCM subaccount at Citibank Prime Brokerage so that it could trade)), the next question is whether FXCM was the primary beneficiary – i.e., did FXCM have both power and benefits.

With regard to benefits, it is likely that FXCM did meet the benefits criterion. While it did not have the obligation to absorb losses, FXCM received what is believed to be a significant portion of the revenues of Effex through the payments for order flow (although financial statements of Effex are not available).

However, it is not reasonable to conclude that FXCM had the power over Effex. Power means having the ability, through voting rights or similar rights, to direct the activities of a legal entity that most significantly impact the entity's economic performance (e.g., the entity's revenues, expenses, margins, gains and losses, cash flows, financial position). Significant activities may include purchasing or selling significant assets, incurring additional debt, making acquisition and/or divestiture decisions or determining the strategic operating direction of the entity.

FXCM had no Board representation, no equity or voting interests, no management representation or rights and had only committed to providing Effex connectivity to its platform in return for a certain $/million of volume traded for volume executed by Effex through a service agreement. It would not appear that FXCM had power over Effex and not consolidating was appropriate.

3. **Was Effex considered a related party?**

Under ASC 850 *Related Party Disclosures*, related parties include:

   a. Affiliates of the entity

   b. Entities for which investments in their equity securities would be required, absent the election of the fair value option under the Fair Value Option Subsection of Section 825-10-15, to be accounted for by the equity method by the investing entity

   c. Trusts for the benefit of employees, such as pension and profit-sharing trusts that are managed by or under the trusteeship of management

   d. Principal owners of the entity and members of their immediate families

   e. Management of the entity and members of their immediate families

   f. Other parties with which the entity may deal if one party controls or can significantly influence the management or operating policies of the other to

> an extent that one of the transacting parties might be prevented from fully pursuing its own separate interests
>
> g. Other parties that can significantly influence the management or operating policies of the transacting parties or that have an ownership interest in one of the transacting parties and can significantly influence the other to an extent that one or more of the transacting parties might be prevented from fully pursuing its own separate interests.

As a number of these do not apply, including that neither FXCM nor Effex owned an interest in each other nor had managerial rights in each other, it is clear that clauses (f) and (g) are the most relevant for consideration.

In these cases, Effex did not account for a substantial portion of the revenue of FXCM and while it did on occasion account for a significant amount of volume, this was a function that could be easily replaced with the other market makers pricing into the FXCM pricing flow. Looking at the other side, while FXCM did account for a substantial portion of Effex's revenues and volumes, it was by no means the only trading venue that Effex operated. Effex's algorithms were developed to price foreign exchange and Effex traded at other retail FX operators and institutional FX venues. While FXCM and Effex would on occasion have conversations and renegotiate the price of which Effex would trade with FXCM, it cannot be said that FXCM could have prevented Effex from fully pursuing its own separate interest. In fact, since Effex has been terminated completely from pricing FXCM, it continues to trade and operate on the other providers and venues with which it has a relationship.

### 4. Whether there was a $2 million loan between Effex and FXCM in 2010 that may have had off market terms and should have been valued as such.

FXCM never provided a $2 million loan or signed a loan document with Effex. What ended up happening instead was that in March 2010, FXCM, as it does frequently in its prime of prime relationships, opened a $2 million subaccount at Citibank Prime Brokerage that Effex could use to settle its trades daily. There was no agreement around this account and FXCM could have cancelled it at any time. No interest was charged as, consistent with other prime of prime relationships had, FXCM either charged a fixed or variable fee to the customer using the account – in this case Effex, which was paying a rebate for order flow executed on FXCM's platform. By June 2010, the sub account was closed. The subaccount relationship was typical of arms length prime of prime relationships and was on market terms.

### 5. Whether the revenues from payments for order flow were properly disclosed in FXCM disclosures.

FXCM has never hidden that it received payment for order flow and that it was an important component of revenues. For example, reviewing the 2010 10-K filed by

Confidential

EY-GBI-WP-00004039

FXCM, payments for order flow are mentioned 16 times in the document. Similar times mentioned occurred in the 10-Ks for 2011-2014, the latter year being when FXCM stopped receiving payments for order flow.

For example, looking in the description of the Primary Sources of Revenues of the 2010 10-K, (it is bolded and italicized in this memo for emphasis), it is discussed, "...*Retail Trading Revenue* — Retail trading revenue is our largest source of revenue and is primarily driven by: (i) the number of active accounts and the mix of those accounts, such as low versus high volume accounts; (ii) the volume these accounts trade, which is driven by the amount of funds customers have on deposit and the overall volatility of the FX market; (iii) the size of the markup we receive, which is a function of the mix of currency pairs traded, the spread we add to the prices supplied by our FX market makers and the interest differential between major currencies and the markup we receive on interest paid and received on customer positions held overnight; and (iv) ***the amount of additional retail revenues earned, including revenues from contracts-for difference (CFD) trading, fees earned through white label relationships and payments we receive for order flow from FX market makers. In addition, 15% and 11% of our retail trading revenues for the twelve months ended December 31, 2010 and December 31, 2009, respectively, were derived from such additional retail revenues earned.***"

In addition, the CFTC indicated that in total, Effex's monthly payments from 2010 through 2014, rebated to FXCM approximately $77 million. While a large sum, it should be noted that it is an amount that would account for 4.5% of FXCM's retail trading revenue over the period and FXCM's disclosures in its financials were reflective that it was an item of significance but not more.

6. **Whether the revenues from payments for order flow should have been pushed down to FXCM's regulated entities**

During the period 2010 to 2014 when Effex paid for order flow, all FXCM retail FX operations routed their customer orders to FXCM US and in return received a volume based payment for each order received, in order to accommodate the originating entity for all the costs of attracting and maintaining the customer account. FXCM US would execute the trade simultaneously with one of its liquidity providers and would typically mark up the price from what the liquidity provider quoted, thus earning FXCM US revenue on the trade.

Originally, in March 2010, the services agreement was between Effex and FXCM US. However, in May 2010 the services agreement was migrated to being between Effex and FXCM Holdings.

As the contract was signed with FXCM Holdings, the sole shareholder and manager of the operations of FXCM US, the revenue was recorded at FXCM Holdings (with the exception of the period between March 2010 and May 2010 when the contract was with

FXCM US). It is worth noting that the only entity that would have been affected if the contract had been pushed down would have been FXCM US – as all other entities just received a fixed fee per volume traded of their customers, regardless of whether the US entity made money or not.

As Holdings does not have any other source of revenues other than distributions from its subsidiaries, if the revenue had been pushed down to US, US would likely have made distributions up to Holdings to fund Holdings costs.  While the revenue would have increased the net capital of US, the distributions would have reduced and thus net capital would not have been significantly affected.