# Exhibit 78

Page 328

1          **CONFIDENTIAL - ADAM WERNER, Ph.D.**
2              **UNITED STATES DISTRICT COURT**
            **FOR THE SOUTHERN DISTRICT OF NEW YORK**
3

     In re:                          :
4                                    :  Master File No.
     Global Brokerage, Inc.   :  1:17-cv-00916-RA
5    F/k/a FXCM, Inc.         :
     Securities Litigation    :
6    ----------------------   :

7

8             **REMOTE VIDEO DEPOSITION OF:**
9                 **ADAM WERNER, Ph.D.**
10              **FRIDAY, JUNE 4, 2021**

11
12
13
14
15
16
17
18
19
20
21
22
23
24   **REPORTED BY:**
     **SILVIA P. WAGE, CCR, CRR, RPR**
25   **JOB NO. 4577228**

Page 485

CONFIDENTIAL - ADAM WERNER, Ph.D.

1  attributable to the withdraw from its US business
2  as opposed to attributable to the undisclosed
3  interest in Effex?
4      MR. BAKER: Objection.
5      THE WITNESS: I'm sorry. Go ahead,
6  Josh.
7      MR. BAKER: Objection to the form.
8      Go ahead.
9      THE WITNESS: Sorry.
10     A. So you're using that word "possible"
11 again. And I don't know. I mean, I don't know
12 what absurd example you want me to come up with.
13     But when you ask the word, "is it
14 possible," short of something being a hundred
15 percent, something happening with a hundred
16 percent certainty, it's possible.
17     Q. And is it also possible that the
18 price reaction was mostly attributable to FXCM's
19 withdraw from the US market, as opposed to the
20 undisclosed interest with Effex?
21     MR. BAKER: Same objection.
22     A. Again, it's -- again, it's a poorly
23 worded question. "Is it possible?" I mean, I
24 referred back to my previous discussions about

Page 486

CONFIDENTIAL - ADAM WERNER, Ph.D.

1  the possibility -- about the theory of
2  possibility.
3      You know, "is it possible?" I --
4  again, anything's possible, unless there's a
5  hundred percent chance that it's impossible.
6      Q. And, in your analysis, you did not
7  attempt to quantify the price reaction for each
8  of those pieces of information separately,
9  correct?
10     MR. BAKER: Objection, asked and
11 answered.
12     THE WITNESS: I'm glad you said that
13 because I was about to say "asked and answered."
14     A. Or instead of "asked and answered,"
15 since I'm not the lawyer here, I refer to my
16 previous answer to that question, which I think
17 has been asked a couple of times now.
18     Q. In connection with your work for the
19 loss causation and damages report, did you
20 analyze whether an agency or no dealing desk
21 model is preferable to a principal or dealing
22 desk model from a valuation standpoint for FXCM?
23     A. For FXCM? I don't believe so.
24     Q. Did you analyze the value

Page 487

CONFIDENTIAL - ADAM WERNER, Ph.D.

1  implications for FXCM of operating as a dealing
2  desk versus a no dealing desk in connection with
3  your work in the loss causation and damages
4  report?
5      A. I valued FXCM -- well, I don't
6  believe so. I mean, there is an implication that
7  I did do that because we're talking about the but
8  for world and the actual world. And so, to the
9  extent that there's a corrective disclosure at
10 the end of the class period, it's implied that I
11 looked at that.
12     Q. But you did no explicit analysis in
13 connection with that?
14     A. "Explicit"? I mean, again, to the
15 extent that I looked at the price decline at the
16 end of the class period, I don't know if that is
17 -- falls under your rubric of "explicit."
18     Q. Does your loss causation and damages
19 analysis include an analysis of Plaintiffs'
20 allegation relating to any GAAP violations?
21     MR. BAKER: Objection.
22     A. So --
23     THE WITNESS: Oh, sorry. Go ahead,
24 Josh.

Page 488

CONFIDENTIAL - ADAM WERNER, Ph.D.

1      MR. BAKER: Objection to form.
2      That's fine.
3      A. So, as I've stated previously, I've
4  assumed that Plaintiffs' allegations are correct.
5  I have not seen anything to suggest that they are
6  incorrect. I mean, based on my understanding of
7  accounting is what they did a GAAP violation.
8  I'm not sure I've been preferred here as -- or
9  proffered here as an expert on accounting.
10     I believe and don't quote me on this
11 and I, certainly, wouldn't want to charge someone
12 for this opinion, but it was a GAAP -- what they
13 did was a GAAP violation, but I am not sure as I
14 sit here today.
15     Q. You're aware that FXCM did not
16 restate its financial statements following the
17 CFTC and NFA settlements; is that right?
18     A. At what point in time?
19     Q. After the CFTC and NFA settlements.
20     A. So immediately after?
21     Q. At anytime after.
22     A. Well, I don't know. I haven't seen
23 their private financials. I don't remember what
24 happened in the context of their bankruptcy. But

Page 489

CONFIDENTIAL - ADAM WERNER, Ph.D.

if you want to stipulate to that, I'll -- I have no reason to think you're wrong.

Q. Do you offer any opinion in your loss causation and damages report about a purported corrective disclosure with regard to GAAP and FXCM's accounting?

A. My report speaks for itself as to what I've considered. And so, you know, I refer to Paragraph 7 of my report as to what I looked at in forming this -- that's what I've been asked to do.

Q. Are you aware that the CFTC and NFA settlement do not address FXCM's compliance with GAAP?

MR. BAKER: Objection, assumes facts not in the record.

A. I don't know one way or the other as I sit here.

Q. I think this would be a good time to take another short break. Maybe give us ten minutes so I can regroup and see how much further we have.

MR. ISAJIW: So let's go off the record.

Page 490

CONFIDENTIAL - ADAM WERNER, Ph.D.

THE VIDEOGRAPHER: The time is 2:51 p.m. We're going off the record.

(Lunch recess taken 2:51 to p.m.)

THE VIDEOGRAPHER: The time is 3:55 p.m. and we're back on the record.

Q. Dr. Werner, just a few more questions hopefully to finish this up.

In connection with your loss causation and damages analysis, did you use valuation multiple models?

A. Did I use "valuation multiple models"? Hmm. I think I know what you're talking about. Can you give me an example?

Q. I can't. But let's put a pin on that and I'll ask another question and come back to it.

A. Okay.

Q. Did you use a discounted cash flow model?

A. Well, I mean -- okay, so that's a difficult question to answer only to the extent that, you know, the change in the stock price will be -- should reflect the same answer you get

Page 491

CONFIDENTIAL - ADAM WERNER, Ph.D.

if you use DCF analysis. So it's implied. But if you're asking if I separately did a DCF cash flow analysis for this, I did not.

Q. Okay. And did you apply a return retribution analysis?

A. I'm not sure I've ever heard of that, "a return retribution," like I'm getting revenge on somebody?

Q. I'm sorry, a return attribution.

A. Oh, okay.

Q. I apologize.

A. It's been a long day. Sorry.

A "return attribution analysis"? So do you mean attributing a return -- different parts of a return to different factors?

Q. So I, actually, am looking to get that information from you. What I -- let me back up and maybe this will give it more context.

A. Okay.

Q. In your market efficiency reports, you did not perform a loss causation and damages analysis, correct?

A. That is correct, yes.

Q. But if you recall, there were

Page 492

CONFIDENTIAL - ADAM WERNER, Ph.D.

discussions about how you would potentially conduct such analysis in those reports; is that correct?

A. I do not recall. It's possible. I don't recall those conversations, as I sit here today.

Q. Fair enough.

Can you take a look at your rebuttal report, which is Exhibit 9.

A. Exhibit 3... Hold on. Sorry.

Rebuttal report, okay, I've got it.

Q. And you recall that -- and I'm not looking for specifics here. Just at a very general level, Dr. Hendershott -- Professor Hendershott submitted a report where he had criticisms of your potential loss causation analysis; is that correct?

A. Well, so, to the extent that I didn't perform a loss causation analysis for that report, I don't -- I'm not sure I would characterize it that way or I'm not sure that that's an accurate characterization of what Dr. Hendershott did.

Q. Fair enough.