# Exhibit 79

**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| In re Global Brokerage, Inc. f/k/a FXCM, Inc. Securities Litigation | Master File No. 1:17-cv-00916-RA-BCM<br><br>CLASS ACTION |
| This Document Relates To: All Actions | |

**PLAINTIFFS' SECOND AMENDED RESPONSES AND OBJECTIONS**
**TO DEFENDANTS' INTERROGATORIES 1-6**

Pursuant to Federal Rule of Civil Procedure 33, Plaintiffs 683 Capital Partners LP ("683 Capital"), Shipco Transport, Inc. ("Shipco"), and E-Global Trade and Finance Group Inc. ("E-Global") (together, "Plaintiffs") hereby submit their amended responses and objections to Interrogatories 1-6 of the First Set of Interrogatories to Plaintiffs ("Interrogatories") issued by Defendants Global Brokerage, Inc. f/k/a FXCM, Inc., Dror Niv, and William Ahdout ("Defendants").[1]

All responses contained herein are based only upon such information and documents presently available and specifically known to Plaintiffs. Further independent discovery, independent investigation, legal research and analysis may supply additional facts and/or add meaning to the known facts.

**GENERAL OBJECTIONS**

Plaintiffs generally object to the Interrogatories on the following grounds, each of which is incorporated by reference in the responses to the individual Interrogatories below. Any undertaking to search for, or provide information in response to, any Interrogatories remains subject to the General Objections. No objection herein, or lack thereof, is an admission by Plaintiffs as to the existence or non-existence of any information or documents.

---

[1] Defendants served a separate set of interrogatories on E-Global which were substantively identical to the interrogatories served on the other Plaintiffs, at least with respect to Interrogatories 1-6.

1.      Plaintiffs object to the Interrogatories, including the "Definitions" and "Instructions" sections, to the extent that they purport to impose any obligations on Plaintiffs that are not imposed by law, or are otherwise inconsistent with the Federal Rules of Civil Procedure or the Local Rules of the United States District Court for the Southern District of New York.

2.      Plaintiffs object to the Definitions and Instructions and to the Interrogatories to the extent that they seek information protected from disclosure by the attorney-client privilege, the solicitor-client privilege, the work-product doctrine, the litigation privilege, the joint defense or common-interest privilege, constitutional, statutory, and/or common-law rights of privacy, or any other applicable privilege, protection, or doctrine ("Privileged Information"). Plaintiffs' responses to all or any part of any Interrogatory shall not be deemed to be a waiver by Plaintiffs of any applicable privilege or doctrine. Any inadvertent disclosure of Privileged Information shall not be deemed to be a waiver of any applicable privilege or other protection from disclosure.

3.      Plaintiffs object to the Definitions and Instructions and to the Interrogatories to the extent that they seek information that is not relevant to any claim or defense.

4.      Plaintiffs object to the Definitions and Instructions and to the Interrogatories to the extent that they are overly broad, unduly burdensome, vague, or ambiguous.

5.      Plaintiffs object to the Definitions and Instructions and to the Interrogatories to the extent that they seek information that is not within Plaintiffs' possession, custody, or control.

6.      Plaintiffs object to the Definitions and Instructions and to the Interrogatories to the extent that they seek information equally available to Defendants through public sources or records, or to the extent that they seek information already in Defendants' possession, custody, or control on the grounds that they subject Plaintiffs to unreasonable annoyance, oppression, burden, or expense.

7.      Plaintiffs object to the Definitions and Instructions and Interrogatories to the extent that they seek private, personal, or highly confidential information.

8.      Plaintiffs object to the Interrogatories to the extent that they do not have personal knowledge of the information sought therein. Plaintiffs further objects to the Interrogatories to the extent that they lack a sufficient basis to verify the responses provided thereto.

9.      Plaintiffs object to the Definitions and Instructions and Interrogatories to the extent that they are compound, conjunctive, disjunctive, and/or contain subparts in contravention of the numerical limits set forth in Fed. R. Civ. P. 33(a).

10.     No incidental or implied admissions are intended by the Responses herein. The fact that Plaintiffs have answered or objected to any interrogatory should not be taken as: (a) an admission that Plaintiffs accept or admit the existence of any "facts" or information set forth or assumed by such interrogatory; (b) that any particular fact, document, or thing exists, is relevant, non-privileged, or is admissible in evidence; or (c) that any statement or characterization in an interrogatory is accurate or complete. Moreover, the fact that Plaintiffs have answered all or part of any interrogatory is not intended to be, and shall not be construed to be, a waiver by Plaintiffs of any part of any objection to any interrogatory. Plaintiffs specifically reserve all questions as to admissibility, competency, relevance, privilege, and materiality of the noted information, the right to object to the use of such information on any or all appropriate grounds, the right to object on any and all proper grounds, at any time, to other discovery procedures involving or related to such information, and the right to revise, correct, supplement, or clarify any of the following objections and responses.

11.     Plaintiffs' responses to these Interrogatories are based on Plaintiffs' present knowledge, information, and beliefs and based on Plaintiffs' continuing investigation of the matters that are the subject of this litigation. Plaintiffs reserve the right to supplement, clarify, revise, or correct any or all of the responses and objections and to rely on or use, at trial and otherwise in the litigation, subsequently discovered facts and information (including, but not limited to, information obtained in

3

discove1y herein), or facts and information omitted from these answers as a result of mistake, error, oversight, or inadvertence.

12.     Plaintiffs object to the use of their Responses to the Interrogatories in any proceeding other than the above-captioned action.

13.     Plaintiffs specifically reserve their right to amend their Responses to these Interrogatories pursuant to Fed. R. Civ. Proc. 26(e)(1)(A).

**SPECIFIC RESPONSES AND OBJECTIONS**

The General Objections set forth above are made with respect to the below Interrogatories and are incorporated into the Specific Objections below. Any failure to repeat any General Objection in the Specific Objections shall not be deemed a waiver. In addition to the foregoing General Objections, Plaintiffs submit the following Specific Objections and limitations:

**INTERROGATORY NO. 1:**

Identify in chronological order each misstatement and omission that forms the basis of your claims in the TAC, and that were not dismissed by the Court's order partially granting Defendants' motions to dismiss.

**RESPONSE TO INTERROGATORY NO. 1:**

Plaintiffs incorporate by reference the General Objections as if fully set forth herein. Plaintiffs note that Defendants' interrogatories to Plaintiffs 683 Capital and Shipco referred to the "SAC," which was later superseded by the TAC. Plaintiffs' responses herein apply equally to the claims in the SAC or TAC. Subject to and without waiving the foregoing Objections, Plaintiffs respond as follows:

1.     On March 15, 2012, FXCM's annual report for the fiscal year ended December 31, 2011, filed with the SEC on Form 10-K ("2011 10-K"):

a.     Omitted that Effex was a Variable Interest Entity ("VIE"). In doing so, FXCM (a) omitted details about FXCM's relationship with Effex, including the nature, purpose,

size and activities of Effex and the methodology for determining that Effex was a VIE; and (b) failed to consolidate Effex's financial results with its own. Alternatively, FXCM's 2011 10-K omitted that Effex was a related party and failed to disclose FXCM's material transactions with Effex.

b.      Stated that "We utilize what is referred to as agency execution or an agency model. When our customer executes a trade on the best price quotation offered by our FX market makers, we act as a credit intermediary, or riskless principal, simultaneously entering into offsetting trades with both the customer and the FX market maker. We earn trading fees and commissions by adding a markup to the price provided by the FX market makers and generate our trading revenues based on the volume of transactions and the spread earned on transactions, not trading profits or losses."

c.      Stated that "Our agency model is fundamental to our core business philosophy because we believe that it aligns our interests with those of our customers, reduces our risks and provides distinct advantages over the principal model used by the majority of retail FX brokers."

d.      Stated that "Retail trading revenue is our largest source of revenue and is primarily driven by: … (iv) the amount of additional retail revenues earned, including … payments we receive for order flow from FX market makers."

e.      Stated that "We earn trading fees and commissions by adding a markup to the price provided by the FX market makers and generate our trading revenues based on the volume of transactions and the spread earned on transactions, not trading profits or losses."

2.      The 2011 10-K also contained Sarbanes-Oxley Act of 2002 ("SOX") certifications attesting to the accuracy of the report, certifying that "this report does not contain any untrue [or

misleading] statement of a material fact," and certifying that Defendant Niv disclosed "[a]ny fraud, whether or not material" to FXCM's auditor and audit committee.

3.    On May 10, 2012, FXCM's quarterly report for the quarter ended March 31, 2012, filed with the SEC on Form 10-Q ("12Q1 10-Q"):

    a.    Omitted that Effex was a Variable Interest Entity ("VIE"). In doing so, FXCM (a) omitted details about FXCM's relationship with Effex, including the nature, purpose, size and activities of Effex and the methodology for determining that Effex was a VIE; and (b) failed to consolidate Effex's financial results with its own. Alternatively, FXCM's 12Q1 10-Q omitted that Effex was a related party and failed to disclose FXCM's material transactions with Effex.

    b.    Stated that "Retail trading revenue is our largest source of revenue and is primarily driven by: … (iv) the amount of additional retail revenues earned, including … payments we receive for order flow from FX market makers."

    c.    Stated that "Income earned on order flow represents payments received from certain FX market makers in exchange for routing trade orders to these firms for execution."

4.    The 12Q1 10-Q also contained SOX certifications attesting to the accuracy of the report, certifying that "this report does not contain any untrue [or misleading] statement of a material fact," and certifying that Defendant Niv disclosed "[a]ny fraud, whether or not material" to FXCM's auditor and audit committee.

5.    On August 9, 2012, FXCM's quarterly report for the quarter ended June 30, 2012, filed with the SEC on Form 10-Q ("12Q2 10-Q"):

    a.    Omitted that Effex was a Variable Interest Entity ("VIE"). In doing so, FXCM (a) omitted details about FXCM's relationship with Effex, including the nature, purpose,

size and activities of Effex and the methodology for determining that Effex was a VIE; and (b) failed to consolidate Effex's financial results with its own. Alternatively, FXCM's 12Q2 10-Q omitted that Effex was a related party and failed to disclose FXCM's material transactions with Effex.

b.      Stated that "Retail trading revenue is our largest source of revenue and is primarily driven by: … (iv) the amount of additional retail revenues earned, including … payments we receive for order flow from FX market makers."

c.      Stated that "Income earned on order flow represents payments received from certain FX market makers in exchange for routing trade orders to these firms for execution."

d.      Stated that "We earn trading fees and commissions by adding a markup to the price provided by the FX market makers and generate our trading revenues based on the volume of transactions and the spread earned on transactions, not trading profits or losses."

e.      Stated that "We intend to launch an initiative to offer our smaller retail clients the option to trade with a dealing desk, or principal model … As a result, we may incur trading losses using principal model execution from changes in the prices of currencies where we are not hedged."

f.      Stated that "[A]s we have for a number of years conducted our retail operations on the basis of the agency model, we could suffer reputational damage and additional regulatory scrutiny by offering execution to retail clients that creates an inherent conflict between the interests of the customer and our interests."

6.      The 12Q2 10-Q also contained SOX certifications attesting to the accuracy of the report, certifying that "this report does not contain any untrue [or misleading] statement of a material fact," and

certifying that Defendant Niv disclosed "[a]ny fraud, whether or not material" to FXCM's auditor and audit committee.

7.      On November 9, 2012, FXCM's quarterly report for the quarter ended September 30, 2012, filed with the SEC on Form 10-Q ("12Q3 10-Q"):

> a.      Omitted that Effex was a Variable Interest Entity ("VIE"). In doing so, FXCM (a) omitted details about FXCM's relationship with Effex, including the nature, purpose, size and activities of Effex and the methodology for determining that Effex was a VIE; and (b) failed to consolidate Effex's financial results with its own. Alternatively, FXCM's 12Q3 10-Q omitted that Effex was a related party and failed to disclose FXCM's material transactions with Effex.

> b.      Stated that "Retail trading revenue is our largest source of revenue and is primarily driven by: … (iv) the amount of additional retail revenues earned, including … payments we receive for order flow from FX market makers."

> c.      Stated that "Income earned on order flow represents payments received from certain FX market makers in exchange for routing trade orders to these firms for execution."

> d.      Stated that "We earn trading fees and commissions by adding a markup to the price provided by the FX market makers and generate our trading revenues based on the volume of transactions and the spread earned on transactions, not trading profits or losses."

8.      The 12Q3 10-Q also contained SOX certifications attesting to the accuracy of the report, certifying that "this report does not contain any untrue [or misleading] statement of a material fact," and certifying that Defendant Niv disclosed "[a]ny fraud, whether or not material" to FXCM's auditor and audit committee.

9.      On March 18, 2013, FXCM's annual report for the fiscal year ended December 31, 2012, filed with the SEC on Form 10-K ("2012 10-K"):

a.      Omitted that Effex was a Variable Interest Entity ("VIE"). In doing so, FXCM (a) omitted details about FXCM's relationship with Effex, including the nature, purpose, size and activities of Effex and the methodology for determining that Effex was a VIE; and (b) failed to consolidate Effex's financial results with its own. Alternatively, FXCM's 2012 10-K omitted that Effex was a related party and failed to disclose FXCM's material transactions with Effex.

b.      Stated that "We primarily offer our customers what is referred to as an agency model to execute their trades. Our agency model is fundamental to our core business philosophy because we believe that it aligns our interests with those of our customers and reduces our risks. In the agency model, when our customer executes a trade on the best price quotation offered by our FX market makers, we act as a credit intermediary, or riskless principal, simultaneously entering into offsetting trades with both the customer and the FX market maker. We earn trading fees and commissions by adding a markup to the price provided by the FX market makers and generate our trading revenues based on the volume of transactions and the spread earned on transactions."

c.      Stated that "Retail trading revenue is our largest source of revenue and is primarily driven by: … (iv) retail revenues earned from … payments we receive for order flow from FX market makers."

d.      Stated that "Income earned on order flow represents payments received from certain FX market makers in exchange for routing trade orders to these firms for execution."

     e.     Stated that "our commitment to the agency model is one example of our core business philosophy to reduce risks."

10.     The 2012 10-K also contained SOX certifications attesting to the accuracy of the report, certifying that "this report does not contain any untrue [or misleading] statement of a material fact," and certifying that Defendant Niv disclosed "[a]ny fraud, whether or not material" to FXCM's auditor and audit committee.

11.     On May 10, 2013, FXCM's quarterly report for the quarter ended March 31, 2013, filed with the SEC on Form 10-Q ("13Q1 10-Q"):

     a.     Omitted that Effex was a Variable Interest Entity ("VIE"). In doing so, FXCM (a) omitted details about FXCM's relationship with Effex, including the nature, purpose, size and activities of Effex and the methodology for determining that Effex was a VIE; and (b) failed to consolidate Effex's financial results with its own. Alternatively, FXCM's 13Q1 10-Q omitted that Effex was a related party and failed to disclose FXCM's material transactions with Effex.

     b.     Stated that "Retail trading revenue is our largest source of revenue and is primarily driven by: … (iv) retail revenues earned from … payments we receive for order flow from FX market makers."

     c.     Stated that "As we predominantly operate our retail business on an agency model with the exception of certain trades of our CFD customers we are not exposed to the market risk of a position moving up or down in value."

12.     The 13Q1 10-Q also contained SOX certifications attesting to the accuracy of the report, certifying that "this report does not contain any untrue [or misleading] statement of a material fact," and certifying that Defendant Niv disclosed "[a]ny fraud, whether or not material" to FXCM's auditor and audit committee.

13.     On August 8, 2013, FXCM's quarterly report for the quarter ended June 30, 2013, filed with the SEC on Form 10-Q ("13Q2 10-Q"):

      a.      Omitted that Effex was a Variable Interest Entity ("VIE"). In doing so, FXCM (a) omitted details about FXCM's relationship with Effex, including the nature, purpose, size and activities of Effex and the methodology for determining that Effex was a VIE; and (b) failed to consolidate Effex's financial results with its own. Alternatively, FXCM's 13Q2 10-Q omitted that Effex was a related party and failed to disclose FXCM's material transactions with Effex.

      b.      Stated that "Retail trading revenue is our largest source of revenue and is primarily driven by: … (iv) retail revenues earned from … payments we receive for order flow from FX market makers."

      c.      Stated that "As we predominantly operate our retail business on an agency model with the exception of certain trades of our CFD customers we are not exposed to the market risk of a position moving up or down in value."

14.     The 13Q2 10-Q also contained SOX certifications attesting to the accuracy of the report, certifying that "this report does not contain any untrue [or misleading] statement of a material fact," and certifying that Defendant Niv disclosed "[a]ny fraud, whether or not material" to FXCM's auditor and audit committee.

15.     On November 12, 2013, FXCM's quarterly report for the quarter ended September 30, 2013, filed with the SEC on Form 10-Q ("13Q3 10-Q"):

      a.      Omitted that Effex was a Variable Interest Entity ("VIE"). In doing so, FXCM (a) omitted details about FXCM's relationship with Effex, including the nature, purpose, size and activities of Effex and the methodology for determining that Effex was a VIE; and (b) failed to consolidate Effex's financial results with its own. Alternatively,

FXCM's 13Q3 10-Q omitted that Effex was a related party and failed to disclose FXCM's material transactions with Effex.

b.      Stated that "Retail trading revenue is our largest source of revenue and is primarily driven by: … (iv) retail revenues earned from … payments we receive for order flow from FX market makers."

c.      Stated that "As we predominantly operate our retail business on an agency model with the exception of certain trades of our CFD customers we are not exposed to the market risk of a position moving up or down in value."

16.      The 13Q3 10-Q also contained SOX certifications attesting to the accuracy of the report, certifying that "this report does not contain any untrue [or misleading] statement of a material fact," and certifying that Defendant Niv disclosed "[a]ny fraud, whether or not material" to FXCM's auditor and audit committee.

17.      On March 17, 2014, FXCM's annual report for the fiscal year ended December 31, 2013 filed with the SEC on Form 10-K ("2013 10-K"):

a.      Omitted that Effex was a Variable Interest Entity ("VIE"). In doing so, FXCM (a) omitted details about FXCM's relationship with Effex, including the nature, purpose, size and activities of Effex and the methodology for determining that Effex was a VIE; and (b) failed to consolidate Effex's financial results with its own. Alternatively, FXCM's 2013 10-K omitted that Effex was a related party and failed to disclose FXCM's material transactions with Effex.

b.      Stated that "We primarily offer our customers what is referred to as an agency model to execute their trades. Our agency model is fundamental to our core business philosophy because we believe that it aligns our interests with those of our customers and reduces our risks. In the agency model, when our customer executes a trade on the

best price quotation offered by our FX market makers, we act as a credit intermediary, or riskless principal, simultaneously entering into offsetting trades with both the customer and the FX market maker. We earn trading fees and commissions by adding a markup to the price provided by the FX market makers and generate our trading revenues based on the volume of transactions and the spread earned on transactions."

c.      Stated that "Retail trading revenue is our largest source of revenue and is primarily driven by: … (iv) retail revenues earned from … payments we receive for order flow from FX market makers."

d.      Stated that "Income earned on order flow represents payments received from certain FX market makers in exchange for routing trade orders to these firms for execution."

e.      Stated that "[A]s we have for a number of years conducted our retail operations on the basis of the agency model, we could suffer reputational damage and additional regulatory scrutiny by offering execution to retail clients that creates an inherent conflict between the interests of the customer and our interests."

18.      The 2013 10-K also contained SOX certifications attesting to the accuracy of the report, certifying that "this report does not contain any untrue [or misleading] statement of a material fact," and certifying that Defendant Niv disclosed "[a]ny fraud, whether or not material" to FXCM's auditor and audit committee.

19.      On May 12, 2014, FXCM's quarterly report for the quarter ended March 31, 2014, filed with the SEC on Form 10-Q ("14Q1 10-Q"):

a.      Omitted that Effex was a Variable Interest Entity ("VIE"). In doing so, FXCM (a) omitted details about FXCM's relationship with Effex, including the nature, purpose, size and activities of Effex and the methodology for determining that Effex was a VIE;

and (b) failed to consolidate Effex's financial results with its own. Alternatively, FXCM's 14Q1 10-Q omitted that Effex was a related party and failed to disclose FXCM's material transactions with Effex.

b.      Stated that "Retail trading revenue is our largest source of revenue and is primarily driven by: … (iv) retail revenues earned from … payments we receive for order flow from FX market makers."

c.      Stated that "As we predominantly operate our retail business on an agency model with the exception of certain trades of our CFD customers we are not exposed to the market risk of a position moving up or down in value."

20.      The 14Q1 10-Q also contained SOX certifications attesting to the accuracy of the report, certifying that "this report does not contain any untrue [or misleading] statement of a material fact," and certifying that Defendant Niv disclosed "[a]ny fraud, whether or not material" to FXCM's auditor and audit committee.

21.      On August 8, 2014, FXCM's quarterly report for the quarter ended June 30, 2014, filed with the SEC on Form 10-Q ("14Q2 10-Q"):

a.      Omitted that Effex was a Variable Interest Entity ("VIE"). In doing so, FXCM (a) omitted details about FXCM's relationship with Effex, including the nature, purpose, size and activities of Effex and the methodology for determining that Effex was a VIE; and (b) failed to consolidate Effex's financial results with its own. Alternatively, FXCM's 14Q2 10-Q omitted that Effex was a related party and failed to disclose FXCM's material transactions with Effex.

b.      Stated that "Retail trading revenue is our largest source of revenue and is primarily driven by: … (iv) retail revenues earned from … payments we receive for order flow from FX market makers."

14

      c.      Stated that "As we predominantly operate our retail business on an agency model with the exception of certain trades of our CFD customers we are not exposed to the market risk of a position moving up or down in value."

22.     The 14Q2 10-Q also contained SOX certifications attesting to the accuracy of the report, certifying that "this report does not contain any untrue [or misleading] statement of a material fact," and certifying that Defendant Niv disclosed "[a]ny fraud, whether or not material" to FXCM's auditor and audit committee.

23.     On November 7, 2014, FXCM's quarterly report for the quarter ended September 30, 2014, filed with the SEC on Form 10-Q ("14Q3 10-Q"):

      a.      Omitted that Effex was a Variable Interest Entity ("VIE"). In doing so, FXCM (a) omitted details about FXCM's relationship with Effex, including the nature, purpose, size and activities of Effex and the methodology for determining that Effex was a VIE; and (b) failed to consolidate Effex's financial results with its own. Alternatively, FXCM's 14Q3 10-Q omitted that Effex was a related party and failed to disclose FXCM's material transactions with Effex.

      b.      Stated that "Retail trading revenue is our largest source of revenue and is primarily driven by: … (iv) retail revenues earned from … payments we receive for order flow from FX market makers."

      c.      Stated that "As we predominantly operate our retail business on an agency model with the exception of certain trades of our CFD customers we are not exposed to the market risk of a position moving up or down in value."

      d.      Stated that the Company "no longer receive[d] payments for order flow."

24.     The 14Q3 10-Q also contained SOX certifications attesting to the accuracy of the report, certifying that "this report does not contain any untrue [or misleading] statement of a material fact," and

certifying that Defendant Niv disclosed "[a]ny fraud, whether or not material" to FXCM's auditor and audit committee.

25.     On March 16, 2015, FXCM's annual report for the fiscal year ended December 31, 2014, filed with the SEC on Form 10-K ("2014 10-K"):

a.     Omitted that Effex was a Variable Interest Entity ("VIE"). In doing so, FXCM (a) omitted details about FXCM's relationship with Effex, including the nature, purpose, size and activities of Effex and the methodology for determining that Effex was a VIE; and (b) failed to consolidate Effex's financial results with its own. Alternatively, FXCM's 2014 10-K omitted that Effex was a related party and failed to disclose FXCM's material transactions with Effex.

b.     Stated that "Retail trading revenue is our largest source of revenue and is primarily driven by: … (iv) retail revenues earned from … payments we receive for order flow from FX market makers."

c.     Stated that "Income earned on order flow represents payments received from certain FX market makers in exchange for routing trade orders to these firms for execution. Our order routing software ensures that payments for order flow do not affect the routing of orders in a manner that is detrimental to our retail customers."

d.     Stated that the Company "no longer receive[d] payments for order flow."

26.     The 2014 10-K also contained SOX certifications attesting to the accuracy of the report, certifying that "this report does not contain any untrue [or misleading] statement of a material fact," and certifying that Defendant Niv disclosed "[a]ny fraud, whether or not material" to FXCM's auditor and audit committee.

27.     On January 27, 2013, FXCM's website[2] stated that "FXCM does not take a market position-eliminating a major conflict of interest."

28.     On February 5, 2013, FXCM's website[3] stated that "FXCM can see your waiting orders when you trade with No Dealing Desk execution. But this does not create a conflict of interest between you and FXCM because we aren't taking a market position."

**INTERROGATORY NO. 2:**

For each misstatement and omission identified in your answer to Interrogatory No. 1, identify the Person who made the misstatement or omission (*i.e.*, the Person who had the ultimate authority over the statement or omission).

**RESPONSE TO INTERROGATORY NO. 2:**

Plaintiffs incorporate by reference the General Objections as if fully set forth herein. Subject to and without waiving the foregoing Objections, Plaintiffs respond as follows:

The Persons who made the correspondingly numbered statements and omissions identified in Plaintiffs' Response to Interrogatory No. 1 were:

1.     FXCM, Dror Niv ("Niv"), and William Ahdout ("Ahdout").

2.     Niv.

3.     FXCM and Niv.

4.     Niv.

5.     FXCM and Niv.

6.     Niv.

7.     FXCM and Niv.

---

[2] *Available at* https://web.archive.org/web/20130127222625/http://www.fxcm.com/advantages/forex-execution/no-dealing-desk

[3] *Available at* https://web.archive.org/web/20130205185432/http://www.fxcm.com/advantages/forex-execution/why-execution-matters-faq/

8.    Niv.

9.    FXCM, Niv and Ahdout.

10.   Niv.

11.   FXCM and Niv.

12.   Niv.

13.   FXCM and Niv.

14.   Niv.

15.   FXCM and Niv.

16.   Niv.

17.   FXCM, Niv and Ahdout.

18.   Niv.

19.   FXCM and Niv.

20.   Niv.

21.   FXCM and Niv.

22.   Niv.

23.   FXCM and Niv.

24.   Niv.

25.   FXCM, Niv and Ahdout.

26.   Niv.

27.   FXCM

28.   FXCM

## INTERROGATORY NO. 3:

For each misstatement and omission identified in your answer to Interrogatory No. 1, identify

all facts that support your contention that the Person (or Persons) who made the misstatement or

omission did so with actual knowledge or severe recklessness that the statement or omission was false or misleading when made.

**RESPONSE TO INTERROGATORY NO. 3:**

Plaintiffs incorporate by reference the General Objections as if fully set forth herein. Plaintiffs object that this Interrogatory is premature to the extent that facts subject to expert discovery are necessary for Plaintiffs' response. Plaintiffs specifically reserve their right to supplement their response after completing expert discovery. The following represents a summary of facts supporting Plaintiffs' contentions relating to this Interrogatory. This summary is not intended as a substitute for documentary or testimonial evidence at subsequent stages of this Litigation. Subject to and without waiving the foregoing Objections, Plaintiffs respond as follows:

FXCM hired John Dittami to a Managing Director position in or around September 2009. Mr. Ahdout and Mr. Niv were involved in the hiring of Mr. Dittami. Mr. Dittami was hired to develop an algorithmic trading system, which became known as EES, that would serve as a liquidity provider for FXCM. Mr. Niv and Mr. Ahdout knew that as a liquidity provider, EES would be on the opposite side of trades with FXCM's customers on FXCM's No Dealing Desk platform.

On September 4, 2009, Mr. Dittami and FXCM entered into an employment contract providing that Mr. Dittami would be compensated primarily by a base salary of $250,000 and a bonus of 30% of the trading profits from EES. The 30% profit share was expected to be multiples of the base salary. The employment contract also provided that FXCM would fund expenses for EES up to $3 million. FXCM expended a portion of the $3 million to support EES.

In 2010, Mr. Ahdout and Mr. Niv were involved in discussions in which FXCM decided that it could not operate EES internally and still claim to its customers that it was not on the other side of their trades, which would vitiate the main selling point of FXCM's No Dealing Desk model. Accordingly, Mr. Niv and Mr. Ahdout decided that Mr. Dittami would have to operate EES as an external entity.

They informed Mr. Dittami of this decision and set about helping Mr. Dittami to establish a new entity, Effex Capital, LLC ("Effex"). Mr. Dittami continued to develop and operate EES until he left FXCM on April 14, 2010. EES began to run test trades in March and April 2010, which were real trades opposite FXCM's retail customers. Mr. Niv and Mr. Ahdout were aware that these trades continued after they had determined that Mr. Dittami would have to trade as Effex, so that the testing was conducted as EES before Mr. Dittami had left FXCM, but for Effex's benefit.

Effex was first formed on March 23, 2010. Mr. Ahdout and FXCM's general counsel helped set up Effex, with Mr. Dittami consulting with them on the name of the entity. Effex served as a continuation of EES – other than becoming a separate legal entity the work continued, the operations continued, the test trades continued, and FXCM employees continued to refer to Effex as EES in internal correspondence and nomenclature within FXCM's accounting and trading systems. Just like EES, Effex traded opposite FXCM's retail customers. With the knowledge and/or approval of Mr. Ahdout and Mr. Niv, FXCM helped incubate Effex by providing a $2 million line of credit as collateral required for Effex to begin trading. The line of credit was secured with a promissory note and personal guaranty signed by Mr. Dittami, who guaranteed the note with his stake in Effex. However, this guaranty was essentially worthless, as Effex lacked any material assets at the time. FXCM provided the $2 million line of credit on terms that Mr. Dittami would not have been able to obtain in an arms' length transaction, charging no interest and requiring no material collateral. Effex also repaid FXCM for the portion of EES's expenses that FXCM had funded. Mr. Ahdout and Mr. Niv were also aware that FXCM set up a prime-of-prime account for Effex with FXCM's prime broker, Citi, which Effex needed at the time in order to trade.

When Mr. Dittami left FXCM, the parties intended to maintain the 70%-30% split of trading profits from Mr. Dittami's employment contract. In Mr. Dittami's resignation letter on April 14, 2010, he and Mr. Ahdout acknowledged that the parties intended to work out an agreement mirroring the

main economic terms from Mr. Dittami's employment agreement, meaning the 70-30 profit split. On the same day, Mr. Dittami and Mr. Ahdout executed an option agreement by which FXCM had the option to purchase a 70% share in Effex for the nominal price of $1. Mr. Niv was aware of the option agreement. The option agreement was part of the efforts to replace the 70-30 profit split. Mr. Dittami, Mr. Niv and Mr. Ahdout also continued to discuss for at least two years the possibility of FXCM buying Effex and potentially switching back to dealing desk execution upon bringing Effex back into the fold.

Over the first few years of its existence, Effex provided regular updates to Mr. Ahdout, Mr. Niv, and others at FXCM. These updates typically included information concerning Effex's trading profits in dollars per million units of volume, on a weekly or monthly basis. These updates continued in various frequency through at least 2012. FXCM also tracked Effex's expenses and income for a certain time in mid-2010. In this way FXCM, including Mr. Ahdout and Mr. Niv, were able to keep tabs on Effex's profitability and use that information to determine how much of Effex's profits it would pay to FXCM.

In June 2010, Mr. Dittami and certain principals of FXCM, including Mr. Ahdout and Mr. Niv, began to discuss structuring the FXCM-Effex profit-sharing relationship as payments for order flow. The parties decided that Effex would pay $21 per million because they projected that Effex would earn roughly $30 per million in trading profits. The parties intended that the rate per million would adjust up or down over time, varying as Effex's profitability waxed or waned. As early as July 2010, Mr. Dittami discussed with FXCM retroactively adjusting the rate per million that Effex would pay for certain months based on Effex's profitability. Mr. Dittami specifically noted in discussions with Mr. Ahdout that the 30% share of profits from his employment contract was replaced by the variable per million payments for order flow. During the time that Effex paid FXCM for order flow, no other liquidity provider paid FXCM for order flow, with the exception of BNP Paribas, which very briefly had a different agreement with FXCM to pay for order flow but only with respect to certain institutional

liquidity streams (as opposed to retail) and in amounts that were "tiny" compared to Effex's payments and considered a "joke" at FXCM.

FXCM filed its S-1 registration statement on September 2, 2010. In August 2010, as FXCM was about to go public, it started to paper over the deal with Effex. Just days before filing the S-1, FXCM and Effex executed services agreements that were back-dated to March 1, 2010 (with FXCM US) and May 1, 2010 (with FXCM Holdings). The March 1 services agreement was dated three weeks before Effex was even formed. It appears the first agreement was necessary to paper over payments that Effex had made to FXCM for March and April 2010. The second agreement provided for payments to be made directly to FXCM Holdings, which was not a regulated entity. FXCM Holdings typically did not have any other external sources of direct revenue. Its revenues comprised almost entirely of upstream payments from FXCM's regulated operating subsidiaries. The services agreements, signed by Mr. Ahdout, memorialized the $21 per million rate for order flow payments that Effex was already paying to FXCM. Mr. Niv was aware of the agreements at the time. Also in the lead up to going public, FXCM's CFO instructed the company's accounting department not to mention the option agreement to E&Y, FXCM's auditors.

As the services agreements were signed, FXCM recorded an accounting adjustment in its books for June 2010 as a retroactive correction so that it would show payments of $21 per million from Effex, meaning that Effex had paid a different rate for some months prior. This correction was not noted in materials FXCM provided to E&Y. Even as the parties were executing the back-dated documents, Mr. Dittami expressed to FXCM's in-house counsel that the parties expected to modify the agreements with the intent of maintaining the 70-30 split of trading profits. Mr. Dittami consistently maintained in correspondence with FXCM, including Mr. Ahdout, that the parties' understanding was that Effex's payments would not exceed 70%. No one at FXCM corrected or challenged Mr. Dittami's statements.

Effex and FXCM had continuous discussions about what rate per million Effex would pay for a given month. Often these discussions occurred after the month at issue had concluded and the amount of order flow that Effex captured was known. In October 2010, Mr. Dittami discussed with Mr. Ahdout what the rate should be for that month in light of Effex earning lower profits per million on its trading. Mr. Dittami suggested $17.50, and FXCM billed Effex $17.50 per million for October and November 2010. The services agreement was not amended to reflect this new rate. Materials submitted to E&Y did not show that FXCM billed Effex $17.50 per million for these two months instead of $21 per million. Mr. Ahdout was the main point of contact at FXCM in discussions with Mr. Dittami or Effex's COO about what rate per million FXCM would charge Effex, and Mr. Niv was generally aware of any changes that resulted from those conversations.

At year-end 2010, Mr. Dittami emailed Mr. Niv and Mr. Ahdout with Effex's trading profits – annualized to approximately $35.5 million – and FXCM's share, which was approximately $23 million, or 70% of Effex's trading profits.

In 2011, Effex continued to discuss with FXCM what per million rate Effex would pay FXCM and adjust the rate based on Effex's profitability. In late 2011, when spreads tightened in the market and Effex's trading on FXCM order flow became less profitable, the parties agreed to reduce Effex's payments to $16 per million. This time the parties amended the services agreement to reflect the new rate.

Effex and FXCM also discussed at various points which liquidity streams would count toward the trading volume that Effex paid FXCM on. Effex provided multiple liquidity streams to FXCM, and some were more profitable than others. Mr. Dittami had multiple discussions with Mr. Ahdout, which Mr. Niv was generally aware of, about including or excluding certain streams in the volume calculations because of how profitable or unprofitable they were for Effex. These conversations occurred in at least 2011 and 2012.

In November 2011, FXCM's in-house counsel discussed with Mr. Dittami a document terminating prior agreements between FXCM and Effex except for the services agreement. Specifically, they discussed terminating the option agreement. However, Mr. Dittami expressed unease with terminating the parties' agreement to follow the economic terms of the employment agreement. The parties never executed the termination agreement.

In April 2013, Mr. Dittami and Mr. Ahdout agreed that Effex would pay a reduced rate per million for trading volume from the dollar-yen currency pair. The basis for this change was that this trading volume had become much less profitable for Effex. Mr. Niv was aware of this change. Beginning with February 2013, FXCM billed Effex separately for dollar-yen volume at only $3 per million, reducing the effective rate that Effex was paying for total order flow. In June 2013, Mr. Dittami and Mr. Ahdout agreed that Effex would likewise split out trading volume in the euro-dollar currency pair, with Effex paying only $6 per million. The reason for this change was that this trading volume had become much less profitable for Effex. Mr. Niv was aware of this change. The effect of these rate changes was to reduce the effective rate per million that Effex was paying on FXCM order flow from February 2013 onward.

From the beginning of Effex's existence, FXCM provided significant advantages to Effex over other liquidity providers to allow Effex to win more trading volume. Mr. Ahdout and Mr. Niv approved or were at least aware of these advantages. The advantages included: (1) Effex would win ties when Effex and another liquidity provider submitted the same price quote; (2) Effex had a real-time read of book, allowing it to see in real-time the prices submitted by other liquidity providers; (3) co-location with FXCM's servers which decreased latency between Effex and FXCM; and (4) FXCM applied lower mark-ups to the prices provided by Effex as compared to prices from other liquidity providers. These advantages allowed Effex to have the best price more often, directing more trading volume to Effex. With these advantages, Effex could choose when it wanted to offer a price to FXCM that would

allow it to win a trade or portion of a trade. On net, the more trading volume Effex captured, the more profitable its trading was. By giving Effex these advantages, FXCM allowed Effex to capture more trading volume. With more trading volume, Effex's trading was more profitable and it paid FXCM more for order flow.

In its early stages Effex was dependent upon FXCM to support its operations. Effex operated its trading algorithm through FXCM servers and on FXCM's network and relied upon FXCM information technology and programming staff to implement its trading systems. It allowed Effex to operate out of FXCM's offices rent-free for a full year after Effex became a separate entity – a favor Effex returned for a brief time in 2012 when Hurricane Sandy displaced FXCM employees from their office. Mr. Dittami maintained an FXCM email address for months after leaving FXCM, and Effex initially used FXCM servers to host their email services. Mr. Dittami and others at Effex also maintained VPN access to desktop computers at FXCM through 2012, and Effex could not fully conduct its business except through VPN connection to FXCM. Multiple FXCM employees also worked for Effex on a regular basis for multiple years, at times spending four days per week doing work for Effex. FXCM personnel also spent time monitoring Effex' trading dashboard for Effex, which continued to late 2013 or early 2014. In 2013 and at least one other year Effex requested to pay bonuses (which FXCM paid, and Effex reimbursed FXCM for) of tens of thousands of dollars to two of these employees, Alex Kochel and Darren Merwitz, for their work done on Effex's behalf. Mr. Merwitz also used an Effex email address for the purposes of communicating with entities outside of Effex and FXCM, such as Citibank, to hide the fact that an FXCM employee was performing work for Effex.

Mr. Niv expressed to an FXCM employee that he did not want to share with other liquidity providers how much of FXCM's order flow Effex was capturing. Mr. Dittami emailed that sharing how much of FXCM's order flow Effex was capturing would bring up questions FXCM did not want brought up.

In the beginning of its operations, all of Effex's revenues came from FXCM. Effex gradually added other revenue sources, but through 2016 trading volume from FXCM comprised a substantial majority of Effex's revenues. In late 2010 and early 2011, approximately 90% of Effex's trading profits came from FXCM trading volume. Mr. Niv estimated in March 2014 that approximately 80% of Effex's revenues came from FXCM trading volume, and he stated that Effex had a lot to lose if they pissed FXCM off. FXCM was Effex's main lifeline. Throughout the class period, many trading venues outside of FXCM would not accept non-bank liquidity providers like Effex. When Effex began operations in 2010, almost no other companies would accept them.

The NFA and CFTC began investigating FXCM's relationship with Effex in 2013 and 2014. As the NFA's investigation intensified in the spring of 2014, FXCM decided to stop taking payments for order flow. FXCM and Mr. Dittami executed two termination letters on August 25, 2014, terminating the services agreement – and with it the order flow payments – and Mr. Dittami's employment termination letter stating that the parties intended to maintain the economic terms from the employment agreement. In November 2015, as the NFA and CFTC investigations further intensified, Effex and FXCM signed an acknowledgement and confirmation purporting that the April 14, 2010 option agreement had never gone into effect. The parties never executed anything in writing prior to 2015 cancelling the option agreement or stating that it was not in effect. FXCM employees also provided false or misleading responses to the regulators' questions regarding Mr. Dittami and Effex.

FXCM was obligated under U.S. Generally Accepted Accounting Principles to disclose Effex as a subsidiary or variable-interest entity and consolidate Effex's results of operations in its contemporaneous financial reports filed with the SEC on forms 10-Q and 10-K. Alternatively, Effex was a related party and FXCM was required to disclose the millions of dollars in order flow payments as material related party transactions. In order to conceal the reality of its relationship with Effex,

FXCM neglected to do so, instead reporting earnings attributable to Effex trading as payments for order flow, without identifying Effex as the source of such payments.

FXCM terminated its relationship with Effex around February 2017. After FXCM terminated Effex, Effex lost its prime broker and numerous other clients. Effex was unable to support itself without FXCM and went out of business shortly thereafter.

## INTERROGATORY NO. 4:

For each misstatement and omission identified in your answer to Interrogatory No. 1, identify when and how the market learned the truth of the misstatement or omission (*i.e.*, identify each corrective disclosure). If you contend that a corrective disclosure only partially revealed the truth of an alleged misstatement or omission, identify the portion of the truth that was revealed and the portion of the truth that was not revealed.

## RESPONSE TO INTERROGATORY NO. 4:

Plaintiffs incorporate by reference the General Objections as if fully set forth herein. Plaintiffs object that this Interrogatory prematurely seeks facts which are subject of expert discovery. Plaintiffs specifically reserve their right to amend their Response upon completion of expert discovery. Subject to and without waiving the foregoing Objections, Plaintiffs respond as follows:

Plaintiffs identity the following corrective disclosures, by which the market learned the truth of each of the misstatements and omissions identified in Plaintiffs' Response to Interrogatory No. 1:

1.     Press release issued by the Commodity Futures Trading Commission ("CFTC") on February 6, 2017, as referenced in paragraph 79 of the TAC.

2.     The CFTC's Order Instituting Proceedings Pursuant to Sections 6(c) and 6(d) of the Commodity Exchange Act, Making Findings, and Imposing Remedial Sanctions dated February 6, 2017, attached to the TAC as Exhibit 1.

3.      The National Futures Association's complaint dated February 6, 2017, attached to the TAC as Exhibit 2.

4.      Press release issued by FXCM on February 6, 2017, as referenced in paragraph 81 of the TAC.

## INTERROGATORY NO. 5:

For each corrective disclosure identified in your answer to Interrogatory No. 4, identify the decline in the market price of FXCM common stock and/or notes caused by the corrective disclosure.

## RESPONSE TO INTERROGATORY NO. 5:

Plaintiffs incorporate by reference the General Objections as if fully set forth herein. Plaintiffs object that this Interrogatory prematurely seeks facts which are subject of expert discovery. Plaintiffs specifically reserve their right to amend their Response upon completion of expert discovery. Subject to and without waiving the foregoing Objections, Plaintiffs respond as follows:

Plaintiffs refer to, and incorporate by reference into their Response, paragraphs 82-83 of the TAC and the Court's Order dated March 28, 2019 (Dkt. No. 135).

## INTERROGATORY NO. 6:

For each omission identified in your answer to Interrogatory No. 1, identify the statute, rule or regulation that required the disclosure, or if no statute, rule or regulation required the disclosure, identify the statement that was rendered false or misleading because of the omission.

## RESPONSE TO INTERROGATORY NO. 6:

Plaintiffs incorporate by reference the General Objections as if fully set forth herein. Plaintiffs object that this Interrogatory prematurely seeks facts which are subject of expert discovery. Plaintiffs specifically reserve their right to amend their Response upon completion of expert discovery. Subject to and without waiving the foregoing Objections, Plaintiffs respond as follows:

Plaintiffs refer to, and incorporate by reference into their Response, their Responses to Interrogatories Nos. 1 and 3. In addition, as identified in the Response to Interrogatory No. 1, omissions 1(a), 3(a), 5(a), 7(a), 9(a), 11(a), 13(a), 15(a), 17(a), 19(a), 21(a), 23(a), and 25(a) ("GAAP Omissions") violated U.S. GAAP, specifically ASC 810-10-50-3 (VIE disclosures) or ASC 850-10-50-1 (related party transactions). Each of the SEC filings in which these GAAP Omissions occurred also stated that the financial statements contained therein were prepared according to GAAP, which was rendered false or at least misleading because of the GAAP Omissions.

Dated: February 18, 2021

**THE ROSEN LAW FIRM, P.A.**

By: /s/ Joshua Baker
Phillip Kim
Laurence M. Rosen
Joshua Baker
275 Madison Ave, 40th Floor
New York, NY 10016
Phone: (212) 686-1060
Fax: (212) 202-3827
Email: pkim@rosenlegal.com
            lrosen@rosenlegal.com
            jbaker@rosenlegal.com

*Lead Counsel for Lead Plaintiffs*

**WOLF HALDENSTEIN ADLER FREEMAN & HERZ LLP**
Matthew M. Guiney
270 Madison Avenue
New York, NY 10016
Tel: (212) 545-4600
Email: guiney@whafh.com

*Additional Counsel*

29

## CERTIFICATE OF SERVICE

I hereby certify that on February 18, 2021, a true and correct copy of the foregoing PLAINTIFFS' SECOND AMENDED RESPONSES AND OBJECTIONS TO DEFENDANTS' INTERROGATORIES 1-6 was served by email to counsel for Defendants as follows:

**KING & SPALDING LLP**
Israel Dahan
Peter Isajiw
Evan Claire Ennis
Ryan Gabay
1185 Avenue of the Americas, 34th Floor
New York, NY 10036
Tel: (212) 556-2100
Email: idahan@kslaw.com
        pisajiw@kslaw.com
        eennis@kslaw.com
        rgabay@kslaw.com

Chelsea Corey
300 S Tryon Street, Suite 1700
Charlotte, NC 28202
Tel: (704) 503-2600
Email: ccorey@kslaw.com

/s/ Joshua Baker
Joshua Baker