UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| In re Global Brokerage, Inc. f/k/a FXCM, Inc. Securities Litigation<br><br><br>This Document Relates To: All Actions | Master File No. 1:17-cv-00916-RA<br><br>CLASS ACTION<br><br>ORAL ARGUMENT REQUESTED |

**DEFENDANTS' REPLY MEMORANDUM OF LAW IN SUPPORT OF THEIR MOTION TO EXCLUDE THE REPORTS, TESTIMONY, AND OPINIONS OF DR. ADAM WERNER**

Israel Dahan
Peter Isajiw
Ryan Gabay
KING & SPALDING LLP
1185 Avenue of the Americas
New York, New York 10036-2601
Tel: (212) 556-2100
Fax: (212) 556-2200

Chelsea Corey
KING & SPALDING LLP
300 S. Tryon Street, Suite 1700
Charlotte, North Carolina 28202
Tel: (704) 503-2575
Fax: (704) 503-2622

*Attorneys for Defendants Global Brokerage, Inc. f/k/a/ FXCM, Inc., Dror Niv, and William Ahdout*

**TABLE OF CONTENTS**

**PRELIMINARY STATEMENT** ...................................................................................................1

**ARGUMENT**..................................................................................................................................3

    I.    Werner's FXCM Notes Analysis Is Unreliable And Must Be Excluded.............................3

    II.   Werner Provides No Analysis Of Loss Causation Or Damages For Plaintiffs' Alleged GAAP Violations ...................................................................................................6

    III. Werner's FXCM Stock Analysis Is Unreliable And Must Be Excluded.............................9

**CONCLUSION** ............................................................................................................................10

# TABLE OF AUTHORITIES

**Cases**                                                                                                     **Page(s)**

*Amorgianos v. Nat'l Railroad Passenger Corp.*,
   303 F.3d 256 (2d Cir. 2002)..................................................................................................2

*Carpenters Pension Tr. Fund of St. Louis v. Barclays PLC*,
   750 F.3d 227 (2d Cir. 2014)..................................................................................................7

*In re Mirena IUS Levonorgestrel-Related Prod. Liab. Litig.*(No. II),
   982 F.3d 113, 123 (2d Cir. 2020)..........................................................................................2

*In re Omnicom Grp., Inc. Sec. Litig.*,
   597 F.3d 501 (2d Cir. 2010)...............................................................................................6, 9

*Royal Park Invs. SA/NV v. U.S. Bank Nat'l Ass'n*,
   324 F. Supp. 3d 387 (S.D.N.Y. 2018)...................................................................................2

*Ruggiero v. Warner-Lambert Co.*,
   424 F.3d 249 (2d Cir. 2005)..................................................................................................2

**Statutes and Other Authorities**

Commodities Exchange Act .........................................................................................................9

C Justin Robinson & Prosper Bangwayo-Skeete, "Semi-strong Form Market
   Efficiency in Stock Markets with Low Levels of Trading Activity: Evidence
   from Stock Price Reaction to Major National and International Events," 18
   GLOBAL BUS. REV. 1447, 1447 (2017)..................................................................................4

Federal Rule of Evidence 702........................................................................................................2

Jeffrey Macintosh, "Event Study Methodology and the Computation of Damages
   for Secondary Market Misrepresentations: Striving for a Technicolor Palette,"
   SSRN ELECTRONIC JOURNAL (January 2020) ...................................................................4

MacKinlay, A. Craig, "Event Studies in Economics and Finance," 35 J. OF ECON.
   LITERATURE 13, 13 (1997)....................................................................................................3

Michael J. Kaufman & John M. Wunderlich, "Regressing: The Troubling
   Dispositive Role of Event Studies in Securities Fraud Litigation," 15 STAN.
   J.L. BUS. & FIN. 183, 190 (2009) .........................................................................................3

Nicholas I. Crew et al., "Federal Securities Acts and Areas of Expert Analysis," in
   Chapter 24 of the Litigation Services Handbook: The Role of the Financial
   Expert, 5th ed., edited by Roman Weil, Daniel Lentz, and Elizabeth Evans,
   John Wiley & Sons, Inc., (2012)...........................................................................................3

Defendants respectfully submit this reply memorandum of law in further support of their Motion to Exclude the Reports, Testimony, and Opinions of Dr. Adam Werner (the "Motion").

## PRELIMINARY STATEMENT

In their Opposition,[1] Plaintiffs' defense of Werner's opinions boils down to "we've done enough, just let the jury decide." But that is not the standard in this circuit. Plaintiffs must demonstrate that Werner's opinions are reliable enough such that they are actually useful to a jury—which they cannot. Accordingly, Werner's opinions and report must be excluded.

With respect to the FXCM Notes, which Plaintiffs still have not proven operate in an efficient market, Werner's analysis is woefully unreliable. Werner previously promised this Court that he would employ a host of valuation tools to ensure his opinions on loss causation and damages were properly supported for the FXCM Notes. Despite this promise, in his Loss Causation Report Werner uses the *very same* flawed event study he created for his Market Efficiency Report. Werner used no other valuation tools and made no adjustment to his prior event study to accommodate for the lack of efficiency in the FXCM Notes market. Yet, he still opines that the alleged misstatements and omissions caused the FXCM Notes to incur losses and ascribes a hefty per-Note damages calculation of $16.31. Werner's Notes analysis is inherently unreliable because, despite the fact that Plaintiffs' own academic authority requires it, not one single adjustment has been made, or even considered, to account for the inefficiencies of the FXCM Notes market.

With respect to Plaintiffs' alleged GAAP misrepresentations and omissions, Werner skips a loss causation analysis altogether. Plaintiffs have taken the position that Werner's analysis

---

[1] ECF No. 268 ("Opposition" or "Opp."). All capitalized terms not defined herein are adopted from the Motion. References to exhibits without ECF numbers refer to the exhibits filed alongside Defendant's Motion, found under ECF No. 245.

implicitly includes analysis of the alleged GAAP violations because those alleged misrepresentations are part and parcel of the other alleged misrepresentations. However, Werner's failure to analyze the causal connection between the alleged GAAP misstatements and Plaintiffs' alleged losses requires any opinions he hopes to offer on this issue to be excluded.

And finally, as stated more fully in Defendants' Motion, Werner's analysis of the loss causation relating to the FXCM Stock is based on incomplete and illogical assumptions. To reach his conclusions Werner summarily opines that all the information disclosed on February 6, 2017 was corrective, and all the events that followed were the "inextricable ramifications" of the alleged misstatements. This is a handy attempt to short-circuit the critical analysis of disaggregating the collateral consequences of the disclosure from the purported removal of price inflation due to alleged misstatements, which is required to demonstrate loss causation and provide useful expert testimony for a jury.

Simply put, Werner's opinions are based on methodology that is inadequate to support his conclusions, and *Daubert* and Federal Rule of Evidence 702 mandate exclusion of his opinions. *See Amorgianos v. Nat'l Railroad Passenger Corp.*, 303 F.3d 256, 266 (2d Cir. 2002); *Ruggiero v. Warner-Lambert Co.*, 424 F.3d 249, 255 (2d Cir. 2005). In cases such as these it is proper for the Court to step in and serve as the gatekeeper that *Daubert* requires. *See, e.g.*, *In re Mirena IUS Levonorgestrel-Related Prod. Liab. Litig.* (No. II), 982 F.3d 113, 123 (2d Cir. 2020). The Court also may exclude only certain of Werner's opinions should it find certain aspects of his report and opinions are particularly unreliable. *See, e.g.*, *Royal Park Invs. SA/NV v. U.S. Bank Nat'l Ass'n*, 324 F. Supp. 3d 387, 394 (S.D.N.Y. 2018). For these reasons, and those discussed in the Motion, Werner's reports, opinions, and testimony must be excluded.

# ARGUMENT

## I. Werner's FXCM Notes Analysis Is Unreliable And Must Be Excluded

In its March 23, 2021 Opinion on Class Certification (adopting Magistrate Judge Moses's March 18, 2021 Report and Recommendation), the Court declined to certify a class of noteholders because Plaintiffs, through Werner, had failed to demonstrate that the FXCM Notes traded in an efficient market. *See* ECF Nos. 232, 229. Specifically, Judge Moses found that:

> [P]laintiffs have not met their burden of demonstrating that the FXCM Notes traded in an efficient market throughout the Notes Period. . . . *The only direct evidence of market efficiency in the record*, offered to show a cause and effect relationship between the release of "company-specific news" and changes to the price of the FXCM Notes, *is Dr. Werner's event study, which is of limited utility due to the nature (and timing) of the two events chosen*.

ECF No. 229 at 37 (emphasis added).

It is well-understood that drawing inferences from event studies conducted on securities that do not trade in efficient markets, like the FXCM Notes, is unreliable. In fact, in his Market Efficiency Report, Werner cites the Litigation Services Handbook, which states that "[a]t least two theoretical conditions should exist if one plans to use an event study approach in a damages analysis or materiality analysis," the first being that "the security of interest *must be traded in an informationally efficient market*, that is, one in which prices respond quickly and appropriately to valuation-relevant news)."[2] This is because an event study is premised upon a market that reacts quickly to news of events and incorporates that news into the security price[3]—a market quality

---

[2] Nicholas I. Crew et al., "Federal Securities Acts and Areas of Expert Analysis," in Chapter 24 of the Litigation Services Handbook: The Role of the Financial Expert, 5th ed., edited by Roman Weil, Daniel Lentz, and Elizabeth Evans, John Wiley & Sons, Inc. (2012) (emphasis added). And in their Opposition, Plaintiffs cite to an article that acnowledges that "[e]vent study methodology is founded on the efficient market hypothesis . . . ." Opp. at 10, n.5, Ex. 207 (Michael J. Kaufman & John M. Wunderlich, "Regressing: The Troubling Dispositive Role of Event Studies in Securities Fraud Litigation," 15 STAN. J.L. BUS. & FIN. 183, 190 (2009)).

[3] *See* MacKinlay, A. Craig, "Event Studies in Economics and Finance," 35 J. OF ECON. LITERATURE 13, 13 (1997) ("The usefullness of [an event] study comes from the fact that, given rationality in the marketplace, the effects of an event will be reflected immediately in security prices. Thus a measure of the event's economic impact can be constructed using security prices observed over a relatively short time period.").

3

that Plaintiffs have failed to demonstrate existed for the FXCM Notes. The FXCM Notes were so thinly traded that Werner had difficulty even identifying events for his event study, which uses only two event dates over a nearly three-year Notes Period.[4]

In their Opposition, Plaintiffs suggest that "[e]vent study methodology remains the gold-standard for establishing loss causation and damages in securities litigation even in slower-clearing markets."[5] Opp. at 21. But the sources Plaintiffs cite acknowledge the difficulties of using event studies to evaluate securities traded in inefficient markets, remarking that "low levels of trading activity may be associated with semi-strong form *inefficiency*, and [security] prices in such markets *may not fully reflect all relevant available information*"[6] and that "inefficient trading and the resulting slow response of price to new information *greatly raises the likelihood that other complications will occur* in the use of [event study methodology], such as the occurrence of confounding corporate events."[7] In fact, Macintosh states that "[a]n inefficient market with correlative slow response of share price to new information necessitates the individualization of damages to each plaintiff." *Id.* at 19. Here, 683 Capital is the only remaining FXCM Notes plaintiff, yet Werner has not analyzed 683 Capital's individual damages. *See* Ex. 2, Werner Tr. 397:10-15; *see generally* Ex. 1 and Ex. 3.

---

[4] The only alleged FXCM Notes damages left at issue in this case are those of 683 Capital which purchased FXCM Notes *after* the SNB Flash Crash. *See* ECF No. 27-2 at 4. Thus, only one of the two event dates that Werner uses in his analysis was during 683 Capital's ownership period.

[5] Plaintiffs provide no empirical support for the proposition that the FXCM Notes traded in a "slower-clearing" market (*e.g.*, the price incorporates information and in an unbiased manner, but just with a slower speed compared to that in an efficient market).

[6] C Justin Robinson & Prosper Bangwayo-Skeete, "Semi-strong Form Market Efficiency in Stock Markets with Low Levels of Trading Activity: Evidence from Stock Price Reaction to Major National and International Events," 18 GLOBAL BUS. REV. 1447, 1447 (2017) (emphasis added). While this article does employ an event study to examine how 183 events affect a number of national stock exchanges with low trading activity, that event study was "adjusted for low trading volumes." *Id.* Werner made no such adjustments.

[7] Jeffrey Macintosh, "Event Study Methodology and the Computation of Damages for Secondary Market Misrepresentations: Striving for a Technicolor Palette," SSRN ELECTRONIC JOURNAL (January 2020) ("Macintosh") (emphasis added).

In response to criticisms of his event study at the class certification stage, Werner stated in his Market Efficiency Rebuttal Report that if he were permitted to conduct a loss causation and damages analysis of the FXCM Notes he would "take special care to ensure that an inflation ribbon is constructed such that it properly controls for potential valuation complexities" of the FXCM Notes. ECF No. 196-1 ¶ 82. Werner listed "a variety of valuation tools designed to accommodate potential valuation complexities" including "valuation multiple models, such as those based on earnings, EBITDA, revenue, book value and cash flow; discounted cash flow models (DCF); return attribution analysis; and the literature regarding valuation effects of factors such as reputation and quality of accounting." *Id.* at ¶ 85. Despite these assurances, in his Loss Causation Report, Werner employed *none* of the valuation tools he took care to mention. *Not one*.

Indeed, Werner acknowledges that his Market Efficiency Report event study—the event study that this Court viewed as "of limited utility," (ECF No. 229 at 37)—is the *very same* event study he relies upon in his Loss Causation Report. *See* Ex. 2 at 374:17-20. Moreover, Werner admitted at his deposition that in connection with his Loss Causation Report he did not even consider whether the FXCM Notes were operating in an efficient market. *See id.* at 403:2-404:3. When asked whether he thought that an event study can properly form the basis of a loss causation analysis if the market for a security is not efficient, Werner replied "that's not anything that I ever thought about." *Id.* at 405:19-24. When asked whether modifications should be made to an event study methodology to accommodate for the fact that the market is inefficient, Werner replied "that's not something I've thought about as of today." *Id.* at 407:15-22. In short, Werner has done absolutely nothing to adjust his prior flawed analysis to respond to the Court's class certification ruling. Worse still, he has not even considered whether adjustments to account for inefficiencies in the Notes market were required despite relying on academic sources indicating that such

5

adjustments are necessary. Werner has, therefore, demonstrated a complete lack of critical thinking when designing the methodology for the event study that forms the basis of his loss causation opinion and damages calculation for the FXCM Notes.

As a final attempt to salvage Werner's unsound opinions, Plaintiffs argue that Defendants are free to address Werner's credibility at trial and that "[a]s long as an expert's scientific testimony rests upon good grounds, based on what is known, it should be tested by the adversary process . . . ." Opp. at 23 (quoting *Ruiz-Troche v. Pepsi Cola of Puerto Rico Bottling Co.*, 161 F.3d 77, 85 (1st Cir. 1998)). This is the rub: contrary to Plaintiffs' contention, Werner's opinions regarding the FXCM Notes do *not* rest on "good grounds." Because Werner's analysis of the FXCM Notes is based upon a methodology that is unreliable as applied to the facts of this case, his report and opinions concerning the FXCM Notes damages should be excluded.

## II. Werner Provides No Analysis Of Loss Causation Or Damages For Plaintiffs' Alleged GAAP Violations

Plaintiffs' GAAP allegations have always been an after-thought, and Werner treats them as such by failing to address them in any substantive manner. To the extent he gives one at all, Werner's opinion on loss causation regarding the GAAP allegations is entirely unreliable because (1) he identifies no relevant corrective disclosure as neither the CFTC nor the NFA alleged that accounting violations had occurred and FXCM has never restated its financial statements; and (2) there can be no materialization of the risk liability theory applicable here because Plaintiffs do not claim that any regulatory consequences are attributable to GAAP violations.

"To sustain a claim under Section 10(b), [plaintiffs] *must show* . . . loss causation"—it cannot be assumed. *In re Omnicom Grp., Inc. Sec. Litig.*, 597 F.3d 501, 509 (2d Cir. 2010)

6

(emphasis added).[8] It is well-settled that loss causation is proven either by showing that losses were caused when the market reacted negatively to a corrective disclosure or that the loss was a foreseeable materialization of a concealed risk. *See Carpenters Pension Tr. Fund of St. Louis v. Barclays PLC*, 750 F.3d 227, 232-33 (2d Cir. 2014). With respect to Plaintiffs' alleged GAAP misrepresentations, Werner provides no reliable opinion as to either. First, there has been no corrective disclosure because neither the CFTC nor NFA settlements mentioned, or even suggested, a failure to comply with GAAP, nor did FXCM ever restate its financial statements.[9] Nor does Plaintiffs' newly introduced "materialization of the risk" argument carry water. Because this argument is entirely focused on the materialization of regulatory consequences, *see* Opp. at 6, these consequences cannot be attributed to any GAAP violations considering *no regulator identified a GAAP violation.* Werner does not engage substantively with Plaintiffs' GAAP allegations, and even testified that analysis of this issue was not within his purview.[10]

Plaintiffs' rejoinders range from irrelevant to illogical. First, they contend that John Barron's report is somehow incorporated into Werner's Loss Causation Report. Opp. at 17-18.[11] While Barron concludes, in a deeply flawed and inaccurate manner, that GAAP violations occurred, this does absolutely nothing to fill the void in Werner's report, which is his utter failure to *causally* tie these alleged occurrences to any losses. Even if GAAP were not followed as

---

[8] *See also* Ex. 2 at 487:19-488:10 ("Q. Does your loss causation and damages analysis include an analysis of Plaintiffs' allegation relating to any GAAP violations? . . . A. So, as I've stated previously, I've assumed that Plaintiffs' allegations are correct. I have not seen anything to suggest that they are incorrect.").

[9] *See* ECF No. 181, Ex. 1 (CFTC Settlement) and Ex. 2 (NFA Complaint); ECF No. 253, Ex. 66 (EY Mem. following settlement). Plaintiffs seek support from precedent in which a partial GAAP corrective disclosure was found in an analyst report raising questions of GAAP compliance. *See* Opp. at 19 (citing *In re Chicago Bridge & Iron Co. N.V. Sec. Litig.*, 2019 WL 5287980, at *25-32 (S.D.N.Y, Oct. 18, 2019)). Yet, here, Plaintiffs do not have an analyst report to serve as a partial corrrective disclosure—they have only their own allegations.

[10] *See* Ex. 2 at 424:6-429:10.

[11] This *post hac* assertion is not credible because Barron's reports are not listed as documents that Werner relied on in forming his opinions (Ex. 1 at 48; Ex. 3 at 27), and at his deposition Werner could not recall whether he had even reviewed Barron's reports (Ex. 2 at 497:5-8).

Plaintiffs allege, this fact would not inherently lead to losses in any proximate sense[12]—the very essence of loss causation.

Plaintiffs next claim that had FXCM complied with GAAP, investors would have known about FXCM's relationship with Effex. Opp. at 18. They argue, therefore, that "FXCM's GAAP violations are an inseparable part of the same materially misleading annual and quarterly reports," and that "disaggregating price impact attributing to the alleged GAAP violations is both unnecessary and likely impossible." Opp. at 18. But this argument only highlights why Werner's GAAP opinion is so deficient. The GAAP allegations differ in kind from the other allegations in Werner's loss causation report, the rest of which are at least superficially tied to the CFTC and NFA settlements since they feature, at least vaguely, in those settlements. Plaintiffs do not contend, nor could they, that Werner concludes the alleged GAAP violations caused any losses—Werner does not say that in his Report, let alone connect the dots required to demonstrate any such losses.

Finally, Plaintiffs state that there was somehow a GAAP-related corrective disclosure in "the same February 6, 2017 CFTC Press Release, NFA Complaint, and FXCM Press Release." Opp. at 19. This argument is easily dismissed because it is not an argument that features even remotely in Werner's reports or testimony. Rather, he attributes losses to the announcements on February 6 (his purported corrective disclosure) and to the regulatory consequences arising therefrom (his "inextricable ramifications" opinion recently recast as a materialization of the risk theory). *See* Ex. 1 at ¶¶ 45, 46. Because Werner does nothing to connect any alleged GAAP violations to any alleged damages, his opinions on loss causation as to GAAP are not reliable and must be excluded.

---

[12] For example, while generally unreliable, Plaintiffs' proffered accounting expert admitted that consolidation of Effex into FXCM would increase FXCM's revenue, and there is surely no opinion from Werner as to how higher reported revenue would lead to a lower share price. *See* ECF No. 240, Ex. 1 (Barron Report) at ¶ 149.

### III.     Werner's FXCM Stock Analysis Is Unreliable And Must Be Excluded

Werner's opinions are also unreliable as to the FXCM Stock, and should be excluded. It is Plaintiffs' loss causation burden to demonstrate that all the effects allegedly emanating from the corrective disclosure were reasonably foreseeable results of failing to disclose the information. *See, e.g.*, *In re Omnicom Grp.*, 597 F.3d at 510-14. Werner fails to do this and, taking an illegitimate and illogical shortcut, assumes that all pieces of information disclosed on February 6, 2017 are "inextricable ramifications" of FXCM's alleged disclosure failure and that they each "could have been disclosed at the beginning of the Class Period." Ex. 2 at 443:2-22. No explanation is given as to why they are inextricable, and foreseeability is given superficial treatment.

It is no wonder that Werner takes this perfunctory tack—thoughtful consideration of the facts raises too many questions to which he has no answer. In March 2012, Defendants accurately disclosed FXCM's regulatory risk, the payments for order flow that FXCM received, and FXCM's use of an agency model.[13] There were no other disclosures that were required, and certainly none that could have been made from the beginning of the Class Period.[14] But even assuming Plaintiffs' version of events were true and Defendants knew they had invited regulatory risk by allegedly misrepresenting FXCM's relationship with Effex, the following is also undisputedly true: (1) FXCM had disclosed the possibility of regulatory risk and had weathered prior CFTC and NFA settlements, without long-term business or reputational effects;[15] (2) FXCM's financial position was strong through much of the Class Period and a regulatory fine would not render FXCM's

---

[13] ECF No. 253, Ex. 1 (FXCM 2011 Form 10-K) at 1.

[14] In their Opposition, Plaintiffs point to Werner's absurd murder analogy. Not only is this analogy entirely inapposite (murder carries a standard sentence, violation of a Commodities Exchange Act (CEA) regulation does not; murder has no statute of limitations, violations of a CEA regulation do; murder is illegal, payment for order flow agreements are not), it is purposefully incendiary and serves as an example of the unsupported and misleading opinions Werner is prepared to provide to a jury.

[15] *See, e.g.*, ECF No. 253, Ex. 1 (FXCM 2011 Form 10-K) at 18.

9

business impracticable;[16] and (3) the dealing desk model of over-the-counter FX trading was the industry-standard, so a forced shift to a dealing desk model would not cause FXCM's business model to "no longer be sustainable" (Ex. 1 at ¶ 46).[17] Werner simply ignores these facts.

In addition, Werner's damages model is unreliable as to the FXCM Stock because the constant-dollar inflation ribbon is inappropriate for this case. Plaintiffs again use Werner's "inextricable ramifications" shortcut to argue that Werner's use of a constant-dollar inflation ribbon is reliable given that all misrepresentations could have been disclosed at the start of the Class Period. Opp. at 16. This argument is unpersuasive for two key reasons: (1) Werner's admission that inflation very possibly varied over the multi-year Class Period (Ex. 2, Werner Tr. at 413:9-414:15); and (2) FXCM's dramatic change in financial position during the Class Period (including a change in ownership structure and a 94% decrease in market capitalization (*see* Ex. 4 at ¶ 110)). Both factors would indicate that the inflationary effect of any alleged misstatements would vary over time, and therefore, the constant-dollar inflation ribbon is inappropriate both as a factual and mathematical matter, rendering Werner's opinion unreliable for using it.[18]

## CONCLUSION

For all the foregoing reasons, and those reasons articulated in Defendants' opening Motion, Defendants respectfully request that the Court exclude the reports, testimony, and opinions of Dr. Adam Werner.

---

[16] *See, e.g.*, ECF No. 253, Ex. 7 (2012 Form 10-K) at F1-F50; ECF No. 253, Ex. 9 (2014 Form 10-K) at F1-F63.

[17] What is more, now that Plaintiffs have seemingly adopted a materialization of the risk theory of loss causation, Defendants' damages theory appears to rely on every single "inextricable ramification" occuring and negatively affecting the FXCM Stock price. Thus, under Werner's logic, if even one of these "inextricable ramifications" was not forseeable in 2012, then he cannot claim the entirety of the 2017 price drop as damages and he has done no work to differentiate how these separate pieces of news affected the FXCM Stock price.

[18] Plaintiffs barely defend the accuracy of their constant-dollar method, citing to a 1931 Supreme Court case and 1983 7th Circuit case for the proposition that juries can determine damages by an estimate, after having decided liability. Thus, Plaintiffs' defense of Werner's constant-dollar damages method is to cite dated and/or out-of-circuit precedent for the proposition that inaccuracy is acceptable.

Dated:   New York, New York
         January 20, 2022

                Respectfully submitted,

                KING & SPALDING LLP

                By: */s/ Israel Dahan*
                    Israel Dahan
                    Peter Isajiw
                    Ryan Gabay
                    KING & SPALDING LLP
                    1185 Avenue of the Americas
                    New York, NY 10036
                    Tel: (212) 556.2100
                    Fax: (212) 556.2200
                    idahan@kslaw.com
                    pisajiw@kslaw.com
                    rgabay@kslaw.com

                    Chelsea Corey
                    KING & SPALDING LLP
                    300 South Tryon Street
                    Suite 1700
                    Charlotte, NC 28202
                    Tel: (704) 503.2575
                    Fax: (704) 503.2622
                    ccorey@kslaw.com

                *Counsel for Defendants*