UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

| In re Global Brokerage, Inc. f/k/a FXCM, Inc. Securities Litigation | Master File No. 1:17-cv-00916-RA<br>CLASS ACTION<br>ORAL ARGUMENT REQUESTED |
|---|---|
| This Document Relates To: All Actions | |

**DEFENDANTS' REPLY MEMORANDUM OF LAW IN SUPPORT OF THEIR MOTION FOR SUMMARY JUDGMENT**

Israel Dahan
Peter Isajiw
Ryan Gabay
KING & SPALDING LLP
1185 Avenue of the Americas
New York, New York 10036-2601
Tel: (212) 556.2100
Fax: (212) 556.2200

Chelsea Corey
KING & SPALDING LLP
300 S. Tryon Street, Suite 1700
Charlotte, North Carolina 28202
Tel: (704) 503.2575
Fax: (704) 503.2622

*Attorneys for Defendants Global Brokerage, Inc. f/k/a/ FXCM, Inc., Dror Niv, and William Ahdout*

# TABLE OF CONTENTS

**PRELIMINARY STATEMENT** .......... 1

**ARGUMENT** .......... 3

I. The Assertions Contained In The CFTC and NFA Orders Are Not Admissible Facts, Let Alone Evidence Of Securities Fraud .......... 3

II. Plaintiffs Have Failed To Establish A Genuine Issue Of Material Fact Regarding The Alleged Misrepresentations Or Omissions .......... 4

A. Defendants Did Not Misrepresent The Nature Of FXCM's Order Flow Payment Relationship With Effex .......... 4

B. Defendants Did Not Misrepresent FXCM's Use Of The Agency Model .......... 8

C. Defendants Complied With GAAP .......... 10

i. FXCM Was Not Required To Disclose Effex As A Related Party .......... 11

ii. FXCM Was Not Required To Consolidate Effex As A VIE .......... 13

III. Plaintiffs Have Failed To Establish A Genuine Issue of Material Fact Regarding Scienter .......... 15

A. Defendants Did Not Knowingly Intend To Deceive Investors About The Effex Relationship .......... 15

B. Defendants Did Not Deceive Investors About FXCM's Compliance With GAAP .......... 17

IV. Plaintiffs Have Failed To Establish A Genuine Issue Of Material Fact Regarding Loss Causation .......... 19

V. Plaintiffs Have Failed To Establish A Genuine Issue Of Material Fact Regarding Economic Loss .......... 22

VI. Individual Plaintiff 683 Capital Cannot Establish Genuine Issues Of Material Fact Regarding Reliance, Loss Causation, Or Economic Loss .......... 24

VII. Plaintiffs Have Failed To Establish A Genuine Issue Of Material Fact Regarding Their Section 20(a) Claim .......... 25

**CONCLUSION** .......... 25

# TABLE OF AUTHORITIES

**Cases** **Page(s)**

*In re BP p.l.c. Sec. Litig.*,
No. 10 MD 2185, 2016 WL 3090779 (S.D. Tex. May 31, 2016)....................24

*Carpenters Pension Tr. Fund of St. Louis v. Barclays PLC*,
750 F.3d 227 (2d Cir. 2014)....................19, 20

*In re Cirrus Logic Sec. Litig.*,
946 F. Supp. 1446 (N.D. Cal. 1996)....................18

*Clements v. County of Nassau*,
835 F.2d 1000 (2d Cir. 1987)....................15

*Comcast v. Behrand*,
569 U.S. 27 (2013)....................22, 23, 24

*Del Norte v. WorldBusiness Capital, Inc.*,
No. 14 Civ. 10143 (CM), 2017 WL 4334005 (S.D.N.Y. Apr. 5, 2017)....................15

*ECD Inv'r Grp. v. Credit Suisse Int'l*,
No. 14-CV-8486, 2017 WL 3841872 (S.D.N.Y. Sept. 1, 2017)....................16

*Erica P. John Fund, Inc. v. Halliburton Co.*,
563 U.S. 804 (2011)....................25

*In re ICN Pharms., Inc.*,
299 F. Supp. 2d 1055 (C.D. Cal. 2004)....................18

*Lentell v. Merrill Lynch & Co.*,
396 F.3d 161 (2d Cir. 2005)....................20

*Lipsky v. Commonwealth United Corp.*,
551 F.2d 887 (2d Cir. 1976)....................3

*In re Pall Corp.*,
No. 07 Civ. 3359, 2013 WL 1702227 (E.D.N.Y. Apr. 8, 2013)....................15

*In re Platinum & Palladium Commodities Litig.*,
828 F. Supp. 2d 588 (S.D.N.Y. 2011)....................3

*In re REMEC Inc. Sec. Litig.*,
702 F. Supp. 2d 1202 (S.D. Cal. 2010)....................17, 18

*Shenk v. Karmazin*,
868 F. Supp. 2d 299 (S.D.N.Y. 2012)....................15

*Teamsters Local 445 Freight Div. Pension Fund v. Dynex Capital Inc.*,
531 F.3d 190 (2d Cir. 2008)....................................................................................19

*Tholke v. Unisys Corp.*,
No. 01-CV-05495, 2008 WL 731595 (S.D.N.Y. Mar. 20, 2008)..........................................17

*In re Vivendi Universal, S.A. Sec. Litig.*,
634 F. Supp. 2d 352 (S.D.N.Y. 2009)...................................................................19, 20

Defendants[1] respectfully submit this reply memorandum of law in further support of their Motion for Summary Judgment on all claims asserted by Plaintiffs, whether individually or as a class (the "Motion").

## PRELIMINARY STATEMENT

Plaintiffs' Opposition confirms that the only way they can defeat summary judgment is by mischaracterizing and ignoring evidence developed in this case. This ploy will not work.

As demonstrated in the Motion, all of Plaintiffs' claims and alleged misstatements hinge on a central premise: that FXCM and Effex were affiliated entities that had a secret 70-30 profit sharing arrangement on executed order flow as opposed to separate legal entities that had a fixed-fee, payment for order flow agreement. Unfortunately for Plaintiffs, evidence in this case, including the language in the executed Services Agreement, the billed invoices, and the sworn testimony of every single witness who has testified on the issue, establishes the latter. In fact, undisputed evidence establishes that Defendants never had any ownership or management position in Effex and FXCM never received 70% of Effex's trading profits.

Ignoring this evidence, Plaintiffs instead point to (1) a few emails exchanged during negotiation of the Services Agreement where there was contemplation of a 70-30 profit sharing relationship, (2) a few emails discussing potential rate changes to the order flow payments, and (3) Dittami's April 2010 resignation letter that includes a vague expression of an understanding to enter into a license agreement (that was never executed) in terms "similar to" Dittami's employment agreement. These few documents, however, do not alter what FXCM and Effex *actually* agreed to in the executed version of the Services Agreement and what Effex *actually* paid FXCM on a monthly basis—a fixed-dollar amount per million of trading volume—as reflected in

---

[1] All capitalized terms not defined herein are adopted from the Motion.

the Services Agreement and invoices. Taking the evidence as a whole, FXCM and Effex were distinct corporate entities that did not have a profit-sharing relationship. Thus, FXCM's representations about its agency model and the payments it received from Effex for order flow were true, and its GAAP reporting was compliant as no consolidation of Effex was required.

Plaintiffs' scienter arguments similarly fall flat. Plaintiffs have presented no credible evidence demonstrating that Defendants sought to deceive investors, or even had motive to deceive investors, about its agency model or its payment for order flow agreement with Effex. Moreover, Plaintiffs offer no evidence that Niv or Ahdout acted with scienter in connection with FXCM's alleged GAAP violations. Instead, Plaintiffs rely exclusively on unsupported interpretations of two emails from FXCM employees in connection with the 2010 audit. This is patently insufficient to establish a material issue of fact with respect to the pivotal question of whether Defendants possessed the requisite scienter.

Lastly, Plaintiffs' loss causation and damages arguments are deficient and reliant on the analysis of an expert who has employed an unreliable methodology to reach unsupported conclusions that the entirety of the post-Class Period stock drop are losses attributable to the "inextricable ramifications" of Defendants' alleged misstatements. The unreliability of these opinions is painfully apparent for the FXCM Notes because the loss causation and damages analyses assume an efficient market that has not been established for the FXCM Notes.

For the reasons discussed more fully in the Motion and below, Defendants' motion for summary judgment should be granted.

# ARGUMENT

## I. The Assertions Contained In The CFTC and NFA Orders Are Not Admissible Facts, Let Alone Evidence Of Securities Fraud

Plaintiffs begin their Opposition by asserting that "[a] reasonable jury will easily be able to find, as the CFTC and NFA already did, that the facts and evidence in this action support Plaintiffs' allegations of securities fraud." Opp. at 1. First, Plaintiffs are wrong that the CFTC and NFA found that Defendants committed securities fraud—they did not. Second, Plaintiffs' reliance on the CFTC and NFA Orders is improper and underscores the weakness of their case. The CFTC and NFA Orders and the "findings" therein are not adjudicated facts and they cannot be used as evidence of wrongdoing.[2]

Significantly, the CFTC itself has issued several rulings in which it concluded that the allegations it made against Defendants in the CFTC Order were nothing more than allegations and could not be used in a different litigation to establish liability against FXCM. As the CFTC stated in dismissing a fraud claim filed by an FXCM customer after the disclosure of the CFTC Order:

> [C]ourts, including the Commission, have held that consent orders cannot be used as evidence in subsequent litigation because the consenting party has agreed to certain terms in exchange for the cessation of litigation—no court or adjudicatory forum has actually made any findings of fact as a result of litigation and [FXCM] neither admit[s] nor den[ies] the facts contained in those orders. . . In other words, no facts have been proven by the CFTC Consent Order where the settling party neither admitted nor denied the allegations. They therefore cannot be treated as proven facts in subsequent litigation.

Ex. 232 at 8-9.[3] Importantly, the CFTC issued these rulings *after* discovery in the reparations actions, at which point the claimants sought to rely on the CFTC Order to survive

---

[2] *See, e.g.*, *Lipsky v. Commonwealth United Corp.*, 551 F.2d 887, 893 (2d Cir. 1976) (holding that consent judgment could not "be used as evidence in subsequent litigation between that corporation and another party"); *In re Platinum & Palladium Commodities Litig.*, 828 F. Supp. 2d 588, 593-94 (S.D.N.Y. 2011).

[3] References to exhibits without ECF numbers refer to the exhibits filed alongside Defendant's Motion, Plaintiffs' Opposition, or this reply, the former two found under ECF Nos. 252 and 271. All exhibits are numbered sequentially.

summary judgment—just as Plaintiffs do in their Opposition. Accordingly, Plaintiffs' attempts to rely on the CFTC and NFA Orders as if they are evidence of securities fraud must be rejected.

## II. Plaintiffs Have Failed To Establish A Genuine Issue Of Material Fact Regarding The Alleged Misrepresentations Or Omissions

### A. Defendants Did Not Misrepresent The Nature Of FXCM's Order Flow Payment Relationship With Effex

Plaintiffs' assertion that Defendants misrepresented the nature of its order flow payment agreement with Effex hinges on whether this relationship was really a profit-sharing relationship and not a fixed-fee, payment for order flow relationship. In their Opposition, Plaintiffs attempt to create genuine issues of fact concerning this question by blatantly mischaracterizing and ignoring relevant evidence. Such tactics are unavailing, and the weight of the evidence cannot be avoided.

There is no genuine dispute that the Services Agreement is the agreement that governed the economic relationship between FXCM and Effex. *See* Ex. 211 (Niv Tr. 133:3-10); Ex. 209 (Dittami Tr. 208:7-22, 220:8-13, 227:6-10). The Services Agreement makes no mention whatsoever of profit sharing between FXCM and Effex and Plaintiffs admit this fact. Ex. 34 (March 2010 Services Agreement); Ex. 41 (May 2010 Services Agreement); ECF No. 264 ¶ 61 (Plaintiffs admitting this fact). Thus, Plaintiffs' claim of a profit-sharing relationship between FXCM and Effex is belied by the very document governing the relationship.

In their Opposition, Plaintiffs attempt to support their profit-sharing theory by contending that "the parties repeatedly manipulated both the rate and the volume calculations to change how much Effex would pay," that "[w]hen Effex's trading profits decreased, the parties decreased Effex's payments accordingly by adjusting the inputs to the order flow payment calculations," and that "Effex and FXCM frequently discuss[ed] what rate would apply for a given month, often after that month had ended." Opp. at 22, 24. These contentions are unfounded and undermined by the invoices FXCM sent to Effex in accordance with the Services Agreement.

As part of fact discovery, Defendants produced copies of the invoices it billed Effex for order flow. The invoices, and ensuing payments, some of which were the subject of EY's random sampling during its audits, establish that from May 2010 to August 2011, Effex paid for order flow at a rate of $21 per million in volume. Ex. 224 (Chart of Payments); Ex. 221 (Meyer Tr. 48:18-49:5 (testifying that Effex always paid invoices in full and Effex did not pay FXCM in excess of the amounts invoiced)).[4] In September 2011, Effex's payment for order flow rate was amended to $16 per million of volume and Effex paid that rate on all currency pairs from September 2011 through January 2013. Ex. 224 (Chart of Payments). From February 2013 through July 2014, Effex still paid a standard order flow rate of $16 per million of volume on most currency pairs, but two currency pairs were adjusted by mutual agreement to account for changing market conditions. Ex. 224 (Chart of Payments); Ex. 95 (Niv CFTC Tr. 131:7-22). In other words, the evidence demonstrates that, by agreement (rather than "manipulation"), the parties renegotiated the per-volume rate a mere *three times over a four-year period*. Ex. 224 (Chart of Payments).[5] The infrequency of these rate changes is confirmed by sworn witness testimony. *See, e.g.*, Ex. 221 (Meyer Tr. 40:12-42:3) (testifying that the agreed-upon rate was determined "before" the monthly transactions would occur and that "[t]he rates did not change monthly. They changed – it was pretty rare for them to change . . . .").

---

[4] With respect to the October and November 2010 invoices reflecting a fee of $17.50, in December 2010 Effex remitted an additional $678,000 to FXCM for "underpayment of fees by Effex in those months." Ex. 231 (GLBR_00184115); *see also* ECF No. 240-1 (Barron Report ¶ 75) (discussing underpayment of fees). With this adjustment, it meant that Effex was charged (and paid) $21 per million for the volume of it trades it executed in 2010. *See, e.g.*, Ex. 224 (Chart of Payments); Ex. 43; Ex. 221 (Meyer Tr. 50:4-10); Ex. 128 (Rosenfeld Tr. 193:9-15). Thus, Plaintiffs are wrong in their claim that Effex paid a rate of $17.50 per million for certain months.

[5] As Niv testified, "as time went on, competition got fiercer, exactly what we wanted to happen happened. . . . Competition got much more intense; therefore dollars per million for market makers declined, including for [Effex]. . . . It is that issue I think is, we told [Dittami] because of this, variability, we would be flexible, but we need a set contract rate." Ex. 95 (Niv CFTC Tr. 131:7-22); *see also* Ex. 121 ("We are going to start with $21 PER MM, although this may need to adjust up or down over time, we intend to try to change it as little as possible."). Moreover, Effex's profits and losses fluctuated daily—far more frequently than the rate was renegotiated. *See* Ex. 4 (Dittami Tr. 347:2-20) (discussing variation in profitability but standardization of the rate per million); Ex. 6 (Niv. Tr. 140:3-22). If profit sharing was the goal, the parties utterly failed.

In a further attempt to mislead, Plaintiffs argue that "the invoices from FXCM were termed 'Rebates' and referred to Effex's payments as 'P&L,' reflecting the parties' understanding that the payments were intended to reflect payments to FXCM of Effex's profits." Opp. at 23. But Plaintiffs know that witnesses testified to the meaning of these terms on the invoices, and no one interpreted the invoices consistent with Plaintiffs' interpretation. For example, when presented with an invoice and in response to the question "was [P&L on the invoice] related in any direct way to Effex's P&L on that order flow," Josh Rosenfeld, FXCM's Managing Director of Finance and Risk, testified: "*Not at all. Not at all*. It was completely dependent on volume. They could have lost millions, they could have made millions, and it was based on the volume that – of business we gave them regardless of whether they made or lost money on it." Ex. 216 (Rosenfeld Tr. 133:14-24) (emphasis added) (testifying that "P&L" on the Effex invoices was a reference to FXCM's P&L). Likewise, "rebate" as used on the invoices meant "a dollar per million." Ex. 222 (Muchinsky Tr. 178:3-8). Plaintiffs ignore this unrebutted testimony.

In their Opposition, Plaintiffs conveniently ignore the actual amounts invoiced and paid, and instead point to a few emails from Dittami in which he discusses potential rate changes or requests for rate changes. *See* Opp. at 22. But, quite obviously, discussions of rate changes and *actual* rate changes are not the same. Numerous witnesses, including Dittami, testified that these emails discussing rate changes were simply attempts to negotiate pricing. *See, e.g.*, Ex. 209 (Dittami Tr. 141:13-15, 181:9-20, 195:20-24); Ex. 215 (Ahdout Tr. 200:6-7); Ex. 210 (Wilson-Taylor Tr. 87:8-88:25). Thus, Plaintiffs' avoidance of the per-million rate that was invoiced and paid, and the lack of relationship it bears to a profit-sharing arrangement, is disingenuous and unpersuasive.[6]

[6] In further support of this argument, Plaintiffs suggest that "Dittami's resignation letter provided Effex with protection so that it was not paying more than 70%." Opp. at 24. Yet, all that Dittami's resignation letter provides is that "[i]t is

Similarly, Plaintiffs' again attempt to mislead by claiming that in 2014 FXCM decided to terminate any order flow agreements based on the regulatory investigation of FXCM's relationship with Effex. *See* Opp. at 14. There is no evidence for this assertion and, instead, multiple witnesses testified that FXCM terminated all payments for order flow globally to ensure compliance with a Financial Conduct Authority regulation that was applicable to FXCM's U.K. entity. *See, e.g.*, Ex. 6 (Niv. Tr. 165:6-20, 175:9-13); Ex. 35 (Ahdout CFTC Tr. 259:18-260:10, 261:18-24).

And finally, Plaintiffs continue to claim that Effex was the only liquidity provider that paid FXCM for order flow (*see* Opp. at 14, 25, 26, 36), knowing that documents and testimony prove otherwise. To begin with, Plaintiffs' allegations are curious given that they have admitted that "FXCM also had pay for flow arrangements with entities other than Effex." Ex. 18 at 30. This admission is confirmed by the fact that Effex paid FXCM for order flow from 2010 to 2014 and evidence produced in discovery establishes that BNP Paribas paid FXCM for order flow during the same period. *See, e.g.*, Ex. 130 (discussing BNP order flow payments in 2010); Ex. 227 GLBR_00152459 (May 2012 email between Ahdout and Sakhai discussing BNP's payment for order flow rate); Ex. 229 (GLBR_00133264) (FXCM Detailed IS tab indicating order flow revenue from BNP P3 and BNP P3J totaling a year to date of $86,438.00); Ex. 228 (GLBR_00185254) (Forex Capital Markets balance sheet indicating order flow revenue from BNP P3 on multiple tabs and booking $336,543.11 in total revenue from this order flow as of April 2013).[7] Unable to refute

the understanding of both parties to enter into an [*sic*] license agreement on economic terms similar to the employment agreement." Both law and logic would suggest that this vague acknowledgement of a shared initial understanding to enter into "similar" (but unspecified) terms is no protection at all. Not to mention the fact that every person who was involved in negotiation of the Services Agreement testified that this purported intention to maintain a profit-sharing relationship was abandoned. *See, e.g.*, Ex. 24 (Dittami CFTC Tr. 132:21-133:5; 377:2-7); Ex. 35 (Ahdout CFTC Tr. 114:24-115:4); *see also* Ex. 18 (Plaintiffs' Response to RFAs at 27, 29); ECF No. 240-3 (Barron Rebuttal, ¶ 33).

[7] In relation to this point, Plaintiffs mischaracterize the testimony of Defendants' FX industry expert, Simon Wilson-Taylor, by insinuating that because he could not identify by name other liquidity providers that paid for retail order flow, that such liquidity providers did not exist. Opp. at 25. Wilson-Taylor testified that he personally negotiated order flow payment agreements with liquidity providers. *See* Ex. 210 (Wilson Taylor Tr. 100:4-24). And while Wilson-Taylor could not identify liquidity providers that he conclusively knew paid more than 50% of their revenues in order

this evidence, Plaintiffs point to testimony from Niv that BNP's payments were "tiny" and a "joke." ECF No. 266 ¶ 205. But the relatively small size of BNP's order flow payments does not mean that they did not exist. As Niv advised Lande in connection with the initial Form S-1 drafting, FXCM received payments for order flow from Effex and BNP (Ex. 130) and thus, FXCM's disclosure of "payments we receive for order flow from FX market makers" (*see, e.g.*, Ex. 1 at 45) is factually correct.

Each of the foregoing baseless contentions is a microcosm of Plaintiffs' gambit in their Opposition: to tell a few half-truths or strip documents from their context so they can reach their unsupported conclusion that Effex and FXCM had a profit-sharing agreement. Based on what FXCM and Effex *actually* agreed to in the Services Agreement, and what Effex *actually* paid FXCM in order flow payments as reflected in the billed invoices, and the unrebutted testimony of every single witness who testified on the relationship, no reasonable jury could conclude that the parties "strove to maintain a profit-sharing relationship" (Opp. at 24) as Plaintiffs aver.

**B. Defendants Did Not Misrepresent FXCM's Use Of The Agency Model**

The foundational premise supporting Plaintiffs' alleged agency model misrepresentations is likewise dependent on whether FXCM and Effex had a profit-sharing agreement. *See* Opp. at 19, 20. As discussed above, no profit-sharing agreement existed between FXCM and Effex. Thus, FXCM did not need to "disclose that [it] was trading opposite its customers, through EES or Effex, and keep[ing] the trading profits" (Opp. at 18), because that is not what FXCM was doing.[8]

---

flow fees, with the limited knowledge he had of other liquidity providers' profitability Wilson-Taylor testified that it was "quite likely that they were paying more than 50 percent at times[.]" *Id.* at 103:6-25. Moreover, Plaintiffs admit that payment for order flow was a standard practice during the Class Period. ECF No. 264 ¶ 77.

[8] As demonstrated in the expert report of Simon Wilson-Taylor, which Plaintiffs have neither rebutted nor challenged, FXCM maintained an agency model at all times during the time that Effex paid FXCM for order flow. *See* Ex. 2 (Wilson-Taylor Report ¶¶ 96-118).

Equally, FXCM did not need to disclose that it was exposed to market risk. FXCM was not exposed to market risk either through its own trading or through its Services Agreement with Effex. It is undisputed that to be exposed to market risk, FXCM's revenues would need to be dependent upon market movements (positive or negative). *See* Ex. 2 (Wilson-Taylor Report ¶ 34). As Plaintiffs admit, FXCM was not in this position as "Effex's order flow payments to FXCM did not increase if Effex made money on a particular trade or decrease if Effex lost money on a particular trade." ECF No. 264, ¶ 64; see also Ex. 18 at p. 32-33.[9] Thus, FXCM was not exposed to market risk because of its payment for order flow agreement with Effex.

Plaintiffs try to salvage this admission by asserting that "even if FXCM did not suffer direct losses due to market movements, its revenues decreased when Effex made less and paid FXCM less through the variable monthly payments." Opp. at 21. As demonstrated above, to refer to the payments for order flow Effex made as "variable monthly payments" is actively misleading, as the rate per million of volume varied (by agreement) only three times in a four-year period. Ex. 224 (Chart of Payments). FXCM never had an obligation to agree to a lesser fee if Effex made less and, conversely, FXCM had no right to demand more from Effex when it made more in profits.[10] Ex. 2 (Wilson-Taylor Report ¶¶ 91, 92); ECF No. 264, ¶ 61. Thus, while Plaintiffs allege that FXCM was exposed to market risk "through its stake in Effex's trading profits" (Opp. at 21), their own admissions and the undisputed facts belie this allegation.

Accordingly, Defendants' public statements regarding FXCM's agency model during the Class Period were true.

---

[9] Defendants note the profound cognitive dissonance between Plaintiffs' admissions and their unsupported assertion that "When Effex's trading profits fell, it paid FXCM less." Opp. at 21. It is obvious that rhetoric has trumped reason in Plaintiffs' attempts to avoid dismissal.

[10] Indeed, Effex paid FXCM less than the "70-30 split of trading profits" beginning even in 2010, and for every year after. Yet, mysteriously, Plaintiffs have failed to produce evidence of FXCM demanding a higher fee to approximate its "share" (Opp. at 6) of Effex's profits.

### C. Defendants Complied With GAAP

Faced with the undisputed fact that FXCM has never been asked to restate its financial statements and the fact that EY reexamined FXCM's reporting obligations after the CFTC and NFA settlements were announced and concluded that "the previously issued financial statements for [FXCM] continue to be appropriate and are in accordance with US GAAP" (Ex. 213 (EY-GBI-WP-00004260 at EY-GBI-WP-00004268)), Plaintiffs claim that EY's review was merely a "self-interested analysis." Opp. at 31. Not only do Plaintiffs fail to provide any support for this assertion, but it is also illogical and conflicts with Plaintiffs' other baseless assertion that "evidence shows that Defendants' concealed FXCM's relationship with Effex from its auditor." Opp. at 31. If EY had determined that information had been concealed during its audits of FXCM, and that information would have changed the required VIE or related party reporting for FXCM, logic dictates that EY would have required restated financial statements—unless Plaintiffs are also now claiming that EY is colluding in the fanciful fraud Plaintiffs have concocted. There has been no such allegation and there is not a shred of evidence to support it.[11]

Neither the CFTC nor the NFA alleged FXCM's financial reporting to be non-compliant with GAAP. And EY, with the benefit of the information provided in previous audits, as well as the CFTC and NFA allegations, and an internal investigation conducted by Weil, Gotshal & Manges, LLP that included dozens of interviews and review of tens of thousands of documents, separately determined that FXCM's previously issued financial statements are in accordance with GAAP. Thus, Plaintiffs' assertion that FXCM did not comply with GAAP rings hollow.

---

[11] Plaintiffs' assertion that information was concealed from EY is also undermined by evidence showing that EY had full access to all necessary information from FXCM. *See, e.g.*, Ex. 212 (Lande Tr. 72:21-73:3) ("Ernst & Young is permanently on [FXCM's] premises at this time full-time 365 days a year except for weekends . . . and have their own room and have free access and would be walking into our offices on a daily basis."); Ex. 6 (Niv Tr. 48:17-24); Ex. 223 (Stollow Tr. 99:6-101:4).

*i. FXCM Was Not Required To Disclose Effex As A Related Party*

With respect to FXCM's related party reporting, Plaintiffs fail to establish that FXCM had significant influence over Effex's management or policies to the extent that Effex could be prevented from fully pursuing its own interests—a necessary element of a related party determination. To the contrary, evidence shows that Effex was a separate, independent entity that was not owned or controlled by FXCM. Indeed, no FXCM employee held board or management positions at Effex (*see* Ex. 12 (Lande Tr. 85:19-86:10)) and at no point in time did FXCM own equity in Effex (*see* Ex. 23 (Dittami Affidavit ¶¶ 10, 13); Ex. 4 (Dittami Tr. 128:24-129:4); *see also* ECF No. 264, ¶ 30).[12] Moreover, Plaintiffs admit, as they must, that (1) "[i]n May 2010 . . . Effex reimbursed FXCM for the investment FXCM had made in" a prime-of-prime account (ECF No. 264, ¶ 36); (2) "[i]n June 2010, Effex ceased using FXCM's prime-of-prime account with Citibank" (*id.* ¶ 37); (3) "[i]n July 2010, Effex entered into its own prime broker agreement with Citibank" and "cancelled the promissory note to FXCM" (*id.* ¶ 38); (4) Effex was capitalized with Dittami's personal funds and "Effex paid FXCM for the intellectual property (trading system and algorithm) Dittami had created" (*id.* ¶ 33); and (5) "Effex had other customers and provided liquidity to FX trading platforms other than FXCM" (*id.* ¶ 41). While Plaintiffs suggest that these are examples of only "a few operational activities that Effex conducted on its own" (Opp. at 28), funding its own trading activity, operating its own trading system, and maintaining customers outside of FXCM is very essence of Effex's business—not just a few operational activities.

In their Opposition, Plaintiffs offer three arguments, all of which have been contravened by evidence, in support of their argument that FXCM was able to significantly influence Effex.

[12] Plaintiffs' claim that FXCM had a *de facto* ownership stake in the form of an unexercised option to purchase Effex. *See* ECF No. 264 ¶ 31. Yet, Defendants have demonstrated that no option ever existed (ECF No. 264, ¶¶ 48-56), and it is entirely undisputed that the non-existent option was also never exercised.

First, Plaintiffs argue that because "none of FXCM's other liquidity providers were willing to pay for retail order flow," FXCM and Effex did not engage in an arm's length negotiation. Opp. at 28. As demonstrated above, however, BNP also paid FXCM for order flow during the same period. *See supra* at 7. Moreover, Niv testified that FXCM did not have order flow agreements with other market makers because they were unwilling or unable to provide the superior execution services that would incentivize FXCM to give them more order flow—and without more order flow, those liquidity providers were unwilling to make payments. *See* Ex. 81 (Niv Tr. 159:8-18.; 162:2-12). Second, Plaintiffs argue that "Effex's payments to FXCM constituted a majority of FXCM's trading profits." This is simply not true in any year within the Class Period. *See* Ex. 233 (E Capital-000117 - E Capital-000118); *see also* Ex. 23 ¶ 11; Ex. 24 (Dittami CFTC Tr. 43:6-24).

Finally, Plaintiffs argue that the parties "intended for Effex's payments to FXCM to mirror the 70-30 split of trading profits from Dittami's employment agreement with FXCM." Opp. at 28. Once again, Plaintiffs ignore the evidence. Representatives of both FXCM and Effex testified that to the extent there was such an intention, it was ultimately abandoned in favor of the dollar-per-million fee expressed in the Services Agreement (*see, e.g.*, Ex. 24 (Dittami CFTC Tr. 132:21-133:5; 377:2-7); Ex. 35 (Ahdout CFTC Tr. 114:24-115:4); *see also* Ex. 18 (Plaintiffs' Response to RFAs at 27, 29); ECF No. 240-3 (Barron Rebuttal, ¶ 33)).[13] Additionally, the evidence shows that a 70-30 split never happened during the entire four year pay-for-flow relationship between FXCM and Effex. As Effex's accountant stated in a sworn affidavit he provided to the CFTC, "[t]rading expenses incurred by Effex Capital with FXCM expressed as a percentage of Effex Capital's revenues" in the years 2011 to 2014 never exceeded 60% and reached as low as 21% in

[13] Any negotiations leading to the Services Agreement are not material facts that are relevant to the Court's disposition of Defendants' Motion for Summary Judgment, as the Services Agreement provides that "[t]he Parties agree that no oral negotiations or other writings are intended to form part of this Agreement." Ex. 41 (Effex 000049 at Effex 000054).

2014. *See* Ex. 233 (E Capital-000117 - E Capital-000118); *see also* Ex. 23 ¶ 11 ("For the period from 2010 to 2017, the Rebate Payments were approximately thirty percent of Effex's gross revenue and not seventy percent of profit from time to time as alleged by NFA.").

In short, Plaintiffs have not demonstrated that FXCM had the power to significantly influence Effex's management or policies that would have required reporting Effex as a related party during the Class Period.

*ii. FXCM Was Not Required To Consolidate Effex As A VIE*

With respect to FXCM's consolidation of Effex as a VIE, in their Opposition Plaintiffs rely entirely on their expert's unsupported conclusion that the equity holders of Effex had insufficient equity at risk to permit it to finance his activities.[14] For all the reasons demonstrated in the Barron Motion and Reply, Barron's conclusion regarding Effex's equity at risk is unreliable and not based on any credible evidence. Barron somehow concludes that Effex had insufficient equity at risk from 2011 through 2014 (ECF No. 240-1, ¶ 11.1) without the benefit of any of Effex's financial statements for any year; any evidence Effex's actual revenues for any year; any evidence of the amount of money capitalizing Effex in any year; or any analysis of Effex's business model to determine the amount of equity investment that would have been sufficient to finance Effex's activities. Rather than rely on actual evidence of Effex's financial position, Barron bases his conclusion regarding the equity at risk on (1) FXCM's generalized "help" with the formation of Effex; (2) FXCM's initial 2010 loan to Effex that was repaid mere months later; and (3) an equivocal statement in a 2017 memorandum, that Lande testified was not based on actual knowledge of Effex's financial position (Ex. 212 (Lande Tr. 170:21-171:11)) that Effex "likely

[14] Moreover, whether there is sufficient equity at risk is only half of the threshold analysis of whether an entity is a VIE. *See* Mot. at 19-20. As demonstrated in the Motion, Effex had the power to direct all of its own activities and cannot be considered a VIE. *Id.* at 20. Plaintiffs rely solely on their expert's assertions to contradict the evidence of Effex's ability to direct its own activities.

did not have sufficient equity to fund its activities" in 2010 (Ex. 129). This paltry evidence is insufficient to form a conclusion on this issue.

Similarly, Barron's conclusion that FXCM had a variable interest in Effex is based entirely on a flawed conclusion that "FXCM was receiving approximately 70% of Effex's profits from FXCM trading volume." Opp. at 29. This conclusion is bolstered by the incorrect assertion that "FXCM's variable interest in Effex is shown by the variation of Effex's payments to FXCM, which followed the variation in Effex's trading profits." *Id.* As demonstrated above, Effex's payments varied in rate only three times during a in four-year period. Ex. 224 (Chart of Payments). This cannot be characterized as "follow[ing] the variation in Effex's trading profits," which varied from day-to-day, month-to-month, and from currency pair to currency pair (*see, e.g.*, Ex. 6 Niv. Tr. 140:3-22); Ex. 4 (Dittami Tr. 347:2-20 (discussing variation in profitability but standardization of the rate per million)) and certainly more frequently than annually.

Finally, in support of their assertion that FXCM was the primary beneficiary of Effex, Plaintiffs grossly mischaracterize evidence.[15] Most importantly, there is no evidence to support the allegation that "once FXCM terminated its relationship with Effex in 2017, Effex was unable to support itself and quickly went out of business." Opp. at 30. To the contrary, Niv testified that Effex's business failed "because when [the CFTC] press release came out, their other clients left them also and a lot of that counterparties cut them off. Prime broker cut them off. So they, basically, are out of business completely." Ex. 81 (Niv Tr. 276:12-18).

Accordingly, Plaintiffs cannot demonstrate that FXCM should have consolidated Effex as a VIE and, therefore, failed to comply with GAAP reporting obligations.

---

[15] Defendants more fully address these mischaracterizations in their responses to Plaintiffs' statements of additional material facts ¶¶ 235, 250-260, and 297.

## III. Plaintiffs Have Failed To Establish A Genuine Issue of Material Fact Regarding Scienter

As Plaintiffs' Opposition confirms, the voluminous record in this case does not contain a shred of evidence to support the notion that Defendants acted with scienter and knowingly sought to deceive investors about the Effex relationship or FXCM's compliance with GAAP.

### A. Defendants Did Not Knowingly Intend To Deceive Investors About The Effex Relationship

To establish scienter at the summary judgment stage, it is Plaintiffs' burden—not Defendants—to "produce evidence '(1) showing that the defendants had both motive and opportunity to commit the fraud or (2) constituting strong circumstantial evidence of conscious misbehavior or recklessness.'" *Shenk v. Karmazin*, 868 F. Supp. 2d 299, 305 (S.D.N.Y. 2012).[16] Plaintiffs do not even attempt to set forth any evidence of motive and opportunity in their Opposition. Opp. at 32, n.8. Instead, Plaintiffs argue that they have shown conscious misbehavior or recklessness because Defendants allegedly concealed their receipt of "kickbacks" from customers, investors, and regulators. Opp. at 34-35. To begin with, the undisputed evidence proves that Defendants did *not* receive kickbacks from Effex but, instead, received legitimate fixed fee, dollar-per-million payments for order flow. *See, e.g.*, Ex. 4 (Dittami Tr. 346:21-347:7); Ex. 6 (Niv Tr. 111:10-18); Ex. 2 (Wilson-Taylor Expert Report ¶ 91).[17] In fact, the unrebutted evidence shows that business relationships based on payments for order flow were common in the FX industry

---

[16] Plaintiffs incorrectly assert in conclusory fashion that "scienter is a question of fact." Opp. at 33. To establish a genuine issue of material fact as to scienter, Plaintiffs must set forth competent evidence showing that Defendants acted with scienter, which is a "difficult element to prove" at the summary judgment stage. *See In re Pall Corp.*, No. 07 Civ. 3359, 2013 WL 1702227, at *3 (E.D.N.Y. Apr. 8, 2013). "[S]ummary judgment is appropriate even when state of mind is at issue." *Clements v. County of Nassau*, 835 F.2d 1000, 1006 (2d Cir. 1987).

[17] Plaintiffs also attempt to establish scienter through a series of attorney arguments. Specifically, Plaintiffs seek to poke holes in the unrebutted testimony of witnesses in this case by characterizing that testimony as "self-serving *post hoc* testimony" provided by "interested parties." Opp. at 33. Plaintiffs also second-guess the Company's disclosures, arguing that it "could have" made certain disclosures at various points in time. *Id.* at 34-35. A non-moving party "must offer actual evidence" to survive a motion for summary judgment. *Del Norte v. WorldBusiness Capital, Inc.*, No. 14 Civ. 10143 (CM), 2017 WL 4334005, at *7 (S.D.N.Y. Apr. 5, 2017). Plaintiffs have not done so.

during the Class Period. *See* ECF 264 ¶¶ 70, 77-83; Ex. 2 (Wilson-Taylor Report ¶¶ 11, 58-60, 62, 64, 89-95); *see also* Ex. 6 (Niv Tr. 156:20-25) (describing payments for order flow as "standard practice," "very common," and "what everybody does in the market, not just Effex").

But more significantly, the evidence shows that FXCM's receipt of order flow payments was repeatedly disclosed (*see, e.g.*, Ex. 1 at 45; Ex. 7 at 1), rather than concealed. Indeed, contrary to Plaintiffs' assertions, the evidence in this case conclusively demonstrates that FXCM acted in good faith to provide transparent disclosures about its receipt of order flow payments. To that end, in August 2010, FXCM's Chief Financial Officer (Robert Lande) asked Niv for his thoughts on how to describe the order flow payments received from Effex. Ex. 172 (GLBR_00003881). Niv responded: "Use dittami in explanation. *We have no choice we have to be transparent*." *Id.* (emphasis added); *see also* ECF No. 250, ¶ 89 (Niv's "modus operandi constantly" was to make changes to the retail business only if they were consistent with the best interests of both FXCM and its customers).[18] And there is no genuine dispute that FXCM disclosed in its public filings that it received pay for flow payments as a means of revenue. *See, e.g.*, Ex. 1 at 45; Ex. 7 at 1; ECF No. 264 ¶ 73. This evidence is fatal to Plaintiffs' claim that Defendants acted with scienter. *See ECD Inv'r Grp. v. Credit Suisse Int'l*, No. 14-CV-8486, 2017 WL 3841872, at *24 (S.D.N.Y. Sept. 1, 2017) (granting summary judgment on scienter grounds where discovery revealed that "nonculpable inferences are the only ones that a reasonable factfinder could draw").[19]

---

[18] Contrary to Plaintiffs' contentions, FXCM's business decision to refrain from disclosing to *other competitors* the identity of Effex as one of its external liquidity providers clearly does not show an intent to defraud anyone, let alone investors. Opp. at 36 (citing ECF No. 266, ¶ 261). Plaintiffs are also incorrect that an email in which *Dittami* suggests that FXCM should not disclose the identity of Effex to FXCM's *competitors* somehow shows Defendants' scienter (*id.* (citing ECF No. 266, ¶ 263)). Dittami's intentions simply cannot be imputed to Defendants. Finally, none of the statements from FXCM to the NFA supports the notion that FXCM intended to defraud investors. *Id.* (citing ECF No. 266, ¶¶ 264-66). These discussions among the NFA and FXCM compliance employees in the context of an investigation are not public statements and were never intended as such.

[19] Plaintiffs further assert that Defendants acted with scienter because Niv stated in a March 2014 email that Effex had "[a lot] to lose if they piss us off." Opp. at 36. But all this email shows is that FXCM's retail and institutional

Thus, Plaintiffs' contention that Defendants knowingly sought to deceive investors about the Effex relationship rests on "improbable inferences and unsupported speculation" rather than actual evidence. *Tholke v. Unisys Corp.*, No. 01-CV-05495, 2008 WL 731595, at *7 (S.D.N.Y. Mar. 20, 2008).

### B. Defendants Did Not Deceive Investors About FXCM's Compliance With GAAP

Plaintiffs' Opposition also confirms that there is no evidence that Defendants acted with scienter in connection with FXCM's alleged GAAP violations. Even if Plaintiffs have proven that FXCM violated GAAP in connection with its VIE and related party disclosures (they have not), it is well-established that "[t]he mere publication of inaccurate accounting figures, or a failure to follow GAAP, without more, does not establish scienter." *In re REMEC Inc. Sec. Litig.*, 702 F. Supp. 2d 1202, 1237 (S.D. Cal. 2010). While Plaintiffs' Opposition is written in such a way as to suggest that Niv and Ahdout were directly involved and knew FXCM's VIE and related party disclosures were allegedly false and misleading, the Court "must separate rhetoric from evidence" in resolving Defendants' summary judgment motion. *Id.* at 1237 ("A jury trial is unnecessary when attorney argument is not supported by the facts that were produced during an extensive and exhaustive discovery process"). As described below, even a cursory review of Plaintiffs' Opposition reveals that it contains virtually no evidence that *Niv or Ahdout themselves* acted with scienter in connection with FXCM's alleged GAAP violations. *See* Opp. at 36-39.

Indeed, the only "evidence" Plaintiffs point to in support of their scienter argument is that: (1) FXCM's CFO, Robert Lande, told Joshua Rosenfeld and Joe Filko (FXCM accountants) that there should be no "further mention of any option to E&Y" (Opp. at 38 (citing ECF No. 266 ¶

---

volume accounted for a sizable percentage of Effex's revenue at the time, and it does not prove that Defendants intended to deceive investors in connection with FXCM's public disclosures.

204)); and (2) another FXCM accountant—Baruch Greenbaum—sent a chart to EY, copying Filko and Rosenfeld, showing payments from Effex in 2010 (*id.* (citing ECF No. 266 ¶¶ 219, 221)).[20] Thus, contrary to Plaintiffs' assertions (Opp. at 38), this evidence of statements from Lande and Greenbaum does not come close to proving that *Niv or Ahdout* withheld material facts about the Effex relationship from EY, or that *Niv or Ahdout* had any involvement whatsoever in deciding whether to make VIE or related party disclosures in connection with the Effex relationship. Plaintiffs have therefore failed to raise a genuine issue of material fact regarding Defendants' scienter. *See In re REMEC*, 702 F. Supp. 2d at 1241 (finding lack of scienter where CEO "was not directly involved in goodwill impairment testing" and there was no evidence that CEO circumvented accounting department); *In re ICN Pharms., Inc.*, 299 F. Supp. 2d 1055, 1066 (C.D. Cal. 2004) (plaintiffs "failed to provide detailed evidence of the contemporaneous decision-making behind the alleged accounting errors that would combine to show the required scienter").

Moreover, Plaintiffs' contention that EY "did not conduct an independent assessment of FXCM's relationship with Effex" is demonstrably false. Opp. at 37. As explained in Defendants' Motion (Mot. at 27-28), EY issued unqualified audit opinions for FXCM's financial statements throughout the Class Period and never suggested, much less required, that FXCM restate its financial statements. ECF No. 250 ¶ 114. In conducting its audits, EY had full access to conduct a thorough and independent audit of FXCM each year during the Class Period (*see* Ex. 212 (Lande Tr. 72:21-73:3); Ex. 6 (Niv Tr. 48:17-24); Ex. 223 (Stollow Tr. 99:6-101:4), which "negate[s] an inference that [Niv or Ahdout] had a scheme to defraud investors." *In re REMEC*, 702 F. Supp. 2d

[20] Neither of these documents shows Defendants' scienter. In Ex. 126, Lande wrote "*There will be no option.* No further mention of any option to E&Y." Ex. 126 (emphasis added on the portion of the email Plaintiffs omitted). Lande testified that, around the time of this email, he "had been discussing how we would record an option . . . with [EY]," but when FXCM determined there would be no Option Agreement the discussions ceased. Ex. 212 (Lande Tr. 221:3-222:8); *see also id.* 99:23-100:3, 123:3-8 ("this all became moot because there was no option."). Similarly, Ex. 43 represents the invoiced amount in each month of 2010 (representing a fee of $21 per million), which includes the retroactive correction. *See* Ex. 128 (Rosenfeld Tr. 193:9-15).

at 1246; *In re Cirrus Logic Sec. Litig.*, 946 F. Supp. 1446, 1465 (N.D. Cal. 1996) (even if plaintiffs raised an issue of material fact that company violated GAAP, review and approval by auditor "would have negated any inference of scienter").

Because there is no evidence that Niv or Ahdout had any reason to believe that FXCM's accounting treatment of Effex violated GAAP, summary judgment may be granted.[21]

## IV. Plaintiffs Have Failed To Establish A Genuine Issue Of Material Fact Regarding Loss Causation

Despite scrambling for a viable theory of loss causation, Plaintiffs still do not have one. Loss causation is proven either by showing that losses were caused when the market reacted negatively to a corrective disclosure or that the loss was a foreseeable materialization of a concealed risk. *See Carpenters Pension Tr. Fund of St. Louis v. Barclays PLC*, 750 F.3d 227, 232-33 (2d Cir. 2014). Although up to this stage Plaintiffs have relied exclusively on a corrective disclosure theory of loss causation—not mentioning the concept of materialization of the risk in any deposition or report to date, *see generally, e.g.*, ECF No. 245-2 (Werner Tr.); Ex. ECF No. 245-1 (Werner Loss Causation Report); ECF No. 245-3 (Werner Loss Causation Rebuttal)—they have now shifted gears, describing Werner's Loss Causation Report in those terms. *See* Opp. at 39-40 (citing, nearly exclusively, *In re Vivendi Universal, S.A. Sec. Litig.*, 634 F. Supp. 2d 352, 360 (S.D.N.Y. 2009) (*Vivendi I*), a paradigmatic materialization of the risk case). This shift in theory is not entirely surprising—Plaintiffs' initial corrective disclosure theory was unsalvageable because, as explained in Defendants' opening brief, if this case were one of corrective disclosure (*i.e.*, correcting the alleged misstatements about an agency model and order flow payments), then Werner and Plaintiffs would have no explanation for the confounding factors of the CFTC and

---

[21] As Plaintiffs have failed to demonstrate a genuine issue of material fact as to scienter on the part of Niv and Ahdout, they have also failed to establish FXCM's corporate scienter. *See Teamsters Local 445 Freight Div. Pension Fund v. Dynex Capital Inc.*, 531 F.3d 190, 195 (2d Cir. 2008).

NFA settlement consequences. Mot. at 29-34. But Plaintiffs' last-second pivot to a materialization of the risk theory does nothing to save their case.

First and foremost, because his report provides only unsupported and unreliable opinions, the testimony of Adam Werner should be excluded. *See generally* ECF No. 244. Without Werner, Plaintiffs have failed to present any evidence on loss causation. But even if the Court were to consider some portion of Werner's testimony, nothing in Werner's Loss Causation Report (or his Loss Causation Rebuttal) creates a genuine issue of material fact with respect to loss causation.

"Loss causation is the causal link between the alleged misconduct and the economic harm ultimately suffered by the plaintiff." *Lentell v. Merrill Lynch & Co*., 396 F.3d 161, 172 (2d Cir. 2005) (quotations omitted). To establish loss causation, a plaintiff must demonstrate "that the subject of the fraudulent statement or omission was the cause of the actual loss suffered." *Carpenters Pension Trust Fund of St. Louis v. Barclays PLC*, 750 F.3d 227, 232 (2d Cir. 2014). Under their new materialization of the risk theory, Plaintiffs argue, through Werner, that the regulatory consequences FXCM suffered were "reasonably foreseeable," and thus Werner's opinion on loss causation creates a genuine issue of material fact. *See* Opp. at 40-41; *see also Vivendi I*, 634 F. Supp. 2d at 360.

But Werner's Loss Causation Report is materially distinguishable from *Vivendi I*. The consequences Werner ties to the alleged misrepresentations here are different in kind from those in *Vivendi I*, and are far more attenuated. In *Vivendi I*, plaintiffs argued that defendant had concealed the true nature of its liquidity, and that throughout the class period shareholders suffered losses when negative liquidity events occurred—materializations of the exact risk concealed by the misrepresentations. *Id.* at 366. Here, in stark contrast, Plaintiffs allege three distinct

misrepresentations by FXCM:[22] its use of an agency model, order flow arrangement details, and non-adherence to GAAP (alleging Effex was a VIE and a related party). ECF No. 181 (TAC), ¶¶ 146-163; 148-151; 131-136; 144-145. Werner, however, does not connect losses to *any* of these alleged misrepresentations. Instead, relying entirely on *ipse dixit*, Werner states that FXCM's misstatements "misled market participants about the extent of FXCM's exposure to regulatory scrutiny," concealing "the inextricable ramifications that would manifest upon corrective disclosure." ECF No. 245-1 (Werner Loss Causation Report ¶ 45). In other words, the risk supposedly concealed by Defendants was the increased risk of regulatory scrutiny (and its attendant consequences), not the subject of the alleged misstatements. Unlike *Vivendi I*, Plaintiffs do not contend that the market found out the truth Defendants concealed, and this hurt prices, but instead say, "these misrepresentations increased the risk of regulatory scrutiny, which then hurt prices when that scrutiny came to bear." Plaintiffs have pointed to no opinion where a Court has accepted *that* materialization of the risk argument, nor could they.

This distinction is consequential for three reasons. First, Plaintiffs' argument is a transparent effort to end run the Court's prior ruling. In its March 28, 2019 Opinion and Order, this Court dismissed Plaintiffs' count predicated on misstating regulatory scrutiny, holding that "Plaintiffs have failed to allege that FXCM made false or misleading statements with respect to the regulatory investigations that it was undergoing." ECF No. 135 at 29. Plaintiffs' materialization of the risk theory restates this dismissed theory of liability couched in the surviving allegations. Second, Plaintiffs' argument stretches a materialization of the risk theory of loss causation well past it's breaking point. As already stated, unlike *Vivendi I*, where the concealed risk materialized and losses were directly attributed to that concealed risk, 634 F. Supp. 2d at 366, Plaintiffs contend

[22] Plaintiffs also allege certain SOX certification misstatements, which are not substantively distinct from the four allegations listed here. ECF No. 181 (TAC), ¶¶ 169-72.

that Defendants' alleged misrepresentations about their business model and order flow *in turn* concealed generalized regulatory risk, which then came to bear. ECF No. 245-1 (Werner Loss Causation Report ¶ 45). This argument, were it accepted, creates a near-automatic loss causation theory for future plaintiffs: utter the magic words "inextricable ramifications" and any consequence, no matter how indirect or unexpected, can be a materialization of the risk to a statement. Third, as set forth more fully below, Plaintiff's pivot from a disclosure theory of liability to a materialization of the risk theory causes Werner's damages opinions to run afoul of the Supreme Court's reasoning in *Comcast v. Behrand,* 569 U.S. 27 (2013).

For the foregoing reasons, Plaintiffs fail to create a genuine issue of fact with respect to loss causation and summary judgment is appropriate.

## V. Plaintiffs Have Failed To Establish A Genuine Issue Of Material Fact Regarding Economic Loss

Plaintiffs' rebuttal on economic loss rebuts none of the points made in Defendants' Motion. Most importantly, for the reasons stated in Defendants' motion to exclude the testimony and opinions of Adam Werner (ECF No. 243), Werner should be excluded. Without Werner, Plaintiffs have failed to present any evidence on economic loss. But even if Werner's testimony and opinions are not excluded, Plaintiffs' economic loss calculations are insufficient.

As an initial matter, Werner's damages model combined with Plaintiffs' recent pivot to a materialization of the risk theory runs afoul of *Comcast*, 569 U.S. at 35, even if his opinions were considered. In *Comcast*, the Supreme Court overturned the certification of an antitrust class. *Id.* at 39. Plaintiffs had raised four theories of damages, which the district court had narrowed to one. *Id.* at 31-32. Plaintiffs' damages model, however, "did not isolate damages resulting from any one theory of antitrust impact." *Id.* at 32. The Supreme Court reversed certification of the class because the model did not attribute damages to the remaining theory of harm, even though "[t]he first step

in a damages study is the translation of the legal theory of the harmful event into an analysis of the economic impact of that event.'" *Id.* at 39. A generalized model showing damages does not satisfy this requirement—damages must be causally tied to the *specific* theory of liability.

Here, Plaintiffs' loss causation and damages argument attempts to do exactly what *Comcast* forbids. Plaintiffs and their expert, Werner, make no effort to disentangle whether damages were caused directly by the misstatements, or by the regulatory consequences therefrom. Did FXCM stock go down because the market believed that FXCM operated an agency model, but then found out that it ran a principal model (direct causation)? Or, did FXCM stock fall because the CFTC and NFA took regulatory actions that were themselves the result of alleged misstatements (indirect causation)? There can be no question that Werner argues the latter, (*see* ECF No. 245-1 (Werner Loss Causation Report ¶ 45)), but it is unclear whether he is also saying the former. (*See, e.g.*, *id.* ¶ 46). This is exactly the sort of conflation *Comcast* does not tolerate. *Comcast*, 569 U.S. at 35 ("If respondents prevail on their claims, they would be entitled only to damages resulting from . . . the only theory of antitrust impact accepted for class-action treatment . . . . It follows that a model purporting to serve as evidence of damages . . . must measure only those damages attributable to that theory.").

But even if this Court sets that issue aside and focuses only on Werner's attribution of losses through indirect causation (*i.e.*, purported inextricable regulatory ramifications), it still runs squarely afoul of *Comcast*. This is because no possible reading of the CFTC and NFA settlements ties those consequences to a GAAP violation, (*see* ECF No. 181 (TAC), Ex. 1 & 2), but Werner admits that his damages and loss causation model does not differentiate between any of FXCM's alleged misstatements. *See* ECF No. 245-2 (Werner Tr. 367:9-372:15; 487:19-488:15) (attributing losses collectively to "corrective disclosure and their inextricable ramifications," the latter

category including numerous direct and indirect consequences, and including GAAP violations as an underlying corrected misstatement). Thus, just as in *Comcast*, attributing losses to GAAP without breaking out losses by theory renders the whole analysis insufficient.

Moreover, as Defendants pointed out in their Motion, Plaintiffs' economic loss calculations are insufficient for the wholly independent reason that Plaintiffs do not address the fact that constant-dollar inflation, without any analytical adjustments, is inappropriate and unreliable here. Plaintiffs' damages model assumes a 100% certainty of regulatory action, and further assumes, without any support, that the nature and consequences of resolving the regulatory actions were certain. *See* ECF No. 245-1 (Werner Loss Causation Report ¶ 45-46). This assumption that the risk was "100 percent" certain is exactly the sort of presumption that courts have found inadequate to show economic loss in Rule 10(b) cases. *See In re BP p.l.c. Sec. Litig.,* No. 10 MD 2185, 2016 WL 3090779, *3, 33 (S.D. Tex. May 31, 2016).

Consequently, summary judgment may be granted because there is no genuine issue of fact that Plaintiffs have not demonstrated economic loss.

## VI. Individual Plaintiff 683 Capital Cannot Establish Genuine Issues Of Material Fact Regarding Reliance, Loss Causation, Or Economic Loss

In response to this Court's March 23, 2021 Opinion and Order declining to certify the proposed Notes Class, ECF No. 232, Plaintiff 683 Capital has opted to take a gamble on a lazy solution: pretend that order never happened. Despite the fact that the Court found that Plaintiffs had not proven that the FXCM Notes traded in an efficient market, and despite Werner's assurance to the Court that he would "take special care to ensure that an inflation ribbon is constructed such that it properly controls for potential valuation complexities" of the FXCM Notes, ECF No. 196-1 ¶ 82, no additional analysis *whatsoever* has been done. *See generally* ECF No. 245-1 (Werner Loss Causation Report); ECF No. 245-2 (Werner Tr. 374:17-20). Instead, Werner has presented

the same flawed event study the Court rejected from his Market Efficiency Report to support his opinion on loss causation and damages for the Notes. *See id*. For the reasons stated in Defendants' briefing on the Motion to Exclude Dr. Werner's Testimony and Opinions, his opinion as to the FXCM Notes is unreliable, and must be excluded. Without that flawed opinion, Plaintiffs have no evidence of loss causation or economic loss for 683 Capital.

As to reliance, 683 Capital must show that it "was aware of a company's statement and engaged in a relevant transaction . . . based on that specific misrepresentation." *Erica P. John Fund, Inc. v. Halliburton Co*., 563 U.S. 804, 810 (2011). Plaintiff 683 Capital has attempted to re-characterize the deposition testimony of Joseph Patt to indicate a reliance that simply is not there—attorney argument cannot substitute for evidence that Patt and his firm *actually relied* on the alleged misrepresentations. *See* Mot. at 40-42.

## VII. Plaintiffs Have Failed To Establish A Genuine Issue Of Material Fact Regarding Their Section 20(a) Claim

Plaintiffs do not rebut Defendants' legal contention that, should they fail to prove a primary violation, they have also failed to demonstrate a claim under Section 20(a). Likewise, Plaintiffs have added no substantive argument that, absent a showing of scienter on the part of any Defendants (which Plaintiffs have failed to do), they have likewise failed to demonstrate culpable participation. Accordingly, a grant of summary judgment on Plaintiffs' 20(a) claim is necessary.

## CONCLUSION

For all the reasons stated above, and the reasons articulated in Defendants' Motion, Defendants' motion for summary judgment should be granted in its entirety.

Dated: January 20, 2022

KING & SPALDING LLP

*/s/ Israel Dahan*

Israel Dahan
Peter Isajiw
Ryan Gabay
KING & SPALDING LLP
1185 Avenue of the Americas
New York, New York 10036-2601
Tel: (212) 556.2100
Fax: (212) 556.2200
idahan@kslaw.com
pisajiw@kslaw.com
rgabay@kslaw.com

Chelsea Corey
KING & SPALDING LLP
300 S. Tryon Street, Suite 1700
Charlotte, North Carolina 28202
Tel: (704) 503.2575
Fax: (704) 503.2622
ccorey@kslaw.com

*Attorneys for Defendants Global Brokerage, Inc. f/k/a/ FXCM, Inc., Dror Niv, and William Ahdout*