UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| In re Global Brokerage, Inc. f/k/a FXCM, Inc. Securities Litigation | Master File No. 1:17-cv-00916-RA |
| | CLASS ACTION |
| | ORAL ARGUMENT REQUESTED |
| This Document Relates To:  All Actions | |

### DEFENDANTS' RESPONSE TO PLAINTIFFS' RULE 56.1 STATEMENT OF ADDITIONAL MATERIAL FACTS

Pursuant to Local Rule 56.1, Defendants Global Brokerage, Inc. f/k/a FXCM Inc. ("FXCM"), Dror Niv, and William Ahdout ("Defendants") respond to the Statement of Additional Material Facts submitted by Plaintiffs alongside their Opposition to Defendants' Motion for Summary Judgment. Documents referenced in these Responses are (1) attached as exhibits to the Declaration of Israel Dahan submitted alongside Defendants' Motion for Summary Judgment (ECF No. 252); (2) attached as exhibits, numbered continuously, to the Declaration of Joshua Baker submitted alongside Plaintiffs' Opposition to Defendants' Motion for Summary Judgment (ECF No. 271); or (3) attached as exhibits, numbered continuously, to the Supplemental Declaration of Israel Dahan submitted alongside this Response. Because all exhibits are numbered consecutively, regardless of the party who submitted the exhibit, all exhibits are referred to as "Ex. __." Defendants note that all Plaintiffs' references to ECF No. 252-XX retain the same exhibit numbers (*e.g.* ECF No. 252-1 is Ex. 1).

### Company Background and Alleged False and Misleading Statements

148.     William Ahdout and Drew Niv were two of the six founding partners of FXCM. Ex. 80 (Ahdout Tr. 27:22-28:2); Ex. 81 (Niv Tr. 22:19-20).

A:  Undisputed.

1

149.     FXCM's annual reports ("10-K") for 2011, 2012, and 2013 stated in substantially similar, if not identical, form:

> We primarily offer our customers what is referred to as an agency model to execute their trades. Our agency model is fundamental to our core business philosophy because we believe that it aligns our interests with those of our customers and reduces our risks. In the agency model, when our customer executes a trade on the bestprice quotation offered by our FX market makers, we act as acredit intermediary, or riskless principal, simultaneously entering into offsetting trades with both the customer and the FX market maker. We earn trading fees and commissions by adding a markup to the price provided by the FX market makers and generate our trading revenues based on the volume of transactions and  the spread earned on transactions.

ECF No. 252-1 (2011 10-K); ECF No. 252-7 (2012 10-K); ECF No. 252-8 (2013 10-K).

A:   Undisputed, although the 2011 10-K contains language that is somewhat different than the above quote:

> Our agency model is fundamental to our core business philosophy because we  believe that it aligns our interests with those of our customers, reduces our risks and provides distinct advantages over the principal model used by the majority of retail FX brokers. In the principal model, the retail FX broker sets the price it presents to the customer and may maintain its trading position if it believes the price may move in its favor and against the customer.

Ex. 1 (2011 10-K at 1).

150.     FXCM's quarterly report ("10-Q") for the second quarter of 2012 ("12Q2") andits 2013 10-K stated:

> [A]s we have for a number of years conducted our retail operationson the basis of the agency model, we could suffer reputational damage and additional regulatory scrutiny by offering execution to retail clients that creates an inherent conflict between the interests of the customer and our interests.

Ex. 83 (12Q2 10-Q); ECF No. 252-8 (2013 10-K).

A:  Undisputed.

151.     FXCM's 2012 10-K stated: "Our commitment to the agency model is   one example of our core business philosophy to reduce risks." ECF No. 252-7 (2012 10-K).

A:  Undisputed.

152.     FXCM's 13Q1 10-Q, 13Q2 10-Q, 13Q3 10-Q, 14Q1 10-Q, 14Q2 10-Q, and 14Q310-Q stated: "As we predominantly operate our retail business on an agency model with the exception of certain trades of our CFD customers we are not exposed to the market risk of a position moving up or down in value." Ex. 85 (13Q1 10-Q). Ex. 86 (13Q2 10-Q). Ex. 87 (13Q3 10-Q); Ex. 88 (14Q1 10-Q); Ex. 89 (14Q2 10-Q); Ex. 90 (14Q3 10-Q).

A:  Undisputed.

153.     On January 27, 2013, FXCM's website stated: "FXCM does not take a market position-eliminating a major conflict of interest." ECF No. 252-13. Niv approved the "main messages" of the content published to FXCM's website, including in 2013. Ex. 81 (Niv Tr. 59:12-15) ("Q. Is the type of content shown on this page something that you would havereviewed and approved back in 2013? A. Yes.").

A:  Undisputed.

154.     On February 5, 2013, FXCM's website stated: "FXCM can see your waiting orders when you trade with No Dealing Desk execution. But this does not create a conflict of interest between you and FXCM because we aren't taking a market position." Ex. 91 (website printout). Niv stated that he would have reviewed or approved the content. Ex. 81 (Niv Tr. 61:24-62-18).

A:  Undisputed.

155.     FXCM's 2011 10-K, 12Q1 10-Q, 12Q2 10-Q, 12Q-3 10-Q, 2012 10-K, 13Q1

10- Q, 13Q2 10-Q, 13Q3 10-Q, 2013 10-K, 14Q1 10-Q, 14Q2 10-Q, 14Q3 10-Q and 2014
10-K stated in substantially similar, if not identical, form: "Retail trading revenue is our largest
source of revenue and is primarily driven by: . . . (iv) the amount of additional retail revenues
earned, including . . . payments we receive for order flow from FX market makers." ECF No. 252-
1 (2011 10-K); Ex. 82 (12Q1 10-Q); Ex. 83 (12Q2 10-Q); Ex. 84 (12Q3 10-Q); ECF No. 252-7
(2012 10-K); Ex. 85 (13Q1 10-Q); Ex. 86 (13Q2 10-Q); Ex. 87 (13Q3 10-Q); ECF No. 252-8
(2013 10-K); Ex. 88 (14Q3 10-Q); Ex. 89 (14Q3 10-Q); Ex. 90 (14Q3 10-Q); ECF No. 252-9
(2014 10-K). Niv signed each of the 10-Qs and 10-Ks, and Ahdout signed each of the 10-Ks. *Id.*

     A:  Undisputed.

156.     FXCM's 12Q1 10-Q, 12Q2 10-Q, 12Q3 10-Q, 2012 10-K, 2013 10-K, and
2014 10-K stated in substantially similar, if not identical, form: "Income earned on order flow
represents payments received from certain FX market makers in exchange for routing trade
orders to these firms for execution. The Company's order routing software ensures that payments
for order flow do not affect the routing of orders in a manner that is detrimental to its retail
customers." Ex. 82 (12Q1 10-Q); Ex. 83 (12Q2 10-Q); Ex. 84 (12Q3 10-Q); ECF No. 252-7 (2012
10-K); ECF No. 252-8 (2013 10-K); ECF No. 252-9 (2014 10-K).

     A:  Undisputed.

157.     FXCM's 2011 10-K, 12Q2 10-Q and 12Q3 10-Q stated in substantially similar,
if not identical, form: "We earn trading fees and commissions by adding a markup to the price
provided by the FX market makers and generate our trading revenues based on the volume of
transactions, not trading profits or losses." ECF No. 252-1 (2011 10-K); Ex. 83 (12Q2 10-Q); Ex.
84 (12Q3 10-Q).

     A:  Undisputed.

158.     FXCM's 14Q3 10-Q and 2014 10-K: The Company "no longer receive[d] payments for order flow." Ex. 90 (14Q3 10-Q); ECF No. 252-9 (2014 10-K).

A:  Undisputed.

159.     FXCM disclosed other related party transactions in each of its annual and quarterly reports during time Effex paid FXCM, and included assessments of VIEs in its annual and quarterly reports through the first quarter of 2013. ECF No. 252-1 (2011 10-K); ECF No. 252-7 (2012 10-K); ECF No. 252-8 (2013 10-K); ECF No. 252-9 (2014 10-K); Ex. 82 (12Q1 10-Q); Ex. 83 (12Q2 10-Q); Ex. 84 (12Q3 10-Q); Ex. 85 (13Q1 10-Q); Ex. 86 (13Q2 10-Q); Ex. 87 (13Q3 10-Q); Ex. 88 (14Q1 10-Q); Ex. 89 (14Q2 10-Q); Ex. 90 (14Q3 10-Q).

A:  Undisputed, but disputed insofar as this statement implies that FXCM stopped reporting these details beyond the first quarter of 2013, which it did not.  *See* Ex. 9 (2014 10-K at F-36).

160.     FXCM's 2010 10-K included the following statements:

We utilize what is referred to as agency execution or an agency model. When our customer executes a trade on the best price quotation offered by our FX market makers, we act as a credit intermediary, or riskless principal, simultaneously entering into offsetting trades with both the customer and the FX market maker. We earn trading fees and commissions by adding a markup to the price provided by the FX market makers and generate our trading revenues based on the volume of transactions, not trading profits orlosses. In addition to trading fees and commissions, we also earn other forms of revenue such as fees earned from: arrangementswith other financial institutions to provide platform, back office and trade execution services, trading in contracts-for-difference, or CFDs, trading in equities and equity options, payments for order flow, FX market prices and other various ancillary FX relatedservices and joint ventures.

Our agency model is fundamental to our core business philosophy because we believe that it aligns our interests with those of our customers, reduces our risks and provides distinct

> advantages over the principal model used by the majority of retail FX brokers. In the principal model, the retail FX broker sets the price it presents to the customer and may maintain its trading position if it believes the price may move in its favor and against the customer. We believe this creates an inherent conflict between the interests of the customer and those of the principal model broker. Principal model brokers' revenues typically consist primarily of trading gains or losses and are more affected by market volatility than those of brokers utilizing the agency model.
>
> *       *       *
>
> Retail trading revenue is our largest source of revenue and is primarily driven by: … (iv) the amount of additional retail revenues earned, including … payments we receive for order flow from FX market makers.
>
> *       *       *
>
> Income earned on order flow represents payments received from certain FX market makers in exchange for routing trade orders to these firms for execution.

ECF No. 252-17 (2010 10-K).

A:  Undisputed subject to the caveat that the above statements do not appear near each other in the FXCM 2010 10-K.  Accordingly, any meaning inferred from the close proximity of these statements is disputed, as that close proximity is inaccurate and does not exist.

**Dittami Joins FXCM**

161.     FXCM hired John Dittami to a Managing Director position in or around September 2009. ECF No. 252-19 (Dittami employment contract). William Ahdout and Drew Niv were involved in the hiring of Dittami. Ex. 81 (Niv Tr. 72:2-18).

A:  Undisputed.

162.     Ahdout and Niv hired Dittami to, among other things, develop an algorithmic

trading system, which became known within FXCM as EES, that would serve as a liquidity provider for FXCM. Ex. 81 (Niv Tr. 64:2-65:2). One of the goals for EES was for FXCM to earn trading profits generated by EES. Ex. 81 (Niv Tr. 68:21-69:25); Ex. 92 (Dittami Tr. 30:10-16).

> A: Defendants do not dispute that Dittami was hired to develop an algorithmic trading system, which became known within FXCM as EES. Defendants dispute that the cited portion of Niv's testimony supports this premise. Defendants likewise do not dispute that a goal for EES, had it ever operated fully under FXCM, was for EES to earn trading profits.

163.    Niv and Ahdout received updates from Dittami on a regular basis regarding his work on EES. Ex. 81 (Niv Tr. 66:2-17).

> A: Defendants do not dispute that Niv and Ahdout received updates from Dittami while he was employed by FXCM and he was operating EES. Defendants dispute this statement to the extent that this statement is meant to encompass any time period after Dittami's resignation on April 14, 2010.

164.    As a liquidity provider, EES was intended to take the opposite side of trades with FXCM's customers on FXCM's No Dealing Desk platform. Ex. 93 (GLBR_00121206, at GLBR_00121207) ("Regarding the counterparty item, I did ask John directly if he was a riskless principle regarding offsetting trades and he said that he wasn't. In my estimation, he has the backing of Citi but he is or was the other side of client trades executed through his pricing and liquidity"); Ex. 94 (GLBR_00060316, at GLBR_00060317) ("For exposure purposes EES will not be clicked on since they are not a true hedge. They are positions we are taking against customers.").

> A: Defendants do not dispute that the quoted text appears in Exs. 93 and 94. Defendants dispute Plaintiffs' characterization of these documents, specifically that

"EES *was intended* to take the opposite side of trades with FXCM's customers" as no documents evidence such an intent held by any unspecified person.

165.    In 2010, FXCM's compliance department determined, and Ahdout and Niv agreed, that FXCM could not operate EES as an internal liquidity provider and still claim to its customers that it was operating a "no dealing desk" model and was not on the other side of their trades. Ex. 95 (Niv CFTC Tr. 77:16-78:8) ("We came to the -- compliance and legal came to the conclusion that we could not do it [operate the EES trading algorithm as a liquidity provider] from inside FXCM and continue to call a no-dealing desk a no-dealing desk… And we could not, if we did internalize him, we could not call it a non -dealing desk, we would have to call it a dealing desk."); ECF No. 252-66 (Ernst & Young LLP ("E&Y") memorandum stating that "Compliance came to the view that operating [Dittami's] algorithm within [FXCM US] would be inconsistent with the no dealing desk arrangement that FXCM used to market itself to customers").

A:  Defendants do not dispute that FXCM's compliance department concluded that EES could not operate within FXCM as an internal liquidity provider.  Defendants dispute that Niv and Ahdout agreed with FXCM's compliance department's assessment and Plaintiffs have not cited testimony to support such a conclusion. Defendants likewise do not dispute that the quoted language appears in Ex. 66 but note that the quote is incomplete and the full sentence states that "Compliance came to the view that operating this algorithm within Forex would be inconsistent with the no dealing desk arrangement that FXCM used to market itself to customers, *but operating this model as an independent liquidity provider would not*."  Ex. 66 (EY Memorandum at 1).

166.    FXCM's compliance department later confirmed that if FXCM were to buy Effex

and Effex continued to operate as a liquidity provider for FXCM, FXCM could no longer represent to its clients that it operated a "no dealing desk" model. Ex. 95 (Niv CFTC Tr. 183:11- 184:8).

> A:  Defendants do not dispute that the quoted language appears in Exhibit 95. Defendants dispute that FXCM ever purchased Effex or had any ownership interest. Ex. 23 (Dittami Affidavit ¶¶ 10, 13, 15); Ex. 4 (Dittami Tr. 128:24-129:4).

167.    Accordingly, FXCM decided that Dittami would have to operate EES as an external liquidity provider. Ex. 81 (Niv Tr. 87:20-88:10) ("we decided to end that venture [EES] and continue with external execution"). Ahdout informed Dittami of this decision and set about helping Dittami to establish a new entity, which would become Effex Capital, LLC ("Effex"). Ex. 96 (Dittami CFTC Tr. 108:21-109:6).

> A:  Defendants do not dispute that FXCM decided that Dittami would have to operate EES as an external liquidity provider.  Defendants dispute that "Ahdout . . . set about helping Dittami to establish a new entity" that would become Effex and the testimony Plaintiffs have cited does not stand for this proposition. Additionally, FXCM did not request or require that Dittami establish Effex, instead Dittami made that decision on his own.  Ex. 23 (Dittami Affidavit ¶ 4).  In service of doing so, Dittami hired his own counsel to advise on formation.  Ex. 92 (Dittami Tr. 43:7-20).

168.    Dittami continued to develop and operate EES at FXCM until he left FXCM on April 14, 2010. Ex. 97 (E Capital-000096 at E Capital-000097); Ex. 92 (Dittami Tr. 42:13-19).

> A:  Defendants dispute this statement.  Ex. 97 states:  "FXCM and Mr. Dittami terminated the employer/employee relationship in April of 2010.  Mr. Dittami and his team *thereafter* proceeded with the continued build out of the technology and

development of the forex institutional liquidity trading system through Effex Capital."  Ex. 97 (Greenberg Traurig Memo at 2) (emphasis added).

169.       EES began to run "test trades" in March and April 2010, which were real trades opposite FXCM's retail customers. Ex. 98 (GLBR_00153994); Ex. 92 (Dittami Tr. 56:15-57:9) Niv and Ahdout were aware of these test trades. Ex. 95 (Niv CFTC Tr. 68:9-12); Ex. 99 (Ahdout CFTC Tr. 78:2-19). These trades continued after Niv and Ahdout had determined that Dittami would have to trade separately as Effex, so that the test trades were conducted before Dittami had left FXCM, but for Effex's benefit. Ex. 100 (GLBR_00046387); Ex. 95 (Niv CFTC Tr. 88:9-13).

> A:  Defendants do not dispute that FXCM began to run a minimal number of test trades in March and April 2010, which were real trades opposite FXCM's retail customers in Japan, not the United States.  EES test trades were run on FXCM Japan's server.  *See* Ex. 100 (GLBR_00046387) ("We only traded 4 days since we spoke 2 weeks ago. Each was only for few hours on japan flow only and 3 pairs only. Results were +3000, +1300, -100, +2000. The numbers our tiny but what is important is our per millions were 80 to 120 on pairs in line with backtest showing 35mm per year end result."); *see also* Ex. 225 (GLBR_00022903).

170.       Niv testified to the CFTC that he believed that if these test trades had continued in larger volumes with Dittami still at FXCM, it would not be consistent with FXCM's representations of operating a "no dealing desk" model. Ex. 95 (Niv CFTC Tr. 105:15-106:23).

> A:  Defendants dispute Plaintiffs' characterization of Ex. 95.  In response to this line of questioning, Niv testified that he did not even consider this issue at the time the test trading occurred.  Ex. 95 (Niv CFTC Tr. 105:15-24).  In response to the

question of whether the test trading had continued in larger volume such that EES "had the same volume as one of your other market makers, you think it would be consistent or it would not be consistent?" Niv testified that it would not be consistent with a no dealing desk model. *Id.* at 106:18-23. Defendants dispute that EES ever conducted more than a limited number of test trades.

### FXCM Helps Form and Incubate Effex

171.    Effex was first formed on March 23, 2010. Ex. 97 (E Capital-000096 at E Capital-000097). Ahdout and FXCM's general counsel helped set up Effex, and Dittami consulted with them on the name of the entity. Ex. 101 (GLBR_00218039); Ex. 92 (Dittami Tr. 43:11-16).

> A: Defendants do not dispute that Effex was first formed on March 23, 2010 or that Dittami consulted Ahdout and Sassoon on the name of the entity. Defendants dispute Plaintiffs' characterization that "Ahdout and FXCM's general counsel helped set up Effex." Dittami testified about this subject as follows: "Q. How did you form EFFEX? A. Signed a document to open an LLC. I bought a website, got an e-mail, things like this. Q. Did anyone assist you in forming EFFEX? A. I believe the FXCM Counsel helped me walk through how I would or how I would initiate this and my own – and my own Counsel to help me assist as well. Q. Okay. Thank you. That was my next question. A. Primarily, my own Counsel, operating group. Q. Did anyone else at FXCM assist you with forming EFFEX? A. No." Ex. 92 (Dittami Tr. 43:7-23).

172.    Effex served as a continuation of EES – other than becoming a separate legal entity the work continued, the operations continued, the test trades continued, and FXCM employees continued to refer to Effex as EES in internal correspondence and nomenclature within

FXCM's accounting and trading systems. Ex. 102 (GLBR_00188104) (Dittami: "do you have any issues from your end on us starting to trade under Effex capital name?"); Ex. 103 (GLBR_00184106) (Rosenfeld asking Dittami for "EES" income figures for October 2010); Ex. 104 (GLBR_00005808 at GLBR_00005808) (FXCM employee referring to "AEES (John Dittami's company, aka EFFEX Capital)").

> A: Defendants dispute this statement. While EES remained Effex's adapter name on FXCM's trading platform, Effex was not a continuation of EES. As Evan Milazzo, FXCM's Executive Vice President of Technology, explained in his testimony regarding his email in Ex. 104, AEES as it is used in this email "is referring to the liquidity provider adapter called AEES." Ex. 219 (Milazzo Tr. 78:10-13). Then, in response to Plaintiffs' counsel's question "Did you view EFFEX as a continuation of the project at FXCM that you described earlier called EES?" Milazzo testified, "From a technical perspective, we used some of the technology that had been created in that project, particularly, the bank adapter called AEES within the FXCM system. *From a business perspective, obviously, EFFEX was a new company that was started in spring of 2010 and therefore not a continuation of the project that was started at FXCM*." *Id.* at 79:18-80:4 (emphasis added). Defendants likewise dispute the remainder of Plaintiffs' characterizations in this statement. Similarly, as Joshua Rosenfeld, FXCM's Managing Director of Finance and Risk, explained in his testimony regarding his email in Ex. 103, in response to the question "Did you sometimes use EES to refer to EFFEX?" Rosenfeld testified, "I don't remember. Maybe since he worked on EES, it's possible. But the two weren't related to each other, so its doubtful. It could have

been a slip where you say one thing, you mean something else, you know, it's like calling one of your kids by another kid's name, that kind of thing." Ex. 216 (Rosenfeld Tr. 169:8-19). Rosenfeld also testified that he never asked Effex for its income in a given month and to the extent he received information regarding Effex's income, he did not retain it because "[t]here is no practical reason for us to – no practical use for his numbers, even if we did get them." *Id.* at 172:6-20.

173.    As a liquidity provider for FXCM, Effex traded opposite FXCM's retail customers, and had the potential to benefit from customer losses. Ex. 95 (Niv CFTC Tr. 199:10-20, 204:13-9). As Dittami explained, "Effex holds positions for a living." Ex. 92 (Dittami Tr. 76:12-77:2).

A:  Undisputed.

174.    With the knowledge and/or approval of Ahdout and Niv, FXCM helped incubate Effex by providing $2 million of trading collateral in a prime-of-prime account, which Effex required to begin trading. Ex. 105 (E Capital-000107 at E Capital-000108); Ex. 80 (Ahdout Tr. 96:23-97:15); Ex. 81 (Niv Tr. 120:15-122:4).

A:  Defendants do not dispute that FXCM provided Effex with access to FXCM's prime-of-prime account with Citigroup and funded the account with $2 million and that Niv and Ahdout were aware of this fact. "The $2,000,000 was never transferred to Effex or John Dittami. In June of 2010, the $2,000,000 was removed by FXCM from the prime of prime account. In July of 2010, Effex discontinued using the prime of prime account, as it had completed the process for establishing a prime brokerage account with Citi." Ex. 105 at E Capital-000108. Defendants dispute Plaintiffs remaining characterizations and note that FXCM provided similar

prime-of-prime access to other counterparties and relationships.  Ex. 31 (Ahdout Tr. 98:2-99:23).

175.    The $2 million of trading collateral was secured with a promissory note and personal guaranty signed by Dittami, who guaranteed the note with his stake in Effex. ECF No. 252-29 (note); ECF No. 252-30 (guaranty). However, this guaranty was essentially worthless, as Effex lacked any material assets at the time. *See* ECF No. 240-3 (Barron Rebuttal) at 20-23.

A:  Defendants do not dispute that the parties executed a Secured Promissory Note ("Note") and a Sole Recourse Guaranty and Pledge Agreement ("Guaranty") in connection with the $2 million in prime-of-prime account funding.  Defendants dispute Plaintiffs' assertion that "this guaranty was essentially worthless, as Effex lacked any material assets at the time" as it is an improper legal conclusion, based solely on expert opinions from an expert Defendants have challenged, and is contravened by evidence.  Plaintiffs have offered no evidence to substantiate the level of assets Effex or Dittami had at any time during the Class Period or before. By contrast, Dittami provided sworn testimony that he capitalized Effex with his personal funds and that he used his own resources to pay FXCM for Effex's right to obtain ownership of the trading system and algorithms.  Ex. 220 (Dittami CFTC Tr. 207:17-208:7); Ex. 209 (Dittami Tr. 82:16-84:9).

176.    FXCM provided the $2 million line of credit on terms that Dittami would not have been able to obtain in an arms' length transaction, charging no interest and requiring no material collateral. Ex. 95 (Niv CFTC Tr. 177:12-178:8); ECF No. 252-37 (option agreement) ("FXCM has loaned to Effex the sum of $2,000,000 pursuant to that Secured Promissory Note, dated the date hereof (the 'Note'), on terms more favorable than Dittami would have obtained in

an arm's-length transaction.").

> A:  Defendants do not dispute that FXCM provided Effex with access to its prime-of-prime account with Citigroup and funded the account with $2 million, nor do Defendants dispute that the quoted language appears in  Exhibit 37.  Defendants dispute the enforceability, and thus utility, of Exhibit 37.  The remainder of Plaintiffs' assertions in this paragraph are rank speculation, unsupported by the exhibits Plaintiffs have cited and no response is required.

177.      Effex also repaid FXCM for the portion of EES's expenses that FXCM had funded. Ex. 105 (E Capital-000107 at E Capital-000107).

> A:  Defendants do not dispute that "After the employee/employer relationship was terminated, Effex repaid FXCM for software licenses, hardware costs, and external consulting costs which FXCM incurred during the employee/employer phase."  Ex. 105 (E Capital-000107 at E Capital-000107).

**The Financial Relationship Between FXCM and Effex**

178.      On September 4, 2009, Dittami and FXCM entered into an employment contract providing that Dittami would be compensated primarily by a base salary of $250,000 and a bonus of 30% of the trading profits from EES. ECF No. 252-19 (Dittami employment contract).

> A:  Undisputed.

179.      Dittami's 30% profit share was expected to be significantly higher, indeed "multiples" of the base salary, in the order of millions of dollars. Ex. 92 (Dittami Tr. 37:9-15); Ex. 81 (Niv Tr. 77:5-10).

> A:  This is not a material fact that is relevant to the Court's disposition of Defendants' Motion for Summary Judgment.  Defendants do not dispute that

Dittami testified that he expected his portion of the profits would be multiples of his base salary, but he also testified that he did not have any discussions with anyone at FXCM about the profit the venture was expected to generate.  Ex. 92 (Dittami Tr. 37:9-20).

180.     Dittami's employment contract also provided that FXCM would commit to spending up to $3 million in expenses to help develop and support EES. ECF No. 252-19 (Dittami employment contract). FXCM expended a portion of the $3 million to help develop and support EES. Ex. 105 (E Capital-000107 at E Capital-000107).

A:  Undisputed.

181.     When Dittami left FXCM, the parties intended to maintain the 70%-30% split of trading profits from Dittami's employment contract. Ex. 106 (GLBR_00189079); Ex. 81 (Niv Tr. 138:2-24) ("the original concept was we were going to have 70/30 profit share"); Ex. 92 (Dittami Tr. 99:9-16).

A:  Defendants dispute that any negotiations leading to the Services Agreement are material facts that are relevant to the Court's disposition of Defendants' Motion for Summary Judgment, as the Services Agreement provides that "[t]he Parties agree that no oral negotiations or other writings are intended to form part of this Agreement."  Ex. 41 (Effex 000049 at Effex 000054).  Defendants do not dispute that Niv and Dittami testified that they had originally considered a 70%-30% profit split, yet they also both testified that this profit split they had initially considered is not part of their ultimate agreement. *See* Ex. 6 (Niv Tr. 76:20-21; 111:3-18; 133:3-10); Ex. 209 (Dittami Tr. 35:10-14; 346:21-25).  Most importantly, the executed Services Agreement does not provide for any 70%-30% profit split.  *See* Ex. 41;

*see also* Ex. 18 (Response to Request for Admission Nos. 81, 86); Defendants' Rule 56.1 Statement ¶¶ 61-62.

182.    As Dittami testified, he understood that his post-employment relationship with FXCM would mirror the economic terms of his employment agreement, including the 70-30 split of trading profits. Ex. 96 (Dittami CFTC Tr. 132:6-20) ("Q: That would mean that in mirroring the employment agreement there would be a 70/30 splint [sic] under the agreement? A: It would be roughly approximate, yes.").

> A: Defendants dispute that any negotiations leading to the Services Agreement are material facts that are relevant to the Court's disposition of Defendants' Motion for Summary Judgment, as the Services Agreement provides that "[t]he Parties agree that no oral negotiations or other writings are intended to form part of this Agreement." Ex. 41 (Effex 000049 at Effex 000054). Defendants do not dispute that the quoted language appears in Ex. 96, but at his deposition, when asked whether the 70-30 split would carry over into the Services Agreement, Dittami testified: "Well, the 70-30 split would not carry over into a services agreement. Ken Grossman said we would not have 70/30, this has to be negotiated has to be per million." Ex. 96 (Dittami CFTC Tr. 132:21-133:5).

183.    In Dittami's resignation letter on April 14, 2010, he and Ahdout acknowledged that the parties intended to work out an agreement mirroring the main economic terms from Dittami's employment agreement. Ex. 107 (E Capital-000049). As Dittami testified, the economic terms referred to in the resignation letter included the 70-30 split of trading profits. Ex. 96 (Dittami CFTC Tr. 136:11-137:7, 138:6-15). Niv was also aware of the resignation letter and the parties' intent. Ex. 81 (Niv Tr. 108:12-108:24).

A:  Defendants dispute that any negotiations leading to the Services Agreement are material facts that are relevant to the Court's disposition of Defendants' Motion for Summary Judgment, as the Services Agreement provides that "[t]he Parties agree that no oral negotiations or other writings are intended to form part of this Agreement."  Ex. 41 (Effex 000049 at Effex 000054).  Defendants otherwise do not dispute this fact but note that the parties ultimately did not agree to a 70%-30% profit split.  *See* Ex. 41; *see, e.g.*, Ex. 96 (Dittami CFTC Tr. 132:21-133:5).

184.    On the same day, as part of the efforts to replace the 70-30 profit split, Dittami and Ahdout executed an option agreement by which FXCM had the option to purchase a 70% share in Effex for the nominal price of $1. ECF No. 252-37 (option agreement). Niv was also aware of the option agreement. Ex. 81 (Niv Tr. 118:11-25).

A:  Defendants do not dispute that Ex. 37 is a proposed option agreement that provided FXCM the option to purchase a 70% share in Effex for $1. However, testimony confirms that neither of the signatories to this document believed it to be in effect.  Dittami testified that he "did not believe that [the Option Agreement] was consummated" and that "[t]his idea was thrown out early."  Ex. 4 (Dittami Tr. 98:22-99:3; 101:4-9).  Moreover, Dittami testified that the Option Agreement was not an effort to "maintain the 70-30 split of trading profits" from Dittami's prior employment at FXCM.  Ex. 4 (Dittami Tr. 99:4-8).  Ahdout testified that "this Option Agreement was never a reality, it never even came to be in existence."  Ex. 31 (Ahdout Tr. 134:21-135:11).  Niv testified that FXCM's legal team determined that it was not practicable for FXCM to have an option to buy out Effex and that the executed option agreement was "null and voided."  Ex. 6 (Niv Tr. 119:2-22);

*see also* Ex. 21 (Niv CFTC Tr. 155:5-11, 159:6-19, 162:16-24).  Likewise, Ahdout did not have authority to enter into this Option Agreement without FXCM Board approval and FXCM management determined that an Option Agreement was not beneficial.  Ex. 21 (Niv CFTC Tr. 159:20-160:8; 161:3-162:7).  In noting why the Option Agreement was not terminated in writing until 2015, Alexander Dick, FXCM's Rule 30(b)(6) corporate representative stated that "the company didn't consider memorializing in writing necessary because the option didn't exist, the consideration never occurred."  Ex. 36 (Dick Tr. 304:9-305:2).

185.     Subsequent correspondence by the parties confirmed that they sought to maintain the 70-30 profit split. Ex. 108 (GLBR_00007733) (Dittami referring to "payment on profits to FXCM," "FXCM's "70% share," "Effex's "profit share percentage," and a "revenue split" where Effex would "pay out net 70% to FXCM"); Ex. 96 (Dittami CFTC Tr. 145:8-24) (Dittami confirming that the reference to Effex's "profit share percentage" refers to the approximately 30% share of trading profits that Effex received pursuant to the services agreement).

A:  Defendants dispute that any negotiations leading to the Services Agreement are material facts that are relevant to the Court's disposition of Defendants' Motion for Summary Judgment, as the Services Agreement provides that "[t]he Parties agree that no oral negotiations or other writings are intended to form part of this Agreement."  Ex. 41 (Effex 000049 at Effex 000054).  Defendants do not dispute that the quoted language appears Ex. 108 and Ex. 96, but dispute that this evidences correspondence or testimony from Defendants that supports the assertion that it "confirm[s] that they sought to maintain the 70-30 profit split."  The executed Services Agreement does not provide for any 70%-30% profit split.  *See* Ex. 41;

*see also* Ex. 18 (Response to Request for Admission Nos. 81, 86); Defendants' Rule 56.1 Statement ¶¶ 61-62.

186.     Additional correspondence between the parties shows that they viewed the option agreement as being in effect. ECF No. 252-33 (Dittami questioning the interplay between a contemplated loan from FXCM and the 70% term in the option agreement); Ex. 109 (GLBR_00218789 at GLBR_00218789) (Dittami referring to option agreement in present tense in July 2010); Ex. 110 (GLBR_00041735, ConvID: 11/15/2010 1:45, lines 18383-18439) (Dittami noting in November 2010 that with potential non-FXCM business, unlike FXCM business, "I'm not constrained by existing agreement and not giving 70% away").

A:  Defendants dispute this statement.  Ex. 33 is an email from Dittami that does not demonstrate a belief that the Option Agreement was actually in effect at the time this email was sent.  Likewise, Ex. 109 does not refer to the Option Agreement as if it is in effect, it only states "The option covers all ownership questions of software and rights etc upon exercise, and really the payment is now really a Per MM flow based versus a software\infrastructure use."  Further, Ex. 109 evidences active negotiation of the terms of a License Agreement that was never executed and was a predicate for the proposed Option Agreement, which states:  "WHEREAS, FXCM has agreed to license to Effex certain intellectual property pursuant to that certain License Agreement, dated as of the date hereof . . . ."  Ex. 37.  Finally, Ex. 110 does not even speak of the Option Agreement and when Dittami was asked what he meant by "giving 70% away" he testified that he was not referencing any agreement in particular and the 70% was likely an oblique reference to the approximated order flow payments to FXCM.  Ex. 209 (Dittami Tr. 171:4-172:4).

187.     In November 2011, FXCM's in-house counsel discussed with Dittami a document terminating prior agreements between FXCM and Effex except for the services agreement. Ex. 111 (GLBR_00152760 at GLBR_00152760). Specifically, they discussed terminating the option agreement. Ex. 111 (GLBR_00152760 at GLBR_00152762).

> A:  Undisputed.  With respect to the mention of the proposed Option Agreement in the draft termination document, Dittami testified that he did not recall ever signing the proposed Option Agreement and that he "recall[ed] us terminating the agreements because this agreement never really existed to get cleanliness."  Ex. 209 (Dittami Tr. 190:5-13; 191:5-12).  Dick clarified in his testimony that he did not recall the parties executing this draft termination document, but that "it was orally terminated and then subsequently there was a written confirmation that terminated the agreements."  Ex. 217 (Dick Tr. 282:25-283:23).

188.     Dittami expressed unease with terminating the parties' agreement to follow the economic terms of the employment agreement and the parties opted not to execute the contemplated termination agreement. Ex. 112 (GLBR_00152765); Ex. 113 (GLBR_00152767 at GLBR_00152767).

> A:  Undisputed.

189.     Dittami testified that "FXCM had a stake in the trades effected by Effex Capital" in the form of Effex's order flow payments, and that when the order flow payments stopped, FXCM "didn't have a stake then." Ex. 96 (Dittami CFTC Tr. 432:15-434:20).

> A:  Defendants' dispute Plaintiffs' characterization of Dittami's testimony, as the quoted text is the text of the CFTC's questioner and Dittami's extended testimony does not refer to FXCM's "stake" as order flow payments.  Rather, Dittami suggests

that FXCM's "stake" in the trade is customer's execution experience.   Ex. 96 (Dittami CFTC Tr. 432:15-434:20).

190.     Effex provided regular updates to Ahdout, Niv, and others at FXCM. These updates typically included information concerning Effex's trading profits in dollars per million units of volume, on a weekly or monthly basis. These updates continued in various frequency through at least 2012. *See, e.g.,* Ex. 114 (GLBR_00189082); Ex. 115 (GLBR_00003915); Ex. 116 (GLBR_00003957); Ex. 117 (GLBR_00036290); Ex. 118 (GLBR_00008068); Ex. 119 (GLBR_00004262); Ex. 120 (GLBR_00004527). No other liquidity providers provided similar updates to FXCM. Ex. 95 (Niv CFTC Tr. 346:19-23).

> A:   Defendants do not dispute that these seven emails are updates that Effex provided to FXCM regarding Effex's business operations.   Defendants dispute Plaintiffs' characterization of Effex's updates as "regular," and note that in Ex. 120 Dittami wrote that "[w]e have gotten somewhat disconnected from day to day things with FXCM, both in terms of you being in loop on what we are working on and doing, and on us knowing what changes are coming and being able to provide more value to your business."   Dittami testified that these updates were primarily sent in 2010 and diminished over time until they eventually stopped altogether.   Ex. 209 (Dittami Tr. 308:10-16).

191.     FXCM also tracked Effex's expenses and income for at least a certain time in mid-2010. Ex. 110 (GLBR_00041735, ConvID: 7/22/2010 17:12, at lines 602-630) ("We'll stille [sic] be tracking your expenses and income for now so that we can see if the $21 fee should be adjusted"). In this way FXCM, including Ahdout and Niv, were able to keep tabs on Effex's profitability and use that information to determine how much of Effex's profits it would pay to

FXCM. Ex. 96 (Dittami CFTC Tr. 153:5-9) ("Q: Do you know whether they would be wanting to track your payments and expenses so that the rate you were paying could be adjusted to a 70/30 split? A: Yeah, I think so.").

> A: Defendants dispute this statement. Dittami testified that FXCM never sought to verify any of Effex's P&L figures that Dittami provided, and that he never provided FXCM with the data to verify Effex's P&L. Ex. 209 (Dittami Tr. 308:23-309:14). In Dittami's testimony to the CFTC, when questioned about Exhibit 110, Dittami testified that FXCM was not tracking Effex's income and he "actually never gave [FXCM] any income statements," and that he "gave [FXCM] revenue numbers sometimes through weekly updates, but I never gave our expenses and I never gave them net income," and that FXCM had "certainly never seen [Effex's] income statements and balance sheets." Ex. 220 (Dittami CFTC Tr. 152:11-153:4). Defendants do not dispute that the quoted testimony appears in Ex. 96, yet this is immediately preceded my Dittami's testimony that FXCM was never given Effex's income information, making Plaintiffs' assertion that "Ahdout and Niv, were able to keep tabs on Effex's profitability and use that information to determine how much of Effex's profits it would pay to FXCM" patently false.

### FXCM and Effex Attempted to Disguise Their Profit Sharing as Payments for Order Flow

192.   In June 2010, Dittami and certain principals of FXCM, including Ahdout and Niv, began to discuss structuring the FXCM-Effex profit-sharing relationship as payments for order flow. Ex. 114 (GLBR_00189082). Under this arrangement, Effex paid FXCM a certain rate in dollars per million units of FXCM trading volume executed by Effex. *See id.*

> A: Defendants dispute Plaintiffs' characterization of Ex. 114, which does not

indicate that this is the beginning of discussions of the payment for order flow agreement. Defendants specifically dispute the assertion that the parties ever had a "profit-sharing relationship" and the terms of the parties' economic relationship is best evidenced by the Services Agreement and Amended Services Agreement. *See* Exs. 34 and 41.

193.     The parties were still discussing the idea of potentially structuring the relationship as payments for order flow, as well as other alternative structures, as of mid-July 2010, months after the purported date of the services agreements. Ex. 109 (GLBR_00218789 at GLBR_00218789).

A: Defendants dispute Plaintiffs' characterization of Ex. 109, which evidences active negotiation of the terms of potential agreements. When asked about Ex. 109 at his deposition, Dittami testified that at the time of this email the structure of the agreement was "definitively per million payments," a requirement made clear by Ken Grossman of FXCM. Ex. 209 (Dittami Tr. 135:16-21). When asked again whether any "alternative structures" had been discussed among the parties, Dittami clarified that there were also negotiations for a separate agreement for the future purchase of Effex. *Id.* at 136:11-18.

194.     The parties intended that the rate per million would adjust up or down over time, varying as Effex's profitability, or "P&L," waxed or waned. Ex. 95 (Niv CFTC Tr. 131:7-22); Ex. 121 (GLBR_00036220 at GLBR_00036222) (Dittami: "We are going to start with $21 PER MM, although this may need to adjust up or down over time"); Ex. 80 (Ahdout Tr. 200:2-7) (the rate of payment "was a very fluid situation and it was negotiated many times"); Ex. 95 (Niv CFTC Tr. 150:15-25, 153:9-13) (Effex's payments for order flow would be adjusted "if Effex's P&L per

million of order flow changed").

A:  Defendants dispute that it was the parties' intent to adjust the per-million rate to vary with Effex's profitability.  Pursuant to the Services Agreement, Effex paid FXCM $21 per million of trading volume for 16 months, from May 2010 to August 2011.  Pursuant to the Amended Services Agreement, Effex then paid FXCM $16 per million of trading volume for 36 months, from September 2011 to July 2014. Effex and FXCM mutually agreed to separate, lower order flow payment rates for only two currency pairs:  (1) Japanese yen/U.S. dollar and (2) euro/U.S. dollar.  For 18 months, from February 2013 to July 2014, Effex paid FXCM $ 3 per million of Japanese yen/U.S. dollar trading volume.  For 14 months, from June 2013 to July 2014, Effex paid FXCM $ 6 per million of euro/U.S. dollar trading volume.  *See* Ex. 224 (Chart of Payments).  This amounts to three, agreed-upon rate changes in a four-year period.  *Id.; see also* Ex. 221 (Meyer Tr. 40:12-42:3).   Multiple deponents testified that Dittami often sought to negotiate Effex's rates, but that those negotiations are evidence of a customary liquidity provider relationship.  Ex. 209 (Dittami Tr. 141:13-15, 181:9-20, 195:20-24, 208:7-22); Ex. 215 (Ahdout Tr. 107:5-12, 200:6-7); Ex. 210 (Wilson-Taylor Tr. 87:8-88:25).   Further, as Niv testified, "as time went on, competition got fiercer, exactly what we wanted to happen happened. . . . Competition got much more intense; therefore dollars per million for market makers declined, including for [Effex]. . . .  It is that issue I think is, we told [Dittami] because of this, variability, we would be flexible, but we need a set contract rate."  Ex. 95 (Niv CFTC Tr. 131:7-22).  Moreover, in Ex. 121, Dittami wrote:  "We are going to start with $21 PER MM, although this may need

to adjust up or down over time, *we intend to try to change it as little as possible*."

Ex. 121 (emphasis on the portion of the sentence Plaintiffs chose to exclude).

195.    When FXCM billed Effex each month, the payments were described as "Rebates"and the amounts billed were described as "P&L," shorthand for profits (and loss). *E.g.,* Ex. 122 (GLBR_00184107 at GLBR_00184108); ECF No. 252-42 (November 2010 invoice); Ex. 123 (GLBR_00185174 at GLBR_00185175).

> A:  Defendants dispute Plaintiffs' characterization of FXCM's invoices to Effex. Witnesses testified that the "P&L" reflected on the invoices refers to FXCM's P&L. *See, e.g.*, Ex. 216 (Rosenfeld Tr. 133:25-134:15).  Likewise, "rebate" as used on the invoices meant "a dollar per million."  Ex. 222 (Muchinsky Tr. 178:3-8). Moreover, in response to the question of whether "P&L" on the invoices was "related in any direct way to Effex's P&L on that order flow," Rosenfeld testified: "Not at all.  Not at all.  It was completely dependent on volume.  They could have lost millions, they could have made millions, and it was based on the volume that – of business we gave them regardless of whether they made or lost money on it." Ex. 216 (Rosenfeld Tr. 133:14-24).

196.    Dittami specifically noted in discussions with Ahdout that the 30% share  of profits from his employment contract was replaced by the variable per million  payments for order flow. Ex. 124 (GLBR_00152107 at GLBR_00152110-14) (Dittami sending Ahdout draft changes to employment agreement with Management Bonus (30% profit share) section deleted and Dittami comments: "replaced with Per MM payment for flow, noted that this may change over time").

> A:  Defendants dispute Plaintiffs' characterization of Ex. 124, in which Dittami deleted several sections of the prior employment agreement and included the quoted

language in a comment attached to all those sections.  Defendants dispute that any negotiations leading to the Services Agreement are material facts that are relevant to the Court's disposition of Defendants' Motion for Summary Judgment, as the Services Agreement provides that "[t]he Parties agree that no oral negotiations or other writings are intended to form part of this Agreement."  Ex. 41 (Effex 000049 at Effex 000054).

197.     Niv confirmed that the parties "initial thought" was for the order flow payments to "mimic" Dittami's employment agreement with respect to the 70-30 split of trading profits. Ex. 81 (Niv Tr. 108:25-109:24).

A: Defendants do not dispute that the quoted text appears in Ex. 81, but Defendants dispute Plaintiffs' characterization of Ex. 81.  Niv testified that:  "So, you know, Mr. Dittami was going to open his own firm and is going to be, you know, taking on FXCM plus other clients.  And, eventually, he had over 30 clients, I believe. Obviously, one of the big ones was FXCM.  But the payment for flow that we would get, right, that's -- kind of the initial thought was that it would mimic this employment agreement. *It's not how we ended it. It's not what we decided at the end, but that was the initial thing.*"  Ex. 81 (Niv Tr. 108:25-109:14) (emphasis added).  And consistent with Niv's testimony, the executed Services Agreement does not provide for any 70%-30% profit split.  *See* Ex. 41; *see also* Ex. 18 (Response to Request for Admission Nos. 81, 86); Defendants' Rule 56.1 Statement ¶¶ 61-62.

198.     FXCM filed its initial registration statement for its initial public offering on in early September 2010. Ex. 81 (Niv Tr. 42:8-13); Ex. 125 (excerpts from Form S-1 registration

statement filed with the SEC).

> A:  Defendants do not dispute that FXCM filed its initial registration statement for its initial public offering on September 3, 2010.  *See* Ex. 208 (FXCM Registration Statement).  Defendants dispute that Ex. 81 and Ex. 125 are the best evidence of the date of FXCM's initial registration statement.

199.    In August 2010, as FXCM was about to go public, it started to paper over the deal with Effex. Just days before filing the S-1, FXCM and Effex executed services agreements that were back-dated to March 1, 2010 (with FXCM US) and May 1, 2010 (with FXCM Holdings). Ex. 126 (GLBR_00194774) (Lande: "This is what we are planning on executing with Datami [sic]. My understanding is that we were not operating under a signed agreement up to now."); Ex. 127 (GLBR_00194756) (FXCM in-house counsel to Dittami, attaching undated services agreement identical to executed March 1, 2010 services agreement: "Here is the updated version of the services agreement. The PDF version is for you to sign."); ECF No. 252-34 (March 1 Services Agreement); ECF No. 252-41 (May 1 Services Agreement).

> A:  Defendants dispute Plaintiffs' unsupported characterization of FXCM's attempt to "paper over the deal with Effex" prior to its initial public offering.  Defendants do not dispute that Ex. 126 is an email chain that culminates in an August 28, 2010 email from Lande and that the quoted text appears in the email.  Defendants also do not dispute that the quoted text appears in Ex. 127.

200.    The March 1 services agreement was backdated three weeks before Effex was even formed, and over six weeks before Dittami left FXCM. ECF No. 252-34 (March 1 Services Agreement); Ex. 97 (E Capital-000096 at E Capital-000097); Ex. 107 (E Capital-000049). The March 1 agreement was needed to paper over payments that Effex had made to FXCM for March

and April 2010. *See* Ex. 126 (GLBR_00194774) (Lande, attaching execution copy of services agreement, "this is $21/million. How does that dovetail with what we were recording in April, May, June, July and now?").

> A:  Defendants dispute Plaintiffs' unsupported characterizations of the motivations for and terms of the March 1, 2010 Services Agreement.  Defendants do not dispute that Dittami formed Effex Capital on March 23, 2010 or that Dittami resigned from FXCM on April 14, 2010.  Defendants likewise do not dispute that the quoted language appears in Ex. 126.

201.     The services agreements, each signed by Ahdout, memorialized the $21 per million rate for order flow payments that Effex was already paying to FXCM. ECF No. 252-34 (March 1 Services Agreement); ECF No. 252-41 (May 1 Services Agreement); Ex. 126 (GLBR_00194774). Niv was also aware of the agreements at the time. Ex. 81 (Niv Tr. 112:15-4, 128:12-129:4).

> A:  Undisputed.

202.     The second agreement provided for payments to be made directly to FXCM Holdings, which was not a regulated entity. ECF No. 252-41 (May 1 Services Agreement); Ex. 81 (Niv Tr. 29:25-30:3).

> A:  Defendants do not dispute that the counterparties to the May 1, 2010 Services Agreement are FXCM Holdings and Effex.  Defendants dispute that FXCM Holdings was not a regulated entity.  FXCM Holdings is "regulated" in a number of ways.  FXCM Holdings, however, is not and was not registered with the NFA and, thus, was not subject to direct NFA and CFTC regulation.  Irrespective of the fact that FXCM Holdings was not registered with the NFA, the NFA received

financial information from FXCM that illustrated receivables from Effex.  *See, e.g.*,
Ex. 230 (GLBR_00054034 at GLBR_00054037) (2010 email between the NFA
and FXCM discussing an internal balance sheet reconciliation evidencing
receivables due from Effex).

203.    FXCM Holdings typically did not have any other external sources of direct
revenue. Ex. 128 (Rosenfeld Tr. 130:11-21). Its only normal revenues, other than the purported
order flow payments from Effex, came from upstream payments from FXCM's regulated
operating subsidiaries. Ex. 81 (Niv Tr. 134:21-13); Ex. 129 (EY-GBI-WP-00003862 at EY-GBI-
WP-00003868) ("[FXCM] Holdings does not have any other source of revenues other than
distributions from its subsidiaries").

A:  Defendants do not dispute that FXCM Holdings' primary source of revenue
during the Class Period was distributions from its subsidiaries.  Defendants dispute
Plaintiffs' assertion that "FXCM Holdings typically did not have any other sources
of direct revenue" as the use of "typically" and "any other" without reference to
specific revenue sources, make this statement so vague that response is impossible.

204.    In the lead up to going public, FXCM's CFO instructed the company's
accounting department not to mention the option agreement to E&Y, FXCM's auditors. Ex. 126
(GLBR_00194774) (Lande: "No further mention of any option to E&Y").

A:  Defendants dispute Plaintiffs' characterization of Ex. 126 which is contravened
by a common sense reading of Ex. 126 and Lande's testimony regarding this email.
In Ex. 126 Lande wrote:  "*There will be no option.*  No further mention of any
option to E&Y."  Ex. 126 (emphasis added on the portion of the email Plaintiffs
omitted).   When asked about this email at his deposition, Lande testified that,

around the time of this email, he "had been discussing how we were going to have [an Option] with [EY]," but when it was determined there would be no Option Agreement the discussions ceased.  Ex. 212 (Lande Tr. 221:3-222:8); *see also id.* 99:23-100:3 ("I do remember having some discussions with them around the option, but then it was concluded that this option wasn't in force and so that was – there was nothing more to be done on that."); *see also id.* 123:3-8 ("I do recall talking to them about how options would be accounted for.  But then as I said, you know, this all became moot because there was no option. They didn't pursue an option and EFFEX was -- went its own way as a completely separate company with no ownership of us in it.").

### Effex was the Only Retail Liquidity Provider Who Paid FXCM for Order Flow Between 2010-2014

205.     During the time that Effex paid FXCM for retail order flow, it was the only liquidity provider to do so. BNP Paribas briefly had a different agreement with FXCM to pay for order flow during the same timeframe, but only with respect to certain institutional liquidity streams (not retail trading). Ex. 81 (Niv Tr. 188:22-189:13). Niv described BNP's payments as "tiny" compared to Effex's payments, and they were considered a "joke" at FXCM and "[n]ot considered a real business." Ex. 130 (GLBR_00022930 at GLBR_00022930); Ex. 81 (Niv Tr. 189:17-25); Ex. 95 (Niv CFTC Tr. 142:14-145:6).

A:  Defendants dispute that during the time that Effex paid FXCM for retail order flow, it was the only provider to do so.  It is undisputed that Effex paid FXCM for order flow from 2010 to 2014.  Evidence produced in discovery establishes that BNP Paribas paid FXCM for order flow during the same time period.  *See, e.g.*, Ex. 130 (discussing BNP order flow payments in 2010); Ex. 227 (GLBR_00152459)

(May 2012 email between Ahdout and Sakhai discussing BNP's payment for order

flow rate of $5 per million and $17 per million); Ex. 229 (GLBR_00133264)

(FXCM Detailed IS tab, which provides Trading Revenue-Order Flow, Other

Income BNP P3 and BNP P3J totaling a year to date of $86,438.00); Ex. 228

(GLBR_00185254) (Forex Capital Markets balance sheet indicating "TRADING

REVENUE – ORDER FLOW: BNP P3" on multiple tabs and booking $336,543.11

in total revenue from this order flow as of April 2013).  Defendants do not dispute

that the testimony quoted above appears in Niv's testimony provided in this Action

as well as to the CFTC.

206.       In response to the NFA's inquiry to "provide record of payment from all liquidity

providers for the period 10/13/08-1/1/13," FXCM responded by attaching a spreadsheet showing

over $55 million in payments from Effex, and none from any other entity. Ex. 131

(GLBR_00110416 at GLBR_00110416) (NFA: "As it seems only one entity paid FXCM for order

flow during the calendar year, please provide record of payment from all  liquidity providers for

the period 10/13/08-1/1/13" FXCM: "Please see the attached file"); *Id.* (GLBR_00110416 at

GLBR_00110420) (spreadsheet titled "Receipts from Effex for order Flow, Inception through

January 31, 2013").

A:  Undisputed.

207.       In November 2013, an FXCM accountant noted that "As far as I know the only

third party payer for order flow, as of October '13, was EEFEX [sic]." ECF No. 252-57.

A:   Defendants do not dispute that the quoted language appears in Ex. 57.

Defendants note that the complete email from the FXCM accountant states:  "As

far as I know the only third party payer for order flow, as of October 13, was

EEFEX [sic].  *There was BNP P3 in FXCM US in the beginning of the year, but that appears to have ceased*."  Ex. 57 (emphasis added).

208.   When FXCM stopped taking payments for order flow from Effex in August 2014, an FXCM employee noted that "Effex was the only LP that we were receiving PFOF [payments for order flow]." ECF No. 252-54.

A:  Undisputed.

209.   In 2010, FXCM had over 15 liquidity providers that it worked with for retail trading. Ex. 81 (Niv Tr. 99:12-13).

A:  Undisputed.

210.   FXCM tried to get its other market makers, who were providing worse execution than Effex, to pay for order flow but those discussions failed as the other market makers were not willing to pay FXCM for order flow. *See* Ex. 81 (Niv Tr. 159:8-162:6).

A:  Defendants dispute Plaintiffs' characterization of Ex. 81.  Niv testified that FXCM "tried and failed with giving [other market makers] preferential access and that – in exchange for improving the customer experience.  And so because they couldn't do it, you know, there was no reason to" enter into a payment for order flow relationship. Ex. 81 (Niv Tr. 159:8-18).  Niv also testified that only Effex and BNP paid for order flow "because the other discussions failed . . . [a]nd these are large institutions, they're not going to enter this agreement without getting preferential treatment and doing a substantial amount of more business because this would then not be sufficiently big enough for them to get into this agreement." *Id.* at 162:2-12.  Niv did not testify that other market makers were not willing to pay FXCM for order flow.

**The Rate of Effex's Payments Varied With Effex's Profitability and Did Not Always Matchthe Services Agreements**

211.     The parties decided that Effex would pay $21 per million to start with because they projected that Effex would earn roughly $30 per million in trading profits. Ex. 96 (Dittami CFTC Tr. 133:6-133:19, 142:5-20) ("Q: But the per million was essentially a 70/30 split? A: Initially it was set to my estimation, yes, correct, 70/30 if my estimation as to what the income would be at that point in time.") ("Q: How was the fee of 21 million arrived at? A: It was to be a rough approximation of the 70/30 initial economic terms, the employment agreement.").

> A: Defendants do not dispute that the quoted language appears in Ex. 96. Defendants dispute that the cited testimony establishes that the projections were Defendants' projections.

212.     Even if the percentages did not remain at exactly 70-30, FXCM intended that the rate per million would reflect that FXCM would get a bigger share of the profits than Effex. Ex. 95 (Niv CFTC Tr. 132:2-9).

> A: Defendants dispute that any negotiations leading to the Services Agreement are material facts that are relevant to the Court's disposition of Defendants' Motion for Summary Judgment, as the Services Agreement provides that "[t]he Parties agree that no oral negotiations or other writings are intended to form part of this Agreement." Ex. 41 (Effex 000049 at Effex 000054). As part of the negotiations of the Services Agreement, the parties discussed, but FXCM ultimately rejected, a 70/30 profit-sharing agreement. Ex. 24 (Dittami CFTC Tr. 132:21-133:5; 377:2-7); Ex. 35 (William Ahdout May 19, 2016 Deposition Transcript ("Ahdout CFTC Tr.") 114:24-115:4); *see also* Ex. 18 (Plaintiffs' Response to RFAs at 27, 29); ECF No. 240-3 (Barron Rebuttal at ¶ 33). Moreover, "bigger share of the profits" is so vague

and ambiguous, no response is necessary.  To the extent that Plaintiffs seek to imply that FXCM would receive a larger share of Effex's profits than Effex, defendants dispute this assertion.  Effex's trading profits, including those earned on trades executed for FXCM's customers and those earned on trades executed for customers from Effex's other clients, were its own.  Ex. 23 at ¶ 10.  Most importantly, regardless of intent, Effex's accountant, Sheldon Abrams, stated in a 2015 affidavit that "[t]rading expenses incurred by Effex Capital with FXCM expressed as a percentage of Effex Capital's revenues" in the years 2011 to 2014 never exceeded 60% and reached as low as 21% in 2014—establishing that a 70-30 split *never* occurred. Ex. 233 (E Capital-000117 - E Capital-000118); *see also* Ex. 23 ¶ 11 ("For the period from 2010 to 2017, the Rebate Payments were approximately thirty percent of Effex's gross revenue and not seventy percent of profit from time to time as alleged by NFA.").

213.     As the parties were executing the back-dated service agreements, Dittami expressed to FXCM's in-house counsel that the parties expected to modify the agreements with the intent of maintaining the 70-30 split of trading profits. Ex. 132 (GLBR_00189088 at GLBR_00189089) (Dittami: "modification to this [services agreement] will occur and intent is to maintain same economic terms as initial employment agreement"); Ex. 133 (GLBR_00218184 at GLBR_00218185) (Dittami: "what we want to maintain is that we are still looking to finalize agreements that reflect the same economic terms similar to initial employment agreement, and doing so on back of this new agreement [referring to attached draft services agreement] will make me feel a lot better.").

A:  Defendants dispute that any negotiations leading to the Services Agreement are

material facts that are relevant to the Court's disposition of Defendants' Motion for Summary Judgment, as the Services Agreement provides that "[t]he Parties agree that no oral negotiations or other writings are intended to form part of this Agreement."  Ex. 41 (Effex 000049 at Effex 000054).  As part of the negotiations of the Services Agreement, the parties discussed, but FXCM ultimately rejected, a 70/30 profit-sharing agreement. Ex. 24 (Dittami CFTC Tr. 132:21-133:5; 377:2-7); Ex. 35 (William Ahdout May 19, 2016 Deposition Transcript ("Ahdout CFTC Tr.") 114:24-115:4); *see also* Ex. 18 (Plaintiffs' Response to RFAs at 27, 29); ECF No. 240-3 (Barron Rebuttal at ¶ 33).  Defendants do not dispute that the quoted language appears in Exs. 132 and 133.

214.     Dittami consistently maintained in correspondence with FXCM,  including Ahdout, that the parties' understanding was that Effex's payments would not exceed 70%. Ex. 134 (GLBR_00054454 at GLBR_00054454) (Dittami references side letter that "says per mm won't exceed 70 percent"); *See also* ECF No. 252-33; Ex. 108 (GLBR_00007733).

A:  Defendants dispute Plaintiffs' characterization of Exs. 108, 134, and 33 as "consistently maintained" correspondence.  Ex. 33 is an April 2010 email, Ex. 108 is a May 2010 email, and Ex. 134 is an October 2010 email—all within 6 months of each other, in the first year of the payment for order flow relationship, and prior to the Class Period.  Defendants also dispute that the parties had an understanding that Effex's payments would not exceed 70%.  As part of the negotiations of the Services Agreement, the parties discussed, but FXCM ultimately rejected, a 70/30 profit-sharing agreement. Ex. 24 (Dittami CFTC Tr. 132:21-133:5; 377:2-7); Ex. 35 (Ahdout CFTC Tr. 114:24-115:4); *see also* Ex. 18 (Plaintiffs' Response to RFAs

at 27, 29); ECF No. 240-3 (Barron Rebuttal at ¶ 33).

215.    Effex and FXCM had continuous discussions about what rate per million Effex would pay for a given month. *E.g.,* Ex. 121 (GLBR_00036220 at GLBR_00036222) (Dittami in June 2010: "We are going to start with $21 PER MM, although this may need to adjust up or down over time"); Ex. 135 (GLBR_00188143) (Dittami in July 2010: "Can we retro back to beginning of our trading the PER MM charge to $23 from the $21, looking closer I think $23 is more appropriate ?"); Ex. 136 (GLBR_00188166 at GLBR_00188166) (Rosenfeld in October 2010 to Dittami: "Does 16 per mil seem like the figure we'll have to go with for Oct?"); Ex. 137 (GLBR_00184132 at GLBR_00184132) (Rosenfeld in February 2011 regarding "January Volume": "John, can we still bill @ $21?"; Dittami: "Probably not, let me check, I think it will need to drop to $18 again while we reassess"); Ex. 138 (GLBR_00184136 at GLBR_00184136) (Dittami in February 2011: "21 is fine for jan[uary 2011]"); Ex. 139 (GLBR_00118420 at GLBR_00118420) (FXCM accountant to Effex COO in April 2011: "Can we remain @ $21 per Million for March?"); Ex. 140 (GLBR_00119217 at GLBR_00119217-18) (Effex COO to FXCM accountant in August 2012: "I had told you we'd go to $17.50 [for July 2012] but we need to wait a month - we should be able to do that for August"; Effex COO responding to FXCM accountant's inquiry in September 2012: "I'd like to … not raise the per MM to $17.50 … That's our very strong preference and it's in line with what we've discussed with William and Drew"; FXCM accountant: "OK, I  understand (… keep it @ $16 per MM)"). Often these discussions occurred after the month at issue had concluded and the amount of order flow that Effex captured was known. *See id.*

A:  Local Civil Rule 56.1(b) instructs that papers opposing a motion for summary judgment shall include . . . if necessary, additional paragraphs containing a separate,

*short and concise statement* of additional material facts . . . ."  L. Civ. R. 56.1 (emphasis added).  This is patently neither a short nor concise statement, and an abuse of the Rule 56.1 requirement for additional material facts.  Defendants dispute that this is a material fact that is relevant to the Court's disposition of Defendants' Motion for Summary Judgment as discussions of the rate for payment—absent any discussion of what was actually paid—is evidence only of negotiations between counterparties to a multi-year contract.  Pursuant to the Services Agreement, Effex paid FXCM $21 per million of trading volume for 16 months, from May 2010 to August 2011.  Pursuant to the Amended Services Agreement, Effex then paid FXCM $16 per million of trading volume for 36 months, from September 2011 to July 2014.  Effex and FXCM mutually agreed to separate, lower order flow payment rates for only two currency pairs:  (1) Japanese yen/U.S. dollar and (2) euro/U.S. dollar.  For 18 months, from February 2013 to July 2014, Effex paid FXCM $ 3 per million of Japanese yen/U.S. dollar trading volume.  For 14 months, from June 2013 to July 2014, Effex paid FXCM $ 6 per million of euro/U.S. dollar trading volume.  *See* Ex. 224 (Chart of Payments).  This amounts to three, agreed-upon rate changes in a four-year period.  Multiple deponents testified that Dittami often sought to negotiate Effex's rates, but that those negotiations are evidence of a customary liquidity provider relationship.  Ex. 209 (Dittami Tr. 141:13-15, 181:9-20, 195:20-24, 208:7-22); Ex. 215 (Ahdout Tr. 107:5-12, 200:6-7); Ex. 210 (Wilson-Taylor Tr. 87:8-88:25).

216.     Ahdout was the main point of contact at FXCM in discussions with Dittami or Effex's COO about what rate per million FXCM would charge Effex. Ex. 92 (Dittami Tr. 207:12-

23, 214:19-24) ("Any negotiations I had [about setting the rate for Effex's payments to FXCM] would have been with William and, you know, Drew"). Niv was aware of any changes that resulted from those conversations. Ex. 81 (Niv Tr. 154:5-10).

> A:  Defendants do not dispute that Ahdout and Niv were the main points of contact for Effex on all matters, including the payment for order flow rate.  Defendants dispute that "what rate per million FXCM would charge Effex" was discussed with frequency or divorced materially from the Services Agreement and Amended Services Agreement.

217.     As early as July 2010, Dittami discussed with FXCM retroactively adjusting the rate per million that Effex would pay for certain months based on Effex's profitability. Ex. 135 (GLBR_00188143) (Dittami: "Can we retro back to beginning of our trading the PER MM charge to $23 from the $21, looking closer I think $23 is more appropriate?"); Ex. 110 (GLBR_00041735, ConvID: 7/22/2010 17:12, lines 602-630) (Dittami: "This month and June FXCM's share was less than 21. May and April more.").

> A:  Defendants do not dispute that the quoted language appears in Exs. 110 and 135.  Defendants dispute that this is a material fact that is relevant to the Court's disposition of Defendants' Motion for Summary Judgment as discussions of the rate for payment—absent any discussion of what was actually paid—is evidence only of negotiations between counterparties to a multi-year contract.  Multiple deponents testified that Dittami often sought to negotiate Effex's rates, but that those negotiations are evidence of a customary liquidity provider relationship.  Ex. 209 (Dittami Tr. 141:13-15, 181:9-20, 195:20-24, 208:7-22); Ex. 215 (Ahdout Tr. 107:5-12, 200:6-7); Ex. 210 (Wilson-Taylor Tr. 87:8-88:25).

218.     In August 2010, as the services agreements were signed, FXCM recorded an accounting adjustment in its books for June 2010 as a retroactive correction so that it would show payments of $21 per million from Effex, meaning that Effex had paid a different rate for some months prior. Ex. 141 (GLBR_00194784 at GLBR_00194784) (Rosenfeld: "Tf [if] you look at US in June there is small negative for Effex. This was a retro correction to bring all Effex income to the $21 per mil rate so that rate is what we are showing since the project began."); Ex. 128 (Rosenfeld Tr. 148:10-149:17).

> A:  Defendants do not dispute that FXCM recorded an accounting adjustment as a retroactive correction to account for a $21 per million payment from Effex. Defendants dispute any unfounded implication that Effex did not actually pay an order flow rate of $21 per million in all months of 2010, (Ex. 224 (Chart of Payments); Ex. 221 (Meyer Tr. 48:18-49:5) (testifying that Effex always paid invoices in full and Effex did not pay FXCM in excess of the amounts invoiced)), or that a retroactive correction of payment mere months after invoicing is in any way improper.

219.     This retroactive correction from June 2010 was not noted in materials FXCM provided to E&Y. ECF No. 252-43 (email from FXCM accountant to E&Y attaching chart showing payments from Effex in 2010); Ex. 128 (Rosenfeld Tr. 193:9-194:17, 222:6-223:3).

> A:  Defendants dispute Plaintiffs' characterization of Exs. 43 and 128.  Ex. 43 represents the invoiced amount in each month of 2010 (representing a fee of $21 per million), which includes the retroactive correction.  *See* Ex. 128 (Rosenfeld Tr. 193:9-15).

220.     In October 2010, Dittami discussed with Ahdout what the rate should be for that

month in light of Effex earning lower profits per million on its trading. Ex. 136 (GLBR_00188166 at GLBR_00188166) (Dittami to Ahdout: "We need to figure out a per MM for October, looking closely we can likely wing it again at $21 per MM… The other alternative is we go half way at $17.50."). Dittami suggested $17.50, and FXCM billed Effex $17.50 per million for October 2010, and again for November 2010. Ex. 122 (GLBR_00184107 at GLBR_00184108); ECF No. 252-42 (November 2010 invoice).

> A: Defendants do not dispute that the quoted language appears in Ex. 136, or that the October and November 2010 invoice reflected a rate per million of $17.50. However, in December 2010 Effex remitted an additional $678,000 to FXCM for "underpayment of fees by Effex in those months." Ex. 231 (GLBR_00184115); *see also* ECF No. 240-1 (Barron Report at ¶ 75). With this adjustment, it meant that Effex was charged (and paid) $21 per million for the volume of it trades it executed in 2010. *See, e.g.*, Ex. 224 (Chart of Payments); Ex. 43; Ex. 221 (Meyer Tr. 50:4-10); Ex. 128 (Rosenfeld Tr. 193:9-15).

221. The operative services agreement in October and November 2010 provided for payments at $21 per million, ECF No. 252-41 (May 1 Services Agreement), and it was not amended to reflect this new rate of $17.50 per million. Ex. 92 (Dittami Tr. 225:7-11) (Dittami: "I don't recall there being one [a services agreement] for $17.50"). Materials submitted to E&Y did not show that FXCM billed Effex $17.50 per million for these two months instead of $21 per million. ECF No. 252-43 (email from FXCM accountant to E&Y attaching chart showing payments from Effex in 2010); Ex. 128 (Rosenfeld Tr. 194:18-25, 223:4-15).

> A: Defendants do not dispute that the quoted language appears in Ex. 92, or that the October and November 2010 invoice reflected a rate per million of $17.50.

Defendants likewise do not dispute that ECF No. 252-41 was not amended to reflect a rate change to $17.50.  However, in December 2010 Effex remitted an additional $678,000 to FXCM for "underpayment of fees by Effex in those months."  Ex. 231 (GLBR_00184115); *see also* ECF No. 240-1 (Barron Report ¶ 75).  With this adjustment, it meant that Effex was charged (and paid) $21 per million for the volume of it trades it executed in 2010.  *See, e.g.*, Ex. 224 (Chart of Payments); Ex. 43; Ex. 221 (Meyer Tr. 50:4-10); Ex. 128 (Rosenfeld Tr. 193:9-15).

222.     At year-end 2010, Dittami emailed Niv and Ahdout with Effex's trading profits – annualized to approximately $33.5 million – and FXCM's share, which was approximately $23 million. Ex. 116 (GLBR_00003957) ("we are looking at 35.5MM annualized revenue, expenses just under $2MM, so 33.5MM net income for effex. That's about $23MM annualized to bottom line for FXCM."). Dittami testified that he reached this estimate by approximating the 70-30 split of Effex's trading profits, which Niv and Ahdout knew was being used as a guideline. Ex. 96 (Dittami CFTC Tr. 164:22-166:4).

A:   Defendants do not dispute that the quoted language appears in Ex. 116. Defendants note that even if Dittami were offering $23 million as FXCM's "share" in 2010, the totality of what Effex was billed for order flow in 2010 amounted to $15.6 million (Ex. 43), undercutting the premise that the parties sought to ensure that FXCM received 70% of Effex's profits.  And if Effex's net income figure as expressed in Ex. 116 is correct, the order flow payments to FXCM in 2010 represented less than 50% of Effex's profits.

223.     In October 2011, when spreads tightened and Effex's trading on FXCM order flow became less profitable for Effex, Dittami and Ahdout agreed to reduce Effex's

payments to $16 per million. Ex. 142 (GLBR_00189249) (Dittami in October 2011: "We had a discussion on the flows and payment with Ken Grossman and William late yesterday. … were also going to lower the per millions fee to $16 going forward."); Ex. 81 (Niv Tr. 141:22-142:12, 151:6-22) (explaining that as spreads narrowed, "they [Effex] just weren't making, you know, that type of money. So, obviously, all market makers, as you noted previously, make less money on narrower spread currencies. And as the spreads were narrowing, you know, in like I said by significant amounts, you -- they could not afford to pay us the amounts that we initially signed for" and that Dittami wanted to reduce Effex's payments because when "spreads contracted … market makers … make less money per trade").

A:  Undisputed.

224.    This time the parties amended the services agreement to reflect the new rate. ECF No. 252-46 (Amendment to Services Agreement). The amendment was backdated to September 1, 2011. *Id*. (Amendment signed October 13, 2011, with an effective date of September 1, 2011). The parties did not execute any other amendments to the services agreement.

A:  Defendants do not dispute that the Amended Services Agreement was executed on October 13, 2011 and made effective as of September 1, 2011.  Ex. 46. Defendants likewise do not dispute that the parties did not execute any other written amendments to the Services Agreement.  Defendants dispute Plaintiffs' characterizations of the parties' actions in amending the Services Agreement.  *See, e.g.*, Ex. 209 (Dittami Tr. 220:8-13, 227:6-10)

225.    Effex provided several liquidity streams to FXCM. Ex. 92 (Dittami Tr. 244:8) ("We did over many years many streams with FXCM"). Dittami had multiple discussions with Ahdout and Niv about including or excluding certain streams in the volume calculations because

of how profitable or unprofitable they were for Effex. These conversations occurred in at least 2011 and 2012, and resulted in certain streams being excluded from the volume calculations. Ex. 143 (GLBR_00003094 at GLBR_00003096) (Effex COO: "we spoke to William about two liquidity streams we've been providing for some time that do not generate the same revenue, both at the request of FXCM. Thus we've subtracted those volumes for July and August out of the payment calculation."); Ex. 142 (GLBR_00189249) (Effex COO: "I need to clarify the exact streams we're paying for flow on and then you should be set to invoice."); Ex. 144 (GLBR_00118665 at GLBR_00118665) (FXCM employee: "I have additional volume from two new CITEX [Effex] spokes identified as CITIEXL2 and CITIEXJ. Can you confirm if we should be including this volume or we should exempt this activity?"; Effex COO: "We actually haven't discussed payments on these new streams with William yet. Therefore, we won't exempt them for now."); Ex. 145 (GLBR_00119021 at GLBR_00119021-22) (Effex COO: "We can't pay the fees on the CitiEXJ stream. We have paid on it in past months because the volume has been so small. However, with these volumes we'd like to omit it."; FXCM accountant: "We will adjust the April 2012 invoice accordingly."; FXCM accountant: "William approved it."); Ex. 140 (GLBR_00119217 at GLBR_00119217-18) (Effex COO responding to inquiry from FXCM accountant in August 2012 regarding July 2012 volume calculations: "Yes, include EXJ and EXL2 this month. We should be able to include the P3B and P3C streams next month, and probably also P3A"; Effex COO responding to inquiry from FXCM accountant in September 2012 regarding August 2012 volume calculations: "I'd like to include P3A …. That's our very strong preference and it's in line with what we've discussed with William and Drew").

> A:  Local Civil Rule 56.1(b) instructs that papers opposing a motion for summary
>
> judgment shall include . . . if necessary, additional paragraphs containing a separate,

*short and concise statement* of additional material facts . . . ."  L. Civ. R. 56.1 (emphasis added).  This is patently neither a short nor concise statement, and an abuse of the Rule 56.1 requirement for additional material facts.  Defendants do not dispute that Effex provided multiple liquidity streams to FXCM customers and that certain liquidity streams were excluded from the payment for order flow calculation.  Defendants do not dispute that the quoted language appears in Exs. 140, 142, 143, 144, and 145.  Dittami testified that it was his understanding that Effex's agreement with FXCM regarding order flow payments was restricted only to the core retail stream.  Ex. 209 (Dittami Tr. 245:4-18).  Dittami further testified that other streams in foreign jurisdictions, custom streams for individual clients, and certain institutional streams were not encompassed by the Services Agreement. *Id.* at 245:19-246:7; 255:5-17.

226.    Neither the services agreement nor any amendments ever specified  which liquidity streams Effex would or would not pay for. Ex. 92 (Dittami Tr. 258:10-23). The invoices FXCM sent to Effex for these months did not reflect which liquidity streams were included or excluded. *E.g.,* Ex. 146 (GLBR_00119092 at GLBR_00119092 and GLBR_00119096) (email discussion of excluding liquidity stream and corresponding invoice).

A:  Undisputed.

227.    In December 2012, Dittami sent an update to Niv and Ahdout, stating in the context of changing the per million rate of payments to FXCM, that "on our per MM payment, for now we are not going to drop it as per our last discussion. … Given we are so close to January, we will keep the payment steady for Jan as well, and its good to know option is available if needed for February." Ex. 120 (GLBR_00004527 at GLBR_00004528).

A:  Undisputed.

228.     In April 2013, Dittami, Ahdout, and Niv agreed that Effex would pay a reduced rate per million for trading volume from the dollar-yen currency pair. Ex. 92 (Dittami Tr. 275:23-276:9). The basis for this change was that dollar-yen trading volume had become much less profitable for Effex. Ex. 92 (Dittami Tr. 275:18-276:23).

A:  Undisputed.

229.     Beginning with February 2013 (retroactively), FXCM billed Effex separately for dollar-yen volume at only $3 per million, reducing the effective rate that Effex was paying for total order flow. Ex. 123 (GLBR_00185174 at GLBR_00185175).

A:  Undisputed.

230.     For each of the months that FXCM billed Effex separately for dollar-yen volume at the lower rate, dollar-yen trading volume comprised a substantial portion of the total trading volume for the month, averaging approximately 24%. *See* Ex. 123 (GLBR_00185174 at GLBR_00185175) (February 2013 invoice); Ex. 147 (GLBR_00185248) (March 2013 invoice); Ex. 148 (GLBR_00120028) (April 2013 invoice); Ex. 149 (GLBR_00217444) (May 2013 invoice); Ex. 150 (GLBR_00120227) (June 2013 invoice); Ex. 151 (GLBR_00185335) (July 2013 invoice); Ex. 152 (GLBR_00120656) (August 2013 invoice); Ex. 153 (GLBR_00185361) (October 2013 invoice); Ex. 154 (GLBR_00185363) (November 2013 invoice); Ex. 155 (GLBR_00185365) (December 2013 invoice); Ex. 156 (GLBR_00121084) (January 2014 invoice); Ex. 157 (GLBR_00121085) (February 2014 invoice); Ex. 158 (GLBR_00121083) (March 2014 invoice); Ex. 159 (GLBR_00154607) (April 2014 invoice); Ex. 160 (GLBR_00154608) (May 2014 invoice); Ex. 161 (GLBR_00154609) (June 2014 invoice); Ex. 162 (GLBR_00120896) (July 2014 invoice).

A:  Defendants dispute that this is a material fact that is relevant to the Court's disposition of Defendants' Motion for Summary Judgment.  Defendants dispute that Plaintiffs' calculation is correct, as they have incorrectly labeled the September 2013 invoice (indicated by the "Invoice 9-2013" in the upper right corner) as the August 2013 invoice, and have excluded the actual August 2013 invoice (GLBR_00217450, attached in Ex. 224 (Chart of Payments)) altogether from this citation and their calculations.

231.    In June 2013, Dittami, Ahdout, and Niv agreed that Effex would, and thereafter did, likewise split out trading volume in the euro-dollar currency pair, with Effex paying only $6 per million. Ex. 150 (GLBR_00120227); Ex. 92 (Dittami Tr. 278:23-279:7); ECF No. 252-61. This change likewise reduced the effective rate that Effex was paying for total order flow.

A:  Undisputed.

232.    The reason for this change was that euro-dollar trading volume had become much less profitable for Effex. Ex. 92 (Dittami Tr. 279:8-19).

A:  Undisputed.

233.    For each of the months that FXCM billed Effex separately for euro-dollar volume at the lower rate, euro-dollar trading volume comprised a substantial portion of the total trading volume for the month, averaging approximately 15%. *See* Exs. 162-74 (invoices for June 2013 through July 2014).

A:  Defendants dispute that this is a material fact that is relevant to the Court's disposition of Defendants' Motion for Summary Judgment.  Defendants dispute that Plaintiffs' calculation is correct, in part because they have incorrectly labeled the September 2013 invoice (indicated by the "Invoice 9-2013" in the upper right

corner) as the August 2013 invoice, and have excluded the actual August 2013 invoice (GLBR_00217450, attached in Ex. 224 (Chart of Payments)) altogether from this citation and their calculations.

234.     During the time that FXCM billed Effex separately for dollar-yen and/or euro-dollar trading volume (February 2013 through July 2014), those currency pairs together accounted for approximately 34% of the total FXCM trading volume that Effex captured for those months, and for some months over half of the total volume. The effective rate Effex paid for total order flow (total payments divided by total volume) for this time period was less than $12 per million, and for some months, less than $10 per million. *See* Exs. 129 and 159-74 (invoices for February 2013 through July 2014).

A:  Defendants dispute that this is a material fact that is relevant to the Court's disposition of Defendants' Motion for Summary Judgment.  Defendants dispute that Plaintiffs' calculation is correct, in part because they have incorrectly labeled the September 2013 invoice (indicated by the "Invoice 9-2013" in the upper right corner) as the August 2013 invoice, and have excluded the actual August 2013 invoice (GLBR_00217450, attached in Ex. 224 (Chart of Payments)) altogether from this citation and their calculations.  Defendants note that Plaintiffs' calculations are not even internally consistent as 15% and 24% would total 39%--not 34%.

**Effex Depended on FXCM, Which Gave Effex Advantages to Win Trading Volume**

235.     In the beginning of its operations, all of Effex's revenues came from FXCM. *See* Ex. 96 (Dittami CFTC Tr. 230:18-21). Effex gradually added other revenue sources, but through 2016 trading volume from FXCM comprised a substantial majority of Effex's revenues. Ex. 92

(Dittami Tr. 335:4-24).

> A:  Defendants do not dispute that FXCM was Effex's first client or that Effex gradually added other revenue sources.  Defendants dispute that Dittami's testimony supports the proposition that "through 2016 trading volume from FXCM comprised a substantial majority of Effex's revenues."  Dittami testified that, without the benefit of metrics in front of him, he did not know whether there was a time between 2010 and 2014 where less than 50% of Effex's revenues came from FXCM order flow.  Ex. 209 (Dittami Tr. 335:25-336:8).

236.     In late 2010 and 2011, approximately 90% of Effex's trading profits came from FXCM trading volume. Ex. 92 (Dittami Tr. 172:20-173:15, 335:4-12) (Dittami estimating that "in 2011 that it [Effex's trading P&L from FXCM order flow] was around, roughly,  90 percent"); Ex. 119 (GLBR_00004262) (Dittami providing update to Niv and Ahdout, explaining that roughly 90% of Effex's revenues for the week came from FXCM as opposed to "external venues").

> A:  Undisputed.

237.     Dittami estimated that by 2014, "more than 50 [percent]" of Effex's revenues still came from FXCM. Ex. 92 (Dittami Tr. 335:18-24). That was still true in 2016, when the"majority" of Effex's profits were derived from FXCM. Ex. 96 (Dittami CFTC Tr. 35:14-19).

> A:  Undisputed.

238.     Niv estimated in March 2014 that approximately 80% of Effex's revenues came from FXCM trading volume. Ex. 163 (GLBR_00103994) (Niv: "We have a great relationship with them [Effex] with lots of transparency on what they do. 80 percent of their revenues come from fxcms retail and institutional volume that they make markets to, so they have all lot to lose if they piss us off.").

A:  Defendants do not dispute that the quoted language appears in Ex. 163. Defendants dispute that Niv was able to accurately estimate the percentage of Effex's revenues that came from FXCM trading volume.  When asked about this exhibit at his deposition, Niv testified:  "it turns out that statistic wasn't true, because by that time a much larger percentage of their business – over 50 percent was coming from other relationships.  But, you know, we -- I kind of took the statistic from early on in the relationship. I was not aware, you know, that things have changed so much and he had so many new clients. So, I mean, later on I realized, but at the time I thought this was kind of late 2010 or turned out where the figure was more true but by 2014 that was far from true."  Ex. 211 (Niv Tr. 234:7-24).  Moreover, both Dittami and Meyer testified that they did not share Effex's income with anyone at FXCM.  Ex. 221 (Meyer Tr. 212:24-213:3); Ex. 4 (Dittami Tr. 346:21-347:7).

239.    Throughout the class period, many trading venues outside of FXCM would not accept non-bank liquidity providers like Effex. Ex. 96 (Dittami CFTC Tr. 39:16-24). When Effex began operations in 2010, almost no other companies would accept them. *Id.*; Ex. 110 (GLBR_00041735, ConvID: 11/15/2010 1:45, Excel lines 18383-18439) (Dittami: "we have to get our stuff straight, no external [non-FXCM] customer will take our current size").

A:  Undisputed.

240.    Dittami testified that if not for his relationship with FXCM as a prior employee, FXCM probably would not have accepted liquidity from Effex either. Ex. 96 (Dittami CFTC Tr. 41:8-14).

A:  Defendants dispute Plaintiffs' characterization of Dittami's testimony to the

CFTC, in which he testified that Effex's non-bank status "probably would have been an issue" for FXCM, had Dittami not started at FXCM.  Ex. 96 (Dittami CFTC Tr. 41:8-14).

241.     In its early stages, Effex operated its trading algorithm through FXCM servers and on FXCM's network and relied upon FXCM information technology and programming staff to implement its trading systems. *See* Ex. 96 (Dittami CFTC Tr. 188:13-203:17).

A:  Undisputed.

242.     FXCM allowed Effex to operate out of FXCM's offices rent-free for a full year after Effex became a separate entity. Ex. 96 (Dittami CFTC Tr. 57:5-58:9).

A:  Undisputed.

243.     Dittami maintained and used an FXCM email address for months after he terminated his employment with FXCM. Ex. 164 (GLBR_00046543) (email sent from "John Dittami <jdittami@fxcm.com>" on July 8, 2010).

A:  Undisputed.

244.     Effex initially used FXCM servers to host their email services. Ex. 96 (Dittami CFTC Tr. 188:13-203:17). Effex employees also used FXCM's instant messenger service from Effex's inception into 2012. Ex. 96 (Dittami CFTC Tr. 207:3-16).

A:  Undisputed.

245.     Dittami and others at Effex also maintained VPN access to desktop computers at FXCM through at least the end of 2012. Ex. 96 (Dittami CFTC Tr. 200:10-19). Dittami testified that Effex could not fully conduct its business except through VPN connection to FXCM. Ex. 96 (Dittami CFTC Tr. 201:14-17); Ex. 165 (GLBR_00028063) (Dittami: "The business requires that I have access to OUR boxes that unfortunately we can't access except thru your VNP of which

we have no control.").

> A:  Undisputed.

246.     Multiple FXCM employees also worked for Effex on a regular basis spanning multiple years, at times spending four days per week with Effex. Ex. 96 (Dittami CFTC Tr. 216:4-16) ("We did use FXCM employees to perform work for Effex Capital, yes"); Ex. 166 (Kochel CFTC Tr. 97:18-17) (FXCM employee testifying that he worked in Effex's offices four days per week); Ex. 167 (Meyer Tr. 201:13-202:5) (Chris Meyer, Effex's COO, explaining that another FXCM employee performed work for Effex for "a few months").

> A:  Undisputed.

247.     Effex also used FXCM personnel to monitor Effex' trading dashboard for Effex's benefit, which continued to late 2013 or early 2014. Ex. 96 (Dittami CFTC Tr. 232:9-235:18).

> A:  Undisputed.

248.     In 2013 and at least one other year Effex paid bonuses (FXCM paid the bonuses at Effex's request and Effex reimbursed FXCM) of tens of thousands of dollars to two of these employees for their work done on Effex's behalf. Ex. 168 (GLBR_00185250) (Effex COO: "Effex would like to pay bonuses to two FXCM employees, as we've done in the past. I believe that you facilitated this for us. Can you help again? We'd like to pay $30,000 to Darren Merwitz and $20,000 to Alex Kochel."); Ex. 167 (Meyer Tr. 207:6-22) (Effex COO confirming that bonuses were paid in multiple years for work that Merwitz and Kochel performed for Effex while they were employed by FXCM).

> A:  Undisputed.

249.     One of these FXCM employees also used an Effex email address for the purposes of communicating with entities outside of Effex and FXCM, such as Citibank, to hide the fact that

an FXCM employee was performing work for Effex. Ex. 96 (Dittami CFTC Tr. 281:18- 283:22).

> A:  Defendants dispute this fact and Plaintiffs' characterization of Ex. 96.  Dittami
>
> testified that an FXCM employee who was monitoring Effex's trading platform
>
> overnight was given an Effex email address in the event of a trading emergency in
>
> which he could not reach an Effex employee first.  Dittami further testified that this
>
> was only to be used to contact Citibank, Effex's prime brokerage, and not any Effex
>
> client.  Ex. 96 (Dittami CFTC Tr. 281:18-283:22).  Dittami made clear that the
>
> FXCM employee was not executing trades for Effex, he was merely monitoring
>
> that trades were executing properly.  *Id.* at 232:9-23.

250.      FXCM also provided significant trading advantages to Effex over other liquidity

providers to allow Effex to win more trading volume. One of these advantages was that Effex

would win ties when Effex and another liquidity provider submitted the same price. Ex. 96

(Dittami CFTC Tr. 327:13-19, 331:12-15).

> A:  Defendants do not dispute that Effex would win ties among Effex and other
>
> liquidity providers at certain times during the Class Period.  *See, e.g.*, Ex. 6 (Niv
>
> Tr. 90:7-95:22) (explaining the logic of how ties would be won based upon the size
>
> offered and the quality of the execution and noting that "somebody has to win ties"
>
> and acknowledging that, due to its execution, Effex won ties a majority of the time
>
> from 2010 to 2014).  Dittami testified that the ability to win ties was contingent
>
> upon providing the best execution.  Ex. 96 (Dittami CFTC Tr. 327:13-25).
>
> Moreover, when asked whether other liquidity providers had the ability to win ties,
>
> Dittami testified, "[t]o my knowledge, every liquidity provider had the ability to
>
> win ties if they were best execution" and that other liquidity providers would win

ties "a few times, but as a general rule Effex was always best execution." *Id.* at 331:6-19.

251.    During the time that Effex paid FXCM for order flow, Effex won ties a majority of the time. Ex. 81 (Niv Tr. 94:11-95:22). Dittami testified that there were "a few times" where liquidity providers other than Effex would win ties, but as a general rule Effex would win all ties. Ex. 96 (Dittami CFTC Tr. 331:12-15).

A:  Undisputed.

252.    Another advantage FXCM granted to Effex was that Effex had access to real-time read of book, allowing it to see in real-time the prices submitted by other liquidity providers; Ex. 118 (GLBR_00008068); Ex. 92 (Dittami Tr. 324:22-326:8). In an update sent to FXCM, Dittami described "real time read of book" as an "Effex Advantage" providing "Greater Effex PNL." Ex. 118 (GLBR_00008068 at GLBR_00008069). FXCM did not give this data to any other liquidity providers. ECF No. 250 ¶ 95.

A:  Defendants do not dispute that the quoted language appears in Ex. 118 or that Effex was provided real-time read of book.  Defendants dispute that FXCM did not give this data to any other liquidity providers.  Milazzo testified that all liquidity providers had access to the best bid and offer in realtime, but that the raw quotes from all liquidity providers were not provided to liquidity providers other than Effex.  Ex. 218 (Milazzo 30(b)(6) Tr. 43:8-15).  Milazzo clarified that FXCM would have considered providing similar access to other liquidity providers, had they asked.  *Id.* at 118:19-119:7.  Defendants dispute that ECF No. 250 ¶ 95 supports the proposition that "FXCM did not give this data to any other liquidity providers."

253.    FXCM also allowed Effex to co-locate with FXCM's servers, which decreased latency between Effex and FXCM. Ex. 96 (Dittami CFTC Tr. 37:23-38:8, 44:23-45:15).

A:  Undisputed.  However, Defendants dispute that the practice of co-location was unique to Effex.  Milazzo testified that, as of 2015, other liquidity providers had begun to co-locate with FXCM, and "[b]y 2015 most if not all would have, but it would have been a gradual process one liquidity provider at a time during" the 2011 to 2015 time period.  Ex. 218 (Milazzo 30(b)(6) Tr. 115:22-116:12).

254.    FXCM also applied lower mark-ups to the prices provided by Effex as compared to prices from other liquidity providers a majority of the time from 2011 through 2016. Ex. 99 (Ahdout CFTC Tr. 240:2-241:12). FXCM even consulted with Dittami as to what mark-ups it should apply to other liquidity providers – which it did not do with any other liquidity providers. Ex. 169 (GLBR_00005534) (Dittami sending Ahdout suggested markups for FXCM to apply to Effex and to other market makers); Ex. 92 (Dittami Tr. 283:3-14, 284:10-15) (Dittami discussed what markups FXCM should apply to liquidity providers other than Effex on "several occasions" after Dittami had left FXCM, and Ahdout implemented some of these recommendations).

A:  Defendants do not dispute that FXCM applied lower mark-ups to the prices provided by Effex on certain currency pairs at certain points during the Class Period.  Defendants dispute that this practice was unusual and that differential markups were not applied to every liquidity provider.  *See* Ex. 222 (Muchinsky Tr. 105:23-106:11) (testifying that "Dresdner Bank, Deutsche Bank, Goldman Sachs, Morgan Stanley" all received lower markups); *id.* at 106:16-107:4 ("We had a number of providers who were preferenced through the markups in our liquidity pool.  It was a standard offering that we made to every single liquidity provider on

the street in order to get more competitive pricing."); *id.* at 107:22-108:15 (explaining that Effex likely had lower markups, but that it was not on every currency pair).   Defendants dispute Plaintiffs' characterization of Ahdout's testimony to the CFTC in which he stated that he did not "have exact date" but that FXCM gave Effex lower markups "to put the fastest, best execution guys in front of the execution line and put the worst guys in the back of the line."  Ex. 99 (Ahdout CFTC Tr. 240:2-16).  Ahdout also testified that Effex was "probably" at the top of the book for a "majority" of the time from 2010 through 2016.  *Id.* at 240:17-241:12. Defendants do not dispute that Dittami was consulted on occasion with respect to markups and that his suggestions may have been implemented.  Defendants dispute that any evidence Plaintiffs have cited stands for the proposition that Effex did not also consult other liquidity providers regarding markups.  Defendants note that in Ex. 169, Dittami has suggested a lower markup for Goldman Sachs, as compared to Effex.  *See* Ex. 169 ("We gave GSAGG and .1 advantage on Usdjpy, and backed off Effex's advantage on the offer for Eur\Usd versus Goldman, to try to get them some more volume."); Ex. 219 (Milazzo Tr. 62:5-23) (testifying that the fact that Dittami was suggesting a lower markup for an Effex competitor "is a reflection of the high quality of pricing service that [Goldman was] offering at that time" and the goal was for FXCM to get the best pricing possible).

255.     These advantages allowed Effex to have the "winning" price more often, even if Effex's raw price (before applying the mark-up) was not the lowest, directing more trading volume to Effex. Ex. 92 (Dittami Tr. 300:20-301:3) (Dittami: "if you did not win ties, you win less volume"); Ex. 96 (Dittami CFTC Tr. 430:4-9) (due to lower markups and winning ties, Effex

could win a trade even if it provided a worse price). With these advantages, Effex could essentially choose when it wanted to offer a price to FXCM that would allow it to win a trade or portion of a trade, and what exact price would achieve that end, instead of competing purely on price. Ex. 96 (Dittami CFTC Tr. 430:10-15) (Effex "could choose to price to win a trade or a portion of a trade"); Ex. 95 (Niv CFTC Tr. 419:6-14). Effex having the ability to win ties, lower mark-ups, and access to a realtime feed of the prices offered by competing liquidity providers, allowed Effex to know exactly what prices it had to offer to win each trade. Ex. 170 (Wilson- Taylor Tr. 139:7-23). If Effex wanted to win a trade, it would have no reason to offer a price better than the next best price except by the smallest possible margin, or by no margin if it won ties. Ex. 170 (Wilson-Taylor Tr. 140:19-24).

> A:  Local Civil Rule 56.1(b) instructs that papers opposing a motion for summary judgment shall include . . . if necessary, additional paragraphs containing a separate, *short and concise statement* of additional material facts . . . ."  L. Civ. R. 56.1 (emphasis added).  This is patently neither a short nor concise statement, and an abuse of the Rule 56.1 requirement for additional material facts.  Defendants dispute Plaintiffs' characterizations of Exs. 92, 95, 96, and 170.  FXCM repeatedly and clearly disclosed that it applied markups to the bids it received from liquidity providers.  *See, e.g.*, Ex. 1 at 1; Ex. 7 at 1; Ex. 9 at 1.  Lower markups were given to liquidity providers that provided better execution—which often included Effex on certain currency pairs, but sometimes included other liquidity providers.  *See* Ex. 59 (Milazzo Tr. 57:12-25) (explaining that FXCM would give markup advantages to liquidity providers who gave better levels of service); Ex. 222 (Muchinsky Tr. 105:23-106:11) (testifying that "Dresdner Bank, Deutsche Bank,

Goldman Sachs, Morgan Stanley" all received lower markups); *id.* at 106:16-107:4

("We had a number of providers who were preferenced through the markups in our

liquidity pool.  It was a standard offering that we made to every single liquidity

provider on the street in order to get more competitive pricing."); *id.* at 107:22-

108:15 (explaining that Effex likely had lower markups, but that it was not on every

currency pair); Ex. 6 (Niv. Tr. 156:3-19) (confirming that Effex had the best

execution and that FXCM provided Effex advantages even after the payment for

order flow relationship terminated because of its superior execution).  Defendants

do not dispute that a liquidity provider who has a lower markup than its competitors

can win more trades with a higher raw price.  Likewise, any liquidity provider can

choose to price to win a trade by offering a price that is the lowest, inclusive of the

markups applied.

256.     On net, due to its algorithmic trading strategies, the more trading volume Effex

captured, the more profitable its trading was. Ex. 96 (Dittami CFTC Tr. 331:20-332:22). By giving

Effex these advantages, FXCM allowed Effex to capture more trading volume. Ex. 96 (Dittami

CFTC Tr. 430:20-25) ("Q: The ability to win all ties and see all the bids and offers and the .1 PIP

advantage in the Euro U.S. dollar were beneficial to Effex because it allowed Effex to capture a

larger portion of trades; is that correct? A Yes, that's correct.").

A:  Undisputed.  But as witnesses testified, FXCM provided Effex with certain

trading advantages because Effex provided more reliable trade execution and

greater liquidity at the best price available to customers.  Ex. 59 (Milazzo Tr. 57:12-

25) (explaining that FXCM would give markup advantages to liquidity providers

who gave better levels of service); Ex. 6 (Niv. Tr. 156:3-19) (confirming that Effex

had the best execution and that FXCM provided Effex advantages even after the payment for order flow relationship terminated because of its superior execution). FXCM would have considered providing similar trading advantages to any other liquidity provider that was able to provide the same trade execution and pricing as Effex.  Ex. 218 (Milazzo 30(b)(6) Tr. 118:19-119:6).

257.     With more trading volume, Effex paid FXCM more for order flow. Ex. 81 (NivTr. 160:10-22) ("as part of receiving preferential treatment, they [Effex] have to pay for order flow, yes, because they are receiving -- therefore, preferential treatment gives them a large portion of the order flow."); Ex. 96 (Dittami CFTC Tr. 432:9-14) (confirming that Effex's advantages of winning ties, lower markups, and real-time read of book "is also beneficial to FXCM because FXCM is receiving a rebate from [trades] that are effected by Effex Capital").

> A:  Defendants do not dispute that by executing more trading volume, per the terms of the Services Agreement and Amended Services Agreement, Effex would pay more to FXCM for order flow.  *See* Ex. 41; Ex. 46.  Defendants dispute that the testimony Plaintiffs have chosen to cite supports this proposition.

258.     Thanks in part to these trading advantages, throughout the time that Effex was paying FXCM for order flow, from 2010 to 2014, Effex captured at least a plurality, if not a majority, of FXCM's retail trading volume. Ex. 99 (Ahdout CFTC Tr. 129:25-130:24).

> A:  Defendants dispute that Ex. 99 supports this assertion.  In response to the question "Do you know what trading volume Effex Capital was able to capture in 2010?," Ahdout replied: "I don't remember the volume."  Then when asked if "it would *probably* be a plurality of the volume throughout [2010, 2011, 2012, 2013, and 2014]?" Ahdout replied "Yes."  Ex. 99 (Ahdout CFTC Tr. 129:25-130:24).

259.     FXCM terminated its relationship with Effex around February 2017. Ex. 81 (Niv Tr. 275:2-24).

> A:  Defendants dispute that this is a material fact that is relevant to the Court's disposition of Defendants' Motion for Summary Judgment.  Defendants otherwise do not dispute this statement.

260.     After FXCM terminated Effex, Effex lost its prime broker and numerous other clients. Ex. 81 (Niv Tr. 276:12-18). Effex was unable to support itself without FXCM and went out of business shortly thereafter. *Id.*

> A:  Defendants dispute that this is an accurate characterization of Niv's testimony, in which he testified that Effex is not in operation today "because when [the CFTC] press release came out, their other clients left them also and a lot of that counterparties cut them off.  Prime broker cut them off. So they, basically, are out of business completely."  Ex. 81 (Niv Tr. 276:12-18).  Moreover, this is not a material fact that is relevant to the Court's disposition of Defendants' Motion for Summary Judgment.

**Defendants Sought to Conceal FXCM's Relationship With Effex**

261.     Niv expressed to an FXCM employee that he did not want to share with other liquidity providers how much of FXCM's trading volume Effex was capturing. Ex. 171 (GLBR_00004281 at GLBR_00004281) ("Provide it and lump all funds like sun, lucid and effex into one bucket and tell the banks its 3 funds who share the pie don't give specifics").

> A:  Defendants do not dispute that the quoted language appears in Ex. 171. Defendants dispute Plaintiffs' characterizations of Ex. 171.  Rather than for some malintent, Niv testified that his intention in making this statement was "not to reveal competitive information" or "trade secrets."  Ex. 221 (Niv Tr. 217:22-219:17); *see*

*also* Ex. 222 (Muchinsky Tr. 160:3-165:23) (testifying that Niv "wasn't telling me to exclude [Effex] at all").

262.     Niv expressed to Lande that FXCM should not highlight in its SEC filings the order flow payments, in response to Lande's question about what language to use "for 'payment for order flow' as applied to us (i.e., Datami [sic])." Ex. 172 (GLBR_00003881 at GLBR_00003882). Lande wrote that "I will show you where this will show up … so you can see & decide whether too sensitive," and Niv responded "We definitely want to not highlight it." *Id.* (GLBR_00003881 at GLBR_00003881). In its SEC filings, FXCM did not identify that Effex was the source of all, or substantially all, of its order flow payment revenue. *See, e.g.,* ECF Nos. 252-1, 252-7, 252-8, and 252-9 (FXCM 10-Ks for 2011-2014); Exs. 82-90 (FXCM 10-Qs for 2012-2014).

> A:  Defendants do not dispute that FXCM did not identify Effex as a source of order flow payment revenue in fiscal years 2010, 2011, 2012, 2013, and 2014.  However, Defendants dispute that FXCM was required to identify that Effex was a source of order flow payment revenue.  Ex. 2 (Wilson-Taylor Report ¶ 11.f) ("FXCM's business relationship with Effex did not make FXCM the liquidity provider, the market maker, or the counterparty on trades with its retail No Dealing Desk customers.").  Defendants do not dispute that the language quoted in this fact appears in Ex. 172.  However, Defendants dispute Plaintiffs' characterizations of Ex. 172, in which Niv later responded:  "Use dittami in explanation.  We have no choice we have to be transparent."  Ex. 172 (GLBR_00003881 at GLBR_00003881).

263.     Dittami stated that sharing how much of FXCM's order flow Effex was capturing

"brings up questions [FXCM] may not want brought up." Ex. 173 (GLBR_00151710 at GLBR_00151710).

> A:  Defendants do not dispute that the quoted language appears in Ex. 173. However, Defendants dispute Plaintiffs' characterizations of Ex. 173.  Dittami testified that he did not "want [his] share being shown to any other [liquidity provider]" because it would "not be a good thing for [Dittami]."  Ex. 209 (Dittami Tr. 293:24-294:14).

264.     An FXCM compliance officer noted in an email, cited in the CFTC Order, that "Given the sensitivity of the counter party involved [Effex] we would prefer the events don't happen so that we do not draw unwanted attention [from the NFA]." Ex. 174 (GLBR_00007684 at GLBR_00007686).

> A:  Defendants do not dispute that the quoted language appears in Ex. 174. Defendants dispute Plaintiffs' bracketed characterizations of Ex. 174 (*i.e.*, "[from the NFA]").  An FXCM compliance officer made the statement in Ex. 174 in connection with a potential issue concerning Effex "hanging orders," noting "[i]f you recall when they ask about these events they also want to know what in the system broke down and why or how it was fixed."  *See* Ex. 174.

265.     On October 22, 2013, an FXCM compliance officer told the NFA: "FXCM LLC does not have any direct or indirect ownership, interest, or affiliation with entities that provide liquidity to retail clients...." Ex. 175 (GLBR_00029513 at GLBR_00029518). After the NFA sought clarification of this statement, FXCM's Chief Compliance Officer stated on March 24, 2014: "To my knowledge, there are no present or past owners, principals, APs, or employees of affiliates of FXCM LLC that have direct or indirect ownership, interest, or affiliation with

entities that provide liquidity to retail clients on our No Dealing Desk Model." *Id.* (GLBR_00029513 at GLBR_00029513).

> A:  Defendants do not dispute that the quoted language appears in Ex. 175.  Niv testified that "what we were asked is that do we own a piece of our liquidity providers, so is it -- am I benefitting on the side or is there other managers that benefit on the side from that -- from being liquidity providers. Obviously that is not the case."  Ex. 214 (Niv CFTC Tr. 432:2-433:12).  Niv also testified that FXCM interacted with the NFA for a year on this subject matter and had conversations other than the ones reflected in the email exchange in Ex. 175.  *Id.* at 433:13-434:14 (testifying that as of March 24, 2014, the NFA already knew that Dittami had been an employee of FXCM, Dittami was the owner of Effex, and Effex was one of FXCM's liquidity providers for its retail business).

266.    On April 4, 2014, in response to further attempts by the NFA to clarify the FXCM-Effex relationship, FXCM's Chief Compliance Officer stated that Dittami "served as a consultant for FXCM" who "worked primarily on software coding." Ex. 176 (GLBR_00110437 at GLBR_00110437).

> A:  Undisputed.

**Regulators Investigate FXCM's Relationship With Effex**

267.    The NFA and CFTC began investigating FXCM's relationship with Effex in 2013and 2014. Ex. 81 (Niv Tr. 166:5-167:7).

> A:  Defendants do not dispute that the NFA investigated FXCM's relationship with Effex in 2013 and 2014.  Defendants dispute that the cited testimony from Niv supports the assertion that the CFTC began investigating FXCM's relationship with Effex in 2013 and 2014.  Niv testified that the CFTC began investigating FXCM's

relationship with Effex "on a much later date" after the NFA investigation began, although he could not recall the precise dates.  Ex. 81 (Niv. Tr. 167:4-14).

268.     As the NFA's investigation intensified in the spring of 2014, FXCM decided to stop taking payments for order flow. Ex. 81 (Niv Tr. 167:10-170:2); Ex. 177 (GLBR_00104025 at GLBR_00104026) (Niv in May 2014: "We have never said NO to them [the NFA], if they want us to change payments for order flow we will.").

> A:  Defendants dispute this statement.  Multiple witnesses have testified that the Services Agreement was terminated due to a 2014 regulation in the UK that placed strict regulations on payments for order flow.  *See, e.g.*, Ex. 211 (Niv Tr. 167:15-169:20) ("Q. Was the NFA investigation a factor in your decision for FXCM to start -- to stop charging Effex for order flow? A. No, it was the determination for the -- it was the determination of the UK authorities not to do it, which then we figured this is going to, you know, become some best practices thing."); *id.* at 165:6-166:3, 175:9-13; Ex. 35 (Ahdout CFTC Tr. 259:18-260:10, 261:18-24); *see also* Ex. 226 (GLBR_00062622) (confirming that "there is no payment for order flow anywhere in the company at this stage" following 2014 UK regulation).

269.     FXCM and Dittami executed two termination letters on August 25, 2014, terminating the services agreement – and with it the order flow payments – and Dittami's resignation letter stating that the parties intended to maintain the economic terms from the employment agreement. Ex. 178 (GLBR_00125304) (letter terminating services agreement);ECF No. 252-27 (letter terminating Dittami's resignation letter).

> A:  Defendants do not dispute that the Termination of Services Agreement (Ex. 178) is dated August 25, 2014 and terminated the Services Agreement dated May

1, 2010.  Defendants also do not dispute that the Termination of Agreement dated as of April 14, 2010 (Ex. 27) is dated August 25, 2014 and terminated the terms of Dittami's April 14, 2010 letter to FXCM.   Defendants dispute Plaintiffs' characterizations of Ex. 178 and note that Plaintiffs have omitted that Ex. 178 was effective as of August 1, 2014.  Defendants also dispute Plaintiffs' characterizations of Ex. 27, which terminated Dittami's resignation letter stating "[i]t is the understanding of both parties to enter into a license agreement on economic terms similar to the employment agreement."

270.     On February 13, 2015, FXCM prepared a memorandum analyzing the benefits to its customers as a result of Effex's pricing. ECF No. 252-62. The memorandum was provided to the NFA, *id.*, and CFTC, Ex. 81 (Niv Tr. 262:12-14), during their investigations. The NFA did not allow FXCM to publish the memorandum in the U.S. Ex. 179 (EY-GBI-WP-00004278 at EY-GBI-WP-00004279) ("the NFA refused to allow FXCM US to print its execution study"); Ex. 81 (Niv Tr. 256:25-257:21).

A:   This is not a material fact that is relevant to the Court's disposition of Defendants' Motion for Summary Judgment.  Defendants do not dispute that FXCM's February 13, 2015 memorandum analyzing the benefits to its customers from Effex's pricing was provided to the NFA and CFTC.  Defendants dispute Plaintiffs' remaining characterizations of Exs. 62, 81, and 179.  Plaintiffs omit Niv's testimony that the NFA's "rules state we can publish anything we want, as long as we have the backup of evidence.  And we had enormous backup for this evidence."  Ex. 211 (Niv Tr. 257:5-258:9).  Niv also testified that although the execution study was not published in the US, there were "electronic copies of it

available widely." *Id.* Plaintiffs also omit that Ex. 179 states that because FXCM's competitors were on the NFA board or in advisory positions, "[i]t is therefore not unexpected that the NFA refused to allow FXCM US to print its Execution Study while it was widely embraced by foreign regulators." Ex. 179.

271.     In November 2015, as the NFA and CFTC investigations further intensified, Ex. 81 (Niv Tr. 178:9-179:6), Effex and FXCM signed an acknowledgement and confirmation purporting that the April 14, 2010 option agreement had never gone into effect. ECF No. 252-38 (Acknowledgement and Confirmation).

> A:  Defendants do not dispute that Ex. 38 is dated as of November 20, 2015 and is an Acknowledgement and Confirmation that Dittami, Effex, and FXCM "never effected the License Agreement contemplated as consideration for the Option Agreement." Defendants dispute Plaintiffs' unsupported characterization that the NFA and CFTC investigations had any bearing on the parties' decision to execute this Acknowledgement and Confirmation.  The cited testimony from Niv states that the NFA and CFTC initially investigated FXCM and then "dropped" those investigations, and then "restarted" investigations of the relationship between FXCM and Effex after the SNB Flash Crash in 2015 "where FXCM . . . lost a lot of money." Ex. 81 (Niv Tr. 178:9-179:13).

272.     The parties never executed anything in writing prior to 2015 cancelling the option agreement or stating that it was not in effect. Ex. 81 (Niv Tr. 120:4-6); Ex. 92 (Dittami Tr. 200:19-24).

> A:  Defendants do not dispute that FXCM and Effex never executed anything in writing prior to 2015 cancelling the Option Agreement.  Defendants dispute that a

written cancellation of the Option Agreement was necessary, "because the option didn't exist, the consideration never occurred" and "both parties orally agreed that it was terminated and of no effect." Ex. 36 (Dick Tr. 304:9-305:2).

273.   On February 6, 2017, the CFTC announced that it banned the Company from operating in the U.S. and fined the Company $7 million after finding that FXCM was taking undisclosed positions opposite its retail customers. Ex. 180 (CFTC Press Release).

> A:  Defendants do not dispute that the CFTC and Defendants reached a no-admit-no deny settlement of the CFTC's claims against them and that the terms of that settlement included that FXCM pay a $7 million fine and "within thirty days of the date of entry of [the CFTC's] Order, withdraw from registration with the Commission." ECF No. 245-7 at 12-13. Defendants dispute any characterizations of Ex. 180, which does not state that FXCM was "taking undisclosed positions opposite its retail customers."

274.   In its Order dated February 6, 2017 ("CFTC Order"), the CFTC found that "FXCM and FXCM Holdings, by and through their officers, employees, and agents, including Respondents Niv and Ahdout, engaged in false and misleading solicitations of FXCM's retail foreign exchange ('forex') customers" by concealing that "FXCM had an undisclosed interest in the market maker that consistently 'won' the largest share of FXCM's trading volume - and thus was taking positions opposite FXCM's retail customers." ECF No. 245-7 at 2 (CFTC Order). The market maker referenced in the CFTC Order was Effex. Ex. 181 (Defendants' responses to Plaintiffs' requests for admission) at 22.

> A:  This is not a material fact that is relevant to the Court's disposition of Defendants' Motion for Summary Judgment. The CFTC's allegations contained in

the CFTC Order are not adjudicated facts that can support the grant or denial of a motion for summary judgment in this case.  The CFTC itself has stated that "no facts have been proven by the CFTC Consent Order where the settling party neither admitted nor denied the allegations. They therefore cannot be treated as proven facts in subsequent litigation."  Ex. 232 (CFTC Reparations Order) at 8-9.  Defendants dispute any characterizations of ECF No. 245-7, which does not state that FXCM "concealed" any undisclosed interest.

275.     The same day, the NFA issued a Complaint and a Decision against FXCM, Niv, Ahdout, and Niv's sister, Ornit Niv. ECF Nos. 245-5 (NFA Decision) and 245-6 (NFA Complaint). The NFA found that the defendants committed the violations alleged in the NFA's Complaint, ECF No. 245-5, including that FXCM directed customer trades to a  liquidity provider, Effex, "that was purportedly independent but which FXCM actually supported and controlled. ECF No. 245-6 at 4-5.

A:  This is not a material fact that is relevant to the Court's disposition of Defendants' Motion for Summary Judgment.  The NFA's allegations contained in the NFA Decision and NFA Complaint are not adjudicated facts that can support the grant or denial of a motion for summary judgment in this case.  The CFTC's logic regarding the inadmissibility of the allegations in the CFTC Order (*see* Ex. 232 (CFTC Reparations Order) at 8-9) is equally applicable to the NFA Decision and NFA Complaint.

276.     The NFA found that in exchange for the order flow that FXCM directed to Effex, Effex paid rebates to FXCM that amounted at times to as much as 70% of Effex's profits from FXCM's order flow and which FXCM referred to internally as 'P&L'." ECF No. 245-6 at 5.

A:  This is not a material fact that is relevant to the Court's disposition of Defendants' Motion for Summary Judgment.  The NFA's allegations contained in the NFA Decision and NFA Complaint are not adjudicated facts that can support the grant or denial of a motion for summary judgment in this case.  The CFTC's logic regarding the inadmissibility of the allegations in the CFTC Order (*see* Ex. 232 (CFTC Reparations Order) at 8-9) is equally applicable to the NFA Decision and NFA Complaint.

277.     The Company also issued a press release on February 6, 2017, disclosing the settlements with the NFA and CFTC and announcing that the Company would withdraw from doing business in the U.S., pursuant to the CFTC's order, and sell its U.S. customer accounts. ECF No. 245-13 at 8.

A:  Defendants admit that FXCM issued a press release on February 6, 2017 and that ECF No. 245-13 contains that press release.  Defendants dispute Plaintiffs' characterizations of the February 6, 2017 press release, which announced simultaneous regulatory settlements with the CFTC and NFA in which "[t]he named FXCM entities and principals neither admit[ted] nor den[ied] the allegations associated with the settlements."  ECF No. 245-13 at 8.

278.     On this news, the Company's share price fell $3.40, over 68%, and the price of FXCM Notes fell over 42%. ECF No. 245-1 (Report of Plaintiffs' expert, Adam Werner) at 7.

A:  Defendants dispute that any FXCM Stock price decline or FXCM Notes price decline was caused by FXCM's February 6, 2017 press release.  Defendants do not dispute that the quoted text appears in the Werner Report, although Defendants disagree with Werner's assertions and calculations.  Defendants have filed a Motion

to Exclude the Reports, Testimony, and Opinions of Dr. Adam Werner ("Werner Motion") that is being briefed contemporaneously with Defendants' Motion for Summary Judgment.

279.     On February 21, 2017, Niv resigned as CEO and from the FXCM board of directors. Ex. 182 (FXCM Form 8-K). That same day, FXCM announced its name change to Global Brokerage Inc. *Id.*

A: Undisputed.

280.     On December 11, 2017, the Company filed for Chapter 11 bankruptcy. Ex. 183 (Chapter 11 Petition).

A: Undisputed.

**Wilson-Taylor Report and Deposition Testimony**

281.     Defendants' witness, Simon Wilson-Taylor, submitted a report in connection with this action. ECF No. 252-2 (Wilson-Taylor Report). In Wilson-Taylor's report, he explained that in a dealing desk model, a broker "can either hedge its position or choose not to hedge." *Id.* at 14 (Figure 1).

A: Undisputed.

282.     Wilson-Taylor could not identify any liquidity providers, other than Effex, who customized its services for the needs of a single FX broker. Ex. 170 (Wilson-Taylor Tr. 64:22-65:2).

A: Defendants dispute Plaintiffs' characterization of Wilson-Taylor's testimony. Wilson-Taylor testified that he was aware of liquidity providers, other than Effex, that customized their services to the needs of a single FX broker that was their largest or only client. Ex. 5 (Wilson-Taylor Tr. 63:10-18) ("I am, certainly, aware of the formation of a number of independent and nonbank liquidity providers and I

have no doubt that when they started they would have had a single client. So I think, yes, I am aware of that.").  Wilson-Taylor also testified that "customization . . . is an extremely important part of the function of these firms" and that he had managed three ECNs "and in each case we very much customize our liquidity to the needs of those customers and it's the same process."  *Id.* at 63:19-64:21.

283.    Wilson-Taylor could not identify any liquidity providers, other than Effex, that derived most of their business from a single broker during 2010-2014 timeframe. Ex. 170 (Wilson-Taylor Tr. 77:22-78:2).

A:  Defendants dispute Plaintiffs' characterization of Wilson-Taylor's testimony. Wilson-Taylor testified that he was "certainly. . . aware of the formation of a number of independent and nonbank liquidity providers and I have no doubt that when they started they would have had a single client."  Ex. 210 (Wilson-Taylor Tr. 63:10-18); *see also id.* at 78:2-5 (noting that new liquidity providers were created between 2010-2014, which "would have started with a single customer"). Wilson-Taylor also testified based on his personal involvement negotiating payments for order flow with liquidity providers that liquidity providers paid his firm "more than 50 percent" of their trading profits in order flow payments.  Ex. 210 (Wilson-Taylor Tr. 100:4-103:25) ("[S]ome of them would show me statements of their profitability and show me that they were, you know, making a, you know, number which meant that my fee was more than 50 percent of their income from flow.").

284.    Wilson-Taylor could not identify any liquidity providers, other than Effex, that paid for order flow for retail forex trading volume in the 2010-2014 timeframe. Ex. 170 (Wilson-

Taylor Tr. 86:19-87:6).

> A: Defendants dispute Plaintiffs' characterization of Wilson-Taylor's testimony.
> Wilson-Taylor testified that "Currenex was very much focused [on] the retail
> segment" and that "the sequence of order flow would be that the broker would white
> label Currenex technology. The retail customer would trade on that platform. And
> Currenex would receive payments from the liquidity providers for that order flow,
> yes." Ex. 210 (Wilson-Taylor Tr. 83:6-84:24) ("the flow . . . went through the
> Currenex pipes and they received payment for order flow for that flow, which
> originated it from a retail customer."). Wilson-Taylor did not provide other specific
> examples because "the relationships between those firms were confidential." *Id.* at
> 86:19-87:3.

285.    Wilson-Taylor could not identify any liquidity providers, other than Effex, that
paid more than 50% of its profits in order flow payments on retail forex trading volume. Ex. 170
(Wilson-Taylor Tr. 104:2-7). To the extent that liquidity providers may have briefly paid
"substantial" amounts, Wilson-Taylor deemed that such practices were "not sustainable." Ex.
170 (Wilson-Taylor Tr. 153:16-154:13).

> A: Defendants dispute Plaintiffs' characterization of Wilson-Taylor's testimony.
> Wilson-Taylor testified based on his personal involvement negotiating payments
> for order flow with liquidity providers that liquidity providers paid his firm "more
> than 50 percent" of their trading profits in order flow payments. Ex. 210 (Wilson-
> Taylor Tr. 100:4-103:25) ("[S]ome of them would show me statements of their
> profitability and show me that they were, you know, making a . . . number which
> meant that my fee was more than 50 percent of their income from flow."); *see also*

*id.* at 154:3-13 (I've been part of negotiations with liquidity providers where they've shown me their profitability and used it to squeeze me on -- and asked me to reduce my fees. And, you know, for a period of time, it would have been a substantial number.").

286.     In Wilson-Taylor's own experience, in which his former employers  received order flow payments from liquidity providers in other contexts, as a matter of policy order flow payments would be memorialized in written agreements, and the agreements would be amended if the rate of the order flow payments changed. As Wilson-Taylor stated: "your policy should always be to make sure that the agreements reflect the nature of the relationship," and he could not think of any instances in which he would not want to amend the written agreement to reflecta change in the rate for order flow payments. Ex. 170 (Wilson-Taylor Tr. 121:7-122:15).

A:  Defendants dispute Plaintiffs' characterization of Wilson-Taylor's testimony. Wilson-Taylor testified that he would expect parties to memorialize changes in order flow fee rates by amending their services agreements "if you're being . . . pedantic about how agreements are kept in step completely all the time," noting his own experience "that that doesn't always happen."  Ex. 210 (Wilson-Taylor Tr. 120:20-121:4).  Wilson-Taylor recalled that his firms had a policy of amending written agreements to reflect changed rates for order flow payments with liquidity providers, but he "can't be certain that we always did record that" because he was not directly responsible for those relationships.  *Id.* at 121:15-22.

287.     Wilson-Taylor could not identify any forex brokers, other than FXCM, who were receiving order flow payments from liquidity providers outside the U.K., but stopped doing so after the FCA's 2014 thematic review. Ex. 170 (Wilson-Taylor Tr. 124:8-14).

A: Defendants dispute Plaintiffs' characterization of Wilson-Taylor's testimony. Wilson-Taylor testified that he understood that payment for order flow is still "an accepted practice in all markets" and that payments for order flow are still permitted despite the FCA's 2014 thematic review and guidelines.  Ex. 210 (Wilson-Taylor Tr. 124:15-125:5).  To the extent any forex brokers other than FXCM stopped receiving order flow payments outside the UK after the FCA's 2014 thematic review, Wilson-Taylor testified that he had "no personal knowledge" of the internal operations of those firms.  *Id.* at 124:8-14.

### 683 Capital Deposition Testimony

288.     683 Capital's representative, Joseph Patt, testified at his deposition that he reviewed FXCM's annual (10-K), quarterly (10-Q), and current (8-K) reports throughout the Class Period. Ex. 184 (Patt Tr. 33:20-25). For example, Patt testified that he was "following the company closely," Ex. 184 (Patt Tr. 30:25, 103:20), and he repeatedly testified that he and 683 Capital reviewed the company's public filings. Ex. 184 (Patt Tr. 35:2, 126:16-19 ("based on the filings, we believed [FXCM] to be a good business"), 129:19-20 ("Based on the filings that had been, you know, that we read"), 139:9-10 ("By reading the public filings from FXCM"), 148:4-7(Q: "Would you have generally reviewed the 10-Ks, 10-Qs, et cetera, in connection with your investment of - - in FXCM?" A: "Yes.")).

A:  Defendants do not dispute that the quoted text appears in Patt's transcript. Defendants dispute that Patt reviewed these throughout the Class Period, which is not supported by Plaintiffs' citation.

289.     Patt also testified that he reviewed the very document that revealed that FXCM no longer received payments for order flow: "Q: Do you recall reviewing a 10-K [sic] for Q3 of 2014? A: Yes." Ex. 184 (Patt Tr. 148:8-10).

A:  Defendants do not dispute that the quoted text appears in Patt's transcript. Defendants dispute that the announcement of the cessation of order flow payments is something that was "revealed," implying that it was ever concealed.

290.     Patt testified that if FXCM had disclosed its relationship with Effex, it would have changed 683 Capital's investment decision. Ex. 184 (Patt Tr. 151:9-25) ("if it had been clear disclosed with valuations, I probably would have -- might have paid a lower price … Because it wasn't what we thought it was.").

A:  Defendants do not dispute that the quoted text appears in Patt's transcript. However, Patt's full testimony is: "if it had been clear disclosed with valuations, I probably would have -- might have paid a lower price, I don't know. It might have been willing to pay a lower price, probably. Because it wasn't what we thought it was." Ex. 184 (Patt Tr. 151:9-25).

291.     As Patt further explained, "[w]e thought it was an agency business that was providing leverage. Instead it was something else with a lot of risk to potentially operating. Like, they were getting -- by putting themselves at risk of being banned, which they clearly were, because they were, they took off a lot of the upside tail in this investment or just general upside, frankly, or any upside. But we didn't know that." Ex. 184 (Patt Tr. 152:2-10).

A:  Defendants do not dispute that the quoted text appears in Patt's transcript.

292.     683 Capital's calculation that it was likely to recover the full value of the FXCM Notes was based on not only FXCM's balance sheet, but also public filings and 683 Capital's assessment of FXCM's public statements about the historical value of their business. Ex. 184 (Patt Tr. 77:23-78:7).

A:  Defendants dispute Plaintiffs' characterization of Patt's testimony.  The cited

portion of the transcript does not specify that 683 Capital was relying on public

filings, nor that any statements they relied on were necessarily public.

293.    Patt's testimony reflects his understanding that the basis of 683 Capital's claims

involved, among other things: (1) an undisclosed relationship with Effex as a related party, Ex.

184 (Patt Tr. 142:16-22); (2) that because of this undisclosed relationship FXCM had conflicts of

interest with its customers contradicting its public statements, Ex. 184 (Patt Tr. 143:12-17); and

(3) kickback payments made by Effex to FXCM, Ex. 184 (Patt Tr. 144:13-14).

> A:  Defendants dispute Plaintiffs' characterization of Patt's testimony.  The cited
>
> portion of the transcript does not support that 683 Capital understood Effex to be a
>
> related party.  Nor does the cited portion of the transcript support that 683 Capital
>
> understood FXCM to have conflicts of interest with its customers, a phrase Patt
>
> does not use.

294.    Patt provided a substantive and accurate explanation of the central claims in

this case:

> [T]hey said they were, basically, an agency business that
> allowed institutional clients to trade … FX products and lever -
> - and lever them up. But it turns out they were also like,
> effectively, betting, you know, against their clients or taking risk
> or doing something it clearly meant they weren't an agency
> product, which put their corebusiness at risk from a regulatory
> perspective, because they were misrepresenting what they were
> doing to their clients and to their investors.

Ex. 184 (Patt Tr. 29:11-25).

> A:  Defendants do not dispute that the quoted text appears in Patt's transcript.
>
> Defendants dispute Plaintiffs' characterization of Patt's testimony.

## **Barron Expert Report and Supporting Deposition Testimony**

295.    Plaintiff's accounting expert, John Barron, submitted his expert reports in

connection with this Action. ECF No. 240-1 (Barron Report) and 240-3 (Barron Rebuttal). In Barron's report, he calculated that "the revenue recognized by FXCM from these order flow payments [from Effex] represented … approximately 26% over the five-year period [in which Effex made these payments.]" ECF No. 240-1 at 5.

> A:  Defendants do not dispute that Plaintiffs have proffered John Barron as an accounting expert in connection with this action.  Defendants do not dispute that the quoted text appears in the Barron Rebuttal, yet Defendants do not adopt Barron's assertions or calculations.  Defendants have filed a Motion to Exclude the Reports, Testimony, and Opinions of John E. Barron ("Barron Motion") that is being briefed contemporaneously with Defendants' Motion for Summary Judgment.

296.     FXCM's management concluded that "Landing in that FXCM may have had a variable interest in Effex, as the entity likely did not have sufficient equity to fund its activities (given the support FXCM was giving at the time of its start-up in 2010 (use of FXCM office space for a period of time including the use by Effex for four months between March 2010 and June 2010 of a FXCM subcontract account at Citibank Prime Brokerage so that it could trade))." ECF No. 240-3 (Barron Rebuttal) at 20 (quoting Ex. 129 (EY-GBI-WP-00003862)).

> A:  Defendants do not dispute that the quoted text appears in Ex. 129.  Likewise, Defendants do not dispute that the quoted text appears in the Barron Rebuttal, yet Defendants do not accept Barron's characterizations of Ex. 129.  Robert Lande testified regarding Ex. 129 and stated with respect to a VIE analysis, "[a]nd that then gets you to power and power is what gets us comfortable that there wasn't a VIE because we didn't have voting rights. We didn't have the ability to name

management or be on the board. We didn't have equity interest. We didn't have voting interest, you know, we didn't have any rights or, frankly, any visibility into what EFFEX's business was doing or not doing and with who or anything. So that was the end of our -- that was our conclusion with it not being a VIE and that was never disputed by Ernst & Young." Ex. 212 (Lande Tr. 170:24-171:11).  Finally, Defendants have filed the Barron Motion that is being briefed contemporaneously with Defendants' Motion for Summary Judgment.

297.    FXCM's management concluded that FXCM satisfied the VIE criteria of having the right to receive benefits from Effex that could potentially be significant to Effex. "With respect to benefits, it is likely that FXCM did meet the benefits criterion. While it did not have the obligation to absorb losses, FXCM received what is believed to be a significant portion of the revenues of Effex through the payments for order flow." ECF No. 240-3 (Barron Rebuttal) at 26-27 (quoting Ex. 129 (EY-GBI-WP-00003862)).

A:  Defendants do not dispute that the quoted text appears in Ex. 129.  Likewise, Defendants do not dispute that the quoted text appears in the Barron Rebuttal, yet Defendants do not accept Barron's characterizations of Ex. 129.  Robert Lande testified regarding Ex. 129 and stated with respect to a VIE analysis, "[a]nd that then gets you to power and power is what gets us comfortable that there wasn't a VIE because we didn't have voting rights. We didn't have the ability to name management or be on the board. We didn't have equity interest. We didn't have voting interest, you know, we didn't have any rights or, frankly, any visibility into what EFFEX's business was doing or not doing and with who or anything. So that was the end of our -- that was our conclusion with it not being a VIE and that was

never disputed by Ernst & Young." Ex. 212 (Lande Tr. 170:24-171:11).  Finally, Defendants have filed the Barron Motion that is being briefed contemporaneously with Defendants' Motion for Summary Judgment.

298.     E&Y audit partner, David Stollow, testified that prior to the investigation by the NFA and CFTC, he had no recollection of E&Y inquiring specifically about whether Effex should have been disclosed as a related party or whether, during the years 2010 – 2013, E&Y considered whether FXCM should have been reporting its relationship with Effex as a potential VIE. Ex. 185 (Stollow Tr. 103:19-104:10, 107:6-107:15).

> A:  Defendants to not dispute that Stollow testified about his lack of a specific recollection on this topic.  However, the lack of a specific recollection from a witness who admittedly did not work on the engagement during the time period is not evidence of any fact and therefore is not a material fact that is relevant to the Court's disposition of Defendants' Motion for Summary Judgment.  In conducting its audits, EY had full access to conduct a thorough and independent audit of FXCM each year during the Class Period.  *See* Ex. 212 (Lande Tr. 72:21-73:3); Ex. 6 (Niv Tr. 48:17-24); Ex. 223 (Stollow Tr. 99:6-101:4).   Moreover, EY conducted a detailed and thorough evaluation of the FXCM and Effex relationship after the announcement of the CFTC and NFA settlements.  *See* Ex. 213 (EY-GBI-WP-00004260).

299.     Stollow also testified that during the periods prior to the CFTC and NFA investigations E&Y was aware of Effex as a liquidity provider from a transactional perspective, but first became aware of the arrangement between Dittami and FXCM over the course of the NFA and CFTC communications in 2015 and 2016. Ex. 185 (Stollow Tr. 114:14-115:7). Stollow further

testified that E&Y was aware of the payments for order flow in the service agreement, but prior to the time of the NFA and CFTC investigation, E&Y was not aware of the entire relationship. Ex. 185 (Stollow Tr. 118:17-119:4).

> A:   Defendants dispute Plaintiffs' characterization of Stollow's testimony, particularly Plaintiffs' vague and ambiguous assertion of knowledge of "the arrangement" between Dittimi and FXCM.  EY was made aware of the Services Agreement in the 2011 financial statement audit.  *See* ECF No. 264 at ¶ 72 (admitting fact that EY was provided Services Agreement).   The Services Agreement is the memorialization of the financial arrangement between the parties.

300.    Lande testified that he could not recall E&Y coming to a conclusion regarding whether Effex needed to be considered a VIE or consolidated. Ex. 186 (Lande Tr. 97:16–99:3). Lande testified that E&Y would have seen the revenue from order flow payments included in the general ledger and "If [EY] had a problem, trust me we would have known about it." *Id.* As Barron's rebuttal report explains, "[t]his suggests that FXCM management did not raise the issue with E&Y in connection with E&Y's audits and that E&Y did not independently identify the relationship as an issue with respect to consolidation." ECF No. 240-3 (Barron Rebuttal) at 35.

> A:   Defendants do not dispute that the quoted language appears in Ex. 186. Defendants dispute Plaintiffs' characterization of Lande's testimony, in which he stated that the Effex relationship "was a substantial relationship, you know.  They could see very clearly in our general ledger system, you know, the lines that were dedicated to revenues or receivables . . . coming from EFFEX . . . .  I don't remember any moment as such where . . . [EY] concluded it wasn't a VIE, that this was an ongoing process that never stopped and would have started . . . right from

when . . . result from EFFEX would have started showing up in our results." Ex. 12 (Lande Tr. 98:5-18). Moreover, it is undisputed that EY received the Services Agreement and was made aware of FXCM's discussions of an Option Agreement with Effex. ECF No. 264 ¶ 72; Ex. 126. Defendants do not dispute that the quoted text appears in the Barron Rebuttal, yet Defendants do not accept Barron's characterizations of Lande's testimony. Defendants have filed the Barron Motion that is being briefed contemporaneously with Defendants' Motion for Summary Judgment.

**Defendants' False and Misleading SOX Certifications**

301.    The 2011 10-K also contained Sarbanes-Oxley Act of 2002 ("SOX") certifications attesting to the accuracy of the report, certifying that "this report does not contain any untrue [or misleading] statement of a material fact," and certifying that Niv disclosed "[a]ny fraud, whether or not material" to FXCM's auditor and audit committee. Niv signed his 2011 10-K SOX certification. Ex. 187 (2011 10-K SOX certification).

A:  Undisputed.

302.    The 12Q1 10-Q also contained SOX certifications attesting to the accuracy of the report, certifying that "this report does not contain any untrue [or misleading] statement of a material fact," and certifying that Niv disclosed "[a]ny fraud, whether or not material" to FXCM's auditor and audit committee. Niv signed his 12Q1 10-Q SOX certification. Ex. 188 (12Q1 10-Q SOX certification).

A:  Undisputed.

303.    The 12Q2 10-Q also contained SOX certifications attesting to the accuracy of the report, certifying that "this report does not contain any untrue [or misleading] statement of a

material fact," and certifying that Niv disclosed "[a]ny fraud, whether or not material" to FXCM's auditor and audit committee. Niv signed his 12Q2 10-Q SOX certification. Ex. 189 (12Q2 10-Q SOX certification).

      A: Undisputed.

304.     The 12Q3 10-Q also contained SOX certifications attesting to the accuracy of the report, certifying that "this report does not contain any untrue [or misleading] statement of a material fact," and certifying that Niv disclosed "[a]ny fraud, whether or not material" to FXCM's auditor and audit committee. Niv signed his 12Q3 10-Q SOX certification. Ex. 190 (12Q3 10-Q SOX certification).

      A: Undisputed.

305.     The 2012 10-K also contained SOX certifications attesting to the accuracy of the report, certifying that "this report does not contain any untrue [or misleading] statement of a material fact," and certifying that Niv disclosed "[a]ny fraud, whether or not material" to FXCM's auditor and audit committee. Niv signed his 2012 10-K SOX certification. Ex. 191(2012 10-K SOX certification).

      A: Undisputed.

306.     The 13Q1 10-Q also contained SOX certifications attesting to the accuracy of the report, certifying that "this report does not contain any untrue [or misleading] statement of a material fact," and certifying that Niv disclosed "[a]ny fraud, whether or not material" to FXCM's auditor and audit committee. Niv signed his 13Q1 10-Q SOX certification. Ex. 192 (13Q1 10-Q SOX certification).

      A: Undisputed.

307.     The 13Q2 10-Q also contained SOX certifications attesting to the accuracy of

the report, certifying that "this report does not contain any untrue [or misleading] statement of a material fact," and certifying that Niv disclosed "[a]ny fraud, whether or not material" to FXCM's auditor and audit committee. Niv signed his 13Q2 10-Q SOX certification. Ex. 193 (13Q2 10-Q SOX certification).

        A: Undisputed.

308.    The 13Q3 10-Q also contained SOX certifications attesting to the accuracy of the report, certifying that "this report does not contain any untrue [or misleading] statement of a material fact," and certifying that Niv disclosed "[a]ny fraud, whether or not material" to FXCM's auditor and audit committee. Niv signed his 13Q3 10-Q SOX certification. Ex. 194 (13Q3 10-Q SOX certification).

        A: Undisputed.

309.    The 2013 10-K also contained SOX certifications attesting to the accuracy of the report, certifying that "this report does not contain any untrue [or misleading] statement of a material fact," and certifying that Niv disclosed "[a]ny fraud, whether or not material" to FXCM's auditor and audit committee. Niv signed his 2013 10-K SOX certification. Ex. 195(2013 10-K SOX certification).

        A: Undisputed.

310.    The 14Q1 10-Q also contained SOX certifications attesting to the accuracy of the report, certifying that "this report does not contain any untrue [or misleading] statement of a material fact," and certifying that Niv disclosed "[a]ny fraud, whether or not material" to FXCM's auditor and audit committee. Niv signed his 14Q1 10-Q SOX certification. Ex. 196 (14Q1 10-Q SOX certification).

        A: Undisputed.

311.     The 14Q2 10-Q also contained SOX certifications attesting to the accuracy of the report, certifying that "this report does not contain any untrue [or misleading] statement of a material fact," and certifying that Niv disclosed "[a]ny fraud, whether or not material" to FXCM's auditor and audit committee. Niv signed his 14Q2 10-Q SOX certification. Ex. 197 (14Q2 10-Q SOX certification).

A:  Undisputed.

312.     The 14Q3 10-Q also contained SOX certifications attesting to the accuracy of the report, certifying that "this report does not contain any untrue [or misleading] statement of a material fact," and certifying that Niv disclosed "[a]ny fraud, whether or not material" to FXCM's auditor and audit committee. Niv signed his 14Q3 10-Q SOX certification. Ex. 198 (14Q3 10-Q SOX certification).

A:  Undisputed.

313.     The 2014 10-K also contained SOX certifications attesting to the accuracy of the report, certifying that "this report does not contain any untrue [or misleading] statement of a material fact," and certifying that Niv disclosed "[a]ny fraud, whether or not material" to FXCM's auditor and audit committee. Niv signed his 2014 10-K SOX certification. Ex. 199(2014 10-K SOX certification).

A:  Undisputed.

Dated: January 20, 2022

KING & SPALDING LLP

*/s/ Israel Dahan*
Israel Dahan
Peter Isajiw
Ryan Gabay
KING & SPALDING LLP
1185 Avenue of the Americas
New York, New York 10036-2601
Tel: (212) 556.2100
Fax: (212) 556.2200
idahan@kslaw.com
pisajiw@kslaw.com
rgabay@kslaw.com

Chelsea Corey
KING & SPALDING LLP
300 S. Tryon Street, Suite 1700
Charlotte, North Carolina 28202
Tel: (704) 503.2575
Fax: (704) 503.2622
ccorey@kslaw.com

*Attorneys for Defendants Global Brokerage, Inc.*
*f/k/a/ FXCM, Inc., Dror Niv, and William Ahdout*