# Exhibit 209

Page 1

1        CONFIDENTIAL -  JOHN DITTAMI
2           UNITED STATES DISTRICT COURT
        FOR THE SOUTHERN DISTRICT OF NEW YORK
3

     In re:                    :
4                              :  Master File No.
     Global Brokerage, Inc.    :  1:17-cv-00916-RA
5    F/k/a FXCM, Inc.          :
     Securities Litigation     :
6    ----------------------    :
7
8           REMOTE VIDEO DEPOSITION OF:
9                  JOHN DITTAMI
10           THURSDAY, JANUARY 21, 2021
11
12
13
14
15
16
17
18
19
20
21
22
23
24    REPORTED BY:
     SILVIA P. WAGE, CCR, CRR, RPR
25

1           CONFIDENTIAL - JOHN DITTAMI
2     EES?
3          A. Yeah, which was subsequently referred
4     to as EES, yes.
5          Q. Yes, thank you.
6              Did you ever consider EES a division
7     of FXCM?
8          A. No.
9          Q. Did anyone at FXCM refer to EES as a
10    division of FXCM in conversations with you?
11         A. No.
12         Q. So looking now to the paragraph under
13    Section 1, which is titled, "Employment."
14             And do you see that paragraph there?
15         A. Yes.
16         Q. While you were at FXCM, did you hold
17    the title of Managing Director?
18         A. I held -- according to this document,
19    yes.
20         Q. To your knowledge, did anyone ever
21    refer to you at FXCM as Managing Director of EES?
22         A. No, no one used the term "Managing
23    Director" with me.
24         Q. Okay. Moving to the next page, I'd
25    like to focus your attention on Sections 4 and 5.

1           CONFIDENTIAL - JOHN DITTAMI
2     And please take a minute to review those
3     sections.
4              My question to you will be, do these
5     sections provide that your compensation will be a
6     base salary of $250,000 rising to 300,000 after
7     six months plus a management bonus equal to
8     30 percent of the profits generated by EES?
9          A. Yes, it does.
10         Q. So is it fair to say that under this
11    agreement you would split the trading profits
12    generated by EES with FXCM with FXCM getting
13    70 percent and you keeping 30 percent?
14         A. Yes.
15         Q. Did you view the base salary and
16    30 percent share of the profits from EES as the
17    main economic terms of this agreement?
18         A. I viewed -- no, I viewed them as some
19    of the economic terms of this agreement.
20         Q. Were there other economic terms in
21    this agreement that you considered central to the
22    agreement?
23         A. Yes.
24         Q. Such as what?
25         A. Such as the -- all of the business

1           CONFIDENTIAL - JOHN DITTAMI
2     that ended early exit terms -- I have to scroll
3     to look at them -- or a potential purchase of the
4     entity, if going public. Off the top of my head,
5     those were the critical ones.
6          Q. Okay.
7              MR. PAYKIN: And you're referring
8     economic terms relating to Mr. Dittami, correct?
9              MR. BAKER: Yes.
10         Q. Mr. Dittami, at the time that you
11    entered into this employment agreement, did you
12    have an expectation as to the amount of profits
13    EES would generate on an annual basis?
14         A. I expected it to make profits. I
15    didn't know how much.
16         Q. Did you have an expectation in terms
17    of order of magnitude of the profits you expected
18    EES to generate?
19             MR. DAHAN: Objection, asked and
20    answered.
21         Q. You can still answer the question.
22         A. I expected it would be substantial
23    enough to be as good as my other alternatives of
24    decisions that would already be in play.
25         Q. Did you have expectation --

1           CONFIDENTIAL - JOHN DITTAMI
2              THE STENOGRAPHER: I'm sorry. You're
3     trailing off and I'm not catching the rest of
4     your answer.
5          A. I expected it to be around the same
6     or better than the other alternative employment
7     options I had available.
8              THE STENOGRAPHER: Thank you.
9          Q. Did you have an expectation as to the
10    size of your management bonus relative to your
11    base salary?
12         A. I expected it would be multiples
13    there.
14         Q. Multiples of your base salary?
15         A. Correct.
16         Q. When you were negotiating this
17    employment agreement, did you have any
18    discussions with anyone at FXCM as to the amount
19    of profits EES was expected to generate?
20         A. No.
21         Q. And going back to Page 1 under
22    Section 2, do you see a reference to a
23    "$3 million initial investment"?
24         A. I do.
25         Q. Okay. And I don't have any questions

10 (Pages 34 - 37)

CONFIDENTIAL - JOHN DITTAMI

1  credit, et cetera.  I need to fund my own
2  accounts with my own money.  I'm negotiate -- I'm
3  trying to negotiate him down to 14.  He didn't
4  agree.
5      Q.  And so I'll just -- I'll try one more
6  time to clarify my question and then if maybe if
7  we're not connecting, we can move on.
8      But you say, "We can likely swing it
9  again at $21 per million, meaning, that Effex can
10 pay FXCM $21 per million for order flow," and you
11 say, "and chew the reserve down to zero."
12     And I'm asking if those two things
13 were connected in your mind at this time?
14     A.  In the -- it went -- when you
15 pay more fees, you have less earnings and
16 capital, which is the reserve that funds your
17 capital that's required Effex to keep capital at
18 Citi.  If I pay less fees, I have more income and
19 I can accumulate more capital with my Citi prime
20 brokerage.  If I pay more, I have less capital to
21 fund my Citi trading, which has a $1 million
22 minimum plus additional reserves for taking risk
23 and carrying risk, and you have a minimum capital
24 and then you have to fund your positions.  If I

CONFIDENTIAL - JOHN DITTAMI

1  pay more money, I have less money to fund my
2  positions.  If I pay less money, I have more
3  money to fund my positions.
4      Q.  Okay.  At the last sentence of that
5  paragraph starting in the second to last line you
6  write, "The other alternative is we go halfway at
7  $17.50 and cut the reserve a little but give us a
8  whole other month to work out how this will shake
9  out."
10     Is 17.50 halfway between $14 the
11 proposed and $21?
12     MR. DAHAN:  Objection to form.  I
13 imagine --
14     A.  It's, approximately, halfway, yes.
15     MR. DAHAN:  Yes.
16     Q.  From Effex's perspective, who had the
17 final say on determining the rate that Effex
18 should pay FXCM for order flow for a given month?
19     A.  It was a negotiation.  They either
20 agreed to it or didn't agree to it.  The final
21 say is a negotiation between two parties and our
22 service contract.
23     Q.  Who had the authority --
24     A.  Effex -- at Effex I had the

CONFIDENTIAL - JOHN DITTAMI

1  authority.
2      Q.  Okay.
3      A.  And at FXCM, I'm not sure how it is,
4  you know.
5      Q.  Thank you.  That was going to be my
6  next question.
7      And so was the rate that Effex should
8  pay FXCM for order flow for a given month
9  determined by an agreement between you and
10 Mr. Ahdout?
11     A.  It was determined by the services
12 agreement.
13     MR. DAHAN:  Objection, form.
14     Q.  Were you aware of anyone else at FXCM
15 who was involved in the negotiations over the
16 rate that Effex should pay FXCM for order flow
17 for a given month?
18     A.  William would be my primary first
19 contact and I would, you know, pitch it to Drew
20 when I felt like I was close enough to be able to
21 make a change, try to negotiate, William and Drew
22 effectively.
23     Q.  Okay.  I'm going to show you the next
24 document.

CONFIDENTIAL - JOHN DITTAMI

1      (Deposition Exhibit 44, e-mail string
2  and attachment GLBR_00184107 & GLBR_00184108
3  marked Confidential, was marked for
4  identification.)
5      Q.  Okay.  Let me know when you can see
6  Exhibit 44.
7      A.  I can see Exhibit 44.
8      Q.  Take a minute to review this
9  document.
10     MR. BAKER:  For the record,
11 Exhibit 44 is GLBR 184107 and an attachment which
12 is GLBR 184108.
13     Q.  Mr. Dittami, just let me know when
14 you're ready.
15     A.  I'm ready.
16     Q.  Is this an e-mail from Josh Rosenfeld
17 to yourself copying two other individuals and
18 attaching with an attachment?
19     A.  It is.
20     Q.  In your second e-mail here, you
21 write, "Please provide me with updated invoice
22 for services for First Derivatives and payment
23 due to" holdings -- "to holding," sorry.
24     By "payment due to holding," were you

Page 82

CONFIDENTIAL - JOHN DITTAMI

1  or invested. I'm just asking if that's referring
2  to the same thing.
3     MR. DAHAN:  Whatever.  Objection to
4  form; whatever.
5     MR. PAYKIN:  Objection to form as
6  well.
7     THE WITNESS:  Joe, am I to attempt to
8  answer that, Joe?
9     MR. PAYKIN:  You can attempt to
10 answer it.
11    A.  This refers to the language in the
12 initial employment agreement with a proposed
13 maximum investment into the employment agreement
14 venture.
15    Q.  Okay.  And as described in this
16 letter, is it correct that only a portion of the
17 $3 million was actually used to fund EES?
18    A.  Only a portion was used to fund,
19 although that was paid back in full.  So no
20 portion was used to fund.  A portion was used and
21 repaid.
22    Q.  Okay.  And do you recall,
23 approximately, how much of the $3 million that
24 portion was?

Page 83

CONFIDENTIAL - JOHN DITTAMI

1     A.  I don't recall.  It was less than --
2  less than a million, substantially less than a
3  million.  But I don't recall the exact amount.
4     Q.  Okay.  And then in the same
5  paragraph, you write or the letter says, "EFFEX
6  repaid FXCM for software licenses, hardware costs
7  and external consulting costs, which FXCM
8  incurred during the employee/employer phase."
9        Do you see that?
10    A.  Yes.
11    Q.  And is that accurate?
12    A.  Yes.
13    Q.  Were those expenses and costs the
14 same as the portion of the $3 million initial
15 investment that was used to fund the EES or were
16 they something else?
17    A.  The description that I just answered
18 in the previous question where less than a
19 million was utilized was these items that were
20 repaid noted in this sentence here.
21    Q.  Okay.  And why did EFFEX repay FXCM
22 for costs that FXCM incurred while you were an
23 FXCM employee?
24    A.  Because EFFEX was becoming an

Page 84

CONFIDENTIAL - JOHN DITTAMI

1  independent venture and wanted to keep its clean
2  ownership of intellectual property.
3     THE STENOGRAPHER:  "Clean ownership"
4  I'm sorry?
5     A.  Clean ownership of intellectual
6  property of all technology built.  EFFEX wanted
7  to make sure it was paid for so that we know the
8  date or dispute of the ownership thereof.
9     Q.  And did you discuss this repayment
10 with anyone at FXCM?
11    A.  I would have had to have speak to the
12 accountants and get bills for exactly what the
13 costs were.
14    Q.  Did you speak to any principals of
15 FXCM about this repayment?
16    A.  I am sure I spoke to William, but I
17 can't recall, specifically.
18    Q.  Do you know who first proposed this
19 repayment, whether it was you or someone else?
20    A.  I don't know who first -- I don't
21 know who first did it.  I would have wanted it.
22    Q.  Okay.  On the next page, you write,
23 "In order to initiate its trading activities,
24 EFFEX required a trading line of credit and a

Page 85

CONFIDENTIAL - JOHN DITTAMI

1  brokerage account for its trading activities."
2        Is that accurate?
3     A.  That's accurate, uh-huh.
4     Q.  And for what purposes did EFFEX need
5  a trading line of credit and brokerage account?
6     A.  Every trading in foreign exchange
7  requires credit between the two counterparts on
8  the sides of the trade.
9     Q.  And, I think, we touched on this
10 before, but to, I guess, clarify a bit.
11       Did EES require a trading line of
12 credit in a brokerage account for its trading
13 activities?
14    A.  No, because EES at the time was part
15 of FXCM.  FXCM and EES is one counterpart.  EFFEX
16 and FXCM were two different counterparts and
17 there is a credit risk between those parties.
18    Q.  And what did EES use for the purposes
19 of the trading line of credit in brokerage
20 account?
21    A.  Initially, EES established a prime of
22 prime account.
23    MR. PAYKIN:  EES or EFFEX, John?
24    A.  EFFEX established a prime of prime

22 (Pages 82 - 85)

Page 134

CONFIDENTIAL - JOHN DITTAMI

1    CONFIDENTIAL - JOHN DITTAMI
2   Agreement?
3       A. It would not refer to the same one as
4   shown. It would refer to the negotiated ones as
5   discussed, yes. Continued negotiation of my
6   attempt to secure a massive payout for Effex
7   Capital.
8       Q. Was there an executed license
9   agreement in place between FXCM and either you or
10  Effex at this time?
11      A. The executed license agreement dated
12  May 1st, I believe, is the one -- that's a
13  Services Agreement. Apologies, that's a Services
14  Agreement.
15      Q. Yes. I want to see a separate --
16      A. I don't think there was agreement
17  titled "License Agreement," no.
18      Q. Okay. Thank you.
19       In the second paragraph of the same
20  e-mail you're looking at, it is the second
21  sentence beginning at the very end of the first
22  line of the second paragraph. You write, "I will
23  also keep Ken G in the loop, as he was a large
24  proponent of the pay for flow idea that came
25  after the last discussions we all had together

Page 135

1    CONFIDENTIAL - JOHN DITTAMI
2   about doing as a license agreement."
3       Do you see that?
4       A. Yes, I do.
5       Q. And "Ken G" is Ken Grossman?
6       A. He is, yes.
7       Q. And do you recall the discussions
8   that you reference here?
9       A. Yes, Ken Grossman was adamant that
10  this be paid dollars per million for flow.
11      Q. Were there other options being
12  discussed at that time? By "options" I mean
13  alternatives to pay for flow.
14      A. This is July. At this time, can you
15  define -- at what time please?
16      Q. The time of this e-mail and the
17  discussions that you said you were --
18      A. Sorry. At the time of this e-mail
19  was -- were definitively per million payments,
20  which Ken was making clear and I'm asking for
21  part of it, earlier ones.
22      Q. Do you recall who else was involved
23  in those discussions besides yourself and
24  Mr. Grossman, if anyone?
25      A. With William, who was my regular, you

Page 136

1    CONFIDENTIAL - JOHN DITTAMI
2   know, would be my person who I would negotiate
3   and discuss this stuff with most frequently.
4       Q. By -- when you say, "doing it as a
5   license agreement," did you mean the discussions
6   concerned potentially structuring the Effex/FXCM
7   relationship as a license agreement?
8       A. I believe the "license agreement" is
9   referred to them getting licensed to my
10  intellectual property.
11       But, again, it was -- nothing was --
12  those negotiations never came to fruition. They
13  gave up trying.
14      Q. And in your discussions with
15  Mr. Grossman and Mr. Ahdout, did you discuss any
16  other alternative structures for Effex/FXCM
17  relationship other than the pay for flow
18  arrangement?
19      A. Just this one that I've been
20  discussing in our negotiation. Negotiation for
21  future our purchase that would then have to have
22  terms assigned upon it, only in that negotiation.
23      Q. Okay. I'm going to show you the next
24  document.
25       (Deposition Exhibit 25, e-mail string

Page 137

1    CONFIDENTIAL - JOHN DITTAMI
2   and attachments GLBR_00152107 to GLBR_00152136
3   marked Confidential, was marked for
4   identification.)
5       A. I see 24.
6       Q. You're a step ahead of me so...
7       MR. DAHAN: We're up to 25, no?
8       MR. BAKER: Yes, that's right.
9       Q. Do you see Exhibit 25? Or perhaps
10  you were a step behind me.
11      A. Yes, a step behind.
12       I see Exhibit 25, yes.
13      Q. Okay. So please take a minute to
14  review. There's a -- it's a relatively long
15  exhibit. So I'm going to point you to specific
16  sections of it. But take a minute to generally
17  review this and as always feel free to review the
18  entirety of it, if you need for context.
19       MR. BAKER: For the record,
20  Exhibit 25 is GLBR 152107 and an attachment,
21  which is GLBR 152108.
22      Q. Mr. Dittami, just let me know when
23  you're ready.
24      A. Okay, I'm ready.
25      Q. And is this an e-mail from yourself

35 (Pages 134 - 137)

Page 138

CONFIDENTIAL - JOHN DITTAMI

1     CONFIDENTIAL - JOHN DITTAMI
2     to Mr. Ahdout with the attachment?
3          A.  Yes, it is.
4          Q.  And in your e-mail you write, "Before
5     we chat on this, I figured you may want to read
6     our initial agreement."
7          And skipping ahead a little to the
8     next line you write, "I crossed out all the stuff
9     that really isn't relevant."
10          Do you see that?
11          A.  Yes.
12          Q.  Do you recall having this discussion
13     with Mr. Ahdout?
14          A.  I don't recall this specific
15     discussion, but I recall generally negotiating --
16     the continued negotiations, as I mentioned.
17          Q.  Okay.  And looking down to the
18     attachment, which starts at GLBR 152108 -- and
19     when I say that, I'm referring to the numbers at
20     the bottom right-hand corner of the page.
21          Do you see where those are?
22          A.  Yes, I am on that page.
23          Q.  Okay.  And throughout the course of
24     today, if I refer to a "Bates stamp," unless I
25     say otherwise, I'm going to be referring to the

Page 139

1     CONFIDENTIAL - JOHN DITTAMI
2     set of letters and numbers that start with "GLBR"
3     and then a set of numbers, okay?
4          A.  Understood.
5          Q.  So is this attachment an unsigned
6     execution copy of your employment agreement that
7     we looked at earlier today marked up with your
8     edits and comments?
9          A.  Yes.
10          Q.  And starting at the third page of the
11     attachment at GLBR 152110, you see the crossed
12     out section titled, "Management Bonus"?
13          A.  I do.
14          Q.  And does this appear to be the
15     section of your employment agreement that
16     provides for a bonus to you of 30 percent of the
17     trading profits from your venture -- sorry, from
18     your trading system with FXCM keeping the other
19     70 percent?
20          A.  The section does address that, yes.
21     Yes, that section, yes.
22          Q.  And this section appears to be -- the
23     entire section appears to be crossed out and then
24     at the end of the section, there's a few pages
25     later at GLBR 152114.  You wrote, "All replaced

Page 140

1     CONFIDENTIAL - JOHN DITTAMI
2     with per MM payment for flow."
3          A.  I see that, yes.
4          Q.  Did you mean that the 70/30 split of
5     trading profits from your employment agreement
6     was replaced by per million payments for order
7     flow?
8          A.  Yes.
9          Q.  And those are payments that Effex
10     would make to FXCM?
11          A.  Correct.
12          Q.  Okay.  I'm going to move onto the
13     next document.
14          (Deposition Exhibit 26, e-mail string
15     and attachment GLBR_00218184 to GLBR_00218193
16     marked Confidential, was marked for
17     identification.)
18          Q.  Okay.  Please let me know when you
19     can see Exhibit 26.
20          A.  I can see Exhibit 26.
21          Q.  Okay.  And take a minute to review.
22          MR. BAKER:  And, for the record,
23     Exhibit 26 is GLBR 218184 and an attachment,
24     which is GLBR 218186.
25          Q.  Mr. Dittami, just let me know when

Page 141

1     CONFIDENTIAL - JOHN DITTAMI
2     you're ready.
3          A.  I'm ready.
4          Q.  Is this an e-mail from yourself to
5     Alexander Dick copying Mr. Paykin?
6          A.  It is copying my legal Counsel, yes.
7          Q.  And also including the attachment to
8     your e-mail?
9          A.  Yes.
10          Q.  Do you recall discussions in August
11     of 2010 about a Services Agreement between Effex
12     and FXCM?
13          A.  General -- again, general
14     negotiations.  I recall generally negotiate --
15     looking at negotiating.
16          Q.  And in this e-mail exchange were you
17     discussing a new Services Agreement separate from
18     the March 1st or May 1st, 2010 agreements that we
19     looked at earlier today?
20          A.  I need -- let me take a minute to
21     look at it closer.
22          Q.  Please, go ahead.
23          A.  Yes.  Could you ask the question
24     again now that I've looked at the contract?
25          Q.  Sure.  My question is, in this e-mail

36 (Pages 138 - 141)

CONFIDENTIAL - JOHN DITTAMI

1    CONFIDENTIAL - JOHN DITTAMI
2  displayed in this document.
3       I am going to focus you down to
4  Line 18409.
5       A. I'm there.
6       Q. Okay. And if you need to look at
7  other parts of this conversation, you're welcome
8  to or, I guess, other parts of the document, but
9  that might take us a while.
10      So start looking at 18409. Does this
11 appear to be an instant message conversation
12 between yourself and James Bradley?
13      A. It does, yes.
14      Q. On November 15, 2010?
15      A. Assuming that date is properly
16 stamped. It's my understanding, yes.
17      Q. That's fair. Thank you.
18      Okay. And starting in that line you
19 write, "Everything brokered by FXCM is same.
20 Everything we broker ourselves is not split with
21 FXCM. That is important, actually, for a few
22 months down road. I can give up more of business
23 down outside FXCM than within percentage-wise
24 because I'm not constrained by existing agreement
25 and not giving 70 percent away elsewhere."

1    CONFIDENTIAL - JOHN DITTAMI
2       Do you see that?
3       A. I see that, yeah.
4       Q. And when you say, "existing
5  agreements," which agreement are you referring to
6  there?
7       A. I don't know which agreements I'm
8  referring to. I'm referring to that I can do
9  business outside of FXCM. But there are no
10 agreements that FXCM constrain me from, from
11 conducting my own business and competing.
12      Q. And what were you referring by
13 "giving 70 percent away"?
14      A. Basically, you know, there's no
15 specific reason for the 70. It's -- I'm not
16 giving away, you know -- I can -- I'm not giving
17 away or hiding from anything. I can -- I have
18 all sorts of room to -- I can charge a dollar, 0,
19 30, you know, there's no -- I can make agreements
20 with anyone however I wish to try to make them.
21      Q. And is the "70 percent" in reference
22 to anything in particular?
23      A. Probably a close approximation to
24 what, roughly, this date, roughly, maybe was --
25 was the event -- was the payment to FXCM were,

1    CONFIDENTIAL - JOHN DITTAMI
2  you know, on that business, probably a rough
3  approximation. It never -- you know, plus or
4  minus 10 percent.
5       Q. Okay. And if you scroll down -- I
6  apologize. My dog is barking in the background.
7       If you scroll down to Line 18433 of
8  the same conversation.
9       Do you see that?
10      A. I see Line 18433.
11      Q. And there Mr. Bradley appears to say,
12 "Can we not try for an external customer sooner?
13 It will be interesting."
14      Do you see that?
15      A. Yes, I see that.
16      Q. And then skipping one line down, you
17 write, "Well we have to get our stuff straight.
18 No external customer will take our current size."
19      A. Yes, I see that.
20      Q. In November 2010, did trades writing
21 from FXCM account for all of Effex's trading
22 revenues?
23      A. In 2010, no, I believe we also traded
24 on EBS, which is a forex venue. I believe that
25 was the only one in 2010 that we were able to

1    CONFIDENTIAL - JOHN DITTAMI
2  acquire.
3       Q. Do you recall approximate -- sorry,
4  go ahead.
5       A. I believe we were able to acquire in
6  EBS in 2010, maybe Waters. I can't recall if
7  that was 2010 or 2011 or earlier.
8       Q. And in November of 2010, do you
9  recall, roughly, what percentage of Effex's
10 trading revenues came from FXCM?
11      A. Majority. It would have been FXCM at
12 this date.
13      Q. And by "majority" do you know mean
14 closer to 50 percent, 90 percent, more?
15      A. Closer to 90 percent on this date.
16      Q. By external customer, were you
17 referring to potential customers for Effex's
18 services outside of FXCM?
19      A. Yes, of course, any customers of
20 Effex Capital, not Effex services. Any Effex
21 Capital customers that were not FXCM, anyone
22 external to Effex, as many as we could get.
23      Q. You say, "anyone external to Effex."
24      Does that include FXCM?
25      A. Yes. Any customer that is not Effex

44 (Pages 170 - 173)

CONFIDENTIAL - JOHN DITTAMI

1  CONFIDENTIAL - JOHN DITTAMI
2  will read his e-mail.
3      I correct my statement.  This appears
4  to be coming from FXCM attempting to come in a
5  second time, not from Effex coming in a second
6  time.  This e-mail reads Alexander Dick
7  initiating a revisit.
8      Q.  Okay.  And are you still reviewing,
9  sorry?
10     A.  I've read the e-mail.
11     Q.  Okay.  So do you see that Mr. Dick
12  described some documents in the body of his
13  e-mail?
14     A.  Yes.
15     Q.  Okay.  So I'm just going to walk
16  through those and ask you to help me match those
17  up to the attachments, if possible.
18      And feel free to look at the title of
19  the attachment, the actual attachments themselves
20  here, whatever you need to.
21      Is the first attachment to this
22  e-mail the option agreement that Mr. Dick refers
23  to in his e-mail?
24     A.  I see the first attachment has an
25  option agreement, yes.

1  CONFIDENTIAL - JOHN DITTAMI
2      Q.  And is the second attachment the --
3      A.  And definitively not the Option
4  Agreement that was the one discussed earlier.
5      Q.  And is the second attachment the,
6  quote, "new operating agreement" that Mr. Dick
7  refers to in his e-mail?
8      A.  It is a proposed operating agreement,
9  as referred to in this e-mail.  And I'll see what
10  it's headed in a second.  So let me find it.  You
11  could help me.
12      Do you have the GLBR number?
13     Q.  Yes, that would be 54006.
14     A.  Okay.  The title is, "First Amended
15  and Restated Limited Liability Company
16  Agreement."  And if I remember the question, you
17  were asking does that refer to the operating
18  agreement.  I believe it does.  But it's
19  confusing.  Because --
20     Q.  Yeah, I'm just asking if --
21     A.  I believe that's what that is.
22     Q.  Okay.  The next one will be Mr. Dick
23  refers to "a new service agreement" in his
24  e-mail.
25     A.  Uh-huh.

1  CONFIDENTIAL - JOHN DITTAMI
2      Q.  Is that the third attachment here?
3      A.  "A new service agreement"?  It would
4  also help if you have the GLBR number.
5      Q.  54024.
6      A.  Thank you.
7      Services Agreement, yes, it appears
8  that -- yes, 54024 is the Services Agreement he's
9  referring to, yes.
10     Q.  And Mr. Dick also refers to "an
11  amendment to the current service agreement."
12      Is that the fourth attachment, which
13  is -- starts at 54033?
14     A.  54022.  Yes, that is.
15     Q.  Okay.  Mr. Dick also refers to "an
16  employment agreement" in his e-mail.
17      But would you agree that there
18  doesn't appear to be an employment agreement
19  attached to this e-mail?
20     A.  I didn't scroll through every GLBR of
21  this.  But I see the one not attached in the
22  e-mail to this.  I don't see one attached to the
23  e-mail.
24     Q.  Okay, thank you.
25      Were any versions of -- sorry.

1  CONFIDENTIAL - JOHN DITTAMI
2      Were these documents or later
3  versions of these documents ever executed or
4  finalized?
5      A.  No.
6      Q.  And do you recall discussions that
7  you had in June 2011 regarding the contractual
8  relationship between FXCM and Effex?
9      A.  I was generally negotiating my
10  position or approve my relationship in the
11  business relationship.
12     Q.  And at this time were those
13  discussions have been with the same individuals
14  as before with Mr. Ahdout, Mr. Grossman and
15  others?
16     A.  It would not have been with -- with
17  Mr. Ahdout, yes.  Mr. Grossman was not a -- he,
18  you know, was not in regular discussions or
19  negotiations with Mr. Grossman.  But with
20  Mr. Ahdout, yes, it would be the same.
21     Q.  Okay.  Thank you.
22     A.  Utilizing my legal Counsel would be
23  the same.
24     Q.  Okay.  Let me show you the next
25  document.

46 (Pages 178 - 181)

Page 190

CONFIDENTIAL - JOHN DITTAMI

1
2     Q.  Okay.  But this option agreement is
3  signed?
4     A.  This agreement is signed, yes.
5     Q.  And I believe before you testified
6  that you don't recall ever signing any other
7  Option Agreement except for the one that we
8  looked at earlier today; is that correct?
9        MR. PAYKIN:  Objection.
10     Q.  You can answer.
11     A.  Yeah, I -- honestly, I didn't recall
12  the signature of this one until I see the
13  document in front of me.
14     Q.  It's okay.  We can move on.
15        Does Exhibit B to the attachment in
16  this exhibit -- so there's layers here.
17        So, in Exhibit 36, the attachment to
18  Exhibit 36 and within that attachment Exhibit B,
19  which is the final page of this document, does
20  this appear to be a copy of the side letter that
21  we looked at earlier today?
22     A.  It does.
23     Q.  And do you recall if you ever
24  finalized or signed the termination of
25  agreements?

Page 191

CONFIDENTIAL - JOHN DITTAMI

1
2     A.  I believe we did, yes.
3     Q.  Do you recall when that happened?
4     A.  I don't recall when.
5     Q.  Do you recall if it was in this form
6  or a substantially similar form to this?
7     A.  I don't recall.  I recall us
8  terminating the agreements because this agreement
9  never really existed to get cleanliness.  This
10  agreement never was, you know -- but I don't
11  recall the -- whether it was this round or
12  something else.
13     Q.  Okay.  I'm going to show you the next
14  document.
15        (Deposition Exhibit 37, e-mail string
16  GLBR_00152765 marked Confidential, was marked for
17  identification.)
18     A.  Document 37.
19     Q.  That is correct.
20        You're able to see it?
21     A.  Yes.
22     Q.  Okay.  Take a minute to review.
23        MR. BAKER:  For the record,
24  Exhibit 37 is GLBR 152765.
25     Q.  And let me know when you're ready.

Page 192

CONFIDENTIAL - JOHN DITTAMI

1
2     A.  I'm ready.
3     Q.  Is this an e-mail from yourself to
4  Alex Dick?
5     A.  It is.
6     Q.  Does this appear to be your response
7  to Mr. Dick's e-mail that we looked at in the
8  previous exhibit?
9     A.  Yes.
10     Q.  And you write, "I'm not comfortable
11  terminating our side letter saying we will do
12  something mirroring initial agreement."
13        By "side letter" were you referring
14  to the side letter that we looked at earlier
15  today?
16     A.  I referred to the side letter we
17  looked at earlier, yes.
18     Q.  Was it your understanding that the
19  side letter was still in effect at this time in
20  November 2011?
21     A.  The side letter was in a contract.
22  It was my understanding that that side letter was
23  my leverage to protection in the business
24  relationship with FXCM.
25     Q.  And was it your understanding that

Page 193

CONFIDENTIAL - JOHN DITTAMI

1
2  that side letter had not been terminated, altered
3  or cancelled at this point in November of 2011?
4     A.  My understanding it had not been,
5  yes.
6     Q.  By "do something mirroring initial
7  agreement," were you referring to maintaining the
8  economic terms from your employment agreement
9  that we looked at earlier today?
10     A.  I'm referring to mirroring, yeah --
11  yes, continued desire to want to get my business
12  bought and paid for at a big number.
13     Q.  Okay.  I'm going to show you the next
14  document.
15        (Deposition Exhibit 38, e-mail string
16  GLBR_00152767 & GLBR_00152767 marked
17  Confidential, was marked for identification.)
18     Q.  Okay.  Let me know when you can see
19  Exhibit 38.
20     A.  Okay, I see Exhibit 38.
21     Q.  Please take a minute to review.
22        MR. BAKER:  For the record,
23  Exhibit 38 is GLBR 152767.
24     Q.  And let me know when you're ready.
25     A.  I'm ready.

49 (Pages 190 - 193)

1          CONFIDENTIAL - JOHN DITTAMI
2       Q.  Is this an e-mail from Alex Dick to
3   yourself?
4       A.  Yes, it is.
5       Q.  And does this appear to be another
6   thread in the same e-mail chain that we looked at
7   in the previous two exhibits starting with the
8   first e-mail from Alex Dick to yourself?
9       A.  And the previous one exhibit on the
10  termination, at least one.  Let me know go back
11  and look for a second.
12      Q.  And, to clarify, my question is just
13  is this an e-mail chain starting from the same --
14      A.  Yes.
15      Q.  -- from the first e-mail?
16      A.  The answer is, yes.
17      Q.  Okay.  And are you back to
18  Exhibit 38?
19      A.  I am.
20      Q.  Okay.  And the e-mail from yourself,
21  the second e-mail down from the top at 2:16 p.m.,
22  you write, "I can't possibly cancel the only
23  document that gives me any protection, which is
24  the side letter."
25           Are you, again, referring to the same

1          CONFIDENTIAL - JOHN DITTAMI
2   "side letter" we looked at earlier today?
3       A.  I am.
4       Q.  Did you discuss the proposed
5   termination agreement with anyone else at FXCM at
6   this time?
7       A.  I can't recall.  I would have
8   regularly discussed with William the concept of
9   wanting to get better terms for myself all the
10  time.
11      Q.  Okay.  And Mr. Dick's e-mail at the
12  top of this chain, he writes, "I understand what
13  your concern is now.  Your want to wait until we
14  have all the new documents finalized.  That's
15  fine.  Just hang onto the termination for now."
16          Do you see that?
17      A.  I see that.
18      Q.  Do you know what "new documents" he
19  was referring to?
20      A.  Another round of trying to find a new
21  way to do business together to put -- in the way
22  we were going that day.  Continued negotiations
23  to try to find another way, for which we never
24  came to terms.
25      Q.  Okay.  I'm going to show you the next

1          CONFIDENTIAL - JOHN DITTAMI
2   document.
3          (Deposition Exhibit 39, 8/25/14
4   Termination of Services Agreement dated as of May
5   1, 2010 GLBR_00125304 marked Confidential, was
6   marked for identification.)
7       A.  There we go.
8       Q.  Okay.  Please let me know when you
9   can see.  It should be Exhibit 39.
10      A.  I see Exhibit 39.
11      Q.  And take a minute to review.
12          MR. BAKER:  For the record,
13  Exhibit 39 is GLBR 125304.
14      Q.  Let me know when you're ready, Mr.
15  Dittami.
16      A.  I'm ready.
17      Q.  Is this a letter terminating the
18  May 1st, 2010 Services Agreement that we looked
19  at earlier today?
20      A.  It is.
21      Q.  And was the termination effective as
22  of August 1st, 2014?
23      A.  Yes.
24      Q.  Did you sign this letter on behalf of
25  Effex?

1          CONFIDENTIAL - JOHN DITTAMI
2       A.  I did.
3       Q.  And did David Sassoon sign the letter
4   on behalf of FXCM Holdings?
5       A.  I see the stamp.  I can't read his
6   signature, but it looks that way.
7       Q.  Okay.  I'm going to show you the next
8   document.
9          (Deposition Exhibit 40, 8/25/14
10  Termination of Services Agreement dated as of
11  April 14, 2010 and Exhibit B GLBR_00110713 &
12  GLBR_00110714 marked Confidential, was marked for
13  identification.)
14      A.  This is...
15      Q.  Can you see Exhibit 40?
16      A.  I see Exhibit 40.
17      Q.  Okay.  Take a minute to review.
18          MR. BAKER:  For the record,
19  Exhibit 40 is GLBR 110713.
20      Q.  My first question to you will be, is
21  this a letter terminating the side letter that we
22  looked at earlier today?
23      A.  It is.
24      Q.  And do you recall why you agreed to
25  terminate the side letter in August 2014?

50 (Pages 194 - 197)

CONFIDENTIAL - JOHN DITTAMI

1  CONFIDENTIAL - JOHN DITTAMI
2      A. I think, you know, whatever -- we did
3  several adjustments for the payment for order
4  flow. And we always had to pick a date for which
5  that started. So, I guess, every time we had --
6  every time we did adjustments to the payment, we
7  had to pick a start date.
8      Q. And when you say, "more appropriate,"
9  in your e-mail, did you mean that 23 per million
10  would more closely approximate 70 percent of
11  Effex's trading profits at this time?
12     A. No, I don't know what I was -- I
13  don't know off this one line what I was -- why I
14  felt it was "more appropriate." I can't remember
15  that; far too back.
16     Q. In 2010, about how often did you
17  discuss changing the rate of -- for order flow
18  payments?
19     A. Not that often. Honestly, I can't
20  remember back then. We didn't change -- I don't
21  think we changed in 2010. The first change was
22  to $16. The date is whatever the exhibit
23  indicate. I believe that's the first one we
24  changed.
25     Q. And, just to clarify, I'm just asking

1  CONFIDENTIAL - JOHN DITTAMI
2  about how often you would have discussed it, as
3  opposed to how often you actually changed it.
4      Does that change your answer?
5      A. We would have discussed it every time
6  we were doing a negotiation for a new situation
7  whenever -- whenever I kept trying to negotiate
8  into a new position, this would have been one of
9  the many elements of it, as part of those
10  negotiations but not as part of the service
11  contract.
12     Q. And in these discussions about
13  changing the rate for order flow payment, would
14  that have been something -- a discussion you had
15  with Mr. Ahdout?
16     A. It would have been with William, yes.
17     Q. Was anyone else typically involved in
18  those conversations?
19     A. Whoever is involved in the
20  negotiations and document negotiations. To
21  actually officially implement the change, like,
22  the one to $16, I would have discussed that with
23  Drew as well.
24     Q. And on July 6th, 2010, the date of
25  this e-mail, was there a signed services

1  CONFIDENTIAL - JOHN DITTAMI
2  agreement in place between Effex and FXCM setting
3  forth the rate per million that Effex would pay
4  to FXCM?
5      A. I don't know what date that -- I
6  don't know what date our docs were signed.
7      Q. Did you have any discussions with
8  Mr. Ahdout or others at FXCM about executing a
9  services agreement with a rate of $23 per million
10  for Effex's order flow payments to FXCM?
11     A. I don't recall. I could have. I
12  don't recall.
13     Q. In the times when you had discussions
14  with Mr. Ahdout about changing the rate for
15  Effex's order flow payments to FXCM, did you
16  believe it was always necessary to draft or amend
17  the Services Agreement setting forth whatever new
18  proposed rate you were discussing?
19     A. I would have wanted an amendment to
20  the rate, yes, every time it went down, I would
21  have wanted an amendment to the rate going down.
22  It's to my benefit.
23     Q. Okay. So I'm going to ask you to
24  turn back to the very large Excel file that we
25  looked at earlier, which let's see, that was

1  CONFIDENTIAL - JOHN DITTAMI
2  Exhibit 32, if you can pull that back up. This
3  will take less scrolling. It will be the last
4  one for today, I think. I will at least give you
5  that. But let me know when you have Exhibit 32
6  pulled up again.
7      A. I have Exhibit 32 open.
8      Q. Okay. And take a little bit of time
9  as needed to -- you can manipulate the document
10  just to expand the column so you can see what's
11  in each column. And I'm going to direct you down
12  to Excel sheet, Lines 602, the conversation ID
13  7/22/2010, 17:12.
14     A. I'm on Line 602 of that conversation.
15     Q. Okay. And you see that that
16  conversation ID applies to lines -- excuse me --
17  602 to 630?
18     A. Yes.
19     Q. Okay. And in starting on Excel
20  Line 610, you see the message from yourself to
21  Mr. Rosenfeld or to Josh Rosenfeld.
22      Does that appear to be what this is?
23     A. So I don't know whether he is the
24  sender or the receiver.
25     Q. I believe if you scroll to the top,

53 (Pages 206 - 209)

CONFIDENTIAL - JOHN DITTAMI

1  CONFIDENTIAL - JOHN DITTAMI
2  credit, et cetera.  I need to fund my own
3  accounts with my own money.  I'm negotiate -- I'm
4  trying to negotiate him down to 14.  He didn't
5  agree.
6      Q.  And so I'll just -- I'll try one more
7  time to clarify my question and then if maybe if
8  we're not connecting, we can move on.
9          But you say, "We can likely swing it
10  again at $21 per million, meaning, that Effex can
11  pay FXCM $21 per million for order flow," and you
12  say, "and chew the reserve down to zero."
13         And I'm asking if those two things
14  were connected in your mind at this time?
15      A.  In the -- yes, it went -- when you
16  pay more fees, you have less earnings and
17  capital, which is the reserve that funds your
18  capital that's required Effex to keep capital at
19  Citi.  If I pay less fees, I have more income and
20  I can accumulate more capital with my Citi prime
21  brokerage.  If I pay more, I have less capital to
22  fund my Citi trading, which has a $1 million
23  minimum plus additional reserves for taking risk
24  and carrying risk, and you have a minimum capital
25  and then you have to fund your positions.  If I

1  CONFIDENTIAL - JOHN DITTAMI
2  pay more money, I have less money to fund my
3  positions.  If I pay less money, I have more
4  money to fund my positions.
5      Q.  Okay.  At the last sentence of that
6  paragraph starting in the second to last line you
7  write, "The other alternative is we go halfway at
8  $17.50 and cut the reserve a little but give us a
9  whole other month to work out how this will shake
10  out."
11         Is 17.50 halfway between $14 the
12  proposed and $21?
13         MR. DAHAN:  Objection to form.  I
14  imagine --
15      A.  It's, approximately, halfway, yes.
16         MR. DAHAN:  Yes.
17      Q.  From Effex's perspective, who had the
18  final say on determining the rate that Effex
19  should pay FXCM for order flow for a given month?
20      A.  It was a negotiation.  They either
21  agreed to it or didn't agree to it.  The final
22  say is a negotiation between two parties and our
23  service contract.
24      Q.  Who had the authority --
25      A.  Effex -- at Effex I had the

1  CONFIDENTIAL - JOHN DITTAMI
2  authority.
3      Q.  Okay.
4      A.  And at FXCM, I'm not sure how it is,
5  you know.
6      Q.  Thank you.  That was going to be my
7  next question.
8          And so was the rate that Effex should
9  pay FXCM for order flow for a given month
10  determined by an agreement between you and
11  Mr. Ahdout?
12      A.  It was determined by the services
13  agreement.
14         MR. DAHAN:  Objection, form.
15      Q.  Were you aware of anyone else at FXCM
16  who was involved in the negotiations over the
17  rate that Effex should pay FXCM for order flow
18  for a given month?
19      A.  William would be my primary first
20  contact and I would, you know, pitch it to Drew
21  when I felt like I was close enough to be able to
22  make a change, try to negotiate, William and Drew
23  effectively.
24      Q.  Okay.  I'm going to show you the next
25  document.

1  CONFIDENTIAL - JOHN DITTAMI
2          (Deposition Exhibit 44, e-mail string
3  and attachment GLBR_00184107 & GLBR_00184108
4  marked Confidential, was marked for
5  identification.)
6      Q.  Okay.  Let me know when you can see
7  Exhibit 44.
8      A.  I can see Exhibit 44.
9      Q.  Take a minute to review this
10  document.
11         MR. BAKER:  For the record,
12  Exhibit 44 is GLBR 184107 and an attachment which
13  is GLBR 184108.
14      Q.  Mr. Dittami, just let me know when
15  you're ready.
16      A.  I'm ready.
17      Q.  Is this an e-mail from Josh Rosenfeld
18  to yourself copying two other individuals and
19  attaching with an attachment?
20      A.  It is.
21      Q.  In your second e-mail here, you
22  write, "Please provide me with updated invoice
23  for services for First Derivatives and payment
24  due to" holdings -- "to holding," sorry.
25         By "payment due to holding," were you

56 (Pages 218 - 221)

Page 226

CONFIDENTIAL - JOHN DITTAMI

1  document.
2
3       (Deposition Exhibit 45, 12/22/10
4  e-mail from Joshua Rosenfeld to John Dittami and
5  attachment GLBR_00184113 & GLBR_00184114 marked
6  Confidential, was marked for identification.)
7       A. Okay, it's open.
8       Q. Okay. And please take a minute to
9  review.
10      MR. BAKER: For the record,
11 Exhibit 450 --
12      A. Yes, I reviewed it.
13      Q. Thank you.
14      MR. BAKER: For the record, Exhibit
15 45 GLBR 184113 and an attachment GLBR 184114.
16      Q. Mr. Dittami, I'm just going to --
17 well, first, is this an e-mail from Josh
18 Rosenfeld to yourself --
19      A. It is.
20      Q. -- with an attachment?
21      A. It is, yes.
22      Q. And looking at the attachment, is
23 this an invoice from FXCM Holdings to Effex for
24 order flow for the month of November 2010?
25      A. It is.

Page 227

CONFIDENTIAL - JOHN DITTAMI

1
2       Q. And this invoice shows a fee per
3  million rate of $17.50 for November 2010; is that
4  correct?
5       A. It does.
6       Q. And at the time this e-mail was sent
7  in December 2010, was there a services agreement
8  in place between Effex and FXCM Holdings?
9       A. Again, I believe, yes, and I believe
10 the May Service Agreement is around this time.
11      Q. And was it your understanding that
12 that Services Agreement set out a rate of $21 per
13 million?
14      A. I recall that $21. I recall it going
15 to 16. I can't recall a 17.50 in the middle.
16      Q. And do you recall --
17      A. Just because it happened, it just
18 means I can't recall that change.
19      Q. And do you recall any formal
20 agreement between FXCM and Effex with respect to
21 the annual rate of 17.50 per million for
22 November 2010?
23      A. No, I don't recall an amendment for
24 17.50. It doesn't mean there isn't one. I don't
25 recall.

Page 228

CONFIDENTIAL - JOHN DITTAMI

1
2       Q. Okay. I'm going to show you another
3  document.
4       (Deposition Exhibit 46, e-mail string
5  GLBR_00184132 & GLBR_00184133 marked
6  Confidential, was marked for identification.)
7       A. I see Exhibit 46.
8       Q. Okay. Please take a minute to review
9  it.
10      MR. BAKER: For the record Exhibit 46
11 is GLBR 184132.
12      Q. Let me know when you are ready to go
13 ahead.
14      A. I'm ready.
15      Q. Is this an e-mail from yourself to
16 Josh Rosenfeld, Aaron Harding and Baruch
17 Greenbaum?
18      A. It is.
19      Q. And if you look down to the second
20 e-mail from the top from Mr. Rosenfeld, he
21 writes, "John can we still bill at 21?"
22      A. I she.
23      Q. And then you respond, "Probably not.
24 Let me check. I think it will need to drop to
25 $18 again while we reassess."

Page 229

CONFIDENTIAL - JOHN DITTAMI

1
2       Is this another conversation with
3  Mr. Rosenfeld about what rate per million FXCM
4  can bill Effex for order flow for a certain month
5  in this case January 2011?
6       A. Yes, it's another conversation on
7  what he should bill me.
8       Q. Had FXCM previously billed Effex at a
9  rate of $18 per million?
10      A. Again, I don't recall that. I saw
11 the invoice that said 17.50. I don't recall that
12 or 18. I do see this e-mail says, can we still
13 bill at 21? That's what I recall. It makes
14 sense to what I recall.
15      Q. And --
16      A. I don't know if there are multiple
17 invoices or we find e-mails. I just don't know.
18 21 is what I recall.
19      Q. I'm sorry, I don't mean to keep
20 interrupting.
21      Are you finished?
22      A. That's it. 21 and then 16 is the
23 next one I recall so...
24      Q. Okay. Do you recall discussing with
25 Mr. Ahdout what rate per million Effex would pay

58 (Pages 226 - 229)

CONFIDENTIAL - JOHN DITTAMI
1
2  to calculate Effex's order flow payment for July
3  and August 2011?
4       A.  I don't know if he would agreed to
5  it.  I would have offered to pay for
6  institutional flow.  But, again, I don't know if
7  the stream was institutional flow, which carries
8  a separate agreement with a separate entity.  If
9  this could have been FXCM Pro, it's
10  institutional.  It could have been -- it could
11  have been any number of ten different
12  institutional streams that have nothing to do
13  with FXCM's forex retail base, but it's a
14  separate FXCM institutional business, which I had
15  the different contract to pay ECN institutional
16  level fess.  But it could have been that.  It
17  could have been -- it could have been some other
18  entity, Japan, Korea, some other entity that we
19  priced to where, you know, I hadn't agreed to the
20  price and paying volume.  I don't know -- I would
21  have to know what these streams are to give you a
22  straight answer.
23       Q.  Okay.  And in Mr. Meyer's e-mail he
24  says, "Thus we've subtracted those volumes out of
25  the payment calculation."

CONFIDENTIAL - JOHN DITTAMI
1
2       Would Effex or would Mr. Meyer have
3  subtracted those volumes if Mr. Ahdout had not
4  agreed to doing so?
5       MR. DAHAN:  Objection to form.
6       A.  Alright.  The payments per million
7  was for a specific set of flow and Services
8  Agreement.  We don't have an agreement to pay for
9  other types of moves.  We would not pay for it.
10  So the question doesn't make sense to me.
11       Q.  So, when you say that the payments
12  per million was for a specific set of flow, are
13  you referring to certain liquidity streams that
14  effect provided to FXCM?
15       A.  For Effex liquidity streams provided
16  to their core retail client base.  That's the
17  Effex services payment for order flow.  It's also
18  supplies institutional pricing, as do many other
19  liquidity providers with FXCM Pro, institutional
20  ECN.  Those fees were Effex and most other
21  providers are in the $1 to $5 region.  Or for
22  makers, it's sometimes zero.  It's very often --
23  if it's that -- again, I don't know what stream
24  it is.  It could be a Japan stream, a brand new
25  stream.  I don't know.  It's not --

CONFIDENTIAL - JOHN DITTAMI
1
2       Q.  So -- sorry, "it's not" what?  I
3  didn't catch the last bit.
4       A.  This is not their core stream.  It's
5  two liquidity streams.  They're clearly not
6  talking about the core stream, which the payment
7  for -- they're talking about some other stream.
8  We did over many years many streams with FXCM and
9  many other companies.
10       Q.  Okay.  And did Effex pay FXCM for
11  order flow for these other streams other than the
12  core retail stream?
13       A.  Just FXCM Pro institutional venue ECN
14  feeds.  But, no, we generally wouldn't agree to
15  pay for the other -- for the other streams, no.
16  We paid institutional technology ECNs fees for
17  FXCM Pro and also for Fast Match.
18       Q.  So, in Mr. Meyer's e-mail here at the
19  -- towards the bottom of Page 3, he refers to
20  these two streams as "not profitable."
21       Do you have April understanding of
22  what Mr. Meyer means by saying that these streams
23  are "not profitable"?
24       A.  He's telling FXCM, we're not making
25  profits on them, on these two streams.  We're not

CONFIDENTIAL - JOHN DITTAMI
1
2  going to pay money for streams that don't -- that
3  aren't profitable, I guess.
4       Q.  Was it your understanding that
5  Effex's agreement with FXCM regarding order flow
6  payments was restricted only to the core retail
7  stream?
8       A.  That's my understanding.  When that
9  agreement was put in place, the only stream is
10  that Effex was providing liquidity to was this
11  core retail stream.  Over the years, as Effex
12  grew, Effex started providing more and more
13  streams of different types, qualities and flavors
14  to FXCM and to their partners.
15       At the time of this Service
16  Agreement, it was only providing a stream for
17  core retail business.  That's what that it
18  encompasses sorry.
19       Q.  Okay.  And so, to your recollection,
20  did Effex ever pay FXCM for order flow for any
21  streams outside of the core retail stream?
22       A.  Effex paid per million fee to Fast
23  Match, the institutional arm of FXCM, for
24  institutional business in the 1 to $5 region.  I
25  can't remember what price, at what month, at what

62 (Pages 242 - 245)

1            CONFIDENTIAL - JOHN DITTAMI
2    time.
3        Q.   Were other streams outside of FXCM's
4    core retail stream ever included in the monthly
5    volume calculations for the per million dollar --
6    you know, $21 per million order flow payments
7    from Effex to FXCM?
8        A.   No, that's what Chris is doing here,
9    saying this doesn't belong here.
10       Q.   Okay.  I'm going to show you another
11   document.
12          (Deposition Exhibit 50, e-mail string
13   GLBR_00189249 marked Confidential, was marked for
14   identification.)
15       A.   There is one possible and I just
16   don't recall.  There's one stream to an entity in
17   Korea.  I don't recall if we did or didn't
18   include.  I'm not sure.  That one's a question
19   mark or all the other streams, no.
20       Q.   Okay.  I'm introducing Exhibit 50.
21   Please let me know when you can see it.
22       A.   Okay.  Okay, it's open.
23       Q.   And if you take a minute to review
24   it.
25          MR. BAKER:  For the record,

1            CONFIDENTIAL - JOHN DITTAMI
2    Exhibit 50 is GLBR 189249.
3        Q.   Let me know when you're ready.
4        A.   Okay, I see that.
5        Q.   Exhibit 50 is this an e-mail from
6    Alex Dick to Ken Grossman forwarding an e-mail
7    from Chris Meyer to Baruch Greenbaum?
8        A.   Yes.
9        Q.   And I'll note you don't appear to be
10   copied on this e-mail.  But focusing on
11   Mr. Meyer's e-mail, he writes, "We had a
12   discussion on the flows and payment with Ken
13   Grossman and William late yesterday."
14          Do you recall if you were a part of
15   that discussion?
16       A.   No, I don't -- I don't recall.
17       Q.   Do you recall if Chris Meyer would
18   regularly have discussions on order flow and
19   payments for order flow with Ken Grossman and
20   William Ahdout?
21       A.   Not regularly, no.  He would have
22   discussions about payments of invoices when need
23   be.  He was -- not regularly, no.  Under Chris's
24   role as COO was accounting and invoicing,
25   payments, payments of the invoices, not

1            CONFIDENTIAL - JOHN DITTAMI
2    negotiating payments.
3        Q.   Okay.  In the second paragraph of
4    Mr. Meyer's e-mail, he writes, "I need to clarify
5    the exact streams we're paying for flow on and
6    then you should be sent an invoice."
7        A.   I see that.
8        Q.   Did you have any discussions with
9    Mr. Meyer about what streams Effex would pay for
10   flow on at this time?
11       A.   I'm sure Chris -- I can't recall
12   these conversations and I don't know what
13   liquidity streams are being discussed out of the
14   many many many we provided.  But if there was a
15   question, I'm sure Chris would have brought it to
16   my attention to determine whether it was a real
17   stream or not.  But I can't recall this -- what
18   the two streams were set through AEO.
19       Q.   Okay.  Let me show you the next
20   document.
21          (Deposition Exhibit 51, e-mail string
22   GLBR_00118665 & GLBR_00118666 marked
23   Confidential, was marked for identification.)
24       A.   Okay, 51 has appeared.
25       Q.   Okay.  Take a minute to review this

1            CONFIDENTIAL - JOHN DITTAMI
2    document.
3          MR. BAKER:  For the record,
4    Exhibit 51 is GLBR 118665.
5        A.   I see it.
6        Q.   And please review and let me know
7    when you're ready to move forward.
8        A.   Okay, I've read it.
9        Q.   Okay.  And does this appear to be an
10   e-mail chain between Aaron Harding, Chris Meyer,
11   Alex Kochel and Baruch Greenbaum?
12       A.   Yes, it is.
13       Q.   And I'll note that it does not appear
14   that you were copied on this e-mail.
15          Looking at the e-mail from
16   Mr. Harding at the bottom of Page 1 towards the
17   bottom of Page 1 at 9:57 a.m.
18          Do you see that?
19       A.   I see that.
20       Q.   And Mr. Harding writes, "I have
21   additional volume from two new CitiEX books
22   identified as CitiEXL2 and CitiEXJ.  Can you
23   confirm if we should be including this volume or
24   we should exempt this activity?"
25       A.   I see that here.

63 (Pages 246 - 249)

Page 254

CONFIDENTIAL - JOHN DITTAMI

1     CONFIDENTIAL - JOHN DITTAMI
2        A. Yes.
3        Q. Mr. Meyer writes, "We can't pay the
4     fees on the CitiEXJ stream. We have paid on it
5     in past months because the volume has been so
6     small. However, with these volumes, we like to
7     omit it. Our commitment is to make a very
8     aggressive price on that stream and therefore it
9     is outside the general retail agreement."
10       Did you have discussions with
11    Mr. Meyer in May of 2012 about excluding the
12    CitiEXJ stream from body calculations for order
13    flow payments?
14       A. I don't know if it would have been
15    May or April, but, I would have -- yes, I would
16    have had a discussion with him excluding to ask
17    him for previous, yes.
18       Q. Was it your understanding that at
19    this time around May of 2012 Effex would
20    sometimes not pay FXCM for order flow on volume
21    from certain liquidity streams where Effex was
22    making a very aggressive price?
23       A. That is a very generic statement.
24    Are you -- are you asking the question about
25    CitiEXJ stream or are you asking the question

Page 255

CONFIDENTIAL - JOHN DITTAMI

1     CONFIDENTIAL - JOHN DITTAMI
2     about -- what stream are you asking about?
3        Q. Let me back it up. Maybe I can break
4     this down a little bit to clarify.
5        Were there times when Effex would pay
6     FXCM for order flow on volume -- sorry. Let me
7     rephrase.
8        Were there times when Effex would
9     sometimes exclude volume from certain liquidity
10    streams from their payments to FXCM for order
11    flow?
12       A. Yeah, Effex would not pay for
13    institutional order flow ever. It's not part of
14    the Services Agreement, other than the FXCM Pro
15    technology fees or Fast Match technology fees are
16    mentioned. It would never include that. It was
17    not part of the Service Agreement.
18       Q. Do you have an understanding of what
19    Mr. Meyer --
20       A. We --
21       Q. -- means by "very aggressive price"?
22       A. Yes.
23       Q. And what's your understanding?
24       A. What he means by that is Japan has a
25    requirement -- has a retail structure with the

Page 256

CONFIDENTIAL - JOHN DITTAMI

1     CONFIDENTIAL - JOHN DITTAMI
2     Japanese customers are accustomed to seeing a
3     fixed price, a spread that never changes for
4     24 hours a day that is available for any amount
5     all of the time and that fixed spread is
6     extremely aggressive and far tighter than the
7     spread available anywhere else in the world and
8     there is nowhere else in the world that I'm aware
9     of that has a fixed spread market structure as
10    did the Japanese retail market. It meant that in
11    order to market make that stream, you had to be
12    in the same spread all the time forever and it's
13    spread way less than any marketable spread. It's
14    extremely aggressive. There is no profits to
15    making such a price. It's a commitment. It's a
16    service level commitment. I would not have
17    created a stream for that and paid for a stream
18    like that. I would provide a stream like that to
19    provide services to foster other business
20    relationships.
21       Q. And at this time, is it true that
22    Effex was providing liquidity to this stream?
23       A. We created this stream that met the
24    standards of the Japanese retail stream.
25       Q. Okay. In going back to the e-mail --

Page 257

CONFIDENTIAL - JOHN DITTAMI

1     CONFIDENTIAL - JOHN DITTAMI
2        A. (Inaudible.)
3        Q. Going back to the e-mail, scroll up
4     towards the bottom of Page 1. Above Mr. Meyer's
5     e-mail, Mr. Greenbaum responds, "We will adjust
6     the April invoice accordingly. Thank you for
7     bringing this to our attention."
8        And at the e-mail at the top -- well,
9     e-mail above that, Mr. Harding writes, "Was this
10    approved?"
11       And the e-mail above that
12    Mr. Greenbaum writes, "Yes, I William approved
13    it."
14       Did you have any discussions with
15    Mr. Ahdout about excluding CitiEXJ volume for
16    order flow payments for April 2012?
17       A. I'm sure I did. I'm sure I would
18    have told them we're not going to provide you
19    with the stream if you're going to make us pay
20    for it. It would have been -- the stream is very
21    -- I know a lot of stream. There is no way I
22    would have paid on this.
23       Q. Okay.
24       A. I wouldn't have provided this service
25    or additional stream.

65 (Pages 254 - 257)

CONFIDENTIAL - JOHN DITTAMI

1  CONFIDENTIAL - JOHN DITTAMI
2  next question.
3      Did you, typically, consult with FXCM
4  on how they should communicate with other
5  liquidity providers?
6      A. I didn't consult with them. I would
7  -- FXCM would, typically, use me and others for
8  advice about the markets, the implications and
9  the repercussions of such things.
10     Q. And was it typical around this time
11 for you to provide advice to FXCM on their
12 communications with other liquidity providers?
13     A. It was for me to provide my opinions
14 and advice and expertise to everyone and every
15 company there, yes. That's part of the business,
16 I think. It's very typical.
17     Q. Look at your e-mail, the second from
18 the top at 12:35 p.m.
19     Do you see that?
20     A. I see that.
21     Q. And in the second paragraph you
22 write, "I would be a little harder on the number
23 of quotes because that is the serious issue for
24 back end systems here."
25     A. I see that.

1  CONFIDENTIAL - JOHN DITTAMI
2      Q. Did you mean that Sun sending FXCM
3  such a large number or frequency of quotes was a
4  serious issue for back end systems at Effex?
5      A. No, I'm saying Sun or any HFT.
6  Sending the quantity of quotes that are being
7  sent is a serious issue for FXCM's back end
8  systems, for anyone's back end system for that
9  matter.
10     Q. Okay. So, when you say "back end
11 systems" here --
12     A. Any order --
13     Q. -- you're referring to FXCM, even
14 though it's sent in November 2011?
15     A. I'm referring to FXCM because FXCM
16 aggregates prices. FXCM's back end aggregation
17 or anyone's back end aggregation increases
18 latency of the quote counts increase and decrease
19 execution performance as the quote counts
20 increase, structural -- part of the structure of
21 that.
22     Q. I'll show you another document.
23     (Deposition Exhibit 59, e-mail string
24 GLBR_00151710 to GLBR_00151711 marked
25 Confidential, was marked for identification.)

1  CONFIDENTIAL - JOHN DITTAMI
2      Q. Okay. Please let me know when you
3  can see Exhibit 59.
4      A. I see Exhibit 59.
5      Q. And please take a minute to review
6  this exhibit.
7      MR. BAKER: For the record,
8  Exhibit 59 is GLBR 151710.
9      A. Okay. I'm ready.
10     Q. And is this an e-mail from yourself
11 to Patricia Muchinsky?
12     A. It is.
13     Q. Did you, typically, view Effex's
14 market share as broken down by currency payor?
15     A. On times I viewed it as currency
16 payor, sometimes by stream. I viewed it
17 differently depending on what I was looking at.
18     Q. And did you have access to
19 information showing Effex's market share of
20 FXCM's order flow broken down by currency payor?
21     A. Yes, I would know Effex's market
22 share of FXCM's liquidity historically, yes. I
23 don't entirely know. I would know -- I would
24 know on its retail. I don't have -- I did not
25 have access to all that information for all of

1  CONFIDENTIAL - JOHN DITTAMI
2  FXCM's businesses.
3      Q. And did you have access to
4  information showing the market share of other
5  liquidity providers?
6      A. I had access to information that
7  would allow me to see the share -- that would
8  allow me to calculate the share --
9      THE STENOGRAPHER: I'm sorry.
10 "Calculate the share" what?
11     A. (Continuing.) Of other liquidity
12 providers.
13     THE WITNESS: My apologies, I'll try
14 to keep the voice constant.
15     Q. Okay. It's been a long day. It
16 happens.
17     So did you have direct access to that
18 information from which you could calculate the
19 market share of other liquidity providers?
20     A. I had access to post-trade data for
21 which I could calculate shares.
22     Q. And how did you -- let me strike
23 that.
24     I think we'll come back to the
25 post-trade data later. I'm going to point you to

74 (Pages 290 - 293)

Page 294

CONFIDENTIAL - JOHN DITTAMI

1    your e-mail the end of the second paragraph in
2    your e-mail.  And the last part of that line you
3    write, "It brings up questions you may not want
4    brought up."
5         Do you know what you were referring
6    to here?
7         A.  Let me find it again.
8         I don't know what I'm referring to
9    here.  But I don't want my share being shown to
10   any other LP.  I know how other LPs will respond
11   to seeing me having my share.  They will not be
12   happy.  It would not be a good thing for me.  It
13   would not be a good thing for FXCM.
14        Q.  And why would that not be a good
15   thing for FXCM?
16        A.  You have to have good relationship
17   with all of your liquidity providers.  No one
18   likes to be told they aren't winning.  It would
19   be embarrassing to my two ex-employees, Citigroup
20   and Sun Trading that I was taking their loss.
21   That does not bode well for positive
22   relationships in business.
23        Q.  Okay.  I'm going to show you another
24   document.

Page 295

CONFIDENTIAL - JOHN DITTAMI

1    (Deposition Exhibit 60, 10/15/12
2    Conversation between John@effexcapital.com and
3    pmuchinsky@fxcm.com GLBR_00217369 & GLBR_00217370
4    marked Confidential, was marked for
5    identification.)
6         Q.  Please let me know when you can see
7    Exhibit 60.
8         A.  I see Exhibit 60.
9         Q.  Please take a minute to review this
10   document.
11        MR. BAKER:  For the record,
12   Exhibit 60 is GLBR 217369.
13        Q.  Mr. Dittami just let me know when
14   you're ready.
15        A.  I'm ready.
16        Q.  Is this an e-mail from you to Ms.
17   Muchinsky, which includes a transcript from an
18   instant messaging conversation between yourself
19   and Ms. Muchinsky?
20        A.  This is in an e-mail.  I see an
21   e-mail.  I see a transcript.  I do not know why
22   they're sitting on top of each other.  I don't
23   recognize the format of -- I'm confused by the
24   format of the instant message transcript in an

Page 296

CONFIDENTIAL - JOHN DITTAMI

1    e-mail together.
2         Q.  Okay.  Would you agree that this
3    appears to be a transcript of an instant
4    messaging conversation between yourself and Ms.
5    Muchinsky?
6         A.  I would agree that I see a transcript
7    of an instant message conversation.  And it was
8    between me and Ms. Muchinsky, yes.
9         Q.  Okay, thank you.
10        I'm going to ask you and you might
11   have to read through the conversation a little
12   bit.
13        But just what is the context for the
14   conversation you were having with Ms. Muchinsky?
15   Are you referring to an e-mail that was sent out
16   to some or all of FXCM's liquidity providers?
17        A.  I have to read this whole thing.  I
18   have...
19        Q.  Please go ahead.
20        A.  It's very hard to interpret.  But
21   generically it seems like it's a conversation
22   about me asking Trisha if she's communicated with
23   liquidity providers about their execution
24   quality.  That's the best I can glean.  It's very

Page 297

CONFIDENTIAL - JOHN DITTAMI

1    broken and out of context, but that's all I can
2    glean from this.
3         Q.  To your knowledge, did FXCM have a
4    system to determine how to route orders in case
5    of a tie between the prices offered by different
6    liquidity providers?
7         A.  To my knowledge, they had guidelines
8    for what dictated who won ties, who won ties
9    between liquidity providers.
10        Q.  Have you heard those guidelines
11   referred to as a "priority system"?
12        A.  I have not heard that name used.
13   Maybe FXCM uses it.  I know there are guidelines
14   as to LP that I had to follow or other LPs would
15   have to follow in order to win ties, which is
16   prioritized or priority, similar words.
17        Q.  And did you provide input to FXCM on
18   allowing Effex or other liquidity providers to
19   win ties with other liquidity providers?
20        A.  I would have provide input to
21   whenever it was to my benefit.  I'd let FXCM know
22   if other liquidity providers I was competing with
23   were not following good execution and I would, of
24   course, for my business interest argue for any

75 (Pages 294 - 297)

Page 306

CONFIDENTIAL - JOHN DITTAMI
1
2  Capital is an LP and other LPs to price it.
3  Effex Capital sells its liquidity to those same
4  institutions. I want to get the flow directly.
5  I don't want to pay for flow. It's a conflict
6  between my business interest and Juan Cafe's
7  business.
8      Q. Okay. I'm introducing another
9  document.
10     (Deposition Exhibit 62, 6/14/10
11  e-mail from John Dittami to William Ahdout and
12  Ken Grossman GLBR_00189082 marked Confidential,
13  was marked for identification.)
14     MR. DAHAN: You have a sense, Josh,
15  of how long you're going be?
16     MR. BAKER: I would say I have less
17  than ten documents left. So it shouldn't be more
18  than an hour, probably less than an hour.
19     MR. DAHAN: Well, you're not getting
20  another hour. I mean, you're a little over seven
21  if you -- there's no way.
22     MR. BAKER: I'm not going to go over
23  seven. I don't think we're -- I think we're
24  around six hours right now. So I won't go over
25  seven. But if it's okay with you, we can keep

Page 307

CONFIDENTIAL - JOHN DITTAMI
1
2  moving ahead and try to get this done.
3      Q. Mr. Dittami, do you see Exhibit 62?
4      A. I do.
5      Q. Please take a minute to review.
6      MR. BAKER: For the record, I'll note
7  Exhibit 62 is GLBR 189082.
8      Q. And let me know when you're ready.
9      A. I'm ready.
10     Q. This is an e-mail from yourself to
11  Mr. Ahdout and Mr. Grossman?
12     A. Yes.
13     Q. And the subject of this e-mail is
14  "per MM."
15     A. Yes.
16     Q. In the first two sentences of this
17  e-mail, are you providing an update to Mr. Ahdout
18  and Mr. Grossman as to Effex's trading P&L per
19  million in the weeks leading up to June 2010 in
20  the first two weeks of June 2010?
21     A. It appears that I am, yes.
22     Q. In 2010, did you provide updates to
23  FXCM concerning Effex's trading P&L?
24     A. Sometimes.
25     Q. And who did you, typically, send

Page 308

CONFIDENTIAL - JOHN DITTAMI
1
2  these updates to?
3      A. William Ahdout, maybe Drew, William
4  and Drew.
5      Q. Do you recall sending them to
6  Mr. Grossman?
7      A. I don't recall. I wouldn't be
8  surprised if I copied him. I wouldn't be
9  surprised if I didn't copy him.
10     Q. And, in 2010, about how often did you
11  send these updates to FXCM regarding Effex's
12  trading P&L?
13     A. I'd say we consistently -- I would
14  say I sent it weekly minus some weeks in 2010 and
15  then teetered off to not sending it off every
16  week. Hopefully, stopped sending it altogether.
17     Q. And was there a particular time when
18  you started slowing down the frequency of these
19  updates or when you stopped?
20     A. I can't remember. I have to go look
21  at all the updates to see. I don't have them in
22  front of me.
23     Q. To your knowledge, did FXCM ever seek
24  to verify the P&L numbers you provided them?
25     MR. DAHAN: Objection.

Page 309

CONFIDENTIAL - JOHN DITTAMI
1
2      A. William --
3      MR. DAHAN: You can answer.
4      A. Apologies.
5      Q. You can answer.
6      A. William and Drew never did. I
7  believe there was one time -- I can think of one
8  time the accounting group asked me for profit
9  numbers and I told them, no. But William and
10  Drew didn't, no.
11     Q. And did you ever provide FXCM with
12  access to data from which they could verify the
13  P&L numbers that you showed with them?
14     A. No.
15     Q. Looking back at your e-mail still in
16  the first paragraph moving down to the fourth
17  line, you write, "If we go with $25, it should
18  be a good start given to help with June average
19  to date being lower, but micro's likely increase
20  this number."
21     A. I see that.
22     Q. And in the next paragraph starting
23  the middle of the third line, you write, "We
24  should review after micro's get added and maybe
25  bring $25 to $30."

78 (Pages 306 - 309)

Page 334

CONFIDENTIAL - JOHN DITTAMI

1     what is that?
2         A.  That's a wide stream for large
3     tickets.  I don't know if they're retail or not
4     retail, I guess.  ECPs professional --
5     professional -- I don't know what you call it,
6     but professional people that need large ticket,
7     big sizes, lots of liquidity.
8         Q.  And when you refer --
9         A.  (INAUDIBLE.)
10        Q.  Sorry, go ahead.  Please finish.
11        A.  I just said it's another additional
12    stream that at that -- in October we were
13    providing in addition to the others.
14        Q.  Okay.  And when you refer to
15    "external venues," does that mean outside of
16    FXCM?
17        A.  Those are venues that we are acting
18    as liquidity provider outside of FXCM, yes.
19        Q.  And based on the numbers that you
20    have in this paragraph, 540K and 490K --
21        A.  It looks like that 90 percent I told
22    you on your last question.
23        Q.  Okay, thank you.
24            So the 90 percent you're referring to

Page 335

CONFIDENTIAL - JOHN DITTAMI

1     --
2         A.  In line with --
3         Q.  -- 90 percent of Effex's trading P&L
4     at this time kept coming from FXCM order flow?
5         A.  Again, that's my best guesstimate on
6     this week.  That's what it was on this week.
7         Q.  Okay.  And was that share typical for
8     Effex in 2011?
9         A.  It's my guess in 2011 that it was
10    around, roughly, 90 percent.  I don't have
11    precise guides.
12        Q.  And did that percentage change
13    between 2011 and 2014?
14        A.  I believe that percentage would have
15    -- there would have been an increased percentage
16    of P&L outside of FXCM.
17        Q.  And in 2014, do you recall, roughly,
18    what percentage of Effex's revenues came from
19    FXCM?
20        A.  I don't know what percentage.  I
21    don't know.
22        Q.  Was it less than that half?
23        A.  -- more than 50.
24        Q.  Okay.  Was there ever a point between

Page 336

CONFIDENTIAL - JOHN DITTAMI

1     2010 and 2014 where Effex -- or less than
2     50 percent of Effex's revenues came from FXCM?
3         A.  I don't know.  On any given month,
4     I'm sure, but I don't know.  I don't have the
5     numbers in front of me.  You have to qualify that
6     with the timeframe and a -- I would have to look
7     it up.
8         Q.  Okay.  I'm going to show you another
9     document.
10            (Deposition Exhibit 68, 12/19/12
11    e-mail from John Dittami to Drew Niv and William
12    Ahdout GLBR_00004527 & GLBR_00004528 marked
13    Confidential, was marked for identification.)
14        A.  Okay; 68?
15        Q.  That's correct.  Are you able to see
16    it?
17        A.  Yes.
18        Q.  Okay.  And take a minute to review.
19            MR. BAKER:  For the record,
20    Exhibit 68 is GLBR 4527.
21        Q.  And my first question to you will be
22    is this an e-mail from yourself to Drew Niv and
23    William Ahdout copying Chris Meyer?
24        A.  It is.

Page 337

CONFIDENTIAL - JOHN DITTAMI

1         Q.  And does it appear that you were
2     e-mailing Mr. Niv and Mr. Ahdout with an update
3     prior to a meeting that you had with them?
4         A.  It does.
5         Q.  Do you recall that meeting?
6         A.  I don't recall the details of that
7     meeting.  It was years ago.
8         Q.  And looking at the bottom of the
9     first paragraph, paragraph numbered 1 in your
10    e-mail you write, We want to start -- "We want to
11    restart doing regular updates again for you with
12    distribution to Drew, William, Evan and I think
13    we should add Randy."
14            Do you see that?
15        A.  I'm trying to find that section, one
16    second; got disconnected, updates.
17            So is it on the second page?  No, I
18    see it.  No, I see it, D, 2D.  Yes, I see that.
19        Q.  No, I'm talking about Paragraph 1,
20    the last sentence in Paragraph 1 on the top of
21    Page 1.
22        A.  Oh, it appears twice.  I see that
23    also in the -- I see that last sentence in
24    Paragraph 1.

85 (Pages 334 - 337)

Page 346

CONFIDENTIAL - JOHN DITTAMI

1
2      2010.
3          Do you recall that?
4      A. Yes.
5      Q. And both of those had in there the
6   agreement that Effex agreed to pay $21 per
7   million flow.
8          Do you recall that?
9      A. Yes, I do.
10     Q. Okay. Now, to -- and you were the
11  owner of Effex at the time, correct?
12     A. Yes, that's correct.
13     Q. You would know --
14         MR. BAKER: Which time?
15         MR. DAHAN: 2010.
16     Q. Correct?
17     A. That is correct.
18     Q. And so you would know what Effex
19  agreed to, correct?
20     A. Correct.
21     Q. Did Effex agree to pay FXCM
22  70 percent of Effex's profits?
23     A. No.
24     Q. Did it ever do that?
25     A. No.

Page 347

CONFIDENTIAL - JOHN DITTAMI

1
2      Q. Did FXCM demand that Effex pay its
3   70 percent of profits?
4      A. No.
5      Q. Did Effex enter into a profit sharing
6   agreement with FXCM?
7      A. No. You were shown some documents
8   earlier where you reported that for certain
9   periods of time that Effex was -- had a P&L of
10  over $35.
11         Do you remember that?
12     A. There were occasions --
13     Q. You saw some documents.
14     A. There were occasions where it was $35
15  per million in some of those documents.
16     Q. And did Effex --
17     A. On occasion.
18     Q. And did Effex agree to pay more than
19  $21 when it did that?
20     A. No.
21     Q. You were shown -- let me see what
22  exhibit that was. It was early in the day. Hold
23  on -- I think it was Exhibit 5. If we can go
24  back to Exhibit 5.
25     A. I have Exhibit 5 open.

Page 348

CONFIDENTIAL - JOHN DITTAMI

1
2      Q. Right. And Counsel for Plaintiffs
3   went through some chosen sentences in here.
4          Do you recall that?
5      A. I -- I recall going through
6   questions, but you'll --
7      Q. Yeah.
8      A. -- need to refresh my memory.
9      Q. Let me go through he, obviously,
10  didn't ask you about.
11         It says -- on Page 3 of the document,
12  there's a paragraph saying, "At the time of its
13  formation, John Dittami owned a hundred percent
14  of the membership."
15         Do you see that?
16     A. I see that.
17     Q. And it describes certain people who
18  had small other interest in Effex?
19     A. I see that.
20     Q. And then it says, "None of the
21  foregoing persons were ever affiliated with
22  FXCM."
23         Do you see that?
24     A. Yes.
25     Q. Is that a true statement to your

Page 349

CONFIDENTIAL - JOHN DITTAMI

1
2      knowledge?
3      A. That's a true statement to my
4   knowledge, yes.
5      Q. Okay. And it says, "Since March of
6   2010, Effex Capital hired, approximately, 30
7   full-time employees, consultants, independent
8   contractors."
9          Do you see that?
10     A. Yes.
11     Q. Did Mr. Niv decide who Effex hired?
12     A. No.
13         MR. BAKER: Objection to form.
14     Q. Did William Ahdout decide those
15  hirings?
16         MR. BAKER: Objection to form.
17     A. No.
18     Q. Who made those hiring decisions?
19     A. Myself and/or the managers who the
20  hire would report to.
21     Q. Anybody from FXCM?
22     A. No.
23     Q. Okay. If you go to Page 4, there's a
24  conclusion.
25         Do you see that?

88 (Pages 346 - 349)