# Exhibit 211

Page 1

UNITED STATES DISTRICT COURT

FOR THE SOUTHERN DISTRICT OF NEW YORK

In re:                          :
                                :  Master File No.
Global Brokerage, Inc.          :  1:17-cv-00916-RA
F/k/a FXCM, Inc.                :
Securities Litigation           :
----------------------          :

CONFIDENTIAL

REMOTE VIDEO DEPOSITION OF:

DROR NIV

THURSDAY, FEBRUARY 11, 2021

REPORTED BY:

SILVIA P. WAGE, CCR, CRR, RPR

Page 130

CONFIDENTIAL - DROR NIV

agreement dated March 1st, 2010, which is hereby terminated in its entirety and superceded by this agreement."
   Do you see that?
A. Yes.
Q. And were you aware that this agreement superceded the March 1 Services Agreement?
A. I'm not aware of specifics.
Q. Were you --
A. It makes sense to because we -- to trade with all of the clients, you know, with all of the entities of FXCM, you can't just do it with the US entity because the trades from the other entities go -- don't go to the US entity.
Q. Okay.
A. So, if you wanted to trade with clients outside of the United States, you would have to do it with Holdings.
THE STENOGRAPHER: I'm sorry. You have would have to do with what?
MR. DAHAN: Holdings.
A. You would have to do it with FXCM Holdings.

Page 131

CONFIDENTIAL - DROR NIV

Q. Thank you. I was just going to ask the same.
   Okay. Were you generally aware that Effex had an original services agreement with FXCM US that was later replaced with a services agreement with FXCM Holdings?
A. Do I recall the specifics, no. It makes no sense that he would have -- I mean, it's just sloppy lawyering, if you had a good (UNINTELLIGIBLE), because it's not how, you know, it's supposed to be with Holdings, if he wants to do business globally.
Q. Other than changing from FXCM US to FXCM Holdings, were you aware of any significant changes between the two services agreements that we looked at today?
A. I am not aware.
Q. And I think you mentioned this earlier.
   But do you know why the decision was made to change the counterparty from FXCM US to FXCM Holdings?
A. Yes. So FXCM Holdings is the sole shareholder of all the FXCM retail operating

Page 132

CONFIDENTIAL - DROR NIV

subsidiaries. And so by having one agreement with Holdings, it, essentially, allows you to do business with all of the FXCM Global retail trading subsidiaries and some of the institutional ones and all the institution ones too.
   So it is just -- you know, instead of signing many agreements, it's just easier to deal with one entity and that was the practice that we did with most of our vendors.
Q. Did other liquidity providers have similar services agreements with FXCM at this time?
A. Most banks have -- there's different people have different ones. So most back have an ISDA agreement, which is, obviously, they provide and then there is other, you know, side letter agreements about, you know, things like, you know, payment for order flow arrangements like we had with BNP or with Goldman Sachs. Those are usually outside the ISDA. But it starts with an ISDA. But, obviously, those documents are completely different. Because there are different banks and they have their own way of

Page 133

CONFIDENTIAL - DROR NIV

doing it.
Q. So was it your understanding that Effex needed to have a services agreement with FXCM in order to provide liquidity to FXCM?
A. No. It needed a, you know, services agreement, you know, in terms of, you know, the payment for order flow and all of the obligations and the responsibilities and the conditions that come with a payment for order flow.
Q. Do you recall any discussions about changing the counterparty to the services agreement with Effex from FXCM US to FXCM Holdings?
A. I don't. I don't deal with those details that I, you know, should have been with Holdings in the first place.
Q. And so is it your understanding that Effex made payments for order flow to FXCM Holdings?
A. That should have been the case. But I don't recall the -- again, I'm not in accounting, so I don't know where -- which bank account this all went into.
Q. Other than the payments from Effex,

Page 166
```
 1              CONFIDENTIAL - DROR NIV
 2   the decision -- I made decision to terminate for
 3   all the, you know, for all of the entities.
 4          Q.  Understood.
 5              Did the NFA at any point investigate
 6   FXCM's relationship with Effex?
 7          A.  Yes.
 8          Q.  And when did you first become aware
 9   of the NFA's investigation into FXCM's
10   relationship with Effex?
11          A.  I do not recall exact dates.  But I
12   do recall making a presentation answering
13   questions in 2013 at NFA offices in Chicago.  But
14   I'm sure we answered questions by e-mail and by
15   phone even before that.  Obviously, the NFA gets
16   -- all the regulators, basically, get -- all the
17   regulated entities have a trading reporting
18   system so they get to see all the trades that our
19   clients do, with who they do it with and, you
20   know, what prices they got.  And they will
21   routinely send us an inquiry saying, oh, we saw
22   this type of trade, this event occurred, please
23   explain, right.  So we would get that on a
24   routine basis and, you know, they inquired about
25   Effex because Effex came up, obviously, in that
```

Page 167
```
 1              CONFIDENTIAL - DROR NIV
 2   -- in the regulatory -- in that regulatory
 3   reporting system.
 4          Q.  And did the CFTC investigate FXCM's
 5   relationship with Effex?
 6          A.  I believe so on a much later date.  I
 7   don't recall when.
 8          Q.  Do you remember what year 2013, 2014?
 9          A.  It's all a blur and I don't recall.
10          Q.  Do you recall if you first became
11   aware of the CFTC investigation before FXCM
12   stopped taking order flow payments from Effex?
13          A.  The NFA one, I know that's the case.
14   The CFTC one, I don't -- I'm not sure.
15          Q.  Was the NFA investigation a factor in
16   your decision for FXCM to start -- to stop
17   charging Effex for order flow?
18          A.  No, it was the determination for the
19   -- it was the determination of the UK authorities
20   not to do it, which then we figured this is going
21   to, you know, become some best practices thing
22   that is likely to happen anyway and might as well
23   get ahead of it and terminate it because clearly
24   the regulators don't like it.  But it is -- when
25   the UK regulator said, no -- because, again, they
```

Page 168
```
 1              CONFIDENTIAL - DROR NIV
 2   were investigating, you know, pieces of it, but,
 3   you know, this is standard practice and this was
 4   something that everybody does and, by the way,
 5   still do outside of the UK.  You have --
 6          Q.  And --
 7          A.  -- wrong and this did not become
 8   Global best practice.  It is just a UK best
 9   practice.
10          Q.  So understanding that the UK
11   regulator -- their decision was the impetus for
12   these discussions in this decision, did the fact
13   that the NFA was investigating FXCM's
14   relationship with Effex play any factor in the
15   decision to stop order flow payments from Effex?
16              MR. DAHAN:  Asked and answered.
17          Q.  You can answer.
18          A.  I mean, that's what I just explained.
19   It is an issue of, we understand if from -- from
20   an optics perspective, this -- the regulators did
21   not like the practice, yet, you know, the
22   regulators allow the practice, you know, and the
23   regulators, you know, absolutely, you know, still
24   -- again, this practice continues at all the
25   major brokerage firms today anyway.
```

Page 169
```
 1              CONFIDENTIAL - DROR NIV
 2          Q.  And --
 3          A.  The NFA and CFTC do not allow this in
 4   the futures, because in futures there's no
 5   practical way to do it and so they're not
 6   familiar with it like the SEC is familiar with it
 7   in equities but -- because of the monopoly status
 8   of our futures exchanges operate.  But in
 9   equities where there's 40 plus venues and there's
10   real competition for trades, there is absolute
11   payment for order flow.
12              So the -- you know, Effex is like
13   equities.  There is lots of venue competition,
14   okay, and therefore there's payment for order
15   flow.  So we thought this was fine.  They did not
16   and this clearly played some role in our decision
17   that, you know, we thought eventually the US
18   regulators would reach the same conclusion that
19   the UK regulators did, okay.  They never did, but
20   that's what we thought they would.
21          Q.  Okay.  And you said, "from an optics
22   perspective" the regulators did not like this
23   practice of payments for order flow.
24              Are you referring to the NFA as one
25   of those regulators?
```

Page 214

CONFIDENTIAL - DROR NIV

1  for dollar/yen trading volume at this time?
2      A. Right.
3      Q. I believe you referenced that earlier
4  that you were generally aware of the fact that
5  FXCM was billing Effex separately for dollar/yen
6  flow at a different rate?
7      A. Correct.
8      Q. And were you aware of any service
9  agreement or amendment to a services agreement
10 reflecting the dollar/yen flow being separated?
11     A. I am not. Again, not details I would
12 be familiar with.
13     Q. Okay. And you were involved in the
14 discussions or the decision to bill Effex at a $3
15 per million rate when the decision was made?
16     A. Yeah, I would have to approve it,
17 yes.
18     Q. Okay. I'm going to show you another
19 document, another document for now.
20         (Deposition Exhibit 54, 8/13/13
21 e-mail from Baruch Greenbaum to Chris Meyer and
22 attachment GLBR_00185332 & GLBR_00185333 marked
23 Confidential, was marked for identification.)
24     Q. Okay. Exhibit 54 should be up.

Page 215

CONFIDENTIAL - DROR NIV

1  Please let me know when you can see it and take a
2  minute to review.
3      MR. BAKER: For the record,
4  Exhibit 54 is GLBR 185332 and an attachment GLBR
5  185333.
6      Q. Mr. Niv, just let me know when you're
7  ready.
8      A. I'm ready.
9      Q. Okay. Again, I'll let you know that
10 you don't appear to be on this e-mail, but does
11 this appear to be an e-mail from Baruch Greenbaum
12 and attachment to that e-mail?
13     A. Yes.
14     Q. And does the attachment appear to be
15 an invoice from FXCM to Effex for order flow for
16 June 2013?
17     A. Yes.
18     Q. And does it appear that FXCM was
19 telling Effex $6 per million for euro/dollar
20 volume, $3 per million for dollar/yen and $16 per
21 million for all other currencies?
22     A. Correct.
23     Q. And were you involved in the decision
24 to bill Effex separately at $6 per million for

Page 216

CONFIDENTIAL - DROR NIV

1  euro/dollar order flow?
2      A. Again, I do not remember the
3  specifics of the meetings and the times but, yes.
4      Q. And do you recall any discussion
5  about amending a services agreement or signing a
6  new services agreement to reflect that change?
7      A. I do not.
8      Q. Okay.
9      A. It would be somebody else's job to do
10 those service agreement changes.
11     Q. Okay. Let me show you the next
12 document.
13     A. And, again, this is reflecting that
14 in less than three years after starting this
15 arrangement, spreads have fallen so much already,
16 right, and tightened that much that, basically,
17 you know, they are making, you know, a hell of
18 lot less, you know, per million traded because,
19 you know, spreads have tightened so much for
20 customer. And so customers are receiving, you
21 know -- the Effex relationship worked really well
22 in tightening those spreads, you know, for the
23 whole market, actually.
24     Q. Okay. I've introduced Exhibit 55.

Page 217

CONFIDENTIAL - DROR NIV

1         (Deposition Exhibit 55, e-mail string
2  GLBR_00004281 to GLBR_00004283 marked
3  Confidential, was marked for identification.)
4      Q. Let me know when you can see it and
5  take a minute to review.
6      MR. BAKER: For the record,
7  Exhibit 55 is GLBR 4281.
8      Q. And Mr. Niv, just let me know when
9  you're ready.
10     A. I'm reading.
11        Go ahead, I'm ready.
12     Q. Okay. Is this an e-mail chain
13 between Ms. Muchinsky, yourself and Mr. Ahdout?
14     A. Yes.
15     Q. And is this a discussion about how to
16 disclose information to FXCM's liquidity
17 providers about the share of FXCM's retail flow
18 that different liquidity providers were
19 capturing?
20     A. Correct.
21     Q. And if you look at your e-mail, the
22 second e-mail from the top, this is from you at
23 1:04 p.m. You write, "Provided in lump all funds
24 like Sun, Lucid and Effex into one bucket and

|  | Page 218 |  | Page 220 |
|---|---|---|---|
| 1 | CONFIDENTIAL - DROR NIV | 1 | CONFIDENTIAL - DROR NIV |
| 2 | tell the banks it's three funds that share the | 2 | Q. And, Mr. Niv -- well, first, are you |
| 3 | pie. Don't give specifics." | 3 | able to see the document? |
| 4 | Were you instructing Ms. Muchinsky to | 4 | A. Yes. |
| 5 | provide market share information under the | 5 | Q. Take a minute to review. I'll note |
| 6 | liquidity providers that did not reveal Effex's | 6 | that the bottom e-mail is quite detailed and |
| 7 | market share? | 7 | lengthy. I'm not going to be asking you much |
| 8 | MR. DAHAN: Objection to form. | 8 | detail about that. But feel free to review it |
| 9 | A. Yes, to provide it in lump sum all | 9 | for context, if you need. So just let me know |
| 10 | the funds that are not banks. | 10 | when you're ready to go forward. |
| 11 | Q. And did you not want other liquidity | 11 | A. Okay. |
| 12 | providers to know what Effex's market share was | 12 | Q. Okay. Is this an e-mail chain |
| 13 | of FXCM's retail flow? | 13 | between yourself, Mr. Dittami and Chris Meyer? |
| 14 | A. I don't think that was the intention. | 14 | A. Yes. |
| 15 | The intention is not to reveal competitive | 15 | Q. And Chris Meyer worked for Effex; is |
| 16 | information. | 16 | that right? |
| 17 | Q. What "competitive information," in | 17 | A. Yes. |
| 18 | particular? | 18 | Q. Was he the COO of Effex? |
| 19 | A. Who is winning our flow and why | 19 | A. Something like -- there was like the |
| 20 | they're winning our flow, you know. You don't | 20 | business development/COO, yeah, one of those |
| 21 | need this to, you know, like people -- if someone | 21 | things. But I don't remember exactly. |
| 22 | is very successful, other competitors will hunt | 22 | Q. Is this a discussion about Effex |
| 23 | down their quants and, you know, offer them a job | 23 | turning off its liquidity to FXCM for certain |
| 24 | and, you know, steal them away. We, you know, we | 24 | currency pairs in particular instance? |
| 25 | needed to protect our, you know, our secret | 25 | A. Yes. |

|  | Page 219 |  | Page 221 |
|---|---|---|---|
| 1 | CONFIDENTIAL - DROR NIV | 1 | CONFIDENTIAL - DROR NIV |
| 2 | sauce. | 2 | Q. And was this in connection with FXCM |
| 3 | Q. Were there any reasons that you | 3 | retail flow? |
| 4 | didn't want other liquidity providers to know how | 4 | A. I don't recall. You know, I have to |
| 5 | much market flow -- market share Effex was | 5 | read the whole e-mail to figure that out. I |
| 6 | capturing from FXCM's trading flow? | 6 | don't recall this one. |
| 7 | MR. DAHAN: Objection to form. I | 7 | Q. Well, I think, read as much as you |
| 8 | think he just answered that. | 8 | need to be able to answer the question, if you |
| 9 | A. I think, again, it's -- these are | 9 | think that will help. |
| 10 | trade secrets. These are things that we do not | 10 | A. I'm not sure what segment of the |
| 11 | -- you know, these are vendors of ours. We do | 11 | business this is, which entity, you know. |
| 12 | not owe them some duty of care. They are not our | 12 | There's -- it could be for some of the retail |
| 13 | customers, you know. We don't have to disclose | 13 | business too. I'm not -- I'm not certain. |
| 14 | to them anything, right. They're the ones -- you | 14 | Q. Okay. I'm going to focus you down to |
| 15 | know, they all know that there's competition. | 15 | your e-mail at the bottom of Page 1 at 1:42 p.m. |
| 16 | Again, that's what it comes down to. They don't | 16 | A. Hold on. Okay. |
| 17 | need to know from whom. | 17 | Q. And starting in the second -- in the |
| 18 | Q. Let me show you the next document. | 18 | second line, you see where you write, "P&L is |
| 19 | (Deposition Exhibit 56, e-mail string | 19 | key"? |
| 20 | GLBR_00004443 to GLBR_00004445 marked | 20 | A. Uh-huh. I see it. |
| 21 | Confidential, was marked for identification.) | 21 | Q. At end of the paragraph you write, "I |
| 22 | Q. Okay. This is Exhibit 56. It should | 22 | definitely wouldn't want to protect others at the |
| 23 | be up now. Let me know when you can see it. | 23 | expense of P&L." |
| 24 | MR. BAKER: For the record, | 24 | So, first, what did you mean by, "P&L |
| 25 | Exhibit 56 is GLBR 4443. | 25 | is key"? |

|  | Page 234 |
|---|---|
| 1 | CONFIDENTIAL - DROR NIV |
| 2 | down to your e-mail at the bottom of page where |
| 3 | you see you have a number of numbered paragraphs? |
| 4 | I'm going to point you to paragraph numbered |
| 5 | three. |
| 6 |     A.  Yes. |
| 7 |     Q.  And starting toward the end of the |
| 8 | first line you write, "80 percent of their |
| 9 | revenues come from FXCM's retail and |
| 10 | institutional volume that they make markets to so |
| 11 | they have a lot to lose if they piss us off." |
| 12 |         Are you referring to Effex there? |
| 13 |     A.  Yeah.  I mean, it turns out that |
| 14 | static wasn't true, because by that time a much |
| 15 | larger percentage of their business -- over |
| 16 | 50 percent was coming from other relationships. |
| 17 | But, you know, we -- I kind of took the statistic |
| 18 | from early on in the relationship.  I was not |
| 19 | aware, you know, that things have changed so much |
| 20 | and he had so many new clients.  So, I mean, |
| 21 | later on I realized, but at the time I thought |
| 22 | this was kind of late 2010 or turned out where |
| 23 | the figure was more true but by 2014 that was far |
| 24 | from true. |
| 25 |     Q.  And how did you come by that |

|  | Page 235 |
|---|---|
| 1 | CONFIDENTIAL - DROR NIV |
| 2 | information of what portion of Effex's business |
| 3 | came from FXCM versus other sources? |
| 4 |     A.  Well, in 2010, John sort of just gave |
| 5 | me some hints, you know, but afterwards I don't |
| 6 | remember when exactly, but, you know, sooner |
| 7 | thereafter he would not give me exactly and he |
| 8 | certainly never spoke about -- |
| 9 |         MR. DAHAN:  Drew, your voice is |
| 10 | getting away from the computer. |
| 11 |         THE WITNESS:  Oh, sorry. |
| 12 |     A.  He, certainly, would not give me |
| 13 | specific numbers of what he's doing with other |
| 14 | counterparties.  He would just say, you know, |
| 15 | you're still my largest client.  I do a lot of |
| 16 | business with you, you know.  I kind of threw |
| 17 | those numbers out there.  But, you know, |
| 18 | obviously, we found out later on and, actually, |
| 19 | you know, one of the reasons I know some of this |
| 20 | stuff is because, you know, you know, Israel told |
| 21 | me from -- |
| 22 |         MR. DAHAN:  Hey, hey, hey -- |
| 23 |     A.  -- it was from John Dittami. |
| 24 |         MR. DAHAN:  Yeah, no. |
| 25 |     Q.  Yeah.  Mr. Niv, I'm not going to ask |

|  | Page 236 |
|---|---|
| 1 | CONFIDENTIAL - DROR NIV |
| 2 | you about anything you spoke about with your |
| 3 | Counsel. |
| 4 |         So, aside from any conversations with |
| 5 | your Counsel, was there any other basis from |
| 6 | which you said 80 percent was the statistic early |
| 7 | on and at this point you said you believed it was |
| 8 | -- |
| 9 |     A.  We only had anecdotal reading -- |
| 10 |     Q.  -- business? |
| 11 |     A.  I mean, we only had -- sorry for |
| 12 | talking over. |
| 13 |         We only had anecdotal reading of his |
| 14 | business from what he would tell us.  Again, in |
| 15 | the beginning, he would give us more detailed |
| 16 | updates.  We -- you know, as he got a lot of |
| 17 | other revenues, business grew.  We had a lot more |
| 18 | clients.  We would not have transparency as to |
| 19 | what size of his business was or how big he was |
| 20 | with other people. |
| 21 |         We thought he was -- you know, a lot |
| 22 | of it was still ours and we were, I believe, the |
| 23 | biggest client, but we were clearly not the bulk |
| 24 | of his business anyway at this time. |
| 25 |     Q.  Okay.  And do you recall around this |

|  | Page 237 |
|---|---|
| 1 | CONFIDENTIAL - DROR NIV |
| 2 | time about how much of Effex's business that came |
| 3 | from FXCM was retail versus institutional volume? |
| 4 |     A.  I don't recall. |
| 5 |     Q.  Okay.  And back to your e-mail here. |
| 6 |         What did you mean by, "they have a |
| 7 | lot to lose if they piss us off"? |
| 8 |     A.  Well, we were one of their big |
| 9 | clients.  So they -- you know, they were not -- |
| 10 | if they screw you over given that you are -- you |
| 11 | know, Mr. Palchak, you or us, you are not going |
| 12 | to screw us over.  So, cause he is looking at the |
| 13 | life as FXCM Capital is a competitor of his, |
| 14 | right, because they're a high frequency trading |
| 15 | operation too.  He does not want to sell them, |
| 16 | you know, an intellectual property. |
| 17 |         I said, one, you will make more money |
| 18 | selling them that, right, and, two -- and, again, |
| 19 | we are 50 percent owner of this.  And, you know, |
| 20 | two, that he's not a really in competition and |
| 21 | he's not going to get into your business because, |
| 22 | you know, he's not going to piss us off.  That |
| 23 | was my intent in this e-mail. |
| 24 |     Q.  And when you say, "We are 50 percent |
| 25 | owner of this," what are you referring to? |

Veritext Legal Solutions
212-267-6868    www.veritext.com    516-608-2400

Page 254

1  CONFIDENTIAL - DROR NIV
2  This was I want to say after 2010 or right before
3  2010.  They came up with a rule that they wrote
4  up a disclaimer that we had to present in large
5  fund to all customers and all customer documents
6  and on our website and no matter what we say and
7  no matter what we do, FX customers should note
8  that the retail Effex dealers, which is FXCMs of
9  the world, are trading against them and have
10 their opposite interests, you know, et cetera, et
11 cetera, et cetera.
12     So that rule -- that disclaimer went
13 to -- all US customers had to sign that
14 disclaimer.  So that had to be prominently on
15 every where.  So the -- they were not really in
16 the mood to approve, you know, even when the NFA
17 wanted the rules on different business models of
18 different firms, they said, no, they're treating
19 every firm the same and they considered us all to
20 be trading against the customer by all the firms
21 no matter who they are.  So that was kind of
22 their take on the issue.  So they didn't want to,
23 quote, unquote, legitimize the industry by, you
24 know, by making, you know -- by saying that, you
25 know, there's external trading and that's real.

Page 255

1  CONFIDENTIAL - DROR NIV
2     Q.  Okay.  Thank you for that
3  explanation.
4     And now I'm going to show you the
5  next exhibit.  This is Exhibit 61, which should
6  be up now.
7     (Deposition Exhibit 61, FXCM Inc.
8  Minutes of Special Telephonic Board of Directors
9  Meeting December 14, 2016 New York, York
10 EY-GBI-WP-00004278 to EY-GBI-WP-00004280 marked
11 Confidential, was marked for identification.)
12    Q.  Let me know when you can see it.
13    A.  I can see it.
14    Q.  Okay.  And take a minute to review.
15    MR. BAKER:  As you do, I'll note for
16 the record Exhibit 61 is EY-GBI-WP 4278.
17    Q.  Mr. Niv, just let me know when you're
18 ready.
19    A.  I am ready.
20    Q.  Okay.  Is this the minutes of a
21 telephonic board meeting of FXCM on December 14,
22 2016?
23    A.  Yes.
24    Q.  If you go down to page -- well,
25 first, do you recall this meeting?

Page 256

1  CONFIDENTIAL - DROR NIV
2     A.  The exact -- we had so many at that
3  time because, clearly, this was an emergency
4  time.  So I do not recall this specific meeting.
5  But I know the subject of what we discussed at
6  all these meetings.
7     Q.  Okay.  If you go down to Page 2 about
8  halfway through the first full paragraph and in
9  there the minutes here say that you discussed an
10 execution study with the Board.
11    Do you see that?
12    A.  Yes.
13    Q.  And do you recall discussing an
14 execution study with the Board?
15    A.  Yes.
16    Q.  Was this the same study that you
17 referred to earlier about improvements in
18 execution?
19    A.  Correct.  This was, obviously, a
20 study that we prepared way before 2016 and we
21 already presented it to foreign regulators, to
22 the US regulators.  This is just in the -- and
23 the Board knew about.  This is just reiterating
24 it.
25    Q.  Did FXCM ever publish this study

Page 257

1  CONFIDENTIAL - DROR NIV
2  anywhere?
3     A.  Yes.
4     Q.  Where?
5     A.  So we published it on our website and
6  the NFA called 2 minutes -- like 20 minutes later
7  literally and told us to take it down, because it
8  was disparaging the CME, because we compared our
9  execution to the execution on CME, UBS and
10 Reuters and CME is their favorite child.  So they
11 decided this is no good because they're -- again,
12 the NFA is the National Futures Association.
13 When it was mandated by Congress in 2000 to
14 oversee -- the retail FX 2 is the futures
15 association and, therefore, they did not want to
16 bias the futures exchange, which was on their
17 board, et cetera, et cetera.
18    So they told us to take it down.  We
19 did publish the study on our foreign websites
20 later and they initially took us to take it out
21 of the foreign websites too.
22    But we said, you kind of don't have
23 jurisdiction over that.  And we published this,
24 you know, this study.  And they're not allowed to
25 tell us not to publish because their rules state

|  |  |
|---|---|
| Page 258<br>1  CONFIDENTIAL - DROR NIV<br>2  we can publish anything we want, as long as we<br>3  have the backup of evidence. And we had enormous<br>4  backup for this evidence. And, in fact, we gave<br>5  they are presentation of all of it with the<br>6  evidence, with the audit and everything and they<br>7  still don't want us to publish it. So it was<br>8  never published in the US. But there is<br>9  electronic copies of it available widely.<br>10     Q. And the last sentence of this<br>11 paragraph reads, "It is therefore not unexpected<br>12 that the NFA refused to allow FXCM US to print<br>13 its execution study while it was widely embraced<br>14 by foreign regulators."<br>15     Was it your understanding that the<br>16 execution study "was widely embraced by foreign<br>17 regulators"?<br>18     A. Yes. And that's why -- if you see<br>19 the history of this entire sham, no foreign<br>20 regulator took actions against FXCM for the same<br>21 reasons -- for the same thing that the NFA did.<br>22 Again, the NFA did this because they are biassed<br>23 towards the futures industry. If you look at<br>24 foreign regulators, they are a government agency.<br>25 They are not biassed and they, you know, just, | Page 260<br>1  CONFIDENTIAL - DROR NIV<br>2     A. Yes.<br>3     Q. Was the UK -- was FXCM's UK website<br>4  one of the places that FXCM published the study?<br>5     A. Correct. And we made a presentation.<br>6  I made the presentation to the FCA, which is the<br>7  UK regulator. I know, you know, my staff in Asia<br>8  made that presentation to the Australian<br>9  regulator, you know, we did a Hong Kong<br>10 regulator. I mean, we did Japanese regulator.<br>11 Clearly, we put everybody there.<br>12     And that's why there is no -- those<br>13 people accepted, you know, the work that clients<br>14 benefitted from, you know, from the Effex/FXCM<br>15 relationships and benefitted tremendously from it<br>16 as, you know, proof that this was not bad for<br>17 clients and did not have -- was not a -- you<br>18 know, this was -- this is form over substance,<br>19 basically, is what it is.<br>20     MR. DAHAN: Josh, I believe there was<br>21 plenty time to produce this before the<br>22 litigation.<br>23     MR. BAKER: That's fine. Thank you.<br>24     Q. Did any of the foreign regulators<br>25 that FXCM dealt with ever explicitly endorse or |
| Page 259<br>1  CONFIDENTIAL - DROR NIV<br>2  you know, agree that a disclosure, you know,<br>3  disagreement absence -- you know, in the absence<br>4  of a rule that mandated the exact language in a<br>5  disclosure -- we did disclose just not in -- you<br>6  know, they said we should have disclosed more<br>7  than we did. And it's not the same as we --<br>8  foreign regulators wanted to know if we cheated<br>9  our clients.<br>10     And at the end of the day, we did not<br>11 cheat our clients. Better than that we saved our<br>12 clients an extraordinary amount of money. You're<br>13 not talking about a few dollars. So, if you read<br>14 this study, you'll note somewhere in the area of<br>15 hundred something and 200 plus million dollars a<br>16 year of savings trading with us versus if had our<br>17 customers been doing the same trades on a<br>18 different venue, right. That's a significant<br>19 amount of money, something that amounted about $2<br>20 per trade.<br>21     Q. Okay. And you mentioned this was<br>22 something FXCM published on foreign non-US<br>23 websites?<br>24     A. Uh-huh, foreign websites.<br>25     Q. On its foreign websites? | Page 261<br>1  CONFIDENTIAL - DROR NIV<br>2  show anything in writing endorsing FXCM's<br>3  execution study?<br>4     A. Foreign regulators don't -- I mean,<br>5  regulators don't endorse.<br>6     MR. DAHAN: Objection to form.<br>7     A. I've never heard of regulators<br>8  endorse anything.<br>9     Q. To put this -- that's fair. I guess<br>10 we'll have to put it together.<br>11     Before we said -- and in the minutes<br>12 it says, the study's widely embraced by foreign<br>13 regulators.<br>14     What did that mean?<br>15     A. Which means that regulators, you<br>16 know, specifically, said, you know, that because<br>17 there is no customer harm and the studies prove<br>18 that there is -- not just no customer harm but<br>19 actually large customer benefit, they basically<br>20 did not, you know, see a reason to penalize FXCM<br>21 in a way that the US regulator did.<br>22     Q. And is that something that they<br>23 expressed to FXCM in writing or just in<br>24 conversations?<br>25     A. I'm not aware of how much of it is in |

66 (Pages 258 - 261)