# Exhibit 212

CONFIDENTIAL

Page 1

1        CONFIDENTIAL - ROBERT N. LANDE
2           UNITED STATES DISTRICT COURT
         FOR THE SOUTHERN DISTRICT OF NEW YORK
3

   In re:                         :
4                                 : Master File No.
   Global Brokerage, Inc.         : 1:17-cv-00916-RA
5  F/k/a FXCM, Inc.,              :
   Securities Litigation          :
6  ----------------------         :

7

8     REMOTE VIDEO DEPOSITION VIA ZOOM OF:
9                ROBERT N. LANDE
10   PURSUANT TO RULE 30(b)(6) and INDIVIDUALLY
11          THURSDAY, JANUARY 14, 2021
12
13
14
15
16
17
18
19
20
21
22
23
24   REPORTED BY:
     SILVIA P. WAGE, CCR, CRR, RPR
25   JOB NO. 4379162

Page 70

1    CONFIDENTIAL - ROBERT N. LANDE
2  that we wouldn't consolidate, you know, this is
3  something that needs to be researched and Ernst &
4  Young and Deloitte had very good platforms that
5  allow you to research and then get to ultimately
6  kind of the decision tree that you're going to
7  need.  And so we paid for that and that was
8  extensively used as well.
9       Q.  And when you refer to "auditors," you
10  referred to ENY and Deloitte?
11          Was ENY your external auditor for the
12  entirety of this time period?
13      A.  Deloitte became our auditor and I am
14  not sure when.  It could have been through this
15  whole period it was Ernst & Young and at the tail
16  end afterwards it became Deloitte.  I don't
17  remember the exact date that we changed to
18  Deloitte.
19      Q.  Do you remember if you had a specific
20  audit partner that was responsible for the
21  external audit at FXCM between fiscal years 2010
22  and 2016?
23      A.  Yeah, you know, certainly, in 2010,
24  it was Joseph Link.  Joe Link was our main
25  auditor -- audit partner.  Remember, it was a

Page 71

1    CONFIDENTIAL - ROBERT N. LANDE
2  Global audit.  So there were statutory audits of
3  the UK entity, of the US entity.  You know, in
4  the case of foreign companies and other branches,
5  Ernst & Young would be brought in.  There would
6  be other partners.  But he was the coordinating
7  Global partner.
8          And at some point that transitioned
9  to Dave Stallow.  And I think that would have
10  been before 2016 that Dave Stallow became our
11  Global partner.
12      Q.  And during your tenure as CFO, did
13  FXCM have a policy or procedure in place to
14  ensure that its financial statements complied
15  with GAAP?
16      A.  Yeah, well, of course.  You know,
17  I'll get to all the reviews that would happen.
18  But before we even get to the reviews that
19  happened, you know, each quarter and yearend
20  close, we would use the checklist that was put
21  together by Ernst & Young and all the big
22  accounting firms do this.  They put together a
23  very extensive checklist for you to put together
24  your filing.  And that gets -- that gets updated,
25  you know, obviously, as GAAP moves along and SOX

Page 72

1    CONFIDENTIAL - ROBERT N. LANDE
2  moves along, that you might need something
3  different.  And so it's constantly updated.
4          But, you know, we would start with
5  the closing checklist, which was a very broad set
6  of things, which literally actually Ernst & Young
7  would work off that, you know, okay, send us this
8  and this, which is evidence of this and this, you
9  know something, you know, something that is
10  required, again, just to go back to related
11  parties, you know, we --  you would send out
12  typically a questionnaire 12 directors and
13  officers, you know, where they would elaborate
14  whether they have any related party relationships
15  that we would need to know about that would
16  probably need to be closed.
17          That would be just one little thing
18  that would be in the checklist to remind you that
19  you -- of what it is you need to get through to
20  go through GAAP.
21          But then, of course, the statements
22  are put together and it's, you know, keep in mind
23  now Ernst & Young is permanently on our premises
24  at this time full-time 365 days a year except for
25  weekends, I guess, and have their own room and

Page 73

1    CONFIDENTIAL - ROBERT N. LANDE
2  have free access and would be walking into our
3  offices on a daily basis.
4          So, you know, as we would get through
5  quarter end or yearend, you know, they're coming
6  in asking questions.  We're supplying them with
7  things.  They are going to all of their audit
8  procedures or in the case of a quarter and a
9  quarterly review procedure.  We're supplying them
10  documents, you know, it's a very extensive and
11  interactive affair and, you know, of course, if
12  there is anything that struck them that was
13  unsupported or maybe not well-considered, they
14  would certainly highlight that in this to and
15  fro.
16          So, you know, through all of that and
17  then, ultimately, you generate your financial
18  statements and, again, you know, all disclosure
19  and end of financial statements themselves would
20  be sent off to external Counsel and for review
21  and then, ultimately, brought to the Audit
22  Committee for approval.
23      Q.  So you mentioned a "closing
24  checklist."
25          Did you receive a closing checklist

Page 98

CONFIDENTIAL - ROBERT N. LANDE

ago. But, you know, any new substantive relationship we have, any new substantive contract we have, everything is considered then. So it wasn't anything unique about the EFFEX relationship. It was a substantial relationship, you know. They could see very clearly in our general ledger system, you know, the lines that were dedicated to revenues or receivables you know, coming from EFFEX, you know, like they would likewise look at any detail from any of the lines in there pretty extensive review.

So, no, I don't remember any moment as such where, you know, they concluded it wasn't a VIE, that this was an ongoing process that never stopped and would have started, you know, right from when, you know, results from EFFEX would have started showing up in our results.

Q. So when you testified earlier as to ENY agreeing with that determination, are you referring to anything -- any specific document or instant or, is that just on the basis of your understanding of this process as it's played out from 2010 through 2016?

A. Yeah, the latter. If ENY had a

Page 99

CONFIDENTIAL - ROBERT N. LANDE

problem, trust me we would have all known about it.

Q. Do you recall any specific conversations between yourself or anyone else from FXCM with anyone from ENY about EFFEX in particular in 2010?

A. No, I -- I mean, besides that's a long time ago. I don't think there was anything particularly unique about this relationship that I would, you know, remember something that was uniquely done on this relationship. I think -- I don't know when exactly it was, but at some point there was some discussion about whether an option on EFFEX was valid or not. The conclusion that we reached and legal reached and, you know, it was certainly borne out my memory is by future communications with EFFEX is that the option was never in effect. But options are -- you know, I do remember having some discussions about options with ENY because options are tricky things to value in financial statements and the disclosures around them can be tricky. And so I do remember having some discussions with them around the option, but then it was concluded that this

Page 100

CONFIDENTIAL - ROBERT N. LANDE

option wasn't in force and so that was -- there was nothing more to be done on that.

Other than, that I don't really remember having a whole lot of conversations with EFFEX with them. We, as you know, disclosed in our MDNA, you know -- you know, the percentage of revenues we got from order flow. We got order -- payments from other firms as well, bank of Paris, I think, Goldman Sachs at one point. I don't know.

So, you know, there was nothing particularly unusual about EFFEX and, you know, we did what was appropriately disclosed and so other than discussions around -- I do remember having some discussions on options and how options would get valued in the financial statement, if they were in effect, but they weren't in effect so it was a nonevent.

Q. But do you remember when those discussions were?

A. 2010, 20 -- I doubt it was 2010 because we were going public. I think this would have probably been -- I don't know, maybe it was. I do not know. It was 2010, 2011. It would have

Page 101

CONFIDENTIAL - ROBERT N. LANDE

been around that time. I don't know exactly when.

Q. So I may want to talk a little bit more about some of the specific things you said later in the contention of your individual deposition.

But I would like to switch gears a little bit to talk about the management representation letters that were issued by FXCM during this time period while we're still in the 30(b)(6) corporate representative.

A. Okay.

Q. So I'm going to show you a document.

(Deposition Exhibit 2, 3/30/12 letter to Ernst & Young from FXCM and attachment EY-GBI-WP-00000018 to EY-GBI-WP-00000026 marked Confidential, was marked for identification.)

Q. And, once again, if you can just let me know when you're able to see that so I know that you can see it and then I'll give you some time to review.

MR. LaPOINTE: I am labeling this --

Q. You shouldn't be able to see it yet.

A. Oh.

Page 122

1      CONFIDENTIAL - ROBERT N. LANDE
2  other than a recollection that I would have
3  discussed -- that I did discuss with them the
4  treatment of options, I don't have any other, you
5  know, recollection of some great discussion with
6  Ernst & Young over EFFEX. It's not -- it was not
7  a significant thing for us that I had discussions
8  with them every year.
9      Q. The discussions that you just
10 mentioned, do you recall when, roughly or
11 approximately, those were?
12     A. Well, as I said before, I don't
13 remember the discussion on the option when
14 exactly. It would have been, you know, around
15 the time, you know, when an option was being
16 considered. You know, the memo summarizing the
17 relationship, you know, that would have been at
18 the time of the CFTC settlement. So I don't
19 know. It was around, I guess, 2017, 2016, 2017
20 -- 2017, I guess.
21     Q. Do you, specifically, recall any
22 discussions with Ernst & Young regarding EFFEX
23 when the option was being considered?
24     A. Yeah. As I said, I don't remember
25 the details of it. But I do remember cause that

Page 123

1      CONFIDENTIAL - ROBERT N. LANDE
2  was the only time I think I run in -- at FXCM
3  ever into an option and I do recall talking to
4  them about how options would be accounted for.
5      But then as I said, you know, this
6  all became moot because there was no option.
7  They didn't pursue an option and EFFEX was --
8  went its own way as a completely separate company
9  with no ownership of us in it.
10     Q. So do you recall, specifically,
11 whether there was any conversation with ENY while
12 the option was being considered?
13     A. Like I said, I don't remember
14 specific conversation, but I do remember that I
15 talked to them about options, you know. So I do
16 remember that.
17     Q. I guess my question is in the context
18 of that conversation, do you remember whether you
19 talked with them, specifically, about an option
20 with respect to EFFEX?
21     A. Yeah, I would have mentioned the name
22 EFFEX, yeah.
23     Q. So, in the course of developing and
24 issuing its annual and periodic financial
25 statements in the period from fiscal year 2010

Page 124

1      CONFIDENTIAL - ROBERT N. LANDE
2  through 2016, did FXCM consider or determine
3  whether to report or disclose EFFEX as a variable
4  interest entity?
5         MR. DAHAN: Objection, asked and
6  answered.
7      A. Well, you've asked this a few times,
8  right.
9         We as a matter of course consider all
10 the time. It's a constant process of considering
11 not just VIEs, everything and reconsidering
12 everything.
13        So, no, nothing in particular. There
14 was nothing in particular that I can think of
15 that changed in EFFEX's relationship that caused
16 me to all the sudden think that I had a different
17 situation than what I had the year before. So --
18 and we had concluded initially that this isn't a
19 VIE. However, I'm sure every time there was a
20 change in anything, we always considered things
21 should be consolidated, not consolidated, VIE,
22 not VIE, capitalized, not capitalized. These are
23 all accounting decisions that are constantly
24 under review.
25     Q. So do you recall whether you or FXCM

Page 125

1      CONFIDENTIAL - ROBERT N. LANDE
2  specifically, at anytime had discussions about
3  EFFEX as a potential VIE with Ernst & Young?
4      A. No, I don't recall that. I recall
5  discussing that they -- whether -- what would be
6  the accounting if there was to be an option. And
7  I don't remember any specific conversations with
8  Ernst & Young from myself being involved whether
9  EFFEX was a VIE or not. And, like I said, there
10 was a memo summarizing the whole EFFEX
11 relationship that was done around the time of the
12 CFTC settlement and I do remember a conversation
13 then and that Ernst & Young was fine with the
14 memo and agreed with us that this was never a VIE
15 and that there was never any issues with how we
16 accounted for it. So I was fine and that was the
17 end of it.
18     Q. And that discussion that you
19 reference about whether it was a VIE or not and
20 the memo, did that occur before or after the NFA
21 investigation?
22     A. Well, that would have occurred
23 certainly, during, you know, and possibly before.
24 But I would think it was during when all of this
25 EFFEX stuff was all over the place and, you know,

Page 170

CONFIDENTIAL - ROBERT N. LANDE

1  VIE, not VIE, you know, VIE and then you're like
2  -- so that's what someone who is writing, this is
3  just working down the decision tree I'm sure that
4  was in that memo.
5          So landing that you might have an
6  VIE, here's what you've got to start thinking
7  about, you know, does the entity have sufficient
8  activity to fund its activity?  So it looks like
9  we're concluding that, you know, at least in the
10 early days, entities didn't have a lot of ability
11 to fund its own activities, which then leads you
12 to are you -- is FXCM a primary beneficiary which
13 has two criterion, do you have power and do you
14 have benefit.  So benefit is a bit of as to up.
15 It, you know, having gone through these enough
16 time absorbing losses is a big deal.  If you
17 somehow have to pay for losses of the entity,
18 you're probably -- that's probably the end of the
19 road for you and you don't need to keep going.
20         But we didn't have that obligation.
21 That being said, though, considerable amount of
22 EFFEX's business, certainly, in the early days
23 was coming from us.  And that then gets you to
24 power and power is what gets us comfortable that

(line numbers 2-25)

Page 171

CONFIDENTIAL - ROBERT N. LANDE

2  there wasn't a VIE because we didn't have voting
3  rights.  We didn't have the ability to name
4  management or be on the board.  We didn't have
5  equity interest.  We didn't have voting interest,
6  you know, we didn't have any rights or, frankly,
7  any visibility into what EFFEX's business was
8  doing or not doing and with who or anything.  So
9  that was the end of our -- that was our
10 conclusion with it not being a VIE and that was
11 never disputed by Ernst & Young.
12      Q.  Would it be fair to say that this
13 section concludes that EFFEX likely did not have
14 sufficient activity fund to fund its own
15 activities?
16      A.  That nearly --
17          MR. DAHAN:  Objection to form.
18 Throughout the entirety of EFFEX?  That's not
19 what it say.  Objects to form,
20 mischaracterizes --
21      A.  Yeah, certainly, in the first four
22 months it's saying that it didn't have much -- I
23 think it it's certainly EFFEX pretty -- you know,
24 had substantial activity going on but, you know,
25 not at the very outset, no.

Page 172

CONFIDENTIAL - ROBERT N. LANDE

2      Q.  It continues, "With regard to
3  benefits, it is likely that FXCM did meet the
4  benefits criteria.  While it did not have the
5  obligation to absorb losses, FXCM received what
6  is believed to be a significant portion of the
7  revenues of EFFEX through the payments of order
8  flow (although financial statements of EFFEX are
9  not available)."
10         Do you see that?
11     A.  Yes.
12     Q.  To your understanding, was this
13 statement restricted to the first four months of
14 EFFEX's operation from March 2010 to June 2010 as
15 the above statement was?
16     A.  I don't know it was necessarily March
17 to June.  But I think it's certainly saying in
18 the early part that that would have been the
19 case, yes.
20     Q.  Now it continues, "However it is not
21 reasonable to conclude that FXCM had the power
22 over EFFEX.  Power means having the ability
23 through voting rights or similar rights to direct
24 the activities of a legal entity that most
25 significantly impact the entities's economic

Page 173

CONFIDENTIAL - ROBERT N. LANDE

2  performance."  And then it lists in parentheses,
3  "e.g., the entity's revenues, expenses margins,
4  gains and losses, cash flows, financial
5  position."
6          It continues, "Significant activities
7  may include purchasing or selling significant
8  assets, incurring additional debt, making
9  acquisition and/or divestiture decisions or
10 determining the strategic operating direction of
11 the entity.  FXCM had no Board representation, no
12 equity or voting interest, no management
13 representation or rights and had only committed
14 to providing EFFEX connectivity to its platform
15 in return for a certain dollars in million of
16 volume traded for volume executed by EFFEX
17 through a service agreement."
18         Do you see that?
19     A.  Yes.
20     Q.  So is this description of "power" or
21 this definition of "power," as reflected here, is
22 that consistent with your understanding of the
23 inquiry required for determination whether an
24 entity should be consolidated or reported as an
25 VIE under US Generally Accepted Accounting

CONFIDENTIAL

Page 218

CONFIDENTIAL - ROBERT N. LANDE

Do you see that?
A. Yeah.
Q. And does it appear to you to be signed by John Dittami and on behalf of Forex Capital Markets LLC by William Ahdout?
A. Correct, yes.
Q. Were you aware of the existence of this document on or about August 28, 2010?
A. Yes.
Q. So turning back to Exhibit 13.
A. Yeah.
Q. When you said, "My understanding is we were not operating under a signed agreement up to now, your understanding as well," did you understand that this option existed prior to that date.
MR. DAHAN: Objection to form to suggest that that is the agreement that's referred to in the first sentence as opposed to the service agreement but okay. That's not -- you're misstating the document totally.
MR. LaPOINTE: Okay. Well, it's -- I would ask him to clarify that, what he's referring to. I mean, that's a perfectly valid

Page 219

CONFIDENTIAL - ROBERT N. LANDE

answer, but you've now coached the witness.
MR. DAHAN: No, no, it says in the first sentence, this is what they're planning on executing with Dittami, and there's a sample document attached to this document that is a service agreement. Come on, Counsel. You're the one who is trying to do this. It's not coaching.
If we were in front of a judge, the judge would scream at you for saying that. I mean, you're kidding me. There is an attached agreement to this document, that's a service agreement.
MR. LaPOINTE: I just --
MR. DAHAN: This is what they're planning on executing with Dittami.
MR. LaPOINTE: I asked him if he was aware of this document at the time.
MR. DAHAN: No, no, no, no. Come on, Counsel. You want to ask about the second sentence, that makes sense. But don't try and imply that that's what's in the first sentence in the first paragraph. Give me a break, Counsel.
MR. LaPOINTE: I'm not trying to imply anything. I'm just asking a question.

Page 220

CONFIDENTIAL - ROBERT N. LANDE

MR. DAHAN: Then objection.
[INSTRUCTION] Don't answer.
Inappropriate, next question, misstates the document, next.
MR. LaPOINTE: I would state that that is not valid grounds for an instructions.
MR. DAHAN: That's fine. Bring it up to the Judge. I'd love him to read some of your questions now that we've wasted seven hours here today on.
Q. So moving onto the second paragraph in the e-mail you state, "There will be no option, no further mention of any option to ENY."
Do you see that?
A. Correct.
Q. In that second sentence, were you referring to the option we just looked at as Exhibit No. 14, or was there some other option that was being --
A. No.
Q. -- discussed at the time?
A. No.
Q. So you were referring to the one we were just looking at?

Page 221

CONFIDENTIAL - ROBERT N. LANDE

A. Correct.
Q. Okay. So, when you say, "no further mention of any options at ENY," were you referring to some specific incidents around that time in which there was a discussion with ENY about this option?
A. It appears so, yeah.
Q. Do you remember anything about the nature of that discussion?
A. Yeah, I told you previously that I had been discussing how we would record an option if we were going to have one with EFFEX or with ENY.
Q. With ENY.
A. Yeah.
Q. And that would be around this time is what you're saying?
A. Yeah.
Q. And is that the first time you recall discussing the option agreement with ENY?
A. When?
Q. Around the time of this e-mail.
A. Oh, I don't know if it was around the time of this e-mail. It could have been earlier

56 (Pages 218 - 221)

Page 222

1  CONFIDENTIAL - ROBERT N. LANDE
2  in the year. It would have been that year I
3  would have discussed the option with ENY.
4      Q. But you don't recall, specifically,
5  when that discussion took place?
6      A. No. But I'm sure it was around the
7  time that we were formulating the idea of having
8  an option on EFFEX.
9      Q. Alright. I would like to show you...
10     (Deposition Exhibit 15,
11  Acknowledgement and Confirmation GLBR_00189371 to
12  GLBR_00189374 marked Confidential, was marked for
13  identification.)
14     MR. LaPOINTE: I'm going to show you
15  another document. And I'm labeling this as
16  Exhibit No. 15.
17     Q. Again, I just ask that you let me
18  know when you're able to see it. I'll give you
19  some time to review it.
20     A. I've got it.
21     Q. Thank you.
22     MR. LaPOINTE: And, again, just for
23  the record, I would say that this is a document
24  beginning with the Bates stamp GLBR 189371.
25     A. Yeah, I've looked at it.

Page 223

1  CONFIDENTIAL - ROBERT N. LANDE
2      Q. Alright. Have you seen this document
3  before?
4      A. I have, yeah.
5      Q. Were you involved in drafting or
6  executing this document at all?
7      A. No.
8      Q. When do you recall first becoming
9  aware of it?
10     A. I don't know. I am presuming around
11  the time that it was being executed.
12     Q. And do you recall when you last saw
13  it or most recently saw it?
14     A. I would think it's probably around
15  the time that the NFA complaint drafts were being
16  circulated and we were going back over the EFFEX
17  relationship with ENY.
18     Q. Does this appear to be an agreement
19  styled Acknowledgement and Confirmation dated
20  November 20th, 2015?
21     A. Yep.
22     Q. And is it your understanding that
23  this document is intended to confirm that the
24  April 14, 2010 option agreement was never legally
25  effective?

Page 224

1  CONFIDENTIAL - ROBERT N. LANDE
2      A. Correct.
3      Q. Are you aware of prior to this
4  confirmation there being any written cancellation
5  or repudiation of the April 14, 2010 option
6  agreement?
7      A. I don't believe there was, no.
8      Q. Are you aware of what prompted FXCM
9  to enter into this acknowledgment confirmation?
10     MR. DAHAN: Yeah, I'm going to
11  object.
12     Q. Without revealing any discussions
13  with Counsel.
14     MR. DAHAN: Do you know from the
15  documents that this was the subject of outside
16  Counsel Weill Gotshal. So I do not want any --
17  other than if you know whether or not the
18  substance.
19     A. I don't know.
20     MR. DAHAN: Okay. There you go.
21     Q. Would it be fair to say that this
22  Acknowledgment and Confirmation was entered in
23  consultation with or on the advice of FXCM's
24  Counsel at the time?
25     A. I don't know. This was not the basis

Page 225

1  CONFIDENTIAL - ROBERT N. LANDE
2  of why we didn't believe there was an option.
3  This is way after the fact. This is 2015. I
4  have no idea why this was prepared, to be honest.
5      Q. So the document here recites -- and I
6  just -- at the middle of the document, there's a
7  clause that begins, "now therefore."
8      Do you see that?
9      A. Uh-huh.
10     Q. It says, "for good and valuable
11  consideration the sufficiency of which is hereby
12  acknowledged. The parties hereby mutually agree
13  as follows."
14     Do you see that?
15     A. Uh-huh.
16     Q. Do you know if there was any
17  consideration exchanged between the parties in
18  connection with this agreement?
19     A. I don't believe there was any.
20     Q. As of the date of this
21  acknowledgment, FXCM and Dittami or EFFEX had
22  previously terminated their relationship under
23  the Service Agreement dated May 1st, 2010; is
24  that correct?
25     A. I don't know precise dates, to be