M7JsINRc

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------x

IN RE GLOBAL BROKERAGE, INC. f/k/a
FXCM INC. SECURITIES LITIGATION,

                                    17 Civ. 916 (RA)


------------------------------x

                                    New York, N.Y.
                                    July 19, 2022
                                    10:00 a.m.

Before:

                    HON. RONNIE ABRAMS,

                                    District Judge

                        APPEARANCES

THE ROSEN LAW FIRM
        Attorneys for Plaintiffs
BY:   JOSHUA E. BAKER
        BRENT LAPOINTE
        PHILLIP C. KIM

KING & SPALDING
        Attorneys for Defendants
BY:   ISRAEL DAHAN
        CHELSEA J. COREY
        RYAN GABAY

M7JsINRc

1      (Case called)

2           THE DEPUTY CLERK:  Counsel, please state your name for

3    the record.

4           MR. BAKER:  Good morning, your Honor.

5           This is Josh Baker, with the Rosen Law Firm, for the

6    plaintiffs.  And with me today are my colleagues, Brent

7    LaPointe and Phillip Kim.

8           THE COURT:  Good morning to all of you.

9           MR. DAHAN:  Good morning, your Honor.

10          Israel Dahan, from King & Spalding.  With me is Ryan

11   Gabay and Chelsea Corey, on behalf of the defendants.

12          THE COURT:  Good morning to all of you as well.

13          So I'll hear from defendants first.  You're welcome to

14   stay seated and speak into the microphone or go to the podium

15   if you would like.  If you're vaccinated, you're free to take

16   off your mask while you're speaking, if you're at a significant

17   distance from others.

18          MR. DAHAN:  I'll go to the podium.

19          THE COURT:  Thank you.

20          MR. DAHAN:  Your Honor, if it's OK, before we proceed,

21   I'd like to hand to you and the clerk a slide deck that we

22   prepared to aid.

23          THE COURT:  Of course.

24          MR. DAHAN:  We recognize it's not evidence, but just

25   to aid argument.

M7JsINRc

1          THE COURT:  That's fine.  Thanks.

2          Do you have two of them?  Thank you.

3          Whenever you're ready to, you may begin.

4          MR. DAHAN:  Israel Dahan, of the law firm King &

5   Spalding, on behalf of the defendant, Global Brokerage, Inc.,

6   formally known as FXCM Inc.  We are here this morning on

7   defendants' motion for summary judgment, asking the Court to

8   dismiss plaintiffs' claims for violation of Section 10(b) and

9   20(a) of the Exchange Act as a matter of law.

10          Plaintiffs filed this action on the heels of a

11   no-admit settlement FXCM entered into with the CFTC and NFA

12   back in 2017 concerning the company's relationship with Effex

13   Capital, one of the foreign exchange liquidity providers,

14   essentially parroting the unadjudicated and unproven

15   allegations – again, not admissible facts, but unadjudicated

16   and unproven allegations – that were set forth in the no-admit

17   settlement documents.  Plaintiffs claim the defendants

18   committed securities fraud.  If the Court recalls, as a result

19   of the prior motion to dismiss ruling, there are essentially

20   three remaining alleged misstatements that comprise plaintiffs'

21   claims for securities fraud by defendants.

22          At end of the day, these three alleged misstatements

23   succeed or fail by answering the following two central

24   questions:  Was the relationship between FXCM and Effex a

25   pay-for-flow relationship and were Effex and FXCM separate and

1   distinct entities?  Based on the undisputed evidence in this

2   case, the answer to both questions is yes.

3        Plaintiffs have had years of fact and expert discovery

4   to meet their burden and prove otherwise, to prove that Effex,

5   instead, had an undisclosed profit-sharing relationship with

6   Effex and that the two entities were essentially corporate

7   affiliated entities.  Plaintiffs have not met their burden.

8   Plaintiffs have not established any of their three alleged

9   misrepresentation theories, which I'll discuss shortly, through

10  the extensive discovery process or as a matter of law.

11       But even if they did, plaintiffs' securities claim

12  still fails because they have not established other required

13  elements of Section 10(b), including scienter, loss causation,

14  and economic loss.  In fact, this Court has multiple grounds to

15  award summary judgment in favor of defendants, when, in the

16  end, the Court just needs to find that plaintiffs have not

17  satisfied even just one of their required elements to grant

18  summary judgment in favor of defendants.

19       For purposes of the argument today, I'll address in

20  more detail why plaintiffs have not established a material

21  misstatement or scienter conduct by defendants.  My colleague,

22  Ms. Corey, will address defendants' loss causation and economic

23  loss arguments, as well as why the Court, at a minimum, should

24  dismiss the individual claim of 683 Capital for lack of

25  individual reliance on loss causation.  Ms. Corey will also

1    address defendants' two Daubert motions after.

2         Let's begin within plaintiffs' first alleged

3    misstatement, whether FXCM's relationship with Effex was a

4    pay-for-flow relationship, as represented by FXCM, or was it an

5    undisclosed profit-sharing relationship as claimed by

6    plaintiffs.  As we demonstrate in our motion papers, the

7    discovery in this case, including the expressed language in the

8    governing services agreement that were executed between the

9    parties, the billed invoices sent to and paid by Effex, and the

10   sworn testimony of every witness who has testified on this

11   issue, all confirm that FXCM had a pay-for-flow contractual

12   relationship with Effex, not a profit-sharing relationship.

13        So let's begin with looking at this governing service

14   agreement, which was Exhibit 41 to my supporting declaration.

15   The services agreement, in Section 3.1, expressly provides as

16   follows:  First, it's entitled fees.  FXCM shall receive from

17   Effex a fee equal to $21 per one million units of base currency

18   for the aggravated volume of transactions executed via the

19   trading system.  The fee shall be calculated by FXCM on a

20   monthly basis.  FXCM shall provide Effex an invoice for all

21   unpaid fees.

22        THE COURT:  Isn't there evidence that expresses the

23   parties' intent that the payment arrangement between FXCM and

24   Effex mirror the 70/30 profit split from the employment

25   agreement?  I'm looking at the resignation letter, which I

1   think is Exhibit 107, testimony from Niv and Dittami's

2   depositions before the CFTC that that was the parties' intent.

3        MR. DAHAN:  No.  I think, as was testified during this

4   case, what the parties testified was that when they were trying

5   to figure out how to set up the relationship, there were many

6   discussions and iterations of what we should do.

7        Should we have a profit-sharing relationship, should

8   we set it up as a 70/30 percent relationship, or should we do

9   something different.  And the evidence is clear in this case,

10  and the testimony of the witnesses, that in the end, this idea

11  of a 70/30 was, in fact, rejected.  And that is why when one

12  looks at how the parties acted in action, the invoices do not

13  reflect 70/30.  They are always, and we'll get to it, looking

14  at the invoices.  Its dollar amount times volume.  If there was

15  more money made on that volume, there wasn't more money paid.

16  It was always $21, $16, it depends what was the set fee at that

17  given point in time.

18        Yes, during negotiations in the early stages, there

19  was discussions how to set it up.  But the testimony is clear

20  that the parties ultimately rejected that idea, therefore, it

21  went with a straight fixed fee.  That's why, as the testimony

22  shows, whether Effex ultimately made more money on a particular

23  volume, they didn't turn around and give more than $21.  The

24  fact is there was a question asked during deposition of

25  Mr. Dittami, were there ever times that you made more; he said,

M7JsINRc

1    at times, we made $35 on the flow, yet they only still paid

2    $21.  If one was to mathematically figure out 70/30, you would

3    have had to pay FXCM $25.  They didn't.

4            So, yes, there were discussions.  That was a

5    contemplation.  But, ultimately, the parties signed an

6    agreement that did not call for that.  The parties rejected

7    that idea.  They chose to not go in that direction.  So looking

8    at the language, so the language is clear --

9            THE COURT:  I'm sorry.  Can I ask you one more

10   question about that?

11           MR. DAHAN:  Sure.

12           THE COURT:  You had referenced the invoices.

13           MR. DAHAN:  Yes.

14           THE COURT:  Several of FXCM's invoices to Effex,

15   including one in 2010 and 2013, used the term P&L, which I

16   assume stands for profit and loss, when calculating the amount

17   Effex owed to FXCM.

18           MR. DAHAN:  I'll answer that.

19           THE COURT:  If you can.

20           MR. DAHAN:  As we set forth in our papers, what the

21   misnomer there is, as the testimony, and I'll quote the

22   testimony of the accounting officer at FXCM, the P&L was not

23   Effex's P&L.  It was, as typical, at the end of the day, if I

24   am sending a bill to your Honor, and your Honor is going to

25   have to pay, it's going to go to my P&L.  That's how it goes.

1          Obviously, I'm earning revenue.  It's going to go to

2    FXCM's P&L.  It is not referencing any profit of Effex.  Effex

3    pays $21 per volume.  It goes to my P&L, of course.  Any

4    company -- if I'm Wal-mart, and I send an invoice, and I get

5    money, it goes to my P&L.  I'm not having a profit-sharing

6    relationship, and that's how it is calculated.

7          So the testimony on this subject, when asked at his

8    deposition, Josh Rosenfeld, FXCM's Director of Finance, was

9    asked whether or not the invoices from FXCM to Effex relate in

10   any way to Effex's P&L.  Not at all.  Not at all.  It was

11   completely dependent on volume.  They could have lost millions;

12   they could have made millions.  It was based on the volume that

13   the business we gave them regardless of whether they made or

14   lost money on it.

15         So, yes, it references P&L, but the testimony is clear

16   that that is FXCM's P&L.  Like that is how it gets -- if you're

17   an accounting purpose, and you see an invoice, it's to be

18   recorded on FXCM's P&L.  It is revenue to FXCM.  No one

19   disputes that.  That doesn't mean we're having a profit-sharing

20   relationship.

21         I was thinking about, actually on my drive over, for

22   example, a true profit-sharing relationship would mean that,

23   for instance, if you're an equity partner at a law firm, OK,

24   you get paid based on the profits of the firm.  If the firm has

25   a banner year, you're going to make more; if the firm has a

lesser year, you're making less.  An employee is, of course,

getting revenue from the firm.  An income partner is getting

revenue from the firm, but you're not sharing in the profits of

the firm just because you take a piece of their revenue.  They

have to pay you.  So the same thing here.

FXCM ultimately, yes, of course, Effex is paying them

money, and, therefore, you're taking money from Effex.  But if

Effex makes more, you still get $21; if Effex makes less, you

still get $21 or $16.  You don't share in that.  That's why

FXCM never shared.  The record's undisputed, they never shared.

Effex had 20 other counterparties.  We didn't share in any of

that.  No money from any other counterparty that Effex made on

its revenue was ever provided to FXCM.  If this was a one

entity type of relationship, and we're essentially a

profit-sharing unit, why aren't we getting all of your profits

or 70 percent of your profits?

So that's the reference to P&L, and the record is

clear, looking at the invoices, and it was audited by ENY, they

testified in this case, the invoices matched the monies that

were provided, no more, no less, and therefore, even regardless

of how Effex ultimately made an outcome of that order flow, it

pays that set fee.  Therefore, that's a difference.

Yes, we got money from Effex, but to be a true

profit-sharing, as our experts have testified in this case, you

truly would have had to be dependent -- their payment was

M7JsINRc

1    dependent ultimately on the profit, and if it was high, you got

2    more, and if it was low, you got less.  That is not what

3    happened here.  We always got paid what the agreed dollar

4    amount was for the millions of order flow.

5              THE COURT:  You may proceed.  Thank you.

6              MR. DAHAN:  Sure.

7              So picking up on the invoices, recognizing that your

8    Honor focused on the P&L portion, again, it is important to

9    look at what invoices say.  You see the invoices.  It says

10   volume, the amount owed by Effex would be what the volume is

11   timed the agreed dollar amount.  I gave you a sample of when it

12   was $21, when it was $16, and that was the amount that went

13   towards FXCM's P&L.  There is no reference here that we're

14   getting a certain percentage, there's no reference there of how

15   much that Effex made on this order flow of tens of thousands of

16   order flow, and, therefore, we're going to give you that

17   percentage.  There's no indication of that, there's no

18   indication that that was ever paid in that fashion.  It was

19   tied to the fixed dollar amount that the parties agreed to.

20             What else could plaintiffs argue to support the

21   theory?  Well, there are some documents that show that there

22   were discussions, when there was invoicing going on in the

23   early stages, about so, you know, how much should be invoiced,

24   and the parties manipulated always the dollar amount of what

25   the, quote-unquote, fixed fee should be to match a 70/30

M7JsINRc

1   percent.  Again, not true, not supported by the evidence.

2              What does the evidence show on that front?  As we show

3   on slide six, the parties' relationship was between 2010 and

4   2014.  Over that four-year period, the parties renegotiated a

5   per million fee three times.  Three.  That's less than one time

6   a year.  When parties today negotiate to have dealings with one

7   another, negotiate pricing and things change, gas prices could

8   change, things could change, and you negotiate fees because a

9   party realizes I'm not making as much.  I'm sure Wal-Mart

10  negotiates a contract on a yearly basis.  Three times in

11  four years.  This is not a monthly event, every month we're

12  deciding, well, how much should I pay.

13             So, for example, the invoices which were -- we've

14  attached as Exhibit 224 to my reply declaration, we had a

15  spreadsheet and then all the invoices following it, and that

16  was audited and affirmed by ENY during the deposition, show

17  that from May 2010 to August 2011, the first 15 months of the

18  relationship, Effex paid for order flow at a rate of $21 per

19  million volume.  There was some discussion of a $17.50 in the

20  early stages; ultimately, the records show that it was

21  upcharged back to $21.

22             In September 2011, the parties amended the agreement,

23  again, that's 15 months into the relationship, and changed it

24  to $16 per million.  And that lasted all the way to January 23,

25  again, about another 15 months, and then to the remainder, they

M7JsINRc

1  continue that $16, but for two currency periods, it was

2  adjusted to $6 and $3, and that's because those had much

3  tighter spreads than normal, which is not usual for a company

4  to deal with.  I'm not going to pay you $16 if I'm only making

5  $8.  So, over the course of a four-year period, it was

6  negotiated three times.  That is not manipulating --

7  consistently manipulating a price to match a 70/30

8  relationship.

9       Importantly, when Chris Meyer, the former Chief

10  Operating Officer of FXCM, not a defendant in this case, has no

11  allegiance to FXCM, the former Chief Operating Officer

12  testified that the agreed-upon rate -- he was asked at his

13  deposition, and if your Honor looks, we have the quote on slide

14  seven:

15       "Question:  For a given month, let's say February 2012

16  is a month that FXCM's billing Effex for this trading volume.

17  Was there an agreement between Effex and FXCM on what rate

18  would apply to that bill?  And I'm just looking for when that

19  was agreed upon for that month, before the month started or

20  after?"

21       He says:  "Before," because, again, one of the issues

22  was that somehow after the month, we're deciding how to -- now

23  that we know the volume, how do we look back and readjust the

24  numbers.  So he contradicted plaintiffs' allegation on that

25  front.

M7JsINRc

1          Then he says:  "The rates did not change monthly.

2     They changed -- it was pretty rare for them to change."  That

3     is the testimony of Chris Meyers, former Chief Operating

4     Officer.

5          So you don't have a single witness in this case who

6     has come forth and says, no, the parties' relationship was a

7     profit-sharing relationship, including someone from Effex,

8     which, again, what do they have to lose if it was a

9     profit-sharing relationship?  They are not getting sued for

10    securities fraud here.  It is simply not true.

11         There is no genuine issue of fact on this issue.

12    Whether you look at the actual services agreement language,

13    which is important, whether you look at the billed invoices,

14    whether you look at the testimony of the witnesses in this

15    case, including Effex witnesses, they all confirm that the

16    parties had a pay-for-flow relationship and not an undisclosed

17    profit-sharing relationship.

18         So we contend, your Honor, that the Court should

19    dismiss this first alleged misstatement as a matter of law.

20         Let me turn to the second alleged misstatement.  The

21    second alleged misstatement is that, again, tied to this notion

22    that there was this profit-sharing relationship, FXCM was

23    representing that it was operating an agency or no dealing this

24    model, acting as an intermediary broker, when, in fact, it was

25    acting as a principal, a dealing desk.  It was on the opposite

M7JsINRc

1    side of the trade.  It was essentially Effex.  It was the

2    counterparty to the trade.  Again, this is simply not true.

3    Again, the fact that it is tied to the profit-sharing argument,

4    again, we submit that there is no profit-sharing, and so you

5    can't use that as a basis to allege that.

6           More so, we have provided an expert in this case, an

7    Effex industry expert, Simon Wilson Taylor, who has opined --

8    and that's on page -- that's slide 9, your Honor -- in a

9    finance report saying that FXCM's business relationship with

10   Effex, specifically the payment for order flow agreement and

11   other business practices concerning Effex's role as a liquidity

12   provider, did not convert FXCM's no dealing desk platform into

13   a dealing desk or otherwise create a conflict of interest

14   between FXCM and its retail no dealing desk customers.

15          And to do so, what he focused on, and I'll discuss,

16   were certain characteristics of what's important to understand

17   is what does it mean to be an agency model, what does it mean

18   to be a principal model.  And looking at those characteristics,

19   which is in slide 10, he concluded that throughout the

20   relationship with Effex during the services agreement, all

21   these characteristics of what makes an agency model continued

22   to be present.  For example, during the time that it had its

23   relationship with Effex, FXCM still would be passing along all

24   orders of its customers to the liquidity providers.  FXCM did

25   not enter into a contract with its customer.  It passed the

M7JsINRc

1  customer's order onto a liquidity provider, it could have been

2  Effex, it could have been somebody else, but even to Effex,

3  Effex executed the transaction opposite the customer.  Again,

4  if Effex made money or a lot of money on that trade, FXCM

5  didn't get paid more; if Effex lost money on that trade, FXCM

6  didn't get paid any less.  The same way whether or not it had

7  the relationship with Effex or any other liquidity provider,

8  all those orders got passed on.

9         Second, another important characteristic of an agency

10  model different than a principal model is market risk.  As he

11  testified, and sets forth in his opinion, the evidence shows

12  that throughout the relationship, FXCM was still not exposed to

13  market risk.  Again, it's not exposed to market risk because if

14  Effex lost money on that trade, it didn't come to FXCM and say,

15  you need to now pay that loss or you need to share in that

16  loss.  Mr. Dittami testified in this case, and we submitted,

17  also, declarations that he set forth in the lawsuit Effex filed

18  in Illinois, that they absorb all the losses.  They were

19  responsible for any losses on trades.

20         Thirdly, what makes an agency model different than a

21  principal model is fees.  In a principal model, the broker

22  earns fees by a market movement.  It makes money on the trade.

23  If it goes in this direction, it makes money; if it goes in the

24  opposite direction, it loses money.  The agency model, the

25  majority of fees will be through commissions.  Here, the

M7JsINRc

1  evidence shows that even while there was this relationship with

2  Effex, almost 95 percent of the fees and revenue earned on

3  trades with retail customers came through commissions earned.

4  Again, very consistent with an agency model.

5           THE COURT:  Can I just ask a question?

6           MR. DAHAN:  Sure.

7           THE COURT:  Even if the statements that FXCM operated

8  an agency model were technically true, couldn't they still be

9  misleading?  Because saying that you operate an agency model

10  implies that you have no interest in a liquidity provider's

11  profits and no interests adverse to your customers, and that

12  may not have been true here.

13           MR. DAHAN:  Well, with all due respect, your Honor,

14  the interests here were alive because, again, the evidence

15  shows that the whole benefit of this even relationship with

16  Effex was to provide.  So one sits back and says why did you

17  even have this relationship with Effex, why did you set up to

18  have a relationship with Effex, and the evidence shows that the

19  central premise of the benefit of this was to provide better

20  execution, less rejection rates, and so the customers

21  ultimately benefited.  What FXCM promises its customers through

22  an agency model is that we will act as your intermediaries,

23  passing the trades along, and ensuring that you'll get best

24  price.  That still happened.  That is what the customer wants

25  to experience, and that still happened.  So the interest was

M7JsINRc

1  still aligned to get the customer the best pricing.  So that's

2  the representation, that our interests are aligned.  And the

3  fact that -- again, we did disclose.  It's not like they could

4  point and say, you never told investors in your public filings

5  that one of your revenue sources was pay-for-flow.  We did

6  disclose that.  All right?  Their issue is it just wasn't --

7  that's their argument, it wasn't pay-for-flow.  Yeah, you said

8  pay-for-flow, but you lied, it's not pay-for-flow, it was

9  profit-sharing.  You had this profit-sharing relationship, not

10  pay-for-flow.  So, yes, you told investors you earned money

11  through fees of commission, through pay-for-flow, what you

12  didn't tell them is you had a profit-sharing relationship.  And

13  we disagree with that because we did not have a profit-sharing

14  relationship.

15      So it goes hand in hand.  If your Honor feels it was a

16  profit-sharing relationship, then, yes, that creates a problem.

17  Our whole point here is, the evidence does not support a

18  profit-sharing relationship, and, therefore, if it was not a

19  profit-sharing relationship, it was pay-for-flow, we did

20  disclose that.  We disclosed to investors that we earned money

21  through pay-for-flow.  So that's what we did.

22      And there is no evidence that somehow our customers

23  were harmed in any way by the fact that we had this

24  relationship, that they did not get best execution or best

25  pricing, you know, or that we gave a deal to Effex at the harm

M7JsINRc

```
1    of a customer.  They ultimately got the best pricing, which is

2    what the agency model is designed to accomplish, and, again,

3    with the understanding that it's our position there was no

4    profit-sharing relationship.

5              THE COURT:  All right.  You may proceed.

6              MR. DAHAN:  Thank you, your Honor.

7              So let's look at the third alleged misstatement.  The

8    third alleged misstatement is that plaintiffs contend that FXCM

9    did not comply with GAAP, and so its filings were not GAAP

10   compliant and, therefore, were misrepresented.  The premise of

11   plaintiffs' GAAP violation claim is essentially that FXCM and

12   Effex were not separate and independent entities.  They were

13   essentially corporate affiliate entities, and therefore should

14   have been treated as such whether through consolidation or

15   whether as a related party in the company's filings.

16             Again, this is simply not true and belied by discovery

17   in this case.  Notably, no one other than plaintiffs have ever

18   claimed that FXCM or Effex are affiliated entities and violated

19   GAAP.  Not the CFTC, not the NFA, not FXCM's outside

20   independent auditors, Ernst & Young.  In fact, ENY has never

21   suggested that FXCM needed to restate its financials.  And as

22   the evidence shows, after the announcement of the CFTC and NFA

23   settlements with FXCM, logically, ENY reexamined FXCM's

24   reporting allegations and again concluded that "the previously

25   issued financial statements for FXCM continued to be
```

M7JsINRc

appropriate and are in accordance with U.S. GAAP," and we set

that quote on slide 12.

Now, in response to these facts, plaintiffs' claim,

well, ENY was performing a self-interested analysis.  In any

event, maybe FXCM was hiding key facts from ENY.  But that's

pure lawyer argument.  That's not supported by any evidence in

this case.

The argument doesn't make sense.  The evidence shows

ENY did a reexamination of this information after the

regulatory settlements, and I'm sure if it felt that there was

an issue or felt like, wait a second, we did not know about

this Effex issue, or now that we know about this Effex

relationship, now given these allegations, we have a much

different perspective, and you should need to restate or we are

pulling our prior financials.  They didn't do any of that.  The

notion that somehow ENY would believe that there is a

restatement necessary or that there is an issue with the prior

issued financials, but chose not to do it because somehow it's

self-interested in FXCM is just plainly absurd.

Now, drilling into what the GAAP violations are, what

are the two types of GAAP violations raised here by plaintiffs?

The first one is whether or not Effex should -- whether or not

they should have been consolidated as a VIE during the class

period, a variable interest entity.  The parties do not dispute

that there is a three-part test under ASC 810 to determine

whether consolidation is necessary:  One, whether the entity

that's considered for consolidation, in this case, Effex, is,

in fact, a variable interest entity; whether the reporting

entity, in this case, FXCM, has a variable interest in the VIE;

and whether the reporting entity, FXCM, is the primary

beneficiary of the VIE, Effex.  Of course, it's plaintiffs'

burden to establish all of these three items.  Not establishing

just one of them would fail this consolidation argument.

Let's look at the first part of the test, whether

Effex is a VIE.  In order to be a VIE, the equity holders in

the contemplated VIE must have insufficient equity at risk or

the equity holders in the contemplated VIE does not have the

power to direct the activities of the entity.  Here, who is the

equity holders in Effex?  The evidence shows the equity holders

was John Dittami and his trust, owning almost 98 percent of

Effex.  The evidence shows there were no FXCM employees,

director or officer who had any ownership interest or any

equity in Effex.

The question is, did Mr. Dittami not have -- have

insufficient equity at risk?  Here, plaintiffs' purported GAAP

expert, John Baron -- and this court will address this later

during in more detail during the Daubert motions -- didn't even

analyze the question of whether the equity holder, in this

case, John Dittami, had insufficient equity at risk in Effex.

He just says, Mr. Dittami had insufficient equity at risk to

M7JsINRc

allow to finance Effex's activities.  Somehow he reached that
conclusion without the benefit of any of Effex's financial
statements for any year, any evidence of Effex's actual revenue
for any year, any analysis of Effex's business model to
determine how much equity would have been sufficient to finance
Effex's activities.

Now, let's look at the second part of the VIE test,
whether or not Mr. Dittami had the power to direct the
activities of Effex.  Here, the evidence shows he clearly had
that power.  If you look at the slide 14, which we took a
portion of his sworn affidavit, in the lawsuit that Effex filed
against the NFA, it makes it clear that he had the power to
direct all activities of Effex and that Effex's operations, as
he says, were never controlled by FXCM.  Effex, as he says,
hired, fired, paid in excess of 30 employees and consultants,
maintained its own independent bank accounts.  We know that
Effex had relationships with dozens of other counterparties
like FXCM.  There is no evidence that they had to approach FXCM
for permission to enter into a contract with another liquidity
provider.  He got to direct all of the decisions of Effex.

So failing to establish any of the components of the
first leg of the consolidation analysis, whether Effex was even
a VIE, the truth is the Court doesn't even need to get to the
second and third leg, and, in our papers, we establish in
detail why even the second and third parts of the ASC 810 test

M7JsINRc

1     were not satisfied.

2              Ms. Corey will address that in more detail during the

3     Daubert portion of the arguments.

4              What's the second type of GAAP violation?  The second

5     type of GAAP violation is related party disclosures.

6     Plaintiffs argued that FXCM was required to disclose Effex as a

7     related party, and they do that based on a single prong of the

8     ASC 850 analysis, whether FXCM could significantly influence

9     Effex to the point that Effex might have been prevented from

10    fully pursuing its own separate interests.  Here, again,

11    contrary to the plaintiffs' assertions, the unrebutted evidence

12    shows that Effex was not owned or controlled by FXCM and Effex

13    could pursue its own separate interests.

14             The record is undisputed --

15             THE COURT:  Let me stop you there.  The February 2017

16    disclosures state that Effex -- I'm going to just read from

17    quotes -- "remained closely aligned with FXCM, received special

18    trading privileges, benefited from a no interest loan provided

19    by FXCM, worked out of FXCM's offices, and used FXCM employees

20    to conduct its business."  They also state that FXCM actually

21    supported and controlled Effex.

22             Why are those statements not sufficient to

23    constructively disclose that Effex was a related party?

24             MR. DAHAN:  Is your Honor reading from the CFTC

25    settlement documents?

M7JsINRc

1          THE COURT:  I'm reading from the February 2017

2     disclosures, but let me go back and see exactly.

3          MR. DAHAN:  I believe those are statements made in the

4     CFTC-NFA settlement documents, but, again, we would contend

5     that, yes, those were allegations made in a no-admit document.

6     The question is so -- which is, first of all, not admissible

7     facts.  That's not evidence in this case.  I mean, I think

8     that's clear.

9          To point to some of the points your Honor has

10     mentioned, what the evidence shows is many of the things your

11     Honor just described were things that took place in 2010, early

12     2011, and well before the class period.  During the class

13     period, as the evidence shows, what the evidence shows is that

14     FXCM in 2010 helped Effex get a prime brokerage account of

15     $2 million with Citi, which the facts show that they helped

16     other counterparties get access -- Effex was a new company, it

17     could not get access to such a line, and so it helped them do

18     that, again, years before the class period.  The evidence shows

19     that by July 2010, as Mr. Dittami testified, Effex stopped

20     using that account and, in fact, got its own prime brokerage

21     account with Citi.

22          There's discussions about allowing them to use some

23     office space.  Again, by 2011, the evidence shows Effex got its

24     own office space in New Jersey, in Jersey City, paid for its

25     own office space.  So what plaintiffs are doing here are

M7JsINRc

1    cherrypicking things that occurred between FXCM and Effex and

2    FXCM trying to get Effex off the ground before the class period

3    and, therefore, somehow suggesting that therefore during the

4    class period, and continuing all the way through 2017, they

5    were related parties.  They were separate and distinct entities

6    by that point.  They focused on the fact that two employees of

7    FXCM -- two -- helped Effex and helped Effex with some of its

8    workload.  Again, that makes them related parties?

9            So that's what they are doing.  So, yes, in the

10    settlement documents, of course, the CFTC and NFA for purposes

11    of a settlement in a no-admit settlement, which is clear that

12    that document was made clear that the parties do not agree to

13    those and they were not to be used as evidence in further

14    litigation, do not support that, in fact, we were one and the

15    same entity.

16            THE COURT:  All right.  You may proceed.  Thank you.

17            MR. DAHAN:  Sure.

18            THE COURT:  I'll confirm where I got those quotes

19    from.

20            MR. DAHAN:  It's definitely not in the public filings

21    of FXCM.

22            THE COURT:  No, I don't doubt that you're right.  I

23    had written them down in my notes, but I'll confirm exactly

24    where they came from.

25            MR. DAHAN:  And that's why that's very important, your

M7JsINRc

1   Honor, is that -- and we have it set forth in our papers -- you

2   know, it struck us when I got the opposition brief -- I mean, I

3   anticipated what I would read in the opposition brief, I mean,

4   we went through discovery, I understand plaintiffs' position --

5   but to start the opposition saying, you know the proof that

6   FXCM did something wrong?  The CFTC and the NFA found they did

7   something wrong.  They didn't find FXCM did something wrong.

8   That's improper.  That's wrong.  When parties enter into

9   no-admit settlements, that is not evidence that regulators --

10  that the courts should say it's already been found that FXCM

11  and -- by the CFTC and NFA that FXCM did something wrong, and,

12  therefore, I can now extend that to securities fraud.  No.  In

13  fact, as we set forth in our papers, one could imagine, after

14  the settlement, some customers learned about this information,

15  and they filed reparation actions for their losses that they

16  believe, they contend, that they suffered in trading with FXCM

17  they believed must have been because of this Effex

18  relationship.  And they filed reparation actions, and as we put

19  forth in our papers, those reparation actions were actually

20  before the CFTC, the one who allegedly found that FXCM already

21  committed wrongdoing and fraud, and you know what the CFTC did

22  with every one of those reparation actions?  Dismissed them on

23  motion.  In fact, they even said it was improper for the

24  plaintiffs to rely on what we said in a no-admit settlement,

25  which are not adjudicated facts, not proven facts, but somehow

M7JsINRc

```
 1   used that as proof that there is fraud.  The burden here --

 2   it's one thing to say we want to use these allegations in our

 3   complaint to show you what we believe existed, and we're going

 4   to prove it existed, and that's different than saying -- which

 5   they have not done, than saying we don't even have to do

 6   anything, it's already been found.  It has not.

 7            THE COURT:  I get your point.  Why don't you move on.

 8   Thanks.

 9            MR. DAHAN:  Sure.

10            On the related party interest, we do not believe --

11   again, Ms. Corey will address this more on the Daubert motion

12   on the flaws of the GAAP violations -- that plaintiffs have met

13   their burden.  No one has found such GAAP violations.

14            So, in sum, your Honor, on the misstatement point, on

15   the material misstatement point, we believe that there is

16   enough evidence for this Court to find that there was none of

17   these alleged three misstatements by defendants.

18            Let me turn now to scienter.  Even if the Court was to

19   find that there is a genuine issue of material fact as to one

20   of these alleged misstatements, summary judgment in favor of

21   defendant is still appropriate because plaintiffs have failed

22   to put forth facts showing that defendants acted with scienter,

23   which, as your Honor knows, is another required element of

24   their Section 10(b) claim.

25            The law is clear that summary judgment is appropriate
```

M7JsINRc

where a plaintiff fails to produce evidence from which a

reasonable jury could infer that defendants acted with a

requisite scienter.  What does that mean, to act with scienter?

        To prove that defendants acted with scienter,

plaintiffs must produce evidence showing either that defendants

had motive and opportunity to commit fraud or strong

circumstantial evidence of conscious misbehavior or

recklessness.  Plaintiffs have not done either.

        First, with respect to motive and opportunity,

plaintiffs have not even attempted to allege, let alone prove,

that defendants therefore had a motive to defraud investors.

And there's none of the typical indicators of motive in a

securities case.  For example, there's no allegation here of

Niv or Ahdout engaging in any sort of share sales -- selling of

their shares before the stock drop.  There's no evidence here

of Niv or Ahdout benefiting from some sort of increased bonus

that they got from the Effex business or some sort of personal

financial interest that they have in Effex.  None of that

exists here.

        So what do you have?  Conscious -- alleged conscious

misbehavior or recklessness.  Well, what does that mean?  As

the evidence -- as the case law makes clear, to show conscious

misbehavior, one must show more than a conscious failure to

disclose.  There must be proof that the nondisclosure was

intended to mislead.  That's the *Reese Pan Am* case that we cite

M7JsINRc

1    by the Second Circuit in our papers.

2              To show recklessness, the Second Circuit has stated

3    that one must show conduct that is "highly unreasonable" and

4    "an extreme departure from the standards of ordinary care."

5    That's the *Rothman v. Gregor* Second Circuit case.

6              There's not a shred of evidence in this case showing

7    that Defendants Niv or Ahdout intended to mislead investors,

8    and there's certainly no evidence that they acted in a way that

9    was in extreme departure from the standards of ordinary care.

10             Again, plaintiffs have not put forth evidence showing

11   that Niv or Ahdout intended to deceive investors about a

12   pay-for-flow relationship or intended to deceive investors

13   about the agency model or intended to deceive investors about

14   FXCM's GAAP compliance.  Again, as I explained earlier, Niv and

15   Ahdout had every reason to believe that what their relationship

16   was was pay-for-flow.  That's what it was.  They got paid a

17   fixed fee based on the flow.  They didn't get more if Effex

18   made more; they didn't get less if Effex made less.  They

19   didn't get anything from Effex's other trading with any other

20   counterparty.  They had no reason to believe that its agency

21   model was not operating as an agency model.  As the evidence

22   shows, again, all the components and characteristics of an

23   agency model continued to occur, and they certainly had no

24   reason to believe that their financials were not in compliance

25   with GAAP.  That is something that ENY, its outside independent

M7JsINRc

```
1    auditors, would, in fact, as the evidence shows, review

2    related-party disclosure issues, and they got a chance to even

3    re-examine that and didn't conclude otherwise.

4            So, based on that, your Honor, we believe that

5    plaintiffs have not put forth evidence showing that defendants,

6    in fact, engaged in scienter conduct.  So for that independent

7    reason, we also believe -- and, again, your Honor doesn't need

8    to find both misstatement and scienter, but we believe both do

9    exist here, but there is this independent ground of lack of

10   scienter for dismissal of the claims.

11           I will now offer your Honor to allow to have Ms. Corey

12   address the loss causation and economic harm.

13           THE COURT:  Yes, you may proceed.

14           MR. DAHAN:  Thank you, your Honor.  I appreciate your

15   time.

16           MS. COREY:  Good morning, your Honor.  Chelsea Corey,

17   from King & Spalding, on behalf of the defendants.

18           So we've discussed the alleged misstatements and

19   scienter, but summary judgment is also appropriate because

20   plaintiffs cannot establish loss causation.  Loss causation is

21   the link between the alleged misconduct and the economic harm.

22   Plaintiffs are required to prove that the subject of the

23   fraudulent statements or omissions was the cause of the actual

24   loss suffered.  It's generally proven in two different ways, a

25   corrective disclosure or materialization of the risk.
```

1            At every stage leading up to summary judgment,

2     plaintiffs relied exclusively on a corrective disclosure theory

3     of loss causation.  Here, the corrective disclosure is the

4     CFTC's and NFA's allegations contained in the February 2017

5     settlement.  This point sometimes gets lost, but it bears

6     repeating.  A corrective disclosure has to be actually

7     corrective.  In other words, it conveys a concealed truth to

8     the market.  The CFTC and NFA settlements contain only

9     allegations, ones which defendants have always disputed.

10    Defendants argue that there's no corrective disclosure here at

11    all.  And, most certainly, because no GAAP violation is even

12    alleged by the CFTC or NFA, no corrective disclosure can exist

13    with respect to GAAP.

14            If this was a corrective disclosure case involving the

15    correction of alleged misstatements about FXCM's agency model

16    and receipt of order flow payments, plaintiffs would have no

17    explanation for the multiple pieces of news that entered the

18    market on February 6, 2017.  On that date, regulators'

19    allegations about FXCM's relationships -- FXCM's relationship

20    with Effex appeared along with several other pieces of news,

21    including FXCM's payment of regulatory penalty, withdrawal from

22    the U.S. market, and its plan to lay off 18 percent of its

23    workforce.

24            Plaintiffs' expert, Dr. Adam Werner, doesn't

25    disaggregate the impact of any of these separate pieces of

M7JsINRc

1   information.  He just says they are all inextricable

2   ramifications of defendants' alleged fraud.

3           THE COURT:  Can I stop you there?

4           MS. COREY:  Sure.

5           THE COURT:  I thought a lot about this disaggregation

6   issue.

7           So if your disaggregation argument is correct, could

8   plaintiffs ever prove loss causation in cases where a

9   corrective disclosure is made at the same time that other -- as

10  other confounding variables, including penalties for a fraud

11  are announced?  In other words, what is a plaintiff supposed to

12  do when a single press release both discloses an alleged fraud

13  and announces other collateral consequences?

14          MS. COREY:  Yes, sure.  I think, actually, a lot of

15  the case law bears it out that experts can do that.  I can't do

16  that, but they can do that through regression analyses and

17  event studies that will target certain aspects of the news that

18  are separated out.  So, for example, in the *Vivendi* case that

19  they rely on, that expert disaggregated the various pieces of

20  news that were released at each of the corrective disclosure

21  dates in his analysis, right?  He does pick apart the separate

22  pieces of news.  So some of it has to do with -- you know, the

23  *Vivendi* case has to do with a new loan, it has to do with

24  announcement of a merger, etc.  There's various pieces of news

25  that are separate, right?  Their expert in that case did that.

M7JsINRc

1    And then I think that probably the great weight of the

2    evidence -- weight of case law is that experts take the time

3    and do disaggregate by performing complex event studies.

4            That's not -- we argue that's just not what their

5    expert did here.

6            THE COURT:  So assume you're right about that,

7    arguendo that plaintiffs have not adequately or properly

8    disaggregated.  Why couldn't a reasonable juror still infer

9    that some of the stock price drop in February of 2017 resulted

10   from the disclosure itself as opposed to the announcement of

11   the regulatory penalties?

12           Why can't a reasonable juror -- why couldn't a

13   reasonable juror find some liability in --

14           MS. COREY:  I understand.  I think, to me, that's a

15   Comcast problem.  So in that case, there were four separate

16   theories of liability, and the court knocked out three of them,

17   but the expert's initial analysis included all four in the

18   damages analysis, the economic loss analysis.

19           The Supreme Court says it's just -- it's not enough.

20   The four different pieces had to be separated out in order for

21   this to be presented to a jury.  You can't ask a jury to just

22   estimate, based on a large lump sum, if one of the different

23   pieces has fallen away, so to speak.

24           THE COURT:  Why can't I allow -- even, again, just

25   assuming arguendo you're right about that, we're not even

M7JsINRc

before a jury.  Why can't I give plaintiffs the opportunity to

do that before a jury?  Why should I decide that now as a

matter of law?

MS. COREY:  Well, to me, this is the classic

gatekeeping function, right?  An expert presenting a regression

theory and event study is intensely complex, it is to present

something to a jury with the imprimatur of an expert that both

precedent and, you know, kind of pure studies have said that

this methodology is incorrect, it's just so misleading, it's

unhelpful to a jury, and they are bound to reach a result that

is unreliable based upon receipt of unreliable expert evidence.

So that's why we filed our motion for exclusion, and that's why

we think that loss causation and economic loss haven't been

proven here because he just hasn't done enough, and to present

that to a jury would be confusing and prejudicial to

defendants.

THE COURT:  All right.  You may proceed.

MS. COREY:  OK.  So let me skip further and save us

some time a little bit.

In plaintiffs' briefing, they have now shifted to a

material decision of the risk theory, in that basically that

the risk of the regulatory consequences has come to bear.  So

Dr. Warner states that FXCM's alleged misstatements "misled

market participants about the extent of FXCM's exposure to

regulatory scrutiny concealing inextricable ramifications that

M7JsINRc

1    would manifest upon corrective disclosure."

2            You have to bear with me, both inexplicable and

3    inefficient are impossible to say.

4            So they think that *Vivendi* is their case, that this is

5    exactly the same as *Vivendi*.  We argue that this is closer to

6    *In re BP, PLC*, in which plaintiffs claimed that BP had

7    misrepresented its internal oil flow rate estimate, causing the

8    market to believe that an oil flow would be relatively small,

9    but when, in fact, BP's internal estimate suggested that the

10   flow rate was far more severe.  Essentially BP understated its

11   regulatory risk.  Similarly here, plaintiffs suggests that FXCM

12   misrepresented its relationship with Effex, causing the market

13   to believe that any regulatory risk was smaller than it was.

14   But in the BP case, the court granted summary judgment, finding

15   that plaintiffs' damages model was flawed because when the

16   corrective event is the materialization of an understated risk,

17   the stock price on the date of the correction will not equate

18   to inflation on the date of the purchase unless the probability

19   of the risk materializing was 100 percent.  In other words, you

20   don't get the 100 percent stock drop on the corrective

21   disclosure day.

22           Again, similar to here, unless the probability of risk

23   of a regulatory settlement is a ban on U.S. trading, a

24   significant workforce reduction, was 100 percent probable on

25   March 15, 2012, plaintiffs' damages model is flawed because it

1    contributed the entirety of the stock drop to plaintiffs'

2    damages.  Accordingly, plaintiffs have failed to create a

3    genuine issue of material fact with respect to loss causation,

4    and dismissal is proven here.

5         Quickly addressing economic loss, we talked about

6    Comcast a little bit, so I won't belabor the topic.  But there

7    are really three theories here, right, and Mr. Dahan went over

8    them.  There's plaintiffs' use of agency model --

9         THE COURT:  We don't need to go over them again.

10        MS. COREY:  Okay, yes.

11        THE COURT:  Just because of timing.

12        MS. COREY:  Totally.

13        So very quickly, individual plaintiff, 683 Capital.

14   Because the Court already found that FXCM noteholders are not

15   entitled to the presumption of reliance under basic or

16   affiliated use, 683 Capital has to prove actual reliance on the

17   alleged misrepresentations at issue in this case when

18   purchasing the FXCM notes.

19        So to satisfy the reliance element of the Section

20   10(b) claim, 683 Capital must demonstrate that it was aware of

21   the company's statement and engaged in a relevant transaction

22   based on that specific misrepresentation.  683 Capital cannot

23   point to any evidence demonstrating that it actually relied on

24   the misrepresentations in this case.  Instead, the evidence

25   shows that 683 Capital made its first purchase of the FXCM

M7JsINRc

notes five months after the termination of FXCM's pay-for-flow
agreement with Effex, after the time in which this Court has
already found that no misstatements were credibly alleged.  So,
that's August 2014.

So 683 Capital's Section 10(b) claim fails for lack of
reliance.  But even if they could establish reliance, they also
fail based on loss causation and economic loss because what
plaintiffs' expert, Dr. Adam Werner, has done with respect to
the notes is he has simply resubmitted his class certification
event study in support of his loss causation and damages
opinions.  And as I'll discuss further in the Daubert motion,
in an inefficient market, which the notes operated in, an event
study is a patently unreliable method of drawing any
conclusions about loss causation or economic loss.

Finally, the Section 20(a) claim, because dismissal is
appropriate for the 10(b) claim, it's the predicate underlying
the 20(a) claim, so we submit that that should be dismissed as
well.

THE COURT:  Thank you very much.

Who would like to be heard on behalf of plaintiffs?

MR. BAKER:  It will be me, your Honor.  I would prefer
to keep my mask on, if that's all right.

THE COURT:  Speak loud and clear and slowly, please.

MR. BAKER:  If you need me to repeat myself, please
say the word.

M7JsINRc

1          So good morning, your Honor.  I believe it's the

2     morning.  My name is Josh Baker.  I'm with The Rosen Law Firm.

3     I'm representing the lead plaintiffs and class representatives

4     in this action.  So I want to jump right in and answer -- sort

5     of address some of the issues that your Honor brought up and

6     some of the arguments that defendants made.

7          Starting with what I think everyone agrees are the

8     central points here are what are the alleged or what are the

9     false statements, are they false.  The falsity element of these

10    claims seems to be at the center here.  As I'll talk about

11    later, there's not really much of a dispute that the defendants

12    knew what was going on here.  It's just whether or not that

13    made these statements false.

14         So, as your Honor pointed out, in the statements about

15    the agency model, even if some of these technical aspects about

16    a dealing desk were still present here or no dealing desk were

17    present here, that doesn't mean that those statements are

18    completely true and they can't be misleading.  Here, as your

19    Honor correctly identified, the central issue is that they

20    said, FXCM said, hey, we're not on the other side of these

21    deals; if you trade with us, unlike everyone else, we're not

22    taking a position, we're not on the other side of these deals.

23    But they were.  That's the central conflict of interest that

24    they said wasn't here.  That's why they said, hey, we are

25    interested in lying, that's why they said this is really an

M7JsINRc

agency model.  That's what they were telling their customers,
was the difference here is we're not on the other side of your
trades.  But they were.

That's from defendants' own words touting that to
their customers, and, again, the technical differences in what
makes a dealing desk in a typical situation, those really don't
matter in terms of that can happen in a no dealing desk or
dealing desk.  If they hold a position, and it's not the
simplified situation where, OK, the customer comes and buys
dollars for euros, and one side hopes it goes up and one side
hopes it goes down, and they are just waiting to see what
happens.  That's not how the trading works.  The trading is
allowing high-frequency traders where the positions are offset
or offloaded immediately, and the key there, what the customers
are interested in, because the customers can do this, the
dealing desks can do this, the liquidity providers can do this.
So what the customers are looking at and what they are hearing
from FXCM is that, hey, we're not on the other side of your
trades.  We don't have a conflict of interest there.  But they
did.

And that -- that conflict of interest is why FXCM's
own compliance department decided that when FXCM had hired
Mr. Dittami, and he was building this EES trading within FXCM,
they said, hold on, hold on.  They were about to go public,
they said, wait, we can't say this, we can't truthfully tell

M7JsINRc

our customers that we're not on the other side of the trades

when they have EES trading against them and we're keeping

70 percent of those profits.  That's why they said, that would

not be truthful, we can't do that.

So they decided to spin them off, spin EES off, as

this supposedly separate entity, Effex, and if that's all they

did, that would have been fine.  They didn't.  They kept the

profits.  They kept the same stake that they had, the same

economic interest, and that made the same conflict of interest

as it would have when it was internal.

When they decided to keep that same economic interest,

they weren't eliminating the conflict of interest, they were

just hiding it, and their actions support that.

An argument that defendants made today and in their

papers is that, you know, why was this really a bad thing?  You

know, this was really something they were trying to do to

support their customers and supposedly generate savings for

their customers.  If that was true, we submit that they would

have just told their customers that.  If they were doing this

thing that was so beneficial for their customers, that was in

their customers' best interest that didn't actually create a

conflict of interest, unlike what they were saying, they would

have told their customers that.  They could have achieved those

same benefits, and as I said before, they could have spun EES

off, said, hey, we can't take a cut here, we have to have them

M7JsINRc

as a separate entity, and they could have worked, they could
have still traded with Effex as they did, they could have had
the same trading relationships as long as they weren't taking
kickbacks of most of the trading profits from trading against
their own customers.

They could have achieved those same benefits without
the payment.  The payment has nothing to do with that.  This is
about greed.  Defendants tried to carve out some extra profits
for FXCM without their customers knowing.  They got caught, and
they suffer the consequences.  Now, investors had no idea about
this scheme, and they did not take on this risk.  When they
made the investment in FXCM's securities, they didn't know
about this.  They should not be the ones left holding the bag
here.

Now, one of the other central issues here that we have
talked about is are these -- you know, is this just a services
agreement, pay-for-flow, that everything was just on paper,
that's what it was, or was this actually a profit-sharing
agreement?  Defendants repeatedly say there's no evidence
otherwise, there's no evidence or undisputed facts show that
the services agreement controlled, but plaintiffs have
submitted a number of evidence, documentary evidence and
testimony, which, for the most part, is contemporaneous as
opposed to defendants' own statements, showing that, yes, this
was a profit-sharing relationship, that this was not simply,

M7JsINRc

1    oh, we had a contract for $21 per million, and that's what we

2    paid because the contract says so.  That's not what this

3    relationship was, and plaintiffs have submitted plenty of

4    evidence showing that to be the case.

5           For starters, from the beginning of the relationship

6    between FXCM and Effex, defendants and Dittami tried to

7    maintain this 70/30 split of profits.  That's what they said

8    was their intent from the beginning.

9           THE COURT:  Do you want to respond to counsel's

10   argument about, well, that's what they talked about initially,

11   but that's not ultimately what they did, as borne out by the

12   invoices and other documents?

13          MR. BAKER:  Yes, your Honor.  That's what they talked

14   about initially, and then that's what they did, and then months

15   later is the first time that these services agreements saying

16   $21 per million came out.  They were making payments for five,

17   six months before that point based on this understanding that,

18   hey, we're going to keep our 70/30 split.  And then once they

19   had those services agreements, which were backdated in an

20   attempt to paper over their arrangement as the company was

21   going public, after that fact, they still adjusted the rates,

22   they discussed on a retroactive basis, on a number of

23   occasions, hey, what should we bill for this past month?  Can

24   you afford to pay 21?  Well, maybe it should be 17.50, then

25   let's split the difference.  In fact, on multiple occasions,

M7JsINRc

1    that is exactly what they did.  They said, oh, here is -- even,

2    to take a step back, Effex provided FXCM with updates showing

3    their profitability, showing, hey, this is how much we're

4    making, and then they would discuss how much can you pay?  On

5    at least two instances, two months in 2010, they billed at a

6    different rate than the services agreement said.  The services

7    agreement said $21 per million, and they were billing at 17.50

8    per million, and then they later adjusted it a number of times.

9          But before I get into the continuing adjustments --

10   well, let me address that, as your Honor has asked for that.

11         So there was the initial time period of five or

12   six months before the services agreement even came into

13   existence, then they were papered over, and then there were

14   two months where they billed at a different rate irrespective

15   of the services agreement.  Then there were discussions beyond

16   that of maybe they didn't end up changing the rate, but there

17   are several months beyond that point when the services

18   agreement was in place, supposedly governing this relationship,

19   but, in fact, they are saying, hey, can you afford to pay this

20   much?  They were tracking their expenses and profits for a

21   while.  Effex was providing that information to FXCM, which is

22   not what a purely arm's length relationship looks like.

23         Then in 2011 and 2012, they decided, OK, we have

24   agreed on -- also, first -- sorry, let me take a step back.

25         First, in October 2011, they decided, OK, Effex isn't

M7JsINRc

1    making as much money, we'll agree to reduce the rate to $16 per

2    million.  That was happening in October, but they retroactively

3    said, OK, we're going to do that starting in September.

4         So, according to one snippet of deposition testimony,

5    someone said, hey, we always did this before the month

6    happened, and plaintiffs have submitted evidence showing that

7    was not the case, where there's numerous conversations that

8    happened after the month has already been completed.  Even when

9    they actually amended their agreement, they backdated that as

10   well.  Then going forward, in 2011 and 2012, multiple times,

11   they had conversations saying, what should we include in the

12   volume?  OK, we're agreeing it's $16 per million, but per

13   million of what?  Maybe this part isn't so profitable for me;

14   let's cut that out.  They are clearly playing with the inputs.

15   It's not just rate times volume equals what they are paying;

16   they are changing what goes into that.

17        Then, again, in 2013 -- yeah, 2013, February 2013,

18   they split out one different currency pair at either three or

19   six dollars, and then four months later, in June of 2013, they

20   split out a different currency pair at another time, which

21   makes two changes, not one.  Defendants' chart is just

22   completely inaccurate, not reflecting any of these changes, and

23   certainly not the two at the end where they admit, and the

24   invoices show, they billed at a different rate, and the

25   services agreement said one thing, they were billing and taking

M7JsINRc

1    payment on another.

2           These weren't little fractions of the flow.  This was

3    for a year and a half long period.  This was for currency pairs

4    which made up roughly a third of the total volume, which made

5    it the effective rate they were paying wasn't $16, it was

6    closer to 12, and some months, it was as low as $10.

7           So their actions, defendants' actions, actual payments

8    here, show that in the span of time that they supposedly had

9    this order flow agreement, that's not what they were doing.

10   For roughly half of the time, they made different payments or

11   had different discussions as to what those rates would be.

12           In addition to that, not just in the beginning of the

13   relationship, but when they were agreeing on the services

14   agreement, Dittami and defendants each expressed that, hey, we

15   want to maintain this 70/30 split, and this wasn't just

16   discussions or some e-mails that were rejected, this is after

17   the services agreements had been signed or when they were being

18   signed that Dittami says, hey, we just want to make sure you

19   know this rate is going to keep changing, this isn't a fixed

20   thing.

21           And to that effect, speaking of written agreements,

22   what was guiding these conversations and these negotiations

23   wasn't just, oh, they had some conversations about a 70/30

24   split, they signed two agreements that said -- there was the

25   resignation letter, Mr. Dittami's resignation letter, that your

M7JsINRc

1    Honor referred to earlier, which said we intend to maintain the

2    same economic relationship, and Mr. Dittami admitted that

3    referred to the 70/30 split, and that was a signed agreement,

4    not, hey, we hope to do this.  They said we want to maintain

5    this 70/30 split in the future agreements, and then they signed

6    this agreement where they said $21 per million because you're

7    making 30, and 70 percent of 30 is 21.  So that's how they even

8    created those numbers in the first place.  And, second, the

9    other agreement that was governing this relationship was the

10    option agreement, which was signed on the same day that

11    Mr. Dittami resigned from FXCM, and it says FXCM can buy a

12    70 percent share of Effex for $1.  At its discretion, FXCM

13    could buy 70 percent of Effex.  It's not could buy, could own

14    for $1, which means effectively they had a 70 percent interest

15    in Effex.

16        Defendants' response to this option agreement is that,

17    oh, you know, we didn't mean it.  They said much later that

18    they didn't mean it.  Much later, when they were under

19    investigation from the CFTC and the NFA, who were looking at

20    this relationship and came across this very same document, they

21    said, oh, no, no, we both understood that -- we didn't really

22    mean this written agreement that we both entered into.

23        In fact, the only evidence that defendants can point

24    to is their own self-serving testimony when they were under

25    investigation, and this termination agreement in 2015, also

M7JsINRc

once the regulatory investigations were well underway for over a year, and they knew exactly what the regulators were looking for. So to cover their own tracks, they said let's sign this thing saying, oh, we didn't mean it. But they did. There's evidence in the record, and plaintiffs point to numerous times where they refer to the option agreement in the present tense where they ask questions about how does this work for the option agreement. In 2011 -- this wasn't just before the services agreement. In 2011, I think it was November 2011, a year after the services agreement, they say, hey, we might want to sign -- this is FXCM's in-house counsel, Alexander Dick, says -- hey, proposes terminating the resignation letter and the option agreement, which there would be no reason to terminate those agreements if no one thought they were in effect in the first place. This wasn't discussed as a, oh, just in case, we should make sure to paper this, you know, we all know this already. Mr. Dittami said, no, I don't want to do that, I don't want to do this termination agreement because these give protection to Effex and the relationship.

So the option agreement, what plaintiffs argue is that this is clear evidence guiding this relationship that might not always have been exactly 70/30 because of difficulties in calculating the specific measures there, in which I'll also note that the reason that no one here is presenting your Honor with a chart that says this is Effex's profits, and here are

M7JsINRc

1    the payments, because Effex was out of business, and in

2    discovery, we requested documents, but the only documents they

3    had access to were those that they produced to regulators.

4          To answer a sort of lingering question, that is why

5    there is no evidence one way or the other.  Although plaintiffs

6    would submit, if, during the CFTC and NFA investigations, Effex

7    had documents saying or evidence showing, hey, look, this is

8    what our actual profits were, and these were our payments, this

9    is clearly not 70/30, they would have shown that to regulators

10   and put the issue to bed much earlier, but as far as anyone can

11   tell, they didn't do that.  The only evidence that they have

12   put forth is one affidavit, I believe, from an accountant

13   showing the payments as a percentage of gross revenues, which

14   gross revenues are not profits, so we don't have any basis to

15   say that those are the same thing.  It's comparing apples to

16   oranges.  And since there is no further evidence that we can

17   get from Effex, there is no way to substantiate or say what

18   does revenues mean versus profits.  From the beginning, we're

19   not saying that FXCM had a right to 70 percent of the entire

20   company, of all of their profits, if they had some small deals

21   with other companies, it was 70 percent of the trading against

22   FXCM's customers on FXCM's platforms.

23         Another piece of evidence, an important one, we

24   believe that shows that this relationship was not simply

25   payments for order flow that are supposedly so standard in the

M7JsINRc

1   industry is that no one else was making them.  No one else was

2   paying for retail order flow, and defendants saying that, oh,

3   well, BP maybe paid some for this one year, that was for a

4   separate type of flow, that was institutional, which is if

5   you're in the foreign exchange world, their retail flow is for

6   everyday, generally, individuals to trade, institutional is for

7   banks and other entities who trade much larger volumes, which

8   FXCM has dedicated streams and agreements with those individual

9   customers.  That's all BP was, and Defendant Niv himself said

10  that those were tiny and a joke, and that was not really

11  business.  They were orders of magnitude different than Effex's

12  payments.  So during the whole time that Effex was paying,

13  where defendants were saying, oh, we're accepting payments for

14  order flow for market makers, plural, that wasn't the case.

15  Effex was the only ones making these payments, and it made no

16  economic sense for them to do so.  In an arm's length

17  relationship, one would think that Effex, who supposedly had

18  more bargaining power than all of these competing market makers

19  who were offering poorer execution in defendants' own

20  admissions, Effex was somehow the only one that had to pay for

21  that flow on top of providing the best execution that they were

22  already providing.

23        I believe your Honor also mentioned earlier, when

24  Mr. Dahan was talking, you questioned the invoices which were

25  labeled P&L.  Defendants' explanation is that, oh, no, that

M7JsINRc

1    really just means FXCM's P&L.  They don't really have an answer

2    for why FXCM would supply an invoice to Effex showing FXCM's

3    P&L and how FXCM was going to account for that.  Why would that

4    be on an invoice sent to Effex?

5              THE COURT:  Can we talk about -- sorry, go ahead.

6    Defense counsel spoke for a while, so I want to give you an

7    opportunity to respond, but I also do want to talk a little bit

8    about the corrective disclosures and the disaggregation issue.

9              MR. BAKER:  Sorry, disaggregation?

10             THE COURT:  Disaggregation.

11             But I don't want to cut you off, so, go ahead.

12             MR. BAKER:  Sure.

13             I'll speak briefly before we get to the point about

14   the GAAP allegations defendants have addressed and sort of

15   round out the falsity issues.  They spent some time on that.

16   As they mentioned, there are two different categories in the

17   alternative that plaintiffs alleged, both that FXCM was a

18   related party and those transactions were undisclosed or that

19   Effex was a VIE and should have been consolidated.

20             Importantly, your Honor, the related party

21   allegations, which they barely address in their papers, and I

22   don't believe made much mention of at all today, they don't

23   even require that this was profit-sharing.  It's simply that

24   there is a basis for finding that this is a related party to

25   FXCM based on the nature of the relationship, the closeness of

M7JsINRc

it, the fact that there were these payments and other

arrangements that were not arm's length.  The fact that this

was a former employee who then maintained a close relationship

that FXCM supported, your Honor referenced findings, which may

have been from the CFTC order, regarding the support that FXCM

provided to Effex, including having its employees work for

Effex using FXCM's office space for a period of a year and

numerous other allegations which plaintiffs have their own

support for and do not rely on the CFTC order for.  They found

their own evidence.

All of those things, as shown in Mr. Baron's report

and in plaintiffs' opposition, show that this was a related

party.  Even if the Court were to find that this wasn't

profit-sharing, this is still a related party, and by failing

to disclose that, defendants' statements were misleading.

Defendants also rely on Ernst & Young's clean audit

opinions to sort of say, hey, Ernst & Young said nothing is

wrong here, there's nothing to see, but as plaintiffs point out

in our papers, Ernst & Young did not have all of the relevant

information about the relationship, some of which was

explicitly hidden from them, including from the CFO, Mr. Lande,

saying don't tell Ernst & Young about the option agreement, and

other times when FXCM billed Effex for amounts that were not

what it says in the services agreement, and those were not

included.

M7JsINRc

1          Ernst & Young admitted it never conducted an

2     independent investigation.  It took management's

3     representations and said, OK, if you say this is what was

4     actually happening, and you have invoices, the invoices add up,

5     fine, that's good enough for them.

6          And so Ernst & Young's findings were not an

7     independent investigation into -- based on all of the facts,

8     including the facts that plaintiffs have shown which were not

9     shared with Ernst & Young, this was not -- these financial

10    statements were false and misleading, whether or not they

11    actually restated them or not after they were delisted, and I

12    believe they've gone private since.

13         Ernst & Young, I'll also point out to your Honor, just

14    last month was fined $100 million by the SEC, the largest ever

15    fine for an auditor, for knowingly letting its accountants

16    cheat on the ethics portions of the continuing education exams,

17    which, again, it included during the class period another

18    allegation similar to that during the class period that just

19    came out this past month.  This is the same auditors that

20    supposedly vouched for everything that FXCM --

21         THE COURT:  Was that specifically related to conduct

22    in connection with this, or you're just tarnishing Ernst &

23    Young generally?

24         MR. BAKER:  I'm saying what the SEC ordered.

25         THE COURT:  OK.

M7JsINRc

1          MR. BAKER:  Regarding the CFTC and NFA complaints, as

2     defendants mentioned, and they say in their papers, oh, we're

3     not allowed to rely on those allegations.  We don't.  The

4     allegations, the plaintiffs only use as a corrective

5     disclosure.  We don't say that the CFTC or NFA alleged X,

6     therefore X is true.  We say that revealed that information to

7     the market in February 2017, but at no point do we rely on that

8     for our -- to substantiate our allegations.  It so happens that

9     we looked at the same set of evidence.  In large part, we

10    conducted discovery on our own from the beginning, not just

11    getting whatever they gave to the CFTC, and conducted our own

12    discovery.  But as you can see through several or many of the

13    exhibits that have been submitted on this motion, there is a

14    Bates stamp that shows that these same documents were produced

15    to the CFTC during the course of their investigation, and, as a

16    result of that, they came to the settlement, that CFTC and NFA

17    settled for the resolution that these defendants would no

18    longer be allowed to do business in the United States.

19          And that decision, that penalty, shows that not only

20    were these allegations, it shows that these allegations were

21    strong enough where that was the outcome, and that I'm sure

22    defendants don't admit it, and they are not proof of this

23    happening, but the fact remains, and what investors could see,

24    which will lead into the loss causation arguments which your

25    Honor requested, that it shows that these allegations had

M7JsINRc

veracity and strength to them by the very outcome that

defendants agreed to, even if they didn't admit the allegations

themselves.

       With respect to scienter, as I mentioned before,

there's no real argument that defendants didn't know about the

relationship.  They signed the documents themselves, and

there's testimony from each of the individuals saying they were

aware of each of the relevant agreements and renegotiations and

the entire relationship with Mr. Dittami, and Mr. Ahdout, in

particular, was the key point person in that relationship.  So

I won't belabor those points other than to say that motive and

opportunity is one possible way of showing scienter, it is not

required, and whether or not it is alleged here, plaintiffs do

have -- do show that there is the motive in that, as I

mentioned before, Defendant FXCM could have accomplished all of

these same supposed auditory outcomes without taking this cut

of profits.  They tried to get an extra cut of profits without

anyone knowing about it, and then they got caught, and that's

what their motivation was.

       And then, yes, moving to the loss causation arguments.

Were there specific questions that your Honor had?

       THE COURT:  Yes.  So one thing, I just want to talk

for a minute about the corrective disclosures.  Is it proper to

equate the announcements of the CFTC and NFA settlements to the

corrective disclosures?  By that, I mean because the

M7JsINRc

settlements were both no admit and no deny, how did the

announcements establish the truth of the relationship between

FXCM and Effex?

MR. BAKER:  They disclosed the facts of the

relationship.  It wasn't just we found that these guys lied, it

was that these are the facts of what happened.  These were the

CFTC's factual findings, and these are the penalties that came

out for it.  And there is no requirement, despite defendants'

attempt to impose one, that a corrective disclosure has to be

a, I solemnly swear that I did commit fraud statement.  There

is no requirement there has to be an admission or a mirror for

mirror -- I'm sorry -- statement-for-statement mirroring of the

alleged false statements.  The information came out.  There

were penalties that stemmed directly from those allegations.

It all came out on the exact same date or at the same time, and

then the very next trading day, the stock dropped by -- the

stock price dropped by, I think, over 50 percent and the notes

price by over 40 percent.  That's the classic case of loss

causation.

THE COURT:  Let's talk about the disaggregation for a

minute.  So you argue that the regulatory penalties are

inexplicable ramifications of the disclosure of the fraud such

that any losses stemming from the disclosure of the regulatory

penalties don't have to be disaggregated from any losses

stemming from the disclosure of the fraud.

1           I'm wondering how that is consistent with the *Barclays*

2   case.  In *Barclays*, the Second Circuit considered an argument

3   that -- now I'm just reading a quote -- "the decline in

4   Barclays' stock price on June 28, 2012, should be attributed to

5   the imposition of regulatory penalties against Barclays rather

6   than to the disclosures contained in the settlement agreement."

7           And the Court responded to that argument by saying --

8   again, I'm quoting -- "To be sure, a securities fraud plaintiff

9   must demonstrate a causal connection between the content of the

10  alleged misstatements or omissions and the harm actually

11  suffered and may not rely on mere attenuated connections."

12          My question is:  Doesn't that suggest that losses from

13  regulatory penalties do have to be disaggregated even if those

14  penalties are announced simultaneously with the disclosure of

15  the fraud and are related to the fraud?

16          I know that was a long question, but I just wanted to

17  sort of state the premise of part of my concern or what I've

18  been thinking about on this issue.

19          MR. BAKER:  Yes.  I'll do my best to respond to it.

20  If I miss a part of it, please let me know.

21          But, no, in this case, these are one and the same.

22  The disclosures came out at the same time, and what -- there's

23  no factual basis -- the idea that these are separate factual

24  issues just doesn't have a basis in fact here when these were

25  the allegations and these are the penalties that came out at

M7JsINRc

1    the same time.

2            The relevant inquiry on loss causation is what does

3    the market perceive to be the cause of these losses.  The

4    market perceived these allegations and these penalties as a

5    direct result of the allegations, defendants agreeing to these

6    penalties, and that's what the market perceived, causing the

7    value to drop significantly the very next trading day.

8            THE COURT:  All right.  Let me follow up.  Assume that

9    I disagree with you that losses caused by the regulatory

10   penalties don't have to be disaggregated from losses caused by

11   the disclosure itself.  What would be the next step?  Would I

12   give you the opportunity to do that and argue disaggregation at

13   trial or give the tools to the jury to assign some rough

14   portion of the loss to the disclosure, or do you just think

15   it's impossible to do that, and you're just going to rely on

16   the argument you just made a moment ago and don't think they

17   can be disaggregated in any way?

18           MR. BAKER:  I don't think in this case that they

19   should be disaggregated.  Defendants say that this is possible,

20   but they put forth an expert report which states no attempt to

21   do so.  They don't say that it's -- any way in which that can

22   actually happen.  They say an expert could theoretically do

23   that.  Here, what you have is the same news coming out at the

24   same time, causing one stock price drop on one day.  This is

25   not a complicated case.  This is not anything like the *BP* case

1   that they referred to where there was a long series of

2   corrective disclosures or material decisions of the risk and

3   stock drops over a long series of time where the only -- in

4   that case, the court only granted summary judgment -- partial

5   summary judgment on one part of the drop, which was a secondary

6   disclosure that after the oil spill, it should have been

7   foreseeable that containment -- measure to contain the oil

8   spill might fail.  That's completely factually distinct from

9   the case we have here.

10          And the same with *Vivendi*.  We're talking about

11   separate disclosures.  Here, there's one disclosure, there's

12   one drop on one date, and the premise that they need to be

13   disaggregated is that these are somehow unrelated to the fraud.

14   These are allegations showing what plaintiffs alleged were

15   either misrepresented or omitted, and these are the penalties

16   for those misrepresentations.  To say that there is some

17   factual basis that those are unrelated to the fraud or not

18   reasonably foreseeable, which those are the standards -- that's

19   what the standard for loss causation is here -- is just not --

20   is disingenuous.

21          THE COURT:  All right.  You may proceed.

22          While you're looking at your notes, I do have one more

23   question to ask on the material decision of risk theory.

24          To the extent that you rely on that, how do you define

25   the risk that was concealed through FXCM's alleged

M7JsINRc

1    misstatements?  Was it the risk that FXCM and Effex undisclosed

2    relationship would result in less profitability or the risk

3    that FXCM would suffer regulatory penalties and lose profits

4    because it was making false or misleading statements about not

5    having the conflict of interest?

6           MR. BAKER:  It's the latter, your Honor.  The risk

7    that was undisclosed is that because of this undisclosed

8    profit-sharing relationship that FXCM had with Effex, it was

9    taking a risk.  From the very beginning of the class period

10   from before -- two years before the class period even started,

11   this risk was already present and not disclosed to

12   shareholders, to investors, that, hey, we're doing something

13   that the regulators might not like and they might severely

14   punish us for.  That is something where it is akin to, say, a

15   bribery case, where this bribery might supposedly be helpful to

16   the company, but it conceals the risk that, oh, these things

17   that you accomplished, these revenues that you got, were

18   through a means that is going to result in punishment, severe

19   punishment, for the company for the way that it got those

20   revenues.

21          THE COURT:  But didn't the alleged misstatements

22   create a risk of regulatory penalties rather than conceal the

23   existing risk?  By that I mean, there would have been no risk

24   of regulatory penalties if FXCM stated that it was operating a

25   principal model and fully disclosed the existing relationship.

M7JsINRc

1   So it's just another way of asking how your theory of risk --

2   of materialization of risk theory works.

3           MR. BAKER:  Yes.  I think that's precisely right, is

4   that there was this -- they were hiding this relationship, they

5   made misrepresentations, including before the class period.  So

6   even at day one of the class period, they have been lying to

7   their customers for two years saying that we have an agency

8   model, that we have order flow payments, etc., that these are

9   not related party transactions.  And from day one of the class

10  period, that was the risk, that because of these lies to their

11  customers, they would be severely penalized by the regulators.

12  That's exactly what happened.

13          THE COURT:  All right.  I have one more question, but

14  on a different topic, and then I'll let you sum up.

15          I want to ask a question about the scienter on the

16  GAAP violations.  I don't think you raised evidence of intent

17  beyond the GAAP violation itself, right?  So there are some

18  cases holding that GAAP violations can show scienter, but only

19  if there are really egregious GAAP violations, like wildly

20  misstating profits or accompanied by other evidence.

21          I don't think you argued that these are akin to such

22  egregious GAAP violations.  So what evidence do you have of the

23  intent other than the GAAP violations themselves?  Is it just

24  the e-mail in which Niv says no further mention of an option to

25  Ernst & Young, is it anything else, or are you arguing that

M7JsINRc

knowledge of the facts underlying the GAAP violation here,

knowledge that Effex was controlled by FXCM, such that it may

not have been able to pursue its own interest, is that

sufficient for the GAAP violation?

MR. BAKER:  To begin with, we do argue that these were

blatant and obvious violations of GAAP that defendants did and

should have known about.  They made other disclosures in the

same statements about related party transactions.  They made

other disclosures about variable interest entities.  That

happened before and during the class period.  They were clearly

aware -- these are not some arcane complex rules.  This is a

related party.  We have millions of dollars coming in from

them, we need to close that.  That's a very basic accounting

concept.  We do argue that part.

And to your Honor's other points, yes, we allege --

and this goes to the loss causation argument that defendants

make concerning the GAAP statements as well.  Yes, we allege,

and we think have proven, or have sufficient evidence to prove,

that defendants knew about this relationship, they knew,

essentially, the facts that underlied the GAAP violations.

They knew that Effex was a related party.  They knew these

facts, which plaintiffs' expert said, this shows Effex was a

related party, this shows Effex was a variable interest entity.

They knew those facts, and they -- not just one

e-mail, but on several occasions where they said, don't share

1   the option agreement with Ernst & Young.  Should we be careful

2   about how we disclose the order flow payments?  It is a

3   sensitive topic, talking about the relationship with Effex.  To

4   regulators, when regulators were looking into this, this goes

5   to the scienter generally, and certainly applies to the GAAP

6   violations as well.  They said, oh, we don't -- there is no one

7   that we know of -- they repeatedly lied to the regulators,

8   including saying that there is no one that was -- no former

9   employee of FXCM does any business with us, even knowing that

10  Mr. Dittami was a former employee of FXCM that they had a major

11  relationship with, who was responsible for most or a plurality

12  or sometimes most of the trading volume at FXCM, the retail

13  trading volume certainly.  And they also tried to hide the fact

14  that Mr. Dittami was a managing director at FXCM, saying that

15  he was a consultant who worked on software programming.  The

16  defendants explicitly went out of their way to try to hide this

17  relationship, and that applies to their decision not to

18  disclose that this was a related party.

19          THE COURT:  All right.  Why don't you just sum up, if

20  there are any additional final points you want to make.

21          MR. BAKER:  To sum up, your Honor, what we have here

22  is defendants' motion.  It's defendants' burden to show there

23  are no genuine issue of material fact.  This is their summary

24  judgment motion.  Plaintiffs are not asserting summary judgment

25  or not moving for summary judgment.  All plaintiffs are

M7JsINRc

1   required to show is that there are genuine issues of material

2   fact.  And each of defendants' arguments rely on saying, hey,

3   because we said this didn't happen, it couldn't possibly have

4   happened.  They ignore the vast bulk of the evidence that

5   plaintiffs have put forth and say there isn't any.  That

6   doesn't make it so.

7        All that plaintiffs are required to do here is produce

8   sufficient and reliable evidence, which they have done, showing

9   each of the elements of their claim, and the fact that

10  defendants disagree or think that plaintiffs' experts credited

11  the wrong witnesses or had -- didn't just completely accept

12  defendants' own version of the facts when they were under

13  investigation, or Mr. Dittami's -- when Effex had this very

14  close relationship with FXCM, Mr. Dittami sued the NFA, and

15  that action was dismissed, which defendants neglected to

16  mention -- the action was dismissed, this action against the

17  NFA -- Effex went out of business as soon as this relationship

18  was over.  Effex, very shortly after, found that it couldn't

19  survive because its fate was so tightly interwoven with FXCM.

20       So, thus, it shows defendants and their, essentially,

21  coconspirator in Mr. Dittami and Effex, they are the ones who

22  are saying after the fact, this didn't really happen, we didn't

23  really mean it.  The evidence that plaintiffs have put forth is

24  contemporary, it shows from defendants' actions at the time,

25  their statements at the time this was happening, and just

M7JsINRc

1    because defendants tried to cover their tracks later doesn't

2    mean it didn't happen.

3              THE COURT:  Thanks very much.

4              I'll give defendants just five minutes for rebuttal,

5    if you would like it, but not more than that, given how long we

6    have gone.

7              MR. DAHAN:  Thank you, your Honor.

8              I'll work backwards.  First of all, on the *Barclays*

9    case, that is exactly the point.  In that release, what you had

10   was the, quote-unquote, nonadmitted facts of wrongdoing that

11   leads to whatever dollar amount we're now saying the parties

12   should settle for.  The same thing here.  February 7, there was

13   this no admit complaint as a settlement document, and, in light

14   of this, the company agreed to pay $7 million, the company

15   agreed it's not going to continue to do business in the U.S.

16             So, yes, it is how do you know that this stock drop

17   maybe had nothing to do with whether or not there was truth.

18   Maybe they didn't have a profit-sharing arrangement.  Maybe

19   they didn't lie.  But at the end of the day, they are having to

20   pay $7 million, they can't be in the U.S., and, so, maybe

21   that's why the stock dropped.  Therefore that's what was the

22   concern of Barclays.  How do I know that that is the reason?

23   It really has nothing to do with whether there was or wasn't a

24   misrepresentation, especially in a middle of a settlement.

25   Plaintiffs here have not, therefore -- they can't just say,

M7JsINRc

well, you know, it was in the same document.  Of course, it's

in the same document.  It' exactly what happened to Barclays,

and that was the concern of the court there.

        And on materialization of risk, that's why they shift

to there.  The problem with materialization of risk is, yes,

it's exactly what your Honor asked him.  It was their position

is the latter.  They are saying somehow we should have known

throughout the class period that we were going to be

investigated by the regulators, they are going to eventually

feel we did something wrong, and then they are going to

eventually go and fine us, and that was going on throughout the

entire class period.  There is no evidence, as we explained

earlier in the case law, that talks about there having to be

that that was almost a 100 percent certainty in the mind.

There's no e-mail that there was a concern by any of the

defendants that the regulators are looking into us, they are

going to look into us, throughout the class period.

        The option agreement, wow.  You know, they could try

whatever they want, but the evidence in this case, including

from Mr. Dittami, he himself has testified in this case, there

was no option agreement.  What the testimony shows is there was

a contemplation of the parties executing an option agreement.

Mr. Dittami signed one, and then it was determined we were not

going to have an option agreement, and, therefore, the parties

operated as if there was no option agreement.  In fact, if

there was an option agreement, the one that they are focusing

on as the April 2010 was a valid option agreement, why were the

parties discussing later on possibly entering into an option

agreement?  If you already had one, why are you having to do

another one?

         So the facts are that there was no option agreement.

The regulators never even took the position there was an option

agreement.  They looked and had all that information.  There

was no valid and enforceable option agreement.

         ENY, after the settlement, had access to all those

documents.  They didn't feel there was an option agreement that

therefore now required a restatement or therefore now changed

their whole view.  So because nobody viewed that option

agreement -- that's how it works.  At the end of the day, it's

do the parties believe that this is a valid, enforceable

agreement.  The evidence shows neither party viewed that option

agreement as a valid and enforceable agreement.  So, again,

that is just a smokescreen that plaintiffs are trying to do in

this case, among others.

         The opening of plaintiffs' argument was, well, FXCM

didn't tell the customers that they took a position opposite

them.  They didn't take a position opposite them.  That's the

key.  The trading position was taken by Effex.  FXCM was never

a trading party to it.  For instance, if Effex lost money, FXCM

didn't lose money.  If you were truly a counterparty, took a

M7JsINRc

position on the trade, and it was opposite the customer, if the

trade went against the customers, FXCM would have money.  The

evidence shows that never happened.  No one has testified, nor

has plaintiff produced any evidence that if the customer lost

money, FXCM made more money.  So that's what it means to truly

be opposite, to be the counterparty to the thing.

          We did disclose that we -- customers were aware that

we got paid for flow.  They acknowledged it.  It's in the

public filings.  Investors were clear.  We got -- so,

therefore, they knew one of the ways we got money is

pay-for-flow.  You get that from liquidity providers.  There

was no hiding that we got money from liquidity providers.  Our

position is you didn't tell them this was a profit-sharing.  We

can go in circles, if it comes down to that question, was this

profit-sharing or not, and we submit it was not.

          The invoices.  I mean, we submitted the invoices, we

submitted the spreadsheets provided to ENY with these invoices,

and the ledgers show that that is what the payments were.  They

could sit here, and you could just say facts as if they are

true, but they are not.  The invoices show that the payments to

FXCM were exactly what they were, like many people that owe

money to someone as a fact.  I get calls from my clients when I

send them an invoice, like, hey, your bill is too high, why

should I pay that, what's your performance this month?  I don't

know if I want to pay that.  And at the end of the day, maybe

1    they decide to pay or work out an agreement to pay less.  In

2    this case, that is not profit-sharing.  I'm not profit-sharing

3    with my client in that instance.  The fact that they want to,

4    listen, I can't afford to continue to pay you, that doesn't

5    mean I have a profit-sharing relationship.  The invoices were

6    billed as paid for flow.  X dollars, here's the flow, that's

7    how much you owe.  And only was that number changed at the end

8    of the day from 21 to 16 was the bulk of the years, and then

9    later on, in 2013, two currency periods changed from the 16 to

10   the six dollars and the three dollars because of paper spreads.

11   That, again, is not profit-sharing.

12          Then, again, as far as related party, again, the

13   question here is, to truly be a related party, there's a

14   standard that GAAP sets forth, and that's ASC 850, and they set

15   forth what the test is.  It talks about control and significant

16   influence.  There is no evidence here that we ultimately, FXCM

17   being the "we," controlled how Effex would go about its

18   business.  When Effex would decide to do any transaction, when

19   Effex would decide to sign on with new counterparties, what

20   Effex did with its money or decisions, and what trades to enter

21   or not enter, those were all decisions made independently by

22   Effex.  That's what creates related party.

23          With that, your Honor, thank you for your time.

24          THE COURT:  Thank you.

25          I just want to say, I thought the advocacy from

M7JsINRc

1  everyone was really excellent.  Thank you, all.

2          It would be helpful, I think, if I could get a copy of

3  the transcript, so I assume there is no objection to maybe both

4  sides sharing the cost of that and ordering the transcript.

5          But thank you, all, for coming in today.  Stay safe.

6  I'll try and rule shortly.

7          Thank you.

8          (Adjourned)

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25