# EXHIBIT 1

M8J8GLOD

1   UNITED STATES DISTRICT COURT
    SOUTHERN DISTRICT OF NEW YORK
2
    ------------------------------x
3
    IN RE GLOBAL BROKERAGE INC.,            17 Cv. 916 (RA)
4   f/k/a FXCM INC. SECURITIES
    LITIGATION
5                                           Decision
    ------------------------------x
6
                                            August 19, 2022
7                                           1:00 p.m.

8   Before:

9                    HON. RONNIE ABRAMS,

10                                          District Judge

11                        APPEARANCES

12  THE ROSEN LAW FIRM
          Attorneys for Plaintiffs
13  BY:  PHILLIP C. KIM
          BRENT LaPOINTE
14        JOSHUA E. BAKER

15  KING & SPALDING LLP
          Attorneys for Defendants
16  BY:  ISRAEL DAHAN
          CHELSEA J. COREY
17        PETER J. ISAJIW

18

19

20

21

22

23

24

25

M8J8GLOD

1              (The Court and parties appearing via teleconference)

2              THE COURT:  Good morning, everyone.  This is Judge

3       Abrams.  We are here for *In re Global Brokerage*.

4              Who do I have on the line, please.

5              MR. KIM:  Good morning, your Honor.  Phillip Kim,

6       Rosen Law Firm, for plaintiffs.

7              THE COURT:  Good morning.

8              MR. BAKER:  Josh Baker, with The Rosen Law Firm, also

9       for plaintiffs.

10             MR. LaPOINTE:  This is Brent LaPointe, with The Rosen

11      Law Firm, also for plaintiffs.

12             THE COURT:  Good morning.

13             MS. COREY:  This is Chelsea Corey, from King &

14      Spalding, on behalf of defendants.

15             MR. DAHAN:  Israel Dahan, from King & Spalding, also

16      on behalf of defendants.

17             THE COURT:  Good morning.

18             MR. ISAJIW:  Peter Isajiw, from King & Spalding as

19      well.

20             THE COURT:  So, as you all know, I am denying each of

21      FXCM's motions.  I have decided to rule orally just because,

22      since the case is going forward anyway, I think it's more

23      efficient to do so, and that way we can move the case forward

24      as quickly as possible.

25             So, I know it can be a little bit tedious to listen to

1    an oral ruling, but I do think that this is more efficient.  I

2    have a court reporter on the line, and you should reach out to

3    the court reporter after the proceeding to get a transcript of

4    my ruling.

5          First, I am denying FXCM's motion to exclude Dr.

6    Werner's reports, testimony, and opinions.  Most of FXCM's

7    objections to Werner's opinions——including his use of a

8    constant-dollar methodology, his conclusion that the February

9    2017 disclosures were value relevant for all class members, and

10   his loss causation conclusions regarding 683 Capital——are

11   better suited to challenging his credibility at trial.  As I

12   will touch on a little later, his disaggregation opinion is

13   useful, or may be useful, to the jury, and uses reliable

14   principles and methods in light of plaintiffs' theory of the

15   case.  Similarly, as I will explain shortly, his conclusion

16   that the corrective disclosures are relevant to GAAP violations

17   is based on sufficient facts.

18         Second, I am granting in part and denying in part the

19   motion to exclude Barron's reports, testimony, and opinions.

20         As an initial matter, FXCM's arguments that Barron's

21   VIE and related-party analyses are reductive and incomplete,

22   and that his conclusions are unsupported by the evidence, are,

23   again, credibility arguments rather than arguments that go to

24   admissibility.

25         On materiality, while Barron may opine that the

M8J8GLOD

transactions with Effex were material related-party
transactions such that the failure to disclose them violated
GAAP, he must be careful to avoid opining that this caused
FXCM's financial statements to be materially misstated, which
draws on the language of the relevant legal standard.

I do agree with FXCM that paragraphs 18 through 114 of
Barron's report comprise factual narrative. Accordingly, to
the extent plaintiffs were planning to introduce the report at
trial, those paragraphs will need to be modified or struck if
they are offered to prove the facts related therein. And I am
just going to cite to the *Malletier v. Dooney & Bourke* case,
525 F.Supp.2d 558, 677-78.

And at trial, the facts on which Barron bases his
opinions should be proved by admissible evidence and not expert
assertion. Thus, if Barron testifies, he should not be
permitted to summarize the background facts, as that will not
assist the jury. And that's a quote from the same case at
677-78. In other words, the factual narrative in Barron's
report should be presented to the jury through witnesses and
documentary evidence, rather than through Barron's unsupported
statements for the purpose of describing what took place. *See,
e.g., Reach Music v. Warner Chappell Music*, 988 F.Supp.2d 395,
at 404.

I also agree that certain statements in Barron's
report that make conclusions about the parties' intent, and/or

M8J8GLOD

that characterize documents for the purposes of having the fact
finder accept that interpretation as fact, should be precluded,
including but not limited to paragraphs 68, 102, and 150.  *See*
*In re Rezulin Prod. Liab. Litig.*, 309 F.Supp.2d 531, at 546.
At trial, Barron must avoid opining on any parties' intent and
must avoid characterizing any documents.

Next, I am denying FXCM's summary judgment motion
because I find that plaintiffs have raised genuine issues of
material fact as to the disputed elements of their fraud
claims.

To prevail on summary judgment, FXCM must show that
there is no genuine dispute as to any material fact.  A fact is
material when it might affect the outcome of the suit under the
governing law.  An issue of fact is genuine if the evidence is
such that a reasonable jury could return a verdict for the
nonmoving party.

I must resolve all ambiguities and draw all
permissible factual inferences in favor of the party against
whom summary judgment is sought.

To prevail on their claim under Section 10(b) and Rule
10b-5, plaintiffs must prove (1) a material misrepresentation
or omission by the defendant; (2) scienter; (3) a connection
between the misrepresentation or omission and the purchase or
sale of a security; (4) reliance upon the misrepresentation or
omission; (5) economic loss; and (6) loss causation.  The

1    parties dispute the first, second, fifth, and sixth prongs.

2             On the first disputed element, there is sufficient

3    evidence from which a reasonable juror could find that FXCM

4    made material misrepresentations with respect to (1) its

5    statements about receiving revenue from order-flow payments;

6    (2) its failure to disclose Effex as a related party; and (3)

7    its statements that it operated under an agency trading model.

8             In addition to statements that are untrue, the

9    securities laws prohibit half-truths, which are statements that

10   are misleading by virtue of what they omit to disclose.

11            First, there is evidence from which a reasonable juror

12   could conclude that the payment arrangement between FXCM and

13   Effex was a profit-sharing arrangement, such that FXCM's

14   statements about revenue from order-flow payments were false or

15   misleading.

16            Communications between Effex and FXCM express the

17   intent that the payment arrangement between the two would

18   mirror the 70/30 profit split from Dittami's employment

19   agreement.

20            Niv's and Dittami's CFTC testimony further supports

21   this inference——indeed, when asked whether the services

22   agreement was intended to approximate that 70/30 profit split,

23   they repeatedly answered in the affirmative.

24            Multiple communications between FXCM and Effex appear

25   to contemplate that Effex's payments under the service

M8J8GLOD

agreement would be tied to its profits.  For instance, in a May

11, 2010 e-mail, Dittami asked Ahdout how certain funds "should

be handled in conjunction with the payment on my profits to

FXCM."  In a July 2010 message, an FXCM employee told Dittami,

"We'll still be tracking your expenses and income for now so

that we can see if the $21 fee should be adjusted."  And in an

October 2010 e-mail, Dittami sent Ahdout a draft of a side

letter to the service agreement that would have stated that the

"per million" fee would not exceed 70 percent.

          Several of FXCM's invoices to Effex used the term

"P&L," or "profit and loss," when calculating the amount Effex

owed to FXCM.  FXCM argued that this referred to FXCM's

profits, but a reasonable juror could find otherwise.

          And e-mail discussions indicate that discretion was

exercised on whether to include certain of Effex's income

streams as "volume" for the purpose of calculating Effex's

payments.

          Taken together, this evidence could support a finding

that the payment arrangement between FXCM and Effex was a

profit-sharing arrangement disguised as an order-flow payment

arrangement.

          Second, there is evidence from which a reasonable

juror could conclude that FXCM made false or misleading

statements by not disclosing material related-party

transactions.

M8J8GLOD

1          According to the accounting standard that controls

2     here, related parties include "other parties with which the

3     reporting entity may deal if one party controls or can

4     significantly influence the management or operating policies of

5     the other to an extent that one of the transacting parties

6     might be prevented from fully pursuing its own separate

7     interests," and "other parties that can significantly influence

8     the management or operating policies of the transacting parties

9     or that have an ownership interest in one of the transacting

10    parties and can significantly influence the other to an extent

11    that one or more of the transacting parties might be prevented

12    from fully pursuing its own separate interests."  A juror could

13    conclude that Effex was so closely related to and/or controlled

14    by FXCM that it was a related party, at least under one of

15    these definitions.

16          First, there is a dispute as to whether an option

17    agreement existed pursuant to which FXCM could buy 70 percent

18    of Effex, and thus whether FXCM had an ownership interest in

19    Effex.  Plaintiffs point to a signed option agreement dated

20    April 14, 2010.  FXCM disputes that agreement's validity, but

21    multiple communications between the parties suggest that they

22    understood the agreement to be enforceable.

23          I am just going to quickly cite -- I am not reading a

24    lot of the citations, again, just for efficiency, because I

25    think you are very familiar with the record.  But I am looking

M8J8GLOD

1    at Exhibit 33, Exhibit 107, Exhibit 109.

2              It is also undisputed that in Effex's early stages:

3    (1) it operated its trading algorithm through FXCM servers and

4    on its network and relied on its IT; (2) it operated out of

5    FXCM's offices rent free; (3) it used FXCM servers and used

6    FXCM's messaging service; (4) Dittami and other Effex employees

7    kept VPN access to FXCM computers; (5) FXCM employees performed

8    work for Effex and Effex paid those employees bonus for that

9    work; and (6) Dittami used an FXCM e-mail address for months

10   after his employment with FXCM terminated.

11             Finally, there is evidence that FXCM comprised 50 to

12   80 percent of Effex's revenues as late as 2014.

13             These facts speak to FXCM's control over Effex and the

14   extent to which Effex was able to pursue its own interests.

15   They thus create a genuine dispute as to whether FXCM violated

16   GAAP by failing to disclose its transactions with Effex as

17   material related-party transactions—and financial statements

18   that are not prepared in accordance with GAAP are presumptively

19   misleading or inaccurate.

20             FXCM also relies on Ernst & Young's opinion that FXCM

21   did not need to disclose Effex as a related party, even after

22   the firm became aware of the regulatory settlements.

23             But there is no rule FXCM cites that an auditor's

24   opinion on whether GAAP was violated is conclusive on that

25   issue.  While this memo supports FXCM's position, it will be

M8J8GLOD

1    weighed by the fact finder against contrary evidence.  Further,

2    in reaching its GAAP opinion, Ernst & Young concluded that "the

3    option was never in force or effect," an issue on which there

4    is a genuine dispute.

5           Given this finding, I need not consider whether there

6    is evidence that Effex was a VIE.

7           Third, in light of all this evidence, a juror could

8    conclude that FXCM made false or misleading statements by

9    stating it operated under an agency model.

10          The evidence of a profit-sharing agreement suggests

11   that FXCM benefited when Effex benefited.  And Effex, in turn,

12   traded opposite FXCM's retail customers and had the potential

13   to benefit from customer losses.  Thus, there is evidence that

14   FXCM effectively benefited from its customer losses, which

15   contravenes the concept underlying the agency model of trading.

16          In other words, even if FXCM still met the formal

17   requirements of an agency model, telling investors it operated

18   under an agency model could have created a misleading

19   impression that FXCM had nothing to gain based on whether its

20   customers won or lost trades.

21          Plaintiffs have also shown sufficient evidence of

22   scienter.

23          One method by which a plaintiff may show scienter is

24   by raising strong circumstantial evidence of conscious

25   misbehavior or recklessness.

M8J8GLOD

1        The Second Circuit has defined reckless conduct as

2   "conduct which is highly unreasonable and which represents an

3   extreme departure from the standards of ordinary care, to the

4   extent that the danger was either known to the defendant or so

5   obvious that the defendant must have been aware of it."  That's

6   from the *Rolf* case, 570 F.2d 38, at 47.  Facts that meet this

7   standard include defendants' knowledge of facts or access to

8   information contradicting their public statements.

9        The record contains evidence that Niv and Ahdout, who

10  signed the financial statements with the alleged misstatements,

11  knew (1) that the payments from Effex were profit-sharing

12  payments, (2) the facts relevant to FXCM's control over Effex,

13  and (3) that through its relationship with Effex, FXCM was not

14  truly operating under an agency model.  Namely, Niv and Ahdout

15  were parties to most of the communications and documents

16  discussed above that detailed the nature of the relationship

17  between Effex and FXCM.  Knowledge of these facts contradicting

18  FXCM's public statements satisfies the scienter standard.

19       Evidence of Niv's and Ahdout's actions and scienter

20  may be imputed to FXCM.

21       I think that there is someone on the line who actually

22  may have not muted their phone.  So I am just going to ask you

23  to do so when you're not speaking, please.

24       Next, I will briefly address FXCM's argument that

25  Ernst & Young's audits of its financial statements preclude a

M8J8GLOD

1    finding of scienter.  Although good faith reliance on the

2    advice of an accountant has been recognized as a viable defense

3    to scienter, to establish the defense, the defendant should

4    show that he/she/it made a complete disclosure, sought the

5    advice as to the appropriateness of the challenged conduct,

6    received advice that the conduct was appropriate, and relied on

7    that advice in good faith.

8            Here, there are disputes as to whether Ernst & Young

9    had all the relevant information.  Plaintiffs point to an

10   e-mail from Niv in which he instructs other employees not to

11   mention the option contract to Ernst & Young.  And deposition

12   testimony from an Ernst & Young auditor indicates that the firm

13   was not aware of FXCM's prior employment relationship with

14   Dittami, or the 70/30 split those parties agreed on, until 2015

15   or 2016.  Thus, Ernst & Young's approval of FXCM's financial

16   statements is not determinative.

17           Plaintiffs have also shown sufficient evidence of loss

18   causation.

19           Loss causation is analogous to the common law concept

20   of proximate cause and requires that plaintiffs show that their

21   loss was caused by the fraud and not by other intervening

22   events.

23           Under the corrective disclosure theory of loss

24   causation, a plaintiff must show that the market reacted

25   negatively to a corrective disclosure, which revealed an

M8J8GLOD

alleged misstatement's falsity or disclosed that allegedly
material information had been omitted.  Under the
"materialization of risk" theory, the plaintiff must show that
the alleged misstatement conceals a condition or event which
then occurs and causes the plaintiff's loss.

To the extent plaintiffs raise a "materialization of
risk" theory and characterize the risk as the risk of
regulatory penalties, this theory fails.  The risk must be
concealed by the misrepresentations and omissions alleged.
That's from *Lentell v. Merrill Lynch*, 396 F.3d 161, at 173.
But false or misleading statements create a risk of regulatory
penalties.

But plaintiffs also rely on corrective disclosure,
arguing that loss causation can be shown by the market reaction
to the February 2017 announcements disclosing the alleged
fraud.

As a threshold matter, the settlement announcements
can be corrective disclosures despite being "no admit, no
deny."  Courts have previously concluded that announcements of
SEC investigations, which precede any findings of fact, are
corrective disclosures.  *See In re Bristol-Myers Squibb*, 586
F.Supp.2d 148, at 164, and *In re Take-Two Interactive Sec.*
*Litig.*, 551 F.Supp.2d 247, at 282.

As a second threshold point, a juror could find that
the disclosures revealed the alleged GAAP violations.  The CFTC

M8J8GLOD

1    release stated that Effex remained closely aligned with FXCM,

2    received special trading privileges, benefited from a

3    no-interest loan provided by FXCM, worked out of FXCM's

4    offices, and used FXCM employees to conduct its business.  It

5    also stated that FXCM actually supported and controlled Effex.

6    These statements are sufficient to inform the market that Effex

7    was a related party.

8            Plaintiffs do, however, have the burden to

9    disaggregate losses caused by disclosures of the truth behind

10   the alleged misstatements from losses caused by

11   non-fraud-related factors, including changed economic

12   circumstances, changed investor expectations, new

13   industry-specific or firm-specific facts, conditions, and other

14   events.

15           FXCM argues that plaintiffs have failed to

16   disaggregate losses that were caused not by the disclosure of

17   the alleged fraud, but by the disclosure of the regulatory

18   penalties.  Plaintiffs contend that the penalties are not

19   confounding events.

20           I am inclined to allow a jury to decide whether or not

21   these are confounding events that needed to be disaggregated.

22   Unlike events that are undisputedly confounding, such as

23   misstatements by third parties, or a CEO's resignation that

24   could have been caused by a variety of factors, the regulatory

25   penalties here are closely connected to the alleged fraud

M8J8GLOD

1    itself and to the disclosure of that fraud.  Indeed, one could

2    argue that the severity of the regulatory penalties imposed was

3    tied to the nature and severity of the alleged misstatements.

4    In other words, it is not out of the question that a reasonable

5    jury could find that the regulatory penalties relate to the

6    subject or content of the alleged misstatements.

7            Although the *Barclays* case could be read to suggest

8    that losses from regulatory penalties in response to a fraud

9    should be disaggregated from the losses caused by disclosure of

10   that fraud, the court ultimately concluded that defendant's

11   argument to this effect involved questions of fact.  I will

12   also note that this question was not properly before the court

13   given its remand order.

14           Because plaintiffs' theory is that these losses did

15   not need to be disaggregated, Dr. Werner's analysis will be

16   helpful to the jury if they agree with that theory, and thus

17   should not be excluded.

18           Indeed, when rejecting a challenge to the jury's

19   verdict in the *Vivendi* case, Judge Scheindlin explained that

20   the credibility of expert testimony that there simply were no

21   confounding events was a matter for the jury, and that a

22   reasonable juror could have found that none of the ostensible

23   confounding events put forth by Vivendi were both non-fraud

24   related and affected Vivendi's share price——further supporting

25   that these are questions for a jury to decide.

M8J8GLOD

1          Even if the losses caused by the penalties must be

2    disaggregated from the losses caused by the disclosure, I am

3    not persuaded that this would require granting summary.

4          In *Gould v. Winstar Communications*, 692 F.3d 148, the

5    Second Circuit rejected the argument that summary judgment must

6    be granted in the face of evidence that declines in stock price

7    may have been caused by other facts, holding that such facts,

8    if established, hardly foreclose the reasonable inference that

9    some part of the decline was substantially caused by the

10   disclosures about the fraud itself and concluding that a jury

11   reasonably could find the requisite causal link between the

12   misconduct and the harm suffered.  I find this case analogous,

13   as a juror could find that at least some of the stock price

14   drop was due to the disclosure of the fraud itself, rather than

15   due to other factors.

16          Similarly, the Second Circuit in *Vivendi* concluded

17   that an expert's testimony was relevant as to loss causation

18   because the total amount of actual inflation that he identified

19   was the maximum amount of loss potentially caused by Vivendi's

20   alleged misstatements.  838 F.3d at 260.  The court explained

21   that it was up to the jury to determine how much, if any, of

22   the artificial inflation identified by the expert was caused by

23   Vivendi's alleged fraud.

24          And in considering the jury's verdict in the *Vivendi*

25   case, Judge Scheindlin accepted the possibility that a jury's

M8J8GLOD

reduction of a plaintiff's expert's damages calculation could
have been based in whole or in part on the conclusion that some
of the defendant's expert's confounding events should have been
factored into plaintiff's expert's analysis.  923 F.Supp.2d at
519, n.49.

        These cases suggest that even in complex securities
litigation, the jury has the capability of disaggregating
confounding factors, and that a damages calculation that does
not fully disaggregate may still be helpful to a jury so long
as the evidence allows the jury to ascribe some rough
proportion of the losses to the fraud.

        *Omnicom*, on which FXCM relies, is distinguishable in
the Court's view.  There, the court granted summary judgment
when an expert failed to draw the requisite causal connection
between a corrective disclosure and the alleged fraud because
his event study merely linked the decline in the value of the
company's stock to various events.  597 F.3d 501, at 512.  But
key to the court's ruling was that the alleged corrective
disclosure contained no new information that could have caused
the loss.  Indeed, the court stated that summary judgment is
appropriate only if a plaintiff cannot show that at least some
of the price drop was due to the fraud.  That's 510, n.3.
Here, a reasonable juror could find that at least some rough
proportion of the decline in stock price was caused solely by
that disclosure.

1          In short, as the district court in one of the *Vivendi*

2     cases observed, "Plaintiffs need only prove that they suffered

3     some damage from the fraud.  Liability obviously does not hinge

4     on how much damage."  And that's 634 F.Supp.2d 352, 364.

5          Finally, plaintiffs have raised sufficient evidence of

6     the loss itself.  FXCM's arguments regarding the propriety of

7     Dr. Werner's methodologies, specifically, his constant-dollar

8     methodology, are better suited to challenging his credibility

9     at trial.

10         And to the extent FXCM continues to rely on the

11    *Comcast* case——which concerns class certification——in its loss

12    and loss causation arguments, this Court already rejected

13    FXCM's reliance on *Comcast* when ruling on class certification.

14         Next, while it presents a somewhat closer question, I

15    am also denying summary judgment with respect to individual

16    plaintiff 683 Capital.

17         First, there is evidence that 683 Capital relied on

18    the alleged misstatements.  "To prove reliance, the plaintiff

19    must show that but for the material misleading statement or

20    omission, she would not have transacted in the security."

21    That's a quote from one of the *Vivendi* cases, 183 F.Supp.3d,

22    458, 463.  The traditional and most direct way a plaintiff can

23    demonstrate reliance is by showing that he was aware of a

24    company's statement and engaged in a relevant transaction based

25    on that specific misrepresentation.

1          683 Capital's 30(b)(6) representative, Joseph Patt,

2     testified that he reviewed the relevant financial statements.

3     And when Patt was asked whether his investment decision would

4     have changed had FXCM disclosed its relationship with Effex,

5     Patt responded:  "I probably would have -- might have paid a

6     lower price, I don't know.  It might have been willing to pay a

7     lower price, probably.  Because it wasn't what we thought it

8     was.  We thought it was an agency business that was providing

9     leverage.  Instead it was something else with a lot of risk to

10    potentially operating."  And that's exhibit 184, page 151, line

11    9, through 152, line 5.

12         While this is far from the strongest evidence of

13    reliance, it is sufficient to survive summary judgment.

14         Second, I am not persuaded that Dr. Werner's loss

15    causation analysis is irrelevant to 683 Capital's losses.  FXCM

16    argues that an event study is irrelevant to determining loss

17    causation on the FXCM notes, because plaintiffs failed to

18    establish that those notes traded in an efficient market.  FXCM

19    relies on its own expert, as well as a scholarly article

20    stating that "event study methodology is founded on the

21    efficient market hypothesis."  But as another court has noted,

22    "the statement that 'event study methodology has its foundation

23    in the efficient market hypothesis' does not equate with the

24    argument that the stock must trade in an efficient market in

25    order for an event study to have some relevance."  *See In re*

M8J8GLOD

1    *Lawrence*, 2008 WL 6786807, at *3.  What FXCM is raising appears

2    to be a legitimate dispute in the field, on which Dr. Werner

3    takes an opposing position, and that should be resolved by a

4    jury.

5            Plaintiffs' Section 20(a) claim survives summary

6    judgment.  To show control person liability under Section

7    20(a), a plaintiff must show (1) a primary violation by the

8    controlled person, (2) control of the primary violator by the

9    defendant, and (3) that the defendant was, in some meaningful

10   sense, a culpable participant in the controlled person's fraud.

11   For the reasons discussed, plaintiffs have raised evidence of a

12   primary violation, control of the primary violators by the

13   defendant, and defendants' culpable participation.

14           Finally, I am denying the motions to seal because the

15   parties do not explain in their letter motions what

16   countervailing privacy interests defeat the *Lugosch* presumption

17   of access.  The parties merely cite the privacy they expected

18   when entering into the confidentiality stipulation, but that

19   stipulation explicitly stated that confidential documents would

20   be subject to the Court's requirement for filing documents

21   under seal.  So that's insufficient.

22           This ruling supersedes my prior rulings allowing the

23   temporary sealing of these documents.

24           So the parties shall file unredacted and unsealed

25   versions of their papers on the docket in the coming days.

M8J8GLOD

1      So that's my ruling.  Thank you again for your

2  patience today.  Thank you to the court reporter.  Again, you

3  all should reach out to the court reporter's office to get a

4  copy of the transcript so that you have the ruling for your

5  review.

6      I think what makes sense in terms of next steps is for

7  the parties to meet and confer and submit a letter to me in,

8  let's say a week from today, proposing next steps in the

9  litigation, including your availability for trial.  To the

10 extent -- and again, we are on a public line, of course, that

11 is open to the press and the public, but to the extent that you

12 want to engage in settlement discussions, I would be happy to

13 make a referral either to the magistrate judge assigned to the

14 case or to the mediation program.  But I am going to leave that

15 to you to tell me what the most productive next step would be.

16     All right.  With all of that said, are there any

17 questions or applications?

18     MR. LaPOINTE:  Your Honor, in your discussion

19 specifically of plaintiffs' burden to disaggregate, you said at

20 one point, or I think I heard you say at one point that part of

21 Dr. Werner's opinion should be excluded, but the rest of the

22 discussions suggest to me that you intended to say should not

23 be excluded.  Can you just clarify your ruling whether that

24 portion of the report should be excluded or not?

25     THE COURT:  Give me one second.

M8J8GLOD

1          MR. LaPOINTE:  This is in the discussion of *Barclays*

2     and just before *Gould* and *Vivendi*.

3          THE COURT:  With respect to Werner, I don't think I

4     excluded any of Werner's reports, testimony, or opinions.  My

5     analysis of Barron was more nuanced.  But with respect to

6     Werner, none of it is being excluded.

7          MR. LaPOINTE:  Thank you, your Honor.

8          THE COURT:  I think the sections that you just

9     referenced were about Barron and not about Werner.  I think it

10    would be helpful for you to go through the transcript, and if

11    you do have any questions following your review of the

12    transcript, I would be happy to address them for clarity.

13         OK.  Thank you.  I will expect a letter no later than

14    a week from today.  And enjoy your weekend.  Be well.

15         (Adjourned)

16

17

18

19

20

21

22

23

24

25