UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| In re Global Brokerage, Inc. f/k/a FXCM, Inc. Securities Litigation | Master File No. 1:17-cv-00916-RA<br><br>CLASS ACTION |
| This Document Relates To: All Actions | |

**DEFENDANTS' REPLY IN SUPPORT OF THEIR MOTION TO CERTIFY THE COURT'S AUGUST 17, 2022 ORDER FOR INTERLOCUTORY APPEAL**

Israel Dahan
Peter Isajiw
Ryan Gabay
KING & SPALDING LLP
1185 Avenue of the Americas
New York, New York 10036-2601
Tel: (212) 556.2100
Fax: (212) 556.2200

Chelsea Corey
KING & SPALDING LLP
300 S. Tryon Street, Suite 1700
Charlotte, North Carolina 28202
Tel: (704) 503.2575
Fax: (704) 503.2622

*Attorneys for Defendants Global Brokerage, Inc. f/k/a/ FXCM, Inc., Dror Niv, and William Ahdout*

## TABLE OF CONTENTS


TABLE OF AUTHORITIES ........ ii

INTRODUCTION ........ 1

ARGUMENT ........ 2

I. This Court Should Certify Its Order on Loss Causation for Interlocutory Appeal ........ 2

A. Whether Plaintiffs Can Recover Losses Under the Securities Laws That Result From Regulatory Penalties Is a Controlling Question of Law ........ 2

B. There Is Substantial Ground for Difference of Opinion Over Whether, as a Matter of Law, Plaintiffs Can Recover Losses Caused by Regulatory Penalties ........ 6

C. Immediate Appeal Would Advance the Ultimate Termination of This Litigation and Promote the Public Interest ........ 9

CONCLUSION ........ 10

## TABLE OF AUTHORITIES

### CASES

*Atlantica Holdings, Inc. v. Sovereign Wealth Fund Samruk-Kazyna JSC*,
477 F. Supp. 3d 88 (S.D.N.Y. 2020) ... 7

*Cal. Div. of Labor Standards Enforcement v. Dillingham Constr., N.A.*,
519 U.S. 316 (1997) ... 3

*Capitol Recs., LLC v. Vimeo, LLC*,
972 F. Supp. 2d 537 (S.D.N.Y. 2013) ... 3

*Caruso v. City of New York*,
2013 WL 656978 (S.D.N.Y. Dec. 12, 2013) ... 10

*Castellano v. Young & Rubicam, Inc.*,
257 F.3d 171 (2d Cir. 2001) ... 4

*Dura Pharms., Inc. v. Broudo*,
544 U.S. 336 (2005) ... 4, 9

*Flo & Eddie, Inc. v. Sirius XM Radio, Inc.*,
821 F.3d 265 (2d Cir. 2016) ... 3

*Gould v. Winstar Commc'ns, Inc.*,
692 F.3d 148 (2d Cir. 2012) ... 5, 6

*Gruber v. Gilbertson*,
2022 WL 4232834 (S.D.N.Y. Sept. 14, 2022) ... 8, 9

*In re Advanced Battery Techs., Inc. Sec. Litig.*,
2012 WL 3758085 (S.D.N.Y. Aug. 29, 2012) ... 7

*In re Fortune Sys. Sec. Litig.*,
680 F. Supp. 1360 (N.D. Cal. 1987) ... 9

*In re Omnicom Grp., Inc. Sec. Litig.*,
541 F. Supp. 2d 546 (S.D.N.Y. 2008),
*aff'd*, 597 F.3d 501 (2d Cir. 2010) ... 5, 8

*In re Sci. Atlanta, Inc. Sec. Litig.*,
754 F. Supp. 2d 1339 (N.D. Ga. 2010) ... 7, 8

*In re Williams Sec. Litig.-WCG Subclass*,
558 F.3d 1130 (10th Cir. 2009)),
*aff'd sub nom. Phillips v. Sci.-Atlanta, Inc.*, 489 F. App'x 339 (11th Cir. 2012) ... 7

*Lentell v. Merrill Lynch & Co.*,
396 F.3d 161 (2d Cir. 2005) ... 3, 7

*Lynn v. Monarch Recovery Mgmt., Inc.*,
953 F. Supp. 2d 612 (D. Md. 2013) ... 10

*Primavera Familienstifung v. Askin*,
139 F. Supp. 2d 567 (S.D.N.Y. 2001) ... 4

*SEC c. Rio Tinto PLC*,
2021 WL 1893165 (S.D.N.Y. May 11, 2021) ... 10

*Suez Equity Invs., L.P. v. Toronto-Dominion Bank*,
250 F.3d 87 (2d Cir. 2001) ... 3

**STATUTES**

28 U.S.C. § 1292 ... 1, 2, 6, 9

## INTRODUCTION

Defendants Global Brokerage, Inc. f/k/a FXCM, Inc., Dror Niv, and William Ahdout file this reply in support of their motion to certify this Court's August 17, 2022 order denying summary judgment on loss causation for interlocutory appeal. Although Plaintiffs oppose certification, their opposition fails to meaningfully grapple with the requirements of § 1292(b). This Court should grant certification for the Second Circuit to consider whether a plaintiff may recover losses that result from regulatory penalties imposed on a defendant because of the alleged securities fraud.

At the outset, Plaintiffs' opposition attempts to obscure the presence of a controlling legal question—§ 1292(b)'s first prong—by repeatedly attempting to reframe the issue as whether regulatory penalties were "sufficiently *related* to the fraud," rather than whether they were a risk concealed by the alleged fraud. Opp. 4; *see also id.* 10, 15, 17, 18 (emphasis added). But whether something "relates" to fraud and whether it is a risk concealed by fraud are different questions. And the Second Circuit has repeatedly explained that for loss causation to be satisfied, a risk *concealed by* fraud must have caused the loss. That legal question is the provenance of the judge, not the jury. Plaintiffs also do not engage with Defendants' arguments that permitting recovery for losses caused by fraud-related regulatory penalties could chill settlements and undermine the rule that a company does not have to disclose it is under investigation.

Plaintiffs' effort to contest § 1292's second prong, that there is substantial ground for a difference of opinion over the Court's resolution of these issues, is equally unavailing. Plaintiffs do not even bother to address *Barclays*, which this Court acknowledged "could be read to suggest that losses from regulatory penalties in response to a fraud should be disaggregated from the losses caused by disclosure of that fraud." Aug. 19, 2022 Hr'g Tr. 15:7–10 (ECF 322-1). And while Plaintiffs trot out a litany of cases for general principles of securities law, none of their cases address the specific issue of regulatory penalties and loss causation.

Finally, as for § 1292(b)'s final prong of whether an interlocutory appeal will materially advance the ultimate termination of the case, Plaintiffs' complaints about delay are unwarranted. Every interlocutory appeal causes some delay; the issue is whether it will advance the termination of this case. There is no reason to have the parties, the public, and the Court incur enormous litigation costs that will be wholly unnecessary if the Second Circuit decides that penalty-related losses cannot be recovered.

## ARGUMENT

### I. This Court Should Certify Its Order on Loss Causation for Interlocutory Appeal[1]

#### A. Whether Plaintiffs Can Recover Losses Under the Securities Laws That Result From Regulatory Penalties Is a Controlling Question of Law

Plaintiffs acknowledge, as they must, that § 1292(b)'s first requirement is met by the presence of a controlling legal question. *See* Opp. 8, 10. Plaintiffs' ability (or inability) to recover losses under the securities laws that result from regulatory penalties imposed on FXCM is a pure legal question that will control whether Plaintiffs can prevail at trial. *See* Mem. 5–7. While Plaintiffs vigorously dispute this, none of their rejoinders is availing.

*The Motion Presents a Question of Law.* Plaintiffs' opposition begins with a long recitation of cases that stand for the general proposition that an interlocutory appeal must involve a question of law. *See* Opp. 8–9. No one disputes that requirement—and none of the general principles of law that Plaintiffs cite addresses the specific question of whether penalty-related losses can establish loss causation. Nor is the motion's summary judgment posture an impediment to interlocutory review. *Contra* Opp. 9. Courts in this district—including this Court—routinely

[1] Plaintiffs open their opposition with a lengthy discussion about motions for reconsideration. That discussion is misplaced and irrelevant, as FXCM did not move for reconsideration. But if this Court were to sua sponte reconsider its summary judgment order, FXCM assumes an appeal (this time by Plaintiffs) would follow.

certify interlocutory appeals from questions presented in a motion for summary judgment. *E.g.*, *Capitol Recs., LLC v. Vimeo, LLC*, 972 F. Supp. 2d 537, 552 (S.D.N.Y. 2013) (Abrams, J.); *see also Flo & Eddie, Inc. v. Sirius XM Radio, Inc.*, 821 F.3d 265, 268 (2d Cir. 2016).

When Plaintiffs eventually turn to the merits, Plaintiffs' basic response is to recast FXCM's legal question as whether losses stemming from regulatory penalties *relate* to fraud. Opp. 8. But whether a loss is *caused* by a misstatement or omission (the legal standard) is a different question from whether the loss might "relate" to the misstatement.[2] *Accord Cal. Div. of Labor Standards Enforcement v. Dillingham Constr., N.A.*, 519 U.S. 316, 335 (1997) (Scalia, J., concurring) ("[A]pplying the 'relate to' provision according to its terms was a project doomed to failure, since, as many a curbstone philosopher has observed, everything is related to everything else.").

The question of whether a plaintiff can recover for "losses" that result from financial penalties imposed as a consequence of securities fraud, rather than from the fraud itself, is a legal question. The question turns on a legal determination of whether regulatory penalties constitute "information misstated or concealed." *Lentell v. Merrill Lynch & Co.*, 396 F.3d 161, 174 (2d Cir. 2005). To answer that question, the Second Circuit will look to other kinds of cases that have discussed information concealed from the market and legal policy considerations—not anything in the factual record in this case. *Contra* Opp. 8–9. For example, the Second Circuit may decide that penalty-related losses bear no resemblance to the types of information concealed from the market that courts typically consider when assessing loss causation. *E.g.*, *Suez Equity Invs., L.P. v. Toronto-Dominion Bank*, 250 F.3d 87, 98 (2d Cir. 2001) (finding that a CEO's "concealed lack of managerial ability" induced the company's failure). It might also weigh the Supreme Court's

[2] The Court's oral decision incorrectly described the standard as whether regulatory penalties "relate" to a misstatement. Aug. 19, 2022 Hr'g Tr. 14:15–15:6 ("a reasonable jury could find that the regulatory penalties relate to the subject or content of the alleged misstatements.").

warning against expanding the securities laws beyond their common-law roots, given that no other court appears to have held that regulatory penalties can satisfy loss causation. *Dura Pharms., Inc. v. Broudo*, 544 U.S. 336, 345 (2005) (warning that "the uniqueness of [a] perspective"—*i.e.*, its novelty—"argues against the validity of its approach," given the securities laws' "roots in the common law"). And it may decide that "legal policy considerations"—such as a desire not to chill settlements or to undermine the rule that a company need not disclose it is under investigation—counsel against permitting regulatory penalties to be the basis for a securities claim. *Castellano v. Young & Rubicam, Inc.*, 257 F.3d 171, 186 (2d Cir. 2001) (applying "legal policy considerations").

*The Issue Is Controlling.* The issue raised in FXCM's motion is also "controlling," because reversal of the district court's order would either terminate the action or (at a minimum) "significantly affect the conduct of the action." *Primavera Familienstifung v. Askin*, 139 F. Supp. 2d 567, 570 (S.D.N.Y. 2001). Plaintiffs do not dispute that certifying FXCM's motion for interlocutory appeal would avoid the prospect of a second trial and streamline the issues to be presented at trial, in the event the Second Circuit did not order summary judgment for FXCM. *Cf.* Opp. 10–14. Because Plaintiffs do not contest this aspect of FXCM's motion, that suffices to find that the question presented for appeal could "significantly affect the conduct of the action."

Even if this Court were to consider whether reversal of its order would terminate this litigation, Plaintiffs would fare no better. *Contra* Opp. 10–13. Plaintiffs' expert made no effort to separate losses caused by steep regulatory penalties from those caused by more relevant information. Instead, their expert tossed everything together on the view that the penalty-related losses were "inextricable ramifications" of fraud. Opp. 4 (acknowledging point); *see also* Werner Report ¶¶ 8, 45, 46, 54, 84. If the Second Circuit disagrees, Plaintiffs have no evidence to show whether the alleged fraud caused any losses once the regulatory penalties are extricated.

That finding would terminate this litigation because disaggregation was *Plaintiffs'* burden to satisfy. Indeed, Plaintiffs acknowledge *Omnicom*—which granted summary judgment because the plaintiff's expert failed to disaggregate confounding factors from the corrective disclosures at issue—but make only a half-hearted attempt to distinguish it. *See* Opp. 12–13 (citing *In re Omnicom Grp., Inc. Sec. Litig.*, 541 F. Supp. 2d 546, 554 (S.D.N.Y. 2008), *aff'd*, 597 F.3d 501 (2d Cir. 2010)). *Omnicom* explained that because "the law requires the disaggregation of confounding factors, disaggregating only *some* of them cannot suffice to establish that the alleged misrepresentations actually caused Plaintiffs' loss." 541 F. Supp. 2d at 554. Here, Plaintiffs' expert made no effort to determine what portion (if any) of the price decline was caused by the revelation concerning FXCM's former financial relationship with Effex. Although Plaintiffs suggest that some "rough proportion" of the stock price decline could be attributed to that relationship (Opp. 13), Plaintiffs do not point to any evidence in support. And, indeed, given that FXCM's supposed financial relationship with Effex ended three years before the disclosure and thus would not have been material to investors at the time of the disclosure, common sense suggests that *none* of the price decline is attributable to the disclosure of that relationship and *all* of the decline is attributable to other factors, such as the imposition of regulatory penalties.

*Winstar*, on which Plaintiffs principally rely to avoid this conclusion, is no help. Opp. 11–12 (citing *Gould v. Winstar Commc'ns, Inc.*, 692 F.3d 148 (2d Cir. 2012)). In that case, the defendant argued that declines in its stock price were caused by a bank's cancellation of its credit facility, rather than fraud. *Gould*, 692 F.3d at 161–62. The problem with this argument, however, was that the decline in Winstar's share price happened before the credit facility was canceled. From March 2001 to "mid-April 2001," Winstar's shares fell from over $10 per share to $0.14 per share following disclosures by an investment firm of Winstar's questionable accounting practices.

*Id.* at 157. Winstar did not reveal that its credit facility had been canceled until April 16, 2001—after its stock had already dropped precipitously. *Id.* Given this timing, the defendant's argument about the credit facility could "hardly foreclose the reasonable inference that some part of the decline was substantially caused by the disclosures about the fraud itself." *Id.* at 162. In stark contrast, the regulatory penalties in this case were disclosed on the same day that FXCM disclosed facts about the supposed fraud—not weeks later, after FXCM's stock had declined.

**B. There Is Substantial Ground for Difference of Opinion Over Whether, as a Matter of Law, Plaintiffs Can Recover Losses Caused by Regulatory Penalties**

Plaintiffs' opposition concedes that § 1292(b)'s second requirement—a substantial ground for a difference of opinion—is satisfied if there is conflicting authority about a legal question or if an "issue is particularly difficult and of first impression for the Second Circuit." Opp. 14. Yet Plaintiffs do not identify a single case holding that penalty-related losses may be considered as part of loss causation. That speaks volumes about the substantial ground for a difference of opinion over whether penalty-related losses satisfy loss causation.

As an initial matter, Plaintiff's opposition does not address the Second Circuit's decision in *Barclays*, which, as this Court acknowledged, "could be read to suggest that losses from regulatory penalties in response to a fraud should be disaggregated from the losses caused by disclosure of that fraud." Aug. 19, 2022 Hr'g Tr. 15:7–10. Nor do Plaintiffs make any effort to reconcile this Court's treatment of the "materialization of the risk" theory with the "corrective disclosure" theory. Opp. 16. As FXCM explained, those theories are just different ways to prove loss causation. If penalty-related losses do not result from the concealed risk, plaintiffs should not be able to recover those losses and should be required to disaggregate them, regardless of whether they proceed on a "materialization of the risk" or "corrective disclosure" theory.

Instead of responding to any of these points, Plaintiffs instead seek solace in a hodgepodge of cases that comprise "the Second Circuit's framework for analyzing loss causation." Opp. 15. Those cases, however, just reinforce FXCM's argument. Loss causation focuses on "the causal link between the alleged misconduct and the economic harm ultimately suffered." Opp. 15 (citing *Lentell*, 396 F.3d at 172). Regulatory penalties are not themselves "the alleged misconduct" because they are not the information concealed from or misrepresented to investors. And for that reason, they must be disaggregated. In fact, other courts in this district have emphasized that loss causation is concerned with information "concealed" from the market and that a plaintiff must disaggregate confounding factors. *See Atlantica Holdings, Inc. v. Sovereign Wealth Fund Samruk-Kazyna JSC*, 477 F. Supp. 3d 88, 110 (S.D.N.Y. 2020); *In re Advanced Battery Techs., Inc. Sec. Litig.*, 2012 WL 3758085, at *13 (S.D.N.Y. Aug. 29, 2012). Plaintiff's opposition makes no effort to consider or address these cases at all. While Defendants believe that these cases (and *Barclays*) already stand for the proposition that penalty-related losses must be disaggregated, at a minimum they create substantial ground for a difference of opinion.

Switching gears, Plaintiffs next challenge whether there is a substantial dispute over whether a "jury is capable of disaggregating confounding factors." Opp. 16–21. They acknowledge, as they must, that courts in other circuits have required plaintiffs to disaggregate confounding factors before presenting loss causation to the jury. Without evidence of disaggregation, the "jury's conclusion as to whether the loss resulted from the fraud as opposed to other factors 'would be no less speculative and unreliable if reached by jurors than when reached by [plaintiffs' expert].'" *In re Sci. Atlanta, Inc. Sec. Litig.*, 754 F. Supp. 2d 1339, 1373 (N.D. Ga. 2010) (quoting *In re Williams Sec. Litig.-WCG Subclass*, 558 F.3d 1130, 1143 (10th Cir. 2009)), *aff'd sub nom. Phillips v. Sci.-Atlanta, Inc.*, 489 F. App'x 339 (11th Cir. 2012) (per curiam)).

Plaintiffs do not contest this basic legal point—instead, they "vigorously dispute that the regulatory penalties are 'confounding information.'" Opp. 18. But that says nothing about whether or how a jury would have a basis to assess loss causation if confounding information is *not* disaggregated. And there is a substantial dispute over that question. *See Sci. Atlanta*, 754 F. Supp. at 1373 (confounding factors must be disaggregated); *see also Omnicom Grp.,* 541 F. Supp. 2d at 554 (summary judgment because plaintiff failed to disaggregate confounding factors).

Plaintiffs' reliance on *Gruber v. Gilbertson*, 2022 WL 4232834, at *10 (S.D.N.Y. Sept. 14, 2022), fares no better. Opp. 18–20. *Gruber* acknowledges that a plaintiff "cannot recover for losses caused by factors other than [the defendant's] fraud." 2022 WL 4232834, at *10. Because of this, "securities fraud plaintiffs must prove that their loss was caused by the revelation of the fraud (or risks concealed by it), rather than other factors." *Id.* This is exactly what Defendants argue here. The question for certification is whether regulatory penalties are a risk concealed by fraud, rather than a consequence of fraud. If the Second Circuit agrees that regulatory penalties are not a risk concealed by fraud, then Plaintiffs must disaggregate them. *Id.*

Continuing to cite *Gruber*, Plaintiffs also observe that a plaintiff satisfies its disaggregation obligation if there is a "factual basis for concluding that there were no company-specific disclosures concerning non-fraudulent information that would have affected [the company's] stock price." Opp. 18. Here, Plaintiffs' expert candidly declined to extricate the regulatory penalties from the other factors he considered in his analysis. If the Second Circuit were to conclude that regulatory penalties are not a risk concealed by fraud, there would be no "factual basis" to conclude that the regulatory penalties did not affect the company's stock. Moreover, the expert in *Gruber* actually "regressed [the defendant's] stock price against a number of other market and industry variables." *Gruber*, 2022 WL 4232834, at *11. Plaintiffs' expert, by contrast, did not.

Finally, Plaintiffs seek to avoid their obligation to show that a supposed falsity actually caused a loss (Opp. 19–20)—a requirement reflected in their own cases. *See Gruber*, 2022 WL 4232834, at *10 (a plaintiff "cannot recover for losses caused by factors other than [the defendant's] fraud."). A plaintiff cannot plead one thing as the fraud (here, an undisclosed relationship between FXCM and Effex) and then seek to establish loss causation through another (penalties from a no-admit settlement) simply by asserting it "relates to" the fraud. To permit this would impermissibly water down the standard to prove (and plead) securities fraud.

### C. Immediate Appeal Would Advance the Ultimate Termination of This Litigation and Promote the Public Interest

Finally, Plaintiffs dispute whether certifying this issue for interlocutory appeal will materially advance the ultimate termination of the litigation, § 1292(b)'s third requirement. Opp. 21–24. But as FXCM explained, prompt resolution of the question whether penalty-related losses must be disaggregated would conserve significant judicial and party resources by obviating the need for a long trial (or retrial). That is all that is required to satisfy this element.

Plaintiffs appear to believe that a retrial would not be necessary because a loss-causation ruling "would affect only the amount of damages—not the existence of liability or damages." Opp. 22. Not so. Loss causation is a central element to whether a defendant is liable at all for violating the securities laws. *E.g.*, *Dura*, 544 U.S. at 346 (discussing "the traditional elements of causation and loss"); *In re Fortune Sys. Sec. Litig.*, 680 F. Supp. 1360, 1369 (N.D. Cal. 1987) ("Plaintiffs ignore the fact that 'loss causation' is an element that must be proven *before* plaintiffs are entitled to recover anything in this action."). If the Second Circuit were to agree that penalty-related losses may not be recovered, that would require vacating any judgment Plaintiffs might win against Defendants, because Plaintiffs' expert made no effort to separate losses caused by the disclosure of the alleged fraud from losses caused by the regulatory penalties.

Plaintiffs also suggest that an interlocutory appeal will unnecessarily delay this litigation. *See* Opp. 21–23. But that misapprehends the issue. Every interlocutory appeal creates some delay in the underlying district court litigation. The question is whether an early appeal "will materially advance the ultimate termination of the litigation." *Lynn v. Monarch Recovery Mgmt., Inc.*, 953 F. Supp. 2d 612, 626 (D. Md. 2013). If this case proceeds to trial, and the Second Circuit then determines that Plaintiffs failed to carry their burden to disaggregate damages because they cannot recover for losses caused by regulatory penalties, the trial would have been for waste. Moreover, the issue of whether penalty-related losses must be disaggregated will be a part of any appeal in this matter. Accordingly, because this issue will be briefed, argued, and adjudged at some point, the question is whether the parties and the Court should expend significant resources on a lengthy trial before it is decided. There are good reasons to save everyone's time and funds and decide the issue now. And Plaintiffs do not dispute that immediate interlocutory may "significantly affect the parties' bargaining positions and may hasten the termination of this litigation through settlement." *SEC c. Rio Tinto PLC*, 2021 WL 1893165, at *3 (S.D.N.Y. May 11, 2021).

Plaintiffs' primary authority, *Caruso v. City of New York*, weighs against their position. 2013 WL 6569783, at *2 (S.D.N.Y. Dec. 12, 2013). A trial here would bear no resemblance to a narrow "trial regarding retaliation claims brought by one former government employee." *Id.* Instead, this will be a 2.5-week jury trial that would involve a company that is in financial distress and trial witnesses who are mainly former employees or officers or other third parties. There would be significant inconvenience to those witnesses of attending two trials—not to mention the significant cost.

## CONCLUSION

For all the reasons stated above, the Court should certify its opinion and order denying FXCM's motion for summary judgment on the issue of loss causation for interlocutory appeal.

Dated: October 11, 2022

KING & SPALDING LLP

*/s/ Israel Dahan*

Israel Dahan
Peter Isajiw
Ryan Gabay
KING & SPALDING LLP
1185 Avenue of the Americas
New York, New York 10036-2601
Tel: (212) 556.2100
Fax: (212) 556.2200

Chelsea Corey
KING & SPALDING LLP
300 S. Tryon Street, Suite 1700
Charlotte, North Carolina 28202
Tel: (704) 503.2575
Fax: (704) 503.2622

*Attorneys for Defendants Global Brokerage, Inc. f/k/a/ FXCM, Inc., Dror Niv, and William Ahdout*