**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| In re Global Brokerage, Inc. f/k/a FXCM Inc. Securities Litigation | Master File No. 1:17-cv-00916(RA)(BCM) |
| | CLASS ACTION |
| This Document Relates To: All Actions | |

**PLAINTIFFS' PRETRIAL MEMORANDUM OF LAW**

# **TABLE OF CONTENTS**

Page(s)

I.   PRELIMINARY STATEMENT ................................................................................. 1

II.  THE ELEMENTS OF PLAINTIFFS' CLAIMS ..................................................... 3

    A.   Claim I – Securities Fraud ....................................................................... 3

    B.   Claim II – Control Person Liability ......................................................... 6

III. SUMMARY OF FACTS SUPPORTING PLAINTIFFS' CLAIMS ...................... 6

    A.   Background of FXCM ............................................................................... 6

    B.   FXCM Hires Dittami to Create an In-House Liquidity Provider ............. 7

    C.   FXCM and Effex Set up a Financial Relationship Mirroring FXCM's Profit-
       Sharing Arrangement with Dittami ......................................................... 8

    D.   Effex's Payments to FXCM Varied With Effex's Trading Profits ......... 10

    F.   Regulators Investigate FXCM's Relationship with Effex ...................... 13

IV. THE EVIDENCE ESTABLISHES EACH ELEMENT OF PLAINTIFFS' CLAIMS ......... 13

    A.   Plaintiffs Will Prove Defendants Violated Section 10(b) of the Exchange Act .... 14

       1.   Falsity ......................................................................................... 14

          a.   "Agency Model" Statements ......................................... 15

          b.   "Order Flow" Statements .............................................. 17

          c.   GAAP Violations .......................................................... 19

       2.   Materiality ................................................................................. 23

       3.   Connection With the Purchase or Sale of Securities ................. 24

       4.   Scienter ...................................................................................... 26

       5.   Reliance ..................................................................................... 29

6.     Loss Causation .......................................................................... 32

7.     Economic Loss ........................................................................... 35

B.   Plaintiffs Will Prove that Defendants Niv and Ahdout are Liable as Control

Persons under Section 20(a) of the Exchange Act ................................... 36

1.     Primary Violation ...................................................................... 36

2.     Control .................................................................................... 36

3.     Culpable Participation ............................................................... 37

C.   Defendants Will Fail to Prove Their Anticipated Affirmative Defenses ............... 38

VIII.   CONCLUSION .................................................................................... 42

# <u>TABLE OF AUTHORITIES</u>

Page(s)

**Cases**

*Acticon AG v. China N. E. Petroleum Holdings Ltd.*,
   692 F.3d 34 (2d Cir. 2012) ............................................................................. 5, 35

*Affiliated Ute Citizens of Utah v. United States*,
   406 U.S. 128 (1972) ....................................................................................... 32, 35

*Ames Dep't Stores, Inc. Stock Litig.*,
   991 F.2d 953 ...................................................................................................... 4, 25

*ATSI Commc'ns, Inc. v. Shaar Fund, Ltd.*,
   493 F.3d 87 (2d Cir. 2007) ...................................................................... 3, 26, 31

*Baena v. Woori Bank*,
   515 F. Supp. 2d 414 (S.D.N.Y. 2007) ................................................................ 28

*Basic Inc. v. Levinson*,
   485 U.S. 224 (1988) ...................................................................................... 23, 29

*Boguslavsky v. Kaplan*,
   159 F.3d 715 (2d Cir. 1998) ............................................................................ 6, 36

*Bos. Ret. Sys. v. Alexion Pharms., Inc.*,
   556 F. Supp. 3d 100 (D. Conn. 2021) ............................................................... 37

*Caiola v. Citibank, N.A., New York*,
   295 F.3d 312 (2d Cir. 2002) ............................................................................... 15

*Cammer v. Bloom*,
   711 F. Supp. 1264 (D.N.J. 1989) ....................................................................... 29

*Chill v. Gen. Elec. Co.*,
   101 F.3d 263 (2d Cir. 1996) ............................................................................ 4, 26

*Colon Velez v. Puerto Rico Marine Mgmt., Inc.*,
   957 F.2d 933 (1st Cir. 1992) .............................................................................. 40

*Com. Union Assurance Co. PLC v. Milken*,
   17 F.3d 608 (2d Cir. 1994) ................................................................................. 38

*CompuDyne Corp. v. Shane*,
   453 F. Supp. 2d 807 (S.D.N.Y. 2006) ............................................................... 36

*Constr. Laborers Pension Tr. for S. California v. CBS Corp.*,
 433 F. Supp. 3d 515 (S.D.N.Y. 2020) ............................................................ 4, 5, 26

*Curiale v. Hartford Life & Accident Ins. Co.*,
 No. 2:21-CV-54, 2022 WL 4364072 (D. Vt. Sept. 21, 2022) .................................... 40

*Desvarieux v. Axiom Holdings, Inc.*,
 No. 17CIV4756JPCGWG, 2022 WL 1467973 (S.D.N.Y. May 10, 2022) ............... 38, 39, 40

*Emergent Cap. Inv. Mgmt., LLC v. Stonepath Grp., Inc.*,
 343 F.3d 189 (2d Cir. 2003) ................................................................................. 33

*Erica P. John Fund, Inc. v. Halliburton Co.*,
 563 U.S. 804 (2011) .............................................................................................. 5

*Frommert v. Conkright*,
 913 F.3d 101 (2d Cir. 2019) ........................................................................ 38, 39, 40

*Garden City Boxing Club, Inc. v. Morales*,
 No. 05-CV-0064 FB KAM, 2005 WL 2476264 (E.D.N.Y. Oct. 7, 2005) ......................... 39

*Halliburton Co. v. Erica P. John Fund, Inc.*,
 573 U.S. 258 (2014) ..................................................................................... 4, 29, 31

*Halperin v. eBanker USA.com, Inc.*,
 295 F.3d 352 (2d Cir. 2002) ................................................................................. 15

*Hansen v. Cont'l Ins. Co.*,
 940 F.2d 971 (5th Cir. 1991) ................................................................................. 40

*In re Alstom SA*,
 406 F. Supp. 2d 433 (S.D.N.Y. 2005) ...................................................................... 37

*In re Am. Preferred Prescription, Inc.*,
 Bankr. No. 893-84170-478 (FGC), 1997 WL 158401 n.11 (Bankr. E.D.N.Y. Mar. 21, 1997)
 ........................................................................................................................ 24

*In re Flag Telecom Holdings, Ltd. Sec. Litig.*,
 352 F. Supp. 2d 429 (S.D.N.Y. 2005) ...................................................................... 37

*In re Lawrence*,
 No. 97-br-11258, 2008 WL 6786807 (N.D.N.Y. Nov. 18, 2008) ................................. 34

*In re LIBOR-Based Fin.Instruments Antitrust Litig.*,
 No. 11 MDL 2262 (NRB), 2015 WL 6243526 (S.D.N.Y. Oct. 20, 2015) ......................... 31

*In re Longfin Corp. Sec. Class Action Litig.*,
 No. 18cv2933 (DLC), 2020 WL 4345731 (S.D.N.Y. July 29, 2020) ...................... 38, 39, 40

*In re Nature's Sunshine Prod. Sec. Litig.*,
   486 F. Supp. 2d 1301 (D. Utah 2007) ................................................................. 28

*In re Novatel Wireless Sec. Litig.*,
   No. 08CV1689 AJB (RBB), 2013 WL 12144150 (S.D. Cal. Oct. 25, 2013) ........................ 35

*In re OSG Sec. Litig.*,
   12 F. Supp. 3d 622 (S.D.N.Y. 2014) ................................................................. 27

*In re Petrobras,
   Sec.*, 862 F.3d 250 (2d Cir. 2017) .............................................................. 29, 30

*In re Philip Servs. Corp. Sec. Litig.*,
   383 F. Supp. 2d 463 (S.D.N.Y. 2004) ............................................................... 37

*In re Puda Coal Sec. Inc.et al. Litig,*
   No. 11-CV-2598 (DLC)(HBP), 2017 WL 65325 (S.D.N.Y. Jan. 6, 2017) ........................... 31

*In re Puda Coal Sec. Inc.*,
   No. 11-CV-2598 (DLC), 2017 WL 511834 (Feb. 8, 2017) ........................................ 31

*In re Time Warner Inc. Sec. Litig.*,
   9 F.3d 259 (2d Cir. 1993) .......................................................................... 14

*In re VEON Ltd. Sec. Litig.*,
   No. 15-CV-08672 (ALC), 2017 WL 4162342 (S.D.N.Y. Sept. 19, 2017) ........................... 17

*In re Vivendi Universal, S.A. Sec. Litig.*,
   634 F. Supp. 2d 352 (S.D.N.Y. 2009) ....................................................... 33, 35, 36

*In re Vivendi, S.A. Sec. Litig.*,
   838 F.3d 223 (2d Cir. 2016) ................................................................. passim

*Indiana Pub. Ret. Sys. v. SAIC, Inc.*,
   818 F.3d 85 (2d Cir. 2016) ..................................................................... 19, 23

*Kleinman v. Elan Corp., plc*,
   706 F.3d 145 (2d Cir. 2013) ....................................................................... 14

*Krogman v. Sterritt*,
   202 F.R.D. 467 (N.D. Tex. 2001) .................................................................. 30

*Lattanzio v. Deloitte & Touche LLP*,
   476 F.3d 147 (2d Cir. 2007) ....................................................................... 32

*Lentell v. Merrill Lynch & Co.*,
   396 F.3d 161 (2d Cir. 2005) ....................................................................... 33

*Liberty Media Corp. v. Vivendi Universal, S.A.*,
  923 F. Supp. 2d 511 (S.D.N.Y. 2013) ............................................................... 36

*Marini v. Adamo*,
  995 F. Supp. 2d 155 (E.D.N.Y. 2014) ............................................................... 40

*Matrixx Initiatives, Inc. v. Siracusano*,
  563 U.S. 27 (2011) ........................................................................................ 14

*McIntire v. China MediaExpress Holdings, Inc.*,
  38 F. Supp. 3d 415 (S.D.N.Y. 2014) ................................................................ 30

*McMahan & Co. v. Wherehouse Ent., Inc.*,
  900 F.2d 576 (2d Cir. 1990) ........................................................................... 14

*Roth v. Jennings*,
  No. 03 CIV. 7760DAB, 2009 WL 1440670 (S.D.N.Y. May 21, 2009) ................... 41

*Rowinski v. Salomon Smith Barney Inc.*,
  398 F.3d 294 (3d Cir. 2005) ........................................................................... 25

*S. Cherry St., LLC v. Hennessee Grp. LLC*,
  573 F.3d 98 (2d Cir. 2009) ............................................................................. 26

*Sec. Ins. Co. of Hartford v. Old Dominion Freight Line, Inc.*,
  314 F. Supp. 2d 201 (S.D.N.Y. 2003) ............................................................... 40

*SEC v. Caserta*,
  75 F. Supp. 2d 79 (E.D.N.Y. 1999) ............................................................. 28, 29

*SEC v. Credit Bancorp, Ltd.*,
  195 F. Supp. 2d 475 (S.D.N.Y. 2002) ............................................................... 24

*SEC v. DCI Telecommunications, Inc.*,
  122 F. Supp. 2d 495 (S.D.N.Y. 2000) .......................................................... 4, 25

*SEC v. First Jersey Sec., Inc.*,
  101 F.3d 1450 (2d Cir. 1996) ................................................................... passim

*SEC v. Gabelli*,
  653 F.3d 49 (2d Cir. 2011) ............................................................................. 14

*SEC v. Muraca*,
  No. 17-CV-11400, 2019 WL 6619297 (D. Mass. Dec. 5, 2019) ........................... 39

*SEC v. Rana Research, Inc.*,
  8 F.3d 1358 (9th Cir. 1993) ........................................................................... 25

*SEC v. StratoComm Corp.*,
    2 F. Supp. 3d 240 (N.D.N.Y. 2014) ................................................................ 25, 26

*SEC v. Texas Gulf Sulphur Co.*,
    401 F.2d 833 (2d Cir. 1968) .......................................................................... 24, 25

*Serv. Emps. Int'l Union, Loc. 32BJ, AFL-CIO v. Stone Park Assocs., LLC*,
    326 F. Supp. 2d 550 (S.D.N.Y. 2004) .................................................................. 40

*Setzer v. Omega Healthcare Invs., Inc.*,
    968 F.3d 204 (2d Cir. 2020) ................................................................................ 14

*Singh v. Cigna Corp.*,
    918 F.3d 57 (2d Cir. 2019) ............................................................................... 3, 14

*Strougo v. Barclays PLC*,
    105 F. Supp. 3d 330 (S.D.N.Y. 2015) .................................................................. 24

*Suez Equity Invs., L.P. v. Toronto-Dominion Bank*,
    250 F.3d 87 (2d Cir. 2001) .................................................................................. 32

*Szulik v. Tagliaferri*,
    966 F. Supp. 2d 339 (S.D.N.Y. 2013) ............................................................. 28, 32

*Tellabs, Inc. v. Makor Issues & Rts., Ltd.*,
    551 U.S. 308 (2007) ............................................................................................ 26

*United States v. Erickson*,
    601 F.2d 296 (7th Cir. 1979) .............................................................................. 29

*Villella v. Chem. & Mining Co. of Chile Inc.*,
    No. 15 CIV. 2106 (ER), 2017 WL 1169629 (S.D.N.Y. Mar. 28, 2017) ................... 24

*Zagami v. Nat. Health Trends Corp.*,
    540 F. Supp. 2d 705 (N.D. Tex. 2008) ................................................................ 24

**Statutes**

26 U.S.C. § 6621(a)(2) ............................................................................................ 41

26 U.S.C. § 6622 .................................................................................................... 41

28 U.S.C. § 1961 .................................................................................................... 40

28 U.S.C. § 1961(a) ............................................................................................... 41

28 U.S.C. § 1961(b) ............................................................................................... 41

**Rules**

N.Y. Civil Practice Law and Rules § 5004(a) ................................................................ 39

**Regulations**

17 C.F.R. § 210.4-01(a)(1) ........................................................................................... 19

17 C.F.R. § 240.10b-5 .................................................................................................... 3

17 C.F.R. § 240.10b-5(b) ............................................................................................. 14

Lead Plaintiff 683 Capital Partners, LP ("683 Capital") and Class Representatives Shipco Transport Inc.  ("Shipco") and E-Global Trade and Finance Group, Inc. ("E-Global," and collectively, "Plaintiffs") submit this pretrial memorandum of law pursuant to the Court's Individual Rules & Practices in Civil Cases, Section 6(B)(ii).

## I.     PRELIMINARY STATEMENT

Plaintiffs bring claims against Defendants Global Brokerage, Inc. f/k/a FXCM, Inc. ("FXCM," or the "Company"), Dror Niv, and William Ahdout (collectively, "Defendants") under Sections 10(b) and 20(a) of the Securities Exchange Act of 1934 ("Exchange Act") and Rule 10b-5 promulgated thereunder. Shipco and E-Global bring claims on behalf of themselves and a certified Class comprising "[a]ll persons and/or entities that purchased or otherwise acquired publicly traded Global Brokerage, Inc., f/k/a FXCM Inc. ("FXCM") Class A common stock, during the period March 15, 2012 through February 6, 2017, both dates inclusive."[1] 683 Capital brings its claims on an individual basis.

The Court rejected each of Defendants' arguments that they were entitled to summary judgment on Plaintiffs' claims, finding that a reasonable jury could enter a verdict for Plaintiffs. *See* ECF No. 322-1 (transcript of oral decision denying Defendants' motion for summary judgment). This memorandum sets forth how and why a jury will enter a verdict for Plaintiffs.

At trial, Plaintiffs will prove that Defendants committed securities fraud by misrepresenting and omitting material facts about FXCM's secret relationship with Effex Capital,

---

[1] ECF No. 232 at 2. Excluded from the Class are: (i) Defendants; (ii) current and former officers, employees, consultants and directors of FXCM and FXCM Holdings, LLC; (iii) siblings, parents, children, spouses, and household members of any person excluded under (i) and (ii); (iv) any entities affiliated with, controlled by, or more than 5% owned by, any person excluded under (i) through (iii); and (v) the legal representatives, heirs, successors or assigns of any person excluded under (i) through (iv).

LLC ("Effex"). FXCM offered foreign exchange trading to retail customers, touting their "No Dealing Desk" or "agency model," where instead of FXCM trading directly opposite the customer, FXCM connected the customer with a liquidity provider offering the best price, with FXCM merely adding a mark-up to the price as a commission. However, unbeknownst to FXCM's customers and investors, FXCM was secretly receiving kickbacks of roughly 70% of the trading profits from Effex, one of FXCM's primary liquidity providers who was trading against FXCM's customers.

Effex was run by John Dittami, whom Defendants Niv and Ahdout hired at FXCM to create an internal trading system, EES, that would compete with external market makers. Dittami's contract with FXCM provided for a 70-30 split of EES's trading profits (70% to FXCM). When FXCM's compliance department decided that FXCM could not truthfully say it was operating an agency model if EES was trading against FXCM's customers, Defendants decided to spin off EES as Effex. However, FXCM and Effex kept the 70-30 split of trading profits—with Effex swapping in for Dittami and FXCM keeping its 70% share—which they disguised as "payments for order flow." FXCM provided critical support to Effex for years, and Effex relied on FXCM to stay afloat. Effex became one of FXCM's biggest liquidity providers and Defendants provided special trading advantages to direct more of FXCM's trading volume to Effex.

In 2013 and 2014 the National Futures Association ("NFA") and the U.S. Commodities Futures Trading Commission ("CFTC") began investigating FXCM's relationship with Effex. Defendants tried to cover their tracks but it was of no avail. On February 6, 2017, after the close of trading, the NFA and CFTC announced regulatory settlements with Defendants, revealing the undisclosed relationship between FXCM and Effex and imposing severe penalties. The next day, the price of FXCM securities dropped precipitously, harming Plaintiffs and the Class.

Plaintiffs will successfully establish each element of their claims at trial, including both the class-wide claims and the individual claims of Plaintiff 683 Capital.

## II.     THE ELEMENTS OF PLAINTIFFS' CLAIMS

### A.     Claim I – Securities Fraud

Plaintiffs allege, and will prove at trial, that Defendants FXCM, Niv, and Ahdout violated Section 10(b) of the Exchange Act and Rule 10b-5 promulgated thereunder (17 C.F.R. § 240.10b-5). To prove a claim brought under Section 10(b) and Rule 10b-5, a plaintiff must show (1) a material misrepresentation or omission (falsity), (2) scienter, (3) a connection with the purchase or sale of a security, (4) reliance, (5) economic loss, and (6) loss causation. *Singh v. Cigna Corp.*, 918 F.3d 57, 62 (2d Cir. 2019).

To show falsity, a plaintiff must prove that a defendant made a statement "that is either 'untrue' outright or 'misleading' by virtue of what it omits to state." *In re Vivendi, S.A. Sec. Litig.*, 838 F.3d 223, 239 (2d Cir. 2016) ("*Vivendi II*").[2] Plaintiffs will prove that Defendants made several false and misleading statements and omissions of material fact in FXCM's SEC filings and on FXCM's website. Those statements can generally be grouped into three categories: (1) statements about FXCM offering "agency model" trading to its retail customers; (2) statements about purported "order flow" payments that FXCM received from multiple "market makers"; and (3) violations of U.S. Generally Accepted Accounting Principles ("GAAP") for failing to disclose Effex as a related party, or alternatively, as a variable interest entity ("VIE").

To show that the statements were made with scienter, a plaintiff must prove facts "(1) showing that the defendants had both motive and opportunity to commit the fraud or (2) constituting strong circumstantial evidence of conscious misbehavior or recklessness." *ATSI*

---

[2] Emphasis is added and internal citations and quotations are omitted unless otherwise indicated.

*Commc'ns, Inc. v. Shaar Fund, Ltd.*, 493 F.3d 87, 99 (2d Cir. 2007). Recklessness is conduct that is "'at the least ... highly unreasonable and which represents an extreme departure from the standards of ordinary care ... to the extent that the danger was either known to the defendant or so obvious that the defendant must have been aware of it.'" *Chill v. Gen. Elec. Co.*, 101 F.3d 263, 269 (2d Cir. 1996). A corporation's scienter is shown by proving scienter for one of its officers or directors. *See, e.g., Constr. Laborers Pension Tr. for S. California v. CBS Corp.*, 433 F. Supp. 3d 515, 549 (S.D.N.Y. 2020). Plaintiffs will prove that Defendants acted knowingly or recklessly in making the challenged statements, as Defendants Niv and Ahdout were personally involved with, or informed of, all relevant aspects of the relationship between FXCM and Effex and the facts rendering the challenged statements false or misleading.

To show a connection with the purchase or sale of a security, a plaintiff must prove that false or misleading statements or omissions were "disseminated into the marketplace in a manner reasonably calculated to influence the investing public." *SEC v. DCI Telecommunications, Inc.*, 122 F. Supp. 2d 495, 499 (S.D.N.Y. 2000) (citing *Ames Dep't Stores, Inc. Stock Litig.*, 991 F.2d 953, 962 and 966 (2d Cir. 1993)). Plaintiffs will prove that Defendants' false and misleading statements and omissions were made in FXCM's public filings with the SEC and on FXCM's own website. Courts routinely find that public statements in SEC filings and a company's website satisfy the "in connection with" requirement. *See id.*, 122 F. Supp. 2d at 499-500.

To show reliance, a plaintiff must prove either that a presumption of reliance applies, or that the plaintiff relied on a misrepresentation or omission in making their purchase. *Halliburton Co. v. Erica P. John Fund, Inc.*, 573 U.S. 258, 267–68 (2014) ("*Halliburton II*"). Class Representatives Shipco and E-Global, and the Class, invoke the fraud-on-the-market presumption of reliance based on the efficiency of the market for FXCM Common Stock. The Court has already

found that Plaintiffs' evidence is sufficient to demonstrate market efficiency, and that the presumption applies. ECF Nos. 229 (report and recommendation of magistrate certifying Class) and 232 (order adopting report and recommendation). The Court also already rejected Defendants' attempts to rebut this presumption as to Shipco and E-Global. *Id.* 683 Capital will prove actual reliance with respect to its purchases of FXCM 2.25% Convertible Senior Notes due 2018 ("FXCM Notes"). To show actual reliance, a plaintiff must show it was "aware of [Defendants'] statement and engaged in a relevant transaction … based on that specific misrepresentation." *Erica P. John Fund, Inc. v. Halliburton Co.*, 563 U.S. 804, 810 (2011) ("*Halliburton I*"). Plaintiff 683 Capital will prove that it read the relevant SEC filings containing the misrepresentations and omissions and incorporated those statements into its decision to purchase FXCM Notes.

To show loss causation, a plaintiff must prove that "the <u>subject</u> of the fraudulent statement or omission was the cause of the actual loss suffered." *Vivendi II*, 838 F.3d at 261 (emphasis in original). Plaintiffs will prove loss causation "by identifying a 'corrective disclosure' that reveals the truth behind the alleged fraud." *Id.* Plaintiffs will prove, through the testimony and reports of their expert witness, Dr. Adam Werner, that the February 6, 2017 disclosures of the regulatory allegations and settlements revealed the truth behind Defendants' false and misleading statements and caused the damages suffered by Plaintiffs and the Class when the price of FXCM stock and FXCM Notes dropped precipitously the following trading day.

Finally, to show economic loss, a plaintiff must prove that it suffered "out-of-pocket" damages equal to the difference between the price paid and the value of the security when purchased. *Acticon AG v. China N. E. Petroleum Holdings Ltd.*, 692 F.3d 34, 38 (2d Cir. 2012). Plaintiffs will prove economic loss through the testimony and reports of their expert witness, Dr. Werner. Dr. Werner will show that Plaintiffs and the Class suffered out-of-pocket damages of

$3.39 per share of FXCM stock. Dr. Werner will also show that Plaintiff 683 Capital suffered out-of-pocket damages of $16.31 per $100 par value of FXCM Notes.

### B.      Claim II – Control Person Liability

Plaintiffs have also alleged, and will prove at trial, that Defendants Niv and Ahdout are secondarily liable under Section 20(a) of the Exchange Act in that they controlled FXCM as FXCM violated Section 10(b) of the Exchange Act. To prove a claim under Section 20(a) of the Exchange Act, "a plaintiff must show (1) a primary violation by a controlled person; (2) control of the primary violator by the defendant; and (3) 'that the controlling person was in some meaningful sense a culpable participant' in the primary violation." *Boguslavsky v. Kaplan*, 159 F.3d 715, 720 (2d Cir. 1998) (quoting *SEC v. First Jersey Sec., Inc.*, 101 F.3d 1450, 1472 (2d Cir. 1996)).

Plaintiffs will prove that Defendants Niv and Ahdout controlled FXCM, which violated Section 10(b) of the Exchange Act, and that Niv and Ahdout culpably participated in FXCM's violation. Through their positions as executive officers of FXCM Niv and Ahdout each had the ability to, and did, control FXCM with respect to FXCM's misrepresentations and omissions, as demonstrated through their signatures on FXCM's SEC filings containing the misrepresentations and omissions. Plaintiffs will prove Niv and Ahdout's culpable participation through largely the same evidence that supports the scienter element of Claim I.

## III.    SUMMARY OF FACTS SUPPORTING PLAINTIFFS' CLAIMS

### A.      Background of FXCM

Defendants Ahdout and Niv co-founded FXCM in 1999 to provide online foreign exchange trading and related services. FXCM offered its retail customers access to over-the-counter trading

through its online trading platform. Until 2007, FXCM offered its customers a "dealing desk" trading model, where it acted as the direct counterparty to retail customers' trades.

In 2007, FXCM debuted its "agency" or "No Dealing Desk" ("NDD") model for retail trading. In this model, FXCM provided customers with a price based on bid/ask quotes from a stable of competing liquidity providers – typically banks, financial institutions, and other market makers – and FXCM would add a small markup to that price. When a customer placed an order to execute a trade, FXCM would simultaneously execute the customer's trade and an offsetting trade with the market maker at the quoted price, keeping the markup as commission.

From the customer's perspective, in this "agency" model FXCM was supposed to serve merely as an intermediary, and the counterparty on the other side of the customer's trade was not FXCM (other than in a technical sense in executing the simultaneous offsetting trades), but one of the supposedly independent market makers. FXCM told its customers and investors that the key difference between the NDD model and a dealing desk was that the NDD model eliminated the main conflict of interest because FXCM would not take the opposite side of customers' trades.

### B.     FXCM Hires Dittami to Create an In-House Liquidity Provider

In 2009, Ahdout and Niv hired John Dittami to develop a trading algorithm for FXCM that would act as an in-house liquidity provider, competing against FXCM's independent marker makers. This in-house liquidity provider, "EES," would allow FXCM to earn trading profits on top of the commissions they were receiving. Per Dittami's employment contract, the trading profits from EES were to be split 70% to FXCM and 30% to Dittami.

By early 2010, EES was nearly ready to roll out for live trading. However, FXCM's compliance department raised concerns about FXCM continuing to claim that it was not on the other side of customers' trades if EES was taking positions opposite FXCM's customers as a

liquidity provider. Accordingly, Ahdout and Niv decided that FXCM could not operate EES internally and still claim to its customers that it was operating an "agency" model. Niv and Ahdout decided they would have to spin off EES as an external entity, headed by Dittami.

Ahdout and Niv helped Dittami establish a new entity, Effex. FXCM employees saw Effex as merely a continuation of EES. Effex relied on assistance from FXCM in its early stages, for office space, computer systems, and a line of credit for trading, among other things.

### C.   FXCM and Effex Set up a Financial Relationship Mirroring FXCM's Profit-Sharing Arrangement with Dittami

When Dittami left FXCM, the parties intended that Dittami's post-employment relationship with FXCM would mirror the economic terms of his employment agreement, meaning the 70-30 split of trading profits. In Dittami's resignation letter on April 14, 2010, he and Ahdout acknowledged that they intended to maintain those economic terms. On the same day as Dittami's resignation letter, Dittami and Ahdout also executed an option agreement by which FXCM had the option to purchase a 70% share in Effex for $1.

The parties' contemporaneous communications show that Defendants and Dittami sought to maintain the 70-30 split of trading profits in their post-spin-off relationship. Contemporaneous communications also show that the parties viewed the option agreement as being in effect. However, the true nature of this financial arrangement was not disclosed to Ernst & Young LLP ("E&Y"), FXCM's auditors. In August 2010, FXCM's CFO Robert Lande instructed the company's accounting department not to mention the option agreement to E&Y.

Effex also provided regular updates to Ahdout, Niv, and others at FXCM. These updates, which continued through at least 2012, typically included information concerning Effex's trading profits on a weekly or monthly basis. No other market makers provided similar updates. FXCM

also initially tracked Effex's expenses and income so Defendants were able to keep tabs on Effex's trading profits to determine how much Effex would kick back to FXCM.

Dittami and Defendants first began to discuss disguising their profit-sharing relationship as payments for "order flow" in June 2010, after Effex had already been trading as a liquidity provider for FXCM for three months. Under this arrangement, Effex paid FXCM a certain rate in dollars per million units of FXCM trading volume executed by Effex. The parties intended for the order flow payments to mimic the 70-30 split of trading profits, such that the payment terms would adjust up or down, varying as Effex's trading profits, or "P&L," waxed or waned. When FXCM billed Effex each month, the payments were described as "Rebates," and the amounts as "P&L," shorthand for profits (and loss). During the time that Effex paid FXCM for retail order flow, they were the only liquidity provider to do so.

In August 2010, as FXCM was preparing to go public, it began to paper over its financial arrangement with Effex. FXCM and Effex executed services agreements back-dated to March 1, 2010 (with FXCM's US operating subsidiary) and May 1, 2010 (with FXCM Holdings, LLC). The March 1 services agreement was dated three weeks before Effex was even formed, and over six weeks before Dittami left his employment with FXCM. The May 1, 2010 agreement provided for payments to be made directly to FXCM Holdings, which was not a regulated entity and did not typically have any other direct sources of revenue.

The parties decided that Effex would pay $21 per million to start with because they projected that Effex would earn roughly $30 per million in trading profits, so $21 per million approximated FXCM's 70% share. Even if the percentages did not remain at exactly 70-30, Defendants intended that FXCM would get the lion's share of the profits.

**D.      Effex's Payments to FXCM Varied With Effex's Trading Profits**

Effex and FXCM had continuous discussions about what rate per million Effex would pay for a given month. Often these discussions occurred after the month at issue had concluded and the amount of order flow that Effex had captured was known.

As early as July 2010, Dittami discussed with FXCM retroactively adjusting the rate per million that Effex would pay for certain months based on Effex's profitability. In October 2010, Dittami and Ahdout negotiated a new rate in light of Effex earning lower profits on its trading. FXCM billed Effex $17.50 per million for October and November 2010. The services agreement was not amended to reflect this new rate, and the fact that FXCM billed Effex $17.50 per million for two months in 2010 instead of $21 per million was not shared with E&Y. At year-end 2010, Dittami emailed Niv and Ahdout, spelling out Effex's trading profits and his calculation of FXCM's share, which was roughly 70% of Effex's trading profits from FXCM order flow. In late 2011, the parties agreed to reduce Effex's payments to $16 per million, and for the first and only time they amended the services agreement to reflect the changed rate.

In April 2013, Dittami, Ahdout, and Niv agreed that Effex would pay only $3 per million for trading volume in the dollar-yen currency pair because that segment of trading volume had become much less profitable for Effex. In June 2013, Dittami, Ahdout, and Niv agreed that Effex would likewise pay only $6 per million for trading volume in the euro-dollar currency pair, because that segment of trading volume had become much less profitable for Effex. During the time that these currency pairs were split out at lower rates they accounted for over one third of the total FXCM trading volume that Effex captured for those months, and for some months over half of the total volume. These changes reduced the total rate Effex paid to less than $12 per million for that time period, and for some months it was less than $10 per million.

Effex and FXCM also discussed at various times whether certain liquidity streams would count toward the calculations of monthly trading volume underlying Effex's payments to FXCM. Effex provided several liquidity streams to FXCM. Dittami and Effex had multiple discussions with Ahdout and Niv about including or excluding certain streams in the volume calculations because of how profitable or unprofitable they were for Effex. *Id.* These conversations occurred in 2011 and 2012 and resulted in certain liquidity streams being excluded from the volume calculations, and thus from Effex's payments to FXCM. The services agreement never specified which liquidity streams would count toward Effex's payments to FXCM, and the invoices for these months did not reflect which liquidity streams were included or excluded. This was another way of manipulating Effex's payments to align with the parties' division of Effex's trading profits.

### E.     Effex Depended on FXCM, Which Provided Effex Extensive Support and Granted Trading Advantages So Effex Would Win More Trading Volume

FXCM was Effex's main lifeline. Throughout the class period, many trading venues outside of FXCM would not accept non-bank liquidity providers like Effex. When Effex began operations in 2010, almost no other companies would accept them as a liquidity provider. In the beginning of its operations, all of Effex's revenues came from FXCM. Effex gradually added other revenue sources, but through 2016 trading volume from FXCM accounted for most of Effex's revenues. As Niv explained in an email, Effex had "alllot [sic] to lose if they piss us off."

In its early stages, Effex was dependent upon FXCM to support its operations. Effex operated its trading algorithm through FXCM servers and on FXCM's network. FXCM allowed Effex to operate out of FXCM's offices rent-free for a full year. Dittami maintained an FXCM email address for months after leaving FXCM. Effex initially used FXCM servers to host their email services and they used FXCM's instant messenger platform into 2012. Effex also maintained

11

VPN access to desktop computers at FXCM through the end of 2012, and Dittami admitted that Effex could not fully conduct its business except through VPN connection to FXCM.

Multiple FXCM employees also worked for Effex on a regular basis spanning multiple years, at times spending four days per week doing work for Effex. FXCM personnel also spent time monitoring Effex's trading dashboard for Effex. Effex paid bonuses of tens of thousands of dollars to two of these FXCM employees for their work done on Effex's behalf.

From the beginning of Effex's existence, FXCM also provided significant trading advantages to Effex over other liquidity providers to allow Effex to win more trading volume. One of these advantages was that Effex would win ties when Effex and another liquidity provider submitted the same price quote. FXCM also allowed Effex to see in real-time the prices submitted by other liquidity providers, data which FXCM gave to no other liquidity provider. FXCM also allowed Effex to co-locate with FXCM's servers. FXCM applied lower mark-ups to the prices provided by Effex. These advantages allowed Effex to have the "winning" price more often, even if Effex's raw price was not the lowest, directing more trading volume to Effex. With these anticompetitive advantages, Effex could essentially choose when it wanted to offer a price that would allow it to win a trade, and what exact price would achieve that end. The more trading volume Effex captured, the more profitable its trading was and the more it kicked back to FXCM.

Thanks in part to these advantages, throughout the time that Effex was paying FXCM for order flow, Effex captured more of FXCM's retail trading volume than any other liquidity provider. When FXCM terminated its relationship with Effex in February 2017, Effex was unable to support itself and went out of business shortly thereafter.

F.      **Regulators Investigate FXCM's Relationship with Effex**

The NFA and CFTC began investigating FXCM's relationship with Effex in 2013 and 2014. As the regulatory investigations intensified in the spring of 2014 and FXCM realized that the payments it received from Effex were being heavily scrutinized, FXCM decided to stop taking those payments. On August 25, 2014, FXCM and Dittami executed two termination letters, terminating the services agreement and Dittami's resignation letter. In November 2015, as the NFA and CFTC investigations further intensified, Effex and FXCM signed a new document claiming for the first time that the April 2010 option agreement had never gone into effect.

In February 2017, FXCM entered into settlements with the NFA and CFTC. On February 6, 2017, the CFTC announced that it banned FXCM from operating in the U.S. and fined the Company $7 million, after finding that Defendants concealed that "FXCM had an undisclosed interest in the market maker [Effex] that consistently 'won' the largest share of FXCM's trading volume - and thus was taking positions opposite FXCM's retail customers." The same day, the NFA issued a Complaint and a Decision against Defendants, finding that "FXCM actually supported and controlled" Effex. The NFA found that in exchange for the order flow that FXCM directed to Effex, Effex paid rebates to FXCM that amounted at times to as much as 70% of Effex's profits from FXCM's order flow and which FXCM referred to internally as 'P&L.'" On this news, the Company's share price fell $3.40, over 68%, and the price of FXCM Notes fell over 42%.

IV.     **THE EVIDENCE ESTABLISHES EACH ELEMENT OF PLAINTIFFS' CLAIMS**

As summarized above, the evidence Plaintiffs produce at trial will prove each of the elements of Plaintiffs' claims.

A. **Plaintiffs Will Prove Defendants Violated Section 10(b) of the Exchange Act**

1. **Falsity**

Statements and omissions of material fact are actionable in the securities fraud context if they are either false or misleading. *See Matrixx Initiatives, Inc. v. Siracusano*, 563 U.S. 27, 36 (2011). To show falsity, a plaintiff must identify a statement "that is either 'untrue' outright or 'misleading' by virtue of what it omits to state." *Vivendi II*, 838 F.3d at 239. Whether a statement is misleading must be "evaluated not only by literal truth, but by context and manner of presentation." *Singh*, 918 F.3d at 63. "Even a statement which is literally true, if susceptible to quite another interpretation by the reasonable investor, may properly be considered a material misrepresentation." *Kleinman v. Elan Corp., plc*, 706 F.3d 145, 153 (2d Cir. 2013); *see also SEC v. Gabelli*, 653 F.3d 49, 57 (2d Cir. 2011) ("The law is well settled ... that so-called half-truths-- literally true statements that create a materially misleading impression--will support claims for securities fraud."), *rev'd on other grounds*, 568 U.S. 442 (2013). "For that reason, the disclosure required by the securities laws is measured not by literal truth, but by the ability of the material to accurately inform rather than mislead prospective buyers." *McMahan & Co. v. Wherehouse Ent., Inc.*, 900 F.2d 576, 579 (2d Cir. 1990).

An omission is actionable under the securities laws when Defendants had a duty to disclose the omitted facts. *See In re Time Warner Inc. Sec. Litig.*, 9 F.3d 259, 267 (2d Cir. 1993). A duty to disclose arises from Rule 10b–5's requirement to disclose "material fact[s] necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading." *Setzer v. Omega Healthcare Invs., Inc.*, 968 F.3d 204, 213 (2d Cir. 2020) (quoting 17 C.F.R. § 240.10b-5(b)). A duty to disclose also arises when a party chooses to speak on a matter,

in which case it has a "duty to be both accurate and complete." *Caiola v. Citibank, N.A., New York*, 295 F.3d 312, 331 (2d Cir. 2002).

In assessing whether a statement or omission is misleading, "[t]he touchstone of the inquiry is not whether isolated statements within a document were true, but whether defendants' representations or omissions, considered together and in context, would affect the total mix of information and thereby mislead a reasonable investor regarding the nature of the securities offered." *Halperin v. eBanker USA.com, Inc.*, 295 F.3d 352, 357 (2d Cir. 2002).

Plaintiffs will prove that Defendants made several false and misleading statements and omissions throughout the Class Period. Those statements and omissions appeared in FXCM's annual and quarterly reports filed with the SEC, and on FXCM's website. The statements at issue can be grouped into three general categories: (1) statements about FXCM offering an agency model that eliminated conflicts of interest from FXCM trading opposite its customers; (2) statements about payments for "order flow" that FXCM received from multiple "market makers"; and (3) financial statements that violated GAAP for failing to disclose Effex as a related party or VIE.

### a.   *"Agency Model" Statements*

Plaintiffs will prove that the agency model statements were false or misleading because the profit-sharing arrangement with Effex meant that FXCM had a major financial interest in the trading profits from a liquidity provider that was trading opposite FXCM's customers. This is precisely why FXCM's own compliance department (and Defendants) determined that EES had to be spun off as a separate entity. FXCM did spin off Effex, but by keeping the lion's share of Effex's trading profits they vitiated the central reason for doing so. Defendants could have disclosed that they were receiving most of the trading profits from Effex, or they could have foregone the trading profits and maintained a mutually beneficial relationship with Effex. Instead,

Defendants tried to keep the profits without disclosing that they were doing so, rendering their statements about operating an "agency model" false or misleading.

Defendants' arguments that there were other ways in which FXCM's NDD platform differed from a dealing desk do not change the fact that their statements about operating an "agency model" were false or misleading. The principal appeal of FXCM's No Dealing Desk model, and the true distinction between a dealing desk model and the agency model that FXCM touted, was that FXCM purported not to have a stake in the opposing side of their customers' trades. That was the "major conflict of interest" that FXCM repeatedly claimed to eliminate.

Defendants' statements about FXCM's agency model were materially false and misleading because of the kickbacks FXCM received from Effex. These undisclosed payments meant that:

(1)     FXCM's NDD model did not truly "align[] our interest with those of our customers";

(2)     the risk that FXCM "could suffer reputational damage and additional regulatory scrutiny by offering execution to retail clients that creates an inherent conflict between the interests of the customer and our interests" was not based on FXCM separately and explicitly offering dealing desk execution, but had already materialized based on the conflict of interest in the NDD model through Effex;

(3)     FXCM was not truly "commit[ted] to the agency model" due to its undisclosed conflict of interest with its customers;

(4)     FXCM did not "predominantly operate [its] retail business on an agency model";

(5)     the fact that FXCM did not directly take a market position did not "eliminat[e] a major conflict of interest" between FXCM and its customers; and

16

(6)     FXCM was, in fact, exposed to market risk in its "agency model" through its stake in Effex's trading profits. Effex was exposed to market risk in the same way that a dealing desk was, and when Effex's trading profits fell it paid FXCM less.

### b.     *"Order Flow" Statements*

Plaintiffs will prove that Defendants' "order flow" statements were materially misleading because they misrepresented the true source and nature of the payments. *In re VEON Ltd. Sec. Litig.*, No. 15-CV-08672 (ALC), 2017 WL 4162342, at *6 (S.D.N.Y. Sept. 19, 2017) ("A company's misleading statements about the sources of its revenue do not make the company's statements of the revenue figures misleading," but falsity may nonetheless be found based on the "misleading statements themselves.").

Defendants' statements that FXCM's retail trading revenue was primarily driven by, among other things, "payments we receive for order flow from FX market makers," and that this income "represents payments received from certain FX market makers in exchange for routing trade orders to these firms for execution," were misleading because the "order flow" payments were actually kickbacks of Effex's trading profits and no other market maker was paying FXCM for order flow from retail trading. Defendants' statements that FXCM "generate[s] our trading revenues based on the volume of transactions, not trading profits or losses" were false and misleading because they omitted that FXCM generated trading revenues from kickback payments from Effex, which varied based on Effex's trading profits. Finally, Defendants' statements that FXCM "no longer receive[d] payments for order flow," were misleading because the only "payments for order flow" that FXCM had received during the relevant periods were actually kickbacks of Effex's trading profits.

Plaintiffs will prove that the monthly "order flow" payments FXCM received from Effex were merely a façade disguising Effex's payments of most of its trading profits to FXCM. The payments were ostensibly based on a certain rate per million units of FXCM trading volume executed by Effex, but the parties repeatedly manipulated both the rate and the volume calculations to adjust how much Effex would pay. When Effex's trading profits decreased, the parties decreased Effex's payments accordingly by adjusting the inputs to the order flow payment calculations. The services agreements did not actually control the payments, which changed notwithstanding the terms of the services agreement on multiple occasions. That the invoices from FXCM were termed "Rebates" and referred to Effex's payments as "P&L," reflected the parties' understanding that the payments were intended to reflect payments to FXCM of Effex's profits.

In reality, Effex's varying payments to FXCM represented the parties' ongoing attempts to approximate a roughly 70-30 split of Effex's trading profits from FXCM trading volume. Guiding these ongoing negotiations were two agreements. First, Dittami's resignation letter stating that the parties intended to work out an agreement mirroring the 70-30 profit split from Dittami's employment contract. Second, the option agreement allowing FXCM to purchase a 70% stake in Effex for $1. Contemporaneous correspondence between the parties demonstrates that the parties believed these agreements were operative, and indeed they discussed, but opted against, terminating these agreements over one year after they were signed. Defendants' only evidence to the contrary consists of self-serving statements made years later under pressure from regulators' investigations of the FXCM-Effex relationship.

The parties' actions also refute Defendants' argument that the services agreements actually governed the payments. The services agreements were backdated several months to cover prior payments. The parties negotiated different rates of payment without modifying the services

agreement on multiple occasions, and they departed significantly from the rate in the services agreements for the entire last year and a half of the arrangement. Even when they didn't actually change the rate, Effex and FXCM frequently discussed what rate would apply for a given month, often after that month had ended, without reference to the services agreement.

Further contradicting Defendants' argument is the fact that not a single one of FXCM's other market makers paid FXCM for retail order flow during the roughly four and a half years that Effex was making these payments. FXCM tried to extract payments from its other retail market makers but none of them were willing to pay for order flow. Despite providing better execution and capturing more trading volume than any other market maker, which presumably would give Effex *more* negotiating power, Effex was still the only one who paid FXCM for order flow. This underscores how FXCM's arrangement with Effex was not merely a commonplace, arm's length transaction. These were unique payments that FXCM extracted only from Effex.

### c.   *GAAP Violations*

Plaintiffs will prove that FXCM's financial statements violated GAAP, rendering them presumptively misleading. *See* 17 C.F.R. § 210.4-01(a)(1); *Indiana Pub. Ret. Sys. v. SAIC, Inc.*, 818 F.3d 85, 93 (2d Cir. 2016). It is undisputed that FXCM did not make the disclosures or consolidation that required under GAAP for material related party transactions or VIEs with respect to Effex. The only dispute is whether the facts show that Effex was a related party or VIE. Plaintiffs will submit testimony and reports from their accounting expert, Mr. John Barron, which show that Effex was a related party or VIE, and thus FXCM's financial statements violated GAAP.[3]

---

[3] Plaintiffs have included in their exhibit list modified versions of Mr. Barron's reports, provided in advance to Defendants, in accordance with the Court's Order and Decision granting in part and denying in part Defendants' *Daubert* motion. *See* ECF No. 322-1.

*First*, Plaintiffs will prove that Effex was an undisclosed related party of FXCM, and thus Effex's payments to FXCM (totaling nearly $80 million) should have been disclosed as material related party transactions. Notably, this does *not* require Plaintiffs to prove that Effex's purported "order flow" payments to FXCM were actually a profit-sharing arrangement, although establishing this fact further buttresses Plaintiffs' GAAP claim. Plaintiffs will prove through evidence and Mr. Barron's testimony and reports that Effex was a related party of FXCM under GAAP because FXCM was in a position to significantly influence the management or operating policies of Effex to the extent that Effex might have been prevented from fully pursuing its own separate interests.

Specifically, Mr. Barron will explain that Effex was a related party because, among other considerations: (1) FXCM helped to spin off EES into Effex, which served as a continuation of EES; (2) Effex could not have begun operations without the financial and other support of FXCM; (3) Effex was initially entirely dependent on FXCM for its revenues and trading volume; (4) Effex relied for years on FXCM's employees, office space, and technology; (5) Effex continued to depend on FXCM for the substantial majority of Effex's business throughout the relevant time period; (6) the signed option agreement entitled FXCM to acquire a 70% interest in Effex for $1; and (7) the companies maintained a profit-sharing arrangement tracking the economic terms of Dittami's employment contract. In contrast, Defendants and their expert will rely almost exclusively on Defendants' and Dittami's self-serving statements, which were made years after the fact during the course of regulatory investigations and often contradicted contemporaneous documentary evidence. Defendants' argument that Effex conducted some operational activities on its own does not preclude a finding that FXCM could significantly influence Effex's management, and thus that Effex was a related party.

Moreover, the existence, magnitude, and intent of Effex's payments to FXCM demonstrate that FXCM both could and did significantly influence Effex's management in that (1) none of FXCM's other liquidity providers were willing to pay for retail order flow, showing that FXCM was not able to extract these payments from other market makers in actual arm's length negotiations; (2) Effex's payments to FXCM constituted a majority of Effex's trading profits from FXCM trading volume; and (3) Dittami and Defendants intended for Effex's payments to FXCM to mirror the 70-30 split of trading profits from Dittami's employment agreement.

*Second*, in the alternative, Plaintiffs will prove through evidence and Mr. Barron's testimony and reports that Effex was an undisclosed VIE of which FXCM was the primary beneficiary. Under GAAP, FXCM was required to consolidate Effex if (1) Effex was a VIE; (2) FXCM had a variable interest in Effex; and (3) FXCM was the primary beneficiary of Effex as a VIE.

Specifically, Mr. Barron will explain that Effex was a VIE because it had insufficient equity at risk to permit it to finance its activities without additional financial support, both at the time of its formation and beyond. Indeed, FXCM's management concluded that Effex "likely did not have sufficient equity to fund its activities" based on the support FXCM gave at Effex's inception. Mr. Barron will also explain how Effex's payments to FXCM demonstrated FXCM's variable interest in Effex, because the profit-sharing arrangement meant that FXCM was absorbing or receiving the variability in Effex's profitability. When Effex made less money, the parties changed the payments so that FXCM made less money.

Mr. Barron will also explain how FXCM was the primary beneficiary of Effex. FXCM had the right to receive benefits from Effex that could potentially be significant to Effex in that FXCM received most of Effex's trading revenues from trading against FXCM retail customers. FXCM

also had the power to direct the activities of Effex that most significantly impacted Effex's economic performance. Effex relied on trading advantages granted by FXCM to increase Effex's trading volume, which would impact Effex's size and profile within the market and eventually allow Effex to attract other customers. Indeed, once FXCM terminated its relationship with Effex in 2017, Effex was unable to support itself and quickly went out of business.

Finally, the fact that FXCM's auditor, E&Y, signed off on FXCM's financial statements does not vindicate Defendants' GAAP violations. Defendants will attempt to argue that because E&Y issued unqualified audit opinions and never required FXCM to restate its financial statements, FXCM must have complied with GAAP. This argument fails because neither E&Y's audit procedures nor the *post mortem* procedures performed by E&Y in connection with Defendants' regulatory settlements included an independent evaluation of the relationship between FXCM and Effex for purposes of determining whether Effex should have been considered a related party or VIE. E&Y's self-interested analysis, coming after regulators heavily penalized FXCM, relied chiefly on representations from Defendants. Defendants failed to provide E&Y with a complete understanding of the nature of FXCM's relationship with Effex and E&Y would not have known to inquire as to Effex being a related party without sufficient disclosures from Defendants.

In fact, E&Y first became aware of the arrangement between Dittami and FXCM in 2015 and 2016, before which time E&Y was not aware of the entire relationship between FXCM and Effex, only the records of the payments. Furthermore, neither FXCM management nor E&Y discussed the effect of FXCM's relationship with Effex on FXCM's financial statements in connection with E&Y's audits. E&Y's clean audit opinions do not vindicate Defendants' GAAP violations, they show only that Defendants concealed the Effex relationship from FXCM's auditor.

22

### 2.    Materiality

Plaintiffs will also prove that Defendants' misrepresentations and omissions were material. A fact is material if it is substantially likely "that the disclosure of the omitted fact would have been viewed by the reasonable investor as having significantly altered the total mix of information made available." *Basic Inc. v. Levinson*, 485 U.S. 224, 231–32 (1988). Plaintiffs will prove that Defendants' "agency model" misrepresentations and omissions were material because they misled investors as to the central feature of their NDD retail trading platform. Retail trading revenue was FXCM's "largest source of revenue." Defendants misrepresented that FXCM had no conflict of interest from trading against its retail customers when in fact it was secretly taking kickbacks of trading profits from one of its biggest purportedly "independent" market makers, who was trading against customers. Had the truth been disclosed it would have undercut the central appeal of FXCM's "agency model" to customers and impaired the Company's largest source of revenue. These facts would assuredly be material to investors.

Plaintiffs will also prove that the "order flow" misrepresentations and omissions were material. Defendants may try to argue that because the order flow payments represented only a small portion of FXCM's total revenues, the statements about order flow revenues were not material. They are wrong. Plaintiffs' accounting expert will explain that the revenue from these payments represented approximately 26% of FXCM's pre-tax income during the years it received these payments from Effex. In any event, Defendants' argument has been consistently rejected by courts in the Second Circuit. *See, e.g., SAIC*, 818 F.3d at 96 (undisclosed kickback scheme that

"was worth a fraction of SAIC's yearly revenues" was material given company's "possible exposure to significant civil and even criminal liability").[4]

Finally, Plaintiffs will prove that Defendants' GAAP violations were material. "'Disclosure is the overriding principle' governing related-party transactions, because while they are 'not inherently bad, they have proven to be an easy and effective way ... to misstate the economic substance and reality of financial transactions.'" *Zagami v. Nat. Health Trends Corp.*, 540 F. Supp. 2d 705, 710–12 (N.D. Tex. 2008) (finding undisclosed related-party transactions were material) (quoting *In re Am. Preferred Prescription, Inc.*, Bankr. No. 893-84170-478 (FGC), 1997 WL 158401, at *3 n.11 (Bankr. E.D.N.Y. Mar. 21, 1997)).

### 3. Connection With the Purchase or Sale of Securities

Plaintiffs will prove that Defendants misrepresentations and omissions were made "in connection with" the purchase or sale of FXCM securities. Courts construe the "in connection with" element of Section 10(b) and Rule 10b–5 broadly. *SEC v. Credit Bancorp, Ltd.*, 195 F. Supp. 2d 475, 491 (S.D.N.Y. 2002); *SEC v. Texas Gulf Sulphur Co.*, 401 F.2d 833, 860 (2d Cir. 1968) (*en banc*), *cert. denied*, 394 U.S. 976 (1969) (holding that in using the phrase "in connection with," Congress "intended only that the device employed, whatever it might be, be of a sort that would cause reasonable investors to rely thereon, and, in connection therewith, so relying, cause them to purchase or sell a corporation's securities.").

---

[4] *See also Villella v. Chem. & Mining Co. of Chile Inc.*, No. 15 CIV. 2106 (ER), 2017 WL 1169629, at *12 (S.D.N.Y. Mar. 28, 2017) (failure to account for bribery payments representing 0.5% of income, but which caused a decrease in stock price, affected the company's reputation, and subjected the company to regulatory penalties, was material to investors); *Strougo v. Barclays PLC*, 105 F. Supp. 3d 330, 349 & n.119 (S.D.N.Y. 2015) (statements regarding trading platform that accounted for 0.1% of total revenue, but which "call into question the integrity of the company as a whole" were material to investors).

The "in connection with" requirement is satisfied when "'assertions are made ... in a manner reasonably calculated to influence the investing public.'" *SEC v. StratoComm Corp.*, 2 F. Supp. 3d 240, 258 (N.D.N.Y. 2014) (quoting *Texas Gulf*, 401 F.2d at 862). There is no dispute that statements made in a publicly traded company's SEC filings satisfy the "in connection with" requirement. *Ames Dep't Stores*, 991 F.2d at 962 and 966 (finding the "in connection with" element is satisfied where a company and its officers disseminated false financial information into the marketplace through press releases, an annual report, a Form 10–K, and two Form 10–Qs). Most of the challenged statements here were made in FXCM's SEC filings, specifically its annual and quarterly reports on Forms 10-K and 10-Q. Courts in this District and around the country have also routinely concluded that "publicly disseminated press releases, research reports, and website representations that contain materially false and misleading statements regarding an issuer of securities satisfies the 'in connection with' requirement." *StratoComm*, 2 F. Supp. 3d at 258-59 (citing *SEC v. Rana Research, Inc.*, 8 F.3d 1358, 1362 (9th Cir. 1993); *Rowinski v. Salomon Smith Barney Inc.*, 398 F.3d 294 (3d Cir. 2005); *DCI Telecommunications*, 122 F. Supp. 2d at 499–500 (statements in press releases and website content satisfy the "in connection with" requirement). Thus, the statements Defendants made on FXCM's website likewise satisfy the "in connection with" requirement.

In *StratoComm*, during the same time that the defendants disseminated the challenged statements, "the company's shares were quoted on the over-the-counter market and were purchased and sold by investors." 2 F. Supp. 3d at 259. Here, FXCM's common stock traded on the NYSE and NASDAQ, and the FXCM Notes were frequently purchased and sold by investors, during the same time that Defendants disseminated the SEC filings and FXCM website statements. Thus, as the *StratoComm* court explained, "***a reasonable fact finder could only conclude*** that

StratoComm made the false and misleading statements in a manner reasonably calculated to influence investors, and the statements coincided with the offer and sale of the company's stock." 2 F. Supp. 3d at 259. Plaintiffs will easily prove that each of Defendants' misrepresentations and omissions were made in connection with the purchase or sale of FXCM securities.

### 4.    Scienter

To prove the element of scienter, Plaintiffs must show that Defendants acted with an "intent to deceive, manipulate, or defraud," which may be satisfied by showing Defendants' "reckless disregard for the truth." *S. Cherry St., LLC v. Hennessee Grp. LLC*, 573 F.3d 98, 109 (2d Cir. 2009). Plaintiffs may meet this standard with facts "constituting strong circumstantial evidence of conscious misbehavior or recklessness." *ATSI*, 493 F.3d at 99. Recklessness is conduct that is "'at the least ... highly unreasonable and which represents an extreme departure from the standards of ordinary care ... to the extent that the danger was either known to the defendant or so obvious that the defendant must have been aware of it.'" *Chill*, 101 F.3d at 269. Plaintiffs need not prove that Defendants had motive and opportunity to commit the fraud. *Tellabs, Inc. v. Makor Issues & Rts., Ltd.*, 551 U.S. 308, 322 (2007) ("While it is true that motive can be a relevant consideration … the absence of a motive allegation is not fatal.").

Plaintiffs will prove that Defendants Niv and Ahdout acted with scienter because there is no real dispute that they were personally involved in negotiating, maintaining, and concealing FXCM's financial arrangements with Dittami and Effex. Niv and Ahdout's scienter is properly imputed to FXCM by virtue of their positions of authority (CEO/Chairman and Chief Dealer/Managing Director, respectively) within the Company. *See, e.g., Constr. Laborers*, 433 F. Supp. 3d at 549 ("Moonves was CEO and Chairman of the Board of CBS, which is more than

sufficient to impute his scienter to the Company") (citing *In re OSG Sec. Litig.*, 12 F. Supp. 3d 622, 634 (S.D.N.Y. 2014)).

Niv and Ahdout knew about FXCM's financial arrangements with Dittami and Effex because Niv and Ahdout hired Dittami. They stayed abreast of his efforts to develop EES into an internal liquidity provider designed to trade against FXCM retail customers. They knew that FXCM's compliance department determined that EES could not continue to trade without rendering FXCM's statements about the NDD untruthful because FXCM was keeping most of EES's trading profits. They helped Dittami to spin off EES as Effex and provided resources to incubate Effex. They signed or knew of the option agreement and Dittami's resignation letter. They were part of the efforts to disguise Effex's payments as payments for order flow. They received regular updates from Dittami on Effex's trading profits. They knew Effex's payments would vary over time. They agreed to change Effex's payments on multiple occasions, approximating the original split of trading profits and disregarding the services agreement.

Rather than contesting Niv and Ahdout's knowledge, Defendants will try to claim that they acted in good faith pursuing the best interests of FXCM's customers. This argument fails because Defendants ignore the simple fact that they could have achieved all of the same purported benefits for their customers *without taking undisclosed payments of trading profits from Effex*. All of these purported benefits arose from the *trading* relationship between FXCM and Effex, not the *financial* relationship. Effex still could have acted as a truly independent liquidity provider that worked closely with FXCM to improve execution quality. It was the secret kickbacks that FXCM extracted from Effex that rendered Defendants' statements false or misleading. Defendants' knowledge of that financial relationship is what establishes their scienter. Their disputed claims of laudable intent as to the trading relationship are beside the point.

Plaintiffs will also show that Defendants attempted to cover up FXCM's relationship with Effex, both in their public statements and in their responses to regulators. These efforts also demonstrate Defendants' scienter. *E.g., Szulik v. Tagliaferri*, 966 F. Supp. 2d 339, 365 (S.D.N.Y. 2013).[5] Defendants hid FXCM's relationship with Effex from other liquidity providers, from FXCM's SEC filings, from its auditors, and from regulators. Defendants also attempted to brazenly mislead the NFA during its investigation of FXCM's relationship with Effex. These facts will further support a finding that Defendants acted with scienter.

With respect to the GAAP violations, Plaintiffs will also prove that Defendants acted with scienter in failing to disclose Effex as a related party or VIE. Plaintiffs will show that Defendants had knowledge of the facts about FXCM's relationship with Effex which rendered Effex a related party or VIE. Moreover, whether Effex was a related party or VIE is not a complicated or unusual accounting issue. Neither were these concepts foreign to FXCM, as FXCM disclosed other related party transactions in each of its annual and quarterly reports during the time Effex was paying FXCM, and it included assessments of VIEs in its annual and quarterly reports through the first quarter of 2013. Courts have found that "egregious violations of GAAP, or GAAP violations together with other evidence" may support a finding of scienter. *SEC v. Caserta*, 75 F. Supp. 2d 79, 94 (E.D.N.Y. 1999) (collecting cases).

Defendants will attempt to assert an affirmative defense that they relied in good faith on the advice of E&Y and thus did not act with scienter with respect to the GAAP violations. Defendants will fail to prove this affirmative defense. This defense requires Defendants to show

---

[5] *See also In re Nature's Sunshine Prod. Sec. Litig.*, 486 F. Supp. 2d 1301, 1310 (D. Utah 2007) ("Evidence that a defendant has taken steps to cover-up [sic] a misdeed is strong proof of scienter"); *Baena v. Woori Bank*, 515 F. Supp. 2d 414, 421 (S.D.N.Y. 2007) ("The subsequent lies — the cover up — [are] strong circumstantial evidence of [...] 'conscious behavior' which raises an inference of an intent to defraud.").

that they "made a complete disclosure, sought the advice as to the appropriateness of the challenged conduct, received advice that the conduct was appropriate, and relied on that advice in good faith." *Caserta*, 75 F. Supp. 2d at 95. As noted above, Plaintiffs will prove that Defendants did not make a complete disclosure to E&Y of the relevant facts regarding FXCM's relationship with Effex. E&Y thus could not and did not specifically advise Defendants that—in light of all the relevant facts about the relationship—Effex was not a related party or VIE. "If a company officer knows that the financial statements are false or misleading and yet proceeds to file them, the willingness of an accountant to give an unqualified opinion with respect to them does not negate the existence of the requisite intent or establish good faith reliance." *United States v. Erickson*, 601 F.2d 296, 305 (7th Cir. 1979).

### 5.    Reliance

To show reliance, a plaintiff must prove either that a presumption of reliance applies, or that the plaintiff actually relied on a misrepresentation or omission in making their purchase. *Halliburton II*, 573 U.S. at 267-68. Class Representatives Shipco and E-Global, and the Class, invoke the fraud-on-the-market presumption of reliance set forth in *Basic Inc. v. Levinson*, 485 U.S. 224, 247 (1988). As the Court explained in *Halliburton II*, in *Basic*, "we held that investors could satisfy this reliance requirement by invoking a presumption that the price of stock traded in an efficient market reflects all public, material information—including material misstatements. In such a case, we concluded, anyone who buys or sells the stock at the market price may be considered to have relied on those misstatements." *Halliburton II*, 573 U.S. at 263.

When evaluating whether a security trades in an efficient market, courts in this Circuit routinely assess the factors derived from *Cammer v. Bloom*, 711 F. Supp. 1264 (D.N.J. 1989). *See In re Petrobras Sec.*, 862 F.3d 250, 276 (2d Cir. 2017). The *Cammer* factors are:

> (1) a large weekly trading volume; (2) the existence of a significant number of analyst reports; (3) the existence of market makers and arbitrageurs in the security; (4) the eligibility of the company to file an S-3 registration statement; and (5) a history of immediate movement of the stock price caused by unexpected corporate events or financial releases.

*McIntire v. China MediaExpress Holdings, Inc.*, 38 F. Supp. 3d 415, 431 (S.D.N.Y. 2014). Courts in the Second Circuit also commonly look at three additional factors discussed in *Krogman v. Sterritt*, 202 F.R.D. 467, 478 (N.D. Tex. 2001): (1) market capitalization; (2) float; and (3) the bid/ask spread. *See Petrobras*, 862 F.3d at 276; *McIntire*, 38 F. Supp. 3d at 431.

Plaintiffs adduced evidence at class certification to demonstrate the efficiency of the market for FXCM Common Stock, primarily the expert reports of Dr. Werner as to market efficiency. ECF Nos. 176-1 and 196-1. Defendants deposed Dr. Werner, submitted their own expert report, and opposed Plaintiffs' motion for class certification on other grounds, but they did not dispute the efficiency of the market for FXCM Common Stock. ECF No. 187 at 18, n.14 ("Defendants are not disputing the market efficiency of FXCM's common stock"). The Court found that "these [*Cammer* and *Krogman*] factors all weigh in favor of efficiency as to the market for FXCM Stock (which, as noted above, is not disputed here)." ECF Nos. 229 (report and recommendation of magistrate certifying Class) and 232 (order adopting report and recommendation). Defendants have produced no evidence whatsoever—before or after the Class was certified—upon which they could possibly dispute market efficiency for FXCM Common Stock. Plaintiffs will easily prove, once again, that Shipco, E-Global, and the Class are entitled to the presumption of reliance.

Defendants may attempt to rebut this presumption by showing that Plaintiffs did not actually rely on the integrity of the market. They will fail to do so because there is no evidence to suggest that Plaintiffs did not rely on the integrity of the market in purchasing FXCM Common

Stock during the Class Period. In fact, the Court already rejected Defendants' attempts to rebut the presumption of reliance as to Shipco and E-Global. ECF No. 229 at 18-20 (rejecting each of Defendants' arguments that Plaintiffs were subject to unique defenses and did not rely on the integrity of the market based on the timing of their purchases and that Plaintiffs were supposedly "value investors"). Defendants have produced no evidence since class certification upon which they could possibly rebut the presumption of reliance as to Class Representatives Shipco and E-Global. They have likewise produced no evidence whatsoever to attempt to rebut the presumption of reliance through a showing of lack of price impact. *See Halliburton II*, 573 U.S. at 278 (explaining price impact argument). Accordingly, Plaintiffs Shipco, E-Global, and the Class, will have no trouble proving reliance at trial.

Lead Plaintiff 683 Capital will prove actual reliance with respect to its purchases of FXCM Notes. To establish reliance, "a plaintiff must demonstrate that 'but for the claimed misrepresentations or omissions, the plaintiff would not have entered into the detrimental securities transaction' that led to the loss." *In re Puda Coal Sec. Inc. et al. Litig.*, No. 11-CV-2598 (DLC) (HBP), 2017 WL 65325 at *9 (S.D.N.Y. Jan. 6, 2017) (quoting *ATSI*, 493 F.3d at 106), *adopted sub nom. In re Puda Coal Sec. Inc.*, No. 11-CV-2598 (DLC), 2017 WL 511834 (Feb. 8, 2017). A plaintiff can establish reliance by showing it was "aware of a company's statement and engaged in a relevant transaction … based on that specific misrepresentation." *Id.* Actual reliance requires only "that a plaintiff actually learned of these statements, took these statements seriously … and incorporated these statements into its decision-making." *In re LIBOR-Based Fin. Instruments Antitrust Litig.*, No. 11 MDL 2262 (NRB), 2015 WL 6243526, at *61 (S.D.N.Y. Oct. 20, 2015).

To the extent that Plaintiffs prove a material omission by Defendants, reliance on the omission is presumed from its materiality such that Plaintiffs (including 683 Capital) need not

provide affirmative proof of reliance. *Affiliated Ute Citizens of Utah v. United States*, 406 U.S. 128, 153–54 (1972).

Plaintiff 683 Capital's corporate representative will testify that 683 Capital read the relevant SEC filings containing the misrepresentations and omissions. The testimony will likewise show that had 683 Capital known the truth behind Defendants' misrepresentations, it would not have made the same transactions; it would have either paid significantly less for the FXCM Notes or not purchased them at all. This testimony is consistent with, and will expand upon, the deposition testimony provided by 683 Capital's representative during discovery. 683 Capital will thus prove the reliance element for its individual claim.

### 6. Loss Causation

Establishing loss causation requires a showing that "the subject of the fraudulent statement or omission was the cause of the actual loss suffered." *Vivendi II*, 838 F.3d at 261 (emphasis in original) (quoting *Suez Equity Invs., L.P. v. Toronto-Dominion Bank*, 250 F.3d 87, 97–99 (2d Cir. 2001)). "[A] plaintiff can establish loss causation either by showing a 'materialization of risk' or by identifying a 'corrective disclosure' that reveals the truth behind the alleged fraud." *Id.* Plaintiffs will prove that the regulatory settlement disclosures on February 6, 2017 (after the close of trading) were corrective disclosures that revealed the truth behind Defendants' fraud, and that these corrective disclosures caused, in substantial part, the losses suffered by Plaintiffs and the Class when the price of FXCM's securities fell precipitously the following day.

To show loss causation, Plaintiffs need only produce sufficient evidence for the jury to "ascribe some rough proportion of the whole loss" to Defendants' fraud. *Lattanzio v. Deloitte & Touche LLP*, 476 F.3d 147, 158 (2d Cir. 2007). *Id.* at 364. At its core, "[l]oss causation 'is the causal link between the alleged misconduct and the economic harm ultimately suffered by the

plaintiff.'" *Lentell v. Merrill Lynch & Co.*, 396 F.3d 161, 172 (2d Cir. 2005) (quoting *Emergent Cap. Inv. Mgmt., LLC v. Stonepath Grp., Inc.*, 343 F.3d 189, 197 (2d Cir. 2003)). Loss causation analysis focuses on whether "the relationship between the plaintiff's investment loss and the information misstated or concealed by the defendant ... is sufficiently direct," or whether "the connection is attenuated, or if the plaintiff fails to 'demonstrate a causal connection between the content of the alleged misstatements or omissions and the harm actually suffered.'" *Vivendi II*, 838 F.3d at 261 (quoting *Lentell*, 396 F.3d at 174 and *Emergent*, 343 F.3d at 199).

The Second Circuit has clarified that it was <u>not</u> suggesting that "plaintiffs were required to allege the precise loss attributable" to defendants' fraud. *Lentell v. Merrill Lynch & Co.*, 396 F.3d 161, 177 (2d Cir. 2005). While Plaintiffs bear the burden of showing loss causation, "it is important not to confuse causation with damages when comparing competing causes for a stock decline." *In re Vivendi Universal, S.A. Sec. Litig.*, 634 F. Supp. 2d 352, 364 (S.D.N.Y. 2009) ("*Vivendi I*"). "Plaintiffs need only prove that they suffered some damage from the fraud. Liability obviously does not hinge on how much damage." *Id.*; *see also* ECF No. 322-1 (decision denying Defendants' summary judgment motion) 18:1-4 (quoting the same).

Plaintiffs will easily prove loss causation based on the paradigmatic corrective disclosure fact pattern presented in this case. On February 6, 2017, after the close of trading, the NFA and CFTC announced regulatory settlements with Defendants, which revealed to the market for the first time the true nature of the FXCM-Effex relationship, and thus the falsity of Defendants' prior statements. It is undisputed that no value-relevant FXCM-specific news was disclosed that day outside of the regulatory settlements. When markets opened the next day, the price of FXCM stock and FXCM Notes fell precipitously. Plaintiffs' expert, Dr. Werner, will prove through his reports

and testimony that, based on commonly accepted event study methodology, these corrective disclosures caused Plaintiffs' losses.

Defendants will likely attempt, once again, to contend that the penalties *contained in the regulatory settlements* are actually separate and unrelated confounding facts that must be disaggregated from the part of the settlements revealing the fraud itself. Defendants do *not* contend, nor can they with a straight face, that the regulatory settlements were not corrective disclosures. As the Court has already ruled, *even if* the jury were to find that the regulatory penalties were divorceable from the regulatory settlements and were actually confounding, unrelated facts that separately contributed to Plaintiffs' loss, this would not defeat loss causation so long as Plaintiffs show that "at least some of the stock price drop was due to the disclosure of the fraud itself." ECF No. 322-1 (decision denying summary judgment motion) 16:13-14.

Plaintiff 683 Capital will also prove loss causation through Dr. Werner's reports and testimony. As the Court recognized in denying Defendants' motion for summary judgment, a security need not trade in an efficient market in order for an event study to be relevant in showing loss causation. *Id.* 19:21-20:1 (quoting *In re Lawrence*, No. 97-br-11258, 2008 WL 6786807, at *3 (N.D.N.Y. Nov. 18, 2008). While the Court previously found that the evidence proffered by Plaintiffs and Dr. Werner did not sufficiently establish the efficiency of the market for FXCM Notes for the purposes of invoking the *Basic* presumption, that does not mean (as Defendants have falsely claimed and may try to reassert) that the market is *inefficient*. As Dr. Werner will explain at trial, there are sufficient facts present here to suggest that value-relevant information was quickly and fully incorporated into the market for FXCM Notes, and thus his event study analysis showing that the immediate and significant price decline for FXCM Notes was caused by the corrective disclosures revealing Defendants fraud ably demonstrates loss causation for 683 Capital's claim.

7.     **Economic Loss**

Section 10(b) damages are traditionally calculated using the "out-of-pocket" damages rule. *See Acticon AG v. China N. E. Petroleum Holdings Ltd.*, 692 F.3d 34, 38 (2d Cir. 2012) (noting a defrauded buyer is entitled to damages equal to the difference between the price paid and the value of the stock when purchased); *Affiliated Ute*, 406 U.S. at 155. The generally accepted practice in securities fraud cases is to estimate "out-of-pocket" damages by reference to the decline in the stock price upon a corrective disclosure or materialization of concealed risk. *See, e.g., Vivendi I*, 634 F. Supp. 2d at 358-59, 370-71 & n.6 (acknowledging the constant-dollar inflation ribbon methodology to be a reliable estimate of per share inflation); *In re Novatel Wireless Sec. Litig.*, No. 08CV1689 AJB (RBB), 2013 WL 12144150, at *10 (S.D. Cal. Oct. 25, 2013) (finding the "commonly accepted method to calculate the value line known as backcasting" was a "reasonable and logical" method to assess the true value and artificial inflation in the stock price prior to the date of the corrective disclosure).

Plaintiffs will prove that they and the Class suffered economic loss through the expert testimony and reports of Dr. Werner, whose constant-dollar inflation ribbon method is both commonly accepted and appropriate here. Using this method, Dr. Werner estimated out-of-pocket damages of up to $3.39 per share of FXCM common stock and $16.31 per $100 par value of FXCM Notes, based on the decline of the prices of FXCM stock and FXCM Notes on February 7, 2017, following the corrective disclosures made after the close of trading on the day prior. Dr. Werner used this widely accepted method because Defendants' misrepresentations and omissions concealed their fraud throughout the entire Class Period. FXCM's undisclosed relationship with Effex began two years prior to the start of the Class Period, and even by day one of the Class Period FXCM had been lying about its NDD model and order flow payments for at least a year.

Dr. Werner's damage estimate methodology is an excellent fit with the facts and plaintiffs' theory of liability, and his use of a constant inflation ribbon is reasonable and appropriate. *Vivendi I*, 634 F. Supp. 2d at 358-59, 370-71 & n.6; *Liberty Media Corp. v. Vivendi Universal, S.A.*, 923 F. Supp. 2d 511, 525 (S.D.N.Y. 2013).

### B.     Plaintiffs Will Prove that Defendants Niv and Ahdout are Liable as Control Persons under Section 20(a) of the Exchange Act

Plaintiffs will prove that Defendants Niv and Ahdout are liable under Section 20(a) of the Exchange Act by showing "(1) a primary violation by a controlled person; (2) control of the primary violator by the defendant; and (3) 'that the controlling person was in some meaningful sense a culpable participant' in the primary violation." *Boguslavsky*, 159 F.3d at 720 (quoting *First Jersey*, 101 F.3d at 1472.

#### 1.     Primary Violation

With respect to Plaintiffs' Section 20(a) claims against Defendants Niv and Ahdout, the relevant "controlled person" is FXCM. As explained above, Plaintiffs will prove that FXCM committed a primary violation of Section 10(b) of the Exchange Act.

#### 2.     Control

Plaintiffs will prove that Niv and Ahdout controlled FXCM and the false and misleading statements it made. "In the Second Circuit, the 'control person' provisions are broadly construed as they were meant to expand the scope of liability under the securities laws." *CompuDyne Corp. v. Shane*, 453 F. Supp. 2d 807, 829 (S.D.N.Y. 2006). Control over a primary violator may be established by showing that the defendant "possessed 'the power to direct or cause the direction of the management and policies of [the controlled] person,'" *First Jersey*, 101 F.3d at 1472-73 (quoting 17 C.F.R. § 240.12b–2). Courts have held that where an officer of a company signed the company's financial statements containing materially false or misleading statements, that is

sufficient to establish the control element. *In re Alstom SA*, 406 F. Supp. 2d 433, 487–88 (S.D.N.Y. 2005) (citing *In re Flag Telecom Holdings, Ltd. Sec. Litig.*, 352 F. Supp. 2d 429, 457 (S.D.N.Y. 2005) and *In re Philip Servs. Corp. Sec. Litig.*, 383 F. Supp. 2d 463, 485 (S.D.N.Y. 2004)). Here, there is no dispute that Niv and Ahdout signed the financial statements containing the challenged false and misleading statements. Plaintiffs will also prove that Niv and/or Ahdout had control over the statements posted to FXCM's website.

### 3.    Culpable Participation

Plaintiffs will prove that Defendants Niv and Ahdout culpably participated in FXCM's primary violation through the same evidence showing Niv and Ahdout's scienter. Niv and Ahdout knew of, and were personally involved in managing, all relevant aspects of FXCM's financial relationship with Effex. They signed the filings that FXCM made with the SEC, which contained the false and misleading statements and omissions. These facts are sufficient to prove culpable participation.

Alternatively, although Plaintiffs recognize that this Court has previously equated culpable participation under Section 20(a) with scienter under Section 10(b), *see* ECF No. 135 at 38, in at least one recent decision a court in this Circuit has explained that defendants could be "in some meaningful sense a culpable participant even though they do not meet the scienter requirements." *Bos. Ret. Sys. v. Alexion Pharms., Inc.*, 556 F. Supp. 3d 100 (D. Conn. 2021) ("It is not apparent why a control person cannot be found, based on an individualized determination, to have been in some meaningful sense a culpable participant even when that control person does not have "conscious recklessness....").

### C.      Defendants Will Fail to Prove Their Anticipated Affirmative Defenses

In their answer to Plaintiffs' operative complaint, Defendants alleged forty-six affirmative defenses. Many of these defenses are moot or irrelevant, and none are supported by facts that Defendants will be able to prove at trial. Defendants have given Plaintiffs no indication as to which of these defenses Defendants will actually try to prove at trial. In addition to the arguments presented above, Plaintiffs will respond to any defenses that Defendants actually raise in their opposition to Defendants' anticipated pretrial memorandum of law.

## V.      PLAINTIFFS ARE ENTITLED TO PRE- AND POST-JUDGMENT INTEREST

In addition to out-of-pocket damages, the Court should also award Plaintiffs and the Class prejudgment interest from the date of the out-of-pocket loss: February 7, 2017. The Court has broad discretion in deciding whether to award prejudgment interest. *Frommert v. Conkright*, 913 F.3d 101, 109–10 (2d Cir. 2019). In determining whether to award prejudgment interest, courts in this Circuit consider: "(i) the need to fully compensate the wronged party for actual damages suffered, (ii) fairness and the relative equities of the award, (iii) the remedial purpose of the statute involved, and/or (iv) such other general principles as are deemed relevant by the court." *Id.* at 109 (cleaned up). In light of these considerations, an award of prejudgment interest is merited here.

"An award of prejudgment interest may be appropriate when a plaintiff recovers out-of-pocket damages for a defendant's violation of § 10(b) of the Securities Act." *In re Longfin Corp. Sec. Class Action Litig.*, No. 18cv2933 (DLC), 2020 WL 4345731, at *4 (S.D.N.Y. July 29, 2020) (citing *Com. Union Assurance Co. PLC v. Milken*, 17 F.3d 608, 615 (2d Cir. 1994) ("Under the rescissory measure of damages appellants would be entitled to a return of the consideration paid for the... interests plus prejudgment interest, less any income received on the interests.")). As the court explained in *Desvarieux v. Axiom Holdings, Inc.*, No. 17CIV4756JPCGWG, 2022 WL

1467973, at *4 (S.D.N.Y. May 10, 2022) (report and recommendation of magistrate judge, adopted by the district judge on May 26, 2022):

> We agree with plaintiffs that an award of prejudgment interest will serve to ensure that plaintiffs are fully compensated for the damages they suffered, and will further the remedial purposes of the securities laws. *See SEC v. Muraca*, No. 17-CV-11400, 2019 WL 6619297, at *9 (D. Mass. Dec. 5, 2019) ("If a court does not order prejudgment interest, a defendant who has violated securities law receives an 'interest-free loan' on the profits he has made through his fraud"). We also conclude that considerations of fairness do not counsel against such an award.

The same reasoning the courts applied in *Longfin* and *Desvarieux* applies here. Plaintiffs and the Class are investors who suffered out-of-pocket damages when Defendants' fraud was revealed and the price of FXCM securities fell on February 7, 2017. Plaintiffs' request for prejudgment interest here accords with *Longfin*, 2020 WL 4345731 at *4, and *Desvarieux*, 2022 WL 1467973 at *5, where the courts awarded prejudgment interest on Section 10(b) claims from the end of the respective class periods. An award of prejudgment interest is merited here to fully compensate Plaintiffs and the Class for both their direct economic loss and the returns they may have earned if not for Defendants' fraud. Not awarding prejudgment interest would amount to granting Defendants an interest-free loan in the amount of the judgment from the time the artificial inflation in the securities dissipated and damaged Plaintiffs, through the many years of litigation, to the time the judgment is entered.

The same factors that a court relies on to determine whether an award of prejudgment interest is warranted "also inform a district court's choice of a particular interest rate." *Frommert*, 913 F.3d at 109. In this case, the New York state statutory rate of 9% is most appropriate. *See* N.Y. Civil Practice Law and Rules § 5004(a). "When a federal statute is silent with respect to a prejudgment interest rate, the 'common practice among courts within the Second Circuit is to grant interest at a rate of 9%, the rate of prejudgment interest under New York State law.'" *Garden City*

*Boxing Club, Inc. v. Morales*, No. 05-CV-0064 FB KAM, 2005 WL 2476264, at *10 (E.D.N.Y. Oct. 7, 2005) ("plaintiff [is] awarded prejudgment interest at a rate of nine percent") (quoting *Serv. Emps. Int'l Union, Loc. 32BJ, AFL-CIO v. Stone Park Assocs., LLC*, 326 F. Supp. 2d 550 (S.D.N.Y. 2004) (holding same)); *see also Marini v. Adamo*, 995 F. Supp. 2d 155, 209 (E.D.N.Y. 2014) (awarding 9% prejudgment interest rate).[6] "[N]o federal statute controls the rate of prejudgment interest." *Sec. Ins. Co. of Hartford v. Old Dominion Freight Line, Inc.*, 314 F. Supp. 2d 201, 203 (S.D.N.Y. 2003). Thus, Plaintiffs request that the Court apply the New York statutory interest rate of 9% for prejudgment interest awarded in this case.

Alternatively, other reasonable rates the Court might apply are the federal prime rate, the statutory interest rate for post-judgment interest set forth in 28 U.S.C. § 1961, and the IRS's rate for underpayment of taxes. Other courts in this district have applied the federal prime rate, which is currently 7%.[7] *Frommert*, 913 F.3d at 109–10; *Curiale v. Hartford Life & Accident Ins. Co.*, No. 2:21-CV-54, 2022 WL 4364072, at *5 (D. Vt. Sept. 21, 2022). The courts in *Longfin*, 2020 WL 4345731 at *4, and *Desvarieux*, 2022 WL 1467973 at *4, each applied the post-judgment interest rate in 28 U.S.C. § 1961. In *First Jersey*, 101 F.3d at 1476, the Second Circuit affirmed the district

---

[6] Other circuits hold similarly. *See Hansen v. Cont'l Ins. Co.*, 940 F.2d 971, 984 (5th Cir. 1991) (affirming "award of 10% prejudgment interest ... because state law is not binding but merely provides guidance, it is within the discretion of the district court to select an equitable rate of prejudgment interest"); *Colon Velez v. Puerto Rico Marine Mgmt., Inc.*, 957 F.2d 933, 941 (1st Cir. 1992) (affirming 12% prejudgment interest rate based on Puerto Rico law even in the absence of a state-law claim: "Because the [federal law] is silent as to pre-judgment interest and the granting of pre-judgment interest falls under the equitable powers of the district court, the court may look to state law in setting the pre-judgment interest rate. ... [T]he court did not abuse its discretion in levying pre-judgment interest against the appellants at a [12%] rate pursuant to Puerto Rico law.").

[7] Forbes, "What Is The Prime Rate Today?," *available at* https://www.forbes.com/advisor/investing/prime-rate/#:~:text=What%20Is%20the%20Current%20Prime,largest%20banks%20in%20each%20country (last visited December 9, 2022).

court's discretionary award of prejudgment interest using "the rate employed by ... IRS[] for an underpayment," which "reflects what it would have cost to borrow" and thus approximates "benefits the defendant derived from its fraud." *Id.* (rejecting treasury bill interest rate: "That advantageous [low] rate would seem highly inappropriate ... where defendants ... had the use of the money"); *see also Roth v. Jennings*, No. 03 CIV. 7760DAB, 2009 WL 1440670, at *7 (S.D.N.Y. May 21, 2009) (awarding the same rate, quoting *First Jersey*). The IRS underpayment interest rate is "the federal short-term rate plus 3 percentage points," which is "compounded daily."[8] Plaintiffs respectfully submit that using the IRS underpayment rate in this case would be overly complex due to the many years that have passed since the injury to Plaintiffs and the Class, as the IRS rate varies on a quarterly basis.[9]

Finally, post-judgment interest is mandated by statute, and will be added to any judgment not promptly paid, at the following statutorily assigned rate:

> Interest shall be allowed on any money judgment in a civil case recovered in a district court. ... Such interest shall be calculated from the date of the entry of the judgment, at a rate equal to the weekly average 1-year constant maturity Treasury yield, as published by the Board of Governors of the Federal Reserve System, for the calendar week preceding the date of the judgment. ... Interest shall be computed daily to the date of payment ... and shall be compounded annually.

28 U.S.C. §§ 1961(a) and (b) (footnote omitted).

## VI.   JURY TRIAL

Plaintiffs seek a jury trial. Since Plaintiffs seek only monetary damages, all of the issues raised in this action are triable to a jury as a matter of right. *See U.S. Const. Amend. VII* ("In Suits

---

[8] IRS, "Quarterly Interest Rates," *available at* https://www.irs.gov/payments/quarterly-interest-rates (citing 26 U.S.C. § 6621(a)(2) and 26 U.S.C. § 6622).

[9] *Id.* (providing quarterly underpayment interest rates dating back to 2017, varying from 3-6%).

at common law, where the value in controversy shall exceed twenty dollars, the right of trial by jury shall be preserved…"). Plaintiffs made a timely demand for a jury trial, iterated in each complaint Plaintiffs filed. *See* ECF Nos. 1, 48, 111, and 181.

## VII.   ATTORNEYS' FEES

In the event Plaintiffs prevail in this litigation, Plaintiffs will tax costs and submit the appropriate application in accordance with the standard practices of this Court in awarding costs and/or attorneys' fees in securities class actions, if and as warranted.

## VIII.   CONCLUSION

Plaintiffs will prove each element of their claims against Defendants at trial, meriting judgment entered in favor of Plaintiffs and the Class.

Dated: December 14, 2022

**THE ROSEN LAW FIRM P.A.**

By: */s/Joshua Baker*
Laurence M. Rosen
Phillip Kim
Joshua Baker
275 Madison Avenue, 40th Floor
New York, New York 10016
Telephone: (212) 686-1060
Fascimile:  (212) 202-3827
Email: lrosen@rosenlegal.com
          pkim@rosenlegal.com
          jbaker@rosenlegal.com

*Class Counsel for Plaintiffs and the Class*

**WOLF HALDENSTEIN ADLER FREEMAN & HERZ LLP**
Matthew M. Guiney
270 Madison Ave.
New York, NY 10016
Tel: (212) 545-4600
Email: guiney@whafh.com

*Additional Counsel*

## <u>CERTIFICATE OF SERVICE</u>

I, the undersigned say:

I am not a party to the above case, and am over eighteen years old. On December 14, 2022, I served true and correct copies of the foregoing PLAINTIFFS' PRETRIAL MEMORANDUM OF LAW, by posting the document electronically to the ECF website of the United States District Court for the Southern District of New York, for receipt electronically by the parties listed on the Court's Service List.

I affirm under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

Executed on December 14, 2022, at Jenkintown, Pennsylvania.

*/s/Joshua Baker*