UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

---

In re Global Brokerage, Inc. f/k/a FXCM, Inc.
Securities Litigation

Master File No. 1:17-cv-00916-RA

CLASS ACTION

---

This Document Relates To:  All Actions

---

## DEFENDANTS' PRETRIAL MEMORANDUM OF LAW

Israel Dahan
Peter Isajiw
Ryan Gabay
KING & SPALDING LLP
1185 Avenue of the Americas
New York, New York 10036-2601
Tel: (212) 556.2100
Fax: (212) 556.2200

Chelsea Corey
KING & SPALDING LLP
300 S. Tryon Street, Suite 1700
Charlotte, North Carolina 28202
Tel: (704) 503.2575
Fax: (704) 503.2622

*Attorneys for Defendants Global Brokerage, Inc. f/k/a/
FXCM, Inc., Dror Niv, and William Ahdout*

## <u>TABLE OF CONTENTS</u>

TABLE OF CONTENTS ...................................................................................................... i

TABLE OF AUTHORITIES ............................................................................................... ii

PRELIMINARY STATEMENT ........................................................................................... 1

BACKGROUND ................................................................................................................. 2

    I.      Relevant Facts ........................................................................................................ 2

    II.    Plaintiffs' Claims .................................................................................................. 6

TRIAL ISSUES .................................................................................................................. 8

    I.      Plaintiffs Cannot Prove Their Section 10(b) Claim ......................................... 8

        A.  Plaintiffs Cannot Show a Misrepresentation or Omission. ................................... 9

        B.  Plaintiffs Cannot Demonstrate a Genuine Issue of Material Fact Regarding Scienter. ................................................................................................................ 18

        C.  Plaintiffs Cannot Demonstrate a Genuine Issue of Material Fact Regarding Loss Causation ...................................................................................................... 21

        D.  Plaintiffs Cannot Demonstrate a Genuine Issue of Material Fact Regarding Economic Loss. ..................................................................................................... 24

    II.    Individual Plaintiff 683 Capital Cannot Prove Its Section 10(b) Claim ................ 26

        A.  683 Capital Cannot Raise a Genuine Issue of Material Fact Regarding Reliance.... ........................................................................................................... 27

        B.  683 Capital Cannot Establish Loss Causation and Economic Loss. .................. 30

    III.   Plaintiffs Cannot Prove Their Section 20(a) Claim. ................................................ 31

CONCLUSION ................................................................................................................. 32

## <u>TABLE OF AUTHORITIES</u>

**Cases**

*Action AG v. China North East Petroleum Holdings Ltd.*,
   692 F.3d 34 (2d Cir. 2012)..................................................................................25

*Affiliated Ute Citizens v. United States*,
   406 U.S. 128 (1972)...........................................................................8, 25, 27

*Atlantica Holdings, Inc. v. Sovereign Wealth Fund Samruk-Kazyna JSC*,
   477 F. Supp. 3d 88 (S.D.N.Y. 2020).........................................................9, 22, 24

*ATSI Commc'ns Inc. v. Shaar Fund, Ltd.*,
   493 F.3d 87 (2d Cir. 2007).....................................................................31

*Basic Inc. v. Levinson*,
   485 U.S. 224 (1988). ECF No. 229.............................................................8, 27

*Beleson v. Schwartz*,
   419 Fed. Appx. 38 (2d Cir. 2010)..............................................................32

*In re BP p.l.c. Sec. Litig.*,
   No. 4:10-md-2185, 2016 WL 3090779 (May 31, 2016)......................................26

*Carpenters Pension Trust Fund of St. Louis v. Barclays PLC*,
   750 F.3d 227 (2d Cir. 2014)................................................................21, 24

*Charney v. Wilkov*,
   734 Fed. App'x 6 (2d Cir. 2018)...............................................................27

*City of Omaha Police & Fire Ret. Sys. v. Evoqua Water Techs. Corp.*,
   450 F. Supp. 3d 379 (S.D.N.Y. 2020)..........................................................20

*Crown Cork & Seal Co., Inc. Master Retirement Trust v. Credit Suisse First
   Boston Corp.*,
   No. 12 Civ. 05803, 2013 WL 978980 (S.D.N.Y. Mar. 12, 2013) ..........................25

*Dodona I, LLC v. Goldman Sachs & Co.*,
   132 F. Supp. 3d 505 (S.D.N.Y. 2015)..........................................................32

*Erica P. John Fund, Inc. v. Halliburton Co.*,
   563 U.S. 804 (2011)........................................................................27, 28

*In re GlaxoSmithKline PLC Sec. Litig.*,
   No. 05 Civ. 3751 (LAP), 2006 WL 2871968 (S.D.N.Y. Oct. 6, 2006) .....................8

*Gruber v. Price Waterhouse*,
   776 F. Supp. 1044 (S.D.N.Y. 1991)............................................................29

*In re Int'l Bus. Machines Corp. Sec. Litig.*,
   163 F.3d 102 (2d Cir. 1998)....................................................................................9

*Lentell v. Merrill Lynch & Co.*,
   396 F.3d 161 (2d Cir. 2005)..........................................................................21, 24

*Novak v. Kasaks*,
   216 F.3d 300 (2d Cir. 2000)..................................................................................20

*In re Omnicom Grp., Inc. Sec. Litig.*,
   597 F.3d 501 (2d Cir. 2010)..................................................................................31

*Pension Comm. of the Univ. of Montreal Pension Plan v. Banc of Am. Sec., LLC*,
   592 F. Supp. 2d 608 (S.D.N.Y. 2009)..................................................................28

*In re Refco, Inc. Sec. Litig.*,
   503 F. Supp. 2d 611 (S.D.N.Y. 2007)..................................................................32

*Reiss v. Pan Am. World Airways, Inc.*,
   711 F.2d 11 (2d Cir. 1983)....................................................................................18

*In re REMEC Inc. Sec. Litig.*,
   702 F. Supp. 2d 1202 (S.D. Cal. 2010)...........................................................20, 21

*Richter v. Achs*,
   962 F. Supp. 31 (S.D.N.Y. 1997)........................................................................28

*Rothman v. Gregor*,
   220 F.3d 81 (2d Cir. 2000)....................................................................................18

*SEC v. Yorkville Advisors, LLC*,
   305 F. Supp. 3d 486 (S.D.N.Y. 2018)..................................................................32

*Special Situations Fund III QP, L.P. v. Deloitte Touche Tohmatsu CPA, Ltd.*,
   33 F. Supp. 3d 401 (S.D.N.Y. 2014)....................................................................32

*Strougo v. Barclays PLC*,
   334 F. Supp. 3d 591 (S.D.N.Y. 2018)..................................................................32

*In re UBS AG Sec. Litig.*,
   No. 07-cv-11225, 2012 WL 4471265 (S.D.N.Y. Sept. 28, 2012), *aff'd*, 752
   F.3d 173 (2d Cir. 2014)........................................................................................21

**Statutes**

15 U.S.C. § 78bb(a) ..................................................................................................25

15 U.S.C. § 78t(a) ....................................................................................................31

Defendants Global Brokerage Inc. f/k/a FXCM Inc. ("FXCM" or the "Company"), Dror Niv and William Ahdout (collectively "Defendants") submit this pretrial memorandum to assist the Court by explaining the facts and legal issues that will be central to the trial of this case.

## PRELIMINARY STATEMENT

At their core, Plaintiffs' securities fraud claims are based on the following premise: that Effex's agreement to pay FXCM a fixed-dollar amount for order flow was really a profit-sharing agreement and that FXCM and Effex were virtually one and the same. The evidence does not support this assertion. As will be conclusively shown at trial, the payments Effex made to FXCM under the Services Agreement were based on the volume of order flow filled by Effex and were not based on how much profit Effex ultimately made on that order flow. In fact, there is not a single witness who will testify at trial that the parties intended to have a profit-sharing arrangement and sought to hide such relationship from investors. Similarly, the evidence at trial will conclusively show that Effex and FXCM were independently operated entities throughout the Class Period, as Effex: (1) managed its own business, maintained its own payroll, opened its own offices, and maintained its own bank accounts; (2) had trading relationships with dozens of counterparties besides FXCM and Effex never paid FXCM for any business Effex transacted with non-FXCM counterparties; and (3) had the obligation to absorb its own losses and the right to its own profits. Importantly, it is undisputed that the Services Agreement was terminated in August 2014—halfway through the Class Period—at which point Effex no longer made payments for order flow to FXCM. And it is undisputed that this termination was publicly disclosed in August 2014.

More than two years later, when Defendants' settlements with the CFTC and NFA were announced in February 2017, Plaintiffs jumped on the opportunity to leverage a no-admit, no-deny settlement (composed of mere allegations of no evidentiary value) into a class action pay day. But

1

the paucity of evidence supporting any aspect of Plaintiffs' claims will prevent that outcome.  As outlined below, no reasonable juror will be able to impose securities fraud liability on Defendants.

## BACKGROUND

### I.      Relevant Facts

FXCM was founded in 1999 as an online provider of foreign exchange ("FX") trading and related services.  FXCM offered its customers access to over-the-counter FX markets through its proprietary technology platform.  On December 7, 2010, FXCM completed its initial public offering.

There are primarily two trading models employed by FX service providers like FXCM:  an agency model, or "No Dealing Desk," and a principal model, or "Dealing Desk."  In an agency trading model, the customer places an order with a broker, a commission is charged, and that order is passed on to be executed with a liquidity provider.  As a result, in an agency model, the broker is not exposed to market risk and primarily makes money by charging a commission or markup.  In contrast to the agency model, in a principal model the broker is the direct counterparty that executes the customer's trade.  Thus, in a principal model, the broker is exposed to market risk and primarily makes money when the market moves in the broker's favor (in a direction adverse to the customer placing the trade).  Contrary to Plaintiffs' unsupported contention, during the Class Period, FXCM primarily employed an agency model.  This was true even during the period of time FXCM had its payment for order flow relationship with Effex.  Notably, in years where payment for order flow was earned, FXCM's trading revenue from commissions never fell below 94% of its total revenue.

In September 2009, FXCM hired John Dittami to manage algorithmic trading projects at FXCM.  The intent of these projects was to improve FXCM's customer experience and combat aggressive trading tactics employed by FXCM's liquidity providers.  In the fall of 2009 through

the spring of 2010, Dittami developed a trading algorithm to provide customers with a better FX trading experience.  The trading algorithm was tested on a limited number of trades in Japan, but it never went live to FXCM's U.S. retail customers.  Shortly thereafter, as a result of concerns raised by its compliance department, FXCM decided to halt the new venture and determined that Dittami should separate from the company and form an independent market marker.  On April 14, 2010, Dittami resigned from FXCM and recommended that he and FXCM release one another from their respective responsibilities under Dittami's employment agreement.

On March 23, 2010, Dittami formed an independent company called Effex to stream foreign currency prices and provide foreign currency execution services—that is, to act as a liquidity provider—to FXCM and other FX counterparties.  Shortly after its formation, Effex began operating as a FX liquidity provider utilizing the trading system and algorithms developed by Dittami.  Dittami paid FXCM for ownership of the trading system and algorithm.  Since the date of its formation, Dittami and the Dittami Dynasty Trust have owned at least 93% of the issued and outstanding units of Effex.  *No FXCM entity, employee, officer, board member, or affiliate has ever held any equity interest or position in Effex.*  Additionally, since its inception, Dittami has been the managing member of Effex and has made all major decisions concerning Effex, including hiring members, establishing banking relationships, determining employee compensation, selecting office locations, client onboarding (including competitors of FXCM), vendor selection, and prime broker selection.

Effex and FXCM Holdings, LLC executed a Services Agreement that was effective as of May 1, 2010.  The Services Agreement provided that "FXCM shall receive from Effex a fee equal to $21.00 USD per million units of Base Currency . . . for the aggregated volume of Transactions executed via the Trading system . . . ."  The Services Agreement was not a profit-sharing

agreement. Instead, per the express terms of this agreement, FXCM received a fixed fee from Effex based on customer trading volume. There is no mention of a profit-sharing agreement in the Services Agreement. In fact, when the Services Agreement was being negotiated, FXCM rejected any proposal to enter into a profit-sharing arrangement with Dittami. And the evidence further shows that Effex never paid FXCM for any order flow business Effex transacted with non-FXCM counterparties.

Between June 2011 and August 2014—a period of more than three years—FXCM and Effex renegotiated the fixed "per million" fee in the Services Agreement only three times based on changing market conditions—twice to set a different fee for two discrete currency pairs, and once to reduce the overall fee from $21 per million in order flow volume to $16 per million. Renegotiation of a payment for order flow fee over the course of a multi-year relationship is not unusual, especially when price spreads start to tighten as occurred in the FX market.

During the term of the Services Agreement, FXCM sent Effex payment invoices that confirm that the amount payable from Effex was determined using the volume of customer trading that Effex executed that month, multiplied by the fee. There is nothing in the invoices reflecting that Effex was required to pay a percentage of its profits to FXCM for such volume of order flow. Indeed, there is no record evidence to demonstrate Effex's profits at any time during the Class Period. FXCM's financial statement auditor, Ernst & Young LLP ("EY"), also confirmed in the course of a number of financial statement audits that the payments Effex made to FXCM under the Services Agreement matched the amounts payable on the invoices. And those amounts payable to FXCM were due and owing regardless of whether Effex made or lost money.

The undisputed evidence further confirms that, during the Services Agreement period, payments for order flow were common and legal in the United States and abroad. For example, in

the U.S. equities market, large brokers such as Charles Schwab and Interactive Brokers received payments for order flow during the Class Period.  And certain institutional FX trading platforms in Europe receive payments for order flow from liquidity providers.  FXCM itself paid for order flow received from introducing brokers.  Indeed, FXCM paid $76.6 million to introducing brokers globally in 2012.  The legality of payment for order flow cuts against Plaintiffs' unsupported claim that Defendants sought to hide such arrangement from investors.

FXCM terminated the Services Agreement with Effex effective August 1, 2014.  FXCM disclosed this termination publicly in its public filings from 2014.  FXCM did not receive payments for order flow from Effex after the termination of the Services Agreement.

On January 15, 2015, the Swiss National Bank announced that it would immediately end its three-year-old peg of 1.20 Swiss francs to one euro, just days after it had assured the market it had no intention of removing the currency peg.  This announcement resulted in widespread market disruption, causing a drop of nearly 30% in the value of the euro relative to the Swiss franc (the "SNB Flash Crash").  FXCM customers with positions in this currency pair lost more than $275 million and FXCM faced a regulatory capital shortfall.  As a result of the SNB Flash Crash, FXCM's share price decreased from $167.00 per share on January 15, 2015 to $16.00 per share on January 20, 2015.  The prices of the FXCM Notes also decreased and they traded below the par thereafter.

More than two years later, on February 6, 2017, FXCM announced simultaneous no-admit regulatory settlements with the NFA and the CFTC against Defendants concerning FXCM's business relationship with Effex and alleged regulatory violations.  Pursuant to the NFA Decision and CFTC Order, FXCM withdrew from the U.S. market.

## II.     Plaintiffs' Claims

The first complaint in this action was filed on February 7, 2017.  ECF No. 1.  On April 10, 2017, various putative class members filed motions requesting consolidation and seeking appointment as lead plaintiff.  ECF Nos. 11-31.  On May 3, 2017, the Court entered an order consolidating the related cases, appointing 683 Capital Partners, LP ("683 Capital") and Shipco Transport Inc. ("Shipco") as co-lead plaintiffs, and appointing the Rosen Law Firm as Lead Counsel.  ECF No. 47.

On June 19, 2017, Plaintiffs filed their Consolidated Securities Class Action Complaint ("CSAC").  ECF No. 48.  The CSAC also included Sergey Regukh and Brian Armstrong as named plaintiffs.  The CSAC was dismissed without prejudice on March 3, 2018.  ECF No. 108.  Plaintiffs filed their Second Amended Consolidated Securities Class Action Complaint ("SAC") on April 6, 2018.  ECF No. 111.  The SAC alleged that the Defendants were responsible for false or misleading public statements with respect to FXCM's agency trading model and the Company's order flow relationship with one of its market makers, Effex Capital LLC ("Effex").  SAC ¶¶ 2, 5.  The SAC also alleged that FXCM's financial statements were false and misleading because the Company had not consolidated Effex as a variable interest entity ("VIE"), or, in the alternative, disclosed Effex as a related entity.  *Id.* ¶ 13.  The SAC also alleged that FXCM had failed to properly disclose investigations by the CFTC and NFA regarding the Company's relationship with Effex.  *Id.* ¶ 15.

On March 28, 2019, the Court granted Defendants' Motion to Dismiss in part, dismissing Plaintiffs' claims against Defendant Robert Lande, FXCM's former CFO.  The Court also denied in part Defendants' Motion to dismiss but limited the time period for all of the misstatements

6

alleged by Plaintiffs to reflect FXCM's publicly announced termination of its order flow arrangement with Effex as of August 2014.  ECF No. 135 at 38.[1]

On January 6, 2020, Plaintiffs filed their first Motion for Class Certification and Appointment of Class Representatives and Class Counsel.  ECF No. 149.  On April 13, 2020, Plaintiffs filed a notice of Amended Motion for Class Certification and Appointment of Class Representatives and Class Counsel (the "Class Certification Motion"), which was substantively identical but substituted E-Global Trade and Finance Group, Inc. ("E-Global") for named Plaintiff Sergey Regukh.  ECF Nos. 174-75.  Defendants did not object to Plaintiffs' motion, and Plaintiffs also subsequently filed their Third Amended Consolidated Securities Class Action Complaint ("TAC") on April 17, 2020.  ECF No. 181.  In their Class Certification Motion, Plaintiffs asked the Court to certify a class consisting of:

> All persons and/or entities that purchased or otherwise acquired publicly traded Global Brokerage, Inc., f/k/a FXCM Inc. ("FXCM") securities, including FXCM 2.25% Convertible Senior Notes due 2018 [the "FXCM Notes"] and Class A common stock, during the period March 15, 2012 through February 6, 2017, both dates inclusive.  ECF No. 175 at 1.

The Class Certification Motion was assigned to Magistrate Judge Barbara Moses for a report and recommendation (ECF No. 171), which Magistrate Moses issued on March 18, 2021, after holding an evidentiary hearing (ECF No. 229).  On March 23, 2021, the Court fully adopted Magistrate Judge Moses' report and recommendation.  ECF No. 232.  The Court therefore granted Plaintiffs' request in their Class Certification Motion to certify a class of common stockholders

---

[1] Specifically, the Court allowed Plaintiffs to proceed on their claims of alleged misstatements as follows:  "the agency-model statements identified by Plaintiffs from the beginning of the Class Period through the end of FXCM and Effex's order flow arrangement; (2) the order flow statements identified by Plaintiffs from the beginning of the Class Period through the Company's 2014 10-K; and (3) [FXCM's] failure the disclose Effex as a VIE from the beginning of the Class Period through the end of FXCM and Effex's order flow arrangement."  ECF No. 135 at 38.

but denied class certification as to the FXCM Notes.  ECF Nos. 232, 229.  Specifically, Magistrate Judge Moses found that Plaintiffs, through their market efficiency expert Dr. Adam Werner, did not establish that the FXCM Notes traded in an efficient market.  Thus, FXCM Noteholders were not entitled to the presumption of reliance under *Basic Inc. v. Levinson*, 485 U.S. 224 (1988).  ECF No. 229 at 14.  Nor were FXCM Noteholders entitled to a presumption of reliance under *Affiliated Ute Citizens v. United States*, 406 U.S. 128 (1972).  *Id.* at 23-24.  Accordingly, the Court found that common questions of fact and law did not predominate.  *Id.* at 23.  In addition, the Court found that the proposed FXCM Noteholder class was not sufficiently numerous to satisfy Federal Rule of Civil Procedure 23.  *Id.* at 15-16.

On November 9, 2021, Defendants moved for summary judgment on all claims.  ECF No. 248.  On August 19, 2022, the Court entered an oral ruling denying the motion on the ground that certain issues of fact prevented the entry of summary judgment.  ECF No. 322-1.  The case is now scheduled for a jury trial beginning on February 13, 2023.  ECF No. 319.

## TRIAL ISSUES

### I.    Plaintiffs Cannot Prove Their Section 10(b) Claim

To prevail on their Section 10(b) claim, Plaintiffs must prove each of the following elements: "1) a material misrepresentation or omission; 2) scienter or 'wrongful state of mind;' 3) a connection with the purchase or sale of a security; 4) reliance; 5) economic loss; and 6) loss causation."  *In re GlaxoSmithKline PLC Sec. Litig.*, No. 05 Civ 3751 (LAP), 2006 WL 2871968, at *5 (S.D.N.Y. Oct. 6, 2006) (citing *Dura Pharms., Inc. v. Broudo*, 544 U.S. 336, 341-42 (2005)).  Plaintiffs cannot prove at least *four* of these elements—namely, misrepresentation or omission, scienter, loss causation, or economic loss.

A.     **Plaintiffs Cannot Show a Misrepresentation or Omission.**

Plaintiffs must prove that Defendants made "false statement[s] or omission[s] of material fact." *In re Int'l Bus. Machines Corp. Sec. Litig.*, 163 F.3d 102, 106 (2d Cir. 1998).  Indeed, if no false statement or omission of material fact can be proven because the relevant statements are true, judgment as a matter of law is required.  *See, e.g.*, *Atlantica Holdings, Inc. v. Sovereign Wealth Fund Samruk-Kazyna JSC*, 477 F. Supp. 3d 88, 100 (S.D.N.Y. 2020) (granting summary judgment because "no reasonable factfinder could conclude that any" of the alleged misstatements were material misstatements or omissions).  Although Plaintiffs allege three categories of misstatement by Defendants—FXCM's agency model, Effex's order flow payments, and GAAP "violations"—they cannot demonstrate any actual misrepresentation or omission concerning any of these categories.

1.     **FXCM Operated an Agency Model Even When It Had an Order Flow Agreement with Effex.**

Plaintiffs allege that certain statements in FXCM's public filings are false and misleading because FXCM did not in fact operate using an agency model.  Those statements are:

1.  From FXCM's 2011 10-K, 2012 10-K, and 2013 10-K:  "We primarily offer our customers what is referred to as an agency model to execute their trades. Our agency model is fundamental to our core business philosophy because we believe that it aligns our interests with those of our customers and reduces our risks. In the agency model, when our customer executes a trade on the best price quotation offered by our FX market makers, we act as a credit intermediary, or riskless principal, simultaneously entering into offsetting trades with both the customer and the FX market maker. We earn trading fees and commissions by adding a markup to the price provided by the FX market makers and generate our trading revenues based on the volume of transactions and the spread earned on transactions."  ECF No. 181 ¶ 146.

2.  From FXCM's 12Q2 10-Q and 2013 10-K: "[A]s we have for a number of years conducted our retail operations on the basis of the agency model, we could suffer reputational damage and additional regulatory scrutiny by offering execution to retail clients that creates an inherent conflict between the interests of the customer and our interests." *Id.* ¶ 156.

9

3. From FXCM's 2012 10-K: "Our commitment to the agency model is one example of our core business philosophy to reduce risks." *Id.* ¶ 158.

4. From FXCM's 13Q1 10-Q, 13Q2 10-Q, 13Q3 10-Q, 14Q1 10-Q, 14Q2 10-Q, and 14Q3 10-Q: "As we predominantly operate our retail business on an agency model with the exception of certain trades of our CFD customers we are not exposed to the market risk of a position moving up or down in value." *Id.* ¶ 160.

5. From FXCM's website on January 27, 2013: "FXCM does not take a market position-eliminating a major conflict of interest."

6. From FXCM's website on February 5, 2013: "FXCM can see your waiting orders when you trade with No Dealing Desk execution. But this does not create a conflict of interest between you and FXCM because we aren't taking a market position."

Plaintiffs claim that these statements are false "because FXCM had not been conducting its retail operations on the agency model since it launched the trading algorithm in 2009 that was later spun off into Effex" (*id.* ¶ 157); "FXCM was not committed to the agency model or reducing associated risks due to its relationship with Effex" (*id.* ¶ 159); and "FXCM did not predominantly operate its business on an agency model due to its relationship with Effex" and "was in fact exposed to the market risks it described" (*id.* ¶¶ 161, 147).  Plaintiffs' assertions are wrong.

As will be explained in depth by Mr. Simon Wilson-Taylor, Defendants' expert on the FX industry, an agency model, alternately called a "no dealing desk" model, is an FX trading model in which the customer places an order with a broker, a commission is charged, and then that order is passed on to be executed with a liquidity provider—all of which happens in milliseconds.  In an agency model, the broker is not exposed to market risk; instead, that risk is passed on to liquidity providers which execute the trades.  In an agency model the broker makes money by charging a commission or receiving volume-based payments for order flow.  In contrast to the agency model, in a principal model (or "dealing desk" model) the broker (principal) is the direct counterparty that executes the customer's trade.  In a principal model, the broker is exposed to market risk.  Further,

in a principal model the broker makes money when the market price moves in its favor and loses money if the market price moves in an adverse direction.  In addition, an agency model allows retail customers access to the best price from a wide range of FX liquidity providers, while in a principal model the retail customer is only provided access to the price from the principal, which acts as the trade counterparty.

As Mr. Simon Wilson-Taylor will testify and demonstrate at trial, at all times during the Class Period, including when FXCM had a payment for order flow agreement with Effex, the No Dealing Desk trading platform that FXCM provided to its customers retained all the foregoing characteristics of an agency model, and FXCM did not have a conflict of interest with its retail trading customers.  Thus, FXCM's representations concerning the operation of its agency model during the Class Period were truthful.  To begin with, it is undisputed that on FXCM's No Dealing Desk trading platform, FXCM passed on every trade it received from a customer to a liquidity provider. The relationship with Effex under the Services Agreement did not alter this fact.  It is also undisputed that FXCM's customers (1) had access to the best price quote from a number of available liquidity providers, as is consistent with an agency model and (2) ultimately received the best available price on their trades, including those trades filled by Effex.

Likewise, it is undisputed that FXCM primarily made money from its retail customers by charging them a commission on trades.  In fact, even in the years where payment for order flow was earned, between 94.03% and 98.03% of FXCM's annual revenue was earned from trading commissions—not payments for order flow.

Despite the mental gymnastics Plaintiffs employ to argue otherwise, FXCM was not exposed to market risk and did not earn profits that were causally linked to customers' profits and losses.  Plaintiffs' assertion that the order flow payments Effex made to FXCM were based on

Effex's profits and losses has been, and at trial will be, shown false in multiple ways:  (1) through the express terms of the Services Agreement and the volume-based payments made pursuant to it; (2) through sworn testimony of both Effex and FXCM employees explaining that Effex made payments to FXCM solely based on the volume of order flow and not based on Effex's profits or losses on the order flow; and (3) Plaintiffs' own expert's observation that FXCM rejected any profit-sharing agreement with Effex.  Under the Services Agreement, if FXCM's customers made money, FXCM was still paid the same fee based on the volume of the trades.  ¶¶ 62-64.  In short, whether FXCM's customers made money or lost money on the trade or whether Effex made money or lost money on the trade, FXCM was paid the same fee based on the volume of the trades.  ¶¶ 62-64.  Indeed, there is not a single fact witness who will testify differently at trial.

Because FXCM's retail trading desk retained all the aspects of an agency model, its public disclosures during the Class Period concerning its agency model were truthful.

### 2.  FXCM Did Not Have a Profit-Sharing Agreement with Effex.

Plaintiffs allege that certain statements in FXCM's public filings are false and misleading because, according to Plaintiffs, Effex's order flow payments to FXCM amounted to an undisclosed profit-sharing agreement.  Those statements are:

1. From the 2011 10-K, 12Q1 10-Q, 12Q2 10-Q, 12Q-3 10-Q, 2012 10-K, 13Q1 10-Q, 13Q2 10-Q, 13Q3 10-Q, 2013 10-K, 14Q1 10-Q, 14Q2 10-Q, 14Q3 10-Q and 2014 10-K:  "Retail trading revenue is our largest source of revenue and is primarily driven by:  . . . (iv) the amount of additional retail revenues earned, including . . . payments we receive for order flow from FX market makers."  ECF No. 181 ¶ 148.

2. From FXCM's 12Q1 10-Q, 12Q2 10-Q, 12Q3 10-Q, 2012 10-K, 2013 10-K, and 2014 10-K:  "Income earned on order flow represents payments received from certain FX market makers in exchange for routing trade orders to these firms for execution.  The Company's order routing software ensures that payments for order flow do not affect the routing of orders in a manner that is detrimental to its retail customers."  *Id.* ¶ 150.

3. From FXCM's 2011 10-K, 12Q2 10-Q and 12Q3 10-Q: "We earn trading fees and commissions by adding a markup to the price provided by the FX market makers and generate our trading revenues based on the volume of transactions, not trading profits or losses." *Id.* ¶ 152.

4. From FXCM's 14Q3 10-Q and 2014 10-K: The Company "no longer receive[d] payments for order flow." *Id.* ¶ 162.

Plaintiffs claim that these statements are false and misleading because "FXCM did not receive payments for order flow from any market makers, much less multiple market makers" and "[t]o the extent it received 'order flow' payments from Effex, those payments were not for order flow but rather an approximation of 70% of Effex's profits and losses from its trades on the FXCM platform." *Id.* ¶¶ 149, 151, 162, 163. Plaintiffs further allege that "the statements fail to disclose that on top of trading fees and commissions, FXCM was earning kickback payments from Effex that were tied directly to Effex's trading profits and losses. Omitting these kickback payments misled investors as to the source of FXCM's revenues." *Id.* ¶ 153.

Plaintiffs' assertions are unsupported by the evidence, which shows that the payments FXCM received from Effex were strictly dependent on the amount of order flow executed by Effex and not dependent on the amount of profit Effex ultimately made on such executed order flow. This is confirmed by the express terms of the Services Agreement, the billed invoices, and first-hand testimony of those involved in the relationship.

The Services Agreement provides that:

FXCM shall receive from Effex a fee equal to $21.00 USD per million units of Base Currency . . . for the aggregated volume of Transactions executed via the Trading System (the 'Fees'). The Fee shall be calculated by FXCM on a monthly basis. FXCM shall provide Effex an invoice for all unpaid Fees. . . . As used herein, 'Base Currency' means the first currency of the given currency pair as displayed on the FXCM Trade Station II platform.

Consistent with the terms of the Services Agreement, payment invoices from FXCM to Effex provide that the amount payable from Effex was determined using the volume of customer trading

13

Effex executed that month, multiplied by the fee.  Robert Lande, FXCM's then-CFO, Josh Rosenfeld, FXCM's then-Director of Finance, and John Dittami, Effex's Founder, all will confirm, by live or deposition testimony, that FXCM's invoices to Effex were based on order flow. Moreover, EY, FXCM's financial statement auditor, confirmed that Effex's payments to FXCM matched the amounts payable on the invoices.  Thus, it is indisputable that the payments Effex made to FXCM were based on the volume of order flow, not the amount of profit Effex ultimately made on its trades.

Nowhere in the Services Agreement, or any other agreement between FXCM and Effex, is there an agreement to share profits or losses.  The evidence shows that Effex paid the same fixed fee to FXCM, regardless of whether it made or lost money on trades.  While Plaintiffs have pointed to Dittami's original employment agreement with FXCM as some form of foundation for a later 70%-30% profit-sharing agreement, such an agreement never materialized.  Dittami's employment agreement was terminated in April 2010, and Plaintiffs' own expert has agreed that the Services Agreement was not amended to incorporate Dittami's requests for a 70/30 profit split.

Plaintiffs have similarly relied on a contemplated option agreement, that both FXCM and Effex agree was never operative, as support for the premise that there was a profit-sharing relationship among the two companies.  As a matter of logic, even if an option agreement existed, an unexercised option to purchase a company is not evidence of active profit sharing.  But in any event, despite the existence of a signed option agreement dated April 14, 2010, Niv, Ahdout, Lande, and Dittami all testified—and will confirm at trial—that an option agreement never came into existence.  And this testimony is bolstered by correspondence from October 2010 that indicates the parties were still considering and negotiating a potential option agreement— seemingly unnecessary negotiations if an option agreement already existed.  For the avoidance of

doubt, on November 20, 2015, the parties signed an Acknowledgement and Confirmation that stated that "Dittami and FXCM signed the document labeled 'Option Agreement' attached as Exhibit A" and "the Parties never effected the License Agreement contemplated as consideration for the Option Agreement."  It further stated: "The Parties acknowledge and agree that no rights or obligations currently exist or ever existed as a result of the Option document and that the Option Document currently has no, and has never had, any legal force or effect."

Thus, neither the Services Agreement, nor the contemplated option agreement, provides Plaintiffs the support they need for their incorrect allegation that FXCM and Effex had an agreement to share profits.

### 3.  FXCM Complied with GAAP.

Plaintiffs allege that FXCM's financial statements violated GAAP, and their publication thereby constituted actionable misstatements, in two ways:

- Regarding Defendants' alleged failure to make disclosures about Effex as a VIE, Plaintiffs allege that each of FXCM's 2011 10-10, 12Q1 10-Q, 12Q2 10-Q, 12Q3 10-Q, 2012 10-K, 13Q1 10-Q, 13Q2 10-Q, 13Q3 10-Q, 2013 10-K, 14Q1 10-Q, 14Q2 10-Q, 14Q3 10-Q, and 2014 10-K were "materially false [and] misleading because: (a) Effex was a [VIE] and FXCM was required to, but did not, disclose Effex and details about its relationship with FXCM including the nature, purpose, size and activities of Effex and the methodology for determining that Effex was a VIE; (b) FXCM was required to consolidate Effex's financial results with FXCM's but failed to do so; and (c) as a result FXCM's financial statements did not comply with GAAP and were false when made."  ECF No. 181 ¶¶ 135, 136.

- Regarding Defendants' failure to make related party disclosures, Plaintiffs allege that each of FXCM's 2011 10-K, 12Q1 10-Q, 12Q2 10-Q, 12Q3 10-Q, 2012 10-K, 13Q1 10-Q, 13Q2 10-Q, 13Q3 10-Q, 2013 10-K, 14Q1 10-Q, 14Q2 10-Q, 14Q3 10-Q, and 2014 10-K "were materially and false misleading because Effex was a related party and FXCM was required to, but did not, disclose its material transactions with Effex including: (a) a description of the transactions for each period for which income statements are presented and such other information necessary to an understanding of the effects of the transactions on the financial statements, (b) the dollar amount of transactions for each of the periods for which income statements are presented, and (c) amounts due from or to Effex as of the date of each balance sheet presented and, if not otherwise apparent, the terms and manner of the settlement."  *Id.* ¶¶ 144, 145.

Plaintiffs cannot prove that any of these statements were false or that FXCM's financial statements did not otherwise comply with GAAP during the Class Period.  Neither the CFTC nor the NFA identified any evidence that would suggest that FXCM violated GAAP, and FXCM's financial statement auditor, EY, never suggested a restatement of FXCM's financials was necessary.  FXCM has never restated its financial statements.

<blockquote>

**a.    FXCM Was Not Required to Consolidate Effex as a VIE During the Class Period.**

</blockquote>

FXCM was not required to consolidate Effex as a VIE.  Defendants' accounting expert Thomas Linsmeier will explain at trial the relevant GAAP considerations.  Specifically, ASC 810 provides the controlling methodology for determining whether such consolidation is appropriate, and it prescribes a three-step test: (1) whether the entity considered for consolidation is a VIE; (2) whether the reporting entity has a variable interest in the VIE; and (3) whether the reporting entity the primary beneficiary of the VIE.  None of these steps is satisfied as to FXCM and Effex.

Whether an entity is considered a VIE is determined by examining (1) whether there is sufficient equity at risk and (2) whether the equity holders in the entity have the power to direct the significant activities of the entity, including the obligation to absorb losses or the right to receive residual returns.  As Mr. Linsmeier will opine, the available evidence indicates that Dittami did have sufficient equity at risk in Effex: among other things, Effex was capitalized with Dittami's personal funds; Dittami, directly or through his family trust, never held less than 93% of Effex's equity (the remainder was held by a few Effex employees, not any FXCM personnel/affiliates); and Dittami, as managing member, made all major decisions regarding Effex.  Critically, John Barron, Plaintiffs' purported accounting expert, fails to perform *any* substantive analysis of the equity that Dittami had at risk in Effex.  Furthermore, the evidence at trial will demonstrate that Effex (i.e., Dittami) had the power to direct the significant activities of the business, from operating

its own trading system; to maintaining its own bank accounts, offices, and employees; to servicing dozens of counterparties besides FXCM; to possessing the sole discretion to accept or reject trades. Most importantly, at all times Effex had the obligation to absorb losses and the right to receive residual returns from its operations.  Thus, Plaintiffs cannot show that Effex was a VIE during the Class Period.

There also is no evidence from which the jury could find that FXCM held a variable interest in Effex.  Whether the reporting entity has a variable interest in the VIE is determined by examining whether the reporting entity holds interests in the VIE that will absorb portions of the VIE's expected losses or receive portions of the VIE's expected residual returns.  But the evidence shows that FXCM's only "interest" in Effex is the fees received under the Services Agreement— which were not dependent on Effex's profits or losses.[2]  Plaintiffs and their accounting expert have not identified any other interest that could serve as the variable interest for this prong of the consolidation analysis.

Finally, the record is clear that FXCM was not the primary beneficiary of Effex.  An entity is a primary beneficiary of a VIE if it has the power to direct its activities, or the obligation to absorb its losses or receive its profits.  As already discussed above, FXCM did not have the power to direct the activities of Effex and, as previously explained, had no obligation to absorb Effex's losses or right to receive Effex's profits.

In light of the foregoing, consolidation of Effex as a VIE was not required under applicable GAAP guidance at any point during the Class Period.  Thus, FXCM complied with GAAP in making its VIE disclosures, and Plaintiffs cannot show otherwise.

---

[2] Moreover, as noted above, the purported option agreement Plaintiffs rely on was never in effect.

        **b.**        **FXCM Was Not Required to Disclose Effex as a Related Party During the Class Period.**

ASC 850 is controlling as to related party disclosures under GAAP.  Plaintiffs base their allegation that FXCM was required to make related party disclosures regarding Effex on a single prong of the ASC 850 analysis: that FXCM was in a position to significantly influence Effex to the extent that Effex might have been prevented from fully pursuing its own separate interests. Yet, the basis for Plaintiffs' assertion is evidence of facts present only *outside* the Class Period. And the assertion is directly contradicted by documents and sworn testimony establishing that (1) Effex was capitalized with Effex's own funds; (2) Effex gained a broad customer base outside of and apart from FXCM during the Class Period; (3) Effex repaid the initial $2 million in prime-of-prime account funding in May 2010, before the Class Period; and (4) Effex operated its business independently from FXCM at all times during the Class Period.  Thus, under ASC 850, FXCM could not significantly influence the management or operating policies of Effex to an extent that Effex might have been prevented from fully pursuing its own separate interests, and there is no basis on which the jury can find that FXCM was required to disclose Effex as a related party of FXCM at any point during the Class Period.

        **B.**        **Plaintiffs Cannot Demonstrate a Genuine Issue of Material Fact Regarding Scienter.**

Plaintiffs will be unable to prove that Defendants acted with scienter—that is, that they made a misrepresentation with the knowledge that the statement was false or with reckless disregard for whether the statement was true.  *See, e.g.*, *Reiss v. Pan Am. World Airways, Inc.*, 711 F.2d 11, 14 (2d Cir. 1983) (scienter requires "more than a conscious failure to disclose" as "there must be proof that the non-disclosure was intended to mislead"); *Rothman v. Gregor*, 220 F.3d 81, 90 (2d Cir. 2000) (to qualify as reckless, conduct must have been "*highly unreasonable*, 'representing an *extreme departure from the standards of ordinary care* . . . to the extent that the

danger was either known to the defendant or so obvious that the defendant must have been aware of it'" (emphases added) (quoting *Rolf v. Blyth, Eastman Dillon & Co.*, 570 F.2d 38, 47 (2d Cir. 1978))).  Plaintiffs have argued that Defendants consciously or recklessly "concealed" FXCM's relationship with Effex and were aware of alleged GAAP violations.  On the contrary, the evidence overwhelmingly shows the opposite.

### 1.  Defendants Did Not Knowingly or Recklessly Intend to Deceive Investors About the Effex Relationship.

The evidence—consisting of the parties' testimony and expert opinion—proves that Defendants did *not* receive kickbacks from Effex but, instead, received legitimate fixed fee, dollar-per-million payments for order flow.  In fact, the unrebutted evidence shows that business relationships based on payments for order flow were common in the FX industry during the Class Period.

The evidence also shows that FXCM's receipt of order flow payments was repeatedly disclosed—not concealed.  Contrary to Plaintiffs' assertions, the evidence in this case conclusively demonstrates that FXCM acted in good faith to provide transparent disclosures about its receipt of order flow payments. To that end, in August 2010, FXCM's Chief Financial Officer (Robert Lande) asked Niv for his thoughts on how to describe the order flow payments received from Effex.  Niv responded: "Use dittami in explanation. *We have no choice we have to be transparent*."[3]

This evidence is fatal to any suggestion that Defendants acted with scienter.  Similarly, Plaintiffs cannot prove that Niv or Ahdout intended to mislead investors by correctly portraying

---

[3] Contrary to Plaintiffs' contentions, FXCM's business decision to refrain from disclosing to other competitors the identity of Effex as one of its external liquidity providers—a disclosure FXCM had no obligation to make—does not show an intent to defraud anyone, let alone investors.

Effex's payments to FXCM as payments for order flow rather than as a profit-sharing arrangement. To begin with, as described above, the Services Agreement was not a profit-sharing agreement. It was a standard, payment-for-order-flow agreement based on a fixed monthly fee. This was confirmed by EY as part of its financial statement audits throughout the Class Period. In fact, EY was provided the Services Agreement, Effex invoices, and Effex payment receipts, all of which were incorporated into the EY's audit workpapers. But more importantly, there is zero evidence indicating that Niv or Ahdout viewed the Services Agreement as a profit-sharing agreement, as opposed to what it actually reflected—i.e., a contract for fixed fee, dollar-per-million payments for order flow.

### 2. Defendants Did Not Deceive Investors About FXCM's Compliance with GAAP.

Even if Plaintiffs could prove that FXCM violated GAAP in connection with its VIE and related party disclosures (they cannot), it is well-established that "GAAP violations or accounting irregularities, standing alone, are insufficient" to show scienter. *See Novak v. Kasaks*, 216 F.3d 300, 309 (2d Cir. 2000); *see also, e.g.*, *City of Omaha Police & Fire Ret. Sys. v. Evoqua Water Techs. Corp.*, 450 F. Supp. 3d 379, 421 (S.D.N.Y. 2020) ("Allegations of a violation of GAAP provisions or SEC regulations, without corresponding fraudulent intent, are not sufficient to state a securities fraud claim." (citing *Chill v. Gen. Elec. Co.*, 101 F.3d 263, 270 (2d Cir. 1996))); *In re REMEC Inc. Sec. Litig.*, 702 F. Supp. 2d 1202, 1237 (S.D. Cal. 2010) ("The mere publication of inaccurate accounting figures, or a failure to follow GAAP, without more, does not establish scienter."). Contrary to Plaintiffs' repeated suggestions that Niv and Ahdout were directly involved and knew FXCM's VIE and related party disclosures were allegedly false and misleading, the evidence overwhelmingly shows that neither *Niv nor Ahdout* could have acted with scienter in connection with FXCM's alleged GAAP violations.

The only "evidence" Plaintiffs will submit to support their scienter argument is that: (1) FXCM's CFO, Robert Lande, told Joshua Rosenfeld and Joe Filko (FXCM accountants) that there should be no "further mention of any option to E&Y"; and (2) another FXCM accountant—Baruch Greenbaum—sent a chart to EY, copying Filko and Rosenfeld, showing payments from Effex in 2010.  This evidence of statements from Lande and Greenbaum does not come close to proving that *Niv or Ahdout* withheld material facts about the Effex relationship from EY, or that *Niv or Ahdout* had any involvement whatsoever in deciding whether to make VIE or related party disclosures in connection with the Effex relationship.

Moreover, EY issued unqualified audit opinions for FXCM's financial statements throughout the Class Period and never suggested, much less required, that FXCM restate its financial statements.  In conducting its audits, EY had full access to conduct a thorough and independent audit of FXCM each year during the Class Period, which "negate[s] an inference that [Niv or Ahdout] had a scheme to defraud investors."  *See REMEC*, 702 F. Supp. 2d at 1246; *see also, e.g.*, *In re UBS AG Sec. Litig.*, No. 07-cv-11225, 2012 WL 4471265, at *18 (S.D.N.Y. Sept. 28, 2012) ("[T]he fact that [defendant's] outside independent auditor, Ernst & Young, did not require a restatement of [defendant's] financials significantly undercuts Plaintiffs' allegations of recklessness as to compliance with [accounting standards]."), *aff'd*, 752 F.3d 173 (2d Cir. 2014).

### C.   Plaintiffs Cannot Demonstrate a Genuine Issue of Material Fact Regarding Loss Causation.

"Loss causation is the causal link between the alleged misconduct and the economic harm ultimately suffered by the plaintiff."  *Lentell v. Merrill Lynch & Co.*, 396 F.3d 161, 172 (2d Cir. 2005) (quotations omitted).  To establish the loss causation element of a securities fraud claim, a plaintiff must demonstrate "that the subject of the fraudulent statement or omission was the cause of the actual loss suffered."  *Carpenters Pension Trust Fund of St. Louis v. Barclays PLC*, 750

F.3d 227, 232 (2d Cir. 2014) (quotation omitted).   "The Second Circuit has articulated several methods for showing loss causation, the most common being the 'corrective disclosure' theory and the 'materialization of risk' theory."  *Atlantica Holdings*, 477 F. Supp. 3d at 110 (citing *In re Omnicom Grp., Inc. Sec. Litig.*, 597 F.3d 501, 511 (2d Cir. 2010)).   "Under the 'corrective disclosure' theory, a plaintiff must show that the market reacted negatively to a 'corrective disclosure,' which revealed an alleged misstatement's falsity or disclosed that allegedly material information had been omitted."  *Id.* (quotation and citation omitted).  By contrast, "[u]nder the 'materialization of risk' theory, the plaintiff must show that the alleged misstatement conceals a condition or event which then occurs and causes the plaintiff's loss."  *Id.* (quotation and citation omitted).

Seeking to satisfy their loss causation burden, Plaintiffs have proffered Adam Werner, their expert on loss causation and damages.  Plaintiffs' theory, as expressed through Werner, is that (1) Defendants' allegedly false and misleading statements regarding FXCM's relationship with Effex caused the prices of the FXCM Securities to be inflated during the Class Period; (2) the February 6, 2017 news of FXCM's settlements with the CFTC and NFA were corrective disclosures that dissipated the price inflation; and (3) Plaintiffs and the other class members were damaged thereby.  So, even though FXCM's financial relationship with Effex ended in 2014, Plaintiffs claim that they were damaged through an inflated stock price up until the news of such relationship was announced on February 7, 2017. Plaintiffs' expert Werner opines that "[t]he alleged misrepresentations and omissions caused the prices of the FXCM stock and FXCM Notes to be artificially inflated over the course of the Class Period."  He calculates a price decline on February 7, 2017 of $3.39 per share for the FXCM common stock and $16.31 per $100 of par for the FXCM Notes, and then applies those dollar amounts over the class period.  Werner's analysis,

however, does not parse what price decline might have been caused by the revelation concerning FXCM's former financial relationship with Effex (which could be recoverable under the securities laws) and what was caused by news of the severe regulatory penalties (which is not) and the laying off of 18 percent of FXCM's workforce (which is not).  Instead, Werner assumes that the regulatory and other results associated with the information concerning FXCM's financial relationship with Effex were the "inextricable ramifications" of the corrective disclosure.

At summary judgment, FXCM challenged Plaintiffs' failure to disaggregate the regulatory penalties from the other pieces of information announced on February 7, 2017. As FXCM explained in its briefing, the jury cannot tell from Werner's cumulative number what part of the damages "was caused by fraud"—for instance, the alleged failure to disclose a prior financial interest in Effex—and what part was caused by the other news announced on February 7, 2017— the payment of a $7 million civil monetary penalty, closure of FXCM's US trading operations, and layoff of 18 percent of its workforce.

In its oral ruling on the summary judgment motion, the Court acknowledged that Plaintiffs have the burden to establish loss causation, and that Plaintiffs must "show that their loss was caused by the fraud and not by other intervening events."  Aug. 19, 2022 Hr'g Tr. 12:19–22.  And the Court agreed that "[t]o the extent plaintiffs raise a 'materialization of risk' theory and characterize the risk as the risk of regulatory penalties, this theory fails."  Citing *Lentell v. Merrill Lynch*, 396 F.3d 161 (2d Cir. 2005), the Court explained that "[t]he risk must be concealed by the misrepresentations and omissions alleged" and that regulatory penalties were not a concealed risk under that theory as a matter of law.  *Id.* at 13:8–12.  The Court nevertheless declined to apply this reasoning to Plaintiffs' "corrective disclosure" theory, which this Court understood to "argu[e] that loss causation can be shown by the market reaction to the February 2017 announcements

disclosing the alleged fraud." *Id.* at 13:13–16. The Court acknowledged that Plaintiffs "have the burden to disaggregate losses caused by disclosures of the truth behind the alleged misstatements from losses caused by non-fraud-related factors." *Id.* at 14:8–11. But it decided that it would "allow a jury to decide whether or not [the regulatory penalties] are confounding events that needed to be disaggregated" rather than decide that question as a matter of law. *Id.* at 14:20–21.

As detailed in their motion to certify an interlocutory appeal on this issue, Defendants respectfully maintain that the Second Circuit would likely hold that "losses from regulatory penalties in response to a fraud" must be disaggregated from "losses caused by disclosure of that fraud"—as a matter of law, not as a question for the jury. *See* ECF No. 321 at 8-13; *see also, e.g.*, *Carpenters Pension Tr. Fund of St. Louis v. Barclays PLC*, 750 F.3d 227, 235 (2d Cir. 2014) (recognizing that plaintiffs cannot recover for "attenuated" losses); *Lentell*, 396 F.3d at 173 ("[T]o establish loss causation, 'a plaintiff must allege' . . . that the misstatement or omission concealed something from the market that, when disclosed, negatively affected the value of the security. Otherwise, the loss in question was not foreseeable."). Nevertheless, even if presented to the jury, no reasonable juror will be able to reach any conclusion other than that the failure to disaggregate renders Plaintiffs' claims of loss hopelessly flawed.[4]

### D.   Plaintiffs Cannot Demonstrate a Genuine Issue of Material Fact Regarding Economic Loss.

Even if Plaintiffs could demonstrate loss causation, they still cannot prove damages—a necessary element of their claim—because their damages model is irreparably flawed.

---

[4] Nor can Plaintiffs establish loss causation with respect to the alleged GAAP violations. Even if Plaintiffs could prove a material misstatement or omission by Defendants, as well as scienter—which they cannot—Plaintiffs must still prove "that the concealed information later reached the market and caused their loss." *Atlantica Holdings*, 477 F. Supp. 3d at 110. Plaintiffs have no evidence of a corrective disclosure that revealed FXCM's supposedly inappropriate accounting practices to the market and caused their losses.

"Traditionally, economic loss in Section 10(b) cases has been determined by the use of the 'out-of-pocket' measure for damages." *Action AG v. China North East Petroleum Holdings Ltd.*, 692 F.3d 34, 38 (2d Cir. 2012). "[T]he correct measure of damages under § 28 of the Act, 15 U.S.C. § 78bb(a), is the difference between the fair value of all that the [plaintiff] received and the fair value of what he would have received had there been no fraudulent conduct." *Affiliated Ute Citizens v. United States*, 406 U.S. 128, 155 (1972). "In other words, damages in a securities fraud case are measured by the difference between the price at which a stock sold and the price at which the stock would have sold absent the alleged misrepresentations or omissions." *Crown Cork & Seal Co., Inc. Master Retirement Trust v. Credit Suisse First Boston Corp.*, No. 12 Civ. 05803, 2013 WL 978980, at *11 (S.D.N.Y. Mar. 12, 2013) (quotation and citation omitted).

To show damages, Plaintiffs rely exclusively on their expert Adam Werner who presents an event study methodology that relies on a constant dollar inflation ribbon to calculate damages on a class-wide basis. Using that flawed methodology, Werner opines that each member of the FXCM stockholder class is entitled to damages of $3.39 per share. In other words, under Plaintiffs' proposed damages model, any stockholder class member is entitled to recover the value of essentially the entire February 7, 2017 residual decline in the price of FXCM's stock no matter when they purchased during the Class Period. Similarly, and despite class certification being denied, Werner opines that FXCM Noteholders are entitled to recover $16.31 per $100 of par as damages regardless of when they purchased during the Notes Period.

But Plaintiffs' damages model is premised on the unsupported assumption that the ramifications of the regulatory settlements concerning FXCM's relationship with Effex were the "inextricable ramifications" of the corrective disclosure. Put differently, Werner's damages analysis assumes that regardless of whether FXCM's relationship with Effex was disclosed at the

beginning, middle, or end of the Class Period, there was a 100% chance that the regulatory enforcement matters would have been brought and settled in exactly the same way; and that they would have created exactly the same price reaction for the FXCM Securities.  This assumption renders Plaintiffs' damages model irreparably flawed and insufficient to allow the jury to find actual economic loss as required under Section 10(b).  *See, e.g.*, *In re BP p.l.c. Sec. Litig.*, No. 4:10-md-2185, 2016 WL 3090779, at *1 (May 31, 2016) (defendants entitled to judgment as a matter of law because plaintiffs' damages model was flawed: "when the corrective event is the materialization of an understated risk, the stock price movement on the date of the correction (*i.e.*, on the date that the risk materialized) will not equate to inflation on the date of purchase unless the probability of the risk materializing was 100 percent").

Worse still, the methodology that Werner uses to reach his damages figure is fundamentally unsound.  Constant-dollar back casting, as Werner has exclusively employed, fails to take into account changes in FXCM's relationship with Effex during the Class Period or changes in FXCM's financial prospects during the Class Period.  As Hendershott will explain, any inflation present in the price of either the FXCM common stock or the FXCM Notes would likely have varied during the Class Period because (among other potential factors): (1) FXCM disclosed that it terminated its relationship with Effex during the Class Period; (2) FXCM disclosed that it was the subject of a regulatory investigation during the Class Period; and (3) FXCM's capital structure changed dramatically during the Class Period as a result of the need for financing to remedy the capital shortfall caused by the SNB Flash Crash.  As a result of these deficiencies, Werner's damages calculation is unreliable.

## II.    Individual Plaintiff 683 Capital Cannot Prove Its Section 10(b) Claim

Individual Plaintiff 683 Capital's Section 10(b) claim will fail for the additional reasons that it cannot prove the elements of reliance, loss causation, and economic loss.

**A.    683 Capital Cannot Raise a Genuine Issue of Material Fact Regarding Reliance.**

Defendants are entitled to summary judgment on 683 Capital's individual claims because there is no genuine dispute regarding its failure to demonstrate reliance, an indispensable element of a securities fraud claim under Section 10(b) and Rule 10b-5.  "Reliance by the plaintiff upon the defendant's deceptive acts is an essential element of the § 10(b) private cause of action." *Erica P. John Fund, Inc. v. Halliburton Co.*, 563 U.S. 804, 810 (2011) (quoting *Stoneridge Inv. Partners, LLC v. Scientific-Atlanta, Inc.*, 552 U.S. 148, 159 (2008)).  "This is because proof of reliance ensures that there is a proper 'connection between a defendant's misrepresentation and a plaintiff's injury.'" *Erica P. John Fund*, 563 U.S. at 810 (quoting *Basic Inc. v. Levinson*, 485 U.S. 224, 243 (1988)).

As the Court already determined, the FXCM Noteholders are not entitled to a presumption of reliance under *Affiliated Ute* or *Basic*.  ECF No. 229 at 23-24 (holding that "the *Affiliated Ute* presumption does not apply"); *id.* at 37 ("Because plaintiffs have not established that the FXCM Notes traded in an efficient market, they cannot rely on the *Basic* presumption of reliance as to the notes, meaning that each note purchaser would be required to prove, individually, that it relied on defendants' allegedly false or misleading statements in making its purchases").  Therefore, in order to prevail on its claims under Section 10(b) and Rule 10b-5, 683 Capital must prove that it actually relied on the alleged misrepresentations that are the subject of the Third Amended Complaint when purchasing the FXCM Notes.  The record is devoid of evidence of actual reliance on the part of 683 Capital.

"In securities fraud cases, reliance is equated with 'transaction causation,' which requires the defendant's conduct be the 'but for' cause of the plaintiff's detrimental action." *Charney v. Wilkov*, 734 Fed. App'x 6, 9 (2d Cir. 2018) (internal citation and quotation omitted).  "The

traditional (and most direct) way a plaintiff can demonstrate reliance is by showing that he was aware of a company's statement and engaged in a relevant transaction . . . based on that specific misrepresentation." *Erica P. John*, 563 U.S. at 810.  Whereas "[a] plaintiff unaware of the relevant statement, on the other hand, could not establish reliance on that basis." *Id*.  "Thus, even if a corporation were to make statements which it knew to be false, a plaintiff could not recover in a 10b-5 action unless it can be shown that he or she directly or indirectly relied on misstatements in purchasing or selling the securities." *Richter v. Achs*, 962 F. Supp. 31, 34 (S.D.N.Y. 1997).  Here, 683 Capital's sole evidence of reliance is the testimony of its partner Joseph Patt.  That testimony is insufficient.

As an initial matter, Patt cannot even say which of the more than four-years' worth of SEC filings relevant to this case were even reviewed by 683 Capital.  Patt testified only that 683 Capital looked at the Company's "latest documents," the "10-K or 10 – and 8, you know 10-Qs" and that he would examine the portions concerning FXCM's balance sheets and investments, and the rescue financing from Leucadia—none of which is alleged to be false or misleading in this case.  683 Capital also has offered no evidence that any of its employees ever reviewed FXCM's website. Defendants are not liable for documents and statements 683 Capital cannot prove it reviewed, let alone relied on.  *See, e.g.*, *Pension Comm. of the Univ. of Montreal Pension Plan v. Banc of Am. Sec., LLC*, 592 F. Supp. 2d 608, 630-31 (S.D.N.Y. 2009) (defendant entitled to judgment as a matter of law where the plaintiff did not show it received allegedly misstated documents or relied on allegedly misstated information it did receive).

Nor does 683 Capital have evidence that the allegedly false and misleading statements were even relevant to, let alone the basis of, its decision to purchase the FXCM Notes.  In fact, 683 Capital's first purchase of FXCM Notes occurred more than five months *after* the termination of

FXCM's pay for flow agreement with Effex.  683 Capital also started purchasing the FXCM Notes immediately *after* the SNB Flash Crash, an event that had a dramatic negative effect on FXCM and the price of its securities.  Indeed, after the SNB Flash Crash the FXCM Notes traded below par.  Patt's deposition testimony indicates that 683 Capital's decision to purchase the FXCM Notes was based on its calculation that the bonds were undervalued.  To this end, one of 683 Capital's investment strategies is to look for opportunities to capitalize on "dislocation or distress" in the market.  683 Capital viewed the SNB Flash Crash as a dislocation, and FXCM as a distressed company.  And Patt testified in his deposition that 683 Capital decided to invest in the FXCM Notes based on its calculation that the FXCM Notes were "really cheap," and that they were worth a lot more than their current price reflected.  Specifically, 683 Capital calculated that, despite FXCM's losses stemming from the SNB Flash Crash, it appeared from FXCM's balance sheet that given the value of the Company's assets and what the business had been worth, that despite the FXCM Notes "trading in the forties," they were likely "to recover a hundred cents on the dollar." And the evidence indicates that it was the prospect of capitalizing on this "dislocation" that motivated 683 Capital's decision to purchase the FXCM Notes and not the alleged misstatements. *See, e.g.*, *Gruber v. Price Waterhouse*, 776 F. Supp. 1044, 1047 (S.D.N.Y. 1991) (finding no reliance because plaintiff purchased stock as "part of a larger strategy to acquire new issues" and "the new issue factor was primary, and the PW audited statements were irrelevant").  Thus, to the extent that 683 Capital reviewed some unidentified FXCM SEC filings, its primary focus was on information relevant to whether the FXCM Notes would regain their value, *i.e.*, the portions

29

concerning FXCM's balance sheets and investments, and the rescue financing from Leucadia. None of those portions of FXCM's SEC filings are alleged to be false or misleading.[5]

**B.      683 Capital Cannot Establish Loss Causation and Economic Loss.**

Like the Class Plaintiffs, 683 Capital proffers only Werner to make the requisite showings of loss causation and economic loss.  As explained above, *none* of the Plaintiffs can establish loss causation and damages because Werner's analysis is the product of a flawed methodology.  The flaws that underlie Werner's methodology are particularly stark with respect to 683 Capital.

The Court denied Plaintiffs' request to certify a class of FXCM Noteholders on several grounds, one of which being that Plaintiffs "ha[d] not met their burden of demonstrating that the FXCM Notes traded in an efficient market throughout the Notes Period."  ECF No. 229 at 37.  The Court noted that "[t]he only direct evidence of market efficiency in the record . . . [was] Dr. Werner's event study, which [was] of limited utility due to the nature (and timing) of the two events chosen."  *Id.*  Yet, despite this Court's holding that his methodology failed to provide sufficient evidence of market efficiency for the FXCM Notes at the class certification stage, Werner relies on the *same* event study methodology when assessing loss causation and damages with respect to 683 Capital.  And Werner performs no additional empirical tests to account for the potential impact of the inefficiencies the Court observed in the Notes market at the class certification stage.

As Defendants' expert Terrence Hendershott explains, "in order to use an event study to evaluate a cause and effect relationship between an event and a change in a firm's securities price

---

[5] Additionally, despite being 683 Capital's corporate representative, Patt had little understanding of 683 Capital's claims for securities fraud: when asked about the No Dealing Desk model (a key part of Plaintiffs' claims), Patt testified that he did not "know what that is"; and he testified that his understanding of the basis for 683 Capital's securities fraud claim is that FXCM was selling its customer's information to Effex (no such allegation exists in this case).

. . . a researcher must assume, or demonstrate, market efficiency."  And "absent market efficiency, Dr. Werner has no basis to conclude that the price decline observed for the FXCM Notes on February 7, 2017, is a reliable and unbiased measure of the price impact on that date."  This is because "[i]f the market fails to react to a certain type of information rapidly and fully, then the residual returns from an event study following the release of the information will not be instructive to measure the value impact of that information."  "Unless the new information is incorporated *fully* and *rapidly* in the security price, the security return during the event window might underestimate or overestimate the value impact of the new information, or not reflect the value impact at all."

There is simply no basis to conclude from Werner's observations of the price reaction on February 7, 2017 that the price of the FXCM Notes was inflated by at least $16.31 per $100 of par from when they began trading on June 24, 2014 until the alleged corrective disclosure on February 6, 2017.  Thus, Plaintiffs have no credible evidence to support their theory of loss causation or economic loss for the FXCM Notes.

## III.   Plaintiffs Cannot Prove Their Section 20(a) Claim.

To set forth a *prima facie* case of control person liability under Section 20(a), Plaintiffs must show "(1) a primary violation by the controlled person, (2) control of the primary violator by the defendant, and (3) that the defendant was, in some meaningful sense, a culpable participant in the controlled person's fraud."  *ATSI Commc'ns Inc. v. Shaar Fund, Ltd.,* 493 F.3d 87, 108 (2d Cir. 2007); *see also* 15 U.S.C. § 78t(a).  If Plaintiffs cannot establish a *prima facie* case for a Section 20(a) violation, summary judgment is proper.  *See, e.g.*, *In re Omnicom Grp., Inc. Sec. Litig.*, 597 F.3d 501, 514 n.6 (2d Cir. 2010) (affirming grant of summary judgment on Section 20(a) claim due to plaintiff's failure to raise a genuine issue of material fact as to a primary

31

violation); *Dodona I, LLC v. Goldman Sachs & Co.*, 132 F. Supp. 3d 505, 518 (S.D.N.Y. 2015) (same); *SEC v. Yorkville Advisors, LLC*, 305 F. Supp. 3d 486, 530 n.26 (S.D.N.Y. 2018) (similar).

For the reasons stated above, Plaintiffs cannot prove that any Defendant committed a primary violation of the Exchange Act.  Accordingly, Plaintiffs' § 20(a) claim necessarily will also fail. *See, e.g., Beleson v. Schwartz*, 419 Fed. Appx. 38, 42 (2d Cir. 2010).  Nor can Plaintiffs point to evidence that Niv or Ahdout were "culpable participant[s]" in a fraud.  Culpable participation "requires 'particularized facts of the controlling person's conscious misbehavior or recklessness.'" *Special Situations Fund III QP, L.P. v. Deloitte Touche Tohmatsu CPA, Ltd.*, 33 F. Supp. 3d 401, 437 (S.D.N.Y. 2014); *see also Strougo v. Barclays PLC*, 334 F. Supp. 3d 591, 598 (S.D.N.Y. 2018) (defendant can prevail on a control person claim "by pointing out that there is an absence of evidence . . . to conclude that the defendant was a culpable participant in the alleged fraud").  Section 20(a)'s culpable participation requirement is "similar to the scienter requirement of Section 10(b)" and requires that "the controlling person knew or should have known that the primary violator . . . was engaging in fraudulent conduct."  *In re Refco, Inc. Sec. Litig.*, 503 F. Supp. 2d 611, 663 (S.D.N.Y. 2007) (noting that culpable participation requires "actual involvement in the making of the fraudulent statements by the putatively controlled entity"); *Special Situations Fund III QP, L.P.*, 33 F. Supp. 3d at 438-39.

For the same reasons that Plaintiffs cannot show scienter by any of the Defendants, Plaintiffs likewise cannot show culpable participation by Niv and Ahdout.  Accordingly, Plaintiffs' Section 20(a) claim against Niv and Ahdout fails.

## CONCLUSION

For all the reasons stated above, Plaintiffs will be unable to prove the essential elements of their securities claims at trial.  Defendants thus expect to prevail and to obtain judgment in their favor at trial.

Dated: December 14, 2022

KING & SPALDING LLP

*/s/ Israel Dahan*
Israel Dahan
Peter Isajiw
Ryan Gabay
KING & SPALDING LLP
1185 Avenue of the Americas
New York, New York 10036-2601
Tel: (212) 556.2100
Fax: (212) 556.2200

Chelsea Corey
KING & SPALDING LLP
300 S. Tryon Street, Suite 1700
Charlotte, North Carolina 28202
Tel: (704) 503.2575
Fax: (704) 503.2622

*Attorneys for Defendants Global Brokerage, Inc. f/k/a/ FXCM, Inc., Dror Niv, and William Ahdout*